**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

FREDERICK F. FAGAL,

      Plaintiff,

          v.

MARYWOOD UNIVERSITY,

      Defendant.

CIVIL ACTION NO. 14-CV-2404
(JUDGE CAPUTO)

## MEMORANDUM

Presently before the Court is Defendant Marywood University's Motion to Dismiss (Doc. 14) the Amended Complaint (Doc. 7) of Plaintiff Professor Frederick Fagal. Defendant seeks to dismiss Plaintiff's sole claim, for breach of contract, for failure to state a claim upon which relief can pursuant to Federal Rule of Civil Procedure 12(b)(6).

Because Plaintiff has plead sufficient facts to state a plausible claim that Defendant breached its contract with him, as embodied in the University's policies and procedures, Defendant's Motion to Dismiss (Doc. 14) Plaintiff's Amended Complaint (Doc. 7) for failure to state a claim upon which r      elief can be granted will be *denied.*

## I. Background

### A. Factual Background

The facts, as alleged in the Amended Complaint (Doc. 7), are as follows:

### 1. Plaintiff's Employment with Marywood University

Defendant Marywood University ("Marywood," "the University") is a Pennsylvania domestic non-profit corporation located in Scranton, Pennsylvania. (Doc. 7, ¶ 1.) In 1992, Plaintiff Frederick Fagal entered into an Agreement and Appointment for Full-Time Faculty with Marywood. (*Id.,* ¶ 10.) The agreement, later called the "Faculty Handbook," includes that the "policies and practices listed in the Faculty Manual are agreed upon by the parties hereto." (*Id.*) Plaintiff Fagal and Marywood entered into written agreements for him to work as a full-time faculty member for each year between 1992 and 2012. (*Id.,* ¶ 12.) Plaintiff Fagal attained tenure at Marywood in September 1994. (*Id.,* ¶ 13.)

On July 1, 2010, Maryood issued an edition of its faculty handbook, which stated that it was "effective with the 2010-2011 letters of agreement." (*Id., ¶* 14.)  It also stated that "Policy changes require the approval of the President of the University and, when required, the Board of Trustees. . . They are effective with formal approval and placement in the Marywood University Policies and Procedure Manual." (*Id*.)

In May 2011, Plaintiff Fagal entered into an agreement with Marywood that he would work as a tenured Associate Professor from August 22, 2011 to May 18, 2012. (*Id., ¶* 15.) This agreement is attached to Plaintiff's Amended Complaint (Doc. 7) as Exhibit C.  At the time, Marywood had a policy which Plaintiff asserts covered this agreement, which stated that this type of agreement is a "binding contract covering a specific period of time and as a vehicle to renew, adjust, and/or alter the terms of the original contract regarding appointment, rank, tenure, salary, benefits, etc." (*Id., ¶* 16.)  This policy, attached to the Amended Complaint as Exhibit D, also stated that "[t]enure is a term designating guaranteed continuous appointment to full-time faculty members until retirement." (*Id.*)  Plaintiff asserts that upon attaining tenure, his employment could only be terminated in conformance with Marywood's Policies and Procedures Manual.  (*Id., ¶* 17.)

## 2. The Underlying Controversy

In November 2011, Plaintiff invited a speaker to his "Introduction to Social Science" course to give a talk on "Know Your Rights: Free Speech and Thought Reform on Campus." (*Id., ¶* 18.)  Plaintiff received approval from the University to hang posters, for which he personally paid, announcing this lecture and inviting all students to attend.  (*Id., ¶* 19.)  On or around November 28-29, University personnel took down almost all of these posters. (*Id., ¶* 20.)  Plaintiff was not informed before or after the posters were taken down.  (*Id.*)

Shortly thereafter, Plaintiff complained to Marywood's Vice President for Academic Affairs, who could not identify any written policy statement behind the decision to take down the posters.  (*Id., ¶* 21.)  Plaintiff Fagal sought an apology and reimbursement for the torn-down posters from the school, but officials refused. (*Id., ¶* 22.)

On January 13, 2012, Plaintiff sent an email from his personal address to Marywood faculty criticizing the administration for taking down his posters, and for "its weak commitment to free speech generally." (*Id., ¶* 23.) It also contained hyperlinks to two videos he had posted online which criticized Marywood President Sister Anne Munley and other administrators for the same reasons. (*Id.*)

## 3. Disciplinary Actions

On January 23, 2012, Plaintiff Fagal was summoned to a meeting with President Munley. (*Id., ¶* 24.) President Munley asked him whether he had posted the online videos included in his email to faculty, and he acknowledged that he had. (*Id., ¶* 26.) Plaintiff asserts that President Munley asked him to explain his actions, but did not allow him to discuss the tear-down of his posters. (*Id.*) He felt that he was unable to explain if he could not discuss the posters. (*Id.*) President Munley then informed Plaintiff that his employment was suspended, effective immediately, and instructed him to turn in his keys and ID card. (*Id.*) That day, the Assistant Vice President for Human Resources emailed Plaintiff confirming his suspension and telling him to clean out his office. (*Id.*, ¶ 27.)

