# Exhibit 1



JEAN-MARC ORLANDO, Plaintiff, -against- BNP PARIBAS NORTH AMERICA, INC., ERIC AULD & FRANCISCO OLIVEIRA, Defendants.

14 Civ. 4102 (AJP)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*2015 U.S. Dist. LEXIS 143822*

**October 22, 2015, Decided**

**COUNSEL:** [*1] For Jean-Marc Orlando, Plaintiff: Jonathan Scott Sack, LEAD ATTORNEY, Sack & Sack, LLP, New York, NY USA; Eric Robert Stern, Sack & Sack, New York, NY USA.

For Bnp Paribas North America Inc., Eric Auld individually, Francisco Oliveira individually, Defendants: Cliff Fonstein, LEAD ATTORNEY, John William Egan, Paul Hugo Galligan, Seyfarth Shaw LLP, New York, NY USA.

**JUDGES:** Andrew J. Peck, United States Magistrate Judge.

**OPINION BY:** Andrew J. Peck

**OPINION**

**OPINION & ORDER**

**ANDREW J. PECK, United States Magistrate Judge:**

Jean-Marc Orlando, a dual citizen of the United States and France, brings this action against his former employer, defendant BNP Paribas North America, and former supervisors Eric Auld and Francisco Oliveira, alleging that he was discriminated against on the basis of his religion, subjected to a hostile work environment, and retaliated against for making complaints, in violation of Title VII, the New York State Human Rights Law and the New York City Human Rights Law. (Dkt. No. 2: Compl.)1

> 1   Pursuant to a June 17, 2015 email between counsel, Orlando's ninth, tenth, and eleventh claims for relief, for conspiracy to discriminate, violation of the *equal protection clause*, and discriminatory discharge have been dismissed voluntarily. [*2] (Dkt. No. 75: Def. Br. at 3 n.1; Dkt. No. 82: Eden Aff. Ex. 13: 6/17/15 email.)

Presently before the Court is defendants' summary judgment motion. (Dkt. No. 66: Notice of Motion). The parties have consented to decision of this case by a Magistrate Judge pursuant to *28 U.S.C. § 636(c)*. (Dkt. No. 26.) For the reasons set forth below, defendants' summary judgment motion is DENIED as to Orlando's claims for retaliation under Title VII, the NYSHRL and the NYCHRL, except GRANTED to the extent that any Title VII claim concerning his bonus compensation is time barred. Defendants' summary judgment motion is DENIED as to Orlando's claims for a hostile work environment under the NYSHRL and the NYCHRL, but GRANTED as to Orlando's claim for a hostile work environment under Title VII. Defendants' summary judgment motion as to Orlando's claims for individual liability under the NYSHRL is GRANTED as to Oliveira but DENIED as to Auld. Defendants' summary judgment

motion as to Orlando's claims for employment discrimination is GRANTED.

## FACTS

### Background

The evidence in the summary judgment record, construed in the light most favorable to Orlando as the nonmoving party, is as follows:

Orlando practices Orthodox Judaism. (Dkt. [*3] No. 2: Compl. ¶ 27.) Orlando's grandparents lived in Tunisia during the Holocaust, and were directly affected by Adolf Hitler and the Nazi regime. (Compl. ¶¶ 28-30.) Management at BNP Paribas ("BNPP") was aware of Orlando's active religious practice. (Compl. ¶ 31.)

In 1995, Orlando began working for BNP Paribas, S.A. in Paris, France. (Dkt. No. 82: Egan Aff. Ex. 5: Orlando Dep. at 10-11.) In 2001, Orlando moved to New York City with his family to work at BNPP as a French expatriate. (Orlando Dep. at 13-14.) In 2006, Orlando entered a three year expatriate contract with BNPP. (Orlando Dep. at 26-28; compare Dkt. No. 74: Def. Rule 56.1 Stmt. ¶ 4 with Dkt. No. 87: Orlando Rule 56.1 Counter Stmt. ¶ 4.) Later that year, Orlando became the global head of BNPP's electronic foreign exchange group, known as the "Algo Group," part of the bank's Fixed Income Department. (Def. Rule 56.1 Stmt. & Orlando Counter Stmt. ¶ 6.)

In 2009, Orlando became a naturalized United States citizen. (Orlando Rule 56.1 Counter Stmt. ¶ 4; Dkt. No. 86: Orlando Aff. ¶ 2.) In September 2009, BNPP's Algo group split into two teams, the Algo Hedge group and the Algo Trading group. (Def. Rule 56.1 Stmt. & Orlando Counter Stmt. ¶ 8.) Orlando was placed in charge of [*4] the Algo Trading group, which was further subdivided into a High Frequency Trading team led by Simon Leger and a Medium Frequency Trading team led by Pierre-Yves Guillo. (Def. Rule 56.1 & Orlando Counter Stmt. ¶ 9.) In his new role, Orlando's global line manager was Eric Auld, and his local manager was Francisco Oliveira. (Def. Rule 56.1 Stmt. & Orlando Counter Stmt. ¶ 10; Dkt. No. 88: Stern Aff. Ex. 9: 9/25/09 Email.) At that time, Oliveira did not hold the FINRA licenses necessary to supervise Orlando, and Orlando asserts that during his time in the Algo Trading group he reported directly to Auld. (Orlando Rule 56.1 Counter Stmt. ¶ 10 & n.2; Orlando Aff. ¶¶ 9-10.)

## BNPP 2011 Off-Site Seminar In Amsterdam and the Hitler Video

On July 20, 2011, BNPP's foreign exchange group held a mandatory off-site training seminar in Amsterdam. (Dkt. No. 87: Orlando Rule 56.1 Counter Stmt. ¶ 90; Dkt. No. 86: Orlando Aff. ¶ 62.) At the first session, Auld, as Co-Head of the off-site seminar, introduced a video presentation that he partook in creating adapted from the movie "Downfall." (Orlando Rule 56.1 Counter Stmt. ¶ 90; Orlando Aff. ¶ 62; Dkt. No 88: Stern Aff. Ex. 56: 1/17/13 Banks Disciplinary Hr'g Tr. at 12-13; Stern Aff. Ex. 58: 7/15/11 [*5] Email; Stern Aff. Ex. 61: 7/17/11 Email; Stern Aff. Ex. 63: 7/17/11 Subtitles Email.) The video portrayed Adolf Hitler as the CEO of a BNPP competitor bank, and Nazi soldiers as competitor bank executives. (Orlando Rule 56.1 Counter Stmt. ¶ 90; Orlando Aff. ¶ 62.) In the video, which is subtitled, Hitler screams and curses at the soldiers in German. (Orlando Rule 56.1 Counter Stmt. ¶ 90.) The video included imagery symbolic of the Nazi regime including German army uniforms and swastikas, and referred to the "Third Reich," "my Fuhrer," "Goebbels," and "a large Polish operation." (Orlando Rule 56.1 Counter Stmt. ¶¶ 90, 95; Orlando Aff. ¶ 62, 64; 7/17/11 Subtitles Email; Stern Aff. Ex. 88: Video; see also Dkt. No. 82: Egan Aff. Ex. 8: 7/17/11 Subtitles email.) After watching the video, Orlando told Auld that as a Jew he was "extremely offended" by it. (Orlando Rule 56.1 Counter Stmt. ¶ 96; Orlando Aff. ¶ 65; Egan Aff. Ex. 5: Orlando Dep. at 85.) Orlando also told Auld's deputy, Hubert de Lambilly, that he was deeply offended by the video, and that he had lost his grandfather during World War II and did not think the subject was a laughing matter. (Orlando Rule 56.1 Counter Stmt. ¶ 96; Orlando Aff. ¶ 65; Stern Aff. Ex. 66: BNPP Prelim. [*6] Investigation Report at 3.) De Lambilly recommended that Orlando complain to his management, "i.e., Eric Auld. " (BNPP Prelim. Investigation Report at 3; see also Orlando Rule 56.1 Counter Stmt. ¶ 96; Orlando Aff. ¶ 65.) De Lambilly also reported Orlando's complaint to Auld. (Orlando Rule 56.1 Counter Stmt. ¶ 96; BNPP Prelim. Investigation Report at 3.) Nevertheless, the video was shown a second time later in the seminar. (Orlando Rule 56.1 Counter Stmt. ¶ 96; Orlando Aff. ¶¶ 64, 65; Stern Aff. Ex. 55: BNPP Defense & Countercl. at 8(b), 8(f), 10(a); Stern Aff. Ex. 57: 1/6/13 Email at 2-3; Stern Aff. Ex. 65: 1/16/13 Disciplinary Hr'g Tr. at 5-8; BNPP Prelim. Investigation Report at 3; Stern Aff. Ex. 87: 2/5/13 Ltr. at 5; Stern Aff. Ex. 91: Orlando Dep. at 63-64.) Orlando was so distressed after the

2015 U.S. Dist. LEXIS 143822, *6

second screening that he was concerned about working with Auld going forward. (Orlando Rule 56.1 Counter Stmt. ¶ 96; Stern Aff. Ex. 91: Orlando Dep. at 100.)

Orlando met Auld for dinner in August 2011 and again expressed that he was deeply hurt "in his skin" by the video, especially in light of his personal experiences with anti-Semitism, and BNPP's "controversial" history. (Orlando Rule 56.1 Counter Stmt. ¶ 108; Orlando Aff. ¶ 73; Stern [*7] Aff. Ex. 91: Orlando Dep. at 101, 103.) Auld asked Orlando what result he expected from their conversation, and Orlando said he expected a "simple apology and a simple action from [his] managers to restore sanity." (Stern Aff. Ex. 91: Orlando Dep. at 107.) Auld requested that Orlando change the subject. (Orlando Rule 56.1 Counter Stmt. ¶ 108.) When Orlando persisted, Auld threatened him, told him to "shut the fuck up" and made an "absolutely bone chilling threat at [him] and [his] career." (Stern Aff. Ex. 91: Orlando Dep. at 107-08; see also Egan Aff. Ex. 5: Orlando Dep. at 337; Orlando Aff. ¶ 73; Dkt. No. 92: Egan Reply Aff. Ex. 6: Orlando Dep. at 112, 265.)

Orlando's 2011 Bonus Compensation is Reduced

In January 2012, prior to the announcement of year-end compensation bonuses, Orlando met Auld at the Landmark Hotel in London. (Dkt. No. 87: Orlando Rule 56.1 Counter Stmt. ¶ 108; Dkt. No. 86: Orlando Aff. ¶ 73.) Auld told Orlando that he might have "'some surprises'" with his 2011 bonus compensation and warned Orlando to prepare himself for the worst. (Orlando Rule 56.1 Counter Stmt. ¶ 108; Orlando Aff. ¶ 73.) Orlando responded that since their August 2011 meeting, he felt that Auld had retaliated against him. [*8] (Orlando Rule 56.1 Counter Stmt. ¶ 108; Orlando Aff. ¶ 73.) Orlando told Auld that he did "'not believe [he was] being judged fairly based on [his] accomplishments, rather [he was] being treated unfairly based on [his] complaints.'" (Orlando Rule 56.1 Counter Stmt. ¶ 108; Orlando Aff. ¶ 73.) Auld responded angrily, telling Orlando: "'[s]top f***ing insinuating things. It is what it is: as I said to you, all captains are impacted.'" (Orlando Rule 56.1 Counter Stmt. ¶ 108; Orlando Aff. ¶ 73.)

Defendants assert that BNPP's 2011 bonus pool was down by sixty-five percent from 2010, but Orlando disputes this assessment. (Dkt. No. 83: Auld Aff. Ex. C at 4039.)[2] Defendants further state that in 2011, BNPP "established a protocol of ranking employees in Fixed Income in an effort to identify key personnel and provide

compensation that would facilitate their continued employment." (Dkt. No. 74: Def. Rule 56.1 Stmt. ¶ 17.) BNPP employees were ranked in quartiles, with employees in the first quartile being essential and in the second quartile slightly less important. (Def. Rule 56.1 Stmt. ¶¶ 18-19.) Orlando contends that even if management was instructed to use such a system, the assignment of quartile rankings was entirely discretionary, rather [*9] than measured against objective performance metrics. (Orlando Rule 56.1 Counter Stmt. ¶¶ 17-19.)

> 2    While technically the human resources memorandum defendants offer to support this statement is hearsay (see Orlando Rule 56.1 Counter Stmt. ¶ 15), that can be cured at trial.

Orlando was ranked in the second quartile (Dkt. No. 83: Auld Aff. ¶¶ 5-6), below Pierre-Yves Guillo, who reported to Orlando as head of the Algo Trade group's Medium Frequency desk (Orlando Rule 56.1 Counter Stmt. ¶¶ 21-22). Orlando's 2011 bonus was [#x20ac]125,000, a reduction from [#x20ac]378,000 in 2010. (Orlando Rule 56.1 Counter Stmt. ¶¶ 27(iii), 31; Orlando Aff. ¶ 24(iii).)

Orlando's Termination From BNPP's New York City Office

On March 15, 2012, Oliveira and Carlos Beltre, who was then BNPP's Fixed Income Regional Human Resources Business Partner, informed Orlando that his position with BNPP in New York was being terminated, and he would be repatriated to France. (Dkt. No. 87: Orlando Rule 56.1 Counter Stmt. ¶ 75; Dkt. No. 86: Orlando Aff. ¶ 52; see also Dkt. No. 73: Beltre Aff. ¶¶ 2, 12.) At that meeting, Orlando was given a letter, dated March 13, 2012. (Orlando Rule 56.1 Counter Stmt. ¶ 75; see also Beltre Aff. ¶ 12 & Ex. C: 3/13/12 Ltr.; Orlando Aff. ¶ 52.) The letter provided [*10] that Orlando's "temporary posting in New York" would end on May 1, 2012, and he would be reinstated at BNPP's Paris office, at the "K level of [BNPP's] collective agreement," with a gross salary of [#x20ac]79,352.39 (3/13/12 Ltr.; Orlando Aff. ¶ 52), a reduction from the $375,000 base salary he was paid in New York (Dkt. No. 88: Stern Aff. Ex. 23: 2009-2010 Compensation Stmt.). The letter further provided that at the time of Orlando's return, he would receive compensation of [#x20ac]27,715.00 to be paid with his May 2012 salary. (Orlando Rule 56.1 Counter Stmt. ¶ 75; Orlando Aff. ¶ 52; 3/13/12 Ltr.) Orlando was

confused by the phrase "temporary posting," because he understood that his expatriate status had expired without renewal on August 31, 2009. (Orlando Rule 56.1 Counter Stmt. ¶¶ 4, 75; Orlando Aff. ¶¶ 4, 6-7, 52; see also Dkt. No. 73: Beltre Aff. Ex. A: Expatriation Agreement with 8/31/09 expiration date; Stern Aff. Ex. 50 (no further contract after 8/31/09 expiration).)

On April 22, 2012, Orlando received a second letter, signed by Jan Verbrugge, BNPP's Director of Human Resources. (Orlando Rule 56.1 Counter Stmt. ¶ 87; Orlando Aff. ¶ 52; Stern Aff. Ex. 53: 4/22/12 Ltr.) The letter provided that Orlando would "reach [*11] the end of [his] expatriation period on May 1, 2012" and confirmed his "reinstatement in the Fixed Income department," where he would "be assigned to the position of Business Developer E-Banking Solutions in PARIS as early as May 2nd, 2012." (4/22/12 Ltr.; Orlando Aff. ¶ 52; Orlando Rule 56.1 Counter Stmt. ¶ 88.) On May 1, 2012, Orlando was terminated from BNPP's United States payroll. (Orlando Rule 56.1 Counter Stmt. ¶ 89; Stern Aff. Ex. 54: 5/6/12 Email; see Orlando Aff. ¶ 57.) Orlando never reported to work in BNPP's Paris office. (Orlando Rule 56.1 Counter Stmt. ¶ 89; Stern Aff. Ex. 54: 5/6/12 Email.)

## ANALYSIS

### I. LEGAL PRINCIPLES

#### A. General Summary Judgment Standard

*Rule 56 of the Federal Rules of Civil Procedure* provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*; see also, e.g., *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986)*; *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10, 91 L. Ed. 2d 202 (1986)*; *Humphreys v. Cablevision Sys. Corp., 553 F. App'x 13, 14 (2d Cir. 2014)*; *Connolly v. Calvanese, 515 F. App'x 62, 62 (2d Cir. 2013)*; *Lang v. Ret. Living Publ'g Co., 949 F.2d 576, 580 (2d Cir. 1991)*.

The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment. See, e.g., *Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970)*; *Alzawahra v. Albany Med. Ctr., 546 F. App'x 53, 54 (2d Cir. 2013)*; *Chambers v. TRM Copy Ctrs. Corp.,*

*43 F.3d 29, 36 (2d Cir. 1994)*; *Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994)*. The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof. See, [*12] e.g., *Celotex Corp. v. Catrett, 477 U.S. at 323, 106 S. Ct. at 2552-53*; *Dolan v. Cassella, 543 F. App'x 90, 90 (2d Cir. 2013)*.

To defeat a summary judgment motion, the non-moving party "'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007)* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986))*. Instead, the non-moving party must "cit[e] to particular parts of materials in the record" to show that "a fact . . . is genuinely disputed." *Fed. R. Civ. P. 56(c)(1)*; see, e.g., *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587, 106 S. Ct. at 1356*; *Alzawahra v. Albany Med. Ctr., 546 Fed. Appx. 53, 2013 WL 6284286 at *1*; *Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)* (at summary judgment, "[t]he time has come . . . 'to put up or shut up'"), cert. denied, *540 U.S. 811, 124 S. Ct. 53, 157 L. Ed. 2d 24 (2003)*.

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc., 477 U.S. at 255, 106 S. Ct. at 2513.*[3] The Court draws all inferences in favor of the non-moving party only after determining that such inferences are reasonable, considering all the evidence presented. See, e.g., *Apex Oil Co. v. DiMauro, 822 F.2d 246, 252 (2d Cir.)*, cert. denied, *484 U.S. 977, 108 S. Ct. 489, 98 L. Ed. 2d 487 (1987)*. "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 37*.

3   See also, e.g., *Crown Castle NG E. Inc. v. Town of Greenburgh, N.Y., 552 F. App'x 47, 49 (2d Cir. 2014)*; *Alzawahra v. Albany Med. Ctr., 546 Fed. Appx. 53, 2013 WL 6284286 at *1*; *Feingold v. New York, 366 F.3d 138, 148 (2d Cir.*

*2004); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 36; Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d at 1223.*

In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine whether [*13] there exists any disputed issue of material fact. See, e.g., *Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986),* cert. denied, *480 U.S. 932, 107 S. Ct. 1570, 94 L. Ed. 2d 762 (1987).* To evaluate a fact's materiality, the substantive law determines which facts are critical and which facts are irrelevant. See, e.g., *Anderson v. Liberty Lobby, Inc., 477 U.S. at 248, 106 S. Ct. at 2510.* While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,] [f]actual disputes that are irrelevant or unnecessary will not be counted." *Id. at 248, 106 S. Ct. at 2510* (citations omitted); see also, e.g., *Knight v. U.S. Fire Ins. Co., 804 F.2d at 11-12.*

**B. Additional Summary Judgment Standards In Employment Discrimination Cases**

When a case turns on the intent of one party, as employment discrimination and retaliation claims often do, a "trial court must be cautious about granting summary judgment." *Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).[4]* Because the employer rarely leaves direct evidence of its discriminatory or retaliatory intent, the Court must carefully comb the available evidence in search of circumstantial proof to undercut the employer's explanations for its actions. E.g., *Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d at 1224.* "[S]ummary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial. There must either be a lack of evidence in support of the plaintiff's position or [*14] the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." *Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir. 1998)* (citations omitted). Nonetheless, when an employer provides convincing evidence to explain its conduct and the plaintiff's argument consists of purely conclusory allegations of discrimination or retaliation, the Court may conclude that no material issue of fact exists and it may grant summary judgment to the employer. E.g., *Budde v.*

*H&K Distrib. Co., No. 99-9449, 216 F.3d 1071 (table), 2000 U.S. App. LEXIS 15811, 2000 WL 900204 at *1 (2d Cir. June 29, 2000); Stern v. Trs. of Columbia Univ., 131 F.3d 305, 312 (2d Cir. 1997); Meloff v. N.Y. Life Ins. Co., 51 F.3d 372, 375 (2d Cir. 1995).*

> 4   Accord, e.g., *Feingold v. New York, 366 F.3d 138, 149 (2d Cir. 2004); Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998)* ("[I]n an employment discrimination case when, as here, the employer's intent is at issue, the trial court must be especially cautious about granting summary judgment."); *McLee v. Chrysler Corp., 109 F.3d 130, 135 (2d Cir. 1997)* ("[C]aution must be exercised in granting summary judgment where motive is genuinely in issue."); *Cardozo v. Healthfirst, Inc., 210 F. Supp. 2d 224, 227 (S.D.N.Y. 1999);* see also, e.g., *Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 40 (2d Cir. 1994).*

In other words, to defeat summary judgment, "the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Stern v. Trs. of Columbia Univ., 131 F.3d at 312;* see, e.g., *Schnabel v. Abramson, 232 F.3d 83, 90-91 (2d Cir. 2000); Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000)* ("[T]he question [on summary judgment is] . . . whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination. [*15] To get to the jury, it is not enough to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination." (quotations & alterations omitted)), cert. denied, *540 U.S. 811, 124 S. Ct. 53, 157 L. Ed. 2d 24 (2003); Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996)* (plaintiff must "produce not simply 'some' evidence, but 'sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not [discrimination] was the real reason for the discharge'").[5] Indeed, the Second Circuit "went out of [its] way to remind district courts that the 'impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable.'" *Weinstock v. Columbia Univ., 224 F.3d at 41.*

> 5   See also, e.g., *Budde v. H&K Distrib. Co., 216*

*F.3d 1071,* [published in full-text format at *2000 U.S. App. LEXIS 15811*] 2000 WL 900204 at *1; *Scaria v. Rubin, 94 Civ. 3333, 1996 U.S. Dist. LEXIS 9659, 1996 WL 389250 at *5 (S.D.N.Y. July 11, 1996)* (Peck, M.J.), aff'd, *117 F.3d 652 (2d Cir. 1997).*

### C. Governing Legal Standard For Title VII Cases

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against any individual "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *42 U.S.C. § 2000e-2(a)(1).*

In connection with discrimination claims under Title VII, the Second Circuit applies the burden-shifting analysis established [*16] by the Supreme Court in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973).*[6] See, e.g., *Vega v. Hempstead Union Free Sch. Dist., No. 14-2265, 801F.3d72 , 2015 U.S. App. LEXIS 15572, 2015 WL 5127519 at *8 (2d Cir. Sept. 2, 2015); Brown v. City of Syracuse, 673 F.3d 141, 150 (2d Cir. 2012); Desir v. City of N.Y., 453 F. App'x 30, 33 (2d Cir. 2011); Leibowitz v. Cornell Univ., 584 F.3d at 498.*

6   Employment discrimination claims brought under the NYSHRL and the NYCHRL also are analyzed using the McDonnell Douglas analysis. E.g., *Teasdale v. N.Y.C. Fire Dep't, FDNY, 574 F. App'x 50, 51 (2d Cir. 2014); Spiegel v. Schulmann, 604 F.3d 72, 80 (2d Cir. 2010)* ("This Court has determined that a plaintiff's discrimination claims under both the NYSHRL and the NYCHRL are subject to the burden-shifting analysis applied to discrimination claims under Title VII."); *Fall v. N.Y.S. United Teachers, 289 F. App'x 419, 422 (2d Cir. 2008)* ("The McDonnell Douglas burden-shifting analysis 'is also applicable to [the plaintiff's] claims under the NYSHRL.'"); *Villar v. City of N.Y., 09 Civ. 7400, F. Supp. 3d , 2015 U.S. Dist. LEXIS 131633, 2015 WL 5707125 at *8 (S.D.N.Y. Sept. 29, 2015); John v. Dep't of Info. Tech. & Telecomms., 06 Civ. 13119, 2008 U.S. Dist. LEXIS 85614, 2008 WL 4694596 at *3 (S.D.N.Y. Oct. 23, 2008)* (McDonnell Douglas analysis applies to NYSHRL and NYCHRL claims.); *Sandiford v. City of N.Y. Dep't of Educ.,*

*22 N.Y.3d 914, 916 n.2, 999 N.E.2d 1144, 977 N.Y.S.2d 699; 22 N.Y.3d 914, 999 N.E.2d 1144, 977 N.Y.S.2d 699, 700 n.2 (2013); Forrest v. Jewish Guild for the Blind, 3 N.Y.3d 295, 305 n.3, 819 N.E.2d 998, 786 N.Y.S.2d 382, 391 n.3 (2004)* ("The standards for recovery under the New York State Human Rights Law are the same as the federal standards under [T]itle VII of the Civil Rights Act of 1964. Thus, '[b]ecause both the Human Rights Law and [T]itle VII address the same type of discrimination, afford victims similar forms of redress, are textually similar and ultimately employ the same standards of recovery, federal case law in this area also proves helpful to the resolution of this appeal.' Further, the human rights provisions of the New York City Administrative Code mirror the [*17] provisions of the [New York State] Executive Law and should therefore be analyzed according to the same standards." (citations omitted)).

However, the NYCHRL is to be more liberally construed. E.g., *Baldwin v. Goddard Riverside Cmty. Ctr., 615 Fed. Appx. 704, 2015 U.S. App. LEXIS 16152, 2015 WL 5294926 at *2 (2d Cir. 2015); Lenart v. Coach Inc., 15 Civ. 1922, F. Supp. 3d , 2015 U.S. Dist. LEXIS 121757, 2015 WL 5319735 at *2 (S.D.N.Y. Sept. 11, 2015); Adams v. City of N.Y., 837 F. Supp. 2d 108, 128 (E.D.N.Y. 2011); Melman v. Montefiore Med. Ctr., 98 A.D.3d 107, 112, 946 N.Y.S.2d 27, 30 (1st Dep't 2012); Williams v. N.Y.C. Hous. Auth., 61 A.D.3d 62, 75, 872 N.Y.S.2d 27, 37-38 (1st Dep't), appeal denied, 13 N.Y.3d 702, 914 N.E.2d 365, 885 N.Y.S.2d 716 (2009); see also, e.g., Hanna v. N.Y. Hotel Trades Council, 18 Misc. 3d 436, 438 n.1, 851 N.Y.S.2d 818, 822 n.1 (Sup. Ct. N.Y. Cnty. 2007)* ("NYCHRL is to be liberally and independently construed with the aim of making it more protective than its federal . . . or state . . . counterparts."). As I previously explained: "As this

Court has pointed out several times, while the cases . . . employ the same federal analysis to NYCHRL claims, the legislative history of the NYCHRL makes clear that it is to be even more liberally construed than the federal and state anti-discrimination laws." *Viruet v. Citizen Advice Bureau, 01 Civ. 4594, 2002 U.S. Dist. LEXIS 15045, 2002 WL 1880731 at *14 n.28 (S.D.N.Y. Aug. 15, 2002)* (Peck, M.J.) (quotations omitted; citing cases). Because the parties in this case have not argued for a different result under the NYCHRL than the NYSHRL or Title VII, and because Orlando's claims survive summary judgment under Title VII or the NYSHRL (see below), the Court will not pursue the issue any further in this case.

Under the familiar McDonnell Douglas burden-shifting analysis, the plaintiff has the burden at the outset of "proving by the preponderance [*18] of the evidence a prima facie case of discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S. Ct. 1089, 1093, 67 L. Ed. 2d 207 (1981)*; see, e.g., *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142, 120 S. Ct. 2097, 2106, 147 L. Ed. 2d 105 (2000); McDonnell Douglas Corp. v. Green, 411 U.S. at 802, 93 S. Ct. at 1824.*[7] Establishment of a prima facie case "'in effect creates a presumption that the employer unlawfully discriminated against the employee.'" *St. Mary's Honor Ctr. v. Hicks, 509 U.S. at 506, 113 S. Ct. at 2747* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. at 254, 101 S. Ct. at 1094*).[8]

7 See also, e.g., *Raytheon Co. v. Hernandez, 540 U.S. 44, 50 n.3, 124 S. Ct. 513, 517 n.3, 157 L. Ed. 2d 357 (2003); O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 310, 116 S. Ct. 1307, 1309, 134 L. Ed. 2d 433 (1996); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507, 113 S. Ct. 2742, 2746-47, 125 L. Ed. 2d 407 (1993); Vega v. Hempstead Union Free Sch. Dist., 2015 U.S. App. LEXIS 15572, 2015 WL 5127519 at *8;*

*Ruszkowski v. Kaleida Health Sys., 422 F. App'x 58, 60 (2d Cir. 2011); United States v. Brennan, 650 F.3d 65, 93 (2d Cir. 2011); Leibowitz v. Cornell Univ., 584 F.3d at 498; Dorfman v. Doar Communs., Inc., 314 Fed. Appx. 389, 390 (2d Cir. 2009); DeSalvo v. Volhard, 312 F. App'x 394, 396 (2d Cir.), cert. denied, 558 U.S. 932, 130 S. Ct. 70, 175 L. Ed. 2d 233 (2009); Fall v. N.Y.S. United Teachers, 289 F. App'x at 420-21; Nader v. ABC Television, Inc., 150 F. App'x 54, 55 (2d Cir. 2005); Mandell v. Cnty. of Suffolk, 316 F.3d 368, 377-78 (2d Cir. 2003); Mario v. P&C Food Mkts., Inc., 313 F.3d 758, 767 (2d Cir. 2002); Collins v. N.Y. City Transit Auth., 305 F.3d 113, 118 (2d Cir. 2002); Schnabel v. Abramson, 232 F.3d 83, 87 (2d Cir. 2000); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).*

8  See also, e.g., *Vega v. Hempstead Union Free Sch. Dist., 2015 U.S. App. LEXIS 15572, 2015 WL 5127519 at *8; Crawford v. Dep't of Investigation, 324 F. App'x 139, 141 (2d Cir. 2009); Smith v. New Venture Gear, Inc., 319 F. App'x 52, 54 (2d Cir. 2009); Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006),* cert. denied, *549 U.S. 1282, 127 S. Ct. 1855, 167 L. Ed. 2d 325 (2007); Mandell v. Cnty. of Suffolk, 316 F.3d at 380; Mario v. P&C Food Mkts., Inc., 313 F.3d at 767; Scaria v. Rubin, 117 F.3d 652, 654 (2d Cir. 1997).*

Once a plaintiff claiming employment discrimination establishes a prima facie case, the burden shifts to the defendant to rebut the presumption of discrimination by articulating a legitimate, non-discriminatory reason for its employment decision. E.g., *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 142-43, 120 S. Ct. at 2106; McDonnell Douglas Corp. v. Green, 411 U.S. at 802, 93 S. Ct. at 1824.*[9] The burden on the defendant at this phase is one of production rather than persuasion. E.g., *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 142, 120 S. Ct. at 2106.*[10]

9  See also, e.g., *Raytheon Co. v. Hernandez, 540 U.S. at 50 n.3, 124 S. Ct. at 517 n.3; O'Connor v. Consol. Coin Caterers Corp., 517 U.S. at 310, 116 S. Ct. at 1309; St. Mary's Honor Ctr. v. Hicks, 509 U.S. at 506-07, 113 S. Ct. at 2747; Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. at 253-54, 101 S. Ct. at 1093-94; Vega v. Hempstead Union Free Sch. Dist., 2015 U.S. App. LEXIS 15572,*

*2015 WL 5127519 at \*8; Desir v. City of N.Y., 453 F. App'x at 33-34; United States v. Brennan, 650 F.3d at 93; Leibowitz v. Cornell Univ., 584 F.3d at 498-99; Dorfman v. Doar Communs., Inc., 314 Fed. Appx. at 390; DeSalvo v. Volhard, 312 F. App'x at 396; Fall v. N.Y.S. United Teachers, 289 F. App'x at 421; Nader v. ABC Television, Inc., 150 F. App'x at 55; Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004); Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003); Mandell v. Cnty. of Suffolk, 316 F.3d at 380; Mario v. P&C Food Mkts., Inc., 313 F.3d at 767; Schnabel v. Abramson, 232 F.3d at 88; Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000), cert. denied, 540 U.S. 811, 124 S. Ct. 53, 157 L. Ed. 2d 24 (2003); Stern v. Trs. of Columbia Univ., 131 F.3d 305, 312 (2d Cir. 1997); Scaria v. Rubin, 117 F.3d at 654; Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 38.*
10  See also, e.g., *St. Mary's Honor Ctr. v. Hicks, 509 U.S. at 507, 113 S. Ct. at 2747; Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. at 257, 101 S. Ct. at 1096; Chiang v. Donahoe, 579 F. App'x 39, 42 (2d Cir. 2014); Terry v. Ashcroft, 336 F.3d at 144 n.17; Scaria v. Rubin, 117 F.3d at 654.*

"Although intermediate evidentiary burdens shift back and forth under [the McDonnell Douglas] framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 143, 120 S. Ct. at 2106.*

If the defendant articulates a non-discriminatory reason, the McDonnell Douglas burden-shifting framework drops out of the picture, and the plaintiff must [*19] show that the adverse employment decision more likely than not was motivated in whole or part by discriminatory reasons. E.g., *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 142-43, 120 S. Ct. at 2106.*[11] "Moreover, although the presumption of discrimination 'drops out of the picture' once the defendant meets its burden of production, . . . the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.'" *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 143, 120 S. Ct. at*

2106 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. at 255 n.10, 101 S. Ct. at 1095 n.10*).

11  See also, e.g., *Raytheon Co. v. Hernandez, 124 S. Ct. at 517 n.3; St. Mary's Honor Ctr. v. Hicks, 509 U.S. at 510, 113 S. Ct. at 2749; Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. at 253, 101 S. Ct. at 1093-94; Vega v. Hempstead Union Free Sch. Dist., 2015 U.S. App. LEXIS 15572, 2015 WL 5127519 at \*8; Allen v. Murray-Lazarus, 463 F. App'x 14, 16 (2d Cir. 2012); Desir v. City of N.Y., 453 F. App'x at 34; United States v. Brennan, 650 F.3d at 93; Leibowitz v. Cornell Univ., 584 F.3d at 499; DeSalvo v. Volhard, 312 F. App'x at 396; Fall v. N.Y.S. United Teachers, 289 F. App'x at 421; Feingold v. New York, 366 F.3d at 152; Mandell v. Cnty. of Suffolk, 316 F.3d at 380-81; Mario v. P&C Food Mkts., Inc., 313 F.3d at 767; Weinstock v. Columbia Univ., 224 F.3d at 42; Scaria v. Rubin, 117 F.3d at 654.*

The Supreme Court in 2000 clarified the standard at this stage of the McDonnell Douglas analysis:

[I]n St. Mary's Honor Center . . . . we held that the factfinder's rejection of the employer's legitimate, nondiscriminatory reason for its action does not compel judgment for the plaintiff. The ultimate question is whether the employer intentionally discriminated, and proof that "the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct." In other words, "[i]t is not enough . . . to dis believe the employer; the factfinder must believe the plaintiff's explanation [*20] of intentional discrimination."

In reaching this conclusion, however, we reasoned that it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation. . . .

Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination,

and it may be quite persuasive. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt." Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that [*21] the employer unlawfully discriminated.

This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred. To hold otherwise would be effectively to insulate an entire category of employment discrimination cases from review under Rule 50 [or *Rule 56*], and we have reiterated that trial courts should not "'treat discrimination differently from other ultimate questions of fact.'"

Whether judgment as a matter of law

[or summary judgment] is appropriate in any particular case will depend on a number of factors. Those include the strength [*22] of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.

*Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 146-49, 120 S. Ct. at 2108-09* (emphasis added & citations omitted).

After Reeves, the Second Circuit has made clear that merely proving a prima facie case and disproving the employer's explanation for its conduct at the third step of the McDonnell Douglas analysis will not preclude summary judgment in all cases; rather, a case-by-case analysis is necessary:

> In examining the impact of Reeves on our precedents, we conclude that Reeves prevents courts from imposing a per se rule requiring in all instances that [a Title VII] claimant offer more than a prima facie case and evidence of pretext. . . . But the converse is not true; following Reeves, we decline to hold that no [Title VII] defendant may succeed on a summary judgment motion so long as the plaintiff has established a prima facie case and presented evidence of pretext. Rather, we hold that the Supreme Court's decision in Reeves clearly mandates a case-by-case approach, with a court examining the entire record to determine [*23] whether the plaintiff could satisfy his "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff."

*Schnabel v. Abramson, 232 F.3d at 90* (emphasis added).12

12 See also, e.g., *Braun v. Securitas Sec. Servs. USA, Inc., 372 F. App'x 113, 114 (2d Cir. 2010)*; *Butts v. N.Y. City Dep't of Hous. Pres. & Dev., 307 Fed. Appx. 596, 599 (2d Cir. 2009)*; *Cross v.*

*N.Y. City Transit Auth., 417 F.3d 241, 248 (2d Cir. 2005); Feingold v. New York, 366 F.3d at 152; Roge v. NYP Holdings, Inc., 257 F.3d 164, 167-68 (2d Cir. 2001); Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 469-70 (2d Cir.)*, cert. denied, *534 U.S. 993, 122 S. Ct. 460, 151 L. Ed. 2d 378 (2001); James v. N.Y. Racing Ass'n, 233 F.3d 149, 156-57 (2d Cir. 2000); Weinstock v. Columbia Univ., 224 F.3d at 42* ("In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination."); *Aksamit v. 772 Park Ave. Corp., 00 Civ. 5520, 2003 U.S. Dist. LEXIS 17499, 2003 WL 22283813 at *6 (S.D.N.Y. Oct. 2, 2003)* ("[A] plaintiff's establishment of a prima facie case and rebuttal of a nondiscriminatory reason for the adverse action do not save the plaintiff from summary judgment when there is insufficient evidence of discrimination."), aff'd, *128 F. App'x 204 (2d Cir. 2005); Weiser v. Forest Pharms., Inc., 99 Civ. 1809, 2001 U.S. Dist. LEXIS 3266, 2001 WL 293951 at *7-8 (S.D.N.Y. Mar. 26, 2001); Tanay v. St. Barnabas Hosp., 99 Civ. 9215, 2001 U.S. Dist. LEXIS 2661, 2001 WL 262695 at *4 (S.D.N.Y. Mar. 15, 2001); Connell v. Consol. Edison Co., 109 F. Supp. 2d 202, 207-08 (S.D.N.Y. 2000)* (Chin, D.J.) ("The key is whether there is sufficient evidence in the record -- whether it consists of just the prima facie case and proof of pretext alone or those items together with additional evidence -- to support an inference of discrimination.").

## II. TIMELINESS OF ORLANDO'S CLAIMS

Defendants assert that all of Orlando's Title VII claims are barred by his failure to timely file a charge with the EEOC. (Dkt. No. 75: Def. Br. at 9-10.) Orlando asserts that his claims are timely, or alternatively, that he [*24] should be given the benefit of equitable tolling. (Dkt. No. 85: Orlando Opp. Br. at 12-14.)

Title VII requires that a plaintiff file a charge with the Equal Employment Opportunity Commission ("EEOC") within 300 days of an alleged discriminatory act. *42 U.S.C. § 2000e-5(e)(1)*. A claim of employment discrimination accrues for statute of limitations purposes on the date the employee learns of the employer's discriminatory conduct. See, e.g., *Delaware State College v. Ricks, 449 U.S. 250, 258, 101 S. Ct. 498, 504, 66 L. Ed.*

*2d 431 (1980); Flaherty v. Metromail Corp., 235 F.3d 133, 137 (2d Cir. 2000).* "In order to establish an 'evenhanded administration of the law,' district courts must follow the Supreme Court's warning not to disregard the timing requirements simply because we may feel sympathy for a particular litigant." *Smith v. Henderson, 137 F. Supp. 2d 313, 317-18 (S.D.N.Y. 2001)* (quoting *Baldwin Cnty. Welcome Ctr. v. Brown, 466 U.S. 147, 152, 104 S. Ct. 1723, 1726, 80 L. Ed. 2d 196 (1984))*. "'[F]iling a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling.'" *Downey v. Runyon, 160 F.3d 139, 145 (2d Cir. 1998)* (quoting *Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393, 102 S. Ct. 1127, 1132, 71 L. Ed. 2d 234 (1982))*.

"[E]quitable estoppel is invoked in cases where the plaintiff knew of the existence of his cause of action but the defendant's conduct caused him to delay bringing his lawsuit." *Dillman v. Combustion Eng'g, Inc., 784 F.2d 57, 60-61 (2d Cir. 1986)*. Equitable estoppel may be invoked when the employer has misrepresented the length of the limitations period or in some other way has "'lulled [*25] the plaintiff into believing that it was not necessary for him to commence litigation.'" *Id. at 61* (quoting *Cerbone v. Int'l Ladies' Garment Workers' Union, 768 F.2d 45, 50 (2d Cir. 1985)* ("One factor that frequently appears in the estoppel cases is a settlement negotiation. Thus, where the defendant assures the plaintiff that he intends to settle and the plaintiff, in reasonable reliance on that assurance, delays in bringing his suit until after the statute has run, the defendant may be estopped to rely on the limitations defense."). "To invoke equitable estoppel, a plaintiff must show that: (1) the defendant made a definite misrepresentation of fact, and had reason to believe that the plaintiff would rely on it; and (2) the plaintiff reasonably relied on that misrepresentation to his detriment." *Buttry v. Gen. Signal Corp., 68 F.3d 1488, 1493 (2d Cir. 1995)*; accord, e.g., *Riddle v. Citigroup, 449 F. App'x 66, 69 (2d Cir. 2011)*.

Equitable tolling, alternatively, is based on the principle that "statute of limitations does not run against a plaintiff who is unaware of his cause of action." *Dillman v. Combustion Eng'g, Inc., 784 F.2d at 60* (quotation & citation omitted). "Equitable tolling of the 300-day statutory deadline is only appropriate in rare and exceptional circumstances in which a party is prevented

in some extraordinary way from exercising his rights." *Walker v. Linklaters LLP, 948 F. Supp. 2d 396, 399-400 (S.D.N.Y. 2013)* (quotation & alteration omitted).

Orlando has not met the standard for [*26] equitable estoppel or equitable tolling. But because of the specific tolling agreement with BNPP, his EEOC complaint is timely as to his termination. It is undisputed that on January 7, 2013 BNPP agreed, at Orlando's request, to toll the statute from January 7 until January 18, 2013. (Dkt. No. 87: Orlando Rule 56.1 Counter Stmt. ¶ 85; Dkt. No. 88: Stern Aff. Ex. 86: 1/7/13 Email; Def. Br. at 9 n.6.) Orlando contends that he filed his charge on January 22, 2013, the first business day after the conclusion of the toll (January 19 and 20, 2013 were a Saturday and Sunday, and January 21, 2013 was Martin Luther King, Jr. Day), but that it was stamped as received by the EEOC on January 23, 2013. (Orlando Rule 56.1 Counter Stmt. ¶ 85; Dkt. No. 86: Orlando Aff. ¶ 57; Dkt. No. 88: Stern Aff. Ex. 70: EEOC Charge.)

Had Orlando filed his EEOC charge on January 7, 2013, it would have been timely for his retaliatory termination claim, which accrued on March 15, 2012, when he was told his BNPP position in New York was terminated. (See page 6 above.) Indeed, he could have filed by January 10, 2013, 300 days after the termination notice on March 15, 2012. Thus, Orlando had three "unused" days at the time of the tolling [*27] agreement. Courts are instructed to consider the "unused" portion of the limitations period as a "significant circumstance to be evaluated in assessing the plaintiff's punctuality." *Buttry v. Gen. Signal. Corp., 68 F.3d at 1494;* see also, e.g., *Melendez v. Wilson, 04 Civ. 0073, 2006 U.S. Dist. LEXIS 65212, 2006 WL 2621083 at *9 (S.D.N.Y. Sept. 12, 2006).* If the EEOC charge was filed "after hours" on January 22 and thus not stamped filed until the morning of January 23, or even if contrary to Orlando's evidence he only filed on January 23, the 300 day period (inclusive of the toll from January 7 to January 18) still would include his March 15, 2012 termination. However, the events prior to his termination (i.e. the Hitler video and Orlando's bonus) are time barred under Title VII.

The NYSHRL and the NYCHRL each have a three-year statute of limitations. *N.Y. C.P.L.R. § 214(2);* N.Y.C. Admin. Code § 8-502(d). This action was filed on June 6, 2014. Accordingly, claims that accrued after June 6, 2011 are timely under the NYSHRL and NYCHRL. Since the Hitler video was shown on July 20, 2011 all of

Orlando's claims under the NYSHRL and NYCHRL are timely.

## III.  ORLANDO'S RETALIATION CLAIM IS SUFFICIENTLY ALLEGED

Orlando's retaliation claim is based on his March 15, 2012 termination from BNPP's New York office, and the reduced bonus compensation [*28] he received for his 2011 performance. (Dkt. No. 85: Orlando Opp. Br. at 21-22.) Orlando's claim for retaliatory termination is timely under Title VII, the NYSHRL and NYCHRL. (See pages 20-21 above.) Orlando's claim that his reduced bonus compensation was retaliatory is timely only under the NYSHRL and NYCHRL. (See pages 20-21 above.)

### A. Retaliation Standard

Under Title VII, it is unlawful for an employer to "retaliate" by discriminating against an employee because the employee engaged in protected activity, that is, "has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *42 U.S.C. § 2000e-3(a); 29 U.S.C. § 623(d).*[13]

> 13   See, e.g., *Univ. of Tex. Southwestern Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2528, 186 L. Ed. 2d 503 (2013); Crawford v. Metro. Gov't of Nashville & Davidson Cnty., 555 U.S. 271, 129 S. Ct. 846, 850, 172 L. Ed. 2d 650 (2009); Chiang v. Donahoe, 579 F. App'x 39, 40 (2d Cir. 2014); Sengillo v. Valeo Elec. Sys., Inc., 328 F. App'x 39, 40-41 (2d Cir. 2009); Richardson v. Comm'n on Human Rights & Opportunities, 532 F.3d 114, 120-21 (2d Cir. 2008),* cert. denied, *558 U.S. 932, 130 S. Ct. 56, 175 L. Ed. 2d 232 (2009); Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 241 (2d Cir. 2007); Kessler v. Westchester Cnty. Dep't of Soc. Servs., 461 F.3d 199, 205 (2d Cir. 2006); Terry v. Ashcroft, 336 F.3d 128, 140 (2d Cir. 2003); Diaz v. Weill Med. College, 02 Civ. 7830, 2004 U.S. Dist. LEXIS 2054, 2004 WL 285947 at *21 (S.D.N.Y. Feb. 13, 2004)* (Peck, M.J.), aff'd, *138 F. App'x 362 (2d Cir. 2005); Minott v. Port Auth. of N.Y. & N.J., 116 F. Supp. 2d 513, 520, 524 (S.D.N.Y. 2000)* ("Title VII defines protected activities as (1) an employee's opposition to any activity which is prohibited by Title VII, or (2) an

employee's participation in any Title VII investigation or proceeding."); see also *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988)* ("The objective of [the section prohibiting retaliation] is obviously to forbid [*29] an employer from retaliating against an employee because of the latter's opposition to an unlawful employment practice.").

"To succeed on a claim of retaliation, a plaintiff must show that 1) the employee engaged in a protected activity; 2) the employer was aware of that activity; 3) the employee suffered an adverse employment action; and 4) there was a causal connection between the protected activity and the adverse employment action." *Blanco v. Brogan, 620 F. Supp. 2d 546, 553 (S.D.N.Y. 2009)*; accord, e.g., *Littlejohn v. City of N.Y., 795 F.3d 297, 316 (2d Cir. 2015)*; *Kessler v. Westchester Cnty. Dep't of Soc. Servs., 461 F.3d at 205-06*; *Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002)*; *Weixel v. Bd. of Educ., 287 F.3d 138, 148-49 (2d Cir. 2002).*[14]

> [14] See also, e.g., *Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 223 (2d Cir. 2001)*; *Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000)*; *Chinnery v. N.Y.S. Office of Children & Family Servs., 10 Civ. 882, 2014 U.S. Dist. LEXIS 60896, 2014 WL 1651950 at *11 (S.D.N.Y. Apr. 25, 2014)*, report & rec. adopted, *2015 U.S. Dist. LEXIS 29523, 2015 WL 1029601 (S.D.N.Y. Mar. 10, 2015)*; *Munck v. New Haven Sav. Bank, 251 F. Supp. 2d 1078, 1085 (D. Conn. 2003).*

Title VII retaliation claims also are governed by the McDonnell Douglas burden-shifting analysis. E.g., *Littlejohn v. City of N.Y., 795 F.3d at 316-17*; *Kirkland v. Cablevision Sys., 760 F.3d 223, 225 (2d Cir. 2014)*; *Kaytor v. Elec. Boat Corp., 609 F.3d 537, 552-53 (2d Cir. 2010).*[15] Thus, once a plaintiff makes out a prima facie case of retaliation, the burden of production shifts to the defendant to articulate a legitimate, non-retaliatory reason for its action. E.g., *Kaytor v. Elec. Boat Corp., 609 F.3d at 552-53*; *Hicks v. Baines, 593 F.3d at 164*; *Jute v. Hamilton Sundstrand Corp., 420 F.3d at 173*. If the defendant meets this burden, to avoid summary judgment the plaintiff must point to evidence sufficient to present an inference that the proffered reason is a mere pretext for retaliation. E.g., *Kirkland v. Cablevision Sys., 760*

*F.3d at 225*; *Kaytor v. Elec. Boat Corp., 609 F.3d at 552-53*; *Hicks v. Baines, 593 F.3d at 164*; *Jute v. Hamilton Sundstrand Corp., 420 F.3d at 173.*

> [15] See also, e.g., *Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010)*; *Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005)*; *Terry v. Ashcroft, 336 F.3d at 141*; *Diaz v. Weill Med. College, 2004 U.S. Dist. LEXIS 2054, 2004 WL 285947 at *21 & n.27 (& cases cited therein).*

Causation can be established either directly through [*30] evidence of retaliatory animus or indirectly by demonstrating that the adverse employment action followed quickly on the heels of the protected activity or through other evidence such as disparate treatment of fellow employees. See, e.g., *Kercado-Clymer v. City of Amsterdam, 370 F. App'x 238, 242-43 (2d Cir. 2010)*; *Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d at 224*; *DeCintio v. Westchester Cnty. Med. Ctr., 821 F.2d 111, 115 (2d Cir.)*, cert. denied, *484 U.S. 965, 108 S. Ct. 455, 98 L. Ed. 2d 395 (1987)*. "Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . . This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Southwestern Med. Ctr. v. Nassar, 133 S. Ct. at 2533*; accord, e.g., *Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 846 n.5 (2d Cir. 2013).*

**B. Orlando Has Presented Sufficient Evidence To Raise A Question Of Fact Regarding Who Initiated The Adverse Employment Decisions Affecting Him**

Defendants first assert that Orlando cannot establish a causal connection between his complaints about the Hitler video and any adverse employment action. (Dkt. No. 75: Def. Br. at 22 24; Dkt. No. 91: Def. Reply Br. at 7-10.) Defendants contend that because "Oliveira was [the] decision maker and knew nothing about [Orlando's] purported complaint, Orlando's retaliation claims fail as a matter of law." (Def. Br. at 23.)

Orlando has presented evidence to demonstrate that while Oliveira was his local manager, Auld had some [*31] level of discretion and control over employment decisions affecting Orlando. For example, as to Orlando's termination, in a December 2, 2011 email discussing the year's successes and failures, Auld wrote that Orlando's desk "is unstable and we may have to make changes next year." (Dkt. No. 88: Stern Aff. Ex. 41: 12/2/11 Email at

2.) In a later email discussing his own 2012 performance, Auld notes "[I] made some tough decisions (Orlando . . .) . . . [T]raders . . . say very strongly that I made the right call." (Stern Aff. Ex. 43: 12/16/12 Email at 3.) Further, in a January 8, 2013 meeting between Auld and other BNPP executives, Auld stated that the decision to repatriate Orlando to France was a "joint decision with Francisco de Oliveira." (Stern Aff. Ex. 20: 1/8/13 Meeting Notes at 3.) Likewise, in an internal investigation report following the video incident, Auld is referred to as Orlando's management. (Stern Aff. Ex. 66: BNPP Prelim. Investigation Report at 3.)

As to Orlando's bonus compensation, Auld is identified as Orlando's "Direct Manager" for bonuses in a compensation review spreadsheet, while Orlando's direct salary manager is identified as being "Not Defined." (Dkt. No. 88: Stern [*32] Aff. Ex. 4: 11/19/12 Email at 5.) In contrast, for numerous employees on the same spreadsheet Auld is identified as the direct manager for bonus, and Oliveira is identified as the direct salary manager. (See, e.g., Stern Aff. Ex. 4: 11/19/12 Email at 1, spreadsheet lines 4, 10.) Further, as a manager with multiple trading teams under his supervision, Auld set the bonus pool for the entirety of the Algo Trade team. (Dkt. No. 83: Auld Aff. ¶ 10.) Because Auld knew Orlando's quartile ranking prior to setting the Algo Trade team bonus pool (compare Stern Aff. Ex. 30 at 3: 12/14/11 email with Auld. Aff. ¶ 10), he implicitly limited Orlando's bonus to no more than [#x20ac]175,000 (as only thirty-five percent of the [#x20ac]500,000 pool was available to employees quartiled two and below).

Thus, while defendants contend that Oliveira was Orlando's direct manager and initiated all decisions pertaining to his bonus compensation and termination (Def. Br. at 22-23; Def. Reply Br. at 7), Orlando has presented sufficient evidence to raise a question of fact for the jury regarding whether Auld influenced or controlled those decisions.

## C. Orlando Has Presented Sufficient Evidence To Establish Pretext and Retaliatory [*33] Animus

Defendants next assert that "Orlando cannot point to any concrete facts showing that the Bank acted with any retaliatory animus," or show that defendants' stated reasons for their adverse employment decisions are pretexts for retaliation. (Dkt. No. 91: Def. Reply Br. at 10; Dkt. No. 75: Def. Br. at 24-25.) A showing of causation "'tend[s] to collapse as a practical matter under

the McDonnell Douglas framework'" with a showing of pretext. *Jeffrey v. Montefiore Med. Ctr., 11 Civ. 6400, 2013 U.S. Dist. LEXIS 141005, 2013 WL 5434635 at *20 (S.D.N.Y. Sept. 27, 2013)* (quoting *Collins v. N.Y. City Transit Auth., 305 F.3d 113, 118 n.1 (2d Cir.2002))*. To establish pretext, Orlando "must produce not simply some evidence, but sufficient evidence to support a rational finding that the . . . reasons proffered by the defendant" for his bonus compensation and termination are "false, and that more likely than not [retaliation] was the real reason for the employment action." *Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000)* (quotations & alterations omitted); see also cases cited at page 11 above. "Plaintiffs may establish pretext and thereby successfully oppose summary judgment, . . . by demonstrat[ing] weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nondiscriminatory reason for its action." *Lyman v. N.Y. & Presbyterian Hosp., 11 Civ. 3889, 2014 U.S. Dist. LEXIS 95492, 2014 WL 3417394 at *14 (S.D.N.Y. July 14, 2014)* (quotations [*34] omitted).

Defendants have articulated several legitimate reasons for Orlando's termination and reduced bonus compensation. (See generally Dkt. No. 75: Def. Br. at 12-15.) For example, Orlando's 2011 performance review -- prepared by Auld, however -- reflected management deficiencies, marked by infighting on his team and poor cooperation. (Dkt. No. 73: Beltre Aff. Ex. I: Orlando 2011 Review at 3, 6.) Further, in early 2011 Orlando's desk lost three million euros in a single day, prompting an investigation by BNPP's Inspection Generale. (Def. Br. at 12; Orlando 2011 Review at 3; Dkt. No. 71: Oliveira Aff. ¶¶ 35-36.) Additionally, the Algo Trade group fell short on its annual revenue targets. (Def. Br. at 12; Oliveira Aff. ¶ 44.)

Orlando asserts that there are several weaknesses in defendants' proffered legitimate reasons, and that defendants are pretextually mischaracterizing his performance. (Dkt. No. 85: Orlando Opp. Br. at 24.) As to his management skill, Orlando presents evidence that as of July 2011, Auld's supervisor, Amblard, viewed Orlando as a candidate for the French HC promotion which required a level of business and management responsibility, true value added, potential for further [*35] evolution, and adaptability to new responsibilities. (Dkt. No. 88: Stern Aff. Ex. 84: HC 2012 Promotion Email.) Further, Orlando asserts that one of the Algo Trade employees with whom he was alleged to have

friction, Pierre Yves Guillo (Oliveira Aff. ¶¶ 27-30), was seen as problematic within the team and was someone Orlando previously had been asked to "'build a dossier'" on to create "a record." (Dkt. No. 86: Orlando Aff. ¶ 51; Stern Aff. Ex. 91: Orlando Dep. at 227-28.) Orlando next contends that the Inspector General report was unrelated to the Algo Trade group's loss, and was instead a general audit of the Fixed Income group. (Orlando Aff. ¶ 39; Stern Aff. Ex. 35: 5/18/11 Email.) Orlando also has presented evidence to show that the Algo Trade group's 2011 performance was viewed internally at BNPP as "[e]xcellent" (Stern Aff. Ex. 83: Auld 2011 Review at 8), and relative to the Fixed Income Group as whole the Algo Trade group was much closer to meeting its 2011 budget. (Stern Aff. Ex. 89: compare Auld Dep. at 91-92 with id. at 96.)

Additionally, a reasonable juror could reject defendants' legitimate reasons in favor of Orlando's contention that the decisions were made on the basis of retaliatory animus. [*36] (Orlando Opp. Br. at 6.) Orlando testified that he met Auld in London at the end of summer 2011 and complained about the Hitler video. (See pages 4-5 above.) Orlando testified that in response, Auld told him to "shut the fuck up" and made an "absolutely bone chilling threat at [him] and [his] career." (See pages 4-5 above.) When Orlando and Auld met again, Auld warned Orlando that he might have "'some surprises'" with his bonus compensation. (See page 5 above.)[16]

> [16] Defendants argue that Auld's positive conduct toward Orlando between the Hitler video showing and Orlando's termination negates any inference of retaliatory animus. (Def. Br. at 24.) In two of the cases cited by defendants to support this argument, two or more years and numerous positive employment actions occurred between the employees' protected activity and the allegedly retaliatory action. See Pace Univ. v. N.Y.C. Comm'n on Human Rights, 85 N.Y.2d 125, 129, 647 N.E.2d 1273, 623 N.Y.S.2d 765, 767(1995); Budzanoski v. Pfizer, Inc., 245 A.D.2d 72, 72, 664 N.Y.S.2d 796, 796 (1st Dep't 1997). In the third case cited by defendants, the Court applied the "same actor" inference in finding that plaintiff could not sustain a national origin discrimination claim against the supervisor who promoted her. Figueroa v. N.Y. Health & Hosps. Corp., 500 F. Supp. 2d 224, 236 (S.D.N.Y. 2007).

The same actor inference is not mandatory. See, e.g., Feingold v. New York, 366 F.3d 138, 154-55 n.15 (2d Cir. 2004) ("We do not pass judgment on the extent to which this [same actor] [*37] inference is either required or appropriate outside the Age Discrimination in Employment Act (ADEA) context in which it generally is applied."); Memnon v. Clifford Chance US, LLP, 667 F. Supp. 2d 334, 351 (S.D.N.Y. 2009) ("[A]s several courts have found, the same-actor inference is permissive, not mandatory."). In light of Auld's alleged overtly threatening behavior, and the relatively passive nature of his intervening supportive behavior (see, e.g., Stern Aff. Ex. 84: 11/7/11 Email; Stern Aff. Ex. 30: 12/14/11 Email), the Court declines to apply the same actor inference here. It will be up to the jury to evaluate all of Auld's conduct toward Orlando.

While Auld disputes Orlando's testimony, a jury could credit it and conclude that Auld initiated a chain of events to terminate Orlando to protect himself from negative consequences that might arise if Orlando were to escalate complaints about the Hitler video. Orlando's testimony regarding Auld's threats is sufficient direct evidence of retaliatory animus to establish a causal connection and demonstrate pretext, thereby precluding summary judgment. See, e.g., Jeffrey v. Montefiore Med. Ctr., 11 Civ. 6400, 2013 U.S. Dist. LEXIS 141005, 2013 WL 5434635 at *22 (S.D.N.Y. Sept. 27, 2013) ("It is true that Plaintiff's proffered evidence consists almost exclusively of her own testimony, which with [*38] few exceptions lacks any independent corroboration. . . . Plaintiff's claim survives at this stage because this a classic 'he said, she said' situation that is not amenable to summary judgment." (quotation & citation omitted)); Bryant v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 12 Civ. 2940, 2013 U.S. Dist. LEXIS 76242, 2013 WL 2359109 at *7 (S.D.N.Y. May 30, 2013) ("If [plaintiff's] testimony is credited, a jury could readily conclude that retaliatory animus motivated Defendant's failure to promote Plaintiff . . . ."); Abel v. Morabito, 04 Civ. 7284, 2009 U.S. Dist. LEXIS 9631, 2009 WL 321007 at *2 (S.D.N.Y. Feb. 10, 2009) (noting in First Amendment context that "direct evidence such as comments by the defendants, may suffice to meet [plaintiff's] burden" of demonstrating a causal connection between the protected activity and the adverse action); Rolon v. Ward, 05 Civ. 168, 2008 U.S. Dist. LEXIS 86781, 2008 WL 4700705 at *25 (S.D.N.Y. Oct. 24, 2008) (in First Amendment

context, supervisor's statement in plaintiff's evaluation that he "'sets himself back with personal complaints'" could constitute direct evidence of a causal connection to retaliation), aff'd, *345 F. App'x 608 (2d Cir. 2009)*.[17]

> 17   While defendants further assert that the temporal proximity between Orlando's complaint and any adverse employment action is too attenuated to demonstrate a causal connection (Def. Br. at 24 n.22), the Court nevertheless considers it additional circumstantial evidence of a causal connection. At most, eight months elapsed between Orlando's [*39] complaint at the end of summer 2011 and his termination. (See pages 4, 6 above.) That period of time is within the outer bounds supporting an inference of causation. See, e.g., *Chan v. Donahoe, 63 F. Supp. 3d 271, 296 (E.D.N.Y. 2014)* ("The Court of Appeals for the Second Circuit has indicated that up to a seven-month gap between protected activity and an adverse employment action is 'not prohibitively remote.'" (quoting *Summa v. Hofstra Univ., 708 F.3d 115, 128 (2d Cir. 2013)*); *Rouse v. City of N.Y., 08 Civ. 7419, 2009 U.S. Dist. LEXIS 46718, 2009 WL 1532054 at *12 (S.D.N.Y. June 2, 2009)* ("the ten month period . . . stretches the bounds of the time frame that courts have allowed to support an inference of causation based on temporal proximity").

Because "[t]he anti-retaliation provisions in Title VII . . . and the NYSHRL contain nearly identical language and are analyzed under the same framework," *Shih v. JPMorgan Chase Bank, N.A., 10 Civ. 9020, 2013 U.S. Dist. LEXIS 32500, 2013 WL 842716 at *5 (S.D.N.Y. Mar. 7, 2013)*, the foregoing analysis applies equally to Orlando's claims under the NYSHRL. See also, e.g., *Santiesteban v. Nestle Waters N. Am., Inc., 61 F. Supp. 3d 221, 240 (E.D.N.Y. 2014)*. Additionally, a finding that summary judgment is not appropriate as to Orlando's Title VII and NYSHRL claims logically precludes summary judgment under the more liberal framework of the NYCHRL. See *Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 723 (2d Cir. 2010)* ("[T]he retaliation inquiry under the [NY]CHRL is 'broader' than its federal counterpart." (quoting *Williams v. N.Y.C. Hous. Auth., 61 A.D. 3d 62, 71, 872 N.Y.S.2d 27, 34 (1st Dep't 2009)*); see also cases cited at page 12 n.6 above. Accordingly, [*40] summary judgment is DENIED as to Orlando's retaliation claims, except GRANTED as to his

Title VII claim concerning his 2011 bonus compensation, since that is time barred.

## IV. ORLANDO HAS SUFFICIENTLY ALLEGED A HOSTILE WORK ENVIRONMENT UNDER THE NYSHRL AND NYCHRL

Orlando's hostile work environment claim based on the July 2011 Hitler video is time barred under Title VII, but is timely under the NYSHRL and NYCHRL's three year statutes of limitations. (See pages 20-21 above.)

### A. NYSHRL Legal Standard

Hostile work environment claims under the NYSHRL are "'generally governed by the same standards as federal claims under Title VII.'" *Turley v. ISG Lackawanna, Inc., 774 F.3d 140, 151 n.6 (2d Cir. 2014)* (quoting *Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 609 (2d Cir. 2006)*); see also, e.g., *Pryor v. Jaffe & Asher, LLP, 992 F. Supp. 2d 252, 256 (S.D.N.Y. 2014)*. Accordingly, to withstand summary judgment, Orlando must produce evidence to show that defendants' conduct was:

> "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., 510 U.S. 17, 21, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1993)* (quoting *Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S. Ct. 2399, 2405, 91 L. Ed. 2d 49 (1986)*) (internal brackets and quotation marks omitted). The conduct must be intimidating, hostile, or offensive, with discriminatory intimidation, ridicule, and insult permeating the workplace. See *Tomka v. Seiler Corp., 66 F.3d 1295, 1305 (2d Cir. 1995)*. All of the circumstances must be considered; a reasonable person would have to find the environment [*41] hostile or abusive, and the victim must have subjectively so perceived it. See *Harris v. Forklift Sys., 510 U.S. 17, 21-23, 114 S. Ct. 367, 370-71, 126 L. Ed. 2d 295 (1993)*; *Tomka v. Seiler Corp., 66 F.3d 1295, 1305 (2d Cir. 1995)*.

*Gallagher v. Delaney, 139 F.3d 338, 346-47 (2d Cir. 1998)*, abrogated on other grounds by *Burlington Indus.,*

*Inc. v. Ellerth*, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998); accord, e.g., *Littlejohn v. City of N.Y.*, 795 F.3d 297, 321 (2d Cir. 2015) ("'This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive.'"); *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009); *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 82 (2d Cir. 2009); *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007); *Feingold v. New York*, 366 F.3d 138, 149-50 (2d Cir. 2004).[18]

18   See also, e.g., *Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 58 (2d Cir. 2004); *Terry v. Ashcroft*, 336 F.3d 128, 147-48 (2d Cir. 2003); *Alfano v. Costello*, 294 F.3d 365, 373-74 (2d Cir. 2002); *Dayes v. Pace Univ.*, 2 F. App'x 204, 207 (2d Cir. 2001); *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F. 3d 62, 69-71 (2d Cir. 2000); *Howley v. Town of Stratford*, 217 F.3d 141, 153-54 (2d Cir. 2000); *Richardson v. N.Y.S. Dep't of Corr. Serv.*, 180 F.3d 426, 437-40 (2d Cir. 1999), abrogated on other grounds by *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998); *Torres v. Pisano*, 116 F.3d 625, 630 (2d Cir.), cert. denied, 522 U.S. 997, 118 S. Ct. 563, 139 L. Ed. 2d 404 (1997); *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1042 (2d Cir. 1993); *Slaitane v. Sbarro, Inc.*, 03 Civ. 5503-04, 2004 U.S. Dist. LEXIS 9839, 2004 WL 1202315 at *12-13 (S.D.N.Y. June 2, 2004) (Peck, M.J.); *Viruet v. Citizen Advice Bureau*, 01 Civ. 4594, 2002 U.S. Dist. LEXIS 15045, 2002 WL 1880731 at *15 (S.D.N.Y. Aug. 15, 2002) (Peck, M.J.); *Williams v. N.Y.C. Dep't of Sanitation*, 00 Civ. 7371, 2001 U.S. Dist. LEXIS 15594, 2001 WL 1154627 at *12-13 (S.D.N.Y. Sept. 28, 2001) (Peck, M.J.); *Adeniji v. Admin. for Children Servs.*, 43 F. Supp. 2d 407, 421 (S.D.N.Y.) (Wood, D.J. & Peck M.J.), aff'd, No. 99-7561, 201 F.3d 430 (table), [published in full-text format at *1999 U.S. App. LEXIS 30451*] 1999 WL 1070027 (2d Cir. Nov. 18, 1999).

"Conduct that is 'merely offensive' and 'not severe or pervasive enough to create an objectively hostile or abusive work environment'" is insufficient to establish a Title VII discrimination claim. *Torres v. Pisano*, 116 F.3d at 631; accord, e.g., *Duch v. Jakubek*, 588 F.3d at 762; *Rios v. Buffalo & Fort Erie Pub. Bridge Auth.*, 326 F. App'x 612, 613-14 (2d Cir. 2009); see, e.g., *Dayes v. Pace Univ.*, 2 F. App'x at 207 (Defendant's "comments and behavior, although boorish and inappropriate, simply do not rise to the level of behavior necessary for a jury reasonably to conclude that they were sufficiently severe or pervasive to alter the condition of [plaintiff]'s employment."). [*42] 19 "Thus, harms suffered in the workplace are cognizable under Title VII, even when they are not the result of 'tangible employment actions,' if they arise from conduct (1) that is 'objectively' severe or pervasive -- that is, if it creates 'an environment that a reasonable person would find hostile or abusive' [the 'objective' requirement], (2) that the plaintiff 'subjectively perceive[s]' as hostile or abusive [the 'subjective' requirement], and (3) that creates such an environment because of plaintiff's . . . characteristic protected by Title VII [the 'prohibited causal factor' requirement]." *Gregory v. Daly*, 243 F.3d 687, 691-92 (2d Cir. 2001) (citations omitted, bracketed material in original); see also, e.g., *Robinson v. Harvard Prot. Servs.*, 495 F. App'x 140, 141 (2d Cir. 2012).

19   See also, e.g., *DeSalvo v. Volhard*, 312 F. App'x 394, 397 (2d Cir.), cert. denied, 558 U.S. 932, 130 S. Ct. 70, 175 L. Ed. 2d 233 (2009); *Slaitane v. Sbarro, Inc.*, 2004 U.S. Dist. LEXIS 9839, 2004 WL 1202315 at *13; *Williams v. N.Y.C. Dep't of Sanitation*, 2001 U.S. Dist. LEXIS 15594, 2001 WL 1154627 at *13.

Isolated incidents of discriminatory comments or conduct are not sufficient to establish a hostile work environment. E.g., *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 2283, 141 L. Ed. 2d 662 (1998) ("'[S]imple teasing,' . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"); *Harris v. Forklift Sys., Inc.*, 510 U.S. at 21, 114 S. Ct. at 370 ("'mere utterance of an . . . epithet which engenders offensive feelings in an employee,' . . . does not sufficiently affect the conditions of employment to implicate Title VII"); *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006) ("Isolated incidents [*43] typically do not rise to the level of a hostile work environment unless they are 'of sufficient severity' to 'alter the terms and conditions of employment as to create such an environment.' Generally, 'incidents must be more than episodic; they must be sufficiently

continuous and concerted in order to be deemed pervasive.'" (citations omitted)); *Petrosino v. Bell Atl., 385 F.3d 210, 223 (2d Cir. 2004)* ("Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment.").[20] "Among the factors [the courts] consider are 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [the] employee's work performance.'" *Feingold v. New York, 366 F.3d at 150* (quoting *Harris v. Forklift Sys., Inc., 510 U.S. at 23, 114 S. Ct. at 371*).[21]

20   See also, e.g., *Byrne v. Telesector Res. Grp., Inc., 339 F. App'x 13, 18 (2d Cir. 2009)* (isolated incidents of offensive misconduct "do not rise to a sufficiently serious level to manifest a work environment 'permeated with discriminatory intimidation'"); *DeSalvo v. Volhard, 312 F. App'x at 397; Feingold v. New York, 366 F.3d at 150* ("'As a general rule, incidents must be more than "episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive."'"); *Holtz v. Rockefeller & Co., 258 F.3d 62, 75 (2d Cir. 2001)* ("'[S]imple teasing, offhand comments, and isolated incidents (unless extremely [*44] serious) will not amount to discriminatory changes in the terms and conditions of employment.'"); *Rizzo-Puccio v. Coll. Auxiliary Servs., Inc., No. 99-9272, 216 F.3d 1073 (table), [published in full-text format at 2000 U.S. App. LEXIS 14116] 2000 WL 777955 at *3 (2d Cir. June 14, 2000)* ("[I]solated remarks or occasional episodes of harassment do not constitute a hostile environment within the meaning of Title VII."); *Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768 (2d Cir. 1998)* ("As a general matter, 'isolated remarks or occasional episodes of harassment will not merit relief under Title VII; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive.'"), abrogated on other grounds by *AMTRAK v. Morgan, 536 U.S. 101, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002); Slaitane v. Sbarro, Inc., 2004 U.S. Dist. LEXIS 9839, 2004 WL 1202315 at *13; Diaz v. Weill Med. College, 02 Civ. 7380, 2004 U.S. Dist. LEXIS 2054, 2004 WL 285947 at *18 (S.D.N.Y. Feb. 13, 2004)*

(Peck, M.J.) (& cases cited therein), aff'd, *138 F. App'x 362 (2d Cir. 2005)*.

21   Accord, e.g., *Aulicino v. N.Y.C. Dep't of Homeless Servs., 580 F.3d at 82; Patane v. Clark, 508 F.3d at 113; Demoret v. Zegarelli, 451 F.3d at 149-50; Mormol v. Costco Wholesale Corp., 364 F.3d at 58; Terry v. Ashcroft, 336 F.3d at 148; Slaitane v. Sbarro, Inc., 2004 U.S. Dist. LEXIS 9839, 2004 WL 1202315 at *13*; see also, e.g., *Clemente v. N.Y. State Div. of Parole, 01 Civ. 3945, 2004 U.S. Dist. LEXIS 16881, 2004 WL 1900330 at *12 (S.D.N.Y. Aug. 24, 2004)* ("As for pervasiveness, the Court concludes that six occurrences of relatively mild workplace difficulty over the course of a year do not, as a matter of law, constitute 'pervasive' harassment.").

**B. Orlando's Allegations Establish A Hostile Work Environment Claim Under The NYSHRL**

Defendants assert that the showing of the Hitler video at the Amsterdam off-site meeting was neither objectively hostile, nor sufficiently severe or pervasive to create a hostile work environment. [*45] (Dkt. No. 75: Def. Br. at 16-21.)[22] A single incident must be "extraordinarily severe" to create a hostile work environment. *Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000)*, superceded by regulation other grounds by, N.Y.C. Local L. No. 85; see also, e.g., *Williams v. N.Y.C. Hous. Auth., 154 F. Supp. 2d 820, 825-26 (S.D.N.Y. 2001)* ("The display of a noose would fall within this category of intimidating conduct. The fact that a white supervisor was displaying the noose obviously intensifies the intimidating effect. Thus, even though there may not have been a large number of isolated remarks or actions, the severity of the conduct at issue, if proven, would be sufficient to establish a hostile work environment." (fn. omitted)).

22   The parties do not dispute that as a supervisor Auld's behavior is imputed to BNPP. See, e.g., *Jackson v. N.Y. State Dep't of Labor, 09 Civ. 6608, 2013 U.S. Dist. LEXIS 20511, 2013 WL 449894 at *4 (S.D.N.Y. Feb. 6, 2013)* ("A supervisor's conduct creating a hostile work environment is imputed to the employer under principles of agency.") (citing *Murray v. N.Y. Univ. Coll. of Dentistry, 57 F.3d 243, 249 (2d Cir. 1995)* (employer's liability for supervisor's conduct creating hostile work environment is

"absolute"))).

As an initial matter, Orlando has demonstrated that he subjectively perceived that the Hitler video made his work environment hostile. (See Dkt. No. 86: Orlando Aff. ¶ 62 ("Following the second screening, Orlando became [*46] emotionally distressed and upset . . . ."); id. ¶ 65 (following the first screening Orlando expressed his "deep" and "extreme" offense to two supervisors); id. ¶ 65 ("Orlando was so distressed after the second screening that he immediately spoke with his rabbi . . . [and] 'expressed a concern about the fact that [he] would work with Eric Auld going forward.'"); id. ¶ 73 (Orlando met with Auld after the seminar to express that he was "deeply hurt" by the video); Dkt. No. 88: Stern Aff. Ex. 91: Orlando Dep. at 100 ("I discussed . . . with my rabbi, Benji Silverman, when I came back what should be the appropriate action."); Dkt. No. 92: Egan Reply Aff. Ex. 6: Orlando Dep. at 265 ("In my house, suffering multiple panic attacks, very, very difficult moment for my family in November 2012.").)[23]

> 23   The standard is subjective. Thus, while Mel Brooks' play and movie "The Producers" were very successful, Orlando found them offensive. (Orlando Aff. ¶ 69.) Of course, Orlando could avoid "The Producers," but could not avoid the workplace showing of the Hitler video at issue in this case.

As to the video's severity, BNPP's internal disciplinary report regarding the video's co-creator, former BNPP employee [*47] Clive Banks, noted that "Hitler is considered to have been one of the most odious historical figures." (Stern Aff. Ex. 87: 2/5/13 Report for Clive Banks at 2.) The report further found:

> The content of the video (including the alterations introduced by the subtitles) was not appropriate for use at a business offsite run on behalf of an international bank. . . . [Banks'] . . . judgment in proceeding with the video was poor. His assessment that the risk of running such footage was negligible or low clearly failed to take into account the potential for such footage to be interpreted in different ways and to cause offense. . . . Hitler is considered to be one of the most odious historical figures. For the [disciplinary] Panel there

is a clear difference between an individual choosing at their discretion to watch a film about Hitler or YouTube footage of this clip in their own time and being forced to watch it twice as part of an Offsite (where they cannot switch off/leave if it makes them feel uncomfortable). Given the multiracial/multinational audience at the Offsite (which also, no doubt, represented diverse religious beliefs), the [disciplinary] Panel believes that alluding to such [*48] a major world conflict and specifically to the Nazi regime in a corporate context, when it may have represented painful and difficult memories for the members of the audience or their families, clearly was not appropriate. . . . [T]he [disciplinary] Panel has evidence from several sources that [the video was not universally well received]. . . . [Banks] did not consider the views of Jewish participants.

(Stern Aff. Ex. 87: 2/5/13 Report for Clive Banks at 1-2.)

Courts in this Circuit and elsewhere have noted that the Nazi regime and swastika are symbols of hatred capable of arousing fear and intimidation. See, e.g., *United States v. Figueroa, 548 F.3d 222, 228 (2d Cir. 2008)* ("It was apparently, and understandably, assumed by the district court and the parties that the swastika is commonly associated with white supremacism and neo-Nazi groups harboring extreme forms of racial, religious and ethnic hatred and prejudice against minority groups . . ."); *Lake v. AK Steel Corp., No. 03-CV-517, 2006 U.S. Dist. LEXIS 25118, 2006 WL 1158610 at *26 (W.D. Pa. May 1, 2006)* ("Swastikas are a symbol of a regime of hatred unparalleled in world history. That regime was dedicated to the oppression of those of Jewish heritage through genocide. The symbol is one of hatred and oppression."); *Williams v. N.Y.C. Hous. Auth., 154 F. Supp. 2d at 824* ("Those of us for whom a particular symbol is just that--a symbol-- may have difficulty [*49] appreciating the very real, very significant fear that such symbols inspire in those to whom they are targeted. No less than the swastika or the Klansman's hood, the noose in this context is intended to arouse fear." (quoting *Vance v. Southern Bell Tel. & Tel. Co., 983 F.2d 1573, 1583 (11th Cir.1993)* (Fay, C.J., dissenting), cert. denied, *513 U.S. 1155, 115 S. Ct. 1110,*

*130 L. Ed. 2d 1075*)); *Turner v. Barr*, 811 *F.Supp. 1, 3 (D.D.C. 1993)* (supervisor's comment about the Holocaust supported Jewish employee's claim of religious discrimination); *Tillmon v. Garnett Corp., No. 97 C 8212, 1999 U.S. Dist. LEXIS 11972, 1999 WL 592119 at *3 n.1 (N.D. Ill. Aug. 2, 1999)* ("[P]laintiff's claim that a swastika was carved into his tool box could be objectively considered extremely serious.").

Orlando has presented evidence to demonstrate that at a mandatory work seminar he was made to watch a video that included actors portraying Hitler and soldiers in Nazi uniform including swastika armbands, and various spoken references to the Nazi regime, including the phrases "Third Reich," "my Fuhrer," "Goebbels," and "a large Polish operation." (See pages 3-4 above.) Orlando additionally presented evidence that the same video was played a second time despite his complaints to management that it offended him as a Jewish person. (See page 6 above.)

Moreover, the Hitler video was not played in a vacuum. Orlando testified at his deposition that his colleagues made a number of anti-Semitic comments during his [*50] tenure at BNPP. (Dkt. No. 82: Egan Aff. Ex. 5: Orlando Dep. at 47-56, 76-77). While defendants correctly assert that claims premised on these remarks are time-barred (Def. Br. at 19 n.16), Orlando "may 'us[e] the prior [time-barred] acts as background evidence in support of a timely claim' of workplace discrimination." *MacMillan v. Millennium Broadway Hotel, 09 Civ. 6053, 2011 U.S. Dist. LEXIS 106295, 2011 WL 4357523 at *5 (S.D.N.Y. Sept. 16, 2011)*.[24] Accordingly, the Court finds that Orlando has presented sufficient evidence to allow a reasonable jury to conclude that he was subjected to a hostile work environment because of the two showings of the Hitler video at the mandatory conference. Defendants' summary judgment motion thus is DENIED as to Orlando's NYSHRL hostile work environment claim.

24   Defendants additionally assert that "there is no evidence that the video was directed at Orlando." (Def. Br. at 19.) Discriminatory conduct need not be "directed at" an employee in order to create an environment that is hostile because of the employee's protected characteristic. See, e.g., *Little v. Nat'l Broad. Co., 210 F. Supp. 2d 330, 389-91 (S.D.N.Y. 2002)* (employee's observation of Ku Klux Klan robes and a noose with a colleague's name on it

sufficient to support a hostile work environment claim); *Jones v. N.Y.C. Dep't of Corr., 99 Civ. 10031, 2001 U.S. Dist. LEXIS 2669, 2001 WL 262844, at *5 (S.D.N.Y. Mar. 15, 2001)* [*51] ("Incidents need not be in the plaintiff's presence or directed at the plaintiff to support his hostile work environment claim." (citing *Schwapp v. Town of Avon, 118 F.3d 106, 111-12 (2d Cir.1997)*)); see also, e.g., *Schwapp v. Town of Avon, 118 F.3d at 111* ("Just as a racial epithet need not be directed at a plaintiff in order to contribute to a hostile work environment, the fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor also can impact the work environment." (citations omitted)); *Thomas v. iStar Fin., Inc., 438 F. Supp. 2d 348, 362 (S.D.N.Y. 2006)* ("Since the Court must consider the totality of circumstances in hostile work environment actions, it need not limit its inquiry to evidence of racially charged comments made in [plaintiff's] presence or directed at him particularly."), aff'd, *629 F.3d 276 (2d Cir. 2010)*.

## C. Orlando's Allegations Establish A Hostile Work Environment Claim Under The NYCHRL

Claims under the NYCHRL must be reviewed "separately and independently from any federal and state law claims." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013)*; see also *Armstrong v. Metro. Transp. Auth., 07 Civ. 3561, 2015 U.S. Dist. LEXIS 27758, 2015 WL 992737 at *6 (S.D.N.Y. Mar. 3, 2015)* ("federal and state civil rights laws [are] a floor below which the City's Human Rights law cannot fall"). "In determining whether a claim of hostile work environment survives summary judgment under the NYCHRL, the relevant consideration [*52] is whether there is a triable issue of fact as to whether the plaintiff has been treated less well than other employees because of his or her protected status." *Armstrong v. Metro. Transp. Auth., 2015 U.S. Dist. LEXIS 27758, 2015 WL 992737 at *6* (quotations omitted). Because Orlando has adequately demonstrated a claim under the NYSHRL, he has also done so under the broad and remedial standards of the NYCHRL. See, e.g., *Pryor v. Jaffe & Asher, LLP, 992 F. Supp. 2d 252, 260 (S.D.N.Y. 2014)*; *Armstrong v. Metro. Transp. Auth., 2015 U.S. Dist. LEXIS 27758, 2015 WL 992737 at *6*.

Case 3:14-cv-02404-ARC   Document 62-2   Filed 11/21/16   Page 21 of 99

Page 20
2015 U.S. Dist. LEXIS 143822, *52

## V.   AULD   AND   OLIVEIRA'S   INDIVIDUAL LIABILITY

Orlando contends that Auld and Oliveira violated NYSHRL § 290 "by aiding, abetting, inciting and coercing" the "unlawful discrimination." (Dkt. No. 2: Compl. ¶¶ 268-72.) As a preliminary matter, Orlando presents neither argument nor evidence to support a finding that Oliveira individually is liable for any of the conduct alleged. (See generally Dkt. No. 85: Orlando Opp. Br.) Summary judgment thus is GRANTED as to Orlando's aiding and abetting claim against Oliveira.

As to Auld, Orlando argues that Auld is personally liable under the NYSHRL and NYCHRL for retaliatory conduct and creating a hostile work environment. (Orlando Opp. Br. at 18, 21.) Because Orlando's complaint alleges only claims for individual liability under the NYSHRL (Compl. ¶¶ 266-69), the Court will not consider any claim under the NYCHRL. See e.g., *Kleinman v. Elan Corp., plc,* 706 F.3d 145, 153 (2d Cir. 2013) [*53] ("a party may not amend pleadings through a brief"); *WSP USA Corp. v. Marinello,* 13 Civ. 4591, 2013 U.S. Dist. LEXIS 178419, 2013 WL 6704885 at *5 n.1 (S.D.N.Y. Dec. 19, 2013)* ("To the extent that plaintiff, for the first time, asserts a [new] claim in its motion papers, parties may not amend pleadings through statements in briefs.").

NYSHRL § 296(6) provides that it shall be an unlawful discriminatory practice "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so." *N.Y. Exec. Law § 296(6).* "The Second Circuit has read § 296(6) broadly to find that supervisors and co-workers can be liable pursuant to this section even if they do not have the ability to hire and fire employees, so long as they 'actually participate[d] in the conduct giving rise to the discrimination.'" *Setelius v. Nat'l Grid Elec. Servs. LLC, No. 11-CV-5528, 2014 U.S. Dist. LEXIS 134789, 2014 WL 4773975 at *34 (E.D.N.Y. Sept. 24, 2014)* (quoting *Feingold v. New York,* 366 F.3d 138, 157 (2d Cir. 2004) (alteration omitted)); see also, e.g., *McArdle v. Arms Acres, Inc.,* 03 Civ. 5721, 2009 U.S. Dist. LEXIS 23373, 2009 WL 755287 at *13 (S.D.N.Y. Mar. 23, 2009).*

Orlando has submitted evidence demonstrating that Auld partook in creating the Hitler video and showing it at the Amsterdam off-site. (See page 3 above.) Orlando complained to Auld (and De Lambilly) that he found the video offensive following its first screening, and De Lambilly separately relayed Orlando's complaint to Auld. (See page 4 above.) The Hitler [*54] video nevertheless was shown in full a second time, without Auld's preventing or interrupting it, which as the co-host of the off-site seminar he was in a position to do. (See pages 3-4 above.) Orlando has submitted evidence that when he complained after the fact about the Hitler video, Auld threatened his career. (See pages 4-5 above.) Finally, Orlando has submitted evidence that within months of that complaint, his bonus compensation was reduced from previous years' levels and his position in New York was terminated, actions for which Auld was responsible. (See pages 5-6 above.)

These allegations are sufficient to give rise to a question of fact as to whether Auld participated in the conduct giving rise to Orlando's hostile work environment and retaliation claims. See, e.g., *Delisi v. Nat'l Ass'n of Prof'l Women, Inc.,* 48 F. Supp. 3d 492, 496 (E.D.N.Y. 2014); *Stathatos v. Gala Res., LLC,* 06 Civ. 13138, 2010 U.S. Dist. LEXIS 50511, 2010 WL 2024967 at *8 (S.D.N.Y. May 21, 2010)* (defendants "aided and abetted the creation of a hostile work environment by participating in the harassing behavior and by not acting to prevent others from engaging in harassing behavior."). Accordingly, summary judgment is DENIED as to Orlando's aiding and abetting claims against Auld.

## V.   ORLANDO'S   EMPLOYMENT DISCRIMINATION CLAIMS ARE WAIVED

Orlando has provided [*55] neither evidence nor argument to support his first, second, third and fourth claims for relief, for unlawful employment discrimination based on religion. (Dkt. No. 2: Compl. ¶¶ 211-27.) Accordingly, the Court considers them abandoned. See, e.g., *Fenn v. Verizon Communs., Inc.,* 08 Civ. 2348, 2010 U.S. Dist. LEXIS 23831, 2010 WL 908918 at *11 (S.D.N.Y. Mar. 15, 2010)* (collecting cases).

## CONCLUSION

For the reasons set forth above, defendants' summary judgment motion (Dkt. No. 66) is GRANTED as to Orlando's employment discrimination claims, Title VII claims for hostile work environment and retaliation as to his bonus (since both are time barred), and NYSHRL claim for individual liability as to Oliveira. Defendants' summary judgment motion is DENIED in all other

2015 U.S. Dist. LEXIS 143822, *55

respects.

    The Joint Pretrial Order is due November 25, 2015.

    SO ORDERED.

    Dated: New York, New York

October 22 , 2015

/s/ Andrew J. Peck

**Andrew J. Peck**

United States Magistrate Judge



JEFFREY C. LAKE and GERALD PATTERSON and EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiffs, v. AK STEEL CORPORATION, Defendant.

2:03cv517

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

*2006 U.S. Dist. LEXIS 25118*

April 27, 2006, Decided

**COUNSEL:** [*1] For JEFFREY C. LAKE, VICKIE PATTERSON, Administratrix of the Estate of Gerald Patterson, Plaintiffs: John W. Murtagh, Murtagh & Cahill, Wexford, PA.

For EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff: Judith A. O'Boyle, Equal Employment Opportunity Commission, Philadelphia, PA; M. Jean Clickner, Equal Employment Opportunity Commission, Pittsburgh, PA.

For AK STEEL CORPORATION, Defendant: Cathy Bissoon, Shweta Gupta, Reed Smith, Pittsburgh, PA.

**JUDGES:** David Stewart Cercone, United States District Judge.

**OPINION BY:** David S. Cercone

**OPINION**

Plaintiffs Jeffrey Lake and Gerald Patterson ("Lake and Patterson") commenced this civil rights action seeking redress for discrimination in the terms and conditions of employment based upon alleged unequal treatment on account of their race, African American. Their amended complaint sets forth causes of action for race discrimination in violation of *42 U.S.C. § 1981*, Title VII and the Pennsylvania Human Relations Act

("PHRA"). Lake and Patterson's claims stem from specific instances of discipline alleged to be discrete acts of invidious race discrimination occurring within an environment asserted to be permeated with [*2] racial hostility and ridicule. They seek an award for lost wages and benefits, compensatory damages, and punitive damages. They also seek injunctive relief directing defendant to (1) institute and carry out appropriate diversity training programs, (2) destroy all written derogatory comments and disciplinary files regarding them, (3) expunge all references to the circumstances of any such discipline, and (4) award all other relief deemed appropriate by the court.

The Equal Employment Opportunity Commission ("EEOC") commenced a related action at Civil Action No. 03-1321 seeking partly overlapping relief on behalf of a class of eight minority workers ("class members") that includes plaintiffs Lake and Patterson, which the court consolidated with Lake and Patterson's action on August 26, 2004. The EEOC seeks both damages and injunctive relief to redress the class members' asserted exposure to a racially hostile work environment.

Plaintiffs Lake and Patterson present claims of individual disparate treatment that assertedly occurred as part of the general hostile work environment underlying the claim brought by the EEOC on behalf of all class members. They allege that over a substantial [*3] period

of time defendant has permitted an environment to exist and flourish in which (1) the use of racial epithets, insults and slogans are tolerated and go unpunished; (2) security personnel and contractors are permitted to display flags and emblems that reflect racial hostility; (3) persons of color are subjected to unwanted horse play, offensive touching, verbal abuse and/or disrespect on account of their race and perpetrators of such conduct are not punished; (4) they have been denied an equal opportunity to train and advance in job openings in comparison to the opportunities provided to white employees; (5) their supervisors have discriminatorily enforced plant rules with respect to attendance, safety, and personal deportment against them and other persons of color; (6) their supervisors are permitted to discriminate on the basis of daily assignments, job requirements, procedures and protocols by demanding more scrupulous performance or observance of the same by non-white employees; (7) they are subjected to drug testing and medical examinations more frequently than their white counterparts; (8) they and other persons of color have been intimidated on account of their race, threatened [*4] with discharge, and discharged based upon false and/or incorrect information, and only reinstated after prolonged, enforced suspensions from employment; (9) defendant has been willfully blind to the complaints they and others have made about the environment and the disparate actions of their supervisors; (10) retaliation has been taken against them and others who have complained about the hostile atmosphere; and (11) a system of peonage, oppression and fear has developed against persons of color.

The EEOC seeks to establish that all class members were required to work in a hostile environment wherein the use of racial slurs and epithets were prevalent, racial graffiti and symbols of white supremacy were routinely displayed and minority employees were ridiculed and humiliated by co-workers and supervisors. Defendant failed to implement effective measures to eradicate and prevent the offensive environment and led employees to believe they would be subject to retaliation if they complained about the environment or assisted others who did. Through these actions defendant assertedly tolerated and condoned a racially hostile work environment.

Defendant has moved for summary judgment as [*5] to all claims on the grounds that it had legitimate, non-discriminatory reasons for any adverse actions taken or employment decisions made regarding any class

member, including Lake and Patterson, which actions and decisions cannot be shown to be pretext. [1] In addition, all of plaintiffs' claims predicated on a hostile work environment fail because it purportedly cannot be held liable for any conduct occurring before it acquired the plant on September 30, 1999, and it took prompt remedial action under its antidiscrimination policy on any harassment brought to its attention thereafter. Consequently, plaintiffs cannot overcome the legal effect from defendant's maintenance and administration of that policy. Finally, defendant asserts Lake and Patterson failed to exhaust their PHRA claims and the record will not support the imposition of punitive damages.

> 1  Defendant's motion for summary judgment on Lake and Patterson's claims was filed before the cases were consolidated. Defendant subsequently filed a motion for summary judgment on the claim brought by the EEOC on behalf of the class members. The court will reference Lake and Patterson's and the class members' claims separately as appropriate and will use the term "plaintiffs" to refer all class members and claims collectively.

[*6]  Plaintiffs maintain that the evidence of record is more than sufficient to support the existence of a racially hostile work environment attributable to defendant. Lake and Patterson further argue the record will support findings that they have been the victims of discrimination within this environment at the hands of their supervisors, and each has been terminated pursuant to standards and practices not applied to white employees. These challenged standards and practices have been found to be inappropriate under the controlling collective bargaining agreement by separate arbitrators. Lake and Patterson further assert they have been disciplined and/or suspended under similar circumstances, and, from their perspective, these tangible employment actions remove any impediment to liability that would otherwise arise from the existence of defendant's anti-discrimination policy. And plaintiffs argue that material issues of fact remain about the propriety and effectiveness of defendant's administration of its anti-harassment policy at the Butler Works in any event.

For the reasons that follow we agree that the record contains sufficient evidence to support liability against defendant on [*7] all of plaintiffs' claims and that

material issues of fact remain about the propriety and effectiveness of defendant's administration of its anti-harassment policy where it appropriately can be raised as an affirmative defense. Accordingly, defendant's motions for summary judgement must be denied.

*Federal Rules of Civil Procedure 56(c)* provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's claim, and upon which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. When the movant does not bear the burden of proof on the claim, [*8] the movant's initial burden may be met by demonstrating the lack of record evidence to support the opponent's claim. *National State Bank v. National Reserve Bank, 979 F.2d 1579, 1582 (3d Cir. 1992)*. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)* (quoting *Fed.R.Civ.P. 56(a), (e)*) (emphasis in Matsushita). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*.

It assessing whether material issues of fact remain for trial, the court must read the record in the light most favorable to the non-moving party. *GTE Corp. v. Allendale Mutual Insurance Co., 372 F.3d 598, 602 (3d Cir. 2004)*. It also must draw all reasonable inferences in that party's favor. *McCarthy v. Recordex Services, Inc., 80 F.3d 842, 847 (3d Cir. 1996)*. [*9] If the non-moving party's evidence merely is colorable or lacks sufficient probative force summary judgment must be granted. *Anderson, 477 U.S. at 249-50*; see also *Big Apple BMW, Inc. v. BMW of North America, 974 F.2d 1358, 1362 (3d Cir. 1992)*, cert. denied, *507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993)* (although the court is not permitted to weigh facts or competing inferences, it is no longer required to "turn a blind eye" to the weight of the evidence).

The record as read in the light most favorable to plaintiffs reveals the backdrop that follows. All class members work or worked for defendant at its plant in Butler, Pennsylvania, know as AK Steel's Butler Works. The Butler Works is a large industrial plant covering over 1300 acres. Defendant acquired the plant from Armco, Inc., on September 30, 1999. Defendant manufacturers electrical parts and stainless steel at the Butler Works and employs more than 1,900 individuals at the plant. The workforce at the Butler Works is less than three percent minority. Fewer than twenty workers are African American.

Lake and Patterson were union employees covered by a 1996 collective bargaining agreement between the [*10] Butler Armco Independent Union and Armco, which AK Steel was obligated to honor upon its acquisition of the plant. In 2001, the union and AK Steel entered into a new collective bargaining agreement.

Lake is a member of the plant's hourly labor department and was working at the time in question as a van driver for the "stores department." He continued to work in that department at all relevant times. Patterson was a member of the hourly cold mill department and was working during the time in question as a utility worker. He continued to work for defendant until May of 2004, when he resigned. [2]

> [2] Patterson met an untimely demise on March 9, 2005. On June 13, 2005, the administratrix of his estate was substituted as a party plaintiff.

Lake became employed at the Butler Works in 1979. Over the next 22 years he worked in a number of positions within the labor department and for numerous supervisors. These positions included laborer, grounds keeper helper, grounds keeper, sewer man helper, sewer man, truck washer, [*11] truck repair shop helper and truck driver. During this time Lake had an unblemished record except for one minor incident involving the failure to wear safety glasses in a restricted area.

Prior to 1998 Lake successfully bid on a driver position in the labor trucks department. In 1998 Lake

requested and received an assignment as a van/truck driver for the storeroom department ("storeroom"). The storeroom is the central place of distribution for most packages delivered to the plant. As a van driver within the department Lake was required to deliver packages throughout the mill, like a UPS driver. In addition to Lake there were two other storeroom delivery drivers, another van driver and a stake truck driver. [3] Lake maintained this position without incident over the next three years.

> [3]   The stake truck was used to deliver significantly larger and heavier items that at times required the use of a forklift.

In January of 2001, Joan McGarvey ("McGarvey") became the supervisor of the storeroom. Although Lake formally [*12] worked out of the labor trucks department, he also came under the supervision of McGarvey because his duties were centralized in the storeroom.

Prior to January of 2001, employees in the storeroom were permitted to utilize what was known as "flextime," which meant that the employee could elect to commence his shift at 6:00, 6:15 or 6:30 a.m., and work for eight hours thereafter. Prior to McGarvey becoming the supervisor of the storeroom Lake made his election on a daily basis. After McGarvey became supervisor, she eliminated Lake's ability to utilize a daily "flex" schedule. McGarvey insisted Lake pick a set starting and ending time and if he failed to do so she unilaterally set Lake's daily schedule.

In April of 2001, Lake was required to deliver a shipment of pocket knives that were to be given as a safety award. The original order was for 125 knives, and a box of knives purportedly containing that number was received in the storeroom. Lake was directed to deliver the box to the silicone processing department, which had an upstairs office off the beaten trail. Lake delivered the package to the downstairs office in the department and was advised by the supply person on duty that [*13] delivery in that manner was sufficient and effective. Lake did not obtain the signature of the employee who accepted the knives at the silicone processing department, but his delivery of the package to the downstairs office in that manner was common and acceptable protocol for the delivery/receipt of similar packages. The silicone processing clerk subsequently picked up the package and took it to her office. There was no evidence that the box

had been tampered with and the packing slip was inside, as normal. The clerk gave the box to another employee who was involved in distributing the safety awards and she subsequently determined that there were only 115 knives in the package. Based on the condition of the box when received and the surrounding circumstances, the silicone processing clerk formed the belief that the vendor had shipped the order short.

Upon learning that the order was short, McGarvey confronted Lake and directed him to go back to silicone processing and find the missing knives before the end of the day. She did so in a demeaning and humiliating manner, implying that Lake had stolen the knives. McGarvey did not question any other employee before confronting Lake and [*14] implying that he was responsible for the missing knives. Lake went back and talked to the silicone processing clerk, but was unable to determine what had happened to the knives.

When McGarvey implied that Lake was responsible for the missing knives and knew of their location, Lake became upset and raised his voice in a defensive and agitated manner. This reaction was understandable given the nature of McGarvey's inquiry and directives. During the course of the conversation Lake became more agitated. At one point during a subsequent exchange with Randolph Lake referred to McGarvey as the "god damn lady." Randolph told Lake to calm down. After Lake became more agitated, McGarvey ended the conversation and returned to her office.

A short time later Lake and Randolph continued to discuss the incident and Lake was talking very loudly. McGarvey and Randolph again attempted to calm him down. At the end of the conversation Lake turned and said as he was walking away: "fucking lady." Although using foul and abusive language, Lake did so as he was walking away and did not make either statement to McGarvey's face.

Subsequently, defendant determined that Lake had violated the plant rules prohibiting [*15] abusive language and disorderly conduct by directing foul language at a supervisor. Lake was suspended for ten days and informed that "similar behavior of this nature may lead to further disciplinary action, up to and including discharge."

In the summer of 2001, Lake approached defendant's manager of human resources at the Butler Works, Rick

Winter, about filing a complaint for harassment, but elected not to do so after Winter advised Lake that there were no forms to fill out and Lake would just verbally have to apprise Winter about any matter he wished to raise. Approximately one week later, Winter contacted Lake out of a concern that he was not reporting workplace harassment. Lake and Winter met on August 15, 2001, and Lake complained about the treatment he was receiving from McGarvey.

McGarvey had formed the belief that Lake was "killing time" during the workday. [4] Lake in turn had formed the belief that McGarvey, and two other salaried employees, Cheryl Moodie and Denny Randolph, were checking on his whereabouts near the end of his shift. Randolph, who previously had held a salaried position in inventory control and worked as a temporary supervisor in the storeroom under McGarvey, [*16] had been directed by McGarvey to monitor Lake at the beginning and end of each day to assure that he was timely reporting to work and performing work-related tasks throughout the entire shift. McGarvey and Randolph also developed and implemented a requirement that delivery personnel receive a signature for each delivered package and record the date and time of delivery on each invoice. McGarvey developed these requirements so she could monitor Lake's whereabouts throughout the day. McGarvey and Randolph believed this was an effective way to "watch" Lake and assure he went from place to place in the most efficient way. This policy was not enforced with regard to the stake truck driver or the other van driver. McGarvey had never received reports of the other two drivers within the department "killing time", nor had she ever attempted to monitor a white employee's compliance with the daily work schedule.

> 4 McGarvey claimed to have received reports from an unidentified source that Lake was "killing time" near the end of his shift. However, McGarvey has never been able to identify the source of these reports.

[*17] In the meeting with Winter, Lake voiced his concern that McGarvey had singled him out for special treatment. Winter developed various interview questions and assigned an individual under his control, Leslie Bergbigler, to interview McGarvey, Moodie and Randolph regarding Lake's allegations of disparate treatment. Bergbigler's investigation produced a determination that McGarvey had placed an emphasis on

efficiency and productivity when she took over the department and had developed new protocols for carrying out various tasks. Everyone was required to comply with the new procedures. Winter accepted the statements of the supervisors denying any improper intent and Bergbigler's conclusions without hesitation. He summarily dismissed any contrary allegations by Lake.

On August 20, 2001, McGarvey announced a new routing and tracking procedure. In response, Lake asserted his seniority rights permitted him to drive the stake truck and indicated he would begin driving it the next day. McGarvey stated she was unfamiliar with and did not know whether seniority rights could be used to claim a specific position within the storeroom. After further discussion, the members of the storeroom department [*18] could not reach a consensus, and McGarvey agreed to investigate the matter. She then directed each employee to continue in their current position until clarification was obtained.

The following day Lake reported to the acting foreman in the trucks department and asked if McGarvey had contacted him regarding whether seniority permitted an employee to operate the stake truck. She had not. Lake then reported to the storeroom and saw a note from McGarvey on the bulletin board indicating she had not yet resolved the issue, but was continuing to investigate. The note directed the employees to continue in their prior positions. It also assigned a priority delivery to Lake. Lake decided not to drive the van and continued with his own investigation into the impact of seniority rights with regard to specific job assignments in the storeroom.

After a few hours Randolph approached Lake and began to question him about the performance of his duties that morning. Lake obtained a union representative and then reported to McGarvey's office. McGarvey expressed concern about the four hours that had elapsed and Lake's failure to do any work, in specific contravention of her order directing him to drive [*19] the van and make priority deliveries. McGarvey gave Lake a five day suspension with intent to discharge for failing to perform work, disregarding a directive, and leaving the work site.

Lake protested the suspension and raised the issue of whether he was required to take instruction from McGarvey. Because the reporting structure within the company was not clear, Lake was permitted to return to work after an eighteen day suspension.

On September 26, 2001, McGarvey ascertained that Lake had delivered several packages without obtaining signatures on the packing slip. McGarvey posted the new delivery procedures on the bulletin board and gave each driver a copy, including Lake. The drivers were reminded that all deliveries except for those made with the stakes truck required a recipient's signature. Otherwise, the item was to be returned to the storeroom until a signature could be obtained. In light of Lake's failure to obtain signatures, McGarvey directed Lake to meet with her personally and review the policy to ensure he understood it. Lake reported to McGarvey's office. McGarvey explained the importance of the procedures and Lake asked whether he needed union representation. McGarvey [*20] assured that the meeting concerned only the review of policy and that union representation was not necessary. She then handed him a copy of the delivery procedures and directed him to read item six aloud, which reflected the signature policy, in a demeaning and humiliating manner. Lake responded by reading item six loudly. [5] McGarvey reiterated the policy to Lake, but Lake refused to continue the conversation. Lake received a five day suspension for insubordinate refusal to converse with McGarvey about department procedure. McGarvey wrote a letter to Lake indicating his behavior could not continue, and similar behavior would lead to additional disciplinary action, including discharge.

[5] Lake has a naturally deep and loud voice.

On November 1, 2000, Lake placed on McGarvey's desk a copy of a written request to work seven hours that day. Lake did not include an explanation with the request although it was standard practice to do so. McGarvey summoned Lake to her office. A short time later McGarvey witnessed Lake [*21] making a xerox copy. McGarvey demanded an explanation because Lake was not permitted to use the copier for personal business without permission. Lake explained he was providing a reason for his request and believed this was obvious from the surrounding circumstances. Lake indicated he would provide the request as soon as the copying process was complete, but McGarvey insisted on an immediate verbal explanation. When it was not immediately forthcoming, McGarvey construed Lake's actions as insubordination. She then denied Lake's request and directed him to deliver two packages. Lake refused to deliver the packages until he had finished photocopying the request and explanation. McGarvey advised that failure to follow

the directive would lead to disciplinary action. When Lake refused to follow the directive, McGarvey directed him to leave the plant. Lake indicated he "wasn't going anywhere" and McGarvey summoned plant security to escort Lake from the plant.

From the start of the incident McGarvey confronted Lake in a manner that reflected hostility and mistrust. [6] Lake became startled and raised his voice with McGarvey. Lake did not hear McGarvey direct him to deliver packages before [*22] she told him to leave the plant, and believed he simply had been instructed to leave the plant. Lake insisted that security escort him from the plant out of fear of being accused of absenteeism. This fear was based on an earlier incident where he had been disciplined for leaving and was advised that he had to be escorted out by plant security under such circumstances. Lake was discharged after the November 30, 2001, incident. Lake's discharge was based in part on the fact that he had three prior incidents of unacceptable behavior in the past eight months.

[6] An arbitrator subsequently determined that "one could hardly imagine a better example of supervisory pettiness" and indicated McGarvey had adopted a policy of directing Lake through hectoring and abuse instead of leadership skills.

Lake grieved his discharge under the collective bargaining agreement. The arbitrator considered all four incidents wherein McGarvey charged Lake with insubordination and disrespect. He reached "the inescapable conclusion that [Lake] [*23] and [McGarvey] had developed a mutual hostility and mistrust for one another." And although Lake's misconduct was deemed significant, the arbitrator indicated that "his mistrust and hostility towards [McGarvey] may well have been provoked." The arbitrator found that McGarvey clearly had raised the inference of theft by the manner and tone in which she first questioned Lake about the missing knives. Similarly, the arbitrator determined that forcing Lake to read a department policy rule aloud in front of others was not instructive but demeaning and humiliating. This treatment justifiably led Lake to create a documentary record regarding his contacts with McGarvey whenever feasible, even though his insistence on the particular occasion in question might not have been justified. In light of the mutual hostility and mistrust that had developed in part due to McGarvey's "oppressive

management style," the arbitrator found discharge to be inappropriate and reduced the matter to a disciplinary suspension of sixty days.

Lake returned to work in February of 2002. On his first day back he suffered a brain aneurism and was life flighted to a Pittsburgh hospital. He was off work for a lengthy [*24] period of time and returned to work in 2003. In January of 2004, McGarvey had Lake's storeroom bid revoked and he was returned to the labor trucks section. [7]

> 7 Any claim for disparate treatment based on this employment action is not part of the instant action.

Patterson began working at the Butler Works on April 12, 1999. He held a variety of positions during his first year and then bid into the cold mill. Patterson worked in that department until July of 2003, when the number two tandem cold mill became idle. At that point he was transferred to employment reserve, which is defendant's plant wide labor pool.

Patterson developed an attendance problem while he worked in the cold mill department. On January 26, 2001, Patterson's immediate supervisor, Jeffrey Cordray, met with Patterson and a union representative to discuss his absenteeism. Between April of 2000 and January of 2001 Patterson had missed twenty-three days, which was unacceptable. During the meeting Patterson expressed genuine concern and indicated [*25] he understood the need to improve. Patterson committed to making such an improvement and Cordray issued a written warning that emphasized the need for immediate improvement in attendance, with the standard cautionary indication that further absenteeism could result in disciplinary action up to and including discharge. [8]

> 8 Cordray met with two other employees around the same time: Jeff Quast and Steve Putney. These employees also had missed several days in 2000 and had received written warnings based on their records of absenteeism.

Patterson's work attendance did not improve. One week later Patterson missed two days prior to a week of scheduled vacation. He missed another day shortly thereafter. On February 28, 2001, Patterson and union representatives met with Cordray to discuss the situation. Cordray reiterated the seriousness of Patterson's

absenteeism and emphasized the need for correction notwithstanding the personal issues Patterson was raising in mitigation. During the course of the meeting Cordray observed [*26] that Patterson had a tendency to miss work around scheduled vacations and on Fridays and Saturdays. Patterson again indicated he understood the seriousness of the situation and intended to improve. Cordray gave Patterson a one day suspension and warned that further absenteeism would result in additional discipline, up to and including discharge.

In early March, 2001, five coils produced in the cold mill department were incorrectly banded. The problem was traced to Patterson's unit. Cordray conducted an investigation and determined that three employees, including Patterson, were at fault. Each of the three were disciplined, but only Patterson received a three day suspension. The others received warnings. Cordray and defendant justified this difference based upon the employees' existing disciplinary records.

Patterson missed another day of work on March 16, 2001, which was one week after the disciplinary meeting concerning the improper banding incident. He also missed work on March 23, 2001, which was three days after he returned from the three day suspension imposed as a result of that incident. When Patterson returned to work on March 26, 2001, Cordray subjected him to a drug test [*27] on the premise that he had a suspicious pattern of absences. Patterson tested positive for cocaine and admitted he had used the drug.

On April 24, 2001, Cordray met with Patterson and a union representative to discuss Patterson's attendance. At that point Patterson had missed eight days in 2001, the last two of which were Fridays. Cordray accused Patterson of not taking his employment seriously, and on April 30, 2001, Patterson received a five day suspension with intent to discharge. He was discharged on May 6, 2001.

Cordray kept a large, color-coded calendar in plain view on his office wall depicting Patterson's absences. Cordray did not visually record the absences of any white employees in the department, notwithstanding similar attendance problems by Quast and Putney. These employees also were not drug tested. Cordray terminated Patterson following his first positive drug test. No white employee had ever been discharged following a first positive drug test. When confronted with an alleged violation of the collective bargaining agreement, Cordray

indicated the drug test had nothing to do with the discharge. A neutral arbitrator rejected this claim and determined Patterson had [*28] inappropriately been discharged for a first positive drug test. Patterson was reinstated. No other employee had ever been treated in this manner.

In May of 2003 a metal pin broke in the machine Patterson was operating. He was given a drug test following the incident, which was normal protocol under the circumstances. Patterson also had a mobile equipment card, although he never operated mobile equipment. All employees who have such cards must be randomly drug tested annually. The arbitrator ruled that defendant could randomly drug test Patterson two times following his return to work. Patterson submitted to the two drug tests, both of which were negative. These tests were in addition to the drug test following the break down of the machine in May of 2003. [9]

> 9   Quast and Putney were not drug tested during this period of time.

Each class member testified about the environment at the Butler Works. Class member Ronald Edwards ("Edwards") was hired in 1979 and experienced racial graffiti from that point on. The [*29] graffiti directed at him typically appeared in the restroom in the vicinity of his work site and made reference to "nigger Edwards" or "nigger Ron." Edwards regularly reported various incidents of racial graffiti between October of 1979 and January of 1983. In January of 1983 someone scratched "nigger Edwards" on his locker door. Edwards reported it. Around the same time additional writing on stairs and walls began to appear involving derogatory graffiti directed at Edwards' race. Several of these were references to "nigger Edwards." Edwards continued to report the matters to his supervisors. After it was reported the supervisors sprayed over the graffiti or tried to scratch it off. At times the graffiti continued to be visible through the attempted cover over. Nothing further was done.

Edwards eventually bid into another section of the mill and things went well for a while. Thereafter, however, the racial graffiti began to reappear. Edwards again reported it and nothing other than covering it over or attempting to do so was done by management. After a while Edwards stopped turning things in because nothing was ever done. He came to the realization that it had become "a way of life" [*30] at the Butler Works and inevitably he would have to endure the presence of racial

graffiti throughout his twenty-six years of employment.

Edwards continued to witness racial graffiti after AK Steel acquired the plant. More recent examples included the drawing of three male penises with the names "Artie," "Dave," and "Ron" above them, which appeared in the restroom at "Plant No. 2." [10] The drawings were fairly large in size and plainly visible inside a restroom stall used both by union and management employees. It was the only restroom in that general area of the mill. The graffiti remained throughout the Spring of 2003. Edwards and Potts subsequently discussed it and the two "just laughed" because it was nothing new.

> 10   Artie Johnson and Dave Potts are additional class members.

Edwards also recalled seeing graffiti in the restroom in the hot mill section of the main plant. There was a small standup urinal with a partition wall around it. Scrawled on the side was the statement "Nathan Vanderzee is a half breed [*31] nigger." This graffiti was plainly visible in September of 2003 and foreman and supervisors in that area used the urinal on a frequent basis. The graffiti was at eye level when facing the urinal.

A piece of paper appeared on the bulletin board in the machine shop in November of 2003. It stated:

> Wanted: Truck Drive
>
>     Want two short niggers for mudflaps, preferably with chrome tennis shoes.

The bulletin board was part of the main plant area. After finding the posting Edwards tore it down and did not report it or discuss it with others. Edwards had just recently started a job which required him to travel into that area, and he believed the posting was directed at him because of his race.

At various times in 2003 Edwards heard individuals using the term "sand niggers" and saw graffiti containing that phrase. He did not report these incidents to management or discuss them with others. He also heard talk referring to equipment being "nigger rigged," but again did not report the statements to management or discuss them with others.

In December of 2003 Edwards began running crane and was no longer on the plant floor regularly. He

frequently witnessed swastikas approximately twelve [*32] inches in size painted on a railroad car owned by defendant. The car regularly traveled from the melt shop to the hot mill. Edwards did not report the swastika but he was aware that class member George Holmes had reported them.

Class member David Potts experienced a similar environment. Periodically he heard people make derogatory comments using the word "nigger." Following the collapse of the World Trade Centers on September 11, 2001, graffiti appeared in the mill which stated "kill all the sand niggers." It was present in the bathroom by the vending machines at Plant No. 2. Potts worked in Plant No. 2 until it became slow and closed near the end of 2003. The graffiti in the restroom was right over the top of a urinal and remained there for some time until someone took a marker and drew a line through it. Even after that, it remained visible and legible.

Potts began working in the melt shop after Plant No. 2 closed. In the latter part of 2003 someone gouged into a door leading out of the melt shop graffiti the phrase "get rid of all the niggers here." The door was at the bottom of a set of stairs leading up to the masonry area where Potts was assigned. The phrase was scratched into [*33] the woodwork in approximately four inch letters and could be seen for some distance.

Potts also traveled into the cold mill after Plant No. 2 closed. There, he witnessed a picture of a stick figure, poignantly colored black, behind a jail window. Beneath the drawing was the phrase "Frosty ought to be behind bars for what he did." Potts later came to understand that Frosty was another African American employee and made the connection between the graffiti and the co-worker. Potts witnessed this incident sometime between 2002 and 2003, after work became slow at Plant No. 2 and he began traveling to various locations while working out of labor reserve.

Potts also witnessed numerous swastikas during the same time. A number of these were in restroom stalls and locker rooms as well as in various walking tunnels in the main plant. They also appeared just outside bathrooms on the walls. The swastikas often appeared by themselves and without additional writing. Potts witnessed at least ten separate swastikas that were commonly two or three inches in size. He perceived them to be aimed at any non-white individual.

Potts similarly witnessed the acronym "KKK" written on the walls. This symbol [*34] appeared at numerous locations in Plant No. 2. On one such occasion the acronym was written on a locker and remained there for at least six months before it was sprayed over pursuant to a plant wide campaign to remove graffiti conducted just prior to a scheduled EEOC visit. Potts was unaware of any prior spray-off campaign.

A Klansman was also present in the melt shop locker room. It was a full-bodied magic-marker drawing in the first or second stall in the men's locker room. It was about a foot in size. It was the typical robed depiction portraying a hood with two eye slits and a symbol of St. Andrew's cross on the hat and breast area of the robe. The locker room in the melt shop was one of the first encountered when entering the plant at the main entrance. Potts also was exposed to similar Klansman figures at various times while he worked in masonry in 2002 and 2003.

Potts couldn't help but feel that the graffiti throughout the plant was directed at his race. Its prevalence made him feel as if tension was in the air. This was particularly true because much of the graffiti appeared in locker rooms and bathrooms used by turn foreman and other management personnel. At times, Potts [*35] would be using such a facility at the same time turn foreman or other manager personnel were using it. And upper management either used such facilities regularly, or had access to them.

Class member George Holmes ("Holmes") also witnessed graffiti on restroom walls, railroad cars and in plant areas where other class members worked. He also was forced to endure racial jokes, slurs and comments throughout his career at the Butler Works.

Holmes recalled the presence of graffiti involving other African American workers. He witnessed graffiti stating "Nate Vanderzee is a half breed nigger," "Ron Edwards is a lazy nigger," and "Kevin Frost is a lazy nigger." These and similar phrases were scratched into urinal walls and other locations in the hot mill and Plant No. 2 at various times after Holmes was hired in 1997 and appeared up through and including 2003. Holmes had worked at Plant No. 2, the hot mill and as a overhead crane operator. The inter-plant railroad cars had numerous swastikas on them which at times were accompanied by phrases such as "slab Nazi." The graffiti on the railroad cars was clearly visible and moved

throughout the plant where it could be seen by everyone.

Holmes [*36] reported the presence of various forms of graffiti to his immediate supervisor such as the salaried turn foreman or the step-up foreman. For example, after viewing the graffiti about Nathan Vanderzee, Holmes reported it to the turn foreman for the hot mill, Ben Geil. The foreman said he would take care of the matter and have it painted over. The image was scratched into the surface, and although it subsequently was painted over, the phrase was still visible. At one point Holmes was speaking to the head of the maintenance department, Joe Spahn, and commented that the graffiti was getting a little out of hand. Holmes referenced a few examples when Spahn indicated he was unaware of what Holmes was talking about and Spahn responded that he was sure the turn foremen would take care of the matter in due course. After the Vanderzee graffiti was painted over but could still be read, Holmes brought the matter to the attention of a new turn foreman that had been assigned to the area. Holmes was assured that the matter would be taken care of, but nothing happened. No effort was made to scrape the paint so the graffiti was no longer visible. Holmes continued to perceive the response as inadequate [*37] because "all they did was paint it over and say it's covered up" when it remained legible through the paint.

Holmes also experienced threatening graffiti that was specifically directed at him. On December 31, 2002, Holmes was written up by his turn foreman for having untied work boots. He was working as an overhead crane operator. The next day, a co-worker, Rudy Digregorio, who was working in the crane beside Holmes, found a drawing on a standard size piece of paper depicting a Klansman on a cross engulfed in flames. The statement "tie your boots!!!" appeared at the bottom of the cross and was underlined. Digregorio contacted Holmes in the middle of his shift and gave him the picture. Holmes, accompanied by Digregorio, gave a copy of the drawing to the turn foreman, Bill Comer, and sent a copy to Ben Kerl. From there, the matter was brought to Winter's attention.

On January 2, 2003, Winter asked the crane operator who had worked the night shift, Larry Fleeger, if he had seen the drawing. Fleeger indicated he had, but said he hadn't touched it because it wasn't his "bid" crane and he didn't like to touch things in anyone else's crane. Fleeger admitted not reporting the incident. Winter [*38] also

discussed the incident with Holmes, and asked if he knew who had created the drawing. Holmes indicated he had only been back in the hot mill for about a week and thought he was getting along with everyone. Holmes suggested a co-worker, Nate Black, might have made the drawing, but admittedly drew this inference based on Black's attitude and presence in the area the previous day, and therefore couldn't be sure.

Winter conducted a search of Digregorio's and Fleeger's lockers. Inappropriate material depicting women as sex objects was found in Fleeger's locker.

Winter issued disciplinary letters to Digregorio and Fleeger. Although Digregorio had turned the drawing over to Holmes and accompanied him while reporting the matter to the turn foreman, Winter disciplined Digregorio for not following company protocol and taking the drawing immediately to an appropriate supervisor. Fleeger also received a disciplinary letter for failing to report the drawing to a supervisor after seeing it in the crane.

Holmes was concerned about the disciplinary measures Winter had taken. He considered Digregorio and Fleeger to be personal friends and did not believe they had anything to do with the drawing. [*39] From his perspective, Digregorio had done nothing wrong and Fleeger had nothing to do with the creation or presence of the drawing. Holmes requested that their disciplinary letters be rescinded, but that did not occur. On March 4, 2003, Winter advised Holmes that the investigation was complete and management had been unable to discover who had created the drawing. Winter emphasized, however, that the imposition of discipline on Digregorio and Fleeger had "sent a strong message to the work force by investigating the situation." Winter advised Holmes that his door was always open if additional troubles surfaced.

Class member Derek Potts similarly witnessed graffiti throughout the Butler Works from the time he was hired in May of 1999 through July of 2003. It included statements in the melt shop bathroom stalls indicating "no niggers wanted here in the melt shop" and "this place is getting to be nigger heaven." The phrase "niggers should go back to Africa" was also there. On the shower wall a circle around the word "niggers" with a line through it was present.

In a bathroom by the cold mill foreman's office

several phrases were present. These included a degrading drawing of Dave Clark [*40] and statements such as "kill all them niggers" and "niggers don't belong with white women." "KKK" symbols were everywhere. Similar graffiti appeared in the bathroom by the cold mill vending machines. For example, the statement "Bin Laddin is just another nigger that needs to be killed" was scratched on the wall behind the toilet. The symbol "KKK" was right over the sink. The statement "bomb those sand niggers" was present. Swastikas appeared at the main plant and down at the Plant No. 2. Derek Potts recalled seeing at least twenty-five at various locations in these areas.

Many of the statements were scratched in the surface while others were written with marker and pen. They frequently appeared in areas that would be observed by anyone using the facility. The pictures of Dave Clark in a jail cell, who was also know as "Frosty," appeared in the stalls near his work area and remained there for months. Similarly, the "KKK" symbols in the cold mill facilities remained present and visible for months.

Derek Potts also witnessed the noose hanging in the "hilltop lunchroom" as early as 2000. It was rumored that the noose had been present for many years.

Derek Potts met with Winter regarding [*41] Patterson's complaints of discrimination. Potts did not inform Winter about the various graffiti he had observed throughout the facility, choosing instead to focus on the matter at hand -- Winter's investigation of Patterson's complaints. Potts also made a racially derogatory comment about an aerobics instructor in front of his co-workers. The phrase was then repeated by one of Pott's co-workers to the turn foreman in a different context. When asked about the incident, Potts emphasized that he did not find derogatory comments necessarily offensive when they were used in jest between friends, but did find them offensive when they were used as a means to slight or belittle all minority workers as a class.

Class member Eric Cook likewise witnessed racial graffiti at various locations. The phrase "yo, homeboy" was written on his locker for several years. Cook did not consider the phrase to be racially derogatory and just attributed it to his co-workers clowning around. Cook did report the presence of "KKK" symbols appearing on his and Lake's lockers around the time Lake was voicing his concerns about the treatment he was receiving from

McGarvey. Cook also experienced racial comments and [*42] inappropriate touching on a number of occasions.

Winter's investigation into Lake's complaints concerning McGarvey as well as his investigation into an incident between Cook and one of his co-workers had significant repercussions for Cook. Cook's co-workers became aware of Winter's investigations and in turn "blackballed" Cook, which he explained as a form of isolation and the lack of appropriate assistance from them. Cook was reluctant to report things to Winter because "he went and put it all out there and everybody clammed up." The "blackballing" from co-workers followed.

In the summer of 2000 or 2001, Cook was dispatched to fix a malfunctioning toilette in the restroom at the transportation department. Upon entering the employee break room Cook witnessed several employees viewing a video in which a young woman was being initiated into the Klu Klux Klan and receiving her robe. The employees looked up as Cook walked in, but continued to watch the video, commenting its only "Cookie". Cook subsequently was told that the female was the daughter of an employee named Charles McPherson. McPherson was believed to be the grand dragon of the Pennsylvania Klavern of the Klan. McPherson worked [*43] in the transportation department. Cook reported the matter to Gerald Hesidenz, defendant's head of security and risk management. Hesidenz informed Cook that he knew all about McPherson's status in the KKK and the state police likewise had received reports about McPherson's activities. Hesidenz advised Cook that without the tape or other corroborating physical evidence, nothing could be done. He told Cook to try to get the tape or anything similar if something happened in the future. Cook was unaware of any follow-up investigation on his report or any action being taken against any individual who was involved in showing or watching the ceremonial induction video. Cook was intimidated and frightened by the incident. McPherson retired from the Butler Works a few years later.

Class member Patterson also witnessed graffiti and experienced what he believed to be inappropriate harassment by co-workers while working in the cold mill. For example, he witnessed phrases such as "KKK for Dave Clark" and statements containing the word "nigger" near the work locations of minority co-workers, such as

Derek Potts. Racial graffiti frequently was written on the console at his work station and at times [*44] degrading racial comments were written by a co-worker. Much of this graffiti was in plain view and the foreman and other management personnel would walk by it every day. Some of it was scrawled near telephones frequently used by management employees.

Co-workers and even crew chiefs made derogatory comments to Patterson. In addition, the crew chiefs in the cold mill continued to inform Cordray that Patterson was not ready to be certified on certain machines while giving less senior white employee more training time, resulting in quicker certification. Scott Hankey, who was training Patterson, told him: "I have to put my bigotry aside to train you, Jerry, but I'm willing to put my bigotry aside to train you." Hankey made this statement to Patterson on more than one occasion. [11]

> 11    Hankey made very similar statements to Derek Potts when he was being trained in the cold mill.

Lake frequently witnessed racial graffiti at the Butler Works. The incidents included a "KKK" symbol scratched into Lake's locker and phrases [*45] being written on the locker room and bathroom walls such as "the KKK lives at Armco" and "Kill the labor niggers." These incidents occurred in 1998.

Lake was also familiar with the noose in the hilltop silicone lunchroom. He became aware of it in 2002 after Patterson witnessed it and advised Lake of its presence. Lake learned that the noose had been there for at least three years and stopped by the lunchroom in order to verify its existence. There were two doors to the lunchroom, one of which provided a direct entrance to the mill. The noose was directly to the right. It was the same color as the background wall, but was clearly visible. Lake informed Derek Potts about the noose and called him into the lunchroom in order to witness it. The noose remained in the lunchroom until the EEOC site visit on June 30, 2003.

Class member William F. Jackson, III, worked in plant protection as a security gateman. Jackson was hired into security in 1981 and continued to hold a position in that department. He and Lake had been friends for over twenty-two years and often shared work experiences with each other. Lake had relayed several of the racial incidents occurring in the workplace over the [*46]

years, including derogatory remarks from employees, offensive graffiti and so forth. Jackson had experienced similar behavior and believed he had been passed over for merit pay increases due in part to the racially charged environment within the Butler Works.

In July of 2001 Jackson found a sheet of drawings on his desk when he reported for day shift. The drawing contained ten symbols which, from Jackson's perspective, appeared to be symbols and sayings associated with racial hatred. Some of the symbols appeared to Jackson to reflect a Klansman's hood and variations of swastikas. The drawings also contained phrases such as "southern pride" and "night digger" which appeared similar to symbols associated with the KKK website. After finding the page of drawings, Jackson put it in a desk drawer and left it there. In November of 2002, after unrelated issues were raised at the Butler High School, Jackson re-examined the drawings and believed the matter should be brought to Winter's attention for appropriate investigation. Jackson informed Winter of the drawing and directed him to the Anti-Defamation League's website. Jackson indicated he believed it had been left by someone working the [*47] night shift.

Winter conducted a brief investigation. After receiving the page of drawings and incident report, Winter asked Jackson if he knew who actually created it. Jackson did not. After viewing the symbols on the Anti-Defamation League's website, Winter took no further action. He did not view the document as depicting racist symbols and concluded it was nothing more than "doodles". Winter did not conduct any further follow-up or question any other employee or supervisor about the incident. In his judgment the drawings did not contain racially intimidating symbols.

In July of 2001 Jackson reported that an incoming truck driver had made demeaning and derogatory comments about an African American child playing in the neighborhood. Jackson completed an incident report which was forwarded to Winter. After receiving the report Winter confirmed that all information Jackson had was contained in the report and indicated a letter would be written to the trucking company. Winter informed Jackson that the driver would be barred, but the driver's name never appeared on AK Steel's barred contractors list. Around the same time, another truck driver made racially derogatory remarks about one [*48] of Jackson's co-workers and attempted to tell Jackson ethnic jokes.

Jackson rebuked the attempt and completed an incident report. Winter again came to the Plant No. 2 gate and spoke to Jackson. The driver subsequently was barred from entering the Butler Works.

During the course of one of the investigations Jackson asked Winter how he perceived the Confederate flag. Winter had just explained that when incidents of a racially harassing nature occurred, the company was required to take corrective measures. When specifically asked about the Confederate flag, Winter indicated he did not view the flag as being racially motivated or charged.

Defendant has a written anti-harassment policy which according to Winter mandates a "zero-tolerance" response for violations. In general, employees seeking to register a complaint are directed to report their claims either to Human Resource Officer Rick Winter or Manager of Industrial Relations, L. William Gonce. Gonce and Winter assertedly maintain a "hand-in-hand" relationship in enforcing defendant's anti-discrimination policy at the Butler Works. Any investigation into complaints of unlawful harassment are conducted by Winter or individuals acting [*49] at his direction.

Defendant's written policy prohibiting unlawful discrimination was revised on November 28, 2000. It prohibited all forms of unlawful discrimination in accordance with state and federal law, including harassment because of race. The policy required individuals who believed they were the subject of harassment, or who had observed or had knowledge of such activity, to report the matter to the human resources manager at the plant, the manager of industrial relations at the plant, or the corporate human resources department. It prohibited retaliation for good faith reporting or cooperating in an investigation, and indicated defendant would accept complaints regardless of whether the offending conduct rose to the level of harassment under the law or defendant's policy. Employees were informed that "the investigation" would be conducted with as much confidentiality as could be provided consistent with a thorough investigation, but that disclosure to appropriate personnel would occur in order to insure an adequate investigation. Sexual harassment was defined and explained in some detail, but other forms of harassment were identified only as verbal or physical conduct based [*50] on race, color, religion, national origin, age or disability that unreasonably interfered with an individual's working performance or created an

intimidating, hostile or offensive working environment. Negative stereotyping, threatening, intimidating and hostile acts were all prohibited.

On May 17, 2002, defendant again revised its policy. The revised policy directed individuals to report any harassment or observation or knowledge of such activity to the human resources manager, the manager of industrial relations or the corporate human resources department. The policy prohibited all unwelcomed comments or conduct directed at employees because of their sex, race, color, religion, national origin, age or disability regardless of whether the conduct actually constituted unlawful harassment. Examples included slurs, negative stereotyping, threatening, intimidating or hostile acts and pornographic materials. The employees were informed that they were responsible for notifying security at the particular location of any threats, threatening behavior or acts of violence.

Defendant's policy was further revised in February of 2004. At this time an ethics and compliance hotline with an "800" [*51] number was added. This was the first opportunity for employees to give an anonymous report about activities believed to be unethical or illegal.

Defendant's initial policy directed individuals who were harassed or observed such activity to report the matter to the employee's immediate supervisor as well as the human resources manager at the plant, the manager of industrial relations at the plant, or the corporate human resources department. The revision of the policy on May 15, 2000, specifically removed immediate supervisors from the reporting chain and mandated that employees report such matters to one of two high ranking plant officers. It was not until February 2, 2004, that an anonymous means of reporting was supplied by creation of the ethics and compliance hotline.

Winter oversaw the investigation into every complaint at the Butler Works. When an employee wanted to "file" a charge, Winter informed the employee that he did not use written forms or record the formal allegations. Instead, he simply sat down with the employee and collected all the information through an interview process. He then investigated the claim or directed others to do so and reported the results of his [*52] investigation to the complainant.

When Winters became aware that an employee was considering making a charge, he would routinely contact

the employee's department and leave a message with the head of the department directing the employee to contact him. He would then set up an appointment, and at times had an assistant accompany him during the interview process.

When Winter received information suggesting that racially offensive conduct had occurred he would investigate the matter by interviewing the individuals alleged to have been involved. For example, when he became aware of the alleged showing of a video tape reflecting KKK activity, Winter interviewed co-worker Mike McPherson. A union representative was present. McPherson disavowed any membership in the KKK, any leadership position, that he had ever brought a tape to work, or that his daughter or family members were involved in the KKK. Winter reported the results of his investigation to class members Lake, Jackson and Cook, and ended his investigation.

Winter similarly investigated graffiti on Cook's locker and concerns Cook had about statements or conduct by his co-workers, including co-worker Mike Chuba. After hearing the various statements [*53] and racial jokes that Cook indicated his co-workers had made, Winter asked Cook who could corroborate Cook's story. Cook was unwilling to provide names, but after Winter insisted, Cook explained that Winter was already aware of the people working around Cook. Winter then conducted a series of interviews with each of those individuals. They disavowed having engaged in any such conduct or making any statements with racial overtones. From Winter's perspective, "that was the end of that."

Winter conducted a similar investigation into complaints of disparate treatment by Patterson. Winter first interviewed Patterson in 2003, and Patterson raised issues of prior treatment. Winter listened to Patterson and the two discussed the issues. Winter perceived Patterson's complaints as "historical for the most part" and concluded that because the incidents had occurred in the distant past, nothing could be done. With regard to more recent matters concerning how Patterson's return to work calculations had been developed, Winter explored the matter and attempted to explain it to Patterson. Although Patterson did not agree with the explanation, Winter took no further action on the matter.

Patterson [*54] called Winter when someone posted a newspaper article regarding the "EEOC lawsuit" in the main plant locker room and highlighted Patterson's name

in the body of the article. Winter already was aware of the posting and had had it removed. Because a number of people used the locker room, Winter concluded that there was no way to determine who had posted the article. That was the end of the matter.

Patterson also called about graffiti appearing in a restroom which stated something to the effect of "the big, fat lazy nigger doesn't deserve a job." Winter "marshaled some forces," went down to the location and spray painted over the graffiti.

Plant protection had the responsibility of producing an incident report after receiving notification of an accident or incident within the plant. The department also had responsible for taking photographs and documenting information pertaining to any investigation within the plant.

On February 1, 2002, a memo was distributed to plant management advising them that any posters, photographs, books, calendars and other materials that violated defendant's harassment policy were to be removed from the work site by the supervisor of the area and an incident [*55] report was to be completed regarding the supervisor's observations and actions. In a meeting held on February 11, 2002, Winter indicated he was continuing to find items out in the plant that violated defendant's anti-harassment policy. Hesidenz then sent a memo to plant supervisors and protection personnel indicating Winter was continuing to find items out in the plant that violated defendant's policy and questioning why supervision was "not uncovering them?".

When defendant revised its discrimination policy in May of 2002, plant protection was provided with new directions for handling reports associated with ethnic or sexual harassment. Hesidenz issued the following directive:

> If Security gets a contact/complaint related to the Subject (graffiti ...), the policy is to refer the caller to Bill Gonce and/or Rick Winter for the purpose of investigation and correction.
>
> Security will not do formal incident reports, take photographs, etc.

Hesidenz followed up with a confidential communication indicating he still wanted a voice mail and log notation

regarding all reports/complaints. Hesidenz thereafter deleted all voice mails regarding such reports/complaints after listening [*56] to them.

Hesidenz repeatedly sent e-mails to supervisors and plant security members containing ethnic jokes. On November 15, 2001, he published a "joke" about Polish marines with a caveat that "anyone of Polish decent, don't take offence." On March 20, 2003, he forwarded a "joke" about two Arabs. And on one other occasion he forwarded a "great chain letter" that contained sexual innuendo. Hesidenz was never formally reprimanded for engaging in this conduct. Instead, Winter merely advised him at one point that his actions were inappropriate.

In conjunction with charges of discrimination filed by Lake, Patterson and Jackson, the EEOC requested an on-site tour of the Butler Works. A few days prior to the scheduled visit laminated placards were posted at common locations throughout the plant warning that defacement of plant property, including graffiti, was prohibited and that violations would result in discipline, up to and including discharge. In addition, Winter organized a massive effort to paint over any graffiti existing in the plant. Winter, other members of the human relations department, and members of the industrial relations department painted over various portions of walls, [*57] bathrooms, stalls, lockers, shower stalls and the like. The EEOC investigators nevertheless came upon swastikas and a picture of a person with an "Afro hairstyle" captioned with the words "Leroy, great American scab." [12] In addition, they found the noose in the hilltop lunchroom. An employee sitting next to it remarked that it "had been there three (3) years." All of the main areas in the plant had sections that recently had been painted. Areas containing graffiti that did not have racial connotations had not been painted. Upon inquiry, Winter admitted the areas had been painted within the last twenty-four hours and stated he regularly had management personnel check their assigned areas and remove graffiti.

> [12]  One of plaintiffs' counsel is prepared to offer historical information indicating this phrase was associated with blacks who were imported into the steel mills in the Pittsburgh area in the late 1800's during work stoppages when unions were trying to get organized.

Winter testified that pursuant to his [*58] direction management would not tolerate graffiti and it was "routinely" removed. When asked whether regular patrols were conducted, Winter indicated he as well as other management personnel would go out into the facility looking for graffiti "periodically" and if it was found or reported it is removed. When questioned about how often such campaigns had been conducted, Winter could neither identify the last time such measures had been taken before the EEOC on-site visit or how long it had been since the last such effort had been undertaken. Nor could he recall any distinct pattern or frequency about when such measures were taken. Instead, Winter would from time to time merely walk out into different areas of the plant and "do spot checks."

Winter submitted an affidavit in support of defendant's motion for summary judgment indicating he covered graffiti in the plant and documented racist graffiti that he found or that had been reported. During his deposition, however, Winter explained that he immediately covered over all racial graffiti and only had photographs taken when something was found that was unique or different. Winter had no photographs of racial graffiti. He did, however, [*59] have pictures of graffiti that depicted swastikas where a reference to AK Steel accompanied it. On occasions when such graffiti was found, Winter directed plant protection to come and photograph it. Winter had no documentation of the racial graffiti directed at specific class members, such as the comment about Patterson not deserving a job.

Winter also attested that managers were trained on equal employment opportunity and harassment policies, and the anti-harassment/discrimination policy had been conspicuously posted throughout the Butler Works. Each employee had been provided with a copy of the policy by mail. Winter and Gonce had attended training on AK Steel's policy at company headquarters in November of 2000. Sign-in sheets from a review and training session on the policy also indicate Cordray, Boehm, Randolph, Gonce and McGarvey attended an instruction session regarding equal employment policies and harassment and work place violence policies, which covered the topic of race discrimination. McGarvey, however, could not recall any details about the training other than management was prohibited from discriminating on the basis of sex, race, color or religion. Randolph could only [*60] recall attending sexual harassment classes prior to 2001 and could not recall attending any instruction or classes regarding racial harassment or discrimination. Gonce could recall only attending a session at a local community

college on one occasion in 2002 or early 2003 involving race relations and sensitivity issues. Beyond that the only other sensitivity training Gonce could recall was human resources management personnel such as Winter attending a stand-up safety meeting and explaining AK Steel's anti-harassment policy.

The record also contains several incidents involving the display of the Confederate flag on company property. One such incident involved security guard David Hodill. Hodill was employed by Johnson Controls, which had taken over part of plant security a few years after defendant acquired the Butler Works. Hodill displayed numerous Confederate flags on his vehicle, frequently drove past the main plant gate playing "Dixie" on his vehicle horn and parked his vehicle directly across from the main office or the plant protection office. Hodill displayed these symbols for months before Winter finally directed him to remove the emblems while on company property. Gonce, [*61] the only other chief plant official who was authorized to receive reports of harassment, joked to the union president and grievance chairman about attending his deposition "with my Confederate flag on."

Class member Frank Ross Lloyd, Supervisor of the Magnetic Testing Laboratory at the Butler Works, received direction to search out and remove any Confederate flags in the area under his control. After doing so, he witnessed a contractor's vehicle on plant property displaying the flag. He called plant security for clarification and learned that plant security had never been advised to remove such flags or tell incoming truckers to cover or remove them. He subsequently learned that other departments in the mill such as industrial relations likewise had not been directed to remove or prohibit displays of the flag. Lloyd discussed what he learned with Lake when Lake asked about defendant's policy about displaying the Confederate flag on company property. Winter learned of the discussion prior to Lloyd's scheduled deposition and advised Lloyd that "you made a mistake." Winter insisted that Lloyd should have come directly to him and not discussed the matter with others. Winter then asked [*62] whether Lloyd had "talked to other black employees about this kind of stuff?" Lloyd indicated he could not recall having done so, and Winter indicated "there is some question here as to your allegiance and loyalty to this company." Winter hung up on Lloyd without further discussion. In a follow-up telephone call, Winter advised:

> Ross, listen up and listen good. I don't want any other conference on this. I don't want anything else in writing about this to me or anyone else in the company. I don't even want you to talk about this. If that's not clear, you call me.

Winter hung up before Lloyd could respond. Lloyd's deposition was taken on November 7, 2003, after which he was advised that he "talked too much."

On November 17, 2003, Winter and Lloyd's direct supervisor summoned Lloyd to a meeting. They advised Lloyd that he was being re-assigned from his office position as supervisor to a position requiring coil inspections in the steel mill. Lloyd had no experience in this work and it required him to work swing shifts alternating on a weekly basis, as opposed to the nine to five hours in his supervisory position. As Winter was explaining the changes, he had a big grin on his [*63] face and kept saying "don't worry, this isn't retaliation. We're keeping your pay the same." [13]

> 13    Although Lloyd's annual salary was not changed, his new position involved a lower pay grade which placed him at the top end of the scale. Thus, from that point forward he had no opportunity to earn raises and the maximum annual bonus he could earn was reduced by fifty percent. Lloyd maintained that there was no justified basis for his transfer and has filed a separate discrimination claim.

The polestar of defendant's motions for summary judgment is its contention that it cannot be held responsible for any conduct that occurred prior to its acquisition of the Butler Works on September 30, 1999. It asserts that it had no control over the environment prior to that date and its anti-discrimination policy and the measures taken to address any racially-based incidents or complaints that surfaced thereafter sufficiently defeat plaintiffs' claims or otherwise shield it from liability. Lake and Patterson emphasize the [*64] treatment they received from their immediate supervisors after defendant's acquisition as well as the "culture" that existed and continued to exist at the Butler Works. The EEOC contends defendant can be held liable for the existence of a racially hostile work environment in accordance with the teaching of *AMTRAK v. Morgan,*

*536 U.S. 101, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002).*

Defendant views its liability for any pre-ownership acts as purely a question of law. We believe it is dependant upon material questions of fact that remain in dispute.

In Morgan, the Supreme Court illuminated Title VII's concept of "an unlawful employment practice" as it relates to discrete discriminatory acts and hostile work environments in clarifying the timeliness of Title VII claims. A discrete discriminatory act, such as termination, failure to promote, denial of transfer, refusal to hire and so forth, constitutes a separate actionable "unlawful employment practice" and a charge challenging any such practice must be filed with the EEOC within one hundred eighty or three hundred days after the particular unlawful practice has occurred. *Id. at 110.* Timely filing a charge [*65] on a discrete act of discrimination does not make timely other discrete acts that occurred outside the time period, even if the untimely acts are related to the conduct giving rise to the timely filed charge. *Id. at 111-12.* In other words, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges [and] each discrete discriminatory act starts a new clock for filing charges alleging that act." *Id. at 113.* The converse is equally true. "The existence of past acts and the employee's prior knowledge of their occurrence, ... does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed." Id. Nor is an employee barred "from using the prior acts as background evidence in support of a timely claim." Id.

"Hostile environment claims are different in kind." *Id. at 115.* They are based on the cumulative effect of individual acts or repeated conduct, any one of which may not be actionable on its own. Id. It is the cumulative effect of such [*66] acts over a period of time, perhaps even years, that elevates the series of acts to the level of an "unlawful employment practice." *Id. at 115-17.* Thus, it does not matter that some of the component acts of a hostile work environment claim are outside the statutory time period because it is the cumulative effect of the entire series of acts that collectively constitute the "unlawful employment practice." *Id. at 117.* In other words, where "an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by the court for

the purposes of determining liability." *Id. at 117.* And the fact that an employer has engaged in sufficient activity to make out an actionable hostile environment claim does not preclude the employee from demonstrating that an unlawful employment practice is ongoing and continues to occur. Id. "Subsequent events ... may still be part of one hostile work environment claim and a charge may be filed at a later date and still encompass the whole." Id.

The general premise of defendant's position -- that it cannot legally be held liable for acts [*67] of its predecessors over which it could not exercise control -- has logical appeal and clearly enjoys precedential support in the context of discrete discriminatory acts. It also enjoys the same appeal with regard to any unknown hostile work environment existing at the time AK Steel acquired the Butler Works. But where a new employer discovers or should have discovered an existing hostile environment at a recently acquired facility and thereafter fails to take prompt and effective remedial measures calculated to eliminate it, the employer in effect permits the cumulative effect of the separate acts occurring before its ownership to continue. In such circumstances the employer permits a series of separate acts partly beyond and partly within its control to culminate in a statutory violation by permitting them to rise to or continue at a level of severity and pervasiveness sufficient to alter the terms and conditions of the victim's employment. In other words, it becomes responsible for the culmination of acts forming a single ongoing unlawful employment practice. When that occurs, we see no basis for artificially sheltering the defendant's exposure to liability for the entire unlawful [*68] employment practice.

It follows that defendant may not be held liable for the separate acts that occurred during Armco's ownership of the plant unless (1) they are part of a series of separate acts that collectively constitute a single unlawful employment practice in the form of an actionable hostile work environment claim and (2) defendant is determined to be liable for the ongoing existence of that environment during its ownership. And contrary to defendant's protestations to the contrary, these are issues to be resolved by the finder of fact provided plaintiffs have proffered sufficient evidence to support their hostile work environment claims and defendant is not entitled to any affirmative defenses as a matter of law. Accordingly, we turn to the resolution of these aspects of defendant's motions. [14]

14  In concluding that defendant's liability for any separate acts occurring during Armco's ownership is factually dependent upon defendant's responsibility for the cumulative of those and related acts occurring under its watch, we have not overlooked the general principles underlying the doctrine of successor liability under Title VII. That doctrine is derived from equitable principles and permits an aggrieved employee to enforce against a successor employer a claim or judgment he or she could have enforced against the predecessor. *Rego v. ARC Water Treatment Company of Pa., 181 F.3d 396, 401 (3d Cir. 1999).* The policy is designed to protect employees when ownership of the employer suddenly changes and pertinent considerations include "(1) continuity in operations and workforce of the successor and predecessor employers; (2) notice to the successor employer of its predecessor's legal obligation; and (3) ability of the predecessor to provide adequate relief directly." *Id. at 402* (quoting *Criswell v. Delta Airlines, Inc., 868 F.2d 1093, 1094 (9th Cir. 1989)).* Here, as explained more fully infra, plaintiffs' evidence will support a finding that there was continuity in the operations and managerial work force of Armco and AK Steel, and sufficient evidence exists to support a finding that defendant knew or should have become aware of ongoing conduct occurring during its ownership that would have provided reasonable notice of the existence of a hostile work environment. Furthermore, to the extent the notice of such conditions properly can be imputed to defendant, its liability is dependent upon the efforts it undertook to prevent and correct the ongoing existence of that environment. Under these circumstances defendant properly can be charged with the cumulative effect of the entire unlawful employment practice under consideration because Armco could not have provided adequate relief for the entire unlawful employment practice and defendant has subsumed through its own action or inaction responsibility for the cumulative effect of all the prior individual acts.

[*69] Title VII of the Civil Rights Act of 1964 prohibits discrimination "against any individual with respect to [his or her] compensation, terms, conditions, or privileges of employment, because of such individual's ... race." *42 U.S.C. § 2000e-2 (a) (1).* The prohibition "not only covers 'terms' and 'conditions' in the narrow contractual sense, but 'evinces a congressional intent to strike at the entire spectrum of disparate treatment of [minority and non-minority employees] in employment." *Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998)* (quoting *Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986)).* 15 "Title VII is violated 'when the workplace is permeated with discriminatory [race-based] intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the condition of the victim's employment and create an abusive working environment.'" *Ocheltree v. Scollon Prods., 335 F.3d 325, 331 (4th Cir. 2003)* (quoting *Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)).* Employees are entitled to protection from "working environments [that are] [*70] so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers." *Meritor, 477 U.S. at 66* (quoting *Rogers v. EEOC, 454 F.2d 234, 238 (5th Cir. 1971)).*

15  "The elements and burden of proof that a Title VII plaintiff must meet are the same for racially charged harassment as for sexually charged harassment." *Harrison v. Metropolitan Gov't. of Nashville and Davidson County, 80 F.3d 1107, 1118 (6th Cir.),* cert. denied, *519 U.S. 863, 117 S. Ct. 169, 136 L. Ed. 2d 111 (1967);* see also *Torres v. Pisano, 116 F.3d 625, 630 (2d Cir. 1997)* (same); *Morgan, 536 U.S. at 116 n. 10.*

Specifically, a prima facia case of a racially hostile work environment has the following elements: (1) the employee suffered intentional discrimination because of race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally [*71] affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability. *Abramson v. William Paterson College of New Jersey, 260 F.3d 265, 276-77 (3d Cir. 2001).* Proffering sufficient evidence to meet each element of a hostile work environment claim generally precludes summary judgment in the defendant's favor and permits the plaintiff to proceed to trial. *Id. at 280-281.*

In analyzing whether a plaintiff has established a prima facia case, the court cannot confine its analysis to "the individual pieces of evidence alone," but must "view the record as a whole picture." *Id. at 276* (citing *Woodson v. Scott Paper Co., 109 F.3d 913, 921 (3d Cir. 1997)*). This is because "[a] play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but the overall scenario." Id. (quoting *Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3d Cir. 1990)*).

Defendant contends plaintiffs have failed to produce any evidence to establish the first [*72] element, i.e. that they suffered intentional discrimination because of race. It asserts that when each incident underlying plaintiffs' complaints is examined in context and considered in conjunction with the responsive actions undertaken by defendant, the record fails to reflect any evidence of discriminatory treatment based on race. It further contends that prompt remedial action was taken whenever warranted and the record reflects a legitimate basis for discipline whenever it was imposed. Thus, the evidence falls short of the quantum needed to prove racial animus.

The record contains sufficient evidence to support a finding that the class members' working environment was sufficiently charged with intimidation and ridicule that was directed at them because of their race. The record also contains sufficient evidence to support Lake and Patterson's contentions that they were held to higher standards and disciplined more frequently and harshly because of their race.

The record is replete with evidence indicating racially derogatory graffiti appeared in common areas throughout the plant. The graffiti frequently contained references to minority workers. Specific examples included [*73] the statement referencing Nathan Vanderzee, references to class member Ronald Edwards, drawings and statements referencing Kevin Frost, the depiction of Dave Clark in a jail cell about to commit suicide, and the statements referencing Patterson. This graffiti typically contained derogatory statements or slurs implying an inferiority of the individual because of his race. Such graffiti commonly remained on company property for lengthy periods of time, sometimes for months on end. The graffiti was only removed after a specific complaint was made, and even then the same or similar graffiti reappeared within a short period of time.

Graffiti directed at African American workers in general likewise repeatedly and regularly appeared during defendant's ownership of the Butler Works. Statements such as "kill all the labor niggers," "kill all them niggers," "no niggers wanted here at the melt shop," and "this place is getting to be nigger heaven" routinely appeared on walls and doorways in common areas throughout the plant. Symbols of white supremacy such as "KKK" and depictions of Klansman also were prevalent in areas where they could be observed by members of the general workforce. A noose [*74] was erected in a lunchroom next to an area used by management and remained in plain view for several years.

Beyond the graffiti, derogatory references to African Americans in the form of racial epithets and jokes were common. Numerous class members testified that derogatory phrases such as "nigger-rigged" and statements such as "what do I look like, you're nigger" were common in the workplace. Displays of the Confederate flag on company property routinely occurred. The other symbols of hatred and racial intolerance also were present in the workplace. Swastikas frequently appeared in areas used by the common workforce or on company property that moved throughout the Butler Works. In addition, derogatory statements appeared about Muslims and/or darker skinned individuals of Middle Eastern origin.

There is little doubt that a "reasonable jury could find statements like the [ones referenced above] send a clear message and carry the distinctive tone of racial motivations and implications." *Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1083 (3d Cir. 1996)*. Certain statements directly conveyed the "message that members of a particular race are disfavored and that [*75] members of that race are, therefore, not full and equal members of the workplace." Id. Beyond these statements, class members testified to "the pervasive use of derogatory and insulting terms directed at members of a protected class generally, and addressed to those employees personally, [which] may served as evidence of a hostile environment." Id. (citing *Andrews, 895 F.2d at 1485*.)

The record when viewed as a whole also raises an inference that the use of racial graffiti, racial insults and racial/ethnic jokes was condoned by management. Numerous class members testified that the racial graffiti

appeared in areas accessible to management employees and commonly frequented by them. Graffiti routinely appeared in bathrooms, locker rooms and common entrance ways that were used by employees and management personnel alike. The graffiti remained in such locations until someone made a formal complaint about it. Ethnic jokes and racial epithets were commonly used by non-minority employees. A high ranking supervisory officer disseminated ethnic jokes on more than one occasion without meaningful reprimand and others failed to recognized and sought to make light of [*76] the displays of a symbol imbued with racial hostility. Furthermore, complaints by class members concerning racial graffiti or offensive treatment resulted in open investigations involving the class member's immediate co-workers. This in turn resulted in non-cooperative attitudes being directed at minority workers and tension and disruption in working relations. The lack of cooperation by co-employees directly impacted the ability of the minority employee to perform in an efficient and productive manner.

Defendant argues that a number of the symbols, statements and conduct referenced by plaintiffs cannot be understood to have racial connotation. For example, it notes that several class members conceded that the display of the swastika in the workplace was done in a way that reflected an editorial comment on AK Steel's management style, likening it to the strict totalitarian approach of the Nazi regime. At times, the swastika was accompanied by the symbol "AK" over it or "fuck AK" and phrases such as "I love Adolph Wardrop," which referred to chief executive officer Richard Wardrop. Defendant also notes that some of the class members testified that they understood the swastika graffiti [*77] to convey this connotation and thus defendant asserts that the class members should not be heard to disingenuously complain that the swastikas contributed to a racially offensive environment. Other instances include testimony by Patterson indicating co-workers "humped" him and poked him in the chest in front of management personnel without repercussion and McGarvey testifying that other employees told her that they thought Lake got away with not doing his job because he was black.

Of course, "racial epithets need not be hurled at the plaintiff in order to contribute to a working environment [that is racially hostile]" *Jackson v. Quanex Corp., 191 F.3d 647, 661 (6th Cir. 1999)*. Title VII affords employees the right to work in an environment free from

"discriminatory intimidation, ridicule and insult, *Meritor, 477 U.S. at 65* ..., without limiting this concept to intimidation or ridicule explicitly racial in nature." Id. (citing *Andrews, 895 F.2d at 1485* (holding that overt racial harassment is not necessary to establish a hostile environment) (parenthetical added)); see also *Aman, 85 F.3d at 1083* (same). "All [*78] that is required is a showing that race is a substantial factor in the harassment, and that if the plaintiff had been white he would have not been treated in the same manner." *Aman, 85 F.3d at 1083*. Indeed, general harassment often forms an integral and important part of proving the existence of an intentional hostile work environment and courts must resist the appeal to "disaggregate" each non-overt act and consider it in a vacuum. *Durham Life Ins. Co., v. Evans, 166 F.3d 139, 149 (3d Cir. 1999)*. Similarly, there is no "talismanic expressions" needed to advance a racial harassment claim and "code words" and symbols may convey a clear message of racial intimidation based on the environment in which they appear and the context in which they are used. *Galdamez v. Potter, 415 F.3d 1015, 1024 n.6 (9th Cir. 2005)*.

The above principles preclude the approach advocated by defendant for two basic reasons. First, we are not permitted to engage in a myopic view of the record or disaggregate the components of a hostile environment claim in a manner that robs them of their cumulative effect. *Jackson, 191 F.3d at 660* (collecting [*79] cases); *Andrews, 895 F.2d at 1484*; *Durham Life, 166 F.3d at 149*. While the record does contain evidence suggesting that the swastikas were at times used to convey dissatisfaction with defendant's management of the working environment, swastikas also symbolize a belief of Arian superiority and the need to brutally oppress any other race or ethnic group perceived as inferior. Swastikas are a symbol of a regime of hatred unparalleled in world history. That regime was dedicated to the oppression of those of Jewish heritage through genocide. The symbol is one of hatred and oppression. *Archuleta v. Am. Airlines, Inc., 2000 U.S. Dist. LEXIS 21076, 2000 WL 65688 (C.D. Cal. 2000)*; E.E.O.C. v. Foster Wheeler Constructors, Inc., 2002 WL 976618 (N.D. Ill. 2002). And it can support a racially hostile environment claim in violation of Title VII when combined with similar symbols of racial hatred and bigotry. See *Bryant v. Indep. Sch. Dist. No. I-38, 334 F.3d 928, 932-33 (10th Cir. 2003)* (displays of Confederate flag, swastikas, KKK symbols and hangman's nooses on clothing and vehicles coupled with

racial slurs, [*80] graffiti inscribed in furniture, and derogatory notes in students' lockers and notebooks created actionable racially hostile environment in violation Title VI where school administrators either facilitated the environment or permitted it to continue); Gooden v. Timpte, Inc., 2000 WL 34507333 (D. Col. 2000) (code words, racial epithets, swastikas and hangman's noose provided evidence of actionable hostile work environment).

Furthermore, defendant's contention that the swastikas appeared only in a manner implicating its management style is an inaccurate reading of the record. Numerous class members indicated the swastikas often appeared without reference to AK Steel. Thus, like other symbols of racial hatred, the display of swastikas cannot be summarily isolated and discounted in assessing whether the environment has a whole reflected conduct directed toward plaintiffs because of their race.

Patterson's account of his interaction with Keith Say similarly cannot be treated in such a manner. Overt racial harassment need not be proven to establish a hostile work environment. Durham Life, 166 F.3d at 148-49. General harassment can and often does reflect [*81] an important component of an abusive work environment. Id. at 149; Aman, 85 F.3d at 1083. All that is required is a showing that if the plaintiff had been white, he or she would not have been treated in the same manner. Aman, 85 F.3d at 1083.

Patterson's testimony concerning the incident with Keith Say satisfies the above standards. Read in proper context, the thrust of Patterson's testimony was that the confrontational conduct by Say was witnessed by foremen and supervisors and it would not have been permitted to occur and/or a response by management would have been immediately forthcoming had it been directed at a Caucasian employee. And although the incident is relatively minor in isolation, it is improper to "disaggregate" it on the ground that it was only general harassment that was independent from any racial hostility claimed by plaintiffs.

Similarly, the presence of the noose at the Hilltop Silicon lunchroom cannot be disregarded because plaintiffs have produced no direct evidence that specific plant supervisors or management personnel witnessed it. It is beyond question that relevant facts may be proven by circumstantial [*82] evidence. Several class members and the union president testified that the lunchroom was

in close proximity to an area used regularly by managers and supervisors, and that supervisors often went into the lunchroom in order to give assignments, provide direction or converse with employees. There is also evidence that the noose was in the lunchroom for an extended period of time, possibly over three years. Thus, notwithstanding that the noose was the same color as the woodwork behind it, there is ample evidence to support findings that its existence was known to management and it was permitted to remain in the lunchroom for an extended period of time.

Second, the United States Court of Appeals for the Third Circuit's jurisprudence has "never required a plaintiff to demonstrate direct proof that her harasser's intent was to create a discriminatory environment." Abramson, 260 F.3d at 278. Indeed, the first prong of the inquiry was not "designed to protect harassers who fail to recognize the hostile or abusive nature of their comments and actions." Id. And it is improper to parse through the plaintiff's evidence in search of a link between the harasser's conduct and [*83] a discriminatory animus in his or her mind. Id. at 277-78. Instead, "the proper inquiry at this stage [is ascertaining] whether a reasonable factfinder could view the evidence as showing that [the plaintiff's] treatment was attributable to her [race]." Id. at 277. In other words, the intent to discriminate can be inferred from the entire context and the conduct of the actors involved.

The class members have proffered sufficient evidence to satisfy this element of their claim. Plaintiffs have produced evidence which will support findings that their work environment consistently was permeated with racial epithets, jokes and signs and symbols of racial hatred and intimidation. Taking into account all of the testimony by the class members, the finder of fact could determine that racial graffiti and epithets routinely appeared in the specific areas were minority workers were assigned to work as well as in the common facilities used by large segments of the work force. Class members frequently experienced disparaging jokes with racial overtones. Offensive graffiti was permitted to remain for extended periods of time and quickly re-appeared after being [*84] covered over. Symbols and badges of racial oppression were erected or displayed in common areas such as lunchrooms, locker rooms and restrooms. Class members experienced incidents of open hostility from co-workers and the witnessing of this treatment by management generated little or no response.

Such "an abundance of racial epithets and racially offensive graffiti could hardly qualify as offhand or isolated." *Jackson, 191 F.3d at 662* (rejecting view that "each minority employee would have to show that the employer had a interest specifically to harass her, and could not proceed on a theory that the employer had a general intent to harass all employees of the minority group."); *Bryant, 334 F.3d at 932-33*; *Ocheltree, 335 F.3d at 333* (open derogatory sex-specific harassment on plant floor sufficient to permit a finding that hostile work environment existed because of victim's sex); *Oncale, 523 U.S. at 80* (same); *Sykes v. Franciscan Skemp Healthcare, 2000 U.S. Dist. LEXIS 22581, 2000 WL 34235984 (W.D. Wis. 2000)* ("it is unquestionably the case that writings such as 'nigger' and 'nigger go home' in plaintiff's work area constitute [*85] actionable harassment"); *Rodgers v. Western-Southern Life Ins. Co., 12 F.3d 668, 673-75 (7th Cir. 1993)* (the presence of racial epithets and the use of slurs such as the word "nigger" essentially constitute specific instances of harassment directed at an employee because of her race). It follows that the cumulative effect of the plaintiffs' evidence concerning the environment at the Butler Works is more than sufficient to support a finding that the conduct was directed at plaintiffs because of their race. See *Aman, 85 F.3d at 1083* ("There are no talismanic expressions which must be invoked as a condition-precedent to the application of the laws designed to protect against discrimination.").

Lake and Patterson also have proffered sufficient evidence to support a finding that they suffered harassment because of their race. Defendant posits that each tangible incident forming Lake and Patterson's claims involved a proper basis for discipline, and when a review of the record is undertaken to determine whether each employment action was a form of or taken in response to any particular complaint of racial harassment, the incidents do not provide any link [*86] to discriminatory animus or create an inference of improperly motivated conduct. But as noted above, that is not the test which this court must apply. The question is whether a reasonable factfinder could conclude from a comprehensive review of the evidence that the treatment underlying the plaintiff's hostile environment claim was attributable to his or her race. In making this assessment the court is not permitted to act as a factfinder and resolve the competing inferences that can be drawn from the evidence. *Farrell v. Planters Lifesavers Co., 206 F.3d 271, 286 (3d Cir. 2000)*. Instead, the evidence must be

considered in the light most favorable to the non-movant, with all reasonable inferences being drawn in that party's favor. Id. In addition to the evidence pertaining to the general environment noted above, when the specific circumstances surrounding the instances of alleged disparate treatment advanced by Lake and Patterson are viewed in context and as a whole, the finder of fact could conclude that the conduct was attributable to their race.

McGarvey was the recipient of numerous racially-based comments from Lake's fellow employees. She recalled being told [*87] on a number of occasions that Lake gets away with not doing his job because he is black. She was also told repeatedly that Lake had a habit of "killing time," but had not received similar comments or reports concerning any other non-minority employee. She could not recall who had made these statements to her and defendant has produced no evidence to substantiate either allegation. McGarvey took no action to correct the racial overtones when these remarks were made, nor did she refer any employee for counseling and/or racial sensitivity training.

After receiving this type of information, McGarvey admittedly formulated a tracking system through which to monitor the specific movements of the two van drivers under her supervision. In addition, Lake received four instances of discipline within eight months: an eighteen day suspension, a ten day suspension, a five day suspension and discharge. It was unusual for such severe discipline to be imposed for the first time infractions involved and/or prior to utilizing warnings and less severe sanctions in accordance with the progressive discipline practices customarily employed. Against this backdrop Lake's complaints of discriminatory treatment [*88] were dismissed as not worthy of belief after summary interviews with McGarvey.

The proper comparison for evaluation of Lake's treatment is not whether Lake can identify other employees in the storeroom department who McGarvey believed were "killing time" and not doing their job, as defendant posits, but whether the factfinder can conclude that Lake was held to higher standards and more readily disciplined by McGarvey because of his race. There is ample evidence from which the finder of fact may make such a finding.

McGarvey did not impose the monitoring system on the stakes truck driver who was white and Lake has proffered evidence from which the finder of fact can

conclude that she did not enforce it against the other white van driver within the department notwithstanding her proclamations to Winter and Bergbigler that she did. Randolph, an individual who helped manage the storeroom department, admitted the tracking system was designed by McGarvey to monitor Lake's whereabouts. McGarvey was unwilling to permit Lake to drive the stake truck until there was proof that his seniority rights permitted him to do so.

The finder of fact could conclude that McGarvey had no evidence that [*89] Lake had been killing time or not doing his job beyond unsubstantiated and unverifiable rumors. These rumors were indicative of a consistent theme in the work place graffiti that African American workers were lazy, untrustworthy and undeserving of a job. Findings that the monitoring system was designed and employed essentially as a means to monitor Lake's whereabouts and the basis of McGarvey's believed need to do so was formulated in part on stereotypical beliefs associated with the color of Lake's skin are well within the province of the finder of fact. And of course, action taken against a minority employee based on negative stereotyping can be construed by the finder of fact as evidence of discriminatory treatment because of race. See *Durham Life, 166 F.3d at 148* ("Hostile or paternalistic acts based on perceptions about womanhood or manhood are sex-based or 'gender-based.'"); *Price Waterhouse v. Hopkins, 490 U.S. 228, 250-51, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989)* (plurality opinion) (reliance on gender stereotypes of appropriate female behavior is sex discrimination); *Aman, 85 F.3d at 1082* (insults hurled at African American employees based on negative stereotyping [*90] such as "don't touch anything" and "don't steal" are "inherently racist remarks").

Similar inferences can be drawn from the circumstances surrounding the discipline McGarvey imposed on Lake. McGarvey confronted Lake about the delivery of the pocket knives in a manner that clearly implied he had stolen them. She did so in a humiliating and insulting fashion that suggested he was untrustworthy. She had no evidence that Lake had taken the knives or that he had done anything untrustworthy. She imposed unprecedented discipline when Lake reacted to her insinuations in a loud and agitated manner. The discipline was not consistent with the progressive discipline policy commonly practiced at the Butler Works, nor was it consistent with an approach formulated solely on the facts and circumstances known to her at the

time. It is within the bounds of reason for the finder of fact to infer that McGarvey accused Lake of theft based on negative racial stereotyping and imposed discipline that would not have been imposed on his white counterparts when he reacted negatively to the insinuations created by her statements and actions.

McGarvey also confronted Lake after she learned he had delivered packages [*91] without obtaining verification of the time of delivery and made him engage in what can be found to be humiliating and demeaning conduct. There is evidence that the other van driver and the stake truck driver did not have to comply with the tracking policy and/or they were not subjected to similar humiliating and demeaning conduct when they delivered packages without verification or recording the date and time of delivery.

Finally, the finder of fact may infer that McGarvey treated Lake in a very demeaning and unwarranted manner on November 30, 2001, when he requested one hour off and thereafter attempted to comply with McGarvey's directive to provide a supporting explanation for the request. The summary denial of Lake's short day request after he failed to provide an immediate verbal explanation and continued to photocopy his written explanation was determined by the arbitrator to be petty and unwarranted, and provoked Lake to respond with vigor and projection. The finder of fact may draw the same inferences. There is also evidence indicating McGarvey has provided conflicting versions of the events that followed, with accounts that provide more support for the discipline imposed being [*92] given after the fact. Those accounts could be found to lack any independent corroboration and the jury could infer that the shifting explanations are mere pretext for unlawful treatment in the terms and conditions of employment. See *Abramson, 260 F.3d at 284* (ever-shifting reasons for adverse action undermine credibility and provide evidence of pretext); *Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994)* (inconsistencies and contradictions are proper basis to prove decision was the product of discriminatory animus).

The record also contains circumstantial evidence from which the finder of fact can infer that McGarvey harbored and acted on racial bias. McGarvey was known to have made racially insensitive remarks in the workplace. An employee who worked in the same office overheard McGarvey comment to another that "it must

have been scarey" working in New Castle because "there are a awful lot of black people there." This same employee got along well and had a good relationship with McGarvey until she placed a wedding picture on her desk that revealed her husband was an African American. Thereafter, McGarvey's treatment of the employee deteriorated [*93] significantly. [16]

16    Defendant contends this statement is inadmissible as hearsay or double hearsay and is based on a remote incident in any event. But, McGarvey was a decisionmaker and agent of defendant and remarks by her reflecting inherent racial bias are neither hearsay nor stray remarks. See *Abrams v. Lightolier, Inc., 50 F.3d 1204, 1214-15 (3d Cir. 1995)* (age related comments by supervisor were probative of supervisor's attitude toward older workers and thus admissible over evidentiary challenge as inadmissible hearsay and unrelated to decision under review); *Walden v. George-Pacific Corp., 126 F.3d 506, 521 (3d Cir. 1997)* ("Our cases distinguish between discriminatory comments made by individuals within and those by individuals outside the chain of decisionmakers who have the authority [over the employee]."); *Abramson, 260 F.3d at 286* ("Under our case law, it is sufficient if those exhibiting discriminatory animus influenced or participated in the [adverse employment decision]" (collecting cases in support)). Nor does the fact that the statement was made years before the event in question bar its use to show inherent bias. *Roebuck v. Drexel University, 852 F.2d 715, 733 (3d Cir. 1988)* (upholding admissibility of discriminatory comment by decisionmaker five years before adverse employment action). And it is beyond question that evidence sufficiently reflecting harassing or discriminating bias is admissible to prove intent or motive, the existence of a hostile environment and pretext. *Aman, 85 F.3d at 1086*. Indeed, such evidence can at times be critical to the interpretation of ambiguous treatment or the general harassment of an employee. *Hurley v. Atlantic City Police Dep't, 174 F.3d 95, 111-12 (3d Cir. 1999)*.

[*94]   In light of the above, it is within the prerogative of the fact finder to conclude that Lake was subjected to higher standards than his Caucasian counterparts and was forced to endure demeaning and humiliating reprimands when he failed to meet those standards. The finder of fact will also have the prerogative to draw inferences from the evidence suggesting these higher standards may have been imposed on Lake in part because of certain unfounded suspicions or beliefs held by McGarvey, which beliefs can be found to correlate to inherently racist beliefs and viewpoints held by some segments of the American population and some of the employees at the Butler Works.

The treatment of Patterson likewise will permit the trier of fact to find he was subjected to similar treatment. Cordray supervised three employees who had similar absentee records. Of these three, only Patterson was African American. Cordray initially met with the two Caucasian employees and Patterson at about the same time in January of 2001 and issued written warnings to all three. Cordray met with Patterson for a second time about a month later and imposed a one day suspension for absenteeism after he missed three more [*95] days. Cordray did not follow the same course when one of the Caucasian employees missed three consecutive days about two months after the January meeting and then missed a fourth day approximately two weeks thereafter.

Cordray also employed a separate means of tracking Patterson's absences. He marked them on a large calendar which he kept on his office wall. All employees were able to see the calender and the markings denoting Patterson's absences, thus creating the image that he was deserving of special monitoring and ridicule. This was not done for either of the other two employees who had comparable records.

Cordray also imposed cumulative discipline on Patterson after the banding incident. Patterson was suspended for three days but the two Caucasian employees involved in the incident received only written warnings. Although defendant attempts to explain this discrepancy based on the cumulative difference in the employees' disciplinary records, it admits that discipline is determined on a case-by-case basis and need not be progressive. In fact, the company has been held to a standard requiring fair, proportionate and progressive discipline under the collective bargaining agreements. [*96] See Plaintiffs' Counter Statement of Facts Doc. No. 21 at P251. And there is no correlation between the grounds underlying Patterson's prior discipline and the circumstances of the banding incident. The inference that

Patterson was held to higher standards and subjected to harsher discipline than his white counterparts is a permissible one.

Cordray also required Patterson to submit to drug testing more often than his white counterparts. And it is also undisputed that Cordray terminated Patterson after a first positive drug test. There is evidence from which the finder of fact can conclude that the first positive drug test was the specific reason for the discharge. No Caucasian employee had ever been discharged for a first positive drug test. Again, the inference that Patterson was held to higher standards and subjected to harsher discipline is a permissible one. Compare *Aman, 85 F.3d at 1083* (evidence raising inference that race was a substantial factor in the harassment coupled with showing that if plaintiff had been white she would not have been treated in the same manner supports both a prima facia case of discrimination and a hostile environment claim).

[*97] Defendant argues the above inferences sufficiently are displaced because the record contains supporting grounds for the discipline received by Lake and Patterson and the details surrounding each incident prove that no other employee had engaged in similar behavior. For example, when McGarvey questioned Lake about the missing knives, it cannot be disputed that Lake became loud and agitated and cursed McGarvey when he walked away. He also failed to follow McGarvey's directive to deliver packages when the tracking system was imposed and refused to talk to her when she demanded that he read the signature and dating requirements of that system aloud in front of his co-workers. Lake refused to provide an oral explanation for his request for one hour off, choosing instead to provide the explanation in writing and failed to follow a directive to deliver packages during the exchange that followed. Defendant further asserts that McGarvey's monitoring of Lake's whereabouts at the end of his shift because of the reports that he was killing time and her refusal to permit him to randomly select his starting time are minor trivial actions that fall short of the type of adverse employment action [*98] needed to support a claim of discrimination. Because the record contains no evidence that Caucasian employees under McGarvey's supervision behaved in a similar manner and the principal actions taken by McGarvey purportedly did not constitute adverse employment action, defendant posits that any disparate treatment claim must fail. In defendant's view Lake cannot prove he was singled out for different

treatment and he is simply a victim of his own poor judgment.

Defendant advances similar arguments regarding Patterson's treatment. It argues that of the three individuals involved in the banding incident, Patterson was the only one with prior discipline. Similarly, Patterson acknowledged the seriousness of his absenteeism on more than one occasion, and nevertheless continued to miss work on days that raised a suspicion of drug use, warranting a random drug test that proved positive. From defendant's perspective, there was a valid basis for all discipline and drug testing and Patterson cannot identify any Caucasian who was in a nearly identical situation, thereby precluding any claim for disparate treatment.

As Lake and Patterson aptly note, they are not advancing claims based on discrete [*99] acts of discrimination; they are advancing a hostile work environment claim which includes instances of specific disparate treatment. Such claims are by their nature "composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Morgan, 536 U.S. at 117*. Their burden is thus one of demonstrating that a series of separate acts collectively permeated the workplace with discriminatory intimidation, ridicule and insult that was sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive working environment. *Id. at 116*. (quoting *Harris, 510 U.S. at 21*). They need not prove that any single act of harassment is actionable. *Id. at 115*.

But even assuming that the alleged disparate treatment underlying Lake and Patterson's complaint were required to withstand a discrete act of discrimination analysis, summary judgment in defendant's favor still would be inappropriate. First, defendant's position is based on an overly stringent understanding of the forms of actionable conduct. To be sure, suffering cognizable injury is a prerequisite to invoking [*100] the protections of Title VII as an aggrieved person. *Storey v. Burns Int'l Sec. Servs., 390 F.3d 760, 764 (3d Cir. 2004)*. Such an injury is referred to as "an adverse employment action," which is defined as any employment action that is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." Id. (quoting *Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001)*.

This definition stems from Title VII itself, which defines unlawful employment practices to include "discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race ... or to limit, segregate, or classify ... employees ... in any way that would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race ...." *42 U.S.C. § 2000e-2(a)*. Thus, discriminatory conduct other than discharge or refusal to hire is prohibited by Title VII if it alters an employee's "compensation, terms, conditions or privileges of employment" [*101] or deprives the employee of "employment opportunities" or "adversely affects [the employee's] status as an employee. *Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997)*. [17]

> 17   It follows from these prohibitions "that 'not everything that makes an employee unhappy' qualifies as [a materially adverse employment action], for otherwise, minor and even trivial employment actions that 'an irritable, chip-on-the-shoulder employee did not like would form the basis for a discrimination suit.'" Id. (quoting *Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996)*). Under this standard "unsubstantiated oral reprimands" "unnecessary derogatory comments" and other minor negative treatment by employer does not rise to the level of a materially adverse employment action. *Id. at 1301.*

Notwithstanding defendant's contentions to the contrary, the evidence pertaining to the reprimands and discipline receive by Lake and Patterson will support findings that they [*102] have suffered materially adverse employment action. Loss of money is not required to establish an actionable change in working conditions; instead adverse employment action can consist of a change in location, duties, perks, or other basic aspects of the job. *Mondzelewski v. Pathmark Stores, Inc., 162 F.3d 778, 787 (3d Cir. 1998)*. Lake and Patterson both experienced discipline and terminations under circumstances that, as explained above, could be found to have been imposed as a result of being held to higher and more stringent standards. And as defendant readily admits in its defense of Patterson's treatment, such discipline has clear impact and a cumulative effect on any further disciplinary measures. The discipline and suspensions that occurred in this case reflect precisely the types of "terms, conditions and privileges" of employment falling within the scope of Title VII.

Defendant's contention that Lake and Patterson's claims are legally deficient because no sufficient comparators have been identified equally is misplaced. First, a finding of pretext can be based on comparisons of employees that are similarly situated and both Lake and Patterson have identified [*103] other co-coworkers under their respective supervisor's immediate supervision who were Caucasian and treated differently. In addition, Lake has provided evidence that his race did influence McGarvey's decisions in setting department policy and responses in dealing with Lake. Cordroy's calendar depicting Patterson's absenteeism and imposition of discipline for the banding incident can be construed as significant circumstantial evidence of disparate treatment based on race. Thus, the record contains ample evidence to permit findings of pretext based Lake and Patterson's treatment in comparison to the other white employees under the supervision of their foremen.

Moreover, establishing a claim of pretext is not merely limited to a comparison of treatment between similarly situated individuals in and outside the protected class. A claim of discrimination properly is submitted to the finder of fact where there is "some evidence, direct or circumstantial, from which [the] fact finder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of [*104] the employer's action." *Jones v. School Dist. of Philadelphia, 198 F.3d 403, 412-13 (3d Cir. 1999)* (citations omitted).

Both Lake and Patterson have proffered circumstantial evidence suggesting they were held to higher standards and more readily subjected to discipline because of their race. The implications from McGarvey's confrontation with Lake concerning the missing pocket knives, the circumstantial evidence suggesting McGarvey harbored racial bias and the degree of discipline imposed for the infractions in questions will permit the finder of fact to conclude that invidious discrimination was a determinative factor in the discipline Lake received. Similarly, the prevalence of racial graffiti in Patterson's work area coupled with Cordray's failure to report or respond to the same in a timely manner, the display of the calendar depicting Patterson's absences, the degree of

discipline imposed, and the frequency of the drug testing will, when all reasonable inferences are drawn in Patterson's favor, permit the same findings. When this evidence is coupled with the evidence surrounding the racial graffiti and that of the prevalent social attitudes in the workforce, [*105] there is more than sufficient evidence to support a finding of that discriminatory animus was a determinative factor in the discipline they received. Thus, defendant's contention that the record is devoid of the critical evidence necessary to support findings that Lake and Patterson suffered actionable disparate treatment is misplaced. Compare, *Hurley, 174 F.3d at 110* ("evidence of harassment of other women and widespread sexism is also probative of 'whether one of the principal nondiscriminatory reasons asserted by [an employer] for its actions was in fact a pretext for ...discrimination."). [18]

18    Plaintiffs have also proffered statistical evidence in support of their claims. Lake and Patterson were both discharged under circumstances found to be in violation of standard practices and policies under the governing labor agreement. Union records indicate that between September of 1999 and December of 2001, an inordinate number of African American hourly employees were discharged. During that time the total hourly workforce was just over 1,900 employees. Fewer than twenty of those employees were African American. Defendant issued twenty-two disciplinary suspensions with the intent to discharge. Of those, six were filed against African-Americans and sixteen were filed against Caucasian employees. Thus, statistically, less than one percent of Caucasian employees were discharged while over thirty percent of the African-American employees were discharged during that brief period of time. While further briefing and consideration will be necessary to determine whether this statistical evidence properly should be admitted at trial, it is potentially capable of being reduced to admissible evidence and therefor cannot be summarily overlooked on summary judgement, at least as to defendant's contention that the treatment of Lake and Patterson cannot be viewed as disparate treatment. See *Stelwagon Mfg. Co. v. Tarmac Roofing Sys., 63 F.3d 1267, 1275 n.17 (3d Cir. 1995)* (citing *Petruzzi's IGA Supermarkets Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1234 n.9*

*(3d Cir. 1993)* and *J.F. Fesser, Inc. v. Serv-a-portion, Inc., 909 F.2d 1524, 1542 (3d Cir. 1990)* (hearsay statements and other forms of objectionable evidence may be considered if the evidence would be admissible at trial or is potentially capable of being reduced to a form of admissible evidence).

[*106] The record also contains sufficient evidence to prove the harassment forming plaintiffs' claims was pervasive and regular. Title VII is violated only where harassment becomes "sufficiently sever or pervasive to alter the conditions of employment and create an abusive work environment." *Meritor, 477 U.S. at 67*. And it was not enacted to create a "general civility code for the workplace." *Oncale, 523 U.S. at 81*. Conduct which amounts to the "ordinary tribulations of the workplace" such as sporadic use of abusive language, off-handed jokes and occasional taunting and teasing is beyond the purview of Title VII. *Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)*. Conduct becomes actionable only where it is perpetrated because of a protected trait and has become sufficiently "extreme to amount to a change in the terms and conditions of employment." *Faragher, 524 U.S. at 788*.

In ascertaining whether the level of severity and pervasiveness needed to find a hostile environment is present, "it is settled law that courts [are not to] consider each incident of harassment in isolation." *Durham Life, 166 F.3d at 155* [*107] (citing *Andrews, 895 F.2d at 1484*). Instead, the sum total of the abusive or offensive conduct must be evaluated. Id. This includes an analysis of "the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment." *Cardenas, 269 F.3d at 261*. This is the only approach consistent with the repeated directives of the Supreme Court that a hostile work environment claim is to be evaluated under a totality of the circumstances approach and in a manner that focuses on the existing "environment" in question. *Jackson, 191 F.3d at 660* (citing *Andrews, 895 F.2d at 1484* in support) ("[a] play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario.")); *Abramson, 260 F.3d at 279* ("no one event alone stands out from the rest, but all the events could be found to aggregate to create an environment

hostile to a person of Abramson's religion.").

"Harassment is pervasive when 'incidents [*108] of harassment occur either in concert or with regularity.'" *Andrews*, 895 F.2d at 1484 (quoting *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1189 (2d Cir. 1987)). And "the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." *Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir. 1991); *Wanchik v. Great Lakes Health Plan, Inc.*, 6 Fed. Appx. 252, 263 (6th Cir. 2001) (same). At base, the severity and pervasiveness evaluation is "quintessentially a question of fact." *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999) (citations omitted).

The class members have proffered sufficient evidence to prove the workplace was permeated with racial slurs, epithets and graffiti coupled with instances of general harassment, insult and ridicule to a degree that reflected a severe and pervasive hostile work environment. Read as a whole, each class member's testimony reflected the persistent existence of racial graffiti, symbols of hatred and racial slurs about minority employees. Their testimony indicated the display of [*109] the offensive graffiti and the writing or uttering of racial slurs and epithets consistently occurred in or around the common work areas where minority members were assigned. A number of class members testified to repeated exposure to racial slurs, derogatory "jokes" and openly hostile attitudes by co-workers from the time AK Steel acquired the Butler Works through the time the class member's deposition testimony was taken in the latter part of 2003 or the early months of 2004. Their testimony was uniform in indicating the written racial slurs and symbols of hatred regularly appeared in areas utilized or frequented by management.

Perhaps the best evidence of a pervasive hostile environment at the Butler Works during AK Steel's ownership comes from its own witnesses. When questioned about the tracking system imposed on the van drivers in the storeroom department, McGarvey admitted that a number of employees had complained to her that Lake was getting away with not doing his job because he is black. She also received repeated reports that Lake had a habit of "killing time," but did not receive similar comments or reports concerning any other non-minority employee. The finder of fact [*110] will be free to infer that such evidence reflected part of a complex tapestry of

discrimination when examined in conjunction with management's overall response to such conduct and the other specific instances of harassing, disparate or retaliatory treatment of individual class members.

Similarly, the finder of fact may conclude that defendant's massive campaign to eliminate graffiti and written derogatory statements one day prior to the EEOC site visit in effect acknowledged the persistent and extensive existence of offensive symbols and written racial slurs and epithets. The finder of fact may well infer that the need to conduct such a cover-over campaign reflected management's recognition that the existence of such symbols and statements was more than isolated or sporadic. In addition, the finder of fact will have before it several instances where class member experienced harassing and intimidating conduct directly. These include the image left for class member Holmes the day after he was written up for failing to tie his boots, the repeated slurs concerning class member Edwards and the general harassment Patterson experienced from his co-workers. Furthermore, a number of class [*111] members testified that the open forms of investigation conducted by Winter whenever a potential violation was reported in turn caused class members to experience difficulty in their working relations with co-workers. Other incidents include the showing and viewing of a video depicting a KKK induction ceremony and the display of a noose for several years in a common work area routinely frequented by management. Taken as a whole, the finder of fact can conclude that of the record warrants a finding that the hostility in the working environment was pervasive and severe.

Defendant argues that merely identifying specific instances of distasteful or offensive conduct that occurred years and at times decades before it acquired the Butler Works, followed by isolated or unrelated incidence in 2002 or 2003, fails to identify a sufficient continuity to the plaintiffs' claims. In addition, it asserts no class member has identified a course of conduct that is sufficiently extreme to alter an employee's terms and conditions of employment as required under Faragher. Each position is unavailing.

Relying on cases which hold that two racially-charged incidents in the workplace or a few racial [*112] insults and slurs by co-workers and a supervisor fails to supply evidence of a severe and pervasive hostile work environment, defendant maintains

that the racial slurs, "slip-ups" and work place graffiti, while indisputably offensive, cannot support a finding that the class members experienced severe or pervasive harassment because many of the past instances identified occurred years prior to any incident allegedly occurring during its ownership. A review of the record reveals, however, that the class members repeatedly testified that there was continuity to the racial hostility they experienced.

For example, defendant notes that class members Edwards only specifically identified two instances of racial graffiti in common areas, a racially offensive posting on a bulletin board, a swastika on a railroad car and a co-employee engaging in a "slip of the tongue" by using the term "nigger rigged," all of which he failed to report as violations of defendant's anti-harassment policy. But Edwards' recounting of his experiences reflected a level of continuity that defendant's reading of the record fails to appreciate. Edwards testified that racial graffiti in and around his work site started [*113] to appear somewhere around 1983 when he was first assigned to work in Plant No. 2 along with vandalism to his vehicles. It had a consistent theme: "pretty much nigger Ron, black ... ." Subsequently he bid into the cold mill and after a short period of time the graffiti resurfaced. It continued "from '83 on in the form of "nigger Edwards" or "nigger Ron" and various other slurs and derogatory comments in the common areas where he was assigned to work. It continued as long as he remained on the plant floor, which was through July 31, 2003. Although he was familiar with and had received a copy of AK Steel's anti-harassment policy, he did not report the matters because in the past he had turned similar things in and nothing was ever done. He did not see any change in management when AK Steel acquired the Butler Works on September 30, 1999, and the same managers continued to be in charge of the same work sites and use the same facilities. No meaningful efforts toward change had occurred. was ever done. No individuals were ever disciplined. At best, the graffiti was sprayed over only to reappear a short time later. Being called a nigger, being told that he would not have been promoted had [*114] he not been a nigger, and hearing comments such as "nigger rigged" were regular occurrences. It was an environment he had to put up with for twenty-six years and it "got to be a way of life down there."

Class member David Potts' recollection was similar. Defendant notes only his recollection of the term "sand nigger" being heard five to ten times mostly around September 11, 2001, hearing the term "nigger" being used at work five times since 1995 and racially derisive graffiti being written on the walls, none of which he reported. But Potts recounted many more incidents. He identified the same graffiti referenced by the other class members. He witnessed racial slurs and derogatory graffiti in common areas of the melt shop, cold mill, Plant No. 2 and the main plant. These included racial slurs, KKK symbols everywhere, swastikas and similar statements of hatred about Arabs. Such graffiti appeared consistently in the areas until "this case started" and a "no graffiti" policy was instituted. After that people started cleaning things up. From his perspective it was written "all over the place" and created a consistent "kind of tension in the air." And while the graffiti did not use his [*115] name personally, from his perspective it was directed at him because of his race.

The testimony of class member George Holmes was similar. He witnessed all the racial slurs of other African American employees, including Nate Vanderzee, Ron Edwards and Kevin Frost. Swastikas appeared on the railroad cars that traveled throughout the plant frequently. Demeaning jokes were told and repeated in his presence throughout his career, which began in 1997. He attempted to provide specific dates on each incident whenever possible. He fairly consistently reported racial slurs and derogatory writings to the appropriate turn foreman at the time, which included at least four different turn foremen. Only one foreman actively prohibited the use of racial jokes, slurs and comments. He experienced this environment throughout his career. And after the "tie your boots" incident Holmes was very disappointed that his two coworkers, which Holmes believed had nothing to do with the incident, were disciplined after Winter because involved.

Class member William F. Jackson, III, witnessed graffiti throughout the years he worked in security and was well aware of the reports of racial slurs, intimidating symbols [*116] and offensive conduct relayed by other class members such as Lake and Patterson. Following an incident at a plant gate in July of 2001, Jackson began to complete an incident report on any matter involving workplace harassment. He was aware of class member Cook's account of witnessing a video depicting a KKK ceremonial ritual. He also had heard of the noose hanging in the Hilltop Silicone lunchroom. After the incident in July of 2001, he began to complete an incident report on

all instances involving potential workplace harassment. On two occasions he made direct complaints to Winter. One involved the page of "doodles" drawn by Johnson Control Guard Hodill and the second involved a Johnson Controls contractor that made a racially charged comment. Additional incidents included the display of Confederate flags on company property, and Lloyd being counseled by Winter regarding his disclosure to Lake about the inconsistency in AK Steel's policy concerning the display of Confederate flags by contract employees and independent truckers.

Class member Cook indicated racial comments occurred many times in his presence. He did not report a number of incidents because he simply tried to avoid [*117] making waves and attempted to do his job. Racial slurs and derogatory statements as well as offensive symbols appeared in common areas from the 1990's forward, but he could not recall exact dates for particular instances. He did report the appearance of KKK symbols on lockers around the time Lake was experiencing difficulties with McGarvey. Cook also reported some of the instances of harassment from coworker Chuba. After Winter conducted an open investigation regarding the matter, Cook felt "black balled" by his co-workers and everyone stopped talking to him. Any meetings with Winter involving complaints essentially consisted of Winter asking the same questions over and over. Winter's meetings with Cook stopped as soon as Cook elected to take a union representative with him to a meeting with Winter.

Derek Potts similarly testified to persistent racially offensive graffiti and slurs in common areas at the melt shop, cold mill, Plant No. 2 and main plant. He had witnessed the swastikas, racial slurs concerning Arabs, KKK symbols and the like, as well as "slip-ups" involving racial slurs or comments "all the time." He was aware of the pictures depicting Dave Clark, numerous KKK symbols, [*118] the noose in the Hilltop Silicone lunchroom and numerous other incidents. He did not report these because if he reported everything he saw over the course of his employment, he'd be "reporting a lot of incidents."

Taken as a whole, the above testimony will support a finding that the atmosphere at the Butler Works was permeated with racial graffiti, slurs and epithets, offensive symbols of hatred and derogatory and demeaning depictions of individual minority employees.

A number or class members testified or implied that this atmosphere was fairly constant from the time they were hired through the point of the EEOC's investigation in 2003. And although the individual members were only able to recall some of the specific instances and examples of conduct they experienced, the detailing of a handful of instances coupled with testimony indicating similar conduct occurred regularly or consistently is sufficient to create a triable issue on the pervasive and regular element. See *Torres, 116 F.3d at 631* ("if a jury were to credit Torres' general allegations of constant abuse, which were confirmed by her coworkers, it could reasonably find pervasive harassment, even in the [*119] absence of specific details about each incident.") (collecting cases in support)).

Furthermore, the class members' testimony as a whole indicates they generally were aware of the experiences of their minority coworkers. The cases are legion for the proposition that incidents of harassment and discrimination experienced by other minority members can contribute to and must be taken into account in assessing whether the workplace was sufficiently permeated with hostility. See *Hurley, 174 F.3d at 111* ("evidence of other acts of harassment [on other minority members] is extremely probative as to whether the harassment" experienced by a particular plaintiff is discriminatory and whether the defendant knew or should have known that it was occurring despite the formal existence of an anti-harassment policy, especially where the defenses include the contention that the incidents were trivial and its written harassment policy is sufficient to insulate it from liability); *Glass v. Philadelphia Elec. Co., 34 F.3d 188, 195 (3d Cir. 1994)* (an atmosphere of condoned harassment in the workplace increases the likelihood of specific instances of retaliation or [*120] discrimination) (citing in support *Hunter v. Allis-Chalmers Corp., 797 F.2d 1417, 1421 (7th Cir. 1986)* (affirming district court's decision to admit evidence of harassment against other black workers in discriminatory discharge case because the "evidence was relevant both in the showing that Allis-Chalmers condoned racial harassment by its workers and in rebutting Allis-Chalmers' defense that it had fired Hunter for cause.")); *Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000)* (because the critical inquiry focuses on workplace environment as a whole, other instances of harassment of a members of the plaintiff's protected class as well as members of other minorities can be used to demonstrate the hostility of a work environment) (citing

*Schwapp v. Town of Avon, 118 F.3d 106, 111-12 (2d Cir. 1997)); Hirase-Doi v. U.S. West Communications, Inc., 61 F.3d 777, 782 (10th Cir. 1995)* ("evidence of a general work atmosphere, including evidence of other [minority members], may be considered in evaluating a [hostile work environment] claim."). There is more than sufficient evidence for the finder of fact to conclude [*121] that the common experiences of the class members reflected in the aggregate an environment permeated with pervasive and regular racial harassment.

Lake and Patterson also have proffered sufficient evidence to support a finding that the harassment they experienced was pervasive and regular. In addition to the evidence discussed above, the jury could find Lake and Patterson were held to higher standards and subjected to ridicule and harsher discipline by their supervisors over a period of several months. After maintaining an unblemished disciplinary record for nearly twenty years, Lake was subjected to unprecedented discipline and ultimately discharged within a very short period of time after coming under McGarvey's supervision. Patterson likewise was monitored closely by Cordray over a period of several months and similarly subjected to unprecedented discipline. While defendant has advanced justification for each separate disciplinary measure, it is the aggregate of the events that must be considered in evaluating the environment. Lake and Patterson's treatment from their supervisors began with modest discipline, but escalated to frequent and unprecedented measures in the months that [*122] followed. Lake was monitored and scrutinized far beyond the other employees under McGarvey's supervision and she treated him in a demeaning and humiliating manner on a number of occasions. She also attempted to ridicule him in front of his co-workers for failing to follow the monitoring system she had imposed to track his whereabouts. Cordray similarly displayed Patterson's ongoing absences to his co-workers and imposed discipline for those absences, but did not do the same for non-minority employees with similar records of absenteeism. Patterson also was the only employee to receive a suspension over the banding incident notwithstanding the fact that all three employees had the same disciplinary records when it came to incidents involving safety. He was subjected to drug tests far in excess of the other employees within his department and discharged in violation of company policy. No non-minority employee had ever been discharged under similar circumstances. When viewed in the entire context each series of events could be construed as reflecting severe and pervasive harassment.

The record also will support a determination that the working environment of each plaintiff constituted [*123] a change in the terms and conditions of employment. Defendant strenuously contends plaintiffs have done nothing more than demonstrate that they believe they were victims of discrimination, and in light of the various remedial measures taken in response to any actual complaints about racial hostility, plaintiffs cannot prove the environment was objectively hostile or offensive. From its perspective the record fails to reflect any conduct that is sufficiently "extreme" to support liability under Title VII. We again must respectfully disagree.

Defendant aptly notes that the standards for judging hostility are designed to assure that "the ordinary tribulations of the workplace" are not substituted for the "extreme" conduct needed "to amount to a change in the terms and conditions in employment." *Faragher, 524 U.S. at 788.* And if the record contained only "isolated incidents of racial enmity" as defendant so strenuously contends, the conduct of which plaintiffs complain would not be actionable under Title VII. See *Woodland v. Joseph T. Ryerson & Son, Inc., 302 F.3d 839, 844 (8th Cir. 2002)* (a handful of incidents where co-workers used racial epithets, [*124] three of which involved a direct reference to the plaintiff, the use of an obscene gesture on one occasion, and a remote and isolated incident involving a hooded figure, drawings of "KKK" and a swastika, which was promptly addressed through a staff meeting emphasizing that such conduct would not be tolerated and severe discipline would be imposed on anyone involved in its reoccurrence, was "neither severe nor pervasive enough to create a hostile work environment."); *Snell v. Suffolk County, 782 F.2d 1094, 1103 (2d Cir. 1986)* ("isolated incidents of racial enmity" do not constitute actionable conduct). But as noted above, the instant record reflects much more than a few isolated incidents of racial enmity.

As an initial matter defendant misapprehends the Court's reiteration in Faragher that courts are to be vigilant in assuring only "extreme" conduct be permitted to supply the foundation for a finding of actionable workplace hostility. To be sure, the Court has repeatedly emphasized that the "mere utterance of an ... epithet which engenders offensive feelings in an employee" does not in itself alter the conditions of the recipient's employment and create [*125] an abusive or hostile

environment. *Harris, 510 U.S. at 21*; *see also Weston v. Pennsylvania Department of Corrections, 251 F.3d 420, 428 (3d Cir. 2001)* ("the mere utterance of an epithet, joke, or inappropriate taunt that may cause offense does not sufficiently affect the conditions of employment to implicate Title VII liability."). But establishing the existence of an abusive work environment does not require a showing that the conduct affected an employee's psychological well-being or caused physical injury. *Id. at 22.* Title VII's protections come "into play before the harassing conduct leads to a nervous breakdown." Id. They also come into play without having to prove overt "economic or tangible discrimination." *Meritor, 477 U.S. at 64.*

What is necessary is a showing that the abusive environment could reasonably be perceived and actually was perceived by the employee as hostile and capable of detracting from job performance, continued employment or career advancements. *Harris, 510 U.S. at 21-22; Faragher, 524 U.S. at 787* (to be actionable, an "objectionable environment must be both objectively [*126] and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."). However such actual tangible effects need not be demonstrated to offend Title VII's broad rule of workplace equality. Id.; *Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1277 (11th Cir. 2002)* ("the harassment need not be shown to be so extreme that it produces tangible effects on job performance in order to be actionable."); *Brantley v. City of Macon, 390 F. Supp.2d 1314, 1327 (M.D. Ga. 2005)* (work environment permeated with racial tension to the point of being "racially charged" is actionable without concrete evidence showing tangible effects on pay or similar terms of employment). Hostility that alters an employee's working conditions for the worse is enough. *Torres, 116 F.3d at 631-32* ("Whenever the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse, it is actionable under Title VII, so long as the employee subjectively experienced a hostile work environment.").

There is no talismanic formula for determining [*127] when an environment objectively is hostile or abusive. Id. The determination must be made by "looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive

utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher, 524 U.S. at 787-88* (quoting *Harris, 510 U.S. at 23*). The cumulative and exacerbating effects of the harassment experienced by all minority workers may be considered where there is evidence that the plaintiff was aware of or familiar with the hostile events experienced by the others. *Hurley, 174 F.3d at 110; Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000)* ("Remarks targeting members of other minorities, for example, may contribute to the overall hostility of the working environment for a minority employee."); *Hirase-Doi, 61 F.3d at 782* ("Evidence of a general work atmosphere, including evidence of harassment of other [protected class members], may be considered in evaluating a claim.").

Read as a whole, the class members' [*128] testimony and accounting of racial epithets and slurs is more akin to a constant bombardment than a few isolated or sporadic instances, regardless of whether the evidence is confined to the four years reflecting AK Steel's ownership or the years preceding it. The offensive graffiti frequently was directed at specific minority employees and appeared in common areas near their work site. Intimidating symbols appeared regularly and were permitted to remain. Offensive racial graffiti and slurs remained visible until a complaint was made and then often re-appeared shortly after being covered over. The statements, slurs and graffiti followed minority workers from one job site to the next.

The record will also permit the finder of fact to make several additional findings or inferences. Effort by a minority management employee to inform another minority employee about the lack of consistency in company policy concerning the display of a racially-insensitive emblem was met with a stern reprisal of dissatisfaction and questioning of his company loyalty by the individual in charge of defendant's anti-harassment policy. Complaints about matters of discipline were addressed through investigations [*129] that kept matters of discipline and disparate treatment separate and distinct, notwithstanding the fact that disproportionate and unprecedented discipline was being imposed on minority members. Plant security were directed to stop preparing incident reports or documenting any display of racially offensive material or conduct implicating defendant's anti-harassment policy. Initiation of complaints at the Butler Works concerning racial matters could only be done by meeting with one of two very high-ranking plant

supervisors. Investigations into complaints of offensive or abusive conduct by co-workers were done openly and without confidentiality, and were followed by isolating and non-cooperative attitudes from co-workers. Such investigations primarily consisted of the questioning of anyone potentially involved followed by a proclamation that nothing could be done in light of the inability to substantiate the claim or identify the perpetrator or culprit.

In addition, certain class members were required to meet performance standards that were not required of non-minority employees working for the same supervisor, and any complaint about or the failure to comply with those standards resulted [*130] in humiliation and ridicule in front of others and/or unprecedented discipline. A significant number of the class members communicated with each other about racially-based or racially perceived incidents occurring at the Butler Works.

The longstanding atmosphere of racial slurs and epithets, offensive symbols and recurrent racial and ethnic jokes is in itself sufficient to support a finding that the environment would be objectively offensive and hostile to a reasonable minority employee. Compare *Jackson, 191 F.3d at 662* ("an abundance of racial epithets and racially offensive graffiti could hardly qualify as offhanded or isolated" and will support "a jury finding that a work environment was racially hostile."); *Rodgers, 12 F.3d at 673-75* (racial graffiti and epithets such as the word "nigger" clearly qualify as forms and incidents of racial harassment); *Allen v. Michigan Dep't of Corrections, 165 F.3d 405 (6th Cir. 1999)* (use of racial epithets, racial slurs and intimidating symbols and depictions such as Klansmen, the "KKK" and nooses establish objectively hostile work environment). In addition, there is evidence to support findings [*131] that Lake and Patterson were held to more stringent performance standards and/or accused of misconduct by their immediate supervisor based on negative stereotyping and complaints about or failure to comply with those standards resulted in humiliation, ridicule and/or unprecedented discipline. Incidents such as the initiation of discipline over first-time infractions, the failure to investigate complaints through independent means, the ever-increasing imposition of discipline, exposure to humiliating and ridiculing conduct for failure to follow work directives, and being discharged under circumstances that violated established labor practices

could all be found to have sufficiently altered the terms and conditions of each plaintiff's employment. See *Aman, 85 F.3d at 1083* (evidence indicating employee is improperly accused of misconduct, subjected to inordinate discipline, overly scrutinized in job performance and given inconsistent directives coupled with statements by co-workers and management that could be understood as code words for racial animosity will support a finding of an objectively offensive racially-hostile work environment); *Jackson, 191 F.3d at 665-67* [*132] (investigations that repeatedly produce no results followed by the posting of the company's anti-harassment policy can contribute to the objective hostility of the environment).

There is also sufficient evidence to support a finding of fact that the class members perceived the work environment as racially offensive. Several class members indicated they did not report specific instances of conduct or graffiti. Some members indicated they were used to such conduct and had come to believe it was just easier to take it in stride. Certain members also admitted that some of the conduct amounted to nothing more than innocuous teasing and taunting that was not personally offensive. At lease one member admitted to using racial epithets on occasion and only considered the use of such language offensive when it was used broadly as opposed to being bantered about among friends. Others admitted that the displays of swastikas were understood by some employees to be a comment on defendant's management style and not as carrying racial connotations.

Nevertheless, the record when viewed as a whole will support a determination that the class members subjectively considered the overall environment to [*133] be racially hostile and abusive. A number of class members testified that the persistent slip-ups, offensive graffiti, racial jokes, and symbols of white supremacy created a persistent feeling of tension in the air and complaints about such depictions or treatment resulted in ostracization by fellow employees due to the way such complaints were handled. A class member in management was reprimanded for attempting to ascertain whether "company policy" on displaying the Confederate flag was uniform throughout the plant and was made to feel as if he was being punished for disloyalty when he disclosed to other class members that a number of departments were unaware of any policy on the matter. Other class members were held to higher work standards, subjected to harsher and unprecedented discipline, and

discharged under circumstances that violated company policy while their complaints of discriminatory treatment were being routinely dropped as being unsubstantiated. Clearly, the fact that some class members tried to cope within the environment in a manner that caused the fewest repercussions given the results of their prior complaints does not equate to a finding that the environment was [*134] not subjectively perceived to be offensive, and, when all reasonable inferences are drawn in plaintiffs' favor, the record will support a finding that plaintiffs perceived the environment as a whole to be racially hostile and abusive.

Defendant vigorously challenges plaintiff's ability to establish the final element of a prima facia case: vicarious liability. It posits that the record lacks any reliable basis to charge it with having notice of many of the incidents underlying the class members' claim because the class members admittedly did not report incidents of harassment and specifically chose not to at times in order to create evidence to support the claims in this case. The record also purportedly shows it promptly responded to any reported complaints, there is no evidence that management was aware of the other offensive workplace incidents and reasonable care was taken to provide a suitable work environment by establishing an appropriate anti-harassment policy with user-friendly reporting procedures. The policy was calculated to eliminate offensive or abusive conduct if properly used by the class members and it was disseminated to employees, reviewed with them and posted at [*135] appropriate locations throughout the plant. Consequently, from defendant's perspective, the circumstances surrounding the underlying conduct and its anti-harassment policy preclude the imposition of respondeat superior liability. We disagree.

In general, although Title VII is a remedial statute, its primary objective is to avoid harm. *Faragher, 524 U.S. at 806.* Consequently, the law and regulations under Title VII recognize an employer's affirmative obligation to prevent violations. Id. They also afford protection to employers that make reasonable efforts to discharge that duty. Id. Similarly, employees have a coordinate duty to use all reasonable means available to avoid or minimize any injury or damages flowing from Title VII violations. Id.

The standards governing employer liability for a hostile work environment differ depending on the source

of the hostility. *Clark v. UPS, 400 F.3d 341, 348 (6th Cir. 2005).* Imputing liability for co-worker harassment is grounded in the employer's direct negligence. *Ocheltree, 335 F.3d at 333-34.* Where a co-worker is the source of the hostile environment, [*136] "liability exists where the defendant knew or should of known of the harassment and failed to take prompt remedial action." *Kunin v. Sears Roebuck and Co., 175 F.3d 289, 293 (3d Cir. 1999)* (quoting *Andrews, 895 F.2d 1486*); see also *Clark, 400 F.3d at 348* ("In the case of a harassing co-worker, 'an employer is liable if it knew or should of known of the charged sexual harassment and failed to implement prompt and appropriate corrective measures.'") (quoting *Hafford v. Seidner, 183 F.3d 506, 513 (6th Cir. 1999)*; *Ocheltree, 335 F.3d at 333-34* (same); *Jackson, 191 F.3d at 659* (same); *Galdamez, 415 F.3d at 1024* ("Once the Postal Service actually knew (or reasonably should have known) about what Galdamez was experiencing, it was required to 'undertake remedial measures reasonably calculated to end the harassment.'") (quoting *McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1113 (9th Cir. 2004)*).

In contrast, "an employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or [*137] successively higher) authority over the employee." *Faragher, 524 U.S. at 807.* This liability is predicated on the theory that the "tortious conduct is made possible or facilitated by the existence of the actual agency relationship." *Durham Life, 166 F.3d at 150.* Liability is divided into two categories: (1) where no tangible employment action is taken, the employer may raise an affirmative defense predicated on the exercise of reasonable care to prevent harm; (2) no defense is available, however, where the supervisor's harassment culminates in "tangible employment action." Id. (quoting *Faragher, 524 U.S. at 808*). A tangible employment action is one that "constitutes a significant change in employment status, such as a hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998).* It likewise may be established by demonstrating a materially adverse change based upon other indices that are unique to the particular situation. Id. (citing with approval *Crady v. Liberty National Bank & Trust Co. of Indiana, 993 F.2d 132, 136 (7th Cir. 1993)*). [*138] In contrast, a demotion without change in pay, benefits, duties or prestige or even a re-assignment to a less

convenient job or location is insufficient. Id. (citing with approval *Kocsis v. Multi-Care Management Inc., 97 F.3d 876, 887 (6th Cir. 1996)* and *Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir. 1994)*).

Where the reasonable care defense is available the employer may defend by establishing two elements: (1) it exercised reasonable care to prevent and correct promptly any harassing conduct; and (2) the employee unreasonably failed to utilize the preventive or corrective opportunities made available or to avoid harm otherwise. *Faragher, 524 U.S. at 807*; *Hurley, 174 F.3d at 118*. The existence of an anti-harassment policy with adequate complaint procedures suitable to the employment circumstances appropriately is considered under the first element. And whether the employee unreasonably failed to utilize a suitable policy or take advantage of some other reasonable means to avoid harm is considered under the second. *Faragher, 524 U.S. at 806-7*; *Clark, 400 F.3d at 348-49*. [*139] The defense thus has both "active and inactive components: before the employer can benefit from the defense, it must prove both that it *acted* reasonably in preventing and correcting harassment and that the victimized employee unreasonably *failed to act* by not utilizing complaint opportunities." *Clark, 400 F.3d at 349* (emphasis in original). The defense is lost if the evidence is insufficient to support either prong. Id.; *Faragher, 524 U.S. at 808*; *Hurley, 174 F.3d at 118*; *Savino v. C.P. Hall Co., 199 F.3d 925, 932 (7th Cir. 1999)* ("Thus, to merit an instruction on the Faragher/Ellerth affirmative defense the employer must show that: (1) the plaintiff endured no tangible employment action; (2) there is some evidence that the employer reasonably attempted to correct and prevent [the] harassment; and (3) there is some evidence that the employee unreasonably failed to utilize the avenues presented to prevent or correct the harassment.").

Defendant's efforts to insulate itself from liability as a matter of law through the reasonable care defense is unavailing for numerous reasons. First, the record contains [*140] ample evidence from which the finder of fact can conclude defendant had notice of the abusive environment of which class plaintiffs complain.

Satisfying the notice requirement under *Andrews* only requires a plaintiff to advance sufficient evidence to prove the defendant "knew or should have known" of the harassment. *Kunin, 175 F.3d at 293-94*. Sufficient evidence of actual or constructive notice will suffice. Id.

*at 294*. Constructive notice will be recognized in at least two separate situations: "where an employee provides management level personnel with enough information to raise a probability of [unlawful] harassment in the mind of a reasonable employer, or where the harassment is so pervasive and open that a reasonable employer would have had to be aware of it." Id. (citing *Zimmerman v. Cook County Sheriff's Dep't., 96 F.3d 1017, 1018-19 (7th Cir. 1996)*).

While defendant denies that it had notice of any environmental conditions that were not reported to Winter, the record contains sufficient evidence to support a finding of notice. Several class members indicated they reported incidents of harassment to their direct supervisors [*141] after they were first exposed to the environment, but little if anything was ever done to eliminate its reoccurrence. Defendant's predecessor was slow to respond to any formal complaint and graffiti reappeared within a short time of its removal, if it was removed at all. No perpetrator was ever identified and disciplined. No educational meetings were held with employees. Management essentially remained unchanged when AK Steel acquired the Butler Works on September 30, 1999. Certain class members reported incidents concerning racial slurs and graffiti to their immediate supervisors during the first couple of years after defendant acquired the plant. These complaints were met with similar responses. Defendant's anti-harassment policy directed supervisors to report incidents that potentially reflected a violation of the policy to Human Resources personnel until May 15, 2000, when defendant officially alleviated such individuals from having to report offensive conduct or events. Some class members continued to make periodic reports to their direct supervisors thereafter. As a whole, these notices to turn foremen and low level supervisors provide some evidence that defendant received direct [*142] notice of various aspects of the abusive environment. Compare *Hurley, 174 F.3d at 118* (an employee only has to attempt a method that the employer has sanctioned for providing notice and has no obligation to exhaust every available method once agents of the defendant who can be presumed to act on the matter have become aware of the offending conduct or event); *Kunin, 175 F.3d at 294* (liability can attach without a formal complaint by the employee where management level personnel gain enough information to raise the probability of offensive conduct with a reasonable employer); *Young v. Bayer Corp., 123 F.3d 672, 675 (7th Cir. 1997)* (finding it

sufficient for a plaintiff to give notice to someone who reasonably should be expected to stop the harassment or refer the complaint up the chain of command to someone who can stop it) (cited with approval in *Hurley, 174 F.3d at 118 n. 17*); *Jackson, 191 F.3d at 663* (the standard is not whether a specific employee reported the offensive conduct of co-workers; instead, the employee must demonstrate that the employer knew or should have known of the offending conduct [*143] and the finder of fact may consider the reports of any minority employees that had the potential to satisfy this standard); *Torres, 116 F.3d at 634 n. 9* ("An employer can be held liable if it had constructive notice of the harassment, that is, if officials sufficiently high in the management hierarchy should have gained knowledge of it through the exercise of reasonable care.").

Beyond the evidence and inferences pertaining to direct notice, the finder of fact will also be able to consider two significant pieces of circumstantial evidence generated by defendant. First, on February 11, 2002, defendant's head of plant security issued an email regarding defendant's "Harassment Policy" to the members of plant security informing them that the topic at that morning's meeting was "posters, photos, books, calenders, etc.," that were offensive either "sexually [or] ethically...." It was reported that "Winter is finding items when he was out in the plant" and security personnel were asked: "why are you not uncovering them?"

Second, defendant initiated a massive paint-over of graffiti throughout the plant just prior to the EEOC's site visit on June 30, 2003. When questioned [*144] about this incident, Winter claimed to have "routinely" removed offensive material from plant property, but could not identify the last time this "routine" was carried out prior to the EEOC site visit or how often such measures were performed.

The inference that Winter was well aware that offensive racial slurs and graffiti "routinely" appeared throughout the plant (or at least of the tendency of this environment to be perpetuated) is a permissible one. Both the February 11, 2002, email from Hesidenz and the massive paint-over provide strong evidence that the chief officer in charge of defendant's harassment policy was well aware of a persistent offensive and abusive environment at the Butler Works. At the very least, the finder of fact may conclude from this circumstantial evidence alone that a reasonable employer would

recognize the probability of an ongoing offensive and abusive environment and that knowledge of a hostile environment properly should be imputed to defendant.

The finder of fact may also determine that the racial harassment at the Butler Works was so pervasive and open that a reasonable employer would have been aware of it. As previously noted, the class members [*145] essentially testified to a fairly constant bombardment of offensive racial slurs and epithets in the workplace with graffiti and symbols of white supremacy being prevalent in most if not all common areas of the major sections of the plant. Derogatory statements and drawings repeatedly appeared in common locations near the work sites where class members were assigned. Racial jokes were posted on bulletin boards and remained there until found and removed by minority workers. Ethnic and racial jokes circulated throughout the workforce, including to high level supervisors who in turn perpetuated their dissemination. High level supervisors were indifferent to, did not take serious and "joked" about incidents involving the presence of offensive or intimidating symbols. Comments about minority workers getting away with not having to perform their jobs because of the color of their skin were made to management personnel who then formulated department policy based on these comments. Collectively, these aspects of the record supply more than ample evidence to support a finding that the hostile environment was sufficiently pervasive and open to place a reasonable employer on notice of its existence.

[*146] Plaintiffs Lake and Patterson also have proffered sufficient evidence to support findings of notice regarding a hostile or abusive working environment fostered by their immediate supervisors. These class members directly and indirectly complained to Winter about being subjected to disparate treatment at the hands of their supervisors. [19] Each relayed a series of past events concerning the environment as well as more recent treatment which they viewed as disparate and/or part of the overall atmosphere. To the extent the finder of fact credits these accounts and concludes that minority workers such as Lake and Patterson were held to higher standards, subjected to inordinate discipline, overly scrutinized in job performance, improperly accused of misconduct, or subjected to humiliating and demeaning conduct by their supervisors because of their race, it will have necessarily determined as well that sufficient notice to alert a reasonable employer to the probability of a hostile environment was received by defendant's

management level employees.

19  Patterson did not initially complain to Winter about being the victim of disparate treatment. Patterson made comments to a shift manager about the offensive graffiti and discriminatory practices within the Butler Works. The shift manager made Winter aware of the comments and Winter set up an interview with Patterson to discuss his concerns. Of course, Winter's acquisition of notice through these channels provides further support for a finding that class members' complaints to their immediate supervisors should be viewed as constructive notice that properly is imputed to defendant.

[*147] When the record is considered as a whole, it is apparent that there will be several avenues available for the finder of fact to find or impute notice to defendant. Thus, plaintiffs have met their burden to proffer sufficient evidence to establish this prerequisite for respondeat superior liability.

The record also contains genuine issues of material fact regarding whether defendant "exercised reasonable care to prevent and correct promptly any [racially] harassing behavior." *Hurley, 174 F.3d at 118* (quoting *Ellerth, 118 S. Ct. at 2270*). Defendant maintains that its harassment policy and its responses to the matters reported by plaintiffs demonstrate that it exercised all necessary due care as a matter of law. From its perspective it implemented measures reasonably calculated to end any reported harassment by co-workers and its agents did not engage in any harassment or assist in perpetrating a hostile environment. Consequently, defendant argues it essentially did all it could do to prevent and correct any harmful conditions and therefore it is entitled to summary judgement. Several aspects of the record undermine this position.

As an initial [*148] matter, to the extent the finder of fact is convinced that Lake and Patterson suffered discipline as part of a racially hostile environment, then the due care defense will be unavailable for that discipline and the repercussions therefrom. 20 But even assuming defendant is not precluded from raising its anti-harassment policy as part of a due care defense, material issues of fact remain regarding whether defendant exercised reasonable care under the circumstances and took adequate measures reasonably calculated to eliminate the abusive and offensive aspects

of the environment. 21

20  The record sufficiently reflects that formal discipline such as a suspension or termination is treated commutatively at the Butler Works and therefore would constitute a materially adverse change in an employee's status. To the extent any such discipline is found to be part of the abusive environment it will therefore constitute tangible employment action against the employee and liability for that action will attach without the need to prove notice and failure to exercise due care. *Faragher, 524 U.S. at 807; Durham Life, 166 F.3d at 150.*

[*149]

21  To the extent defendant relies on its harassment policy to defeat any harassment perpetrated or condoned by its managers, defendant clearly bears the burden of proof and persuasion on each element of the Faragher/Ellerth affirmative defense. *Faragher, 524 U.S. at 807; Hurley, 174 F.3d at 120* ("Faragher and Ellerth established that the defense of employer due care is an affirmative one."). As "the party who bears the burden of proof at trial, the standard [defendant must meet for summary judgment] is more stringent." *National State Bank v. Federal Reserve Bank, 979 F.2d 1579, 1582 (3d Cir. 1992).* In such circumstances the motion must be denied "even if no opposing evidentiary material is presented" provided the evidence referenced by the movement actually reflects "a genuine factual issue." Id. (citing *Resolution Trust Corp. v. Gill, 960 F.2d 336, 340 (3d Cir. 1992)).* We will assume that defendant bears the same burden to the extent it relies on its policy and the actions taken thereunder to overcome the proof that plaintiffs advance to establish that due care was not taken to correct promptly the components of plaintiffs' hostile environment claim and prevent future harassment. See *Hurley, 174 F.3d at 118-19* (analyzing whether the defendant had conclusively proved the affirmative defense in response to a claim of co-worker harassment of which at least one of the defendant's agents had knowledge); *Ocheltree, 335 F.3d at 333-35* (analyzing the evidence supporting the affirmative defense in concluding that the plaintiff had proffered sufficient evidence to support findings that the employer "knew or should have known

about the [co-worker] harassment and failed to take effective action to stop it.").

[*150] Defendant's attempt to insulate itself from liability based on the existence of its anti-harassment policy fails for a number of reasons. First, the applicable appellate precedent does "not, as the defendant seem[s] to assume, focus mechanically on the formal existence of a [anti-] harassment policy, allowing an absolute defense to a hostile work environment claim whenever the employer can point to an anti-harassment policy of some sort." *Hurley, 174 F.3d at 118*. In addition to satisfying the elements on paper, a stated policy must "suitable to the employment circumstances" and the record must reflect an adequate exercise of due care in attempting to both prevent and correct harassing behavior. Id.; see also *Clark, 400 F.3d at 349-50* (the proper inquiry in determining whether a defendant has sufficiently exercised due care in attempting to prevent and correct the alleged harassing behavior is not only on the existence and content of a harassment policy, but also the employer's implementation of that policy); *Ocheltree, 335 F.3d at 335-36* (procedures under and manner of implementing a harassment policy must be analyzed in determining [*151] whether the defendant's harassment policy reflects a reasonable response to workplace harassment that is designed to provide prompt and effective measures to eliminate it); *Thomas v. BET Soundstage Restaurant, 104 F. Supp.2d 558 (D. Md. 2000)* ("An anti-harassment policy that an employer adopts must be 'both reasonably designed and reasonably effectual.'") (quoting *Brown v. Perry, 184 F.3d 388, 396 (4th Cir. 1999)); Jackson, 191 F.3d at 664-66* (assessing the appropriateness of an employer's response and its potential effectiveness in eliminating and preventing future harassment under the circumstances presented are essential in evaluating an employer's invocation of the Faragher/Ellerth affirmative defense).

Defendant notes the record will support a finding that some responsive action was taken by Winter after he became aware of any explicit complaint of workplace harassment and argues that it could not correct or eliminate workplace discrimination that was not explicitly brought to its attention through an employee complaint. It further notes that on a number of occasions the harassment stopped after Winter's investigation. For [*152] example, when Lake informed Winter that someone from the combustion department was referring to him in a racially derogatory manner but was unable or

unwilling to identify the perpetrator, Winter developed "an interview guide" and questioned everyone within that department. Although this approach did not reveal the culprit, the conduct thereafter stopped. Similarly, after William Jackson reported inappropriate conduct by contractors coming on to AK Steel property, Winter reported to Jackson that he had taken responsive measures and those contractors did not appear on AK Steel property thereafter. When Eric Cook reported that statements were made that made him uncomfortable and alluded that the statements were uttered by certain individuals working with him, Winter conducted a series of interviews with the employees. After each employee disavowed any knowledge of the incident, Winter reported the results of his investigation to Cook and advised him that nothing more could be done. Cook did not report any similar conduct thereafter. The same approach was utilized with regard to the video tape showing of the KKK induction ceremony with the same result. When Holmes discovered the intimidating [*153] drawing referencing the citation for failing to tie his boots, Winter interviewed some of the employees that could have created the picture and, after he was unable to identify the culprit due to everyone's denials, Winter sent "a strong message" by disciplining the two employees who technically had violated defendant's policy by not immediately reporting the incident to him.

Winter also investigated the complaints of disparate treatment by Lake and Patterson. Winter used a similar approach when Lake made his first complaint about disparate treatment from McGarvey. Bergbigler was directed to read interview questions to McGarvey. The use of these questions led to plausible explanations for the conduct underlying Lake's complaint and therefore Winter informed Lake that McGarvey was just running a tighter ship.

A similar approach was employed in the matters Patterson indirectly brought to Winter's attention. Winter separated those incidents that were historical, and then examined the more recent matters concerning Patterson's work calculations. After determining that there was nothing inappropriate in the wok calculations, he advised Patterson that there was nothing improper in the [*154] calculations. Thus, Winter found no basis to support either Lake or Patterson's complaints and thereafter viewed their complaints about discrimination as matters separate and distinct from their complaints involving discipline or other workplace incidents.

Finally, Winter covered over any specific racial graffiti reported to him. And after this lawsuit was filed he conducted a plant-wide cover-over of all graffiti or symbols on plant property the evening before the EEOC's scheduled site visit.

Defendant maintains that these and similar aspects of the record indicate it took prompt and appropriate remedial measures regarding all explicit complaints of harassment brought to its attention and beyond that it cannot be faulted for failing to correct or eliminate unknown workplace conditions or treatment that were not brought to its attention. As a result, it exercised a degree of due care that precludes liability.

Defendant's effort to limit its responsibility to only those incidents which plaintiffs formally reported is unavailing. "An employer cannot 'use its own policies to insulate itself from liability by placing an increased burden on a complainant to prove notice beyond that required [*155] by law.'" *Hurley, 174 F.3d at 118* (quoting *Williamson v. City of Houston, 148 F.3d 462, 467 (5th Cir. 1998)*. To the contrary "the law is clear that 'an employer may not stand by and allow an employee to be subjected to a course of racial and/or sexual harassment by co-workers' or supervisors." *Torres, 116 F.3d at 636* (quoting *Snell, 782 F.2d at 1104*). In other words, "once an employer has knowledge of the harassment, the law imposes upon the employer a 'duty to take reasonable steps to eliminate it.'" Id. And as explained above, the record contains numerous avenues that could lead to a finding that defendant had at least constructive notice that the "workplace [was] permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris, 510 U.S. at 21* (citations omitted).

Furthermore, the structure of defendant's policy creates material issues of fact regarding whether it was reasonably suited to the circumstances. "While there is no exact formula for what [*156] constitutes a 'reasonable' [racial] harassment policy, an effective policy should at least: (1) require supervisors to report incidents of [offensive] harassment, see *Varner v. Nat'l Super Markets, Inc., 94 F.3d 1209, 1214 (8th Cir. 1996)*; (2) permit both informal and formal complaints of harassment to be made, *Wilson v. Tulsa Junior Coll., 164 F.3d 534, 541 (10th Cir. 1998)*; (3) provide a mechanism

for bypassing a harassing supervisor when making a complaint, *Faragher, 524 U.S. at 808, 118 S. Ct. 2275*; and (4) provide for training regarding the policy *Wilson, 164 F.3d at 541*." *Clark, 400 F.3d at 349* (citations in original). Defendant's policy falls short of containing even these basic foundational planks.

First, the failure to place any duty on supervisors working with employees to report incidents of harassment to those with full management authority is a factor the jury can consider in determining whether a policy reflected the exercise of due care. *Ocheltree, 335 F.3d at 334* ("The first problem with Scollon Productions' complaint procedure is that, by the company's own admission, [*157] it fails to place any duty on supervisors to report incidents of [prohibited] harassment to their supervisors."). While defendant did place a reporting obligation on foreman and lower level supervisors for a brief time after it acquired the Butler Works, within six months it eliminated that responsibility from these individuals. These individuals were consistently on the plant floor and in close contact with the employees and their working environment. They were part of the working pulse of the plant and the jury may well conclude that removing their obligation to report inappropriate behavior or incidents reflected indifference and the lack of due care in preventing an abusive environment. See *Ocheltree, 335 F.3d at 335* (lack of supervisor's responsibility to report harassment of which he or she is aware may be given "negative weight" by the jury in deciding whether a company has adopted a reasonably suited harassment policy).

A similar inference can be drawn from defendant's decision to withdraw any responsibility from plant security to document and create formal reports on the incidents that implicated defendant's harassment policy. This directive removed a formal [*158] means of documenting offensive or abusive incidents and displays and narrowed rather than expanded the collection of information concerning violations of defendant's policy. The finder of fact may well conclude that the decision expanded the opportunity for offensive and abusive conduct to flourish or go unreported. *Faragher, 524 U.S. at 808* (efforts of employer to monitor and keep track of offensive or abusive incidents is pertinent to the employer's exercise of due care); *Hurley, 174 F.3d at 118* (degree to which an employer monitors the acts of its employees is relevant to an employer's use of a harassment policy to establish due care).

In addition, the finder of fact may well conclude that defendant failed to adopt adequate channels for reporting potentially abusive or offensive incidents. On site reporting was limited to two of the Plant's highest supervisors. And there is no evidence that Gonce ever handled any complaint or report of harassment. Employees wishing to make a complaint were required to meet personally with Winter and discuss their concerns directly with him. And there is no evidence that a report telephoned directly to company headquarters [*159] would have resulted in a different method of inquiry and investigation. A jury may find fault with a procedures that forces an employee to muster up the courage to contact and meet with an upper management supervisor over any matter involving an incident that could involve defendant's discrimination policy. See *Ocheltree, 335 F.3d at 335* (requiring employee to complain directly to top management supervisors can be found to undermine effective reporting due to the psychological impediments created from forcing employee to muster the courage to complain to top management over every incident).

Defendant's policy also failed to contain mechanisms that would permit both formal and informal reporting. Numerous class members testified about the lack of confidentiality in Winter's investigation of any incident brought to his attention. The record contains incidents where class members Lake and Cook expressed concern about particular incidents in the workplace but wanted to have the matter handled informally or discretely. But Winter's admitted approach was to contact the employee's department openly and indiscretely, leave messages for the employee to call him and openly [*160] conduct an investigation. Class members were unwilling to continue to make reports under such a system because of the reaction of coworkers whenever Winter became involved. The lack of avenues for informal reporting and the lack of confidentiality in exploring or investigating any reported concern involving coworkers are matters the finder of fact may conclude further undermined the reasonableness and effectiveness of defendant's policy toward fulfilling its obligation to eliminate conduct creating a hostile environment. See *Thomas, 104 F. Supp.2d at 565-66* (the failure to provide confidentiality or protection from retaliation where there is evidence of prevalent hostility can support finding that policy was defective and dysfunctional, thus making it an inadequate response to the general climate which it must be calculated to address).

The finder of fact may also conclude that defendants' managers and supervisors received an inadequate degree of training to produce an effective implementation of defendant's anti-harassment policy. When asked to describe any past training, McGarvey's response was simply to indicate the training she received merely reiterated the prohibitions [*161] in defendant's policy. Gonce recalled attending one offsite seminar presented by the EEOC sometime in the past, but this was the only racial sensitivity training provided, and otherwise the training consisted of (1) the occasional reiteration of the content of defendant's policy at a stand-up safety meeting or similar event and (2) the reporting procedures under the policy. Step-up supervisors such as Randolph never received training on defendant's policy. Plant Security never received training designed to promote effective implementation of defendant's policy and Winter expressly verified that these individuals, who could be viewed as the ones most likely to come in contact with or become aware of racial incidents, were specifically instructed not to document or follow-up on any such incidents because "security personnel are not trained on how to handle EEO and harassment investigations." Admittedly, only Gonce or Winter had enough training to handle such matters. A fair inference is raised that the vast majority of supervisors, management employees and other integral members of defendant's operations received no or only cursory training on handling racial incidents in the workplace [*162] and ethnic and racial issues among the rank and file members of the workforce.

In addition to the lack of the basic foundational planks noted above, other aspects of the record also create a material issue about whether defendant's policy was "suitable to the employment circumstances" and suffices to establish the needed exercise of reasonable care aimed at eliminating and preventing future harassment. Defendant correctly points out that its response need only be reasonably calculated to stop or end the harassment and, where it does, the standard of care has been satisfied. See *Bonenberger v. Plymouth Twp., 132 F.3d 20, 26 (3d Cir. 1997)* (an employer may avoid liability by taking prompt remedial action "reasonably calculated to prevent further harassment"); *Savino, 199 F.3d at 933* (an employer's response to complaints of harassment "is adequate if it is reasonably calculated to end the harassment"); *Kunin v. Sears Roebuck & Co., 175 F.3d 289, 294 (3d Cir. 1997)* ("Our precedents provide that when an employer's response stops the harassment, there cannot be Title VII

Case 3:14-cv-02404-ARC   Document 62-2   Filed 11/21/16   Page 64 of 99

Page 41
2006 U.S. Dist. LEXIS 25118, *162

liability."). Defendant asserts that after any particular incident of harassment was brought to Winter's attention [*163] he conducted an investigation and the harassment stopped or the claim was determined to be unfounded, thus verifying the effectiveness of defendant's policy. And it purportedly is without responsibility for the matters class plaintiffs failed to report. From defendant's perspective that is the end of the matter. We again must disagree.

Satisfying the requisite degree of due care as a matter of law cannot be reduced to the simple legal equation advanced by defendant. "While the affirmative duty on the part of the employer will often include the requirement that it have some sort of [] harassment policy in place, the duty does not end there." *Clark, 400 F.3d at 349.* "Prong one of the affirmative defense requires an inquiry that looks behind the face of the policy to determine whether the policy was effective in practice in reasonably preventing and correcting any harassing behavior." Id. When examined as a whole, the record falls far short of reflecting a glowing report on the effectiveness of defendant's policy.

Whether defendant's policy constitutes a response reasonably calculated to foreclose subsequent harassment cannot be judged solely on the specific incidents [*164] class members reported to defendant and its response to those reports. "An employer cannot avoid Title VII liability for coworker harassment by adopting a 'see on evil, hear no evil' strategy." *Ocheltree, 335 F.3d at 334.* To the contrary, the reasonableness of a response must be judged by the knowledge the employer had or should of had concerning the environment. *Clark, 400 F.3d at 350-51* (incidents of harassment of which the defendant should of known are properly considered in assessing whether the adequacy of a defendant's response creates a jury question on the exercise of reasonable care); *Savino, 199 F.3d at 934* (adequacy of employer's response must be judged by what the employer knew or should of known when it implemented a corrective measure); *Ocheltree, 335 F.3d at 334* (same). It also must be judged by the gravity and pervasiveness of the harassment occurring within the workplace. *Torres, 116 F.3d at 638; Jackson, 191 F.3d at 664-65* (the frequency and severity of the harassment must be taken into account in assessing whether a policy reflects a response reasonably calculated [*165] to end the harassment).

As explained above, the finder of fact may conclude

that indicia of a racially hostile environment were prevalent throughout the plant over a long period of time, including during defendant's ownership of the Butler Works. The finder of fact may well also conclude that formal complaints of disparate treatment under defendant's anti-harassment policy were viewed circumspectly and investigated separately and distinctly from all other workplace matters. And those who sought to attest to or provide support for others who complained of racial harassment or an offensive environment were intimidated, ostracized and punished.

Moreover, the finder of fact may conclude that defendant was more concerned with "sanitizing" any incident that potentially raised the specter of disparate racial treatment and eliminating any actual proof of abusive or offensive conduct occurring in the workplace than with eliminating and preventing future harassment. During the first few years of its ownership defendant eliminated the formerly expressed responsibility of turn foreman and lower-level management to report incidents or events implicating defendant's harassment policy, and thereby [*166] removed from the channels of responsibility the individuals most likely to be aware of such conduct and to view offensive displays, and so forth. It also eliminated any formal reporting and documentation of such conduct or displays by plant security, thereby eliminating the routine generation of any documentation regarding matters violating defendant's "no tolerance" anti-harassment policy and/or pictures reflecting the prevalence of racial graffiti and oppressive or offensive symbols in the workplace. The investigation of all claims of disparate treatment, workplace harassment or offensive events or displays thereafter was conducted in a manner that eliminated the formal recording of the actual information reported by the complainant. Little or no documentation was made of graffiti or the display of inappropriate symbols except where those displays could be explained as having non-racial connotations, in which event specific documentation was created and pictures were taken.

Although gradual and incremental, the elimination of the means by which reports of offensive or abusive conduct and displays could be reported and documented occurred when defendant's own internal communications [*167] and actions indicate it was becoming increasingly aware of the prevalence of such activity and certain class members' growing dissatisfaction with their working environment. And members of defendant's management

that provided corroboration of the existence of such activities within the working environment were made to feel as if they had been disloyal to the company, ostracized and subsequently led to believe their actions warranted retaliation under circumstances where it could not be easily proven.

Furthermore, complaints of disparate treatment were routinely investigated through questionnaires and responses of management were accepted without further question. After management advanced a plausible explanation for the action taken, no further follow-up was undertaken and subsequent complaints regarding disparate treatment were considered as "separate and distinct" from matters of discipline. Investigations into matters raised by minority workers were conducted in an open and publicized manner with no concern about the reactions of or repercussions from the complainant's co-employees and immediate supervisors. No effort was made to monitor or compare the degree or proportionality [*168] of the discipline imposed on class members who made formal complaints. Complaining class members were discharged for minor violations after making formal complaints. [22] When the individuals likely responsible for anonymous offensive conduct could not be identified through direct questioning, no further investigation was undertaken and class members were repeatedly told that without independent proof nothing could be done. Employees making complaints that could not be verified were warned of the provision of defendant's policy permitting discipline for false reports, including discharge. No employee was ever disciplined for engaging in offensive or abusive conduct. No racial sensitivity or workplace etiquette training was conducted at either the workforce or managerial levels.

22   For example, when Lake returned from medical leave after his discharge that was converted to a lengthy suspension, he was written up for a minor safety violation by Hodill, an individual about whom Lake had made complaints concerning the display of Confederate flags on company property. The "ticket" was then "superceded" by the imposition of discipline and discharge directly from the plant manager. The finder of fact could construe these events as evidence that complaints about the work environment fell on an unreceptive audience and those in management such as McGarvey who were the subject of similar complaints would be

vindicated by upper management through the subsequent use of severe discipline in matters involving minor infractions.

[*169]   When the record is read in the light most favorable to plaintiffs and the reasonable inferences from that reading are drawn in plaintiffs' favor, it is clear that the finder of fact may conclude that defendant's anti-harassment policy lacked basic features which undermined its effectiveness and/or it was implemented at the Butler Works in a manner that essentially rendered it illusory and dysfunctional. The finder of fact could also determine that the administration of defendant's anti-harassment policy was done in a manner that condoned discrimination and permitted it to flourish. It follows that neither defendant's anti-harassment policy nor the evidence surrounding its implementation preclude plaintiffs from proving the elements necessary for vicarious liability. Consequently, defendant is not entitled to avail itself of the reasonable care defense as a matter of law and its motion for summary judgement must be denied. [23]

23   The ability of the finder of fact to conclude that defendant was more concerned with sanitizing any incidents potentially implicating its anti-harassment policy than with eliminating and preventing future workplace hostility forecloses defendant's request for summary judgement on plaintiffs' prayer for punitive damages. Punitive damages are available under Title VII and § 1981 where the employer acted "with malice or with reckless indifference to the [employee's] federally protected rights." 42 U.S.C. § 1981a(b)(1). Findings that defendant subtly attempted to eliminate any concrete evidence of hostile or abusive incidents in the workplace, narrowed the channels designed to document any such incidents, increased the psychological pressures involved in reporting workplace harassment or disparate treatment and conducted investigations in a manner designed to disprove the claim rather than eliminate harm in the workplace would provide more than an adequate basis to support an award of punitive damages.

[*170]   Finally, defendant's attempt to eliminate plaintiff Lake and Patterson's PHRA claims on the ground that the proceedings before the Pennsylvania Human Relations Commission ("PHRC") were

terminated in a manner that forecloses further pursuit of their claims is misplaced. Right to sue letters were received from the PHRC before this action was commenced. They thus had the right to proceed in court notwithstanding the fact that the PHRC had not completed it processing of their consolidated charges within one year. See *43 P.S. § 962(c)*.

For the reasons set forth above, defendant's motions for summary judgement must be denied. An appropriate order will follow.

Date: April 27, 2006

David Stewart Cercone,

United States District Judge



**MOSES TILLMON, Plaintiff, v. GARNETT CORPORATION, an Illinois corporation, DEAN GARNETT, individually, JED MILLER, individually, and MICHAEL MILLER, individually, Defendants.**

**No. 97 C 8212**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*1999 U.S. Dist. LEXIS 11972; 80 Fair Empl. Prac. Cas. (BNA) 1470*

**July 27, 1999, Decided**
**August 2, 1999, Docketed**

**DISPOSITION:** [*1] Defendants' motion for summary judgment granted. Defendants' motion to strike plaintiff's affidavit denied as moot.

**COUNSEL:** For MOSES TILLMON, plaintiff: John William Billhorn, John W. Billhorn, P.C., Chicago, IL.

For GARNETT CORPORATION, DEAN GARNETT, JED MILLER, MICHAEL MILLER, defendants: Kenneth A. Jenero, Phillip Michael Schreiber, McBride, Baker & Coles, Chicago, IL.

**JUDGES:** Robert W. Gettleman, United States District Judge.

**OPINION BY:** Robert W. Gettleman

**OPINION**

*MEMORANDUM OPINION AND ORDER*

Plaintiff Moses Tillmon has brought a three count complaint against his former employer Garnett Corporation, Dean Garnett, Jed Miller and Michael Miller, alleging racial discrimination in violation of Title VII of the Civil Rights Act of 19964 as amended, *42*

*U.S.C. § 2000(e)* (Count I) and *42 U.S.C. § 1981* (Counts II and III). Defendants have moved for summary judgment on all counts. In addition, defendants have moved to strike plaintiff's affidavit submitted in opposition to the motion for summary judgment. For the reasons set forth below, defendants' motion for summary judgment is granted. The motion to strike is denied as moot.

*Facts*

[*2] Plaintiff, an African-American with a high school education, was employed by defendant Garnett Corporation as a laborer from February 1995 through March 31, 1997, when he resigned. Garnett Corporation is a general contractor that provides construction and remodeling services. Dean Garnett was president and owner during the period in question. Anthony Robinson, an African-American, was project manager and second in command. Defendants Jed and Michael Miller were employees and plaintiff's coworkers.

Plaintiff was an at-will employee. His initial basic laborer duties included taking out garbage, tearing up carpet and other manual labor type tasks. Within a month he was given painting, patching and taping type tasks. At various times he also performed light carpentry, carpet laying, and worked on a series of store closings that

Case 3:14-cv-02404-ARC   Document 62-2   Filed 11/21/16   Page 69 of 99

Page 2

1999 U.S. Dist. LEXIS 11972, *2; 80 Fair Empl. Prac. Cas. (BNA) 1470

involved taking inventory. On these store closings, plaintiff's supervised one employee.

During his employment with Garnett Corporation, plaintiff was also involved in professional bicycle racing. Between February 1995 and March 1997 he competed in ten to fifteen national races and in excess of 30 local races. As a result of these competitions, plaintiff periodically [*3] missed work and was often late for work. During this period, plaintiff missed more work and was late to work more often than any other Garnett Corporation employee. Plaintiff admits that he was injured on at least five occasions during races and was always given time off work to recover with no adverse employment action.

Plaintiff alleges that he was subject to approximately eight instances of racial harassment during his 25 months on the job. In plaintiff's first month, Michael Miller allegedly referred to another employee as a "250 buck nigger." Michael Miller also allegedly referred to a stray dog as a "nigger dog." In April 1995 while plaintiff was in a dump truck shoveling mulch, Jed Miller made a reference to "picking cotton." In mid-1995 Dean Garnett wrote a "2" on plaintiff's tool box, explaining that since plaintiff was not white, he had a "2 box" rather than a "tool box." Also in 1995, Jed Miller allegedly offered plaintiff a tie presented as a "noose," and once referred to plaintiff as his "slave." In early 1996, Dean Garnett jokingly referred to the Million Man March as a "pack of lips," an apparent play on the word "apocalypse." Garnett also allegedly told plaintiff that [*4] Chris Miller, a hiring manager, would throw out job applications of African-Americans, claiming he smelled alcohol or something else. The final incident, which allegedly precipitated plaintiff's voluntary resignation from his job at Garnett Corporation, was his discovery of a small dime sized swastika etched onto his tool box. Plaintiff claims that he complained to Dean Garnett initially, and then to Robinson, who told him that the company was filled with racists, including Dean Garnett, and that plaintiff would have to get used to it. Defendants have provided different versions of the incidents in question, but argue that even if plaintiff's versions are accepted they are still entitled to judgment as a matter of law.

### Discussion

A movant is entitled to summary judgment under *Rule 56* when the moving papers and affidavits demonstrate that there is no genuine issue of material fact

and that the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*; *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. Once a moving party has met its burden, the nonmoving party must go beyond the pleadings and set forth specific [*5] facts showing that there is a genuine issue for trial. *Becker v. Tenenbaum-Hill Associates, Inc., 914 F.2d 107, 110 (7th Cir. 1990)*. The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. *Fisher v. Transco Services-Milwaukee, Inc., 979 F.2d 1239, 1242 (7th Cir. 1992)*.

A genuine issue of material facts exists when "the evidence is such that a reasonable jury can return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. This standard is applied with added rigor in employment discrimination cases, where issues of intent and credibility often dominate. *Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1038 (7th Cir. 1993)*. The nonmoving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)*. "The mere existence of a scintilla of evidence in support of the [nonmoving parties'] [*6] position would be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson, 477 U.S. at 252*.

### Count I-Title VII

Plaintiff admits that the undisputed evidence demonstrates the Garnett Corporation did not employ 15 or more people for 20 or more weeks during the relevant time period and, therefore, is not an employer for purposes of Title VII. *42 U.S.C. § 2000(e)(b)*. Accordingly, defendants' motion for summary judgment is granted by agreement as to Count I.

### Count II - Section 1981

In Count II, plaintiff alleges that defendants created a racially hostile work environment causing him to resign. He also claims that he was paid less and given less responsibility than a similarly situated white coworker.

Defendants raise a number of attacks on Count II. First, they argue that because plaintiff was an at-will employee, he had no contract and cannot state a claim

Case 3:14-cv-02404-ARC   Document 62-2   Filed 11/21/16   Page 70 of 99

Page 3

1999 U.S. Dist. LEXIS 11972, *6; 80 Fair Empl. Prac. Cas. (BNA) 1470

under *§ 1981*, which provides that all persons shall have the same right to make and enforce contracts as is enjoyed by white citizens. *42 U.S.C. § 1981(e)*. This court has rejected this [*7] argument in the past and rejects it again. *See Jones v. Sabis Educational Systems, Inc., 52 F. Supp. 2d 868, 1999 WL 412600* at *5-6 (N.D. Ill. 1999) (and cases cited therein).

Next, defendants argue that plaintiff's claim of a hostile work environment and disparate treatment fail as a matter of law. Under Title VII it is unlawful "for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." *42 U.S.C. § 2000(e)(2)(a)(1)*. Although *§ 1981* and Title VII differ in the types of discrimination they prescribe, the methods of proof and elements of a case are essentially identical. *Johnson v. City of Fort Wayne, 91 F.3d 922, 939-40 (7th Cir. 1996)*. An employer violates Title VII [and *§ 1981*] when there is discrimination in the employer's workplace that "creates a hostile or abusive work environment." *Meritor Savings Bank v. Vinson, 477 U.S. 57, 66, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986)*. [*8] To prevail on a hostile environment harassment claim, plaintiff must demonstrate to the court that his work environment was both subjectively and objectively hostile. *Harris v. Forklift Systems, Inc., 510 U.S. 17, 21-22, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993)*. That is, the court considers not only the effect that the discriminatory conduct actually had on plaintiff, and also the impact that it likely would have had on a reasonable employee in the plaintiff's position. *Id.*

An objectively hostile environment "is one that a reasonable person would find hostile or abusive." *Adusumilli v. City of Chicago, 164 F.3d 353, 361 (7th Cir. 1998)*. It is often difficult to draw a line between conduct that a reasonable person would find "merely vulgar and mildly offensive, and that which is "deeply offensive and . . . harassing" and therefore hostile. *Carr v. Allison Gas Turbine Division, 32 F.3d 1007, 1010 (7th Cir. 1994)*. The Supreme Court and Seventh Circuit, however, have provided some useful guidance. The Supreme Court instructs courts to consider all of the circumstances, including "the frequency of the discriminatory conduct; its severity; [*9] whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris, 510 U.S. at 22.* In a sexual harassment case the Seventh Circuit has described this distinction as ( *Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995)*):

> on one side lies sexual assaults; other physical conduct, whether amorous or hostile, for which there is no consent expressed or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. On the other lies the occasional vulgar banter, tinged with sexual innuendo, or coarse or boarish workers.

Analyzing plaintiff's claim under this guidance leads to the inescapable conclusion that even if true, defendants' conduct does not fall on the harassment side of the line. Plaintiff was not physically attacked, nor was he directly threatened or intimidated. Rather, the conduct consisted of isolated instances of offensive remarks. There were only eight racial comments in 25 months, which averages to one every three months, and some of those incidents were [*10] not directed at plaintiff. As the Supreme Court has stated, "simple teasing, offhand comments, and isolated instances (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton, 524 U.S. 775, 118 S. Ct. 2275, 2283, 141 L. Ed. 2d 662 (1998).* [1] although, defendants' alleged conduct was reprehensible and without place in a civilized society, it simply was not sufficiently severe or frequent to create a hostile work environment.

> 1   Only plaintiff's claim that a swastika was carved into his tool box could be objectively considered extremely serious, and plaintiff admits that he has no evidence that any of the defendants were responsible for that act.

Plaintiff's disparate treatment claim fairs no better. Although not argued in his brief, plaintiff apparently claims that a similarly situated white employee, Josh Kurgan, was treated more favorably. Specifically, plaintiff claims that Kurgan received more training, [*11] advancement, and pay because of his race. The undisputed evidence belies plaintiff's claim. Defendant Garnett Corporation's payroll records indicate that

plaintiff was paid at a higher hourly rate than Kurgan. Moreover, it is undisputed that Kurgan was never given supervisory responsibilities as was plaintiff. Indeed, on at least one occasion plaintiff acted as Kurgan's supervisor. Accordingly, the court concludes that plaintiff cannot establish that he was treated less favorably that a similar situated white employee. Therefore, he cannot establish a prima facie case of discrimination under *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)*, because he has never suffered an adverse employment action.

## Conclusion

For the reasons set forth above, defendants' motion for summary judgment is granted. Defendants' motion to strike plaintiff's affidavit is denied as moot.

**ENTER: July 27, 1999**

**Robert W. Gettleman**

**United States District Judge**



OSCAR SMITH, JR. and O. SMITH AGENCY, INC. v. THE ALLSTATE CORPORATION and THE ALLSTATE INSURANCE COMPANY; GREG BURRIS and THE GREG BURRIS AGENCY v. THE ALLSTATE CORPORATION and THE ALLSTATE INSURANCE COMPANY

CIVIL ACTION NO. 12-0144,CIVIL ACTION NO. 12-0145

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*2012 U.S. Dist. LEXIS 95950*

July 10, 2012, Decided
July 11, 2012, Filed

**SUBSEQUENT HISTORY:** Summary judgment granted, in part, summary judgment denied, in part by *Smith v. Allstate Corp., 2013 U.S. Dist. LEXIS 35077 (E.D. Pa., Mar. 12, 2013)*

**COUNSEL:** [*1] For OSCAR SMITH, JR., O. SMITH AGENCY, INC. (2:12-cv-00144-TJS), Plaintiffs: JACQUELINE E. JACKSON-DEGARCIA, JJ LAW OFFICE LLC, HARRISBURG, PA.

For THE ALLSTATE CORPORATION, THE ALLSTATE INSURANCE COMPANY, Defendants: KATHERINE M. KATCHEN, MATTHEW RYAN VARZALLY, LEAD ATTORNEYS, AKIN GUMP STRAUSS HAUER & FELD, LLP, PHILADELPHIA, PA.

For GREG BURRIS, THE GREG BURRIS AGENCY (2:12-cv-00145-MAM), Plaintiffs: JACQUELINE E. JACKSON-DEGARCIA, LEAD ATTORNEY, JJ LAW OFFICE LLC, HARRISBURG, PA.

For THE ALLSTATE CORPORATION, THE ALLSTATE INSURANCE COMPANY, Defendants: KATHERINE M. KATCHEN, MATTHEW RYAN VARZALLY, LEAD ATTORNEYS, AKIN GUMP STRAUSS HAUER & FELD, LLP, PHILADELPHIA,

PA.

**JUDGES:** TIMOTHY J. SAVAGE, J.

**OPINION BY:** TIMOTHY J. SAVAGE

**OPINION**

## MEMORANDUM OPINION

**Savage, J.**

The defendants, The Allstate Corporation and The Allstate Insurance Company (collectively, "Allstate") have moved to dismiss the complaint filed by Greg Burris and Oscar Smith, Jr., former Allstate insurance agents, in which they allege that Allstate engaged in a hostile takeover of their insurance agency businesses. According to the plaintiffs, Allstate induced them to sign exclusive agency agreements by extolling the benefits of the agreements. After they [*2] built their businesses under the agency relationship, Allstate established customer satisfaction standards that set the plaintiffs up to fail. When the plaintiffs did not meet these standards, Allstate terminated the agreements and forced the plaintiffs to sell their books of business to Allstate-approved agents at

below-market rates.

The plaintiffs filed suit as individuals and on behalf of their agencies alleging that Allstate fraudulently or negligently induced them to enter into the contracts, was fraudulent or negligent in the performance and termination of the contract, and breached the duty of good faith and fair dealing. They assert that Allstate breached their contracts when it did not provide their agencies with formal reviews and was unjustly enriched when it forced them to sell their books of business to Allstate-approved agents for less than they were worth. The plaintiffs, African Americans, also claim that Allstate's performance under and termination of the agency agreements was discriminatory, in violation of *42 U.S.C. § 1981.* [1] Allstate has moved to dismiss all claims. After carefully reviewing the plaintiffs' complaints, Allstate's motions and the plaintiffs' consolidated [*3] response, we shall grant the motion to dismiss on all claims except the one for breach of contract.

> 1   Upon the order of Chief Judge Joyner, the Burris and Smith cases were consolidated for pre-trial purposes.

**Background**

In June of 2000, Allstate terminated its employer-employee relationships with its incumbent agents. These agents were given three options: (1) become independent contractors to sell only Allstate products pursuant to an Allstate Exclusive Agency Agreement ("agency agreement"); (2) become temporary independent contractors to sell the existing books of business they had generated while they had been Allstate employees; or, (3) accept a severance package. Smith and Burris chose the first option, electing to become exclusive Allstate agents.

According to Smith, Allstate told him that if he sold Allstate products as an independent contractor, he would have a major stake in his business, including his book of business, and be able to grow his business more profitably. Smith claims that he relied on these representations, incorporated his own insurance agency, and signed the R3001A agency agreement on behalf of his agency. [2]

> 2   Burris does not identify any specific representations [*4] that Allstate made to induce him to sign the agency agreement. Instead, his

complaint alleges that "[t]o induce [him] to become an Allstate captive agent, Allstate publicly extolled the virtues of the exclusive agency agreement." Burris Compl. ¶ 98. Burris signed the R3001S agreement on his own behalf and incorporated an agency.

The plaintiffs claim that they achieved exemplary results as independent contractors. Smith alleges that he built and maintained a book of business that generated approximately $3,000,000 per year in insurance premiums, and Burris claims that he generated premiums of approximately $1,000,000 per year. The customer retention rates for both agencies were at or above the national and regional averages over a ten-year period.

Allstate periodically evaluates each agency and produces a report known as the Agency Status Review, which measures expected results based on a number of factors including the agency's productivity, retention, and profitability. In 2007, Allstate implemented a new client survey called the Agency Loyalty Index ("ALI"). Allstate conducted the survey through questionnaires mailed to each agency's clients to measure customer satisfaction. Before [*5] Allstate implemented the ALI, customer satisfaction was measured by retention rates. In March 2009, Allstate informed its agents that the ALI would be included as part of its calculation of expected results.

In the 2009 ALI survey, both the Burris and Smith agencies scored below sixty, the benchmark established by Allstate. Both agencies received warning letters issued by Allstate stating that "failure to achieve a score of 60 or higher in the 2010 survey could jeopardize [their] relationship[s] with Allstate." [3] Despite efforts to raise their scores, the plaintiffs again failed to score sixty or higher on the 2010 ALI. The plaintiffs allege that much of the negative feedback on the 2010 ALI was due to Allstate increasing their customers' premiums. The plaintiffs also allege that in determining customer satisfaction, Allstate failed to make adjustments for demographics, including the ethnic and racial makeup of the customer bases, thus giving them low scores that were not representative of their overall performances.

> 3   Burris Compl. ¶ 47; Smith Compl. ¶ 55.

Based on their ALI scores, Allstate terminated Smith and Burris's agency agreements on February 21, 2011 and August 30, 2011 respectively. [*6] [4] Plaintiffs allege that once Allstate terminated the agreement, their only options

Case 3:14-cv-02404-ARC   Document 62-2   Filed 11/21/16   Page 75 of 99

Page 3
2012 U.S. Dist. LEXIS 95950, *6

were to sell their books of business to an Allstate-approved buyer or accept a severance and forfeit their books to Allstate. Both plaintiffs sold their books at what they claim were below-market rates. The plaintiffs, both African American, also claim that their agencies were the only Pennsylvania-based ones whose agency agreements were terminated because of low ALI scores.

4  Burris Compl. ¶ 53; Smith Compl. ¶ 63.

The plaintiffs bring claims for fraud, negligence, unjust enrichment, breach of contract, breach of good faith and fair dealing, and discrimination in contracting in violation of *42 U.S.C. § 1981* to recover for damages for monetary loses and emotional distress. Allstate has moved to dismiss all claims.

**Standard of Review**

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief," *Fed. R. Civ. P. 8(a)(2)*, giving the defendant "fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus, 551 U.S. 89, 93, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007)* (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))*. Although this standard "does not [*7] require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (quoting *Twombly, 550 U.S. at 555)*.

A complaint is subject to dismissal if the plaintiff fails to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly, 550 U.S. at 556)*. The plaintiff must allege facts that indicate "more than a sheer possibility that a defendant has acted unlawfully." *Id.* Pleading only "facts that are 'merely consistent with' a defendant's liability" is insufficient and cannot survive a motion to dismiss. *Id.* (quoting *Twombly, 550 U.S. at 557)*.

We apply a three-step approach in examining the complaint to determine the sufficiency of a claim under *Iqbal* and *Twombly*. *Burtch v. Milberg Factors, Inc., 662 F.3d 212, 221 (3d Cir. 2011)*. First, we identify the elements the plaintiffs must plead to state a claim. *Id.* (quoting *Santiago v. Warminster Twp., 629 F.3d 121, 130*

*(3d Cir. 2010))*. Second, we discount conclusory allegations because they are not entitled to the assumption of truth. *Id.* (quoting *Santiago, 629 F.3d at 130)*. [*8] Third, we assume the veracity of well-pleaded factual allegations and determine whether they plausibly give rise to an entitlement for relief. *Id.* (quoting *Santiago, 629 F.3d at 130)*.

When considering a motion to dismiss for failure to state a claim under *Fed. R. Civ. P. 12(b)(6)*, all well-pleaded allegations in the complaint are accepted as true and viewed in the light most favorable to the plaintiff. *Holk v. Snapple Beverage Corp., 575 F.3d 329, 334 (3d Cir. 2009)* (quoting *Phillips v. Cnty. of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008))*. We may consider authentic documents that form the basis of the plaintiffs' claims. *See Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010)* ("[A] court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputably authentic documents if the complainant's claims are based upon these documents.") (citations and quotations omitted). With these standards in mind, we shall accept as true the facts as they appear in the plaintiffs' complaints and draw all possible inferences from these facts in their favor.

**Fraudulent Inducement and Negligent Misrepresentation**

In Counts Four and Five of the complaints, [*9] the plaintiffs allege that Allstate acted fraudulently and negligently in the inducement, performance and termination of the agency agreements. Allstate argues that the fraud allegations lack the degree of specificity required by Federal Rule of Civil Procedure 9(b); the alleged fraudulent and negligent statements are inadmissible under the parol evidence rule; and, the claims are barred by the "gist of the action" doctrine, the "economic loss" doctrine, and the statute of limitations.

*Federal Rule of Civil Procedure 9(b)* requires that in "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." To meet this standard, "the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico v. Home Depot, 507 F.3d 188, 200 (3d Cir. 2007)*.

Under Pennsylvania law, which the parties agree applies, the elements for fraud are: (1) the defendant

made a representation; (2) the fact represented was material to the transaction; (3) the defendant knew it was false or made it recklessly without regard for its truth or falsity; (4) [*10] the defendant intended the plaintiff to rely on it; (5) the plaintiff justifiably relied on it; and (6) the plaintiff suffered damages proximately caused by the misrepresentation. *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 275 (3d Cir. 2010); *Gibbs v. Ernst*, 538 Pa. 193, 647 A.2d 882, 889 (Pa. 1994). A claim for fraudulent inducement requires that the misrepresentation was made with the intent to induce another to enter into a contract. *In re Allegheny Int'l*, 954 F.2d 167, 178 (3d Cir. 1992).

Plaintiffs allege that Allstate, through misrepresentations, induced them to enter into the agency agreements and become independent contractors. According to Smith, he relied upon Allstate's representations that he would have a major stake in his business, own his book of business, and be able to grow his businesses in a more profitable way. [5] Smith's recitation of the alleged fraudulent statements upon which he relied is sufficiently specific to meet *Rule 9(b)'s* requirements.

5   Smith Compl. ¶¶ 30-31.

Unlike Smith, Burris does not identify any statements Allstate made that fraudulently induced him to sign the agency agreement. Instead, he avers that Allstate "publicly extolled the virtues of the exclusive [*11] agency agreement," knowing that these representations were false. [6] These general allegations, unsupported by any reference to a false statement of fact, lack the specificity required by *Rule 9(b)*.

6   Burris Compl. ¶¶ 98-99.

Allstate also argues that the parol evidence rule prohibits the plaintiffs from introducing the fraudulent or negligent statements that support the plaintiffs' inducement claims. Under Pennsylvania law, the parol evidence rule bars consideration of prior representations concerning matters covered in a fully integrated agreement. *Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1299-1300 (3d Cir. 1996) (discussing *HCB Contractors v. Liberty Place Hotel Assocs.*, 539 Pa. 395, 652 A.2d 1278, 1279-80 (Pa. 1995)); see also *Yocca v. Pittsburgh Steelers Sports, Inc.*, 578 Pa. 479, 854 A.2d 425, 436-37 (Pa. 2004) ("Once a writing is determined to be the parties' entire contract, the parol evidence rule applies

and evidence of any previous oral or written negotiations or agreements involving the same subject matter as the contract is almost always inadmissible to explain or vary the terms of the contract.") (citation omitted). For the parol evidence rule to apply, there must be an integrated written contract. [*12] *Toy v. Metropolitan Life Ins. Co.*, 593 Pa. 20, 928 A.2d 186, 203-04 (Pa. 2007) (citing and discussing *Yocca*). Whether such a contract exists is determined by "assessing whether the writing appears to be a contract complete in itself, importing a complete legal obligation without any uncertainty as to the object or extent of the parties' engagement." *Id.* An integration clause demonstrates that the contract represents the parties' entire agreement. *Yocca*, 854 A.2d at 436.

District courts in the Third Circuit disagree over the extent of the *Dayhoff* holding. Some have applied the parol evidence rule to bar prior representations when the agreement is fully integrated. Other courts have imposed the additional requirement that the representations sought to be introduced concern matters covered in the contract. *Compare Interwave Tech. Inc. v. Rockwell Automation, Inc.*, No. 05-398, 2005 U.S. Dist. LEXIS 37980, 2005 WL 3605272, at *18 (E.D. Pa. Dec. 30, 2005) ("[T]his court finds persuasive the numerous opinions that interpreted *Dayhoff* to preclude parol evidence when the plaintiff is making a claim of fraudulent inducement and the contract at issue contains an integration clause."), with *Aamco Transmissions, Inc. v. Wirth*, No. 11-4250, 2011 U.S. Dist. LEXIS 140457, 2011 WL 6088671, at *4 (E.D. Pa. Dec. 7, 2011) [*13] ("Where prior fraudulent representations are alleged, the parol evidence rule bars such representations where the written agreement: (1) contains terms which directly deal with the subject matter of the alleged oral representation; and (2) represents the entire contract between the parties, particularly where the written agreement also contains an integration clause.") (quotation and citation omitted). Reflecting this disagreement, the parties in this case rely on different standards to argue that the parol evidence rule does or does not apply. [7] However, this dispute is not material to our parol evidence analysis. Under either approach, the statements are barred.

7   *Compare* Br. in Supp. of Defs.' Mot. to Dismiss 15 (quoting *Morales v. Superior Living Prods., LLC*, No. 07-4419, 2009 U.S. Dist. LEXIS 91578, at *20 (E.D. Pa. Sept. 30, 2009) for the proposition that "Pennsylvania law prohibits recovery on a claim of fraud in the inducement

2012 U.S. Dist. LEXIS 95950, *13

where the contract [at issue] represents a fully integrated written agreement."), *with* Pls.' Br. in Opp. to Mot. to Dismiss 20 (citing *HCB Contractors, 652 A.2d at 1279-80* for the proposition that "[t]he parol evidence rule applies to bar only that evidence [*14] regarding claims *specifically* addressed in the written contract").

The agency agreements contain integration clauses. [8] The inducements Smith alleges concern matters addressed by the agency agreements. Specifically, as expressed in the agency agreement, the parties agreed that Smith was an independent contractor, [9] the business he generated belonged to Allstate, [10] and either party had a right to terminate the relationship according to established procedures. [11]

[8]   R3001A Agency Agreement § I.C. ("This Agreement is the sole and entire agency agreement between the Company and Agency, and it supersedes and replaces any prior employment, agency, or other agreement between the Company and Agency and any of its officers, directors, shareholders, members, and employees. This Agreement also supersedes any prior oral statements and representations by the Company and any prior written statements and representations by the Company in letters, manuals, booklets, memoranda, or any other format."); R3001S Agency Agreement § I.B. ("This Agreement is the sole and entire agency agreement between the Company and you, and it supersedes and replaces any prior employment, agency, or other agreement between [*15] the Company and you. This Agreement also supersedes any prior written statements and representations by the Company to you in letters, manuals, booklets, memoranda, or any other format.").

Hence, if we only examined whether the contract is fully integrated to determine whether the parol evidence rule applies, the inquiry would be at an end, and the alleged inducing statements would be inadmissible.

[9]   R3001A Agency Agreement § I.B.
[10]   R3001A Agency Agreement § I.A.
[11]   R3001A Agency Agreement § XVII.

Smith alleges that Allstate "extolled the virtues of the exclusive agency agreement" [12] by representing that he

would have a major stake in his business, including an ownership interest in his book of business, and be able to grow his business in a more productive way. [13] Because the agreement contains terms addressing the representations Smith relies upon and the agreement "supercedes any prior oral statements and representations by [Allstate]," [14] the parol evidence rule bars admission of these statements. Without these statements, Smith cannot make out a claim for fraudulent inducement or negligent misrepresentation. Therefore, Counts Four and Five of his complaint will be dismissed.

[12]   Smith Compl. [*16] ¶ 108.
[13]   Smith Compl. ¶¶ 30-31.
[14]   R3001A Agency Agreement, § I.C.

Burris does not identify specific statements Allstate made that induced him sign the agency agreement. Instead, he alleges that Allstate "publicly extolled the virtues" of the agreement. The agreement is unambiguous. It provides that Burris was an independent contractor, [15] Allstate owned all business he generated under the agreement, [16] he was required to meet business objectives established by Allstate, [17] his sole compensation was commission he earned, [18] and he or Allstate had the right to terminate the agreement. [19] The agreement contains terms which directly deal with the subject matter of how beneficial it would be for agents. Even if it did not, Allstate's puffery cannot form the basis of Burris's inducement claims. *See Berkebile v. Brantly Helicopter Corp., 462 Pa. 83, 337 A.2d 893, 903 (Pa. 1975)* (holding statements that "you are assured of a safe and dependable helicopter," and that the helicopter was "easy to operate" were non-actionable puffery); *Teng Moua v. Jani-King of Minn., Inc., 810 F. Supp. 2d 882, 890 (D. Minn. 2011)* (holding statements that owning a franchise was "good business" and that the business could continue [*17] "for a long time" constituted non-actionable puffery). Counts Four and Five of Burris's complaint will be dismissed. [20]

[15]   R3001S Agency Agreement § I.D.
[16]   R3001S Agency Agreement § I.A.
[17]   R3001S Agency Agreement § II.B.
[18]   R3001S Agency Agreement §XV.
[19]   R3001S Agency Agreement §§ XVII.
[20]   Accordingly, we do not decide whether the gist of the action doctrine, the economic loss doctrine, or the statute of limitations bar the plaintiffs' inducement claims.

## Unjust Enrichment - *Quantum Meruit*

Unjust enrichment, an equitable doctrine sounding in quasi-contract or contract implied in law, is unavailable where the parties' relationship is derived from a contract. In other words, the presence of a contract bars a claim for unjust enrichment. *Wayne Moving & Storage of N.J., Inc. v. Sch. Dist. of Phila., 625 F.3d 148, 153 n.1 (3d Cir. 2010)* (citation omitted); *see also Wilson Area Sch. Dist. v. Skepton, 586 Pa. 513, 895 A.2d 1250, 1254 (Pa. 2006)* (plurality) ("[I]t has long been held in this Commonwealth that the doctrine of unjust enrichment is inapplicable when the relationship between the parties is founded upon a written agreement or express contract . . . .") (citations omitted); *Schott v. Westinghouse Elec. Corp., 436 Pa. 279, 259 A.2d 443, 448 (Pa. 1969)* [*18] ("[W]e note that this Court has found the quasi-contractual doctrine of unjust enrichment inapplicable when the relationship between parties is founded on a written agreement or express contract.").

Despite this well-established principle, the plaintiffs argue that they may seek recovery under an unjust enrichment theory where contractual remedies are inadequate. They are incorrect. Indeed, a contract governing the parties' relationship serves to bar an unjust enrichment claim, "regardless of how 'harsh the provisions of such contracts may seem in the light of subsequent happenings.'" *Wilson Area Sch. Dist., 895 A.2d at 1254* (quoting *Third Nat'l & Trust Co. of Scranton v. Lehigh Valley Coal Co., 353 Pa. 185, 44 A.2d 571, 574 (Pa. 1945)); see also Curley v. Allstate Ins. Co., 289 F. Supp. 2d 614, 619-20 (E.D. Pa. 2003)* (rejecting plaintiff's argument that an insufficient contractual remedy allows him to state an unjust enrichment claim and dismissing the claim). Because the parties' relationships were governed by the agency agreements, [21] the plaintiffs may not pursue an unjust enrichment claim. Thus, Count Three of their complaints will be dismissed.

21  Burris Compl. ¶ 62; Smith Compl. ¶ 72.

## Breach [*19] of Contract

The plaintiffs allege that Allstate breached the agency agreements; and, as a result, they suffered the loss of their agencies together with the loss of investment capital, their books of business, and income. They allege that Allstate failed to conduct annual and semi-annual reviews as required by the Independent Contractor manual, which was incorporated into the agency agreement. As claimed by the plaintiffs, the reviews would have alerted them to the problems, giving them the chance to cure or respond to the complaints. Allstate counters that the plaintiffs' admitted breach of the agency agreement -- failing to achieve a passing customer satisfaction score -- bars recovery for Allstate's alleged breach of contract.

A material breach by one party entitles the non-breaching party to suspend performance of the contract. *LJL Transp., Inc. v. Pilot Air Freight Corp., 599 Pa. 546, 962 A.2d 639, 648 (Pa. 2009)*. Consequently, a party who has committed a material breach may not insist upon performance of the contract. *Id.* (quotation omitted). On the other hand, an immaterial breach will not excuse the non-breaching party's performance. *Cimina v. Bronich, 517 Pa. 378, 537 A.2d 1355, 1358 (Pa. 1988)* (citation [*20] omitted). Whether a breach is material is an issue of fact unless the question "admits only one reasonable answer." *Norfolk S. Ry. Co. v. Basell USA Inc., 512 F.3d 86, 92 (3d Cir. 2008)*.

Allstate relies on Section II.B. of the agency agreements, which requires that agents meet certain business objectives established by Allstate. Among these goals are levels of "profitability, growth, retention, customer satisfaction and customer service." According to the plaintiffs, Allstate based its termination decisions on the plaintiffs' failures to satisfy the customer satisfaction benchmarks. The plaintiffs contend that they met all other stated objectives. Whether the failure to achieve the customer satisfaction and service goals, which are not defined in the agreements, is material is a question for the factfinder. So is whether Allstate's failure to conduct the periodic reviews amounted to a material breach of the contract, excusing the plaintiffs from performing.

Allstate also argues that the plaintiffs' alleged damages are too speculative to permit recovery. In doing so, it invites us to engage in fact finding. Specifically, it asks us to assess evidence. That is not our function in considering [*21] a 12(b)(6) motion.

The plaintiffs have each stated a claim for breach of contract. Therefore, we shall deny Allstate's motion as to Count II.

## Implied Duty of Good Faith and Fair Dealing

Plaintiffs import claims for breach of the implied duty of good faith and fair dealing into their breach of contract claims. They allege that Allstate's "hostile takeover" of the plaintiffs' books of business breached the duty of good faith and fair dealing. Specifically, they allege that Allstate acted in bad faith when it terminated the agency agreements based on the ALI without first working with them to raise their customer service scores through the contractually mandated performance reviews. They also challenge the manner in which Allstate acquired their books of business.

The plaintiffs do not have a cause of action for an implied duty of good faith. An implied duty arising from the contract cannot supercede an express contract term. *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 91 (3d Cir. 2000); *see also USX Corp. v. Prime Leasing, Inc.*, 988 F.2d 433, 438 (3d Cir. 1993) ("There [*22] can be no implied covenant as to any matter specifically covered by the written contract between the parties." (quoting *Reading Terminal Merchs. Ass'n v. Samuel Rappaport Assocs.*, 310 Pa. Super. 165, 456 A.2d 552, 557 (Pa. Super. Ct. 1983)). The agreements establish termination procedures, providing for immediate termination for cause or by either party upon ninety days written notice. [22] Therefore, the duty of good faith does not provide the plaintiffs with a cause of action to challenge the manner in which Allstate terminated their agency agreements.

> 22  R3001A Agency Agreement § XVII; R3001S Agency Agreement § XVII.

In opposing the motion to dismiss, the plaintiffs rely on *Section 205 of the Restatement (Second) of Contracts*. Pennsylvania courts have relied on *Section 205*, holding that there is a general duty of good faith and fair dealing in the performance of a contract. *Baker v. Lafayette Coll.*, 350 Pa. Super. 68, 504 A.2d 247, 255 (Pa. Super. Ct. 1986), aff'd, 516 Pa. 291, 532 A.2d 399 (1987). Comment d provides examples of strains of bad faith, including "abuse of power to specify terms."

The plaintiffs maintain that Allstate abused its authority by setting unreasonable customer satisfaction standards under the contract. In predicating [*23] its termination of the relationship on the failure to meet these standards, the plaintiffs argue that Allstate breached the duty of good faith and fair dealing. However, the agreements provided that either party could terminate the contract without cause. The plaintiffs cannot rely on an implied duty to alter this provision by challenging Allstate's proffered reason for terminating the agreements because Allstate was not required to provide a reason in the first place.

The agreements also provide the processes for payment upon their termination. [23] The plaintiffs cannot override these provisions by alleging that Allstate breached an implied warranty by forcing them to sell their books of business.

> 23  *See* R3001A Agency Agreement § XIX; R3001S Agency Agreement § XVII.B.2.

The plaintiffs attempt to support their good faith claims by relying on *40 Pa. Stat. §§ 241-46* (West 2012) ("Act 143" or "Act"). Act 143 establishes notice and administrative review requirements when an insurer terminates its contract with an agent. *See 40 Pa. Stat. § 242(a)*, (d). The plaintiffs do not claim that Allstate violated the Act when it terminated the agency agreement. [24] Instead, they contend [*24] that the Act evinces an "overarching policy that governs the termination of agency agreements." [25] Because Allstate did not follow the termination procedures set forth in the Act, plaintiffs argue that it breached the implied covenant of good faith and fair dealing implicit in all contracts.

> 24  *See* Pls.' Brief in Opp'n to Mot. to Dismiss 8 n.5 ("Plaintiffs recognize that the Act 143 [sic] does not provide a remedy to enforce the termination provisions of the Agency Agreements through the Commonwealth of Pennsylania, Department of Insurance. However, Plaintiffs contend that Defendants' failure to follow the termination provisions of Act 143 which evidence the public policy of Pennsylvania's General Assembly to protect the insured demonstrates evidence of Defendants' breach of the implied covenant of good faith and fair dealing.).
> 25  Pls.' Brief in Opp'n to Mot. to Dismiss 7.

The Act, by its express terms, does not apply to "business owned by the insurer and not by the agent, provided such insurer offers to continue such policies through another of its agents." *40 Pa. Stat. § 241.1(b)*. [26] In the agency agreement, the parties agreed that Allstate "own[s] all business produced under [*25] the terms of th[e] Agreement." [27] As plaintiffs allege, Allstate sold their books of business to other agents with Allstate offering policies through other agents. Accordingly, there

can be no cause of action arising out of an implied duty of good faith and fair dealing under Act 143 because the statute expressly provides that it does not apply to the type of business arrangement at issue here. *See Mattus v. Allstate Corp., No. 11-681, 2011 U.S. Dist. LEXIS 155659, *8 (M.D. Pa. Sept. 15, 2011)* (holding that plaintiff challenging Allstate's termination of the agency agreement "impermissibly attempt[ed] to incorporate the protections of Act 143 into the contract by equating such protections with the duty of good faith").

> 26 The Act defines "Agent" as: "An individual, partnership or corporation, licensed by the Insurance Department, who contracts with an insurer to sell insurance on behalf of the insurer." *40 Pa. Stat. § 241.* It defines "Insurer" as: "An insurance company, association or exchange authorized to transact and transacting the business of property or casualty insurance, or both, in the Commonwealth." *Id.*
>
> 27 R3001A Agency Agreement, § I.A.; R3001S Agency Agreement, § I.A.

### Negligence

In [*26] Count Five, the plaintiffs allege that Allstate was negligent in the performance and termination of the agency agreement. [28] Allstate correctly argues that the plaintiffs' negligence claims are barred by the "gist of the action" doctrine.

> 28 Burris Compl. ¶ 109; Smith Compl. ¶ 119.

Under the gist of the action doctrine, plaintiffs are precluded from "recasting" a claim for breach of contract into a tort claim. *Erie Ins. Exch. v. Abbott, 2009 PA Super 88, 972 A.2d 1232, 1238 (Pa. Super. Ct. 2009)*; *see also Jones v. ABN Amro Mortg. Grp., Inc., 606 F.3d 119, 123 (3d Cir. 2010)*. The "critical" distinction between a breach of contract claim and a tort claim "is that the former arises out of 'breaches of duties imposed by mutual consensus agreements between particular individuals,' while the latter arises out of 'breaches of duties imposed by law as a matter of social policy.'" *Erie Ins. Exch., 972 A.2d at 1238* (quoting *Reardon v. Allegheny Coll., 2007 PA Super 160, 926 A.2d 477, 486--87 (Pa. Super. Ct. 2007))*. Where the duty the defendant allegedly breached is intertwined with contractual obligations, the claim sounds in contract, not tort. *Sunburst Paper, LLC v. Keating Fibre Int'l, Inc., No. 06-3959, 2006 U.S. Dist. LEXIS 78890, 2006 WL*

*3097771, at *2 (E.D. Pa. Oct. 30, 2006)*.

The [*27] plaintiffs' negligence claims challenge the manner in which Allstate performed under and terminated a contract governing the parties' relationship. The claims are grounded in the contract. Thus, they are barred by the gist of the action doctrine. [29]

> 29 Smith also predicates his negligence claim on a purported breach of a duty created by Act 143. Because the Act does not apply to the type of business arrangement at issue here, Smith cannot rely on the Act to support his negligence claim.

### Discrimination in Contracting -- 42 U.S.C. § 1981

The plaintiffs claim that they, as African Americans, were disparately impacted by Allstate's reliance on ALI scores because they were the only two agents terminated in Pennsylvania on the basis of low ALI scores. [30] They also challenge the use of the ALI in measuring customer satisfaction in minority communities. Specifically, they assert that the survey was disseminated by mail, but "[m]embers of an urban minority community are largely distrustful and are more likely to disregard mailed surveys"; [31] "Allstate failed to differentiate between responses critical of decisions made by Allstate from those critical of the agency or agent"; [32] "[i]n evaluating [*28] the responses, Allstate failed to account for the inherent nonresponsive issues in a predominant [sic] minority clientele"; [33] and "Allstate failed to compare the survey score to the [plaintiffs'] retention rate[s]." [34]

> 30 Burris Compl. ¶ 73; Smith Compl. ¶ 83.
> 31 Burris Compl. ¶ 67; Smith Compl. ¶ 77.
> 32 Burris Compl. ¶ 69; Smith Compl. ¶ 79.
> 33 Burris Compl. ¶ 70; Smith Compl. ¶ 80.
> 34 Burris Compl. ¶ 71; Smith Compl. ¶ 81.

Unlike Title VII, which permits a claim based on a theory of discriminatory impact, § 1981 provides a cause of action only for *purposeful* disparate treatment. *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania, 458 U.S. 375, 388-91, 102 S. Ct. 3141, 73 L. Ed. 2d 835 (1982)*; *Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 562 (3d Cir. 2002)*. To establish § 1981 liability for intentional racial discrimination, plaintiffs must show that: (1) they belong to a racial minority; (2) the discrimination involved the right to make and enforce contracts; and, (3) the defendants had an intent to discriminate on the basis of race. *Brown v. Philip Morris*

*Inc., 250 F.3d 789, 797 (3d Cir. 2001).* The core of a *§ 1981* action is *intentional* discrimination.

The plaintiffs do not plead intentional discrimination. The allegation [*29] that "Allstate failed to make any adjustments for the demographic, racial or ethnic make-up of an agency's customer base" [35] falls short of a claim that Allstate intended to discriminate against African-American agents or intended the ALI to negatively impact African-American agents. [36] More importantly, the plaintiffs' challenges to the ALI focus on the race and ethnicity of *customers*, not the agents. The plaintiffs attack the reliability of the ALI. They do not allege that the ALI was purposefully designed to discriminate against African-American agents. Assuming, as plaintiffs allege, that "[i]t is well known that minority communities generally do not respond to [mailed] surveys and those that do are the ones who have negative statements to make," [37] ALI scores would negatively impact any agent with a large minority clientele, regardless of that agent's race or ethnicity. In that scenario, white agents with minority customers would score worse in customer satisfaction than equally performing minority agents with white customers. [38] Thus, the race of the clientele, not the agents, affects the measure of customer satisfaction.

35   Smith Compl. ¶ 53.
36   For this reason, plaintiffs' reliance [*30] on *Hicks v. Arthur, 843 F. Supp. 949 (E.D. Pa. 1994)* is misplaced. In *Hicks,* the plaintiff alleged that she was denied a promotion and eventually fired "because she was black." *Id. at 955.*
37   Burris Compl. ¶ 44; Smith Compl. ¶ 52.
38   The plaintiffs did not allege that the ALI customer satisfaction scores were enforced selectively, resulting in Allstate terminating the plaintiffs' agency agreements while retaining white agents with similar scores.

Absent allegations linking Allstate's actions to the plaintiffs' race, we are left with the assertion that the two agents terminated for low customer satisfaction scores are African American. This allegation is insufficient to state a claim under *§ 1981.*

## Dismissal of Parties

Allstate moves to dismiss The Allstate Corporation as a defendant. The plaintiffs allege that The Allstate Insurance Company is a wholly owned subsidiary of The Allstate Corporation. [39] The Allstate Insurance Company, not The Allstate Corporation, is the signatory to Burris and Smith's agency agreements. Parent corporations are not normally liable for the contractual obligations of wholly owned subsidiaries. *See, e.g., Lowenstein v. Catholic Health E., 820 F. Supp. 2d 639, 643-44 (E.D. Pa. 2011).* [*31] However, it is premature to determine whether The Allstate Corporation may be held liable for the purported breach of the agreement by The Allstate Insurance Company. For example, plaintiffs' breach of contract claim is predicated on Allstate's failure to conduct formal performance reviews. We do not know what role, if any, The Allstate Corporation had in conducting the performance reviews. Therefore, we decline to dismiss The Allstate Corporation as a defendant at this time. [40]

39   Burris Compl. ¶ 20; Smith Compl. ¶ 23.
40   Similarly, we shall not dismiss the Burris Agency as a plaintiff at this time. Although Burris signed the agency agreement as an individual, not on behalf of his agency, he alleges that the agency agreement requires that his Agency receive the benefit of the formal performance reviews. *See* Burris Compl. ¶ 79 ("The Agency Agreement mandates that the Burris Agency receive a formal evaluation on an annual basis and a mid-year review.").

## Conclusion

We shall grant Allstate's motion to dismiss the plaintiffs' fraud, negligence, unjust enrichment, breach of good faith and fair dealing, and *§ 1981* claims. We shall deny the motion to dismiss the plaintiffs' breach of contract claims. [*32] The Allstate Corporation and the Burris Agency shall remain as parties.

## ORDER

**AND NOW,** this 10th day of July, 2012, upon consideration of Defendants' Motions to Dismiss (Document No. 6), the plaintiff's response and the defendants' reply, it is **ORDERED** that the motion is **GRANTED IN PART** and **DENIED IN PART.**

IT IS FURTHER ORDERED as follows:

1. The motion is **DENIED** as to Count II.

2. The motion is **GRANTED** as to Counts I, III, IV

2012 U.S. Dist. LEXIS 95950, *32

and V.

3. Counts I, III, IV and V are **DISMISSED**.

/s/ Timothy J. Savage

TIMOTHY J. SAVAGE, J.


LexisNexis®

FRANK SYLVESTER a/k/a Frank J. Sylvester, MILDRED SYLVESTER, Plaintiffs
v. SOUTHWESTERN ENERGY PRODUCTION COMPANY, Defendant

3:CV-09-1653

UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF
PENNSYLVANIA

*2009 U.S. Dist. LEXIS 101788*

November 2, 2009, Filed

**COUNSEL:** [*1] For Frank Sylvester, also known as Frank J. Sylvester, Mildred Sylvester, Plaintiffs: Patrick N. Coleman, LEAD ATTORNEY, Tellie & Coleman, Dunmore, PA; Richard B. Henry, LEAD ATTORNEY, Richard B. Henry, Esq, Honesdale, PA.

For Southwestern Energy Production Company, Defendant: David R. Fine, LEAD ATTORNEY, K&L Gates LLP, Harrisburg, PA.

**JUDGES:** Thomas I. Vanaskie, United States District Judge.

**OPINION BY:** Thomas I. Vanaskie

**OPINION**

**MEMORANDUM**

At issue on Defendant's Motion to Dismiss in this action removed to this Court from the Court of Common Pleas of Lackawanna County on the basis of diversity of citizenship is whether the untimely tender of payment on a natural gas lease entitles the lessor to declare the lease "null and void." Because the parties' agreement did not include a "time is of the essence" clause, the tender of payment was only a few weeks late, and the payment was made within the lease's 90-day cure period, the question must be answered in the negative. Accordingly,

Defendant's Motion to Dismiss will be granted.

**I. BACKGROUND**

On December 8, 2007, Plaintiffs and NewPenn Exploration, LLC ("NewPenn") entered into a ten (10) year natural-gas lease. (Dkt. 1, Tab "B" at 6, P 3.) [1] The lease provided that NewPenn [*2] would pay to Plaintiffs $ 15,665.00 within sixty (60) calendar days of NewPenn's receipt from Plaintiffs of a signed copy of the order of payment. (*Id.*) Plaintiffs signed and returned the order of payment to NewPenn on December 8, 2007, making the payment due no later than February 6, 2008. (*Id.*) On February 29, 2008, 23 days after the due date, NewPenn tendered the full payment to Plaintiffs by check. (*Id.* at P 7.) On March 17, 2008, through their counsel, Plaintiffs returned the check marked as "void" to NewPenn, and requested that NewPenn return the "originally signed document [] so it may be destroyed." (*Id.* at PP 8-9.)

1   For the convenience of the reader of this Memorandum opinion in electronic format, hyperlinks to the Court's record and to authority cited herein have been inserted. The Court accepts no responsibility for, and does not endorse, any product, organization, or content at any hyperlinked site, or at any site to which that site might be linked. The Court accepts no responsibility for the availability or functionality

of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the Court.

The lease [*3] included a cure provision:

> **12. Breach or Default**. No litigation shall be initiated by Lessor [Plaintiffs] for damages, forfeiture or cancellation with respect to any breach or default by Lessee hereunder, for a period of at least 90 days after Lessor has given Lessee written notice fully describing the breach or default, and then only if Lessee fails to remedy the breach or default within such period . . . .

(*Id.* at 14, P 12.)

On September 15, 2008, NewPenn assigned its rights in the lease to Defendant Southwestern Energy Production Company ("SEPCO"). (*Id.* at 6, P 10.) On December 1, 2008, Plaintiffs brought this action against NewPenn. On August 7, 2009, Plaintiffs filed an amended complaint, changing the identity of the defendant from NewPenn to SEPCO. Plaintiffs seek a declaratory judgment that the lease is unenforceable, (*id.* at 7, P 18), and to quiet title on Plaintiffs' property. (*Id.* at 8, P 23.) SEPCO removed the action to this Court on August 26, 2009 (Dkt. 1), and moved to dismiss the amended complaint on September 3, 2009. (Dkt. 4-5.)

## II. DISCUSSION

### A. Standard of Review

The court's task on a Rule 12(b)(6) motion to dismiss for failure to state a claim is to "determine whether, [*4] under any reasonable reading of the pleadings, the plaintiffs may be entitled to relief." *Langford v. City of Atlantic City, 235 F.3d 845, 847 (3d Cir. 2000)*. In doing so, all factual allegations and all reasonable inferences drawn therefrom are assumed to be true. *Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996)*. "The complaint will be deemed to have alleged sufficient facts if it adequately puts the defendants on notice of the essential elements of the cause of action." *Id.*

The Supreme Court recently abrogated its longstanding decision in *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*, which had held that a complaint may be dismissed only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." The Court retired this "no set of facts" language in favor of a new standard: a plaintiff's obligation to state a claim for relief under *Rule 8(a)(2)* "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. As a result of *Twombly*, plaintiffs are required to nudge their claims "across the line from conceivable [*5] to plausible." *Id. at 570*. To state a claim consistent with the language of *Fed. R. Civ. P. 8(a)(2)*, which requires only a "short and plain statement of the claim showing that the pleader is entitled to relief," a complaint must contain factual allegations sufficient "to raise a right to relief above a speculative level." *Id.* As such, courts may dismiss a complaint if it fails to "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Twombly, 550 U.S. at 562* (quotation and citation omitted).

### B. The Breach of Contract Was Not Material and Timely Cured

"When performance of a duty under a contract is due, any nonperformance is a breach." *Restatement (Second) of Contracts § 235(2)* (1981). The averments of the amended complaint plainly disclose a breach of contract: tender of the lump sum payment was late. A mere breach of contract, however, does not necessarily discharge the non-breaching party's contractual obligations.

In Pennsylvania, the law is "clear that only [a] material [breach] of [contract] by one party discharges the other [party's duties]. An immaterial failure does not operate as such [*6] a discharge." *Schlein v. Gross, 186 Pa. Super. 618, 142 A.2d 329, 333 (Pa. Super. Ct. 1958)* (citing Restatement (First) Of Contracts, § 274). Thus, "the non-breaching party does not have a right to suspend performance [if the breach is not material]." *Widmer Engineering, Inc. v. Dufalla, 2003 PA Super 391, 837 A.2d 459, 468 (Pa. Super. Ct. 2003)* (internal quotations omitted).

"Whether a breach is so substantial as to justify an injured party's regarding the whole transaction as at an end is a question of degree . . . ." *Id.* (internal quotations omitted). The following factors are considered when

determining materiality for purposes of breach of contract:

> a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

> b) the extent to which the injured party can be adequately compensated for that part of the benefit of which he will be deprived;

> c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

> d) the likelihood that the party failing to perform or offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

> e) the extent to which the behavior of the party failing to perform or offer to [*7] perform comports with standards of good faith and fair dealing.

*Id.* (internal quotations and citations omitted). In *Widmer Engineering*, the court applied these factors to find that the seller's failure to pay taxes and amounts owed as adjustments to the contract purchase price for a business did not constituted a material breach so as to discharge the buyer's contractual duties.

In this case, NewPenn's untimely tender of payment did not constitute a material breach of the contract. Plaintiffs reasonably expected to receive $ 15,665.00, which was tendered approximately three weeks late, yet Plaintiffs deprived themselves of this benefit by returning the check as void. Similarly, Plaintiffs can be adequately compensated by accepting the payment that they are entitled to receive. Indeed, SEPCO remains ready to reissue a check to Plaintiffs. (Dkt. 8, at 3 n.2.) Additionally, although NewPenn attempted to perform its duty to pay Plaintiffs under the lease, NewPenn's interest would be forfeited if the lease were found invalid. *See Barraclough v. Atlantic Refining Co., 230 Pa. Super. 276, 326 A.2d 477, 479 (Pa. Super. Ct. 1974)* ("Equity does not favor a forfeiture and it has been long held that courts should greatly [*8] hesitate in enforcing one, especially when the contract has been carried out or its

literal fulfillment has been prevented by oversight").

Moreover, NewPenn cured its breach by making a good faith tender of payment to Plaintiffs on February 29, 2008, which would have been well within the 90-day cure period had Plaintiffs given notice with an opportunity to cure. The fact that the lease contained a 90-day cure period also indicates that Plaintiffs' reasonable expectation was that a failure of payment could be cured within 90 days of the default. This expectation was met in this case.

It is also significant that the lease did not include a "time is of the essence" provision. "[W]here time is not of the essence, the mere failure to perform on the date mentioned in a contract is not per se a breach which wholly destroys the contract." *Gorzelsky v. Leckey, 402 Pa. Super. 246, 586 A.2d 952, 956 (Pa. Super. Ct. 1991), appeal denied, 528 Pa. 630, 598 A.2d 284 (Pa. 1991)* (quoting *Bogojavlensky v. Logan, 181 Pa. Super. 312, 124 A.2d 412, 416 (Pa. Super. Ct. 1956)).* Thus, it has been recognized that "a brief delay in performance does not constitute an actionable breach of contract." *Singh v. Wal-Mart Stores, Inc., No. Civ.A. 98-1613, 1999 U.S. Dist. LEXIS 8531, 1999 WL 374184, at *9 (E.D. Pa. June 10, 1999), [*9] aff'd mem., 225 F.3d 650 (3d Cir. 2000).* Given the absence of a time is of the essence clause in the lease and NewPenn's tender of payment before any notice of default had been communicated, the brief delay in making payment is not such a breach as to entitled Plaintiffs to cancel the transaction. Therefore, Plaintiffs have not shown that they are entitled to relief. On the contrary, it is clear that Plaintiffs are unable to present a viable claim for rescission of the lease based upon the facts and circumstances of this case. Accordingly, SEPCO's motion to dismiss for failure to state a claim will be granted, and this case will be dismissed, without prejudice. [2]

> [2]  It is, of course, anticipated that SEPCO will timely tender the payment due under the lease, and that Plaintiffs will accept the tender. If SEPCO fails to make tender, then Plaintiffs may seek appropriate relief, including cancellation of the lease.

/s/ Thomas I. Vanaskie

Thomas I. Vanaskie

United States District Judge

2009 U.S. Dist. LEXIS 101788, *9

**ORDER**

NOW, THIS 2nd DAY OF NOVEMBER, 2009, for the reasons set forth in the foregoing memorandum, **IT IS HEREBY ORDERED THAT:**

    1. Defendant's Motion to Dismiss (Dkt. 4) is **GRANTED**.

    2. This action is **DISMISSED, WITHOUT [*10] PREJUDICE.**

3. The Clerk of Court shall mark this matter **CLOSED.**

**/s/ Thomas I. Vanaskie**

Thomas I. Vanaskie

United States District Judge



NORFOLK SOUTHERN RAILWAY CO., Plaintiff, v. BASELL USA, INC., Defendant.

CIVIL ACTION No. 05-3419

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*2008 U.S. Dist. LEXIS 62390*

August 15, 2008, Decided
August 15, 2008, Filed, August,15, 2008, Entered

**PRIOR HISTORY:** *Norfolk S. Ry. Co. v. Basell USA Inc., 512 F.3d 86, 2008 U.S. App. LEXIS 363 (3d Cir. Pa., 2008)*

**COUNSEL:** [*1] For NORFOLK SOUTHERN RAILWAY COMPANY, Plaintiff: PAUL D. KEENAN, LEAD ATTORNEY, CHARLES L. HOWARD, JAMES R. LLOYD, KEENAN COHEN & HOWARD P.C., JENKINTOWN, PA.

For BASELL USA INC., Defendant, Counter Claimant: CONRAD O. KATTNER, JOHN P. MCSHEA, LEAD ATTORNEYS, MCSHEA TECCE P.C., PHILADELPHIA, PA; NICHOLAS J. DIMICHAEL, LEAD ATTORNEY, THOMPSON HINE LLP, WASHINGTON, DC.

For NORFOLK SOUTHERN RAILWAY COMPANY, Counter Defendant: CHARLES L. HOWARD, KEENAN COHEN & HOWARD P.C., JENKINTOWN, PA.

For BASELL USA INC., Counter Claimant: JOHN P. MCSHEA, LEAD ATTORNEY, MCSHEA TECCE PC, PHILADELPHIA, PA.

**JUDGES:** Berle M. Schiller, J.

**OPINION BY:** Berle M. Schiller

**OPINION**

**MEMORANDUM AND ORDER**

Schiller, J.

August 15, 2008

Plaintiff Norfolk Southern Railway Company ("Norfolk Southern") brings this action against Basell USA, Inc. ("Basell") alleging material breach of contract and repudiation, and seeking restitution. A bench trial was held on April 7, 2008. The Court now enters the following findings of fact and conclusions of law pursuant to *Federal Rule of Civil Procedure 52(a)*.

**I. FINDINGS OF FACT**

Norfolk Southern is an interstate rail carrier that provides transportation services to shippers of freight. (Jt. Pretrial Stipulation § I Agreed Facts [hereinafter [*2] Agreed Facts] P 1.) Basell manufactures plastic resin pellets at production facilities in West Lake Charles, Louisiana, ("WLC"), Bayport, Texas and locations in Canada. (*Id.* PP 3, 8; Apr. 7, 2008 Tr. [hereinafter Tr.] at 243.) Basell purchases transportation services from rail carriers, including Norfolk Southern, in order to transport its product from its facilities to its customers. (Agreed Facts P 3.) Basell and Norfolk Southern entered into a

contract whereby Basell agreed to ship a certain percentage of its traffic originating from its WLC facility in exchange for discounted shipping rates from Norfolk Southern. At issue in this case is whether Basell's failure to tender the full percentage of traffic promised to Norfolk Southern constitutes a material breach of the parties' contract, and, if so, whether Norfolk Southern is entitled to restitution as a remedy.

## A. Background

Because no single rail line spans the entire route, Basell must ship goods from its WLC facility to the east coast by at least two carriers. First, an "Origin Carrier," either Burlington Northern Sante Fe ("BNSF") or Union Pacific Railway ("UP"), transports the freight from WLC, or from a nearby storage yard, [*3] to an interchange location. (Agreed Facts P 9; Tr. at 235.) From there, the freight is moved by a carrier that services the eastern sea board, either Norfolk Southern or CSX Transportation Company ("CSX"), to the ultimate destination, which can be one of two types -- "rail direct" or "truck transfer." (Agreed Facts P 11.) A "rail direct" destination is one that can be served exclusively by rail; freight delivered to a "truck transfer" destination is initially shipped by railcar, then transferred to a truck for delivery to customers. (Tr. at 5-6.)

Rail direct destinations vary by whether they are "sole-served" or "competitive." (Agreed Facts P 12.) A destination is said to be "sole-served" when it is reached by a line serviced by only one carrier; here, either Norfolk Southern or CSX. (Tr. at 5-6.) In contrast, a destination is "competitive" when it may be reached by service of more than one rail carrier. (Id. at 6.) "Truck transfer" destinations are competitive between Norfolk Southern and CSX.

As a common carrier, Norfolk Southern is obligated to move freight for anyone seeking to use its lines. (Id. at 135.) In the absence of a contract, Norfolk Southern charges its customers published [*4] tariff rates for rail movements. (Id. at 135-37.) In general, tariff rates are significantly higher than contract rates. (Id. at 137.)

## B. The Marriott Accords

Certain of Basell's WLC traffic was subject to a contract with Norfolk Southern that was scheduled to terminate in January 2002. (Id. at 7.) Accordingly, in late 2001, Basell's WLC traffic was up for bid; this included

its rail direct, rail competitive and truck transfer traffic. (Id. at 5, 7.) Since Norfolk Southern did not want to lose Basell's business, it began negotiations with Basell for a new contract. (Id. at 5-7, 11-12; Pl.'s Ex. 1 (Oct. 10, 2001 E-mail).)

On January 29, 2002, Alan Julian, Joe Osborne, and Don Seale of Norfolk Southern met with Cathy Rosenkranz, Bob Granatelli and Sam Slovak of Basell at the Courtyard Marriott at the Philadelphia Airport in order to finalize negotiations. (Tr. at 18-20; Agreed Facts P 13-15.) Norfolk Southern sought, and ultimately obtained, an agreement securing a large part of Basell's rail direct competitive and truck transfer traffic. (Tr. at 20; Pl.'s Ex. 3 (Jan. 22, 2002 E-mail from Julian) & Ex. 4 (Jan. 28, 2002 E-mail re "Basell Update").) By the end of the meeting, the parties [*5] reached agreement on several aspects of the new contract; these agreements came to be known as the "Marriott Accords." (Tr. at 20-21, 150.)

Since BNSF would first move Basell's cargo from WLC to the interchange location, the parties envisioned an "implementing agreement" that was intended to work in conjunction with a master contract between Basell and BNSF. (Id. at 21-22, 149; see also Pl.'s Ex. 9 (BNSF Master Contract).) Although there is no written contract memorializing the Marriott Accords in full, the main facets of the agreement can be gleaned from the BNSF master contract and a post-Marriott Accords email summarizing the parties' agreement. (See Tr. at 21, 150, 200-01, 206; Pl.'s Ex. 8 (E-mail Chain re "Implementing Agreement Summary") & Ex. 51 (Mar. 16, 2006 Slovak Dep.) at 41) [1]

> 1    At trial, Plaintiff moved for the admission of the 30(b)(6) depositions of Cathy Rosenkranz and Samuel Slovak pursuant to Federal Rule of Civil Procedure 32(a)(3). (Tr. at 192.) Plaintiff also moved for the admission of the deposition of Randy Overbey, a CSX employee, pursuant to Rule 32(a)(4), because he was not available to testify at trial. (Id. at 78-79.)

The parties agreed to a term of five years [*6] and four months -- from February 1, 2002 through March 31, 2007. (Pl.'s Ex. 8.) Each contract year ran from February 1st of the year in question through January 31st of the following year, with the exception of contract year 2007, which ran from February 1, 2007 through May 31, 2007. (Agreed Facts P 16.) The agreement contained an annual

minimum volume commitment -- Basell agreed to tender to Norfolk Southern (1) 95% of its cargo originating in WLC to destinations that could be served by Norfolk Southern, including truck transfer movements within a 100 mile radius of a Norfolk Southern terminal, and (2) 95% of its truck transfer movements within a 100 mile radius of a Norfolk Southern terminal. (Tr. at 25-28, 168; Pl.'s Ex. 8 at BAS0003 & Ex. 9 at NS00024-25 & Ex. 51 at 150-53.) Norfolk Southern specifically sought this minimum volume commitment to secure competitive traffic. (Tr. at 28; Pl.'s Ex. 9 at NS00024.)

In exchange for the annual minimum volume commitment, Norfolk Southern agreed to ship Basell's freight from WLC to various destinations, whether sole-served rail direct, competitive rail direct, or truck transfer, at rates below the published tariff rate. (Tr. at 29-34, 38; [*7] Pl.'s Ex. 8 at BAS-0003-0004.) Norfolk Southern would charge Basell "point-to-point rates" -- set rates for shipment to destinations where Basell had customers at the time the contract was negotiated. (Tr. at 31-35, 40, 202-04; see Pl.'s Ex. 13 (Rate Matrix) & Ex. 14 (Rate Matrix); Def.'s Ex. 16 (BNSF Offer No. 4) & Ex. 22 (Email Accepting Offer No. 4).) If Basell acquired a customer at a new destination during the course of the contract who could be serviced by Norfolk Southern, Basell could request a rate for shipping to that new destination. (Tr. at 28, 34, 76-77; Pl.'s Ex. 8 & Ex. 9 at NS00026.) Movements to that destination would then be priced at a "scale rate" below the tariff rate to be determined according to a "Discounted Private Through Rate Scale." (Tr. at 28-31, 270; Pl.'s Ex. 8 at BAS0004 & Ex. 9 at NS00026 & Ex. 10 (E-mails Regarding New Rate).) Although Basell was not obligated to ask for a rate to new destinations, traffic moving to any new destinations from WLC that could be serviced by Norfolk Southern would be part of the universe of traffic from which the minimum volume commitment was derived (thus, it was in Basell's best interest to request a new rate so as to [*8] avoid being charged the tariff rate). [2] In addition to the reduced rates, Norfolk Southern agreed to absorb certain truck transfer-related charges. (Tr. at 38; Pl.'s Ex. 8 at BAS0002-3).)

2   The Court rejects Basell's argument that the parties' contract only applied to destinations for which Norfolk Southern established a point-to-point rate in February 2002. (See Def.'s Am. Proposed Findings of Fact and Conclusions of Law [hereinafter "Def.'s Am. Findings"] at

23-24 P 16.) If this was the case, there would have been no reason to establish a system for the parties to develop rates to new destinations. Furthermore, during the course of the contract, Basell requested, and Norfolk Southern provided, rates for destinations that were not covered at the onset of the Marriott Accords. (Pl.'s Ex. 10 (May 20, 2002 E-mail requesting new rate).) Clearly then, the parties intended the Marriott Accords, and the minimum volume commitment, to apply to new business arising during the term of the contract that could be handled by Norfolk Southern.

Throughout negotiations, Norfolk Southern was clearly driven by its desire to capture the majority of Basell's rail direct competitive and truck transfer movements. [*9] (Tr. at 11, 17, 133-34; Pl.'s Ex. 1 & Ex. 4.) The minimum volume commitment secured this benefit. Norfolk Southern would not have agreed to reduced shipping rates for all moves, including sole-served moves, if Basell had not agreed to the minimum volume commitment. (Tr. at 49-50, 76, 138-39.) Without the minimum volume commitment, Norfolk Southern would not have contracted with Basell, and would have instead charged Basell tariff rates for sole-served or any other moves. (Id. at 75-76.)

## C. Basell contracts with CSX

In late 2004, Basell was undergoing changes in its Origin Carrier at its Bayport, Texas facility and its Canadian facilities. (Id. at 282-83.) In January 2005, Basell sought to put its "Gulf Coast traffic" and its Canadian traffic up for bid. (Id. at 42-43, 243-44; Pl.'s Ex. 21 (Jan. 7, 2005 Email re Bayport-WLC Destinations for CSX).) The "Gulf Coast Traffic" included traffic originating at Basell's Bayport facility and its WLC facility. (Tr. at 42-43, 243-44; Pl.'s Ex. 19 (Jan. 5, 2005 Email re WLC Competitive Desitinations) & Ex. 21.) In January 2005, in response to Basell's request for a bid from Norfolk Southern, Alan Julian of Norfolk Southern told Bob Granatelli of [*10] Basell that the WLC traffic was already subject to the Marriott Accords. (Tr. at 42-44.) Granatelli responded that Basell did not consider the traffic to be under contract and that it was putting the traffic up for bid. (Id. at 43-45; Def.'s Ex. 56 (Jan 26, 2005 Email from Julian to Granatelli).) Ultimately, Norfolk Southern did not place a bid for the Bayport and Canadian traffic. (Tr. at 47-48, 246-47, 286.)

On January 28, 2005, Basell entered into a contract with CSX, Norfolk Southern's competitor, for Basell's Gulf Coast traffic and Canadian traffic (the "2005 CSX Contract"). (*Id.* at 212, 249-50; Pl's Ex. 31 (2005 CSX Contract) & Ex. 60 (Overbey Dep.) at 9, 24, 91 & Ex. 60a (2005 CSX Contract) at CSXT005518-5522 & Ex. 73 (Apr. 20, 2008 Slovak Dep.) at 26.) The 2005 CSX Contract had a two year term -- the first contract year ran from February 1, 2005 through January 31, 2006 and the second contract year ran from February 1, 2006 through January 31, 2007. (Tr. at 250.) Pursuant to this contract, CSX provided discounted rates in exchange for Basell's commitment of 95% of its rail direct shipments from the origins subject to the contract, and 95% of its truck transfer traffic from the [*11] those origins within a 75 mile radius of a CSX truck terminal. (*Id.* at 252; Pl.'s Ex. 31 at BAS007056-7057 & Ex. 60 at 13-22.)

Consequently, beginning February 1, 2005, Basell's WLC traffic was subject to both the Mariott Accords and the 2005 CSX Contract. (Tr. at 275, 296; Pl.'s Ex. 60 at 73 & Ex. 73 at 26.) This was because of Basell's choice to include the WLC traffic among the traffic that was up for bid in early 2005 and in the 2005 CSX Contract. Indeed, Basell made a business decision to include the WLC traffic in the 2005 CSX Contract in order to increase its profitability. [3] (Tr. at 296-97.) Since Basell's Bayport facility was much larger than its WLC facility, however, the WLC traffic only comprised a small portion of the total traffic promised to CSX in the 2005 CSX Contract. (*Id.* at 199, 277-78, 288-90.) Accordingly, at the time it entered into the 2005 CSX Contract, Basell believed that it would be able to meet both minimum volume requirements. (*Id.* at 288-90.) Nevertheless, at the start of the 2005 contract year, Basell began diverting traffic it had already promised to Norfolk Southern, to CSX.

[3] Basell's proffered reason for this decision was that it was not operationally [*12] feasible to split the truck transfer traffic out of WLC and Bayport between Norfolk Southern and CSX because of scheduling difficulties and increased inventory costs. (Def.'s Am. Findings at 13 P 32; Tr. at 286-88, 291-92, 298; Pl.'s Ex. 51 at 76-80.) However, this does not explain why it was necessary for Basell to include the rail direct traffic in its contract with CSX. Furthermore, all of the shortfall in 2005 was attributable to Norfolk Southern's loss of rail direct traffic. (Tr. at

271-74.) Accordingly, the Court concludes that this explanation is merely an excuse offered by Basell to mask its true reason for including this traffic in the CSX contract -- that Basell sought to take advantage of CSX's rates in derogation of its contract with Norfolk Southern.

Just days after Basell entered into the 2005 CSX Contract, Granatelli indicated to Julian that Basell would use tariff rates for destinations solely served by Norfolk Southern, and that "Basell will move [other] rail shipments to the carrier who has offered [Basell] bids on movements from all Basell Gulf Coast Facilities." (Pl.'s Ex. 33 (Feb. 1, 2005 Email String).) Without explicitly saying Basell was breaching the Marriott [*13] Accords or that it wanted out of the contract, Granatelli's email suggests that as of February 1, 2005, Basell essentially sought to proceed as if there were no contract in place. Julian's responded that the Marriott Accords were still in effect and that Norfolk Southern was "pursuing all legal means necessary" to enforce them. (*Id.*)

**D. Basell renegotiates with CSX despite failing to meet its minimum volume commitment to Norfolk Southern in 2005**

Although it was theoretically possible for Basell to meet its minimum volume commitment to both Norfolk Southern and CSX, Basell was unable to do so in reality. (Pl.'s Ex. 73 at 17-18, 25-26.) Basell met its minimum volume commitment under the Marriot Accords for the 2002, 2003 and 2004 contract years, but failed to satisfy that commitment for the 2005 contract year. (Agreed Facts PP 17-18 & Pl.'s Ex. 73 at 14, 18, 21-22.) This was a direct result of Basell's having promised the same traffic to both Norfolk Southern and CSX. In contrast, Basell satisfied its minimum volume commitment to CSX for the 2005 contract year. (Tr. at 268.)

In 2007, CSX and Basell renegotiated their contract ("2007 CSX Contract"). (*Id.* at 251-53; Pl.'s Ex. 34 (E-mail Attaching [*14] Termination Letter).) The 2007 CSX Contract retained most of the terms of the 2005 CSX Contract, including the minimum volume commitment, but required Basell to pay higher rates for movements; it had a one-year term beginning on February 1, 2007. (*Id.* at 253-55.) There is no evidence that Basell made any effort to remove the WLC traffic from the scope of the minimum volume requirement, even though Basell was aware that it had not been meeting its obligations to Norfolk Southern.

As with the 2005 contract year, Basell failed to meet its minimum volume commitment for the 2006 and 2007 contract years as a result of its obligations to CSX. (*Id.* at 269.) In contrast, Basell met its minimum volume commitment to CSX for the overlapping 2006 and 2007 contract years. (*Id.* at 268-69; Pl.'s Ex. 60 at 16.)

### E. Procedural history

Norfolk Southern filed the instant lawsuit in July 2005 in response to Granatelli's statement that Basell did not consider the WLC traffic to be subject to the Marriott Accords. Norfolk Southern sought declaratory judgment that Basell was obligated to pay tariff rates for all moves that Norfolk Southern made on behalf of Basell from June 2002 forward in light of Basell's apparent [*15] position that the parties did not have a contract. Basell counterclaimed for declaratory judgment in its favor, quantum meruit, unfair competition, and tortious interference with existing and prospective contractual relations. Both parties subsequently added a breach of contract claim.

Two months before trial, Norfolk Southern first learned of the 2005 CSX Contract during Samuel Slovak's deposition. Norfolk Southern then notified this Court on the eve of trial of a change in its strategy: Norfolk Southern was now asserting that Basell committed a material breach of contract and/or repudiated the parties' contract by entering into the 2005 CSX Contract and failing to meet the Marriott Accords's minimum volume commitment as a result. Since the parties were in agreement that Basell had, in fact, breached the Marriott Accords, this Court ordered cross-motions for summary judgment pertaining to whether the breach was material and whether Basell repudiated the contract; determination of these issues would affect whether Norfolk Southern was entitled to restitution as opposed to lost profits. As part of Basell's argument that its failure to meet the minimum volume commitment was not material, [*16] Basell represented to this Court in June 2006 that "[t]here could very well be no shortfall in 2007, since Basell's obligations to [CSX] are currently set to end on January 31, 2007, and Basell may be in a position to tender traffic to Norfolk Southern in full." (Def.'s Mem. of Law in Supp. of Mot. for Summ. J. at 34.) After oral argument on June 16, 2006, this Court concluded that Basell's breach of the Marriott Accords was not material. Nonetheless, because Basell breached the parties' contract, the Court entered summary

judgment in favor of Norfolk Southern in the amount of its lost profits. Norfolk Southern appealed, maintaining that the breach was material and that Norfolk Southern was therefore entitled to greater damages.

After oral argument, Basell sought to mitigate the damages to Norfolk Southern by redirecting some of the competitive rail traffic that it had previously diverted to CSX; Basell did not redirect the majority of the truck transfer business that had been diverted. (Tr. 212-14, 258, 262-63; Def.'s Ex. 84 (2006 Shortfall Spreadsheet); Pl.'s Ex. 53 at 124.) In formulating this plan, Basell did not look at its actual shipments to determine how to best cure the shortfall; [*17] instead, Basell merely redirected competitive traffic to Norfolk Southern in hopes that the shortfall would be cured. (Tr. at 231-33, 258-63; Def.'s Ex. 84; Pl.'s Ex. 38 (2007 Shortfall Spreadsheet).) However, a review of the records from the 2006 contract year indicates that Basell would have needed to redirect additional truck transfer traffic in order to satisfy the minimum volume commitment for that year. (Tr. at 263-67; Def.'s Ex. 84; Pl.'s Ex. 39 (Demonstrative Exhibit).) Nevertheless, Basell's efforts to meet the minimum volume commitment continued through the end of the contract.

On January 9, 2008 the Third Circuit vacated this Court's summary judgment order and remanded the matter for trial. *Norfolk Southern Ry. Co. v. Basell USA, Inc., 512 F.3d 86 (3d Cir. 2008).* Since the intentions of the parties were instrumental in determining whether Basell's breach was material, the Third Circuit concluded that the issue could not be determined on summary judgment. The Third Circuit also entertained Norfolk Southern's repudiation theory, noting that whether Basell repudiated the Marriott Accords depended on whether it was able to fulfill both of its minimum volume commitments at once. [*18] After remand, Norfolk Southern filed a Second Amended Complaint alleging material breach of contract and repudiation, and seeking restitution. Prior to trial, Basell paid Norfolk Southern a total of $ 398,250.00 in an effort to compensate Norfolk Southern for its lost profits.

## II. CONCLUSIONS OF LAW

Based on the above facts, the Court concludes that Basell's failure to meet its minimum volume commitment to Norfolk Southern for the 2005, 2006, and 2007 contract years constitutes a material breach of the Marriott Accords and that Norfolk Southern is entitled to

restitution as a remedy. However, Basell's entry into the 2005 CSX Contract does not constitute a repudiation of the Marriott Accords.

**A. Basell's repeated failure to meet its minimum volume commitment to Norfolk Southern constitutes a material breach of the Marriott Accords**

The parties' contract is governed by Delaware law. *Norfolk Southern, 512 F.3d at 91 n.6*; (Agreed Facts It 7.) Delaware applies the *Restatement (Second) of Contracts* to determine whether a breach is material. *BioLife Solutions, Inc. v. Endocare, Inc., 838 A.2d 268, 278 (Del. Ch. 2003); Eastern Elec. and Heating Co. v. Pike Creek Professional Ctr., 1987 Del. Super. LEXIS 1115, 1987 WL 9610, at **4-5 (Del. Super. Ct. Apr. 7, 1987)* [*19] , *aff'd,* 1998 WL 320028 (Del. Apr. 5, 1988). Pursuant to the *Restatement,* five factors guide the materiality analysis:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

> (e) the extent to which the behavior of the party failing to perform comports with standards of good faith and fair dealing.

*Restatement (Second) of Contracts § 241* (1981). The factors must be applied in light of the specific facts of each case; "no single factor is dispositive." *Norfolk Southern, 512 F.3d at 92.* A material breach by one party justifies non-performance by the non-breaching party. In other words, the non-breaching party's obligations terminate after the material breach. *Eastern Elec. and Heating Co., 1987 Del. Super. LEXIS 1115, 1987 WL*

*9610, at *4*; [*20] *Restatement (Second) of Contracts § 237.*

Taking all of the *Restatement* factors into consideration, Norfolk Southern has proven by a preponderance of the evidence that Basell's failure to satisfy the minimum volume commitment for the 2005, 2006 and 2007 contract years constitutes a material breach of the Marriott Accords. The first factor, the extent to which the injured party will be deprived of the benefit which he reasonably expected, weighs heavily in favor of Norfolk Southern. Clearly, Norfolk Southern was deprived of the primary benefit that it bargained for -- the high percentage of Basell's competitive traffic, both rail direct and truck transfer, which it reasonably expected to secure with the minimum volume commitment. In contrast, Basell retained the benefit of its bargain -- reduced contract rates for moves -- to which Norfolk Southern would not have agreed had Basell rejected the terms of the minimum volume commitment. That the minimum volume commitment was comprised of sole-served traffic in addition to competitive traffic, as Basell points out, is besides the point. Norfolk Southern was willing to relinquish the ability to charge Basell tariff rates on sole-served traffic [*21] -- business that would necessarily go to Norfolk Southern in the absence of a contract -- in exchange for a minimum volume requirement that would entitle it to a large share of Basell's competitive traffic coming out of WLC -- business that would not go to Norfolk Southern in the absence of a contract. Accordingly, Basell's failure to satisfy the minimum volume commitment by redirecting competitive traffic to CSX deprived Norfolk Southern of the essence of its bargain. *See In re General Datacomm Indus., Inc., 407 F.3d 616, 628 (3d Cir. 2005)* (Pollack, J. concurring) ("[T]he Restatement will deem one party's obligation material where it serves as consideration for the other party's promised performance."). That Norfolk Southern retained all of its sole-served traffic despite Basell's breach only underscores the extent to which Basell retained the benefit of the Marriott Accords while depriving Norfolk Southern of its reciprocal benefit.

The second *Restatement* factor, the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived, is considered "a corollary of the first." *Restatement (Second) of Contracts § 241 cmt. c.* The [*22] "[d]ifficulty that [a plaintiff] may have in proving with sufficient certainty the amount of [his] loss will affect the

adequacy of compensation." *Id.* This factor weighs in favor of Basell because Norfolk Southern's lost profits can be calculated with reasonable certainty by multiplying the number of railcars comprising the shortfall for the 2005, 2006 and 2007 contract years by the amount of damages per railcar. The parties agree that the Norfolk Southern's damages equate to $ 1540.00 for each railcar that it should have, but did not, receive pursuant to the Marriott Accords. (Agreed Facts P 20.) According to Basell's records, Basell fell 121 cars short in 2005, 115 cars short in 2006, and 25 cars short in 2007. (Agreed Facts PP 18-19; Tr. 220-22, 234-35; Pl.'s Ex. 53 (Mar. 26, 2008 Rosenkranz Dep.) at 82-83.) Norfolk Southern's lost profits can therefore be easily calculated as $ 401,940.00. [4] Accordingly, this factor weighs in favor of Basell.

> [4] Norfolk Southern argues that it is difficult to prove its damages because Basell undercounted the cars owed. This argument is based on a spreadsheet produced by CSX, which documents moves made by CSX on behalf of Basell during the relevant [*23] time period, some of which arguably could have been moved by Norfolk Southern. (Pl.'s Ex. 37 (CSX Spreadsheet).) However, witnesses for both parties, and even Plaintiff's counsel, acknowledged that whether those destinations could be served by Norfolk Southern was not ascertainable from the spreadsheet. (Tr. at 128, 215-17, 222-224, 306-07.) Although the Court recognizes that some of these movements may have, in fact, been subject to the Marriott Accords, Norfolk Southern has failed to prove that it was entitled to any of these movements because it is not clear from the record which movements made by CSX could have also been handled by Norfolk Southern. Although Norfolk Southern's failure to adduce additional evidence on this point makes the record incomplete, it does not render Norfolk Southern's lost profits unascertainable.

The third *Restatement* factor, the extent to which the party failing to perform or to offer to perform will suffer forfeiture, weighs in favor of Norfolk Southern. Any forfeiture suffered by Basell results from its conscious choice to promise traffic subject to the Marriott Accords to Norfolk Southern's competitor. Accordingly, Basell cannot complain of a forfeiture [*24] "of [its] own making." [5] *Norfolk Southern, 512 F.3d at 94-95.*

Likewise, the fourth factor, likelihood of cure, favors Norfolk Southern: now that the contract has run its course, it is clear that Basell did not cure its breach, and that its June 2006 efforts to cure were half-hearted. Basell merely redirected competitive rail traffic to Norfolk Southern, crossed its fingers, and hoped that market conditions would shift such that it could fulfill both minimum volume commitments. If Basell had made a good faith effort to cure, by reviewing its records and monitoring its progress under both the Marriott Accords and the CSX agreements, Basell would have realized the necessity of redirecting additional truck transfer traffic to satisfy the minimum volume commitment. Furthermore, Basell's suggestion to Norfolk Southern and this Court, that Basell might be able to satisfy the minimum volume commitment for the 2007 contract year, was meaningless in light of Basell's choice to renegotiate its contract with CSX. If Basell had honestly sought to cure the injury suffered by Norfolk Southern, it would have terminated its contract with CSX instead.

> [5] As discussed *infra*, the Court concludes that the [*25] proper remedy here is restitution for the sole-served traffic that Norfolk Southern moved for Basell during the course of the contract, i.e., moves for which Basell had no choice but to use Norfolk Southern as the carrier. Accordingly, Basell's forefeiture is wholly unrelated to its efforts to perform under the contract.

The final factor, the extent to which the behavior of the breaching party comports with good faith and fair dealing, also favors Nofolk Southern. "[G]ood faith captures the notion that neither party to a contract will subvert the other party's right to receive the intended benefit of the bargain." *Daystar Const. Mgmt., Inc. v. Mitchell, Civ. A. No. 04-05-175, 2006 Del. Super. LEXIS 286, 2006 WL 2053649, at *8 (Del. Super. Ct. July 15, 2006).* "Similarly, the covenant [of good faith and fair dealing] directs the parties not to facilitate an 'evasion of the spirit of the bargain.'" *Id. (quoting Restatement (Second) of Contracts § 205(d) (1981)).* Here, Basell's intentional subversion of the contract is entirely inconsistent with the standards of good faith and fair dealing. Basell took the competitive traffic which comprised the heart of its bargain with Norfolk Southern and gave it to CSX. Basell could [*26] have avoided this problem had it removed the WLC traffic from the set of traffic up for bid in 2004, or specifically from the 2005 CSX contract, but neglected to do so in light of its own

bottom line. The real indicia of bad faith here, however, is Basell's decision to enter into the 2007 CSX Contract. Despite the fact that Basell knew of its failure to meet its minimum volume commitment to Norfolk Southern in 2005 as a result of its contradictory obligations, and despite the instant litigation between the parties, Basell renegotiated its contract with CSX. Once it became clear that Basell had stretched itself too thin after entering into the 2005 CSX Contract, Basell could have terminated the 2005 CSX contract after the 2006 year, or it could have renegotiated that contract to exclude the WLC traffic. Nevertheless, Basell shirked the Marriott Accords and renegotiated its contract with CSX for the 2007 year, knowing full well that it would likely fail to meet its minimum volume commitment to Norfolk Southern as a result. By disregarding its contractual obligations to Norfolk Southern, Basell disregarded the standards of good faith and fair dealing. [6] *See Restatement (Second) of Contracts* § 205(d) [*27] ("willful rendering of imperfect performance" constitutes bad faith). Since four of the five *Restatement* factors weigh in favor of Norfolk Southern, Basell's breach is clearly material.

> [6]   Basell argues that its "business decision" to enter into the CSX contract "thereby taking a risk that it might not fully perform its contract with Norfolk [Southern]" was an "efficient breach," and thus, "does not mean that, under Delaware law, the decision was made in bad faith." (Def.'s Am. Findings 27-28 P 27.) "The theory [of efficient breach] holds that properly calculated expectation damages increase economic efficiency by giving the [breaching party] an incentive to break the contract if, but only if, he gains enough from the breach that he can compensate the injured party for his losses and still retain some of the benefits from the breach." *E.I. DuPont de Nemours and Co. v. Pressman, 679 A.2d 436, 445 (Del. 1996)* (internal quotations omitted). Delaware courts have used this doctrine to emphasize that in some circumstances, intentional breaches may be legitimate, and in those cases, courts should not authorize extreme remedies such as specific performance or allow punitive damages merely because [*28] a breach is intentional. *Id. at 445-46; Morabito v. Harris, Civ. A. No. 1463-K, 2002 Del. Ch. LEXIS 27, 2002 WL 550117, at *3 (Del. Ch. Mar. 26, 2002).* This theory is inapplicable here. If Basell sought to "efficiently

breach" the Marriott Accords, it would have disclosed the 2005 CSX Contract to Norfolk Southern, requested termination of the Marriott Accords, and offered to compensate Norfolk Southern for its lost profits. Instead, Basell subverted the parties' contract so it could benefit from both carriers' discounted rates at the same time. The Court will not permit Basell to hide behind the theory of efficient breach as an after the fact justification for its conduct. *Cf. Morabito, 2002 Del. Ch. LEXIS 27, 2002 WL 550117, at *3* (invoking the theory of efficient breach to justify refusal of specific performance where "nothing suggests that the promisor is in breach because of an effort by the promisor to exploit the promisee").

Basell asserts that Norfolk Southern has waived its right to claim material breach by continuing to perform under the Marriott Accords. (Def.'s Am. Findings 33-34 PP 44-49.) "[T]he general rule that one party's uncured, material failure of performance will suspend or discharge the other party's duty to [*29] perform does not apply where the latter party, with knowledge of the facts, either performs or indicates a willingness to do so, despite the breach, or insists that the defaulting party continue to render future performance." *DeMarie v. Neff, Civ. A. No. 2077-S, 2005 Del. Ch. LEXIS 5, 2005 WL 89403, at *5 (Del. Ch. Jan. 12, 2005)* (quoting WILLISTON ON CONTRACTS § 43:15 (footnotes omitted).) Requiring a plaintiff who sues for material breach to suspend performance in order to succeed on its claim, however, would subject the plaintiff to its own liability or risk of forfeiture of any damages for immaterial breach in order to litigate its claim. *See Commonwealth Const. Co. v. Cornerstone Fellowship Baptist Church, Inc., Civ. A. No. 04L-10-101, 2006 Del. Super. LEXIS 349, 2006 WL 2567916, at *19 (Del. Super. Ct. Aug. 31, 2006)* ("It is established Delaware law that in order to recover damages for a breach of contract, the plaintiff must demonstrate substantial compliance with all of the provisions of the contract.") (quoting *Eastern Elec. and Heating Co., 1987 Del. Super. LEXIS 1115, 1987 WL 9610 at *4*); *BioLife Solutions Inc., 838 A.2d at 282* (defendant, which claimed that it suspended performance because of plaintiff's material breach, was required to pay damages [*30] where court determined that plaintiff's breach was not material); E. ALLEN FARNSWORTH, CONTRACTS § 8:16 (4th ed. 2004) ("If the injured party disrupts performance by suspending in response to [what

a court determines to be only] an immaterial breach, that party commits a breach itself."). Here, Norfolk Southern took legal action shortly after Granatelli indicated that Basell was subverting the contract, and was not required to suspend its performance under the contract while it litigated the instant action against Basell. Accordingly, Norfolk Southern has not waived its right to assert that Basell materially breached the Marriott Accords.

Basell chose to lump the WLC traffic in with the other traffic being contracted to CSX. As a result, Basell put itself in a situation in which it might not, and ultimately did not, satisfy its obligations to both carriers at the same time. For the reasons discussed above, Basell's entry into the 2005 CSX Contract and related diversion of traffic to CSX beginning February 1, 2005 constitute a material breach that, for damages purposes, permits Norfolk Southern to treat the Marriott Accords as terminated as of February 1, 2005. *See BioLife Solutions Inc., 838 A.2d at 278* [*31] ("A party is excused from performance under a contract if the other party is in material breach thereof.").

**B. Basell's contract with CSX does not constitute a repudiation of its contract with Norfolk Southern**

Norfolk Southern also argues that Basell repudiated the Marriott Accords by entering into the 2005 CSX Contract. "'A repudiation of a contract is an outright refusal by a party to perform a contract or its conditions.'" *HIFN, Inc. v. Intel Corp., 2007 Del. Ch. LEXIS 58, 2007 WL 1309376, at *14 (Del. Ch. May 2, 2007) (quoting PAMI-LEMB I Inc. v. EMB-NHC, LLC, 857 A.2d 998, 1014 (Del. Ch. 2004)).* As with a material breach, repudiation permits the non-repudiating party to terminate the contract. *CitiSteel USA, Inc. v. Connell Ltd. P'ship, 758 A.2d 928, 931 (Del. Super. 2000); Restatement (Second) of Contracts § 253.* Delaware applies the *Restatement (Second) of Contracts* to determine whether a contracting party has repudiated a contract. *Norfolk Southern, 512 F.3d at 96; CitiSteel, 758 A.2d at 931 n.7.* For present purposes, the *Restatement* defines a repudiation as "a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach." *Restatement (Second) of Contracts § 250(b).* [*32] The issue then is whether it "was inevitable, or apparent, from the start" that Basell's voluntary act of entering into the 2005 CSX Contract would render it unable to meet its minimum volume commitment to Norfolk Southern. *Norfolk Southern, 512*

*F.3d at 97.*

Although Basell's conduct constitutes a material breach of its contract with Norfolk Southern, Basell did not repudiate the Marriott Accords by entering into the 2005 CSX Contract. As Basell's Sam Slovak and Cathy Rosenkranz testified, there was some "wiggle room" in the contracts, in that it was possible to satisfy both at the same time with some effort by Basell and cooperating market conditions. (Tr. at 275, 289-90.) Indeed, the contracts' minimum volume commitments are derived from different, albeit overlapping, sets of traffic. Accordingly, it is not apparent or inevitable that Basell could not have satisfied both of its contractual obligations in the 2005, 2006 and 2007 contract years. That Basell needed to redirect additional traffic to Norfolk Southern in order to meet the minimum volume commitment for those years does not necessarily imply that had Basell done so, it would not also have met its minimum volume commitment [*33] to CSX.

Indeed, Basell could have, and should have, handled matters differently: Basell should not have included the WLC traffic in the CSX deal in the first place, Basell could have made more of an effort to satisfy its minimum volume commitment to Norfolk Southern in the wake of the 2005 CSX Contract, and Basell certainly should not have entered into the 2007 CSX Contract. While this conduct is indicative of Basell's bad faith and material breach of the Marriot Accords, it does not constitute a repudiation.

**C. Norfolk Southern is entitled to restitution**

Norfolk Southern argues that the proper remedy here is restitution because Basell was unjustly enriched by the discounted rate it received for movements for which it would have paid tariff rates in the absence of a contract. Norfolk Southern asserts that it is entitled to restitution in the amount of $ 6,810,972 -- essentially the difference between the tariff rate and the contract rate for all movements Norfolk Southern made on behalf of Basell from February 1, 2005 through May 31, 2007. In the alternative, Norfolk Southern requests restitution only for the sole-served traffic that it moved for Basell during that time period -- a total [*34] of $ 2,870,281.00. Basell argues that Norfolk Southern's remedy should be limited to its expectation interest -- damages for lost profits (to be determined based on Basell's records) -- and that since Basell has paid Norfolk Southern for that shortfall, no additional money is owed.

"Historically, damages for breach of contract have been limited to the non-breaching parties' expectation interest." *Pressman, 679 A.2d at 445 (citing Restatement (Second) of Contracts § 347).* However, where a breach is material, the injured party may seek restitution as an alternative remedy. *See Mobil Oil Exploration and Producing Southeast Inc. v. United States, 530 U.S. 604, 629, 120 S. Ct. 2423, 147 L. Ed. 2d 528 (2000)* ("[A]n injured party may seek restitution as an alternative remedy only on a breach by nonperformance that gives rise to a claim for damages for total breach . . . .") (internal quotations omitted); *Segovia v. Equities First Holdings, LLC, Civ. A. No. 06-09-149, 2008 Del. Super. LEXIS 197, 2008 WL 2251218, at *22 (Del. Super. Ct. May 30, 2008)* (where a breach is material, "it is appropriate to award breach damages on a restitution . . . theory of recovery"); *see also Restatement (Second) of Contracts § 373.* "[T]he purpose [of restitution] is to require [*35] the wrongdoer to restore what he has received and thus . . . put the injured party in as good a position as that occupied by him before the contract was made." ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS, § 1107 (1993). A party's restitution interest is measured by either "(a) the reasonable value to the [breaching] party of what he received in terms of what it would have cost him to obtain it from a person in the claimant's position, or (b) the extent to which the [breaching] party's property has been increased in value or his other interests advanced." *Restatement (Second) of Contracts § 371.* Recovery under a restitution theory is not limited by the value of the contract. CORBIN, *supra* § 1112.

Since Basell materially breached the Marriott Accords, restitution is an available remedy. The Court concludes that restitution is appropriate here because Norfolk Southern conferred a benefit on Basell -- savings in the amount of the difference between the tariff rate and the contract rate for each car moved -- and Norfolk Southern is entitled to recoup that benefit. However, Norfolk Southern is only entitled to restitution for sole-served traffic that it moved for Basell during the 2005, 2006 [*36] and 2007 contract years. Norfolk Southern is not entitled to restitution for all moves because the purpose of restitution is to put the non-breaching party in as good of a position as it would have been in *ex ante, i.e.,* if there were no contract in place. In the absence of a contract, Norfolk Southern would only have been guaranteed Basell's sole-served traffic since Basell would have had no choice but to move

this traffic by Norfolk Southern. In contrast, Norfolk Southern was unlikely to have received a majority of Basell's competitive traffic without a contract. Indeed, this is why Norfolk Southern entered into negotiations with Basell in the first place -- to secure Basell's competitive traffic that it would not have otherwise acquired. It would be wholly unfair then, to allow Norfolk Southern to recover its discount for competitive traffic under a restitution theory when Basell was only giving competitive traffic to Norfolk Southern *because of* the parties' contract (especially after Basell initiated its effort to cure).

Accordingly, Norfolk Southern is entitled to $ 2,870,281.00 in restitution for the sole-served traffic it moved for Basell since February 1, 2005. [7] Donna Fisher [*37] of Norfolk Southern testified at length regarding the calculation of Norfolk Southern's restitution figures, and the Court adopts her analysis. [8] (Tr. at 80-100; Pl.'s Ex. 61 (Tariff Rates) & Ex. 62 (Fuel Surcharge Rates) & Ex. 66 (Spreadsheet of Local Versus Competitive Traffic) & Ex. 67 (Local Traffic Restitution Spreadsheet).) The amount of restitution owed equates to the tariff rate for the cars Norfolk Southern shipped for Basell, plus applicable fuel charges, [9] less the amount Basell has already paid pursuant to the contract, less the car hire payments which Norfolk Southern would have paid Basell for transportation. [10] Norfolk Southern is also entitled to $ 114,000.00, for truck terminal charges it absorbed for Basell from February 1, 2005 through May 31, 2007 per the Marriott Accords. (Tr. at 97; Pl.'s Ex. 8 at BAS0003.) Since Basell has made payments to Norfolk Southern for its lost profits in the amount of $ 398,250.00, this amount must be subtracted from the final figure. (Tr. at 165, 220.) Accordingly, Norfolk Southern is entitled to $ 2,586,031.00 in restitution.

[7] Notably, this is the outcome envisioned by Granatelli's February 2005 email to Julian. (*See* Pl.'s Ex. 33 at [*38] BAS00882.)

[8] Although Basell contests the availability of restitution, Basell does not appear to contest the accuracy of Plaintiff's restitution calculations. Additionally, Norfolk Southern assumed throughout its calculations that the freight moved was less than 200,000 pounds, such that the lowest applicable tariff rate was applied to each movement. (Tr. at 89-90.)

[9] Tariff rates were subject to fuel charges until November 2006. (Tr. at 90, 95; Pl.'s Ex. 62.)

10   Norfolk Southern shipped Basell's freight in cars owned or leased by Basell. Accordingly, beginning July 1, 2005, Norfolk Southern would have credited Basell for use of those cars, at an average rate of 54.1 cents per mile. (Tr. at 91-92, 96.)

## D. Norfolk Southern is entitled to prejudgment interest

"In Delaware, prejudgment interest is awarded as a matter of right" in contract cases. *Citadel Holding Corp. v. Roven, 603 A.2d 818, 826 (Del. 1992)* (citing *Moskovitz v. Mayor & Council of Wilmington, 391 A.2d 209 (Del. 1978)*); *see also Rollins Envt'l Servs., Inc. v. WSMW Indus., Inc., 426 A.2d 1363, 1364 (Del. Super. Ct. Dec. 31, 1980)*. Pre judgment interest may be computed from the date of the defendant's breach of contract. *Chaplake Holdings, Ltd. v. Chrysler Corp.,* Civ. A. No. 94-04-164, 2003 WL 22853462, at *4 (Del. Super. Ct. Oct. 30, 2003). [*39] A plaintiff who recovers restitution from a defendant for a breach of contract, is entitled to prejudgment interest at the "legal rate." *See Segovia, 2008 Del. Super. LEXIS 197, 2008 WL 2251218, at *23.* The "legal rate" of interest in Delaware is 5% over the Federal Reserve discount rate as of the time interest is due. *DEL. CODE ANN. TIT. 6, § 2301(a)* (2008).

Since Norfolk Southern is entitled to restitution for sole-served movements made for Basell since February 1, 2005, Norfolk Southern is also entitled to prejudgment interest of 8.5 % as of that date. *See* Federal Reserve Historical Discount Rates, http://www.frbdiscountwindow.org/primary

secondary.xls (noting that the Federal Reserve discount rate was 3.5% in February 2005) (last visited July 28, 2008). The interest shall be computed as simple interest.

## III. CONCLUSION

For the foregoing reasons, judgment is entered in favor of Plaintiff Norfolk Southern and against Defendant Basell in the amount of $ 2,586,031.00, plus prejudgment interest at the legal rate of 8.5%. An appropriate Order follows.

## ORDER

**AND NOW,** this **15th** day of **August, 2008,** upon consideration of the parties' proposed findings of fact and conclusions of law, following a bench trial on the merits, [*40] and for the foregoing reasons, it is hereby **ORDERED** that:

1. Judgment is entered in favor of Plaintiff Norfolk Southern and against Defendant Basell in the amount of $ 2,586,031.00, plus prejudgment interest at the legal rate of 8.5%.

2. The Clerk of Court is directed to close this case.

/s/ Berle M. Schiller

**Berle M. Schiller, J.**