# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FREDERICK F. FAGAL, JR. :
        :
  *Plaintiff,*    :
        :  CIVIL ACTION
  v.      :
        :  NO. _____
MARYWOOD UNIVERSITY, :
        :  ELECTRONICALLY FILED
  *Defendant.*   :
        :

## COMPLAINT

Frederick F. Fagal, Jr., Plaintiff, hereby brings this Complaint against

Marywood University, Defendant, and avers as follows:

## PARTIES

**1.** Marywood University (hereinafter "Marywood" or the

"University") is a university and a Pennsylvania domestic non-profit corporation

located in Scranton, Pennsylvania.

**2.** Frederick F. Fagal, Jr. (hereinafter "Professor Fagal") is a natural

person who has resided in Skaneateles, New York for more than 20 years.

**3.** Professor Fagal earned a bachelor's degree in 1968 from Union

College in Schenectady, New York, a Masters in Economics from Cornell

University in 1971, and a Ph.D. in Social Studies Education from Syracuse
University in 1981.

4.     Professor Fagal became a member of Marywood's faculty in the fall
semester of 1987.

5.     Professor Fagal attained tenure at Marywood in September 1994.

6.     Marywood terminated Professor Fagal's tenure and employment on
April 3, 2012.

## JURISDICTION AND VENUE

7.     This Court has original jurisdiction over this action under 28 U.S.C. §
1332 as the matter in controversy exceeds the sum of $75,000.00 exclusive of
interest and costs, and is between citizens of different states.

8.     This Court has general personal jurisdiction over Marywood as the
University has continuous and systematic contacts within the Commonwealth of
Pennsylvania.

9.     Venue is proper under 28 U.S.C. § 1391 as a substantial portion of the
events giving rise to Professor Fagal's claim occurred within the Middle District of
Pennsylvania.

## FACTUAL BACKGROUND

10.     In 1992, Professor Fagal entered into an Agreement and Appointment for Full-Time Faculty with Marywood. The agreement states that "[t]he policies and practices listed in the Faculty Manual are agreed upon by the parties hereto." A partially redacted copy of that agreement is attached hereto as Exhibit A.

11.     The "Faculty Manual" was also known as or later became known as the "Faculty Handbook."

12.     Professor Fagal and Marywood entered into written agreements for him to serve on the University's full-time faculty for each year between 1992 and 2012.

13.     Professor Fagal became a tenured faculty member of Marywood in September 1994.

14.     On July 1, 2010, Marywood issued an edition of its Faculty Handbook. The first four pages of the Faculty Handbook are attached hereto as Exhibit B. The third page states, in part: "This handbook is effective with the 2010-2011 faculty letters of agreement." The fourth page states, in part: "Policy changes require the approval of the President of the University and, when required, the Board of Trustees. Changes are disseminated by the Secretary of the University. They are

effective with formal approval and placement in the Marywood University Policies
and Procedures Manual."

15.     In May 2011, Professor Fagal entered into an agreement with
Marywood stating that he would serve as a tenured Associate Professor from
August 22, 2011 to May 18, 2012 and earn a specific salary. A partially redacted
copy of that agreement is attached hereto as Exhibit C.

16.     At the time that Professor Fagal and Marywood entered into the May
2011 agreement, Marywood's "Contractual Agreements with Faculty Members"
policy stated that this type of agreement is a "binding contract covering a specific
period of time and as a vehicle to renew, adjust and/or alter the terms of the
original contract regarding appointment, rank, tenure, salary, benefits, etc." The
same policy stated: "Tenure is a term designating guaranteed continuous
appointment to full-time faculty members until retirement." A copy of that policy
is attached hereto as Exhibit D.

17.     If Professor Fagal was ever an at-will employee of Marywood, he was
no longer so upon attaining tenure. His tenure and employment could only be
terminated in conformance with Marywood's Policies and Procedures Manual.

4

## Marywood Tears Down Professor Fagal's Posters Inviting Students to a Lecture on Free Speech

18.   In November 2011, Professor Fagal invited and paid for a speaker from the Philadelphia-based Foundation for Individual Rights in Education (hereinafter "FIRE") to give a presentation to his "Introduction to Social Science" course at the end of the month. The topic of the presentation was "Know Your Rights: Free Speech and Thought Reform on Campus," which was related to Professor Fagal's teaching of the United States Constitution.

19.   Professor Fagal received approval from Marywood to hang posters (which he arranged to have printed and he paid for) announcing the FIRE presentation and inviting any and all Marywood students to attend at the University's Comerford Auditorium.

20.   On or around November 28-29, 2011, Marywood personnel tore down almost all of the FIRE posters. A Marywood official confirmed that the University was responsible. Marywood did not provide any notice to Professor Fagal before or after the FIRE posters were torn down.

21.   When Professor Fagal complained about the poster tear-downs shortly thereafter, Marywood's Vice President for Academic Affairs could not identify any written policy statements by the University that warranted these actions.

22.     Professor Fagal attempted to secure an apology by Marywood as well as reimbursement for the posters that were torn down, but Marywood refused these requests.

23.     On January 13, 2012, Professor Fagal sent an email from his personal email address to Marywood faculty members about the removal of his posters. In that email, Professor Fagal criticized the Marywood administration for tearing down his posters and for its weak commitment to free speech generally.

24.     The January 13th email also contained hyperlinks to two related videos criticizing Sister Anne Munley, President of Marywood, and several other administrators for ordering or participating in the poster tear-downs and again for a weak commitment to free speech. The videos were posted to YouTube.

25.     The videos were created by replacing the English subtitles corresponding to several scenes from a well-known foreign movie. The subtitles expressed Professor Fagal's own satirical message. Dr. Fagal's adaptation of this movie was a fair use of copyrighted material.

### Marywood Suspends Professor Fagal

26.     At approximately 8:45 AM on January 23, 2012, a Marywood dean visited Professor Fagal's office as he was preparing for his 9:00 AM class and stated that President Munley was summoning him to a meeting at the same time.

6

27.     At the 9:00 AM meeting, President Munley asked Professor Fagal whether he posted the two-part video on YouTube. Professor Fagal acknowledged posting the video. Professor Fagal was asked to explain his actions, but when he attempted to raise the issue of the poster tear-down, that topic was not allowed. Permitted no context to "explain" Professor Fagal's actions, he could "explain" nothing. President Munley then told Professor Fagal that his employment was suspended effective immediately and that he should return his keys and University identification card to Marywood's Assistant Vice President for Human Resources.

28.     Several hours later, Marywood's Assistant Vice President for Human Resources sent Professor Fagal an email confirming that he had been suspended and directing him to clean out his University office.

29.     At the time of Professor Fagal's suspension, Marywood's "Progressive Discipline" policy (attached hereto as Exhibit E) stated:

> Marywood University endorses a progressive discipline policy designed to promote resolution in a fair and orderly manner.  This policy applies to faculty members with tenure or whose terms of appointment have not yet expired.

> The policy is intended to provide an effective and flexible means of identifying problem areas, resolving complaints, and preventing repetitive incidents by prompt intervention and assistance.  It is designed to accomplish these ends by a series of gradual steps involving strategies such as personal conferences, oral and written warnings,

7

and opportunities for monitored assistance where
applicable.

....

*Suspension.* The faculty member may be suspended by
the Vice President for Academic Affairs at any time
during the proceedings involving him or her. Suspension
is justified if immediate harm to the faculty member or
others is threatened by the person's continuance in the
faculty position.

30.     Marywood's suspension of Professor Fagal was a breach of contract in

several ways. First, there was nothing "progressive" about the discipline meted out

to Professor Fagal. There was no oral or written warning—nor was any opportunity

for monitored assistance provided.

31.     Second, President Munley—not the Vice President for Academic

Affairs—suspended Professor Fagal.

32.     Third, at the time of the suspension, there was no immediate harm to

Professor Fagal or to others threatened by Professor Fagal's continuance in his

faculty position—and no Marywood official or representative has ever stated

otherwise to him.

## Marywood Moves to Terminate Professor Fagal

33.     On January 24, 2012, approximately 28 hours after President Munley

suspended Professor Fagal, she sent him a letter stating that she was

"recommending that [his] tenure and employment with Marywood be terminated immediately."

34.    In the January 24th letter, President Munley provided a "Statement of Charges," which she was "prepared to send . . . to a duly appointed faculty committee for review along with the emails and videos you forwarded to members of our community."

35.    The end of the second "charge" contained in the January 24th letter is missing, and therefore it was initially impossible for Professor Fagal to know the full extent of the "charges" against him.

36.    After Professor Fagal's attorney wrote to President Munley requesting an amended "Statement of Charges"—among other breaches that he identified—President Munley sent a second letter to Professor Fagal on February 8, 2012.

37.    In the February 8th letter, President Munley again stated that she was recommending that Professor Fagal's "tenure and employment with Marywood be terminated immediately" and offered a "Statement of Charges."

38.    In the second "charge" against Professor Fagal, President Munley accused him of violating Marywood's Civil Rights Policy.

39.    Near the end of the February 8th letter, President Munley wrote:

9

As a result of this recommendation, I am prepared to
send this statement of charges to a duly appointed faculty
committee for review along with the emails and videos
you forwarded to members of our community.  In order
to do so and out of respect for your privacy, I would ask
that you please sign and return to me the attached
authorization granting the University permission to do so.
That faculty committee may agree or disagree with my
recommendation.  Once I receive the review committee's
determination, I will finalize my decision.  Should you
choose to forego that faculty review, I will finalize my
recommendation based upon my own findings and
conclusions.

**40.**   A document titled "Release of Personal Information" enclosed with

President Munley's February 8th letter states, in part:

_____ I DO NOT grant permission for Marywood
University to release Sister Anne Munley's
Recommendation for Termination and Statement of
Charges dated 1/24/12 to a faculty review committee
comprised of tenured faculty. I understand that by
refusing such permission that there will be no faculty
committee review of Sister Anne Munley's decision to
terminate my tenure and employment with the
University prior to it being finalized.

OR

_____ I DO grant permission for Marywood University to
release Sister Anne Munley's Recommendation for
Termination and Statement of Charges dated 1/24/12 to
a review committee comprised of tenured faculty.

**41.**   President Munley's recommendation to terminate Professor Fagal's

employment and tenure violated the "Progressive Discipline" policy in effect at

the time. That policy contained one sentence addressing dismissal: "If remedial actions(s) taken during the suspension does not sufficiently resolve the issues that lead to the suspension, the university may move towards dismissal of the faculty member."

42.    Marywood took no "remedial actions" to "resolve the issues" that led to Professor Fagal's suspension. Professor Fagal's suspension began on the morning of January 23, 2012, and the first letter recommending his termination arrived in his inbox at 1:11 PM on the next day. Nor did Marywood attempt any "remedial actions" before sending the February 8th letter.

43.    President Munley's February 8th letter also violated Marywood's "Civil Rights Complaint Procedures" policy in effect at the time. That policy required an individual allegedly aggrieved by a civil rights violation to file a complaint, among other procedures. Those procedures "must be followed any time a member of the Marywood University community believes s/he has been the victim of . . . discrimination, harassment, or assault by any member of the University community . . . ." A copy of that policy is attached hereto as Exhibit F.

44.    No Marywood employee filed a civil rights complaint against Professor Fagal after his January 13, 2012 email, and thus President Munley's

11

attempt to "charge" him with violating the University's Civil Rights Policy was a breach of Marywood policy as well as a breach of contract.

### Marywood Refuses to Allow Professor Fagal to Appeal His Suspension

45.     In President Munley's January 24th and February 8th letters, she asked Professor Fagal to authorize her to send the "statement of charges" against him to a "duly appointed faculty committee for review" of her decision to terminate his employment and tenure.

46.     Nowhere in the letters or the authorizations did President Munley offer to convene a faculty committee to review her suspension of Professor Fagal.

47.     President Munley offered Professor Fagal two choices: a faculty review of her recommendation to terminate him or the "finalization" of her own decision to terminate him.

48.     The "Progressive Discipline" policy in effect at the time of President Munley's letters stated that faculty members "have the right to convene an ad hoc committee in order to appeal either a decision to suspend the faculty member or a decision to dismiss the faculty member."

49.     On February 2, 2012, Professor Fagal, through his attorney, elected in writing to convene two ad hoc faculty committees: one for President Munley's decision to suspend him and the other for her recommendation to terminate him.

50.     On February 9, 2012, Marywood, through its attorney, rejected

Professor Fagal's request to convene an ad hoc committee to review his

suspension. The letter stated, in part, that Professor Fagal had breached his

contract with Marywood and thus the University "had no further contractual

obligations to him."

51.     Marywood's position—if accepted—would mean that any time that

the University deemed—in its sole discretion—that a member of its community

breached a contract with the University, then the University could disregard any of

its own disciplinary policies. Such a position is absurd.

## Professor Fagal Files a Formal Grievance Against President Munley; she Retaliates by Terminating Him.

52.     On February 22, 2012, Professor Fagal filed a formal grievance against

President Munley under Marywood's "Faculty Grievances and Appeals" policy. A

copy of that grievance is attached hereto as Exhibit G.

53.     In the grievance, Professor Fagal alleged that President Munley

violated Marywood policy by improperly suspending him, by improperly moving to

terminate his employment and tenure, and by not accepting his request to convene

an ad hoc committee to appeal the suspension.

13

54.     On March 26, 2012, the Chair of Marywood's Faculty Grievance Committee sent a letter to Dr. Fagal summarizing his grievances and concluding: "I now write to inform you that in reviewing each of these grievances, we have found no evidence of improper action on President Munley's part which would constitute a legitimate grievance."

55.     On April 3, 2012, President Munley sent a letter to Professor Fagal stating in part: "Since the grievance process is now complete, I have decided to finalize my recommendation.  As a result, your employment with Marywood and your tenure are terminated effective today, April 3, 2012." A copy of that letter is attached hereto as Exhibit H.

56.     One paragraph after declaring Professor Fagal's relationship with Marywood at an end, however, President Munley offered to convene the two ad hoc faculty committees that he had been requesting for months. President Munley claimed: "I am doing this despite the fact that on two separate occasions you refused my offer and did not choose to convene an ad hoc committee to review my decision to suspend you and my recommendation to terminate your employment and tenure before I finalized my decision." President Munley's claim that Professor Fagal did not convene an ad hoc committee to review the suspension decision is verifiably false.

14

57.    Further, President Munley's offer to convene two ad hoc committees was effectively a dead letter because she had—in the very same letter—declared the termination of his employment and tenure to be final.

58.    The "Progressive Discipline" policy in effect at the time conveyed that before a faculty member may be dismissed, an ad hoc faculty committee must recommend a formal action toward dismissal. Therefore, President Munley's termination of Professor Fagal's employment on April 3, 2012 was premature and in contravention of Marywood policy.

59.    President Munley's premature termination also violated the "Faculty Grievances and Appeals" policy (attached hereto as Exhibit G), which stated that "[g]rievants will not be adversely affected for exercising their right to file a grievance, regardless of outcome" and that "[g]rievants will not be subject to adverse consequences for either initiating a grievance or in presenting evidence on behalf of a grievant."

60.    On July 2, 2012, a group of Marywood faculty members calling themselves the "Faculty Senate Ad Hoc Hearing Committee" ("FSAHHC") issued a document titled "Review of Sister Anne Munley's Decision to Terminate the Employment and Tenure of Dr. Frederick Fagal."

15

**61.**     The FSAHHC did not concur with all of the charges lodged against Professor Fagal. Nonetheless, the FSAHHC concurred with President Munley's decision to revoke the tenure and terminate the employment of Professor Fagal.

**62.**     Contrary to Marywood's "Progressive Discipline" policy and President Munley's April 3rd letter, neither the FSAHHC nor any other ad hoc faculty committee reviewed Professor Fagal's suspension.

**63.**     At the time of the FSAHHC's decision, Marywood's "Progressive Discipline" policy stated, in part:

> Faculty members have the right to convene an ad hoc committee in order to appeal either a decision to suspend the faculty member or a decision to dismiss the faculty member . . . . Should a faculty member request that such a committee be convened twice (i.e., once for suspension and once for dismissal), the membership of the committee may be similar or different, a determination which is made by the President of the University in consultation with the faculty member and the Vice President for Academic Affairs.

**64.**     Accordingly, the failure of any Marywood ad hoc faculty committee to review Professor Fagal's suspension was a breach of Marywood's "Progressive Discipline" policy.

**65.**     On July 13, 2012, President Munley sent Professor Fagal a letter stating, in part: "My decision to terminate your employment with Marywood University and your tenure effective April 3, 2012 stands."

16

66.     Professor Fagal received his agreed-upon salary through August 2012, at which point Marywood ceased paying him.

## COUNT I
### (Breach of Contract)

67.     Professor Fagal adopts by reference each and every allegation stated above.

68.     Marywood's Faculty Manual, Faculty Handbook, Policies and Procedures Manual, and the letter agreements referenced above constitute binding contracts between Professor Fagal and the University.

69.     Marywood repeatedly breached duties owed to Professor Fagal under the above-referenced contracts.

70.     Marywood's breaches of its duties to Professor Fagal caused him to suffer damages, including but not limited to the loss of continued salary and other benefits owed to tenured faculty members.

## RELIEF REQUESTED

**WHEREFORE**, Professor Fagal demands judgment in his favor and against Marywood for:

A.     Back pay in an amount to be proved at trial;

B.     Reinstatement of Professor Fagal's employment and tenure with Marywood;

C.  Front pay up to the reinstatement of Professor Fagal's employment with Marywood or—if reinstatement is not awarded—through the end of Marywood's spring semester in 2018 (when Professor Fagal would be 72 years old);

D.  Stock market foregone gains on 403(b) salary deductions not invested in Professor Fagal's Fidelity retirement account;

E.  Pre-judgment interest;

F.  Post-judgment interest;

G.  Reasonable attorneys' fees and court costs;

H.  Such other and further relief to which Professor Fagal may be entitled at law or equity.

Respectfully,


By:     s/ Jonathan Z. Cohen
        Jonathan Z. Cohen (PA205941)
        175 Strafford Avenue
        Suite 1 PMB 212
        Wayne, Pennsylvania 19087-3340
        (484) 253-1175
        (215) 839-8951 (fax)
        jzc@jzc-law.com

        *Attorney for Plaintiff Frederick F. Fagal, Jr.*

Date: December 17, 2014

JS 44 (Rev. 12/12)

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Fagal, Frederick, F. Jr. | Marywood University |

| (b) County of Residence of First Listed Plaintiff   Onandaga | County of Residence of First Listed Defendant   Lackawanna |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF<br>THE TRACT OF LAND INVOLVED. |

| (c) Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| Jonathan Z. Cohen Ltd.; PMB 212, 175 Strafford Avenue, Suite 1, Wayne, PA 19087; (484) 253-1175; Jonathan Z. Cohen | Jackson Lewis P.C.; 1601 Cherry Street, Suite 1350, Philadelphia, PA 19102; (267) 319-7802; Stephanie J. Peet |

### II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
    Plaintiff

☐ 2  U.S. Government
    Defendant

☐ 3  Federal Question
    *(U.S. Government Not a Party)*

☒ 4  Diversity
    *(Indicate Citizenship of Parties in Item III)*

### III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*     *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | Liability | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☒ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:**<br>☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

### V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original
   Proceeding

☐ 2 Removed from
   State Court

☐ 3 Remanded from
   Appellate Court

☐ 4 Reinstated or
   Reopened

☐ 5 Transferred from
   Another District
   *(specify)*

☐ 6 Multidistrict
   Litigation

### VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332

Brief description of cause:
Breach of contract

### VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☒ No

### VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____    DOCKET NUMBER _____

DATE
12/17/2014

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

[ Print ]    [ Save As... ]    [ Reset ]

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)**   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)**   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; NOTE: federal question actions take precedence over diversity cases.)

**III.**   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.**   **Origin.** Place an "X" in one of the six boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

**VI.**   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.**   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

EXHIBIT

A

**MARYWOOD COLLEGE**
Scranton, Pennsylvania
**AGREEMENT and APPOINTMENT**
for
**FULL-TIME FACULTY**

TERMS OF THIS AGREEMENT are offered on the ____ day of _____, A.D. 19____

to _____

_____
party of the first part, by Marywood College, a non-profit corporation, created and existing by and under
the laws of the Commonwealth of Pennsylvania, party of the second part.

The parties witness that, in consideration of the mutual promises and agreements herein contained,

the following terms are in effect from _____September 1, 1980_____ to _____May 31, 19____ ;

(1) Type of Appointment _____Full-Time (9 Months)_____

   Rank _____Assistant Professor_____

   Department _____Social Science (7680)_____

   Responsibility to _____Department Chairperson_____

   Salary                                  $_██████_ per _██████_

   Employee Benefits:

   Social Security (FICA)            $_██████_

   Retirement (TIAA-CREF)           _██████_

   Hosp. Ins. (B.C.-B.S.-M.M.)       _██████_

   Workers' Compensation            _██████_

   Total Disability Ins. (TIAA)      _██████_

   Life Insurance (TIAA)            _██████_

   Total Compensation                $_██████_

(2) The policies and practices listed in the Faculty Manual are agreed upon by the parties hereto.
(3) Benefits other than Social Security must be applied for by the faculty member at the Office of
    Personnel Services. Failure to apply indicates waiver of the benefit.
(4) This signed Agreement must be returned to the President's office by the date specified.
(5) U.S. Government form W-4 must be on file in the Office of Personnel Services.

IN WITNESS WHEREOF, the said parties have hereunto agreed to the above terms and have set
their hands at Marywood College, in said State, as follows:

_____          (Signed) _____
  Date Accepted                              First Party

_____          (Signed) _____
  Date Executed                                President

EXHIBIT
B



# Marywood

### U N I V E R S I T Y

# FACULTY HANDBOOK

## July 1, 2010

**Reap College of Education and Human Development**
**Insalaco College of Creative and Performing Arts**
**College of Health and Human Services**
**College of Liberal Arts and Sciences**
**School of Architecture**

AO 398 (Rev. 01/09) Notice of a Lawsuit and Request to Waive Service of a Summons

# UNITED STATES DISTRICT COURT
### for the
Middle District of Pennsylvania

| | | |
|---|---|---|
| Frederick F. Fagal, Jr. | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   3:14-cv-02404-ARC |
| Marywood University | ) | |
| *Defendant* | ) | |

## NOTICE OF A LAWSUIT AND REQUEST TO WAIVE SERVICE OF A SUMMONS

To:  Marywood University
*(Name of the defendant or - if the defendant is a corporation, partnership, or association - an officer or agent authorized to receive service)*

**Why are you getting this?**

A lawsuit has been filed against you, or the entity you represent, in this court under the number shown above. A copy of the complaint is attached.

This is not a summons, or an official notice from the court. It is a request that, to avoid expenses, you waive formal service of a summons by signing and returning the enclosed waiver. To avoid these expenses, you must return the signed waiver within   30   days *(give at least 30 days, or at least 60 days if the defendant is outside any judicial district of the United States)* from the date shown below, which is the date this notice was sent. Two copies of the waiver form are enclosed, along with a stamped, self-addressed envelope or other prepaid means for returning one copy. You may keep the other copy.

**What happens next?**

If you return the signed waiver, I will file it with the court. The action will then proceed as if you had been served on the date the waiver is filed, but no summons will be served on you and you will have 60 days from the date this notice is sent (see the date below) to answer the complaint (or 90 days if this notice is sent to you outside any judicial district of the United States).

If you do not return the signed waiver within the time indicated, I will arrange to have the summons and complaint served on you. And I will ask the court to require you, or the entity you represent, to pay the expenses of making service.

Please read the enclosed statement about the duty to avoid unnecessary expenses.

I certify that this request is being sent to you on the date below.

Date:        12/22/2014

*Signature of the attorney or unrepresented party*

Jonathan Z. Cohen
*Printed name*

175 Strafford Avenue, Suite 1 PMB 212
Wayne, PA 19087-3340

*Address*

jzc@jzc-law.com
*E-mail address*

(484) 253-1175
*Telephone number*

Address comments or questions
to

Secretary of the University
Marywood University
Scranton, PA  18509-1598

# FACULTY HANDBOOK

This handbook is effective with
the 2010-2011 faculty letters of agreement.

**Marywood University**
Scranton, Pennsylvania
18509

Case 3:14-cv-02404-UN3   Document 11-2   Filed 12/17/14   Page 26 of 26

## INTRODUCTION

The faculty of Marywood University are dedicated professionals who have an important role in providing intellectual leadership. They are committed to the service of the University, their disciplines, and others. While the teaching role of the faculty is primary, they devote time and energy to a variety of activities. They serve on committees and contribute their talent to strategic planning, research, grant writing, and recruitment.

It would be impossible to capture in detail in one handbook all of the many issues that affect faculty. The *Faculty Handbook* is intended to be one of several sources of general guidance. It brings together brief descriptions of the privileges and obligations that are most central to membership on the faculty of Marywood University and selected other information of special interest.

Nothing contained in the *Faculty Handbook* negates the right of the University to augment, repeal, or revise its policies at any time. Policy changes require the approval of the President of the University and, when required, the Board of Trustees. Changes are disseminated by the Secretary of the University. They are effective with formal approval and placement in the *Marywood University Policies and Procedures Manual*.

The *Faculty Handbook* is maintained by the Secretary of the University, who is responsible for updating and editing it. This assumes the authority to make non-substantive changes that improve the precision of its language, and substantive changes that are necessary to conform to applicable laws. To the extent that modification and revision of Chapter Two constitute other substantive changes, the Faculty Senate will be consulted in the interest of collegiality.



EXHIBIT
C



# Marywood
UNIVERSITY

Tenured Faculty
Letter of Agreement
2011~2012 Academic Year

May 10, 2011

Dr. Frederick F. Fagal, Jr.
17 East Lake Street
Skaneateles, NY 13152

Dear Dr. Fagal, Jr.,

This Letter of Agreement is offered to you for the 2011~2012 Academic Year.  In accord with the agreed upon Salary Plan, your salary reflects a 2.5% annual increase of $█████.

Other terms of this agreement are as follows:

| | |
|---|---|
| Term: | 8/22/2011 to 5/18/2012 |
| Type of Appointment: | Full-Time (9 months) Tenure |
| Rank: | Associate Professor |
| College: | Liberal Arts & Sciences |
| Department: | Social Science |
| Responsible to: | Department Chairperson |
| Salary: | $█████ |

Faculty members must apply for benefits other than Social Security and Worker's Compensation through the Human Resources Department.  Full-time faculty benefits include health, dental, long-term disability, group life, and accidental death and dismemberment under the Flexible Benefits Plan.  Elections are made by June 1 of each year for the subsequent fiscal year beginning July 1.  Retirement contributions by the University vary based on the contribution level selected by the faculty member.  The appropriate government forms, including Form W-4 and I-9, must be completed and on file in the Human Resources Department.

This agreement is valid for one month from the date of this letter.  The original copy of this Letter of Agreement must be signed and returned to my office by June 10, 2011.  If you do not return the original signed copy by June 10, it will be assumed that you are not returning to Marywood.  On behalf of the Board of Trustees and myself, I express our gratitude for your dedicated service and commitment to Marywood University.  May God continue to bless you.

Sincerely,

*Sister Anne Munley IHM*

Anne Munley, IHM, Ph.D.
President

Agreed this _25_ day of _May_, 2011

Signature _Frederick F. Fagal_

Case 3:14-cv-02404-ARC   Document 11-2   Filed 12/17/14   Page 28 of 245



# Marywood
## U N I V E R S I T Y

## Contractual Agreements with Faculty Members

## Policy Statement

### Full -Time Faculty

The *Letter of Agreement* is the official contract issued to a faculty member at the time of appointment or reappointment.  It is a statement of conditions and obligations mutually agreed to by the faculty member and Marywood University. It serves as a binding contract covering a specific period of time and as a vehicle to renew, adjust and/or alter the terms of the original contract regarding appointment, rank, tenure, salary, benefits, etc.

Faculty contracts are normally for a period of nine months or twelve months.

Ordinarily, the academic year will begin no earlier than two weeks before Labor Day and will end no later than nine months from that date.

A copy of the *Letter of Agreement* is retained by the faculty member.  Copies are also on file in the Office of Human Resources.

In general, any faculty member, who intends to be a long-term stakeholder in the University and who has the appropriate terminal academic degree, should have either a tenure appointment or an appointment probationary for tenure.

### Categories of Full-Time Appointment

Regular membership in a Faculty includes appointments with continuous tenure, appointments probationary for tenure, and contract appointments without tenure.

Membership in the Faculty of a School or Department is held by persons with valid appointments to one of the four generally recognized Faculty ranks, namely, Professor, Associate Professor, Assistant Professor, or Instructor.

The University, however, also requires the services of professionally competent individuals to meet teaching and service responsibilities in selected areas or positions in which assignments do not necessarily include research or creative work. To meet these responsibilities effectively and to be competitive in attracting and retaining needed professional personnel, the University has established and recognizes a third kind of Regular Faculty appointment: Regular Contracts Appointments without Tenure.

### Contract Appointments with Tenure

The probationary period shall not exceed seven years of full-time teaching at Marywood, with application for tenure being made in the sixth year. Faculty members on leave during the probationary period must follow the policy on Leaves of Absence. Prior service at Marywood University or at another regionally accredited, four-year college or university may be credited toward the fulfillment of the probationary period as indicated in the original *Letter of Agreement.*

Tenure is a term designating guaranteed continuous appointment to full-time faculty members until retirement. It implies a mutual commitment on the part of the faculty member and the University and cannot be taken lightly. The commitment of a faculty member who requests tenure is as deep and binding on the faculty member as it is on the University.  Just as the conferring of tenure by the University recognizes the competence of an individual faculty member, submission to the University of an application for tenure suggests a strong acceptance by that individual of the goals and objectives of the University.  The request represents commitment to work jointly with faculty, students, administrators, and members of the staff for the growth and welfare of the University.  It is a commitment to devote one's energies to continued personal development and continued high levels of achievement as a member of the Marywood academic community.  It is a definite assertion of career goals; it is expected that faculty will not lightly withdraw from this relationship.

Once tenure is granted, it will be discontinued only for grave reason, which may include moral turpitude, flagrant abuse of academic freedom, or lack of professional competency as demonstrated in instruction and/or research.  In addition, the University may be required to discontinue tenure because of severe financial exigencies of the University or reorganization of the department and/or curriculum resulting in lack of need as described in *Retrenchment of Faculty*.

A faculty member with an appointment probationary for tenure may apply for a Clinical or Per Annum appointment, if a vacancy exists, under normal procedures for recruitment and appointment.  However, a faculty member in probationary status is not eligible to apply for such a change of status if that faculty member has been reviewed for tenure with the result that tenure was not recommended.

**Contract Appointments without Tenure**

Two types of full-time contract appointments without tenure are available: Clinical Faculty Appointments and Per Annum Faculty Appointments.

**Clinical Faculty**

On the recommendation of the cognizant chairperson, or person acting in the capacity of a chair, with the approval of the Vice-President for Academic Affairs and based on a written description of the teaching and related duties, a Faculty position involving full-time teaching in a clinical or professional skills program may be designated as a non-tenure track clinical position.  Titles associated with clinical positions shall be appropriately distinguishing, such as "Clinical Assistant Professors" as determined by the Vice-President for Academic Affairs.

The initial appointment may be for one or two years and may be renewed for successive terms under the same procedures as those applying to faculty members with appointments probationary for tenure.  After six years of continuous service, subsequent reappointments may be for periods of up to five years but without tenure.

**Per Annum Faculty**

With the approval of the Vice-President for Academic Affairs and based upon a written description of the teaching and related duties, a faculty position involving full-time teaching for a period of one year may also be designated as a non-tenured position (Per Annum).

Normally a Per Annum appointment may be renewed on an annual basis for up to an additional five years, followed by a terminal contract for the seventh year of employment. If an exception is made, it will be done by

the Vice-President for Academic Affairs in consultation with the appropriate dean and director or chairperson. Notification of non-renewal shall follow the notice requirements of the Non-Reappointment of Full-Time Faculty Member policy.

Clinical or Per Annum appointments may be made at the level of Instructor, Assistant Professor, Associate Professor or Professor.  A Faculty Member with a Clinical or Per Annum appointment is accorded parity of compensation, benefits and perquisites, and governance and voting rights, as with other Faculty members of comparable rank.

A Faculty member with a Clinical or Per Annum appointment may apply for an appointment probationary for tenure, if a vacancy exists, under normal procedures for recruitment and appointment. In such a case, time served in the Clinical or Per Annum position beyond the first year counts toward the maximum allowable period of probationary service. If time served in the Clinical or Per Annum position exceeds the maximum allowable period of probationary service, the Faculty member shall be considered to have completed five years of probationary service and shall be reviewed for tenure upon application for the change of status. In either case, in the event the outcome of the review is negative, the terms of the current Clinical or Per Annum appointment shall be honored but the Faculty member shall not be eligible for subsequent reappointment to the Clinical or Per Annum position.

**Pro - Rata Faculty**

Pro-rata ranked faculty serve on nine-month or twelve-month contracts. Their contracts are processed and issued as are those of full-time faculty.

The initial appointment of pro-rata faculty determines their rank; their *Letters of Agreement* are awarded for one year at a time with no implied obligation of continuous appointment.

**Part -Time Faculty**

Part-time faculty are those faculty members who ordinarily teach from one to six credit hours per semester and are not usually otherwise employed in the affairs of the University. They receive a formal appointment on a semester basis, provided enrollment justifies it at registration time.  Part- time faculty members are not eligible for tenure.

**Letters of Agreement**

*Letters of Agreement* for continuing faculty members are issued on or before May 10. *Letters of Agreement* are distributed from the office of the President of the University.

**Appointment Procedures**

Members of the faculty are appointed by the President of the University. Prospective faculty members are interviewed and recommended by the chairperson and faculty of the department in which a vacancy exists to the Dean and Vice-President for Academic Affairs.

The formal offer of employment made by the Vice President for Academic Affairs to a prospective faculty member contains the conditions of continued employment and promotion as described during the interview process and as outlined in the *Faculty Handbook.*

Offers to part-time faculty are made by department chairpersons or those acting in the capacity of a chair, and concluded by an agreement approved by the appropriate academic dean. A part-time faculty member receives a formal appointment on a semester basis, provided enrollment justifies it at registration time. A part- time faculty member is not eligible for tenure.

## Related Policies

- Promotion of Faculty Members
- Faculty Status

## History

07/01/89 - Reaffirmed with publication of Faculty Manual
02/24/99 - Revised, as recommended to the President by the Policy Committee of the University, to include possibility of opening the fall semester in August.
10/04/02 - Revised to change the reference to the opening date of the academic year, as recommended to the President of the University by the Policy Committee of the University.
03/28/08 - Revised to provide for permanent non-tenured faculty, as recommended to the President of the University by the Policy Committee of the University.
2/18/11 - Revision approved by the President of the University as recommended by the Policy Committee of the University.

 

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu

EXHIBIT

E



## Marywood
### UNIVERSITY

# Progressive Discipline

## Policy Statement

Marywood University endorses a progressive discipline policy designed to promote resolution in a fair and orderly manner. This policy applies to faculty members with tenure or whose terms of appointment have not yet expired. Its objectives support the collegial relationships at Marywood University and are directed toward continual institutional improvement. Because the University regards disciplinary action as corrective and not punitive, the policy recognizes personal and professional problems that may be rectified by an informal educational process, as well as serious violations of professional responsibilities implicating possible recommendation for suspension or dismissal.

The policy is intended to provide an effective and flexible means of identifying problem areas, resolving complaints, and preventing repetitive incidents by prompt intervention and assistance. It is designed to accomplish these ends by a series of gradual steps involving strategies such as personal conferences, oral and written warnings, and opportunities for monitored assistance where applicable.

## Procedures

*Commencement.* Disciplinary action may be initiated by a complaint, oral or written, which alleges violation of institutional policy, practice, procedure or other functions and responsibilities of the faculty member in pursuing his or her customary teaching and institutional role. The complaint, which may reflect an incident or incidents of misconduct or deficiency, may be communicated to the faculty member's immediate supervisor or to the appropriate dean.

*Meeting with Administrator.* The administrator receiving the complaint shall discuss the matter with the faculty member in a confidential conference. If additional information from the faculty member provides a satisfactory explanation, the decision may be to close the matter then. If, however, additional light is not shed on the allegation or an explanation is not satisfactory, the administrator will specify corrective action to be taken, and the discussion will constitute an oral warning.

*Written Warning.* If the alleged problem continues or additional complaints are received, the immediate supervisor or dean must notify the Vice President for Academic Affairs, who shall conduct a preliminary investigation concerning the merits of the complaint. A written warning to the faculty member may follow where circumstances indicate that the problem is not resolved. The written warning will become a part of the faculty member's personnel file, but will be expunged after three years if no other written warnings have occurred.

*Suspension.* The faculty member may be suspended by the Vice President for Academic Affairs at any time during the proceedings involving him or her. Suspension is justified if immediate harm to the faculty member or others is threatened by the person's continuance in the faculty position. Unless in direct violation of the law, any

such suspension should be with pay.

*Special Assistance.* In those circumstances where it is evident that the faculty member is in need of special professional assistance, the Vice President for Academic Affairs may require in writing any of the following remedial actions:

- counseling and/or another type of treatment program, such as Alcoholics Anonymous or Narcotics Anonymous;
- psychological counseling and/or treatment, including out-patient treatment prescribed by a duly credentialed and qualified professional;
- peer faculty monitoring to assist in resolving work-related performance problems;
- a specified number of periodic conferences with the faculty member's Dean to assist in resolving administrative or institutional problems.

Special professional assistance will be for a specific period of time. Where the assistance necessitates in-patient treatment or time away from teaching, that temporary time-off shall be with pay. During the period of assistance, the faculty member shall communicate weekly or at other intervals specified by the Vice President for Academic Affairs, who shall monitor the faculty member's progress to determine when and if the special assistance has achieved its objective. Part of this monitoring function may involve the faculty member providing summary statements from treatment providers regarding compliance and prognosis. If the faculty member has refused to participate, or the remedial objective has not been reached during the specified period of time, a recommendation to terminate employment may be made to the President of the University.

*Dismissal*

If remedial actions(s) taken during the suspension does not sufficiently resolve the issues that lead to the suspension, the university may move towards dismissal of the faculty member.

*Ad Hoc Faculty Committee*

Faculty members have the right to convene an ad hoc committee in order to appeal either a decision to suspend the faculty member or a decision to dismiss the faculty member.

