# EXHIBIT E



Dr Patricia E Dunleavy <dunleavy@maryu.marywood.edu>

## Important Information from Sister Anne

Frances D Ferrese <ferrese@maryu.marywood.edu>                    Tue, Jan 24, 2012 at 1:11 PM
To: fffagal@yahoo.com
Bcc: dunleavy@marywood.edu

Dr. Fagal,

Please see attached documents from Sister Anne.

*Through def 248*

—
Frances D. Ferrese
Executive Secretary to the President
Marywood University
Immaculata Hall #107
2300 Adams Avenue
Scranton, PA  18509-1598
Phone:  570-348-6231
FAX:  570-340-6014
E-mail:  ferrese@marywood.edu

**9 attachments**

📄 **Fagal 1-24-12.pdf**
    100K

📄 **Letter of Agreement.pdf**
    44K

📄 **Tenure.pdf**
    434K

📄 **Civil Rights Policy.pdf**
    121K

📄 **Conditions of Computer Use.pdf**
    215K

📄 **Academic Freedom.pdf**
    96K

📄 **Professional Ethics.pdf**
    115K

📄 **Mission & Core Values.pdf**
    75K

📄 **Release.pdf**
    31K





## Marywood
U N I V E R S I T Y
OFFICE OF THE PRESIDENT

MARYWOOD UNIVERSITY
SCRANTON, PA 18509-1598
TEL: (570) 348-6231
FAX: (570) 340-6014
ANNEMUNLEY@MARYWOOD.EDU
www.marywood.edu

January 24, 2012

Dr. Frederick Fagal
17 East Lake Street
Skaneateles NY 13152

Sent via email (fffagal@yahoo.com), certified mail, regular mail

Re: Recommendation for Termination

Dear Dr. Fagal:

In follow up to our meeting yesterday, I am writing to inform you that I am recommending that your tenure and employment with Marywood be terminated immediately; the University will, however, pay you the remainder of your 2011-12 Agreement and keep you on benefits through August, 2012. This recommendation comes after much consideration of and reflection on your actions which I find to be highly offensive and directly contrary to Marywood's Mission and Values, your tenure agreement and your obligation as an employee of this University to conduct yourself in accordance with our policies and values.

As you know, our values include:

- A commitment to spiritual, ethical and intellectual values in the context of a faith community.
- Respect for the value of each human being, for diversity in the context of vibrant community, and for the earth and all creation.

After reviewing the subtitles you authored and transposed onto a film depicting Adolf Hitler and the Nazi regime, I find that you deliberately and maliciously violated our principles and your commitment to this University by: 1) depicting Executive Officers and me in an offensive and hostile light, including making highly inappropriate comments about family members of these individuals; 2) used sexually explicit, offensive and insulting language; and 3) portrayed an image of Marywood in a manner that was an affront to the University community as a whole. As a result, I am recommending that your tenure and employment be terminated and provide you the following Statement of Charges:

- Violation of Tenure Policy which includes "a strong acceptance by the individual (requesting tenure) of the mission, goals and objective of the University";
- Violation of Civil Rights Policy (re in particular harassment of Dr. Levine and his family and other personal attacks on executive officers) which states that "Marywood

*An education inspired by the Sisters, Servants of the Immaculate Heart of Mary.*

- Violation of Professional Ethics Policy which states that professors "do not discriminate against or harass colleagues"; and
- Violation of the University's Mission and Values as well as the principles of collegiality.

I have attached a copy of your 2011-12 Letter of Agreement and the above policies so that you have them. They can also be found on our website.

As a result of this recommendation, I am prepared to send this statement of charges to a duly appointed faculty committee for review along with the emails and videos you forwarded to members of our community. In order to do so, I would ask that you please sign and return to me the attached authorization granting the University permission to do so.

Please respond no later than Friday, February 3, 2012. Should you choose not to grant permission or would like to decline the offer to have a faculty committee review my recommendation, I will finalize my recommendation.

If you have any questions regarding this matter, you may direct them to me or to Dr. Dunleavy.

Very truly yours,

Sister Anne Munley, IHM
President

Enclosures:
2011-12 Letter of Agreement
Tenure Policy
Civil Rights Policy
Conditions of Computer Use Policy
Academic Freedom Policy
Professional Ethics Policy
Marywood University Mission and Core Values
Release of Personal Information Authorization Form



# Marywood
UNIVERSITY

Tenured Faculty
Letter of Agreement
2011-2012 Academic Year

May 10, 2011

Dr. Frederick F. Fagal, Jr.
17 East Lake Street
Skaneateles, NY 13152

Dear Dr. Fagal, Jr.,

This Letter of Agreement is offered to you for the 2011-2012 Academic Year. In accord with the agreed upon Salary Plan, your salary reflects a 2.5% annual increase of $1,850.00.

Other terms of this agreement are as follows:

| | |
|---|---|
| Term: | 8/22/2011 to 5/18/2012 |
| Type of Appointment: | Full-Time (9 months) Tenure |
| Rank: | Associate Professor |
| College: | Liberal Arts & Sciences |
| Department: | Social Science |
| Responsible to: | Department Chairperson |
| Salary: | $76,196.00 |

Faculty members must apply for benefits other than Social Security and Worker's Compensation through the Human Resources Department. Full-time faculty benefits include health, dental, long-term disability, group life, and accidental death and dismemberment under the Flexible Benefits Plan. Elections are made by June 1 of each year for the subsequent fiscal year beginning July 1. Retirement contributions by the University vary based on the contribution level selected by the faculty member. The appropriate government forms, including Form W-4 and I-9, must be completed and on file in the Human Resources Department.

This agreement is valid for one month from the date of this letter. The original copy of this Letter of Agreement must be signed and returned to my office by June 10, 2011. If you do not return the original signed copy by June 10, it will be assumed that you are not returning to Marywood. On behalf of the Board of Trustees and myself, I express our gratitude for your dedicated service and commitment to Marywood University. May God continue to bless you.

Sincerely,

*Sister Anne Munley IHM*

Anne Munley, IHM, Ph.D.
President

Agreed this 25 day of May, 2011

Signature *Frederick F. Fagal*



# Policies and Procedures Manual: Tenure

## Policy Statement

Tenure is a term designating permanent and continuous appointment for a full-time faculty member. It implies a mutual commitment on the part of the faculty member and the University and cannot be taken lightly.

Once tenure is granted, it will be discontinued only for grave reason, which may include moral turpitude, flagrant abuse of academic freedom, or professional incompetence. In addition, as expressed in its *Retrenchment of Faculty* policy, the University may be required to discontinue tenure because of severe financial exigencies or reorganization of the department and/or curriculum resulting in lack of need.

The commitment of a faculty member who requests tenure is as deep and binding on the faculty member as it is on the University. Just as the conferring of tenure by the University recognizes the competence of an individual faculty member, submission to the University of an application for tenure suggests a strong acceptance by that individual of the mission, goals and objectives of the University. The request represents a commitment to work jointly with faculty, students, administrators and staff for the growth and welfare of the University. It is a commitment to devote one's energies to continued personal development and continued high levels of achievement as a member of the Marywood academic community. It is an assertion of career goals; it is expected that a faculty member will not lightly withdraw from this relationship.

The probationary period shall not exceed seven years of full-time teaching/librarianship at Marywood, with application for tenure being made in the sixth year. Successful candidates receive a tenure contract for the seventh year; unsuccessful candidates receive a one-year terminal contract for the seventh year. Faculty members on leave during the probationary period must follow the University's policy on leaves. Interrupted service at Marywood University and also prior service at another regionally accredited, four-year college or university may be credited toward the fulfillment of the probationary period. Such credit will be determined by the Vice President for Academic Affairs.

Tenure occurs by action of the President of the University.

## Definitions

This revised *Tenure* policy is effective January 1, 2012. Faculty members whose date of hire as full time is before January 1, 2012, may choose the policy in effect prior to that date if they wish.

## Procedures

*Procedures for Tenure Consideration*

1 of 6

A candidate for tenure must submit a *Notification of Application for Tenure* form and submit relevant data and documentation in the sixth year of the probationary period, according to the deadline dates noted below. The candidate for tenure is encouraged to meet with the dean and chairperson during the summer prior to submission to discuss the application. The intent of this review is to afford the dean and chairperson the opportunity to offer the candidate informal guidance that will help the candidate to make the strongest case possible for tenure. The candidate is also encouraged to meet with the tenured members of the department one year before submission of the application to identify areas of strength and weakness in meeting the tenure criteria. In applying these tenure procedures for faculty librarians, the Director of Library Services acts in place of both dean and department head. If the candidate decides to withdraw the application, he/she must do so by October 17 or February 21.

(A faculty member who is hired to begin work at Marywood in the spring semester submits a tenure application in the spring of his/her sixth year. For the spring semester dates of submission of the application, refer to the procedures in the *Promotion of Faculty Members* policy.)

If a due date below falls on a weekend or a holiday, the due date becomes the next business day.

1. By September 1 or January 3, the faculty member initiates the process by submitting the *Notification of Application for Tenure* form to the Chair of the Rank and Tenure Committee. The Chair will be responsible for providing a list of candidates who are applying for tenure to the Vice President for Academic Affairs, the appropriate dean(s), and the head of the applicant's academic department.

2. By September 21 or January 21, the applicant submits paper copies of the *Application for Tenure* form, together with an up-to-date curriculum vitae and a narrative not to exceed an equivalent of 100 printed pages in 12-point font to the head of the applicant's department. (If the applicant is the department head, the senior member of the department functions as the department head during these procedures.) The candidate may submit supplementary materials in the form of appendices. The application must be structured based on how the tenure criteria section of the handbook is organized. The document must be numbered sequentially, include definitions of terms related to one's discipline, and carefully proofread. All annual evaluations of the candidate written by the appropriate dean and the department head must be included in the application materials. The Vice President's report to the candidate on the results of his/her 3 year pre-tenure review must be included.

3. The department head notifies the department's full-time, tenured and tenure-track faculty members that the application is available for their review. The Chair of the Rank and Tenure Committee notifies the tenured members of the applicant's department of their responsibility to complete the *Confidential Colleague Evaluation Form*. Each tenured faculty member is to submit the *Confidential Colleague Evaluation Form* to the Chair of the Rank and Tenure Committee by September 28 or January 28.

   If a candidate for tenure is the chair of a department, the most senior tenured member of the department acts as chair during the tenure process. If no senior tenured faculty member is available, the Rank and Tenure Committee, in consultation with the appropriate dean and the candidate, chooses a senior tenured faculty member from another department to act as chair.

   Once an untenured faculty member submits a pre-tenure file to the Rank and Tenure Committee, he/she completes by September 28 or January 28 the *Confidential Colleague Evaluation* form for tenure applications that originate in his/her department.

4. By October 7 or February 7, the department head submits to the dean of the appropriate college all application materials and a recommendation letter that is based on a thorough review of the

Fagal v. Marywood University          February 26, 2016                    DEF000170

application documents. By this date, the department head also submits to the applicant a copy of the same recommendation letter.

5. By October 17 or February 21, the appropriate dean or the Director of Library Services reviews the evaluation of the department head when applicable and submits to the Chair of the Rank and Tenure Committee a recommendation letter and all application materials. The recommendation letter is to be based on a thorough review of the application materials.

6. The Rank and Tenure Committee evaluates the application and submits its recommendation, vote, and materials upon which the recommendation was based to the Vice President for Academic Affairs.

7. Having received all materials by November 21 or March 20, the Vice President for Academic Affairs evaluates the application with its accompanying documents, and submits a recommendation with the materials on which it is based to the President of the University. This includes the Rank and Tenure Committee's recommendation and vote, all other recommendations, and all application and evaluative documentation.

8. Having received the documents by January 10 or April 15, the President of the University reviews them and renders a final decision. The President or the Vice President for Academic Affairs informs the faculty member of the status of the application, including the recommendations of all reviewing bodies. In the case of a negative decision, the criteria not met are communicated to the applicant.

All materials submitted by the applicant will be returned at the conclusion of the process.

*Criteria*

The candidate for tenure must:

1. have completed all formal educational requirements in the relevant academic field, judged necessary to meet the needs of the department and the University;

2. have achieved at least the rank of Associate Professor or, if currently an Assistant Professor, must apply for promotion to Associate Professor and Tenure at the same time and may do so with the submission of a single document using the tenure criteria;

3. have evidenced an expertise needed by one's department or a related department, which may include developing new courses and teaching a diversity of courses as needed, or in the case of faculty librarians by developing new library services and initiatives;

4. have demonstrated consistently effective teaching/librarianship ability as attested to by the evaluation procedures of the University;

5. have provided service to students extending beyond the teaching/librarianship function to student advisement and direction;

6. have evidenced accomplishment and promise in research, scholarship, publication, and/or creative achievement;

7. have evidenced membership and involvement in the activities of professional societies;

8. have demonstrated significant involvement in community service related to the mission, goals or core values of the University, and the University community's academic, cultural, administrative, and student affairs.

*Procedures for Pre-Tenure Review*

A pre-tenure review system evaluates the first three years of each tenure-track faculty member's

Fagal v. Marywood University        February 26, 2016                DEF000171

progress toward tenure.

The candidate submits pre-tenure review materials in the fall of his/her fourth year. The candidate must notify the Chair of the Rank and Tenure Committee by September 1 or January 3 of his/her intent to submit materials. The candidate must submit the materials to the appropriate department chairperson by September 10 or January 12. By September 20 or January 22 the department chair submits to the appropriate dean all pre-tenure materials and an evaluation letter based on a thorough review of the pre-tenure documents. By October 1 or February 1 the Dean submits all materials to the Chair of Rank and Tenure along with an evaluation letter based on a thorough review of all pre-tenure materials.

Pre-tenure review materials should be no more than 35 pages (12-point font). The document should be numbered sequentially, include definitions of terms related to one's discipline, be proofread carefully and contain no appendices.

The pre-tenure portfolio should include:

1. a description of the pre-tenure candidate's progress to date in fulfilling each of the criteria for tenure (organized according to the tenure criteria section above);
2. the dean's detailed evaluation, or in the case of library faculty, the Director of the Library's evaluation of the pre-tenure candidate's portfolio, which must include a summative statement of the pre-tenure candidate's progress toward tenure;
3. the department chairperson's detailed evaluation of the pre-tenure candidate's progress toward tenure; must include a summative statement of the pre-tenure candidate's portfolio, which must include a summative statement of the pre-tenure candidate's progress toward tenure;
4. tables that compile the pre-tenure candidate's teaching evaluations, including department, college, and University teaching evaluation means;
5. a self-assessment of the pre-tenure candidate's scholarly/creative work (e.g., selectivity of venues, impact of articles, citations);
6. the pre-tenure candidate's reflection on his/her teaching/librarianship;
7. the pre-tenure candidate's reflection on his/her service;
8. the pre-tenure candidate's description of his/her scholarship/creative activity agenda/plan.

Pre-tenure faculty members must structure their annual self-evaluations based on guidelines for the tenure application portfolio as described in the *Tenure* policy.

Deans and chairs must organize their responses to pre-tenure faculty members' self-evaluations and pre-tenure portfolios based on how the tenure section of handbook is organized. These responses must take into account departmental standards for scholarship/creative activity.

Model pre-tenure files are available in the office of the Vice President for Academic Affairs for the pre-tenure candidate's review.

*Pre-Tenure Review Procedures*

If a due date below falls on a weekend or a holiday, the due date becomes the next business day.

1. By September 1 or January 3, the faculty member initiates the process by submitting the Notification of Submission of Pre-Tenure Materials form to the Chair of the Rank and Tenure Committee. The Chair will be responsible for providing a list of faculty members who are submitting pre-tenure materials to the Vice President for Academic Affairs, the appropriate dean(s), and the head of the individual faculty member's academic department.

2. By September 10 or January 12, the faculty member submits to the department chairperson pre-tenure review materials of no more than 35 pages (12-point font). (If the applicant is the department head, the senior member of the department functions as the department head during these procedures.) The submitted materials must be structured based on how the tenure criteria section of the handbook is organized. The document must be numbered sequentially, include definitions of terms related to one's discipline, and carefully proofread. All annual evaluations of the candidate written by the appropriate dean and the department head must be included as part of the 35-page application.

3. By September 20 or January 22, the department head submits to the dean of the appropriate college all pre-tenure materials and an evaluation letter that is based on a thorough review of the pre-tenure documents.

4. By October 1 or February 1, the appropriate dean or the Director of Library Services reviews the evaluation of the department head when applicable and submits to the Chair of the Rank and Tenure Committee an evaluation letter and all pre-tenure materials. The evaluation letter is to be based on a thorough review of the pre-tenure materials.

5. The Rank and Tenure Committee evaluates the pre-tenure materials and submits its evaluation and the materials upon which the evaluation was based to the Vice President for Academic Affairs.

6. Having received all materials by October 21 or February 21, the Vice President for Academic Affairs evaluates the pre-tenure materials and accompanying documents.

7. By November 15 or March 15, the Vice President for Academic Affairs responds to the faculty member with an evaluation letter that is based on a thorough review of the pre-tenure material.

## Related Policies

- Promotion of Faculty Members
- Evaluation of Faculty Members
- Contractual Agreements with Faculty Members

## History

07/01/89 - Reaffirmed with publication of Faculty Manual
04/16/99 - Sentence re degrees from various institutions moved to *Qualifications for Appointment to Rank* policy as recommended by the Policy Committee of the University
03/22/00 - Reference to retirement age deleted at Executive Committee meeting of the Policy Committee of the University
07/01/03 - Editorial changes made to reflect academic restructuring
04/20/04 - Revision approved by the President of the University as recommended by the Policy Committee of the University to include faculty librarians
12/02/05 - Revision approved by the President of the University as recommended by the Policy Committee of the University
01/19/08 - Amended to reflect that decisions on rank and tenure are made by the President of the University
05/02/08 and 5/05/08 - Revision approved by the President of the University as recommended by the Policy Committee of the University
06/24/09 - Revision approved by the President of the University as recommended by the Executive Committee of the Policy Committee of the University.

Fagal v. Marywood University          February 26, 2016                DEF000173

09/09/09 - Change in Procedure No. 4 recommended by the Provost and Vice President for Academic Affairs and approved.

05/04/10 - Revision approved by the President of the University as recommended by the Executive Committee of the Policy Committee of the University. 12/09/11 - Revision approved by the President of the University as recommended by the Policy Committee of the University.

12/09/11 - Revision approved by the President of the University as recommended by the Policy Committee of the University.

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu

Policy Detail - Marywood University                    http://www.marywood.edu/policy/detail.html?id=16391&crumbTra...



# Policies and Procedures Manual: Civil Rights Policy

## Policy Statement

Marywood University declares and reaffirms a policy of equal educational and employment opportunity and non-discrimination in the provision of educational and other services to the public. Marywood University does not condone and will not tolerate discrimination, harassment, or assault by any member of the Marywood community upon another individual, regardless of whether the action is based on race, sex, color, national or ethnic origin, age, creed, ancestry, religion, disability, or any other legally protected status. Marywood University will make reasonable accommodations to known physical or mental limitations of otherwise qualified individuals with disabilities unless doing so would impose an undue hardship on the University. Any person who believes he or she may require such accommodation should contact the Assistant Vice President for Human Resources and Affirmative Action Officer.

Marywood University is committed to take all necessary steps to comply with any obligations it may have under Section 504 of the Rehabilitation Act, the Americans with Disabilities Act, and Title IX of the Civil Rights Act of 1964, as amended. These are explicit civil and legal applications of the formulation of beliefs already cherished in Marywood's religious commitment, objectives, and practices.

## Definitions

### *Sexual Harassment*

Marywood University adopts the following definition of sexual harassment based on the statement endorsed by the American Association of University Professors, revised June 1995, and considers it applicable to the entire Marywood community:

Sexual advances, requests for sexual favors, and other conduct of a sexual nature constitute sexual harassment when:

1. such advances or requests are made under circumstances implying that one's response might affect academic or personnel decisions that are subject to the influence of the person making the proposal; or
2. such speech or conduct is directed against another and is either abusive or severely humiliating and/or persists despite objection of the person targeted by the speech or conduct; or
3. such speech or conduct is reasonably regarded as offensive and substantially impairs the academic or work opportunity of students, colleagues, or co-workers. If it takes place in the teaching context, it must also be severe, pervasive, and not germane to the subject matter. The academic setting is distinct from the workplace in that wide latitude is required for professional judgment in determining the appropriate content and presentation of academic material.

