## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| FREDERICK F. FAGAL, JR., | : | |
| | : | |
| *Plaintiff,* | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 3:14-cv-02404-ARC |
| MARYWOOD UNIVERSITY, | : | |
| | : | (JUDGE CAPUTO) |
| *Defendant.* | : | |
| | : | <u>ORAL ARGUMENT REQUESTED</u> |

## <u>STATEMENT OF MATERIAL FACTS IN SUPPORT OF</u>
## <u>MOTION FOR SUMMARY JUDGMENT BY PLAINTIFF</u>

JONATHAN Z. COHEN LTD.
Jonathan Z. Cohen, Esq.
175 Strafford Avenue
Suite 1 # 212
Wayne, PA 19087-3340
(215) 874-0047
(215) 839-8951 (fax)
jzc@jzc-law.com

*Attorney for Plaintiff*

Plaintiff Frederick F. Fagal, Jr. ("Fagal") hereby submits this Statement of Material Facts in Support of his Motion for Summary Judgment.

1.      Fagal is a natural person residing in New York State, and he intends to remain there indefinitely. *See* Ex. 1 at 1 (¶ 2); Ex. 2 at 1 (¶ 2); Ex. 3 at 14:13-19; Ex. 12.

2.      Fagal earned a bachelor's degree in 1968 from Union College in Schenectady, NY, a Master's degree in Economics from Cornell University in 1971, and a Ph.D. in Social Studies Education from Syracuse University in 1981. *See* Ex. 3 at 19:18-22:5; Ex. 12.

3.      Defendant Marywood University ("Marywood" or the "University") is a university and a Pennsylvania domestic non-profit corporation located in Scranton, PA. *See* Ex. 1 at 1 (¶ 1); Ex. 2 at 1 (¶ 1).

4.      Fagal became a member of Marywood's faculty in the fall semester of 1987. *See* Ex. 1 at 2 (¶ 4); Ex. 2 at 1 (¶ 4); Ex. 12.

5.      Fagal attained tenure at Marywood in September 1994. *See* Ex. 1 at 2 (¶ 5); Ex. 2 at 2 (¶ 5); Ex. 12.

**6.**     Marywood terminated Fagal's tenure and employment on April 3, 2012. *See* Ex. 1 at 2 (¶ 6); Ex. 2 at 2 (¶ 6); Ex. 12.

**7.**     In 1992, Fagal signed an "Agreement and Appointment for Full-Time Faculty." *See* Ex. 1 at 3 (¶ 10); Ex. 2 at 2 (¶ 10); Ex. 4; Ex. 12. This document states that "[t]he policies and practices listed in the Faculty Manual are agreed upon by the parties hereto." *See* Ex. 1 at 3 (¶ 10); Ex. 4.

**8.**     Fagal and Marywood entered into written agreements for him to serve on the University's full-time faculty for each year between 1992 and 2012. *See* Ex. 1 at 3 (¶ 12); Ex. 2 at 2 (¶ 12); Ex. 12. The agreement that the parties entered into for the 2010-2011 academic year is attached as Exhibit 39. *See* Ex. 12; Ex. 39.

**9.**     As of July 1, 2003, Marywood had a written policy titled "Non-reappointment of Faculty Member." *See* Ex. 52. That policy states: "Non-reappointment of a faculty member is the right of the President of Marywood University, so long as there is no violation of tenure policies, contractual agreements, or other policies stated in the Faculty Handbook." Ex. 52 at FFF001445.

3

**10.**    As of February 24, 2006, Marywood had a written policy titled

"Employment At-will Relationship with Administrators and Staff." *See* Ex.

51. That policy stated, in part: "Some jobs require a contractual relationship

with the University, and they have a fixed term of employment." Ex. 51 at

FFF001199. The policy distinguishes between those jobs requiring a

"contractual relationship" and others that were deemed to be "at-will." *See*

Ex. 51.

**11.**    On July 1, 2010, Marywood issued an edition of its Faculty

Handbook. *See* Ex. 1 at 3 (¶ 14); Ex. 2 at 3 (¶ 14). A copy of that Faculty

Handbook produced by Marywood in discovery is attached as Exhibits 5(a)

and 5(b). *See* Ex. 5(a); Ex. 5(b). The third page of that Faculty Handbook

states: "This handbook is effective with the 2010-2011 faculty letters of

agreement." Ex. 5(a) at DEF3458. The fourth page states, in part: "Policy

changes require the approval of the President of the University and, when

required, the Board of Trustees. Changes are disseminated by the

Secretary of the University. They are effective with formal approval and

placement in the Marywood University Policies and Procedures Manual."

Ex. 5(a) at DEF3460.

4

**12.**     On February 18, 2011, Marywood's president, Sr. Anne

Munley, IHM, Ph.D. ("Munley"), approved a revision of the University's

"Contractual Agreements with Faculty Members" policy. *See* Ex. 7. That

policy stated that a "Letter of Agreement" is a "binding contract covering a

specific period of time and as a vehicle to renew, adjust and/or alter the

terms of the original contract regarding appointment, rank, tenure, salary,

benefits, etc." Ex. 7. The same policy also stated: "Tenure is a term

designating guaranteed continuous appointment to full-time faculty

members until retirement." Ex. 7.

