# Exhibit 1

EXHIBIT
1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FREDERICK F. FAGAL, JR. : | |
| : | |
| *Plaintiff,* : | |
| : | CIVIL ACTION |
| v. : | |
| : | NO. 3:14-cv-02404-ARC |
| MARYWOOD UNIVERSITY, : | |
| : | ELECTRONICALLY FILED |
| *Defendant.* : | |
| : | |

### AMENDED COMPLAINT

Frederick F. Fagal, Jr., Plaintiff, hereby brings this Amended Complaint

against Marywood University, Defendant, and avers as follows:

### PARTIES

**1.** Marywood University (hereinafter "Marywood" or the

"University") is a university and a Pennsylvania domestic non-profit corporation

located in Scranton, Pennsylvania.

**2.** Frederick F. Fagal, Jr. (hereinafter "Professor Fagal") is a natural

person who has resided in New York State for more than 20 years and intends to

remain there indefinitely. Professor Fagal is thus a citizen of New York State.

**3.** Professor Fagal earned a bachelor's degree in 1968 from Union

College in Schenectady, New York, a Masters in Economics from Cornell

University in 1971, and a Ph.D. in Social Studies Education from Syracuse University in 1981.

    **4.**    Professor Fagal became a member of Marywood's faculty in the fall semester of 1987.

    **5.**    Professor Fagal attained tenure at Marywood in September 1994.

    **6.**    Marywood terminated Professor Fagal's tenure and employment on April 3, 2012.

## JURISDICTION AND VENUE

    **7.**    This Court has original jurisdiction over this action under 28 U.S.C. § 1332 as the matter in controversy exceeds the sum of $75,000.00 exclusive of interest and costs, and is between citizens of different states.

    **8.**    This Court has general personal jurisdiction over Marywood as the University has continuous and systematic contacts within the Commonwealth of Pennsylvania.

    **9.**    Venue is proper under 28 U.S.C. § 1391 as a substantial portion of the events giving rise to Professor Fagal's claim occurred within the Middle District of Pennsylvania.

## FACTUAL BACKGROUND

**10.**     In 1992, Professor Fagal entered into an Agreement and Appointment for Full-Time Faculty with Marywood. The agreement states that "[t]he policies and practices listed in the Faculty Manual are agreed upon by the parties hereto." A partially redacted copy of that agreement is attached hereto as Exhibit A.

**11.**     The "Faculty Manual" was also known as or later became known as the "Faculty Handbook."

**12.**     Professor Fagal and Marywood entered into written agreements for him to serve on the University's full-time faculty for each year between 1992 and 2012.

**13.**     Professor Fagal became a tenured faculty member of Marywood in September 1994.

**14.**     On July 1, 2010, Marywood issued an edition of its Faculty Handbook. The first four pages of the Faculty Handbook are attached hereto as Exhibit B. The third page states, in part: "This handbook is effective with the 2010-2011 faculty letters of agreement." The fourth page states, in part: "Policy changes require the approval of the President of the University and, when required, the Board of Trustees. Changes are disseminated by the Secretary of the University. They are

3

effective with formal approval and placement in the Marywood University Policies and Procedures Manual."

**15.** In May 2011, Professor Fagal entered into an agreement with Marywood stating that he would serve as a tenured Associate Professor from August 22, 2011 to May 18, 2012 and earn a specific salary. A partially redacted copy of that agreement is attached hereto as Exhibit C.

**16.** At the time that Professor Fagal and Marywood entered into the May 2011 agreement, Marywood's "Contractual Agreements with Faculty Members" policy stated that this type of agreement is a "binding contract covering a specific period of time and as a vehicle to renew, adjust and/or alter the terms of the original contract regarding appointment, rank, tenure, salary, benefits, etc." The same policy stated: "Tenure is a term designating guaranteed continuous appointment to full-time faculty members until retirement." A copy of that policy is attached hereto as Exhibit D.

**17.** If Professor Fagal was ever an at-will employee of Marywood, he was no longer so upon attaining tenure. His tenure and employment could only be terminated in conformance with Marywood's Policies and Procedures Manual.

## Marywood Tears Down Professor Fagal's Posters Inviting Students to a Lecture on Free Speech

18.     In November 2011, Professor Fagal invited and paid for a speaker from the Philadelphia-based Foundation for Individual Rights in Education (hereinafter "FIRE") to give a presentation to his "Introduction to Social Science" course at the end of the month. The topic of the presentation was "Know Your Rights: Free Speech and Thought Reform on Campus," which was related to Professor Fagal's teaching of the United States Constitution.

19.     Professor Fagal received approval from Marywood to hang posters (which he arranged to have printed and he paid for) announcing the FIRE presentation and inviting any and all Marywood students to attend at the University's Comerford Auditorium.

20.     On or around November 28-29, 2011, Marywood personnel tore down almost all of the FIRE posters. A Marywood official confirmed that the University was responsible. Marywood did not provide any notice to Professor Fagal before or after the FIRE posters were torn down.

21.     When Professor Fagal complained about the poster tear-downs shortly thereafter, Marywood's Vice President for Academic Affairs could not identify any written policy statements by the University that warranted these actions.

5

22.     Professor Fagal attempted to secure an apology by Marywood as well as reimbursement for the posters that were torn down, but Marywood refused these requests.

23.     On January 13, 2012, Professor Fagal sent an email from his personal email address to Marywood faculty members about the removal of his posters. In that email, Professor Fagal criticized the Marywood administration for tearing down his posters and for its weak commitment to free speech generally.

24.     The January 13th email also contained hyperlinks to two related videos criticizing Sister Anne Munley, President of Marywood, and several other administrators for ordering or participating in the poster tear-downs and again for a weak commitment to free speech. The videos were posted to YouTube.

### Marywood Suspends Professor Fagal

25.     At approximately 8:45 AM on January 23, 2012, a Marywood dean visited Professor Fagal's office as he was preparing for his 9:00 AM class and stated that President Munley was summoning him to a meeting at the same time.

26.     At the 9:00 AM meeting, President Munley asked Professor Fagal whether he posted the two-part video on YouTube. Professor Fagal acknowledged posting the video. Professor Fagal was asked to explain his actions, but when he attempted to raise the issue of the poster tear-down, that topic was not allowed.

Permitted no context to "explain" his actions, Professor Fagal could "explain"

nothing. President Munley then told Professor Fagal that his employment was

suspended effective immediately and that he should return his keys and University

identification card to Marywood's Assistant Vice President for Human Resources.

27.     Several hours later, Marywood's Assistant Vice President for Human

Resources sent Professor Fagal an email confirming that he had been suspended

and directing him to clean out his University office.

28.     At the time of Professor Fagal's suspension, Marywood's

"Progressive Discipline" policy (attached hereto as Exhibit E) stated:

> Marywood University endorses a progressive discipline
> policy designed to promote resolution in a fair and
> orderly manner.  This policy applies to faculty members
> with tenure or whose terms of appointment have not yet
> expired.
>
> The policy is intended to provide an effective and flexible
> means of identifying problem areas, resolving complaints,
> and preventing repetitive incidents by prompt
> intervention and assistance.  It is designed to accomplish
> these ends by a series of gradual steps involving strategies
> such as personal conferences, oral and written warnings,
> and opportunities for monitored assistance where
> applicable.
>
> ....
>
> ***Suspension***.  The faculty member may be suspended by
> the Vice President for Academic Affairs at any time
> during the proceedings involving him or her.  Suspension

7

is justified if immediate harm to the faculty member or
others is threatened by the person's continuance in the
faculty position.

29.     Marywood's suspension of Professor Fagal was a breach of contract in

several ways. First, there was nothing "progressive" about the discipline meted out

to Professor Fagal. There was no oral or written warning—nor was any opportunity

for monitored assistance provided.

30.     Second, President Munley—not the Vice President for Academic

Affairs—suspended Professor Fagal.

31.     Third, at the time of the suspension, there was no immediate harm to

Professor Fagal or to others threatened by Professor Fagal's continuance in his

faculty position—and no Marywood official or representative has ever stated

otherwise to him.

## Marywood Moves to Terminate Professor Fagal

32.     On January 24, 2012, approximately 28 hours after President Munley

suspended Professor Fagal, she sent him a letter stating that she was

"recommending that [his] tenure and employment with Marywood be terminated

immediately."

33.     In the January 24th letter, President Munley provided a "Statement of

Charges," which she was "prepared to send . . . to a duly appointed faculty

8

committee for review along with the emails and videos you forwarded to members of our community."

**34.**     The end of the second "charge" contained in the January 24th letter is missing, and therefore it was initially impossible for Professor Fagal to know the full extent of the "charges" against him.

**35.**     After Professor Fagal's attorney wrote to President Munley requesting an amended "Statement of Charges"—among other breaches that he identified—President Munley sent a second letter to Professor Fagal on February 8, 2012.

**36.**     In the February 8th letter, President Munley again stated that she was recommending that Professor Fagal's "tenure and employment with Marywood be terminated immediately" and offered a "Statement of Charges."

**37.**     In the second "charge" against Professor Fagal, President Munley accused him of violating Marywood's Civil Rights Policy.

**38.**     Near the end of the February 8th letter, President Munley wrote:

> As a result of this recommendation, I am prepared to
> send this statement of charges to a duly appointed faculty
> committee for review along with the emails and videos
> you forwarded to members of our community.  In order
> to do so and out of respect for your privacy, I would ask
> that you please sign and return to me the attached
> authorization granting the University permission to do so.
> That faculty committee may agree or disagree with my

recommendation. Once I receive the review committee's determination, I will finalize my decision. Should you choose to forego that faculty review, I will finalize my recommendation based upon my own findings and conclusions.

39. A document titled "Release of Personal Information" enclosed with

President Munley's February 8th letter states, in part:

> ____ I DO NOT grant permission for Marywood University to release Sister Anne Munley's Recommendation for Termination and Statement of Charges dated 1/24/12 to a faculty review committee comprised of tenured faculty. I understand that by refusing such permission that there will be no faculty committee review of Sister Anne Munley's decision to terminate my tenure and employment with the University prior to it being finalized.
>
> OR
>
> ____ I DO grant permission for Marywood University to release Sister Anne Munley's Recommendation for Termination and Statement of Charges dated 1/24/12 to a review committee comprised of tenured faculty.

40. President Munley's recommendation to terminate Professor Fagal's

employment and tenure violated the "Progressive Discipline" policy in effect at

the time. That policy contained one sentence addressing dismissal: "If remedial

actions(s) taken during the suspension does not sufficiently resolve the issues that

lead to the suspension, the university may move towards dismissal of the faculty

member."

10

41.     Marywood took no "remedial actions" to "resolve the issues" that led to Professor Fagal's suspension. Professor Fagal's suspension began on the morning of January 23, 2012, and the first letter recommending his termination arrived in his inbox at 1:11 PM on the next day. Nor did Marywood attempt any "remedial actions" before sending the February 8th letter.

42.     President Munley's February 8th letter also violated Marywood's "Civil Rights Complaint Procedures" policy in effect at the time. That policy required an individual allegedly aggrieved by a civil rights violation to file a complaint, among other procedures. Those procedures "must be followed any time a member of the Marywood University community believes s/he has been the victim of . . . discrimination, harassment, or assault by any member of the University community . . . ." A copy of that policy is attached hereto as Exhibit F.

43.     No Marywood employee filed a civil rights complaint against Professor Fagal after his January 13, 2012 email, and thus President Munley's attempt to "charge" him with violating the University's Civil Rights Policy was a breach of Marywood policy as well as a breach of contract.

**Marywood Refuses to Allow Professor Fagal to Appeal His Suspension**

44.     In President Munley's January 24th and February 8th letters, she asked Professor Fagal to authorize her to send the "statement of charges" against

11

him to a "duly appointed faculty committee for review" of her decision to terminate his employment and tenure.

**45.** Nowhere in the letters or the authorizations did President Munley offer to convene a faculty committee to review her suspension of Professor Fagal.

**46.** President Munley offered Professor Fagal two choices: a faculty review of her recommendation to terminate him or the "finalization" of her own decision to terminate him.

**47.** The "Progressive Discipline" policy in effect at the time of President Munley's letters stated that faculty members "have the right to convene an ad hoc committee in order to appeal either a decision to suspend the faculty member or a decision to dismiss the faculty member."

**48.** On February 2, 2012, Professor Fagal, through his attorney, elected in writing to convene two ad hoc faculty committees: one for President Munley's decision to suspend him and the other for her recommendation to terminate him.

**49.** On February 9, 2012, Marywood, through its attorney, rejected Professor Fagal's request to convene an ad hoc committee to review his suspension. The letter stated, in part, that Professor Fagal had breached his contract with Marywood and thus the University "had no further contractual obligations to him."

12

**50.**     Marywood's position—if accepted—would mean that any time that the University deemed—in its sole discretion—that a member of its community breached a contract with the University, then the University could disregard any of its own disciplinary policies. Such a position is absurd.

## Professor Fagal Files a Formal Grievance Against President Munley; she Retaliates by Terminating Him.

**51.**     On February 22, 2012, Professor Fagal filed a formal grievance against President Munley under Marywood's "Faculty Grievances and Appeals" policy. A copy of that grievance is attached hereto as Exhibit G.

**52.**     In the grievance, Professor Fagal alleged that President Munley violated Marywood policy by improperly suspending him, by improperly moving to terminate his employment and tenure, and by not accepting his request to convene an ad hoc committee to appeal the suspension.

**53.**     On March 26, 2012, the Chair of Marywood's Faculty Grievance Committee sent a letter to Dr. Fagal summarizing his grievances and concluding: "I now write to inform you that in reviewing each of these grievances, we have found no evidence of improper action on President Munley's part which would constitute a legitimate grievance."

54.     On April 3, 2012, President Munley sent a letter to Professor Fagal stating in part: "Since the grievance process is now complete, I have decided to finalize my recommendation.  As a result, your employment with Marywood and your tenure are terminated effective today, April 3, 2012." A copy of that letter is attached hereto as Exhibit H.

55.     One paragraph after declaring Professor Fagal's relationship with Marywood at an end, however, President Munley offered to convene the two ad hoc faculty committees that he had been requesting for months. President Munley claimed: "I am doing this despite the fact that on two separate occasions you refused my offer and did not choose to convene an ad hoc committee to review my decision to suspend you and my recommendation to terminate your employment and tenure before I finalized my decision." President Munley's claim that Professor Fagal did not convene an ad hoc committee to review the suspension decision is verifiably false.

56.     Further, President Munley's offer to convene two ad hoc committees was effectively a dead letter because she had—in the very same writing—declared the termination of his employment and tenure to be final.

57.     The "Progressive Discipline" policy in effect at the time conveyed that before a faculty member may be dismissed, an ad hoc faculty committee must

14

recommend a formal action toward dismissal. Therefore, President Munley's termination of Professor Fagal's employment on April 3, 2012 was premature and in contravention of Marywood policy.

58.     President Munley's premature termination also violated the "Faculty Grievances and Appeals" policy (attached hereto as Exhibit G), which stated that "[g]rievants will not be adversely affected for exercising their right to file a grievance, regardless of outcome" and that "[g]rievants will not be subject to adverse consequences for either initiating a grievance or in presenting evidence on behalf of a grievant."

59.     On July 2, 2012, a group of Marywood faculty members calling themselves the "Faculty Senate Ad Hoc Hearing Committee" ("FSAHHC") issued a document titled "Review of Sister Anne Munley's Decision to Terminate the Employment and Tenure of Dr. Frederick Fagal."

60.     The FSAHHC did not concur with all of the charges lodged against Professor Fagal. Nonetheless, the FSAHHC concurred with President Munley's decision to revoke the tenure and terminate the employment of Professor Fagal.

61.     Contrary to Marywood's "Progressive Discipline" policy and President Munley's April 3rd letter, neither the FSAHHC nor any other ad hoc faculty committee reviewed Professor Fagal's suspension.

15

**62.** At the time of the FSAHHC's decision, Marywood's "Progressive Discipline" policy stated, in part:

> Faculty members have the right to convene an ad hoc committee in order to appeal either a decision to suspend the faculty member or a decision to dismiss the faculty member . . . . Should a faculty member request that such a committee be convened twice (i.e., once for suspension and once for dismissal), the membership of the committee may be similar or different, a determination which is made by the President of the University in consultation with the faculty member and the Vice President for Academic Affairs.

**63.** Accordingly, the failure of any Marywood ad hoc faculty committee to review Professor Fagal's suspension was a breach of Marywood's "Progressive Discipline" policy.

**64.** Had an ad hoc faculty committee actually reviewed Professor Fagal's suspension, it would have likely found that suspension improper given that he posed no harm to himself or to others. Such a finding would have logically caused the ad hoc faculty committee reviewing Professor Fagal's termination to rule in his favor given that the propriety of a dismissal depends on the propriety of a suspension under the "Progressive Discipline" policy.

**65.** On July 13, 2012, President Munley sent Professor Fagal a letter stating, in part: "My decision to terminate your employment with Marywood University and your tenure effective April 3, 2012 stands."

16

66.     Professor Fagal received his agreed-upon salary through August 2012, at which point Marywood ceased paying him.

## Postscript

67.     After terminating Professor Fagal, the University amended its disciplinary policies so as to allow it to handle future "Professor Fagals" in the same way—but without breaching such policies. Accordingly, Marywood is well-aware that it breached its own policies as alleged above.

## COUNT I
### (Breach of Contract)

68.     Professor Fagal adopts by reference each and every allegation stated above.

69.     Marywood's Faculty Manual, Faculty Handbook, Policies and Procedures Manual, and the letter agreements referenced above constitute binding contracts between Professor Fagal and the University.

70.     Marywood repeatedly breached duties owed to Professor Fagal under the above-referenced contracts.

71.     Marywood's breaches of its duties to Professor Fagal caused him to suffer damages, including but not limited to the loss of continued salary and other benefits owed to tenured faculty members.

17

## **RELIEF REQUESTED**

**WHEREFORE**, Professor Fagal demands judgment in his favor and against

Marywood for:

**A.**     Back pay in an amount to be proved at trial;

**B.**     Reinstatement of Professor Fagal's employment  and tenure with

Marywood;

**C.**     Front pay up to the reinstatement of Professor Fagal's employment

with Marywood or—if reinstatement is not awarded—through the end of

Marywood's spring semester in 2018 (when Professor Fagal would be 72 years

old);

**D.**     Stock market foregone gains on 403(b) salary deductions not invested

in Professor Fagal's Fidelity retirement account;

**E.**     Pre-judgment interest;

**F.**     Post-judgment interest;

**G.**     Reasonable attorneys' fees and court costs; and

**H.**     Such other and further relief to which Professor Fagal may be entitled

at law or equity.

Respectfully,


By:     s/ Jonathan Z. Cohen
        Jonathan Z. Cohen (PA205941)
        175 Strafford Avenue, Suite 1
        Wayne, Pennsylvania 19087-3340
        (484) 253-1175
        (215) 839-8951 (fax)
        jzc@jzc-law.com

        *Attorney for Plaintiff Frederick F. Fagal, Jr.*

Date: January 15, 2015

EXHIBIT
A

**MARYWOOD COLLEGE**
Scranton, Pennsylvania
**AGREEMENT and APPOINTMENT**
for
**FULL-TIME FACULTY**

TERMS OF THIS AGREEMENT are offered on the _____ day of _____, A.D. 19_____

to _____

_____

party of the first part, by Marywood College, a non-profit corporation, created and existing by and under the laws of the Commonwealth of Pennsylvania, party of the second part.

The parties witness that, in consideration of the mutual promises and agreements herein contained,

the following terms are in effect from _____ to _____ :

(1) Type of Appointment _____

    Rank _____

    Department _____

    Responsibility to _____

    Salary      $_____ per _____

    Employee Benefits:

        Social Security (FICA)    $_____

        Retirement (TIAA-CREF)    _____

        Hosp. Ins. (B.C.-B.S.-M.M.)    _____

        Workers' Compensation    _____

        Total Disability Ins. (TIAA)    _____

        Life Insurance (TIAA)    _____     _____

    Total Compensation      $_____

(2) The policies and practices listed in the Faculty Manual are agreed upon by the parties hereto.
(3) Benefits other than Social Security must be applied for by the faculty member at the Office of Personnel Services. Failure to apply indicates waiver of the benefit.
(4) This signed Agreement must be returned to the President's office by the date specified.
(5) U.S. Government form W-4 must be on file in the Office of Personnel Services.

IN WITNESS WHEREOF, the said parties have hereunto agreed to the above terms and have set their hands at Marywood College, in said State, as follows:

_____    (Signed) _____
      Date Accepted                             First Party

_____    (Signed) _____
      Date Executed                             President

(2/86)

EXHIBIT
B



# Marywood

## U N I V E R S I T Y

# FACULTY HANDBOOK

## July 1, 2010

**Reap College of Education and Human Development**
**Insalaco College of Creative and Performing Arts**
**College of Health and Human Services**
**College of Liberal Arts and Sciences**
**School of Architecture**

Address comments or questions
to

Secretary of the University
Marywood University
Scranton, PA   18509-1598

# FACULTY  HANDBOOK

**This handbook is effective with
the 2010-2011 faculty letters of agreement.**

**Marywood  University**
**Scranton,  Pennsylvania**
**18509**

# INTRODUCTION

The faculty of Marywood University are dedicated professionals who have an important role in providing intellectual leadership.  They are committed to the service of the University, their disciplines, and others.  While the teaching role of the faculty is primary, they devote time and energy to a variety of activities.  They serve on committees and contribute their talent to strategic planning, research, grant writing, and recruitment.

It would be impossible to capture in detail in one handbook all of the many issues that affect faculty.  The *Faculty Handbook* is intended to be one of several sources of general guidance.  It brings together brief descriptions of the privileges and obligations that are most central to membership on the faculty of Marywood University and selected other information of special interest.

Nothing contained in the *Faculty Handbook* negates the right of the University to augment, repeal, or revise its policies at any time.  Policy changes require the approval of the President of the University and, when required, the Board of Trustees.  Changes are disseminated by the Secretary of the University.  They are effective with formal approval and placement in the *Marywood University Policies and Procedures Manual*.

The *Faculty Handbook* is maintained by the Secretary of the University, who is responsible for updating and editing it.  This assumes the authority to make non-substantive changes that improve the precision of its language, and substantive changes that are necessary to conform to applicable laws.  To the extent that modification and revision of Chapter Two constitute other substantive changes, the Faculty Senate will be consulted in the interest of collegiality.

EXHIBIT

C



# Marywood
U N I V E R S I T Y

Tenured Faculty
Letter of Agreement
2011-2012 Academic Year

May 10, 2011

Dr. Frederick F. Fagal, Jr.
17 East Lake Street
Skaneateles, NY 13152

Dear Dr. Fagal, Jr.,

This Letter of Agreement is offered to you for the 2011-2012 Academic Year.  In accord with the agreed upon Salary Plan, your salary reflects a 2.5% annual increase of $▇▇▇▇.

Other terms of this agreement are as follows:

| | |
|---|---|
| Term: | 8/22/2011 to 5/18/2012 |
| Type of Appointment: | Full-Time (9 months) Tenure |
| Rank: | Associate Professor |
| College: | Liberal Arts & Sciences |
| Department: | Social Science |
| Responsible to: | Department Chairperson |
| Salary: | $▇▇▇▇ |

Faculty members must apply for benefits other than Social Security and Worker's Compensation through the Human Resources Department.  Full-time faculty benefits include health, dental, long-term disability, group life, and accidental death and dismemberment under the Flexible Benefits Plan.  Elections are made by June 1 of each year for the subsequent fiscal year beginning July 1.  Retirement contributions by the University vary based on the contribution level selected by the faculty member.  The appropriate government forms, including Form W-4 and I-9, must be completed and on file in the Human Resources Department.

This agreement is valid for one month from the date of this letter.  The original copy of this Letter of Agreement must be signed and returned to my office by June 10, 2011.  If you do not return the original signed copy by June 10, it will be assumed that you are not returning to Marywood.  On behalf of the Board of Trustees and myself, I express our gratitude for your dedicated service and commitment to Marywood University.  May God continue to bless you.

Sincerely,

*Sister Anne Munley IHM*

Anne Munley, IHM, Ph.D.
President

Agreed this 25 day of May, 2011

Signature *Frederick F. Fagal*


EXHIBIT
D



# Contractual Agreements with Faculty Members



## Policy Statement

### Full -Time Faculty

The *Letter of Agreement* is the official contract issued to a faculty member at the time of appointment or reappointment.  It is a statement of conditions and obligations mutually agreed to by the faculty member and Marywood University. It serves as a binding contract covering a specific period of time and as a vehicle to renew, adjust and/or alter the terms of the original contract regarding appointment, rank, tenure, salary, benefits, etc.

Faculty contracts are normally for a period of nine months or twelve months.

Ordinarily, the academic year will begin no earlier than two weeks before Labor Day and will end no later than nine months from that date.

A copy of the *Letter of Agreement* is retained by the faculty member.  Copies are also on file in the Office of Human Resources.

In general, any faculty member, who intends to be a long-term stakeholder in the University and who has the appropriate terminal academic degree, should have either a tenure appointment or an appointment probationary for tenure.

### *Categories of Full-Time Appointment*

Regular membership in a Faculty includes appointments with continuous tenure, appointments probationary for tenure, and contract appointments without tenure.

Membership in the Faculty of a School or Department is held by persons with valid appointments to one of the four generally recognized Faculty ranks, namely, Professor, Associate Professor, Assistant Professor, or Instructor.

The University, however, also requires the services of professionally competent individuals to meet teaching and service responsibilities in selected areas or positions in which assignments do not necessarily include research or creative work. To meet these responsibilities effectively and to be competitive in attracting and retaining needed professional personnel, the University has established and recognizes a third kind of Regular Faculty appointment: Regular Contracts Appointments without Tenure.

### Contract Appointments with Tenure

The probationary period shall not exceed seven years of full-time teaching at Marywood, with application for tenure being made in the sixth year. Faculty members on leave during the probationary period must follow the policy on Leaves of Absence. Prior service at Marywood University or at another regionally accredited, four-year college or university may be credited toward the fulfillment of the probationary period as indicated in the original *Letter of Agreement.*

Tenure is a term designating guaranteed continuous appointment to full-time faculty members until retirement. It implies a mutual commitment on the part of the faculty member and the University and cannot be taken lightly. The commitment of a faculty member who requests tenure is as deep and binding on the faculty member as it is on the University.  Just as the conferring of tenure by the University recognizes the competence of an individual faculty member, submission to the University of an application for tenure suggests a strong acceptance by that individual of the goals and objectives of the University.  The request represents commitment to work jointly with faculty, students, administrators, and members of the staff for the growth and welfare of the University.  It is a commitment to devote one's energies to continued personal development and continued high levels of achievement as a member of the Marywood academic community.  It is a definite assertion of career goals; it is expected that faculty will not lightly withdraw from this relationship.

Once tenure is granted, it will be discontinued only for grave reason, which may include moral turpitude, flagrant abuse of academic freedom, or lack of professional competency as demonstrated in instruction and/or research.  In addition, the University may be required to discontinue tenure because of severe financial exigencies of the University or reorganization of the department and/or curriculum resulting in lack of need as described in *Retrenchment of Faculty*.

A faculty member with an appointment probationary for tenure may apply for a Clinical or Per Annum appointment, if a vacancy exists, under normal procedures for recruitment and appointment.  However, a faculty member in probationary status is not eligible to apply for such a change of status if that faculty member has been reviewed for tenure with the result that tenure was not recommended.

### Contract Appointments without Tenure

Two types of full-time contract appointments without tenure are available: Clinical Faculty Appointments and Per Annum Faculty Appointments.

### Clinical Faculty

On the recommendation of the cognizant chairperson, or person acting in the capacity of a chair, with the approval of the Vice-President for Academic Affairs and based on a written description of the teaching and related duties, a Faculty position involving full-time teaching in a clinical or professional skills program may be designated as a non-tenure track clinical position.  Titles associated with clinical positions shall be appropriately distinguishing, such as "Clinical Assistant Professors" as determined by the Vice-President for Academic Affairs.

The initial appointment may be for one or two years and may be renewed for successive terms under the same procedures as those applying to faculty members with appointments probationary for tenure.  After six years of continuous service, subsequent reappointments may be for periods of up to five years but without tenure.

### Per Annum Faculty

With the approval of the Vice-President for Academic Affairs and based upon a written description of the teaching and related duties, a faculty position involving full-time teaching for a period of one year may also be designated as a non-tenured position (Per Annum).

Normally a Per Annum appointment may be renewed on an annual basis for up to an additional five years, followed by a terminal contract for the seventh year of employment. If an exception is made, it will be done by

the Vice-President for Academic Affairs in consultation with the appropriate dean and director or chairperson. Notification of non-renewal shall follow the notice requirements of the Non-Reappointment of Full-Time Faculty Member policy.

Clinical or Per Annum appointments may be made at the level of Instructor, Assistant Professor, Associate Professor or Professor.  A Faculty Member with a Clinical or Per Annum appointment is accorded parity of compensation, benefits and perquisites, and governance and voting rights, as with other Faculty members of comparable rank.

A Faculty member with a Clinical or Per Annum appointment may apply for an appointment probationary for tenure, if a vacancy exists, under normal procedures for recruitment and appointment. In such a case, time served in the Clinical or Per Annum position beyond the first year counts toward the maximum allowable period of probationary service. If time served in the Clinical or Per Annum position exceeds the maximum allowable period of probationary service, the Faculty member shall be considered to have completed five years of probationary service and shall be reviewed for tenure upon application for the change of status. In either case, in the event the outcome of the review is negative, the terms of the current Clinical or Per Annum appointment shall be honored but the Faculty member shall not be eligible for subsequent reappointment to the Clinical or Per Annum position.

## Pro - Rata Faculty

Pro-rata ranked faculty serve on nine-month or twelve-month contracts. Their contracts are processed and issued as are those of full-time faculty.

The initial appointment of pro-rata faculty determines their rank; their *Letters of Agreement* are awarded for one year at a time with no implied obligation of continuous appointment.

## Part -Time Faculty

Part-time faculty are those faculty members who ordinarily teach from one to six credit hours per semester and are not usually otherwise employed in the affairs of the University. They receive a formal appointment on a semester basis, provided enrollment justifies it at registration time.  Part- time faculty members are not eligible for tenure.

## Letters of Agreement

*Letters of Agreement* for continuing faculty members are issued on or before May 10. *Letters of Agreement* are distributed from the office of the President of the University.

## Appointment Procedures

Members of the faculty are appointed by the President of the University. Prospective faculty members are interviewed and recommended by the chairperson and faculty of the department in which a vacancy exists to the Dean and Vice-President for Academic Affairs.

The formal offer of employment made by the Vice President for Academic Affairs to a prospective faculty member contains the conditions of continued employment and promotion as described during the interview process and as outlined in the *Faculty Handbook.*

Offers to part-time faculty are made by department chairpersons or those acting in the capacity of a chair, and concluded by an agreement approved by the appropriate academic dean. A part-time faculty member receives a formal appointment on a semester basis, provided enrollment justifies it at registration time. A part- time faculty member is not eligible for tenure.

## Related Policies

- Promotion of Faculty Members
- Faculty Status

## History

07/01/89 - Reaffirmed with publication of Faculty Manual

02/24/99 - Revised, as recommended to the President by the Policy Committee of the University, to include possibility of opening the fall semester in August.

10/04/02 - Revised to change the reference to the opening date of the academic year, as recommended to the President of the University by the Policy Committee of the University.

03/28/08 - Revised to provide for permanent non-tenured faculty, as recommended to the President of the University by the Policy Committee of the University.

2/18/11 - Revision approved by the President of the University as recommended by the Policy Committee of the University.

 

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu





# Progressive Discipline



## Policy Statement

Marywood University endorses a progressive discipline policy designed to promote resolution in a fair and orderly manner.  This policy applies to faculty members with tenure or whose terms of appointment have not yet expired. Its objectives support the collegial relationships at Marywood University and are directed toward continual institutional improvement.  Because the University regards disciplinary action as corrective and not punitive, the policy recognizes personal and professional problems that may be rectified by an informal educational process, as well as serious violations of professional responsibilities implicating possible recommendation for suspension or dismissal.

The policy is intended to provide an effective and flexible means of identifying problem areas, resolving complaints, and preventing repetitive incidents by prompt intervention and assistance.  It is designed to accomplish these ends by a series of gradual steps involving strategies such as personal conferences, oral and written warnings, and opportunities for monitored assistance where applicable.

## Procedures

***Commencement.***  Disciplinary action may be initiated by a complaint, oral or written, which alleges violation of institutional policy, practice, procedure or other functions and responsibilities of the faculty member in pursuing his or her customary teaching and institutional role.  The complaint, which may reflect an incident or incidents of misconduct or deficiency, may be communicated to the faculty member's immediate supervisor or to the appropriate dean.

***Meeting with Administrator.***  The administrator receiving the complaint shall discuss the matter with the faculty member in a confidential conference.   If additional information from the faculty member provides a satisfactory explanation, the decision may be to close the matter then.  If, however, additional light is not shed on the allegation or an explanation is not satisfactory, the administrator will specify corrective action to be taken, and the discussion will constitute an oral warning.

***Written Warning.***  If the alleged problem continues or additional complaints are received, the immediate supervisor or dean must notify the Vice President for Academic Affairs, who shall conduct a preliminary investigation concerning the merits of the complaint.   A written warning to the faculty member may follow where circumstances indicate that the problem is not resolved.  The written warning will become a part of the faculty member's personnel file, but will be expunged after three years if no other written warnings have occurred.

***Suspension***.  The faculty member may be suspended by the Vice President for Academic Affairs at any time during the proceedings involving him or her.  Suspension is justified if immediate harm to the faculty member or others is threatened by the person's continuance in the faculty position.  Unless in direct violation of the law, any

such suspension should be with pay.

***Special Assistance.***  In those circumstances where it is evident that the faculty member is in need of special professional assistance, the Vice President for Academic Affairs may require in writing  any of the following remedial actions:

- counseling and/or another type of treatment program, such as Alcoholics Anonymous or Narcotics Anonymous;
- psychological counseling and/or treatment, including out-patient treatment prescribed by a duly credentialed and qualified professional;
- peer faculty monitoring to assist in resolving work-related performance problems;
- a specified number of periodic conferences with the faculty member's Dean to assist in resolving administrative or institutional problems.

Special professional assistance will be for a specific period of time.  Where the assistance necessitates in-patient treatment or time away from teaching, that temporary time-off shall be with pay.  During the period of assistance, the faculty member shall communicate weekly or at other intervals specified by the Vice President for Academic Affairs, who shall monitor the faculty member's progress to determine when and if the special assistance has achieved its objective.  Part of this monitoring function may involve the faculty member providing summary statements from treatment providers regarding compliance and prognosis. If the faculty member has refused to participate, or the remedial objective has not been reached during the specified period of time, a recommendation to terminate employment may be made to the President of the University.

## Dismissal

If remedial actions(s) taken during the suspension does not sufficiently resolve the issues that lead to the suspension, the university may move towards dismissal of the faculty member.

## Ad Hoc Faculty Committee

Faculty members have the right to convene an ad hoc committee in order to appeal either a decision to suspend the faculty member or a decision to dismiss the faculty member.

- Having received a written recommendation for either suspension or dismissal from the Vice President for Academic Affairs, the President of the University sends a written communication to the faculty member, stating with reasonable particularity the basis for suspension or dismissal and offering, if requested by the faculty member within 10 days, to convene a tenured faculty ad hoc committee to consider the matter, to render confidential advice, and thereby to effect a remedy if possible.
- Should the faculty member request a review by an ad hoc committee, it shall consist of three members selected in the following order:  (a) one tenured faculty member selected by the person seeking assistance, and (2) two tenured faculty members selected by the Executive Council of the Faculty Senate.  The choice of members should be on the basis of their objectivity and competence and of the regard in which they are held in the academic community.  The President of the University or his/her delegate has the option of attending the meetings of the Committee.  Should a faculty member request that such a committee be convened twice (i.e., once for suspension and once for dismissal), the membership of the committee may be similar or different, a determination which is made by the President of the University in consultation with the faculty member and the Vice President for Academic Affairs.  Normally the committee would make its

recommendation within 30 days of being convened.

- The Committee elects its own Chair, who sends the opinion of the committee in writing to the President of the University, copied to the faculty member and to the Vice President for Academic Affairs.  If the opinion of the Faculty Committee is that the matter is successfully resolved or that there is no merit to the complaint, a recommendation shall be made to discontinue proceedings.  If the problem has not been corrected and reason still exists to question the fitness of the faculty member, the recommendation shall be to either continue a suspension or initiate a formal action toward dismissal.

*Publicity.*  Public statements by the faculty member or others about possible or actual termination of employment should be avoided.

## Related Policies

- Teaching Responsibility
- Librarianship Responsibility
- Tenure
- Faculty Status
- Academic Workload

## History

07/01/89 - Reaffirmed with publication of Faculty Manual
12/12/97 - Addition of informal process approved by the President of the University as recommended by the Policy Committee of the University
07/01/03 - Editorial changes made to reflect academic restructuring

10/12/11 - Revision approved by the President of the University as recommended by the Policy Committee of the University

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu



**4.2          CIVIL RIGHTS COMPLAINT PROCEDURES**
(Revision approved by the President of the University 4/03/00, 7/21/03, 6/24/09)

The following process must be followed any time a member of the Marywood University community believes s/he has been the victim of or witness to discrimination, harassment, or assault by any member of the University community on University property or any property controlled by the University. Any individual who believes s/he has been subject to discrimination on the basis of disability should file a grievance consistent with Marywood's *Disability Grievance Procedures.* Confidentiality is expected of all persons involved in the process.

In furtherance of Marywood University's commitment to its duties and obligations, regular training on harassment, discrimination and related topics is provided for managers and supervisors in the Marywood community.

**Internal Process**

1.   As soon as possible, but not later than 30 working days, except in unusual circumstances, after the alleged incident(s) occurs, the complainant must present the complaint to the appropriate University administrator as listed below:

> Claims Against Faculty Members or Librarians
> Contact: Academic Dean or Director of Library and/or Provost and Vice President for Academic Affairs
>
> Claims Against Administrators, Professional Staff, or Support Staff Members
> Contact: Immediate supervisor and/or a vice president
>
> Claims Against Students
> Contact: Dean of Students and/or Vice President for Student Life.

In all cases, individuals may contact the Assistant Vice President for Human Resources and Affirmative Action Officer if they feel they cannot contact the appropriate individual as noted.

In cases that involve two or more categories of Marywood community members, the University administrator first contacted will consult with the President of the University to determine the appropriate course of action.

2.   The initial discussion between the complainant and the University administrator will be kept confidential to every extent possible. The University administrator must contact the Assistant Vice President for Human Resources and Affirmative Action Officer in cases involving employees.

3.   If the complainant, after an initial meeting with the University administrator, decides to proceed, the complainant submits within 10 working days a formal complaint, preferably in writing, to the appropriate University administrator. The complaint must include detailed factual information concerning the incident(s), and should include what the victim feels will correct the situation.

In certain serious cases the University administrator may proceed even without a formal complaint.

Cases involving alleged discrimination, harassment, and sexual assault are particularly sensitive and demand special attention to issues of confidentiality. Dissemination of information relating to the case is to be limited, so as to insure, as fully as possible, the privacy of the individuals involved.

4. The University administrator must inform both parties of the need for confidentiality. Any individual who retaliates against the complainant will be subject to discipline up to and including discharge from employment and/or termination of student status.

5. Within 5 working days after receipt of a formal complaint, the University administrator must initiate the appropriate steps to effect an informal resolution of the complaint that will be acceptable to both the complainant and the alleged offender.

6. Within 10 working days after the initiation of the steps to effect an informal resolution, the University administrator must provide a written summary of the complaint and the proceedings to date to both the complainant and the alleged offender. Appropriate remedial action will be determined by the University administrator after consultation with executive officer(s) and/or legal counsel if deemed necessary. Action will be taken to eliminate the discriminatory or harassing conduct, including but not limited to warning, suspension, transfer, community service, discipline, discharge, or dismissal of the offender or anyone making a knowingly false complaint. The remedial action may also include offering assistance/training to the victim and/or the offender. The parties will be formally notified of the final decision, including punishment or sanctions, if any.

7. Either party, if not satisfied with the informal resolution proposed by the University administrator, will have 10 working days to file an appeal. Appeals must be in writing and submitted to the President of the University. Within 5 working days, the President will direct the appeal to the appropriate University body, described below. The appeals committee will have 30 working days to review and make a recommendation to the President of the University. The President of the University will provide a written response to the appellant within 10 working days of the receipt of the appeals committee's recommendation. The decision of the President of the University is final and binding internally.

> Claims against Faculty Members including Librarians, Administrators, Professional Staff, and Support Staff
>> The President of the University will appoint and convene a committee of 5 employees comprised of professional staff, administrators and/or faculty who are independent of the claim.
>>
>> Note: Claims by faculty members against faculty members may choose to contact the Faculty Grievance and Appeals Committee in lieu of this process.
>
> Claims against Students
>> The President of the University will refer the appeal to the Vice President for Student Life within 5 working days. The Vice President for Student Life will convene an Appeal Board within 3 working days of the President's notification. The Appeal Board will have 30 working days to review and make a recommendation to the Vice President for Student Life. The Vice President will notify the President of the recommendation within 3 working days. The President of the University will provide a written response to the appellant within 10 working days of the receipt of the appeals committee's recommendation. The decision of the President of the University is final and binding internally.

**External Process**

Victims may choose to file a report with the proper law enforcement authorities. Marywood University has personnel on staff who can explain criminal complaint procedures and assist victims in beginning the process. Police investigation and legal prosecution are conducted outside of and in addition to University procedures.

**Resources**

A list of Marywood University and community resources is available at the Human Resources Office and the Student Life Offices.

Students are encouraged to use the services of the Counseling and Student Development Center, the Student Health Services Office, and the Students with Disabilities Services Office.

**4.3      DISABILITY GRIEVANCE PROCEDURES**
(Approved by the President of the University 6/24/09)

**Students are strongly encouraged to contact the Office of Student Support Services
at the first sign of any difficulties obtaining
their approved academic accommodations from faculty,
or if they encounter difficulties related to their disabilities
from any Marywood University staff, administrators, or students.**

It is the policy of Marywood University not to discriminate on the basis of disability.  The University has adopted an internal grievance procedure providing for prompt and equitable resolution of grievances by either students or employees alleging any action prohibited by Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794) or the relevant U.S. Department of Health and Human Services regulations implementing the Act (34 C.F.R. Part 104) (together, "Section 504").  Section 504 prohibits discrimination on the basis of disability in any program or activity receiving Federal financial assistance. The Law and Regulations may be examined in the office of the Section 504 Coordinator, Dr. Patricia E. Dunleavy, Assistant Vice President for Human Resources and Affirmative Action Officer, who has been designated to coordinate the efforts of the University to comply with Section 504.

Any person who believes she or he has been subjected to discrimination on the basis of disability may file a grievance under this procedure. It is against the law for the University to retaliate against anyone who files a grievance or cooperates in the investigation of a grievance.  The University will make every effort to protect the grievant from retaliatory action.  Any individual who retaliates against the grievant will be subject to discipline up to and including discharge from employment and/or termination of student status.

**Procedures**

All alleged incidents involving disability discrimination are to be dealt with immediately.  When a Marywood University employee or student believes s/he has been the victim of disability discrimination or witnessed disability discrimination, the following procedures should be used:

1.    Grievances must be submitted to the Section 504 Coordinator, or her designee, within 30 calendar days of the date the person filing the grievance becomes aware of the alleged discriminatory action.  (Special circumstances warranting later filings will be considered on a case-by-case basis.)  A grievant may contact the Vice President for Enrollment Management if he or she feels he or she cannot contact the Section 504 Coordinator, who will designate an appropriate person to fulfill the Section 504 Coordinator's responsibilities under this policy.

2.    A grievance must be in writing and must contain the name, address and other contact information of the grievant, describe the problem or alleged action alleged to be discriminatory in sufficient detail to inform the Section 504 Coordinator of the nature and date of the alleged violation and permit an adequate investigation to be conducted, include the names of University employees or students involved and state the remedy or relief sought.

**Marywood**
U N I V E R S I T Y

# Faculty Grievances and Appeals



## Policy Statement

As an institution of higher education, Marywood University brings together a faculty, administration, and governing board united in a common bond of academic purpose. Essential to the fulfillment of this purpose is a mutual recognition of institutional integrity and individual human rights, along with an understanding of the respective roles of the several entities which constitute this educational organization.

Circumstances may arise at times, however, wherein a grievant--full-time, part-time, or pro-rata--may question decisions which affect his/her professional role in the institution. To assist in the resolution of these matters, a series of guidelines for grievances is herein set forth.

### Definitions

Grievance: A grievance refers to any disagreement between two parties. A grievance identifies a complaint one party has against another party for some alleged wrongful action on the part of the second party.

Grievant: A Grievant initiates a grievance.

### Types of Issues That Can Be Grieved

It is understood that procedural rather than substantive factors provide appropriate areas of review, and the Faculty Grievance Committee will not attempt to substitute its judgment for that of the decision-maker(s) involved in the case.

Thus, the Faculty Grievance Committee will hear grievances   concerning:

 1) Allegations of violation of academic freedom resulting in: denial of tenure, promotion, or sabbatical leave; non-reappointment.

 2) Allegations of impermissible discrimination. Tenured and non-tenured faculty are protected against illegal or unconstitutional discrimination, or on any basis not relevant to job performance, and includes, but is not limited to, race, sex, religion, national origin, age, disability, marital status, or sexual orientation

 3) Allegations of inadequate consideration resulting in: denial of tenure, promotion, or sabbatical leave; non-reappointment; or termination of employment due to retrenchment.

 4) Allegations of violations of procedures used in rendering decisions in numbers 1 and 2 above as set forth in Chapter 2 of the *Faculty Handbook*.

Procedures regarding dismissal, suspension, and sanctions of faculty members are in the *Progressive Discipline*

policy.

Should a grievant allege cause for grievance in any matter not identified in the above guidelines, the grievant may consult the Faculty Grievance Committee. In such circumstances, the Committee's first decision is whether the complaint is appropriate and sufficiently serious to merit consideration.

**Persons Against Whom Grievances May be Directed**

Fundamentally, a grievance may arise from an allegation of improper implementation of a procedure or process leading to a decision. The person(s) or body who perform(s) that procedure or process is (are) the subject(s) of the grievance. Thus, a grievant may direct a grievance against the person(s) or body responsible for the decision identified herein.

The decisions or actions of the Faculty Grievance Committee or Ad Hoc Hearing Committee may not themselves be grieved.

# Procedures

## Informal Procedure

  1) A member of the faculty must initially discuss a complaint with the person or body responsible for the action to which the grievant takes exception in order to determine if a resolution is possible.

  2) A complaint must be presented within (10) calendar days of the occurrence or discovery of the alleged violation.

  3) No grievance may be filed without the initiation of this informal complaint procedure.

  4) If the grievance still exists after step one the grievant initiates a consultation with the Vice President for Academic Affairs in order to try to resolve the matter.

## Formal Procedure for Filing a Grievance

  1) The Faculty Grievance Committee is convened.

## Faculty Grievance Committee

The Faculty Grievance Committee consisting of three tenured faculty members and two alternates (also tenured) is specifically charged with responsibility for resolving matters of grievance and appeal. The Faculty Senate conducts the election of this committee. Faculty currently serving on the Rank and Tenure Committee or the Faculty Development Committee are not eligible for election to this committee.

The term of each member extends for three years, with one person replaced each year. An alternate will be identified at each election. Any member of the Grievance Committee who has had any prior involvement in a case under consideration must recuse him/herself. The Grievance Committee shall annually elect a chair-elect who will succeed the Chair.

## Grievance Process

The grievant may consult the President of Faculty Senate for assistance in contacting the Faculty Grievance Committee Chair. The Chair should be provided with a written statement setting forth, in detail, the nature of the grievance or appeal and identifying the person(s) or body against whom the grievance or appeal is directed; this document may also include a proposal for resolving the issue. A grievance must be filed within thirty (30) calendar days of the occurrence or discovery of the alleged violation but not fewer than five (5) calendar days after the initiation of the informal complaint.

In considering the grievance or appeal, the Faculty Grievance Committee will take the following steps:

1) The Committee notifies the decision maker(s) that a grievance has been filed.

2) The Grievance Committee requests from the grievant written information regarding the issues. The Grievance Committee also requests from the decision maker(s) written statements describing the basis for the decision being appealed or grieved, as well as any attempts to settle the matter informally. This information shall be held in confidence by the Grievance Committee. At this point in the process, the information gathered is solely for review by the Committee and is not to be shared with either party involved.

3) At any point, the Grievance Committee may request additional information in writing from the grievant and from the decision-maker(s).

4) If after completing the above steps, the Committee determines that the grievance is improper or unsubstantial, or that sufficient time had not yet been allowed for its normal resolution, or that there is no evidence of improper action on the part of the decision maker(s) which would constitute a legitimate grievance, the Committee will communicate this determination to the grievant and the decision maker(s).

5) If the Grievance Committee determines that there was inadequate consideration or violation of procedures (see No. 3 and 4 under Types of Issues Which Can Be Grieved above), the Committee will return the case to the decision maker for reconsideration.

6) If the grievance is deemed appropriate for mediation, the Chair will appoint a Mediator from the University. The Mediator does not represent either party. Any party may object to the Mediator on the grounds of actual or apparent bias or conflict of interest and submit such objections to the Chair in writing. The Chair will review the objections and may replace the mediator.

7) The Offices of the Vice President for Academic Affairs or Human Resources may be consulted by the Mediator on mediation procedure or other matters involved in the grievance.

8) The Mediator shall try to resolve the grievance within thirty (30) calendar days of formal submission to the chair. With the consent of both parties, the period of mediation may be extended for a short period of time. If the grievance is not resolved within the thirty (30) calendar days, the mediator will advise the chair of the committee in writing that that the issue has not been resolved. If a mutually accepted agreement is reached, this will be communicated to the chair of the committee.

9) Grievances not appropriate for mediation or grievances not resolved through mediation shall be referred to the Ad Hoc Hearing Committee. All evidence collected will be passed on to the Ad Hoc Hearing Committee.

10) If the Faculty Grievance Committee recommends a formal hearing, in cases of violation of academic freedom or impermissible discrimination, an Ad Hoc Hearing Committee will be created to conduct a formal

investigation and to arrive at a recommendation for resolving the issue.

11) The Grievance Committee will make a summary report of its activities at the end of each academic year to the Faculty Senate. No details relevant to the privacy of the participants in any cases will be included in this report.

## Ad Hoc Hearing Committee

The Ad Hoc Hearing Committee shall consist of three members, selected by the Faculty Senate Executive Council, from a standing committee of fifteen tenured Faculty Members elected for one-year terms by the faculty at large. The Faculty Senate conducts the election of this committee.

Each party shall have two challenges without stated cause regarding membership of the Ad Hoc Hearing Committee. No member of the Ad Hoc Hearing Committee shall have had any prior involvement in the case.

If the three-person Ad Hoc Hearing Committee cannot be chosen from the fifteen members of the standing committee, the Executive Council of the Faculty Senate is empowered to conduct a special election to obtain fifteen additional members with terms of one year.

The Ad Hoc Hearing Committee must select a chairperson.

## Ad Hoc Hearing Procedures

1) The Ad Hoc Hearing Committee is empowered to gather information and documents specific to the case of the Grievant, conduct interviews, hold a hearing and take actions as are necessary to investigate the grievance to the extent that the law and University policy permit. The Ad Hoc Hearing Committee will provide recommendations in writing forty (40) calendar days from the date of its official appointment.

2) All Hearings are closed to anyone other than the parties and their advisors, members of the Ad Hoc Hearing Committee, and any witnesses invited to testify by the Committee. The hearing may be audio or video recorded and a written record will be maintained. The hearing is not a legal proceeding. At the beginning of the hearing, all procedures will be made known to the parties, and all information will be kept confidential.

3) Each party to the grievance may have one advisor during the hearing. The advisor may not participate in the hearing.

4) Strict rules of legal evidence will not be binding upon the Ad Hoc Hearing Committee and evidence of probative value in defining issues may be admitted.

5) The hearing record will be used exclusively as the basis for findings of fact and for arriving at a decision.

6) Upon reaching a decision on the issue and a recommendation for action, the Ad Hoc Hearing Committee will provide a summary written report to the petitioner, the person(s) named in the grievance, and the appropriate administrative officer and the President.

7) After receiving the recommendation of the Ad Hoc Hearing Committee, the appropriate administrative officer will review the recommendation and notify the Ad Hoc Hearing Committee and petitioner whether the recommendation has been accepted. If the recommendation of the Ad Hoc Hearing Committee is not

accepted by the appropriate administrative officer, the administrative officer will review it with the Ad Hoc Hearing Committee.

8) No details relevant to the privacy of the participants in the case will be included in the notice from the Hearing Committee. Public statements and publicity about the case by the participants will be avoided until the proceedings have been completed, including consideration by the President

## Action by the President of the University

Following the recommendation of the Ad Hoc Hearing Committee, should the petitioner desire further consideration of the issue beyond the immediate administrative channels of the University, the President may be requested, within twenty calendar days, to review the case.

This review will be based on the record from the committee hearing and may provide opportunity for argument, oral or written, or both, by the principals. Then the President will then make the final decision.

## Responsibility for Expenses Incurred in Grievance and Appeal

Expenses incurred by the grievant are the responsibility of the individual. These include, but are not limited to, the following:

Cost of an advisor.

Travel expenses for advisor, witnesses, or others engaged by petitioner.

Cost of preparing any documents and copies thereof.

## Withdrawal of a Grievance

The grievance can be withdrawn at any point in the process.

## Non-Retaliation

Grievants will not be adversely affected for exercising their right to file a grievance, regardless of outcome.

Grievants will not be subject to adverse consequences for either initiating a grievance or in presenting evidence on behalf of a grievant. Anyone who violates this mandate can be subject to disciplinary action, up to and including dismissal.

## Related Policies

- Academic Freedom
- Disability Grievance Procedures
- Civil Rights Policy
- Civil Rights Complaint Procedures
- Sabbatical Leave for Faculty Member
- Non-reappointment of Faculty Member

- Promotion of Faculty Members
- Evaluation of Faculty Members
- Retrenchment of Faculty
- Tenure
- Progressive Discipline

---

## History

10/02/92 - Proposal returned to committee of Faculty Senate by College Committee on Policy

11/13/92 - Proposed policy dated 3/13/92, as amended, recommended by College Committee on Policy to the President

04/26/93 - Presidential approval affirmed with publication of the President's Memo

03/20/98 - Revision proposed by Faculty Senate approved by the President of the University as recommended by the Policy Committee of the University

04/29/11 - Revision approved by the President of the University as recommended by the Policy Committee of the University

---

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

---

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu

EXHIBIT
H



MARYWOOD UNIVERSITY
SCRANTON, PA 18509-1598
TEL: (570) 348-6231
FAX: (570) 340-6014
EMAIL: ANNEMUNLEY@MARYWOOD.EDU
*www.marywood.edu*

# Marywood
U N I V E R S I T Y

OFFICE OF THE PRESIDENT

April 3, 2012

Dr. Frederick F. Fagal, Jr.
17 East Lake Street
Skaneateles, NY 13152

Dear Dr. Fagal,

I have received your letter dated March 29, 2012. You chose to file a grievance under the Marywood University Faculty Grievance and Appeals Policy and chose not to convene an ad hoc committee to review my recommendation as I had offered to you on two occasions. The Faculty Grievance Committee reviewed your grievance and found no evidence of improper action on my part which would constitute a legitimate grievance.

Since the grievance process is now complete, I have decided to finalize my recommendation. As a result, your employment with Marywood and your tenure are terminated effective today, April 3, 2012.

Further, to provide you with a review of my decision, I will consider your letter dated March 29, 2012 as your authorization for me to convene two faculty ad hoc committees to appeal my decisions to suspend you and to terminate your employment and tenure. I am doing this despite the fact that on two separate occasions you refused my offer and did not choose to convene an ad hoc committee to review my decision to suspend you and my recommendation to terminate your employment and tenure before I finalized my decision.

According to the terms of the Progressive Discipline Policy, you must now select a tenured faculty member for the ad hoc committee. Please submit the name of your selection to Sr. Gail Cabral, President of the Faculty Senate, as soon as possible.

Sincerely,

*Sister Anne Munley IHM*

Sister Anne Munley, IHM
President

*An education inspired by the Sisters, Servants of the Immaculate Heart of Mary.*

# Exhibit 2

**EXHIBIT 2**

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FREDERICK F. FAGAL, JR., | : |
| | : |
| Plaintiff, | : |
| | : CIVIL ACTION NO. 3:14-cv-2404- |
| v. | : ARC |
| | : |
| MARYWOOD UNIVERSITY, | : |
| | : |
| Defendant. | : |
| | : |

## DEFENDANT'S ANSWER TO PLAINTIFF'S
## AMENDED COMPLAINT AND AFFIRMATIVE AND OTHER DEFENSES

Defendant Marywood University ("Defendant"), by and through its undersigned counsel, hereby responds to the Amended Complaint of Frederick F. Fagal, Jr. ("Plaintiff") as follows:

### PARTIES

1.      Admitted.

2.      Admitted in part, denied in part.  Defendant admits that Plaintiff is a natural person.  Defendant is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 2 and, thus, they are denied.

3.      Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 3 and, thus, they are denied.

4.      Admitted.

5.     Admitted.

6.     Admitted.

## JURISDICTION AND VENUE

7.     The allegations in Paragraph 7 are legal conclusions to which no response is required. To the extent the allegations in Paragraph 7 require a response, they are denied.

8.     The allegations in Paragraph 8 are legal conclusions to which no response is required. To the extent the allegations in Paragraph 8 require a response, they are denied.

9.     The allegations in Paragraph 9 are legal conclusions to which no response is required. To the extent the allegations in Paragraph 9 require a response, they are denied.

## FACTUAL BACKGROUND

10.     Admitted in part, denied in part. Defendant admits only that Plaintiff received a document entitled "Agreement and Appointment for Full-Time Faculty," a partially redacted copy of which is attached to his Amended Complaint. The "Agreement and Appointment for Full-Time Faculty" is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.

11.     Denied.

12.    Admitted.

13.    Admitted.

14.    Admitted in part, denied in part.  Defendant admits only that on July 1, 2010, it issued an edition of its Faculty Handbook.  The Faculty Handbook is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.

15.    Admitted.

16.    Admitted in part, denied in part.  Defendant admits only that it had a "Contractual Agreements with Faculty Members" policy in May 2011.  The policy is a document that speaks for itself and, thus, all characterizations of it are denied.

17.    The allegations in Paragraph 17 are legal conclusions to which no response is required.  To the extent the allegations in Paragraph 17 require a response, they are denied.

18.    Admitted in part, denied in part.  Defendant admits only that in November 2011, Plaintiff scheduled a speaker from the Foundation for Individual Rights in Education ("FIRE") to come to the University in connection with one of Plaintiff's courses. Defendant is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 18, and thus they are denied.

19.     Admitted in part, denied in part.  Defendant admits only that Plaintiff received approval from Defendant to hang posters announcing the speaker from FIRE.  Defendant is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 19 and, thus, they are denied.

20.     Admitted in part, denied in part.  Defendant admits only that it removed some of Plaintiff's posters announcing the FIRE speaker.  The remainder of the allegations in Paragraph 20 are denied.

21.     Denied.

22.     Denied.

23.     Admitted.

24.     Admitted.  By way of further answer, Plaintiff's January 13, 2012 email to Defendant's faculty contained hyperlinks to vulgar and highly offensive YouTube videos depicting Defendant's personnel as Adolph Hitler and other members of the Nazi regime.

25.     Admitted in part, denied in part.  Defendant admits only that on January 23, 2012, one of Defendant's deans visited Plaintiff and advised that President Munley was requesting a meeting with him.  Defendant is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 25, and thus they are denied.

26.     Admitted in part, denied in part.  Defendant admits that on January 23, 2012, President Munley met with Plaintiff regarding whether he posted the YouTube video likening Defendant's faculty to Nazis, and that Plaintiff admitted doing so.  Defendant further admits that Plaintiff was suspended immediately and advised to return his keys and identification to Defendant's Human Resources Department.  The remainder of the allegations in Paragraph 26 are denied.

27.     Admitted.

28.     Admitted in part, denied in part.  Defendant admits only that it has a "Progressive Discipline" policy, a copy of which is attached to Plaintiff's Amended Complaint.  The policy is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.

29.     Denied.

30.     Admitted in part, denied in part.  Defendant admits that Plaintiff was suspended.  Defendant denies that this was a breach of contract and the remainder of the allegations in Paragraph 30.

31.     Denied.

32.     Admitted in part, denied in part.  Defendant admits that on January 24, 2012, President Munley sent Plaintiff a letter recommending Plaintiff be terminated.  Defendant denies the remainder of the allegations in Paragraph 32.

33.     Admitted in part, denied in part.  Defendant admits that President Munley sent a letter to Plaintiff on January 24, 2012.  The letter is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.

34.     Admitted in part, denied in part.  Defendant admits only that a portion of the second charge against Plaintiff was inadvertently omitted in President Munley's January 24, 2012 letter.  The remainder of the allegations in Paragraph 34 are denied.

35.     Admitted in part, denied in part.  Defendant admits only that Plaintiff, through his attorney, requested an amended Statement of Charges and that President Munley sent a letter to Plaintiff on February 8, 2012.  The remaining allegations in Paragraph 35 are denied.

36.     Admitted in part, denied in part.  Defendant admits that President Munley sent a letter to Plaintiff on February 8, 2012.  The letter is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.

37.     Admitted in part, denied in part.  Defendant admits that President Munley sent a letter to Plaintiff on February 8, 2012.  The letter is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.

38. Admitted in part, denied in part. Defendant admits that President Munley sent a letter to Plaintiff on February 8, 2012. The letter is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.

39. Admitted in part, denied in part. Defendant admits that President Munley included a document entitled "Release of Personal Information" in her February 8, 2012 letter to Plaintiff. The release is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.

40. Admitted in part, denied in part. Defendant admits only that it has a "Progressive Discipline" policy, which was in effect at the time of Plaintiff's termination. The policy is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied. The remainder of the allegations in Paragraph 40 are denied.

41. Admitted in part, denied in part. Defendant admits only that Plaintiff's suspension began on January 23, 2012. The remainder of the allegations in Paragraph 41 are denied.

42. Admitted in part, denied in part. Defendant admits only that it has a "Civil Rights Complaint Procedures" policy, which was in effect at the time of Plaintiff's termination. The policy is a document that speaks for itself, and, thus,

all accurate quotations are admitted and all mischaracterizations of it are denied. The remainder of the allegations in Paragraph 42 are denied.

43.    The allegations in Paragraph 43 are legal conclusions to which no response is required.   To the extent the allegations in Paragraph 43 require a response, they are denied.

44.    Admitted in part, denied in part.  Defendant admits only that President Munley sent letters to Plaintiff on January 24, 2012 and February 8, 2012.  These letters are documents that speak for themselves and, thus, all accurate quotations are admitted and all mischaracterizations of them are denied.

45.    Admitted in part, denied in part.  Defendant admits only that President Munley sent letters to Plaintiff on January 24, 2012 and February 8, 2012.  These letters are documents that speak for themselves and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.

46.    Admitted in part, denied in part.  Defendant admits only that President Munley sent letters to Plaintiff on January 24, 2012 and February 8, 2012.  These letters are documents that speak for themselves and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.

47.    Admitted in part, denied in part.  Defendant admits only that it has a "Progressive Discipline" policy, which was in effect at the time of Plaintiff's

termination. The policy is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.

48. Admitted in part, denied in part. Defendant admits only that Plaintiff, through his attorney, communicated with Defendant on February 2, 2012. The communication is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.

49. Admitted in part, denied in part. Defendant admits only that its counsel sent a letter to Plaintiff's counsel on February 9, 2012. The letter is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.

50. Denied.

51. Admitted in part, denied in part. Defendant admits only that on February 22, 2012, Plaintiff filed a grievance against President Munley. The remainder of the allegations in Paragraph 51 are denied.

52. Admitted in part, denied in part. Defendant admits only that Plaintiff filed a grievance against President Munley. The grievance is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.

53. Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 53 and, thus, they are denied.

54.     Admitted in part, denied in part.  Defendant admits only that on April 3, 2012, President Munley sent a letter to Plaintiff.  The letter is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.

55.     Admitted in part, denied in part.  Defendant admits only that on April 3, 2012, President Munley sent a letter to Plaintiff.  The letter is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.  The remaining allegations in Paragraph 55 are denied.

56.     Denied.

57.     Admitted in part, denied in part.  Defendant admits only that it has a "Progressive Discipline" policy, which was in effect at the time of Plaintiff's termination.  The policy is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.   The remaining allegations in Paragraph 57 are denied.

58.     Admitted in part, denied in part.  Defendant admits only that it has a "Faculty Grievances and Appeals" policy, which was in effect at the time of Plaintiff's termination.  The policy is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.  The remaining allegations in Paragraph 58 are denied.

59. Admitted.

60. Admitted in part, denied in part. Defendant admits only that the Faculty Senate Ad Hoc Hearing Committee issued a document titled "Review of Sister Anne Munley's Decision to Terminate the Employment and Tenure of Dr. Frederick Fagal." This review is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.

61. Denied.

62. Admitted in part, denied in part. Defendant admits only that it had a "Progressive Discipline" policy, which was in effect at the time the Faculty Senate Ad Hoc Hearing Committee issued its "Review of Sister Anne Munley's Decision to Terminate the Employment and Tenure of Dr. Frederick Fagal." The policy is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.

63. Denied.

64. Denied.

65. Admitted in part, denied in part. Defendant admits only that on July 13, 2012, President Munley sent Plaintiff a letter. The letter is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.

66. Admitted.

67.     Denied.

## COUNT I
### Breach of Contract

68.     Defendant incorporates by reference its responses to Paragraphs 1-67 as if fully set forth herein.

69.     To the extent the allegations contained in Paragraph 69 are legal conclusions, no response is required.  The remainder of the allegations in Paragraph 69 are denied.

70.     To the extent the allegations contained in Paragraph 70 are legal conclusions, no response is required.  The remainder of the allegations in Paragraph 70 are denied.

71.     To the extent the allegations contained in Paragraph 71 are legal conclusions, no response is required.  The remainder of the allegations in Paragraph 71 are denied.

Defendant denies that Plaintiff is entitled to any relief requested in the WHEREFORE clause of the Amended Complaint.

Defendant denies any allegation not specifically admitted, denied, or referred to on information and belief.

WHEREFORE, Defendant respectfully requests that this Court:

a.  Dismiss the Amended Complaint in its entirety;

b.  Deny each and every demand, claim and prayer for relief contained in the Amended Complaint;

c.  Award to Defendant reimbursement for reasonable attorneys' fees and costs incurred in defending this meritless and vexatious action; and

d.  Grant such other and further relief as the Court may deem just and proper.

## AFFIRMATIVE AND OTHER DEFENSES

### FIRST DEFENSE

The Amended Complaint fails to state any claim upon which relief can be granted.

### SECOND DEFENSE

Plaintiff's claims for damages are barred or reduced by his failure to mitigate his alleged damages by using reasonable diligence to obtain subsequent employment.

### THIRD DEFENSE

Defendant acted reasonably and in good faith at all times.

### FOURTH DEFENSE

Defendant's Faculty Manual, Faculty Handbook, Policies and Procedures Manual, including all policies therein, and the letter agreements referenced in Plaintiff's Amended Complaint, do not constitute binding, enforceable contracts.

### FIFTH DEFENSE

To the extent Defendant and Plaintiff had an enforceable contract related to Plaintiff's employment and/or tenure, Plaintiff materially breached that agreement, Defendant provided notice of such breach, and Defendant was absolved of any obligations thereunder.

**SIXTH DEFENSE**

Each and every action taken by Defendant with respect to Plaintiff was justified by business necessity.

**SEVENTH DEFENSE**

The unclean hands doctrine applies and prohibits Plaintiff from judgment in his favor.

**EIGHTH DEFENSE**

Defendant did not breach any contract with Plaintiff.

**NINTH DEFENSE**

Defendant followed its applicable policies and procedures with respect to suspending and terminating Plaintiff.


Respectfully submitted,

*/s/ - Stephanie Peet*
Stephanie J. Peet (PA ID: 91744)
Katharine Thomas Batista (PA ID: 312366)
**JACKSON LEWIS P.C.**
Three Parkway
1601 Cherry Street, Suite 1350
Philadelphia, PA 19102
T: (267) 319-7802
F: (215) 399-2249
stephanie.peet@jacksonlewis.com
katharine.thomas@jacksonlewis.com

*ATTORNEYS FOR DEFENDANT*

Dated:  June 30, 2015

**CERTIFICATE OF SERVICE**

I, Katharine Thomas Batista, do hereby certify that on the 30th day of June, 2015, I caused a true and correct copy of Defendant's Answer to Plaintiff's Amended Complaint and Affirmative and Other Defenses to be served upon the following individuals by CM/ECF and U.S. First Class Mail:

Jonathan Z. Cohen, Esquire
175 Strafford Avenue
Suite 1 PMB 212
Wayne, PA 19087

**JACKSON LEWIS P.C.**

*/s/ - Katharine Thomas Batista*
Katharine Thomas Batista
Attorney ID #312366
Three Parkway
1601 Cherry Street
Suite 1350
Philadelphia, PA 19102-1317
T: (267) 319-7802
F: (215) 399-2249
katharine.thomas@jacksonlewis.com

*ATTORNEYS FOR DEFENDANT*

4837-9752-4261, v. 2

# Exhibit 3

EXHIBIT
3

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF PENNSYLVANIA

- - -

FREDERICK F. FAGAL,      :   NO.
JR.,                         3:14-cv-02404-ARC
                         :
     Plaintiff,
                         :
  - vs -
                         :
MARYWOOD UNIVERSITY,
                         :
     Defendant.


- - -
June 7, 2016
- - -


       Videotape Deposition of
FREDERICK F. FAGAL, JR., taken pursuant to
notice, was held at JACKSON LEWIS, P.C.,
Three Parkway, 1601 Cherry Street, Suite
1350, Philadelphia, Pennsylvania,
commencing at 9:35 a.m. on the above date,
before Edward J. Ruggeri, Registered
Professional Reporter, Certified Court
Reporter and Notary Public.

- - -

MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com



Page 2

```
 1    A P P E A R A N C E S :
 2
 3
 4    JONATHAN Z. COHEN, LTD
      BY:  JONATHAN Z. COHEN, ESQUIRE
 5        175 Strafford Avenue
          Suite 1 PMB 212
 6        Wayne, PA 19087
          (215) 874-0047
 7            Counsel for the Plaintiff
 8
 9    JACKSON LEWIS, P.C.
      BY:  STEPHANIE J. PEET, ESQUIRE
10        ASIMA J. AHMAD, ESQUIRE
          Three Parkway
11        1601 Cherry Street, Suite 1350
          Philadelphia, PA 19102
12        (267) 319-7802
              Counsel for the Defendant
13
14
15
16    A L S O  P R E S E N T :
17
      Patricia Dunleavy
19    Chelsea Lynch, Videographer
20
21
22
23
24
```

Page 4

```
 1                 E X H I B I T S
 2
 3
 4    NUMBER    DESCRIPTION              PAGE
 5
 6    FAGAL-1   Amended Complaint          26
 7    FAGAL-2   Objections and Answers to  28
 8        Defendant's First Set of
 9        Interrogatories to Plaintiff
10    FAGAL-3   DEF000005                  43
11    FAGAL-4   DEF3456 - 3696             47
12    FAGAL-5   DEF001447 - 1475           98
13    FAGAL-6   DEF000010 - 000012        110
14    FAGAL-7   DEF000159                 117
15    FAGAL-8   DEF002329 - 002331        124
16    FAGAL-9   000200747.00001 - 00003   152
17    FAGAL-10  DEF001480                 157
18    FAGAL-11  000200380.00001 - 00002   162
19    FAGAL-12  000200732.00001 - 00002   169
20    FAGAL-13  000200613.00001,          170
21        000200614.00001 - 00009,
22        000200615.00001 - 00003
23    FAGAL-14  000200328.00001           179
24
```

Page 3

```
 1                 I N D E X
 2
 3
 4    WITNESS:                    PAGE
 5
 6    FREDERICK F. FAGAL, JR.
 7
 8    By:  Ms. Peet         9, 376
 9    By:  Mr. Cohen          368
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 5

```
 1                 E X H I B I T S
 2
 3
 4    NUMBER    DESCRIPTION              PAGE
 5
 6    FAGAL-15  DEF001443 - 001491        184
 7    FAGAL-16  DEF000067 - 000142        213
 8    FAGAL-17  000200324.00001 - 00002   222
 9    FAGAL-18  000200091.00001 - 00004   224
10    FAGAL-19  000000172.00001 - 00018   226
11    FAGAL-20  000200378.00001 - 00005   230
12    FAGAL-21  000200209.00001 - 00004   235
13    FAGAL-22  000200439.00001 - 00004   245
14    FAGAL-23  DEF000143 - 000144        267
15    FAGAL-24  DEF000165 - 000187        273
16    FAGAL-25  DEF000249 - 000257        297
17    FAGAL-26  DEF000206 - 000226        304
18    FAGAL-27  DEF000269                 310
19    FAGAL-28  DEF000234 - 000237        311
20    FAGAL-29  DEF000272 - 000273        312
21    FAGAL-30  DEF000276                 314
22    FAGAL-31  DEF000283 - 000296        317
23    FAGAL-32  DEF000297 - 000298        320
24
```



Page 6

| 1 | E X H I B I T S | | |
| 2 | | | |
| 3 | | | |
| 4 | NUMBER | DESCRIPTION | PAGE |
| 5 | | | |
| 6 | FAGAL-33 | DEF000302 | 321 |
| 7 | FAGAL-34 | DEF001496 | 324 |
| 8 | FAGAL-35 | DEF000306 - 000308 | 326 |
| 9 | FAGAL-36 | DEF001433 - 001442 | 327 |
| 10 | FAGAL-37 | DEF000350 - 000351 | 328 |
| 11 | FAGAL-38 | DEF000412 - 000415 | 331 |
| 12 | FAGAL-39 | DEF000416 - 000417 | 333 |
| 13 | FAGAL-40 | DEF000424 | 338 |
| 14 | FAGAL-41 | 000200541.00001 - 00002 | 349 |
| 15 | FAGAL-42 | 000200288.00001 | 350 |
| 16 | FAGAL-43 | 000000060.00001 | 353 |
| 17 | FAGAL-44 | 000000054.00001, | 354 |
| 18 | | 000000055.00001, | |
| 19 | | 000000061.00001 | |
| 20 | FAGAL-45 | 000200369.00001, | 357 |
| 21 | | 000200370.00001 | |
| 22 | FAGAL-46 | Photographs | 365 |
| 23 | | | |
| 24 | | | |

Page 7

1      DEPOSITION SUPPORT INDEX
2
3
4   Direction To Witness Not To Answer
5   Page  Line
6    361    1
7
8
9   Request For Production Of Documents
10  Page  Line
11  (None)
12
13
14  Stipulations
15  Page  Line
16  (None)
17
18
19  Questions Marked
20  Page  Line
21  (None)
22
23
24

Page 8

1            THE VIDEOGRAPHER:  We are now
2   on the record.  My name is Chelsea
3   Lynch.  I'm a videographer from Magna
4   Legal Services.  This is a video
5   deposition of the United States
6   District Court, Middle District of
7   Pennsylvania.
8        Today's date is June 7, 2016,
9   and the time is 9:35 a.m.  This
10  deposition is being held at 1601
11  Cherry Street, Suite 1350 in
12  Philadelphia, Pennsylvania, in the
13  matter of Frederick Fagal, Jr.,
14  versus Marywood University.  The
15  deponent is Frederick Fagal, Jr.
16       This deposition is being taken
17  on behalf of the defendants, and
18  would all counsel please identify
19  themselves.
20       MR. COHEN:  I'm Jonathan Cohen.
21  I represent Plaintiff, Frederick F.
22  Fagal, Jr.
23       MS. PEET:  Stephanie Peet from
24  Jackson Lewis representing Marywood

Page 9

1   University.
2        THE VIDEOGRAPHER:  The court
3   reporter is Edward Ruggeri who will
4   now swear in the witness.
5            - - -
6        FREDERICK F. FAGAL, JR., after
7   having been duly sworn by Edward J.
8   Ruggeri, a Notary Public within and
9   for the State of Pennsylvania, was
10  examined and testified as follows:
11           - - -
12          EXAMINATION
13           - - -
14  BY MS. PEET:
15      Q.   Good morning, Mr. Fagal.
16      A.   Good morning.
17      Q.   We had met last week at --
18      A.   Yes.
19      Q.   -- Sister Munley's deposition.
20       Again, my name is Stephanie
21  Peet and it's my pleasure to represent
22  Marywood University with reference to the
23  lawsuit that you have filed against it.
24  We are here today to take your deposition.

3 (Pages 6 to 9)



1        Have you ever been deposed
2   before?
3        A.   No.
4        Q.   Okay.
5        Although you were at Sister
6   Munley's deposition and did have the
7   opportunity to see how it went, I'm still
8   going to just discuss with you very
9   briefly the instructions for this
10  deposition so we make sure we're on the
11  same page.
12       Okay?
13       A.   Fine.
14       Q.   As you know, we have a court
15  reporter who is here taking down
16  everything that we say at today's
17  deposition.  For that reason, we're going
18  to ask that you keep your answers verbal.
19  So while I'll understand the nodding of
20  the head or the shrugging of the
21  shoulders, it won't appear on the record.
22  So your answers today do need to be
23  verbal.
24       Do you understand that?

1        A.   Yes, I do.
2        Q.   For that same reason, please
3   allow me to ask my questions in full
4   before you go ahead and start answering
5   the question, and I will grant you the
6   same courtesy.
7        Do you understand that?
8        A.   Yes.
9        Q.   If at any point in time I begin
10  to ask another question and you weren't
11  done answering the one I had already
12  asked, please let me know.  I'm sure it
13  was just inadvertent and I'll allow you to
14  go ahead and finish answering your
15  question.
16       Okay?
17       A.   Okay.
18       Q.   If at any point in time today
19  you don't understand a question -- I like
20  to think I ask good questions but I can't
21  promise you all of my questions today will
22  be good ones.  So if you don't understand
23  the question that I asked, please let me
24  know and I can do my best to rephrase the

1   question.  If you answer the question, I'm
2   going to assume you understood the
3   question I had asked you.
4        Do you understand that?
5        A.   Yes, I do.
6        Q.   Do you understand that you are
7   under oath and all of your testimony needs
8   to be truthful today?
9        A.   Yes.
10       Q.   While we're sitting here in a
11  conference room in our offices, we're
12  certainly not in the court, your testimony
13  does have the same full effect as if we
14  were in a court of law.
15       Do you understand that?
16       A.   I do understand.
17       Q.   Is there any reason today that
18  you wouldn't be able to provide complete
19  and truthful testimony?
20       A.   No.
21       Q.   Are you on any type of
22  medication or suffering from any sort of
23  impairment that would affect your ability
24  to testify truthfully today?

1        A.   No.
2        Q.   Is there anything that would
3   affect your ability to remember events
4   that happened four to five years ago?
5        A.   I'll do the best I can but
6   nothing specific to affect that.
7        Q.   It's my understanding that
8   other than a small claims court matter
9   that you had in the 1970s, you haven't
10  been involved in any other litigation
11  other than the one presently pending
12  against Marywood; is that correct?
13       A.   That's correct.
14       Q.   And the one in the 1970s, that
15  was a small claims matter?
16       A.   Yes, it was.
17       Q.   And you were the plaintiff?
18       A.   It might have been my wife
19  involved also.
20       Q.   Nonetheless, it was you and/or
21  you and your wife were --
22       A.   Correct.
23       Q.   -- the plaintiffs; is that
24  correct?



1    A.   Yes.
2    Q.   What was that matter over?
3    A.   It was about the return of a
4  security deposit from an apartment.  We
5  rented it in Ithaca when I was grad
6  student at Cornell.
7    Q.   Okay.
8         And were you successful in that
9  litigation?
10   A.   No.
11   Q.   What is your date of birth?
12   A.   ████████ 1946.
13   Q.   Where do you currently live?
14   A.   17 East Lake Street in
15  Skaneateles, New York.
16   Q.   How long have you lived at that
17  address?
18   A.   At that address, since November
19  of 1987.
20   Q.   Does your wife live at that
21  address with you?
22   A.   Yes.
23   Q.   I see that you look a little
24  pensive.  Are you --

1    A.   I'm just wondering if it was
2  November of 1988 on the -- when we moved
3  into that house.
4    Q.   Okay.
5         I didn't give you this
6  instruction earlier, but you did the right
7  thing.  If at any point in time you're not
8  sure about something --
9    A.   Right.
10   Q.   -- and unless your attorney
11  says otherwise, no one wants you to guess
12  today.
13   A.   Right.
14   Q.   So if you are going to be
15  approximating, or estimating, or guessing,
16  just let us know that you're doing that.
17        Okay?
18   A.   Right, uh-huh.
19   Q.   One other instruction I did not
20  give you but it is kind of important for
21  you to know.  This is not meant to be
22  torturous.  If at any point in time you do
23  need to have a break, you need to get
24  water, use the restroom, whatever it is,

1  that's perfectly fine.  All I ask is that
2  any question that I've already asked has
3  been answered.
4         Okay?
5    A.   Would you repeat that again?
6  I'm sorry.
7    Q.   Sure.
8         If you need to take a break,
9  that's fine.  Just let us know you want to
10  have a break.
11   A.   Right.
12   Q.   And we're going to have breaks
13  throughout the day, but if you need a
14  break while we're taking the deposition,
15  let us know.  As long as any question that
16  I've asked has been answered and there's
17  no question pending on the table --
18   A.   Yes.
19   Q.   -- we can take a break.
20   A.   I understand.
21   Q.   Okay.
22        Who lives at this home with
23  you?
24   A.   My wife, Janet.

1    Q.   Okay.
2         Anyone else?
3    A.   No.
4    Q.   Okay.
5         Do you have any intentions of
6  moving in the next one to two years?
7    A.   No.
8    Q.   Do you have children?
9    A.   Yes, yes.
10   Q.   How many?
11   A.   One.
12   Q.   And how old is your child?
13   A.   31.
14   Q.   Is your -- son or daughter?
15   A.   Son.
16   Q.   Is your son financially
17  dependent on you?
18   A.   No.
19   Q.   Congratulations.  That must
20  feel great.  I would like to know that one
21  day.
22        What is your -- any e-mail
23  addresses that you currently use, can you
24  state those on the record?



Page 18

1    A.   Yes. fffagal@yahoo.com, that's
2  my main address, and my backup address
3  which I use very seldom is
4  fffagal@gmail.com.
5    Q.   To the best of your abilities,
6  how long have you had the Yahoo e-mail
7  address?
8    A.   Oh, I'll guess 2001, but that's
9  an estimate.
10    Q.   What about the Gmail address?
11    A.   That'd be a little later, maybe
12  2002, 2003, but I'm -- that's -- again,
13  that's an estimate.
14    Q.   Okay.
15        It's my -- and we're going to
16  talk obviously about -- more about this
17  today, but you worked at Marywood and you
18  had a Marywood e-mail address as well; is
19  that correct?
20    A.   There were various addresses,
21  correct.
22    Q.   Okay.
23        Other than the Yahoo, the
24  Gmail, and, when you worked at Marywood,

Page 19

1  the Marywood e-mail address, have you had
2  any other e-mail addresses in the past
3  five years?
4    A.   No.
5    Q.   Do you use a cell phone?
6    A.   Yes.
7    Q.   Okay.
8        And what's your cell phone
9  number?
10    A.   Area code 315-406-8063.
11    Q.   And how long have you had this
12  number approximately?
13    A.   About 15 years.
14    Q.   Have you had any other cell
15  phone numbers other than the one you just
16  identified in the past five years?
17    A.   No.
18    Q.   I assume you graduated college;
19  is that correct?
20    A.   I graduated from college, yes.
21    Q.   And what college did you go to?
22    A.   Union College is Schenectady,
23  New York.
24    Q.   After you graduated college,

Page 20

1  did you attend any other educational
2  institutions?
3    A.   Yes.
4    Q.   And what was that?
5    A.   I went to Cornell University
6  right after graduating from Union.
7    Q.   When did you graduate Union?
8    A.   1968, June.
9    Q.   And what was your degree in?
10    A.   Economics.
11    Q.   You said after you graduated
12  Union, you went to Cornell University; is
13  that correct?
14    A.   Correct.
15    Q.   Did you receive a degree from
16  Cornell University?
17    A.   Yes.
18    Q.   And what was your degree?
19    A.   The degree I received was a
20  master's of arts in economics.
21    Q.   Pardon my ignorance.
22        Is that two separate degrees or
23  is that master's of arts and master's of
24  economics --

Page 21

1    A.   That's --
2    Q.   -- or is that one degree?
3    A.   It's master of arts in
4  economics, so it's one degree.
5    Q.   And when did you receive your
6  master's degree?
7    A.   1971.
8    Q.   Did you continue your education
9  thereafter?
10    A.   Yes, I did.
11    Q.   And what was that?
12    A.   I went to Syracuse University.
13    Q.   Did you receive any degrees
14  from Syracuse?
15    A.   Yes.
16    Q.   And what was that?
17    A.   I received a master of arts in
18  education and I received a Ph.D. in social
19  studies education.
20    Q.   When did you receive the
21  master's of arts in education from
22  Syracuse?
23    A.   That would have been in 1976.
24    Q.   Would that have been the same



1   time you received your Ph.D. in social
2   studies education?
3      A.  No.
4      Q.  When did you receive that?
5      A.  1981.
6      Q.  Other than what we've
7   discussed, have you done any other
8   education --
9      A.  Yes.
10      Q.  -- following college?
11      A.  Yes.
12      Q.  Okay.
13         And what's that?
14      A.  I would audit, sit in on
15   graduate courses at Syracuse.  I also took
16   an electronics course at Cayuga Community
17   College.
18      Q.  Did you receive any degrees
19   with your electronics course?
20      A.  No.
21      Q.  When you said you audited
22   graduate courses at Syracuse, did that
23   come with a degree?
24      A.  No.  I already had a Ph.D.

1      Q.  When you mean you were auditing
2   the graduate courses, what does that mean?
3      A.  I believe I paid -- it was in
4   the 1990s.  I was taking some courses.
5   Unix and the Internet was one course.  I
6   knew an econometrics professor.  I sat in
7   on an econometrics course.  I can't
8   remember exactly whether I paid tuition or
9   a low audit fee or whether the professor
10   just let me sit in.  I can't remember that
11   exactly.
12      Q.  Okay.
13         Other than the degrees that
14   we've already discussed, do you have any
15   other degrees?
16      A.  No.
17      Q.  Okay.
18         As we sit here today, what
19   types of subjects do you feel that you
20   could be a professor for?
21      A.  Teach introductory U.S. history
22   based on my experience at Marywood, and
23   based on my experience at Marywood,
24   introductory economics courses.  At

1   Marywood I did teach for one semester a
2   course in statistics in the math
3   department, an introductory statistics
4   course.  That was an emergency basis fill
5   in.
6      Q.  Do you feel you'd be qualified
7   to teach an introductory to statistics
8   course today?
9      A.  I would need to review.  I
10   couldn't start tomorrow.
11      Q.  Okay.
12         But if you reviewed, do you
13   feel that that's something that you might
14   be able to do?
15      A.  Yes.
16      Q.  So we talked about U.S. --
17   introduction to U.S. history, introduction
18   to economics, introduction to statistics.
19      A.  Yes.
20      Q.  Are there any other subject
21   matters or courses that you believe you're
22   qualified to teach?
23      A.  Marywood had a course called
24   introduction to social science.

1      Q.  Do you feel you are qualified
2   to teach that?
3      A.  Yes.
4      Q.  Okay.
5         Anything else as we sit here?
6      A.  No.
7      Q.  When did you first contact an
8   attorney regarding this matter?
9      A.  Well, I contacted the
10   Foundation for Individual Rights in
11   Education on the day I was suspended, and
12   they do have attorneys working for them
13   but that was not an attorney for me
14   personally.
15      Q.  The group that you just
16   mentioned, is that also known as FIRE?
17      A.  Yes.
18      Q.  For today's deposition, just
19   for ease of communication, can we refer to
20   that group as FIRE?
21      A.  Yes.
22      Q.  I'm not asking for the
23   communications that you had with the
24   attorneys, but did you speak with any



Page 26

1    attorneys at FIRE?
2        A.   I can't recall.
3        Q.   Okay.
4            When was the first time that
5    you remember speaking to an attorney?
6        A.   It was probably Jonathan Cohen
7    within a few days of the suspension.
8        Q.   How did you know of Jonathan
9    Cohen?
10       A.   FIRE gave me his name as a
11   possible contact.
12       Q.   And you believe that would have
13   been within a few days after your
14   suspension of employment?
15       A.   Yes.
16       Q.   Did FIRE give you any other
17   names besides Mr. Cohen?
18       A.   No.
19           - - -
20           (At this time, a document was
21       marked for identification as Exhibit
22       Fagal-1.)
23           - - -
24           THE WITNESS:  Let me just

Page 27

1    think.  I don't think FIRE gave me
2    any other names.  I don't believe I
3    had to make any choices.  I'm sorry.
4    BY MS. PEET:
5        Q.   Is it fair to say that you
6    don't recall speaking with any other
7    attorneys besides Mr. Cohen?
8        A.   That's correct.
9        Q.   Okay.
10           What has been placed before you
11   and marked as Fagal Exhibit-1 purports to
12   be the Amended Complaint that was filed in
13   the United States District Court for the
14   Middle District of Pennsylvania.
15           Do you recognize this?
16       A.   Yes.
17       Q.   And is this the Amended
18   Complaint that was filed on your behalf
19   against Marywood University?
20       A.   Yes.
21       Q.   Have you had an opportunity to
22   review this before it was filed with the
23   court?
24       A.   Yes.

Page 28

1        Q.   Can you confirm that all of the
2    information contained herein to the best
3    of your knowledge is accurate and
4    complete?
5        A.   To the best of my knowledge,
6    accurate and complete, yes.
7            - - -
8            (At this time, a document was
9        marked for identification as Exhibit
10       Fagal-2.)
11           - - -
12   BY MS. PEET:
13       Q.   Mr. Fagal, what has been placed
14   before you is what has been marked as
15   Fagal Exhibit-2.  These purport to be
16   objections and answers to Defendant's
17   first set of interrogatories to Plaintiff.
18           Do you see that?
19       A.   Yes.
20       Q.   Okay.
21           And do you agree that these
22   were served on your behalf in response to
23   interrogatories served upon you by
24   Marywood University?

Page 29

1        A.   Yes.
2        Q.   Did you assist in providing
3    these answers and objections?
4        A.   I did.
5        Q.   To the best of your knowledge,
6    is all of the information contained in --
7    herein accurate and complete?
8        A.   Yes.
9        Q.   If I can draw your attention to
10   what appears to be the third to the last
11   page.  The last two pages for whatever
12   reason are blank, at least on my copy.  It
13   has oath.  Turn to the next page.  My
14   apologies.  No, the other way.  Yes.
15       A.   Yes.
16       Q.   Do you see the page that says
17   oath?
18       A.   I do.
19       Q.   And it says I declare under the
20   penalty of perjury that the foregoing is
21   true and correct.
22           Do you see that?
23       A.   I do.
24       Q.   Is that your signature?



1      A.   Yes, it is.
2      Q.   If you can turn to page 25 of
3  this document, interrogatory number 11.
4          Do you see that?
5      A.   I do.
6      Q.   It asks you to identify other
7  tenured professors who you believe engaged
8  in similar conduct to you in sending out
9  an e-mail to faculty containing links to
10  two satirical videos.
11          Do you see that?
12      A.   Yes.
13      Q.   And your answer is Laurie
14  McMillan, Ph.D.
15          Do you see that?
16      A.   Yes.
17      Q.   What do you believe that
18  Ms. McMillan did that was similar to what
19  you did?
20      A.   Well, I was following
21  controversy on campus last fall via the
22  local newspaper, the Times Tribune and --
23  and The Wood Word, and I know that there
24  was some faculty concern and there was a

1  protest by faculty at -- I believe it was
2  one hundredth anniversary celebration, and
3  I believe Laurie McMillan was protesting
4  and carrying a sign in front of a crowd
5  protesting the president.
6      Q.   Anything else?
7      A.   No.
8      Q.   Okay.
9          Do you know what was -- if
10  there were any words on her sign or
11  pictures?
12      A.   Pardon me.
13      Q.   Do you know if there were any
14  words or pictures on the sign that you
15  believe she was carrying?
16      A.   There were words.
17      Q.   Okay.
18          What were those words?
19      A.   I can't recall.
20      Q.   Do you have any firsthand
21  knowledge?  Were you there?
22      A.   No.
23      Q.   So is it fair to say that all
24  of the knowledge that you have about the

1  McMillan event, for lack of better words,
2  is based on what you've read in the
3  newspaper; is that correct?
4      A.   That's correct.
5      Q.   Are you aware if Ms. McMillan
6  created any satirical videos?
7      A.   Not aware.
8      Q.   Okay.
9          Are you aware if Ms. McMillan
10  sent around any e-mails to folks in the
11  Marywood community talking about Sister
12  Munley as Hitler?
13      A.   No.
14      Q.   At the protest, did
15  Ms. McMillan, to your knowledge, equate
16  Sister Anne Munley with Adolf Hitler?
17      A.   No.
18      Q.   The McMillan incident, that
19  occurred after your termination of
20  employment, correct?
21      A.   Correct.
22      Q.   And I believe you said perhaps
23  last year.
24          Would that have been 2015?

1      A.   Yes.
2      Q.   As we sit here today, are you
3  aware of any tenured professor that
4  created satirical videos such as the ones
5  that you've created?
6      A.   No.
7      Q.   When did you first commence
8  employment with Marywood?
9      A.   I might be wrong on the dates
10  but while I was working at Wyoming
11  Seminary in Wilkes-Barre, I taught a
12  part-time course at Marywood.  It might
13  have been 1985 to '86 or one of those
14  semesters.
15      Q.   To the best of your knowledge,
16  what course were you teaching during that
17  time frame?
18      A.   That would have been an
19  introduction -- introductory -- pardon me
20  -- introduction to economics course.
21  Either -- it would have been either
22  probably micro or macro.
23      Q.   We discussed earlier about
24  courses that you believe you're qualified



Page 34

1  to teach and we talked about intro to
2  economics being one of them.
3          Do you believe that you'd be
4  qualified to teach both intro to economics
5  micro and macro?
6      A.   Yes.
7      Q.   After you taught this course in
8  1985, 1986, did you have any other
9  employment relationship with Marywood?
10     A.   After I started full-time on a
11 tenure track position.
12     Q.   Okay.
13         And when was that?
14     A.   1987 in the fall.
15     Q.   Now, when you commenced
16 employment, fall of 1987, you were not a
17 tenured professor at that time; is that
18 correct?
19     A.   Correct.
20     Q.   But I believe it's your
21 testimony you were on a tenure track?
22     A.   Correct.
23     Q.   Okay.
24         What does it mean to you to be

Page 35

1  a tenured professor?
2      A.   It means that in a sense you
3  have given up -- I won't say given up.
4  You have a commitment to -- from the
5  university to employ you as long as you
6  have fulfilled whatever requirements exist
7  for that university.
8      Q.   Do you believe that the
9  commitment is mutual in that the tenured
10 professor is making commitments to the
11 university as well as the university
12 making commitments to the tenured
13 professor?
14     A.   Yes.
15     Q.   When you commenced employment
16 with Marywood, fall of 1987, was that a
17 full-time position?
18     A.   Yes.
19     Q.   Were you in a certain
20 department?
21     A.   Let me go back.  Full-time
22 position -- usually considered a
23 nine-month academic year, a full-time
24 position.

Page 36

1      Q.   Thank you.
2          Were you in a department?
3      A.   Yes.
4      Q.   And what department was that?
5      A.   The Department of Social
6  Sciences.
7      Q.   And how long were you in the
8  Department of Social Sciences?
9      A.   During my complete tenure at
10 Marywood.
11     Q.   Okay.
12         So until the time of your
13 termination in 2012?
14     A.   Correct.
15     Q.   At some point in time, did you
16 become a tenured professor?
17     A.   Yes, I did.
18     Q.   And when did that take place?
19     A.   I believe that was September of
20 1994.
21     Q.   As a professor at Marywood in
22 the Department of Social Sciences, to whom
23 would you report?  Generally, job
24 position.  I don't need the name of the

Page 37

1  person yet.
2      A.   The chairperson of the
3  department.
4      Q.   Would that also be known as the
5  dean of the department?
6      A.   No.
7      Q.   Are those two different people,
8  two different positions?
9      A.   Yes.  There is no dean of the
10 department position.
11     Q.   Okay.
12         So the professor reports to the
13 chairperson of the department; is that
14 correct?
15     A.   Correct.
16     Q.   And who does the -- to your
17 knowledge, the chairperson of the
18 department report to by job position?
19     A.   I believe it might have
20 depended on the structure of the college
21 over the time, so that would be -- that
22 answer would have different answers.
23     Q.   Okay.
24         When -- from 1987 until 1994,



Page 38

1    who was the chairperson of the department?
2         A.   That would have been Jack
3    Barrett for all those years.
4         Q.   Is he still with the
5    university, to your knowledge?
6         A.   No.
7         Q.   In 1994 when you became a
8    tenured professor, was Jack Barrett still
9    the chairperson of the department?
10        A.   Yes.
11        Q.   Do you remember when Jack
12   Barrett no longer was the chairperson of
13   the department?
14        A.   I can't recall the exact date.
15        Q.   Who was the next chairperson?
16        A.   I believe it was Kathleen
17   Munley.
18        Q.   To your knowledge, is there any
19   relation between Kathleen Munley and
20   Sister Anne Munley?
21        A.   No.
22        Q.   Do you know the time period in
23   which Kathleen Munley served as the
24   chairperson of the Department of Social

Page 39

1    Sciences?
2         A.   Not the exact dates.
3         Q.   After Kathleen Munley, who was
4    the chairperson?
5         A.   I believe it was Sister
6    Margaret Gannon.
7         Q.   Do you recall the dates that
8    she served as the chairperson of the
9    department?
10        A.   No.
11        Q.   At some point in time, was
12   there a different chairperson after Sister
13   Margaret Gannon?
14        A.   After I left, there was.
15        Q.   Okay.
16             And who was that?
17        A.   I -- Alexander Vari.
18        Q.   At the time of your termination
19   in 2012, was Sister Margaret Gannon the
20   chairperson of the social sciences
21   department?
22        A.   Yes.
23        Q.   Does the name Michael Foley
24   ring -- familiar to you?

Page 40

1         A.   Yes.
2         Q.   Was he employed at Marywood at
3    the time of your termination?
4         A.   Yes.
5         Q.   What was his position, to the
6    best of your knowledge?
7         A.   I believe his title is dean of
8    liberal arts college.
9         Q.   From an organizational
10   structure at the time of your termination
11   -- so I'm focussing on 2012.
12             As a tenured professor, is it
13   fair to say that you reported to Sister
14   Margaret Gannon?
15        A.   Yes.
16        Q.   Did Sister Margaret Gannon
17   report to Michael Foley, the dean of
18   liberal arts?
19        A.   I presume she did.
20        Q.   Do you know how long Michael
21   Foley was in that position?
22        A.   No.
23        Q.   Can you approximate?
24        A.   Six years perhaps.

Page 41

1         Q.   So at least since 2010?
2         A.   Yes.
3         Q.   Okay.
4         A.   Excuse me.  When I said six
5    years, I meant six years prior to 2012.
6         Q.   Okay.
7             So we're talking maybe
8    2006-ish?
9         A.   Maybe 2006-ish.
10        Q.   Ish.
11             To the best of your
12   knowledge -- again, I'm just focussing,
13   trying to get an organizational picture.
14             So Dr. Fagal reports to Sister
15   Margaret Gannon at the time of your
16   termination, Sister Margaret Gannon
17   reports to Dr. Foley.
18             Who does Dr. Foley report to?
19        A.   I don't know.
20        Q.   Okay.
21             Who is the ultimate boss, for
22   lack of better words, at the university?
23        A.   I presume it would be Sister
24   Anne Munley.

11 (Pages 38 to 41)



Page 42

1     Q.   The president of the
2  university?
3     A.   The president of the
4  university.
5     Q.   So if someone doesn't have a
6  direct dotted -- direct line reporting to
7  the president of the university, everyone
8  that works at the university ultimately
9  reports to the president of the
10  university; is that correct?
11     A.   Yes, indirectly.
12     Q.   Is there anyone higher on the
13  food chain than the president of the
14  university at Marywood?
15     A.   I'm not sure.
16     Q.   Can you identify anyone that's
17  higher up than Sister Anne Munley who was
18  president of the university at the time of
19  your termination as we sit here today?
20     A.   As a title, I might presume the
21  president of the Sisters of the Immaculate
22  Heart of Mary but I don't really know.
23     Q.   Okay.
24         So as far as you know, Sister

Page 43

1  Munley, the president of the university,
2  was the boss of the university?
3     A.   As far as I know, yes.
4           - - -
5         (At this time, a document was
6      marked for identification as Exhibit
7      Fagal-3.)
8           - - -
9  BY MS. PEET:
10     Q.   Mr. Fagal, what has been placed
11  before you marked as Fagal Exhibit-3 is a
12  Letter of Agreement between you and
13  Marywood University dated May 10, 2011.
14         Do you see that?
15     A.   Yes.
16     Q.   And if you look at the bottom
17  right of this page, it has signature.
18         Is that your signature?
19     A.   Yes.
20     Q.   And by signing this letter,
21  were you accepting the agreement -- the
22  tenured faculty agreement between you and
23  Marywood University?
24     A.   Yes.

Page 44

1     Q.   And to the best of your
2  knowledge, the terms and conditions that
3  are set forth in this letter, are they
4  accurate?
5     A.   Well, let me read the letter.
6     Q.   Take your time.
7           - - -
8         (At this time, the witness
9      complies with request.)
10           - - -
11         THE WITNESS:  Okay.
12         Could you repeat the question,
13  please?
14  BY MS. PEET:
15     Q.   I sure can.
16         The -- as you can see that this
17  Letter of Agreement sets forth some of the
18  terms.
19         Do you see that?
20     A.   Yes.
21     Q.   To the best of your knowledge,
22  are these terms accurate?
23     A.   Yes.
24     Q.   Okay.

Page 45

1         We discussed earlier about an
2  incident involving Laurie McMillan.
3         To your knowledge, was she
4  disciplined by Marywood University?
5     A.   No.
6     Q.   Do you know one way or the
7  other?
8     A.   No.
9     Q.   I just -- sometimes a question
10  can evoke a "no", but I'm not sure if it's
11  no, you don't know or no, she wasn't.
12     A.   I do not know if she was
13  disciplined or not disciplined.
14     Q.   And that's going to happen
15  throughout the deposition.  I'll try
16  and --
17     A.   I understand.
18     Q.   -- make sure we catch those
19  situations.
20         To your knowledge, did Marywood
21  University have missions and core values?
22     A.   Yes.
23     Q.   Okay.
24         Off the top of your head, do



Page 46

1   you know what those core values are?
2       A.   Well, I know one that they were
3   stressing recently was respect for the
4   individual.  Another one was I believe
5   something about stewardship of the earth.
6   I'm a little vague on that one.  That's
7   what I can surely recall at the moment.
8       Q.   Is Marywood University's
9   mission and core values -- is that written
10  down somewhere?
11      A.   Yes.
12      Q.   Is that made available to you
13  as -- was it made available to you as a
14  tenured professor?
15      A.   Yes.
16      Q.   Were the mission and core
17  values posted anywhere around the
18  university?
19      A.   I can't recall.
20      Q.   Okay.
21           And does that mean you can't
22  recall one way or the other?
23      A.   I can't recall one way or the
24  other whether there was a posting or not.

Page 47

1       Q.   Did you ever hear anyone at the
2   university discuss the missions or core
3   values?
4       A.   Yes.
5            - - -
6            (At this time, a document was
7        marked for identification as Exhibit
8        Fagal-4.)
9            - - -
10  BY MS. PEET:
11      Q.   Now, Dr. Fagal, I put before
12  you a rather sizable document.  The good
13  news is I'm not asking any questions about
14  it specifically or really asking you to go
15  through it with a fine-tooth comb.  All
16  I'm going to ask you to do is to identify
17  that this is the handbook that was in
18  existence at the time of your termination
19  of employment.  As you can see, the
20  handbook is dated July 1, 2010.
21           MR. COHEN:  I'm going to have
22       to object.  There's no way he can
23       know whether it's the same handbook.
24       This is like 200 pages.

Page 48

1            MS. PEET:  Well, if you look at
2   paragraph 14 of his Complaint, he
3   talks about on July 1, 2010, Marywood
4   issued an edition of its faculty
5   handbook, and then you attach the
6   first four pages as Exhibit-B to your
7   Complaint -- your Amended Complaint.
8   Pardon me.
9   BY MS. PEET:
10      Q.   Is the handbook that I've just
11  put before you the July 1, 2010, handbook
12  that you were referencing in your Amended
13  Complaint?
14      A.   I don't know.  I'm assuming
15  that this is it though one would have to
16  run a, you know, computer -- check some
17  test to test whether any secret changes
18  had been put in.  Do I think that any have
19  been put in?  No, I don't, but I cannot
20  testify as to whether this is in fact it.
21      Q.   Okay.
22           The July 1, 2010, handbook that
23  you reference in your Amended Complaint
24  and what I purport is in front of you as

Page 49

1   Exhibit-4, do you have any reason to
2   dispute that it applied to you as a
3   tenured professor at Marywood?
4       A.   No.
5       Q.   So is it fair to say that as a
6   tenured professor at Marywood, you had to
7   comply with the policies and procedures
8   contained in the handbook?
9            MR. COHEN:  Objection, legal
10      conclusion.  You can answer.
11           THE WITNESS:  To the extent
12      that they were clear and not vague,
13      yes.
14  BY MS. PEET:
15      Q.   Are there any policies that you
16  sought clarification because you believed
17  they were vague?
18      A.   When?
19      Q.   During your employment.
20      A.   Yes.
21      Q.   Okay.
22           And what policies do you
23  believe that you sought clarification
24  because they were vague?

13 (Pages 46 to 49)



Page 50

1      A.   I remember asking Dean Torell
2  some questions about what was okay or not
3  okay to do.
4      Q.   You asked Dean Torell what was
5  okay and not okay with reference to what?
6      A.   About postings on my office
7  door, news stories and things like that.
8      Q.   Other than asking Dean Torell
9  about what you can and cannot do with
10 postings on your office door, any other
11 policies that you thought were vague for
12 which you sought clarification?
13     A.   No.
14     Q.   Okay.
15          Did Dean Torell provide a
16 response to you --
17     A.   No.
18     Q.   -- about what you can or cannot
19 do with postings on your office door?
20     A.   He did not reply.
21     Q.   When you say he did not reply,
22 is it fair to say that you sent him an
23 e-mail?
24     A.   Yes.

Page 51

1      Q.   Did you follow up with Dean
2  Torell to nudge him to respond?
3      A.   No.
4      Q.   Did you seek clarification from
5  anyone else at Marywood other than Dean
6  Torell on this issue?
7      A.   I can't recall.
8      Q.   To the best of your
9  recollection, other than e-mailing Dean
10 Torell once, did you reach out to Dean
11 Torell in any other way to seek
12 clarification on this issue?
13     A.   I can't recall.
14     Q.   November of 2011, it's my
15 understanding that you invited a speaker
16 from FIRE to speak at the campus; is that
17 correct?
18     A.   I invited a speaker to come to
19 my class which is held on campus, so yes.
20     Q.   And what class was that at the
21 time?
22     A.   Introduction to social science.
23     Q.   Was this the first time you
24 ever had a FIRE speaker speak on your

Page 52

1  behalf either in a course or at the
2  university generally?
3      A.   No.
4      Q.   Can you identify the other
5  times in which you had a FIRE speaker come
6  to the university?
7      A.   Yes.  Luke Sheehan came to
8  speak on campus at an evening event, and I
9  believe that might have been in 2007 plus
10 or minus a year.
11     Q.   Anyone else?
12     A.   Do you mean anyone else from
13 FIRE?
14     Q.   Correct.
15     A.   No.
16     Q.   What was your role in getting
17 Luke Sheehan to speak at Marywood?
18     A.   I'm not sure what you mean by
19 role.
20     Q.   Sure.
21          Did you initiate the -- Luke
22 Sheehan to speak at Marywood?
23     A.   Luke.  I'm sorry.  Good.  Luke
24 Sheehan.  I was thinking of -- I can't

Page 53

1  recall who initiated it.
2      Q.   Is it possible it was you?
3      A.   It's possible it was me.
4      Q.   What was Mr. Sheehan's what did
5  he speak about at Marywood?
6      A.   Something to do with free
7  speech on college campuses around the
8  United States.
9      Q.   Did Mr. Sheehan in fact speak
10 at Marywood University?
11     A.   Yes, he did.
12     Q.   To the best of your
13 recollection, were posters hung with
14 reference to Mr. Sheehan's speaking
15 engagement?
16     A.   I can't recall exactly.  Could
17 have happened.
18     Q.   Do you know if there was an
19 attendance prize for attending the --
20 Mr. Sheehan's speaking engagement?
21     A.   There was no dollar attendance
22 prize but we might have given food away,
23 but I really can't recall the details.
24     Q.   Did anyone, to your knowledge,

14 (Pages 50 to 53)



Page 54

1   tear down any posters with reference to
2   the Mr. Sheehan speaking engagement?
3       A.   No.
4       Q.   In 2007, was Sister Anne Munley
5   the president of the university?
6       A.   I can't recall but I think so.
7       Q.   Did anyone at Marywood
8   University ask you to not have Mr. Sheehan
9   speak at the university?
10      A.   No.
11      Q.   Did you have any issues or
12  run-ins with anyone at Marywood
13  administration about the Mr. Sheehan
14  speaking engagement?
15      A.   No.
16      Q.   I believe I asked you if you
17  were aware if any posters were torn down
18  by Marywood administration with reference
19  to Mr. Sheehan, and I believe it was your
20  testimony that you don't know; is that
21  correct?
22      A.   My testimony is I don't know.
23  I can't recall if there were posters, and
24  if I can't recall there were posters, I

Page 55

1   certainly can't recall if any were torn
2   down or not.
3       Q.   Okay.
4           The -- when Mr. Sheehan spoke
5   at the university, was it in connection
6   with any course or class you were
7   teaching?
8       A.   No.
9       Q.   Did anyone besides you help
10  initiate and plan this speaking
11  engagement?
12      A.   Well, I was an advisor to the
13  Republican Club, and so there were
14  students involved with planning the event.
15      Q.   Is it fair to say that
16  Mr. Sheehan, who was a speaker from the
17  FIRE organization, came to Marywood
18  University, at least as part of your
19  initiation in 2007, spoke without issue?
20      A.   Mr. Sheehan spoke without
21  issue.
22      Q.   And he's connected with FIRE;
23  is that correct?
24      A.   At the time, he was.

Page 56

1       Q.   So back to November of 2011,
2   who was the speaker that you brought from
3   FIRE to your course?
4       A.   Will Creeley.
5       Q.   And what did Mr. Creeley speak
6   about?
7       A.   I believe he had a stock speech
8   and he had four different titles for it.
9   I believe it was pretty much the same but
10  he would speak about free speech on
11  college campuses and maybe thought control
12  or -- that might have been in the title.
13      Q.   So what Mr. Creeley spoke about
14  was similar to what Mr. Sheehan had spoken
15  about in 2007?
16      A.   Yes.
17      Q.   With Mr. Sheehan, did anyone at
18  the university tell you you could not hang
19  up posters?
20      A.   No.
21      Q.   Other than you initiating, are
22  you aware of any other speaker from FIRE
23  that spoke at the university?
24      A.   I can't recall.

Page 57

1       Q.   To your knowledge, is Marywood
2   University a public or private university?
3       A.   Officially a private university
4   but it does get public funds, of course.
5       Q.   Did you tell anyone at the
6   university that you wanted Will Creeley to
7   come speak?
8       A.   Yes.
9       Q.   Who did you tell?
10      A.   Well, I discussed with Sister
11  Margaret Gannon having a speaker from
12  FIRE.  At what point the name Will Creeley
13  emerged I'm not exactly sure, but I'm sure
14  it would have come out before the event
15  took place.  I contacted -- Sister
16  Margaret told me that there was no money
17  and she gave me a name, cultural affairs
18  person.  I'm drawing a blank on the name
19  now, but she said go and ask them if they
20  have any money for speakers.  When the
21  plans were made with FIRE, I contacted
22  Carl Oliveri and told him who was coming.
23  I can't recall any more right now.
24      Q.   When you told Sister Margaret



1  that you were -- you wanted to have a
2  speaker from FIRE come, what was her
3  response?
4      A.   I believe she -- I said
5  something -- she might have said well,
6  that ties into the course, right, and I
7  said yes, it's -- you know, it has to do
8  with the first amendment in the
9  Constitution.  It was very -- we were very
10 low key.
11     Q.   Did -- I assume she didn't tell
12 you no, that's not possible, that can't
13 happen, or we object?
14     A.   No objections on her part.
15     Q.   When she told you that she
16 didn't believe there were money for
17 speakers, was it there was -- to your
18 knowledge, was it we don't have money for
19 speakers from FIRE or we don't have money
20 for speakers generally?
21     A.   It was a question of
22 departmental budget, no more money for
23 speakers generally.
24     Q.   How much did FIRE want in terms

1  of money for a speaking engagement?
2      A.   A thousand dollars was the
3  usual fee.
4      Q.   I believe you testified that
5  Sister Margaret Gannon suggested that you
6  talk to someone from the cultural
7  department about seeking funds for the --
8      A.   Not a cultural department,
9  cultural affairs.  Cerda might have been
10 the name, C-E-R-D-A.  That name rings a
11 bell but I'm not sure.
12     Q.   Is Cerda affiliated with
13 Marywood University?
14     A.   She was if that was -- it was
15 just an e-mail contact.
16     Q.   Did you indeed contact Cerda to
17 determine whether --
18     A.   Yes.
19     Q.   -- there was money for this
20 speaking --
21     A.   I did go --
22     Q.   -- engagement?
23     A.   I'm sorry.  Go ahead.
24     Q.   Did you indeed contact Cerda to

1  determine whether there was money in the
2  budget for a speaker?
3      A.   I can't recall if I e-mailed
4  her directly or if there was another name
5  I e-mailed, too, but I did contact that
6  higher level.
7      Q.   And what was the response, to
8  the best of your memory?
9      A.   I know I was told by someone
10 there was no money there either.
11     Q.   Okay.
12          And did you believe that to be
13 no money in the budget for speakers
14 generally or did you attribute that to the
15 fact that the speaker was from FIRE?
16     A.   I believe it was no money
17 generally.
18     Q.   Was the FIRE speaker something
19 that was required by Marywood on you to
20 have at the university?
21     A.   No.
22     Q.   Did you decide to proceed
23 anyway knowing that Marywood wasn't going
24 to be able to fund a speaker?

1      A.   Yes.
2      Q.   Was that a voluntary choice
3  that you made?
4      A.   Yes.
5      Q.   You said you spoke to Carl
6  Oliveri.
7          Who is Carl?
8      A.   He was the director of what I
9  think was called the student activities --
10 SAL -- I called it student activities.
11     Q.   Can we call it student
12 activities for the purpose of this
13 deposition?
14     A.   That would be helpful.
15     Q.   Okay.
16          What did you and Mr. Oliveri
17 speak about with reference to you wanting
18 to have a FIRE speaker?
19     A.   I wanted to hang -- get some
20 posters to try to draw a crowd because I
21 wanted to open the presentation, open the
22 class to other Marywood students, and I
23 wasn't sure.  I never hung posters as a
24 faculty member before for my class or



1 anything like that, so I wasn't sure of
2 the protocol.
3          I did know that students groups
4 had to get permission to hang posters
5 because I would see posters around and I
6 would see them stamped approved by student
7 life, or student activities, or whatever
8 the stamp was. So I figured it couldn't
9 do any harm to get the posters stamped by
10 student activities.
11     Q.   And is that why you went to
12 Mr. Oliveri?
13     A.   That's why I went to
14 Mr. Oliveri, and I thought that maybe
15 because it was -- I was trying to reach
16 out to the broad student body that perhaps
17 he would be able to print a few posters
18 for me and I was going to print some
19 others on my own.
20     Q.   What was Mr. Oliveri's
21 response?
22     A.   He said okay. He said he could
23 print -- I believe it was 12 to 15
24 posters.

1     Q.   Did he say that there would be
2 a fee associated with the printing of
3 those 12 to 15 posters?
4     A.   No.
5     Q.   So to your understanding, for
6 him to print those 12 to 15 posters, you
7 would not be responsible for paying
8 anything; is that correct?
9     A.   That's correct.
10     Q.   And did you want to print more
11 posters than what Mr. Oliveri was able to
12 print?
13     A.   Yes.
14     Q.   And did you in fact print more
15 posters?
16     A.   Yes.
17     Q.   Was that something you
18 voluntarily chose to do?
19     A.   Yes.
20     Q.   And how many more posters did
21 you print?
22     A.   I believe the number was 46.
23     Q.   Where did you print these
24 posters?

1     A.   I had the UPS Store in
2 Skaneateles print the posters.
3     Q.   The posters that you printed,
4 were they the same posters that Carl was
5 printing as well?
6     A.   Yes. Let me clarify. FIRE --
7 this is Thanksgiving weekend. FIRE had
8 sent the sample poster announcing the
9 speech, and the title, and the date, and
10 the time and place, and Carl Oliveri said
11 that was fine.
12          Then -- this is before the
13 weekend of Thanksgiving weekend. Then
14 Carl Oliveri noticed that the posters did
15 not have contact information on them. The
16 PDF sample that FIRE had sent to me that I
17 sent to Carl, no contact information.
18 Carl Oliveri told me, Fred -- he says you
19 need to have contact information on them,
20 an e-mail address would do. You could
21 even handwrite it on because Carl knew
22 that I was bringing posters.
23          And so at that point I said
24 okay, the posters have to be modified.

1 This is maybe Friday and Saturday of
2 Thanksgiving weekend, and so I sent to
3 Carl Oliveri an e-mail saying, Carl,
4 here's a sample strip that's going to be
5 attached to each poster, and on that strip
6 is my e-mail address, fagal@marywood.edu,
7 for the contact information and also on
8 the poster was a notice for the $50.00
9 attendance prize drawing for a student who
10 came to the event. And I said that those
11 would all be attached to the posters that
12 would be delivered for stamping first
13 thing on Monday morning, and that was in
14 an e-mail.
15     Q.   What was Carl's response?
16     A.   I don't believe I got an e-mail
17 response from him that weekend.
18     Q.   Did you go back to Carl Monday
19 morning with the posters with the strips
20 on it for approval?
21     A.   No.
22     Q.   Why not?
23     A.   Because a student brought the
24 posters over with the strips attached.

17 (Pages 62 to 65)



Page 66

1    Q.  Who was that student?
2    A.  Geri Smith and I believe
3  Samantha Cocoa was with her, and Ben
4  Harrington might have been with them also.
5  I'm not sure about him.
6    Q.  Are they all students?
7    A.  They were all students at the
8  time.
9    Q.  Okay.
10    To your knowledge, Geri Smith
11  and perhaps others went to Carl on Monday
12  morning with the posters which included
13  the strip that was to be added to the
14  poster for approval?
15    A.  No.
16    Q.  Okay.
17    What am I missing?
18    A.  When Geri Smith brought the
19  posters over, Carl -- she -- I was not
20  there.  This is what she -- Carl Oliveri
21  was not there.  In charge was a woman who
22  worked for the student activities office
23  and she is the one who stamped all of
24  those posters with the approval, and all

Page 67

1  of those posters had on them the prize
2  announcement and the contact information.
3    Q.  And you don't know who that
4  woman is?
5    A.  I believe her name is Katie
6  Aunchman but I do not know her.
7    Q.  Do you know what her job
8  position is with Marywood?
9    A.  I believe she was a graduate
10  student.  I think she was -- I'm not sure
11  of her title.  I was told it was advisor.
12  She worked for the clubs or something.
13  I'm not sure exactly what she worked for
14  at Marywood, but she worked for Marywood.
15    Q.  Okay.
16    Do you know one way or the
17  other whether she had approval to stamp
18  posters?
19    A.  I do not know.
20    Q.  And this information about Carl
21  not being there and Katie putting the
22  stamp of approval on it, you don't have
23  firsthand knowledge of that; is that
24  correct?

Page 68

1    A.  I do not.
2    Q.  And this is information that
3  was told to you by Geri Smith, a student,
4  correct?
5    A.  Yes.
6    Q.  Okay.
7    A.  I do know that posters were
8  stamped because Geri Smith brought back
9  some posters to give to me to hang up and
10  all of them were stamped.
11    Q.  The posters that were stamped,
12  did they have the strip -- the additional
13  strip that we've just discussed on the
14  posters before they were stamped?
15    A.  Yes, they did.  The strip was
16  on the posters before they were stamped.
17    Q.  Did you see the posters with
18  the strips on them before they were
19  stamped?
20    A.  Yes.  I made the posters.  I
21  taped all the strips on myself.
22    Q.  And before you taped the strips
23  on, were those posters stamped?
24    A.  No.

Page 69

1    Q.  Did -- I believe you testified
2  -- and I'm sorry to be repetitive -- that
3  Sister Margaret Gannon did not tell you
4  that the FIRE speaker couldn't come to the
5  university, correct?
6    A.  She did not tell me the FIRE
7  speaker could not come to the university.
8    Q.  What about Carl Oliveri?
9    A.  He didn't tell me anything
10  about the speaker.
11    Q.  Okay.
12    You said the speaker was slated
13  for Thanksgiving weekend; is that correct?
14    A.  Well, the speaker was slated
15  for November 30th, which was a Wednesday
16  after Thanksgiving weekend.
17    Q.  Was the university in session
18  at that time?
19    A.  Yes.  November 30th the
20  university was in session.
21    Q.  Who picked the date for the
22  speaker?
23    A.  Dr. Jackson and I were the
24  co-teachers for the course and we chose



Page 70

1 the date. It was getting near the end of
2 the semester and that was the most obvious
3 date.
4     Q.   Was this speaking engagement a
5 required element of the course you were
6 teaching?
7     A.   Yes, in the sense that it was
8 held during the class time and it was a
9 speaker during the class.
10     Q.   Was it held in the classroom
11 itself?
12     A.   No.
13     Q.   Okay.
14         Where was it held?
15     A.   Comerford Auditorium.
16     Q.   And who selected the location?
17     A.   I did.
18     Q.   Did anyone at the university
19 make any objection to holding the speaking
20 engagement in the auditorium?
21     A.   No.
22     Q.   You said Dr. Jackson; is that
23 Dr. Thomas Jackson?
24     A.   Yes.

Page 71

1     Q.   To your knowledge, is he
2 currently a tenured professor at Marywood
3 University?
4     A.   Yes.
5     Q.   You said he was a co-teacher of
6 the course.
7         What did you mean by that?
8     A.   We split the duties and the
9 time.
10     Q.   Do you and Dr. Jackson get up
11 in front of the course and would you speak
12 together?
13     A.   Generally not.
14     Q.   Okay.
15         So would it be some days
16 Dr. Fagal would show up and teach the
17 class and some days --
18     A.   Yes.
19     Q.   -- Dr. Jackson would show up
20 and teach the class?
21     A.   Yes, sorry.
22     Q.   But it was one class with the
23 same students; is that correct?
24     A.   Will you repeat? Was what?

Page 72

1     Q.   One class with the same
2 students?
3     A.   Correct.
4     Q.   What were Dr. Jackson's
5 thoughts on having this FIRE speaker come
6 to campus?
7     A.   We didn't have any big
8 discussion. He thought it was a good
9 idea.
10     Q.   Okay.
11         Is it fair to say it was your
12 idea and he supported it?
13     A.   Yes.
14     Q.   Did Dr. Jackson have an opinion
15 about the posters?
16     A.   I don't understand the
17 question.
18     Q.   Sure.
19         Did he have an opinion one way
20 or the other about posting posters on the
21 university for the speaking engagement?
22     A.   I don't recall any opinion.
23     Q.   Did Dr. Jackson participate in
24 making the posters?

Page 73

1     A.   No.
2     Q.   Did Dr. Jackson participate in
3 hanging the posters?
4     A.   No.
5     Q.   Was he at all involved in the
6 poster incident, for lack of better words?
7     A.   No.
8     Q.   When, to your knowledge, in
9 relation to the November 30th speaking
10 engagement were the posters hung?
11     A.   The posters were hung the
12 morning of November 28th and a few were
13 hung early in the afternoon of November
14 28th.
15     Q.   So prior to November 28, 2011,
16 there were no posters hung for this event;
17 is that correct?
18     A.   That is correct.
19     Q.   And these posters were hung on
20 November 28th for a speaking engagement
21 that was occurring on November 30th; is
22 that correct?
23     A.   Yes.
24     Q.   Who hung the posters?



Page 74

1     A.   Geri Smith hung most of the
2  posters.  Samantha Cocoa told me in an
3  e-mail that she hung some posters.  I
4  don't know how many.  And I hung some
5  posters.
6     Q.   How many posters were hung
7  approximately generally?
8     A.   I'd say 46.
9     Q.   Now, you testified earlier that
10 you made 46 posters and Carl said he would
11 give you 12 to 15 posters?
12    A.   Correct.
13    Q.   Did Mr. Oliveri not give you
14 his 12 to 15 posters?
15    A.   I was not there.  Geri Smith
16 reported to me in an e-mail that -- she
17 said there were 12 or 15 posters -- I
18 forget the exact number -- that were not
19 stamped, but that of course makes sense
20 because those posters Mr. Oliveri had
21 printed out and they were the plain PDF
22 posters as we see from FIRE without any
23 contact information.  So he printed
24 posters without contact information and I

Page 75

1  guess I forgot.
2        I did not provide any strips --
3  contact or prize information strips
4  combined to hang on those posters.  So,
5  therefore, if the person in student
6  activities saw that there were posters but
7  the posters did not have contact
8  information on them, then she would
9  understandably not stamp them approved.
10    Q.   Is it fair to say that Carl
11 told you that in order for them to be
12 approved, they needed to have contact
13 information on them, correct?
14    A.   That is correct.
15    Q.   And is it also fair to say that
16 you were the one that needed to provide
17 the contact information to Carl, correct,
18 or someone on your behalf?
19    A.   Yeah.  If I was bringing
20 posters to get approved, it had to have
21 contact information, and Carl said that I
22 could actually write it on if I wanted to.
23    Q.   Okay.
24        But that was your

Page 76

1  responsibility, correct?
2     A.   Yes.
3     Q.   And is it fair to say that, for
4  whatever reason, whether you forgot or
5  whatever, you did not provide that
6  information to Carl either by a strip or
7  you didn't write on your contact
8  information on those 12 to 15 posters you
9  asked him to print out?
10    A.   No.
11        Could you repeat the question?
12    Q.   Sure.
13        So we've already set forth that
14 Carl told you in order for them to get
15 approved, they had to have contact
16 information on them, correct?
17    A.   Correct.
18    Q.   We've already, I believe,
19 solidified that Carl told you that you
20 needed to provide the contact information.
21        You could have done it by
22 strip, you could have written something
23 on, but that you had to do it, correct?
24    A.   He did not say that.

Page 77

1     Q.   Okay.
2     A.   We did not have any discussion
3  about whether I would like him to put
4  contact information on the strips.  I did
5  send him the sample of the strips with the
6  prize announcement and my e-mail address
7  and I said this is what would be on the
8  posters that I brought in on Monday.  If
9  Carl had chosen to print out those strips
10 himself, he could have easily done so and
11 taped them to the posters that he printed.
12 He chose not to do that or didn't think
13 about it, and I didn't think about it, and
14 that's what happened.
15    Q.   Okay.
16        Do you blame Carl for not
17 putting contact information on those
18 posters?
19    A.   No, because I believe those
20 were only 8 and a half by 11 small
21 posters, nothing big.
22    Q.   Okay.
23        How big were the posters that
24 you printed?



1          A.   I believe they were 11 by --
2     most of them were 11 by 17, but there were
3     some smaller ones.  I can't remember the
4     exact mix out of the 46.
5          Q.   Of the 46 posters that you
6     believe were hung, how many did you
7     personally hang?
8          A.   I probably hung seven or eight.
9          Q.   Were there specific places in
10    the university that you wanted these
11    posters hung or were you planning on
12    posting them throughout the university?
13         A.   I'm not sure if the question is
14    clear to me.
15         Q.   Sure.
16              Where in the university were
17    you hanging these posters?
18         A.   The general idea was to hang
19    them where students could see them and
20    maybe be inspired to come to the
21    presentation.
22         Q.   Now, November 28th would have
23    been a Monday, correct?
24         A.   That's correct.

1          Q.   Would that have been the first
2     day back at school following a
3     Thanksgiving break for the students?
4          A.   Yes.
5          Q.   Other than the seven to eight
6     posters you hung, did you ever see the
7     other posters that Geri or perhaps
8     Samantha hung?
9          A.   I certainly saw some of them.
10         Q.   Okay.
11              Approximately how many did you
12    see?
13         A.   I'm estimating here.  Including
14    my own, 30.
15         Q.   And can you identify the
16    buildings in which you saw these posters?
17         A.   I saw posters in the science
18    building.  I saw posters in the liberal
19    arts center.  I saw posters on the library
20    door.  I can't recall if I saw posters
21    elsewhere.  I might have.
22         Q.   I believe it's your position
23    that the posters were torn down; is that
24    correct?

1          A.   Most of them were torn down.
2          Q.   When you say most of them, does
3     that mean some posters were not torn down?
4          A.   Yes.
5          Q.   I understand this is going to
6     require an approximation.  If you can,
7     that would be helpful.
8              Of the 46 posters, how many
9     believe -- how many do you believe were
10    torn down?
11         A.   My approximation would be --
12    I'll say 38.
13         Q.   And where do you come up with
14    that number?
15         A.   Well, I walked around and
16    looked -- to look for posters and I found
17    some still hanging but not a lot, so that
18    would be my guess.  When I say 38, it
19    could have been 34.  That's a -- you know,
20    mid-thirties type number.
21         Q.   Okay.
22              When was it that you were
23    walking around and noticed that posters --
24    that all the posters that you believe were

1     hung up were not still hanging?
2          A.   Probably about 7:15 a.m.
3     Wednesday morning.
4          Q.   And that would have been
5     November 30th?
6          A.   November 30th.
7          Q.   And that would have been the
8     day of the speaking engagement?
9          A.   That's correct.
10         Q.   Do you have any knowledge when
11    any posters were allegedly taken down?
12         A.   I received an e-mail from Geri
13    Smith on -- it was dated on Tuesday
14    afternoon that she sent it around -- I'll
15    say 1:30 p.m., more or less, and the gist
16    of that e-mail was Professor Fagal, is the
17    FIRE speech cancelled, and I saw that
18    e-mail from Geri late in the afternoon,
19    perhaps around 5:00 p.m.  I wrote back and
20    I said what do you mean, and she said
21    well, the posters are all torn down, and I
22    was shocked.
23              And was there another part of
24    the question?  Have I answered the





1  question?
2      Q.   I believe you have answered the
3  question in full.  Thank you.
4          Is that the way that you
5  learned that posters were taken down by
6  getting an e-mail from Geri Smith?
7      A.   Yes.
8      Q.   When -- you've been using the
9  terminology throughout this litigation of
10  torn down; is that correct?
11      A.   That's correct.
12      Q.   Okay.
13          When I think of torn down, I
14  think of someone physically like tearing
15  something off the wall.
16      A.   Yes.
17      Q.   Did you have any -- did you
18  witness people taking the posters down?
19      A.   No.
20      Q.   Okay.
21          Do you know if in fact they
22  were torn down or just removed from the
23  wall?
24      A.   In some cases, I saw some

1  remnants, you know, like leftover tape or
2  whatever just on top.  So they were
3  removed quickly at least in some cases.
4      Q.   Is it fair to say that you
5  didn't witness any posters being removed;
6  is that correct?
7      A.   I did not witness any posters
8  being removed.
9      Q.   Did Geri Smith tell you that
10  she witnessed any posters being removed?
11      A.   I don't think she did.
12      Q.   Did anyone tell you they saw
13  the posters being removed?
14      A.   Not that I can recall.
15      Q.   As we sit here today, do you
16  know in fact who removed posters from the
17  walls?
18      A.   Could you rephrase that?
19      Q.   Sure.
20          As we sit here today, do you
21  know who removed posters that you believe
22  were removed about the FIRE speaker?
23      A.   I don't know individual names
24  of who actually performed the task.  I'm

1  presuming they could have been work study
2  students who were told to take them down
3  but I don't know any specific person who
4  specifically tore down posters.
5      Q.   Do you know who instructed
6  anyone to remove those posters?
7      A.   I have no firsthand knowledge
8  of who told anybody to do it, though Alan
9  Levine did tell me that posters had been
10  torn down.
11      Q.   Did Alan Levine tell you he
12  wanted the posters to be torn down?
13      A.   Alan Levine told me when I had
14  a meeting with him that the posters were
15  torn down because of the prize
16  announcement, and the way he told that to
17  me I drew the conclusion that he approved
18  that they were torn down because of the
19  prize announcement.
20      Q.   I believe you testified you
21  drew a conclusion.
22          Did Alan Levine tell you one
23  way or the other about his position --
24      A.   Well, yes.

1      Q.   Let me --
2      A.   I'm sorry.
3      Q.   -- finish asking the question.
4          Did Alan Levine tell you that
5  he approved of the posters being torn
6  down?
7      A.   I will say yes.
8      Q.   And what were his words?
9      A.   He said that I was pandering to
10  the students by offering prize money to
11  come to class.
12      Q.   You testified that the FIRE
13  speaker spoke Wednesday evening, November
14  30th; is that correct?
15      A.   No.
16      Q.   That the FIRE speaker was
17  scheduled to speak Wednesday evening,
18  November 30th?
19      A.   No.
20      Q.   What do I have wrong?
21      A.   The FIRE speaker spoke at my
22  2:00 p.m. class on Wednesday, November
23  30th.
24      Q.   Okay.



1    So the class that you normally
2 taught was 2:00 on Wednesdays during that
3 semester; is that correct?
4    A.   That's correct.
5    Q.   And as part of the class, it
6 was required that the students attend this
7 lecture, correct?
8    A.   No.
9    Q.   Did you take attendance?
10    A.   No.
11    Q.   Did you tell the students that
12 it was encouraged that they attend?
13    A.   Yes.
14    Q.   If the students didn't attend
15 the lecture, did that mean they missed the
16 class that day?
17    A.   Yes.
18    Q.   And I believe you testified
19 that Dr. Levine told you it was pandering
20 to offer prize money to come to the class;
21 is that correct?
22    A.   Yes.
23    Q.   You testified that Dr. Levine
24 told you that the posters were torn down

1 because of the prize announcement; is that
2 correct?
3    A.   Yes.
4    Q.   Did Dr. Levine tell you that
5 the posters were torn down because it was
6 a FIRE speaker?
7    A.   No.
8    Q.   Did Dr. Levine tell you that
9 the posters were being torn down because
10 the speaker was going to be talking about
11 free speech?
12    A.   No.
13    Q.   Did the posters actually offer
14 prize money?
15    A.   No.
16    Q.   Okay.
17    Tell me why not.
18    A.   Because the posters that
19 offered the prize money were torn down.
20 Most of them were torn down.
21    Q.   So --
22    A.   I --
23    Q.   I'm sorry.  Go ahead.
24    A.   I learned about the posters

1 being torn down and I did not think that
2 Marywood University tore them down.  I
3 assumed it was some student who didn't
4 like me or something about the topic tore
5 them down.  I did not assume the
6 university tore them down.
7    So I immediately went down to
8 the UPS Store on Tuesday, luckily before
9 they closed, and I got not 46 posters done
10 but maybe 20 or so and I had them printed,
11 and I sent an e-mail to Sister Anne Munley
12 and Carl Oliveri expressing surprise that
13 my posters had been torn down.  I said I
14 got them reprinted and I would show up on
15 Wednesday morning bright and early to get
16 them hung up and could the university
17 please send out a blast e-mail to students
18 saying something along the lines of, gee,
19 we had a terrible thing happen.  Professor
20 Fagal's posters were torn down.  We'd like
21 to let you know there is a presentation
22 speech you could attend on Wednesday
23 afternoon and wouldn't it be nice to go
24 to, you know, counteract the tearing down

1 of the posters.  So that's the e-mail I
2 sent.
3    So I showed up on Wednesday
4 morning with the newly-printed posters
5 with the prize announcement on them, as
6 had done on Monday morning, and I
7 personally went over to the student
8 activities office with the posters ready
9 to get stamped and would go quickly hang
10 them up to do the best we could at getting
11 a crowd, and that's when I was told that,
12 no, the prize announcement could not be on
13 there and had to be cut off before the
14 posters could be stamped approved.
15    Q.   Okay.
16    Was it your understanding if
17 you took that prize money off that the
18 posters would be stamped and approved?
19    A.   Yes.
20    Q.   Did you take the prize money
21 off?
22    A.   Yes.
23    Q.   And the posters were stamped
24 and approved?



1    A.   Yes.
2    Q.   And were those posters hung?
3    A.   Yes.
4    Q.   Were those posters torn down?
5    A.   Some were.
6    Q.   Do you know who did that?
7    A.   No, I do not.
8    Q.   Do you know if it was the
9    administration?
10    A.   I do not know for sure.
11    Q.   You'd just be speculating?
12    A.   I could speculate.
13    Q.   Okay.
14         But it would be that
15    speculation, you don't know?
16    A.   I don't know.
17    Q.   You testified earlier that
18    before you posted another 20 posters that
19    of the posters that you believe were torn
20    down, it was the posters with the prize
21    money --
22    A.   Yes.
23    Q.   -- is that correct?
24    A.   Yes.

1    Q.   Posters that were not torn
2    down, did they have the prize money on it?
3    A.   Yes.
4    Q.   Okay.
5         So some posters with the prize
6    money stayed up, some posters with the
7    prize money were torn down?
8    A.   Yes.  Posters that remained
9    were mostly the small ones because I
10    printed some small ones that were 8 and a
11    half by 11.  And, for example, one of the
12    first ones I saw hanging was outside the
13    -- I think the second floor men's room in
14    the liberal arts center on a bulletin
15    board with a lot of other posters,
16    something that would be easy to overlook
17    in terms if somebody had gone on a
18    tear-down campaign.  So some posters were
19    not torn down.  They were missed by those
20    who were given the task of tearing down
21    the posters.
22    Q.   And it was up to you or people
23    that were working with you to decide where
24    those posters would be hung, correct?  No

1    one at the administration said these are
2    where you have to hang the posters,
3    correct?
4    A.   Correct.
5    Q.   You alluded to the fact that
6    perhaps it was a student who didn't like
7    you tore down the posters.
8    A.   Well, that's mere speculation.
9    I had no idea.
10    Q.   Do you know one way or the
11    other whether there were students that
12    didn't like you?
13    A.   No, not particularly.
14         MR. COHEN:  Stephanie, can we
15    take a five-minute bathroom break?
16         MS. PEET:  Sure.
17         - - -
18         THE VIDEOGRAPHER:  We're now
19    off the record.  The time is 11:04
20    a.m.
21         - - -
22         (At this time, a short break
23    was taken.)
24         - - -

1         THE VIDEOGRAPHER:  We are now
2    on the record.  The time is 11:16
3    a.m.
4         - - -
5    BY MS. PEET:
6    Q.   Dr. Fagal, are you okay to
7    continue?
8    A.   Yes.
9    Q.   Just a reminder, you are still
10    under oath and all of the testimony you
11    provide needs to be complete, accurate,
12    and truthful.
13         Do you understand?
14    A.   I understand.
15    Q.   Okay.
16         Right before we took a break,
17    you testified that you had another 20
18    posters printed for the purposes of
19    hanging them for the speaker.
20         Do you remember that testimony?
21    A.   Yes.
22    Q.   Were those 20 posters that you
23    printed -- were they ultimately hung?
24    A.   Yes.

24  (Pages 90 to 93)


MAGNA
LEGAL SERVICES

1    Q.   To your knowledge, did anyone
2  tear those down?
3    A.   To my knowledge, there were
4  posters missing that should have been
5  hanging that day.
6    Q.   Do you have any knowledge as to
7  what happened with those posters?
8    A.   I have no personal knowledge as
9  to what happened to those posters.
10   Q.   Okay.
11        As of 2:00 p.m. Wednesday,
12 November 30th, were there posters hung at
13 Marywood University about the advertising
14 for the speaking engagement?
15   A.   Posters had been hung prior to
16 2:00 p.m. that day to announce the
17 speaking engagement.
18   Q.   Okay.
19        Between November 28th when the
20 posters first were hung by you and your
21 team until November 30, 2012 -- 2011, was
22 there always a poster -- at least one
23 poster hung at the university about this
24 speaking engagement?

1    A.   I presume, yes.
2    Q.   Did Mr. Creeley from FIRE come
3  to speak?
4    A.   Yes, he did.
5    Q.   How long did he speak for?
6    A.   Approximately 40 minutes.
7    Q.   And was that the scheduled
8  length of his presentation?
9    A.   Yes.  There was some discussion
10 time afterwards, so 40 minutes is an
11 estimate.
12   Q.   Is it fair to say that no one
13 from Marywood administration shut down the
14 speaker?
15   A.   Yes, it's fair to say that.
16   Q.   Is it fair to say that no one
17 from Marywood administration shortened the
18 speaker's discussion?
19   A.   No one from the Marywood
20 University administration shortened the
21 speaker's presentation or discussion.
22   Q.   Did anyone from Marywood
23 administration sensor or try to sensor
24 what it is that he was going to discuss?

1    A.   Do you mean of knowledge I had
2  at the time?
3    Q.   I'm asking you did anyone from
4  Marywood try and change the topic or tell
5  Mr. Creeley he couldn't speak about
6  specific topics?
7    A.   No.
8    Q.   How many people were in
9  attendance at this speaking engagement?
10   A.   Probably most of my class
11 members, and that might have been -- I'll
12 say -- I'm not sure what that number would
13 have been between Dr. Jackson and myself
14 but let me pick a number.  Say -- I'll say
15 33, and then I would say there were
16 probably roughly 12 to 15 more people who
17 showed up.
18   Q.   The 12 to 15 additional folks
19 that showed up, were they students?
20   A.   Some were students, I believe,
21 but I didn't know -- I don't know for
22 sure.
23   Q.   Do you know who the other
24 people were?

1    A.   One person I noticed was Frank
2  Falcone.
3    Q.   And who is Mr. Falcone?
4    A.   I think his title was -- had
5  something to do with graduate students and
6  he had been a student in my class some
7  years previously, and so he showed up.
8    Q.   Was he -- so I just want to
9  make sure I understand this correctly.
10        Was he part of the faculty or
11 administration at Marywood?
12   A.   Administration.
13   Q.   Okay.
14        Do you know how the 12 to 15
15 folks that were not part of your course
16 learned about this speaking engagement?
17   A.   I do not know how they learned
18 about the speaking engagement.
19   Q.   Do you have any knowledge of
20 anyone from Marywood administration
21 telling students, faculty or anyone, not
22 to attend the speaking engagement?
23   A.   I have no knowledge of anything
24 like that.

MAGNA ›
LEGAL SERVICES

```
 1            - - -
 2            (At this time, a document was
 3      marked for identification as Exhibit
 4      Fagal-5.)
 5            - - -
 6      BY MS. PEET:
 7      Q.    What has been marked and placed
 8   before you as Fagal Exhibit-5 are
 9   documents Bates stamped DEF001447 through
10   1475. It's my understanding that this is,
11   for lack of better words, a chronology of
12   events regarding the FIRE speaker that was
13   prepared by you.
14            Is that an accurate
15   description?
16      A.    Yes.
17      Q.    So is it fair to say that what
18   has been marked as Exhibit-5 is a document
19   you prepared that, to the best of your
20   recollection and knowledge, put together
21   the chronology of the events that led to
22   the November 2011 FIRE incident, for lack
23   of better words?
24      A.    I did my best to compile this
```

```
 1   accurately, and at the time I did.
 2      Q.    When did you prepare this?
 3      A.    According to my date here, it
 4   says December -- 12/21/2011 is the date on
 5   comment one.
 6      Q.    Does that seem about accurate
 7   as to when you put this together?
 8      A.    Yes.
 9      Q.    Why did you put this together?
10      A.    Well, I felt I had been
11   wronged, if you will say that -- if I can
12   say that, by the university. I had tried
13   to find out what happened to my posters.
14   I inquired about the decision-making that
15   went into tearing down the posters. I had
16   tried to get to the bottom of what had
17   happened.
18      Q.    Were you preparing this for you
19   or for you to give to someone else?
20      A.    I was preparing this. I had
21   tried to, as they say, go through channels
22   and seek redress for what had happened. I
23   got no redress for what had happened and
24   -- although I tried to work with the
```

```
 1   administration, and so now I was thinking
 2   about perhaps going public in some way
 3   with what had happened.
 4      Q.    And by going public, what is it
 5   that you're referencing?
 6      A.    Well, at this point, I wasn't
 7   exactly sure. It could have been sending
 8   out e-mails to people. It could have been
 9   trying to say, hey, something is rotten in
10   the state of Denmark, to quote a phrase.
11      Q.    Did you ever ask to have a
12   meeting with Sister Munley to discuss
13   this?
14      A.    No.
15      Q.    If I'm doing my math right, is
16   it fair to say that approximately 45 to 50
17   people attended this event?
18      A.    That sounds about right.
19      Q.    Were you pleased with the
20   turnout?
21      A.    I wasn't displeased given the
22   situation. In this day and age, crowds
23   form with a lot of social media, spur of
24   the moment type things, but I'm not a
```

```
 1   social media expert. But people can tweet
 2   and say, hey, what the heck, let's go to
 3   -- you know, last minute, let's go to that
 4   Fagal, you know, presentation and if one
 5   of us wins the 50 bucks, you know, we'll
 6   all buy pizza.
 7            So crowds -- you can read in
 8   any of the news, they can form almost
 9   instantaneously with, you know, Facebook
10   messages and tweets, and Snapchats, and
11   all these things I really don't use but
12   the students do, and so you never know
13   what will catch the spark.
14            So if one student sees one
15   poster and that student is, shall we say,
16   a tweeting ringleader, then she might be
17   the one who by herself causes a crowd of
18   one hundred students to come out, and if
19   she's that one student who doesn't see
20   that one poster, bingo, you don't get
21   those hundred students.
22            So it's a crap shoot, shall we
23   say, in gambling terms, and that's why the
24   posters were important because you never
```

26 (Pages 98 to 101)



1    know which poster will catch which
2    person's eye and what that person might do
3    in this day and age with social media to
4    gather a crowd together.
5        Q.   Was Twitter popular in 2011?
6        A.   I don't know but there were
7    various instant message things going on
8    and that's why I tried to cover whatever
9    was going on.  I don't know.
10       Q.   Was Snapchat popular in 2011?
11       A.   I don't know.
12       Q.   Did you use social media to
13    advertise the event?
14       A.   No.
15       Q.   So you were hoping other people
16    used social media to advertise the event?
17       A.   Yes.  I sent an e-mail to class
18    members, you know, telling them about the
19    event.  I think in that -- I think in that
20    e-mail I mentioned that it was open to
21    other people.
22       Q.   Did the folks that you sent the
23    e-mail to -- did they attend?
24       A.   Most of them did.  Most of the

1    class members attended.
2       Q.   Besides your class members, did
3    you send an e-mail out to anyone else?
4       A.   No, not that I recall.
5       Q.   Did anyone tell you you
6    couldn't?
7       A.   No.
8       Q.   Did anyone win the prize money?
9       A.   Yes.
10       Q.   Do you remember who won?
11       A.   I don't recall the name.
12       Q.   Was it a student?
13       A.   Yes.
14       Q.   Was it someone from your class?
15       A.   I believe it was.
16       Q.   Do you know if that person
17    attended the speaking engagement because
18    of the attendance prize?
19       A.   I don't know.
20       Q.   So whatever happened with the
21    posters, the event still went on, correct?
22       A.   Yes.
23       Q.   And people attended the event?
24       A.   Some people attended the event.

1       Q.   And you're not aware of anyone
2    that was told they couldn't attend the
3    event, correct?
4       A.   Not aware of anyone who was
5    told they couldn't attend the event.
6       Q.   Have we exhausted all of the
7    ways in which you chose to advertise the
8    event?
9       A.   (Indicating.)
10       Q.   And in summary, you posted
11    posters and you sent an e-mail out to
12    students in your class, correct?
13       A.   That's correct.
14       Q.   Were you told you couldn't
15    engage in any other ways to advertise or
16    promote the event?
17       A.   No.
18       Q.   The -- I believe you testified
19    that the posters that Mr. Oliveri printed
20    out, which ultimately you didn't use, no
21    one required you to pay for that, correct?
22       A.   That's correct.
23       Q.   The posters that you went to
24    UPS to print out, you paid for that,

1    correct?
2       A.   That's correct.
3       Q.   Did you ever submit for
4    reimbursement to Marywood?
5       A.   No.
6       Q.   Why not?
7       A.   Because it was my donation to
8    academia.
9       Q.   I believe you testified earlier
10    this morning that at some point you
11    contacted FIRE.
12           Did you contact FIRE shortly
13    after the event on November 30th?
14       A.   Well, Will Creeley was from
15    FIRE, of course, and he knew that poster
16    -- he knew that day that posters had been
17    torn down because I told him.
18       Q.   Because you told him?
19       A.   Uh-huh.
20       Q.   Did you talk to anyone else at
21    FIRE about the incident?  And I'm calling
22    it an incident for lack of better words.
23       A.   Yes, later -- later in December
24    at some point I contacted FIRE and


MAGNA
LEGAL SERVICES

1  explained to them how the events unfolded.
2      Q.   Okay.
3          Other than what we've already
4  discussed about the unfolding of events,
5  is there anything else that is relevant to
6  what happened with the speaker?
7      A.   I'm not sure I understand your
8  question.
9      Q.   Sure.
10         You said you contacted FIRE
11  sometime in December to explain to them
12  the events that transpired.
13         Have we exhausted all of the
14  events that transpired regarding this FIRE
15  poster incident?
16     A.   I don't know about specific
17  events.  At one point -- I'm trying to
18  remember when.  I think somebody said the
19  posters had not been stamped approved on
20  Monday and that's why they were torn down,
21  and I'm trying to refresh my memory who
22  said that but I was also told that.
23     Q.   Okay.
24         Anything else that you could

1  think of that pertains to this speaker or
2  poster FIRE incident that we haven't
3  already discussed?
4      A.   Not right now.
5      Q.   What was FIRE's response to
6  you?
7      A.   I forget the exact response but
8  FIRE -- I did provide FIRE with
9  information about what had happened, and
10  FIRE contacted Sister Anne Munley about
11  the events.
12     Q.   Why did you contact FIRE?
13     A.   Well, it was their speaker
14  whose presentation I think had been
15  interfered with, not physically but in
16  terms of the publicity, and FIRE's
17  mission, as I understand it, is free
18  speech on college campuses.  And so I
19  thought that there might be a fit where
20  FIRE might contact Marywood and saying
21  perhaps there's a problem here that needs
22  looking at or fixing, so that's why FIRE
23  would be the people to contact.
24     Q.   Did you contact anyone outside

1  of Marywood administration to discuss
2  this?
3      A.   I'm not sure what you mean by
4  outside Marywood administration.
5      Q.   Well, you contacted FIRE?
6      A.   Yes.
7      Q.   Did you contact any other group
8  or entity?
9      A.   No.
10     Q.   You said it was in December
11  when you contacted FIRE.
12         Do you remember when that was?
13     A.   I can't recall exactly.
14     Q.   Do you remember with whom you
15  spoke?
16     A.   I believe I had e-mails with
17  Peter Bonilla.
18     Q.   When you contacted FIRE, was
19  that by e-mail, phone, in person?  How did
20  you do that?
21     A.   E-mail.
22     Q.   So it's your testimony that you
23  e-mailed with Peter -- probably Peter
24  Bonilla at FIRE?

1      A.   Yes.
2      Q.   Did you produce those e-mails
3  in this litigation?
4      A.   I can't recall.
5      Q.   I'm going to ask that to the
6  extent there's any e-mails that you have
7  with Peter Bonilla or anyone at FIRE
8  regarding the November 2011 incident that
9  you check for those and produce those.
10     A.   Yes.
11     Q.   Thank you.
12         MR. COHEN:  Stephanie, you're
13  saying that there are none in the
14  production?
15         MS. AHMAD:  I would have to
16  check.
17         MR. COHEN:  Okay.
18         MS. PEET:  For what it's worth,
19  there's been a very large production
20  and we'll talk about that, but that
21  doesn't -- that does not ring any
22  bells.
23         MR. COHEN:  Okay.
24         MS. PEET:  And if it has been



1    produced, then please just let us
2    know.
3           MR. COHEN:  Okay.
4           - - -
5           (At this time, a document was
6    marked for identification as Exhibit
7    Fagal-6.)
8           - - -
9           THE WITNESS:  It's possible I
10   might have contacted Will Creeley at
11   FIRE and then I might be recalling
12   that Bonilla sent an e-mail to Sister
13   Anne.  It's possible, so...
14   BY MS. PEET:
15      Q.   I recognize we're going back --
16      A.   Yeah.
17      Q.   -- four to five years.
18      A.   Four and a half years, right.
19      Q.   And that's perfectly fine.  I
20   don't expect you --
21      A.   Right.
22      Q.   -- to have everything committed
23   to memory.  All I am suggesting and
24   telling you is to the extent there are any

1    written communications which would include
2    e-mails between you and anyone at FIRE
3    about this incident, then they be
4    produced --
5       A.   Yes.
6       Q.   -- to the extent that they have
7    not.
8       A.   Uh-huh.
9       Q.   And if they have been produced,
10   just kindly direct us to those and all is
11   good.
12          You testified just a few
13   moments ago that after you contacted FIRE
14   to discuss the November 2011 incident,
15   FIRE then contacted Sister Munley.
16          This letter that has been
17   placed before you, is this what you mean
18   by FIRE contacting Sister Munley?
19      A.   Yes.
20      Q.   Did you have any part in
21   drafting this letter?
22      A.   No.
23      Q.   Did you see this letter before
24   it was sent to President Munley?

1       A.   I can't recall.
2       Q.   Do you remember making any
3    edits, or suggestions, or comments to this
4    letter?
5       A.   No.
6       Q.   Did you receive a copy of the
7    letter after it was sent out?
8       A.   I can't recall for sure but I
9    think I received a copy.
10      Q.   Did you ask for FIRE to send
11   this letter to Sister Munley on your
12   behalf?
13      A.   I would say I didn't ask FIRE
14   to send the letter.  FIRE got the facts
15   and then they decided to send the letter.
16      Q.   The facts that FIRE received,
17   were those the facts that you gave to
18   FIRE?
19      A.   Yes.
20      Q.   Do you know if FIRE got the
21   facts from any other source?
22      A.   No.
23      Q.   Did you authorize or approve
24   this letter to be sent to President

1    Munley?
2       A.   No.
3       Q.   Did Carl Oliveri tell you that
4    Alan Levine endorsed the action of tearing
5    down the posters?
6       A.   When I met with Carl Oliveri on
7    November 30th and I asked him what had
8    happened -- actually, I first started
9    saying, gee, wasn't it terrible that my
10   posters got torn down, geez, and then he
11   said we tore them down.  I was shocked.  I
12   said -- taken aback and I said why, and
13   then that's when he brought up, well, at
14   Marywood we don't pay students to go to
15   class.  I shook my head and I said what.
16   He said, well, you had the prize
17   announcement on the posters and that can't
18   happen, so that's why the posters were --
19   that's why we tore down the posters.
20          That's why they were torn down,
21   and I said well, why, and then he said
22   well -- and I said who -- you know,
23   basically I said who gave you the
24   directions because I thought he was not



1   the top person on the totem pole, and
2   that's when he mentioned Alan Levine and
3   he mentioned executive council had had a
4   meeting and had discussed this and had
5   approved tearing down the posters.
6       Q.   Did Mr. Oliveri tell you that
7   Dr. Levine endorsed the tearing down of
8   the posters?
9       A.   He did not use the word
10  "endorsed".  He just said that Alan Levine
11  -- that was the name brought up and then
12  he used the general term "executive
13  council".  So I assume that just like any
14  organization you might be in the minority
15  but if you're on the executive council and
16  if you're one of five and maybe you don't
17  agree with it but if the other four said
18  yes, then you might go ahead with it.  So
19  you might not approve but you might still
20  give the order.  So I don't know exactly
21  what Alan Levine thought.
22      Q.   Did Carl tell you that the
23  posters were being torn down because of
24  the fact that the speaker was from FIRE?

1       A.   No.
2       Q.   Did Carl tell you that the
3   posters were torn down because the speaker
4   was going to be talking about free speech
5   at a university?
6       A.   No.
7       Q.   The 20 new posters that you
8   posted on campus, did they have the
9   attendance prize language?
10      A.   No.
11      Q.   And is that because it was your
12  understanding that was not approved?
13      A.   I was told it was not approved.
14      Q.   Is that why you didn't include
15  that language in the posters?
16      A.   The language was on the posters
17  as I delivered them on Wednesday morning
18  because I knew nothing about any reasoning
19  behind that decision.  So with the 20
20  posters, Carl Oliveri and I together
21  snipped off with scissors the prize
22  announcement part of the posters leaving
23  the e-mail contact information, and then
24  those are the posters that got hung up as

1   soon as I left the office.
2       Q.   Okay.
3       A.   And some of those posters were
4   torn -- were missing later in the day.
5       Q.   And I believe you testified you
6   don't know the whereabouts of those
7   posters, correct?
8       A.   I do not know.
9       Q.   And do you have any idea how
10  many posters were missing, using your
11  words?
12      A.   Well, I know I took some
13  pictures of blank walls, so I would say
14  about at least seven or ten especially on
15  big areas like on a wall by the hallway or
16  the stairs come in from outside in LAC, so
17  some posters were missing that day.
18      Q.   Did anyone tell you what they
19  believed happened with those posters?
20      A.   I sent an e-mail to Carl
21  Oliveri that day and said, gee, Carl, even
22  those posters were torn down even though
23  they had had the prize announcement torn
24  off, and he wrote back saying he had no

1   knowledge of that, basically saying that
2   he did not direct those posters to be torn
3   down.
4       MS. PEET:  Okay.  Let's just
5   let her finish the tape.
6           - - -
7       THE VIDEOGRAPHER:  We are now
8   off the record.  The time is 11:45
9   a.m.  This ends disk number one.
10          - - -
11      (At this time, a short break
12  was taken.)
13          - - -
14      THE VIDEOGRAPHER:  We are now
15  on the record.  The time is 11:49
16  a.m.  This starts disk number two.
17          - - -
18      (At this time, a document was
19  marked for identification as Exhibit
20  Fagal-7.)
21          - - -
22  BY MS. PEET:
23      Q.   Dr. Fagal, have you ever seen
24  this document before?



1      A.   I believe I have as a quick --
2  long time ago.
3      Q.   Okay.
4          Is it fair to say that this is
5  Sister Munley's response to the letter
6  that Marywood received from Peter Bonilla
7  at FIRE?
8      A.   I assume that's correct.
9      Q.   Okay.
10         It says here please note that
11 the posters announcing the lecture but not
12 the offer of a monetary reward for
13 attendance were permitted to be posted
14 throughout the university campus.
15         Did I read that correctly?
16     A.   Let me see where this is now.
17 Let's see.
18     Q.   It's the fourth line of the
19 first paragraph.  It starts with please.
20     A.   I see what the second sentence
21 says.
22     Q.   All my question was do you see
23 that.
24     A.   What is your question?

1      Q.   Do you see that?
2      A.   I see that.
3      Q.   Okay.
4          Is it true that posters that
5  did not offer the monetary reward for
6  attendance were posted and allowed to be
7  posted at the university?
8      A.   Yes, subject to the
9  qualification that some of those posters
10 that were approved without the prize
11 announcement were torn down or went
12 missing on the day of the lecture, the day
13 they were hung.
14     Q.   And were those the posters that
15 you testified that Carl told you he didn't
16 know what happened?
17     A.   Yes.
18     Q.   And Carl told you that he did
19 not authorize, or approve, or tell anyone
20 to take down those posters?
21     A.   I believe he said something to
22 those -- he said something along those
23 lines.
24     Q.   Are you aware of anyone else at

1  Marywood that instructed or told anyone to
2  remove those posters?
3      A.   I don't know who gave the
4  directions to tear down the posters or --
5  nor do I know who tore down the posters.
6      Q.   You don't even know if a
7  direction was given, correct?
8      A.   I have no firsthand knowledge
9  that the direction was given.
10     Q.   Okay.
11     A.   Other than being told by Carl
12 Oliveri that we tore down the posters.
13     Q.   I'm talking about the 20 new
14 posters that you posted.
15     A.   No.
16     Q.   Do you have any knowledge that
17 anyone from Marywood instructed anyone to
18 take them down?
19     A.   I have no knowledge but I could
20 speculate.
21     Q.   Okay.
22         And the FIRE lecture took place
23 on the university, correct?
24     A.   FIRE took place at the

1  university.
2      Q.   Did you receive a copy of what
3  is marked as Exhibit-7?
4      A.   Yes.
5          May I point something out in
6  regard to the second sentence?
7      Q.   Sure.
8      A.   It says the alleged occurrence
9  is in regard to taking down a poster
10 announcing a lecture.  A poster is
11 singular.  We're talking about multiple
12 posters being taken down.
13     Q.   Okay.
14         So you take issue with the fact
15 that it says a poster, correct?
16     A.   Yes, I do.
17     Q.   Okay.
18         The posters that were taken
19 down, were they for the same event?
20     A.   Yes.
21     Q.   Okay.
22         And the posters were largely
23 identical except for maybe size?
24     A.   Yes.

31 (Pages 118 to 121)



1      Q.    Anything else that you take
2  issue with?
3      A.    Factually, let me see.  I don't
4  understand what both sets of posters might
5  be.  Try to help me here.  The sentence
6  that says moreover, the lecture announced
7  in the posters was conducted on the
8  university campus in the Comerford Theater
9  on November 30, 2011, as advertised in
10 both sets of posters.
11     So both -- the first set of
12 posters would be the set that had been
13 stamped approved with the prize
14 announcements and then were torn down, so
15 they were up for a brief while.  The
16 second set of posters -- when you say both
17 sets, I presume two.  The second set of
18 posters were those stamped approved on
19 Wednesday the 30th and they did not have
20 the prize announcement on them and many of
21 those were torn down.
22     If I may speculate here, I'm
23 assuming that perhaps a work study student
24 was originally told tear down the posters

1  that announce the speech and that -- at
2  that point, all the posters had on them
3  the FIRE announcement -- I mean the prize
4  announcement, and the student doing the
5  best he or she could tore down those
6  posters.
7      And then on Wednesday morning,
8  being a good work study student said oh,
9  my goodness, here are more posters.  Let
10 me do my job and tear them down even
11 though Carl Oliveri, if asked, would say
12 no, no, no, those posters are fine, leave
13 them up.
14     So what I believe is that those
15 posters were torn down by somebody like I
16 just described but not under the direction
17 of Carl Oliveri.  That's what I think but
18 I have no firsthand knowledge.
19     Q.    Do you believe Mr. Bonilla or
20 someone else from FIRE gave you this
21 letter?
22     A.    This response from Sister Reed
23 -- I mean Sister Munley?
24     Q.    Sister Munley.

1      A.    I can't recall.
2      - - -
3      (At this time, a document was
4  marked for identification as Exhibit
5  Fagal-8.)
6      - - -
7  BY MS. PEET:
8      Q.    Do you recognize this document?
9      A.    Yes.
10     Q.    Did you write this?
11     A.    Yes.
12     Q.    Did anyone help you write this?
13     A.    No.
14     Q.    Did you show it to anyone
15 before you sent it to Dr. Levine?
16     A.    I can't remember exactly.  I
17 might have shown it or parts of it to
18 Dr. Jackson.
19     Q.    Do you remember what his
20 reaction was, if anything?
21     A.    I believe he might have -- let
22 me say as I recall, he said -- I was
23 asking when I had my list of requests, he
24 said maybe I'm asking for too much and of

1  course that would be -- maybe I wouldn't
2  expect all those requests to be granted
3  but that would be a bargain point and one
4  could then say, okay, I'll give up the
5  apology for the speaker or whatever.  So
6  that was an opening list of things that I
7  thought should happen based on the past.
8      Q.    When Jackson told you maybe
9  you're asking for too much, did you make
10 any changes?
11     A.    I can't recall.  I don't think
12 so though.
13     Q.    Did you ever want to demand
14 more than what you demand in here?
15     A.    No.
16     Q.    How did you come up with this
17 list of demands?
18     A.    Marywood had held events that I
19 had been aware of where they would have
20 prize money and food and stuff like that
21 offered to the students to come to the
22 events, so I thought, well, that would be
23 good.
24     Q.    In those situations you just



Page 126

1  described, was it ever associated with a
2  course?
3      A.   There were -- there were
4  associations with courses in the sense
5  that professors were encouraged to come
6  and bring their class and have it be part
7  of their class for that evening, so that
8  would be an official class.
9      Q.   What about instructors putting
10  a monetary prize for a lecture that's part
11  of a course syllabus?
12      A.   What about that?  What was the
13  question?
14      Q.   Are you aware of that
15  happening?
16      A.   I'm not aware of professors
17  offering monetary prizes to their class.
18  I know Alan Levine, for example, told me
19  about professors bringing pizza to class.
20      Q.   What about a monetary prize for
21  attending a course or a lecture affiliated
22  with a course?
23      A.   I don't recall any.
24      Q.   Okay.

Page 127

1          At the time that you made these
2  list of demands, I assume you already knew
3  that there were -- it wasn't in the budget
4  for Marywood to pay a thousand dollars for
5  a speaker, correct?
6      A.   No.
7      Q.   Well, I think you testified
8  earlier that you were told that there was
9  no room in the budget to pay to have a
10  FIRE -- or any speaker come to campus,
11  correct?
12      A.   I -- no.  That was the fall
13  semester of 2011.  I'm not a budget person
14  but I assume that budgets for the
15  following semester would be different and
16  things had not been totally allocated
17  financially for that semester, and of
18  course one could also say, well, gee, you
19  know, there's no money in the 2011-2012
20  budget, Professor Fagal, but we can do the
21  fall of 2012.  So that's something that's
22  obviously to me anyway open to
23  negotiation.
24      Q.   Do you say anywhere in here

Page 128

1  that you're willing to negotiate?
2      A.   I finish it by saying by
3  agreeing to the above, I will consider
4  this matter closed.  I do not say anywhere
5  that if you don't give me everything, then
6  nothing can happen.  So I think in any,
7  you know, economic negotiation like this
8  people will have their high offers and
9  people have their low offers, and then
10  there'll be negotiation in the normal
11  course of business as I believe lawyers do
12  all the time --
13      Q.   Okay.
14      A.   -- when they have settlements,
15  for example.
16      Q.   Did you make it known to
17  Dr. Levine that you wanted to negotiate?
18      A.   I believe that was the
19  implication by my discussion with him and
20  the fact that he sent -- he wanted to send
21  this letter on to Sister Anne Munley.  And
22  I believe you're probably going to come to
23  it, but he wrote later -- he said Sister
24  Anne Munley -- I might not be quoting

Page 129

1  exactly.  She agrees to none of your
2  requests or demands, however he phrased
3  it.  So it was no movement by the other
4  side to talk.
5      Q.   Do you think you were
6  reasonable in this e-mail?
7      A.   I think I was reasonable in
8  terms of an opening offer or suggestion.
9      Q.   Do you think --
10      A.   If you would like to go through
11  these individually, go ahead.
12      Q.   Do you think it's reasonable to
13  tell a Catholic university that they
14  should atone for its sins?
15      A.   If they had -- if the
16  university can be considered to have
17  sinned, yes.
18      Q.   But you wrote that?
19      A.   Yes.
20      Q.   So you think that was
21  reasonable?
22      A.   Yes.
23      Q.   Okay.
24          Do you think it's reasonable



1  that they issue you a written public
2  apology?
3      A.   I think it's not unreasonable
4  because I think that will -- confession
5  might be good for the soul and will make
6  one think twice before doing such things
7  again in the future.
8      Q.   Okay.
9          And that that written public
10 apology be sent to e-mail to every faculty
11 member including adjuncts and every
12 student?
13     A.   That would be my wish.  I think
14 that would -- you know, if something is --
15 if people have made, shall we say,
16 mistakes, to own up to your mistakes I
17 think is a noble thing.
18     Q.   Do you think it was reasonable?
19     A.   What do you mean by reasonable?
20     Q.   I'm asking you; do you think it
21 was reasonable?
22     A.   Yes.
23     Q.   Okay.
24         Do you think it was reasonable

1  to ask Marywood to pay $2,000.00 to FIRE
2  to give two presentations on campus for
3  spring 2012 and also pay normal meal and
4  lodging expenses?
5      A.   Yes.  I believe when they
6  invite speakers to come, they pay lodging
7  expenses and meals.
8      Q.   Okay.
9          Do you think it was reasonable
10 to tell Marywood to host a $1,000.00 FIRE
11 session in -- probably in February for a
12 daytime class presentation to the social
13 science 201 class and the presentation
14 should be open to all of campus?
15     A.   Which number --
16     Q.   Do you think that was
17 reasonable?
18     A.   Which number are we on?
19     Q.   Five.
20     A.   Well, my idea here, yes, was to
21 have a daytime event because many students
22 might be on campus during the day and so
23 you would have a presentation during the
24 day, and then sometimes students are more

1  free to come to presentations at night
2  and, therefore, a presentation at night
3  would be good.
4      Q.   Do you think that demand was
5  reasonable?
6      A.   Yes.
7      Q.   Do you think it was reasonable
8  that you said a week before the event
9  Marywood will print ten 11 by 17 color
10 posters, ten 11 by 17 black and white
11 posters, ten 8 and a half by 14 color
12 posters, and ten 8 and a half by 14 black
13 and white posters advertising the event?
14     A.   Yes.
15     Q.   Do you think it was reasonable
16 to demand that Marywood use the other
17 $1,000.00 FIRE fee plus food and motel
18 bill to pay for an evening presentation
19 open to the whole community probably in
20 early April?  Reasonable?
21     A.   Yes, make it -- open it to the
22 public and to the community would be I
23 think not a bad idea.  Marywood does have
24 events where they invite -- make it clear

1  to the community they're invited.
2      Q.   Okay.
3          Reasonable for you to demand
4  that Marywood spend at least $1,000.00
5  documented on publicity to be coordinated
6  with you for the evening program which
7  would be open to the public and all
8  members of the campus community?
9      A.   I would say this one would be a
10 little -- a little more unreasonable given
11 that there be -- that posters might go up.
12 That would be a negotiating point, shall
13 we say.
14     Q.   Do you think it was reasonable
15 to demand that Marywood provide 1,000
16 thousand slices of free pizza and 500 cans
17 of cold soda at the evening presentation?
18     A.   Well, I think the soda might be
19 reasonable because that will not spoil.
20 So if only 200 people -- if 100 people
21 showed up, it might be 100 cans of soda if
22 everybody gets one and that would be it.
23     Q.   Do you think it was reasonable?
24     A.   The 500 cans of soda?



1    Q.   And the 1,000 slices of free
2  pizza for your evening presentation.
3    A.   I think that might be a bit of
4  a reach.  1,000 slices of pizza depending
5  on -- you know, two slices a person would
6  be 500 people.  That would be a pretty
7  full house, a crowd, but, again, that
8  could be -- instead of pizza one could
9  offer Snickers bars or something.  That's
10  a negotiating point.
11    Q.   You didn't demand Snickers
12  bars.
13          You demanded 1,000 slices of
14  pizza, correct?
15    A.   What do you mean by demand?
16    Q.   Aren't these demands?
17    A.   Well, if I look back, it says
18  -- let me read.  Do I use the word
19  "demand" anywhere and imply anywhere where
20  it's all or nothing?
21          At the top of DEF2330, I wrote
22  due to Marywood's actions, I request at
23  this stage, and then I ask -- preceding
24  number one, I ask that I immediately

1  receive by December 15th, and then I go on
2  to item number one.  I don't see -- help
3  me out -- if there's anything here that
4  says I'm going to stamp my feet and go
5  home if I don't get all 11.
6    Q.   Is it your position that these
7  are not -- cannot -- should not be
8  characterized as demands?
9    A.   They should not be
10  characterized as demands if by demands you
11  mean that it's all or nothing.
12    Q.   It's however you define
13  demands.
14    A.   That's how I define --
15    Q.   Is it you feel that these are
16  not demands?
17    A.   I believe any -- I believe
18  these are -- if by demands you mean all or
19  nothing, I will not talk about anything
20  else, I will not negotiate, this is it,
21  then I would say these are not demands.
22    Q.   Okay.  I'm not defining it.
23    A.   Okay.  I just --
24    Q.   It's however you define it.

1    A.   That's fine.
2    Q.   My question to you --
3    A.   Right.
4    Q.   -- is do you feel that calling
5  these demands is inappropriate, that
6  that's not what they're -- that's not what
7  you would call them?
8    A.   I don't know if the word is
9  inappropriate.  A lot of people use
10  demands in negotiation, these are my
11  demands, and everybody knows that by
12  demands you mean that the demands are open
13  to negotiation.
14    Q.   Okay.
15    A.   So you have to qualify demands
16  by saying that it's really all or nothing.
17    Q.   Okay.
18    A.   And these are not all or
19  nothing demands.
20    Q.   But these are demands
21  nonetheless?
22    A.   Some people call them demands.
23  I would not call them demands.  I don't
24  think I use the word "demands" in here.

1    Q.   Okay.
2          Do you think it was reasonable
3  to require that -- to ensure the publicity
4  for each event it must include two
5  separate e-mails, they have to be approved
6  by you, sent to the complete faculty list
7  including adjuncts and the student e-mail
8  list.  The e-mails will advertise the
9  upcoming FIRE event and these, probably in
10  April, evening event e-mails will include
11  the offer of free pizza.  For each FIRE
12  event that the first e-mail will be sent
13  one week before the event.  The remainder
14  e-mails also with complete information --
15    A.   Reminder.  Excuse me.
16    Q.   -- will be sent 24 hours before
17  each event.  Every e-mail must meet your
18  approval.
19          Is that reasonable?
20    A.   Yes, and let me explain.  Two
21  separate e-mails, one ahead of time so the
22  students have time to plan and then a
23  last-minute reminder.  I believe that
24  aspect is reasonable.  Sending e-mails

35 (Pages 134 to 137)



1    basically costs nothing but a small amount
2    of time for somebody to compose the
3    e-mail.  The free pizza business, whether
4    it's free pizza or a one cent Tootsie
5    Roll, that is obviously open to
6    negotiation from the previous discussion
7    we just had.
8        And every e-mail must meet my
9    approval, you know, one can couch an
10   e-mail announcement in terms of, let's
11   say, coloring the enthusiasm with which
12   the e-mail is sent out.  So I just was
13   trying to make sure it was a fair e-mail
14   that went out.  I did not say I would
15   write the e-mail.  I would just say the
16   e-mail would have my approval.
17       Q.   Okay.
18           And it's your position that
19   this --
20       A.   Is reasonable.
21       Q.   -- demand or request, whatever
22   you want to call it in number ten --
23       A.   I would call it reasonable.
24       Q.   -- is reasonable?

1        A.   I would call it reasonable.
2        Q.   Okay.
3            Just for clarification, you did
4    not send an e-mail ahead of time other
5    than to your own class about the November
6    30th speaker, correct?
7        A.   That's correct.
8        Q.   And you did not send any
9    reminder e-mail before the November 30th
10   event, correct?
11       A.   No.  I had no access to any
12   student e-mail lists.
13       Q.   Did you ask anyone to do that?
14       A.   I did.
15       Q.   Who did you ask?
16       A.   I asked -- I believe it was Amy
17   Paciej, one of the deans, to send out an
18   e-mail announcing the event.
19       Q.   And what was her response?
20       A.   I can't recall her response but
21   I know that she did not send it out.
22       Q.   Did you -- how did you ask Amy,
23   by e-mail?
24       A.   Yes.

1        Q.   Did you ask anyone else?
2        A.   I can't recall, but the e-mail
3    announcements about events like this would
4    generally come from her.
5        Q.   Do you think it was reasonable
6    that requesting or demanding, whatever
7    words you want, of Marywood that by
8    sponsoring a fall 2012 appearance on
9    campus by Robert Spencer of Jihad,
10   J-I-H-A-D, Watch that Mr. Spencer, based
11   on the jihadwatch.org Web site, will be
12   willing to debate anyone regarding aspects
13   of Islam but his appearance would not be
14   contingent on the existence of a debater
15   for the other side?
16           You continue that the event
17   shall be publicized by the number of
18   posters outlined in number five and by
19   single topic e-mails sent to the faculty
20   and student e-mail lists as outlined
21   above.  You continue that your friends and
22   you will hang the posters designed with
23   your approval.  The opposition side in the
24   proposed debate can of course hang its own

1    posters or participate in the poster
2    design.
3            Do you think that was
4    reasonable?
5        A.   Well, yes, in the sense that
6    it's easy to be for ideas one supports.
7    It's easy to be for free speech when it
8    supports your ideas.  It's hard to
9    sponsor, shall we say, a debate in which
10   one might hear two widely opposing views,
11   and as a university I think that would be
12   a -- it's a good thing to have happen to
13   have students exposed to wide range of
14   viewpoints.
15       Q.   For your demand number 11,
16   there's no requirement by you that there
17   be a debater on the other side, correct?
18       A.   Correct.
19       Q.   So it would be possible then
20   that it would only have one side on the
21   topic, correct?
22       A.   That's correct, and that's
23   because sometimes Mr. Spencer, as I
24   understand it, has had trouble getting



1  debaters.  So if you want to present a
2  side that says red is the favorite color
3  but we must have a debater on the other
4  side for a different color, well, if the
5  other -- if the other color says I won't
6  show up at the debate, then you don't get
7  the red point of view.
8        So one way to prevent the red
9  point of view would be to have the other
10  colors refuse to show up.  So I would want
11  -- the whole point of that is to have a
12  debate or a presentation of different
13  views.  That was the whole point.  That's
14  what I would want.  I would not want a
15  one-sided presentation.
16     Q.   But you didn't require two
17  different views, correct, for number 11?
18     A.   I didn't require it because --
19  but I would fully support it.  I would
20  even probably paid money to ensure that it
21  happened if it was a question of money.
22     Q.   Did you think the university
23  was going to accept your 11 demands?
24     A.   I would have been shocked and

1  pleasantly surprised if it accepted all 11
2  demands.  I would say I didn't expect all
3  11 demands to be accepted, but they
4  weren't really demands in the sense of all
5  or nothing.  They were negotiating let's
6  talk items.
7     Q.   What did you think Marywood's
8  reaction was going to be?
9     A.   I didn't know what it would be.
10  I would have been guessing on my part.  I
11  could guess.
12     Q.   I'm asking you at the time that
13  you drafted this, what did you think the
14  university's response was going to be?
15     A.   I thought that the university
16  would admit to me that it had wrongly torn
17  down the posters with the prize money,
18  and, by the way, they did not even inform
19  me of that.  They could have -- the
20  university could have simply scratched out
21  the prize announcement with a black magic
22  marker, and so I thought it was rather,
23  shall we say, bad behavior on the part of
24  the university with regard to the whole

1  posters incident.
2        I also thought that perhaps the
3  university had a way out in terms of
4  perhaps Sister Munley was, I thought at
5  the time, maybe not fully informed about
6  what had happened at the lower levels of
7  the tearing down, whether I believe at
8  some point there was a discussion that the
9  other posters that were torn down were not
10  stamped approved, which was totally wrong.
11  They were all stamped approved, but there
12  was that story out there among the
13  administration.
14        And so, therefore, if Sister
15  Munley had said to me, gee, Fred, you're
16  right, we goofed up, the posters shouldn't
17  have been torn down, we made a mistake,
18  but I can't do all these 11 things, and
19  then I would presume she should have said
20  you're right, we should reimburse you for
21  the FIRE speaker and your posters
22  expenses.  We should reimburse you the
23  $500.00 that you paid out to try to do a
24  good job for the university.  I will, you

1  know, do my best to make sure that this
2  doesn't happen again, but I would really
3  not issue a public apology but I will
4  invite some more FIRE speakers to come to
5  campus next weekend.
6        And so basically if Sister Anne
7  Munley had gone that route, then she would
8  have paid me $500.00, basically apologized
9  to me in private.  She would have invited
10  FIRE speakers, say, to come to an evening
11  presentation, something like that, and I
12  could have lived with that.  Of course, I
13  would have preferred, you know, a
14  full-blown let's go for some excitement on
15  campus with controversial debate but I'm
16  not unreasonable.  I thought that would
17  have been a good response and a correct
18  response.  If I was president, that's what
19  I would have done.
20     Q.   Do you -- can you see how
21  someone would find your 11 demands to be
22  unreasonable?
23     A.   I can see how somebody would
24  say that's way too much to ask for for a



Page 146

1  case like this.  Yes, I can see that point
2  of view.
3      Q.   Did you ultimately meet with
4  Dr. Levine regarding the posters?
5      A.   Yes.
6      Q.   And I believe that happened on
7  or around December 5, 2011?
8      A.   Yes.  I'd have to refresh --
9  yes.  I sent this letter, Exhibit-8, on
10 December 2nd.  Was it -- at some point I
11 was told President Munley considered and
12 will give you nothing.
13     Q.   So you had a meeting with
14 Dr. Levine?
15     A.   Yes.
16     Q.   Who was at the meeting?
17     A.   I believe it was just
18 Dr. Levine and I.
19     Q.   And the meeting, just for
20 purposes of chronology, was after you sent
21 this letter, correct?
22     A.   Yes.  This letter is December
23 2nd, and December 5th meeting sounds
24 correct.

Page 147

1      Q.   Just to refresh your
2  recollection, if you can go through your
3  stack there and pull out Exhibit-5, which
4  is the chronology of events --
5      A.   Yes.
6      Q.   -- that you prepared.
7      A.   Okay.
8      Q.   If you can flip to the Bates
9  stamp on the bottom is DEF001468.
10     A.   Okay.
11     Q.   You wrote those comments,
12 correct?
13     A.   Comment 15?
14     Q.   Yeah.  It says while driving
15 home after the December 5 meeting --
16     A.   Let's see.
17     Q.   -- with Alan Levine.
18         Does that refresh your memory
19 of when the meeting you had with
20 Dr. Levine was?
21     A.   Yeah.  Let me see here.  Okay.
22 So he was --
23         MR. COHEN:  What Bates stamp
24     are we looking at?

Page 148

1      MS. PEET:  1468.
2      THE WITNESS:  Yes.  So this was
3  when I believe I had the discussion
4  with Dr. Levine about the pandering.
5  BY MS. PEET:
6      Q.   Okay.
7         And I believe you testified
8  about that earlier.
9         Have we exhausted what happened
10 at that meeting with Dr. Levine and what
11 was discussed?
12     A.   Yes.  He brought up the
13 pandering and he said the executive
14 council had discussed it and that was --
15 pandering was a bad thing.
16     Q.   Okay.
17         Anything else that was
18 discussed during that meeting?
19     A.   Checking here on the dates.
20 When did -- my December 2nd letter went
21 out and so he -- let's see.  I believe I
22 had met with Dr. Levine a bit earlier,
23 December 1st.
24     Q.   Would that have been before you

Page 149

1  drafted the list of demands because that's
2  dated December 2nd?
3      A.   That's dated December 2nd.
4  Check my chronology here.
5      Q.   According to your chronology,
6  you had a meeting with him on December
7  5th.  That's what you --
8      A.   Yes, I understand that.  Let me
9  see here.  No.  If you look at -- let's
10 see here.  Let's see, 1461.  There's a
11 December 1st e-mail where I say I'm still
12 at loss to explain for what happened.
13     Q.   I'm just asking about your
14 meeting with Dr. Levine.
15     A.   Yeah.  I'm trying to remember
16 which meeting because I think there might
17 have been two.  I'm getting a little --
18     Q.   And I'm asking about the
19 meeting that you had with Dr. Levine about
20 your list of demands which was on December
21 -- sent on December 2nd, and we know you
22 met with him on December 5th.
23     A.   What I did was when I -- trying
24 to recall here.  I met with Alan Levine



1  and I had printed out, I believe, the list
2  of demands, if you want to call them
3  demands, and Alan read that list at that
4  meeting where he first saw them, and then
5  he said would you please send them to me
6  by e-mail so that I could then send them
7  on to President Munley.  And so he saw
8  that letter by hand-printed copy before he
9  saw it by e-mail.
10      Q.   Okay.
11      A.   And so I'm trying to -- I'd
12  have to review here to figure out exactly
13  when in the chronology --
14      Q.   It's okay.
15      A.   Okay.
16      Q.   How did the meeting conclude?
17      A.   The first e-mail with -- I'm
18  trying to --
19      Q.   Meeting.  I'm sorry, meeting.
20      A.   Yeah.  The first -- the
21  meetings were all cordial.  The meeting
22  where I first showed Alan the letter he
23  said he would forward it on to Sister --
24  President Anne Munley, and we had that

1  pandering discussion.  And so then you
2  referred me to -- that's when I told him
3  about the -- later that night I told him
4  about the Harvard professor.
5          And what page were we on for
6  that?  I'm sorry.
7      Q.   I'm not on a page.  I was just
8  trying to refresh --
9      A.   Okay.
10      Q.   -- your recollection about
11  December 5th.  That's all.
12      A.   I'd have to review.  I can't
13  recall exactly --
14      Q.   Okay.
15      A.   -- that exact date.
16      Q.   So did the meeting conclude
17  with Dr. Levine saying please send me the
18  e-mail of the demands and I'll present
19  them to Sister Munley?
20      A.   If that was the meeting when I
21  first showed him the picture, that's what
22  he said, yes.
23      Q.   Okay.
24          Were you satisfied with that

1  meeting?
2      A.   Yes.  I didn't expect him to
3  have any power to grant any of my wishes.
4      Q.   And you think that it was the
5  president that would have the power to
6  grant those wishes, right?
7      A.   Yes.
8      Q.   Do you know Dr. Levine's
9  religion?
10      A.   Not for a fact.
11      Q.   What do you believe it to be?
12      A.   I assumed he was Jewish.
13      Q.   Did you assume he was Jewish
14  when you met with him in December of 2011?
15      A.   I think I had always assumed
16  it, just not as any big deal.
17              - - -
18          (At this time, a document was
19      marked for identification as Exhibit
20      Fagal-9.)
21              - - -
22  BY MS. PEET:
23      Q.   What has been placed before you
24  as Exhibit-9 seems to be an e-mail chain.

1  If you look at the first page, there are
2  e-mails between you and Dr. Jackson.
3          Do you see that?
4      A.   I see.  I haven't seen these
5  lately.  Go ahead.
6      Q.   Okay.
7          Are these in fact e-mails that
8  you and Dr. Jackson were sending each
9  other in December of 2011?
10      A.   Yes, they appear to be.
11      Q.   And just for the record, these
12  are -- these three pages are documents
13  that you produced to Marywood in this
14  case?
15      A.   Yes.
16      Q.   Okay.
17          Who is Adolf Eichmann?
18      A.   He was a German in World War II
19  who was fairly low level functionary who
20  signed orders or, you know, did processing
21  sending Jews to the gas chamber and he was
22  captured by Israeli Mossad in 1960 in I
23  think -- I think it was Brazil, and there
24  was a trial in the early 1960s in Israel



1   and I believe he was executed.
2       Q.   Did you say he sent Jews to gas
3   chambers?
4       A.   I don't know that he had the
5   power to do that but, you know, he was --
6   I don't know the exact details of what his
7   powers were but he was functioning as
8   such.
9       Q.   On the top of page two, do you
10  write that Alan becomes the equivalent of
11  Adolf Eichmann?  Do you see that?
12      A.   Yes, I do.  And I would like to
13  point out my parenthetical comment, well,
14  comma, not quite the gas chambers, comma,
15  but the same idea.
16      Q.   Okay.
17      And when you say --
18      A.   Meaning -- meaning simply, as I
19  just explained, that Alan Levine -- I
20  viewed him as being a functionary.
21      Q.   And was Adolf Eichmann a
22  functionary of Adolf Hitler?
23      A.   Yes.
24      Q.   Okay.

1       So you're -- okay.
2       And the Alan in this e-mail, is
3   that Alan Levine?
4       A.   Yes.
5       Q.   If you look back to the first
6   page, there's an e-mail from Dr. Jackson
7   to you.  It says Eichmann slash Alan,
8   dash, get that meta out of your head
9   before it comes out at the wrong time.
10      Do you know what he meant by
11  that?
12      A.   In the very top first part?
13      Q.   The e-mail from --
14      A.   Where I say I thought the
15  Eichmann comparison might get him to wake
16  up but maybe it can be toned down?
17      Q.   I'm referring to -- if you look
18  down a little bit, there's an e-mail from
19  Dr. Jackson to you.
20      A.   What time of day?  Which one
21  are you looking at?
22      Q.   December 2, 2011, 9:19 p.m.
23      A.   Okay.
24      Q.   And Dr. Jackson writes Eichmann

1   slash Alan, dash, get that meta out of
2   your head before it comes out at the wrong
3   time.
4       Do you see that?
5       A.   Yes, I do.
6       Q.   What do you think he meant by
7   that?
8       A.   He's saying that some people
9   have, shall we say, gut reactions to even
10  the mention of that relationship to call
11  -- if you say somebody is a -- say a
12  lackey of somebody where they do their
13  bidding because it's their job to follow
14  orders, and if the orders are not, shall
15  we say, good orders, if I -- if somebody
16  says well, that would be Eichmann-like,
17  that might be, you know, you're saluting
18  and saying yes, ma'am, I'll do what you
19  say.
20      I personally don't see any
21  connotation where if you're saying
22  somebody is Eichmann-like that they are
23  actually anti-semitic or sending Jews to
24  the gas chamber or anything at all like

1   that.  It simply means that they are doing
2   the boss's -- boss's bidding in this
3   instance, nothing --
4       Q.   Do you -- do you see how if you
5   refer to someone as Alan Eichmann, how
6   they can -- how they can view that as
7   perhaps anti-semitic?
8       A.   Some people might view that.
9   People view things different ways.
10      Q.   Okay.
11      Do you think someone could be
12  offended if you refer to them as Alan
13  Eichmann who is in part responsible for
14  killing over six million Jews?
15      A.   They could be.  They could be.
16          ---
17      (At this time, a document was
18      marked for identification as Exhibit
19      Fagal-10.)
20          ---
21  BY MS. PEET:
22      Q.   Do you recognize this letter?
23      A.   Yes.  Let me read it quickly,
24  please.



Page 158

```
1        Q.   Sure.
2              - - -
3              (At this time, the witness
4        complies with request.)
5              - - -
6              THE WITNESS:  Okay.
7   BY MS. PEET:
8        Q.   Okay.
9              Do you recall receiving this
10  letter from Dr. Levine?
11       A.   Yes.
12       Q.   What was your reaction?
13       A.   I was a little surprised and
14  disappointed.  I would say dis -- yes.
15       Q.   At the time that you received
16  this letter, December 15, 2011, did you
17  already have the idea of creating this
18  video?
19       A.   No, I don't believe I did.
20       Q.   Did you have any idea what you
21  were going to do if Marywood didn't agree
22  to your demands?
23       A.   No.  I thought about -- I
24  didn't have any specific ideas.  I thought
```

Page 159

```
1   about maybe getting FIRE involved.
2        Q.   Anything else?
3        A.   The thought crossed my mind
4   that maybe I would contact Glenn Reynolds
5   perhaps at Instapundit which is a big
6   blog.
7        Q.   Anything else?
8        A.   Not that I can recall.
9        Q.   What about sitting down with
10  Sister Munley?
11       A.   Well, I already sent her -- she
12  already got the complete letter and I had
13  laid everything out as totally clearly as
14  possible.  I thought the letter -- it says
15  appears -- Alan wrote appears we have a
16  different understanding of what
17  transpired.
18             I thought Marywood is not
19  interested in finding out the truth about
20  the posters because I thought it was quite
21  clear and that Marywood could have
22  investigated, you know, was Carl Oliveri
23  not there, was the grad student who
24  stamped them approved -- was she
```

Page 160

```
1   misinformed or not informed, you know.
2   Was there an out?  I had given all those
3   possibilities and this to me was just
4   saying done, President Munley is not
5   interested in talking to you at all,
6   period.
7        Q.   So is it fair to say you did
8   not request a meeting with her?
9        A.   I did not request a meeting
10  with her.
11       Q.   Did you get FIRE involved at
12  this point?
13       A.   Well, we discussed there was a
14  letter that went out.  We -- yes, FIRE
15  did --
16       Q.   Okay.
17       A.   -- was involved.
18       Q.   So other than -- anything other
19  than those letters for FIRE involvement?
20       A.   I did not contact the blog or
21  anything like that.
22       Q.   When you say the blog, would
23  that be Instapundit?
24       A.   Yes.
```

Page 161

```
1        Q.   You did not contact them?
2        A.   No.
3        Q.   Did you post on
4   marywoodfreespeech.com about this?
5        A.   No.
6        Q.   When did you decide to create
7   these videos?
8        A.   I don't remember the exact
9   dates.  The Downfall movie parity videos
10  were and have been a huge event on
11  YouTube.  They're often used to get points
12  across and usually in a humorous way.  It
13  helps attract an audience and some of the
14  topics that are used by the videos on
15  YouTube on Downfall are humorous, some are
16  serious.
17             For example, there was one that
18  compared the New York State commissioner
19  of education and they had his, you know,
20  policy decisions, you know, evidenced in a
21  Downfall YouTube video.  So these are
22  very, very popular, their own Wikipedia
23  page, and so this is a way to maybe get
24  the message out.
```

41 (Pages 158 to 161)



1      Q.    What message?
2      A.    In this case, what had happened
3  in regard to the posters tear down
4  incident.
5                    - - -
6          (At this time, a document was
7      marked for identification as Exhibit
8      Fagal-11.)
9                    - - -
10  BY MS. PEET:
11      Q.    Exhibit-11, would you agree,
12  are e-mail communications between you and
13  Pamela Parsons --
14      A.    Yes.
15      Q.    -- on December 14, 2011?
16      A.    Yes.
17      Q.    Okay.
18          If you look at the bottom of
19  the first page, it's an e-mail from you to
20  Pam, December 13, 2011, at 6:30 p.m.
21          Do you see that?
22      A.    Yes.
23      Q.    And you -- I -- you say I
24  included the demand dash requests in this

1  version.
2      A.    Okay.
3      Q.    In the, quote, demand letter I
4  sent Alan Levine last week, I asked for
5  reimbursement by the 15th, so I guess I
6  will hang tight at least until then.
7          Do you see that?
8      A.    Yes.
9          May I point something out,
10  please.
11      Q.    Sure.
12      A.    The word "demand" is in quotes.
13      Q.    Okay.
14          Did you write the word
15  "demand"?
16      A.    Yes.
17      Q.    And the demand letter that
18  you're referring to that you sent to Alan
19  Levine, is that what we've already
20  discussed and has been marked as
21  Exhibit-8?
22      A.    Yes, it would be.
23      Q.    And those were your words,
24  correct?

1      A.    Which words?
2      Q.    Demand.
3      A.    Yes.
4      Q.    Above that Pam writes you back,
5  and one of the things she says or
6  questions is can you get legal advice
7  before commencing.
8          Do you see that?
9      A.    Yes.
10      Q.    Did you get legal advice before
11  commencing?
12      A.    No.
13      Q.    Why not?
14      A.    I wasn't thinking of this
15  really as a legal issue.  It was just an
16  issue I had to deal with.
17      Q.    But Pamela thought maybe you
18  should get legal advice?
19      A.    I don't know if she thought
20  that.  She asked -- she said -- she wrote
21  what she wrote.
22      Q.    Okay.
23          Right above that you send her
24  an e-mail, and one of the things you

1  write, I did write it in a way which might
2  suggest that I am ready to fight, open
3  parentheses, in court perhaps, closed
4  parentheses, period.
5          Were you still not thinking
6  litigation at that point?
7      A.    I was actually thinking suing
8  in small claims court for tearing down my
9  posters and making the publicity that way.
10  I wasn't thinking it was any giant legal
11  action.
12      Q.    If you read right above that,
13  you say don't know if my brother-in-law
14  lawyer will have time or inclination to
15  look at this.
16      A.    Right.
17      Q.    Not his area of the law.  I
18  will run it by a University of Chicago law
19  student to see what he thinks.
20          Are you referring to a small
21  claims court matter?
22      A.    No.  I was just seeing if they
23  had any ideas.  I wasn't thinking of any
24  action I was going to take.

**42 (Pages 162 to 165)**



Page 166

1       Q.   Were you trying to prepare
2   yourself for action that might be taken
3   against you?
4       A.   I didn't know.  I was thinking
5   -- I was -- my brother-in-law is a good
6   lawyer.  If I -- at Christmastime if I
7   said to him, gee, Jim, you know, I've
8   gotten in a brouhaha with the university
9   and if he said what happened, Fred, and I
10  told him, I showed him the e-mail thread,
11  and, you know, I don't know what -- I
12  don't know what he'd think about that.  He
13  might -- he'd probably say well, you
14  know -- you know, he's too -- he wouldn't
15  want to get involved in the small stuff,
16  right, so not his area of the law.  I know
17  that.
18          The University of Chicago
19  student was a former Marywood student who
20  worked heavily on free speech issues and,
21  you know, if they thought there was
22  something I should be careful of, they
23  might tell me, Fred, be careful, don't do
24  this, but I had no plans to do any --

Page 167

1   anything.
2       Q.   Okay.
3           Who was the University of
4   Chicago student to whom you're referring?
5       A.   Who was it?  William
6   Ziegelbauer.
7       Q.   Did you ever get the cartoon
8   drawn that you reference here?
9       A.   Pam sketched one real rough
10  quick cartoon of a nun unidentified
11  tearing -- I can't remember if it was
12  unidentified but a nun tearing down a
13  poster from a pillar, but I didn't use
14  that in anything.
15      Q.   Why not?
16      A.   We were thinking of making a
17  big montage sequence, shall we say, you
18  know, cartoon showing posters being torn
19  down around campus but it was just a mere,
20  you know, quick discussion, no big plans.
21  It didn't come to any fruition.
22      Q.   That cartoon that you just
23  referenced, was that what you produced
24  yesterday as a quick little video?

Page 168

1       A.   It was a quick little -- it
2   just showed a picture of the pillar.
3       Q.   Correct.
4       A.   Yeah.  We produced it recently,
5   yes.
6           MS. PEET:  Why don't we take a
7   break here.
8           - - -
9           THE VIDEOGRAPHER:  We're now
10  off the record.  The time is 12:46
11  p.m.
12          - - -
13          (At this time, a luncheon
14  recess was taken.)
15          - - -
16          THE VIDEOGRAPHER:  We are now
17  on the record.  The time is 1:33 p.m.
18          - - -
19  BY MS. PEET:
20      Q.   Mr. Fagal, are you ready to
21  continue?
22      A.   Yes, I am.
23      Q.   Just a reminder, you're still
24  under oath, so all of the testimony you

Page 169

1   give to the remainder of this deposition
2   must be truthful, accurate, and complete.
3           Do you understand that?
4       A.   Yes.
5           - - -
6           (At this time, a document was
7   marked for identification as Exhibit
8   Fagal-12.)
9           - - -
10  BY MS. PEET:
11      Q.   Mr. Fagal, what has been placed
12  before you is a two-page e-mail exchange
13  between you and Pam Parsons in December of
14  2011.
15          Do you see that?
16      A.   Yes.
17      Q.   Do you agree that that's what I
18  purported to be is what it is?
19      A.   Yes.
20      Q.   The top e-mail seems to be from
21  Pam to you.
22      A.   Yes.
23      Q.   Do you see that?
24      A.   Uh-huh.

43 (Pages 166 to 169)



1    Q.   And then in the middle there's
2  just two lines that seem to be from you to
3  Pam, and then the bottom is an e-mail from
4  Pam to you.
5        Do you see that?
6    A.   Yes.
7    Q.   What are you and Pam
8  discussing?
9    A.   I'm trying to think about how
10 if I didn't get a response from Marywood
11 about my 11 requests and some sort of
12 negotiation about going public in some
13 sense to a certain extent with what
14 happened, and so we were talking about
15 maybe some sort of cartoon poster.
16 Nothing came of it but...
17   Q.   Okay.
18            - - -
19        (At this time, a document was
20 marked for identification as Exhibit
21 Fagal-13.)
22            - - -
23 BY MS. PEET:
24   Q.   Exhibit-13 is an e-mail from

1  you to William Ziegelbauer dated
2  December 15, 2011, with attachments; is
3  that correct?
4    A.   Yes.  I believe he pronounces
5  his name Ziegelbauer, but that's okay,
6  yes.
7    Q.   I apologize.
8        Is this the person you
9  discussed earlier that's a University of
10 Chicago law student and a previous
11 Marywood University student?
12   A.   He was at the University of
13 Chicago as a law student at the time, yes.
14   Q.   And what is this first
15 attachment?  If you turn to the second
16 page, it says Marywood's shame, November
17 2000 -- November dash December 2011, and
18 it says something about Professor Fagal
19 again under attack.
20       What is this?
21   A.   This would be a draft of an
22 explanation as to what happened with --
23 you know, going along with the timeline
24 about being called a panderer and stuff

1  like that, so it's about the posters tear
2  down.
3    Q.   Okay.
4        If you turn -- keep on the
5  first page.  The end of the fourth
6  paragraph.  It's a very short paragraph.
7  It says I think Alan Levine is deep down
8  actually in my corner but no one but the
9  president has any real power.
10       Do you see that?
11   A.   No, I don't yet.
12   Q.   On the first page.
13   A.   Oh, the first -- not the
14 Marywood's shame but before that?
15   Q.   Yeah.
16   A.   Okay.
17   Q.   The cover e-mail.
18   A.   Yeah, uh-huh.  Fourth
19 paragraph; one, two, three -- yeah.
20   Q.   I think Alan Levine is deep
21 down actually in my corner but no one but
22 the president has any real power.
23       Do you see that?
24   A.   Yes.

1    Q.   Do you still agree with that?
2    A.   Do I still agree with that?
3    Q.   Uh-huh.
4    A.   Clarify the -- do you mean do I
5  agree today that Alan Levine is in my
6  corner?  Is that the question?
7    Q.   Yes.
8        Do you still agree with the
9  statement that you wrote here?
10   A.   No, not as much as I did then.
11   Q.   And what changed that position?
12   A.   In discovery I saw some e-mails
13 that Alan Levine was involved with that
14 implied that he wasn't happy with the
15 posters, the speaker coming to campus and
16 things like that.
17   Q.   Okay.
18       The next paragraph says in
19 bold, so unless I have grounds to sue the
20 bastards.
21       Do you see that?
22   A.   Uh-huh.
23   Q.   Who are the bastards?
24   A.   That would be the people who

44 (Pages 170 to 173)



MAGNA
LEGAL SERVICES

Page 174

1    tore down my posters.
2        Q.   Were you referring to Marywood
3    University?
4        A.   It was general statement that I
5    was angry and I wanted to do something
6    about it.  It wasn't a real intention
7    unless I have grounds, a violation of
8    contract.  I mean --
9        Q.   Well, you --
10       A.   -- as a professor, what rights
11   did I have?  So --
12       Q.   Well, you sued Marywood
13   for breach of contract?
14       A.   Yes.
15       Q.   So is Marywood University the
16   bastards in this e-mail?
17       A.   At least some people affiliated
18   with it.
19       Q.   Okay.
20            Who are the bastards?
21       A.   If I had to name names, it
22   would probably be -- I don't know -- Carl
23   Oliveri.  I didn't know who was involved.
24   I knew that the executive council was

Page 175

1    somehow involved but I didn't know to what
2    extent and who did what.  For instance, I
3    didn't know what any individual felt or
4    was -- you know, who was the ringleader,
5    for example.  I did not know.
6        Q.   Okay.
7            Do you think everyone in the
8    executive council is a bastard?
9        A.   That would depend on the term
10   "bastard".  I would say the traditional --
11   I would have no idea.  It depends on
12   the --
13       Q.   It's your wording, so however
14   you interpret it.
15       A.   Yeah.  My wording here is not
16   the son of an unmarried mother or daughter
17   of an unmarried mother bastard but just a
18   general term that people use all the time
19   when you say those people who, you know,
20   did me wrong or, you know, the team that
21   beat my team, you know.
22       Q.   Okay.
23            So who are the people that you
24   believe did you wrong, Carl Oliveri?

Page 176

1        A.   Carl Oliveri I was presuming.
2    I think anybody who did not pursue -- Alan
3    Levine I don't think pursued -- gave up
4    pursuing -- as far as I could tell from
5    his letter, gave up pursuing what happened
6    with the posters tear down.  This is
7    basically an offhanded comment.
8        Q.   Okay.
9            I'm just trying to have --
10       A.   Okay.
11       Q.   -- you identify who you
12   think --
13       A.   That's fine.
14       Q.   Did you exhaust that?
15       A.   Yeah.  I was assuming here that
16   Anne Munley was not directly involved in
17   the, you know, initial posters tear down
18   business.  So I was assuming it was at a
19   little lower level, but I didn't -- I
20   didn't know for sure.  That's why I was
21   trying to give her -- give Alan Levine an
22   out to say that there was
23   miscommunication.
24       Q.   You say here all I can do is

Page 177

1    shame the hell out of them and hope a
2    little bad publicity.
3        A.   Uh-huh.
4        Q.   Who were you trying to shame
5    the hell out of?
6        A.   Well, that would be the
7    administrators and, in this case, it would
8    be Anne Munley.  She's in charge tearing
9    down a free speech poster.
10       Q.   The poster wasn't for free
11   speech, correct?  It was a poster
12   advertising a speaking engagement,
13   correct?
14       A.   Speaking engagement by somebody
15   from FIRE, and one of FIRE's main charges
16   is free speech on college campuses.
17       Q.   No one from the university or
18   administration told you that the reason
19   why the posters were removed were because
20   of it was associated with FIRE or free
21   speech, correct?
22       A.   They did not tell me that.
23       Q.   If you go down another
24   paragraph, you -- the last sentence says I

45 (Pages 174 to 177)



Page 178

1    guess they will have to take comfort in
2    schadenfreude.
3            What is schadenfreude?
4        A.   Where is the -- what line is
5    it?
6        Q.   After you say hit them in the
7    solar plexus.  I guess they will have to
8    take comfort in schadenfreude.
9        A.   Let's see.  So unless -- I'm
10   looking in the bold.
11           Now how many lines down are we
12   going?
13       Q.   The next paragraph --
14       A.   The next paragraph.
15       Q.   -- starts to get --
16       A.   Okay.
17       Q.   -- info into the hands of
18   parents.
19       A.   Yes.  Schadenfreude, take
20   pleasure in the agony of others.  I
21   believe that's the definition of that
22   term.
23       Q.   So I guess they will have to
24   take comfort in the -- in the agony of

Page 179

1    others is what --
2        A.   Yes.
3        Q.   -- you meant to write?
4        A.   Uh-huh.
5        Q.   Okay.
6            And whose agony were you trying
7    to take comfort in?
8        A.   Let me read the paragraph here.
9        Q.   Sure.
10       A.   That would be the
11   administration.  Here I was thinking
12   about -- again, just thinking about
13   passing out fliers to parents as they
14   drove their children to the dorms and say
15   here, here's what's going on at the
16   college, at the university.
17       Q.   As of December 15, 2001(sic),
18   have you decided to create the Hitler
19   videos?
20       A.   I don't think so.  I don't see
21   anything here.  I'm not sure when I got
22   that idea.
23           - - -
24           (At this time, a document was

Page 180

1    marked for identification as Exhibit
2    Fagal-14.)
3            - - -
4    BY MS. PEET:
5        Q.   Do you agree that this is an
6    e-mail from you to Pam Parsons dated
7    December 19, 2011?
8        A.   Yes.
9        Q.   And, again, in this e-mail you
10   are talking to Pam about a possible comic
11   or cartoon about this FIRE incident,
12   correct?
13       A.   Correct.
14       Q.   And you talk about maybe
15   showing Sister Munley maybe wearing a
16   guarder belt with a little dog and the
17   female lawyer Paterson.
18           Are you referring to Sister
19   Mary Theresa Paterson?
20       A.   Is she a nun?
21       Q.   I said Mary Theresa Paterson.
22   She's not a nun.
23       A.   Right.
24       Q.   Okay.

Page 181

1            Is that who you're referring
2    to?
3        A.   Let's see, yes.
4        Q.   Okay.
5            And you have a toy dog labeled
6    CO or Oliveri, so the dog would be labeled
7    for Carl Oliveri?
8        A.   Yes.
9        Q.   Okay.
10           And the dog lifts his leg to
11   pee on a poster which is on the ground?
12       A.   Yes.
13       Q.   The poster will be a little
14   crumpled and torn at the lying base of a
15   tree and the only word you can see is
16   FIRE, so the dog is pissing on FIRE to put
17   it out; is that right?
18       A.   Yes.
19       Q.   Okay.
20           And then you -- couple
21   paragraphs later you say to Pam but the
22   next best thing -- strike that.
23           You say meanwhile, I'm
24   beginning to learn how to use Windows

46 (Pages 178 to 181)



1    Movie Maker just well enough so I can make
2    a Hitler parody video.
3         Do you see that?
4    A.   Yes, I do.
5    Q.   So is it fair to say around
6    December 19th you at least have the idea?
7    A.   Yes.
8    Q.   With luck, this will all come
9    together and the semester off to a rousing
10   start.
11        Do you see that?
12   A.   Yes.
13   Q.   What do you mean by rousing
14   start?
15   A.   Get students on campus
16   interested in the issue of free speech and
17   say what the heck's going on at this
18   university.
19   Q.   Okay.
20        If no one is roused, at least
21   I, in parentheses we with your help,
22   closed parentheses, will have tried and at
23   least caused some discomfort.
24        Do you see that?

1    A.   Yes.
2    Q.   Who were you trying to cause
3    discomfort to?
4    A.   The administration, hoping they
5    would change their policies.
6    Q.   And, again, this is all about
7    the poster?
8    A.   Yes.
9    Q.   Okay.
10        You write this is all good,
11   ideally policy changes, but next best is
12   to make them pay something, and then in
13   bold italicized, at least cause some
14   discomfiture.
15   A.   Uh-huh.
16   Q.   Again, discomfort to Marywood
17   administration?
18   A.   Yes.
19   Q.   And that would be the purpose
20   at least of this video?
21   A.   The main purpose of the video
22   would be to change policy.
23   Q.   And another purpose was to
24   create discomfort?

1    A.   If by discomfort that
2    encouraged them to change policy, then
3    that would be okay.
4              - - -
5         (At this time, a document was
6    marked for identification as Exhibit
7    Fagal-15.)
8              - - -
9    BY MS. PEET:
10   Q.   Okay.
11        This is a packet of documents.
12   It starts off with an e-mail with various
13   attachments.
14        Do you see this?
15   A.   Yes.
16   Q.   Now, the e-mail on the first
17   page where it says forwarded message, it's
18   from Fred Fagal to your Gmail account
19   dated January 13, 2012.
20        Do you see that?
21   A.   Yes, I see that.
22   Q.   Okay.
23        So you're sending an e-mail
24   from your Yahoo account to your Gmail

1    account, correct?
2    A.   Okay, yeah.
3    Q.   And then it says dear Marywood
4    University faculty colleague.
5         Do you see that?
6    A.   Uh-huh.
7    Q.   Are there -- are you blind
8    copying people on this e-mail?
9    A.   I don't recall if it was blind
10   copying or I had about -- I had access to
11   e-mail addresses and I was able to paste a
12   certain number of them in to send out as a
13   batch e-mail.  So these are faculty
14   members now, so that's what I did.
15   Q.   Okay.
16        So you agree you sent out this
17   e-mail to Marywood faculty members,
18   correct?
19   A.   Yes.
20   Q.   Did you send it to the faculty
21   members at their personal e-mail addresses
22   or at their Marywood e-mail addresses?
23   A.   Whatever e-mail addresses I
24   had, so it was probably mixed perhaps.  I



1    don't know.
2        Q.   So for at least some faculty,
3    it went to their Marywood e-mail address?
4        A.   That's correct.
5        Q.   Did you send it to any
6    students?
7        A.   Geri Smith might have gotten a
8    copy because she was intimately involved.
9        Q.   And she would have been a
10   student, correct?
11       A.   She would have been a student.
12   I --
13       Q.   Would you have sent it to Geri
14   at her personal e-mail address or at her
15   Marywood e-mail address?
16       A.   Personal, I believe.
17       Q.   Do you know one way or the
18   other?
19       A.   I'm not sure.
20       Q.   So it's possible you sent it to
21   her at her Marywood e-mail address?
22       A.   I could give you a probability.
23       Q.   But you'd be guessing?
24       A.   But I'd be guessing.

1        Q.   Okay.
2            So it's possible one way or the
3    other?
4        A.   It's possible one way or the
5    other.
6        Q.   Okay.
7            Where were you when you sent
8    this e-mail?
9        A.   I don't know for sure.
10       Q.   If it helps, it's 2:31 p.m. on
11   a Friday in January.
12       A.   Right.  So either -- I'm not
13   sure when my last class was.  It takes me
14   about two hours to drive home.  So if my
15   last class was at -- ended at 11:50, you
16   know, it's possible I could have sent this
17   from home.  It's possible I could have
18   sent this from my office.
19       Q.   Is your office at Marywood
20   University on the campus?
21       A.   Yes.  It's also possible I did
22   not use the Marywood, you know, Wi-Fi or
23   cable.
24       Q.   And do you know one way or the

1    other?
2        A.   I'm not sure.  At the time, I
3    could tell you I had a tether program on
4    my computer and it was working pretty well
5    with my cell phone to get Internet access,
6    and sometimes I would -- so I would use
7    that sometimes in my office also.
8        Q.   Okay.
9            As we sit here today, do you
10   know one way or the other whether you
11   used --
12       A.   No.
13       Q.   -- a tether?  Okay.
14           Just to make sure we're clear,
15   this right here is the e-mail that you
16   sent to members of Marywood community
17   including the two hyperlink videos that
18   you created, correct?
19       A.   I'll say no.  Community -- I
20   would say faculty.
21       Q.   Well, Geri Smith is not
22   faculty, correct?
23       A.   True.
24       Q.   Okay.

1            Did you post -- did you create
2    the Hitler videos?
3        A.   Yes.
4        Q.   Did you post them on YouTube?
5        A.   Yes.
6        Q.   Were they publically available
7    or did you need to enter a password to
8    view the videos?
9        A.   No password.  They were
10   publically available.
11       Q.   Did you have to receive your
12   e-mail in order to view the videos or
13   could anyone have viewed those videos?
14       A.   Anyone could have viewed them.
15   The question is would they have found them
16   without the information.
17       Q.   Okay.
18           But they did not need to be
19   invited to watch the videos, correct?
20       A.   Correct.
21       Q.   Did anyone help you draft this
22   e-mail?
23       A.   Draft this e-mail, no.
24       Q.   Okay.



1        You write towards the bottom,
2 it says based on the evidence.
3        Do you see that?
4     A.   Yes.
5     Q.   I expect most of you, if only
6 in private, will agree the Marywood
7 administration, real people here, not an
8 abstraction, exhibited egregious,
9 despicable, contemptible behavior.
10        What's the behavior you're
11 talking about here?
12     A.   Tearing down my posters.
13     Q.   And when you write this
14 poisoned and considered, exclamation mark,
15 behavior reflects badly on everyone
16 associated with Marywood, is that again
17 referring to the poster issue?
18     A.   Yes.
19     Q.   Okay.
20        If you turn to the second page,
21 you have number three.  You talk about the
22 letter that you sent to Dr. Levine dated
23 December 5th that we already talked about
24 earlier today.

1        Do you remember that?
2     A.   Yes.
3     Q.   And you mention in this twice
4 that you refer to these as demands.
5        Do you see that?
6     A.   Yes, but I would note there's a
7 question mark after demands and the first
8 word is "requests".  You see --
9     Q.   It says requests, open parens,
10 demands, question mark, end parens,
11 correct?
12     A.   Yes.
13     Q.   And then the second demand
14 doesn't have a question mark and it's not
15 in quotation marks, correct?
16     A.   Correct.
17     Q.   Okay.
18        Then if you go down a little
19 bit, you say Corynne McSherry, an attorney
20 specializing in intellectual property
21 stated, and then she said something about
22 the Downfall movie.
23        Do you see that?
24     A.   Let's see.  I'm looking.

1     Q.   It starts --
2     A.   Yes, I see that.
3     Q.   Did you reach out or speak with
4 Corynne McSherry?
5     A.   No.
6     Q.   Did you speak to any
7 intellectual property lawyer?
8     A.   No.
9     Q.   Did you ever get approval from
10 anyone to use the Downfall movie?
11     A.   No.
12     Q.   Next paragraph, you talk about
13 comments that you got from pre-release
14 viewers.
15        Do you see that?
16     A.   Yes.
17     Q.   Who are they?
18     A.   Rod Carveth I know saw them.
19 What's his name?  Let's see.  Bill
20 Ziegelbauer saw them.  I believe Geri
21 Smith saw them.  I'm trying to remember.
22 I'm drawing a blank, the name of the man
23 in our department who taught some
24 economics after I left, I think.  He saw

1 them.  Pam Parsons saw them.  I believe my
2 dental hygienist saw them.  I can't
3 remember anybody else right now.
4     Q.   Okay.
5        By the way, did you pay Geri
6 Smith to hang up the posters?
7     A.   No.
8     Q.   Did you pay anyone to hang up
9 the posters?
10     A.   Yes.
11     Q.   Who did you pay?
12     A.   I can't remember his name.  A
13 student in my -- I believe it was 12:00
14 economics class.
15     Q.   How much did you pay him?
16     A.   I believe it was $5.00.
17     Q.   How long did it take him?
18     A.   I don't know.
19     Q.   Was that approved by Marywood
20 University?
21     A.   Was what approved by Marywood
22 University?
23     Q.   The payment to a student.
24     A.   No.



1    Q.   You include various comments
2  from your -- the pre-release viewers.  One
3  of the comments is in quotations, it was
4  nice knowing you, Fred.
5    A.   Yes.
6    Q.   Who said that?
7    A.   Again, I'm drawing a blank on
8  the name.  I know -- I know the name.  He
9  worked in our social science department
10  but he saw the videos and -- Larry Walsh
11  is his name, so that's his comment.
12    Q.   Okay.
13        Fair to say that he thought it
14  was not a good idea?
15    A.   Yes.  Well, in terms of --
16    Q.   What it can do for your
17  career --
18    A.   What it could do for my
19  career --
20    Q.   -- at Marywood?
21    A.   -- at Marywood.
22    Q.   Was he trying to say that
23  perhaps this would be the end of your
24  career at Marywood?

1    A.   I think he was trying to say
2  that, yes.
3    Q.   Okay.
4        Who's Rod Carveth?
5    A.   Former professor at Marywood.
6    Q.   In January of 2012, was
7  Mr. Carveth a professor at Marywood?
8    A.   No.
9    Q.   Do you remember -- do you know
10  the name of your dental hygienist that you
11  sent it to?
12    A.   Yes.
13    Q.   What's her name?
14    A.   Kim Mingess(ph).
15    Q.   Why did you send it to her?
16    A.   Because I had a dentist
17  appointment for my checkup and I had a
18  tooth cleaning.  I saw my dentist that
19  same day, and so I was talking with my --
20  my dentist asked me how things are going
21  and I told him the quick story, and Kim
22  listened.  She seemed interested, so I
23  said I'll send you a copy of the video.
24    Q.   Did you send it to your dentist

1  as well?
2    A.   No.
3    Q.   If you can go to the next page,
4  there are two hyperlinks to YouTube.
5        Are those the videos?  If I
6  would click on link to video number one --
7    A.   Uh-huh.
8    Q.   If I clicked on that, would
9  that direct me to YouTube and direct me to
10  your video?
11    A.   When?
12    Q.   In January of 2012.
13    A.   Yes.
14    Q.   If I clicked on the link to
15  video number two, would that direct me to
16  YouTube in January 2012 with your video?
17    A.   Yes.
18    Q.   You then say a few colleagues
19  concerned for my welfare have told me they
20  fear the administration will try and fire
21  me over this.
22        Who are those few colleagues?
23    A.   Larry Walsh was one of them.  I
24  can't right now remember who the other one

1  was.
2    Q.   Is it possible there were more
3  since you wrote a few colleagues?
4    A.   We're talking two or three
5  here.  It may be, not many.
6    Q.   Okay.
7        You say -- and, again, these
8  are pre-release viewers, correct?
9    A.   Yes.
10    Q.   Then you say one colleague says
11  perhaps I should have asked for an
12  appointment with President Munley and made
13  a final appeal, that is I should have
14  pursued every last ditch channel possible.
15        You testified you did not do
16  that, correct?
17    A.   That's correct.  I did not
18  pursue an appointment with Professor
19  Munley -- or President Munley.
20    Q.   And what -- who -- what
21  colleague was the one that suggested you
22  do that?
23    A.   I don't know for sure.
24    Q.   Okay.



1        Who do you think it is?
2        A.   I think it was Larry Walsh but
3   I wouldn't testify to that.
4        Q.   Okay.
5        Then you said I did not want to
6   go into such a meeting and in essence have
7   as the only new point to raise, quote, a
8   blackmail, end quote, threat to go public
9   as I do here and in the videos.
10       Do you believe these videos are
11  blackmail?
12       A.   No.
13       Q.   Okay.
14       You say if the risk to me is
15  there, it is there, semicolon, and if the
16  worst does come to pass, I will have to
17  battle as best as I can with the support
18  of family, and friends, and colleagues,
19  and perhaps concerned outsiders.
20       What was the worst does come to
21  pass?  Would that be your termination of
22  employment from Marywood?
23       A.   Yes.
24       Q.   So you realized that that was a

1   possible alternative when you posted these
2   videos?
3        A.   I had been warned that it might
4   be, yes.
5        Q.   And you understood that by
6   doing this, this might be the end of your
7   employment with Marywood?
8        A.   I understood that it was a
9   risk.
10       Q.   Okay.
11       You then say, in all caps,
12  beware, dash, according to page 86 of the
13  faculty handbook, you then quote there are
14  no specific laws, comma, rules, comma, or
15  regulations that protect the privacy of a
16  user's files, comma, electronic mail
17  messages, comma, or any other information
18  retrieved as a result of person's session
19  on the Marywood system, period, end quote.
20       A.   Yes.
21       Q.   You then say thus, if you
22  e-mail me and want to protect yourself,
23  you might best use a backup e-mail address
24  such as your old youthful one,

1   coolcat@hotmail.com, and send it from
2   anywhere but Marywood.
3        Do you see that?
4        A.   Yes, I do.
5        Q.   And that's because Marywood has
6   a computer policy, correct?
7        A.   Correct.
8        Q.   If you turn to the next page
9   very much towards the end, it is
10  transparently obvious Marywood University
11  is discriminating against Professor Fagal;
12  Your Honor, I rest my case.
13       Do you see that?
14       A.   Yes.
15       Q.   So do you believe you're -- you
16  were being discriminated against?
17       A.   I don't know that -- I'm not
18  sure how we define the word
19  "discriminating" here.
20       Q.   You wrote this, right?
21       A.   Yes, I did.
22       Q.   Okay.
23       A.   I believe that at the time that
24  they were -- the administration was

1   perhaps looking to interfere with things I
2   might do on campus that they didn't like.
3        Q.   Okay.
4        Well, you wrote it is
5   transparently obvious --
6        A.   And so I would say -- yeah.
7   And so I would say that based -- based on
8   my recounting of the posters story and the
9   pandering phrase before that, when
10  Marywood itself was giving out Visa cards
11  and whatnot at events for people to come
12  to class that they were discriminating
13  against me as opposed to other professors
14  who would send students to an evening
15  class where students could get a prize or
16  food.
17       Q.   Okay.
18       Do you believe you were being
19  discriminated against?
20       A.   Yes, I did.
21       Q.   Based on what protective
22  status?
23       A.   I was not considering this as a
24  legal phrase.



1      Q.   Okay.
2          You didn't sue for
3   discrimination, correct?
4      A.   No.
5      Q.   Did you -- are the videos still
6   posted on YouTube?
7      A.   No.
8      Q.   Why not?
9      A.   Why not?
10          MR. COHEN:  Without disclosing
11   any attorney-client communication.
12          THE WITNESS:  What did you say
13   there?
14          MR. COHEN:  I said without
15   disclosing any attorney-client
16   communication.
17          THE WITNESS:  Without
18   disclosing any attorney-client
19   communication.
20          It was just a gesture to take
21   them down.  They -- I guess they had
22   served their purpose.  I made
23   certainly enough of a point to get
24   suspended and termination

1   recommended.
2   BY MS. PEET:
3      Q.   What purpose did they serve?
4      A.   What purpose did the videos
5   serve?  Is that --
6      Q.   You said they served their
7   purpose, so I'm saying what purpose did
8   they serve.
9      A.   They publicized the posters
10   events.
11      Q.   Did you post them on anything
12   other than YouTube?
13      A.   No.
14      Q.   When did you take them off of
15   YouTube?
16      A.   I can give an approximate date.
17   I would say it was around the end of
18   February 2012.
19      Q.   We're going to watch the
20   videos.
21          - - -
22          (At this time, videos were
23   played.)
24          - - -

1   BY MS. PEET:
2      Q.   Those videos you created?
3      A.   Yes.
4      Q.   Anyone help you?
5      A.   Yes.
6      Q.   Who?
7      A.   Bill Ziegelbauer helped a
8   little bit.
9      Q.   Anyone else?
10      A.   No.
11      Q.   As we sit here today, do you
12   have any remorse for doing that?
13      A.   I remorse that I lost my job.
14      Q.   Do you have any remorse for
15   creating those videos and depicting Sister
16   Anne Munley as Adolf Hitler who killed six
17   million Jews?
18      A.   I would say that instead of
19   depicting Anne Munley as Hitler -- in
20   other words, think of Anne Munley doing
21   Hitler stuff in the 1930s or '40s as being
22   -- let's say a newsreel.  You took the
23   newsreel and you superimposed Anne Munley
24   into that newsreel, then Anne Munley would

1   be portraying Hitler.
2          In this case, it's more a
3   question of an actor dressed as Adolf
4   Hitler portraying Anne Munley, and under
5   her direction some fascist type
6   activities, namely tearing down posters,
7   were done; therefore, the satire parody.
8   Absolutely no intention to cause anyone to
9   think that -- and I don't think anyone
10   would think that I was in any way implying
11   that Anne Munley would do horrible things
12   like Hitler did in terms of killing six
13   million Jews.
14      Q.   In the video, there's an actor
15   obviously portraying Adolf Hitler?
16      A.   Yes.
17      Q.   Is that Sister Munley in the
18   video?
19      A.   He is portraying Sister Munley,
20   again.
21      Q.   And other members of Marywood's
22   administration, they're being depicted as
23   members of the Nazi regime, correct?
24      A.   Mostly in a vague



1  unidentifiable sense.
2      Q.   Are they being identified as
3  members of the Nazi regime?
4      A.   No, because I would say again
5  that members of the Nazi regime are
6  portraying the Marywood personnel.
7      Q.   So the members of the Nazi
8  regime are various members of Marywood
9  administration, correct, in your video?
10     A.   The point of the satire is
11 to --
12     Q.   That's not my question.
13     A.   Okay.  Say it again.
14     Q.   Strike as nonresponsive.
15     A.   Okay.
16     Q.   This is a video --
17     A.   Yes.
18     Q.   -- correct?
19     A.   Correct.
20     Q.   And the original video depicts
21 Adolf Hitler and members of the Nazi
22 regime, correct?  They are actors
23 nonetheless because --
24     A.   The video Downfall -- the

1  Downfall movie depicts actors as members
2  of the Nazi regime.
3      Q.   Okay.
4           Various members of the Nazi
5  regime in the video are various members of
6  Marywood administration, correct, in your
7  video?
8      A.   In my video, those actors are
9  standing in for Marywood personnel.
10     Q.   When did you start creating
11 these videos?
12     A.   Right around that December -- I
13 was learning how to use the software and
14 whatnot.  Somewhere around December 20th,
15 21st, just before Christmas.
16     Q.   I'm not sure you responded to
17 the question, so if you did, my apologies.
18          But as we sit here today, are
19 you remorseful that you did that?  And by
20 that, I mean creating these two videos.
21     A.   No.
22     Q.   Okay.
23          How long did it take you to
24 create them?

1      A.   I would have to measure that
2  answer in hours and I would have to
3  estimate.  I'd have to think to come up
4  with a good answer.
5      Q.   Okay.
6      A.   Many hours.
7      Q.   Many?
8      A.   Yes.
9      Q.   More than 10?
10     A.   Yes.
11     Q.   More than 20?
12     A.   Yes.
13     Q.   More than 30?
14     A.   Probably.
15     Q.   More than 40?
16     A.   Probably not.
17     Q.   Did you ever work on it in your
18 office on campus?
19     A.   No.
20     Q.   Did you only work on it in your
21 home?
22     A.   Yes.
23     Q.   There's someone in the video
24 that's spelled L-E-V-I-N-E.

1      A.   Correct.
2      Q.   Is that supposed to be Alan
3  Levine?
4      A.   Yes and no.
5      Q.   Did you change his name?
6      A.   Yes.
7      Q.   Why did you do that?
8      A.   I wanted to make it be a French
9  name, Levine, that's why I emphasized the
10 V-I-N-E to make it clear that it was
11 nothing at all about what -- some people
12 might say Levine was a Jewish name, and
13 that's -- I wanted to make it clear that I
14 was not affiliating Alan Levine with any
15 connotation.
16     Q.   Well, do you think people would
17 be offended if they saw a Hitler movie and
18 a Jewish person was a member of a Nazi
19 regime or depicted as a member of a Nazi
20 regime?
21     A.   I realize that some people
22 could be offended and have the right to be
23 offended.
24     Q.   Do you understand how people



1    that watch that video could be offended?
2        A.   That's -- I can't under -- I
3    mean I can understand that they are.  I
4    don't understand in the context here why
5    they would be.
6        Q.   Did you watch those videos?
7        A.   Yes, I did.
8        Q.   Okay.
9        A.   Uh-huh.
10       Q.   And you don't see how someone
11   that watches that could be offended by
12   what you just did?
13       A.   I do understand that they could
14   be offended.
15       Q.   For the people that watched it
16   pre-release, how did they get access to
17   it?
18       A.   Some I showed on my laptop and
19   a few people I e-mailed low quality video
20   files.
21       Q.   Where did you e-mail them?
22       A.   Can you rephrase the question?
23       Q.   Where was it that you -- how
24   was it that you e-mailed it to them?  Was

1    it to their personal e-mail accounts or to
2    their Marywood e-mail accounts to those
3    that are affiliated with Marywood?
4        A.   I don't recall e-mailing it to
5    anybody at Marywood -- at a Marywood
6    account.
7        Q.   For the pre-release, correct?
8        A.   For the pre-release.
9        Q.   You talk in your video about
10   rape.
11            Are you suggesting that they
12   would try and frame you and have you
13   seduce a young woman and then have that
14   person call rape and then so they can fire
15   you?  Is that what you were implying?
16       A.   No.
17       Q.   What were you implying when you
18   were talking rape?
19       A.   I wasn't implying anything.
20       Q.   Okay.
21       A.   It was a humorous satire part
22   of the video.
23       Q.   The rape --
24       A.   A sub --

1        Q.   The rape part?
2        A.   A substory.
3        Q.   Yeah.
4        A.   There was no rape.
5        Q.   So the rape part was meant to
6    be comical?
7        A.   The rape part was meant to be
8    comical.
9        Q.   Okay.
10            When you talk about the hot
11   young pretty thing --
12       A.   Excuse me.  Can I amplify a
13   little bit?
14            There was no rape.  There was
15   some supposed humorous non-existent plot
16   to have the Fagal character be seduced and
17   then claim rape.  So there was never a
18   rape, and of course there was never such a
19   plot, and there was never such a
20   seduction, and I don't think anybody would
21   have thought that to be the case.
22       Q.   Do you think when someone is
23   watching this video and they're talking
24   about rape, do you think someone can get

1    offended by that or think it's
2    inappropriate?
3        A.   Anybody could be offended by
4    anything.
5        Q.   Including these videos,
6    correct?
7        A.   If they choose to be.
8        Q.   The hot young pretty thing that
9    you're referencing, would that be
10   Dr. Levine's wife?
11       A.   What was the exact quote?  I
12   don't know if that's the exact quote.  I
13   have the -- we had -- I had the scene by
14   scene.
15       Q.   Well, since you mention it, we
16   have the scene by scene as well.
17       A.   Where I made comments in each
18   scene.
19            - - -
20            (At this time, a document was
21        marked for identification as Exhibit
22        Fagal-16.)
23            - - -
24   BY MS. PEET:



1      Q.    First off, what has been marked
2  as Exhibit-16, are these the frames from
3  the video that we just showed?
4      A.    They certainly appear to be.
5      Q.    Okay.
6      A.    Very grainy, but yes.
7      Q.    If you flip to DEF136, it's
8  towards the end.  Some member of the Nazi
9  regime slash Marywood administrator is
10 saying so you wanted a hot young thing,
11 now you pay.
12         Do you see that?
13     A.    Yes, I do.
14     Q.    And they're directing this to
15 the character that's portraying
16 Dr. Levine, correct?
17     A.    Yes.
18     Q.    And is that referring to --
19 that hot young thing, would that be
20 Dr. Levine's wife that you're referring
21 to?
22     A.    Yes.
23     Q.    Do you think Dr. Levine might
24 find that offensive?

1      A.    I don't know whether he would.
2  This is satire comedy parody.  If I may
3  refer to the previous scene, the Levine
4  character says I should quit as VP and be
5  a professor again, but my young wife
6  number two and one percent kids need
7  money.  So here Dr. Levine is making a
8  joke.  It's understood through common
9  knowledge that Dr. Levine had been
10 divorced and married again.
11     Q.    When you say Dr. Levine is
12 making a joke, let's be abundantly clear
13 here.  It's Dr. Fagal --
14     A.    Yes, but in the --
15     Q.    -- making a joke about
16 Dr. Levine, correct?  Dr. Levine did not
17 make this joke, correct?
18     A.    That's correct.  The character
19 in the movie representing Dr. Levine is
20 making a joke about his situation.  He's
21 got a second family to support and all
22 this turmoil.  He could go back to be a
23 professor at a lower pay rate but his wife
24 might not appreciate the lower salary and

1  his one percent kids need money.  That's a
2  joke reference to the Occupy Wall Street
3  movement that was going on at the time,
4  and so that I would say makes this, you
5  know, be a joke.
6         And the next scene where you
7  say so you wanted a hot young thing, now
8  you pay, you know, there's Hot in
9  Cleveland, the television show that was
10 very popular at the time.  The term "hot"
11 is a very general term.  It means, you
12 know, attractive.
13         So could Dr. -- your question
14 is could Dr. Levine be offended?  He could
15 be if he wanted to.
16     Q.    Do you think this might be
17 offensive to Dr. Levine's second wife?
18     A.    I personally don't see why it
19 would be.
20     Q.    Have you ever posted anything
21 else on YouTube about Marywood University?
22     A.    No.
23     Q.    Did you ever consult with an
24 attorney about this video before you

1  posted it?
2      A.    No.
3      Q.    Ever consider not posting this
4  video after you prepared it and watched
5  it?
6      A.    I don't recall.  I did listen
7  to Larry Walsh if he offered his opinion.
8      Q.    Was he the only person that
9  provided commentary to the effect that you
10 could be terminated if you do this?
11     A.    He's the only one I can recall
12 at this moment.
13     Q.    Did you show it to your wife
14 before you posted it?
15     A.    Yes.
16     Q.    Was she in agreement that you
17 should do this?
18     A.    She was wondering if I would
19 get in trouble about it and she didn't
20 want all that, and I told her it's
21 something I had to do, and she said fine.
22     Q.    When you say you had to do it,
23 no one at Marywood asked you to do this,
24 correct?



1      A.   No.
2      Q.   When you had to do it, it was a
3  decision that you --
4      A.   My personal decision.
5      Q.   -- personally made --
6      A.   Right.
7      Q.   -- correct?
8           And when you say your wife
9  didn't want any trouble, would that imply
10  a termination of your employment?
11     A.   It could be anything.  Just
12  being called in on the carpet, just the
13  stress of ongoing back and forth that had
14  already been going on for months.  So...
15     Q.   What is your personal opinion
16  of Adolf Hitler?
17          MR. COHEN:  Can you repeat
18     that?
19          MS. PEET:  What is his personal
20     opinion of Adolf Hitler?
21          THE WITNESS:  A horrible human
22     being.
23  BY MS. PEET:
24     Q.   Why is he a horrible human

1  being in your opinion?
2      A.   He was a ruthless dictator who
3  did all sorts of bad things.
4      Q.   Such as?
5      A.   Such as Kristallnacht, such as
6  putting Jews in concentration camps, such
7  as going after anybody who spoke out
8  against him, such as mentioned in the
9  video beheading the white -- what is it,
10  the white flower protesters, concentration
11  camps, war crimes.
12     Q.   In your opinion, do you think
13  someone would be fond of being associated
14  with Adolf Hitler?
15     A.   Fond, no.
16     Q.   Do you think someone would be
17  fond or think favorably if they were being
18  associated with a Nazi?
19     A.   No, but let me -- not all Nazi
20  behaviors were equivalently bad.  So if
21  somebody said you tore down the posters
22  like a Nazi would, well, that's a
23  descriptive term.  That's -- if you did
24  it, you did it.  It's a comparison.

1      Q.   Did it ever cross your mind
2  that you were depicting a member of the
3  Jewish faith as a Nazi?
4           MR. COHEN:  Can you repeat
5      that?
6  BY MS. PEET:
7      Q.   Did it ever cross your mind
8  that you were depicting a member of the
9  Jewish faith as a Nazi?
10     A.   Well, it crossed my mind
11  because I changed the name to Levine and I
12  wanted to make it clear that Alan Levine
13  -- I didn't really consider him to be my,
14  quote/unquote, enemy.
15     Q.   Although you changed the name,
16  the person that you're depicting is
17  Dr. Alan Levine, correct?
18     A.   Yes.
19     Q.   Okay.
20     A.   I mean -- yes.
21     Q.   Do you think the videos are
22  professional?
23     A.   What do you mean by
24  professional?

1      Q.   Do you think it was a
2  professional thing to do as a tenured
3  professor at Marywood University?
4      A.   Well, as part of my professor's
5  job is to seek, you know, open expression
6  and free inquiry, and I was inquiring as
7  to what had happened.  And so I didn't
8  think it was out of the ordinary for some
9  college professors to speak up in a case
10  like this.
11     Q.   Do you think it was
12  professional?
13     A.   I don't have an opinion really.
14     Q.   Can you understand how some
15  people would find it to be unprofessional?
16     A.   Again, I'm not sure what you
17  mean by unprofessional.  You say, oh, that
18  wasn't a polite thing to do.  I could
19  understand why some people wouldn't think
20  it was polite.  Unprofessional, I really
21  don't have a good answer for that.
22     Q.   What about inappropriate
23  conduct from a tenured professor?
24     A.   I wouldn't say what I did was



Page 222

```
 1    inappropriate given the circumstances.
 2        Q.   And the circumstances being --
 3    you're talking about the posters?
 4        A.   That's correct.
 5            MS. PEET:  Why don't you change
 6    the video.
 7                   - - -
 8            THE VIDEOGRAPHER:  We're now
 9    off the record.  The time is 2:36
10    p.m.  This ends disk number two.
11                   - - -
12            (At this time, a short break
13    was taken.)
14                   - - -
15            THE VIDEOGRAPHER:  We are now
16    on the record.  The time is 2:43 p.m.
17    This starts disk number three.
18                   - - -
19            (At this time, a document was
20    marked for identification as Exhibit
21    Fagal-17.)
22                   - - -
23    BY MS. PEET:
24        Q.   Exhibit-17 seems to be e-mail
```

Page 223

```
 1    exchange between you and Benjamin
 2    Harrington.
 3            Do you see that?
 4        A.   Yes.
 5        Q.   Was Benjamin Harrington at this
 6    time, January of 2012, a student at
 7    Marywood?
 8        A.   I believe he was registered for
 9    the spring semester though I don't know
10    that for sure.
11        Q.   Well, you sent it to him at his
12    Marywood --
13        A.   That's correct.
14        Q.   -- .edu e-mail address --
15        A.   That's correct.
16        Q.   -- is that correct?
17        A.   That's correct.
18        Q.   So he's not a faculty member,
19    correct?
20        A.   No.
21        Q.   He was a student, correct?
22        A.   Correct.
23        Q.   And you were telling him to go
24    to YouTube to look at those videos,
```

Page 224

```
 1    correct?
 2        A.   Let me see.
 3        Q.   Down at the bottom.
 4        A.   Yes.  He -- yes.  Uh-huh.
 5            And, yes, I see that -- I say
 6    what is your best time for Republican
 7    Conservative Club meeting, so he was -- he
 8    would have been a student.
 9        Q.   Thank you.
10                   - - -
11            (At this time, a document was
12    marked for identification as Exhibit
13    Fagal-18.)
14                   - - -
15    BY MS. PEET:
16        Q.   Is one of the people that you
17    sent the e-mail to with the videos Kevin
18    Wyllie?
19        A.   I presume he's on that e-mail
20    list, yes.
21        Q.   Okay.
22            And who is Kevin?
23        A.   I don't know for sure, but I
24    looked him up after I got this and he was
```

Page 225

```
 1    on the member of the faculty on arc --
 2    school of architecture.
 3        Q.   Kevin wrote to you that he
 4    understands your concern, but this type of
 5    mass e-mail seems a little inflammatory
 6    and unprofessional.
 7            Do you see that?
 8        A.   Yes.
 9        Q.   Do you disagree with what he
10    wrote?
11        A.   I would -- I would agree with
12    the a little inflammatory part and I would
13    disagree with the unprofessional part.
14        Q.   Okay.
15            But, nonetheless, it's a
16    colleague of yours at Marywood telling you
17    that he found it to be unprofessional,
18    correct?
19        A.   He said it seems
20    unprofessional.
21        Q.   Okay.
22        A.   Right.
23        Q.   And he also said it seems like
24    you're having a tantrum.
```

57 (Pages 222 to 225)



1    A.   He said that it seems to be a
2  tantrum.
3    Q.   He writes although the freedom
4  to protest is a valuable democratic
5  exercise, it should not become a source of
6  fashionable entertainment.
7    Do you see that?
8    A.   I do.
9    Q.   Do you disagree with what he
10  wrote?
11    A.   Yes.
12    Q.   Did you receive this e-mail
13  from Kevin?
14    A.   Yes.
15    - - -
16    (At this time, a document was
17  marked for identification as Exhibit
18  Fagal-19.)
19    - - -
20  BY MS. PEET:
21    Q.   Did you prepare Exhibit-19?
22    A.   Yes.
23    Q.   What is it?
24    A.   I believe that I prepared this

1  in the -- after January 23rd after I had
2  been suspended and after I had heard the
3  concerns expressed by President Munley and
4  about how terrible the video was, and so I
5  decided I would go through each screen and
6  copy the words exactly -- all the words in
7  the video exactly as they were and I would
8  try to, shall we say, footnote each set of
9  comments that were in the video to explain
10  further where they came from, what the
11  relationship to, say, a history reference
12  was and things like that.
13    Q.   Did anyone help you prepare
14  this?
15    A.   No.
16    Q.   Did you share it with anyone?
17    MR. COHEN:  Without disclosing
18  any -- other than --
19    MS. PEET:  I didn't ask about
20  communications.  I just said did you
21  share it with anyone, and that would
22  include counsel.
23    THE WITNESS:  I --
24    MR. COHEN:  Wait, you're asking

1  if he shared it with counsel?
2    MS. PEET:  It would include
3  counsel.
4    MR. COHEN:  Okay.
5    MS. PEET:  Sure.
6  BY MS. PEET:
7    Q.   I'm not -- I didn't ask for
8  what any attorney's views are or what they
9  spoke about, but my question was did you
10  share this document with anyone after you
11  created it?
12    A.   I sent it to the -- I believe
13  -- quite sure I recall that I sent it to
14  the -- one of the committees, like the ad
15  hoc committee that was considering my
16  case, the faculty committee, and I sent it
17  to them but I did not distribute this to
18  the faculty or anything like that.
19    Q.   Did you share it with anyone
20  else other than the ad hoc committee?
21    A.   I might have sent it to Bill
22  Ziegelbauer and a few people but not -- I
23  can't recall right now.
24    Q.   Who were the other few people?

1    A.   I might have sent it to my
2  sisters.  I can't recall.  I don't
3  remember sending it to anybody other than
4  the committee.
5    Q.   And was the purpose of creating
6  this to give it to the ad hoc committee?
7    A.   I believe the original purpose
8  was for myself.  I wanted to, shall we
9  say, convince myself that I wasn't crazy
10  and -- but I really wanted to explain to
11  anybody who wanted to know why this scene,
12  why that, I wanted to be able to have a
13  record -- complete record of what I did,
14  so that's why I created this really for
15  myself.
16    Q.   Did you convince yourself that
17  you're not crazy?
18    A.   Yes.
19    Q.   Do you think other people think
20  you're crazy?
21    A.   I don't know.
22    Q.   Do you think it would be
23  reasonable for other people to think
24  you're crazy?





1     A.   No.
2     Q.   Have you ever been treated with
3  a psychiatrist or psychologist or other
4  mental health provider?
5     A.   No.
6     Q.   Had anyone ever suggested that
7  you treat with a psychologist,
8  psychiatrist, or any other type of mental
9  health provider?
10    A.   No.
11    Q.   Have you ever been diagnosed
12 with any sort of mental health disease or
13 illness?
14    A.   No.
15    Q.   Have you ever been diagnosed
16 with OCD?
17    A.   No.
18              ---
19       (At this time, a document was
20  marked for identification as Exhibit
21  Fagal-20.)
22              ---
23 BY MS. PEET:
24    Q.   You're e-mailing here with a

1  Lindsay, correct?
2     A.   Yes.
3     Q.   Who's Lindsay?
4     A.   Lindsay Groves is a cellist
5  with the Syracuse Symphony Orchestra.  She
6  lives in Skaneateles, New York.
7     Q.   She's one of the folks that you
8  sent the e-mail to with the videos,
9  correct?
10    A.   Yes, I did.
11    Q.   Okay.
12       And her response to that is on
13 the bottom of the first page.
14       Do you see that, January 15,
15 2012?
16    A.   Yes.
17    Q.   Okay.
18       And she writes, Fred, the real
19 estate portfolio slash young wife stuff is
20 really personal, exclamation mark.
21       Do you see that?
22    A.   Yes.
23    Q.   Geez, I'm wondering if the
24 students, who are transients, can get into

1  this as much as you want and convince
2  their parents to write.  I think you
3  should take down the second video with
4  three exclamation marks.
5       Do you see that?
6     A.   I see that, uh-huh.
7     Q.   Why did you send it to Lindsay?
8     A.   She's a good friend and I
9  valued her opinion.
10    Q.   Okay.
11       What did you think when she
12 sent you her opinion?
13    A.   I understood her point to a
14 short extent, a small extent.  I didn't
15 think it was really personal.  The real
16 estate portfolio I thought was a joke
17 about the real estate market, et cetera,
18 so I disagreed with her opinion.
19    Q.   Okay.
20       And she's not a Marywood
21 administration, correct?
22    A.   No.
23    Q.   Did you in fact take down the
24 second video after she told you to do

1  that?
2     A.   No.  Again, she did not tell me
3  to do that.
4     Q.   On the top, you write back to
5  Lindsay.
6       Do you see that?
7     A.   Yes.
8     Q.   And in part you write only
9  those in the know know that Levine, open
10 parens, written Levine, all capital, as a
11 joke because as a Jewish guy working for
12 Hitler, his name cannot be Levine,
13 exclamation point, closed parens, is on a
14 second family --
15    A.   Right.
16    Q.   -- period.
17    A.   Uh-huh.
18    Q.   So do you agree that it would
19 be outlandish for a Jewish person to be
20 portrayed working for Hitler?
21    A.   I don't know if outlandish is
22 the word I would use, but I was trying to
23 make a point about free speech and didn't
24 want to get anything in there about



Page 234

1  raising some subsidiary issue about what
2  religion anybody was in administration, so
3  that's why I changed the name.
4      Q.   Were you concerned about
5  offending people?
6      A.   I was not willing to offend
7  people just gratuitously.  If it had to be
8  done to make a point if they would be
9  offended by the video, unhappy with it,
10  shall we say, then that was part of the
11  price.  No one would appreciate being
12  criticized, I don't think, in public.
13      Q.   And this was public, correct?
14      MR. COHEN:  Excuse me.  Say
15      that again.
16  BY MS. PEET:
17      Q.   This was public, correct?
18      A.   It was available on YouTube, so
19  the public could access it.
20      Q.   Do you think this video or the
21  videos do anything to further a supportive
22  or welcoming environment at Marywood
23  University?
24      A.   Yes.

Page 235

1      Q.   How is that?
2      A.   Because it might tell people,
3  look, if you come to Marywood University,
4  you can speak your mind and have free
5  speech, an open honest debate, and tackle
6  big issues, and this is a university that
7  does that.
8          - - -
9          (At this time, a document was
10      marked for identification as Exhibit
11      Fagal-21.)
12          - - -
13  BY MS. PEET:
14      Q.   These are e-mails between you
15  and Geri Smith, correct?
16      A.   Yes.
17      Q.   And Geri is the student that
18  you testified about earlier today?
19      A.   Yes.
20      Q.   And if you can look on the
21  second page, you can see that it's at her
22  Marywood e-mail address.
23      A.   I see that.
24      Q.   Do you see that?

Page 236

1      A.   She has a private e-mail
2  address, too, but I see the Marywood
3  address there.  That's correct.
4      Q.   Okay.
5          Does this refresh your memory
6  that you sent it to her as a pre-release
7  at her Marywood e-mail address?
8      A.   Let me read.  Let's see.  Yes.
9      Q.   If you look on -- at the time
10  that you were e-mailing with Geri, you did
11  not yet make these videos public, correct?
12      A.   That's correct.
13      Q.   You write on the first page I
14  do not think -- and "not" being all
15  capitals -- they will try to fire me over,
16  quote, all this, end quote.  If by, quote,
17  this, end quote, you mean over what
18  happened so far, then absolutely not,
19  underlined.
20          But, again, at this point you
21  haven't made the videos public?
22      A.   That's correct.
23      Q.   All right.
24          You then say assuming the

Page 237

1  videos are released, open parens, and at
2  this point I would say they will be with
3  -- I guess 95 percent.
4          Is that what you're trying to
5  say?
6      A.   Probability equals point 95,
7  which is 95 percent, yes.
8      Q.   Closed parentheses, comma,
9  there will be some very pissed off
10  administrators.
11          Do you see that?
12      A.   Yes.
13      Q.   Why do you think there were
14  going to be pissed off administrators?
15      A.   Because they're being publicly
16  criticized in a satirical funny way that
17  might get a lot of attention.
18      Q.   Okay.
19          And who are the administrators
20  that you think would be pissed off?
21      A.   Well, the ones mentioned in the
22  video.
23      Q.   Who are they?
24      A.   As I recall, the names that



Page 238

1   were mentioned were Paterson, and Munley,
2   and Garvey, and Heath, and Oliveri, and
3   Levine or Levine, if you will.
4       Q.   Okay.
5            You then write in essence I
6   have called President Anne Munley a
7   fascist.
8            See that?
9       A.   Yes, uh-huh.
10      Q.   You then go on to write tenure
11  is on my side --
12      A.   Yes.
13      Q.   -- period.
14      A.   Uh-huh.
15      Q.   To fire me, they would have to
16  go through procedures, comma, set up a
17  committee, comma, have hearings, and then
18  you can continue.
19           You see that?
20      A.   Yes, uh-huh.
21      Q.   So you gave thought about
22  whether or not they were going to
23  terminate you over this?  It crossed your
24  mind?

Page 239

1       A.   It crossed my mind.
2       Q.   And you gave some thought to
3   it?
4       A.   Yes, I did.
5       Q.   You then wrote they know I
6   would raise a big stink and they would
7   look foolish, game not worth the candle.
8            Are you trying to say that
9   Marywood probably wouldn't terminate you
10  because it's not worth it to them?  You're
11  just going to raise a big stink and it's
12  just not worth it?
13      A.   As I said, better for them to
14  grimace and wait it out until I retire,
15  and then I give them a suggestion how they
16  could make me retire early with a five day
17  a week crazy teaching schedule.
18           But as I said in the video, the
19  way I was thinking at the time was it's
20  the older professors who have to stand up
21  because the younger professors who don't
22  have tenure are too scared to speak out,
23  and the middle-aged professors who have a
24  family and kids, generally speaking, and

Page 240

1   they got their careers and whatnot and
2   they've got -- they're very busy and they
3   don't maybe have time for all the stuff,
4   and I think too many older professors just
5   say well, I'll just not rock the boat and
6   cruise to retirement, and so I felt it was
7   my duty to speak up at some possible cost
8   to myself.
9       Q.   Were you calling Marywood's
10  bluff when you posted those videos?
11      A.   Bluff?
12           MR. COHEN:  Object to the form.
13  BY MS. PEET:
14      Q.   You're saying, you know, I
15  don't think they're going to terminate me.
16  I'm going to raise a big stink.  They have
17  to go through this whole procedure.  They
18  might as well just wait it out until I
19  retire.
20           Were you just kind of pressing
21  their boundaries and see what they were
22  going to do to you, stir the pot a little
23  bit?
24      A.   What I was thinking, as I

Page 241

1   recall back then, was that I would have
2   made the video splash.  I presume that
3   that would not go on forever but it would
4   make a -- say a two-week or so hot topic
5   on campus and would be, shall we say,
6   embarrassing to the administration to have
7   been found out for what it did, and my
8   hope would be that even if they didn't
9   publically do anything that they would
10  mend their ways and that life would go on.
11  I would continue teaching.
12           If it came to being called in
13  on the carpet and trying to be escalated
14  into firing me for some presumed violation
15  of something, then depending how that was
16  handled publicity-wise one could either,
17  you know, keep it all quite and let the
18  committees do their work or one could --
19  which I did not do, one could go down
20  battling raising a public outcry, Fagal up
21  on charges, blah, blah, blah, blah, blah,
22  you know, students march, if any would,
23  you know, for free speech, you know.  It
24  could have been a huge semester-long cause

61 (Pages 238 to 241)


MAGNA
LEGAL SERVICES

1  celebre.
2  Q.  So you did them a favor?
3      MR. COHEN:  Excuse me.
4  BY MS. PEET:
5  Q.  So you did --
6  A.  Yes.
7  Q.  -- them a favor?
8  A.  I did them a favor.
9  Q.  Do you think that these videos
10 warranted any type of discipline?
11 A.  I would say no.
12 Q.  And why do you say that?
13 A.  I would say -- I would assume
14 that I would perhaps have been called on
15 the carpet and told something along the
16 lines of, gee, Dr. Fagal, I wish you
17 hadn't gone that far.  I wish you had -- I
18 wish we had contacted you earlier.  I wish
19 we made a settlement before.  I wish --
20 you know, I wish you'd come to see
21 President Munley and make a -- and shown
22 her the videos ahead of time.
23     I mean something like that
24 maybe could have happened, and obviously

1  in that case I would have known that she
2  was very upset about the videos going
3  public but that -- and I would be told,
4  gee, please always come to see me before
5  you do anything major like this and, you
6  know, that would have been not a
7  comfortable conversation but it would have
8  been a conversation and that would have
9  been it.
10 Q.  Did you try to show the video
11 to Sister Munley before you posted it
12 publicly?
13 A.  No, I did not.
14 Q.  Did you try to show the video
15 to Dr. Levine before you posted it
16 publicly?
17 A.  No.
18 Q.  Why not?
19 A.  Because I had already tried so
20 very, very hard to find out what had
21 happened.  I had made proposals and I
22 thought that was enough.  I had done
23 enough.
24 Q.  Okay.

1      In this Exhibit-21, you mention
2  something about not supporting the
3  mission's core values, and we talked about
4  core values earlier.
5      Do you see that?
6  A.  Not yet.
7      Whereabouts?
8  Q.  It's in the middle of the page
9  in the paragraph that starts --
10 A.  The first page?
11 Q.  -- tenure is on my side,
12 correct.
13 A.  Yes, yes.  I see what you're
14 saying.
15 Q.  Okay.
16     To your knowledge, when you
17 were a tenured professor in January of
18 2012, were you expected to uphold
19 Marywood's missions and core values?
20 A.  Yes.
21 Q.  Did you ever apologize to
22 Sister Munley or Dr. Levine about these
23 videos?
24 A.  At the meeting -- Dr. Levine

1  was not at the termination meeting, so I
2  did not see Dr. Levine at all after the
3  videos were posted.  I did not make an
4  explicit apology at the January 23rd
5  meeting.
6  Q.  Did you ever apologize to
7  Sister Munley about those videos?
8  A.  No.
9  Q.  Did you ever apologize to
10 Dr. Levine about those videos?
11 A.  No.
12 Q.  Did you ever apologize to any
13 member of the Marywood administration
14 about those videos?
15 A.  No.
16     - - -
17     (At this time, a document was
18 marked for identification as Exhibit
19 Fagal-22.)
20     - - -
21 BY MS. PEET:
22 Q.  What's been marked as Exhibit-2
23 seems to be e-mails between -- 22 --
24 between you and Rod Carveth dated early



1  January 2012.
2       Do you see that?
3       A.   Yes.
4       Q.   And I believe you testified
5  earlier that he was one of the folks that
6  saw the pre-release of the videos.
7       A.   Yes.
8       Q.   If you look at the bottom of
9  the first page --
10      A.   Yes.
11      Q.   -- Rod writes to you honestly I
12  think it is a brilliant satire.  If it was
13  released, however, I think you would catch
14  an incomparable amount of grief.  Anytime
15  Hitler gets raised, no one pays attention
16  to the message but the symbolism of Hitler
17  as a murderer and butcher.  I think the
18  university would try and find some
19  loophole to undo your tenure and fire you.
20  It's not what you -- what you are saying
21  here but how you are saying it that puts
22  you at risk.
23      Do you see that?
24      A.   Yes, I do.

1       Q.   Did you understand what Rod was
2  trying to say to you?
3       A.   Yes, I did.
4       Q.   Okay.
5       And what was he trying to say
6  to you?
7       A.   He was trying to say I was
8  taking a risk by posting those videos.
9       Q.   And you understood that was a
10  risk?
11      A.   I understood it was a risk.
12      Q.   And then you -- the top of the
13  page is an e-mail that you wrote back to
14  Rod, and then you write to him you sound
15  like my wife.
16      A.   Yes.
17      Q.   Did your wife make similar
18  comments to you?
19      A.   As I mentioned before, she was
20  worried that I would upset some people and
21  get in trouble of some sort.
22      Q.   And perhaps lose your job?
23      A.   Well, losing the job -- just
24  had been an ongoing brouhaha and that

1  would, you know, continue in some fashion.
2       Q.   You then wrote and I know the
3  Hitler link is considered by many to be
4  out of bounds.
5       A.   Yes.
6       Q.   I would have to face that
7  possibility.
8       A.   Uh-huh.
9       Q.   I am going to rethink this but
10  I think I won't change my mind about the
11  release.  I will look over the faculty
12  manual again, heh.
13      Do you see that?
14      A.   Yes, uh-huh.
15      Q.   Okay.
16      So is it fair to say that you
17  didn't change your mind?
18      A.   That's correct.
19      Q.   Okay.
20      You then wrote down assuming
21  the videos are released, if Marywood
22  considered going after my job, they will
23  probably realize that I would not -- all
24  caps -- go quietly.  If I were a tenured

1  42-year-old likely to cause trouble for
2  another 20 to 25 years, then the game
3  might be worth their votive candle, but I
4  will be 66 years old in a month.  If --
5  all caps -- they are rational, they will
6  think I can't be around that -- bold
7  italicized -- much longer and they will
8  take a big publicity hit for trying to get
9  rid of me.
10      Do you see that?
11      A.   Yes, I do.
12      Q.   So were you -- did you consider
13  the fact that because you were 66 years
14  old and you probably didn't have that much
15  longer of a tenure at Marywood University
16  that that weighed in your favor?
17      A.   What do you mean by weighed in
18  my favor?
19      Q.   That they more likely will not
20  terminate your tenure than had you been
21  younger?
22      A.   Yes, because I think that if a
23  younger person were to do what I did --
24  big if there because when I said they were



Page 250

1    younger, I don't think they would tend to
2    do it because of the trade-offs.  Because
3    if the younger person did in fact lose
4    their tenured job, it'd be very difficult
5    for that person to find work.  It would
6    cause much family turmoil.
7            But I -- as I just recently
8    explained, if one is older, then I
9    considered it my duty to do what I did
10   given my position and, again, as we just
11   discussed, if Marywood had to make the
12   decision what to do about the videos, if
13   it was a 42-year-old, to be rid of that,
14   quote/unquote, troublemaker, they'd be rid
15   of that troublemaker for at least 25
16   years, and so the game would be worth the
17   candle.  For me being older, it might be
18   more -- have been more rational for them
19   to take the -- shall we call it a two-week
20   publicity hit and tolerate me for what
21   would not be another 25 years.
22       Q.    How many years at that point?
23       A.    I had no particular plans to
24   retire.  If I was going to retire that

Page 251

1    year, I would have filed earlier for the
2    bonus.  I was thinking of going at least
3    to age 70 and maybe longer depending how
4    things went.
5        Q.    At that point, have you spoken
6    to anyone about retirement?
7        A.    No.
8        Q.    Did you meet with a financial
9    advisor?
10       A.    No, not about retirement.  Now,
11   maybe briefly I might have talked to a
12   TIAA-CREF guy once about investments but
13   nothing retirement per se.
14       Q.    Do you agree or disagree with
15   Rod's comment that Hitler is a symbolism
16   of murder and -- of a murderer and a
17   butcher?
18       A.    Hitler is often used as a
19   symbol that way, yes, but he's also used
20   in movies like Mel Brooks as a comedy
21   figure.
22       Q.    The videos, were they connected
23   to your intro to social sciences course?
24       A.    No.

Page 252

1        Q.    Were they -- what other courses
2    were you teaching that semester?
3        A.    In the spring of 2012, I
4    believe I was teaching two sections of
5    economics, a U.S. history class, and I
6    think I had the social science class also.
7    I'm not sure.
8        Q.    Was the video connected to any
9    of those courses?
10       A.    No.
11       Q.    Was it part of some academic
12   research?
13       A.    I follow the news on American
14   campuses quite closely in terms of what's
15   going on, in terms of social justice
16   protests, Occupy Wall Street protests,
17   free speech protests, all sorts of Black
18   Lives Matter protests, whatever might be
19   going on on any different campus, or not
20   going on, or not allowed to go on.
21           So I was always -- and plus I
22   always had -- I had that contact with
23   FIRE, so I was aware of what was going on
24   and I was also aware that, you know, part

Page 253

1    of what had happened to me was not unique
2    perhaps to Marywood and so, therefore, if
3    it came out what had happened to me, that
4    might very well get picked up by other,
5    shall we see, researchers or academics,
6    you know, studying, you know, what's going
7    on on campus.
8        Q.    Were you a researcher?
9        A.    I was not doing official
10   research for journal article about free
11   speech on campus.
12       Q.    So this article -- this video
13   -- these videos were not connected to any
14   sort of official research for any journal
15   articles, correct?
16       A.    That's correct.
17       Q.    Were they -- were these videos
18   part of some scholarly pursuit?
19       A.    Well, I was pursuing this in a
20   -- for intellectual free speech purposes
21   if you want to call that a scholarly
22   pursuit.  I think I would.
23       Q.    Okay.
24           Was it part of the curriculum?



1      A.   Well, when we do introduction
2  to social science, there's usually a
3  student who'd study the Constitution,
4  maybe read a few federalist papers, and
5  there'd be a discussion about how it might
6  relate to current events, and so something
7  like this could be used as an example.
8      Q.   Could in the hypothetical
9  sense, correct?
10     A.   Yes.  I had no specific plans
11 to incorporate it in the course content
12 for that semester.
13     Q.   Okay.
14          When you made the videos and
15 then posted those videos on YouTube, you
16 knew why you did it, right?
17     A.   Would you repeat the question,
18 please?
19     Q.   When you made the videos and
20 then you posted them on YouTube, you know
21 why you did it, right?
22     A.   Yes.
23     Q.   And as of January 13, 2012,
24 when they were officially posted and you

1  e-mailed them around, you knew at that
2  time why you had done this, correct?
3      A.   Yes.
4      Q.   And prior to January 13, 2012,
5  you had already consulted with a lawyer,
6  correct?
7      A.   No.
8      Q.   I thought you testified earlier
9  that you had consulted with a lawyer
10 perhaps in December of 2011.
11          Is that not true?
12     A.   I mentioned to my
13 brother-in-law, who's a lawyer, that, you
14 know, I was involved with a dispute on
15 campus.  I had written to FIRE and lawyers
16 at FIRE, but that was about the incident
17 and publicity.  It was not a consulting
18 for a lawyer for me, so I did no
19 consulting.
20     Q.   In your opinion, can a tenured
21 professor say or do anything they want?
22     A.   I don't know.
23     Q.   Can a tenured professor use the
24 N word?

1      A.   That's a good question.
2          MR. COHEN: I'm going to
3  object, legal conclusion.  You can
4  answer.
5  BY MS. PEET:
6      Q.   Is your answer I don't know?
7      A.   The answer would be I would
8  hope a professor could use the N word, as
9  you phrase it, in an academic setting, for
10 instance, talking about the use of the
11 word in Huckleberry Finn and what it means
12 and how it was often used as a
13 vituperative term and as an academic
14 discussion.
15          For example, there was a
16 professor, I believe, at the University of
17 Oklahoma who just basically got driven out
18 of class because she was trying to use it
19 in that type of context.  So in that
20 sense, I think it should be allowed to be
21 used.
22     Q.   What about in a satirical
23 video?
24          MR. COHEN: Objection, legal

1  conclusion and to form.
2          THE WITNESS: I'm sorry.
3          MR. COHEN: You can answer.
4          THE WITNESS: I can answer.
5  I've never used the word in
6  class.  I would -- I have not
7  contemplated using the word.  I would
8  imagine somebody could make some sort
9  of -- there are rap videos that use
10 the word all the time that are out
11 there from what I understand.
12 BY MS. PEET:
13     Q.   Are you aware of any rap video
14 artist that's a tenured professor at a
15 university?
16     A.   I couldn't name one.
17     Q.   Okay.
18          So my question to you is do you
19 feel if it's appropriate for a tenured
20 professor to use the N word in a satirical
21 video?
22     A.   I would have to see the
23 satirical video.  I don't know.
24     Q.   When was the first time you

65 (Pages 254 to 257)



1  heard from anyone in Marywood
2  administration after you posted these
3  videos?
4      A.   I believe it would have been
5  Mike Foley Monday morning, January 23rd.
6      Q.   Okay.
7          And how did Michael Foley get
8  in contact with you?
9      A.   He came to my office at 8:45
10  a.m.
11     Q.   And what did he tell you he was
12  -- did he talk to you then?  What
13  happened?
14     A.   He came to me and he said that
15  Sister Anne Munley or President Munley,
16  however he used the term, wanted to see me
17  at 9 o'clock.
18     Q.   Did he tell you why?
19     A.   I asked him -- I asked him.  I
20  said well, why, and he said well, we can
21  -- you can probably figure it out.
22     Q.   And did you figure it out?
23     A.   I assumed it had something to
24  do with the videos.

1      Q.   Do you think she was going to
2  be happy with you?
3      A.   No.
4      Q.   Were you surprised that up
5  until January 23rd you didn't hear from
6  anyone at Marywood about the videos?
7      A.   I was a little surprised but I
8  thought maybe they were thinking it was
9  better to let them, as I discussed before,
10  lie low, take -- take the publicity hit.
11     Q.   Okay.
12          Did you in fact go to that 9
13  o'clock meeting?
14     A.   Yes, I did.
15     Q.   And where did that meeting take
16  place?
17     A.   It was in President Munley's
18  office complex in a room with a conference
19  table.
20     Q.   And this meeting was exactly
21  ten days after you posted the videos,
22  correct, or at least e-mailed it to
23  Marywood that you posted it?
24     A.   Yes.  The meeting was the 23rd

1  and I e-mailed to the faculty on January
2  13th.
3      Q.   Were you surprised that
4  President Munley wanted to speak with you?
5      A.   No.  A little surprised but not
6  -- not totally.
7      Q.   Why weren't you totally
8  surprised?
9      A.   Only because I knew that she
10  would be unhappy with the videos.
11     Q.   Because you depict her as
12  Hitler?
13     A.   I wasn't thinking so much about
14  that really as -- in fact, I wasn't
15  thinking about that at all.
16     Q.   What were you thinking about?
17     A.   I was thinking about the -- the
18  fact that the Hitler -- the parody videos
19  might be seen as funny and, therefore, get
20  a lot of views and raise the issue that I
21  was concerned about raising about what
22  happened to the posters.
23     Q.   You were present at Sister
24  Munley's deposition last week, correct?

1      A.   Yes.
2      Q.   And you heard Sister Munley
3  discuss at length what her background and
4  experiences are and have been, correct?
5      A.   Yes.
6      Q.   After hearing that, do you have
7  a different opinion on what you did and
8  perhaps have a little bit of remorse that
9  you depicted her as Adolf Hitler?
10     A.   Again, I wouldn't say that I
11  depicted her as Adolf Hitler.  I would say
12  it was -- somebody in a Hitler costume was
13  playing Anne Munley's role.  Anne Munley
14  was not playing a Hitler role.  So she was
15  dressed, if you will, in a Hitler costume
16  to make the point that there was what I
17  would consider bad behavior tearing down
18  the posters as the fascists would do.  I
19  point out in the video I never use the
20  word Nazi, not once.
21     Q.   There are swastikas on those
22  people's arms, correct?
23     A.   Yes.
24     Q.   There's no -- there can be no



1  debate or room for a question whether or
2  not those people depicted Nazi member --
3  Nazi members, correct?
4      A.   The people in the Downfall
5  video were depicting Nazis.
6      Q.   Okay.
7          Who was present at this
8  meeting?
9      A.   Mike Foley was present and
10  Patricia Dunleavy was present.
11      Q.   Back to my question.
12          After hearing Sister Munley's
13  testimony about her experience, and her
14  background --
15      A.   Yes.
16      Q.   -- and her beliefs, has your
17  views on the videos changed?
18      A.   My views on the video haven't
19  changed.  I certainly am sorry if
20  President Munley took them what I would
21  consider the wrong way as being accused of
22  being like Adolf Hitler's worst traits as
23  if I was calling her a murderer of Jews.
24  That was absolutely no intent and I don't

1  think anybody seeing the video -- I won't
2  say anybody.  I don't think most people
3  seeing the video would take it in that
4  sense.
5      Q.   Do you have any remorse after
6  hearing Sister Munley's deposition about
7  those videos?
8      A.   I feel sad that she feels that
9  way.
10      Q.   Do you wish you didn't do it?
11      A.   No.
12      Q.   Knowing how she felt, you would
13  still do it again?
14      A.   Knowing how she felt, I might
15  have gone in and showed her the video
16  ahead of time.
17      Q.   So you may have changed
18  strategy a little bit?
19      A.   That's correct.  But at the
20  time, if I was put back in a time machine
21  given the same circumstances, given who I
22  was at the time, I presume I would have
23  made the same decision.
24      Q.   Do you believe that Sister

1  Munley wasn't sincere about what she was
2  saying, that she was making it up, or did
3  you feel that she really felt that way
4  when she was describing it during her
5  deposition?
6      A.   I don't know.  Sometimes people
7  will play the victim card, so I don't
8  know.
9      Q.   Tell us everything that
10  happened during that meeting.
11      A.   Well, I was called in and, as I
12  recall, Sister Anne Munley was at the head
13  of the table about where the videographer
14  is and Mike Foley was approximately where
15  that empty chair is, the first empty
16  chair.  I believe Patricia Dunleavy was
17  not at the table but sitting in a chair
18  just to the back maybe with a little
19  notebook in her lap of some sort, and I
20  was sitting approximately where you are
21  sitting.
22          And the discussion -- I was
23  asked if I posted the videos and I really
24  post -- I posted them to YouTube -- if I

1  sent the e-mail and posted the videos and
2  I agreed to that, and then I was asked, I
3  believe, to explain the videos in terms of
4  how they fit into the core values or
5  something, and so I started to explain --
6  remember, the videos are all about the
7  poster tear downs.  So I wanted to go back
8  and explain the poster tear downs and how
9  those led to the video and all the things
10  I had done and to, you know, set the
11  stage, and when I began to explain about
12  the posters, again, leading up to the
13  videos, I was cut off and told no, I could
14  not discuss that.  And then I believe I
15  said well, I would like to answer in
16  writing; no, you can't do that, and Sister
17  Anne Munley wanted to hear about the
18  videos.
19          And so I couldn't explain -- as
20  I saw it, I couldn't explain the videos
21  without the context of the whole posters
22  history, and so it was a 15-minute
23  meeting.  It ended at 9:15 and I was
24  probably suspended I'll say six -- maybe



Page 266

1  six or seven minutes into the meeting.
2  And after that, as far as I was concerned,
3  well, the hammer has dropped and it was a
4  simple question of, okay, what's next, and
5  then Sister Anne Munley was saying she
6  wanted an explanation about the videos.
7       So I was explaining -- I tried
8  to explain how I had tried to cooperate
9  and seek some sort of agreement through
10  Alan Levine and whatnot, and so I got, you
11  know, that off my chest. So I explained
12  some of the videos even though I hadn't
13  been allowed to before I got suspended,
14  and Sister Anne wanted me to justify --
15  explain the videos, and I really -- at
16  that point the game was over and the
17  questions were vague, and I said -- I was
18  talking about justice. The videos -- I
19  tried to, you know, get justice for the
20  free speech cause basically, and so
21  there's some, should I say, dumping out by
22  me of some of those concerns I had but I
23  -- philosophically, you know, explaining
24  the videos. I'd been suspended already

Page 267

1  and at that point it was what's your
2  e-mail address and turn in the keys to Pat
3  Dunleavy.
4       - - -
5       (At this time, a document was
6       marked for identification as Exhibit
7       Fagal-23.)
8       - - -
9  BY MS. PEET:
10      Q.   Mr. Fagal, have you ever seen
11  this document before? It's a two-page
12  document.
13      A.   Yes.
14      Q.   And it appears to be notes from
15  the meeting that you just described that
16  took place on January 23, 2012.
17      Is this a fairly accurate
18  description of the -- a summary of what
19  took place at the meeting?
20      A.   Well, I remember reading this
21  and I had some problems with some of these
22  notes because these were written up after
23  the raw notes. I'd have to go over this
24  in some detail here, review it.

Page 268

1       MR. COHEN:  Can you give him
2  some time to read it?
3       MS. PEET:  Sure.
4       - - -
5       (At this time, the witness
6  complies with request.)
7       - - -
8       THE WITNESS:  Okay.
9       So in the third paragraph
10  here --
11  BY MS. PEET:
12      Q.   The one that starts Sister Anne
13  asked Dr. Fagal?
14      A.   Yes.
15       If we went down to where it
16  says Sister Anne asked Dr. Fagal how the
17  videos upheld those values, and then your
18  next sentence says Dr. Fagal says he
19  wouldn't answer any more questions.
20  Well...
21      Q.   Do you dispute that?
22      A.   If we go down -- yes. Just
23  jump down a minute. Next to last
24  paragraph, Sister Anne -- okay. The

Page 269

1  middle there, Sister Anne told Dr. Fagal
2  that she was suspending him with pay.
3       There's nothing here after it
4  says Sister Anne asked Dr. Fagal how the
5  videos upheld those values, that is when I
6  started to explain the videos controversy
7  leading up -- pardon me -- the posters
8  controversy leading up to the videos, and
9  as soon as I started to do that to set the
10  context for the videos, I was summarily
11  cut off and told that I could not do that.
12       I could not discuss the
13  posters, that she wanted to know about the
14  videos, and basically I was -- I can't --
15  like Hamlet without the prince of Denmark
16  or whatever it is. I needed to explain
17  the videos in terms of the posters and I
18  was not allowed to do that.
19      Q.   Okay.
20      A.   And so when I stopped talking
21  and was told to discuss the videos and I
22  said the word "justice", and then that was
23  it. I mean I couldn't -- I was not
24  allowed to explain, and at that point I

68 (Pages 266 to 269)



Page 270

1    was suspended.
2        Q.   Okay.
3            Were you surprised you were
4    suspended?
5        A.   I was a little bit surprised,
6    yes.
7        Q.   Why?
8        A.   Because I thought there might
9    be a different conversation.  I mean there
10   wasn't...
11       Q.   Were you -- to your knowledge,
12   were you suspended over those videos?
13       A.   I presume that's what it was
14   for, yes.
15       Q.   You were suspended with pay,
16   correct?
17       A.   Correct.
18       Q.   So the meeting happened on a
19   Monday.
20           Did you call Alan Levine at his
21   home that prior Saturday?
22       A.   Yes.
23       Q.   Did you speak with Alan?
24       A.   No.

Page 271

1        Q.   Did you leave him a voice mail?
2        A.   Yes.
3        Q.   Did you tell him you wanted to
4    have a conversation off the record?
5        A.   Yes.
6        Q.   Why?
7        A.   Because I was wondering.  As
8    you said, a week had gone by and I hadn't
9    heard anything.  So I was just wondering
10   what -- what had happened and if there was
11   any -- I wouldn't say anything I could do
12   but anything to -- I assumed something
13   might be happening but I didn't know.  I
14   just wanted to touch base and see what was
15   going on.
16       Q.   Do you know what Dr. Levine's
17   reaction was to the videos?
18       A.   Not at the time I did not.  I
19   did not know.
20       Q.   As we sit here today, do you
21   know what Dr. Levine's reaction was?
22       A.   In some e-mail discovery, I
23   learned that he said he was upset.
24       Q.   Do you know whether or not he

Page 272

1    agreed with the decision to suspend your
2    employment?
3        A.   At the time, I didn't know.  I
4    thought maybe he didn't support it because
5    he was not the one who suspended me.
6        Q.   Okay.
7            As we sit here today, do you
8    have any reason to believe that Dr. Levine
9    supported the decision to suspend your
10   employment?
11       A.   I can't remember the exact --
12   when I was looking at some of the
13   discovery e-mails, I believe -- I know
14   there was administration meetings about
15   having the meeting with me on the 23rd
16   and, as I recall, he seemed to be all in
17   favor of that.
18       Q.   Of that being suspension?
19       A.   I recall that -- I believe
20   suspension was on the table in one of
21   those agendas that I read.
22       Q.   And when you say you learned
23   Dr. Levine was in favor of that, of that,
24   did you mean suspension?

Page 273

1        A.   I know he was in favor of the
2    meeting.  I don't know exactly what
3    punishment, shall we say, he was in favor
4    of.
5        Q.   Okay.
6            You were ultimately terminated,
7    correct?
8        A.   Correct.
9        Q.   And is it your understanding
10   you were terminated based on those videos
11   you created?
12       A.   Yes, that's the -- that's the
13   basic charge.
14       Q.   Both suspension and termination
15   are forms of discipline, correct?
16       A.   Well, yes.  Suspension I would
17   call discipline and termination would be
18   execution.
19       Q.   So would you agree that
20   suspension is a lesser form of discipline
21   than termination?
22       A.   Yes.
23           - - -
24           (At this time, a document was

69 (Pages 270 to 273)



1     marked for identification as Exhibit
2     Fagal-24.)
3                    - - -
4     BY MS. PEET:
5         Q.    Do you know who Frances Ferrese
6     -- and I apologize if I'm mispronouncing
7     that -- is?
8         A.    Yes, I do know Fran Ferrese.
9         Q.    And was she the administrative
10    assistant to President Munley?
11        A.    That sounds like a good title
12    these days.  Executive secretary to the
13    president it says here.
14        Q.    Okay.
15              And you received this e-mail
16    from her on January 24, 2012; is that
17    correct?
18        A.    Yes.
19        Q.    And it included various
20    attachments, correct?
21        A.    Do I remember?
22        Q.    Just for --
23        A.    Okay.  Yeah.
24        Q.    -- for the last two policies,

1     249 through 257, I will tell you were not
2     provided with the letter.  The rest were,
3     and those would be the progressive
4     discipline policy and the faculty
5     grievances and appeals policy, but the
6     other letter -- the other policies you
7     were provided with.
8         A.    Okay.  So...
9         Q.    Is this how you learned that
10    Sister Munley was recommending your
11    termination of employment?
12        A.    Yes.
13        Q.    And it was -- these were the
14    issues that you were discussing the
15    previous day in the meeting with President
16    Munley, correct?
17        A.    Which issues?  On the letter on
18    page --
19        Q.    Yeah, what's contained in the
20    letter.
21        A.    Do you mean where it says as
22    you know, our values include?  Does
23    that --
24        Q.    Yes.

1         A.    Okay.
2         Q.    This was the same idea that was
3     discussed with you the day before,
4     correct, in the meeting?
5         A.    Let me read here.  I see what
6     she wrote.
7               And what's the question?
8         Q.    The issue that's being
9     addressed in this letter, namely how she
10    viewed your behavior, that was discussed
11    the day before with you in the meeting,
12    correct?  This is not the first time
13    you're hearing that Sister Munley --
14        A.    Yes.  I can't recall all the
15    terms such as sexually explicit.  I don't
16    recall all those terms being used.  I knew
17    there was unhappiness with the --
18        Q.    Okay.
19        A.    -- videos but not all those
20    terms.
21        Q.    What did you do when you
22    received this letter?
23        A.    Right around this time, if not
24    the day, I would have called -- I believe

1     I called FIRE.  I might have been in
2     contact with them the day before thinking
3     perhaps I needed -- I should have a
4     lawyer.
5               And so your question was what
6     did I do that day?
7         Q.    When you received this letter.
8         A.    Yes.  So I believe I called
9     FIRE.  That would have been my first call.
10        Q.    Okay.
11              And is that when they gave you
12    Jonathan Cohen as a referral?
13        A.    Yes.
14        Q.    Did you do anything else after
15    you received this letter?
16        A.    I can't recall.  I told my
17    wife.
18        Q.    What did your wife say?
19        A.    I can't remember exactly what
20    she said but she didn't cry or throw
21    dishes or anything.
22        Q.    Were there some expletives?
23        A.    No, no.
24        Q.    Was she happy?  Was she



1    pleased?
2        A.   I would say she was not pleased
3    but she understood.
4        Q.   Okay.
5            If you look at DEF187, which
6    was the last page of the actual packet
7    that was sent to you.
8        A.   187, okay.
9        Q.   Do you see it has a release of
10   personal information document and then a
11   place for you to sign and date?
12       A.   Yes.
13       Q.   Do you remember receiving this?
14       A.   Yes.
15       Q.   Did you check one of the boxes,
16   sign, date it, and return it by
17   February 3, 2012?
18       A.   No.
19       Q.   Why not?
20           MR. COHEN:  Without disclosing
21   attorney-client communications.
22           THE WITNESS:  Without
23   disclosing attorney-client --
24           MR. COHEN:  Yes.

1            THE WITNESS:  I'm not sure what
2    would -- it was suggested that I not.
3    BY MS. PEET:
4        Q.   Let's look at DEF169 and it
5    goes through 174.  It's the tenure policy.
6        A.   Okay.
7        Q.   Did you understand that tenured
8    professors, nonetheless, still have to
9    abide by the tenure policy?
10           MR. COHEN:  Objection, legal
11   conclusion.  You can answer.
12           THE WITNESS:  If you have
13       obligations, you should comply with
14       those as you understand them.  There
15       might be disagreements as to
16       interpreting a policy.
17   BY MS. PEET:
18       Q.   Okay.
19           Did you understand, as of
20   January of 2012, that this tenure policy
21   applied to you?
22       A.   Okay.
23       Q.   And prior to January of 2005,
24   have you seen this policy, the tenure

1    policy?
2        A.   Would you repeat the question?
3        Q.   Prior to January of 2012, have
4    you seen --
5        A.   You said 2005.  Okay.  I'm
6    sorry.
7        Q.   Oh, my apologies.
8        A.   Okay.  So --
9        Q.   It's been a long day.
10       A.   -- just repeat it one more
11   time.
12       Q.   Sure, of course.
13           Prior to January of 2012, had
14   you ever seen this tenure policy?
15       A.   I had seen it.  I don't know if
16   I read every single word of it because it
17   does change over the years.
18       Q.   But the policy was made
19   available to you nonetheless?
20       A.   Yes.
21       Q.   Okay.
22           If you go to the next policy,
23   which is the civil rights policy, 175
24   through 176.

1        A.   Okay.
2        Q.   Did you understand in January
3    of 2012 that this policy applied to you?
4            MR. COHEN:  Objection, legal
5        conclusion.  You can answer.
6            THE WITNESS:  Okay.
7            I knew if policies were -- you
8        know, as part of the official
9        Marywood policies that I would be
10       subject to the policies.
11   BY MS. PEET:
12       Q.   Did you have -- did you
13   understand in January of 2012 that you had
14   to comply with various Marywood policies
15   including the civil rights policy?
16           MR. COHEN:  Objection, legal
17       conclusion.
18           THE WITNESS:  Well, I
19       understood I had to follow -- follow
20       the law in terms of -- you know.
21   BY MS. PEET:
22       Q.   Okay.
23           My question is not about the
24   law.  My question is about Marywood's

71 (Pages 278 to 281)



1    civil rights policy.
2        A.   Yeah, civil rights policy.  I
3    would assume I'd have to follow it, yes.
4        Q.   Okay.
5            So you agree it applied to you?
6        MR. COHEN:  Same objection.
7        THE WITNESS:  Yeah.
8        MS. PEET:  Okay.
9        THE WITNESS:  Yes.
10   BY MS. PEET:
11       Q.   Do you agree that it --
12   Marywood did not condone and will not
13   tolerate discrimination, harassment, or
14   assault by any member of the Marywood
15   community, and then it lists different
16   protective statuses?
17           MR. COHEN:  Objection, legal
18   conclusion.
19           MS. PEET:  It's not a legal
20   conclusion.  I'm reading what the
21   policy says.
22           THE WITNESS:  Yes.  Okay.
23   BY MS. PEET:
24       Q.   Do you see how someone could

1    have found the video to be discriminatory
2    or harassing?
3        A.   I can understand how some
4    people would be offended by it.  Whether
5    that would be defined as harassing
6    somebody or discriminating against
7    somebody, in my case I would say no.
8        Q.   Okay.
9            Do you understand how one could
10   have found the policies to be an abuse of
11   academic freedom?
12       A.   No, I don't understand.
13       Q.   Do you understand how people
14   that watch the videos could have saw them
15   to be -- or you to have exhibited
16   professional incompetence?
17       A.   No, I don't.
18       Q.   If you turn to the next policy,
19   177 through 180, it's Marywood's
20   conditions of computer use policy.
21           Do you see that?
22       A.   Yes.
23       Q.   Did you have any reason to
24   believe in January of 2012 that this

1    policy did not apply to you?
2        A.   No.
3        Q.   And in fact you knew about this
4    policy because you reference this policy
5    in your January 13, 2012, e-mail, correct?
6        A.   I can't recall specifically
7    referencing it.  I'd have to look at it.
8        Q.   Okay.  We can do that.  It is
9    Exhibit-15, and if you look at DEF1445.
10       A.   I do remember referring to that
11   Marywood could monitor one's e-mail.  I do
12   remember that discussion.
13       Q.   Do you remember referring to,
14   in words or substance, a -- that Marywood
15   had a computer policy and beware --
16       A.   Yes.
17       Q.   -- is the words you used?
18       A.   Yes.
19       Q.   Okay.
20       A.   Yes.
21       Q.   Do you feel that with the
22   videos, you were respecting the civil
23   rights of others?
24           MR. COHEN:  Can you repeat

1    that?
2    BY MS. PEET:
3        Q.   Do you feel that with those
4    videos, you were respecting the civil
5    rights of others to an open and hospitable
6    environment?
7        A.   So are we referring to a
8    specific phrase here?  Where is this?
9        Q.   It comes from the second page,
10   number eleven, but I'm asking you if do
11   you believe that those videos respected
12   the civil rights of others to an open and
13   hospitable environment?
14       A.   Yes.
15       Q.   Okay.
16           Turn to the next policy, 181
17   through 182, the academic freedom policy.
18           Do you believe that your videos
19   were in furtherance of academic freedom?
20       A.   Yes.
21       Q.   And how's that?
22       A.   Trying to open up discussion,
23   and the videos themselves criticized the
24   forces that would reduce discussion and



1   free speech.
2       Q.   Okay.
3           The policy talks about teachers
4   being entitled to freedom in the
5   classroom.
6           Were the videos shown in the
7   classroom?
8       A.   No, they were not.
9       Q.   And the videos had nothing to
10  do with the classroom, correct?
11      A.   I might have shown them in the
12  class later that semester if we got --
13  when we got to the Constitution and free
14  speech. I might have chosen to say, hey,
15  here's something that happened on campus
16  last semester and I might have talked
17  about first amendment briefly, talked
18  about first amendment issues in public
19  universities versus private, et cetera,
20  and that would have been -- videos don't
21  take long. So I did not have -- plan -- I
22  did not plan to show them but I might
23  have.
24      Q.   Okay.

1           MR. COHEN:  Do you mind if I
2   take a five-minute break?
3           MS. PEET:  Sure.
4               - - -
5           THE VIDEOGRAPHER:  We're now
6   off the record.  The time is 3:57
7   p.m.
8               - - -
9           (At this time, a short break
10  was taken.)
11              - - -
12          THE VIDEOGRAPHER:  We are back
13  on the record.  The time is 4:05 p.m.
14              - - -
15  BY MS. PEET:
16      Q.   Just another reminder that
17  you're still under oath and your testimony
18  needs to be truthful, accurate, and
19  complete.
20          Do you understand?
21      A.   I do understand.
22      Q.   183 to 184 is the Marywood's
23  policy on professional ethics.
24          Do you see that?

1       A.   Yes.
2       Q.   Do you have any reason to
3   dispute that in January of 2012 this
4   policy applied to you?
5           MR. COHEN:  Objection, legal
6   conclusion.  Go ahead.
7           THE WITNESS:  No.
8   BY MS. PEET:
9       Q.   Okay.
10          Do you believe that with your
11  videos you were exercising critical
12  self-discipline and judgment?
13      A.   I thought about what I did.  It
14  was a tough choice.
15      Q.   What was your choice?
16      A.   The choice was to -- since I
17  was warned by Rod Carveth and Lindsay, and
18  I think they were the ones who explicitly
19  raised the issue that some people have
20  what I might call a knee jerk reaction to
21  a Hitler reference, that there was a risk
22  I was running by doing that.  So I had to
23  think about whether I would do it that way
24  or not and I chose to do it.

1       Q.   Okay.
2           Do you believe that those
3   videos -- strike that.
4           Do you believe that with those
5   videos you were exercising critical
6   self-discipline and judgment?
7       A.   Yes.
8       Q.   Okay.
9           Do you believe that with those
10  videos you showed due respect for the
11  opinions of others?
12      A.   Yes.
13      Q.   Okay.
14          The next 185 through 186 is
15  Marywood's mission and core values.
16          We discussed this earlier
17  today, correct?
18      A.   Yes.
19      Q.   And you have seen this before,
20  right, Marywood's mission statement and
21  core values?
22      A.   Yes.
23      Q.   And was it -- I believe you
24  already testified that you understood as a



1    tenured professor at Marywood you were
2    committed to abiding by Marywood's mission
3    and core values, correct?
4           MR. COHEN:  Objection, legal
5    conclusion.
6           THE WITNESS:  Yes.
7    BY MS. PEET:
8       Q.   Okay.
9           The first core value is
10   Catholic identity.
11          Do you see that?
12      A.   Yes.
13      Q.   Do you feel that those videos
14   upheld Marywood's Catholic identity?
15      A.   I would say the one sentence
16   there is vague to the extent that my
17   videos tried to promote intellectual
18   discourse and criticize what Marywood did
19   to not encourage intellectual values that
20   that would be part of -- that that could
21   be seen as part of the Catholic identity,
22   and I do realize that other people would
23   say no.
24      Q.   Okay.

1           Do you believe that your videos
2    upheld Marywood's respect for each person
3    core value?
4       A.   Again, respect is a vague term.
5    I can respect -- people have rights, and
6    as a human being they have certain rights.
7    On the other hand, that doesn't mean
8    there's a right not to be criticized, and
9    if one is criticized, one might be
10   offended that they're criticized.  That I
11   would say comes with the territory of
12   being a human being.
13      Q.   Okay.
14          Do you believe that with those
15   videos you were upholding Marywood's core
16   value of respect for each person?
17      A.   Yes.
18      Q.   Okay.
19          Do you believe that with your
20   videos you were upholding Marywood's core
21   value of empowerment?
22      A.   Yes.  Certainly I was the one
23   trying to empower people to be exposed to
24   ideas.

1       Q.   And do you see how other folks
2    might have watched the video and have
3    believed that the videos did not uphold
4    Marywood's core value of empowerment?
5       A.   Well, let me just read the one
6    sentence.  Empowerment says education to
7    enable access and to empower the
8    underserved to take a full role in the
9    life of the broader society.  I would say
10   that the videos -- by criticizing what
11   Marywood did with respect to the posters,
12   they were encouraging empowerment on the
13   part of students to be exposed to, in this
14   case, the speaker.
15      Q.   Okay.
16          My question to you is do you
17   see how folks that watched those
18   videos may have concluded that they did
19   not uphold Marywood's commitment to
20   empowerment?
21      A.   No.
22      Q.   Do you believe that your videos
23   upheld Marywood's commitment to service?
24      A.   Let me read the sentence.

1    Well, rooted in the deep belief that
2    learning and scholarship serve the global
3    community is the belief in the value of
4    the diverse types of work that support
5    that service, and the preparation of
6    students for leadership by participation
7    in that service.
8           One way people got exposed to
9    ideas these days is through YouTube videos
10   and sometimes you can use comedy and
11   satire to make a point, and so you can
12   show the unempowered how they can be
13   powerful by making a video with cheap
14   software.  So I would say yes.
15      Q.   Depicting their boss as a
16   fascist Adolf Hitler?
17      A.   I wouldn't say as a fascist
18   Adolf Hitler but I would say as -- there
19   is some behavior that -- such as the
20   tearing down of posters that was
21   paralleled by behavior of the fascist.
22      Q.   Do you remember sending an
23   e-mail in which you said essentially you
24   are depicting Sister Munley as a fascist?



1        A.   She -- I can't remember the
2    exact phrase, but I think we just saw that
3    I did use that term.  I would note that I
4    did not use the term "Nazi".
5        Q.   Okay.
6        Do you believe that with your
7    videos you were upholding Marywood's core
8    value of commitment to excellence?
9        A.   Well, the videos certainly did
10   get a lot of views and certainly some
11   people did think they were excellent.
12   That's a matter of opinion as to whether
13   they were excellent or not.
14       Q.   I'll ask the question again.
15       Do you believe that the videos
16   uphold Marywood's core value of commitment
17   to excellence?
18       A.   Yes.
19       Q.   Okay.
20       You said that the videos got a
21   number of views.
22       How many views did it get?
23       A.   I believe the first video got
24   somewhere near 2,000 views, and perhaps

1    100 of them or 50 of them were by me just
2    checking to see how many views there were.
3    The second video probably got about half
4    that.
5        Q.   Did you hear from folks outside
6    the Marywood community, other than we've
7    talked about today, people that you don't
8    know that viewed the videos that reached
9    out to you?
10       A.   Let me think.
11       Would you repeat the question,
12   please?
13       Q.   Sure.
14       Did you ever hear from anyone
15   that's not affiliated with Marywood that
16   saw the videos that reached out to you,
17   other than what we have already discussed
18   today, to give you their opinion about the
19   videos?
20       A.   I believe some ex-Marywood
21   students, through the Marywood grapevine,
22   learned about the videos and saw them and
23   made a comment, and I don't recall anybody
24   without a Marywood connection contacting

1    me --
2        Q.   Okay.
3        A.   -- saying they had seen the
4    videos.
5        Q.   What kind of comments did they
6    make?
7        A.   Supportive.
8        Q.   How did they do that, by
9    e-mail?
10       A.   Was it the videos?  Let's see.
11   Let me think.  I can't remember whether it
12   was the videos now that I think about it
13   or whether it was the reaction to the
14   lawsuit.  That might have been -- I might
15   be wrong on the videos.
16       Q.   Did you send an e-mail out to
17   folks that you filed a lawsuit against
18   Marywood?
19       A.   No.  I told some friends of
20   mine that I had but I did not send out any
21   blast e-mail to anybody.
22       Q.   Again, I will tell you that the
23   next policy, 249 through 251, was not
24   provided.

1        MS. PEET:  Actually, can we
2    change this and make -- off the
3    record.
4             - - -
5        (At this time, a discussion was
6    held off the record.)
7             - - -
8        (At this time, a document was
9    marked for identification as Exhibit
10   Fagal-25.)
11            - - -
12   BY MS. PEET:
13       Q.   What has been placed before you
14   is Marywood's progressive discipline
15   policy.
16       Do you see that?
17       A.   Yes.
18       Q.   Have you seen this before?
19       A.   Yes.
20       Q.   Is it your contention that
21   Marywood violated this policy?
22       A.   Yes.
23       Q.   Why is that?
24       A.   Because the procedures weren't

75 (Pages 294 to 297)



1    followed as outlined in the policy.
2        Q.   Okay.
3             What procedures weren't
4    followed?
5        A.   Well, it says Marywood
6    University endorses a progressive
7    discipline policy designed to promote
8    resolution in a fair and orderly manner
9    because the university regards
10   disciplinary action is corrective and not
11   punitive, and then it talks about
12   procedures and how they commence, and meet
13   with administrator, suspension.  The
14   faculty member may be suspended by the
15   vice president for academic affairs.
16   Suspension is justified if immediate harm
17   to the faculty member or others is
18   threatened by the person's continuance.
19            So there are various procedures
20   that I don't think were followed.  No
21   remedial -- let's see.  Where's the phrase
22   here?  My suspension wasn't reviewed by a
23   committee.  As I recall, we -- various
24   issues that we raised pertaining to this

1    set of policies.
2        Q.   Okay.
3             The vice president for academic
4    affairs, that would have been Alan Levine,
5    correct?
6        A.   Yes.
7        Q.   Do you know to whom he
8    reported?
9        A.   I presume President Munley.
10       Q.   Okay.
11            Does it say that the faculty
12   member can only be suspended by the vice
13   president of academic affairs?
14       A.   No.
15       Q.   Okay.
16            Does it say suspension is only
17   justified if immediate harm to the faculty
18   member or others is threatened by the
19   person's continuance in the faculty
20   position?
21       A.   The word "only" does not appear
22   there.
23       Q.   Okay.
24       A.   Though it looks like a

1    declarative sentence.
2        Q.   Have we exhausted all the
3    reasons why you believe the progressive
4    discipline policy has been violated?
5        A.   No, because my memory is not
6    perfect.
7        Q.   Okay.
8             What are the other reasons?
9        A.   I would have to review the
10   Complaint to refresh my memory.
11       Q.   Okay.
12            So anything that's included in
13   the Complaint would you like to
14   incorporate here today for the reasons why
15   you believe the progressive discipline
16   policy was violated?
17       A.   I believe the Complaint would
18   cover these issues.
19       Q.   And by Complaint, just so we're
20   on the same page, we're referring to the
21   Amended Complaint, correct?
22       A.   That's correct.
23       Q.   Would your position at all
24   change if Dr. Levine was the one that

1    advised you of your suspension versus
2    Sister Munley?
3        A.   I believe that that would have
4    been, shall we say, in Marywood's favor if
5    he had been the one who had done it.
6        Q.   Okay.
7             How would that have impacted
8    you?  When I mean that, who advised you of
9    your suspension.
10       A.   Well, if Dr. Levine had been at
11   the meeting, to put this position in here
12   as being the one, the position person who
13   actually does the suspension, then that
14   would seem to follow that that would be
15   the one who would have been at the meeting
16   to do the suspending.
17       Q.   Is there a requirement that a
18   meeting like that take place prior to a
19   suspension?
20            MR. COHEN:  Objection, legal
21   conclusion.  You can answer.
22            THE WITNESS:  It says -- let's
23   see.  It says here the administrator
24   receiving the complaint shall discuss



1    the matter with the faculty member in
2    a confidential conference.  So to me
3    that says there should be a
4    meeting --
5         MS. PEET:  Okay.
6         THE WITNESS:  -- with the
7    administrator.
8    BY MS. PEET:
9         Q.   And a meeting took place,
10   correct?
11        A.   We did have a meeting, yes.
12        Q.   Okay.
13             The next policy is 252 through
14   257, faculty grievances and appeals.
15             Do you see that?
16        A.   262 to 260 --
17        Q.   252. Pardon me.
18        A.   I'm sorry.  252.
19        Q.   Okay.  257.
20        A.   Okay.
21        Q.   The faculty grievances and
22   appeals.
23             Do you see that?
24        A.   Yes.

1         Q.   Do you allege that this policy
2    was violated?
3         A.   Yes.
4         Q.   And on what basis?
5         A.   There was supposed to be a
6    separate committee to hear an appeal for
7    suspension, and that meeting would have
8    been solely to deal with suspension.
9         Q.   Where does it say that there's
10   supposed to be a separate committee to
11   hear the suspension versus termination?
12        A.   Let me see.  Where does it say
13   -- this is the grievances and appeals
14   section.  Is there a section about the
15   suspension?  I don't see where that would
16   be.  Would that be under progressive
17   discipline somewhere?
18             I know it's -- I recall reading
19   somewhere that one gets a committee for
20   suspension and termination and that the
21   policy says that the committee members for
22   each committee may or may not be the same,
23   that the president of the university
24   determines whether the members of the

1    committee would be the same or not, but I
2    don't have it in front of me.  I recall
3    that it's explicit that there are two
4    committees, one for suspension and one for
5    termination.
6         Q.   Okay.
7              Any other basis for your belief
8    that the faculty grievances and appeals
9    policy was violated?
10        A.   Well, the grievance committee
11   was grieving whether the procedures were
12   followed and the grievance committee said
13   they were, but we disputed that in terms
14   of there was no committee for the
15   suspension.
16        Q.   Okay.
17             Anything else?
18        A.   Not that I can recall right
19   now.
20        Q.   Okay.
21             - - -
22             (At this time, a document was
23   marked for identification as Exhibit
24   Fagal-26.)

1              - - -
2    BY MS. PEET:
3         Q.   After you received the first
4    letter from Sister Munley, you then
5    received another statement of charges,
6    correct?
7         A.   Yes, I believe on February 8th.
8         Q.   And I believe it was in part
9    because perhaps something was missing and
10   your attorney advised Sister Munley that
11   and she --
12        A.   Yes.
13        Q.   -- provided a more full
14   context --
15        A.   Correct.
16        Q.   -- is that correct?  Okay.
17             And that's what Exhibit-26 is,
18   correct, the revised statement of charges,
19   for lack of better words?
20        A.   I see the February 8th, yes.
21        Q.   Okay.  On this policy there --
22   on this packet there's a policy that was
23   not attached to the last one which is on
24   224 through 225 towards the end of your



1  packet, Marywood University's goals and
2  objectives.
3           Do you see that?
4       A.   President's page, Marywood
5  University's goals and objectives.  Okay.
6  I see it.
7       Q.   Okay.
8           Do you believe that your videos
9  upheld what is provided here in Marywood
10 University's goals and objectives?
11      A.   I can't remember reading this.
12          May I read it now, please?
13      Q.   Of course.
14               - - -
15          (At this time, the witness
16 complies with request.)
17               - - -
18          THE WITNESS:  Okay.  I read the
19 goals and objectives.
20 BY MS. PEET:
21      Q.   Okay.
22          My question to you was do you
23 believe that the videos upheld Marywood's
24 -- Marywood University's goals and

1  objectives?
2       A.   I don't know because, as I read
3  these, almost all of them pertain to
4  outcomes such as a majority of the
5  students who participate in service
6  opportunities in an ongoing way.  I mean
7  how the videos would support, for
8  instance, that goal, I don't know.  Maybe
9  the students would be inspired to say,
10 hey, maybe I can make a video some day and
11 maybe that would be a public service
12 video, maybe I too can use whatever.
13      Q.   Are you suggesting the Hitler
14 videos would be a PSA, a public service
15 announcement?
16      A.   No, but I'm suggesting that
17 once students see what can be done with
18 videos, they might be inspired to try it
19 themselves.  The only thing I see it
20 implies to -- the fourth bullet says
21 employer -- employees will demonstrate
22 core values in the workplace, and we've
23 already discussed those.
24      Q.   And you believe you upheld the

1  core values in the workplace?
2       A.   I -- we went through all those
3  just a short while ago.
4       Q.   Right.
5           And the question is you believe
6  that you upheld the core values in the
7  workplace with those videos?
8       A.   Yes.  I -- yes, that's correct.
9       Q.   Okay.
10      A.   And the second set of bullets
11 there about the awareness, I don't -- I
12 just see that as being irrelevant.  The
13 next four bullet points, I don't see
14 really the relevance there.
15      Q.   Okay.
16      A.   The last bullet point on the
17 page, employees will serve as role models
18 as socially responsible leaders.  Again,
19 however one defines a socially responsible
20 leader, but I certainly tried to carry the
21 fire torch and do something I thought was
22 worthwhile.  Others might not have agreed.
23      Q.   Pun intended?
24      A.   Yes, absolutely.

1       Q.   Okay.
2           On pages 209 --
3       A.   And -- excuse me.
4       Q.   Oh, you're not done?
5       A.   No, no.  Let me go to the last
6  one.  Challenging instructional program.
7  I just want to say that I was a
8  challenging professor.
9       Q.   Okay.
10          On pages 209 to -- bottom of
11 209 and top of 210, Sister Munley again
12 talks about that release document that she
13 attached and asked you to sign it if you
14 wanted to by Friday, February 17, 2012.
15          Do you see that?
16      A.   As I recall, it was a Hobson's
17 choice where she was trying to speed up
18 the process of terminating me, which is
19 why I was advised not to sign that.
20      Q.   Okay.
21          So is it fair to say that you
22 did not sign and return that document?
23      A.   That's correct.
24      Q.   And that document I'm referring



Page 310

1  to is the release of personal information
2  authorization form.
3      A.   Yes, yes.
4      Q.   You talked about the fact that
5  you had a -- you grieved your decision --
6  the decision, correct?
7      A.   Yes.  Excuse me.
8           The decision to do what?
9      Q.   The suspension and
10  recommendation to terminate your
11  employment.
12      A.   Yes.
13              - - -
14           (At this time, a document was
15  marked for identification as Exhibit
16  Fagal-27.)
17              - - -
18  BY MS. PEET:
19      Q.   Did you ever see this letter
20  before?
21      A.   I think -- I'm not sure.  I
22  believe I saw this in discovery e-mails.
23      Q.   Okay.
24           Do you have any reason to

Page 311

1  dispute that Dr. Sadlack was the chair of
2  the Faculty Grievance Committee?
3      A.   No.
4      Q.   Do you have any reason to
5  dispute that she advised President Munley
6  on or around March 19, 2012, that you
7  filed a grievance and that a committee has
8  been convened to review your complaint?
9      A.   Yeah, that's what the letter --
10  yes.
11      Q.   Okay.
12           You have no reason to dispute
13  that, correct?
14      A.   No, no reason to disagree with
15  it.
16      Q.   And to your knowledge, a
17  committee was ultimately formed?
18      A.   To my knowledge, a committee
19  was ultimately formed.
20              - - -
21           (At this time, a document was
22  marked for identification as Exhibit
23  Fagal-28.)
24              - - -

Page 312

1  BY MS. PEET:
2      Q.   On this document that has been
3  placed before you, is this set forth the
4  grievance that -- against President Munley
5  that you submitted to the committee?
6      A.   Yes.
7      Q.   Did you draft this grievance
8  that's contained on Exhibit-28?
9      A.   I worked on this with my
10  attorney.
11      Q.   Okay.
12           And this is the final product,
13  what you submitted?
14      A.   Yes.
15      Q.   Anyone else between -- besides
16  you and your attorney work on this?
17      A.   No.
18              - - -
19           (At this time, a document was
20  marked for identification as Exhibit
21  Fagal-29.)
22              - - -
23  BY MS. PEET:
24      Q.   Do you remember receiving this

Page 313

1  e-mail from Dr. Sadlack informing you that
2  they received your official grievance
3  regarding your suspension and termination?
4      A.   Yes, I recall this.
5      Q.   Did -- she says if there's any
6  additional information you would like us
7  to consider, please let me know.
8           Did you contact Dr. Sadlack
9  with additional information?
10      A.   I can't recall for sure but I
11  think I did.
12      Q.   What did you provide?
13      A.   At some point, I believe I
14  submitted the explanation of the
15  scene-by-scene videos.
16      Q.   And that's what we discussed
17  earlier today, right?
18      A.   What we discussed earlier, at
19  least you had a copy of it, but I cannot
20  remember exactly whether it was this
21  committee or another committee that got
22  those.
23      Q.   Okay.
24           Do you know whether or not the




1 grievance committee met to discuss your
2 grievance?
3      A.   I don't know for a fact.  I was
4 told they met and discussed the grievance.
5 I got a report that they discussed the
6 grievance.
7      Q.   Were you involved at all in
8 their decision-making or thought process?
9      A.   I wasn't involved in their
10 thought process or decision-making, no.
11      Q.   Okay.
12           To your knowledge, did the
13 grievance committee ultimately make a
14 decision with reference to your grievance?
15      A.   The grievance committee
16 informed me by an e-mail that they
17 examined the grievance and found it
18 wanting and...
19           - - -
20           (At this time, a document was
21      marked for identification as Exhibit
22      Fagal-30.)
23           - - -
24 BY MS. PEET:

1      Q.   Is this the e-mail that you
2 received from Dr. Sadlack with reference
3 to the grievance committee's findings?
4      A.   Yes.  This is what I was just
5 referring to.
6      Q.   Okay.
7           And she writes we have found no
8 evidence of improper action on President
9 Munley's part which would constitute a
10 legitimate grievance.
11           Do you see that?
12      A.   I see that.
13      Q.   Do you disagree with
14 Dr. Sadlack and the committee's decision?
15      A.   Yes.
16      Q.   Okay.
17           And what do you disagree with?
18      A.   Well, she mentions the five
19 things here; the issue of which individual
20 was doing the suspending, whether I was a
21 cause of immediate harm to myself or
22 others, whether there was no progressive
23 discipline in the sense of a chance for
24 any remediation, and then the last one is

1 about there being no specific committee to
2 deal with the appropriateness of the
3 suspension.
4      Q.   Okay.
5           So you disagreed with the
6 grievance committee's findings?
7      A.   Yes.
8      Q.   Did Sister Munley sit on the
9 grievance committee, to your knowledge?
10      A.   I don't know.
11      Q.   Do you have any --
12      A.   I don't -- I don't --
13      Q.   -- knowledge that she did?
14      A.   No knowledge that she did.  I
15 don't know if there's any contact.  I
16 don't know.
17      Q.   Do you -- same question for
18 Dr. Levine.
19           Do you have any knowledge of
20 whether or not he sat on the committee?
21      A.   No knowledge.  I presume he did
22 not.
23      Q.   Okay.
24           Likewise, do you presume Sister

1 Munley did not sit on the committee?
2      A.   I presume she was not an
3 official committee member.
4      Q.   Is it fair to say that Sister
5 Munley did not stop you from filing a
6 grievance?
7      A.   That would -- Sister Munley did
8 not stop me from filing a grievance.
9           - - -
10           (At this time, a document was
11      marked for identification as Exhibit
12      Fagal-31.)
13           - - -
14 BY MS. PEET:
15      Q.   What has been marked as
16 Exhibit-31 is -- are e-mail exchanges
17 between you and Dr. Sadlack about your
18 grievance.
19           Do you see that?
20      A.   Yes.
21      Q.   Do you remember having these
22 e-mails with Dr. Sadlack?
23      A.   Let me look at them.  Yes, on
24 the first page here.



1      Q.   If you look at document DEF295,
2   which is towards the end.
3      A.   295, okay.
4      Q.   Which is an e-mail -- the top
5   one is an e-mail from Erin to you dated
6   March 29, 2012, at 5:03 p.m.
7           Do you see that?
8      A.   It's from Sister Gail Cabral to
9   me.  Oh, wait, wait.  I'm sorry.
10      Q.   She's copied on the letter.
11      A.   Wait, wait.  I'm sorry.  I'm
12   sorry.  That was -- right.  From the
13   bottom of the previous page, it's from
14   Sadlack to me with a copy to Cabral,
15   right.
16      Q.   Okay.
17      A.   So dear Fred, okay.
18      Q.   She says -- she being Erin says
19   all I can do is say what I did in the
20   letter, that we checked the policy wording
21   carefully and did not find a violation of
22   procedure in any of the five instances you
23   grieved.
24           Do you see that?

1      A.   Yes.
2      Q.   She also wrote in addition, the
3   policy manual states that the findings of
4   the grievance committee cannot themselves
5   be grieved.
6           Do you see that?
7      A.   Yes.
8      Q.   Do you disagree with that?
9      A.   No.
10      Q.   And then she then writes please
11   note that our findings do not preclude
12   your appealing the termination itself
13   through an ad hoc committee as outlined in
14   the progressive discipline policy.
15           Do you see that?
16      A.   I see that.
17      Q.   And then it says if you want to
18   do that, you need to contact Sister Gail
19   Cabral as faculty senate president to
20   exercise that option.
21           Do you see that?
22      A.   Yes.
23      Q.   And in fact Sister Cabral is
24   copied on that e-mail, correct?

1      A.   Yes.
2      Q.   Did you then request an ad hoc
3   committee be put together to review Sister
4   Munley's decision?
5      A.   Sister Munley's decision to?
6      Q.   Suspend and term -- and
7   recommend your termination of employment.
8      A.   Yes.
9           - - -
10           (At this time, a document was
11      marked for identification as Exhibit
12      Fagal-32.)
13           - - -
14   BY MS. PEET:
15      Q.   Exhibit-32 is an e-mail from
16   you to Sister Munley regarding your
17   request for an ad hoc faculty committee,
18   correct?
19      A.   Correct.
20      Q.   And it's dated March 29, 2012,
21   correct?
22      A.   Correct.
23      Q.   Was your request granted?
24      A.   Yes.

1      Q.   Did anyone assist you in
2   drafting that letter?
3      A.   This letter here?  I believe my
4   -- consulted with my attorney.
5      Q.   Okay.
6           - - -
7           (At this time, a document was
8      marked for identification as Exhibit
9      Fagal-33.)
10           - - -
11   BY MS. PEET:
12      Q.   Do you recall receiving this
13   letter from Sister Munley dated April 3,
14   2012?
15      A.   Yes.  I recall receiving this
16   letter.
17      Q.   Okay.
18           And she has agreed to convene
19   an ad hoc committee to appeal the
20   decisions, correct?
21      A.   Let me see here now.  This is
22   April 3rd and the second sentence says
23   chose to file a grievance under the
24   Marywood University grievance and appeals



Page 322

1 policy. That part of the statement is
2 true.
3      Q.   Okay.
4      A.   Chose not to convene an ad hoc
5 committee to review my recommendations as
6 I had offered you on two occasions. I
7 presume there she's talking about those
8 two cases where, as I put it, she was
9 trying to speed up the policy.
10     Q.   The release documents?
11     A.   Speed up the release documents,
12 that's correct.
13     Q.   And you agree you did not --
14     A.   I did not --
15     Q.   -- sign and submit them?
16     A.   -- sign those, that's correct.
17     Q.   Okay.
18     A.   Faculty Grievance Committee
19 reviewed your grievance, found no evidence
20 of improper action on my part. Okay. And
21 she said the grievance process is now
22 complete, decide to finalize my
23 recommendation. As a result, your
24 employment with Marywood and your tenure

Page 323

1 are terminated effective today, April 3,
2 2012.
3      Q.   Okay.
4      A.   Okay.
5           So at this point I am done.
6      Q.   Okay.
7           She tells --
8      A.   And then she offers a chance to
9 review what has been said is a -- really a
10 final recommendation.
11     Q.   Okay.
12     A.   But she did terminate me. She
13 says I am terminated as of April 3rd.
14     Q.   Okay.
15          Did you select a tenured
16 faculty member to be included on the ad
17 hoc committee?
18     A.   Yes.
19     Q.   And did you submit a name to
20 Sister Cabral?
21     A.   Yes.
22     Q.   And did you choose Ed O'Brien?
23     A.   Yes.
24     Q.   And was Ed O'Brien indeed

Page 324

1 selected to the committee?
2      A.   Yes.
3      Q.   Why did you choose Ed O'Brien?
4      A.   I'd known him for many years.
5 I knew he was intelligent and I knew he
6 had -- we worked together on the academic
7 commuting -- computing committee, and so I
8 had worked with Ed before and I knew that
9 he would probably be -- because of his
10 status he would be allowed to be chosen.
11          - - -
12          (At this time, a document was
13     marked for identification as Exhibit
14     Fagal-34.)
15          - - -
16 BY MS. PEET:
17     Q.   Did you receive this e-mail
18 from Sister Cabral on April 30, 2012?
19     A.   Let me see. I -- yes, I did
20 receive this.
21     Q.   Did you assert any objection to
22 Dr. Bittel and Mr. Povse being selected as
23 the other individuals on the committee?
24     A.   I did not, but at the time I --

Page 325

1 looking back, I might wish I had grieved
2 one of them.
3      Q.   Okay.
4           Why is that?
5      A.   Mr. Povse, who I do not know --
6 I believe he's a tenured professor, of
7 course, but his wife has a -- had a
8 nontenured position at Marywood. And so
9 looking back after I learned that, I
10 thought there might have been a little
11 conflict of interest there because if the
12 committee didn't come up with the approved
13 decision and President Munley, let's say,
14 found out that Mr. Povse had supported me,
15 that might not have been good for his
16 wife. I'm not saying that would have
17 happened. I'm just saying there would be
18 what they call a potential conflict of
19 interest.
20     Q.   Okay.
21          And, again, you didn't assert
22 any objection, correct?
23     A.   I did not, no. I did not know
24 that relationship at the time.

82 (Pages 322 to 325)



Page 326

```
 1        MS. PEET:  Okay.  Let's change
 2   the tape.
 3        THE VIDEOGRAPHER:  We're now
 4   off the record.  The time is 4:52
 5   p.m.  This ends disk number three.
 6            - - -
 7        (At this time, a short break
 8   was taken.)
 9            - - -
10        THE VIDEOGRAPHER:  We are now
11   on the record.  The time is 4:57 p.m.
12   This starts disk number four.
13            - - -
14        (At this time, a document was
15   marked for identification as Exhibit
16   Fagal-35.)
17            - - -
18   BY MS. PEET:
19     Q.   Did you prepare this e-mail to
20   Alan Levine dated April 25, 2012?
21     A.   Did I prepare?  Would you
22   rephrase the question?
23     Q.   Did you draft this e-mail?
24     A.   I believe I worked on this with
```

Page 327

```
 1   my lawyer.
 2     Q.   Okay.
 3          Anyone else?
 4     A.   No.
 5            - - -
 6        (At this time, a document was
 7   marked for identification as Exhibit
 8   Fagal-36.)
 9            - - -
10   BY MS. PEET:
11     Q.   Did you draft this e-mail and
12   the document to be sent to the ad hoc
13   committee?
14     A.   This is the May 6, 2012, one,
15   Exhibit --
16     Q.   Correct.
17     A.   -- 36?
18     Q.   Uh-huh.
19     A.   Yes.
20     Q.   Okay.
21          And you write that the
22   progressive discipline policy doesn't
23   provide for the person charged with the
24   chance to present a defense but,
```

Page 328

```
 1   nonetheless, you decided to submit a
 2   written defense to the charges, agreed?
 3     A.   Yes.  I thought it was -- yes.
 4     Q.   Okay.
 5          Did anyone help you draft this?
 6     A.   Yes.
 7     Q.   All right.
 8          And who was that?
 9     A.   It would have been Jonathan
10   Cohen, my lawyer.
11     Q.   Anyone else?
12     A.   No.
13            - - -
14        (At this time, a document was
15   marked for identification as Exhibit
16   Fagal-37.)
17            - - -
18   BY MS. PEET:
19     Q.   Why did you e-mail the ad hoc
20   committee on May 23, 2012, about your
21   personnel file?
22     A.   As I read here, it says I've
23   given Patricia Dunleavy permission to
24   release the new documents in my personnel
```

Page 329

```
 1   file.  As I recall, my personnel file was
 2   released earlier in the semester or in the
 3   year and later on Marywood discovered that
 4   not all relevant items that they found,
 5   wherever they found them, had been turned
 6   over.  And so Patricia Dunleavy sent me an
 7   e-mail asking if she could release those
 8   documents.
 9     Q.   Did you have any concern that
10   the committee would consider previous
11   disputes that you had with the university
12   in making its decision?
13     A.   I was only concerned in the
14   sense that I would hope they would look
15   at, you know, the surrounding details of
16   what had occurred and not just say, oh, he
17   got called on the carpet three times, so
18   he must be a bad boy.
19     Q.   Do you agree that you had
20   previous disputes with Marywood
21   administration involving the issue of free
22   speech?
23     A.   Yes.
24     Q.   And would you agree that with
```





Page 330

1   those previous issues you've had, you were
2   never terminated?
3       A.   Correct.
4       Q.   Would you agree that the
5   previous disputes that you had with
6   Marywood about free speech but they never
7   suspended you?
8       A.   That's correct.
9       Q.   To your knowledge, was an ad
10  hoc committee -- I believe you testified
11  the ad hoc committee was ultimately
12  formed --
13      A.   Yes.
14      Q.   -- per your request, correct?
15      A.   An ad hoc committee was formed
16  to examine my -- I believe the phrase was
17  termination and suspension.
18      Q.   Okay.
19           And, to your knowledge, did the
20  committee make a decision?
21      A.   Yes.
22      Q.   And what was that decision?
23      A.   That I should be terminated.
24      Q.   To your knowledge, did Sister

Page 331

1   Munley sit on that ad hoc committee?
2       A.   Not to my knowledge.
3       Q.   To your knowledge, did
4   Dr. Levine sit on that committee?
5       A.   Not to my knowledge.
6       Q.   There were three members on
7   that committee, correct?
8       A.   Correct.
9       Q.   And you selected one of those
10  members, correct?
11      A.   Correct.
12           - - -
13           (At this time, a document was
14      marked for identification as Exhibit
15      Fagal-38.)
16           - - -
17  BY MS. PEET:
18      Q.   Did you ever see the ad hoc
19  committee's findings with reference to
20  your employment and tenure at Marywood?
21      A.   I saw them recently in
22  discovery.
23      Q.   Okay.
24           Would you agree that this is

Page 332

1   the second committee that was formed about
2   your suspension and termination and they
3   found no wrongdoing on Munley's part?
4       A.   I recall a grievance committee
5   and the ad hoc committee but not a
6   committee for the suspension.
7       Q.   Okay.
8           Both the grievance committee
9   and the ad hoc committee both concluded no
10  wrongdoing on Sister Munley's part,
11  correct?
12      A.   I believe the charge for the
13  grievance committee was to see whether
14  procedures had been followed correctly and
15  there was found no wrongdoing by President
16  Munley's part.  The ad hoc committee was
17  not, I believe, examining whether Anne
18  Munley did anything wrong but whether I
19  did anything wrong.  So...
20      Q.   And did the ad hoc committee
21  find that you did anything wrong?
22      A.   Yes.  They terminated -- they
23  agreed with her decision to terminate me.
24      Q.   Okay.

Page 333

1           And the folks on the ad hoc
2   committee were different people than were
3   on the grievance committee?
4       A.   I believe they were all
5   different, yes.
6           - - -
7           (At this time, a document was
8      marked for identification as Exhibit
9      Fagal-39.)
10           - - -
11  BY MS. PEET:
12      Q.   Did you send this e-mail to the
13  ad hoc faculty committee on July 6, 2012?
14      A.   I sent this, yes.
15      Q.   If the ad hoc committee agreed
16  that you should have been terminated, what
17  does it matter whether or not your
18  suspension was justified?
19      A.   Well, procedures say first
20  things first.  As part of the sequence,
21  you do the suspension and then you see if
22  there's any hope for remediation or any
23  change that would maybe be satisfactory to
24  the university from their point of view

84 (Pages 330 to 333)



1  and then go on from there.
2      Q.   If a committee who was formed
3  to determine whether or not your behavior
4  warranted termination determined that your
5  behavior in fact warranted termination,
6  wouldn't a committee to review the
7  suspension based on the exact same conduct
8  be moot?
9      A.   I don't know if it'd be moot
10  because if -- you might have somebody --
11  if I could -- let's say somebody was
12  accused of -- being a faculty member, they
13  were accused of absconding funds from
14  clubs treasury, and so there's enough
15  evidence that came out and somebody says
16  well, let's suspend professor -- this
17  professor for doing this.
18         So let's say there was some
19  evidence of irregularities on that
20  committee.  I might say, okay, this person
21  is not a harm to anybody.  We don't see
22  this is going to affect the teaching.
23  Let's see where it goes.  And so the
24  professor does not get suspended and then

1  it comes out that he or she had in fact
2  squirrelled away not just 50 bucks that he
3  forgot about recording but had been taking
4  a lot off the top for years, then that
5  could be grounds for terminating even
6  though the person was not suspended
7  initially.
8         And you could have -- of course
9  if it says do the suspension and do the
10  termination, if it was an egregious case
11  you could say we'll have a suspension
12  hearing today and a termination hearing in
13  the afternoon, so we'll go morning,
14  afternoon.  We'll suspend and then we'll
15  terminate and we'll follow our laws on the
16  same -- our procedures on the same
17  evidence, but at least you would follow
18  procedures of doing the suspension first
19  and then the termination.
20      Q.   If a -- if a committee
21  determines that your termination was
22  justified on the same conduct for which
23  you were suspended, why would a committee
24  need to be formed to review your

1  suspension?  What substantively and --
2      A.   There was no --
3      Q.   -- purpose would that serve?
4      A.   -- committee to -- I was
5  suspended and I was not allowed to have a
6  committee to review the suspension.
7      Q.   If a committee -- and that's
8  not my question.
9      A.   Okay.
10      Q.   If a committee substantively
11  looks at your termination and concludes
12  that your termination was appropriate --
13      A.   Okay.
14      Q.   -- which has happened here,
15  correct?
16      A.   Okay.
17      Q.   Agreed?
18      A.   Agreed.
19      Q.   Then why have a committee
20  review your suspension which is a lesser
21  offense based on the exact same conduct?
22  What purpose would that serve?
23      A.   The purpose it would serve
24  would be following the agreed procedures.

1      Q.   Any other purpose?
2      A.   I'll say no.
3      Q.   Okay.
4         What damages did you incur from
5  a committee that upheld a termination of
6  employment but, in your opinion, didn't
7  look at your suspension?
8      A.   The damages would be somebody
9  thinking they did not get a fair -- a fair
10  deal.  They did not have the -- should we
11  say the law it followed which by itself is
12  -- is not -- not right.
13      Q.   Any other damages?
14      A.   Do you mean financial damages?
15      Q.   I'm asking you.
16      A.   I don't know.
17      Q.   Okay.
18      A.   If I might say -- can I amend
19  my answer a little bit?
20      Q.   Sure.
21      A.   By not having a suspension,
22  there was no chance for remediation and
23  that -- with remediation then perhaps an
24  agreement could have been -- you know,



1  then maybe I would not have been
2  terminated.
3              - - -
4          (At this time, a document was
5  marked for identification as Exhibit
6  Fagal-40.)
7              - - -
8  BY MS. PEET:
9      Q.   Did you receive this July 13,
10 2012, letter from Sister Munley to you?
11     A.   Yes.
12     Q.   She says here that this was the
13 second independent tenured faculty review
14 accorded to you.  Both faculty committees
15 concurred with my decision.
16          Is that a true statement?
17     A.   I -- the two committees we're
18 presuming here are the grievance committee
19 and the ad hoc committee on the
20 termination, yes.
21     Q.   And is that an accurate
22 statement?
23     A.   Yes.
24     Q.   Okay.

1          She then says my decision to
2  terminate your employment with Marywood
3  University and your tenure effective
4  April 3, 2012, stands.
5      A.   Yes.
6      Q.   Do you see that?
7      A.   Uh-huh.
8      Q.   Are you currently employed?
9      A.   No.
10     Q.   Have you looked for a job since
11 your termination of employment at
12 Marywood?
13     A.   Yes.
14     Q.   Okay.
15          When was the first time you
16 looked for a job?
17     A.   I was looking at newspaper
18 advertisements in the Syracuse newspaper
19 in the fall of 2012.
20     Q.   Did you apply for any jobs?
21     A.   No.  I didn't see any that were
22 applicable.
23     Q.   Other than in the Syracuse
24 newspaper, did you look at any other

1  newspapers, Web sites?
2      A.   My son was in the job market at
3  the time, so I knew that there were Web
4  sites.  So I would go to the -- I think
5  Inside Higher Education had some and the
6  Chronicle of Higher Education had some job
7  things, and I would look through -- look
8  through those and there were big -- big
9  listings, and then at some point in 2013 I
10 saw the Chronicle of Higher Education had
11 a service where you could -- you would
12 sign up, you would say you were, let's
13 say, an art professor looking for jobs in
14 the Rochester, New York, vicinity within a
15 certain radius.  So I signed up to get the
16 Chronicle of Higher Education job
17 announcements.
18     Q.   Okay.
19          Did you -- you have produced
20 documents in this case about job postings
21 that I guess you saw following your
22 termination of employment.
23          Have you produced, to the best
24 of your knowledge, all documents that

1  evidence job search efforts that you've
2  undergone since your employment at
3  Marywood was terminated?
4      A.   Yeah.  I don't -- I don't have
5  -- when I would look through the
6  classified ads in the Syracuse newspaper,
7  I did not keep a record of that, but since
8  2013 there's a record.
9      Q.   Okay.
10          And everything that you have
11 has been produced?
12     A.   Yes.
13     Q.   Okay.
14          Approximately how many -- how
15 much time per week beginning in the fall
16 of 2012 did you spend trying to find a
17 job?
18     A.   Those e-mail announcements
19 would come out probably weekly.  Sometimes
20 you get two a week.  It would depend
21 perhaps on the season, and I would read
22 those and scroll down the list depending
23 how long the list was and that was
24 probably -- to look at that list and I'd





Page 342

1    open the e-mail, you know, five or ten
2    minutes, read -- read the description, see
3    if anything looked promising.
4        Q.   Did you spend more or less than
5    one hour a week since the fall of 2012
6    looking for a job?
7        A.   It would probably be about --
8    it would be less than one hour.
9        Q.   Okay.
10            What were you doing with all of
11   your spare time?
12       A.   I did have some employment at
13   the YMCA as a lifeguard instructor and
14   teaching some swim classes.  That's
15   tapered off recently with a different
16   aquatics director.
17       Q.   Approximately how much money
18   did you earn from the YMCA?
19       A.   Depending on the year, I'd have
20   to look.  I think I have maybe -- maybe
21   about $500.00.
22       Q.   You're an avid swimmer,
23   correct?
24       A.   Yeah.  I swim regularly to try

Page 343

1    to stay in shape.
2        Q.   Did you ever refer to students
3    as thunder thighs and in words or
4    substance tell them that they probably
5    should spend more time in the pool than in
6    your class?
7        A.   I saw that, and the answer
8    would be I would have to say I never told
9    a student that they should do that.
10            Would you repeat the question,
11   please?
12       Q.   Sure.
13            Did you ever call any students
14   thunder thighs?
15       A.   No.
16       Q.   Did you ever use the word
17   "thunder thighs"?
18       A.   I don't recall but I really
19   don't think so.
20       Q.   Okay.
21            So if a student said that you
22   did, they would be lying?
23       A.   Depends how they told the
24   story.  I could tell you how I can

Page 344

1    conceive how I could have said it.
2        Q.   Why don't you tell us.
3        A.   The Complaint I read just
4    recently -- and I was surprised to read it
5    -- was from two students, one name was
6    Callahan and I can't remember the other.
7        Q.   You don't need to mention the
8    students on the record.
9        A.   Okay.
10            And there was a complaint along
11   the lines you said, and I'm thinking this
12   is during the -- this is in August.  It
13   would be the first week of class.  I
14   wouldn't even know any students, and I
15   said could I have said that.  Number one,
16   I'd say I would never have said that to a
17   student.
18            Number two, if I had said that,
19   it could have been -- and I don't say -- I
20   don't think I did this, but it would have
21   been along the lines of this is
22   introduction to social science, we're
23   going to examine human behavior, and it
24   comes from many different sources, shall

Page 345

1    we say.  One of those sources that people
2    might have their behavior changed would be
3    by economic incentives, and I'm trying to
4    conceive how I could possibly have said
5    such a thing.
6            I might have said some
7    employers now even have wellness plans
8    where they will subsidize your gym
9    membership.  Again, this would be me
10   speaking in front of a whole class, and I
11   can conceive of myself as saying so the
12   incentive -- you know, the employers want
13   employees to lower health costs, and lose
14   weight, and lose -- you know, lose your
15   thunder thighs.  So you go to the -- you
16   know, you're pool membership would be
17   subsidized.
18            So it would have been -- if I
19   had said such a thing, it would have been
20   a very general context such as that.  I
21   would never have said to a student, you
22   have thunder thighs, you should go
23   swimming and not come to class.  That --
24   no.

87 (Pages 342 to 345)



Page 346

```
 1        Q.   Do you dispute that students
 2   made that complaint to the university?
 3        A.   The little bit I read seemed to
 4   me as if the students were in some sort --
 5   had been in some sort of trouble
 6   themselves, that they had violated some
 7   university rules and were consulting with
 8   somebody, I think, from student activities
 9   and there's some sort of conversation.  So
10   whether -- what the motives of the
11   students to say such a -- such a thing was
12   I have no idea.
13        Q.   Do you know whether or not the
14   university had problems enrolling students
15   in your class?
16        A.   Yes.
17        Q.   Okay.
18             Why do you think that was?
19        A.   Well, I was probably the
20   hardest grader on campus, perhaps the
21   hardest grader, and so sometimes if one
22   can take a course and avoid -- you know,
23   get a better grade off campus than on
24   campus then I understand that incentive.
```

Page 347

```
 1        Q.   Are you aware of a Muslim
 2   student complaining -- filing a civil
 3   complaint against you about a cartoon that
 4   you posted on your door?
 5        A.   Yes.
 6        Q.   And what was the cartoon about?
 7        A.   The cartoon -- well, there was
 8   -- there as a famous cartoon about the
 9   Muhammad bomb cartoon where the Danish
10   embassies were bombed because
11   Jyllands-Posten had posted a -- had
12   published drawings of Muhammad, and over
13   the years I would often have news stories
14   on my door of various -- various kinds,
15   and this was a news story.  I had that on
16   my door.
17             I had -- in terms of cartoons,
18   there was another one I might have had --
19   I don't know which -- I can't remember
20   which cartoon he was complaining about
21   specifically at this point.  That might
22   have been it.
23        Q.   Is there a lot of them?
24        A.   At one point, I might have had
```

Page 348

```
 1   a -- again, a newsworthy cartoon by
 2   another European person.  I had a joke I
 3   think he was -- Akhar(ph) was complaining
 4   about.  It was a -- it wasn't a cartoon.
 5   It was a photograph of about eight nuns
 6   from 1958 or so, based on their hats, and
 7   they were all carrying 22 rifles.  They
 8   had been to the rifle range or something,
 9   and so I had a joke up there about Islamic
10   terrorists, radical Muslim committed a
11   suicide bombing and died himself.  These
12   would be the 72 virgins he would see in
13   heaven.
14        Q.   Do you understand how a Muslim
15   could be offended by that?
16        A.   Yes, I guess I do.
17        Q.   In your complaint, part of the
18   relief that you ask for is to be returned
19   to Marywood.
20             Is that something you want?
21        A.   As I get older -- you know, if
22   I did go back, it would be for probably a
23   couple of years because I'm 70 years old
24   now, but I would do it.
```

Page 349

```
 1             - - -
 2             (At this time, a document was
 3        marked for identification as Exhibit
 4        Fagal-41.)
 5             - - -
 6   BY MS. PEET:
 7        Q.   Who's Linda Rose?
 8        A.   Linda Rose is my -- one of my
 9   two sisters.
10        Q.   Okay.
11             And you're e-mailing with her
12   on June 6, 2012.
13             Do you see that?
14        A.   Uh-huh.
15        Q.   And sort of in the middle of
16   the page you write to her I don't really
17   want the job back but part of me would
18   love to go back to work for even just a
19   year just to say -- in caps -- fuck you, I
20   won.
21             Do you see that?
22        A.   Let me see.
23             Now, where are we?
24        Q.   The middle of the page.
```

88 (Pages 346 to 349)



1     A.   Yes.  I don't really want the
2   job but part of me -- right.  You know,
3   with all the hassles, there's certain bad
4   parts about going back to work but part of
5   me would love to go back to work for even
6   just a year just to say what I -- what's
7   here.
8     Q.   The fuck you, I won?
9     A.   Fuck you, I won.
10    Q.   And the job that you're talking
11  about there, that would be the Marywood
12  University job --
13    A.   Yes.
14    Q.   -- correct?
15    A.   That's correct.
16          - - -
17         (At this time, a document was
18  marked for identification as Exhibit
19  Fagal-42.)
20          - - -
21  BY MS. PEET:
22    Q.   Who is Jeffy Benedict?
23    A.   She's my other sister.
24    Q.   Okay.

1         You e-mail Jeffy on
2   December 25, 2011, at 9:40 p.m., so
3   Christmas 2011.
4         Do you see that?
5     A.   Yes.
6     Q.   The bottom e-mail, and you
7   write to her, hi, Jeffy, just in case I
8   need or want one, please see if Jim can
9   come up with a few names of good labor,
10  dash, employment law lawyers, dash, firms
11  in PA, period.
12    A.   Yes.
13    Q.   Do you see that?
14    A.   I do see that.
15    Q.   Okay.
16         And who is Jim?
17    A.   Jim is Jim Benedict.
18    Q.   Would that be her husband?
19    A.   That's her husband, yes.
20    Q.   Your brother-in-law?
21    A.   My brother-in-law.
22    Q.   Okay.
23         And then her response is right
24  above that.

1         Do you see that?
2     A.   Yes.
3     Q.   And she wrote, Fred, I asked
4   Jim -- her husband, correct?
5     A.   Yes.
6     Q.   And he has no clue about any
7   labor lawyers in Penn --
8     A.   Right.
9     Q.   -- period.
10         And Penn I would assume is
11  Pennsylvania --
12    A.   Pennsylvania, uh-huh.
13    Q.   -- correct?  Okay.
14         And then she -- and I know he
15  thinks this is a little nuts at your age,
16  period.
17    A.   Right.
18    Q.   Okay.
19         He does not want to get
20  involved in any way in this one.
21    A.   Right.
22    Q.   See that?
23    A.   Uh-huh.
24          - - -

1         (At this time, a document was
2   marked for identification as
3   Exhibit-43.)
4          - - -
5   BY MS. PEET:
6     Q.   Why were you inquiring about a
7   labor or employment lawyer in December of
8   2011?
9     A.   Because I had started to work
10  on the videos and I realized that they
11  might be problematic.
12    Q.   And you might need a lawyer?
13    A.   If worse came to worst.
14    Q.   Okay.
15         Exhibit-43 seems to be a letter
16  that you sent to Onondaga Community
17  College --
18    A.   Yes.
19    Q.   -- on January 11, 2013.
20         Do you see that?
21    A.   Correct.
22    Q.   Okay.
23         And in the first introductory
24  paragraph, you tell the community college



Page 354

1  that you got fired last year over a free
2  speech issue and then direct them to your
3  resume for more information.
4      Do you see that?
5  A.  Yes.
6  Q.  Was that your practice to tell
7  any college or university to whom you were
8  seeking employment about this free speech
9  issue for which you got fired over at
10  Marywood, in your opinion?
11  A.  Well, this is a sample of one,
12  so this was my practice because this was
13  the only application that got this far.
14  Q.  Okay.
15      Would you agree with -- that
16  this is the only application you submitted
17  to any university or college since April
18  of 2012?
19  A.  Yes.
20          - - -
21      (At this time, a document was
22  marked for identification as Exhibit
23  Fagal-44.)
24          - - -

Page 355

1  BY MS. PEET:
2  Q.  Would you agree that this is
3  the resume that you submitted to Onondaga
4  Community College?
5  A.  Yes.  This seems to be part of
6  their online application form as I recall.
7  Q.  Okay.
8      And on the third page of this
9  document, it's a one-page resume from you.
10      Do you see that?
11  A.  Yes.
12  Q.  And the second to last
13  paragraph is called other perhaps of
14  interest.
15  A.  Yes.
16  Q.  Do you see that?
17  A.  Uh-huh.
18  Q.  And then you talk about the
19  poster, and this YouTube videos, and your
20  firing.
21      Do you see that?
22  A.  Yes.
23  Q.  Do you think it's a good
24  practice to include that in a resume for

Page 356

1  employment?
2  A.  I think it shows honesty and it
3  doesn't hide anything.  If I was an
4  employer and somebody applied and they did
5  not include that, and then the employer
6  Googles the person and says what the heck
7  is going on here, why didn't you tell me
8  about that.  I thought it was better to be
9  honest and straightforward.
10  Q.  Okay.
11      Did you receive any call back
12  or interview from the community college?
13  A.  Not to go in for an interview.
14  I think it might have been some form.  I
15  can't recall anything special.
16  Q.  Okay.
17      Do you know why it is that they
18  didn't pursue you further?
19  A.  I was really looking for a
20  full-time job and this might -- they might
21  have gone with adjuncts cheaper.  I don't
22  know.  Because I had worked there before,
23  so I figured they knew me.  So that was...
24          - - -

Page 357

1      (At this time, a document was
2  marked for identification as Exhibit
3  Fagal-45.)
4          - - -
5  BY MS. PEET:
6  Q.  Would you agree this is an
7  e-mail between you and Bill Ziegelbauer,
8  February 5, 2015?
9  A.  Yes.
10  Q.  Okay.
11      And if you look down at the
12  bottom of the first page, the paragraph
13  says I am probably overdoing this, Rule 26
14  damages stuff.
15      Do you see that?
16  A.  Yeah, bottom of the first --
17  Q.  First page.
18  A.  -- page.  Oh, yeah.
19  Q.  I'm going to read --
20  A.  The paragraph, yes.  I'm
21  probably overdoing this, uh-huh.  I see
22  that.
23  Q.  I am probably overdoing this
24  Rule 26 damages stuff, but at the worst I



1  will make the other side spend a lot of
2  hours poring through what I have done.
3  What's the old phrase?  Baffle them with
4  bullshit and bury them in paper.
5      A.   Yes.
6      Q.   Was that your litigation
7  strategy here?
8      A.   No.
9      Q.   Were you trying to bury them in
10  paper and baffle them with bullshit to
11  increase Marywood's litigation costs?
12      A.   No.
13      Q.   Were you trying to make the
14  other side spend a lot of hours poring
15  through what they have done so we can --
16  Marywood can spend more money on this
17  litigation?
18      A.   No.
19      Q.   What were you saying here?
20      A.   I was developing a
21  comprehensive report about the damages and
22  I was using every economist skill I had to
23  make spreadsheets that clearly were
24  commented and explained all the details of

1  each calculation of damages, and the basic
2  report, you know, with revisions is about
3  42 pages not including appendixes, but the
4  reference here to baffle them with
5  bullshit is -- it's a joke, obviously, but
6  it refers -- I'm really referring to the
7  fact that probably most lawyers are not
8  economists and when they read my Rule 26
9  damages computation report, if they wanted
10  to truly understand it -- but I tried to
11  make it as clear as possible, but if they
12  wanted to truly understand where each
13  figure came from, they would need good
14  spreadsheet skills and that would take a
15  lot of good effort on their part, and
16  that's what I was referring to.
17      Q.   Do you understand how people
18  just might not get your humor?
19      A.   Yes.  If you look at the next
20  sentence, but on the other hand, I want to
21  early on put the best foot forward.
22      Q.   Right.
23           But if you read the sentence
24  before, it says I want to make the other

1  side spend a lot of hours poring through
2  what I have done.
3      A.   Right.  Because the way I
4  understand litigation on this end, it
5  would be if it comes toward trial, let's
6  say, then when it comes to economic
7  damages one would be hiring forensic
8  economics experts and they're not cheap.
9  I know that.
10           And so I wanted to do all the
11  heavy duty forensic economic type work
12  that could possibly be done by me, get it
13  done early, and so the Rule 26 damages
14  computation report would be as complete as
15  possible, really complete.  And then I was
16  hoping further on down the road that
17  perhaps a forensic expert might look at
18  what I did and say, oh, Fagal has done
19  most of my homework.  It will take me many
20  fewer hours, therefore, to write up a
21  report that I can present as something I
22  would testify to as my analysis.  And so I
23  was trying to do huge amounts of work
24  ahead of time.

1      Q.   How much have you spent in
2  litigation fees to date?
3           MR. COHEN:  No, don't answer
4  that.
5           MS. PEET:  Are you instructing
6  him not to answer?
7           MR. COHEN:  Can we go off the
8  record for a second?
9           MS. PEET:  Sure.
10           - - -
11           THE VIDEOGRAPHER:  We are now
12  off the record.  The time is 5:35
13  p.m.
14           - - -
15           MR. COHEN:  Can I just get a
16  sense of what the purpose of your --
17  this question is?
18           MS. PEET:  Which question?
19           MR. COHEN:  How much have you
20  spent on litigation fees.
21           MS. PEET:  Because it goes --
22  if you read the thousands of
23  documents he's produced, he talks
24  about the fact that he's -- what his



1    budget is going to be in order to
2    make Marywood spend as much as
3    possible; hence, baffle them with
4    bullshit and bury them in paper.
5        If you're instructing him not
6    to answer, that's fine.  We can take
7    it up with the court if necessary.
8    That's up to you.
9        MR. COHEN:  I'm instructing you
10   not to answer for now.
11       - - -
12       THE VIDEOGRAPHER:  We are now
13   on the record.  The time is 5:36 p.m.
14       - - -
15   BY MS. PEET:
16       Q.   I've asked you what you have
17   spent on litigation fees to date and your
18   attorney has instructed you not to answer.
19       A.   Right.
20       Q.   And I assume you're going to
21   take your attorney's instruction.
22       A.   I'll take my attorney's advice.
23       Q.   Okay.
24           Do you know Tony Spinillo?

1        A.   Yes.
2        Q.   And is he chief intelligence
3    officer at Marywood University?
4        A.   I believe the title is chief
5    information officer.
6        Q.   At Marywood?
7        A.   Yes.
8        Q.   Did you ever tell him to keep
9    his eyes and ears open?
10       A.   That sounds like something I
11   would have written in an e-mail.
12       Q.   Why did you do that?
13       A.   Oh, if he heard anything, any
14   chatter about the case or something or
15   whatever is going on at Marywood that
16   might be of interest to me.  That's all.
17       Q.   Why would you do that -- e-mail
18   that to Tony at his private e-mail
19   account, not his Marywood University
20   e-mail account?
21       A.   We often e-mailed each other
22   back and forth on, you know, short quick
23   things about whatever we were doing.
24       Q.   Any reason you wouldn't have

1    e-mailed him that at his Marywood e-mail
2    account?
3        A.   I hadn't thought about it.  We
4    always had e-mail conversations or back
5    and forth with his personal account.
6        Q.   Did you ever e-mail Tony since
7    you have left at his Marywood e-mail
8    account?
9        A.   Since I left Mary -- could you
10   repeat the question, please?
11       Q.   Have you ever e-mailed Tony
12   Spinillo at his Marywood e-mail account
13   since you've left Marywood?
14       A.   I'll say I don't know but I
15   don't think so.
16       Q.   Has Tony provided you with any
17   documentation or information about this
18   case?
19       A.   No.
20       Q.   Who, if anyone, do you speak to
21   that is employed at Marywood?
22       A.   I have e-mail contact with
23   Marty O'Connor.
24       Q.   Anyone else?

1        A.   Who's currently employed at --
2    currently employed at Marywood?  Is that
3    the question?  Nobody -- nobody regularly.
4    I might -- I might say if there's a story
5    in the newspaper about Africa, I might
6    have e-mailed Jeremy Rich in the past year
7    or so and said, you know, how are the kids
8    doing, but nothing -- I believe that's it.
9        Q.   Have you --
10       A.   Oh, wait.  Excuse me, one more.
11   Chris Troiani who works at the Regina
12   desk.  I'll have an occasional friendly
13   e-mail with her.
14       Q.   Have you spoken to Chris,
15   Marty, or anyone else at Marywood about
16   this case?
17       A.   No.
18       - - -
19       (At this time, photographs were
20   marked for identification as Exhibit
21   Fagal-46.)
22       - - -
23   BY MS. PEET:
24       Q.   Mr. Fagal, these pictures were



MAGNA
LEGAL SERVICES

1    just produced to us.
2        A.   Yes.
3        Q.   What are they?
4        A.   I was going through my -- I was
5    getting a new phone or my phone died.  My
6    Note 3 died and I was looking for Note 3
7    and I found my old Droid X phone.  I had a
8    backup file from there from years ago, and
9    so I had forgotten that I took these
10   pictures, and these were quickly taken, I
11   guess, on November 28th showing where some
12   posters I had hung that were no longer
13   there on November 28th.  I had gone
14   around.  I had always planned to after the
15   speech was over.  I had always planned to
16   take down the posters just to clean up and
17   not have them up any longer than they
18   needed to be.  That's why I used the blue
19   painter's tape, so it'd be easy to take
20   off.
21        And so as I was going around to
22   take off posters that had been hung up
23   that morning, I was finding that -- and
24   any others that might, you know, be

1    evidence that had not been torn down
2    before, I found that posters where I had
3    hung them were missing.  So -- from where
4    I had hung them that very day.  So I just
5    took quick pictures.
6        MS. PEET:  I have no further
7        questions, but I do want to put on
8        the record that we just received an
9        additional document production from
10       you.  It was sent to us over the
11       weekend which we couldn't access
12       until Monday for technical reasons;
13       one of which was a 141-page damages
14       analysis.
15           We obviously haven't gone
16       through it in fine detail yet but we
17       reserve the right to bring you back
18       if we need to given the obvious late
19       production and your deposition being
20       deposed -- being noticed for today.
21       THE WITNESS:  Yes.  That would
22       be an updated Rule 26 from January
23       25th, I believe.
24       MR. COHEN:  How much time do we

1    have left?
2        - - -
3        THE VIDEOGRAPHER:  We're now
4    off the record.  The time is 5:42
5    p.m.
6        - - -
7        (At this time, a short break
8    was taken.)
9        - - -
10       THE VIDEOGRAPHER:  We are now
11   on the record.  The time is 5:46 p.m.
12       - - -
13   BY MR. COHEN:
14       Q.   Okay.
15           Fred, we know each other.  I'm
16   Jonathan Cohen.  I'm your attorney.  I
17   just have a few questions for you.
18           And earlier today, do you
19   remember being asked -- you were shown a
20   copy of your interrogatory answers, and
21   one of the questions was something to the
22   effect of are you aware of any other
23   Marywood tenured professor who --
24       A.   Had done something similar to

1    what I did?
2        Q.   -- who had done things similar
3    to what you had done, and you had written
4    Laurie McMillan, correct?
5        A.   Correct.
6        Q.   And Ms. Peet had asked you a
7    little bit about it.
8            And do you have any more
9    information to provide about why
10   Ms. McMillan's case is similar to your
11   case?
12       A.   Well, besides the public
13   protest in her case of carrying a sign, a
14   gathering I think for the 100th
15   anniversary, I remember reading in -- I
16   think one of the -- either The Wood Word
17   or -- I believe it was The Wood Word or
18   the Scranton Times, but I think it was The
19   Wood Word about Laurie McMillan was upset
20   with decision-making at the university in
21   terms of finances and the money spent on
22   learning commons, and the Scranton School
23   for the Deaf property, and various
24   expensive renovations to the president's

**93 (Pages 366 to 369)**





Page 370

1    house.
2        And so there's general worry
3    about what was seen by Ms. McMillan and I
4    understand from others about financial
5    mismanagement, and so Ms. McMillan had
6    some fliers that she placed in the rotunda
7    and in public places around campus, and in
8    one case Ann Boland-Chase, who is an
9    administrator, again, according to the
10   news story went around and picked up those
11   fliers and confiscated them, if you will.
12       And I guess there was a quote
13   -- a story in that news story about how
14   faculty members were quite upset, many of
15   them.  They -- according to the news
16   story, there had been attempts through the
17   faculty senate to work with the
18   administration, but there were many
19   professors who were not happy with what
20   had happened.  And Alan Levine was quoted
21   something to the effect of, well, if
22   anybody was upset, they could come in and
23   we could have ways of discussing that in
24   private.

Page 371

1        And so in that sense,
2    Ms. McMillan had protested decision-making
3    by the president and I believe Joe Garvey
4    and had not gotten any satisfaction, and
5    so she turned to fliers, or handouts, or
6    something similar placed around campus
7    which had been gathered up, at least some
8    of them by -- from what I read -- again, I
9    was not there, by Ann Boland-Chase.  So I
10   think the similarities are to be drawn by
11   somebody who looks at both cases.
12       Q.   Okay.
13       Also, earlier today Ms. Peet
14   asked you, I think in sum and substance,
15   do you have any evidence that anyone in
16   the Marywood administration took down your
17   posters because they didn't like the FIRE
18   organization or its principles.
19       Do you remember something like
20   that?
21       A.   Yes.  I remember the --
22       MS. PEET:  Objection,
23   mischaracterization of question.
24       THE WITNESS:  Pardon me.

Page 372

1        MS. PEET:  I'm just asserting
2    an objection for the record.
3    BY MR. COHEN:
4        Q.   I didn't ask a question yet
5    either.
6        A.   Okay.
7        Q.   I just said do you remember
8    that.
9        A.   Yes.
10       Q.   Yeah.
11       Do you have Exhibit-10 in front
12   of you still?  Can you turn to that?
13       A.   I'd have to dig and have luck
14   finding it some sort of way.  I did find
15   10.
16       Q.   Okay.
17       And, briefly, what is this
18   document again?
19       A.   I had met with Alan Levine and
20   tried to understand who tore down the
21   posters and why, and I had -- we
22   disagreed.  We couldn't come to agreement
23   about what had happened, and that's why
24   Alan wrote we have a different

Page 373

1    understanding of what transpired.
2        Q.   And so you and Dr. Levine had a
3    meeting about the removal of the FIRE
4    posters, correct?
5        A.   Yes.  I tried to clear that up.
6        Q.   And you had made a number of
7    requests, you know, including to be
8    reimbursed?
9        A.   Yes.
10       Q.   Do you remember that?
11       A.   Yes.
12       Q.   We talked --
13       A.   I showed him that -- that
14   letter and he asked for the e-mail copy,
15   and I sent it to him and he forwarded that
16   to President Munley.
17       Q.   Right.
18       And do you see in this
19   Exhibit-10, this letter from Dr. Levine,
20   in the second paragraph, first sentence,
21   it says Sister Anne Munley and I remain
22   open to future presentations that are not
23   in conflict with our mission statement or
24   core values and are organized according to



Page 374

1    our policies and practices?
2        A.   Yes.
3        Q.   From that sentence, did you
4    understand that Dr. Levine was suggesting
5    that presentations from FIRE are not in
6    line -- not in -- are not in line with
7    Marywood's mission statement or core
8    values?
9            MS. PEET:  Objection, absolute
10       leading.  Why don't you rephrase
11       that.
12           MR. COHEN:  Excuse me.
13           MS. PEET:  I think you should
14       rephrase that.
15   BY MR. COHEN:
16       Q.   First sentence of paragraph
17   two, why don't you explain to me -- do you
18   understand Dr. Levine to have been making
19   any characterizations about FIRE?
20           MS. PEET:  Objection, leading.
21   BY MR. COHEN:
22       Q.   You can answer.
23       A.   I did not take this as
24   necessary -- I took this more as

Page 375

1    boilerplate university, shall I say,
2    reason for not allowing a debate on
3    something where the other side of the
4    debate would be against what were
5    perceived as the university's core values.
6            So it could be in some
7    instances if there was an abortion debate,
8    pro and anti-abortion, perhaps if the
9    university -- I'm not saying Marywood --
10   said we can't have that discussion even
11   raised on our campus because it's against
12   our core values, so, therefore, we will
13   not allow a debate.
14           Or I know that the university
15   -- I know there was a case of a student a
16   few years ago who tried to start an
17   atheist club at the university.  That was
18   denied.  So I didn't -- when I read this,
19   I did not think it necessarily pertained
20   to FIRE but it could have, you know.  They
21   didn't -- certainly they did not like FIRE
22   I don't think.  I think there's evidence
23   of that by e-mails in the discovery where
24   they're talking about Will Creeley and

Page 376

1    trying to keep the attendance down.
2            And so there was certain animus
3    shown in those e-mails I read in discovery
4    against FIRE.  Whether they would actually
5    step up publicly and not allow FIRE to
6    come in the future, I would assume they
7    wouldn't have done that but they might not
8    have given any money.
9            MR. COHEN:  I have no further
10       questions.
11           MS. PEET:  Just a couple of
12       follow-ups.
13           - - -
14   BY MS. PEET:
15       Q.   With reference to the McMillan
16   incident that your attorney just talked to
17   you --
18       A.   Yes.
19       Q.   -- about, again, you have all
20   of this information from what you read in
21   a newspaper, correct?
22       A.   That's correct.
23       Q.   Are you aware, either from
24   reading the newspaper or otherwise, that

Page 377

1    after Ms. McMillan protested and Ann Chase
2    took down the fliers, whether or not she
3    made a video depicting Sister Munley as
4    Hitler?
5        A.   I have no knowledge.
6            MS. PEET:  No further
7        questions.
8            - - -
9            THE VIDEOGRAPHER:  We are now
10       off the record.  The time is 5:56
11       p.m.  This ends disk number four and
12       today's deposition.
13           - - -
14
15
16
17
18
19
20
21
22
23
24

**95 (Pages 374 to 377)**



Page 378

```
 1        C E R T I F I C A T I O N
 2
 3
 4            I, Edward J. Ruggeri,
 5    Registered Professional Reporter,
 6    Certified Court Reporter and Notary
 7    Public, do hereby certify that the
 8    foregoing is a true and accurate
 9    transcript of the stenographic notes taken
10    by me in the aforementioned matter.
11
12            - - -
13
14
15
16
17
18
19
20
21
22
23    DATE:  _____
24          Edward J. Ruggeri, RPR, CCR
```

Page 379

```
 1        - - - - - - - -
 2        LAWYER'S NOTES
 3        - - - - - - - -
 4    PAGE  LINE
 5    -- --- ----------------
 6    -- --- ----------------
 7    -- --- ----------------
 8    -- --- ----------------
 9    -- --- ----------------
10    -- --- ----------------
11    -- --- ----------------
12    -- --- ----------------
13    -- --- ----------------
14    -- --- ----------------
15    -- --- ----------------
16    -- --- ----------------
17    -- --- ----------------
18    -- --- ----------------
19    -- --- ----------------
20    -- --- ----------------
21    -- --- ----------------
22    -- --- ----------------
23    -- --- ----------------
24    -- --- ----------------
```

96 (Pages 378 to 379)



# Exhibit 4

**MARYWOOD COLLEGE**
Scranton, Pennsylvania
**AGREEMENT and APPOINTMENT**
for
**FULL-TIME FACULTY**

**EXHIBIT 4**

TERMS OF THIS AGREEMENT are offered on the _____ day of _____, A.D. 19_____

to _____

_____

party of the first part, by Marywood College, a non-profit corporation, created and existing by and under the laws of the Commonwealth of Pennsylvania, party of the second part.

The parties witness that, in consideration of the mutual promises and agreements herein contained,

the following terms are in effect from _____ September 1, 1992 _____ to _____ May 11, 19__ _____ :

(1) Type of Appointment _____ Full-Time (9 Months) _____

   Rank _____ Assistant Professor _____

   Department _____ Social Science (7000) _____

   Responsibility to _____ Department Chairperson _____

   Salary                                     $ _____ per _____

   Employee Benefits:

   Social Security (FICA)        $ _3,580.00_____

   Retirement (TIAA-CREF)          _1,760.00_____

   Hosp. Ins. (B.C.-B.S.-M.M.)     _5,010.00_____

   Workers' Compensation            _400.00_____

   Total Disability Ins. (TIAA)     _130.00_____

   Life Insurance (TIAA)            _150.00_____          _____

   Total Compensation            $ _45,160.00_____

(2) The policies and practices listed in the Faculty Manual are agreed upon by the parties hereto.
(3) Benefits other than Social Security must be applied for by the faculty member at the Office of Personnel Services. Failure to apply indicates waiver of the benefit.
(4) This signed Agreement must be returned to the President's office by the date specified.
(5) U.S. Government form W-4 must be on file in the Office of Personnel Services.

IN WITNESS WHEREOF, the said parties have hereunto agreed to the above terms and have set their hands at Marywood College, in said State, as follows:

_____          *(Signed)* _____
     Date Accepted                              First Party

_____          *(Signed)* _____
     Date Executed                               President

(2/86)