# Exhibit 32



EXHIBIT 32

EXHIBIT 4-2-14
#20
Munley



Marywood
UNIVERSITY
OFFICE OF THE PRESIDENT

MARYWOOD UNIVERSITY
SCRANTON, PA 18509-1598
TEL: (570) 348-6231
FAX: (570) 340-6014
EMAIL: ANNEMUNLEY@MARYWOOD.EDU
www.marywood.edu

April 3, 2012

Dr. Frederick F. Fagal, Jr.
17 East Lake Street
Skaneateles, NY 13152

Dear Dr. Fagal,

I have received your letter dated March 29, 2012. You chose to file a grievance under the Marywood University Faculty Grievance and Appeals Policy and chose not to convene an ad hoc committee to review my recommendation as I had offered to you on two occasions. The Faculty Grievance Committee reviewed your grievance and found no evidence of improper action on my part which would constitute a legitimate grievance.

Since the grievance process is now complete, I have decided to finalize my recommendation. As a result, your employment with Marywood and your tenure are terminated effective today, April 3, 2012.

Further, to provide you with a review of my decision, I will consider your letter dated March 29, 2012 as your authorization for me to convene two faculty ad hoc committees to appeal my decisions to suspend you and to terminate your employment and tenure. I am doing this despite the fact that on two separate occasions you refused my offer and did not choose to convene an ad hoc committee to review my decision to suspend you and my recommendation to terminate your employment and tenure before I finalized my decision.

According to the terms of the Progressive Discipline Policy, you must now select a tenured faculty member for the ad hoc committee. Please submit the name of your selection to Sr. Gail Cabral, President of the Faculty Senate, as soon as possible.

Sincerely,

Sister Anne Munley IHM

Sister Anne Munley, IHM
President

*An education inspired by the Sisters, Servants of the Immaculate Heart of Mary.*

# Exhibit 33

3

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FREDERICK F. FAGAL,      )   CIVIL ACTION - LAW
JR.,                     )
                         )
        Plaintiff        )
                         )
    -vs-                 )
                         )
MARYWOOD UNIVERSITY,     )
                         )
        Defendant        )   NO. 3:14-CV-02404
_____ x

DEPOSITION TESTIMONY OF

**SISTER ANNE MUNLEY, IHM, Ph.D.**

THURSDAY, JUNE 2, 2016

RADISSON HOTEL
700 LACKAWANNA AVENUE
SCRANTON, PA

MARY ANN RUANE
COURT REPORTER
NOTARY PUBLIC

**KEYSTONE COURT REPORTING AGENCY, INC.**
**4099 BIRNEY AVENUE, SUITE 9**
**MOOSIC, PA  18507**
**(570) 558-3011    (800) 570-3773**
**FAX  (570) 558-3014**

**EXHIBIT 33**

**INDEX OF EXHIBITS**

DEPOSITION
EXHIBIT      DESCRIPTION            MARKED

Exhibit 1    5/10/11 Letter of Agreement. . . .21
Exhibit 2    11/28/11 E-Mail Chain. . . . . .22
Exhibit 3    12/2/11 Fagal Letter . . . . . .27
Exhibit 4    12/5/11 E-Mail . . . . . . . . .29
Exhibit 5    12/15/11 Levine Letter . . . . .37
Exhibit 6    1/17/12 E-Mail . . . . . . . . .42
Exhibit 7    Talking Points for Meeting . . .69
Exhibit 8    Handwritten Notes. . . . . . . .95
Exhibit 9    1/23/12 E-Mail . . . . . . . .104
Exhibit 10   1/23/12 Meeting Notes. . . . .105
Exhibit 11   1/24/12 E-Mail w/ Attachments. .108
Exhibit 12   Talking Points for Board . . .113
Exhibit 13   2/2/12 Cohen Letter. . . . . .122
Exhibit 14   2/3/12 Handwritten Note. . . .123
Exhibit 15   2/9/12 E-Mail w/ Attachments . .124
Exhibit 16   2/9/12 Anthony Letter. . . . .132
Exhibit 17   2/20/12 E-Mail . . . . . . . .134
Exhibit 18   3/7/12 E-Mail. . . . . . . . .137
Exhibit 19   3/26/12 Sadlack Letter . . . .140
Exhibit 20   4/3/12 Munley Letter . . . . .141
Exhibit 21   4/25/12 E-Mail Chain . . . . .147
Exhibit 22   4/30/12 E-Mail . . . . . . . .148
Exhibit 23   5/3/12 E-Mail Chain. . . . . .151
Exhibit 24   6/5/12 E-Mail. . . . . . . . .152
Exhibit 25   Faculty Grievance Committee
             Meeting Notes, 6/19/12 . . . .152
Exhibit 26   1/9/15 E-Mail. . . . . . . . .154
Exhibit 27   1/18/12 Handwritten Notes. . . .156
Exhibit 28   1/20/12 Handwritten Notes. . . .157

-o0o-

2

C O U N S E L   P R E S E N T :

**On behalf of the Plaintiff:**
    LAW OFFICE OF JONATHAN Z. COHEN, ESQ.
    BY: JONATHAN Z. COHEN, ESQ.
    175 Strafford Avenue
    Wayne, PA 19087

**On behalf of the Defendant:**
    JACKSON LEWIS
    BY: STEPHANIE JILL PEET, ESQ.
        ASIMA J. AHMAD, ESQ.
    1601 Cherry Street, Suite 1350
    Philadelphia, PA 19102

**Also Present:** Frederick F. Fagal, Jr. Ph.D,
                Patricia E. Dunleavy, Ph.D

**STIPULATIONS**

    It was agreed by and between counsel that all
objections, except as to the form of the question,
will be reserved until the time of trial.
    It was further agreed that the sealing and
filing of the deposition transcript will be waived.

**INDEX OF WITNESSES**

EXAMINATION                    PAGE NUMBER
**SISTER ANNE MUNLEY, IHM, Ph.D**
By Mr. Cohen. . . . . . . . . . . . . . . . 4

-o0o-

4

1    S I S T E R   A N N E   M U N L E Y, IHM, Ph.D

2    WAS CALLED, AND HAVING BEEN DULY SWORN,

3    WAS EXAMINED AND TESTIFIED AS FOLLOWS:

4    (9:36 a.m.)

5

6    **EXAMINATION BY MR. COHEN:**

7        Q.     Sister Munley, my name is Jonathan

8    Cohen, and I represent the Plaintiff in this case

9    Frederick F. Fagal, Jr.

10        How would you like to be called today,

11   Sister or President Munley or --

12       A.     **Sister Anne is just fine.**

13       Q.     Sister Anne, okay.  And you understand

14   today that you're under the same oath as if you were

15   in a courtroom, correct?

16       A.     **I do understand.**

17       Q.     And let me just go over some of the

18   ground rules.  Have you ever had a deposition before?

19       A.     **No, I haven't.**

20       Q.     Okay.  So the idea is that I ask you

21   the questions and you provide the answers.  But if

22   you don't understand a question, please feel free to

23   say so, and I'll try to rephrase.

24       A.     **Okay.**

25       Q.     Because if you do answer, then I'm just

7

1 going to assume that you understand. If you need a
2 break at all, that's fine, just wait until the end of
3 your answer; like it can't be after I ask the
4 question, but before your answer.
5          If you could -- even if you think that
6 you know what I'm about to ask, if you could just
7 wait until I get to the end, because the Court
8 Reporter has to take everything down, and also
9 depending on the question your Attorney might want to
10 object.
11     A.     Um-hum.
12     Q.     Is there anything that would prevent
13 you from thinking clearly and testifying truthfully
14 today, and that includes like medications or --
15     A.     No.
16     Q.     Okay. What is your full name,
17 including your middle name?
18     A.     I'm Sister Anne Munley. My middle name
19 is Margaret, I do not use it.
20     Q.     Okay.
21     A.     And my complete name includes IHM. I'm
22 a Sister Servant of the Immaculate Heart of Mary.
23     Q.     Okay. And what is -- Could you
24 summarize your educational background from after high
25 school on?

1 Doctorate full time. And so I studied at Boston
2 College, and was part kind of a consortium
3 arrangement where I could also study at Brandeis and
4 at B.U. So my program was focused on qualitative
5 research emphasizing gerontology. And I wrote my
6 dissertation on hospice.
7          And after that I came back to Marywood,
8 and I taught for a couple years. And during that
9 time I taught some courses at both the graduate and
10 undergraduate level. And I did work with both
11 sociological theory and research with the students at
12 the undergraduate level. And I did some courses on
13 the graduate level on nursing home administration,
14 care of the aging, death and dying, that kind of
15 thing.
16          Part of my work brought me to England,
17 where I studied the original form of the hospice, and
18 that was the basis which I then converted into a
19 book.
20          After I completed a couple years I got
21 elected to serve as Vice-President of the IHM
22 Congregation in my capacity of being responsible for
23 all the ministries of the Sisters, including their
24 multiple sponsored works. Marywood is one of their
25 sponsored works. At that time we had -- we were

6

1     A.     I'd be happy to do that. After high
2 school -- well, actually right after high school I
3 entered the Congregation of the Sister Servants of
4 the Immaculate Heart of Mary. I've been educated by
5 them my entire life. And I went -- while I was in
6 religious formation I also began study at Marywood
7 then College, now it is the University.
8          After my religious profession I began
9 to teach. I was -- my background at Marywood was
10 that I was a sociology, history and government major,
11 and I had a psychology -- almost a double major in
12 psychology. As soon as I finished Marywood College
13 at that time, I was enrolled in Catholic University
14 of America in Washington D.C., and there I completed
15 over the course of several summers a Master's Degree
16 in Sociology.
17          After that I came back to Marywood. I
18 taught at high school level in two places in those
19 years that I was doing the work on my Master's in the
20 summers. And then I went to Marywood for two years.
21 And the Congregation asked me to see my interest in
22 serving in higher education. And I taught in the
23 Department of Social Science. I taught sociology and
24 various other courses related to that.
25          And then I went to study for my

8

1 heavily involved in work in hospitals, and St.
2 Joseph's Center, which cares for severely
3 neurologically impaired children. And we had Sisters
4 serving in, I believe at that time 19 states, three
5 or four countries. And so that was the work that I
6 did, which was all related to mission and service.
7          After I completed eight years as
8 Vice-President -- in fact the term in religious life
9 at that time was Assistant to the Superior General --
10 I came back to Marywood as Director of Institutional
11 Research and Planning. And part of my work was to
12 develop a methodology to create a strategic plan for
13 Marywood University. So it was a comprehensive
14 program where I had 42 different committees with
15 direct input in shaping the strategic, and then from
16 the strategic plan develop various operational plans.
17 I did that for four years.
18          And then I got elected President of the
19 IHM Congregation. And that meant that I was the
20 leader of the Congregation. And a big part of that
21 role is the emphasis in all of the decisions that are
22 made based on what the IHM mission is, and what our
23 spirit of charism is. And so those years I was very
24 focused on developing a Congregation and it's
25 mission, ministries and sponsored works in accordance

1  with our charism, which is very deeply rooted in the
2  spirit of St. Alphonsus Liguori, which is about God's
3  unconditional love for everyone, and also a sense
4  that gifts are God given.  And the responsibility of
5  our charism and mission is to help people overcome
6  obstacles to develop their God-given gifts and
7  potential.  And so that was very much my emphasis in
8  those years.
9              At the same time I became very much
10  involved in religious life in broader circles in the
11  United States.  I did -- I was a member of the
12  Leadership Conference of Women Religious.  I was
13  elected President of the Leadership Conference of
14  Women Religious.  And in those years I also did a
15  national study of the ministry of Catholic Sisters
16  throughout the United States, both looking at their
17  sponsored works and the magnitude of their impact on
18  developing this country in terms of their various
19  forms of service.
20              I also at that time became very
21  involved in the International Union of Superiors
22  General, and that's based in Rome, Italy.  And while
23  I was serving as President of the Congregation I was
24  elected as a delegate of that body, so that brought
25  me into a great deal of global contact with the

1  you know, the actual goals, purpose and spirit of the
2  charism as expressed in the mission and core values
3  of the University.
4              So after I completed my service as
5  President I took a couple months and studied Spanish.
6  And then I went to work in Rome at the International
7  Union of Superiors General.  And then that brought me
8  -- I was Director of Social Missions worldwide.  And
9  so as a result of that out of the charism, that is
10  IHM charism, which is around service, excellence and
11  empowerment, and especially looking toward the needs
12  of women and children, a lot of the programs that we
13  involved were extensions of that spirit.  So I worked
14  on programs that were educating Catholic Sisters in
15  different parts of the world to counter trafficking
16  of human beings, especially women and children.  And
17  so I did some work in Thailand, and also worked in
18  Nigeria.  We were trying to develop networks of
19  Sisters that would identify potential women to be
20  trafficked in countries of origin, link up Sisters in
21  countries of origin, countries of transit, and
22  countries of destination.  And so that was another
23  part of the experience of where I directly -- Much of
24  my life has been directly encountering people who are
25  experiencing oppression of some form, or suffering of

1  missions and ministries of women religious throughout
2  the world.
3              And our charism, our spirit is all
4  around the notion of, you know, realizing the
5  giftedness of others, and we did that through the
6  ministry of education.
7              And so part of the work that I then got
8  into was the international exposure to women
9  religious in Africa led me to work with other
10  congregations to start a program called the African
11  Sisters Educational Collaborative, which has now
12  evolved into direct service and education of Catholic
13  Sisters in 10 sub-Saharan countries on leadership,
14  on, you know, financial management, on how to write
15  grants.  And it ties into the charism, which is all
16  about that sense of empowerment and service and
17  excellence.
18              So then after I completed my -- I did
19  two terms.  I was re-elected.  I did two terms.  And
20  the whole time that I was President of the
21  Congregation -- President of the Congregation is also
22  the Chair of the Corporation of Marywood.  We have a
23  dual tiered form of governance at the Board level,
24  and is also an ex officio member of the Board.  So I
25  was always in direct contact with the mission, and,

1  some form.
2              The work in Africa, also when we were
3  working on developing programs for Sisters in Africa
4  -- and I did some of that as part of my work in UISG
5  as well -- I worked with the International
6  Organization of Migration, who partnered with UISG in
7  this counter-trafficking type of activity.
8              And I also facilitated a number of
9  large gatherings of Superiors General from all over
10  the world; I did some in Africa, I did some in
11  Warsaw.  I would say for about 30 years of my life I
12  did extensive work with women religious about how to
13  take their mission, and how to take it to confront
14  the needs of the contemporary world, and to continue
15  to be true to that spirit and charism.
16              So after working with USIG, this
17  African Sisters education movement was developing.
18  We got -- I wrote a large grant, which I received
19  from the Conrad N. Hilton Foundation, that enabled us
20  to begin to set up computer centers for the Sisters
21  so that they could be educated.
22              And so after that started to really
23  develop -- and in my time there I was in Uganda,
24  Kenya, Tanzania, Nigeria, Ghana, and saw the direct
25  impact of the Sisters in working with extremely poor

13

1  persons they served.  And also I was in Uganda at the
2  time when, you know, the war was still in action, and
3  I saw how they were a force for good in the presence
4  of that.
5        So this was so in keeping with the IHM
6  charism and our Congregation, along with three other
7  congregations were the sponsors of this African
8  Sisters Education Collaborative.  And Marywood was a
9  key factor in it.  Marywood received the grant.  So I
10  came back.  I concluded my work in Rome, came back
11  because I wanted to establish this African Sisters
12  Education Collaborative as a 501(c)(3) entity, and
13  with corporate bylaws, incorporated in the State of
14  Pennsylvania so it could continue to grow.  Now it
15  has grown, and it touches 10 -- you know, women
16  religious in 10 sub-Saharan countries.
17        So after I came back and I did that, I
18  was the first Executive Director of that.  And I, you
19  know, got it incorporated, and I continued to raise
20  funds, and continued to go back and forth to Africa.
21        My predecessor Sister Mary Reap, IHM,
22  was retiring as President of Marywood.  So several
23  people approached me.  I knew many people in the
24  Marywood community, I had been there many years,
25  asked me to consider applying, so I did.  I went

14

1  through all the interview process, and I was selected
2  as Marywood's 11th President.  And then I have served
3  as the President of Marywood.  I am concluding, I am
4  retiring now at the conclusion of this year after
5  nine years as President.  My total service at
6  Marywood, either as a faculty member, or as Director
7  of Institutional Research and Planning, or as
8  President totals 20 years.  And this year I received
9  the Cor Mariae Medal, which comes after 20 years of
10  direct service.
11        That's sort of like a little rundown of
12  what my life has been like.  It's been very -- I've
13  been very graced in the experiences I've had.
14        Q.    Thank you.  And so I understand that
15  you will be leaving Marywood and Pennsylvania for
16  Texas soon; am I right?
17        A.    That's correct, I am going to take a
18  sabbatical.
19        Q.    So during that time you'll still be
20  associated with Marywood?
21        A.    No, I'm really retiring as President of
22  Marywood.  And I'm going to spend some time just --
23  you know, the notion of a sabbatical is you light out
24  to let the new light come forward and your next path.
25  Before I select my next ministry I'm going to take

15

1  some time for prayer and reflection.
2        Q.    Okay.  When did you -- You, obviously,
3  know my client Professor Fagal, correct?
4        A.    I do.
5        Q.    And when did you first meet him?
6        A.    You know, I wouldn't be able to give
7  you an exact year.
8        Q.    Approximately?
9        A.    When I came back to Marywood after
10  serving as Vice-President, I pretty much had a
11  general knowledge of the faculty, because I was
12  Director of Institutional Research and Planning, and
13  I facilitated numerous meetings across campus.  And I
14  had been a faculty member earlier there from '74 to
15  '76, and then '80 to '81 or '82 when I got elected
16  President.  So, yeah, I probably would have
17  encountered him in those times.
18        Q.    Okay.  And you're, obviously, aware
19  that around January 2012 Professor Fagal sent an
20  e-mail containing video links.  And then that's been
21  the subject of this litigation, which ultimately led
22  to his suspension and termination, correct?
23        A.    Yes.
24        Q.    And prior to that day, and that was
25  January 13th, 2012, did you consider Professor Fagal

16

1  to be a problematic employee for Marywood?
2              MS. PEET:  Objection to the form.
3        You can answer.
4              THE WITNESS:  I'm sorry?
5              MS. PEET:  You can answer.
6              THE WITNESS:  I had no direct
7        dealings with Dr. Fagal, or any I would
8        say encounter that would be of that
9        nature.
10  BY MR. COHEN:
11        Q.    So you had no direct dealings.  But had
12  you heard from others in Marywood's administration,
13  or Professors that Professor Fagal was a problematic
14  employee?
15        A.    I really didn't have an opinion of Dr.
16  Fagal.
17        Q.    I understand that.  But had you heard
18  from others that they had a problem with Professor
19  Fagal?
20        A.    I don't recall conversations about Dr.
21  Fagal.
22        Q.    Okay.  So your interactions with
23  Professor Fagal prior to January 2012 were limited?
24        A.    I would say so; perhaps at faculty
25  meetings, or passing by in the hall.

17

1      Q.   Okay.  And Marywood has a set of core
2  values, correct?
3      A.   Yes, they do.  And they are very
4  related to the mission of the University.  And they
5  are Catholic identity.  And they are rooted in our
6  Catholic identity and our Catholic tradition.  We're
7  a faith-based institution of service, respect,
8  excellence and empowerment.
9      Q.   And did you -- would you say that these
10 core values are just symbolic, or do they play a
11 genuine role in the life of the University?
12     A.   I think they play a very genuine role
13 in the life of the University, which goes deeply into
14 the founding vision of the IHM Sisters when they
15 founded Marywood in 1915, because there was no
16 education available for women at all.  And they're
17 also directly related to the IHM charism, which I
18 mentioned before, which is about developing God-given
19 gifts and potential wherever it's found.
20          And so, you know, the mission of
21 Marywood talks -- and it's an enduring mission across
22 time -- helping our students, our faculty, and the
23 whole member of the Marywood community to live
24 responsibly in a diverse and interdependent world.
25 It's all about the common good.

18

1      Q.   And prior to the -- I'm just going to
2  call -- the e-mail and the videos that are the
3  subject of this litigation, I'm going to --
4  throughout this deposition I'm going to call it the
5  January 13th, 2012 incident.  Is that around the time
6  when you thought it happened?
7      A.   I mean, I'm not -- this is four and a
8  half years ago, so I wouldn't say a date would be in
9  my mind.
10     Q.   Right.
11     A.   But a very significant part of this for
12 me, of course, is the matter of the videos, that's
13 the substance of it for me.
14     Q.   And the e-mail -- and I'll just
15 represent to you that the e-mail that Professor Fagal
16 sent containing these links to the videos was sent on
17 January 13th, 2012.  And when I say the January 13th,
18 2012 incident, that's what I'm referring to.
19     A.   All right.
20     Q.   And prior to the January 13th, 2012
21 incident, would you say that Professor Fagal fit into
22 the University's core values?
23          MS. PEET:  Objection to the form.
24     You can answer.
25          THE WITNESS:  I do not recall

19

1      having an opinion specifically regarding
2      Dr. Fagal in that manner.
3  BY MR. COHEN:
4      Q.   So you didn't have an opinion.  But did
5  he -- Did Professor Fagal have a reputation as
6  someone that prior to the January 13th, 2012
7  incident, as someone that didn't necessarily tow the
8  University line?
9          MS. PEET:  Objection to
10     competency.  You can answer, if you
11     know.
12          THE WITNESS:  Again, I cannot, you
13     know, say that I've had any
14     conversations of that nature regarding
15     Dr. Fagal.
16  BY MR. COHEN:
17     Q.   Okay.  So prior to the January 13th,
18 2012 incident, did you have any knowledge of various
19 run-ins that Professor Fagal had with the Marywood
20 administration?
21          MS. PEET:  Objection to the form.
22     You can answer.
23          THE WITNESS:  Again, I would say
24     that that is -- that was not, you know,
25     something that as I look back that I

20

1      ever was very involved in or recall
2      discussions of.
3  BY MR. COHEN:
4      Q.   Okay.  Specifically prior to the
5  January 13th, 2012 incident, were you aware that
6  Professor Fagal had a very strong -- had very strong
7  opinions on free speech at Marywood?
8          MS. PEET:  Objection to the form.
9          THE WITNESS:  I'd like you to
10     rephrase that, and just give me the
11     sense of what it is your question is
12     dealing with.
13  BY MR. COHEN:
14     Q.   Prior to the incident involving the
15 videos and the e-mail, were you aware that Professor
16 Fagal had a strong -- had strong feelings about free
17 speech at Marywood University?
18          MS. PEET:  Objection to the form.
19          THE WITNESS:  I guess I would say
20     I was minimally aware.
21  BY MR. COHEN:
22     Q.   Minimally aware?
23     A.   Um-hum.
24     Q.   Okay.  Were you aware in and around
25 2007 Professor Fagal -- Let me scratch that.  I'll

21

1  move on.
2      Are you aware of the organization
3  called the Foundation for Individual Rights and
4  Education, also known as FIRE?
5      **A.**    **At some point I did have a letter, and**
6  **I did respond to a letter from that organization.**
7      **Q.**    Okay. I'm going to pass you some
8  documents.
9      MR. COHEN: I would like to have
10      this marked as we'll call it Munley 1.
11      (At this time, Munley Deposition
12      Exhibit 1 was marked for
13      identification.)
14  BY MR. COHEN:
15      **Q.**    Sister, could you briefly review this,
16  and let me know if you recognize this document?
17      **A.**    **Of course. Yes, this is our Letter of**
18  **Agreement. And this is the Letter of Agreement**
19  **offered to Dr. Frederick Fagal for the '11-'12**
20  **academic year. And it specifies the salary, the**
21  **rank, the college, the responsibility. And then**
22  **there are a couple paragraphs additionally that talk**
23  **about various benefits, and talks about the original**
24  **copy being signed and returned to my office by a**
25  **specific date.**

22

1      **Q.**    And that's your signature in the bottom
2  left, correct?
3      **A.**    **That is correct, yes.**
4      **Q.**    Okay. In November of 2011 do you
5  recall Professor Fagal inviting a speaker from the
6  FIRE organization to speak on campus?
7      **A.**    **Yes, and -- yes.**
8      **Q.**    And how did you first learn about this?
9      **A.**    **I believe it was -- I'm not sure at**
10  **what point in November, but there are speakers --**
11  **many of our Professor have outside speakers in their**
12  **classes, and I was aware that this was occurring.**
13      **Q.**    And were you at all concerned that
14  someone from FIRE might be coming to speak on campus?
15      **A.**    **I would have to say that we have many**
16  **speakers of -- We're a University, and we have**
17  **outside speakers. This was one outside speaker who**
18  **was coming.**
19      **Q.**    Right, I understand. But my question
20  was; were you at all concerned with a FIRE speaker
21  coming to speak on campus?
22      **A.**    **I don't recall concern.**
23      MR. COHEN: I'm going to make this
24      Munley 2.
25      (At this time, Munley Deposition

23

1      Exhibit 2 was marked for
2      identification.)
3  BY MR. COHEN:
4      **Q.**    And, Sister, could you briefly review
5  this document, and let me know if you recognize it?
6      **A.**    **Yes, this is -- okay, this is**
7  **November 28, 2011, almost five years ago, a memo to**
8  **me e-mailed from Dr. Levine. And it talks about an**
9  **outside speaker, and it refers to posters advertising**
10  **the event, and moving the class to a larger room.**
11  **And it talks about political agenda, and it mentions**
12  **two Professors. And it mentions guidelines**
13  **concerning outside speakers.**
14      **Q.**    Okay. I know this was a long time ago.
15      **A.**    **It was almost five years ago.**
16      **Q.**    Do you remember responding to this
17  e-mail?
18      **A.**    **I really -- I don't have any memory of**
19  **responding to this at all.**
20      **Q.**    But it seems like, and correct me if
21  I'm wrong, he says, "I'd like to speak
22  with you about this." Correct, the first line?
23      **A.**    **All that I know is that the speaker**
24  **came and the speaker spoke.**
25      **Q.**    Right.

24

1      **A.**    **And that's all I can remember.**
2      **Q.**    I understand that he spoke. But do you
3  remember having a conversation with Dr. Levine in
4  response to his request to speak with you about this
5  FIRE speaker?
6      MS. PEET: Objection, asked and
7      answered. You can go ahead.
8      THE WITNESS: I don't have
9      anything different to say, other than I
10      know that the speaker came, and I know
11      that as with any other situation faculty
12      do have outside speakers.
13  BY MR. COHEN:
14      **Q.**    I understand, but the question is more
15  simple. The speaker came, but -- and it's fine if
16  you have no memory. But do you remember, or do you
17  not remember having a conversation about Dr. Levine
18  about this in response to his e-mail?
19      MS. PEET: Do you mean with Dr.
20      Levine or about Dr. Levine?
21  BY MR. COHEN:
22      **Q.**    Yes, with Dr. Levine in response to his
23  request to speak with you?
24      **A.**    **I really -- I don't recall it. It**
25  **would not be out of character for me to have**

25

1    conversations, but I don't recall this.

2          Q.    And correct me I'm wrong, Dr. Levine is

3    suggesting that the speaker from FIRE has a political

4    agenda; am I right?

5          MS. PEET:  Objection, the document

6          speaks for itself.  It calls for

7          speculation.  She can't possibly know

8          what Dr. Levine meant or said.  You can

9          answer to the best that you can.

10         THE WITNESS:  All that I could

11         speak to would be that, you know,

12         guidelines when we have outside

13         speakers, it's always our expectation

14         that if something is being discussed

15         that all dimensions of it are discussed.

16         That's the only thing I can relate to in

17         that e-mail.

18   BY MR. COHEN:

19         Q.    Well, let me ask you so you don't have

20   to speculate about what Dr. Levine thought, but did

21   you think that FIRE had a political agenda?

22         A.    I was not really familiar with, you

23   know, all of the aspects of the organization.  And, I

24   mean, it's title is about free speech, so, you know,

25   I'm not certainly opposed to free speech.

26

1          Q.    Okay.  And did you agree with Dr.

2    Levine that Professor Fagal was trying to circumvent

3    Marywood's guidelines concerning outside speakers?

4          A.    I can't speak to that.  I have no

5    recollection of that at all.

6          Q.    Okay.  Did you issue any advice or

7    instructions to Dr. Levine, or anyone else at

8    Marywood's administration, about how the FIRE speech

9    would be handled?

10         A.    I would say that having the speaker

11   would be in character with what we would have happen.

12   And I would be in favor of the speaker coming and

13   give whatever -- you know, speaking to whatever group

14   was involved.  I would not have stopped that.  So I

15   would -- to the best of my recollection that would

16   have been what I would've --

17         Q.    Did you advise or order that any

18   posters advertising the FIRE event be removed from

19   Marywood's walls?

20         A.    Absolutely no recollection of that.

21         Q.    Do you know whether anybody else at

22   Marywood's administration ordered that the posters

23   advertising the FIRE speech be removed from

24   Marywood's walls?

25         A.    That was not a part of my -- I was not

27

1    involved in that order.  That was not anything that I

2    was directly involved in in any way.  I would not

3    have any awareness of that.

4          MR. COHEN:  Okay.  Let's move on

5          to a new document.  We're going to make

6          this -- We're going to mark this as

7          Munley 3.

8          (At this time, Munley Deposition

9          Exhibit 3 was marked for

10         identification.)

11   BY MR. COHEN:

12         Q.    Sister, do you recognize the document?

13         A.    I do recognize this document.

14         Q.    And this is a letter that Professor

15   Fagal sent to Dr. Levine --

16         A.    Right.

17         Q.    -- dated December 2nd, 2011, correct?

18         A.    Right.  I do recognize this.

19         Q.    And in this letter Professor Fagal

20   expresses some disappointment about the removal of

21   his FIRE posters; am I right?

22         A.    That's what the letter says, yes.

23         Q.    I'm sorry?

24         A.    Yes, that is what this letter says,

25   yes.

28

1          Q.    Okay.  And Professor Fagal requested

2    reimbursement for his expenses and time in arranging

3    for the FIRE posters, as well as an apology, correct?

4          A.    Um-hum.

5          MS. PEET:  Objection to the form.

6          The document speaks for itself.  You can

7          go ahead and answer.

8          THE WITNESS:  Um-hum.

9    BY MR. COHEN:

10         Q.    Do you remember -- Outside of the

11   context of this litigation, do you remember seeing

12   this letter?

13         A.    What do you mean outside the context of

14   this litigation?

15         Q.    What I mean is --

16         A.    Please clarify that.

17         Q.    What I mean is -- okay, so it appears

18   that Professor Fagal sent this to Dr. Levine.

19         A.    Yes.

20         Q.    Did you then see it soon after that?

21         A.    This is all after the fact I did see

22   this letter.  And I did see the various demands that

23   are on the second page of this.  I did see this

24   letter.

25         MR. COHEN:  And let's move on to

29

1  the next document.
2       THE WITNESS:  And I think, you
3  know, if you look at this letter, it's
4  requiring various elements of
5  reimbursement, apologies, payments to
6  FIRE, hosting events, providing food and
7  motel bill, publicity payments, free
8  pizza and soda to students, publicity.
9  It's quite an extensive list of demands.
10      MR. COHEN:  We're going to make
11  this document Munley 4.
12      (At this time, Munley Deposition
13      Exhibit 4 was marked for
14      identification.)
15  BY MR. COHEN:
16      Q.   Before you look at that, do you recall
17  a meeting of the -- of Marywood's Executive Committee
18  regarding Professor Fagal's FIRE posters?
19      A.   First of all, I think I have to
20  clarify, the only Executive Committee that we have
21  that uses that title is the Executive Committee in
22  the Board of Directors, and that's -- I think that's
23  not what you're referring to.
24      Q.   I'm not referring to the Board.  I'm
25  referring --

30

1       A.   If you're referring to the President's
2  Cabinet that's --
3       Q.   Yes.
4       A.   -- the group of the Executive Officers
5  with whom I meet.  But the term Executive Committee
6  is a body of the Chairs of the various Board
7  committees, or Executive Council, it's a different --
8       Q.   I'm referring to the President's
9  Cabinet.  Do you remember a meeting involving the
10  Executive Cabinet about Professor Fagal's posters?
11      A.   Not explicitly about the posters.  You
12  know, this is five years ago so like timing
13  everything it's hard to recall.  I do remember all
14  that happened after the fact once the video occurred,
15  that's when the posters became more of a discussion.
16      Q.   So you don't remember a meeting
17  explicitly about the posters.  But I'm not referring
18  to just meeting explicitly just for the purpose of
19  the posters.  Do you remember a meeting of the
20  Executive Cabinet in which, let's say, the topic of
21  the FIRE posters came up in discussion?
22      A.   I don't explicitly remember, but it's
23  highly likely as this thing continued to grow that it
24  would have in some way be dealt with in Cabinet
25  discussions.  Especially when it got to the videos,

31

1  because that impacted every single one of the
2  Executive Officers.
3       Q.   Do you remember a meeting with the
4  Executive Cabinet in which the issue of whether the
5  posters should be removed came up in discussion?
6       A.   No, that would not have been a thing
7  that I would recall.
8       Q.   Okay.  So a document has been placed
9  before you.  I think we've called it Munley 4.  Do
10  you recognize this?
11      A.   Actually, I don't, but it has my name
12  on it.  And it's December 5th, 2011 so.
13      Q.   And this is an e-mail from Dr. Levine
14  to you dated December 5th, 2011, at 8:47 p.m.
15  correct?
16      A.   That's what it says.
17      Q.   And Dr. Levine is forwarding you a copy
18  of the letter that we just discussed?
19      A.   Oh, so this is the cover page from that
20  letter?
21      Q.   Yes.
22      A.   Okay.
23      MS. PEET:  Objection, lack of
24      foundation.  You can answer.
25  BY MR. COHEN:

32

1       Q.   The subject line reads, "Letter to Alan
2  Levine December 5th, 2011 re compensation for poster
3  tear down."  Do you see that, or the attachments?
4       A.   Yes, I see that, yes.
5       Q.   Do you remember discussing a response
6  with Dr. Levine to the attachment to this e-mail?
7       A.   Now, can you just tell me what you're
8  referring to?  Are you talking now about Exhibit 3?
9       Q.   Yes.
10      A.   Is that the attachment you're talking
11  about?
12      Q.   Yes.
13      A.   I would say that my response to reading
14  these, what I'm going to refer to as demands,
15  actually I thought that they were, for want of a
16  better term, absurd.
17      Q.   So you thought it was absurd for
18  Professor Fagal to request any reimbursement for his
19  posters?
20      MS. PEET:  Objection,
21      mischaracterization of the testimony.
22      THE WITNESS:  I think that I'm
23      referring to this entire letter that
24      includes reimbursement.  I -- that whole
25      -- whatever you're referring to with

33

1  regard to posters, that's not the realm
2  in which I live and spend my days.
3        As I see this, "$500 reimbursement
4  check for my expenses and wasted time."
5        "In addition, besides making me
6  merely financially whole regarding this
7  matter, I think it is only fair that
8  Marywood atone for its sins -- in quotes
9  -- and show its willingness to support
10 free speech by inviting FIRE to campus
11 for two spring 2012 presentations and
12 hosting a presentation by Robert Spencer
13 and anyone who cares to join him in
14 debate [see item (11) below].  The ideal
15 way to show commitment to free speech is
16 by action with respect to sponsoring a
17 presentation by someone with whom you
18 vehemently disagree."
19       And then the next line is, "By
20 issuing to me a written public apology
21 which indicates the actions [outlined
22 below] Marywood will take to remedy the
23 damages done to its reputation."
24       It goes on further, "By having the
25 apology in (2) to me also sent by e-mail

34

1  to every faculty member (including
2  adjuncts) and every student."
3        "(4) By paying FIRE $2,000 (its
4  normal rate) to give two presentations
5  on campus during the Spring 2012
6  semester.  Marywood will also pay normal
7  meal and lodging expenses."
8        "(5) By hosting one $1,000 FIRE
9  session (probably in February) for a
10 daytime class presentation to the Social
11 Science 201 class (presentation to be
12 open to all on campus).  A large room
13 will be provided (at least the size of
14 Comerford).  A week before the event
15 Marywood will also print ten 11x17 color
16 posters, ten 11x17 black and white
17 posters, ten 8.5x14 color posters, and
18 ten 8.5x14 black and white posters
19 advertising the event.  I, perhaps with
20 others, will hang the posters.  Each
21 poster will announce a $50 random door
22 prize to a student attending the
23 lecture.  (I will pay the prize money)."
24       "(6) By using the other $1,000
25 FIRE fee (plus food and motel bill) to

35

1  pay for an evening presentation open to
2  the whole community (probably in early
3  April).
4        (7) --
5  BY MR. COHEN:
6        Q.    Sister --
7        A.    I need to continue this because you
8  asked me my reaction to it.
9        Q.    Well --
10       MS. PEET:  Mr. Cohen, your
11 question to her was so you thought it
12 was absurd that he asked for
13 reimbursement.
14       MR. COHEN:  Yes.
15       MS. PEET:  There are -- This is
16 his demand.  His demand is not even
17 close to just the reimbursement.  She is
18 telling you what the demand is.  She has
19 to finish what she has testified to.
20 BY MR. COHEN:
21       Q.    It includes -- To be fair, I did not
22 ask you to read the entire letter.  We can all read.
23 But would it be correct to say that among the demands
24 that Professor Fagal made was reimbursement for the
25 posters?  That's not the only thing he requested; am

36

1  I right?
2        A.    It was one of 11 demands, many of the
3  demands being quite substantial.
4        Q.    Okay.  And do you agree that posters --
5  these posters advertising the FIRE event were hung
6  and then removed?
7        A.    That's the assertion.  Did I see
8  posters removed, or was I -- you know, can I say they
9  were there and they were not there, I had no visual
10 experience of that.
11       Q.    Did someone tell you that they were
12 removed, other than Professor Fagal?
13       A.    It's in the -- it's in this
14 documentation.
15       Q.    Yes.  My question is; did you think it
16 was unreasonable for Professor Fagal to request some
17 reimbursement for the posters that were taken down?
18       MS. PEET:  Objection to the form,
19 lack of foundation.
20 BY MR. COHEN:
21       Q.    You can answer.
22       MS. PEET:  Well, she just
23 testified she doesn't know if the
24 posters were taken down.  All she knows
25 is Professor Fagal's assertion in this

37

1    letter that the posters were taken down,
2    she doesn't know.
3    BY MR. COHEN:
4        **Q.**    Sister, have you heard from anyone
5    other than Professor Fagal that the posters had been
6    taken down?
7        **A.    This is, you know, five years ago.  And**
8    **it's -- you know, for me to recall conversations, I**
9    **can't answer that I had any conversations regarding**
10   **this specifically.**
11       **Q.**    Do you remember seeing any FIRE posters
12   on the wall?
13       **A.    No.**
14           MR. COHEN:  Let's make this Munley
15   5.
16           (At this time, Munley Deposition
17           Exhibit 5 was marked for
18           identification.)
19   BY MR. COHEN:
20       **Q.**    Sister, do you recognize this document?
21       **A.    Yes, I do.**
22       **Q.**    And this is a letter from --
23       **A.    This is copied to me from Dr. Levine,**
24   **yes.**
25       **Q.**    It's a letter from Dr. Levine to

38

1    Professor Fagal and you're copied, correct?
2        **A.    December 15, 2011.**
3        **Q.**    Correct.  And this is a response to
4    Professor Fagal's demand letter, correct?
5        **A.    Let me just read.**
6           MS. PEET:  Take your time.
7           THE WITNESS:  Right, okay, in the
8           second paragraph it reiterates the --
9           yeah, we were not going to honor the
10          requests contained in the letter, or
11          demands I should say.
12   BY MR. COHEN:
13       **Q.**    And did you assist Dr. Levine in
14   crafting this letter?
15       **A.    I have no recollection of that.**
16       **Q.**    Did you discuss the issue of Professor
17   Fagal's December 5th, 2011 letter to Dr. Levine with
18   Dr. Levine?
19       **A.    Is that the -- wait a minute.**
20   **December 5th is where?  Are you talking about**
21   **December 2nd?**
22       **Q.**    Well, if you look at the end of the
23   first paragraph he says, "but at any rate I do want
24   to respond to your letter of December 5, 2011."
25           MS. PEET:  I think just by way of

39

1    clarification, the e-mail is dated
2    December 5th, but the letter itself is
3    dated December 2nd.  I think that's
4    causing some confusion.
5           THE WITNESS:  Oh, I see, okay.
6           So would you repeat your question
7           then, because I did get caught up in the
8           dates there.
9    BY MR. COHEN:
10       **Q.**    Sure.  Do you remember discussing
11   Professor Fagal's letter dated December 5th, 2011
12   with Dr. Levine?
13           MS. PEET:  The letter is December
14           2nd.
15           MR. COHEN:  Oh, I'm sorry.
16   BY MR. COHEN:
17       **Q.**    The letter dated December 2nd, 2011?
18       **A.    I remember discussing the demands, yes.**
19       **Q.**    Okay.  And, correct me if I'm wrong,
20   but the second paragraph of the December 15th, 2011
21   letter from Dr. Levine says, "Sister Anne Munley and
22   I remain open to future presentations that are not in
23   conflict with our mission statement or core values,
24   and are organized according to our policies and
25   practices." Did I read that correctly?

40

1        **A.    That is correct.**
2        **Q.**    So would it be correct to say that you
3    believed that the FIRE presentation was not in
4    conflict with Marywood's mission statement and core
5    values?
6        **A.    I cannot agree with your interpretation**
7    **of that.  You're putting words in my mouth.**
8        **Q.**    Okay.  So when Dr. Levine states that,
9    "Sister Anne Munley and I remain open," in essence
10   he's putting words in your mouth then, is that what
11   you're saying?
12           MS. PEET:  Objection to the form.
13           THE WITNESS:  I think that's a
14           general statement that reiterates the
15           practice that we have that, you know,
16           you can have presentations.  I think
17           that's what that says.
18   BY MR. COHEN:
19       **Q.**    So --
20       **A.    And I think the statement that I think**
21   **is a distinctive element of that paragraph that says,**
22   **you know, was the response to this list of the 11**
23   **demands.**
24       **Q.**    So is it your testimony that the FIRE
25   -- the proposed FIRE presentation was not in conflict

41

43

1  with Marywood's mission statement and core values?

2          MS. PEET:  Objection to the form.

3      I don't understand what you mean by

4      proposed FIRE presentation.

5  BY MR. COHEN:

6      Q.      The presentation that -- I don't mean

7  proposed -- but the presentation that was given by

8  FIRE on campus, is it your testimony that that was

9  not in conflict with Marywood's mission and core

10  values?

11      A.      I think when there are -- We're a

12  University.  And at Universities there are

13  presentations occurring on a regular basis.  That's

14  what I see in that paragraph, that we are open to

15  future presentations.

16          MR. COHEN:  Okay.  Let's move on

17      to a new document.

18  BY MR. COHEN:

19      Q.      Let me ask you this; the fact that

20  Professor Fagal wanted a speaker from FIRE to make a

21  presentation on campus, did that make you question

22  whether Professor Fagal was a good fit with

23  Marywood's core values?

24          MS. PEET:  Objection to the form.

25          THE WITNESS:  I think that I -- it

1          identification.)

2  BY MR. COHEN:

3      Q.      And if you could briefly review this,

4  Sister, and let me know whether you recognize this

5  document?

6      A.      Okay.  Yes, I do recognize this

7  document.  It's from Dr. Levine to me.  And I was

8  away at the time.  It references Dr. Fagal's e-mail,

9  and the links to videos embedded with the e-mail.

10      Q.      And was this the first time that you

11  had Professor Fagal's January 13th, 2012 e-mail and

12  the videos were brought to your attention?

13      A.      I would say, yes.  I mean, this is

14  dated the 17th.  I was obviously traveling, because

15  it indicates that.  But this mentions the videos,

16  which I looked at.

17      Q.      What was your first reaction to reading

18  Professor Fagal's January 13th, 2012 e-mail and the

19  videos that the e-mail linked to?

20      A.      You know, may I see those?  I mean,

21  that helps me to -- I know my reaction to the videos.

22  I don't remember, you know --

23      Q.      Okay, let me rephrase.

24      A.      This is, again, five years ago.

25      Q.      Let me rephrase it.  I don't have the

42

44

1      is not my practice to categorize people

2      as -- the framework that you're putting

3      around this, I don't put people in

4      boxes.  It's not my nature, or my

5      professional practice to categorize

6      people in the way that you referred in

7      that question.

8  BY MR. COHEN:

9      Q.      Okay.  Well, my question was not

10  whether you put Professor Fagal in a box.  Did you

11  have any thoughts at all -- Did you wonder at all

12  whether the fact that Professor Fagal wanted to have

13  a FIRE speaker reflected on his adherence to the core

14  values of the University?

15      A.      I think that how I -- The core values

16  and the mission are the ones which, you know, I make

17  the decision.  I would not recall making a direct

18  application in this particular case at this time.

19  You know, the incident in the videos is a far

20  different matter.

21      Q.      I know, we'll get to that.

22          MR. COHEN:  We'll mark this as

23      Munley 6.

24          (At this time, Munley Deposition

25      Exhibit 6 was marked for

1  video here.  I'm not going to play it, but you

2  remember it?

3      A.      Oh, it is embedded in my memory.

4      Q.      What was your first reaction to seeing

5  the video?  Forget about the e-mail.

6      A.      Okay.  I was absolutely and totally

7  appalled.  And I, first of all, was highly offended

8  to be personally depicted as Hitler, and to see the

9  members, the Executive members of -- Officers of

10  Marywood University depicted as Hitler's aides.  And

11  I was absolutely distressed, especially because Dr.

12  Alan Levine is of the Jewish faith.  And I thought it

13  was anti-Semitic to even involve Dr. Levine in

14  something of this nature.  And virtually every member

15  of the Cabinet was in some way directly insulted, as

16  well as their family members.  And the IHM Sisters

17  were characterized as SS.

18          And, you know, I think of the founding

19  charism of the IHM Congregation, it's emphasis on,

20  you know, empowerment, and service, and excellence.

21  And I think of Hitler as a dictator responsible for

22  the annihilation of six million innocent people.  And

23  I think of my direct experiences in working in very

24  poor countries, and seeing victims of trafficking,

25  and the boy soldiers, and the war that was going on

45

1  in Uganda; and trafficking of children and women in
2  Asia, and in South Africa the experience of the
3  apartheid that I had an opportunity to understand
4  Mandela's work.  I was disgusted, appalled, repulsed.
5  And everything -- I thought it was a personal attack
6  on everything that Marywood stands for, as well as an
7  egregious assault to our mission and core values.
8          And our mission is about an educational
9  program that really is involved in enabling students
10 to live responsibly in a diverse and interdependent
11 world.  And the whole essence of a Marywood education
12 is to respect, basically respect every single person,
13 every culture, every ethnicity.  I was sickened by
14 it.  I could not -- I couldn't even believe that I
15 was -- and it was vulgar.  It was sexually explicit.
16 It mentioned, you know, the spouses and family of
17 some of our Executive Officers.  It demeaned them.
18 It mentioned -- it mentioned someone's wife.  I was
19 totally appalled, disgusted.
20         And I have to say that in my entire
21 lifetime, and I've been in very difficult situations,
22 so I've seen great human suffering, I could not
23 believe that in a context like Marywood University
24 that this, you know, Hitler -- I can't -- the video
25 was incomprehensible to me that anybody who would be

46

1  a tenured Professor at Marywood University where we
2  are so explicit in what our mission and values are
3  would produce something of this nature.
4          And I found it, you know -- as soon as
5  I saw it I was especially sensitive to Dr. Levine,
6  who was very, very much affected by this, because it
7  was his wife that was mentioned in the video.  And he
8  is Jewish, and he was very much emotionally impacted
9  by it, as were the other Cabinet members.  We just
10 don't operate like that as a people.  We emphasize
11 respect.
12         And I found the Congregation -- you
13 know, we have Sister missionaries in various
14 countries, who lived in all sorts of circumstances.
15 They welcome the sacrifice, it's who we are.  We
16 teach this mission to our students.  We have a Hope
17 course, University 100, that emphasizes the heritage,
18 why we have these values.  And, you know, we have
19 worked very hard as an institution.
20         I, personally, because of my global
21 opportunities to be in so many parts of the world
22 have emphasized global education and the importance
23 of that.  And so, you know, I'm a sociologist.  I've
24 taught anthropology.  I believe in the value of
25 multiple cultures.  I was sickened by this.

47

1          And this to me violated everything that
2  Marywood stands for.  And it was the core of who we
3  are was being affronted by this.  And I decided that
4  this was -- this was a major violation of what it is
5  to be considered a member, a tenured faculty member
6  of Marywood University, it violates everything that's
7  involved in that.
8      Q.     After viewing these videos did you feel
9  like Professor Fagal should be suspended or fired?
10     A.     I have to say that this was such an
11 egregious offense of not only of what my
12 understanding of the responsibility of a tenured
13 faculty member at Marywood is, that this was
14 something for which there should be a suspension.
15 And I wanted to have a direct conversation with Dr.
16 Fagal.
17         This was something that, you know,
18 because it affected every member of the Cabinet,
19 because it was directly involved with our mission, as
20 leader of the institution I felt a great
21 responsibility to directly engage with Dr. Fagal
22 about this matter.
23     Q.     Okay.  So you testified that you
24 thought he should be suspended.  My question was did
25 you also believe after seeing this video that he

48

1  should be terminated?
2      A.     I wanted to talk to him.  I wanted to
3  personally sit down with Dr. Fagal.  This to me --
4  suspension was the first thing on my mind, but I
5  wanted to have the opportunity to directly talk to
6  Dr. Fagal.
7      Q.     Understood.  Whether you wanted to
8  discuss this with Dr. Fagal at all or not, did the
9  thought after seeing this video of terminating him
10 come to your mind?
11         MS. PEET:  Objection, asked and
12         answered.
13         THE WITNESS:  I can't give you an
14         answer directly to that.  I just know
15         that I was severely offended and wanted
16         to immediately deal with the situation
17         because it rose to the level of the
18         President of the University.
19 BY MR. COHEN:
20     Q.     Okay.  So the document that's in front
21 of you --
22     A.     Yes.
23     Q.     -- again, this was January 17th, 2012,
24 this e-mail from Dr. Levine to you where he informs
25 you of the videos.  Do you see this?

49

1    A.    That's right, I'm looking at it.

2    Q.    So you say that you wanted to

3  immediately deal with the situation.  But isn't it

4  true that you did not in fact deal immediately with

5  the situation, it waited until at least January 23rd,

6  2012?

7         MS. PEET:  Objection to the form.

8         THE WITNESS:  I was traveling.  I

9         was -- you know, the work of the

10        Presidency involves traveling, Board

11        meetings in other locations.  I don't

12        know exactly, I would have to revisit my

13        calendar, but I was also at that time on

14        the ACCU Board of Directors, the

15        Association of Catholic Colleges and

16        Universities, so I don't know where I

17        was at this time, I would have to

18        revisit.  You know, but this -- if I got

19        this on the 17th and I was somewhere

20        else -- I don't remember what date you

21        said I dealt with this, but my goal was

22        to deal with it.

23  BY MR. COHEN:

24    Q.    You do have people on your staff on the

25  Cabinet that you occasionally delegate

50

1  responsibilities to, am I correct?

2    A.    I think that each of the -- yes.  I

3  would say this:  Each of the Cabinet Officers is a

4  direct report to the President, and they have certain

5  responsibilities, and then they report directly to

6  the President, yes.

7    Q.    Did you -- Even though you were away

8  when you received this e-mail January 17, 2012, did

9  you think about delegating the handling of this

10  situation to anybody on your staff?

11    A.    I would never delegate anything of this

12  magnitude.  I would discuss it with the staff,

13  because each of them were directly affected by it.

14  But I was away at the time.  I knew this was

15  something that I was going to deal with.

16    Q.    When you were away did you have access

17  to e-mail?

18    A.    I always have access to e-mail, right.

19    Q.    Did you feel -- After having viewed

20  these videos that Dr. Fagal posted, did you feel that

21  Dr. Fagal posed an immediate harm to himself?

22    A.    I think that, you know, the first thing

23  I thought was this is totally contrary to what it

24  means to be a tenured Professor at Marywood

25  University.  And then I began to think about all the

51

1  other elements of policy that were a part of it.  And

2  I think that when you talk about the harm, I think my

3  sense of harm was harm to the University and all that

4  it stands for; harm to the people who were being

5  defamed in this.  And, you know, distortion of things

6  like basic collegial relationships toward the people

7  with whom you work; administrative Officers.  Civil

8  rights in the sense of, you know, identifying a

9  particular group that then is looked upon in a

10  discriminatory way.  I think professional standards

11  of professional behavior.  I mean, these are the

12  thoughts that, you know, were going through my mind

13  then, and they are the thoughts that go through my

14  mind now as this is brought back to me.  And I can

15  experience it vividly, it affected me because it

16  distorted everything we stand for.

17    Q.    Did you feel like the videos after you

18  first saw them posed an immediate harm to the

19  Marywood community?

20         MS. PEET:  Objection, asked and

21         answered.

22         THE WITNESS:  I think I already

23         answered that question.

24  BY MR. COHEN:

25    Q.    Well, I think you testified --

52

1    A.    I think it was highly offensive, and

2  actually in a sense defamed the essence of what we're

3  all about.

4    Q.    Did you feel like it had to be dealt

5  with immediately?

6    A.    I felt it had to be dealt with, but,

7  you know, I don't know where I was at the time.  And

8  I knew that that was going to be something personally

9  that I would deal with as President.  When you're

10  President, the buck stops there.

11    Q.    Did you feel like this -- the creation

12  and posting of the videos was an emergency, created

13  an emergency for Marywood?

14    A.    I don't know that I would put that word

15  on it.  It's something very serious, something

16  offensive, something that had to be dealt with, and

17  dealt with in a very strong and direct manner.

18    Q.    But not necessarily immediately?

19         MS. PEET:  Objection, asked and

20         answered.

21  BY MR. COHEN:

22    Q.    You can answer.

23         MS. PEET:  She already answered.

24         MR. COHEN:  So are you not going

25         to answer again?

53

1      THE WITNESS:  Well, I was away.
2   This is, again, five years ago.  I can't
3   say day by day by day.  I know that the
4   first chance that I had to deal with it,
5   I dealt with it.
6   BY MR. COHEN:
7      Q.   Did you feel that Professor Fagal posed
8   any physical threat to himself or to others after
9   viewing this video?
10      MS. PEET:  Objection, lack of
11   competency.  She's not an expert.  But
12   you can answer, if you know.
13      THE WITNESS:  I wouldn't know how
14   to answer that question.  For me the
15   harm was that the thing was done in the
16   first place, that it was made public,
17   that, you know, it attacks everything we
18   stand for.
19   BY MR. COHEN:
20      Q.   What more do you need in order to
21   answer that question?  You said you don't know how to
22   answer it.  Did it occur to you -- whether you're
23   qualified to say it or not -- but did it occur to you
24   that Professor Fagal had become a physical threat to
25   himself or others after viewing the video?

54

1      A.   I don't recall thinking about that in
2   the way in which you're asking the question.
3      Q.   Okay.  Do you recall -- I want you to
4   describe what your response -- not your thought
5   process, but what was your first response in terms of
6   handling these videos once you returned to campus?
7      A.   Well, there are a few things.
8   Regularly when I'm on campus we have a Cabinet
9   meeting.  So I knew there would be a Cabinet meeting
10   at which this would be discussed.  I also sought
11   appropriate legal advice.
12      MS. PEET:  I'm going to instruct
13   you not at all at this question or any
14   other time during the deposition today
15   to discuss what you discussed with
16   Counsel.
17   BY MR. COHEN:
18      Q.   Do you remember the date that you first
19   returned to campus?
20      A.   I really don't, sir.  This is five
21   years ago.  And, you know, I traveled extensively.  I
22   was on multiple Boards, been to multiple meetings,
23   visited donors at alumni events all over the country.
24   I couldn't give you explicitly.  And, you know, when
25   you come back -- when you're President and you come

55

1   back, you have many, many things to deal with all at
2   once.  So I can't give you a date.
3      Q.   Did you review -- and I'm not asking
4   you to reveal the content of any attorney/client
5   conversations, or any documents that were provided --
6   may or may not have been provided to you, but in
7   preparing for this deposition did you review any
8   documents?  Don't tell me what they were, just kind
9   of a yes or no.
10      A.   In preparing for this --
11      Q.   Deposition.
12      A.   -- deposition I looked at a few things,
13   yes.
14      Q.   Did you review -- Do you keep a
15   personal calendar?
16      A.   I have a calendar that my secretary
17   keeps of appointments that I have, and -- I have a
18   calendar, yes.
19      Q.   Does it go back to January 2012?
20      A.   I have a yearly calendar of all of the
21   appointments that I have that my secretary maintains.
22   It might not, you know -- Are you asking me -- I
23   would say, yes, there would be a calendar that my
24   secretary would have maintained, yeah.
25      Q.   And you know that this litigation is, a

56

1   large part of it involves a meeting that you held
2   with Professor Fagal around January 23rd, 2012, where
3   he was suspended.  Do you remember that?
4      A.   I do.  Oh, I recall that very much.
5      Q.   So you know that you first got this
6   e-mail in front of you on January 17, 2012?
7      A.   I'm seeing that now.  I mean, it
8   certainly wasn't on the top of my mind.
9      Q.   Right.  And you know that he was
10   suspended on January 23rd, 2012, correct?
11      A.   If that's the date that you're telling
12   me.
13      Q.   Did you think it was important to
14   review, you know, your calendar of events in
15   January 2012 in preparing for this deposition?
16      A.   I did not do anything like that, no.
17      Q.   So, again, without revealing the
18   content of any attorney/client conversations, when in
19   fact you did return to campus, if you could to the
20   best of your memory tell me chronologically the steps
21   you took to handle this situation involving Professor
22   Fagal's e-mails.
23      MS. PEET:  Without disclosing any
24   attorney/client privilege.
25   BY MR. COHEN:

59

**Q.**   Yes.

**A.**   The only thing, I'm not sure that
chronologically I can say A, B, C, D, E.  I can tell
you that the event that is in my mind is the Cabinet
meeting that I had at which the -- everybody by this
point had seen this video.  It was sent to various
members of the Marywood community to their Marywood
e-mail address.  I know there were students who saw
it.  And so when we had the Cabinet meeting every
Cabinet member there virtually was either directly in
it, or offended by it because of the colleagues who
were offended by it.  And it was a very emotional
Cabinet meeting.  It was very --

I remember, for example, Dr. Levine was
highly affected by it on a number of levels.  And,
you know, especially around mentioning of his wife in
the context in which she was mentioned.  And Mr.
Garvey, who is our Vice-President of Fiscal Affairs,
a reference to a business.  There were things here --
and then I, personally, I was -- you know, we operate
on the basis of respect, you know, and to be -- I,
personally, felt to be characterized as Hitler, and
then the whole rather -- the vulgar, inappropriate
reference to, you know, I have to leave to go to the
ladies' room, et cetera.  The whole thing was highly

58

-- I remember that that meeting -- I have never had a
Cabinet meeting like that, because we all felt this
was an affront to everything that Marywood stands
for, to the founding vision of the Sisters, to all
the values that we hold dear, and to what we teach
our students, and what we expect of our members of
the Marywood community, including our Professors.
And a violation of just so many of the elements of
what civil, professional, ethical behavior involves.
And that's my memory, that is a very strong memory
that I have of that Cabinet meeting.  And the
importance of my -- since it affected everybody, it
became without question for me it was my
responsibility to deal with it.

**Q.**   And do you remember the date of that
meeting that you're referring to?

**A.**   I don't.

**Q.**   Okay.  And so I think you have
testified that Dr. Levine was at the meeting?

**A.**   Yes, he's on the Cabinet.

**Q.**   And Mr. Garvey?

**A.**   I can tell you who the members of the
Cabinet are.  They're all the Executive Officers,
many of whom were -- many of whom were in the video,
referenced in the video.

60

**Q.**   I'm sure you can tell me that.  But do
you remember exactly who was at that meeting?

**A.**   No, it's five years ago.  I mean, it's
a rare thing that people miss a Cabinet meeting.  But
I wouldn't be able to say that everybody was there,
but most likely people were.

**Q.**   And you didn't review your notes before
this deposition to refresh your recollection on who
might've been at that meeting?

**A.**   No, I didn't reference anything on the
Cabinet meeting.

**Q.**   Okay.

**A.**   But the memory is very much with me,
because it was a very -- you know, it was a very sad
meeting, you know, to the point that some people felt
so affronted they were considering litigation.  It
was a very intense meeting.

**Q.**   Was the topic of potential discipline
of Professor Fagal raised at that meeting?

**A.**   I don't recall that specifically, but I
know that I had -- I know that everybody at the
meeting just felt this was just crossing the line of
what we stood for.

**Q.**   Okay, so you don't remember explicitly
the topic of discipline coming up.  Do you remember

60

anyone even hinting at it, or suggesting that
Professor Fagal should be disciplined over the video?

**A.**   I would -- you know, I can't say
exactly what was said, but I'm sure I said that this
is serious, and there will be consequences.  But I
don't remember what I said five years ago.  I just
know myself well enough to know that at this meeting,
that was the nature of the meeting, part of the
meeting.  We probably had a big agenda of a lot of
things.  We never talked just about one thing, you
know, we had standard agendas.

**Q.**   When you say someone -- I think a
moment ago you testified that somebody at the meeting
was considering litigation?

**A.**   Yes.

**Q.**   And, again, I'm not asking about any
attorney/client communications.  But who was it that
suggested litigation that you remember?

**A.**   I think -- well, I think the people who
felt highly offended because their families were
involved were angry enough to do that.

**Q.**   Do you remember the specific people
that contemplated litigation?

**A.**   I do.

**Q.**   Who were they?

61

1    **A.    I think that Dr. Levine was very**
2 **offended.**
3    Q.    Did anyone else express interest in
4 litigation at that meeting?
5    **A.    I think that Mr. Garvey was offended,**
6 **too.  You know, it was a very emotional meeting.  It**
7 **could've been even a nod of the head, I don't recall,**
8 **except I remember that that stuck in my head, and it**
9 **gave me a sense of how offended.  When one feels**
10 **discriminated against, one reacts intensely.  I've**
11 **seen lots of examples of that in my life.**
12    Q.    Okay.  So I asked you about the steps
13 that were taken by you after your return to campus
14 regarding the videos.  We just discussed a meeting of
15 the Executive Cabinet, right?
16    **A.    Um-hum.**
17    Q.    And we talked a little bit about Dr.
18 Levine's reactions to the videos.  Did Dr. Levine
19 recommend that Professor Fagal be suspended?
20    **A.    I don't remember a specific statement,**
21 **but we were in accord that this needed to be dealt**
22 **with, and that this was very serious, and I would**
23 **deal with the consequences.  Everybody agreed with**
24 **that.**
25    Q.    You keep saying you don't remember

62

1 explicitly, but did anyone --
2    **A.    Well, in my mind -- you know, you're**
3 **asking me to remember conversations five years ago,**
4 **which is very difficult, and I'm very -- I want to be**
5 **as thoughtful as possible, and as accurate as**
6 **possible, which is what I'm trying to do here.  I**
7 **just know that this was so serious to me that this**
8 **was going to be a suspension.  Do I remember the**
9 **exact words that may have taken place in our**
10 **discussion of this, I can't give you an exact sense**
11 **of it.  But I know that this for me was so serious,**
12 **and so egregious that it was going to have**
13 **consequences of a serious nature.**
14    Q.    Okay.  So you can't remember the exact
15 words verbatim?
16    **A.    Right.  But I had come to the**
17 **conclusion that this was -- this is something for**
18 **which the individual concerned should be suspended.**
19 **But I wanted to talk to that person with every**
20 **benefit of the doubt to give Dr. Fagal the**
21 **opportunity to talk to me about why these videos were**
22 **done.**
23    Q.    So just to be clear, you don't remember
24 explicitly whether Dr. Levine recommended the
25 suspension of Dr. Fagal, correct?

63

1    **A.    I would recall that Dr. Levine, and**
2 **everybody else there, was in accord with me for doing**
3 **-- making sure that the consequences of such action**
4 **would be pursued.  That's my recollection of the**
5 **meeting.**
6    Q.    And nobody specifically explained what
7 those consequences would be?
8       MS. PEET:  Objection.  She just
9    said this happened five years ago, she
10    doesn't remember.  That's the take away
11    that she remembers.
12       THE WITNESS:  Right.  I remember
13    the intensity of my awareness that there
14    would be consequences, and suspension
15    was a consequence.  What I said at that
16    meeting, I don't recall.
17 BY MR. COHEN:
18    Q.    Right, and I wasn't just -- I don't
19 want to know just what you said at the meeting.
20    **A.    Well, everybody was pretty much in**
21 **support of -- everybody was highly offended by this.**
22    Q.    Everybody was pretty much in support of
23 what?
24    **A.    Of whatever action would be taken for**
25 **this egregious offense.**

64

1    Q.    Everyone was in support of whatever you
2 wanted to do with regard to discipline, or -- I'm
3 trying to get at specifics.  And I realize this is a
4 long time ago.
5    **A.    Sir, this is five years ago, and it's**
6 **very hard for me to try to -- I mean, I have 10**
7 **people that I'm meeting on the Cabinet level, 9**
8 **people.  And I just know that I had -- that everyone**
9 **on the Cabinet, Executive Officers were highly**
10 **offended by this, saw it as an egregious affront to**
11 **what Marywood stands for, and that it needed to be**
12 **dealt with accordingly.**
13    Q.    So I understand you were the President,
14 and there are Executive Cabinet Officers beneath you.
15 Did anyone on that Cabinet have the authority to
16 discipline Professors without a green light from you?
17 I'm not talking just about Professor Fagal.  But does
18 anyone on the Executive Cabinet have the authority to
19 discipline Professors without seeking you out first?
20    **A.    Okay.  In University, in academe, okay,**
21 **there are a lot of layers.  And there are cases, for**
22 **example, where let's say a Professor's teaching**
23 **performance is very, very poor.  Well, you know, a**
24 **lot of that doesn't rise to the President.  Like a**
25 **Dean will make an appropriate judgment, the Academic**

65

1    Vice-President will make an appropriate judgment.

2          There are all sorts of matters.  You

3    know, there's the whole advancement area of the

4    University.  There's the whole student life

5    enrollment management.  You know, there's the

6    academic area.  There's a physical area.  And there

7    are many, many situations where, you know, because of

8    the policies and procedures involved that there are

9    decisions made within areas where that is within the

10   scope and competence of the area concerned.

11         And so, I mean, that's an ordinary,

12   every day operational practice within a University.

13   So there are many things that -- for example, we have

14   committees that make huge decisions on rank and

15   tenure, for example, or curriculum, that's the

16   competence that they have.  And how the President

17   enters into it is only when, you know, I get a

18   recommendation, and then, you know, I typically

19   follow the recommendation of that entity.  So there

20   are things of that nature that go on every single

21   day.

22         Q.     At the time in January 2012, who were

23   Professor Fagal's superiors at the University?  There

24   was, obviously, you; but between you and Professor

25   Fagal, who had supervisory authority over him?

66

1          A.     Well, there's the Department Chair.

2          Q.     And who was that?

3          A.     I believe that would have been Sister

4    Margaret at that time, Sister Margaret Gannon.

5          Q.     Let's go up the levels.

6          A.     You know, okay, I will be glad do that,

7    but I also want to say that, you know, there's a

8    collegial relationship, and there's a team

9    relationship.  So I'm not necessarily always in a

10   hierarchical mode here in discussing people's

11   authority levels and responsible levels.  But there

12   is a Department Chair, there is a Dean.  The Dean at

13   that time would have been Dr. Michael Foley.

14         Q.     Dean of what?

15         A.     The College of Liberal Arts and

16   Sciences.

17         Q.     Let's keep going.

18         A.     Dr. Alan Levine was the Vice-President

19   of Academic Affairs, and I was President at that

20   time.

21         Q.     So would it be fair to say that at

22   least three people beneath you had the ability to

23   discipline Professor Fagal over these videos?

24         MS. PEET:  Objection to the form.

25         THE WITNESS:  You know, I'm saying

67

1    that there are certain responsibilities

2    within the scope and role discretion of

3    a Department Chair.  There are certain

4    responsibilities within the scope and

5    discretion of what a Dean does.  And

6    there's certain scope and

7    responsibilities for an AVP; however,

8    AVP is a direct report to the President;

9    the Dean is a direct report to the AVP;

10   and the Chairs report to the Dean.  So

11   there is a flow of information.

12         The situation with this particular

13   incident of the videos rose to the level

14   of the Presidency because it involved

15   the whole institution, the total

16   institution, it involved the entire

17   Executive Officer body, it involved the

18   essence of our mission and core values.

19   And it involved a number of policies

20   which are directly something that

21   ultimately the President has the

22   responsibility for seeing that the

23   institution is compliant with.

24   BY MR. COHEN:

25         Q.     Okay.

68

1          A.     So if this were a case of poor

2    teaching, you know, because of student evaluations

3    coming in, the Chair would deal with that, the Deans

4    would deal with that, the Vice-President would deal

5    with that.  And the Vice-President in this case was

6    the person who perhaps was most egregiously offended.

7          Q.     So eventually, and specifically I mean

8    January 23rd, 2012, you had a meeting with Professor

9    Fagal in which he was suspended; am I right?

10         A.     That is correct.

11         Q.     Before that meeting would it be fair to

12   say that Professor Fagal had not been disciplined

13   over the videos?

14         A.     I think that's fair to say, yes,

15   because this was my first opportunity to talk to him

16   directly.

17         MR. COHEN:  Does anyone need to

18   take a break?

19         MS. PEET:  Do you want to take a

20   few minutes?

21         THE WITNESS:  I suppose I could.

22         MR. COHEN:  I'm thinking like 10

23   minutes.

24         MS. PEET:  Sure.

25         (At this time, 11:14 a.m., there

69

1      was a brief break taken.)

2          MR. COHEN:  (11:28 a.m.)  Back on

3      the record.  We'll mark this as Munley

4      7, please.

5          (At this time, Munley Deposition

6          Exhibit 7 was marked for

7          identification.)

8  BY MR. COHEN:

9      Q.    Sister, do you recognize --

10     A.    I do.

11     Q.    -- the document in front of you?  And,

12  just briefly, what are we looking at here?

13     A.    These are thought processes, talking

14  points, things that -- sort of like guidelines for

15  the meeting that was to occur.

16     Q.    And you're referring to the

17  January 23rd, 2012 meeting involving Professor Fagal,

18  Michael Foley, Patricia Dunleavy?

19     A.    Dr. Fagal and I were the ones meeting.

20  Dr. Foley was the Dean, and that's why he was

21  appropriately to be there.  And Dr. Dunleavy is

22  Associate Vice-President for H.R.

23     Q.    And so these were --

24     A.    These are my thinking points.

25     Q.    And so it's correct to say that you

70

1  generated this document?

2      A.    Some of this was in consultation.

3      Q.    I was going to say it looks like --

4  some of the wording it looks like someone else may

5  have generated it.  And I'm specifically referring to

6  Ms. Dunleavy, but I don't know.  But you're not sure

7  whether you did it?

8      A.    Well, I know I work with Dr. Dunleavy

9  about H.R. steps, because that's her role, you know.

10  But this document is very familiar to me.

11     Q.    I'm sorry?

12     A.    This document is very familiar to me,

13  because it was the guidelines for the meeting that we

14  were having.

15     Q.    And so you think that these talking

16  points were -- this was like a collaborative endeavor

17  between you and Dr. Dunleavy?

18     A.    Yes, I think Dr. Dunleavy -- Dr.

19  Dunleavy's role as Associate Vice-President for H.R.,

20  she is the person who has all of the H.R. related

21  policies, she works with all the time.  So, you know,

22  I work with her frequently on these matters.  And she

23  also assists me with personnel matters that aren't of

24  a legal nature.

25     Q.    Okay.  And do you know exactly when

71

1  this document was generated?

2      A.    I couldn't tell you exactly when, but

3  it would have been in preparation for the meeting.

4      Q.    Right.  And this is not the first time

5  you're seeing this document?

6      A.    No, it's not.

7      Q.    Okay.  And so you would have approved

8  these talking points, if not created some of them

9  yourself, correct?

10     A.    Some of it was like informational

11  pieces.  We have multiple policies, you know, so like

12  whenever I had to deal with any kind of a situation I

13  always reference all the policies, particularly all

14  the policies that are -- you know, if it's a faculty

15  matter, I review the policies in the Faculty

16  Handbook.  So, I mean, this is an approach that when

17  you get down to the bottom it's like looking at some

18  of the matters regarding policies; what we would do

19  if A, B or C were to occur.  This is just sort of

20  like a prep sheet.  This is like something that I

21  typically would do in collaboration drawing on the

22  expertise both within the house, and if I needed to

23  go beyond that in terms of conversation with Counsel,

24  I would have done so.

25     Q.    Do you remember specifically adding or

72

1  changing any of these talking points prior to the

2  January 23rd, 2012 meeting?

3      A.    Again, that was five years ago, I can't

4  say that I recall anything that I could say

5  specifically.

6      Q.    If you look at the 7th bullet point

7  down, it begins with, "Tell Fagal," do you see that?

8      A.    Um-hum.

9      Q.    Can you read that briefly to yourself,

10  and let me know when you're finished?

11     A.    (Witness complies.)  Um-hum.

12     Q.    So it seems to me, and correct me if

13  I'm wrong, but the way that that is written, it's

14  almost as if you were not supposed to preside over

15  this meeting, someone else was; because you're

16  referred to in the third person, am I right?

17         MS. PEET:  That's a compound

18         question, so why don't you break it

19         down.

20  BY MR. COHEN:

21     Q.    Initially was the meeting with

22  Professor Fagal supposed to just be with Dr. Dunleavy

23  and not you?

24     A.    Oh, no.  This, you know, "Ask Fagal,"

25  that was -- I recall talking a lot of this out with

73

1  Dr. Dunleavy.

2      **Q.**   So even though this bullet point says,

3  "Tell Fagal that Sister views this conduct to be a

4  serious breach," even those it's written in the third

5  person, it was you that was going -- that planned to

6  say that?

7      **A.**   **I was the one who was going to meet**

8  **with Dr. Fagal, yes.  I had decided that earlier on,**

9  **it goes with office of the President.  And, you know,**

10 **often when I have meetings and work through processes**

11 **somebody takes the notes, it's not always me.**

12     **Q.**   Right, right.  Okay.  The next bullet

13 point reads, "Ask Fagal to leave campus; wait for

14 Sister's decision," am I right?

15     **A.**   **Um-hum.**

16     **Q.**   And then there's like a sub-bullet

17 point underneath that, it says, "Suspended with pay,"

18 correct?

19     **A.**   **These are all the things to think**

20 **about, yes.  These are elements to think about.**

21     **Q.**   But I did read that correctly, correct?

22     **A.**   **You read -- I'm sorry, you read --**

23     **Q.**   It says, "Ask Fagal to leave campus;

24 wait for Sister's decision."  And then there's a

25 sub-bullet point saying, "Suspended with pay,"

74

1  correct?

2      **A.**   **Right, that's what the document says.**

3      **Q.**   Okay.  So leading up to the meeting

4  with Professor Fagal on January 23rd, 2012, was it

5  your plan to suspend him regardless of what was said

6  at the meeting?

7      **A.**   **Yes.**

8      **Q.**   Okay.

9      **A.**   **I wanted to give him an opportunity to**

10 **address the video as a tenured Professor and the**

11 **responsibilities of a tenured Professor.  And then,**

12 **you know, I was looking for information that would**

13 **help me to see further down the line.  But this**

14 **warranted suspension in my opinion.**

15     **Q.**   What type of information were you

16 hoping to hear from Dr. Fagal?

17     **A.**   **When I met with Dr. Fagal I asked him**

18 **directly, you know, was he responsible for the**

19 **videos, and immediately he said yes.  And then I**

20 **asked him, you know, how these videos -- in what way**

21 **did these videos support his role as a tenured**

22 **Professor at Marywood University.  Because, you know,**

23 **the whole policy on tenure talks about upholding the**

24 **mission and values of the institution, it's a mutual**

25 **agreement.  And he did not answer.  He chose not to**

75

1  answer that.

2      **Q.**   Okay.

3      **A.**   **And I asked him multiple times, about**

4  **three or four times, trying to see if there was any**

5  **more enlightenment he could give me, because I was so**

6  **appalled by it.**

7      **Q.**   Okay.  We're going to talk more about

8  that in a minute or so, but I just want to get

9  through this document.  Do you see on the first page

10 there's also a bullet point that says, "Post

11 Suspension"?

12     **A.**   **Um-hum, that's a contingency thing.  I**

13 **always review -- if I may, I always review what are**

14 **the pertinent policies, and what are the steps,**

15 **because when you deal with, you know, various -- We**

16 **have a whole series of policies.  I always -- some of**

17 **them are time related, some say within a certain**

18 **period of time.  So this was like the elements of if**

19 **we would go this path, these are some of the steps.**

20     **Q.**   And underneath that, underneath, "Post

21 Suspension," it says, "Sister recommends termination

22 and prepares notice of charges," correct?

23     **A.**   **That's in the policies.**

24     **Q.**   Okay.  Was your plan going into this

25 meeting on January 23rd, 2012 to move from -- well,

76

1  first of all, you already testified it was to suspend

2  Professor Fagal, correct?

3      **A.**   **I felt this was very serious.  And if**

4  **you don't stand up for what is the essence of your**

5  **institution, what are you opening the future to?  I**

6  **thought it was very serious, it rose to the level of**

7  **the President; and, yes, it deserved consequences,**

8  **that was where I was.**

9      **Q.**   Was the plan also to not only suspend

10 him, but to move directly to termination regardless

11 of what occurred during the meeting?

12     **A.**   **In the meeting I was intentionally**

13 **giving Dr. Fagal the opportunity to really give me**

14 **some sort of explanation, which I asked for**

15 **repeatedly and didn't get.**

16     **Q.**   Right, I understand what you --

17     **A.**   **This document reflects the whole range**

18 **of potential developments in looking down the line as**

19 **to depending on contingencies.**

20     **Q.**   Okay.  Now, I know what you believe was

21 asked at the meeting, what was said or not said.  And

22 I know we can both read this document.  But my

23 question was a little more simple.  Was your plan to

24 move directly from suspension to termination

25 regardless of what occurred at the meeting?

77

1    **A.    I would have to say that I was very**
2    **interested in hearing from Dr. Fagal why he did these**
3    **videos and how that related to his responsibilities**
4    **as a tenured Professor at Marywood.**
5        Q.    I understand.
6    **A.    And, you know, depending on the kind of**
7    **answers, that would then affect my next thoughts on**
8    **it.  But this is a preparation of all of the various**
9    **things I would have to take into consideration for**
10   **whatever direction this case took.  But I had**
11   **determined that suspension was going to be the**
12   **outcome of this meeting.**
13       Q.    Okay.  I don't think --
14   **A.    And the next steps were yet to be**
15   **determined.**
16       Q.    Other than this document in front of
17   you, these talking points, was there -- are you aware
18   of another set of talking points to help prepare you
19   for this meeting, the January 23rd, 2012 meeting?
20   **A.    I know that I had -- typically, when I**
21   **have things of this nature I have bullet points.  So,**
22   **yes, I'm sure that there was something modified,**
23   **because this was like a whole range of potential**
24   **outcomes.  I think that I -- I think as a way of just**
25   **giving me some guidelines I think I had another**

78

1    document, too.
2        Q.    Do you think it was handwritten or
3    typed out?  Do you remember?
4    **A.    I don't remember actually.  I usually**
5    **work from typed documents.**
6            MR. COHEN:  Stephanie, if there
7        was another document, I don't think -- I
8        may have missed it, but if there is we
9        would --
10           MS. PEET:  We'll check, but I can
11       confidently say everything that we have
12       that is not privileged that's relevant
13       has been produced.
14           THE WITNESS:  I may just have
15       taken this apart, I don't know, it's
16       five years ago, sir.
17           MR. COHEN:  Okay, I understand.
18   BY MR. COHEN:
19       Q.    Do you remember having this document in
20   front of you at the meeting, the January 3rd, 2012
21   meeting?
22   **A.    I probably did.**
23       Q.    But you're not sure?
24   **A.    I'm not sure, because sometimes in my**
25   **mind, you know, like I have a sequence of some**

79

1    thoughts that -- you know, when I meet with people I
2    don't -- you know, I don't always have a document in
3    front of me; but I may have had.
4        Q.    Okay.
5    **A.    I don't recall.**
6        Q.    So let's talk a little bit about this
7    meeting on January 23rd, 2012; the meeting, you were
8    there?
9    **A.    Yes.**
10       Q.    Professor Fagal was there, correct?
11   **A.    That's correct.**
12       Q.    Patricia Dunleavy was there?
13   **A.    That's correct.**
14       Q.    And Michael Foley was there, correct?
15   **A.    Right, right.**
16       Q.    Was there anyone else there?
17   **A.    No.**
18       Q.    And would it be fair to say that there
19   was a plan for Dr. Foley to visit Professor Fagal at,
20   approximately, 8:45 a.m. that day, and tell him to
21   appear at your office at 9:00?
22   **A.    Yes, yes.**
23       Q.    Okay.  And so it would be correct to
24   say that Professor Fagal received 15 minutes notice
25   of this meeting?

80

1    **A.    Yes.**
2        Q.    Was there any reason that he was
3    provided with only 15 minutes notice?
4            MS. PEET:  Objection to the form.
5            THE WITNESS:  I don't recall any
6        -- I couldn't give any answer to that.
7        I just knew that this was the date I was
8        going to deal with this situation.
9    BY MR. COHEN:
10       Q.    And would it be fair to say that in
11   your mind the content of this meeting could determine
12   whether Professor Fagal was going to remain at the
13   University?
14   **A.    Yes.**
15       Q.    So it was an important meeting?
16           MS. PEET:  Objection to the form.
17           THE WITNESS:  I'm sorry?
18           MS. PEET:  I objected to the form,
19       but you can go ahead and answer.
20           THE WITNESS:  I think any meeting
21       that I have -- you know, any meeting
22       that I would have with a faculty member
23       over something so serious in my mind was
24       an important meeting.
25   BY MR. COHEN:

81

1    **Q.**   And at the time of this meeting,
2  Professor Fagal, he had been a tenured Professor for
3  a long time, correct?
4         MS. PEET:  Objection to the form.
5    You can answer.
6         THE WITNESS:  I don't know when he
7         was tenured.  But he's at Marywood for a
8         number of years, so I know he's tenured,
9         but I don't know when.
10  BY MR. COHEN:
11   **Q.**   But you knew he had been an employee of
12  the University for many years before the meeting?
13   **A.**   **Yes.**
14   **Q.**   Did you think it was reasonable for a
15  long-time, tenured Professor to be given 15 minutes
16  notice of a meeting that was so important to his
17  future with Marywood?
18         MS. PEET:  Objection to the form.
19         THE WITNESS:  I thought it was an
20         important meeting.  I wanted to have an
21         opportunity to speak with Dr. Fagal, and
22         I set up an opportunity to do so.
23  BY MR. COHEN:
24   **Q.**   But you don't remember having any
25  thoughts about the reasonableness one way or the

82

1  other of --
2    **A.**   **No.**
3    **Q.**   -- of the 15 minutes notice?
4    **A.**   **No.**
5    **Q.**   Okay.  Do you think it would have been
6  more reasonable to send Professor Fagal an advanced
7  note stating that you would like to meet with him
8  about the video; you know, provide it more in advance
9  than 15 minutes?
10         MS. PEET:  Objection to the form.
11         THE WITNESS:  I can't put myself
12         back in a moment of time five years ago
13         and answer a hypothetical question.
14  BY MR. COHEN:
15   **Q.**   Okay.  In your history as President of
16  the University, Professor Fagal is not the first
17  employee that has been disciplined, correct?
18         MS. PEET:  Objection.
19  BY MR. COHEN:
20   **Q.**   I'm not asking for names.  But he's not
21  the first employee you can ever remember
22  disciplining, correct?
23         MS. PEET:  That she personally
24         disciplined --
25         MR. COHEN:  Yes.

83

1         MS. PEET:  -- or Marywood
2         University disciplined?
3  BY MR. COHEN:
4    **Q.**   Either one.
5    **A.**   **There are cases and there are**
6  **processes.  There are all sorts of different elements**
7  **within a University that reach the President in very**
8  **different ways.**
9    **Q.**   Okay.  But even as this was going on
10  there was disciplinary -- there were disciplinary
11  proceedings with a Professor named Palmiter, right?
12   **A.**   **I really -- we're talking about --**
13         MS. PEET:  Yeah, I'm going to
14         object to this line of questioning,
15         outside the scope of discovery.  This is
16         a breach of contract issue between Dr.
17         Fagal and Marywood University.  What
18         happened or didn't happen with other
19         Professors of the University bear no
20         relevance.
21  BY MR. COHEN:
22   **Q.**   Well, let me ask you this; was it
23  common -- and I do need an answer to this question.
24  I don't need names.  But would it be fair to say that
25  Professor Fagal was not the first Professor that

84

1  you'd have met with regarding a disciplinary matter
2  of that Professor?
3         MS. PEET:  Same objection.  You
4         can answer.
5         THE WITNESS:  Can you say that
6         again?  I didn't really hear the last
7         part of that question.  Is it fair to
8         say what?
9  BY MR. COHEN:
10   **Q.**   Let me -- I can make it more clear.
11         Have you ever met -- Prior to the
12  meeting with Professor Fagal on January 23rd, 2012,
13  had you ever met personally with another Professor
14  regarding whether that Professor should be
15  disciplined?
16         MS. PEET:  Again, objection.  This
17         is completely outside the scope of
18         discovery.  This is a breach of contract
19         issue between -- the contract at issue
20         is between Dr. Fagal and Marywood
21         University.  What had or had not
22         happened with other Professors at the
23         University bear no relevance on the
24         claims, damages or defense in this
25         matter.

1    MR. COHEN:  Are you directing your
2  client not to answer?
3    MS. PEET:  I am.  At this point I
4  am.
5  BY MR. COHEN:
6    Q.    Was it common or routine to provide an
7  employee that you were considering disciplining
8  approximately 15 minutes notice before meeting with
9  them?
10    MS. PEET:  Objection to the
11  question.  You can answer.
12    THE WITNESS:  I wanted to talk to
13  Dr. Fagal, and this was the way in which
14  it was arranged so that I could meet
15  with him directly because of the
16  importance of this matter, and that was
17  the circumstances under which it
18  occurred.
19  BY MR. COHEN:
20    Q.    I understand that that's what happened.
21  My question was different.  Was it -- Was this
22  standard operating procedure to provide a Professor
23  that you were considering disciplining with only
24  15 minutes notice of meeting with you?
25    MS. PEET:  Objection to the form.

1  BY MR. COHEN:
2    Q.    I don't think you've answered yet, I
3  mean.
4    **A.    I guess what I would say is, is in my**
5  **experience as President, this was a circumstance that**
6  **rose to a level that I had not experienced.  And I**
7  **was attempting to deal with it in a proactive way**
8  **that would enable me to deal with something of this**
9  **magnitude.  And that's what this refers to.**
10    Q.    I understand that.  But I still don't
11  think you've answered the question, and I think I'm
12  entitled to an answer.
13    **A.    Well, then can you rephrase it in a way**
14  **that I'm able to understand what it is you're trying**
15  **to evoke as a response?**
16    Q.    I'm not looking for any particular
17  response.  I just want an answer to the question,
18  which is was it routine or standard to provide only
19  15 minutes notice to an employee of a meeting with
20  you, who you were considering disciplining?
21    MS. PEET:  Objection to the form,
22  asked and answered.  She already said
23  this was a very unique experience she
24  never dealt with before.
25  BY MR. COHEN:

1    Q.    I believe it was asked, it wasn't
2  answered.
3    **A.    It was an event that was -- I've never**
4  **had an event like this, this was a one-time event.**
5    Q.    So the answer would be no, not --
6    MS. PEET:  It's asked and
7  answered.  You might not like what she
8  testified to, but the question has been
9  asked and answered to its completion.
10  BY MR. COHEN:
11    Q.    Did you deliberately give Professor
12  Fagal only 15 minutes notice of the meeting, as
13  opposed to a longer period of time; was that like a
14  specific thing you were planning?
15    MS. PEET:  Objection to the form.
16  You can answer.
17    THE WITNESS:  It was appropriate
18  for Dr. Foley to contact Dr. Levine[sic]
19  to ask him to come to see me, that's how
20  it worked out.
21  BY MR. COHEN:
22    Q.    Okay, that's still not an answer to the
23  question.  Do you remember specifically choosing to
24  only give a short amount of notice to Professor Fagal
25  of this meeting?

1    MS. PEET:  Objection to the form
2  of the question, but you can go ahead
3  and answer.
4    THE WITNESS:  You know, honestly,
5  I don't remember all of the nuances of
6  timing here.  I just knew my goal was to
7  spend time with Dr. Fagal, and that, you
8  know, the appropriate person to let him
9  know I wanted to see him was Dr. Foley.
10  And, you know, I don't remember spending
11  time thinking about time elements.
12  BY MR. COHEN:
13    Q.    Okay.  Can you state in as much detail
14  as you can what was stated at that meeting, including
15  you, Professor Fagal, anyone else at that meeting?
16    **A.    Well, I know that when I asked Dr.**
17  **Foley and Dr. Dunleavy to come to that meeting, it**
18  **was not really to participate in the meeting.  I just**
19  **felt that as Dean, you know, Dr. Foley's presence was**
20  **important.  And Dr. Dunleavy as Associate**
21  **Vice-President for H.R. was present, and then I asked**
22  **her to take notes so I would have a record of the**
23  **meeting.**
24    Q.    I understand.  But you were at the
25  meeting?

1    **A.**    I was at the meeting, and I led the

2    meeting.

3    **Q.**    So, presumably, you know in some part

4    at least what was said and what wasn't said at the

5    meeting?

6    **A.**    Oh, I definitely do, yes.

7    **Q.**    Can you --

8    **A.**    I can do that.

9    **Q.**    Can you recount that as best you can?

10    **A.**    Yes.

11    **Q.**    And preferably in chronological order.

12    I realize --

13    **A.**    I shall try.  I shall try.  This is

14    five years ago, but I shall try.

15    **Q.**    And I'm not asking you -- I do not

16    expect verbatim -- a verbatim accounting.

17    **A.**    I'll give you my memory.

18    **Q.**    Okay.

19    **A.**    Dr. Fagal came into the meeting, and I

20    greeted him.  And it was held in my conference room,

21    which is right off the President's office.  And I got

22    -- I introduced the topic of the videos, and I asked

23    him -- I remember asking him if he had been the

24    author of these videos, and he said yes.

25        And then I -- you know, for me these

1    videos were a violation of the responsibilities of a

2    tenured Professor.  So I asked him to explain to me

3    how these videos related to or supported his role as

4    a tenured Professor at Marywood University, and he

5    did not answer that.  And I know that I waited.  I

6    think I asked the question a few different ways, and,

7    you know, he didn't answer that.

8        I remember that he started at one point

9    to talk about posters.  I said, I'm not here to talk

10    about posters, this is about the videos.  I am

11    wanting to know about these videos.  And, you know,

12    again he didn't answer.

13        I said -- I remember, you know, because

14    I had prepared for this meeting, and I looked at a

15    lot of the policies that are related to the faculty

16    and the personnel.  And to me this was a violation, a

17    breach of what it means to be a tenured Professor at

18    Marywood, and that doing this violated -- because it

19    talks about upholding the mission and values of the

20    institution very clearly in the description of what

21    that tenure means.

22        And when I related that question

23    again -- there were several times that, you know, I

24    gave him the opportunity to talk about that.  I

25    mentioned that -- again, I started to talk about the

1    violation, that I felt in addition to the tenure that

2    for me this was a violation of the civil rights of my

3    colleagues, especially Dr. Levine, who is Jewish.

4    And, you know, implicating family members; I spoke to

5    discrimination and collegiality.

6        I referenced academic freedom, because

7    in our academic freedom policy it's very, very clear

8    that one exercises academic freedom in accord with

9    the propriety of the discipline professionally, with

10    due respect to the opinions of others.  And, you

11    know, there certainly wasn't anything scholarly about

12    these videos, they were defaming people.

13        So I was trying to just say just look

14    at all of the things that are involved here.  I

15    talked about the professional ethics policy that we

16    have at the University that talks about, you know,

17    non-discrimination and collegiality, and various

18    other elements.

19        I was also concerned about our computer

20    use, use of computers, because this video was sent to

21    faculty members at their Marywood address.  And I

22    believe there were students, because I know students

23    had also seen it.

24        And then, you know, when you think

25    about the mission and the core values, you know,

1    foundational to all of our core values is respect,

2    and I talked about that at that meeting.  And, you

3    know, I remember at one point just saying, "Why did

4    you do this?"  And the only answer I remember was Dr.

5    Fagal said, "Justice."  And I thought well, you know,

6    look at all these other areas, you know.  When you're

7    talking about tenure, civil rights, or professional

8    ethics, or use of computers, appropriate use of

9    computers, you know, for something that flies in the

10    face of what we stand for.  I was just trying to have

11    a basic conversation about that.

12        At one point I know Dr. Fagal was

13    getting ready to leave, and I said, "I'm not

14    finished."  "This is our opportunity to talk about

15    this."  And he did not leave, you know, he stayed

16    there.

17        And when I didn't get, you know,

18    anything -- there was no, you know, I'm sorry I did

19    it, or I wish I didn't do this, or, you know, no

20    effort to say, oh, I didn't think about the impact

21    this might have on Alan Levine, or on anybody else,

22    there was none of that.

23        There was this, you know, continued

24    resistance to giving me any explanation that would

25    carry any sway as to in any way make me think that

93

1  this wasn't, you know, a spur of the moment, or
2  ill-conceived, or something that I really didn't mean
3  to do, or none of that ever -- there was nothing like
4  that that came out in that meeting.
5          So I went on and I said, all right,
6  you're suspended.  And that means that you turn in
7  your keys.  And, you know, I asked to verify as this,
8  you know, says, your home address, a way in which I
9  could reach him, and that there would be follow-up.
10     Q.    Okay.
11     A.    That's the basis probably of my -- but
12  there was at no time in any way, any effort on Dr.
13  Fagal's part to any way say that he regretted doing
14  it, or that he thought -- you know, would look at it
15  another way, or would do anything in the future to
16  make up for this, or anything like that, anything of
17  that nature.  So he left after I said that.
18     Q.    At what point in the meeting did you
19  actually state that to Professor Fagal, you're
20  suspended; was it towards the end, middle, beginning?
21     A.    Oh, it certainly wasn't at the
22  beginning, because in the beginning I was trying to,
23  you know -- it was probably at the end, you know.  I
24  can't give you an absolute sequence, again, five
25  years ago, but I know that's where I got to, because

94

1  that's what I felt this action -- I think it was of
2  such magnitude that this was the -- there needed to
3  be a consequence for it.
4      Q.    Isn't it true that -- okay.  So you
5  testified that you provided Professor Fagal with an
6  opportunity to explain the nature of the video,
7  correct?
8      A.    Several times.
9      Q.    And isn't it true that Professor Fagal
10  did attempt to explain the larger context of the
11  video, but he was cut off?
12     A.    I don't think that's a fair
13  characterization.  Dr. Fagal started to talk about
14  posters.  And I said, we're not here to talk about
15  the posters.  This is what we're here to talk about,
16  the videos.  And the videos are what was done that
17  was a total affront to all that Marywood stands for,
18  that's what I was there to talk about.
19     Q.    But wasn't it true that the video was
20  related to the posters?
21          MS. PEET:  Objection, lack of
22  competency.
23          THE WITNESS:  The videos were a
24  gratuitous extension of whatever was the
25  rationale for whatever Doctor's behavior

95

1  was.  I don't know, I can't get guess
2  that.  I was reacting to the videos as
3  President, because of the impact on the
4  total University, the impact on our
5  students, the impact on our Cabinet, and
6  the impact on all that we stand for.
7  BY MR. COHEN:
8      Q.    Isn't it also true that Professor Fagal
9  at the meeting stated that he would like an
10  opportunity to craft a written response to your
11  questions?
12     A.    That may have happened, yes.
13          MR. COHEN:  Can we mark this as
14  Munley 8.
15          (At this time, Munley Deposition
16          Exhibit 8 was marked for
17          identification.)
18  BY MR. COHEN:
19     Q.    And, Sister, do you recognize this
20  document that is in front of you?
21     A.    I don't think so.  They're notes,
22  obviously.
23     Q.    Is this your handwriting?
24     A.    No.
25     Q.    Do you recognize this as Dr. Dunleavy's

96

1  handwriting?
2      A.    It's probably that, yes; dot the I's.
3  Okay.
4      Q.    I'm sorry?
5      A.    Yeah, I think it is Dr. Dunleavy's,
6  yes.
7      Q.    But you've never seen this before?
8      A.    I don't recall this.
9      Q.    Okay.  Does this appear to you to be
10  Dr. Dunleavy's, you know, contemporaneous notes of
11  the January 23rd, 2012 meeting?
12          MS. PEET:  Objection, that would
13          call for speculation.  She just
14          testified she doesn't recall this.  But
15          you can go ahead an answer, if you know.
16          THE WITNESS:  It looks like the
17          flow of the meeting.
18  BY MR. COHEN:
19     Q.    Okay.  Do you see on the first page,
20  about three-quarters of the way down it says, "F -
21  writing - he'll craft response"?
22     A.    See, I don't know what that means,
23  he'll craft that, because I don't recall the elements
24  of that.
25          MR. COHEN:  Okay.  In that case,

97

1    let's move on to a new document.

2    BY MR. COHEN:

3        Q.    Do you know if there is any audio or

4    video recording of the meeting?

5        A.    No, I never do that.

6        Q.    You never do that you said?

7        A.    I don't.  I know there would not have

8    been an audio or video recording.

9        Q.    And is it true that there was another

10   individual named David Elliott in the Presidential

11   suite at the time of this meeting?

12       A.    Yes, there was.

13       Q.    Was he listening in?

14       A.    No.

15       Q.    Was he just like in the next room?

16       A.    I don't know exactly where he was.

17   But, you know, when I have meetings of this nature I

18   never know what dynamic is going to occur.  So I

19   think that was standard, you know, policy of having

20   somebody accessible in the event that any assistance

21   would be needed; and I didn't, no.

22       Q.    So other than you, Mr. Foley --

23       A.    Dr. Foley.

24       Q.    -- Dr. Foley, Dr. Dunleavy and

25   Professor Fagal, you don't know of any other

98

1    witnesses to the meeting?

2        A.    Absolutely nobody else, no.

3        Q.    And I'm not suggesting any, I just want

4    to -- for discovery purposes I want to make sure I

5    cover all the bases.

6        A.    Yes, right.

7        Q.    So the suspension happened -- This

8    meeting happened in the morning of January 23rd,

9    2012, right?

10       A.    Yes, 9 o'clock, yes.

11       Q.    And at the time -- and you did suspend

12   him during the meeting?

13       A.    I did.  And I suspended him with pay.

14       Q.    Right.  At the time that you suspended

15   Professor Fagal, did you feel like he posed immediate

16   harm to himself or to others if he continued to serve

17   in his position?

18       A.    The harm for me was the harm to the

19   institution, to its mission, to the values, to the

20   identity, the whole purpose for which we exist; I

21   felt it was egregiously offended, that was the harm.

22            And I think I said earlier that, you

23   know, like harm to Dr. Fagal, that he would harm

24   himself did not enter into my mind, that's not in my

25   realm of memory.

99

1        Q.    Did it occur to you that he might be --

2    that he might be a physical threat to someone else

3    other than himself?  Do you remember thinking about

4    that?

5        A.    You know, I don't explicitly recall

6    that.  But, you know, I know that I did take the

7    precaution of having somebody available in the event

8    that there would be any action.

9        Q.    Okay.  So the harm that you think was

10   created by Professor Fagal's video was more of a --

11   you would characterize it as an assault on the values

12   of the University?

13       A.    I think on everything we stand for.

14   That was from my first moment I felt this is just

15   totally a gratuitous, egregious assault on everything

16   that Marywood stands for, and thus affects everybody

17   in the institution.  And explicitly I was very, very

18   upset because of the, you know, personal nature of

19   the attacks, which were not professional in any way,

20   shape or form.  It's not the role model.  It's not

21   what we expect of a tenured Professor at Marywood.

22   And that to me was very harmful.  It's harmful to the

23   profession.  It's harmful to the discipline.  I'm a

24   social scientist.  I think it's harmful to all the

25   disciplines related to, you know, the professional

100

1    level of what is expected.

2        Q.    Did you think that the harm was

3    irreparable, or maybe with time it would pass to the

4    institution?

5        A.    I saw no indication in the time of this

6    meeting that there was anything on Dr. Fagal's part

7    that would indicate a desire to relook at the

8    situation, to say I'm sorry I did it, or, you know,

9    this is not what I intended.  There was nothing that

10   that absolutely.  And so much so that at the very end

11   I remember -- it's always my nature when I'm in a

12   dialogue such as this to go back, "Is there anything

13   further that you want to say?"  I do that repeatedly

14   in meetings.  And there was never anything that

15   indicated to me in the course of that meeting that

16   there was any sense even that -- nothing was

17   communicated to me that there was even awareness that

18   anything that had been done had been offensive.  I

19   found that also quite shocking.

20       Q.    Between the posting of the videos, the

21   time that the videos were posted and the time you

22   suspended Professor Fagal, are you aware of anybody

23   at Marywood taking special security precautions with

24   regard to him, other than Mr. Elliott in the next

25   room during the meeting?

1      A.   **I don't recall anything like that.**

2      Q.   Do you know whether Professor Fagal was

3   under some type of monitoring or surveillance?

4           MS. PEET:  Objection to the form.

5           THE WITNESS:  I'm not aware of

6      anything like that.

7   BY MR. COHEN:

8      Q.   Do you know whether his University

9   office was searched prior to the suspension?

10     A.   **I'm not at all aware of that.**

11     Q.   Do you know whether -- Did he have a

12  University computer, do you know?

13     A.   **Every -- yeah, every faculty, all the**

14  **offices are University.**

15     Q.   Do you know whether Professor Fagal's

16  computer was searched?

17     A.   **Nothing to my knowledge like that ever**

18  **happened.**

19     Q.   Do you know if anyone at the University

20  informed the police about Dr. Fagal?

21     A.   **I'm not aware of that.  I don't recall**

22  **anything like that.**

23     Q.   Do you remember on the next day -- The

24  suspension happened on January 23rd, correct?

25     A.   **Um-hum.**

1      Q.   On the next day, January 24th, do you

2   remember sending through your secretary a statement

3   of the charges to Professor Fagal?

4      A.   **Yes.**

5      Q.   And in that statement of charges, do

6   you remember stating that you were recommending that

7   Professor Fagal be terminated?

8      A.   **Um-hum.**

9           MS. PEET:  Your answer is yes.

10          THE WITNESS:  Oh, pardon me, yes.

11     I'm sorry.

12          MS. PEET:  That's okay.

13          THE WITNESS:  Yes, I do.  I

14     remember that letter, because that was

15     deeply considered.  I mean, I didn't --

16     it reflected the elements that I felt

17     were very important, yes.  And it was my

18     recommendation knowing that, you know,

19     I was open to having that reviewed.

20  BY MR. COHEN:

21     Q.   Do you know when that first statement

22  of charges was drafted?

23     A.   **I can't tell you exactly, but it would**

24  **-- it was -- I know that the letter was prepared the**

25  **next day.  I did it the next day.**

1      Q.   Was it begun -- Was the letter begun

2   before the January 23rd, 2012 meeting?

3      A.   **I don't recall that.**

4      Q.   Okay.  Is there anything in your mind

5   that Professor Fagal could have said at the

6   January 23rd, 2012 meeting that could have led to you

7   not pursuing termination?

8           MS. PEET:  Objection, calls for

9      speculation.  You can answer.

10          THE WITNESS:  It's hard for me to

11     revisit that.  The reason that I had the

12     meeting was to give him an opportunity

13     to speak to it, and repeatedly asked him

14     to do it, but he didn't.

15  BY MR. COHEN:

16     Q.   But, again, you said you think that he

17  asked to draft a written response to your questions;

18  am I right?

19          MS. PEET:  Objection, asked and

20     answered.  You don't have to answer it

21     again.

22          MR. COHEN:  Are you directing her

23     not to answer?

24          MS. PEET:  Yeah, it's already on

25     the transcript.

1           THE WITNESS:  I already answered

2      that.

3           MR. COHEN:  Let's mark this as

4      Munley 8 -- 9.

5           (At this time, Munley Deposition

6           Exhibit 9 was marked for

7           identification.)

8   BY MR. COHEN:

9      Q.   Briefly could you review this and let

10  me know if you recognize it?

11     A.   **What date is this?  The 23rd, okay.**

12  **This talks about --**

13          MS. PEET:  There's no question.

14          THE WITNESS:  Oh, I'm sorry, I

15     thought you asked a question.

16  BY MR. COHEN:

17     Q.   You do recognize this document?

18     A.   **Yes, it was sent to me.**

19     Q.   This is an e-mail from Patricia

20  Dunleavy to you, dated January 23rd, 2012 --

21     A.   **Right.**

22     Q.   -- at 6:22 p.m., right?

23     A.   **That's the time that's on here, yes.**

24     Q.   Okay.  And Dr. Dunleavy states, "Will

25  had an appointment over lunch; we will finish up the

105

1  Fagal statement of charges and the response to
2  Palmiter re his appeals and the appointment of the
3  committee when he gets back this afternoon." So does
4  this refresh your recollection of the approximate
5  time when the statement of charges began the drafting
6  stage? I mean, this is 6:22 p.m.
7      **A.    Well, it says it's after the meeting.**
8  **We met at 9 o'clock in the morning, so it indicates**
9  **that it was after the meeting. I know that I did the**
10 **letter the next day.**
11     **Q.    Right. Was your plan to terminate**
12 Professor Fagal no matter what he said at the
13 January 23rd, 2012 meeting?
14         MS. PEET: Objection, asked and
15     answered.
16         THE WITNESS: You've asked me that
17     several ways.
18 BY MR. COHEN:
19     **Q.    Excuse me?**
20     **A.    You've asked me that several ways. I**
21 **had determined to suspend. I had that meeting. Then**
22 **I began to move toward termination.**
23         MR. COHEN: Can you mark this
24     Munley 10, please.
25         (At this time, Munley Deposition

106

1         Exhibit 10 was marked for
2         identification.)
3  BY MR. COHEN:
4      **Q.    And, Sister, do you recognize this**
5  document?
6      **A.    Yes. Yes, these are the notes of the**
7  **meeting.**
8      **Q.    Whose notes are these?**
9      **A.    These are Dr. Dunleavy's notes. I**
10 **asked her to take notes.**
11     **Q.    And at the end there are two**
12 signatures, right?
13     **A.    That's correct.**
14     **Q.    Yours is not among them, correct?**
15     **A.    That's right. Dr. Dunleavy and Dr.**
16 **Foley.**
17     **Q.    Okay. Why didn't you sign this as**
18 well?
19     **A.    I don't know. It reflects my memory of**
20 **the meeting.**
21     **Q.    On the first page do you see the**
22 paragraph that begins, "Dr. Fagal said he was leaving
23 the meeting"?
24     **A.    Um-hum.**
25     **Q.    And then it says, "Sister Anne said she**

107

1  was not done; and told Dr. Fagal that this was his
2  opportunity to address the issue as she considers her
3  response. Dr. Fagal said that if she would put her
4  questions in writing he would craft his response."
5  Does that refresh your recollection of whether --
6      **A.    I didn't agree to put questions in**
7  **writing. This was the context in which this dialogue**
8  **was to occur.**
9      **Q.    There would be no other opportunity?**
10         MS. PEET: Objection.
11 BY MR. COHEN:
12     **Q.    You can answer.**
13     **A.    I was asking for the information at**
14 **this meeting.**
15     **Q.    Given the short notice that was**
16 provided to Professor Fagal, did you think it was
17 reasonable for him to address your questions in
18 writing?
19         MS. PEET: Objection to the form
20     of the question. You may answer.
21         THE WITNESS: I felt that Dr.
22     Fagal as a Professor, and as an
23     extremely well-educated, and articulate
24     person, would in a direct conversation
25     be more than adequately able to address

108

1  questions and answer them appropriately.
2  He is an academic.
3         MR. COHEN: Can we have this
4     marked as Munley 11, please.
5         (At this time, Munley Deposition
6         Exhibit 11 was marked for
7         identification.)
8  BY MR. COHEN:
9      **Q.    And, Sister, do you recognize this**
10 document?
11     **A.    Yes, this is my letter of January 24 of**
12 **2012 to Dr. Fagal.**
13     **Q.    The first page, that is an e-mail from**
14 --
15     **A.    Something is cut off on the bottom of**
16 **the first page.**
17     **Q.    We'll get there.**
18     **A.    Oh, okay.**
19     **Q.    The first page is an e-mail, though,**
20 from your secretary to Dr. Fagal, correct?
21     **A.    That's my secretary, yes. And it**
22 **included all of the things that I had referred to.**
23     **Q.    And so this is your first statement of**
24 charges, correct, to Dr. Fagal?
25     **A.    Yes.**

109

1    **Q.**   And it was sent to him on January 24th,
2    2012, at 1:11 p.m.?
3    **A.**   **That's what it says, yes.**
4    **Q.**   And in the letter you are recommending
5    Professor Fagal's -- that he be terminated
6    immediately?
7    **A.**   **Um-hum.**
8    **Q.**   Correct?
9    **A.**   **It says, "Your tenure and employment be**
10   **terminated immediately," yes.**
11   **Q.**   Between the time that Professor Fagal
12   was suspended and the time that this letter was sent,
13   did Marywood take any remedial actions with regard to
14   Professor Fagal?
15           MS. PEET:  Objection to the form
16   of the question.
17           THE WITNESS:  There were -- There
18   was nothing in the conversation with Dr.
19   Fagal that indicated there was any
20   looking toward remediating -- What do I
21   want to say?  What's the word?  There
22   was no remorse.  There was no desire to
23   seem to, you know, look at it another
24   way, nothing occurred of that nature.
25   So, no, this was a matter of the next

110

1    day.
2    BY MR. COHEN:
3    **Q.**   So you said, no, this was a matter of
4    the next day?
5    **A.**   **The letter was on the 24th.**
6    **Q.**   Yes.  And no, you're referring to no
7    there was no remedial actions taken with regard to
8    Professor Fagal?
9    **A.**   **There was no indication at the meeting**
10   **that I had with him that there was any possibility of**
11   **our moving toward anything that was remediation.**
12   **Q.**   I understand that.  But the question --
13   Whether there was an opportunity for remediation,
14   that's a different question.  I want to just be
15   clear.  There was no remedial action taken by
16   Marywood University from the time of the suspension
17   to the time of this letter, correct?
18   **A.**   **The answer to that is no.**
19   **Q.**   Do you remember at the end of all the
20   proceedings with Professor Fagal, the last letter you
21   wrote to him terminating him, do you remember that as
22   being around July 2012?
23   **A.**   **You know, I don't.  I can't give you**
24   **months.  I know that it took -- there were various**
25   **correspondence, because you sent correspondence, and**

111

1    we sent correspondence.  There was a lot of back and
2    forth.  So, you know, if there's a document that is
3    dated July and has my signature, I would say it came
4    from me.
5    **Q.**   Ultimately you did write him a letter
6    at some time saying it's over, you're done, right?
7            MS. PEET:  Object to the
8    characterization.  You can answer.
9    BY MR. COHEN:
10   **Q.**   I mean, he's no longer employed by
11   Marywood University, correct?
12   **A.**   **There were many intermediary steps.  I**
13   **offered the possibility of, you know, having my**
14   **decision reviewed, this offer was made.  I believe**
15   **that in this January 24th document one of the items**
16   **listed here was a release.  And that in addition to**
17   **all the policies that are indicated here included --**
18   **okay, yeah, on the very last page, in order to give**
19   **-- I also believe in due process, and so I was giving**
20   **Dr. Fagal an opportunity to have my recommendation**
21   **reviewed appropriately.  And sent a release so that I**
22   **would be authorized to give a faculty review**
23   **committee, comprised of tenured faculty, you know,**
24   **the documentation involved in this.  And this was**
25   **never signed (indicating).**

112

1    **And so I did this on the 24th, but then**
2    **later I know there was another letter in February**
3    **that I wrote.  I'm not sure of the sequencing of all**
4    **these letters.**
5    **Q.**   But in this letter that you're looking
6    at now, you're just recommending that he be
7    terminated.  He hadn't been terminated yet as of the
8    date of that letter, right?
9    **A.**   **And he was still being paid all the way**
10   **through August.  He was suspended, and I was**
11   **recommending the next step.**
12   **Q.**   Am I correct that in that letter you
13   were not terminating him yet, you were just
14   recommending it, correct?
15   **A.**   **"I am writing to inform you that I am**
16   **recommending that your tenure and employment be**
17   **terminated immediately."  And I talk about payment,**
18   **and benefits, all of that.**
19   **Q.**   Between the time that Professor Fagal
20   was suspended and the time that he was actually
21   terminated, whenever that was, did Marywood take any
22   remedial actions with regard to him?
23           MS. PEET:  Objection to the form.
24   Answer if you understand the question.
25           THE WITNESS:  We did not.

113

1    MR. COHEN:  Okay.  Should we take
2  a break so that we can order?
3    MS. PEET:  Why don't we just take
4  a quick break, look at the lunch menu
5  and we'll order.
6    THE WITNESS:  Can we finish with
7  this document before we break?
8    MR. COHEN:  I might be finished
9  with it -- I am finished with it, yes.
10   (At this time, 12:37 p.m., a brief
11   break was taken.)
12   MR. COHEN:  (12:43 p.m.)  Can we
13  have this marked as Munley 12.
14   (At this time, Munley Deposition
15   Exhibit 12 was marked for
16   identification.)
17  BY MR. COHEN:
18   Q.    And, Sister, do you recognize this
19  document?
20   A.    **I do.  This was -- one of the things**
21  **that I do, because it's -- you know, the nature of**
22  **this, termination of a tenured faculty member, I**
23  **reported it to the Board, and this was -- these were**
24  **the things that guided my conversation.  Actually, I**
25  **think this was to inform them about the video**

114

1  **basically, and then subsequently how it unfolded.**
2   Q.    I know there are several dates on this
3  document.  The last date is January 24th?
4   A.    **Yeah, I think that would have been --**
5  **well, I'm not sure when -- this was the chronological**
6  **piece of what -- you know, sort of what was my**
7  **talking to explain what happened from the 17th**
8  **through the 24th, yes.**
9   Q.    I'm just curious about whether you
10  remember the date of this Board meeting?
11   A.    **I don't, but I could probably find out.**
12  **I don't remember when it was, but I know that I had**
13  **gone to the Board.**
14   Q.    And this document, did you draft this?
15   A.    **Yes.**
16   Q.    And was it with help from anybody else?
17   A.    **I'm sorry, when you say was it**
18  **withheld --**
19   Q.    No, did you have anyone's assistance in
20  drafting this, or was it just you?
21   A.    **You know, I work so closely with Dr.**
22  **Dunleavy, I may have asked her to review this with**
23  **me.  But I know that I -- I remember working on this.**
24  **But, you know, it would be typical of me to have**
25  **assistance in Dr. Dunleavy working with me.**

115

1   Q.    Okay.  When you met -- When you did
2  meet with the Board, whenever that was --
3   A.    **Yes.**
4   Q.    -- did you have this document with you?
5  Would you have been referring to it as you're
6  speaking?
7   A.    **Yes, yes.**
8   Q.    Okay.  And --
9   A.    **Anything I call talking points, that**
10  **means it's something that I -- so I stay focused,**
11  **yes.**
12   Q.    So at this Board meeting, obviously the
13  Board was there?
14   A.    **Yes.**
15   Q.    You're a member of the Board, too?
16   A.    **I am an ex officio member of the Board.**
17   Q.    Was there anyone else at the meeting
18  that you remember, the Board meeting?
19   A.    **The total Board was there.**
20   Q.    Other than the Board and you, for
21  example, was Dr. Dunleavy there?
22   A.    **No.**
23   Q.    Would you say that these talking points
24  represent an accurate summary of what occurred with
25  regard to the University's handling of Professor

116

1  Fagal's videos between January 17th, 2012 and
2  January 24th, 2012?
3   A.    **I would say, yes, if -- yes.**
4   Q.    And I take it that these redactions,
5  you didn't do this, correct?
6   A.    **I didn't take them out, but that**
7  **probably, you know --**
8   Q.    Probably your Lawyers did?
9   A.    **Well, most likely because also as part**
10  **of what I did going forward, as I mentioned earlier,**
11  **I sought appropriate legal counsel.**
12   Q.    Right, and I don't want to -- I'm not
13  asking what's underneath these redactions, or at
14  least not yet.
15   MS. PEET:  For purposes of the
16   record, it was redacted by defense
17   counsel as part of attorney/client
18   privileged communication.
19  BY MR. COHEN:
20   Q.    Okay.  Is it -- When you spoke to the
21  Board about this, did you stick to your talking
22  points?
23   A.    **I typically do, yeah.  You know, I try**
24  **to be concise.  I mean, Board meetings are very comprehensive, and you want to make**
25  **meetings are very comprehensive, and you want to make**

117

1  sure that in the time you have that you convey the
2  information.  And the Board was really very receptive
3  to the information that I gave them.
4         Q.    Do you know if someone takes like
5  minutes of Board meetings?
6         A.    We do have minutes of Board meetings.
7  If this was -- if this were an Executive session,
8  there would not have been minutes of this.
9         Q.    Who normally takes these minutes?
10        A.    The recording secretary is the Attorney
11 of the University and the secretary of the
12 University.  But I don't recall if this was an
13 Executive session; it probably was, I don't know.
14        Q.    And the University's internal Counsel
15 is Ms. Patterson?
16        A.    That's Mary Theresa Patterson, Attorney
17 Mary Theresa Patterson.
18        Q.    Okay.  Other than stating that the
19 Board was very receptive to your information, do you
20 remember any other responses they gave to you?
21        A.    Yes, I do indeed.  The Board was just
22 appalled, astounded, offended; totally agreeing that
23 this was an egregious, counterproductive measure,
24 discriminatory.  I mean, they were really -- they
25 were taken back that a Professor at Marywood out of

118

1  our core values and identity and mission, just
2  thought it was also highly inappropriate.  They were
3  very offended.
4         Q.    Did the Board direct you to terminate
5  Dr. Fagal, or take any other disciplinary steps?
6         A.    I don't recall that.  I just know I had
7  the support for what I was doing from the Board.
8         Q.    Okay.  In these talking points that are
9  in front of you, on the third bullet point do you see
10 where it says, "Dr. Dunleavy began collecting
11 information"?
12        A.    Yeah, policy information.
13        Q.    And then the second sub point, "History
14 of Dr. Fagal's performance issues," correct?
15        A.    I didn't get into any -- I wasn't -- My
16 focus was on the videos.  I didn't deal with that.
17        Q.    So you didn't -- At this Board meeting
18 you didn't discuss performance issues?
19        A.    No, this is just detailing the steps.
20        Q.    When you drafted these talking points,
21 what performance issues were you referring to, other
22 than the video sent on January 12th, 2012, if any?
23        A.    Well, I wouldn't recall what that would
24 be, that would be a Dr. Dunleavy question.
25        Q.    Okay.

119

1         A.    I know that I was -- My goal in the
2  meeting with the Trustees was just to give them what
3  had occurred and what my actions were and why.
4         Q.    On Friday, January 20th, 2012, there's
5  a series of bullet points?
6         A.    Yes.
7         Q.    And one of them says, "Dr. Dunleavy
8  reviewed plan with Mr. Elliott (Senior Director for
9  Security & Safety)."  Do you see that?
10        A.    I do see that.
11        Q.    What plan was that?
12        A.    The only plan that I was aware of was
13 that he would be available in the event that we
14 needed somebody.
15        Q.    Available at the January 23rd
16 meeting --
17        A.    Yeah.
18        Q.    -- or available generally?
19        A.    Strikes me as the 23rd, I don't know
20 that there was anything beyond that.  You know, once
21 again, it's hard for me to recall all these details.
22        Q.    At the bottom of the first page there's
23 a sub bullet point, it says, "Sister Anne gave Dr.
24 Fagal repeated opportunities to explain his actions
25 with regard to the videos and how they supported

120

1  University policy."  And then you said, "Dr. Fagal's
2  only response was to review a November incident re
3  posters for a speaker."  Is that correct?
4         A.    Yes, he wanted to talk about the
5  posters.  And I said, look it, I'm here to talk about
6  the videos.
7         Q.    That's not -- This is not completely
8  accurate, though, because he ask for an opportunity
9  to craft a written response, correct?
10              MS. PEET:  Objection to the form.
11              THE WITNESS:  What I understood
12        Dr. Fagal was asking me is, give me your
13        questions in writing and I'll answer
14        them.  And I was saying, here I am,
15        let's talk.
16 BY MR. COHEN:
17        Q.    Now?
18        A.    Here I am, let's talk.  You're an
19 articulate person.
20        Q.    Okay.  So when you said Dr. Fagal's
21 only response, you meant his only response like at
22 the meeting itself contemporaneously?
23        A.    His only response when I would ask him
24 for an explanation the one time was to try to talk
25 about the posters.  And I said, look it, the

1  substance of this meeting is the videos.  I'm asking
2  you about the videos, that's what that line means.
3      Q.    You didn't want him to talk about the
4  posters?
5      A.    Well, you know, at that point what we
6  were there -- what I found was really the matter that
7  was at hand were those videos.
8      Q.    Okay.
9      A.    That to me was very serious, that's why
10  -- that's why it rose to the level of what it rose
11  to.
12      Q.    And on the next page, about halfway
13  down the page there's a sub bullet that says, "Sister
14  Anne reiterated that her concern was with the videos,
15  not the posters, and again asked Dr. Fagal if he had
16  an explanation for the videos; Dr. Fagal had nothing
17  to say."
18      A.    That's right.
19      Q.    But, again, that's not completely
20  correct, because he did ask for at least an
21  opportunity to draft a written response, correct?
22          MS. PEET:  Objection to the form,
23      mischaracterization of testimony.  You
24      can answer, if you can.
25          THE WITNESS:  That's not the

1  dynamic of the meeting.  The dynamic of
2  the meeting was around we're here, let's
3  talk.
4  BY MR. COHEN:
5      Q.    Okay.
6      A.    Repeatedly.
7          MR. COHEN:  Can we have this
8      marked as Munley 13, please.
9          (At this time, Munley Deposition
10      Exhibit 13 was marked for
11      identification.)
12  BY MR. COHEN:
13      Q.    Do you recognize this document, Sister?
14      A.    Yes, I do.  It's a letter from you to
15  me, right?
16      Q.    It looks like that to me.  You received
17  this from me, correct?
18      A.    Yes.
19      Q.    And this was on February 2nd, 2012?
20      A.    Right.
21      Q.    And in this letter, I'm essentially in
22  summary saying Professor Fagal is entitled to
23  progressive discipline.  This isn't progressive
24  discipline, blah, blah, blah, blah.  Is that
25  basically what I'm saying?

1          MS. PEET:  Objection, the letter
2      speaks for itself, but you can answer.
3          THE WITNESS:  I think this letter
4      speaks to your interpretation of what
5      you were advancing.
6  BY MR. COHEN:
7      Q.    Okay.  And did you actually read that
8  letter, or did someone on your staff read it?  How
9  does that work?
10      A.    I read the letter.  It's addressed to
11  me.
12      Q.    Right.
13          MR. COHEN:  And can we have this
14      marked as Munley 14.
15          (At this time, Munley Deposition
16      Exhibit 14 was marked for
17      identification.)
18  BY MR. COHEN:
19      Q.    And, Sister, do you recognize this
20  document?
21      A.    I really don't.
22      Q.    This is not your handwriting?
23      A.    No.
24      Q.    Again, do you think this is Dr.
25  Dunleavy's handwriting?

1      A.    Yes, I would think so.
2      Q.    So before today have you seen this --
3  had you seen this?
4      A.    I don't recall ever seeing this, no.
5          MR. COHEN:  Okay, let's move on to
6  -- We'll have this marked as Munley 14
7  -- 15, please.
8          (At this time, Munley Deposition
9      Exhibit 15 was marked for
10      identification.)
11  BY MR. COHEN:
12      Q.    And, Sister, do you recognize this
13  document?
14      A.    I do.  This is -- yes, this was the
15  February 8th letter to Dr. Fagal, and it indicates
16  all of the charges.
17      Q.    This is a revised statement of charges,
18  correct, Sister?
19      A.    It's a follow-up to that other January
20  letter that we made reference to earlier, and this
21  lays everything out, and the policies are attached.
22      Q.    At the end --
23      A.    And, again, the form is to allow me to
24  bring in a review committee.  This was the second
25  time it was offered.  Yeah, it's on the back.

125

1    **Q.**    And this is your signature on the
2    letter, right?
3        **A.    Of course, yes.**
4        **Q.**    And on the first page of the letter --
5    the first page is the e-mail attachment letter,
6    right?
7        **A.    Yes, that would be my secretary's**
8    **reference.**
9        **Q.**    And so the next page is the first page
10   of your actual letter?
11       **A.    Correct.**
12       **Q.**    The second sentence says, "As a result
13   of your breach of a material term of your obligations
14   as a tenured Professor, I am recommending that your
15   tenure and employment with Marywood be terminated
16   immediately."  Did I read that correctly?
17       **A.    That is correct.**
18       **Q.**    And what did you mean by a material
19   term?
20           MS. PEET:  Objection.  You can
21   answer.
22           THE WITNESS:  I think that's a
23   legal expression.  What it means to me
24   is that the responsibility of being a
25   tenured Professor at Marywood was

126

1    violated; that in fact that Dr. Fagal
2    violated what's expected of a tenured
3    Professor.  That's the breach of the
4    tenure agreement, and it talks about the
5    mutual commitment deep and binding on
6    the faculty member as much as it is on
7    the University.  Suggests a strong
8    acceptance by that individual of the
9    mission, and core values and objectives.
10   I mean, this alone could have been
11   grounds for termination; however, I
12   added all of the other elements of the
13   policy that were violated, and
14   indicating why.
15           And then, you know, also, once
16   again, offering the opportunity to give
17   -- I had come to the conclusion of
18   termination, offering Dr. Fagal the
19   opportunity to have my decision reviewed
20   by appropriate tenured faculty, and that
21   was attached to this.
22   BY MR. COHEN:
23       **Q.**    And which material term precisely did
24   you think that Dr. Fagal was violating?
25           MS. PEET:  Objection, calls for a

127

1    legal conclusion.  You can answer, if
2    you know.
3           THE WITNESS:  I would have that
4    defined by legal counsel, defer to legal
5    counsel for elaboration of that.
6    BY MR. COHEN:
7        **Q.**    Okay.  On Page 2 of the letter --
8        **A.    Yes.**
9        **Q.**    -- you write, "Depicting the
10   University's President," do you see that line?
11       **A.    I do.**
12       **Q.**    "Depicting the University's President
13   as Adolf Hitler, a man who is responsible for
14   torturing and killing in excess of 6 million people
15   simply because they are Jewish is an intentional,
16   malicious and blatant violation of your tenure
17   commitments.  Portraying other University officials
18   as Nazi leaders, using crude and vulgar language and
19   belittling University officials also violates your
20   agreement with Marywood."  Did I read that correctly?
21       **A.    Yes, that's exactly what that says.**
22   **"You gravely injured our community by your actions."**
23       **Q.**    Having watched the video, did you
24   really believe that Professor Fagal was actually
25   depicting you as Adolf Hitler?

128

1        **A.    Yes.**
2        **Q.**    That he was --
3        **A.    It said you're a -- you know,**
4    **repeatedly I was the Führer.**
5        **Q.**    But did you actually think that he was
6    in any way likening you to Adolf Hitler?
7        **A.    What would one think when you saw the**
8    **video?**
9        **Q.**    Well, I'm asking you.
10       **A.    Well, of course I thought, I mean, you**
11   **know, my name was attached to it, certainly.**
12       **Q.**    Did you think that Professor Fagal was
13   saying that like Hitler you would kill 6 million
14   people?
15       **A.    To compare me to Hitler I thought was**
16   **an extreme violation of anything to do with the**
17   **mission and core values of Marywood, and I took great**
18   **exception to it.  And, again, the whole**
19   **discriminatory aspect with regard to Dr. Levine was**
20   **of grave concern to me.**
21       **Remember, I have spent much of my life**
22   **working directly with people who have been on the**
23   **other end of dictatorships.  And so, you know, I**
24   **found it extremely offensive to be compared to Hitler**
25   **in any way, shape or form.  And as an IHM Sister, I**

129

1  thought it was an affront to our Congregation.  We

2  have served the poor since we were created in 1845,

3  and established institutions to educate and develop

4  potential, because we're about empowering, not about

5  tearing down and destroying.  And certainly value of

6  life, the value of life is a prime value.

7          So, yes, I feel that for a tenured

8  Professor at Marywood University to compare the

9  President of the University to Adolf Hitler, and to

10 take the Executive Officers and to portray them as

11 collaborators in an atrocity is certainly a violation

12 of anything that it means to be a professional

13 academic with tenured status in a Catholic

14 faith-based institution.

15     Q.     Your interpretation of the video is

16 that Professor Fagal accused various members in the

17 Marywood administration as having collaborated in an

18 atrocity?

19     A.     He belittled --

20          MS. PEET:  Objection,

21     mischaracterization of testimony.

22 BY MR. COHEN:

23     Q.     Did you in any way recognize, or

24 consider, let's say that, that this video was satire?

25     A.     This was not -- for me this was not

130

1  satire.  This was a blatant affront to what all we

2  stand for.

3      Q.     And at some point did you come to learn

4  that this video was actually an adaptation of a real

5  movie that other people had made satires about?

6      A.     I don't recall even, you know, pursuing

7  any thought about satire.  I know it was on YouTube.

8  I know people were looking at it, but to me the video

9  was the video.

10     Q.     I guess my question is; did you know

11 that apart from what you think about the video, that

12 many people have taken -- had taken that film and

13 added their own subtitles to it?  And there are many

14 Hitler parodies just like this on YouTube, did you

15 know that?

16     A.     It has no bearing on what we're talking

17 about.

18          MS. PEET:  Objection, lack of

19     foundation.

20          MR. COHEN:  I'm asking if she

21     knows.

22          MS. PEET:  No, the question was

23     there are many Hitler videos out there.

24     That's your testimony.  There is no

25     foundation for that.

131

1  BY MR. COHEN:

2      Q.     I'm asking if she is aware that this is

3  one of many Hitler parodies?

4      A.     I don't -- I don't follow Hitler

5  whatever, anything to do with Hitler, sorry.

6      Q.     Okay.  Let's stay on Page 2 of this

7  letter.  There's a heading where it says, "2.

8  Violation of Civil Rights Policy."

9      A.     Right.

10     Q.     And here you're charging Professor

11 Fagal with what it says, a violation of civil rights,

12 correct?

13     A.     Discrimination.  Marywood does not

14 condone and will not tolerate discrimination,

15 harassment, et cetera.  That's from our policy.

16     Q.     And did you really believe that

17 Professor Fagal's video was a civil rights issue?

18     A.     I think it was harassment.  It was an

19 example of discrimination and harassment.

20     Q.     How was it an example of

21 discrimination?

22     A.     Dr. Levine is Jewish.  And I think

23 that, you know, to have a colleague belittled in that

24 way to me is harassment.

25     Q.     Does --

132

1      A.     And, you know, again, it also goes on

2  further to talk about personal attacks.  I felt there

3  were personal attacks.  And it was really to bring in

4  the family members in the way in which that was done,

5  I thought that was demeaning, discriminating,

6  harassing behavior.

7      Q.     Okay.  Do you know whether anybody at

8  Marywood filed a complaint under the University Civil

9  Rights Complaint Procedure Policy about these videos?

10     A.     I'm not aware of that.

11     Q.     Did you propose that anyone do that?

12     A.     No.

13          MR. COHEN:  Let's move on to --

14     Can we have this marked as Munley 16,

15     please.

16          (At this time, Munley Deposition

17          Exhibit 16 was marked for

18          identification.)

19 BY MR. COHEN:

20     Q.     Do you recognize this document, Sister?

21     A.     I have seen this document, yes.

22     Q.     And this is a letter from Will Anthony

23 to me dated February 9th, 2012, right?

24     A.     Yes.

25     Q.     And on the first page it says after the

133

1  No. 2, "As a result of his first breach, he is not
2  entitled to pick and choose which policies and
3  procedures he believes will suit him best," correct?
4      **A.    That's what it says, yes.**
5      **Q.    Okay.  And on the next page, Mr.**
6  Anthony says, "As a result of Dr. Fagal's breach of
7  contract, Marywood had no further contractual
8  obligations to him," correct?
9      **A.    That's what legal counsel indicated.**
10     **Q.    Mr. Anthony is speaking on Marywood's**
11 behalf, right?
12     **A.    Yes.**
13     **Q.    This argument if one party to a**
14 contract breaches first, then the other party has no
15 further obligations under the contract, is that
16 something that you've used in other cases of
17 discipline with Professors?
18         MS. PEET:  Objection.  This goes
19         to the heart of the legal defense in
20         this case.  And she is not a lawyer, and
21         she is not Mr. Anthony.  And I don't
22         believe she is in a position to testify
23         about that.
24         MR. COHEN:  You're instructing her
25         not to answer?

134

1          MS. PEET:  If she knows, she can
2          answer.
3          THE WITNESS:  I can't speak to
4          that, that's a legal question.  I would
5          defer to the attorneys.
6          MR. COHEN:  All right.  Why don't
7          we take a break now.
8          (1:18 p.m., lunch recess taken.)
9          (1:56 p.m., deposition resumed.)
10         MR. COHEN:  We'll mark this as
11 Munley 17, please.
12         (At this time, Munley Deposition
13         Exhibit 17 was marked for
14         identification.)
15 BY MR. COHEN:
16     **Q.    And do you recognize this document,**
17 Sister?
18     **A.    Yes, I do.**
19     **Q.    And the first part of it is an e-mail**
20 from Dr. Levine to you, dated February 20th, 2012, at
21 2:20 p.m., and then your response is above that,
22 correct?
23     **A.    That's correct.**
24     **Q.    And so my understanding of this**
25 document is that Fred could have been recognized for

135

1  service, 25 years of service, but Dr. Levine is not
2  inclined to honor him, and then you agreed with that,
3  correct?
4      **A.    I agreed, yeah.**
5      **Q.    And this is February 20th, 2012, so**
6  that's after his suspension, but before all of the
7  disciplinary proceedings were completed, right?
8          MS. PEET:  Objection to the form.
9          You can answer.
10         THE WITNESS:  I'm not sure of all
11         the dates, okay; but, yes, this -- I did
12         agree with this decision.
13 BY MR. COHEN:
14     **Q.    Were you trying to convey to Dr. Levine**
15 that -- Well, let me back up a little bit.
16         This 25 years of service, is this just
17 a tradition that Marywood honors faculty members with
18 how many years of service?
19     **A.    It's the years of service event where**
20 **we list, you know, in 5-year increments, and we have**
21 **a, you know, coffee, tea, some food.  I thank people**
22 **for their service, and for their support of the**
23 **mission and values publically.**
24     **Q.    So here you don't want Professor Fagal**
25 honored for 25 years of service.  Are you trying to

136

1  convey that as of this date he is no longer working
2  for the University?
3          MS. PEET:  Objection to the form.
4          THE WITNESS:  I wasn't trying to
5          convey anything other than --
6  BY MR. COHEN:
7      **Q.    He doesn't deserve it?**
8      **A.    Well, that I agreed with his decision.**
9      **Q.    Okay.  At some point do you remember**
10 Professor Fagal initiating a faculty grievance
11 against you?
12     **A.    Oh, yes.  And that was one of the**
13 **reviews that was open to him.  We have a specific**
14 **policy on faculty and grievance it entails.**
15     **Q.    And to your memory he alleged,**
16 Professor Fagal alleged -- I'm not saying this is
17 true, this is just what he alleged -- that you
18 violated Marywood policy by improperly suspending
19 him, by improperly moving to terminate his employment
20 and tenure, and that he had not had an opportunity to
21 convene an ad hoc committee to appeal the suspension,
22 is that what he has essentially alleged?
23     **A.    If that's what's on the document that**
24 **he sent, then I would say that's what he alleged,**
25 **yes.**

137

1    Q.    What was your reaction to receiving --
2  to learning that a grievance had been filed against
3  you?
4    A.    I immediately set into motion, you
5  know, that that's his right, that's our process, it's
6  our policy.  And so it happened.  And there is within
7  the policy itself, within the policy it's exactly
8  spelled out how that goes forward, and who the people
9  are that are on that committee.  They are tenured
10  faculty members that are elected by the faculty.
11    Q.    Were you angry with Dr. Fagal for
12  initiating this grievance against you?
13    A.    I felt that that was his right.  That's
14  why repeatedly in those other letters I asked -- I
15  made him aware of the fact that he had these rights;
16  so, no, I was not angry.
17    Q.    Okay.  In any way would you say you
18  were exasperated?
19    A.    I rarely get exasperated.  I would say
20  this was his right, and he had a right to do it, and
21  that's what was done.
22          MR. COHEN:  All right.  Can I have
23      this marked, please.
24          (At this time, Munley Deposition
25      Exhibit 18 was marked for

138

1          identification.)
2  BY MR. COHEN:
3    Q.    Do you recognize this document, Sister?
4    A.    It was sent to me so -- I don't really
5  remember, but I can see it was sent to me, so I would
6  assume, yes, from Pat.
7    Q.    From Pat Dunleavy to you --
8    A.    Right.
9    Q.    -- dated March 7th, 2012, right?
10    A.    That's right, yes.
11    Q.    And can you briefly review this e-mail,
12  and let me know when you're finished?
13    A.    (Witness complies.)  Okay.
14    Q.    Do you know, did you and Dr. Dunleavy
15  meet with Sister Gail?  And here it says, "We should
16  be able to meet tomorrow."  I'm asking did you
17  ultimately meet with her?
18    A.    I don't recall that I met with Sister
19  Gail.  But I know that Dr. Dunleavy got all the
20  materials.  I may have met with her, but I don't
21  specifically recall meeting with her myself.
22    Q.    Ever about Dr. Fagal, or just with
23  reference to this e-mail?
24    A.    You know, I can't say with certainty.
25  I really don't recall.  I may have met with her.  But

139

1  my concern was that Dr. Fagal would have the
2  opportunity to appeal.  So whatever was necessary --
3  I may have met with her.
4    Q.    But you do think that Dr. Dunleavy did
5  meet?
6    A.    I would expect, because it says, "I'll
7  let you know how the meeting goes.  Thank you."
8    Q.    Did Dr. Dunleavy ultimately let you
9  know how the meeting went?
10    A.    You know, I don't recall the details of
11  that, but I'm sure it was something that -- you know,
12  that would be the pattern.
13    Q.    Do you know, approximately, how many
14  times Dr. Dunleavy met with the Faculty Grievance
15  Committee?
16    A.    No.
17    Q.    And you don't remember whether you ever
18  met with them, do you?
19    A.    I don't recall.  I may have -- you
20  know, I got the correspondence in the end.  I don't
21  know if I met with them in the beginning.  I really
22  don't recall whether I met with them or not.  It's
23  five years ago, and I've had a lot of meetings with a
24  lot of people.  I don't remember one meeting.
25    Q.    Would it refresh your recollection if I

140

1  said that Erin Sadlack was on this committee and Bill
2  Conway --
3    A.    Bill Conway.
4    Q.    -- and Ms. Carter?
5    A.    And Patricia Carter.  I don't think I
6  met with all of them, no.  I don't remember only
7  meeting with -- I've met with some of them about
8  other matters, but I don't remember on this matter;
9  it may have been by mail.
10    Q.    Okay.  Do you know whether Will
11  Anthony, or anybody else from Jackson Lewis,
12  communicated with the Faculty Grievance Committee?
13    A.    I don't know.
14          MR. COHEN:  Can we please have
15      this marked.
16          (At this time, Munley Deposition
17      Exhibit 19 was marked for
18      identification.)
19  BY MR. COHEN:
20    Q.    And do you recognize this document,
21  Sister?
22    A.    Yes, I do.
23    Q.    And this is the letter from Erin
24  Sadlack to you, dated March 26th, 2012, right?
25    A.    That's correct.

141

1      **Q.**    And this is the letter you received
2  advising that the Faculty Grievance Committee had
3  ruled in your favor, right?
4      **A.    Right.  It says here, "We have found no**
5  **evidence of improper action on your part which would**
6  **constitute a legitimate grievance."**
7      **Q.**    Did you have any advance notice that
8  this would be the result?
9      **A.    No.**
10     **Q.**    Do you know -- Do you remember if
11  anyone was meeting with or communicating with the
12  Faculty Grievance Committee, and kind of updating you
13  on their progress?
14     **A.    No, I don't have any memory of that.**
15         MR. COHEN:  Could we please have
16      this marked.
17         (At this time, Munley Deposition
18         Exhibit 20 was marked for
19         identification.)
20  BY MR. COHEN:
21     **Q.**    And, Sister, do you recognize this
22  letter?
23     **A.    No.**
24     **Q.**    This is a letter to Professor Fagal
25  from you, dated April 3rd, 2012?

142

1      **A.    Right.**
2      **Q.**    And that's your signature?
3      **A.    Yes, it is.**
4      **Q.**    And you state here in the second
5  paragraph, "Since the grievance process is now
6  complete, I have decided to finalize my
7  recommendation.  As a result, your employment with
8  Marywood and your tenure are terminated effective
9  today, April 3, 2012."  Did I read that correctly?
10     **A.    That's right, because this was the**
11  **result of the grievance filed according to the**
12  **grievance and appeals policy, and that was the**
13  **outcome of it.**
14     **Q.**    When you say the outcome --
15     **A.    There was a committee, they reviewed my**
16  **recommendation, and sought to follow my**
17  **recommendation.  This is under that policy which is**
18  **grievance and appeals.**
19     **Q.**    Okay.  But then in the next paragraph,
20  correct me if I'm wrong, you're offering an
21  opportunity to have your decision reviewed and to
22  convene two faculty ad hoc committees, correct?
23     **A.    That was because, you know, to give Dr.**
24  **Fagal every effort since he had not chosen to do that**
25  **before this.  This was one last effort to allow that**

143

1  to occur.
2      **Q.**    So as of the date of this letter, was
3  he terminated or not?
4      **A.    He was terminated as of April 3rd,**
5  **2012, that's what the letter says.**
6      **Q.**    And that's -- that recommendation was
7  finalized?
8      **A.    On my part I finalized my**
9  **recommendation, but I was giving him the opportunity**
10  **to have it reviewed.**
11     **Q.**    But if you had already terminated him,
12  what was the purpose of the review?
13     **A.    To give him every possible opportunity,**
14  **since, you know, he had decided early on, on**
15  **progressive discipline.  And in my mind it was not a**
16  **matter of progressive discipline, but to give him**
17  **every opportunity.**
18     **Q.**    Okay.  But if you had already
19  terminated him, then the review would just be
20  symbolic and just for show, right?
21     **A.    I don't do anything for show, sir.  I**
22  **did it as I believe in the process.  I believe in**
23  **giving an individual every opportunity.  This was**
24  **another opportunity.  I was trying to go above and**
25  **beyond in giving Dr. Fagal the opportunity to have**

144

1  **his peers review the decisions that I had made,**
2  **that's why I did this.**
3      **Q.**    If these ad hoc committees that you
4  were permitting to now review your decision had said
5  that the suspension and termination were unfounded,
6  would you have changed your mind, or were you
7  prepared to overrule the committee?
8      **A.    I would have given it serious**
9  **consideration.**
10     **Q.**    Is that all?
11     **A.    That's all I could say.  I would give**
12  **it very serious consideration.  If I asked a**
13  **committee -- you know, if a committee does very**
14  **serious work, I would give it very serious**
15  **consideration.  Any committee -- When we have**
16  **committees of tenured faculty studying something, I**
17  **mean, the input that they give I give very serious**
18  **consideration to it, that is my practice.**
19     **Q.**    Prior to this letter of April
20  3rd -- dated April 3rd, 2012, had any Ad Hoc Faculty
21  Committee made any recommendation regarding your
22  recommendation to terminate Dr. Fagal?
23     **A.    I think the only thing that happened**
24  **was the response to the Grievance and Appeals**
25  **Committee.**

145

1    Q.    Why did you choose to terminate Dr.
2    Fagal on April 3rd, 2012, prior to the ad hoc faculty
3    review?
4         A.    Because the grievance that was filed,
5    the letter that came to me on March 26th said, you
6    know, we found no evidence of improper action on your
7    part, so I followed through.
8         Q.    Okay.  But isn't it true that the
9    Faculty Grievance Committee didn't review the
10   termination and suspension itself, it reviewed
11   procedural aspects?
12        A.    That's what our policy is.  They
13   followed the policy.
14        Q.    Okay.  So they reviewed the procedure?
15        A.    They followed exactly what is indicated
16   in the policy for grievance and appeals.
17        Q.    The committee, the Faculty Grievance
18   Committee never said, yes, there is just cause to
19   terminate Dr. Fagal; that was up to the next
20   committee, right?
21        MS. PEET:  Objection, lack of
22        competency.  To the extent you can
23        answer, you can go ahead and answer.
24        THE WITNESS:  I know that we have
25        multiple, multiple policies.  And I know

146

1        that the Faculty Grievance Committee
2        followed that policy that was applied to
3        faculty grievance exactly.
4        When I gave Dr. Fagal the
5        opportunity to have it reviewed yet
6        again, then that committee followed the
7        policy exactly as they're stated.
8    BY MR. COHEN:
9         Q.    Well, let's go back to the letter from
10   Ms. Sadlack to you dated March 26, 2012.  What
11   Exhibit was that?
12        A.    It's Exhibit 19.
13        Q.    19.  I'm sorry, scratch that.
14        The decision on April 3rd, 2012, to
15   terminate Dr. Fagal, did you do that because he filed
16   a grievance against you?
17        A.    I got the recommendation from the
18   Faculty Grievance Committee.  I felt that I had taken
19   that policy, that process through.  And I enacted
20   what my decision was, which was termination.
21        Q.    Right, understood.  But my question is;
22   did you decide to terminate Dr. Fagal because he had
23   filed a grievance?
24        A.    I wanted Dr. Fagal to have every
25   opportunity to have my decisions reviewed.  So when

147

1    he chose to use the, you know, grievance -- file a
2    grievance, that was his right.  And, I mean,
3    certainly I would support that.  So if you're saying
4    I decided this because of that; no.
5         Q.    No, I'm asking.
6         A.    I felt that he should have every avenue
7    open to him to have my decision reviewed.  My
8    decisions were very carefully reflected upon.  And I
9    felt that he had a right to have my decisions
10   reviewed.
11        MR. COHEN:  Could we have this
12        marked, please.
13        (At this time, Munley Deposition
14        Exhibit 21 was marked for
15        identification.)
16   BY MR. COHEN:
17        Q.    Do you recognize this document, Sister?
18        A.    I don't.  But I don't recall this,
19   because this is so long ago.  I'll need to take a
20   minute just to read it.
21        Q.    Sure, review it briefly, and let me
22   know when you're finished.
23        MS. PEET:  For the record, certain
24        parts have been redacted from the e-mail
25        based on attorney/client privileged

148

1        communications.
2        THE WITNESS:  I don't recall any
3        of this, but, I mean, it basically was
4        sent to me.
5    BY MR. COHEN:
6         Q.    The language that you use, "Just let me
7    know when the committee is convened and the clock
8    starts ticking."  You don't remember what you meant
9    by the clock starts ticking?
10        A.    Well, I really don't.  You know some of
11   these policies have a certain number of days to
12   inform people.  And then when a committee gets its
13   charge it has a certain number of days to complete
14   it.  There's so many policies that we have, and some
15   say 10 business days, some say -- some are 30 days.
16   We have all sorts of different types of committees
17   acting on different things.  So I probably just
18   wanted to make sure that anything that I was
19   responsible for I was observing the timeline for.
20   But I don't have any specific recollection of this at
21   all.
22        MR. COHEN:  Okay.  Can we have
23        this marked, please.
24        (At this time, Munley Deposition
25        Exhibit 22 was marked for

1    identification.)

2    BY MR. COHEN:

3         Q.    Do you recognize this document, Sister?

4         A.    **Let me just take a look.  Yes, I**

5    **believe I saw this.**

6         Q.    In the last paragraph that begins,

7    "According to the Progressive Discipline Policy," the

8    next sentence says, "The President has received your

9    e-mail, and after review and consultation, Sister

10   Anne has determined that the membership will be the

11   same."  So was Sister Gail, is she accurately

12   conveying your thoughts on the matter, too?  Because

13   you're not cc.'d here.

14        A.    **Yeah, you know, termination -- when**

15   **you're talking about suspension and you're talking**

16   **about termination, termination is the bigger thing**

17   **than suspension is.  And so the membership of the**

18   **committee could be the same.  So, yeah, I don't -- I**

19   **mean, I'm looking at this, and, I mean, that would be**

20   **my interpretation.**

21        Q.    But did you also agree -- was it also

22   your understanding that the committee would be

23   convened twice to determine -- to review the

24   suspension and the termination?

25        A.    **It's hard for me to remember exactly.**

1    **You know, again, this is five years ago.  But the**

2    **same committee had the competence to look at the**

3    **whole issue.**

4         Q.    Okay.

5         A.    **The people picked on these committees,**

6    **I don't have anything to do with picking who they**

7    **are, you know.  So the criteria are that they are**

8    **objective and competent and tenured.**

9         Q.    Let's talk a little about the Ad Hoc

10   Faculty Committee that ultimately reviewed Professor

11   Fagal's termination.  And the people on that

12   committee were Helen Bittel, Matt Povse --

13        A.    **Povse.**

14        Q.    -- and Ed O'Brien, right?

15        A.    **Correct.**

16        Q.    So are you saying that you didn't

17   select Bittel and Povse?

18        A.    **They come from the Faculty Senate.  And**

19   **I believe that Dr. Fagal selected Dr. O'Brien.**

20        Q.    Did you ever communicate with the Ad

21   Hoc Faculty Committee?

22        A.    **Again, I don't recall if I did or not.**

23   **If I asked them to serve, or express gratitude for**

24   **service or not, you know, again, it's a long time**

25   **ago, and I can't specify a detailed answer to that.**

1         MR. COHEN:  Could we have this

2    marked, please.

3         (At this time, Munley Deposition

4         Exhibit 23 was marked for

5         identification.)

6    BY MR. COHEN:

7         Q.    Sister, do you recognize this e-mail?

8         A.    **I have to take a look.**

9         Q.    Sure.

10        A.    **Okay.**

11        Q.    This is an e-mail from --

12        A.    **From Pat Dunleavy to me.  I think that**

13   **was an update.**

14        Q.    It's dated May 3rd, 2012, right?

15        A.    **That's correct.**

16        Q.    And Dr. Dunleavy here is saying that

17   she and Sister Gail met with the committee.  And at

18   some point she says that you were very willing to

19   talk to them.  Does that refresh your recollection of

20   whether you ultimately did talk to them?

21        A.    **I don't believe I talked to them, no.**

22   **No, I don't remember talking to them.  I'm fairly**

23   **certain I didn't.**

24        Q.    And Dr. Dunleavy also says that she

25   gave the committee Will's contact information.  Did

1    you take that to mean Will Anthony?

2         A.    **That must be who it is, I would**

3    **imagine.**

4         Q.    Do you know if Will Anthony actually

5    ever communicated with the committee?

6         A.    **I have no idea.  I don't know.**

7         MR. COHEN:  Can we please have

8    this marked.

9         (At this time, Munley Deposition

10        Exhibit 24 was marked for

11        identification.)

12   BY MR. COHEN:

13        Q.    And could you briefly review, Sister,

14   and let me know when you're finished.

15        A.    **Yeah, I read this, but I don't recall**

16   **it.  I really don't recall answering questions.  I**

17   **may have, but I don't remember.  I really don't**

18   **remember.**

19        Q.    Okay, that's what I was going to ask

20   you.

21        MR. COHEN:  Can we have this

22   marked, please.

23        (At this time, Munley Deposition

24        Exhibit 25 was marked for

25        identification.)

153

1  BY MR. COHEN:
2      Q.  And have you ever seen this document
3  before, Sister?
4      A.  I may have.  I must have met with them
5  then, because this is minutes from our June 18th
6  meeting.  Yeah, I just don't recall it.
7      Q.  Okay.  Do you know whether -- I
8  might've asked this already --
9      A.  I'm sorry?
10     Q.  I might've asked this already, but do
11 you know whether Patricia Dunleavy ever met with the
12 Ad Hoc Faculty Committee?
13     A.  I don't know if she met with them to
14 give them materials or not, you know.  You know,
15 that's usually how they get materials.
16     Q.  Okay, but you're not absolutely sure?
17     A.  I'm not positive.
18     Q.  So if you don't remember actually --
19 you don't remember actually meeting with the
20 committee, then surely I guess you don't remember
21 what was said?
22     A.  No.  And, you know, I really don't
23 remember meeting with them.  I believe I did, there
24 were minutes.  But, typically, I thank people for
25 their service, and tell them that they can get the

154

1  materials from Dr. Dunleavy.  I mean, that's usually
2  just a -- but I don't remember this actually.
3      Q.  Okay.  Do you know whether Will
4  Anthony, or any other Jackson Lewis Attorneys
5  communicated with the Ad Hoc Faculty Committee?
6      A.  I don't know.
7      Q.  Did you recommend or suggest that the
8  committee speak to anybody from Jackson Lewis?
9      A.  I'm sure that I did not.  That would
10 not have been my -- I don't -- I try to just stay at
11 the end of these committee actions when some
12 recommendation comes to me.  You know, I thank
13 people, and then I wait to see what they do, and stay
14 out of the way.
15     Q.  Do you know whether the Ad Hoc Faculty
16 Committee once they produced a draft of their
17 decision, do you know whether they provided that
18 draft to anybody at Jackson Lewis?
19     A.  I have no idea.  I don't know.
20         MR. COHEN:  Could we have this
21     marked, please.
22         (At this time, Munley Deposition
23     Exhibit 26 was marked for
24     identification.)
25 BY MR. COHEN:

155

1      Q.  And could you briefly review this, and
2  let me know when you're finished, please?
3      A.  I just read it, okay.  It indicates
4  that --
5         MS. PEET:  No question yet.
6         MR. COHEN:  Yeah, I didn't ask you
7      a question yet.
8         THE WITNESS:  Oh, no question,
9      okay.
10 BY MR. COHEN:
11     Q.  But this appears to be -- it looks like
12 there's a little chain.  And the first part of the
13 chain is an e-mail from Matthew Povse to you, dated
14 June 25th, 2012, correct?
15     A.  Am I looking at the same thing you are?
16 This says January 9th.  Oh, I'm sorry, I beg your
17 pardon.
18     Q.  So the first part of this chain is an
19 e-mail from Matthew Povse to you, dated June 25th,
20 2012, right?
21     A.  Okay.  I don't remember this, but, you
22 know, it was sent to me, yes.
23     Q.  I'm trying to understand why Mr. Povse
24 is communicating, you know, the decision to you in
25 advance of it actually being made.  I mean, did you

156

1  request that?
2      A.  No, I know I didn't request that.
3      Q.  Do you remember --
4      A.  Not my style.
5      Q.  Do you remember if Mr. Povse e-mailed
6  you before about the Fagal matter?
7      A.  No.
8      Q.  And does this refresh your recollection
9  over whether Will Anthony did, in fact, receive a
10 draft of the final response?
11     A.  See, I really -- I really don't know
12 that.  You know, as I said, I was waiting for the end
13 of the -- This is June 25th, right?
14     Q.  That appears to be the first e-mail,
15 and then it looks like it was forwarded to Dr.
16 Dunleavy on January 9th, 2015.
17     A.  I don't --
18         MS. PEET:  No question.
19         (At this time, Munley Deposition
20     Exhibit 27 was marked for
21     identification.)
22 BY MR. COHEN:
23     Q.  Sister, do you recognize this document?
24     A.  No.
25     Q.  That's not your handwriting?

157

1      A.      That's not my handwriting.

2      Q.      Does this look like Dr. Dunleavy's

3 handwriting?

4      A.      It may be.  I don't recognize this

5 document.

6      Q.      Is there someone named Tony on your

7 staff?

8      A.      There is, the Chief Information

9 Officer's name is Tony.

10      MR. COHEN:  And let's have this

11 marked, please.

12      (At this time, Munley Deposition

13      Exhibit 28 was marked for

14      identification.)

15 BY MR. COHEN:

16      Q.      And do you recognize this document,

17 Sister?

18      A.      No.

19      Q.      Not your handwriting?

20      A.      It's not my handwriting.

21      Q.      Dave Elliott is the head of Security?

22      A.      At the time, yes.

23      Q.      The last line, can you make that out?

24 I mean, I know you didn't write this, but I'm trying

25 to -- I think it says, Will check --

158

1      A.      Sister's office for -- I'm not sure, is

2 that layout, layout Friday okay, Fran -- I can't get

3 this word (indicating).

4      Q.      Okay.

5      A.      Okay with Fran -- I don't know.

6      Q.      All right.

7      A.      It's not my writing.

8      Q.      Do you remember taking any handwritten

9 notes at all about Professor Fagal's video?

10      A.      No, I don't.  I watched it a few times.

11 I didn't take notes.  I remember it.

12      Q.      Right.  I don't just mean the video,

13 but about the video and all the disciplinary

14 proceedings involving Dr. Fagal.

15      A.      No.

16      Q.      Did you take any notes on a computer

17 about it?

18      A.      The only thing I would have done would

19 be the things we already talked about, which would be

20 those talking points.  I don't typically do that.

21      Q.      Okay.  Is it true that after Professor

22 Fagal left Marywood that the Progressive Discipline

23 Policy was revised?

24      MS. PEET:  Objection to the form,

25      outside the scope of discovery.  You can

159

1 answer.

2      THE WITNESS:  Well, what I would

3      say is that, you know, policies are

4      living documents, so we always -- if you

5      refer to our policies you'll see that a

6      number of them have revisions.  And

7      sometimes we streamline them, you know,

8      we put clearer language, so that would

9      not be unusual.

10 BY MR. COHEN:

11      Q.      When a new policy is -- When a policy

12 is revised or created --

13      A.      Right.

14      Q.      -- ultimately the President of the

15 University signs off on it, correct?

16      A.      This is how it happens, the Secretary

17 of the University is in charge of all the policies

18 and keeping the ongoing records.  There is a

19 standardized template, you know, format, which

20 indicates the origin of the policy, it shows -- if

21 it's a revision of a policy one column says what it

22 said and the other column shows the statements as

23 revised.  After this is prepared and put into the

24 correct format, there is a meeting of the Executive

25 Committee and of the Policy Committee.  The Policy

160

1 Committee has members from the entire University,

2 it's like a representative body.  I attend the

3 Executive Committee meeting of that where they look

4 for any questions or concerns by the representatives

5 who are there, and then if there are none, they then

6 send it to the entire Policy Committee, which is a

7 very large group of people.  And then I go to that

8 meeting, it's chaired by a member of the Policy

9 Committee, an elected Chair, and then they will

10 present the policy.

11      The person who was responsible for

12 developing the policy, say that it's a student life

13 policy, okay, the Vice-President for Student Life

14 would be there to explain the nature of it.  If it's

15 something -- for example, all the legislation

16 regarding the safety and security of children, you

17 know, Dr. Dunleavy regularly handed comments re

18 revised policy in accordance with legal changes.

19 That person presents the changes, the Chair asks are

20 there clarifying questions, they discuss it.  And

21 sometimes if it's not ready for action it's tabled.

22 Sometimes they decide this is ready to go, and so

23 they will -- someone will call for a vote, it's

24 Roberts Rules.  If it gets passed, I sign it, approve

25 it, it's promulgated immediately.  I do that action

161

1   **right at the end of the meeting, all the things that**

2   **were passed by the University Policy Committee,**

3   **because I've already been a part of the discussion.**

4        **Q.**   Do you have the option not to sign

5   that, and then the policy wouldn't go through?

6        **A.**   **You know, I have never not acted**

7   **favorably toward a policy that was passed by the**

8   **entire -- it's one of the most prestigious and**

9   **powerful committees on campus.**

10       **Q.**   But, ultimately, before a proposed

11  policy becomes a real policy, you have to sign off on

12  it, correct?

13       **A.**   **Oh, yes, that's the Executive Office of**

14  **the Presidency.**

15           MR. COHEN:  Okay.  I have no

16      further questions.

17           MS. PEET:  No questions.

18           (At this time, 2:55 p.m., the

19           deposition in the above-captioned

20           matter was concluded.)

21

22

23

24

25

# Exhibit 34

EXHIBIT

34

**Faculty Senate Ad Hoc Hearing Committee (Dr. Helen Bittel, Dr. Edward O'Brien, Mr. Mathew Povse)**

**Review of Sister Anne Munley's Decision to Terminate the Employment and Tenure of Dr. Frederick Fagal**

**2 July 2012**

After thorough investigation, reflection, and deliberation, we the —Faculty Senate Ad Hoc Hearing Committee, —are in agreement with Sister Anne Munley's decision to revoke the tenure and terminate the employment of Dr. Frederick Fagal.

A.   We acknowledge that revocation of tenure is one of the most extreme actions that an academic administrator can take and that it has very serious implications both for the individual whose employment is terminated and for the entire university community.  The traditions of academic freedom require a strong defense of the rights of tenured faculty members to speak openly, explore their work, and participate in faculty governance without fearing reprisal.  We maintain that academic freedom is the cornerstone of our work as faculty members and have, throughout our deliberations, sought to ensure that its principles are upheld, both in Dr. Fagal's case and for all Marywood faculty in years to come.  We are mindful of the potential or perceived threat to academic freedoms when a speech violation leads to revocation of tenure.  Thus in rendering our decision, we maintain that Dr. Fagal's is an extreme case and that his words and actions (specifically, his producing and sending out links to two YouTube videos to colleagues at Marywood) are not protected by the principles of academic freedom, as detailed below.

B.   In coming to this decision, we have taken our charge very seriously, thoroughly researching the events leading to Dr. Fagal's dismissal, Dr. Fagal's personnel record over his years at Marywood, the Marywood *Policies and Procedures Manual (PPM)*, and relevant AAUP guidelines during our deliberations (see Appendix A for a listing of the AAUP documents we reviewed).  We believe that we gave this case the open-minded, careful consideration and thorough investigation that we would want for ourselves or for any of our colleagues.

C.   Dr. Fagal was given the opportunity to explain his video in his meeting with Sister Anne Munley and Drs. Patricia Dunleavy and Michael Foley on 23 January 2012.  Dr. Fagal appears to have not acknowledged any errors in judgment on his part at this meeting and left little room for pursuing progressive discipline or a mediated solution to this situation. The Faculty Grievance Committee has already determined that Sister Anne Munley followed appropriate procedure in moving directly to termination.

D.   In rendering our decision, we carefully considered the four charges outlined by Sister Anne Munley in her Recommendation for Termination memo (8 February 2012) as well as Dr. Fagal's response to those charges (Letter to the Ad Hoc Committee, 6 May 2012).

**Charge #1: Breach of Tenure Agreement.**  The Tenure policy outlined in the *PPM* states that tenure "will be discontinued only for grave reason, which may include moral turpitude, flagrant abuse of academic freedom, or professional incompetence."  We agree that Dr. Fagal's action does constitute "a

[Page]

flagrant abuse of academic freedom" because it includes gratuitous and malicious personal attacks well beyond the spirit and limits of academic freedom. We discuss this at greater length below, under "Charge #4"

-We also agree, however, that according to the policy, these are not the only three reasons why tenure may be revoked. The wording of the policy pointedly uses the phrase "*may* include" [Italics ours] in order to allow for other rare and extreme---but very "grave"---circumstances in which an individual's actions seriously injure the community.   We are in agreement that Sister Anne Munley is justified in saying that Dr. Fagal's actions constitute such an injury.

While it is difficult to precisely define what constitutes a violation of Core Values at Marywood, the egregious nature of Dr. Fagal's video parodies and their gratuitous personal attacks are, in the view of this committee, sufficiently extreme to justify the actions taken by Sister Anne Munley.

The AAUP, which fiercely opposes campus speech codes, acknowledges that "[t]he governing board and the administration have a special duty not only to set an outstanding example of tolerance but also to challenge boldly and condemn immediately serious breaches of civility." ("On Freedom of Expression and Campus Speech Codes, 10/26/06, p.38) Dr. Fagal's video, in both its general premise and in the specific insults directed at individual Executive Officers, is, in the opinion of this committee, indeed such a breach.

-**Charge #2: Violation of Civil Rights Policy**.  We question whether all of the insults to Executive Officers qualify as Civil Rights violations in terms of how the Civil Rights Policy relates to specific protected groups.  However, we do think that Dr. Fagal's portrayal of Alan Levine, a Jewish man, as a Nazi officer might be interpreted as anti-Semitic, regardless of whether this was Dr. Fagal's intention. It is, for example, analogous to portraying an African American as a Klansman in a video or document intended to insult that person.  Thus it could qualify as a violation of our Civil Rights Policy, since religion and ethnicity are protected categories.  -While Dr. Fagal is correct in saying that he was not given an opportunity to respond to this point, there might have been one if he had answered Sister Anne Munley's questions on 23 January 2012 or if he had sought out additional opportunities to explain his actions in a subsequent meeting.

-**Charge #3: Violation of Marywood's Conditions of Computer Use Policy.**  -The committee does not have sufficient information from Sister Anne Munley's complaint to adjudicate this violation, nor is determining copyright infringement within our expertise.  The onus for providing evidence here rests with the administration in needing to prove that such violations occurred and not with Dr. Fagal in terms of proving that he did not engage in such violations.  We therefore cannot support this statement of violation.

**Charge #4: Violation of Academic Freedom Policy, Professional Ethics Policy, and the University's Mission and Core Values as well as the principles of collegiality.**

As we have indicated above, under "Charge #1," we do not believe that Dr. Fagal's video is protected by academic freedom because it is neither part of an academic exercise (teaching- or research-related) nor produced and disseminated in the context of such a scholarly pursuit.  Moreover, it is not informed by legitimate academic research and does not abide by the professional and scholarly standards of Dr.

[Page]

DEF001517

Fagal's discipline (or any other academic discipline).  While the initial FIRE incident (the posters being taken down last fall) that sparked Dr. Fagal's anger did take place alongside and with relevance to his course (SSCI 201), this is not the case with the Jan 13 video. -Dr. Fagal has the right to protest Marywood administrativeer's actions, but to receive the protection of academic freedom, he would need to limit his analysis to an examination of the FIRE incident rather than bringing in personal attacks on individual Executive Officers.  His critique of the Marywood administration could have been achieved without these attacks on the videos with their gratuitous and malicious elements that speak to his anger but do not illuminate our understanding of the issue of free speech and constitutionality.  Moreover, Dr. Fagal could have pursued his complaint through other channels and could have criticized the university's actions in appropriate ways that would be protected under academic freedom.

Joan DelFattore, author of *Knowledge in the Making: Academic Freedom and Free Speech in America's Schools and Universities*, makes a clear distinction between academic freedom and speech protected under the first amendment: "Academic freedom as a professional norm upholds the authority of the faculty as a whole to establish and maintain academic standards and to share in institutional governance.  It poses no obstacle to penalizing individual faculty members for scholarly speech that is judged to be professionally incompetent, even if the First Amendment would protect the expression of those same ideas by a citizen on the street.  The applications are different because the fundamental purposes are different." (*Chronicle of Higher Education*, "To Protect Academic Freedom, Look Beyond the First Amendment," 31 Oct 2010)

We agree that the videos constitute harassment of the individuals who are impugned therein and therefore agree that Dr. Fagal has violated our Professional Ethics policy (*PPM*) as well as our mission and values.

In keeping with the recommendations of the AAUP, we do not, however, think that violating principles of collegiality in itself should be a criterion for revoking tenure.  (See "On Collegiality as a Criterion for Faculty Evaluation).

**Conclusion:** We believe that Sister Anne Munley's termination of Dr. Fagal's employment and tenure is an extreme decision justified by the extreme nature of Dr. Fagal's behavior., and we We maintain that revocation of tenure at Marywood has been and ought to continue to be a very rare event.  Tenure serves to ensure that faculty can speak their truths without reprisal, whether in the context of academic freedom or of faculty governance.  This is critically important to the health of a university.  However, Dr. Fagal was not operating in either of these contexts, and his video is outside the bounds of legitimate academic purpose.  Moreover, Dr. Fagal's egregious violation of our core values, --- especially the value of respect, ---has caused grave and irreparable harm to our community.


Dr. Helen Bittel, Chair of Committee, Associate Professor

Dr. Edward O'Brien, Professor

Mr. Mathew Povse, Assistant Professor

DEF001518

Appendix A.  AAUP Documents Consulted in Our Review

The committee initially identified a number of AAUP documents that seemed relevant to our deliberations and then contacted AAUP with this listing of documents and asked if there were other AAUP documents that might be relevant to our charge.  In our contact with AAUP we identified the nature of our committee review in general terms and not with reference to any specific details of the current case.  Below is a listing of the final list of AAUP documents reviewed as part of our committee deliberations.

1940 Statement of Principles on Academic Freedom and Tenure with 1970 Interpretive Comments

1958 Statement on Procedural Standards in Faculty Dismissal Proceedings

Ensuring Academic Freedom in Politically Controversial Academic Personnel Decisions (2011, full report and executive summary)

On Collegiality as a Criterion for Faculty Evaluation (1999)

On Freedom of Expression and Campus Speech Codes (1994)

On the Relationship of Faculty Governance to Academic Freedom (1994)

Post-Tenure Review: An AAUP Response (1999)

Procedural Standards in the Renewal or Nonrenewal of Faculty Appointments (1989 revision)

Recommended Institutional Regulations on Academic Freedom and Tenure (1940-2009)

[Page]

DEF001519

# Exhibit 35

EXHIBIT

35

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

- - -

FREDERICK F. FAGAL, JR.   : CIVIL ACTION
                         :
         Plaintiff,    : NO. 3:14-cv-02404-ARC
                         :
    vs.               : (JUDGE CAPUTO)
                         :
MARYWOOD UNIVERSITY,    :
                         :
        Defendant.    :

— — —

June 28, 2016
- - -

        Oral deposition of Erin Ann Sadlack,
taken pursuant to notice, was held at the
Radisson Lackawanna Station Hotel, Suite 206, 700
Lackawanna Avenue, Scranton, Pennsylvania,
commencing at 9:35 a.m., on the above date,
before Judy A. Black, a Registered Professional
Court Reporter and Notary Public in and for the
Commonwealth of Pennsylvania.

- - -

MAGNA LEGAL SERVICES

Seven Penn Center, 8th Floor

1635 Market Street

Philadelphia, Pennsylvania 19103

(866) 624-6221



Page 2

A P P E A R A N C E S :
JONATHAN Z. COHEN, LTD
BY:  JONATHAN Z. COHEN, ESQUIRE
175 Strafford Avenue
Suite 1 PMB 212
Wayne, PA 19087
(215) 874-0047
Attorneys for Plaintiff

JACKSON LEWIS, P.C.
BY:  STEPHANIE J. PEET, ESQUIRE
Three Parkway
1601 Cherry Street, Suite 1350
Philadelphia, PA 19102
(267) 319-7802
Attorneys for the Defendant

ALSO PRESENT:

FREDERICK F. FAGAL, JR.
PATRICIA DUNLEAVY

MAGNA LEGAL SERVICES

---

Page 3

I N D E X
---

Testimony of:  Erin Ann Sadlack

DIRECT  CROSS  REDIRECT  RECROSS

By Mr. Cohen        5
By Ms. Peet              55

E X H I B I T S
---

NUMBER     DESCRIPTION                    PAGE
Sadlack-1  E-Mail chain, Bates Nos.       10
           DEF003295-297

Sadlack-2  Letter dated March 26, 2012,   12
           Bates No. DEF002088
Sadlack-3  Multipage document, Bates Nos. 15
           DEF003417-423

Sadlack-4  E-mail chain, Bates Nos.       26
           DEF003448
Sadlack-5  Document, Bates Nos.           27
           DEF000143-144

Sadlack-6  Marywood University Progressive 31
           Discipline Policy Statement

MAGNA LEGAL SERVICES

---

Page 4

---
DEPOSITION SUPPORT INDEX
---

Direction to Witness Not to Answer
Page Line     Page Line     Page Line
None

Request for Production of Documents
Page Line     Page Line     Page Line
None

Stipulations
Page Line     Page Line     Page Line
5    1

Question Marked
Page Line     Page Line     Page Line
None

MAGNA LEGAL SERVICES

---

Page 5

    1              ---
    2        STIPULATIONS
    3              ---
    4        IT IS STIPULATED by and between counsel
    5   that the Deposition of Erin Ann Sadlack, is
    6   being taken pursuant to agreement and that all
    7   objections, except as to form, are reserved
    8   until the time of trial.  Erin Ann Sadlack does
    9   not waive the reading, signing, and filing of
   10   the Deposition.
   11              ---
   12        E R I N   A N N   S A D L A C K, having
   13   been first duly sworn, was examined and
   14   testified as follows:
   15              ---
   16   DIRECT EXAMINATION BY MR. COHEN:
   17        Q.    Good morning.  I'm Jonathan Cohen.  I
   18   represent Frederick F. Fagal in this lawsuit.
   19        Should I call you Dr. Sadlack or
   20   Ms. Sadlack?
   21        A.    Dr. Sadlack.
   22        Q.    Okay.  So you understand that today
   23   you're under the same oath as if you were in a
   24   courtroom, correct?

MAGNA LEGAL SERVICES



Page 6

```
1        A.   I do.
2        Q.   And have you ever had your deposition
3   taken?
4        A.   No.
5        Q.   Okay.  So the way this works is I ask
6   the questions and you try to answer them, and if you
7   don't understand my question, then you should just
8   let me know and I'll try to rephrase it.  If you
9   don't, then I'll just assume that you understand it.
10  Does that sound fair?
11       A.   Yes.
12       Q.   Okay.  Is there anything like medication
13  that would prevent you from thinking clearly and
14  testifying truthfully today?
15       A.   No.
16       Q.   And if at any time you need to take a
17  break during the deposition, please let me know.
18  We're not, like, on a very strict schedule.
19       A.   Thank you.
20       Q.   Now, when I'm asking a question, it's
21  very tempting sometimes to -- you probably think you
22  might know what I'm going to ask, so you might start
23  answering, but it's hard for the court reporter to
24  take everything down, and also your attorney might
```
MAGNA LEGAL SERVICES

Page 7

```
1   want to pose an objection before you answer the
2   question, so if you can just wait until I'm finished,
3   that would be helpful.
4            What is your full name, including any
5   middle name?
6        A.   Erin Ann Sadlack.
7        Q.   Okay.  And what is your educational
8   background, Dr. Sadlack?
9        A.   I have a Ph.D. in English literature
10  from the University of Maryland.  I did my master's
11  there, as well, and my undergraduate at the College
12  of New Jersey.
13       Q.   And what's your professional background
14  before you started working for Marywood University?
15       A.   Just to clarify, my complete
16  professional background?  You don't mean my summer
17  jobs.  You just mean my full-time?
18       Q.   Right.
19       A.   At the University of Maryland, I worked
20  as a financial aid counselor and then as a teaching
21  assistant, a fellow, and other similar kinds of work
22  while I was a graduate student there.
23       Q.   And when did you first start working for
24  Marywood University?
```
MAGNA LEGAL SERVICES

Page 8

```
1        A.   In 2005.
2        Q.   And have you worked there continuously
3   since 2005?
4        A.   Yes.
5        Q.   And are you currently a tenured
6   professor?
7        A.   Yes.
8        Q.   And you teach English?
9        A.   Um-hum, yes.
10       Q.   So you know my client, Professor Fagal,
11  correct?
12       A.   Yes.
13       Q.   When did you first meet Professor Fagal?
14       A.   My first year, in 2005.  My office was
15  in the social sciences suite, so I met him then.
16       Q.   And what were your general impressions
17  of Dr. Fagal before you had any exposure to the other
18  discipline that's at issue in this case?
19            MS. PEET:  Objection to the form.  You
20  can answer.
21       A.   So my general impressions of Dr. Fagal?
22       Q.   He's got thick skin.  Don't worry.
23       A.   I would say that there were certainly
24  things that he said that I did not agree with or care
```
MAGNA LEGAL SERVICES

Page 9

```
1   for, but he was a colleague and we always treated
2   each other -- or certainly I always treated him with
3   courtesy.
4        Q.   Okay.  How often would you talk to him
5   typically?
6        A.   I honestly don't remember.  I would say
7   I saw him on a weekly basis, so -- for that first
8   year, but after that, my office moved out of that
9   suite.  I was able to join the whole English
10  department, and then months might go by without my
11  seeing him, or I might see him three times in a day.
12  It sort of just depended.
13       Q.   And did you prepare at all for today's
14  deposition?
15       A.   Only in the sense of meeting with the
16  attorneys to -- yeah.
17       Q.   Okay.  That's what I meant.  And I'm
18  not --
19            MS. PEET:  I'm just putting the
20  instruction on the record, and this goes for your
21  entire deposition, it's okay to say that we met, but
22  you are not allowed to disclose what we discussed
23  during the meeting.  Okay?
24       Q.   And in preparing for today's deposition,
```
MAGNA LEGAL SERVICES



1  did you review any documents, without telling me what
2  they were?
3      A.   Yes.
4      Q.   Okay.  Now, at some point in 2012, do
5  you recall serving on a faculty grievance committee
6  to adjudicate a grievance that Professor Fagal had
7  filed against President Munley?
8      A.   Yes.
9      Q.   And do you recall the general substance
10 of Professor Fagal's grievance?
11     A.   Yes.
12     Q.   And what was that, to your
13 understanding?
14     A.   Professor Fagal had several aspects of
15 his grievance, that he -- ultimately it's that he was
16 terminated by Marywood University, but he had several
17 procedural complaints about how that process had come
18 to be.
19     Q.   Okay.
20         MR. COHEN:  I'd like to have this marked
21 as exhibit Sadlack-1, please.
22         (Sadlack-1, E-Mail chain, Bates Nos.
23 DEF003295-297, is received and marked for
24 identification.)

1      Q.   And if you could just take a look at
2  this for a moment and let me know when you're
3  finished.
4      A.   Yes.
5      Q.   And do you recognize this document?
6      A.   Yes.
7      Q.   And what are we looking at?
8      A.   This was the substance of Dr. Fagal's
9  grievance.  These were the charges that he asked us
10 to look into to investigate as a grievance committee.
11     Q.   And when you say the grievance
12 committee, who -- you were part of that committee,
13 correct?
14     A.   Yes.
15     Q.   And who else?
16     A.   Dr. Bill Conlogue and Dr. Trish Arter.
17     Q.   And did Sister Cabral have any role with
18 regard to the committee?
19     A.   Only in the sense that she was the
20 president of faculty senate, and when a person has a
21 grievance, they typically contact the head of faculty
22 senate to let them know that a grievance is going to
23 be filed if the grievance committee is not in
24 existence, which it wasn't at the time, because

1  grievance is a subcommittee of faculty senate, so
2  they had to run an election to convene the committee.
3         So that was -- so she met with us --
4  once we had been elected, she met with us to give us
5  the grievance, but after that, no.
6      Q.   Okay.  And the three professors that
7  were chosen for the committee, what were they -- how
8  large in general was the faculty grievance committee?
9  I mean, did they select three from a larger group
10 or --
11     A.   No, the way it works is that the only
12 people who were eligible for the committee -- you
13 must be tenured, and you cannot serve on rank and
14 tenure or on the faculty development committee, and
15 so they issue a list of all of the names of people
16 who are eligible for the committee.  They do a
17 SurveyMonkey, and then people are elected by all the
18 campus faculty, and then -- so the three of us were
19 elected.
20     Q.   So there was just you three?
21     A.   Correct, to my knowledge.
22         MR. COHEN:  Okay.  Let's mark this as
23 Sadlack-2.
24         (Sadlack-2, Letter dated March 26, 2012,

1  Bates No. DEF002088, is received and marked for
2  identification.)
3      Q.   And if you could briefly review this and
4  let me know when you're finished, Dr. Sadlack.
5      A.   Yes.
6      Q.   And do you recognize this document?
7      A.   Yes.
8      Q.   And what is this?
9      A.   This is the letter that I sent to
10 Dr. Fagal at the conclusion of the grievance
11 committee's investigation.
12     Q.   And it's dated March 26, 2012?
13     A.   Yes.
14     Q.   And in this document, you sort of
15 summarized five complaints or arguments that
16 Professor Fagal made in his grievance, and you were
17 informing him that in the committee's view, they
18 lacked merit?
19     A.   Correct.
20     Q.   And in this letter, you did not provide
21 any reasoning for the committee's decision, right?
22     A.   Correct.
23     Q.   And why not?
24     A.   The -- according to the grievance



1  policies, the actions of the grievance committee are
2  not themselves grievable, and it seemed it would only
3  invite further argumentation.  It was better to be
4  succinct.
5      Q.    And was that your decision or did you --
6  was this a matter for discussion that you were just
7  going to announce your decision without any
8  reasoning?
9      A.    The committee felt that -- the other
10  members of the committee, we agreed that this was how
11  we wanted to communicate.
12     Q.    Okay.  And, by the way, were you -- was
13  there a chair of the committee?
14     A.    I was the chair of the committee.
15     Q.    And as the chair, did you have -- what
16  was the role of the chair?
17     A.    Frankly, I would say I was elected the
18  chair by showing up five minutes late to our first
19  meeting.  This was not something that we took that
20  seriously in terms of anyone desiring the position.
21  It's more additional paperwork.  It was my job as
22  chair to communicate with Dr. Fagal and with the
23  decision maker, but beyond that, that was the -- that
24  was pretty much the extent of my role.

1      Q.    So it didn't give you extra voting
2  authority or --
3      A.    Absolutely not.
4           MR. COHEN:  Could we mark this as
5  Sadlack-3, please.
6           (Sadlack-3, Multipage document, Bates
7  Nos. DEF003417-423, is received and marked for
8  identification.)
9      Q.    Could you review this and let me know
10  when you're finished?
11     A.    Yes.
12     Q.    And, Dr. Sadlack, do you recognize this
13  document and its attachments?
14     A.    Yes.
15     Q.    And what is the document that I just
16  handed to you?
17     A.    These were -- as I said before, the
18  whole committee was the one that -- we all agreed
19  what our findings were going to be, and so once I had
20  written those up, I wanted to make sure that I had
21  their approval for the letters that I was going to be
22  sending to Dr. Fagal, to Sister Anne Munley, and a
23  record of our notes of what we had done in the
24  committee.

1      Q.    Okay.  Now, in one of the -- let me ask
2  this:  One of the attachments is labeled "Grievance
3  Committee Notes," and it's typewritten.  Do you
4  recall taking any written, like, handwritten notes
5  about the meetings that you had or the deliberations
6  that you had?
7      A.    I don't remember.
8      Q.    When you were deliberating over
9  Professor Fagal's grievance, do you remember sitting
10  with a laptop or --
11     A.    I don't remember.
12     Q.    Do you remember whether someone was --
13  someone on your committee was designated to take
14  minutes?
15     A.    No, there was no one.
16     Q.    Okay.  So this typewritten document
17  labeled "Grievance Committee Notes," did you generate
18  this?
19     A.    I did.
20     Q.    Okay.  And did you generate it from
21  memory or --
22     A.    It was a mixture of my calendar to get
23  the dates and then memory for what we had said.
24     Q.    Okay.  Now, at the bottom of -- if you

1  see on the bottom right of each page, there's a
2  number, and it usually begins with DEF00.  Do you see
3  that?
4      A.    Um-hum, yes.
5      Q.    We call that a Bates number.  Lawyers
6  put that there.  It's just for us to identify the
7  documents, the many documents that have been turned
8  over in this case.  But I'm looking at the page that
9  is marked DEF003420.
10     A.    Yes.
11     Q.    And at the bottom of that page, it says,
12  March 19th, and it begins, "Erin also e-mailed."  Do
13  you see that?
14     A.    Yes.
15     Q.    And it later says, "Pat agreed, but Mary
16  Theresa in a series of e-mails said that she was not
17  able to meet with us because she represents the
18  university."  Do you see that?
19     A.    Yes.
20     Q.    Have I read that correctly?
21     A.    Yes.
22     Q.    And Mary Theresa is the university's
23  general counsel, correct?
24     A.    Yes.



1    Q.    So is this, in fact, accurate?  I mean,
2  is it -- Mary Theresa did claim in an e-mail to you
3  that she couldn't meet with you?
4    A.    Yes.
5    Q.    And was that ultimately the reality?
6  Did --
7    A.    Ultimately we determined we didn't need
8  to meet with her, so we did not pursue it further.
9    Q.    Now, correct me if I'm wrong, but it
10  sounds like although ultimately you decided you
11  didn't need to meet with her, but at some point were
12  you interested in meeting with her?
13    A.    We had -- we were a brand-new committee,
14  and it was a committee that had not been convened in
15  I don't know how many years.  Typically at Marywood
16  when you have a changeover in leadership, you meet
17  with the prior committee chair and discover what some
18  of the committee's precedents are, what its practice
19  had been.  We didn't have that, and since we were a
20  new committee, we wanted to make sure that we were
21  doing our due diligence in understanding what we
22  needed to do.  We just had very basic questions
23  making sure that we had the most up-to-date of the
24  policies.

1        When we met with Pat Dunleavy, she
2  confirmed what we needed to know, and that's what we
3  had wanted to ask Mary Theresa Paterson.  So once we
4  had the answer, we no longer needed to meet with her.
5    Q.    Okay.  Now, if you turn to the next
6  page, it's labeled DEF003421.
7    A.    Yes.
8    Q.    At the top of the page, it says, "March
9  21st, 8:30 to 9:00, met with Dr. Pat Dunleavy."  Do
10  you see that?
11    A.    Yes.
12    Q.    And there are five bullet points,
13  correct?
14    A.    Yes.
15    Q.    And, in fact, on March 21st, 2012, you
16  did meet with Dr. Dunleavy, correct?
17    A.    Yes.
18    Q.    And the second bullet point says,
19  "Remediation is not always appropriate.  Pat cited
20  several cases where that did not happen before
21  employee fired."  Did I read that correctly?
22    A.    Yes.
23    Q.    I realize this was several years ago,
24  but do you remember the precise language that -- and

1  by the way, Pat is Dr. Dunleavy?
2    A.    Yes, yes.
3    Q.    Do you remember the precise language
4  that Dr. Dunleavy used in conveying that remediation
5  is not always appropriate?
6    A.    I do not.
7    Q.    And do you remember which cases
8  Dr. Dunleavy cited where remediation did not occur?
9    A.    All I remember is that none of them are
10  faculty and it was very general.  We truly were
11  seeking general HR kind of procedural things.
12    Q.    And the last bullet point, it says, "If
13  we need to talk with a lawyer, she will help us get
14  in touch with Will Anthony," correct?
15    A.    Yes.
16    Q.    And did you or your committee ever get
17  in touch with Will Anthony?
18    A.    We did not feel we needed to.
19    Q.    Okay.  And then on March 21st, on the
20  same page, there's an item that says, "Mary Theresa
21  Paterson e-mailed Erin that on reflection -- "
22        Do you see that?
23    A.    Yes.
24    Q.    " -- we were misinformed.  We should not

1  speak to Pat Dunleavy, Will Anthony or herself, and
2  that we should make the decision on our own."  Did I
3  read that correctly?
4    A.    Yes.
5    Q.    So just to clarify, your committee did
6  not speak to Ms. Paterson or Mr. Anthony anyway?
7    A.    Correct, we did not speak with them.
8    Q.    Okay.  And after receiving this e-mail
9  from Mary Theresa Paterson, did you then -- it seems
10  like you had already spoken with Dr. Dunleavy,
11  though, correct?
12    A.    Correct.
13    Q.    Did you attempt to disregard anything
14  that Dr. Dunleavy stated?
15    A.    No.
16    Q.    Okay.  Let's turn to page DEF003422.
17  Near the bottom of the page, it says, "Ultimately we
18  find."  Do you see that paragraph?
19    A.    Yes.
20    Q.    "Ultimately we find that remediation is
21  not guaranteed nor in this instance was there
22  anything to warrant such remediation; therefore, we
23  find Dr. Fagal's complaint to be without
24  justification."  Did I read that correctly?



Page 22

1    A.    Yes.
2    Q.    And in reaching that conclusion -- let's
3  just step back a little bit.  How did you reach the
4  conclusion that remediation is not guaranteed?
5    A.    If you look above just under the very
6  first paragraph in 2A, we quote the actual
7  progressive discipline policy, which reads, "The
8  policy recognizes personal and professional problems
9  that may be rectified by an informal educational
10  process, as well as serious violations of
11  professional responsibilities implicating possible
12  recommendation for suspension or dismissal."
13       If you note those words in particular,
14  "may" and "as well as," suggest leeway.
15    Q.    And that's -- this language is the only
16  language and guidance you're relying on in coming to
17  the conclusion that remediation is not guaranteed?
18    A.    That was the opening of the entire
19  policy.  That sets the tone for everything that
20  follows.
21    Q.    Let me ask you this.  This is
22  hypothetical.  I know this didn't happen.  But let's
23  assume that you -- you and the committee had
24  discussed the progressive discipline policy with Mary

Page 23

1  Theresa Paterson or Will Anthony.  And, again,
2  hypothetical.  I know this didn't happen.  And one of
3  them -- let's say both of them told you that, in
4  fact, progressive discipline is guaranteed in all
5  cases.  Would you have listened to that guidance and
6  then ruled, well, Dr. Fagal did not get progressive
7  discipline so his grievance is well founded?
8       MS. PEET:  Objection, calls for
9  speculation.  She is but one of three committee
10  members.  She can't possibly speak for the entire
11  committee.
12    Q.    All right.  Would you have voted that
13  way?
14       MS. PEET:  Same objection.
15       If you can possibly, based on that, then
16  go ahead.
17    Q.    Do you understand my question?
18    A.    May I clarify?  I think that what you
19  are asking is did we -- could we have seen an avenue
20  in which remediation should have occurred?  Is that
21  what you --
22    Q.    No, that's not my question.
23       A few minutes ago, you already testified
24  that your committee did not seek out, you know, the

Page 24

1  guidance of Ms. Paterson or Mr. Anthony because you
2  didn't feel you needed it.  My question is:  If you
3  had and you had asked for their interpretation of the
4  policy and they said, well, in our legal judgment,
5  remediation and progressive discipline is guaranteed,
6  and, you know, you have to go from an oral warning to
7  a written warning and then to a suspension, and only
8  then to termination, would you have -- I know you
9  can't speak for the committee.  Would you have come
10  to the conclusion that they were, in fact, correct?
11       MS. PEET:  Objection.  It assumes
12  various facts not in evidence as you suggested she
13  already testified that they didn't speak with
14  Mr. Anthony or Ms. Paterson.  Number two, she already
15  testified how she described and interpreted the
16  remediation language, so all of this is purely
17  hypothetical, purely speculative.  There's no
18  relevance to the lawsuit.
19       If you have any way of answering the
20  question or you know how you would have done that of
21  all those factors that are lined up in the sky, go
22  right ahead, but if you don't know, you don't know.
23    A.    I think I would have wondered what
24  possible remediation could there have been.

Page 25

1  Dr. Fagal certainly knew what the core values of
2  respect were.  He refers to them in a letter, and
3  also every year as faculty members will write a
4  faculty activity report in which we outline what our
5  activities were for the year and how we relate to the
6  core values.  So there's certainly not a case of
7  ignorance of the core values; and, moreover, we also
8  recalled that Dr. Fagal had been present at the
9  general faculty meeting there before when we had a
10  Title IX harassment training, so it wasn't even as
11  though you could say, well, you should attend some
12  kind of training.  So I think that I would have
13  questioned what possible remediation there could have
14  been.
15    Q.    And would you then have ignored the
16  legal advice given?
17       MS. PEET:  Objection.  Again, purely
18  hypothetical.
19    Q.    Yes, understood, this is purely
20  hypothetical.
21    A.    I cannot possibly say what I would have
22  done under those circumstances.
23    Q.    And do you have any legal training,
24  Dr. Sadlack?



1      A.    I took a common law class in undergrad.
2  That does not constitute any formal legal training.
3            MR. COHEN:  Sadlack-4, please.
4            (Sadlack-4, E-mail chain, Bates Nos.
5  DEF003448, is received and marked for
6  identification.)
7      Q.    And if you could just take a moment to
8  review this and let me know when you're finished.
9      A.    Yes.
10     Q.    And do you recognize this document?
11     A.    I do.
12     Q.    And what are we looking at?
13     A.    This was an e-mail that Dr. Fagal sent
14  to me after I sent him the grievance committee
15  finding, and then I responded back to him.
16     Q.    So to be clear, on March 28, 2012, you
17  sent Dr. Fagal an e-mail attaching the faculty
18  grievance committee's findings, and we already talked
19  about that today, correct?
20     A.    Yes.
21     Q.    And then Dr. Fagal wrote to you on the
22  same day essentially stating that he -- well,
23  suggesting that he would like to know the reasoning
24  of the committee.  Am I correct?

1      A.    Yes.
2      Q.    And you state that there -- the
3  committee proceedings are confidential.
4            Was it your understanding from the way
5  the policy was worded -- I mean, do you remember it
6  actually saying that the committee proceedings were
7  confidential, or was that just your understanding?
8      A.    I don't recall.
9            MR. COHEN:  Okay.  Let's have this
10  marked as Sadlack-5, please.
11           (Sadlack-5, Document, Bates Nos.
12  DEF000143-144, is received and marked for
13  identification.)
14     Q.    And just take a moment to briefly review
15  this and let me know whether you recognize it.
16     A.    Yes.
17     Q.    Now, do you recognize this document
18  because you were given this while you were in
19  committee, or do you recognize it from some other
20  time?
21     A.    This was part of the packet of materials
22  we were given as part of the committee.
23     Q.    Okay.  So you knew then that -- if we
24  look at the first page, DEF000143, looking in about

1  the middle of the page, the paragraph starts,
2  "Dr. Fagal said he was leaving the meeting."  Do you
3  see that?
4      A.    Yes.
5      Q.    It says, "Sister Anne said she was not
6  done and told Dr. Fagal that this was his opportunity
7  to address the issue as she considers her response.
8  Dr. Fagal said that if she would put her questions in
9  writing, he would craft his response."  Did I read
10  that correctly?
11     A.    Yes.
12     Q.    And so it's fair to say that you knew
13  that -- you and your committee knew that Dr. Fagal
14  had requested an opportunity to explain himself in
15  writing?
16           MS. PEET:  Objection to the form.
17     A.    I think I'm confused by what you're
18  asking.
19     Q.    So you testified earlier, a few minutes
20  ago, that you had seen this document as part of your
21  materials -- your committee materials, correct?
22     A.    Yes.
23     Q.    So if this was part of your committee
24  materials, then you must have known, correct, that

1  Dr. Fagal had requested an opportunity to respond in
2  writing to President Munley, correct?
3      A.    We saw this -- yes, we certainly read
4  this document.
5      Q.    Okay.  That's all I wanted to know.
6            Now, earlier today you testified that
7  your committee did speak with Dr. Dunleavy, correct?
8      A.    Correct.
9      Q.    Do you recall whether you and your
10  committee communicated with anybody else from
11  Marywood's administration regarding Dr. Fagal's
12  grievance?
13           MS. PEET:  Other than Dr. Cabral that
14  she already testified to?
15           MR. COHEN:  Yes.
16     A.    No, we did not.
17     Q.    You did not with President Munley?
18     A.    No.  Actually, let me -- as chair, I
19  notified President Munley that a grievance was being
20  filed.  Beyond that, certainly we didn't meet with
21  anyone else.
22     Q.    I know that earlier you testified that
23  you don't remember whether you took handwritten
24  notes, correct?



1    A.   No.
2    Q.   Do you remember whether anyone else on
3  your committee took handwritten notes?
4    A.   It was too long ago.  I have no idea.
5        MR. COHEN:  I'd like to take just a few
6  minutes' break.  Okay?
7        (A recess is taken.)
8    Q.   All right.  Let's go back to the exhibit
9  containing Professor Fagal's initial grievance.  I
10  don't know what exhibit number that is, but --
11    A.   Number 1.  This one?
12    Q.   Yes.
13        Let's start on the page that reads
14  DEF003296.  And Professor Fagal is arguing that
15  President Munley improperly suspended him, and part
16  A, he says that the -- a faculty member may be
17  suspended by the present vice for academic affairs at
18  any time during the proceedings involving him or her.
19  Do you see that?
20    A.   Yes.
21    Q.   And, further, he goes on that in his
22  view, the vice president of academic affairs had no
23  involvement in the suspension and that only the
24  president did.  Is that right?

1    A.   Yes, he states that, right.
2    Q.   And your committee came to the
3  conclusion that Professor Fagal was wrong about the
4  vice president for academic affairs needing to have
5  been the one to do the suspension, correct?
6    A.   Correct.
7    Q.   And what was your -- what was the
8  reasoning of the committee?  I realize you didn't
9  tell Professor Fagal, but what was your reasoning?
10    A.   The policy which is quoted here includes
11  the word "may," "may be suspended."  That doesn't
12  mean only the vice president of academic affairs, and
13  we concluded it was illogical to suggest that the
14  president wouldn't be involved -- the president
15  couldn't be involved, that all power essentially does
16  go back to her.
17    Q.   Do you remember whether the progressive
18  discipline policy -- well, I made that an exhibit.
19  Let's -- I think we're up to 6, correct?  Let's make
20  this Sadlack-6.
21        (Sadlack-6, Marywood University
22  Progressive Discipline Policy Statement, is received
23  and marked for identification.)
24    Q.   Do you recognize this document,

1  Dr. Sadlack?
2    A.   Yes.
3    Q.   And is this the progressive discipline
4  policy?
5    A.   Yes.
6    Q.   And if you look on the last page, where
7  it says "History," the last revision, it says,
8  "October 12, 2011," correct?
9    A.   Yes.
10    Q.   And on the first page, the bottom of the
11  first page, there's a paragraph that starts
12  "Suspension."  Do you see that in bold?
13    A.   Yes.
14    Q.   And it says, "The faculty member may be
15  suspended by the vice president for academic affairs
16  at any time during the proceedings involving him or
17  her."  Do you see that?
18    A.   Yes.
19    Q.   Is there anywhere in this policy where
20  it says that the president of Marywood can be the one
21  to suspend the faculty member?
22    A.   Not explicitly, but if you look at the
23  "may be suspended," it doesn't say only the vice
24  present for academic affairs.

1    Q.   So the school cafeteria workers, they
2  could do it, too?
3    A.   That's just not logical.
4    Q.   So the -- you interpreted the policy
5  based on your view of what was logical?
6        MS. PEET:  Objection.  You can go ahead
7  and answer.
8    A.   We looked at the language of the actual
9  policy.  It says "may be suspended."  It does not
10  imply that this is the only person that can be
11  suspended.  If you also look above that, you can have
12  people -- you know, you can start with the supervisor
13  or dean.  Things move up the chain of command.  It's
14  logical that they could move up the chain of command.
15    Q.   So, in your view, the president was
16  authorized to conduct a suspension because she had a
17  higher -- she had higher authority than the vice
18  president?
19    A.   Correct.
20    Q.   Okay.  So under this policy, would it be
21  your view that a member of the board or the board of
22  trustees in general, they could also do it, do a
23  suspension?
24    A.   I wouldn't know.  I don't know how



1  that -- I don't know enough of how that
2  relationship -- the board is an advisory body, so I
3  wouldn't see that as necessarily the same kind of
4  thing.
5      Q.   Okay.  And the next sentence in the
6  suspension paragraph says, "Suspension is justified
7  if immediate harm to the faculty member or others is
8  threatened by the person's continuance in the faculty
9  position."
10     And it's true that Professor Fagal
11  contested his suspension on this basis, too; that, to
12  his knowledge, no one had deemed him to be a threat
13  to himself or to any other faculty members, correct?
14  I'm saying, that was his argument?
15     A.   That he mentioned in his -- yes.
16     Q.   Yes.
17     And the committee rejected that
18  argument, as well, correct?
19     A.   Correct.
20     Q.   And what was the basis for the
21  committee's rejection of that argument?
22     A.   There are two reasons.  One is that we
23  actually didn't think that "harm" did not necessarily
24  mean only physical harm; that, in fact, a harm to the

1  university community had happened.  We thought that
2  in particular, by characterizing Dr. Levine, a member
3  that everyone knows is Jewish, a member of the
4  committee, as a Nazi, causes -- that's a form of
5  harassment that causes harm.  The fact that the
6  videos were public meant that there was also damage
7  to the university's public reputation.  However, we
8  also, for the second reason -- that's not the only
9  reason why suspension may be justified.  That is one
10  possible reason, but that's not the only reason why
11  someone might be suspended.
12     Q.   So --
13     A.   That's not a laundry list.  That's just
14  one instance of what could merit suspension.
15     Q.   So, in your view, the university could
16  simply -- assuming a suspension was not justified by
17  immediate harm, however that's defined, the
18  administration could find another rationale to
19  suspend someone other than immediate harm?
20     MS. PEET:  Object to the form.  You can
21  answer.
22     A.   Yes.
23     Q.   And your view is that it's just left
24  open-ended and the university could simply choose a

1  rationale?
2      MS. PEET:  Objection to the form.
3      THE WITNESS:  Should I go ahead?
4      MS. PEET:  Um-hum.
5      A.   I think that it's impossible to codify
6  all the possible reasons, but that's precisely why
7  you have a grievance committee.  If a suspension is
8  unfair, then you have someone who will review it.
9  But if you try to prescribe in advance everything
10  that might possibly happen, it would be impossible to
11  do.
12     Q.   So you think that this paragraph on
13  suspension was -- couldn't be more clear about the
14  grounds for suspension than it already is?
15     MS. PEET:  Objection to the form.  You
16  can answer.
17     A.   I think that there are -- I think
18  policies can always be a little clearer, you know,
19  but in this particular case, this was one possible --
20  and that was the judgment of our entire committee.
21     Q.   So in your view, the role of your
22  committee was -- let me ask you this:  In your view,
23  was the role of the committee to adjudicate
24  procedural grievances or substantive grievances or

1  both?
2      A.   In this particular instance, our role
3  was procedural, were these particular procedures
4  violated unreasonably.
5      Q.   Okay.  That being said, you also
6  determined, correct me if I'm wrong, that Professor
7  Fagal's suspension was justified?
8      A.   There -- Professor Fagal would have the
9  right to appeal the actual judgment of what had
10  happened.  That would be a separate committee that
11  would review that particular one.  What we ruled on
12  were the different specific violations that he
13  alleged procedurally.
14     Q.   Now, your view that suspension under
15  this progressive discipline policy could be justified
16  by immediate harm that wasn't necessarily physical,
17  that was your view, correct?
18     A.   Correct.
19     Q.   What other types of immediate harm in
20  your view could the policy cover?
21     MS. PEET:  Objection.  Already asked and
22  answered, but if you have any more you want to add to
23  that.
24     A.   I don't know -- what you're asking me to



1   do is far beyond what we ever discussed.  We were
2   looking at the specifics of this particular case.
3      Q.   And your judgment was that what
4   Professor Fagal did constituted immediate harm?
5      A.   Well, that's not -- that's not what --
6   that there was some -- that there was a right for him
7   to have been suspended is what we had decided.
8      Q.   That there was a right for him to be
9   suspended?
10      A.   I'm sorry, that -- that caused to.  That
11   he was improperly suspended because he has not been a
12   cause of immediate harm to yourself or others, we
13   thought that there were no grounds for that
14   particular complaint.
15      Q.   Yes, I understand that.  And was it your
16   testimony today that Dr. Fagal's specific argument
17   that his suspension was not grounded in immediate
18   harm had no merit but that he could -- he was free to
19   appeal that suspension?  Or is that --
20      A.   Correct, that he could convene an ad hoc
21   committee to review the actual substance.
22      Q.   Okay.  Let's move back to the first
23   exhibit, which was Professor Fagal's grievance, and
24   I'm on the page where it says DEF003296 at the bottom

1   right.  Paragraph 2, it begins, "President Munley
2   improperly moved to terminate my employment and
3   tenure."  Do you see that?
4      A.   Yes.
5      Q.   And, here, Professor Fagal is
6   essentially arguing that he was terminated
7   prematurely.  I'm not asking you to agree with it.
8   I'm asking you whether that's what he's arguing:  He
9   was terminated prematurely and there were no remedial
10   actions taken during his suspension that could have
11   led to -- that could have led to termination.
12         MS. PEET:  Objection, lack of
13   foundation.  She can't possibly know what was in his
14   mind, but she can know what she interpreted it to be.
15      Q.   I'm asking for your interpretation.
16      A.   Yes, that's my understanding.
17      Q.   And if we go back to the progressive
18   discipline policy, on the second page -- second page,
19   you see the paragraph that says "Dismissal"?
20      A.   Yes.
21      Q.   And that says, "If remedial actions," in
22   parentheses, another S, "taken during the suspension
23   does not sufficiently resolve the issues that lead to
24   the suspension, the university may move towards

1   dismissal of the faculty member."  Did I read that
2   correctly?
3      A.   Yes.
4      Q.   And so the view of the committee was
5   that essentially it was -- it was okay for the
6   president to move directly to termination even though
7   there were no remedial actions taken?
8      A.   It was our unanimous view, if you look
9   at the opening of the progressive discipline policy,
10   the statement -- the third statement in there that
11   the university -- "the policy recognizes professional
12   and personal" -- "personal and professional problems
13   that may be rectified by informal educational
14   process, as well as serious violations of
15   professional responsibilities."  That language,
16   again, suggests that remedial action is not
17   appropriate in every instance.
18      Q.   So that initial prefatory language that
19   you just read, that indicates to you that progressive
20   discipline is optional in some cases but that the
21   university could just immediately move to suspension
22   or termination?
23         MS. PEET:  Objection to form.
24      Q.   In some circumstances, correct?

1      A.   It was the view of our entire committee
2   that there is leeway in that policy.
3      Q.   So the language under "Dismissal" where
4   it says, "If remedial actions taken during the
5   suspension does not sufficiently resolve the issues
6   that lead to the suspension, the university may move
7   towards dismissal of the faculty member," that's
8   just -- did you just ignore that language?
9         MS. PEET:  Objection to form.
10      A.   No, it's -- again, you cannot isolate
11   one part of the policy from another part of the
12   policy.
13      Q.   Isn't that what you did, though?
14      A.   No, we looked at -- there are cases
15   where -- there are times when you can have
16   progressive discipline and there are times where it's
17   not guaranteed.
18      Q.   And who decides that?
19      A.   The decision maker.  The role of the
20   grievance committee is to give a decision maker
21   advice on their decision if they feel that there is a
22   problem.  We did not feel in this particular case
23   that there was a problem that merited reconsideration
24   by the decision maker.



1    Q.    Okay.  So in your view, there were no
2  remedial actions taken by the university prior to
3  Professor Fagal's termination but that that was okay,
4  correct?
5        MS. PEET:  Objection to the form.
6    A.    Correct.  As I said before, we did not
7  understand what possible remediation there could be.
8    Q.    So how did you come to that conclusion
9  that there was no possible remediation?  Did you --
10  can you predict the future?
11        MS. PEET:  Objection to the form.
12    A.    We certainly discussed, you know, this
13  whole matter at length, and as I said before, we knew
14  that Professor Fagal was very familiar with the core
15  values, that there's not a case of -- that he could
16  claim that he was ignorant of what he was doing.  We
17  saw no remorse in his letter to the grievance
18  committee, and we knew that he had been present at
19  harassment training, so we're not -- we could not
20  have envisioned a further one.  That doesn't mean
21  there aren't possible other things, but we did not
22  see anything possible that we could come up with.
23    Q.    And you testified earlier that you did
24  meet with Dr. Dunleavy as part of your committee

1  deliberations.
2    A.    Correct.
3        May I correct that?
4    Q.    Sure.
5    A.    Not as part of our deliberations but
6  just general fact seeking about policy and things
7  like that.
8    Q.    And Dr. Dunleavy was head of Marywood's
9  human resources department, correct?
10    A.    Correct.
11    Q.    Do you remember asking Dr. Dunleavy what
12  forms of remediation are sometimes offered to
13  disciplined employees of the university?
14    A.    I don't remember.
15    Q.    But you do remember deciding on your own
16  that no possible remediation was warranted in
17  Professor Fagal's case, correct?
18    A.    Not that it wasn't -- we certainly
19  didn't feel that there were grounds for overturning
20  what he was asking us to overturn.
21    Q.    Okay.  And you didn't interview
22  Dr. Fagal, correct?
23    A.    No, we relied on his statement.
24    Q.    On just his grievance statement?

1    A.    Yes.
2    Q.    Okay.  But you also relied on several --
3  on a set of written notes from Dr. Dunleavy, correct,
4  about what had occurred at the meeting between
5  Dr. Fagal, the president, Dr. Dunleavy?
6        MS. PEET:  Objection to the form.
7    Q.    You did rely on that?
8    A.    That was part of it.
9    Q.    Do you remember what other materials,
10  written materials, you considered as part of your
11  deliberations?
12    A.    We were given a packet of -- it had the
13  different policies included, it had Professor Fagal's
14  e-mails, and then his -- and his grievance.
15    Q.    Do you remember --
16    A.    I can't recall -- there may have been
17  others, but that's -- I think -- I cannot remember --
18  we had some kind of access to the videos, screen
19  shots or transcripts or something.  I don't remember.
20  Maybe it might have been the actual videos
21  themselves.  I don't recall.
22    Q.    So coming back to the first exhibit,
23  Professor Fagal's grievance, and we're still on the
24  second page, at the bottom, Dr. Fagal had argued that

1  his request to convene a committee to appeal his
2  suspension had not been accepted.  And he quoted the
3  progressive discipline policy stating that it could
4  be convened twice, once for suspension and once for
5  dismissal, and that that had not occurred.  And I'm
6  not asking you to agree with what he's saying, but
7  that's your interpretation of what he's arguing,
8  correct?
9    A.    Yes.
10    Q.    And ultimately you ruled that that
11  argument had no merit, either, correct?
12    A.    Correct.
13    Q.    And what was your reasoning for that?
14    A.    I have to look back in here.
15        Again, it came back to the logic of what
16  was happening here.  We found that the policy doesn't
17  guarantee that series of steps, but rather it's a
18  possibility wherever remediation is warranted; and in
19  particular, we had noted that if you got a
20  recommendation for either suspension or dismissal,
21  you would have the right to have a committee consider
22  the matter, but, again, we didn't think it was
23  logical or even a use of resources -- why would you
24  have a different committee look at the exact same

1  circumstances?  That just didn't make sense either.
2  We thought it was very important that Professor Fagal
3  have a committee to review the substance of the
4  matter.  We absolutely believed that he was entitled
5  to that, but we didn't see it as the suspension --
6  you know, appeal the suspension and appeal the
7  termination, that those were connected.  There was no
8  reason for those to be separate.
9      Q.    Okay.  So to be clear, you did believe
10  that Professor Fagal had a right to appeal his
11  suspension, just not as a separate -- just not have
12  two separate committees, one for suspension and one
13  for termination.  Is that what you're saying?
14      A.    We believed he had the right to a
15  committee that's going to review the entire matter.
16      Q.    Okay.  Coming back to the progressive
17  discipline policy.  I think that's Sadlack Exhibit 6.
18  Am I right about that, Exhibit 6?
19      A.    Yes.
20      Q.    If you look on page 2, do you see where
21  it says "Ad Hoc Faculty Committee" in bold?
22      A.    Um-hum.  Yes.
23      Q.    And at the very bottom of the page, it
24  says, "Should a faculty member request that such a

1  committee be convened twice," in parentheses, "i.e.,
2  once for suspension and once for dismissal, the
3  membership of the committee may be similar."  Do you
4  see that sentence?
5      A.    Yes.
6      Q.    So, in essence, did you ignore that
7  statement in coming to the conclusion that Professor
8  Fagal was not entitled to a separate committee to
9  review his suspension?
10      MS. PEET:  Objection to the form.
11      A.    No.  Again, there's -- this is not an
12  absolute.  There is an element -- there is this
13  element of should the committee -- if you look at the
14  very beginning of that, "Should the faculty member
15  request a review by the ad hoc committee," at that
16  point, that was a separate committee that would have
17  then -- would have to then be convened.  And if you
18  look at the very beginning, "You have the right to
19  convene the ad hoc committee to appeal the decision
20  or the decision to dismiss," so he has the right --
21  so dealing with that together made sense.
22      Q.    I don't understand.  So your view was
23  that a professor in Dr. Fagal's position had a right
24  to appeal his suspension but not necessarily that --

1  not necessarily to have a separate committee,
2  separate from the committee reviewing his
3  termination, review his suspension, as well, correct?
4      MS. PEET:  Objection to form.  Lack of
5  foundation.
6      A.    I have to rely on what our notes were.
7  I don't remember -- this is so many years ago, but
8  what we had said here was, in particular, that the
9  language is that if you get a recommendation for
10  either suspension or dismissal, you then send that
11  written communication stating with reasonable
12  particularity to convene the committee to consider
13  the matter.  Whatever decision is reached, that
14  decision may be appealed.  That's what we thought.
15  We thought that was a reasonable interpretation.
16      Q.    And you thought that it wouldn't be
17  logical for Professor Fagal to have two separate
18  committees, one to review his suspension, one to
19  review his termination?
20      MS. PEET:  Are we talking about an ad
21  hoc committee or a faculty grievance committee?
22      MR. COHEN:  Ad hoc.
23      MS. PEET:  Lack of foundation.
24      A.    They -- that is correct.  There's

1  nothing that it would be illogical.  It would be the
2  exact same matter under consideration, so it would
3  just be an instance of the entire substance of
4  everything was exactly the same, nothing would have
5  changed in between them, so that that wasn't logical.
6      Q.    So your interpretation of what was
7  logical could sometimes override what the policy
8  states?
9      MS. PEET:  Objection to the form,
10  mischaracterization of testimony and complete lack of
11  foundation.
12      A.    Again, it is our job as the committee to
13  determine what we think -- you know, what is --
14  that's exactly what Professor Fagal was asking us to
15  do, was to look and see had he been treated fairly,
16  and we felt unanimously that he was.
17      Q.    Your view was that Dr. Fagal was asking
18  you to see if he was treated fairly or whether he was
19  treated according to the actual policy?
20      A.    None of the grounds of his complaint
21  were justified.
22      Q.    I don't understand.
23      A.    He asked us to look into several
24  specific things and that we found that none of those



1  complaints were grounded in what was reasonable
2  according to the language of the policy and our own
3  logic.
4      Q.    Coming back to Professor Fagal's
5  grievance.  Again, we're on the second page, and
6  paragraph 2, it says, "President Munley improperly
7  moved to terminate my employment and tenure."  Do you
8  see that?
9      A.    Yes.
10     Q.    Part B, Professor Fagal argues that only
11 a vice president could recommend dismissal, and he
12 quotes from the progressive discipline policy,
13 "Having received a written recommendation for either
14 suspension or dismissal from the vice president for
15 academic affairs."  Do you see that?
16     A.    Yes.
17     Q.    And you determined that he was --
18 Professor Fagal was wrong about that, too?
19     A.    We applied the same logic that we had in
20 the earlier instance, that the authority ultimately
21 stems from the president; and, again, the language
22 was ambiguous to -- where it says "may," it
23 doesn't -- it's not ambiguous, but it doesn't
24 allow -- it doesn't suggest that the president
                    MAGNA LEGAL SERVICES

1  cannot.
2      Q.    Let's turn back to the progressive
3  discipline policy, then.  Again, page 2, do you see
4  where it says "Ad Hoc Faculty Committee"?
5      A.    Yes.
6      Q.    And the first bullet point says, "Having
7  received a written recommendation for either
8  suspension or dismissal."  This is the language that
9  Professor Fagal was quoting, correct?
10     A.    Yes.
11     Q.    Where does it say "may" here?
12     A.    Again, we had gone back to the earlier
13 suspension, that this may be and, again, applying the
14 same kind of logic all the way through.  The
15 president is ultimately the one who has say over all
16 the faculty.  She is the one who ultimately rules on
17 faculty tenure.  All of these policies, she's
18 ultimately our boss, so to suggest that she is not --
19 that it should only come from someone who's below her
20 is illogical.
21     Q.    At the time that you were -- that you
22 served on the faculty grievance committee for
23 Professor Fagal's particular grievance, at that time
24 were you a tenured professor?
                    MAGNA LEGAL SERVICES

1      A.    Yes.
2      Q.    And everyone on the committee was also
3  tenured?
4      A.    Correct.
5      Q.    While you were serving on this faculty
6  grievance committee, did you feel any pressure to
7  rule in one way or the other?
8      A.    Absolutely not, only the pressure to do
9  right by everyone.
10     Q.    Okay.  At some point do you remember
11 being contacted by members of an ad hoc committee
12 regarding what exactly the faculty grievance
13 committee did with regard to Professor Fagal?
14     A.    Yes.
15     Q.    And who contacted you?
16     A.    Dr. Helen Bittel.
17     Q.    And ultimately did you actually meet
18 with the ad hoc committee?
19     A.    I did.
20     Q.    And do you remember what questions were
21 asked of you?
22     A.    Not in detail.  We were trying to sort
23 out the purview of each committee.  We had looked at
24 the procedural elements, and they were looking at the
                    MAGNA LEGAL SERVICES

1  substantive.  So we were just clarifying it.
2      Q.    When you say clarifying it, you were
3  looking into -- you mean the faculty grievance
4  committee was considering the procedural aspects of
5  Professor Fagal's discipline; the ad hoc faculty
6  committee was just reviewing it substantively?
7      A.    Yes.
8      Q.    And how did you reach that conclusion,
9  that the ad hoc faculty committee should not consider
10 procedure?
11     A.    Because the actions of the grievance
12 committee cannot be grieved.  It doesn't make sense
13 to have an entire group of faculty then rereview
14 everything that had been already filed.
15     Q.    And in reaching that conclusion, you
16 were just relying on common sense?
17     A.    And the language of the policy that says
18 the actions of the grievance committee cannot
19 themselves be grieved.
20     Q.    Do you know whether any of the language
21 regarding the ad hoc faculty committee says that they
22 can't also consider procedure?
23     A.    That was not my committee.
24     Q.    But, nonetheless, you advised the ad hoc
                    MAGNA LEGAL SERVICES



1   faculty committee that they should just consider
2   substance?
3          MS. PEET:  Objection,
4   mischaracterization of testimony.  You can answer.
5      A.    That was our overall consensus.
6      Q.    So let me ask this:  If a professor does
7   not file a faculty grievance and just moved straight
8   to an ad hoc faculty committee, is it your view that
9   he has kind of waived any procedural arguments?
10     A.    You would not actually -- you would
11  always start with the faculty grievance committee.
12     Q.    Really?
13     A.    Yes.
14     Q.    Okay.  The language of the progressive
15  discipline policy, did you find it to be vague in any
16  way, or ambiguous?
17     A.    There were -- as we first looked at it,
18  in particular, it looked like a series of steps that
19  all had to be taken.  We just had to sort out that
20  aspect of things.
21     Q.    So at first --
22     A.    When we first read through the policy,
23  it was you could do this, you could do this, you
24  could do that.  We didn't have to do all of those

1   particular steps.
2      Q.    Okay.
3      A.    But that was easily clarified.
4          MS. PEET:  Could we take a quick break?
5          MR. COHEN:  Sure.
6          (A recess is taken.)
7      Q.    After your faculty grievance committee
8   ruled in Professor Fagal's case, do you remember
9   discussing your deliberations after the fact with
10  anyone other than attorneys in this case?
11     A.    No.  Our deliberations, no.
12     Q.    Not the president?
13     A.    No.
14     Q.    Nobody else?
15     A.    No one.
16         MR. COHEN:  Okay.  I think I'm finished.
17         MS. PEET:  Can I just ask --
18         MR. COHEN:  Sure.
19  CROSS-EXAMINATION BY MS. PEET:
20     Q.    I believe all of us in the room,
21  Dr. Sadlack, understood what you meant earlier, but
22  I'm not quite sure it's going to come clear on the
23  record, so I just want to ask clarification.
24         When Mr. Cohen was asking you earlier

1   about how you were selected as chairman of the
2   committee and you talked about the fact that no one
3   took it too seriously, I just want to make sure it's
4   clear on the record.  You weren't talking about the
5   fact that you weren't taking the committee seriously,
6   correct?
7      A.    No.  In fact, honestly, all of us -- I
8   remember us talking about that.  We felt we had been
9   honored by being elected by our fellow faculty
10  members to serve in this role, that they trusted us
11  with that.  No, it was purely just the role of being
12  chair sounds very prestigious, but what it actually
13  tends to be is paperwork, and so no one thinks of
14  that as anything more than just an onerous duty.
15     Q.    And that comment was specifically about
16  the chair position, correct?
17     A.    Right.  Not the committee, absolutely
18  not, right.
19         MS. PEET:  That's all I have.
20         (Whereupon, at 11:10 a.m., the
21  deposition of Erin Ann Sadlack concluded.)
22
23
24

1              CERTIFICATE
2
3      I HEREBY CERTIFY that the witness was
4   duly sworn by me and that the deposition is a
5   true record of the testimony given by the
6   witness.
7
8
9
10         Judy A. Black
           Registered Professional Reporter
11         Dated:  July 13, 2016
12
13
14
15
16         (The foregoing certification of this
17  transcript does not apply to any reproduction of
18  the same by any means, unless under the direct
19  control and/or supervision of the certifying
20  reporter.)
21
22
23
24



Page 58

INSTRUCTIONS TO WITNESS

1
2
3          Please read your deposition over
4    carefully and make any necessary corrections.
5    You should state the reason in the appropriate
6    space on the errata sheet for any corrections
7    that are made.
8          After doing so, please sign the
9    errata sheet and date it.
10         You are signing same subject to
11   the changes you have noted on the errata sheet,
12   which will be attached to your deposition.
13         It is imperative that you return
14   the original errata sheet to the deposing
15   attorney within thirty (30) days of receipt of
16   the deposition transcript by you.  If you fail
17   to do so, the deposition transcript may be
18   deemed to be accurate and may be used in court.
19
20
21
22
23
24

MAGNA LEGAL SERVICES

---

Page 60

1    ACKNOWLEDGMENT OF DEPONENT
2
3      I, Erin Ann Sadlack, do hereby
       certify that I have read the foregoing
4      pages and that the same is a correct
       transcription of the answers given by me
5      to the questions therein propounded,
       except for the corrections or changes in
6      form or substance, if any, noted in the
       attached Errata Sheet.
7
8
9    Erin Ann Sadlack          Date
10
11
     Subscribed and sworn
12   to before me this
        day of          , 2016
13
     My commission expires:
14
15
     Notary Public
16
17
18
19
20
21
22
23
24

MAGNA LEGAL SERVICES

---

Page 59

1          - - - - - -
             E R R A T A
2          - - - - - -
3    PAGE  LINE  CHANGE
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

MAGNA LEGAL SERVICES

---

Page 61

1          LAWYER'S NOTES
2    PAGE  LINE
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

MAGNA LEGAL SERVICES



16  (Pages 58 to 61)

# Exhibit 36



EXHIBIT
36

✓HR



# Marywood
### UNIVERSITY

OFFICE OF THE PRESIDENT

MARYWOOD UNIVERSITY
SCRANTON, PA 18509-1598
TEL: (570) 348-6231
FAX: (570) 340-6014
EMAIL: ANNEMUNLEY@MARYWOOD.EDU
www.marywood.edu

July 13, 2012

Dr. Frederick F. Fagal, Jr.
17 East Lake Street
Skaneateles, NY 13152

Dear Dr. Fagal,

I have received and reviewed the report of the independent tenured faculty committee that was convened at your request under the Progressive Discipline Policy to appeal my decision to suspend you and to terminate your employment and tenure. This was the second independent tenured faculty review accorded to you; both faculty committees concurred with my decisions.

My decision to terminate your employment with Marywood University and your tenure effective April 3, 2012 stands.

I wish you good luck in your future endeavors.

Sincerely,

*Sister Anne Munley IHM*

Sister Anne Munley, IHM
President



EXHIBIT
FAGAL-40
6/1/16

# Exhibit 37

EXHIBIT

37

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FREDERICK F. FAGAL, JR.  :
         :
   *Plaintiff,*   :
         :  CIVIL ACTION
   v.     :
         :  NO. 3:14-cv-02404-ARC
MARYWOOD UNIVERSITY,  :
         :
   *Defendant.*  :
         :

## PLAINTIFF'S FIRST SET OF INTERROGATORIES
## DIRECTED TO DEFENDANT

Plaintiff Frederick F. Fagal, Jr. ("Plaintiff" or "Professor Fagal"), pursuant

to Federal Rule of Civil Procedure 33, propounds the following interrogatories

upon Defendant Marywood University to be answered in writing within 30 days, in

accordance with the definitions and instructions set forth below.

## DEFINITIONS

Notwithstanding any definitions set forth below, each word or term used in

these document requests is intended to have the broadest meaning permitted under

the Federal Rules of Civil Procedure. Unless the context indicates otherwise, the

following words and phrases shall be defined and used in these interrogatories as

follows:

1. "Communications" means any transmission of information and shall include writings, correspondence, oral communications, telephone conversations, electronic mail, SMS or text messages, computer-generated transmissions, meetings, conferences, visits, discussions, and any other contacts, oral or written, formal or informal, at any time or place, and under any circumstances whatsoever in which information of any nature is transmitted or exchanged in any form.

2. "Person" or "Persons" means any natural person, groups of persons, corporation, partnership, firm, unincorporated association, joint venture, company, business, institution, trust, estate, public agency, department, bureau, board, governmental entity of any kind, and any other entity.

3. "Documents" or "Document" refers to each and every document and writing (including emails and other electronic communications or publications), now or previously in your actual or constructive possession, custody or control, whether a copy, draft, or original, and wherever located.

4. In order to bring within the scope of these interrogatories any and all conceivable relevant matters or documents which might otherwise be construed to be outside of their scope:

   **a.** The singular of each word shall be construed to include its plural and vice versa;

   **b.** "And" as well as "or" shall be construed both conjunctively and disjunctively;

   **c.** "Each" shall be construed to include every and vice versa;

   **d.** "Any" shall be construed to include "all" and vice versa; and

   **e.** The present tense shall be construed to include the past tense and vice versa.

5. "Identify" shall mean, with respect to any document, to set forth the date thereof, the title, the name of the person or persons authorizing such document, the name of the person or persons to whom such document was given or transmitted, the present location and custodian of such document, and the topic dealt with therein with reasonable specificity, and to describe the relevant page or pages and line or lines thereof (or annex a copy to these responses with appropriate designations of such page or pages and line or lines).

6. "Identify," with respect to any individual, shall be read to require a statement of all of the following information pertaining to such individual: full legal name; last-known home address; last-known home or mobile

telephone number; last-known employer; last-known business address; last-known business telephone number; and last-known job title.

## **INTERROGATORIES**

1. In Paragraph No. 20 of Defendant's Answer to Plaintiff's Amended Complaint and Affirmative and Other Defenses (hereinafter your "Answer"), you admitted to removing some of Plaintiff's posters announcing the FIRE speaker. Did you or anybody working for you instruct or suggest that these posters be removed? If so, who made this instruction or suggestion? If the instruction or suggestion was oral, please state its content in as close to verbatim form as possible.

2. Do you contend that Professor Fagal was an at-will employee of Marywood at any time between November 1, 2011 and August 31, 2012? If so, explain the basis for this contention in detail.

3. Prior to January 23, 2012, did you or anybody who worked for you provide to Professor Fagal any oral warning, written warning, or any opportunity for monitored assistance relating to the email and videos referenced in Paragraph Nos. 23 and 24 of the Amended Complaint? If so, please provide a detailed description of each such oral warning, written warning, and opportunity for monitored assistance.

4. Did your Vice President for Academic Affairs, Dr. Alan Levine, participate in any way in the decision to suspend Professor Fagal or to maintain this suspension thereafter? If so, please describe Dr. Levine's participation in as much detail as possible.

5. If Dr. Levine has made any statements—oral or written—relating to the email or videos referenced in Paragraph Nos. 23 and 24 of the Amended Complaint, please describe the content of these statements in as close to verbatim form as possible, including the date and recipients of such statements.

6. In Paragraph No. 31 of your Answer, you denied that there was no immediate harm to Professor Fagal or to others threatened by Professor Fagal's continuance in his faculty position. Please explain the basis for your denial in as much detail as possible.

7. In Paragraph No. 31 of your Answer, you denied that no Marywood official or representative had ever stated to Professor Fagal that there was no immediate harm to him or to others threatened by his continuance in his faculty position. Please explain the basis for your denial in as much detail as possible, including the date and substance of each and every such statement by a Marywood official or representative.

8. For each academic year, please provide the actual amount of extra dollars that your primary provider of health insurance would have charged (or is predicted to charge) you to add Plaintiff and his wife (born February 5, 1946 and November 15, 1958, respectively) to the standard family health insurance plan provided by the insurer had he been employed by you between September 1, 2012 and August 31, 2018.

**9.** Identify any and all fact witnesses that you intend to call at trial.

**10.**     Identify any and all expert witnesses that you intend to call at trial.

**11.** Identify any and all exhibits that you intend to introduce at trial.

**12.** Identify any and all facts that you believe to support your affirmative
defenses.

13. Did any attorney or other representative of Jackson Lewis LLP communicate—in writing or orally—with any members of Marywood's Faculty Grievance Committee while that committee was deliberating on Plaintiff's grievance filed on February 22, 2012? If so, please identify all individuals participating in each communication, the time and date of each such communication, and—if the communication was oral—describe the content of such communication in as much detail as possible.

14. Did any attorney or other representative of Jackson Lewis LLP communicate—in writing or orally—with any members of Marywood's Faculty Senate Ad Hoc Hearing Committee while that committee was deliberating on President Munley's recommendation to terminate and/or suspend Plaintiff? If so, please identify each and every individual that participated in each communication, the time and date of each such communication, and—if the communication was oral—describe the content of such communication in as much detail as possible.

15. Please provide the exact times and dates that each word processing file or Google Docs file used to generate President Munley's letter to Plaintiff dated January 24, 2012 was first created and last modified.

16. Please provide the exact times and dates that each word processing file used to generate Patricia Dunleavey's typewritten notes (DEF000143) about the January 23, 2012 meeting between Plaintiff, President Munley, herself, and Michael Foley, was first created and last modified.

17. With as much precision as possible, state the time and date that President
    Munley decided (in her own mind) to recommend Professor Fagal's
    termination and suspension.

Respectfully,

By:  _____

Jonathan Z. Cohen (PA205941)
975 Strafford Avenue
Suite 1 # 212
Wayne, PA 19087-3340
(215) 874-0047
(215) 839-8951 (fax)
jzc@jzc-law.com

*Attorney for Plaintiff Frederick F. Fagal, Jr.*

Date: June 22, 2016

22

# Exhibit 38



Representing Management Exclusively in Workplace Law and Related Litigation

Jackson Lewis P.C.
Three Parkway
1601 Cherry Street, Suite 1350
Philadelphia, PA 19102-1317
Tel 267 319-7802
Fax 215 399-2249
www.jacksonlewis.com

| | | | |
|---|---|---|---|
| ALBANY, NY | GREENVILLE, SC | MONMOUTH COUNTY, NJ | RALEIGH, NC |
| ALBUQUERQUE, NM | HARTFORD, CT | MORRISTOWN, NJ | RAPID CITY, SD |
| ATLANTA, GA | HONOLULU, HI* | NEW ORLEANS, LA | RICHMOND, VA |
| AUSTIN, TX | HOUSTON, TX | NEW YORK, NY | SACRAMENTO, CA |
| BALTIMORE, MD | INDIANAPOLIS, IN | NORFOLK, VA | SALT LAKE CITY, UT |
| BIRMINGHAM, AL | JACKSONVILLE, FL | OMAHA, NE | SAN DIEGO, CA |
| BOSTON, MA | KANSAS CITY REGION | ORANGE COUNTY, CA | SAN FRANCISCO, CA |
| CHICAGO, IL | LAS VEGAS, NV | ORLANDO, FL | SAN JUAN, PR |
| CINCINNATI, OH | LONG ISLAND, NY | PHILADELPHIA, PA | SEATTLE, WA |
| CLEVELAND, OH | LOS ANGELES, CA | PHOENIX, AZ | ST. LOUIS, MO |
| DALLAS, TX | MADISON, WI | PITTSBURGH, PA | STAMFORD, CT |
| DAYTON, OH | MEMPHIS, TN | PORTLAND, OR | TAMPA, FL |
| DENVER, CO | MIAMI, FL | PORTSMOUTH, NH | WASHINGTON, DC REGION |
| DETROIT, MI | MILWAUKEE, WI | PROVIDENCE, RI | WHITE PLAINS, NY |
| GRAND RAPIDS, MI | MINNEAPOLIS, MN | | |

*through an affiliation with Jackson Lewis P.C., a Law Corporation

**EXHIBIT 38**

**jackson | lewis**
Attorneys at Law

STEPHANIE J. PEET
E-MAIL ADDRESS: STEPHANIE.PEET@JACKSONLEWIS.COM

September 1, 2016

**VIA FIRST CLASS MAIL AND EMAIL**
Jonathan Z. Cohen, Esquire
JONATHAN Z. COHEN LTD.
175 Strafford Avenue
Suite 1 PMB 212
Wayne, PA 19087-3340

RE:   **Fagal v. Marywood University**
      **U.S. District Court, MDPA; Case No.:  3:14-cv-02404-ARC**

Dear Jonathan:

Please accept this letter in response to your correspondence of August 25, 2016.  To address your first point, and as you were previously advised, Defendant is preparing a privilege log which outlines the various redactions in its document production and the reasons that DEF001359-DEF001628 have been withheld.  We apologize for the delay in providing this log to you. Unfortunately, due to the voluminous production, as well as issues with our e-discovery vendor, preparing the privilege log has taken significantly longer than expected.   We are enclosing the privilege log as it currently stands.   This version will be supplemented once complete. As the final version of the privilege log will be lengthy, we have no objection to requesting an extension if you find one necessary, and we are amenable to making a joint request to the court.

In addition to the privilege log, please find redacted versions of DEF001370-71, DEF001372-75, DEF001376, DEF001377, DEF001380-82, DEF001384-86, DEF001387-88 and DEF001429-31, which were mistakenly withheld.  Please note that other than DEF001370-71 and DEF001429-31, all of these documents have already been produced to you in their redacted form as reflected in the chart below.

| Previously Withheld: | Later Produced As: |
|---|---|
| DEF001372-75 | DEF000396-400; DEF000407-411 |
| DEF001376 | DEF002819; DEF002827 |
| DEF001377 | DEF002819; DEF002823 |
| DEF001380-82 | DEF002795 |
| DEF001384-86 | DEF002792-DEF002794 |
| DEF001387-88 | DEF002799 |



Second, regarding your assertion that Defendant's discovery responses are deficient, Defendant maintains that it provided detailed answers to Plaintiff's interrogatories and fully responsive documents to Plaintiff's requests to produce, where appropriate, and that any objections they raised to Plaintiff's discovery demands were also appropriate. Nevertheless, in a good faith effort to address your concerns, we have reviewed your letter and provide the following responses.

**Interrogatory No. 3**
Prior to January 23, 2012, Defendant did not provide Professor Fagal with an oral warning, written warning, or any opportunity for monitored assistance relating to the e-mail and videos referenced in Paragraph Nos. 23 and 24 of the Amended Complaint.

**Interrogatory Nos. 13 and 14**
Defendant maintains that its objections to these interrogatories were proper.   Any correspondence between an attorney or representative of Jackson Lewis P.C. with members of Marywood's Faculty Grievance Committee or Faculty Senate Ad Hoc Hearing Committee are protected by attorney-client privilege and/or work-product doctrine.  To the extent that these interrogatories seek attorney work-product, the request is clearly improper.  However, William J. Anthony of Jackson Lewis P.C. spoke to Helen Bittel.

**Interrogatory No. 15 and Document Request No. 1**
Defendant maintains that its objections to these requests were proper. Providing the exact times and dates that each word processing file or Google Docs file used to generate President Munley's letter to Plaintiff dated January 24, 2012 was first created and last modified remains irrelevant. The date the termination letter was created is not germane given the fact that there is no dispute that 1) Dr. Munley recommended Plaintiff's termination by letter dated January 24, 2012 and 2) that Plaintiff was ultimately terminated.

Finally, to follow up on our August 12, 2016 letter regarding privileged documents which were inadvertently produced, attached please find redacted versions of DEF000280, DEF000396-400 and DEF000407-411.  If you wish to discuss any of these issues, please contact us at your earliest convenience.

Sincerely,

**JACKSON LEWIS P.C.**

Stephanie J. Peet
Asima J. Ahmad

Enclosures

4814-2509-6757, v. 1

# Exhibit 39

**EXHIBIT**

**39**



# Marywood
## U N I V E R S I T Y

**Tenured Faculty
Letter of Agreement
2010-2011 Academic Year**

May 10, 2010

Dr. Frederick F. Fagal, Jr.
17 East Lake Street
Skaneateles, NY 13152

Dear Dr. Fagal, Jr.,

In accord with the agreed upon Salary Plan, salaries for 2010-2011 will increase by 2.75%. In addition, an adjustment of .5% will be made up or down to this increase if the University's gross tuition revenue and fees as computed at September 30, 2010 (last census day) is either 2% above or below the tuition and fee revenue upon which the original budget modeling was based. Merit increases will not be affected. The adjustment will be effective in the pay dated October 15, 2010 and will be reflected in all subsequent pay periods covered by this agreement. Below, you will find the three possibilities of your salary for 2010-2011 depending on tuition and fee revenue.

$74,338.00 - Reflects a 2.75% annual increase of $1,990.00.

$74,699.00 - If the University's gross tuition revenue and fees is 2% above the current agreed upon base gross revenue and fees, your salary will reflect a 3.25% annual increase of $2,351.00.

$73,976.00 - If the University's gross tuition revenue and fees is 2% below the current agreed upon base gross revenue and fees, your salary will reflect a 2.25% annual increase of $1,628.00.

Other terms of this agreement are as follows:
| | |
|---|---|
| Term: | 8/23/2010 to 5/20/2011 |
| Type of Appointment: | Full-Time (9 months) Tenure |
| Rank: | Associate Professor |
| College: | Liberal Arts & Sciences |
| Department: | Social Science (7080) |
| Responsible to: | Department Chairperson |

Faculty members must apply for benefits other than Social Security and Worker's Compensation through the Human Resources Department. Full-time faculty benefits include health, dental, long-term disability, group life, and accidental death and dismemberment under the Flexible Benefits Plan. Elections are made by June 1 of each year for the subsequent fiscal year beginning July 1. Retirement contributions by the University vary based on the contribution level selected by the faculty member. The appropriate government forms, including Form W-4 and I-9, must be completed and on file in the Human Resources Department.

This agreement is valid for one month from the date of this letter. The original copy of this Letter of Agreement must be signed and returned to my office by June 10, 2010. If you do not return the original signed copy by June 10, it will be assumed that you are not returning to Marywood. On behalf of the Board of Trustees and myself, I express our gratitude for your dedicated service and commitment to Marywood University. May God continue to bless you.

Sincerely,                                    Agreed this _12_ day of _May_ , 2010

*Sister Anne Munley IHM*

Anne Munley, IHM, Ph.D.              Signature _Frederick F. Fagal J._
President

FFF000432

# Exhibit 40

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| EXHIBIT |
| 40 |

FREDERICK F. FAGAL, JR.,   )   CIVIL ACTION
                           )
            Plaintiff      )
                           )
-vs-                       )
                           )
MARYWOOD UNIVERSITY,       )
                           )
            Defendant      )   NO. 3:14-cv-02404-ARC

- - -

Deposition of Patricia E. Dunleavy, Ph.D.

Thursday, August 11, 2016

- - -

     The deposition of PATRICIA E. DUNLEAVY, Ph.D.,
called as a witness by the Plaintiff, pursuant to
notice and the Pennsylvania Rules of Civil
Procedure pertaining to the taking of depositions,
taken before me, the undersigned, Karin E. Volpitta,
a Notary Public in and for the Commonwealth of
Pennsylvania, at the Radisson Lackawanna Station
Hotel, 700 Lackawanna Avenue, Scranton,
Pennsylvania 18503, commencing at 9:01 a.m., the
day and date above set forth.

- - -



Page 2

```
1    APPEARANCES
2    On behalf of the Plaintiff:
3    JONATHAN Z. COHEN, LTD.
     BY:  JONATHAN Z. COHEN, ESQ.
4    175 Strafford Avenue , Suite 1, #212
     Wayne, Pennsylvania 19087
5
6    On behalf of the Defendant:
7    JACKSON LEWIS, P.C.
     BY:  STEPHANIE J. PEET, ESQ.
8    1601 Cherry Street, Suite 1350
     Philadelphia, Pennsylvania 19102
9
10
11
12          STIPULATIONS
13
14   It was agreed by and between counsel that all
     objections, except as to the form of the question,
     will be reserved until the time of trial.
15
16   It was further agreed that the sealing and
     filing of the deposition transcript will be waived.
17
18
19
20
21          WITNESS INDEX
22   EXAMINATION BY              PAGE
23   Mr. Cohen              4
24
```

Page 3

```
1
2          EXHIBIT INDEX
3    DEPOSITION EXHIBIT MARKED          PAGE
     1 - Progressive Discipline Policy        7
4    2 - 1/17/12 e-mail chain             9
     3 - 1/17/12 e-mail chain            14
5    4 - 1/18/12 handwritten note        16
     5 - 1/20/12 handwritten note        17
6    6 - 1/22/12 e-mail chain            18
     7 - Typewritten Talking Points      21
7    8 - Handwritten notes of 1/23/12 meeting    51
     9 - 1/23/12 e-mail                  59
8    10 - 1/23/12 e-mail                 63
     11 - Typewritten notes of 1/23/12 meeting   64
9    12 - 1/23/12 e-mail                 66
     13 - 1/24/12 e-mail with attachments   67
10   14 - Typewritten Talking Points for Board   72
     15 - 1/26/12 handwritten note       78
11   16 - 1/27/12 e-mail                 79
     17 - 1/30/12 e-mail                 81
12   18 - 2/3/12 handwritten note        82
     19 - 2/3/12 handwritten note        83
13   20 - 2/22/12 e-mail                 86
     21 - 2/29/12 e-mail                 87
14   22 - 3/6/12 handwritten note        88
     23 - 3/7/12 e-mail                  89
15   24 - 3/12/12 Grievance Committee notes   90
     26 - 4/17/12 e-mail chain           96
16   27 - 4/25/12 handwritten note       97
     28 - 4/26/12 e-mail                 99
17   29 - 4/30/12 handwritten note      100
     30 - 5/3/12 e-mail                 103
18   31 - 5/15/12 e-mail chain          103
     32 - 5/17/12 minutes of Ad Hoc Committee  105
19   33 - 5/17/12 e-mail                106
     34 - 5/21/12 e-mail                107
20   35 - 5/24/12 e-mail                108
     36 - 6/5/12 handwritten note       113
21   37 - 6/25/12 e-mail                114
     38 - 6/26/12 e-mail chain          115
22   39 - 7/2/12 e-mail                 116
     40 - 7/18/12 e-mail                116
23   41 - Handwritten note             118
     42 - Defendant's Answers and Objections to
24   Plaintiff's First Set of Interrogatories
     Directed to Defendant             119
```

Page 4

```
1    P A T R I C I A  E. D U N L E A V Y, Ph.D.,
2    WAS CALLED, AND HAVING BEEN DULY SWORN,
3    WAS EXAMINED AND TESTIFIED AS FOLLOWS:
4
5              EXAMINATION
6    BY MR. COHEN:
7    Q   Good morning, Dr. Dunleavy.
8    A   Good morning.
9    Q   Do you want me to call you Dr. Dunleavy or
10   Patricia?
11   A   Dr. Dunleavy is fine, thank you.
12   Q   So you know that I'm Jonathan Cohen, and I
13   represent the Plaintiff, Frederick F. Fagal, Jr.;
14   correct?
15   A   Yes, I do.
16   Q   And you understand that you're under the
17   same oath today as if you were in a courtroom,
18   correct?
19   A   Yes, I do.
20   Q   And I'm going to ask you questions and I'm
21   going to assume that you understand them, but if
22   you don't, feel free to -- you could let me know.
23   A   I will.
24   Q   And I'll try to rephrase.  You should wait
```

Page 5

```
1    until I finish the question because that helps the
2    court reporter and your attorney might want to
3    object and that wouldn't give her any time.
4        Is there anything that would prevent you
5    from thinking clearly and testifying truthfully
6    today?
7    A   No.
8    Q   And if at any time you need to take a break
9    during the deposition, let me know.
10   A   I will.
11   Q   So, Dr. Dunleavy, what is your full name
12   including middle name?
13   A   Patricia Elizabeth Dunleavy.
14   Q   And could you describe your educational
15   background, please.
16   A   Certainly.  I have a Ph.D. in Higher Ed.
17   Administration from Marywood University.  I have a
18   Master of Science in Industrial Management from
19   Marywood University.  I have a Master of Arts in
20   Music from Marywood University, and I have a
21   Bachelor of Arts in Music and English from
22   Mansfield University.
23   Q   Mansfield?
24   A   Yes.
```



Page 6

1    Q   And I'm assuming you got all of those
2  degrees before you actually started working for
3  Marywood, correct?
4    A   No.
5    Q   Okay.  So you have met my client before,
6  Professor Fagal; correct?
7    A   Yes.
8    Q   And when did you meet him first?
9    A   I don't remember.
10   Q   How long have you been employed by Marywood?
11   A   I started at Marywood in March of 1980.
12   Q   And he would not have been there then,
13 right; do you remember?
14   A   I don't remember.
15   Q   I think he started in '85.  So this case is
16 about, you know, certain incidents that happened in
17 2011 involving a few e-mails and videos that he
18 posted on YouTube.  You're obviously familiar with
19 that?
20   A   Yes.
21   Q   Before those incidents, would it be fair to
22 say that Dr. Fagal had had a number of run-ins with
23 Marywood's administration?
24   A   I know that there were some incidents.  I

Page 7

1  don't know a lot about them.
2           MS. PEET:  For the record, when you say
3  events in 2011, I do believe that the videos are early
4  2012.
5           MR. COHEN:  Actually, you're right, yes.
6           MS. PEET:  I just want to make sure we're
7  clear.
8           (Dunleavy Exhibit No. 1 was marked
9            for identification.)
10 BY MR. COHEN:
11   Q   Dr. Dunleavy, could you briefly skim this
12 and let me know whether you're familiar with this
13 document?
14   A   (Witness reviews document.)  Yes, I am
15 familiar with it.
16   Q   And what is it?
17   A   It is a copy of the Marywood University
18 Progressive Discipline Policy.
19   Q   Well, is there an effective date to that
20 policy at the end?
21   A   The latest revision that's noted on this
22 copy is 10/12/11, Revision approved by the
23 President of the University as recommended by the
24 Policy Committee of the University.

Page 8

1    Q   Did you have any role in helping to
2  formulate the Progressive Discipline Policy that
3  we're looking at now?
4    A   No.  I do sit on the Policy Committee so
5  policies in general come to that body to vote on
6  but formulate, no.
7    Q   Well, maybe that's too broad a word.  I
8  mean, did you give any input into the substance of
9  the Progressive Discipline Policy?
10   A   No.
11   Q   Do you know, who did have input into this
12 Progressive Discipline Policy?
13   A   No, I do not.
14   Q   It is approved by the President, correct?
15   A   Yes.
16   Q   Do you know if any attorneys working for
17 Marywood or outside of Marywood had any role in
18 formulating the policy?
19   A   I don't know.
20   Q   Now, this isn't the first time you've seen
21 this policy; correct?
22   A   That's correct.
23   Q   Would it be fair to say you've read it
24 pretty thoroughly given the nature of these

Page 9

1  proceedings, what led up to them?
2           MS. PEET:  Objection to the form.  You can
3  answer.
4           THE WITNESS:  Actually, no.
5  BY MR. COHEN:
6    Q   No?
7    A   No, it's not a policy I deal with a lot so,
8  no.
9    Q   Well, have you ever read the entire policy?
10 I don't mean the entire policies and procedures
11 manual, just what we're looking at.
12   A   I don't recall.
13          MR. COHEN:  We'll call this Dunleavy 2.
14          (Dunleavy Exhibit No. 2 was marked
15           for identification.)
16 BY MR. COHEN:
17   Q   Now, I tried to put these exhibits in
18 chronological order so it makes sense to everybody.
19 Do you recognize the document before you?
20   A   No.
21   Q   It appears to be an e-mail, though; correct?
22   A   Yes.
23   Q   And it's from Joseph X. Garvey, Jr. to
24 Dr. Alan Levine?



Page 10

1    A  Yes.
2        MS. PEET:  Just for the record, it's an
3    e-mail chain.  You're focusing only on the top?
4        MR. COHEN:  Yes.
5    BY MR. COHEN:
6    Q  This is an e-mail chain and the top e-mail
7    is from Joseph X. Garvey, Jr. to Dr. Alan Levine
8    dated January 17th, 2012, 2:48 p.m.; correct?
9    A  Yes, correct.
10   Q  And if you could since this is so short,
11   could you briefly read this to yourself and let me
12   know when you're finished.
13   A  (Witness reviews document.)  I read it,
14   thank you.
15   Q  And who is Joseph X. Garvey, Jr.?
16   A  Joseph X. Garvey, Jr. was the Vice President
17   for Business Affairs at this time.
18   Q  And who is Dr. Alan Levine?
19   A  Dr. Alan Levine was the Vice President for
20   Academic Affairs at this time.
21   Q  And based on the date of these e-mails, the
22   chain before you, it appears that these were sent
23   soon after Dr. Fagal's videos were posted on
24   YouTube; correct?

Page 11

1        MS. PEET:  Objection to the form.
2        THE WITNESS:  I don't remember the date of
3    the videos.
4    BY MR. COHEN:
5    Q  Well, the first e-mail in the chain, it's
6    from Sister Margaret Gannon; correct?
7    A  Yes.
8    Q  And she says, "Alan, the texts don't offer
9    anything new but look at the two videos."  Correct?
10   A  Yes.
11   Q  And then Mr. Garvey is commenting on the
12   videos, correct?
13   A  Yes.
14   Q  So it would be fair to say that these
15   e-mails were sent after the videos, we just don't
16   know exactly when?
17   A  Yes.
18   Q  And Dr. Garvey no longer works for Marywood
19   or he's in a different position now?
20   A  Mr. Garvey retired in March of 2016.
21   Q  Okay.  Based on your reading of Dr. Garvey's
22   e-mail, would it be fair to say that he was of the
23   view that Marywood had a protocol for faculty
24   dismissal but he thought that Professor Fagal

Page 12

1    should be at least suspended?
2        MS. PEET:  Objection to the form; calls for
3    speculation.  Answer the question if you understand it.
4        THE WITNESS:  That's what Mr. Garvey's
5    e-mail says.
6    BY MR. COHEN:
7    Q  I think I asked this before but let me make
8    sure.  The e-mail itself does not reflect that you
9    were a recipient, but do you know whether you
10   received it as maybe a blind carbon copy?
11   A  I don't believe I've ever seen this e-mail
12   before.
13   Q  Had Mr. Garvey ever expressed the views that
14   he's expressing in this e-mail to you in any other
15   way, orally, in a separate e-mail?
16   A  I don't remember.
17   Q  Did you share the views that Mr. Garvey is
18   making in his e-mail?
19       MS. PEET:  Objection to the form.  It's a
20   mischaracterization of testimony.  She's testified that
21   she's never seen this e-mail before.
22       THE WITNESS:  Could you clarify that.  I'm
23   not sure what you're asking me.
24   BY MR. COHEN:

Page 13

1    Q  Let me rephrase.  Regardless of whether
2    you've seen this e-mail before or communicated with
3    Mr. Garvey about the videos, did you have after the
4    videos were posted the same opinion as Dr. Garvey
5    about whether an exception should be made to
6    Marywood's protocol for faculty dismissal?
7        MS. PEET:  Objection to the form;
8    mischaracterization of testimony.  You can answer.
9        THE WITNESS:  I don't believe anything I
10   thought then would have been an exception to policy.
11   BY MR. COHEN:
12   Q  Do you recall whether any other members of
13   Marywood's cabinet had a similar view as the one
14   that's expressed by Mr. Garvey in this e-mail?
15   A  I remember that other members of cabinet
16   were very upset by the videos, but I don't remember
17   whether they shared the sentiments that are
18   expressed here in this e-mail.
19   Q  Now, Mr. Garvey in the e-mail suggests a
20   meeting with Dr. Levin, Mary Theresa, you and the
21   VPs; correct?
22   A  Yes.
23   Q  Was there ever this meeting that he
24   suggested?



1    A  I don't recall.
2        MR. COHEN:  Let's make this Dunleavy 3.
3        (Dunleavy Exhibit No. 3 was marked
4         for identification.)
5    BY MR. COHEN:
6    Q  It's double-sided but most of the backside
7    is redacted.  If you could briefly review this
8    because it's so short and let me know when you're
9    finished.
10   A  (Witness reviews document.)
11   Q  And do you recognize this document?
12   A  Yes.
13       MR. COHEN:  Wait a second, we have different
14   documents.
15       (At this time there was a brief
16        discussion held off the record.)
17   BY MR. COHEN:
18   Q  Do you recognize this document?
19   A  Yes, I do.
20   Q  And this is an e-mail chain first.  The
21   first e-mail is from Dr. Levine to you dated
22   January 17th, 2012 at 12:11 p.m.; right?
23   A  Yes.
24   Q  And the second e-mail is from you to

1    Dr. Levine the same day, 8:45 p.m.; right?
2    A  Yes.
3    Q  Now, you wrote to Dr. Levine, "Internally
4    you can file a formal complaint under the Civil
5    Rights Policy."  Correct?
6    A  That's correct.
7    Q  Do you know if Dr. Levine ultimately did
8    file a formal complaint under Marywood's Civil
9    Rights Policy?
10   A  He did not.
11   Q  And then the next sentence from you is,
12   "We're exploring options from the University
13   perspective with or without a formal complaint from
14   any individual."  Did I read that correctly?
15   A  Yes.
16   Q  Now, what options was the University
17   exploring at this time?
18   A  I don't remember.
19   Q  Do you know what Dr. Levine meant when he
20   asked you about possible responses for him
21   personally?
22   A  Yes.  He was so offended and angry by the
23   videos that he wanted to sue Dr. Fagal himself.
24   Q  But he wasn't so offended that he didn't

1    just file a civil rights complaint, right?
2        MS. PEET:  Objection to the form.
3        THE WITNESS:  I can't speak for Dr. Levine.
4        MR. COHEN:  Let's make this Dunleavy 4.
5        (Dunleavy Exhibit No. 4 was marked
6         for identification.)
7    BY MR. COHEN:
8    Q  Do you recognize this document?
9    A  Yes, that's my handwriting.
10   Q  Now, I found a lot of notes in Marywood's
11   production which are the same handwriting and I
12   couldn't always read it so I'm going to ask you
13   today for you to read it to me and/or explain.  Can
14   you read this aloud?
15   A  Yes.  This is notes I took from what would
16   have been probably a phone call with Tony Spinillo,
17   who was -- or is the CIO at Marywood.  The date is
18   January 8th, 2012.  And the information that Tony
19   gave me was about e-mails and how far back we save
20   them.
21       So he told me that ten years were backed up
22   and can't be deleted.  If something was sent to
23   Marywood, it's saved or if it's sent from here,
24   meaning from Marywood's e-mail, that would also be

1    saved.  The last line, I believe, says "e-mail gets
2    archive."
3        MR. COHEN:  Let's make this Dunleavy 5.
4        (Dunleavy Exhibit No. 5 was marked
5         for identification.)
6    BY MR. COHEN:
7    Q  And do you recognize this document?
8    A  Yes, that's my handwriting.
9    Q  And could you read this aloud, please.
10   A  Certainly.  This is dated January 20 of 2012
11   and it's a note saying that I called Dave Elliott
12   at 7:25 in the morning and that he will -- "WCB" is
13   will call back.  I believe this means he called at
14   8:39 and that he told me he is generally on campus
15   by 8:20 and that he would check Sister's office --
16   that would be Sister Anne Munley's office -- for
17   the layout of her conference room area on Friday
18   and that -- then I have "Ok with Fran."  That would
19   be Sister Anne's secretary.  She'll tell Sister
20   Anne Munley, SAM, that Dave Elliott would come up
21   and check the office for the layout.
22   Q  And who is Dave Elliott?
23   A  He was the Senior Director for Campus
24   Safety.  I don't remember his exact title.



1    Q   Why would he check the layout of Sister
2  Munley's office?
3    A   Sister wanted him to be outside the office
4  when she met with Dr. Fagal because she wasn't sure
5  what Dr. Fagal might do so she was concerned about
6  a potential threat and wanted security presence
7  outside of the meeting.
8    Q   So this note again is dated January 20,
9  2012; right?
10   A   Yes.
11   Q   So it would be fair to say that as early as
12  January 20th, 2012 President Munley was planning to
13  bring Professor Fagal in for a meeting about the
14  videos?
15   A   Yes.
16   Q   And that meeting ultimately happened on
17  January 23rd, 2012; right?
18   A   Yes.
19       MR. COHEN:  Let's have this marked as
20  Dunleavy 6.
21       (Dunleavy Exhibit No. 6 was marked
22        for identification.)
23  BY MR. COHEN:
24   Q   This is double-sided also.  Could you just

1  read this to yourself and let me know when you're
2  finished.
3    A   (Witness reviews the document.)  Okay.
4    Q   Do you recognize this document?
5    A   Yes.
6    Q   And the first e-mail in the chain is from
7  Dr. Levine to you and someone named Mike.  I assume
8  that's Mike Foley?
9    A   I would assume that as well.
10   Q   And here Dr. Levine is sort of laying out a
11  script for bringing Professor Fagal in to speak
12  with President Munley about the videos; correct?
13       MS. PEET:  Objection to the form.
14       THE WITNESS:  That's what it appears to be,
15  yes.
16  BY MR. COHEN:
17   Q   Now, before Dr. Levine sent this first
18  e-mail in this chain, did you meet with him or
19  communicate with him about how Professor Fagal
20  would be handled the next day?
21   A   I don't remember.
22   Q   And then there's an e-mail in this chain
23  sent on January 21st, 2012 at 10:33 p.m. where
24  Dr. Levine is e-mailing you; correct?

1    A   Yes.
2    Q   And Dr. Levine mentions that Professor Fagal
3  left him a telephone message, right?
4    A   Yes, that's what the e-mail says.
5    Q   And then at 1:04 p.m. you responded and the
6  first thing you said was, "Oh, yes, very."
7  Correct?
8    A   Yes.
9    Q   And by that you meant, Oh, yes, very
10  interesting?
11   A   Yes.
12   Q   And why did you think that was interesting?
13   A   It just was that Dr. Fagal would call Alan
14  Levine at home.
15   Q   And you told Dr. Levine to save the message,
16  right?
17   A   I did.
18   Q   Do you know whether Dr. Levine did, in fact,
19  save the message?
20   A   I have no idea.
21       MR. COHEN:  And this is more for Stephanie,
22  but if it exists, do you think that we could try to
23  obtain that message?
24       MS. PEET:  It is my understanding it has not

1  been saved.
2        MR. COHEN:  Let's make this Dunleavy 7.
3        (Dunleavy Exhibit No. 7 was marked
4         for identification.)
5  BY MR. COHEN:
6    Q   This is double-sided as well.  You don't
7  have to read the whole thing but let me know
8  whether you recognize this.
9    A   I do.
10   Q   And what is this document?
11   A   These are talking points that I typed up for
12  Sister Anne based on points that she raised and
13  asked me to just put them in writing for her, and
14  then she reviewed and -- but it was based on
15  conversations and her directive and they were
16  talking points for her meeting with Dr. Fagal.
17   Q   Now, there's no date on this document but do
18  you have any idea when you might have -- if the
19  meeting with Dr. Fagal was held on the morning of
20  January 23, 2012, when do you think you might have
21  generated this?
22   A   I don't remember.
23   Q   Now, the seventh bullet point down begins,
24  "Tell Fagal that."  Do you see that?



Page 22

1    A   Yes.
2    Q   And the full sentence is "Tell Fagal that
3    Sister views this conduct to be a serious breach of
4    his tenure agreement and Marywood's mission and
5    values."  Correct?
6    A   Yes.
7    Q   So when you wrote this, were you suggesting
8    that President Munley should express this view to
9    Dr. Fagal because it seems almost like originally
10   maybe you had planned to tell him because Sister is
11   in the third person.  Do you see what I mean?
12   A   Yes, I do but, no, your assumption is not
13   correct.  These were notes that I wrote for Sister.
14   Because I wrote them, I wanted clear that she was
15   doing the talking, I was not.  She knew that and I
16   knew that.  So this was for her based on these were
17   the notes that she talked about and asked me simply
18   to write out for her.
19   Q   So the contents of this document were
20   President Munley's ideas and you simply just typed
21   them up?
22   A   Yes.
23   Q   And did President Munley convey these views
24   to you in a meeting or --

Page 23

1    A   I don't remember.
2    Q   Now, the eighth bullet point down begins
3    "Ask Fagal to leave campus."  Do you see that?
4    A   Yes, I do.
5    Q   And then there's a sub-bullet point
6    underneath that that says, "Suspended with pay."
7    Do you see that?
8    A   Yes, I do.
9    Q   So would it be fair to say that going into
10   the meeting with Professor Fagal that it was
11   President Munley's plan to suspend him regardless
12   of what occurred during the meeting?
13   A   No.  If you look at the next two large
14   bullets, there was an alternate plan.  There was a
15   post -- these were just all the different things
16   that could happen, which she had no idea what would
17   transpire in the meeting.  None of us did.
18        If you look at the very first bullet, she
19   wanted to know if he authored and sent the e-mail
20   and then ask him why.  And then these were just
21   possible scenarios that could play out based on the
22   conversation.
23   Q   Well, you mentioned, you know, the bullet
24   point called Alternate Plans.  Do you see that?

Page 24

1    A   Yes.
2    Q   And that says, "Sister could ask if he has a
3    resolution for her to consider (retirement on the
4    spot.)"  Right?
5    A   Yes.
6    Q   Now, ultimately President Munley and you and
7    Dr. Foley did meet with Professor Fagal on
8    January 23rd, 2012; correct?
9    A   Yes.
10   Q   Did the topic of -- do you remember whether
11   President Munley ever asked Professor Fagal whether
12   he had a resolution for her to consider?
13        MS. PEET:  Are you talking about at that
14   meeting?
15        MR. COHEN:  Yes.
16        THE WITNESS:  Sister Anne asked Dr. Fagal if
17   he authored the video, if he sent the video and why and
18   the conversation more or less died there.  She asked him
19   several times about the video and he wouldn't respond,
20   so the meeting didn't run in that direction.  It just
21   sort of stopped.
22   BY MR. COHEN:
23   Q   So President Munley did not raise any
24   alternate plans other than suspension, correct?

Page 25

1        MS. PEET:  Objection to the form.
2        THE WITNESS:  That's correct, Sister did not
3    get answers to her questions.
4    BY MR. COHEN:
5    Q   So apart from what this document says, did
6    President Munley tell you before the meeting with
7    Professor Fagal that she intended to suspend
8    Professor Fagal?
9    A   I don't remember.
10   Q   Now, let's forget about the words "suspend"
11   or "suspension."  The eighth bullet point again
12   says, "Ask Fagal to leave campus; wait for Sister's
13   decision."  Right?
14   A   Yes.
15   Q   Now, was this going to be something definite
16   that President Munley was going to do, to ask him
17   to leave campus or is that one of several alternate
18   resolutions?
19   A   This is one of several alternates.  These
20   were just talking points and they were just
21   possibilities to consider.
22   Q   But again, there's an alternate -- there's a
23   bullet point that says "Alternate Plans;" correct?
24   A   Yes.



Page 26

1    Q   And one of those plans was Sister could ask
2  if he has a resolution for her to consider; for
3  example, retiring on the spot, right?
4    A   Yes.
5    Q   And then the next sub-bullet point says, "If
6  Fagal refuses to leave, tell him we'll consider it
7  trespassing."  Right?
8    A   Yes.
9    Q   So based on what I'm reading, the options
10 for Professor Fagal were he could retire on the
11 spot or he could leave campus; correct?
12       MS. PEET:  Objection to the form;
13 mischaracterization of testimony.  You can answer.
14       THE WITNESS:  That would depend on the
15 answers to her first few questions, so they were still
16 all just options at that point.
17 BY MR. COHEN:
18   Q   Let me ask you this:  Under the eighth
19 bullet point where it says, "Ask Fagal to leave
20 campus; wait for Sister's decision," there's a
21 sub-bullet point that says, "Classes will be
22 covered."  Correct?
23   A   Yes.
24   Q   In going into this meeting with Professor

Page 27

1  Fagal, had someone already arranged for Professor
2  Fagal's classes to be covered?
3    A   That would have been an option if needed.
4  It was not a definite.
5    Q   Now, is there anywhere on this document that
6  conveys whether Professor Fagal was going to be
7  asked to leave the campus or be suspended depended
8  on his responses to previous questions?
9        MS. PEET:  Objection to the form.
10       THE WITNESS:  No, but this is not an
11 all-inclusive document.  These are talking points so if
12 the conversation needed to go down these routes, these
13 were some of the details that would have to be
14 considered.
15       Sister Anne Munley was perfectly capable of
16 making decisions and other choices.  These are just
17 simply talking points.
18 BY MR. COHEN:
19   Q   Do you know if during the meeting with
20 Professor Fagal on January 23rd, whether President
21 Munley had these talking points before her?
22   A   I don't remember.
23   Q   Now, going further down the document there's
24 a bullet point that just says "Post Suspension."

Page 28

1  Correct?
2    A   Yes.
3    Q   And right underneath that there is a
4  sub-bullet point that says, "Sister recommends
5  termination and prepares notice of charges."
6  Correct?
7    A   Yes.
8    Q   So based on what we're reading here, would
9  it be fair to say that if President Munley
10 suspended Professor Fagal, that she would then
11 definitely follow up with a recommendation for
12 termination?
13   A   No.  I think it's simply listed as another
14 option.
15   Q   What are some of the other options?
16 Assuming that President suspended Professor Fagal,
17 what are some of the other options other than
18 terminating him that you see on this document?
19   A   There aren't any others listed on this
20 document.
21   Q   Now, you've attended all of the other
22 depositions in this case except for the first one
23 where Dr. Foley was in North Carolina; right?
24   A   Yes.  I was on the phone for that.

Page 29

1    Q   But you've either been present or present
2  over the phone, right?
3    A   Yes, yes.
4    Q   So you've heard me ask several witnesses --
5  let me rephrase.
6        You've heard several witnesses testify that
7  progressive discipline really was not an option for
8  Professor Fagal because he did not really express
9  any remorse or regrets at this meeting with
10 President Munley; correct?
11       MS. PEET:  Objection to the form;
12 mischaracterization of testimony.  You can go ahead and
13 answer.
14       THE WITNESS:  I don't remember the specifics
15 of other testimony.
16 BY MR. COHEN:
17   Q   Okay.  Well, apart from whatever testimony
18 you heard or remember, was one of the reasons that
19 President Munley suspended Professor Fagal and then
20 shortly thereafter recommended his termination,
21 that he did not express any remorse at this meeting
22 with President Munley?
23       MS. PEET:  Objection; calls for speculation.
24       THE WITNESS:  I can't speak for Sister Anne.



Page 30

BY MR. COHEN:
1
2    Q   Well, did you ever say that to you?
3    A   Not that I recall.
4    Q   So you testified that President Munley --
5   these bullet points were her ideas, you just kind
6   of typed them out; right?
7    A   Yes.
8    Q   Did anyone else other than you and President
9   Munley see these bullet points prior to the
10  January 23rd, 2012 meeting with Professor Fagal,
11  to your knowledge?
12   A   Not to my knowledge.
13   Q   Did Dr. Levine have any input into these
14  talking points?
15   A   Not that I'm aware of.
16   Q   Now, going into the January 23rd, 2012
17  meeting with President Munley, you, Dr. Foley and
18  Professor Fagal, did you have any doubt about
19  whether Professor Fagal authored and sent the
20  e-mail and the videos posted on YouTube?
21   A   Before the meeting?
22   Q   Yes.
23   A   I did not know.  I don't go into those
24  meetings assuming.  That's why the first question

Page 31

1   is did he author it.  That's what Sister was going
2   to do.  That's what I would have done if it was my
3   meeting.  I don't want to assume.
4    Q   Now, you recall that these events all
5   started with an e-mail that Professor Fagal sent to
6   many members of Marywood's community in November of
7   2011; right?
8        MS. PEET:  Objection to the form.  That's
9   not the testimony of record.
10       THE WITNESS:  I don't know that.
11  BY MR. COHEN:
12   Q   Well, you're aware of an e-mail that he did
13  send to many members of Marywood's community in
14  November of 2011 criticizing President Munley and
15  the decision to remove certain posters; right?
16   A   I don't remember an e-mail from November.
17   Q   Well, you did see the videos posted on
18  YouTube, that Professor Fagal posted on YouTube;
19  correct?
20   A   Yes.
21   Q   Now, how did you know where to look for
22  them?
23       MS. PEET:  Can I help you for a second.  Are
24  you talking about the January 2012 e-mail?

Page 32

1        MR. COHEN:  I think you're right.
2        MS. PEET:  Because there's no -- as I'm
3   sitting here, I don't know anything about a November of
4   2011 e-mail.
5        MR. COHEN:  I think you're right.  Let me
6   rephrase.
7   BY MR. COHEN:
8    Q   You're aware of an e-mail that Professor
9   Fagal sent to the University community in January
10  of 2012 criticizing President Munley and what he
11  perceived as the administration's teardown of his
12  FIRE posters; correct?
13       MS. PEET:  Objection to the form.  You can
14  answer.
15       THE WITNESS:  I remember an e-mail from
16  January that had links to the videos and a lot of other
17  stuff.
18  BY MR. COHEN:
19   Q   And you know that that e-mail purported to
20  come from Professor Fagal, right?
21   A   Yes, it did, yeah.
22   Q   So why would you -- why did you have any
23  doubt about whether he had authored the video if he
24  sent an e-mail with links to those videos?

Page 33

1    A   I never assumed that until I hear it from
2   the individual that they authored it and they sent
3   it.  It's possible somebody hacked his account so I
4   always ask first did you do this.  That's what I
5   do.  That's clearly what Sister wanted to do here
6   as well.
7    Q   Okay.  Let's move back to Dunleavy
8   Exhibit 6.  Just so I know we're looking at the
9   same document, is this an e-mail from you to
10  Dr. Levine dated January 22nd, 2012 at 1:04 p.m.?
11   A   Yes, it is.
12   Q   And again, it's actually a chain --
13   A   Yes.
14   Q   -- of e-mails between you and
15  Dr. Levine; correct?
16   A   Yes.
17   Q   And the most recent e-mail in the chain is
18  you to Dr. Levine saying, "Oh, yes very.  He may be
19  wondering why he's heard nothing yet."  And that's
20  just part of your e-mail, right?
21   A   Yes.
22   Q   And when you say, "He may be wondering why
23  he's heard nothing yet," are you referring to
24  Professor Fagal?



Page 34

1    A  Yes.
2    Q  And by this statement, you meant Professor
3  Fagal may be wondering why he's heard nothing yet
4  from Marywood's administration about his e-mail and
5  the videos; right?
6    A  Yes.
7    Q  So here in this e-mail would it be fair to
8  say you were pretty sure that he sent the e-mail on
9  January and posted the videos on YouTube; correct?
10       MS. PEET:  Objection to the form.
11       THE WITNESS:  It appeared from the e-mail
12  that he sent it, but I would not -- I would not say I
13  was certain until he had the opportunity to answer the
14  question.
15  BY MR. COHEN:
16    Q  Okay. So let's finally get to this meeting
17  between Professor Fagal, President Munley, you and
18  Dr. Foley on January 23rd, 2012, that morning.  You
19  remember there was a meeting, right?
20    A  Yes, I do.
21    Q  And the plan, again we discussed there was
22  kind of a plan for the meeting was to get him at
23  8:45 a.m.; right?
24    A  Yes.

Page 35

1    Q  And if he said no, then Dr. Foley was going
2  to suggest another time; correct?
3    A  Yes.
4    Q  Now, the first part of that plan was for
5  Dr. Foley to visit Professor Fagal at approximately
6  8:45 a.m.; right?
7    A  Yes.
8    Q  And for Dr. Foley to tell Professor Fagal to
9  come to President Munley's office at 9 a.m.,
10  correct?
11    A  Yes.
12    Q  What was the reason for providing Professor
13  Fagal with only 15 minutes' notice of this meeting,
14  if any?
15    A  There was no reason and nothing that he
16  would have had to prep for.  The questions that
17  Sister was going to ask him were pretty simple and
18  wouldn't have required any kind of prep on his part
19  to answer.
20    Q  Let me ask you this:  Isn't it correct that
21  Professor Fagal had class scheduled for 9 a.m.?
22    A  I don't know.
23    Q  So you said that there was not really any
24  reason to provide more notice because the questions

Page 36

1  that President Munley was planning to ask him were
2  pretty simple, right?
3       MS. PEET:  Mischaracterization of testimony.
4  You can answer.
5       THE WITNESS:  Yes, the questions that Sister
6  Anne Munley planned to ask Dr. Fagal that I knew about
7  didn't -- wouldn't have required any research or prep on
8  his part.
9  BY MR. COHEN:
10    Q  So based on the talking points that you
11  jotted down for this meeting, some of the
12  alternatives mentioned for Professor Fagal included
13  retirement, suspension, later on a recommendation
14  for termination; correct?
15    A  Yes.
16    Q  So would it be fair to say that this meeting
17  with Professor Fagal, whatever was said at the
18  meeting or not said at the meeting had the
19  potential to end Professor Fagal's position at
20  Marywood?
21       MS. PEET:  Objection to the form.
22       THE WITNESS:  The talking points were simply
23  options that were available.
24  BY MR. COHEN:

Page 37

1    Q  So they were options.  Some of those options
2  included suspension, retirement, possibly
3  termination; correct?
4    A  Yes.
5    Q  So would it be fair to say that what
6  occurred at this meeting had the potential to
7  terminate Professor Fagal's position voluntarily or
8  involuntary at Marywood?
9       MS. PEET:  Objection.  Dr. Dunleavy lacks
10  competence to answer the question.  But if she knows the
11  answer, then she can go ahead and answer the question.
12       THE WITNESS:  No, I can't get into Sister
13  Anne's head and answer that.
14  BY MR. COHEN:
15    Q  Well, let's go back to Dunleavy Exhibit 7.
16  Again, these are the talking points for the
17  meeting; correct?
18    A  Yes.
19    Q  And we talked today about how these bullet
20  points were really President Munley's ideas and you
21  just kind of put them into writing, correct?
22    A  That's correct.
23    Q  So you say that you don't really know what
24  President Munley was thinking, which is obvious,



Page 38

1  but you do know what she told you to write down;
2  right?
3      A   Yes.
4      Q   And among the things she told you to write
5  down were possibilities that Professor Fagal would
6  be suspended, that he could retire, ultimately that
7  President Munley could recommend his termination;
8  correct?
9      A   Yes.
10     Q   So you knew, at least from what President
11  Munley was telling you, that this meeting with
12  Professor Fagal could end his career at Marywood;
13  correct?
14         MS. PEET:  Objection to the form.
15         THE WITNESS:  The creation and distribution
16  of the videos, if Dr. Fagal admitted to those, would
17  have been what resulted in his suspension.  He freely
18  chose to do that.
19  BY MR. COHEN:
20     Q   Okay.  But I thought you just testified that
21  going to the meeting you weren't absolutely sure
22  that he even generated the videos, correct?
23     A   Correct, if he admitted.  That's why the
24  first question was did you author and did you send.

Page 39

1  If he admitted to it then and that was his choice
2  to have done that, that would have resulted in a
3  suspension or any of the other options.
4      Q   Would it have been more reasonable to
5  provide Professor Fagal with more than 15 minutes
6  notice of this meeting on January 23rd, 2012?
7          MS. PEET:  Objection to the form.
8          THE WITNESS:  I don't think so.
9  BY MR. COHEN:
10     Q   Let me ask you this, and this is a
11  hypothetical, I know that, but if you had sent the
12  e-mail that Professor Fagal had and generated the
13  videos that he posted on YouTube, would you have
14  preferred more than 15 minutes' notice of a meeting
15  with the President, was asking you questions that
16  the answers to which could lead to termination?
17         MS. PEET:  Objection; calls for speculation.
18  You can answer.
19         THE WITNESS:  First of all, I want it on the
20  record I would never, ever send an e-mail or videos like
21  that.  But, no, if I did that kind of a thing, I
22  wouldn't expect any notice.
23  BY MR. COHEN:
24     Q   So going into this meeting of Professor

Page 40

1  Fagal on January 23rd, 2012, at that time how long
2  had you been -- at that time you were Vice
3  President for Human Resources; correct?  Is that
4  the exact terminology?
5      A   No.  I think I was still Assistant Vice
6  President.  I think I became Associate Vice
7  President in 2013, but I'm not positive.
8      Q   Would it be fair to say that you were
9  essentially in charge of HR at Marywood at that
10  time?
11     A   Yes.
12     Q   And at that time, the meeting on
13  January 23rd, 2012, how long had you been
14  essentially in charge of Marywood's HR?
15     A   Since 19 -- no, I'm sorry, since 1984.
16     Q   So a long time?
17     A   A long time.
18     Q   And Professor Fagal was certainly not the
19  first Marywood employee that you saw being
20  disciplined, correct?
21     A   That's correct.
22     Q   And the meeting with Professor Fagal on
23  January 23rd, 2012 wasn't the first meeting that
24  you had with an employee where President Munley or

Page 41

1  a previous President wanted more information from
2  an employee about whether he did something and, if
3  so, what explanations he or she could provide;
4  correct?
5      A   I don't remember because you specified a
6  President.  It may have been other administrators.
7      Q   Any other administrator.
8      A   So rephrase the question so I can answer it
9  correctly, I'm sorry.
10     Q   The meeting that you held with Professor
11  Fagal on January 23rd, 2012 was not the first
12  meeting that you participated in with a Marywood
13  employee where he or she was asked whether he or
14  she did something and, if so, why?
15         MS. PEET:  Just for classification, there's
16  no testimony that Dr. Dunleavy held the meeting on
17  January 23rd.  You can answer.
18  BY MR. COHEN:
19     Q   Participated.
20     A   That's correct.
21     Q   Now, prior to the January 23rd, 2012 meeting
22  with Professor Fagal, was it your practice to offer
23  only 15 minutes' notice of a meeting where
24  discipline could potentially be meted out?



MAGNA ▶
LEGAL SERVICES

Page 42

1    A   Sometimes less.  Sometimes it would be an
2  immediate call, please come down or please -- yeah.
3    Q   What about other times?
4    A   I think 15 minutes was generous notice for
5  those kind of situations.
6    Q   So the meeting between you, Professor Fagal,
7  President Munley and Dr. Foley started at around
8  9 a.m. on January 23rd, 2012; right?
9    A   Yes.
10    Q   And could you state in as much detail as you
11  can what was said at that meeting by all of the
12  participants.  I realize it's been a while.
13    A   Sister Anne conducted the meeting.  I was
14  there simply as note taker.  Dr. Foley was there as
15  a witness.  He was the Dean of the college in which
16  Dr. Fagal taught.  Neither of us spoke at the
17  meeting, and Dr. Fagal was there.
18        Sister Anne opened with the question of
19  whether he authored the video.  I believe Dr. Fagal
20  said, "Yes."  She asked him if he sent it.  I
21  believe he said "Yes" to that.  She asked him why
22  and that's where he stopped.  He didn't want to
23  answer anymore.
24        She asked him repeatedly about the videos.

Page 43

1  He kept referencing a prior incident from several
2  months earlier about posters.  Sister kept saying,
3  "I'm talking about the videos."  And I think the
4  meeting lasted about 20 minutes.
5    Q   Now, this prior incident that you mentioned
6  about posters, didn't you think that that was
7  relevant to the videos?
8    A   I did not.
9    Q   Okay.  Isn't it clear from what you know now
10  that Professor Fagal posted the videos in part at
11  least because he was angry about the poster
12  incident?
13        MS. PEET:  Objection to the form.
14        THE WITNESS:  From sitting in other
15  depositions, it seems he tries to link that.  At the
16  time I didn't know that at all.
17  BY MR. COHEN:
18    Q   Okay.
19    A   They were entirely separate incidents.
20    Q   Well, again, the videos -- I keep saying
21  videos but it's one video, a two-part video on
22  YouTube; right?
23    A   There were two different links, yes.
24    Q   And those links were provided by Professor

Page 44

1  Fagal in an e-mail that he sent in January of 2012
2  to many members of the Marywood community; correct?
3        MS. PEET:  Objection; asked and answered.
4        THE WITNESS:  Yes.
5  BY MR. COHEN:
6    Q   And in that e-mail he discussed at length
7  this incident involving FIRE posters that happened
8  in November of 2011, correct?
9    A   I focused on the videos.  I don't remember
10  reading a lot of the detail of the e-mail.  It
11  wasn't relevant to me or anything I had to deal
12  with.  That was done.
13    Q   So President Munley asked Professor Fagal
14  whether he authored the videos, correct?
15    A   Yes.
16    Q   Asked him why, correct?
17    A   Yes.
18    Q   And is it your testimony that he didn't
19  answer or that he tried to answer but he starts
20  speaking about a poster incident first?
21    A   I would have to look at my notes.  I know
22  that he talked about posters.  I don't remember the
23  exact order of what he said.  I know at some point
24  he said he didn't want to answer any more

Page 45

1  questions.
2    Q   Isn't it true that Professor Fagal stated at
3  this meeting that he wanted President Munley to put
4  her questions in writing and he would like the
5  opportunity to craft a written response?
6    A   Yes, I do remember that.
7    Q   Do you remember whether President Munley
8  responded to that request that he be given an
9  opportunity to craft a written response?
10        MS. PEET:  At the meeting?
11        MR. COHEN:  Yes.
12        THE WITNESS:  I believe that Sister asked
13  him again and said she wanted to talk about it there at
14  the meeting.
15  BY MR. COHEN:
16    Q   So essentially his request to respond in
17  writing was denied?
18        MS. PEET:  Objection to the form.
19        THE WITNESS:  I don't remember.
20  BY MR. COHEN:
21    Q   Well, you do remember, correct, that the
22  meeting was on the morning of January 23rd, 2012
23  and then the next morning President Munley had
24  e-mailed or a secretary had e-mailed Professor



Page 46

1  Fagal a letter with a statement of charges
2  recommending termination; correct?
3    A  Yes.
4    Q  Okay.  At what point in this January 23rd,
5  2012 meeting did President Munley inform Professor
6  Fagal that he was being suspended?
7    A  I don't remember without looking at my
8  notes.
9    Q  Going into the meeting, did Dr. Levine have
10  any role in suggesting or recommending that
11  Professor Fagal be suspended?
12    A  Not that I'm aware of.
13    Q  Was there any audio or video recording of
14  the January 23rd, 2012 meeting?
15    A  No.
16    Q  Was David Elliott listening or watching the
17  meeting from like another room?
18    A  No.  David Elliott was stationed out by the
19  secretary's desk.
20    Q  So there were no other witnesses to the
21  meeting other than the actual people in the room?
22    A  That's correct.
23    Q  And ultimately at some point, you're not
24  sure when, President Munley told Professor Fagal

Page 47

1  that he was suspended; correct?
2    A  Yes.
3    Q  Did that shock you?
4      MS. PEET:  Objection to the form.
5      THE WITNESS:  No.
6  BY MR. COHEN:
7    Q  At the time that President Munley stated to
8  Professor Fagal that he was suspended, did you
9  believe that Professor Fagal posed an immediate
10  harm to himself or to others?
11    A  Could you repeat the question.
12    Q  At the time that President Munley told
13  Professor Fagal that he was suspended, did you
14  believe that Professor Fagal posed an immediate
15  harm to himself or to others?
16    A  Tying it to that specific time, I don't
17  remember.  The fact that those videos were created
18  and disseminated and put on YouTube and the fact
19  that we felt it important to have Dave Elliott
20  nearby because we at that point didn't know how
21  Dr. Fagal would respond, yeah, imminent threat if
22  not to himself to others and to University and its
23  reputation.
24    Q  An imminent physical threat to himself or to

Page 48

1  others?
2    A  I don't know.  That was probably in the
3  range of possibility at that point.  Those videos
4  were outrageous.
5    Q  Did the videos or the e-mail that linked to
6  the videos, in either did Professor Fagal, you
7  know, advise or incite any violence?
8    A  I don't recall.
9    Q  So if you thought that Professor Fagal
10  possibly posed a threat of imminent harm to himself
11  or to others, why didn't you recommend that he be
12  brought in immediately after the video was sent as
13  opposed to several days after?
14    A  This wasn't my meeting.
15    Q  Right.
16    A  This was Sister Anne Munley's.  I believe
17  she was out of town.
18    Q  But you were the head of HR, right?
19    A  Yes.
20    Q  Was Marywood incapable of making a decision
21  without President Munley actually being there?
22    A  Certainly not.
23    Q  If you had really thought that Professor
24  Fagal posed a threat, a physical threat to himself

Page 49

1  or to others, you would have attempted to take
2  steps to have him removed from campus immediately;
3  right?
4      MS. PEET:  Objection; mischaracterization of
5  testimony.  You can answer.
6      THE WITNESS:  I'm not sure why we're focused
7  on just physical harm.  Harm can take many,
8  many --
9  BY MR. COHEN:
10    Q  We'll get to that.  My question is about
11  physical harm.
12    A  I don't know -- I don't recall if I thought
13  he posed physical harm prior to the meeting.
14    Q  Okay.  Are you aware of -- well, apart from
15  what you thought, did anyone else, in particular
16  members of Marywood's cabinet, tell you that they
17  thought that Professor Fagal posed an immediate
18  threat of harm to themselves or to others?  This is
19  prior to the meeting where he was suspended.
20    A  I don't recall.
21    Q  Prior to the January 23rd, 2012 meeting with
22  Professor Fagal, are you aware of anybody at
23  Marywood taking special security precautions with
24  regard to Professor Fagal?



1    A  I don't recall.
2    Q  Do you remember yourself or any other member
3  of the Marywood cabinet informing Marywood's
4  security department prior to January 23rd, 2012
5  that Professor Fagal could be a threat to himself
6  or to others?
7    A  I testified earlier on my notes with that
8  conversation I had with Dave Elliott, and that
9  happened prior to the meeting so that was us
10  preparing for that meeting. That's all I remember,
11  though.
12    Q  Do you know whether Professor Fagal was
13  under any type of surveillance or monitoring prior
14  to the January 23rd meeting?
15    A  I don't know.
16    Q  Do you know whether his office was searched
17  prior to the meeting?
18    A  I don't know.
19    Q  Do you know whether his University computer
20  was searched prior to the meeting?
21    A  I don't know.
22    Q  Do you know whether police were informed
23  about Professor Fagal prior to the meeting?
24    A  I don't know.

1         MR. COHEN:  Can we take a brief break.
2         (At this time a brief recess
3          was taken.)
4         MR. COHEN:  Let's make this Dunleavy 8.
5         (Dunleavy Exhibit No. 8 was marked
6          for identification.)
7  BY MR. COHEN:
8    Q  And this is your handwriting. Do you
9  recognize this?
10    A  Yes, I do.
11    Q  And would it be fair to say that these are
12  your contemporaneous notes of the January 23rd,
13  2012 meeting with Professor Fagal?
14    A  Yes.
15    Q  And you were taking these notes as the
16  meeting occurred?
17    A  Yes.
18    Q  Now, I think we can save a lot of time
19  because I've tried to read these many times and I
20  understand some of it but not all of it. If you
21  could read it line for line so that it's clear to
22  everybody, I would appreciate it.
23    A  Sure. On the top left I have the
24  participants in the room, Sister Anne, Mike -- it

1  would be Mike Foley -- me and Fred Fagal and the
2  date is 1/23/12. At 8:45, this would have been
3  before the meeting, Mike Foley went to Fred Fagal,
4  asked -- he asked why. That would be Fred asked
5  why. Mike Foley said we can both probably guess.
6  And so Mike came up to the meeting before 9 and
7  told Sister Anne this and said that Mike assumed
8  he, being Fagal, would be here at 9.
9         The double lines mean that's the break.
10  That was the pre-meeting. The meeting started.
11  "FF" is Fred Fagal. Surprised three here. Sister
12  Anne -- the SAM is Sister Anne Munley -- asked are
13  you the author? He responded, "Yes, I am." She
14  asked "Sent to whom?" How disseminated?"
15         Then the next line would be Fagal's
16  response, not sure why he would answer that. Can
17  figure out for yourself. Won't answer.
18         F is Fagal. Purpose of meeting?
19         Then SAM, Sister, tenure responsibility,
20  mission, core values, how?
21         Next line, F:  Won't answer anymore.
22    Q  I'm sorry, let me just stop you right there.
23  When she said "how," are you trying to say that she
24  says how did your videos comport with --

1    A  Yes.
2    Q  -- mission and core values?
3    A  Yes.
4    Q  Okay. Go on.
5    A  And then Fagal says he won't answer anymore.
6  A is Sister Anne. What did you want to accomplish?
7  Fred said "Justice." Sister said, "Please
8  elaborate." Fagal said, "Don't choose to
9  elaborate." Sister went back to the policies,
10  tenure --
11    Q  CR?
12    A  I'm not sure what that is. I would have to
13  look at the typed notes. I might have spelled it
14  out better there. Academic freedom, professional
15  ethics, all appropriate support in the mission or
16  support the mission.
17         Fred said he was leaving. Sister said she
18  wasn't done with the meeting, that it was his
19  chance to address and that she would consider her
20  response. And Fred asked -- this is where Fred
21  asked for her questions in writing and he'll craft
22  a response.
23         Sister asked him, "Nothing else to say?" He
24  said, "No." And then Sister told him he was

1  suspended with pay, asked him to return his keys
2  and I.D. to me, Pat, and to take his personal stuff
3  and leave.
4      Fred brought up the faculty manual, mortal
5  danger it looks like, moral turpitude at all his
6  questions, I believe.  Sister Anne said look at
7  those policies that she had mentioned.  Fred said
8  he had lots in his office and it wouldn't fit
9  today.
10      Next page, Sister verified his home address,
11  e-mail and his Yahoo account and his phone number,
12  asked for his cell and he provided it.  And Sister
13  said she would pursue with her determination and he
14  could arrange to get his other stuff with me or
15  with Campus Safety.
16      Sister asked him again if there was --
17    Q  Wait a second, I'm sorry.  You said "She
18  will pursue with her determination"?
19    A  That's what that says.
20    Q  What did you mean, determination of what?
21        MS. PEET:  What did Pat mean or what -- Pat
22  was just the note taker.
23  BY MR. COHEN:
24    Q  What did you mean when you wrote that?

1    A  With her determination of what would happen
2  next is what I presume.
3    Q  With regard to Professor Fagal's employment?
4    A  Yes.  She had already told him he was
5  suspended so she would go then further.
6    Q  Okay.
7    A  Sister Anne asked if Dr. Fagal had other
8  information or input to consider.  Dr. Fagal -- I'm
9  not sure if he read something or wanted Sister to
10  read it.  He said he called AL -- is Alan Levine --
11  on Saturday at his house and he left a message to
12  talk off the record.
13      He wrote to FIRE, but I don't know if that
14  means he wrote when, and he was trying to give
15  Sister Anne Munley an out re: the posters.  He
16  went to -- this is still Dr. Fagal -- went to Alan
17  Levine, AL, on 12/5.  Said Carl O. -- that would be
18  Carl Oliveri who was then the Director of Student
19  Activities, said the posters didn't have prize on
20  then, and then it says "That's a lie."  I don't
21  remember if that was Fred's comment or if he said
22  Carl said that.
23      Carl was not there Monday, whatever Monday
24  that was.  His -- that would be Carl's assistant

1  lied, question mark.  If executive council lied to
2  about that, could explain actions."  I'm not sure
3  what that references.
4      Fagal wrote to -- I think that's the name of
5  somebody at FIRE and another friend.  Munley's only
6  narrowing escape, if false information -- I'm
7  sorry, I don't know what that little arrow is, that
8  little caret word.  It might be "saw" but I'm not
9  sure.  I type things up very quickly because my
10  writing is so bad.
11      FIRE response was flawed.  Maybe that's your
12  FIRE response or her, I don't know.  Evidence - see
13  if there's a way out to explain what I observed.
14      Drafted a response to Sister Anne - amend
15  response to FIRE.  Give Sister Anne his response to
16  FIRE in her response.  Try to give Sister Anne
17  Munley more time to rescue herself from depths.
18  Feels she's not doing best for University in this
19  case.
20      Posters - e-mailed Carl Friday about posters
21  with prize money.  Could get affidavit about
22  posters.  Sister Anne said this is all input about
23  the posters.  I want input about the videos.  And
24  Fred said they were satire.

1      Sister Anne asked him if that was
2  appropriate and talked about the foundational value
3  of respect.  Fred said, "Um...said in faculty
4  report not everybody deserves respect; i.e.,
5  Hitler, Bin Laden."
6      Sister said, "What do you mean?"  Fred said,
7  "I don't want to get philosophical."  Talked about
8  dancing, angels on the head of a pin.  Sister asked
9  him if the content was not offensive.  Fred said
10  people could be offended all the time, living in
11  dictatorship soon.  Shows willingness to find way
12  out.  1. FIRE; 2. Called Alan; 3. Lies in student
13  life office.
14      Sister Anne wanted a response to the nature
15  of the video.  Very clear.  And then Fred left at
16  9:15 pulling out his keys.
17    Q  Now, at 9:15 when Fred left, do you remember
18  whether everyone else in the room remained there to
19  talk about what had just transpired?
20    A  I don't remember -- Fred left first but I
21  don't remember anybody staying for any length of
22  time so, no.
23    Q  Were you surprised at what Fred said during
24  the meeting, at anything he said?



Page 58

1      A   No.
2      Q   Did anyone after he left express any
3  surprise?
4      A   Not that I remember.
5      Q   Well, did you find his -- scratch that.
6          Is there another set of handwritten notes
7  that you made, not necessarily contemporaneous
8  about this meeting but soon after the meeting?
9      A   No, not that I'm aware of.  I typed up those
10  notes, these notes later -- probably later that
11  morning because, as you see, I can't read my own
12  handwriting so --
13     Q   I'm not criticizing your handwriting.
14     A   You can, that's okay.
15     Q   Fred and I could have sworn that there was
16  another set of handwritten notes other than what
17  you wrote contemporaneously and not what you typed
18  up, but you don't think that's true?
19     A   No.
20         MS. PEET:  Off the record.
21         (At this time there was a brief
22          discussion held off the record.)
23  BY MR. COHEN:
24     Q   Now, on the next day, January 24th, 2012,

Page 59

1  you recall that President Munley e-mailed a
2  statement of charges to Professor Fagal; right?
3      A   Yes.
4      Q   Do you know who drafted that statement of
5  charges?
6      A   No, I don't.
7      Q   Do you know when that statement of charges
8  was when someone started drafting it?
9      A   No, I don't.
10         MR. COHEN:  Let's make this Dunleavy 9.  It
11  also happens to be Munley 9.
12         (Dunleavy Exhibit No. 9 was marked
13          for identification.)
14  BY MR. COHEN:
15     Q   And if you could briefly read this to
16  yourself and let me know when you finish.
17     A   (Witness reviews document.)
18     Q   So this is an e-mail from you to Sister Anne
19  dated January 23rd, 2012 at 6:22 p.m., correct?
20     A   Yes, that's correct.
21     Q   And you mention in the second paragraph that
22  begins "Will have an appointment over lunch."
23     A   Yes.
24     Q   And there's a semi-colon and then it says,

Page 60

1  We will finish up the Fagal statement of charges
2  and the response to Palmiter and it just goes on.
3  Correct?
4      A   Yes.
5          MS. PEET:  For the record, the Palmiter
6  stuff has nothing to do with this lawsuit.
7          MR. COHEN:  Right.  I wasn't going to ask
8  about Palmiter.
9          MS. PEET:  Okay.
10  BY MR. COHEN:
11     Q   Now, the Fagal statement of charges they are
12  referring to here, is that the same statement of
13  charges that Professor Fagal was sent the next day?
14     A   I don't know.
15     Q   Well, was there another statement of charges
16  sent?
17     A   No, but I don't know.
18     Q   Okay.  So when you say, "We will finish up
19  the Fagal statement of charges," does that refresh
20  your recollection of who drafted it or who
21  participated in drafting?
22     A   Not really.  My goal really was a conduit at
23  that point so whether Sister and Will -- Will would
24  be Will Anthony -- so whether Sister and Will had

Page 61

1  started and Will was -- I don't remember that.  And
2  I may have just been Will would have been back to
3  me and I would have given them to Sister.
4          MS. PEET:  Dr. Dunleavy, just an instruction
5  for the remainder of the deposition, anything that you
6  had discussed with Will Anthony is protected by the
7  attorney/client privilege and you are not to disclose
8  any communications that you had with Mr. Anthony or any
9  other lawyer including anyone from Jackson Lewis.
10         THE WITNESS:  Okay.
11  BY MR. COHEN:
12     Q   Now, recently I drafted a set of
13  interrogatories which you signed.  Do you recall
14  signing some Answers to Interrogatories?
15     A   Yes.
16     Q   And one of the questions that I asked was
17  about the file containing the statement of charges
18  and whether you knew when it was created and there
19  was an objection to that question.  But do you
20  know?
21     A   No, I don't.
22     Q   Have you tried to research this?  Have you
23  looked for the file and looked at the metadata?  Do
24  you even know who has the file?



1    A   No.
2    Q   Now, in the same paragraph, the second
3 paragraph, you mention your recommendation to
4 dismiss, you're writing to President Munley so
5 you're referring to her recommendation to dismiss;
6 correct?
7    A   Yes.
8    Q   So as of 6:22 p.m. on January 23rd, 2012,
9 would it be fair to say that President Munley had
10 already made a decision that she was going to
11 recommend dismissal of Professor Fagal?
12    A   I can't speak for where Sister was at that
13 point.
14    Q   Could you think of any reason why you would
15 reference President Munley's recommendation to
16 dismiss if she hadn't told you that she was
17 recommending dismissal?
18    A   It would probably have been in the realm of
19 possibility but, again, these were her decisions,
20 not mine.
21    Q   Okay.  Now, in the next paragraph you write,
22 "Dr. Fagal has requested a statement regarding his
23 suspension."  Correct?
24    A   Yes.

1    Q   Now, I don't think I've ever seen this
2 e-mail.  Do you know whether it exists because I
3 don't think it's been produced.  I don't have it.
4    A   I did send him an e-mail.
5    Q   Right, I know you did but what I'm wondering
6 is whether you have his secretary's e-mail
7 requesting a statement regarding his suspension?
8    A   No.  It is possible, I don't know, that it
9 could have gone to someone else but, no.
10       MR. COHEN:  Let's call this Dunleavy 10.
11       (Dunleavy Exhibit No. 10 was marked
12         for identification.)
13 BY MR. COHEN:
14    Q   Do you recognize this document?
15    A   It's an e-mail that I sent to Sister Anne on
16 Monday, January 23rd, 2012.
17    Q   And the time is 8:52 p.m., right?
18    A   Yes.
19    Q   Were you actually working in the office at
20 that time or did you send this from home?
21    A   I don't remember.  It is possible that I
22 sent it from home.
23    Q   Now, regarding Fagal in this e-mail, you
24 wrote, "Will's draft of the statement of charges

1 will follow."  Right?
2    A   Yes.
3    Q   So as of this time, the sending of the
4 e-mail, it would be fair to say that a draft of the
5 statement of charges was complete or nearly
6 complete; correct?
7    A   There was a draft that would follow.  I
8 don't know what state it was in at this point.
9    Q   Do you remember whether there was some kind
10 of rush to get the statement of charges done as
11 soon as possible?
12    A   I didn't recall.
13    Q   Did President Munley tell you that she
14 wanted it sent out the next day?
15    A   I don't recall.
16       MR. COHEN:  Let's mark this Dunleavy 11.
17       (Dunleavy Exhibit No. 11 was marked
18         for identification.)
19 BY MR. COHEN:
20    Q   And do you recognize this document?
21    A   Yes.
22    Q   And this is a typewritten set of notes that
23 you made explaining what had occurred at the
24 meeting on January 23, 2012 with Professor Fagal;

1 right?
2    A   Yes, that's correct.
3    Q   And in generating this document, you used
4 your contemporaneous notes; correct?
5    A   Yes.
6    Q   Did you use any other sources, someone
7 else's notes or someone else's memory?
8    A   No.
9    Q   How soon after January 23rd, 2012 did you
10 generate this document?  I know it's dated
11 January 23rd, 2012, but did you go right into your
12 office and start this right away?
13    A   I don't remember exactly what time, but I
14 believe it was that morning.
15    Q   When you have a meeting with a Marywood
16 employee that was going to be disciplined, is this
17 common for you to make a set of contemporaneous
18 notes and then follow it up with a set of
19 typewritten notes?
20    A   Yes.
21    Q   And it's signed by you and Michael Foley,
22 correct?
23    A   Yes, it is.
24    Q   Did you ask President Munley to sign it?



1    A   No.
2    Q   Any reason why?
3    A   Sister Anne asked me to take notes.  She had
4  asked Mike Foley to sit in on the meeting as a
5  witness so he was the eyes and ears and I was the
6  note taker.  I wanted to make sure he concurred
7  that my depiction was accurate and I gave the notes
8  to Sister Anne.  That's all.
9    Q   And this document that we're looking at,
10  Dunleavy 11, is this an accurate representation of
11  what occurred at the January 23rd, 2012 meeting?
12    A   Yes.
13        MR. COHEN: Let's make this Dunleavy 12.
14        (Dunleavy Exhibit No. 12 was marked
15        for identification.)
16  BY MR. COHEN:
17    Q   And do you recognize this document?
18    A   Yes, I do.
19    Q   And here you're forwarding an e-mail that
20  you had sent to Dr. Fagal at 2:14 p.m. on
21  January 23rd, 2012; correct?
22    A   Yes.
23    Q   You're forwarding it to President Munley?
24    A   Yes.

1    Q   And you wrote, "Sister Anne Munley provided
2  you with several opportunities to explain your
3  actions or to provide any information you thought
4  she should consider regarding your actions
5  concerning the videos.  You declined her
6  invitation."  Correct?
7    A   Yes.
8    Q   But that's not really completely accurate,
9  though, because Professor Fagal did ask for an
10  opportunity to respond in writing; correct?
11    A   Yes, he did.
12        MR. COHEN:  Let's make this Dunleavy 13.
13        (Dunleavy Exhibit No. 13 was marked
14        for identification.)
15  BY MR. COHEN:
16    Q   Dunleavy 13, do you recognize this document?
17    A   Yes, I do.
18    Q   And the first page is an e-mail that
19  President Munley's executive secretary sent to
20  Dr. Fagal, correct?
21    A   That's correct.
22    Q   On January 24th, 2012 at 1:11 p.m., correct?
23    A   Yes.
24    Q   And it looks like you're bcc'd on this

1  e-mail, right?
2    A   That's correct.
3    Q   Now, looking at this, after the e-mail are
4  the attachments to the e-mail, does that appear to
5  be correct to you?
6    A   Yes.
7    Q   And the first attachment is a letter from
8  President Munley to Dr. Fagal and he or she is
9  recommending his termination, correct?
10    A   Yes.
11    Q   I might have asked this before, but did you
12  play any role in drafting this letter or providing
13  any input into this letter?
14    A   I would have pulled copies of the policies
15  that Sister requested to enclose with a letter.
16    Q   But you don't know whether you actually put
17  any other input into the wording of the letter?
18    A   I don't believe I did.
19    Q   Now, between the time that Dr. Fagal was
20  suspended on the morning of January 23rd, 2012 and
21  the time that this e-mail we're looking at was sent
22  to him, are you aware of any remedial actions that
23  Marywood took to resolve the issues that led to
24  Professor Fagal's suspension?

1        MS. PEET:  Objection to the form.  You can
2  answer.
3        THE WITNESS:  I don't know.
4  BY MR. COHEN:
5    Q   Well, you were head of HR at the time;
6  correct?
7    A   Yes.
8    Q   So wouldn't it be your job to know whether
9  any remedial actions are taken to resolve issues
10  that led to his suspension?
11        MS. PEET:  Objection to the form.
12        THE WITNESS:  Not with tenured faculty, no.
13  BY MR. COHEN:
14    Q   Between the time that Professor Fagal was
15  suspended and the time that this e-mail was sent to
16  him, did you work pretty closely with President
17  Munley about her plans for Professor Fagal?
18        MS. PEET:  Objection to the form.
19        THE WITNESS:  I don't remember specifically.
20  I do remember pulling copies of policies as she
21  requested them.
22  BY MR. COHEN:
23    Q   Between the time of the meeting on
24  January 23rd and the time that this e-mail was



1  sent, were you in contact with Will Anthony without
2  saying -- I'm not asking what was said, if
3  anything, but were you in touch with any Marywood
4  attorney?
5      A  I don't remember.
6      Q  Is your office located close to President
7  Munley's?
8      A  Our offices are in adjoining buildings.
9      Q  So when I asked you if between the time of
10  this suspension and the time of this e-mail whether
11  Marywood had taken any remedial actions with regard
12  to Professor Fagal, I think you said you don't
13  know?
14      A  That's correct.
15      Q  And then I asked you, well, isn't it your
16  job to know and you said, Well, not necessarily;
17  right?
18      A  I said not with tenured faculty.
19      Q  Well, whose job would it be to know?
20      A  It would be either the Vice President for
21  Academic Affairs and/or President, perhaps a Dean
22  depending on what the issue was.
23      Q  And the Vice President for Academic Affairs
24  at the time was Dr. Levine, right?

1      A  Correct.
2      Q  And what was the other position you
3  mentioned?
4      A  The President.
5      Q  Other than that, there was Dean?
6      A  Depending on the level, and I don't work
7  with the Progressive Discipline Policy a lot, but I
8  believe there are initial steps depending on the
9  circumstances where a Dean might take a role, not
10  in this particular case but in some.
11      Q  And the Dean that was -- who were the Deans
12  that supervised Professor Fagal at this time, like
13  who were his superiors?
14      A  He would have had a department chairperson,
15  I have no idea who that would have been at the
16  time.  Dr. Foley would have been the Dean of that
17  college, Dr. Levine was the Vice President over the
18  Dean and then Sister Anne would have been
19  President.
20      MR. COHEN:  I need to take a ten-minute
21  break.
22      (At this time a brief recess
23      was taken.)
24      MR. COHEN:  Let's make this Dunleavy 14.

1      (Dunleavy Exhibit No. 14 was marked
2      for identification.)
3  BY MR. COHEN:
4      Q  And do you recognize this document?
5      A  Yes.
6      Q  And what is it?
7      A  These are talking points again for Sister
8  Anne that she would have requested me to have typed
9  up for her to take to her board meeting about the
10  Fagal incident.
11      Q  Now, was there a special board meeting just
12  for this incident or were there like regularly
13  scheduled board meetings?
14      A  There are regularly scheduled board
15  meetings.  To my recollection, that's what this
16  was.
17      Q  Do you know when this document was created?
18      A  No.  The board meeting is generally the end
19  of January and the last thing on this -- the first
20  piece of paper on Page 2, I guess, is dated
21  January 24th so probably on or after that.
22      Q  On Tuesday, January 17th, 2012, the third
23  bullet point down it says, "Dr. Dunleavy began
24  collecting information."  Do you see that?

1      A  Yes, I do.
2      Q  And there's three sub-bullets:  "Policy
3  review, history of Dr. Fagal's performance issues
4  and insurance coverage."  Did I read that
5  correctly?
6      A  Yes, you did.
7      Q  And what does policy review mean?
8      A  They would have been policies that might
9  have applied so that would have been a review of
10  any policies that might have been violated by the
11  videos.
12      Q  What about any policies about disciplinary
13  procedure?
14      A  Probably, so policy review could be anything
15  about this incident, anything that I might have
16  felt would have applied to give to Sister for her
17  review.
18      Q  And this history of Dr. Fagal's performance
19  issues, what performance issues are you referring
20  to?
21      A  What I believe I was doing at that point was
22  looking to see -- that's standard what I would do
23  in any kind of a complaint of this nature, look to
24  see was there a history, is any of it relevant,



Page 74

1    look at policies that might apply.
2         Q   Well, was there a history that was relevant?
3         A   No.  There were, as I recall, a few
4    incidents but they were not related, no.
5         Q   And what is insurance coverage?
6         A   That would have been to check with our
7    insurance carrier and see what kind of coverage we
8    had under what kind of policies in case this became
9    a big issue.  So these were all just standard
10   things that I would do in any complaint.
11        Q   Now, on Wednesday, January 18th, 2012, the
12   first bullet point underneath that, it says,
13   "Dr. Dunleavy briefed Sister Anne Munley on actions
14   to date."  Correct?
15        A   Yes.
16        Q   And is that true?
17        A   It says I did so.  I assume I did.
18        Q   And what actions had been taken to date?
19        A   The actions from Tuesday, the 17th.
20        Q   Now, when you briefed Sister Anne, how did
21   that occur, in person?  Over the phone?
22        A   I don't recall other than I believe Sister
23   was out of town so it was probably over the phone.
24        Q   Okay.  Now, on Thursday, January 19th, 2012,

Page 75

1    there's a bullet point that's entirely redacted.
2    And then the next one says, "Dr. Levine and
3    Dr. Dunleavy reviewed AAUP policies."  Right?
4         A   Yes.
5         Q   And is that, in fact, true that you did
6    that?
7         A   It says I did so I assume I did.
8         Q   Do you remember doing that?
9         A   No.
10        Q   And what is the AAUP?
11        A   American Association of University
12   Professors.
13        Q   And does it make sense to you that you would
14   have reviewed AAUP policies?
15            MS. PEET:  Objection to the form.
16            THE WITNESS:  Yes.
17   BY MR. COHEN:
18        Q   Why would you review those policies?
19        A   This was all part of data collection so we
20   would look at anything that might be relevant.
21        Q   But why were AAUP policies relevant?
22            MS. PEET:  Objection to the form.
23            THE WITNESS:  AAUP policies are often times
24   guidelines and they deal with faculty issues and

Page 76

1    Dr. Fagal was faculty.
2    BY MR. COHEN:
3         Q   But the AAUP policies were not like
4    governing for Marywood's purposes, they were just,
5    like you said, guiding; right?
6            MS. PEET:  Objection to the form; lack of
7    foundation.  You can answer if you know.
8            THE WITNESS:  Marywood has its own policies
9    that it uses to govern.  AAUP are guidelines.
10   BY MR. COHEN:
11        Q   On the next day Friday -- well, before I get
12   to there, do you know whether the text underneath
13   these redactions is attorney/client privilege or is
14   it you just -- was it irrelevant?  Do you happen to
15   know?  And I don't know even know who made these
16   redactions.
17            MS. PEET:  I can put it on the record
18   Dr. Dunleavy actually didn't make the redactions.  It
19   was getting ready for production.  It's attorney/client
20   privilege.
21   BY MR. COHEN:
22        Q   On Friday, January 20th, 2012, the second
23   bullet point, it says, "Dr. Dunleavy and
24   Mr. Kilcullen drafted statements."  Do you see

Page 77

1    that?
2         A   Yes.
3         Q   What statements?
4         A   Peter Kilcullen is the -- I don't know what
5    his title was then but he was in charge of
6    marketing and communications and he still is.  He
7    and I would have talked about statements to be
8    prepared in case the videos went public and hit the
9    news media and concern over other kinds of harm,
10   like reputational damage.
11           So Peter Kilcullen's responsibility would
12   have been to draft the media responses to be ready
13   in case those questions came, and I would have
14   provided him with whatever facts I knew at that
15   point.
16        Q   And then the next bullet point says,
17   "Dr. Dunleavy reviewed plan with Mr. Elliott."
18   Right?
19        A   Yes.
20        Q   And what plan is referred to here?
21        A   That would have been the plan to have him
22   stationed outside the conference room for the
23   meeting on the 23rd, again because of the potential
24   for some kind of harm or threat.

1    Q   Did you attend the board meeting that these
2  notes were taken for?
3    A   No.
4    Q   I assume that President Munley did, though?
5         MS. PEET:  Object to the form; calls for
6  speculation.
7         THE WITNESS:  She always attends board
8  meetings.
9  BY MR. COHEN:
10    Q   Did she tell you what happened at this board
11  meeting?
12    A   No.
13         MR. COHEN:  Let's make this Dunleavy 15.
14         (Dunleavy Exhibit No. 15 was marked
15            for identification.)
16  BY MR. COHEN:
17    Q   And do you recognize this document?
18    A   Yes.
19    Q   And these are your handwritten notes?
20    A   Yes.
21    Q   Dated January 26th, 2012; right?
22    A   Yes.
23    Q   Can you read these aloud?
24    A   Sure.  January 26th, 2012 around 9:30 a.m.,

1  "Bob Shaw -- Bob Shaw is the Director of our
2  Student Counseling Center -- "called me regarding
3  Fred Fagal.  He -- meaning Bob Shaw -- saw the
4  video.  Just wanted to let me know he supports our
5  taking this seriously."
6         And then he must have mentioned that he
7  thought it was a threat potential.  "Bob did not
8  ask me to comment and I did not other than to thank
9  him for the call."
10         MR. COHEN:  Let's make this Dunleavy 16.
11         (Dunleavy Exhibit No. 16 was marked
12            for identification.)
13  BY MR. COHEN:
14    Q   And do you recognize this document?
15    A   Yes, I do.
16    Q   It's an e-mail from you to Sister Munley
17  dated January 27th, 2012 at 1:24 p.m.; right?
18    A   Yes.
19    Q   And you're kind of updating Sister Munley
20  about the videos and how many hits there were,
21  right?
22    A   Correct.
23    Q   You also told her that you were checking the
24  FIRE site and Marywood Free Speech site that

1  Dr. Fagal created, right?
2    A   Yes.
3    Q   Did you make it a habit to check up on
4  Professor Fagal's statements online?
5         MS. PEET:  Objection to the form.
6  BY MR. COHEN:
7    Q   I'm not just talking about the videos.
8    A   No.
9    Q   So it was because of the videos that you
10  were kind of --
11    A   Yes.
12    Q   -- checking online to see if he was doing
13  more or --
14    A   Yes.
15    Q   Okay.  Did someone direct you to monitor the
16  videos and any statements on FIRE's website or the
17  Marywood Free Speech site?
18    A   Not that I recall.  I was worried about
19  reputational damage, potential reputational damage.
20    Q   Well, let me ask you this:  Do you know
21  whether anyone -- I certainly know that you and
22  Marywood's cabinet was very upset at these videos,
23  but do you know if anyone asked Professor Fagal to
24  take them down?

1         MS. PEET:  Objection to the form.
2         THE WITNESS:  I don't know.
3  BY MR. COHEN:
4    Q   You don't remember asking certainly?
5    A   No.
6    Q   And you don't remember it coming up at the
7  meeting with Professor Fagal on January 23rd?
8    A   I don't remember.
9    Q   Would that have made sense to ask him to
10  take them down?
11         MS. PEET:  Objection to the form.
12         THE WITNESS:  I was in that meeting as a
13  note taker.
14  BY MR. COHEN:
15    Q   Right.
16    A   That was not my role.
17    Q   Do you know whether someone, whether you or
18  anyone else at Marywood told YouTube that these
19  videos were defamatory and they should be taken
20  down?
21    A   I don't recall.
22         MR. COHEN:  Let's make this Dunleavy 17.
23         (Exhibit No. 17 was marked
24            for identification.)



Page 82

1  BY MR. COHEN:
2      Q   Do you recognize this document?
3      A   Yes.
4      Q   And this is another e-mail you sent to
5  Sister Anne dated January 30th, 2012 at 4:38 p.m.;
6  right?
7      A   That's correct.
8      Q   And again, you're updating her on, you know,
9  how often the videos had been viewed and the
10 Marywood Free Speech site and the FIRE site; right?
11     A   Yes.
12     Q   You refer to Mary Theresa Paterson.  That's
13 Marywood's inside counsel, right?
14     A   Yes.
15         MR. COHEN: Let's make this Dunleavy 18.
16     (Exhibit No. 18 was marked
17         for identification.)
18 BY MR. COHEN:
19     Q   And these are again your handwritten notes,
20 right?
21     A   That's correct.
22     Q   And can you read these aloud?
23     A   Sure.  It's my notes of a meeting or a phone
24 call, I don't know which, with Sister Anne on

Page 83

1  February 3rd, 2012 and it would have been regarding
2  Fagal.  And I have written "Progressive discipline,
3  n/a and talk to Sister and Will together Monday."
4      Q   Again, don't tell me what Will said.
5      A   I don't remember.  And then I have 4700 and
6  I don't know what that is either.
7      Q   I was wondering that, too.  And "n/a" here
8  means non-applicable?
9      A   Yes.
10     Q   And was that your conclusion or was that
11 something that somebody told you?  Again, I don't
12 want to know anything about attorney/client
13 communications but you are saying here -- you're
14 writing here that progressive discipline was not
15 applicable; right?
16     A   Yes, yes.
17     Q   How did you come to that conclusion?
18     A   I don't know that I came to that conclusion.
19 What I do when I'm on a phone call is I write what
20 I hear, that maybe that Sister said that.  I don't
21 recall.  I just write.
22         MR. COHEN:  Make this Dunleavy 19.
23     (Dunleavy Exhibit No. 19 was marked
24         for identification.)

Page 84

1  BY MR. COHEN:
2      Q   These are more handwritten notes by you,
3  right?
4      A   Yes.
5      Q   And could you read these aloud?
6      A   Up at the top I have written "Copies" and
7  then I have "Ask Will: Medical applications, FSA
8  claims, other benefits apps."  I don't know what
9  that squiggle is and then there's 3/12.  I don't
10 know what the -- it looks like "el" but I don't
11 know what that is.
12     Then I have "Ask: Does separate out mean
13 copy?  Medical apps/changes to -- that would be to
14 medical benefits -- FSA.  Will to check PA law.
15 Payroll screens?
16     "Other issues, FIRE, cartoons, survey,
17 deans.  Never in his personnel file.  Other files -
18 Sister Anne.  Dean's.  Question mark."
19     Q   And does everything on this piece of paper
20 relate to Fagal or just the part where you begin
21 "Other issues"?
22     A   This was all related to pulling the
23 personnel file for -- one of the committees, I
24 believe, requested it.  And so these were just as

Page 85

1  we went through to see what other things I have to
2  make sure that I look because not everything is in
3  the same place.
4      Q   When you write "cartoon" here, what are you
5  referring to?
6      A   There was an incident, oh, several years
7  prior where Dr. Fagal posted a cartoon, I think it
8  was that Danish cartoonist and we had several
9  Muslim students, one in particular I think filed a
10 complaint that was handled by the Dean.
11     Q   And the survey, what survey is that?
12     A   I don't remember.
13     Q   And you called them issues but in quotation
14 marks.  Did you think they were issues or did
15 someone else?
16         MS. PEET: Objection to the form.
17         THE WITNESS:  I wrote "issues."  They were
18 issues at some point in time.  I don't know -- I don't
19 think I had any comment on whether they were relevant to
20 the videos.
21 BY MR. COHEN:
22     Q   Why was FIRE an issue?
23         MS. PEET: Objection to the form.
24         THE WITNESS:  FIRE would have referred



1  probably to the poster incident which, again, was a
2  separate incident to me.
3  BY MR. COHEN:
4     Q   And underneath "Survey," does that say
5  "Deans"?
6     A   Yes.
7     Q   Do you know what that refers to?
8     A   Most of these things -- in fact, I have
9  written on the right that these issues, my word,
10 were never in his personnel file.  So just
11 checking, were there other things in the Dean's
12 file and would they be part of this request, would
13 it be fair or not fair to provide those.
14        MR. COHEN:  Let's make this Dunleavy 20.
15        (Dunleavy Exhibit No. 20 was marked.
16         for identification.)
17 BY MR. COHEN:
18    Q   This is an e-mail from your personal address
19 to your work address, right?
20    A   Yes.
21    Q   And what does CJ mean?
22    A   I have no idea.  I know at the time I would
23 have known.
24    Q   And how does this relate to Qing cabinet?

1     A   I don't know.  These could all have been
2  very distinct issues.  What happens to me sometimes
3  when I get home at night, I think of a thousand
4  things and I'll send myself the briefest of notes
5  knowing that in the morning it will trigger, but it
6  doesn't trigger anything today.
7         MR. COHEN:  Let's make this Dunleavy 21.
8         (Dunleavy Exhibit No. 21 was marked
9          for identification.)
10 BY MR. COHEN:
11    Q   Do you recognize this document?
12    A   Yes.
13    Q   And this is an e-mail from you to Sister
14 Anne dated February 29th, 2012.  Who is John Coval?
15    A   John Coval is the Director of Conferences
16 and Special Events.
17    Q   And this dinner that is referred to in this
18 e-mail, is this just an informal thing for people
19 who have worked 25 years or longer at Marywood?
20    A   There's a dinner every year for faculty and
21 administrators who are honored at 20, 25, 30, etc.
22 There's another event for staff that's always held
23 that same week, so there's the Cor Mariae dinner.
24    Q   And Professor Fagal was going to be excluded

1  from that dinner, correct?
2     A   That's correct.
3     Q   And was this because he was suspended or
4  because you felt he didn't deserve it or all of the
5  above?
6     A   Because he was suspended.
7         MR. COHEN:  Let's make this Dunleavy 22.
8         (Dunleavy Exhibit No. 22 was marked.
9          for identification.)
10 BY MR. COHEN:
11    Q   These are more of your handwritten notes,
12 right?
13    A   Yes.
14    Q   And could you read this aloud?
15    A   Certainly.  It's notes from again either a
16 call or a meeting with Sister Anne dated March 6th,
17 2012 regarding Fagal.  It says "Sister Gail Cabral
18 e-mail.  Then Conlogue, Arter, Sadlack.  Copy
19 video, question mark.
20        "Sister Anne will send Sister Gail to me.
21 Meeting notes from 1/23/12, video and other
22 documents, question mark."
23    Q   And who is Sister Gail Cabral.
24    A   Sister Gail Cabral is a tenured faculty

1  member who I believe was President of the Faculty
2  Senate that year.
3         MR. COHEN:  Let's make this Dunleavy 23.
4         (Dunleavy Exhibit No. 23 was marked
5          for identification.)
6  BY MR. COHEN:
7     Q   Do you recognize this document?
8     A   Yes.
9     Q   And this is an e-mail from you to Sister
10 Anne dated March 7th, 2012 at 1:23 a.m.?
11    A   That's what it says.  The time stamp seems
12 very odd to me.  I work late but not that late.
13    Q   And again, you're referring to a Sister
14 Gail.  Is this Sister Gail Cabral?
15    A   Yes.
16    Q   And you say "I received an e-mail from
17 Sister Gail this evening.  We should be able to
18 meet tomorrow afternoon.  I'm waiting for her to
19 confirm the time."
20        What was the purpose of the meeting referred
21 to here?
22    A   This was the meeting that was referenced in
23 the Dunleavy 22 exhibit where Sister Anne told
24 Sister Gail to contact me.  Sister Gail, I think,



Page 90

1    as President of the Faculty Senate was in charge of
2    convening whatever committee came first.  And so my
3    role really was to hand documents to her to then
4    give to the committee to do their work.
5        Q   And did you, in fact, meet with Sister
6    Cabral?
7        A   Yes.
8        Q   Did President Munley?
9        A   I don't know.  This meeting was just me and
10   Sister Gail in my office, that I do remember.
11       Q   And do you remember this meeting?
12       A   I do.
13       Q   And what was discussed at the meeting?
14       A   I gave Sister the documents that I listed
15   and I don't know if we discussed anything else.
16   Probably not.
17           MR. COHEN:  We'll call this Dunleavy 24.
18           (Dunleavy Exhibit No. 24 was marked
19               for identification.)
20   BY MR. COHEN:
21       Q   And do you recognize this document?
22       A   Vaguely.
23       Q   And what is your vague understanding of this
24   document?

Page 91

1        A   I probably received a copy and put it in the
2    file.
3        Q   These appear to be Grievance Committee notes
4    from the Faculty Grievance Committee, right?
5        A   That's what it says, yes.
6        Q   Now, if you turn to the second page, on
7    March 21st, it says, "Met with Dr. Pat Dunleavy in
8    HR conference room."  Do you see that?
9        A   Yes, I do.
10       Q   And read the five bullet points to yourself
11   and let me know when you finish.
12       A   (Witness reviews document.)  Okay.
13       Q   And do you, in fact, remember this meeting
14   with the Faculty Grievance Committee?
15       A   Vaguely.  I have no reason to dispute that
16   it happened.
17       Q   Is this an accurate summary of what occurred
18   at this meeting?
19           MS. PEET:  Objection.  She just testified
20   she vaguely remembers the meeting but she has no reason
21   to dispute it.  But you can answer if you know.
22   BY MR. COHEN:
23       Q   Based on your vague recollection.
24       A   This sounds, yeah, like things I would have

Page 92

1    said.
2        Q   And do you recall telling the Faculty
3    Grievance Committee that remediation is not always
4    appropriate?
5        A   Yes, that's something I would say.
6        Q   And how did you come to that conclusion?
7        A   I would have cited examples where if
8    something so egregious happened, there would be no
9    need for any kind of progressive discipline, if
10   someone brings a gun to work, someone brings a box
11   cutter to work, porn.  Ages ago we had an employee
12   and there was some personal dispute and he tried to
13   run over another employee, no remediation.
14       Q   There was an employee that tried to run
15   over --
16       A   Yeah.  He didn't get that far but neither of
17   them work there any longer.
18       Q   And he or she was fired right away?
19       A   As I recollect, yeah.  That was a very long
20   time ago, probably 30 years.
21       Q   So you cited that case?
22       A   I probably would have.  Those are vivid
23   memories.
24       Q   What other cases would you have cited where

Page 93

1    remediation was not appropriate?
2        A   Other than the few I just rattled off?
3        Q   I thought you just rattled off --
4        A   Some of those -- the gun was hypothetical.
5    The box cutter, the porn and the running over were
6    not hypotheticals.
7        Q   The gun --
8        A   The gun was hypothetical, if someone brought
9    a gun to work.  The box cutter was not
10   hypothetical.  The porn on Marywood computers was
11   not hypothetical, and the car incident was not
12   hypothetical.
13       Q   The non-hypothetical cases where remediation
14   was not appropriate, did they involve tenured
15   professors?
16       A   No, they were support staff and professional
17   staff.
18       Q   Now, when you said remediation is not always
19   appropriate and you support that with, you know,
20   possible cases of violence or threatened violence,
21   is this just your personal opinion or is this
22   reflected somewhere in Marywood policy that
23   remediation is not always appropriate?
24           MS. PEET:  Objection to the form.



24  (Pages 90 to 93)

1      THE WITNESS:  I don't know what policy it
2   might be stated in or implicit in, and these are not my
3   notes.  These are --
4   BY MR. COHEN:
5      Q   Someone's --
6      A   Someone else's character -- yes.
7      Q   But you do remember telling the Faculty
8   Grievance Committee that remediation is not always
9   appropriate, though; right?
10     A   I tell every group this kind of information.
11  Do I remember exactly telling them that, no, but I
12  can't dispute it, it's here so I probably did.
13     Q   Did you tell the Faculty Grievance Committee
14  that Fred Fagal requested an opportunity to respond
15  in writing to President Munley?
16     A   I don't recall, but I believe they got my
17  notes from that meeting of January 23rd.
18     Q   Further down in this document also on
19  March 21st, it says, "Mary Theresa Paterson
20  e-mailed Erin that on reflection we were
21  misinformed.  We should not speak to Pat Dunleavy,
22  Will Anthony or herself and that we should make the
23  decision on our own."  Correct?
24     A   That's what that says, yes.

1      Q   Did you receive the same e-mail from Mary
2   Theresa Paterson?
3      A   I don't recall ever receiving that, no.
4      Q   Did you find out some other way that Mary
5   Theresa Patterson had told Erin this information
6   that she shouldn't meet with you and Will Anthony?
7      A   I don't recall it at the time at all.
8      Q   Are you surprised that Mary Theresa Paterson
9   would have this view?
10     A   I don't understand what her perception -- I
11  didn't speak to her at the time.  That may have
12  been in reference to content.
13     Q   To content?
14     A   To content, that they needed to make the
15  decision on their own based on the content they
16  had.  I don't know.  I can't speak for Mary
17  Theresa, though.
18         MR. COHEN:  Off the record.
19         (At this time there was a brief
20          discussion held off the record.)
21         (Dunleavy Exhibit No. 25 was marked
22          for identification.)
23  BY MR. COHEN:
24     Q   And these appear to be more of your

1   handwritten notes, right?
2      A   Yes.
3      Q   And could you read these aloud?
4      A   It says -- I believe that says Will and it's
5   dated 4/2/12.
6         MS. PEET:  I'm going to cut you off.  I
7   don't know if anyone understood what it said at this
8   time.  If this reflects conversations that you had with
9   Will Anthony, then we're going to pull this back.  Is
10  that what this is?
11         THE WITNESS:  I assume so.  I could read it.
12         MS. PEET:  Read it to yourself but if this
13  appears to be --
14         THE WITNESS:  Yes, yeah.
15         MS. PEET:  Don't discuss it and we're going
16  to pull this back into our disclosure.
17         MR. COHEN:  Let's make this Dunleavy 26.
18         (Dunleavy Exhibit No. 26 was marked
19          for identification.)
20  BY MR. COHEN:
21     Q   And do you recognize this document?
22     A   Yes.
23     Q   And this is an e-mail from Sister Anne to
24  you dated April 17th, 2012; correct?

1      A   Yes.
2      Q   And actually it's a chain, two e-mails.  The
3   first is from you to Sister Anne on April 17th at
4   1:43 p.m., right?
5      A   Yes.  And that pertains to a conversation
6   with the attorney Will.
7      Q   With Dr. Fagal's attorney?
8      A   No.  It says "Will's draft."  Will would
9   have been --
10         MS. PEET:  You can talk about this because
11  it doesn't disclose conversations with an attorney.
12  BY MR. COHEN:
13     Q   In President Munley's e-mail to you she
14  says, "I would like to see you for a few minutes
15  about this.  Please bring the Progressive
16  Discipline Policy or whatever policy describes the
17  hearing."  Correct?
18     A   Yes.
19     Q   And did you, in fact, meet with Sister Anne
20  as she is instructing?
21     A   I don't recall.
22         MR. COHEN:  Let's make this Dunleavy 27.
23         (Dunleavy Exhibit No. 27 was marked
24          for identification.)



1  BY MR. COHEN:
2     Q   And these are more of your handwritten
3  notes, right?
4     A   Yes.
5     Q   And could you read these aloud?
6     A   Sure.  It's a meeting or a call with Sister
7  Anne dated 4/25/12.  The first part appears to be
8  totally unrelated.  Do you still want me to read
9  that?  ASEC is a whole different function at
10  Marywood.
11     Q   Don't worry about that.
12     A   And then the dash means that now we're
13  talking about Fagal.  "Review committee, meet with
14  them, give them Will's contact materials, check
15  with Will, video plus materials.  Will's letter,
16  question mark.  Fagal's e-mail to Alan today.
17  Respond to Fred.  Do we tell -- I don't know what
18  that next part is -- who the committee is or work
19  through Sister Gail, question mark."
20     Q   That's what I really wanted to know that
21  word, do we tell --
22     A   It may be Fred Fagal, FF.  I change the way
23  I make my F's now that I look at it.  It looks like
24  FA but I think it's FF.

1        MR. COHEN: This will be Dunleavy 28.
2        (Dunleavy Exhibit No. 28 was marked.
3         for identification.)
4  BY MR. COHEN:
5     Q   Do you recognize this document?
6     A   Yes.
7     Q   And this is actually two e-mails.  The first
8  is from Linda -- how do you pronounce her last
9  name?
10     A   Pochis.
11     Q   -- Pochis to you dated April 26th, 2012 and
12  she's asking you whether Dr. Fagal is entitled to
13  his years of service payment; correct?
14     A   That's correct.
15     Q   And you say, "No, he is not."  Right?
16     A   Yes.
17     Q   What is this years of service payment?
18     A   This is part of that Cor Mariae 25 year
19  award so because Dr. Fagal was suspended, he didn't
20  get any of that recognition.  Linda worked in our
21  office and did payroll and just was checking to see
22  if she should cut that small payment.
23     Q   Isn't it true that Dr. Fagal was suspended
24  with pay, though?

1     A   Yes, he received his pay.
2     Q   So he probably should have gotten his years
3  of service payment, shouldn't he?
4        MS. PEET:  Objection to the form.
5        THE WITNESS:  I would say no.  I said no at
6  the time.  I don't remember.
7  BY MR. COHEN:
8     Q   How much money are we talking about?
9     A   Probably about $100, somewhere around there.
10        (Dunleavy Exhibit No. 29 was marked
11         for identification.)
12  BY MR. COHEN:
13     Q   And it's more of your handwritten notes,
14  right?
15     A   Yes.
16     Q   And could you read this aloud?
17     A   Sure.  This is a meeting or a phone call
18  with Sister Gail -- that would have been Sister
19  Gail Cabral -- dated April 30th, 2012 where we
20  discussed the Progressive Discipline Policy.
21        Then I have written "Ed O'Brien, Linda P.,
22  Annette F - tenured on ex com.  Will tell ex com
23  with names.  Helen Bittel okay with ex com.  Matt
24  Povse."

1        Then "Sent e-mail to Fred.  Hold Wednesday.
2  All but 2 to 4 open for Sister Gail.  Hold Thursday
3  until 2:30 open for Sister Gail."
4        And then there was a sticky note that was
5  attached, "If Alan wants this, okay to give him."
6  And P" is me.
7     Q   You said somewhere "ex com"?
8     A   That's what I have written.
9     Q   What does that mean?
10     A   I don't know.
11     Q   And do you know what this is when you write
12  "If Alan wants this, okay to give him"?
13     A   No.  I believe this was a conversation about
14  people to be on one of the committees and that's
15  all this was and so if Alan wanted a copy of who
16  those names were, that's all.
17        (At this time there was a luncheon
18         recess taken.)
19        MR. COHEN:  We can make this Dunleavy
20  Exhibit 30.
21        (Dunleavy Exhibit No. 30 was marked
22         for identification.)
23  BY MR. COHEN:
24     Q   And do you recognize this document?

1    A  Yes.
2    Q  It's an e-mail from you to Sister Anne dated
3  May 3rd, 2012 at 3:59 p.m.?
4    A  That's correct.
5    Q  And you say in the e-mail that you did meet
6  with the committee this afternoon.  Which committee
7  are you referring to?
8    A  I don't remember.
9    Q  But you did, in fact, meet with a committee?
10    A  Yes.
11    Q  And the committee members asked you a number
12  of questions, which you have listed here; correct?
13    A  Yes.
14    Q  And the third one down is:  "Did you follow
15  process as per the policy; and if not, did you have
16  to?"  Did I read that correctly?
17    A  Yes.
18    Q  Did you answer that question?
19    A  I don't recall specifically but I don't
20  believe I answered any questions, direct questions
21  at that meeting.  That wasn't my role.
22    Q  Okay.  But the last bullet point says, "Were
23  there going to be two committees (I referenced the
24  policy and your decision that one body would review

1  both actions.)"  You did tell the committee that?
2    A  It appears I did.
3        MR. COHEN:  Why don't we make this
4  Dunleavy 31.
5        (Dunleavy Exhibit No. 31 was marked
6        for identification.)
7  BY MR. COHEN:
8    Q  Why don't you take a few moments, read this
9  to yourself, the whole chain and let me know when
10  your finished?
11    A  (Witness complies.)  Okay.
12    Q  The e-mail in the middle from you to Helen
13  Bittel dated May 15th, 2012 at 8:40 a.m., do you
14  see that?
15    A  Yes.
16    Q  And you're responding to Helen's e-mail in
17  which she's asking you several questions; right?
18    A  Yes.
19    Q  And the last sentence in your e-mail is,
20  "Thanks, Helen.  Sorry to be vague.  We all want to
21  make sure we don't overstep our reach."  Right?
22    A  Yes.
23    Q  What did you mean by "We all want to make
24  sure we don't overstep our reach"?

1    A  I was willing and happy to give either
2  committee whatever documentation I had and whatever
3  broad process information I had.  I was not going
4  to interpret policy for them, especially these
5  policies.  These are not policies I deal with.  So
6  that in my mind would have been overstepping my
7  reach and I wasn't going to do that.
8    Q  But earlier we talked about how you told one
9  committee that remediation is not always
10  appropriate, right?
11    A  Yes.
12    Q  Isn't that in a way interpreting policy?
13        MS. PEET:  Objection to the form.
14        THE WITNESS:  No, I think that's just best
15  practices and just information for them.
16  BY MR. COHEN:
17    Q  So sometimes you're saying that whatever is
18  best practices could trump policy?
19        MS. PEET:  Objection to the form;
20  mischaracterization of testimony.  You can answer.
21        THE WITNESS:  No.  I was giving them
22  examples.  I don't -- I would not interpret these
23  policies for these committees.  That was their job.
24  BY MR. COHEN:

1    Q  And why wouldn't you interpret policies?
2        MS. PEET:  Asked and answered.
3        THE WITNESS:  These are policies --
4  BY MR. COHEN:
5    Q  Even if it's their job.
6    A  These are policies I don't deal with
7  regularly.  They were the ones in the weeds of all
8  the documentation, not me.  At this point I'm
9  pretty much a gopher handing materials back and
10  forth.  I'm not making decisions on this case.
11        MR. COHEN:  Let's move on to Dunleavy 32.
12        (Dunleavy Exhibit No. 32 was marked
13        for identification.)
14  BY MR. COHEN:
15    Q  Do you recognize this document?  It's
16  double-sided.
17    A  Vaguely.  I believe I've seen it.  I don't
18  believe I saw it at the time.
19    Q  Your understanding of this document is that
20  it's minutes of Ad Hoc Committee meeting?
21    A  That's what it says, yes.
22    Q  And on the second page there's a heading
23  that says "Actions."  Do you see that?
24    A  Yes.

MAGNA▶
LEGAL SERVICES

1    Q  It says, "Helen will e-mail PD and let her
2  know what we understand our charge -- and let her
3  know that we understand our charge to be the review
4  of substance, determination and denial of tenure
5  charges.  We understand that the issues of
6  suspension and procedure will resolve by the FGC."
7        Now, your initials are PD; right?
8    A  Yes.
9    Q  Whoever wrote this document, when they said,
10  "We understand that the issues of suspension and
11  procedure will resolve by the FGC," did you tell
12  the Ad Hoc Committee that?
13    A  No.
14    Q  Did the Ad Hoc Committee tell you that that
15  was their understanding?  It says that "Helen will
16  e-mail you."
17    A  I don't recall.
18        MR. COHEN:  Let's make this Dunleavy 33.
19        (Dunleavy Exhibit No. 33 was marked
20        for identification.)
21  BY MR. COHEN:
22    Q  Do you recognize this?
23    A  I think I have seen it but not at the time.
24    Q  So it looks like it's notes from a phone

1  conversation with you or somebody named Pat.  If
2  you look at No. 3, it says, "Pat thought that
3  asking Erin about the scope of the FGA's work
4  sounded reasonable but again stressed that we
5  needed to be an independent review, and that's in
6  quotation marks, and come to a decision
7  independently from the administration and from the
8  FGA."  Was that your view?
9    A  I don't remember this exactly, but I don't
10  dispute that is says that and that sounds somewhat
11  reasonable so --
12    Q  And I guess you don't remember who this
13  telephone conversation is with?
14    A  No, I don't, I'm sorry.
15        MR. COHEN:  Let's make this Dunleavy 34.
16        (Dunleavy Exhibit No. 34 was marked
17        for identification.)
18  BY MR. COHEN:
19    Q  And do you recognize this document?
20    A  Yes.
21    Q  And what is it?
22    A  It appears to be an exchange from Matt Povse
23  to Helen Bittel and Ed O'Brien, that that part is
24  dated May 21st, 2012 at 2:50 p.m. and there's an

1  earlier, I guess, e-mail, so e-mails back and
2  forth.  I think that was the composition of one of
3  the committees.  Helen sent this to me in January
4  of 2015, I believe, as part of data collection.
5    Q  Did you ever tell anything informally about
6  the history of progressive discipline in Fred's
7  case to Matt Povse?
8    A  It says I did.  I don't recall.
9    Q  To your knowledge, was there a history of
10  progressive discipline in Fred's case?
11    A  I wouldn't characterize it as progressive
12  discipline because I don't know if progressive
13  discipline was taken.  I would think very formally
14  about that phrase, but there were incidents in
15  Fred's past, the cartoon, the things that I have
16  testified about earlier, that as far as I know were
17  isolated incidents.
18        MR. COHEN:  Let's make this Dunleavy 35.
19        (Dunleavy Exhibit No. 35 was marked
20        for identification.)
21  BY MR. COHEN:
22    Q  And do you recognize this document?
23    A  Yes.
24    Q  And this is two e-mails, one from Ann

1  Boland-Chase to you and the response; correct?
2    A  Yes.
3    Q  Dated May 24th, 2012?
4    A  Yes.
5    Q  Who is Ann Boland-Chase?
6    A  Ann Boland-Chase is the Vice President for
7  Enrollment Services and Student Success.  I believe
8  at that point she was the Vice President for
9  Enrollment Management.
10    Q  And who is David Crisci?
11    A  David Crisci is no longer at Marywood.  He
12  was -- I don't remember his exact title, but he
13  worked in the International Affairs office.  He was
14  the director or the coordinator, whatever his title
15  was.
16    Q  And Ann Boland-Chase is telling you about an
17  alleged interaction between Professor Fagal and a
18  student?
19    A  Yes.
20    Q  And your response was, "Oh, boy, thanks.
21  We'll have to see how this fits in with
22  everything."
23    A  Yes.
24    Q  What did you mean by that?

Page 110

1    A  Simply that we would have to see if there
2  was an investigation if there was anything
3  warranted and what happened with this.  Dr. Fagal
4  at this point, I believe, was still on suspension
5  so if there was another incident, I don't know what
6  would happen.  We would have to see what happened
7  with it.
8    Q  So you weren't trying to see how this
9  alleged incident fit in with the videos or
10  something like that?
11    A  No.
12    Q  I'm still trying to understand what did you
13  wonder what this incident would fit into?
14        MS. PEET:  Objection; asked and answered.
15  BY MR. COHEN:
16    Q  Is it related to something else?
17    A  The only thing it would be related to is the
18  fact there was an employee, Dr. Fagal, who was
19  already on suspension for something serious.  If
20  this ended up being something serious, we would
21  have to figure out how that worked in with the fact
22  that he was already on suspension.  It was not
23  related to the videos in any direct way, just the
24  fact that here was an employee who was on

Page 111

1  suspension.
2    Q  Well, to even see if this incident fit in
3  with anything else, wouldn't you have to verify
4  whether it's true?
5        MS. PEET:  Objection to the form.
6        THE WITNESS:  Yeah.  This was an initial
7  report, that's all.
8  BY MR. COHEN:
9    Q  Right.  Because if it never happened, it
10  wouldn't fit in with anything; right?
11    A  That's right.
12    Q  What is the SSW student?  I'm not asking you
13  to identify the student, but is this the same
14  student that Dr. Fagal allegedly touched?
15    A  No.  SSW of School of Social Work.  I don't
16  remember what that was, but that student was a he
17  and this student that Dave Crisci discusses is a
18  she, so they are not the same.
19    Q  Do you know if someone instructed Ann
20  Boland-Chase and other Marywood employees to find
21  additional instances of wrongdoing that Professor
22  Fagal could be accused of?
23    A  No.
24    Q  You don't know or you know it didn't happen?

Page 112

1    A  I don't know.  I cannot imagine that it
2  would have happened.
3    Q  Was it common for Ms. Boland-Chase to send
4  you e-mails about, hey, this student alleged that
5  this professor did this without any kind of formal
6  investigation of it?
7        MS. PEET:  Objection to the form.
8        THE WITNESS:  Administrators know that
9  I -- part of my role is as Title 9 coordinator, and the
10  two policies -- well, there are two now but at the time
11  the policy that I did know and work with a lot was the
12  civil rights policy.  So whenever there was an
13  allegation or even a hint that there was harassment or
14  discrimination or bullying or any kind of disrespectful
15  treatment, people would let me know.
16        Sometimes it went someplace, sometimes it
17  didn't.  But, yeah, that would be common for any
18  administrator to let me know.
19  BY MR. COHEN:
20    Q  After receiving this e-mail from Ann
21  Boland-Chase, did you do any investigation into the
22  alleged incident involving Professor Fagal?
23    A  No, I did not.  The e-mail from Ann
24  indicates that she was going to do that.

Page 113

1    Q  Do you know whatever came of that
2  investigation?
3    A  No, I do not.
4        MR. COHEN:  Let's mark this Dunleavy 36.
5        (Dunleavy Exhibit No. 36 was marked
6          for identification.)
7  BY MR. COHEN:
8    Q  And this is another one of your handwritten
9  notes, right?
10    A  Yes.
11    Q  Can you read that aloud, please.
12    A  Sure.  It says, "Helen, 6/5/12, re:  Fred
13  Fagal.  Scheduled time away, delays.  6/6, then
14  6/18-19 should be end.  Do have questions for
15  Sister Anne."
16    Q  Do you know what any of this means?  I know
17  what it says but --
18    A  I believe this is Helen Bittel telling me --
19  just giving me a progress report on whatever
20  committee she was on and where they were with time
21  lines and that they did have questions for Sister
22  Anne.
23    Q  Did you ask Helen Bittel to keep you updated
24  about Fred Fagal's case?

MAGNA▶
LEGAL SERVICES

Page 114

1    A   I don't recall doing that.
2        MR. COHEN:  Let's mark this Dunleavy 37.
3        (Dunleavy Exhibit No. 37 was marked
4          for identification.)
5    BY MR. COHEN:
6    Q   Do you recognize this?
7    A   Yes.
8    Q   Did you ask anyone in the Ad Hoc Faculty
9    Committee to keep Sister Munley or you or anyone
10   else in Marywood's cabinet informed about the
11   status of Fred Fagal's matter?
12   A   I don't recall.  I may have asked them to
13   let Sister know where they were time wise.  That
14   would have been the extent of it if I did, but I
15   don't recall.
16   Q   And here Matthew Povse says that they were
17   drafting a final response to their charge, which
18   will go to Will Anthony for comments very soon.
19   "We wanted you to know now that our report is in
20   support of your actions in this case."
21       Do you know whether, in fact, the Ad Hoc
22   Faculty Committee submitted their response to Will
23   Anthony prior to it being finalized?
24   A   I do not know.

Page 115

1    Q   Did you ask that it be submitted to Will
2    Anthony for comments?
3    A   No.
4    Q   Do you know whether anyone did?
5    A   I don't know.
6        MR. COHEN:  I need ten minutes.
7        (At this time there was a brief
8          recess taken.)
9        MR. COHEN:  Let's make this Dunleavy 38.
10       (Dunleavy Exhibit No. 38 was marked
11         for identification.)
12   BY MR. COHEN:
13   Q   This is a multi-page document.  Do you
14   recognize it?
15   A   It's a series of e-mails.
16   Q   And the most recent one is -- I'm sorry, the
17   oldest one is an e-mail to you from Helen Bittel
18   dated June 26th, 2012.  She says, "Dear Pat, our
19   Ad Hoc Hearing Committee is very close -- then I
20   think there was maybe a white-out error or
21   something -- finishing our work.  And then there's
22   a redaction.
23       And it says, "Now I am awaiting final
24   approval (of the document with notice changes) from

Page 116

1    Matt and Ed then and will be done?"
2        When Helen Bittel says she's awaiting final
3    approval of the document with those changes, whose
4    changes is she referring to, do you know?
5    A   No, I don't know.
6        MR. COHEN:  Let's make this Dunleavy 39.
7        (Dunleavy Exhibit No. 39 was marked.
8          for identification.)
9    BY MR. COHEN:
10   Q   Do you recognize this document?
11   A   Yes.
12   Q   You're responding here to Matt Povse, right?
13   A   Yes.
14   Q   In an e-mail dated July 2nd, 2012,
15   12:31 p.m., and he wrote, "Alan is listed by title
16   as getting one but since he's not been involved,
17   I'm not sure."  Involved in what, what did you
18   mean?
19   A   Alan was not involved in this progressive
20   discipline procedure.
21       MR. COHEN:  Dunleavy 40.
22       (Dunleavy Exhibit No. 40 was marked
23         for identification.)
24   BY MR. COHEN:

Page 117

1    Q   Why don't you read this to the bottom and
2    let me know when you're finished.
3    A   (Witness reviews document.)  Okay.
4    Q   At the very end the last bullet point it
5    says -- well, first of all, this is an e-mail from
6    you to Sister Ann dated July 18th, 2012; correct?
7    A   Yes.
8    Q   Subject on Cabinet Retreat -- Possible
9    topics.  Last bullet point it says, "Faculty
10   grievance and appeals and progressive discipline
11   for faculty - post Fagal.  We probably want to
12   revise these (perhaps using some of the faculty who
13   sat on Review Committees)."  Is that right?
14   A   Yes.
15   Q   Why did you think that these policies needed
16   revision post Fagal?
17   A   Because while the two committees were
18   working through their work, they seemed to have
19   several procedural questions and it seemed that
20   maybe some of that could be clarified and tightened
21   up in policy language.
22   Q   Do you also think that the Progressive
23   Discipline Policy as written could potentially --
24   let me rephrase.

MAGNA ▶
LEGAL SERVICES

1    Did you also believe that the Progressive
2  Discipline Policy as written could allow someone
3  like Fred Fagal to do something outrageous but be
4  protected from immediate firing?
5    MS. PEET:  Objection to the form.
6    THE WITNESS:  I'm not familiar with -- I
7  wasn't then and I am not now with this policy and I'm
8  not comfortable making any kind of an interpretation of
9  the policy.
10    Can I just say this is the document you gave
11  me earlier that was out of order so you probably do have
12  another copy somewhere.
13    MR. COHEN:  Let's make this Dunleavy 41.
14    (Dunleavy Exhibit No. 41 was marked
15      for identification.)
16  BY MR. COHEN:
17    Q  This is your handwritten note, right?
18    A  Yes.
19    Q  Could you read this aloud, please.
20    A  It says, "Fagal - grievances not just
21  justified, keeps contacting Erin - first - why.
22  E and then in brackets, proceedings confidential,
23  our finding can't be grieved, could an Ad Hoc
24  Progressive Discipline Policy.  2nd, not yet ter'd,

1  recommend, but suspended.  No. 3, Done by faculty
2  grievance suspension."
3    Q  When you say not yet ter'd, do you think
4  maybe you meant terminated?
5    A  Yes.
6    Q  Do you think this was notes you made based
7  on the telephone call with Erin maybe?
8    A  I would assume so.  I can't confirm that,
9  but I would assume so based on what's there.
10    MR. COHEN:  Let's make this Dunleavy 42.
11    (Dunleavy Exhibit No. 42 was marked
12      for identification.)
13  BY MR. COHEN:
14    Q  Do you recognize this document?
15    A  Yes.
16    Q  These are interrogatory answers that you
17  recently signed off on, right?
18    A  Yes.
19    Q  I just want to ask you a little bit about
20  your answers.  Let's move to No. 3, which begins on
21  Page 3.  The question was: "Prior to January 23rd,
22  2012, did you or anybody who worked for you provide
23  to Professor Fagal any oral warning, written
24  warning or any opportunity for monitored assistance

1  relating to the e-mail and videos referenced in
2  paragraph Nos. 23 and 24 of the Amended Complaint?
3  If so, please provide a detailed description of
4  each such oral warning, written warning and
5  opportunity for monitored assistance."
6    And I think there was an objection because
7  you're not able to determine the meeting of
8  monitored assistance.  You don't know what that
9  means?
10    A  No.
11    Q  Let's move back to the first exhibit,
12  Dunleavy 1.  Now, this again is the Progressive
13  Discipline Policy; right?
14    A  Yes.
15    Q  And the second paragraph that begins, "The
16  policy is intended to provide."
17    A  Yes.
18    Q  The next sentence, it says, "It is designed
19  to accomplish these ends by a series of gradual
20  steps involving strategies such as personal
21  conferences, oral and written warnings and
22  opportunities for monitored assistance where
23  applicable."
24    Does that at all enlighten you as to the

1  meaning of monitored assistance?
2    A  No.  This is a policy that I don't deal
3  with.
4    Q  Okay.  Well, let's take "opportunity for
5  monitored assistance" out of the question and let's
6  just ask, Prior to January 23rd, 2012, did you or
7  anybody who worked for you provide to Professor
8  Fagal any oral warning or written warning relating
9  to the e-mail and videos referenced in paragraph
10  Nos. 23 and 24 of the Amended Complaint?
11    A  Not that I'm aware of.
12    Q  Let's move to the next Interrogatory, No. 4.
13  It says: "Did your Vice President for Academic
14  Affairs, Dr. Alan Levine, participate in any way in
15  the decision to suspend Professor Fagal or to
16  maintain this suspension thereafter?  If so, please
17  describe Dr. Levine's participation in as much
18  detail as possible."
19    And your answer or Marywood's answer was:
20  "Dr. Levine supported President Munley's decision
21  to suspend Professor Fagal and was aware of and
22  helped orchestrate the January 23rd, 2012 meeting
23  where Professor Fagal was suspended as outlined in
24  DEF002760."



Page 122

1       My question is how did Dr. Levine support
2   President Munley's decision to suspend Professor
3   Fagal?
4          MS. PEET: Objection to competency. You can
5   answer if you know.
6          THE WITNESS: All I know is that Dr. Levine
7   was so upset and outraged that he questioned me about
8   filing his own personal lawsuit against Dr. Fagal, so I
9   am sure he supported that decision to suspend.
10  BY MR. COHEN:
11      Q   In answering this question, did you talk to
12  Dr. Levine and ask him directly, you know, whether
13  he participated in any way in the decision to
14  suspend Professor Fagal?
15         MS. PEET: Objection to the form.
16         THE WITNESS: No.
17  BY MR. COHEN:
18      Q   Any particular reason why? I mean, don't
19  tell me anything your attorney told you to do or
20  not to do but, I mean, you don't think it would
21  have been helpful given that the question was about
22  Dr. Levine to ask him?
23         MS. PEET: Objection. She signed the
24  Verification and it clearly says she might not have

Page 123

1   personal information about everything that's in here but
2   she's signing it on behalf of the company. It doesn't
3   say that she answered every question on behalf of the
4   company.
5          MR. COHEN: I would still like --
6          MS. PEET: You can go ahead and answer.
7          THE WITNESS: Could you ask the question
8   again, please.
9   BY MR. COHEN:
10      Q   Did you think it was important in answering
11  this question to talk to Dr. Alan Levine and ask
12  him simply whether he participated in any way in
13  the decision to suspend Professor Fagal or to
14  maintain the suspension afterwards?
15      A   No. This would be one of those questions
16  that I didn't have personal information about when
17  I signed on behalf of.
18      Q   Well, precisely because you don't have
19  personal knowledge, I thought it might be useful to
20  ask the person who does have personal knowledge but
21  you don't think so?
22         MS. PEET: Objection to the form.
23         THE WITNESS: I didn't think it was my role.
24  BY MR. COHEN:

Page 124

1       Q   If we move to No. 6, No. 6 reads: "In
2   paragraph No. 31 of your Answer you denied that
3   there was no immediate harm to Professor Fagal or
4   to others threatened by Professor Fagal's
5   continuance in his faculty position. Please
6   explain the basis for your denial in as much detail
7   as possible."
8          And then your answer is or Marywood's answer
9   is: "Defendant denies that there was no immediate
10  harm to others as Plaintiff's continued employment
11  would create emotional harm to members of the
12  administration, faculty and student body who were
13  offended and impacted by Plaintiff's actions.
14      "Additionally, Defendant sought to prevent
15  further reputational harm to the University after
16  Plaintiff, a tenured professor, made a mockery of
17  the President, the University's executive staff and
18  the University community as a whole by drafting and
19  creating the e-mail and videos referenced in
20  paragraph Nos. 23 and 24 of the Amended Complaint."
21      Have I read that correctly?
22      A   Yes.
23      Q   What did you mean by emotional harm?
24      A   The videos were outrageous. They portrayed

Page 125

1   Sister Anne Munley as Hitler and other members of
2   her cabinet as SS officers. They mocked different
3   members of cabinet and in some cases family
4   members. That's emotional harm.
5          And then they are public for everybody to
6   view and join in the mockery if they want out in
7   the world and the reputational harm to the
8   University to think that a tenured faculty member
9   at Marywood would create that and put that out
10  there, what does that say to students, to other
11  faculty, to administrators, to prospective students
12  and their families.
13      Q   And how would suspending Professor Fagal
14  alleviate the emotional harm? The video was still
15  up, right?
16         MS. PEET: Objection to the form; lack of
17  competency. You can answer if you know.
18         MR. COHEN: Well, let me backtrack.
19  BY MR. COHEN:
20      Q   At the time that he was suspended, you know
21  that the video, the two-part video was still up on
22  YouTube; correct?
23      A   Yes.
24      Q   In fact, you were monitoring it?



1  A  Yes.
2  Q  So how does the act of suspending Professor
3  Fagal, how did that at all alleviate or cure any
4  emotional harm that was caused by the video?  It
5  was still up until we took it down.
6      MS. PEET:  Compound question.  You can
7  answer if you know.
8      THE WITNESS:  Our responsibility, I think,
9  under our Civil Rights Policy at the time and continuing
10  today is to stop behavior that is offensive, to prevent
11  it from recurring and to mitigate any damages.  To the
12  extent we could, we stopped it from recurring by
13  suspending Dr. Fagal.  He would no longer have access to
14  the Marywood e-mail.  Could we stop him from creating
15  videos, probably not.
16  BY MR. COHEN:
17  Q  Isn't it true, he didn't even use his
18  Marywood e-mail address to distribute the videos;
19  correct?
20      MS. PEET:  Objection; competency.
21      THE WITNESS:  I don't know.
22  BY MR. COHEN:
23  Q  And, again, you don't remember whether
24  anybody in Marywood's administration asked

1  Professor Fagal to take the video down?
2  A  I don't know.
3  Q  So if you were really concerned about -- if
4  the University was really concerned about emotional
5  harm caused by the video, wouldn't it make sense if
6  someone had asked him that?
7      MS. PEET:  Objection to the form.
8      THE WITNESS:  I don't know that anybody did
9  or did not.
10  BY MR. COHEN:
11  Q  And further, how did suspending Professor
12  Fagal alleviate or prevent any reputational harm to
13  Marywood given that the video was still up?
14      MS. PEET:  Objection.  The testimony very
15  clearly demonstrates Dr. Dunleavy was not the
16  decisionmaker in any way, shape, or form.
17      You can answer if you know.
18      THE WITNESS:  Suspending Dr. Fagal says to
19  the Marywood community that this is serious and we take
20  it seriously.  If we allow that to continue without
21  consequence, we might as well throw everything, the
22  mission, the core values, everything out the window.
23  BY MR. COHEN:
24  Q  Did Marywood make a public statement to its

1  members that Professor Fagal had been suspended?
2  A  No.
3  Q  In fact, it was kept pretty quiet, wasn't
4  it?
5      MS. PEET:  Objection to the form.
6      THE WITNESS:  Personnel matters always are.
7  BY MR. COHEN:
8  Q  So how would it make a statement if his
9  suspension, if Marywood didn't publicize it?
10  A  Dr. Fagal was no longer on campus.  We don't
11  say why.  We just say, Dr. Fagal is no longer on
12  campus.
13  Q  Did Marywood have plans on how to handle the
14  video if it was to remain online and we hadn't
15  taken it down?
16  A  I don't know.
17  Q  When you saw the video, did you believe that
18  Professor Fagal was actually comparing Marywood's
19  President and certain members of the cabinet to
20  Nazis?
21  A  Yes.
22  Q  You believed that he was maybe equating, you
23  know, the moral character of Marywood's
24  administrators with Nazis?

1      MS. PEET:  Objection to the form.  Can you
2  repeat the question.
3  BY MR. COHEN:
4  Q  What aspects -- a moment ago I asked you did
5  you believe that Professor Fagal was comparing
6  President Munley and certain Marywood cabinet
7  members to Nazis and I think you said yes.
8  A  Yes.
9  Q  And my next question is what aspects of both
10  groups of people, Marywood's cabinet and Nazis did
11  you think he was saying were similar?
12      MS. PEET:  Objection.  I don't understand it
13  but if you do, go ahead.
14      THE WITNESS:  I don't know that I
15  understand.  I don't know that I parsed it that deeply.
16  It was very clear as I watched the video that Sister
17  Anne, and I don't remember the words in the video, but
18  that Sister Anne was portrayed as Hitler and I don't
19  know how you make that anything good.
20  BY MR. COHEN:
21  Q  Let me drill down a little bit more deeply.
22  Did you think that Professor Fagal was saying that
23  President Munley looks like Adolf Hitler?
24      MS. PEET:  Objection to the form.

MAGNA▶
LEGAL SERVICES

1        THE WITNESS:  No.  I think it was more that
2   he was saying that in his mind she reminds somehow, I
3   don't know, that would be in his mind, but not in
4   physical appearance, maybe in everything else.  I don't
5   know what he was thinking.  It was offensive.
6   BY MR. COHEN:
7        Q   Did you know that after seeing the video,
8   did you recognize it as a -- did you recognize what
9   Professor Fagal was doing was just making another
10  parody of a well-known movie?
11       A   No.
12       Q   Were you aware that other parodies had been
13  made of that movie?
14       A   No.
15       Q   Do you know that today?
16       A   Yes.
17       Q   Have you seen any of these other parodies?
18       A   No.
19       Q   Was there any part of the two-part video
20  that Professor Fagal posted that you thought was
21  even a little bit humorous?
22       A   No, not at all.
23       Q   Is it Marywood's policy that faculty and
24  students, other members of the Marywood community

1   should never criticize the administration, the
2   University administration?
3        A   No.
4        Q   Now, you wrote in this interrogatory answer
5   that "Continued employment would create emotional
6   harm to members of the administration, faculty and
7   student body who were offended and impacted by
8   Plaintiff's actions."
9        Now, I understand that you know that
10  Dr. Levine was highly offended and President Munley
11  was highly offended, but do you actually know --
12  and it sounds like you were highly offended, even
13  though you weren't in the video; right?
14       A   Yes.
15       Q   Do you actually know any other members of
16  Marywood's administration, faculty or student body
17  who told you that they were offended?
18            MS. PEET:  Other than the two e-mails we saw
19  earlier with Mr. Garvey and Bill or Bob?
20            THE WITNESS:  Bob Shaw.
21            MR. COHEN:  Yes.
22            THE WITNESS:  Those two.
23  BY MR. COHEN:
24       Q   Other than those?

1        A   Dr. Heath at a cabinet meeting when we
2   discussed this briefly, other faculty.  The
3   faculty, I don't remember specific names, in
4   reading the responses from the faculty committees,
5   it was clear they were also offended.
6        Q   So we're talking about between five and ten
7   individuals in the Marywood community?  I mean, do
8   you know of anybody else?
9            MS. PEET:  Objection to the form; lack of
10  competency.  She can only testify to what she knows, but
11  she's also identified various people and says that
12  there's a lot of other people.  She just can't remember
13  the names so it's a mischaracterization of testimony.
14  BY MR. COHEN:
15       Q   You did say that, that there were a lot of
16  other people?
17       A   There -- yeah, there were other faculty.  I
18  don't remember who, but please remember people
19  weren't coming to me with this directly.  That was
20  not my role, so I don't know how many but I
21  wouldn't have been normally -- the reason that
22  people reached out to me, that they were extra.  I
23  wasn't the decisionmaker in this at all.
24       Q   Now, in the deposition of my client -- which

1   you attended that one, right?
2        A   Yes.
3        Q   Do you remember there were a few questions,
4   I think, by Ms. Peet about whether my client was
5   aware of any other faculty member that had done
6   something similar and was not accorded the same
7   discipline.  Do you remember that?
8        A   Vaguely.
9        Q   And my client mentioned something about an
10  employee named Lori -- do you remember this at all?
11       A   It's sort of all blurs.  I'm sorry, I wasn't
12  taking notes, I don't think, at that point.
13       Q   Lori McMillen, does that ring a bill?
14       A   Lori McMillen, okay, she was a faculty
15  member, yeah.
16       Q   Are you aware of an incident where she was
17  going around secretly distributing flyers that were
18  highly critical of President Munley's financial
19  administration of the university?
20            MS. PEET:  Objection to the form.  You can
21  answer.
22            THE WITNESS:  I knew of anonymous flyers
23  that were placed around campus.  I never knew who wrote
24  them.

Page 134

1    BY MR. COHEN:
2        Q  I think she admitted it.  I think it was in
3    the newspaper but --
4            MS. PEET:  Are you testifying?
5    BY MR. COHEN:
6        Q  Do you know whether she was ever
7    disciplined?
8        A  I don't know.
9            MR. COHEN:  We're finished.
10           MS. PEET:  I have no questions for you.
11
12           (At this time the deposition in the
13           above-captioned matter was concluded at
14           2:20 p.m.)
15
16
17
18
19
20
21
22
23
24

Page 135

1
2
3            CERTIFICATE
4
     COMOMNWEALTH OF PENNSYLVANIA,)
5                          ) SS:
     COUNTY OF LACKAWANNA.     )
6
7
       I, Karin E. Volpitta, do hereby certify that
8    before me, a Notary Public in and for the
     Commonwealth aforesaid, personally appeared
9    PATRICIA E. DUNLEAVY, who then was by me first duly
     cautioned and sworn to testify the truth, the whole
10   truth, and nothing but the truth in the taking of
     the oral deposition in the cause aforesaid; that
11   the testimony then given by her as above set forth
     was by me reduced to stenotype in the presence of
12   said computer-aided transcription.
13     I do further certify that this deposition was
     taken at the time and place in the foregoing
14   caption specified and was completed without
     adjournment.
15
       I do further certify that I am not a relative,
16   counsel or attorney of either party, or otherwise
     interested in the event of this action.
17
       IN WITNESS WHEREOF, I have hereunto set my hand
18   and affixed my seal of office at Scranton,
     Pennsylvania, on this
19   _____ day of _____, 2016.
20
21
22   _____
     Karin E. Volpitta
23   In and for the Commonwealth of Pennsylvania
     My commission expires January 20, 2017
24

Page 136

1          - - -
2
3
     COMMONWEALTH OF PENNSYLVANIA    )  E R R A T A
4    COUNTY OF LACKAWANNA        )  S H E E T
5    I, _____, have read the
     foregoing pages of my deposition given and wish to
6    make the following, if any, amendments, additions,
     deletions or corrections:
7
     Page/Line   Should Read        Reason for Change
8
9
10
11
12
13
14
15
16
17
18
19
     In all other respects, the transcript is true and
20   correct.
21   _____
             Signature
22
23   Subscribed and sworn to before me this _____ day
     of _____, 2016.
24   Notary Public

Page 137

1
2    August 18, 2016
3
4    Jackson Lewis
5    1601 Cherry Street, Suite 1350
6    Philadelphia, Pennsylvania 19102
7    ATTN:  Stephanie J. Peet, Esquire
8
         NOTICE OF NON-WAIVER OF SIGNATURE
9
10   Please have the deponent read her deposition
     transcript.  All corrections are to be noted on the
     preceding Errata Sheet.
11
     Upon completion of the above, the deponent must
12   affix her signature on the Errata Sheet, and it is
     to then be notarized.
13
     Please forward the signed original of the Errata
14   Sheet to Jonathan Z. Cohen, Esquire, for attachment
     to the original transcript, which is in his
15   possession, copying all other counsel and myself.
16   As per the rules, if the witness does not sign the
     signature page within 30 days after receipt of the
17   transcript, signature is deemed waived.
18
19
     Karin E. Volpitta
20   Court Reporter
21
22
23
24



Exhibit 41

EXHIBIT

41

1              UNITED STATES DISTRICT COURT

2         FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

3

4   FREDERICK F. FAGAL, JR.,      )
                                  )
5                  Plaintiff,     )
                                  )
6        vs.                      )  No. 3:14-cv-02404-ARC
                                  )
7   MARYWOOD UNIVERSITY,          )
                                  )
8                  Defendant.     )
    _____)
9

10

11

12         DEPOSITION OF MICHAEL A. FOLEY, Ph.D.

13              (Taken by Plaintiff)

14             Raleigh, North Carolina

15           Friday, February 26, 2016

16

17

18

19

20

21

22

23

24              Reported in Stenotype by
              Joan Daly Snover, RMR/CRR
25   Transcript produced by computer-aided transcription

Page 2

```
1              A P P E A R A N C E S
2
  ON BEHALF OF PLAINTIFF:
3
       JONATHAN Z. COHEN, ESQUIRE
4      Law Office of Jonathan Z. Cohen
       175 Strafford Avenue
5      Suite 1, # 212
       Wayne, Pennsylvania 19087
6      215.874.0047
       jzc@jzc-law.com
7
8  ON BEHALF OF DEFENDANT:
9      ASIMA J. AHMAD, ESQUIRE
       Jackson Lewis, P.C.
10     1601 Cherry Street
       Suite 1350
11     Philadelphia, Pennsylvania 19102
       267.319.7802
12     asima.ahmad@jacksonlewis.com
13
14
  ALSO PRESENT:
15
       Frederick Fagal, Ph.D.
16     Patricia Dunleavy
17
18
19
20  Deposition of MICHAEL A. FOLEY, Ph.D., a witness called
21  on behalf of the Plaintiff before Joan Daly Snover, RMR/CRR,
22  Reporter and Notary Public, in and for the State of North
23  Carolina, at CaseWorks, Inc., REGUS, 8601 Six Forks Road,
24  Raleigh, North Carolina, on Friday, February 26, 2016,
25  commencing at 10:00 a.m.
```

Page 3

```
1              INDEX OF EXAMINATION
2  WITNESS: Michael A. Foley, Ph.D.           PAGE
3    By Mr. Cohen.................................   4
4    By Ms. Ahmad................................  41
5    By Mr. Cohen................................  43
6
7
8
9              INDEX OF EXHIBITS
10 NUMBER       EXHIBIT                    MARKED
11
   Exhibit 1     Subpoena......................   5
12
   Exhibit 2     Letter requesting apology......  10
13
   Exhibit 3     E-mail dated 1/13/12...........  12
14
15
```

Page 4

1           P R O C E E D I N G S
2        * * * * * * * * * * * * * * * * * * *
3           MICHAEL A. FOLEY, Ph.D.
4  A witness called on behalf of Plaintiff being duly
5  sworn testified before me as follows:
6              EXAMINATION
7  BY MR. COHEN:
8     Q.   Dr. Foley, my name is Jonathan Cohen again.
9     A.   Yes.
10    Q.   You're aware that I represent Frederick
11 Fagal, right?
12    A.   Yes.
13    Q.   And you understand that you're under the
14 same oath today as if you were in a courtroom?
15    A.   Yes.
16    Q.   I'm going to assume that you understand my
17 questions unless you tell me that you don't understand
18 them.  Is that fair?
19    A.   Yes.
20    Q.   Is there anything that would prevent you
21 from thinking clearly and testifying truthfully today?
22    A.   No.
23    Q.   If at any time during the deposition you
24 need to take a break, just say so, and we'll
25 accommodate you.  All right?

Page 5

1     A.   Okay.
2     Q.   Are you here today because you received a
3  subpoena from me?
4     A.   Yes.
5          (Exhibit 1 marked for identification.)
6          MR. COHEN:  Joan, could you pass
7     Dr. Foley, Exhibit 1.
8  BY MR. COHEN:
9     Q.   Is this the subpoena that you received,
10 Dr. Foley?
11    A.   Yes, it is.
12    Q.   What is your middle name by the way?
13    A.   Alan, A-L-A-N.
14    Q.   Okay.  And what is your birthday?
15    A.   ███/46.
16    Q.   And would you list all of your physical
17 addresses, please?
18    A.   Current physical address?
19    Q.   Yes.
20    A.   817 Canyoncreek, that's all one word,
21 Canyoncreek Lane in Fuquay, F-U-Q-U-A-Y, Varina,
22 V-A-R-I-N-A, North Carolina, 27526.
23    Q.   And do you have any other physical
24 addresses?
25    A.   No.

Page 6

1    Q.  Can you list all of your telephone numbers,
2  please?
3      A.  One cell phone.  570-954-1202.
4    Q.  Any land lines?
5      A.  There is a land line I never use.  My wife
6  knows the number.  I do not.  I'm sorry.
7    Q.  That's all right.  How about e-mail address?
8      A.  E-mail address is mafjazz817@gmail.com.
9    Q.  And any other e-mail addresses?
10     A.  No.
11    Q.  Do you have a driver's license?
12     A.  Yes.
13    Q.  And what state issued that driver's license?
14     A.  North Carolina.
15    Q.  And I assume you have it on you?
16     A.  Yes.
17    Q.  Could you read the number on the driver's
18  license, please.
19     A.  Number 31874377.
20    Q.  Dr. Foley, you previously worked for
21  Marywood University, right?
22     A.  Yes.
23    Q.  And for how long?
24     A.  Total 34 years.
25    Q.  Can you list all of the job titles that you

Page 7

1  had at Marywood?
2      A.  In addition to professor of philosophy, I
3  mean I was assistant, then associate and then full
4  professor of philosophy.  I was director of the Honors
5  Program for nine years, chair of the Philosophy
6  Department for almost 11 years, and then Dean of the
7  College of Arts and Sciences for four years.
8    Q.  So your last title was Dean of the College
9  of Arts and Sciences you said?
10     A.  Yes.
11    Q.  And have you ever served on the policy
12  committee of Marywood?
13     A.  Yes.
14    Q.  And what did you do on the policy committee?
15     A.  Attended policy committee meetings on Friday
16  afternoons when they occurred.  I chaired the policy
17  committee once in the mid to late '80s.  And other
18  than that I served a number of years on policy where
19  we would receive an agenda and discuss new policies
20  that should be adopted or could be adopted by the
21  university.
22    Q.  And were you on the policy committee when
23  you retired?
24     A.  By virtue of my position, yes.
25    Q.  Okay.  When exactly did you retire?

Page 8

1      A.  June 30, 2012, was my last day.
2    Q.  I'm sorry.  I missed the first part.  You
3  said 2012 --
4      A.  Oh.  June 30.
5    Q.  Okay.  Dr. Foley, do you know my client
6  Frederick Fagal?
7      A.  Yes.
8    Q.  How long have you known him?
9      A.  As many years as he was at Marywood.
10    Q.  Okay.  Were you ever Professor Fagal's
11  superior at Marywood?
12     A.  As Dean I would be considered a superior.
13    Q.  Do you recall in November of 2007 when
14  Professor Fagal invited a speaker from the Foundation
15  For Individual Rights in Education to give a
16  presentation on campus?
17     A.  Yes.
18    Q.  And from now on I'm just going to call the
19  Foundation For Individual Rights and Education FIRE.
20  Okay?
21     A.  Okay.
22    Q.  Do you recall Professor Fagal hanging
23  posters announcing the FIRE speaker?
24     A.  Yes.
25    Q.  Do you recall communicating with anybody

Page 9

1  from the Marywood administration about the FIRE
2  presentation or the FIRE posters?
3      A.  No.
4    Q.  Okay.  Do you recall in late November 2011
5  that almost all of the FIRE posters were removed?
6      A.  Yes.
7    Q.  Do you know the circumstances of which they
8  were removed?
9      A.  Not specifically.
10    Q.  Well, do you know whether Marywood personnel
11  ordered the removal of the FIRE posters?
12     A.  What I remember was I believe they did not
13  contain the proper stamp from the office for
14  student -- Vice President For Student Affairs.  I
15  think all posters had to be cleared.  My recollection
16  is that was the reason, but that was four and a half
17  years ago.
18    Q.  Right.  I understand.  I understand the
19  reason.  My question is did Marywood administration
20  order the removal of the FIRE posters.
21     A.  I can't say.  No, I don't know for sure.  I
22  just know what I heard.
23    Q.  What did you hear?
24     A.  Basically that there was no appropriate
25  stamp on the posters.

02/26/2016 Michael A. Foley, PhD

Page 10

1    Q.  Okay.  So you weren't involved in any
2  discussions with Marywood administrators over whether
3  to remove the FIRE posters?
4    **A.  No.**
5    Q.  Okay.  And do you know who was?
6    **A.  Not specifically.**
7    Q.  I'm sorry.  I missed what you said?
8    **A.  I would say not specifically.  I made an**
9  **assumption.**
10   Q.  Okay.  What's your assumption?
11   **A.  Vice President For Student Life Ray Heath**
12 **would have.  He was vice president for that area, and**
13 **it was his office through which those kinds of things**
14 **were cleared.  That would be my assumption that it**
15 **would be at his level.**
16   Q.  Okay.  At some point do you recall Professor
17 Fagal attempting to secure an apology from Marywood
18 and to seek reimbursement for the posters?
19   **A.  I don't recall, no.**
20       MR. COHEN:  Joan, could you pass the
21   witness Exhibit 2, please.
22       (Exhibit 2 marked for identification.)
23 BY MR. COHEN:
24   Q.  Dr. Foley, if you could read this very short
25 letter briefly and let me know when you're finished.

Page 11

1    **A.  Okay.  I've read.  I see that I was copied**
2  **on it.**
3        MS. AHMAD:  I'm sorry.  I just want to
4    place one objection on the record that this
5    letter referencing Dr. Fagal, December 5, 2011,
6    letter, which is not included as an exhibit.
7        MR. COHEN:  That's true.  Okay.
8  BY MR. COHEN:
9    Q.  So Dr. Foley, you're saying that you see
10 that you're copied on this letter?
11   **A.  I see that I was copied.  I do not remember**
12 **receiving the letter.**
13   Q.  Okay.
14   **A.  I had just had a total hip replacement maybe**
15 **three weeks before.  I really did not return to work**
16 **until early January.**
17   Q.  Does this letter refresh your recollection
18 at all as to whether Professor Fagal attempted to
19 secure an apology or get reimbursed for the posters?
20   **A.  No.**
21   Q.  Okay.  You have no recollection that
22 Professor Fagal had discussions with Alan Levine about
23 this?
24   **A.  No.**
25   Q.  Okay.  Did you have any discussions about

Page 12

1  this with Dean Levine?
2    **A.  Vice President Levine?**
3    Q.  Yes.
4    **A.  No.**
5    Q.  Just curious.  Why would Vice President
6  Levine have copied you on this letter?
7        MS. AHMAD:  Objection.
8  BY MR. COHEN:
9    Q.  You can answer.
10   **A.  Oh, okay.**
11       MS. AHMAD:  I'm sorry.  Yes.  You can
12   answer.
13   **A.  I would assume because I was Dean of the**
14 **college in which he taught.**
15 BY MR. COHEN:
16   Q.  Okay.  Do you recall Professor Fagal sending
17 an e-mail to Marywood's faculty about the removal of
18 the FIRE posters in January of 2012?
19   **A.  I can't recall, no.**
20   Q.  Okay.
21       MR. COHEN:  Joan, could you pass the
22   witness Exhibit 3, please.
23       (Exhibit 3 marked for identification.)
24 BY MR. COHEN:
25   Q.  If you could just skim this e-mail,

Page 13

1  Dr. Foley, and let me know when you're finished.
2    **A.  Okay.**
3        MS. AHMAD:  Dr. Foley, feel free to read
4    the entire e-mail if you want to.
5        **THE WITNESS:  Okay.**
6        MS. AHMAD:  If you don't, then just let us
7    know if you skimmed it.
8    **A.  Okay.  I have finished reading it.  I forgot**
9  **that there was a stamp.  I didn't recall that.  I do**
10 **not recall this memo.**
11 BY MR. COHEN:
12   Q.  You don't recall what?  I'm sorry.
13   **A.  I do not recall the memo.**
14   Q.  Okay.  Do you recall reading this e-mail
15 before today?
16   **A.  No.**
17   Q.  What's the date on this e-mail.
18   **A.  January 13, 2012.**
19   Q.  Do you remember visiting Professor Fagal on
20 the morning of January 23, 2012, and telling him that
21 he had to attend a meeting with the President in about
22 15 minutes?
23   **A.  Yes.**
24   Q.  Okay.  What exactly did you tell Professor
25 Fagal when you first visited him and told him he had

Page 14

1 this meeting to get to?  I realize it's a long time
2 ago, and you can only do the best that your memory
3 serves to.
4     A.  Basically what you just said.  I went to
5 Dr. Fagal's office, and I said that he was to report
6 to Sister Anne's office in 15 minutes.  And he asked
7 me what this was about, and my recollection is I said
8 I think you know what it's about.  That was the most
9 that I said to my recollection.
10     We did not discuss anything further, and I
11 wasn't exactly sure what it was about.  I mean, I knew
12 what it was about, but Sister Anne asked me as dean to
13 go talk to Dr. Fagal to report to her office in 15
14 minutes, and that's what I did.
15     Q.  Okay.  Just curious.  If you had never seen
16 the e-mail that you just read that was Exhibit 3, why
17 would you assume that Dr. Fagal would know what the
18 meeting was about?
19     A.  I had seen the video.  I had seen the first
20 video.
21     Q.  All right.  I understand.  Do you remember
22 that when you visited Dr. Fagal he was preparing for a
23 class that was about to begin 15 minutes later?
24     A.  Yes.
25     Q.  Okay.  And whose decision was it to summon

Page 15

1 Professor Fagal 15 minutes before his class was to
2 begin?
3     A.  Sister Anne Munley.
4     Q.  Okay.  Did you consider providing Professor
5 Fagal with 15 minutes advanced notice was appropriate?
6     A.  Did I think it was appropriate?
7     Q.  Yes.
8     A.  Honestly I never thought about it.
9     Q.  Okay.  When you worked for Marywood, did you
10 ever participate in the discipline of any employee
11 other than Professor Fagal?
12     A.  Yes.
13     Q.  In your experience was it typical to give an
14 employee only 15 minutes notice of a meeting when he
15 had class in 15 minutes, a meeting with the President?
16     A.  No.  When I served on, did not involve the
17 President directly at the point in time that I served.
18     Q.  Okay.  So before you visited Professor Fagal
19 and told him he had this meeting, you never had to
20 summon another faculty member this way?
21     A.  No.
22     Q.  Okay.  Do you know for how long this meeting
23 with the President had been planned?
24     A.  No.
25     Q.  Can you explain the circumstances of

Page 16

1 President Munley telling you to summon Dr. Fagal?  Did
2 she say anything the night before, five minutes
3 before?  Do you remember?
4     A.  I was called to Sister Anne's office some
5 time between 7:30 and maybe 20 until.  I think that
6 was the time.  But it was maybe 15 minutes before I
7 went and told Fred.  It was that morning.
8     Q.  And what exactly did President Munley say to
9 you?
10     A.  She said for me to go and tell Fred that he
11 was supposed to report at her office at I believe 8:00
12 was the time.
13     Q.  Okay.  Are you sure it wasn't 9?
14     A.  No, I'm not sure.  It could have been 9.
15     Q.  All right.
16     A.  It was 15 minutes before his first class of
17 the day.
18     Q.  Right.  Do you recall whether President
19 Munley was -- did she appear angry?
20     A.  No.
21     Q.  So just a few minutes ago you said
22 that when you visited Professor Fagal that morning you
23 said something about, "I think you know what this is
24 about".
25     A.  He asked me what it was about, and I said I

Page 17

1 think you know.  I was making the assumption that it
2 was about the video.
3     Q.  So the President didn't mention that to you?
4     A.  No.
5     Q.  Okay.  So why did you assume it was about
6 the video?
7     A.  Because it was a hot topic of conversation.
8 The video seemed to be public knowledge.
9     Q.  Okay.  You say it was a hot topic of
10 conversation.  Who specifically were you conversing
11 about this e-mail with, do you remember?
12     A.  About the e-mail or the video?
13     Q.  Well, actually the video because you said
14 you never saw --
15     A.  Yes.  The video, faculty who once the video
16 was posted and people saw it, faculty would come by my
17 office and make comments.  Just general conversation.
18 I don't remember specifically faculty members who
19 dropped by.
20     Q.  And do you remember what they said?
21     A.  I can't say for sure, no.
22     Q.  Okay.  So let's move on to the meeting with
23 President Munley that occurred on the morning of
24 January 23.  Where was it held?
25     A.  In her board room.

02/26/2016 Michael A. Foley, PhD

Page 18

1    Q.   And who attended the meeting?
2    A.   Pat Dunleavy and I attended the meeting.
3    Q.   And President Munley?
4    A.   Well, yes.
5    Q.   And Dr. Fagal of course?
6    A.   Yes.
7    Q.   Nobody else?
8    A.   No.
9    Q.   Okay.  Do you know whether the meeting was
10   recorded in some way?
11   A.   Pat Dunleavy took minutes.
12   Q.   Do you know if there was an audio recording
13   or video recording?
14   A.   I do not know.  I do not believe so.
15   Q.   Okay.  Did anybody other than Pat Dunleavy
16   take notes at the meeting?
17   A.   No.  I mean Sister Anne might have.  I don't
18   recall.  I don't recall.  I know Pat took minutes and
19   wrote up a report after the meeting that I signed off
20   on.  I signed off on Pat's reporting of what
21   transpired at that meeting.
22   Q.   Okay.  Let's talk about Ms. Dunleavy's
23   report.  What do you mean by "report"?  Did she write
24   a memo?
25   A.   It was just putting the notes together so

Page 19

1    that there would be a record of what occurred.  And I
2    read her -- she brought it to my office if I remember
3    correctly.  I read it and thought that that captured
4    the essence of the meeting, and I signed off.
5    Q.   What do you mean by signing off?  Did you
6    literally sign it?
7    A.   I believe I literally signed it to say that,
8    yes, I was in attendance, and this reflects what I
9    heard.
10   Q.   Okay.  Did you say not literally?  I'm
11   sorry.  I have a bad connection.
12        THE COURT REPORTER:  I'll read it back for
13   you, counsel.
14        (The reporter read back as was requested.)
15   BY MR. COHEN:
16   Q.   Did you take any notes after the meeting
17   about what had occurred during the meeting?
18   A.   No.
19   Q.   Okay.  I want you to tell me in as much
20   detail as you can remember about what was stated at
21   the meeting starting from the beginning until the end.
22   Can you do that?
23   A.   Sister Anne began her questions with -- I
24   think the very first question was, "Did you post the
25   videos?" to Dr. Fagal.  Dr. Fagal acknowledged that he

Page 20

1    indeed had posted the videos.  Then Sister Anne went
2    on to ask the why and the wherefore.  I don't recall
3    specifically after that until the end of the meeting
4    at which time she told him that he was being
5    dismissed.
6         MR. COHEN:  Joan, can you read Dr. Foley's
7    answer back into the record again.
8         (The reporter read back as was requested.)
9    BY MR. COHEN:
10   Q.   So it sounds like you're telling me exactly
11   what you remember the President saying, but do you
12   remember anything that Professor Fagal said except to
13   admit that he made the videos?
14   A.   No.
15   Q.   A minute ago you stated that President
16   Munley asked Professor Fagal the why and the
17   wherefore, right?
18   A.   Yes.
19   Q.   And by that did you mean she asked Professor
20   Fagal why did you post the video?
21   A.   Yes.
22   Q.   And do you remember Professor Fagal's
23   response?
24   A.   No, I do not.
25   Q.   Okay.  Do you remember Professor Fagal

Page 21

1    attempting to answer and then President Munley cutting
2    him off?
3    A.   I don't recall that, no.
4    Q.   Do you remember Professor Fagal making a
5    comment something to the effect of, "Well, if I can't
6    talk about the posters, then I can't really explain
7    myself.  It would be like trying to find out how many
8    angels can dance on the head of a pin."
9         Does that ring a bell?
10   A.   No, it does not.
11   Q.   Okay.  A moment ago you said that President
12   Munley told Professor Fagal he was dismissed, right?
13   A.   I don't know if dismissed was the exact
14   word, but that was the -- that was the bottom line.
15   He was no longer on the faculty.
16   Q.   Okay.
17   A.   Yes, told to clear out his office.
18   Q.   Okay.  So before this meeting, do you know
19   whether President Munley was prepared to dismiss
20   Professor Fagal?
21   A.   No.
22   Q.   You didn't discuss any discipline of
23   Professor Fagal before the meeting started?
24   A.   No.
25   Q.   And were you aware of any such discussions?

1    A.  No.
2    Q.  Let me ask you this:  What was your role at
3  the meeting?  Why would you have been there?  Why were
4  you invited?
5    A.  I think because I was dean of the college.
6    Q.  Okay.  Do you remember whether Patricia
7  Dunleavy said anything at the meeting?
8    A.  No, she did not.
9    Q.  And what about you?
10    A.  No.
11    Q.  Approximately how long was the meeting?
12    A.  Going back four years.  I don't know.  25
13  minutes, 30.
14    Q.  Okay.  Do you remember what you did
15  immediately after the meeting?
16    A.  As far as I remember I returned to my
17  office.
18    Q.  But you didn't remain in the room to discuss
19  what had just transpired?
20    A.  My recollection is that I did remain in the
21  room, but no real discussion occurred.  I just wanted
22  to take a minute and then return to my office.  I
23  can't remember any discussion --
24    Q.  I'm sorry.  I missed what you said there.
25    A.  I can't remember any discussion after

1  Dr. Fagal left the room.
2    Q.  Okay.  But he did leave the room leaving
3  you, Patricia Dunleavy and Professor Munley in the
4  room without him?
5    A.  Yes.  Yes.
6    Q.  Okay.  Do you remember approximately how
7  long you were there after Professor Fagal left?
8    A.  No more than a couple minutes.
9    Q.  Okay.  So a few minutes ago I had you read
10  the e-mail dated January 13, 2012.  That was
11  Exhibit 3.
12    A.  Yes.
13    Q.  And we just talked about a meeting that
14  occurred on January 23; is that right?
15    A.  Yes.
16    Q.  So about ten days.  Do you recall during
17  that 10-day period any discussions between Marywood
18  administrators about how to handle the videos?
19    A.  No.
20    Q.  Do you remember any discussion by any
21  Marywood administrators about how the university's
22  written policies and procedures might apply to
23  Professor Fagal's conduct?
24    A.  No.
25    Q.  Do you remember any Marywood administrator

1  stating that -- in those 10 days do you remember any
2  Marywood administrator stating that Professor Fagal
3  should be disciplined?
4    A.  No.
5    Q.  Okay.  Do you know whether Vice President
6  Levine approved the -- strike that.  Never mind.
7        Do you recall talking to Vice President
8  Levine about the meeting on January 23, 2012?
9    A.  No.
10    Q.  Was it unusual that Vice President Levine
11  wasn't at that meeting?
12    A.  Did I find it unusual?
13    Q.  Yes.
14    A.  I never thought about it.
15    Q.  Okay.  Well, thinking about it now, given
16  Vice President Levine's position, do you find it
17  unusual that he wasn't at the meeting?
18    A.  I'm really not sure.
19    Q.  I'm sorry.  Go ahead.
20    A.  I just don't recall.  I mean, right now I
21  haven't thought about it until you just asked this
22  question.  And I'm a philosopher by training, and I
23  can see thinking about it in terms of reasons for him
24  to be there and reasons for him not to be there.
25        So at the moment I really can't answer that.

1  I never even thought about it, what was appropriate or
2  inappropriate or who should or should not be present.
3    Q.  What are some reasons that he should have
4  been there?
5    A.  Umm, he was vice president for academic
6  affairs, and as such oversaw all faculty in all five
7  colleges or schools.
8    Q.  Okay.  Is that it?
9    A.  Yes.  As far as if I'm thinking about it
10  now.  But I also think that I was there because I was
11  dean, and it was going to affect my college and what
12  would have to be done to get those courses that Fred
13  taught covered.
14    Q.  Okay.
15    A.  That's the first thing I had to do when I
16  got back to my office.  I had to figure out how to get
17  those courses covered.
18    Q.  At the time of the January 23 meeting when
19  you said that Professor Fagal had been dismissed, did
20  you believe that Professor Fagal had posed an
21  immediate harm to himself?
22    A.  No.
23    Q.  How about to any others?
24    A.  No.
25    Q.  Okay.  Do you recall any statements made by

Page 26

1  Marywood administrators about whether Professor Fagal
2  posed an immediate harm to himself or to others?
3      A.  No, I do not.
4      Q.  Okay.  Do you recall a day after the
5  January 23 meeting that President Munley sent a letter
6  to Professor Fagal stating that she was recommending
7  that his tenure and employment be terminated?
8      A.  I do not remember, no.
9      Q.  Okay.  Do you recall any letter President
10  Munley sent Professor Fagal about the discipline that
11  was imposed?
12      A.  I'm trying to recall and I can't.  But I
13  don't recall that December 15 letter from Alan to
14  Fred, but as I noted it was copied on that.  So if
15  there was a letter, it wouldn't surprise me that I was
16  copied on that as well.  If I was, it would be in my
17  files which are in the Dean's office at Marywood.
18      Q.  Okay.  After the January 23, 2012, meeting
19  with President Munley, do you recall any statements
20  from Marywood personnel about potentially amending the
21  university's disciplinary rules to give more latitude
22  in disciplining employees?
23      A.  I don't recall, no.
24      Q.  In your time at Marywood, do you recall the
25  termination of any tenured professor other than

Page 27

1  Professor Fagal?
2          MS. AHMAD:  Objection.  Relevance.  You
3  can answer.
4      A.  In 1985, '86, in that timeframe I served on
5  a committee that recommended that a case proceed
6  against a faculty member filed by a student that
7  involved sexual harassment.  I believe that faculty
8  member was indeed tenured, and that he was dismissed.
9  BY MR. COHEN:
10      Q.  Do you remember that employee's name?
11      A.  Murali Nair.
12      Q.  And you said 1986?
13      A.  It was in around 1985, '86, '87.  In the mid
14  '80s.
15      Q.  Other than Professor Nair and Professor
16  Fagal, you don't remember any other tenured professor
17  being terminated?
18      A.  Again I think the professor was tenured, but
19  there was an art professor who was dismissed over
20  sexual harassment of a secretary.
21      Q.  This is someone other than Professor Nair?
22      A.  Yes.
23      Q.  Do you remember the art professor's name?
24      A.  That I do not, no.
25      Q.  And do you remember when this happened?

Page 28

1      A.  I don't remember that either.  What I do
2  remember is I actually ran into that professor at an
3  outlet in East Strasburg, and I didn't know anything
4  was going on with him or about it.  We talked for
5  maybe 5-10 minutes, and that was on Saturday or
6  Sunday.  And then I arrive back to school on Monday,
7  and I find out he's no longer on the faculty.
8          I thought I just had a conversation with
9  him, he didn't say anything about it.  So he had been
10  dismissed maybe just recently, but I didn't know any
11  of the specifics about that case.  I did know some of
12  the specifics about the Murali Nair case because I
13  served on the initial committee that recommended the
14  university move forward with potentially disciplinary
15  actions against him.
16      Q.  Okay.  In your time at Marywood, can you
17  recall any tenured professor publicly criticizing the
18  administration in a way that was similar to Professor
19  Fagal?
20      A.  No.
21      Q.  Did President Munley ever express any
22  dislike for Professor Fagal prior to the videos that
23  he posted?
24      A.  Not to my knowledge, no.
25      Q.  How about Vice President Levine?

Page 29

1      A.  No.
2      Q.  Do you remember any other Marywood
3  administrators expressing any dislike or contempt for
4  Professor Fagal before -- this is before January 2012.
5      A.  No.
6      Q.  What about you?
7      A.  What about me?
8      Q.  Yes.
9      A.  As dean I certainly had some concerns about
10  what Fred would do in class because I would have
11  students come and report to me.
12      Q.  Okay.  What were those concerns?
13      A.  Well, he would make comments that really
14  were not appropriate for a classroom and created what
15  could be called a hostile learning environment.  I had
16  two students in my office one time from a comment that
17  he made in class about people with thunder thighs,
18  specifically women with thunder thighs, and that they
19  should be in a swimming pool, not in a classroom.
20          I asked the students if I could go -- or if
21  they would go on record.  I said I really can't talk
22  to Dr. Fagal about this unless you give me permission.
23  I said would you go see Pat Dunleavy to at least file
24  a complaint.  I think I may have even mentioned Ray
25  Heath's office or Dr. Levine's office, but I certainly

Page 30

1 mentioned Pat Dunleavy because I had other students
2 that had come forward with specific comments made in
3 class. That is one that I remember specifically. But
4 no one would go on record.
5      So as I told the students I said I will take
6 note, but I can't really do anything unless you're
7 willing to make a formal statement. And over the
8 years -- I mean, there were a couple of other
9 encounters with Fred that I had to address indirectly.
10     Sister Patricia Matthews back in 2003, 2004,
11 2005, somewhere in that area, I was President of
12 Senate, Faculty Senate at the time. I guess that was
13 another hat that I wore for a couple of years. But as
14 President of the Faculty Senate, Sister Patricia
15 called me into her office and said that Fred had
16 circulated an e-mail that made one of our Muslim
17 faculty very uneasy. And this faculty member was not
18 tenured. I think she was in her second or third year.
19     Patricia had talked to her, but the faculty
20 member was very uneasy, asked me to go down and talk
21 with her and tell her that his e-mail certainly did
22 not reflect the mission, goals, or objectives of
23 Marywood or even the general attitude among faculty.
24 But again the specifics of the e-mail I don't
25 remember.

Page 31

1      I remember I met with that faculty member
2 and assured her that those views were Fred's views and
3 not the views of the university and not the views of
4 any other faculty member of which I was aware. I was
5 also called to the vice president Peter Cimbolic
6 office because of some cartoons that Fred had posted
7 on his door.
8      I had to verify, in fact, that those
9 cartoons were there, and that they were unacceptable
10 for an institution or to be posted at least at
11 Marywood. Again because they created what could be
12 called a hostile learning environment.
13     My concern was as dean what can I say that
14 would say, you know, you're beginning to step over the
15 line. We can't have a classroom -- because I did have
16 at least one other faculty member or students came to
17 me about -- actually two I can remember. They were
18 willing to go on record, and one of them I was able to
19 call in and say these kinds of things can't be said in
20 class again.
21     Q. Mm-hmm. Okay. Over the past few minutes
22 you just recounted a number of complaints that various
23 students and faculty members made about Professor
24 Fagal.
25     A. Yes.

Page 32

1      Q. My question for you, though, is did you
2 personally dislike him.
3      A. It's not an easy question to answer. Fred
4 and I had a lot of good conversations in probably the
5 first ten years he was at Marywood. We didn't
6 continue those conversations maybe for a variety of
7 reasons, none of which I recall at the moment. But I
8 always found him a good conversationalist, but I did
9 not like some of his thoughts on education.
10     Q. Okay.
11     A. And especially some of his thoughts on
12 students. So as a colleague I found him okay. But as
13 a faculty member in charge of student learning, I had
14 some difficulty.
15     Q. Mm-hmm.
16     A. None of which was ever expressed. I was
17 never asked for my thoughts.
18     Q. Okay. Do you remember President Mary Reep?
19     A. Yes.
20     Q. Would you say she ever expressed any dislike
21 for Professor Fagal?
22     A. Not to my knowledge.
23     Q. A few minutes ago I think you said that
24 before the January 23, 2012, meeting that you had
25 arranged for Professor Fagal's 9 a.m. class to be

Page 33

1 covered?
2      A. I did not.
3      Q. You didn't say that?
4      A. I did not. I said -- I may have said it
5 will be cancelled. The class was cancelled. It was
6 not covered.
7      Q. Did you take care of cancelling it?
8      A. I don't recall. I'm pretty sure I did not,
9 but I certainly probably asked someone to go and do
10 that.
11     Q. All right. Can you just give me one moment?
12     A. Yes.
13     Q. Did any faculty member or student that ever
14 visited your office in Marywood ever suggest that
15 Professor Fagal be disciplined?
16     A. No, not to my knowledge.
17     Q. And how about any administrators that came
18 to your office --
19     A. No.
20     Q. -- and suggest that?
21     A. No.
22     Q. The report that you said you signed off on
23 after the January 23 meeting, that was in writing,
24 right?
25     A. Yes.

02/26/2016 Michael A. Foley, PhD

Page 34

1    Q.   Do you remember whether Professor Fagal got
2   that report?
3    A.   No, I don't recall.  I --
4    Q.   What's that?
5    A.   I don't think so.
6    Q.   Okay.  But did you get a copy of the report?
7    A.   I signed off on it if I did get it.  I don't
8   recall getting a copy.  I knew Pat would keep a copy.
9   If there is a copy, it would again be in Dr. Fagal's
10  folder that would be in my office.
11   Q.   You also mentioned that you had seen the
12  videos that Professor Fagal had posted in January of
13  2012.
14   A.   I saw the first video.
15   Q.   Okay.  Do you remember the circumstances of
16  you seeing it?  Who gave you the link for the video?
17   A.   That I don't recall.  Someone sent me an
18  e-mail.  It could have been Dr. Fagal.  It could have
19  been another faculty member.  At any rate it said
20  "check this out".  So I checked it out.
21   Q.   Okay.  Just a few more questions.  In the
22  past ten years have you been convicted of a felony?
23   A.   No.
24   Q.   And what educational degrees do you have?
25   A.   I have a Ph.D. in philosophy.  Do you want

Page 35

1   me to go back to bachelors?
2    Q.   Yes, sure.
3    A.   I have a bachelors degree.
4    Q.   And where did you get it from?
5    A.   I got a bachelors degree with a double
6   major, German and Philosophy, from Eastern Illinois
7   University; a masters degree and a Ph.D. in Philosophy
8   from Southern Illinois University; and a masters in
9   Public Administration from New York University.
10   Q.   Okay.  Did you review any documents to
11  prepare for this deposition?
12   A.   No.  Other than what you sent me, I don't
13  have any documents.  I left everything at Marywood.
14   Q.   You mean other than the subpoena I sent you?
15   A.   Other than that, no, I did not review
16  anything.  I don't have any folders from Marywood.  I
17  left everything in my office.
18   Q.   Do you still have access to your Marywood
19  e-mail account?
20   A.   I don't think so.  I haven't used it since I
21  left Marywood.
22   Q.   Okay.  Do you still receive e-mails from
23  Marywood?  I mean, is it possible that you had your
24  Marywood e-mails forwarded to a personal account?
25   A.   Oh, I can't imagine doing that, no.  I do

Page 36

1   not receive any internal e-mails from Marywood.  I
2   thought my account was probably terminated on July 1
3   of 2012.  I didn't think I would have access to my
4   e-mail account at Marywood.  I was retired.
5    Q.   Okay.  Did you discuss this deposition with
6   anybody before today?
7    A.   Stephanie and Asima, we talked on Monday
8   just in general about what might happen.  I mean, when
9   I received your deposition, to go back a few weeks
10  before, I was served at 7:30 in the evening and
11  somewhat shocked.  I knew I was going to be asked for
12  a deposition.  I just didn't know it would arrive as
13  it did at 7:30.
14       The person serving the subpoena said -- my
15  wife answered the door.  I was coming down some steps
16  and I heard him say, don't worry, your husband is not
17  in trouble.  And I said, well, I'm the husband, what's
18  this about.  And he said I have a subpoena for you
19  here.
20       So that evening I sent an e-mail to Pat
21  Dunleavy, and I said basically what's this about, can
22  we talk.  I believe that was a Thursday, and maybe she
23  and I talked on a Friday.  We talked around I think it
24  was 11:00 in the morning, and she said she was unaware
25  that the subpoena was being served at that moment, the

Page 37

1   night before.  She said that, yes, I am asked to give
2   a deposition.  And I said, Pat, I don't remember
3   anything basically.
4        I mean, it was four years ago.  As Dean you
5   have a lot of things on your plate.  This isn't the
6   only issue that was on my desk.  She said, well, not
7   to worry.  She said that she would be talking to
8   Jackson Lewis, some attorneys from Jackson Lewis or an
9   attorney from Jackson Lewis, on that afternoon and let
10  them know that I received a subpoena; and that they
11  would, in fact, contact me and talk about the
12  deposition to assure me that they would be there or
13  someone from Jackson Lewis would be there in case I
14  had any questions.
15       And they asked me some questions very
16  similar to what you asked.  But in general they simply
17  told me to be as truthful as I could be in terms of
18  what I could recollect from four years ago.
19   Q.   Are you represented by an attorney?
20   A.   No.
21   Q.   Okay.  Then in that case do you remember
22  anything else that Asima and Stephanie told you?
23   A.   Other than to be truthful?
24   Q.   Yes.
25   A.   No.  I mean, I don't think there was

Page 38

1  anything that was said that hasn't been said here
2  today.  More has been said here today than it was the
3  other day.  They just wanted to assure me that I would
4  be okay.  I mean I was a little --
5      Q.  All right.  Were you worried?
6      A.  Was I worried?  No.  No.  I wasn't, but I
7  did want to talk to somebody about something that
8  happened four years ago or at least what would be
9  expected from me.  I have no folders here.  I have no
10  notes.
11      As I said, I don't even recall the Exhibits
12  2 and 3 that you told me, and the odds are I probably
13  received them.  But in terms of what I recollect, no,
14  I don't remember especially that memo in which I was
15  copied.
16      Q.  Okay.  Do you remember what you told
17  Stephanie or Asima?
18      A.  What I told them?
19      Q.  Yes.
20      A.  Some of the same things what I said here,
21  about what I knew, when I knew it, did I know what was
22  going to happen at that meeting on the 23rd.  And I
23  didn't.  I wasn't involved at that level.  And they
24  just said -- Stephanie and Asima just said, well, tell
25  the truth, tell what you know.

Page 39

1      Q.  Okay.  You mentioned you sent an e-mail to
2  Patricia Dunleavy about this subpoena?
3      A.  Yes.
4      Q.  Do you still have that e-mail?
5      A.  I might have.  It was a very short e-mail.
6  I just wanted to talk.  I said "subpoena" was the, I
7  think, the topic, and I said I have some questions,
8  can we talk.  And the next morning was when she got to
9  her office and got my e-mail and contacted me and said
10  she would be free at 11, would I be free at 11.  And I
11  said yes, I would.
12      That was the extent of the e-mail.  I just
13  wanted to know -- well, the other thing, there was a
14  check attached for $83.91 or something like that.  I
15  didn't understand that because I hadn't read the
16  entire subpoena at that point where it does make clear
17  that you will be paid, but I wanted to know what that
18  was about, why would I receive a check.  Although now
19  that I've driven 40 miles one way, I understand why I
20  received the check.
21      Q.  You can deposit that check.
22      A.  You know, just would I just be giving a
23  deposition without ever -- without any kind of what
24  was going to be -- any way to know what kinds of
25  questions might be asked.

Page 40

1      In my opinion my role was relatively minor.
2  And I couldn't imagine why what I would have to say
3  would be important, but I now see why it's important
4  in terms of trying to get the entire picture of what
5  was going on.  But again I obviously don't know the
6  entire picture, everything that was happening outside
7  my office.
8      Q.  Okay.  Would you mind sending me and Jackson
9  Lewis a copy of the e-mail that you sent to Patricia
10  later?
11      A.  Yes.  I can do that if I can find it.  I
12  will also e-mail you if it has been deleted.  I don't
13  know why I would delete it, but I will check, yes.
14  And I can send a copy to both of you.
15      MS. AHMAD:  I have a copy of that e-mail,
16  and we'll be producing it today along with --
17      MR. COHEN:  Okay.
18      THE WITNESS:  Oh, okay.
19      MR. COHEN:  Okay.  All right, Dr. Foley, I
20  have nothing further.
21      THE WITNESS:  Okay.
22      MR. COHEN:  But if Asima has anything,
23  it's her turn.
24      MS. AHMAD:  Thank you.  I just have a few
25  quick follow up questions, Dr. Foley.

Page 41

1      EXAMINATION
2  BY MS. AHMAD:
3      Q.  First, thank you again for taking the time
4  to come here today.  I know that you mentioned that
5  you don't recall the specifics of who came to your
6  office and what comments were made once this video was
7  posted and went around campus.  But do you recall the
8  general feelings people had towards the video?
9      A.  The general feelings?
10      MR. COHEN:  Objection to form.  You can
11  answer.  You can answer.  I just made an
12  objection.
13      A.  Okay.  I don't know anyone who was happy
14  about it.  Everyone was pretty much disgusted.  They
15  found it offensive, disrespectful.
16  BY MS. AHMAD:
17      Q.  Okay.  And did you ever hear any complaints?
18  I know you mentioned a few earlier.  Do you recall the
19  specific complaints about this cartoon that was posted
20  on Dr. Fagal's door and what the cartoon was?
21      A.  The cartoon -- the one cartoon that I
22  recall, and I think there were several, but the one I
23  recall that had come to my office from somewhere, a
24  student expressing concern, if not outrage, it
25  pictured an Islamic terrorist at the gates of heaven

Page 42

1  waiting for his 72 virgins.  And the 72 virgins were
2  depicted as about 10 or 12 nuns, all of whom had
3  shotguns.  And that was going to be, I guess, the
4  terrorist's future.
5      Q.  Okay.  And what was the complaint you
6  received from the student?
7      A.  The student, that it created, well, a
8  hostile learning environment; that it was offensive;
9  that he was, in fact, Muslim; and seeing that cartoon
10  made him uneasy at Marywood, uncomfortable, and
11  uncertain about where we were as an institution.
12      Q.  Did you speak to Dr. Fagal about the
13  cartoon?
14      A.  I think Peter Cimbolic told me to tell Fred
15  to take it down.  That was my recollection, but then I
16  think Peter said he was going to go do it.  That was
17  several months even before this situation.  I'm not
18  exactly sure of the timeline there.
19          So I may have been the one who was asked to
20  go tell Fred to remove it.  And it might have been
21  Dr. Cimbalic himself, who was Vice President For
22  Academic Affairs when that happened, which would have
23  been a couple years before what transpired in November
24  and December of 2011.
25      Q.  Okay.  And I think my last question would be

Page 43

1  regarding what transpired in November, December 2011,
2  did you agree with the decision of Sister Munley to
3  terminate Professor Fagal?
4      A.  Yes.
5          MS. AHMAD:  That's all I have.
6          RE-EXAMINATION
7  BY MR. COHEN:
8      Q.  One follow up question, Dr. Foley.
9      A.  Yes.
10      Q.  A few moments ago I think you said that you
11  don't know anybody that wasn't disgusted by the video
12  that Professor Fagal posted.
13      A.  I recall the general sentiment being one of
14  disgust.
15      Q.  Okay.  Did you talk to every faculty member
16  on campus about the video?
17      A.  No.
18      Q.  Approximately how many?
19      A.  A dozen maybe.
20      Q.  Okay.  And approximately how many professors
21  were on staff at Marywood at the time?
22      A.  150 full time, maybe 145.  Between 140 and
23  150 full time faculty members.
24      Q.  Okay.  So would it be fair to say that you
25  don't really know what the general consensus of

Page 44

1  professors was if you only spoke to 12 out of 150?
2      A.  In terms of the 150, no, I can't say what
3  150 people thought.  I don't even know if 150 people
4  saw the video.
5      Q.  Okay.  Thank you for coming in today.  I'm
6  finished.  I think under the rules that you will get a
7  copy of the transcript, and you'll have 30 days to
8  review the transcript of today's deposition and to
9  make any corrections.  Am I right, Joan?
10          THE COURT REPORTER:  Only if he chooses to
11  read and sign.  He can waive that as well.
12          MR. COHEN:  All right.  You're free to go.
13          THE COURT REPORTER:  What would you like
14  for your transcripts?
15          MR. COHEN:  The cheapest option.  I don't
16  need an expedited.  I don't need a hard copy.  An
17  electronic copy is fine.  Best if we can get it
18  on PDF.
19          MS. AHMAD:  The Minuscript version as well
20  and electronic.
21          (Signature is reserved.)
22          (DEPOSITION CONCLUDED AT 11:26 A.M.)
23
24
25

Page 45

1  CERTIFICATE OF NOTARY - COURT REPORTER
2  STATE OF NORTH CAROLINA          )
3  COUNTY OF WAKE                   )
4          I, JOAN DALY SNOVER, RMR/CRR, Notary
5  Public in and for the above county and state, do
6  hereby certify that the deposition of the person
7  hereinbefore named was taken before me at the time and
8  place hereinbefore set forth; that the witness was by
9  me first duly sworn to testify to the truth, the whole
10  truth and nothing but the truth; that thereupon the
11  foregoing questions were asked and foregoing answers
12  made by the witness which were duly recorded by me by
13  means of stenotype; which is reduced to written form
14  under my direction and supervision, and that this is,
15  to the best of my knowledge and belief, a true and
16  correct transcript.
17      I further certify that I am neither of counsel
18  to either party nor interested in the events of this
19  case.  Today is the 12th day of March 2016.
20
21
22  Joan Daly Snover, RMR/CRR
    Notary Public, Wake County,
23  North Carolina.
    Notary No. 201214400003
24  Expiration Date:  5/17/2017
25

02/26/2016 Michael A. Foley, PhD

Pages 46..48

Page 46

```
1              WITNESS'S CERTIFICATE

2

3          I, MICHAEL A. FOLEY, do hereby certify

4    that I have read and understand the foregoing

5    transcript and believe it to be a true, accurate, and

6    complete transcript of my testimony, subject to

7    the attached list of changes, if any.

8    _____

9              MICHAEL A. FOLEY

10

11       This deposition was signed in my presence by

12   _____, on the _____ day of

13   _____, 2016.

14

15   _____

16              Notary Public

17

18   My commission expires:

19

20

21

22

23

24

25
```

Page 48

```
1    Page _____ Line _____ should      (Page 2 of 2)

2    read:_____

3    Page _____ Line _____ should

4    read:_____

5    Page _____ Line _____ should

6    read:_____

7    Page _____ Line _____ should

8    read:_____

9    Page _____ Line _____ should

10   read:_____

11   Page _____ Line _____ should

12   read:_____

13   Page _____ Line _____ should

14   read:_____

15   Page _____ Line _____ should

16   read:_____

17   Page _____ Line _____ should

18   read:_____

19   Page _____ Line _____ should

20   read:_____

21   Page _____ Line _____ should

22   read:_____

23   Page _____ Line _____ should

24   read:_____

25
```

Page 47

```
1    CaseWorks, Inc.
     7622 Bentley Rd                      (Page 1 of 2)
2    Greensboro, North Carolina 27409
3            E R R A T A   S H E E T
4    Re: Frederick F. Fagal, Jr. v. Marywood University
5    Deposition of: MICHAEL A. FOLEY
6            Please read this transcript with care, and if
     you find any corrections or changes you wish made, list
7    them by page and line number below.   DO NOT WRITE IN
     THE TRANSCRIPT ITSELF.  Return the
8    Certificate and Errata Sheet to this office after
     it is signed.  We would appreciate your prompt
9    attention to this matter.
             To assist you in making any such corrections,
10   please use the form below.  If supplemental or
     additional pages are necessary, please furnish same and
11   attach them to the errata sheet.
12   Page _____ Line _____ should
13   read:_____
14   Page _____ Line _____ should
15   read:_____
16   Page _____ Line _____ should
17   read:_____
18   Page _____ Line _____ should
19   read:_____
20   Page _____ Line _____ should
21   read:_____
22   Page _____ Line _____ should
23   read:_____
24   Page _____ Line _____ should
25   read:_____
```

# Exhibit 42

EXHIBIT
**42**


DEPOSITION
EXHIBIT
LEVINE-8
9/6/16 895

| | |
|---|---|
| **From:** | Patricia Dunleavy [dunleavy@maryu.marywood.edu] |
| **Sent:** | Sunday, January 22, 2012 1:04:26 PM |
| **To:** | Dr Alan Levine |
| **Subject:** | Re: Monday Morning |

Oh yes, very. He may be wondering why he's heard nothing yet. Save the message, or at least keep a record of the date and time and content written down.

Tomorrow should be interesting,

Pat

Sent from my iPhone

On Jan 21, 2012, at 10:33 PM, Dr Alan Levine <levine@maryu.marywood.edu> wrote:

> Pat,
>
> Interesting piece of info. Fred Fagal called me at home this afternoon. I have the one of those phones that lets me know who is calling so I decided to see if he would leave a message. He did. Asked me to give him a call to speak "off the record" if I wanted.
>
> I decided not to; at this point I don't trust "off the record", since it may really mean nothing, except when talking to the press.
>
> Interesting, eh!
>
> Alan
>
>
> Alan M. Levine, PhD
> Vice President for
>    Academic Affairs
> Marywood University
> 2300 Adams Ave
> Scranton, PA  18509
> (t) 570 348-6290
> (f) 570 961-4743
> e-mail: levine@marywood.edu
>
>
>
> On Sat, Jan 21, 2012 at 3:24 PM, Patricia Dunleavy <dunleavy@marywood.edu> wrote:
>> Thanks Alan, this sounds good. Dave will be at Marywood early as well, I spoke to him late yesterday. Sounds like weather may get in the way - I heard ice overnight to rain. We'll hope for the best,
>>
>> Pat
>>
>> On Fri, Jan 20, 2012 at 5:09 PM, Dr Alan Levine <levine@maryu.marywood.edu> wrote:


EXHIBIT
Dunleavy 6
8/11/16   KJ

**DEF002759**

Pat and Mike,

I just finished chatting with Sr. Anne about our plans for Monday morning. Just to make sure we are all on the same page, this is what we envision.

Mike - at about 8:45 you will go down to Fred's office to let him know that Sr. Anne would like to meet with him at 9 in her office. You do not have to accompany him to the meeting, but if he says he is available, you should then go directly to Sr. Anne's office to be "stationed" in the correct place. If Fred is unable to meet at 9, please ask him to meet at 10, and if not that 11, and if not that noon. Please get a commitment from Fred as to the time he can meet. Also, please let Sr. Anne know when the meeting will take place, as she has a number of other things that need to be completed that morning.

Pat - as I understand it, you will be in Sr. Anne's office a few minutes before the meeting, also to be correctly "stationed". I believe that you will make the necessary arrangement with Dave Elliot, after finding out what time the meeting will take place, although it seems that we should anticipate a 9 AM meeting until told differently.

Possibly the two of you should communicate with each other earlier in the morning just to make sure that you agree on how this will play out.

I think that does it. Please feel free to contact me over the weekend if any questions arise. I plan to be at Marywood no later than 8:30 on Monday morning.

Thanks

Alan

Alan M. Levine, PhD
Vice President for
    Academic Affairs
Marywood University
2300 Adams Ave
Scranton, PA  18509
(t) 570 348-6290
(f) 570 961-4743
e-mail: levine@marywood.edu

--
Patricia E. Dunleavy, Ph.D.
Assistant Vice President for Human Resources
Marywood University
2300 Adams Avenue
Scranton PA 18509
dunleavy@marywood.edu
570-348-6220 phone
570-961-4740 fax

DEF002760