# Exhibit 43

EXHIBIT

**43**

Page 1

           IN THE UNITED STATES DISTRICT COURT
        FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

                    -  -  -

FREDERICK F. FAGAL, JR.        : CIVIL ACTION
                               :
              Plaintiff,        : NO. 3:14-cv-02404-ARC
                               :
    vs.                         : (JUDGE CAPUTO)
                               :
MARYWOOD UNIVERSITY,            :
                               :
              Defendant.        :


                    —  —  —

          September 6, 2016
                    -  -  -


          Oral deposition of Alan M.
Levine, taken pursuant to notice, was
held at the Radisson Lackawanna Station
Hotel, Suite 206, 700 Lackawanna Avenue,
Scranton, Pennsylvania, commencing at
9:30 a.m., on the above date, before Judy
A. Black, a Registered Professional Court
Reporter and Notary Public in and for the
Commonwealth of Pennsylvania.




                    -  -  -


          MAGNA LEGAL SERVICES
       Seven Penn Center, 8th Floor

          1635 Market Street

     Philadelphia, Pennsylvania 19103

          (866) 624-6221



Page 2

APPEARANCES:
  JONATHAN Z. COHEN, LTD
  BY:  JONATHAN Z. COHEN, ESQUIRE
  175 Strafford Avenue
  Suite 1 PMB 212
  Wayne, PA 19087
  (215) 874-0047
  Attorneys for Plaintiff

  JACKSON LEWIS, P.C.
  BY:  STEPHANIE J. PEET, ESQUIRE
  Three Parkway
  1601 Cherry Street, Suite 1350
  Philadelphia, PA 19102
  (267) 319-7802
  Attorneys for the Defendant


ALSO PRESENT:

  FREDERICK F. FAGAL, JR.

MAGNA LEGAL SERVICES

---

Page 4

Levine-6   E-mail chain dated Tuesday,        27
       January 17, 2012, Bates Nos.
       DEF002743-2746
Levine-7   E-mail chain dated Tuesday,        28
       January 17, 2012, Bates Nos.
       DEF002734-2735
Levine-8   E-mail chain dated Sunday,         30
       January 22, 2012, Bates Nos.
       DEF002759-2760
Levine-9   Letter dated January 24, 2012,    44
       with attachments, Bates Nos.
       DEF000166-187
Levine-10   Document headed "Talking Points  46
       for Board," Bates Nos.
       DEF000145-146
Levine-11   Document headed "Talking Points  48
       for Meeting," Bates No.
       DEF000147
Levine-12   E-mail dated Monday,             48
       January 30, 2012, Bates No.
       DEF002756
Levine-13   E-mail dated Monday, April 2,    49
       2012, Bates No. DEF002380

MAGNA LEGAL SERVICES

---

Page 3

INDEX
– – –

Testimony of:  Alan M. Levine

       DIRECT  CROSS  REDIRECT  RECROSS

By Mr. Cohen      6
By Ms. Peet      53


EXHIBITS
– – –

NUMBER     DESCRIPTION             PAGE
Levine-1   5-page document headed       10
       "Marywood University
       Progressive Discipline
Levine-2   E-mail dated Wednesday,      11
       November 9, 2011, Bates No.
       DEF002392
Levine-3   E-mail chain dated Monday,   14
       November 28, 2011, Bates Nos.
       DEF002703-2705
Levine-4   E-mail chain dated Wednesday, 20
       November 30, 2011, Bates Nos.
       DEF002713-2714
Levine-5   E-mail chain dated Thursday, 24
       December 1, 2011, Bates No.
       DEF002416

MAGNA LEGAL SERVICES

---

Page 5

- - -
DEPOSITION SUPPORT INDEX
- - -


Direction to Witness Not to Answer
Page Line     Page Line     Page Line
None


Request for Production of Documents
Page Line     Page Line     Page Line
None


Stipulations
Page Line     Page Line     Page Line
6    1


Question Marked
Page Line     Page Line     Page Line
None

MAGNA LEGAL SERVICES



1               - - -
2          STIPULATIONS
3               - - -
4        IT IS STIPULATED by and between counsel
5    that the Deposition of Alan M. Levine, is being
6    taken pursuant to agreement and that all
7    objections, except as to form, are reserved
8    until the time of trial.  Alan M. Levine does
9    not waive the reading, signing, and filing of
10   the Deposition.
11              - - -
12        A L A N  M. L E V I N E, having
13   been duly sworn, was examined and testified as
14   follows:
15              - - -
16   DIRECT EXAMINATION BY MR. COHEN:
17        Q.   Good morning, Dr. Levine.
18        A.   Good morning.
19        Q.   My name is Jonathan Cohen.  I represent
20   the plaintiff in this litigation, Frederick F. Fagal,
21   Jr.  Do you understand that you're under oath today,
22   the same as if you were in a courtroom?
23        A.   I do.
24        Q.   And have you ever had your deposition

1    taken?
2        A.   Nope.
3        Q.   Okay.  So the way this works is I just
4    ask you questions, and unless your attorney instructs
5    you not to answer, you're supposed to answer them.
6    If you don't understand the question, please just say
7    so and I'll rephrase it.  If you need to take a
8    break, that's fine, too.
9            As I'm asking a question, you might
10   think that you know what I'm about to ask and you
11   might start answering it, but that's hard for the
12   court reporter to take everything down, so if you can
13   just wait until I finish the question, it's easier
14   for everybody.
15           Is there anything that would prevent you
16   from thinking clearly or testifying truthfully today?
17       A.   Nope.
18       Q.   What is your full name including any
19   middle name?
20       A.   Alan Michael Levine.
21       Q.   And could you tell me a little bit about
22   your educational background, Dr. Levine?
23       A.   I could.
24       Q.   Could you?

1        A.   I could.
2        Q.   Could you explain -- did you go to
3    college, did you go to grad school?
4        A.   Yes.
5        Q.   Tell me where you went.
6        A.   I went to college at Hofstra University.
7        Q.   Okay.  Did you attend graduate school?
8        A.   I did.
9        Q.   And where did you go to graduate school?
10       A.   New York University.
11       Q.   And what were your degrees in?
12       A.   Where?
13       Q.   Both places.
14       A.   Psychology undergrad, nutrition and
15   dietetics master's, nutrition and dietetics Ph.D.
16       Q.   Okay.  When did you first begin working
17   for Marywood University?
18       A.   1978.
19       Q.   And what did you do before then
20   professionally?
21       A.   Lots of things.
22       Q.   Okay.  And, today, are you still
23   employed by Marywood University?
24       A.   Yes.

1        Q.   And what's your position there?
2        A.   Professor.
3        Q.   And it's true that at one point you were
4    vice president, correct, of academic affairs?
5        A.   Correct.
6        Q.   When did you first meet my client,
7    Professor Fagal?
8        A.   I don't remember.
9        Q.   Would it be fair to say that Professor
10   Fagal has had a number of run-ins with Marywood's
11   administration?
12           MS. PEET:  Objection to the form.  You
13   can answer.
14           THE WITNESS:  Yes, I can answer?
15           MS. PEET:  You can answer.
16       A.   Would you repeat the question?
17       Q.   Would it be fair to say that Professor
18   Fagal has had a number of run-ins with Marywood's
19   administration?
20           MS. PEET:  Objection.  You can answer.
21       A.   I don't know what run-ins means.
22       Q.   Confrontations?
23       A.   You'd have to define that term for me.
24       Q.   You don't understand what a



1  confrontation is?
2     A.   There's all levels of confrontation.
3     Q.   Okay.  We'll move on.  We're going to
4  mark this as exhibit Levine-1, please.
5         (Levine-1, 5-page document headed
6  "Marywood University Progressive Discipline Policy
7  Statement," is received and marked for
8  identification.)
9     Q.   Now, Dr. Levine, are you familiar with
10  that document?  And you can briefly review it,
11  please.
12     A.   Yes.
13     Q.   Okay.  And what is it?
14     A.   Marywood University progressive
15  discipline policy statement.
16     Q.   And could you turn to the last page?  Do
17  you see the section where it says "History"?
18     A.   Yes.
19     Q.   And this section covers, you know, when
20  various versions of this policy became effective,
21  correct?
22         MS. PEET:  Objection, lack of
23  foundation.  You can answer.
24     A.   I believe that to be true.

1     Q.   And do you know if this is a policy that
2  was in effect when Professor Fagal departed Marywood
3  University?
4     A.   I don't know.
5     Q.   Did you have any role in helping to
6  formulate the policy that we're looking at?
7         I'm sorry, did you say something?
8     A.   I'm looking.  I didn't say anything yet.
9         I don't believe the policy -- no, I
10  don't believe so.
11     Q.   Did you serve on the policy committee at
12  Marywood?
13     A.   Yes.
14     Q.   Okay.  Have you ever read this policy in
15  full?
16     A.   Yes.
17     Q.   Let's move on.
18         I'm going to have this marked as Levine
19  Exhibit 2?
20         (Levine-2, E-mail dated Wednesday,
21  November 9, 2011, Bates No. DEF002392, is received
22  and marked for identification.)
23     Q.   And could you, Dr. Levine, read this to
24  yourself, let me know when you're finished?

1     A.   I'm finished.
2     Q.   Do you recognize this document,
3  Dr. Levine?
4     A.   Yes.
5     Q.   And what is this?
6     A.   An e-mail document.
7     Q.   That's correct.  Is it an e-mail from
8  you to -- from Dr. Foley to you dated November 8,
9  2011, at 8:25 p.m.?
10     A.   No.
11         MS. PEET:  November 9th.
12     Q.   November 9, 2011?
13     A.   Yes.
14     Q.   Who is Dr. Michael Alan Foley?
15     A.   Who is he?
16     Q.   Yes.
17     A.   He's a man.  I don't understand your
18  question.
19     Q.   Did he have a position at Marywood
20  University?
21     A.   Yes.
22     Q.   What was his position?
23     A.   When?
24     Q.   At the time this e-mail was written.

1     A.   Dean, College of Liberal Arts and
2  sciences.
3     Q.   Did you ever respond to this e-mail?  I
4  know this was a long time ago.
5     A.   I don't remember.
6     Q.   Okay.  At the time this e-mail was
7  written, was it, in fact, becoming more and more
8  difficult to staff Professor Fagal's courses?
9     A.   The e-mail says it was.
10     Q.   I'm aware of that.  I'm asking you if,
11  in fact, that was true.
12     A.   As I read the e-mail, it appears to be
13  true.
14     Q.   Okay.  Why was it becoming more
15  difficult to staff Professor Fagal's courses?
16         MS. PEET:  Objection, lack of
17  foundation.  You can answer, if you know.
18     A.   I'm not sure.
19     Q.   Was this e-mail the first time that this
20  issue came to your attention, difficulty in staffing
21  Professor Fagal's courses?
22     A.   I don't remember.
23     Q.   Do you remember if you or Dr. Foley came
24  to a solution to the problem of the difficulty in



MAGNA ▶
LEGAL SERVICES

1   staffing Professor Fagal's courses?
2        MS. PEET:  Objection to the form.  You
3   can answer.
4        A.    I don't believe so.
5        Q.    Okay.  If fewer and fewer students were
6   taking Professor Fagal's classes, would it be fair to
7   say Professor Fagal was becoming a more expensive
8   employee to keep around?
9        MS. PEET:  Objection to the form, lack
10  of foundation.  Calls for speculation.
11       You can answer, if you know.
12       A.    Would you repeat the question?
13       Q.    If it was becoming harder and harder to
14  enroll students in Professor Fagal's classes, would
15  it be fair to say that it became more and more
16  expensive to keep Professor Fagal around?
17       MS. PEET:  Objection.
18       A.    Same salary.  There's no change in the
19  expense.
20       I'm going to get some water.
21       MS. PEET:  Sure.
22       MR. COHEN:  Okay.  We're going to make
23  this Levine Exhibit 3.
24       (Levine-3, E-mail chain dated Monday,

1   November 28, 2011, Bates Nos. DEF002703-2705, is
2   received and marked for identification.)
3   BY MR. COHEN:
4        Q.    And can you review this entire e-mail
5   chain and let me know when you're finished, please?
6        A.    Finished.
7        Q.    Do you recognize this document,
8   Dr. Levine?
9        A.    Yes.
10       Q.    Okay.  It begins with an e-mail from
11  Professor Fagal on November 23rd, 2011, correct, to
12  Mr. Oliveri?
13       A.    Correct.
14       Q.    And then Sister Margaret Gannon forwards
15  you that e-mail, correct, on November -- on the same
16  day?
17       A.    Correct.
18       Q.    And at the time, what position did
19  Sister Margaret Gannon have with Marywood?
20       A.    I believe she was chair.
21       Q.    Of Professor Fagal's department?
22       A.    Of the social science department.
23       Q.    Okay.
24       A.    I believe.  I believe that.

1        Q.    And so she forwards you Professor
2   Fagal's e-mail, and then on November 24, 2011, you
3   respond, correct?
4        A.    Yes.
5        Q.    And you say, "Thanks for the heads-up."
6   That's your first line, correct?
7        A.    Correct.
8        Q.    Why did you thank her for the heads-up?
9        A.    I was being polite.
10       Q.    Well, what is it about the situation
11  that even needed your input?
12       A.    I'm not sure anything needed my input.
13       Q.    Do you have any idea why Sister Gannon
14  forwarded this to you?
15       MS. PEET:  Objection to the form.  Calls
16  for speculation.  You can answer, if you know.
17       A.    I was vice president academic affairs.
18  It was an academic issue.
19       Q.    Anytime a professor wanted to bring a
20  speaker to class, it became an issue for you?
21       MS. PEET:  Objection to the form.  You
22  can answer.
23       A.    No.
24       Q.    Okay.  What is it about this particular

1   class -- what is it about this particular attempt to
2   call an outside speaker to class that it rose to your
3   level and it became an issue?
4        MS. PEET:  Objection to the form.  You
5   can answer.
6        A.    Movement to a venue that was not normal
7   class -- not the normal place for the class and
8   inviting the entire community to class, that's very
9   unusual.
10       Q.    Is it problematic?
11       A.    Problematic?  Not if a venue is
12  available and the class is run the way classes are
13  normally run.
14       Q.    And your second sentence reads, "I'm in
15  Michigan, so I'm less able to check out some things
16  which I believe to be germane to the situation,"
17  correct?
18       A.    Yes.
19       Q.    What things did you think were germane
20  to the situation?
21       A.    Movement to a different venue, whether
22  or not that class is being scheduled at a time the
23  class is normally scheduled or whether students were
24  being asked to attend the class at a time other than



Page 18

1 our regularly scheduled class.
2     Q.    Why did you -- further down in your
3 e-mail, you mentioned that you'd be interested in
4 knowing whether anyone in social sciences had ever
5 opened their class to the entire campus, correct?
6     A.    Yes, that's what the e-mail says, yes.
7     Q.    Why did you care whether anyone in
8 social sciences had ever opened their class to the
9 entire campus?
10     A.    Seemed unusual to have a change in venue
11 and invite the entire campus.  That is generally not
12 done at Marywood.  I don't know it's ever been done,
13 although I don't know that for sure.  Seemed odd.
14     Q.    The fact that it was odd to you, did
15 that make it a problem?
16     A.    It makes it something, as VPAA, I should
17 investigate.
18     Q.    After your e-mail, Sister Gannon replied
19 to you, correct, on November 26th?
20     A.    Yes.
21     Q.    And then you forwarded Sister Gannon's
22 e-mail to Sister Anne Munley, correct?
23     A.    I don't know.  Obviously I wrote an
24 e-mail to Sister Anne Munley, but whether I forwarded

MAGNA LEGAL SERVICES

Page 19

1 this, I'm not sure.
2     Q.    Okay.
3     A.    Did I?
4     Q.    Now, to Sister Munley, you were --
5 you're mentioning that there will be posters
6 advertising the event, and -- correct?
7     A.    Let's see.
8         MS. PEET:  Is the question does the
9 e-mail say there will be posters advertising the
10 event?
11         MR. COHEN:  Yes.
12     A.    Yes.
13     Q.    And the last sentence in your e-mail
14 says, "It seems to me that Fred and Tom are simply
15 trying to circumvent our guidelines concerning
16 outside speakers who have a political agenda,"
17 correct?
18     A.    That's what it says, yes.
19     Q.    So the real issue to you was not so much
20 that the entire campus was invited or that it was in
21 a different room, it was that you thought the speaker
22 had a political agenda, correct?
23         MS. PEET:  Object to the form.
24 Mischaracterization of testimony.  You can answer.

MAGNA LEGAL SERVICES

Page 20

1     A.    The real issue to me was what I told
2 you.  Additionally, Marywood has a policy wherein if
3 a speaker comes representing one side of an issue,
4 the university invites at the same time a speaker
5 representing the other side.
6     Q.    Is that a written policy, or was it a
7 written policy?
8     A.    I don't know.
9     Q.    What was the political agenda that you
10 thought that the speaker that Professor Fagal had
11 proposed to bring had?
12     A.    I don't remember.  I don't remember back
13 at the time.
14     Q.    It's okay.
15         Do you remember if Sister Munley
16 responded to your e-mail?
17     A.    I don't remember.
18     Q.    Okay.
19         MR. COHEN:  Let's make this exhibit
20 Levine-4, please.
21         (Levine-4, E-mail chain dated Wednesday,
22 November 30, 2011, Bates Nos. DEF002713-2714is
23 received and marked for identification.)
24     Q.    And could you read this to yourself, as

MAGNA LEGAL SERVICES

Page 21

1 well, and let me know when you're finished?
2     A.    I'm finished.
3     Q.    Raymond P. Heath, he was vice president
4 for student life at the time?
5     A.    Yes.
6     Q.    And in Dr. Heath's e-mail to you, the
7 most recent one in the exchange on November 30, 2011,
8 his first sentence is, "Without all of the details
9 now, Fred Fagal's poor behavior has continued."
10 Correct?
11     A.    That's what the e-mail says.
12     Q.    Do you know what Dr. Heath meant by
13 "Fred Fagal's poor behavior"?
14         MS. PEET:  Objection to the form, calls
15 for speculation.  You can answer if you know.
16     A.    No, I don't know.
17     Q.    Later on in the e-mail, Dr. Heath
18 states, "After enabling him for so long, isn't a
19 similar session overdue?  If you agree, could a
20 conversation with him, the dean, you, me, and anyone
21 else you suggest be scheduled soon?"  Did I read that
22 correctly?
23     A.    Yes.
24     Q.    Did you agree that Professor Fagal was

MAGNA LEGAL SERVICES



Page 22

1 being enabled?
2     A.    I don't remember if I agreed with him.
3     Q.    Did you agree with Dr. Heath that a
4 conversation with Professor Fagal was in order
5 regarding his behavior?
6     A.    I don't remember for sure.
7     Q.    Do you know whether this was ever done,
8 whether someone had a talk with Professor Fagal about
9 his behavior?
10    A.    Define "someone."
11    Q.    Any administrators at Marywood
12 University, including you?
13        MS. PEET:  I'm sorry.  Could you repeat
14 the question?
15 BY MR. COHEN:
16    Q.    At some point, did you, did any other
17 administrators have a conversation with Professor
18 Fagal regarding the poor behavior referenced in this
19 e-mail?
20        MS. PEET:  Objection to the form.  You
21 can answer.
22    A.    Yeah, I can't speak for what other
23 administrators did.  I'm not privy to that.
24    Q.    How about you?

MAGNA LEGAL SERVICES

Page 23

1     A.    I don't remember if I had a conversation
2 concerning this e-mail, but I have had conversations
3 with Fagal.
4     Q.    About behavior?
5     A.    I don't remember.
6     Q.    Okay.  Do you remember if you ever
7 responded to Dr. Heath's e-mail here?
8     A.    I believe I did.
9     Q.    Do you remember what you said?
10    A.    No.
11    Q.    Okay.
12        MR. COHEN:  Stephanie, if indeed
13 Dr. Levine replied to this e-mail, I don't think we
14 saw it in production.  Maybe it doesn't exist.
15        MS. PEET:  To the extent it exists, it's
16 been produced.  I can confirm that for sure.  And you
17 can trust me, it's been.
18        MR. COHEN:  I understand it's been a
19 large document production.
20        MS. PEET:  Yes, we're not holding
21 anything back.  So to the extent there was a
22 response, it's been produced.
23        MR. COHEN:  Let's have this marked as
24 exhibit Levine-5.

MAGNA LEGAL SERVICES

Page 24

1        (Levine-5, E-mail chain dated Thursday,
2 December 1, 2011, Bates No. DEF002416, is received
3 and marked for identification.)
4     Q.    And could you read this exchange to
5 yourself and let me know when you're finished?
6     A.    Finished.
7     Q.    The latest e-mail in the chain is again
8 from Dr. Heath to you on December 1st, 2011, correct?
9     A.    Correct.
10    Q.    He references Peter's staff here.  Do
11 you know who he's referring to, which Peter?
12    A.    Yes.
13    Q.    Who is that?
14    A.    Who is Peter?
15    Q.    Yes.
16    A.    Peter Kilcullen.
17    Q.    In this e-mail, Dr. Heath is telling you
18 that Professor Fagal is attempting to intimidate, if
19 not bully, Carl Oliveri and Peter's staff.  Would you
20 agree with that?
21    A.    I agree that the e-mail says, "I do
22 think a conversation with Fred Fagal to discuss his
23 attempts to intimidate, if not bully, Carl Oliveri
24 and Peter's staff is overdue."  That's what it says.

MAGNA LEGAL SERVICES

Page 25

1     Q.    I understand that.  Do you agree that,
2 in fact, Professor Fagal was attempting to intimidate
3 or bully Carl Oliveri?
4        MS. PEET:  Objection to the form.
5     A.    I don't know.
6     Q.    Did you investigate this?
7     A.    No.
8     Q.    Did you agree with Raymond Heath that a
9 conversation with Professor Fagal was necessary to
10 address the alleged bullying and intimidation?
11        MS. PEET:  Objection to the form.  You
12 could answer.
13    A.    Probably.  Probably it was necessary.
14    Q.    Okay.  Did you ever have a conversation
15 with Professor Fagal about this?
16    A.    No.
17    Q.    Why was it necessary?
18    A.    It was a student-life issue that Ray
19 Heath felt that a conversation was necessary.  As a
20 fellow vice president, I didn't disagree.
21    Q.    I'm sorry, what was the last thing you
22 said?
23    A.    I said, as a fellow vice president.  I
24 was a fellow vice president.  I didn't disagree that

MAGNA LEGAL SERVICES



1 a conversation wasn't necessary.
2     Q.    In the same e-mail, Dr. Heath references
3 Professor Fagal's other agenda.  Do you see that?
4     A.    Yes.
5     Q.    Do you know what agenda he was referring
6 to?
7     A.    No.
8     Q.    Did you agree that Professor Fagal's
9 behavior was affecting individual's outside of his
10 department?
11     A.    Yes.
12     Q.    How was he affecting them?
13     A.    He was causing difficulty for some
14 students.
15     Q.    What type of difficulty?
16     A.    Emotional difficulty.
17     Q.    How was he causing emotional difficulty?
18     A.    By putting a cartoon demeaning Muslims
19 on his door, he was causing difficulty for Muslim
20 students who didn't agree with him.  Emotional
21 difficulty, or emotional pain.
22     Q.    Is that the only way that you know of
23 that he was affecting these students?
24     A.    As far as I remember now.

MAGNA LEGAL SERVICES

1     Q.    And do you remember responding to this
2 e-mail?
3     A.    I don't remember, but I'm sure you have
4 a response if there is one.
5         MR. COHEN:  Let's have this marked as
6 Levine Exhibit 6, please.
7         (Levine-6, E-mail chain dated Tuesday,
8 January 17, 2012, Bates Nos. DEF002743-2746, is
9 received and marked for identification.)
10     Q.    And could you read this to yourself and
11 let me know when you're finished, please?
12     A.    Finished.
13     Q.    Okay.  These e-mails reference Mary
14 Theresa.  That's Marywood's inside attorney, correct?
15     A.    Correct.
16     Q.    Now, I don't want to know what you asked
17 her, but --
18         MS. PEET:  That would also go to what
19 she said to you, to the extent she said anything.
20     Q.    Yes, I'm not trying to ask you anything
21 that's privileged.  But what I am interested in is
22 you're saying to Pat Dunleavy, you're trying to find
23 out what your -- what our options are.  What type of
24 options did you have in mind?

