# Exhibit 54

**EXHIBIT**

**54**



EXHIBIT 6-3-10
#6
Munley

From:           Dr Alan Levine
Sent:           Tuesday, January 17, 2012 2:48 PM
To:             Munley, Sr. Anne
Subject:        Fwd: Fagal videos
Attachments:    Synopsis Free Speech Poster tear-down Marywood 2011.pdf; Free Speech Marywood
                Poster Tear-Down Email Exchange sent to FIRE.pdf; Letter to Alan Levine Dec 2 2011 re
                compensation for poster tear down.pdf; Levine responds to Fagal requests 2011 12-15.pdf

Sr. Anne,

Sorry to do this to you while you are traveling home, but I thought you should have Fagal's e-mail ASAP.
Please pay particular attention to the links to videos embedded within his e-mail. At this time, we are not sure
to whom it was distributed, but it appears to have gone to some if not all  faculty. It is also on you tube. I have
asked Mary Theresa and Pat Dunleavy to explore possible response options. I've also forwarded the e-mail to
those who were named in either Part 1 or Part 2 and are still at Marywood.  Rest assured no one will do anything
until you are back and have had a chance to think things through.

Alan


Alan M. Levine, PhD
Vice President for
    Academic Affairs
Marywood University
2300 Adams Ave
Scranton, PA  18509
(t) 570 348-6290
(f) 570 961-4743
e-mail: levine@marywood.edu




---------- Forwarded message ----------
From: **Sr Margaret Gannon** <gannon@maryu.marywood.edu>
Date: Mon, Jan 16, 2012 at 9:28 AM
Subject: Fwd: Fagal videos
To: Alan Levine <levine@marywood.edu>


Alan,
The texts don't offer anything new. But look at the two videos.

Margaret

---------- Forwarded message ----------
From: Frederick Fagal <fffagal@yahoo.com>
Date: Fri, Jan 13, 2012 at 2:31 PM

DEF002418

Subject:
To: "fffagal@gmail.com" <fffagal@gmail.com>

Dear Marywood University Faculty Colleague,          January 13, 2012

We deserve better. Our students deserve better. In November 2011 I spent my own money to get a speaker from the Foundation for Individual Rights in Education (FIRE) to give a presentation to an Introduction to Social Science class on November 30, 2011. The topic was "Know Your Rights: Free Speech and Thought Reform on Campus," and the speech tied into our study of the United States Constitution. I also spent my own money to pay for posters advertising the speech in Comerford Auditorium which was to be announced as open to all. Total cost to me about $500. Given my previous run-ins with the administration,
http://www.marywoodfreespeech.com/History%20Page/Fatal%20History/adminVSfagal.htm

just to be safe (but), I had my posters stamped with the Student Life poster approval stamp. The Marywood Administration, without telling me, then decided to tear down the posters. No, I am not kidding.... laughable yet sad.
This letter ends with a fuller but still brief summary abstract of what occurred. I hope you read the attachments which tell the complete story. For fun and insight as to "how it all went down" you must view the Hitler Parody satire videos on YouTube (see letter below for links).
Based on the evidence, I expect most of you (if only in private), will agree the Marywood administration (real people here...not an abstraction) exhibited

egregious, despicable, contemptible behavior. This poisonous and *considered!* behavior reflects badly on *everyone* associated with Marywood. I am ashamed for the institution and hope it mends its ways. At this point I think publicity is the only tool which might affect the Administration and inspire "hope and change" ☺ on this campus. Perhaps the Board of Trustees could at least discuss this type of behavior behind closed doors or in private emails and conversations. One can hope ... nay pray.— Attached to this email are four items which I hope some (many?) of you read (#2 similar to #1 but even more complete):

1.    A rather complete *synopsis of the events* surrounding the tearing down (circa Nov 29, 2011) of my "approved" posters announcing a speech about free speech (irony anyone?)

2.    A complete record of *what I sent to* the Foundation for Individual Rights in Education (FIRE) to *document how the situation unfolded*. Learn about FIRE here: http://thefire.org/about/mission/. This big document includes (3 ) below, my letter to Levine (and President Munley by agreed-to forwarding).

3.    A copy of my (at first on paper) December 5, 2011 letter to VP Alan Levine. In that letter and in the December 5 meeting with Alan Levine I proposed a resolution of the "free speech poster tear down" controversy. Mr. Levine asked me for an electronic copy (which I sent) and he said he would forward it to President Anne Munley. In any negotiation list of requests (demands?) such as I submitted there is obviously a possibility for a meeting of the minds and compromise — e.g. perhaps I would give up my demand for pizza for students (heh) or a public apology or one of the requested FIRE visits.

4.    A copy of the December 15, 2011 letter to me from Alan Levine (VP for Academic Affairs) which responds to my letter of December 5, 2011. In the response letter Mr. Levine, speaking for the administration (i.e. President Anne Munley), writes "...we are not willing to undertake *any (emphasis added-ill)* of the specific requests that are contained in your letter."

Perhaps you have heard of Hitler Parody videos. From Wikipedia the movie *Downfall*, http://en.wikipedia.org/wiki/Downfall_%28film%29  the film about Adolph Hitler's last days, which provided selected snippets so I could create the Marywood free speech poster tear-down parodies.

"In October 2010, YouTube stopped blocking any *Downfall*-derived parodies,[18] and is now placing advertisements on some of them. Coryane McSherry, an attorney specializing in intellectual property and free speech issues[19] for the Electronic Frontier Foundation, stated, "All the [*Downfall* parody videos] that I've seen are very strong fair use cases and so they're not infringing, and they shouldn't be taken down."[18]

I made two short satire videos. Part 1 deals with the events of November 28, Part 2 deals with the events of November 30. Comments from (pre-release) viewers:
"Brilliant!" ... "Love these!" ... "SO funny" ... "It's definitely funny and I think it will appeal to students and faculty alike." ..."IT DOES HAVE ITS MOMENTS, ESP THE SCRATCHING PART!" ..."It was nice knowing you, Fred." ..."I think you will get a positive response from your video...too funny to not.", ..."OMG! Funny as hell. Pretty powerful stuff. Keep fighting the good fight." ...."The videos were definitely very amusing and certainly got the point across" ..."Wow Fred... Great job on the video.... what a brilliant way to get your point across!!!! I hope it helps open their eyes!!!! very creative and well done!!!!"

