# Exhibit 65

EXHIBIT

65

DEPOSITION
EXHIBIT
LEVINE-13
9/6/16  8ab
PENGAD 800-631-6989

---

**From:** Barbara McNally
**Sent:** Monday, April 2, 2012 2:41 PM
**To:** Dr Alan Levine
**Subject:** Faculty Members

Hi Dr. Levine

These are the faculty members that are on my list for "leaving" Marywood after this year and or leaving their position in the capacity that they were hired.

> **Redacted:**
> **Confidential**

Fred Fagel

> **Redacted:**
> **Confidential**

Please let me know if this list is correct so that I can forward it on to HR.

Barb

—
Barbara McNally, M.P.A.
Executive Asst. to the Vice President of Academic Affairs
Marywood University
2300 Adams Avenue
Scranton, PA 18509
(570) 340-6086
Fax (570) 961-4743
bmcnally@maryu.marywood.edu

1

DEF002380

Exhibit 66

LAW OFFICES *of*

# DAVID G. CONCANNON, LLC

April 4, 2012

<u>Via E-Mail</u>

William J. Anthony, Esquire
Jackson Lewis LLP
90 State House Square, 8th Floor
Hartford, Connecticut 01603

      **Re:**   Marywood University / Dr. Frederick F. Fagal, Jr.

Dear Mr. Anthony:

      Dr. Fagal received the attached letter from President Munley yesterday morning.  On Dr. Fagal's behalf, I make several points below about the letter as well as the upcoming ad hoc faculty hearings.

**President Munley's letter of April 3, 2012**

      President Munley stated in her letter:

> Since the grievance process is now complete, I have decided to finalize my recommendation.  As a result, your employment with Marywood and your tenure are terminated effective today, April 3, 2012.

Please note that President Munley had no right to "terminate" Dr. Fagal prior to considering any recommendation of the ad hoc faculty committee that has been convened in this matter.  The ad hoc faculty committee may recommend that disciplinary proceedings against Dr. Fagal be "discontinued," to "continue a suspension," or to "initiate a formal action toward dismissal."  <u>See</u> <u>Policies and Procedures Manual – Marywood University</u>, "Progressive Discipline," http://www.marywood.edu/policy ("<u>PPM</u>").  President Munley has once again triggered a breach of Marywood policy and contract.

      President Munley's decision to "finalize" her recommendation to terminate Dr. Fagal immediately after the Faculty Grievances and Appeals Committee concluded its proceedings and before the ad hoc committee could review the propriety of the suspension and the termination recommendation suggests that she has retaliated against Dr. Fagal.  Retaliation against a faculty member for filing a grievance is a violation of Marywood policy, as I previously warned

LAW OFFICES *of*

# DAVID G. CONCANNON, LLC

Marywood.  See PPM, "Faculty Grievances and Appeals." President Munley's premature "finalization" of Dr. Fagal's "termination" also suggests that she lacks the capacity to objectively consider an ad hoc faculty committee's recommendation on this matter.  This bias is in addition to the bias inherent in an administrator deciding whether her own actions were appropriate. Therefore, Dr. Fagal requests that Marywood's Board of Trustees vote on whether to rescind Dr. Fagal's premature "termination" and whether to "undelegate" President Munley from any authority that she may have to determine Dr. Fagal's employment status with Marywood, including any consideration of the ad hoc faculty committee hearing's findings.  See PPM, "Delegation to the President." Please forward this letter to Marywood's Board or kindly authorize me to do so.

President Munley's statements that Dr. Fagal previously chose not to convene an ad hoc committee are, of course, demonstrably false.  Her letter of yesterday was the first time that she permitted Dr. Fagal to convene an ad hoc faculty committee to review his suspension.

## Ad Hoc Faculty Committee(s) Preparations

In anticipation of the ad hoc faculty committee hearing(s), Dr. Fagal requests that an authorized representative of Marywood promptly answer the following questions as comprehensively as possible:

- Prior to President Munley's suspension of Dr. Fagal on January 23, 2012, did she or Dr. Levine make any determination that immediate harm to Dr. Fagal or others would be threatened by Dr. Fagal's continuance in his faculty position?  If so, please elaborate on this "immediate harm" in as much detail as possible.
- What remedial actions, if any, were taken by Marywood officials to resolve the issues that allegedly led to Dr. Fagal's suspension?  If any such remedial actions were taken, did President Munley or Dr. Levine make any determination that the remedial actions failed to resolve the issues that allegedly led to Dr. Fagal's suspension?
- Prior to President Munley's letter to Dr. Fagal dated January 24, 2012, did Dr. Levine issue any written recommendation that Dr. Fagal be suspended or dismissed?

