# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FREDERICK F. FAGAL, JR.,    :
                               :
          Plaintiff,    :
                               :
v.                       :   CIVIL ACTION NO. 3:14-cv-2404-UN3
                               :
MARYWOOD UNIVERSITY,    :
                               :
          Defendant.    :

## DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant Marywood University ("Marywood"), by and through its undersigned counsel, submits this statement of undisputed material facts in support of its Motion for Summary Judgment.

## I.     BACKGROUND

### A.     Marywood University

1.     Marywood is a Catholic university sponsored by the Congregation of the Sisters, Servants of the Immaculate Heart of Mary, and is located in Scranton, Pennsylvania.  <u>See</u> Compl. ¶ 1, attached hereto as Exhibit ("Ex.") A.

2.      Marywood roots itself in traditions of "service, respect, excellence and empowerment."  See Munley Dep. Tr., attached hereto as Ex. B, at 17:1-8; Ex. 26 to Plaintiff's Deposition at DEF000222, attached hereto as Ex. C.

3.      Marywood offers students "a welcoming and supporting environment" with a mission to help students, faculty and the Marywood community "live responsibly in a diverse and interdependent world."  See Ex. B at 17:20-25; Ex. C at DEF000222.

4.      Guided by Catholic identity, respect, empowerment, service, and excellence, Marywood has adopted and strives to embody the University's Core Values, which include "[r]espect for the value of each human being, for diversity in the context of vibrant community, and for the earth and all creation."  See Ex. C at DEF000222; Plaintiff's Dep. Tr., attached hereto as Ex. D, at 45:20-46:7.

5.      At all times relevant to this litigation, Marywood's President was Sister Anne Munley, IHM ("Sister Munley").  See Ex. B at 14:1-10.

**B.      Plaintiff's Employment at Marywood**

6.      Plaintiff became a full-time member of Marywood's faculty in the Fall semester of 1987 and attained tenure in September 1994.  See Ex. A at ¶¶ 4, 5; Ex. D at 34:7-14; 36:15-20.

7.     Throughout his employment at Marywood, Plaintiff was a professor in the Department of Social Sciences and reported to the Chairperson of the Department.  <u>See</u> Ex. D at 36:2-37:3.

8.     At the time of Plaintiff's termination, the Chairperson of the Social Sciences Department was Sister Margaret Gannon, who Plaintiff presumed reported to Michael Foley, the Dean of the Liberal Arts College.  <u>See</u> Ex. D at 39:18-40:19.

9.     Plaintiff ultimately reported to the President of the University, Sister Munley.  <u>See</u> Ex. D at 41:21-42:11, 42:24-43:3.

C.    <u>Marywood's Policies and Values</u>

10.    In addition to its Core Values, Marywood maintains an employee handbook as well as various policies and procedures for which faculty members are expected to comply, including policies on tenure, civil rights, computer use, academic freedom and professional ethics.  <u>See</u> Ex. C at DEF000212-DEF000226.

i.    **Tenure Policy**

11.    Marywood's Tenure Policy provides a "mutual commitment on the part of the faculty member and the University" which is "as deep and binding on the faculty member as it is on the University."  <u>See</u> Ex. 24 to Plaintiff's Deposition at DEF000169, attached hereto as Ex. E; Ex. D at 35:8-14.

12.     The Tenure Policy further states that "submission to the University of an application for tenure suggests a strong acceptance by that individual of the mission, goals and objectives of the University" and represents "a commitment to work jointly with faculty, students, administrators and staff for the personal growth and welfare of the University." See Ex. E at DEF000169.

13.     Recognizing the importance of this relationship, the Tenure Policy states that "[o]nce tenure is granted, it will be discontinued only for grave reason, which may include moral turpitude, flagrant abuse of academic freedom, or professional incompetence." See Ex. E at DEF000169.

### ii.     Civil Rights Policy

14.     Marywood's Civil Rights Policy states that the University "does not condone and will not tolerate discrimination, harassment, or assault by any member of the Marywood community upon another individual, regardless of whether the action is based on race, sex, color, national or ethnic origin, age, creed, ancestry, religion, disability, or any other legally protected status." See Ex. C at DEF000208, DEF000212-213.

