# EXHIBIT N

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FREDERICK F. FAGAL, JR.,   )   CIVIL ACTION
                        )
      Plaintiff       )
                        )
-vs-                 )
                        )
MARYWOOD UNIVERSITY,   )
                        )
      Defendant      )  NO. 3:14-cv-02404-ARC

- - -

Deposition of Patricia E. Dunleavy, Ph.D.

Thursday, August 11, 2016

- - -

The deposition of PATRICIA E. DUNLEAVY, Ph.D., called as a witness by the Plaintiff, pursuant to notice and the Pennsylvania Rules of Civil Procedure pertaining to the taking of depositions, taken before me, the undersigned, Karin E. Volpitta, a Notary Public in and for the Commonwealth of Pennsylvania, at the Radisson Lackawanna Station Hotel, 700 Lackawanna Avenue, Scranton, Pennsylvania 18503, commencing at 9:01 a.m., the day and date above set forth.

- - -



Page 14

```
1      A  I don't recall.
2           MR. COHEN:  Let's make this Dunleavy 3.
3           (Dunleavy Exhibit No. 3 was marked
4             for identification.)
5   BY MR. COHEN:
6      Q  It's double-sided but most of the backside
7   is redacted.  If you could briefly review this
8   because it's so short and let me know when you're
9   finished.
10     A  (Witness reviews document.)
11     Q  And do you recognize this document?
12     A  Yes.
13          MR. COHEN:  Wait a second, we have different
14  documents.
15          (At this time there was a brief
16            discussion held off the record.)
17  BY MR. COHEN:
18     Q  Do you recognize this document?
19     A  Yes, I do.
20     Q  And this is an e-mail chain first.  The
21  first e-mail is from Dr. Levine to you dated
22  January 17th, 2012 at 12:11 p.m.; right?
23     A  Yes.
24     Q  And the second e-mail is from you to
```

Page 15

```
1   Dr. Levine the same day, 8:45 p.m.; right?
2      A  Yes.
3      Q  Now, you wrote to Dr. Levine, "Internally
4   you can file a formal complaint under the Civil
5   Rights Policy."  Correct?
6      A  That's correct.
7      Q  Do you know if Dr. Levine ultimately did
8   file a formal complaint under Marywood's Civil
9   Rights Policy?
10     A  He did not.
11     Q  And then the next sentence from you is,
12  "We're exploring options from the University
13  perspective with or without a formal complaint from
14  any individual."  Did I read that correctly?
15     A  Yes.
16     Q  Now, what options was the University
17  exploring at this time?
18     A  I don't remember.
19     Q  Do you know what Dr. Levine meant when he
20  asked you about possible responses for him
21  personally?
22     A  Yes.  He was so offended and angry by the
23  videos that he wanted to sue Dr. Fagal himself.
24     Q  But he wasn't so offended that he didn't
```

Page 16

```
1   just file a civil rights complaint, right?
2           MS. PEET:  Objection to the form.
3           THE WITNESS:  I can't speak for Dr. Levine.
4           MR. COHEN:  Let's make this Dunleavy 4.
5           (Dunleavy Exhibit No. 4 was marked
6             for identification.)
7   BY MR. COHEN:
8      Q  Do you recognize this document?
9      A  Yes, that's my handwriting.
10     Q  Now, I found a lot of notes in Marywood's
11  production which are the same handwriting and I
12  couldn't always read it so I'm going to ask you
13  today for you to read it to me and/or explain.  Can
14  you read this aloud?
15     A  Yes.  This is notes I took from what would
16  have been probably a phone call with Tony Spinillo,
17  who was -- or is the CIO at Marywood.  The date is
18  January 8th, 2012.  And the information that Tony
19  gave me was about e-mails and how far back we save
20  them.
21          So he told me that ten years were backed up
22  and can't be deleted.  If something was sent to
23  Marywood, it's saved or if it's sent from here,
24  meaning from Marywood's e-mail, that would also be
```

Page 17

```
1   saved.  The last line, I believe, says "e-mail gets
2   archive."
3           MR. COHEN:  Let's make this Dunleavy 5.
4           (Dunleavy Exhibit No. 5 was marked
5             for identification.)
6   BY MR. COHEN:
7      Q  And do you recognize this document?
8      A  Yes, that's my handwriting.
9      Q  And could you read this aloud, please.
10     A  Certainly.  This is dated January 20 of 2012
11  and it's a note saying that I called Dave Elliott
12  at 7:25 in the morning and that he will -- "WCB" is
13  will call back.  I believe this means he called at
14  8:39 and that he told me he is generally on campus
15  by 8:20 and that he would check Sister's office --
16  that would be Sister Anne Munley's office -- for
17  the layout of her conference room area on Friday
18  and that -- then I have "Ok with Fran."  That would
19  be Sister Anne's secretary.  She'll tell Sister
20  Anne Munley, SAM, that Dave Elliott would come up
21  and check the office for the layout.
22     Q  And who is Dave Elliott?
23     A  He was the Senior Director for Campus
24  Safety.  I don't remember his exact title.
```



Page 18

1    Q   Why would he check the layout of Sister
2  Munley's office?
3    A   Sister wanted him to be outside the office
4  when she met with Dr. Fagal because she wasn't sure
5  what Dr. Fagal might do so she was concerned about
6  a potential threat and wanted security presence
7  outside of the meeting.
8    Q   So this note again is dated January 20,
9  2012; right?
10    A   Yes.
11    Q   So it would be fair to say that as early as
12  January 20th, 2012 President Munley was planning to
13  bring Professor Fagal in for a meeting about the
14  videos?
15    A   Yes.
16    Q   And that meeting ultimately happened on
17  January 23rd, 2012; right?
18    A   Yes.
19        MR. COHEN:  Let's have this marked as
20  Dunleavy 6.
21        (Dunleavy Exhibit No. 6 was marked
22           for identification.)
23  BY MR. COHEN:
24    Q   This is double-sided also.  Could you just

Page 19

1  read this to yourself and let me know when you're
2  finished.
3    A   (Witness reviews the document.)  Okay.
4    Q   Do you recognize this document?
5    A   Yes.
6    Q   And the first e-mail in the chain is from
7  Dr. Levine to you and someone named Mike.  I assume
8  that's Mike Foley?
9    A   I would assume that as well.
10    Q   And here Dr. Levine is sort of laying out a
11  script for bringing Professor Fagal in to speak
12  with President Munley about the videos; correct?
13        MS. PEET:  Objection to the form.
14        THE WITNESS:  That's what it appears to be,
15  yes.
16  BY MR. COHEN:
17    Q   Now, before Dr. Levine sent this first
18  e-mail in this chain, did you meet with him or
19  communicate with him about how Professor Fagal
20  would be handled the next day?
21    A   I don't remember.
22    Q   And then there's an e-mail in this chain
23  sent on January 21st, 2012 at 10:33 p.m. where
24  Dr. Levine is e-mailing you; correct?

Page 20

1    A   Yes.
2    Q   And Dr. Levine mentions that Professor Fagal
3  left him a telephone message, right?
4    A   Yes, that's what the e-mail says.
5    Q   And then at 1:04 p.m. you responded and the
6  first thing you said was, "Oh, yes, very."
7  Correct?
8    A   Yes.
9    Q   And by that you meant, Oh, yes, very
10  interesting?
11    A   Yes.
12    Q   And why did you think that was interesting?
13    A   It just was that Dr. Fagal would call Alan
14  Levine at home.
15    Q   And you told Dr. Levine to save the message,
16  right?
17    A   I did.
18    Q   Do you know whether Dr. Levine did, in fact,
19  save the message?
20    A   I have no idea.
21        MR. COHEN:  And this is more for Stephanie,
22  but if it exists, do you think that we could try to
23  obtain that message?
24        MS. PEET:  It is my understanding it has not

Page 21

1  been saved.
2        MR. COHEN:  Let's make this Dunleavy 7.
3        (Dunleavy Exhibit No. 7 was marked
4           for identification.)
5  BY MR. COHEN:
6    Q   This is double-sided as well.  You don't
7  have to read the whole thing but let me know
8  whether you recognize this.
9    A   I do.
10    Q   And what is this document?
11    A   These are talking points that I typed up for
12  Sister Anne based on points that she raised and
13  asked me to just put them in writing for her, and
14  then she reviewed and -- but it was based on
15  conversations and her directive and they were
16  talking points for her meeting with Dr. Fagal.
17    Q   Now, there's no date on this document but do
18  you have any idea when you might have -- if the
19  meeting with Dr. Fagal was held on the morning of
20  January 23, 2012, when do you think you might have
21  generated this?
22    A   I don't remember.
23    Q   Now, the seventh bullet point down begins,
24  "Tell Fagal that."  Do you see that?



Page 38

1  but you do know what she told you to write down;
2  right?
3      A  Yes.
4      Q  And among the things she told you to write
5  down were possibilities that Professor Fagal would
6  be suspended, that he could retire, ultimately that
7  President Munley could recommend his termination;
8  correct?
9      A  Yes.
10     Q  So you knew, at least from what President
11 Munley was telling you, that this meeting with
12 Professor Fagal could end his career at Marywood;
13 correct?
14         MS. PEET: Objection to the form.
15         THE WITNESS: The creation and distribution
16 of the videos, if Dr. Fagal admitted to those, would
17 have been what resulted in his suspension. He freely
18 chose to do that.
19 BY MR. COHEN:
20     Q  Okay. But I thought you just testified that
21 going to the meeting you weren't absolutely sure
22 that he even generated the videos, correct?
23     A  Correct, if he admitted. That's why the
24 first question was did you author and did you send.

Page 39

1  If he admitted to it then and that was his choice
2  to have done that, that would have resulted in a
3  suspension or any of the other options.
4      Q  Would it have been more reasonable to
5  provide Professor Fagal with more than 15 minutes
6  notice of this meeting on January 23rd, 2012?
7          MS. PEET: Objection to the form.
8          THE WITNESS: I don't think so.
9  BY MR. COHEN:
10     Q  Let me ask you this, and this is a
11 hypothetical, I know that, but if you had sent the
12 e-mail that Professor Fagal had and generated the
13 videos that he posted on YouTube, would you have
14 preferred more than 15 minutes' notice of a meeting
15 with the President, was asking you questions that
16 the answers to which could lead to termination?
17         MS. PEET: Objection; calls for speculation.
18 You can answer.
19         THE WITNESS: First of all, I want it on the
20 record I would never, ever send an e-mail or videos like
21 that. But, no, if I did that kind of a thing, I
22 wouldn't expect any notice.
23 BY MR. COHEN:
24     Q  So going into this meeting of Professor

Page 40

1  Fagal on January 23rd, 2012, at that time how long
2  had you been -- at that time you were Vice
3  President for Human Resources; correct? Is that
4  the exact terminology?
5      A  No. I think I was still Assistant Vice
6  President. I think I became Associate Vice
7  President in 2013, but I'm not positive.
8      Q  Would it be fair to say that you were
9  essentially in charge of HR at Marywood at that
10 time?
11     A  Yes.
12     Q  And at that time, the meeting on
13 January 23rd, 2012, how long had you been
14 essentially in charge of Marywood's HR?
15     A  Since 19 -- no, I'm sorry, since 1984.
16     Q  So a long time?
17     A  A long time.
18     Q  And Professor Fagal was certainly not the
19 first Marywood employee that you saw being
20 disciplined, correct?
21     A  That's correct.
22     Q  And the meeting with Professor Fagal on
23 January 23rd, 2012 wasn't the first meeting that
24 you had with an employee where President Munley or

Page 41

1  a previous President wanted more information from
2  an employee about whether he did something and, if
3  so, what explanations he or she could provide;
4  correct?
5      A  I don't remember because you specified a
6  President. It may have been other administrators.
7      Q  Any other administrator.
8      A  So rephrase the question so I can answer it
9  correctly, I'm sorry.
10     Q  The meeting that you held with Professor
11 Fagal on January 23rd, 2012 was not the first
12 meeting that you participated in with a Marywood
13 employee where he or she was asked whether he or
14 she did something and, if so, why?
15         MS. PEET: Just for clarification, there's
16 no testimony that Dr. Dunleavy held the meeting on
17 January 23rd. You can answer.
18 BY MR. COHEN:
19     Q  Participated.
20     A  That's correct.
21     Q  Now, prior to the January 23rd, 2012 meeting
22 with Professor Fagal, was it your practice to offer
23 only 15 minutes' notice of a meeting where
24 discipline could potentially be meted out?



Page 86

1   probably to the poster incident which, again, was a
2   separate incident to me.
3   BY MR. COHEN:
4      Q   And underneath "Survey," does that say
5   "Deans"?
6      A   Yes.
7      Q   Do you know what that refers to?
8      A   Most of these things -- in fact, I have
9   written on the right that these issues, my word,
10  were never in his personnel file.  So just
11  checking, were there other things in the Dean's
12  file and would they be part of this request, would
13  it be fair or not fair to provide those.
14          MR. COHEN: Let's make this Dunleavy 20.
15          (Dunleavy Exhibit No. 20 was marked
16          for identification.)
17  BY MR. COHEN:
18     Q   This is an e-mail from your personal address
19  to your work address, right?
20     A   Yes.
21     Q   And what does CJ mean?
22     A   I have no idea.  I know at the time I would
23  have known.
24     Q   And how does this relate to Qing cabinet?

Page 87

1      A   I don't know.  These could all have been
2   very distinct issues.  What happens to me sometimes
3   when I get home at night, I think of a thousand
4   things and I'll send myself the briefest of notes
5   knowing that in the morning it will trigger, but it
6   doesn't trigger anything today.
7          MR. COHEN: Let's make this Dunleavy 21.
8          (Dunleavy Exhibit No. 21 was marked
9          for identification.)
10  BY MR. COHEN:
11     Q   Do you recognize this document?
12     A   Yes.
13     Q   And this is an e-mail from you to Sister
14  Anne dated February 29th, 2012.  Who is John Coval?
15     A   John Coval is the Director of Conferences
16  and Special Events.
17     Q   And this dinner that is referred to in this
18  e-mail, is this just an informal thing for people
19  who have worked 25 years or longer at Marywood?
20     A   There's a dinner every year for faculty and
21  administrators who are honored at 20, 25, 30, etc.
22  There's another event for staff that's always held
23  that same week, so there's the Cor Mariae dinner.
24     Q   And Professor Fagal was going to be excluded

Page 88

1   from that dinner, correct?
2      A   That's correct.
3      Q   And was this because he was suspended or
4   because you felt he didn't deserve it or all of the
5   above?
6      A   Because he was suspended.
7          MR. COHEN: Let's make this Dunleavy 22.
8          (Dunleavy Exhibit No. 22 was marked
9          for identification.)
10  BY MR. COHEN:
11     Q   These are more of your handwritten notes,
12  right?
13     A   Yes.
14     Q   And could you read this aloud?
15     A   Certainly.  It's notes from again either a
16  call or a meeting with Sister Anne dated March 6th,
17  2012 regarding Fagal.  It says "Sister Gail Cabral
18  e-mail.  Then Conlogue, Arter, Sadlack.  Copy
19  video, question mark.
20      "Sister Anne will send Sister Gail to me.
21  Meeting notes from 1/23/12, video and other
22  documents, question mark."
23     Q   And who is Sister Gail Cabral.
24     A   Sister Gail Cabral is a tenured faculty

Page 89

1   member who I believe was President of the Faculty
2   Senate that year.
3          MR. COHEN: Let's make this Dunleavy 23.
4          (Dunleavy Exhibit No. 23 was marked
5          for identification.)
6   BY MR. COHEN:
7      Q   Do you recognize this document?
8      A   Yes.
9      Q   And this is an e-mail from you to Sister
10  Anne dated March 7th, 2012 at 1:23 a.m.?
11     A   That's what it says.  The time stamp seems
12  very odd to me.  I work late but not that late.
13     Q   And again, you're referring to a Sister
14  Gail.  Is this Sister Gail Cabral?
15     A   Yes.
16     Q   And you say "I received an e-mail from
17  Sister Gail this evening.  We should be able to
18  meet tomorrow afternoon.  I'm waiting for her to
19  confirm the time."
20      What was the purpose of the meeting referred
21  to here?
22     A   This was the meeting that was referenced in
23  the Dunleavy 22 exhibit where Sister Anne told
24  Sister Gail to contact me.  Sister Gail, I think,

# EXHIBIT O

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

— — —

FREDERICK F. FAGAL, JR.    : CIVIL ACTION
                         :
        Plaintiff,    : NO. 3:14-cv-02404-ARC
                         :
    vs.                : (JUDGE CAPUTO)
                         :
MARYWOOD UNIVERSITY,    :
                         :
        Defendant.    :

— — —

June 28, 2016
— — —

         Oral deposition of Erin Ann Sadlack,
taken pursuant to notice, was held at the
Radisson Lackawanna Station Hotel, Suite 206, 700
Lackawanna Avenue, Scranton, Pennsylvania,
commencing at 9:35 a.m., on the above date,
before Judy A. Black, a Registered Professional
Court Reporter and Notary Public in and for the
Commonwealth of Pennsylvania.

— — —

MAGNA LEGAL SERVICES

Seven Penn Center, 8th Floor

1635 Market Street

Philadelphia, Pennsylvania 19103

(866) 624-6221



Page 10

1    did you review any documents, without telling me what
2    they were?
3        A.    Yes.
4        Q.    Okay.  Now, at some point in 2012, do
5    you recall serving on a faculty grievance committee
6    to adjudicate a grievance that Professor Fagal had
7    filed against President Munley?
8        A.    Yes.
9        Q.    And do you recall the general substance
10   of Professor Fagal's grievance?
11       A.    Yes.
12       Q.    And what was that, to your
13   understanding?
14       A.    Professor Fagal had several aspects of
15   his grievance, that he -- ultimately it's that he was
16   terminated by Marywood University, but he had several
17   procedural complaints about how that process had come
18   to be.
19       Q.    Okay.
20             MR. COHEN:  I'd like to have this marked
21   as exhibit Sadlack-1, please.
22             (Sadlack-1, E-Mail chain, Bates Nos.
23   DEF003295-297, is received and marked for
24   identification.)
                 MAGNA LEGAL SERVICES

Page 11

1        Q.    And if you could just take a look at
2    this for a moment and let me know when you're
3    finished.
4        A.    Yes.
5        Q.    And do you recognize this document?
6        A.    Yes.
7        Q.    And what are we looking at?
8        A.    This was the substance of Dr. Fagal's
9    grievance.  These were the charges that he asked us
10   to look into to investigate as a grievance committee.
11       Q.    And when you say the grievance
12   committee, who -- you were part of that committee,
13   correct?
14       A.    Yes.
15       Q.    And who else?
16       A.    Dr. Bill Conlogue and Dr. Trish Arter.
17       Q.    And did Sister Cabral have any role with
18   regard to the committee?
19       A.    Only in the sense that she was the
20   president of faculty senate, and when a person has a
21   grievance, they typically contact the head of faculty
22   senate to let them know that a grievance is going to
23   be filed if the grievance committee is not in
24   existence, which it wasn't at the time, because
                 MAGNA LEGAL SERVICES

Page 12

1    grievance is a subcommittee of faculty senate, so
2    they had to run an election to convene the committee.
3             So that was -- so she met with us --
4    once we had been elected, she met with us to give us
5    the grievance, but after that, no.
6        Q.    Okay.  And the three professors that
7    were chosen for the committee, what were they -- how
8    large in general was the faculty grievance committee?
9    I mean, did they select three from a larger group
10   or --
11       A.    No, the way it works is that the only
12   people who are eligible for the committee -- you
13   must be tenured, and you cannot serve on rank and
14   tenure or on the faculty development committee, and
15   so they issue a list of all of the names of people
16   who are eligible for the committee.  They do a
17   SurveyMonkey, and then people are elected by all the
18   campus faculty, and then -- so the three of us were
19   elected.
20       Q.    So there was just you three?
21       A.    Correct, to my knowledge.
22             MR. COHEN:  Okay.  Let's mark this as
23   Sadlack-2.
24             (Sadlack-2, Letter dated March 26, 2012,
                 MAGNA LEGAL SERVICES

Page 13

1    Bates No. DEF002088, is received and marked for
2    identification.)
3        Q.    And if you could briefly review this and
4    let me know when you're finished, Dr. Sadlack.
5        A.    Yes.
6        Q.    And do you recognize this document?
7        A.    Yes.
8        Q.    And what is this?
9        A.    This is the letter that I sent to
10   Dr. Fagal at the conclusion of the grievance
11   committee's investigation.
12       Q.    And it's dated March 26, 2012?
13       A.    Yes.
14       Q.    And in this document, you sort of
15   summarized five complaints or arguments that
16   Professor Fagal made in his grievance, and you were
17   informing him that in the committee's view, they
18   lacked merit?
19       A.    Correct.
20       Q.    And in this letter, you did not provide
21   any reasoning for the committee's decision, right?
22       A.    Correct.
23       Q.    And why not?
24       A.    The -- according to the grievance
                 MAGNA LEGAL SERVICES



Page 14

1  policies, the actions of the grievance committee are
2  not themselves grievable, and it seemed it would only
3  invite further argumentation.  It was better to be
4  succinct.
5      Q.    And was that your decision or did you --
6  was this a matter for discussion that you were just
7  going to announce your decision without any
8  reasoning?
9      A.    The committee felt that -- the other
10 members of the committee, we agreed that this was how
11 we wanted to communicate.
12     Q.    Okay.  And, by the way, were you -- was
13 there a chair of the committee?
14     A.    I was the chair of the committee.
15     Q.    And as the chair, did you have -- what
16 was the role of the chair?
17     A.    Frankly, I would say I was elected the
18 chair by showing up five minutes late to our first
19 meeting.  This was not something that we took that
20 seriously in terms of anyone desiring the position.
21 It's more additional paperwork.  It was my job as
22 chair to communicate with Dr. Fagal and with the
23 decision maker, but beyond that, that was the -- that
24 was pretty much the extent of my role.

MAGNA LEGAL SERVICES

Page 15

1      Q.    So it didn't give you extra voting
2  authority or --
3      A.    Absolutely not.
4      MR. COHEN:  Could we mark this as
5  Sadlack-3, please.
6      (Sadlack-3, Multipage document, Bates
7  Nos. DEF003417-423, is received and marked for
8  identification.)
9      Q.    Could you review this and let me know
10 when you're finished?
11     A.    Yes.
12     Q.    And, Dr. Sadlack, do you recognize this
13 document and its attachments?
14     A.    Yes.
15     Q.    And what is the document that I just
16 handed to you?
17     A.    These were -- as I said before, the
18 whole committee was the one that -- we all agreed
19 what our findings were going to be, and so once I had
20 written those up, I wanted to make sure that I had
21 their approval for the letters that I was going to be
22 sending to Dr. Fagal, to Sister Anne Munley, and a
23 record of our notes of what we had done in the
24 committee.

