# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FREDERICK F. FAGAL, JR.,              :
                                      :
          Plaintiff,                  :
                                      :
v.                                    :   CIVIL ACTION NO. 3:14-cv-2404-UN3
                                      :
MARYWOOD UNIVERSITY,                  :
                                      :
          Defendant.                  :

---

## DEFENDANT'S MEMORANDUM OF LAW IN
## SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

---

Respectfully submitted,

**JACKSON LEWIS P.C.**

*/s/ Stephanie Peet*
Stephanie J. Peet (PA ID: 91744)
Asima J. Ahmad (PA ID: 316001)
Three Parkway
1601 Cherry Street, Suite 1350
Philadelphia, PA 19102-1317
T: (267) 319-7802
F: (215) 399-2249
stephanie.peet@jacksonlewis.com
asima.ahmad@jacksonlewis.com

ATTORNEYS FOR DEFENDANTS

Dated:  November 21, 2016

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ...................................................................................... 2

II.  STATEMENT OF FACTS ........................................................................ 4

III. PROCEDURAL HISTORY ...................................................................... 4

IV.  STATEMENT OF QUESTION INVOLVED ......................................... 5

V.   LEGAL ARGUMENT .............................................................................. 5

  A.  Summary Judgment Standard ....................................................... 5

  B.  Plaintiff's Breach of Contract Claim Against Marywood Should
      Be Dismissed ................................................................................... 7

      1.  Marywood Followed its Policies and Procedures with
          Respect to Suspending and Terminating Plaintiff's Tenure
          and Employment. ..................................................................... 8

      2.  Marywood Is Entitled to Use its Discretion in Disciplining
          and Terminating its Faculty Members ................................. 15

      3.  Plaintiff Materially Breached the Agreement, Entitling
          Marywood to Suspend Performance ..................................... 19

VI.  CONCLUSION ....................................................................................... 30

## TABLE OF AUTHORITIES

**Cases**

2401 Pa. Ave. Corp. v. Fed'n of Jewish Agencies,
466 A.2d 132, 139 (Pa. Super. Ct. 1983) ...........................................................23

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 248 (1986) .....................................................................................5

Baker v. Lafayette Coll.,
532 A.2d 399, 403 (Pa. 1987)...............................................................17, 19, 21

Bryan v. Erie Cnty. Office of Children & Youth,
637 Fed. Appx. 693, 698 (3d Cir. Pa. 2016) ......................................................29

Celotex Corp. v. Catrett,
477 U.S. 317, 327 (1986) .....................................................................................6

Gen. State Auth. v. Coleman Cable & Wire Co.,
27 Pa.Cmwlth. 385, 365 A.2d 1347, 1349 (1976) ...............................................7

Gen. Motors Corp. v. New A.C. Chevrolet,
263 F.3d 296 (3d Cir. 2001) ...............................................................................22

Gillard v. Martin,
13 A.3d 482, 487 (Pa. Super 2010) .....................................................................28

GMC v. New A.C. Chevrolet,
263 F.3d 296, 315, n.5 (3d Cir. 2001) .................................................................29

Gray v. Gray,
448 Pa. Super. 456 (Pa. Super. Ct. 1996).............................................................23

Hozier v. Midwest Fasteners, Inc.,
908 F.2d 1155, 1158 (3d Cir. 1990) ......................................................................6

J.E. Mamiye & Sons, Inc. v. Fidelity Bank,
813 F.2d 610, 618 (3d Cir. 1987) ..........................................................................7

J.W.S. Delavau, Inc. v. E. Am. Transp. & Warehousing, Inc.,
810 A.2d 672, 686 (Pa. Super. 2002) ..................................................................30

Lake v. AK Steel Corp.,
  2006 U.S. Dist. LEXIS 25118 (W.D. Pa. Apr. 27, 2006) ....................................13

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
  475 U.S. 574, 586 (1986) ..........................................................................................6

Murphy v. Duquesne Univ. of the Holy Ghost,
  777 A.2d 418, 433 (Pa. 2001)..................................................................18, 19, 20

Norfolk S. Ry. Co. v. Basell USA Inc.,
  512 F.3d 86 (3d Cir. Pa. 2008) ..........................................................................22, 31

Orlando v. BNP Paribas N. Am., Inc.,
  2015 U.S. Dist. LEXIS 143822 (S.D.N.Y. Oct. 22, 2015) ............................12, 13

Robertson v. Drexel Univ.,
  991 A.2d 315, 320 (Pa. Super. 2010) ....................................................................17

Shepard v. Temple Univ.,
  948 A.2d 852 (Pa. Super. 2008) ............................................................................18

Smith v. Allstate Corp.,
  2012 U.S. Dist. LEXIS 95950, *19-20.............................................................21, 22

Stringer v. Pittsburgh Police,
  408 Fed. Appx. 578, 579 (3d Cir. Pa. 2011) ..........................................................7

Sylvester v. Southwestern Energy Prod. Co.,
  2009 U.S. Dist. LEXIS 101788, at *5 (M.D. Pa. 2009).........................................29

Tillmon v. Garnett Corp.,
  No. 97 C 8212, 1999 U.S. Dist. LEXIS 11972 at *10 (N.D. Ill. July 27, 1999) .15

Turner v. Barr,
  811 F.Supp. 1, 3 (D.D.C. 1993)..............................................................................15

United States v. Figueroa,
  548 F.3d 222, 228 (2d Cir. 2008) ..........................................................................14

Vance v. Southern Bell Tel. & Tel. Co.,
  983 F.2d 1573, 1583 (11th Cir.1993) (Fay, C.J., dissenting),
  cert. denied, 513 U.S. 1155, 115 S. Ct. 1110, 130 L. Ed. 2d 1075)......................14

