# EXHIBIT "1"

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

- - -

FREDERICK F. FAGAL, JR.      : CIVIL ACTION
                             :
         Plaintiff,          : NO. 3:14-cv-02404-ARC
                             :
    vs.                      : (JUDGE CAPUTO)
                             :
MARYWOOD UNIVERSITY,         :
                             :
         Defendant.          :

- - -

June 28, 2016

- - -

Oral deposition of Edward Joseph O'Brien, taken pursuant to notice, was held at the Radisson Lackawanna Station Hotel, Suite 206, 700 Lackawanna Avenue, Scranton, Pennsylvania, commencing at 12 p.m., on the above date, before Judy A. Black, a Registered Professional Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania.

- - -

MAGNA LEGAL SERVICES

Seven Penn Center, 8th Floor

1635 Market Street

Philadelphia, Pennsylvania 19103

(866) 624-6221



## Page 18

1  whether Helen told you what she meant by "strange"?
2  A. No.
3  Q. At the bottom of the first page, it says
4  "5/3," for May 3rd, "AHC meets with HR and Sister
5  Gail."
6  Do you recall your committee meeting
7  with HR and Sister Gail at some point?
8  A. Yes.
9  Q. And do you remember what was discussed
10 at this meeting?
11 A. I don't actually recall if Sister Gail
12 was at the meeting or if it was two separate
13 meetings. The meeting with HR, I believe, was with
14 Dr. Dunleavy essentially giving our charge to the
15 committee, why you're meeting, here's some
16 guidelines, confidentiality, things that you should
17 look at in adjudicating this.
18 Q. Do you remember asking or do you
19 remember anybody on your committee asking
20 Dr. Dunleavy whether there would be two committees,
21 one to review Professor Fagal's suspension and one
22 for reviewing the termination?
23 A. No, I don't --
24 MS. PEET: Object to the form.

MAGNA LEGAL SERVICES

## Page 19

1  Q. You don't remember?
2  A. I don't remember that being part of that
3  meeting.
4  Q. Oh, you don't? Okay.
5  A. I don't remember much about that
6  meeting. That was a general charge to us and giving
7  some background.
8  Q. Do you remember at that meeting
9  discussing the possibility of talking to someone
10 named Will Anthony?
11 A. No.
12 Q. Does that name ring a bell?
13 A. I believe that he was an attorney
14 involved.
15 Q. A minute ago I asked you if you
16 remembered discussing at this meeting with HR the
17 possibility of talking to Will Anthony, and I think
18 you said no. Do you remember ever talking to Will
19 Anthony?
20 A. I'm not certain. If we did -- I know we
21 talked about it, but I don't recall if we did.
22 Q. Okay.
23 A. One of the things that happened, I
24 believe, was that Helen was the chair of the

MAGNA LEGAL SERVICES

## Page 20

1  committee, and some of the work of the committee
2  involved her being a liaison with Dr. Dunleavy, and
3  possibly with Will Anthony, but, again --
4  Q. But you don't know?
5  A. I don't remember specifically in this
6  case.
7  MR. COHEN: Let's mark this O'Brien-7,
8  please.
9  (O'Brien-7, Minutes for Ad Hoc Committee
10 Meeting #2, May 17, 2012, Bates Nos. DEF000322-323,
11 is received and marked for identification.)
12 Q. Now, I'd like you to actually review
13 this document, actually read it to yourself instead
14 of just briefly, and I'm going to ask you about it.
15 And, Dr. O'Brien, do you recognize this
16 document?
17 A. Yes.
18 Q. Did you have any role in actually
19 generating this document?
20 A. I'm not certain. I mean, I -- I'm not
21 certain. I would have read it and reacted to it.
22 Q. To be clear --
23 A. Whether I had comments about it, I don't
24 know.

