# EXHIBIT  A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FREDERICK F. FAGAL, JR. : | |
| : | |
| *Plaintiff,* : | |
| : | CIVIL ACTION |
| v. : | |
| : | NO. 3:14-cv-02404-ARC |
| MARYWOOD UNIVERSITY, : | |
| : | ELECTRONICALLY FILED |
| *Defendant.* : | |
| : | |

### AMENDED COMPLAINT

Frederick F. Fagal, Jr., Plaintiff, hereby brings this Amended Complaint against Marywood University, Defendant, and avers as follows:

### PARTIES

**1.**    Marywood University (hereinafter "Marywood" or the "University") is a university and a Pennsylvania domestic non-profit corporation located in Scranton, Pennsylvania.

**2.**    Frederick F. Fagal, Jr. (hereinafter "Professor Fagal") is a natural person who has resided in New York State for more than 20 years and intends to remain there indefinitely. Professor Fagal is thus a citizen of New York State.

**3.**    Professor Fagal earned a bachelor's degree in 1968 from Union College in Schenectady, New York, a Masters in Economics from Cornell

University in 1971, and a Ph.D. in Social Studies Education from Syracuse University in 1981.

**4.**     Professor Fagal became a member of Marywood's faculty in the fall semester of 1987.

**5.**     Professor Fagal attained tenure at Marywood in September 1994.

**6.**     Marywood terminated Professor Fagal's tenure and employment on April 3, 2012.

## JURISDICTION AND VENUE

**7.**     This Court has original jurisdiction over this action under 28 U.S.C. § 1332 as the matter in controversy exceeds the sum of $75,000.00 exclusive of interest and costs, and is between citizens of different states.

**8.**     This Court has general personal jurisdiction over Marywood as the University has continuous and systematic contacts within the Commonwealth of Pennsylvania.

**9.**     Venue is proper under 28 U.S.C. § 1391 as a substantial portion of the events giving rise to Professor Fagal's claim occurred within the Middle District of Pennsylvania.

# FACTUAL BACKGROUND

**10.**    In 1992, Professor Fagal entered into an Agreement and Appointment for Full-Time Faculty with Marywood. The agreement states that "[t]he policies and practices listed in the Faculty Manual are agreed upon by the parties hereto." A partially redacted copy of that agreement is attached hereto as Exhibit A.

**11.**    The "Faculty Manual" was also known as or later became known as the "Faculty Handbook."

**12.**    Professor Fagal and Marywood entered into written agreements for him to serve on the University's full-time faculty for each year between 1992 and 2012.

**13.**    Professor Fagal became a tenured faculty member of Marywood in September 1994.

**14.**    On July 1, 2010, Marywood issued an edition of its Faculty Handbook. The first four pages of the Faculty Handbook are attached hereto as Exhibit B. The third page states, in part: "This handbook is effective with the 2010-2011 faculty letters of agreement." The fourth page states, in part: "Policy changes require the approval of the President of the University and, when required, the Board of Trustees. Changes are disseminated by the Secretary of the University. They are

effective with formal approval and placement in the Marywood University Policies and Procedures Manual."

16.     In May 2011, Professor Fagal entered into an agreement with Marywood stating that he would serve as a tenured Associate Professor from August 22, 2011 to May 18, 2012 and earn a specific salary. A partially redacted copy of that agreement is attached hereto as Exhibit C.

16.     At the time that Professor Fagal and Marywood entered into the May 2011 agreement, Marywood's "Contractual Agreements with Faculty Members" policy stated that this type of agreement is a "binding contract covering a specific period of time and as a vehicle to renew, adjust and/or alter the terms of the original contract regarding appointment, rank, tenure, salary, benefits, etc." The same policy stated: "Tenure is a term designating guaranteed continuous appointment to full-time faculty members until retirement." A copy of that policy is attached hereto as Exhibit D.

17.     If Professor Fagal was ever an at-will employee of Marywood, he was no longer so upon attaining tenure. His tenure and employment could only be terminated in conformance with Marywood's Policies and Procedures Manual.

## Marywood Tears Down Professor Fagal's Posters Inviting Students to a Lecture on Free Speech

18.     In November 2011, Professor Fagal invited and paid for a speaker from the Philadelphia-based Foundation for Individual Rights in Education (hereinafter "FIRE") to give a presentation to his "Introduction to Social Science" course at the end of the month. The topic of the presentation was "Know Your Rights: Free Speech and Thought Reform on Campus," which was related to Professor Fagal's teaching of the United States Constitution.

19.     Professor Fagal received approval from Marywood to hang posters (which he arranged to have printed and he paid for) announcing the FIRE presentation and inviting any and all Marywood students to attend at the University's Comerford Auditorium.

20.     On or around November 28-29, 2011, Marywood personnel tore down almost all of the FIRE posters. A Marywood official confirmed that the University was responsible. Marywood did not provide any notice to Professor Fagal before or after the FIRE posters were torn down.

21.     When Professor Fagal complained about the poster tear-downs shortly thereafter, Marywood's Vice President for Academic Affairs could not identify any written policy statements by the University that warranted these actions.

22.     Professor Fagal attempted to secure an apology by Marywood as well as reimbursement for the posters that were torn down, but Marywood refused these requests.

23.     On January 13, 2012, Professor Fagal sent an email from his personal email address to Marywood faculty members about the removal of his posters. In that email, Professor Fagal criticized the Marywood administration for tearing down his posters and for its weak commitment to free speech generally.

24.     The January 13th email also contained hyperlinks to two related videos criticizing Sister Anne Munley, President of Marywood, and several other administrators for ordering or participating in the poster tear-downs and again for a weak commitment to free speech. The videos were posted to YouTube.

## Marywood Suspends Professor Fagal

25.     At approximately 8:45 AM on January 23, 2012, a Marywood dean visited Professor Fagal's office as he was preparing for his 9:00 AM class and stated that President Munley was summoning him to a meeting at the same time.

26.     At the 9:00 AM meeting, President Munley asked Professor Fagal whether he posted the two-part video on YouTube. Professor Fagal acknowledged posting the video. Professor Fagal was asked to explain his actions, but when he attempted to raise the issue of the poster tear-down, that topic was not allowed.

6

Permitted no context to "explain" his actions, Professor Fagal could "explain" nothing. President Munley then told Professor Fagal that his employment was suspended effective immediately and that he should return his keys and University identification card to Marywood's Assistant Vice President for Human Resources.

27.     Several hours later, Marywood's Assistant Vice President for Human Resources sent Professor Fagal an email confirming that he had been suspended and directing him to clean out his University office.

28.     At the time of Professor Fagal's suspension, Marywood's "Progressive Discipline" policy (attached hereto as Exhibit E) stated:

> Marywood University endorses a progressive discipline policy designed to promote resolution in a fair and orderly manner.  This policy applies to faculty members with tenure or whose terms of appointment have not yet expired.
>
> The policy is intended to provide an effective and flexible means of identifying problem areas, resolving complaints, and preventing repetitive incidents by prompt intervention and assistance.  It is designed to accomplish these ends by a series of gradual steps involving strategies such as personal conferences, oral and written warnings, and opportunities for monitored assistance where applicable.
>
> ….
>
> ***Suspension***.  The faculty member may be suspended by the Vice President for Academic Affairs at any time during the proceedings involving him or her.  Suspension

7

> is justified if immediate harm to the faculty member or
> others is threatened by the person's continuance in the
> faculty position.

