**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| FREDERICK F. FAGAL, JR., :<br>:<br>*Plaintiff,* :<br>:<br>v. :<br>:<br>MARYWOOD UNIVERSITY, :<br>:<br>*Defendant.* :<br>: | CIVIL ACTION<br><br>NO. 3:14-cv-02404-ARC<br><br>(JUDGE CAPUTO)<br><br><u>ORAL ARGUMENT REQUESTED</u> |

<u>**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**</u>

JONATHAN Z. COHEN LTD.
Jonathan Z. Cohen, Esq.
175 Strafford Avenue
Suite 1 # 212
Wayne, PA 19087-3340
(215) 874-0047
(215) 839-8951 (fax)
jzc@jzc-law.com

*Attorney for Plaintiff*

Date: December 26, 2016

## **TABLE OF CONTENTS**

I.      INTRODUCTION…………………………………………………..6

II.     PROCEDURAL COUNTER-HISTORY………………………….....6

III.    COUNTER-STATEMENT OF FACTS......…………...........................7

IV.    COUNTER-STATEMENT OF QUESTIONS INVOLVED…………......7

V.     ARGUMENT……………………………………………………….....7

       A.    Legal standard for a motion for summary judgment..................7

       B.    General legal standard for breach of contract...........................8

       C.    Legal standard for a breach of contract action between a
             private university and a professor...............................................9

       D.    Marywood breached its procedures when it
             suspended Plaintiff and terminated his tenure and
             employment..................................................................................10

             1.    Marywood breached its Progressive Discipline
                   Policy...............................................................................10

                   (a)    Marywood failed to provide Plaintiff with any
                          warnings or any opportunity for monitored
                          assistance..............................................................10

                   (b)    Since Plaintiff did not pose an "immediate
                          harm" to himself or to others, Marywood could
                          not suspend him....................................................12

                   (c)    Only the Vice President for Academic
                          Affairs could suspend Plaintiff................................13

(d)   Marywood could not recommend the termination of Plaintiff's employment and tenure in the absence of any efforts at remediation............................................................14

(e)   Marywood breached the contract by failing to convene an ad hoc faculty committee to review Plaintiff's suspension............16

2.   Marywood breached its Civil Rights Complaint Procedures......................................................................17

3.   Marywood retaliated against Plaintiff for filing a grievance.......................................................................18

4.   Marywood did not fulfill its procedural obligations in good faith..................................................................19

E.   Plaintiff did not materially breach the agreement.....................20

F.   Marywood waived any "material breach" by Plaintiff................23

G.   Plaintiff has established resultant damages............................25

VI.   CONCLUSION…………………………………………………………...26

# TABLE OF AUTHORITIES

## Cases

*Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575 (3d Cir. 2009)..........................................................................................9

*Borrell v. Bloomsburg Univ.*, 955 F. Supp. 2d 390 (M.D. Pa. 2013)...........................................................................................8

*Cedrone v. Unity Sav. Ass'n*, 609 F. Supp. 250 (E.D. Pa. 1985)................23

*Emerson Radio Corp. v. Orion Sales, Inc.*, 253 F.3d 159 (3d Cir. 2001)..........................................................................................9

*Fuller Co. v. Brown Minneapolis Tank & Fabricating Co.*, 678 F. Supp. 506 (E.D. Pa. 1987)..........................................................23

*Gillard v. Martin*, 13 A.3d 482, 2010 PA Super 238 (Pa. Super. Ct. 2010)..............................................................................23, 24

*Great Am. Ins. Co. v. Norwin Sch. Dist.*, 544 F.3d 229 (3d Cir. 2008)..........................................................................................9

*Int'l Diamond Importers, Ltd. v. Singularity Clark, L.P.*, 2012 PA Super 71, 40 A.3d 1261 (Pa. Super. Ct. 2012)...........................................21

*Murphy v. Duquesne Univ. Of The Holy Ghost*, 565 Pa. 571, 777 A.2d 418 (Pa. 2001).................................................9, 10, 11

