2008 WL 3832518
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

NORFOLK SOUTHERN RAILWAY, CO., Plaintiff,
v.
BASELL USA, INC., Defendant.

Civil Action No. 05-3419.
|
Aug. 15, 2008.

**Attorneys and Law Firms**

Paul D. Keenan, Charles L. Howard, James R. Lloyd, Keenan, Cohen & Howard P.C., Jenkintown, PA, for Plaintiff.

Conrad O. Kattner, John P. McShea, McShea, Tecce, P.C., Philadelphia, PA, Nicholas J. Dimichael, Thompson, Hine, LLP, Washington, DC, for Defendant.

*MEMORANDUM AND ORDER*

SCHILLER, District Judge.

**\*1** Plaintiff Norfolk Southern Railway Company ("Norfolk Southern") brings this action against Basell USA, Inc. ("Basell") alleging material breach of contract and repudiation, and seeking restitution. A bench trial was held on April 7, 2008. The Court now enters the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

**I. FINDINGS OF FACT**

Norfolk Southern is an interstate rail carrier that provides transportation services to shippers of freight. (Jt. Pretrial Stipulation § I Agreed Facts [hereinafter Agreed Facts] ¶ 1.) Basell manufactures plastic resin pellets at production facilities in West Lake Charles, Louisiana, ("WLC"), Bayport, Texas and locations in Canada. (*Id.* ¶¶ 3, 8; Apr. 7, 2008 Tr. [hereinafter Tr.] at 243.) Basell purchases transportation services from rail carriers, including Norfolk Southern, in order to transport its product from its facilities to its customers. (Agreed Facts ¶ 3.) Basell and Norfolk Southern entered into a contract whereby Basell agreed to ship a certain percentage of its traffic originating from its WLC facility in exchange for discounted shipping rates from Norfolk Southern. At issue in this case is whether Basell's failure to tender the full percentage of traffic promised to Norfolk Southern constitutes a material breach of the parties' contract, and, if so, whether Norfolk Southern is entitled to restitution as a remedy.

**A. Background**

Because no single rail line spans the entire route, Basell must ship goods from its WLC facility to the east coast by at least two carriers. First, an "Origin Carrier," either Burlington Northern Sante Fe ("BNSF") or Union Pacific Railway ("UP"), transports the freight from WLC, or from a nearby storage yard, to an interchange location. (Agreed Facts ¶ 9; Tr. at 235.) From there, the freight is moved by a carrier that services the eastern sea board, either Norfolk Southern or CSX Transportation Company ("CSX"), to the ultimate destination, which can be one of two types-"rail direct" or "truck transfer." (Agreed Facts ¶ 11.) A "rail direct" destination is one that can be served exclusively by rail; freight delivered to a "truck transfer" destination is initially shipped by railcar, then transferred to a truck for delivery to customers. (Tr. at 5-6.)

Rail direct destinations vary by whether they are "sole-served" or "competitive." (Agreed Facts ¶ 12.) A destination is said to be "sole-served" when it is reached by a line serviced by only one carrier; here, either Norfolk Southern or CSX. (Tr. at 5-6.) In contrast, a destination is "competitive" when it may be reached by service of more than one rail carrier. (*Id.* at 6.) "Truck transfer" destinations are competitive between Norfolk Southern and CSX.

As a common carrier, Norfolk Southern is obligated to move freight for anyone seeking to use its lines. (*Id.* at 135.) In the absence of a contract, Norfolk Southern charges its customers published tariff rates for rail movements. (*Id.* at 135-37.) In general, tariff rates are significantly higher than contract rates. (*Id.* at 137.)

**B. The Marriott Accords**

**\*2** Certain of Basell's WLC traffic was subject to a contract with Norfolk Southern that was scheduled to terminate in January 2002. (*Id.* at 7.) Accordingly, in late 2001, Basell's WLC traffic was up for bid; this included

its rail direct, rail competitive and truck transfer traffic. (*Id.* at 5, 7.) Since Norfolk Southern did not want to lose Basell's business, it began negotiations with Basell for a new contract. (*Id.* at 5-7, 11-12; Pl.'s Ex. 1 (Oct. 10, 2001 E-mail).)

On January 29, 2002, Alan Julian, Joe Osborne, and Don Seale of Norfolk Southern met with Cathy Rosenkranz, Bob Granatelli and Sam Slovak of Basell at the Courtyard Marriott at the Philadelphia Airport in order to finalize negotiations. (Tr. at 18-20; Agreed Facts ¶ 13-15.) Norfolk Southern sought, and ultimately obtained, an agreement securing a large part of Basell's rail direct competitive and truck transfer traffic. (Tr. at 20; Pl.'s Ex. 3 (Jan. 22, 2002 E-mail from Julian) & Ex. 4 (Jan. 28, 2002 E-mail re "Basell Update").) By the end of the meeting, the parties reached agreement on several aspects of the new contract; these agreements came to be known as the "Marriott Accords." (Tr. at 20-21, 150.)

