2008 WL 4091015
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

Beatrice WAGGAMAN, Ph.D., Plaintiff,
v.
VILLANOVA UNIVERSITY, Defendant.

No. Civ. 04-4447.
|
Sept. 4, 2008.

**Attorneys and Law Firms**

Anna M. Durbin, Law Offices of Anna M. Durbin, Ardmore, PA, Alice W. Ballard, Law Office of Alice W. Ballard, PC, Philadelphia, PA, for Plaintiffs.

Hope A. Comisky, Maureen Q. Dwyer, Pepper Hamilton L.L.P., Philadelphia, PA, for Defendants.

OPINION

POLLAK, J.

**\*1** Presently before the court is defendant Villanova University's motion for summary judgment (Docket No. 87). The motion is ripe for disposition.

I. Background

Beatrice Waggaman, a longtime assistant professor of French at Villanova, claims that Villanova, in refusing to promote her to the rank of associate professor in 2002-2003, retaliated against her for serving as a witness for another professor, Shams Inati, in Inati's disability discrimination suit against the university. She brings suit under the Americans with Disabilities Act (ADA), the Rehabilitation Act, the Pennsylvania Human Relations Act (PHRA), and for common-law breach of contract. [1]

According to Villanova's rank and tenure policy document, promotion is based on achievement in three areas: teaching, scholarship, and service to the university (with an admitted emphasis on teaching and scholarship). Def's Ex. F, at 3-6. To be promoted to the rank of associate professor, a faculty member must submit "[c]lear evidence of: (a) teaching and advising effectiveness; (b) continuing quality scholarship, including work other than that contained in one's doctoral dissertation ... (c) effective service to the University, college, department, profession, and, as appropriate, community; and (d) on-going professional development in these areas." *Id.* at 6.

In terms of process, the application for promotion, which includes a dossier of the applicant's scholarly works, teaching reviews, and other materials, is first reviewed by a departmental rank and tenure committee, as well as the department chair. The committee (acting by majority vote) and the chair submit separate recommendations. *Id.* at 9-10. Next, the application is reviewed by a college-level rank and tenure committee consisting of representatives from each of the college's areas of study. The departmental committee and department chair's recommendations are available to the college committee. While the dean of the college attends the college committee meeting, and is available for factual information, he is prohibited from expressing a position on the caudidate. The college committee, by majority vote, decides whether to recommend promotion, and it submits a report explaining its recommendation. The dean then prepares and submits his own recommendation. *Id.* at 11-12. Next, the materials are reviewed by a university-level rank and tenure committee composed of representative from each of the colleges. The university committee votes whether to recommend promotion, and the vice president for academic affairs makes the final decision as to what university-level recommendation will be made to the president. *Id.* at 12-13. The president, who has available to him the recommendations of (1) the departmental committee, (2) the department chair, (3) the college committee, (4) the college dean, and (5) the university committee as conveyed through the vice president for academic affairs, makes the final decision. *Id.* at 1, 13.

**\*2** Waggaman began teaching at Villanova in 1987 and received tenure in 1993. She immediately applied for promotion in 1993-94. She was not recommended for promotion by the departmental committee (vote: 4-5-1), [2] the department chair, the college committee (vote: 0-7), the dean, or the university committee (vote: 0-11). Def.'s Ex. E, Tab 1. Accordingly, the president decided against promotion primarily on the ground that she had not completed sufficient post-dissertation scholarship. *Id.*

After publishing two additional articles, Waggaman applied again in 1997-98. This time, the departmental committee recommended promotion (by a 6-2-1 vote), as did her department chair. Again, however, the college committee (vote: 0-7), dean, and university committee (vote: 0-11) declined to recommend her, and the president concurred in their assessment. As summed up in a letter from John Johannes, Vice President for Academic Affairs, to Waggaman explaining the reasons for the president's decision, it was not thought that the production of two peer-reviewed articles over a ten-year academic career was sufficient to warrant promotion. Def.'s Ex. E, Tab 2.

Waggaman applied again in 2000-01, having published two additional articles. This time, the departmental committee supported the application unanimously. Def.'s Ex. E, Tab 4. The college committee, however, continued, unanimously, not to recommend promotion, and Kail Ellis, dean of the College of Liberal Arts and Sciences, concurred in its assessment. *Id.* The college committee and Ellis both expressed dissatisfaction that her additional articles were short,[3] that there was a publications gap between 1997 and 2000, that Waggaman had not presented a conference paper since 1996, and that one of her external reviewers claimed that her scholarship ignored certain works that the reviewer deemed of particular importance. *Id.* The college committee also noted that her two most recent articles were published in journals not widely available in the United States, which made quality difficult to assess.[4] *Id.* The university committee voted 1-10 to recommend against promotion, based on the same basic reasoning as the college committee and Ellis, and Edmund Dobbin, president of the university, concurred and declined to promote Waggaman. *Id.* Waggaman appealed the decision, submitting a substantial brief that attempted to refute the dean and committees' reasoning. Waggaman Dep., Ex. 10. It was in this submission that she first alleged retaliation on the basis of her protected activity. *Id.* Dobbin allowed an appeal (despite the fact that the policy document does not provide for one), but confined the review to procedural error and delegated the appeal to a three-person committee (essentially following the procedure for appeals of tenure denials). Waggaman Dep., Ex. 11. The committee did not find procedural error, and Dobbin abided by its decision. *Id.*

Waggaman applied for promotion for the fourth time in 2002-03. The 2002-03 application is the only one at issue in this litigation. The vote counts lined up the same way as in 2000-01. Def.'s Ex. E, Tab 6. The college committee voted unanimously against promotion, noting that Waggaman had not produced any additional publications since her prior application. *Id.* She had presented two papers at conferences, which the committee called "quite similar in topic" and which remained unpublished at the time of the review. *Id.* The committee deemed that insufficient research and scholarship for the period and wrote that it "wishe[d] to make clear that at least two more publications in refereed journals [would be] required." *Id.* The dean and university committee (vote: 1-10) concurred in this assessment, as did Dobbin. *Id.* Waggaman again appealed, alleging retaliation. Waggaman Dep., Ex. 23. Dobbin responded to Waggaman, stating that he had "ordered and considered a full review of the concern you have expressed about retaliation," but that he had concluded that it did not occur. Waggaman Dep., Ex. 24. In his deposition, Dobbin testified that the review was conducted by the university's general counsel. Dobbin Dep., at 188. The letter also stated that Dobbin had "considered [Waggaman's] appeal with great care and concern," but decided to abide by his initial decision to not grant promotion. Waggaman Dep., Ex. 24.

**\*3** Waggaman was listed as a witness in Inati's EEOC complaint filed in February 1999. She was deposed in connection with that litigation in May 2001. The content of her deposition does not appear in the record. According to this court's docket sheet, Inati's case was settled before trial and voluntarily dismissed in January 2002.

Inati was deposed in connection with Waggaman's case and testified that Ellis was angry with Inati for suing the university, to the point that she was told by some faculty members that they were afraid to be seen with her lest Ellis find out.[5] Inati Dep., at 83-86. Inati did not, in the excerpts submitted, testify to any action that Ellis took against her or anyone else as a result of his alleged anger.

In exploring her allegations of retaliation, Waggaman deposed some members of the college and university committees, as well as Johannes, Ellis, and Dobbin.[6]

Michael Hones, a member of the college committee, testified that he was unaware at the time of the college committee's decisions that Waggaman was involved with Inati's lawsuit. Hones Dep. 119-20. He further testified that he had never heard Ellis, Johannes,

Dobbin, or anyone else at Villanova discuss Waggaman's participation in that matter. *Id.* In addition, he testified that Ellis did not offer opinions on candidates at college committee meetings. *Id.* at 58-59.

Robert DeFina, a member of the university committee in 2000-01 and 2002-03, testified that he did not know that Waggaman had participated in the Inati suit, nor had he ever heard Ellis, Johannes, or anyone else at Villanova discuss her participation. DeFina Dep., at 148-49.

Similarly, Johannes testified that he was unaware of Waggaman's participation in the Inati matter, and that he did not participate in any discussions about her participation. Johannes Dep., at 119-20. He also testified that the university committee disagrees with the departmental committee on promotion applications about one-fourth of the time.[7] *Id.* at 40.

In the materials submitted. Ellis testified that he could not remember knowing who any of Inati's witnesses were. Ellis Dep., at 83-83, 184. He admitted to spending some time on the Inati litigation as a witness, but he testified that he would have had no reason to know the identity of any other witnesses. *Id.* at 184. Whether Ellis was deposed in the Inati matter is not clear from the record. Ellis further testified that he was unaware of who Inati's friends at Villanova were. *Id.* at 84. In addition, he testified that, while he was present for the college committee meetings in 2000-01 and 2002-03, at which Waggaman's applications were discussed, he did not offer any commentary or recommendation on Waggaman's dossier. *Id.* at 26.