The next day, January 24, President Munley sent Professor Fagal a letter informing him that she was recommending that his tenure and employment with the University be terminated. (*Id., ¶* 32.) Included in this letter was a "statement of charges" against Plaintiff. (*Id., ¶* 33.) However, part of the charge statement was missing, so Plaintiff's attorney requested a new copy, which he received on February 8. (*Id., ¶* 36.) This included a charge that Professor Fagal had violated the University's civil rights policy. (*Id., ¶* 37.) In this letter, President Munley wrote:

> I am prepared to send this statement of charges to a duly appointed faculty committee for review along with the emails and videos you forwarded to members of our community. In order to do so and out of respect for your privacy, I would ask that you please sign and return to me the attached authorization granting the University permission to do so. That faculty committee may agree or disagree with my recommendation. Once I receive the review committee's determination, I will finalize my decision. Should you choose to forego that faculty review, I will finalize my recommendation based upon my own findings and conclusions. (*Id., ¶* 38.)

3

This letter enclosed a document which gave Professor Fagal the option to grant or not grant President Munley permission to release her recommendation that he be terminated and statement of charges to a faculty committee for review. (*Id.,* ¶ 39.) It included that if he refused to grant such permission, there would "be no faculty committee review of Sister Anne Munley's decision. . . prior to it being finalized." (*Id.*) The letter did not include an offer to submit Plaintiff's suspension to faculty review, only his termination. (*Id.,* ¶ 45.)

On February 2, 2012, Plaintiff, through his attorney, sent a letter requesting two ad hoc faculty committees: one to review his suspension, and one to review President Munley's termination recommendation. (*Id.,* ¶ 48.) On February 9, Marywood rejected this request in a letter, which stated in part that Plaintiff had breached his contract with the school, and thus it "had no further contractual obligations to him." (*Id.,* ¶ 49.)

On February 22, 2012, Plaintiff filed a formal grievance against President Munley, pursuant to the University's "Faculty Grievances and Appeals" policy. (*Id.,* ¶ 51.) This grievance alleged that the president violated Marywood policy by suspending him, by moving to terminate his employment and tenure, and by not accepting his request to have a committee review his suspension in addition to his termination. (*Id.,* ¶ 52.)

On March 26, 2012, the Chair of the University's Faculty Grievance Committee found that, upon review, "we have found no evidence of improper action on President Munley's part which would constitute a legitimate grievance." (*Id.,* ¶ 53.)

On April 3, 2012, President Munley sent a letter to Plaintiff stating that she was finalizing her recommendation that he be terminated, writing: "your employment with Marywood and your tenure are terminated effective today, April 3, 2012." (*Id.,* ¶ 54.) In the letter, she offered to convene the two ad hoc committees that Plaintiff had requested. (*Id.*) Plaintiff contends that the decision to terminate him before the ad hoc committee recommended dismissal violated the school's "Progressive Discipline" policy. (*Id.,* ¶ 57.)

On July 2, 2012, a committee of Marywood professors calling themselves the "Faculty Senate Ad Hoc Hearing Committee" ("FSAHHC") issued a document reviewing President Munley's decision to terminate Plaintiff. (*Id.,* ¶ 59.) They concurred with President Munley's

ultimate decision, but did not agree with all of the charges against Plaintiff.  (*Id.,* ¶ 60.)  This report did not review the suspension of Professor Fagal, which Professor Fagal asserts violated University policy.  (*Id.,* ¶ 61.)  Plaintiff maintains that had they reviewed the suspension, they would have found it improper, since he did not pose a harm to himself or others, as required by University policy.  (*Id.,* ¶ 64.)

On July 13, 2012, President Munley sent Professor Fagal a letter stating that her decision to terminate his employment and tenure would stand, effective April 3, 2012.  (*Id.,* ¶ 65.)  Plaintiff continued to receive his salary through August 2012.  (*Id.,* ¶ 66.)