- Having received a written recommendation for either suspension or dismissal from the Vice President for Academic Affairs, the President of the University sends a written communication to the faculty member, stating with reasonable particularity the basis for suspension or dismissal and offering, if requested by the faculty member within 10 days, to convene a tenured faculty ad hoc committee to consider the matter, to render confidential advice, and thereby to effect a remedy if possible.
- Should the faculty member request a review by an ad hoc committee, it shall consist of three members selected in the following order: (a) one tenured faculty member selected by the person seeking assistance, and (2) two tenured faculty members selected by the Executive Council of the Faculty Senate. The choice of members should be on the basis of their objectivity and competence and of the regard in which they are held in the academic community. The President of the University or his/her delegate has the option of attending the meetings of the Committee. Should a faculty member request that such a committee be convened twice (i.e., once for suspension and once for dismissal), the membership of the committee may be similar or different, a determination which is made by the President of the University in consultation with the faculty member and the Vice President for Academic Affairs. Normally the committee would make its

2/2/12

recommendation within 30 days of being convened.

- The Committee elects its own Chair, who sends the opinion of the committee in writing to the President of the University, copied to the faculty member and to the Vice President for Academic Affairs.  If the opinion of the Faculty Committee is that the matter is successfully resolved or that there is no merit to the complaint, a recommendation shall be made to discontinue proceedings.  If the problem has not been corrected and reason still exists to question the fitness of the faculty member, the recommendation shall be to either continue a suspension or initiate a formal action toward dismissal.

*Publicity.*  Public statements by the faculty member or others about possible or actual termination of employment should be avoided.

## Related Policies

- Teaching Responsibility
- Librarianship Responsibility
- Tenure
- Faculty Status
- Academic Workload

## History

07/01/89 - Reaffirmed with publication of Faculty Manual
12/12/97 - Addition of informal process approved by the President of the University as recommended by the Policy Committee of the University
07/01/03 - Editorial changes made to reflect academic restructuring

10/12/11 - Revision approved by the President of the University as recommended by the Policy Committee of the University

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu

EXHIBIT F

### 4.2    CIVIL RIGHTS COMPLAINT PROCEDURES
(Revision approved by the President of the University 4/03/00, 7/21/03, 6/24/09)

The following process must be followed any time a member of the Marywood University community believes s/he has been the victim of or witness to discrimination, harassment, or assault by any member of the University community on University property or any property controlled by the University. Any individual who believes s/he has been subject to discrimination on the basis of disability should file a grievance consistent with Marywood's *Disability Grievance Procedures*. Confidentiality is expected of all persons involved in the process.

In furtherance of Marywood University's commitment to its duties and obligations, regular training on harassment, discrimination and related topics is provided for managers and supervisors in the Marywood community.

**Internal Process**

1.  As soon as possible, but not later than 30 working days, except in unusual circumstances, after the alleged incident(s) occurs, the complainant must present the complaint to the appropriate University administrator as listed below:

    Claims Against Faculty Members or Librarians
    Contact: Academic Dean or Director of Library and/or Provost and Vice President for Academic Affairs

    Claims Against Administrators, Professional Staff, or Support Staff Members
    Contact: Immediate supervisor and/or a vice president

    Claims Against Students
    Contact: Dean of Students and/or Vice President for Student Life.

    In all cases, individuals may contact the Assistant Vice President for Human Resources and Affirmative Action Officer if they feel they cannot contact the appropriate individual as noted.

    In cases that involve two or more categories of Marywood community members, the University administrator first contacted will consult with the President of the University to determine the appropriate course of action.

2.  The initial discussion between the complainant and the University administrator will be kept confidential to every extent possible. The University administrator must contact the Assistant Vice President for Human Resources and Affirmative Action Officer in cases involving employees.

3.  If the complainant, after an initial meeting with the University administrator, decides to proceed, the complainant submits within 10 working days a formal complaint, preferably in writing, to the appropriate University administrator. The complaint must include detailed factual information concerning the incident(s), and should include what the victim feels will correct the situation.

    In certain serious cases the University administrator may proceed even without a formal complaint.

    Cases involving alleged discrimination, harassment, and sexual assault are particularly sensitive and demand special attention to issues of confidentiality. Dissemination of information relating to the case is to be limited, so as to insure, as fully as possible, the privacy of the individuals involved.

4. The University administrator must inform both parties of the need for confidentiality. Any individual who retaliates against the complainant will be subject to discipline up to and including discharge from employment and/or termination of student status.

5. Within 5 working days after receipt of a formal complaint, the University administrator must initiate the appropriate steps to effect an informal resolution of the complaint that will be acceptable to both the complainant and the alleged offender.

6. Within 10 working days after the initiation of the steps to effect an informal resolution, the University administrator must provide a written summary of the complaint and the proceedings to date to both the complainant and the alleged offender. Appropriate remedial action will be determined by the University administrator after consultation with executive officer(s) and/or legal counsel if deemed necessary. Action will be taken to eliminate the discriminatory or harassing conduct, including but not limited to warning, suspension, transfer, community service, discipline, discharge, or dismissal of the offender or anyone making a knowingly false complaint. The remedial action may also include offering assistance/training to the victim and/or the offender. The parties will be formally notified of the final decision, including punishment or sanctions, if any.

7. Either party, if not satisfied with the informal resolution proposed by the University administrator, will have 10 working days to file an appeal. Appeals must be in writing and submitted to the President of the University. Within 5 working days, the President will direct the appeal to the appropriate University body, described below. The appeals committee will have 30 working days to review and make a recommendation to the President of the University. The President of the University will provide a written response to the appellant within 10 working days of the receipt of the appeals committee's recommendation. The decision of the President of the University is final and binding internally.

> Claims against Faculty Members including Librarians, Administrators, Professional Staff, and Support Staff
> > The President of the University will appoint and convene a committee of 5 employees comprised of professional staff, administrators and/or faculty who are independent of the claim.
>
> > Note: Claims by faculty members against faculty members may choose to contact the Faculty Grievance and Appeals Committee in lieu of this process.

> Claims against Students
> > The President of the University will refer the appeal to the Vice President for Student Life within 5 working days. The Vice President for Student Life will convene an Appeal Board within 3 working days of the President's notification. The Appeal Board will have 30 working days to review and make a recommendation to the Vice President for Student Life. The Vice President will notify the President of the recommendation within 3 working days. The President of the University will provide a written response to the appellant within 10 working days of the receipt of the appeals committee's recommendation. The decision of the President of the University is final and binding internally.

**External Process**

Victims may choose to file a report with the proper law enforcement authorities. Marywood University has personnel on staff who can explain criminal complaint procedures and assist victims in beginning the process. Police investigation and legal prosecution are conducted outside of and in addition to University procedures.

**Resources**

A list of Marywood University and community resources is available at the Human Resources Office and the Student Life Offices.

Students are encouraged to use the services of the Counseling and Student Development Center, the Student Health Services Office, and the Students with Disabilities Services Office.

4.3      **DISABILITY GRIEVANCE PROCEDURES**
(Approved by the President of the University 6/24/09)

Students are strongly encouraged to contact the Office of Student Support Services
at the first sign of any difficulties obtaining
their approved academic accommodations from faculty,
or if they encounter difficulties related to their disabilities
from any Marywood University staff, administrators, or students.

It is the policy of Marywood University not to discriminate on the basis of disability. The University has adopted an internal grievance procedure providing for prompt and equitable resolution of grievances by either students or employees alleging any action prohibited by Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794) or the relevant U.S. Department of Health and Human Services regulations implementing the Act (34 C.F.R. Part 104) (together, "Section 504"). Section 504 prohibits discrimination on the basis of disability in any program or activity receiving Federal financial assistance. The Law and Regulations may be examined in the office of the Section 504 Coordinator, Dr. Patricia E. Dunleavy, Assistant Vice President for Human Resources and Affirmative Action Officer, who has been designated to coordinate the efforts of the University to comply with Section 504.

Any person who believes she or he has been subjected to discrimination on the basis of disability may file a grievance under this procedure. It is against the law for the University to retaliate against anyone who files a grievance or cooperates in the investigation of a grievance. The University will make every effort to protect the grievant from retaliatory action. Any individual who retaliates against the grievant will be subject to discipline up to and including discharge from employment and/or termination of student status.

**Procedures**

All alleged incidents involving disability discrimination are to be dealt with immediately. When a Marywood University employee or student believes s/he has been the victim of disability discrimination or witnessed disability discrimination, the following procedures should be used:

1. Grievances must be submitted to the Section 504 Coordinator, or her designee, within 30 calendar days of the date the person filing the grievance becomes aware of the alleged discriminatory action. (Special circumstances warranting later filings will be considered on a case-by-case basis.) A grievant may contact the Vice President for Enrollment Management if he or she feels he or she cannot contact the Section 504 Coordinator, who will designate an appropriate person to fulfill the Section 504 Coordinator's responsibilities under this policy.

2. A grievance must be in writing and must contain the name, address and other contact information of the grievant, describe the problem or alleged action alleged to be discriminatory in sufficient detail to inform the Section 504 Coordinator of the nature and date of the alleged violation and permit an adequate investigation to be conducted, include the names of University employees or students involved and state the remedy or relief sought.



EXHIBIT
G



# Faculty Grievances and Appeals



## Policy Statement

As an institution of higher education, Marywood University brings together a faculty, administration, and governing board united in a common bond of academic purpose. Essential to the fulfillment of this purpose is a mutual recognition of institutional integrity and individual human rights, along with an understanding of the respective roles of the several entities which constitute this educational organization.

Circumstances may arise at times, however, wherein a grievant--full-time, part-time, or pro-rata--may question decisions which affect his/her professional role in the institution. To assist in the resolution of these matters, a series of guidelines for grievances is herein set forth.

## Definitions

Grievance: A grievance refers to any disagreement between two parties. A grievance identifies a complaint one party has against another party for some alleged wrongful action on the part of the second party.

Grievant: A Grievant initiates a grievance.

## Types of Issues That Can Be Grieved

It is understood that procedural rather than substantive factors provide appropriate areas of review, and the Faculty Grievance Committee will not attempt to substitute its judgment for that of the decision-maker(s) involved in the case.

Thus, the Faculty Grievance Committee will hear grievances  concerning:

1) Allegations of violation of academic freedom resulting in: denial of tenure, promotion, or sabbatical leave; non-reappointment.

2) Allegations of impermissible discrimination. Tenured and non-tenured faculty are protected against illegal or unconstitutional discrimination, or on any basis not relevant to job performance, and includes, but is not limited to, race, sex, religion, national origin, age, disability, marital status, or sexual orientation

3) Allegations of inadequate consideration resulting in: denial of tenure, promotion, or sabbatical leave; non-reappointment; or termination of employment due to retrenchment.

4) Allegations of violations of procedures used in rendering decisions in numbers 1 and 2 above as set forth in Chapter 2 of the *Faculty Handbook.*

Procedures regarding dismissal, suspension, and sanctions of faculty members are in the *Progressive Discipline*

policy.

Should a grievant allege cause for grievance in any matter not identified in the above guidelines, the grievant may consult the Faculty Grievance Committee. In such circumstances, the Committee's first decision is whether the complaint is appropriate and sufficiently serious to merit consideration.

**Persons Against Whom Grievances May be Directed**

Fundamentally, a grievance may arise from an allegation of improper implementation of a procedure or process leading to a decision. The person(s) or body who perform(s) that procedure or process is (are) the subject(s) of the grievance. Thus, a grievant may direct a grievance against the person(s) or body responsible for the decision identified herein.

The decisions or actions of the Faculty Grievance Committee or Ad Hoc Hearing Committee may not themselves be grieved.

## Procedures

**Informal Procedure**

1) A member of the faculty must initially discuss a complaint with the person or body responsible for the action to which the grievant takes exception in order to determine if a resolution is possible.

2) A complaint must be presented within (10) calendar days of the occurrence or discovery of the alleged violation.

3) No grievance may be filed without the initiation of this informal complaint procedure.

4) If the grievance still exists after step one the grievant initiates a consultation with the Vice President for Academic Affairs in order to try to resolve the matter.

**Formal Procedure for Filing a Grievance**

1) The Faculty Grievance Committee is convened.

**Faculty Grievance Committee**

The Faculty Grievance Committee consisting of three tenured faculty members and two alternates (also tenured) is specifically charged with responsibility for resolving matters of grievance and appeal. The Faculty Senate conducts the election of this committee. Faculty currently serving on the Rank and Tenure Committee or the Faculty Development Committee are not eligible for election to this committee.

The term of each member extends for three years, with one person replaced each year. An alternate will be identified at each election. Any member of the Grievance Committee who has had any prior involvement in a case under consideration must recuse him/herself. The Grievance Committee shall annually elect a chair-elect who will succeed the Chair.

**Grievance Process**

The grievant may consult the President of Faculty Senate for assistance in contacting the Faculty Grievance Committee Chair. The Chair should be provided with a written statement setting forth, in detail, the nature of the grievance or appeal and identifying the person(s) or body against whom the grievance or appeal is directed; this document may also include a proposal for resolving the issue. A grievance must be filed within thirty (30) calendar days of the occurrence or discovery of the alleged violation but not fewer than five (5) calendar days after the initiation of the informal complaint.

In considering the grievance or appeal, the Faculty Grievance  Committee will take the following steps:

1) The Committee notifies the decision maker(s) that a grievance has been filed.

2) The Grievance Committee requests from the grievant written information regarding the issues. The Grievance Committee also requests from the decision maker(s) written statements describing the basis for the decision being appealed or grieved, as well as any attempts to settle the matter informally. This information shall be held in confidence by the Grievance Committee. At this point in the process, the information gathered is solely for review by the Committee and is not to be shared with either party involved.

3) At any point, the Grievance Committee may request additional information in writing from the grievant and from the decision-maker(s).

4) If after completing the above steps, the Committee determines that the grievance is improper or unsubstantial, or that sufficient time had not yet been allowed for its normal resolution, or that there is no evidence of improper action on the part of the decision maker(s) which would constitute a legitimate grievance, the Committee will communicate this determination to the grievant and the decision maker(s).

5) If the Grievance Committee determines that there was inadequate consideration or violation of procedures (see No. 3 and 4 under Types of Issues Which Can Be Grieved above), the Committee will return the case to the decision maker for reconsideration.

6) If the grievance is deemed appropriate for mediation, the Chair will appoint a Mediator from the University. The Mediator does not represent either party. Any party may object to the Mediator on the grounds of actual or apparent bias or conflict of interest and submit such objections to the Chair in writing. The Chair will review the objections and may replace the mediator.

7) The Offices of the Vice President for Academic Affairs or Human Resources may be consulted by the Mediator on mediation procedure or other matters involved in the grievance.

8) The Mediator shall try to resolve the grievance within thirty (30) calendar days of formal submission to the chair. With the consent of both parties, the period of mediation may be extended for a short period of time. If the grievance is not resolved within the thirty (30) calendar days, the mediator will advise the chair of the committee in writing that that the issue has not been resolved. If a mutually accepted agreement is reached, this will be communicated to the chair of the committee.

9) Grievances not appropriate for mediation or grievances not resolved through mediation shall be referred to the Ad Hoc Hearing Committee. All evidence collected will be passed on to the Ad Hoc Hearing Committee.

10) If the Faculty Grievance Committee recommends a formal hearing, in cases of violation of academic freedom or impermissible discrimination, an Ad Hoc Hearing Committee will be created to conduct a formal

investigation and to arrive at a recommendation for resolving the issue.

11) The Grievance Committee will make a summary report of its activities at the end of each academic year to the Faculty Senate. No details relevant to the privacy of the participants in any cases will be included in this report.

## Ad Hoc Hearing Committee

The Ad Hoc Hearing Committee shall consist of three members, selected by the Faculty Senate Executive Council, from a standing committee of fifteen tenured Faculty Members elected for one-year terms by the faculty at large. The Faculty Senate conducts the election of this committee.

Each party shall have two challenges without stated cause regarding membership of the Ad Hoc Hearing Committee. No member of the Ad Hoc Hearing Committee shall have had any prior involvement in the case.

If the three-person Ad Hoc Hearing Committee cannot be chosen from the fifteen members of the standing committee, the Executive Council of the Faculty Senate is empowered to conduct a special election to obtain fifteen additional members with terms of one year.

The Ad Hoc Hearing Committee must select a chairperson.

## Ad Hoc Hearing Procedures

1) The Ad Hoc Hearing Committee is empowered to gather information and documents specific to the case of the Grievant, conduct interviews, hold a hearing and take actions as are necessary to investigate the grievance to the extent that the law and University policy permit. The Ad Hoc Hearing Committee will provide recommendations in writing forty (40) calendar days from the date of its official appointment.

2) All Hearings are closed to anyone other than the parties and their advisors, members of the Ad Hoc Hearing Committee, and any witnesses invited to testify by the Committee. The hearing may be audio or video recorded and a written record will be maintained. The hearing is not a legal proceeding. At the beginning of the hearing, all procedures will be made known to the parties, and all information will be kept confidential.

3) Each party to the grievance may have one advisor during the hearing. The advisor may not participate in the hearing.

4) Strict rules of legal evidence will not be binding upon the Ad Hoc Hearing Committee and evidence of probative value in defining issues may be admitted.

5) The hearing record will be used exclusively as the basis for findings of fact and for arriving at a decision.

6) Upon reaching a decision on the issue and a recommendation for action, the Ad Hoc Hearing Committee will provide a summary written report to the petitioner, the person(s) named in the grievance, and the appropriate administrative officer and the President.

7) After receiving the recommendation of the Ad Hoc Hearing Committee, the appropriate administrative officer will review the recommendation and notify the Ad Hoc Hearing Committee and petitioner whether the recommendation has been accepted. If the recommendation of the Ad Hoc Hearing Committee is not

accepted by the appropriate administrative officer, the administrative officer will review it with the Ad Hoc Hearing Committee.

8) No details relevant to the privacy of the participants in the case will be included in the notice from the Hearing Committee. Public statements and publicity about the case by the participants will be avoided until the proceedings have been completed, including consideration by the President

## Action by the President of the University

Following the recommendation of the Ad Hoc Hearing Committee, should the petitioner desire further consideration of the issue beyond the immediate administrative channels of the University, the President may be requested, within twenty calendar days, to review the case.

This review will be based on the record from the committee hearing and may provide opportunity for argument, oral or written, or both, by the principals.  Then the President will then make the final decision.

## Responsibility for Expenses Incurred in Grievance and Appeal

Expenses incurred by the grievant are the responsibility of the individual. These include, but are not limited to, the following:

Cost of an advisor.

Travel expenses for advisor, witnesses, or others engaged by petitioner.

Cost of preparing any documents and copies thereof.

## Withdrawal of a Grievance

The grievance can be withdrawn at any point in the process.

## Non-Retaliation

Grievants will not be adversely affected for exercising their right to file a grievance, regardless of outcome.

Grievants will not be subject to adverse consequences for either initiating a grievance or in presenting evidence on behalf of a grievant.  Anyone who violates this mandate can be subject to disciplinary action, up to and including dismissal.

## Related Policies

- Academic Freedom
- Disability Grievance Procedures
- Civil Rights Policy
- Civil Rights Complaint Procedures
- Sabbatical Leave for Faculty Member
- Non-reappointment of Faculty Member

- Promotion of Faculty Members
- Evaluation of Faculty Members
- Retrenchment of Faculty
- Tenure
- Progressive Discipline

## History

10/02/92 - Proposal returned to committee of Faculty Senate by College Committee on Policy

11/13/92 - Proposed policy dated 3/13/92, as amended, recommended by College Committee on Policy to the President

04/26/93 - Presidential approval affirmed with publication of the President's Memo

03/20/98 - Revision proposed by Faculty Senate approved by the President of the University as recommended by the Policy Committee of the University

04/29/11 - Revision approved by the President of the University as recommended by the Policy Committee of the University

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu



# Marywood
U N I V E R S I T Y

OFFICE OF THE PRESIDENT

MARYWOOD UNIVERSITY
SCRANTON, PA 18509-1598
TEL: (570) 348-6231
FAX: (570) 340-6014
EMAIL: ANNEMUNLEY@MARYWOOD.EDU
www.marywood.edu

April 3, 2012

Dr. Frederick F. Fagal, Jr.
17 East Lake Street
Skaneateles, NY 13152

Dear Dr. Fagal,

I have received your letter dated March 29, 2012. You chose to file a grievance under the Marywood University Faculty Grievance and Appeals Policy and chose not to convene an ad hoc committee to review my recommendation as I had offered to you on two occasions. The Faculty Grievance Committee reviewed your grievance and found no evidence of improper action on my part which would constitute a legitimate grievance.

Since the grievance process is now complete, I have decided to finalize my recommendation. As a result, your employment with Marywood and your tenure are terminated effective today, April 3, 2012.

Further, to provide you with a review of my decision, I will consider your letter dated March 29, 2012 as your authorization for me to convene two faculty ad hoc committees to appeal my decisions to suspend you and to terminate your employment and tenure. I am doing this despite the fact that on two separate occasions you refused my offer and did not choose to convene an ad hoc committee to review my decision to suspend you and my recommendation to terminate your employment and tenure before I finalized my decision.

According to the terms of the Progressive Discipline Policy, you must now select a tenured faculty member for the ad hoc committee. Please submit the name of your selection to Sr. Gail Cabral, President of the Faculty Senate, as soon as possible.

Sincerely,

*Sister Anne Munley, IHM*

Sister Anne Munley, IHM
President

*An education inspired by the Sisters, Servants of the Immaculate Heart of Mary.*

# EXHIBIT B

1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FREDERICK F. FAGAL,      )   CIVIL ACTION - LAW
JR.,                     )
                         )
        Plaintiff        )
                         )
-vs-                     )
                         )
MARYWOOD UNIVERSITY,     )
                         )
        Defendant        )   NO. 3:14-CV-02404
_____x

DEPOSITION TESTIMONY OF

**SISTER ANNE MUNLEY, IHM, Ph.D.**

THURSDAY, JUNE 2, 2016

RADISSON HOTEL
700 LACKAWANNA AVENUE
SCRANTON, PA

MARY ANN RUANE
COURT REPORTER
NOTARY PUBLIC

**KEYSTONE COURT REPORTING AGENCY, INC.**
**4099 BIRNEY AVENUE, SUITE 9**
**MOOSIC, PA 18507**
**(570) 558-3011    (800) 570-3773**
**FAX  (570) 558-3014**

---

2

**C O U N S E L   P R E S E N T :**

**On behalf of the Plaintiff:**
LAW OFFICE OF JONATHAN Z. COHEN, ESQ.
BY: JONATHAN Z. COHEN, ESQ.
175 Strafford Avenue
Wayne, PA 19087

**On behalf of the Defendant:**
JACKSON LEWIS
BY: STEPHANIE JILL PEET, ESQ.
ASIMA J. AHMAD, ESQ.
1601 Cherry Street, Suite 1350
Philadelphia, PA 19102

**Also Present:**  Frederick F. Fagal, Jr. Ph.D,
Patricia E. Dunleavy, Ph.D

**STIPULATIONS**

It was agreed by and between counsel that all
objections, except as to the form of the question,
will be reserved until the time of trial.
It was further agreed that the sealing and
filing of the deposition transcript will be waived.

**INDEX OF WITNESSES**

EXAMINATION                    PAGE NUMBER
SISTER ANNE MUNLEY, IHM, Ph.D
By Mr. Cohen. . . . . . . . . . . . . . . . 4

-o0o-

---

3

**INDEX OF EXHIBITS**

DEPOSITION
EXHIBIT       DESCRIPTION            MARKED

Exhibit 1    5/10/11 Letter of Agreement. . . 21
Exhibit 2    11/28/11 E-Mail Chain. . . . . . 22
Exhibit 3    12/2/11 Fagal Letter . . . . . . 27
Exhibit 4    12/5/11 E-Mail . . . . . . . . . 29
Exhibit 5    12/15/11 Levine Letter . . . . . 37
Exhibit 6    1/17/12 E-Mail . . . . . . . . . 42
Exhibit 7    Talking Points for Meeting . . . 69
Exhibit 8    Handwritten Notes. . . . . . . . 95
Exhibit 9    1/23/12 E-Mail . . . . . . . . .104
Exhibit 10   1/23/12 Meeting Notes. . . . . .105
Exhibit 11   1/24/12 E-Mail w/ Attachments. .108
Exhibit 12   Talking Points for Board . . . .113
Exhibit 13   2/2/12 Cohen Letter. . . . . . .122
Exhibit 14   2/3/12 Handwritten Note. . . . .123
Exhibit 15   2/9/12 E-Mail w/ Attachments . .124
Exhibit 16   2/9/12 Anthony Letter. . . . . .132
Exhibit 17   2/20/12 E-Mail . . . . . . . . .134
Exhibit 18   3/7/12 E-Mail. . . . . . . . . .137
Exhibit 19   3/26/12 Sadlack Letter . . . . .140
Exhibit 20   4/3/12 Munley Letter . . . . . .141
Exhibit 21   4/25/12 E-Mail Chain . . . . . .147
Exhibit 22   4/30/12 E-Mail . . . . . . . . .148
Exhibit 23   5/3/12 E-Mail Chain. . . . . . .151
Exhibit 24   6/5/12 E-Mail. . . . . . . . . .152
Exhibit 25   Faculty Grievance Committee
             Meeting Notes, 6/19/12 . . . . .152
Exhibit 26   1/9/15 E-Mail. . . . . . . . . .154
Exhibit 27   1/18/12 Handwritten Notes. . . .156
Exhibit 28   1/20/12 Handwritten Notes. . . .157

-o0o-

---

4

1       S I S T E R  A N N E  M U N L E Y, IHM, Ph.D

2   WAS CALLED, AND HAVING BEEN DULY SWORN,

3   WAS EXAMINED AND TESTIFIED AS FOLLOWS:

4   (9:36 a.m.)

5

6   **EXAMINATION BY MR. COHEN:**

7       Q.      Sister Munley, my name is Jonathan

8   Cohen, and I represent the Plaintiff in this case

9   Frederick F. Fagal, Jr.

10          How would you like to be called today,

11  Sister or President Munley or --

12      A.      **Sister Anne is just fine.**

13      Q.      Sister Anne, okay.  And you understand

14  today that you're under the same oath as if you were

15  in a courtroom, correct?

16      A.      **I do understand.**

17      Q.      And let me just go over some of the

18  ground rules.  Have you ever had a deposition before?

19      A.      **No, I haven't.**

20      Q.      Okay.  So the idea is that I ask you

21  the questions and you provide the answers.  But if

22  you don't understand a question, please feel free to

23  say so, and I'll try to rephrase.

24      A.      **Okay.**

25      Q.      Because if you do answer, then I'm just

13

1  persons they served. And also I was in Uganda at the
2  time when, you know, the war was still in action, and
3  I saw how they were a force for good in the presence
4  of that.
5          So this was so in keeping with the IHM
6  charism and our Congregation, along with three other
7  congregations were the sponsors of this African
8  Sisters Education Collaborative. And Marywood was a
9  key factor in it. Marywood received the grant. So I
10 came back. I concluded my work in Rome, came back
11 because I wanted to establish this African Sisters
12 Education Collaborative as a 501(c)(3) entity, and
13 with corporate bylaws, incorporated in the State of
14 Pennsylvania so it could continue to grow. Now it
15 has grown, and it touches 10 -- you know, women
16 religious in 10 sub-Saharan countries.
17         So after I came back and I did that, I
18 was the first Executive Director of that. And I, you
19 know, got it incorporated, and I continued to raise
20 funds, and continued to go back and forth to Africa.
21         My predecessor Sister Mary Reap, IHM,
22 was retiring as President of Marywood. So several
23 people approached me. I knew many people in the
24 Marywood community, I had been there many years,
25 asked me to consider applying, so I did. I went

14

1  through all the interview process, and I was selected
2  as Marywood's 11th President. And then I have served
3  as the President of Marywood. I am concluding, I am
4  retiring now at the conclusion of this year after
5  nine years as President. My total service at
6  Marywood, either as a faculty member, or as Director
7  of Institutional Research and Planning, or as
8  President totals 20 years. And this year I received
9  the Cor Mariae Medal, which comes after 20 years of
10 direct service.
11         That's sort of like a little rundown of
12 what my life has been like. It's been very -- I've
13 been very graced in the experiences I've had.
14     Q.    Thank you. And so I understand that
15 you will be leaving Marywood and Pennsylvania for
16 Texas soon; am I right?
17     A.    That's correct, I am going to take a
18 sabbatical.
19     Q.    So during that time you'll still be
20 associated with Marywood?
21     A.    No, I'm really retiring as President of
22 Marywood. And I'm going to spend some time just --
23 you know, the notion of a sabbatical is you light out
24 to let the new light come forward and your next path.
25 Before I select my next ministry I'm going to take

15

1  some time for prayer and reflection.
2      Q.    Okay. When did you -- You, obviously,
3  know my client Professor Fagal, correct?
4      A.    I do.
5      Q.    And when did you first meet him?
6      A.    You know, I wouldn't be able to give
7  you an exact year.
8      Q.    Approximately?
9      A.    When I came back to Marywood after
10 serving as Vice-President, I pretty much had a
11 general knowledge of the faculty, because I was
12 Director of Institutional Research and Planning, and
13 I facilitated numerous meetings across campus. And I
14 had been a faculty member earlier there from '74 to
15 '76, and then '80 to '81 or '82 when I got elected
16 President. So, yeah, I probably would have
17 encountered him in those times.
18     Q.    Okay. And you're, obviously, aware
19 that around January 2012 Professor Fagal sent an
20 e-mail containing video links. And then that's been
21 the subject of this litigation, which ultimately led
22 to his suspension and termination, correct?
23     A.    Yes.
24     Q.    And prior to that day, and that was
25 January 13th, 2012, did you consider Professor Fagal

16

1  to be a problematic employee for Marywood?
2          MS. PEET: Objection to the form.
3  You can answer.
4          THE WITNESS: I'm sorry?
5          MS. PEET: You can answer.
6          THE WITNESS: I had no direct
7      dealings with Dr. Fagal, or any I would
8      say encounter that would be of that
9      nature.
10 BY MR. COHEN:
11     Q.    So you had no direct dealings. But had
12 you heard from others in Marywood's administration,
13 or Professors that Professor Fagal was a problematic
14 employee?
15     A.    I really didn't have an opinion of Dr.
16 Fagal.
17     Q.    I understand that. But had you heard
18 from others that they had a problem with Professor
19 Fagal?
20     A.    I don't recall conversations about Dr.
21 Fagal.
22     Q.    Okay. So your interactions with
23 Professor Fagal prior to January 2012 were limited?
24     A.    I would say so; perhaps at faculty
25 meetings, or passing by in the hall.

**17**

1    Q.    Okay. And Marywood has a set of core
2 values, correct?
3    A.    Yes, they do. And they are very
4 related to the mission of the University. And they
5 are Catholic Identity. And they are rooted in our
6 Catholic Identity and our Catholic tradition. We're
7 a faith-based institution of service, respect,
8 excellence and empowerment.
9    Q.    And did you -- would you say that these
10 core values are just symbolic, or do they play a
11 genuine role in the life of the University?
12    A.    I think they play a very genuine role
13 in the life of the University, which goes deeply into
14 the founding vision of the IHM Sisters when they
15 founded Marywood in 1915, because there was no
16 education available for women at all. And they're
17 also directly related to the IHM charism, which I
18 mentioned before, which is about developing God-given
19 gifts and potential wherever it's found.
20         And so, you know, the mission of
21 Marywood talks -- and it's an enduring mission across
22 time -- helping our students, our faculty, and the
23 whole member of the Marywood community to live
24 responsibly in a diverse and interdependent world.
25 It's all about the common good.

**18**

1    Q.    And prior to the -- I'm just going to
2 call -- the e-mail and the videos that are the
3 subject of this litigation, I'm going to --
4 throughout this deposition I'm going to call it the
5 January 13th, 2012 incident. Is that around the time
6 when you thought it happened?
7    A.    I mean, I'm not -- this is four and a
8 half years ago, so I wouldn't say a date would be in
9 my mind.
10    Q.    Right.
11    A.    But a very significant part of this for
12 me, of course, is the matter of the videos, that's
13 the substance of it for me.
14    Q.    And the e-mail -- and I'll just
15 represent to you that the e-mail that Professor Fagal
16 sent containing these links to the videos was sent on
17 January 13th, 2012. And when I say the January 13th,
18 2012 incident, that's what I'm referring to.
19    A.    All right.
20    Q.    And prior to the January 13th, 2012
21 incident, would you say that Professor Fagal fit into
22 the University's core values?
23         MS. PEET: Objection to the form.
24    You can answer.
25         THE WITNESS: I do not recall

**19**

1 having an opinion specifically regarding
2 Dr. Fagal in that manner.
3 BY MR. COHEN:
4    Q.    So you didn't have an opinion. But did
5 he -- Did Professor Fagal have a reputation as
6 someone that prior to the January 13th, 2012
7 incident, as someone that didn't necessarily tow the
8 University line?
9         MS. PEET: Objection to
10    competency. You can answer, if you
11    know.
12         THE WITNESS: Again, I cannot, you
13    know, say that I've had any
14    conversations of that nature regarding
15    Dr. Fagal.
16 BY MR. COHEN:
17    Q.    Okay. So prior to the January 13th,
18 2012 incident, did you have any knowledge of various
19 run-ins that Professor Fagal had with the Marywood
20 administration?
21         MS. PEET: Objection to the form.
22    You can answer.
23         THE WITNESS: Again, I would say
24    that that is -- that was not, you know,
25    something that as I look back that I

**20**

1 ever was very involved in or recall
2 discussions of.
3 BY MR. COHEN:
4    Q.    Okay. Specifically prior to the
5 January 13th, 2012 incident, were you aware that
6 Professor Fagal had a very strong -- had very strong
7 opinions on free speech at Marywood?
8         MS. PEET: Objection to the form.
9         THE WITNESS: I'd like you to
10    rephrase that, and just give me the
11    sense of what it is your question is
12    dealing with.
13 BY MR. COHEN:
14    Q.    Prior to the incident involving the
15 videos and the e-mail, were you aware that Professor
16 Fagal had a strong -- had strong feelings about free
17 speech at Marywood University?
18         MS. PEET: Objection to the form.
19         THE WITNESS: I guess I would say
20    I was minimally aware.
21 BY MR. COHEN:
22    Q.    Minimally aware?
23    A.    Um-hum.
24    Q.    Okay. Were you aware in and around
25 2007 Professor Fagal -- Let me scratch that. I'll

41

1  with Marywood's mission statement and core values?
2         MS. PEET:  Objection to the form.
3     I don't understand what you mean by
4     proposed FIRE presentation.
5  BY MR. COHEN:
6     Q.    The presentation that -- I don't mean
7  proposed -- but the presentation that was given by
8  FIRE on campus, is it your testimony that that was
9  not in conflict with Marywood's mission and core
10 values?
11    A.    I think when there are -- We're a
12 University.  And at Universities there are
13 presentations occurring on a regular basis.  That's
14 what I see in that paragraph, that we are open to
15 future presentations.
16        MR. COHEN:  Okay.  Let's move on
17    to a new document.
18 BY MR. COHEN:
19    Q.    Let me ask you this; the fact that
20 Professor Fagal wanted a speaker from FIRE to make a
21 presentation on campus, did that make you question
22 whether Professor Fagal was a good fit with
23 Marywood's core values?
24        MS. PEET:  Objection to the form.
25        THE WITNESS:  I think that I -- it

42

1     is not my practice to categorize people
2     as -- the framework that you're putting
3     around this, I don't put people in
4     boxes.  It's not my nature, or my
5     professional practice to categorize
6     people in the way that you referred in
7     that question.
8  BY MR. COHEN:
9     Q.    Okay.  Well, my question was not
10 whether you put Professor Fagal in a box.  Did you
11 have any thoughts at all -- Did you wonder at all
12 whether the fact that Professor Fagal wanted to have
13 a FIRE speaker reflected on his adherence to the core
14 values of the University?
15    A.    I think that how I -- The core values
16 and the mission are the ones which, you know, I make
17 the decision.  I would not recall making a direct
18 application in this particular case at this time.
19 You know, the incident in the videos is a far
20 different matter.
21    Q.    I know, we'll get to that.
22        MR. COHEN:  We'll mark this as
23    Munley 6.
24        (At this time, Munley Deposition
25        Exhibit 6 was marked for

43

1         identification.)
2  BY MR. COHEN:
3     Q.    And if you could briefly review this,
4  Sister, and let me know whether you recognize this
5  document?
6     A.    Okay.  Yes, I do recognize this
7  document.  It's from Dr. Levine to me.  And I was
8  away at the time.  It references Dr. Fagal's e-mail,
9  and the links to videos embedded with the e-mail.
10    Q.    And was this the first time that you
11 had Professor Fagal's January 13th, 2012 e-mail and
12 the videos were brought to your attention?
13    A.    I would say, yes.  I mean, this is
14 dated the 17th.  I was obviously traveling, because
15 it indicates that.  But this mentions the videos,
16 which I looked at.
17    Q.    What was your first reaction to reading
18 Professor Fagal's January 13th, 2012 e-mail and the
19 videos that he linked to?
20    A.    You know, may I see those?  I mean,
21 that helps me to -- I know my reaction to the videos.
22 I don't remember, you know --
23    Q.    Okay, let me rephrase.
24    A.    This is, again, five years ago.
25    Q.    Let me rephrase it.  I don't have the

44

1  video here.  I'm not going to play it, but you
2  remember it?
3     A.    Oh, it is embedded in my memory.
4     Q.    What was your first reaction to seeing
5  the video?  Forget about the e-mail.
6     A.    Okay.  I was absolutely and totally
7  appalled.  And I, first of all, was highly offended
8  to be personally depicted as Hitler, and to see the
9  members, the Executive members of -- Officers of
10 Marywood University depicted as Hitler's aides.  And
11 I was absolutely distressed, especially because Dr.
12 Alan Levine is of the Jewish faith.  And I thought it
13 was anti-Semitic to even involve Dr. Levine in
14 something of this nature.  And virtually every member
15 of the Cabinet was in some way directly insulted, as
16 well as their family members.  And the IHM Sisters
17 were characterized as SS.
18        And, you know, I think of the founding
19 charism of the IHM Congregation, it's emphasis on,
20 you know, empowerment, and service, and excellence.
21 And I think of Hitler as a dictator responsible for
22 the annihilation of six million innocent people.  And
23 I think of my direct experiences in working in very
24 poor countries, and seeing victims of trafficking,
25 and the boy soldiers, and the war that was going on

45

1  in Uganda; and trafficking of children and women in
2  Asia, and in South Africa the experience of the
3  apartheid that I had an opportunity to understand
4  Mandela's work. I was disgusted, appalled, repulsed.
5  And everything -- I thought it was a personal attack
6  on everything that Marywood stands for, as well as an
7  egregious assault to our mission and core values.
8          And our mission is about an educational
9  program that really is involved in enabling students
10  to live responsibly in a diverse and interdependent
11  world. And the whole essence of a Marywood education
12  is to respect, basically respect every single person,
13  every culture, every ethnicity. I was sickened by
14  it. I could not -- I couldn't even believe that I
15  was -- and it was vulgar. It was sexually explicit.
16  It mentioned, you know, the spouses and family of
17  some of our Executive Officers. It demeaned them.
18  It mentioned -- it mentioned someone's wife. I was
19  totally appalled, disgusted.
20          And I have to say that in my entire
21  lifetime, and I've been in very difficult situations,
22  so I've seen great human suffering, I could not
23  believe that in a context like Marywood University
24  that this, you know, Hitler -- I can't -- the video
25  was incomprehensible to me that anybody who would be

46

1  a tenured Professor at Marywood University where we
2  are so explicit in what our mission and values are
3  would produce something of this nature.
4          And I found it, you know -- as soon as
5  I saw it I was especially sensitive to Dr. Levine,
6  who was very, very much affected by this, because it
7  was his wife that was mentioned in the video. And he
8  is Jewish, and he was very much emotionally impacted
9  by it, as were the other Cabinet members. We just
10  don't operate like that as a people. We emphasize
11  respect.
12          And I found the Congregation -- you
13  know, we have Sister missionaries in various
14  countries, who lived in all sorts of circumstances.
15  They welcome the sacrifice, it's who we are. We
16  teach this mission to our students. We have a Hope
17  course, University 100, that emphasizes the heritage,
18  why we have these values. And, you know, we have
19  worked very hard as an institution.
20          I, personally, because of my global
21  opportunities to be in so many parts of the world
22  have emphasized global education and the importance
23  of that. And so, you know, I'm a sociologist. I've
24  taught anthropology. I believe in the value of
25  multiple cultures. I was sickened by this.