### *Sexual Assault*

Fagal v. Marywood University          February 26, 2016                DEF000175

Sexual assault is defined as threats of, or deliberate physical contact of a sexual nature that is against another person's will or without consent. Examples of such behavior include, but are not limited to the following:

1. deliberate physical contact of a lewd type, including brushing, touching, grabbing, pinching, patting, hugging and kissing;
2. deliberate or reckless threats, actual or implied, of physical contact of a sexual nature that results in reasonable fear of sexual assault or physical harm;
3. coerced sexual activities, including rape. Rape, the most severe type of sexual assault, is legally defined in Pennsylvania as sexual intercourse that is coerced through force or threats of force, or with someone who is unconscious or with someone who is so mentally deranged or deficient as to be incapable of consent.

## Procedures

In furtherance of Marywood University's commitment to its duties and obligations, regular training on harassment, discrimination and related topics is provided for managers and supervisors in the Marywood community.

A list of Marywood University and community resources is available at the Human Resources Office.

## History

11/03/97 - Reaffirmed by Board of Trustees and Members of the Corporation
04/15/00 - Revision approved by the Board of Trustees

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu

Fagal v. Marywood University          February 26, 2016                DEF000176



# Marywood
## U N I V E R S I T Y

## Policies and Procedures Manual: Conditions of Computer Use

### Policy Statement

Users of Marywood University computing facilities and services are held to high ethical standards. These conditions of use are based on the "spiritual, ethical and religious values and a tradition of service" expressed in the Mission Statement of the University. They underscore responsible, ethical, legal, and secure use of the campus-wide information system, and they derive from standards of common sense and common decency that apply to any shared resource. Responsibility extends to access, use of information, and distribution of data.

Marywood University administrators, faculty members, staff, and students may use the computers in all public computing facilities for research work and classroom assignments. Within the limitations of lab scheduling, students have priority over others for use of the facilities. Anyone who is not a currently enrolled student or employee may use the public facilities only at the discretion of University staff. Marywood University does not assume any liability for data loss. Those who use its computers do so at their own risk. Use of administrative computers is authorized with the permission of the appropriate department head.

Access to the Marywood computer system is not a right, but a privilege. When individuals log on to the University's computer system, they become responsible for adhering to University policy and state and federal laws governing individual privacy rights and confidentiality. The following list is not all-inclusive:

1.  They respect the privacy of others by not attempting to access their accounts or tampering with their data.

2.  They honor the intellectual rights of others by avoiding copyright infringement. This includes all Marywood University-owned computers, i.e., computers purchased with University funds.

3.  They respect the policies and procedures of external networks, such as the Internet and systems that can be accessed via the Internet.

4.  They do not make or use unauthorized copies of copyrighted or licensed programs or data. They only use authorized copies in full accord with the license agreement and national and international laws.

5.  They do not attempt to bypass any security system in order to access privileged information or alter existing interfaces.

6.  They do not develop or use programs, transactions, data, or processes that harass other users, infiltrate the system, or damage or alter data or software.

7.  They do not develop or use mechanisms to alter University records.

Fagal v. Marywood University          February 26, 2016                    DEF000177

8. They do not load or use personal or existing programs that affect the stability of systems, or use programs in an attempt to hinder or harass others.

9. They do not load software in classroom or computer labs, drop-in facilities, or other University-owned computers.

10. They use only their own User ID and password; rights to individual accounts are not transferable. All members of the University community are responsible for securing their passwords. All passwords are to be treated as confidential University information.

11. They respect the civil rights of others to an open and hospitable environment, regardless of race, sex, color, national or ethnic origin, age, creed, ancestry, religion, disability, or any other legally protected status, and with respect to sexual harassment including e-mailing inappropriate messages.

12. They do not use University owned or operated computers for a personal business.

13. They do not open or download pornographic materials or other materials that violate the Mission Statement of the University.

14. They use resources efficiently, avoiding printing large amounts of unnecessary information or downloading files for long periods of time.

15. They do not damage or alter equipment or software either physically or with a virus. They do not bring food or drink into computer labs, drop-in areas, near computers or computer-related equipment.

16. They abide by an instructor's requirements for computer use, including participation in an on-line course or in a listserv. They honor an instructor's right to allow or disallow use of a computer while the room is in use for instructional purposes. They do not disrupt a class that is being held in a computer lab or other technologically oriented facility, such as broadcast studio or video conferencing room.

Marywood University reserves the right to monitor and record any action performed while using the computer system. An audit trail is kept by system management software. If it is determined that use is contrary to Marywood policy, the appropriate department may examine the user's actions. If computing staff members suspect that any of these conditions are being violated, staff will initiate an investigation through the appropriate agency on campus. During the investigation, the account in question and all computing services may be suspended.

Privacy is neither a goal nor a condition of the University's computing system. There is not an expectation of privacy with regard to the information stored on University-owned or operated computers or, when applicable, other computers attached to the Marywood University network; and there are no specific laws, rules, or regulations that protect the privacy of a user's files, electronic mail messages, or any other information retrieved as a result of a person's session on the Marywood system.

While Marywood University respects an individual's privacy whenever possible, it does have and will exercise its right to examine a University-owned or operated computer and its contents if there is a reasonable indication that it has been used to download or store illegal materials, such as pornography or illegal software.

Marywood University reserves the right to report suspected criminal offenses to civil authorities. Institutional disciplinary charges may be filed in addition to civil actions.

These conditions of use have been established for the protection of all users but provide neither absolute security nor unqualified privacy.

## Definitions

System is used in a generic sense to refer to the aggregate of all hardware and software owned or licensed by Marywood University, including the network.

As a general matter, copyright infringement occurs when a copyrighted work is reproduced, distributed, performed, publicly displayed, or made into a derivative work without the permission of the copyright owner.

## Procedures

Contact the Office of Information Technology with questions about

- computer network support of instructional, research, and service activities;
- computer network support of administrative activities;
- voice and data network design and maintenance, desk-top computer repairs and installations.

## Related Policies

- Website Policy
- University Website Policy

## Related Committees

Technology Advisory Committee
Academic Computing Advisory Committee

## History

01/10/97 - Recommended to the President by the College Committee on Policy
02/06/97 - Approved by the President of the University with publication of The President's Memo
04/17/04 - Revision approved by the President of the University as recommended by the Policy Committee of the University
02/20/09 - Procedures changed in order to direct all questions to the Office of Information Technology

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

Fagal v. Marywood University            February 26, 2016            DEF000179

Policy Detail - Marywood University                         http://www.marywood.edu/policy/detail.html?id=95039&crumbTrai...

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary.
Comments to Marywood University Web Development Office: webber@marywood.edu

Fagal v. Marywood University          February 26, 2016              DEF000180



# Policies and Procedures Manual: Academic Freedom

## Policy Statement

Marywood University affirms its commitment to academic freedom. In so doing, it reaffirms its commitment to the tradition of higher learning that is the heritage of both the Roman Catholic Church and the nation. It is a tradition grounded on respect for truth, social responsibility and individual rights. It is a tradition that posits freedom of inquiry, open discussion and unrestricted exchange of ideas as essential to the pursuit of knowledge.

Marywood University upholds academic freedom as a fundamental condition for research and dissemination of information. The University is a center of discourse where inquiry is encouraged and discoveries are verified and refined by the interaction of scholar with scholar. Marywood University respects the right and responsibility of its faculty and students to conduct research, to publish their findings, and to discuss ideas according to the principles, sources and methods of their academic disciplines. These principles, sources and methods, as they develop over time, are not external to their respective disciplines. The University sanctions and encourages investigation of unexplored phenomena, advancement of knowledge, and critical examination of ideas, old and new. The University accepts the responsibility of protecting both teacher and student from being forced to deny truth that has been discovered or to assert claims that have not been established in the discipline. Teachers are entitled to freedom in the classroom in discussing their subject, but they should be careful not to introduce into their teaching material matter that has no relation to their subject.

Where the faculty is concerned, academic freedom presupposes, first of all, personal integrity in dealing with students, peers and officers of the University. Second, it presumes scholarly competence, observance of the professional standards of one's discipline, commitment to the stated mission of the University, and openness to having one's ideas and findings subjected to the judgment of one's peers. Third, faculty members have a responsibility as professional scholars to be accurate and judicious in their public statements, and respectful of the opinions and responsibilities of others.

## Related Policies

- Professional Ethics
- Evaluation of Faculty Members
- Faculty Status

## Related Committees

Fagal v. Marywood University          February 26, 2016                    DEF000181

Institutional Review Board for the Protection of Human Participants

## History

12/01/79 - Reaffirmed with publication of *Faculty Manual*
07/01/93 - Introduction and postscript added
07/01/03 - "Human Subejcts" changed to "Human Participants"
02/19/10 - Revision approved by the President of the University as recommended by the Policy
Committee of the University

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

Marywood[YOU] E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu

Fagal v. Marywood University          February 26, 2016                    DEF000182



# Marywood
U·N·I·V·E·R·S·I·T·Y

## Policies and Procedures Manual: Professional Ethics

## Policy Statement

The American Association of University Professors recognizes that membership in the academic profession carries with it special responsibility. The Statement on Professional Ethics that follows sets forth general standards assumed by members of the profession.

Professors, guided by a deep conviction of the worth and dignity of the advancement of knowledge, recognize the special responsibilities placed upon them. Their primary responsibility to their subject is to seek and to state the truth as they see it. To this end, professors devote their energies to developing and improving their scholarly competence. They accept the obligation to exercise critical self-discipline and judgment in using, extending, and transmitting knowledge. They practice intellectual honesty. Although professors may follow subsidiary interests, these interests must never seriously hamper or compromise their freedom of inquiry.

As teachers, professors encourage the free pursuit of learning in their students. They hold before them the best scholarly and ethical standards of their discipline. Professors demonstrate respect for students as individuals and adhere to their proper roles as intellectual guides and counselors. Professors make every reasonable effort to foster honest academic conduct and to assure that their evaluations of students reflect each student's true merit. They respect the confidential nature of the relationship between professor and student. They avoid any exploitation, harassment, or discriminatory treatment of students. They acknowledge significant academic or scholarly assistance from them. They protect their academic freedom.

As colleagues, professors have obligations that derive from common membership in the community of scholars. Professors do not discriminate against or harass colleagues. They respect and defend the free inquiry of associates. In the exchange of criticism and ideas, professors show due respect for the opinions of others. Professors acknowledge academic debt and strive to be objective in their professional judgment of colleagues. Professors accept their share of faculty responsibilities for the governance of their institution.

As members of an academic institution, professors seek above all to be effective teachers and scholars. Although professors observe the stated regulations of the institution, provided the regulations do not contravene academic freedom, they maintain their right to criticize and seek revision. Professors give due regard to their paramount responsibilities within their institution in determining the amount and character of work done outside it. When considering the interruption or termination of their service, professors recognize the effect of their decision upon the program of the institution and give due notice of their intentions.

As members of their community, professors have the rights and obligations of other citizens. Professors measure the urgency of these obligations in the light of their responsibilities to their

1 of 2                                                                                          1/23/2012 4:20 PM

Fagal v. Marywood University          February 26, 2016                    DEF000183

subject, to their students, to their profession, and to their institution. When they speak or act as private persons, they avoid creating the impression of speaking or acting for their college or university. As citizens engaged in a profession that depends upon freedom for its health and integrity, professors have a particular obligation to promote conditions of free inquiry and to further public understanding of academic freedom.

## Related Policies

* Teaching Responsibility
* Librarianship Responsibility
* Faculty Status

## History

07/01/89 – Reaffirmed with publication of Faculty Manual

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu

Fagal v. Marywood University        February 26, 2016        DEF000184



## President's Page: Marywood University Mission & Core Values

### Mission Statement

A Catholic university sponsored by the Congregation of the Sisters, Servants of the Immaculate Heart of Mary, Marywood University roots itself in the principle of justice and a belief that education empowers people. Enacting its ideals, Marywood offers students a welcoming and supportive community that encourages men and women of all backgrounds to shape their lives as leaders in service to others. Proud of its liberal arts tradition and host of professional disciplines, Marywood challenges students to broaden their understanding of global issues and to make decisions based on spiritual, ethical, and religious values. Marywood calls upon students to seek their full potential and invites all to engage in a lifelong process of learning. Witnessing the efficacy of teaching and scholarship, Marywood educates students to live responsibly in a diverse and interdependent world.

### Core Values

#### Catholic Identity

A commitment to spiritual, ethical and intellectual values in the context of a faith community.

#### Respect for Each Person

Respect for the value of each human being, for diversity in the context of vibrant community, and for the earth and all creation.

#### Empowerment

Education to enable access and to empower the underserved to take a full role in the life of the broader society.

#### Service

Rooted in the deep belief that learning and scholarship serve the global community is the belief in the value of the diverse types of work that support that service, and the preparation of students for leadership by participation in service.

#### Commitment to Excellence

The belief that the work of education has the capacity to forward the kingdom of God, in broad and varied ways, leads us to care passionately for the quality of the mission of Marywood.

---

President's Office | Fran Ferrese, Executive Secretary | (570) 348-6231 | ferrese@marywood.edu

Fagal v. Marywood University          February 26, 2016          DEF000185

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

Marywood YOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu

· Fagal v. Marywood University          February 26, 2016          DEF000186

Release of Personal Information
*Please check one box below; sign, date, and return by February 3, 2012*

____ I DO NOT grant permission for Marywood University to release Sister Anne Munley's Recommendation for Termination and Statement of Charges dated 1/24/12 to a faculty review committee comprised of tenured faculty. I understand that by refusing such permission that there will be no faculty committee review of Sister Anne Munley's decision to terminate my tenure and employment with the University prior to it being finalized.

OR

____ I DO grant permission for Marywood University to release Sister Anne Munley's Recommendation for Termination and Statement of Charges dated 1/24/12 to a review committee comprised of tenured faculty.

This authorization is valid until rescinded by me in writing.

_____          _____
Frederick F. Fagal, Jr.                            Date

# EXHIBIT F



# Marywood
### U N I V E R S I T Y

# FACULTY HANDBOOK

## July 1, 2010

Reap College of Education and Human Development
Insalaco College of Creative and Performing Arts
College of Health and Human Services
College of Liberal Arts and Sciences
School of Architecture



104

**4.2        CIVIL RIGHTS COMPLAINT PROCEDURES**
(Revision approved by the President of the University 4/03/00, 7/21/03, 6/24/09)

The following process must be followed any time a member of the Marywood University community believes s/he has been the victim of or witness to discrimination, harassment, or assault by any member of the University community on University property or any property controlled by the University.  Any individual who believes s/he has been subject to discrimination on the basis of disability should file a grievance consistent with Marywood's *Disability Grievance Procedures*. Confidentiality is expected of all persons involved in the process.

In furtherance of Marywood University's commitment to its duties and obligations, regular training on harassment, discrimination and related topics is provided for managers and supervisors in the Marywood community.

**Internal Process**

1.   As soon as possible, but not later than 30 working days, except in unusual circumstances, after the alleged incident(s) occurs, the complainant must present the complaint to the appropriate University administrator as listed below:

> Claims Against Faculty Members or Librarians
>        Contact: Academic Dean or Director of Library and/or Provost and Vice
>        President for Academic Affairs

> Claims Against Administrators, Professional Staff, or Support Staff Members
>        Contact: Immediate supervisor and/or a vice president

> Claims Against Students
>        Contact: Dean of Students and/or Vice President for Student Life.

In all cases, individuals may contact the Assistant Vice President for Human Resources and Affirmative Action Officer if they feel they cannot contact the appropriate individual as noted.

In cases that involve two or more categories of Marywood community members, the University administrator first contacted will consult with the President of the University to determine the appropriate course of action.

2.   The initial discussion between the complainant and the University administrator will be kept confidential to every extent possible.  The University administrator must contact the Assistant Vice President for Human Resources and Affirmative Action Officer in cases involving employees.

3.   If the complainant, after an initial meeting with the University administrator, decides to proceed, the complainant submits within 10 working days a formal complaint, preferably in writing, to the appropriate University administrator.  The complaint must include detailed factual information concerning the incident(s), and should include what the victim feels will correct the situation.

In certain serious cases the University administrator may proceed even without a formal complaint.

Cases involving alleged discrimination, harassment, and sexual assault are particularly sensitive and demand special attention to issues of confidentiality.  Dissemination of information relating to the case is to be limited, so as to insure, as fully as possible, the privacy of the individuals involved.

**Marywood University Faculty Handbook  2010**

4.  The University administrator must inform both parties of the need for confidentiality.  Any individual who retaliates against the complainant will be subject to discipline up to and including discharge from employment and/or termination of student status.

5.  Within 5 working days after receipt of a formal complaint, the University administrator must initiate the appropriate steps to effect an informal resolution of the complaint that will be acceptable to both the complainant and the alleged offender.

6.  Within 10 working days after the initiation of the steps to effect an informal resolution, the University administrator must provide a written summary of the complaint and the proceedings to date to both the complainant and the alleged offender.  Appropriate remedial action will be determined by the University administrator after consultation with executive officer(s) and/or legal counsel if deemed necessary.  Action will be taken to eliminate the discriminatory or harassing conduct, including but not limited to warning, suspension, transfer, community service, discipline, discharge, or dismissal of the offender or anyone making a knowingly false complaint. The remedial action may also include offering assistance/training to the victim and/or the offender.  The parties will be formally notified of the final decision, including punishment or sanctions, if any.

7.  Either party, if not satisfied with the informal resolution proposed by the University administrator, will have 10 working days to file an appeal.  Appeals must be in writing and submitted to the President of the University.  Within 5 working days, the President will direct the appeal to the appropriate University body, described below.  The appeals committee will have 30 working days to review and make a recommendation to the President of the University.  The President of the University will provide a written response to the appellant within 10 working days of the receipt of the appeals committee's recommendation.  The decision of the President of the University is final and binding internally.

> Claims against Faculty Members including Librarians, Administrators, Professional Staff, and Support Staff
> > The President of the University will appoint and convene a committee of 5 employees comprised of professional staff, administrators and/or faculty who are independent of the claim.
>
> > Note:  Claims by faculty members against faculty members may choose to contact the Faculty Grievance and Appeals Committee in lieu of this process.

> Claims against Students
> > The President of the University will refer the appeal to the Vice President for Student Life within 5 working days.  The Vice President for Student Life will convene an Appeal Board within 3 working days of the President's notification. The Appeal Board will have 30 working days to review and make a recommendation to the Vice President for Student Life.  The Vice President will notify the President of the recommendation within 3 working days.  The President of the University will provide a written response to the appellant within 10 working days of the receipt of the appeals committee's recommendation.  The decision of the President of the University is final and binding internally.

**External Process**

Victims may choose to file a report with the proper law enforcement authorities.  Marywood University has personnel on staff who can explain criminal complaint procedures and assist victims in beginning the process.  Police investigation and legal prosecution are conducted outside of and in addition to University procedures.

**Marywood University Faculty Handbook  2010**

Resources

A list of Marywood University and community resources is available at the Human Resources Office and the Student Life Offices.

Students are encouraged to use the services of the Counseling and Student Development Center, the Student Health Services Office, and the Students with Disabilities Services Office.

4.3      **DISABILITY GRIEVANCE PROCEDURES**
         (Approved by the President of the University 6/24/09)

         Students are strongly encouraged to contact the Office of Student Support Services
         at the first sign of any difficulties obtaining
         their approved academic accommodations from faculty,
         or if they encounter difficulties related to their disabilities
         from any Marywood University staff, administrators, or students.

         It is the policy of Marywood University not to discriminate on the basis of disability. The University has adopted an internal grievance procedure providing for prompt and equitable resolution of grievances by either students or employees alleging any action prohibited by Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794) or the relevant U.S. Department of Health and Human Services regulations implementing the Act (34 C.F.R. Part 104) (together, "Section 504"). Section 504 prohibits discrimination on the basis of disability in any program or activity receiving Federal financial assistance. The Law and Regulations may be examined in the office of the Section 504 Coordinator, Dr. Patricia E. Dunleavy, Assistant Vice President for Human Resources and Affirmative Action Officer, who has been designated to coordinate the efforts of the University to comply with Section 504.