**13.**     On April 29, 2011, Munley approved a revision to the

University's "Faculty Grievances and Appeals" policy. *See* Ex. 29. That

policy stated that "[g]rievants will not be adversely affected for exercising

their right to file a grievance, regardless of outcome" and that "[g]rievants

will not be subject to adverse consequences for either initiating a grievance

or in presenting evidence on behalf of a grievant." Ex. 29 at FFF000113. It

also stated: "Procedures regarding dismissal, suspension, and sanctions of

faculty members are in the *Progressive Discipline* policy." Ex. 29 at

FFF000109-FFF000110.

**14.**     Also on April 29, 2011, Munley approved a revision to the

University's "Violent Acts and Threats" policy, which is attached as Exhibit

53. *See* Ex. 53. That policy obviously addresses acts of violence, including

"aggravated assault." Ex. 53 at FFF001460. It further states that "a

Marywood University student, faculty, or staff member in violation of this

policy will be subject to University disciplinary policies and procedures up to

and including termination." Ex. 53 at FFF001460.

**15.**     In May 2011, Fagal and Munley signed the "Letter of

Agreement" attached as Exhibit 6. *See* Ex. 1 at 4 (¶ 15); Ex. 2 at 3 (¶ 15);

Ex. 6. That document states that Fagal would serve as a tenured Associate

Professor from August 22, 2011 to May 18, 2012 and earn a salary of

$76,196.00.

**16.**     Beginning on October 12, 2011, Marywood had the

"Progressive Discipline" policy attached as Exhibit E to the Amended

Complaint. *See* Ex. 1 at 7-8 (¶ 28) and Ex. E (ECF No. 7-4); Ex. 2 at 5 (¶

28). That policy was not revised again until May 7, 2014. *See* Ex. 26.

**17.**     The "Progressive Discipline" policy effective on October 12,

2011 stated, in part:

> Marywood University endorses a progressive
> discipline policy designed to promote resolution in a

fair and orderly manner. This policy applies to all faculty members with tenure or whose terms of appointment have not yet expired. Its objectives support the collegial relationships at Marywood University and are directed toward continual institutional improvement. Because the University regards disciplinary action as corrective and not punitive, the policy recognizes personal and professional problems that may be rectified by an informal educational process, as well as serious violations of professional responsibilities implicating possible recommendation for suspension or dismissal.

The policy is intended to provide an effective and flexible means of identifying problem areas, resolving complaints, and preventing repetitive incidents by prompt intervention and assistance. It is designed to accomplish these ends by a series of gradual steps involving strategies such as personal conferences, oral and written warnings, and opportunities for monitored assistance where applicable.

....

***Suspension.*** The faculty member may be suspended by the Vice President for Academic Affairs at any time during the proceedings involving him or her. Suspension is justified if immediate harm to the faculty member or others is threatened by the person's continuance in the faculty position.

....

### *Dismissal*

If remedial actions(s) taken during the suspension does not sufficiently resolve the issues that lead to

the suspension, the university may move towards dismissal of the faculty member.

### *Ad Hoc Faculty Committee*

Faculty members have the right to convene an ad hoc committee in order to appeal either a decision to suspend the faculty member or a decision to dismiss the faculty member.

- Having received a written recommendation for either suspension or dismissal from the Vice President for Academic Affairs, the President of the University sends a written communication to the faculty member, stating with reasonable particularity the basis for suspension or dismissal and offering, if requested by the faculty member within 10 days, to convene a tenured faculty ad hoc committee to consider the matter, to render confidential advice, and thereby to effect a remedy if possible.
- Should the faculty member request a review by an ad hoc committee, it shall consist of three members selected in the following order: (a) one tenured faculty member selected by the person seeking assistance, and (2) two tenured faculty members selected by the Executive Council of the Faculty Senate. The choice of members should be on the basis of their objectivity and competence and of the regard in which they are held in the academic community. The President of the University or his/her delegate has the option of attending the meetings of the Committee. Should a faculty member request that such a committee be convened twice (i.e., once for suspension and once for dismissal), the membership of the committee may be similar or different, a determination which is made by the

8

President of the University in consultation with the faculty member and the Vice President for Academic Affairs. Normally the committee would make its recommendation within 30 days of being convened.

- The Committee elects its own Chair, who sends the opinion of the committee in writing to the President of the University, copied to the faculty member and to the Vice President for Academic Affairs. If the opinion of the Faculty Committee is that the matter is successfully resolved or that there is no merit to the complaint, a recommendation shall be made to discontinue proceedings. If the problem has not been corrected and reason still exists to question the fitness of the faculty member, the recommendation shall be to either continue a suspension or initiate a formal action toward dismissal.

Ex. 1 at 7-8 (¶ 28) and Ex. E (ECF No. 7-4); Ex. 2 at 5 (¶ 28). The "Progressive Discipline" policy does not list any explicit exceptions. *See* Ex. 1 at Ex. E.

18.     Marywood does not contend that Fagal was an at-will employee at any time between November 1, 2011 and August 31, 2012. *See* Ex. 8 at 3.