MAGNA LEGAL SERVICES

1     A.    Whether I can sue this bastard for the
2 egregious, what he called, Hitler parody.  That was
3 the main thing I was interested in personally.
4     Q.    What about options not for you
5 personally but for the university?
6     A.    Whether the university had to allow that
7 parody, what this bastard called a parody, to be out
8 on YouTube.
9     Q.    Were you specifically interested in
10 possible discipline for Professor Fagal?
11     A.    Specifically what do you mean?
12     Q.    Written warning, oral warning,
13 suspension, termination.  You know what discipline
14 means, right?
15     A.    All of those things should have been on
16 the table.
17     Q.    Okay.
18         MR. COHEN:  Let's mark this as Levine
19 Exhibit 7.
20         (Levine-7, E-mail chain dated Tuesday,
21 January 17, 2012, Bates Nos. DEF002734-2735, is
22 received and marked for identification.)
23     Q.    And, again, Dr. Levine, could you read
24 this to yourself and let me know when you're

MAGNA LEGAL SERVICES

1 finished?
2     A.    Finished.
3     Q.    Okay.  Again, here you're asking Pat for
4 possible responses for you and Marywood, correct?
5     A.    Correct.
6     Q.    And Dr. Dunleavy responds that
7 internally you can file a formal complaint under the
8 civil rights policy, correct?
9     A.    Correct.
10     Q.    Did you ever do that?
11     A.    No.
12     Q.    Why not?
13     A.    I'm not sure.  It is a mistake.  I
14 should have sued the bastard for defamation of
15 character.  I'm told I can't do that now, but I
16 should have gotten that bastard for that.
17     Q.    Well, I'm not referring to any possible
18 suit.  I'm specifically referring to the civil rights
19 policy.  You said you didn't file one and you regret
20 it?
21     A.    I don't regret not filing a civil
22 rights.  I regret not suing this bastard for
23 defamation of character.  That's what I said.
24     Q.    And why didn't you file a complaint

MAGNA LEGAL SERVICES

Page 30

1  under the civil rights policy?
2      A.   I don't remember why.
3          MR. COHEN:  Let's make this Levine
4  Exhibit 8, please.
5          (Levine-8, E-mail chain dated Sunday,
6  January 22, 2012, Bates Nos. DEF002759-2760, is
7  received and marked for identification.)
8      Q.   And could you read this to yourself, as
9  well, and let me know when you're finished?
10     A.   Finished.
11     Q.   Do you recognize this exchange of
12 e-mails, Dr. Levine?
13     A.   Yes.
14     Q.   Now, the first e-mail in the exchange is
15 from you to Patricia Dunleavy and I'm guessing Mike
16 Foley, correct?
17     A.   Correct.
18     Q.   And here you're kind of -- you're
19 discussing plans for bringing Professor Fagal in to
20 meet with President Munley, correct?
21     A.   Correct.
22     Q.   And the first line in this e-mail says,
23 "I just finished chatting with Sister Anne," right?
24     A.   Correct.

Page 31

1      Q.   So that's, in fact, true.  You did chat
2  with her?
3      A.   Obviously.
4      Q.   For how long?
5      A.   For how long did we have a chat?
6      Q.   Yes.
7      A.   I don't know.
8      Q.   Do you remember the substance of your
9  conversation?
10     A.   Yes.
11     Q.   Could you convey it to me in as much
12 detail as possible?
13     A.   Yes.
14     Q.   Please do so.
15     A.   Sister Anne was interested in having
16 Fagal brought into the office to discuss disciplinary
17 action concerning the video.  She wanted my input, as
18 was appropriate being that I was vice president of
19 academic affairs at the time, and we discussed the
20 strategy to have Fagal come in and be interviewed.
21     Q.   What was your input?
22     A.   My input was that was appropriate to
23 have him come in to be interviewed.  I was not there
24 because of the angst and anxiety that I felt as a

Page 32

1  result of this bastard's Nazi video, portraying me as
2  a Nazi, as well as involving my family members.
3  Sister Anne, out of the kindness of her heart,
4  decided it would be appropriate not to have me there
5  to spare me that.  Shalom.  Mother fucker.
6      Q.   Dr. Levine, I understand you're upset.
7  Is it really necessary to continue calling him
8  bastard throughout the entire deposition, calling me
9  a mother fucker?  Or are you calling me a mother
10 fucker?
11     A.   I don't understand how you can defend
12 this bastard.
13     Q.   Well, I am, and you're here, and do we
14 have to continue with, you know, berating him?
15     A.   It's my option, isn't it?
16          MS. PEET:  He's very emotional about
17 this.
18          MR. COHEN:  I know.
19          MS. PEET:  As well as if I were in a
20 video, you were in a video.  We can't control how
21 people are going to feel.  And this brings up all
22 sorts of emotion again.
23          If you can refrain from using the
24 language.  We all understand how you feel, by all

Page 33

1  means, but if -- I get that you're emotional.
2  BY MR. COHEN:
3      Q.   So my question is:  Do you think you
4  could refrain from continuing to call my client
5  bastard, calling me and/or my client mother fucker,
6  throughout the rest of the deposition?
7      A.   I'm not sure.
8      Q.   Do we really need to get the judge
9  involved?
10     A.   I don't know.
11     Q.   Okay.  So do you want to take a break?
12     A.   I'm good.
13     Q.   You're good?  All right.
14          So we just finished talking about
15 various plans for bringing in Dr. Fagal.  You talked
16 about how you had a conversation with President
17 Munley about it before sending this e-mail.  Did you
18 communicate about your plans to bring Professor Fagal
19 in to meet with President Munley with anyone other
20 than President Munley, Patricia Dunleavy, or
21 Dr. Foley?
22     A.   I don't believe so.
23     Q.   Okay.  Ultimately do you remember, in
24 fact -- I know you weren't there, but are you aware



Page 34

1  that on January 23rd, 2012, Professor Fagal was
2  brought in to meet with President Munley, Dr. Foley
3  and Patricia Dunleavy?
4      A.   Yes, I'm aware of it.
5      Q.   Okay.  Are you aware at that meeting
6  Professor Fagal was suspended?
7      A.   Yes.
8      Q.   Prior to that meeting on January 23rd,
9  2012, do you know whether President Munley had a --
10  was planning to suspend Professor Fagal?
11      MS. PEET:  Objection to the form.  Calls
12  for speculation.  You can answer.
13      A.   I don't know.
14      Q.   Did she tell you that?
15      A.   Could you repeat the question?
16      Q.   Sure.  Prior to the January 23rd, 2012
17  meeting with Professor Fagal, President Munley,
18  Dr. Foley and Patricia Dunleavy, did President Munley
19  tell you that she intended to suspend Professor
20  Fagal?
21      A.   She told me that that was one of the
22  options.
23      Q.   Did anyone else in Marywood's
24  administration tell you that that was an option,

MAGNA LEGAL SERVICES

Page 35

1  suspending Professor Fagal?
2      A.   I don't remember.
3      Q.   Again, prior to this meeting, had you
4  recommended that Professor Fagal be suspended?
5      A.   In my conversation with President
6  Munley, that came up.
7      Q.   Do you remember any more detail other
8  than suspending him came up?
9      A.   I was certainly on board with it knowing
10  what I knew, but I knew there was more that would
11  come out of the interview.
12      Q.   So you were on board with it, the
13  suspension, prior to the meeting?
14      A.   From what -- yes.
15      Q.   Now, prior to the January 23rd, 2012
16  meeting, were you also aware of a plan to seek the
17  termination of Professor Fagal?
18      MS. PEET:  Objection,
19  mischaracterization of testimony.  It implies that
20  there was such a plan.  You can answer.
21      A.   That was certainly a possibility.
22      Q.   In your mind or did you discuss it with
23  someone?
24      A.   Both, in my mind and in discussions with

MAGNA LEGAL SERVICES

Page 36

1  President Munley.
2      Q.   Okay.  What exactly did you or President
3  Munley say about possible termination of Professor
4  Fagal?
5      A.   I can't answer exactly from your
6  question.
7      Q.   In as much detail as possible?
8      A.   We talked about the possibility of Fagal
9  being suspended and/or terminated.  I was certainly
10  on board with either/or both.  I thought what he did
11  was so egregious that that was a legitimate outcome
12  pending the conversation with the meeting on Monday.
13      Q.   Do you recall anybody else in Marywood's
14  administration or cabinet other than yourself and
15  President Munley recommending that Professor Fagal be
16  terminated?  This is prior to the January 23rd
17  meeting.
18      A.   I don't remember for sure.
19      Q.   We're going to come back to this e-mail
20  from you to Dr. Dunleavy and Dr. Foley, the first
21  e-mail in this chain, and in the second paragraph,
22  first sentence, you wrote, "Mike, at about 8:45 you
23  will go down to Fred's office to let him know that
24  Sister Anne would like to meet with him at 9:00 in

MAGNA LEGAL SERVICES

Page 37

1  her office."  Did I read that correctly?
2      A.   Correct.
3      Q.   What was the reason for providing
4  Professor Fagal only 15 minutes' notice of the
5  meeting with President Munley?
6      MS. PEET:  Objection to the form.  You
7  can answer.
8      A.   I don't know.  I don't remember.
9      Q.   Now, you said earlier that President
10  Munley spared you from the meeting, correct?
11      A.   Correct.
12      Q.   Did you want to attend?
13      A.   Yes and no.
14      Q.   Ultimately why did you decide not to
15  attend the meeting?
16      MS. PEET:  Objection to the form.  You
17  can answer.
18      A.   She asked me not to.  I also thought
19  with the wound much fresher than it is right now --
20  do you think my responses at this time are
21  problematic?  I lost people in the fucking Holocaust.
22      Q.   We'll move on to the next e-mail in the
23  chain.  This is just Dunleavy saying, "Sounds good,"
24  and then the next e-mail from you to Patricia

MAGNA LEGAL SERVICES



Page 38

1  Dunleavy, January 21st, 2012, at 10:33 p.m.  Do you
2  see that?
3      A.   Yes, I do.
4      Q.   And here you tell Dr. Dunleavy that
5  Professor Fagal attempted to call you at home.  You
6  didn't pick up.  He left a message, correct?
7      A.   That's what the e-mail says, yes.
8      Q.   And then Patricia Dunleavy says, "That's
9  interesting.  Save the message or at least keep a
10 record," correct?
11     A.   Yes, that's what the e-mail says, yes.
12     Q.   Did you save the message?
13     A.   I may have saved it but I don't anymore
14 have it.  Phones go the way they go.
15     Q.   As phones --
16     A.   As phones go the way they go, new
17 machines, and it's gone.
18     Q.   So this was a -- was it like a digital
19 voicemail or an answering machine?
20     A.   Answering machine.
21     Q.   So was it stored on a tape or was it
22 stored digitally?
23     A.   You know, I don't remember what I had at
24 the time.  It's not my current phone.
                MAGNA LEGAL SERVICES

Page 39

1      Q.   Do you remember the substance of the
2  message that Professor Fagal left?
3      A.   I remember the substance because I'm
4  reading the e-mail, and it reminds me that the
5  substance was that your client wanted to talk off the
6  record.
7      Q.   You didn't call him back, correct?
8      A.   Correct.
9      Q.   Other than actually having the message
10 itself, did you record the content in some way.
11 Like, did you write down what he said anywhere, other
12 than this e-mail?
13     A.   I don't believe so.
14     Q.   Now, coming back to the January 23rd,
15 2012 meeting, you said before the meeting you had
16 discussed possible discipline for Professor Fagal
17 with President Munley, correct?
18     A.   Correct.
19     Q.   The issue of a suspension came up in
20 that conversation, correct?
21     A.   Yes.
22     Q.   You said that you supported it, correct?
23     A.   Yes, but I supported also termination.
24     Q.   Prior to the January 23rd, 2012 meeting,
                MAGNA LEGAL SERVICES

Page 40

1  did you make a written recommendation that Professor
2  Fagal be suspended?
3      A.   I don't remember, but as I said before,
4  if I did, I'm sure you have it.
5      Q.   Did you make a written recommendation of
6  any other type of discipline other than suspension
7  prior to the January 23rd, 2012 meeting?
8      A.   I don't remember, but, again, if I did,
9  I'm sure you have it.
10     Q.   So your role, if any, in the decision to
11 suspend Professor Fagal, would it be fair to say
12 would be limited to your conversation with President
13 Munley before the January 23rd, 2012 meeting?
14     A.   No.
15          MS. PEET:  Objection to the form.  Go
16 ahead.
17     A.   No, it would not be fair to say that.
18     Q.   Why not?
19     A.   We had a conversation before the
20 meeting.  We had a conversation after the meeting,
21 and so that my role was both before -- pre and post
22 meeting.
23     Q.   You had a conversation with President
24 Munley after the January 23rd, 2012 meeting?
                MAGNA LEGAL SERVICES

Page 41

1      A.   Yes.
2      Q.   Okay.  Provide to me the detail of that
3  conversation to the best of your ability.
4      A.   As I remember it, we talked about what
5  transpired at the meeting and we talked about
6  suspension and/or termination.  I was on board with
7  termination after the meeting.  I was good with
8  termination.  I thought he should have been
9  terminated.  I agreed with her, with that
10 recommendation or that idea.
11     Q.   How soon after the January 23rd, 2012
12 meeting did you have this conversation?
13     A.   I can only speculate in answer to that.
14     Q.   All right.
15          THE WITNESS:  I'm getting more water.
16 Feel free to continue.
17          MS. PEET:  Do you need a break?
18          THE WITNESS:  No, I'm good.
19 BY MR. COHEN:
20     Q.   So we established that President Munley
21 suspended Professor Fagal.  You were on board with
22 it, correct?
23     A.   Suspended, terminated, as well, I think.
24     Q.   We'll get to the termination.
                MAGNA LEGAL SERVICES



Page 42

1    A.   Yes, I was on board.
2    Q.   Did you object to President Munley that
3  it was your job to suspend Professor Fagal?
4         MS. PEET:  Objection to form.  You can
5  answer.
6    A.   I don't remember objecting.
7    Q.   Did you tell President Munley that it
8  was your job to suspend Professor Fagal?
9         MS. PEET:  Objection to the form.
10  Assumes facts not in evidence.  You can answer.
11    A.   I believe we discussed it.
12    Q.   Okay.  Can you elaborate on your
13  discussion?
14    A.   We agreed that the situation was so
15  egregious that she as -- that she as president
16  certainly had the ability to do that with my input,
17  as I gave it.
18    Q.   But on more routine, less egregious
19  cases, would you agree that it was your job and your
20  job alone to suspend employees?
21         MS. PEET:  Objection to the form.  You
22  can answer.
23    A.   Under normal -- yes, yes.  Answer it
24  that way.

MAGNA LEGAL SERVICES

Page 43

1    Q.   Prior to Professor Fagal's suspension on
2  January 23rd, 2012, did you believe that Professor
3  Fagal posed an immediate harm to himself or to
4  others?
5    A.   Yes.
6    Q.   Okay.  What type of harm?
7    A.   Emotional harm.  He harmed me and
8  probably others.
9    Q.   Do you remember exactly when Professor
10  Fagal sent his e-mail, you know, with the links to
11  the videos?  I think it was among the exhibits.
12    A.   Yeah.
13         MS. PEET:  Do you just want to point him
14  to it?
15    A.   January 13, 2012, it appears.
16    Q.   And when did you learn of it?
17    A.   I believe I learned of it when Margaret
18  Gannon sent me an e-mail with the link.  That may
19  well be here.
20    Q.   January 16, 2012?
21    A.   Yes, correct.
22    Q.   So if you saw Professor Fagal's videos
23  on January 16, 2012, and you thought that he posed an
24  immediate harm, why didn't you just suspend him right

MAGNA LEGAL SERVICES

Page 44

1  then and there?
2         MS. PEET:  Objection to the form.  You
3  can answer.
4    A.   I was in a car driving back from
5  Michigan.  My wife was driving.  I was shocked.  She
6  was shocked.
7    Q.   Okay.  As soon as you finished your car
8  ride -- let me put it this way.  When did you get
9  back to Marywood's campus, if you remember?
10    A.   I'm speculating the next day.
11    Q.   So that would be approximately
12  January 17, 2012?
13    A.   I believe that's correct.
14         MR. COHEN:  Let's make this Levine
15  Exhibit 9.
16         (Levine-9, Letter dated January 24,
17  2012, with attachments, Bates Nos. DEF000166-187, is
18  received and marked for identification.)
19  BY MR. COHEN:
20    Q.   I don't want you to read this whole
21  thing.  Do you recognize it?
22    A.   I do recognize it.
23    Q.   Okay.  This is a letter that President
24  Munley sent to Professor Fagal on January 24, 2012,

MAGNA LEGAL SERVICES

Page 45

1  correct?
2    A.   Correct.
3    Q.   And she here is recommending his
4  termination, correct?
5    A.   Correct.
6    Q.   And this is a day after the meeting,
7  January -- which was on January 23rd, 2012, correct?
8    A.   Yes.  Is that correct?  Yes, correct.
9    Q.   Did you contribute or provide any input
10  into this letter before it was sent?
11    A.   Yes.
12    Q.   What was your contribution?
13    A.   I thought we discussed that.
14    Q.   Well, we discussed you had several
15  conversations.  I'm wondering if there was more.
16    A.   I believe the conversation that I had
17  with Sister Anne after the meeting, which was
18  discussed, was some input, and as I recall, I saw
19  this letter before it was sent and was final.  I
20  believe that.
21    Q.   Did you write any part of this letter?
22    A.   I don't believe I wrote or edited any
23  part of this letter.
24    Q.   Do you know when President Munley began

MAGNA LEGAL SERVICES



1  generating this letter?
2      A.   No.
3      Q.   Prior to this letter going out, did you
4  make any written recommendation to terminate
5  Professor Fagal?
6      A.   I don't believe so, but if I did, I'm
7  sure you'd have it.
8          MR. COHEN:  Let's have this marked as
9  Levine Exhibit 10.
10         (Levine-10, Document headed "Talking
11  Points for Board," Bates Nos. DEF000145-146, is
12  received and marked for identification.)
13     Q.   And do you recognize this document?
14     A.   Not immediately.  Give me a second.
15  Yes.
16     Q.   These are "talking points for the
17  board," correct?
18     A.   Correct.
19     Q.   Did you have any input into drafting
20  these talking points?
21     A.   I don't believe so.
22     Q.   But you have seen this before?
23     A.   Yes.
24     Q.   In reference to this litigation or

1  before that?
2          MS. PEET:  Just by way of clarification,
3  I think what he's trying to get at is did you see it
4  in preparing for this deposition or parts of this
5  litigation or in January or thereabouts 2012?
6      A.   I believe I saw it in January 2012.
7      Q.   If you look down towards the middle of
8  the first page, it says Thursday, January 19, 2012,
9  and then there's a black block, and then there's a
10  second bullet point that says, "Dr. Levine and
11  Dr. Dunleavy reviewed AAUP policies," right?
12     A.   Right.
13     Q.   Is that accurate?  I know it says that.
14  I want to know if that actually happened.
15     A.   Yes.
16     Q.   Why would you review AAUP policies?
17     A.   To make sure we were not doing anything
18  that was -- could be sanctioned by AAUP.
19     Q.   Did you review the progressive
20  discipline policy that Marywood had in place at the
21  time?
22     A.   I don't remember but I suspect we did.
23         MR. COHEN:  Let's have this marked as
24  Levine Exhibit 11.

1          (Levine-11, Document headed "Talking
2  Points for Meeting," Bates No. DEF000147, is received
3  and marked for identification.)
4      Q.   Do you recognize this document?
5      A.   No, I don't recognize this document.  I
6  may have seen it, I just -- I don't recognize it.
7      Q.   Well, that's all I need to know about
8  that.
9          MR. COHEN:  Let's have this marked as
10  Levine Exhibit 12, please.
11         (Levine-12, E-mail dated Monday,
12  January 30, 2012, Bates No. DEF002756, is received
13  and marked for identification.)
14     Q.   Could you read this to yourself and let
15  me know when you're finished, please?
16     A.   Finished.
17     Q.   What did you mean when you said to
18  Joseph Garvey, "I await the massive flare-up to
19  come"?
20     A.   This.
21     Q.   You expected there would be litigation?
22     A.   Mine or his.
23         MR. COHEN:  Let's mark this as Levine
24  Exhibit 13.

1          (Levine-13, E-mail dated Monday,
2  April 2, 2012, Bates No. DEF002380, is received and
3  marked for identification.)
4      Q.   And could you read this to yourself?
5      A.   Finished.
6      Q.   Barbara McNally was your assistant at
7  the time?
8      A.   She was one of -- yes, yes.
9      Q.   Did you tell Miss McNally Professor
10  Fagal would be leaving Marywood before the date of
11  this e-mail?
12     A.   Probably.
13     Q.   You thought that before Professor
14  Fagal's disciplinary procedures were over, it was a
15  foregone conclusion he would be out of Marywood?
16         MS. PEET:  Objection to the form.  You
17  can answer.
18     A.   I thought that was a distinct
19  possibility, yeah.
20     Q.   Do you know what an interrogatory is?
21     A.   No.
22     Q.   As far as legal proceedings go?
23     A.   No.
24     Q.   Let me just explain briefly.  An



1  interrogatory is just a question in writing that one
2  party in litigation can send to another and it has to
3  be answered under oath, kind of like the written
4  version of what we're doing here.
5       So before today I had sent Marywood an
6  interrogatory -- several interrogatories, and they
7  had been answered, and some of them pertain to you
8  and I want to see whether they're accurate.
9       So question number one, in paragraph
10  number 20 of defendant's answer to plaintiff's
11  amended complaint and affirmative and other defenses,
12  hereinafter your answer -- and I realize you probably
13  haven't seen these documents --
14       A.   Correct.
15       Q.   -- you admitted, I'm talking about
16  Marywood admitted, to removing some of plaintiff's
17  posters announcing the FIRE speaker. "Did you or
18  anyone working for you instruct or suggest that these
19  posters be removed?  If so, who made this instruction
20  or suggestion?  If instruction or suggestion was
21  oral, please state its content in as close to
22  verbatim form as possible."
23       The answer that we received, and I want
24  you to let me know if it's accurate, is: "Defendant

MAGNA LEGAL SERVICES

1  Marywood is unaware of the identity of the individual
2  who removed plaintiff's posters announcing the FIRE
3  speaker other than Dr. Alan Levine who removed one
4  poster.  Additionally, defendant is unaware of anyone
5  who instructed or suggested that plaintiff's FIRE
6  speaker posters be removed."
7       A.   I believe that's correct.  I did remove
8  a poster.
9       Q.   Okay.  Question number four is: "Did
10  your vice president for academic affairs, Dr. Alan
11  Levine, participate in any way in the decision to
12  suspend Professor Fagal or to maintain the suspension
13  thereafter?  If so, please describe Dr. Levine's
14  participation in as much detail as possible."
15       The answer that was provided is:
16  "Dr. Levine supported President Munley's decision to
17  suspend Professor Fagal and was aware of and helped
18  orchestrate the January 23rd, 2012, meeting where
19  Professor Fagal was suspended."  Is that accurate?
20       A.   Accurate.
21       Q.   Do you have anything more to add to
22  that?
23       A.   No.
24       Q.   The poster that you removed, was it

MAGNA LEGAL SERVICES

1  stamped approved?
2       A.   I don't remember.  Probably it was.
3       Q.   Why would you remove an approved poster?
4       MS. PEET:  Objection.  He said he's not
5  sure, is the appropriate testimony, so you're making
6  assumptions.
7       MR. COHEN:  You can answer.
8       THE WITNESS:  Should I answer that?
9       MS. PEET:  If you can.
10  BY MR. COHEN:
11       Q.   If you can.
12       A.   So would you just repeat it one more
13  time?
14       Q.   Why would you remove an approved poster?
15       MS. PEET:  Same objection, but you can
16  answer.
17       A.   I wanted to bring it to cabinet so we
18  could have a discussion.
19       MR. COHEN:  Okay.  I'm finished,
20  Dr. Levine.  But, Stephanie, do you have any
21  questions?  Stephanie?
22       MS. PEET:  I'm thinking.
23       MR. COHEN:  I didn't know whether you
24  heard me.

MAGNA LEGAL SERVICES

1  CROSS-EXAMINATION BY MS. PEET:
2       Q.   Dr. Levine, why did you want to discuss
3  the poster at cabinet?
4       A.   The $50 raffle was something I had never
5  seen nor was it something that Marywood does.  We
6  don't give money to have people attend classes.
7       Q.   Did your bringing the poster to the
8  cabinet have anything to do with the fact the speaker
9  was from the organization called FIRE?
10       A.   No, I could care less.  What do I care
11  about that?
12       Q.   I assume you viewed the videos at that
13  Dr. Fagal posted on YouTube?
14       A.   I'm sorry.  Did you say have I seen
15  them?
16       Q.   Did you view them?
17       A.   I viewed them.
18       Q.   And what was your reaction?
19       A.   I was horrified.  They not only defamed
20  me, they defamed my wife.  They brought my wife into
21  this fucking thing.  And I lost people in the
22  Holocaust.  I'm Jewish.  I was horrified that this
23  was going out to the world.  Are you -- are you
24  fucking kidding me?