On YouTube just search for Hitler parody Marywood, I imagine it will show up...

LINK to VIDEO #1 http://www.youtube.com/watch?v=1naxKnNc06o&feature=youtu.be

LINK to VIDEO #2
http://www.youtube.com/watch?v=4hzvy5sTqUw&context=C3c1bc55ADOEgsToPDskIZs
ilt3K7AqlLR-ci2V9HK

I can send anyone  low definition versions of the videos suitable (each is under 20 MB) for email attachments. Just ask ..

A few colleagues concerned for my welfare have told me they fear the administration will try to fire me over this. One colleague says perhaps I should have asked for an appointment with President Munley and made a final appeal - i.e. I should have pursued every last ditch channel possible. I did not want to go into such a meeting and in essence have as the only new point to raise a "blackmail" threat to go public as I do here and in the videos. I did not want that. If the risk to me is there it is there; and if the worst does come to pass I will have to battle as best I can with the support of family and friends and colleagues and perhaps concerned outsiders.

I will of course be pleased to hear from any of you - from the grizzled veteran to the first-year hire. ▓▓▓▓▓▓▓ – according to page 86 of the Faculty Handbook
"... there are no specific laws, rules, or regulations that protect the privacy of a user's files, electronic mail messages, or any other information retrieved as a result of a person's session on the Marywood system."

Thus, if you *email* me and want to protect yourself, you might best *use a backup email address such as your old youthful one* coolcat@hotmail.com *and send it from anywhere but Marywood*. Also, if you are my friend, or will soon be,

DEF002419

# Exhibit 55



**EXHIBIT**

**55**

Talking Points for Meeting (my checklist):

- Ask Fagal if he authored and sent the email/videos
- Ask Fagal who he sent the email to and if he sent it to Marywood email addresses
- Ask Fagal how he believes this fits w/ tenure commitment to mission and values
- Ask Fagal what his purpose was, what was he hoping to accomplish
- Ask Fagal if he obtained permission to use a copyrighted film
- Sister Anne – reference policies – Tenure/Civil Rights/Academic Freedom/Professional Ethics
- Tell Fagal that Sister views this conduct to be a serious breach of his tenure agreement and Marywood's mission and values. Tell tha Sister will be finalizing her decision on how to best address this issue and ask him if he wants Sister to consider any other views he has while she is pondering an appropriate means of addressing his conduct.
- Ask Fagal to leave campus; wait for Sister's decision
    - o Suspended with pay
    - o Ask for keys, ID
    - o Actions taken during suspended may impact Sister's decision
    - o Allow to return to office to get some personal items if he wants
    - o Classes will be covered
    - o Verify contact information – home/cell/email
        - 17 East Lake Street, Skaneateles NY 13152
        - Home 315-685-0429
        - Home email fffagal@yahoo.com or fffagal@gmail.com
        - Ask for cell?
- Alternate Plans:
    - o Sister could ask if he has a resolution for her to consider (retirement on the spot)
        - Buy out remainder of contract? 1% deal?
    - o If Fagal refuses to leave, tell him we'll consider it trespassing
    - o Fagal refuses to come to meeting
        - Email and hand deliver letter
        - Meeting not optional
        - Report at second time
        - If no show, suspend and offer one last time to come in to talk
- Post Suspension
    - o Sister recommends termination and prepares notice of charges
    - o Sister asks faculty committee to convene
        - Use faculty committee in place for Faculty Grievance & Appeals Policy:
        - The Ad Hoc Hearing Committee shall consist of three members, selected by the Faculty Senate Executive Council, from a standing committee of fifteen tenured Faculty Members elected for one-year terms by the faculty at large. The Faculty Senate conducts the election of this committee.
        - Each party shall have two challenges without stated cause regarding membership of the Ad Hoc Hearing Committee. No member of the Ad Hoc Hearing Committee shall have had any prior involvement in the case.
        - If the three-person Ad Hoc Hearing Committee cannot be chosen from the fifteen members of the standing committee, the Executive Council of the Faculty Senate is empowered to conduct a special election to obtain fifteen additional members with terms of one year.
        - The Ad Hoc Hearing Committee must select a chairperson.

DEF002898

- - Write to Fagal to inform him that committee will be convened; if he waives committee, resignation
  - Committee recommendation not binding
  - President makes final decision
- Sister Anne distributes internal President's Memo
  - Underscore mission and values
  - No direct link to incident
- Comments for media prepared

DEF002899

# Exhibit 56

JoAnne   8:45 MF went to FF; he asked why, M F — we can both
Mike   probably guess. Assume he'll be here @ 9.

**EXHIBIT 56**

Pat Fred ⎯ FF suspend 3 here

1/23/12   SAM — author? Yes Sam

Sent to whom? — how disseminated

not sure why he'd answer that

(can figure out for yourself)

won't answer —

F — purpose of mtg? —

SAM — tenure resp. — mission / CV's

how?

F — won't answer any more

A what to accomplish

F — justice.

A — elaborate

F — don't choose to elaborate

A — tenure, CR, acad freed, prof etheis — all approp

support mission

F — I'm leaving

A — not done —, your chance to address, she'll

consider response

F — writing — he'll craft response

A — nothing else?

F — no.

A — suspend w/ pay —

Keys / ID to me, take personal stuff · leave

F — Fac Man —?, mortal danger?

moral turpitude — ?

A — look at policies —

F Lots in my office, won't fit today —

EXHIBIT
Dunleavy 8
8/11/16   KV
PENGAD 800-631-6989

2) A - verify home address / email / phone

cell ? — 315-406-8063

will pursue of her determination

arrange — other stuff of me (C. Safety)

A - other info / input to consider?