In addition to answering these questions, please produce any and all unprivileged documents that support Marywood's answers.  Please also produce any and all unprivileged documents related to the decisions to suspend Dr. Fagal, to recommend the termination of his employment and tenure, and to "finalize" such termination recommendations.

I recognize that Marywood and Dr. Fagal are not presently engaged in litigation, and thus Marywood owes no formal or informal discovery to Dr. Fagal.  Nonetheless, if Marywood chooses not to answer the above questions or to produce the requested documents, Dr. Fagal will

LAW OFFICES *of*

# DAVID G. CONCANNON, LLC

inform the ad hoc faculty committee of Marywood's choice and will invite the committee to draw any appropriate inferences.

Dr. Fagal also requests that President Munley and Dr. Levine appear at the ad hoc faculty committee hearing(s) in this matter. Dr. Fagal intends to cross-examine both individuals, particularly if Marywood chooses not to answer the questions listed above or to provide the requested documents. If Marywood chooses not to make President Munley or Dr. Levine available for cross-examination, Dr. Fagal will again invite the ad hoc faculty committee(s) to draw any appropriate inferences.

Finally, I am requesting once again that Marywood permit me to represent Dr. Fagal at the ad hoc faculty committee hearing(s). You previously denied this request on Marywood's behalf by letter dated February 9, 2012, stating that I "will not be part of the process other than as an outside advisor" to Dr. Fagal and that "[i]t is a closed process and will remain that way." In fact, all ad hoc committee hearings "are closed to anyone other than the parties and their advisors." PPM, "Faculty Grievances and Appeals." (emphasis added).

Sincerely,

Jonathan Z. Cohen, Esquire

Attachment
cc: Dr. Frederick F. Fagal, Jr.

3

Exhibit 67

**EXHIBIT**

**67**

| | |
|---|---|
| **From:** | Frederick Fagal <fffagal@yahoo.com> |
| **Sent:** | Sunday, May 6, 2012 8:42 AM |
| **To:** | bittel@marywood.edu; povse@marywood.edu; obrien@marywood.edu |
| **Cc:** | cabral@marywood.edu |
| **Subject:** | Fagal's defense attached for Ad Hoc Committee |
| **Attachments:** | Fagal Defense to Ad Hoc Committee May 6 2012.pdf |

Dear Dr. Fagal Ad Hoc Committee Members (Dr. Edward O'Brien, Dr. Helen Bittel, Mr. Mathew Povse) and Sr. Gail Cabral:

Attached please find my brief defense against the charges brought against me by President Anne Munley.

I had earlier asked about the chance to present a defense and got no reply regarding that question. The Progressive Discipline section of the Policies and Procedures Manual does not provide for the person charged the chance to present a defense. But, being a bit contrarian, I have decided to submit (again, see attached)  a brief written defense to the charges.

Sincerely,

Frederick F. Fagal, Jr

# Exhibit 68

EXHIBIT

68

To the Ad Hoc Faculty Committee:

Sister Gail Cabral has informed me that you have been selected to serve on the Ad Hoc Faculty Committee convened for the purpose of reviewing my suspension and termination of employment and tenure. Since Marywood's Progressive Discipline policy does not provide any details on how or even whether a faculty member may offer a defense to disciplinary charges, I have taken it upon myself to simply offer my defense in writing here. Obviously, I cannot force you to read or consider this e-mail—but having sent it provides me with some reassurance that I have done all that I could.

As you likely know, I was suspended by President Munley on January 23, 2012. On the next day, President Munley sent a letter notifying me that she was "recommending that [my] tenure and employment with Marywood be terminated immediately." On February 9, President Munley e-mailed a revised letter (dated the day prior) notifying me of this recommendation again. On April 3, President Munley notified me that she had decided to "finalize" her recommendation—that my employment and tenure with Marywood were "terminated effective today, April 3, 2012." Below I offer my defenses to the suspension and the termination.