15.     Among other things, the Marywood's handbook provides a complaint mechanism for individuals in the Marywood community in the event they wish to file a complaint regarding discrimination, harassment, or assault by

any member of the University community.  See Ex. 4 to Plaintiff's Deposition at

DEF03579-DEF35781, attached hereto as Ex. F.

16.    The handbook explicitly states that "[i]n certain serious cases

the University administrator may proceed even without a formal complaint."  See

Ex. F at DEF03579.

### iii.    Computer Use Policy

17.    Marywood's Computer Use Policy stresses that users are held

to "high ethical standards" and that conditions of use are based on the "'spiritual,

ethical and religious values and a tradition of service' expressed in the Mission

Statement of the University.   They underscore responsible, ethical, legal, and

secure use of the campus-wide information system, and they derive from standards

of common sense and common decency that apply to any shared resource.

Responsibility extends to access, use of information, and distribution of data."  See

Ex. C at DEF000208-209, DEF000214.

18.    The Computer Use Policy contains a non-inclusive list

governing individual privacy rights and confidentiality, which among other items,

includes that users "respect the civil rights of others to an open and hospitable

environment, regardless of race, sex, color, national or ethnic origin, age, creed,

ancestry, religion, disability, or any other legally protected status, and with respect

to sexual harassment including e-mailing inappropriate messages." <u>See</u> Ex. C at DEF000208-209, DEF000214-217.

### iv.    Academic Freedom Policy

19.    Marywood's Academic Freedom Policy provides that the tradition of higher learning is grounded "on respect for truth, social responsibility and individual rights." <u>See</u> Ex. C at DEF000209-210, DEF000218-219.

20.    As applied to faculty, the policy states that academic freedom "presupposes, first of all, personal integrity in dealing with students, peers and officers of the University. Second, it presumes scholarly competence, observance of the professional standards of one's discipline, commitment to the stated mission of the University…" <u>See</u> Ex. C at DEF000218.

21.    Further, the Academic Freedom Policy states that "faculty members have a responsibility as professional scholars to be accurate and judicious in their public statements, and respectful of the opinions and responsibilities of others."   <u>See</u> Ex. C at DEF000218.

### v.    Professional Ethics Policy and Goals and Objectives

22.    Marywood's Professional Ethics Policy states that professors have "special responsibilities" and "obligations" to the Marywood community, including not to "discriminate against or harass colleagues" and to "show due

respect for the opinions of others" when exchanging criticism and ideas.  See Ex. C
at DEF000220-221.

23.     Marywood's Goals and Objectives provide that employees will
"demonstrate core values in the workplace" and "serve as role models of socially
responsible leaders."  See Ex. C at DEF000224-225.

### vi.     Progressive Discipline Policy

24.     Marywood's Progressive Discipline Policy "recognizes
personal and professional problems that may be rectified by an informal
educational process, as well as serious violations of professional responsibilities
implicating possible recommendation for suspension or dismissal" and provides an
"effective and flexible" means to resolving complaints when applicable.  See Ex.
25 to Plaintiff's Deposition at DEF000249, attached hereto as Ex. G.

25.     The policy further provides, in relevant part, that:

> ***Meeting with Administrator***.   The administrator receiving the
> complaint shall discuss the matter with the faculty member in a
> conditional conference. . . . If, however, additional light is not shed on
> the allegation or an explanation is not satisfactory, the administrator
> will specify corrective action to be taken, and the discussion will
> constitute an oral warning.
> …
> ***Suspension***. The faculty member may be suspended by the Vice
> President for Academic Affairs at any time during the proceedings
> involving him or her. Suspension is justified if immediate harm to the
> faculty member of others is threatened by the person's continuance in
> the faculty position. Unless in direct violation of the law, any such
> suspension should be with pay.
> . . .

*Dismissal*.  If remedial action(s) taken during the suspension does not sufficiently resolve the issues that lead to the suspension, the university may move towards dismissal of the faculty member.

*Ad Hoc Faculty Committee* Faculty members have the right to convene an ad hoc committee in order to appeal either a decision to suspend the faculty member or a decision to dismiss the faculty member.

…

<u>See</u> Ex. G at DEF000249-DEF000250.

### vii.   Faculty Grievances and Appeals

26.    Finally, Marywood maintains a policy on Faculty Grievances and Appeals, which states that upon receipt of a grievance, the Faculty Grievance Committee will hear grievances concerning four specific topics, including "[a]llegations of violation of academic freedom resulting in: denial of tenure, promotion, or sabbatical leave; non-reappointment." <u>See</u> Ex. G at DEF000252-255.