MAGNA LEGAL SERVICES

Page 16

1      Q.    Okay.  Now, in one of the -- let me ask
2  this:  One of the attachments is labeled "Grievance
3  Committee Notes," and it's typewritten.  Do you
4  recall taking any written, like, handwritten notes
5  about the meetings that you had or the deliberations
6  that you had?
7      A.    I don't remember.
8      Q.    When you were deliberating over
9  Professor Fagal's grievance, do you remember sitting
10 with a laptop or --
11     A.    I don't remember.
12     Q.    Do you remember whether someone was --
13 someone on your committee was designated to take
14 minutes?
15     A.    No, there was no one.
16     Q.    Okay.  So this typewritten document
17 labeled "Grievance Committee Notes," did you generate
18 this?
19     A.    I did.
20     Q.    Okay.  And did you generate it from
21 memory or --
22     A.    It was a mixture of my calendar to get
23 the dates and then memory for what we had said.
24     Q.    Okay.  Now, at the bottom of -- if you

MAGNA LEGAL SERVICES

Page 17

1  see on the bottom right of each page, there's a
2  number, and it usually begins with DEF00.  Do you see
3  that?
4      A.    Um-hum, yes.
5      Q.    We call that a Bates number.  Lawyers
6  put that there.  It's just for us to identify the
7  documents, the many documents that have been turned
8  over in this case.  But I'm looking at the page that
9  is marked DEF003420.
10     A.    Yes.
11     Q.    And at the bottom of that page, it says,
12 March 19th, and it begins, "Erin also e-mailed."  Do
13 you see that?
14     A.    Yes.
15     Q.    And it later says, "Pat agreed, but Mary
16 Theresa in a series of e-mails said that she was not
17 able to meet with us because she represents the
18 university."  Do you see that?
19     A.    Yes.
20     Q.    Have I read that correctly?
21     A.    Yes.
22     Q.    And Mary Theresa is the university's
23 general counsel, correct?
24     A.    Yes.

MAGNA LEGAL SERVICES



Page 30

1    A.   No.
2    Q.   Do you remember whether anyone else on
3  your committee took handwritten notes?
4    A.   It was too long ago.  I have no idea.
5    MR. COHEN:  I'd like to take just a few
6  minutes' break.  Okay?
7    (A recess is taken.)
8    Q.   All right.  Let's go back to the exhibit
9  containing Professor Fagal's initial grievance.  I
10  don't know what exhibit number that is, but --
11    A.   Number 1.  This one?
12    Q.   Yes.
13    Let's start on the page that reads
14  DEF003296.  And Professor Fagal is arguing that
15  President Munley improperly suspended him, and part
16  A, he says that the -- a faculty member may be
17  suspended by the present vice for academic affairs at
18  any time during the proceedings involving him or her.
19  Do you see that?
20    A.   Yes.
21    Q.   And, further, he goes on that in his
22  view, the vice president of academic affairs had no
23  involvement in the suspension and that only the
24  president did.  Is that right?
                    MAGNA LEGAL SERVICES

Page 31

1    A.   Yes, he states that, right.
2    Q.   And your committee came to the
3  conclusion that Professor Fagal was wrong about the
4  vice president for academic affairs needing to have
5  been the one to do the suspension, correct?
6    A.   Correct.
7    Q.   And what was your -- what was the
8  reasoning of the committee?  I realize you didn't
9  tell Professor Fagal, but what was your reasoning?
10    A.   The policy which is quoted here includes
11  the word "may," "may be suspended."  That doesn't
12  mean only the vice president of academic affairs, and
13  we concluded it was illogical to suggest that the
14  president wouldn't be involved -- the president
15  couldn't be involved, that all power essentially does
16  go back to her.
17    Q.   Do you remember whether the progressive
18  discipline policy -- well, I made that an exhibit.
19  Let's -- I think we're up to 6, correct?  Let's make
20  this Sadlack-6.
21    (Sadlack-6, Marywood University
22  Progressive Discipline Policy Statement, is received
23  and marked for identification.)
24    Q.   Do you recognize this document,
                    MAGNA LEGAL SERVICES

Page 32

1  Dr. Sadlack?
2    A.   Yes.
3    Q.   And is this the progressive discipline
4  policy?
5    A.   Yes.
6    Q.   And if you look on the last page, where
7  it says "History," the last revision, it says,
8  "October 12, 2011," correct?
9    A.   Yes.
10    Q.   And on the first page, the bottom of the
11  first page, there's a paragraph that starts
12  "Suspension."  Do you see that in bold?
13    A.   Yes.
14    Q.   And it says, "The faculty member may be
15  suspended by the vice president for academic affairs
16  at any time during the proceedings involving him or
17  her."  Do you see that?
18    A.   Yes.
19    Q.   Is there anywhere in this policy where
20  it says that the president of Marywood can be the one
21  to suspend the faculty member?
22    A.   Not explicitly, but if you look at the
23  "may be suspended," it doesn't say only the vice
24  present for academic affairs.
                    MAGNA LEGAL SERVICES

Page 33

1    Q.   So the school cafeteria workers, they
2  could do it, too?
3    A.   That's just not logical.
4    Q.   So the -- you interpreted the policy
5  based on your view of what was logical?
6    MS. PEET:  Objection.  You can go ahead
7  and answer.
8    A.   We looked at the language of the actual
9  policy.  It says "may be suspended."  It does not
10  imply that this is the only person that can be
11  suspended.  If you also look above that, you can have
12  people -- you know, you can start with the supervisor
13  or dean.  Things move up the chain of command.  It's
14  logical that they could move up the chain of command.
15    Q.   So, in your view, the president was
16  authorized to conduct a suspension because she had a
17  higher -- she had higher authority than the vice
18  president?
19    A.   Correct.
20    Q.   Okay.  So under this policy, would it be
21  your view that a member of the board or the board of
22  trustees in general, they could also do it, do a
23  suspension?
24    A.   I wouldn't know.  I don't know how
                    MAGNA LEGAL SERVICES



Page 34

1   that -- I don't know enough of how that
2   relationship -- the board is an advisory body, so I
3   wouldn't see that as necessarily the same kind of
4   thing.
5       Q.   Okay. And the next sentence in the
6   suspension paragraph says, "Suspension is justified
7   if immediate harm to the faculty member or others is
8   threatened by the person's continuance in the faculty
9   position."
10          And it's true that Professor Fagal
11  contested his suspension on this basis, too; that, to
12  his knowledge, no one had deemed him to be a threat
13  to himself or to any other faculty members, correct?
14  I'm saying, that was his argument?
15      A.   That he mentioned in his -- yes.
16      Q.   Yes.
17          And the committee rejected that
18  argument, as well, correct?
19      A.   Correct.
20      Q.   And what was the basis for the
21  committee's rejection of that argument?
22      A.   There are two reasons. One is that we
23  actually didn't think that "harm" did not necessarily
24  mean only physical harm; that, in fact, a harm to the
MAGNA LEGAL SERVICES

Page 35

1   university community had happened. We thought that
2   in particular, by characterizing Dr. Levine, a member
3   that everyone knows is Jewish, a member of the
4   committee, as a Nazi, causes -- that's a form of
5   harassment that causes harm. The fact that the
6   videos were public meant that there was also damage
7   to the university's public reputation. However, we
8   also, for the second reason -- that's not the only
9   reason why suspension may be justified. That is one
10  possible reason, but that's not the only reason why
11  someone might be suspended.
12      Q.   So --
13      A.   That's not a laundry list. That's just
14  one instance of what could merit suspension.
15      Q.   So, in your view, the university could
16  simply -- assuming a suspension was not justified by
17  immediate harm, however that's defined, the
18  administration could find another rationale to
19  suspend someone other than immediate harm?
20          MS. PEET: Object to the form. You can
21  answer.
22      A.   Yes.
23      Q.   And your view is that it's just left
24  open-ended and the university could simply choose a
MAGNA LEGAL SERVICES

Page 36

1   rationale?
2          MS. PEET: Objection to the form.
3          THE WITNESS: Should I go ahead?
4          MS. PEET: Um-hum.
5       A.   I think that it's impossible to codify
6   all the possible reasons, but that's precisely why
7   you have a grievance committee. If a suspension is
8   unfair, then you have someone who will review it.
9   But if you try to prescribe in advance everything
10  that might possibly happen, it would be impossible to
11  do.
12      Q.   So you think that this paragraph on
13  suspension was -- couldn't be more clear about the
14  grounds for suspension than it already is?
15          MS. PEET: Objection to the form. You
16  can answer.
17      A.   I think that there are -- I think
18  policies can always be a little clearer, you know,
19  but in this particular case, this was one possible --
20  and that was the judgment of our entire committee.
21      Q.   So in your view, the role of your
22  committee was -- let me ask you this: In your view,
23  was the role of the committee to adjudicate
24  procedural grievances or substantive grievances or
MAGNA LEGAL SERVICES

Page 37

1   both?
2       A.   In this particular instance, our role
3   was procedural, were these particular procedures
4   violated unreasonably.
5       Q.   Okay. That being said, you also
6   determined, correct me if I'm wrong, that Professor
7   Fagal's suspension was justified?
8       A.   There -- Professor Fagal would have the
9   right to appeal the actual judgment of what had
10  happened. That would be a separate committee that
11  would review that particular one. What we ruled on
12  were the different specific violations that he
13  alleged procedurally.
14      Q.   Now, your view that suspension under
15  this progressive discipline policy could be justified
16  by immediate harm that wasn't necessarily physical,
17  that was your view, correct?
18      A.   Correct.
19      Q.   What other types of immediate harm in
20  your view could the policy cover?
21          MS. PEET: Objection. Already asked and
22  answered, but if you have any more you want to add to
23  that.
24      A.   I don't know -- what you're asking me to
MAGNA LEGAL SERVICES



Page 38

1  do is far beyond what we ever discussed.  We were
2  looking at the specifics of this particular case.
3      Q.     And your judgment was that what
4  Professor Fagal did constituted immediate harm?
5      A.     Well, that's not -- that's not what --
6  that there was some -- that there was a right for him
7  to have been suspended is what we had decided.
8      Q.     That there was a right for him to be
9  suspended?
10     A.     I'm sorry, that -- that caused to.  That
11 he was improperly suspended because he has not been a
12 cause of immediate harm to yourself or others, we
13 thought that there were no grounds for that
14 particular complaint.
15     Q.     Yes, I understand that.  And was it your
16 testimony today that Dr. Fagal's specific argument
17 that his suspension was not grounded in immediate
18 harm had no merit but that he could -- he was free to
19 appeal that suspension?  Or is that --
20     A.     Correct, that he could convene an ad hoc
21 committee to review the actual substance.
22     Q.     Okay.  Let's move back to the first
23 exhibit, which was Professor Fagal's grievance, and
24 I'm on the page where it says DEF003296 at the bottom

MAGNA LEGAL SERVICES

Page 39

1  right.  Paragraph 2, it begins, "President Munley
2  improperly moved to terminate my employment and
3  tenure."  Do you see that?
4      A.     Yes.
5      Q.     And, here, Professor Fagal is
6  essentially arguing that he was terminated
7  prematurely.  I'm not asking you to agree with it.
8  I'm asking you whether that's what he's arguing:  He
9  was terminated prematurely and there were no remedial
10 actions taken during his suspension that could have
11 led to -- that could have led to termination.
12     MS. PEET:  Objection, lack of
13 foundation.  She can't possibly know what was in his
14 mind, but she can know what she interpreted it to be.
15     Q.     I'm asking for your interpretation.
16     A.     Yes, that's my understanding.
17     Q.     And if we go back to the progressive
18 discipline policy, on the second page -- second page,
19 you see the paragraph that says "Dismissal"?
20     A.     Yes.
21     Q.     And that says, "If remedial actions," in
22 parentheses, another S, "taken during the suspension
23 does not sufficiently resolve the issues that lead to
24 the suspension, the university may move towards

MAGNA LEGAL SERVICES

Page 40

1  dismissal of the faculty member."  Did I read that
2  correctly?
3      A.     Yes.
4      Q.     And so the view of the committee was
5  that essentially it was -- it was okay for the
6  president to move directly to termination even though
7  there were no remedial actions taken?
8      A.     It was our unanimous view, if you look
9  at the opening of the progressive discipline policy,
10 the statement -- the third statement in there that
11 the university -- "the policy recognizes professional
12 and personal" -- "personal and professional problems
13 that may be rectified by informal educational
14 process, as well as serious violations of
15 professional responsibilities."  That language,
16 again, suggests that remedial action is not
17 appropriate in every instance.
18     Q.     So that initial prefatory language that
19 you just read, that indicates to you that progressive
20 discipline is optional in some cases but that the
21 university could just immediately move to suspension
22 or termination?
23     MS. PEET:  Objection to form.
24     Q.     In some circumstances, correct?

MAGNA LEGAL SERVICES

Page 41

1      A.     It was the view of our entire committee
2  that there is leeway in that policy.
3      Q.     So the language under "Dismissal" where
4  it says, "If remedial actions taken during the
5  suspension does not sufficiently resolve the issues
6  that lead to the suspension, the university may move
7  towards dismissal of the faculty member," that's
8  just -- did you just ignore that language?
9      MS. PEET:  Objection to the form.
10     A.     No, it's -- again, you cannot isolate
11 one part of the policy from another part of the
12 policy.
13     Q.     Isn't that what you did, though?
14     A.     No, we looked at -- there are cases
15 where -- there are times when you can have
16 progressive discipline and there are times where it's
17 not guaranteed.
18     Q.     And who decides that?
19     A.     The decision maker.  The role of the
20 grievance committee is to give a decision maker
21 advice on their decision if they feel that there is a
22 problem.  We did not feel in this particular case
23 that there was a problem that merited reconsideration
24 by the decision maker.

MAGNA LEGAL SERVICES



Page 42

1    Q.   Okay.  So in your view, there were no
2  remedial actions taken by the university prior to
3  Professor Fagal's termination but that that was okay,
4  correct?
5        MS. PEET:  Objection to the form.
6    A.   Correct.  As I said before, we did not
7  understand what possible remediation there could be.
8    Q.   So how did you come to that conclusion
9  that there was no possible remediation?  Did you --
10  can you predict the future?
11       MS. PEET:  Objection to the form.
12   A.   We certainly discussed, you know, this
13  whole matter at length, and as I said before, we knew
14  that Professor Fagal was very familiar with the core
15  values, that there's not a case of -- that he could
16  claim that he was ignorant of what he was doing.  We
17  saw no remorse in his letter to the grievance
18  committee, and we knew that he had been present at
19  harassment training, so we're not -- we could not
20  have envisioned a further one.  That doesn't mean
21  there aren't possible other things, but we did not
22  see anything possible that we could come up with.
23   Q.   And you testified earlier that you did
24  meet with Dr. Dunleavy as part of your committee

MAGNA LEGAL SERVICES

Page 43

1  deliberations.
2    A.   Correct.
3        May I correct that?
4    Q.   Sure.
5    A.   Not as part of our deliberations but
6  just general fact seeking about policy and things
7  like that.
8    Q.   And Dr. Dunleavy was head of Marywood's
9  human resources department, correct?
10   A.   Correct.
11   Q.   Do you remember asking Dr. Dunleavy what
12  forms of remediation are sometimes offered to
13  disciplined employees of the university?
14   A.   I don't remember.
15   Q.   But you do remember deciding on your own
16  that no possible remediation was warranted in
17  Professor Fagal's case, correct?
18   A.   Not that it wasn't -- we certainly
19  didn't feel that there were grounds for overturning
20  what he was asking us to overturn.
21   Q.   Okay.  And you didn't interview
22  Dr. Fagal, correct?
23   A.   No, we relied on his statement.
24   Q.   On just his grievance statement?

MAGNA LEGAL SERVICES

Page 44

1    A.   Yes.
2    Q.   Okay.  But you also relied on several --
3  on a set of written notes from Dr. Dunleavy, correct,
4  about what had occurred at the meeting between
5  Dr. Fagal, the president, Dr. Dunleavy?
6        MS. PEET:  Objection to the form.
7    Q.   You did rely on that?
8    A.   That was part of it.
9    Q.   Do you remember what other materials,
10  written materials, you considered as part of your
11  deliberations?
12   A.   We were given a packet of -- it had the
13  different policies included, it had Professor Fagal's
14  e-mails, and then his -- and his grievance.
15   Q.   Do you remember --
16   A.   I can't recall -- there may have been
17  others, but that's -- I think -- I cannot remember --
18  we had some kind of access to the videos, screen
19  shots or transcripts or something.  I don't remember.
20  Maybe it might have been the actual videos
21  themselves.  I don't recall.
22   Q.   So coming back to the first exhibit,
23  Professor Fagal's grievance, and we're still on the
24  second page, at the bottom, Dr. Fagal had argued that

MAGNA LEGAL SERVICES

Page 45

1  his request to convene a committee to appeal his
2  suspension had not been accepted.  And he quoted the
3  progressive discipline policy stating that it could
4  be convened twice, once for suspension and once for
5  dismissal, and that that had not occurred.  And I'm
6  not asking you to agree with what he's saying, but
7  that's your interpretation of what he's arguing,
8  correct?
9    A.   Yes.
10   Q.   And ultimately you ruled that that
11  argument had no merit, either, correct?
12   A.   Correct.
13   Q.   And what was your reasoning for that?
14   A.   I have to look back in here.
15       Again, it came back to the logic of what
16  was happening here.  We found that the policy doesn't
17  guarantee that series of steps, but rather it's a
18  possibility wherever remediation is warranted; and in
19  particular, we had noted that if you got a
20  recommendation for either suspension or dismissal,
21  you would have the right to have a committee consider
22  the matter, but, again, we didn't think it was
23  logical or even a use of resources -- why would you
24  have a different committee look at the exact same

MAGNA LEGAL SERVICES



Page 46

1  circumstances? That just didn't make sense either.
2  We thought it was very important that Professor Fagal
3  have a committee to review the substance of the
4  matter. We absolutely believed that he was entitled
5  to that, but we didn't see it as the suspension --
6  you know, appeal the suspension and appeal the
7  termination, that those were connected. There was no
8  reason for those to be separate.
9      Q.   Okay. So to be clear, you did believe
10  that Professor Fagal had a right to appeal his
11  suspension, just not as a separate -- just not have
12  two separate committees, one for suspension and one
13  for termination. Is that what you're saying?
14     A.   We believed he had the right to a
15  committee that's going to review the entire matter.
16     Q.   Okay. Coming back to the progressive
17  discipline policy. I think that's Sadlack Exhibit 6.
18  Am I right about that, Exhibit 6?
19     A.   Yes.
20     Q.   If you look on page 2, do you see where
21  it says "Ad Hoc Faculty Committee" in bold?
22     A.   Um-hum. Yes.
23     Q.   And at the very bottom of the page, it
24  says, "Should a faculty member request that such a"

MAGNA LEGAL SERVICES

Page 47

1  committee be convened twice," in parentheses, "i.e.,
2  once for suspension and once for dismissal, the
3  membership of the committee may be similar." Do you
4  see that sentence?
5      A.   Yes.
6      Q.   So, in essence, did you ignore that
7  statement in coming to the conclusion that Professor
8  Fagal was not entitled to a separate committee to
9  review his suspension?
10     MS. PEET: Objection to the form.
11     A.   No. Again, there's -- this is not an
12  absolute. There is an element -- there is this
13  element of should the committee -- if you look at the
14  very beginning of that, "Should the faculty member
15  request a review by the ad hoc committee," at that
16  point, that was a separate committee that would have
17  then -- would have to then be convened. And if you
18  look at the very beginning, "You have the right to
19  convene the ad hoc committee to appeal the decision
20  or the decision to dismiss," so he has the right --
21  so dealing with that together made sense.
22     Q.   I don't understand. So your view was
23  that a professor in Dr. Fagal's position had a right
24  to appeal his suspension but not necessarily that --

MAGNA LEGAL SERVICES

Page 48

1  not necessarily to have a separate committee,
2  separate from the committee reviewing his
3  termination, review his suspension, as well, correct?
4      MS. PEET: Objection to form. Lack of
5  foundation.
6      A.   I have to rely on what our notes were.
7  I don't remember -- this is so many years ago, but
8  what we had said here was, in particular, that the
9  language is that if you get a recommendation for
10  either suspension or dismissal, you then send that
11  written communication stating with reasonable
12  particularity to convene the committee to consider
13  the matter. Whatever decision is reached, that
14  decision may be appealed. That's what we thought.
15  We thought that was a reasonable interpretation.
16     Q.   And you thought that it wouldn't be
17  logical for Professor Fagal to have two separate
18  committees, one to review his suspension, one to
19  review his termination?
20     MS. PEET: Are we talking about an ad
21  hoc committee or a faculty grievance committee?
22     MR. COHEN: Ad hoc.
23     MS. PEET: Lack of foundation.
24     A.   They -- that is correct. There's

MAGNA LEGAL SERVICES

Page 49

1  nothing that it would be illogical. It would be the
2  exact same matter under consideration, so it would
3  just be an instance of the entire substance of
4  everything was exactly the same, nothing would have
5  changed in between them, so that that wasn't logical.
6      Q.   So your interpretation of what was
7  logical could sometimes override what the policy
8  states?
9      MS. PEET: Objection to the form,
10  mischaracterization of testimony and complete lack of
11  foundation.
12     A.   Again, it is our job as the committee to
13  determine what we think -- you know, what is --
14  that's exactly what Professor Fagal was asking us to
15  do, was to look and see had he been treated fairly,
16  and we felt unanimously that he was.
17     Q.   Your view was that Dr. Fagal was asking
18  you to see if he was treated fairly or whether he was
19  treated according to the actual policy?
20     A.   None of the grounds of his complaint
21  were justified.
22     Q.   I don't understand.
23     A.   He asked us to look into several
24  specific things and that we found that none of those

MAGNA LEGAL SERVICES



Page 50

1 complaints were grounded in what was reasonable
2 according to the language of the policy and our own
3 logic.
4 Q. Coming back to Professor Fagal's
5 grievance. Again, we're on the second page, and
6 paragraph 2, it says, "President Munley improperly
7 moved to terminate my employment and tenure." Do you
8 see that?
9 A. Yes.
10 Q. Part B, Professor Fagal argues that only
11 a vice president could recommend dismissal, and he
12 quotes from the progressive discipline policy,
13 "Having received a written recommendation for either
14 suspension or dismissal from the vice president for
15 academic affairs." Do you see that?
16 A. Yes.
17 Q. And you determined that he was --
18 Professor Fagal was wrong about that, too?
19 A. We applied the same logic that we had in
20 the earlier instance, that the authority ultimately
21 stems from the president; and, again, the language
22 was ambiguous to -- where it says "may," it
23 doesn't -- it's not ambiguous, but it doesn't
24 allow -- it doesn't suggest that the president

Page 51

1 cannot.
2 Q. Let's turn back to the progressive
3 discipline policy, then. Again, page 2, do you see
4 where it says "Ad Hoc Faculty Committee"?
5 A. Yes.
6 Q. And the first bullet point says, "Having
7 received a written recommendation for either
8 suspension or dismissal." This is the language that
9 Professor Fagal was quoting, correct?
10 A. Yes.
11 Q. Where does it say "may" here?
12 A. Again, we had gone back to the earlier
13 suspension, that this may be and, again, applying the
14 same kind of logic all the way through. The
15 president is ultimately the one who has say over all
16 the faculty. She is the one who ultimately rules on
17 faculty tenure. All of these policies, she's
18 ultimately our boss, so to suggest that she is not --
19 that it should only come from someone who's below her
20 is illogical.
21 Q. At the time that you were -- that you
22 served on the faculty grievance committee for
23 Professor Fagal's particular grievance, at that time
24 were you a tenured professor?