Widmer Eng'g, Inc. v. Dufalla,
    837 A.2d 459, 467 (Pa. Super. 2003) ...................................................................30

Williams v. N.Y.C. Hous. Auth.,
    154 F. Supp. 2d 820, 824 (S.D.N.Y. 2001) .........................................................14

**Rules**

Federal Rule of Civil Procedure 56(a) .................................................................5, 30

**JACKSON LEWIS P.C.**
Stephanie J. Peet (PA ID: 91744)
Asima J. Ahmad (PA ID: 316001)
Three Parkway
1601 Cherry Street, Suite 1350
Philadelphia, PA 19102
T: (267) 319-7802
F: (215) 399-2249

ATTORNEYS FOR DEFENDANT

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FREDERICK F. FAGAL, JR., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 3:14-cv-2404-UN3 |
| | : | |
| MARYWOOD UNIVERSITY, | : | |
| | : | |
| Defendant. | : | |

## DEFENDANT'S MEMORANDUM OF LAW IN
## SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant Marywood University ("Marywood"), by and through its

undersigned counsel, submits this Memorandum of Law in Support of its Motion for

Summary Judgment.

## I.     <u>INTRODUCTION</u>

While a tenured Associate Professor at Marywood University, Plaintiff Frederick Fagal ("Plaintiff") created, disseminated, and posted on YouTube two videos depicting the President of the University as Adolf Hitler and various Marywood administrators as members of the Nazi regime, discussing false plots of rape, and otherwise making a mockery of University administrators and their families.[1] Many members of the Marywood community—including the University's President, Vice President of Academic Affairs, all members of the Ad Hoc Committee, and all members of the Faculty Grievance Committee—found his actions to be egregious, deplorable, and in direct violation of Plaintiff's contract with the University as well as the University's Mission, Core Values, and policies. Accordingly, his employment and tenure were terminated. Plaintiff now claims that Marywood breached its contractual obligations with him—not because it terminated his employment and tenure—but rather because it allegedly did not follow its internal procedures when terminating his employment and tenure. Clearly, his claim fails as a matter of law because the undisputed evidence of record demonstrates that:

- Plaintiff understood that Marywood's Tenure Policy provides a mutual commitment between the University and tenured faculty members;

---

[1] A thumb drive containing the videos Plaintiff created and disseminated will be sent overnight to the Court.

- Plaintiff created and disseminated videos to numerous members of the Marywood community, including students and faculty, and to the public at large, depicting the President of the University as Adolf Hitler, and numerous Marywood administrators as members of the Nazi regime;

- One of the individuals that Plaintiff depicted as part of the Nazi regime was Jewish, and Plaintiff assumed him to be Jewish;

- Plaintiff was suspended and ultimately terminated for engaging in the same conduct – namely, creating, posting and disseminating these deplorable and  discriminatory videos;

- Prior to disseminating these videos, Plaintiff was aware that doing so may lead to his termination, was advised by others not to send the videos, but chose to proceed anyway;

- Plaintiff does not believe the videos constitute inappropriate conduct, does not have remorse for creating the videos and has never apologized to the individuals depicted in his videos or to any member of the Marywood administration about the videos; and

- Plaintiff's suspension and termination were ultimately reviewed and upheld by two separately convened committees composed of tenured faculty members, none of whom felt pressured or obligated to rule in a certain manner.

Plaintiff clearly disagrees with the committees' decisions to uphold Sister Munley's findings.   But his disagreement does not translate to a violation of Marywood's procedures.   The President's decision to suspend and ultimately terminate Plaintiff's employment was upheld and finalized only after Marywood's President, Vice President of Academic Affairs, and six tenured faculty members found Plaintiff's conduct to be in direct violation of the University's Mission and Core Values as well as contrary to the behavior expected from a tenured faculty member.

In light of these facts, none of which are in dispute, Defendant respectfully submits that it is entitled to judgment as a matter of law and that Plaintiff's claim should be dismissed in its entirety.

## II.   <u>STATEMENT OF FACTS</u>

The relevant facts upon which this motion is based are set forth in the accompanying Statement of Undisputed Material Facts.   These facts will not be repeated at length here, but will be referred to with citations to the Statement of Undisputed Material Facts ("Facts") in the argument portion of this brief.

## III.   <u>PROCEDURAL HISTORY</u>

On or around December 17, 2014, Plaintiff filed a one-count Complaint against Defendant in the United States District Court for the Middle District of Pennsylvania.   Plaintiff filed an Amended Complaint ("Compl.") on January 15,

2015 asserting a common law claim for breach of contract.  Discovery closed on

October 6, 2016 and this case was placed on the May 2017 trial list.  Defendant now

moves for summary judgment.

## IV.   STATEMENT OF QUESTION INVOLVED

Did Marywood University breach its agreement with Plaintiff when it

suspended and ultimately terminated his employment and tenure for creating and

disseminating videos depicting the University's President as Adolf Hitler and

administrators as members of the Nazi regime – decisions that were reviewed and

upheld by two separate and independent committees?

## V.   LEGAL ARGUMENT

### A.   Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  FED. R.

CIV. P. 56(a).  Asserted disputes of fact are "material" if their resolution could affect

the outcome of the case under the applicable substantive law, and are "genuine" if

the evidence bearing on the disputed facts is such that a reasonable jury could find

for the non-moving party.  Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248

(1986); Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155, 1158 (3d Cir. 1990).  The

Supreme Court has advised that "[s]ummary judgment procedure is properly

regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting FED. R. CIV. P. 1).