MAGNA LEGAL SERVICES

## Page 21

1  Q. To be clear, this document consists of
2  minutes of an ad hoc committee meeting that took
3  place on May 17, 2012, right?
4  A. Yes.
5  Q. And do you remember whose job it was, if
6  anybody's, to take minutes of these meetings?
7  A. I believe Helen took the minutes. I'm
8  not -- I'm not positive, though.
9  Q. Do you remember taking any handwritten
10 notes or any type of notes at these meetings?
11 A. I could have taken some notes but not
12 ones that I -- that I kept or did anything with,
13 other than in the process of commenting on, on the
14 minutes.
15 Q. But you don't know whether you kept any
16 notes, right?
17 A. I would not have kept those handwritten
18 scribbles, I would call them.
19 Q. All right. Do you actually have any
20 memory of -- having read this document, do you have
21 any memory of this particular meeting?
22 A. Yes, I do.
23 Q. And do you take issue in any way with
24 the accuracy of these minutes?

MAGNA LEGAL SERVICES



Page 22

1   A. Well, I have a bit of a question about
2 termination versus suspension, exactly how that was
3 understood at the time.
4   Q. Let's back up. Which area? And point
5 to me or direct me to the place on this document, if
6 you have some questions about the accuracy.
7   A. It would be the fourth paragraph from
8 the bottom of the first page.
9   Q. Starting with, "The FGC informally"?
10   A. Yes.
11   Q. What is it about this paragraph that you
12 question the accuracy?
13   A. My recollection is that -- that we were
14 paying attention to both suspension and termination,
15 but the substance of the termination charge was the
16 most important. That was the focus, but -- it says,
17 "The FGC informally via Sister Gail advised" -- it
18 seems a little confusing, that paragraph. I don't
19 recall how that was -- how that was reflected in the
20 meeting discussion.
21   Q. And a minute ago, I think you said that
22 you recall your committee's role as reviewing the
23 substance of Professor Fagal's discipline, and you
24 mean as opposed to the procedure?
MAGNA LEGAL SERVICES

Page 23

1   A. Yes.
2   Q. And what led you to believe that that --
3 that your committee's role was reviewing the
4 substance and not the procedure?
5   A. Our discussions, our review of
6 university policy documents, discussion with Erin
7 Sadlack in this meeting. That was part of the
8 process of delineation of what were the overlapping
9 responsibilities of the committees, what were the
10 separate responsibilities of the committees. One of
11 the purposes of this meeting was to just clarify how
12 these two processes would relate to one another,
13 preserving their independence but also trying to not
14 duplicate one another's work if that wasn't
15 necessary.
16   And I assume there's documentation about
17 what Dr. Sadlack's committee -- we were not privy to
18 their, nor did we ask for their process or their --
19 their notes and working documents. We didn't want to
20 be unduly influenced by their deliberations. So that
21 was part of the differentiation, separation of the
22 two committees. We didn't want our committee to just
23 repeat what their committee had reviewed, so we
24 wanted to do our own independent work.
MAGNA LEGAL SERVICES

Page 24

1   Q. Okay. Do you ever recall yourself or
2 anyone on your committee communicating to Professor
3 Fagal this view of the role of your committee being
4 only a substantive review as opposed to procedural
5 review?
6   MS. PEET: Objection to the form.
7   Q. You can answer. Unless your attorney
8 says --
9   MR. FABER: I'm sorry, yes. You can go
10 ahead and answer. I'll tell you when you can't
11 answer.
12   A. Okay. Can you repeat the question? I'm
13 not sure what you're asking.
14   Q. Sure. A minute ago I think you
15 testified that your view of the role of your
16 committee was to review the substance of Professor
17 Fagal's discipline, not the procedure. Am I correct?
18   A. I'd say it was more primary to focus on
19 the substance, define the disposition of the charges
20 and --
21   Q. Do you know whether Professor Fagal was
22 made aware by anyone on the committee of that
23 limitation, that the committee would only review --
24 or primarily review substantive -- the substantive
MAGNA LEGAL SERVICES