29.     Marywood's suspension of Professor Fagal was a breach of contract in

several ways. First, there was nothing "progressive" about the discipline meted out

to Professor Fagal. There was no oral or written warning—nor was any opportunity

for monitored assistance provided.

30.     Second, President Munley—not the Vice President for Academic

Affairs—suspended Professor Fagal.

31.     Third, at the time of the suspension, there was no immediate harm to

Professor Fagal or to others threatened by Professor Fagal's continuance in his

faculty position—and no Marywood official or representative has ever stated

otherwise to him.

## Marywood Moves to Terminate Professor Fagal

32.     On January 24, 2012, approximately 28 hours after President Munley

suspended Professor Fagal, she sent him a letter stating that she was

"recommending that [his] tenure and employment with Marywood be terminated

immediately."

33.     In the January 24th letter, President Munley provided a "Statement of

Charges," which she was "prepared to send . . . to a duly appointed faculty

8

committee for review along with the emails and videos you forwarded to members of our community."

**34.** The end of the second "charge" contained in the January 24th letter is missing, and therefore it was initially impossible for Professor Fagal to know the full extent of the "charges" against him.

**35.** After Professor Fagal's attorney wrote to President Munley requesting an amended "Statement of Charges"—among other breaches that he identified—President Munley sent a second letter to Professor Fagal on February 8, 2012.

**36.** In the February 8th letter, President Munley again stated that she was recommending that Professor Fagal's "tenure and employment with Marywood be terminated immediately" and offered a "Statement of Charges."

**37.** In the second "charge" against Professor Fagal, President Munley accused him of violating Marywood's Civil Rights Policy.

**38.** Near the end of the February 8th letter, President Munley wrote:

> As a result of this recommendation, I am prepared to
> send this statement of charges to a duly appointed faculty
> committee for review along with the emails and videos
> you forwarded to members of our community. In order
> to do so and out of respect for your privacy, I would ask
> that you please sign and return to me the attached
> authorization granting the University permission to do so.
> That faculty committee may agree or disagree with my

9

recommendation. Once I receive the review committee's determination, I will finalize my decision. Should you choose to forego that faculty review, I will finalize my recommendation based upon my own findings and conclusions.

**39.** A document titled "Release of Personal Information" enclosed with President Munley's February 8th letter states, in part:

> ____ I DO NOT grant permission for Marywood University to release Sister Anne Munley's Recommendation for Termination and Statement of Charges dated 1/24/12 to a faculty review committee comprised of tenured faculty. I understand that by refusing such permission that there will be no faculty committee review of Sister Anne Munley's decision to terminate my tenure and employment with the University prior to it being finalized.
>
> OR
>
> ____ I DO grant permission for Marywood University to release Sister Anne Munley's Recommendation for Termination and Statement of Charges dated 1/24/12 to a review committee comprised of tenured faculty.

**40.** President Munley's recommendation to terminate Professor Fagal's employment and tenure violated the "Progressive Discipline" policy in effect at the time. That policy contained one sentence addressing dismissal: "If remedial actions(s) taken during the suspension does not sufficiently resolve the issues that lead to the suspension, the university may move towards dismissal of the faculty member."

10

41.     Marywood took no "remedial actions" to "resolve the issues" that led to Professor Fagal's suspension. Professor Fagal's suspension began on the morning of January 23, 2012, and the first letter recommending his termination arrived in his inbox at 1:11 PM on the next day. Nor did Marywood attempt any "remedial actions" before sending the February 8th letter.

42.     President Munley's February 8th letter also violated Marywood's "Civil Rights Complaint Procedures" policy in effect at the time. That policy required an individual allegedly aggrieved by a civil rights violation to file a complaint, among other procedures. Those procedures "must be followed any time a member of the Marywood University community believes s/he has been the victim of . . . discrimination, harassment, or assault by any member of the University community . . . ." A copy of that policy is attached hereto as Exhibit F.

43.     No Marywood employee filed a civil rights complaint against Professor Fagal after his January 13, 2012 email, and thus President Munley's attempt to "charge" him with violating the University's Civil Rights Policy was a breach of Marywood policy as well as a breach of contract.

## Marywood Refuses to Allow Professor Fagal to Appeal His Suspension

44.     In President Munley's January 24th and February 8th letters, she asked Professor Fagal to authorize her to send the "statement of charges" against

him to a "duly appointed faculty committee for review" of her decision to terminate his employment and tenure.

**45.**     Nowhere in the letters or the authorizations did President Munley offer to convene a faculty committee to review her suspension of Professor Fagal.

**46.**     President Munley offered Professor Fagal two choices: a faculty review of her recommendation to terminate him or the "finalization" of her own decision to terminate him.

**47.**     The "Progressive Discipline" policy in effect at the time of President Munley's letters stated that faculty members "have the right to convene an ad hoc committee in order to appeal either a decision to suspend the faculty member or a decision to dismiss the faculty member."

**48.**     On February 2, 2012, Professor Fagal, through his attorney, elected in writing to convene two ad hoc faculty committees: one for President Munley's decision to suspend him and the other for her recommendation to terminate him.

**49.**     On February 9, 2012, Marywood, through its attorney, rejected Professor Fagal's request to convene an ad hoc committee to review his suspension. The letter stated, in part, that Professor Fagal had breached his contract with Marywood and thus the University "had no further contractual obligations to him."

12

**50.** Marywood's position—if accepted—would mean that any time that the University deemed—in its sole discretion—that a member of its community breached a contract with the University, then the University could disregard any of its own disciplinary policies. Such a position is absurd.

## Professor Fagal Files a Formal Grievance Against President Munley; she Retaliates by Terminating Him.

**51.** On February 22, 2012, Professor Fagal filed a formal grievance against President Munley under Marywood's "Faculty Grievances and Appeals" policy. A copy of that grievance is attached hereto as Exhibit G.

**52.** In the grievance, Professor Fagal alleged that President Munley violated Marywood policy by improperly suspending him, by improperly moving to terminate his employment and tenure, and by not accepting his request to convene an ad hoc committee to appeal the suspension.

**53.** On March 26, 2012, the Chair of Marywood's Faculty Grievance Committee sent a letter to Dr. Fagal summarizing his grievances and concluding: "I now write to inform you that in reviewing each of these grievances, we have found no evidence of improper action on President Munley's part which would constitute a legitimate grievance."

**54.**     On April 3, 2012, President Munley sent a letter to Professor Fagal stating in part: "Since the grievance process is now complete, I have decided to finalize my recommendation.  As a result, your employment with Marywood and your tenure are terminated effective today, April 3, 2012." A copy of that letter is attached hereto as Exhibit H.

**55.**     One paragraph after declaring Professor Fagal's relationship with Marywood at an end, however, President Munley offered to convene the two ad hoc faculty committees that he had been requesting for months. President Munley claimed: "I am doing this despite the fact that on two separate occasions you refused my offer and did not choose to convene an ad hoc committee to review my decision to suspend you and my recommendation to terminate your employment and tenure before I finalized my decision." President Munley's claim that Professor Fagal did not convene an ad hoc committee to review the suspension decision is verifiably false.

**56.**     Further, President Munley's offer to convene two ad hoc committees was effectively a dead letter because she had—in the very same writing—declared the termination of his employment and tenure to be final.

**57.**     The "Progressive Discipline" policy in effect at the time conveyed that before a faculty member may be dismissed, an ad hoc faculty committee must

recommend a formal action toward dismissal. Therefore, President Munley's termination of Professor Fagal's employment on April 3, 2012 was premature and in contravention of Marywood policy.