*Norfolk S. Ry., Co. v. Basell USA, Inc.*, No. 05-3419, 2008 WL 3832518 (E.D. Pa. Aug. 15, 2008)..............................................25

*Raddison Design Mgmt., Inc. v. Cummins*, No. 07-92, 2011 WL 818668 (W.D. Pa. Mar. 2, 2011)................................................23

*Shovel Transfer & Storage, Inc. v. Pa. Liquor Control Bd.*, 559 Pa. 56, 739 A.2d 133 (Pa. 1999)....................................................................9

*Tax Matrix Techs., LLC v. Wegmans Food Markets, Inc.*, 154 F. Supp. 3d 157 (E.D. Pa. 2016)..........................................................................9

*Thorsen v. Iron & Glass Bank*, 328 Pa. Super. 135, 476 A.2d 928 (Pa. Super. Ct. 1984)..............................................................................25

*Waggaman v. Villanova Univ.*, No. 04-4447, 2008 WL 4091015 (E.D. Pa. Sept. 4, 2008).............................................................9, 10

*Wolfe v. Allstate Prop. & Cas. Ins. Co.*, 790 F.3d 487 (3d Cir. 2015)...............................................................................................................25

*Wright v. Corning*, 679 F.3d 101 (3d Cir. 2012)............................................8

**Statutes**

42 Pa. Stat. and Cons. Stat. Ann. § 5525....................................................24

**Rules**

Fed. R. Civ. P. 56.........................................................................................7

**Other Authorities**

13 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* (4th ed. 1990)...........................................................................24

## I.   INTRODUCTION

Plaintiff Frederick F. Fagal, Jr. ("Plaintiff" or "Fagal") hereby responds in opposition to Defendant's Marywood University's Motion for Summary Judgment (ECF No. 62). While Marywood prefers to inflame these proceedings with references to Adolf Hitler, the Nazi regime, and genocide, this is actually a simple case of an employer violating its written disciplinary policies. Offering no warning or remediation, Marywood suspended and fired a long-tenured professor for publishing a video satirizing the University administration after it removed posters informing the community about a free-speech event. Now Marywood is attempting to argue that its "Progressive Discipline Policy" was not truly progressive and that the University had no obligation to comply with it anyway. The Court should reject Marywood's excuses and deny its Motion for Summary Judgment.

## II.   PROCEDURAL COUNTER-HISTORY

On January 15, 2015, Plaintiff filed an Amended Complaint. On February 23, 2015, Defendant filed a motion to dismiss under Rule 12(b)(6). The Court denied Defendant's Motion to Dismiss on June 16, 2015. (ECF No. 29; ECF No. 30.) On June 30, 2015, Defendant filed an Answer to Plaintiff's Amended Complaint and Affirmative and Other Claims.

The discovery period closed on September 6, 2016. On November 21,

2016, both parties both filed motions for summary judgment.

## III.   COUNTER-STATEMENT OF FACTS

Plaintiff incorporates his Response to Defendant's Statement of

Material Facts as well as his own Statement of Material Facts in Support of

Motion for Summary Judgment, which is attached as Exhibit 70.[1]

## IV.   COUNTER-STATEMENT OF QUESTION INVOLVED

Is Marywood entitled to summary judgment on any part of Plaintiff's

Amended Complaint? The answer is no.

## V.   ARGUMENT

### A.   Legal standard for a motion for summary judgment

"The court shall grant summary judgment if the movant shows that

there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary

judgment is appropriate when 'the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the

---

[1] All numbered exhibits are attached separately to Plaintiff's Exhibit Set in
Opposition to Defendant's Motion for Summary Judgment.

7

moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012).

### B.   General legal standard for breach of contract

"To state a breach of contract claim under Pennsylvania law, a plaintiff must allege '(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages.'" *Borrell v. Bloomsburg Univ.*, 955 F. Supp. 2d 390, 407 (M.D. Pa. 2013).