Since BNSF would first move Basell's cargo from WLC to the interchange location, the parties envisioned an "implementing agreement" that was intended to work in conjunction with a master contract between Basell and BNSF. (*Id.* at 21-22, 149; *see also* Pl.'s Ex. 9 (BNSF Master Contract).) Although there is no written contract memorializing the Marriott Accords in full, the main facets of the agreement can be gleaned from the BNSF master contract and a post-Marriott Accords email summarizing the parties' agreement. (*See* Tr. at 21, 150, 200-01, 206; Pl.'s Ex. 8 (E-mail Chain re "Implementing Agreement Summary") & Ex. 51 (Mar. 16, 2006 Slovak Dep.) at 41.) [1]

The parties agreed to a term of five years and four months-from February 1, 2002 through March 31, 2007. (Pl.'s Ex. 8.) Each contract year ran from February 1st of the year in question through January 31st of the following year, with the exception of contract year 2007, which ran from February 1, 2007 through May 31, 2007. (Agreed Facts ¶ 16.) The agreement contained an annual minimum volume commitment-Basell agreed to tender to Norfolk Southern (1) 95% of its cargo originating in WLC to destinations that could be served by Norfolk Southern, including truck transfer movements within a 100 mile radius of a Norfolk Southern terminal, and (2) 95% of its truck transfer movements within a 100 mile radius of a Norfolk Southern terminal. (Tr. at 25-28, 168; Pl.'s Ex. 8 at BAS0003 & Ex. 9 at NS00024-25 & Ex. 51 at 150-53.) Norfolk Southern specifically sought this minimum volume commitment to secure competitive traffic. (Tr. at 28; Pl.'s Ex. 9 at NS00024.)

In exchange for the annual minimum volume commitment, Norfolk Southern agreed to ship Basell's freight from WLC to various destinations, whether sole-served rail direct, competitive rail direct, or truck transfer, at rates below the published tariff rate. (Tr. at 29-34, 38; Pl.'s Ex. 8 at BAS-0003-0004.) Norfolk Southern would charge Basell "point-to-point rates"-set rates for shipment to destinations where Basell had customers at the time the contract was negotiated. (Tr. at 31-35, 40, 202-04; *see* Pl.'s Ex. 13 (Rate Matrix) & Ex. 14 (Rate Matrix); Def.'s Ex. 16 (BNSF Offer No. 4) & Ex. 22 (Email Accepting Offer No. 4).) If Basell acquired a customer at a new destination during the course of the contract who could be serviced by Norfolk Southern, Basell could request a rate for shipping to that new destination. (Tr. at 28, 34, 76-77; Pl.'s Ex. 8 & Ex. 9 at NS00026.) Movements to that destination would then be priced at a "scale rate" below the tariff rate to be determined according to a "Discounted Private Through Rate Scale." (Tr. at 28-31, 270; Pl.'s Ex. 8 at BAS0004 & Ex. 9 at NS00026 & Ex. 10 (E-mails Regarding New Rate).) Although Basell was not obligated to ask for a rate to new destinations, traffic moving to any new destinations from WLC that could be serviced by Norfolk Southern would be part of the universe of traffic from which the minimum volume commitment was derived (thus, it was in Basell's best interest to request a new rate so as to avoid being charged the tariff rate). [2] In addition to the reduced rates, Norfolk Southern agreed to absorb certain truck transfer-related charges. (Tr. at 38; Pl.'s Ex. 8 at BAS0002-3).)

**\*3** Throughout negotiations, Norfolk Southern was clearly driven by its desire to capture the majority of Basell's rail direct competitive and truck transfer movements. (Tr. at 11, 17, 133-34; Pl.'s Ex. 1 & Ex. 4.) The minimum volume commitment secured this benefit. Norfolk Southern would not have agreed to reduced shipping rates for all moves, including sole-served moves, if Basell had not agreed to the minimum volume commitment. (Tr. at 49-50, 76, 138-39.) Without the minimum volume commitment, Norfolk Southern would not have contracted with Basell, and would have instead charged Basell tariff rates for sole-served or any other moves. (*Id.* at 75-76.)

### C. Basell contracts with CSX

In late 2004, Basell was undergoing changes in its Origin Carrier at its Bayport, Texas facility and its Canadian facilities. (*Id.* at 282-83.) In January 2005, Basell sought to put its "Gulf Coast traffic" and its Canadian traffic up for bid. (*Id.* at 42-43, 243-44; Pl.'s Ex. 21 (Jan. 7, 2005 Email re Bayport-WLC Destinations for CSX).) The "Gulf Coast Traffic" included traffic originating at Basell's Bayport facility and its WLC facility. (Tr. at 42-43, 243-44; Pl.'s Ex. 19 (Jan. 5, 2005 Email re WLC Competitive Desitinations) & Ex. 21.) In January 2005, in response to Basell's request for a bid from Norfolk Southern, Alan Julian of Norfolk Southern told Bob Granatelli of Basell that the WLC traffic was already subject to the Marriott Accords. (Tr. at 42-44.) Granatelli responded that Basell did not consider the traffic to be under contract and that it was putting the traffic up for bid. (*Id.* at 43-45; Def.'s Ex. 56 (Jan 26, 2005 Email from Julian to Granatelli).) Ultimately, Norfolk Southern did not place a bid for the Bayport and Canadian traffic. (Tr. at 47-48, 246-47, 286.)

On January 28, 2005, Basell entered into a contract with CSX, Norfolk Southern's competitor, for Basell's Gulf Coast traffic and Canadian traffic (the "2005 CSX Contract"). (*Id.* at 212, 249-50; Pl's Ex. 31 (2005 CSX Contract) & Ex. 60 (Overbey Dep.) at 9, 24, 91 & Ex. 60a (2005 CSX Contract) at CSXT005518-5522 & Ex. 73 (Apr. 20, 2008 Slovak Dep.) at 26.) The 2005 CSX Contract had a two year term-the first contract year ran from February 1, 2005 through January 31, 2006 and the second contract year ran from February 1, 2006 through January 31, 2007. (Tr. at 250.) Pursuant to this contract, CSX provided discounted rates in exchange for Basell's commitment of 95% of its rail direct shipments from the origins subject to the contract, and 95% of its truck transfer traffic from the those origins within a 75 mile radius of a CSX truck terminal. (*Id.* at 252; Pl.'s Ex. 31 at BAS007056-7057 & Ex. 60 at 13-22.)