Inati, on the other hand, testified that Ellis would "express really to [her] how he felt about certain candidates, you know, whether he felt positively or negatively ... and [she] certainly got the message, you know, how [Ellis] would like [her] to vote." Inati Dep., at 83. On cross-examination, Inati backtracked a bit, and clarified that she had not meant that Ellis actually told her how to vote, but merely that "[Ellis] definitely made his attitude toward certain people clear and, you know, [Inati] assumed he expected [her] to vote in a certain way." *Id.* at 89. Inati further clarified that she was speaking of candidates for the chairmanship of her department, not candidates for promotion. *Id.* at 89-90. From the excerpt of the deposition submitted by plaintiff, it is not clear under what circumstances Inati would have been voting for candidates. Nothing in the record suggests that she was ever a member of the college or university committees. Inati conceded that she had not heard Ellis talk about how he felt about promotion candidates: "I [Inati] have to give him [Ellis] credit for something with regard to confidential papers of candidates[;] I don't think he would discuss confidential papers, you know, with people. What I was referring to is he may give an idea how he feel abouts [*sic*] the candidate, but he would not, even though I was close to him, he would not come and tell me, you know, this person is not qualified for promotion and, you know, I don't want people to vote for him, no, no, no. He was, you know, he wouldn't do something like that, but I was able to sense how he felt about people .... who, for example, came up for certain elections." *Id.* at 90.

**\*4** Dobbin also testified that he did not know of Waggaman's participation in the Inati matter at the times he made his decisions to not offer her promotion. Dobbin Dep., at 10. As to the 2002-03 promotion decision, this testimony is subject to dispute, since Waggaman's 2001 appeal letter brought Waggaman's participation in the Inati matter to Dobbin's attention. Waggaman Dep., Ex. 10. A reasonable juror could find that Dobbin read the letter, and, in contravention of his testimony, therefore knew of Waggaman's participation by the time he decided not to offer Waggaman promotion in 2003.[8]

Estella Ogden, a member of Waggaman's department and the departmental committee, testified that she "wouldn't disregard" the possibility that Waggaman's denial was retaliatory. Ogden Dep., at 47. She also testified, however, that she had never heard Dobbin talk about Waggaman being a witness for Inati and that, as to retaliation, she "[could not] really elaborate because [she] d[id]n't know." *Id.* She further testified that it was, in her experience as a member of the modern languages department, highly unusual for the college and university committees to disagree with the department's unanimous recommendation on promotion. *Id.* at 48.

Elsayed Omran, an associate professor of Arabic at Villanova, testified that, soon after be was identified as a witness in the Inati matter, three of his courses were cancelled despite the fact that students had registered for them. Omran Dep., at 21. He further testified that other courses with fewer students were not cancelled, and that Ellis refused to reinstate his courses. *Id.*

Waggaman v. Villanova University, Not Reported in F.Supp.2d (2008)
2008 WL 4091015
Case 3:14-cv-02404-ARC Document 83-3 Filed 12/26/16 Page 4 of 19

III. Discussion
Under Fed.R.Civ.P. 56(c), summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."

Retaliation claims under the PHRA, ADA, and Rehabilitation Act are evaluated using the familiar *McDonnell Douglas* framework. *Marra v. Phila. Housing Auth.,* 497 F.3d 286, 300 (3d Cir.2007); *see also McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The first step of the framework requires that the plaintiff come forward with evidence making out a prima facie case of retaliation. *Id.* The burden then shifts to the employer to come forward with legitimate non-retaliatory reasons for the allegedly retaliatory action. *Id.* Following this, the burden shifts back to the plaintiff to show that the proffered non-retaliatory reasons comprise only a pretext for retaliation. *Id.*

A. Prima facie case
The elements of a prima facie case of retaliation are (1) protected activity by the employee, (2) the employer's adverse employment action against the employee, and (3) a causal link between the employee's protected activity and the employer's adverse action. *Id.* Villanova admits that Waggaman's serving as a plaintiff's witness in the Inati suit was protected activity. It further admits that its refusal to promote Waggaman constituted adverse action. It argues, however, that Waggaman has not produced evidence from which a reasonable juror could infer a causal link between the two events.

*5 The Third Circuit has noted that "a plaintiff may rely on a 'broad array of evidence' to demonstrate a causal link between his protected activity and the adverse action taken against him." *Id.* at 302 (quoting *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 284 (3d Cir.2000)). The causal link may be established when the adverse action followed so closely upon the protected activity that the temporal proximity of the two is " 'unusually suggestive.' " *Id.* (quoting *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1302 (3d Cir.1997)). Failing that, the link may be established by a pattern of antagonism in the intervening period, by evidence of retaliatory animus, by the employer's failure to give consistent or credible reasons for the adverse action, or by the employer's treatment of other employees. *Id.*

1. Employer's knowledge
Villanova raises the threshold argument that plaintiff has not produced evidence from which a reasonable juror could infer that the relevant decision makers knew of plaintiff's protected activity at the time they made their decisions. This is relevant because a retaliation plaintiff cannot establish causation without, at the least, evidence from which the decision maker's knowledge of the protected activity could be reasonably inferred. *Moore v. City of Phila.,* 461 F.3d 331, 351 (3d Cir.2006) (requiring that a retaliation plaintiff prove knowledge of the decision maker in addition to showing temporal proximity); *cf. Ambrose v. Twp. of Robinson,* 303 F.3d 488, 494 (3d Cir.2002) (rejecting the proposition that, in a First Amendment-based retaliation case, temporal proximity alone could establish causation without additional evidence of the employer's knowledge of the protected activity).

Here, Dobbin, as president of the university, was the final decision maker. Though he testified to not knowing of Waggaman's protected activity in his deposition, it appears that Waggaman alerted him to it in her 2001 letter to him appealing his decision not to offer her a promotion that year. From that letter, a reasonable juror could infer, notwithstanding Dobbin's testimony, that he was aware of her participation in the Inati suit as of the summer of 2001 (and was thus aware of it when he decided to deny her 2002-03 application for promotion).[9] There is, however, no evidence that he was aware of Waggaman's protected activity any earlier than her 2001 letter.

At his deposition, Dobbin testified that he shared Waggaman's 2001 appeal with Dr. Johannes. Pl.'s Ex. 5, at 128. Thus, there is record evidence that Dr. Jobannes also knew of Waggaman's participation in the Inati matter at the time of the 2002-03 promotion decision.

There is no evidence on record that any of the other decision makers were aware of the protected activity at the time of their participation in the 2002-03 promotion decision. In particular, the court notes that there is no evidence that Ellis, the person around whom plaintiff's allegations seem to center, knew about plaintiff's participation in the Inati matter. Though Ellis testified

Case 3:14-cv-02404-ARC Document 83-3 Filed 12/26/16 Page 5 of 19
Waggaman v. Villanova University, Not Reported in F.Supp.2d (2008)
2008 WL 4091015

that he was consulted by counsel for Villanova in the Inati matter, he also testified that he did not know-and had no reason to know-who Inati's witnesses were. Ellis further admitted that he spent "a lot of time" on the Inati matter, but he pointed to giving a deposition as an example of spending a lot of time, so it is unclear how much time he meant, and plaintiff's counsel did not pursue the question. *See* Def.'s Ex. I, at 184. While it may be possible in some instances to infer from a person's position or involvement in his employer's legal actions that he knew the identity of an adverse witness in another case, on this record, Ellis's involvement with the Inati matter-and with Villanova's lawsuits generally-is too underdeveloped to allow for any inference that Ellis must have known of Waggaman's involvement in the Inati matter. It is of course possible-as it is always possible-that Ellis's testimony on this point was not accurate, but, because the record does not contain "sufficient grounds for impeachment that would place the facts to which he testifie[d] in legitimate dispute," *El v. SEPTA,* 479 F.3d 232, 237 (3d Cir.2007), Ellis's testimony on this point cannot be controverted. [10]

**\*6** While Waggaman's failure to prove that most of the decision makers had any knowledge of her protected activity does not prevent the analysis from continuing, the lack of knowledge on the part of these decision makers is, as discussed *infra,* relevant in considering what inferences a reasonable juror could draw from Waggaman's evidence.

Because there is record evidence-albeit disputed-that Dobbin, the final decision maker, and Johannes were aware of Waggaman's protected activity, this threshold portion of the causation prong is satisfied.

2. Temporal proximity

To raise a genuine issue of fact as to whether the adverse action and the protected activity were causally related, the employee must produce evidence pointing toward such a link. The Third Circuit has held that the temporal proximity between the protected activity and the adverse action, when "unusually suggestive," can be sufficient. *Doe v. C.A.R.S. Protection Plus, Inc.,* 527 F.3d 358, 369 (3d Cir.2008); *Fasold v. Justice,* 409 F.3d 178, 189-90 (3d Cir.2005). Here, however, the 2002-03 promotion denial was not particularly close in time to Waggaman's participation in the Inati lawsuit. The final event in the Inati matter in which Waggaman was involved was Waggaman's deposition in May 2001. The first adverse action against her in the 2002-03 application process was the college committee's vote, which appears to have occurred on January 24, 2003. Def.'s Ex. E, Tab 6. This is twenty months after the deposition. Moreover, the college committee's recommendation cannot be attributed to retaliatory animus, as there is no evidence that any member of the committee knew of Waggaman's protected activity. Dobbin, the only person whose knowledge is provable on this record, did not act until May 2003, twenty-four months after Waggaman's deposition. [11] *Id.* Thus, while the lack of temporal proximity is not fatal to Waggaman's claim, it is not sufficient, in and of itself, to satisfy the causation prong of Waggaman's prima facie case. [12]

3. Pattern of antagonism

One way a retaliation plaintiff can prove causation despite a lack of temporal proximity is by coming forward with evidence of a pattern of the employer acting antagonistically toward her. *Marra,* 497 F.3d at 302. Here, Waggaman argues that the record reveals a pattern of antagonism consisting primarily of the 2000-01 denial and the administration's discouraging Waggaman from reapplying in 2001-02. In other words, she argues that, from the time of her protected activity, Villanova has been determined not to promote her, and the 2002-03 denial was merely the last in a series of manifestations of Villanova's retaliation-based antagonism.