## 3. Marywood's Written Policies

Marywood's "Progressive Discipline" policy, in place at the time of Plaintiff's firing, stated that the University:

> endorses a progressive discipline policy designed to promote resolution in a fair and orderly manner. This policy applies to faculty members with tenure or whose terms of appointment have not yet expired.
> The policy is intended to provide an effective and flexible means of identifying problem areas, resolving complaints, and preventing repetitive incidents by prompt intervention and assistance. It is designed to accomplish these ends by a series of gradual steps involving strategies such as personal conferences, oral and written warnings, and opportunities for monitored assistance where applicable. . . .

> Suspension. The faculty member may be suspended by the Vice President for Academic Affairs at any time during the proceedings involving him or her. Suspension is justified if immediate harm to the faculty member or others is threatened by the person's continuance in the faculty position.

Plaintiff asserts that his suspension was not progressive in accordance with the above policy.  (Doc. 7, ¶ 29.)

This policy also stated that faculty members:

> have the right to convene an ad hoc committee in order to appeal either a decision to suspend the faculty member or a decision to dismiss the faculty member . . . . Should a faculty member request that such a committee be convened twice (i.e., once for suspension and once for dismissal), the membership of the committee may be similar or different, a determination which is made by the President of the University in consultation with the faculty member and the Vice President for Academic Affairs.

(*Id.,* ¶ 62.)

The policy addressed dismissal as well: "If remedial actions(s) taken during the suspension does not sufficiently resolve the issues that lead to the suspension, the university may move towards dismissal of the faculty member." (*Id.,* ¶ 40.)  Plaintiff claims that Marywood took no remedial actions. (*Id.,* ¶ 41.)  His dismissal was recommended the day immediately after his suspension.  (*Id.*)  Plaintiff contends that the Progressive Discipline policy required that before a faculty member be dismissed, a faculty committee must recommend a formal action toward dismissal, which did not occur in his case.  (*Id.,* ¶ 57.)

Plaintiff also alleges that Defendant violated the "Faculty Grievances and Appeals Policy" in place at Marywood, which stated that "[g]rievants will not be adversely affected for exercising their right to file a grievance, regardless of outcome" and that "[g]rievants will not be subject to adverse consequences for . . . initiating a grievance." (*Id.,* ¶ 58.)

Marywood had a "Civil Rights Complaint Procedures" policy, which "required an individual allegedly aggrieved by a civil rights violation to file a complaint, among other procedures." (*Id.,* ¶ 42.)  Plaintiff attached a copy of that policy to his Complaint as Exhibit F.  No Marywood employee filed a civil rights complaint against Professor Fagal in response to his January 13, 2012 email.  (*Id.*)

Plaintiff contends that after he was fired, the University changed its policies to comport with the way that it terminated Professor Fagal.  (*Id.,* ¶ 67.)

## B. Procedural Background

Based on the foregoing, on December 17, 2014, Plaintiff filed a Complaint (Doc. 1), which he amended on January 15, 2015 (Doc. 7.)  In his Complaint, Plaintiff asserts one count, for breach of contract.  (*Id.*)

On February 23, 2015, Defendant Marywood University filed a Motion to Dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6) (Doc. 14), along with a Brief in Support (Doc. 15).  On March 19, Plaintiff filed a Brief in Opposition (Doc. 23).  On April 9, Defendant filed a Reply Brief (Doc. 27).  Thus, this motion is fully briefed and ripe for disposition.

## II. Standard

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, for failure to state a claim upon which relief can be granted. When considering such a motion, the Court's role is limited to determining if a plaintiff is entitled to offer evidence in support of his claims. *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 173 (3d Cir. 2000). The Court does not consider whether a plaintiff will ultimately prevail. *See id.* A defendant bears the burden of establishing that a plaintiff's complaint fails to state a claim. *See Gould Elecs. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000).

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The statement required by F.R.C.P. 8(a)(2) must "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (*per curiam*) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Detailed factual allegations are not required. *Twombly*, 550 U.S. at 555. However, mere conclusory statements will not do; "a complaint must do more than allege the plaintiff's entitlement to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). Instead, a complaint must "show" this entitlement by alleging sufficient facts. *Id.* "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). As such, "[t]he touchstone of the pleading standard is plausibility." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012).

The inquiry at the motion to dismiss stage is "normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).

Dismissal is appropriate only if, accepting as true all the facts alleged in the complaint, a plaintiff has not pleaded "enough facts to state a claim to relief that is plausible on its face," *Twombly*, 550 U.S. at 570, meaning enough factual allegations "'to raise a reasonable

expectation that discovery will reveal evidence of'" each necessary element. *Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.