47

1          And this to me violated everything that
2  Marywood stands for. And it was the core of who we
3  are was being affronted by this. And I decided that
4  this was -- this was a major violation of what it is
5  to be considered a member, a tenured faculty member
6  of Marywood University, it violates everything that's
7  involved in that.
8      Q.  After viewing these videos did you feel
9  like Professor Fagal should be suspended or fired?
10     A.  I have to say that this was such an
11  egregious offense of not only of what my
12  understanding of the responsibility of a tenured
13  faculty member at Marywood is, that this was
14  something for which there should be a suspension.
15  And I wanted to have a direct conversation with Dr.
16  Fagal.
17          This was something that, you know,
18  because it affected every member of the Cabinet,
19  because it was directly involved with our mission, as
20  leader of the institution I felt a great
21  responsibility to directly engage with Dr. Fagal
22  about this matter.
23     Q.  Okay. So you testified that you
24  thought he should be suspended. My question was did
25  you also believe after seeing this video that he

48

1  should be terminated?
2      A.  I wanted to talk to him. I wanted to
3  personally sit down with Dr. Fagal. This to me --
4  suspension was the first thing on my mind, but I
5  wanted to have the opportunity to directly talk to
6  Dr. Fagal.
7      Q.  Understood. Whether you wanted to
8  discuss this with Dr. Fagal at all or not, did the
9  thought after seeing this video of terminating him
10  come to your mind?
11          MS. PEET: Objection, asked and
12      answered.
13          THE WITNESS: I can't give you an
14      answer directly to that. I just know
15      that I was severely offended and wanted
16      to immediately deal with the situation
17      because it rose to the level of the
18      President of the University.
19  BY MR. COHEN:
20     Q.  Okay. So the document that's in front
21  of you --
22     A.  Yes.
23     Q.  -- again, this was January 17th, 2012,
24  this e-mail from Dr. Levine to you where he informs
25  you of the videos. Do you see this?

49

51

**A.** That's right, I'm looking at it.

**Q.** So you say that you wanted to immediately deal with the situation. But isn't it true that you did not in fact deal immediately with the situation, it waited until at least January 23rd, 2012?

MS. PEET: Objection to the form.

THE WITNESS: I was traveling. I was -- you know, the work of the Presidency involves traveling, Board meetings in other locations. I don't know exactly, I would have to revisit my calendar, but I was also at that time on the ACCU Board of Directors, the Association of Catholic Colleges and Universities, so I don't know where I was at this time, I would have to revisit. You know, but this -- if I got this on the 17th and I was somewhere else -- I don't remember what date you said I dealt with this, but my goal was to deal with it.

BY MR. COHEN:

**Q.** You do have people on your staff on the Cabinet that you occasionally delegate

50

responsibilities to, am I correct?

**A.** I think that each of the -- yes. I would say this: Each of the Cabinet Officers is a direct report to the President, and they have certain responsibilities, and then they report directly to the President, yes.

**Q.** Did you -- Even though you were away when you received this e-mail January 17, 2012, did you think about delegating the handling of this situation to anybody on your staff?

**A.** I would never delegate anything of this magnitude. I would discuss it with the staff, because each of them were directly affected by it. But I was away at the time. I knew this was something that I was going to deal with.

**Q.** When you were away did you have access to e-mail?

**A.** I always have access to e-mail, right.

**Q.** Did you feel -- After having viewed these videos that Dr. Fagal posted, did you feel that Dr. Fagal posed an immediate harm to himself?

**A.** I think that, you know, the first thing I thought was this was totally contrary to what it means to be a tenured Professor at Marywood University. And then I began to think about all the

other elements of policy that were a part of it. And I think that when you talk about the harm, I think my sense of harm was harm to the University and all that it stands for; harm to the people who were being defamed in this. And, you know, distortion of things like basic collegial relationships toward the people with whom you work; administrative Officers. Civil rights in the sense of, you know, identifying a particular group that then is looked upon in a discriminatory way. I think professional standards of professional behavior. I mean, these are the thoughts that, you know, were going through my mind then, and they are the thoughts that go through my mind now as this is brought back to me. And I can experience it vividly, it affected me because it distorted everything we stand for.

**Q.** Did you feel like the videos after you first saw them posed an immediate harm to the Marywood community?

MS. PEET: Objection, asked and answered.

THE WITNESS: I think I already answered that question.

BY MR. COHEN:

**Q.** Well, I think you testified --

52

**A.** I think it was highly offensive, and actually in a sense defamed the essence of what we're all about.

**Q.** Did you feel like it had to be dealt with immediately?

**A.** I felt it had to be dealt with, but, you know, I don't know where I was at the time. And I knew that that was going to be something personally that I would deal with as President. When you're President, the buck stops there.

**Q.** Did you feel like this -- the creation and posting of the videos was an emergency, created an emergency for Marywood?

**A.** I don't know that I would put that word on it. It's something very serious, something offensive, something that had to be dealt with, and dealt with in a very strong and direct manner.

**Q.** But not necessarily immediately?

MS. PEET: Objection, asked and answered.

BY MR. COHEN:

**Q.** You can answer.

MS. PEET: She already answered.

MR. COHEN: So are you not going to answer again?

61

1      A.     I think that Dr. Levine was very
2  offended.
3      Q.     Did anyone else express interest in
4  litigation at that meeting?
5      A.     I think that Mr. Garvey was offended,
6  too. You know, it was a very emotional meeting. It
7  could've been even a nod of the head, I don't recall,
8  except I remember that that stuck in my head, and it
9  gave me a sense of how offended. When one feels
10  discriminated against, one reacts intensely. I've
11  seen lots of examples of that in my life.
12     Q.     Okay. So I asked you about the steps
13  that were taken by you after your return to campus
14  regarding the videos. We just discussed a meeting of
15  the Executive Cabinet, right?
16     A.     Um-hum.
17     Q.     And we talked a little bit about Dr.
18  Levine's reactions to the videos. Did Dr. Levine
19  recommend that Professor Fagal be suspended?
20     A.     I don't remember a specific statement,
21  but we were in accord that this needed to be dealt
22  with, and that this was very serious, and I would
23  deal with the consequences. Everybody agreed with
24  that.
25     Q.     You keep saying you don't remember

62

1  explicitly, but did anyone --
2      A.     Well, in my mind -- you know, you're
3  asking me to remember conversations five years ago,
4  which is very difficult, and I'm very -- I want to be
5  as thoughtful as possible, and as accurate as
6  possible, which is what I'm trying to do here. I
7  just know that this was so serious to me that this
8  was going to be a suspension. Do I remember the
9  exact words that may have taken place in our
10  discussion of this, I can't give you an exact sense
11  of it. But I know that this for me was so serious,
12  and so egregious that it was going to have
13  consequences of a serious nature.
14     Q.     Okay. So you can't remember the exact
15  words verbatim?
16     A.     Right. But I had come to the
17  conclusion that this was -- this is something for
18  which the individual concerned should be suspended.
19  But I wanted to talk to that person with every
20  benefit of the doubt to give Dr. Fagal the
21  opportunity to talk to me about why these videos were
22  done.
23     Q.     So just to be clear, you don't remember
24  explicitly whether Dr. Levine recommended the
25  suspension of Dr. Fagal, correct?

63

1      A.     I would recall that Dr. Levine, and
2  everybody else there, was in accord with me for doing
3  -- making sure that the consequences of such action
4  would be pursued. That's my recollection of the
5  meeting.
6      Q.     And nobody specifically explained what
7  those consequences would be?
8          MS. PEET: Objection. She just
9      said this happened five years ago, she
10     doesn't remember. That's the take away
11     that she remembers.
12         THE WITNESS: Right. I remember
13     the intensity of my awareness that there
14     would be consequences, and suspension
15     was a consequence. What I said at that
16     meeting, I don't recall.
17  BY MR. COHEN:
18     Q.     Right, and I wasn't just -- I don't
19  want to know just what you said at the meeting.
20     A.     Well, everybody was pretty much in
21  support of -- everybody was highly offended by this.
22     Q.     Everybody was pretty much in support of
23  what?
24     A.     Of whatever action would be taken for
25  this egregious offense.

64

1      Q.     Everyone was in support of whatever you
2  wanted to do with regard to discipline, or -- I'm
3  trying to get at specifics. And I realize this is a
4  long time ago.
5      A.     Sir, this is five years ago, and it's
6  very hard for me to try to -- I mean, I have 10
7  people that I'm meeting on the Cabinet level, 9
8  people. And I just know that I had -- that everyone
9  on the Cabinet, Executive Officers were highly
10  offended by this, saw it as an egregious affront to
11  what Marywood stands for, and that it needed to be
12  dealt with accordingly.
13     Q.     So I understand you were the President,
14  and there are Executive Cabinet Officers beneath you.
15  Did anyone on that Cabinet have the authority to
16  discipline Professors without a green light from you?
17  I'm not talking just about Professor Fagal. But does
18  anyone on the Executive Cabinet have the authority to
19  discipline Professors without seeking you out first?
20     A.     Okay. In University, in academe, okay,
21  there are a lot of layers. And there are cases, for
22  example, where let's say a Professor's teaching
23  performance is very, very poor. Well, you know, a
24  lot of that doesn't rise to the President. Like a
25  Dean will make an appropriate judgment, the Academic

1    MR. COHEN: Are you directing your
2  client not to answer?
3        MS. PEET: I am. At this point I
4  am.
5  BY MR. COHEN:
6    Q.    Was it common or routine to provide an
7  employee that you were considering disciplining
8  approximately 15 minutes notice before meeting with
9  them?
10       MS. PEET: Objection to the
11  question. You can answer.
12       THE WITNESS: I wanted to talk to
13       Dr. Fagal, and this was the way in which
14       it was arranged so that I could meet
15       with him directly because of the
16       importance of this matter, and that was
17       the circumstances under which it
18       occurred.
19  BY MR. COHEN:
20    Q.    I understand that that's what happened.
21  My question was different. Was it -- Was this
22  standard operating procedure to provide a Professor
23  that you were considering disciplining with only
24  15 minutes notice of meeting with you?
25       MS. PEET: Objection to the form.

1  BY MR. COHEN:
2    Q.    I don't think you've answered yet, I
3  mean.
4    A.    I guess what I would say is, is in my
5  experience as President, this was a circumstance that
6  rose to a level that I had not experienced. And I
7  was attempting to deal with it in a proactive way
8  that would enable me to deal with something of this
9  magnitude. And that's what this refers to.
10    Q.    I understand that. But I still don't
11  think you've answered the question, and I think I'm
12  entitled to an answer.
13    A.    Well, then can you rephrase it in a way
14  that I'm able to understand what it is you're trying
15  to evoke as a response?
16    Q.    I'm not looking for any particular
17  response. I just want an answer to the question,
18  which is was it routine or standard to provide only
19  15 minutes notice to an employee of a meeting with
20  you, who you were considering disciplining?
21       MS. PEET: Objection to the form,
22       asked and answered. She already said
23       this was a very unique experience she
24       never dealt with before.
25  BY MR. COHEN:

1    Q.    I believe it was asked, it wasn't
2  answered.
3    A.    It was an event that was -- I've never
4  had an event like this, this was a one-time event.
5    Q.    So the answer would be no, not --
6       MS. PEET: It's asked and
7       answered. You might not like what she
8       testified to, but the question has been
9       asked and answered to its completion.
10  BY MR. COHEN:
11    Q.    Did you deliberately give Professor
12  Fagal only 15 minutes notice of the meeting, as
13  opposed to a longer period of time; was that like a
14  specific thing you were planning?
15       MS. PEET: Objection to the form.
16       You can answer.
17       THE WITNESS: It was appropriate
18       for Dr. Foley to contact Dr. Levine[sic]
19       to ask him to come to see me, that's how
20       it worked out.
21  BY MR. COHEN:
22    Q.    Okay, that's still not an answer to the
23  question. Do you remember specifically choosing to
24  only give a short amount of notice to Professor Fagal
25  of this meeting?

1       MS. PEET: Objection to the form
2       of the question, but you can go ahead
3       and answer.
4       THE WITNESS: You know, honestly,
5       I don't remember all of the nuances of
6       timing here. I just knew my goal was to
7       spend time with Dr. Fagal and that, you
8       know, the appropriate person to let him
9       know I wanted to see him was Dr. Foley.
10       And, you know, I don't remember spending
11       time thinking about time elements.
12  BY MR. COHEN:
13    Q.    Okay. Can you state in as much detail
14  as you can what was stated at that meeting, including
15  you, Professor Fagal, anyone else at that meeting?
16    A.    Well, I know that when I asked Dr.
17  Foley and Dr. Dunleavy to come to that meeting, it
18  was not really to participate in the meeting. I just
19  felt that as Dean, you know, Dr. Foley's presence was
20  important. And Dr. Dunleavy as Associate
21  Vice-President for H.R. was present, and then I asked
22  her to take notes so I would have a record of the
23  meeting.
24    Q.    I understand. But you were at the
25  meeting?

89

1      A.    I was at the meeting, and I led the

2   meeting.

3      Q.    So, presumably, you know in some part

4   at least what was said and what wasn't said at the

5   meeting?

6      A.    Oh, I definitely do, yes.

7      Q.    Can you --

8      A.    I can do that.

9      Q.    Can you recount that as best you can?

10     A.    Yes.

11     Q.    And preferably in chronological order.

12  I realize --

13     A.    I shall try. I shall try. This is

14  five years ago, but I shall try.

15     Q.    And I'm not asking you -- I do not

16  expect verbatim -- a verbatim accounting.

17     A.    I'll give you my memory.

18     Q.    Okay.

19     A.    Dr. Fagal came into the meeting, and I

20  greeted him. And it was held in my conference room,

21  which is right off the President's office. And I got

22  -- I introduced the topic of the videos, and I asked

23  him -- I remember asking him if he had been the

24  author of these videos, and he said yes.

25         And then I -- you know, for me these

90

1   videos were a violation of the responsibilities of a

2   tenured Professor. So I asked him to explain to me

3   how these videos related to or supported his role as

4   a tenured Professor at Marywood University, and he

5   did not answer that. And I know that I waited. I

6   think I asked the question a few different ways, and,

7   you know, he didn't answer that.

8          I remember that he started at one point

9   to talk about posters. I said, I'm not here to talk

10  about posters, this is about the videos. I am

11  wanting to know about these videos. And, you know,

12  again he didn't answer.

13         I said -- I remember, you know, because

14  I had prepared for this meeting, and I looked at a

15  lot of the policies that are related to the faculty

16  and the personnel. And to me this was a violation, a

17  breach of what it means to be a tenured Professor at

18  Marywood, and that doing this violated -- because it

19  talks about upholding the mission and values of the

20  institution very clearly in the description of what

21  that tenure means.

22         And when I related that question

23  again -- there were several times that, you know, I

24  gave him the opportunity to talk about that. I

25  mentioned that -- again, I started to talk about the

91

1   violation, that I felt in addition to the tenure that

2   for me this was a violation of the civil rights of my

3   colleagues, especially Dr. Levine, who is Jewish.

4   And, you know, implicating family members; I spoke to

5   discrimination and collegiality.

6          I referenced academic freedom, because

7   in our academic freedom policy it's very, very clear

8   that one exercises academic freedom in accord with

9   the propriety of the discipline professionally, with

10  due respect to the opinions of others. And, you

11  know, there certainly wasn't anything scholarly about

12  these videos, they were defaming people.

13         So I was trying to just say just look

14  at all of the things that are involved here. I

15  talked about the professional ethics policy that we

16  have at the University that talks about, you know,

17  non-discrimination, and collegiality, and various

18  other elements.

19         I was also concerned about our computer

20  use, use of computers, because this video was sent to

21  faculty members at their Marywood address. And I

22  believe there were students, because I know students

23  had also seen it.

24         And then, you know, when you think

25  about the mission and the core values, you know,

92

1   foundational to all of our core values is respect,

2   and I talked about that at that meeting. And, you

3   know, I remember at one point just saying, "Why did

4   you do this?" And the only answer I remember was Dr.

5   Fagal said, "Justice." And I thought well, you know,

6   look at all these other areas, you know. When you're

7   talking about tenure, civil rights, or professional

8   ethics, or use of computers, appropriate use of

9   computers, you know, for something that flies in the

10  face of what we stand for. I was just trying to have

11  a basic conversation about that.

12         At one point I know Dr. Fagal was

13  getting ready to leave, and I said, "I'm not

14  finished." "This is our opportunity to talk about

15  this." And he did not leave, you know, he stayed

16  there.

17         And when I didn't get, you know,

18  anything -- there was no, you know, I'm sorry I did

19  it, or I wish I didn't do this, or, you know, no

20  effort to say, oh, I didn't think about the impact

21  this might have on Alan Levine, or on anybody else;

22  there was none of that.

23         There was this, you know, continued

24  resistance to giving me any explanation that would

25  carry any sway as to in any way make me think that

93

1  this wasn't, you know, a spur of the moment, or
2  ill-conceived, or something that I really didn't mean
3  to do, or none of that ever -- there was nothing like
4  that that came out in that meeting.
5          So I went on and I said, all right,
6  you're suspended.  And that means that you turn in
7  your keys.  And, you know, I asked to verify as this,
8  you know, says, your home address, a way in which I
9  could reach him, and that there would be follow-up.
10     Q.    Okay.
11     A.    That's the basis probably of my -- but
12  there was at no time in any way, any effort on Dr.
13  Fagal's part to any way say that he regretted doing
14  it, or that he thought -- you know, would look at it
15  another way, or would do anything in the future to
16  make up for this, or anything like that, anything of
17  that nature.  So he left after I said that.
18     Q.    At what point in the meeting did you
19  actually state that to Professor Fagal, you're
20  suspended; was it towards the end, middle, beginning?
21     A.    Oh, it certainly wasn't at the
22  beginning, because in the beginning I was trying to,
23  you know -- it was probably at the end, you know.  I
24  can't give you an absolute sequence, again, five
25  years ago, but I know that's where I got to, because

94

1  that's what I felt this action -- I think it was of
2  such magnitude that this was the -- there needed to
3  be a consequence for it.
4      Q.    Isn't it true that -- okay.  So you
5  testified that you provided Professor Fagal with an
6  opportunity to explain the nature of the video,
7  correct?
8      A.    Several times.
9      Q.    And isn't it true that Professor Fagal
10  did attempt to explain the larger context of the
11  video, but he was cut off?
12     A.    I don't think that's a fair
13  characterization.  Dr. Fagal started to talk about
14  posters.  And I said, we're not here to talk about
15  the posters.  This is what we're here to talk about,
16  the videos.  And the videos are what was done that
17  was a total affront to all that Marywood stands for,
18  that's what I was there to talk about.
19     Q.    But wasn't it true that the video was
20  related to the posters?
21         MS. PEET:  Objection, lack of
22     competency.
23         THE WITNESS:  The videos were a
24     gratuitous extension of whatever was the
25     rationale for whatever Doctor's behavior

95

1  was.  I don't know, I can't get guess
2  that.  I was reacting to the videos as
3  President, because of the impact on the
4  total University, the impact on our
5  students, the impact on our Cabinet, and
6  the impact on all that we stand for.
7  BY MR. COHEN:
8      Q.    Isn't it also true that Professor Fagal
9  at the meeting stated that he would like an
10  opportunity to craft a written response to your
11  questions?
12     A.    That may have happened, yes.
13         MR. COHEN:  Can we mark this as
14     Munley 8.
15         (At this time, Munley Deposition
16         Exhibit 8 was marked for
17         identification.)
18  BY MR. COHEN:
19     Q.    And, Sister, do you recognize this
20  document that is in front of you?
21     A.    I don't think so.  They're notes,
22  obviously.
23     Q.    Is this your handwriting?
24     A.    No.
25     Q.    Do you recognize this as Dr. Dunleavy's

96

1  handwriting?
2      A.    It's probably that, yes; dot the I's.
3  Okay.
4      Q.    I'm sorry?
5      A.    Yeah, I think it is Dr. Dunleavy's,
6  yes.
7      Q.    But you've never seen this before?
8      A.    I don't recall this.
9      Q.    Okay.  Does this appear to you to be
10  Dr. Dunleavy's, you know, contemporaneous notes of
11  the January 23rd, 2012 meeting?
12         MS. PEET:  Objection, that would
13         call for speculation.  She just
14         testified she doesn't recall this.  But
15         you can go ahead an answer, if you know.
16         THE WITNESS:  It looks like the
17         flow of the meeting.
18  BY MR. COHEN:
19     Q.    Okay.  Do you see on the first page,
20  about three-quarters of the way down it says, "F -
21  writing - he'll craft response"?
22     A.    See, I don't know what that means,
23  he'll craft that, because I don't recall the elements
24  of that.
25         MR. COHEN:  Okay.  In that case,

97

1          let's move on to a new document.
2    BY MR. COHEN:
3          Q.    Do you know if there is any audio or
4    video recording of the meeting?
5          A.    No, I never do that.
6          Q.    You never do that you said?
7          A.    I don't.  I know there would not have
8    been an audio or video recording.
9          Q.    And is it true that there was another
10   individual named David Elliott in the Presidential
11   suite at the time of this meeting?
12         A.    Yes, there was.
13         Q.    Was he listening in?
14         A.    No.
15         Q.    Was he just like in the next room?
16         A.    I don't know exactly where he was.
17   But, you know, when I have meetings of this nature I
18   never know what dynamic is going to occur.  So I
19   think that was standard, you know, policy of having
20   somebody accessible in the event that any assistance
21   would be needed; and I didn't, no.
22         Q.    So other than you, Mr. Foley --
23         A.    Dr. Foley.
24         Q.    -- Dr. Foley, Dr. Dunleavy and
25   Professor Fagal, you don't know of any other

98

1    witnesses to the meeting?
2          A.    Absolutely nobody else, no.
3          Q.    And I'm not suggesting any, I just want
4    to -- for discovery purposes I want to make sure I
5    cover all the bases.
6          A.    Yes, right.
7          Q.    So the suspension happened -- This
8    meeting happened in the morning of January 23rd,
9    2012, right?
10         A.    Yes, 9 o'clock, yes.
11         Q.    And at the time -- and you did suspend
12   him during the meeting?
13         A.    I did.  And I suspended him with pay.
14         Q.    Right.  At the time that you suspended
15   Professor Fagal, did you feel like he posed immediate
16   harm to himself or to others if he continued to serve
17   in his position?
18         A.    The harm for me was the harm to the
19   institution, to its mission, to the values, to the
20   identity, the whole purpose for which we exist; I
21   felt it was egregiously offended, that was the harm.
22               And I think I said earlier that you,
23   know, like harm to Dr. Fagal, that he would harm
24   himself did not enter into my mind, that's not in my
25   realm of memory.

99

1          Q.    Did it occur to you that he might be --
2    that he might be a physical threat to someone else
3    other than himself?  Do you remember thinking about
4    that?
5          A.    You know, I don't explicitly recall
6    that.  But, you know, I know that I did take the
7    precaution of having somebody available in the event
8    that there would be any action.
9          Q.    Okay.  So the harm that you think was
10   created by Professor Fagal's video was more of a --
11   you would characterize it as an assault on the values
12   of the University?
13         A.    I think on everything we stand for.
14   That was from my first moment I felt this is just
15   totally a gratuitous, egregious assault on everything
16   that Marywood stands for, and thus affects everybody
17   in the institution.  And explicitly I was very, very
18   upset because of the, you know, personal nature of
19   the attacks, which were not professional in any way,
20   shape or form.  It's not the role model.  It's not
21   what we expect of a tenured Professor at Marywood.
22   And that to me was very harmful.  It's harmful to the
23   profession.  It's harmful to the discipline.  I'm a
24   social scientist.  I think it's harmful to all the
25   disciplines related to, you know, the professional

100

1    level of what is expected.
2          Q.    Did you think that the harm was
3    irreparable, or maybe with time it would pass to the
4    institution?
5          A.    I saw no indication in the time of this
6    meeting that there was anything on Dr. Fagal's part
7    that would indicate a desire to relook at the
8    situation, to say I'm sorry I did it, or, you know,
9    this is not what I intended.  There was nothing like
10   that absolutely.  And so much so that at the very end
11   I remember -- it's always my nature when I'm in a
12   dialogue such as this to go back, "Is there anything
13   further that you want to say?"  I do that repeatedly
14   in meetings.  And there was never anything that
15   indicated to me in the course of that meeting that
16   there was any sense even that -- nothing was
17   communicated to me that there was even awareness that
18   anything that had been done had been offensive.  I
19   found that also quite shocking.
20         Q.    Between the posting of the videos, the
21   time that the videos were posted and the time you
22   suspended Professor Fagal, are you aware of anybody
23   at Marywood taking special security precautions with
24   regard to him, other than Mr. Elliott in the next
25   room during the meeting?

**117**

1   sure that in the time you have that you convey the

2   information. And the Board was really very receptive

3   to the information that I gave them.

4       Q.   Do you know if someone takes like

5   minutes of Board meetings?

6       A.   We do have minutes of Board meetings.

7   If this was -- if this were an Executive session,

8   there would not have been minutes of this.

9       Q.   Who normally takes these minutes?

10      A.   The recording secretary is the Attorney

11  of the University and the secretary of the

12  University. But I don't recall if this was an

13  Executive session; it probably was, I don't know.

14      Q.   And the University's internal Counsel

15  is Ms. Patterson?

16      A.   That's Mary Theresa Patterson, Attorney

17  Mary Theresa Patterson.

18      Q.   Okay. Other than stating that the

19  Board was very receptive to your information, do you

20  remember any other responses they gave to you?

21      A.   Yes, I do indeed. The Board was just

22  appalled, astounded, offended; totally agreeing that

23  this was an egregious, counterproductive measure,

24  discriminatory. I mean, they were really -- they

25  were taken back that a Professor at Marywood out of

**118**

1   our core values and identity and mission, just

2   thought it was also highly inappropriate. They were

3   very offended.

4       Q.   Did the Board direct you to terminate

5   Dr. Fagal, or take any other disciplinary steps?

6       A.   I don't recall that. I just know I had

7   the support for what I was doing from the Board.

8       Q.   Okay. In these talking points that are

9   in front of you, on the third bullet point do you see

10  where it says, "Dr. Dunleavy began collecting

11  information"?

12      A.   Yeah, policy information.

13      Q.   And then the second sub point, "History

14  of Dr. Fagal's performance issues," correct?

15      A.   I didn't get into any -- I wasn't -- My

16  focus was on the videos. I didn't deal with that.

17      Q.   So you didn't -- At this Board meeting

18  you didn't discuss performance issues?

19      A.   No, this is just detailing the steps.

20      Q.   When you drafted these talking points,

21  what performance issues were you referring to, other

22  than the video sent on January 12th, 2012, if any?

23      A.   Well, I wouldn't recall what that would

24  be, that would be a Dr. Dunleavy question.

25      Q.   Okay.

**119**

1       A.   I know that I was -- My goal in the

2   meeting with the Trustees was just to give them what

3   had occurred and what my actions were and why.

4       Q.   On Friday, January 20th, 2012, there's

5   a series of bullet points?

6       A.   Yes.

7       Q.   And one of them says, "Dr. Dunleavy

8   reviewed plan with Mr. Elliott (Senior Director for

9   Security & Safety)." Do you see that?

10      A.   I do see that.

11      Q.   What plan was that?

12      A.   The only plan that I was aware of was

13  that he would be available in the event that we

14  needed somebody.

15      Q.   Available at the January 23rd

16  meeting --

17      A.   Yeah.

18      Q.   -- or available generally?

19      A.   Strikes me as the 23rd, I don't know

20  that there was anything beyond that. You know, once

21  again, it's hard for me to recall all these details.

22      Q.   At the bottom of the first page there's

23  a sub bullet point, it says, "Sister Anne gave Dr.

24  Fagal repeated opportunities to explain his actions

25  with regard to the videos and how they supported any

**120**

1   University policy." And then you said, "Dr. Fagal's

2   only response was to review a November incident re

3   posters for a speaker." Is that correct?

4       A.   Yes, he wanted to talk about the

5   posters. And I said, look it, I'm here to talk about

6   the videos.

7       Q.   That's not -- This is not completely

8   accurate, though, because he ask for an opportunity

9   to craft a written response, correct?

10          MS. PEET: Objection to the form.

11          THE WITNESS: What I understood

12      Dr. Fagal was asking me is, give me your

13      questions in writing and I'll answer

14      them. And I was saying, here I am,

15      let's talk.

16  BY MR. COHEN:

17      Q.   Now?

18      A.   Here I am, let's talk. You're an

19  articulate person.

20      Q.   Okay. So when you said Dr. Fagal's

21  only response, you meant his only response like at

22  the meeting itself contemporaneously?

23      A.   His only response when I would ask him

24  for an explanation the one time was to try to talk

25  about the posters. And I said, look it, the

# EXHIBIT C



Dr Patricia E Dunleavy <dunleavy@maryu.marywood.edu>

# Recommendation for Termination

**Frances D Ferrese** <ferrese@maryu.marywood.edu>                    Thu, Feb 9, 2012 at 9:06 AM
To: fffagal@yahoo.com
Bcc: dunleavy@maryu.marywood.edu

Dear Dr. Fagal,

Please see attached information from Sister Anne Munley, IHM.

--
Frances D. Ferrese
Executive Secretary to the President
Marywood University
Immaculata Hall #107
2300 Adams Avenue
Scranton, PA  18509-1598
Phone:  570-348-6231
FAX:  570-340-6014
E-mail:  ferrese@marywood.edu

---

**10 attachments**

📄 **Fagal 2-08-12.pdf**
231K

📄 **Letter of Agreement 2011-12.pdf**
46K

📄 **Tenure.pdf**
434K

📄 **Civil Rights Policy.pdf**
121K

📄 **Conditions of Computer Use.pdf**
215K

📄 **Academic Freedom.pdf**
96K

📄 **Professional Ethics.pdf**
115K

📄 **Mission & Core Values.pdf**
75K

📄 **U Goals & Objectives.pdf**
95K

📄 **Release.pdf**
31K





# Marywood
### UNIVERSITY

OFFICE OF THE PRESIDENT

MARYWOOD UNIVERSITY
SCRANTON, PA 18509-1598
TEL: (570) 348-6231
FAX: (570) 340-6014
ANNEMUNLEY@MARYWOOD.EDU
www.marywood.edu

February 8, 2012

Dr. Frederick Fagal
17 East Lake Street
Skaneateles NY 13152

Sent via email (fffagal@yahoo.com), certified mail, regular mail

Re:  Recommendation for Termination

Dear Dr. Fagal:

Pursuant to your attorney's request, the following is a revised statement of charges.  As a result of your breach of a material term of your obligations as a tenured professor, I am recommending that your tenure and employment with Marywood be terminated immediately.  The University will, however, pay you the remainder of your 2011-12 Agreement and keep you on benefits through August, 2012.  This recommendation comes after much consideration of and reflection on your actions which I find to be highly offensive and directly contrary to Marywood's Mission and Values, your tenure agreement and your obligation as an employee of this University to conduct yourself in accordance with our policies and values.

As you know, our values include, among others:

- A commitment to spiritual, ethical and intellectual values in the context of a faith community.
- Respect for the value of each human being, for diversity in the context of vibrant community, and for the earth and all creation.

After reviewing the subtitles you authored and transposed onto a film depicting Adolf Hitler and the Nazi regime, I find that you deliberately and maliciously violated our principles and your commitment to this University by:  1) depicting Executive Officers and me in an offensive and hostile light, including making highly inappropriate comments about family members of these individuals; 2) using sexually explicit, offensive and insulting language; and 3) portraying an image of Marywood in a manner that was an affront to the University community as a whole.  As a result, I am recommending that your tenure and employment be terminated and provide you the following Statement of Charges:

1.  Breach of Tenure Agreement

Marywood's tenure policy provides in relevant part:

> It implies a mutual commitment on the part of the faculty member and the University and cannot be taken lightly...Once tenure is granted, it will be discontinued only for grave reason, which may include moral turpitude, flagrant abuse of academic freedom, or professional incompetence...The commitment of a faculty member who requests tenure is as deep and binding on the faculty member as it is on the University. Just as

*An education inspired by the Sisters, Servants of the Immaculate Heart of Mary.*

the conferring of tenure by the University recognizes the competence of an individual faculty member, submission to the University of an application for tenure suggests a strong acceptance by that individual of the mission, goals and objectives of the University. The request represents a commitment to work jointly with faculty, students, administrators and staff for the growth and welfare of the University.

(Emphasis added).

Your decision to author and disseminate the above described video is a breach of your commitment to Marywood and is in direct contravention of the letter and spirit of Marywood's Mission, Core Values and Objectives. To be clear, however, enclosed is a copy of Marywood's Mission, Core Values and Objectives. Depicting the University's President as Adolf Hitler, a man who is responsible for torturing and killing in excess of 6 million people simply because they are Jewish is an intentional, malicious and blatant violation of your tenure commitments. Portraying other University officials as Nazi leaders, using crude and vulgar language and belittling University officials also violates your agreement with Marywood. You gravely injured our community by your actions.

2. **Violation of Civil Rights Policy**

Marywood's Civil Rights Policy provides in relevant part:

Marywood University does not condone and will not tolerate discrimination, harassment, or assault by any member of the Marywood community upon another individual, regardless of whether the action is based on race, sex, color, national or ethnic origin, age, creed, ancestry, religion, disability, or any other legally protected status.

In your video, not only do you attempt to make light of the Nazi regime, which evokes deep personal reminders of the extreme hate of members of the Jewish faith, but you also demean and belittle Dr. Levine and his family and launch other personal attacks on executive officers. Harassment of this type directly violates our Civil Rights Policy and will not be tolerated.

3. **Violation of Marywood's Conditions of Computer Use Policy**

Marywood's Conditions of Computer Use policy provides in relevant part:

Users of Marywood University computing facilities and services are held to high ethical standards. These conditions of use are based on the "spiritual, ethical and religious values and a tradition of service" expressed in the Mission Statement of the University. They underscore responsible, ethical, legal, and secure use of the campus-wide information system, and they derive from standards of common sense and common decency that apply to any shared resource. Responsibility extends to access, use of information, and distribution of data.

Marywood University administrators, faculty members, staff, and students may use the computers in all public computing facilities for research work and classroom assignments...

Access to the Marywood computer system is not a right, but a privilege. When individuals log on to the University's computer system, they become responsible for adhering to University policy and state and federal laws governing individual privacy rights and confidentiality. The following list is not all-inclusive: [and includes the following:

- They honor the intellectual rights of others by avoiding copyright infringement. This includes all Marywood University-owned computers, i.e., computers purchased with University funds.
- They do not make or use unauthorized copies of copyrighted or licensed programs or data. They only use authorized copies in full accord with the license agreement and national and international laws.
- They respect the civil rights of others to an open and hospitable environment, regardless of race, sex, color, national or ethnic origin, age, creed, ancestry, religion, disability, or any other legally protected status, and with respect to sexual harassment including e-mailing inappropriate messages.

Clearly you used Marywood's system by emailing to members of its community the above described video using their Marywood email accounts. In doing so, it appears that you used violated copyright laws associated with the use of a copyrighted video, although you are free to prove to us that you obtained permission from the owners of that copyright to publish the video. Even if you did obtain the requisite permission, you failed to respect the civil rights of others by your conduct. I believe I have sufficiently described this conduct above.

### 4. Violation of Academic Freedom Policy; Professional Ethics Policy and University's Mission and Values as well as the principles of collegiality.

I have attached a copy of your 2011-12 Letter of Agreement and the above policies so that you have them. They can also be found on our website. As an initial matter, your video is not in furtherance of any scholarly pursuit and was clearly not intended to be part of an academic exercise. Nevertheless, even if it were, our policy provides that academic freedom "presupposes, first of all, personal integrity in dealing with students, peers and officers of the University. Second, it presumes scholarly competence, observance of the professional standards of one's discipline, commitment to the stated mission of the University..." As detailed above, your email and video is devoid of personal integrity, has no scholarly competence and is in total disregard of the stated mission of the University.

I hope you will take the time to read the Professional Ethics Policy. In it you will find that you had a "special responsibility," "obligations" to the Marywood community and the obligation to not discriminate or harass your colleagues. Once again, you violated these policies and instead chose to invoke images of hatred and to ridicule your colleagues. Further, as set forth in detail above, you violated Marywood's Mission and Values which are at the core of what this University and all for which this community stands.