         Any person who believes she or he has been subjected to discrimination on the basis of disability may file a grievance under this procedure. It is against the law for the University to retaliate against anyone who files a grievance or cooperates in the investigation of a grievance. The University will make every effort to protect the grievant from retaliatory action. Any individual who retaliates against the grievant will be subject to discipline up to and including discharge from employment and/or termination of student status.

Procedures

All alleged incidents involving disability discrimination are to be dealt with immediately. When a Marywood University employee or student believes s/he has been the victim of disability discrimination or witnessed disability discrimination, the following procedures should be used:

1.   Grievances must be submitted to the Section 504 Coordinator, or her designee, within 30 calendar days of the date the person filing the grievance becomes aware of the alleged discriminatory action. (Special circumstances warranting later filings will be considered on a case-by-case basis.) A grievant may contact the Vice President for Enrollment Management if he or she feels he or she cannot contact the Section 504 Coordinator, who will designate an appropriate person to fulfill the Section 504 Coordinator's responsibilities under this policy.

2.   A grievance must be in writing and must contain the name, address and other contact information of the grievant, describe the problem or alleged action alleged to be discriminatory in sufficient detail to inform the Section 504 Coordinator of the nature and date of the alleged violation and permit an adequate investigation to be conducted, include the names of University employees or students involved and state the remedy or relief sought.

**Marywood University Faculty Handbook 2010**

# EXHIBIT G

*Not provided, in that letter*

# Marywood University
## Policies and Procedures Manual                                     4.307.3

### Progressive Discipline

**Policy Statement**

Marywood University endorses a progressive discipline policy designed to promote resolution in a fair and orderly manner. This policy applies to faculty members with tenure or whose terms of appointment have not yet expired. Its objectives support the collegial relationships at Marywood University and are directed toward continual institutional improvement. Because the University regards disciplinary action as corrective and not punitive, the policy recognizes personal and professional problems that may be rectified by an informal educational process, as well as serious violations of professional responsibilities implicating possible recommendation for suspension or dismissal.

The policy is intended to provide an effective and flexible means of identifying problem areas, resolving complaints, and preventing repetitive incidents by prompt intervention and assistance. It is designed to accomplish these ends by a series of gradual steps involving strategies such as personal conferences, oral and written warnings, and opportunities for monitored assistance where applicable.

**Procedures**

*Commencement.* Disciplinary action may be initiated by a complaint, oral or written, which alleges violation of institutional policy, practice, procedure or other functions and responsibilities of the faculty member in pursuing his or her customary teaching and institutional role. The complaint, which may reflect an incident or incidents of misconduct or deficiency, may be communicated to the faculty member's immediate supervisor or to the appropriate dean.

*Meeting with Administrator.* The administrator receiving the complaint shall discuss the matter with the faculty member in a confidential conference. If additional information from the faculty member provides a satisfactory explanation, the decision may be to close the matter then. If, however, additional light is not shed on the allegation or an explanation is not satisfactory, the administrator will specify corrective action to be taken, and the discussion will constitute an oral warning.

*Written Warning.* If the alleged problem continues or additional complaints are received, the immediate supervisor or dean must notify the Vice President for Academic Affairs, who shall conduct a preliminary investigation concerning the merits of the complaint. A written warning to the faculty member may follow where circumstances indicate that the problem is not resolved. The written warning will become a part of the faculty member's personnel file, but will be expunged after three years if no other written warnings have occurred.

*Suspension.* The faculty member may be suspended by the Vice President for Academic Affairs at any time during the proceedings involving him or her. Suspension is justified if immediate harm to the faculty member or others is threatened by the person's continuance in the faculty position. Unless in direct violation of the law, any such suspension should be with pay.



*Special Assistance.* In those circumstances where it is evident that the faculty member is in need of special professional assistance, the Vice President for Academic Affairs may require in writing any of the following remedial actions:

- counseling and/or another type of treatment program, such as Alcoholics Anonymous or Narcotics Anonymous;
- psychological counseling and/or treatment, including out-patient treatment prescribed by a duly credentialed and qualified professional;
- peer faculty monitoring to assist in resolving work-related performance problems;
- a specified number of periodic conferences with the faculty member's Dean to assist in resolving administrative or institutional problems.

Special professional assistance will be for a specific period of time. Where the assistance necessitates in-patient treatment or time away from teaching, that temporary time-off shall be with pay. During the period of assistance, the faculty member shall communicate weekly or at other intervals specified by the Vice President for Academic Affairs, who shall monitor the faculty member's progress to determine when and if the special assistance has achieved its objective. Part of this monitoring function may involve the faculty member providing summary statements from treatment providers regarding compliance and prognosis. If the faculty member has refused to participate, or the remedial objective has not been reached during the specified period of time, a recommendation to terminate employment may be made to the President of the University.

## *Dismissal*

If remedial actions(s) taken during the suspension does not sufficiently resolve the issues that lead to the suspension, the university may move towards dismissal of the faculty member.

## *Ad Hoc Faculty Committee*

Faculty members have the right to convene an ad hoc committee in order to appeal either a decision to suspend the faculty member or a decision to dismiss the faculty member.

- Having received a written recommendation for either suspension or dismissal from the Vice President for Academic Affairs, the President of the University sends a written communication to the faculty member, stating with reasonable particularity the basis for suspension or dismissal and offering, if requested by the faculty member within 10 days, to convene a tenured faculty ad hoc committee to consider the matter, to render confidential advice, and thereby to effect a remedy if possible.

- Should the faculty member request a review by an ad hoc committee, it shall consist of three members selected in the following order: (a) one tenured faculty member selected by the person seeking assistance, and (2) two tenured faculty members selected by the Executive Council of the Faculty Senate. The choice of members should be on the basis of their objectivity and competence and of the regard in which they are held in the academic community. The President of the University or his/her delegate has the option of attending the meetings of the Committee. Should a faculty member request that such a committee be convened twice (i.e., once for suspension and once for dismissal), the membership of the committee may be similar or different, a determination which is made by the President of the University in consultation with the faculty member and the Vice

President for Academic Affairs. Normally the committee would make its recommendation within 30 days of being convened.

- The Committee elects its own Chair, who sends the opinion of the committee in writing to the President of the University, copied to the faculty member and to the Vice President for Academic Affairs. If the opinion of the Faculty Committee is that the matter is successfully resolved or that there is no merit to the complaint, a recommendation shall be made to discontinue proceedings. If the problem has not been corrected and reason still exists to question the fitness of the faculty member, the recommendation shall be to either continue a suspension or initiate a formal action toward dismissal. .

*Publicity.* ·Public statements by the faculty member or others about possible or actual termination of employment should be avoided.

---

**Related Policies**

4.302.1 – Contractual Agreements with Faculty
4.305.3 – Tenure
4.307.2 – Non-reappointment of Faculty Member

---

**History of Policy No. 4.307.3 – Progressive Discipline**

07/01/89 – Reaffirmed with publication of Faculty Manual
12/12/97 – Addition of informal process approved by the President
07/01/03 – Editorial changes made to reflect academic restructuring
10/12/11 – Revision approved by the President of the University as recommend by the Policy Committee of the University

---

MARYWOOD UNIVERSITY
POLICIES AND PROCEDURES MANUAL

Mary Theresa Gardier Paterson, Esquire
Secretary of the University
Phone: (570) 340-6018
E-mail: paterson@maryu.marywood.edu

# Marywood University
## Policies and Procedures Manual                         4.312.1
### Faculty Grievances and Appeals

As an institution of higher education, Marywood University brings together a faculty, administration, and governing board united in a common bond of academic purpose. Essential to the fulfillment of this purpose is a mutual recognition of institutional integrity and individual human rights, along with an understanding of the respective roles of the several entities which constitute this educational organization.

Circumstances may arise at times, however, wherein a grievant--full-time, part-time, or pro-rata-- may question decisions which affect his/her professional role in the institution. To assist in the resolution of these matters, a series of guidelines for grievances is herein set forth.

**Definitions**

Grievance: A grievance refers to any disagreement between two parties. A grievance identifies a complaint one party has against another party for some alleged wrongful action on the part of the second party.

Grievant: A Grievant initiates a grievance.

**Types of Issues That Can Be Grieved**

It is understood that procedural rather than substantive factors provide appropriate areas of review, and the Faculty Grievance Committee will not attempt to substitute its judgment for that of the decision-maker(s) involved in the case.

Thus, the Faculty Grievance Committee will hear grievances  concerning:

1) Allegations of violation of academic freedom resulting in: denial of tenure, promotion, or sabbatical leave; non-reappointment.

2) Allegations of impermissible discrimination. Tenured and non-tenured faculty are protected against illegal or unconstitutional discrimination, or on any basis not relevant to job performance, and includes, but is not limited to, race, sex, religion, national origin, age, disability, marital status, or sexual orientation

3) Allegations of inadequate consideration resulting in: denial of tenure, promotion, or sabbatical leave; non-reappointment; or termination of employment due to retrenchment.

4) Allegations of violations of procedures used in rendering decisions in numbers 1 and 2 above as set forth in Chapter 2 of the *Faculty Handbook.*

Procedures regarding dismissal, suspension, and sanctions of faculty members are in the *Progressive Discipline* policy.

Fagal v. Marywood University          February 26, 2016                DEF000252

Should a grievant allege cause for grievance in any matter not identified in the above guidelines, the grievant may consult the Faculty Grievance Committee. In such circumstances, the Committee's first decision is whether the complaint is appropriate and sufficiently serious to merit consideration.

### Persons Against Whom Grievances May be Directed

Fundamentally, a grievance may arise from an allegation of improper implementation of a procedure or process leading to a decision. The person(s) or body who perform(s) that procedure or process is (are) the subject(s) of the grievance. Thus, a grievant may direct a grievance against the person(s) or body responsible for the decision identified herein.

The decisions or actions of the Faculty Grievance Committee or Ad Hoc Hearing Committee may not themselves be grieved.

### Informal Procedure

1) A member of the faculty must initially discuss a complaint with the person or body responsible for the action to which the grievant takes exception in order to determine if a resolution is possible.

2) A complaint must be presented within (10) calendar days of the occurrence or discovery of the alleged violation.

3) No grievance may be filed without the initiation of this informal complaint procedure.

4) If the grievance still exists after step one the grievant initiates a consultation with the Vice President for Academic Affairs in order to try to resolve the matter.

### Formal Procedure for Filing a Grievance

1) The Faculty Grievance Committee is convened.

### Faculty Grievance Committee

The Faculty Grievance Committee consisting of three tenured faculty members and two alternates (also tenured) is specifically charged with responsibility for resolving matters of grievance and appeal. The Faculty Senate conducts the election of this committee. Faculty currently serving on the Rank and Tenure Committee or the Faculty Development Committee are not eligible for election to this committee.

The term of each member extends for three years, with one person replaced each year. An alternate will be identified at each election. Any member of the Grievance Committee who has had any prior involvement in a case under consideration must recuse him/herself. The Grievance Committee shall annually elect a chair-elect who will succeed the Chair.

## Grievance Process

The grievant may consult the President of Faculty Senate for assistance in contacting the Faculty Grievance Committee Chair. The Chair should be provided with a written statement setting forth, in detail, the nature of the grievance or appeal and identifying the person(s) or body against whom the grievance or appeal is directed; this document may also include a proposal for resolving the issue. A grievance must be filed within thirty (30) calendar days of the occurrence or discovery of the alleged violation but not fewer than five (5) calendar days after the initiation of the informal complaint.

In considering the grievance or appeal, the Faculty Grievance    Committee will take the following steps:

1) The Committee notifies the decision maker(s) that a grievance has been filed.

2) The Grievance Committee requests from the grievant written information regarding the issues. The Grievance Committee also requests from the decision maker(s) written statements describing the basis for the decision being appealed or grieved, as well as any attempts to settle the matter informally. This information shall be held in confidence by the Grievance Committee. At this point in the process, the information gathered is solely for review by the Committee and is not to be shared with either party involved.

3) At any point, the Grievance Committee may request additional information in writing from the grievant and from the decision-maker(s).

4) If after completing the above steps, the Committee determines that the grievance is improper or unsubstantial, or that sufficient time had not yet been allowed for its normal resolution, or that there is no evidence of improper action on the part of the decision maker(s) which would constitute a legitimate grievance, the Committee will communicate this determination to the grievant and the decision maker(s).

5) If the Grievance Committee determines that there was inadequate consideration or violation of procedures (see No. 3 and 4 under Types of Issues Which Can Be Grieved above), the Committee will return the case to the decision maker for reconsideration.

6) If the grievance is deemed appropriate for mediation, the Chair will appoint a Mediator from the University. The Mediator does not represent either party. Any party may object to the Mediator on the grounds of actual or apparent bias or conflict of interest and submit such objections to the Chair in writing. The Chair will review the objections and may replace the mediator.

7) The Offices of the Vice President for Academic Affairs or Human Resources may be consulted by the Mediator on mediation procedure or other matters involved in the grievance.

Fagal v. Marywood University          February 26, 2016          DEF000254

8) The Mediator shall try to resolve the grievance within thirty (30) calendar days of formal submission to the chair. With the consent of both parties, the period of mediation may be extended for a short period of time. If the grievance is not resolved within the thirty (30) calendar days, the mediator will advise the chair of the committee in writing that that the issue has not been resolved. If a mutually accepted agreement is reached, this will be communicated to the chair of the committee.

9) Grievances not appropriate for mediation or grievances not resolved through mediation shall be referred to the Ad Hoc Hearing Committee. All evidence collected will be passed on to the Ad Hoc Hearing Committee.

10) If the Faculty Grievance Committee recommends a formal hearing, in cases of violation of academic freedom or impermissible discrimination, an Ad Hoc Hearing Committee will be created to conduct a formal investigation and to arrive at a recommendation for resolving the issue.

11) The Grievance Committee will make a summary report of its activities at the end of each academic year to the Faculty Senate. No details relevant to the privacy of the participants in any cases will be included in this report.

**Ad Hoc Hearing Committee**

The Ad Hoc Hearing Committee shall consist of three members, selected by the Faculty Senate Executive Council, from a standing committee of fifteen tenured Faculty Members elected for one-year terms by the faculty at large. The Faculty Senate conducts the election of this committee.

Each party shall have two challenges without stated cause regarding membership of the Ad Hoc Hearing Committee. No member of the Ad Hoc Hearing Committee shall have had any prior involvement in the case.

If the three-person Ad Hoc Hearing Committee cannot be chosen from the fifteen members of the standing committee, the Executive Council of the Faculty Senate is empowered to conduct a special election to obtain fifteen additional members with terms of one year.

The Ad Hoc Hearing Committee must select a chairperson.

**Ad Hoc Hearing Procedures**

1) The Ad Hoc Hearing Committee is empowered to gather information and documents specific to the case of the Grievant, conduct interviews, hold a hearing and take actions as are necessary to investigate the grievance to the extent that the law and University policy permit. The Ad Hoc Hearing Committee will provide recommendations in writing forty (40) calendar days from the date of its official appointment.

2) All Hearings are closed to anyone other than the parties and their advisors, members of the Ad Hoc Hearing Committee, and any witnesses invited to testify by the Committee. The hearing may be audio or video recorded and a written record will be maintained. The

hearing is not a legal proceeding. At the beginning of the hearing, all procedures will be made known to the parties, and all information will be kept confidential.

3) Each party to the grievance may have one advisor during the hearing. The advisor may not participate in the hearing.

4) Strict rules of legal evidence will not be binding upon the Ad Hoc Hearing Committee and evidence of probative value in defining issues may be admitted.

5) The hearing record will be used exclusively as the basis for findings of fact and for arriving at a decision.

6) Upon reaching a decision on the issue and a recommendation for action, the Ad Hoc Hearing Committee will provide a summary written report to the petitioner, the person(s) named in the grievance, and the appropriate administrative officer and the President.

7) After receiving the recommendation of the Ad Hoc Hearing Committee, the appropriate administrative officer will review the recommendation and notify the Ad Hoc Hearing Committee and petitioner whether the recommendation has been accepted. If the recommendation of the Ad Hoc Hearing Committee is not accepted by the appropriate administrative officer, the administrative officer will review it with the Ad Hoc Hearing Committee.

8) No details relevant to the privacy of the participants in the case will be included in the notice from the Hearing Committee. Public statements and publicity about the case by the participants will be avoided until the proceedings have been completed, including consideration by the President

### Action by the President of the University

Following the recommendation of the Ad Hoc Hearing Committee, should the petitioner desire further consideration of the issue beyond the immediate administrative channels of the University, the President may be requested, within twenty calendar days, to review the case.

This review will be based on the record from the committee hearing and may provide opportunity for argument, oral or written, or both, by the principals.  Then the President will then make the final decision.

### Responsibility for Expenses Incurred in Grievance and Appeal

Expenses incurred by the grievant are the responsibility of the individual. These include, but are not limited to, the following:

> Cost of an advisor.
> Travel expenses for advisor, witnesses, or others engaged by petitioner.
> Cost of preparing any documents and copies thereof.

### Withdrawal of a Grievance
The grievance can be withdrawn at any point in the process.

Fagal v. Marywood University        February 26, 2016              DEF000256

**Non-Retaliation**

Grievants will not be adversely affected for exercising their right to file a grievance, regardless of outcome.

Grievants will not be subject to adverse consequences for either initiating a grievance or in presenting evidence on behalf of a grievant. Anyone who violates this mandate can be subject to disciplinary action, up to and including dismissal.

**Related Policies**

4.300.2 - Faculty Senate
4.304.1 - Evaluation of Faculty
4.305.1 - Promotion of Faculty
4.305.3 - Tenure
4.307.2 - Non-reappointment of Faculty Member
4.307.3 - Progressive Discipline
4.307.4 - Retrenchment of Faculty
4.308.1 - Academic Freedom
4.309.2 - Sabbatical Leave
5.350.4 - Complaint Procedures for Non-faculty Employees

**History of Policy No. 4.312.1 – Faculty Grievances and Appeals**

10/02/92 – Proposal returned to committee of Faculty Senate by College Committee on Policy
11/13/92 – Proposed policy dated 3/13/92, as amended, recommended by College Committee on Policy to the President
04/26/93 – Presidential approval affirmed with publication of the President's Memo
07/01/93 – Reaffirmed with publication of the Faculty Manual 2.16
07/01/95 – Reaffirmed with publication of the Faculty Manual 2.16
03/20/98 - Revision proposed by Faculty Senate approved by the President of the University as recommended by the Policy Committee of the University
04/29/11 – Revision approved by the President of the University as recommended by the Policy Committee of the University.

MARYWOOD UNIVERSITY
POLICIES AND PROCEDURES MANUAL

Mary Theresa Gardier Paterson, Esquire
Secretary of the University and General Counsel
Phone:  570-340-6018
Fax:  paterson@marywood.edu

Fagal v. Marywood University          February 26, 2016                  DEF000257

# EXHIBIT H

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

– – –

FREDERICK F. FAGAL, JR.        : CIVIL ACTION
                               :
            Plaintiff,         : NO. 3:14-cv-02404-ARC
                               :
      vs.                      : (JUDGE CAPUTO)
                               :
MARYWOOD UNIVERSITY,           :
                               :
            Defendant.         :


– – –

September 6, 2016

– – –


            Oral deposition of Alan M.
Levine, taken pursuant to notice, was
held at the Radisson Lackawanna Station
Hotel, Suite 206, 700 Lackawanna Avenue,
Scranton, Pennsylvania, commencing at
9:30 a.m., on the above date, before Judy
A. Black, a Registered Professional Court
Reporter and Notary Public in and for the
Commonwealth of Pennsylvania.