19.     In November 2011, Fagal scheduled a speaker from the Foundation for Individual Rights in Education ("FIRE") to speak at the

University in connection with one of his courses. *See* Ex. 1 at 5 (¶ 18); Ex.

2 at 3 (¶ 18).

**20.**   Fagal paid for the FIRE speaker. *See* Ex. 12.

**21.**   The topic of the FIRE presentation was "Know Your Rights:

Free Speech and Thought Reform on Campus," which was related to

Fagal's teaching of the U.S. Constitution. *See* Ex. 3 at 57:24-58:10; Ex. 12.

**22.**   Fagal received approval from Marywood to hang posters

announcing the FIRE speaker. *See* Ex. 1 at 5 (¶ 19); Ex. 2 at 4 (¶ 19).

Fagal paid for these posters. *See* Ex. 12.

**23.**   Subsequently, Marywood personnel removed at least some of

Fagal's posters. *See* Ex. 1 at 5 (¶ 20); Ex. 2 at 4 (¶ 20); Ex. 3 at 84:5-85:7,

86:23-87:3, 113:6-114:5, 120:11-12; Ex. 43 at 51:7-8, 51:24-52:18.

Marywood did not provide any notice to Fagal before or after the FIRE

posters were torn down. *See* Ex. 12.

**24.**   Fagal attempted to secure an apology by Marywood as well as

reimbursement for the posters that were removed, but Marywood refused

these requests. *See* Ex. 3 at 99:20-23; Ex. 12.

**25.**   On December 9, 2011, Marywood approved a new version of

its "Tenure" policy. *See* Ex. 13. The policy stated:

> Tenure is a term designating permanent and
> continuous appointment for a full-time faculty
> member. It implies a mutual commitment on the part
> of the faculty member and the University and cannot
> be taken lightly. Once tenure is granted, it will be
> discontinued only for grave reason, which may
> include moral turpitude, flagrant abuse of academic
> freedom, or professional incompetence.

Ex. 13.

**26.**   On January 13, 2012, Fagal sent an email from his personal
email address to Marywood faculty members about the removal of his
posters. *See* Ex. 1 at 6 (¶ 23); Ex. 2 at 4 (¶ 23); Ex. 9; Ex. 12. In the email,
Fagal criticized the Marywood administration for removing his posters and
for its weak commitment to free speech generally. *See* Ex. 1 at 6 (¶ 23);
Ex. 2 at 4 (¶ 23); Ex. 9; Ex. 12.

**27.**   Fagal's January 13, 2012 email also contained hyperlinks to
two related videos criticizing Munley and several other administrators for
ordering or participating in the poster removals and again for a weak
commitment to free speech. *See* Ex. 1 at 6 (¶ 24); Ex. 2 at 4 (¶ 24); Ex. 12.

**28.**   A copy of the first video can be found on the DVD-R at Exhibit
10. *See* Ex. 10; Ex. 12. A copy of the second video can be found on the
DVD-R at Exhibit 11. *See* Ex. 11; Ex. 12. At no time did anybody at

Marywood ask Fagal to remove the videos from YouTube. *See* Ex. 12.

However, Fagal did so by February 28, 2012. *See* Ex. 12; Ex. 63.

**29.** Fagal's two videos are adaptations of scenes in *Downfall*, a

2004 German-language movie depicting the last days of Adolf Hitler's rule.

*See* Ex. 10; Ex. 11; Ex. 17. Specifically, the scenes adapted by Fagal show

actor Bruno Ganz (playing Hitler) chastising several other actors (playing

Hitler's lieutenants) over setbacks suffered by the Nazis during World War

II. *See* Ex. 10; Ex. 11; Ex. 17 at 40:32-44:29 and 126:15-129:13.[1] Fagal

replaced the English subtitles appearing in these *Downfall* scenes with his

own subtitles satirizing the Marywood administration's conduct surrounding

the FIRE speaker. *See* Ex. 10; Ex. 11; Ex. 12; Ex. 17 at 40:32-44:29 and

126:15-129:13.

**30.** References to *Downfall* parodies have appeared in *BBC News*

*Magazine*, *The Telegraph*, *The Atlantic*, and the *New York Times*. *See* Ex.

12; Ex. 18; Ex. 19; Ex. 20; Ex. 21; Ex. 22.

**31.** "Downfall" parodies are very popular on YouTube. *See* Ex. 3 at

161:9-24. Examples of other "Downfall" parodies appearing on YouTube

---

[1] The citations corresponding to Exhibit 17 are in the form of
minutes:seconds on the DVD.

include: a parody in which NFL Commissioner Roger Goodell (depicted as Ganz's Hitler) is upset upon learning that the New England Patriots continue to win games despite the suspension of quarterback Tom Brady (Exhibit 23); a parody regarding the sub-prime crisis (Exhibit 24); and a parody in which New York Commissioner of Education John King (depicted as Ganz's Hitler) is upset about complaints regarding the Common Core and standardized testing (Exhibit 25). *See* Ex. 12.[2]

**32.**    On January 17, 2012, Munley received an email from Alan M. Levine, Ph.D., Marywood's Vice President for Academic Affairs, informing her about Fagal's January 13, 2012 email and videos. *See* Ex. 33 at 42:22-43:16; Ex. 54 at DEF002418. This was the first time that Munley was made aware of Fagal's January 13, 2012 email and videos. *See* Ex. 33 at 43:10-