MAGNA LEGAL SERVICES



Page 54

1    Q.    Did you share your -- these sentiments
2  with Sister Munley?
3    A.    Yeah.
4    Q.    Prior to the suspension of Dr. Fagal?
5    A.    Yes.
6    Q.    As we sit here today, are you -- I
7  assume you're aware that Dr. Fagal was ultimately
8  terminated from his employment at Marywood
9  University, correct?
10    A.    Yes, I am.
11    Q.    And as we sit here today, do you find
12  that decision to be appropriate?
13    A.    Very much so.
14    Q.    Did you support the decision to
15  terminate Dr. Fagal's employment with Marywood?
16    A.    I did then and I do now.
17         MS. PEET:  No other questions.
18         MR. COHEN:  I have no follow-up.
19         (Whereupon, at 11:05 a.m., the
20  deposition of Alan Michael Levine concluded.)
21
22
23
24
                MAGNA LEGAL SERVICES

Page 55

1              CERTIFICATE
2
3         I HEREBY CERTIFY that the witness was
4  duly sworn by me and that the deposition is a
5  true record of the testimony given by the
6  witness.
7
8
9
10         Judy A. Black
            Registered Professional Reporter
11         Dated:  September 16, 2016
12
13
14
15
16         (The foregoing certification of this
17  transcript does not apply to any reproduction of
18  the same by any means, unless under the direct
19  control and/or supervision of the certifying
20  reporter.)
21
22
23
24
                MAGNA LEGAL SERVICES

Page 56

1         INSTRUCTIONS TO WITNESS
2
3         Please read your deposition over
4  carefully and make any necessary corrections.  You
5  should state the reason in the appropriate space on
6  the errata sheet for any corrections that are made.
7         After doing so, please sign the errata
8  sheet and date it.
9         You are signing same subject to the
10  changes you have noted on the errata sheet, which will
11  be attached to your deposition.
12         It is imperative that you return the
13  original errata sheet to the deposing attorney within
14  thirty (30) days of receipt of the deposition
15  transcript by you.  If you fail to do so, the
16  deposition transcript may be deemed to be accurate and
17  may be used in court.
18
19
20
21
22
23
24

Page 57

1              - - - - - -
                E R R A T A
2              - - - - - -
3  PAGE  LINE  CHANGE
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



Page 58

1        ACKNOWLEDGMENT OF DEPONENT
2
3          I, Alan M. Levine, do hereby certify
   that I have read the foregoing pages and that the same
4  is a correct transcription of the answers given by me
   to the questions therein propounded, except for the
5  corrections or changes in form or substance, if any,
   noted in the attached Errata Sheet.
6
7
8  Alan M. Levine          Date
9
10
   Subscribed and sworn
11 to before me this
        day of          , 2016
12
   My commission expires:
13
14
   Notary Public
15
16
17
18
19
20
21
22
23
24

Page 59

1              LAWYER'S NOTES
2     PAGE
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



# Exhibit 44

**EXHIBIT 44**



**COLLEGE OF LIBERAL ARTS AND SCIENCES**

# Marywood
## U N I V E R S I T Y

MARYWOOD UNIVERSITY
SCRANTON, PA 18509-1598
TEL: (570) 348-6219
*www.marywood.edu/english*

DEPARTMENT OF ENGLISH



Dr. Frederick Fagal
17 East Lake Street
Skaneateles, NY, 13152

Sent via email to fffagal@yahoo.com, as well as regular mail.

March 26, 2012

Dear Dr. Fagal,

As Chair of the Faculty Grievance Committee, I write to inform you that the committee has reviewed thoroughly your grievance about your recent suspension and recommendation for termination of employment and tenure, namely, your arguments:

1. That you were improperly suspended by President Munley; the action should have originated with Dr. Levine.
2. That you were improperly suspended because you have not been a cause of immediate harm to yourself or to others.
3. That President Munley moved improperly to terminate your employment and tenure because you should have had a chance for remediation.
4. That President Munley moved improperly to terminate your employment and tenure because only the Vice President can take such action.
5. That you have not had an opportunity to convene an ad hoc committee to appeal the suspension.

I now write to inform you that in reviewing each of these grievances, we have found no evidence of improper action on President Munley's part which would constitute a legitimate grievance.

I will notify President Munley of the decision as well.

Sincerely,

*Erin A. Sadlack*

Erin A. Sadlack, Ph.D.
Chair, Faculty Grievance Committee

cc:     Sr. Gail Cabral, IHM, Ph.D., Faculty Senate President

*An education inspired by the Sisters, Servants of the Immaculate Heart of Mary.*

DEF002088

# Exhibit 45

EXHIBIT

45

| | |
|---|---|
| **From:** | Frederick Fagal |
| **To:** | annemunley@marywood.edu |
| **Subject:** | Regarding: Ad Hoc Faculty Committee |
| **Date:** | Thursday, March 29, 2012 10:01:54 AM |

17 East Lake Street
Skaneateles, NY 13152

March 29, 2012

<u>Via E-Mail & USPS First-Class Mail</u>

President Anne Munley, IHM
2300 Adams Avenue
Marywood University
Scranton, Pennsylvania 18509

   Re:  <u>Ad Hoc Faculty Committee</u>

Dear President Munley:

   Yesterday I received a letter from Dr. Erin A. Sadlack stating that the Faculty Grievance Committee
"found no evidence of improper action on [your] part which would constitute a legitimate
grievance."  I strongly disagree with that Committee's "finding."  In any case, I am again exercising my
right under Marywood University's Progressive Discipline policy to convene an ad hoc committee to
appeal your suspension of me as well as your recommendation to terminate my employment and tenure.

   I grant permission for Marywood University to release your "Recommendation for Termination
and Statement of Charges" dated February 8, 2012 to an ad hoc committee in order to appeal your
decision to suspend me as well as your recommendation to terminate my employment and tenure.  To be
clear, I am requesting that the ad hoc committee be convened twice—once to appeal my suspension and
once to appeal your recommendation to terminate my employment and tenure.

   If you have any questions, please do not hesitate to contact me or my attorney, Jonathan Z. Cohen.

          Sincerely,

          Frederick F. Fagal, Jr.

FFF001665

# Exhibit 46

EXHIBIT

46

LAW OFFICES *of*

# DAVID G. CONCANNON, LLC

February 17, 2012

<u>Via E-Mail, Facsimile & USPS First-Class Mail</u>

William J. Anthony, Esquire
Jackson Lewis LLP
90 State House Square, 8th Floor
Hartford, Connecticut 01603

      **Re:**    Employment status of Dr. Frederick F. Fagal, Jr.

Dear Mr. Anthony:

      I have closely considered your letter of February 9, 2012 and President Munley's letter dated the day prior.  I have also reviewed the cases that you cited, among many others.  My conclusions are that:

    **(1)**    Marywood cannot, at least under these circumstances, undo the contractually incorporated policies and procedures that it alone has drafted and reaffirmed;

    **(2)**    Marywood remains vulnerable to a breach-of-contract action alleging at least the procedural irregularities listed in my letter to President Munley dated February 2, 2012;

    **(3)**    Your letter of February 9, 2012 and President Munley's letter dated the day prior added additional grounds for such a breach-of-contract claim, namely a denial of Dr. Fagal's right to convene an ad hoc committee to review the propriety of President Munley's suspension of him commencing on January 23, 2012; and

    **(4)**    Marywood's denial of Dr. Fagal's right to convene an ad hoc committee to review the propriety of his suspension as well as its implied denial of a Statement of Charges regarding the same provide him with independent claims that the University has failed to apply fundamentally fair procedures to him.  <u>See</u> <u>PSI Upsilon of Phila. v. Univ. of Pa.</u>, 591 A.2d 755, 758 (Pa. Super. Ct. 1991) (citing <u>Boehm v. Univ. of Pa. Sch. of Veterinary Med.</u>, 573 A.2d 575 (Pa. Super. Ct. 1990)).

      To repeat, Dr. Fagal has elected to convene two separate ad hoc committees pursuant to Marywood's official policy:  one for President Munley's decision to suspend him and the other, if necessary, for her recommendation to terminate him.  <u>See</u> <u>Policies and Procedures Manual – Marywood University</u>, "Progressive Discipline," http://www.marywood.edu/policy ("<u>PPM</u>").  As I have already explained, the propriety of a faculty member's termination depends, in part, upon

FFF001686

LAW OFFICES *of*

# DAVID G. CONCANNON, LLC

the propriety of his preceding suspension.  See id.  Therefore, Dr. Fagal will not sign the "Release of Personal Information" proffered by President Munley or any other document that would permit her to circumvent a review of the propriety of his suspension.  If President Munley drafts a separate Statement of Charges for Dr. Fagal's suspension, Dr. Fagal will consider signing an appropriate "Release of Personal Information."

In the meantime, Dr. Fagal will pursue all internal remedies available to him prior to filing a lawsuit.  Dr. Fagal accordingly intends to file a faculty grievance against President Munley.  I enclose a copy of Marywood's Faculty Grievances and Appeals policy for your convenience.[*]  As suggested therein, Dr. Fagal has begun consulting the President of Marywood's Faculty Senate for assistance in contacting the Faculty Grievance Committee Chair. Please be advised of the Non-Retaliation provisions of Marywood's Faculty Grievances and Appeals policy.  If and when President Munley chooses to follow Marywood's Progressive Discipline policy, Dr. Fagal will consider withdrawing his grievance against her.

Finally, Marywood's position that its disciplinary process is "closed" and that I cannot participate "other than as an outside advisor" to Dr. Fagal finds no support in Marywood's Progressive Discipline policy.  See id.

Sincerely,

Jonathan Z. Cohen, Esquire

---

[*] Given that the President of Marywood may be called upon to review an Ad Hoc Hearing Committee's recommendation under this policy, Dr. Fagal may request that the University's Board of Trustees intervene.  See PPM, "Delegation to the President."  President Munley has already violated the authority delegated to her by the Board in this matter, necessitating Dr. Fagal's grievance in the first place.

FFF001687

# Marywood
## U N I V E R S I T Y

# Faculty Grievances and Appeals



## Policy Statement

As an institution of higher education, Marywood University brings together a faculty, administration, and governing board united in a common bond of academic purpose. Essential to the fulfillment of this purpose is a mutual recognition of institutional integrity and individual human rights, along with an understanding of the respective roles of the several entities which constitute this educational organization.

Circumstances may arise at times, however, wherein a grievant--full-time, part-time, or pro-rata--may question decisions which affect his/her professional role in the institution. To assist in the resolution of these matters, a series of guidelines for grievances is herein set forth.

### Definitions

Grievance: A grievance refers to any disagreement between two parties. A grievance identifies a complaint one party has against another party for some alleged wrongful action on the part of the second party.

Grievant: A Grievant initiates a grievance.

### Types of Issues That Can Be Grieved

It is understood that procedural rather than substantive factors provide appropriate areas of review, and the Faculty Grievance Committee will not attempt to substitute its judgment for that of the decision-maker(s) involved in the case.

Thus, the Faculty Grievance Committee will hear grievances   concerning:

    1) Allegations of violation of academic freedom resulting in: denial of tenure, promotion, or sabbatical leave; non-reappointment.

    2) Allegations of impermissible discrimination. Tenured and non-tenured faculty are protected against illegal or unconstitutional discrimination, or on any basis not relevant to job performance, and includes, but is not limited to, race, sex, religion, national origin, age, disability, marital status, or sexual orientation

    3) Allegations of inadequate consideration resulting in: denial of tenure, promotion, or sabbatical leave; non-reappointment; or termination of employment due to retrenchment.

    4) Allegations of violations of procedures used in rendering decisions in numbers 1 and 2 above as set forth in Chapter 2 of the *Faculty Handbook*.

Procedures regarding dismissal, suspension, and sanctions of faculty members are in the *Progressive Discipline*

FFF001688

policy.

Should a grievant allege cause for grievance in any matter not identified in the above guidelines, the grievant may consult the Faculty Grievance Committee. In such circumstances, the Committee's first decision is whether the complaint is appropriate and sufficiently serious to merit consideration.

**Persons Against Whom Grievances May be Directed**

Fundamentally, a grievance may arise from an allegation of improper implementation of a procedure or process leading to a decision. The person(s) or body who perform(s) that procedure or process is (are) the subject(s) of the grievance. Thus, a grievant may direct a grievance against the person(s) or body responsible for the decision identified herein.

The decisions or actions of the Faculty Grievance Committee or Ad Hoc Hearing Committee may not themselves be grieved.

# Procedures

### Informal Procedure

 1) A member of the faculty must initially discuss a complaint with the person or body responsible for the action to which the grievant takes exception in order to determine if a resolution is possible.

 2) A complaint must be presented within (10) calendar days of the occurrence or discovery of the alleged violation.

 3) No grievance may be filed without the initiation of this informal complaint procedure.

 4) If the grievance still exists after step one the grievant initiates a consultation with the Vice President for Academic Affairs in order to try to resolve the matter.

### Formal Procedure for Filing a Grievance

 1) The Faculty Grievance Committee is convened.

### Faculty Grievance Committee

The Faculty Grievance Committee consisting of three tenured faculty members and two alternates (also tenured) is specifically charged with responsibility for resolving matters of grievance and appeal. The Faculty Senate conducts the election of this committee. Faculty currently serving on the Rank and Tenure Committee or the Faculty Development Committee are not eligible for election to this committee.

The term of each member extends for three years, with one person replaced each year. An alternate will be identified at each election. Any member of the Grievance Committee who has had any prior involvement in a case under consideration must recuse him/herself. The Grievance Committee shall annually elect a chair-elect who will succeed the Chair.

### Grievance  Process

FFF001689

The grievant may consult the President of Faculty Senate for assistance in contacting the Faculty Grievance Committee Chair. The Chair should be provided with a written statement setting forth, in detail, the nature of the grievance or appeal and identifying the person(s) or body against whom the grievance or appeal is directed; this document may also include a proposal for resolving the issue. A grievance must be filed within thirty (30) calendar days of the occurrence or discovery of the alleged violation but not fewer than five (5) calendar days after the initiation of the informal complaint.

In considering the grievance or appeal, the Faculty Grievance   Committee will take the following steps:

1) The Committee notifies the decision maker(s) that a grievance has been filed.

2) The Grievance Committee requests from the grievant written information regarding the issues. The Grievance Committee also requests from the decision maker(s) written statements describing the basis for the decision being appealed or grieved, as well as any attempts to settle the matter informally. This information shall be held in confidence by the Grievance Committee. At this point in the process, the information gathered is solely for review by the Committee and is not to be shared with either party involved.

3) At any point, the Grievance Committee may request additional information in writing from the grievant and from the decision-maker(s).

4) If after completing the above steps, the Committee determines that the grievance is improper or unsubstantial, or that sufficient time had not yet been allowed for its normal resolution, or that there is no evidence of improper action on the part of the decision maker(s) which would constitute a legitimate grievance, the Committee will communicate this determination to the grievant and the decision maker(s).

5) If the Grievance Committee determines that there was inadequate consideration or violation of procedures (see No. 3 and 4 under Types of Issues Which Can Be Grieved above), the Committee will return the case to the decision maker for reconsideration.

6) If the grievance is deemed appropriate for mediation, the Chair will appoint a Mediator from the University. The Mediator does not represent either party. Any party may object to the Mediator on the grounds of actual or apparent bias or conflict of interest and submit such objections to the Chair in writing. The Chair will review the objections and may replace the mediator.

7) The Offices of the Vice President for Academic Affairs or Human Resources may be consulted by the Mediator on mediation procedure or other matters involved in the grievance.

8) The Mediator shall try to resolve the grievance within thirty (30) calendar days of formal submission to the chair. With the consent of both parties, the period of mediation may be extended for a short period of time. If the grievance is not resolved within the thirty (30) calendar days, the mediator will advise the chair of the committee in writing that that the issue has not been resolved. If a mutually accepted agreement is reached, this will be communicated to the chair of the committee.

9) Grievances not appropriate for mediation or grievances not resolved through mediation shall be referred to the Ad Hoc Hearing Committee. All evidence collected will be passed on to the Ad Hoc Hearing Committee.

10) If the Faculty Grievance Committee recommends a formal hearing, in cases of violation of academic freedom or impermissible discrimination, an Ad Hoc Hearing Committee will be created to conduct a formal

investigation and to arrive at a recommendation for resolving the issue.

   11) The Grievance Committee will make a summary report of its activities at the end of each academic year to the Faculty Senate. No details relevant to the privacy of the participants in any cases will be included in this report.

## Ad Hoc Hearing Committee

The Ad Hoc Hearing Committee shall consist of three members, selected by the Faculty Senate Executive Council, from a standing committee of fifteen tenured Faculty Members elected for one-year terms by the faculty at large. The Faculty Senate conducts the election of this committee.

Each party shall have two challenges without stated cause regarding membership of the Ad Hoc Hearing Committee. No member of the Ad Hoc Hearing Committee shall have had any prior involvement in the case.

If the three-person Ad Hoc Hearing Committee cannot be chosen from the fifteen members of the standing committee, the Executive Council of the Faculty Senate is empowered to conduct a special election to obtain fifteen additional members with terms of one year.

The Ad Hoc Hearing Committee must select a chairperson.

## Ad Hoc Hearing Procedures

   1) The Ad Hoc Hearing Committee is empowered to gather information and documents specific to the case of the Grievant, conduct interviews, hold a hearing and take actions as are necessary to investigate the grievance to the extent that the law and University policy permit. The Ad Hoc Hearing Committee will provide recommendations in writing forty (40) calendar days from the date of its official appointment.

   2) All Hearings are closed to anyone other than the parties and their advisors, members of the Ad Hoc Hearing Committee, and any witnesses invited to testify by the Committee. The hearing may be audio or video recorded and a written record will be maintained. The hearing is not a legal proceeding. At the beginning of the hearing, all procedures will be made known to the parties, and all information will be kept confidential.

   3) Each party to the grievance may have one advisor during the hearing. The advisor may not participate in the hearing.

   4) Strict rules of legal evidence will not be binding upon the Ad Hoc Hearing Committee and evidence of probative value in defining issues may be admitted.

   5) The hearing record will be used exclusively as the basis for findings of fact and for arriving at a decision.

   6) Upon reaching a decision on the issue and a recommendation for action, the Ad Hoc Hearing Committee will provide a summary written report to the petitioner, the person(s) named in the grievance, and the appropriate administrative officer and the President.

   7) After receiving the recommendation of the Ad Hoc Hearing Committee, the appropriate administrative officer will review the recommendation and notify the Ad Hoc Hearing Committee and petitioner whether the recommendation has been accepted. If the recommendation of the Ad Hoc Hearing Committee is not

accepted by the appropriate administrative officer, the administrative officer will review it with the Ad Hoc Hearing Committee.

 8) No details relevant to the privacy of the participants in the case will be included in the notice from the Hearing Committee. Public statements and publicity about the case by the participants will be avoided until the proceedings have been completed, including consideration by the President

## Action by the President of the University

Following the recommendation of the Ad Hoc Hearing Committee, should the petitioner desire further consideration of the issue beyond the immediate administrative channels of the University, the President may be requested, within twenty calendar days, to review the case.

This review will be based on the record from the committee hearing and may provide opportunity for argument, oral or written, or both, by the principals.  Then the President will then make the final decision.

## Responsibility for Expenses Incurred in Grievance and Appeal

Expenses incurred by the grievant are the responsibility of the individual. These include, but are not limited to, the following:

Cost of an advisor.

Travel expenses for advisor, witnesses, or others engaged by petitioner.

Cost of preparing any documents and copies thereof.

## Withdrawal of a Grievance

The grievance can be withdrawn at any point in the process.

## Non-Retaliation

Grievants will not be adversely affected for exercising their right to file a grievance, regardless of outcome.

Grievants will not be subject to adverse consequences for either initiating a grievance or in presenting evidence on behalf of a grievant.  Anyone who violates this mandate can be subject to disciplinary action, up to and including dismissal.

---

## Related Policies

- Academic Freedom
- Disability Grievance Procedures
- Civil Rights Policy
- Civil Rights Complaint Procedures
- Sabbatical Leave for Faculty Member
- Non-reappointment of Faculty Member

FFF001692

- Promotion of Faculty Members
- Evaluation of Faculty Members
- Retrenchment of Faculty
- Tenure
- Progressive Discipline

---

## History

10/02/92 - Proposal returned to committee of Faculty Senate by College Committee on Policy

11/13/92 - Proposed policy dated 3/13/92, as amended, recommended by College Committee on Policy to the President

04/26/93 - Presidential approval affirmed with publication of the President's Memo

03/20/98 - Revision proposed by Faculty Senate approved by the President of the University as recommended by the Policy Committee of the University

04/29/11 - Revision approved by the President of the University as recommended by the Policy Committee of the University

---

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

---

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu

FFF001693

# Exhibit 47

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

- - -

FREDERICK F. FAGAL, JR.   ) CIVIL ACTION
                     )
        Plaintiff    )
                     )
    v.             ) No.:  3:14-cv-02404-ARC
                     )
MARYWOOD UNIVERSITY,    )
                     ) JUDGE CAPUTO
        Defendant    )

- - -

Deposition of Helen Bittel, Ph.D.

Thursday, September 29, 2016

- - -

    The deposition of Helen Bittel, Ph.D., called as
a witness by the Plaintiff, pursuant to notice and
the Pennsylvania Rules of Civil Procedure
pertaining to the taking of depositions, taken
before me, the undersigned, Christine A. Messner, a
Notary Public in and for the Commonwealth of
Pennsylvania, at 700 Lackawanna Avenue, Scranton,
Pennsylvania 18503, commencing at 10:04 a.m., the
day and date above set forth.

- - -

MAGNA LEGAL SERVICES
Seven Penn Center
1635 Market Street, 8th Floor

Philadelphia, Pennsylvania 19103

www.MagnaLS.com

866-624-6221



1  APPEARANCES:
2  On behalf of the Plaintiff:
   JONATHAN Z. COHEN, LTD
3  JONATHAN Z. COHEN, ESQUIRE
   175 Strafford Avenue, Suite 1
4  Wayne, Pennsylvania 19087
5
   On behalf of the Defendant:
6  JACKSON LEWIS, P.C.
   STEPHANIE J. PEET, ESQUIRE
7  Three Parkway, 1601 Cherry Street, Suite 1350
   Philadelphia, Pennsylvania 19102
8
9              - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1              I-N-D-E-X  P-A-G-E
2  DEPOSITION EXHIBIT MARKED              PAGE
   Bittel 1 - February 8, 2012 letter        10
3  Bittel 2 - Response to charges            11
   Bittel 3 - Draft of minutes               12
4  Bittel 4 - January 23, 2012 document         16
   Bittel 5 - Progressive Discipline         17
5  Bittel 6 - May 17, 2012 e-mail            17
   Bittel 7 - May 17, 2012 minutes            22
6  Bittel 8 - May 17, 2012 notes             32
   Bittel 9 - May 18, 2012 e-mail            39
7  Bittel 10 - June 2, 2012 e-mail           40
   Bittel 11 - E-mails                       42
8  Bittel 12 - June 19, 2012 minutes         46
   Bittel 13 - June 26, 2012 e-mail          54
9  Bittel 14 - E-mails                       58
   Bittel 15 - E-mail                        60
10 Bittel 16 - E-mail                        70
   Bittel 17 - E-mail                        71
11 Bittel 18 - E-mail                        72
12
13
14
   EXAMINATION BY                     PAGE
15 Helen Bittel, Ph.D.
   By Mr. Cohen                       4-72
16
17
18
              - - -
19
20
21
22
23
24

1  HELEN BITTEL, Ph.D., was called, and having been
2  duly sworn, was examined and testified as follows:
3              EXAMINATION
4  BY MR. COHEN:
5     Q  Would you like to be called Doctor Bittel or
6  Helen?
7     A  Helen is fine.
8     Q  Good morning, Helen.  My name is Jonathan Cohen.
9  I represent the plaintiff in this case Fred F. Fagal,
10 Jr.  Do you understand that you are under the same oath
11 today as if you were in a courtroom?
12    A  That is correct.
13    Q  And the way this -- have you ever had a
14 deposition?
15    A  I have not.
16    Q  Okay.  The way this works I just ask you
17 questions and you try to answer them.
18    A  Okay.
19    Q  If you don't understand the question, please
20 just let me know and I'll rephrase it.  If you need to
21 take a break, that's fine just not in the middle of the
22 question.
23    A  Right.
24    Q  Is there anything that would prevent you from

1  thinking clearly and testifying truthfully today?
2     A  No.
3     Q  Can you tell me a little bit about your
4  educational background before Marywood?
5     A  Sure.  Just prior to Marywood I was a visiting
6  assistant professor in Oswego State, which is part of
7  the SUNY system.  I did my Ph.D. at the University of
8  Rochester and I also taught as part-time -- as graduate
9  assistant or graduate instructor and also as a -- later
10 as an adjunct at the University of Rochester, the
11 Eastman School of Music and SUNY Brockport.  Before
12 that I was at Rutgers, I did a B.A. in English.
13    Q  Okay.  Currently you're employed by Marywood
14 University?
15    A  I am.
16    Q  For how long?
17    A  I started working there in the fall semester
18 2002, so 14 years and change.  This is my 15th year.
19    Q  Okay.  And when you came to Marywood, what was
20 your first title?
21    A  My first title was assistant professor of
22 English.
23    Q  And now you're a full professor?
24    A  No, I'm not a full professor.  I'm an associate



Page 6

1 professor.
2 Q  Are you tenured?
3 A  I am tenured.
4 Q  Okay.  Have you ever met my client Professor
5 Fagal before?
6 A  Yes, I have.
7 Q  And when did you first meet him?
8 A  Sometime in my early years at Marywood, no
9 particular date comes to mind.  We worked in the same
10 building, so we go downstairs to get a cup of coffee.
11 Q  At some point in 2012 you participated in a
12 committee regarding certain disciplinary measures that
13 the administration was trying to bring against my
14 client, correct?
15 A  Correct.
16 Q  And before that --
17 A  Okay.
18 Q  -- what were your general impressions of
19 Professor Fagal?
20     MS. PEET:  Objection to the form.  You can
21 answer.
22 BY MR. COHEN:
23 Q  So unless your attorney objects and instructs
24 you not to answer, you have to try to answer, but --