F - need something —

called AZ Sat — (house) left msg. Talk off record

wrote to FIRE —

trying to give SAM out (w posters)

went to AZ 12/5 —

Y said Carl said posters didn't have prize on

them — that's a lie.

Carl not here Monday — his asst. lied — ?

of exec. council lied to @ test. could explain actions

F wrote to Mosnia (Fire) & another friend

Monday's only narrowing escape — if false info

1 FIRE response — flawed

widesce — see of trend's a way out to explain what A

observed.

drafted response to SAM — amend response to FIRE;

gave SAM her response to FIRE re her response

tried to give SAM more time to rescue herself from depths)

feels she's not doing best for U that in this case

posters — emailed Carl Friday @ posters "prize &

could get affidavit e posters

A - input re posters. Pursuant input re video.

F satis.

3)

A - appropriate ? found. value of respect ?

F - Um.... said in fac report - not everyone deserves
respect - i e Hitler, Bin Laden...

A - what did you mean ?

F - doesn't want to get philosophical -
dance angels on head of pin

A - content not offensive

F - people can be offended all the time
wrong in dictatorship soon...
shows willingness to find way out
1) Fire
2) called AL
3) lies in SL office

A - resp. do nature of video, v. clear

9:15 left (pulling our keys)

# Exhibit 57

EXHIBIT
**57**



Re: Dr. Fred Fagal's authorship and distribution of videos depicting the executive officers as Nazis

Meeting 1/23/12, Sr. Anne's conference room, 9:00 am
Sr. Anne Munley
Dr. Michael Foley
Dr. Pat Dunleavy
Dr. Fred Fagal



Before Dr. Fagal arrived Dr. Foley told Sr. Anne that he went to Dr. Fagal's office at 8:45 to tell him that Sr. Anne wanted to see him at 9. Dr. Fagal asked what the purpose of the meeting was; Dr. Foley said he responded that "we can both probably guess."

Dr. Fagal arrived at 9:00 am. Dr. Fagal commented that he was surprised to see three of us; that he only "expected you" talking to Sr. Anne.

Sr. Anne asked Dr. Fagal if he was the author of the videos. Dr. Fagal responded "Yes, I am." Sr. Anne asked who Dr. Fagal sent the video to, how it was disseminated. Dr. Fagal appeared hesitant, then said he wasn't sure why he would want to answer that, that we could figure it out for ourselves, and then said that he wouldn't answer. Dr. Fagal asked what the purpose of the meeting was. Sr. Anne stated that Dr. Fagal is a tenured faculty member and that he has an obligation as tenured faculty to uphold the mission and core values of the University. Sr. Anne asked Dr. Fagal how the videos upheld those values. Dr. Fagal said he wouldn't answer any more questions. Sr. Anne asked what he hoped to accomplish. Dr. Fagal said "justice." Sr. Anne asked him to elaborate; Dr. Fagal said he didn't "choose to elaborate."

Sr. Anne cited other University policies including Civil Rights, Academic Freedom, and Professional Ethics, all of which cite supporting mission as integral.

Dr. Fagal said he was leaving the meeting. Sr. Anne said she was not done; and told Dr. Fagal that this was his opportunity to address the issue as she considers her response. Dr. Fagal said that if she would put her questions in writing he would craft his response. Sr. Anne asked if he had anything else to say. Dr. Fagal said "no."

Sr. Anne told Dr. Fagal that she was suspending him with pay and asked him to return his keys and ID to Dr. Dunleavy; that he should collect his personal items and leave campus.

Dr. Fagal asked about the Faculty Manual and whether suspension was reserved for issues like mortal danger and moral turpitude. Sr. Anne suggested to Dr. Fagal that he review all the University policies. Dr. Fagal said he had lots of personal items in his office and they wouldn't all fit in his car today.

Sr. Anne asked Dr. Fagal to verify his home address and preferred home email. He confirmed his home address, said he uses the yahoo account, and confirmed his home phone. Dr. Fagal gave us his cell – 315-406-8063. Sr. Anne said she will continue with her determination. Sr. Anne told Dr. Fagal that he could make arrangements to gather the remainder of his personal items with Dr. Dunleavy.

Sr. Anne asked Dr. Fagal if there was anything else, any other information or input he would like her to consider.



Dr. Fagal said yes, and open up a folded piece of paper. (From my chair I could see that he had clipped out what appeared to be address lines from the top of the first paper.) Dr. Fagal said he called Alan Levine at his house on Saturday and left a message that he wanted to talk off the record. Dr. Fagal said he also wrote to FIRE, that he was trying to give Sr. Anne "an out" re the posters.

Dr. Fagal said he went to Alan Levine on December 5, and that in that meeting Dr. Levine said that Carl Oliveri told Alan that the posters that were approved did not have the prize listed on them. Dr. Fagal said that's a lie. Dr. Fagal added that Carl was not in the office the following Monday when additional posters were requested, and said that perhaps Carl's assistant lied about the posters not including the prize. Dr. Fagal said that if the "executive council" was lied to that could explain their actions. Dr. Fagal said he wrote to Mannia (FIRE?) and "another friend" and they agreed that "Munley's only narrowing escape" was if she was given false information. Dr. Fagal said he saw Sr. Anne's response to FIRE and considers it flawed. Dr. Fagal said these actions are evidence that he's been trying to see if there's a way out that would explain what he observed. Dr. Fagal said he had drafted a response to Sr. Anne, but had not sent it, suggesting she amend her response to FIRE. Dr. Fagal gave Sr. Anne a copy of her response and his response to FIRE. Dr. Fagal said that he was trying to give Sr. Anne more time to "rescue herself from the depths," and added that he does not believe she's doing the best for the University in this matter. Dr. Fagal continued to talk about the posters, noting that he sent an email to Carl Oliveri on Friday (Thanksgiving weekend) and that he could get affidavits about all of that.