## Suspension

At approximately 8:45 AM on January 23, Dr. Michael A. Foley, Dean of Marywood's College of Liberal Arts and Sciences, visited me in my office in LAC 82. Dr. Foley stated that President Munley had summoned me to her office for a 9:00 AM meeting on the same day. At that meeting, President Munley asked me whether I had posted a two-part video on YouTube. I acknowledged posting the video. At the end of the meeting, President Munley told me that I was suspended with pay; that I should turn in my Marywood ID and keys to Patricia Dunleavy; and that I should clean out my office.

At 1:11 PM on the following day, I received an e-mail from Frances D. Ferrese, Executive Secretary to President Munley. That e-mail attached a letter from President Munley and five (5) other documents. That letter begins: "In follow up to our meeting yesterday, I am writing to inform you that that I am recommending that your tenure and employment with Marywood be terminated immediately..." President Munley then purported to offer a "Statement of Charges." Neither the word "suspension" nor any form or synonym for it appears in President Munley's letter of January 24; this will become more important below.

On February 2, my attorney, Jonathan Z. Cohen, sent a letter to President Munley on my behalf. In that letter, Mr. Cohen addressed my suspension as follows:

> Under [the Progressive Discipline] policy, suspension "is justified if immediate harm to the faculty member or others is threatened by the person's continuance in the faculty position." The decision to suspend is left to the Vice President for Academic Affairs (Dr. Alan M. Levine)—not you.

> Dr. Fagal is not aware of any allegation by a Marywood official that his presence on campus threatens "immediate harm" to any individual. Nor could such hypothetical allegations be taken seriously under the circumstances: Dr. Levine has not required that Dr. Fagal participate in counseling or any other type of treatment pursuant to the Progressive Discipline policy; Dr. Fagal has not been barred from campus to his knowledge; and he is not aware of any report to law enforcement authorities regarding any "immediate harm."

On April 4, Mr. Cohen sent a letter to William J. Anthony, Marywood's outside counsel on this matter. In that letter, Mr. Cohen stated:

> In anticipation of the ad hoc faculty committee hearing(s), Dr. Fagal requests that an authorized representative of Marywood promptly answer the following questions as comprehensively as possible:
>
> - Prior to President Munley's suspension of Dr. Fagal on January 23, 2012, did she or Dr. Levine make any determination that immediate harm to Dr. Fagal or others would be threatened by Dr. Fagal's continuance in his faculty position? If so, please elaborate on this "immediate harm" in as much detail as possible
>   ....
> - Prior to President Munley's letter to Dr. Fagal dated January 24, 2012, did Dr. Levine issue any written recommendation that Dr. Fagal be suspended or dismissed?
>
> In addition to answering these questions, please produce any and all unprivileged documents that support Marywood's answers. Please also produce any and all unprivileged documents related to the decisions to suspend Dr. Fagal, to recommend the termination of his employment and tenure, and to "finalize" such termination recommendations.

Despite Mr. Cohen's letters, neither President Munley, nor any other Marywood administrator, nor Mr. Anthony has alleged that my continuance in my position would have threatened "immediate harm" to any individual. Nor have any of these individuals alleged that Dr. Levine had any involvement in the decision to suspend me. Nobody has answered the bullet-pointed questions above—nor provided any related documents.

Thus, my defenses to my suspension are based on procedure and substance. Procedurally, I was never suspended by Marywood's Vice President for Academic Affairs. Marywood's Progressive Discipline policy states: "The faculty member may be suspended by the Vice President for Academic Affairs at any time during the proceedings involving him or

her." See Marywood University, Policies and Procedures Manual, "Progressive Discipline," http://www.marywood.edu/policy ("PPM"). This policy mentions the "President of the University" of Marywood five (5) times, but it never authorizes her to suspend a Marywood faculty member unilaterally. See PPM, "Progressive Discipline." Thus it would have been improper for President Munley to suspend me on any ground.

In substance, the suspension was improper because no Marywood official has ever alleged that my continuance in my position would have threatened "immediate harm" to any individual. Nor is there any actual evidence that I ever posed an "immediate harm."

In the event that President Munley or a delegate attends any meetings of the Committee, I would invite the Committee to seek answers on the issues where Marywood has remained silent. If no reasonable answers surface, then I would ask the Committee to draw any reasonable inferences.

The Committee can and should recommend that "there is no merit to the complaint[1]" with regard to Dr. Fagal's suspension. See PPM, "Progressive Discipline."