27.    The Policy outlines the makeup of the Ad Hoc Hearing Committee and hearing procedures and states that the decisions or actions of the Faculty Grievance Committee or Ad Hoc Hearing Committee may not themselves be grieved.  <u>See</u> Ex. G at DEF000253, DEF000255-256.

28.    Plaintiff understood that the Tenure Policy, Civil Rights Policy, Computer Use Policy and Professional Ethics applied to him, and that as a tenured professor at Marywood, he was committed to abiding by the University's Mission and Core Values, and that the commitment between the university and tenured

faculty was mutual.  <u>See</u> Ex. D at 35:8-14, 45:20-47:4, 279:19-22, 281:23-282:7, 283:18-284:2, 287:22-288:7, 289:14-290:6.

## II. <u>PLAINTIFF'S INVITATION AND ADVERTISING FOR AN OUTSIDE SPEAKER TO PRESENT AT MARYWOOD</u>

29.   In November 2011, Plaintiff invited Will Creeley, a speaker from the Foundation for Individual Rights in Education ("FIRE") to speak on November 30, 2011 at his Introduction to Social Science class regarding free speech on college campuses.  <u>See</u> Ex. D at 51:14-22, 56:1-12, 69:12-16.

30.   Approximately two days before Mr. Creeley's presentation, Plaintiff and some students, one of whom Plaintiff paid, hung posters around campus advertising the event and announcing a $50 attendance prize.  <u>See</u> Ex. D at 73:8-74:5, 193:5-24; Ex. A at ¶ 19.

31.   Plaintiff contends that within the 48-hour window of the posters being hung advertising the event and the event itself, some, but not all, of the posters were removed.  <u>See</u> Ex. D at 94:19-95:1.

32.   Plaintiff ultimately learned from Dr. Alan Levine, former Vice President of Academic Affairs, and the Director of Student Activities that posters were removed because of the prize announcement, namely that "at Marywood we don't pay students to go to class."  <u>See</u> Ex. D at 84:13-16, 85:9-11, 113:6-114:5; Levine Dep. Tr. at 9:3-5, attached hereto as Ex. H.

33.     No one from the Marywood administration prevented Mr. Creeley from speaking, shortened the length of his speech, censored the discussion, or otherwise tried to change or influence the topic of his discussion.  <u>See</u> Ex. D at 57:24-58:14, 69:1-10, 95:12-96:7.

34.     On the contrary, Mr. Creeley spoke as scheduled in the University's auditorium about free speech on college campuses to an audience of 45 to 50 people.   <u>See</u> Ex. D at 100:15-18.  Even Plaintiff admitted he "wasn't displeased" with the attendance.  <u>See</u> Ex. D at 100:19-22.

35.     Although Plaintiff was unhappy with the removal of posters advertising the event, he never requested a meeting with Sister Munley to discuss his concerns.  <u>See</u> Ex. D at 160:7-10, 197:10-19.

## III.    <u>CREATION AND DISSEMINATION OF A VIDEO PORTRAYING MARYWOOD OFFICIALS AS MEMBERS OF THE NAZI REGIME</u>

36.     On January 13, 2012, Plaintiff sent an e-mail from his personal e-mail address to various members of the Marywood community, including faculty members and students, at their Marywood e-mail addresses "criticiz[ing] the Marywood administration" and included hyperlinks to two YouTube videos "criticizing Sister Anne Munley, President of Marywood, and several other

administrators."  <u>See</u> Ex. A ¶¶ 23, 24; Ex. D at 184:16-186:24; 188:14-23; 223:5-224:8.[1]

37.     Plaintiff signed this e-mail in his capacity as an Associate Professor at Marywood.   <u>See</u> Ex. 15 to Plaintiff's Deposition at DEF001446, attached hereto as Ex. I.

38.     Notably, in his e-mail, Plaintiff advised the recipients about Marywood's Conditions of Computer Use policy, even citing a specific page of the policy, and suggested that they respond to him using their personal e-mail addresses.  <u>See</u> Ex. D at 199:11-200:7; Ex. I at DEF001445.