Page 52

1 A. Yes.
2 Q. And everyone on the committee was also
3 tenured?
4 A. Correct.
5 Q. While you were serving on this faculty
6 grievance committee, did you feel any pressure to
7 rule in one way or the other?
8 A. Absolutely not, only the pressure to do
9 right by everyone.
10 Q. Okay. At some point do you remember
11 being contacted by members of an ad hoc committee
12 regarding what exactly the faculty grievance
13 committee did with regard to Professor Fagal?
14 A. Yes.
15 Q. And who contacted you?
16 A. Dr. Helen Bittel.
17 Q. And ultimately did you actually meet
18 with the ad hoc committee?
19 A. I did.
20 Q. And do you remember what questions were
21 asked of you?
22 A. Not in detail. We were trying to sort
23 out the purview of each committee. We had looked at
24 the procedural elements, and they were looking at the

Page 53

1 substantive. So we were just clarifying it.
2 Q. When you say clarifying it, you were
3 looking into -- you mean the faculty grievance
4 committee was considering the procedural aspects of
5 Professor Fagal's discipline; the ad hoc faculty
6 committee was just reviewing it substantively?
7 A. Yes.
8 Q. And how did you reach that conclusion,
9 that the ad hoc faculty committee should not consider
10 procedure?
11 A. Because the actions of the grievance
12 committee cannot be grieved. It doesn't make sense
13 to have an entire group of faculty then rereview
14 everything that had been already filed.
15 Q. And in reaching that conclusion, you
16 were just relying on common sense?
17 A. And the language of the policy that says
18 the actions of the grievance committee cannot
19 themselves be grieved.
20 Q. Do you know whether any of the language
21 regarding the ad hoc faculty committee says that they
22 can't also consider procedure?
23 A. That was not my committee.
24 Q. But, nonetheless, you advised the ad hoc



1  faculty committee that they should just consider
2  substance?
3         MS. PEET: Objection,
4  mischaracterization of testimony. You can answer.
5     A.    That was our overall consensus.
6     Q.    So let me ask this: If a professor does
7  not file a faculty grievance and just moved straight
8  to an ad hoc faculty committee, is it your view that
9  he has kind of waived any procedural arguments?
10    A.    You would not actually -- you would
11  always start with the faculty grievance committee.
12    Q.    Really?
13    A.    Yes.
14    Q.    Okay. The language of the progressive
15 discipline policy, did you find it to be vague in any
16 way, or ambiguous?
17    A.    There were -- as we first looked at it,
18 in particular, it looked like a series of steps that
19 all had to be taken. We just had to sort out that
20 aspect of things.
21    Q.    So at first --
22    A.    When we first read through the policy,
23 it was you could do this, you could do this, you
24 could do that. We didn't have to do all of those

1  particular steps.
2     Q.    Okay.
3     A.    But that was easily clarified.
4         MS. PEET: Could we take a quick break?
5         MR. COHEN: Sure.
6         (A recess is taken.)
7     Q.    After your faculty grievance committee
8  ruled in Professor Fagal's case, do you remember
9  discussing your deliberations after the fact with
10 anyone other than attorneys in this case?
11    A.    No. Our deliberations, no.
12    Q.    Not the president?
13    A.    No.
14    Q.    Nobody else?
15    A.    No one.
16        MR. COHEN: Okay. I think I'm finished.
17        MS. PEET: Can I just ask --
18        MR. COHEN: Sure.
19 CROSS-EXAMINATION BY MS. PEET:
20    Q.    I believe all of us in the room,
21 Dr. Sadlack, understood what you meant earlier, but
22 I'm not quite sure it's going to come clear on the
23 record, so I just want to ask clarification.
24        When Mr. Cohen was asking you earlier

1  about how you were selected as chairman of the
2  committee and you talked about the fact that no one
3  took it too seriously, I just want to make sure it's
4  clear on the record. You weren't talking about the
5  fact that you weren't taking the committee seriously,
6  correct?
7     A.    No. In fact, honestly, all of us -- I
8  remember us talking about that. We felt we had been
9  honored by being elected by our fellow faculty
10 members to serve in this role, that they trusted us
11 with that. No, it was purely just the role of being
12 chair sounds very prestigious, but what it actually
13 tends to be is paperwork, and so no one thinks of
14 that as anything more than just an onerous duty.
15    Q.    And that comment was specifically about
16 the chair position, correct?
17    A.    Right. Not the committee, absolutely
18 not, right.
19        MS. PEET: That's all I have.
20        (Whereupon, at 11:10 a.m., the
21 deposition of Erin Ann Sadlack concluded.)
22
23
24

1         CERTIFICATE
2
3      I HEREBY CERTIFY that the witness was
4  duly sworn by me and that the deposition is a
5  true record of the testimony given by the
6  witness.
7
8
9
10        Judy A. Black
          Registered Professional Reporter
11        Dated: July 13, 2016
12
13
14
15
16     (The foregoing certification of this
17 transcript does not apply to any reproduction of
18 the same by any means, unless under the direct
19 control and/or supervision of the certifying
20 reporter.)
21
22
23
24



# EXHIBIT P



Erin Sadlack <easadlack@maryu.marywood.edu>

## Notice of Grievance Committee's receipt of materials
3 messages

**Dr Erin A Sadlack <easadlack@maryu.marywood.edu>**               Mon, Mar 19, 2012 at 5:52 PM
To: fffagal@yahoo.com
Bcc: Dr William P Conlogue <conlogue@maryu.marywood.edu>, Dr Patricia Sullivan Arter
<psarter@maryu.marywood.edu>

Dear Fred,

This email is just to inform you that the Faculty Grievance Committee has received your official grievance
regarding your suspension and termination and to tell you that we have begun the process of reviewing your
arguments. If there is any additional information you would like us to consider, please let me know. Otherwise we
will be in touch when we have our findings ready.