"[T]he burden on the moving party may be discharged by 'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.  The burden then shifts to the opposing party to "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Rather, the party must "adduce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." J.E. Mamiye & Sons, Inc. v. Fidelity Bank, 813 F.2d 610, 618 (3d Cir. 1987) (Becker, J., concurring); see also Stringer v. Pittsburgh Police, 408 Fed. Appx. 578, 579 (3d Cir. Pa. 2011) (party "cannot avert summary judgment by resting on the allegations in his pleadings, but rather must present evidence from which a jury could find in his favor.").

In the instant matter, there is no genuine dispute as to any material fact and the evidence of record demonstrates that Plaintiff, and not Marywood, breached the agreement.  Accordingly, Plaintiff's Complaint should be dismissed with prejudice.

## B. <u>Plaintiff's Breach of Contract Claim Against Marywood Should Be Dismissed.</u>

The crux of Plaintiff's claim is that Marywood violated its own procedures when it suspended and then terminated his employment and tenure following notice that he posted and disseminated videos depicting numerous Marywood leaders as members of the Nazi regime. <u>See</u> Compl. ¶¶ 29-31, 40-42, 50. Three elements are necessary to establish a cause of action for breach of contract: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages. <u>See</u> <u>Gen. State Auth. v. Coleman Cable & Wire Co.</u>, 27 Pa.Cmwlth. 385, 365 A.2d 1347, 1349 (1976).

Here, the evidence of record does not establish a viable claim for a breach of contract claim against Marywood. First, the undisputed facts demonstrate that Marywood adhered to its policies and procedures, even after informing Plaintiff of his material breach. Second, there is no question that Marywood is entitled to exercise discretion in terminating its faculty and aligning such decisions with the mission and goals of the University. Third, even if Marywood deviated from its procedures—which it did not—Plaintiff has nonetheless failed to establish that he suffered damages as a result of any procedural flaw. On the contrary, Plaintiff knew—even before he disseminated the videos—that his actions could be viewed as a terminable offense and that the termination of his employment and tenure was a possible outcome.

### 1.  **Marywood Followed its Policies and Procedures with Respect to Suspending and Terminating Plaintiff's Tenure and Employment.**

Plaintiff alleges that Marywood breached its Progressive Discipline Policy because (1) his discipline was not progressive, (2) the President, and not the Vice President of Academic Affairs, advised him of his suspension, (3) his continued employment did not pose a threat of immediate harm to himself or to others, and (4) he was not offered an ad hoc panel to review his suspension.  Additionally, Plaintiff alleges that his suspension violated the Progressive Discipline policy as Marywood took no remedial actions prior to his suspension or termination.  Plaintiff also alleges that the University's Civil Rights Policy was breached because no Marywood employee filed a complaint against him.  Finally, Plaintiff alleges that the Faculty Grievances and Appeals Policy was violated because he was retaliated against for filing a grievance.

Despite Plaintiff's "everything but the kitchen sink" approach, the evidence of record clearly demonstrates that there has been no breach by Marywood.

### a.  **Progressive Discipline Policy**

As an initial matter, Plaintiff admitted that he was suspended and terminated for engaging *in the same conduct*—that is, for creating and posting videos which depicted Marywood's President, a nun, as Hitler, and members of the administration, including a Jewish male, as Nazis wearing swastikas.  Facts at ¶¶ 39, 91.  There is

no dispute that the merits of Plaintiff's suspension *and* termination were reviewed and upheld by both the Faculty Grievance Committee and the Ad Hoc Committee. Facts at ¶¶ 83, 100.  However, because the decisions to suspend and terminate were premised on the same behavior, both committees separately determined that convening two panels to review Plaintiff's actions, or preparing two separate reports on the same conduct, would be redundant and an exercise in futility.  Facts at ¶¶ 90, 104.  Moreover, there is no dispute that both committees similarly concluded that:

- Progressive discipline was not required in every instance, and given the egregious conduct at issue, progressive discipline was not appropriate in Plaintiff's case. Facts at ¶¶ 87, 89, 103, 105.

- The policy does not state that a suspension may only be justified by a threat of immediate harm or that physical harm was required for suspension. Facts at ¶¶ 25, 85.  Nonetheless, Plaintiff's actions caused harm to the University's reputation, to the community generally, and to members of the Jewish faith specifically.  Facts at ¶¶ 86, 101.

- Marywood's policy did not require remediation prior to termination in every instance, and that Plaintiff's case did not warrant remediation as he was "very familiar with the core values," was not ignorant of what he was doing, and because he "showed no remorse in his letter to the grievance committee." Facts at ¶¶ 25, 87, 88, 102.

Indeed, Plaintiff *himself* admitted that the progressive discipline policy does not state that suspension is *only* justified if immediate harm is threatened, or that *only* the Vice President of Academic Affairs can suspend faculty members.  Facts at ¶ 85. Simply stated, while Plaintiff **wishes** the policy included certain language and requirements, the actual policy contains no such constraints.

Moreover, Plaintiff's argument that he should have been given some opportunity for remediation is frankly illogical.  Plaintiff **admitted** that he did not believe the videos constituted inappropriate conduct, that he does not have any remorse for creating the videos, and that he never apologized to Sister Munley, Dr. Levine, or any member of the Marywood administration about the videos. Facts at ¶ 57.  As the Faculty Grievance Committee determined, when Plaintiff did not, and could not, accept that his conduct was unacceptable or otherwise be contrite, remediation was not possible.  Facts at ¶ 88.  Similarly, the Ad Hoc Committee found that Plaintiff "appears to have not acknowledged any errors in judgment on his part at [the January 23, 2012] meeting and left little room for pursuing progressive discipline or a mediated solution to this situation."  Facts at ¶ 103.  Point in fact— Plaintiff admitted at deposition that over five years later, he still has no remorse or regrets regarding his actions.  Facts at ¶ 57.