Page 25

1 discipline?
2   A. No, I don't know.
3   Q. Okay.
4   MR. COHEN: Could you have this marked
5 as O'Brien-8, please?
6   (O'Brien-8, E-mail dated May 22, 2012,
7 with attachments, Bates Nos. DEF000337-342, is
8 received and marked for identification.)
9   Q. Dr. O'Brien, do you recognize the
10 document that has just been placed before you?
11   A. It appears to be a note from me to Helen
12 regarding minutes from the first two meetings.
13   Q. And attached to this note are these
14 minutes with comments, correct?
15   A. Yes.
16   Q. And do you know whether any of these
17 comments were ever formally adopted into, like, a
18 final version of the minutes?
19   MS. PEET: Objection to the form.
20   A. No. I would -- well, I would assume
21 we -- in a subsequent meeting or by e-mail we would
22 have discussed these and approved revised minutes, I
23 believe. So I don't have any reason to think they
24 weren't considered. Which ones were accepted or not
MAGNA LEGAL SERVICES


MAGNA LEGAL SERVICES

Page 38

1  received and marked for identification.)
2      Q.  Do you recognize this e-mail and the
3  attachment?
4      A.  This looks like the final version with
5  Helen's explanation of what happened.
6      Q.  Helen says to Sister Munley here,
7  "Hopefully this one will work. I'll ask Mat to edit
8  it and sign the hard copy, as well."
9          Do you remember actually signing a hard
10 copy?
11     A.  No.
12     Q.  No, you didn't, or you don't remember?
13     A.  I don't remember.
14     Q.  Do you remember whether your committee
15 reviewed whether Professor Fagal's suspension was
16 proper?
17     A.  My recollection was that we reviewed
18 both the suspension and the termination kind of as
19 one event. They were so close in proximity, but,
20 again, I defer to whatever we said in the document as
21 whenever the termination was.
22     Q.  Coming back to this -- the final version
23 of the faculty senate ad hoc hearing committee
24 review, you see paragraph A begins, "We acknowledge
              MAGNA LEGAL SERVICES

Page 39

1  that revocation of tenure"?
2      A.  Yes.
3      Q.  And further down the paragraph, it says,
4  "We are mindful of the potential or perceived threat
5  to academic freedoms when a speech violation leads to
6  revocation of tenure." Do you see that?
7      A.  Yes.
8      Q.  What did you mean by this sentence?
9          MS. PEET: Objection to the form.
10     A.  That faculty have a right to, in terms
11 of academic freedom, speak freely, and any limitation
12 to that is something to be took very seriously. And
13 that's the reason for tenure, that people can speak
14 freely.
15     Q.  In paragraph C, it says, "Dr. Fagal was
16 given the opportunity to explain his video in his
17 meeting with Sister Anne Munley." Do you see that?
18     A.  Yes.
19     Q.  Was your committee informed that
20 Dr. Fagal had asked for an opportunity to respond in
21 writing to President Munley?
22     A.  I don't recall.
23     Q.  Also in paragraph C, the last sentence,
24 it says, "The faculty grievance committee has already
              MAGNA LEGAL SERVICES

Page 40

1  determined that Sister Anne Munley followed
2  appropriate procedure in moving directly to
3  termination." Do you see that?
4      A.  Yes.
5      Q.  Does this sentence refresh your
6  recollection over whether your committee actually did
7  consider the suspension or whether they just
8  considered termination?
9          MS. PEET: Objection to form,
10 mischaracterization of testimony. You can answer.
11     A.  The procedure -- procedural issue is one
12 thing. The substantive issue was what I think we
13 were focused on, and I think the substantive issue
14 was essentially the same with regard to suspension
15 and revocation or termination. So the timing of the
16 two, I think, is what's being referenced there, that
17 determined had followed appropriate procedure, that
18 she could have done things in that order
19 procedurally. We didn't adjudicate that, but the
20 substance of her decision was more the focus of our
21 work. The timing of when she did things was less the
22 focus of what of what we attended to.
23         MR. COHEN: Let's mark this O'Brien-16.
24         (O'Brien-16, E-mail dated July 6, 2012,
              MAGNA LEGAL SERVICES