58.     President Munley's premature termination also violated the "Faculty Grievances and Appeals" policy (attached hereto as Exhibit G), which stated that "[g]rievants will not be adversely affected for exercising their right to file a grievance, regardless of outcome" and that "[g]rievants will not be subject to adverse consequences for either initiating a grievance or in presenting evidence on behalf of a grievant."

59.     On July 2, 2012, a group of Marywood faculty members calling themselves the "Faculty Senate Ad Hoc Hearing Committee" ("FSAHHC") issued a document titled "Review of Sister Anne Munley's Decision to Terminate the Employment and Tenure of Dr. Frederick Fagal."

60.     The FSAHHC did not concur with all of the charges lodged against Professor Fagal. Nonetheless, the FSAHHC concurred with President Munley's decision to revoke the tenure and terminate the employment of Professor Fagal.

61.     Contrary to Marywood's "Progressive Discipline" policy and President Munley's April 3rd letter, neither the FSAHHC nor any other ad hoc faculty committee reviewed Professor Fagal's suspension.

15

62.     At the time of the FSAHHC's decision, Marywood's "Progressive Discipline" policy stated, in part:

> Faculty members have the right to convene an ad hoc committee in order to appeal either a decision to suspend the faculty member or a decision to dismiss the faculty member . . . . Should a faculty member request that such a committee be convened twice (i.e., once for suspension and once for dismissal), the membership of the committee may be similar or different, a determination which is made by the President of the University in consultation with the faculty member and the Vice President for Academic Affairs.

63.     Accordingly, the failure of any Marywood ad hoc faculty committee to review Professor Fagal's suspension was a breach of Marywood's "Progressive Discipline" policy.

64.     Had an ad hoc faculty committee actually reviewed Professor Fagal's suspension, it would have likely found that suspension improper given that he posed no harm to himself or to others. Such a finding would have logically caused the ad hoc faculty committee reviewing Professor Fagal's termination to rule in his favor given that the propriety of a dismissal depends on the propriety of a suspension under the "Progressive Discipline" policy.

65.     On July 13, 2012, President Munley sent Professor Fagal a letter stating, in part: "My decision to terminate your employment with Marywood University and your tenure effective April 3, 2012 stands."

16

66.    Professor Fagal received his agreed-upon salary through August 2012, at which point Marywood ceased paying him.

## Postscript

67.    After terminating Professor Fagal, the University amended its disciplinary policies so as to allow it to handle future "Professor Fagals" in the same way—but without breaching such policies. Accordingly, Marywood is well-aware that it breached its own policies as alleged above.

## COUNT I
### (Breach of Contract)

68.    Professor Fagal adopts by reference each and every allegation stated above.

69.    Marywood's Faculty Manual, Faculty Handbook, Policies and Procedures Manual, and the letter agreements referenced above constitute binding contracts between Professor Fagal and the University.

70.    Marywood repeatedly breached duties owed to Professor Fagal under the above-referenced contracts.

71.    Marywood's breaches of its duties to Professor Fagal caused him to suffer damages, including but not limited to the loss of continued salary and other benefits owed to tenured faculty members.

17

## RELIEF REQUESTED

**WHEREFORE**, Professor Fagal demands judgment in his favor and against Marywood for:

**A.** Back pay in an amount to be proved at trial;

**B.** Reinstatement of Professor Fagal's employment and tenure with Marywood;

**C.** Front pay up to the reinstatement of Professor Fagal's employment with Marywood or—if reinstatement is not awarded—through the end of Marywood's spring semester in 2018 (when Professor Fagal would be 72 years old);

**D.** Stock market foregone gains on 403(b) salary deductions not invested in Professor Fagal's Fidelity retirement account;

**E.** Pre-judgment interest;

**F.** Post-judgment interest;

**G.** Reasonable attorneys' fees and court costs; and

**H.** Such other and further relief to which Professor Fagal may be entitled at law or equity.

Respectfully,


By:     s/ Jonathan Z. Cohen
        Jonathan Z. Cohen (PA205941)
        175 Strafford Avenue, Suite 1
        Wayne, Pennsylvania 19087-3340
        (484) 253-1175
        (215) 839-8951 (fax)
        jzc@jzc-law.com

        *Attorney for Plaintiff Frederick F. Fagal, Jr.*

Date: January 15, 2015

EXHIBIT

A

## MARYWOOD COLLEGE
Scranton, Pennsylvania
### AGREEMENT and APPOINTMENT
for
### FULL-TIME FACULTY

TERMS OF THIS AGREEMENT are offered on the _____ day of _____, A.D. 19_____

to _____

_____

party of the first part, by Marywood College, a non-profit corporation, created and existing by and under the laws of the Commonwealth of Pennsylvania, party of the second part.

The parties witness that, in consideration of the mutual promises and agreements herein contained,

the following terms are in effect from _____ to _____ :

(1) Type of Appointment _____

Rank      _____

Department      _____

Responsibility to      _____

Salary      $_____ per _____

Employee Benefits:

Social Security (FICA)    $_____

Retirement (TIAA-CREF)    _____

Hosp. Ins. (B.C.-B.S.-M.M.)    _____

Workers' Compensation    _____

Total Disability Ins. (TIAA)    _____

Life Insurance (TIAA)    _____  _____

Total Compensation    $_____

(2) The policies and practices listed in the Faculty Manual are agreed upon by the parties hereto.
(3) Benefits other than Social Security must be applied for by the faculty member at the Office of Personnel Services. Failure to apply indicates waiver of the benefit.
(4) This signed Agreement must be returned to the President's office by the date specified.
(5) U.S. Government form W-4 must be on file in the Office of Personnel Services.

IN WITNESS WHEREOF, the said parties have hereunto agreed to the above terms and have set their hands at Marywood College, in said State, as follows:

_____  *(Signed)* _____
Date Accepted            First Party

_____  *(Signed)* _____
Date Executed            President

(2/86)

EXHIBIT

B



# Marywood

U N I V E R S I T Y

# FACULTY HANDBOOK

## July 1, 2010

**Reap College of Education and Human Development**
**Insalaco College of Creative and Performing Arts**
**College of Health and Human Services**
**College of Liberal Arts and Sciences**
**School of Architecture**

Address comments or questions
to

Secretary of the University
Marywood University
Scranton, PA   18509-1598

# FACULTY  HANDBOOK

**This handbook is effective with
the 2010-2011 faculty letters of agreement.**

**Marywood  University**
**Scranton,  Pennsylvania**
**18509**

# INTRODUCTION

The faculty of Marywood University are dedicated professionals who have an important role in providing intellectual leadership.  They are committed to the service of the University, their disciplines, and others.  While the teaching role of the faculty is primary, they devote time and energy to a variety of activities.  They serve on committees and contribute their talent to strategic planning, research, grant writing, and recruitment.

It would be impossible to capture in detail in one handbook all of the many issues that affect faculty.  The *Faculty Handbook* is intended to be one of several sources of general guidance.  It brings together brief descriptions of the privileges and obligations that are most central to membership on the faculty of Marywood University and selected other information of special interest.

Nothing contained in the *Faculty Handbook* negates the right of the University to augment, repeal, or revise its policies at any time.  Policy changes require the approval of the President of the University and, when required, the Board of Trustees.  Changes are disseminated by the Secretary of the University.  They are effective with formal approval and placement in the *Marywood University Policies and Procedures Manual*.