The Third Circuit and the Supreme Court of Pennsylvania have summarized the principles of contract interpretation:

> The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties. The intent of the parties to a written agreement is to be regarded as being embodied in the writing itself. The whole instrument must be taken together in arriving at contractual intent. Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed. When a writing is clear and unequivocal, its meaning must be determined by its contents alone.
>
> Only where a contract's language is ambiguous may extrinsic or parol evidence be considered to determine the intent of the parties. A contract contains an ambiguity if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.

*Great Am. Ins. Co. v. Norwin Sch. Dist.*, 544 F.3d 229, 243 (3d Cir. 2008)

(quoting *Murphy v. Duquesne Univ. Of The Holy Ghost*, 565 Pa. 571, 590-

91, 777 A.2d 418, 429-30 (Pa. 2001)).

Ambiguities in a contract are construed against the drafter. *See Tax*

*Matrix Techs., LLC v. Wegmans Food Markets, Inc.*, 154 F. Supp. 3d 157,

177 (E.D. Pa. 2016); *Shovel Transfer & Storage, Inc. v. Pa. Liquor Control*

*Bd.*, 559 Pa. 56, 67, 739 A.2d 133, 139 (Pa. 1999). Even so, when a

contract is ambiguous, the finder of fact must determine its meaning. *See*

*Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 587 (3d Cir. 2009).

A court may grant summary judgment when the contract "is subject to only

one reasonable interpretation." *Emerson Radio Corp. v. Orion Sales, Inc.*,

253 F.3d 159, 164 (3d Cir. 2001).

### C.  Legal standard for a breach of contract action between a private university and a professor

Contracts between professors and private universities are construed

no differently than contracts between other private parties. *See Waggaman*

*v. Villanova Univ.*, No. 04-4447, 2008 WL 4091015, at *20 (E.D. Pa. Sept.

4, 2008)[2]; *Murphy*, 777 A.2d at 428. A professor alleges a breach of

contract by a private university by pleading that the university did not

---

[2] All unpublished cases are attached separately to this brief.

comply with its own procedural rules. *See Waggaman*, 2008 WL 4091015, at *20; *Murphy*, 777 A.2d at 433. A university must follow the procedures detailed in its contract "to the letter" and must fulfill these obligations "with good faith." *See Murphy*, 777 A.2d at 434.

Marywood argues that a university "is entitled to use its discretion in...interpreting its own policies and procedures" and that it is "accorded deference in its...adherence to procedures." Def. Mem. 15, 18. This is incorrect. In *Murphy*, a case involving the termination of a professor by a private university, the Supreme Court of Pennsylvania rejected a deferential standard of review. *See* 777 A.2d at 424, 428-29.

**D.   Marywood breached its procedures when it suspended Plaintiff and terminated his tenure and employment.**

    **1.**   Marywood breached its Progressive Discipline Policy.

        (a)   *Marywood failed to provide Plaintiff with any warnings or any opportunity for monitored assistance.*

Marywood argues that neither progressive discipline nor an opportunity for remediation were required. *See* Def. Mem. 9, 10. Marywood is wrong. As stated in the Progressive Discipline ("PD") Policy, discipline imposed by Marywood is "progressive," "corrective," "gradual," "educational," and "remedial." *See* Ex. 9. After a complaint occurs, the first disciplinary measure is an "oral warning." *See* Ex. 9. Following that is a

"written warning." *See* Ex. 9. And following that is "monitored assistance" or

"special assistance," where "applicable." *See* Ex. 9.

Marywood asserts that progressive discipline was not required or

"appropriate" because Erin Sadlack and Helen Bittel, members of the two

faculty committees involved in this matter, concluded this. *See* Def. Mem. 9

(citing SMF ¶¶ 87, 89, 103, 105). Again, a university is not entitled to

deference in in interpreting its own procedures. *See Murphy*, 777 A.2d at

424, 428-29. Sadlack and Bittel emphasized the following sentence in the

PD Policy:

> Because the University regards disciplinary actions
> as corrective and not punitive, the policy recognizes
> personal and professional problems that may be
> rectified by an informal educational process, <u>as well
> as serious violations of professional responsibilities
> implicating possible recommendation for
> suspension or dismissal</u>.