Consequently, beginning February 1, 2005, Basell's WLC traffic was subject to both the Mariott Accords and the 2005 CSX Contract. (Tr. at 275, 296; Pl.'s Ex. 60 at 73 & Ex. 73 at 26.) This was because of Basell's choice to include the WLC traffic among the traffic that was up for bid in early 2005 and in the 2005 CSX Contract. Indeed, Basell made a business decision to include the WLC traffic in the 2005 CSX Contract in order to increase its profitability.[3] (Tr. at 296-97.) Since Basell's Bayport facility was much larger than its WLC facility, however, the WLC traffic only comprised a small portion of the total traffic promised to CSX in the 2005 CSX Contract. (*Id.* at 199, 277-78, 288-90.) Accordingly, at the time it entered into the 2005 CSX Contract, Basell believed that it would be able to meet both minimum volume requirements. (*Id.* at 288-90.) Nevertheless, at the start of the 2005 contract year, Basell began diverting traffic it had already promised to Norfolk Southern, to CSX.

**\*4** Just days after Basell entered into the 2005 CSX Contract, Granatelli indicated to Julian that Basell would use tariff rates for destinations solely served by Norfolk Southern, and that "Basell will move [other] rail shipments to the carrier who has offered [Basell] bids on movements from all Basell Gulf Coast Facilities." (Pl.'s Ex. 33 (Feb. 1, 2005 Email String).) Without explicitly saying Basell was breaching the Marriott Accords or that it wanted out of the contract, Granatelli's email suggests that as of February 1, 2005, Basell essentially sought to proceed as if there were no contract in place. Julian's responded that the Marriott Accords were still in effect and that Norfolk Southern was "pursuing all legal means necessary" to enforce them. (*Id.*)

### D. Basell renegotiates with CSX despite failing to meet its minimum volume commitment to Norfolk Southern in 2005

Although it was theoretically possible for Basell to meet its minimum volume commitment to both Norfolk Southern and CSX, Basell was unable to do so in reality. (Pl.'s Ex. 73 at 17-18, 25-26.) Basell met its minimum volume commitment under the Marriot Accords for the 2002, 2003 and 2004 contract years, but failed to satisfy that commitment for the 2005 contract year. (Agreed Facts ¶¶ 17-18 & Pl.'s Ex. 73 at 14, 18, 21-22.) This was a direct result of Basell's having promised the same traffic to both Norfolk Southern and CSX. In contrast, Basell satisfied its minimum volume commitment to CSX for the 2005 contract year. (Tr. at 268.)

In 2007, CSX and Basell renegotiated their contract ("2007 CSX Contract"). (*Id.* at 251-53; Pl.'s Ex. 34 (E-mail Attaching Termination Letter).) The 2007 CSX Contract retained most of the terms of the 2005 CSX Contract, including the minimum volume commitment, but required Basell to pay higher rates for movements; it had a one-year term beginning on February 1, 2007. (*Id.* at 253-55.) There is no evidence that Basell made any effort to remove

Case 3:14-cv-02404-ARC Document 83-1 Filed 12/26/16 Page 4 of 10
Norfolk Southern Ry., Co. v. Basell USA, Inc., Not Reported in F.Supp.2d (2008)
2008 WL 3832518

the WLC traffic from the scope of the minimum volume requirement, even though Basell was aware that it had not been meeting its obligations to Norfolk Southern.

As with the 2005 contract year, Basell failed to meet its minimum volume commitment for the 2006 and 2007 contract years as a result of its obligations to CSX. (*Id.* at 269.) In contrast, Basell met its minimum volume commitment to CSX for the overlapping 2006 and 2007 contract years. (*Id.* at 268-69; Pl.'s Ex. 60 at 16.)

### E. Procedural history

Norfolk Southern filed the instant lawsuit in July 2005 in response to Granatelli's statement that Basell did not consider the WLC traffic to be subject to the Marriott Accords. Norfolk Southern sought declaratory judgment that Basell was obligated to pay tariff rates for all moves that Norfolk Southern made on behalf of Basell from June 2002 forward in light of Basell's apparent position that the parties did not have a contract. Basell counterclaimed for declaratory judgment in its favor, quantum meruit, unfair competition, and tortious interference with existing and prospective contractual relations. Both parties subsequently added a breach of contract claim.

**\*5** Two months before trial, Norfolk Southern first learned of the 2005 CSX Contract during Samuel Slovak's deposition. Norfolk Southern then notified this Court on the eve of trial of a change in its strategy: Norfolk Southern was now asserting that Basell committed a material breach of contract and/or repudiated the parties' contract by entering into the 2005 CSX Contract and failing to meet the Marriott Accords's minimum volume commitment as a result. Since the parties were in agreement that Basell had, in fact, breached the Marriott Accords, this Court ordered cross-motions for summary judgment pertaining to whether the breach was material and whether Basell repudiated the contract; determination of these issues would affect whether Norfolk Southern was entitled to restitution as opposed to lost profits. As part of Basell's argument that its failure to meet the minimum volume commitment was not material, Basell represented to this Court in June 2006 that "[t]here could very well be no shortfall in 2007, since Basell's obligations to [CSX] are currently set to end on January 31, 2007, and Basell may be in a position to tender traffic to Norfolk Southern in full." (Def.'s Mem. of Law in Supp. of Mot. for Summ. J. at 34.) After oral argument on June 16, 2006, this Court concluded that Basell's breach of the Marriott Accords was not material. Nonetheless, because Basell breached the parties' contract, the Court entered summary judgment in favor of Norfolk Southern in the amount of its lost profits. Norfolk Southern appealed, maintaining that the breach was material and that Norfolk Southern was therefore entitled to greater damages.