The problem with this logic is that there is no record evidence that anyone involved in the 2000-01 denial, save Dobbin and Johannes (and they only by way of Waggaman's appeal) knew of Waggaman's protected activity. Thus, while the 2000-01 denial may have been antagonistic, in the sense that the decision was not in Waggaman's favor, it cannot be connected with her protected activity, and thus cannot serve as part of the basis for inferring a causal link.

**\*7** Waggaman's allegation that she was discouraged from applying for promotion in 2001-02 has a slightly different problem. The e-mail in which the administration allegedly discouraged her was sent by Johannes, and copied to Ellis. Waggaman Dep., Ex. 29. While there is evidence that Johannes knew of Waggaman's protected activity, it would take a substantial amount of creativity to view his e-mail to Waggaman as antagonistic. Waggaman

notified Johannes of her intent to seek promotion on October 31, 2001, four full months after that year's deadline for giving notice had passed. primarily on the basis of a forthcoming conference presentation that Waggaman intended, in time, to convert into a peer-reviewed publication. Waggaman Dep., Ex. 28. In response, Johannes asked Waggaman for two additional pieces of information: (1) some assurance that her dossier would include something new (rather than merely promises of future developments), and (2) assurance that the department could evaluate her dossier in a timely fashion (as two departmental deadlines had also already passed). Waggaman Dep., Ex. 29. In light of the tardiness of Waggaman's notice, viewing Johannes's responses as antagonistic for purposes of proving retaliation would stretch the imagination too far. [13]

In support of her reading of Jobannes's e-mail, plaintiff contends that another Villanova professor, Dr. A, [14] was permitted to reapply the year after being denied promotion. But plaintiff does not contend, and does not identify evidence showing, that this professor applied late. Moreover, though plaintiff correctly observes that one of Dr. A's external reviewers did not submit his letter until December 9, 2001, after the college committee had already met, *see* Redacted File for Dr. A, at 01189, plaintiff negleets to note a key difference between her application and Dr. A's: as explained at greater length *infra,* Dr. A had, in 2000-01, obtained the support of the college committee. Her procurement of additional material supporting the scholarly quality of her work in 2001-02 was geared entirely toward convincing the university committee, the only body that voted against her in 2000-01. Thus, it was of no moment that she was unable to procure one piece of that additional supportive material until after the college committee met, but before the university committee met. Plaintiff, however, needed to convince both the college and university committees that promotion should be granted, so, for her, ensuring sufficient time for a proper review at both levels was of more import, and thus of legitimate concern to Johannes.

Plaintiff also argues that Dr. A's application contained nothing new except that a book accepted for publication at the time of her 2000-01 application had actually been published at the time of the 2001-02 application. A fair reading of the record reveals, however, that the primary difference in Dr. A's two applications was that, in her 2001-02 application, Dr. A submitted materials clarifying the scholarly quality and import of her book, *see, e.g., id.* at 01189, 01201-02, something the university committee had doubted in 2000-01. In other words, Dr. A's situation was a bit different, insofar as her goal in submitting a 2001-02 application was not primarily to augment her scholarly record, but to clarify the quality of that record in response to the university committee's concerns. Plaintiff, however, in seeking to re-apply in 2001-02 did not represent that she wanted to try to clarify the quality of her record; rather, in her letter to Johannes, she stated that her goal was to show that she had augmented her record with a conference presentation. Waggaman Dep., Ex. 28. Johannes's e-mail queried whether she really had substantial new material responsive to the college and university committee's comments, and whether there was sufficient time for any new material to be adequately reviewed. These concerns make sense in light of plaintiff's situation, but would have made less sense with regard to Dr. A's situation. Given the dissimilarity of the situations of Dr. A and plaintiff, a reasonably jury could not use Dr. A's situation to conclude that Johannes acted antagonistically toward plaintiff.

4. Inconsistent or noncredible [15] reasoning

**\*8** An aggrieved employee can also establish a causal link by coming forward with evidence that the employer offered inconsistent or noncredible reasons for the adverse action. *Marra,* 497 F.3d at 302. It is not enough for the employee to proffer evidence allowing a reasonable juror to *disagree* with the employer's reasoning; rather, the employee must come forward with evidence from which a reasonable juror could *disbelieve* the employer's proffered reason. *See Combs v. Plantation Patterns,* 106 F.3d 1519, 1543 (11th Cir.1997).

Waggaman argues that Ellis committed several errors in his 2000-01 report that he repeated in his 2002-03 report despite the fact that Waggaman's 2000-01 appeal pointed out those errors. This, according to Waggaman, raises a fair inference that Ellis's reasoning is not credible. The alleged errors are: (1) Ellis's statement that Waggaman's dossier should contain more recent peer reviews of her teaching, (2) Ellis's characterization of her articles published in 2000 as 11-12 pages long when, according to Waggaman, one was 18 pages long, (3) Ellis's acceptance of an outside reviewer's criticism as to the currency of Waggaman's scholarship, (4) the "moving target" nature of Ellis's scholarship expectations, and (5) Ellis's comment

that Waggaman listed no memberships in professional organizations when, in fact, her dossier did list several memberships.

One problem with plaintiff's use of her 2000-01 appeal to attack Ellis's reasoning is that she has not pointed the court to any evidence that Ellis saw plaintiff's appeal; thus, it is not apparent that he had reason to know of her critique of his reasoning. If the errors consisted solely of faulty representations of Waggaman's dossier, and were obvious and material, then it is possible that they could serve as evidence of noncredible reasoning on Ellis's part, but the court is not persuaded that it should assume that Ellis was or should have been aware of the material in Waggaman's appeal.

As to the comments on teaching and service, it is clear that these observations were immaterial to Ellis's recommendation, and to the ultimate decision. Rather, Ellis's report gave deficiencies in scholarship as the only reasons for his recommendation against promotion. Def.'s Ex. E, Tab 6. Ellis admitted in his deposition that he had overlooked Waggaman's professional-organization memberships. Ellis Dep., at 159.

As to plaintiff's complaint that Ellis misstated the length of her articles, the court is unable to determine the length of the disputed essay for two reasons: (1) because a copy was not submitted to the court, and (2) because Waggaman's 2000-01 dossier and 2002-03 dossier appear to disagree about the essay's length. Plaintiff's 2000-01 dossier lists the article "Les Paysans de Balzac: structures, techniques at strategies d'un recit de querelles" as appearing at pages 1-12 of a "special collection of essays" published by Presses de l'Universite de Reims-Champagne-Ardenne. Waggaman Dep., Ex. 3, at 20. Plaintiff's 2002-03 dossier, however, lists that same essay as appearing at pages 287-304 of *La Querelle: Historie, ethnologie, linguistique, litterature,* a book published by Presses de l'Universite de Reims-Champagne-Ardenne. Waggaman Dep., Ex. 16, at 34. How the article morphed from 12 pages in 2000-01 to 18 pages in 2002-03 is not clear to the court. What is clear is that Ellis's recitation of the article's length was correct per plaintiff's 2000-01 dossier. It should also be noted that the sentence that includes Ellis's recitation of the article's length in his 2002-03 report appears to be an exact cut-and-paste of that very sentence in his 2000-01 report. *Compare* Waggaman Dep., Ex. 7, *with* Waggaman Dep., Ex. 19. From this, a jury could readily conclude that Ellis had not noted the pagination change in the 2002-03 dossier. It would be unreasonable, however, to view this oversight as evidence of some untoward motive. The court can find nothing in Waggaman's 2002-03 dossier, or any other materials from the 2002-03 promotion process, highlighting the pagination change or the length of the article. Thus, ou this record, the only thing Ellis had that would have alerted him to the change in the article's asserted length was the pagination entry in the 2002-03 dossier. Inferring willfulness from Ellis's failure to pick up on such a subtle alteration would stretch the imagination too far. [16]

**\*9** It is true that Ellis, like the college and university committees, appears to have been bothered by a comment from outside reviewer Byron Wells that Waggaman's scholarship failed to grapple with recent notable works in her field. Pl.'s Ex. 9. While Waggaman's appeal explains in great detail why she disagrees with this assessment, and while Waggaman correctly notes that members of the departmental committee apparently were not bothered by Wells's critical comments, the court cannot fault Ellis, or the college or university committees, for being concerned that an external reviewer criticized the quality of plaintiff's work. Indeed, the faculty handbook states that one of the qualifications for promotion to associate professor is "publication in media of quality and significance as judged by the staff member's colleagues *and others in the field."* Waggaman Dep., Ex. 42, at 318 (emphasis added). Plaintiff's argument, however, seems to be that Wells's criticisms were accorded too much weight in light of the fact that those criticisms were not repeated by other reviewers or by members of plaintiff's department. But it is not within the court's or the jury's purview to redetermine how much weight the various proper ingredients into Villanova's decision should have received. Wells, a full professor of Romance languages at a prestigious institution and an apparent expert in plaintiff's field of study, articulated cogent and relevant criticisms of plaintiff's work. Ellis and the college and university committees, not being French scholars, were entitled to take note of his criticisms, and for those criticisms to be ingredients in a decision to not recommend promotion. There is nothing untoward about the various decision makers refusing to discount Wells's criticisms simply because they were not echoed by other reviewers or plaintiff's colleagues. The university may well solicit the views of multiple reviewers on the assumption that they will seize on different aspects of a candidate's work, and

that one reviewer might notice a problem that another does not. That Ellis and others were bothered by Wells's criticism does not give rise to any inference that their reasoning was disingenuous.