The Court need not assume the plaintiff can prove facts that were not alleged in the complaint, *see City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 263 & n.13 (3d Cir. 1998), or credit a complaint's "'bald assertions'" or "'legal conclusions.'" *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429–30 (3d Cir. 1997)).

In deciding a motion to dismiss, the Court considers the complaint, exhibits attached to the complaint, and matters of public record. *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) (citing *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir. 1993)). The Court may also consider "undisputedly authentic" documents when the plaintiff's claims are based on the documents and the defendant has attached copies of the documents to the motion to dismiss. *Pension Benefit Guar.* Corp, 998 F.2d at 1196.

### III. Analysis

Defendant Marywood University asserts that Plaintiff failed to state a claim upon which relief can be granted for breach of contract, and thus his complaint should be dismissed pursuant to F.R.C.P. 12(b)(6). (Doc. 14-1, 6.) Plaintiff argues that Marywood breached its contract with him, as embodied in its policies and procedures, in firing him. Marywood contends that Plaintiff failed to sufficiently plead that Marywood breached its contract, and even if he did, Marywood was entitled to "suspend performance of its contract with Plaintiff" because he breached it himself. (*Id.,* 15-16.) Defendant argues that universities are granted discretion in hiring and terminating faculty, and in interpreting their

8

policies.  Furthermore, Defendant argues that it did follow all of its policies and procedures, as the policies and procedures require "progressive discipline" only in some instances.

As this case is before me pursuant to diversity jurisdiction, Pennsylvania law applies. "To state a breach of contract claim under Pennsylvania law, a plaintiff must allege '(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages.' *Borrell v. Bloomsburg Univ.*, 955 F. Supp. 2d 390, 407 (M.D. Pa. 2013) (quoting *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super.1999) (further citations omitted)).

The parties do not dispute that a contract existed between them, and that this contract included the University's policies and procedures.  Rather, the University argues that Plaintiff's Complaint should be dismissed because it fails to state that the contract was breached.  Professor Fagal asserts that the "Progressive Discipline" policy was violated by Marywood University when it suspended and then terminated him.

Thus, the question is whether in his Complaint, Plaintiff plead sufficient facts to state a claim that Marywood violated its policies in the manner in which it suspended and then fired him.  Viewing the facts–and in particular, the policies and procedures–in a light most favorable to the plaintiff, and resolving all possible inferences in his favor, I find that the Complaint contains sufficient facts to state a plausible claim of breach of contract.

Under Pennsylvania law, to state a breach of contract claim against an employer-university, "generally applicable principles of contract law" apply. *Murphy v. Duquesne Univ. Of the Holy Ghost,* 565 Pa. 571, 589 (2001).  The Pennsylvania Supreme Court has held that contracts should be interpreted to "ascertain and give effect to the intent of the contracting parties." *Crawford Cent. Sch. Dist. v. Com.*, 585 Pa. 131, 143 (2005).

> The intent of the parties to a written agreement is embodied in the writing itself. Courts do not assume a contract's language was chosen carelessly, nor do they assume the parties were ignorant of the meaning of the language employed. When contractual language is clear and unequivocal, its meaning must be determined by its contents alone.

*Id.* (internal citations omitted.)

9

Defendant Marywood asserts that the policies and procedures that set out a progressive discipline framework (Doc. 7-5) were only meant to be followed in some circumstances.  Thus, it did not breach its contract with Professor Fagal by failing to follow this policy.  However, viewing the policy and resolving all inferences in favor of Plaintiff, the progressive discipline policy appears to apply in all circumstances.   The progressive discipline policy appears to have been instituted to protect tenured faculty members from the type of instant suspension and termination that Professor Fagal experienced.  The policy indicates that tenured professors should be given an opportunity to correct their behavior after an initial warning or suspension before being terminated.  The University recognizes that these policies and procedures were part of tenured professors' contracts.  The written employment agreement, which Plaintiff Fagal and Marywood entered into every year that he was tenured, included that the "policies and practices listed in the Faculty Manual are agreed upon by the parties hereto."  (Doc. 7.)

Plaintiff has stated sufficient facts to state a plausible claim that Marywood breached its contract with him to survive a motion for summary judgment.  Therefore, Defendant's motion to dismiss Plaintiffs' claim for breach of contact will be *denied*.

## IV. Conclusion

For the above reasons, Defendant's Motion to Dismiss (Doc. 14) Plaintiff's Amended Complaint will be *denied*.  An appropriate order follows.


June 16, 2015                                          /s/ A. Richard Caputo
Date                                                        A. Richard Caputo
                                                              United States District Judge