As a result of this recommendation, I am prepared to send this statement of charges to a duly appointed faculty committee for review along with the emails and videos you forwarded to members of our community. In order to do so and out of respect for your privacy, I would ask that you please sign and return to me the attached authorization granting the University permission to do so. That faculty

committee may agree or disagree with my recommendation.  Once I receive the review committee's determination, I will finalize my decision.  Should you choose to forego that faculty review, I will finalize my recommendation based upon my own findings and conclusions.

Please respond no later than Friday, February 17, 2012.

If you have any questions regarding this matter, you may direct them to me or to Dr. Dunleavy.

Very truly yours,

Sister Anne Munley, IHM
President

Enclosures:
2011-12 Letter of Agreement
Tenure Policy
Civil Rights Policy
Conditions of Computer Use Policy
Academic Freedom Policy
Professional Ethics Policy
Marywood University Mission and Core Values
Release of Personal Information Authorization Form



## Marywood
UNIVERSITY

Tenured Faculty
Letter of Agreement
2011-2012 Academic Year

May 10, 2011

Dr. Frederick F. Fagal, Jr.
17 East Lake Street
Skaneateles, NY 13152

Dear Dr. Fagal, Jr.,

This Letter of Agreement is offered to you for the 2011-2012 Academic Year.  In accord
with the agreed upon Salary Plan, your salary reflects a 2.5% annual increase of
$1,858.00.

Other terms of this agreement are as follows:

| | |
|---|---|
| Term: | 8/22/2011 to 5/18/2012 |
| Type of Appointment: | Full-Time (9 months). Tenure |
| Rank: | Associate Professor |
| College: | Liberal Arts & Sciences |
| Department: | Social Science |
| Responsible to: | Department Chairperson |
| Salary: | $76,196.00 |

Faculty members must apply for benefits other than Social Security and Worker's
Compensation through the Human Resources Department.  Full-time faculty benefits include
health, dental, long-term disability, group life, and accidental death and dismemberment
under the Flexible Benefits Plan.  Elections are made by June 1 of each year for the
subsequent fiscal year beginning July 1.  Retirement contributions by the University vary
based on the contribution level selected by the faculty member.  The appropriate
government forms, including Form W-4 and I-9, must be completed and on file in the Human
Resources Department.

This agreement is valid for one month from the date of this letter.  The original copy of
this Letter of Agreement must be signed and returned to my office by June 10, 2011.  If
you do not return the original signed copy by June 10, it will be assumed that you are
not returning to Marywood.  On behalf of the Board of Trustees and myself, I express our
gratitude for your dedicated service and commitment to Marywood University.  May God
continue to bless you.

Sincerely,                                    Agreed this 25 day of May, 2011

*Sister Anne Munley, IHM*

Anne Munley, IHM, Ph.D.                       Signature *Frederick F. Fagal, Jr.*
President



# Policies and Procedures Manual: Civil Rights Policy

## Policy Statement

Marywood University declares and reaffirms a policy of equal educational and employment opportunity and non-discrimination in the provision of educational and other services to the public. Marywood University does not condone and will not tolerate discrimination, harassment, or assault by any member of the Marywood community upon another individual, regardless of whether the action is based on race, sex, color, national or ethnic origin, age, creed, ancestry, religion, disability, or any other legally protected status. Marywood University will make reasonable accommodations to known physical or mental limitations of otherwise qualified individuals with disabilities unless doing so would impose an undue hardship on the University. Any person who believes he or she may require such accommodation should contact the Assistant Vice President for Human Resources and Affirmative Action Officer.

Marywood University is committed to take all necessary steps to comply with any obligations it may have under Section 504 of the Rehabilitation Act, the Americans with Disabilities Act, and Title IX of the Civil Rights Act of 1964, as amended. These are explicit civil and legal applications of the formulation of beliefs already cherished in Marywood's religious commitment, objectives, and practices.

## Definitions

*Sexual Harassment*

Marywood University adopts the following definition of sexual harassment based on the statement endorsed by the American Association of University Professors, revised June 1995, and considers it applicable to the entire Marywood community:

Sexual advances, requests for sexual favors, and other conduct of a sexual nature constitute sexual harassment when:

1. such advances or requests are made under circumstances implying that one's response might affect academic or personnel decisions that are subject to the influence of the person making the proposal; or
2. such speech or conduct is directed against another and is either abusive or severely humiliating and/or persists despite objection of the person targeted by the speech or conduct; or
3. such speech or conduct is reasonably regarded as offensive and substantially impairs the academic or work opportunity of students, colleagues, or co-workers. If it takes place in the teaching context, it must also be severe, pervasive, and not germane to the subject matter. The academic setting is distinct from the workplace in that wide latitude is required for professional judgment in determining the appropriate content and presentation of academic material.

*Sexual Assault*

Sexual assault is defined as threats of, or deliberate physical contact of a sexual nature that is against another person's will or without consent. Examples of such behavior include, but are not limited to the following:

1. deliberate physical contact of a lewd type, including brushing, touching, grabbing, pinching, patting, hugging and kissing;
2. deliberate or reckless threats, actual or implied, of physical contact of a sexual nature that results in reasonable fear of sexual assault or physical harm;
3. coerced sexual activities, including rape. Rape, the most severe type of sexual assault, is legally defined in Pennsylvania as sexual intercourse that is coerced through force or threats of force, or with someone who is unconscious or with someone who is so mentally deranged or deficient as to be incapable of consent.

## Procedures

In furtherance of Marywood University's commitment to its duties and obligations, regular training on harassment, discrimination and related topics is provided for managers and supervisors in the Marywood community.

A list of Marywood University and community resources is available at the Human Resources Office.

## History

11/03/97 - Reaffirmed by Board of Trustees and Members of the Corporation
04/15/00 - Revision approved by the Board of Trustees

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu



# Policies and Procedures Manual: Conditions of Computer Use

## Policy Statement

Users of Marywood University computing facilities and services are held to high ethical standards. These conditions of use are based on the "spiritual, ethical and religious values and a tradition of service" expressed in the Mission Statement of the University. They underscore responsible, ethical, legal, and secure use of the campus-wide information system, and they derive from standards of common sense and common decency that apply to any shared resource. Responsibility extends to access, use of information, and distribution of data.

Marywood University administrators, faculty members, staff, and students may use the computers in all public computing facilities for research work and classroom assignments. Within the limitations of lab scheduling, students have priority over others for use of the facilities. Anyone who is not a currently enrolled student or employee may use the public facilities only at the discretion of University staff. Marywood University does not assume any liability for data loss. Those who use its computers do so at their own risk. Use of administrative computers is authorized with the permission of the appropriate department head.

Access to the Marywood computer system is not a right, but a privilege. When individuals log on to the University's computer system, they become responsible for adhering to University policy and state and federal laws governing individual privacy rights and confidentiality. The following list is not all-inclusive:

1. They respect the privacy of others by not attempting to access their accounts or tampering with their data.

2. They honor the intellectual rights of others by avoiding copyright infringement. This includes all Marywood University-owned computers, i.e., computers purchased with University funds.

3. They respect the policies and procedures of external networks, such as the Internet and systems that can be accessed via the Internet.

4. They do not make or use unauthorized copies of copyrighted or licensed programs or data. They only use authorized copies in full accord with the license agreement and national and international laws.

5. They do not attempt to bypass any security system in order to access privileged information or alter existing interfaces.

6. They do not develop or use programs, transactions, data, or processes that harass other users, infiltrate the system, or damage or alter data or software.

7. They do not develop or use mechanisms to alter University records.

8. They do not load or use personal or existing programs that affect the stability of systems, or use programs in an attempt to hinder or harass others.

9. They do not load software in classroom or computer labs, drop-in facilities, or other University-owned computers.

10. They use only their own User ID and password; rights to individual accounts are not transferable. All members of the University community are responsible for securing their passwords. All passwords are to be treated as confidential University information.

11. They respect the civil rights of others to an open and hospitable environment, regardless of race, sex, color, national or ethnic origin, age, creed, ancestry, religion, disability, or any other legally protected status, and with respect to sexual harassment including e-mailing inappropriate messages.

12. They do not use University owned or operated computers for a personal business.

13. They do not open or download pornographic materials or other materials that violate the Mission Statement of the University.

14. They use resources efficiently, avoiding printing large amounts of unnecessary information or downloading files for long periods of time.

15. They do not damage or alter equipment or software either physically or with a virus. They do not bring food or drink into computer labs, drop-in areas, near computers or computer-related equipment.

16. They abide by an instructor's requirements for computer use, including participation in an on-line course or in a listserv. They honor an instructor's right to allow or disallow use of a computer while the room is in use for instructional purposes. They do not disrupt a class that is being held in a computer lab or other technologically oriented facility, such as broadcast studio or video conferencing room.

Marywood University reserves the right to monitor and record any action performed while using the computer system. An audit trail is kept by system management software. If it is determined that use is contrary to Marywood policy, the appropriate department may examine the user's actions. If computing staff members suspect that any of these conditions are being violated, staff will initiate an investigation through the appropriate agency on campus. During the investigation, the account in question and all computing services may be suspended.

Privacy is neither a goal nor a condition of the University's computing system. There is not an expectation of privacy with regard to the information stored on University-owned or operated computers or, when applicable, other computers attached to the Marywood University network; and there are no specific laws, rules, or regulations that protect the privacy of a user's files, electronic mail messages, or any other information retrieved as a result of a person's session on the Marywood system.

While Marywood University respects an individual's privacy whenever possible, it does have and will exercise its right to examine a University-owned or operated computer and its contents if there is a reasonable indication that it has been used to download or store illegal materials, such as pornography or illegal software.

Marywood University reserves the right to report suspected criminal offenses to civil authorities. Institutional disciplinary charges may be filed in addition to civil actions.

These conditions of use have been established for the protection of all users but provide neither absolute security nor unqualified privacy.

## Definitions

System is used in a generic sense to refer to the aggregate of all hardware and software owned or licensed by Marywood University, including the network.

As a general matter, copyright infringement occurs when a copyrighted work is reproduced, distributed, performed, publicly displayed, or made into a derivative work without the permission of the copyright owner.

## Procedures

Contact the Office of Information Technology with questions about

- computer network support of instructional, research, and service activities;
- computer network support of administrative activities;
- voice and data network design and maintenance, desk-top computer repairs and installations.

## Related Policies

- Website Policy
- University Website Policy

## Related Committees

Technology Advisory Committee
Academic Computing Advisory Committee

## History

01/10/97 - Recommended to the President by the College Committee on Policy
02/06/97 - Approved by the President of the University with publication of The President's Memo
04/17/04 - Revision approved by the President of the University as recommended by the Policy Committee of the University
02/20/09 - Procedures changed in order to direct all questions to the Office of Information Technology

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu



## Policies and Procedures Manual: Academic Freedom

### Policy Statement

Marywood University affirms its commitment to academic freedom. In so doing, it reaffirms its commitment to the tradition of higher learning that is the heritage of both the Roman Catholic Church and the nation. It is a tradition grounded on respect for truth, social responsibility and individual rights. It is a tradition that posits freedom of inquiry, open discussion and unrestricted exchange of ideas as essential to the pursuit of knowledge.

Marywood University upholds academic freedom as a fundamental condition for research and dissemination of information. The University is a center of discourse where inquiry is encouraged and discoveries are verified and refined by the interaction of scholar with scholar. Marywood University respects the right and responsibility of its faculty and students to conduct research, to publish their findings, and to discuss ideas according to the principles, sources and methods of their academic disciplines. These principles, sources and methods, as they develop over time, are not external to their respective disciplines. The University sanctions and encourages investigation of unexplored phenomena, advancement of knowledge, and critical examination of ideas, old and new. The University accepts the responsibility of protecting both teacher and student from being forced to deny truth that has been discovered or to assert claims that have not been established in the discipline. Teachers are entitled to freedom in the classroom in discussing their subject, but they should be careful not to introduce into their teaching material matter that has no relation to their subject.

Where the faculty is concerned, academic freedom presupposes, first of all, personal integrity in dealing with students, peers and officers of the University. Second, it presumes scholarly competence, observance of the professional standards of one's discipline, commitment to the stated mission of the University, and openness to having one's ideas and findings subjected to the judgment of one's peers. Third, faculty members have a responsibility as professional scholars to be accurate and judicious in their public statements, and respectful of the opinions and responsibilities of others.

### Related Policies

- Professional Ethics
- Evaluation of Faculty Members
- Faculty Status

### Related Committees

Institutional Review Board for the Protection of Human Participants

## History

12/01/79 - Reaffirmed with publication of *Faculty Manual*
07/01/93 - Introduction and postscript added
07/01/03 - "Human Subejcts" changed to "Human Participants"
02/19/10 - Revision approved by the President of the University as recommended by the Policy Committee of the University

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu



# Marywood
UNIVERSITY

## Policies and Procedures Manual: Professional Ethics

### Policy Statement

The American Association of University Professors recognizes that membership in the academic profession carries with it special responsibility. The Statement on Professional Ethics that follows sets forth general standards assumed by members of the profession.

Professors, guided by a deep conviction of the worth and dignity of the advancement of knowledge, recognize the special responsibilities placed upon them. Their primary responsibility to their subject is to seek and to state the truth as they see it. To this end, professors devote their energies to developing and improving their scholarly competence. They accept the obligation to exercise critical self-discipline and judgment in using, extending, and transmitting knowledge. They practice intellectual honesty. Although professors may follow subsidiary interests, these interests must never seriously hamper or compromise their freedom of inquiry.

As teachers, professors encourage the free pursuit of learning in their students. They hold before them the best scholarly and ethical standards of their discipline. Professors demonstrate respect for students as individuals and adhere to their proper roles as intellectual guides and counselors. Professors make every reasonable effort to foster honest academic conduct and to assure that their evaluations of students reflect each student's true merit. They respect the confidential nature of the relationship between professor and student. They avoid any exploitation, harassment, or discriminatory treatment of students. They acknowledge significant academic or scholarly assistance from them. They protect their academic freedom.

As colleagues, professors have obligations that derive from common membership in the community of scholars. Professors do not discriminate against or harass colleagues. They respect and defend the free inquiry of associates. In the exchange of criticism and ideas, professors show due respect for the opinions of others. Professors acknowledge academic debt and strive to be objective in their professional judgment of colleagues. Professors accept their share of faculty responsibilities for the governance of their institution.

As members of an academic institution, professors seek above all to be effective teachers and scholars. Although professors observe the stated regulations of the institution, provided the regulations do not contravene academic freedom, they maintain their right to criticize and seek revision. Professors give due regard to their paramount responsibilities within their institution in determining the amount and character of work done outside it. When considering the interruption or termination of their service, professors recognize the effect of their decision upon the program of the institution and give due notice of their intentions.

As members of their community, professors have the rights and obligations of other citizens. Professors measure the urgency of these obligations in the light of their responsibilities to their

subject, to their students, to their profession, and to their institution. When they speak or act as private persons, they avoid creating the impression of speaking or acting for their college or university. As citizens engaged in a profession that depends upon freedom for its health and integrity, professors have a particular obligation to promote conditions of free inquiry and to further public understanding of academic freedom.

## Related Policies

- Teaching Responsibility
- Librarianship Responsibility
- Faculty Status

## History

07/01/89 - Reaffirmed with publication of Faculty Manual

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu

http://www.marywood.edu/president/core-values.html



## President's Page: Marywood University Mission & Core Values

### Mission Statement

A Catholic university sponsored by the Congregation of the Sisters, Servants of the Immaculate Heart of Mary, Marywood University roots itself in the principle of justice and a belief that education empowers people. Enacting its ideals, Marywood offers students a welcoming and supportive community that encourages men and women of all backgrounds to shape their lives as leaders in service to others. Proud of its liberal arts tradition and host of professional disciplines, Marywood challenges students to broaden their understanding of global issues and to make decisions based on spiritual, ethical, and religious values. Marywood calls upon students to seek their full potential and invites all to engage in a lifelong process of learning. Witnessing the efficacy of teaching and scholarship, Marywood educates students to live responsibly in a diverse and interdependent world.

### Core Values

#### Catholic Identity

A commitment to spiritual, ethical and intellectual values in the context of a faith community.

#### Respect for Each Person

Respect for the value of each human being, for diversity in the context of vibrant community, and for the earth and all creation.

#### Empowerment

Education to enable access and to empower the underserved to take a full role in the life of the broader society.

#### Service

Rooted in the deep belief that learning and scholarship serve the global community is the belief in the value of the diverse types of work that support that service, and the preparation of students for leadership by participation in service.

#### Commitment to Excellence

The belief that the work of education has the capacity to forward the kingdom of God, in broad and varied ways, leads us to care passionately for the quality of the mission of Marywood.

---

President's Office | Fran Ferrese, Executive Secretary | (570) 348-6231 | ferrese@marywood.edu

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu



# Marywood
### U N I V E R S I T Y

## President's Page: Marywood University's Goals & Objectives

**Provide a values based context for university experiences.**

- A majority of students will participate in service opportunities in an on-going way.
- Students will demonstrate an understanding of the ethical dimensions of their fields of study.
- A majority of students will participate in spiritual development activities.
- Employees will demonstrate core values in the work place.

**Foster an awareness and appreciation of the pluralistic nature of contemporary society.**

- Graduates will choose to study or work in multicultural settings either at home or abroad.
- Students will demonstrate a deeper appreciation for cultural diversity and an understanding of global issues.
- Enrolled students will travel abroad during their college years.
- Employee groups and governing bodies will reflect the pluralistic nature of contemporary society.

**Provide a supportive and welcoming environment to a diverse academic community.**

- Students enrolled in any program will fulfill their academic goals by successfully completing their degree work.
- An increasing number of racially and culturally diverse students and employees will choose Marywood as a welcoming community.
- Students from a cross-section of socio-economic groups will enroll in each incoming class.
- Campus constituencies will express satisfaction with all campus services.

**Prepare people for socially responsible leadership roles.**

- Students will participate in an internship or practicum experience.
- Students will demonstrate a significant level of co-curricular activities.
- Students will experience positive interactions with faculty members outside of class.
- Employees will serve as role models of socially responsible leaders.

**Provide a challenging instructional program.**

- Students will demonstrate achievement of cognitive skills at a level comparable to peers on standardized tests.
- Students will demonstrate the ability to think critically by engaging in research activities and by developing problem solving strategies.
- Students will demonstrate the ability to integrate the liberal arts tradition with their professional specializations.
- Students will demonstrate competence in both information literacy skills and communications skills.
- Faculty will provide evidence of ongoing scholarly activity.

**Inspire a sense of personal responsibility for responding to social justice issues.**

- Faculty, staff, and students will participate in projects designed to address social inequities.
- Students will demonstrate knowledge of both national and international social justice issues.
- Faculty, students, and staff will serve as advocates for justice in their personal and professional lives.

President's Office | Fran Ferrese, Executive Secretary | (570) 348-6231 | ferrese@marywood.edu

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

Marywood YOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu

Release of Personal Information
*Please check one box below; sign, date, and return by February 3, 2012*

____ I DO NOT grant permission for Marywood University to release Sister Anne Munley's Recommendation for Termination and Statement of Charges dated 1/24/12 to a faculty review committee comprised of tenured faculty. I understand that by refusing such permission that there will be no faculty committee review of Sister Anne Munley's decision to terminate my tenure and employment with the University prior to it being finalized.

OR

____ I DO grant permission for Marywood University to release Sister Anne Munley's Recommendation for Termination and Statement of Charges dated 1/24/12 to a review committee comprised of tenured faculty.

This authorization is valid until rescinded by me in writing.

_____          _____
Frederick F. Fagal, Jr.                              Date

# EXHIBIT D

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF PENNSYLVANIA

- - -

FREDERICK F. FAGAL,    :  NO.
JR.,                      3:14-cv-02404-ARC
                       :
    Plaintiff,
                       :
  - vs -
                       :
MARYWOOD UNIVERSITY,
                       :
    Defendant.


- - -

June 7, 2016

- - -


        Videotape Deposition of
FREDERICK F. FAGAL, JR., taken pursuant to
notice, was held at JACKSON LEWIS, P.C.,
Three Parkway, 1601 Cherry Street, Suite
1350, Philadelphia, Pennsylvania,
commencing at 9:35 a.m. on the above date,
before Edward J. Ruggeri, Registered
Professional Reporter, Certified Court
Reporter and Notary Public.

- - -

MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com



Page 34

1   to teach and we talked about intro to
2   economics being one of them.
3          Do you believe that you'd be
4   qualified to teach both intro to economics
5   micro and macro?
6       A.   Yes.
7       Q.   After you taught this course in
8   1985, 1986, did you have any other
9   employment relationship with Marywood?
10      A.   After I started full-time on a
11  tenure track position.
12      Q.   Okay.
13         And when was that?
14      A.   1987 in the fall.
15      Q.   Now, when you commenced
16  employment, fall of 1987, you were not a
17  tenured professor at that time; is that
18  correct?
19      A.   Correct.
20      Q.   But I believe it's your
21  testimony you were on a tenure track?
22      A.   Correct.
23      Q.   Okay.
24         What does it mean to you to be

Page 35

1   a tenured professor?
2       A.   It means that in a sense you
3   have given up -- I won't say given up.
4   You have a commitment to -- from the
5   university to employ you as long as you
6   have fulfilled whatever requirements exist
7   for that university.
8       Q.   Do you believe that the
9   commitment is mutual in that the tenured
10  professor is making commitments to the
11  university as well as the university
12  making commitments to the tenured
13  professor?
14      A.   Yes.
15      Q.   When you commenced employment
16  with Marywood, fall of 1987, was that a
17  full-time position?
18      A.   Yes.
19      Q.   Were you in a certain
20  department?
21      A.   Let me go back.  Full-time
22  position -- usually considered a
23  nine-month academic year, a full-time
24  position.

Page 36

1       Q.   Thank you.
2          Were you in a department?
3       A.   Yes.
4       Q.   And what department was that?
5       A.   The Department of Social
6   Sciences.
7       Q.   And how long were you in the
8   Department of Social Sciences?
9       A.   During my complete tenure at
10  Marywood.
11      Q.   Okay.
12         So until the time of your
13  termination in 2012?
14      A.   Correct.
15      Q.   At some point in time, did you
16  become a tenured professor?
17      A.   Yes, I did.
18      Q.   And when did that take place?
19      A.   I believe that was September of
20  1994.
21      Q.   As a professor at Marywood in
22  the Department of Social Sciences, to whom
23  would you report?  Generally, job
24  position.  I don't need the name of the

Page 37

1   person yet.
2       A.   The chairperson of the
3   department.
4       Q.   Would that also be known as the
5   dean of the department?
6       A.   No.
7       Q.   Are those two different people,
8   two different positions?
9       A.   Yes.  There is no dean of the
10  department position.
11      Q.   Okay.
12         So the professor reports to the
13  chairperson of the department; is that
14  correct?
15      A.   Correct.
16      Q.   And who does the -- to your
17  knowledge, the chairperson of the
18  department report to by job position?
19      A.   I believe it might have
20  depended on the structure of the college
21  over the time, so that would be -- that
22  answer would have different answers.
23      Q.   Okay.
24         When -- from 1987 until 1994,

10  (Pages 34 to 37)



MAGNA
LEGAL SERVICES

Page 38

```
 1    who was the chairperson of the department?
 2        A.   That would have been Jack
 3    Barrett for all those years.
 4        Q.   Is he still with the
 5    university, to your knowledge?
 6        A.   No.
 7        Q.   In 1994 when you became a
 8    tenured professor, was Jack Barrett still
 9    the chairperson of the department?
10        A.   Yes.
11        Q.   Do you remember when Jack
12    Barrett no longer was the chairperson of
13    the department?
14        A.   I can't recall the exact date.
15        Q.   Who was the next chairperson?
16        A.   I believe it was Kathleen
17    Munley.
18        Q.   To your knowledge, is there any
19    relation between Kathleen Munley and
20    Sister Anne Munley?
21        A.   No.
22        Q.   Do you know the time period in
23    which Kathleen Munley served as the
24    chairperson of the Department of Social
```

Page 40

```
 1        A.   Yes.
 2        Q.   Was he employed at Marywood at
 3    the time of your termination?
 4        A.   Yes.
 5        Q.   What was his position, to the
 6    best of your knowledge?
 7        A.   I believe his title is dean of
 8    liberal arts college.
 9        Q.   From an organizational
10    structure at the time of your termination
11    -- so I'm focussing on 2012.
12             As a tenured professor, is it
13    fair to say that you reported to Sister
14    Margaret Gannon?
15        A.   Yes.
16        Q.   Did Sister Margaret Gannon
17    report to Michael Foley, the dean of
18    liberal arts?
19        A.   I presume she did.
20        Q.   Do you know how long Michael
21    Foley was in that position?
22        A.   No.
23        Q.   Can you approximate?
24        A.   Six years perhaps.
```

Page 39

```
 1    Sciences?
 2        A.   Not the exact dates.
 3        Q.   After Kathleen Munley, who was
 4    the chairperson?
 5        A.   I believe it was Sister
 6    Margaret Gannon.
 7        Q.   Do you recall the dates that
 8    she served as the chairperson of the
 9    department?
10        A.   No.
11        Q.   At some point in time, was
12    there a different chairperson after Sister
13    Margaret Gannon?
14        A.   After I left, there was.
15        Q.   Okay.
16             And who was that?
17        A.   I -- Alexander Vari.
18        Q.   At the time of your termination
19    in 2012, was Sister Margaret Gannon the
20    chairperson of the social sciences
21    department?
22        A.   Yes.
23        Q.   Does the name Michael Foley
24    ring -- familiar to you?
```

Page 41

```
 1        Q.   So at least since 2010?
 2        A.   Yes.
 3        Q.   Okay.
 4        A.   Excuse me.  When I said six
 5    years, I meant six years prior to 2012.
 6        Q.   Okay.
 7             So we're talking maybe
 8    2006-ish?
 9        A.   Maybe 2006-ish.
10        Q.   Ish.
11             To the best of your
12    knowledge -- again, I'm just focussing,
13    trying to get an organizational picture.
14             So Dr. Fagal reports to Sister
15    Margaret Gannon at the time of your
16    termination, Sister Margaret Gannon
17    reports to Dr. Foley.
18             Who does Dr. Foley report to?
19        A.   I don't know.
20        Q.   Okay.
21             Who is the ultimate boss, for
22    lack of better words, at the university?
23        A.   I presume it would be Sister
24    Anne Munley.
```

11 (Pages 38 to 41)



Page 42

```
1        Q.   The president of the
2    university?
3        A.   The president of the
4    university.
5        Q.   So if someone doesn't have a
6    direct dotted -- direct line reporting to
7    the president of the university, everyone
8    that works at the university ultimately
9    reports to the president of the
10   university; is that correct?
11       A.   Yes, indirectly.
12       Q.   Is there anyone higher on the
13   food chain than the president of the
14   university at Marywood?
15       A.   I'm not sure.
16       Q.   Can you identify anyone that's
17   higher up than Sister Anne Munley who was
18   president of the university at the time of
19   your termination as we sit here today?
20       A.   As a title, I might presume the
21   president of the Sisters of the Immaculate
22   Heart of Mary but I don't really know.
23       Q.   Okay.
24            So as far as you know, Sister
```

Page 43

```
1    Munley, the president of the university,
2    was the boss of the university?
3        A.   As far as I know, yes.
4            - - -
5            (At this time, a document was
6        marked for identification as Exhibit
7        Fagal-3.)
8            - - -
9    BY MS. PEET:
10       Q.   Mr. Fagal, what has been placed
11   before you marked as Fagal Exhibit-3 is a
12   Letter of Agreement between you and
13   Marywood University dated May 10, 2011.
14            Do you see that?
15       A.   Yes.
16       Q.   And if you look at the bottom
17   right of this page, it has signature.
18            Is that your signature?
19       A.   Yes.
20       Q.   And by signing this letter,
21   were you accepting the agreement -- the
22   tenured faculty agreement between you and
23   Marywood University?
24       A.   Yes.
```

Page 44

```
1        Q.   And to the best of your
2    knowledge, the terms and conditions that
3    are set forth in this letter, are they
4    accurate?
5        A.   Well, let me read the letter.
6        Q.   Take your time.
7            - - -
8            (At this time, the witness
9        complies with request.)
10            - - -
11           THE WITNESS:  Okay.
12           Could you repeat the question,
13       please?
14   BY MS. PEET:
15       Q.   I sure can.
16           The -- as you can see that this
17   Letter of Agreement sets forth some of the
18   terms.
19           Do you see that?
20       A.   Yes.
21       Q.   To the best of your knowledge,
22   are these terms accurate?
23       A.   Yes.
24       Q.   Okay.
```

Page 45

```
1            We discussed earlier about an
2    incident involving Laurie McMillan.
3            To your knowledge, was she
4    disciplined by Marywood University?
5        A.   No.
6        Q.   Do you know one way or the
7    other?
8        A.   No.
9        Q.   I just -- sometimes a question
10   can evoke a "no", but I'm not sure if it's
11   no, you don't know or no, she wasn't.
12       A.   I do not know if she was
13   disciplined or not disciplined.
14       Q.   And that's going to happen
15   throughout the deposition.  I'll try
16   and --
17       A.   I understand.
18       Q.   -- make sure we catch those
19   situations.
20           To your knowledge, did Marywood
21   University have missions and core values?
22       A.   Yes.
23       Q.   Okay.
24           Off the top of your head, do
```





MAGNA
LEGAL SERVICES

Page 46

1   you know what those core values are?
2     A.  Well, I know one that they were
3   stressing recently was respect for the
4   individual. Another one was I believe
5   something about stewardship of the earth.
6   I'm a little vague on that one. That's
7   what I can surely recall at the moment.
8     Q.  Is Marywood University's
9   mission and core values -- is that written
10  down somewhere?
11     A.  Yes.
12     Q.  Is that made available to you
13  as -- was it made available to you as a
14  tenured professor?
15     A.  Yes.
16     Q.  Were the mission and core
17  values posted anywhere around the
18  university?
19     A.  I can't recall.
20     Q.  Okay.
21     And does that mean you can't
22  recall one way or the other?
23     A.  I can't recall one way or the
24  other whether there was a posting or not.

Page 47

1     Q.  Did you ever hear anyone at the
2   university discuss the missions or core
3   values?
4     A.  Yes.
5      - - -
6     (At this time, a document was
7     marked for identification as Exhibit
8     Fagal-4.)
9      - - -
10  BY MS. PEET:
11     Q.  Now, Dr. Fagal, I put before
12  you a rather sizable document. The good
13  news is I'm not asking any questions about
14  it specifically or really asking you to go
15  through it with a fine-tooth comb. All
16  I'm going to ask you to do is to identify
17  that this is the handbook that was in
18  existence at the time of your termination
19  of employment. As you can see, the
20  handbook is dated July 1, 2010.
21     MR. COHEN: I'm going to have
22     to object. There's no way he can
23     know whether it's the same handbook.
24     This is like 200 pages.

Page 48

1     MS. PEET: Well, if you look at
2   paragraph 14 of his Complaint, he
3   talks about on July 1, 2010, Marywood
4   issued an edition of its faculty
5   handbook, and then you attach the
6   first four pages as Exhibit-B to your
7   Complaint -- your Amended Complaint.
8   Pardon me.
9  BY MS. PEET:
10     Q.  Is the handbook that I've just
11  put before you the July 1, 2010, handbook
12  that you were referencing in your Amended
13  Complaint?
14     A.  I don't know. I'm assuming
15  that this is it though one would have to
16  run a, you know, computer -- check some
17  test to test whether any secret changes
18  had been put in. Do I think that any have
19  been put in? No, I don't, but I cannot
20  testify as to whether this is in fact it.
21     Q.  Okay.
22     The July 1, 2010, handbook that
23  you reference in your Amended Complaint
24  and what I purport is in front of you as

Page 49

1   Exhibit-4, do you have any reason to
2   dispute that it applied to you as a
3   tenured professor at Marywood?
4     A.  No.
5     Q.  So is it fair to say that as a
6   tenured professor at Marywood, you had to
7   comply with the policies and procedures
8   contained in the handbook?
9     MR. COHEN: Objection, legal
10     conclusion. You can answer.
11     THE WITNESS: To the extent
12     that they were clear and not vague,
13     yes.
14  BY MS. PEET:
15     Q.  Are there any policies that you
16  sought clarification because you believed
17  they were vague?
18     A.  When?
19     Q.  During your employment.
20     A.  Yes.
21     Q.  Okay.
22     And what policies do you
23  believe that you sought clarification
24  because they were vague?



Page 50

1    A.   I remember asking Dean Torell
2  some questions about what was okay or not
3  okay to do.
4    Q.   You asked Dean Torell what was
5  okay and not okay with reference to what?
6    A.   About postings on my office
7  door, news stories and things like that.
8    Q.   Other than asking Dean Torell
9  about what you can and cannot do with
10 postings on your office door, any other
11 policies that you thought were vague for
12 which you sought clarification?
13   A.   No.
14   Q.   Okay.
15        Did Dean Torell provide a
16 response to you --
17   A.   No.
18   Q.   -- about what you can or cannot
19 do with postings on your office door?
20   A.   He did not reply.
21   Q.   When you say he did not reply,
22 is it fair to say that you sent him an
23 e-mail?
24   A.   Yes.

Page 51

1    Q.   Did you follow up with Dean
2  Torell to nudge him to respond?
3    A.   No.
4    Q.   Did you seek clarification from
5  anyone else at Marywood other than Dean
6  Torell on this issue?
7    A.   I can't recall.
8    Q.   To the best of your
9  recollection, other than e-mailing Dean
10 Torell once, did you reach out to Dean
11 Torell in any other way to seek
12 clarification on this issue?
13   A.   I can't recall.
14   Q.   November of 2011, it's my
15 understanding that you invited a speaker
16 from FIRE to speak at the campus; is that
17 correct?
18   A.   I invited a speaker to come to
19 my class which is held on campus, so yes.
20   Q.   And what class was that at the
21 time?
22   A.   Introduction to social science.
23   Q.   Was this the first time you
24 ever had a FIRE speaker speak on your

Page 52

1  behalf either in a course or at the
2  university generally?
3    A.   No.
4    Q.   Can you identify the other
5  times in which you had a FIRE speaker come
6  to the university?
7    A.   Yes.  Luke Sheehan came to
8  speak on campus at an evening event, and I
9  believe that might have been in 2007 plus
10 or minus a year.
11   Q.   Anyone else?
12   A.   Do you mean anyone else from
13 FIRE?
14   Q.   Correct.
15   A.   No.
16   Q.   What was your role in getting
17 Luke Sheehan to speak at Marywood?
18   A.   I'm not sure what you mean by
19 role.
20   Q.   Sure.
21        Did you initiate the -- Luke
22 Sheehan to speak at Marywood?
23   A.   Luke.  I'm sorry.  Good.  Luke
24 Sheehan.  I was thinking of -- I can't

Page 53

1  recall who initiated it.
2    Q.   Is it possible it was you?
3    A.   It's possible it was me.
4    Q.   What was Mr. Sheehan's what did
5  he speak about at Marywood?
6    A.   Something to do with free
7  speech on college campuses around the
8  United States.
9    Q.   Did Mr. Sheehan in fact speak
10 at Marywood University?
11   A.   Yes, he did.
12   Q.   To the best of your
13 recollection, were posters hung with
14 reference to Mr. Sheehan's speaking
15 engagement?
16   A.   I can't recall exactly.  Could
17 have happened.
18   Q.   Do you know if there was an
19 attendance prize for attending the --
20 Mr. Sheehan's speaking engagement?
21   A.   There was no dollar attendance
22 prize but we might have given food away,
23 but I really can't recall the details.
24   Q.   Did anyone, to your knowledge,

14 (Pages 50 to 53)



Page 54

1  tear down any posters with reference to
2  the Mr. Sheehan speaking engagement?
3      A.   No.
4      Q.   In 2007, was Sister Anne Munley
5  the president of the university?
6      A.   I can't recall but I think so.
7      Q.   Did anyone at Marywood
8  University ask you to not have Mr. Sheehan
9  speak at the university?
10     A.   No.
11     Q.   Did you have any issues or
12 run-ins with anyone at Marywood
13 administration about the Mr. Sheehan
14 speaking engagement?
15     A.   No.
16     Q.   I believe I asked you if you
17 were aware if any posters were torn down
18 by Marywood administration with reference
19 to Mr. Sheehan, and I believe it was your
20 testimony that you don't know; is that
21 correct?
22     A.   My testimony is I don't know.
23 I can't recall if there were posters, and
24 if I can't recall there were posters, I

Page 55

1  certainly can't recall if any were torn
2  down or not.
3      Q.   Okay.
4          The -- when Mr. Sheehan spoke
5  at the university, was it in connection
6  with any course or class you were
7  teaching?
8      A.   No.
9      Q.   Did anyone besides you help
10 initiate and plan this speaking
11 engagement?
12     A.   Well, I was an advisor to the
13 Republican Club, and so there were
14 students involved with planning the event.
15     Q.   Is it fair to say that
16 Mr. Sheehan, who was a speaker from the
17 FIRE organization, came to Marywood
18 University, at least as part of your
19 initiation in 2007, spoke without issue?
20     A.   Mr. Sheehan spoke without
21 issue.
22     Q.   And he's connected with FIRE;
23 is that correct?
24     A.   At the time, he was.

Page 56

1      Q.   So back to November of 2011,
2  who was the speaker that you brought from
3  FIRE to your course?
4      A.   Will Creeley.
5      Q.   And what did Mr. Creeley speak
6  about?
7      A.   I believe he had a stock speech
8  and he had four different titles for it.
9  I believe it was pretty much the same but
10 he would speak about free speech on
11 college campuses and maybe thought control
12 or -- that might have been in the title.
13     Q.   So what Mr. Creeley spoke about
14 was similar to what Mr. Sheehan had spoken
15 about in 2007?
16     A.   Yes.
17     Q.   With Mr. Sheehan, did anyone at
18 the university tell you you could not hang
19 up posters?
20     A.   No.
21     Q.   Other than you initiating, are
22 you aware of any other speaker from FIRE
23 that spoke at the university?
24     A.   I can't recall.