– – –


MAGNA LEGAL SERVICES
Seven Penn Center, 8th Floor

1635 Market Street

Philadelphia, Pennsylvania 19103

(866) 624-6221



```
 1              - - -
 2          STIPULATIONS
 3              - - -
 4      IT IS STIPULATED by and between counsel
 5  that the Deposition of Alan M. Levine, is being
 6  taken pursuant to agreement and that all
 7  objections, except as to form, are reserved
 8  until the time of trial. Alan M. Levine does
 9  not waive the reading, signing, and filing of
10  the Deposition.
11              - - -
12          A L A N  M.  L E V I N E, having
13  been duly sworn, was examined and testified as
14  follows:
15              - - -
16  DIRECT EXAMINATION BY MR. COHEN:
17      Q.    Good morning, Dr. Levine.
18      A.    Good morning.
19      Q.    My name is Jonathan Cohen. I represent
20  the plaintiff in this litigation, Frederick F. Fagal,
21  Jr. Do you understand that you're under oath today,
22  the same as if you were in a courtroom?
23      A.    I do.
24      Q.    And have you ever had your deposition
```

```
 1  taken?
 2      A.    Nope.
 3      Q.    Okay. So the way this works is I just
 4  ask you questions, and unless your attorney instructs
 5  you not to answer, you're supposed to answer them.
 6  If you don't understand the question, please just say
 7  so and I'll rephrase it. If you need to take a
 8  break, that's fine, too.
 9          As I'm asking a question, you might
10  think that you know what I'm about to ask and you
11  might start answering it, but that's hard for the
12  court reporter to take everything down, so if you can
13  just wait until I finish the question, it's easier
14  for everybody.
15          Is there anything that would prevent you
16  from thinking clearly or testifying truthfully today?
17      A.    Nope.
18      Q.    What is your full name including any
19  middle name?
20      A.    Alan Michael Levine.
21      Q.    And could you tell me a little bit about
22  your educational background, Dr. Levine?
23      A.    I could.
24      Q.    Could you?
```

```
 1      A.    I could.
 2      Q.    Could you explain -- did you go to
 3  college, did you go to grad school?
 4      A.    Yes.
 5      Q.    Tell me where you went.
 6      A.    I went to college at Hofstra University.
 7      Q.    Okay. Did you attend graduate school?
 8      A.    I did.
 9      Q.    And where did you go to graduate school?
10      A.    New York University.
11      Q.    And what were your degrees in?
12      A.    Where?
13      Q.    Both places.
14      A.    Psychology undergrad, nutrition and
15  dietetics master's, nutrition and dietetics Ph.D.
16      Q.    Okay. When did you first begin working
17  for Marywood University?
18      A.    1978.
19      Q.    And what did you do before then
20  professionally?
21      A.    Lots of things.
22      Q.    Okay. And, today, are you still
23  employed by Marywood University?
24      A.    Yes.
```

```
 1      Q.    And what's your position there?
 2      A.    Professor.
 3      Q.    And it's true that at one point you were
 4  vice president, correct, of academic affairs?
 5      A.    Correct.
 6      Q.    When did you first meet my client,
 7  Professor Fagal?
 8      A.    I don't remember.
 9      Q.    Would it be fair to say that Professor
10  Fagal has had a number of run-ins with Marywood's
11  administration?
12          MS. PEET: Objection to the form. You
13  can answer.
14          THE WITNESS: Yes, I can answer?
15          MS. PEET: You can answer.
16      A.    Would you repeat the question?
17      Q.    Would it be fair to say that Professor
18  Fagal has had a number of run-ins with Marywood's
19  administration?
20          MS. PEET: Objection. You can answer.
21      A.    I don't know what run-ins means.
22      Q.    Confrontations?
23      A.    You'd have to define that term for me.
24      Q.    You don't understand what a
```



Page 26

1  a conversation wasn't necessary.
2      Q.    In the same e-mail, Dr. Heath references
3  Professor Fagal's other agenda.  Do you see that?
4      A.    Yes.
5      Q.    Do you know what agenda he was referring
6  to?
7      A.    No.
8      Q.    Did you agree that Professor Fagal's
9  behavior was affecting individual's outside of his
10 department?
11     A.    Yes.
12     Q.    How was he affecting them?
13     A.    He was causing difficulty for some
14 students.
15     Q.    What type of difficulty?
16     A.    Emotional difficulty.
17     Q.    How was he causing emotional difficulty?
18     A.    By putting a cartoon demeaning Muslims
19 on his door, he was causing difficulty for Muslim
20 students who didn't agree with him.  Emotional
21 difficulty, or emotional pain.
22     Q.    Is that the only way that you know of
23 that he was affecting these students?
24     A.    As far as I remember now.
                    MAGNA LEGAL SERVICES

Page 27

1      Q.    And do you remember responding to this
2  e-mail?
3      A.    I don't remember, but I'm sure you have
4  a response if there is one.
5           MR. COHEN:  Let's have this marked as
6  Levine Exhibit 6, please.
7           (Levine-6, E-mail chain dated Tuesday,
8  January 17, 2012, Bates Nos. DEF002743-2746, is
9  received and marked for identification.)
10     Q.    And could you read this to yourself and
11 let me know when you're finished, please?
12     A.    Finished.
13     Q.    Okay.  These e-mails reference Mary
14 Theresa.  That's Marywood's inside attorney, correct?
15     A.    Correct.
16     Q.    Now, I don't want to know what you asked
17 her, but --
18          MS. PEET:  That would also go to what
19 she said to you, to the extent she said anything.
20     Q.    Yes, I'm not trying to ask you anything
21 that's privileged.  But what I am interested in is
22 you're saying to Pat Dunleavy, you're trying to find
23 out what your -- what our options are.  What type of
24 options did you have in mind?
                    MAGNA LEGAL SERVICES

Page 28

1      A.    Whether I can sue this bastard for the
2  egregious, what he called, Hitler parody.  That was
3  the main thing I was interested in personally.
4      Q.    What about options not for you
5  personally but for the university?
6      A.    Whether the university had to allow that
7  parody, what this bastard called a parody, to be out
8  on YouTube.
9      Q.    Were you specifically interested in
10 possible discipline for Professor Fagal?
11     A.    Specifically what do you mean?
12     Q.    Written warning, oral warning,
13 suspension, termination.  You know what discipline
14 means, right?
15     A.    All of those things should have been on
16 the table.
17     Q.    Okay.
18          MR. COHEN:  Let's mark this as Levine
19 Exhibit 7.
20          (Levine-7, E-mail chain dated Tuesday,
21 January 17, 2012, Bates Nos. DEF002734-2735, is
22 received and marked for identification.)
23     Q.    And, again, Dr. Levine, could you read
24 this to yourself and let me know when you're
                    MAGNA LEGAL SERVICES

Page 29

1  finished?
2      A.    Finished.
3      Q.    Okay.  Again, here you're asking Pat for
4  possible responses for you and Marywood, correct?
5      A.    Correct.
6      Q.    And Dr. Dunleavy responds that
7  internally you can file a formal complaint under the
8  civil rights policy, correct?
9      A.    Correct.
10     Q.    Did you ever do that?
11     A.    No.
12     Q.    Why not?
13     A.    I'm not sure.  It is a mistake.  I
14 should have sued the bastard for defamation of
15 character.  I'm told I can't do that now, but I
16 should have gotten that bastard for that.
17     Q.    Well, I'm not referring to any possible
18 suit.  I'm specifically referring to the civil rights
19 policy.  You said you didn't file one and you regret
20 it?
21     A.    I don't regret not filing a civil
22 rights.  I regret not suing this bastard for
23 defamation of character.  That's what I said.
24     Q.    And why didn't you file a complaint
                    MAGNA LEGAL SERVICES



under the civil rights policy?
A. I don't remember why.
MR. COHEN: Let's make this Levine Exhibit 8, please.
(Levine-8, E-mail chain dated Sunday, January 22, 2012, Bates Nos. DEF002759-2760, is received and marked for identification.)
Q. And could you read this to yourself, as well, and let me know when you're finished?
A. Finished.
Q. Do you recognize this exchange of e-mails, Dr. Levine?
A. Yes.
Q. Now, the first e-mail in the exchange is from you to Patricia Dunleavy and I'm guessing Mike Foley, correct?
A. Correct.
Q. And here you're kind of -- you're discussing plans for bringing Professor Fagal in to meet with President Munley, correct?
A. Correct.
Q. And the first line in this e-mail says, "I just finished chatting with Sister Anne," right?
A. Correct.

Q. So that's, in fact, true. You did chat with her?
A. Obviously.
Q. For how long?
A. For how long did we have a chat?
Q. Yes.
A. I don't know.
Q. Do you remember the substance of your conversation?
A. Yes.
Q. Could you convey it to me in as much detail as possible?
A. Yes.
Q. Please do so.
A. Sister Anne was interested in having Fagal brought into the office to discuss disciplinary action concerning the video. She wanted my input, as was appropriate being that I was vice president of academic affairs at the time, and we discussed the strategy to have Fagal come in and be interviewed.
Q. What was your input?
A. My input was that was appropriate to have him come in to be interviewed. I was not there because of the angst and anxiety that I felt as a

result of this bastard's Nazi video, portraying me as a Nazi, as well as involving my family members. Sister Anne, out of the kindness of her heart, decided it would be appropriate not to have me there to spare me that. Shalom. Mother fucker.
Q. Dr. Levine, I understand you're upset. Is it really necessary to continue calling him bastard throughout the entire deposition, calling me a mother fucker? Or are you calling him a mother fucker?
A. I don't understand how you can defend this bastard.
Q. Well, I am, and you're here, and do we have to continue with, you know, berating him?
A. It's my option, isn't it?
MS. PEET: He's very emotional about this.
MR. COHEN: I know.
MS. PEET: As well as if I were in a video, you were in a video. We can't control how people are going to feel. And this brings up all sorts of emotion again.
If you can refrain from using the language. We all understand how you feel, by all

means, but if -- I get that you're emotional.
BY MR. COHEN:
Q. So my question is: Do you think you could refrain from continuing to call my client bastard, calling me and/or my client mother fucker, throughout the rest of the deposition?
A. I'm not sure.
Q. Do we really need to get the judge involved?
A. I don't know.
Q. Okay. So do you want to take a break?
A. I'm good.
Q. You're good? All right.
So we just finished talking about various plans for bringing in Dr. Fagal. You talked about how you had a conversation with President Munley about it before sending this e-mail. Did you communicate about your plans to bring Professor Fagal in to meet with President Munley with anyone other than President Munley, Patricia Dunleavy, or Dr. Foley?
A. I don't believe so.
Q. Okay. Ultimately do you remember, in fact -- I know you weren't there, but are you aware

Page 38

1  Dunleavy, January 21st, 2012, at 10:33 p.m. Do you
2  see that?
3      A.   Yes, I do.
4      Q.   And here you tell Dr. Dunleavy that
5  Professor Fagal attempted to call you at home. You
6  didn't pick up. He left a message, correct?
7      A.   That's what the e-mail says, yes.
8      Q.   And then Patricia Dunleavy says, "That's
9  interesting. Save the message or at least keep a
10 record," correct?
11     A.   Yes, that's what the e-mail says, yes.
12     Q.   Did you save the message?
13     A.   I may have saved it but I don't anymore
14 have it. Phones go the way they go.
15     Q.   As phones --
16     A.   As phones go the way they go, new
17 machines, and it's gone.
18     Q.   So this was a -- was it like a digital
19 voicemail or an answering machine?
20     A.   Answering machine.
21     Q.   So was it stored on a tape or was it
22 stored digitally?
23     A.   You know, I don't remember what I had at
24 the time. It's not my current phone.

MAGNA LEGAL SERVICES

Page 39

1      Q.   Do you remember the substance of the
2  message that Professor Fagal left?
3      A.   I remember the substance because I'm
4  reading the e-mail, and it reminds me that the
5  substance was that your client wanted to talk off the
6  record.
7      Q.   You didn't call him back, correct?
8      A.   Correct.
9      Q.   Other than actually having the message
10 itself, did you record the content in some way.
11 Like, did you write down what he said anywhere, other
12 than this e-mail?
13     A.   I don't believe so.
14     Q.   Now, coming back to the January 23rd,
15 2012 meeting, you said before the meeting you had
16 discussed possible discipline for Professor Fagal
17 with President Munley, correct?
18     A.   Correct.
19     Q.   The issue of a suspension came up in
20 that conversation, correct?
21     A.   Yes.
22     Q.   You said that you supported it, correct?
23     A.   Yes, but I supported also termination.
24     Q.   Prior to the January 23rd, 2012 meeting,

MAGNA LEGAL SERVICES

Page 40

1  did you make a written recommendation that Professor
2  Fagal be suspended?
3      A.   I don't remember, but as I said before,
4  if I did, I'm sure you have it.
5      Q.   Did you make a written recommendation of
6  any other type of discipline other than suspension
7  prior to the January 23rd, 2012 meeting?
8      A.   I don't remember, but, again, if I did,
9  I'm sure you have it.
10     Q.   So your role, if any, in the decision to
11 suspend Professor Fagal, would it be fair to say
12 would be limited to your conversation with President
13 Munley before the January 23rd, 2012 meeting?
14     A.   No.
15          MS. PEET: Objection to the form. Go
16 ahead.
17     A.   No, it would not be fair to say that.
18     Q.   Why not?
19     A.   We had a conversation before the
20 meeting. We had a conversation after the meeting,
21 and so that my role was both before -- pre and post
22 meeting.
23     Q.   You had a conversation with President
24 Munley after the January 23rd, 2012 meeting?

MAGNA LEGAL SERVICES

Page 41

1      A.   Yes.
2      Q.   Okay. Provide to me the detail of that
3  conversation to the best of your ability.
4      A.   As I remember it, we talked about what
5  transpired at the meeting and we talked about
6  suspension and/or termination. I was on board with
7  termination after the meeting. I was good with
8  termination. I thought he should have been
9  terminated. I agreed with her, with that
10 recommendation or that idea.
11     Q.   How soon after the January 23rd, 2012
12 meeting did you have this conversation?
13     A.   I can only speculate in answer to that.
14     Q.   All right.
15          THE WITNESS: I'm getting more water.
16 Feel free to continue.
17          MS. PEET: Do you need a break?
18          THE WITNESS: No, I'm good.
19 BY MR. COHEN:
20     Q.   So we established that President Munley
21 suspended Professor Fagal. You were on board with
22 it, correct?
23     A.   Suspended, terminated, as well, I think.
24     Q.   We'll get to the termination.

MAGNA LEGAL SERVICES



# EXHIBIT I

| | |
|---|---|
| **From:** | Bill Conlogue |
| **Sent:** | Tuesday, January 17, 2012 3:24 PM |
| **To:** | Dr Helen Bittel |
| **Subject:** | Fwd: |
| **Attachments:** | Synopsis Free Speech Poster tear-down Marywood 2011.pdf; Free Speech Marywood Poster Tear-Down Email Exchange sent to FIRE.pdf; Letter to Alan Levine Dec 2 2011 re compensation for poster tear down.pdf; Levine responds to Fagal requests 2011 12-15.pdf |

---------- Forwarded message ----------
From: Frederick Fagal <fffagal@yahoo.com>
Date: Fri, Jan 13, 2012 at 2:31 PM
Subject:
To: "fffagal@gmail.com" <fffagal@gmail.com>

Dear Marywood University Faculty Colleague ,
      January 13, 2012
We deserve better. Our students deserve better.  In November 2011 I
spent my own money to get a speaker from the Foundation for Individual
Rights in Education (FIRE) to give a presentation to an Introduction
to Social Science class on November 30, 2011. The topic was "Know Your
Rights: Free Speech and Thought Reform on Campus," and the speech tied
into our study of the United States  Constitution. I also spent my own
money to pay for posters advertising the speech in Comerford
Auditorium which was to be announced as open to all.  Total cost to me
about $500. Given my previous run-ins with the administration,
http://www.marywoodfreespeech.com/History%20Page/Fagal%20History/adminVSfagal.htm
just to be safe (ha), I had my posters stamped with the Student Life
poster approval stamp. The Marywood Administration, without telling
me, then decided to tear down the posters. No, I am not kidding....
laughable yet sad.
This letter ends with a fuller but still brief summary abstract of
what occurred.  I hope you read the attachments which tell the
complete story.  For fun and insight as to "how it all went down" you
must view the Hitler Parody satire videos on YouTube (see later below
for links).
Based on the evidence, I expect most of you (if only in private), will
agree the Marywood administration (real people here...not an
abstraction) exhibited egregious, despicable, contemptible behavior.
This poisonous and considered! behavior reflects badly on everyone
associated with Marywood.  I am ashamed for the institution and hope
it mends its ways.  At this point I think publicity is the only tool
which might affect the Administration and inspire "hope and change" J
on this campus. Perhaps the Board of Trustees could at least discuss
this type of behavior behind closed doors or in private emails and
conversations. One can hope..., nay pray.....  Attached to this email are
four items which I hope some (many?) of you read (#2 similar to #1 but
even more complete):
1.      A rather complete synopsis of the events surrounding the

1



tearing down (circa Nov 29, 2011) of my "approved" posters announcing a speech about free speech (irony anyone?)

2.      A complete record of what I sent to the Foundation for Individual Rights in Education (FIRE) to document how the situation unfolded. Learn about FIRE here: http://thefire.org/about/mission/. This big document includes (3.) below, my letter to Levine (and President Munley by agreed-to forwarding)

3.      A copy of my (at first on paper) December 5, 2011 letter to VP Alan Levine. In that letter and in the December 5 meeting with Alan Levine I proposed a resolution of the "free speech poster tear down" controversy. Mr. Levine asked me for an electronic copy (which I sent) and he said he would forward it to President Anne Munley. In any negotiation list of requests (demands?) such as I submitted there is obviously a possibility for a meeting of the minds and compromise – e.g. perhaps I would give up my demand for pizza for students (heh) or a public apology or one of the requested FIRE visits.

4.      A copy of the December 15, 2011 letter to me from Alan Levine [VP for Academic Affairs] which responds to my letter of December 5, 2011. In the response letter Mr. Levine, speaking for the administration (i.e. President Anne Munley), writes "...we are not willing to undertake any (emphasis added-fff) of the specific requests that are contained in your letter."

Perhaps you have heard of Hitler Parody videos. From Wikipedia regarding the movie Downfall, http://en.wikipedia.org/wiki/Downfall_%28film%29 the film about Adolph Hitler's last days, which provided selected snippets so I could create the Marywood free speech poster tear-down parodies:

"In October 2010, YouTube stopped blocking any Downfall-derived parodies,[18] and is now placing advertisements on some of them. Corynne McSherry, an attorney specializing in intellectual property and free speech issues[19] for the Electronic Frontier Foundation, stated, "All the [Downfall parody videos] that I've seen are very strong fair use cases and so they're not infringing, and they shouldn't be taken down."[20] "

I made two short satire videos. Part 1 deals with the events of November 28, Part 2 deals with the events of November 30. Comments from (pre-release) viewers:
"Brilliant!" .... "Love these!" .... "SO funny"... "It's definitely funny and I think it will appeal to students and faculty alike." ... "IT DOES HAVE ITS MOMENTS, ESP THE SCRATCHING PART!" ..."It was nice knowing you, Fred." ..."I think you will get a positive response from your video...too funny to not."..."OMG! Funny as hell.  Pretty powerful stuff. Keep fighting the good fight." ...."The videos were definitely very amusing and certainly got the point across"  ..."Wow Fred.... Great job on the video.... what a brilliant way to get your point across!!!! I hope it helps open their eyes!!!!! very creative and well done!!!!"

2

DEF001444

On YouTube just search for Hitler parody Marywood, I imagine it will show up…
LINK to VIDEO #1 http://www.youtube.com/watch?v=1naxKnNc06o&feature=youtu.be

LINK to VIDEO #2
http://www.youtube.com/watch?v=4hzvy5sTqUw&context=C3c1bc55ADOEgsToPDskIZsi1t3K7AqlLR-
ci2V9HK

I can send anyone low definition versions of the videos suitable
(each is under 20 MB) for email attachments. Just ask…

A few colleagues concerned for my welfare have told me they fear the
administration will try to fire me over this. One colleague says
perhaps I should have asked for an appointment with President Munley
and made a final appeal – i.e. I should have pursued every last ditch
channel possible. I did not want to go into such a meeting and in
essence have as the only new point to raise a "blackmail" threat to go
public as I do here and in the videos. I did not want that. If the
risk to me is there it is there; and if the worst does come to pass I
will have to battle as best I can with the support of family and
friends and colleagues and perhaps concerned outsiders.
I will of course be pleased to hear from any of you – from the
grizzled veteran to the first-year hire. BEWARE -- according to page 86
of the Faculty Handbook "…there are no specific laws, rules, or
regulations that protect the privacy of a user's files, electronic
mail messages, or any other information retrieved as a result of a
person's session on the Marywood system."