---

[2] Plaintiff believes that Exhibits 10, 11, 17, and 23-25—if they are copyrighted works—constitute fair use in this litigation. *See* 17 U.S.C. § 107; *Bond v. Blum*, 317 F.3d 385, 394-95 (4th Cir. 2003) (use of entire copyrighted work for its evidentiary value in a child-custody proceeding fell within the scope of fair use); *Denison v. Larkin*, 64 F. Supp. 3d 1127, 1133 (N.D. Ill. 2014) ("The House Committee on the Judiciary explicitly listed 'reproduction of a work in legislative or judicial proceedings or reports' as an example of a fair use") (quoting H.R. Rep. No. 94-1476, 65 (1976)); *Stern v. Does*, 978 F. Supp. 2d 1031, 1047-48 (CD. Cal. 2011) ("Reproduction of copyrighted material in litigation or potential litigation is generally fair use...."); *Healthcare Advocates, Inc. v. Harding, Earley, Follmer & Frailey*, 497 F. Supp. 2d 627, 638, 2007 WL 2085358 (E.D. Pa. 2007).

15. Munley testified that "suspension was the first thing on my mind." Ex. 33 at 48:4. Before discussing the January 13, 2012 email and videos with Fagal, Munley "had come to the conclusion that this was – this is something for which the individual concerned should be suspended." Ex. 33 at 62:16-22.

**33.**    When Plaintiff's counsel asked Munley whether it occurred to her that Fagal had become a physical threat to himself or others, she testified: "I don't recall thinking about that in the way in which you're asking the question." Ex. 33 at 53:22-54:2.

**34.**    Before meeting with Fagal to discuss his email and videos, Munley and Marywood's Vice President for Human Resources, Patricia E. Dunleavy, Ph.D. ("Dunleavy"), worked together to create a typewritten list of "talking points." *See* Ex. 33 at 69:5-70:21; Ex. 40 at 21:2-16; Ex. 55; Ex. 59. Leading up to that meeting, it was Munley's plan to suspend Fagal regardless of what was said at the meeting. *See* Ex. 33 at 73:12-74:7, 75:24-76:8, 77:6-12; Ex. 55 at DEF002898; Ex. 59 at DEF000147.

**35.**    Munley's "talking points" contain a bullet point titled "Post-Suspension." Ex. 55 at DEF002898. Directly beneath that bullet point is a

sub-bullet point stating: "Sister recommends termination and prepares notice of charges." *Id.*

**36.**   To Dunleavy's knowledge, Levine had no input into the "talking points" document. *See* Ex. 40 at 30:8-15.

**37.**   At approximately 8:45 AM on January 23, 2012, former Marywood Dean of the College of Arts and Sciences, Michael A. Foley, Ph.D. ("Foley"), visited Fagal's office as Fagal was preparing for his 9:00 AM class and stated that President Munley was summoning him to a meeting at the same time (15 minutes' notice). *See* Ex. 1 at 6 (¶ 25); Ex. 2 at 4 (¶ 25); Ex. 3 at 257:24-258:17; Ex. 12; Ex. 33 at 79:18-80:14; Ex. 40 at 34:15-35:10; Ex. 41 at 7:2-7, 13:19-14:14; Ex. 42; Ex. 43 at 30:3-20, 36:19-37:8.

**38.**   Fagal, Munley, Dunleavy, and Foley—and nobody else—attended the 9:00 AM meeting. *See* Ex. 33 at 79:6-17. Dunleavy was asked to take notes at the 9:00 AM meeting on January 23, 2012, and she did so. *See* Ex. 33 at 88:20-23; Ex. 40 at 51:4-17; Ex. 56.

**39.**   At the meeting, Munley asked Fagal whether he posted the two-part video on YouTube. *See* Ex. 1 at 6 (¶ 26); Ex. 2 at 5 (¶ 26). Fagal acknowledged posting the video. *See* Ex. 1 at 6 (¶ 26); Ex. 2 at 5 (¶ 26).

Munley asked Fagal to explain his actions, but when he attempted to raise the issue of the poster removals, that topic was not allowed. *See* Ex. 3 at 265:7-14, 269:3-11; Ex. 12.

**40.**    At the meeting, Fagal also requested that Munley put her questions in writing so that he could craft a response. *See* Ex. 3 at 265:14-16; Ex. 33 at 120:7-15; Ex. 40 at 45:2-6, 53:20-22, 67:8-10; Ex. 56 at DEF000162; Ex. 57 at DEF000143. Munley did not agree to do so. *See* Ex. 33 at 106:25-107:14.

**41.**    At the meeting, Munley told Fagal that his employment was suspended effective immediately and that he should return his keys and University identification card. *See* Ex. 1 at 6 (¶ 26); Ex. 2 at 5 (¶ 26). Foley testified that Munley told Fagal that he was being "dismissed." Ex. 41 at 20:2-5. Then Foley testified: "I don't know if dismissed was the exact word, but that was the – that was the bottom line. He was no longer on the faculty." Ex. 41 at 21:13-15.