Page 7

1 and also after I ask a question, you might want to give
2 your attorney like a few seconds so that she can
3 interpose an objection.
4     MS. PEET:  Thanks, Mr. Cohen.
5     MR. COHEN:  I'm sorry.  It's useful advice,
6 right?
7     MS. PEET:  Yeah.
8 BY MR. COHEN:
9 Q  Do you need me to rephrase the question?
10 A  I had no strong opinions either way.
11 Q  Okay.
12 A  Someone I would see in the building and see at
13 general faculty meetings.
14 Q  Okay.  Did you prepare at all for today's
15 deposition?
16 A  For today's deposition, yes.  I met with
17 Stephanie this summer.
18 Q  Okay.
19 A  And I reviewed documents relative to my part and
20 my role in this process.
21 Q  When was --
22     MS. PEET:  I'm just going to instruct you,
23 and I know Mr. Cohen didn't ask you any questions about
24 it, but you are not to discuss any substantive

Page 8

1 discussions you and I had --
2     THE WITNESS:  Right.
3     MS. PEET:  -- at any point.
4     THE WITNESS:  That's our privilege.
5     MS. PEET:  That would be specific to the
6 attorney/client privilege, that's correct.
7 BY MR. COHEN:
8 Q  Do you remember what documents you did review in
9 preparation for this?
10 A  E-mail exchanges between members of my
11 committee, drafts of the statement we ultimately
12 prepared, other general e-mails we presented along the
13 way including Doctor Fagal's statement and request for
14 appeal.  We did receive the findings of the Faculty
15 Grievance Committee who adjudicated the procedural
16 aspects.
17 Q  So eventually in 2012 you did serve on what's
18 called an Ad Hoc Faculty Committee?
19 A  That is correct.
20 Q  What was, in your own words, what was the
21 purpose of that committee?
22 A  We were convened following the meeting --
23 following the meeting of the Faculty Grievance
24 Committee.  The Faculty Grievance Committee functions

Page 9

1 as a grand jury and decides whether a grievance --
2 whether procedure has been followed and whether the
3 grievant should go forward.  If the person appeals,
4 then the head of faculty senate calls a committee from
5 a pool of I think it's 15 tenured faculty members and
6 we are appointed to adjudicate the substance of the
7 case.
8     In this case responding to -- I guess we all
9 obviously saw, you know, as part of our review process
10 Sister Anne's documents to -- Fred Fagal's appeal to
11 Anne Munley, Anne Munley's written responses, all of
12 the back and forth.
13 Q  Okay.
14 A  But we -- bottom line we were supposed to
15 adjudicate the substance of Fred's grievance.
16 Q  And you were supposed to adjudicate the
17 substance of his grievance or the administration's
18 requested of discipline of him?
19 A  Of his appeal which was -- his appeal which was
20 his response, his grievance against Sister Anne's
21 statement of charges.
22 Q  Okay.
23 A  So we had to look at Sister Anne's statement of
24 charges and also why Fred said that those were not



1  valid.
2    Q  Okay.  And --
3    A  We had to ultimately decide and we saw in our
4  final document was based on the same format that Sister
5  Anne used, which was the same format that he followed a
6  list of charges and whether we believed they were
7  justified or not.
8    Q  And did you view your role, the committee's role
9  as deciding on the appropriateness of Professor Fagal's
10  suspension?
11    A  Yes, we did.
12    Q  As well as his termination?
13    A  As well as his termination, correct.  And as
14  well as his revocation of tenure, we also talked a
15  great deal about that.
16    Q  And there were two other individuals on the
17  committee, Matt Povse and --
18    A  Ed O'Brien.
19    Q  -- Ed O'Brien.  I'm going to show you a
20  document, let's have this marked as Bittel 1 please.
21      (Whereupon Bittel Exhibit 1 was marked for
22  identification.)
23  BY MR. COHEN:
24    Q  And do you recognize this document?  You can

1  take a few moments.
2    A  Yes, I do recognize this.
3    Q  And what is that?
4    A  This is the letter that Sister Anne sent to Fred
5  Fagal to detail her reasons for his termination.
6    Q  And did you consider that letter during your
7  committee deliberations?
8    A  We did because this is the -- we answered, we
9  evaluated each of these charges and found in favor of
10  Sister Anne on some of them but not on all of them.
11    Q  Okay.  There weren't any other charges that you
12  decided on?  It was just the ones in that letter,
13  correct?
14    A  We did that, we did that.
15      MS. PEET:  Don't talk out loud.
16      THE WITNESS:  I believe there may have been
17  something else considered in part one beyond breach of
18  tenure.  No, part one was about revocation of tenure,
19  so that would be correct.
20      MR. COHEN:  Can we mark this as Bittel 2
21  please.
22      (Whereupon Bittel Exhibit 2 was marked for
23  identification.)
24        - - -

1  BY MR. COHEN:
2    Q  And can you take a few moments and review this
3  and let me know if you recognize it.
4    A  I do recognize these.
5    Q  And what is the document that you're looking at?
6    A  This is Fred Fagal's response to Anne Munley's
7  letter detailing charges against him.
8    Q  And this isn't the first time you're seeing
9  this?
10    A  No.  This was forwarded, this was one of the
11  documents that our committee did consider.
12    Q  Okay.  That was my question.
13      MR. COHEN:  Can we have this marked as
14  Bittel 3 please.
15      (Whereupon Bittel Exhibit 3 was marked for
16  identification.)
17  BY MR. COHEN:
18    Q  Can you take a few moments and let me know if
19  you recognize this.
20    A  This is a draft of minutes of our first full
21  committee meeting.
22    Q  Okay.  And the comments on the right side of the
23  paper, do you know whose comments they are, the ones
24  that are like in little boxes?

1    A  Yes.  My -- I don't remember for certain, but my
2  guess is Ed O'Brien because it looks like his writing
3  style.
4    Q  In the first paragraph the last line, correct me
5  if I'm wrong, says -- the last two lines, Helen knows
6  F.F. casually from working in the same building.  Some
7  of her conversations with him have been strange, but
8  their relationship has been collegial.  Matt has had
9  very little contact with Fred at all.  Did I read that
10  correctly?
11    A  You did read that correctly, yes.
12    Q  Is that true that you told the committee that
13  some of your conversations with Professor Fagal had
14  been strange?
15    A  Strange in the sense of eccentric.
16    Q  Okay.  And what do you mean by eccentric?
17    A  A conversation that I had in mind was a
18  conversation we were going out with a couple -- my
19  friends and I were going downstairs to get lunch and we
20  ran into Fred and he referred to us as a coven.
21    Q  As a coven?
22    A  Yeah.  It was just eccentric.  It was an
23  eccentric thing to say, and that's what was meant by
24  that.



Page 14

1    Q  If you go down to the bottom of the first page
2  it says 5/3 AHC meets with HR and Sister Gail, do you
3  see that?
4    A  Yes, I do.
5    Q  AHC stands for Ad Hoc Committee?
6    A  Correct.
7    Q  And obviously HR stands for human resources?
8    A  Yes.
9    Q  And were you part of this meeting?
10   A  I was part of this meeting, the three of us and
11  Pat Dunleavy and Sister Gail.
12   Q  And that's Sister Gail Cabral?
13   A  Correct.
14   Q  What was discussed at that meeting?
15   A  Why they had summoned the committee and what we
16  would be charged with doing and here's the documents
17  that you need.
18   Q  And you said that Patricia Dunleavy was there?
19   A  I believe so.
20   Q  Did you ask Doctor Dunleavy whether there would
21  be two committees, one to review Professor Fagal's
22  suspension and one for termination?
23   A  I don't recall asking that.
24   Q  Do you remember her saying anything about that?

Page 15

1    A  I don't recall.
2    Q  Do you remember anyone at the meeting saying
3  anything about that?
4    A  I don't.
5    Q  Okay.  And would you say having reviewed this
6  document this is an accurate representation of what
7  occurred at Ad Hoc Committee meeting one on May 11,
8  2012?
9    A  We decided -- the full disclosure was to make
10  sure also that none of us had anything that would --
11  any cause to recuse ourselves and we found out no one
12  did.  We selected a chair.  We constructed a timeline
13  based on the documents we had received to make
14  everything easier to understand.  And then we
15  considered the three issues on the back page as things
16  that we would need to investigate or consider before we
17  started to discuss the charges proper.
18   Q  So what's in this document, would you say that's
19  an accurate representation of what you guys did in the
20  first meeting?
21   A  To the best of my recollection, yes, but it was
22  four-and-a-half years ago.
23   Q  Right.  Do you remember anything, any
24  significant omissions that should be here that aren't?

Page 16

1        MS. PEET:  Objection to the form.  You can
2  answer.
3  BY MR. COHEN:
4    Q  Any omission whatsoever?
5    A  I don't recognize any.  It was a long time ago.
6    Q  Right.
7        MR. COHEN:  Can we make this Bittel 4
8  please.
9        (Whereupon Bittel Exhibit 4 was marked for
10  identification.)
11  BY MR. COHEN:
12   Q  Ma'am, can you read this to yourself and let me
13  know if you recognize it please.
14   A  I think I recognize it, I'm not positive.  We
15  reviewed a lot of documents.
16   Q  There's another side to it.
17   A  Oh, there is another side.  I don't remember
18  whether I saw this document or not.  The events
19  described are familiar.  I can't say for sure, I may
20  have seen the actual document but I can't say for sure
21  either way.
22   Q  You mean you may have considered it as part of
23  your deliberations?
24   A  Correct.

Page 17

1    Q  Do you know one way or another whether you
2  reviewed this document for preparing for today?
3    A  I don't know one way or another.
4        MR. COHEN:  Okay.  Can we have this marked
5  as Bittel 5 please.
6        (Whereupon Bittel Exhibit 5 was marked for
7  identification.)
8  BY MR. COHEN:
9    Q  And do you recognize this document?
10   A  This, I do.  Yes, I do recognize this document.
11   Q  Did you consider this during your committee
12  deliberations?
13   A  Definitely.  This was one of the first documents
14  we were given.
15   Q  Okay.
16   A  And we looked very carefully at the language of
17  this document.
18       MR. COHEN:  Let's mark this as Bittel 6
19  please.
20       (Whereupon Bittel Exhibit 6 was marked for
21  identification.)
22  BY MR. COHEN:
23   Q  Can you read this to yourself and let me know
24  when you're finished please.



Page 18

1    A  I'm done.
2    Q  Okay.  So the first part of this e-mail is from
3  you to Doctor Erin A. Sadlack dated May 17, 2012;
4  right?
5    A  That's correct.
6    Q  And this was later forwarded on to Patricia
7  Dunleavy, right?
8    A  Correct.
9    Q  Now, your message to Doctor Sadlack you
10  mentioned here that discussing the -- talking with
11  Doctor Sadlack and her committee, you expressed some
12  concern about whether that would compromise the
13  independence of your investigation; correct?
14    A  Correct.
15    Q  Why would potentially talking with Erin Sadlack
16  compromise the independence of your investigation?
17    A  We didn't want to know the reasons behind their
18  findings because we wanted to be able to know that our
19  own findings came from our own deliberations.
20    Q  Okay.
21    A  Findings as to the -- related to the substance
22  of the case.
23    Q  And in general you thought that was important
24  that your Ad Hoc Committee conduct an independent

Page 19

1  investigation?
2    A  Correct.
3    Q  Later in the e-mail you mention that you have a
4  call in to the attorney to get a little more detail
5  from him.  Again I'm not going to ask you what you
6  discussed, but you're referring to Marywood's attorney?
7    A  Correct.
8    Q  Will Anthony?
9    A  That is correct.
10    Q  What did you view his role as?
11    A  Our understanding is that we could contact him
12  if we had questions or concerns about the process.
13    Q  Who did you think that Mr. Anthony represented?
14    A  That he --
15      MS. PEET:  Objection to form, lack of
16  foundation.
17  BY MR. COHEN:
18    Q  Did you think that Mr. Anthony represented
19  anyone in particular?
20    A  Not an individual, no.
21    Q  You don't think he had any client?
22    A  Marywood University as a corporate university,
23  but not Sister Anne Munley or any one individual.
24    Q  Okay.  As of the date that you were writing this

Page 20

1  e-mail, you had already conducted your first Ad Hoc
2  Committee meeting; right?
3    A  Yes, correct.
4    Q  And so did you know at this point that Mr.
5  Anthony and I had been exchanging letters about
6  disciplinary process?
7    A  I'm pulling up document 3 here, we did have a
8  timeline.  So we were aware on the 11th that you sent a
9  letter to Sister Anne Munley challenging the charges
10  and we were also aware that on February 9th Anthony
11  sent a letter to you; we specify not included in our
12  packet by mentioned by Fred Fagal in his grievance.
13    Q  Mr. Anthony's letter wasn't -- you don't have
14  that?
15    A  I don't think so.  We just know that there was
16  one because he referenced it in his grievance.
17    Q  Okay.  Were you aware that Mr. Anthony and I
18  were having a dispute about the appropriateness of
19  Professor Fagal's discipline and the procedure
20  regarding it?
21      MS. PEET:  Objection to the form.
22      THE WITNESS:  Yes.
23  BY MR. COHEN:
24    Q  Did it ever occur to you that discussing any

Page 21

1  part of your deliberations with Mr. Anthony might
2  compromise the independence of your investigation?
3      MS. PEET:  Objection to the form.  You can
4  answer.
5      THE WITNESS:  At that stage we were not
6  seeking any clarification on the substance of the case.
7      MS. PEET:  I just want to instruct you not
8  to disclose any communications that you have had either
9  with myself, with Mr. Anthony, with any other counsel
10  for Marywood, for Doctor Fagal, for Sister Munley
11  pursuant to attorney/client privilege.
12  BY MR. COHEN:
13    Q  Also I don't want to know anything Mary Theresa
14  Patterson said or might not have had said to you.  I
15  just want to know if the thought had ever crossed your
16  mind that talking with Mr. Anthony could compromise the
17  independence of the Ad Hoc Faculty Committee's
18  investigation?
19    A  No, because --
20    Q  I don't want to know what anyone said to you,
21  any attorney.  But you were about to say because;
22  unless the answer was someone told you, some attorney
23  told you that it wouldn't then I don't want to know.
24    A  That was not.



Page 22

1   Q  So what were you going to say?
2   A  I was going to say because our question was
3   procedural, we were not calling him about a substantive
4   aspect of the case.
5       MS. PEET:  I don't want you to talk about
6   anything else.
7       MR. COHEN:  Can we have this marked as
8   Bittel 7 please.
9       (Whereupon Bittel Exhibit 7 was marked for
10  identification.)
11  BY MR. COHEN:
12  Q  Could you read this to yourself and let me know
13  when you're finished.
14  A  All right.
15  Q  Do you recognize this?
16  A  I do recognize it.
17  Q  And what is it?
18  A  It is the minutes from our second meeting.
19  Q  And did you generate this, these minutes or did
20  another committee member do that?
21  A  I believe that I generated them.
22  Q  Okay.  During your actual -- during your
23  meetings, your Ad Hoc Committee meetings, were you
24  taking contemporaneous written notes or did you later

Page 23

1   just type this out from memory?
2   A  No, I took minutes on my iPad.
3   Q  Okay.  Do you know whether --
4       MR. COHEN:  Could we just go off the record
5   for a second.
6       (Whereupon an off-the-record discussion
7   took place.)
8   BY MR. COHEN:
9   Q  These notes that you took on your iPad, do they
10  exist any longer?
11  A  Probably.  I think that I sent them to Pat
12  Dunleavy at some point at that January 2015 when we had
13  a meeting and they let us know that this might be going
14  to a deposition.
15  Q  Okay.
16  A  I don't remember for sure.
17  Q  Okay.
18      MS. PEET:  For what it's worth, I will
19  check.
20      MR. COHEN:  Thank you.
21  BY MR. COHEN:
22  Q  Do you still have the iPad that you took the
23  notes on?
24  A  Yes.

Page 24

1   Q  So you don't feel the need to upgrade your iPad
2   every year like Apple wants you to?
3   A  No.  This is a five-year-old iPad with a crack
4   across the screen.  Nobody is going to steal it.
5   Q  After having read these minutes, do they
6   accurately reflect what occurred during the second Ad
7   Hoc Committee meeting on May 17, 2012 to the best of
8   your memory?
9   A  They reflect what we understood at that moment,
10  at the moment of that meeting.  But as all of our
11  minutes indicate, this is a new process that had never
12  been, to our knowledge, been used at Marywood before
13  and there were some anomalies in that we did not have
14  authorization to go to Ad Hoc Committee between
15  suspension and termination.
16      So the bottom line there is that we were coming
17  to understand the process as we -- as it evolved.  But
18  this is what we understood that day, although later we
19  did in our actual deliberations we did consider three
20  things.  We considered suspension, we considered
21  termination and we considered revocation of tenure.
22  Q  Okay.  So there's a lot to unpack from all of
23  that.  You understood that the process that the
24  committee was engaged in was the first time that the

Page 25

1   progressive discipline policy had ever been used at
2   Marywood?
3   A  No, I didn't --
4       MS. PEET:  Objection, mischaracterization
5   of testimony.  You can answer.
6   BY MR. COHEN:
7   Q  What was it that --
8   A  None of us had any --- the three of us on the
9   committee who had been there a long time had no memory
10  of such a committee being convened.
11  Q  Ever?
12  A  We wouldn't know if one ever was because other
13  people in the university don't know that this is
14  happening.  We didn't have -- faculty said Executive
15  Committee was not able to say, oh, yeah, this has
16  happened before and this is what was done.
17  Q  And you mentioned that -- you mentioned the word
18  anomalies in the process.  What did you mean by that?
19  A  That we would have expected to have been
20  convened following suspension, but that because Fred
21  didn't sign off on the authorization to convene the
22  committee that we were not convened until later.
23  Q  Were you aware that Fred through his attorney,
24  me, had requested that a committee review his



1 suspension?
2         MS. PEET:  Objection; lack of foundation,
3 mischaracterization of evidence.  You can go ahead and
4 answer if you know.
5         THE WITNESS:  By this point.
6         MS. PEET:  You don't need to look at
7 anything, he's asking you if you know.
8         THE WITNESS:  I don't remember.  We know
9 that Sister Anne Munley had received papers from you.
10 BY MR. COHEN:
11   Q  When you were using your iPad to take notes at
12 this committee meeting, what program on your iPad were
13 you using?
14   A  Notability.
15         MS. PEET:  Can we go off the record for a
16 second.
17         MR. COHEN:  Sure.
18         (Whereupon an off-the-record discussion
19 took place.)
20 BY MR. COHEN:
21   Q  On the first page of these minutes towards the
22 bottom, do you see where it says first page?
23   A  First page towards the bottom.
24   Q  Do you see where it says after Erin left we

1 concluded?
2   A  Mm-mm.
3   Q  We concluded that we, the AHC, are in charge of
4 reviewing the substance of the termination charge, in
5 parentheses, dismissal and revocation of tenure.  Did I
6 read that correctly?
7         MS. PEET:  There's no question.  Did he
8 read it correctly?
9         THE WITNESS:  Yes.
10 BY MR. COHEN:
11   Q  So is it true that you didn't view the role of
12 the committee as reviewing any of the procedural
13 aspects of the recommended discipline against Fred?
14   A  Our understanding at this moment in time was
15 that the procedural aspects had already been decided by
16 the FGC and could not themselves be appealed, that
17 their decision was final.
18   Q  Let's turn to the next page.  You wrote some of
19 the questions we will consider going forward include
20 and the second point says did F.F. in essence reject or
21 refuse remediation especially in his meeting with
22 S.A.M. on January 23rd when he refused to discuss the
23 video, correct?
24   A  Yes.

1   Q  Why did you want to know whether Professor Fagal
2 rejected or refused remediation?
3   A  Because he was claiming in his documents that he
4 should have had the opportunity for remediation.
5   Q  And did you think that -- scratch that.  Two
6 points down then you ask does the video, in
7 parentheses, understood as an escalation of
8 inappropriate behavior represent a failure of the
9 discipline system at Marywood; correct?
10   A  Yes.
11   Q  What did you mean by that question?
12   A  Part of what was happening there is that
13 someone, I think that may have been Ed's point, was
14 that we wanted to make sure that we were considering
15 all angles; that we were -- that we were considering
16 the ways that Sister Anne might be correct or incorrect
17 in her charges and the way that Fred may have been
18 correct or incorrect in his charges.  We wanted to make
19 sure that we were judicious and that we did our due
20 diligence in weighing both sides fairly.  And so this
21 was on the table as -- just on the table as a question
22 to be assessed.
23   Q  Right.  But why would the video potentially
24 represent a failure of progressive discipline at

1 Marywood?
2         MS. PEET:  Objection to the form.  You can
3 answer.
4         THE WITNESS:  This was a very -- I mean
5 this was a very hard question to answer because you
6 would only see it as a failure of progressive
7 discipline if there had been a record of progressive
8 discipline, and that was not information that we were
9 given at this moment.  So we couldn't know either way,
10 right, we couldn't know had there been previous
11 progressive discipline and it failed or had there not
12 been.  We just didn't know at that point.
13 BY MR. COHEN:
14   Q  Later on did you later learn whether there had
15 been a history of progressive discipline against Fred?
16   A  I know we inquired about it, inquired about
17 whether we could have access to personnel records.  I
18 believe, if I'm remembering correctly, that Fred signed
19 off on it and we were given some information about
20 things that had happened previously concerning a
21 cartoon but that did not result in formal discipline.
22   Q  And if we keep going down the page under the
23 heading actions, the first point says Helen will e-mail
24 P.D. and let her know that we understand our charge to



1  be the review of substance, the termination and denial
2  of tenure charges.  We understand that the issues of
3  suspension and procedure were resolved by the FGC.  Did
4  I read that correctly?
5      A  You did read it correctly.
6      Q  And P.D. stands for Patricia Dunleavy, right?
7      A  That's correct.
8      Q  And FGC stands for Faculty Grievance Committee,
9  right?
10     A  Correct.
11     Q  Now, earlier today I think you said that your
12  committee, one of the purposes was to consider
13  Professor Fagal's suspension; correct?
14     A  We later came to consider that in our
15  deliberations, but at this moment in the process of
16  figuring out who does what and what our role was in the
17  judicial process at this moment we were less sure.
18     Q  So what made you sure later that you were
19  supposed to consider the suspension?
20     A  We just -- because the same action precipitated
21  the suspension and the dismissal.  And so we did not
22  prepare a separate statement on the suspension because
23  if you found -- since our findings upheld a greater
24  charge on the same action, it doesn't make any sense

1  that they wouldn't uphold a lesser charge on the same
2  action.
3      Q  So did you consider that -- did you think that
4  reviewing the suspension; if you had already determined
5  that Professor Fagal's termination was appropriate, did
6  that lead you to think that you did not need to
7  consider whether the suspension was appropriate?
8          MS. PEET:  Objection to the form.
9          THE WITNESS:  We discussed the suspension,
10  but we did not prepare a formal -- we did not prepare a
11  statement on it because if termination is justified,
12  why wouldn't a suspension be justified unless there
13  were a procedural problem and the FGC had already
14  adjudicated that there was not a procedural issue.
15  BY MR. COHEN:
16     Q  So why would you discuss the suspension at all
17  if you thought that the termination was appropriate?
18     A  Because it was on the table.  I mean we did have
19  to ask ourselves first could suspension be justified by
20  the actions and then could termination and revocation
21  of tenure be justified by the actions.
22     Q  But you didn't make any formal finding about
23  whether the suspension was appropriate?
24     A  No, because termination and especially

1  revocation of tenure, which in some ways is the more
2  serious issue were found to be justified.
3          MR. COHEN:  Okay.  Can we have this marked
4  as Bittel 8 please.
5          (Whereupon Bittel Exhibit 8 was marked for
6  identification.)
7  BY MR. COHEN:
8      Q  And could you read this to yourself and let me
9  know when you're finished please.
10     A  Okay.
11     Q  Do you recognize this?
12     A  It appears to -- I vaguely recognize it.  It
13  looks like my writing.
14     Q  Are these notes that you took about a telephone
15  conversation that you had with Pat Dunleavy?
16     A  Yes.
17          MS. PEET:  And for the record, can we
18  describe the blackouts so she understands.
19  BY MR. COHEN:
20     Q  Yes.  The blackouts no one is saying that you
21  did that.  Marywood's attorneys have to redact certain
22  things --
23     A  Okay.
24     Q  -- because they may be privileged.