Sr. Anne noted that Dr. Fagal was providing input about the posters. Sr. Anne said "I want input regarding the videos." Dr. Fagal responded "Satire." Sr. Anne asked if he thought it was appropriate given the University's foundational value of respect. Dr. Fagal hesitated, then said that as he noted in his last faculty activity report "not everyone deserves respect; for example Hitler, Bin Laden." Sr. Anne asked Dr. Fagal "what do you mean Fred?" Dr. Fagal said he did not want to get "all philosophical" and commented that we could discuss dancing angels on the head of a pin.

Sr. Anne asked Dr. Fagal if he thought the content was not offensive. Dr. Fagal replied that "people can be offended all the time, that soon we'll be living in a dictatorship." Dr. Fagal said that he has shown a willingness to find a way out by contacting FIRE after Sr. Anne responded; by calling Alan Levine and pointing out the lies in the Student Activities office. Dr. Fagal said this was a good place for him to stop talking.

Sr. Anne said she will respond to the nature of the videos, and she wanted that made very clear.

Dr. Fagal stood up, started pulling his keys out, presumably to give them to me, but left as Sister Anne told him he could give them to me after he took his personal belongings today.

The meeting ended at 9:15 am.

1/23/12

1/23/12

# Exhibit 58

**EXHIBIT 58**

EXHIBIT 6-246
#22
Man leg

7/5/12                                          Print

Subject:  Re: Any Fred Fagal ad hoc committee information?

From:    Sr. Gail Cabral IHM PhD (cabral@maryu.marywood.edu)

To:      fffagal@yahoo.com;

Date:    Monday, April 30, 2012 5:03 PM

Dear Fred,

Sr. Anne Munley and Dr. Levine asked me to respond to your question about the status of the ad hoc committee. The committee has not yet been convened but I expect that to take place this week. I am currently working to schedule the meeting.

Your suggestion to include Dr. Ed O'Brien on the committee has been accepted. The other two members of the ad hoc committee are Dr. Helen Bittel and Mr. Matt Povse. The choice of these two individuals was made in accordance with the Progressive Discipline Policy, on the basis "of their objectivity and competence and of the regard in which they are held in the academic community."

According to the Progressive Discipline Policy, when a faculty member requests that a committee be convened twice, the President determines whether the membership of the committee is similar or different. The President has received your email, and after review and consultation, Sr. Anne has determined that the membership will be the same.

I hope this is helpful.

Gail

On Thu, Apr 19, 2012 at 2:52 PM, Frederick Fagal <fffagal@yahoo.com> wrote:

Dear Sr. Gail,

Would you please give me an update regarding any progress in selecting an ad hoc committee and what the future "schedule of events" may be?

Thanks very much.

Sincerely,

Fred

DEF001496

# Exhibit 59

**EXHIBIT 59**

Talking Points for Meeting (my checklist):

- Ask Fagal if he authored and sent the email/videos
- Ask Fagal who he sent the email to and if he sent it to Marywood email addresses
- Ask Fagal how he believes this fits w/ tenure commitment to mission and values
- Ask Fagal what his purpose was, what was he hoping to accomplish
- Ask Fagal if he obtained permission to use a copyrighted film
- Sister Anne – reference policies – Tenure/Civil Rights/Academic Freedom/Professional Ethics
- Tell Fagal that Sister views this conduct to be a serious breach of his tenure agreement and Marywood's mission and values. Tell Fagal tha Sister will be finalizing her decision on how to best address this issue and ask him if he wants Sister to consider any other views he has while she is pondering an appropriate means of addressing his conduct.
- Ask Fagal to leave campus; wait for Sister's decision
  - o Suspended with pay
  - o Ask for keys, ID
  - o Actions taken during suspended may impact Sister's decision
  - o Allow to return to office to get some personal items if he wants
  - o Classes will be covered
  - o Verify contact information – home/cell/email
    - ▪ 17 East Lake Street, Skaneateles NY 13152
    - ▪ Home 315-685-0429
    - ▪ Home email fffagal@yahoo.com or fffagal@gmail.com
    - ▪ Ask for cell?
- Alternate Plans:
  - o Sister could ask if he has a resolution for her to consider (retirement on the spot)
    - ▪ Buy out remainder of contract? 1% deal?
  - o If Fagal refuses to leave, tell him we'll consider it trespassing
  - o Fagal refuses to come to meeting
    - ▪ Email and hand deliver letter
    - ▪ Meeting not optional
    - ▪ Report at second time
    - ▪ If no show, suspend and offer one last time to come in to talk
- Post Suspension
  - o Sister recommends termination and prepares notice of charges
  - o Sister asks faculty committee to convene
    - ▪ Use faculty committee in place for Faculty Grievance & Appeals Policy:
    - ▪ The Ad Hoc Hearing Committee shall consist of three members, selected by the Faculty Senate Executive Council, from a standing committee of fifteen tenured Faculty Members elected for one-year terms by the faculty at large. The Faculty Senate conducts the election of this committee.
    - ▪ Each party shall have two challenges without stated cause regarding membership of the Ad Hoc Hearing Committee. No member of the Ad Hoc Hearing Committee shall have had any prior involvement in the case.
    - ▪ If the three-person Ad Hoc Hearing Committee cannot be chosen from the fifteen members of the standing committee, the Executive Council of the Faculty Senate is empowered to conduct a special election to obtain fifteen additional members with terms of one year.
    - ▪ The Ad Hoc Hearing Committee must select a chairperson.