**Termination**

President Munley's recommendation to terminate my employment and tenure, followed recently by the "finalization" of her own recommendation prior to any Ad Hoc Faculty Committee, were also improper.

Dismissal is the step following suspension under Marywood's Progressive Discipline policy. See PPM, "Progressive Discipline." Specifically: "If remedial actions(s) taken during the suspension does not sufficiently resolve the issues that lead to the suspension, the university may move towards dismissal of the faculty member." PPM, "Progressive Discipline." This policy also strongly suggests that the Vice President for Academic Affairs must recommend the faculty member's dismissal before the President can act. See PPM, "Progressive Discipline."

In the approximately 28 hours between the commencement of my suspension and the arrival of President Munley's letter recommending my termination, there is no evidence that Marywood officials directed any remedial efforts toward me. In Mr. Cohen's February 2 letter to President Munley, he wrote: "Dr. Fagal is not aware of any 'remedial actions' taken by Marywood to 'resolve the issues' that led to his suspension. As you know, Dr. Fagal's suspension began on the morning of January 23; your letter regarding termination arrived in his inbox at 1:11 PM on the next day." In Mr. Cohen's letter of April 4 directed to Mr. Anthony, he asked:

> What remedial actions, if any, were taken by Marywood officials to resolve the issues that allegedly led to Dr. Fagal's suspension? If

---

[1] Assuming that President Munley's "revised statement of charges" dated February 8, 2012 constitutes a "complaint" under the Progressive Discipline policy, such a "complaint" would be inherently meritless on the point of my suspension because it does not actually mention my suspension—let alone any reasons that the suspension was proper.

any such remedial actions were taken, did President Munley or Dr. Levine make any determination that the remedial actions failed to resolve the issues that allegedly led to Dr. Fagal's suspension?

Mr. Cohen requested documentary proof on this subject as well.  Again, no information or documents from Marywood officials or Mr. Anthony on the subject of "remedial actions" have arrived.  Of course, untaken remedial actions can never resolve any alleged problem.  Nor is there any evidence that Marywood's Vice President for Academic affairs recommended my dismissal in writing.  Therefore, President Munley had no right to pursue my dismissal.

Even if President Munley had the right to pursue my dismissal, she did not have the right to "finalize" it prior to the Committee's review.  Under the Progressive Discipline policy, an ad hoc faculty committee may recommend that disciplinary proceedings against a faculty member be "discontinued," to "continue a suspension," or to "initiate a formal action toward dismissal."  See PPM, "Progressive Discipline."  In President Munley's statement of charges, she writes at the end that "[o]nce I receive the review committee's determination, I will finalize my decision."  That "finalization" has already occurred, however; the statement of charges is a dead letter.  I urge the Committee to respond by rejecting all of the charges against me.

Even if President Munley had the right to pursue my dismissal and then to "finalize" it, President Munley's asserted, retroactive grounds for doing so would be insufficient.  All such alleged grounds for dismissal are presumably laid out in President Munley's letter dated February 8, 2012.  I address each such ground below:

1.      *"Breach of Tenure Agreement"*

President Munley first alleges a breach of Marywood's Tenure policy.  The Tenure policy begins as follows:

> Tenure is a term designating permanent and continuous appointment for a full-time faculty member.  It implies a mutual commitment on the part of the faculty member and the University and cannot be taken lightly.

> Once tenure is granted, it will be discontinued only for grave reason, which may include moral turpitude, flagrant abuse of academic freedom, or professional incompetence.  In addition, as expressed in its *Retrenchment of Faculty* policy, the University may be required to discontinue tenure because of severe financial exigencies or reorganization of the department and/or curriculum resulting in lack of need.

> The commitment of a faculty member who requests tenure is as deep and binding on the faculty member as it is on the University.  Just as the conferring of tenure by the University recognizes the competence of an individual faculty member, submission to the

University of an application for tenure suggests a strong acceptance by that individual of the mission, goals and objectives of the University. The request represents a commitment to work jointly with faculty, students, administrators and staff for the growth and welfare of the University.

PPM, "Tenure."