39.     The videos in Plaintiff's e-mail—where Plaintiff altered English subtitles corresponding to several scenes from a well-known foreign movie "Downfall"—depicted Sister Munley as Adolf Hitler and other University officials as members of the Nazi regime with swastika bands on their arms.  <u>See</u> Ex. A ¶ 25; Ex. D at 189:1-5, 204:14-207:9, 261:10-262:5.

40.     One of the individuals depicted as part of the Nazi regime was Dr. Levine, who is Jewish and who Plaintiff assumed to be Jewish.  <u>See</u> Ex. D at 152:8-16, 208:23-209:23, 220:7-18.

41.     Among other things, Plaintiff included a "supposed humorous non-existent plot to have the Fagal character be seduced and then claim rape", and

---

[1] A thumb drive containing the videos Plaintiff created and disseminated will be sent overnight to the Court.

Plaintiff testified that "the rape part was meant to be comical."  <u>See</u> Ex. D at 212:5-17.

42.     Plaintiff depicted Sister Munley, as Hitler, screaming "If a rape charge is too brazen switch gears! BRIBE him! Use the old SS Sisters of Subversion."  Sister Munley was also portrayed as saying "Fagal will want us to pay him for the posters and speaker. We will say NO and IGNORE him unless he sues or we are shamed into it." <u>See</u> Ex. 16 to Plaintiff's Deposition at DEF000081, DEF000122 (emphasis in original), attached hereto as Ex. J.

43.     In another part of the video, the Nazi official portraying Dr. Levine exclaimed: "I should quit as VP and be a professor again but my young wife #2 and 1% kids need money."  <u>See</u> Ex. J at DEF000135.

44.     Additionally Plaintiff referred to Dr. Levine's wife as a "hot young thing", because "the character in the movie representing Dr. Levine" is "making a joke" as it was "understood through common knowledge that Dr. Levine had been divorced and married again." <u>See</u> Ex. D at 214:7-216:1; <u>See</u> Ex. J at DEF000136.

45.     Not only did Plaintiff e-mail hyperlinks of these videos to members of the Marywood community, he also posted these videos on YouTube, making them "publically available" for all to see.   <u>See</u> Ex. D at 189:1-20, 234:13-19.

46.     According to Plaintiff, he primarily created and disseminated these videos to change policy and cause discomfort to the administration.  <u>See</u> Ex. D at 182:20-184:3.

47.     Plaintiff admitted that the videos were not connected to any of his courses, to any research about free speech on campus, or part of any curriculum he had planned for the semester.  <u>See</u> Ex. D at 252:8-254:12.

48.     Plaintiff further admitted that "some people could be offended [by the videos] and have the right to be offended."  <u>See</u> Ex. D at 209:16-210:14, 212:22-213:7.

49.     Indeed, many members of the Marywood community found the video to be "offensive, disrespectful" and were "emotionally impacted" by them. <u>See</u> Foley Dep. Tr. at 41:13-15, attached hereto as Ex. K; Ex. B at 45:4-46:11.

50.     For example, Sister Munley "was absolutely and totally appalled" and was "highly offended to be personally depicted as Hitler, and to see … Officers of Marywood University depicted as Hitler's aides." <u>See</u> Ex. B at 44:6-10.

51.     According to Sister Munley, she was "distressed" over the videos and found them to be anti-Semitic, especially because Dr. Levine is of the Jewish faith.  <u>See</u> Ex. B at 44:6-14.

52.     Additionally, Sister Munley was "disgusted, appalled, [and] repulsed" by the videos, and felt the videos were "a personal attack on everything that Marywood stands for, as well as an egregious assault to [Marywood's] mission and Core Values." See Ex B. at 45:4-19.

53.     Dr. Levine felt "angst and anxiety" as a result of Plaintiff's videos portraying him as a Nazi and directly involving his family members, especially in light of the fact that he lost people in the Holocaust, and he believes it was a "mistake" not to file a formal complaint against Plaintiff under Marywood's Civil Rights Policy.  See Ex. H at 29:3-16, 31:22-32:2, 37:18-21.

54.     In fact, prior to Plaintiff sending his e-mail, some "pre-release viewers", including Plaintiff's wife, warned Plaintiff that the videos were not a good idea, may lead to his termination, and that he should "take down the second video!!!" because "[t]he real-estate portfolio/young wife stuff is really personal!" See Ex. D at 194:1-195:2, 196:18-197:9, 198:14-199:9, 217:13-21, 230:24-232:6, 246:11-248:1; Ex. 20 to Plaintiff's Deposition, attached hereto as Ex. L.