Sincerely,
Erin

~~~~~~~~~~~~~~~~~~~~~~~
Erin A. Sadlack, Ph.D.
Associate Professor, English Department
Honors Program Director
Marywood University
2300 Adams Avenue
Scranton, PA 18509
570-348-6211, x2344

---

**Frederick Fagal <fffagal@yahoo.com>**                          Mon, Mar 19, 2012 at 10:10 PM
Reply-To: Frederick Fagal <fffagal@yahoo.com>
To: Dr Erin A Sadlack <easadlack@maryu.marywood.edu>

Hello Erin,

Thanks for keeping me informed. I am suspended (I am surely not teaching) but at this
point/stage President Munley has only *recommended* my termination. I can think of
nothing more you and the others should know at the moment, but will let you know if
something comes up.

Sincerely,

Fred

Frederick F. Fagal, Jr., Ph.D.
Associate Professor of Economics, Social Science Department
Marywood University
2300 Adams Avenue
Scranton, PA 18509



**From:** Dr Erin A Sadlack <easadlack@maryu.marywood.edu>
**To:** fffagal@yahoo.com
**Sent:** Monday, March 19, 2012 5:52 PM
**Subject:** Notice of Grievance Committee's receipt of materials
[Quoted text hidden]

**Dr Erin A Sadlack** <easadlack@maryu.marywood.edu>          Wed, Mar 21, 2012 at 8:02 PM
To: Dr William P Conlogue <conlogue@maryu.marywood.edu>, Dr Patricia Sullivan Arter
<psarter@maryu.marywood.edu>

Here is Fred's response.
[Quoted text hidden]
---
[Quoted text hidden]

# EXHIBIT Q



COLLEGE OF LIBERAL ARTS AND SCIENCES

# Marywood
U N I V E R S I T Y

MARYWOOD UNIVERSITY
SCRANTON, PA 18509-1598
TEL: (570) 348-6219
www.marywood.edu/english

DEPARTMENT OF ENGLISH

Dr. Frederick Fagal
17 East Lake Street
Skaneateles, NY, 13152

Sent via email to fffagal@yahoo.com, as well as regular mail.

March 26, 2012

Dear Dr. Fagal,

As Chair of the Faculty Grievance Committee, I write to inform you that the committee has reviewed thoroughly your grievance about your recent suspension and recommendation for termination of employment and tenure, namely, your arguments:

1. That you were improperly suspended by President Munley; the action should have originated with Dr. Levine.
2. That you were improperly suspended because you have not been a cause of immediate harm to yourself or to others.
3. That President Munley moved improperly to terminate your employment and tenure because you should have had a chance for remediation.
4. That President Munley moved improperly to terminate your employment and tenure because only the Vice President can take such action.
5. That you have not had an opportunity to convene an ad hoc committee to appeal the suspension.

I now write to inform you that in reviewing each of these grievances, we have found no evidence of improper action on President Munley's part which would constitute a legitimate grievance.

I will notify President Munley of the decision as well.

Sincerely,

Erin A. Sadlack, Ph.D.
Chair, Faculty Grievance Committee

cc:   Sr. Gail Cabral, IHM, Ph.D., Faculty Senate President



*An education inspired by the Sisters, Servants of the Immaculate Heart of Mary.*

# EXHIBIT R

Sr Anne Munley <annemunley@maryu.marywood.edu>

 **Regarding: Ad Hoc Faculty Committee**
1 message

Frederick Fagal <fffagal@yahoo.com>                          Thu, Mar 29, 2012 at 10:01 AM
Reply-To: Frederick Fagal <fffagal@yahoo.com>
To: "annemunley@marywood.edu" <annemunley@marywood.edu>

17 East Lake Street
Skaneateles, NY 13152

March 29, 2012

Via E-Mail & USPS First-Class Mail

President Anne Munley, IHM
2300 Adams Avenue
Marywood University
Scranton, Pennsylvania 18509

Re: Ad Hoc Faculty Committee

Dear President Munley:

Yesterday I received a letter from Dr. Erin A. Sadlack stating that the Faculty Grievance
Committee
"found no evidence of improper action on [your] part which would constitute a legitimate
grievance." I strongly disagree with that Committee's "finding." In any case, I am again
exercising my
right under Marywood University's Progressive Discipline policy to convene an ad hoc committee
to
appeal your suspension of me as well as your recommendation to terminate my employment and
tenure.

I grant permission for Marywood University to release your "Recommendation for Termination
and Statement of Charges" dated February 8, 2012 to an ad hoc committee in order to appeal your
decision to suspend me as well as your recommendation to terminate my employment and tenure.
To be
clear, I am requesting that the ad hoc committee be convened twice—once to appeal my
suspension and
once to appeal your recommendation to terminate my employment and tenure.

If you have any questions, please do not hesitate to contact me or my attorney, Jonathan Z.
Cohen.

Sincerely,

Frederick F. Fagal, Jr.



17 East Lake Street
Skaneateles, NY 13152

March 29, 2012

<u>Via E-Mail & USPS First-Class Mail</u>

President Anne Munley, IHM
2300 Adams Avenue
Marywood University
Scranton, Pennsylvania 18509

Re:  <u>Ad Hoc Faculty Committee</u>

Dear President Munley:

Yesterday I received a letter from Dr. Erin A. Sadlack stating that the Faculty Grievance
Committee "found no evidence of improper action on [your] part which would constitute a legitimate
grievance." I strongly disagree with that Committee's "finding." In any case, I am again exercising my
right under Marywood University's Progressive Discipline policy to convene an ad hoc committee to
appeal your suspension of me as well as your recommendation to terminate my employment and tenure.

I grant permission for Marywood University to release your "Recommendation for Termination
and Statement of Charges" dated February 8, 2012 to an ad hoc committee in order to appeal your
decision to suspend me as well as your recommendation to terminate my employment and tenure. To be
clear, I am requesting that the ad hoc committee be convened twice—once to appeal my suspension and
once to appeal your recommendation to terminate my employment and tenure.

If you have any questions, please do not hesitate to contact me or my attorney, Jonathan Z.
Cohen.

Sincerely,

Frederick F. Fagal, Jr.

· Frederick F. Fagal, Jr.

cc:   Jonathan Z. Cohen, Esquire

# EXHIBIT S



**Marywood**
UNIVERSITY

OFFICE OF THE PRESIDENT

MARYWOOD UNIVERSITY
SCRANTON, PA 18509-1598
TEL: (570) 348-6231
FAX: (570) 340-6014
EMAIL: ANNEMUNLEY@MARYWOOD.EDU
www.marywood.edu

April 3, 2012

Dr. Frederick F. Fagal, Jr.
17 East Lake Street
Skaneateles, NY 13152

Dear Dr. Fagal,

I have received your letter dated March 29, 2012. You chose to file a grievance under the Marywood University Faculty Grievance and Appeals Policy and chose not to convene an ad hoc committee to review my recommendation as I had offered to you on two occasions. The Faculty Grievance Committee reviewed your grievance and found no evidence of improper action on my part which would constitute a legitimate grievance.

Since the grievance process is now complete, I have decided to finalize my recommendation. As a result, your employment with Marywood and your tenure are terminated effective today, April 3, 2012.

Further, to provide you with a review of my decision, I will consider your letter dated March 29, 2012 as your authorization for me to convene two faculty ad hoc committees to appeal my decisions to suspend you and to terminate your employment and tenure. I am doing this despite the fact that on two separate occasions you refused my offer and did not choose to convene an ad hoc committee to review my decision to suspend you and my recommendation to terminate your employment and tenure before I finalized my decision.

According to the terms of the Progressive Discipline Policy, you must now select a tenured faculty member for the ad hoc committee. Please submit the name of your selection to Sr. Gail Cabral, President of the Faculty Senate, as soon as possible.

Sincerely,

*Sister Anne Munley IHM*

Sister Anne Munley, IHM
President



*An education inspired by the Sisters, Servants of the Immaculate Heart of Mary.*

# EXHIBIT T

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

– – –

| | | |
|---|---|---|
| FREDERICK F. FAGAL, JR. | ) | CIVIL ACTION |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | No.:  3:14-cv-02404-ARC |
| | ) | |
| MARYWOOD UNIVERSITY, | ) | |
| | ) | JUDGE CAPUTO |
| Defendant | ) | |

– – –

Deposition of Helen Bittel, Ph.D.

Thursday, September 29, 2016

– – –


    The deposition of Helen Bittel, Ph.D., called as
a witness by the Plaintiff, pursuant to notice and
the Pennsylvania Rules of Civil Procedure
pertaining to the taking of depositions, taken
before me, the undersigned, Christine A. Messner, a
Notary Public in and for the Commonwealth of
Pennsylvania, at 700 Lackawanna Avenue, Scranton,
Pennsylvania 18503, commencing at 10:04 a.m., the
day and date above set forth.

– – –


MAGNA LEGAL SERVICES
Seven Penn Center
1635 Market Street, 8th Floor

Philadelphia, Pennsylvania 19103

www.MagnaLS.com

866-624-6221



Page 6

1  professor.
2      Q   Are you tenured?
3      A   I am tenured.
4      Q   Okay.  Have you ever met my client Professor
5  Fagal before?
6      A   Yes, I have.
7      Q   And when did you first meet him?
8      A   Sometime in my early years at Marywood, no
9  particular date comes to mind.  We worked in the same
10  building, so we go downstairs to get a cup of coffee.
11     Q   At some point in 2012 you participated in a
12  committee regarding certain disciplinary measures that
13  the administration was trying to bring against my
14  client, correct?
15     A   Correct.
16     Q   And before that --
17     A   Okay.
18     Q   -- what were your general impressions of
19  Professor Fagal?
20         MS. PEET:  Objection to the form.  You can
21  answer.
22  BY MR. COHEN:
23     Q   So unless your attorney objects and instructs
24  you not to answer, you have to try to answer, but --

Page 7

1  and also after I ask a question, you might want to give
2  your attorney like a few seconds so that she can
3  interpose an objection.
4         MS. PEET:  Thanks, Mr. Cohen.
5         MR. COHEN:  I'm sorry.  It's useful advice,
6  right?
7         MS. PEET:  Yeah.
8  BY MR. COHEN:
9      Q   Do you need me to rephrase the question?
10     A   I had no strong opinions either way.
11     Q   Okay.
12     A   Someone I would see in the building and see at
13  general faculty meetings.
14     Q   Okay.  Did you prepare at all for today's
15  deposition?
16     A   For today's deposition, yes.  I met with
17  Stephanie this summer.
18     Q   Okay.
19     A   And I reviewed documents relative to my part and
20  my role in this process.
21     Q   When was --
22         MS. PEET:  I'm just going to instruct you,
23  and I know Mr. Cohen didn't ask you any questions about
24  it, but you are not to discuss any substantive

Page 8

1  discussions you and I had --
2         THE WITNESS:  Right.
3         MS. PEET:  -- at any point.
4         THE WITNESS:  That's our privilege.
5         MS. PEET:  That would be specific to the
6  attorney/client privilege, that's correct.
7  BY MR. COHEN:
8      Q   Do you remember what documents you did review in
9  preparation for this?
10     A   E-mail exchanges between members of my
11  committee, drafts of the statement we ultimately
12  prepared, other general e-mails we presented along the
13  way including Doctor Fagal's statement and request for
14  appeal.  We did receive the findings of the Faculty
15  Grievance Committee who adjudicated the procedural
16  aspects.
17     Q   So eventually in 2012 you did serve on what's
18  called an Ad Hoc Faculty Committee?
19     A   That is correct.
20     Q   What was, in your own words, what was the
21  purpose of that committee?
22     A   We were convened following the meeting --
23  following the meeting of the Faculty Grievance
24  Committee.  The Faculty Grievance Committee functions

Page 9

1  as a grand jury and decides whether a grievance --
2  whether procedure has been followed and whether the
3  grievant should go forward.  If the person appeals,
4  then the head of faculty senate calls a committee from
5  a pool of I think it's 15 tenured faculty members and
6  we are appointed to adjudicate the substance of the
7  case.
8         In this case responding to -- I guess we all
9  obviously saw, you know, as part of our review process
10  Sister Anne's documents to -- Fred Fagal's appeal to
11  Anne Munley, Anne Munley's written responses, all of
12  the back and forth.
13     Q   Okay.
14     A   But we -- bottom line we were supposed to
15  adjudicate the substance of Fred's grievance.
16     Q   And you were supposed to adjudicate the
17  substance of his grievance or the administration's
18  requested of discipline of him?
19     A   Of his appeal which was -- his appeal which was
20  his response, his grievance against Sister Anne's
21  statement of charges.
22     Q   Okay.
23     A   So we had to look at Sister Anne's statement of
24  charges and also why Fred said that those were not



Page 30

1  be the review of substance, the termination and denial
2  of tenure charges. We understand that the issues of
3  suspension and procedure were resolved by the FGC. Did
4  I read that correctly?
5     A  You did read it correctly.
6     Q  And P.D. stands for Patricia Dunleavy, right?
7     A  That's correct.
8     Q  And FGC stands for Faculty Grievance Committee,
9  right?
10    A  Correct.
11    Q  Now, earlier today I think you said that your
12  committee, one of the purposes was to consider
13  Professor Fagal's suspension; correct?
14    A  We later came to consider that in our
15  deliberations, but at this moment in the process of
16  figuring out who does what and what our role was in the
17  judicial process at this moment we were less sure.
18    Q  So what made you sure later that you were
19  supposed to consider the suspension?
20    A  We just -- because the same action precipitated
21  the suspension and the dismissal. And so we did not
22  prepare a separate statement on the suspension because
23  if you found -- since our findings upheld a greater
24  charge on the same action, it doesn't make any sense

Page 31

1  that they wouldn't uphold a lesser charge on the same
2  action.
3     Q  So did you consider that -- did you think that
4  reviewing the suspension; if you had already determined
5  that Professor Fagal's termination was appropriate, did
6  that lead you to think that you did not need to
7  consider whether the suspension was appropriate?
8        MS. PEET:  Objection to the form.
9        THE WITNESS:  We discussed the suspension,
10 but we did not prepare a formal -- we did not prepare a
11 statement on it because if termination is justified,
12 why wouldn't a suspension be justified unless there
13 were a procedural problem and the FGC had already
14 adjudicated that there was not a procedural issue.
15 BY MR. COHEN:
16    Q  So why would you discuss the suspension at all
17 if you thought that the termination was appropriate?
18    A  Because it was on the table. I mean we did have
19 to ask ourselves first could suspension be justified by
20 the actions and then could termination and revocation
21 of tenure be justified by the actions.
22    Q  But you didn't make any formal finding about
23 whether the suspension was appropriate?
24    A  No, because termination and especially

Page 32

1  revocation of tenure, which in some ways is the more
2  serious issue were found to be justified.
3        MR. COHEN:  Okay. Can we have this marked
4  as Bittel 8 please.
5        (Whereupon Bittel Exhibit 8 was marked for
6  identification.)
7  BY MR. COHEN:
8     Q  And could you read this to yourself and let me
9  know when you're finished please.
10    A  Okay.
11    Q  Do you recognize this?
12    A  It appears to -- I vaguely recognize it. It
13 looks like my writing.
14    Q  Are these notes that you took about a telephone
15 conversation that you had with Pat Dunleavy?
16    A  Yes.
17       MS. PEET:  And for the record, can we
18 describe the blackouts so she understands.
19 BY MR. COHEN:
20    Q  Yes. The blackouts no one is saying that you
21 did that. Marywood's attorneys have to redact certain
22 things --
23    A  Okay.
24    Q  -- because they may be privileged.

Page 33

1     A  Okay.
2     Q  So ignore that please.
3     A  Okay.
4     Q  So based on these notes, Doctor Dunleavy told
5  you that your committee needed to provide an
6  independent review?
7     A  Yes, that word was used several times.
8     Q  And that your committee needed to come to a
9  decision independently from the administration?
10    A  That was made very clear to us from the first
11 meeting. The first time we met with Sister Gail and
12 Pat Dunleavy, we were told that there's no punitive
13 action against you if you find against the
14 administration. There's no -- you know, that you need
15 to be an independent review or an independent review of
16 the substance of the charges.
17    Q  Point five here you're taking notes on advice
18 that Doctor Dunleavy gave you about when the
19 progressive discipline policy applies and when it
20 doesn't apply, right?
21    A  Correct.
22    Q  So you understood that there are some cases in
23 which the progressive discipline policy does not apply?
24    A  Yes. And we came to the conclusion prior to



Page 34

1  this conversation with Pat that we wanted to verify
2  with her as well.  This was a conclusion that we came
3  to based on our reading of the progressive discipline
4  policy that she gave me previously.
5      Q  How did you come to the conclusion that the
6  progressive discipline policy sometimes doesn't apply?
7      A  The word may, it's a verb.
8          MS. PEET:  Do you need to look at
9  something?
10         THE WITNESS:  Should I look in the --
11  BY MR. COHEN:
12     Q  I'm not asking you to look at the exhibit yet.
13     A  Okay.  It was the wording and the language of
14  the policy particularly, the verbs like may and might
15  as opposed to will or should.
16     Q  Let's turn back to Bittel 5.  This is the
17  progressive discipline policy, right?
18     A  Yes, it is.
19     Q  Now, can you tell me again how you came to the
20  conclusion that in some cases this policy does not
21  apply?
22         MS. PEET:  Just for clarification, that the
23  policy didn't apply generally or the policy doesn't
24  apply in this situation?

Page 35

1  BY MR. COHEN:
2      Q  In this situation.
3      A  Because paragraph one; one, two, three, four
4  lines down; because the university regards disciplinary
5  action as corrective and not punitive, the policy
6  recognizes personal and professional problems that may
7  be rectified by an informal educational process as well
8  as serious violations and professional responsibility
9  is implicating possible recommendations for suspension
10 or dismissal.
11     Q  And the word may is what --
12     A  Yes.
13     Q  -- led you to believe that in this case
14 progressive discipline wasn't appropriate?
15     A  Right.
16     Q  Anything else in the policy that led you to that
17 conclusion?
18     A  On top of page two special assistance; in those
19 circumstances where it is evident that the faculty
20 member is in need of special professional assistance,
21 the vice president for academic affairs may require any
22 one of these remedial actions.  Where it is evident
23 that the faculty member is in need of special
24 professional assistance, we did not think it was

Page 36

1  evident in this case.
2          Similarly in the first paragraph of the policy
3  statement may be rectified by an informal education
4  process, we did not see this as a -- we considered
5  whether this was a situation where an educational
6  process, an informal education process -- whether
7  personal and professional problems that may be
8  rectified by an informal educational process applied to
9  this case, and we determined that it did not apply to
10 this case.
11     Q  So if the progressive discipline policy didn't
12 apply to this case, what written rules were you
13 supposed to follow, if any?
14     A  Well, we looked here the justification for
15 suspension; the faculty member may be suspended by the
16 VPA at any time during the proceedings.  Suspension is
17 justified if immediate harm to the faculty members or
18 others is threatened by the person's continuance in a
19 faculty position.  And we debated whether such harm was
20 present in this situation and ultimately determined
21 that it was.
22     Q  But the suspension paragraph is part of the
23 progressive discipline policy, right?
24     A  Yes.

Page 37

1      Q  Okay.
2      A  But we didn't see any -- but the bottom line is
3  that when it says the policy recognizes personal and
4  professional problems that may be rectified, and we saw
5  may be rectified as not applying, as written in a way
6  that does not apply to every case; that you don't
7  automatically get progressive discipline because it
8  says may be rectified, not will be rectified.
9      Q  So if the progressive discipline policy didn't
10 apply in this case, I guess my question is were there
11 any other written rules that you thought the university
12 was bound by --
13         MS. PEET:  Objection to the form.
14 BY MR. COHEN:
15     Q  -- regarding discipline?
16     A  Yeah.  I don't think I understand the form.  I
17 don't think I understand the phrasing.
18     Q  Okay.  If you concluded that the progressive
19 discipline policy, and by that I'm talking about the
20 entire document that we're looking at now, did not
21 apply --
22     A  Okay.  I was not talking about the entire
23 document.  I was talking about the opportunity for
24 remediation --


MAGNA
LEGAL SERVICES

Page 38

1    Q  Okay.
2    A  -- did not apply to these circumstances.  The
3  policy applies but the opportunity for remediation, I
4  guess I was not clear in speaking before.  The
5  opportunity for remediation is not guaranteed by this
6  policy.
7    Q  Okay.
8    A  I would also point out in the end of the policy
9  statement it ends by saying is designed to be a series
10  of gradual steps involved, da, da, da, where applicable
11  and that means not every step is applicable to every
12  case and remediation in particular is not applicable to
13  every case.
14    Q  If someone in the administration like Pat
15  Dunleavy had told you that -- this is hypothetical --
16  had told you that the progressive discipline policy
17  applies in every case and that remediation applies in
18  every case, would you have come to the conclusion that
19  President Munley's termination of Professor Fagal was
20  appropriate?
21        MS. PEET:  Objection; calls for
22  speculation, assumes facts not in evidence.  If you can
23  somehow answer that, you can answer.
24        THE WITNESS:  That's too speculative for me

Page 39

1  to answer.
2        MR. COHEN:  Okay.  Can we have this marked
3  as Bittel 9 please.
4        (Whereupon Bittel Exhibit 9 was marked for
5  identification.)
6  BY MR. COHEN:
7    Q  Can you read this to yourself and let me know
8  when you're finished please.
9    A  Yes.
10    Q  This is an e-mail from you to Patricia Dunleavy
11  dated May 18, 2012 at 4:03 p.m., right?
12    A  Mm-mm.
13        MS. PEET:  Is that a yes?
14        THE WITNESS:  Yes, that is.
15  BY MR. COHEN:
16    Q  And here again you're saying to Doctor Dunleavy
17  we agreed that our charge should be the review of
18  substance, the termination and denial of tenure and
19  that you understood that the issues of suspension and
20  procedure were resolved by the Faculty Grievance
21  Committee; is that correct?
22    A  That is what we understood at that moment.  This
23  is basically our followup to her on the May 17th
24  meeting.

Page 40

1    Q  Can we take a ten-minute break?
2    A  Sure.
3        (Whereupon a recess took place.)
4        (Whereupon Bittel Exhibit 10 was marked for
5  identification.)
6  BY MR. COHEN:
7    Q  Could you go through this and let me know when
8  you're finished please.
9    A  Sure.  I'm done.
10    Q  Okay.  So first page there's an e-mail from
11  Doctor O'Brien to you and Matt dated June 2, 2012 at
12  9:52 a.m., do you see that?
13    A  Yes.
14    Q  And Doctor O'Brien in the second paragraph he
15  say his current inclination is that it will be useful
16  to interview Sister Anne about a few narrow questions
17  and then he goes on to list them, right?
18    A  Mm-mm.
19        MS. PEET:  Is that a yes?
20        THE WITNESS:  Yes, it is.
21  BY MR. COHEN:
22    Q  Do you know whether the committee ever did get
23  the opportunity to ask these questions?
24        MS. PEET:  Objection to the form.

Page 41

1        MR. COHEN:  What is it about the question?
2        MS. PEET:  Whether or not they had the
3  opportunity.
4  BY MR. COHEN:
5    Q  Let me rephrase it.  Did the committee ever
6  actually ask these questions of Sister Anne?
7    A  To the best of my recollection we did meet with
8  her, but I don't remember if these were the questions
9  that we discussed or what the final form of the
10  questions we discussed was.
11    Q  But you do know that you met with her, but you
12  just don't remember the exact questions?
13    A  I'm fairly certain we met with her, but I don't
14  remember for sure.  If I had to guess, I would guess --
15    Q  Don't guess.
16    A  Okay.
17    Q  In the next paragraph Doctor O'Brien says that
18  he also thinks that we may want to interview Fred by
19  phone, do you see that?
20    A  Yeah.
21    Q  And that never happened, right?
22    A  I don't believe that happened.
23    Q  Just take my word for it, it didn't happen.  Do
24  you know why you guys didn't interview Fred by phone?



1      (Whereupon Bittel Exhibit 12 was marked for
2  identification.)
3  BY MR. COHEN:
4      Q  Do you recognize this document?
5      A  It's meeting minutes, June 18th -- June 19th.
6      Q  And again you generated these minutes?
7      A  I did.
8      Q  Okay.  Is there any reason to doubt the accuracy
9  of these minutes?
10     A  Let me take a look.  I would like to read it
11 closer.
12     Q  Sure.
13     A  Okay.  I'm done.
14     Q  Okay.  Based on your reading, is there any
15 reason to doubt the accuracy of these minutes?
16     A  I don't see any.
17     Q  So it's clear from these minutes that you did
18 meet with Sister Anne on June 18th, right?
19     A  That's correct.
20     Q  And you don't remember what was discussed?
21     A  No.
22     Q  Do you remember whether President Munley ever
23 informed you that Professor Fagal had asked for an
24 opportunity to answer her questions in writing?

1      A  I don't recall that.
2      Q  Other than the fact that you don't recall her
3  saying it to you, did you know if Professor Fagal had
4  asked for an opportunity to answer President Munley's
5  questions in writing?
6      A  I don't think so.  Meaning President Munley's
7  questions with regard to the original questions she
8  asked on January 23th with respect to the video?
9      Q  Right.
10     A  I don't think so.
11     Q  Okay.  If you had done that, would that have
12 changed any of your conclusions about -- any of the