It is immaterial that Sister Munley delivered the news of Plaintiff's suspension as opposed to the Vice President for Academic Affairs.  Facts at ¶ 68.  As an initial

matter, Sister Munley was the President of the University, the superior of the Vice President of Academic Affairs, and the ultimate "boss" and decision-maker.  Facts at ¶ 9.  Moreover, Dr. Levine wholeheartedly agreed with the decision to suspend and terminate Plaintiff's employment, but was not present at the time of Plaintiff's suspension due to the nature of the personal attacks against him and his family in the videos.  Facts at ¶¶ 62-63.

### b.  Civil Rights Policy

The impact the videos had on Dr. Levine alone underscore the gravity of Plaintiff's actions and how they clearly violated Marywood's Civil Rights Policy. This policy expressly states that the University "will not tolerate discrimination, harassment, or assault by any member of the Marywood community upon another individual."  Facts at ¶ 14.  Plaintiff admitted that his depiction of a Jewish male as a member of the Nazi regime could offend certain individuals, that they "have the right to be offended," and that he could understand how someone could be offended by his videos.  Facts at ¶ 48.  Dr. Levine testified that the videos' portrayal of him as a Nazi, as well as the fact that it involved his family members, caused "angst and anxiety."  Facts at ¶ 53.

Sister courts previously have held that video adaptations of "Downfall" can be viewed as discriminatory in nature.  For example, in Orlando v. BNP Paribas N. Am., Inc., 2015 U.S. Dist. LEXIS 143822 (S.D.N.Y. Oct. 22, 2015), plaintiff Jean-

Marc Orlando's ("Orlando") manager created a video portraying Adolf Hitler as the CEO of a competitor bank, and Nazi soldiers as competitor bank executives.[2] Like Plaintiff's videos here, the video in <u>Orlando</u> included "imagery symbolic of the Nazi regime including German army uniforms and swastikas, and referred to the 'Third Reich,' 'my Fuhrer,' 'Goebbels,' and 'a large Polish operation.'" <u>Orlando</u>, 2015 U.S. Dist. LEXIS 143822 at *5. As a Jewish male, Orlando was offended and hurt by the videos (despite not being portrayed in them himself) and ultimately complained about them to his manager. When finding that Orlando presented sufficient evidence for a hostile work environment claim, the Court noted that defendant's internal report found that the CEO's decision to proceed with the video was poor judgment, and "clearly not appropriate." <u>Id.</u> at *48.

Plaintiff's actions clearly were discriminatory in nature and courts consistently have found similar behavior to be just that, noting that "the Nazi regime and swastika are symbols of hatred capable of arousing fear and intimidation." <u>Orlando</u>, 2015 U.S. Dist. LEXIS 143822. <u>See</u> <u>also</u> <u>Lake v. AK Steel Corp.</u>, 2006 U.S. Dist. LEXIS 25118 (W.D. Pa. Apr. 27, 2006) ("Swastikas are a symbol of a regime of hatred unparalleled in world history. That regime was dedicated to the oppression of those of Jewish heritage through genocide. The symbol is one of hatred and oppression."); <u>United States v. Figueroa</u>, 548 F.3d 222, 228 (2d Cir. 2008) ("It

---

[2] All unpublished opinions are attached hereto as Exhibit 1.

was apparently, and understandably, assumed by the district court and the parties that the swastika is commonly associated with white supremacism and neo-Nazi groups harboring extreme forms of racial, religious and ethnic hatred and prejudice against minority groups . . ."); <u>Williams v. N.Y.C. Hous. Auth.</u>, 154 F. Supp. 2d 820, 824 (S.D.N.Y. 2001) ("Those of us for whom a particular symbol is just that—a symbol— may have difficulty appreciating the very real, very significant fear that such symbols inspire in those to whom they are targeted. No less than the swastika or the Klansman's hood, the noose in this context is intended to arouse fear." (quoting <u>Vance v. Southern Bell Tel. & Tel. Co.</u>, 983 F.2d 1573, 1583 (11th Cir.1993) (Fay, C.J., dissenting), <u>cert. denied</u>, 513 U.S. 1155, 115 S. Ct. 1110, 130 L. Ed. 2d 1075)); <u>Turner v. Barr</u>, 811 F.Supp. 1, 3 (D.D.C. 1993) (supervisor's comment about the Holocaust supported Jewish employee's claim of religious discrimination); <u>Tillmon v. Garnett Corp.</u>, No. 97 C 8212, 1999 U.S. Dist. LEXIS 11972 at *10 (N.D. Ill. July 27, 1999) ("[P]laintiff's claim that a swastika was carved into his tool box could be objectively considered extremely serious.").

Since Plaintiff cannot get around the obviously offensive and discriminatory nature of the videos, he argues only that he should not have been charged with violating the Civil Rights Policy because no one at Marywood filed a civil rights complaint against him following his January 13, 2012 e-mail. <u>See</u> Compl. at ¶ 43. However, his argument is devoid of any merit, as the policy does not require that a

complaint be filed before the University takes action on discrimination or harassment that the University administration learns of or experiences first hand.  In fact, the policy explicitly states that "[i]n certain serious cases the University administrator may proceed even without a formal complaint."  Facts at ¶ 16.  Further, while Dr. Levine ultimately decided not to file a complaint against Plaintiff, a decision he referred to as a "mistake," he was wholly in favor of Plaintiff's suspension and termination.  Facts at ¶¶ 53, 63.