Page 41

1  with attachment, Bates Nos. DEF001494-496, is
2  received and marked for identification.)
3      Q.  If you could read this to yourself and
4  let me know when you're finished, Dr. O'Brien.
5      A.  Is this final page part of what I'm
6  reading now?
7      Q.  Um-hum.
8      A.  Okay.
9      Q.  So in this first document, this e-mail,
10 this is from Professor Fagal to your committee dated
11 July 6, 2012, correct?
12     A.  Yes.
13     Q.  Do you remember receiving this?
14     A.  Yes.
15     Q.  And in this e-mail, Dr. Fagal requested
16 that your committee convene to review the
17 appropriateness of his suspension, correct?
18     A.  He raises a number of different issues,
19 but that was one of them.
20     Q.  Your committee did not, in fact, convene
21 to review the suspension, correct?
22         MS. PEET: Objection to the form,
23 mischaracterization of testimony.
24     A.  I don't know if we met after this. I'd
              MAGNA LEGAL SERVICES



Page 42

1  have to look at the record and I don't have that in
2  front of me. Whether we met or talked, e-mailed, I
3  don't, sitting here, remember what we had -- what
4  deliberations we did. We did discuss it.
5      Q.  Discuss what?
6      A.  The reaction to his -- his message.
7      Q.  And what was -- what specifically was
8  said during that discussion?
9      A.  I need something to refresh my memory.
10 I don't have an independent memory of what that
11 discussion was, other than that we were not persuaded
12 by, you know, Fred's e-mail message.
13     Q.  And were you aware that Sister Cabral
14 and Sister Anne had determined that the committee be
15 convened twice, once to review the suspension, once
16 the termination?
17         MS. PEET: Objection to the form, lack
18 of foundation.
19         You can answer.
20     A.  Can you repeat the question?
21     Q.  Were you aware that Sister Cabral and
22 Sister Anne had determined that the committee be
23 convened twice, once to review the suspension and
24 once to review the termination?
                MAGNA LEGAL SERVICES

Page 43

1          MS. PEET: Same objection.
2      A.  My recollection is that those two
3  issues, the substance of those two issues was part of
4  our deliberation. Exactly how that was communicated
5  to us and by whom, I don't, sitting here today,
6  remember exactly how that was communicated to us.
7      Q.  So you do know that -- you said that
8  someone did communicate to you that the committee was
9  to be convened twice, once for the --
10     A.  Well, not that -- we considered both,
11 the suspension and the termination.
12     Q.  I know that. My specific question is:
13 Do you have any recollection of anyone, Sister Cabral
14 or Sister Anne, telling your committee that it was to
15 be convened twice, once for the suspension and once
16 for the termination?
17         MS. PEET: The way you asked the
18 question, it assumed that it actually happened and
19 that you're just asking him if he remembers that
20 happened. It's a very inappropriate question. It's
21 going to be very poorly received on the record, so
22 I'm going to ask that you rephrase that question in a
23 way that it doesn't assume facts not in evidence and
24 it has some foundation to it.
                MAGNA LEGAL SERVICES