The *Faculty Handbook* is maintained by the Secretary of the University, who is responsible for updating and editing it.  This assumes the authority to make non-substantive changes that improve the precision of its language, and substantive changes that are necessary to conform to applicable laws.  To the extent that modification and revision of Chapter Two constitute other substantive changes, the Faculty Senate will be consulted in the interest of collegiality.

EXHIBIT

C



## Marywood
### U N I V E R S I T Y

Tenured Faculty
Letter of Agreement
2011-2012 Academic Year

May 10, 2011

Dr. Frederick F. Fagal, Jr.
17 East Lake Street
Skaneateles, NY 13152

Dear Dr. Fagal, Jr.,

This Letter of Agreement is offered to you for the 2011-2012 Academic Year.  In accord with the agreed upon Salary Plan, your salary reflects a 2.5% annual increase of
$ ████████ .

Other terms of this agreement are as follows:

| | |
|---|---|
| Term: | 8/22/2011 to 5/18/2012 |
| Type of Appointment: | Full-Time (9 months) Tenure |
| Rank: | Associate Professor |
| College: | Liberal Arts & Sciences |
| Department: | Social Science |
| Responsible to: | Department Chairperson |
| Salary: | $ ████████ |

Faculty members must apply for benefits other than Social Security and Worker's Compensation through the Human Resources Department.  Full-time faculty benefits include health, dental, long-term disability, group life, and accidental death and dismemberment under the Flexible Benefits Plan.  Elections are made by June 1 of each year for the subsequent fiscal year beginning July 1.  Retirement contributions by the University vary based on the contribution level selected by the faculty member.  The appropriate government forms, including Form W-4 and I-9, must be completed and on file in the Human Resources Department.

This agreement is valid for one month from the date of this letter.  The original copy of this Letter of Agreement must be signed and returned to my office by June 10, 2011.  If you do not return the original signed copy by June 10, it will be assumed that you are not returning to Marywood.  On behalf of the Board of Trustees and myself, I express our gratitude for your dedicated service and commitment to Marywood University.  May God continue to bless you.

Sincerely,

*Sister Anne Munley IHM*

Anne Munley, IHM, Ph.D.
President

Agreed this __25__ day of __May__, 2011

Signature __Frederick F. Fagal, Jr.__





# Contractual Agreements with Faculty Members



## Policy Statement

### Full -Time Faculty

The *Letter of Agreement* is the official contract issued to a faculty member at the time of appointment or reappointment.  It is a statement of conditions and obligations mutually agreed to by the faculty member and Marywood University. It serves as a binding contract covering a specific period of time and as a vehicle to renew, adjust and/or alter the terms of the original contract regarding appointment, rank, tenure, salary, benefits, etc.

Faculty contracts are normally for a period of nine months or twelve months.

Ordinarily, the academic year will begin no earlier than two weeks before Labor Day and will end no later than nine months from that date.

A copy of the *Letter of Agreement* is retained by the faculty member.  Copies are also on file in the Office of Human Resources.

In general, any faculty member, who intends to be a long-term stakeholder in the University and who has the appropriate terminal academic degree, should have either a tenure appointment or an appointment probationary for tenure.

### *Categories of Full-Time Appointment*

Regular membership in a Faculty includes appointments with continuous tenure, appointments probationary for tenure, and contract appointments without tenure.

Membership in the Faculty of a School or Department is held by persons with valid appointments to one of the four generally recognized Faculty ranks, namely, Professor, Associate Professor, Assistant Professor, or Instructor.

The University, however, also requires the services of professionally competent individuals to meet teaching and service responsibilities in selected areas or positions in which assignments do not necessarily include research or creative work. To meet these responsibilities effectively and to be competitive in attracting and retaining needed professional personnel, the University has established and recognizes a third kind of Regular Faculty appointment: Regular Contracts Appointments without Tenure.

### Contract Appointments with Tenure

The probationary period shall not exceed seven years of full-time teaching at Marywood, with application for tenure being made in the sixth year. Faculty members on leave during the probationary period must follow the policy on Leaves of Absence. Prior service at Marywood University or at another regionally accredited, four-year college or university may be credited toward the fulfillment of the probationary period as indicated in the original *Letter of Agreement.*

Tenure is a term designating guaranteed continuous appointment to full-time faculty members until retirement. It implies a mutual commitment on the part of the faculty member and the University and cannot be taken lightly. The commitment of a faculty member who requests tenure is as deep and binding on the faculty member as it is on the University.  Just as the conferring of tenure by the University recognizes the competence of an individual faculty member, submission to the University of an application for tenure suggests a strong acceptance by that individual of the goals and objectives of the University.  The request represents commitment to work jointly with faculty, students, administrators, and members of the staff for the growth and welfare of the University.  It is a commitment to devote one's energies to continued personal development and continued high levels of achievement as a member of the Marywood academic community.  It is a definite assertion of career goals; it is expected that faculty will not lightly withdraw from this relationship.

Once tenure is granted, it will be discontinued only for grave reason, which may include moral turpitude, flagrant abuse of academic freedom, or lack of professional competency as demonstrated in instruction and/or research.  In addition, the University may be required to discontinue tenure because of severe financial exigencies of the University or reorganization of the department and/or curriculum resulting in lack of need as described in *Retrenchment of Faculty*.

A faculty member with an appointment probationary for tenure may apply for a Clinical or Per Annum appointment, if a vacancy exists, under normal procedures for recruitment and appointment.  However, a faculty member in probationary status is not eligible to apply for such a change of status if that faculty member has been reviewed for tenure with the result that tenure was not recommended.

## Contract Appointments without Tenure

Two types of full-time contract appointments without tenure are available: Clinical Faculty Appointments and Per Annum Faculty Appointments.

## Clinical Faculty

On the recommendation of the cognizant chairperson, or person acting in the capacity of a chair, with the approval of the Vice-President for Academic Affairs and based on a written description of the teaching and related duties, a Faculty position involving full-time teaching in a clinical or professional skills program may be designated as a non-tenure track clinical position.  Titles associated with clinical positions shall be appropriately distinguishing, such as "Clinical Assistant Professors" as determined by the Vice-President for Academic Affairs.

The initial appointment may be for one or two years and may be renewed for successive terms under the same procedures as those applying to faculty members with appointments probationary for tenure.  After six years of continuous service, subsequent reappointments may be for periods of up to five years but without tenure.

## Per Annum Faculty

With the approval of the Vice-President for Academic Affairs and based upon a written description of the teaching and related duties, a faculty position involving full-time teaching for a period of one year may also be designated as a non-tenured position (Per Annum).

Normally a Per Annum appointment may be renewed on an annual basis for up to an additional five years, followed by a terminal contract for the seventh year of employment. If an exception is made, it will be done by

the Vice-President for Academic Affairs in consultation with the appropriate dean and director or chairperson. Notification of non-renewal shall follow the notice requirements of the Non-Reappointment of Full-Time Faculty Member policy.

Clinical or Per Annum appointments may be made at the level of Instructor, Assistant Professor, Associate Professor or Professor.  A Faculty Member with a Clinical or Per Annum appointment is accorded parity of compensation, benefits and perquisites, and governance and voting rights, as with other Faculty members of comparable rank.