*See* SMF Ex. O at 40:8-17 (underlined emphasis added); SMF Ex. T at

34:5-14 (same). However, this sentence is still consistent with the

progressive application of warnings or monitored/special assistance for

"serious violations of professional responsibility" (an undefined term).

Before a recommendation for suspension or termination is made, an ad hoc

committee determines whether the problem has been "successfully

resolved" or has "not been corrected and reasons still exists to question the

fitness of the faculty member." *See* Ex. 9 at DEF000251. Thus, the PD

Policy requires that Marywood attempt to correct the problem before

pursuing suspension or termination.

> (b)   *Since Plaintiff did not pose an "immediate harm" to himself or to others, Marywood could not suspend him.*

The PD Policy states that suspension "is justified if <u>immediate harm</u>

to the faculty member or others is <u>threatened</u> by the person's continuance

in the faculty position." Ex. 9 at DEF000249 (emphasis added). The policy

provides no other criteria for determining whether a suspension is

appropriate. *See* Ex. 9. Nor is "immediate harm" defined. *See* Ex. 9. Given

the word "immediate" and the context in which "immediate harm" appears—

the removal of a faculty member from campus—the phrase likely refers

only to <u>physical</u> harm. Any interpretation allowing for emotional,

reputational, or any other subjective form of harm would grant Marywood

virtually limitless discretion to bar a faculty member from campus.

Marywood contends that the PD Policy does not state that a

suspension is "only" justified by a threat of immediate harm. *See* Def. Mem.

9. Still, the wording, structure, and purpose of the policy suggest that

"immediate harm" is the only justification for a suspension. No other

justification is listed. Marywood would have the Court believe that it could

suspend a professor on a whim. Of course, this would strip the PD Policy of any claim to being "progressive."

(c) *Only the Vice President for Academic Affairs could suspend Plaintiff.*

The PD Policy is clear about who is entitled to suspend a faculty member:

> The faculty member may be suspended by the <u>Vice President for Academic Affairs</u> at any time during the proceedings involving him or her.
>
> ....
>
> Having received a written recommendation for either suspension or dismissal from the <u>Vice President for Academic Affairs</u>, the President of the University sends a written communication to the faculty member....

Ex. 9 at DEF000249, DEF000250 (emphasis added).

Still, Marywood argues that the President is entitled to suspend a faculty member since the PD Policy does not use the phrase "only by the Vice President for Academic Affairs" and because the President outranks the VPAA. *See* Def. Mem. 10-11.

Marywood's interpretation is wrong. First, the PD Policy fails to provide explicit suspension authority to the President even though it specifically addresses her role in other aspects of the disciplinary process—sometimes addressing the Vice President for Academic Affairs'

13

("VPAA") role in the same sentence. *See generally* Ex. 9. Clearly the PD Policy is designed to provide the President and VPAA with different authorities in the disciplinary process.

Second, the President does not always outrank the VPAA. The VPAA has final authority in a number of contexts at Marywood. *See* Ex. 21 at DEF3480, DEF3494, DEF3553, DEF3571. Most importantly, he or she is the "chief academic officer with direct responsibility for the proper functioning of the academic programs of the University." Ex. 21 at DEF3480.)

Third, providing the VPAA with the exclusive authority to suspend faculty members would be consistent with his or explicit role in the "written warning" phase of the PD Policy. During that phase, which immediately precedes the suspension phase, the VPAA "shall conduct a preliminary investigation concerning the merits of the complaint." Ex. 9 at DEF000249.

> (d) *Marywood could not recommend the termination of Plaintiff's employment and tenure in the absence of any efforts at remediation.*

The PD Policy states: "If remedial actions(s) taken during the suspension does not sufficiently resolve the issues that lead to the suspension, the university may move towards dismissal of the faculty

member." Ex. 9 at DEF000250. Marywood argues that its policy "did not require remediation prior to termination in every instance." Def. Mem. 9.