After oral argument, Basell sought to mitigate the damages to Norfolk Southern by redirecting some of the competitive rail traffic that it had previously diverted to CSX; Basell did not redirect the majority of the truck transfer business that had been diverted. (Tr. 212-14, 258, 262-63; Def.'s Ex. 84 (2006 Shortfall Spreadsheet); Pl .'s Ex. 53 at 124.) In formulating this plan, Basell did not look at its actual shipments to determine how to best cure the shortfall; instead, Basell merely redirected competitive traffic to Norfolk Southern in hopes that the shortfall would be cured. (Tr. at 231-33, 258-63; Def.'s Ex. 84; Pl.'s Ex. 38 (2007 Shortfall Spreadsheet).) However, a review of the records from the 2006 contract year indicates that Basell would have needed to redirect additional truck transfer traffic in order to satisfy the minimum volume commitment for that year. (Tr. at 263-67; Def.'s Ex. 84; Pl.'s Ex. 39 (Demonstrative Exhibit).) Nevertheless, Basell's efforts to meet the minimum volume commitment continued through the end of the contract.

On January 9, 2008 the Third Circuit vacated this Court's summary judgment order and remanded the matter for trial. *Norfolk Southern Ry. Co. v. Basell USA, Inc.,* 512 F.3d 86 (3d Cir.2008). Since the intentions of the parties were instrumental in determining whether Basell's breach was material, the Third Circuit concluded that the issue could not be determined on summary judgment. The Third Circuit also entertained Norfolk Southern's repudiation theory, noting that whether Basell repudiated the Marriott Accords depended on whether it was able to fulfill both of its minimum volume commitments at once. After remand, Norfolk Southern filed a Second Amended Complaint alleging material breach of contract and repudiation, and seeking restitution. Prior to trial, Basell paid Norfolk Southern a total of $398,250.00 in an effort to compensate Norfolk Southern for its lost profits.

### II. CONCLUSIONS OF LAW

**\*6** Based on the above facts, the Court concludes that Basell's failure to meet its minimum volume commitment to Norfolk Southern for the 2005, 2006, and 2007

contract years constitutes a material breach of the Marriott Accords and that Norfolk Southern is entitled to restitution as a remedy. However, Basell's entry into the 2005 CSX Contract does not constitute a repudiation of the Marriott Accords.

### A. Basell's repeated failure to meet its minimum volume commitment to Norfolk Southern constitutes a material breach of the Marriott Accords

The parties' contract is governed by Delaware law. *Norfolk Southern,* 512 F.3d at 91 n. 6; (Agreed Facts ¶ 7.) Delaware applies the *Restatement (Second) of Contracts* to determine whether a breach is material. *BioLife Solutions, Inc. v. Endocare, Inc.,* 838 A.2d 268, 278 (Del.Ch.2003); *Eastern Elec. and Heating Co. v. Pike Creek Professional Ctr.,* 1987 WL 9610, at ----4-5 (Del.Super.Ct. Apr.7, 1987), *aff'd,* 1998 WL 320028 (Del. Apr. 5, 1988). Pursuant to the *Restatement,* five factors guide the materiality analysis:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
>
> (e) the extent to which the behavior of the party failing to perform comports with standards of good faith and fair dealing.

*Restatement (Second) of Contracts* § 241 (1981). The factors must be applied in light of the specific facts of each case; "no single factor is dispositive." *Norfolk Southern,* 512 F.3d at 92. A material breach by one party justifies non-performance by the non-breaching party. In other words, the non-breaching party's obligations terminate after the material breach. *Eastern Elec. and Heating Co.,* 1987 WL 9610, at *4; *Restatement (Second) of Contracts* § 237.

Taking all of the *Restatement* factors into consideration, Norfolk Southern has proven by a preponderance of the evidence that Basell's failure to satisfy the minimum volume commitment for the 2005, 2006 and 2007 contract years constitutes a material breach of the Marriott Accords. The first factor, the extent to which the injured party will be deprived of the benefit which he reasonably expected, weighs heavily in favor of Norfolk Southern. Clearly, Norfolk Southern was deprived of the primary benefit that it bargained for-the high percentage of Basell's competitive traffic, both rail direct and truck transfer, which it reasonably expected to secure with the minimum volume commitment. In contrast, Basell retained the benefit of its bargain-reduced contract rates for moves-to which Norfolk Southern would not have agreed had Basell rejected the terms of the minimum volume commitment. That the minimum volume commitment was comprised of sole-served traffic in addition to competitive traffic, as Basell points out, is besides the point. Norfolk Southern was willing to relinquish the ability to charge Basell tariff rates on sole-served traffic-business that would necessarily go to Norfolk Southern in the absence of a contract-in exchange for a minimum volume requirement that would entitle it to a large share of Basell's competitive traffic coming out of WLC-business that would not go to Norfolk Southern in the absence of a contract. Accordingly, Basell's failure to satisfy the minimum volume commitment by redirecting competitive traffic to CSX deprived Norfolk Southern of the essence of its bargain. *See In re General Datacomm Indus., Inc.,* 407 F.3d 616, 628 (3d Cir.2005) (Pollack, J. concurring) ("[T]he Restatement will deem one party's obligation material where it serves as consideration for the other party's promised performance."). That Norfolk Southern retained all of its sole-served traffic despite Basell's breach only underscores the extent to which Basell retained the benefit of the Marriott Accords while depriving Norfolk Southern of its reciprocal benefit.