Waggaman complains that Ellis set a "moving target" for the amount of scholarly production required. After the 2000-01 denial, Waggaman was advised to resume participation in academic conferences. Def.'s Ex. E, Tab 4. She did so by presenting two papers. Ellis and the college and university committees were not satisfied by this alone, and, in denying promotion in 2002-03, encouraged plaintiff to turn those papers into two additional refereed publications. Def.'s Ex. E, Tab 6. This may not constitute Waggaman's claimed "moving target," though. Close reading of the various reports reveals that, in considering her 2000-01 application, the college committee, Ellis, and the university committee all recommended that Waggaman continue publishing in addition to resuming regular conference participation. Def.'s Ex. E, Tab 4, at 371 (college committee recommending that Waggaman publish in journals accessible to American scholars and expand and strengthen her arguments), *id.* at 373 (Ellis recommendation noting that the college committee would like to see more publications). *id.* at 377 (university committee recommendation noting weaknesses in publication record as well as conference-presentation record). Thus, Waggaman was on notice that she would be expected to continue publishing and resume conference participation. In light of the 2000-01 reports, she can claim no inconsistency in the dean and committees' declining to recommend promotion in 2002-03 given that she had not published anything new.

**\*10** Waggaman has identified several reasons why Ellis's reasoning could be viewed as inconsistent or not credible. On examination, however, it does not appear that any of the problems she identifies are ones that could support a fair inference of causation. At most, she has identified room for reasonable persons to disagree as to Waggaman's qualifications, which is insufficient to defeat a motion for summary judgment.

5. Retaliatory animus

Direct evidence of retaliatory animus can satisfy the causation element of a plaintiff's prima facie case. *Marra,* 497 F.3d at 302. On this record, however, there is no such evidence. It is true that Inati testified that Ellis was upset at *her* for suing the university. Pl.'s Ex. 11, at 83.

But there is no evidence of Ellis acting on his emotions in any manner other than ceasing to be friends with Inati. Cutting off a social friendship because of a disagreement is very different from taking retaliatory action against an employee, and it is not clear that the former would raise a fair inference of the latter. More importantly, however, with no record evidence that Ellis knew of Waggaman's protected activity, his alleged annoyance with Inati cannot be causally connected to any adverse action against Waggaman, the plaintiff in this case.

There is no evidence of record of anyone else connected with the promotion decision being unfavorably disposed toward Waggaman because of her protected activity. Moreover, the only other evidence of retaliatory treatment at Ellis's hands-Omran's complaint about his courses being cancelled-is too undeveloped to be of value. Nothing submitted to the court suggests that Ellis knew of Omran's involvement in the Inati suit, thus precluding a finding that Omran's role there bore some relation to the cancellation of Omran's conrses. In addition, with no evidence on record about the standards or practices associated with course cancellations, it would be difficult to conclude, on the short excerpt submitted, *see* Pl.'s Ex. 13, at 21, that the cancellations were somehow wrongful or retaliatory.

Thus, the court concludes that there is no evidence of retaliatory animus on record that could causally connect Waggaman's protected activity and the decision not to promote her in 2002-03.

6. Differential treatment

Causation may also be established by showing that the employer treated the plaintiff differently from those similarly situated. *Marra,* 497 F.3d at 302. To successfully aver such treatment, a plaintiff must show that her comparators are similar in all relevant respects. *Singh v. Wal-Mart Stores, Inc.,* Civ. A. No. 98-1613, 1999 WL 374184 (E.D.Pa. Jun.10, 1999), *aff'd* 225 F.3d 650 (3d Cir.2000).

At the time of her 2002-03 application, Dr. Waggaman's record stood as follows. She had been at Villanova for fifteen years, and had been tenured for nine. In that time she had published one book based on her dissertation (1992), one book chapter (1999), three to five refereed journal articles (2000, 1997, 1995, 1990, 1987-88),[17]

four refereed conference proceedings (1992, 1988(3)), and eighteen conference presentations (mix of national, regional, and university-level). Waggaman Dep., Ex. 16.

 **\*11**  When comparing Dr. Waggaman's dossier to those of other applicants for promotion, it is to be noted that, at the time of her 2002-03 application, Dr. Waggaman had been on the Villanova faculty substantially longer than the typical applicant for promotion to associate professor.

The closest comparator appears to be Dr. A, [18] a longtime assistant professor of French, who was promoted to associate professor in 2001-2002. Dr. A was hired as an assistant professor in 1981 and tenured in 1987. At the time of her [19] promotion, Dr. A had published one book not based on her dissertation (2002), one book chapter, two refereed articles, one book review, and thirteen conference presentations. *See* Redacted File for Dr. A, at 01147-50.

Dr. A's application was somewhat controversial, at least at the university level. She applied in 2000-01 and received the recommendation of her department, department chair, the college committee, and Ellis (though in somewhat equivocal terms). All acknowledged that Dr. A's scholarly output was small, but believed that her book, a translation of correspondence between two important French writers and philosophers, including a translation of the original French annotations and the addition of some new annotations, was important enough to make up for the gaps in production. *See id.* at 1127, 1129. The university committee, however, declined to recommend promotion by a 2-9 vote, and Dobbin concurred. *Id.* at 1602. The two members who voted in Dr. A's favor commented that her case was not strong-indeed, one wrote that she "minimally meets the criteria for promotion," and the other observed that her "research is not at a superior level." *Id.* Those voting against all commented on Dr. A's lack of scholarship. *Id.*

Dr. A applied for promotion again in 2001-02, primarily on the grounds that her book had actually been published (as opposed to merely being accepted for publication) and that outside reviews of her book had been received. This time, the university committee recommended promotion by a vote of 7-4. *Id.* at 1212. Several members who voted in favor of the application commented that the outside reviews clarified the scholarly character and quality of her book. *Id.* Others opined again that the application was sufficient, but just barely. *Id.* (e.g., "[Dr. A's] case is not a strong one."). The negative voters commented that the book, though scholarly, was not enough to make up for Dr. A's limited scholarly output. *Id.* (e.g., "Although the ... translation is a good piece of scholarship-it's very meager.").

The comparison between plaintiff and Dr. A presents, on the one hand, plaintiff's small but more steady production of short journal articles and conference presentations with Dr. A's production of a substantial work of scholarly translation after several years of less regular scholarly activity. The court cannot regard this comparison as one that gives rise to a fair inference of differential treatment. To do so would be to allow the jury to delve into weighing two different, but not manifestly mismatched, bodies of scholarly work against one another, which is exactly the sort of thing that a jury-sitting as a trier of fact and not as a super-personnel department-may not do. *Cf. Brewer v. Quaker State Oil Ref. Corp.,* 72 F.3d 326, 332 (3d Cir.1995). Dr. A also received her promotion by a very close margin. This does not support an inference that plaintiff, also a marginal candidate, faced differential treatment.

 **\*12** Another comparator is Dr. B, a Spanish scholar who was granted tenure and promotion to associate professor in 1998-99. At the time of her promotion, Dr. B was in her seventh year of teaching (fifth at Villanova), and had published one book based on her dissertation, two refereed journal articles, [20] three invited articles, two edited texts, and seven conference proceedings; in addition, she had made sixteen conference presentations. Plaintiff emphasizes that Dr. B, at the time of her promotion, had only one or two refereed journal articles. But she also had three invited articles, which, it appears, some of the committee members viewed as important signs of scholarly development, [21] had been very active in presenting at conferences, and had already published a book that, according to some reviewers, substantially added to her dissertation. *See* Redacted File for Dr. B., at 2154, 2179, 2181, 2183. Given that Dr. B had only been teaching for seven years at the time of her application-as opposed to Dr. Waggaman's fifteen years at the time of her 2002-03 application-it cannot be said that the university's determination that Dr. B's scholarly production qualified for promotion in any way undermines its determination that Dr. Waggaman's did not. Moreover, it must be noted that the external reviews of Dr. B's scholarship were

effusive in their praise for both the importance of her work and the quantity produced in a relatively short academic career. *Id.* at 2155-58, 2164-68. In sum, the university's treatment of Dr. B's application simply cannot support plaintiff's contention that its reason for not promoting plaintiff was not credible.