Page 57

1      Q.   To your knowledge, is Marywood
2  University a public or private university?
3      A.   Officially a private university
4  but it does get public funds, of course.
5      Q.   Did you tell anyone at the
6  university that you wanted Will Creeley to
7  come speak?
8      A.   Yes.
9      Q.   Who did you tell?
10     A.   Well, I discussed with Sister
11 Margaret Gannon having a speaker from
12 FIRE.  At what point the name Will Creeley
13 emerged I'm not exactly sure, but I'm sure
14 it would have come out before the event
15 took place.  I contacted -- Sister
16 Margaret told me that there was no money
17 and she gave me a name, cultural affairs
18 person.  I'm drawing a blank on the name
19 now, but she said go and ask them if they
20 have any money for speakers.  When the
21 plans were made with FIRE, I contacted
22 Carl Oliveri and told him who was coming.
23 I can't recall any more right now.
24     Q.   When you told Sister Margaret

15  (Pages 54 to 57)



MAGNA
LEGAL SERVICES

Page 58

1 that you were -- you wanted to have a
2 speaker from FIRE come, what was her
3 response?
4     A.   I believe she -- I said
5 something -- she might have said well,
6 that ties into the course, right, and I
7 said yes, it's -- you know, it has to do
8 with the first amendment in the
9 Constitution.  It was very -- we were very
10 low key.
11     Q.   Did -- I assume she didn't tell
12 you no, that's not possible, that can't
13 happen, or we object?
14     A.   No objections on her part.
15     Q.   When she told you that she
16 didn't believe there were money for
17 speakers, was it there was -- to your
18 knowledge, was it we don't have money for
19 speakers from FIRE or we don't have money
20 for speakers generally?
21     A.   It was a question of
22 departmental budget, no more money for
23 speakers generally.
24     Q.   How much did FIRE want in terms

Page 59

1 of money for a speaking engagement?
2     A.   A thousand dollars was the
3 usual fee.
4     Q.   I believe you testified that
5 Sister Margaret Gannon suggested that you
6 talk to someone from the cultural
7 department about seeking funds for the --
8     A.   Not a cultural department,
9 cultural affairs.  Cerda might have been
10 the name, C-E-R-D-A.  That name rings a
11 bell but I'm not sure.
12     Q.   Is Cerda affiliated with
13 Marywood University?
14     A.   She was if that was -- it was
15 just an e-mail contact.
16     Q.   Did you indeed contact Cerda to
17 determine whether --
18     A.   Yes.
19     Q.   -- there was money for this
20 speaking --
21     A.   I did go --
22     Q.   -- engagement?
23     A.   I'm sorry.  Go ahead.
24     Q.   Did you indeed contact Cerda to

Page 60

1 determine whether there was money in the
2 budget for a speaker?
3     A.   I can't recall if I e-mailed
4 her directly or if there was another name
5 I e-mailed, too, but I did contact that
6 higher level.
7     Q.   And what was the response, to
8 the best of your memory?
9     A.   I know I was told by someone
10 there was no money there either.
11     Q.   Okay.
12          And did you believe that to be
13 no money in the budget for speakers
14 generally or did you attribute that to the
15 fact that the speaker was from FIRE?
16     A.   I believe it was no money
17 generally.
18     Q.   Was the FIRE speaker something
19 that was required by Marywood on you to
20 have at the university?
21     A.   No.
22     Q.   Did you decide to proceed
23 anyway knowing that Marywood wasn't going
24 to be able to fund a speaker?

Page 61

1     A.   Yes.
2     Q.   Was that a voluntary choice
3 that you made?
4     A.   Yes.
5     Q.   You said you spoke to Carl
6 Oliveri.
7          Who is Carl?
8     A.   He was the director of what I
9 think was called the student activities --
10 SAL -- I called it student activities.
11     Q.   Can we call it student
12 activities for the purpose of this
13 deposition?
14     A.   That would be helpful.
15     Q.   Okay.
16          What did you and Mr. Oliveri
17 speak about with reference to you wanting
18 to have a FIRE speaker?
19     A.   I wanted to hang -- get some
20 posters to try to draw a crowd because I
21 wanted to open the presentation, open the
22 class to other Marywood students, and I
23 wasn't sure.  I never hung posters as a
24 faculty member before for my class or

16  (Pages 58 to 61)



Page 66

1    Q.   Who was that student?
2    A.   Geri Smith and I believe
3  Samantha Cocoa was with her, and Ben
4  Harrington might have been with them also.
5  I'm not sure about him.
6    Q.   Are they all students?
7    A.   They were all students at the
8  time.
9    Q.   Okay.
10       To your knowledge, Geri Smith
11  and perhaps others went to Carl on Monday
12  morning with the posters which included
13  the strip that was to be added to the
14  poster for approval?
15    A.   No.
16    Q.   Okay.
17       What am I missing?
18    A.   When Geri Smith brought the
19  posters over, Carl -- she -- I was not
20  there. This is what she -- Carl Oliveri
21  was not there. In charge was a woman who
22  worked for the student activities office
23  and she is the one who stamped all of
24  those posters with the approval, and all

Page 68

1    A.   I do not.
2    Q.   And this is information that
3  was told to you by Geri Smith, a student,
4  correct?
5    A.   Yes.
6    Q.   Okay.
7    A.   I do know that posters were
8  stamped because Geri Smith brought back
9  some posters to give to me to hang up and
10  all of them were stamped.
11    Q.   The posters that were stamped,
12  did they have the strip -- the additional
13  strip that we've just discussed on the
14  posters before they were stamped?
15    A.   Yes, they did. The strip was
16  on the posters before they were stamped.
17    Q.   Did you see the posters with
18  the strips on them before they were
19  stamped?
20    A.   Yes. I made the posters. I
21  taped all the strips on myself.
22    Q.   And before you taped the strips
23  on, were those posters stamped?
24    A.   No.

Page 67

1  of those posters had on them the prize
2  announcement and the contact information.
3    Q.   And you don't know who that
4  woman is?
5    A.   I believe her name is Katie
6  Aunchman but I do not know her.
7    Q.   Do you know what her job
8  position is she?
9    A.   I believe she was a graduate
10  student. I think she was -- I'm not sure
11  of her title. I was told she was advisor.
12  She worked for the clubs or something.
13  I'm not sure exactly what she worked for
14  at Marywood, but she worked for Marywood.
15    Q.   Okay.
16       Do you know one way or the
17  other whether she had approval to stamp
18  posters?
19    A.   I do not know.
20    Q.   And this information about Carl
21  not being there and Katie putting the
22  stamp of approval on it, you don't have
23  firsthand knowledge of that; is that
24  correct?

Page 69

1    Q.   Did -- I believe you testified
2  -- and I'm sorry to be repetitive -- that
3  Sister Margaret Gannon did not tell you
4  that the FIRE speaker couldn't come to the
5  university, correct?
6    A.   She did not tell me the FIRE
7  speaker could not come to the university.
8    Q.   What about Carl Oliveri?
9    A.   He didn't tell me anything
10  about the speaker.
11    Q.   Okay.
12       You said the speaker was slated
13  for Thanksgiving weekend; is that correct?
14    A.   Well, the speaker was slated
15  for November 30th, which was a Wednesday
16  after Thanksgiving weekend.
17    Q.   Was the university in session
18  at that time?
19    A.   Yes. November 30th the
20  university was in session.
21    Q.   Who picked the date for the
22  speaker?
23    A.   Dr. Jackson and I were the
24  co-teachers for the course and we chose

18 (Pages 66 to 69)



Page 70

1  the date.  It was getting near the end of
2  the semester and that was the most obvious
3  date.
4       Q.   Was this speaking engagement a
5  required element of the course you were
6  teaching?
7       A.   Yes, in the sense that it was
8  held during the class time and it was a
9  speaker during the class.
10      Q.   Was it held in the classroom
11 itself?
12      A.   No.
13      Q.   Okay.
14           Where was it held?
15      A.   Comerford Auditorium.
16      Q.   And who selected the location?
17      A.   I did.
18      Q.   Did anyone at the university
19 make any objection to holding the speaking
20 engagement in the auditorium?
21      A.   No.
22      Q.   You said Dr. Jackson; is that
23 Dr. Thomas Jackson?
24      A.   Yes.

Page 71

1       Q.   To your knowledge, is he
2  currently a tenured professor at Marywood
3  University?
4       A.   Yes.
5       Q.   You said he was a co-teacher of
6  the course.
7            What did you mean by that?
8       A.   We split the duties and the
9  time.
10      Q.   Do you and Dr. Jackson get up
11 in front of the course and would you speak
12 together?
13      A.   Generally not.
14      Q.   Okay.
15           So would it be some days
16 Dr. Fagal would show up and teach the
17 class and some days --
18      A.   Yes.
19      Q.   -- Dr. Jackson would show up
20 and teach the class?
21      A.   Yes, sorry.
22      Q.   But it was one class with the
23 same students; is that correct?
24      A.   Will you repeat?  Was what?

Page 72

1       Q.   One class with the same
2  students?
3       A.   Correct.
4       Q.   What were Dr. Jackson's
5  thoughts on having this FIRE speaker come
6  to campus?
7       A.   We didn't have any big
8  discussion.  He thought it was a good
9  idea.
10      Q.   Okay.
11           Is it fair to say it was your
12 idea and he supported it?
13      A.   Yes.
14      Q.   Did Dr. Jackson have an opinion
15 about the posters?
16      A.   I don't understand the
17 question.
18      Q.   Sure.
19           Did he have an opinion one way
20 or the other about posting posters on the
21 university for the speaking engagement?
22      A.   I don't recall any opinion.
23      Q.   Did Dr. Jackson participate in
24 making the posters?

Page 73

1       A.   No.
2       Q.   Did Dr. Jackson participate in
3  hanging the posters?
4       A.   No.
5       Q.   Was he at all involved in the
6  poster incident, for lack of better words?
7       A.   No.
8       Q.   When, to your knowledge, in
9  relation to the November 30th speaking
10 engagement were the posters hung?
11      A.   The posters were hung the
12 morning of November 28th and a few were
13 hung early in the afternoon of November
14 28th.
15      Q.   So prior to November 28, 2011,
16 there were no posters hung for this event;
17 is that correct?
18      A.   That is correct.
19      Q.   And these posters were hung on
20 November 28th for a speaking engagement
21 that was occurring on November 30th; is
22 that correct?
23      A.   Yes.
24      Q.   Who hung the posters?



Page 74

1    A.   Geri Smith hung most of the
2  posters. Samantha Cocoa told me in an
3  e-mail that she hung some posters. I
4  don't know how many. And I hung some
5  posters.
6    Q.   How many posters were hung
7  approximately generally?
8    A.   I'd say 46.
9    Q.   Now, you testified earlier that
10 you made 46 posters and Carl said he would
11 give you 12 to 15 posters?
12   A.   Correct.
13   Q.   Did Mr. Oliveri not give you
14 his 12 to 15 posters?
15   A.   I was not there. Geri Smith
16 reported to me in an e-mail that -- she
17 said there were 12 or 15 posters -- I
18 forget the exact number -- that were not
19 stamped, but that of makes sense
20 because those posters Mr. Oliveri had
21 printed out and they were the plain PDF
22 posters as we see from FIRE without any
23 contact information. So he printed
24 posters without contact information and I

Page 75

1  guess I forgot.
2    I did not provide any strips --
3  contact or prize information strips
4  combined to hang on those posters. So,
5  therefore, if the person in student
6  activities saw that there were posters but
7  the posters did not have contact
8  information on them, then she would
9  understandably not stamp them approved.
10   Q.   Is it fair to say that Carl
11 told you that in order for them to be
12 approved, they needed to have contact
13 information on them, correct?
14   A.   That is correct.
15   Q.   And is it also fair to say that
16 you were the one that needed to provide
17 the contact information to Carl, correct,
18 or someone on your behalf?
19   A.   Yeah. If I was bringing
20 posters to get approved, it had to have
21 contact information, and Carl said that I
22 could actually write it on if I wanted to.
23   Q.   Okay.
24   But that was your

Page 76

1  responsibility, correct?
2    A.   Yes.
3    Q.   And is it fair to say that, for
4  whatever reason, whether you forgot or
5  whatever, you did not provide that
6  information to Carl either by a strip or
7  you didn't write on your contact
8  information on those 12 to 15 posters you
9  asked him to print out?
10   A.   No.
11   Could you repeat the question?
12   Q.   Sure.
13   So we've already set forth that
14 Carl told you in order for them to get
15 approved, they had to have contact
16 information on them, correct?
17   A.   Correct.
18   Q.   We've already, I believe,
19 solidified that Carl told you that you
20 needed to provide the contact information.
21   You could have done it by
22 strip, you could have written something
23 on, but that you had to do it, correct?
24   A.   He did not say that.

Page 77

1    Q.   Okay.
2    A.   We did not have any discussion
3  about whether I would like him to put
4  contact information on the strips. I did
5  send him the sample of the strips with the
6  prize announcement and my e-mail address
7  and I said this is what would be on the
8  posters that I brought in on Monday. If
9  Carl had chosen to print out those strips
10 himself, he could have easily done so and
11 taped them to the posters that he printed.
12 He chose not to do that or didn't think
13 about it, and I didn't think about it, and
14 that's what happened.
15   Q.   Okay.
16   Do you blame Carl for not
17 putting contact information on those
18 posters?
19   A.   No, because I believe those
20 were only 8 and a half by 11 small
21 posters, nothing big.
22   Q.   Okay.
23   How big were the posters that
24 you printed?

20 (Pages 74 to 77)



Page 82

1  question?
2      Q.   I believe you have answered the
3  question in full.  Thank you.
4          Is that the way that you
5  learned that posters were taken down by
6  getting an e-mail from Geri Smith?
7      A.   Yes.
8      Q.   When -- you've been using the
9  terminology throughout this litigation of
10  torn down; is that correct?
11      A.   That's correct.
12      Q.   Okay.
13          When I think of torn down, I
14  think of someone physically like tearing
15  something off the wall.
16      A.   Yes.
17      Q.   Did you have any -- did you
18  witness people taking the posters down?
19      A.   No.
20      Q.   Okay.
21          Do you know if in fact they
22  were torn down or just removed from the
23  wall?
24      A.   In some cases, I saw some

Page 83

1  remnants, you know, like leftover tape or
2  whatever just on top.  So they were
3  removed quickly at least in some cases.
4      Q.   Is it fair to say that you
5  didn't witness any posters being removed;
6  is that correct?
7      A.   I did not witness any posters
8  being removed.
9      Q.   Did Geri Smith tell you that
10  she witnessed any posters being removed?
11      A.   I don't think she did.
12      Q.   Did anyone tell you they saw
13  the posters being removed?
14      A.   Not that I can recall.
15      Q.   As we sit here today, do you
16  know in fact who removed posters from the
17  walls?
18      A.   Could you rephrase that?
19      Q.   Sure.
20          As we sit here today, do you
21  know who removed posters that you believe
22  were removed about the FIRE speaker?
23      A.   I don't know individual names
24  of who actually performed the task.  I'm

Page 84

1  presuming they could have been work study
2  students who were told to take them down
3  but I don't know any specific person who
4  specifically tore down posters.
5      Q.   Do you know who instructed
6  anyone to remove those posters?
7      A.   I have no firsthand knowledge
8  of who told anybody to do it, though Alan
9  Levine did tell me that posters had been
10  torn down.
11      Q.   Did Alan Levine tell you he
12  wanted the posters to be torn down?
13      A.   Alan Levine told me when I had
14  a meeting with him that the posters were
15  torn down because of the prize
16  announcement, and the way he told that to
17  me I drew the conclusion that he approved
18  that they were torn down because of the
19  prize announcement.
20      Q.   I believe you testified you
21  drew a conclusion.
22          Did Alan Levine tell you one
23  way or the other about his position --
24      A.   Well, yes.

Page 85

1      Q.   Let me --
2      A.   I'm sorry.
3      Q.   -- finish asking the question.
4          Did Alan Levine tell you that
5  he approved of the posters being torn
6  down?
7      A.   I will say yes.
8      Q.   And what were his words?
9      A.   He said that I was pandering to
10  the students by offering prize money to
11  come to class.
12      Q.   You testified that the FIRE
13  speaker spoke Wednesday evening, November
14  30th; is that correct?
15      A.   No.
16      Q.   That the FIRE speaker was
17  scheduled to speak Wednesday evening,
18  November 30th?
19      A.   No.
20      Q.   What do I have wrong?
21      A.   The FIRE speaker spoke at my
22  2:00 p.m. class on Wednesday, November
23  30th.
24      Q.   Okay.

22  (Pages 82 to 85)



Page 94

1    Q.   To your knowledge, did anyone
2    tear those down?
3    A.   To my knowledge, there were
4    posters missing that should have been
5    hanging that day.
6    Q.   Do you have any knowledge as to
7    what happened with those posters?
8    A.   I have no personal knowledge as
9    to what happened to those posters.
10   Q.   Okay.
11         As of 2:00 p.m. Wednesday,
12   November 30th, were there posters hung at
13   Marywood University about the advertising
14   for the speaking engagement?
15   A.   Posters had been hung prior to
16   2:00 p.m. that day to announce the
17   speaking engagement.
18   Q.   Okay.
19         Between November 28th when the
20   posters first were hung by you and your
21   team until November 30, 2012 -- 2011, was
22   there always a poster -- at least one
23   poster hung at the university about this
24   speaking engagement?

Page 95

1    A.   I presume, yes.
2    Q.   Did Mr. Creeley from FIRE come
3    to speak?
4    A.   Yes, he did.
5    Q.   How long did he speak for?
6    A.   Approximately 40 minutes.
7    Q.   And was that the scheduled
8    length of his presentation?
9    A.   Yes.  There was some discussion
10   time afterwards, so 40 minutes is an
11   estimate.
12   Q.   Is it fair to say that no one
13   from Marywood administration shut down the
14   speaker?
15   A.   Yes, it's fair to say that.
16   Q.   Is it fair to say that no one
17   from Marywood administration shortened the
18   speaker's discussion?
19   A.   No one from the Marywood
20   University administration shortened the
21   speaker's presentation or discussion.
22   Q.   Did anyone from Marywood
23   administration sensor or try to sensor
24   what it is that he was going to discuss?

Page 96

1    A.   Do you mean of knowledge I had
2    at the time?
3    Q.   I'm asking you did anyone from
4    Marywood try and change the topic or tell
5    Mr. Creeley he couldn't speak about
6    specific topics?
7    A.   No.
8    Q.   How many people were in
9    attendance at this speaking engagement?
10   A.   Probably most of my class
11   members, and that might have been -- I'll
12   say -- I'm not sure what that number would
13   have been between Dr. Jackson and myself
14   but let me pick a number.  Say -- I'll say
15   33, and then I would say there were
16   probably roughly 12 to 15 more people who
17   showed up.
18   Q.   The 12 to 15 additional folks
19   that showed up, were they students?
20   A.   Some were students, I believe,
21   but I didn't know -- I don't know for
22   sure.
23   Q.   Do you know who the other
24   people were?

Page 97

1    A.   One person I noticed was Frank
2    Falcone.
3    Q.   And who is Mr. Falcone?
4    A.   I think his title was -- had
5    something to do with graduate students and
6    he had been a student in my class some
7    years previously, and so he showed up.
8    Q.   Was he -- so I just want to
9    make sure I understand this correctly.
10         Was he part of the faculty or
11   administration at Marywood?
12   A.   Administration.
13   Q.   Okay.
14         Do you know how the 12 to 15
15   folks that were not part of your course
16   learned about this speaking engagement?
17   A.   I do not know how they learned
18   about the speaking engagement.
19   Q.   Do you have any knowledge of
20   anyone from Marywood administration
21   telling students, faculty or anyone, not
22   to attend the speaking engagement?
23   A.   I have no knowledge of anything
24   like that.

25 (Pages 94 to 97)



Page 98

1                     - - -
2          (At this time, a document was
3     marked for identification as Exhibit
4     Fagal-5.)
5                     - - -
6     BY MS. PEET:
7          Q.   What has been marked and placed
8     before you as Fagal Exhibit-5 is
9     documents Bates stamped DEF001447 through
10    1475. It's my understanding that this is,
11    for lack of better words, a chronology of
12    events regarding the FIRE speaker that was
13    prepared by you.
14                Is that an accurate
15    description?
16         A.   Yes.
17         Q.   So is it fair to say that what
18    has been marked as Exhibit-5 is a document
19    you prepared that, to the best of your
20    recollection and knowledge, put together
21    the chronology of the events that led to
22    the November 2011 FIRE incident, for lack
23    of better words?
24         A.   I did my best to compile this

Page 99

1     accurately, and at the time I did.
2          Q.   When did you prepare this?
3          A.   According to my date here, it
4     says December -- 12/21/2011 is the date on
5     comment one.
6          Q.   Does that seem about accurate
7     as to when you put this together?
8          A.   Yes.
9          Q.   Why did you put this together?
10         A.   Well, I felt I had been
11    wronged, if you will say that -- if I can
12    say that, by the university. I had tried
13    to find out what happened to my posters.
14    I inquired about the decision-making that
15    went into tearing down the posters. I had
16    tried to get to the bottom of what had
17    happened.
18         Q.   Were you preparing this for you
19    or for you to give to someone else?
20         A.   I was preparing this. I had
21    tried to, as they say, go through channels
22    and seek redress for what had happened. I
23    got no redress for what had happened and
24    -- although I tried to work with the

Page 100

1     administration, and so now I was thinking
2     about perhaps going public in some way
3     with what had happened.
4          Q.   And by going public, what is it
5     that you're referencing?
6          A.   Well, at this point, I wasn't
7     exactly sure. It could have been sending
8     out e-mails to people. It could have been
9     trying to say, hey, something is rotten in
10    the state of Denmark, to quote a phrase.
11         Q.   Did you ever ask to have a
12    meeting with Sister Munley to discuss
13    this?
14         A.   No.
15         Q.   If I'm doing my math right, is
16    it fair to say that approximately 45 to 50
17    people attended this event?
18         A.   That sounds about right.
19         Q.   Were you pleased with the
20    turnout?
21         A.   I wasn't displeased given the
22    situation. In this day and age, crowds
23    form with a lot of social media, spur of
24    the moment type things, but I'm not a

Page 101

1     social media expert. But people can tweet
2     and say, hey, what the heck, let's go to
3     -- you know, last minute, let's go to that
4     Fagal, you know, presentation and if one
5     of us wins the 50 bucks, you know, we'll
6     all buy pizza.
7               So crowds -- you can read in
8     any of the news, they can form almost
9     instantaneously with, you know, Facebook
10    messages and tweets, and Snapchats, and
11    all these things I really don't use but
12    the students do, and so you never know
13    what will catch the spark.
14              So if one student sees one
15    poster and that student is, shall we say,
16    a tweeting ringleader, then she might be
17    the one who by herself causes a crowd of
18    one hundred students to come out, and if
19    she's that one student who doesn't see
20    that one poster, bingo, you don't get
21    those hundred students.
22              So it's a crap shoot, shall we
23    say, in gambling terms, and that's why the
24    posters were important because you never

26  (Pages  98  to  101)



1   produced, then please just let us
2   know.
3        MR. COHEN:  Okay.
4        - - -
5        (At this time, a document was
6   marked for identification as Exhibit
7   Fagal-6.)
8        - - -
9        THE WITNESS:  It's possible I
10   might have contacted Will Creeley at
11   FIRE and then I might be recalling
12   that Bonilla sent an e-mail to Sister
13   Anne.  It's possible, so...
14   BY MS. PEET:
15        Q.   I recognize we're going back --
16        A.   Yeah.
17        Q.   -- four to five years.
18        A.   Four and a half years, right.
19        Q.   And that's perfectly fine.  I
20   don't expect you --
21        A.   Right.
22        Q.   -- to have everything committed
23   to memory.  All I am suggesting and
24   telling you is to the extent there are any

1   written communications which would include
2   e-mails between you and anyone at FIRE
3   about this incident, then they be
4   produced --
5        A.   Yes.
6        Q.   -- to the extent that they have
7   not.
8        A.   Uh-huh.
9        Q.   And if they have been produced,
10   just kindly direct us to those and all is
11   good.
12        You testified just a few
13   moments ago that after you contacted FIRE
14   to discuss the November 2011 incident,
15   FIRE then contacted Sister Munley.
16        This letter that has been
17   placed before you, is this what you mean
18   by FIRE contacting Sister Munley?
19        A.   Yes.
20        Q.   Did you have any part in
21   drafting this letter?
22        A.   No.
23        Q.   Did you see this letter before
24   it was sent to President Munley?

1        A.   I can't recall.
2        Q.   Do you remember making any
3   edits, or suggestions, or comments to this
4   letter?
5        A.   No.
6        Q.   Did you receive a copy of the
7   letter after it was sent out?
8        A.   I can't recall for sure but I
9   think I received a copy.
10        Q.   Did you ask for FIRE to send
11   this letter to Sister Munley on your
12   behalf?
13        A.   I would say I didn't ask FIRE
14   to send the letter.  FIRE got the facts
15   and then they decided to send the letter.
16        Q.   The facts that FIRE received,
17   were those the facts that you gave to
18   FIRE?
19        A.   Yes.
20        Q.   Do you know if FIRE got the
21   facts from any other source?
22        A.   No.
23        Q.   Did you authorize or approve
24   this letter to be sent to President

1   Munley?
2        A.   No.
3        Q.   Did Carl Oliveri tell you that
4   Alan Levine endorsed the action of tearing
5   down the posters?
6        A.   When I met with Carl Oliveri on
7   November 30th and I asked him what had
8   happened -- actually, I first started
9   saying, gee, wasn't it terrible that my
10   posters got torn down, geez, and then he
11   said we tore them down.  I was shocked.  I
12   said -- taken aback and I said why, and
13   then that's when he brought up, well, at
14   Marywood we don't pay students to go to
15   class.  I shook my head and I said what.
16   He said, well, you had the prize
17   announcement on the posters and that can't
18   happen, so that's why the posters were --
19   that's why we tore down the posters.
20        That's why they were torn down,
21   and I said well, why, and then he said
22   well -- and I said who -- you know,
23   basically I said who gave you the
24   directions because I thought he was not



Page 114

1 the top person on the totem pole, and
2 that's when he mentioned Alan Levine and
3 he mentioned executive council had had a
4 meeting and had discussed this and had
5 approved tearing down the posters.
6     Q.   Did Mr. Oliveri tell you that
7 Dr. Levine endorsed the tearing down of
8 the posters?
9     A.   He did not use the word
10 "endorsed". He just said that Alan Levine
11 -- that was the name brought up and then
12 he used the general term "executive
13 council". So I assume that just like any
14 organization you might be in the minority
15 but if you're on the executive council and
16 if you're one of five and maybe you don't
17 agree with it but if the other four said
18 yes, then you might go ahead with it. So
19 you might not approve but you might still
20 give the order. So I don't know exactly
21 what Alan Levine thought.
22     Q.   Did Carl tell you that the
23 posters were being torn down because of
24 the fact that the speaker was from FIRE?

Page 115

1     A.   No.
2     Q.   Did Carl tell you that the
3 posters were torn down because the speaker
4 was going to be talking about free speech
5 at a university?
6     A.   No.
7     Q.   The 20 new posters that you
8 posted on campus, did they have the
9 attendance prize language?
10     A.   No.
11     Q.   And is that because it was your
12 understanding that was not approved?
13     A.   I was told it was not approved.
14     Q.   Is that why you didn't include
15 that language in the posters?
16     A.   The language was on the posters
17 as I delivered them on Wednesday morning
18 because I knew nothing about any reasoning
19 behind that decision. So with the 20
20 posters, Carl Oliveri and I together
21 snipped off with scissors the prize
22 announcement part of the posters leaving
23 the e-mail contact information, and then
24 those are the posters that got hung up as

Page 116

1 soon as I left the office.
2     Q.   Okay.
3     A.   And some of those posters were
4 torn -- were missing later in the day.
5     Q.   And I believe you testified you
6 don't know the whereabouts of those
7 posters, correct?
8     A.   I do not know.
9     Q.   And do you have any idea how
10 many posters were missing, using your
11 words?
12     A.   Well, I know I took some
13 pictures of blank walls, so I would say
14 about at least seven or ten especially on
15 big areas like on a wall by the hallway or
16 the stairs come in from outside in LAC, so
17 some posters were missing that day.
18     Q.   Did anyone tell you what they
19 believed happened with those posters?
20     A.   I sent an e-mail to Carl
21 Oliveri that day and said, gee, Carl, even
22 those posters were torn down even though
23 they had had the prize announcement torn
24 off, and he wrote back saying he had no

Page 117

1 knowledge of that, basically saying that
2 he did not direct those posters to be torn
3 down.
4         MS. PEET:  Okay. Let's just
5 let her finish the tape.
6         - - -
7         THE VIDEOGRAPHER:  We are now
8 off the record. The time is 11:45
9 a.m. This ends disk number one.
10         - - -
11         (At this time, a short break
12 was taken.)
13         - - -
14         THE VIDEOGRAPHER:  We are now
15 on the record. The time is 11:49
16 a.m. This starts disk number two.
17         - - -
18         (At this time, a document was
19 marked for identification as Exhibit
20 Fagal-7.)
21         - - -
22 BY MS. PEET:
23     Q.   Dr. Fagal, have you ever seen
24 this document before?

30  (Pages 114 to 117)



Page 150

1　and I had printed out, I believe, the list
2　of demands, if you want to call them
3　demands, and Alan read that list at that
4　meeting where he first saw them, and then
5　he said would you please send them to me
6　by e-mail so that I could then send them
7　on to President Munley.  And so he saw
8　that letter by hand-printed copy before he
9　saw it by e-mail.
10　　Q.   Okay.
11　　A.   And so I'm trying to -- I'd
12　have to review here to figure out exactly
13　when in the chronology --
14　　Q.   It's okay.
15　　A.   Okay.
16　　Q.   How did the meeting conclude?
17　　A.   The first e-mail with -- I'm
18　trying to --
19　　Q.   Meeting.  I'm sorry, meeting.
20　　A.   Yeah.  The first -- the
21　meetings were all cordial.  The meeting
22　where I first showed Alan the letter he
23　said he would forward it on to Sister --
24　President Anne Munley, and we had that

Page 151

1　pandering discussion.  And so then you
2　referred me to -- that's when I told him
3　about the -- later that night I told him
4　about the Harvard professor.
5　　　And what page were we on for
6　that?  I'm sorry.
7　　Q.   I'm not on a page.  I was just
8　trying to refresh --
9　　A.   Okay.
10　　Q.   -- your recollection about
11　December 5th.  That's all.
12　　A.   I'd have to review.  I can't
13　recall exactly --
14　　Q.   Okay.
15　　A.   -- that exact date.
16　　Q.   So did the meeting conclude
17　with Dr. Levine saying please send me the
18　e-mail of the demands and I'll present
19　them to Sister Munley?
20　　A.   If that was the meeting when I
21　first showed him the picture, that's what
22　he said, yes.
23　　Q.   Okay.
24　　　Were you satisfied with that

Page 152

1　meeting?
2　　A.   Yes.  I didn't expect him to
3　have any power to grant any of my wishes.
4　　Q.   And you think that it was the
5　president that would have the power to
6　grant those wishes, right?
7　　A.   Yes.
8　　Q.   Do you know Dr. Levine's
9　religion?
10　　A.   Not for a fact.
11　　Q.   What do you believe it to be?
12　　A.   I assumed he was Jewish.
13　　Q.   Did you assume he was Jewish
14　when you met with him in December of 2011?
15　　A.   I think I had always assumed
16　it, just not as any big deal.
17　　　　- - -
18　　　(At this time, a document was
19　　marked for identification as Exhibit
20　　Fagal-9.)
21　　　　- - -
22　BY MS. PEET:
23　　Q.   What has been placed before you
24　as Exhibit-9 seems to be an e-mail chain.

Page 153

1　If you look at the first page, there are
2　e-mails between you and Dr. Jackson.
3　　　Do you see that?
4　　A.   I see.  I haven't seen these
5　lately.  Go ahead.
6　　Q.   Okay.
7　　　Are these in fact e-mails that
8　you and Dr. Jackson were sending each
9　other in December of 2011?
10　　A.   Yes, they appear to be.
11　　Q.   And just for the record, these
12　are -- these three pages are documents
13　that you produced to Marywood in this
14　case?
15　　A.   Yes.
16　　Q.   Okay.
17　　　Who is Adolf Eichmann?
18　　A.   He was a German in World War II
19　who was fairly low level functionary who
20　signed orders or, you know, did processing
21　sending Jews to the gas chamber and he was
22　captured by Israeli Mossad in 1960 in I
23　think -- I think it was Brazil, and there
24　was a trial in the early 1960s in Israel




Page 158

1   Q.   Sure.
2         - - -
3         (At this time, the witness
4   complies with request.)
5         - - -
6         THE WITNESS: Okay.
7   BY MS. PEET:
8   Q.   Okay.
9         Do you recall receiving this
10  letter from Dr. Levine?
11  A.   Yes.
12  Q.   What was your reaction?
13  A.   I was a little surprised and
14  disappointed.  I would say dis -- yes.
15  Q.   At the time that you received
16  this letter, December 15, 2011, did you
17  already have the idea of creating this
18  video?
19  A.   No, I don't believe I did.
20  Q.   Did you have any idea what you
21  were going to do if Marywood didn't agree
22  to your demands?
23  A.   No.  I thought about -- I
24  didn't have any specific ideas.  I thought

Page 159

1   about maybe getting FIRE involved.
2   Q.   Anything else?
3   A.   The thought crossed my mind
4   that maybe I would contact Glenn Reynolds
5   perhaps at Instapundit which is a big
6   blog.
7   Q.   Anything else?
8   A.   Not that I can recall.
9   Q.   What about sitting down with
10  Sister Munley?
11  A.   Well, I already sent her -- she
12  already got the complete letter and I had
13  laid everything out as totally clearly as
14  possible.  I thought the letter -- it says
15  appears -- Alan wrote appears we have a
16  different understanding of what
17  transpired.
18        I thought Marywood is not
19  interested in finding out the truth about
20  the posters because I thought it was quite
21  clear and that Marywood could have
22  investigated, you know, was Carl Oliveri
23  not there, was the grad student who
24  stamped them approved -- was she

Page 160

1   misinformed or not informed, you know.
2   Was there an out?  I had given all those
3   possibilities and this to me was just
4   saying done, President Munley is not
5   interested in talking to you at all,
6   period.
7   Q.   So is it fair to say you did
8   not request a meeting with her?
9   A.   I did not request a meeting
10  with her.
11  Q.   Did you get FIRE involved at
12  this point?
13  A.   Well, we discussed there was a
14  letter that went out.  We -- yes, FIRE
15  did --
16  Q.   Okay.
17  A.   -- was involved.
18  Q.   So other than -- anything other
19  than those letters for FIRE involvement?
20  A.   I did not contact the blog or
21  anything like that.
22  Q.   When you say the blog, would
23  that be Instapundit?
24  A.   Yes.

Page 161

1   Q.   You did not contact them?
2   A.   No.
3   Q.   Did you post on
4   marywoodfreespeech.com about this?
5   A.   No.
6   Q.   When did you decide to create
7   these videos?
8   A.   I don't remember the exact
9   dates.  The Downfall movie parity videos
10  were and have been a huge event on
11  YouTube.  They're often used to get points
12  across and usually in a humorous way.  It
13  helps attract an audience and some of the
14  topics that are used by the videos on
15  YouTube on Downfall are humorous, some are
16  serious.
17        For example, there was one that
18  compared the New York State commissioner
19  of education and they had his, you know,
20  policy decisions, you know, evidenced in a
21  Downfall YouTube video.  So these are
22  very, very popular, their own Wikipedia
23  page, and so this is a way to maybe get
24  the message out.

41 (Pages 158 to 161)


MAGNA ◗
LEGAL SERVICES

Page 182

1   Movie Maker just well enough so I can make
2   a Hitler parody video.
3         Do you see that?
4         A.   Yes, I do.
5         Q.   So is it fair to say around
6   December 19th you at least have the idea?
7         A.   Yes.
8         Q.   With luck, this will all come
9   together and the semester off to a rousing
10  start.
11        Do you see that?
12        A.   Yes.
13        Q.   What do you mean by rousing
14  start?
15        A.   Get students on campus
16  interested in the issue of free speech and
17  say what the heck's going on at this
18  university.
19        Q.   Okay.
20        If no one is roused, at least
21  I, in parentheses we with your help,
22  closed parentheses, will have tried and at
23  least caused some discomfort.
24        Do you see that?

Page 183

1         A.   Yes.
2         Q.   Who were you trying to cause
3   discomfort to?
4         A.   The administration, hoping they
5   would change their policies.
6         Q.   And, again, this is all about
7   the poster?
8         A.   Yes.
9         Q.   Okay.
10        You write this is all good,
11  ideally policy changes, but next best is
12  to make them pay something, and then in
13  bold italicized, at least cause some
14  discomfiture.
15        A.   Uh-huh.
16        Q.   Again, discomfort to Marywood
17  administration?
18        A.   Yes.
19        Q.   And that would be the purpose
20  at least of this video?
21        A.   The main purpose of the video
22  would be to change policy.
23        Q.   And another purpose was to
24  create discomfort?

Page 184

1         A.   If by discomfort that
2   encouraged them to change policy, then
3   that would be okay.
4         - - -
5         (At this time, a document was
6   marked for identification as Exhibit
7   Fagal-15.)
8         - - -
9   BY MS. PEET:
10        Q.   Okay.
11        This is a packet of documents.
12  It starts off with an e-mail with various
13  attachments.
14        Do you see this?
15        A.   Yes.
16        Q.   Now, the e-mail on the first
17  page where it says forwarded message, it's
18  from Fred Fagal to your Gmail account
19  dated January 13, 2012.
20        Do you see that?
21        A.   Yes, I see that.
22        Q.   Okay.
23        So you're sending an e-mail
24  from your Yahoo account to your Gmail

Page 185

1   account, correct?
2         A.   Okay, yeah.
3         Q.   And then it says dear Marywood
4   University faculty colleague.
5         Do you see that?
6         A.   Uh-huh.
7         Q.   Are there -- are you blind
8   copying people on this e-mail?
9         A.   I don't recall if it was blind
10  copying or I had about -- I had access to
11  e-mail addresses and I was able to paste a
12  certain number of them in to send out as a
13  batch e-mail.  So these are faculty
14  members now, so that's what I did.
15        Q.   Okay.
16        So you agree you sent out this
17  e-mail to Marywood faculty members,
18  correct?
19        A.   Yes.
20        Q.   Did you send it to the faculty
21  members at their personal e-mail addresses
22  or at their Marywood e-mail addresses?
23        A.   Whatever e-mail addresses I
24  had, so it was probably mixed perhaps.  I

47 (Pages 182 to 185)



Page 186

1  don't know.
2      Q.   So for at least some faculty,
3  it went to their Marywood e-mail address?
4      A.   That's correct.
5      Q.   Did you send it to any
6  students?
7      A.   Geri Smith might have gotten a
8  copy because she was intimately involved.
9      Q.   And she would have been a
10  student, correct?
11     A.   She would have been a student.
12  I --
13     Q.   Would you have sent it to Geri
14  at her personal e-mail address or at her
15  Marywood e-mail address?
16     A.   Personal, I believe.
17     Q.   Do you know one way or the
18  other?
19     A.   I'm not sure.
20     Q.   So it's possible you sent it to
21  her at her Marywood e-mail address?
22     A.   I could give you a probability.
23     Q.   But you'd be guessing?
24     A.   But I'd be guessing.