Thus, if you email me and want to protect yourself, you might best use
a backup email address such as your old youthful one
coolcat@hotmail.com and send it from anywhere but Marywood. Also, if
you are my friend, or will soon be, you need not say hello to me in
public (heh). My home phone is 315-685-0429. Even a regular mail
anonymous "good luck" note sent to me at home (address below) would be
very appreciated…

Abstract: On November 28-29 2011 Marywood University tore down
"stamped approved" posters announcing an open to all presentation by
Will Creeley of FIRE (Foundation for Individual Rights in Education)
titled "Know Your Rights: Free Speech and Thought Reform on Campus."
On December 5 Alan Levine, VP for Academic Affairs, told me there were
no written policy statements which justified Marywood's action, but
that my offer of a $50 random prize to a student for attending was, in
the eyes of the administration's Executive Council which met on
November 29, "pandering" to students to get them to come to class, and
that this justified tearing down the posters (without even the mere
common courtesy of notifying me about the supposed problem). Even if a
problem did exist a magic marker could have solved it, poster
tear-downs were not necessary. Later that day (Dec. 5) I sent Mr.
Levine two emails, one showing that Professor N. Gregory Mankiw of
Harvard (former Chairman of the President's Council of Economic

3

DEF001445

Advisers, author of today's largest selling economics textbook) recently pandered to his students by inviting ten select quick email responders (first come, first served) to join him as his guest for lunch after class at a Chinese restaurant in Harvard Square. I suggested that Marywood University warn Harvard that it has a panderer in its midst ! Finally, also on December 5, I forwarded to Mr. Levine an email from spring 2011 wherein the Marywood Administration encouraged professors to send students to a speech about sexual assault. Raffle prizes galore, including food and TWO $50 VISA cards. Quotation from the email "We hope faculty will offer students extra credit for attending, or use some of your class time to attend the event with your students [emphasis added]." Laughable! Talk about "pandering!" It is transparently obvious Marywood University is discriminating against Professor Fagal...Your Honor, I rest my case. Full details below.

    By Frederick F. Fagal. Jr. (Ph.D.) Associate Professor of Economics, Marywood University, Scranton, PA

Thank you for reading.....

Sincerely,
Fred Fagal
(Frederick F. Fagal, Jr.  Associate Professor of Economics)...at Marywood  1987 –
Home address:
Fred Fagal
17 East Lake Street
Skaneateles, NY 13152


--
Bill Conlogue
English Department
Marywood University
Scranton, PA 18509
570-348-6219

DEF001446

January 13, 2012  as attached in an email sent to the Marywood University faculty by Fred Fagal

Below are the late November- mid December 2011 email exchanges I (Fred Fagal, Assoc. Prof. Economics, Marywood University, Scranton, PA)) had with Carl Oliveri and then Alan Levine. The emails were forwarded to FIRE (The Foundation for Individual Rights In Education). The emails reprinted below in their entirety (but for redacting a student's name so it appears as StudentX) are the result of clicking on Yahoo email's Print tab and then copying and pasting the individual results into the cells of a Microsoft Word table. Explanatory comments appear in separate cells and are clearly indicated as comments.

| #1 COMMENT: The email below had attached to it the publicity posters [Will-BW-Marywood.pdf and Will-Color-Marywood.pdf] FIRE had sent to me. One poster was in black and white, the other in color. The posters had time and date and place and topic information for Will Creeley's speech but did not have "contact information" on the poster. [Fred Fagal 12/21/2011] |
| --- |

Subject: Posters
From:   Frederick Fagal (fffagal@yahoo.com)
To:     coliveri@marywood.edu;
Cc:     jacksont@maryu.marywood.edu; gannon@marywood.edu;
Date:   Wednesday, November 23, 2011 8:50 AM


Dear Carl,

As part of the SSCI201 Introduction to Social Science class Professor Tom Jackson and I have arranged for an outside speaker to make a presentation to the class. This session of the class and the discussion period following the presentation are open to all members of the Marywood community. I just sent the following blurb to to Dean Paciej:

**On Wednesday November 30, at 2 PM in the Comerford Auditorium in the Science Building, the SSCI 201 Introduction to Social Science class will have a guest speaker, and the presentation is open to all members of the Marywood community. Mr. Will Creeley, Director of Legal and Public Advocacy for the Foundation for Individual Rights in Education (FIRE) will deliver a speech**
   **"Know Your Rights: Free Speech and Thought Reform on Campus."**
**An open question and discussion period will follow Mr. Creeley's presentation.**

This presentation is NOT a club sponsored activity. Because the event is open to all, are you able to print publicity posters today (see attached)? Either I or some

DEF001447

students can pick them up first thing on  Monday morning November 28 assuming
you can print them today (**I apologize for the short notice**).

Would you please let me know by 2 pm today if you can do the posters or not? If
the posters cannot be done I will print them myself. I presume that to post such
posters they will need the "hanging approved" Marywood stamp. Either I or some
students will bring the posters ready for stamping first thing Monday morning. I
just wanted to give you a "heads up" and check in. If my posters do not need a
stamp from your office (e.g. because of the academic classroom nature of the
event) please let me know.

Thank you very much. If you need to call me my cell phone number is 315-406-
8063 and I should be available but NOT between 10 am and 11 am when I will be
in the YMCA swimming pool.

Sincerely,

Frederick F. Fagal, Jr. (Ph.D.)
Associate Professor of Economics
Marywood University

#2 COMMENT: Mr. Oliveri responded a little over an hour later so a copy of my email [above] to which he
responded is included to initiate a "thread." No mention of any problem with the posters other than he did not
want to or could not print any color posters.

Print - Close Window

Subject:Re: Posters
From:   Carl Oliveri (coliveri@maryu.marywood.edu)
To:     fffagal@yahoo.com;
Date:   Wednesday, November 23, 2011 9:58 AM


i can print black and white for you, I can do about 15 if that works.

On Wed, Nov 23, 2011 at 8:50 AM, Frederick Fagal <fffagal@yahoo.com> wrote:
Dear Carl,

As part of the SSCI201 Introduction to Social Science class Professor Tom
Jackson and I have arranged for an outside speaker to make a presentation to the
class. This session of the class and the discussion period following the presentation
are open to all members of the Marywood community. I just sent the following

DEF001448

blurb to to Dean Paciej:

**On Wednesday November 30, at 2 PM in the Comerford Auditorium in the Science Building, the SSCI 201 Introduction to Social Science class will have a guest speaker, and the presentation is open to all members of the Marywood community. Mr. Will Creeley, Director of Legal and Public Advocacy for the Foundation for Individual Rights in Education (FIRE) will deliver a speech "Know Your Rights: Free Speech and Thought Reform on Campus."** An open question and discussion period will follow Mr. Creeley's presentation.

This presentation is NOT a club sponsored activity. Because the event is open to all, are you able to print publicity posters today (see attached)? Either I or some students can pick them up first thing on Monday morning November 28 assuming you can print them today (**I apologize for the short notice**).

Would you please let me know by 2 pm today if you can do the posters or not? If the posters cannot be done I will print them myself. I presume that to post such posters they will need the "hanging approved" Marywood stamp. Either I or some students will bring the posters ready for stamping first thing Monday morning. I just wanted to give you a "heads up" and check in. If my posters do not need a stamp from your office (e.g. because of the academic classroom nature of the event) please let me know.

Thank you very much. If you need to call me my cell phone number is 315-406-8063 and I should be available but NOT between 10 am and 11 am when I will be in the YMCA swimming pool.

Sincerely,

Frederick F. Fagal, Jr. (Ph.D.)
Associate Professor of Economics
Marywood University

--
Carl Oliveri
Director, Student Activities and Leadership Development
Marywood University
Scranton, PA 18509

(570) 340-6016
www.marywood.edu/studentactivities

#3 COMMENT: I responded eleven minutes later mid-morning the day before Thanksgiving. The thread continues with the previous emails in the thread appearing below. I said I would get some color posters printed.

Print - Close Window

Subject:Re: Posters
From:   Frederick Fagal (fffagal@yahoo.com)
To:     coliveri@maryu.marywood.edu;
Date:   Wednesday, November 23, 2011 10:09 AM


Thank you Carl. Service even with no water main. Much appreciate. I will get some color ones done....Happy Thanksgiving.....Fred Fagal

---

**From:** Carl Oliveri <coliveri@maryu.marywood.edu>
**To:** Frederick Fagal <fffagal@yahoo.com>
**Sent:** Wednesday, November 23, 2011 9:58 AM
**Subject:** Re: Posters

i can print black and white for you, I can do about 15 if that works.

On Wed, Nov 23, 2011 at 8:50 AM, Frederick Fagal <fffagal@yahoo.com> wrote:
Dear Carl,

As part of the SSCI201 Introduction to Social Science class Professor Tom Jackson and I have arranged for an outside speaker to make a presentation to the class. This session of the class and the discussion period following the presentation are open to all members of the Marywood community. I just sent the following blurb to to Dean Paciej:

**On Wednesday November 30, at 2 PM in the Comerford Auditorium in the Science Building, the SSCI 201 Introduction to Social Science class will have a guest speaker, and the presentation is open to all members of the Marywood community. Mr. Will Creeley, Director of Legal and Public Advocacy for the Foundation for Individual Rights in Education (FIRE) will deliver a speech**
     **"Know Your Rights: Free Speech and Thought Reform on Campus."**
**An open question and discussion period will follow Mr. Creeley's presentation.**

DEF001450

This presentation is NOT a club sponsored activity. Because the event is open to all, are you able to print publicity posters today (see attached)? Either I or some students can pick them up first thing on  Monday morning November 28 assuming you can print them today (**I apologize for the short notice**).

Would you please let me know by 2 pm today if you can do the posters or not? If the posters cannot be done I will print them myself. I presume that to post such posters they will need the "hanging approved" Marywood stamp. Either I or some students will bring the posters ready for stamping first thing Monday morning. I just wanted to give you a "heads up" and check in. If my posters do not need a stamp from your office (e.g. because of the academic classroom nature of the event) please let me know.

Thank you very much. If you need to call me my cell phone number is 315-406-8063 and I should be available but NOT between 10 am and 11 am when I will be in the YMCA swimming pool.

Sincerely,

Frederick F. Fagal, Jr. (Ph.D.)
Associate Professor of Economics
Marywood University


--
Carl Oliveri
Director, Student Activities and Leadership Development
Marywood University
Scranton, PA 18509
(570) 340-6016
www.marywood.edu/studentactivities

---

#4 COMMENT: Fifty-seven minutes later Mr. Oliveri had noticed that that poster did not have a contact [phone] number on it or a contact email. I would be allowed to "right"[sic] the contact information on the [printed] poster(s).

Print - Close Window

DEF001451

Subject:Re: Posters
From:   Carl Oliveri (coliveri@maryu.marywood.edu)
To:     fffagal@yahoo.com;
Date:   Wednesday, November 23, 2011 11:06 AM


Fred,

I was looking at the poster, and it needs to have a contact number or email on it. you can right it on if you want, but it needs to be on there somewhere.

On Wed, Nov 23, 2011 at 10:09 AM, Carl Oliveri <coliveri@maryu.marywood.edu> wrote: happy thanksgiving


On Wed, Nov 23, 2011 at 10:09 AM, Frederick Fagal <fffagal@yahoo.com> wrote:

**Thank you Carl. Service even with no water main. Much appreciate. I will get some color ones done....Happy Thanksgiving.....Fred Fagal**

---

**From:** Carl Oliveri <coliveri@maryu.marywood.edu>
**To:** Frederick Fagal <fffagal@yahoo.com>
**Sent:** Wednesday, November 23, 2011 9:58 AM
**Subject:** Re: Posters

i can print black and white for you, I can do about 15 if that works.

On Wed, Nov 23, 2011 at 8:50 AM, Frederick Fagal <fffagal@yahoo.com> wrote:
Dear Carl,

As part of the SSCI201 Introduction to Social Science class Professor Tom Jackson and I have arranged for an outside speaker to make a presentation to the class. This session of the class and the discussion period following the presentation are open to all members of the Marywood community. I just sent the following blurb to to Dean Paciej:

**On Wednesday November 30, at 2 PM in the Comerford Auditorium in the Science Building, the SSCI 201 Introduction to Social Science class will have a guest speaker, and the presentation is open to all members of the Marywood community. Mr. Will Creeley, Director of Legal and Public Advocacy for the Foundation for Individual Rights in Education (FIRE) will deliver a speech**

DEF001452

**"Know Your Rights: Free Speech and Thought Reform on Campus."**
**An open question and discussion period will follow Mr. Creeley's**
**presentation.**

This presentation is NOT a club sponsored activity. Because the event is open to all, are you able to print publicity posters today (see attached)? Either I or some students can pick them up first thing on Monday morning November 28 assuming you can print them today (**I apologize for the short notice**).

Would you please let me know by 2 pm today if you can do the posters or not? If the posters cannot be done I will print them myself. I presume that to post such posters they will need the "hanging approved" Marywood stamp. Either I or some students will bring the posters ready for stamping first thing Monday morning. I just wanted to give you a "heads up" and check in. If my posters do not need a stamp from your office (e.g. because of the academic classroom nature of the event) please let me know.

Thank you very much. If you need to call me my cell phone number is 315-406-8063 and I should be available but NOT between 10 am and 11 am when I will be in the YMCA swimming pool.

Sincerely,

Frederick F. Fagal, Jr. (Ph.D.)
Associate Professor of Economics
Marywood University


--
Carl Oliveri
Director, Student Activities and Leadership Development
Marywood University
Scranton, PA 18509
(570) 340-6016
www.marywood.edu/studentactivities

--
Carl Oliveri
Director, Student Activities and Leadership Development
Marywood University
Scranton, PA 18509
(570) 340-6016
www.marywood.edu/studentactivities


--
Carl Oliveri
Director, Student Activities and Leadership Development
Marywood University
Scranton, PA 18509
(570) 340-6016
www.marywood.edu/studentactivities

#5 COMMENT: Late Friday afternoon, the day after Thanksgiving, I sent Carl Oliveri an email informing him that on Monday morning a student would show up at his office with 46 posters which **each INCLUDED a taped-on announcement of a "$50 Attendance Prize Draw to a Student"**

Print - Close Window

Subject: Posters Done + stamping
From:   Frederick Fagal (fffagal@yahoo.com)
To:     coliveri@maryu.marywood.edu;
Date:   Friday, November 25, 2011 5:54 PM


Hello Carl,

I printed (I think) 46 posters to add to any you have done.

16 color 11x17
10 color 8.5x14
20 b&w 11x17

On each poster I will have taped a strip reading:

------------------------------------------------------------------------------------------

# $50 Attendance Prize Draw to a Student ! Contact: fagal@marywood.edu

------------------------------------------------------------------------------------------

On Monday November 28 when your office opens at 8:30 am (or soon thereafter) some student(s) will bring the posters to you to get the "hanging stamp." The student(s) will wait while this is done so the posters can be hung around campus on Monday morning.

DEF001454

With luck we'll draw a crowd and of course you are welcome....

Sincerely,

Fred Fagal
Assoc. Prof. of Economics
Marywood University

---

#6 COMMENT: I sent the following email to the Marywood University President, Sr. Anne Munley, because I thought the tearing down of approved posters was a horrible thing and that the leader at the top should know what happened and condemn it. I figured that if the administration would condemn the action AND via a publicity blast email to all students and faculty nip such actions in the bud – i.e. tear down posters and CREATE more publicity for the person or viewpoint you dislike. Seemed logical to me. Cabral is Sr. Gail Cabral, a leader in the faculty senate. Gannon is Sr. Margaret Gannon, the chair of the Department of Social Sciences. Foley is the Dean of Liberal Arts. Will is Will Creeley of the Foundation for Individual Rights in Education – he was the scheduled speaker. Student X is an undergraduate student. S/he was the one who brought the 46 posters to Mr. Oliveri's office at ~8:30 am on Monday November 28, 2011. S/he waited and observed each of the 46 posters receive the stamp of approval – and EACH of the posters had the $50 attendance draw prize announcement and contact information strip of paper taped to the top of each poster.

**NOTE** that by this point in time (5:37 PM on Tuesday November 29) I had sent an email on Nov. 25 which told Mr. Oliveri that the posters *would* have the prize announcement strip of paper attached to the posters. In the 5:37 PM Tuesday November 29 email below in the third and fourth sentences affirm and essentially confirm that the posters stamped for approval on Monday were as I described in the Nov. 25 email to Mr. Oliveri. The posters that were torn down were identical to the attached except that, as you know, the contact information fagal@marywood.edu was printed on a white strip of paper taped to the top of the posters. Also appearing on that white strip was yellow highlighted text announcing that a random student would win a $50 attendance prize. **NOTE** that by this time (5:37 PM Tuesday Nov. 29 ) I had no inkling that the prize money was (supposedly) an issue. *Heck, I did not even know that the administration had torn down the posters !!!!*

---

Print - Close Window

Subject: Posters Torn Down
From:     Frederick Fagal (fffagal@yahoo.com)
To:       annemunley@marywood.edu;
Cc:       oliveri@marywood.edu; cabral@marywood.edu; gannon@marywood.edu;
          will@thefire.org; foley@marywood.edu;
Date:     Tuesday, November 29, 2011 5:37 PM

Dear Sr. Anne - below fyi....

DEF001455

Dear Carl,

The email report below is from Student X. I just got some more posters printed and will have them at your office at 8:30 ready for quick stamping. The posters that were torn down were identical to the attached except that, as you know, the contact information fagal@marywood.edu was printed on a white strip of paper taped to the top of the posters. Also appearing on that white strip was yellow highlighted text announcing that a random student would win a $50 attendance prize.

I certainly would appreciate it if tomorrow morning someone could email the student and faculty lists announcing/denouncing the removal of posters and at the same time publicize the 2 pm appearance by Mr. Creeley (speaking on **Know Your Rights: Free Speech and Thought Reform on Campus**)

Thank you very much.

Sincerely,

Frederick F. Fagal, Jr.

----- Forwarded Message -----
**From:** Student X<StudentX@m.marywood.edu>
**To:** Frederick Fagal <fffagal@yahoo.com>
**Sent:** Tuesday, November 29, 2011 4:59 PM
**Subject:** Re:

Last night I noticed that there weren't any posters in the Rotunda, which I thought was odd since you mentioned that you hung a couple in there. This morning I noticed that basically all the ones I had seen in the LAC the day before were gone; when I went over to the Science Center, all the ones I had hung up were gone. The library had posted one on the exit door yesterday, but it was gone today. No other group's/event's posters were gone, I noticed that. I still saw all the same posters that were around where I hung all of ours, so it wasn't like someone went around just to clean up the walls. It seems like someone really wanted to get rid of our posters. Is someone really trying to censor free speech when we're trying to advocate for free speech?

Interestingly though, I remember at the conference I recall hearing that schools just requiring groups or people to have their posters stamped or reviewed before posting was an infringement on free speech and a form of speech code.

On Tue, Nov 29, 2011 at 4:29 PM, Frederick Fagal <fffagal@yahoo.com> wrote:
You're kidding, right? No, nothing happened on this end.
More later....

**From:** Student X <StudentX@m.marywood.edu>
**To:** Frederick Fagal <fffagal@yahoo.com>
**Sent:** Tuesday, November 29, 2011 2:38 PM
**Subject:**

Dr. Fagal,

Did something happen with having the FIRE speaker? As I noticed today that all the posters are gone.

-StudentX

---

#7 COMMENT: Wednesday morning Nov. 29, 2011, the day for Mr. Creeley's speech. As I announced in the email of the previous evening written to Mr. Oliveri, I showed up at his office at 8:30 am. The office was closed, when I returned 15 minutes later it was open and he was there. He saw me immediately (I with newly printed posters in hand including taped-on prize announcements for each poster). I of course immediately mentioned the tear down and the reply was a confession/admission that the administration had torn down the posters and Alan Levine's name was mentioned [i.e. a "higher up" who was involved in and knew about the decision]. I do admit that the Subject line "Thanks for helping me cut" does carry the flavor of a hint of sarcasm..."You save me" should of course be "You saved me"

Print - Close Window

Subject: Thanks for helping me cut
From:   Frederick Fagal (fffagal@yahoo.com)
To:     coliveri@marywood.edu;
Date:   Wednesday, November 30, 2011 10:49 AM


Dear Carl,

Thank you for explaining why my Nov. 28 approved posters regarding Will Creely of FIRE's visit to campus and 2 pm speech were torn down. It would have been civil if someone had told me...or even offered to reprint and rehang posters without the offending offer.  You said that the yellow highlighted poster heading

$50 Attendance Prize Draw to a Student

was not allowed because "we" [Marywood] do not pay students to come to class, and hence what I was doing was not allowed. You cited Dr. Alan Levine, the Vice President for Academic Affairs, as the person who told you this.