**42.**    Levine was not present at the January 23, 2012 meeting with Fagal and Munley. *See* Ex. 12. At no time did Levine tell Fagal that he was to be suspended. *See* Ex. 12. Dunleavy was not aware of any role played by Levine in suggesting that Fagal be suspended. *See* Ex. 40 at 46:9-12.

16

**43.**    The January 23, 2012 meeting was the first time that Fagal had heard from anybody in the Marywood administration after he posted the videos. *See* Ex. 3 at 257:24-258:5.

**44.**    At 2:14 PM on the same day, Dunleavy sent an email to Fagal confirming that he had been suspended and directing him to clean out his University office. *See* Ex. 1 at 7 (¶ 27); Ex. 2 at 5 (¶ 27); Ex. 12; Ex. 14.

**45.**    At some point after the January 23, 2012 meeting, Dunleavy created a typewritten summary of what she believed occurred at that meeting based on her contemporaneous written notes. *See* Ex. 33 at 105:23-106:9; Ex. 40 at 64:16-65:8; Ex. 57. Dunleavy and Foley signed off on this summary. *See* Ex. 40 at 65:21-23; Ex. 41 at 18:18-19:9; Ex. 57.

**46.**    At no time before Fagal's suspension did Marywood personnel tell Fagal that he posed an immediate harm to himself or to others. *See* Ex. 12. Foley testified that he did not believe that Fagal posed an immediate harm to himself or to others at the time of the January 23, 2012 meeting. *See* Ex. 41 at 25:18-24.

**47.**    Prior to this lawsuit, Marywood personnel never advised Fagal that his suspension was justified on the ground that he posed an immediate harm to himself or to others. *See* Ex. 12.

**48.**     Prior to January 23, 2012, Marywood did not provide Fagal with an oral warning, written warning, or any opportunity for monitored assistance relating to the emails and videos referenced in Paragraph Nos. 23 and 24 of the Amended Complaint. *See* Ex. 12; Ex. 37 at 7; Ex. 38 at 2; Ex. 40 at 121:4-11.

**49.**     At 1:11 PM on January 24, 2012, Frances D. Ferrese, Executive Secretary to Munley, sent an email to Fagal. *See* Ex. 15. One attachment to the email was a letter from Munley to Fagal dated January 24, 2012. *See* Ex. 1 at 8 (¶ 32); Ex. 2 at 5 (¶ 32); Ex. 15 at DEF000166-DEF000167. In that letter, Munley stated that she was "recommending that [Fagal's] tenure and employment with Marywood be terminated immediately." *See* Ex. 15 at DEF000166. Munley's letter repeatedly references an "agreement" between Fagal and Marywood. *See* Ex. 15 at DEF000166, DEF000167.

**50.**     In the January 24th letter, Munley provided a "Statement of Charges," which she was "prepared to send...to a duly appointed faculty committee for review along with the emails and videos you forwarded to members of our community." Ex. 15 at DEF000167.

**51.**   The end of the second "charge" contained in Munley's January 24th letter was missing, and therefore it was initially impossible for Fagal to know the full "charges" against him. *See* Ex. 1 at 9 (¶ 34); Ex. 2 at 6 (¶ 34); Ex. 15 at DEF000166-DEF000167.

**52.**   Prior to Munley's January 24, 2012 letter, Marywood personnel took no remedial actions to resolve whatever issues they believed had led to Fagal's suspension. *See* Ex. 12; Ex. 33 at 110:12-18.

**53.**   Prior to Munley's January 24, 2012 letter, Levine did not believe that he had made a written recommendation to terminate Fagal. *See* Ex. 43 at 44:23-46:7.

**54.**   On February 2, 2012, Fagal's attorney, Jonathan Z. Cohen, Esq. ("Cohen"), sent a letter to Munley advising that Marywood was in breach of its contract and requesting that the University convene two ad hoc faculty committees: one for her decision to suspend Fagal and the other for her recommendation to terminate him. *See* Ex. 1 at 12 (¶ 48); Ex. 2 at 9 (¶ 48); Ex. 27 at DEF000194, DEF000196. Cohen also advised that the end of the second "charge" in Munley's January 24, 2012 letter was missing. *See* Ex. 27 at DEF000195.

55.     On February 3, 2012, Dunleavy made a handwritten note regarding a meeting or a telephone conversation that she had had with Munley regarding Fagal. *See* Ex. 40 at 82:15-83:2; Ex. 60. The note reads, in part: "Progressive Discipline- n/a -." Ex. 60. Dunleavy testified that she was conveying that progressive discipline was not applicable. *See* Ex. 40 at 83:7-16.

56.     On February 8, 2012, Munley sent a second letter to Fagal. *See* Ex. 1 at 9 (¶ 35); Ex. 2 at 6 (¶ 35); Ex. 16 at DEF000206-DEF000210.

57.     In the February 8th letter, Munley stated again that she was recommending that Fagal's "tenure and employment with Marywood be terminated immediately" and offered a "Statement of Charges." Ex. 16 at DEF000206-DEF000210. Once again, Munley's letter repeatedly referenced an "agreement" between Fagal and Marywood and alleged a "breach" of that "agreement." *See* Ex. 16 at DEF000207-DEF000209.