1      A  Okay.
2      Q  So ignore that please.
3      A  Okay.
4      Q  So based on these notes, Doctor Dunleavy told
5  you that your committee needed to provide an
6  independent review?
7      A  Yes, that word was used several times.
8      Q  And that your committee needed to come to a
9  decision independently from the administration?
10     A  That was made very clear to us from the first
11  meeting.  The first time we met with Sister Gail and
12  Pat Dunleavy, we were told that there's no punitive
13  action against you if you find against the
14  administration.  There's no -- you know, that you need
15  to be an independent review or an independent review of
16  the substance of the charges.
17     Q  Point five here you're taking notes on advice
18  that Doctor Dunleavy gave you about when the
19  progressive discipline policy applies and when it
20  doesn't apply, right?
21     A  Correct.
22     Q  So you understood that there are some cases in
23  which the progressive discipline policy does not apply?
24     A  Yes.  And we came to the conclusion prior to



1  this conversation with Pat that we wanted to verify
2  with her as well.  This was a conclusion that we came
3  to based on our reading of the progressive discipline
4  policy that she gave me previously.
5      Q  How did you come to the conclusion that the
6  progressive discipline policy sometimes doesn't apply?
7      A  The word may, it's a verb.
8          MS. PEET:  Do you need to look at
9  something?
10         THE WITNESS:  Should I look in the --
11  BY MR. COHEN:
12     Q  I'm not asking you to look at the exhibit yet.
13     A  Okay.  It was the wording and the language of
14  the policy particularly, the verbs like may and might
15  as opposed to will or should.
16     Q  Let's turn back to Bittel 5.  This is the
17  progressive discipline policy, right?
18     A  Yes, it is.
19     Q  Now, can you tell me again how you came to the
20  conclusion that in some cases this policy does not
21  apply?
22         MS. PEET:  Just for clarification, that the
23  policy didn't apply generally or the policy doesn't
24  apply in this situation?

1  BY MR. COHEN:
2      Q  In this situation.
3      A  Because paragraph one; one, two, three, four
4  lines down; because the university regards disciplinary
5  action as corrective and not punitive, the policy
6  recognizes personal and professional problems that may
7  be rectified by an informal educational process as well
8  as serious violations and professional responsibility
9  is implicating possible recommendations for suspension
10  or dismissal.
11     Q  And the word may is what --
12     A  Yes.
13     Q  -- led you to believe that in this case
14  progressive discipline wasn't appropriate?
15     A  Right.
16     Q  Anything else in the policy that led you to that
17  conclusion?
18     A  On top of page two special assistance; in those
19  circumstances where it is evident that the faculty
20  member is in need of special professional assistance,
21  the vice president for academic affairs may require any
22  one of these remedial actions.  Where it is evident
23  that the faculty member is in need of special
24  professional assistance, we did not think it was

1  evident in this case.
2      Similarly in the first paragraph of the policy
3  statement may be rectified by an informal education
4  process, we did not see this as a -- we considered
5  whether this was a situation where an educational
6  process, an informal education process -- whether
7  personal and professional problems that may be
8  rectified by an informal educational process applied to
9  this case, and we determined that it did not apply to
10  this case.
11     Q  So if the progressive discipline policy didn't
12  apply to this case, what written rules were you
13  supposed to follow, if any?
14     A  Well, we looked here the justification for
15  suspension; the faculty member may be suspended by the
16  VPA at any time during the proceedings.  Suspension is
17  justified if immediate harm to the faculty members or
18  others is threatened by the person's continuance in a
19  faculty position.  And we debated whether such harm was
20  present in this situation and ultimately determined
21  that it was.
22     Q  But the suspension paragraph is part of the
23  progressive discipline policy, right?
24     A  Yes.

1      Q  Okay.
2      A  But we didn't see any -- but the bottom line is
3  that when it says the policy recognizes personal and
4  professional problems that may be rectified, and we saw
5  may be rectified as not applying, as written in a way
6  that does not apply to every case; that you don't
7  automatically get progressive discipline because it
8  says may be rectified, not will be rectified.
9      Q  So if the progressive discipline policy didn't
10  apply in this case, I guess my question is were there
11  any other written rules that you thought the university
12  was bound by --
13         MS. PEET:  Objection to the form.
14  BY MR. COHEN:
15     Q  -- regarding discipline?
16     A  Yeah.  I don't think I understand the form.  I
17  don't think I understand the phrasing.
18     Q  Okay.  If you concluded that the progressive
19  discipline policy, and by that I'm talking about the
20  entire document that we're looking at now, did not
21  apply --
22     A  Okay.  I was not talking about the entire
23  document.  I was talking about the opportunity for
24  remediation --



Page 38

1   Q   Okay.
2   A   -- did not apply to these circumstances.  The
3   policy applies but the opportunity for remediation, I
4   guess I was not clear in speaking before.  The
5   opportunity for remediation is not guaranteed by this
6   policy.
7   Q   Okay.
8   A   I would also point out in the end of the policy
9   statement it ends by saying is designed to be a series
10  of gradual steps involved, da, da, da, where applicable
11  and that means not every step is applicable to every
12  case and remediation in particular is not applicable to
13  every case.
14  Q   If someone in the administration like Pat
15  Dunleavy had told you that -- this is hypothetical --
16  had told you that the progressive discipline policy
17  applies in every case and that remediation applies in
18  every case, would you have come to the conclusion that
19  President Munley's termination of Professor Fagal was
20  appropriate?
21        MS. PEET:  Objection; calls for
22  speculation, assumes facts not in evidence.  If you can
23  somehow answer that, you can answer.
24        THE WITNESS:  That's too speculative for me

Page 39

1   to answer.
2        MR. COHEN:  Okay.  Can we have this marked
3   as Bittel 9 please.
4        (Whereupon Bittel Exhibit 9 was marked for
5   identification.)
6   BY MR. COHEN:
7   Q   Can you read this to yourself and let me know
8   when you're finished please.
9   A   Yes.
10  Q   This is an e-mail from you to Patricia Dunleavy
11  dated May 18, 2012 at 4:03 p.m., right?
12  A   Mm-mm.
13        MS. PEET:  Is that a yes?
14        THE WITNESS:  Yes, that is.
15  BY MR. COHEN:
16  Q   And here again you're saying to Doctor Dunleavy
17  we agreed that our charge should be the review of
18  substance, the termination and denial of tenure and
19  that you understood that the issues of suspension and
20  procedure were resolved by the Faculty Grievance
21  Committee; is that correct?
22  A   That is what we understood at that moment.  This
23  is basically our followup to her on the May 17th
24  meeting.

Page 40

1   Q   Can we take a ten-minute break?
2   A   Sure.
3        (Whereupon a recess took place.)
4        (Whereupon Bittel Exhibit 10 was marked for
5   identification.)
6   BY MR. COHEN:
7   Q   Could you go through this and let me know when
8   you're finished please.
9   A   Sure.  I'm done.
10  Q   Okay.  So first page there's an e-mail from
11  Doctor O'Brien to you and Matt dated June 2, 2012 at
12  9:52 a.m., do you see that?
13  A   Yes.
14  Q   And Doctor O'Brien in the second paragraph he
15  say his current inclination is that it will be useful
16  to interview Sister Anne about a few narrow questions
17  and then he goes on to list them, right?
18  A   Mm-mm.
19        MS. PEET:  Is that a yes?
20        THE WITNESS:  Yes, it is.
21  BY MR. COHEN:
22  Q   Do you know whether the committee ever did get
23  the opportunity to ask these questions?
24        MS. PEET:  Objection to the form.

Page 41

1        MR. COHEN:  What is it about the question?
2        MS. PEET:  Whether or not they had the
3   opportunity.
4   BY MR. COHEN:
5   Q   Let me rephrase it.  Did the committee ever
6   actually ask these questions of Sister Anne?
7   A   To the best of my recollection we did meet with
8   her, but I don't remember if these were the questions
9   that we discussed or what the final form of the
10  questions we discussed was.
11  Q   But you do know that you met with her, but you
12  just don't remember the exact questions?
13  A   I'm fairly certain we met with her, but I don't
14  remember for sure.  If I had to guess, I would guess --
15  Q   Don't guess.
16  A   Okay.
17  Q   In the next paragraph Doctor O'Brien says that
18  he also thinks that we may want to interview Fred by
19  phone, do you see that?
20  A   Yeah.
21  Q   And that never happened, right?
22  A   I don't believe that happened.
23  Q   Just take my word for it, it didn't happen.  Do
24  you know why you guys didn't interview Fred by phone?



1      MS. PEET:  Objection, it assumes facts not
2   in evidence.  You can go ahead and answer.
3      THE WITNESS:  Again this is four-and-a-half
4   years ago.  I'm relying on, you know; a lot of time has
5   passed since then.  I believe that there was an e-mail
6   exchange with Fred rather than a phone call.
7   BY MR. COHEN:
8      Q  You believe there was an e-mail exchange in lieu
9   of a phone call?
10     A  Yes, correct.
11          MR. COHEN:  Okay.  Call this Bittel 11.
12          (Whereupon Bittel Exhibit 11 was marked for
13   identification.)
14   BY MR. COHEN:
15     Q  Can you read this to yourself and let me know
16   when you're finished please.
17     A  I'm done.
18     Q  Okay.  On the second page there's an e-mail from
19   Doctor O'Brien to you and Matt Povse dated June 7, 2012
20   at 12:46 p.m., do you see that?
21     A  Yes, I do.
22     Q  Third paragraph down that begins I like the
23   open-ended format, do you see that?
24     A  Mm-mm.

1      Q  Does this paragraph refresh your recollection
2   about whether or not Sister Anne Munley was interviewed
3   by your committee?
4      A  It does refresh my recollection that we did meet
5   with her.
6      Q  Okay.
7      A  I don't remember offhand the substance of that
8   conversation.
9      Q  Okay.  On the first page there's an e-mail from
10   you to at least Doctor O'Brien dated June 11, 2012 at
11   10:57 a.m., do you see that?
12     A  Yes.
13     Q  And three paragraphs down it begins I definitely
14   agree?
15     A  Mm-mm, I see that.
16          MS. PEET:  Is that a yes?
17          THE WITNESS:  Yes, I see that.
18   BY MR. COHEN:
19     Q  Here you're saying that you're reluctant to ask
20   to interview Fred because you fear that that would be
21   opening the door to a gigantic rant, do you see that?
22     A  Yes, I see that.
23     Q  What do you mean by a gigantic rant?
24     A  That I was fearful that instead of answering our

1   question, he would just tell us what's on his mind
2   regarding the unjustice of what happened with the fire
3   posters.
4      Q  Why do you think he would do that?
5      A  Because in what we know and the records we
6   eventually received regarding the January 23rd meeting,
7   he didn't -- he kept coming back to that when Sister
8   Anne asked him about explaining the video.
9      Q  So you didn't actually think he would answer
10   your questions?
11     A  Correct, that particular.  I didn't think that
12   he -- I had reservations that he might not answer,
13   answer the question as asked.
14     Q  What would have been the big deal, that would
15   have been if you wasted minutes, right?
16          MS. PEET:  Objection to form.  You can
17   answer.
18          THE WITNESS:  I don't remember.
19   BY MR. COHEN:
20     Q  Okay.  At the bottom of that paragraph you said
21   and it would parallel the second questions we have for
22   Sister Anne, do you see that?
23     A  It would parallel the second questions we had
24   for Sister Anne, on the other hand if we did have to

1   uphold Sister Anne --
2          MS. PEET:  Don't read out loud.
3          THE WITNESS:  I do see that.
4   BY MR. COHEN:
5      Q  What did you mean by -- did you mean the second
6   round of questions or like a second question, what did
7   you mean by that?
8      A  A second question, that's a typo.
9      Q  You mean a second question?
10     A  Yes.
11     Q  And by second question you're referring to what
12   actual question?
13     A  I don't remember, presumably the questions that
14   we were planning to ask her in the meeting that are not
15   included in this e-mail.
16     Q  Ask --
17     A  Ask of Sister Anne.
18     Q  Okay.  But based on the date of the e-mail from
19   Doctor O'Brien on June 7th, is it your impression by
20   that point that you had already interviewed Sister Anne
21   or rather you were planning to?
22     A  I think we had not yet interviewed her.
23          MR. COHEN:  Okay.  Let's mark this as
24   Bittel 12 please.



1      (Whereupon Bittel Exhibit 12 was marked for
2  identification.)
3  BY MR. COHEN:
4      Q  Do you recognize this document?
5      A  It's meeting minutes, June 18th -- June 19th.
6      Q  And again you generated these minutes?
7      A  I did.
8      Q  Okay.  Is there any reason to doubt the accuracy
9  of these minutes?
10     A  Let me take a look.  I would like to read it
11  closer.
12     Q  Sure.
13     A  Okay.  I'm done.
14     Q  Okay.  Based on your reading, is there any
15  reason to doubt the accuracy of these minutes?
16     A  I don't see any.
17     Q  So it's clear from these minutes that you did
18  meet with Sister Anne on June 18th, right?
19     A  That's correct.
20     Q  And you don't remember what was discussed?
21     A  No.
22     Q  Do you remember whether President Munley ever
23  informed you that Professor Fagal had asked for an
24  opportunity to answer her questions in writing?

1      A  I don't recall that.
2      Q  Other than the fact that you don't recall her
3  saying it to you, did you know if Professor Fagal had
4  asked for an opportunity to answer President Munley's
5  questions in writing?
6      A  I don't think so.  Meaning President Munley's
7  questions with regard to the original questions she
8  asked on January 23th with respect to the video?
9      Q  Right.
10     A  I don't think so.
11     Q  Okay.  If you had done that, would that have
12  changed any of your conclusions about -- any of the
13  conclusions that you made and adjudicated the
14  discipline that was imposed on Fred?
15         MS. PEET:  Objection.  She said she doesn't
16  think so, but she doesn't know.  And secondly, it calls
17  for speculation, it assumes facts not in evidence.  You
18  can answer.
19         THE WITNESS:  I can't guess what the -- we
20  came to our decision as a committee, not as a -- we
21  thought about the issue individually, but we came --
22  our decision and our deliberations were collective and
23  I can't speculate as to what other people would say.
24              - - -

1  BY MR. COHEN:
2      Q  Yeah.  But I asked about would it have changed
3  your opinion.
4         MS. PEET:  Same objection.
5         THE WITNESS:  Would it have changed my mind
6  to know that he had requested that?
7  BY MR. COHEN:
8      Q  Yes.
9      A  And would it have changed my mind about what
10  specifically?
11     Q  About whether remediation was appropriate.
12     A  It would not have changed my mind on the
13  remediation question because the policy does not
14  require remediation to be offered.
15     Q  Now, at the bottom of -- do you see the
16  paragraph that begins we then took our first vote?
17     A  Yes.
18     Q  And the bottom of that paragraph it says he also
19  had multiple opportunities to make amends, show remorse
20  and explain his actions; do you see that?
21     A  Yes.
22     Q  Does that imply that you felt that he never took
23  any of those opportunities?
24     A  That's referring to when Anne Munley asked him

1  to explain his actions on January 23rd and he did not
2  and did not subsequently in the period to our knowledge
3  and did not subsequently after that explain his reasons
4  to Anne Munley.
5      Q  Right.  But I'm now bringing to your attention
6  if he had said at that meeting with President Munley
7  can I put my -- can I answer your questions in writing,
8  that would sort of conflict with the view that he --
9      A  Had multiple opportunities?
10     Q  Yes.
11         MS. PEET:  Objection to form, calls for
12  speculation.  That's your opinion, doesn't necessarily
13  means it's her opinion and it assumes that he would
14  have put in writing that he was remorseful, which there
15  is no evidence that he would have done such a thing.
16  BY MR. COHEN:
17     Q  I'm looking for your answer.
18     A  You're looking for my answer.
19     Q  If he had asked for an opportunity to answer
20  President Munley's questions in writing, that would
21  make this statement not very accurate; right; he also
22  had multiple opportunities to make amends, show remorse
23  and explain his actions?
24         MS. PEET:  Objection to the form.



1    THE WITNESS:  If we knew that that was the
2  case, yes, that would make my statement there, it would
3  problematize my statement there.  It may not have
4  changed the outcome.
5  BY MR. COHEN:
6    Q  On the second page it says charge two, the
7  bottom of that paragraph it says while Fagal is correct
8  in saying that he was not getting a review in this
9  point, there might have been one if he had answered
10  Munley's questions on January 23rd.  Do you see that?
11    A  Yes.
12    Q  And again that would -- if he had asked for an
13  opportunity to answer her questions in writing, that
14  would sort of conflict with the statement here; right?
15    MS. PEET:  Objecting to the form, it calls
16  for speculation.  You can answer.
17    THE WITNESS:  It would object, it would --
18  yes, it would conflict with that point, but that's not
19  the -- as with the previous case, the point that is
20  potentially invalidated is not the only point that was
21  made or the only reason on the table.
22  BY MR. COHEN:
23    Q  On the last page under action items it says
24  Povse -- how do you pronounce his name by the way?

1    A  Povse.
2    Q  Povse will contact Anne Munley and apprise her
3  of her progress, is that right?
4    A  That is correct.  He was not indicating --
5    MS. PEET:  There's no question on the
6  table.  Let him ask.
7  BY MR. COHEN:
8    Q  Why did -- why was it important that Povse keep
9  President Munley apprised of the progress of the
10  committee?
11    MS. PEET:  Objection to the form.
12    THE WITNESS:  By progress he meant
13  timeline.  This was -- these deliberations largely
14  occurred over the summer when we were all off contract
15  and had various travel plans.  So it took a lot longer
16  to get through it than we had expected because one of
17  us would be away and then the other would be away.  And
18  there's three people, you know, who did not plan their
19  summer expecting this.  So he was apprising her of --
20  by progress he means of our timeline and we are at the
21  stage of drafting a decision.
22  BY MR. COHEN:
23    Q  But nobody wanted to keep Professor Fagal
24  informed of the progress of the committee, is that

1  correct?
2    A  I believe that's correct.
3    Q  Why?
4    A  Because our -- Anne Munley is the person who
5  asked us keep her apprised of the timeline and she's
6  the one who said can you -- she's the one who said when
7  are you going to be finished, I need to know what the
8  date is.
9    Q  She said that?
10    A  I mean I can't say with 100 percent certainty,
11  but I know that she asked us when our expected date of
12  completion would be because she didn't want it to drag
13  out too long either.  But this was in -- as far as I
14  can remember, it was in response to her inquiry about
15  when we would submit a final decision.
16    Q  How many inquiries did she make about the
17  timetable?
18    A  I don't remember, obviously at least one.
19    Q  Did she say why it was important that this not
20  drag out?
21    A  I don't remember.  I mean I'm guessing that
22  there's -- you're supposed to complete --
23    MS. PEET:  Don't guess.
24    - - -

1  BY MR. COHEN:
2    Q  She didn't say?
3    A  I don't remember her saying.
4    Q  Okay.  Did you in any way feel time pressured?
5    A  No.
6    Q  Did you in any way feel that she was pressuring
7  you to rule in her way?
8    A  Not at all.  And again we were assured by Pat
9  Dunleavy and -- we were assured by Pat Dunleavy on the
10  first day that nobody in the administration can take
11  any action against you if your decision disagrees with
12  theirs.  We were promised that protection.
13    Q  The last paragraph says after we workshop our
14  draft, we will send it to Will Anthony for comment, is
15  he an independent voice or does he work for
16  Munley/Marywood?
17    A  Yes.
18    Q  Did you ever get an answer to your question is
19  he an independent voice?
20    A  I don't recall.
21    Q  Well, why did you think that he might work for
22  Munley/Marywood?
23    MS. PEET:  Objection to the form, assumes
24  facts not in evidence.



1      THE WITNESS:  Because Marywood is paying
2  for him.
3      MR. COHEN:  Okay.  May I have this marked
4  as Bittel 13 please.
5      (Whereupon Bittel Exhibit 13 was marked for
6  identification.)
7  BY MR. COHEN:
8   Q  Could you read this to yourself and let me know
9  when you're finished, just the e-mail not the
10  attachment.
11   A  So not the attachment?
12   Q  Right.
13   A  Yes, I read it.
14   Q  Okay.  Now, this is an e-mail from you to
15  Matthew Povse and Doctor O'Brien?
16   A  Yes.
17   Q  Dated June 26, 2012 at 12:24 p.m.?
18   A  Correct.
19   Q  Other than this block redaction, do you remember
20  writing this?
21   A  It's my e-mail account, it's my signature.
22   Q  I'm trying to get you to authenticate it.  This
23  is in fact an e-mail that you sent?
24   A  This is an e-mail that I sent, yes.

1   Q  And you remember sending your draft, the
2  committee's draft to Will Anthony for his input.  And
3  I'm not asking you what he said, don't tell me.  You
4  did send it to him for seeking his input?
5      MS. PEET:  Objection to the form.
6      THE WITNESS:  I did.
7  BY MR. COHEN:
8   Q  And he did provide input?
9   A  Correct.
10   Q  Did it ever occur to you that if you were asking
11  Will Anthony for his input, that he might be
12  communicating with Sister Munley or Pat Dunleavy about
13  your deliberations?
14   A  No, that never occurred to us.  We understood
15  that our conversations with him were privileged.
16   Q  Why did you think that, that your conversations
17  with Will Anthony were not to be provided to the
18  administration?
19   A  Because he's the attorney and we were contacting
20  him as a client.
21   Q  But again earlier today you said that he
22  represented the university, right?
23   A  That was what -- we understood that the
24  university was paying him and that that was who he has

1  a -- his contract was with them.  But we also
2  understood that he was available as a resource to us.
3  On our first meeting Pat Dunleavy gave us his contact
4  information and said if you need to contact him,
5  contact him.  She didn't say if you want to contact
6  him, let me know or if you want to contact him, let
7  Sister Anne know.  She just gave us his card.
8   Q  Okay.  Let me ask you this, in your committee
9  deliberations did you actually view the videos that
10  Professor Fagal made and posted to You Tube?
11   A  They were given the videos on a flash drive.  We
12  viewed them individually, but not as a -- we
13  individually each borrowed the flash drive and watched
14  the video.
15   Q  Okay.  So it wasn't like a screen shot?
16   A  No, it was not a screen shot.  It was the actual
17  video on a flash.
18   Q  Would you say that you did a scene-by-scene
19  analysis of the video?
20      MS. PEET:  Objection.
21  BY MR. COHEN:
22   Q  To examine the validity of the charges?
23   A  To examine the validity of the charges, no.
24  That's not a format for making charges.

1   Q  What's not a format?
2   A  A You Tube video is not a vehicle for making
3  formal charges.
4   Q  I guess I don't understand.  I'm not asking you
5  whether anyone was making charges by -- through a You
6  Tube video.  I'm asking as part of your analysis of
7  whether President Munley's charges were appropriate,
8  did you do a scene-by-scene analysis of the video?
9      MS. PEET:  Same objection.  I don't
10  understand what it is you're seeking.  If you do, then
11  by all means you can answer the question.  I just don't
12  know what you mean by scene-by-scene analysis.
13  BY MR. COHEN:
14   Q  Do you understand?
15   A  We made a list of who he said what about.
16   Q  Okay.  Did you know that this video was in the
17  format of like a popular parody that people were doing?
18   A  Yes, we did.
19   Q  Okay.  Did you see any other parodies based on
20  that movie?
21   A  No.
22   Q  Okay.  Did you believe that Professor Fagal was
23  actually likening President Munley to Hitler?
24      MS. PEET:  I'm sorry, can you repeat that?



Page 58

1  BY MR. COHEN:
2     Q   Did you believe that Professor Fagal was
3  actually likening President Munley to Adolph Hitler?
4     A   In the context of satire, yes.  We understood
5  that the video was a parody and the context was a
6  satire.
7     Q   Right.  Okay.
8         (Whereupon Bittel Exhibit 14 was marked for
9  identification.)
10 BY MR. COHEN:
11    Q   Could you read this to yourself and let me know
12 when you're finished please.
13    A   Okay.
14    Q   And we're looking at an e-mail from Matthew
15 Povse to Sister Anne and you are CC'd as well as Doctor
16 O'Brien, right?
17    A   Yes.
18    Q   And Matthew Povse says we wanted you to know
19 that our report is in support of your actions in this
20 case, correct?
21    A   Yes.
22    Q   But at this point you were still, the committee
23 was still drafting its response, it wasn't finished
24 yet; right?

Page 59

1     A   We drafted the response.  We did not submit it
2  to Sister Anne Munley as our formal response.
3     Q   Right.  Did you tell -- or before Matthew Povse
4  sent this e-mail, were you aware, did you discuss with
5  him that he would inform President Munley that your
6  decision was going to be in support of her actions?
7     A   I don't recall.
8     Q   Okay.  Were you surprised that Mr. Povse told
9  Sister Anne in advance that they were going to rule,
10 the committee was going to rule in favor of her
11 actions?
12    A   I guess not.  I mean I understand draft at this
13 point as we've already made a decision and articulated
14 our decision and we're fine-tuning it, you know, that's
15 the point.  We did not understand it as we're still
16 drafting, we're deliberating.  The deliberations were
17 finished.  We were fine-tuning the document that
18 explained our conclusions.
19    Q   Did the committee inform Professor Fagal in
20 advance of the final decision that they were going to
21 rule in favor of Sister Munley?
22    A   I don't believe so, but I don't recall for sure.
23 My understanding again going back to what we said
24 before is that Sister Anne wanted to know the timeline.