EXHIBIT
Dunleavy 7
8/11/16   KV
PENGAD 800-631-6989

- o   Write to Fagal to inform him that committee will be convened; if he waives committee, resignation
  - o   Committee recommendation not binding
  - o   President makes final decision
- Sister Anne distributes internal President's Memo
  - o   Underscore mission and values
  - o   No direct link to incident
- Comments for media prepared

# Exhibit 60

**EXHIBIT**

**60**

Sr Anne - Fagal

2/3/12      Progressive Discipline - n/a -

       Talk to Sr c Will together Monday

     4700

**EXHIBIT**

Dunleavy 18

8/11/16   KV

PENGAD 800-631-6989

# Exhibit 61

**EXHIBIT 61**

| | |
|---|---|
| **From:** | Patricia Dunleavy |
| **Sent:** | Wednesday, July 18, 2012 1:52 PM |
| **To:** | Sr Anne Munley |
| **Subject:** | Cabinet Retreat - Possible Topics |

Sr. Anne,

I'd like to suggest the following topics for your consideration for Cabinet Retreat. I'll categorize them under broad headings. At this point none of these are particularly time-sensitive, so if there isn't room I can bring them up in area reports or at a future Cabinet meeting.

Health, Wellness and Safety

- Updates to Health Care Reform
- Smoking - we need to make a few interim decisions before we change the policy and ban smoking completely
- Wellness plans for 2012-13
- Next table top - reschedule through Safety (chemical incident in Mellow) or create one involving study abroad
- Review parking procedure changes suggested by Dave Elliott (review committee for appeals) and repeal of standing committee - hasn't met in years.

Training

- Ideas for Title IX annual training (online v live)
- Online Title IX training for students through United Educators - discussion around how to disseminate

Policies

- Post Title IX policy review
  - Code of Conduct for Administrators and Staff
  - Complaint Procedures for Administrators and Staff
  - Disability Grievance Procedures
  - Faculty Grievance and Appeals
  - Progressive Discipline for Administrators and Staff
- Changes to the Vacation Policy for Administrators and Staff, and to the Vacation Policy for Faculty
- Possible new policy - Adoption Benefits for FT Employees
- Administrators with Rank & Tenure - adding Dean, School of Architecture
- Faculty Grievance and Appeals and Progressive Discipline for Faculty - post Fagal, we probably want to revise these (perhaps using some of the faculty who sat on the review committees)

Thank you,

Pat
--
Patricia E. Dunleavy, Ph.D.
Assistant Vice President for Human Resources
Title IX Coordinator

1



EXHIBIT
Dunleavy 40
8/11/16   KV
PENGAD 800-631-6989

**DEF002781**

Marywood University
2300 Adams Avenue
Scranton PA 18509
dunleavy@marywood.edu
570-348-6220 phone
570-961-4740 fax

2

DEF002782

# Exhibit 62

EXHIBIT

62

LAW OFFICES *of*

# DAVID G. CONCANNON, LLC

February 17, 2012

<u>Via E-Mail, Facsimile & USPS First-Class Mail</u>

William J. Anthony, Esquire
Jackson Lewis LLP
90 State House Square, 8th Floor
Hartford, Connecticut 01603

     **Re:**    Employment status of Dr. Frederick F. Fagal, Jr.

Dear Mr. Anthony:

     I have closely considered your letter of February 9, 2012 and President Munley's letter dated the day prior.  I have also reviewed the cases that you cited, among many others.  My conclusions are that:

    **(1)**    Marywood cannot, at least under these circumstances, undo the contractually incorporated policies and procedures that it alone has drafted and reaffirmed;

    **(2)**    Marywood remains vulnerable to a breach-of-contract action alleging at least the procedural irregularities listed in my letter to President Munley dated February 2, 2012;

    **(3)**    Your letter of February 9, 2012 and President Munley's letter dated the day prior added additional grounds for such a breach-of-contract claim, namely a denial of Dr. Fagal's right to convene an ad hoc committee to review the propriety of President Munley's suspension of him commencing on January 23, 2012; and

    **(4)**    Marywood's denial of Dr. Fagal's right to convene an ad hoc committee to review the propriety of his suspension as well as its implied denial of a Statement of Charges regarding the same provide him with independent claims that the University has failed to apply fundamentally fair procedures to him.  See <u>PSI Upsilon of Phila. v. Univ. of Pa.</u>, 591 A.2d 755, 758 (Pa. Super. Ct. 1991) (citing <u>Boehm v. Univ. of Pa. Sch. of Veterinary Med.</u>, 573 A.2d 575 (Pa. Super. Ct. 1990)).

     To repeat, Dr. Fagal has elected to convene two separate ad hoc committees pursuant to Marywood's official policy:  one for President Munley's decision to suspend him and the other, if necessary, for her recommendation to terminate him.  See <u>Policies and Procedures Manual – Marywood University</u>, "Progressive Discipline," http://www.marywood.edu/policy ("<u>PPM</u>").  As I have already explained, the propriety of a faculty member's termination depends, in part, upon

FFF001686

LAW OFFICES *of*

# DAVID G. CONCANNON, LLC

the propriety of his preceding suspension.  See id.  Therefore, Dr. Fagal will not sign the "Release of Personal Information" proffered by President Munley or any other document that would permit her to circumvent a review of the propriety of his suspension.  If President Munley drafts a separate Statement of Charges for Dr. Fagal's suspension, Dr. Fagal will consider signing an appropriate "Release of Personal Information."

In the meantime, Dr. Fagal will pursue all internal remedies available to him prior to filing a lawsuit.  Dr. Fagal accordingly intends to file a faculty grievance against President Munley.  I enclose a copy of Marywood's Faculty Grievances and Appeals policy for your convenience.[*]  As suggested therein, Dr. Fagal has begun consulting the President of Marywood's Faculty Senate for assistance in contacting the Faculty Grievance Committee Chair.  Please be advised of the Non-Retaliation provisions of Marywood's Faculty Grievances and Appeals policy.  If and when President Munley chooses to follow Marywood's Progressive Discipline policy, Dr. Fagal will consider withdrawing his grievance against her.

Finally, Marywood's position that its disciplinary process is "closed" and that I cannot participate "other than as an outside advisor" to Dr. Fagal finds no support in Marywood's Progressive Discipline policy.  See id.

Sincerely,

Jonathan Z. Cohen, Esquire

---

[*] Given that the President of Marywood may be called upon to review an Ad Hoc Hearing Committee's recommendation under this policy, Dr. Fagal may request that the University's Board of Trustees intervene.  See PPM, "Delegation to the President."  President Munley has already violated the authority delegated to her by the Board in this matter, necessitating Dr. Fagal's grievance in the first place.