My dissemination to Marywood's faculty of text hyperlinks to parodied movie scenes is not a "grave reason" within the meaning of Marywood's Tenure policy. My parody is one of many made from scenes from the 2004 motion picture, "Downfall." See Finlo Rohrer, The rise, rise and rise of the Downfall Hitler Parody, BBC News Magazine (Apr. 13, 2010), http://news.bbc.co.uk/2/hi/8617454.stm; Hitler Downfall parodies: 25 worth watching, The Telegraph (Oct. 6, 2009), http://www.telegraph.co.uk/technology/news/6262709/Hitler-Downfall-parodies-25-worth-watching.html; Virginia Heffernan, The Hitler Meme, N.Y. Times, Oct. 24, 2008, (Magazine) at MM20, available at http://www.nytimes.com/2008/10/26/magazine/26wwln-medium-t.html.

President Munley has characterized my parody in the inflammatory rhetoric of the Holocaust:

> Depicting the University's President as Adolf Hitler, a man who is responsible for torturing and killing in excess of 6 million people simply because they are Jewish is an intentional, malicious and blatant violation of your tenure commitments. Portraying other University officials as Nazi leaders, using crude and vulgar language and belittling University officials also violates your agreement with Marywood. You gravely injured our community by your actions.

Letter from Sister Anne Munley to Frederick F. Fagal (Feb. 8, 2012). One purpose of my parody was to convey what I believed to be terrible behavior by a heavy-handed and narrow-minded university administration when it tore down my approved posters announcing a speech about free speech on college campuses. Implying or even directly proclaiming that a person has certain traits of a "Person H" does not logically lead to the conclusion that the person has all the traits of "Person H." Simple logic. It is ironic in the extreme that President Munley has responded to my parody by trampling over Marywood's disciplinary process in order to force me out of my job.

Specific examples of "crude and vulgar language" are not cited by President Munley, probably because the language in the video is quite tame—at worst a PG-13 rating if not a G for General Audiences rating. Merely claiming "crude and vulgar" language was used is not evidence that such language was used.

2.    "Violation of Civil Rights Policy"

Again, President Munley dresses up my parody as something that it is not—a "violation of civil rights." What President Munley does not do is cite the Civil Rights Complaint Procedures policy that was in effect until February 27, 2012. That policy required an aggrieved individual to file a complaint, among other procedures. Those procedures "must be followed any time a member of the Marywood University community believes s/he has been the victim of...discrimination, harassment, or assault by any member of the University community...." The old Civil Rights Complaint Procedures policy can be viewed at Section 4.2 of the Faculty Handbook.

I have never received any complaint pursuant to the Civil Rights Complaint Procedures policy. Not from Dr. Levine or from any other Marywood administrator. If any Marywood administrators felt that their civil rights had been violated by me, one would expect them to have filed a complaint. Even after Mr. Cohen informed President Munley on February 2 that I had never received a complaint, no action was taken in this regard. By charging Dr. Fagal with violating Marywood's Civil Rights Policy without following the corresponding enforcement provisions, President Munley has made an end-run around the Civil Rights Policy.

Even assuming that this is the proper vehicle for a civil rights complaint, this charge would be weak. "Harassment" means "aggressive pressure or intimidation." Oxford Dictionaries defines "harassment" as "aggressive pressure or intimidation." Oxford Dictionaries, "Definition for harassment," http://oxforddictionaries.com/definition/harassment (accessed May 6, 2012). Further, Marywood's Civil Rights policy only bans harassment "based on race, sex, color, national or ethnic origin, age, creed, ancestry, religion, disability, or any other legally protected status." PPM, "Civil Rights Policy." President Munley has not alleged any "legally protected status" targeted by me, although she alludes to the Jewish faith. If President Munley is alleging that I harassed Dr. Levine or other Marywood officers for being Jewish, that allegation would not make any sense. Dr. Levine and other Marywood officials are depicted in my parody as actors from the movie "Downfall," who in turn depict Nazi-Fascist figures.

3.      "Violation of Marywood's Conditions of Computer Use Policy"

I am not aware of any evidence that I used "Marywood's system" as President Munley alleges. The Conditions of Computer Use policy contains the following relevant definition: "**System** is used in a generic sense to refer to the aggregate of all hardware and software owned or licensed by Marywood University, including the network." See PPM, "Conditions of Computer Use."