55.     In addition, a former Marywood Professor, who was also a pre-release viewer, warned Plaintiff that if he released the videos, he would "catch an incomparable amount of grief" because "[a]nytime Hitler gets raised, no one pays attention to the message but the symbolism of Hitler as a murderer and butcher. … It's not what you're saying hear [sic], but how you are saying it that puts you at

risk." See Ex. 22 to Plaintiff's Deposition, attached hereto as Ex. M; Ex. D at 195:3-5, 246:11-22.

56.     Plaintiff testified that he understood the risk associated with posting the videos, that he thought about the "risk [he] was running" by using a Hitler reference, and that it "was a tough choice" but that it did not change his mind.  See Ex. D at 198:14-199:9, 246:11-247:21, 288:13-24.

57.     Nonetheless, Plaintiff does not believe the videos constituted inappropriate conduct.  Plaintiff admitted that he has no remorse for creating the videos and that he never apologized to Sister Munley, Dr. Levine, or any member of the Marywood administration.  See Ex. D at 207:18-21; 221:22-222:4; 245:6-15, 261:6-262:5; 263:5-11; Ex. B at 93:11-17.

## IV.     SUSPENSION OF PLAINTIFF'S EMPLOYMENT AND RECOMMENDATION FOR TERMINATION OF PLAINTIFF'S TENURE AND EMPLOYMENT WITH MARYWOOD

58.     On January 23, 2012, Dr. Foley informed Plaintiff at or around 8:45 a.m. that Sister Munley wanted to meet with him at 9:00 a.m.  See Ex. A at ¶ 26, Ex. D at 258:4-21; Ex. K at 13:19-14:14.[2]

59.     The meeting was attended by Plaintiff, Sister Munley, Dr. Foley and Patricia Dunleavy, who at the time was Assistant Vice President for

---

[2] Sister Munley was traveling at the time Plaintiff sent his e-mail and did not want to delegate a situation of this magnitude to a member of her staff, and she knew that it was something she would handle as the President of the University.  See Ex. B at 49:2-22, 50:7-15.

Human Resources.  See Ex. D at 262:7-10; Ex. B at 88:13-23; Ex. K at 18:1-8; Dunleavy Dep. Tr. at 39:24-40:15, attached hereto as Ex. N.

60.     Dr. Foley attended as a witness and Dr. Dunleavy attended as a note taker. See Ex. K at 18:9-11; Ex. B at 88:13-23.

61.     Sister Munley also arranged to have the Senior Director for Security and Safety available in the next room in the event that his assistance was needed.  See Ex. B at 119:7-21; Ex. N at 17:10-18:7.

62.     Dr. Levine was asked not to attend the meeting due to the "angst and anxiety" he felt as a result of being portrayed as a Nazi and because the videos involved his family members.  See Ex. H at 31:22-32:2.

63.     However, Dr. Levine agreed with Sister Munley that the videos warranted Plaintiff's suspension.  See Ex. B at 62:16-22; Ex. H at 28:9-16, 39:19-23.  In fact, Dr. Levine believed that written warning, oral warning, suspension, and termination should all "have been on the table." See Ex. H at 28:12-16.

64.     During the meeting, Plaintiff admitted to creating and posting the YouTube videos. See Ex. D at 264:22-265:2; Ex. B at 89:19-24.

65.     When asked to explain how the videos related to or supported Marywood's Core Values, Plaintiff focused on the posters from the FIRE presentation.  See Ex. D at 264:22-265:23; Ex. B at 90:2-12.

66.     Sister Munley indicated that she wanted to discuss the videos that Plaintiff created, not the poster incident, and informed Plaintiff that the videos violated Marywood's Civil Rights Policy, Academic Freedom Policy, Professional Ethics Policy, Tenure Policy, Computer Use Policy, and were in contrast to Marywood's Mission and Core Values. See Ex. D at 264:22-265:23; Ex. B at 90:2-92:2; 94:12-18.

67.     When Sister Munley asked Plaintiff why he created the videos, Plaintiff responded that he wanted to "get justice for free speech."  See Ex. D at 266:7-24; Ex. B at 92:2-5.