13 conclusions that you made and adjudicated the
14 discipline that was imposed on Fred?
15         MS. PEET:  Objection.  She said she doesn't
16 think so, but she doesn't know.  And secondly, it calls
17 for speculation, it assumes facts not in evidence.  You
18 can answer.
19         THE WITNESS:  I can't guess what the -- we
20 came to our decision as a committee, not as a -- we
21 thought about the issue individually, but we came --
22 our decision and our deliberations were collective and
23 I can't speculate as to what other people would say.
24              - - -

1  BY MR. COHEN:
2      Q  Yeah.  But I asked about would it have changed
3  your opinion.
4          MS. PEET:  Same objection.
5          THE WITNESS:  Would it have changed my mind
6  to know that he had requested that?
7  BY MR. COHEN:
8      Q  Yes.
9      A  And would it have changed my mind about what
10 specifically?
11     Q  About whether remediation was appropriate.
12     A  It would not have changed my mind on the
13 remediation question because the policy does not
14 require remediation to be offered.
15     Q  Now, at the bottom of -- do you see the
16 paragraph that begins we then took our first vote?
17     A  Yes.
18     Q  And the bottom of that paragraph it says he also
19 had multiple opportunities to make amends, show remorse
20 and explain his actions; do you see that?
21     A  Yes.
22     Q  Does that imply that you felt that he never took
23 any of those opportunities?
24     A  That's referring to when Anne Munley asked him

1  to explain his actions on January 23rd and he did not
2  and did not subsequently in the period to our knowledge
3  and did not subsequently after that explain his reasons
4  to Anne Munley.
5      Q  Right.  But I'm now bringing to your attention
6  if he had said at that meeting with President Munley
7  can I put my -- can I answer your questions in writing,
8  that would sort of conflict with the view that he --
9      A  Had multiple opportunities?
10     Q  Yes.
11         MS. PEET:  Objection to form, calls for
12 speculation.  That's your opinion, doesn't necessarily
13 means it's her opinion and it assumes that he would
14 have put in writing that he was remorseful, which there
15 is no evidence that he would have done such a thing.
16 BY MR. COHEN:
17     Q  I'm looking for your answer.
18     A  You're looking for my answer.
19     Q  If he had asked for an opportunity to answer
20 President Munley's questions in writing, that would
21 make this statement not very accurate; right; he also
22 had multiple opportunities to make amends, show remorse
23 and explain his actions?
24         MS. PEET:  Objection to the form.



1    THE WITNESS: If we knew that that was the
2  case, yes, that would make my statement there, it would
3  problematize my statement there. It may have
4  changed the outcome.
5  BY MR. COHEN:
6    Q  On the second page it says charge two, the
7  bottom of that paragraph it says while Fagal is correct
8  in saying that he was not getting a review in this
9  point, there might have been one if he had answered
10  Munley's questions on January 23rd. Do you see that?
11    A  Yes.
12    Q  And again that would -- if he had asked for an
13  opportunity to answer her questions in writing, that
14  would sort of conflict with the statement here; right?
15    MS. PEET: Objecting to the form, it calls
16  for speculation. You can answer.
17    THE WITNESS: It would object, it would --
18  yes, it would conflict with that point, but that's not
19  the -- as with the previous case, the point that is
20  potentially invalidated is not the only point that was
21  made or the only reason on the table.
22  BY MR. COHEN:
23    Q  On the last page under action items it says
24  Povse -- how do you pronounce his name by the way?

1    A  Povse.
2    Q  Povse will contact Anne Munley and apprise her
3  of her progress, is that right?
4    A  That is correct. He was not indicating --
5    MS. PEET: There's no question on the
6  table. Let him ask.
7  BY MR. COHEN:
8    Q  Why did -- why was it important that Povse keep
9  President Munley apprised of the progress of the
10  committee?
11    MS. PEET: Objection to the form.
12    THE WITNESS: By progress he meant
13  timeline. This was -- these deliberations largely
14  occurred over the summer when we were all off contract
15  and had various travel plans. So it took a lot longer
16  to get through it than we had expected because some of
17  us would be away and then the other would be away. And
18  there's three people, you know, who did not plan their
19  summer expecting this. So he was apprising her of --
20  by progress he means of our timeline and we are at the
21  stage of drafting a decision.
22  BY MR. COHEN:
23    Q  But nobody wanted to keep Professor Fagal
24  informed of the progress of the committee, is that

1  correct?
2    A  I believe that's correct.
3    Q  Why?
4    A  Because our -- Anne Munley is the person who
5  asked us keep her apprised of the timeline and she's
6  the one who said can you -- she's the one who said when
7  are you going to be finished, I need to know what the
8  date is.
9    Q  She said that?
10    A  I mean I can't say with 100 percent certainty,
11  but I know that she asked us when our expected date of
12  completion would be because she didn't want it to drag
13  out too long either. But this was in -- as far as I
14  can remember, it was in response to her inquiry about
15  when we would submit a final decision.
16    Q  How many inquiries did she make about the
17  timetable?
18    A  I don't remember, obviously at least one.
19    Q  Did she say why it was important that this not
20  drag out?
21    A  I don't remember. I mean I'm guessing that
22  there's -- you're supposed to complete --
23    MS. PEET: Don't guess.
24          - - -

1  BY MR. COHEN:
2    Q  She didn't say?
3    A  I don't remember her saying.
4    Q  Okay. Did you in any way feel time pressured?
5    A  No.
6    Q  Did you in any way feel that she was pressuring
7  you to rule in her way?
8    A  Not at all. And again we were assured by Pat
9  Dunleavy and -- we were assured by Pat Dunleavy on the
10  first day that nobody in the administration can take
11  any action against you if your decision disagrees with
12  theirs. We were promised that protection.
13    Q  The last paragraph says after we workshop our
14  draft, we will send it to Will Anthony for comment, is
15  he an independent voice or does he work for
16  Munley/Marywood?
17    A  Yes.
18    Q  Did you ever get an answer to your question is
19  he an independent voice?
20    A  I don't recall.
21    Q  Well, why did you think that he might work for
22  Munley/Marywood?
23    MS. PEET: Objection to the form, assumes
24  facts not in evidence.



Page 66

1    appropriate as opposed to procedurally appropriate?
2      A  That was ours.  But if it was substantively
3    appropriate for suspension -- if it was substantively
4    appropriate; if a case was substantively appropriate
5    for suspension, it may not be substantively appropriate
6    for termination.  But if a case is appropriate for
7    termination, then of course the lesser charge applies
8    as well; or it meets the lower standard for suspension
9    if it meets the higher required for termination and the
10   highest standard required for revocation of tenure
11   which is an even higher standard.
12     Q  And is that why your review of President
13   Munley's decision does not address whether the
14   suspension was appropriate?
15         MS. PEET:  Asked and answered.  You can go
16   ahead one more time.
17         THE WITNESS:  Correct.
18   BY MR. COHEN:
19     Q  Okay.  If you look at Bittel 5.
20     A  Okay.
21     Q  Do you see at the bottom that there's a
22   paragraph called suspension?
23     A  Yes.
24     Q  It says the faculty member may be suspended by

Page 67

1    the vice president for academic affairs at any time
2    during the proceedings involving him or her, suspension
3    is justified if immediate harm to the faculty member or
4    others is threatened by person's continuance of the
5    faculty position; right?
6      A  Yes.
7      Q  And then below that there's a paragraph it says
8    dismissal, right?
9      A  Mm-mm.
10         MS. PEET:  Is that a yes?
11         THE WITNESS:  Yes, it is a yes.
12   BY MR. COHEN:
13     Q  It says if remedial actions taken during the
14   suspension does not sufficiently resolve the issues
15   that lead to the suspension, the university may move
16   towards dismissal of the faculty member; right?
17     A  Yes.
18     Q  So doesn't that suggest that if a suspension is
19   not appropriate, that the university cannot even try to
20   terminate an employee?
21         MS. PEET:  Objection to the form.  You can
22   answer if you know.
23         THE WITNESS:  I don't know.  We do say
24   here, we do say that the -- we do say in the final

Page 68

1    sentence Doctor Fagal's egregious violation of our core
2    values especially the value of respect has caused grave
3    and irreparable harm to our community.  And above in --
4    under charge one; we are in agreement that Sister Anne
5    Munley is justified in saying that Doctor Fagal's
6    actions constitute such an injury.
7    BY MR. COHEN:
8      Q  Okay.  Now, going back to this dismissal
9    paragraph in Bittel Exhibit 5.
10     A  Okay.
11     Q  It mentions if remedial action is taken during
12   the suspension, right?
13     A  Right.
14     Q  Now, your committee could not have determined
15   whether remedial actions taken during the suspension
16   resolved any issues that led to the suspension, right?
17         MS. PEET:  Objection.  This is a complete
18   mischaracterization of testimony.  She already
19   testified that they confirmed that remediation was not
20   appropriate here.  So what you're asking her is you're
21   assuming what she said I think forgetting about it.
22   She clearly talked about the remediation and how it
23   impacts this case.
24         THE WITNESS:  Yes.  We determined that

Page 69

1    remediation, though the policy makes it possible does
2    not say it has to be offered in every situation and we
3    determined that this was not a situation where
4    remediation was a fruitful avenue or was justified.
5    BY MR. COHEN:
6      Q  So based on that view it was the committee's
7    opinion that President Munley could move directly from
8    suspension to termination?
9      A  She did not need to offer remediation before
10   moving to termination, no, because remediation is not a
11   guarantee.
12     Q  We're coming back to Bittel 15, paragraph C
13   begins Doctor Fagal is given the opportunity to explain
14   his video; do you see that?
15     A  Yes.  This is the section where we give the
16   background to our discussion of charges.
17     Q  And again this paragraph doesn't account,
18   couldn't account for the fact that Doctor Fagal had
19   asked for an opportunity to explain himself in writing;
20   correct?
21     A  Correct.
22     Q  Because you didn't know that?
23     A  We did not know that.
24     Q  On the second page under charge two, again it



# EXHIBIT U

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

\-   \-   \-

FREDERICK F. FAGAL, JR.    :   CIVIL ACTION
                   : 
       Plaintiff,    :   NO. 3:14-cv-02404-ARC
                   : 
    vs.              :   (JUDGE CAPUTO)
                   : 
MARYWOOD UNIVERSITY,     : 
                   : 
       Defendant.    :

\-   \-   \-

June 28, 2016

\-   \-   \-

       Oral deposition of Edward Joseph
O'Brien, taken pursuant to notice, was held at
the Radisson Lackawanna Station Hotel, Suite
206, 700 Lackawanna Avenue, Scranton,
Pennsylvania, commencing at 12 p.m., on the
above date, before Judy A. Black, a Registered
Professional Court Reporter and Notary Public in
and for the Commonwealth of Pennsylvania.

\-   \-   \-

MAGNA LEGAL SERVICES

Seven Penn Center, 8th Floor

1635 Market Street

Philadelphia, Pennsylvania 19103

(866) 624-6221



Page 22

1      A.     Well, I have a bit of a question about
2   termination versus suspension, exactly how that was
3   understood at the time.
4      Q.     Let's back up.  Which area?  And point
5   to me or direct me to the place on this document, if
6   you have some questions about the accuracy.
7      A.     It would be the fourth paragraph from
8   the bottom of the first page.
9      Q.     Starting with, "The FGC informally"?
10      A.     Yes.
11      Q.     What is it about this paragraph that you
12   question the accuracy?
13      A.     My recollection is that -- that we were
14   paying attention to both suspension and termination,
15   but the substance of the termination charge was the
16   most important.  That was the focus, but -- it says,
17   "The FGC informally via Sister Gail advised" -- it
18   seems a little confusing, that paragraph.  I don't
19   recall how that was -- how that was reflected in the
20   meeting discussion.
21      Q.     And a minute ago, I think you said that
22   you recall your committee's role as reviewing the
23   substance of Professor Fagal's discipline, and you
24   mean as opposed to the procedure?

MAGNA LEGAL SERVICES

Page 23

1      A.     Yes.
2      Q.     And what led you to believe that that --
3   that your committee's role was reviewing the
4   substance and not the procedure?
5      A.     Our discussions, our review of
6   university policy documents, discussion with Erin
7   Sadlack in this meeting.  That was part of the
8   process of delineation of what were the overlapping
9   responsibilities of the committees, what were the
10   separate responsibilities of the committees.  One of
11   the purposes of this meeting was to just clarify how
12   these two processes would relate to one another,
13   preserving their independence but also trying to not
14   duplicate one another's work if that wasn't
15   necessary.
16            And I assume there's documentation about
17   what Dr. Sadlack's committee -- we were not privy to
18   their, nor did we ask for their process or their --
19   their notes and working documents.  We didn't want to
20   be unduly influenced by their deliberations.  So that
21   was part of the differentiation, separation of the
22   two committees.  We didn't want our committee to just
23   repeat what their committee had reviewed, so we
24   wanted to do our own independent work.

MAGNA LEGAL SERVICES

Page 24

1      Q.     Okay.  Do you ever recall yourself or
2   anyone on your committee communicating to Professor
3   Fagal this view of the role of your committee being
4   only a substantive review as opposed to procedural
5   review?
6         MS. PEET:  Objection to the form.
7      Q.     You can answer.  Unless your attorney
8   says --
9         MR. FABER:  I'm sorry, yes.  You can go
10   ahead and answer.  I'll tell you when you can't
11   answer.
12      A.     Okay.  Can you repeat the question?  I'm
13   not sure what you're asking.
14      Q.     Sure.  A minute ago I think you
15   testified that your view of the role of your
16   committee was to review the substance of Professor
17   Fagal's discipline, not the procedure.  Am I correct?
18      A.     I'd say it was more primary to focus on
19   the substance, define the disposition of the charges
20   and --
21      Q.     Do you know whether Professor Fagal was
22   made aware by anyone on the committee of that
23   limitation, that the committee would only review --
24   or primarily review substantive -- the substantive

MAGNA LEGAL SERVICES

Page 25

1   discipline?
2      A.     No, I don't know.
3      Q.     Okay.
4         MR. COHEN:  Could you have this marked
5   as O'Brien-8, please?
6         (O'Brien-8, E-mail dated May 22, 2012,
7   with attachments, Bates Nos. DEF000337-342, is
8   received and marked for identification.)
9      Q.     Dr. O'Brien, do you recognize the
10   document that has just been placed before you?
11      A.     It appears to be a note from me to Helen
12   regarding minutes from the first two meetings.
13      Q.     And attached to this note are these
14   minutes with comments, correct?
15      A.     Yes.
16      Q.     And do you know whether any of these
17   comments were ever formally adopted into, like, a
18   final version of the minutes?
19         MS. PEET:  Objection to the form.
20      A.     No.  I would -- well, I would assume
21   we -- in a subsequent meeting or by e-mail we would
22   have discussed these and approved revised minutes, I
23   believe.  So I don't have any reason to think they
24   weren't considered.  Which ones were accepted or not

MAGNA LEGAL SERVICES



| | |
|---|---|
| Page 38 | Page 40 |

**Page 38**

1 received and marked for identification.)
2    Q.    Do you recognize this e-mail and the
3 attachment?
4    A.    This looks like the final version with
5 Helen's explanation of what happened.
6    Q.    Helen says to Sister Munley here,
7 "Hopefully this one will work. I'll ask Mat to edit
8 it and sign the hard copy, as well."
9          Do you remember actually signing a hard
10 copy?
11    A.    No.
12    Q.    No, you didn't, or you don't remember?
13    A.    I don't remember.
14    Q.    Do you remember whether your committee
15 reviewed whether Professor Fagal's suspension was
16 proper?
17    A.    My recollection was that we reviewed
18 both the suspension and the termination kind of as
19 one event. They were so close in proximity, but,
20 again, I defer to whatever we said in the document as
21 whenever the termination was.
22    Q.    Coming back to this -- the final version
23 of the faculty senate ad hoc hearing committee
24 review, you see paragraph A begins, "We acknowledge

**Page 39**

1 that revocation of tenure"?
2    A.    Yes.
3    Q.    And further down the paragraph, it says,
4 "We are mindful of the potential or perceived threat
5 to academic freedoms when a speech violation leads to
6 revocation of tenure." Do you see that?
7    A.    Yes.
8    Q.    What did you mean by this sentence?
9          MS. PEET: Objection to the form.
10    A.    That faculty have a right to, in terms
11 of academic freedom, speak freely, and any limitation
12 to that is something to be took very seriously. And
13 that's the reason for tenure, that people can speak
14 freely.
15    Q.    In paragraph C, it says, "Dr. Fagal was
16 given the opportunity to explain his video in his
17 meeting with Sister Anne Munley." Do you see that?
18    A.    Yes.
19    Q.    Was your committee informed that
20 Dr. Fagal had asked for an opportunity to respond in
21 writing to President Munley?
22    A.    I don't recall.
23    Q.    Also in paragraph C, the last sentence,
24 it says, "The faculty grievance committee has already

**Page 40**

1 determined that Sister Anne Munley followed
2 appropriate procedure in moving directly to
3 termination." Do you see that?
4    A.    Yes.
5    Q.    Does this sentence refresh your
6 recollection over whether your committee actually did
7 consider the suspension or whether they just
8 considered termination?
9          MS. PEET: Objection to form,
10 mischaracterization of testimony. You can answer.
11    A.    The procedure -- procedural issue is one
12 thing. The substantive issue was what I think we
13 were focused on, and I think the substantive issue
14 was essentially the same with regard to suspension
15 and revocation or termination. So the timing of the
16 two, I think, is what's being referenced there, that
17 determined had followed appropriate procedure, that
18 she could have done things in that order
19 procedurally. We didn't adjudicate that, but the
20 substance of her decision was more the focus of our
21 work. The timing of when she did things was less the
22 focus of what of what we attended to.
23          MR. COHEN: Let's mark this O'Brien-16.
24          (O'Brien-16, E-mail dated July 6, 2012,

**Page 41**

1 with attachment, Bates Nos. DEF001494-496, is
2 received and marked for identification.)
3    Q.    If you could read this to yourself and
4 let me know when you're finished, Dr. O'Brien.
5    A.    Is this final page part of what I'm
6 reading now?
7    Q.    Um-hum.
8    A.    Okay.
9    Q.    So in this first document, this e-mail,
10 this is from Professor Fagal to your committee dated
11 July 6, 2012, correct?
12    A.    Yes.
13    Q.    Do you remember receiving this?
14    A.    Yes.
15    Q.    And in this e-mail, Dr. Fagal requested
16 that your committee convene to review the
17 appropriateness of his suspension, correct?
18    A.    He raises a number of different issues,
19 but that was one of them.
20    Q.    Your committee did not, in fact, convene
21 to review the suspension, correct?
22          MS. PEET: Objection to the form,
23 mischaracterization of testimony.
24    A.    I don't know if we met after this. I'd

MAGNA LEGAL SERVICES



Page 42

1  have to look at the record and I don't have that in
2  front of me. Whether we met or talked, e-mailed, I
3  don't, sitting here, remember what we had -- what
4  deliberations we did. We did discuss it.
5      Q.   Discuss what?
6      A.   The reaction to his -- his message.
7      Q.   And what was -- what specifically was
8  said during that discussion?
9      A.   I need something to refresh my memory.
10 I don't have an independent memory of what that
11 discussion was, other than that we were not persuaded
12 by, you know, Fred's e-mail message.
13     Q.   And were you aware that Sister Cabral
14 and Sister Anne had determined that the committee be
15 convened twice, once to review the suspension, once
16 the termination?
17         MS. PEET: Objection to the form, lack
18 of foundation.
19         You can answer.
20     A.   Can you repeat the question?
21     Q.   Were you aware that Sister Cabral and
22 Sister Anne had determined that the committee be
23 convened twice, once to review the suspension and
24 once to review the termination?
                 MAGNA LEGAL SERVICES

Page 43

1          MS. PEET: Same objection.
2      A.   My recollection is that those two
3  issues, the substance of those two issues was part of
4  our deliberation. Exactly how that was communicated
5  to us and by whom, I don't, sitting here today,
6  remember exactly how that was communicated to us.
7      Q.   So you do know that -- you said that
8  someone did communicate to you that the committee was
9  to be convened twice, once for the --
10     A.   Well, not that -- we considered both,
11 the suspension and the termination.
12     Q.   I know that. My specific question is:
13 Do you have any recollection of anyone, Sister Cabral
14 or Sister Anne, telling your committee that it was to
15 be convened twice, once for the suspension and once
16 for the termination?
17         MS. PEET: The way you asked the
18 question, it assumed that it actually happened and
19 that you're just asking him if he remembers that
20 happened. It's a very inappropriate question. It's
21 going to be very poorly received on the record, so
22 I'm going to ask that you rephrase that question in a
23 way that it doesn't assume facts not in evidence and
24 it has some foundation to it.
                 MAGNA LEGAL SERVICES

Page 44

1      Q.   Did you understand that question,
2  Dr. O'Brien?
3      A.   No. Specifically what you're asking,
4  I'm not sure. I mean, we were -- we were discussing
5  as a committee both the suspension and the
6  termination. They were so closely related in time
7  that I don't know that we had a formal, now we're
8  talking about this and we're going to have a separate
9  convening of the committee. We were discussing both
10 as part of our deliberation process, the substance of
11 both, not the procedures. That was the other
12 committee -- Erin's committee had evaluated the
13 procedural parts of that. The substantive parts of
14 that is what I understood we were adjudicating.
15     Q.   I understand your testimony. My
16 question is different, and I think it's clear, but
17 I'll restate it.
18         Do you remember anybody telling your
19 committee that it was to convene twice, once for
20 Professor Fagal's suspension and once for the
21 termination?
22         MS. PEET: Objection to the form, lack
23 of foundation. Same objection. You can answer.
24     A.   I don't -- I don't recall.
                 MAGNA LEGAL SERVICES

Page 45

1          MR. COHEN: Let's call this O'Brien
2  Exhibit 17.
3          (O'Brien-17, E-mail chain, Bates Nos.
4  DEF001611-615, is received and marked for
5  identification.)
6      Q.   Specifically I'd like you to look at
7  page 3. There's an e-mail from you dated Monday,
8  July 9, 2012, at 1:10 p.m. Do you see that?
9      A.   Yes.
10     Q.   Can you read that to yourself and let me
11 know when you're finished?
12     A.   Okay.
13     Q.   When you refer to the university
14 attorney, did you mean Will Anthony?
15     A.   I believe so. I'm not sure.
16     Q.   And why did you think that you would be
17 wise to contact the university attorney?
18     A.   I think I'm addressing next steps, what
19 the next steps of the committee process would be.
20 What are the next steps?
21     Q.   Do you remember after sending this
22 e-mail whether the university attorney was ultimately
23 contacted by the committee?
24     A.   No. I don't recall.
                 MAGNA LEGAL SERVICES



Page 50

1  of documents refreshing my memory.
2      Q.    This is a hypothetical question. I
3  realize it might not have happened. If your
4  committee had received legal guidance to the effect
5  that progressive discipline at Marywood was required
6  in every case and that you could not simply skip
7  directly to termination and that remediation was
8  required, attempted remediation was required in every
9  instance, would you have voted the way you did to
10 support President Munley's actions?
11         MS. PEET: Objection to the form. Calls
12 for speculation, assumes tons of facts not in
13 evidence, including the fact that he got legal
14 advice, that progressive discipline is required in
15 every case, that you can't skip progressive
16 discipline, and that remediation is required. But
17 given -- assuming that the sun and Mars -- the sun
18 and the moon and Pluto line up and you know the
19 hypothetical answer --
20     Q.    That's what a hypothetical is. A
21 hypothetical is asking you to make certain
22 assumptions.
23         Do you need me to rephrase?
24     A.    Yeah.
         MAGNA LEGAL SERVICES

Page 51

1      Q.    Okay. Hypothetically, if your committee
2  had received legal guidance stating that progressive
3  discipline was required in every case and that the
4  university had to make an attempt to offer
5  remediation to the disciplined professor, would you
6  have voted the way you did to support President
7  Munley's actions?
8          MS. PEET: Same objections.
9      A.    I don't know.
10     Q.    What would you -- do you need to know