Plaintiff's videos were abhorrent.  No reasonable person would find that the University had to wait for a formal complaint to be filed before addressing the discriminatory and harassing conduct taken by Plaintiff.  Nor should Marywood have had to risk defending against litigation for failing to take action and abide by its own policies against discrimination and harassment after such a public discriminatory act was committed by a member of its tenured faculty.

### c.  Faculty Grievances and Appeals Policy

Finally, Plaintiff baldly claims that Marywood's decision to terminate his tenure and employment was related to his filing a grievance in violation of its Faculty Grievances and Appeals Policy, which protects faculty from retaliation for filing grievances. See Compl. at ¶ 58.  However, the record makes clear that Plaintiff's suspension and subsequent termination were initiated on January 23 and 24, 2012, nearly one full month ***before*** Plaintiff filed a grievance, and were based on Plaintiff's

14

distribution of the hateful and highly offensive Nazi videos. Facts at ¶¶ 68, 70. Accordingly, Plaintiff's argument regarding the Faculty Grievances and Appeals Policy fails as a matter of law.

Simply put, Plaintiff's breach of contract claim is premised on conclusory statements of procedural deviance unsupported by the record, his own testimony, as well as the testimony of the decision makers and individuals assigned to review his grievance and appeal. Marywood provided Plaintiff the opportunity to have Sister Munley's decision to suspend and terminate his employment reviewed by two separate committees (even though he twice refused to submit executed authorizations to convene the committees), and both committees agreed with her decisions. Since the evidence of record demonstrates that Marywood did not violate its own procedures, Plaintiff cannot state a claim for relief and his Complaint should be dismissed accordingly.

### 2. Marywood Is Entitled to Use its Discretion in Disciplining and Terminating its Faculty Members

It is well recognized that a university is entitled to use its discretion in hiring and terminating faculty and interpreting its own policies and procedures. See Baker v. Lafayette Coll., 532 A.2d 399, 403 (Pa. 1987) ("This Court has no jurisdiction to review the factual determinations of a college's governing body unless it can be clearly demonstrated that that body violated its own procedures."); Robertson v. Drexel Univ., 991 A.2d 315, 320 (Pa. Super. 2010) ("private parties, including

religious and educational institutions, may draft employment contracts which restrict review of professional employees' qualifications to an internal process that, if conducted in good faith, is final within the institution and precludes or prohibits review in a court of law.") (citations omitted); Shepard v. Temple Univ., 948 A.2d 852 (Pa. Super. 2008) (where assistant professor claimed that the denial of her application for tenure constituted a breach of her employment contract with the university, the court concluded that the decision regarding the assistant professor's tenure was not a proper judicial function since the evaluation of her suitability to the university's educational needs, goals, and philosophies necessarily involved many subjective, non-quantifiable factors, which were best performed by the university and not judges); Murphy v. Duquesne Univ. of the Holy Ghost, 777 A.2d 418, 433 (Pa. 2001) (affirming Defendant's summary judgment motion following President's decision and Board's approval to terminate professor's employment despite professor's belief that, among other things, a procedural term of the contract was breached).   Additionally, when an employer "expressly provides in an employment contract for a comprehensive evaluation and review process, [a court] may look to the employer's good faith to determine whether the employer has in fact performed those contractual obligations."   See e.g., Baker v. Lafayette Coll., 504 A.2d 247, 255 (Pa. Super. Ct. 1986).

Here, Plaintiff has failed to present any evidence that Marywood violated its own policies or otherwise did not follow its internal processes in good faith. On the contrary, the undisputed evidence of record shows that following Sister Munley's decision to suspend Plaintiff and ultimately recommend his termination, he had not one, but *two separate committees* review her decisions, in accordance with Marywood's policies. Facts at ¶¶ 77, 96. Plaintiff was granted this courtesy despite the fact that he failed to submit executed authorizations on *two separate occasions*. Facts at ¶¶ 72, 76. In fact, Plaintiff was given the opportunity to, and did, select one of the three tenured faculty members to serve on the Ad Hoc Committee, and his hand-selected committee member agreed with Sister Munley's decision and found that termination of Plaintiff's employment and tenure was appropriate and warranted under the circumstances. Facts at ¶¶ 97, 100, 106. The committees reviewed both the procedural and substantive merits of Plaintiff's suspension and termination of tenure and employment, interpreted Marywood's policies when necessary, and ultimately agreed with Sister Munley's decision to suspend and terminate Plaintiff's tenure and employment. Facts at ¶¶ 80, 83, 99, 100.

Like in Murphy, Marywood provided Plaintiff with a "judicial-like process and a standard for determining whether tenure forfeiture was warranted" and his suspension and subsequent termination were not "subject to the President's whim." Murphy, 777 A.2d at 434. 81. The Faculty Grievance Committee reviewed the

17

procedural aspects of Plaintiff's suspension and recommended termination and ultimately found "no evidence of improper action on President Munley's part which would constitute a legitimate grievance." Facts at ¶¶ 80, 83.   Then, Plaintiff was afforded a second opportunity for review through the Ad Hoc Committee, which reviewed his suspension and termination from a substantive perspective. Facts at ¶¶ 96, 99.   While the Ad Hoc Committee did not agree with all of Sister Munley's findings, it concluded that "Sister Anne Munley's termination of Dr. Fagal's employment and tenure is an extreme decision **justified by the extreme nature of Dr. Fagal's behavior**."   Facts at ¶ 100 (emphasis supplied).   Each member of the Ad Hoc Committee and the Chair of the Faculty Grievance committee testified that they did not feel any pressure to rule in a particular manner.[3]  Facts at ¶ 106.  Instead, they carefully reviewed Plaintiff's grievance and the facts presented when making their determinations. Facts at ¶ 93.   This undertaking, like the one afforded to the plaintiff in <u>Baker</u>, was honest, meaningful and "not a sham formality designed to ratify an arbitrary decision already made." <u>Baker</u>, 504 A.2d at 255.  The committees' obligations were fulfilled in good faith, and accordingly, Marywood is afforded deference in its internal decisions and adherence to procedures.