Page 44

1      Q.  Did you understand that question,
2  Dr. O'Brien?
3      A.  No. Specifically what you're asking,
4  I'm not sure. I mean, we were -- we were discussing
5  as a committee both the suspension and the
6  termination. They were so closely related in time
7  that I don't know that we had a formal, now we're
8  talking about this and we're going to have a separate
9  convening of the committee. We were discussing both
10 as part of our deliberation process, the substance of
11 both, not the procedures. That was the other
12 committee -- Erin's committee had evaluated the
13 procedural parts of that. The substantive parts of
14 that is what I understood we were adjudicating.
15     Q.  I understand your testimony. My
16 question is different, and I think it's clear, but
17 I'll restate it.
18         Do you remember anybody telling your
19 committee that it was to convene twice, once for
20 Professor Fagal's suspension and once for the
21 termination?
22         MS. PEET: Objection to the form, lack
23 of foundation. Same objection. You can answer.
24     A.  I don't -- I don't recall.
                MAGNA LEGAL SERVICES

Page 45

1          MR. COHEN: Let's call this O'Brien
2  Exhibit 17.
3          (O'Brien-17, E-mail chain, Bates Nos.
4  DEF001611-615, is received and marked for
5  identification.)
6      Q.  Specifically I'd like you to look at
7  page 3. There's an e-mail from you dated Monday,
8  July 9, 2012, at 1:10 p.m. Do you see that?
9      A.  Yes.
10     Q.  Can you read that to yourself and let me
11 know when you're finished?
12     A.  Okay.
13     Q.  When you refer to the university
14 attorney, did you mean Will Anthony?
15     A.  I believe so. I'm not sure.
16     Q.  And why did you think that you would be
17 wise to contact the university attorney?
18     A.  I think I'm addressing next steps, what
19 the next steps of the committee process would be.
20 What are the next steps?
21     Q.  Do you remember after sending this
22 e-mail whether the university attorney was ultimately
23 contacted by the committee?
24     A.  No. I don't recall.
                MAGNA LEGAL SERVICES



Page 50

1  of documents refreshing my memory.
2      Q.  This is a hypothetical question. I
3  realize it might not have happened. If your
4  committee had received legal guidance to the effect
5  that progressive discipline at Marywood was required
6  in every case and that you could not simply skip
7  directly to termination and that remediation was
8  required, attempted remediation was required in every
9  instance, would you have voted the way you did to
10 support President Munley's actions?
11         MS. PEET:  Objection to the form. Calls
12 for speculation, assumes tons of facts not in
13 evidence, including the fact that he got legal
14 advice, that progressive discipline is required in
15 every case, that you can't skip progressive
16 discipline, and that remediation is required. But
17 given -- assuming that the sun and Mars -- the sun
18 and the moon and Pluto line up and you know the
19 hypothetical answer --
20     Q.  That's what a hypothetical is. A
21 hypothetical is asking you to make certain
22 assumptions.
23         Do you need me to rephrase?
24     A.  Yeah.
MAGNA LEGAL SERVICES

Page 51

1      Q.  Okay. Hypothetically, if your committee
2  had received legal guidance stating that progressive
3  discipline was required in every case and that the
4  university had to make an attempt to offer
5  remediation to the disciplined professor, would you
6  have voted the way you did to support President
7  Munley's actions?
8          MS. PEET:  Same objections.
9      A.  I don't know.
10     Q.  What would you -- do you need to know
11 more information or are you just -- you just don't
12 know how you would have voted?
13     A.  I don't. It's not what happened, so I
14 don't have an opinion about, you know --
15         MR. COHEN:  Let me just take a
16 one-minute break. I'll be right back.
17         (A recess is taken.)
18     Q.  Back on the record.
19         Did Helen Bittel ever tell you that she
20 had communicated with Marywood's attorneys?
21     A.  I believe so. I believe she did.
22         MR. COHEN:  Okay. I have nothing
23 further.
24         MS. PEET:  I have some questions.
MAGNA LEGAL SERVICES