A Faculty member with a Clinical or Per Annum appointment may apply for an appointment probationary for tenure, if a vacancy exists, under normal procedures for recruitment and appointment. In such a case, time served in the Clinical or Per Annum position beyond the first year counts toward the maximum allowable period of probationary service. If time served in the Clinical or Per Annum position exceeds the maximum allowable period of probationary service, the Faculty member shall be considered to have completed five years of probationary service and shall be reviewed for tenure upon application for the change of status. In either case, in the event the outcome of the review is negative, the terms of the current Clinical or Per Annum appointment shall be honored but the Faculty member shall not be eligible for subsequent reappointment to the Clinical or Per Annum position.

## Pro - Rata Faculty

Pro-rata ranked faculty serve on nine-month or twelve-month contracts. Their contracts are processed and issued as are those of full-time faculty.

The initial appointment of pro-rata faculty determines their rank; their *Letters of Agreement* are awarded for one year at a time with no implied obligation of continuous appointment.

## Part -Time Faculty

Part-time faculty are those faculty members who ordinarily teach from one to six credit hours per semester and are not usually otherwise employed in the affairs of the University. They receive a formal appointment on a semester basis, provided enrollment justifies it at registration time.  Part- time faculty members are not eligible for tenure.

## Letters of Agreement

*Letters of Agreement* for continuing faculty members are issued on or before May 10. *Letters of Agreement* are distributed from the office of the President of the University.

## Appointment Procedures

Members of the faculty are appointed by the President of the University. Prospective faculty members are interviewed and recommended by the chairperson and faculty of the department in which a vacancy exists to the Dean and Vice-President for Academic Affairs.

The formal offer of employment made by the Vice President for Academic Affairs to a prospective faculty member contains the conditions of continued employment and promotion as described during the interview process and as outlined in the *Faculty Handbook.*

Offers to part-time faculty are made by department chairpersons or those acting in the capacity of a chair, and concluded by an agreement approved by the appropriate academic dean. A part-time faculty member receives a formal appointment on a semester basis, provided enrollment justifies it at registration time. A part- time faculty member is not eligible for tenure.

## Related Policies

- Promotion of Faculty Members
- Faculty Status

## History

07/01/89 - Reaffirmed with publication of Faculty Manual

02/24/99 - Revised, as recommended to the President by the Policy Committee of the University, to include possibility of opening the fall semester in August.

10/04/02 - Revised to change the reference to the opening date of the academic year, as recommended to the President of the University by the Policy Committee of the University.

03/28/08 - Revised to provide for permanent non-tenured faculty, as recommended to the President of the University by the Policy Committee of the University.

2/18/11 - Revision approved by the President of the University as recommended by the Policy Committee of the University.

 

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

2300 Adams Avenue, Scranton, PA 18509

570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu





# Progressive Discipline



## Policy Statement

Marywood University endorses a progressive discipline policy designed to promote resolution in a fair and orderly manner. This policy applies to faculty members with tenure or whose terms of appointment have not yet expired. Its objectives support the collegial relationships at Marywood University and are directed toward continual institutional improvement. Because the University regards disciplinary action as corrective and not punitive, the policy recognizes personal and professional problems that may be rectified by an informal educational process, as well as serious violations of professional responsibilities implicating possible recommendation for suspension or dismissal.

The policy is intended to provide an effective and flexible means of identifying problem areas, resolving complaints, and preventing repetitive incidents by prompt intervention and assistance. It is designed to accomplish these ends by a series of gradual steps involving strategies such as personal conferences, oral and written warnings, and opportunities for monitored assistance where applicable.

## Procedures

***Commencement.*** Disciplinary action may be initiated by a complaint, oral or written, which alleges violation of institutional policy, practice, procedure or other functions and responsibilities of the faculty member in pursuing his or her customary teaching and institutional role. The complaint, which may reflect an incident or incidents of misconduct or deficiency, may be communicated to the faculty member's immediate supervisor or to the appropriate dean.

***Meeting with Administrator.*** The administrator receiving the complaint shall discuss the matter with the faculty member in a confidential conference. If additional information from the faculty member provides a satisfactory explanation, the decision may be to close the matter then. If, however, additional light is not shed on the allegation or an explanation is not satisfactory, the administrator will specify corrective action to be taken, and the discussion will constitute an oral warning.

***Written Warning.*** If the alleged problem continues or additional complaints are received, the immediate supervisor or dean must notify the Vice President for Academic Affairs, who shall conduct a preliminary investigation concerning the merits of the complaint. A written warning to the faculty member may follow where circumstances indicate that the problem is not resolved. The written warning will become a part of the faculty member's personnel file, but will be expunged after three years if no other written warnings have occurred.

***Suspension***. The faculty member may be suspended by the Vice President for Academic Affairs at any time during the proceedings involving him or her. Suspension is justified if immediate harm to the faculty member or others is threatened by the person's continuance in the faculty position. Unless in direct violation of the law, any

such suspension should be with pay.

**Special Assistance.**  In those circumstances where it is evident that the faculty member is in need of special professional assistance, the Vice President for Academic Affairs may require in writing  any of the following remedial actions:

- counseling and/or another type of treatment program, such as Alcoholics Anonymous or Narcotics Anonymous;
- psychological counseling and/or treatment, including out-patient treatment prescribed by a duly credentialed and qualified professional;
- peer faculty monitoring to assist in resolving work-related performance problems;
- a specified number of periodic conferences with the faculty member's Dean to assist in resolving administrative or institutional problems.

Special professional assistance will be for a specific period of time.  Where the assistance necessitates in-patient treatment or time away from teaching, that temporary time-off shall be with pay.  During the period of assistance, the faculty member shall communicate weekly or at other intervals specified by the Vice President for Academic Affairs, who shall monitor the faculty member's progress to determine when and if the special assistance has achieved its objective.  Part of this monitoring function may involve the faculty member providing summary statements from treatment providers regarding compliance and prognosis. If the faculty member has refused to participate, or the remedial objective has not been reached during the specified period of time, a recommendation to terminate employment may be made to the President of the University.

### Dismissal

If remedial actions(s) taken during the suspension does not sufficiently resolve the issues that lead to the suspension, the university may move towards dismissal of the faculty member.

### Ad Hoc Faculty Committee

Faculty members have the right to convene an ad hoc committee in order to appeal either a decision to suspend the faculty member or a decision to dismiss the faculty member.

- Having received a written recommendation for either suspension or dismissal from the Vice President for Academic Affairs, the President of the University sends a written communication to the faculty member, stating with reasonable particularity the basis for suspension or dismissal and offering, if requested by the faculty member within 10 days, to convene a tenured faculty ad hoc committee to consider the matter, to render confidential advice, and thereby to effect a remedy if possible.
- Should the faculty member request a review by an ad hoc committee, it shall consist of three members selected in the following order:  (a) one tenured faculty member selected by the person seeking assistance, and (2) two tenured faculty members selected by the Executive Council of the Faculty Senate.  The choice of members should be on the basis of their objectivity and competence and of the regard in which they are held in the academic community.  The President of the University or his/her delegate has the option of attending the meetings of the Committee.  Should a faculty member request that such a committee be convened twice (i.e., once for suspension and once for dismissal), the membership of the committee may be similar or different, a determination which is made by the President of the University in consultation with the faculty member and the Vice President for Academic Affairs.  Normally the committee would make its

recommendation within 30 days of being convened.