Marywood's argument that remediation is optional is inconsistent with the wording and purpose of the PD Policy, and it is unworkable. The PD Policy states:

> If the opinion of the Faculty Committee is that the matter is successfully <u>resolved</u> or that there is no merit to the complaint, a recommendation shall be made to discontinue proceedings. If the problem <u>has not been corrected and reason still exists to question the fitness of the faculty member</u>, the recommendation shall be to either continue a suspension or initiate a formal action toward dismissal.

Ex. 9 at DEF000251. Of course, this passage along with the "Dismissal" section contemplate that Marywood must at least attempt to remediate a problem prior to initiating dismissal.

Marywood's argument also leaves itself, faculty members, faculty committees, and this Court with no criteria by which to determine the procedural propriety of some dismissals. Marywood is essentially arguing that it has the right to dismiss a professor any time that it prognosticates— without attempting remediation at all—that there is no hope for remediation.

15

(e)   *Marywood breached the contract by failing to convene an ad hoc faculty committee to review Plaintiff's suspension.*

The PD Policy states the following about a faculty member's right to appeal a suspension:

> Faculty members have the right to convene an ad hoc committee in order to appeal either a decision to suspend the faculty member or a decision to dismiss the faculty member.
>
> ....
>
> Should a faculty member request that such a committee be convened twice (i.e., once for suspension and once for dismissal), the membership of the committee may be similar or different....

Ex. 9 at DEF000250-DEF000251. Despite Marywood's suggestion that a faculty member does not have the right to convene two committees when his suspension and termination are premised on the same conduct, the terms quoted above could hardly be more clear about the right of a professor to convene an ad hoc committee to review his suspension even when the professor is also subject to termination. The drafters of the PD Policy may have believed that a suspension must be found justified before a termination could be found justified.

(f)   *Marywood improperly terminated Plaintiff's employment before any ad hoc faculty committee recommended doing so.*

The PD Policy states:

> If the opinion of the Faculty Committee is that the matter is successfully resolved or that there is no merit to the complaint, a recommendation shall be made to discontinue proceedings. <u>If the problem has not been corrected and reason still exists to question the fitness of the faculty member, the recommendation shall be to either continue a suspension or initiate a formal action toward dismissal</u>.

Ex. 9 at DEF000251 (emphasis added). There is no dispute that President Anne Munley ("Munley") sent a letter on April 3, 2012 advising Fagal that his "employment with Marywood and your tenure are terminated effective today...." *See* Ex. 15; Ex. 40 at 141:18-142:10, 143:2-5; Ex. 67. This letter was sent before any ad hoc committee convened to review Fagal's discipline (despite his multiple requests beginning in February 2012)—let alone before any committee recommended his termination. *See* SMF ¶¶ 95-100; RSMF ¶¶ 72, 76, 95-100; Ex. 15; Ex. 47 at DEF000194, DEF000196; Ex. 48 at FFF001686-FFF001687; Ex. 57; Ex. 67.

### 2.   Marywood breached its Civil Rights Complaint Procedures.

Plaintiff alleges that Marywood breached its Civil Rights Complaint Procedures ("CRCP") when it charged him with violating the Civil Rights

Policy in the absence of any civil rights complaint. *See* Ex. 4 at ¶¶ 42, 43. Marywood counters that the CRCP states that "[i]n certain serious cases the University administrator may proceed even without a formal complaint." *See* Def. Mem. 13-14.

Marywood is misreading the CRCP. The CRCP states that it "must be followed any time a member of the Marywood University community believes s/he has been the victim of or witness to discrimination, harassment, or assault by any member of the University community on University property or any property controlled by the University." Ex. 21 at DEF3579. The CRCP requires that the complainant "must present the complaint to the appropriate University administrator." Ex. 21 at DEF3579. The complainant may submit a "formal complaint" later. Ex. 21 at DEF3579. While Marywood is correct that "[i]n certain serious cases the University administrator may proceed even without a formal complaint," the process still must begin with a "complaint." *See* Ex. 21 at DEF3579.

**3.** Marywood retaliated against Plaintiff for filing a grievance.

Marywood's Faculty Grievances and Appeals ("FGA") Policy states that "[g]rievants will not be adversely affected for exercising their right to file a grievance, regardless of outcome" and that "[g]rievants will not be subject

to adverse consequences for either initiating a grievance or in presenting evidence on behalf of a grievant." Ex. 10 at DEF000257.