*7 The second *Restatement* factor, the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived, is considered "a corollary of the first." *Restatement (Second) of Contracts* § 241 cmt. c. The "[d]ifficulty that [a plaintiff] may have in proving with sufficient certainty the amount of [his] loss will affect the adequacy of compensation." *Id.* This factor weighs in favor of Basell because Norfolk Southern's lost profits can be calculated with reasonable certainty by multiplying the number of

Case 3:14-cv-02404-ARC Document 83-1 Filed 12/26/16 Page 6 of 10
Norfolk Southern Ry., Co. v. Basell USA, Inc., Not Reported in F.Supp.2d (2008)
2008 WL 3832518

railcars comprising the shortfall for the 2005, 2006 and 2007 contract years by the amount of damages per railcar. The parties agree that the Norfolk Southern's damages equate to $1540.00 for each railcar that it should have, but did not, receive pursuant to the Marriott Accords. (Agreed Facts ¶ 20.) According to Basell's records, Basell fell 121 cars short in 2005, 115 cars short in 2006, and 25 cars short in 2007. (Agreed Facts ¶¶ 18-19; Tr. 220-22, 234-35; Pl.'s Ex. 53 (Mar. 26, 2008 Rosenkranz Dep.) at 82-83.) Norfolk Southern's lost profits can therefore be easily calculated as $401,940.00.[4] Accordingly, this factor weighs in favor of Basell.

The third *Restatement* factor, the extent to which the party failing to perform or to offer to perform will suffer forfeiture, weighs in favor of Norfolk Southern. Any forfeiture suffered by Basell results from its conscious choice to promise traffic subject to the Marriott Accords to Norfolk Southern's competitor. Accordingly, Basell cannot complain of a forfeiture "of [its] own making."[5] *Norfolk Southern,* 512 F.3d at 94-95. Likewise, the fourth factor, likelihood of cure, favors Norfolk Southern: now that the contract has run its course, it is clear that Basell did not cure its breach, and that its June 2006 efforts to cure were half-hearted. Basell merely redirected competitive rail traffic to Norfolk Southern, crossed its fingers, and hoped that market conditions would shift such that it could fulfill both minimum volume commitments. If Basell had made a good faith effort to cure, by reviewing its records and monitoring its progress under both the Marriott Accords and the CSX agreements, Basell would have realized the necessity of redirecting additional truck transfer traffic to satisfy the minimum volume commitment. Furthermore, Basell's suggestion to Norfolk Southern and this Court, that Basell might be able to satisfy the minimum volume commitment for the 2007 contract year, was meaningless in light of Basell's choice to renegotiate its contract with CSX. If Basell had honestly sought to cure the injury suffered by Norfolk Southern, it would have terminated its contract with CSX instead.

The final factor, the extent to which the behavior of the breaching party comports with good faith and fair dealing, also favors Nofolk Southern. "[G]ood faith captures the notion that neither party to a contract will subvert the other party's right to receive the intended benefit of the bargain." *Daystar Const. Mgmt., Inc. v. Mitchell,* Civ. A. No. 04-05-175, 2006 WL 2053649, at

*8 (Del.Super.Ct. July 15, 2006). "Similarly, the covenant [of good faith and fair dealing] directs the parties not to facilitate an 'evasion of the spirit of the bargain.' " *Id.* (quoting *Restatement (Second) of Contracts* § 205d (1981)). Here, Basell's intentional subversion of the contract is entirely inconsistent with the standards of good faith and fair dealing. Basell took the competitive traffic which comprised the heart of its bargain with Norfolk Southern and gave it to CSX. Basell could have avoided this problem had it removed the WLC traffic from the set of traffic up for bid in 2004, or specifically from the 2005 CSX contract, but neglected to do so in light of its own bottom line. The real indicia of bad faith here, however, is Basell's decision to enter into the 2007 CSX Contract. Despite the fact that Basell knew of its failure to meet its minimum volume commitment to Norfolk Southern in 2005 as a result of its contradictory obligations, and despite the instant litigation between the parties, Basell renegotiated its contract with CSX. Once it became clear that Basell had stretched itself too thin after entering into the 2005 CSX Contract, Basell could have terminated the 2005 CSX contract after the 2006 year, or it could have renegotiated that contract to exclude the WLC traffic. Nevertheless, Basell shirked the Marriott Accords and renegotiated its contract with CSX for the 2007 year, knowing full well that it would likely fail to meet its minimum volume commitment to Norfolk Southern as a result. By disregarding its contractual obligations to Norfolk Southern, Basell disregarded the standards of good faith and fair dealing.[6] *See Restatement (Second) of Contracts* § 205(d) ("willful rendering of imperfect performance" constitutes bad faith). Since four of the five *Restatement* factors weigh in favor of Norfolk Southern, Basell's breach is clearly material.

*8 Basell asserts that Norfolk Southern has waived its right to claim material breach by continuing to perform under the Marriott Accords. (Def.'s Am. Findings 33-34 ¶¶ 44-49.) "[T]he general rule that one party's uncured, material failure of performance will suspend or discharge the other party's duty to perform does not apply where the latter party, with knowledge of the facts, either performs or indicates a willingness to do so, despite the breach, or insists that the defaulting party continue to render future performance." *DeMarie v. Neff,* Civ. A. No.2077-S, 2005 WL 89403, at *5 (Del.Ch. Jan.12, 2005) (*quoting* WILLISTON ON CONTRACTS § 43:15 (footnotes omitted).) Requiring a plaintiff who sues for material breach to suspend performance in order to

Case 3:14-cv-02404-ARC Document 83-1 Filed 12/26/16 Page 7 of 10
Norfolk Southern Ry., Co. v. Basell USA, Inc, Not Reported in F.Supp.2d (2008)
2008 WL 3832518

succeed on its claim, however, would subject the plaintiff to its own liability or risk of forfeiture of any damages for immaterial breach in order to litigate its claim. *See Commonwealth Const. Co. v. Cornerstone Fellowship Baptist Church, Inc.,* Civ. A. No. 04L-10-101, 2006 WL 2567916, at * 19 (Del.Super.Ct. Aug.31, 2006) (" 'It is established Delaware law that in order to recover damages for a breach of contract, the plaintiff must demonstrate substantial compliance with all of the provisions of the contract.' ") (*quoting Eastern Elec. and Heating Co.,* 1987 WL 9610 at *4); *BioLife Solutions Inc.,* 838 A.2d at 282 (defendant, which claimed that it suspended performance because of plaintiff's material breach, was required to pay damages where court determined that plaintiff's breach was not material); E. ALLEN FARNSWORTH, CONTRACTS § 8:16 (4th ed. 2004) ("If the injured party disrupts performance by suspending in response to [what a court determines to be only] an immaterial breach, that party commits a breach itself."). Here, Norfolk Southern took legal action shortly after Granatelli indicated that Basell was subverting the contract, and was not required to suspend its performance under the contract while it litigated the instant action against Basell. Accordingly, Norfolk Southern has not waived its right to assert that Basell materially breached the Marriott Accords.