Dr. C, a Japanese and Chinese scholar, was promoted from assistant to associate professor in 2003-04. At the time of her application, Dr. C had published one book based on her dissertation, seven refereed journal articles, two refereed conference proceedings, three invited articles, and two abstracts, had submitted two additional articles to peer-reviewed journals, and had presented at twenty-two conferences. Redacted File of Dr. C, at 2208-16. The thrust of plaintiff's argument with regard to Dr. C is that many of Dr. C's articles were published in peer reviewed journals of limited distribution, whereas plaintiff's articles were published in journals of wider distribution. The court does not believe that plaintiff points to territory into which a jury may wander when considering disparate treatment. The "core facts" regarding Dr. C as compared to plaintiff are not in dispute, *cf. Kautz v. Met-Pro Corp.,* 412 F.3d 463, 467 (3d Cir.2005): Dr. C had more publications in peer-reviewed journals in a slightly shorter academic career, more conference presentations, more invited articles, and excellent external reviews of her work (with particular emphasis on the rarity of a scholar capable of reading and intelligently comparing classical Chinese literature to medieval Japanese literature, *see* Redacted File of Dr. C, at 2408, 2413). All that is in dispute is what weight the various decision makers should have given to those core facts, and neither the ADA, the Rehabilitation Act, nor the PHRA, empowers the court or the jury to make that sort of decision.

**\*13** The parties bring up Dr. D, a poet, who was both tenured and promoted to associate professor in 1999. The court does not regard Dr. D as a useful comparator, since her primary output was poetry, *see* Redacted File for Dr. D, at 3935, which neither the court nor the jury is in any position to compare with Dr. Waggaman's analytic scholarship with a view to determining differential treatment.[22]

The court has now reviewed all of the comparators from the classical and modern languages department. Plaintiff points to ten additional comparators outside the department. The court will address those comparators, but, before doing so, it must be noted that comparisons between members of different departments are of diminished value. Comparisons between members of the classical and modern languages department are facilitated by the fact that members of the department, as a general matter, produce the same kinds of scholarship and are bound by a relatively common set of expectations reflected in the departmental guidelines for tenure and promotion.[23] *See* Pl.'s Ex. 7. Comparisons between members of different departments, however, become more problematic because different disciplines engender different types and quantities of scholarship.[24] This is not to say that the comparison is necessarily impossible; it is merely to say, as a preface to considering whether a proffered comparison gives rise to a reasonable inference of differential treatment or disingenuousness on the part of the university, that some allowance must be made for the natural differences in disciplines and the type and amount of scholarship deemed sufficient. In short, there is some sense at the outset that these comparators are less "similarly situated" than the first group.[25]

Plaintiff identified Dr. E, a historian who was tenured in 1999 and promoted to associate professor in 2000-01. At the time of her promotion, Dr. E had published one book based on her dissertation (which was nominated for an award by a national literary organization), three refereed journal articles, two book chapters, and four not-peer-reviewed articles, and had presented at seven conferences. Pl.'s Supp. Exs., at 2467-69. The college committee also noted that one of her most recent conference presentations was the starting point for a new and substantial project. *Id.* at 2508. The department chair noted that she had another article in manuscript form, and that external reviewers had praised it as an original work of scholarship. *Id.* at 2506-07. All told, Dr. E's dossier does not look substantially different from plaintiff's in terms of quantity of scholarship, except that Dr. E's dossier reflects eight years of work, whereas plaintiff's reflects fifteen. But Dr. E's book was nominated for what appears to be a prestigious award. In addition, what apparently made Dr. E's application compelling is not just her current output, but the fact that she had embarked on a focused research program that was expected to yield scholarly dividends for some time. Nothing in the commentary on plaintiff's application-even from those favorable to her-seems to reflect this sort of scholarly focus or expectation for future work. Given these differences, many of which

would seem favorable to Dr. E's application as compared to plaintiff's, the court does not believe that a reasonable jury could draw a fair inference of differential treatment or noncredible reasoning on the part of the university.

**\*14** Dr. F, a theology scholar, was tenured and promoted to associate professor in 1998-99. At the time of her promotion, Dr. F had published one book based on her dissertation, five refereed journal articles (four of which were in press at the time of application), three book chapters, and three refereed conference proceedings, and had presented at thirteen conferences. *Id.* at 3819-20, 3834-36. It is important to note that Dr. F's scholarship, though similar in quantity to plaintiff's, was produced in about half the time. Plaintiff asserts that the three-year gap between Dr. F's 1996 articles and her four 1999 articles was not held against her, but that the gap is explained in the departmental committee report, which states that "articles 'iu press' have, in several cases, been 'in the pipeline' for some time as a result of the slowness with which submissions reach print in some journals." *Id.* at 3865. Put simply, Dr. F's record of publication included an extended dry-spell which was then followed by a publication glut, and this was traceable not to shortcomings on the part of Dr. F but to the quirks of journal publication schedules. Though plaintiff experienced several gaps in scholarship, the court is unable to identify any ensuing glut that would be similarly explainable; more importantly, no explanation seems to appear in plaintiff's dossier.[26] The court sees nothing in the comparison between Dr. F and plaintiff that would raise a fair inference of differential treatment or noncredible reasoning on the part of the university with regard to its assertion that plaintiff's publication record was considered insufficient.

Dr. G, also a theology scholar, was promoted to associate professor in 2000-01. At the time of her promotion, she had one monograph in press, three journal articles (one of which was in press), one book chapter, three refereed conference proceedings, one encyclopedia entry, two invited electronically published studies as part of an ongoing working group, and two long book reviews, and had presented at twelve conferences. *Id.* at 8530-33. Dr. G's scholarship record reflects only five-and-a-half years of post-doctoral work. The department chair attributed the speed with which Dr. G became an important scholar in her filed to the fact that she had many years of professional experience dealing with her subject prior to commencing formal doctoral work. *Id.* at 8562. Indeed, the amount of scholarship produced in a relatively short amount of time was noted by the decision makers at all levels, as were the comments of the external reviewers, which were thought to be markedly effusive. *Id.* at 8557, 8562, 8565, 8567, 8569. As with Dr. F, Dr. G's dossier is broadly comparable with plaintiff's in terms of the quantity of scholarship, but Dr. G's record reflects only five-and-a-half years of work, as compared to plaintiff's fifteen. Thus, nothing in Dr. G's record, as compared with plaintiff's, allows for a fair inference of differential treatment or noncredible reasoning on the part of the university.

**\*15** Dr. H, an English scholar, was promoted to associate professor in 2001-02, after seventeen years of post-doctoral teaching (twelve of them at Villanova). At the time of her promotion, Dr. H had published two books (one of which was in press and supported by a National Endowment for the Humanities grant), five refereed articles, four book chapters, and one refereed conference proceeding, and had made twenty-six conference presentations. *Id.* at 7786-91. Plaintiff notes that the various decision makers did not take issue with the gaps in article publication present in Dr. H's dossier. Dr. H, however, in addition to compiling a journal-article record similar to plaintiff's, published a book unrelated to her dissertation that garnered high praise. *See, e.g., id.* at 7841, 7845. It would seem permissible for the university to determine that Dr. H's work on her book more than made up for any gap in journal-article publications. Thus, in the court's view, a comparison between Dr. H's record and plaintiff's cannot yield any reasonable inference of differential treatment or noncredible reasoning.

Dr. I, an English scholar, was promoted to associate professor in 2001-02, after six years of post-doctoral work. At the time of her promotion, she had published six refereed articles (three of which were in press) and two hook chapters (one of which was in press). *Id.* at 7506-10. In addition, she had made nine conference presentations, and represented that she was four chapters into writing a book. *Id.* She had also submitted an additional article to a peer-reviewed journal. *Id.* The departmental and college committees observed that Dr. I explained persuasively her decision to publish a series of refereed articles before finishing her book, and expressed confidence, based on her record, that her book was indeed well under way and would be finished before long. *Id.* at 7536-38, 7541. Given the quantity of academic work that Dr. I produced in a

relatively short period of time, and the universal praise for its quality, the court does not believe that it would be reasonable, on comparing Dr. I's record to plaintiff's, to draw any inference that the university was disingenuous in its assessment that plaintiff's scholarship record was insufficient to warrant promotion.

Dr. J, a religious education scholar, was promoted in 2001-02 after fourteen-and-a-half years of post-doctoral work. At the time of her promotion she had published her dissertation as a book, five monographs (disseminated by the commissioning organizations, apparently not published in the traditional sense), eight refereed journal articles (with two additional articles drafted and submitted), two book chapters, and three invited articles. *Id.* at 7071-76. She had also made thirteen conference presentations and twenty invited lectures. *Id.* In addition, Dr. I represented that she was three chapters into writing a book. *Id.* Plaintiff faults the college committee for not distinguishing between work completed before and after tenure was granted in 1995. But this criticism seems inaccurate. In fact, the college committee did note a slight gap in publications between 1994 and 1996 (during which tenure was granted), but further observed that the publications picked up again in 1997 and continued to the time of promotion. *Id.* at 7160. In addition, the college committee pointed out that she was working on a hook and that she had made important contributions to the National Conference of Catholic Bishops and to Catholic-Jewish dialog. *Id.* Viewed as a whole, the short gap notwithstanding, the various decision makers believed her record of scholarship sufficient to warrant promotion. In terms of pure quantity, Dr. J appears to have produced more scholarship than plaintiff; moreover, it was noted that Dr. J had established herself as a national authority in the filed of religious education. *Id.* Based on the apparent quantity and quality of Dr. J's scholarly record, the court cannot determine that the comparison between Dr. J's record and plaintiffs gives rise to a fair inference of noncredible reasoning on the part of the university.