Page 187

1      Q.   Okay.
2          So it's possible one way or the
3  other?
4      A.   It's possible one way or the
5  other.
6      Q.   Okay.
7          Where were you when you sent
8  this e-mail?
9      A.   I don't know for sure.
10     Q.   If it helps, it's 2:31 p.m. on
11  a Friday in January.
12     A.   Right.  So either -- I'm not
13  sure when my last class was.  It takes me
14  about two hours to drive home.  So if my
15  last class was at -- ended at 11:50, you
16  know, it's possible I could have sent this
17  from home.  It's possible I could have
18  sent this from my office.
19     Q.   Is your office at Marywood
20  University on the campus?
21     A.   Yes.  It's also possible I did
22  not use the Marywood, you know, Wi-Fi or
23  cable.
24     Q.   And do you know one way or the

Page 188

1  other?
2      A.   I'm not sure.  At the time, I
3  could tell you I had a tether program on
4  my computer and it was working pretty well
5  with my cell phone to get Internet access,
6  and sometimes I would -- so I would use
7  that sometimes in my office also.
8      Q.   Okay.
9          As we sit here today, do you
10  know one way or the other whether you
11  used --
12     A.   No.
13     Q.   -- a tether?  Okay.
14          Just to make sure we're clear,
15  this right here is the e-mail that you
16  sent to members of Marywood community
17  including the two hyperlink videos that
18  you created, correct?
19     A.   I'll say no.  Community -- I
20  would say faculty.
21     Q.   Well, Geri Smith is not
22  faculty, correct?
23     A.   True.
24     Q.   Okay.

Page 189

1          Did you post -- did you create
2  the Hitler videos?
3      A.   Yes.
4      Q.   Did you post them on YouTube?
5      A.   Yes.
6      Q.   Were they publically available
7  or did you need to enter a password to
8  view the videos?
9      A.   No password.  They were
10  publically available.
11     Q.   Did you have to receive your
12  e-mail in order to view the videos or
13  could anyone have viewed those videos?
14     A.   Anyone could have viewed them.
15  The question is would they have found them
16  without the information.
17     Q.   Okay.
18          But they did not need to be
19  invited to watch the videos, correct?
20     A.   Correct.
21     Q.   Did anyone help you draft this
22  e-mail?
23     A.   Draft this e-mail, no.
24     Q.   Okay.

48  (Pages 186 to 189)



Page 190

1      You write towards the bottom,
2  it says based on the evidence.
3      Do you see that?
4      A.   Yes.
5      Q.   I expect most of you, if only
6  in private, will agree the Marywood
7  administration, real people here, not an
8  abstraction, exhibited egregious,
9  despicable, contemptible behavior.
10     What's the behavior you're
11 talking about here?
12     A.   Tearing down my posters.
13     Q.   And when you write this
14 poisoned and considered, exclamation mark,
15 behavior reflects badly on everyone
16 associated with Marywood, is that again
17 referring to the poster issue?
18     A.   Yes.
19     Q.   Okay.
20     If you turn to the second page,
21 you have number three.  You talk about the
22 letter that you sent to Dr. Levine dated
23 December 5th that we already talked about
24 earlier today.

Page 191

1      Do you remember that?
2      A.   Yes.
3      Q.   And you mention in this twice
4  that you refer to these as demands.
5      Do you see that?
6      A.   Yes, but I would note there's a
7  question mark after demands and the first
8  word is "requests".  You see --
9      Q.   It says requests, open parens,
10 demands, question mark, end parens,
11 correct?
12     A.   Yes.
13     Q.   And then the second demand
14 doesn't have a question mark and it's not
15 in quotation marks, correct?
16     A.   Correct.
17     Q.   Okay.
18     Then if you go down a little
19 bit, you say Corynne McSherry, an attorney
20 specializing in intellectual property
21 stated, and then she said something about
22 the Downfall movie.
23     Do you see that?
24     A.   Let's see.  I'm looking.

Page 192

1      Q.   It starts --
2      A.   Yes, I see that.
3      Q.   Did you reach out or speak with
4  Corynne McSherry?
5      A.   No.
6      Q.   Did you speak to any
7  intellectual property lawyer?
8      A.   No.
9      Q.   Did you ever get approval from
10 anyone to use the Downfall movie?
11     A.   No.
12     Q.   Next paragraph, you talk about
13 comments that you got from pre-release
14 viewers.
15     Do you see that?
16     A.   Yes.
17     Q.   Who are they?
18     A.   Rod Carveth I know saw them.
19 What's his name?  Let's see.  Bill
20 Ziegelbauer saw them.  I believe Geri
21 Smith saw them.  I'm trying to remember.
22 I'm drawing a blank, the name of the man
23 in our department who taught some
24 economics after I left, I think.  He saw

Page 193

1  them.  Pam Parsons saw them.  I believe my
2  dental hygienist saw them.  I can't
3  remember anybody else right now.
4      Q.   Okay.
5      By the way, did you pay Geri
6  Smith to hang up the posters?
7      A.   No.
8      Q.   Did you pay anyone to hang up
9  the posters?
10     A.   Yes.
11     Q.   Who did you pay?
12     A.   I can't remember his name.  A
13 student in my -- I believe it was 12:00
14 economics class.
15     Q.   How much did you pay him?
16     A.   I believe it was $5.00.
17     Q.   How long did it take him?
18     A.   I don't know.
19     Q.   Was that approved by Marywood
20 University?
21     A.   Was what approved by Marywood
22 University?
23     Q.   The payment to a student.
24     A.   No.

49 (Pages 190 to 193)



Page 194

1    Q.   You include various comments
2  from your -- the pre-release viewers.  One
3  of the comments is in quotations, it was
4  nice knowing you, Fred.
5    A.   Yes.
6    Q.   Who said that?
7    A.   Again, I'm drawing a blank on
8  the name.  I know -- I know the name.  He
9  worked in our social science department
10  but he saw the videos and -- Larry Walsh
11  is his name, so that's his comment.
12    Q.   Okay.
13       Fair to say that he thought it
14  was not a good idea?
15    A.   Yes.  Well, in terms of --
16    Q.   What it can do for your
17  career --
18    A.   What it could do for my
19  career --
20    Q.   -- at Marywood?
21    A.   -- at Marywood.
22    Q.   Was he trying to say that
23  perhaps this would be the end of your
24  career at Marywood?

Page 195

1    A.   I think he was trying to say
2  that, yes.
3    Q.   Okay.
4       Who's Rod Carveth?
5    A.   Former professor at Marywood.
6    Q.   In January of 2012, was
7  Mr. Carveth a professor at Marywood?
8    A.   No.
9    Q.   Do you remember -- do you know
10  the name of your dental hygienist that you
11  sent it to?
12    A.   Yes.
13    Q.   What's her name?
14    A.   Kim Mingess(ph).
15    Q.   Why did you send it to her?
16    A.   Because I had a dentist
17  appointment for my checkup and I had a
18  tooth cleaning.  I saw my dentist that
19  same day, and so I was talking with my --
20  my dentist asked me how things are going
21  and I told him the quick story, and Kim
22  listened.  She seemed interested, so I
23  said I'll send you a copy of the video.
24    Q.   Did you send it to your dentist

Page 196

1  as well?
2    A.   No.
3    Q.   If you can go to the next page,
4  there are two hyperlinks to YouTube.
5       Are those the videos?  If I
6  would click on link to video number one --
7    A.   Uh-huh.
8    Q.   If I clicked on that, would
9  that direct me to YouTube and direct me to
10  your video?
11    A.   When?
12    Q.   In January of 2012.
13    A.   Yes.
14    Q.   If I clicked on the link to
15  video number two, would that direct me to
16  YouTube in January 2012 with your video?
17    A.   Yes.
18    Q.   You then say a few colleagues
19  concerned for my welfare have told me they
20  fear the administration will try and fire
21  me over this.
22       Who are those few colleagues?
23    A.   Larry Walsh was one of them.  I
24  can't right now remember who the other one

Page 197

1  was.
2    Q.   Is it possible there were more
3  since you wrote a few colleagues?
4    A.   We're talking two or three
5  here.  It may be, not many.
6    Q.   Okay.
7       You say -- and, again, these
8  are pre-release viewers, correct?
9    A.   Yes.
10    Q.   Then you say one colleague says
11  perhaps I should have asked for an
12  appointment with President Munley and made
13  a final appeal, that is I should have
14  pursued every last ditch channel possible.
15       You testified you did not do
16  that, correct?
17    A.   That's correct.  I did not
18  pursue an appointment with Professor
19  Munley -- or President Munley.
20    Q.   And what -- who -- what
21  colleague was the one that suggested you
22  do that?
23    A.   I don't know for sure.
24    Q.   Okay.



1      Who do you think it is?
2      A.   I think it was Larry Walsh but
3  I wouldn't testify to that.
4      Q.   Okay.
5      Then you said I did not want to
6  go into such a meeting and in essence have
7  as the only new point to raise, quote, a
8  blackmail, end quote, threat to go public
9  as I do here and in the videos.
10     Do you believe these videos are
11 blackmail?
12     A.   No.
13     Q.   Okay.
14     You say if the risk to me is
15 there, it is there, semicolon, and if the
16 worst does come to pass, I will have to
17 battle as best as I can with the support
18 of family, and friends, and colleagues,
19 and perhaps concerned outsiders.
20     What was the worst does come to
21 pass? Would that be your termination of
22 employment from Marywood?
23     A.   Yes.
24     Q.   So you realized that that was a

1  possible alternative when you posted these
2  videos?
3      A.   I had been warned that it might
4  be, yes.
5      Q.   And you understood that by
6  doing this, this might be the end of your
7  employment with Marywood?
8      A.   I understood that it was a
9  risk.
10     Q.   Okay.
11     You then say, in all caps,
12 beware, dash, according to page 86 of the
13 faculty handbook, you then quote there are
14 no specific laws, comma, rules, comma, or
15 regulations that protect the privacy of a
16 user's files, comma, electronic mail
17 messages, comma, or any other information
18 retrieved as a result of person's session
19 on the Marywood system, period, end quote.
20     A.   Yes.
21     Q.   You then say thus, if you
22 e-mail me and want to protect yourself,
23 you might best use a backup e-mail address
24 such as your old youthful one,

1  coolcat@hotmail.com, and send it from
2  anywhere but Marywood.
3      Do you see that?
4      A.   Yes, I do.
5      Q.   And that's because Marywood has
6  a computer policy, correct?
7      A.   Correct.
8      Q.   If you turn to the next page
9  very much towards the end, it is
10 transparently obvious Marywood University
11 is discriminating against Professor Fagal;
12 Your Honor, I rest my case.
13     Do you see that?
14     A.   Yes.
15     Q.   So do you believe you're -- you
16 were being discriminated against?
17     A.   I don't know that -- I'm not
18 sure how we define the word
19 "discriminating" here.
20     Q.   You wrote this, right?
21     A.   Yes, I did.
22     Q.   Okay.
23     A.   I believe that at the time that
24 they were -- the administration was

1  perhaps looking to interfere with things I
2  might do on campus that they didn't like.
3      Q.   Okay.
4      Well, you wrote it is
5  transparently obvious --
6      A.   And so I would say -- yeah.
7  And so I would say that based -- based on
8  my recounting of the posters story and the
9  pandering phrase before that, when
10 Marywood itself was giving out Visa cards
11 and whatnot at events for people to come
12 to class that they were discriminating
13 against me as opposed to other professors
14 who would send students to an evening
15 class where students could get a prize or
16 food.
17     Q.   Okay.
18     Do you believe you were being
19 discriminated against?
20     A.   Yes, I did.
21     Q.   Based on what protective
22 status?
23     A.   I was not considering this as a
24 legal phrase.

51  (Pages 198 to 201)



Page 202

1    Q.   Okay.
2        You didn't sue for
3    discrimination, correct?
4    A.   No.
5    Q.   Did you -- are the videos still
6    posted on YouTube?
7    A.   No.
8    Q.   Why not?
9    A.   Why not?
10       MR. COHEN:  Without disclosing
11   any attorney-client communication.
12       THE WITNESS:  What did you say
13   there?
14       MR. COHEN:  I said without
15   disclosing any attorney-client
16   communication.
17       THE WITNESS:  Without
18   disclosing any attorney-client
19   communication.
20       It was just a gesture to take
21   them down.  They -- I guess they had
22   served their purpose.  I made
23   certainly enough of a point to get
24   suspended and termination

Page 203

1    recommended.
2    BY MS. PEET:
3    Q.   What purpose did they serve?
4    A.   What purpose did the videos
5    serve?  Is that --
6    Q.   You said they served their
7    purpose, so I'm saying what purpose did
8    they serve.
9    A.   They publicized the posters
10   events.
11   Q.   Did you post them on anything
12   other than YouTube?
13   A.   No.
14   Q.   When did you take them off of
15   YouTube?
16   A.   I can give an approximate date.
17   I would say it was around the end of
18   February 2012.
19   Q.   We're going to watch the
20   videos.
21          - - -
22       (At this time, videos were
23   played.)
24          - - -

Page 204

BY MS. PEET:
1    BY MS. PEET:
2    Q.   Those videos you created?
3    A.   Yes.
4    Q.   Anyone help you?
5    A.   Yes.
6    Q.   Who?
7    A.   Bill Ziegelbauer helped a
8    little bit.
9    Q.   Anyone else?
10   A.   No.
11   Q.   As we sit here today, do you
12   have any remorse for doing that?
13   A.   I remorse that I lost my job.
14   Q.   Do you have any remorse for
15   creating those videos and depicting Sister
16   Anne Munley as Adolf Hitler who killed six
17   million Jews?
18   A.   I would say that instead of
19   depicting Anne Munley as Hitler -- in
20   other words, think of Anne Munley doing
21   Hitler stuff in the 1930s or '40s as being
22   -- let's say a newsreel.  You took the
23   newsreel and you superimposed Anne Munley
24   into that newsreel, then Anne Munley would

Page 205

1    be portraying Hitler.
2        In this case, it's more a
3    question of an actor dressed as Adolf
4    Hitler portraying Anne Munley, and under
5    her direction some fascist type
6    activities, namely tearing down posters,
7    were done; therefore, the satire parody.
8    Absolutely no intention to cause anyone to
9    think that -- and I don't think anyone
10   would think that I was in any way implying
11   that Anne Munley would do horrible things
12   like Hitler did in terms of killing six
13   million Jews.
14   Q.   In the video, there's an actor
15   obviously portraying Adolf Hitler?
16   A.   Yes.
17   Q.   Is that Sister Munley in the
18   video?
19   A.   He is portraying Sister Munley,
20   again.
21   Q.   And other members of Marywood's
22   administration, they're being depicted as
23   members of the Nazi regime, correct?
24   A.   Mostly in a vague



Page 206

1  unidentifiable sense.
2      Q.   Are they being identified as
3  members of the Nazi regime?
4      A.   No, because I would say again
5  that members of the Nazi regime are
6  portraying the Marywood personnel.
7      Q.   So the members of the Nazi
8  regime are various members of Marywood
9  administration, correct, in your video?
10     A.   The point of the satire is
11  to --
12     Q.   That's not my question.
13     A.   Okay.  Say it again.
14     Q.   Strike as nonresponsive.
15     A.   Okay.
16     Q.   This is a video --
17     A.   Yes.
18     Q.   -- correct?
19     A.   Correct.
20     Q.   And the original video depicts
21  Adolf Hitler and members of the Nazi
22  regime, correct?  They are actors
23  nonetheless because --
24     A.   The video Downfall -- the

Page 207

1  Downfall movie depicts actors as members
2  of the Nazi regime.
3      Q.   Okay.
4          Various members of the Nazi
5  regime in the video are various members of
6  Marywood administration, correct, in your
7  video?
8      A.   In my video, those actors are
9  standing in for Marywood personnel.
10     Q.   When did you start creating
11  these videos?
12     A.   Right around that December -- I
13  was learning how to use the software and
14  whatnot.  Somewhere around December 20th,
15  21st, just before Christmas.
16     Q.   I'm not sure you responded to
17  the question, so if you did, my apologies.
18         But as we sit here today, are
19  you remorseful that you did that?  And by
20  that, I mean creating these two videos.
21     A.   No.
22     Q.   Okay.
23         How long did it take you to
24  create them?

Page 208

1      A.   I would have to measure that
2  answer in hours and I would have to
3  estimate.  I'd have to think to come up
4  with a good answer.
5      Q.   Okay.
6      A.   Many hours.
7      Q.   Many?
8      A.   Yes.
9      Q.   More than 10?
10     A.   Yes.
11     Q.   More than 20?
12     A.   Yes.
13     Q.   More than 30?
14     A.   Probably.
15     Q.   More than 40?
16     A.   Probably not.
17     Q.   Did you ever work on it in your
18  office on campus?
19     A.   No.
20     Q.   Did you only work on it in your
21  home?
22     A.   Yes.
23     Q.   There's someone in the video
24  that's spelled L-E-V-I-N-E.

Page 209

1      A.   Correct.
2      Q.   Is that supposed to be Alan
3  Levine?
4      A.   Yes and no.
5      Q.   Did you change his name?
6      A.   Yes.
7      Q.   Why did you do that?
8      A.   I wanted to make it be a French
9  name, Levine, that's why I emphasized the
10  V-I-N-E to make it clear that it was
11  nothing at all about what -- some people
12  might say Levine was a Jewish name, and
13  that's -- I wanted to make it clear that I
14  was not affiliating Alan Levine with any
15  connotation.
16     Q.   Well, do you think people would
17  be offended if they saw a Hitler movie and
18  a Jewish person was a member of a Nazi
19  regime or depicted as a member of a Nazi
20  regime?
21     A.   I realize that some people
22  could be offended and have the right to be
23  offended.
24     Q.   Do you understand how people

53 (Pages 206 to 209)



Page 210

1 that watch that video could be offended?
2  A. That's -- I can't under -- I
3 mean I can understand that they are.  I
4 don't understand in the context here why
5 they would be.
6  Q. Did you watch those videos?
7  A. Yes, I did.
8  Q. Okay.
9  A. Uh-huh.
10  Q. And you don't see how someone
11 that watches that could be offended by
12 what you just did?
13  A. I do understand that they could
14 be offended.
15  Q. For the people that watched it
16 pre-release, how did they get access to
17 it?
18  A. Some I showed on my laptop and
19 a few people I e-mailed low quality video
20 files.
21  Q. Where did you e-mail them?
22  A. Can you rephrase the question?
23  Q. Where was it that you -- how
24 was it that you e-mailed it to them?  Was

Page 211

1 it to their personal e-mail accounts or to
2 their Marywood e-mail accounts to those
3 that are affiliated with Marywood?
4  A. I don't recall e-mailing it to
5 anybody at Marywood -- at a Marywood
6 account.
7  Q. For the pre-release, correct?
8  A. For the pre-release.
9  Q. You talk in your video about
10 rape.
11  Are you suggesting that they
12 would try and frame you and have you
13 seduce a young woman and then have that
14 person call rape and then so they can fire
15 you?  Is that what you were implying?
16  A. No.
17  Q. What were you implying when you
18 were talking rape?
19  A. I wasn't implying anything.
20  Q. Okay.
21  A. It was a humorous satire part
22 of the video.
23  Q. The rape --
24  A. A sub --

Page 212

1  Q. The rape part?
2  A. A substory.
3  Q. Yeah.
4  A. There was no rape.
5  Q. So the rape part was meant to
6 be comical?
7  A. The rape part was meant to be
8 comical.
9  Q. Okay.
10  When you talk about the hot
11 young pretty thing --
12  A. Excuse me.  Can I amplify a
13 little bit?
14  There was no rape.  There was
15 some supposed humorous non-existent plot
16 to have the Fagal character be seduced and
17 then claim rape.  So there was never a
18 rape, and of course there was never such a
19 plot, and there was never such a
20 seduction, and I don't think anybody would
21 have thought that to be the case.
22  Q. Do you think when someone is
23 watching this video and they're talking
24 about rape, do you think someone can get

Page 213

1 offended by that or think it's
2 inappropriate?
3  A. Anybody could be offended by
4 anything.
5  Q. Including these videos,
6 correct?
7  A. If they choose to be.
8  Q. The hot young pretty thing that
9 you're referencing, would that be
10 Dr. Levine's wife?
11  A. What was the exact quote?  I
12 don't know if that's the exact quote.  I
13 have the -- we had -- I had the scene by
14 scene.
15  Q. Well, since you mention it, we
16 have the scene by scene as well.
17  A. Where I made comments in each
18 scene.
19   - - -
20  (At this time, a document was
21 marked for identification as Exhibit
22 Fagal-16.)
23   - - -
24 BY MS. PEET:



Page 214

1    Q.   First off, what has been marked
2    as Exhibit-16, are these the frames from
3    the video that we just showed?
4    A.   They certainly appear to be.
5    Q.   Okay.
6    A.   Very grainy, but yes.
7    Q.   If you flip to DEF136, it's
8    towards the end.  Some member of the Nazi
9    regime slash Marywood administrator is
10   saying so you wanted a hot young thing,
11   now you pay.
12        Do you see that?
13   A.   Yes, I do.
14   Q.   And they're directing this to
15   the character that's portraying
16   Dr. Levine, correct?
17   A.   Yes.
18   Q.   And is that referring to --
19   that hot young thing, would that be
20   Dr. Levine's wife that you're referring
21   to?
22   A.   Yes.
23   Q.   Do you think Dr. Levine might
24   find that offensive?

Page 215

1    A.   I don't know whether he would.
2    This is satire comedy parody.  If I may
3    refer to the previous scene, the Levine
4    character says I should quit as VP and be
5    a professor again, but my young wife
6    number two and one percent kids need
7    money.  So here Dr. Levine is making a
8    joke.  It's understood from common
9    knowledge that Dr. Levine had been
10   divorced and married again.
11   Q.   When you say Dr. Levine is
12   making a joke, let's be abundantly clear
13   here.  It's Dr. Fagal --
14   A.   Yes, but in the --
15   Q.   -- making a joke about
16   Dr. Levine, correct?  Dr. Levine did not
17   make this joke, correct?
18   A.   That's correct.  The character
19   in the movie representing Dr. Levine is
20   making a joke about his situation.  He's
21   got a second family to support and all
22   this turmoil.  He could go back to be a
23   professor at a lower pay rate but his wife
24   might not appreciate the lower salary and

Page 216

1    his one percent kids need money.  That's a
2    joke reference to the Occupy Wall Street
3    movement that was going on at the time,
4    and so that I would say makes this, you
5    know, be a joke.
6         And the next scene where you
7    say so you wanted a hot young thing, now
8    you pay, you know, there's Hot in
9    Cleveland, the television show that was
10   very popular at the time.  The term "hot"
11   is a very general term.  It means, you
12   know, attractive.
13        So could Dr. -- your question
14   is could Dr. Levine be offended?  He could
15   be if he wanted to.
16   Q.   Do you think this might be
17   offensive to Dr. Levine's second wife?
18   A.   I personally don't see why it
19   would be.
20   Q.   Have you ever posted anything
21   else on YouTube about Marywood University?
22   A.   No.
23   Q.   Did you ever consult with an
24   attorney about this video before you

Page 217

1    posted it?
2    A.   No.
3    Q.   Ever consider not posting this
4    video after you prepared it and watched
5    it?
6    A.   I don't recall.  I did listen
7    to Larry Walsh if he offered his opinion.
8    Q.   Was he the only person that
9    provided commentary to the effect that you
10   could be terminated if you do this?
11   A.   He's the only one I can recall
12   at this moment.
13   Q.   Did you show it to your wife
14   before you posted it?
15   A.   Yes.
16   Q.   Was she in agreement that you
17   should do this?
18   A.   She was wondering if I would
19   get in trouble about it and she didn't
20   want all that, and I told her it's
21   something I had to do, and she said fine.
22   Q.   When you say you had to do it,
23   no one at Marywood asked you to do this,
24   correct?



Page 218

1    A.   No.
2    Q.   When you had to do it, it was a
3  decision that you --
4    A.   My personal decision.
5    Q.   -- personally made --
6    A.   Right.
7    Q.   -- correct?
8         And when you say your wife
9  didn't want any trouble, would that imply
10  a termination of your employment?
11    A.   It could be anything.  Just
12  being called in on the carpet, just the
13  stress of ongoing back and forth that had
14  already been going on for months.  So...
15    Q.   What is your personal opinion
16  of Adolf Hitler?
17         MR. COHEN:  Can you repeat
18  that?
19         MS. PEET:  What is his personal
20  opinion of Adolf Hitler?
21         THE WITNESS:  A horrible human
22  being.
23  BY MS. PEET:
24    Q.   Why is he a horrible human

Page 219

1  being in your opinion?
2    A.   He was a ruthless dictator who
3  did all sorts of bad things.
4    Q.   Such as?
5    A.   Such as Kristallnacht, such as
6  putting Jews in concentration camps, such
7  as going after anybody who spoke out
8  against him, such as mentioned in the
9  video beheading the white -- what is it,
10  the white flower protesters, concentration
11  camps, war crimes.
12    Q.   In your opinion, do you think
13  someone would be fond of being associated
14  with Adolf Hitler?
15    A.   Fond, no.
16    Q.   Do you think someone would be
17  fond or think favorably if they were being
18  associated with a Nazi?
19    A.   No, but let me -- not all Nazi
20  behaviors were equivalently bad.  So if
21  somebody said you tore down the posters
22  like a Nazi would, well, that's a
23  descriptive term.  That's -- if you did
24  it, you did it.  It's a comparison.

Page 220

1    Q.   Did it ever cross your mind
2  that you were depicting a member of the
3  Jewish faith as a Nazi?
4         MR. COHEN:  Can you repeat
5  that?
6  BY MS. PEET:
7    Q.   Did it ever cross your mind
8  that you were depicting a member of the
9  Jewish faith as a Nazi?
10    A.   Well, it crossed my mind
11  because I changed the name to Levine and I
12  wanted to make it clear that Alan Levine
13  -- I didn't really consider him to be my,
14  quote/unquote, enemy.
15    Q.   Although you changed the name,
16  the person that you're depicting is
17  Dr. Alan Levine, correct?
18    A.   Yes.
19    Q.   Okay.
20    A.   I mean -- yes.
21    Q.   Do you think the videos are
22  professional?
23    A.   What do you mean by
24  professional?

Page 221

1    Q.   Do you think it was a
2  professional thing to do as a tenured
3  professor at Marywood University?
4    A.   Well, as part of my professor's
5  job is to seek, you know, open expression
6  and free inquiry, and I was inquiring as
7  to what had happened.  And so I didn't
8  think it was out of the ordinary for some
9  college professors to speak up in a case
10  like this.
11    Q.   Do you think it was
12  professional?
13    A.   I don't have an opinion really.
14    Q.   Can you understand how some
15  people would find it to be unprofessional?
16    A.   Again, I'm not sure what you
17  mean by unprofessional.  You say, oh, that
18  wasn't a polite thing to do.  I could
19  understand why some people wouldn't think
20  it was polite.  Unprofessional, I really
21  don't have a good answer for that.
22    Q.   What about inappropriate
23  conduct from a tenured professor?
24    A.   I wouldn't say what I did was



Page 222

1    inappropriate given the circumstances.
2        Q.    And the circumstances being --
3    you're talking about the posters?
4        A.    That's correct.
5        MS. PEET:  Why don't you change
6    the video.
7                - - -
8        THE VIDEOGRAPHER:  We're now
9    off the record.  The time is 2:36
10   p.m.  This ends disk number two.
11               - - -
12       (At this time, a short break
13   was taken.)
14               - - -
15       THE VIDEOGRAPHER:  We are now
16   on the record.  The time is 2:43 p.m.
17   This starts disk number three.
18               - - -
19       (At this time, a document was
20   marked for identification as Exhibit
21   Fagal-17.)
22               - - -
23   BY MS. PEET:
24       Q.    Exhibit-17 seems to be e-mail

Page 223

1    exchange between you and Benjamin
2    Harrington.
3        Do you see that?
4        A.    Yes.
5        Q.    Was Benjamin Harrington at this
6    time, January of 2012, a student at
7    Marywood?
8        A.    I believe he was registered for
9    the spring semester though I don't know
10   that for sure.
11       Q.    Well, you sent it to him at his
12   Marywood --
13       A.    That's correct.
14       Q.    -- .edu e-mail address --
15       A.    That's correct.
16       Q.    -- is that correct?
17       A.    That's correct.
18       Q.    So he's not a faculty member,
19   correct?
20       A.    No.
21       Q.    He was a student, correct?
22       A.    Correct.
23       Q.    And you were telling him to go
24   to YouTube to look at those videos,

Page 224

1    correct?
2        A.    Let me see.
3        Q.    Down at the bottom.
4        A.    Yes.  He -- yes.  Uh-huh.
5        And, yes, I see that -- I say
6    what is your best time for Republican
7    Conservative Club meeting, so he was -- he
8    would have been a student.
9        Q.    Thank you.
10               - - -
11       (At this time, a document was
12   marked for identification as Exhibit
13   Fagal-18.)
14               - - -
15   BY MS. PEET:
16       Q.    Is one of the people that you
17   sent the e-mail to with the videos Kevin
18   Wyllie?
19       A.    I presume he's on that e-mail
20   list, yes.
21       Q.    Okay.
22       And who is Kevin?
23       A.    I don't know for sure, but I
24   looked him up after I got this and he was

Page 225

1    on the member of the faculty on arc --
2    school of architecture.
3        Q.    Kevin wrote to you that he
4    understands your concern, but this type of
5    mass e-mail seems a little inflammatory
6    and unprofessional.
7        Do you see that?
8        A.    Yes.
9        Q.    Do you disagree with what he
10   wrote?
11       A.    I would -- I would agree with
12   the a little inflammatory part and I would
13   disagree with the unprofessional part.
14       Q.    Okay.
15       But, nonetheless, it's a
16   colleague of yours at Marywood telling you
17   that he found it to be unprofessional,
18   correct?
19       A.    He said it seems
20   unprofessional.
21       Q.    Okay.
22       A.    Right.
23       Q.    And he also said it seems like
24   you're having a tantrum.

57  (Pages 222 to 225)



Page 230

1    A.   No.
2    Q.   Have you ever been treated with
3  a psychiatrist or psychologist or other
4  mental health provider?
5    A.   No.
6    Q.   Had anyone ever suggested that
7  you treat with a psychologist,
8  psychiatrist, or any other type of mental
9  health provider?
10    A.   No.
11    Q.   Have you ever been diagnosed
12  with any sort of mental health disease or
13  illness?
14    A.   No.
15    Q.   Have you ever been diagnosed
16  with OCD?
17    A.   No.
18           - - -
19       (At this time, a document was
20    marked for identification as Exhibit
21    Fagal-20.)
22           - - -
23  BY MS. PEET:
24    Q.   You're e-mailing here with a

Page 231

1  Lindsay, correct?
2    A.   Yes.
3    Q.   Who's Lindsay?
4    A.   Lindsay Groves is a cellist
5  with the Syracuse Symphony Orchestra.  She
6  lives in Skaneateles, New York.
7    Q.   She's one of the folks that you
8  sent the e-mail to with the videos,
9  correct?
10    A.   Yes, I did.
11    Q.   Okay.
12       And her response to that is on
13  the bottom of the first page.
14       Do you see that, January 15,
15  2012?
16    A.   Yes.
17    Q.   Okay.
18       And she writes, Fred, the real
19  estate portfolio slash young wife stuff is
20  really personal, exclamation mark.
21       Do you see that?
22    A.   Yes.
23    Q.   Geez, I'm wondering if the
24  students, who are transients, can get into

Page 232

1  this as much as you want and convince
2  their parents to write.  I think you
3  should take down the second video with
4  three exclamation marks.
5       Do you see that?
6    A.   I see that, uh-huh.
7    Q.   Why did you send it to Lindsay?
8    A.   She's a good friend and I
9  valued her opinion.
10    Q.   Okay.
11       What did you think when she
12  sent you her opinion?
13    A.   I understood her point to a
14  short extent, a small extent.  I didn't
15  think it was really personal.  The real
16  estate portfolio I thought was a joke
17  about the real estate market, et cetera,
18  so I disagreed with her opinion.
19    Q.   Okay.
20       And she's not a Marywood
21  administration, correct?
22    A.   No.
23    Q.   Did you in fact take down the
24  second video after she told you to do

Page 233

1  that?
2    A.   No.  Again, she did not tell me
3  to do that.
4    Q.   On the top, you write back to
5  Lindsay.
6       Do you see that?
7    A.   Yes.
8    Q.   And in part you write only
9  those in the know know that Levine, open
10  parens, written Levine, all capital, as a
11  joke because as a Jewish guy working for
12  Hitler, his name cannot be Levine,
13  exclamation point, closed parens, is on a
14  second family --
15    A.   Right.
16    Q.   -- period.
17    A.   Uh-huh.
18    Q.   So do you agree that it would
19  be outlandish for a Jewish person to be
20  portrayed working for Hitler?
21    A.   I don't know if outlandish is
22  the word I would use, but I was trying to
23  make a point about free speech and didn't
24  want to get anything in there about

59 (Pages 230 to 233)



Page 234

1  raising some subsidiary issue about what
2  religion anybody was in administration, so
3  that's why I changed the name.
4      Q.   Were you concerned about
5  offending people?
6      A.   I was not willing to offend
7  people just gratuitously.  If it had to be
8  done to make a point if they would be
9  offended by the video, unhappy with it,
10 shall we say, then that was part of the
11 price.  No one would appreciate being
12 criticized, I don't think, in public.
13     Q.   And this was public, correct?
14          MR. COHEN:  Excuse me.  Say
15     that again.
16 BY MS. PEET:
17     Q.   This was public, correct?
18     A.   It was available on YouTube, so
19 the public could access it.
20     Q.   Do you think this video or the
21 videos do anything to further a supportive
22 or welcoming environment at Marywood
23 University?
24     A.   Yes.

Page 235

1      Q.   How is that?
2      A.   Because it might tell people,
3  look, if you come to Marywood University,
4  you can speak your mind and have free
5  speech, an open honest debate, and tackle
6  big issues, and this is a university that
7  does that.
8          - - -
9          (At this time, a document was
10     marked for identification as Exhibit
11     Fagal-21.)
12         - - -
13 BY MS. PEET:
14     Q.   These are e-mails between you
15 and Geri Smith, correct?
16     A.   Yes.
17     Q.   And Geri is the student that
18 you testified about earlier today?
19     A.   Yes.
20     Q.   And if you can look on the
21 second page, you can see that it's at her
22 Marywood e-mail address.
23     A.   I see that.
24     Q.   Do you see that?

Page 236

1      A.   She has a private e-mail
2  address, too, but I see the Marywood
3  address there.  That's correct.
4      Q.   Okay.
5          Does this refresh your memory
6  that you sent it to her as a pre-release
7  at her Marywood e-mail address?
8      A.   Let me read.  Let's see.  Yes.
9      Q.   If you look on -- at the time
10 that you were e-mailing with Geri, you did
11 not yet make these videos public, correct?
12     A.   That's correct.
13     Q.   You write on the first page I
14 do not think -- and "not" being all
15 capitals -- they will try to fire me over,
16 quote, all this, end quote.  If by, quote,
17 this, end quote, you mean over what
18 happened so far, then absolutely not,
19 underlined.
20         But, again, at this point you
21 haven't made the videos public?
22     A.   That's correct.
23     Q.   All right.
24         You then say assuming the

Page 237

1  videos are released, open parens, and at
2  this point I would say they will be with
3  -- I guess 95 percent.
4          Is that what you're trying to
5  say?
6      A.   Probability equals point 95,
7  which is 95 percent, yes.
8      Q.   Closed parentheses, comma,
9  there will be some very pissed off
10 administrators.
11         Do you see that?
12     A.   Yes.
13     Q.   Why do you think there were
14 going to be pissed off administrators?
15     A.   Because they're being publicly
16 criticized in a satirical funny way that
17 might get a lot of attention.
18     Q.   Okay.
19         And who are the administrators
20 that you think would be pissed off?
21     A.   Well, the ones mentioned in the
22 video.
23     Q.   Who are they?
24     A.   As I recall, the names that



Page 242

1  celebre.
2      Q.   So you did them a favor?
3          MR. COHEN:  Excuse me.
4  BY MS. PEET:
5      Q.   So you did --
6      A.   Yes.
7      Q.   -- them a favor?
8      A.   I did them a favor.
9      Q.   Do you think that these videos
10  warranted any type of discipline?
11     A.   I would say no.
12     Q.   And why do you say that?
13     A.   I would say -- I would assume
14  that I would perhaps have been called on
15  the carpet and told something along the
16  lines of, gee, Dr. Fagal, I wish you
17  hadn't gone that far.  I wish you had -- I
18  wish we had contacted you earlier.  I wish
19  we made a settlement before.  I wish --
20  you know, I wish you'd come to see
21  President Munley and make a -- and shown
22  her the videos ahead of time.
23          I mean something like that
24  maybe could have happened, and obviously

Page 243

1  in that case I would have known that she
2  was very upset about the videos going
3  public but that -- and I would be told,
4  gee, please always come to see me before
5  you do anything major like this and, you
6  know, that would have been not a
7  comfortable conversation but it would have
8  been a conversation and that would have
9  been it.
10     Q.   Did you try to show the video
11  to Sister Munley before you posted it
12  publicly?
13     A.   No, I did not.
14     Q.   Did you try to show the video
15  to Dr. Levine before you posted it
16  publicly?
17     A.   No.
18     Q.   Why not?
19     A.   Because I had already tried so
20  very, very hard to find out what had
21  happened.  I had made proposals and I
22  thought that was enough.  I had done
23  enough.
24     Q.   Okay.