You save me some time as you helped me cut off the offending phrase from about half my new posters so that I could re-hang them around campus (using blue painter's tape). Thank you.

Sincerely,

Frederick F. Fagal, Jr

#8 COMMENT: On Wednesday morning Nov. 30, 2011 the newly printed posters with the announcement were presented to Mr. Oliveri for hanging approval stamps. As described above, we cut off the "offending" strips at the top which included the prize draw announcement. We cut off the prize part and left my email contact information. I then spent about one hour hanging posters in buildings before I taught my 11 am and noon classes and then prepared to meet Mr. Creeley at 1:45 PM at the Science Building (location of Comerford Auditorium, the site for his presentation). Near the end of the day (circa 6 pm) I decided to (as always) be conscientious and REMOVE the now moot posters I had hung that morning. As I went around to my morning hanging locations I was shocked to find that most of my posters (each 17x11 color) in major locations had been removed! Were the posters removed after the speech? Mr. Creeley had finished with questions at ~3:15 pm. Or had the posters been removed soon after I hung them and before the speech? Someone who knew I taught from 11-1 and would surely be busy before 2 pm might have removed the posters. I figured I would at least ask....

Print - Close Window

Subject: Posters removed yesterday from LAC
From:   Frederick Fagal (fffagal@yahoo.com)
To:     levine@marywood.edu;
Cc:     coliveri@marywood.edu;
Date:   Thursday, December 1, 2011 10:29 AM


Dear Alan and Carl,
Yesterday someone removed from LAC **at least 5** posters promoting Mr. Will Creeley's speech "Know Your Rights: Free Speech and Thought Reform on Campus." These posters were approved and stamped yesterday morning by Carl Oliveri and hung by me in LAC; these posters did not mention a $50 attendance prize drawing for a student. Locations form which the posters

DEF001458

were removed included the tile wall opposite the Regina driveway entrance to LAC, east and west Terrace floor stairwells, 1st floor outside elevator, and east third floor top of stairs doorway entry right side.

Am I right in assuming that someone under your control removed these posters, perhaps mistakenly based on that person's or persons' poster removal activity(ies) conducted on Monday and/or Tuesday Nov. 28 and 29th?

Sincerely,

Frederick F. Fagal, Jr.

Associate Professor of Economics

Marywood Univeristy

---

**#9 COMMENT:** Nineteen minutes after I sent the inquiry Alan Levine responds that he knows nothing about the Wednesday Nov. 30, 2011 tear-down. I was alarmed by Mr. Levine's reference to "...other issues surrounding Mr. Creeley's speech,". In a Wednesday Nov. 23, 2011 email to my co-teacher (Dr. Thomas Jackson) of the Introduction to Social Science course I wrote **"I will make sure Creeley mentions the constitution so that if anyone bitches we can easily say the topic is relevant to the course.... I do not anticipate a problem. We have a little academic freedom leg to stand on or swing as in the jawbone of an ass."** I do not trust the Marywood administration. I suspected that if they thought they could make the case that an outside speaker was a mere propagandist discussing something outside the realm of the course the Marywood administration would go after me. The Creeley topic certainly tied into the constitution and the course so we were covered. I could only assume that the "other issues" comment by Levine referred to the topic of the speech and the relevance of the speaker to the course. I was not worried but a bit peeved at the audacity....

Print - Close Window

Subject: Re: Posters removed yesterday from LAC

From:  Dr Alan Levine (levine@maryu.marywood.edu)

To:    fffagal@yahoo.com;

Date:  Thursday, December 1, 2011 10:48 AM

Fred,

The only posters that were removed, as far as I know, were the ones that mentioned a $50 Attendance prize drawing, something that was not approved by the Carl Oliveri's office. If you would like to make an appointment to discuss this or other issues surrounding Mr. Creeley's speech, please feel free to contact me or Jamie Strong to set up an appointment.

Alan

Alan M. Levine, PhD

Vice President for
    Academic Affairs

Marywood University

DEF001459

2300 Adams Ave
Scranton, PA  18509
(t) 570 348-6290
(f) 570 961-4743
e-mail: levine@marywood.edu


On Thu, Dec 1, 2011 at 10:29 AM, Frederick Fagal <fffagal@yahoo.com> wrote:
Dear Alan and Carl,
Yesterday someone removed from LAC **at least 5** posters promoting Mr. Will Creeley's speech
"Know Your Rights: Free Speech and Thought Reform on Campus." These posters were
approved and stamped yesterday morning by Carl Oliveri and hung by me in LAC; these posters
did not mention a $50 attendance prize drawing for a student. Locations form which the posters
were removed included the tile wall opposite the Regina driveway entrance to LAC, east and
west Terrace floor stairwells, 1st floor outside elevator, and  east third floor top of stairs doorway
entry  right side.
Am I right in assuming that someone under your control removed these posters, perhaps
mistakenly based on that person's or persons' poster removal activity(ies) conducted on Monday
and/or Tuesday Nov. 28 and 29th?
Sincerely,
Frederick F. Fagal, Jr.
Associate Professor of Economics
Marywood Univeristy

#10 COMMENT: Twenty-three minutes after my inquiry regarding the previous day's tear-down of
posters Mr. Oliveri claims that he did not inform his students to remove the posters and that if the
posters were removed it was not by his doing. A little hint here that his students HAD done the pre-
Creeley speech tear-downs. Also note that Oliveri's statement does NOT say that he knew or knows
nothing about the second tear-down, but only that "...it was not by my doing."....over-zealous work
study students could have taken it upon themselves to tear down what they had been told the previous
day were unapproved posters. I wonder if the (student) tearer-downers were told that the reason they
were given the job was because of the prize money strip on the posters or whether they were just
shown a sample poster and told to "go get 'em!". hmm....This is great. Federal student work-study
dollars paying students to tear down posters advertising a speech-presentation about free speech on
campuses....

Print - Close Window

Subject:Re: Posters removed yesterday from LAC
From:    Carl Oliveri (coliveri@maryu.marywood.edu)
To:      fffagal@yahoo.com;
Date:    Thursday, December 1, 2011 10:52 AM


I did not inform my students to remove the posters, so if they were removed, it was not by my
doing.

DEF001460

On Thu, Dec 1, 2011 at 10:29 AM, Frederick Fagal <fffagal@yahoo.com> wrote:

Dear Alan and Carl,

Yesterday someone removed from LAC **at least** 5 posters promoting Mr. Will Creeley's speech "Know Your Rights: Free Speech and Thought Reform on Campus." These posters were approved and stamped yesterday morning by Carl Oliveri and hung by me in LAC; these posters did not mention a $50 attendance prize drawing for a student. Locations form which the posters were removed included the tile wall opposite the Regina driveway entrance to LAC, east and west Terrace floor stairwells, 1st floor outside elevator, and  east third floor top of stairs doorway entry  right side.

Am I right in assuming that someone under your control removed these posters, perhaps mistakenly based on that person's or persons' poster removal activity(ies) conducted on Monday and/or Tuesday Nov. 28 and 29th?

Sincerely,

Frederick F. Fagal, Jr.

Associate Professor of Economics

Marywood Univeristy


--

Carl Oliveri

Director, Student Activities and Leadership Development

Marywood University

Scranton, PA 18509

(570) 340-6016

www.marywood.edu/studentactivities

---

#11 COMMENT: Thursday evening December 1, 2011 asking Alan Levine for a rule/policy citation (note typo in subject line ☺ )

Print - Close Window

Subject: Rule Citatation Please

From:   Frederick Fagal (fffagal@yahoo.com)

To:   levine@maryu.marywood.edu;

Date:   Thursday, December 1, 2011 8:53 PM


Dear Alan,

I am still at a loss as to an explanation for what happened. I have gone through the Faculty Handbook with some care, and can find nothing [e.g. pertaining to my $50 Attendance Prize Draw notice on the posters] that allows the university to tear down my posters that were approved for hanging. **Please direct me to the Marywood rule/policy you claim I have violated. I assume you can do this right away if such a rule exists so I would appreciate a very quick reply.**

DEF001461

Thank you very much.

Fred

---

#12 COMMENT: Friday afternoon seeking a meeting for Monday to clarify "other issues" [but note how I pre-emptively make clear Mr. Creeley was relevant to the course] and pointing out no rule/policy violation citation given to me.

Print - Close Window

Subject:"or other issues surrounding Mr. Creeley's speech"
From:   Frederick Fagal (fffagal@yahoo.com)
To:     levine@marywood.edu;
Date:   Friday, December 2, 2011 3:03 PM


Hello Alan,

In your email Dec. 1 (yesterday) you mentioned "other issues surrounding Mr. Creeley's speech" [see indented below] and I wonder what those issues might be. For the life of me I can't imagine what. Intro to Social Science course SSCI201, includes government and political science, speaker dealt with a practical relevant constitutional issue. Still no citation regarding claimed poster hanging transgression on my part...Perhaps we can meet on Monday morning. As usual, I will be in early. I teach from 11 to 1 so before 10 am would be best. I could meet with you after 1 pm, the earlier the better. ..

Best... Fred

"The only posters that were removed, as far as I know, were the ones that mentioned a $50 Attendance prize drawing, something that was not approved by the Carl Oliveri's office.  If you would like to make an appointment to discuss this or other issues surrounding Mr. Creeley's speech, please feel free to contact me or Jamie Strong to set up an appointment."

---

#13 COMMENT: Alan Levine responds very quickly and backs off the "other issues surrounding Mr. Creeley's speech" red herring and claims the phrase merely an invitation to talk about stuff in general. I did meet with Mr. Levine on the following Monday at 1:15 pm and at that meeting when I broached the "other issues surrounding Mr. Creeley's speech" Mr. Levine in a very friendly manner indicated that he simply meant to issue an invitation to chat about other issues. Still, what he wrote is what he wrote, and the reader with have to draw his or her own conclusions.

Mr. Levine does raise an interesting issue (and one I raised in a Nov. 23 email to a colleague), and that is what gives "Student Life" ["the group who stamps the posters"] ANY power over the posting of ACADEMIC posters !

Print - Close Window

Subject:Re: "or other issues surrounding Mr. Creeley's speech"
From:   Dr Alan Levine (levine@maryu.marywood.edu)
To:      fffagal@yahoo.com;
Date:    Friday, December 2, 2011 3:59 PM


Fred,

The "other issues" was an opening for you to chat about anything else you wanted to discuss. 1
have left a message with folks from Student Activities, the group who stamps the posters to see
from where they derive their authority. So, without an answer from them, I'm not sure meeting
on Monday would be productive, but if you do want to get together, I'm available at 1 or after 3.

Alan


Alan M. Levine, PhD
Vice President for
    Academic Affairs
Marywood University
2300 Adams Ave
Scranton, PA  18509
(t) 570 348-6290
(f) 570 961-4743
e-mail: levine@marywood.edu


On Fri, Dec 2, 2011 at 3:03 PM, Frederick Fagal <fffagal@yahoo.com> wrote:
Hello Alan,

In your email Dec. 1 (yesterday) you mentioned "other issues surrounding Mr. Creeley's speech"
[see indented below] and I wonder what those issues might be. For the life of me I can't imagine
what. Intro to Social Science course SSCI201, includes government and political science,
speaker dealt with a practical relevant constitutional issue. Still no citation regarding claimed
poster hanging transgression on my part...Perhaps we can meet on Monday morning. As usual, I
will be in early. I teach from 11 to 1 so before 10 am would be best. I could meet with you after
1 pm, the earlier the better. ..

Best... Fred

"The only posters that were removed, as far as I know, were the ones that mentioned a $50 Attendance prize
drawing, something that was not approved by the Carl Oliveri's office. If you would like to make an appointment to
discuss this or other issues surrounding Mr. Creeley's speech, please feel free to contact me or Jamie Strong to set up
an appointment."

DEF001463

#14 COMMENT: Monday December 5, 2011, from 1:15 pm to approximately 2:10 PM, I met with Alan Levine, VP for Academic Affairs. At the meeting Alan said that he had rather carefully gone through the Faculty Handbook and that he had done a lot of searching through Marywood's "Policies and Procedures" but that he could NOT find anything pertaining to me offering a random attendance prize to a student who came to class.

When asked about the "other issues surrounding Mr. Creeley's speech" Mr. Levine said there were no issues pertaining to the speech, and in a friendly manner said that he merely meant that he wanted me to feel free to raise any issue pertaining to Marywood that was on my mind.

Alan did mention the meeting of the Executive Council (maybe he said Committee). I took the meeting to have occurred on Tuesday Nov. 29, but on Dec. 21, in an email from the student who got the posters approved on Nov. 28, learned that posters were seen to be missing as early as Monday evening Nov. 28. So maybe the meeting took place on Monday (afternoon?) November 28. Mr. Levine was at the meeting and he mentioned Mr. Heath as being in attendance. I did not ask for a roster of those attending.

Perhaps Mr. Levine's most interesting comment was that the big word at the meeting was PANDERING. Bad old me (Fagal), by offering the $50 attendance prize random draw, was accused of *pandering* to the students. I basically shook my head in disbelief. Mr. Levine mentioned professor(s) who brought in pizza for the class on course evaluation day. We agreed that was not too cool.

Finally, Mr. Levine seemed truly shocked when I told him that **each and every** poster which had been stamped "approved" on Monday morning in fact had on it, taped to the top, a strip of paper announcing the prize (and my contact information). Each prize announcement strip had been personally highlighted by me with a yellow highlighter before I gave them to student Student X to take to Student Life on Monday Nov. 28 at 8:30 am. Mr. Levine said that is not what he had been told by Mr. Oliveri; that Mr. Oliveri had told him that the posters which were torn down did NOT have the prize information on them.

I showed Mr. Levine a printed copy of what I thought Marywood should do to atone for its outrageous behavior. Mr. Levine asked if I could send him a copy by email and I said I would. See ATTACHMENT below for the full text of the letter. Of course I knew that Mr. Levine would have to send the letter "to the top."

Print - Close Window

Subject: Letter attached
From:   Frederick Fagal (fffagal@yahoo.com)
To:     levine@marywood.edu;
Date:   Monday, December 5, 2011 2:36 PM

# Hello Alan,

Please find attached the letter I shared with you earlier this afternoon.

I will not be available to see anyone until Monday December 12.

Thank you for what the diplomats call a "full and frank discussion."

Best,

Fred

ATTACHMENT To above December 5, 2011 2:36 PM email to Alan Levine. In the attached letter [printed here] I make some requests....

December 5, 2011 [10:39 am]

Alan Levine, Ph.D.
VP for Academic Affairs
Marywood University
Scranton, PA 18509

Dear Alan,

I am still at a loss as to an explanation for what happened. I have gone through the Faculty Handbook with some care and can find nothing that allows the university to tear down my posters that were approved for hanging. I asked you to direct me to the Marywood rule/policy Mr. Oliveri claims you said I have violated, but I have yet to hear from you.

The posters advertised that a speaker (Will Creeley of The Foundation for Individual Rights in Education [FIRE]) would give a presentation before Dr. Jackson's and my SSCI 201 Introduction to Social Science class. Dr. Jackson and I decided to open this special class presentation to all comers, and so reserved the Comerford Auditorium and advertised the event.

*I paid* for the speaker. *I paid* for the posters. To induce attendance (I am an economist) and give Marywood students a little fun [in short supply if you believe the Princeton Review] *I offered a $50 lecture attendance prize* (random drawing) to some lucky student. *The fifty dollars was mine. I also paid a few students my money to hang some posters* to save me time.

I knew (don't ask me how) that for posters to be hung around campus the hanger supposedly needed to have the "Marywood Unversity Approved by Student Life" stamp on the poster. I am

DEF001465

not sure why this would apply to faculty academically oriented posters, but I figured "better safe than sorry at the last minute," and so got the posters stamped. On November 28, 2011 (Monday morning) at 8:30 AM the 46 original posters were delivered to the Student Activities/Student Life office by a Marywood student. She waited while the 46 posters received the stamp of approval. Each approved poster had a paper strip taped onto the top of the poster which read "$50 Attendance Prize Draw to a Student!" Just because one of Mr. Oliveri's authorized underlings stamped the poster is not my problem. No one in the Marywood University Administration contacted me to inform me of a potential problem/issue relating to the offer on the poster of a prize drawing. Late Tuesday afternoon I learned via email from a student that my posters had been torn down. I immediately went to the UPS store to get new posters printed. *I paid to reprint the approved posters* torn down by Marywood University! Finally, at least five of these new posters were torn down on Wednesday (see below) for which you claim no knowledge.

Even if you still claim justification [source?] for tearing down the original posters the Marywood Administration comes off poorly --- certainly in my eyes, and I think when and if widely publicized the eyes of all neutral observers. Why not just chase away a few prospective students?! Some Marywood administrators (dare I say the Administration if the culprit has a big title?) showed an incredibly rude and crude and vindictive side by not even contacting me to inform me of the perceived problem. If not rude or crude or vindictive then perhaps obliviously stupid would be an alternative explanation.... I would prefer the oblivious explanation, I too can be oblivious....

As Dr. Jackson wrote in an email to Mr. Oliveri:

1) Dr. Fagal deserved an immediate call that the posters were taken down by school authorities.
2) The common sense solution to the problem identified as to the poster transgression was merely to remove the offending part of the posters. The lack of the call and the overreactive response clearly points to an effort to deny Dr. Fagal an opportunity to implement the common sense remedy for the situation.

Due to Marywood's actions I request, at this stage, fair compensation for financial damages you have imposed on me.
I ask that I immediately receive (by December 15, 2011)
(1) A $500 reimbursement check for my expenses and wasted time

**In addition, besides making me merely financially whole regarding this matter, I think it is only fair that Marywood "atone for its sins" and show its willingness to support free speech and inquiry** by inviting FIRE to campus for two Spring 2012 presentations and hosting a presentation by Robert Spencer of jihadwatch.org and anyone who cares to join him in debate [see item **(11)** below]. The ideal way to show commitment to free speech and open inquiry is by *action* with respect to sponsoring a presentation by someone with whom you vehemently disagree.

(2) By issuing to me a written public apology which indicates the actions [further outlined below] Marywood will take to remedy the damages done to its reputation.

DEF001466

(3) By having the apology in (2) to me also sent by email to every faculty member (including adjuncts) and every student.

(4) By paying FIRE $2000 (its normal rate) to give two presentations on campus during the Spring 2012 semester. Marywood will also pay normal meal and lodging expenses.

(5) By hosting [see (4)] one $1000 FIRE session (probably in February) for a daytime class presentation to the Social Science 201 class (presentation to be open to all on campus). A large room will be provided (at least the size of Comerford). A week before the event Marywood will also print ten 11x17 color posters, ten 11x17 black and white posters, ten 8.5x14 color posters, and ten 8.5x14 black and white posters advertising the event. I, perhaps with others, will hang the posters. Each poster will announce a $50 random door prize to a student attending the lecture. (I will pay the prize money).

(6) By using the other $1000 FIRE fee (plus food and motel bill) to pay for an evening presentation open to the whole community (probably in early April).

(7) By Marywood spending at least $1000 [documented] on publicity (to be coordinated with me) for the evening program which will be open to the public and all members of the campus community. This can be switched to the event in (11) if I so decide.

(8) By Marywood providing "free pizza and soda" (1000 slices of pizza and 500 cold cans of soda) at the evening presentation. The advertising and free food is an effort to draw a large crowd. This could be switched to the event in (11) if I choose to do so.

(9) By including as part of every publicity notice for any evening event, the fact (prominently displayed) that a randomly chosen person will win a $50 attendance prize (which I will provide).

(10) By ensuring the publicity for **each** event [including the event in (11)] will include two separate emails [to be approved by me] sent to the complete faculty list (including adjuncts) and the student email list. The emails will advertise the upcoming FIRE event or event (11), and one of these evening event emails (probably in April if FIRE, and Fall 2012 for Spencer) will include the offer of "Free Pizza and Soda." For each event the first email will be sent one week before the event, the reminder emails (also with complete information) will be sent 24 hours before each event. Every email must meet my approval.