58.     In the second "charge" against Fagal, Munley accused him of violating Marywood's "Civil Rights" policy. *See* Ex. 16 at DEF000208.

59.     At the time of Munley's February 8, 2012 letter, Marywood had a "Civil Rights Complaint Procedures" policy in effect. *See* Ex. 1 at 11 (¶ 42); Ex. 2 at 7-8 (¶ 42). A copy of that policy can be found at Exhibit 5 at

DEF3579-DEF3581. The policy stated in part that it "must be followed any time a member of the Marywood University community believes s/he has been the victim of...discrimination, harassment, or assault by any member of the University community." Ex. 5(a) at DEF3579.

60.    Nowhere in Munley's January 24, 2012 letter or February 8, 2012 letter—or in any attachments to either letter—did she offer to convene a faculty committee to review her suspension of Fagal. *See* Ex. 15; Ex. 16.

61.    Although Munley's letters of January 24, 2012 and February 8, 2012 reference Marywood's "Civil Rights" policy and the latter letter charges Fagal with violating that policy, no Marywood employee had filed a civil rights complaint against Fagal after his January 13, 2012 email. *See* Ex. 12; Ex. 33 at 132:7-12; Ex. 40 at 15:7-10; Ex. 43 at 29:6-12.

62.    On February 9, 2012, Marywood's attorney, William J. Anthony, Esq. ("Anthony"), sent a letter to Cohen. *See* Ex. 1 at 12 (¶ 49); Ex. 2 at 9 (¶ 49); Ex. 28. In that letter, Anthony stated that Fagal was "not entitled to pick and choose which policies and procedures he believes will suit him best" and that Marywood "had no further contractual obligations to him." *See* Ex. 28 at FFF000163, FFF000164. Anthony repeatedly referenced a

"contract" between Fagal and Marywood. *See* Ex. 28 at FFF000163, FFF000164.

**63.**    On February 17, 2012, Cohen sent a letter to Anthony, which is attached as Exhibit 62. *See* Ex. 62. Cohen stated in part: "To repeat, Dr. Fagal has elected to convene two separate ad hoc committees pursuant to Marywood's official policy: one for President Munley's decision to suspend him and the other, if necessary, for her recommendation to terminate him." Ex. 62 at FFF001686.

**64.**    On February 22, 2012, Fagal filed a grievance against Munley. *See* Ex. 1 at 13 (¶ 51); Ex. 2 at 9 (¶ 51); Ex. 12; Ex. 30; Ex. 31. In the grievance, Fagal alleged that Munley violated Marywood policy by improperly suspending him, by improperly moving to terminate his employment and tenure, and by not accepting his request to convene an ad hoc committee to appeal the suspension. *See* Ex. 30; Ex. 31.

**65.**    On February 28, 2012, Cohen sent a letter to Anthony advising that Fagal had removed the videos that he had posted to YouTube. *See* Ex. 63. Nobody at Marywood had asked Fagal to remove the videos. *See* Ex. 12.

**66.**     On March 26, 2012, Erin A. Sadlack, Ph.D. ("Sadlack"), the

Chair of Marywood's Faculty Grievance Committee sent a letter to Fagal

summarizing his grievances and concluding: "I now write to inform you that

in reviewing each of these grievances, we have found no evidence of

improper action on President Munley's part which would constitute a

legitimate grievance." *See* Ex. 12; Ex. 35 at 12:22-13:19; Ex. 44.

**67.**     On March 29, 2012, Fagal sent a letter to Munley objecting to

the Faculty Grievance Committee's decision and stating:

> I grant permission for Marywood University to
> release your "Recommendation for Termination and
> Statement of Charges" dated February 8, 2012 to
> an ad hoc committee in order to appeal your
> decision to suspend me as well as your
> recommendation to terminate my employment and
> tenure. To be clear, I am requesting that the ad hoc
> committee be convened twice—once to appeal my
> suspension and once to appeal your
> recommendation to terminate my employment and
> tenure.

*See* Ex. 12; Ex. 45.

**68.**     On April 2, 2012, Barbara McNally, an assistant for Levine, sent

an email to Levine stating that Fagal was on her list of faculty members

"leaving" Marywood after that year or leaving their position in the capacity

that they were hired. *See* Ex. 43 at 49:1-19; Ex. 65. Levine testified that he

probably told McNally that Fagal would be leaving. *See* Ex. 43 at 49:9-12.

When Plaintiff's counsel asked Levine, "You thought that before Professor

Fagal's disciplinary procedures were over, it was a foregoing conclusion

that he would be out of Marywood?", Levine stated: "I thought that was a

distinct possibility, yeah." Ex. 43 at 49:13-19.

      **69.**    On April 3, 2012, Munley sent a letter to Fagal. *See* Ex. 1 at 14

(¶ 54); Ex. 2 at 10 (¶ 54); Ex. 12. The letter stated, in part:

> Since the grievance process is now complete, I
> have decided to finalize my recommendation. As a
> result, your employment with Marywood and your
> tenure are terminated effective today, April 3, 2012.
>
> Further, to provide you with a review of my decision,
> I will consider your letter dated March 29, 2012 as
> your authorization for me to convene two faculty ad
> hoc committees to appeal my decisions to suspend
> you and to terminate your employment and tenure. I
> am doing this despite the fact that on two separate
> occasions you refused my offer and did not choose
> to convene an ad hoc committee to review my
> decision to suspend you and my recommendation to
> terminate your employment and tenure before I
> finalized my decision.