Page 60

1     Q   Right.  Did she ask for the final result before
2  you were finished?
3     A   She did not ask for the final result before we
4  were finished, no.  She was concerned about the
5  timeline.
6         MR. COHEN:  Let's make this Bittel 15
7  please.
8         (Whereupon Bittel Exhibit 15 was marked for
9  identification.)
10 BY MR. COHEN:
11    Q   Could you view this, let me know when you are
12 finished including the attachment.
13    A   Review the e-mail and the attachment?
14    Q   Yes, please.
15    A   Okay.  I've read the document.
16    Q   Do you recognize it?
17    A   I do recognize it.
18    Q   And on the first page there's a series of
19 exchange of e-mails between you and Sister Anne --
20    A   Yes.
21    Q   -- correct?
22    A   Correct.
23    Q   And you first tried to give her the committee's
24 review and it turns out there's changes and she asked

Page 61

1  for a final copy, right?
2     A   Yes.  She didn't -- I had never used track
3  changes before and didn't know that the comments would
4  appear in the document.
5     Q   And this attachment is the version without tract
6  changes?
7     A   Correct.
8     Q   Is this the final version of the committee's
9  review and Sister Anne Munley's decision?
10    A   I believe so.
11    Q   And do you know if -- in the first e-mail it
12 says hopefully this one will work, I'll ask Matt and Ed
13 to sign a hard copy as well.  Do you know if there was
14 a copy ever signed?
15    A   I don't remember.
16    Q   Having read this just now, would it be fair to
17 say that the Ad Hoc Committee did not review whether
18 Professor Fagal's suspension was appropriate?
19        MS. PEET:  Objection to the form;
20 mischaracterization of testimony, asked and answered.
21 You can go ahead.
22        THE WITNESS:  We discussed whether the
23 suspension was justifiable, but our ruling was on the
24 termination because if you are -- I mean the revocation



Page 62

1  of tenure because if we find the higher, the more
2  serious charges are found to be justifiable, it doesn't
3  make sense that a lesser charge would not be
4  justifiable.
5  BY MR. COHEN:
6      Q   And the committee's review -- let me ask you
7  this:  Were you primarily responsible for generating a
8  draft of this, is this mostly your writing?
9      A   Yes.  Yes.  It started with the notes that we
10  took in a meeting when we were together and then we --
11  then I put them into a document and made them, made
12  full sentences and things like that and then gave it to
13  the others for comment.
14      Q   And they provided some comments?
15      A   Yes.
16      Q   In paragraph A of the actual review --
17      A   Yes.  And some of the language did come directly
18  from conversations or from other people because I know
19  some of the phrasing here is Ed's.
20      Q   Okay.  In paragraph A the one that begins that
21  we acknowledge that revocation, do you see that?
22      A   Mm-mm.
23      Q   There's a sentence in that paragraph that says
24  we are mindful of the potential or perceived threat to

Page 63

1  academic freedoms when a speech violation leads to
2  revocation of tenure, do you see that?
3      A   Yes.
4      Q   What do you mean by that?
5      A   That academic freedom is the -- academic freedom
6  protects the integrity of faculty work.  And so any
7  time that -- and I think what was meant here by -- we
8  were very, very careful that we considered the larger
9  ramifications; does ruling in favor of Sister Anne
10  Munley's decision potentially compromise the academic
11  freedom of others, does it set a precedent.
12      We ultimately, as you see in the statement,
13  determined that that was not the case because this is
14  not a case of academic freedom.  Academic freedom did
15  not apply to this particular situation.  But as tenure
16  faculty we were very aware of how important it is to
17  protect true academic freedom.
18      Q   I want to turn back to Bittel 5, it's the
19  progressive discipline policy.
20      A   Yes.
21      Q   A few minutes ago, correct me if I'm wrong, you
22  mentioned that if the committee had determined that
23  termination was appropriate, then there really would be
24  no point in deciding whether suspension was

Page 64

1  appropriate; correct?
2          MS. PEET:  Objection, mischaracterization
3  of testimony.
4  BY MR. COHEN:
5      Q   You can still answer if you understand.
6      A   That the event that led to suspension and
7  termination are the event, was the same event in both
8  cases.  So there was no need to prepare a second, a
9  separate document determining that as far as whether
10  the procedural elements that led to suspension were in
11  place, that's determined by the other committee.
12      The Faculty Grievance Committee determines
13  whether procedure was followed in moving to suspend and
14  then moving later from suspension to termination.  So
15  they already adjudicated the procedural aspect.  We
16  were adjudicating whether the event, the action
17  itself --
18          (Whereupon there was an interruption during
19  the deposition.)
20          THE WITNESS:  We were adjudicating whether
21  the action itself warranted those actions.
22  BY MR. COHEN:
23      Q   Okay.  So if you -- but it was your thought
24  process that if you had determined that the event

Page 65

1  itself warranted termination, that there was no point
2  in reviewing whether the event also warranted
3  suspension?
4          MS. PEET:  Objection, mischaracterization
5  of testimony.
6          THE WITNESS:  I guess I don't know.
7  BY MR. COHEN:
8      Q   You don't understand my question?
9      A   No, I don't.
10      Q   Okay.  You would agree that your committee did
11  not determine whether Professor Fagal's suspension was
12  appropriate, correct?
13          MS. PEET:  Objection, mischaracterization
14  of testimony.  Go ahead.
15          THE WITNESS:  We discussed the suspension,
16  but we did -- but the event itself; if the event itself
17  we determined warranted -- we discussed the event
18  itself, the substantive aspects of the case.  Whether
19  Sister Anne was out of line in suspending him in the
20  first place, that was the other committee because they
21  are responsible for procedural elements.
22  BY MR. COHEN:
23      Q   So who -- which committee, if any, determined
24  whether Professor Fagal's suspension was substantively



Page 66

1    appropriate as opposed to procedurally appropriate?
2       A  That was ours.  But if it was substantively
3    appropriate for suspension -- if it was substantively
4    appropriate; if a case was substantively appropriate
5    for suspension, it may not be substantively appropriate
6    for termination.  But if a case is appropriate for
7    termination, then of course the lesser charge applies
8    as well; or it meets the lower standard for suspension
9    if it meets the higher required for termination and the
10   highest standard required for revocation of tenure
11   which is an even higher standard.
12      Q  And is that why your review of President
13   Munley's decision does not address whether the
14   suspension was appropriate?
15         MS. PEET:  Asked and answered.  You can go
16   ahead one more time.
17         THE WITNESS:  Correct.
18   BY MR. COHEN:
19      Q  Okay.  If you look at Bittel 5.
20      A  Okay.
21      Q  Do you see at the bottom that there's a
22   paragraph called suspension?
23      A  Yes.
24      Q  It says the faculty member may be suspended by

Page 67

1    the vice president for academic affairs at any time
2    during the proceedings involving him or her, suspension
3    is justified if immediate harm to the faculty member or
4    others is threatened by person's continuance of the
5    faculty position; right?
6       A  Yes.
7       Q  And then below that there's a paragraph it says
8    dismissal, right?
9       A  Mm-mm.
10         MS. PEET:  Is that a yes?
11         THE WITNESS:  Yes, it is a yes.
12   BY MR. COHEN:
13      Q  It says if remedial actions taken during the
14   suspension does not sufficiently resolve the issues
15   that lead to the suspension, the university may move
16   towards dismissal of the faculty member; right?
17      A  Yes.
18      Q  So doesn't that suggest that if a suspension is
19   not appropriate, that the university cannot even try to
20   terminate an employee?
21         MS. PEET:  Objection to the form.  You can
22   answer if you know.
23         THE WITNESS:  I don't know.  We do say
24   here, we do say that the -- we do say in the final

Page 68

1    sentence Doctor Fagal's egregious violation of our core
2    values especially the value of respect has caused grave
3    and irreparable harm to our community.  And above in --
4    under charge one; we are in agreement that Sister Anne
5    Munley is justified in saying that Doctor Fagal's
6    actions constitute such an injury.
7    BY MR. COHEN:
8       Q  Okay.  Now, going back to this dismissal
9    paragraph in Bittel Exhibit 5.
10      A  Okay.
11      Q  It mentions if remedial action is taken during
12   the suspension, right?
13      A  Right.
14      Q  Now, your committee could not have determined
15   whether remedial actions taken during the suspension
16   resolved any issues that led to the suspension, right?
17         MS. PEET:  Objection.  This is a complete
18   mischaracterization of testimony.  She already
19   testified that they confirmed that remediation was not
20   appropriate here.  So what you're asking her is you're
21   assuming what she said I think forgetting about it.
22   She clearly talked about the remediation and how it
23   impacts this case.
24         THE WITNESS:  Yes.  We determined that

Page 69

1    remediation, though the policy makes it possible does
2    not say it has to be offered in every situation and we
3    determined that this was not a situation where
4    remediation was a fruitful avenue or was justified.
5    BY MR. COHEN:
6       Q  So based on that view it was the committee's
7    opinion that President Munley could move directly from
8    suspension to termination?
9       A  She did not need to offer remediation before
10   moving to termination, no, because remediation is not a
11   guarantee.
12      Q  We're coming back to Bittel 15, paragraph C
13   begins Doctor Fagal is given the opportunity to explain
14   his video; do you see that?
15      A  Yes.  This is the section where we give the
16   background to our discussion of charges.
17      Q  And again this paragraph doesn't account,
18   couldn't account for the fact that Doctor Fagal had
19   asked for an opportunity to explain himself in writing;
20   correct?
21      A  Correct.
22      Q  Because you didn't know that?
23      A  We did not know that.
24      Q  On the second page under charge two, again it



Page 70

1 says at the bottom the charge two it says while Doctor
2 Fagal is correct in saying that he was not given an
3 opportunity to respond to this point, there might have
4 been one if he had answered Sister Anne Munley's
5 questions on 23 January 2012 or if he had sought out
6 additional opportunities to explain his actions in a
7 subsequent meeting; right?
8    A  Correct.
9    Q  And again this is not correct because -- let me
10 rephrase. If it is true that Doctor Fagal had asked
11 for an opportunity to explain his -- himself in
12 writing, this would not be correct; right?
13    A  That last sentence would not be correct, but the
14 other pieces of the evaluation would still stand;
15 right. The first piece that says we didn't think that
16 all insults qualify as Civil Rights violations and then
17 our explanation of why it might apply in one case. So
18 that point only applies to his charge that he didn't
19 get an opportunity to respond to that point.
20        MR. COHEN: Let's call this Bittel 16
21 please.
22        (Whereupon Bittel Exhibit 16 was marked for
23 identification.)
24           - - -

Page 71

1 BY MR. COHEN:
2    Q  And can you read this to yourself and let me
3 know when you're finished.
4    A  I've read it.
5    Q  Do you recognize this?
6    A  I do recognize it.
7    Q  And you received this document?
8    A  Yes, I did.
9    Q  In this e-mail, this is an e-mail from Professor
10 Fagal to you and the other committee members. He's
11 essentially requesting that your committee convene to
12 review the appropriateness of his suspension, right?
13    A  Correct.
14    Q  Following your receipt of this e-mail, you did
15 not in fact reconvene to review the appropriateness of
16 the suspension; right?
17    A  No, we did not.
18    Q  Do you need to take a break?
19    A  I'm good.
20        MR. COHEN: Let's make this Bittel 17.
21        (Whereupon Bittel Exhibit 17 was marked for
22 identification.)
23 BY MR. COHEN:
24    Q  Could you read this to yourself please and let

Page 72

1 me know when you're finished.
2    A  Yes. Okay. I've read this.
3    Q  On the second page there's -- it appears to be
4 an e-mail from you to Doctor Dunleavy dated July 10,
5 2012 at 10:04 a.m., correct?
6    A  Yes.
7    Q  This is in fact an e-mail that you wrote,
8 correct?
9    A  Yes.
10        MR. COHEN: Can you make this Bittel 18.
11        (Whereupon Bittel Exhibit 18 was marked for
12 identification.)
13 BY MR. COHEN:
14    Q  I just want to know if you can confirm that this
15 is your e-mail?
16    A  This is my e-mail.
17    Q  That's all I have.
18        MS. PEET: I have no questions for you.
19 Thank you very much.
20        (Whereupon the deposition of Helen Bittel
21 concluded at 12:39 p.m.)
22
23
24

Page 73

1            CERTIFICATE
2 COMMONWEALTH OF PENNSYLVANIA
         ) SS:
3 COUNTY OF WYOMING       )
4   I, Christine A. Messner, do hereby certify that
before me, a Notary Public in and for the
5 Commonwealth aforesaid, personally appeared Helen
Bittel, Ph.D., who then was by me first duly cautioned
6 and sworn to testify the truth, the whole truth, and
nothing but the truth in the taking of his oral
7 deposition in the cause aforesaid; that the testimony
then given by him as above set forth was by me reduced
8 to stenotypy in the presence of said witness, and
afterwards transcribed by means of computer-aided
9 transcription.
  I do further certify that this deposition
10 was taken at the time and place in the foregoing
caption specified, and was completed without
11 adjournment.
  I do further certify that I am not a relative,
12 counsel or attorney of either party, or
otherwise interested in the event of this action.
13
IN WITNESS WHEREOF, I have hereunto set my hand and
14 affixed my seal of office at Factoryville,
Pennsylvania, on this ___ day of _____, 2016.
15
16     _____
    Christine A. Messner, Notary Public
17     In and for the Commonwealth of Pennsylvania
    My commission expires April 10, 2017
18           - - -
19
20
21
22
23
24



Page 74

```
1    COMMONWEALTH OF PENNSYLVANIA )    E R R A T A
     COUNTY OF WYOMING       )      S H E E T
2

     I, Helen Bittel, Ph.D., have read the foregoing
3    pages of my deposition given and wish to make the
     following, if any, amendments, additions, deletions or
4    corrections:
5    Page/Line   Should Read       Reason for Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19   In all other respects, the transcript is true and
     correct.
20
     _____
21   Helen Bittel
22   Subscribed and sworn to before me this _____ day of
     _____, 2016.
23
     _____
24            Notary Public
```

Page 75

```
1    October 10, 2016
2    Jackson Lewis
     Three Parkway, 1601 Cherry Street, Suite 1350
3    Philadelphia, Pennsylvania 19102
     ATTN:  Stephanie J. Peet, Esquire
4
             NOTICE OF NON-WAIVER OF SIGNATURE
5
     Please have the deponent read his deposition
6    transcript.  All corrections are to be noted on the
     preceding Errata Sheet.  Upon completion of the above,
7    the deponent must affix his signature on the Errata
     Sheet, and it is to then be notarized.  Please forward
8    the signed original of the Errata Sheet to Jonathan Z.
     Cohen, Esquire, for attachment to the original
9    transcript, which is in his possession, copying all
     other counsel and myself.
10
     As per the rules, if the witness does not sign the
11   signature page within 30 days after receipt of the
     transcript, signature is deemed waived.
12
13
     Christine A. Messner
14   Court Reporter
15
16
17
18
19
20
21
22
23
24
```



# Exhibit 48





**Redacted:**
**Attorney Client Privilege**

From: **Bittel, Helen** <bittel@maryu.marywood.edu>
Date: Fri, May 18, 2012 at 4:03 PM
Subject: Ad Hoc Business
To: Dr Patricia E Dunleavy <dunleavy@maryu.marywood.edu>

Dear Pat,

I just wanted to let you know (in case you need to know and to make sure we are moving appropriately) that, during yesterday's meeting, we agreed that our charge should be the review of substance the termination and denial of tenure charges. We understood that the issues of suspension and procedure were resolved by the FGC.

We would also like to see Fred's personnel file, if that is not privileged. We agreed, following our discussion, that the issue of whether there is a history of progressive discipline is germane to the termination charge (though not necessarily to the suspension).

Thank you for your support and consideration.

Best,
helen

--
Helen M. Bittel, Ph.D.
Associate Professor and Chair
Department of English
Marywood University
2300 Adams Ave.
Scranton, PA 18509

--
Patricia E. Dunleavy, Ph.D.
Assistant Vice President for Human Resources
Title IX Coordinator
Marywood University
2300 Adams Avenue

DEF001749

Scranton PA 18509
dunleavy@marywood.edu
570-348-6220 phone
570-961-4740 fax

--
Patricia E. Dunleavy, Ph.D.
Assistant Vice President for Human Resources
Title IX Coordinator
Marywood University
2300 Adams Avenue
Scranton PA 18509
dunleavy@marywood.edu
570-348-6220 phone
570-961-4740 fax

**Redacted:**
**Attorney Client Privilege**

--
Patricia E. Dunleavy, Ph.D.
Assistant Vice President for Human Resources
Title IX Coordinator
Marywood University
2300 Adams Avenue
Scranton PA 18509
dunleavy@marywood.edu
570-348-6220 phone
570-961-4740 fax

--
Patricia E. Dunleavy, Ph.D.
Assistant Vice President for Human Resources
Title IX Coordinator
Marywood University
2300 Adams Avenue
Scranton PA 18509
dunleavy@marywood.edu
570-348-6220 phone
570-961-4740 fax

--

Patricia E. Dunleavy, Ph.D.
Assistant Vice President for Human Resources
Title IX Coordinator
Marywood University
2300 Adams Avenue
Scranton PA 18509
dunlcavy@marywood.cdu
570-348-6220 phone
570-961-4740 fax

DEF001751

# Exhibit 49




**Minutes. Ad Hoc Committee Meeting #2. May 17, 2012. 2-4p**

**Guest:** Erin Sadlack, Chair of the Faculty Grievance Committee, with permission from PD and WJA.

Erin was invited to the meeting so that she could explain the scope of the work already done by the FGC. She opening by saying that when their group was convened, they were given the analogy of a grand jury, charged with determining whether a grievance is justifiable and worth moving forward. That group spent hours going over the documentation and understood that their decision was supposed to be final.

Helen asked Erin to explain more directly what the charge of the committee was and what questions they were supposed to answer.

EAS referred us to the PPM/FGA Section #4. The FGC notified SAM that a grievance was filed. They were charged with finding whether the grievance was justified and should go forward. They didn't meet with SAM or FF.

She explained that the FGC responded to 5 points made by FF in claiming that his suspension was improper because procedure was not followed. **Their charge was to review whether procedure was properly followed,** not to review the substance of SAM's decisions to suspend and to later terminate. **Their procedural review was limited to the charge of suspension,** not termination and revocation of tenure.

The committee's decision addressed points of procedure and affirmed that, in the case of FF's suspension:

- The President (and not only the VPAA) can suspend and can recommend dismissal

- "Harm" can take many forms

- The PPM does not guarantee the right to remedial action (prior to suspension)

- The PPM does not guarantee the right to appeal suspension, only termination

The FGC informally (via Sr. Gail) advised FF to ask the ad hoc committee to review the substance of the termination charge. FF was very clearly told by EAS that the suspension was no longer appealable according to the PPM.

Erin understands that the decisions of the two committees cannot themselves be grieved.

After Erin left, we concluded that we (the AHC) are charged with reviewing the substance of the termination charge (dismissal and revocation of tenure).

Looking at the PPM: Progressive Discipline, we agreed that the policy recognizes problems that MAY BE remediated but does not imply that all problems can be remediated. That i

the right to remediation is not guaranteed.

**Some of the questions we will consider going forward include:**

- Can and should FF's problem (re: the video) be remediated? Who gets to decide whether a particular problem is remediable?

- Did FF in essence reject or refuse remediation, especially in his meeting with SAM on 1/23, when he refused to discuss the video?

- Should FF's production and dissemination of the video be understood as a personal problem (e.g. anger management) analogous to the kind of potentially remediable problems described in the Progressive Discipline policy (e.g. addiction, mental health crisis)?

- Does the video (understood as an escalation of inappropriate behavior) represent a failure of the progressive discipline system at Marywood?

- Where does what happened fit or not fit with the causes for revocation of tenure outlined in the Faculty Manual?

**Actions:**

- Helen will email PD and let her know that we understand our charge to be the review of substance the termination and denial of tenure charges. We understand that the issues of suspension and procedure were resolved by the FGC.

- After some discussion, we decided that it would be very helpful to see FF's personnel file because the question of whether there is a history of progressive discipline (or whether this is a "first offense") are germane. Helen will ask PD for access.

- Because the guidelines around revoking tenure are very sparse and out of sync with AAUP recommendations, we will, after we have resolved this case, ask Faculty Senate to ask for a revision to that section of the Faculty Manual.

# Exhibit 50

EXHIBIT

50

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

- - -

FREDERICK F. FAGAL, JR.      : CIVIL ACTION
                             :
            Plaintiff,       : NO. 3:14-cv-02404-ARC
                             :
     vs.                     : (JUDGE CAPUTO)
                             :
MARYWOOD UNIVERSITY,         :
                             :
            Defendant.       :


— — —

June 28, 2016
- - -


          Oral deposition of Mathew R.
Povse, taken pursuant to notice, was held at
the Radisson Lackawanna Station Hotel, Suite
206, 700 Lackawanna Avenue, Scranton,
Pennsylvania, commencing at 3 p.m., on the
above date, before Judy A. Black, a Registered
Professional Court Reporter and Notary Public
in and for the Commonwealth of Pennsylvania.




          - - -


          MAGNA LEGAL SERVICES

     Seven Penn Center, 8th Floor

        1635 Market Street

   Philadelphia, Pennsylvania 19103

        (866) 624-6221



Page 2

APPEARANCES:
JONATHAN Z. COHEN, LTD
  BY:  JONATHAN Z. COHEN, ESQUIRE
  175 Strafford Avenue
  Suite 1 PMB 212
  Wayne, PA 19087
  (215) 874-0047
  Attorneys for Plaintiff

JACKSON LEWIS, P.C.
  BY:  STEPHANIE J. PEET, ESQUIRE
  Three Parkway
  1601 Cherry Street, Suite 1350
  Philadelphia, PA 19102
  (267) 319-7802
  Attorneys for the Defendant


ALSO PRESENT:

  FREDERICK F. FAGAL, JR.
  PATRICIA DUNLEAVY

MAGNA LEGAL SERVICES

Page 4

Povse-6  Document, Bates Nos.        19
         DEF000143-144

Povse-7  E-mail chain, Bates Nos.     20
         DEF000353-356
Povse-8  Faculty Grievance Committee  22
         Meeting, June 19, 2012, Bates
         Nos. DEF001510-512
Povse-9  E-mail dated June 25, 2012, Bated  28
         No. DEF000393

Povse-10  E-mail Bates No. DEF0024530    30

Povse-11  E-mail dated July 2, 2012, with  31
          attachment, Bates Nos.
          DEF001515-521

Povse-12  E-mail dated July 5, 2012, with  31
          attachment, Bates Nos.
          DEF001585-590

Povse-13  E-mail dated July 6, 2012, with  38
          attachment, Bates Nos.
          DEF001494-496

Povse-14  E-mail chain, Bates Nos.        42
          DEF001611-615
Povse-15  E-mail dated July 15, 2012, Bates  44
          No. DEF001513

MAGNA LEGAL SERVICES

Page 3

– – –
I N D E X
– – –

Testimony of:  Mathew R. Povse

DIRECT  CROSS  REDIRECT  RECROSS

By Mr. Cohen  5        47

By Ms. Peet      44      49

E X H I B I T S
– – –

NUMBER   DESCRIPTION              PAGE
Povse-1   Letter dated February 8, 2012,   10
          with attachments, Bates Nos.
          DEF000207-226
Povse-2   E-mail dated May 6, 2012, with   11
          attachments, Bates Nos.
          DEF001433-442
Povse-3   Minutes for Ad Hoc Committee     12
          Meeting #1, May 11, 2012, Bates
          Nos. DEF001408-509
Povse-4   Minutes for Ad Hoc Committee     16
          Meeting #2, May 17, 2012, Bates
          Nos. DEF000322-323
Povse-5   E-mail dated May 22, 2012, with  18
          attachments, Bates Nos.
          DEF000337-342

MAGNA LEGAL SERVICES

Page 5

- - -
DEPOSITION SUPPORT INDEX
- - -

Direction to Witness Not to Answer
Page Line    Page Line    Page Line
None

Request for Production of Documents
Page Line    Page Line    Page Line
None

Stipulations
Page Line    Page Line    Page Line
5    1

Question Marked
Page Line    Page Line    Page Line
None

MAGNA LEGAL SERVICES



Page 6

```
 1              - - -
 2          STIPULATIONS
 3              - - -
 4       IT IS STIPULATED by and between counsel
 5  that the Deposition of Mathew R. Povse, is
 6  being taken pursuant to agreement and that all
 7  objections, except as to form, are reserved
 8  until the time of trial.  Mathew R. Povse does
 9  not waive the reading, signing, and filing of
10  the Deposition.
11              - - -
12          M A T H E W   R.   P O V S E,
13  having been duly sworn, was examined and
14  testified as follows:
15              - - -
16  DIRECT EXAMINATION BY MR. COHEN:
17       Q.    Mr. Povse, my name is Jonathan Cohen.  I
18  represent Frederick F. Fagal, Jr.
19           Have you ever had your deposition taken?
20       A.    No.
21       Q.    Okay.  The way it works, as I'm sure
22  Stephanie has explained to you, is that I ask you
23  questions and you're supposed to answer to the best
24  of your ability and to the best of your knowledge and
```

MAGNA LEGAL SERVICES

Page 7

```
 1  memory.  If my question is not clear to you, feel
 2  free to tell me that and I'll try to rephrase.  If
 3  you think you can anticipate my question, I would
 4  still ask that you wait until I'm finished, because
 5  the court reporter has to take everything down.  Two
 6  people talking at once is a mess.
 7           Also, your attorney, you know, once I'm
 8  finished asking a question, Ms. Peet over here may
 9  want to make an objection, and she may or may not
10  want you to answer the question.
11           Is all that clear to you?
12       A.    Um-hum.
13       Q.    And you understand today that you're
14  under the same oath today that you would be in a
15  courtroom?
16       A.    Yeah.
17       Q.    Is there anything that would prevent you
18  from thinking clearly and testifying truthfully
19  today, such as medication?
20       A.    No.
21       Q.    And if at any time you need to take a
22  break during the deposition, just let me know.
23       A.    Yeah.
24       Q.    What is your educational background,
```

MAGNA LEGAL SERVICES

Page 8

```
 1  Mr. Povse?
 2           Do you want me to call you Mr. Povse or
 3  Mat?
 4       A.    Mat is fine.
 5           What is my educational background?
 6       Q.    Yes.
 7       A.    I have one bachelor's degree in fine
 8  arts and two MFAs, graduate degrees, in fine arts.
 9       Q.    And what are those degrees?
10       A.    They specialize in ceramics and
11  sculpture.
12       Q.    I mean, is it like a master's degree?
13       A.    Yeah, BFA, bachelor of fine arts, and
14  two master's of fine arts, which is considered a
15  terminal degree in the visual arts area.
16       Q.    And you are currently employed by
17  Marywood University?
18       A.    I am ending -- I am currently employed
19  and close to the end.  I'm retiring.
20       Q.    Oh, really?
21       A.    Yes.
22       Q.    For how long have you worked for
23  Marywood?
24       A.    I believe it's around 27 years,
```

MAGNA LEGAL SERVICES

Page 9

```
 1  approximately.
 2       Q.    And are you a tenured professor?
 3       A.    Yes.
 4       Q.    When did you attain tenure?
 5       A.    I can't really tell you that.  I don't
 6  remember.
 7       Q.    So long ago --
 8       A.    I have a bad memory, I have to warn you.
 9       Q.    Okay.  Is this the first time you are
10  seeing my client, Professor Fagal?
11       A.    Well, I think, actually I -- up to this
12  point I did not put together the face and the name.
13  Now that I've seen you walk in, I remember seeing you
14  on campus, but I -- that's about it.
15       Q.    So you had never spoken to him?
16       A.    I may have said hello.
17       Q.    Okay.  And prior to what you learned as
18  serving in the committee regarding Professor Fagal,
19  you really knew nothing about him?
20       A.    Very little.
21       Q.    Did you prepare at all for today's
22  deposition?
23       A.    I looked at some of the files, notes,
24  that were accessible to me, try to refresh my memory.
```

MAGNA LEGAL SERVICES



1    Q.    And what documents did you review?
2    A.    Oh --
3    Q.    If any?
4    A.    I don't know.  Lots of letters, lots of
5    memos.  Whatever I had accessible to me.
6          MR. COHEN:  Can we also have this marked
7    as Povse-1.
8          (Povse-1, Letter dated February 8, 2012,
9    with attachments, Bates Nos. DEF000207-226, is
10   received and marked for identification.)
11   Q.    And, Mr. Povse, can you briefly review
12   this and let me know whether you recognize it?
13   A.    I -- this is from -- I think I've seen
14   it.
15   Q.    Is this the statement of charges that
16   President Munley made against Professor Fagal and
17   that your committee was asked to review?
18   A.    I would say -- I would say yes.
19   Q.    Okay.  And you served on what's called
20   an ad hoc committee, correct?
21   A.    Yes.
22   Q.    And that committee consisted of you,
23   Edward O'Brien and Helen Bittel, correct?
24   A.    Yes.