FFF001687

# Marywood
# U N I V E R S I T Y

# Fac. lty Grievances and Appeals



## Policy Statement

As an institution of higher education, Marywood University brings together a faculty, administration, and governing board united in a common bond of academic purpose. Essential to the fulfillment of this purpose is a mutual recognition of institutional integrity and individual human rights, along with an understanding of the respective roles of the several entities which constitute this educational organization.

Circumstances may arise at times, however, wherein a grievant--full-time, part-time, or pro-rata--may question decisions which affect his/her professional role in the institution. To assist in the resolution of these matters, a series of guidelines for grievances is herein set forth.

## Definitions

Grievance: A grievance refers to any disagreement between two parties. A grievance identifies a complaint one party has against another party for some alleged wrongful action on the part of the second party.

Grievant: A Grievant initiates a grievance.

## Types of Issues That Can Be Grieved

It is understood that procedural rather than substantive factors provide appropriate areas of review, and the Faculty Grievance Committee will not attempt to substitute its judgment for that of the decision-maker(s) involved in the case.

Thus, the Faculty Grievance Committee will hear grievances   concerning:

  1) Allegations of violation of academic freedom resulting in: denial of tenure, promotion, or sabbatical leave; non-reappointment.

  2) Allegations of impermissible discrimination. Tenured and non-tenured faculty are protected against illegal or unconstitutional discrimination, or on any basis not relevant to job performance, and includes, but is not limited to, race, sex, religion, national origin, age, disability, marital status, or sexual orientation

  3) Allegations of inadequate consideration resulting in: denial of tenure, promotion, or sabbatical leave; non-reappointment; or termination of employment due to retrenchment.

  4) Allegations of violations of procedures used in rendering decisions in numbers 1 and 2 above as set forth in Chapter 2 of the Facult. Handbook.

Procedures regarding dismissal, suspension, and sanctions of faculty members are in the Progressive Discipline

FFF001688

policy.

Should a grievant allege cause for grievance in any matter not identified in the above guidelines, the grievant may consult the Faculty Grievance Committee. In such circumstances, the Committee's first decision is whether the complaint is appropriate and sufficiently serious to merit consideration.

### Persons Against Whom Grievances May be Directed

Fundamentally, a grievance may arise from an allegation of improper implementation of a procedure or process leading to a decision. The person(s) or body who perform(s) that procedure or process is (are) the subject(s) of the grievance. Thus, a grievant may direct a grievance against the person(s) or body responsible for the decision identified herein.

The decisions or actions of the Faculty Grievance Committee or Ad Hoc Hearing Committee may not themselves be grieved.

## Procedures

### Informal Procedure

1) A member of the faculty must initially discuss a complaint with the person or body responsible for the action to which the grievant takes exception in order to determine if a resolution is possible.

2) A complaint must be presented within (10) calendar days of the occurrence or discovery of the alleged violation.

3) No grievance may be filed without the initiation of this informal complaint procedure.

4) If the grievance still exists after step one the grievant initiates a consultation with the Vice President for Academic Affairs in order to try to resolve the matter.

### Formal Procedure for Filing a Grievance

1) The Faculty Grievance Committee is convened.

### Faculty Grievance Committee

The Faculty Grievance Committee consisting of three tenured faculty members and two alternates (also tenured) is specifically charged with responsibility for resolving matters of grievance and appeal. The Faculty Senate conducts the election of this committee. Faculty currently serving on the Rank and Tenure Committee or the Faculty Development Committee are not eligible for election to this committee.

The term of each member extends for three years, with one person replaced each year. An alternate will be identified at each election. Any member of the Grievance Committee who has had any prior involvement in a case under consideration must recuse him/herself. The Grievance Committee shall annually elect a chair-elect who will succeed the Chair.

### Grievance Process

FFF001689

The grievant may consult the President of Faculty Senate for assistance in contacting the Faculty Grievance Committee Chair. The Chair should be provided with a written statement setting forth, in detail, the nature of the grievance or appeal and identifying the person(s) or body against whom the grievance or appeal is directed; this document may also include a proposal for resolving the issue. A grievance must be filed within thirty (30) calendar days of the occurrence or discovery of the alleged violation but not fewer than five (5) calendar days after the initiation of the informal complaint.

In considering the grievance or appeal, the Faculty Grievance   Committee will take the following steps:

1) The Committee notifies the decision maker(s) that a grievance has been filed.

2) The Grievance Committee requests from the grievant written information regarding the issues. The Grievance Committee also requests from the decision maker(s) written statements describing the basis for the decision being appealed or grieved, as well as any attempts to settle the matter informally. This information shall be held in confidence by the Grievance Committee. At this point in the process, the information gathered is solely for review by the Committee and is not to be shared with either party involved.

3) At any point, the Grievance Committee may request additional information in writing from the grievant and from the decision-maker(s).

4) If after completing the above steps, the Committee determines that the grievance is improper or unsubstantial, or that sufficient time had not yet been allowed for its normal resolution, or that there is no evidence of improper action on the part of the decision maker(s) which would constitute a legitimate grievance, the Committee will communicate this determination to the grievant and the decision maker(s).

5) If the Grievance Committee determines that there was inadequate consideration or violation of procedures (see No. 3 and 4 under Types of Issues Which Can Be Grieved above), the Committee will return the case to the decision maker for reconsideration.

6) If the grievance is deemed appropriate for mediation, the Chair will appoint a Mediator from the University. The Mediator does not represent either party. Any party may object to the Mediator on the grounds of actual or apparent bias or conflict of interest and submit such objections to the Chair in writing. The Chair will review the objections and may replace the mediator.

7) The Offices of the Vice President for Academic Affairs or Human Resources may be consulted by the Mediator on mediation procedure or other matters involved in the grievance.