First, when I sent the January 13 e-mail containing links to the "Downfall" parody, I was not using a Marywood-owned computer. I was using my own Lenovo T61p laptop computer. Second, I cannot recall whether I was using Marywood's network. Occasionally, I connected to the internet while on campus by "tethering" my laptop computer to my Android smartphone. On those occasions, I was using the network of my mobile phone provider. I cannot recall for certain how I was connected to the internet when I sent the January 13 e-mail. It is Marywood's practice to keep an "audit trail," and thus the university would be in a better position to provide evidence on this point. See PPM, "Conditions of Computer Use." Marywood has charged me with disciplinary offenses, and it should be the University's burden to provide evidence.

I did not, as President Munley asserts, actually e-mail any video to the Marywood community. I e-mailed hyperlinks to a video, which was previously posted by me on YouTube. Anyone who viewed the video made a conscious decision to click on the hyperlink. I also sent the e-mail from my Yahoo! Mail e-mail account—not from my official Marywood e-mail address. If I was using "Marywood's system" by sending e-mails *to* official Marywood e-mail addresses, then the inverse would have to be true: President Munley was "using Yahoo's system" when she e-mailed her statement of charges to me on February 9, 2012. Both propositions are nonsense.

President Munley also alleges that "it *appears* that you...violated copyright laws associated with the use of a copyrighted video...." (emphasis added). It is further suggested that I could have complied with copyright law only by obtaining permission to publish from the owner of the video. If President Munley is going to charge me with violating the law, she should just do so—not dance around it by alleging what "appears" to be the case. This qualifier suggests a weakness in President Munley's position.

Furthermore, it is important to recognize that the question of whether a faculty member has violated copyright law is not suitable for a committee that has no formal legal credentials or training. Copyright law can be highly subjective. Even the Conditions of Computer Use policy hints at this: "As a *general matter*, copyright infringement occurs when a copyrighted work is reproduced, distributed, performed, publicly displayed, or made into a derivative work without the permission of the copyright owner." See PPM, "Conditions of Computer Use" (emphasis added). This is not a "general matter," however. This is a very specific matter, the resolution of which could terminate my connection to Marywood. Yet President Munley has not cited a single provision of copyright provision law or any case law on the subject. The Committee can and should reject President Munley's allegations based on (apparent) copyright violations for this reason alone.

Should the Committee wish to delve into the substance of copyright law anyway, it should start with the "fair use" doctrine. This doctrine has been codified in federal law, and provides as follows in relevant part:

> [T]he fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to
the copyrighted work as a whole; and
(4) the effect of the use upon the potential market for or value of
the copyrighted work.

17 U.S.C. § 107. The U.S. Supreme Court has held that parody, "like other comment or
criticism, may claim fair use" under the provision quoted above. *See Campbell v. Acuff-Rose
Music*, 510 U.S. 569, 579 (1994). An attorney for the Electronic Freedom Foundation has stated
that all of the "Downfall" parodies she has seen "are very strong fair use cases and so they're not
infringing." See Laura Sydell, YouTube Pulls Hitler 'Downfall' Parodies (Apr. 23, 2010),
http://www.npr.org/templates/story/story.php?storyId=126225405.

4.      *"Violation of Academic Freedom Policy; Professional Ethics Policy and
        University's Mission and Values as well as the principles of collegiality."*

President Munley's allegations here—and the policies that she relies upon—are
hopelessly vague. Marywood's Academic Freedom policy encourages "*unrestricted exchange of
ideas*," for example. See PPM, "Academic Freedom." (emphasis added). The Professional
Ethics policy even suggests that Marywood faculty members are protected by the First
Amendment. See PPM, "Professional Ethics" ("As members of their community, professors
have the rights and obligations of other citizens.") The same policy ends as follows: "As
citizens engaged in a profession that depends upon freedom for its health and integrity,
professors have a particular obligation to promote conditions of free inquiry and to further public
understanding of academic freedom." PPM, "Professional Ethics."

Where President Munley has alleged violations of these policies, I can find support for
my e-mail and parody: I was protesting the University administration's removal of posters
notifying students of a visit by Will Creeley, from the Foundation for Individual Rights in
Education ("FIRE"), to my course. At the time, I was teaching SSCI210, "Introduction to Social
Science." The topic was the First Amendment to the United States Constitution. FIRE is the
leading non-profit organization that promotes freedom of expression on college campuses. See
FIRE, "Mission – The Foundation for Individual Rights in Education – FIRE,"
http://thefire.org/about/mission.