68.     At the conclusion of the meeting, Sister Munley suspended Plaintiff with pay and requested that he turn in his keys and provide his home address so she could reach him for follow-up.  See Ex. B at 93:5-9, 98:7-13; Ex. D at 265:23-267:3.

69.     Plaintiff admitted that this meeting was held to discuss the matter confidentially, in accordance with Marywood's Progressive Discipline Policy.  See Ex. D at 301:17-302:11.

70.     The next day, January 24, 2012, via e-mail, Sister Munley provided Plaintiff a statement of charges against him with relevant policies attached and advised him that she was recommending that his tenure and employment with Marywood be terminated immediately "[a]s a result of [his]

breach of a material term of [his] obligations as a tenured professor." See Ex. D at 274:15-18, 275:9-12; Ex. E at DEF000166-167.

71.     Additionally, Sister Munley advised Plaintiff that she was prepared to send her statement of charges to a duly appointed faculty committee for review along with the e-mails and videos that Plaintiff forwarded to the Marywood community, and asked that he execute and return an authorization to permit the University to do so. See Ex. E at DEF000167.

72.     Plaintiff did not return an executed authorization by the date provided. See Ex. D at 278:9-18.

73.     By e-mail and letter dated February 2, 2012, Plaintiff, through his attorney, notified Sister Munley that a portion of the Statement of Charges was missing. See Ex. A at ¶¶ 35, 36.

74.     Accordingly, Sister Munley sent Plaintiff a second letter with a revised Statement of Charges and additional attachments on February 8, 2012. See Ex. D at 305:3-20; Ex. C at DEF000207-210.

75.     Sister Munley's February 8, 2012 letter stated, for the second time, that she would send her Statement of Charges to a duly appointed faculty committee for review upon receiving an executed authorization from Plaintiff. See Ex. D at 309:10-310:3; Ex. C at DEF000209-210.

76.    Again, Plaintiff did not return an executed authorization.  <u>See</u> Ex. D at 309:10-310:3.

## V.    <u>GRIEVANCE PROCESS AND OUTCOME</u>

### A.    **Faculty Grievance Committee**

77.    Ultimately, following discussion among counsel, a Faculty Grievance Committee was formed to review Plaintiff's suspension and recommended termination.  <u>See</u> Ex. D at 310:24-311:19, 312:24-313:4.

78.    The committee was comprised of three tenured professors: Dr. Erin Sadlack, Dr. Patricia Arter, and Dr. William Conlogue. <u>See</u> Sadlack Dep. Tr. at 11:11-16, 12:6-19, attached hereto as Ex. O.

79.    Dr. Sadlack served as the chair of the Faculty Grievance Committee.  <u>See</u> Ex. O at 14:14.

80.    The Faculty Grievance Committee focused on whether there were any procedural issues with Plaintiff's suspension and recommended termination.  <u>See</u> Ex. O at 36:21-37:4, 52:22-53:7.

81.    On February 22, 2012, Plaintiff submitted a written grievance to the Committee, arguing that (1) he was improperly suspended because President Munley, not Dr. Levine, informed him of the suspension and because he was not a cause of immediate harm to himself or to others; (2) President Munley improperly moved to terminate his employment and tenure without remedial measures; and (3)

he had not had an opportunity to convene an Ad Hoc Committee to appeal his suspension. Plaintiff also submitted his explanation of the scene-by-scene videos. See Ex. A at ¶ 52; Ex. D at 312:2-313:22.

82.     On March 19, 2012, Dr. Sadlack e-mailed Plaintiff to advise him that the committee received his official grievance regarding his suspension and recommended termination and had begun the process of reviewing his arguments. See Ex. D at 312:24-313:15; Ex. 29 to Plaintiff's Deposition, attached hereto as Ex. P.

83.     On March 26, 2012, Dr. Sadlack wrote Plaintiff to inform him that the committee reviewed his grievance and found "no evidence of improper action on President Munley's part which would constitute a legitimate grievance." See Ex. A at ¶ 54; Ex. D at 315:1-12; Ex. 30 to Plaintiff's Deposition, attached hereto as Ex. Q.