11 more information or are you just -- you just don't
12 know how you would have voted?
13     A.    I don't. It's not what happened, so I
14 don't have an opinion about, you know --
15         MR. COHEN: Let me just take a
16 one-minute break. I'll be right back.
17         (A recess is taken.)
18     Q.    Back on the record.
19         Did Helen Bittel ever tell you that she
20 had communicated with Marywood's attorneys?
21     A.    I believe so. I believe she did.
22         MR. COHEN: Okay. I have nothing
23 further.
24         MS. PEET: I have some questions.
         MAGNA LEGAL SERVICES

Page 52

1  CROSS-EXAMINATION BY MS. PEET:
2      Q.    Dr. O'Brien, if you can look at
3  Exhibit 7, if you don't mind, in the middle of the
4  page with the paragraph that starts, "She explained."
5      A.    Yes.
6      Q.    And the "she," I believe, is Erin
7  Sadlack. Is that correct?
8      A.    Yes.
9      Q.    Okay. It says here, and I'm just
10 reading what it says, "Their charge was to review
11 whether procedure was properly followed, not to
12 review the substance of SAM's decision to suspend and
13 to later terminate." Do you see that?
14     A.    Yes.
15     Q.    It then continues to say, "Their
16 procedural review was limited to the charges to
17 suspension, not termination, revocation of tenure."
18 Do you see that?
19     A.    Yes.
20     Q.    Is that your understanding? Do you
21 believe that to be correct?
22     A.    I don't know what they thought they were
23 doing, but I think our understanding from our
24 committee was that they had reviewed the termination
         MAGNA LEGAL SERVICES

Page 53

1  and the revocation of tenure.
2      Q.    Okay. So it was your understanding that
3  the faculty grievance committee --
4      A.    From a procedural point of view.
5      Q.    Okay. So it's your understanding that
6  from a procedural point of view, the faculty
7  grievance committee reviewed both the suspension and
8  termination, correct?
9      A.    I think that was my understanding.
10     Q.    So as written here would not be correct.
11 Correct?
12     A.    Yes.
13     Q.    Okay. Anyone either in Marywood
14 University or outside of Marywood University tell you
15 how you had to vote?
16     A.    No.
17     Q.    Did anyone either in Marywood University
18 or outside Marywood University suggest to you how you
19 should vote on this decision?
20     A.    No. No.
21     Q.    Did you fear that your job would be in
22 jeopardy if you didn't support President Munley's
23 decision?
24     A.    No.
         MAGNA LEGAL SERVICES



Page 54

1    Q.    Did anyone other than the committee
2  itself influence your decision to vote in support of
3  President Munley's decision?
4    A.    No.
5    Q.    Do you believe that you served on the
6  committee in an impartial fashion?
7    A.    Yes.
8    Q.    Do you believe that ultimately the
9  committee made the right decision?
10   A.    Yes.
11   Q.    Do you support the decision that you and
12 the committee made?
13   A.    Yes.
14   Q.    Do you know how you were selected to be
15 on the committee?
16   A.    Not exactly.  I believe that -- that
17 Fred had the right to request one member of the
18 committee and that I was someone he requested to be
19 on the committee.
20   Q.    As of the time --
21   A.    I don't know the process of that, but
22 that's my understanding of -- I don't know the
23 specific process he went through, was I the first
24 person, the second person, but I believe that's how I

MAGNA LEGAL SERVICES

Page 55

1  ended up on that committee.
2    Q.    As of the time that you served on the
3  committee, would you have considered yourself friends
4  with Dr. Fagal?
5    A.    We were friendly acquaintances, fellow
6  faculty members, colleagues.
7       MS. PEET:  No further questions.
8    A.    Not people that socialized outside
9  Marywood, but we've been on a number of committees
10 and, you know, I had a positive view of Fred and
11 valued him as a colleague.
12      MS. PEET:  No further questions.
13      MR. COHEN:  Follow-up.
14 REDIRECT EXAMINATION BY MR. COHEN:
15   Q.    You said, Dr. O'Brien, that you had a
16 positive view of Fred?
17   A.    Um-hum.
18   Q.    Can you elaborate on that?
19   A.    We served on a number of committees
20 together, in technology or other committees, and, you
21 know, I thought he was very up to date in technology,
22 practical about what -- you know, what were next
23 steps for the university to move forward in a way
24 that was practical and keeping -- keeping the

MAGNA LEGAL SERVICES

Page 56

1  university up to speed; thought he spoke well, is
2  knowledgeable.
3    Q.    Okay.  That's all you meant?
4    A.    (Nodding head.)
5       MR. COHEN:  No further questions.
6       (Whereupon, at 2:05 p.m., the deposition
7  of Edward Joseph O'Brien concluded.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

MAGNA LEGAL SERVICES

Page 57

1              CERTIFICATE
2
3       I HEREBY CERTIFY that the witness was
4  duly sworn by me and that the deposition is a
5  true record of the testimony given by the
6  witness.
7
8
9
10      Judy A. Black
        Registered Professional Reporter
11      Dated:  July 13, 2016
12
13
14
15
16      (The foregoing certification of this
17 transcript does not apply to any reproduction of
18 the same by any means, unless under the direct
19 control and/or supervision of the certifying
20 reporter.)
21
22
23
24

MAGNA LEGAL SERVICES



# EXHIBIT V

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

– – –

FREDERICK F. FAGAL, JR.   : CIVIL ACTION
                             :
         Plaintiff,    : NO. 3:14-cv-02404-ARC
                             :
     vs.               : (JUDGE CAPUTO)
                             :
MARYWOOD UNIVERSITY,    :
                             :
         Defendant.    :

– – –

June 28, 2016
– – –

Oral deposition of Mathew R.
Povse, taken pursuant to notice, was held at
the Radisson Lackawanna Station Hotel, Suite
206, 700 Lackawanna Avenue, Scranton,
Pennsylvania, commencing at 3 p.m., on the
above date, before Judy A. Black, a Registered
Professional Court Reporter and Notary Public
in and for the Commonwealth of Pennsylvania.

– – –

MAGNA LEGAL SERVICES

Seven Penn Center, 8th Floor

1635 Market Street

Philadelphia, Pennsylvania 19103

(866) 624-6221



Page 10

1      Q.    And what documents did you review?
2      A.    Oh --
3      Q.    If any?
4      A.    I don't know.  Lots of letters, lots of
5   memos.  Whatever I had accessible to me.
6          MR. COHEN:  Can we also have this marked
7   as Povse-1.
8          (Povse-1, Letter dated February 8, 2012,
9   with attachments, Bates Nos. DEF000207-226, is
10   received and marked for identification.)
11      Q.    And, Mr. Povse, can you briefly review
12   this and let me know whether you recognize it?
13      A.    I -- this is from -- I think I've seen
14   it.
15      Q.    Is this the statement of charges that
16   President Munley made against Professor Fagal and
17   that your committee was asked to review?
18      A.    I would say -- I would say yes.
19      Q.    Okay.  And you served on what's called
20   an ad hoc committee, correct?
21      A.    Yes.
22      Q.    And that committee consisted of you,
23   Edward O'Brien and Helen Bittel, correct?
24      A.    Yes.
               MAGNA LEGAL SERVICES

Page 11

1      Q.    And the job of your committee was to
2   adjudicate the charges that President Munley lodged
3   against Professor Fagal, correct?
4      A.    To an extent.
5      Q.    What do you mean by "to an extent"?
6      A.    We were to look at the substantive
7   portion of the charge, not the procedural, so --
8      Q.    Okay.
9      A.    That's what we were looking at.
10          MR. COHEN:  Can you mark O'Brien-5 also
11   as Povse-2.
12          (Povse-2, E-mail dated May 6, 2012, with
13   attachments, Bates Nos. DEF001433-442, is received
14   and marked for identification.)
15      Q.    And can you briefly review this and let
16   me know whether you recognize this document?
17      A.    It looks familiar.
18      Q.    Would you say that this is Professor
19   Fagal's written defense to President Munley's
20   charges?
21      A.    Well, it's his explanation.
22      Q.    Okay.  Did you review this document in
23   preparing for today's deposition?
24      A.    I've seen it.  I don't know -- I didn't
               MAGNA LEGAL SERVICES

Page 12

1   review much of anything for this --
2      Q.    But you've --
3      A.    -- for this meeting.  But I've seen
4   this.
5      Q.    Do you remember reading the whole thing
6   at any time?
7      A.    Well, I prob -- I'm sure that I read it
8   when we were meeting.  And, again, you know, there
9   was so much information that we had that I can't
10   recall.  But I would -- whatever information we were
11   given, I could assure you that I read at the time we
12   were meeting for that committee.
13      Q.    Okay.
14          MR. COHEN:  Let's take O'Brien-6 and
15   call it also Povse-3.
16          (Povse-3, Minutes for Ad Hoc Committee
17   Meeting #1, May 11, 2012, Bates Nos. DEF001408-509,
18   is received and marked for identification.)
19      Q.    Mr. Povse, do you recognize this
20   document?
21      A.    It looks familiar.  Yeah.
22      Q.    What is it?
23      A.    Minutes from our -- looks like our first
24   meeting.
               MAGNA LEGAL SERVICES

Page 13

1      Q.    Do you know who made the comments on the
2   right side of the page?
3      A.    No.  Let me -- no.
4      Q.    Okay.  But you know that it wasn't you?
5      A.    No, I can't really say.
6      Q.    Okay.  On the first paragraph, last
7   sentence, there's a sentence that begins, "Helen
8   knows FF casually."  Do you see that?
9      A.    Yeah.  Yeah.
10      Q.    And then it says, "Some of her
11   conversations with him have been, quote, strange, but
12   the relationship has been collegial."  Do you
13   remember Helen explaining what she meant by having
14   strange conversations with Professor Fagal?
15      A.    No, I don't remember.  I don't remember
16   if she expounded on that.
17      Q.    If you look down at the bottom of this
18   page, it says, "5/3," which I guess is for May 3rd,
19   "AHC meets with HR and Sister Gail."  Do you -- and
20   AHC means ad hoc committee, correct?
21      A.    Correct.
22      Q.    And do you remember meeting with HR and
23   Sister Gail?
24      A.    I know we did.  That's about all I
               MAGNA LEGAL SERVICES



Page 30

1 Povse-10.
2        (Povse-10, E-mail Bates No. DEF00245, is
3 received and marked for identification.)
4        Q.    Why don't you briefly review this,
5 Mr. Povse, and let me know if you recognize it.
6        A.    Yeah, I guess I recognize it. It's --
7 I'm sure.
8        Q.    Do you remember sending the e-mail on
9 June 29, 2012, at 12:08 p.m. to Dr. Dunleavy?
10       A.    No, I don't remember it, but I'm sure I
11 did.
12       Q.    Do you remember receiving the e-mail
13 above it from Dr. Dunleavy?
14       A.    I don't remember, but, again, it's in
15 front of me.
16       Q.    You don't have any reason to doubt that
17 this is authentic?
18       A.    Right, right.
19             MR. COHEN:  I'd like to take O'Brien-14
20 and also mark this as Povse Exhibit 11.
21       (Povse-11, E-mail dated July 2, 2012,
22 with attachment, Bates Nos. DEF001515-521, is
23 received and marked for identification.)
24       Q.    Do you recognize this e-mail and the
                MAGNA LEGAL SERVICES

Page 31

1 attachment?
2        A.    Yeah, I recognize it.
3        Q.    And the attachment is your committee's
4 review of Sister Anne's decision to terminate
5 Professor Fagal's employment, correct?
6        A.    This attachment here?
7        Q.    Yes.
8        A.    Yes.
9        Q.    And do you know if this is the final
10 version?  Because it appears to me that there's still
11 track changes here.  Do you know what I mean by track
12 changes?
13       A.    No.
14       Q.    If you see the edits, like the lines on
15 the left?
16       A.    Um-hum.
17       Q.    Do you know if this was the final
18 version?
19       A.    I can't tell you.
20             MR. COHEN:  Okay, let's take O'Brien-15
21 and mark this as Povse-12, please.
22       (Povse-12, E-mail dated July 5, 2012,
23 with attachment, Bates Nos. DEF001585-590, is
24 received and marked for identification.)
                MAGNA LEGAL SERVICES

Page 32

1        Q.    Do you recognize this document and the
2 attachment to it?
3        A.    Yeah.
4        Q.    This is another copy of your committee's
5 review, correct?
6        A.    Um-hum.
7        Q.    But there are no edits here.  Do you see
8 that?
9        A.    Um-hum.
10       Q.    Do you know whether this was the final
11 version of your review or not?
12       A.    No.
13       Q.    Do you know if -- do you remember
14 signing a hard copy version of your review, your
15 committee's review?
16       A.    I don't remember.  I would think that I
17 did, but I don't remember.  I would think that we
18 signed off on it.
19             MS. PEET:  If you don't know, the answer
20 is you don't know.
21       A.    I don't know.
22       Q.    Would it be fair to say, Mr. Povse, that
23 your committee reviewed whether Professor Fagal's
24 termination was proper?
                MAGNA LEGAL SERVICES

Page 33

1        A.    Yes.
2        Q.    Would it also be fair to say that your
3 committee reviewed whether Professor Fagal's
4 suspension was proper?
5        A.    Yes.
6        Q.    In this document that we were just
7 looking at, the review of President Munley's
8 decision, do you know whether it mentions your
9 analysis of Professor Fagal's suspension?
10             MS. PEET:  Objection to the form.
11       A.    What's the question?
12       Q.    Does this review contain any analysis
13 about whether Professor Fagal's suspension was
14 appropriate?
15       A.    I don't know.  I'd have to look through
16 this.  I'd have to read it thoroughly.
17       Q.    Okay.  If it's not in there, would it be
18 fair to say that it wasn't memorialized?
19             MS. PEET:  Objection.
20       A.    No.
21       Q.    If the suspension was reviewed, would it
22 be odd for it not to be mentioned in your review?
23             MS. PEET:  Objection,
24 mischaracterization of testimony.  He just testified
                MAGNA LEGAL SERVICES



Page 34

1 that it was reviewed.
2       A.    I'm getting confused here.
3             MS. PEET:  Exactly.  That's what he's
4 trying to do and I don't want you to get confused.
5       A.    Ask me that question.
6       Q.    We'll skip ahead.
7             Before your committee convened to review
8 Professor Fagal's discipline, do you recall that
9 there was another committee, a faculty grievance
10 committee, that also reviewed parts of Professor
11 Fagal's discipline?
12      A.    Yeah.
13            MS. PEET:  Objection to the form.
14      Q.    And what was your understanding of what
15 the first committee did?
16      A.    It was the procedure that they were
17 looking at of the events, and I can't really say
18 that, first of all, I have a memory of exactly what
19 their job was or duties were.  I know that we did
20 meet with Erin and got more information as to their
21 committee and what they were charged with.
22      Q.    Coming back to this last exhibit with
23 the review of President Munley's decision --
24            MS. PEET:  I'm sorry, which exhibit is
                    MAGNA LEGAL SERVICES

Page 35

1 it again, Povse-12?
2             MR. COHEN:  Yes.
3       Q.    Can you turn to part A of the decision,
4 the one that begins with, "We acknowledge that"?  Do
5 you see that?
6       A.    Um-hum.
7       Q.    And further down, do you see the
8 sentence that says, "We are mindful of the potential
9 or perceived threat to academic freedoms when a
10 speech violation leads to revocation of tenure"?
11      A.    Um-hum.
12      Q.    And you had a role in -- would it be
13 fair to say you had a role in generating this
14 document?
15      A.    Um-hum.
16      Q.    What did --
17            MS. PEET:  Keep your answers verbal,
18 make sure.  Is that a yes or a no?
19      A.    Yes.
20      Q.    Yes, you did have a role?
21      A.    Yes.
22      Q.    What did you mean by this sentence, "We
23 are mindful of the potential" --
24      A.    I would -- first of all, I would have to
                    MAGNA LEGAL SERVICES

Page 36

1 say that the words were probably created, formulated,
2 by both Helen and Ed, because they had more talent in
3 that department, but I certainly agreed with anything
4 and everything that's -- that's in this document.  We
5 are mindful of the potential perceived threat to
6 academic freedom when a speech violation leads to
7 revocation of tenure.  I mean, it's pretty obvious
8 that, you know, that's pretty thin ice.  That's scary
9 stuff right there.  And we were certainly mindful of
10 it.
11      Q.    Would you say that Drs. Bittel and
12 O'Brien were more heavily involved in the committee's
13 deliberations than you were?
14            MS. PEET:  Objection to the form.
15      A.    They put it into words, I think, better
16 than I did, but our sentiments were the same.  We
17 were in full agreement with each other.
18      Q.    Did you feel -- let me ask it this way:
19 Do you wish that you had never served on this ad hoc
20 committee?
21            MS. PEET:  Objection to form.
22      A.    No. No.
23      Q.    Do you feel like you were under pressure
24 to make a particular decision?
                    MAGNA LEGAL SERVICES

Page 37

1       A.    No. No.
2       Q.    And is that because you were already
3 tenured at the time?
4       A.    No, no. No, I -- no.
5       Q.    You had no fear that a decision
6 against -- even if it did not support President
7 Munley's decision would lead to adverse consequences?
8       A.    No.
9       Q.    Why not?
10      A.    I don't know.  It didn't -- it didn't
11 enter my mind.  I don't know.  Fearless.
12      Q.    You were fearless?  That's a good
13 answer.
14            Looking back on it, do you think it
15 would have been more appropriate to have more fear that
16 deciding -- making a decision that did not support
17 President Munley would have adverse consequences?
18            MS. PEET:  Objection.
19      A.    No.  And it really never entered my
20 mind.
21      Q.    You're aware that your committee had to
22 consist -- was required to consist of tenured
23 professors, right?
24      A.    Yes.
                    MAGNA LEGAL SERVICES



# EXHIBIT W

Faculty Senate Ad Hoc Hearing Committee (Dr. Helen Bittel, Dr. Edward O'Brien, Mr. Mathew Povse)

Review of Sister Anne Munley's Decision to Terminate the Employment and Tenure of Dr. Frederick Fagal

2 July 2012

After thorough investigation, reflection, and deliberation, we----the Faculty Senate Ad Hoc Hearing Committee---are in agreement with Sister Anne Munley's decision to revoke the tenure and terminate the employment of Dr. Frederick Fagal.

A.   We acknowledge that revocation of tenure is one of the most extreme actions that an academic administrator can take and that it has very serious implications both for the individual whose employment is terminated and for the entire university community. The traditions of academic freedom require a strong defense of the rights of tenured faculty members to speak openly, explore their work, and participate in faculty governance without fearing reprisal. We maintain that academic freedom is the cornerstone of our work as faculty members and have, throughout our deliberations, sought to ensure that its principles are upheld, both in Dr. Fagal's case and for all Marywood faculty in years to come. We are mindful of the potential or perceived threat to academic freedoms when a speech violation leads to revocation of tenure. Thus in rendering our decision, we maintain that Dr. Fagal's is an extreme case and that his words and actions (specifically, his producing and sending out links to two YouTube videos to colleagues at Marywood) are not protected by the principles of academic freedom, as detailed below.

B.   In coming to this decision, we have taken our charge very seriously, thoroughly researching the events leading to Dr. Fagal's dismissal, Dr. Fagal's personnel record over his years at Marywood, the Marywood *Policies and Procedures Manual (PPM)*, and relevant AAUP guidelines during our deliberations (see Appendix A for a listing of the AAUP documents we reviewed). We believe that we gave this case the open-minded, careful consideration and thorough investigation that we would want for ourselves or for any of our colleagues.

C.   Dr. Fagal was given the opportunity to explain his video in his meeting with Sister Anne Munley and Drs. Patricia Dunleavy and Michael Foley on 23 January 2012. Dr. Fagal appears to have not acknowledged any errors in judgment on his part at this meeting and left little room for pursuing progressive discipline or a mediated solution to this situation. The Faculty Grievance Committee has already determined that Sister Anne Munley followed appropriate procedure in moving directly to termination.

D.   In rendering our decision, we carefully considered the four charges outlined by Sister Anne Munley in her Recommendation for Termination memo (8 February 2012) as well as Dr. Fagal's response to those charges (Letter to the Ad Hoc Committee, 6 May 2012).

**Charge #1: Breach of Tenure Agreement.** The Tenure policy outlined in the *PPM* states that tenure "will be discontinued only for grave reason, which may include moral turpitude, flagrant abuse of academic freedom, or professional incompetence." We agree that Dr. Fagal's action does constitute "a



1

flagrant abuse of academic freedom" because it includes gratuitous and malicious personal attacks well beyond the spirit and limits of academic freedom. We discuss this at greater length below, under "Charge #4"

We also agree, however, that according to the policy, these are not the only three reasons why tenure may be revoked. The wording of the policy pointedly uses the phrase "*may* include" [Italics ours] in order to allow for other rare and extreme—but very "grave"—circumstances in which an individual's actions seriously injure the community.   We are in agreement that Sister Anne Munley is justified in saying that Dr. Fagal's actions constitute such an injury.

While it is difficult to precisely define what constitutes a violation of Core Values at Marywood, the egregious nature of Dr. Fagal's video parodies and their gratuitous personal attacks are, in the view of this committee, sufficiently extreme to justify the actions taken by Sister Anne Munley.

The AAUP, which fiercely opposes campus speech codes, acknowledges that "[t]he governing board and the administration have a special duty not only to set an outstanding example of tolerance but also to challenge boldly and condemn immediately serious breaches of civility." ("On Freedom of Expression and Campus Speech Codes, 10/26/06, p.38) Dr. Fagal's video, in both its general premise and in the specific insults directed at individual Executive Officers, is, in the opinion of this committee, indeed such a breach.

Charge #2: Violation of Civil Rights Policy.  We question whether all of the insults to Executive Officers qualify as Civil Rights violations in terms of how the Civil Rights Policy relates to specific protected groups.  However, we do think that Dr. Fagal's portrayal of Alan Levine, a Jewish man, as a Nazi officer might be interpreted as anti-Semitic, regardless of whether this was Dr. Fagal's intention. It is, for example, analogous to portraying an African American as a Klansman in a video or document intended to insult that person.   Thus it could qualify as a violation of our Civil Rights Policy, since religion and ethnicity are protected categories.  While Dr. Fagal is correct in saying that he was not given an opportunity to respond to this point, there might have been one if he had answered Sister Anne Munley's questions on 23 January 2012 or if he had sought out additional opportunities to explain his actions in a subsequent meeting.

Charge #3: Violation of Marywood's Conditions of Computer Use Policy.  The committee does not have sufficient information from Sister Anne Munley's complaint to adjudicate this violation, nor is determining copyright infringement within our expertise.  The onus for providing evidence here rests with the administration in needing to prove that such violations occurred and not with Dr. Fagal in terms of proving that he did not engage in such violations.  We therefore cannot support this statement of violation.

Charge #4: Violation of Academic Freedom Policy, Professional Ethics Policy, and the University's Mission and Core Values as well as the principles of collegiality.

As we have indicated above, under "Charge #1," we do not believe that Dr. Fagal's video is protected by academic freedom because it is neither part of an academic exercise (teaching- or research-related) nor produced and disseminated in the context of such a scholarly pursuit. Moreover, it is not informed by legitimate academic research and does not abide by the professional and scholarly standards of Dr.

2

Fagal's discipline (or any other academic discipline). While the initial FIRE incident (the posters being taken down last fall) that sparked Dr. Fagal's anger did take place alongside and with relevance to his course (SSCI 201), this is not the case with the Jan 13 video. Dr. Fagal has the right to protest Marywood administrative actions, but to receive the protection of academic freedom, he would need to limit his analysis to an examination of the FIRE incident rather than bringing in personal attacks on individual Executive Officers. His critique of the Marywood administration could have been achieved without these attacks on the videos with their gratuitous and malicious elements that speak to his anger but do not illuminate our understanding of the issue of free speech and constitutionality. Moreover, Dr. Fagal could have pursued his complaint through other channels and could have criticized the university's actions in appropriate ways that would be protected under academic freedom.

Joan DelFattore, author of *Knowledge in the Making: Academic Freedom and Free Speech in America's Schools and Universities*, makes a clear distinction between academic freedom and speech protected under the first amendment: "Academic freedom as a professional norm upholds the authority of the faculty as a whole to establish and maintain academic standards and to share in institutional governance. It poses no obstacle to penalizing individual faculty members for scholarly speech that is judged to be professionally incompetent, even if the First Amendment would protect the expression of those same ideas by a citizen on the street. The applications are different because the fundamental purposes are different." (*Chronicle of Higher Education*, "To Protect Academic Freedom, Look Beyond the First Amendment," 31 Oct 2010)