---

[3] Plaintiff did not depose any members of the Faculty Grievance Committee other the Chair, Erin Sadlack.

### 3.  **Plaintiff Materially Breached the Agreement, Entitling Marywood to Suspend Performance**

Even if Marywood breached its agreement with Plaintiff—which it did not—Marywood was entitled to suspend performance because Plaintiff materially breached his obligations to the University when he distributed egregiously offensive videos to Marywood faculty members and students depicting other Marywood administrators as Adolf Hitler and members of the Nazi regime.  "A material breach by one party entitles the non-breaching party to suspend performance of the contract. . . . Consequently, a party who has committed a material breach may not insist upon performance of the contract. . . ." <u>Smith v. Allstate Corp.</u>, 2012 U.S. Dist. LEXIS 95950, \*19-20 (citations omitted).  Moreover, the record clearly demonstrates that Plaintiff cannot show any resultant damages stemming from Marywood's alleged breach.

### i.  **Plaintiff's Distribution of the Nazi Videos Was a Material Breach of His Agreement.**

Plaintiff's distribution of the videos constitutes a material breach as a matter of law.  A breach is material when it goes to the "essence of the contract" and if it "'will deprive the injured party of the benefit that is justifiably expected' under the contract."   <u>General Motors Corp. v. New A.C. Chevrolet</u>, 263 F.3d 296 (3d Cir. 2001) (quoting 2 E. Allan Farnsworth, Farnsworth on Contracts § 8.16, at 497 (2d ed. 1998)).  The question of whether a breach is material is generally an issue of fact

unless the question "admits only one reasonable answer." <u>Smith</u>, 2012 U.S. Dist. LEXIS 95950, *19-20 (citations omitted.); <u>see</u> <u>also</u> <u>Norfolk S. Ry. Co. v. Basell USA Inc.</u>, 512 F.3d 86 (3d Cir. Pa. 2008) ("[I]f the materiality question in a given case admits of only one reasonable answer (because the evidence on the point is either undisputed or sufficiently lopsided), then the court must intervene and address what is ordinarily a factual question as a question of law."). "Whether a breach is so substantial as to justify an injured party's regarding the whole transaction as at an end 'is a question of degree; and it must be answered by weighing the consequences in the actual custom of men in the performance of contracts similar to the one that is involved in the specific case.'" <u>2401 Pa. Ave. Corp. v. Fed'n of Jewish Agencies</u>, 466 A.2d 132, 139 (Pa. Super. Ct. 1983) (quoting 4 Corbin, Contracts, § 946 (1951)); <u>see</u> <u>also</u> <u>Gray v. Gray</u>, 448 Pa. Super. 456 (Pa. Super. Ct. 1996) (same).  Therefore, the Court should consider the consequences of Plaintiff's actions within the context of similar contractual relationships between religious institutions and professors.

As a tenured professor at Marywood, Plaintiff agreed to adhere to and embody the University's various policies, including its Tenure Policy, Civil Rights Policy, Conditions of Computer Use Policy, Academic Freedom Policy, and Professional Ethics Policy as well as its Mission and Core Values.  Plaintiff materially breached his agreement with the University when he voluntarily and knowingly disseminated a message and videos to Marywood's faith-based community—and to the public at

large—using  vulgar language, making light of rape, and depicting Marywood's personnel as members of the Nazi regime (a group responsible for the murder of 6 million Jews and millions of others. In fact, Plaintiff was warned by "pre-release viewers" and others that the dissemination of the videos was not a good idea, that their dissemination may very well lead to his termination of employment, and that releasing the videos would cause Plaintiff to "catch an incomparable amount of grief", since "[a]nytime Hitler gets raised, no one pays attention to the message but the symbolism of Hitler as a murderer and butcher. … It's not what you're saying hear [sic], but how you are saying it that puts you at risk."  Facts at ¶¶ 54, 55.  Despite these warnings, Plaintiff decided to proceed to "get justice for free speech."  Facts at ¶¶ 56, 67.

### a.  **Plaintiff Materially Breached Marywood's Tenure Policy**

By accepting his tenure position with Marywood, Plaintiff agreed to abide by Marywood's Tenure Policy which specifically states that "submission to the University of an application for tenure suggests a strong acceptance by that individual of the mission, goals and objectives of the University."  Facts at ¶ 12. Marywood's Mission and Core Values include "a welcoming and supporting environment" and to educate students to "live responsibility in a diverse and interdependent world." Facts at ¶ 3.  Moreover, Marywood's "core values" include "respect for the value of each human being, for diversity in the context of vibrant

community, and for the earth and all creation." Facts at ¶ 4. The Tenure Policy also states that the tenured professor will be committed to "work jointly with faculty, students, administrators and staff for the growth and welfare of the University." Facts at ¶ 12. Plaintiff admitted that the commitment between the University and tenured faculty member was mutual. Facts at ¶¶ 11, 28. It is axiomatic that disseminating a message and videos to the Marywood Community which uses vulgar language, makes light of rape, belittles its leaders through personal insults, and depicts University administrators as Nazis does not create a "supportive environment," foster diversity, or support the goal of working with other faculty for the welfare of Marywood.