Page 52

1  CROSS-EXAMINATION BY MS. PEET:
2      Q.  Dr. O'Brien, if you can look at
3  Exhibit 7, if you don't mind, in the middle of the
4  page with the paragraph that starts, "She explained."
5      A.  Yes.
6      Q.  And the "she," I believe, is Erin
7  Sadlack. Is that correct?
8      A.  Yes.
9      Q.  Okay. It says here, and I'm just
10 reading what it says, "Their charge was to review
11 whether procedure was properly followed, not to
12 review the substance of SAM's decision to suspend and
13 to later terminate." Do you see that?
14     A.  Yes.
15     Q.  It then continues to say, "Their
16 procedural review was limited to the charges to
17 suspension, not termination, revocation of tenure."
18 Do you see that?
19     A.  Yes.
20     Q.  Is that your understanding? Do you
21 believe that to be correct?
22     A.  I don't know what they thought they were
23 doing, but I think our understanding from our
24 committee was that they had reviewed the termination
MAGNA LEGAL SERVICES

Page 53

1  and the revocation of tenure.
2      Q.  Okay. So it was your understanding that
3  the faculty grievance committee --
4      A.  From a procedural point of view.
5      Q.  Okay. So it's your understanding that
6  from a procedural point of view, the faculty
7  grievance committee reviewed both the suspension and
8  termination, correct?
9      A.  I think that was my understanding.
10     Q.  So as written here would not be correct.
11 Correct?
12     A.  Yes.
13     Q.  Okay. Anyone either in Marywood
14 University or outside of Marywood University tell you
15 how you had to vote?
16     A.  No.
17     Q.  Did anyone either in Marywood University
18 or outside Marywood University suggest to you how you
19 should vote on this decision?
20     A.  No. No.
21     Q.  Did you fear that your job would be in
22 jeopardy if you didn't support President Munley's
23 decision?
24     A.  No.
MAGNA LEGAL SERVICES



14 (Pages 50 to 53)

# EXHIBIT "2"

**EXHIBIT 2**

December 2, 2011

Alan Levine, Ph.D.
VP for Academic Affairs
Marywood University
Scranton, PA 18509

Dear Alan,

I am still at a loss as to an explanation for what happened. I have gone through the Faculty Handbook with some care and can find nothing that allows the university to tear down my posters that were approved for hanging. I asked you to direct me to the Marywood rule/policy you claim I have violated [i.e. the fact that I offered a random drawing prize to an attendee] but I have yet to hear from you.

The posters advertised that a speaker (Will Creeley of The Foundation for Individual Rights in Education [FIRE]) would give a presentation before Dr. Jackson's and my SSCI 201 Introduction to Social Science class. Dr. Jackson and I decided to open the class to all comers and so reserved the Comerford Auditorium and advertised the event.

*I paid* for the speaker. *I paid* for the posters. To induce attendance (I am an economist) and give Marywood students a little fun [in short supply if you believe the Princeton Review] *I offered a $50 lecture attendance prize* (random drawing) to some lucky student. *The fifty dollars was mine. I also paid a few students my money to hang some posters* to save me time.

I knew (don't ask me how) that for posters to be hung around campus the hanger needed to have the "Marywood Unversity Approved by Student Life" stamp on the poster. On November 28, 2011 (Monday morning) at 8:30 am the 46 original posters were delivered to the Student Activities/Student Life office by a Marywood student. She waited while the 46 posters received the stamp of approval. Each approved poster had a paper strip taped onto the top of the poster which read "$50 Attendance Prize Draw to a Student!" Just because one of Mr. Oliveri's authorized underlings stamped the poster is not my problem. No one in the Marywood University Administration contacted me to inform me of a potential problem/issue. Late Tuesday afternoon I learned via email from a student that my posters had been torn down. I immediately went to the UPS store to get more posters printed. *I paid to reprint the approved posters* torn down by Marywood University! Finally, some of these new posters were torn down on Wednesday (see below) for which you claim no knowledge.

Even if you claim justification [which you have not yet done} for tearing down the posters, Marywood's Administration comes off poorly --- certainly in my eyes, and I think when and if widely publicized the eyes of all neutral observers. Why not just become a pathetic laughingstock while chasing away a few prospective students ?! Certainly some Marywood administrator(s) showed an incredibly rude and crude and vindictive side by not even contacting me to inform me of the perceived problem.