- The Committee elects its own Chair, who sends the opinion of the committee in writing to the President of the University, copied to the faculty member and to the Vice President for Academic Affairs. If the opinion of the Faculty Committee is that the matter is successfully resolved or that there is no merit to the complaint, a recommendation shall be made to discontinue proceedings. If the problem has not been corrected and reason still exists to question the fitness of the faculty member, the recommendation shall be to either continue a suspension or initiate a formal action toward dismissal.

*Publicity.* Public statements by the faculty member or others about possible or actual termination of employment should be avoided.

## Related Policies

- Teaching Responsibility
- Librarianship Responsibility
- Tenure
- Faculty Status
- Academic Workload

## History

07/01/89 - Reaffirmed with publication of Faculty Manual

12/12/97 - Addition of informal process approved by the President of the University as recommended by the Policy Committee of the University

07/01/03 - Editorial changes made to reflect academic restructuring

10/12/11 - Revision approved by the President of the University as recommended by the Policy Committee of the University

---

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu



## 4.2       CIVIL RIGHTS COMPLAINT PROCEDURES
(Revision approved by the President of the University 4/03/00, 7/21/03, 6/24/09)

The following process must be followed any time a member of the Marywood University community believes s/he has been the victim of or witness to discrimination, harassment, or assault by any member of the University community on University property or any property controlled by the University.  Any individual who believes s/he has been subject to discrimination on the basis of disability should file a grievance consistent with Marywood's *Disability Grievance Procedures.* Confidentiality is expected of all persons involved in the process.

In furtherance of Marywood University's commitment to its duties and obligations, regular training on harassment, discrimination and related topics is provided for managers and supervisors in the Marywood community.

**Internal Process**

1.  As soon as possible, but not later than 30 working days, except in unusual circumstances, after the alleged incident(s) occurs, the complainant must present the complaint to the appropriate University administrator as listed below:

    > Claims Against Faculty Members or Librarians
    > Contact: Academic Dean or Director of Library and/or Provost and Vice President for Academic Affairs

    > Claims Against Administrators, Professional Staff, or Support Staff Members
    > Contact: Immediate supervisor and/or a vice president

    > Claims Against Students
    > Contact: Dean of Students and/or Vice President for Student Life.

    In all cases, individuals may contact the Assistant Vice President for Human Resources and Affirmative Action Officer if they feel they cannot contact the appropriate individual as noted.

    In cases that involve two or more categories of Marywood community members, the University administrator first contacted will consult with the President of the University to determine the appropriate course of action.

2.  The initial discussion between the complainant and the University administrator will be kept confidential to every extent possible.  The University administrator must contact the Assistant Vice President for Human Resources and Affirmative Action Officer in cases involving employees.

3.  If the complainant, after an initial meeting with the University administrator, decides to proceed, the complainant submits within 10 working days a formal complaint, preferably in writing, to the appropriate University administrator.  The complaint must include detailed factual information concerning the incident(s), and should include what the victim feels will correct the situation.

    In certain serious cases the University administrator may proceed even without a formal complaint.

    Cases involving alleged discrimination, harassment, and sexual assault are particularly sensitive and demand special attention to issues of confidentiality.  Dissemination of information relating to the case is to be limited, so as to insure, as fully as possible, the privacy of the individuals involved.

4. The University administrator must inform both parties of the need for confidentiality. Any individual who retaliates against the complainant will be subject to discipline up to and including discharge from employment and/or termination of student status.

5. Within 5 working days after receipt of a formal complaint, the University administrator must initiate the appropriate steps to effect an informal resolution of the complaint that will be acceptable to both the complainant and the alleged offender.

6. Within 10 working days after the initiation of the steps to effect an informal resolution, the University administrator must provide a written summary of the complaint and the proceedings to date to both the complainant and the alleged offender. Appropriate remedial action will be determined by the University administrator after consultation with executive officer(s) and/or legal counsel if deemed necessary. Action will be taken to eliminate the discriminatory or harassing conduct, including but not limited to warning, suspension, transfer, community service, discipline, discharge, or dismissal of the offender or anyone making a knowingly false complaint. The remedial action may also include offering assistance/training to the victim and/or the offender. The parties will be formally notified of the final decision, including punishment or sanctions, if any.

7. Either party, if not satisfied with the informal resolution proposed by the University administrator, will have 10 working days to file an appeal. Appeals must be in writing and submitted to the President of the University. Within 5 working days, the President will direct the appeal to the appropriate University body, described below. The appeals committee will have 30 working days to review and make a recommendation to the President of the University. The President of the University will provide a written response to the appellant within 10 working days of the receipt of the appeals committee's recommendation. The decision of the President of the University is final and binding internally.

> Claims against Faculty Members including Librarians, Administrators, Professional Staff, and Support Staff
> > The President of the University will appoint and convene a committee of 5 employees comprised of professional staff, administrators and/or faculty who are independent of the claim.
> >
> > Note: Claims by faculty members against faculty members may choose to contact the Faculty Grievance and Appeals Committee in lieu of this process.
>
> Claims against Students
> > The President of the University will refer the appeal to the Vice President for Student Life within 5 working days. The Vice President for Student Life will convene an Appeal Board within 3 working days of the President's notification. The Appeal Board will have 30 working days to review and make a recommendation to the Vice President for Student Life. The Vice President will notify the President of the recommendation within 3 working days. The President of the University will provide a written response to the appellant within 10 working days of the receipt of the appeals committee's recommendation. The decision of the President of the University is final and binding internally.

**External Process**

Victims may choose to file a report with the proper law enforcement authorities. Marywood University has personnel on staff who can explain criminal complaint procedures and assist victims in beginning the process. Police investigation and legal prosecution are conducted outside of and in addition to University procedures.

**Resources**

A list of Marywood University and community resources is available at the Human Resources Office and the Student Life Offices.

Students are encouraged to use the services of the Counseling and Student Development Center, the Student Health Services Office, and the Students with Disabilities Services Office.

**4.3      DISABILITY GRIEVANCE PROCEDURES**
(Approved by the President of the University 6/24/09)

> **Students are strongly encouraged to contact the Office of Student Support Services**
> **at the first sign of any difficulties obtaining**
> **their approved academic accommodations from faculty,**
> **or if they encounter difficulties related to their disabilities**
> **from any Marywood University staff, administrators, or students.**

It is the policy of Marywood University not to discriminate on the basis of disability.  The University has adopted an internal grievance procedure providing for prompt and equitable resolution of grievances by either students or employees alleging any action prohibited by Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794) or the relevant U.S. Department of Health and Human Services regulations implementing the Act (34 C.F.R. Part 104) (together, "Section 504").  Section 504 prohibits discrimination on the basis of disability in any program or activity receiving Federal financial assistance. The Law and Regulations may be examined in the office of the Section 504 Coordinator, Dr. Patricia E. Dunleavy, Assistant Vice President for Human Resources and Affirmative Action Officer, who has been designated to coordinate the efforts of the University to comply with Section 504.

Any person who believes she or he has been subjected to discrimination on the basis of disability may file a grievance under this procedure. It is against the law for the University to retaliate against anyone who files a grievance or cooperates in the investigation of a grievance.  The University will make every effort to protect the grievant from retaliatory action.  Any individual who retaliates against the grievant will be subject to discipline up to and including discharge from employment and/or termination of student status.