On February 22, 2012, Fagal filed a grievance against Munley under the FGA Policy. *See* SMF ¶ 81; RSMF ¶ 81. On March 26, 2012, the Faculty Grievance Committee ("FGC") rejected Fagal's grievance. *See* SMF ¶ 83; RSMF ¶ 83. On April 3, 2012, eight days after the FGC's decision, Munley terminated Fagal's tenure and employment even though no ad hoc committee ("AHC") had been convened let alone had recommended termination. *See* SMF ¶¶ 95-100; RSMF ¶¶ 72, 76, 95-100; Ex. 15; Ex. 47 at DEF000194, DEF000196; Ex. 48 at FFF001686-FFF001687; Ex. 57; Ex. 67.

Marywood argues that it could not have acted with a retaliatory motive because Fagal's suspension and termination were initiated on January 23 and 24, 2012. *See* Def. Mem. 14. While Marywood is correct about the beginning of the proceedings, the actual date of termination was April 3, 2012. The timing of Munley's letter suggests a retaliatory motive.

> **4.** <u>Marywood did not fulfill its procedural obligations in good faith.</u>

Marywood argues that its review of Fagal's discipline was "honest, meaningful and 'not a sham formality designed to ratify an arbitrary

decision already made'" and that it conducted itself in "good faith." *See* Def. Mem. 17, 18. This is not quite true.

The AHC provided a pre-release draft of its decision to Marywood's attorney "for comment" and received his "input" and "responses" despite having doubts about whether that attorney was an "independent voice" and despite being instructed that it needed to "come to [its] decision independently from the university." *See* Ex. 36 at 32:5-33:16, 46:1-16, 53:13-17; Ex. 58 at DEF001512; Ex. 59 at 28:22-29:7; Ex. 60; Ex. 61; Ex. 63. This was the same attorney whom Fagal's counsel had been corresponding with—in adversarial tones—beginning in February 2012. *See* Ex. 48; Ex. 62; Ex. 72. Before that attorney screened the AHC's decision, he was in regular contact with the AHC. *See* Ex. 36 at 19:3-9, 54:5-56:7; Ex. 59 at 26:8-17 Ex. 61; Ex. 68.

The fact that Marywood allowed its attorney to communicate with the AHC and to shape the AHC's decision strongly suggests that the AHC was not independent.

### E.   Plaintiff did not "materially breach" the agreement.

Marywood suggests that it was entitled to suspend the procedures that it created for the purpose of addressing even "serious violations" of University policy because Fagal's alleged violations were "material

breaches" of University policy. *See* Def. Mem. 19-25. This argument is almost perfectly circular. Assuming that the "material breach" defense is even available under these circumstances, there would be a genuine issue of fact as to "materiality."[3]

Materiality requires a "substantial showing" of several factors, including "the extent to which the injured party will be deprived of the benefit which he reasonably expected," "the extent to which the party failing to perform or to offer to perform will suffer forfeiture" and "the likelihood that the party failing to perform or offer to perform will cure his failure." *Int'l Diamond Importers, Ltd. v. Singularity Clark, L.P.*, 2012 PA Super 71, 40 A.3d 1261, 1271 (Pa. Super. Ct. 2012). The circumstances of this case suggest that Fagal did not materially breach his agreement with Marywood.

Marywood represents in its Faculty Handbook that its professors have the "rights and obligations of other citizens" and reminds them that "[a]s citizens engaged in a profession that depends upon freedom for its health and integrity," they have a "particular obligation to promote conditions of free inquiry...." Ex. 21 at DEF3524. Marywood claims a commitment to a "tradition grounded on...individual rights"—a tradition that

---

[3] Marywood is correct that materiality is generally an issue of fact. *See* Def. Mem. 19-20.