Basell chose to lump the WLC traffic in with the other traffic being contracted to CSX. As a result, Basell put itself in a situation in which it might not, and ultimately did not, satisfy its obligations to both carriers at the same time. For the reasons discussed above, Basell's entry into the 2005 CSX Contract and related diversion of traffic to CSX beginning February 1, 2005 constitute a material breach that, for damages purposes, permits Norfolk Southern to treat the Marriott Accords as terminated as of February 1, 2005. *See BioLife Solutions Inc.,* 838 A.2d at 278 ("A party is excused from performance under a contract if the other party is in material breach thereof.").

### B. Basell's contract with CSX does not constitute a repudiation of its contract with Norfolk Southern

*\*9* Norfolk Southern also argues that Basell repudiated the Marriott Accords by entering into the 2005 CSX Contract. " 'A repudiation of a contract is an outright refusal by a party to perform a contract or its conditions.' " *HIFN, Inc. v. Intel Corp.,* 2007 WL 1309376, at * 14 (Del.Ch. May 2, 2007) (*quoting PAMI-LEMB I Inc. v. EMB-NHM, LLC,* 857 A.2d 998, 1014 (Del.Ch.2004)). As with a material breach, repudiation permits the non-repudiating party to terminate the contract. *CitiSteel USA, Inc. v. Connell Ltd. P'ship,* 758 A.2d 928, 931 (Del.Super.2000); *Restatement (Second) of Contracts* § 253. Delaware applies the *Restatement (Second) of Contracts* to determine whether a contracting party has repudiated a contract. *Norfolk Southern,* 512 F.3d at 96; *CitiSteel,* 758 A.2d at 931 n. 7. For present purposes, the *Restatement* defines a repudiation as "a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach." *Restatement (Second) of Contracts* § 250(b). The issue then is whether it "was inevitable, or apparent, from the start" that Basell's voluntary act of entering into the 2005 CSX Contract would render it unable to meet its minimum volume commitment to Norfolk Southern. *Norfolk Southern,* 512 F.3d at 97.

Although Basell's conduct constitutes a material breach of its contract with Norfolk Southern, Basell did not repudiate the Marriott Accords by entering into the 2005 CSX Contract. As Basell's Sam Slovak and Cathy Rosenkranz testified, there was some "wiggle room" in the contracts, in that it was possible to satisfy both at the same time with some effort by Basell and cooperating market conditions. (Tr. at 275, 289-90.) Indeed, the contracts' minimum volume commitments are derived from different, albeit overlapping, sets of traffic. Accordingly, it is not apparent or inevitable that Basell could not have satisfied both of its contractual obligations in the 2005, 2006 and 2007 contract years. That Basell needed to redirect additional traffic to Norfolk Southern in order to meet the minimum volume commitment for those years does not necessarily imply that had Basell done so, it would not also have met its minimum volume commitment to CSX.

Indeed, Basell could have, and should have, handled matters differently: Basell should not have included the WLC traffic in the CSX deal in the first place, Basell could have made more of an effort to satisfy its minimum volume commitment to Norfolk Southern in the wake of the 2005 CSX Contract, and Basell certainly should not have entered into the 2007 CSX Contract. While this conduct is indicative of Basell's bad faith and material breach of the Marriott Accords, it does not constitute a repudiation.

### C. Norfolk Southern is entitled to restitution

Norfolk Southern argues that the proper remedy here is restitution because Basell was unjustly enriched by the discounted rate it received for movements for which it would have paid tariff rates in the absence of a contract. Norfolk Southern asserts that it is entitled to restitution in the amount of $6,810,972-essentially the difference between the tariff rate and the contract rate for all movements Norfolk Southern made on behalf of Basell from February 1, 2005 through May 31, 2007. In the alternative, Norfolk Southern requests restitution only for the sole-served traffic that it moved for Basell during that time period-a total of $2,870,281.00. Basell argues that Norfolk Southern's remedy should be limited to its expectation interest-damages for lost profits (to be determined based on Basell's records)-and that since Basell has paid Norfolk Southern for that shortfall, no additional money is owed.

**\*10** "Historically, damages for breach of contract have been limited to the non-breaching parties' expectation interest." *Pressman,* 670 A.2d at 445 (*citing Restatement (Second) of Contracts* § 347). However, where a breach is material, the injured party may seek restitution as an alternative remedy. *See Mobil Oil Exploration and Producing Southeast Inc. v. United States,* 530 U.S. 604, 629, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000) ("[A]n injured party may seek restitution as an alternative remedy only on a breach by nonperformance that gives rise to a claim for damages for total breach ....") (internal quotations omitted); *Segovia v. Equities First Holdings, LLC,* Civ. A. No. 06-09-149, 2008 WL 2251218, at \*22 (Del.Super.Ct. May 30, 2008) (where a breach is material, "it is appropriate to award breach damages on a restitution ... theory of recovery"); *see also Restatement (Second) of Contracts* § 373. "[T]he purpose [of restitution] is to require the wrongdoer to restore what he has received and thus ... put the injured party in as good a position as that occupied by him before the contract was made." ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS, § 1107 (1993). A party's restitution interest is measured by either "(a) the reasonable value to the [breaching] party of what he received in terms of what it would have cost him to obtain it from a person in the claimant's position, or (b) the extent to which the [breaching] party's property has been increased in value or his other interests advanced." *Restatement (Second) of Contracts* § 371. Recovery under a restitution theory is not limited by the value of the contract. CORBIN, *supra* § 1112.