 *\*16* Dr. K, a philosophy scholar, presents a record that is difficult to evaluate. At the time of her promotion to associate professor in 2002-03 (concurrent to Dr. K being granted tenure), she had published four refereed journal articles (one of which was in press) and two refereed conference proceedings. *Id.* at 6908-10. She also had two refereed conference proceedings in press, one invited article in press, and one scholarly article in press with a non-peer-reviewed journal. *Id.* She had made fourteen conference presentations and given three invited papers. *Id.* She represented that she was working on a book manuscript and an invited journal article. *Id.* Dr. K's application for promotion was controversial at all levels. In particular, the college committee, though recommending Dr. K for tenure, did not recommend her for promotion. *Id.* at 6954. On the scholarship criteria, the committee voted 3-4 against her. *Id.* The committee noted that she had demonstrated a commitment to scholarly publication but, because of a relatively late start-her first refereed article appeared in 2000, some four years after she arrived at Villanova-was insufficiently developed to warrant promotion. *Id.* Ellis concurred in that assessment, and recommended Dr. K for tenure but not promotion. *Id.* at 6956 & 6958. The university committee, however, voted 6-5 in favor of promotion, and Dobbin accepted its recommendation. *Id.* at 2111. In their comments, committee members appear to have relied on the overwhelmingly positive comments from the external reviewers regarding the quality of Dr. K's scholarship, which was thought to make up for her relative lack of quantity. *Id.* Indeed, according to the departmental committee report, some of the external evaluators expressed interest in having Dr. K in their department. *Id.* at 6945.

What apparently struck those voting in favor of Dr. K's promotion was her ability, once she overcame the doldrums of her first few post-doctoral years, to produce a good amount of very high quality scholarship in a very short period of time. *Id.* at 2111. This apparent burst of scholarly energy seems to have convinced just enough voters that Dr. K had embarked on a program of research that would make her a productive scholar for years to come. Dr. K's wave of productivity also distinguishes her dossier from plaintiff's, which does not seem to reflect the same sort of strong upward trend in scholarly production. Moreover, in terms of pure quantity, after taking into account that Dr. K was only seven years removed from her Ph.D., as compared to fifteen for plaintiff, it does not appear that plaintiff can claim a higher rate of scholarly production than Dr. K. Nothing in the comparison of Dr. K's record, which squeaked through the promotion process, to plaintiff's, which did not, reveals the sort of contradiction, objective weakness, or implausibility on which a jury could rely in finding the university's reasoning with regard to plaintiff not credible.

**\*17** Dr. L, a historian, was granted tenure and promoted to associate professor in 2002-03, after six years of post-doctoral work. At the time of her promotion, Dr. L had published one book based on, but a substantial reworking of an elaboration of, her dissertation as well as two refereed journal articles. *Id.* at 7012-15. One of her articles won an award for being the best article published in the top journal in her filed in 1999. *Id.* She also gave nine conference presentations and seventeen invited lectures. *Id.* Dr. L claimed to be working on two new research projects, each of which she expected to eugender a book and multiple journal articles. *Id.* Plaintiff appears to contend that her level of scholarship clearly exceeded Dr. L's. But Dr. L's scholarship, like Dr. A's, included a book that, though somewhat based on her dissertation, was uniformly thought to be (1) a substantial reworking and expansion of her dissertation, and (2) a particularly notable work. *Id.* at 7048, 7051, 7053. In addition, Dr. L's journal articles were adjudged to be of markedly high quality, with one winning a prestigious award. *Id.* Given Dr. L's conference and invited lecture activity, and given that her book appears to have been a very substantial undertaking, and given that Dr. L's record is based on only six years of work, it is not clear that, even were quantities alone a useful means of comparison, plaintiff's productivity could be considered superior. Moreover, Dr. L's record seems to have been thought to be of markedly high quality, and was accompanied by a program of future research that was thought to be coherent and productive. These factors distinguish Dr. L's record from plaintiffs, and effectively prevent a reasonable jury from drawing a fair inference that the university was disingenuous in its assessment that plaintiff's scholarship record was insufficient for promotion.

Dr. M. an English scholar, was tenured and promoted to assoeiate professor in 2004-05. [27] This decision was somewhat controversial, inasmuch as one member of the departmental committee, a slight 3-4 majority of the college committee, and one member of the university committee opposed tenure and promotion on the ground that Dr. M had not produced sufficient scholarship. *Id.* at 2106, 5665, 5672. At the time of her promotion, Dr. M had one edited manuseript in press, one refereed journal article, two book chapters (one of which was in press), two articles submitted for publication to referred journals, four conference presentations, and eight invited lectures. *Id.* at 5638-42. In addition, she had received a Ford Foundation fellowship to support her research, and represented that she had two major research projects under way. *Id*. Dr. M's edited manuscript was a nineteenth century document that was unpublished and obscure until Dr. M uncovered it in her archival research, recognized its value, and undertook to annotate and publish it. *Id.* at 5662. Most members of Dr. M's department agreed that the process of rediscovering and annotating a previously little known, but ultimately valuable, manuscript is an arduous task involving far more work than the finished product would suggest. *Id.* As to the value of the manuscript itself, one of Dr. M's external reviewers labeled it "one of the most significant finds ... in the last 10 years" in Dr. M's field. *Id.* The departmental committee recognized that Dr. M had not been as prolific in producing scholarship as an ideal candidate might be, but concluded that she had produced a small but significant body of scholarship and was very much on track to continue producing high quality scholarship at an acceptable rate. *Id.* at 5663-64. A slight majority of the college committee, however, took a different view, arguing that her one manuscript was not entirely finished, and that, as a whole, Dr. M's scholarly record did not support tenure/promotion. *Id.* at 5672. Ellis agreed with the departmental committee, arguing that the scholarship produced was of high quality and that Dr. M filled a teaching and service niche that was previously unfilled- and was difficult to fill-at Villanova. *Id.* at 5676-77. Given her distinctly valuable contributions to the university's teaching, and given her small but high-quality body of scholarship, Ellis recommended in favor of tenure and promotion. *Id.*

**\*18** Plaintiff argues that Dr. M is a probative comparator because the quantity of scholarship reflected in Dr. M's dossier is substantially less than that reflected in plaintiff's, thus casting doubt on the university's assertion that plaintiff did not produce enough scholarship for promotion. Plaintiff's argument has two problems.

First, it is not clear to the court that the difference between Dr. M's record and plaintiff's is substantial enough to support a fair inference of noncredible reasoning. To be sure, Dr. M produced only a relatively small body of scholarship in her six post-doctoral years. Dr. M's manuscript, however, was not based on her dissertation (thus, under Villanova's criteria, it carried more weight than plaintiff's book), her participation in conferences and invited lectures seemed to outpace plaintiff's, and her production of book chapters was the same (except that

**Waggaman v. Villanova University, Not Reported in F.Supp.2d (2008)**
2008 WL 4091015
Case 3:14-cv-02404-ARC   Document 83-3   Filed 12/26/16   Page 14 of 19

Dr. M's were produced over the course of six, not fifteen, years). In light of these aspects of scholarly production in which Dr. M seems to compare favorably to plaintiff, the court is not convinced that Dr. M's failure to produce as many refereed journal articles as plaintiff (one in print with two submitted, versus three to five already in print) makes plaintiff's dossier clearly superior.

Second, and perhaps more importantly, the decision makers voting in Dr. M's favor gave plausible justifications for their acceptance of her relatively thin scholarship record. For one, her edited manuscript was thought to be a more substantial contribution than is typically made by a junior faculty member-both in terms of the "finding" of the manuscript and the quality of the annotations. For another, it was noted that she had put forward a continuing research program that was thought to be coherent and substantial, thus demonstrating that her scholarly productivity would continue to improve. For yet another, it was thought that her teaching and service-and particularly her teaching-were so impressive as to balance out her modest but high-quality scholarship and, as a whole, to recommend in favor of tenure and promotion. These are justifications that make sense in light of the university's published criteria, particularly since the university claims to emphasize teaching, Waggaman Dep., Ex. 42, at 10 ("Villanova has traditionally given and continues to give priority to teaching ability."). They also are justifications that, it would seem, were not thought to apply to plaintiff's application.[28] Because any differential between Dr. M and plaintiff, based on their respective scholarly records, is cogently explained by the various decision makers, it would not be reasonable to draw from the comparison any inference of noncredible reasoning on the university's part with regard to its assertion that plaintiff's record was insufficient for promotion.