Page 244

1          In this Exhibit-21, you mention
2  something about not supporting the
3  mission's core values, and we talked about
4  core values earlier.
5          Do you see that?
6      A.   Not yet.
7          Whereabouts?
8      Q.   It's in the middle of the page
9  in the paragraph that starts --
10     A.   The first page?
11     Q.   -- tenure is on my side,
12  correct.
13     A.   Yes, yes.  I see what you're
14  saying.
15     Q.   Okay.
16          To your knowledge, when you
17  were a tenured professor in January of
18  2012, were you expected to uphold
19  Marywood's missions and core values?
20     A.   Yes.
21     Q.   Did you ever apologize to
22  Sister Munley or Dr. Levine about these
23  videos?
24     A.   At the meeting -- Dr. Levine

Page 245

1  was not at the termination meeting, so I
2  did not see Dr. Levine at all after the
3  videos were posted.  I did not make an
4  explicit apology at the January 23rd
5  meeting.
6      Q.   Did you ever apologize to
7  Sister Munley about those videos?
8      A.   No.
9      Q.   Did you ever apologize to
10  Dr. Levine about those videos?
11     A.   No.
12     Q.   Did you ever apologize to any
13  member of the Marywood administration
14  about those videos?
15     A.   No.
16          - - -
17          (At this time, a document was
18  marked for identification as Exhibit
19  Fagal-22.)
20          - - -
21  BY MS. PEET:
22     Q.   What's been marked as Exhibit-2
23  seems to be e-mails between -- 22 --
24  between you and Rod Carveth dated early

62  (Pages 242 to 245)



Page 246

1    January 2012.
2         Do you see that?
3         A.   Yes.
4         Q.   And I believe you testified
5    earlier that he was one of the folks that
6    saw the pre-release of the videos.
7         A.   Yes.
8         Q.   If you look at the bottom of
9    the first page --
10        A.   Yes.
11        Q.   -- Rod writes to you honestly I
12   think it is a brilliant satire.  If it was
13   released, however, I think you would catch
14   an incomparable amount of grief.  Anytime
15   Hitler gets raised, no one pays attention
16   to the message but the symbolism of Hitler
17   as a murderer and butcher.  I think the
18   university would try and find some
19   loophole to undo your tenure and fire you.
20   It's not what you -- what you are saying
21   here but how you are saying it that puts
22   you at risk.
23        Do you see that?
24        A.   Yes, I do.

Page 247

1         Q.   Did you understand what Rod was
2    trying to say to you?
3         A.   Yes, I did.
4         Q.   Okay.
5         And what was he trying to say
6    to you?
7         A.   He was trying to say I was
8    taking a risk by posting those videos.
9         Q.   And you understood that was a
10   risk?
11        A.   I understood it was a risk.
12        Q.   And then you -- the top of the
13   page is an e-mail that you wrote back to
14   Rod, and then you write to him you sound
15   like my wife.
16        A.   Yes.
17        Q.   Did your wife make similar
18   comments to you?
19        A.   As I mentioned before, she was
20   worried that I would upset some people and
21   get in trouble of some sort.
22        Q.   And perhaps lose your job?
23        A.   Well, losing the job -- just
24   had been an ongoing brouhaha and that

Page 248

1    would, you know, continue in some fashion.
2         Q.   You then wrote and I know the
3    Hitler link is considered by many to be
4    out of bounds.
5         A.   Yes.
6         Q.   I would have to face that
7    possibility.
8         A.   Uh-huh.
9         Q.   I am going to rethink this but
10   I think I won't change my mind about the
11   release.  I will look over the faculty
12   manual again, heh.
13        Do you see that?
14        A.   Yes, uh-huh.
15        Q.   Okay.
16        So is it fair to say that you
17   didn't change your mind?
18        A.   That's correct.
19        Q.   Okay.
20        You then wrote down assuming
21   the videos are released, if Marywood
22   considered going after my job, they will
23   probably realize that I would not -- all
24   caps -- go quietly.  If I were a tenured

Page 249

1    42-year-old likely to cause trouble for
2    another 20 to 25 years, then the game
3    might be worth their votive candle, but I
4    will be 66 years old in a month.  If --
5    all caps -- they are rational, they will
6    think I can't be around that -- bold
7    italicized -- much longer and they will
8    take a big publicity hit for trying to get
9    rid of me.
10        Do you see that?
11        A.   Yes, I do.
12        Q.   So were you -- did you consider
13   the fact that because you were 66 years
14   old and you probably didn't have that much
15   longer of a tenure at Marywood University
16   that that weighed in your favor?
17        A.   What do you mean by weighed in
18   my favor?
19        Q.   That they more likely will not
20   terminate your tenure than had you been
21   younger?
22        A.   Yes, because I think that if a
23   younger person were to do what I did --
24   big if there because when I said they were



Page 250

1    younger, I don't think they would tend to
2    do it because of the trade-offs. Because
3    if the younger person did in fact lose
4    their tenured job, it'd be very difficult
5    for that person to find work. It would
6    cause much family turmoil.
7        But I -- as I just recently
8    explained, if one is older, then I
9    considered it my duty to do what I did
10   given my position and, again, as we just
11   discussed, if Marywood had to make the
12   decision what to do about the videos, if
13   it was a 42-year-old, to be rid of that,
14   quote/unquote, troublemaker, they'd be rid
15   of that troublemaker for at least 25
16   years, and so the game would be worth the
17   candle. For me being older, it might be
18   more -- have been more rational for them
19   to take the -- shall we call it a two-week
20   publicity hit and tolerate me for what
21   would not be another 25 years.
22       Q.   How many years at that point?
23       A.   I had no particular plans to
24   retire. If I was going to retire that

Page 251

1    year, I would have filed earlier for the
2    bonus. I was thinking of going at least
3    to age 70 and maybe longer depending how
4    things went.
5        Q.   At that point, have you spoken
6    to anyone about retirement?
7        A.   No.
8        Q.   Did you meet with a financial
9    advisor?
10       A.   No, not about retirement. Now,
11   maybe briefly I might have talked to a
12   TIAA-CREF guy once about investments but
13   nothing retirement per se.
14       Q.   Do you agree or disagree with
15   Rod's comment that Hitler is a symbolism
16   of murder and -- of a murderer and a
17   butcher?
18       A.   Hitler is often used as a
19   symbol that way, yes, but he's also used
20   in movies like Mel Brooks as a comedy
21   figure.
22       Q.   The videos, were they connected
23   to your intro to social sciences course?
24       A.   No.

Page 252

1        Q.   Were they -- what other courses
2    were you teaching that semester?
3        A.   In the spring of 2012, I
4    believe I was teaching two sections of
5    economics, a U.S. history class, and I
6    think I had the social science class also.
7    I'm not sure.
8        Q.   Was the video connected to any
9    of those courses?
10       A.   No.
11       Q.   Was it part of some academic
12   research?
13       A.   I follow the news on American
14   campuses quite closely in terms of what's
15   going on, in terms of social justice
16   protests, Occupy Wall Street protests,
17   free speech protests, all sorts of Black
18   Lives Matter protests, whatever might be
19   going on on any different campus, or not
20   going on, or not allowed to go on.
21       So I was always -- and plus I
22   always had -- I had that contact with
23   FIRE, so I was aware of what was going on
24   and I was also aware that, you know, part

Page 253

1    of what had happened to me was not unique
2    perhaps to Marywood, and so, therefore, if
3    it came out what had happened to me, that
4    might very well get picked up by other,
5    shall we see, researchers or academics,
6    you know, studying, you know, what's going
7    on on campus.
8        Q.   Were you a researcher?
9        A.   I was not doing official
10   research for journal article about free
11   speech on campus.
12       Q.   So this article -- this video
13   -- these videos were not connected to any
14   sort of official research for any journal
15   articles, correct?
16       A.   That's correct.
17       Q.   Were they -- were these videos
18   part of some scholarly pursuit?
19       A.   Well, I was pursuing this in a
20   -- for intellectual free speech purposes
21   if you want to call that a scholarly
22   pursuit. I think I would.
23       Q.   Okay.
24       Was it part of the curriculum?

64 (Pages 250 to 253)



Page 254

1      A.   Well, when we do introduction
2  to social science, there's usually a
3  student who'd study the Constitution,
4  maybe read a few federalist papers, and
5  there'd be a discussion about how it might
6  relate to current events, and so something
7  like this could be used as an example.
8      Q.   Could in the hypothetical
9  sense, correct?
10      A.   Yes.  I had no specific plans
11  to incorporate it in the course content
12  for that semester.
13      Q.   Okay.
14          When you made the videos and
15  then posted those videos on YouTube, you
16  knew why you did it, right?
17      A.   Would you repeat the question,
18  please?
19      Q.   When you made the videos and
20  then you posted them on YouTube, you know
21  why you did it, right?
22      A.   Yes.
23      Q.   And as of January 13, 2012,
24  when they were officially posted and you

Page 255

1  e-mailed them around, you knew at that
2  time why you had done this, correct?
3      A.   Yes.
4      Q.   And prior to January 13, 2012,
5  you had already consulted with a lawyer,
6  correct?
7      A.   No.
8      Q.   I thought you testified earlier
9  that you had consulted with a lawyer
10  perhaps in December of 2011.
11          Is that not true?
12      A.   I mentioned to my
13  brother-in-law, who's a lawyer, that, you
14  know, I was involved with a dispute on
15  campus.  I had written to FIRE and lawyers
16  at FIRE, but that was about the incident
17  and publicity.  It was not a consulting
18  for a lawyer for me, so I did no
19  consulting.
20      Q.   In your opinion, can a tenured
21  professor say or do anything they want?
22      A.   I don't know.
23      Q.   Can a tenured professor use the
24  N word?

Page 256

1      A.   That's a good question.
2          MR. COHEN: I'm going to
3  object, legal conclusion.  You can
4  answer.
5  BY MS. PEET:
6      Q.   Is your answer I don't know?
7      A.   The answer would be I would
8  hope a professor could use the N word, as
9  you phrase it, in an academic setting, for
10  instance, talking about the use of the
11  word in Huckleberry Finn and what it means
12  and how it was often used as a
13  vituperative term and as an academic
14  discussion.
15          For example, there was a
16  professor, I believe, at the University of
17  Oklahoma who just basically got driven out
18  of class because she was trying to use it
19  in that type of context.  So in that
20  sense, I think it should be allowed to be
21  used.
22      Q.   What about in a satirical
23  video?
24          MR. COHEN: Objection, legal

Page 257

1  conclusion and to form.
2          THE WITNESS: I'm sorry.
3          MR. COHEN: You can answer.
4          THE WITNESS: I can answer.
5  I've never used the word in
6  class.  I would -- I have not
7  contemplated using the word.  I would
8  imagine somebody could make some sort
9  of -- there are rap videos that use
10  the word all the time that are out
11  there from what I understand.
12  BY MS. PEET:
13      Q.   Are you aware of any rap video
14  artist that's a tenured professor at a
15  university?
16      A.   I couldn't name one.
17      Q.   Okay.
18          So my question to you is do you
19  feel if it's appropriate for a tenured
20  professor to use the N word in a satirical
21  video?
22      A.   I would have to see the
23  satirical video.  I don't know.
24      Q.   When was the first time you

65  (Pages 254 to 257)



Page 258

1  heard from anyone in Marywood
2  administration after you posted these
3  videos?
4      A.   I believe it would have been
5  Mike Foley Monday morning, January 23rd.
6      Q.   Okay.
7          And how did Michael Foley get
8  in contact with you?
9      A.   He came to my office at 8:45
10  a.m.
11     Q.   And what did he tell you he was
12  -- did he talk to you then?   What
13  happened?
14     A.   He came to me and he said that
15  Sister Anne Munley or President Munley,
16  however he used the term, wanted to see me
17  at 9 o'clock.
18     Q.   Did he tell you why?
19     A.   I asked him -- I asked him.   I
20  said well, why, and he said well, we can
21  -- you can probably figure it out.
22     Q.   And did you figure it out?
23     A.   I assumed it had something to
24  do with the videos.

Page 259

1      Q.   Do you think she was going to
2  be happy with you?
3      A.   No.
4      Q.   Were you surprised that up
5  until January 23rd you didn't hear from
6  anyone at Marywood about the videos?
7      A.   I was a little surprised but I
8  thought maybe they were thinking it was
9  better to let them, as I discussed before,
10  lie low, take -- take the publicity hit.
11     Q.   Okay.
12         Did you in fact go to that 9
13  o'clock meeting?
14     A.   Yes, I did.
15     Q.   And where did that meeting take
16  place?
17     A.   It was in President Munley's
18  office complex in a room with a conference
19  table.
20     Q.   And this meeting was exactly
21  ten days after you posted the videos,
22  correct, or at least e-mailed it to
23  Marywood that you posted it?
24     A.   Yes.  The meeting was the 23rd

Page 260

1  and I e-mailed to the faculty on January
2  13th.
3      Q.   Were you surprised that
4  President Munley wanted to speak with you?
5      A.   No.  A little surprised but not
6  -- not totally.
7      Q.   Why weren't you totally
8  surprised?
9      A.   Only because I knew that she
10  would be unhappy with the videos.
11     Q.   Because you depict her as
12  Hitler?
13     A.   I wasn't thinking so much about
14  that really as -- in fact, I wasn't
15  thinking about that at all.
16     Q.   What were you thinking about?
17     A.   I was thinking about the -- the
18  fact that the Hitler -- the parody videos
19  might be seen as funny and, therefore, get
20  a lot of views and raise the issue that I
21  was concerned about raising about what
22  happened to the posters.
23     Q.   You were present at Sister
24  Munley's deposition last week, correct?

Page 261

1      A.   Yes.
2      Q.   And you heard Sister Munley
3  discuss at length what her background and
4  experiences are and have been, correct?
5      A.   Yes.
6      Q.   After hearing that, do you have
7  a different opinion on what you did and
8  perhaps have a little bit of remorse that
9  you depicted her as Adolf Hitler?
10     A.   Again, I wouldn't say that I
11  depicted her as Adolf Hitler.   I would say
12  it was -- somebody in a Hitler costume was
13  playing Anne Munley's role.   Anne Munley
14  was not playing a Hitler role.   So she was
15  dressed, if you will, in a Hitler costume
16  to make the point that there was what I
17  would consider bad behavior tearing down
18  the posters as the fascists would do.   I
19  point out in the video I never use the
20  word Nazi, not once.
21     Q.   There are swastikas on those
22  people's arms, correct?
23     A.   Yes.
24     Q.   There's no -- there can be no

66 (Pages 258 to 261)


MAGNA ◆
LEGAL SERVICES

Page 262

1  debate or room for a question whether or
2  not those people depicted Nazi member --
3  Nazi members, correct?
4       A.   The people in the Downfall
5  video were depicting Nazis.
6       Q.   Okay.
7            Who was present at this
8  meeting?
9       A.   Mike Foley was present and
10 Patricia Dunleavy was present.
11      Q.   Back to my question.
12           After hearing Sister Munley's
13 testimony about her experience, and her
14 background --
15      A.   Yes.
16      Q.   -- and her beliefs, has your
17 views on the videos changed?
18      A.   My views on the video haven't
19 changed.  I certainly am sorry if
20 President Munley took them what I would
21 consider the wrong way as being accused of
22 being like Adolf Hitler's worst traits as
23 if I was calling her a murderer of Jews.
24 That was absolutely no intent and I don't

Page 263

1  think anybody seeing the video -- I won't
2  say anybody.  I don't think most people
3  seeing the video would take it in that
4  sense.
5       Q.   Do you have any remorse after
6  hearing Sister Munley's deposition about
7  those videos?
8       A.   I feel sad that she feels that
9  way.
10      Q.   Do you wish you didn't do it?
11      A.   No.
12      Q.   Knowing how she felt, you would
13 still do it again?
14      A.   Knowing how she felt, I might
15 have gone in and showed her the video
16 ahead of time.
17      Q.   So you may have changed
18 strategy a little bit?
19      A.   That's correct.  But at the
20 time, if I was put back in a time machine
21 given the same circumstances, given who I
22 was at the time, I presume I would have
23 made the same decision.
24      Q.   Do you believe that Sister

Page 264

1  Munley wasn't sincere about what she was
2  saying, that she was making it up, or did
3  you feel that she really felt that way
4  when she was describing it during her
5  deposition?
6       A.   I don't know.  Sometimes people
7  will play the victim card, so I don't
8  know.
9       Q.   Tell us everything that
10 happened during that meeting.
11      A.   Well, I was called in and, as I
12 recall, Sister Anne Munley was at the head
13 of the table about where the videographer
14 is and Mike Foley was approximately where
15 that empty chair is, the first empty
16 chair.  I believe Patricia Dunleavy was
17 not at the table but sitting in a chair
18 just to the back maybe with a little
19 notebook in her lap of some sort, and I
20 was sitting approximately where you are
21 sitting.
22           And the discussion -- I was
23 asked if I posted the videos and I really
24 post -- I posted them to YouTube -- if I

Page 265

1  sent the e-mail and posted the videos and
2  I agreed to that, and then I was asked, I
3  believe, to explain the videos in terms of
4  how they fit into the core values or
5  something, and so I started to explain --
6  remember, the videos are all about the
7  poster tear downs.  So I wanted to go back
8  and explain the poster tear downs and how
9  those led to the video and all the things
10 I had done and to, you know, set the
11 stage, and when I began to explain about
12 the posters, again, leading up to the
13 videos, I was cut off and told no, I could
14 not discuss that.  And then I believe I
15 said well, I would like to answer in
16 writing; no, you can't do that, and Sister
17 Anne Munley wanted to hear about the
18 videos.
19           And so I couldn't explain -- as
20 I saw it, I couldn't explain the videos
21 without the context of the whole posters
22 history, and so it was a 15-minute
23 meeting.  It ended at 9:15 and I was
24 probably suspended I'll say six -- maybe

67  (Pages 262 to 265)



Page 266

1    six or seven minutes into the meeting.
2    And after that, as far as I was concerned,
3    well, the hammer has dropped and it was a
4    simple question of, okay, what's next, and
5    then Sister Anne Munley was saying she
6    wanted an explanation about the videos.
7         So I was explaining -- I tried
8    to explain how I had tried to cooperate
9    and seek some sort of agreement through
10   Alan Levine and whatnot, and so I got, you
11   know, that off my chest.  So I explained
12   some of the videos even though I hadn't
13   been allowed to before I got suspended,
14   and Sister Anne wanted me to justify --
15   explain the videos, and I really -- at
16   that point the game was over and the
17   questions were vague, and I said -- I was
18   talking about justice.  The videos -- I
19   tried to, you know, get justice for the
20   free speech cause basically, and so
21   there's some, should I say, dumping out by
22   me of some of those concerns I had but I
23   -- philosophically, you know, explaining
24   the videos.  I'd been suspended already

Page 267

1    and at that point it was what's your
2    e-mail address and turn in the keys to Pat
3    Dunleavy.
4         - - -
5         (At this time, a document was
6    marked for identification as Exhibit
7    Fagal-23.)
8         - - -
9    BY MS. PEET:
10   Q.   Mr. Fagal, have you ever seen
11   this document before?  It's a two-page
12   document.
13   A.   Yes.
14   Q.   And it appears to be notes from
15   the meeting that you just described that
16   took place on January 23, 2012.
17        Is this a fairly accurate
18   description of the -- a summary of what
19   took place at the meeting?
20   A.   Well, I remember reading this
21   and I had some problems with some of these
22   notes because these were written up after
23   the raw notes.  I'd have to go over this
24   in some detail here, review it.

Page 268

1         MR. COHEN:  Can you give him
2    some time to read it?
3         MS. PEET:  Sure.
4         - - -
5         (At this time, the witness
6    complies with request.)
7         - - -
8         THE WITNESS:  Okay.
9         So in the third paragraph
10   here --
11   BY MS. PEET:
12   Q.   The one that starts Sister Anne
13   asked Dr. Fagal?
14   A.   Yes.
15        If we went down to where it
16   says Sister Anne asked Dr. Fagal how the
17   videos upheld those values, and then your
18   next sentence says he
19   wouldn't answer any more questions.
20   Well...
21   Q.   Do you dispute that?
22   A.   If we go down -- yes.  Just
23   jump down a minute.  Next to last
24   paragraph, Sister Anne -- okay.  The

Page 269

1    middle there, Sister Anne told Dr. Fagal
2    that she was suspending him with pay.
3         There's nothing here after it
4    says Sister Anne asked Dr. Fagal how the
5    videos upheld those values, that is when I
6    started to explain the videos controversy
7    leading up -- pardon me -- the posters
8    controversy leading up to the videos, and
9    as soon as I started to do that to set the
10   context for the videos, I was summarily
11   cut off and told that I could not do that.
12        I could not discuss the
13   posters, that she wanted to know about the
14   videos, and basically I was -- I can't --
15   like Hamlet without the prince of Denmark
16   or whatever it is.  I needed to explain
17   the videos in terms of the posters and I
18   was not allowed to do that.
19   Q.   Okay.
20   A.   And so when I stopped talking
21   and was told to discuss the videos and I
22   said the word "justice", and then that was
23   it.  I mean I couldn't -- I was not
24   allowed to explain, and at that point I

68 (Pages 266 to 269)





MAGNA

LEGAL SERVICES

Page 270

1    was suspended.
2        Q.   Okay.
3            Were you surprised you were
4    suspended?
5        A.   I was a little bit surprised,
6    yes.
7        Q.   Why?
8        A.   Because I thought there might
9    be a different conversation.  I mean there
10   wasn't...
11       Q.   Were you -- to your knowledge,
12   were you suspended over those videos?
13       A.   I presume that's what it was
14   for, yes.
15       Q.   You were suspended with pay,
16   correct?
17       A.   Correct.
18       Q.   So the meeting happened on a
19   Monday.
20           Did you call Alan Levine at his
21   home that prior Saturday?
22       A.   Yes.
23       Q.   Did you speak with Alan?
24       A.   No.

Page 271

1        Q.   Did you leave him a voice mail?
2        A.   Yes.
3        Q.   Did you tell him you wanted to
4    have a conversation off the record?
5        A.   Yes.
6        Q.   Why?
7        A.   Because I was wondering.  As
8    you said, a week had gone by and I hadn't
9    heard anything.  So I was just wondering
10   what -- what had happened and if there was
11   any -- I wouldn't say anything I could do
12   but anything to -- I assumed something
13   might be happening but I didn't know.  I
14   just wanted to touch base and see what was
15   going on.
16       Q.   Do you know what Dr. Levine's
17   reaction was to the videos?
18       A.   Not at the time I did not.  I
19   did not know.
20       Q.   As we sit here today, do you
21   know what Dr. Levine's reaction was?
22       A.   In some e-mail discovery, I
23   learned that he said he was upset.
24       Q.   Do you know whether or not he

Page 272

1    agreed with the decision to suspend your
2    employment?
3        A.   At the time, I didn't know.  I
4    thought maybe he didn't support it because
5    he was not the one who suspended me.
6        Q.   Okay.
7            As we sit here today, do you
8    have any reason to believe that Dr. Levine
9    supported the decision to suspend your
10   employment?
11       A.   I can't remember the exact --
12   when I was looking at some of the
13   discovery e-mails, I believe -- I know
14   there was administration meetings about
15   having the meeting with me on the 23rd
16   and, as I recall, he seemed to be all in
17   favor of that.
18       Q.   Of that being suspension?
19       A.   I recall that -- I believe
20   suspension was on the table in one of
21   those agendas that I read.
22       Q.   And when you say you learned
23   Dr. Levine was in favor of that, of that,
24   did you mean suspension?

Page 273

1        A.   I know he was in favor of the
2    meeting.  I don't know exactly what
3    punishment, shall we say, he was in favor
4    of.
5        Q.   Okay.
6            You were ultimately terminated,
7    correct?
8        A.   Correct.
9        Q.   And is it your understanding
10   you were terminated based on those videos
11   you created?
12       A.   Yes, that's the -- that's the
13   basic charge.
14       Q.   Both suspension and termination
15   are forms of discipline, correct?
16       A.   Well, yes.  Suspension I would
17   call discipline and termination would be
18   execution.
19       Q.   So would you agree that
20   suspension is a lesser form of discipline
21   than termination?
22       A.   Yes.
23           - - -
24           (At this time, a document was

69 (Pages 270 to 273)



Page 274

1     marked for identification as Exhibit
2     Fagal-24.)
3              - - -
4     BY MS. PEET:
5         Q.   Do you know who Frances Ferrese
6     -- and I apologize if I'm mispronouncing
7     that -- is?
8         A.   Yes, I do know Fran Ferrese.
9         Q.   And was she the administrative
10    assistant to President Munley?
11        A.   That sounds like a good title
12    these days.  Executive secretary to the
13    president it says here.
14        Q.   Okay.
15             And you received this e-mail
16    from her on January 24, 2012; is that
17    correct?
18        A.   Yes.
19        Q.   And it included various
20    attachments, correct?
21        A.   Do I remember?
22        Q.   Just for --
23        A.   Okay.  Yeah.
24        Q.   -- for the last two policies,

Page 275

1     249 through 257, I will tell you were not
2     provided with the letter.  The rest were,
3     and those would be the progressive
4     discipline policy and the faculty
5     grievances and appeals policy, but the
6     other letter -- the other policies you
7     were provided with.
8         A.   Okay.  So...
9         Q.   Is this how you learned that
10    Sister Munley was recommending your
11    termination of employment?
12        A.   Yes.
13        Q.   And it was -- these were the
14    issues that you were discussing the
15    previous day in the meeting with President
16    Munley, correct?
17        A.   Which issues?  On the letter on
18    page --
19        Q.   Yeah, what's contained in the
20    letter.
21        A.   Do you mean where it says as
22    you know, our values include?  Does
23    that --
24        Q.   Yes.

Page 276

1         A.   Okay.
2         Q.   This was the same idea that was
3     discussed with you the day before,
4     correct, in the meeting?
5         A.   Let me read here.  I see what
6     she wrote.
7              And what's the question?
8         Q.   The issue that's being
9     addressed in this letter, namely how she
10    viewed your behavior, that was discussed
11    the day before with you in the meeting,
12    correct?  This is not the first time
13    you're hearing that Sister Munley --
14        A.   Yes.  I can't recall all the
15    terms such as sexually explicit.  I don't
16    recall all those terms being used.  I knew
17    there was unhappiness with the --
18        Q.   Okay.
19        A.   -- videos but not all those
20    terms.
21        Q.   What did you do when you
22    received this letter?
23        A.   Right around this time, if not
24    the day, I would have called -- I believe

Page 277

1     I called FIRE.  I might have been in
2     contact with them the day before thinking
3     perhaps I needed -- I should have a
4     lawyer.
5              And so your question was what
6     did I do that day?
7         Q.   When you received this letter.
8         A.   Yes.  So I believe I called
9     FIRE.  That would have been my first call.
10        Q.   Okay.
11             And is that when they gave you
12    Jonathan Cohen as a referral?
13        A.   Yes.
14        Q.   Did you do anything else after
15    you received this letter?
16        A.   I can't recall.  I told my
17    wife.
18        Q.   What did your wife say?
19        A.   I can't remember exactly what
20    she said but she didn't cry or throw
21    dishes or anything.
22        Q.   Were there some expletives?
23        A.   No, no.
24        Q.   Was she happy?  Was she

70 (Pages 274 to 277)



Page 278

1  pleased?
2      A.   I would say she was not pleased
3  but she understood.
4      Q.   Okay.
5           If you look at DEF187, which
6  was the last page of the actual packet
7  that was sent to you.
8      A.   187, okay.
9      Q.   Do you see it has a release of
10 personal information document and then a
11 place for you to sign and date?
12     A.   Yes.
13     Q.   Do you remember receiving this?
14     A.   Yes.
15     Q.   Did you check one of the boxes,
16 sign, date it, and return it by
17 February 3, 2012?
18     A.   No.
19     Q.   Why not?
20          MR. COHEN:  Without disclosing
21 attorney-client communications.
22          THE WITNESS:  Without
23 disclosing attorney-client --
24          MR. COHEN:  Yes.

Page 279

1          THE WITNESS:  I'm not sure what
2  would -- it was suggested that I not.
3  BY MS. PEET:
4      Q.   Let's look at DEF169 and it
5  goes through 174.  It's the tenure policy.
6      A.   Okay.
7      Q.   Did you understand that tenured
8  professors, nonetheless, still have to
9  abide by the tenure policy?
10          MR. COHEN:  Objection, legal
11 conclusion.  You can answer.
12          THE WITNESS:  If you have
13 obligations, you should comply with
14 those as you understand them.  There
15 might be disagreements as to
16 interpreting a policy.
17 BY MS. PEET:
18     Q.   Okay.
19          Did you understand, as of
20 January of 2012, that this tenure policy
21 applied to you?
22     A.   Yes.
23     Q.   And prior to January of 2005,
24 have you seen this policy, the tenure

Page 280

1  policy?
2      A.   Would you repeat the question?
3      Q.   Prior to January of 2012, have
4  you seen --
5      A.   You said 2005.  Okay.  I'm
6  sorry.
7      Q.   Oh, my apologies.
8      A.   Okay.  So --
9      Q.   It's been a long day.
10     A.   -- just repeat it one more
11 time.
12     Q.   Sure, of course.
13          Prior to January of 2012, had
14 you ever seen this tenure policy?
15     A.   I had seen it.  I don't know if
16 I read every single word of it because it
17 does change over the years.
18     Q.   But the policy was made
19 available to you nonetheless?
20     A.   Yes.
21     Q.   Okay.
22          If you go to the next policy,
23 which is the civil rights policy, 175
24 through 176.

Page 281

1      A.   Okay.
2      Q.   Did you understand in January
3  of 2012 that this policy applied to you?
4          MR. COHEN:  Objection, legal
5  conclusion.  You can answer.
6          THE WITNESS:  Okay.
7          I knew if policies were -- you
8  know, as part of the official
9  Marywood policies that I would be
10 subject to the policies.
11 BY MS. PEET:
12     Q.   Did you have -- did you
13 understand in January of 2012 that you had
14 to comply with various Marywood policies
15 including the civil rights policy?
16          MR. COHEN:  Objection, legal
17 conclusion.
18          THE WITNESS:  Well, I
19 understood I had to follow -- follow
20 the law in terms of -- you know.
21 BY MS. PEET:
22     Q.   Okay.
23          My question is not about the
24 law.  My question is about Marywood's

71 (Pages 278 to 281)



Page 282

1   civil rights policy.
2       A.   Yeah, civil rights policy.  I
3   would assume I'd have to follow it, yes.
4       Q.   Okay.
5            So you agree it applied to you?
6            MR. COHEN:  Same objection.
7            THE WITNESS:  Yeah.
8            MS. PEET:  Okay.
9            THE WITNESS:  Yes.
10  BY MS. PEET:
11      Q.   Do you agree that it --
12  Marywood did not condone and will not
13  tolerate discrimination, harassment, or
14  assault by any member of the Marywood
15  community, and then it lists different
16  protective statuses?
17           MR. COHEN:  Objection, legal
18  conclusion.
19           MS. PEET:  It's not a legal
20  conclusion.  I'm reading what the
21  policy says.
22           THE WITNESS:  Yes.  Okay.
23  BY MS. PEET:
24      Q.   Do you see how someone could

Page 283

1   have found the video to be discriminatory
2   or harassing?
3       A.   I can understand how some
4   people would be offended by it.  Whether
5   that would be defined as harassing
6   somebody or discriminating against
7   somebody, in my case I would say no.
8       Q.   Okay.
9            Do you understand how one could
10  have found the policies to be an abuse of
11  academic freedom?
12      A.   No, I don't understand.
13      Q.   Do you understand how people
14  that watch the videos could have saw them
15  to be -- or you to have exhibited
16  professional incompetence?
17      A.   No, I don't.
18      Q.   If you turn to the next policy,
19  177 through 180, it's Marywood's
20  conditions of computer use policy.
21           Do you see that?
22      A.   Yes.
23      Q.   Did you have any reason to
24  believe in January of 2012 that this

Page 284

1   policy did not apply to you?
2       A.   No.
3       Q.   And in fact you knew about this
4   policy because you reference this policy
5   in your January 13, 2012, e-mail, correct?
6       A.   I can't recall specifically
7   referencing it.  I'd have to look at it.
8       Q.   Okay.  We can do that.  It is
9   Exhibit-15, and if you look at DEF1445.
10      A.   I do remember referring to that
11  Marywood could monitor one's e-mail.  I do
12  remember that discussion.
13      Q.   Do you remember referring to,
14  in words or substance, a -- that Marywood
15  had a computer policy and beware --
16      A.   Yes.
17      Q.   -- is the words you used?
18      A.   Yes.
19      Q.   Okay.
20      A.   Yes.
21      Q.   Do you feel that with the
22  videos, you were respecting the civil
23  rights of others?
24           MR. COHEN:  Can you repeat

Page 285

1   that?
2   BY MS. PEET:
3       Q.   Do you feel that with those
4   videos, you were respecting the civil
5   rights of others to an open and hospitable
6   environment?
7       A.   So are we referring to a
8   specific phrase here?  Where is this?
9       Q.   It comes from the second page,
10  number eleven, but I'm asking you if do
11  you believe that those videos respected
12  the civil rights of others to an open and
13  hospitable environment?
14      A.   Yes.
15      Q.   Okay.
16           Turn to the next policy, 181
17  through 182, the academic freedom policy.
18           Do you believe that your videos
19  were in furtherance of academic freedom?
20      A.   Yes.
21      Q.   And how's that?
22      A.   Trying to open up discussion,
23  and the videos themselves criticized the
24  forces that would reduce discussion and

72  (Pages 282 to 285)


MAGNA
LEGAL SERVICES

Page 286

1    free speech.
2        Q.   Okay.
3            The policy talks about teachers
4    being entitled to freedom in the
5    classroom.
6            Were the videos shown in the
7    classroom?
8        A.   No, they were not.
9        Q.   And the videos had nothing to
10   do with the classroom, correct?
11       A.   I might have shown them in the
12   class later that semester if we got --
13   when we got to the Constitution and free
14   speech.  I might have chosen to say, hey,
15   here's something that happened on campus
16   last semester and I might have talked
17   about first amendment briefly, talked
18   about first amendment issues in public
19   universities versus private, et cetera,
20   and that would have been -- videos don't
21   take long.  So I did not have -- plan -- I
22   did not plan to show them but I might
23   have.
24       Q.   Okay.

Page 287

1            MR. COHEN:  Do you mind if I
2    take a five-minute break?
3            MS. PEET:  Sure.
4                --- 
5            THE VIDEOGRAPHER:  We're now
6    off the record.  The time is 3:57
7    p.m.
8                --- 
9            (At this time, a short break
10   was taken.)
11               --- 
12           THE VIDEOGRAPHER:  We are back
13   on the record.  The time is 4:05 p.m.
14               --- 
15   BY MS. PEET:
16       Q.   Just another reminder that
17   you're still under oath and your testimony
18   needs to be truthful, accurate, and
19   complete.
20           Do you understand?
21       A.   I do understand.
22       Q.   183 to 184 is the Marywood's
23   policy on professional ethics.
24           Do you see that?

Page 288

1        A.   Yes.
2        Q.   Do you have any reason to
3    dispute that in January of 2012 this
4    policy applied to you?
5            MR. COHEN:  Objection, legal
6    conclusion.  Go ahead.
7            THE WITNESS:  No.
8    BY MS. PEET:
9        Q.   Okay.
10           Do you believe that with your
11   videos you were exercising critical
12   self-discipline and judgment?
13       A.   I thought about what I did.  It
14   was a tough choice.
15       Q.   What was your choice?
16       A.   The choice was to -- since I
17   was warned by Rod Carveth and Lindsay, and
18   I think they were the ones who explicitly
19   raised the issue that some people have
20   what I might call a knee jerk reaction to
21   a Hitler reference, that there was a risk
22   I was running by doing that.  So I had to
23   think about whether I would do it that way
24   or not and I chose to do it.

Page 289

1        Q.   Okay.
2            Do you believe that those
3    videos -- strike that.
4            Do you believe that with those
5    videos you were exercising critical
6    self-discipline and judgment?
7        A.   Yes.
8        Q.   Okay.
9            Do you believe that with those
10   videos you showed due respect for the
11   opinions of others?
12       A.   Yes.
13       Q.   Okay.
14           The next 185 through 186 is
15   Marywood's mission and core values.
16           We discussed this earlier
17   today, correct?
18       A.   Yes.
19       Q.   And you have seen this before,
20   right, Marywood's mission statement and
21   core values?
22       A.   Yes.
23       Q.   And was it -- I believe you
24   already testified that you understood as a

73  (Pages 286 to 289)



Page 290

1  tenured professor at Marywood you were
2  committed to abiding by Marywood's mission
3  and core values, correct?
4         MR. COHEN: Objection, legal
5  conclusion.
6         THE WITNESS: Yes.
7  BY MS. PEET:
8     Q.   Okay.
9         The first core value is
10 Catholic identity.
11        Do you see that?
12    A.   Yes.
13    Q.   Do you feel that those videos
14 upheld Marywood's Catholic identity?
15    A.   I would say the one sentence
16 there is vague to the extent that my
17 videos tried to promote intellectual
18 discourse and criticize what Marywood did
19 to not encourage intellectual values that
20 that would be part of -- that that could
21 be seen as part of the Catholic identity,
22 and I do realize that other people would
23 say no.
24    Q.   Okay.

Page 291

1         Do you believe that your videos
2  upheld Marywood's respect for each person
3  core value?
4     A.   Again, respect is a vague term.
5  I can respect -- people have rights, and
6  as a human being they have certain rights.
7  On the other hand, that doesn't mean
8  there's a right not to be criticized, and
9  if one is criticized, one might be
10 offended that they're criticized.  That I
11 would say comes with the territory of
12 being a human being.
13    Q.   Okay.
14        Do you believe that with those
15 videos you were upholding Marywood's core
16 value of respect for each person?
17    A.   Yes.
18    Q.   Okay.
19        Do you believe that with your
20 videos you were upholding Marywood's core
21 value of empowerment?
22    A.   Yes.  Certainly I was the one
23 trying to empower people to be exposed to
24 ideas.