(11) By sponsoring a Fall 2012 appearance on campus by Robert Spencer of Jihad Watch. Mr. Spencer, based on the jihadwatch.org website, will be willing to debate anyone regarding aspects of Islam, but his appearance is not contingent on the existence of a debater for the other side. This event shall be publicized by the number of posters outlined in (5) and by single topic emails sent to the faculty and student email lists as outlined above. The event will be open to the community and receive normal Marywood publicity for such an event. My friends and I will hang the posters designed with my approval. The opposition side in the proposed debate can of course hang its own posters or participate in the poster design.

By agreeing to the above I will consider this matter closed.

DEF001467

Sincerely,

Frederick F. Fagal, Jr.

#15 COMMENT: While driving home after the December 5 meeting with Alan Levine I did some thinking. I recalled the Harvard Professor of Economics Greg Mankiw, former chairman of president's Council of Economic Advisors, had just offered to take out to lunch (right after class) at a Chinese Restaurant in Harvard Square the first ten members of his large Ec 10 (introductory) economics class to respond to his email. Knowing that Marywood can teach Harvard a thing or two [heh], I sent an email to Mr. Levine pointing out the panderer at Harvard and suggested the Marywood administration warn Harvard of the panderer in its midst. Professor Mankiw is the author of best-selling economics textbooks and has a blog which is widely read.

Print - Close Window

Subject: Pandering at Harvard !!
From:   Frederick Fagal (fffagal@yahoo.com)
To:     levine@marywood.edu;
Date:   Monday, December 5, 2011 6:48 PM


Hello Allen,

I talked to a senior faculty member. She said that what I did and similar has often been done. Generally speaking I don't think Marywood wants to go down the pandering route.

If it does Marywood needs to get in touch with Harvard. Professor Greg Mankiw (former chair of the president's Council of Economic Advisors), very highly respected.....I think I could get him to support me on the "pandering charge." The below from his blog. Again, does Marywood REALLY want to go down this road? I can't imagine that the Marywood faculty would deem it wise. Upon reflecting further, professors who bring students pizza on evaluation day might well get laughed at

DEF001468

in the comments. And me having only one lottery winner might very well make more enemies (after the fact) than friends. After all I would have created an "occupy worthy" 1%....

Best... Fred

# Greg Mankiw's Blog

Random Observations for Students of Economics

## Monday, November 28, 2011

**Have lunch with me**

To current ec 10 students (only):

I will take up to ten students out to lunch after Wednesday's lecture at Yenching, my favorite Chinese restaurant in Harvard Square. Email me if you are interested in joining the group. First come, first served.
*permanent link* ✉

---

#16 COMMENT: While driving home after the December 5 meeting with Alan Levine another fact jumped into my mind. The Marywood administration itself [Subject: [MWADMIN] request your SUPPORT of Release the Light on April 13th] sponsored speeches and other events for which it encouraged professors to give "extra credit" to student who attended such favored events. The administration also encouraged professor to let such events substitute for class time. But to top it off, random PRIZES including $50 VISA card were offered to students who attended the favored event. I must admit to showing much glee as I sent these emails to Mr. Levine the same day we met....

---

Print - Close Window

Subject: PANDERING ALERT !! Fw: [MWADMIN] request your SUPPORT of Release the Light on April 13th
From:    Frederick Fagal (fffagal@yahoo.com)
To:      levine@marywood.edu;
Date:    Monday, December 5, 2011 7:14 PM

DEF001469

Alan,

See Yellow Highlighted and bolded. Extra credit ! Class time! Prizes at the door!  Enough Said ! I rest my case....not that I couldn't come up with more evidence.  **I am laughing....This is like shooting fish in a barrel....Fred**

----- Forwarded Message -----
**From:** "Decker, Barbara" <bdecker@marywood.edu>
**To:** mwadmin@mail.marywood.edu
**Sent:** Tuesday, April 5, 2011 12:30 AM
**Subject:** [MWADMIN] request your SUPPORT of Release the Light on April 13th

Announcing!  Announcing!  The 10th annual Release the Light sexual assault awareness program will be held on Wed. April 13th from 11:30am to 1:00pm in the Fireplace Lounge.  Like last year, the program will include a Let Your Feet Speak mile March through campus from 11:30 to 12:00 noon, beginning and ending at Nazareth.  Then from noon to 1pm, we will hold a Food and Information Fair, with written materials and speakers available to cover topics on a variety of sexual and physical violence topics.  Speakers will include David Elliott, Senior Director for Marywood University Safety, Erika Del Rosso, M.Ed, Teen Advocate of the Women's Resource Center, and Sr. Gail Cabral I.H.M., Ph.D.,Full Professor Psychology at Marywood.  There will be an assortment of food donated from Chartwells and community businesses.  Also, raffles will include two $50 VISA gift cards and more.
Thus far, the following groups and organizations will be participating: Counseling/Student Development Center, Peers on Wellness, Women's Studies, Diversity United, Psychological Services, Active Minds, Music Therapy Department, Chi Sigma, Graduate Student Council, RAE (Relationship Awareness and Empowerment Task Force), Criminal Justice Club, and the Women's Resource Center.  This year's program will again include a clothesline project, which will involve participants writing messages on a variety of colored t-shirts representing different types of violence.  In addition, we will again take a community wide pledge against sexual violence, which will involve participants leaving their hand stamp and signature on a large bed sheet that contains our pledge.  During the fair, we will have music and an open mike available to those who would like to address the subject of violence with a poem, readings, or songs.
In conjunction with Release the Light will be a tree planting ceremony for Caitlin McGuire at 11am near the Schwartz Center, to which we welcome faculty, staff, and students in memorializing Caitlin.
I am writing to you to ask that you help to make this a campus wide event by becoming involved in the

DEF001470

following ways:  First, if you would take a minute in your classes and club meetings to announce that April is National Sexual Assault Awareness Month and share with them the information in this email about the fair.  Secondly, we encourage you to attend the event yourselves along with your students. **We hope faculty will offer students extra credit for attending, or use some of your class time to attend the event with your students.** Also, if you are an advisor of a student group (athletics, student life, academics), we ask that you consider requiring your entire group to attend the program, starting with the march at 11:30am and the fair 12pm.

Looking forward to all of us uniting together on the 13th in taking a community wide pledge against sexual violence!  I thank you in advance for your support of this important  cause!

<div style="text-align:right">Sincerely,  Barb Decker</div>

Barbara B. Decker, M.A., LPC, NCC
Associate Director and Peers on Wellness Advisor
Counseling/Student Development Center
Marywood University
570-348-6245
bdecker@marywood.edu

---

#17 COMMENT: It is now December 13 and in my letter of December 5 I had asked for, among other things, $500 reimbursement for my expenses. With no reply yet I sent a a concise reminder email..

Print - Close Window

Subject:?

From:   Frederick Fagal (fffagal@yahoo.com)

To:    levine@marywood.edu;

Date:   Tuesday, December 13, 2011 12:21 PM

?

---

#18 COMMENT: On December 15 I received the email below from Alan Levine. A letter was attached to the email, and in this letter Mr. Levine responded to the requests I laid out in my letter of December 5. The attached letter, denying all requests, is reproduced below following the email.

Print - Close Window

DEF001471

Subject: Response to 12-5-11 letter

From:    Dr Alan Levine (levine@maryu.marywood.edu)

To:      fffagal@yahoo.com;

Date:    Thursday, December 15, 2011 1:23 PM


Fred,

Please see the attached response to your 12-5-2011 letter to me.

Alan


--
Alan M. Levine, PhD
Vice President for
  Academic Affairs
Marywood University
2300 Adams Ave
Scranton, PA  18509
(t) 570 348-6290
(f) 570 961-4743
e-mail: levine@marywood.edu

DEF001472



**Marywood**
U N I V E R S I T Y
OFFICE OF ACADEMIC AFFAIRS

MARYWOOD UNIVERSITY
SCRANTON, PA 18509-1598
TEL: (570) 348-6232
FAX: (570) 961-4743
LEVINE@MARYWOOD.EDU
www.marywood.edu

December 15, 2011

Dr. Frederick F. Fagal, Jr
Department of Social Sciences
Marywood University
2300 Adams Ave.
Scranton, PA 18509

Dear Fred,

It appears we have a different understanding of what transpired around the issue of the posters that advertised the presentation by Will Creeley of the Foundation for Individual Rights in Education (FIRE). Whether we will ever come to complete agreement concerning the exact timeframe for approval, or lack thereof, remains to be seen, but at any rate I do want to respond to your letter of December 5, 2011.

Sr. Anne Munley and I remain open to future presentations that are not in conflict with our mission statement or core values, and are organized according to our policies and practices. However, we are not willing to undertake any of the specific requests that are contained in your letter.

Please feel free to be in touch if you want to further discuss this issue.

Sincerely,

Alan M. Levine, PhD
Vice President for Academic Affairs

Cc:   Sr. Anne Munley, IHM, President
      Michael Foley, Ph.D., Dean, College of Liberal Arts and Sciences
      File

---

#19 COMMENT : Friday December 16, 2011 8:43 AM I ask Alan Levine if he could clarify by what he meant by "...we have a different understanding of what transpired..."   "you email" obvious typo 🙂 as is "transpired" for transpired in the subject line.

Print - Close Window

DEF001473

Subject: Is the "what trasnpired" issue to which you refer?

From:   Frederick Fagal (fffagal@yahoo.com)

To:     levine@marywood.edu;

Date:   Friday, December 16, 2011 8:43 AM

Hello Alan,

Based on our December 2 meeting and you email of December15 am I correct in assuming that when you wrote yesterday

"we have a different understanding of what transpired around the issue of the posters that advertised the presentation by Will Creeley."

you are referring solely to what (as I recall) you said Mr. Oliveri told you, *namely that the 46 posters which received the stamp of approval did **not** have attached to them the prize offer?*

Thank you.

Sincerely,

Fred Fagal

---

#20 COMMENT: Much appreciated clarification from Mr. Levine. As outlined above in COMMENT #14, at our December 5 meeting Mr. Levine had shown surprise when I told him that ALL the posters approved on Monday morning November 28 did in fact have attached to them the strip of white paper announcing the $50 prize draw for attendance. Also on that strip was my email address as Contact information. At the December 5 meeting Mr. Levine said that Mr. Oliveri had told him a different story. Below is the first time that Mr. Heath's name has come up regarding this matter where Mr. Levine claims that Mr. Heath had also said the Monday posters when approved did NOT have on them the prize (or contact)) information.
Print - Close Window

Subject: Re: Is the "what trasnpired" issue to which you refer?

From:   Dr Alan Levine (levine@maryu.marywood.edu)

DEF001474

To:       fffagal@yahoo.com;

Date:     Monday, December 19, 2011 9:10 AM


Fred,

Yes, I was referring to information that I received from Carl Oliveri
and Ray Heath.

Alan


On 12/16/11, Frederick Fagal <fffagal@yahoo.com> wrote:
> Hello Alan,
>
> Based on our December 2 meeting and you email of December15 am I correct in
> assuming that when you wrote yesterday
>
>
> "we have a different
> understanding of what transpired around the issue of the posters that
> advertised the presentation by Will Creeley."
>
> you are referring solely to what (as I recall) you said Mr. Oliveri told
> you, namely that the 46 posters which received the stamp of approval did
> not have attached to them the prize offer?
>
> Thank you.
>
> Sincerely,
>
> Fred Fagal
>


--
Alan M. Levine, PhD
Vice President for
   Academic Affairs
Marywood University
2300 Adams Ave
Scranton, PA 18509
(t) 570 348-6290
(f) 570 961-4743
e-mail: levine@marywood.edu

DEF001476

December 2, 2011

Alan Levine, Ph.D.
VP for Academic Affairs
Marywood University
Scranton, PA 18509

Dear Alan,

I am still at a loss as to an explanation for what happened. I have gone through the Faculty Handbook with some care and can find nothing that allows the university to tear down my posters that were approved for hanging. I asked you to direct me to the Marywood rule/policy you claim I have violated [i.e. the fact that I offered a random drawing prize to an attendee] but I have yet to hear from you.

The posters advertised that a speaker (Will Creeley of The Foundation for Individual Rights in Education [FIRE]) would give a presentation before Dr. Jackson's and my SSCI 201 Introduction to Social Science class. Dr. Jackson and I decided to open the class to all comers and so reserved the Comerford Auditorium and advertised the event.

*I paid* for the speaker. *I paid* for the posters. To induce attendance (I am an economist) and give Marywood students a little fun [in short supply if you believe the Princeton Review] *I offered a $50 lecture attendance prize* (random drawing) to some lucky student. *The fifty dollars was mine. I also paid a few students my money to hang some posters* to save me time.

I knew (don't ask me how) that for posters to be hung around campus the hanger needed to have the "Marywood Unversity Approved by Student Life" stamp on the poster. On November 28, 2011 (Monday morning) at 8:30 am the 46 original posters were delivered to the Student Activities/Student Life office by a Marywood student. She waited while the 46 posters received the stamp of approval. Each approved poster had a paper strip taped onto the top of the poster which read "$50 Attendance Prize Draw to a Student!" Just because one of Mr. Oliveri's authorized underlings stamped the poster is not my problem. No one in the Marywood University Administration contacted me to inform me of a potential problem/issue. Late Tuesday afternoon I learned via email from a student that my posters had been torn down. I immediately went to the UPS store to get more posters printed. *I paid to reprint the approved posters* torn down by Marywood University! Finally, some of these new posters were torn down on Wednesday (see below) for which you claim no knowledge.

Even if you claim justification [which you have not yet done] for tearing down the posters, Marywood's Administration comes off poorly --- certainly in my eyes, and I think when and if widely publicized the eyes of all neutral observers. Why not just become a pathetic laughingstock while chasing away a few prospective students ?! Certainly some Marywood administrator(s) showed an incredibly rude and crude and vindictive side by not even contacting me to inform me of the perceived problem.

As Dr. Jackson wrote in an email to Mr. Oliveri:

DEF001477

1) Dr. Fagal deserved an immediate call that the posters were taken down by school authorities.
2) The common sense solution to the problem identified as to the poster transgression was merely to remove the offending part of the posters. The lack of the call and the overreactive response clearly points to an effort to deny Dr. Fagal an opportunity to implement the common sense remedy for the situation.

Due to Marywood's actions I request, at this stage, fair compensation for financial damages you have imposed on me.
I ask that I immediately receive (by December 15, 2011)
(1) A $500 reimbursement check for my expenses and wasted time

**In addition, besides making me merely financially whole regarding this matter, I think it is only fair that Marywood "atone for its sins" and show its willingness to support free speech** by inviting FIRE to campus for two Spring 2012 presentations and hosting a presentation by Robert Spencer and anyone who cares to join him in debate [see item **(11)** below]. The ideal way to show commitment to free speech is by action with respect to sponsoring a presentation by someone with whom you vehemently disagree.

(2) By issuing to me a written public apology which indicates the actions [outlined below] Marywood will take to remedy the damages done to its reputation.

(3) By having the apology in (2) to me also sent by email to every faculty member (including adjuncts) and every student.

(4) By paying FIRE $2000 (its normal rate) to give two presentation on campus during the Spring 2012 semester. Marywood will also pay normal meal and lodging expenses.

(5) By hosting [see (4)] one $1000 FIRE session (probably in February) for a daytime class presentation to the Social Science 201 class (presentation to be open to all on campus). A large room will be provided (at least the size of Comerford). A week before the event Marywood will also print ten 11x17 color posters, ten 11x17 black and white posters, ten 8.5x14 color posters, and ten 8.5x14 black and white posters advertising the event. I, perhaps with others, will hang the posters. Each poster will announce a $50 random door prize to a student attending the lecture. (I will pay the prize money).

(6) By using the other $1000 FIRE fee (plus food and motel bill) to pay for an evening presentation open to the whole community (probably in early April).

(7) By Marywood spending at least $1000 [documented] on publicity (to be coordinated with me) for the evening program which will be open to the public and all members of the campus community.

(8) By Marywood providing "free pizza and soda" (1000 slices of pizza and 500 cold cans of soda) at the evening presentation. The advertising and free food is an effort to draw a large crowd.

DEF001478

(9) By including as part of every publicity notice for the evening event, the fact (prominently displayed) that a randomly chosen person will win a $50 attendance prize (which I will provide).

(10) By ensuring the publicity for **each** event will include two separate emails [to be approved by me] sent to the complete faculty list (including adjuncts) and the student email list. The emails will advertise the upcoming FIRE event, and these (probably April) evening event emails will include the offer of "Free Pizza." For each FIRE event the first email will be sent one week before the event, the reminder emails (also with complete information) will be sent 24 hours before each event. Every email must meet my approval.

(11) By sponsoring a Fall 2012 appearance on campus by Robert Spencer of Jihad Watch. Mr. Spencer, based on the jihadwatch.org website, will be willing to debate anyone regarding aspects of Islam, but his appearance is not contingent on the existence of a debater for the other side. This event shall be publicized by the number of posters outlined in (5) and by single topic emails sent to the faculty and student email lists as outlined above. My friends and I will hang the posters designed with my approval. The opposition side in the proposed debate can of course hang its own posters or participate in the poster design.

By agreeing to the above I will consider this matter closed.

Sincerely,


Frederick F. Fagal, Jr.

DEF001479



**Marywood**
U N I V E R S I T Y
OFFICE OF ACADEMIC AFFAIRS

MARYWOOD UNIVERSITY
SCRANTON, PA 18509-1598
TEL: (570) 348-6232
FAX: (570) 961-4743
LEVINE@MARYWOOD.EDU
www.marywood.edu

December 15, 2011

Dr. Frederick F. Fagal, Jr
Department of Social Sciences
Marywood University
2300 Adams Ave.
Scranton, PA  18509

Dear Fred,

It appears we have a different understanding of what transpired around the issue of the posters that advertised the presentation by Will Creeley of the Foundation for Individual Rights in Education (FIRE). Whether we will ever come to complete agreement concerning the exact timeframe for approval, or lack thereof, remains to be seen, but at any rate I do want to respond to your letter of December 5, 2011.

Sr. Anne Munley and I remain open to future presentations that are not in conflict with our mission statement or core values, and are organized according to our policies and practices. However, we are not willing to undertake any of the specific requests that are contained in your letter.

Please feel free to be in touch if you want to further discuss this issue.

Sincerely,

Alan M. Levine, PhD
Vice President for Academic Affairs

Cc:    Sr. Anne Munley, IHM, President
       Michael Foley, Ph.D., Dean, College of Liberal Arts and Sciences
       File

*An education inspired by the Sisters, Servants of the Immaculate Heart of Mary.*

DEF001480

# Marywood's Shame

November - December 2011

## Marywood University's Administration Tears Down Previously Approved Posters

## Advertising A Speech Before Students-----

## *A Speech About Free Speech on Campus* !!

*−Professor Frederick Fagal again the target —*

### But who is next ? You perhaps?

**For immediate wide release – share as you will**          **Date: January 13, 2012**

**Contact: Frederick Fagal fffagal@yahoo.com**

1 | P a g e

DEF001481

**Abstract:** On November 28-29 2011 Marywood University tore down "stamped approved" posters announcing an open to all presentation by Will Creeley of FIRE (Foundation for Individual Rights in Education) titled "Know Your Rights: Free Speech and Thought Reform on Campus." On December 5 Alan Levine, VP for Academic Affairs, told me there were no written policy statements which justified Marywood's action, but that my offer of a $50 random prize to a student for attending was, in the eyes of the administration's Executive Council which met on November 29, "pandering" to students to get them to come to class, and that this justified tearing down the posters. Later that day (Dec. 5) I sent Mr. Levine two emails, one showing that Professor N. Gregory Mankiw of Harvard (former Chairman of the President's Council of Economic Advisers, author of today's largest selling economics textbook) recently pandered to his students by inviting ten select quick email responders (first come, first served) to join him as his guest for lunch after class at a Chinese restaurant in Harvard Square. *I suggested that Marywood University warn Harvard that it has a panderer in its midst* ! Finally, also on December 5, I forwarded to Mr. Levine an email from spring 2011 wherein the Marywood Administration encouraged professors to send students to a speech about sexual assault. Raffle prizes galore, including food and **TWO $50 VISA cards.** Quotation from the email "We hope faculty will offer students extra credit for attending, or *use some of your class time to attend the event with your students* [emphasis added]." Laughable! Talk about "pandering!" It is transparently obvious Marywood University is discriminating against Professor Fagal...Your Honor, I rest my case. Full details below.