Ex. 32; Ex. 33 at 141:17-143:10. Munley's claim that Fagal did not request

that the University convene an ad hoc committee to review his suspension

was untrue. *See* Ex. 12; Ex. 27; Ex. 45; Ex. 46 at FFF001686.

**70.**    When Plaintiff's counsel asked Munley whether—prior to her

letter of April 3, 2012—any ad hoc faculty committee had made any

recommendation regarding her recommendation to terminate Fagal, she

testified: "I think the only thing that happened was the response to the

Grievance and Appeals Committee." Ex. 33 at 144:19-25. To Fagal's

knowledge, prior to Munley's letter of April 3, 2012, no ad hoc faculty

committee had made any recommendation regarding Munley's

recommendation to terminate him. *See* Ex. 12.

**71.**    On April 4, 2012, Cohen sent a letter to Anthony advising that

Munley had no right to terminate Fagal prior to considering any

recommendation of an ad hoc faculty committee under the "Progressive

Discipline" policy. *See* Ex. 66.

**72.**    On April 30, 2012, Sr. Gail Cabral of Marywood sent the email

to Fagal that is attached as Exhibit 58. *See* Ex. 12; Ex. 58. Sr. Cabral

stated:

> Sr. Anne Munley and Dr. Levine asked me to
> respond to your question about the status of the ad
> hoc committee. The committee has not yet
> convened but I expect that to take place this week. I
> am currently working to schedule the meeting.
>
> Your suggestion to include Dr. Ed O'Brien on the
> committee has been accepted. The other two

> members of the ad hoc committee are Dr. Helen
> Bittel and Mr. Matt Povse. The choice of these two
> individuals was made in accordance with the
> Progressive Discipline Policy, on the basis "of their
> objectivity and competence and of the regard in
> which they are held in the academic community."
>
> According to the Progressive Discipline Policy,
> when a faculty member requests that a committee
> be convened twice, the President determines
> whether the membership of the committee is similar
> or different. The President has received your email,
> and after review and consultation, Sr. Anne has
> determined that the membership will be the same.

Ex. 58.

**73.**   On May 6, 2012, Fagal sent an email to Bittel, O'Brien, and

Povse attaching a written defense to the charges made by Munley on

February 8, 2012. A copy of that email is attached as Exhibit 67. *See* Ex.

12; Ex. 67. A copy of the attachment is attached as Exhibit 68. *See* Ex. 12;

Ex. 68.

**74.**   On May 17, 2012, the ad hoc faculty committee held a meeting

about Fagal's case. *See* Ex. 47 at 22:9-24:15; Ex. 49. Minutes taken by

Bittel about that meeting state, in part: "[W]e concluded that we (the AHC)

are charged with reviewing the substance of the termination charge

(dismissal and revocation of tenure)....we understand our charge to be the

review of substance the termination and denial of tenure charges. We

26

understand that the issues of suspension and procedure were resolved by the FGC." Ex. 49.

**75.**    On May 18, 2012, Bittel sent an email to Dunleavy stating: "I just wanted to let you know...that, during yesterday's meeting, we agreed that our charge should be the review of substance the termination and denial of tenure charges.  We understand that the issues of suspension and procedure were resolved by the FGC." *See* Ex. 47 at 39:4-22; Ex. 48.

**76.**    On July 2, 2012, the ad hoc faculty committee issued a document titled "Review of Sister Anne Munley's Decision to Terminate the Employment and Tenure of Dr. Frederick Fagal." *See* Ex. 1 at 15 (¶ 59); Ex. 2 at 11 (¶ 59); Ex. 34.

**77.**    The ad hoc faculty committee did not concur with all of the charges lodged against Professor Fagal. *See* Ex. 34. Nonetheless, the committee concurred with Munley's decision to revoke the tenure and terminate the employment of Fagal. *See* Ex. 34. The FSAHHC's document did not mention Fagal's suspension. *See* Ex. 34.

**78.**    Bittel later acknowledged that she did not make any formal findings about whether Fagal's suspension was appropriate. *See* Ex. 47 at 31:22-24, 66:12-17. She testified: "Whether Sister Anne was out of line in

27

suspending him in the first place, that was the other committee because they are responsible for procedural elements." Ex. 47 at 65:19-21.

**79.** Bittel also testified that she did not think that Munley had ever informed her that Fagal had asked for an opportunity to answer Munley's questions in writing. *See* Ex. 47 at 46:22-47:10. She acknowledged that—had she known that Fagal had asked for that opportunity—that would "problematize" her understanding that Fagal had declined multiple opportunities to make amends, to show remorse, and to explain his actions. *See* Ex. 47 at 49:19-50:3. Bittel further stated that Fagal's request to answer Munley's questions in writing conflicted with her committee's findings and that these findings could not account for Fagal's request. *See* Ex. 47 at 50:12-18, 69:17-70:13

**80.** Bittel also testified that Munley had asked for the ad hoc faculty committee's expected date of completion because "she didn't want it to drag out too long." Ex. 47 at 50:12-18.