1    Q.    And the job of your committee was to
2    adjudicate the charges that President Munley lodged
3    against Professor Fagal, correct?
4    A.    To an extent.
5    Q.    What do you mean by "to an extent"?
6    A.    We were to look at the substantive
7    portion of the charge, not the procedural, so --
8    Q.    Okay.
9    A.    That's what we were looking at.
10         MR. COHEN:  Can you mark O'Brien-5 also
11   as Povse-2.
12         (Povse-2, E-mail dated May 6, 2012, with
13   attachments, Bates Nos. DEF001433-442, is received
14   and marked for identification.)
15   Q.    And can you briefly review this and let
16   me know whether you recognize this document?
17   A.    It looks familiar.
18   Q.    Would you say that this is Professor
19   Fagal's written defense to President Munley's
20   charges?
21   A.    Well, it's his explanation.
22   Q.    Okay.  Did you review this document in
23   preparing for today's deposition?
24   A.    I've seen it.  I don't know -- I didn't

1    review much of anything for this --
2    Q.    But you've --
3    A.    -- for this meeting.  But I've seen
4    this.
5    Q.    Do you remember reading the whole thing
6    at any time?
7    A.    Well, I prob -- I'm sure that I read it
8    when we were meeting.  And, again, you know, there
9    was so much information that we had that I can't
10   recall.  But I would -- whatever information we were
11   given, I could assure you that I read at the time we
12   were meeting for that committee.
13   Q.    Okay.
14         MR. COHEN:  Let's take O'Brien-6 and
15   call it also Povse-3.
16         (Povse-3, Minutes for Ad Hoc Committee
17   Meeting #1, May 11, 2012, Bates Nos. DEF001408-509,
18   is received and marked for identification.)
19   Q.    Mr. Povse, do you recognize this
20   document?
21   A.    It looks familiar.  Yeah.
22   Q.    What is it?
23   A.    Minutes from our -- looks like our first
24   meeting.

1    Q.    Do you know who made the comments on the
2    right side of the page?
3    A.    No.  Let me -- no.
4    Q.    Okay.  But you know that it wasn't you?
5    A.    No, I can't really say.
6    Q.    Okay.  On the first paragraph, last
7    sentence, there's a sentence that begins, "Helen
8    knows FF casually."  Do you see that?
9    A.    Yeah.  Yeah.
10   Q.    And then it says, "Some of her
11   conversations with him have been, quote, strange, but
12   the relationship has been collegial."  Do you
13   remember Helen explaining what she meant by having
14   strange conversations with Professor Fagal?
15   A.    No, I don't remember.  I don't remember
16   if she expounded on that.
17   Q.    If you look down at the bottom of this
18   page, it says, "5/3," which I guess is for May 3rd,
19   "AHC meets with HR and Sister Gail."  Do you -- and
20   AHC means ad hoc committee, correct?
21   A.    Correct.
22   Q.    And do you remember meeting with HR and
23   Sister Gail?
24   A.    I know we did.  That's about all I



1  remember.
2     Q.   Do you remember what was discussed at
3  that meeting?
4     A.   No.
5     Q.   And you know that Patricia Dunleavy is
6  head of HR for Marywood, right?
7     A.   Yes.
8     Q.   And was at that time, right?
9     A.   Yes.
10    Q.   Do you remember asking Dr. Dunleavy
11 whether there would be two committees for Professor
12 Fagal, one to review his suspension and one for
13 termination?
14       MS. PEET:  As stated, I think it's
15 confusing and implies facts not in evidence.
16       If you understand the question, you can
17 go ahead and answer it.
18    A.   Repeat your question again.
19    Q.   At any time do you recall asking
20 Dr. Dunleavy whether there would be two committees to
21 review the discipline imposed on Professor Fagal, one
22 of them to review his suspension and the other for
23 termination?
24       MS. PEET:  Same objection.  You can

1  was mentioned somewhere along the line.
2     Q.   How did his name first come up for you?
3     A.   I don't know.
4     Q.   This meeting with Dr. Dunleavy and
5  Sister Gail, did the name Jackson Lewis come up?
6     A.   Jackson Lewis?
7     Q.   Yes.
8     A.   Doesn't sound familiar.
9     Q.   Okay.
10       MR. COHEN:  We'll take O'Brien-7 and
11 mark this as Povse-4, please.
12       (Povse-4, Minutes for Ad Hoc Committee
13 Meeting #2, May 17, 2012, Bates Nos. DEF000322-323,
14 is received and marked for identification.)
15    Q.   Mr. Povse, can you -- why don't you read
16 this entire document to yourself and let me know when
17 you're finished.
18    A.   All right.  Okay.
19    Q.   Have you ever seen this before?
20    A.   Yeah.  Yeah, looks familiar.
21    Q.   Did you review this document for today's
22 deposition?
23    A.   No.
24    Q.   Do you think this accurately reflects

1  answer.
2     Q.   Unless your attorney says -- instructs
3  you not to answer, you pretty much have to answer.
4  To the best of your ability.
5        MS. PEET:  Yes.
6     A.   Okay.  I don't --
7     Q.   You don't remember?
8     A.   I don't remember.  That's the problem.
9     Q.   Do you remember --
10    A.   If this was a meeting right at the very
11 start of this committee, I doubt very much if I asked
12 that question, since I knew so very little in the
13 beginning.
14    Q.   Do you remember anybody else on the
15 committee asking that question?
16    A.   No.
17    Q.   Do you remember the name Will Anthony?
18    A.   Yeah.
19    Q.   Did you -- at this meeting with HR and
20 Sister Gail, did you discuss the possibility of
21 talking to Will Anthony?
22    A.   I'm not sure his name came up at that
23 meeting.  I know -- I'm aware that he was an attorney
24 associated with Marywood, and I know that his name

1  what occurred during the May 17, 2012 meeting?
2        MS. PEET:  Objection to form.  You can
3  answer.
4     A.   I could -- I would -- you know, trying
5  to reach back that far, I'm going to say yeah.
6     Q.   Let me ask it this way:  Do you have any
7  reason to doubt the accuracy of any part of this?  Is
8  there any part of it that stands out as unlikely or
9  inaccurate to you?
10    A.   No.
11    Q.   Now, on the second page -- scratch that.
12       On the second page, do you see the
13 heading "Actions"?
14    A.   Yeah.
15    Q.   And then there's several bullet points
16 under each.  The first bullet point says, "Helen will
17 e-mail TD."  Do you see that?
18    A.   Um-hum.
19    Q.   Does this bullet point also reflect your
20 understanding of the role of your committee?
21    A.   Yeah.
22    Q.   And how did you form that understanding?
23    A.   How did I form that?  How did I -- I
24 guess it was based -- and, again, I'm trying to



Page 18

1    recall all this, but I would assume it was based on
2    all of the information of -- that we were given as
3    far as our charge is concerned.
4         Q.    Was it also based partly on advice you
5    received from Erin Sadlack?
6              MS. PEET:  Objection to --
7         A.    I don't remember.
8              MS. PEET:  Objection to form.
9         Q.    Do you know who Erin Sadlack is?
10        A.    Yeah.
11        Q.    And she was a guest --
12        A.    Right.
13        Q.    -- at this meeting, correct?
14        A.    Right, right.
15        Q.    Do you actually remember her being
16   there?
17        A.    Well, I remember her being there, yeah.
18   That's probably about it.  I do remember I met with
19   her.
20             MR. COHEN:  O'Brien-8, could we have
21   this marked, please, as Povse-5, as well.
22             (Povse-5, E-mail dated May 22, 2012,
23   with attachments, Bates Nos. DEF000337-342, is
24   received and marked for identification.)

MAGNA LEGAL SERVICES

Page 19

1         Q.    Do you recognize this document,
2    Mr. Povse, as well as the attachments?
3         A.    Yeah.
4         Q.    Yes?
5         A.    Yes.
6         Q.    In these attachments -- these
7    attachments appear to be minutes for ad hoc committee
8    meetings, correct?
9         A.    Um-hum.
10        Q.    And there are comments on the right side
11   of each --
12        A.    Yes.
13        Q.    -- document.
14             Do you know whether these comments were
15   ever adopted into the final version of these minutes?
16        A.    No.
17        Q.    Okay.
18             MR. COHEN:  Let's take O'Brien-11 and
19   also mark it as Povse-6, please.
20             (Povse-6, Document, Bates Nos.
21   DEF000143-144, is received and marked for
22   identification.)
23        Q.    Do you recognize this document,
24   Mr. Povse?

MAGNA LEGAL SERVICES

Page 20

1              MS. PEET:  Is that also a Sadlack
2    document?
3              MR. COHEN:  Yes.
4              MS. PEET:  And it's Povse what?
5              MR. COHEN:  6.
6         A.    I don't -- I don't recall it, to be
7    honest with you.  I may have seen it.  If it was
8    given to us, I saw it, but I don't remember it.
9         Q.    Okay.
10             MR. COHEN:  Can we take O'Brien-9 and
11   mark this as Povse-7, as well, please?
12             (Povse-7, E-mail chain, Bates Nos.
13   DEF000353-356, is received and marked for
14   identification.)
15        Q.    Do you recognize any part of this
16   document, Mr. Povse?  You might have to take some
17   time to review it.
18        A.    It looks familiar.
19        Q.    Part of this on the first page, there's
20   an e-mail from Dr. O'Brien to you and Helen dated
21   June 2nd, 2012, right?
22        A.    Um-hum.  Um-hum.
23        Q.    Do you remember receiving this?
24        A.    Yeah.

MAGNA LEGAL SERVICES

Page 21

1         Q.    And the second paragraph that begins,
2    "My current inclination," could you read that to
3    yourself and let me know when you've finished?
4         A.    Okay.
5         Q.    So this paragraph has four questions or
6    topics that Dr. O'Brien wanted to raise with
7    President Munley, correct?
8         A.    Um-hum.
9              MS. PEET:  Objection to the form.
10        Q.    And do you know whether, in fact,
11   anybody on your committee ever asked these questions
12   of President Munley?
13        A.    I know I didn't.  I really -- again, I
14   apologize, but I cannot remember.  I -- I can't
15   remember.  I know I didn't.  I know these were issues
16   that we talked about, and I would think that -- that
17   someone did.
18        Q.    Do you remember whether President Munley
19   ever met with your committee?
20        A.    I don't remember -- I know she didn't
21   meet with me.
22        Q.    Not with you?
23        A.    Not with me, no.
24        Q.    But you don't know whether she met with

MAGNA LEGAL SERVICES



1  someone --
2      A.   I don't.  I swear I don't.
3      Q.   That's okay.  But you don't know if she
4  met with someone else on the committee without you
5  there?
6      A.   I don't remember.
7      Q.   And on the next paragraph, it begins, "I
8  also think we may want to interview Fred by phone."
9      A.   Um-hum.
10     Q.   You don't remember ever interviewing
11 Fred by phone, right?
12     A.   No.  No.
13     Q.   And no one else on the committee did,
14 either, right?
15     A.   That, I don't know.  I know I never
16 talked to Fred.
17     Q.   You don't remember a decision ultimately
18 being made on whether to interview him, Fred, at all?
19     A.   No.
20          MR. COHEN:  Okay.  Can we make
21 O'Brien-12 Povse-8.
22          (Povse-8, Faculty Grievance Committee
23 Meeting, June 19, 2012, Bates Nos. DEF001510-512, is
24 received and marked for identification.)

1      Q.   And could you read this to yourself and
2  let me know when you're finished?
3      A.   All right.
4      Q.   Have you ever seen this document before?
5      A.   Yes, it looks familiar.
6      Q.   Did you generate this document?
7      A.   Did I generate it?  I don't know.
8      Q.   You're not sure if you did?
9      A.   Hmm?
10     Q.   You're not sure if you did?
11     A.   No, I don't know.  I may have been the
12 note taker that day.
13     Q.   And on the third paragraph, the one that
14 begins, "We then took our first vote," and the last
15 sentence of that paragraph says, "Povse expressed
16 agreement with these but also wondered whether the
17 administration has since had any second thoughts
18 about their decision."  Did I read that correctly?
19     A.   Yes.
20     Q.   Do you remember expressing those
21 sentiments?
22     A.   I -- the minute I read this, I realized
23 that it's -- in my opinion, it's out of context.  I
24 have no idea right now why I said that.  I have no

1  idea what that was based on.  I don't remember.  I
2  have no idea.
3      Q.   Well, as you sit here today, do you
4  wonder whether Marywood's administration has had any
5  second thoughts about terminating Fred?
6      A.   No, no, and I certainly have no second
7  thoughts as far as my personal vote.  So, again, I
8  don't know what that referred to and I cannot
9  remember.
10     Q.   Okay.  On the last page, last two
11 paragraphs say, "Povse will contact Anne Munley and
12 apprise her of our progress."
13     A.   Um-hum.
14     Q.   Do you remember actually contacting Anne
15 Munley?
16     A.   Yes.  Yeah.
17     Q.   Why was that something you wanted -- or
18 the committee wanted to do, keep President Munley
19 apprised of the progress?
20     A.   I'm not sure.  We might have -- I don't
21 know.  I don't know what -- if there was a deadline
22 we were working towards or what.  I don't know.
23     Q.   Did you think it was important at all --
24 did you think about keeping Professor Fagal apprised

1  of the progress of the committee?
2      A.   I would have to say I don't -- I don't
3  know what I was thinking of at the time, but I would
4  say I wouldn't have thought it was appropriate at
5  that point.
6      Q.   Why was it appropriate to keep President
7  Munley advised at that point of the committee's
8  progress?
9      A.   I guess it was just to notify her that
10 we had more or less come to a decision for what our
11 committee was charged.
12     Q.   Did you come to a decision before
13 actually issuing a formal decision?
14     A.   Yeah.  Well, whatever was here.
15     Q.   Did you view your -- the committee's
16 role as simply a formality that you had to go through
17 before President Munley could get the decision she
18 wanted, or no?
19     A.   I didn't consider it to be a mere
20 formality at all.  I mean, I realize the seriousness
21 of this whole event, so -- I mean, it was a process
22 that was part of the whole thing.
23     Q.   Then the next sentence, it says, "After
24 we workshop our draft, we will send it to Will



1    Anthony for comment."  Do you know if the committee
2    did, in fact, send the draft to Will Anthony for
3    comment?
4        A.    I don't remember.
5        Q.    Do you remember receiving anything from
6    Will Anthony in writing in response to the draft?
7        A.    No.
8        Q.    And why did you think it was important
9    or useful to send Will Anthony -- or to even plan on
10   sending Will Anthony a draft for comment?
11       MS. PEET:  Objection to the form.
12       THE WITNESS:  Pardon me?
13       MS. PEET:  Objection to the form.  I'm
14   just noting it for the record.  You can answer.
15       A.    I can answer.  Well, I guess he was the
16   school attorney.  You know, I guess that he was part
17   of the whole process.
18       Q.    The next sentence, or it's more of a
19   question, says, "Is he an independent voice or does
20   he work for Munley/Marywood?"  Is that a thought that
21   occurred to you, whether he was an independent?
22       A.    That seems -- that's curious, that
23   sentence there.  I -- I -- I don't understand that
24   question.  My understanding was that Will Anthony was

1    an attorney for the school.
2        Q.    Did you know at the time before your
3    deliberations -- before your committee deliberations
4    began, did you know that Mr. Anthony and an attorney
5    for Professor Fagal were kind of arguing out this
6    procedure in writing?
7        MS. PEET:  Objection to form.
8        A.    No.
9        Q.    So you don't know that there was, like,
10   an adversarial --
11       A.    No.  No, I didn't know anything about
12   that.
13       Q.    You knew that there was a possibility in
14   any committee review of a president -- of a
15   president's decision, there was possibility that you
16   may not agree with the president, right?
17       A.    Sure.
18       Q.    So wouldn't you agree that the interests
19   of the committee were not necessarily in line with
20   the interests of the president?
21       MS. PEET:  Objection to the form.
22       A.    Ask me that question again.
23       Q.    Wouldn't you agree that the interest of
24   your committee or any ad hoc committee reviewing a

1    professor's discipline is not necessarily the same
2    interest as the president has?
3        A.    Yeah.
4        MS. PEET:  Objection to the form.
5        Q.    You would agree?
6        A.    Yeah.
7        Q.    So that in that case, you didn't cite as
8    part of a -- of a conflict of interest for your
9    committee to be showing a draft of your deliberations
10   to the university's attorney?
11       MS. PEET:  Objection to the form.
12       A.    No.
13       Q.    Did you think the university's attorney
14   was sharing what he learned with President Munley?
15       MS. PEET:  Objection to the form.  Calls
16   for speculation, lack of foundation, calls for
17   consideration of evidence not on the record.
18       A.    I don't know.  I may not have been
19   considering that.
20       MR. COHEN:  Okay, let's take O'Brien-13
21   and mark it whatever we're up to in Povse.
22       (Povse-9, E-mail dated June 25, 2012,
23   Bated No. DEF000393, is received and marked for
24   identification.)

1        Q.    Mr. Povse, do you recognize this
2    document?  I'll give you a chance to review it.
3        A.    It looks familiar.
4        Q.    And do you remember, in fact, providing
5    a draft of your response to Mr. Anthony?
6        A.    No, I don't, but I have to assume that
7    we did.
8        Q.    And why did you feel the need to advise
9    Sister Anne that your committee's report would be in
10   support of her actions in Professor Fagal's case?
11       MS. PEET:  Objection to form.
12       A.    Common courtesy.
13       Q.    What about common courtesy to Professor
14   Fagal?
15       MS. PEET:  Object to the form.
16       A.    Again, I -- I was under the impression
17   that we -- you know, we were working for the school.
18   In a way, we were charged, and in our charge, we
19   weren't told to keep Dr. Fagal in the loop.
20       Q.    Were you told to keep President Munley
21   in the loop?
22       A.    I don't think so.  I think this was just
23   keeping the administration apprised of where we were.
24       MR. COHEN:  Let's have this marked as



1  Povse-10.
2       (Povse-10, E-mail Bates No. DEF00245, is
3  received and marked for identification.)
4       Q.   Why don't you briefly review this,
5  Mr. Povse, and let me know if you recognize it.
6       A.   Yeah, I guess I recognize it.  It's --
7  I'm sure.
8       Q.   Do you remember sending the e-mail on
9  June 29, 2012, at 12:08 p.m. to Dr. Dunleavy?
10      A.   No, I don't remember it, but I'm sure I
11  did.
12      Q.   Do you remember receiving the e-mail
13  above it from Dr. Dunleavy?
14      A.   I don't remember, but, again, it's in
15  front of me.
16      Q.   You don't have any reason to doubt that
17  this is authentic?
18      A.   Right, right.
19           MR. COHEN:  I'd like to take O'Brien-14
20  and also mark this as Povse Exhibit 11.
21      (Povse-11, E-mail dated July 2, 2012,
22  with attachment, Bates Nos. DEF001515-521, is
23  received and marked for identification.)
24      Q.   Do you recognize this e-mail and the

1  attachment?
2       A.   Yeah, I recognize it.
3       Q.   And the attachment is your committee's
4  review of Sister Anne's decision to terminate
5  Professor Fagal's employment, correct?
6       A.   This attachment here?
7       Q.   Yes.
8       A.   Yes.
9       Q.   And do you know if this is the final
10  version?  Because it appears to me that there's still
11  track changes here.  Do you know what I mean by track
12  changes?
13      A.   No.
14      Q.   If you see the edits, like the lines on
15  the left?
16      A.   Um-hum.
17      Q.   Do you know if this was the final
18  version?
19      A.   I can't tell you.
20           MR. COHEN:  Okay, let's take O'Brien-15
21  and mark this as Povse-12, please.
22      (Povse-12, E-mail dated July 5, 2012,
23  with attachment, Bates Nos. DEF001585-590, is
24  received and marked for identification.)

1       Q.   Do you recognize this document and the
2  attachment to it?
3       A.   Yeah.
4       Q.   This is another copy of your committee's
5  review, correct?
6       A.   Um-hum.
7       Q.   But there are no edits here.  Do you see
8  that?
9       A.   Um-hum.
10      Q.   Do you know whether this was the final
11  version of your review or not?
12      A.   No.
13      Q.   Do you know if -- do you remember
14  signing a hard copy version of your review, your
15  committee's review?
16      A.   I don't remember.  I would think that I
17  did, but I don't remember.  I would think that we
18  signed off on it.
19           MS. PEET:  If you don't know, the answer
20  is you don't know.
21      A.   I don't know.
22      Q.   Would it be fair to say, Mr. Povse, that
23  your committee reviewed whether Professor Fagal's
24  termination was proper?