8) The Mediator shall try to resolve the grievance within thirty (30) calendar days of formal submission to the chair. With the consent of both parties, the period of mediation may be extended for a short period of time. If the grievance is not resolved within the thirty (30) calendar days, the mediator will advise the chair of the committee in writing that that the issue has not been resolved. If a mutually accepted agreement is reached, this will be communicated to the chair of the committee.

9) Grievances not appropriate for mediation or grievances not resolved through mediation shall be referred to the Ad Hoc Hearing Committee. All evidence collected will be passed on to the Ad Hoc Hearing Committee.

10) If the Faculty Grievance Committee recommends a formal hearing, in cases of violation of academic freedom or impermissible discrimination, an Ad Hoc Hearing Committee will be created to conduct a formal

FFF001690

investigation and to arrive at a recommendation for resolving the issue.

   11) The Grievance Committee will make a summary report of its activities at the end of each academic year to the Faculty Senate. No details relevant to the privacy of the participants in any cases will be included in this report.

## Ad Hoc Hearing Committee

The Ad Hoc Hearing Committee shall consist of three members, selected by the Faculty Senate Executive Council, from a standing committee of fifteen tenured Faculty Members elected for one-year terms by the faculty at large. The Faculty Senate conducts the election of this committee.

Each party shall have two challenges without stated cause regarding membership of the Ad Hoc Hearing Committee. No member of the Ad Hoc Hearing Committee shall have had any prior involvement in the case.

If the three-person Ad Hoc Hearing Committee cannot be chosen from the fifteen members of the standing committee, the Executive Council of the Faculty Senate is empowered to conduct a special election to obtain fifteen additional members with terms of one year.

The Ad Hoc Hearing Committee must select a chairperson.

## Ad Hoc Hearing Procedures

   1) The Ad Hoc Hearing Committee is empowered to gather information and documents specific to the case of the Grievant, conduct interviews, hold a hearing and take actions as are necessary to investigate the grievance to the extent that the law and University policy permit. The Ad Hoc Hearing Committee will provide recommendations in writing forty (40) calendar days from the date of its official appointment.

   2) All Hearings are closed to anyone other than the parties and their advisors, members of the Ad Hoc Hearing Committee, and any witnesses invited to testify by the Committee. The hearing may be audio or video recorded and a written record will be maintained. The hearing is not a legal proceeding. At the beginning of the hearing, all procedures will be made known to the parties, and all information will be kept confidential.

   3) Each party to the grievance may have one advisor during the hearing. The advisor may not participate in the hearing.

   4) Strict rules of legal evidence will not be binding upon the Ad Hoc Hearing Committee and evidence of probative value in defining issues may be admitted.

   5) The hearing record will be used exclusively as the basis for findings of fact and for arriving at a decision.

   6) Upon reaching a decision on the issue and a recommendation for action, the Ad Hoc Hearing Committee will provide a summary written report to the petitioner, the person(s) named in the grievance, and the appropriate administrative officer and the President.

   7) After receiving the recommendation of the Ad Hoc Hearing Committee, the appropriate administrative officer will review the recommendation and notify the Ad Hoc Hearing Committee and petitioner whether the recommendation has been accepted. If the recommendation of the Ad Hoc Hearing Committee is not

FFF001691

accepted by the appropriate administrative officer, the administrative officer will review it with the Ad Hoc Hearing Committee.

8) No details relevant to the privacy of the participants in the case will be included in the notice from the Hearing Committee. Public statements and publicity about the case by the participants will be avoided until the proceedings have been completed, including consideration by the President

## Action by the President of the University

Following the recommendation of the Ad Hoc Hearing Committee, should the petitioner desire further consideration of the issue beyond the immediate administrative channels of the University, the President may be requested, within twenty calendar days, to review the case.

This review will be based on the record from the committee hearing and may provide opportunity for argument, oral or written, or both, by the principals. Then the President will then make the final decision.

## Responsibility for Expenses Incurred in Grievance and Appeal

Expenses incurred by the grievant are the responsibility of the individual. These include, but are not limited to, the following:

Cost of an advisor.

Travel expenses for advisor, witnesses, or others engaged by petitioner.

Cost of preparing any documents and copies thereof.

## Withdrawal of a Grievance

The grievance can be withdrawn at any point in the process.

## Non-Retaliation

Grievants will not be adversely affected for exercising their right to file a grievance, regardless of outcome.

Grievants will not be subject to adverse consequences for either initiating a grievance or in presenting evidence on behalf of a grievant. Anyone who violates this mandate can be subject to disciplinary action, up to and including dismissal.

---

## Related Policies

- Academic Freedom
- Disability Grievance Procedures
- Civil Rights Policy
- Civil Rights Complaint Procedures
- Sabbatical Leave for Faculty Member
- Non-reappointment of Faculty Member

FFF001692

- Promotion of Faculty Members
- Evaluation of Faculty Members
- Retrenchment of Faculty
- Tenure
- Progressive Discipline

---

## History

10/02/92 - Proposal returned to committee of Faculty Senate by College Committee on Policy

11/13/92 - Proposed policy dated 3/13/92, as amended, recommended by College Committee on Policy to the President

04/26/93 - Presidential approval affirmed with publication of the President's Memo

03/20/98 - Revision proposed by Faculty Senate approved by the President of the University as recommended by the Policy Committee of the University

04/29/11 - Revision approved by the President of the University as recommended by the Policy Committee of the University

---

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

---

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright .  2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu

FFF001693

# Exhibit 63

EXHIBIT
63

LAW OFFICES *of*

# DAVID G. CONCANNON, LLC

February 28, 2012

<u>Via E-Mail</u>

William J. Anthony, Esquire
Jackson Lewis LLP
90 State House Square, 8th Floor
Hartford, Connecticut 01603

    **Re:**    Marywood University / Dr. Frederick F. Fagal, Jr.

Dear Mr. Anthony:

    This letter is to inform Marywood University that Dr. Fagal has removed from YouTube the two-part video referenced in President Munley's letters of January 24 and February 8, 2012 and your letter of February 9, 2012.  The video is no longer accessible on the internet to Dr. Fagal's knowledge.  In the event that Marywood requires an "offline" copy of the video, please let me know.