It is important to note that Marywood's Tenure policy conveys that not just any violation
of academic freedom—should the Committee find any—warrants termination of tenure. "Once
tenure is granted, it will be discontinued only for grave reason, which may include moral
turpitude, *flagrant abuse of academic freedom*, or professional incompetence." PPM, "Tenure."
(emphasis added). "Flagrant" means "conspicuously or obviously offensive." Oxford
Dictionaries, "Definition for flagrant," http://oxforddictionaries.com/definition/flagrant (accessed
May 6, 2012).

President Munley also alleges that I violated Marywood's "Mission and Values." Those
documents are not attached to President Munley's statement of charges, and I think she should
forfeit such allegations. In any case, the "Mission" and "Core Values" are even more vague than
Marywood's Academic Freedom and Professional Ethics policies. See PPM, "Mission," "Core

Values."  Arguably, the Committee would have to divine the intentions of God to determine whether a faculty member has violated Marywood's Mission and Values.

Sincerely,


Frederick F. Fagal, Jr.

# Exhibit 69



EXHIBIT
69

Bittel
17
9/29/16 CHM

From: **Bittel, Helen** <bittel@maryu.marywood.edu>
Date: Fri, Jan 9, 2015 at 11:50 AM
Subject: Fwd: Our Mutual Friend
To: Dr Patricia E Dunleavy <dunleavy@maryu.marywood.edu>


---------- Forwarded message ----------
From: **Matthew R Povse** <povse@maryu.marywood.edu>
Date: Tue, Jul 10, 2012 at 11:26 AM
Subject: Re: Our Mutual Friend
To: "Bittel, Helen" <bittel@maryu.marywood.edu>
Cc: Dr Edward J O'Brien <obrien@maryu.marywood.edu>


Hi Helen,

Will you call Will ? I think that Pat is right about not having to respond, but it might be good for us to get together to review and answer some questions for ourselves.

Matt


On Tue, Jul 10, 2012 at 10:25 AM, Bittel, Helen <bittel@maryu.marywood.edu> wrote:


---------- Forwarded message ----------
From: **Patricia Dunleavy** <dunleavy@marywood.edu>
Date: Tue, Jul 10, 2012 at 10:08 AM
Subject: Re: Our Mutual Friend
To: "Bittel, Helen" <bittel@maryu.marywood.edu>


Hi Helen,

I'd suggest you talk to Will. My thought would be you don't need to respond since the recommendation you made went to the President with others cc'ed. I think it'd be up to Sr. Anne to respond if she chooses to. But I'd check with Will, he'll know.

Thanks, and good luck,

1

Pat

On Tue, Jul 10, 2012 at 10:04 AM, Bittel, Helen <bittel@maryu.marywood.edu> wrote:
Dear Pat,

On Friday afternoon, our committee received a response from Dr. F. He has found several problems/omissions with our report and has asked us to review and resubmit. Mostly, he objects to the fact that we did not separately adjudicate his suspension; we, however, understood that this was adjudicated by the prior committee and that their findings were supposed to be final.

Do you have an advice going forward? We are planning to meet on Friday as a committee. Do you think we should also be conferring with Will, Sr. Anne, or Sr. Gail at this point?

Thank you for your consideration.

Best,
Helen

--
Helen M. Bittel, Ph.D.
Associate Professor
Department of English
Marywood University
2300 Adams Ave.
Scranton, PA  18509

--
Patricia E. Dunleavy, Ph.D.
Assistant Vice President for Human Resources
Title IX Coordinator
Marywood University
2300 Adams Avenue
Scranton PA 18509
dunleavy@marywood.edu
570-348-6220 phone
570-961-4740 fax

--
Helen M. Bittel, Ph.D.
Associate Professor
Department of English
Marywood University

2

2300 Adams Ave.
Scranton, PA  18509


Mathew R. Povse
Chair
Art Department


Helen M. Bittel, Ph.D.
Associate Professor
Interim Writing Coordinator
Department of English
Marywood University
2300 Adams Ave.
Scranton, PA  18509


Patricia E. Dunleavy, Ph.D.
Associate Vice President for Human Resources
Title IX Coordinator
Marywood University
2300 Adams Avenue
Scranton PA 18509
dunleavy@marywood.edu
570-348-6220 phone
570-961-4740 fax

3