84.     First, the Committee concluded that the Progressive Discipline Policy did not require that *only* the Vice President of Academic Affairs could suspend faculty members, as the policy included the word "may".   See Ex. O at 31:2-16.   According to Dr. Sadlack, "[t]hat doesn't mean only the Vice President of Academic Affairs, and we concluded it was illogical to suggest that … the President couldn't be involved, [because] all power essentially does go back to her." See Ex. O at 31:2-16, 32:19-33:19; Ex. G at DEF000249-251.

85.     Notably, Plaintiff admits that the Progressive Discipline Policy does not state that a faculty member can *only* be suspended by the Vice President of Academic Affairs or that suspension is *only* justified if immediate harm to the faculty member or others is threatened by the faculty member's continuance in their position. See Ex. D at 299:11-22.

86.     Moreover, the Committee concluded that Plaintiff's actions indeed caused harm.  According to Dr. Sadlack, the Faculty Grievance Committee did not view "harm" as used in the Progressive Discipline Policy to "necessarily mean only physical harm; that, in fact, a harm to the university community had happened. [The Committee] thought that in particular, by characterizing Dr. Levine, a member that everyone knows is Jewish, a member of the committee, as a Nazi, causes – that's a form of harm. The fact that the videos were public meant that there was also damage to the university."  See Ex. O at 34:10-35:22.

87.     As for Plaintiff's "remedial measures" argument, the Faculty Grievance Committee unanimously believed that based on the language of the Progressive Discipline Policy, remedial action was not appropriate in every instance prior to termination.  See Ex. O at 40:4-17.

88.     Specifically, the Faculty Grievance Committee "did not understand what possible remediation there could be" prior to Plaintiff's termination, as he was "very familiar with the core values", was not ignorant of

what he was doing, and because he "showed no remorse in his letter to the grievance committee."  <u>See</u> Ex. O at 42:1-22.

89.     The Faculty Grievance Committee further determined that progressive discipline was not appropriate in connection with Plaintiff's case.  Ex. O at 40:18-41:17.

90.     With respect to Plaintiff's argument that there should have been separate committees formed to hear appeals on his suspension and his termination, the Faculty Grievance Committee determined it was illogical to convene one committee to appeal Plaintiff's suspension and another to appeal his termination when the reasoning behind the suspension and termination was "connected. There was no reason for those to be separate."  <u>See</u> Ex. O at 45:15-46:8.

91.     To that end, Plaintiff admitted that he was suspended and terminated for the same conduct, and agreed that suspension is a lesser form of discipline than termination.  <u>See</u> Ex. D at 270:11-17, 273:6-22.

92.     Plaintiff further admitted that the only purpose for a committee to review his suspension separately from his termination would be "following the agreed procedures."  <u>See</u> Ex. D at 336:19-24.

93.     Dr. Sadlack testified that the Committee took their responsibility seriously, understood the ramifications of their decision, and did not feel any pressure to rule in a particular manner.  <u>See</u> Ex. O at 52:5-9, 55:20-56:18.

94.     Plaintiff disagreed with the committee's decision but the actions of the Grievance Committee cannot themselves be grieved. See Ex. D at 315:13-15, 319:2-9; Ex. O at 13:24-14:4; 53:17-19.

**B.     Ad Hoc Committee**

95.     On March 29, 2012, Plaintiff wrote to Sister Munley and requested that an Ad Hoc Faculty Committee be convened, once to appeal his suspension and once to appeal Sister Munley's recommendation to terminate his employment and tenure.  See Ex. D at 320:15-24; Ex. 32 to Plaintiff's Deposition, attached hereto as Ex. R.

96.     On April 3, 2012, Sister Munley wrote to Plaintiff stating that following the Faculty Grievance Committee's decision, she was finalizing her recommendation to terminate his tenure and employment effective immediately. However, she would consider his March 29, 2012 letter as authorization to convene an ad hoc committee to review her decision to suspend and terminate his employment. See Ex. D at 320:15-24, 321:12-323:13; Ex. 33 to Plaintiff's Deposition, attached hereto as Ex. S.

97.     Per the Progressive Discipline Policy, Plaintiff chose Edward O'Brien to serve as one of the three tenured faculty members for the Ad Hoc Committee. See Ex. D at 323:15-324:2, 331:6-11.

98.     Plaintiff did not assert any objection to the other members selected to serve on the Ad Hoc Committee, Dr. Helen Bittel and Mr. Matthew Povse.  See Ex. D at 324:17-24.