We agree that the videos constitute harassment of the individuals who are impugned therein and therefore agree that Dr. Fagal has violated our Professional Ethics policy (*PPM*) as well as our mission and values.

In keeping with the recommendations of the AAUP, we do not, however, think that violating principles of collegiality in itself should be a criterion for revoking tenure. (See "On Collegiality as a Criterion for Faculty Evaluation).

**Conclusion:** We believe that Sister Anne Munley's termination of Dr. Fagal's employment and tenure is an extreme decision justified by the extreme nature of Dr. Fagal's behavior. We maintain that revocation of tenure at Marywood has been and ought to continue to be a very rare event. Tenure serves to ensure that faculty can speak their truths without reprisal, whether in the context of academic freedom or of faculty governance. This is critically important to the health of a university. However, Dr. Fagal was not operating in either of these contexts, and his video is outside the bounds of legitimate academic purpose. Moreover, Dr. Fagal's egregious violation of our core values, especially the value of respect, has caused grave and irreparable harm to our community.


Dr. Helen Bittel, Chair of Committee, Associate Professor

Dr. Edward O'Brien, Professor

Mr. Mathew Povse, Assistant Professor

3

Appendix A. AAUP Documents Consulted in Our Review

The committee initially identified a number of AAUP documents that seemed relevant to our deliberations and then contacted AAUP with this listing of documents and asked if there were other AAUP documents that might be relevant to our charge. In our contact with AAUP we identified the nature of our committee review in general terms and not with reference to any specific details of the current case. Below is a listing of the final list of AAUP documents reviewed as part of our committee deliberations.

1940 Statement of Principles on Academic Freedom and Tenure with 1970 Interpretive Comments

1958 Statement on Procedural Standards in Faculty Dismissal Proceedings

Ensuring Academic Freedom in Politically Controversial Academic Personnel Decisions (2011, full report and executive summary)

On Collegiality as a Criterion for Faculty Evaluation (1999)

On Freedom of Expression and Campus Speech Codes (1994)

On the Relationship of Faculty Governance to Academic Freedom (1994)

Post-Tenure Review: An AAUP Response (1999)

Procedural Standards in the Renewal or Nonrenewal of Faculty Appointments (1989 revision)

Recommended Institutional Regulations on Academic Freedom and Tenure (1940-2009)

4

# EXHIBIT X



✓ HR

Marywood University
Scranton, PA 18509-1598
TEL: (570) 348-6231
FAX: (570) 340-6014
EMAIL: ANNEMUNLEY@MARYWOOD.EDU
www.marywood.edu

OFFICE OF THE PRESIDENT

July 13, 2012


Dr. Frederick F. Fagal, Jr.
17 East Lake Street
Skaneateles, NY 13152

Dear Dr. Fagal,

I have received and reviewed the report of the independent tenured faculty committee that was
convened at your request under the Progressive Discipline Policy to appeal my decision to suspend you
and to terminate your employment and tenure.  This was the second independent tenured faculty
review accorded to you; both faculty committees concurred with my decisions.

My decision to terminate your employment with Marywood University and your tenure effective April 3,
2012 stands.

I wish you good luck in your future endeavors.

Sincerely,

*Sister Anne Munley, IHM*

Sister Anne Munley, IHM
President

*An education inspired by the Sisters, Servants of the Immaculate Heart of Mary.*



# EXHIBIT Y

# THE CENTER FOR
# FORENSIC ECONOMIC STUDIES

Economic & Statistical Analysis

CFES@CFES.COM   WWW.CFES.COM



> EXPERT ANALYSIS AND TESTIMONY SINCE 1980

**Reply to Philadelphia Office**

Chad L. Staller, J.D., MBA, MAC, CVA
*President*

James Markham, Ph.D., J.D., CPCU
*Senior Economist*

Bernard F. Lentz, Ph.D.
*Senior Economist*

David R. Adams
*Senior Economist*

Stephen M. Dripps, M. Fin., CVA
*Senior Economist / Manager*

Brian Conley
*Senior Economist*

Adam Gilham
*Economist*

November 18, 2016

Stephanie J. Peet, Esquire
Jackson Lewis PC
Three Parkway
1601 Cherry Street, Suite 1350
Philadelphia, PA 19102-1317

Re:   *Frederick F. Fagal, Jr. v. Marywood University*

Dear Ms. Peet:

At your request, we assess the economic loss suffered by Frederick F. Fagal, Jr. as a result of a
separation of employment with Marywood University (hereafter "Marywood") which occurred
on April 3, 2012.  We reserve the right to amend this report upon receipt of any additional
relevant information.

## I.   DOCUMENTS REVIEWED

- Amended Complaint and Answer
- Objections and Answers to Defendant's First Set of Interrogatories to Plaintiff
- June 7, 2016 deposition of Frederick F. Fagal, Jr., with Exhibits
- Dr. Fagal's LinkedIn Profile as of November 9, 2016
- Dr. Fagal's Payroll Records, 2007 to 2010
- Dr. Fagal's resume
- Dr. Fagal's mitigation records
- "Preliminary Calculation of Damages"
- Dr. Fagal's W-2 Wage and Tax Statements, 2011 and 2012
- November 2, 2016 report of Sobel Tinari Economics Group (hereafter "STEG")

Any additional documents used in preparation of this report, such as professional and
governmental publications, are fully cited herein.

This report has been prepared for the use of counsel in the instant matter.  Given the personal, financial and/or
medical information contained herein, any transmission, copy, or utilization of this report or material contained
herein is strictly prohibited without the written consent of the Center for Forensic Economic Studies.

## II.   BACKGROUND

Frederick F. Fagal, Jr. was born on ███████ 1946.  At the time of the separation, he was 66.1 years of age.  According to Dr. Fagal's June 7, 2016 deposition, he began teaching at Marywood on a part-time basis in 1985 or 1986 before joining the faculty full-time in the fall of 1987, and became a tenured professor in the fall of 1994.[1]  Subsequent to his separation, Dr. Fagal began seeking alternate employment in the fall of 2012 by looking at newspaper advertisements in the Syracuse newspaper; he also consulted Inside Higher Education and the Chronicle of Higher Education.[2]  Dr. Fagal estimates he has spent, on average, less than one hour per week seeking alternate employment; he has worked as a lifeguard and swimming instructor at the YMCA.[3]  Dr. Fagal feels he is qualified to teach introductory United States history, introductory micro/ macroeconomics, introductory statistics, and introductory social science.[4]  Dr. Fagal holds a Master of Arts in Economics from Cornell University, a Master of Arts in Education from Syracuse University, and a Ph.D. in Social Studies Education from Syracuse University.[5]  Dr. Fagal is married with one adult child and resides in Skaneateles, New York.[6]

## III.   EARNING HISTORY

Dr. Fagal's recent earning history from Marywood, as reported on his Social Security Earnings Record and W-2 Wage and Tax Statements, is shown in Table A below:

| Table A: Fagal Earning History | |
| --- | --- |
| Year | Earnings |
| 2008 | 68,128 |
| 2009 | 71,795 |
| 2010 | 73,626 |
| 2011 | 74,323 |
| 2012 | 52,172 |

Dr. Fagal was paid through the end of his contract in August 2012.[7]  Subsequent to the separation, Dr. Fagal reported minimal earnings from the YMCA.

---

[1] Id., pp. 33-37.
[2] Id., pp. 339-340.
[3] Id., pp. 342-343.
[4] Id., pp. 23-25, 34.
[5] Id., pp. 20-22.
[6] pp. 14-17.
[7] STEG report, p. 3.

## IV.   JOB SEARCH EFFORTS

As stated earlier, Dr. Fagal testified he began searching for alternate employment in the fall of 2012 by looking at newspaper advertisements in the Syracuse newspaper and consulting Inside Higher Education and the Chronicle of Higher Education, spending less than one hour per week seeking alternate employment.  Dr. Fagal's mitigation records primarily consist of printed job listings emailed to him, a cover letter expressing an interest in a part-time position at Onondaga Community College, and an application for an adjunct professor position with the State University of New York (hereafter "SUNY").  In his deposition, Dr. Fagal confirmed the SUNY application was the only application he submitted to any college or university since his separation.[8]  Dr. Fagal also mentioned the circumstances of his separation from Marywood in his cover letter to Onondaga Community College and his resume.  In addition, Dr. Fagal's LinkedIn page references his position with Marywood as a "ReFired Associate Professor of Economics."

The U.S. Department of Labor, Employment and Training Administration - U.S. Employment Service created a list of "Job Search Guide Strategies for Professionals" in searching for employment.[9]  This job search guide was originally released by the U.S. Department of Labor in 1993 and is currently posted and relied upon by the New York Department of Labor.  The Department of Labor job search guide states that:

> Most job seekers probably spend too much of their time using formal methods, not realizing there are alternative methods.  You must carry out an active, as opposed to a passive, job search.  It is not enough to respond to leads from want ads or employment agencies.  Carrying out an active search allows you to control the job search process and opens up many more job opportunities.

The United States Department of Labor study indicated that about two thirds of jobs are obtained using two "informal" methods: personal contacts (networking) and direct employer contacts.  It is further stated that only one-third of available openings are obtained using "formal" methods like want ads, employment agencies, hiring halls, and civil service tests.  It is also indicated that the use of the Internet can become addicting; however, the Internet should be only one of the tools used; not the only tool.  According to this guide, a job search should consist of:

- networking,
- sending resumes or letters to target companies,
- contacting by phone target companies,
- visiting in-person the target companies,
- responding to classified advertising in newspapers or trade journals,
- using private employment agencies and executive search firms (head-hunters),
- using public employment agencies,
- using Internet job banks.

In order to illustrate the amount of job search activity which could be considered reasonable, we note that according to the Pennsylvania Department of Labor and Industry, individuals are

---

[8] p. 354.

[9] http://www.labor.state.ny.us/careerservices/findajob/tableco.shtm

required at a minimum to apply for two jobs and participate in one work search activity each week in order to maintain eligibility for unemployment benefits.  Work search activities include:

- Attending a job fair.
- Searching positions posted on the JobGateway® system or Internet job banks.
- Creating or posting a résumé in the JobGateway® system or post a résumé in other résumé-posting services.
- Contacting colleagues, former co-workers or other individuals in similar professions or occupations to make known your availability for employment or obtain information about available positions, prospective employers or other employment opportunities.
- Utilizing an employment agency, employment registry or school placement service.
- Taking a civil service test or other pre-employment test.
- Participating in a program or activity offered through the Pennsylvania CareerLink® system.

Individuals may substitute a third weekly job application or a job interview in lieu of work search activity.[12]  The New York Department of Labor also has a requirement of three job contacts per week in order to maintain eligibility for unemployment benefits.[13]

The Pennsylvania Department of Workforce Development provides numerous resources for Pennsylvania residents on securing employment.[14]  Pennsylvania's job search services include PA CareerLink, which "provides help finding a job, looking for a better job, receiving job training and seeking vocational rehabilitation services."  The New York State Department of Labor also provides numerous resources for New York residents on securing employment, including New York State Career Centers.[15]

Additionally, The websites Scholarly Hires[16], Academic Careers[17], and Higher Ed Jobs[18] are websites dedicated to job placement for higher education.

To date, we have not reviewed any information indicating that Dr. Fagal availed himself of any of these resources.  Given the foregoing details of a thorough job search, and Dr. Fagal's testimony and mitigation records, it is our opinion that his job search was not exhaustive or diligent.

---

[12] Pennsylvania Unemployment Compensation Handbook, p. 7; http://www.uc.pa.gov/Documents/UCP%20Forms/ucp-1.pdf
[13] https://www.labor.ny.gov/ui/claimantinfo/work-search.shtm#3
[14] http://www.paworkforce.state.pa.us/portal/server.pt/community/job_seekers/12886
[15] https://labor.ny.gov/careerservices/CareerServicesIndex.shtm
[16] http://www.scholarlyhires.com
[17] http://www.academiccareers.com
[18] http://www.higheredjobs.com

## V.   RELEVANT UNEMPLOYMENT AND EARNINGS STATISTICS

The number of positions, mean earnings, and median earnings for workers classified postsecondary teachers in Business, Mathematical Science, Economics and History in metropolitan areas near Dr. Fagal's residence, according to the Bureau of Labor Statistics' May 2012 *Metropolitan and Nonmetropolitan Area Occupational Employment and Wage Estimates*, is shown in Table B below: [19]

| Table B:  Employment and Earnings Near Dr. Fagal's Residence | | | | |
|---|---|---|---|---|
| Metropolitan Area | Occupation | Positions | Mean | Median |
| Rochester, NY | Business Teachers, Postsecondary | 290 | 103,380 | 91,940 |
| Rochester, NY | Mathematical Science Teachers, Postsecondary | 240 | 88,540 | 70,320 |
| Rochester, NY | Economics Teachers, Postsecondary | 90 | 129,940 | 109,360 |
| Rochester, NY | History Teachers, Postsecondary | 140 | 113,700 | 89,470 |
| Syracuse, NY | Business Teachers, Postsecondary | 600 | 78,000 | 65,060 |
| Syracuse, NY | Mathematical Science Teachers, Postsecondary | 220 | 67,440 | 60,020 |
| Syracuse, NY | Economics Teachers, Postsecondary | 90 | 88,510 | 74,440 |
| Syracuse, NY | History Teachers, Postsecondary | 110 | 67,580 | 66,790 |
| Utica-Rome, NY | Economics Teachers, Postsecondary | 40 | 99,610 | 98,520 |
| Utica-Rome, NY | History Teachers, Postsecondary | 40 | 89,940 | 98,200 |
| Scranton/Wilkes-Barre, PA | Mathematical Science Teachers, Postsecondary | 160 | 77,540 | 69,440 |
| Scranton/Wilkes-Barre, PA | Economics Teachers, Postsecondary | 40 | 80,600 | 75,380 |
| Scranton/Wilkes-Barre, PA | History Teachers, Postsecondary | 70 | 76,630 | 73,020 |
| Total Employment/Weighted Average Earnings | | 2,130 | 86,599 | 74,789 |

The median tenure of employees in educational services in January 2012 was 4.3 years.[20]  By implication, approximately 248 postsecondary teaching positions in Business, Mathematical Science, Economics and History were available and subsequently filled in the metropolitan areas shown in Table B in 2012.[21]  The mean and median earnings of these positions are comparable, if not greater, than Dr. Fagal's earnings with Marywood.

In April 2012, the median duration of unemployment for individuals in service occupations was 20.5 weeks and the median duration of unemployment for individuals in the education and health services industry was 26.4 weeks.[22]

---

[19] *Occupational Employment Statistics,* Bureau of Labor Statistics, http://www.bls.gov/oes
[20] *Employee Tenure in 2016,* Bureau of Labor Statistics, http://www.bls.gov/cps
[21] 2,130/2/4.3 = 248
[22] *Employment and Earnings,* Bureau of Labor Statistics, http://www.bls.gov/opub/ee

## VI.   CURRENT EMPLOYMENT OPPORTUNITIES

To provide an illustration of potential employment opportunities that recently existed for Dr. Fagal, we conducted a limited internet job search[23] on November 9, 2016 for professor positions in the areas he identified: Economics, Social Science, U.S. History, and Statistics.  The results of this search are shown in Table C below:

| Table C:  Job Listings for Economics Professor Positions | | | |
|---|---|---|---|
| Date | Job Title | Employer | Location |
| 7/23/2016 | Assistant/Associate Professor of Statistics | Skidmore College | Saratoga Springs, NY |
| 8/26/2016 | Assistant Professor -- History | St. Bonaventure University | St. Bonaventure, NY |
| 9/1/2016 | Assistant Professor - Public Economics | Syracuse University | Syracuse, NY |
| 9/14/2016 | Assistant Professor - Probability/Statistics | Farmingdale State College | Farmingdale, NY |
| 9/22/2016 | Assistant, Associate or Full Professor - Economics | Cornell University | Ithaca, NY |
| 9/27/2016 | Assistant Professor - Economics | Columbia University | New York, NY |
| 9/27/2016 | Assistant Professor - Statistics | Syracuse University | Syracuse, NY |
| 9/30/2016 | Tenure-stream position - Microeconomics | Colgate University | Hamilton, NY |
| 10/3/2016 | Assistant or Associate Professor - Economics | CUNY John Jay | New York, NY |
| 10/5/2016 | Tenure-track faculty - Economics | Bucknell University | Lewisburg, PA |
| 10/10/2016 | Assistant Professor - Economics | Farmingdale State College | Farmingdale, NY |
| 10/14/2016 | Part-time Faculty, Section Lead for MBA, Microeconomics | Syracuse University | Syracuse, NY |
| 10/14/2016 | Assistant Professor - Economics | St. Lawrence University | Canton, NY |
| 10/14/2016 | Faculty Position in History | Hofstra University | Hempstead, NY |
| 10/17/2016 | Auxiliary Professor in Economics | Molloy College | Rockville Centre, NY |
| 10/17/2016 | Assistant Professor - Economics | Lafayette College | Easton, PA |
| 10/19/2016 | Economics, Full-time Tenure track faculty | Onondaga Community College | Syracuse, NY |
| 10/19/2016 | Assistant Professor of Economics - Tenure Track | Washington & Jefferson College | Washington, PA |
| 10/21/2016 | Assistant Professor of Economics | SUNY at Cortland | Cortland, NY |
| 10/24/2016 | Assistant Professor of History | SUNY College at Old Westbury | Old Westbury, NY |
| 10/27/2016 | Assistant Professor of Economics | SUNY College at Old Westbury | Old Westbury, NY |
| 10/31/2016 | Assistant Professor in Development Economics | Cornell University | Ithaca, NY |
| 10/31/2016 | Adjunct US History - Summer 2017 | Genesee Commuity College | Batavia, NY |
| 11/3/2016 | Lecturer, 3-year position, Economics | Cornell University | Ithaca, NY |
| 11/14/2016 | Assistant Professor - US History | CUNY LaGuardia Community College | New York, NY |

As shown in Table C, we found 25 positions currently available.  Had the opportunities available for such positions been cataloged from the time of the separation, it is likely that a greater number of opportunities would have been available to Dr. Fagal.[24]

---

[23] A more complete job search would consist of seeking job opportunities through multiple forums, including attending college job fairs,  networking, sending resumes or letters to target companies, colleges/universities contacting by phone target companies,c olleges and universties, visiting in-person the target companies, colleges/universities, responding to classified advertising in newspapers or trade journals, using private employment agencies and executive search firms (head-hunters), using public employment agencies, and using Internet job banks (http://labor.ny.gov/careerservices/findajob/tableco.shtm)

[24] There is no economic data to suggest that a similar number of jobs and potential opportunities were not available at the time of Dr. Fagal's separation in April 2012.

## VII.   ECONOMIC LOSS ANALYSIS

Dr. Fagal's job search effort, consisting of one documented cover letter and one documented employment application, can be considered minimal at best.  Dr. Fagal did not avail himself of the services of either the Pennsylvania or New York Departments of Labor, nor did he meet their minimum criteria for a reasonable job search.  Furthermore, Dr. Fagal makes mention of the circumstances of his separation from Marywood in his one documented cover letter, in his resume, and alludes to same on his LinkedIn page.

A detailed labor market review indicates that in 2012 approximately 248 postsecondary teaching positions in Business, Mathematical Science, Economics and History were likely available and subsequently filled in the metropolitan areas closest to Dr. Fagal's home.  Unemployment data indicates that individuals with similar characteristics to Dr. Fagal had a median duration of unemployment ranging from 20.5 to 26.4 weeks.  Our limited November 2016 job search found openings which could and should have been pursued by Dr. Fagal.  Had Dr. Fagal conducted a diligent job search upon his separation, he should have secured alternate employment with comparable compensation by the beginning of the following school year.   We conclude that Dr. Fagal's mitigation efforts were not reasonable or diligent, and that Dr. Fagal failed to mitigate his economic loss.  Therefore, our estimate of economic loss is zero ($0).

## VIII.   COMMENTS RE: NOVEMBER 2, 2016 REPORT OF SOBEL TINARI ECONOMICS GROUP

We examined the report of STEG in this matter and disagree with several assumptions.  STEG does not present any estimate of post-separation earnings.  As discussed earlier, Dr. Fagal has a duty to mitigate his losses and search for comparable employment.  As such, the STEG estimates should assume Dr. Fagal will be successful in this regard.

In addition, STEG reduces earnings by 5% to account for "job maintenance expenses", including transportation, clothing, meals outside the home, and other costs.  Dr. Fagal likely incurred significant commuting expenses while working for Marywood, as he resides in Skaneateles, New York, 126 miles from Marywood.  Assuming a daily commute to and from work for four days per week, 40 weeks per year, at the 2012 federal mileage reimbursement rate of 55.5 cents per mile,[28] Dr. Fagal incurred $22,378 in annual commuting costs, approximately 29% of his earnings.[29]  Therefore, STEG's estimates of job maintenance expenses are severely understated, leading to an overstated estimate of economic loss.

Last, STEG provides an estimate of excess taxes on a lump sum award.  STEG's estimate of excess taxes is specific only to their damages estimate, and is not applicable to any other damages award.  It is only appropriate for settlement purposes should the settlement amount equal STEG's estimate of damages.  Estimates of excess taxes should only be made upon an award being made.  Furthermore, STEG's estimate of excess taxes is based on effective tax rates, assuming the entire award is being taxed at one level.

---

[28] https://www.irs.gov/uac/irs-announces-2012-standard-mileage-rates-most-rates-are-the-same-as-in-july
[29] $22,378 = $0.555/mile * 126 miles/trip * 2 trips/day * 4 days/week * 40 weeks/year

## IX.   SUMMARY

As outlined in our report, the total economic loss equals $0.  Please do not hesitate to contact us if you have further questions.

All relevant documents as required by F.R.C.P. 26(a)(2)(B) are attached hereto as Appendix A.

Sincerely,

The Center for Forensic Economic Studies

Chad L. Staller, JD, MBA, MAC, CVA

James Markham, Ph.D., JD, CPCU

# APPENDIX A

THE CENTER FOR
# FORENSIC ECONOMIC STUDIES

1608 Walnut Street - Suite 801, Philadelphia, Pennsylvania 19103 - (215) 546-5600 - FAX (215) 732-8158
E-Mail Address: cfes@cfes.com

November 18. 2016

Stephanie J. Peet, Esquire
Jackson Lewis P.C.
Three Parkway
1601 Cherry Street, Suite 1350
Philadelphia, PA 19102-1317

Re: Frederick F. Fagal, Jr. v. Marywood University
Our File # 1823

Dear Ms. Peet:

Our compensation rates for professional time and testimony are listed below:

| | |
|---|---|
| Professional time (Hourly) | $ 325 |
| Testimony/Deposition (Half Day Session) | $ 2500 |
| Expenses | As Incurred |

We have not yet totaled the time invested in this matter.  When that calculation is made we will then forward the total to you.

Sincerely,

The Center for Forensic Economic Studies

Chad L. Staller, J.D., M.B.A., M.A.C.
President

CLS/da

# THE CENTER FOR
# FORENSIC ECONOMIC STUDIES
### Research · Analysis · Litigation Support

1608 Walnut Street, Suite 801
Philadelphia, Pennsylvania 19103





## Chad Staller, J.D., M.B.A., M.A.C., C.V.A
### President, Senior Economist

800.966.6099 | 215.546.5600 | fax 215.732.8158
cstaller@cfes.com

**Chad L. Staller** is president of the Center for Forensic Economic Studies. He has extensive experience working with both plaintiff and defense counsel in a wide variety of civil matters, quantifying loss sustained by many types of plaintiffs, including union members, state and federal employees, business owners and injured children. He regularly analyzes claims brought in employment-discrimination matters, quantifying back-pay damages, front-pay damages and lost benefits, and also frequently consults on commercial matters, analyzing lost-profit and business-interruption claims.

He serves on the faculty of Temple University's Beasley School of Law LL.M. in Trial Advocacy program and lectures regularly at Villanova University School of Law and Drexel University's Thomas R. Kline School of Law.  Mr. Staller is a certified instructor through the National Institute of Trial Advocacy where he lectures to practicing lawyers in the area of forensic economics.  He frequently presents seminars and speaks on forensic-economic topics at law firms, accounting continuing education seminars, and before professional organizations.

He received his Master of Business Administration, *with honors*, from the Fox School of Business and Management at Temple University.  Mr. Staller also received his Juris Doctorate, *with honors*, from the Beasley School of Law at Temple University and his Master of Accountancy from Villanova University.  He holds a C.V.A. through the National Association of Certified Valuation Analysts.

## Professional Organizations & Affiliations

- American Economic Association
- National Association of Forensic Economics
- American Bar Association

## Awards and Honors

- 2014 Honoree as a "Top 40 Under 40" for work as an Economic Damages Expert by NACVA and CTI.

## Accreditation

Certified Valuation Analyst (C.V.A.) by the National Association of Certified Valuation Analysts, 2007.

Certified Instructor by the National Institute of Trial Advocacy (NITA), 2013.

## Education

Villanova University, Master of Accountancy, 2006.

Temple University, Fox School of Business & Management, Master of Business Administration, Certificate of Academic Excellence, Concentration in Business Administration, 2005.

Temple University's James E. Beasley School of Law, Juris Doctorate, Cume Laude, 2001.

Lehigh University, Bachelor of Science in Business and Economics, 1998.