### b. **Plaintiff Materially Breached Marywood's Civil Rights Policy**

In addition, Plaintiff breached his obligations under Marywood's Civil Rights Policy, which declares Marywood's intolerance for discrimination, harassment, or assault based on religion, among other protected characteristics. Facts at ¶ 14. In Plaintiff's video, he not only makes light of the Nazi regime and evokes deeply painful reminders of the hate demonstrated for members of the Jewish faith, but he also demeans executive officers and their families. Facts at ¶¶ 39-44. Sister Munley viewed Plaintiff's conduct as a "personal attack" on "everything that Marywood stands for, as well as an egregious assault to [Marywood's] mission and Core Values. Facts ¶ 88. Sister Munley also found the videos to be anti-Semitic, especially

because Dr. Levine was portrayed as a Nazi, despite Plaintiff knowing that Dr. Levine was Jewish.  Facts at ¶ 40, 51.   As previously outlined, Plaintiff admitted that "people could be offended [by the videos] and have the right to be offended." Facts at ¶ 48.  Many members of the Marywood community were in fact offended, and found the videos to be offensive, disrespectful and were emotionally impacted by them. Facts ¶ 49, 50, 53.

### c. Plaintiff Materially Breached Marywood's Academic Freedom Policy and Professional Ethics Policy

Plaintiff also violated Marywood's Academic Freedom Policy and Professional Ethics Policy.  Marywood's policy provides that academic freedom "presupposes, first of all, personal integrity in dealing with students, peers and officers of the University.  Second, it presumes scholarly competence, observance of the professional standards of one's discipline, commitment to the stated mission of the University." Facts ¶ 20.  Plaintiff admitted that the videos were not connected to any scholarly pursuit or academic exercise, intended for use in his courses, for research about free speech on campus, or otherwise part of any curriculum he had planned for the semester. Facts ¶ 47.  Moreover, Plaintiff's dissemination of his videos was devoid of personal integrity, in complete disregard of professional standards, and invoked images of hatred to ridicule his colleagues.

### d. **Plaintiff Materially Breached Marywood's Computer Policy**

Finally, while the Ad Hoc Committee did not support this charge, Sister Munley found that Plaintiff's actions breached Marywood's Computer Policy. Facts at ¶¶ 66, 100. Marywood's Computer Policy sets forth that users should exhibit responsible and ethical use of the University's computing system and should use common sense and common decency in distributing data. Facts ¶ 17. The Computer Policy also states that when using Marywood's computer system, individuals should respect the civil rights of others and should not e-mail inappropriate messages. Facts at ¶ 18. Plaintiff admits that he used Marywood's system by e-mailing members of the University community at their Marywood e-mail accounts from his personal e-mail account. Facts at ¶ 36. Plaintiff was well aware of the policy, as his January 13, 2012 e-mail cited a specific page of it and he suggested that anyone wishing to respond use their personal e-mail address, not their Marywood e-mail account. Facts at ¶ 38. Plaintiff's videos were devoid of common sense and decency and in no way respected the recipients' civil rights.

Simply put, when Plaintiff accepted his tenure position with Marywood, he agreed to uphold Marywood's mission to foster diversity and acceptance and to cultivate an environment conducive to growth and learning. However, Plaintiff materially breached Marywood's policies and principles as well as his commitment to the University when he depicted Marywood leaders as members of the Nazi

24

regime, used sexually explicit, offensive, and insulting language and portrayed an image of Marywood in a manner that is an affront to the University community as a whole.

### ii.   Marywood Clearly Communicated Its Termination of the Agreement.

Even accepting as true all of Plaintiff's allegations, there is no question that:

- Marywood expressly communicated to Plaintiff its belief that Plaintiff had breached material terms of his obligations as a tenured professor (Facts at ¶¶ 66, 70, 74);

- Marywood took measures to address Plaintiff's material breach (Facts at ¶¶ 58, 69, 70, 74); and

- Marywood suspended Plaintiff's employment and did not accept any further performance from him under his agreement (Facts at ¶ 68).

In other words, Marywood believed that Plaintiff materially breached his agreement, and it properly communicated its belief to Plaintiff that he materially breached his agreement. Accordingly, Marywood did not waive Plaintiff's breach.

As described above, Plaintiff breached material terms of his obligations as a tenured professor. Accordingly, "[w]hen one party commits a material breach of contract, the other party has a choice between two inconsistent rights -- he or she can either elect to allege a total breach, terminate the contract and bring an action, or,

25

instead, elect to keep the contract in force, declare the default only a partial breach, and recover those damages caused by that partial breach. . . ."  Gillard v. Martin, 13 A.3d 482, 487 (Pa. Super 2010) (citations and quotations omitted); see also GMC v. New A.C. Chevrolet, 263 F.3d 296, 315, n.5 (3d Cir. 2001) ("It is hornbook law that when one party to a contract commits a material breach, the non-breacher has the option of . . . terminating the agreement in its entirety.").  Marywood elected to notify Plaintiff of his total breach and terminate the contract by Sister Munley recommending his termination.  Facts at ¶ 68, 70, 74.  Consequently, Marywood had no further contractual obligations to Plaintiff.  See, e.g., Bryan v. Erie Cnty. Office of Children & Youth, 637 Fed. Appx. 693, 698 (3d Cir. Pa. 2016) (stating that the material breach by the plaintiff discharged the defendants of any additional obligations under the agreement); Sylvester v. Southwestern Energy Prod. Co., 2009 U.S. Dist. LEXIS 101788, at *5 (M.D. Pa. 2009) (a material breach of contract by one party discharges the other party's duties).