As Dr. Jackson wrote in an email to Mr. Oliveri:


EXHIBIT FAGAL-8

DEF002329

Case 3:14-cv-02404-ARC   Document 76-1   Filed 12/12/16   Page 10 of 11

1) Dr. Fagal deserved an immediate call that the posters were taken down by school authorities.
2) The common sense solution to the problem identified as to the poster transgression was merely to remove the offending part of the posters. The lack of the call and the overreactive response clearly points to an effort to deny Dr. Fagal an opportunity to implement the common sense remedy for the situation.

Due to Marywood's actions I request, at this stage, fair compensation for financial damages you have imposed on me.
I ask that I immediately receive (by December 15, 2011)
**(1)** A $500 reimbursement check for my expenses and wasted time

**In addition, besides making me merely financially whole regarding this matter, I think it is only fair that Marywood "atone for its sins" and show its willingness to support free speech** by inviting FIRE to campus for two Spring 2012 presentations and hosting a presentation by Robert Spencer and anyone who cares to join him in debate [see item **(11)** below]. The ideal way to show commitment to free speech is by action with respect to sponsoring a presentation by someone with whom you vehemently disagree.

**(2)** By issuing to me a written public apology which indicates the actions [outlined below] Marywood will take to remedy the damages done to its reputation.

**(3)** By having the apology in (2) to me also sent by email to every faculty member (including adjuncts) and every student.

**(4)** By paying FIRE $2000 (its normal rate) to give two presentation on campus during the Spring 2012 semester. Marywood will also pay normal meal and lodging expenses.

**(5)** By hosting [see (4)] one $1000 FIRE session (probably in February) for a daytime class presentation to the Social Science 201 class (presentation to be open to all on campus). A large room will be provided (at least the size of Comerford). A week before the event Marywood will also print ten 11x17 color posters, ten 11x17 black and white posters, ten 8.5x14 color posters, and ten 8.5x14 black and white posters advertising the event. I, perhaps with others, will hang the posters. Each poster will announce a $50 random door prize to a student attending the lecture. (I will pay the prize money).

**(6)** By using the other $1000 FIRE fee (plus food and motel bill) to pay for an evening presentation open to the whole community (probably in early April).

**(7)** By Marywood spending at least $1000 [documented] on publicity (to be coordinated with me) for the evening program which will be open to the public and all members of the campus community.

**(8)** By Marywood providing "free pizza and soda" (1000 slices of pizza and 500 cold cans of soda) at the evening presentation. The advertising and free food is an effort to draw a large crowd.

DEF002330

(9) By including as part of every publicity notice for the evening event, the fact (prominently displayed) that a randomly chosen person will win a $50 attendance prize (which I will provide).

(10) By ensuring the publicity for **each** event will include two separate emails [to be approved by me] sent to the complete faculty list (including adjuncts) and the student email list. The emails will advertise the upcoming FIRE event, and these (probably April) evening event emails will include the offer of "Free Pizza." For each FIRE event the first email will be sent one week before the event, the reminder emails (also with complete information) will be sent 24 hours before each event. Every email must meet my approval.

(11) By sponsoring a Fall 2012 appearance on campus by Robert Spencer of Jihad Watch. Mr. Spencer, based on the jihadwatch.org website, will be willing to debate anyone regarding aspects of Islam, but his appearance is not contingent on the existence of a debater for the other side. This event shall be publicized by the number of posters outlined in (5) and by single topic emails sent to the faculty and student email lists as outlined above. My friends and I will hang the posters designed with my approval. The opposition side in the proposed debate can of course hang its own posters or participate in the poster design.

By agreeing to the above I will consider this matter closed.

Sincerely,


Frederick F. Fagal, Jr.