**Procedures**

All alleged incidents involving disability discrimination are to be dealt with immediately.  When a Marywood University employee or student believes s/he has been the victim of disability discrimination or witnessed disability discrimination, the following procedures should be used:

1.  Grievances must be submitted to the Section 504 Coordinator, or her designee, within 30 calendar days of the date the person filing the grievance becomes aware of the alleged discriminatory action.  (Special circumstances warranting later filings will be considered on a case-by-case basis.)  A grievant may contact the Vice President for Enrollment Management if he or she feels he or she cannot contact the Section 504 Coordinator, who will designate an appropriate person to fulfill the Section 504 Coordinator's responsibilities under this policy.

2.  A grievance must be in writing and must contain the name, address and other contact information of the grievant, describe the problem or alleged action alleged to be discriminatory in sufficient detail to inform the Section 504 Coordinator of the nature and date of the alleged violation and permit an adequate investigation to be conducted, include the names of University employees or students involved and state the remedy or relief sought.

EXHIBIT G

# Marywood
## U N I V E R S I T Y

# Faculty Grievances and Appeals



## Policy Statement

As an institution of higher education, Marywood University brings together a faculty, administration, and governing board united in a common bond of academic purpose. Essential to the fulfillment of this purpose is a mutual recognition of institutional integrity and individual human rights, along with an understanding of the respective roles of the several entities which constitute this educational organization.

Circumstances may arise at times, however, wherein a grievant--full-time, part-time, or pro-rata--may question decisions which affect his/her professional role in the institution. To assist in the resolution of these matters, a series of guidelines for grievances is herein set forth.

### Definitions

Grievance: A grievance refers to any disagreement between two parties. A grievance identifies a complaint one party has against another party for some alleged wrongful action on the part of the second party.

Grievant: A Grievant initiates a grievance.

### Types of Issues That Can Be Grieved

It is understood that procedural rather than substantive factors provide appropriate areas of review, and the Faculty Grievance Committee will not attempt to substitute its judgment for that of the decision-maker(s) involved in the case.

Thus, the Faculty Grievance Committee will hear grievances concerning:

   1) Allegations of violation of academic freedom resulting in: denial of tenure, promotion, or sabbatical leave; non-reappointment.

   2) Allegations of impermissible discrimination. Tenured and non-tenured faculty are protected against illegal or unconstitutional discrimination, or on any basis not relevant to job performance, and includes, but is not limited to, race, sex, religion, national origin, age, disability, marital status, or sexual orientation

   3) Allegations of inadequate consideration resulting in: denial of tenure, promotion, or sabbatical leave; non-reappointment; or termination of employment due to retrenchment.

   4) Allegations of violations of procedures used in rendering decisions in numbers 1 and 2 above as set forth in Chapter 2 of the *Faculty Handbook*.

Procedures regarding dismissal, suspension, and sanctions of faculty members are in the *Progressive Discipline*

policy.

Should a grievant allege cause for grievance in any matter not identified in the above guidelines, the grievant may consult the Faculty Grievance Committee. In such circumstances, the Committee's first decision is whether the complaint is appropriate and sufficiently serious to merit consideration.

**Persons Against Whom Grievances May be Directed**

Fundamentally, a grievance may arise from an allegation of improper implementation of a procedure or process leading to a decision. The person(s) or body who perform(s) that procedure or process is (are) the subject(s) of the grievance. Thus, a grievant may direct a grievance against the person(s) or body responsible for the decision identified herein.

The decisions or actions of the Faculty Grievance Committee or Ad Hoc Hearing Committee may not themselves be grieved.

# Procedures

## Informal Procedure

 1) A member of the faculty must initially discuss a complaint with the person or body responsible for the action to which the grievant takes exception in order to determine if a resolution is possible.

 2) A complaint must be presented within (10) calendar days of the occurrence or discovery of the alleged violation.

 3) No grievance may be filed without the initiation of this informal complaint procedure.

 4) If the grievance still exists after step one the grievant initiates a consultation with the Vice President for Academic Affairs in order to try to resolve the matter.

## Formal Procedure for Filing a Grievance

 1) The Faculty Grievance Committee is convened.

## Faculty Grievance Committee

The Faculty Grievance Committee consisting of three tenured faculty members and two alternates (also tenured) is specifically charged with responsibility for resolving matters of grievance and appeal. The Faculty Senate conducts the election of this committee. Faculty currently serving on the Rank and Tenure Committee or the Faculty Development Committee are not eligible for election to this committee.

The term of each member extends for three years, with one person replaced each year. An alternate will be identified at each election. Any member of the Grievance Committee who has had any prior involvement in a case under consideration must recuse him/herself. The Grievance Committee shall annually elect a chair-elect who will succeed the Chair.

## Grievance Process

The grievant may consult the President of Faculty Senate for assistance in contacting the Faculty Grievance Committee Chair. The Chair should be provided with a written statement setting forth, in detail, the nature of the grievance or appeal and identifying the person(s) or body against whom the grievance or appeal is directed; this document may also include a proposal for resolving the issue. A grievance must be filed within thirty (30) calendar days of the occurrence or discovery of the alleged violation but not fewer than five (5) calendar days after the initiation of the informal complaint.

In considering the grievance or appeal, the Faculty Grievance   Committee will take the following steps:

1) The Committee notifies the decision maker(s) that a grievance has been filed.

2) The Grievance Committee requests from the grievant written information regarding the issues. The Grievance Committee also requests from the decision maker(s) written statements describing the basis for the decision being appealed or grieved, as well as any attempts to settle the matter informally. This information shall be held in confidence by the Grievance Committee. At this point in the process, the information gathered is solely for review by the Committee and is not to be shared with either party involved.

3) At any point, the Grievance Committee may request additional information in writing from the grievant and from the decision-maker(s).

4) If after completing the above steps, the Committee determines that the grievance is improper or unsubstantial, or that sufficient time had not yet been allowed for its normal resolution, or that there is no evidence of improper action on the part of the decision maker(s) which would constitute a legitimate grievance, the Committee will communicate this determination to the grievant and the decision maker(s).

5) If the Grievance Committee determines that there was inadequate consideration or violation of procedures (see No. 3 and 4 under Types of Issues Which Can Be Grieved above), the Committee will return the case to the decision maker for reconsideration.

6) If the grievance is deemed appropriate for mediation, the Chair will appoint a Mediator from the University. The Mediator does not represent either party. Any party may object to the Mediator on the grounds of actual or apparent bias or conflict of interest and submit such objections to the Chair in writing. The Chair will review the objections and may replace the mediator.

7) The Offices of the Vice President for Academic Affairs or Human Resources may be consulted by the Mediator on mediation procedure or other matters involved in the grievance.

8) The Mediator shall try to resolve the grievance within thirty (30) calendar days of formal submission to the chair. With the consent of both parties, the period of mediation may be extended for a short period of time. If the grievance is not resolved within the thirty (30) calendar days, the mediator will advise the chair of the committee in writing that that the issue has not been resolved. If a mutually accepted agreement is reached, this will be communicated to the chair of the committee.

9) Grievances not appropriate for mediation or grievances not resolved through mediation shall be referred to the Ad Hoc Hearing Committee. All evidence collected will be passed on to the Ad Hoc Hearing Committee.

10) If the Faculty Grievance Committee recommends a formal hearing, in cases of violation of academic freedom or impermissible discrimination, an Ad Hoc Hearing Committee will be created to conduct a formal

investigation and to arrive at a recommendation for resolving the issue.

11) The Grievance Committee will make a summary report of its activities at the end of each academic year to the Faculty Senate. No details relevant to the privacy of the participants in any cases will be included in this report.