21

"posits...open discussion and unrestricted exchange of ideas." Ex. 21 at DEF3522. Professors "maintain their right to criticize." Ex. 21 at DEF3524. The Faculty Handbook also notes that the "primary" role of the faculty is to teach. *See* Ex. 21 at DEF3560. The University has a liberal disciplinary policy, making even violent acts and threats, theft against the institution, and carrying deadly weapons "subject to University disciplinary policies and procedures" or the PD Policy. *See* Ex. 11; Ex. 12; Ex. 13. The PD Policy contemplates "immediate harm." *See* Ex. 9.

Here, a professor in his 25th year of service to Marywood and his 18th year of tenure was terminated for publishing a video parody of the Marywood administration's reprehensible seizure of approved posters that Fagal had hung to inform the student body of a free speech event. *See* SMF ¶¶ 6, 29, 30, 31, 32, 36, 39; RSMF ¶¶ 6, 29, 30, 31, 32, 36, 39. The video was easily recognizable satire. *See* SMF ¶ 39; RSMF ¶ 39. Apparently no member of the Marywood community filed a civil rights complaint against Fagal. *See* RSMF ¶ 49; Ex. 15. Nor did anybody ask Fagal to remove the video, which he did anyway. *See* Ex. 15; Ex. 69. There is no objective evidence that Marywood's reputation suffered because of Plaintiff's video. There is no allegation that Fagal abandoned his primary role as a teacher or that his teaching skills suffered in any way. Given the

above-listed factors, it is a stretch to argue that Plaintiff's video parody was so substantial a breach as to permit Marywood to bypass its own disciplinary rules.

### F.   <u>Marywood waived any "material breach" by Plaintiff.</u>

A party alleging that it could suspend performance under a contract because another party materially breached that contract cannot then continue performance without waiving the breach. *Cf. Raddison Design Mgmt., Inc. v. Cummins*, No. 07-92, 2011 WL 818668, at *6-7 (W.D. Pa. Mar. 2, 2011); *Fuller Co. v. Brown Minneapolis Tank & Fabricating Co.*, 678 F. Supp. 506, 509 (E.D. Pa. 1987); *Gillard v. Martin*, 2010 PA Super 238,13 A.3d 482, 487-88 (Pa. Super. Ct. 2010). Waiver is generally an issue of fact, but it can be decided as a matter of law "where only one reasonable conclusion can be drawn from the undisputed facts." *See Cedrone v. Unity Sav. Ass'n*, 609 F. Supp. 250, 254 (E.D. Pa. 1985) (citing cases).

Faced with an alleged material breach of contract, a party has only the following options:

> When one party commits a material breach of contract, the other party has a choice between two inconsistent rights—he or she can either elect to allege a total breach, terminate the contract and bring an action, or, instead, elect to keep the contract in force, declare the default only a partial breach, and recover those damages caused by that partial breach—but the nonbreaching party, by

> electing to continue receiving benefits pursuant to
> the agreement, cannot then refuse to perform his or
> her part of the bargain.

*Gillard*, 13 A.3d at 487 (quoting 13 R. Lord, *Williston on Contracts* (4th Ed.

1990), § 39:32, p. 645 (in pertinent part) (footnotes omitted)).

After Marywood's attorney alleged a "material breach" in a letter to

Fagal's attorney, the University did not terminate the contract or bring an

action against Fagal.[4] Instead, it elected to do all of the following:

1. offered to convene the AHC to review Munley's recommendation for Fagal's termination;

2. convened the FGC to adjudicate Fagal's grievance;

3. permitted Fagal to select a faculty member for the AHC;

4. convened the AHC;

5. permitted the AHC to deliberate over the course of several months and to reach a decision;

6. repeatedly referenced the written policies that it is now repudiating as if they remained in force; and

7. continued to pay Fagal through August 2012.

*See* Ex. 4 at ¶¶ 59, 66; Ex. 5 at ¶¶ 59, 66; SMF ¶¶ 71, 75, 77, 81-83, 95-

97, 99, 100; RSMF ¶¶ 71, 75, 77, 81-83, 95-97, 99, 100; Ex. 62; Ex. 67 at

---

[4] Marywood has not filed a counterclaim for breach of contract, and it is too late to do so now. *See* 42 Pa. Stat. and Cons. Stat. Ann. § 5525.