Since Basell materially breached the Marriott Accords, restitution is an available remedy. The Court concludes that restitution is appropriate here because Norfolk Southern conferred a benefit on Basell-savings in the amount of the difference between the tariff rate and the contract rate for each car moved-and Norfolk Southern is entitled to recoup that benefit. However, Norfolk Southern is only entitled to restitution for sole-served traffic that it moved for Basell during the 2005, 2006 and 2007 contract years. Norfolk Southern is not entitled to restitution for all moves because the purpose of restitution is to put the non-breaching party in as good of a position as it would have been in *ex ante,* i.e., if there were no contract in place. In the absence of a contract, Norfolk Southern would only have been guaranteed Basell's sole-served traffic since Basell would have had no choice but to move this traffic by Norfolk Southern. In contrast, Norfolk Southern was unlikely to have received a majority of Basell's competitive traffic without a contract. Indeed, this is why Norfolk Southern entered into negotiations with Basell in the first place-to secure Basell's competitive traffic that it would not have otherwise acquired. It would be wholly unfair then, to allow Norfolk Southern to recover its discount for competitive traffic under a restitution theory when Basell was only giving competitive traffic to Norfolk Southern *because* of the parties' contract (especially after Basell initiated its effort to cure).

**\*11** Accordingly, Norfolk Southern is entitled to $2,870,281.00 in restitution for the sole-served traffic it moved for Basell since February 1, 2005.[7] Donna Fisher of Norfolk Southern testified at length regarding the calculation of Norfolk Southern's restitution figures, and the Court adopts her analysis.[8] (Tr. at 80-100; Pl .'s Ex. 61 (Tariff Rates) & Ex. 62 (Fuel Surcharge Rates) & Ex. 66 (Spreadsheet of Local Versus Competitive Traffic) & Ex. 67 (Local Traffic Restitution Spreadsheet).) The amount of restitution owed equates to the tariff rate for the cars Norfolk Southern shipped for Basell, plus applicable fuel charges,[9] less the amount Basell has already paid pursuant to the contract, less the car hire payments which Norfolk Southern would have paid Basell for transportation.[10] Norfolk Southern is also entitled to $114,000 .00, for truck terminal charges it absorbed for Basell from February 1, 2005 through May 31, 2007 per the Marriott Accords. (Tr. at 97; Pl.'s Ex. 8 at BAS0003.) Since Basell has made payments to Norfolk Southern for its lost profits in the amount of $398,250.00, this

Norfolk Southern Ry., Co v. Basell USA, Inc., Not Reported in F.Supp.2d (2008)
2008 WL 3832518
Case 3:14-cv-02404-ARC Document 83-1 Filed 12/26/16 Page 9 of 10

amount must be subtracted from the final figure. (Tr. at 165, 220.) Accordingly, Norfolk Southern is entitled to $2,586,031.00 in restitution.

**D. Norfolk Southern is entitled to prejudgment interest**

"In Delaware, prejudgment interest is awarded as a matter of right" in contract cases. *Citadel Holding Corp. v. Roven,* 603 A.2d 818, 826 (Del.1992) (*citing Moskowitz v. Mayor & Council of Wilmington,* 391 A.2d 209 (Del.1978)); *see also Rollins Envt'l Servs., Inc. v. WSMW Indus., Inc.,* 426 A.2d 1363, 1364 (Del.Super.Ct. Dec.31, 1980). Prejudgment interest may be computed from the date of the defendant's breach of contract. *Chaplake Holdings, Ltd. v. Chrysler Corp.,* Civ. A. No. 94-04-164, 2003 WL 22853462, at *4 (Del.Super.Ct. Oct.30, 2003). A plaintiff who recovers restitution from a defendant for a breach of contract, is entitled to prejudgment interest at the "legal rate." *See Segovia,* 2008 WL 2251218, at *23. The "legal rate" of interest in Delaware is 5% over the Federal Reserve discount rate as of the time interest is due. DEL.CODE ANN. TIT. 6, § 2301(a) (2008).

Since Norfolk Southern is entitled to restitution for sole-served movements made for Basell since February 1, 2005, Norfolk Southern is also entitled to prejudgment interest of 8.5 % as of that date. *See* Federal Reserve Historical Discount Rates, http://www.frbdiscountwindow.org/primarysecondary.xls (noting that the Federal Reserve discount rate was 3.5% in February 2005) (last visited July 28, 2008). The interest shall be computed as simple interest.

**III. CONCLUSION**

For the foregoing reasons, judgment is entered in favor of Plaintiff Norfolk Southern and against Defendant Basell in the amount of $2,586,031.00, plus prejudgment interest at the legal rate of 8.5%. An appropriate Order follows.

*ORDER*

**\*12 AND NOW,** this **15th** day of **August, 2008,** upon consideration of the parties' proposed findings of fact and conclusions of law, following a bench trial on the merits, and for the foregoing reasons, it is hereby **ORDERED** that:

1. Judgment is entered in favor of Plaintiff Norfolk Southern and against Defendant Basell in the amount of $2,586,031.00, plus prejudgment interest at the legal rate of 8.5%.