Dr. N, a historian, was tenured and promoted to associate professor in 2004-05 after six years of post-doctoral work. At the time of her promotion, she had one book in press, two refereed journal articles, two invited biographical entries in press, five conference presentations (all at national or international conferences), and eight invited lectures. Pl.'s Supp. Exs., at 4995-98. In addition, she had received several fellowship and grants to support her work. *Id.* She had also embarked on a detailed new research project; in furtherance of that project, she had secured one grant to aid in funding and had presented preliminary findings at a national conference. *Id.*

**\*19** Plaintiff argues that Dr. N was promoted despite her scholarly record being, at least in terms of quantity, inferior to plaintiff's own. The court cannot agree. The college committee appears to have determined that Dr. N's book, though ostensibly based on her dissertation, was almost entirely new work, and thus, according to Villanova's stated policy, of substantial weight (and, it would seem, of more weight than plaintiff's book, which appears to have been seen as a re-working of her dissertation, but not a nearly new effort). *Id.* at 5039. In terms of refereed journal articles, Dr. N's two in six years would seem to compare favorably to plaintiff's three in fifteen years, and not unfavorably if plaintiff were credited with five. Moreover, in terms of rate of production, Dr. N appears to have been similarly prolific in terms of regular participation in national or international conferences and in giving invited lectures. Dr. N also proved successful in obtaining funding for her research, and had embarked on a detailed new project, which was expected to bear substantial fruit going forward. Given the similarity of plaintiff's and Dr. N's scholarly records, and Dr. N's record of obtaining funding and of beginning work on a new project thought to be of substantial value, any comparison between the treatment of Dr. N and plaintiff cannot give rise to a fair inference that the university was disingenuous in its conclusion that plaintiff's scholarly record was insufficient to warrant promotion.

In sum, though plaintiff has pointed to much evidence in the record perceived by plaintiff as supportive of her claim of a causal link between her promotion denial and her protected activity, on examination the court can find no evidence capable of supporting plaintiff's contention. Starting in 1993, Waggaman began seeking a promotion and failed to achieve her goal multiple times. In each instance, a lack of substantive scholarship in light of her time as a post-doctoral scholar was the stated reason. The record suggests that this same reason, and not invidious motivations, caused the decision makers to reject her bid during the period at issue in this suit. Plaintiff has not advanced sufficient evidence to raise any issue of material fact concerning causation within the first phase of the *McDonnell Douglas* framework. Accordingly, plaintiff's claim must fail and summary judgment is appropriate because there are no outstanding issues of fact and the defendant is entitled to judgment as a matter of law.

### B. Pretext

It is the court's view that plaintiff's case fails at step one of the *McDonnell Douglas* framework because plaintiff cannot point to evidence that her protected activity was the cause of her promotion denial. However, for the sake of completeness, the court finds that even were plaintiff to survive step one, her case would fail at step three.

At the second step of the *McDonnell Douglas* framework, the employer must advance a reason for the adverse action against the aggrieved employee. A defendant meets its burden of rebutting the prima facie case if it articulates any legitimate reason for the adverse employment action. *Krouse v. Am. Sterilizer Co.,* 126 F.3d 494, 500 (3d Cir.1997). This burden is "relatively light." *Id.* Here, Villanova University asserts that the plaintiff was denied a promotion based on "her continued failure to meet the standards for scholarship in the opinions of those who reviewed her application." Def.'s Reply Memo. at 2. This stated reason is legitimate and would meet the burden to rebut even a successful prima facie case.

**\*20** At step three, to avoid summary judgment, a plaintiff must establish by a preponderance of the record evidence that the employer's proffered non-retaliatory reasons are pretextual. To do so, the employee must identify (1) evidence that undermines the credibility of the employer's proffered reasons, or (2) evidence of retaliatory animus. *Keller v. Orix Credit Alliance,* 130 F.3d 1101, 1108-09 (3d Cir.1997) (en banc). Waggaman has averred neither successfully.

Under the first prong, the plaintiff cannot merely assert that the employer's decision was wrong. Instead, the plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reasons that a reasonable jury could find them unworthy of credence and thus suggestive of improper motive. *Id.* As stated in Parts III.A(4), (6) *supra,* Dr. Waggaman's arguments for inconsistency of action by the defendants or differential treatment toward herself fail to reveal inconsistencies or contradictions or to suggest improper motive. She appears to have received a full and thorough process of review during the year in question. The problems she identifies may be subject to policy debate among her colleagues at Villanova, but none of them helps her meet her burden to defeat summary judgment.

Under the second prong, a plaintiff must advance evidence sufficient to permit a reasonable jury to infer that discrimination was more likely than not a motivating or determinative cause of the adverse action. *Id.* at 1111. As stated in Part III.A(5) *supra,* the record here reveals no reliable evidence of discriminatory motive, let alone enough to meet the plaintiff's burden. Mere allegations of improper animus will not suffice.

Thus, plaintiff would not survive the final review under the *McDonnell Douglas* framework, even if she were to establish a viable prima facie case.

### IV. Motion for summary judgment-breach of contract

Dr. Waggaman claims that, in denying her application for promotion, Villanova hreached her employment contract by not fairly considering her application and by failing to evaluate it on the basis of the criteria set forth in the university's Rank and Tenure Policies and Procedures manual. The court disagrees.

Since the defendant does not dispute that provisions of the manual at issue here constitute part of an enforceable contract, the following rules of Pennsylvania law apply to plaintiff's claim of breach. The standard of review for an action for breach of a tenure contract is the same as that applicable to a contract between private parties. *Murphy v. Duquesne Univ.,* 565 Pa. 571, 777 A.2d 418, 429 (Pa.2001). Breach of a tenure contract can consist of failure by the institution to comply with the procedures established, but no action exists to challenge whether a university simply made the wrong decision after following the correct process. *Id.* at 433. The Villanova manual does not guarantee promotion; rather, it guarantees good-faith consideration and particular procedures. The manual emphasizes that acting on a promotion or tenure application is *"inherently a process of judgmnet* that looks prospectively and retrospectively and which evolves over time." Def.'s Ex. F, at 3 (emphasis in original). This stance reflects the established view of courts in the Commonwealth of Pennsylvania concerning such dispntes. *See Murphy,* 777 A.2d at 433 ("All of these decisions involved subjective judgments of a teacher's professional and personal qualities.... The Contract, therefore, gave to the University's process, final authority to make them."); *Baker v. Lafayette College,* 516 Pa. 291, 532 A.2d 399, 403 (Pa.1987) (expressing a similar stance that established process, even if imperfect, governs

promotion decisions and only deviation from established process provides rceourse through the eourts).

**\*21** Concerning breach of contract, Waggaman's claim is two-fold. First, she elaims that retaliatory animus infected the decision, in violation of the contract's provision that the sole criteria are service, teaching, and scholarship. Second, she claims that the university failed to apply standards to her application comparable to those applied to other applications.

As to the retaliation claim, for the same reasons given in the previous section of this opinion, the court concludes that there is not evidence on record from which a reasonable juror could infer that the promotion decision was infected by retaliatory animus. The record suggests that the decision to deny the plaintiff a promotion arose from legitimate reasons spelled out in the contract document. [29]

As to the comparable-standards claim, the court has already explained why the difference in outcome between Dr. Waggaman's application and the applications of her eomparators is within the realm of reasonable academic judgment. The fact that plaintiff is convinced that she was equally or more deserving of promotion than certain of her colleagues who were advanced does not suggest breach via misapplication of established procedures. This court cannot review every decision and factor that entered into a very complex calculus in order to determine if it was correct; it can only determine whether the process followed the steps outlined in the contract and properly relied on by employees. *Murphy,* 777 A.2d at 433. The record suggests that, in Dr. Waggaman's case, the established process was followed and the consideration of her application for promotion was fair.

V. Conclusion

For the reasons stated above, the court will grant Villanova University's motion for summary judgment. A separate order of judgment follows.

ORDER

AND NOW, this 3rd day of September, 2008, for the reasons in the foregoing opinion, it is hereby ORDERED that defendant's motion for summary judgment (Docket No. 87) is GRANTED.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4091015

Footnotes

1   The court previously dismissed a number of counts in the plaintiff's amended complaint of October 12, 2004 because some were time-barred, others offered no valid cause of action for plaintiff, and still others were subsurned into other enumerated claims. *See* Memorandum/Order of September 28, 2005. This opinion addresses all of the remaining claims in this lawsuit.

2   The first number represents the number of votes in favor of promotion; the second number represents the number of votes against; and the third number, if there is one, represents the number of abstentions.

3   Waggaman takes issue with the dean's recitation that the articles were 11-12 pages long, when, according to Waggaman, one was 18 pages. Yet, the dossier submitted in connection with her application for promotion in 2000-01 lists that article as 12 pages. (Waggaman concedes that the other was 11 pages long). As the court does not have the article in question before it, suffice it to say that there is some dispute over the length of the article (though the court notes that it would be more than difficult to infer that Ellis willfully misstated the article's length, when he merely recited the length that Waggaman represented to him via her *curriculum vitae* ).

4   The record reflects that the journals were published in France and Australia. Waggaman expresses some puzzlement at why it would be unsatisfactory for a professor of French to publish in French journals. The committee, however, was referencing a concern of external reviewer Byron Wells, who stated that the journals' unavailability made it difficult to assess how much effect Waggaman's work had on scholarship in the United States. This seems a fair, albeir disputable, point and one that the college committee might legitimately endorse.