Page 292

1     Q.   And do you see how other folks
2  might have watched the video and have
3  believed that the videos did not uphold
4  Marywood's core value of empowerment?
5     A.   Well, let me just read the one
6  sentence.  Empowerment says education to
7  enable access and to empower the
8  underserved to take a full role in the
9  life of the broader society.  I would say
10 that the videos -- by criticizing what
11 Marywood did with respect to the posters,
12 they were encouraging empowerment on the
13 part of students to be exposed to, in this
14 case, the speaker.
15    Q.   Okay.
16        My question to you is do you
17 see how folks that have watched those
18 videos may have concluded that they did
19 not uphold Marywood's commitment to
20 empowerment?
21    A.   No.
22    Q.   Do you believe that your videos
23 upheld Marywood's commitment to service?
24    A.   Let me read the sentence.

Page 293

1  Well, rooted in the deep belief that
2  learning and scholarship serve the global
3  community is the belief in the value of
4  the diverse types of work that support
5  that service, and the preparation of
6  students for leadership by participation
7  in that service.
8         One way people got exposed to
9  ideas these days is through YouTube videos
10 and sometimes you can use comedy and
11 satire to make a point, and so you can
12 show the unempowered how they can be
13 powerful by making a video with cheap
14 software.  So I would say yes.
15    Q.   Depicting their boss as a
16 fascist Adolf Hitler?
17    A.   I wouldn't say as a fascist
18 Adolf Hitler but I would say as -- there
19 is some behavior that -- such as the
20 tearing down of posters that was
21 paralleled by behavior of the fascist.
22    Q.   Do you remember sending an
23 e-mail in which you said essentially you
24 are depicting Sister Munley as a fascist?

74  (Pages 290 to 293)



Page 298

1  followed as outlined in the policy.
2  Q.   Okay.
3        What procedures weren't
4  followed?
5  A.   Well, it says Marywood
6  University endorses a progressive
7  discipline policy designed to promote
8  resolution in a fair and orderly manner
9  because the university regards
10  disciplinary action is corrective and not
11  punitive, and then it talks about
12  procedures and how they commence, and meet
13  with administrator, suspension. The
14  faculty member may be suspended by the
15  vice president for academic affairs.
16  Suspension is justified if immediate harm
17  to the faculty member or others is
18  threatened by the person's continuance.
19        So there are various procedures
20  that I don't think were followed. No
21  remedial -- let's see. Where's the phrase
22  here? My suspension wasn't reviewed by a
23  committee. As I recall, we -- various
24  issues that we raised pertaining to this

Page 299

1  set of policies.
2  Q.   Okay.
3        The vice president for academic
4  affairs, that would have been Alan Levine,
5  correct?
6  A.   Yes.
7  Q.   Do you know to whom he
8  reported?
9  A.   I presume President Munley.
10  Q.   Okay.
11        Does it say that the faculty
12  member can only be suspended by the vice
13  president of academic affairs?
14  A.   No.
15  Q.   Okay.
16        Does it say suspension is only
17  justified if immediate harm to the faculty
18  member or others is threatened by the
19  person's continuance in the faculty
20  position?
21  A.   The word "only" does not appear
22  there.
23  Q.   Okay.
24  A.   Though it looks like a

Page 300

1  declarative sentence.
2  Q.   Have we exhausted all the
3  reasons why you believe the progressive
4  discipline policy has been violated?
5  A.   No, because my memory is not
6  perfect.
7  Q.   Okay.
8        What are the other reasons?
9  A.   I would have to review the
10  Complaint to refresh my memory.
11  Q.   Okay.
12        So anything that's included in
13  the Complaint would you like to
14  incorporate here today for the reasons why
15  you believe the progressive discipline
16  policy was violated?
17  A.   I believe the Complaint would
18  cover these issues.
19  Q.   And by Complaint, just so we're
20  on the same page, we're referring to the
21  Amended Complaint, correct?
22  A.   That's correct.
23  Q.   Would your position at all
24  change if Dr. Levine was the one that

Page 301

1  advised you of your suspension versus
2  Sister Munley?
3  A.   I believe that that would have
4  been, shall we say, in Marywood's favor if
5  he had been the one who had done it.
6  Q.   Okay.
7        How would that have impacted
8  you? When I mean that, who advised you of
9  your suspension.
10  A.   Well, if Dr. Levine had been at
11  the meeting, to put this position in here
12  as being the one, the position person who
13  actually does the suspension, then that
14  would seem to follow that that would be
15  the one who would have been at the meeting
16  to do the suspending.
17  Q.   Is there a requirement that a
18  meeting like that take place prior to a
19  suspension?
20  MR. COHEN:  Objection, legal
21  conclusion. You can answer.
22  THE WITNESS:  It says -- let's
23  see. It says here the administrator
24  receiving the complaint shall discuss

76 (Pages 298 to 301)


MAGNA
LEGAL SERVICES

Page 302

1    the matter with the faculty member in
2    a confidential conference. So to me
3    that says there should be a
4    meeting --
5        MS. PEET: Okay.
6        THE WITNESS: -- with the
7    administrator.
8    BY MS. PEET:
9       Q.   And a meeting took place,
10   correct?
11      A.   We did have a meeting, yes.
12      Q.   Okay.
13      The next policy is 252 through
14   257, faculty grievances and appeals.
15      Do you see that?
16      A.   262 to 260 --
17      Q.   252. Pardon me.
18      A.   I'm sorry. 252.
19      Q.   Okay. 257.
20      A.   Okay.
21      Q.   The faculty grievances and
22   appeals.
23      Do you see that?
24      A.   Yes.

Page 303

1      Q.   Do you allege that this policy
2   was violated?
3      A.   Yes.
4      Q.   And on what basis?
5      A.   There was supposed to be a
6   separate committee to hear an appeal for
7   suspension, and that meeting would have
8   been solely to deal with suspension.
9      Q.   Where does it say that there's
10   supposed to be a separate committee to
11   hear the suspension versus termination?
12      A.   Let me see. Where does it say
13   -- this is the grievances and appeals
14   section. Is there a section about the
15   suspension? I don't see where that would
16   be. Would that be under progressive
17   discipline somewhere?
18      I know it's -- I recall reading
19   somewhere that one gets a committee for
20   suspension and termination and that the
21   policy says that the committee members for
22   each committee may or may not be the same,
23   that the president of the university
24   determines whether the members of the

Page 304

1    committee would be the same or not, but I
2    don't have it in front of me. I recall
3    that it's explicit that there are two
4    committees, one for suspension and one for
5    termination.
6      Q.   Okay.
7      Any other basis for your belief
8    that the faculty grievances and appeals
9    policy was violated?
10      A.   Well, the grievance committee
11   was grieving whether the procedures were
12   followed and the grievance committee said
13   they were, but we disputed that in terms
14   of there was no committee for the
15   suspension.
16      Q.   Okay.
17      Anything else?
18      A.   Not that I can recall right
19   now.
20      Q.   Okay.
21        - - -
22    (At this time, a document was
23   marked for identification as Exhibit
24   Fagal-26.)

Page 305

1        - - -
2    BY MS. PEET:
3      Q.   After you received the first
4   letter from Sister Munley, you then
5   received another statement of charges,
6   correct?
7      A.   Yes, I believe on February 8th.
8      Q.   And I believe it was in part
9   because perhaps something was missing and
10   your attorney advised Sister Munley that
11   and she --
12      A.   Yes.
13      Q.   -- provided a more full
14   context --
15      A.   Correct.
16      Q.   -- is that correct? Okay.
17      And that's what Exhibit-26 is,
18   correct, the revised statement of charges,
19   for lack of better words?
20      A.   I see the February 8th, yes.
21      Q.   Okay. On this policy there --
22   on this packet there's a policy that was
23   not attached to the last one which is on
24   224 through 225 towards the end of your



Page 306

1　packet, Marywood University's goals and
2　objectives.
3　　　Do you see that?
4　　　A.　President's page, Marywood
5　University's goals and objectives.  Okay.
6　I see it.
7　　　Q.　Okay.
8　　　Do you believe that your videos
9　upheld what is provided here in Marywood
10　University's goals and objectives?
11　　　A.　I can't remember reading this.
12　　　May I read it now, please?
13　Q.　Of course.
14　　　　　- - -
15　　　(At this time, the witness
16　complies with request.)
17　　　　　- - -
18　　　THE WITNESS:  Okay.  I read the
19　goals and objectives.
20　BY MS. PEET:
21　　　Q.　Okay.
22　　　My question to you was do you
23　believe that the videos upheld Marywood's
24　-- Marywood University's goals and

Page 307

1　objectives?
2　　　A.　I don't know because, as I read
3　these, almost all of them pertain to
4　outcomes such as a majority of the
5　students who participate in service
6　opportunities in an ongoing way.  I mean
7　how the videos would support, for
8　instance, that goal, I don't know.  Maybe
9　the students would be inspired to say,
10　hey, maybe I can make a video some day and
11　maybe that would be a public service
12　video, maybe I too can use whatever.
13　　　Q.　Are you suggesting the Hitler
14　videos would be a PSA, a public service
15　announcement?
16　　　A.　No, but I'm suggesting that
17　once students see what can be done with
18　videos, they might be inspired to try it
19　themselves.  The only thing I see it
20　implies to -- the fourth bullet says
21　employer -- employees will demonstrate
22　core values in the workplace, and we've
23　already discussed those.
24　　　Q.　And you believe you upheld the

Page 308

1　core values in the workplace?
2　　　A.　I -- we went through all those
3　just a short while ago.
4　　　Q.　Right.
5　　　And the question is you believe
6　that you upheld the core values in the
7　workplace with those videos?
8　　　A.　Yes.  I -- yes, that's correct.
9　　　Q.　Okay.
10　　　A.　And the second set of bullets
11　there about the awareness, I don't -- I
12　just see that as being irrelevant.  The
13　next four bullet points, I don't see
14　really the relevance there.
15　　　Q.　Okay.
16　　　A.　The last bullet point on the
17　page, employees will serve as role models
18　as socially responsible leaders.  Again,
19　however one defines a socially responsible
20　leader, but I certainly tried to carry the
21　fire torch and do something I thought was
22　worthwhile.  Others might not have agreed.
23　　　Q.　Pun intended?
24　　　A.　Yes, absolutely.

Page 309

1　　　Q.　Okay.
2　　　On pages 209 --
3　　　A.　And -- excuse me.
4　　　Q.　Oh, you're not done?
5　　　A.　No, no.  Let me go to the last
6　one.  Challenging instructional program.
7　I just want to say that I was a
8　challenging professor.
9　　　Q.　Okay.
10　　　On pages 209 to -- bottom of
11　209 and top of 210, Sister Munley again
12　talks about that release document that she
13　attached and asked you to sign it if you
14　wanted to by·Friday, February 17, 2012.
15　　　Do you see that?
16　　　A.　As I recall, it was a Hobson's
17　choice where she was trying to speed up
18　the process of terminating me, which is
19　why I was advised not to sign that.
20　　　Q.　Okay.
21　　　So is it fair to say that you
22　did not sign and return that document?
23　　　A.　That's correct.
24　　　Q.　And that document I'm referring

78  (Pages 306 to 309)


MAGNA
LEGAL SERVICES

Page 310

1    to is the release of personal information
2    authorization form.
3        A.   Yes, yes.
4        Q.   You talked about the fact that
5    you had a -- you grieved your decision --
6    the decision, correct?
7        A.   Yes.  Excuse me.
8            The decision to do what?
9        Q.   The suspension and
10   recommendation to terminate your
11   employment.
12       A.   Yes.
13           - - -
14           (At this time, a document was
15       marked for identification as Exhibit
16       Fagal-27.)
17           - - -
18   BY MS. PEET:
19       Q.   Did you ever see this letter
20   before?
21       A.   I think -- I'm not sure.  I
22   believe I saw this in discovery e-mails.
23       Q.   Okay.
24           Do you have any reason to

Page 311

1    dispute that Dr. Sadlack was the chair of
2    the Faculty Grievance Committee?
3        A.   No.
4        Q.   Do you have any reason to
5    dispute that she advised President Munley
6    on or around March 19, 2012, that you
7    filed a grievance and that a committee has
8    been convened to review your complaint?
9        A.   Yeah, that's what the letter --
10   yes.
11       Q.   Okay.
12           You have no reason to dispute
13   that, correct?
14       A.   No, no reason to disagree with
15   it.
16       Q.   And to your knowledge, a
17   committee was ultimately formed?
18       A.   To my knowledge, a committee
19   was ultimately formed.
20           - - -
21           (At this time, a document was
22       marked for identification as Exhibit
23       Fagal-28.)
24           - - -

Page 312

1    BY MS. PEET:
2        Q.   On this document that has been
3    placed before you, is this set forth the
4    grievance that -- against President Munley
5    that you submitted to the committee?
6        A.   Yes.
7        Q.   Did you draft this grievance
8    that's contained on Exhibit-28?
9        A.   I worked on this with my
10   attorney.
11       Q.   Okay.
12           And this is the final product,
13   what you submitted?
14       A.   Yes.
15       Q.   Anyone else between -- besides
16   you and your attorney work on this?
17       A.   No.
18           - - -
19           (At this time, a document was
20       marked for identification as Exhibit
21       Fagal-29.)
22           - - -
23   BY MS. PEET:
24       Q.   Do you remember receiving this

Page 313

1    e-mail from Dr. Sadlack informing you that
2    they received your official grievance
3    regarding your suspension and termination?
4        A.   Yes, I recall this.
5        Q.   Did -- she says if there's any
6    additional information you would like us
7    to consider, please let me know.
8            Did you contact Dr. Sadlack
9    with additional information?
10       A.   I can't recall for sure but I
11   think I did.
12       Q.   What did you provide?
13       A.   At some point, I believe I
14   submitted the explanation of the
15   scene-by-scene videos.
16       Q.   And that's what we discussed
17   earlier today, right?
18       A.   What we discussed earlier, at
19   least you had a copy of it, but I cannot
20   remember exactly whether it was this
21   committee or another committee that got
22   those.
23       Q.   Okay.
24           Do you know whether or not the

79  (Pages 310 to 313)



Page 314

```
 1    grievance committee met to discuss your
 2    grievance?
 3         A.   I don't know for a fact.  I was
 4    told they met and discussed the grievance.
 5    I got a report that they discussed the
 6    grievance.
 7         Q.   Were you involved at all in
 8    their decision-making or thought process?
 9         A.   I wasn't involved in their
10    thought process or decision-making, no.
11         Q.   Okay.
12              To your knowledge, did the
13    grievance committee ultimately make a
14    decision with reference to your grievance?
15         A.   The grievance committee
16    informed me by an e-mail that they
17    examined the grievance and found it
18    wanting and...
19                   - - -
20              (At this time, a document was
21    marked for identification as Exhibit
22    Fagal-30.)
23                   - - -
24    BY MS. PEET:
```

Page 315

```
 1         Q.   Is this the e-mail that you
 2    received from Dr. Sadlack with reference
 3    to the grievance committee's findings?
 4         A.   Yes.  This is what I was just
 5    referring to.
 6         Q.   Okay.
 7              And she writes we have found no
 8    evidence of improper action on President
 9    Munley's part which would constitute a
10    legitimate grievance.
11              Do you see that?
12         A.   I see that.
13         Q.   Do you disagree with
14    Dr. Sadlack and the committee's decision?
15         A.   Yes.
16         Q.   Okay.
17              And what do you disagree with?
18         A.   Well, she mentions the five
19    things here; the issue of which individual
20    was doing the suspending, whether I was a
21    cause of immediate harm to myself or
22    others, whether there was no progressive
23    discipline in the sense of a chance for
24    any remediation, and then the last one is
```

Page 316

```
 1    about there being no specific committee to
 2    deal with the appropriateness of the
 3    suspension.
 4         Q.   Okay.
 5              So you disagreed with the
 6    grievance committee's findings?
 7         A.   Yes.
 8         Q.   Did Sister Munley sit on the
 9    grievance committee, to your knowledge?
10         A.   I don't know.
11         Q.   Do you have any --
12         A.   I don't -- I don't --
13         Q.   -- knowledge that she did?
14         A.   No knowledge that she did.  I
15    don't know if there's any contact.  I
16    don't know.
17         Q.   Do you -- same question for
18    Dr. Levine.
19              Do you have any knowledge of
20    whether or not he sat on the committee?
21         A.   No knowledge.  I presume he did
22    not.
23         Q.   Okay.
24              Likewise, do you presume Sister
```

Page 317

```
 1    Munley did not sit on the committee?
 2         A.   I presume she was not an
 3    official committee member.
 4         Q.   Is it fair to say that Sister
 5    Munley did not stop you from filing a
 6    grievance?
 7         A.   That would -- Sister Munley did
 8    not stop me from filing a grievance.
 9                   - - -
10              (At this time, a document was
11    marked for identification as Exhibit
12    Fagal-31.)
13                   - - -
14    BY MS. PEET:
15         Q.   What has been marked as
16    Exhibit-31 is -- are e-mail exchanges
17    between you and Dr. Sadlack about your
18    grievance.
19              Do you see that?
20         A.   Yes.
21         Q.   Do you remember having these
22    e-mails with Dr. Sadlack?
23         A.   Let me look at them.  Yes, on
24    the first page here.
```

80  (Pages 314 to 317)



Page 318

1    Q.   If you look at document DEF295,
2  which is towards the end.
3    A.   295, okay.
4    Q.   Which is an e-mail -- the top
5  one is an e-mail from Erin to you dated
6  March 29, 2012, at 5:03 p.m.
7      Do you see that?
8    A.   It's from Sister Gail Cabral to
9  me.  Oh, wait, wait.  I'm sorry.
10   Q.   She's copied on the letter.
11   A.   Wait, wait.  I'm sorry.  I'm
12  sorry.  That was -- right.  From the
13  bottom of the previous page, it's from
14  Sadlack to me with a copy to Cabral,
15  right.
16   Q.   Okay.
17   A.   So dear Fred, okay.
18   Q.   She says -- she being Erin says
19  all I can do is say what I did in the
20  letter, that we checked the policy wording
21  carefully and did not find a violation of
22  procedure in any of the five instances you
23  grieved.
24      Do you see that?

Page 319

1    A.   Yes.
2    Q.   She also wrote in addition, the
3  policy manual states that the findings of
4  the grievance committee cannot themselves
5  be grieved.
6      Do you see that?
7    A.   Yes.
8    Q.   Do you disagree with that?
9    A.   No.
10   Q.   And then she then writes please
11  note that our findings do not preclude
12  your appealing the termination itself
13  through an ad hoc committee as outlined in
14  the progressive discipline policy.
15      Do you see that?
16   A.   I see that.
17   Q.   And then it says if you want to
18  do that, you need to contact Sister Gail
19  Cabral as faculty senate president to
20  exercise that option.
21      Do you see that?
22   A.   Yes.
23   Q.   And in fact Sister Cabral is
24  copied on that e-mail, correct?

Page 320

1    A.   Yes.
2    Q.   Did you then request an ad hoc
3  committee be put together to review Sister
4  Munley's decision?
5    A.   Sister Munley's decision to?
6    Q.   Suspend and term -- and
7  recommend your termination of employment.
8    A.   Yes.
9         - - -
10     (At this time, a document was
11  marked for identification as Exhibit
12  Fagal-32.)
13         - - -
14  BY MS. PEET:
15   Q.   Exhibit-32 is an e-mail from
16  you to Sister Munley regarding your
17  request for an ad hoc faculty committee,
18  correct?
19   A.   Correct.
20   Q.   And it's dated March 29, 2012,
21  correct?
22   A.   Correct.
23   Q.   Was your request granted?
24   A.   Yes.

Page 321

1    Q.   Did anyone assist you in
2  drafting that letter?
3    A.   This letter here?  I believe my
4  -- consulted with my attorney.
5    Q.   Okay.
6         - - -
7      (At this time, a document was
8  marked for identification as Exhibit
9  Fagal-33.)
10         - - -
11  BY MS. PEET:
12   Q.   Do you recall receiving this
13  letter from Sister Munley dated April 3,
14  2012?
15   A.   Yes.  I recall receiving this
16  letter.
17   Q.   Okay.
18      And she has agreed to convene
19  an ad hoc committee to appeal the
20  decisions, correct?
21   A.   Let me see here now.  This is
22  April 3rd and the second sentence says
23  chose to file a grievance under the
24  Marywood University grievance and appeals



Page 322

1   policy.  That part of the statement is
2   true.
3       Q.   Okay.
4       A.   Chose not to convene an ad hoc
5   committee to review my recommendations as
6   I had offered you on two occasions.  I
7   presume there she's talking about those
8   two cases where, as I put it, she was
9   trying to speed up the policy.
10      Q.   The release documents?
11      A.   Speed up the release documents,
12  that's correct.
13      Q.   And you agree you did not --
14      A.   I did not --
15      Q.   -- sign and submit them?
16      A.   -- sign those, that's correct.
17      Q.   Okay.
18      A.   Faculty Grievance Committee
19  reviewed your grievance, found no evidence
20  of improper action on my part.  Okay.  And
21  she said the grievance process is now
22  complete, decide to finalize my
23  recommendation.  As a result, your
24  employment with Marywood and your tenure

Page 323

1   are terminated effective today, April 3,
2   2012.
3       Q.   Okay.
4       A.   Okay.
5           So at this point I am done.
6       Q.   Okay.
7           She tells --
8       A.   And then she offers a chance to
9   review what has been said is a -- really a
10  final recommendation.
11      Q.   Okay.
12      A.   But she did terminate me.  She
13  says I am terminated as of April 3rd.
14      Q.   Okay.
15          Did you select a tenured
16  faculty member to be included on the ad
17  hoc committee?
18      A.   Yes.
19      Q.   And did you submit a name to
20  Sister Cabral?
21      A.   Yes.
22      Q.   And did you choose Ed O'Brien?
23      A.   Yes.
24      Q.   And was Ed O'Brien indeed

Page 324

1   selected to the committee?
2       A.   Yes.
3       Q.   Why did you choose Ed O'Brien?
4       A.   I'd known him for many years.
5   I knew he was intelligent and I knew he
6   had -- we worked together on the academic
7   commuting -- computing committee, and so I
8   had worked with Ed before and I knew that
9   he would probably be -- because of his
10  status he would be allowed to be chosen.
11          - - -
12          (At this time, a document was
13      marked for identification as Exhibit
14      Fagal-34.)
15          - - -
16  BY MS. PEET:
17      Q.   Did you receive this e-mail
18  from Sister Cabral on April 30, 2012?
19      A.   Let me see.  I -- yes, I did
20  receive this.
21      Q.   Did you assert any objection to
22  Dr. Bittel and Mr. Povse being selected as
23  the other individuals on the committee?
24      A.   I did not, but at the time I --

Page 325

1   looking back, I might wish I had grieved
2   one of them.
3       Q.   Okay.
4           Why is that?
5       A.   Mr. Povse, who I do not know --
6   I believe he's a tenured professor, of
7   course, but his wife has a -- had a
8   nontenured position at Marywood.  And so
9   looking back after I learned that, I
10  thought there might have been a little
11  conflict of interest there because if the
12  committee didn't come up with the approved
13  decision and President Munley, let's say,
14  found out that Mr. Povse had supported me,
15  that might not have been good for his
16  wife.  I'm not saying that would have
17  happened.  I'm just saying there would be
18  what they call a potential conflict of
19  interest.
20      Q.   Okay.
21          And, again, you didn't assert
22  any objection, correct?
23      A.   I did not, no.  I did not know
24  that relationship at the time.

82  (Pages 322 to 325)


MAGNA
LEGAL SERVICES

Page 326

1    MS. PEET: Okay.  Let's change
2  the tape.
3    THE VIDEOGRAPHER:  We're now
4  off the record.  The time is 4:52
5  p.m.  This ends disk number three.
6          - - -
7    (At this time, a short break
8  was taken.)
9          - - -
10    THE VIDEOGRAPHER:  We are now
11  on the record.  The time is 4:57 p.m.
12  This starts disk number four.
13          - - -
14    (At this time, a document was
15  marked for identification as Exhibit
16  Fagal-35.)
17          - - -
18  BY MS. PEET:
19    Q.   Did you prepare this e-mail to
20  Alan Levine dated April 25, 2012?
21    A.   Did I prepare?  Would you
22  rephrase the question?
23    Q.   Did you draft this e-mail?
24    A.   I believe I worked on this with

Page 327

1  my lawyer.
2    Q.   Okay.
3          Anyone else?
4    A.   No.
5          - - -
6    (At this time, a document was
7  marked for identification as Exhibit
8  Fagal-36.)
9          - - -
10  BY MS. PEET:
11    Q.   Did you draft this e-mail and
12  the document to be sent to the ad hoc
13  committee?
14    A.   This is the May 6, 2012, one,
15  Exhibit --
16    Q.   Correct.
17    A.   -- 36?
18    Q.   Uh-huh.
19    A.   Yes.
20    Q.   Okay.
21          And you write that the
22  progressive discipline policy doesn't
23  provide for the person charged with the
24  chance to present a defense but,

Page 328

1  nonetheless, you decided to submit a
2  written defense to the charges, agreed?
3    A.   Yes.  I thought it was -- yes.
4    Q.   Okay.
5          Did anyone help you draft this?
6    A.   Yes.
7    Q.   All right.
8          And who was that?
9    A.   It would have been Jonathan
10  Cohen, my lawyer.
11    Q.   Anyone else?
12    A.   No.
13          - - -
14    (At this time, a document was
15  marked for identification as Exhibit
16  Fagal-37.)
17          - - -
18  BY MS. PEET:
19    Q.   Why did you e-mail the ad hoc
20  committee on May 23, 2012, about your
21  personnel file?
22    A.   As I read here, it says I've
23  given Patricia Dunleavy permission to
24  release the new documents in my personnel

Page 329

1  file.  As I recall, my personnel file was
2  released earlier in the semester or in the
3  year and later on Marywood discovered that
4  not all relevant items that they found,
5  wherever they found them, had been turned
6  over.  And so Patricia Dunleavy sent me an
7  e-mail asking if she could release those
8  documents.
9    Q.   Did you have any concern that
10  the committee would consider previous
11  disputes that you had with the university
12  in making its decision?
13    A.   I was only concerned in the
14  sense that I would hope they would look
15  at, you know, the surrounding details of
16  what had occurred and not just say, oh, he
17  got called on the carpet three times, so
18  he must be a bad boy.
19    Q.   Do you agree that you had
20  previous disputes with Marywood
21  administration involving the issue of free
22  speech?
23    A.   Yes.
24    Q.   And would you agree that with



Page 330

1  those previous issues you've had, you were
2  never terminated?
3      A.   Correct.
4      Q.   Would you agree that the
5  previous disputes that you had with
6  Marywood about free speech but they never
7  suspended you?
8      A.   That's correct.
9      Q.   To your knowledge, was an ad
10 hoc committee -- I believe you testified
11 the ad hoc committee was ultimately
12 formed --
13     A.   Yes.
14     Q.   -- per your request, correct?
15     A.   An ad hoc committee was formed
16 to examine my -- I believe the phrase was
17 termination and suspension.
18     Q.   Okay.
19          And, to your knowledge, did the
20 committee make a decision?
21     A.   Yes.
22     Q.   And what was that decision?
23     A.   That I should be terminated.
24     Q.   To your knowledge, did Sister

Page 331

1  Munley sit on that ad hoc committee?
2      A.   Not to my knowledge.
3      Q.   To your knowledge, did
4  Dr. Levine sit on that committee?
5      A.   Not to my knowledge.
6      Q.   There were three members on
7  that committee, correct?
8      A.   Correct.
9      Q.   And you selected one of those
10 members, correct?
11     A.   Correct.
12          - - -
13          (At this time, a document was
14 marked for identification as Exhibit
15 Fagal-38.)
16          - - -
17 BY MS. PEET:
18     Q.   Did you ever see the ad hoc
19 committee's findings with reference to
20 your employment and tenure at Marywood?
21     A.   I saw them recently in
22 discovery.
23     Q.   Okay.
24          Would you agree that this is

Page 332

1  the second committee that was formed about
2  your suspension and termination and they
3  found no wrongdoing on Munley's part?
4      A.   I recall a grievance committee
5  and the ad hoc committee but not a
6  committee for the suspension.
7      Q.   Okay.
8          Both the grievance committee
9  and the ad hoc committee both concluded no
10 wrongdoing on Sister Munley's part,
11 correct?
12     A.   I believe the charge for the
13 grievance committee was to see whether
14 procedures had been followed correctly and
15 there was found no wrongdoing by President
16 Munley's part.  The ad hoc committee was
17 not, I believe, examining whether Anne
18 Munley did anything wrong but whether I
19 did anything wrong.  So...
20     Q.   And did the ad hoc committee
21 find that you did anything wrong?
22     A.   Yes.  They terminated -- they
23 agreed with her decision to terminate me.
24     Q.   Okay.

Page 333

1          And the folks on the ad hoc
2  committee were different people than were
3  on the grievance committee?
4      A.   I believe they were all
5  different, yes.
6          - - -
7          (At this time, a document was
8  marked for identification as Exhibit
9  Fagal-39.)
10          - - -
11 BY MS. PEET:
12     Q.   Did you send this e-mail to the
13 ad hoc faculty committee on July 6, 2012?
14     A.   I sent this, yes.
15     Q.   If the ad hoc committee agreed
16 that you should have been terminated, what
17 does it matter whether or not your
18 suspension was justified?
19     A.   Well, procedures say first
20 things first.  As part of the sequence,
21 you do the suspension and then you see if
22 there's any hope for remediation or any
23 change that would maybe be satisfactory to
24 the university from their point of view

84  (Pages 330 to 333)



Page 334

1 and then go on from there.
2     Q.   If a committee who was formed
3 to determine whether or not your behavior
4 warranted termination determined that your
5 behavior in fact warranted termination,
6 wouldn't a committee to review the
7 suspension based on the exact same conduct
8 be moot?
9     A.   I don't know if it'd be moot
10 because if -- you might have somebody --
11 if I could -- let's say somebody was
12 accused of -- being a faculty member, they
13 were accused of absconding funds from
14 clubs treasury, and so there's enough
15 evidence that came out and somebody says
16 well, let's suspend professor -- this
17 professor for doing this.
18         So let's say there was some
19 evidence of irregularities on that
20 committee. I might say, okay, this person
21 is not a harm to anybody. We don't see
22 this is going to affect the teaching.
23 Let's see where it goes. And so the
24 professor does not get suspended and then

Page 335

1 it comes out that he or she had in fact
2 squirrelled away not just 50 bucks that he
3 forgot about recording but had been taking
4 a lot off the top for years, then that
5 could be grounds for terminating even
6 though the person was not suspended
7 initially.
8         And you could have -- of course
9 if it says do the suspension and do the
10 termination, if it was an egregious case
11 you could say we'll have a suspension
12 hearing today and a termination hearing in
13 the afternoon, so we'll go morning,
14 afternoon. We'll suspend and then we'll
15 terminate and we'll follow our laws on the
16 same -- our procedures on the same
17 evidence, but at least you would follow
18 procedures of doing the suspension first
19 and then the termination.
20     Q.   If a -- if a committee
21 determines that your termination was
22 justified on the same conduct for which
23 you were suspended, why would a committee
24 need to be formed to review your

Page 336

1 suspension? What substantively and --
2     A.   There was no --
3     Q.   -- purpose would that serve?
4     A.   -- committee to -- I was
5 suspended and I was not allowed to have a
6 committee to review the suspension.
7     Q.   If a committee -- and that's
8 not my question.
9     A.   Okay.
10     Q.   If a committee substantively
11 looks at your termination and concludes
12 that your termination was appropriate --
13     A.   Okay.
14     Q.   -- which has happened here,
15 correct?
16     A.   Okay.
17     Q.   Agreed?
18     A.   Agreed.
19     Q.   Then why have a committee
20 review your suspension which is a lesser
21 offense based on the exact same conduct?
22 What purpose would that serve?
23     A.   The purpose it would serve
24 would be following the agreed procedures.

Page 337

1     Q.   Any other purpose?
2     A.   I'll say no.
3     Q.   Okay.
4         What damages did you incur from
5 a committee that upheld a termination of
6 employment but, in your opinion, didn't
7 look at your suspension?
8     A.   The damages would be somebody
9 thinking they did not get a fair -- a fair
10 deal. They did not have the -- should we
11 say the law it followed which by itself is
12 -- is not -- not right.
13     Q.   Any other damages?
14     A.   Do you mean financial damages?
15     Q.   I'm asking you.
16     A.   I don't know.
17     Q.   Okay.
18     A.   If I might say -- can I amend
19 my answer a little bit?
20     Q.   Sure.
21     A.   By not having a suspension,
22 there was no chance for remediation and
23 that -- with remediation then perhaps an
24 agreement could have been -- you know,

85 (Pages 334 to 337)



Page 338

1 then maybe I would not have been
2 terminated.
3 - - -
4 (At this time, a document was
5 marked for identification as Exhibit
6 Fagal-40.)
7 - - -
8 BY MS. PEET:
9 Q. Did you receive this July 13,
10 2012, letter from Sister Munley to you?
11 A. Yes.
12 Q. She says here that this was the
13 second independent tenured faculty review
14 accorded to you. Both faculty committees
15 concurred with my decision.
16 Is that a true statement?
17 A. I -- the two committees we're
18 presuming here are the grievance committee
19 and the ad hoc committee on the
20 termination, yes.
21 Q. And is that an accurate
22 statement?
23 A. Yes.
24 Q. Okay.

Page 339

1 She then says my decision to
2 terminate your employment with Marywood
3 University and your tenure effective
4 April 3, 2012, stands.
5 A. Yes.
6 Q. Do you see that?
7 A. Uh-huh.
8 Q. Are you currently employed?
9 A. No.
10 Q. Have you looked for a job since
11 your termination of employment at
12 Marywood?
13 A. Yes.
14 Q. Okay.
15 When was the first time you
16 looked for a job?
17 A. I was looking at newspaper
18 advertisements in the Syracuse newspaper
19 in the fall of 2012.
20 Q. Did you apply for any jobs?
21 A. No. I didn't see any that were
22 applicable.
23 Q. Other than in the Syracuse
24 newspaper, did you look at any other

Page 340

1 newspapers, Web sites?
2 A. My son was in the job market at
3 the time, so I knew that there were Web
4 sites. So I would go to the -- I think
5 Inside Higher Education had some and the
6 Chronicle of Higher Education had some job
7 things, and I would look through -- look
8 through those and there were big -- big
9 listings, and then at some point in 2013 I
10 saw the Chronicle of Higher Education had
11 a service where you could -- you would
12 sign up, you would say you were, let's
13 say, an art professor looking for jobs in
14 the Rochester, New York, vicinity within a
15 certain radius. So I signed up to get the
16 Chronicle of Higher Education job
17 announcements.
18 Q. Okay.
19 Did you -- you have produced
20 documents in this case about job postings
21 that I guess you saw following your
22 termination of employment.
23 Have you produced, to the best
24 of your knowledge, all documents that

Page 341

1 evidence job search efforts that you've
2 undergone since your employment at
3 Marywood was terminated?
4 A. Yeah. I don't -- I don't have
5 -- when I would look through the
6 classified ads in the Syracuse newspaper,
7 I did not keep a record of that, but since
8 2013 there's a record.
9 Q. Okay.
10 And everything that you have
11 has been produced?
12 A. Yes.
13 Q. Okay.
14 Approximately how many -- how
15 much time per week beginning in the fall
16 of 2012 did you spend trying to find a
17 job?
18 A. Those e-mail announcements
19 would come out probably weekly. Sometimes
20 you get two a week. It would depend
21 perhaps on the season, and I would read
22 those and scroll down the list depending
23 how long the list was and that was
24 probably -- to look at that list and I'd



Page 354

1  that you got fired last year over a free
2  speech issue and then direct them to your
3  resume for more information.
4      Do you see that?
5      A.  Yes.
6      Q.  Was that your practice to tell
7  any college or university to whom you were
8  seeking employment about this free speech
9  issue for which you got fired over at
10  Marywood, in your opinion?
11      A.  Well, this is a sample of one,
12  so this was my practice because this was
13  the only application that got this far.
14      Q.  Okay.
15      Would you agree with -- that
16  this is the only application you submitted
17  to any university or college since April
18  of 2012?
19      A.  Yes.
20          - - -
21      (At this time, a document was
22  marked for identification as Exhibit
23  Fagal-44.)
24          - - -

Page 355

1  BY MS. PEET:
2      Q.  Would you agree that this is
3  the resume that you submitted to Onondaga
4  Community College?
5      A.  Yes.  This seems to be part of
6  their online application form as I recall.
7      Q.  Okay.
8      And on the third page of this
9  document, it's a one-page resume from you.
10      Do you see that?
11      A.  Yes.
12      Q.  And the second to last
13  paragraph is called other perhaps of
14  interest.
15      A.  Yes.
16      Q.  Do you see that?
17      A.  Uh-huh.
18      Q.  And then you talk about the
19  poster, and this YouTube videos, and your
20  firing.
21      Do you see that?
22      A.  Yes.
23      Q.  Do you think it's a good
24  practice to include that in a resume for

Page 356

1  employment?
2      A.  I think it shows honesty and it
3  doesn't hide anything.  If I was an
4  employer and somebody applied and they did
5  not include that, and then the employer
6  Googles the person and says what the heck
7  is going on here, why didn't you tell me
8  about that.  I thought it was better to be
9  honest and straightforward.
10      Q.  Okay.
11      Did you receive any call back
12  or interview from the community college?
13      A.  Not to go in for an interview.
14  I think it might have been some form.  I
15  can't recall anything special.
16      Q.  Okay.
17      Do you know why it is that they
18  didn't pursue you further?
19      A.  I was really looking for a
20  full-time job and this might -- they might
21  have gone with adjuncts cheaper.  I don't
22  know.  Because I had worked there before,
23  so I figured they knew me.  So that was...
24          - - -

Page 357

1      (At this time, a document was
2  marked for identification as Exhibit
3  Fagal-45.)
4          - - -
5  BY MS. PEET:
6      Q.  Would you agree this is an
7  e-mail between you and Bill Ziegelbauer,
8  February 5, 2015?
9      A.  Yes.
10      Q.  Okay.
11      And if you look down at the
12  bottom of the first page, the paragraph
13  says I am probably overdoing this, Rule 26
14  damages stuff.
15      Do you see that?
16      A.  Yeah, bottom of the first --
17      Q.  First page.
18      A.  -- page.  Oh, yeah.
19      Q.  I'm going to read --
20      A.  The paragraph, yes.  I'm
21  probably overdoing this, uh-huh.  I see
22  that.
23      Q.  I am probably overdoing this
24  Rule 26 damages stuff, but at the worst I

90  (Pages 354 to 357)