By Frederick F. Fagal. Jr. (Ph.D.) Associate Professor of Economics, Marywood University, Scranton, PA

### [Students – Faculty – Parents:  See the last page for **"What Can You Do?"**]

During the Fall 2011 semester I wanted to invite an "outside speaker" to give a presentation to the SSCI 201 Introduction to Social Science class I teach with Dr. Tom Jackson. I wanted the presentation to the class to be open to all members of the Marywood University and even open to the public. The chosen topic, relevant to the course and the United States constitution, was related to free speech. The very respected Foundation for Individual Rights in Education (FIRE) http://www.thefire.org  agreed to send a speaker.

*I hope that anyone who reads this does so with an open mind and asks himself or herself: "What if I wanted to express, or even be exposed to, some views which others find objectionable? Would I want those views silenced? Who does the silencing- the most easily offended? Do I want to be part of a society where there is, in essence, a "dictatorship by the most easily offended" ? I will be sixty-six years old in February 2012. It would be easiest for me to "cruise to retirement" and not get "all riled up." But I think about young untenured faculty too scared to speak out, I think of students brow-beaten with politically correct notions of what is allowable thought and speech, and I think about the future world my son (and eventual grandchildren?) will either revel in or endure in silent desperation. If I do not speak out, who will?*

DEF001482

I sought funding from the Social Science Department but there was no money. At Sr. Margaret Gannon's suggestion I contacted Clayton Pheasant's Cultural Affairs Committee office, but was told no funds were available. FIRE, being based in Philadelphia, kindly offered to provide a speaker for only $350 because I would cover the cost from my own funds.

FIRE sent me a pdf file which, when printed, advertised the time and place and topic of the presentation. The topic title which appeared on the poster was "Know Your Rights: Free Speech and Thought Reform on Campus." The listed and actual presenter was Will Creeley, FIRE's Director of Legal and Public Advocacy. The place was the Comerford Auditorium (which I had reserved for this special occasion), and the announced time was November 30 at 2 pm.

Before Thanksgiving I contacted Carl Oliveri (Director of Student Activities and Leadership Development) by email to see if he could print some posters. The pdf poster files (color and black and white) were attached to that email. I wanted to get the posters stamped with the Student Life "seal of approval" so there would be no issues raised about the posters which were to be hung/posted (as I explained to Mr. Oliveri in one of the emails). Mr. Oliveri said he could print 15 black and white posters.  Early on Wednesday morning  November 23, the day before Thanksgiving, the university community was notified by email that there was a water main break and that the university would close for the day.

Because the university closed on November 23 due to the water emergency I assumed that there might be a problem printing the posters and getting them ready to be hung around campus on Monday November 28. On Friday evening November 25 I sent an email to Mr. Oliveri stating that I would print the posters myself and that I or someone else would show up first thing Monday morning November 28 to get the posters stamped. I also wrote (on Friday Nov 25 ) that besides the contact information the proposed posters needed, the revised posters would have an announcement on them which read

<div align="center">$50 Attendance Prize Draw to a Student !</div>

At 8:30 am Monday November 28 a student, acting on my behalf, delivered 46 posters to the Student Activities office and that student waited and observed while all 46 posters got stamped with the Student Life stamp of approval. Upon submission, *each of the 46 posters had the $50 prize announcement taped to the top as a ~2 inch wide strip of white paper with yellow highlighting on the black printed announcement*. I personally taped the announcements to each of the posters on the weekend of November 26-27 in Skaneateles, NY.

## Posters Hung Monday Nov. 28 Were Torn Down by 2:38 pm Tuesday November 29

The student who got the posters stamped on Monday morning Nov. 28 immediately returned to my office in LAC 82 circa 9:15-9:30 am with all 46 stamped posters.  One of Mr. Oliveri's staff had stamped the posters. I then hung posters in the Liberal Arts Center (LAC), and the student hung posters in the Science Building and the Library and the Art building. Later that morning (about 10:40 am) the student returned and I showed the student where I had hung some of the posters in the LAC. Soon after 1 pm on Monday November 28 another student (from my noon economics class) hung posters in McGowan and other buildings on the north side of campus.

The student who'd gotten the posters stamped and hung sent me an email at 2:38 PM the next afternoon [see below] announcing that posters were "gone." I replied immediately  after opening the email [see below].

3 | P a g e

DEF001483

**From:** [redacted-fff]
**To:** Frederick Fagal <fffagal@yahoo.com>
**Sent:** Tuesday, November 29, 2011 2:38 PM
**Subject:**

Dr. Fagal,

Did something happen with having the FIRE speaker? As I noticed today that all the posters are gone.

TO: [redacted-fff]
Tuesday, November 29, 2011 4:29 PM

You're kidding, right? No, nothing happened on this end.
More later....

## My Immediate Reaction to Learning the Posters Were Torn Down

I sent an email after immediately getting some of the posters reprinted (at my expense) I :

> **To:** "annemunley@marywood.edu" <annemunley@marywood.edu>
> **Cc:** "coliverj@marywood.edu" <coliverj@marywood.edu>; "cabral@marywood.edu" <cabral@marywood.edu>;
> "gannon@marywood.edu" <gannon@marywood.edu>; Will Creeley <will@thefire.org>; "foley@marywood.edu"
> <foley@marywood.edu>
> **Sent:** Tuesday, November 29, 2011 5:37 PM
> **Subject:** Posters Torn Down
>
> Dear Sr. Anne - below fyi....
>
> Dear Carl,
>
> The email report below is from [2:38 PM email above from the student, name redacted]. I just got some more
> posters printed and will have them at your office at 8:30 ready for quick stamping. The posters that were torn
> down were identical to the attached except that, as you know, the contact information fagal@marywood.edu was
> printed on a white strip of paper taped to the top of the posters. Also appearing on that white strip was yellow
> highlighted text announcing that a random student would win a $50 attendance prize.
>
> I certainly would appreciate it if tomorrow morning someone could email the student and faculty lists
> announcing/denouncing the removal of posters and at the same time publicize the 2 pm appearance by Mr.
> Creeley (speaking on Know Your Rights: Free Speech and Thought Reform on Campus)
>
> Thank you very much.
>
> Sincerely,
>
> Frederick F. Fagal, Jr.

During the evening of November 29 my son and I cut and pasted prize announcement and contact information
strips of paper to the top of the twenty newly printed posters. We yellow highlighted the $50 random student
draw prize information. On Wednesday November 30 at 8:30 am I was at the Student Activities Office door and
it was not open. I left, then returned at 8:45 am and the office was open and I entered and almost immediately

4 | Page

DEF001484

Carl Oliveri appeared. I had the new posters with me, and I started the conversation by mentioning the poster tear-down. Mr. Oliveri immediately said "We tore them down." Of course I asked **"WHY?"** Mr. Oliveri mentioned Alan Levine's name as an authority [Levine is the Vice President for Academic Affairs], and said that the offer of the random $50 attendance prize was the problem because it amounted to *"paying students to attend class"* and that *"we do not do that at Marywood."* Mr. Oliveri said the rest of the poster was fine, and he offered to help me cut off the offending prize announcement strips from the newly printed posters so I could hang them. Together we cut; then I did some poster hanging in the next hour or so from about 9:15 am to 10:15 am.

> N.B. :When Mr. Oliveri said "We tore them down." I did not (and do not) necessarily take that to mean
> that he or his minions had torn down the posters or instigated the tear-down. Rather, I assumed the
> "We" meant the Marywood administration – especially after the Vice-President for Academic Affair's
> name (Alan Levine) was invoked by Mr. Oliveri.

**No one in the administration had the** *mere common courtesy* **to inform me by telephone or email on Nov. 28-29 that there was a perceived problem with my posters.** No one seems to have considered the possibility that the supposedly offending strips of paper with the prize announcement could (1) have been easily torn from the posters or (2) easily and merely modified (i.e. blacked out) with a black magic marker....Instead what can only be described as **brown-shirt Nazi SA or Gestapo-like tactics ruled the day.** You don't like the Nazi comparison ? Try East German **Stasi** or the Soviet Union's **NKVD**.....Very sad....in fact scary....and if you really think the $50 prize announcement was the issue keep reading...

# Communication with Alan Levine, VP Academic Affairs

On Thursday, December 1, 2011 8:53 PM I sent an email to Alan Levine:

> Dear Alan,
>
> I am still at a loss as to an explanation for what happened. I have gone through the Faculty
> Handbook with some care, and can find nothing [e.g. pertaining to my $50 Attendance Prize
> Draw notice on the posters] that allows the university to tear down my posters that were
> approved for hanging. **Please direct me to the Marywood rule/policy you claim I have
> violated.** I assume you can do this right away if such a rule exists so I would **appreciate a
> very quick reply.**
>
> Thank you very much.
>
> Fred

I did *not* get a quick reply to my request for a citation of the Marywood rule/policy I had supposedly violated....

On Monday December 5 I met with Alan Levine in his office at 1:15 pm. Alan told me that he too had pored through the Faculty Handbook and could find nothing in it to substantiate any charges against me. Alan also said he had also spent time searching through "policies and procedures" and could find nothing that would uphold the idea that I had done *anything* in the way of violating any policy.

DEF001485

At the meeting Alan said that the Executive Council (or Committee?) (see below the list of "Executive Officers") had met on Tuesday (Nov. 29) and discussed my case. Alan Levine did not say, nor did I ask, when on Tuesday this meeting had occurred. The student email informing me of the poster tear-down was sent at 2:38 PM on Tuesday (Nov.29). Later the student told me s/he had observed some posters were missing on Monday evening Nov. 28....Were any posters torn down *before* the Executive Council meeting? I wonder who "rang the fire alarm" regarding the posters? Was it a student? If so, what was his/her complaint? Given my history, naturally I *suspected* that all this *perhaps might be* related to the possibility that FIRE was the issue because it had supported me in the past regarding the posting on my office door of the infamous free speech icon "Mohammed Bomb Cartoon" and quotes from the Koran (see www.marywoodfreespeech.com and click on History)? Was Marywood's president Anne Munley the instigator? Was it Mr. Oliveri or another administrator? Why the desperation ? I did not press Alan regarding the deliberations of the "Executive Council" or when the meeting had been called to discuss me or who instigated the meeting. I did not ask Alan for a list of who was at the meeting. Alan did mention that Ray Heath (*Vice President for Student Life* ) was at the meeting [Heath is on the list or Executive Officers printed below]. Alan did say that the magic word most bandied about during the meeting regarding my (supposed) transgression was PANDERING. By offering the $50 random draw attendance prize to a student, members of the Executive Council said I was PANDERING to students. I asked Alan if he thought a poster advertising a "liberal" speech and advertising a $50 random attendance prize would also get torn down, or whether I was a victim of [viewpoint] discrimination. Alan told me he "*hoped*" that would be the case [that the posters would be torn down]. I admit I chuckled more than a little bit....

From the Marywood web page http://www.marywood.edu/president/executive_admin.htm

the  list of names. I assume that the persons below are what Alan Levine meant by the phrase "The Executive Council":

**Executive Officers**

**Sister Anne Munley, I.H.M., Ph.D.**
*President of the University*

**Alan M. Levine, Ph.D.**
*Vice President for Academic Affairs*

**Joseph X. Garvey, M.S., C.P.A.**
*Vice President for Business Affairs and Treasurer*

**Clayton N. Pheasant, D.Min.**
*Vice President for University Advancement*

**Raymond P. Heath, Ph.D.**
*Vice President for Student Life*

**Mary T. Gardier Paterson, Esquire**
*Secretary of the University*

At the meeting I gave Alan a letter (and sent him a copy by email) where I requested that Marywood do certain things to atone for its *outrageous* behavior.

6 | P a g e

(1)  Marywood issue me a public apology
(2)  Marywood reimburse me $500 for my expenses,
(3)  Marywood invite FIRE to speak twice on campus during the Spring of 2011 (Before a daytime class open to all, and at an evening lecture open to all) and
(4)  Marywood to fully sponsor a Fall 2012 debate (i.e. both sides represented) over Islam involving Robert Spencer of www.jihadwatch.org and an opposition debate opponent to be chosen later. To show you stand up for free speech sponsor a very controversial debate!

## *Amusing Yet Important "Aside"*

*Following my December 5, 2011 meeting with Alan Levine I drove home and did some thinking. I remembered that a famous Harvard professor had recently bought lunch for some of his students. I recalled that Marywood's Administration had recently offered prizes for attending certain lectures and/or presentations and urged that student attendance count as class time (i.e. "pandering"). After I got home I found the evidence, and gleefully submitted it (see below) to Mr. Levine via email that very evening. May you the reader please forgive me for expressing my personal glee and satisfaction in the two emails (below) sent to Mr. Levine. Going through this is stressful, a little levity helps me keep going. Ultimately the issue for you is NOT me. (but I hope you understand and maybe laugh to yourself at the "glee" I express below)*

## Harvard University - Home of Panderers – Marywood Must Warn Harvard !

**To:** "levine@marywood.edu" <levine@marywood.edu>
**Sent:** Monday, December 5, 2011 6:48 PM
**Subject:** Pandering at Harvard II

Hello Allen [sic, should be Alan! –fff]

I talked to a senior faculty member. She said that what I did and similar has often been done. Generally speaking I don't think Marywood wants to go down the pandering route.

If it does Marywood needs to get in touch with Harvard. **Professor Greg Mankiw (former chair of the president's Council of Economic Advisors), very highly respected** [emphasis added-fff].....I think I could get him to support me on the "pandering charge." The below from his blog. Again, does Marywood REALLY want to go down this road? I can't imagine that the Marywood faculty would deem it wise. Upon reflecting further, professors who bring students pizza on evaluation day *[Alan had mentioned this as an example of pandering –fff]* might well get laughed at in the [course evaluation –fff 1/6/2012] comments. And me having only one lottery winner might very well make more enemies (after the fact) than friends. After all I would have created an "occupy worthy" 1%....

Best... Fred

DEF001487

**Greg Mankiw's Blog**
Random Observations for Students of Economics

· Monday, November 28, 2011

### Have lunch with me
### To current ec 10 students (only):

I will take up to ten students out to lunch after Wednesday's lecture at Yenching, my favorite Chinese restaurant in Harvard Square. Email me if you are interested in joining the group. First come, first served.

***permanent link*** ✉

---

## Marywood's Administration – PANDERERS ! Egg on face much ?

The email below should be dispositive. I was laughing almost uncontrollably when I hit the Send button on December 5, 2011 as I sent the following email to Alan Levine, Marywood's Vice President for Academic Affairs:

**From:** Frederick Fagal <fffagal@yahoo.com>
**To:** "levine@marywood.edu" <levine@marywood.edu>
**Sent:** Monday, December 5, 2011 7:14 PM
**Subject:** PANDERING ALERT !! Fw: [MWADMIN] request your SUPPORT of Release the Light on April 13th

Alan,

See Yellow Highlighted and bolded. Extra credit ! Class time! Prizes at the door!  Enough Said ! I rest my case....not that I couldn't come up with more evidence.  I am

DEF001488

# laughing....This is like shooting fish in a barrel....Fred

---- Forwarded Message -----
**From:** "Decker, Barbara" <bdecker@marywood.edu>
**To:** mwadmin@mail.marywood.edu
**Sent:** Tuesday, April 5, 2011 12:30 AM
**Subject:** [MWADMIN] request your SUPPORT of Release the Light on April 13th

Announcing! Announcing! The 10th annual Release the Light sexual assault awareness program will be held on Wed. April 13th from 11:30am to 1:00pm in the Fireplace Lounge. Like last year, the program will include a Let Your Feet Speak mile March through campus from 11:30 to 12:00 noon, beginning and ending at Nazareth. Then from noon to 1pm, we will hold a **Food and Information Fair**, with written materials and speakers available to cover topics on a variety of sexual and physical violence topics. Speakers will include David Elliott, Senior Director for Marywood University Safety, Erika Del Rosso, M.Ed, Teen Advocate of the Women's Resource Center, and Sr. Gail Cabral I.H.M., Ph.D.,Full Professor Psychology at Marywood. There will be an assortment of food donated from Chartwells and community businesses. Also, **raffles** will include two $50 VISA gift cards and more.

Thus far, the following groups and organizations will be participating: Counseling/Student Development Center, Peers on Wellness, Women's Studies, Diversity United, Psychological Services, Active Minds, Music Therapy Department, Chi Sigma, Graduate Student Council, RAE (Relationship Awareness and Empowerment Task Force), Criminal Justice Club, and the Women's Resource Center. This year's program will again include a clothesline project, which will involve participants writing messages on a variety of colored t-shirts representing different types of violence. In addition, we will again take a community wide pledge against sexual violence, which will involve participants leaving their hand stamp and signature on a large bed sheet that contains our pledge. During the fair, we will have music and an open mike available to those who would like to address the subject of violence with a poem, readings, or songs.

In conjunction with Release the Light will be a tree planting ceremony for Caitlin McGuire at 11am near the Schwartz Center, to which we welcome faculty, staff, and students in memorializing

Caitlin.

I am writing to you to ask that you help to make this a campus wide event by becoming involved in the following ways: First, if you would take a minute in your classes and club meetings to announce that April is National Sexual Assault Awareness Month and share with them the information in this email about the fair. Secondly, we encourage you to attend the event yourselves along with your students. **We hope faculty will offer students extra credit for attending, or use some of your class time to attend the event with your students.** Also, if you are an advisor of a student group (athletics, student life, academics), we ask that you consider requiring your entire group to attend the program, starting with the march at 11:30am and the fair 12pm.

Looking forward to all of us uniting together on the 13th in taking a community wide pledge against sexual violence! I thank you in advance for your support of this important cause!

Sincerely, Barb Decker

DEF001489

Barbara B. Decker, M.A., LPC, NCC
Associate Director and Peers on Wellness Advisor
Counseling/Student Development Center
Marywood University
570-348-6245
bdecker@marywood.edu

# What can you do?

**News media** — think there's a story here? Contact me for latest updates fffagal@yahoo.com

**Members of the Board of Trustees** — are you independent thinkers? Aren't there questions you should raise? Should you perhaps communicate with each other about this matter?

**Parents** – write a polite email and/or letter expressing your concern to Marywood's president, Sr. Anne Munley. A telephone call is possible too...

Sr. Anne Munley's Contact Information:  Telephone:  570-348-6231      Email: annemunley@marywood.edu

**Sr. Anne Munley**
**Immaculata Hall 107C**
**Marywood Univesity**
**2300 Adams Avenue**
**Scranton, PA 18509**

You might also contact members of the Board of Trustees. Please email me for some contact information. Tell the board members you are concerned about the administration's oppressive behavior and lack of support for free speech at Marywood. Let the trustees know what you think. For some historical background go to http://www.marywoodfreespeech.com/History%20Page/Fagal%20History/adminVSfagal.htm and scroll down to 02/22/06 and begin reading. Tell President Munley that you will encourage other parents to talk to their teens, and together take free speech concerns into family decision making when it comes time to choose a college or university – or even considering whether to transfer from Marywood. Consider writing a brief letter to your local newspaper, mention this Marywood incident, and urge students and parents to visit the Foundation for Individual Rights in Education (FIRE) at http://thefire.org/ for information about free speech policies at various colleges and universities.

DEF001490

**Faculty** – first, any communication I receive from any of you I will hold in the strictest of confidence. My email address is fffagal@yahoo.com . Warning, Marywood reserves the right to monitor your email. Consider sending from home from an alternate email address. Let me know what you are thinking. Thank you for your support. Again, please think of the big issues involved.

**Students** – I am much older than you are. When I am dead most of you will be vibrantly alive! What kind of world do *you* want ? Stuff like this is easy to ignore. But you have more power than you think. Marywood is a tuition-driven institution so you and potential students have *much* more power than you know...If you would like to help form a student group (even just a Facebook page) please contact me – be a leader! If you merely wish to express your support please shoot me an email with "Student Supporter!" in the Subject line.  If you'd be willing to have me share your name and email with a student leader for free speech let me know in the body of the email...THANKS !— and good luck...

DEF001491