**81.** On July 6, 2012, Fagal sent an email to the ad hoc faculty committee members objecting that they had not reviewed his suspension and requesting that they do so. *See* Ex. 12; Ex. 64. The committee did not

reconvene to review Fagal's suspension. *See* Ex. 47 at 71:14-17; Ex. 50 at

40:7-11.

**82.**    On July 10, 2012, Bittel sent an email to Dunleavy stating, in

part:

> On Friday afternoon, our committee received a
> response from Dr. F. He has found several
> problems/omissions with our report and has asked
> us to review and resubmit. Mostly he objects to the
> fact that we did not separately adjudicate his
> suspension; we, however, understood that this was
> adjudicated by the prior committee and that their
> findings were supposed to be final.

*See* Ex. 47 at 71:20-72:9; Ex. 69 at DEF3733.

**83.**    Members of the ad hoc faculty committee have stated or

suggested that their committee did not review Fagal's suspension. *See* Ex.

47 at 22:7-21, 24:5-10, 29:22-30:10, 39:4-21; Ex. 48 at DEF001749; Ex. 49

at DEF000323; Ex. 50 at 16:10-17:21.

**84.**    On July 13, 2012, Munley sent Fagal a letter stating, in part:

"My decision to terminate your employment with Marywood University and

your tenure effective April 3, 2012 stands." *See* Ex. 1 at 16 (¶ 65); Ex. 2 at

11 (¶ 65); Ex. 12; Ex. 35 at 338:4-11; Ex. 36.

**85.**   Between the time that Fagal was suspended and the time that

he was terminated, Marywood took no remedial actions directed to him.

*See* Ex. 33 at 112:19-25.

**86.**   On July 18, 2012, Dunleavy sent an email to Munley stating, in

part: "I'd like to suggest the following topics for your consideration for

Cabinet Retreat....Faculty Grievance and Appeals and Progressive

Discipline for Faculty - post Fagal, we probably want to revise these

(perhaps using some of the faculty who sat on the review committees)." Ex.

40 at 116:22-117:14; Ex. 61 at DEF002781.

**87.**   Fagal received his agreed-upon salary through August 2012, at

which point Marywood ceased paying him. *See* Ex. 1 at 17 (¶ 66); Ex. 2 at

11 (¶ 66).

**88.**   On May 7, 2014, a new version of Marywood's "Progressive

Discipline" policy took effect. *See* Ex. 26. Unlike the previous version, this

one states:

> Progressive discipline, however, is not guaranteed
> in every instance. In certain and extreme
> cases, the President has the authority to initiate
> procedures for suspension or dismissal of a tenured
> faculty member without that person first undergoing
> progressive discipline.
> ...

*Exceptions to Progressive Discipline*

In most cases, it is expected that faculty members
will be entitled to the processes of progressive
discipline. However, in the rare event of an
egregious breach of professional discipline or illegal
activity, the President may elect to initiate
suspension or dismissal procedures immediately.
There is no obligation for the President or VPAA to
suspend the faculty member before moving to
dismissal procedures given severe circumstances.

Ex. 1 at Ex. E; Ex. 26.

**89.**   On November 2, 2016, Cohen served an expert economic

report on Marywood's counsel. *See* Ex. 70. That report, by the Sobel Tinari

Economics Group, states: "With a reasonable degree of economic

certainty, based on the information received and the analysis contained in

this report, it is our professional opinion that the total present value of the

economic loss sustained by Frederick Fagal amounts to...**$755,395**." Ex.

70.

Respectfully,


By:    s/ Jonathan Z. Cohen
       Jonathan Z. Cohen (PA 205941)
       175 Strafford Avenue
       Suite 1 # 212
       Wayne, PA 19087-3340
       (215) 874-0047
       (215) 839-8951 (fax)
       jzc@jzc-law.com

       *Attorney for Plaintiff*

Date: November 21, 2016

## **CERTIFICATE OF SERVICE**

I, Jonathan Z. Cohen, attorney for Plaintiff, certify that the foregoing document has been filed electronically and is available for viewing and downloading from the ECF system. The following parties have consented to electronic service:

**Asima J. Ahmad**
asima.ahmad@jacksonlewis.com, Philadelphia-
Secretaries@jacksonlewis.com,
PhiladelphiaDocketing@jacksonlewis.com

**Katharine Thomas Batista**
katharine.thomas@jacksonlewis.com, Philadelphia-
Secretaries@jacksonlewis.com,
PhiladelphiaDocketing@jacksonlewis.com

**Jonathan Zachary Cohen**
jzc@jzc-law.com

**Stephanie Jill Peet**
Stephanie.Peet@jacksonlewis.com,
PhiladelphiaDocketing@JacksonLewis.com, Philadelphia-
Secretaries@jacksonlewis.com

Respectfully,


By:   s/ Jonathan Z. Cohen
      Jonathan Z. Cohen (PA 205941)
      175 Strafford Avenue
      Suite 1 # 212
      Wayne, PA 19087-3340
      (215) 874-0047
      (215) 839-8951 (fax)
      jzc@jzc-law.com

      *Attorney for Plaintiff*

Date: November 21, 2016