1       A.   Yes.
2       Q.   Would it also be fair to say that your
3  committee reviewed whether Professor Fagal's
4  suspension was proper?
5       A.   Yes.
6       Q.   In this document that we were just
7  looking at, the review of President Munley's
8  decision, do you know whether it mentions your
9  analysis of Professor Fagal's suspension?
10           MS. PEET:  Objection to the form.
11      A.   What's the question?
12      Q.   Does this review contain any analysis
13  about whether Professor Fagal's suspension was
14  appropriate?
15      A.   I don't know.  I'd have to look through
16  this.  I'd have to read it thoroughly.
17      Q.   Okay.  If it's not in there, would it be
18  fair to say that it wasn't memorialized?
19           MS. PEET:  Objection.
20      A.   No.
21      Q.   If the suspension was reviewed, would it
22  be odd for it not to be mentioned in your review?
23           MS. PEET:  Objection,
24  mischaracterization of testimony.  He just testified



Page 34

1 that it was reviewed.
2     A.    I'm getting confused here.
3         MS. PEET:  Exactly.  That's what he's
4 trying to do and I don't want you to get confused.
5     A.    Ask me that question.
6     Q.    We'll skip ahead.
7         Before your committee convened to review
8 Professor Fagal's discipline, do you recall that
9 there was another committee, a faculty grievance
10 committee, that also reviewed parts of Professor
11 Fagal's discipline?
12    A.    Yeah.
13        MS. PEET:  Objection to the form.
14    Q.    And what was your understanding of what
15 the first committee did?
16    A.    It was the procedure that they were
17 looking at the events, and I can't really say
18 that, first of all, I have a memory of exactly what
19 their job was or duties were.  I know that we did
20 meet with Erin and got more information as to their
21 committee and what they were charged with.
22    Q.    Coming back to this last exhibit with
23 the review of President Munley's decision --
24        MS. PEET:  I'm sorry, which exhibit is
        MAGNA LEGAL SERVICES

Page 35

1 it again, Povse-12?
2         MR. COHEN:  Yes.
3     Q.    Can you turn to part A of the decision,
4 the one that begins with, "We acknowledge that"?  Do
5 you see that?
6     A.    Um-hum.
7     Q.    And further down, do you see the
8 sentence that says, "We are mindful of the potential
9 or perceived threat to academic freedoms when a
10 speech violation leads to revocation of tenure"?
11    A.    Um-hum.
12    Q.    And you had a role in -- would it be
13 fair to say you had a role in generating this
14 document?
15    A.    Um-hum.
16    Q.    What did --
17        MS. PEET:  Keep your answers verbal,
18 make sure.  Is that a yes or a no?
19    A.    Yes.
20    Q.    Yes, you did have a role?
21    A.    Yes.
22    Q.    What did you mean by this sentence, "We
23 are mindful of the potential" --
24    A.    I would -- first of all, I would have to
        MAGNA LEGAL SERVICES

Page 36

1 say that the words were probably created, formulated,
2 by both Helen and Ed, because they had more talent in
3 that department, but I certainly agreed with anything
4 and everything that's -- that's in this document.  We
5 are mindful of the potential perceived threat to
6 academic freedom when a speech violation leads to
7 revocation of tenure.  I mean, it's pretty obvious
8 that, you know, that's pretty thin ice.  That's scary
9 stuff right there.  And we were certainly mindful of
10 it.
11    Q.    Would you say that Drs. Bittel and
12 O'Brien were more heavily involved in the committee's
13 deliberations than you were?
14        MS. PEET:  Objection to the form.
15    A.    They put it into words, I think, better
16 than I did, but our sentiments were the same.  We
17 were in full agreement with each other.
18    Q.    Did you feel -- let me ask it this way:
19 Do you wish that you had never served on this ad hoc
20 committee?
21        MS. PEET:  Objection to form.
22    A.    No.  No.
23    Q.    Do you feel like you were under pressure
24 to make a particular decision?
        MAGNA LEGAL SERVICES

Page 37

1     A.    No.  No.
2     Q.    And is that because you were already
3 tenured at the time?
4     A.    No, no.  No, I -- no.
5     Q.    You had no fear that a decision
6 against -- even if it did not support President
7 Munley's decision would lead to adverse consequences?
8     A.    No.
9     Q.    Why not?
10    A.    I don't know.  It didn't -- it didn't
11 enter my mind.  I don't know.  Fearless.
12    Q.    You were fearless?  That's a good
13 answer.
14        Looking back on it, do you think it
15 would have been appropriate to have more fear that
16 deciding -- making a decision that did not support
17 President Munley would have adverse consequences?
18        MS. PEET:  Objection.
19    A.    No.  And it really never entered my
20 mind.
21    Q.    You're aware that your committee had to
22 consist -- was required to consist of tenured
23 professors, right?
24    A.    Yes.
        MAGNA LEGAL SERVICES



Page 38

1    Q.   And why do you think that was?
2         MS. PEET:  Objection, calls for
3    speculation.
4         THE WITNESS:  Can I answer that?
5         MS. PEET:  Absolutely.
6    A.   That's really the process that
7    everything is decided by at a university.  I mean,
8    the tenured faculty are the most respected faculty.
9    I mean, most faculty members, if they were faced with
10   any kind of committee and decisions being made about
11   them would, I assume, prefer to have tenured faculty
12   because of their experience, dedication to the
13   school.  And that's law of the land, really, when it
14   comes to committees and all, for the most part.
15        MR. COHEN:  Okay.  This is O'Brien-16.
16   Can we mark this as the next Povse exhibit?
17        (Povse-13, E-mail dated July 6, 2012,
18   with attachment, Bates Nos. DEF001494-496, is
19   received and marked for identification.)
20        Q.   Just if you could briefly review this
21   and let me know whether you recognize it.
22   A.   Yes, I recognize it.
23   Q.   You do recognize it?
24   A.   Yes.
                 MAGNA LEGAL SERVICES

Page 39

1    Q.   And what is it?
2    A.   What is it?
3    Q.   Yes.
4    A.   It's a letter to the ad hoc committee
5    from Fred.
6    Q.   You mean it's an e-mail, right?
7    A.   Or an e-mail.
8    Q.   Dated July 6, 2012?
9    A.   Yeah.
10   Q.   And essentially Professor Fagal is
11   disappointed in your decision and he'd like you to
12   review certain aspects again, correct?
13   A.   Yeah.
14   Q.   Specifically on the last page, do you
15   see the paragraph that begins, "In light of the facts
16   above"?
17   A.   Um-hum.
18   Q.   Do you see that?
19   A.   Yes.
20   Q.   It says, "I respectfully request that
21   the committee convene to review the propriety of my
22   suspension and that it consider the issue of
23   Marywood's failure to take any remedial action prior
24   to pursuing dismissal."  Have I read that correctly?
                 MAGNA LEGAL SERVICES

Page 40

1    A.   Yes.
2    Q.   And you don't remember -- did the
3    committee respond to Professor Fagal's e-mail?
4    A.   I don't remember.
5    Q.   Did you convene again to review the
6    suspension?
7    A.   I don't think so.
8    Q.   Do you know why?
9    A.   We -- no, I don't remember.  But I would
10   say that we felt as though it wasn't necessary for
11   our committee to do that.
12   Q.   There's an -- actually there's an
13   attachment to this e-mail.
14   A.   Yeah.
15   Q.   And -- on the last page.  Do you see
16   that?  It's from Sister Cabral to Professor Fagal.
17   A.   Um-hum.
18   Q.   Do you remember reading this e-mail,
19   this attachment?
20   A.   No, I don't remember this.
21   Q.   You don't?  You don't remember receiving
22   this?
23   A.   Again, I -- it's pretty obvious that --
24   no, I don't remember.  I don't remember receiving it,
                 MAGNA LEGAL SERVICES

Page 41

1    but it --
2    Q.   Do you have any doubt that Gail Cabral
3    actually sent this e-mail to Professor Fagal?
4    A.   No.
5    Q.   Are you surprised she stated in the last
6    paragraph that the committee be convened twice?
7         MS. PEET:  Objection to the form.
8    A.   No.
9    Q.   Did your committee convene twice?
10   A.   No.
11   Q.   So do you think you were supposed to
12   convene twice or you don't know?
13   A.   I don't know.
14        MS. PEET:  Objection.
15   Q.   You don't know?
16   A.   No, I -- I was never under the
17   impression that we were supposed to convene twice,
18   never.
19   Q.   Nobody told your committee that they
20   should convene twice, once for suspension and once
21   for termination?
22        MS. PEET:  Objection to the form, lack
23   of foundation.  You can go ahead and answer.
24   A.   No, I don't remember.
                 MAGNA LEGAL SERVICES



1       MR. COHEN:  Let's mark this as the next
2  exhibit, please.  This is O'Brien-17.
3       (Povse-14, E-mail chain, Bates Nos.
4  DEF001611-615, is received and marked for
5  identification.)
6       Q.   Mr. Povse, why don't you review this.
7  It's a whole chain of e-mails.  Let me know whether
8  you recognize any of them.
9       A.   Okay.
10      Q.   Do you remember any part of -- well,
11 first of all, this is an e-mail exchange between you
12 and the other committee members, correct?
13      A.   Um-hum.
14      Q.   And it begins on July 9, 2012, right?
15      A.   July 12th?
16      Q.   July 9th.
17      A.   Oh, okay.  Yeah.
18      Q.   And the first e-mail in the chain is
19 from you to Helen and Ed, and you say, "No surprise
20 that we heard back from Dr. Fagal."  Do you remember
21 writing that e-mail?
22      A.   No, but I'm sure I did.
23      Q.   Why was it no surprise that you heard
24 back from Dr. Fagal?
MAGNA LEGAL SERVICES

1       A.   Well, because of the importance of this
2  whole decision.
3       Q.   And then the most recent e-mail in the
4  chain is one from you to Helen and Ed stating, "I
5  would prefer to get together even for a short time to
6  clarify a few things."  Do you remember --
7       A.   I don't remember what those "few things"
8  were.
9       Q.   Do you even remember meeting?
10      A.   No, I don't remember.
11      MR. COHEN:  Can you mark this as the
12 next Povse exhibit, please.
13      (Povse-15, E-mail dated July 15, 2012,
14 Bates No. DEF001513, is received and marked for
15 identification.)
16      Q.   Do you recognize this document,
17 Mr. Povse?
18      A.   Yes.
19      Q.   And this is an e-mail that Helen Bittel
20 sent to Sister Munley in which you were copied,
21 right?
22      A.   Yeah.
23      Q.   On July 15, 2012?
24      A.   Yeah.
MAGNA LEGAL SERVICES

1       Q.   And there's a paragraph that says, "In
2  coming to this decision, we made the following
3  determinations," and then there's, like, five bullet
4  points.
5       A.   Um-hum.
6       Q.   Do you know how you arrived at these
7  determinations?
8       MS. PEET:  Objection to the form.
9       Q.   Well, let me ask you this:  Dr. Bittel
10 is essentially stating that your committee met on
11 Friday, July 13th, correct?
12      A.   Um-hum.
13      MS. PEET:  Is that a yes?
14      Is that a yes?
15      A.   Yes.  Yes, I'm sorry.  Yes.
16      Q.   And in essence, Dr. Bittel is
17 explaining, you know, the view of the committee when
18 she's writing this e-mail, right?
19      A.   Um-hum, yep.
20      Q.   So do you know how the committee arrived
21 at these bulleted determinations?
22      A.   I'm sure based on a lot of information
23 that we had and a lot of discussion.
24      Q.   Do you remember whether your committee
MAGNA LEGAL SERVICES

1  ever communicated with the university's own inside
2  counsel, Maria Theresa Paterson?
3       A.   I don't remember.  I -- I don't
4  remember.
5       Q.   Do you know whether they -- whether your
6  attorney consulted with any other attorney other than
7  possibly Will Anthony?
8       A.   I don't think so.
9       MR. COHEN:  I have nothing further.
10 CROSS-EXAMINATION BY MS. PEET:
11      Q.   I just have a few questions for you.
12      Mat, did anyone tell you either
13 in Marywood University or outside of Marywood
14 University how you needed to vote with reference to
15 the charges?
16      A.   No.
17      Q.   Did -- that's a no?
18      A.   No.
19      Q.   Okay.  Did anyone from Marywood or
20 outside of Marywood suggest to you the way that you
21 should vote with reference to these charges?
22      A.   No.
23      Q.   Did you feel that you needed to vote in
24 support of Sister Munley's position in order to keep
MAGNA LEGAL SERVICES



1 your job or to avoid any adverse consequences?
2     A.    No.
3     Q.    Did you fear that your job was in
4 jeopardy if you had voted in support -- against
5 Sister Munley?
6     A.    No.
7     Q.    Did you believe that you served
8 objectively and impartially?
9     A.    Yes.
10     Q.    Do you feel that your vote was
11 appropriate under the circumstances?
12     A.    Yes.
13     Q.    As we sit here today, do you still
14 support the way that you voted, which was to uphold
15 the suspension and termination of Dr. Fagal's
16 employment and tenure?
17     A.    Yes.  Yes.
18     Q.    You testified earlier about the
19 committee's responsibility, and in short you
20 testified that you had to review whether Dr. Fagal's
21 suspension and termination was appropriate from a
22 substantive standpoint, correct?
23     A.    Yes.
24     Q.    Was it your understanding that the

1 faculty grievance committee's responsibility was the
2 same, that is, reviewing the suspension and
3 termination but just from a procedural perspective?
4     A.    Yes.  Yes.
5     Q.    And was that your understanding at the
6 time you were selected to be on the committee?
7     A.    Yes, from what I could remember.
8     Q.    And this is four years ago, correct?
9     A.    Right.
10     Q.    If you can take a look at what has been
11 marked as Povse Exhibit 4.  You just testified that
12 it was your understanding that the faculty grievance
13 committee -- that was the one on which Erin Sadlack
14 chaired -- they reviewed from a procedural
15 perspective both the suspension and termination of
16 Dr. Fagal, correct?
17     A.    Yes.
18     Q.    If I can draw your attention to the
19 paragraph where it starts, "She explained."
20     A.    Um-hum.
21     Q.    And it reads, "Their charge was to
22 review whether" -- "their charge" being the faculty
23 grievance committee -- "was to review whether
24 procedure was properly followed, not to review the

1 substance of Sister Anne Munley's decisions to
2 suspend and later terminate."  That's not correct,
3 correct?
4     A.    Right.
5     Q.    In other words, what is stated in this
6 document is an incorrect statement, correct?
7     A.    Right.
8     Q.    Likewise, where it says, "Their
9 procedural review was limited to the charge of
10 suspension, not termination or revocation of tenure,"
11 that's also an inaccurate statement, correct?
12     A.    Um-hum.
13     Q.    Is that a yes?
14     A.    Yes.  Yes.  Sorry.
15         MS. PEET:  I have no other questions.
16         MR. COHEN:  A few more.
17         Can I see that exhibit?
18         THE WITNESS:  Yes.
19 REDIRECT EXAMINATION BY MR. COHEN:
20     Q.    A few minutes ago Ms. Peet asked you if
21 you had any fear for your job if your committee ruled
22 against President Munley, and you said no, right?
23     A.    Yeah.
24     Q.    Isn't it also true that your wife is

1 not -- she serves as a professor at Marywood but
2 she's not tenured?
3     A.    My wife is the director of the
4 galleries, so she's not a teaching member, so
5 there -- there is no such thing as tenure in those
6 positions.
7     Q.    Would it be fair to say that your wife
8 has less job security than you do, given that you're
9 tenured?
10     A.    I guess you might say that.  Actually,
11 she does her job better than I do.  She's probably
12 more valuable than I have ever been.
13     Q.    You know she's not going to see a copy
14 of this.
15     A.    She's retiring, too, so none of this
16 really matters all that much.
17     Q.    All right.  Let's go back to this
18 Povse-4 exhibit.  Now, this is minutes of one of your
19 committee's meetings, correct?
20     A.    Yes.
21     Q.    And before -- had you seen -- I might
22 have asked this before.  Had you seen these minutes
23 before today?
24     A.    I would say that I must have seen them



Page 50

1    at some point in time.
2        Q.    And a minute or two ago, Ms. Peet asked
3    you about several statements that were made in these
4    minutes and asked you whether they were accurate, and
5    I think you said no.  Correct?
6        A.    Yeah.  Yes.
7        Q.    Do you have any idea how a statement
8    that wasn't accurate can nonetheless make it
9    through three committee members and wind up on this
10   document?
11           MS. PEET:  Objection to the form.
12       A.    No.  I don't know.
13           MR. COHEN:  Okay.  I have no further
14   questions.
15           MS. PEET:  I just have a couple
16   follow-ups.
17           We tend to do that.
18   RECROSS-EXAMINATION BY MS. PEET:
19       Q.    Did you ever fear that your wife's job
20   would be in jeopardy had you voted against Sister
21   Munley?
22       A.    No.
23       Q.    Did that thought of your wife's job even
24   cross your mind when you were voting whether or not

Page 51

1    to uphold Sister Munley's decision?
2        A.    No.
3        Q.    As we sit here today, do you feel that
4    Sister Munley would have taken any action against
5    your wife had you voted against her?
6        A.    No.
7            MS. PEET:  No further questions.  I
8    believe you are all done.
9            (Whereupon, at 4:38 p.m., the deposition
10   of Mathew R. Povse concluded.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 52

1            CERTIFICATE
2
3        I HEREBY CERTIFY that the witness was
4    duly sworn by me and that the deposition is a
5    true record of the testimony given by the
6    witness.
7
8
9
10           Judy A. Black
             Registered Professional Reporter
11           Dated:  July 13, 2016
12
13
14
15
16       (The foregoing certification of this
17   transcript does not apply to any reproduction
18   of the same by any means, unless under the
19   direct control and/or supervision of the
20   certifying reporter.)
21
22
23
24

Page 53

1        INSTRUCTIONS TO WITNESS
2
3        Please read your deposition
4    over carefully and make any necessary
5    corrections.  You should state the reason in
6    the appropriate space on the errata sheet for
7    any corrections that are made.
8            After doing so, please sign the
9    errata sheet and date it.
10           You are signing same subject to
11   the changes you have noted on the errata sheet,
12   which will be attached to your deposition.
13           It is imperative that you
14   return the original errata sheet to the
15   deposing attorney within thirty (30) days of
16   receipt of the deposition transcript by you.
17   If you fail to do so, the deposition transcript
18   may be deemed to be accurate and may be used in
19   court.
20
21
22
23
24



Page 54

```
1          - - - - - -
           E R R A T A
2          - - - - - -
3    PAGE  LINE  CHANGE
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

MAGNA LEGAL SERVICES

Page 56

```
1              LAWYER'S NOTES
2    PAGE LINE
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

MAGNA LEGAL SERVICES

Page 55

```
1        ACKNOWLEDGMENT OF DEPONENT
2
3        I, Mathew R. Povse, do hereby
     certify that I have read the foregoing
4    pages and that the same is a correct
     transcription of the answers given by me
5    to the questions therein propounded,
     except for the corrections or changes in
6    form or substance, if any, noted in the
     attached Errata Sheet.
7
8
9    Mathew R. Povse          Date
10
11
     Subscribed and sworn
12   to before me this
         day of          , 2016
13
     My commission expires:
14
15
     Notary Public
16
17
18
19
20
21
22
23
24
```

MAGNA LEGAL SERVICES

Page 57

```
1    Povse-1, Letter dated February    10
     8, 2012, with attachments,
2    Bates Nos. DEF000207-226
3    Povse-2, E-mail dated May 6,      11
     2012, with attachments, Bates
     Nos. DEF001433-442
4    Povse-3, Minutes for Ad Hoc       12
     Committee Meeting #1, May 11,
5    2012, Bates Nos. DEF001408-509
     Povse-4, Minutes for Ad Hoc       16
6    Committee Meeting #2, May 17,
     2012, Bates Nos. DEF000322-323
7    Povse-5, E-mail dated May 22,     18
     2012, with attachments, Bates
8    Nos. DEF000337-342
     Povse-6, Document, Bates Nos.     19
9    DEF000143-144
     Povse-7, E-mail chain, Bates      20
10   Nos. DEF000353-356
     Povse-8, Faculty Grievance        22
11   Committee Meeting, June 19,
     2012, Bates Nos. DEF001510-512
12   Povse-9, E-mail dated June 25,    28
     2012, Bated No. DEF000393
13   Povse-10, E-mail Bates No.        30
     DEF00245
14   Povse-12, E-mail dated July 5,    31
     2012, with attachment, Bates
15   Nos. DEF001585-590
     Povse-13, E-mail dated July 6,    38
16   2012, with attachment, Bates
     Nos. DEF001494-496
17   Povse-14, E-mail chain, Bates     42
     Nos. DEF001611-615
18   Povse-15, E-mail dated July 15,
     2012, Bates No. DEF001513
19
20
21
22
23
24
```

MAGNA LEGAL SERVICES



# Exhibit 51

EXHIBIT
51

**MARYWOOD**
U N I V E R S I T Y

# Policies and Procedures Manual: Employment At-will Relationship with Administrators and Staff



## Policy Statement

Employment at Marywood University is entered into voluntarily. Some jobs require a contractual relationship with the University, and they have a fixed term of employment. In the absence of a fixed contractual term, an administrator's or staff member's employment relationship with Marywood University is presumed to be at-will.

Employees are free to resign at any time. Those who are employed at-will are requested to give at least two weeks written notice to their immediate supervisors of intent to resign. In recognition of the responsibilities inherent in each position, however, those who wish to receive payment for unused vacation and personal days at the end of their employment must adhere to the following rules:

Exempt employees must give at least twenty work days written notice to their immediate supervisors.

Non-exempt full-time employees must give at least ten work days written notice. Non-exempt part-time employees must give the equivalent of at least two work weeks written notice.

The University reserves the right to shorten the notice period.

An exit interview with the Human Resources Department must be scheduled and attended by the resigning employee.

Employees may take vacation, personal, or snow days during the time between giving notice and resignation only with the prior approval of their immediate supervisors. However, they are required to be at work on the last day as indicated in the notice of intent to resign. If an employee fails to report for work on that day, the last day actually worked will become the date of resignation.

Employees who become sick or have accidents or other emergencies during the time between giving notice and resignation must provide a statement from a health care provider, regardless of the amount of time taken off.

Employees are covered by applicable benefits through the end of the month in which their last day of work occurs.

## Definitions

*Employment at-will* is a legal term that permits the termination of employees for any or no reason, with or without cause, with or without notice, at any time it seems to be in the interest of the University.

*Exempt* employees are management, supervisory, professional and administrative employees whose positions meet specific tests established by the Fair Labor Standards Act (FLSA) and state law and who are exempt from overtime pay requirements.  Exempt employees are expected to perform functions of responsibility and supervision that may require them to work beyond the normal workweek without additional payment.

*Nonexempt* employees are those whose positions do not meet FLSA exemption tests and who are paid for all hours worked.  Nonexempt employees are paid one-and-one-half times their regular rate for hours worked in excess of 40 in one workweek.  Overtime work must be approved in advance by the immediate supervisor.

## Procedures

Quesions should be addressed to the Human Resources Department.

---

## Related Policies

- Complaint Procedures for Administrators and Staff

---

## History

07/01/91 - Reaffirmed with publication of Personnel Manual with the title Employment Relationship
04/07/00 - Revision approved by the President of the University as recommended
by the Policy Committee of the University
02/24/06 - Revision approved by the President of the University, including change of title from Employment Relationship with Non-faculty Employees, as recommended by the Policy Committee of the University

 

---

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

---

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu

FFF001200

# Exhibit 52

EXHIBIT
52

![Marywood University logo]
**Marywood**
U N I V E R S I T Y

# Non-reappointment of Faculty Member



## Policy Statement

Non-reappointment of a faculty member is the right of the President of Marywood University, so long as there is no violation of tenure policies, contractual agreements, or other policies stated in the Faculty Handbook. Notification of non-reappointment is made based on length of service as follows:

  not later than March 1 of the first academic year of service;

  not later than December 15 of the second academic year of service; or

  at least twelve months before the expiration of an appointment after two or more years at Marywood University.

## Related Policies

- Tenure
- Contractual Agreements with Faculty Members

## History

07/01/89 - Reaffirmed with publication of Faculty Manual
07/01/03 - Editorial changes made to reflect academic restructuring

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu

FFF001445

FFF001446

# Exhibit 53

EXHIBIT

53

# Policies and Procedures Manual: Violent Acts and Threats



## Policy Statement

Marywood University is committed to maintaining an environment that avoids exposure of staff, students, and visitors to foreseeable risks and prevents unnecessary damage to University property. If violent acts occur or threats of violence are perceived on campus or on other property controlled by the University, decisive action will be taken immediately to limit the potential for further development.

The Senior Director of Safety, Security and Environmental Compliance is responsible for ensuring that federal and state laws regarding crimes and offenses and University regulations related to a safe environment are enforced. She/he has the authority to determine whether circumstances surrounding the behavior constitute a credible threat or act of violence, and to inform law enforcement authorities in the case of an alleged violation of public law. Calls to 911 by others in obvious emergency situations must be reported to the Chief of Campus Safety and the Senior Director of Safety, Security and Environmental Compliance as soon as possible.

A Marywood University student, faculty, or staff member in violation of this policy will be subject to University disciplinary policies and procedures up to and including termination.

## Definitions

For purposes of this policy, threats and acts of violence include but are not limited to

- Repeatedly swearing or using abusive or offensive language toward others;
- Intentionally damaging property;
- Verbalizing a wish or intent to hurt others;
- Sending aggressive or threatening written, verbal, electronic, or visual communications;
- Engaging in felony property damage;
- Engaging in aggravated assault;
- Possession, whether open or concealed, storage in or on personal or University property, delivery, transportation, use, sale, purchase or receipt of a weapon on University property.

 

## Procedures

In the event of an act or threat of one that appears to be violent, the Chief of Campus Safety is to be notified as soon as possible. Threatening behavior is complex, and it is not expected that students, faculty, or staff will be experts in assessing it. If the Chief of Campus Safety is not available, the Director of Safety, Security and Environmental Compliance shall be notified.

The Emergency Response Plan and Personnel Manual for the Campus Safety Department are maintained in the Office of Campus Safety.

FFF001460

**Related Policies**

- Safe University Environment
- Drug-Free Workplace
- Civil Rights Policy
- Complaint Procedures for Administrators and Staff
- Civil Rights Complaint Procedures
- Institutional Property Policy
- Faculty Grievances and Appeals

---

**History**

12/07/01 - Approved by the President of the University as recommended by the University Committee on Policy
01/30/06 - Cyclical review approved
04/29/11 - Revision approved by the President of the University as recommended by The Policy Committee of the University

 

---

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

---

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu

FFF001461