    Please note that Dr. Fagal does not admit any of the charges or allegations—formal or informal—lodged against him in any of the above-referenced letters.  The video has been removed from YouTube as a gesture of good faith.

    Sincerely,

Jonathan Z. Cohen, Esquire

FFF001748

# Exhibit 64

EXHIBIT
64

| | |
|---|---|
| **From:** | Frederick Fagal |
| **To:** | bittel@marywood.edu; obrien@marywood.edu; povse@marywood.edu |
| **Cc:** | annemunley@marywood.edu; levine@marywood.edu; cabral@marywood.edu |
| **Subject:** | Ad Hoc Committee report re Fred Fagal |
| **Date:** | Friday, July 06, 2012 3:00:58 PM |
| **Attachments:** | Sr Gail Cabral to Fagal April 30 2012.pdf |

To the Ad Hoc Faculty Committee:

I have received and considered your Review of Sister Anne Munley's Decision to Terminate the Employment and Tenure of Dr. Frederick Fagal, dated July 2, 2012. Except for your decision as to Charge No. 3, "Violation of Marywood's Conditions of Computer Use Policy," I respectfully disagree with the conclusions drawn by the Ad Hoc Faculty Committee.

The purpose of this e-mail is not to re-argue the same points contained in my written defense to President Munley's charges, dated May 6, 2012. I merely point out several troublesome omissions in your Review, and ask that the Committee remedy them.

First, the Review fails to mention—let alone discuss—the propriety of President Munley's suspension of me, which commenced on January 23, 2012. It does not appear from the Review that the Committee was separately convened to review the suspension. Marywood's Progressive Discipline Policy states, in relevant part: "The faculty member may be suspended by the Vice President for Academic Affairs at any time during the proceedings involving him or her. Suspension is justified if immediate harm to the faculty member or others is threatened by the person's continuance in the faculty position." See Marywood University, Policies and Procedures Manual, "Progressive Discipline," http://www.marywood.edu/policy ("PPM").

Moreover, a faculty member has the "*right* to convene an ad hoc committee in order to *appeal either a decision to suspend* the faculty member or a decision to dismiss the faculty member," and to have "such a committee be convened *twice* (i.e., *once for suspension and once for dismissal*)." PPM, "Progressive Discipline" (emphasis added). On April 30, 2012, Sister Gail Cabral confirmed that the Ad Hoc Faculty Committee should be convened twice for this case, and apparently President Munley concurred with my selection of Dr. O'Brien to review the suspension and termination [but she did not consult me about the composition of the second committee]. See E-Mail from Sr. Gail Cabral IHM to Frederick Fagal (Apr. 30, 2012), attached hereto.

The Review states that the "Faculty Grievance Committee has already determined that Sister Anne Munley followed appropriate procedure in moving directly to termination," but this is irrelevant. The Progressive Discipline Policy states that the Ad Hoc Faculty Committee must review my suspension; there is no exception for cases in which the Faculty Grievance Committee previously reviewed a suspension. The reason that I filed a faculty grievance in addition to requesting an Ad Hoc Faculty Committee review was to exhaust all remedies available to me. Marywood's Policies and Procedures Manual does not compel a choice of one or the other, and neither should the Committee.

Second, I must object to your statement that I "left little room for pursuing progressive discipline or a mediated solution to this situation." Until your Review, I

was not made aware of any Marywood administrator or representative having ever defended the lack of remedial action taken on the basis that there had been "little room" for it.  On the contrary, the Progressive Discipline Policy states:  "*If remedial actions(s) taken during the suspension* does not sufficiently resolve the issues that lead to the suspension, the university may move towards dismissal of the faculty member."  PPM, "Progressive Discipline" (emphasis added).  In other words, remedial actions must actually be taken before the University can pursue dismissal. Respectfully, the responsibility of an ad hoc faculty committee is not to prognosticate on whether remedial action would have succeeded had Marywood taken it.  Your responsibilities in reviewing my dismissal, among others, were to first determine whether Marywood had taken remedial action, and, if so, whether such remedial actions had "sufficiently resolve[d] the issues" that allegedly led to my suspension. A move to dismiss a faculty member may not even be considered without an affirmative answer to both questions.

In light of the facts above, I respectfully request that the Committee convene to review the propriety of my suspension and that it reconsider the issue of Marywood's failure to take any remedial action prior to pursuing dismissal.

Sincerely,

Frederick F. Fagal, Jr.

| Subject: | Re: Any Fred Fagal ad hoc committee information? |
|----------|---------------------------------------------------|
| From: | Sr. Gail Cabral IHM PhD (cabral@maryu.marywood.edu) |
| To: | fffagal@yahoo.com; |
| Date: | Monday, April 30, 2012 5:03 PM |

Dear Fred,

Sr. Anne Munley and Dr. Levine asked me to respond to your question about the status of the ad hoc committee. The committee has not yet been convened but I expect that to take place this week. I am currently working to schedule the meeting.

Your suggestion to include Dr. Ed O'Brien on the committee has been accepted. The other two members of the ad hoc committee are Dr. Helen Bittel and Mr. Matt Povse. The choice of these two individuals was made in accordance with the Progressive Discipline Policy, on the basis "of their objectivity and competence and of the regard in which they are held in the academic community."

According to the Progressive Discipline Policy, when a faculty member requests that a committee be convened twice, the President determines whether the membership of the committee is similar or different. The President has received your email, and after review and consultation, Sr. Anne has determined that the membership will be the same.

I hope this is helpful.

Gail

On Thu, Apr 19, 2012 at 2:52 PM, Frederick Fagal <fffagal@yahoo.com> wrote:
> Dear Sr. Gail,
>
> Would you please give me an update regarding any progress in selecting an ad hoc committee and what the future "schedule of events? may be?
>
> Thanks very much.
>
> Sincerely,
>
> Fred