99.     On May 6, 2012, Plaintiff submitted a written defense to the Ad Hoc Committee, which focused on whether there were any substantive issues with Plaintiff's suspension and termination.  See Ex. D at 327:11-328:3; Bittel Dep. Tr. at 8:20-9:21, attached hereto as Ex. T; O'Brien Dep. Tr. at 22:13-20, 24:14-20, attached hereto as Ex. U; Povse Dep. Tr. at 11:1-7, attached hereto as Ex. V.

100.    Ultimately, on July 2, 2012, the Ad Hoc Committee issued its decision.  While it did not agree with all of Sister Munley's findings, it concluded that "Sister Anne Munley's termination of Dr. Fagal's employment and tenure is an extreme decision justified by the extreme nature of Dr. Fagal's behavior."  See Ex. D at 330:9-23; Ex. 38 to Plaintiff's Deposition, attached hereto as Ex. W.

101.    The Ad Hoc Committee found that harm was present in Plaintiff's situation, by way of "grave and irreparable harm to [the Marywood] community."  See Ex. T at 36:14-21, 67:23-68:6.

102.    The Ad Hoc Committee also determined that the Progressive Discipline Policy did not require remediation in every instance, and that Plaintiff's case "was not a situation where remediation was a fruitful avenue or was justified." See Ex. T at 37:22-38:13, 48:12-14, 68:11-69:11.

103.   The Ad Hoc Committee's findings specifically stated that Plaintiff "appears to have not acknowledged any errors in judgment on his part at [the January 23, 2012] meeting and left little room for pursuing progressive discipline or a mediated solution to this situation."  See Ex. W at 1.

104.   Each member of the Ad Hoc Committee testified that Plaintiff's suspension and termination were discussed and reviewed, but that they "did not prepare a statement on it because if termination is justified, why wouldn't a suspension be justified unless there were a procedural problem and the [Faculty Grievance Committee] had already adjudicated that there was not a procedural issue."  See Ex. T at 31:9-14; Ex. U at 38:14-21, 42:21-43:11, 53:5-9; Ex. V at 32:22-33:5.

105.   Furthermore, both the Ad Hoc Committee and the Faculty Grievance Committee determined that progressive discipline was not required in every instance and that it was not appropriate in Plaintiff's connection with Plaintiff's case.  See Ex. T at 34:5-35:15; Ex. O at 40:18-41:17.

106.   Each member of the Ad Hoc Committee and the Chair of the Faculty Grievance committee testified that they did not feel any pressure to rule in a particular manner.  See Ex. O at 52:5-9; Ex. T at 53:4-12; Ex. U at 53:13-54:13; Ex. V at 36:23-37:20.

107.   By letter dated July 13, 2012, Sister Munley advised Plaintiff that she received and reviewed the report of the second committee that reviewed her decision to suspend Plaintiff and terminate his employment and tenure, and that her decision to terminate his employment and tenure effective April 3, 2012 stands. <u>See</u> Ex. D at 338:9-339:7; Ex. 40 to Plaintiff's Deposition, attached hereto as Ex. X.

## VI.   <u>PLAINTIFF'S EFFORTS TO FIND EMPLOYMENT POST-TERMINATION</u>

108.   Plaintiff admitted that following his termination from Marywood, he spent "less than one hour" a week looking for a job.  <u>See</u> Ex. D at 342:4-8.

109.   As of November 1, 2016, Plaintiff had submitted only one application to any university or college since his termination.  <u>See</u> Ex. D at 354:15-19.

110.   Defendant's economic expert estimated that Plaintiff incurred an economic loss of $0.  <u>See</u> November 18, 2016 Economic Assessment, attached hereto as Exhibit Y.

Respectfully submitted,

**JACKSON LEWIS P.C.**

*/s/ Stephanie Peet*
Stephanie J. Peet (PA ID: 91744)
Asima J. Ahmad (PA ID: 316001)
Three Parkway
1601 Cherry Street, Suite 1350
Philadelphia, PA 19102-1317
T: (267) 319-7802
F: (215) 399-2249
stephanie.peet@jacksonlewis.com
asima.ahmad@jacksonlewis.com

ATTORNEYS FOR DEFENDANTS

Dated:  November 21, 2016