■ THE CENTER FOR FORENSIC ECONOMIC STUDIES ■

THE CENTER FOR
# FORENSIC ECONOMIC STUDIES
Research     Analysis     Litigation Support

1608 Walnut Street, Suite 801
Philadelphia, Pennsylvania 19103

## Professional Background

President and Senior Economist, the Center for Forensic Economic Studies, Philadelphia, Pennsylvania, concentrating on the analysis of, and testimony on, commercial damages (lost profits), personal-injury and wrongful-death damages and damages and liability in labor and employment matters (including FINRA arbitrations). July 2005 - present.

Law practice representing a wide range of clients, including major trucking companies and insurance firms. Served as lead attorney in many types of civil matters, including personal injury, product liability, premises liability, breach of contract, contract interpretation and trademark filings before the United States Trademark Office.

Law Clerk to Judge S. Michael Pincus, Circuit Court for Montgomery County, Maryland.

Research Assistant, Lehigh Valley Economic Development Corporation, Allentown, Pennsylvania. Developed a wage-analysis study showing which industries would be best suited to the Lehigh Valley region.

## Selected Engagements

### Commercial Disputes

- Evaluated economic loss relating to an alleged breach of contract involving a startup UPS franchise.
- Evaluated economic loss to a limousine company resulting from the destruction of a portion of its fleet.
- Evaluated economic loss relating to crop damage sustained by a commercial farm as a result of a housing developer's conduct.
- Evaluated economic loss sustained by real property owner as a result of a property manager's conduct.
- Evaluated economic loss stemming from an alleged breach of an employment contract with a medical practice.
- Evaluated economic loss sustained by a commercial property owner as a result of an alleged breach of contract.
- Evaluated economic loss sustained by an airline services company as a result an alleged breach of contract with the prior owner.
- Evaluated economic loss resulting from a disputed business acquisition of an emergency-response firm.
- Performed a valuation of a controlling interest in an insurance-claims processor.
- Performed a valuation of a controlling interest in a coin-operated laundry.
- Evaluated economic loss to many other types of businesses, including:
  - Photo finishers
  - Information technologists
  - Funeral homes
  - Dry cleaners
  - Grocers
  - Medical practices
  - Cable TV services
  - Interpreters

THE CENTER FOR
# FORENSIC ECONOMIC STUDIES
Research     Analysis     Litigation Support

1608 Walnut Street, Suite 801
Philadelphia, Pennsylvania 19103

**Personal Injury and Wrongful Death Matters**

Calculated economic loss to individuals in a variety of occupations, including:

- Accountants
- Children with projected lost future earnings
- Construction workers
- Doctors, nurses and other medical professionals
- Financial advisors (including FINRA Arbitrations)
- Homemakers
- Information technologists
- Lawyers

- Mechanics
- Pilots
- Police officers
- Retirees
- Sales representatives
- Teachers
- Union members
  (ironworkers, carpenters, steamfitters, electrical workers, laborers and painters)

## Publications

- "What's It Worth? Best Practices in Defending Economic Damages in the Catastrophic Accident." (with Matthew Keris), Litigation Management Magazine, Fall 2012.
- "Without a Floor There is Only a Ceiling." Counter Point, Pennsylvania Defense Institute, August 2012.
- "PA Courts Make the Case for Detailed Damages Arguments," New Jersey Law Journal, May 23, 2012.
- "PA Courts Make the Case for Detailed Damages Arguments," Pennsylvania Law Weekly, May 8, 2012.
- "Personal Injury Damages Road Map," US Law Magazine Spring/Summer 2012.
- "Is It Finally Time to Challenge Kaczkowski," Counterpoint (the Pennsylvania Defense Institute), October 2011.
- "Goodbye Kaczkowski? A Recent Ruling Reopens the Door to Debate," The Pennsylvania Law Weekly, May 20, 2011.
- "Practice Tip: Lost Earning Capacity of Undocumented Workers," Product Liability Law & Strategy, May 2011.
- "The Basics of Pension Damages," Product Liability Law & Strategy, October 2010.
- "Hedonic Damages Update," Product Liability Law & Strategy, February 2010.
- "A Tax Break for Plaintiffs Raises Interesting Issues," Employment Law Strategist, November 2009 (With Stephen M. Dripps).
- "An Economist Defends Against Punitive Damages," Product Liability Law & Strategy, December 2008.
- "Determining Damages in the Keystone State," At Issue, Young Lawyers Division of the Pennsylvania Bar Association, Winter 2008.
- "Determining Damages to Entrepreneurs," Product Liability Law & Strategy, February 2008.
- "The Earning Capacity of Business Owners," Product Liability Law & Strategy, November 2007.
- "Economic Damages 101," The Sidebar: The New Lawyers Division Newsletter, American Association for Justice, Fall 2007.
- "Sixth Circuit Rules on Privilege in Two Cases," Product Liability Law & Strategy, April 2007.

**THE CENTER FOR**
**FORENSIC ECONOMIC STUDIES**
Research    Analysis    Litigation Support

1608 Walnut Street, Suite 801
Philadelphia, Pennsylvania 19103

## Faculty/Lectures

- Temple University's Beasley School of Law LL.M. in Trial Advocacy program, 2007 - present.
- Rutgers Institute for Professional Education, 2011- present.
- Villanova University School of Law, 2005 - present.
- Drexel University's Thomas R. Kline School of Law Trial Advocacy Program, 2012 - present.
- University of Pennsylvania, Organizational Dynamics Exchange Network, Graduate Division of Arts & Sciences, November 2011.
- University of Baltimore School of Law, October 2013, November 2010.
- Mid Atlantic Council Institute of Management Accountants, November 2015, Exton, Pennsylvania.
- Main Line Association for Continuing Education, "MACE" Accounting, Malvern, PA March 2014.
- American Association of Nurse Life Care Planners, Philadelphia PA, November 2013
- American Rehabilitation Economics Association, June 2016
- Pennsylvania Defense Institute, Annual Conference, July 2013
- Philadelphia Bar Association, Medical Legal Committee Meeting, February 2013.
- National Business Institute, Philadelphia, Pennsylvania, December 2007.
- National Business Institute, Philadelphia, Pennsylvania, December 2008.
- National Business Institute, Philadelphia, Pennsylvania, December 2010.
- National Business Institute, Philadelphia, Pennsylvania, November 2013.
- National Business Institute, Philadelphia, Pennsylvania, February 2015.
- Council on Litigation Management: Orlando, FL, April 2016, Boca Raton, FL, April 2014, Boston, MA, July 2013, San Antonio, TX, April 2013, Nashville, TN, November 2012, Washington, DC, May 2012, Philadelphia, PA, October 2011, Milwaukee, WI, June 2011, New Orleans, LA, March 2011, Jacksonville, FL, March 2010.
- Defense Research Institute (DRI), Civil Rights and Governmental Tort Liability Seminar, Miami Beach, February 2012.
- Ballard Spahr, Philadelphia, Pennsylvania, May 2010, May 2012, May 2014.
- Cozen O'Connor Trial Academy (COTA), Philadelphia, Pennsylvania, June 2009, June 2011, June 2013 and June 2015.
- PIAA, November 2105, New Orleans, Louisianna.
- US Attorney's Office, Newark, New Jersey, December 2010.
- Sunoco, Philadelphia, December 2010.
- Middlesex Community College paralegal program, Middlesex, New Jersey, November 2008.
- New York City Law Department, New York, New York, 2008.
- Law Firms throughout the U.S.
- Defense Research Institute (DRI), Defending Trucking Litigation, A Primer for Young Lawyers, Chicago Illinois, June 2015.

**THE CENTER FOR**
# FORENSIC ECONOMIC STUDIES
Research      Analysis      Litigation Support

1608 Walnut Street, Suite 801
Philadelphia, Pennsylvania 19103

## Testimony

**Federal Court:**
District of Columbia, District of New Jersey, Eastern District of Pennsylvania, Middle District of Pennsylvania, Southern District of New York, District of Delaware, Eastern District of New York, District of Maryland

**State Court:**
Delaware, District of Columbia, Florida, Illinois, Maryland, Massachusetts, Missouri, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, Virginia

## State Bar Memberships

- Maryland
- Pennsylvania
- New Jersey

## Contact Information

1608 Walnut Street, Suite 801,
Philadelphia, Pennsylvania 19103

Toll Free: 800.966.6099
Telephone: 215.546.5600
Fax: 215.732.8158
www.cfes.com

# Testimony List for Chad L. Staller, Esq., M.B.A., M.A.C.

| Month/Year | Case Name | Location | Type |
|---|---|---|---|
| Nov 16 | Estate of William S. Hartman, Jr. v. Carborundum | Harrisburg, PA | Trial |
| Nov 16 | Martin T. Fischer, III v. Christopher D. Kager, M. | Lancaster, PA | Trial |
| Nov 16 | James LaGarde et al v. PRMC et al | Philadelphia, PA | Deposition |
| Oct 16 | Ronald Frantz v. Brett Roberts, M.D. et al | Philadelphia, PA | Deposition |
| Oct 16 | Estate of Edward Brittain v. Johns Hopkins Bayvie | Philadelphia, PA | Deposition |
| Oct 16 | Matthew Borden v. Sean Ondish and Christa Ondis | Philadelphia, PA | Trial |
| Oct 16 | Arjay Punzalan, Jr. v. Lauren Rodgers, M.D. et al | Upper Marlboro, MD | Trial |
| Sep 16 | Adriana Reichard v. Hitesh Amin, M.D. et al | Philadelphia, PA | Deposition |
| Sep 16 | Raymond Edward Carter, Jr. et al v. Toshio Sasmor | Philadelphia, PA | Deposition |
| Sep 16 | Kyle Reber, a minor v. University of Maryland Me | Philadelphia, PA | Deposition |
| Sep 16 | Suzanne L. Houser et al v. Tamra L. Heimert, M.D. | Carlisle, PA | Trial |
| Sep 16 | Estate of John Ryan v. Barbara Holbert, M.D. et al | Boston, Massachusetts | Trial |
| Aug 16 | Estate of Leonard Wayda v. Charles Burns, Jr., M. | Wilkes-Barre, PA | Trial |
| Aug 16 | Ava McGuire et el v. Mark Conway, M.D. et al | Philadelphia, PA | Deposition |
| Aug 16 | Sandra Juarez et al v. DC Water and Sewer Authori | Washington, DC | Deposition |
| Aug 16 | David P. Suresch et al v. Kelley Elizabeth Banagan | Philadelphia, PA | Deposition |
| Jul 16 | Estate of Ryan Imwold et al v. Jeffrey L. Fillmore, | Philadelphia, PA | Deposition |
| Jul 16 | D&L Typing Service, Inc. v. Milton Hershey Medi | Stroudsburg, PA | Trial |
| Jul 16 | Estate of Deborah Wells v. Drexel Univ College of | Philadelphia, PA | Trial |
| Jun 16 | Donelle Schultz, et al. v. Johns Hopkins Hospital | Philadelphia, PA | Deposition |
| Jun 16 | Daniel Ancherani v. GEICO | Scranton, PA | Trial |
| Jun 16 | Kamora Murrell, a minor, et al. v. James E. Riojas, | Liberty, MO | Trial |
| May 16 | Ralph M. Bailets v. Pennsylvania Turnpike Commi | Harrisburg, PA | Trial |
| May 16 | Scott R. Storick v. MetLife Securities, Inc., et al. | Boca Raton, FL | Trial |
| May 16 | Dimas M. Chavez, et ux. v. Wal-Mart Stores, Inc., | Rockville, MD | Trial |
| May 16 | Kevin F. Ryan v. Patrick Zarwie, et al. | Philadelphia, PA | Trial |
| May 16 | Elizabeth K. Newsholme, et al. v. Palms West Hos | Philadelphia, PA | Deposition |
| Apr 16 | Sarah G. Stauffer, et al. v. F-F Athletic Company, I | Allentown, PA | Trial |
| Apr 16 | Pamela Hill, Parent of Malakhi Hill v. John K. Yac | Philadelphia, PA | Deposition |
| Apr 16 | Antoine Elias Kfuri, M.D., et al. v. Ismail Ahmad S | Towson, MD | Trial |
| Apr 16 | Elliot D. Engel v. Abington Memorial Hospital, et | Norristown, PA | Trial |
| Apr 16 | John Cannon, Sr., et al. v. Joseph F. Richardson, P | Philadelphia, PA | Deposition |
| Apr 16 | Richard C. Angino, et al. v. The Cincinnati Insuran | Harrisburg, PA | Trial |
| Apr 16 | Marlene Drody v. University of Medicine & Dentis | Philadelphia, PA | Deposition |
| Apr 16 | Keith Matteson, et al. v. Central Bucks Cardiology, | Doylestown, PA | Trial |
| Apr 16 | Wayne Simpson v. Prince Telecom, LLC | Wilmington, DE | Deposition |
| Apr 16 | Joel S. Lippman, M.D. v. Ethicon, Inc., & Johnson | New Brunswick, NJ | Trial |
| Apr 16 | Leslie Scott Matthews, M.D., et al. v. Maia Gottlie | Philadelphia, PA | Deposition |
| Apr 16 | Rainmaker Capital of Mt. Effort, LLC v. Tender Tr | Stroudsburg, PA | Trial |
| Mar 16 | Scott Maxwell, a minor, et al. v. Union Hospital of | Philadelphia, PA | Deposition |
| Mar 16 | Peter Khouri, et al. v. Outdoor Expressions, LLC, e | Carlisle, PA | Trial |
| Mar 16 | Estate of Teshima Lashaun Walker, et al. v. Kaiser | Philadelphia, PA | Deposition |
| Mar 16 | Mailauni R. Williams Irrevocable Trust v. Henry F | Philadelphia, PA | Deposition |
| Feb 16 | Alaina Harris v. Cherl Lee-Pow, D.C., et al. | Greenbelt, MD | Trial |
| Feb 16 | Estate of Calvin M. Wilson, Jr. v. Kahlile Gray | Philadelphia, PA | Trial |
| Feb 16 | Estate of Raymond Nicholas Moore, et al. v. Micha | Philadelphia, PA | Deposition |
| Feb 16 | Antoine Elias Kfuri, M.D., et al. v. Ismail A. Shalab | Philadelphia, PA | Deposition |
| Feb 16 | Ora Sincere, Conservator for Delisa Sincere v. Hen | Philadelphia, PA | Deposition |
| Feb 16 | Thomas Lee Finley, Jr. v. Paul M. Appostolo, M.D. | Philadelphia, PA | Deposition |
| Feb 16 | Mashell J. Smith, et al. v. University of Maryland | Philadelphia, PA | Deposition |

# Testimony List for Chad L. Staller, Esq., M.B.A., M.A.C.

| Month/Year | Case Name | Location | Type |
|---|---|---|---|
| Jan 16 | Simone DeVito, M.D., et al. v. William Butler, M. | Boston, MA | Trial |
| Jan 16 | Joel S. Lippman, M.D. v. Ethicon, Inc. and Johnso | Philadelphia, PA | Deposition |
| Jan 16 | Estate of James Vaugh, et al. v. Jeffrey I. Jackerson | Wilmington, DE | Deposition |
| Jan 16 | Estate of Ainsworth Mallet, et al. v. Schmidt Bakin | Philadelphia, PA | Deposition |
| Dec 15 | Travis Emery v. Johns Hopkins Hospital | Philadelphia, PA | Deposition |
| Dec 15 | Lee Siegel v. Bloomberg, L.P., et al. | Philadelphia, PA | Deposition |
| Dec 15 | Glenn Jones v. Rutgers, The State University of Ne | Newark, NJ | Deposition |
| Dec 15 | Prakash Raghubar v. Amrit, Inc., et al. | Baltimore, MD | Trial |
| Nov 15 | Angelique Kerr-Loper v. Verizon Wireless, et al. | Philadelphia, PA | Deposition |
| Nov 15 | Lafayette James v. Albert Einstein Medical Center, | Philadelphia, PA | Trial |
| Nov 15 | Neil Ross, M.D., et al. v. Gail Glotfelty Kramer, M | Philadelphia, PA | Deposition |
| Oct 15 | Jose Rodriguez v. Troy W. Fraker, et al. | Cherry Hill, NJ | Deposition |
| Oct 15 | Timothy L. Dorer, et al. v. Concrete Restoration, In | York, PA | Trial |
| Oct 15 | James O. Scott, Jr. v. United States of America | Washington D.C. | Trial |
| Oct 15 | Brian Hinchey, et al. v. Burton A. Waisbren, Jr., M | Mt. Laurel, NJ | Deposition |
| Sep 15 | Lucia DiStefano, et al. v. Carroll Hospital Center, I | Philadelphia, PA | Deposition |
| Sep 15 | Shawn Coleman v. Yafl 3, Inc., et al. | Philadelphia, PA | Trial |
| Jun 15 | Estate of Joseph Luton v. Phoenixville Hospital | West Chester, PA | Trial |
| Jun 15 | Albert Wolf v. Fujitsu America, Inc., et al. | Hackensack, NJ | Trial |
| Jun 15 | Isaiah Amaya Perez, et al. v. Lauren Mayer, CRN | Philadelphia, PA | Deposition |
| Jun 15 | Robert Triebe v. State of New Jersey, et al. | Philadelphia, PA | Deposition |
| May 15 | Christina Villavicencio, et al. v. NY City Dept of E | Brooklyn, NY | Trial |
| May 15 | Carolyn Lovejoy, et al. v. New York City Departm | Brooklyn, NY | Trial |
| Apr 15 | Charles Santore v. Nationwide Mutual Insurance C | Philadelphia, PA | Trial |
| Apr 15 | Andrew Roebuck v. Bear Creek Mountain Resort, | Reading, PA | Trial |
| Apr 15 | Atlantic City Electric Company v. Wal-Mart Stores | Cherry Hill, NJ | Deposition |
| Mar 15 | Anita Saah v. Bradley Dick, M.D., et al. | Rockville, MD | Trial |
| Mar 15 | Delaney Grey v. Tutasi Waters, M.D., et al. | Plymouth, MA | Trial |
| Mar 15 | Stanely Ray White, et al. v. Douglas Winfred Rudo | Philadelphia, PA | Deposition |
| Feb 15 | Estate of Tanya Renee Wilson v. U.S. Sec. Assoc., | Philadelphia, PA | Trial |
| Feb 15 | Estate of Latonya Brown v. U.S. Sec. Assoc., et al. | Philadelphia, PA | Trial |
| Feb 15 | Steven Leventhal, et al. v. John W. Warwick, III, et | Trenton, NJ | Trial |
| Feb 15 | Matish, et al. v. Jospeh P. Riley, D.O., et al. | Philadelphia, PA | Deposition |
| Feb 15 | Romeo Morgan, a/k/a Anthony Williams v. Jay We | Philadelphia, PA | Deposition |
| Feb 15 | Enna Rodas v. Richard W. Nystrom, et al. | Rockville, MD | Trial |
| Jan 15 | Estate of Richard Frey v. Robert Potorski, M.D., et | Wilkes-Barre, PA | Trial |
| Jan 15 | Timothy P. Walsh v. james Gregory Howard, et al. | Philadelphia, PA | Deposition |
| Jan 15 | Estate of Deanna Nicole v. City of Philadelphia | Philadelphia, PA | Trial |
| Jan 15 | Shinsuke Konno, et al. v. Kiyomi Yamanaka, et al. | Georgetown, DE | Trial |
| Jan 15 | Evelyn Downey, et al. v. District of Columbia, et al | Washington, DC | Trial |
| Dec 14 | Peter Watson, et al. v. Suzanne R. Davis, Inc., et al. | Washington, D.C. | Deposition |
| Dec 14 | Edward Holldenshade, Jr. v. Kerry Clement Prewitt | Philadelphia, PA | Deposition |
| Dec 14 | David Edwards v. Delilah's Den | Philadelphia, PA | Trial |
| Dec 14 | Sarah Connors v. Target | Newark, NJ | Trial |
| Nov 14 | Raheel Malik v. Cooper Tire & Rubber Company | Philadelphia, PA | Deposition |
| Nov 14 | Andre Henry v. Delaware State University | Wilmington, DE | Deposition |
| Nov 14 | Scott Toth v. Plaid Paisley Enterprises | Philadelphia, PA | Deposition |
| Nov 14 | Gregory Morris v. York Excavating Company | Frederick, MD | Trial |
| Oct 14 | Raymond Grote v. Carl A. Frankel, M.D. | Harrisburg, PA | Trial |
| Oct 14 | Lauren Adle v. Michael Anton Gillespie, M.D. | Philadelphia, PA | Deposition |

# Testimony List for Chad L. Staller, Esq., M.B.A., M.A.C.

| Month/ Year | Case Name | Location | Type |
|---|---|---|---|
| Oct 14 | Mark W. Darragh v. Nationwide Mutual Insurance | Sanford, FL | Trial |
| Oct 14 | Estate of Ejay Santiago v. York Hospital | York, PA | Trial |
| Oct 14 | Anita Saah v. Bradley Dick, M.D. | Philadelphia, PA | Deposition |
| Oct 14 | Robert Butka v. Joseph John Andrews, M.D. | Wilkes Barre, PA | Trial |
| Sep 14 | Charles Bonner, Ph.D. v. K12, Inc. | Philadelphia, PA | Trial |
| Sep 14 | Angela Barrett v. Federal Express Corporation | Philadelphia, PA | Trial |
| Sep 14 | George Hardy v. Anthony Chiaramonte, III, M.D. | Towson, MD | Trial |
| Sep 14 | Lisa Tisdel v. Eugene Harasym, M.D., et al | Scranton, PA | Trial |
| Sep 14 | Dayon Pattawi v. Mercy Hospital | Philadelphia, PA | Deposition |
| Sep 14 | Est. of Raj Kumar Chopra v. Berlin County Apart | Mount Laurel, NJ | Deposition |
| Sep 14 | Gregory Morris, Sr. v. York Excavating, Inc. | Philadelphia, PA | Deposition |
| Aug 14 | Estate of Lucas Sieg v. Covington Township Mun. | Clearfield, PA | Trial |
| Jul 14 | George Edward Hardy, Jr. v. Anthony Chiaramonte | Philadelphia, PA | Deposition |
| Jul 14 | Judith Mitnick v. Linda E. Rosenthal | Towson, MD | Trial |
| Jul 14 | Terry Hopper v. Marc S. Williams, D.O. | Bloomsburg, PA | Trial |
| Jul 14 | Est. of Margaret A. Mateja v. Chestnut Hill Hospit | Philadelphia, PA | Trial |
| Jul 14 | Geraldine Coward v. Washington Hospital Center | Philadelphia, PA | Deposition |
| Jun 14 | Est. of Frederick Wayne Shawl v. Howard Slotorof | Philadelphia, PA | Deposition |
| Jun 14 | Estate of Opal Nojunas v. John R. Mulvey, M.D. | Elkton, MD | Trial |
| Jun 14 | Adam Thissell v. Frank Wilson, M.D., et al | Plymouth, MA | Trial |
| Jun 14 | Abraham Mbony, et al v. Xtreme Acro & Cheer | Philadelphia, PA | Deposition |
| Jun 14 | Judith Faye Mitnick v. Linda Rosenthal, M.D. | Philadelphia, PA | Deposition |
| Jun 14 | Estate of John Foley v. St. Lucie Medical Specialist | Philadelphia, PA | Deposition |
| May 14 | Trinity Elias v. Michelle Phillips, R.N. | Boston, MA | Trial |
| Apr 14 | Mark W. Darragh v. Nationwide | Boca Raton, FL | Deposition |
| Apr 14 | Est. of Nelson L. Degangi v. Borg-Warner Corp. | Wilmington, DE | Trial |
| Apr 14 | Roman Szyjka v. Peter Vandermeer, M.D. | Baltimore, MD | Trial |
| Mar 14 | Estate of Elysia Durgam v. Holy Cross Hospital | Philadelphia, PA | Deposition |
| Mar 14 | Aundre Anderson v. ATMI, Inc. | Philadelphia, PA | Deposition |
| Mar 14 | Kathryn Rawles v. Nieva T. Duque-Salva, M.D. | Philadelphia, PA | Deposition |
| Mar 14 | Estate of Susan Lee Bott v. Ira M. Thal, M.D. | West Chester, PA | Trial |
| Mar 14 | Estate of Lee Lumpkins v. Samuel Galvagno, M.D. | Philadelphia, PA | Deposition |
| Mar 14 | Carolyn Lovejoy, et al v. NYC Department of Edu | Brooklyn, New York | Trial |
| Feb 14 | Oleh Ljachin, Jr. v. Armour & Sons Electric, Inc. | Philadelphia, PA | Trial |
| Feb 14 | Michael Mills v. Office Basics, Inc. | Philadelphia, PA | Trial |
| Feb 14 | Danielle Vincent v. New Castle County, Delaware | Hockessin, DE | Deposition |
| Feb 14 | Spectrum Clinical Research v. St. Joseph's Medical | Towson, MD | Trial |
| Feb 14 | City of Baltimore v. Unisys Corporation | Baltimore, MD | Deposition |
| Feb 14 | Jay Nilson v. Softmart, et al | Philadelphia, PA | Deposition |
| Jan 14 | Elizabeth Musso v. County of Bergen | Philadelphia, PA | Deposition |
| Jan 14 | Spectrum Clinical Research v. St. Joseph's Medical | Philadelphia, PA | Deposition |
| Jan 14 | William Gooch, et al v. Patient First Maryland Med | Philadelphia, PA | Deposition |
| Jan 14 | Lilliam Marie Ciechoski v. Phoenixville Hospital | West Chester, PA | Trial |
| Jan 14 | Sandra Rumanek v. Independent School Managem | Wilmington, DE | Trial |
| Dec 13 | Roman Szyjka v. Peter Vandermeer, M.D. | Philadelphia, PA | Deposition |
| Dec 13 | Mitchell Eismont v. Dae Wa Industries | Philadelphia, PA | Deposition |
| Dec 13 | Nadira Smith v. Albert Einstein Medical Center, et | Philadelphia, PA | Trial |
| Nov 13 | Jacqueline Farrar v. Jay Nathan, M.D. | Minneola, NY | Trial |
| Nov 13 | Daniel Cito v. Matthew S. Bergey, et al | Philadelphia, PA | Deposition |
| Nov 13 | Edward Xu, et al v. Theresa Willett, M.D | Boston, MA | Trial |

# Testimony List for Chad L. Staller, Esq., M.B.A., M.A.C.

| Month/Year | Case Name | Location | Type |
|---|---|---|---|
| Oct 13 | Kam-Chiu Lee v. Bruce S. Worrell, D.O., et al | Hamilton OH | Trial |
| Oct 13 | Sumeet Goel v. Nationwide | Baltimore, MD | Deposition |
| Sep 13 | Teach Solais LP v. Ernest R. Wilke | Philadelphia, PA | Trial |
| Aug 13 | Kam Lee v. Bruce Worrell, M.D. | Philadelphia, PA | Deposition |
| Jun 13 | Wayman Fire Protection v. Premium Fire & Servic | Wilmington, DE | Trial |
| Jun 13 | Estate of Ashley Judge v. HTCAA, et al | Wilkes-Barre, PA | Trial |
| Jun 13 | Jose Noel Ramos v. Astra Foods | Philadelphia, PA | Trial |
| May 13 | Estate of Johnquan Wright v. District of Columbia | Washington, DC | Trial |
| May 13 | Sandra Rumanek v. Independent School Managem | Wilmington, DE | Deposition |
| Apr 13 | Thomas Humphrey v. Mercer County | Trenton, NJ | Trial |
| Apr 13 | Estate of Daniel W. Sullivan, Jr. v. Ajay Bakhshi, | Philadelphia, PA | Deposition |
| Mar 13 | Doreen Klevinsky v. Mary Bielik | Philadelphia, PA | Deposition |
| Mar 13 | Estate of Kristy McRiffey v. Richard Philip Frankli | Philadelphia, PA | Deposition |
| Mar 13 | Laura A. Jimenez v. Edward Denmead, et al | Elizabeth, NJ | Trial |
| Feb 13 | Estate of David P. Hurn v. David Makram Bishai, | Philadelphia, PA | Deposition |
| Feb 13 | Estate of Sally Flowers v. Evelyn D. Jackson, M.D. | Philadelphia, PA | Deposition |
| Feb 13 | Aubrey Wright v. Holy Cross Hospital | Philadelphia, PA | Deposition |
| Feb 13 | Jacquelyn Goodman v. Advanced Radiology | Philadelphia, PA | Deposition |
| Feb 13 | Catherine Corbitt v. Tipton Trucking Company, et | Philadelphia, PA | Trial |
| Jan 13 | Jeannette Rodriguez v. Archana Raj Rao,M.D. | Philadelphia, PA | Deposition |
| Jan 13 | Tiffany Craig v. Georgette Kendo Bilburn, M.D., e | Philadelphia, PA | Deposition |
| Dec 12 | LaShunda Smith v. Ratan R. Park, et al | Hackensack, NJ | Trial |
| Dec 12 | Rondra Marcelli v. Capitol Cleaning Concepts | Ellicott City, MD | Trial |

# Testimony List for James Markham, Ph.D., J.D., CPCU

| Month/ Year | Case Name | Location | Type |
|---|---|---|---|
| Mar 16 | John Ray, PPA John Ray, Erin Ray and John Ray v | Lawrence, MA | Trial |
| Jan 16 | Jeniah Gallego, PPA Jeanette Gutierrez v. Emily W | Springfield, MA | Trial |
| Sep 15 | Jakwan Davis, et al. v. Janet Conley, M.D., et al. | Worcester, MA | Trial |
| Aug 15 | Dale Ihnken v. Jane Garnder, et al. | Baltimore, MD | Trial |
| Jul 15 | Estate of Mark Lucius v. Duane Pinto, M.D., et al. | Suffolk County, MA | Trial |
| May 15 | Estate of Elaine Booker v. United States | Philadelphia, PA | Trial |
| May 15 | Estate of Elaine Booker v. United States | Philadelphia, PA | Trial |
| Oct 14 | PICA v. Hewlett Packard Company | New Castle County, DE | Trial |
| Oct 14 | Estate of Louis T. Goll v. Ace Hardware | Philadelphia, PA | Trial |
| Aug 14 | Joseph Wagner v. Perry Warren | Philadelphia, PA | Trial |
| Jul 14 | Maglio Foods v. Charter Oak Insurance Company | Philadelphia, PA | Trial |
| Jun 14 | Santiago Cortes, et al v. J.C. Penney Corporation | New York, NY | Trial |
| May 14 | Nina Shervin, M.D. v. Partners Healthcare System | Boston, MA | Trial |
| May 14 | Lewis J. Pagano v. Kumar Sinha | Philadelphia, PA | Deposition |
| Apr 14 | PSCOA Consult | Harrisburg, PA | Trial |
| Apr 14 | Eugene J. Corrado v. Balfour Beatty Construction | Upper Marlboro, MD | Trial |
| Mar 14 | PICA v. Hewlett-Packard Company | Wilmington, DE | Deposition |
| Feb 14 | Anthony Sollitto v. Gleeson Construction Co. | Cape May County, NJ | Trial |
| Feb 14 | Jay Nilson v. Softmart, et al | Philadelphia, PA | Deposition |
| Dec 13 | Mackenzie Barnes v. Robert Vanderlin, M.D. | Boston, MA | Trial |
| Nov 13 | Estate of Nayelis R. Roman v. United States | Philadelphia, PA | Trial |
| Oct 13 | Hailey Velho v. Yun J. Lee, M.D., et al | New Bedford, MA | Trial |
| Oct 13 | Catherine Marcucci, M.D. v. Department of Vetera | Philadelphia, PA | Deposition |
| Sep 13 | Peter Klimaszewski v. Kimberly Porter, RN, et al | Philadelphia, PA | Deposition |
| Aug 13 | Smyrna Hospitality v. Petrucon Construction | Wilmington, DE | Deposition |
| Aug 13 | Thomas Conway v. Walker Nell Partners, Inc. | Philadelphia, PA | Trial |
| Mar 13 | Coleen Curran v. Juan S. Mendez | Atlantic City, NJ | Trial |
| Feb 13 | Mary Ellen Breen v. Francis Breen | Doylestown, PA | Trial |
| Feb 13 | Carter Emond v. Jonathan Friedes, M.D | Boston, MA | Trial |
| Jan 13 | Golden Star, Inc. v. Mass Mutual Life Insurance C | Philadelphia, PA | Deposition |
| Oct 12 | Karen Brandli v. Micrus Endovascular Corp. | Philadelphia, PA | Deposition |
| Sep 12 | Local Union No. 98 v. RGB Services, LLC | Philadelphia, PA | Trial |
| Aug 12 | Michael and Roseanne Panebianco v. Marine Max | New Brunswick, NJ | Deposition |
| Jul 12 | Megan Petry v. Savannah College of Art | Egg Harbor, NJ | Deposition |
| Jul 12 | Esate of Burnell Polk, Sr. v. Hector E. Sanchez | Philadelphia, PA | Trial |
| May 12 | David Huang, et al v. Joseph C. Lin, M.D., et al | Baltimore, MD | Trial |
| May 12 | Marist College v. Matt Brady, et al | Poughkeepsie, NY | Trial |
| Mar 12 | Sean Hogan v. Melody J. Eckhardt, M.D., et al | Dedham, MA | Trial |