Plaintiff was explicitly advised in person and in writing that his conduct constituted a material breach of his agreement. Facts at ¶¶ 66, 70, 74.  That is, upon meeting to discuss Plaintiff's actions, Sister Munley informed Plaintiff that the videos violated Marywood's civil rights policy, academic freedom policy, professional ethics policy, tenure policy, computer use policy, and were in contrast to Marywood's Mission and Core Values.  Facts at ¶ 66.  Sister Munley then advised

26

Plaintiff in writing that she was recommending that his tenure and employment with Marywood be terminated immediately "[a]s a result of [his] breach of a material term of [his] obligations as a tenured professor." Facts at ¶ 70, 74. At that point, Marywood was entitled to suspend performance of the contract. Widmer Eng'g, Inc. v. Dufalla, 837 A.2d 459, 467 (Pa. Super. 2003) (noting "settled principle of contract law: a material breach by one party to a contract entitles the non-breaching party to suspend performance"); J.W.S. Delavau, Inc. v. E. Am. Transp. & Warehousing, Inc., 810 A.2d 672, 686 (Pa. Super. 2002) ("A party that materially breaches a contract cannot be awarded compensation for damages resulting from the other party's subsequent refusal to perform its obligations under the contract.").

Plaintiff, through counsel, insisted that he be afforded committee review of his suspension and termination according to the agreement. Facts at ¶ 77. "[T]he general rule that one party's uncured, material failure of performance will suspend or discharge the other party's duty to perform does not apply where the latter party, with knowledge of the facts, either performs or indicates a willingness to do so, despite the breach, or insists that the defaulting party continue to render future performance." Norfolk Southern Ry. Co. v. Basell USA, Inc., 2008 U.S. Dist. LEXIS 62390, *28-29 (E.D. Pa. Aug. 15, 2008) (citations and quotations omitted). Though Marywood's actions signaled clearly and consistently that it sought to end Plaintiff's contract due to his material breach, Marywood permitted faculty committees to

27

review Plaintiff's suspension and proposed termination out of an abundance of caution.  See id. at *29 (a non-breaching party need not suspend performance of its duties after a breach of contract and risk exposure to liability should the breach be found to be immaterial).  Therefore, any further performance under the contract by Marywood may not be considered waiver of its ability to assert material breach as a defense.

### iii.   Plaintiff Has Failed to Establish That He Suffered Damages as a Result of Any Alleged Procedural Flaw

Assuming, *arguendo* that Defendant deviated from its outlined policies and procedures, Plaintiff is still required to prove resultant damages to succeed on his breach of contract claim, which he fails to do.  Plaintiff is not bringing a wrongful termination claim, nor can he, as he knew that the videos he created may lead to his termination and he admitted that he was warned against sending them.  Facts at ¶¶ 54-56.  Instead, Plaintiff is contesting the means to an end—that is, he is challenging the procedures that led to the decision to suspend and terminate his employment, and not the decision to suspend and terminate itself (a decision that was reviewed by two separate committees and upheld on both occasions).

Plaintiff cannot, however, demonstrate that the end result would be any different had Defendant's policies been followed in the manner which he believes was correct.  Even if Dr. Levine, and not Sister Munley, delivered the news of Plaintiff's suspension, the end result would be the same: Plaintiff would have been

suspended.  Likewise, even if the review committees convened separate panels or reports to address his suspension apart from his termination, the end result would be the same: Sister Munley's decision to suspend *and* terminate Plaintiff's employment would have been upheld.  In fact, Plaintiff admitted that the only purpose that would be served had a separate committee been formed to review his suspension was "following the agreed procedures."  Facts at ¶ 92.  Plaintiff has not, and cannot, demonstrate any damages resulting from what he believes Marywood's policies required.

On the contrary, any damages Plaintiff has incurred are solely a result of his *own* conduct and the conscious decision *he made* to create and disseminate his depraved videos to the Marywood community.  In fact, Plaintiff admitted that prior to sending the videos he created, he thought about the risks associated with doing so, but chose to proceed regardless in the name of free speech and for "justice."  Facts at ¶¶ 56, 67.  Plaintiff is now asking Marywood to pay for ***his*** poor decisions, ***the decisions that he knew could lead to his termination***.  Further, Plaintiff admitted that following his termination from Marywood, he spent "less than one hour" a week looking for a job, and that as of November 1, 2016, he had submitted only *one* application to *any* university or college since his termination.  Facts at ¶¶ 108, 109.  Defendant's economic expert estimated that Plaintiff incurred an economic loss of $0.  Facts at ¶ 110.

The evidence of record demonstrates that Plaintiff cannot establish that he incurred damages as a result of a procedural deviance by Marywood, as opposed to his own conduct.  Accordingly, his breach of contract claim must fail as a matter of law.

## VI.    CONCLUSION

For these reasons, Defendant respectfully requests that the Court grant its motion for summary judgment pursuant to FED. R. CIV. P. 56 and dismiss Plaintiff's Complaint in its entirety.

Respectfully submitted,

**JACKSON LEWIS P.C.**

*/s/ Stephanie Peet*
Stephanie J. Peet (PA ID: 91744)
Asima J. Ahmad (PA ID: 316001)
Three Parkway
1601 Cherry Street, Suite 1350
Philadelphia, PA 19102-1317
T: (267) 319-7802
F: (215) 399-2249
stephanie.peet@jacksonlewis.com
asima.ahmad@jacksonlewis.com

ATTORNEYS FOR DEFENDANTS

Dated:  November 21, 2016