## Ad Hoc Hearing Committee

The Ad Hoc Hearing Committee shall consist of three members, selected by the Faculty Senate Executive Council, from a standing committee of fifteen tenured Faculty Members elected for one-year terms by the faculty at large. The Faculty Senate conducts the election of this committee.

Each party shall have two challenges without stated cause regarding membership of the Ad Hoc Hearing Committee. No member of the Ad Hoc Hearing Committee shall have had any prior involvement in the case.

If the three-person Ad Hoc Hearing Committee cannot be chosen from the fifteen members of the standing committee, the Executive Council of the Faculty Senate is empowered to conduct a special election to obtain fifteen additional members with terms of one year.

The Ad Hoc Hearing Committee must select a chairperson.

## Ad Hoc Hearing Procedures

1) The Ad Hoc Hearing Committee is empowered to gather information and documents specific to the case of the Grievant, conduct interviews, hold a hearing and take actions as are necessary to investigate the grievance to the extent that the law and University policy permit. The Ad Hoc Hearing Committee will provide recommendations in writing forty (40) calendar days from the date of its official appointment.

2) All Hearings are closed to anyone other than the parties and their advisors, members of the Ad Hoc Hearing Committee, and any witnesses invited to testify by the Committee. The hearing may be audio or video recorded and a written record will be maintained. The hearing is not a legal proceeding. At the beginning of the hearing, all procedures will be made known to the parties, and all information will be kept confidential.

3) Each party to the grievance may have one advisor during the hearing. The advisor may not participate in the hearing.

4) Strict rules of legal evidence will not be binding upon the Ad Hoc Hearing Committee and evidence of probative value in defining issues may be admitted.

5) The hearing record will be used exclusively as the basis for findings of fact and for arriving at a decision.

6) Upon reaching a decision on the issue and a recommendation for action, the Ad Hoc Hearing Committee will provide a summary written report to the petitioner, the person(s) named in the grievance, and the appropriate administrative officer and the President.

7) After receiving the recommendation of the Ad Hoc Hearing Committee, the appropriate administrative officer will review the recommendation and notify the Ad Hoc Hearing Committee and petitioner whether the recommendation has been accepted. If the recommendation of the Ad Hoc Hearing Committee is not

accepted by the appropriate administrative officer, the administrative officer will review it with the Ad Hoc Hearing Committee.

 8) No details relevant to the privacy of the participants in the case will be included in the notice from the Hearing Committee. Public statements and publicity about the case by the participants will be avoided until the proceedings have been completed, including consideration by the President

## Action by the President of the University

Following the recommendation of the Ad Hoc Hearing Committee, should the petitioner desire further consideration of the issue beyond the immediate administrative channels of the University, the President may be requested, within twenty calendar days, to review the case.

This review will be based on the record from the committee hearing and may provide opportunity for argument, oral or written, or both, by the principals.  Then the President will then make the final decision.

## Responsibility for Expenses Incurred in Grievance and Appeal

Expenses incurred by the grievant are the responsibility of the individual. These include, but are not limited to, the following:

Cost of an advisor.

Travel expenses for advisor, witnesses, or others engaged by petitioner.

Cost of preparing any documents and copies thereof.

## Withdrawal of a Grievance

The grievance can be withdrawn at any point in the process.

## Non-Retaliation

Grievants will not be adversely affected for exercising their right to file a grievance, regardless of outcome.

Grievants will not be subject to adverse consequences for either initiating a grievance or in presenting evidence on behalf of a grievant.  Anyone who violates this mandate can be subject to disciplinary action, up to and including dismissal.

## Related Policies

- Academic Freedom
- Disability Grievance Procedures
- Civil Rights Policy
- Civil Rights Complaint Procedures
- Sabbatical Leave for Faculty Member
- Non-reappointment of Faculty Member

- Promotion of Faculty Members
- Evaluation of Faculty Members
- Retrenchment of Faculty
- Tenure
- Progressive Discipline

---

# History

10/02/92 - Proposal returned to committee of Faculty Senate by College Committee on Policy

11/13/92 - Proposed policy dated 3/13/92, as amended, recommended by College Committee on Policy to the President

04/26/93 - Presidential approval affirmed with publication of the President's Memo

03/20/98 - Revision proposed by Faculty Senate approved by the President of the University as recommended by the Policy Committee of the University

04/29/11 - Revision approved by the President of the University as recommended by the Policy Committee of the University

---

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

---

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU | E-Mail | Tech Help | Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu

EXHIBIT

H



MARYWOOD
UNIVERSITY

OFFICE OF THE PRESIDENT

MARYWOOD UNIVERSITY
SCRANTON, PA 18509-1598
TEL: (570) 348-6231
FAX: (570) 340-6014
EMAIL: ANNEMUNLEY@MARYWOOD.EDU
*www.marywood.edu*

April 3, 2012

Dr. Frederick F. Fagal, Jr.
17 East Lake Street
Skaneateles, NY 13152

Dear Dr. Fagal,

I have received your letter dated March 29, 2012. You chose to file a grievance under the Marywood University Faculty Grievance and Appeals Policy and chose not to convene an ad hoc committee to review my recommendation as I had offered to you on two occasions. The Faculty Grievance Committee reviewed your grievance and found no evidence of improper action on my part which would constitute a legitimate grievance.

Since the grievance process is now complete, I have decided to finalize my recommendation. As a result, your employment with Marywood and your tenure are terminated effective today, April 3, 2012.

Further, to provide you with a review of my decision, I will consider your letter dated March 29, 2012 as your authorization for me to convene two faculty ad hoc committees to appeal my decisions to suspend you and to terminate your employment and tenure. I am doing this despite the fact that on two separate occasions you refused my offer and did not choose to convene an ad hoc committee to review my decision to suspend you and my recommendation to terminate your employment and tenure before I finalized my decision.

According to the terms of the Progressive Discipline Policy, you must now select a tenured faculty member for the ad hoc committee. Please submit the name of your selection to Sr. Gail Cabral, President of the Faculty Senate, as soon as possible.

Sincerely,

*Sister Anne Munley IHM*

Sister Anne Munley, IHM
President

*An education inspired by the Sisters, Servants of the Immaculate Heart of Mary.*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FREDERICK F. FAGAL, JR. : | |
| : | |
| *Plaintiff,* : | |
| : | CIVIL ACTION |
| v. : | |
| : | NO. 3:14-cv-02404-ARC |
| MARYWOOD UNIVERSITY, : | |
| : | ELECTRONICALLY FILED |
| *Defendant.* : | |
| : | |

## <u>CERTIFICATE OF SERVICE</u>

I, Jonathan Z. Cohen, attorney for Plaintiff Frederick F. Fagal, Jr., certify

that the Amended Complaint (Doc. No. 7) has been filed electronically and is

available for viewing and downloading from the ECF system. The following parties

have consented to electronic service:

**Jonathan Zachary Cohen**
jzc@jzc-law.com

**Stephanie Jill Peet**
Stephanie.Peet@jacksonlewis.com,
PhiladelphiaDocketing@JacksonLewis.com, Philadelphia-
Secretaries@jacksonlewis.com

Respectfully,


By: s/ Jonathan Z. Cohen
Jonathan Z. Cohen (PA205941)
175 Strafford Avenue, Suite 1
Wayne, Pennsylvania 19087-3340
(484) 253-1175
(215) 839-8951 (fax)
jzc@jzc-law.com

*Attorney for Plaintiff Frederick F. Fagal, Jr.*

Date: January 15, 2015