FFF001697; Ex. 71; Ex. 73. These facts strongly support that Marywood

has waived any alleged material breach by Plaintiff.

Marywood cites *Norfolk Southern Railway, Co. v. Basell USA, Inc.*, a

case decided under Delaware law, for the proposition that "a non-breaching

party need not suspend performance of its duties after a breach of contract

and risk exposure to liability should the breach be found to be immaterial."

*See* Def. Mem. 27-28. In fact, *Norfolk Southern* states that the non-

breaching party must take that risk. *See Norfolk S. Ry., Co. v. Basell USA,

Inc.*, No. 05-3419, 2008 WL 3832518, at *6 (E.D. Pa. Aug. 15, 2008).

### G.   Plaintiff has established resultant damages.

Marywood argues that Plaintiff has not shown damages resulting

from its breaches. Even if a plaintiff cannot show actual damages resulting

from a breach, he is entitled to recover nominal damages. *See Wolfe v.

Allstate Prop. & Cas. Ins. Co.*, 790 F.3d 487, 497 (3d Cir. 2015) (citing

*Thorsen v. Iron & Glass Bank*, 328 Pa. Super. 135, 141, 476 A.2d 928, 931

(Pa. Super. Ct. 1984)).

Plaintiff has suffered actual and nominal damages. Before proceeding

to the dismissal stage, the PD Policy required Marywood to: provide Fagal

with at an oral warning; provide him with a written warning; satisfy itself that

Fagal was an "immediate harm"; attempt remediation; and to wait for

remediation to fail. None of those events occurred, and Fagal has lost several years of salary as an inevitable result.

## VI.   <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff Frederick F. Fagal, Jr. respectfully requests that Defendant's Motion for Summary Judgment be denied in its entirety.

Respectfully,


By:   s/ Jonathan Z. Cohen
Jonathan Z. Cohen (PA 205941)
175 Strafford Avenue
Suite 1 # 212
Wayne, PA 19087-3340
(215) 874-0047
(215) 839-8951 (fax)
jzc@jzc-law.com

*Attorney for Plaintiff*

Date: December 26, 2016

## <u>CERTIFICATE REGARDING BRIEF LENGTH</u>

I, Jonathan Z. Cohen, attorney for Plaintiff, certify that the foregoing document contains 5,000 words.

Respectfully,

By:   <u>s/ Jonathan Z. Cohen</u>
Jonathan Z. Cohen (PA 205941)
175 Strafford Avenue
Suite 1 # 212
Wayne, PA 19087-3340
(215) 874-0047
(215) 839-8951 (fax)
jzc@jzc-law.com

*Attorney for Plaintiff*

Date: December 26, 2016

## CERTIFICATE OF SERVICE

I, Jonathan Z. Cohen, attorney for Plaintiff, certify that the foregoing document has been filed electronically and is available for viewing and downloading from the ECF system. The following parties have consented to electronic service:

**Asima J. Ahmad**
asima.ahmad@jacksonlewis.com, Philadelphia-Secretaries@jacksonlewis.com,
PhiladelphiaDocketing@jacksonlewis.com

**Katharine Thomas Batista**
katharine.thomas@jacksonlewis.com, Philadelphia-Secretaries@jacksonlewis.com,
PhiladelphiaDocketing@jacksonlewis.com

**Jonathan Zachary Cohen**
jzc@jzc-law.com

**Stephanie Jill Peet**
Stephanie.Peet@jacksonlewis.com,
PhiladelphiaDocketing@JacksonLewis.com, Philadelphia-Secretaries@jacksonlewis.com

Respectfully,


By:   s/ Jonathan Z. Cohen
      Jonathan Z. Cohen (PA 205941)
      175 Strafford Avenue
      Suite 1 # 212
      Wayne, PA 19087-3340
      (215) 874-0047
      (215) 839-8951 (fax)
      jzc@jzc-law.com

      *Attorney for Plaintiff*

Date: December 26, 2016