2. The Clerk of Court is directed to close this case.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 3832518

Footnotes

1 At trial, Plaintiff moved for the admission of the 30(b)(6) depositions of Cathy Rosenkranz and Samuel Slovak pursuant to Federal Rule of Civil Procedure 32(a)(3). (Tr. at 192.) Plaintiff also moved for the admission of the deposition of Randy Overbey, a CSX employee, pursuant to Rule 32(a)(4), because he was not available to testify at trial. (*Id.* at 78-79.)

2 The Court rejects Basell's argument that the parties' contract only applied to destinations for which Norfolk Southern established a point-to-point rate in February 2002. (*See* Def.'s Am. Proposed Findings of Fact and Conclusions of Law [hereinafter "Def.'s Am. Findings"] at 23-24 ¶ 16.) If this was the case, there would have been no reason to establish a system for the parties to develop rates to new destinations. Furthermore, during the course of the contract, Basell requested, and Norfolk Southern provided, rates for destinations that were not covered at the onset of the Marriott Accords. (Pl.'s Ex. 10 (May 20, 2002 E-mail requesting new rate).) Clearly then, the parties intended the Marriott Accords, and the minimum volume commitment, to apply to new business arising during the term of the contract that could be handled by Norfolk Southern.

3 Basell's proffered reason for this decision was that it was not operationally feasible to split the truck transfer traffic out of WLC and Bayport between Norfolk Southern and CSX because of scheduling difficulties and increased inventory costs. (Def.'s Am. Findings at 13 ¶ 32; Tr. at 286-88, 291-92, 298; Pl.'s Ex. 51 at 76-80.) However, this does not explain why it was necessary for Basell to include the rail direct traffic in its contract with CSX. Furthermore, all of the shortfall in 2005 was attributable to Norfolk Southern's loss of rail direct traffic. (Tr. at 271-74.) Accordingly, the Court concludes that this explanation is merely an excuse offered by Basell to mask its true reason for including this traffic in the CSX contract-that Basell sought to take advantage of CSX's rates in derogation of its contract with Norfolk Southern.

| | |
|---|---|
| 4 | Norfolk Southern argues that it is difficult to prove its damages because Basell undercounted the cars owed. This argument is based on a spreadsheet produced by CSX, which documents moves made by CSX on behalf of Basell during the relevant time period, some of which arguably could have been moved by Norfolk Southern. (Pl.'s Ex. 37 (CSX Spreadsheet).) However, witnesses for both parties, and even Plaintiff's counsel, acknowledged that whether those destinations could be served by Norfolk Southern was not ascertainable from the spreadsheet. (Tr. at 128, 215-17, 222-224, 306-07.) Although the Court recognizes that some of these movements may have, in fact, been subject to the Marriott Accords, Norfolk Southern has failed to prove that it was entitled to any of these movements because it is not clear from the record which movements made by CSX could have also been handled by Norfolk Southern. Although Norfolk Southern's failure to adduce additional evidence on this point makes the record incomplete, it does not render Norfolk Southern's lost profits unascertainable. |
| 5 | As discussed *infra,* the Court concludes that the proper remedy here is restitution for the sole-served traffic that Norfolk Southern moved for Basell during the course of the contract, i.e., moves for which Basell had no choice but to use Norfolk Southern as the carrier. Accordingly, Basell's forefeiture is wholly unrelated to its efforts to perform under the contract. |
| 6 | Basell argues that its "business decision" to enter into the CSX contract "thereby taking a risk that it might not fully perform its contract with Norfolk [Southern]" was an "efficient breach," and thus, "does not mean that, under Delaware law, the decision was made in bad faith." (Def.'s Am. Findings 27-28 ¶ 27.) "The theory [of efficient breach] holds that properly calculated expectation damages increase economic efficiency by giving the [breaching party] an incentive to break the contract if, but only if, he gains enough from the breach that he can compensate the injured party for his losses and still retain some of the benefits from the breach." *E.I. DuPont de Nemours and Co. v. Pressman,* 679 A.2d 436, 445 (Del.1996) (internal quotations omitted). Delaware courts have used this doctrine to emphasize that in some circumstances, intentional breaches may be legitimate, and in those cases, courts should not authorize extreme remedies such as specific performance or allow punitive damages merely because a breach is intentional. *Id.* at 445-46; *Morabito v. Harris,* Civ. A. No. 1463-K, 2002 WL 550117, at *3 (Del.Ch. Mar.26, 2002). This theory is inapplicable here. If Basell sought to "efficiently breach" the Marriott Accords, it would have disclosed the 2005 CSX Contract to Norfolk Southern, requested termination of the Marriott Accords, and offered to compensate Norfolk Southern for its lost profits. Instead, Basell subverted the parties' contract so it could benefit from both carriers' discounted rates at the same time. The Court will not permit Basell to hide behind the theory of efficient breach as an after the fact justification for its conduct. *Cf. Morabito,* 2002 WL 550117, at *3 (invoking the theory of efficient breach to justify refusal of specific performance where "nothing suggests that the promisor is in breach because of an effort by the promisor to exploit the promisee"). |
| 7 | Notably, this is the outcome envisioned by Granatelli's February 2005 email to Julian. (*See* Pl.'s Ex. 33 at BAS00882.) |
| 8 | Although Basell contests the availability of restitution, Basell does not appear to contest the accuracy of Plaintiff's restitution calculations. Additionally, Norfolk Southern assumed throughout its calculations that the freight moved was less than 200,000 pounds, such that the lowest applicable tariff rate was applied to each movement. (Tr. at 89-90.) |
| 9 | Tariff rates were subject to fuel charges until November 2006. (Tr. at 90, 95; Pl.'s Ex. 62.) |
| 10 | Norfolk Southern shipped Basell's freight in cars owned or leased by Basell. Accordingly, beginning July 1, 2005, Norfolk Southern would have credited Basell for use of those cars, at an average rate of 54.1 cents per mile. (Tr. at 91-92, 96.) |