5   The court will consider this evidence, though it is hearsay, because it appears to be testimony about the declarants' motives and emotions. *See* Fed.R.Evid. 803(3). Thus, it would likely be admissible at trial, and can be considered on summary judgment.

6     The review of testimony that follows does not purport to cover all of the testimony submitted to the court in connection with these motions. It is merely a summary.

7     Indeed, in the same academic year as the process disputed here, an assistant professor of history, M.S., applied for promotion to associate. After receiving an unanimous vote from her department, M.S. was not recommended by the later committees on grounds that her record of scholarship was too weak to warrant advancement. Def's Ex. E, at 19-20, Tab 8.

8     This is not to say that Dobbin's testimony is necessarily false or without credibility. A reasonable juror could conclude that, though Dobbin had been informed of Waggaman's protected activity in Waggaman's 2001 appeal letter to him, that information had slipped his mind between 2001 and 2003. Thus, it is possible that Dobbin testified accurately that he did not have the retaliation issue in mind when he decided to not promote Wggaman in 2003.

9     *But see supra* note 8.

10     Plaintiff, in trying to elucidate Ellis's involvement with the Inati matter, does not appear to have been impeded by any assertion of the attorney-client privilege by Villanova. If plaintiff's inquiries were impeded, she has not made the court aware of it.

11     As stated earlier, Johannes also may have known about Waggaman's protected activity, but, in this case, he merely conveyed the university committee's recommendation to Dobbin; he did not add any substantive comments of his own, so it does not appear that he played any substantial role in the decision.

12     In the Third Circuit's recent jurisprudence, "unusually suggestive" refers to a very short length of time. *Compare, e.g., C.A.R.S. Protection Plus,* 527 F.3d at 369 (three days is unusually suggestive), *with LeBoon v. Lancaster Jewish Cmty. Ctr.,* 503 F.3d 217, 233 (3d Cir.2007) (three months is not unusually suggestive).

13     The court is aware of its obligation to view the evidence in the light most favorable to plaintiff. Reasonable inference, however, does not convert into an act of antagonism a gentle attempt to garner the information necessary to decide whether accommodating plaintiff's tardiness would be possible or prndent.

14     In the interest of confidentiality, the court will use aliases to identify faculty members who are not parties to this action, and the court will preserve their personnel records under seal. In addition, to further promote confidentiality, the court will use feminine prononns with all comparators, regardless of their actual gender.

15     Though the word "noncredible" is not in wide use, the court views it as preferable to the more common "incredible," because that word has acquired connotations that stray from its straightforward definition, which is simply "not worthy of belief."

16     The court is unclear on whether the article itself was submitted to Ellis, and, if so, in what format (or formats, if the format of the 2000-01 submission varied from the format of the 2002-03 submission). Had plaintiff submitted the article itself as part of the record here, the court could count the pages for itself and determine whether any inference of willfulness could properly arise from Ellis's miscounting, if indeed he did miscount. But no such evidence appears in this record. It is plaintiff's obligation, when opposing summary judgment, to submit to the court evidence showing the existence of a genuine dispute of material fact. Here, given the materials submitted, the court can find no legitimate dispute as to whether Ellis willfully misstated the length of plaintiff's article.

17     The college committee only counted three refereed publications, since two of the articles listed were in the *Journal of Patristic, Medieval, and Renaissance Studies,* a Villanova-based journal published following an annual conference. *See* Waggaman Dep, Ex. 6. The university is entitled to decide what journals are considered of sufficient quality to count as refereed journals. Since Waggaman has not pointed to any cases in which the university has viewed that publication differently, the court cannot consider Villanova's treatment of the journal as probative of noncredible reasoning on its part; rather, it appears to be a permissible exercise of the university's academie judgment.

18     This is, of course, the same Dr. A referenced in Part III.A.4, *supra.*

19     For reasons stated in note 14 *supra,* the court uses feminine pronouns for all comparators.

20     Waggaman takes issue with Dr. B's assertion, in her dossier, that *Allegorica,* a journal of medieval and renaissance studies, is peer reviewed. Dr. B stated that *Allegorica* was the top American journal for medieval and renaissance studies, and that it was blind peer reviewed. *See* Redacted File for Dr. B, at 2152. She further claimed to have submitted with her dossier an explanation from the journal of the its review process. *Id.* Unfortunately, the appendix of Dr. B's dossier was not submitted to the court. Plaintiff, however, at Dr. Hones's deposition, produced an internet printout from the MLA Directory of Periodicals that lists the journal as not peer reviewed. Pl.'s Ex. 6, at 102-03.

> For purposes of this motion, it is enough to note that, at the time of Dr. B's application, no one seems to have disputed her contention that *Allegorica* was a peer-reviewed journal. If indeed it is not peer reviewed, then perhaps this is something the department should have found out-though it should be noted that the department chair claimed to have verified that the journal was peer reviewed. Redacted File for Dr. B, at 2177. At all events, without evidence that

Waggaman v. Villanova University, Not Reported in F.Supp.2d (2008)
Case 3:14-cv-02404-ARC Document 83-3 Filed 12/26/16 Page 18 of 19
2008 WL 4091015

21     anyone purposefully overlooked the nature of the journal, it must he assumed that the various committees in good faith considered the article as though it had been published in a peer reviewed journal.

21     The Department of Classical and Modern Langnages Department's rank and tenure policy states as follows:
> [W]hile we lend to rate peer-reviewed (referred) publications more highly than invited ones, we do not presume to say that invited work is a priori inferior. The invited essay, often allotted to a leading expert in the field, can indeed be a matter of prestige; it represents the favorable judgment of one's colleagues, which is itself a touchstone of scholarly proficiency.

Pl.'s Ex. 7, at 3.

22     It should be mentioned, however, that Dr. D appears to be a poet of some consequence. The college committee called her "a poet of international stature," Redacted File for Dr. D, at 3986; Ellis observed that "[b]ooks and articles have been written *about*" her, *id.* at 3991 (emphasis in original).

23     This is not always the case. For example, Dr. D's primary scholarly output was poetry. As noted in the text, poetry is so unlike the analytic scholarship that has been the mainstay of plaintiff's career that comparing her dossier to Dr. D's in the context of this litigation is not feasible.

24     The court has not been provided with the guidelines on tenure and promotion for any department other than the classical and modern languages department, making comparators from outside that department particularly difficult to evaluate.

25     Villanova has advanced the argument that all of these proffered comparators should be ignored because of their dissimilarity to plaintiff. The court acknowledges that, as a general matter, differential treatment may only be demonstrated through comparisons with persons
> similarly situated with respect to performance, qualifieations and conduct, and that the relevant aspects of [their] employment situation were nearly identical to [the] alleged comparator[s]. Such a showing normally entails establishing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them. In addition, the [p]laintiff must establish that the similarly situated employees were treated more favorably at the time of the alleged discrimination against [her].

*Keri v. Bd. of Tr. of Purdue Univ.,* 428 F.3d 620, 624 (7th Cir.2006) (internal citations and quotation marks omitted, first three sets of brackets in original).

There is considerable weight in the defendant university's argument that, once one leaves the bounds of the same academic department, and further once one strays from decisions made in the 2002-03 academic year, the similarities in terms of standards, expectations, and decision makers becomes too attenuated to he of any use. Ultimately, however, the court is of the view that the comparators should be considered because they, along with plaintiff, were all subject to the promotion criteria set forth in the university faculty handbook, and because, though many of the individual decision makers changed, the presence of Ellis, Johannes, Dobbin, and several members of the college and university committees was constant. These similarities are enough to at least merit an examination of plaintiff's proffered comparators.

26     In her appeal, plaintiff stated that one her articles published in 2000 was ready for publication in 1999, but publication was delayed for reasons beyond her control, *see* Waggaman Dep., Ex. 10, at 9. Even taking this as true, there is a one-article difference between the three-article glut at the end of Dr. F's three-year gap, and the two-article glut at the end of plaintiff's three-year gap.

27     It appears that, by 2004-05, the heretofore separate tenure and promotion processes were formally combined in such a way that each committee member, rather than casting a tenure vote and a promotion vote, cast a single vote for or against tenure and promotion.

28     Plaintiff's external reviewers, though positive in their evaluations, appear not to have claimed that plaintiff had made the kind of name for herself, or that she had produced a work of as much substance, as the Dr. M's reviewers claimed for Dr. M. Plaintiff's dossier does not appear to contain any explanation of her future research plans; it certainly does not contain the sort of detailed explanation of ongoing projects that Dr. M's contains. While plaintiff's teaching reviews were positive, her department does not appear to portray her as the sort of uniquely valuable and highly gifted teacher that the English department judged Dr. M to be.

29     Furthermore, this court already has acknowledged, in its Memorandum/ Order of September 28, 2005, that Pennsylvania courts disallow claims for breach of contract on the basis of discrimination alone because such claims are preempted by statutory claims. *See also Keck v. Commercial Union Ins. Co.,* 785 F.Supp. 1034, 1039 (M.D.Pa.1991).

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.