## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FREDERICK F. FAGAL, JR., | : | |
| | : | |
| *Plaintiff,* | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 3:14-cv-02404-ARC |
| MARYWOOD UNIVERSITY, | : | |
| | : | (JUDGE CAPUTO) |
| *Defendant.* | : | |
| | : | ORAL ARGUMENT REQUESTED |

## PLAINTIFF'S RESPONSE TO STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

JONATHAN Z. COHEN LTD.
Jonathan Z. Cohen, Esq.
175 Strafford Avenue
Suite 1 # 212
Wayne, PA 19087-3340
(215) 874-0047
(215) 839-8951 (fax)
jzc@jzc-law.com

*Attorney for Plaintiff*

Date: December 26, 2016

Plaintiff Frederick F. Fagal, Jr. ("Fagal") hereby responds to Defendant's Statement of "Undisputed" Material Facts in Support of its Motion for Summary Judgment (ECF No. 69). All numbered exhibits cited below are attached separately to Plaintiff's Exhibit Set in Opposition to Defendant's Motion for Summary Judgment.

**1.** Admitted.

**2.** Admitted that President Anne Munley, IHM, Ph.D. ("Munley") testified that "[w]e're a faith-based institution of service, respect, excellence and empowerment."

**3.** Admitted that Marywood offers some students "a welcoming and supporting environment and that its stated mission is to help students, faculty, and the Marywood community "live responsibly in a diverse and interdependent world."

**4.** Admitted that Marywood purports to be guided by Catholic identity, respect, empowerment, service, and excellence; that Marywood has adopted certain "Core Values," including "[r]espect for the value of each human being, for diversity in the context of vibrant community, and for the earth and all creation."

**5.**    Admitted.

**6.**    Admitted.

**7.**    Admitted.

**8.**    Admitted.

**9.**    Denied. Plaintiff and Munley ultimately reported to Marywood's Board of Trustees. *See* Ex. 1; Ex. 2. "The President may not perform, allow, or cause to be performed any act which is unlawful or insufficient to meet commonly accepted business or professional ethics or a 'prudent person' test, in violation of enactments of regulatory bodies, requirements of funding sources, or explicit Board restraints on executive authority." Ex. 2.

**10.**    Denied that faculty members are <u>required</u> to comply with Marywood's Core Values. *See* Def. Ex. C at DEF000224 ("Marywood University's Goals & Objectives"). The remainder is admitted subject to the qualification that alleged violations of Marywood policies be properly adjudicated under the University's disciplinary policies. *See* Ex. 3; Ex. 4 at ¶ 28 (citing internal Ex. E); Ex. 5 at ¶ 28; Def. Ex. A at Ex. E (ECF No. 69-1 at 34-36) and Ex. G (ECF No. 69-1 at 42-43); Def. Ex. D at 298:1-18 (ECF No. 69-1 at 129); Def. Ex. G at DEF000249-DEF000252 (ECF No. 69-2 at

31-34); Def. Ex. R at DEF000297-DEF000298 (ECF No. 69-4 at 24-25); Def. SMF ¶¶ 24, 25.

**11.** Admitted that Marywood's Tenure Policy contains the quoted language.

**12.** Admitted that Marywood's Tenure Policy contains the quoted language.

**13.** Admitted that Marywood's Tenure Policy contains the quoted language. However, in the event that Marywood wishes to terminate a tenured professor because of an alleged disciplinary problem, it must proceed via the Progressive Discipline Policy. *See* Ex. 9; Ex. 10 at DEF000252.

**14.** Admitted.

**15.** Admitted.

**16.** Admitted that the quoted language appears in the handbook. By way of further answer, the handbook states:

> 1. As soon as possible, but not later than 30 working days, except in unusual circumstances, after the alleged incident(s) occurs, the complainant must present the complaint to the appropriate University administrator as listed below:
>
>    ....

4

3.      If the complainant, after an initial meeting with the University administrator, decides to proceed, the complainant submits within 10 working days a formal complaint, preferably in writing, to the appropriate University administrator. The complaint must include detailed factual information concerning   the incident(s), and should include what the victim feels will correct the situation.

In certain serious cases the University administrator may proceed even without a formal complaint.

Def. Ex. F at DEF3579. The handbook still requires the complainant to present a "complaint to the appropriate University administrator." *Id.* The handbook does not state that a University administrator may proceed without even a complainant presenting a complaint to the University administrator.

**17.**   Admitted that the quoted language appears in Marywood's Computer Use Policy.

**18.**   Admitted that the quoted language appears in Marywood's Computer Use Policy.

**19.**   Admitted that the quoted language appears in Marywood's Academic Freedom Policy. That policy also states that the "tradition of

higher learning...posits...unrestricted exchange of ideas as essential to the pursuit of knowledge." Def. Ex. C at DEF000218; Ex. 6 at DEF000218.

**20.**  Admitted that the quoted language appears in Marywood's Academic Freedom Policy. That policy also states that the "tradition of higher learning...posits...open discussion and unrestricted exchange of ideas as essential to the pursuit of knowledge." Def. Ex. 6 at DEF000218; Ex. 6 at DEF000218.

**21.**  Admitted that the quoted language appears in Marywood's Academic Freedom Policy. That policy also states that the "tradition of higher learning...posits...open discussion and unrestricted exchange of ideas as essential to the pursuit of knowledge." Def. Ex. 6 at DEF000218; Ex. 6 at DEF000218.

**22.**  Admitted that the quoted language appears in a statement from the American Association of University Professors ("AAUP"), which is quoted in Marywood's Professional Ethics Policy. *See* Ex. 7; Def. Ex. C at DEF000220-DEF000221. The same passage also states that professors "maintain their right to criticize" and:

> As members of their community, professors have the rights and obligations of other citizens....As citizens engaged in a profession that depends upon freedom for its health and integrity, professors have

> a particular obligation to promote conditions of free
> inquiry and to further public understanding of
> academic freedom.

Ex. 7; Def. Ex. C at DEF000220-DEF000221.

**23.**   Admitted that the quoted language appears in Marywood's "Goals and Objectives" document. Denied that a "goal" or an "objective" is contractually binding. By way of further answer, the same "Goals and Objectives" document states that faculty "will serve as advocates for justice in their personal and professional lives." Ex. 8 at DEF000225; Def. Ex. C at DEF000225.

**24.**   Admitted that the quoted language appears in Marywood's Progressive Discipline Policy.

**25.**   Denied that Marywood's Progressive Discipline Policy referred to a "conditional conference." Ex. 9 at DEF000249; Def. Ex. G at DEF000249. Denied that Marywood's Progressive Discipline Policy referred to "immediate harm to the faculty member of others." Ex. 9 at DEF000249; Def. Ex. G at DEF000249. Admitted that the remaining quoted text appeared in the Progressive Discipline Policy that was approved on October 12, 2011. *See* Ex. 9; Def. Ex. G at DEF000249-DEF000251. Denied that the quoted text comprises the entirety of the Progressive

Discipline Policy that was approved on October 12, 2011. *See* Ex. 9; Def.

Ex. G at DEF000249-DEF000251. The present-day Progressive Discipline

Policy, which came into effect after Fagal's termination, is somewhat

different. *See* Ex. 14.

26.    Denied that Marywood's Faculty Grievances and Appeals policy

states that the Faculty Grievance Committee will hear grievances

concerning only the four specific topics listed. *See* Ex. 10; Ex. G at

DEF000252-DEF000255. The remainder is admitted.

27.    To the extent that Marywood asserts that the "Ad Hoc Hearing

Committee" referenced in the Faculty Grievances and Appeals Policy is the

same as the "Ad Hoc Faculty Committee" discussed in the Progressive

Discipline Policy, that is denied. *See* Ex. 9; Ex. 10. The remainder is

admitted.

28.    Denied that Plaintiff was required to abide by the University's

Mission and Core Values. *See* Ex. 8 at DEF000224 ("Marywood

University's Goals & Objectives") (emphasis added); Def. Ex. C at

DEF000224 ("Marywood University's Goals & Objectives") (emphasis

added). Demonstration of core values at Marywood was merely a "goal" or

an "objective." *See* Ex. 8 at DEF000224 ("Marywood University's Goals &

Objectives") (emphasis added); Def. Ex. C at DEF000224 ("Marywood University's Goals & Objectives") (emphasis added). The remainder is admitted subject to the qualification that alleged violations of Marywood policies be properly adjudicated under the University's disciplinary policies. *See* Ex. 3; Ex. 4 at ¶ 28 (citing internal Ex. E); Ex. 5 at ¶ 28; Def. Ex. A at Ex. E (ECF No. 69-1 at 34-36) and Ex. G (ECF No. 69-1 at 42-43); Def. Ex. D at 298:1-18 (ECF No. 69-1 at 129); Def. Ex. G at DEF000249-DEF000252 (ECF No. 69-2 at 31-34); Def. Ex. R at DEF000297-DEF000298 (ECF No. 69-4 at 24-25); Def. SMF ¶¶ 24, 25. Fagal understood that alleged violations of Marywood policies would be properly adjudicated under the University's disciplinary policies—particularly the Progressive Discipline Policy. *See* Ex. 15; Ex. 16 at 238:15-18.

**29.** Admitted.

**30.** Admitted.

**31.** Denied that there is merely a "contention" that some of the posters were removed, as this suggests that Marywood has a different view. There is no dispute that some of Fagal's posters were removed—and by Marywood. *See* Ex. 4 at 5 (¶ 20); Ex. 5 at 4 (¶ 20); Ex. 16 at 79:22-83:3, 84:8-85:7, 86:23-87:3, 87:18-20, 90:4-5, 91:4-8, 113:3-114:5, 116:3-4,

116:9-17, 119:8-13, 122:17-21, 365:19-367:3; Ex. 17 at 3 (¶ 1); Ex. 18 at

50:9-52:18; Ex. 19 at 6, 8, 19, 22. The remainder is admitted.

**32.**    Admitted that Levine and Marywood's Director of Student

Activities, Carl Oliveri, attempted to justify Marywood's poster removals to

Fagal by stating, in sum and substance, that "we don't pay students to go

to class." Denied that this was the actual reason that Marywood removed

Fagal's posters: On December 15, 2011, after Fagal requested an apology

for the poster removals from Marywood's administration, Levine wrote a

letter to Fagal declining his request and stating: "Sr. Anne Munley and I

remain open to future presentations that are not in conflict with our mission

statement or core values...." *See* Ex. 15; Ex. 16 at 372:11-374:2; Ex. 20.

Further, Marywood had no policy against faculty making awards to certain

students for attending class or presentations or advertising such awards—

and subsequently Levine told Fagal that he could not find such a policy.

*See* Ex. 15; Ex. 21; Ex. 22. Finally, there is some precedent for offering

rewards to Marywood students for attending presentations. *See* Def. Ex. I

at DEF001470-DEF001471.

**33.**    Admitted.

**34.**   Admitted. Fagal concurs that approximately 40 to 50 people attended the FIRE presentation despite Marywood's removal of posters advertising the event. *See* Ex. 4 at 5 (¶ 20); Ex. 5 at 4 (¶ 20); Ex. 16 at 79:22-83:3, 84:8-85:7, 86:23-87:3, 87:18-20, 90:4-5, 91:4-8, 100:15-18, 113:3-114:5, 116:3-4, 116:9-17, 119:8-13, 122:17-21, 365:19-367:3; Ex. 17 at 3 (¶ 1); Ex. 18 at 50:9-52:18; Ex. 19 at 6, 8, 19, 22.

**35.**   Admitted. However, Fagal did meet with Levine regarding the same matter. *See* Ex. 15; Ex. 16 at 84:13-14, 146:3-152:2. Levine stated that Munley would consider the matter, and she did. *See* Ex. 15; Ex. 16 at 149:23-150:24, 151:16-22, 159:9-14; Ex. 20.

**36.**   Denied that on January 13, 2012 Fagal sent the email to any Marywood students. *See* Ex. 15. The email begins, "Dear Marywood University Colleague." Ex. 23 at DEF000014; Def. Ex. I at DEF001443. The remainder is admitted.

**37.**   Admitted.

**38.**   Admitted.

**39.**   Denied that the videos depicted Sister Munley as Adolf Hitler and other University officials as members of the Nazi regime. To be accurate, Munley and other University officials are depicted as actors in

11

*Downfall*; the actors depict Hitler and Nazi regime members. *See* Ex. 15; Ex. 16 at 204:18-207:9, 261:10-262:5; Ex. 24; Ex. 25; Ex. 26 at 40:32-44:29 and 126:15-129:13.[1] To the extent that Marywood asserts that Fagal was seriously comparing Munley and other Marywood officials to Nazis, this is denied: Fagal's videos were adaptations of well-known *Downfall* parodies. References to *Downfall* parodies have appeared in *BBC News Magazine*, *The Telegraph*, *The Atlantic*, and the *New York Times*. See Exs. 27-32. Examples of the many *Downfall* parodies appearing on YouTube include: a parody in which NFL Commissioner Roger Goodell is upset upon learning that the New England Patriots continue to win games despite the suspension of quarterback Tom Brady (Exhibit 33); a parody regarding the sub-prime crisis (Exhibit 34); and a parody in which New York Commissioner of Education John King is upset about complaints regarding the Common Core and standardized testing (Exhibit 36). *See* Ex. 15.[2] The remainder is admitted.

---

[1] The citations corresponding to Exhibit 26 are in the form of minutes:seconds on the DVD.

[2] Plaintiff believes that Exhibits 24-26 and 33-35—if they are copyrighted works—constitute fair use in this litigation. *See* 17 U.S.C. § 107; *Bond v. Blum*, 317 F.3d 385, 394-95 (4th Cir. 2003) (use of entire copyrighted work

**40.**     Denied that Levine is "depicted as part of the Nazi regime." To be accurate, Levine is depicted as "LeVINE," who is depicted as an actor in *Downfall*; that actor depicts a member of the Nazi regime. *See* Ex. 15; Ex. 16 at 204:18-207:9, 261:10-262:5; Ex. 24; Ex. 25; Ex. 26 at 40:32-44:29 and 126:15-129:13. To the extent that Marywood asserts that Fagal was seriously likening Levine to a Nazi, this is denied. As stated in Paragraph No. 39 above, Fagal's videos were adaptations of well-known *Downfall* parodies that have been referenced in popular media and which appear frequently on YouTube. *See* Ex. 15; Exs. 27-35. The remainder is admitted.

**41.**     Admitted.

**42.**     Denied that Munley is depicted "as Hitler." Munley is depicted as an actor in *Downfall*; that actor depicts Hitler. *See* Ex. 15; Ex. 16 at 204:18-207:9, 261:10-262:5; Ex. 24; Ex. 25; Ex. 26 at 40:32-44:29 and

---

for its evidentiary value in a child-custody proceeding fell within the scope of fair use); *Denison v. Larkin*, 64 F. Supp. 3d 1127, 1133 (N.D. Ill. 2014) ("The House Committee on the Judiciary explicitly listed 'reproduction of a work in legislative or judicial proceedings or reports' as an example of a fair use") (quoting H.R. Rep. No. 94-1476, 65 (1976)); *Stern v. Does*, 978 F. Supp. 2d 1031, 1047-48 (CD. Cal. 2011) ("Reproduction of copyrighted material in litigation or potential litigation is generally fair use...."); *Healthcare Advocates, Inc. v. Harding, Earley, Follmer & Frailey*, 497 F. Supp. 2d 627, 638, 2007 WL 2085358 (E.D. Pa. 2007).

126:15-129:13. As stated in Paragraph No. 39 above, Fagal's videos were adaptations of well-known *Downfall* parodies that have been referenced in popular media and which appear frequently on YouTube. *See* Ex. 15; Exs. 27-35. The remainder is admitted.

**43.**    Denied that a Nazi official portrays Levine. Levine is depicted as "LeVINE," who is depicted as an actor in *Downfall*; that actor depicts a Nazi official. *See* Ex. 15; Ex. 16 at 204:18-207:9, 261:10-262:5; Ex. 24; Ex. 25; Ex. 26 at 40:32-44:29 and 126:15-129:13. As stated in Paragraph No. 39 above, Fagal's videos were adaptations of well-known *Downfall* parodies that have been referenced in popular media and which appear frequently on YouTube. *See* Ex. 15; Exs. 27-35. The remainder is admitted.

**44.**    Admitted.

**45.**    Admitted.

**46.**    Denied that Fagal's primary purpose was to cause discomfort to the administration. *See* Ex. 16 at 183:21-184:3.

**47.**    Admitted.

**48.**    Admitted. However, Fagal has also repeatedly stated that the videos were in the nature of satire and parody, and he continues to believe that. *See* Ex. 15; Ex. 16 at 205:7, 206:10, 211:21-22, 215:2, 260:18. The

Ad Hoc Faculty Committee members adjudicating Fagal's termination also realized this. *See* Ex. 36 at 57:16-18, 58:2-6. One member forwarded Fagal's January 13, 2012 email (with links to the videos) to members of the public and commented: "I thought you might enjoy this one. Hold onto your chair while you take this ride!" *See* Ex. 37 at 9:17-10:21; Ex. 38 at DEF003079; Ex. 39.

**49.**   Fagal objects that the testimony quoted from the depositions of Michael A. Foley, Ph.D. and Munley are not admissible evidence. *See* Fed. R. Civ. P. 56(c)(2). Their statements about how others allegedly felt are hearsay. *See* F.R.E. 801; F.R.E. 802. The facts offered are also denied; Fagal is not aware of any civil rights complaint filed over his videos. *See* Ex. 15.

**50.**   Admitted that Munley testified as quoted. Denied that Munley is "depicted as Hitler." Munley is depicted as an actor in *Downfall*; that actor depicts Hitler. *See* Ex. 15; Ex. 16 at 204:18-207:9, 261:10-262:5; Ex. 24; Ex. 25; Ex. 26 at 40:32-44:29 and 126:15-129:13. As stated in Paragraph No. 39 above, Fagal's videos were adaptations of well-known *Downfall* parodies that have been referenced in popular media and which appear frequently on YouTube. *See* Ex. 15; Exs. 27-35.

**51.**    Admitted that Munley testified that she was "distressed" and that she "thought it was anti-Semitic to even involve Dr. Levine in something of this nature." Ex. 40 at 44:11-14. However, Munley did not "recall...pursuing any thought about satire." Ex. 40 at 130:3-7.

**52.**    Admitted that Munley testified as quoted. However, Munley did not "recall...pursuing any thought about satire." Ex. 40 at 130:3-7.

**53.**    The "fact that he lost people in the Holocaust" does not appear in Defendant's exhibits. Admitted that Levine testified that he felt "angst and anxiety." Admitted that, when Plaintiff's counsel asked Levine why he did not file a formal complaint under the civil rights policy, Levine stated, "It is a mistake." Ex. 18 at 29:6-13. However, moments later, Levine testified: "I don't regret not filing a civil rights." Ex. 18 at 29:17-21. Denied that Fagal's videos "portray[ed] him as a Nazi and directly involv[ed] his family members." To be accurate, Levine is depicted as "LeVINE," who is depicted as an actor in *Downfall*; that actor depicts a member of the Nazi regime. *See* Ex. 15; Ex. 16 at 204:18-207:9, 261:10-262:5; Ex. 24; Ex. 25; Ex. 26 at 40:32-44:29 and 126:15-129:13. None of Levine's family members are mentioned by name in Fagal's videos. *See generally* Ex. 24; Ex. 25. As stated in Paragraph No. 39 above, Fagal's videos were

16

adaptations of well-known *Downfall* parodies that have been referenced in popular media and which appear frequently on YouTube. *See* Ex. 15; Exs. 27-35.

**54.** Denied that each and every "pre-release viewer" referenced here "warned Plaintiff that the videos were not a good idea, may lead to his termination, and that he should 'take down the second video!!!' because '[t]he real-estate portfolio/young wife stuff is really personal!'" *See* Def. Ex. D at 194:1-195:2, 196:18-197:9, 198:14-199:9, 217:13-21, 230:24-232:6, 246:11-248:1.

**55.** Admitted that a former Marywood professor made the quoted statements, in sum and substance. However, the same professor stated that the videos were "[f]unny as hell" and "brilliant satire." Ex. 41.

**56.** Admitted that Fagal testified as stated. However, Fagal is not a lawyer and did not fully understand Marywood's Progressive Discipline Policy at the time that he published the videos. *See* Ex. 15.

**57.** Fagal objects that the facts offered are not admissible evidence. *See* Fed. R. Civ. P. 56(c)(2). They are not relevant. *See* F.R.E. 401; F.R.E. 402. Admitted that Fagal never apologized to Munley, Levine, or any member of the Marywood administration. The remainder is denied.

Fagal answered "No" when asked by Defendant's counsel whether he is "remorseful" that he created the two videos. Ex. 16 at 207:18-21. Fagal also testified: "I wouldn't say what I did was inappropriate given the circumstances." Ex. 16 at 221:24-222:1.

58.     Admitted that Munley testified that she "would never delegate anything of this magnitude" and that she "knew this was something that I was going to deal with." Ex. 40 at 50:11-15. Denied that the Progressive Discipline Policy provided Munley with the right to intervene before the Vice President for Academic Affairs acted. *See* Ex. 9. The remainder is admitted.

59.     Admitted.

60.     Admitted.

61.     Admitted.

62.     Fagal objects that Levine's alleged feelings are not admissible evidence. *See* Fed. R. Civ. P. 56(c)(2). They are not relevant. *See* F.R.E. 401; F.R.E. 402. Admitted that Levine did not attend the meeting. Denied that Marywood's citations show that Levine "was asked not to attend the meeting." Without waiving the above objection, admitted that Levine testified that he felt "angst and anxiety." Denied that Fagal's videos

"portrayed him as a Nazi" or that the videos "involved his family members."

Levine is depicted as "LeVINE," who is depicted as an actor in *Downfall*;

that actor depicts a member of the Nazi regime. *See* Ex. 15; Ex. 16 at

204:18-207:9, 261:10-262:5; Ex. 24; Ex. 25; Ex. 26 at 40:32-44:29 and

126:15-129:13. None of Levine's family members are mentioned by name

in Fagal's videos. *See generally* Ex. 24; Ex. 25. As stated in Paragraph No.

39 above, Fagal's videos were adaptations of well-known *Downfall*

parodies that have been referenced in popular media and which appear

frequently on YouTube. *See* Ex. 15; Exs. 27-35.

**63.**　　Admitted that Levine testified as stated. However, Levine's

failure to actually suspend Fagal or to recommend Fagal's suspension or

termination in writing—both of which are specifically mentioned in the

Progressive Discipline Policy—undercuts Levine's testimony. *See* Ex. 9 at

DEF000249, DEF000250; Ex. 18 at 39:24-40:4, 46:3-7; Ex. 40 at 61:17-20;

Ex. 42 at 46:4-12.

**64.**　　Admitted.

**65.**　　Denied. Fagal began his explanation by discussing the removal

of the posters from the FIRE presentation, but he was not permitted to

discuss that or to put any response in writing. *See* Ex. 15; Ex. 16 at 264:9-

266:13, 267:5-269:24; Ex. 40 at 90:8-11, 94:13-16,107:3-8, 120:4-121:7;

Ex. 42 at 45:2-14, 51:4-14, 53:20-22, 56:22-23, 67:1-11; Ex. 43 at

DEF000143, DEF000144; Ex. 44 at DEF000163.

**66.**   Denied that Marywood's citations show that Munley informed

Plaintiff that the videos "violated Marywood's Academic Freedom Policy,

Professional Ethics Policy, Computer Use Policy, and were in contrast to

Marywood's Mission and Core Values." *See* Def. Ex. D at 264:22-265:23;

Def. Ex. B at 90:2-92:2, 94:12-18. The remainder is admitted.

**67.**   Admitted that Fagal referenced "justice" when Munley asked

him why he created the videos. Denied that Marywood's citations support

the remainder.

**68.**   Admitted that Munley suspended Fagal with pay during the

meeting and requested that he turn in his keys and provide his home

address. Denied that Munley waited until the conclusion of the meeting to

suspend Fagal; this occurred six to seven minutes after the meeting began.

*See* Ex. 15; Ex. 16 at 265:22-266:1, 266:11-267:3; Ex. 42 at 55:4-5; Ex. 43;

Ex. 44.

**69.**   Denied that Marywood's citations support that "Plaintiff admitted

that this meeting was held to discuss the matter confidentially, in

accordance with Marywood's Progressive Discipline Policy." *See* Def. Ex. D
at 301:17-302:11. Fagal further denies this in general. The Progressive
Discipline Policy states: "***Meeting with Administrator.***  The administrator
receiving the complaint shall discuss the matter with the faculty member in
a confidential conference." Ex. 9 at DEF000249. First, there was no
"complaint" to Fagal's knowledge. *See* Ex. 15. Second, the January 23,
2012 meeting was not "confidential"; there were three people other than
Fagal at the meeting. *See* Ex. 15; Ex. 16 at 264:9-21; Ex. 40 at 79:6-15;
Ex. 42 at 24:6-9; Ex. 43 at DEF000143; Ex. 45 at 17:22-18:6.

70.    Admitted that, on January 24, 2012, Munley's secretary emailed
Fagal a letter containing an incomplete list of charges against him, several
attached policies, and a recommendation that his tenure and employment
with Marywood be terminated immediately. *See* Def. Ex. E. Denied that
Munley advised Fagal in the above-referenced letter that she was
recommending that his tenure and employment with Marywood be
terminated "[a]s a result of [his] breach of a material term of [his] obligations
as a tenured professor," and denied that Marywood's citations support this.
*See* Ex. 15; Def. Ex. D at 274:15-18, 275:9-12; Def. Ex. E at DEF000166-
DEF000167. It was only on February 8, 2012—after Fagal's attorney

advised Marywood that proceeding with termination in this manner would be a breach of contract—that Munley sent a second letter to Fagal using the terms "breach" and "breach of a material term." *See* Ex. 15; Ex. 40 at 122:9-123:11, 124:8-21; Ex. 46 at DEF000207, DEF000208; Ex. 47.

**71.**     Admitted that Munley's January 24, 2012 letter states this.

**72.**     Admitted that Fagal did not return the specific "authorization" that Munley had requested in her January 24, 2012 letter. Denied that Fagal did not authorize Marywood to properly proceed with duly appointed faculty committees. Fagal had elected in writing—through his attorney—to convene an ad hoc faculty committee to review his suspension and another to review his termination. *See* Ex. 47 at DEF000194, DEF000196. The reason that Plaintiff did not return the specific "authorization" requested was that doing so would be waiving several contractual breaches by Marywood. *See* Ex. 47 (particularly DEF000196). Moreover, the Progressive Discipline Policy did not require a faculty member in Fagal's position to complete such an authorization. *See* Ex. 9.

**73.**     Admitted.

**74.**     Admitted.

**75.**     Admitted.

**76.**    Admitted that Fagal did not return the specific "authorization" that Munley had requested in her February 9, 2012 letter. Denied that Fagal did not authorize Marywood to properly proceed with duly appointed faculty committees. At least twice, Fagal had elected in writing—through his attorney—to convene an ad hoc faculty committee to review his suspension and another to review his termination. *See* Ex. 47 at DEF000194, DEF000196; Ex. 48 at FFF001686-FFF001687. The reason that Plaintiff did not return the specific "authorization" requested was that doing so would be waiving several contractual breaches by Marywood and "it was a Hobson's choice where [Munley] was trying to speed up the process of terminating [Fagal]." *See* Ex. 16 at 309:10-19; Ex. 47 (particularly DEF000196); Ex. 48 at FFF001686-FFF001687. Moreover, the Progressive Discipline Policy did not require a faculty member in Fagal's position to complete such an authorization. *See* Ex. 9. Finally, the "authorization" attached to Munley's February 9, 2012 letter still referred to "Sister Anne Munley's Recommendation for Termination and Statement of Charges dated 1/24/12." Ex. 46 at DEF000226 (underlined emphasis added).

**77.**    Admitted with the clarification that the Faculty Grievance Committee ("FGC") was only formed because Fagal was forced to file a

23

faculty grievance for the purpose of adjudicating specific aspects of his suspension and recommended termination—and the FGC stated that it adjudicated those aspects. *See* Ex. 15; Ex. 48 at DEF000233; Ex. 49 at DEF003295-DEF003297; Ex. 50. The substance of Fagal's grievances are explained in detail at Exhibit 49 at DEF003295-DEF003297.

**78.**   Admitted.

**79.**   Admitted.

**80.**   Denied that the FGC focused on whether there were "any procedural issues" with Fagal's suspension and recommended termination. The FGC focused on the specific procedural and substantive issues that Fagal grieved. *See* Ex. 49 at DEF003295-DEF003297; Ex. 50.

**81.**   Denied that Fagal ever submitted his explanation of the scene-by-scene videos to anybody at Marywood until discovery in this action. *See* Ex. 15; Ex. 49. Although Fagal testified in his deposition that he "believe[d]" that he had submitted this to one Marywood committee or another, he was mistaken. *See* Ex. 15. The remainder is admitted.

**82.**   Admitted.

**83.**   Admitted that this is what Sadlack's March 26, 2012 letter stated.

**84.**   Admitted that this was only Sadlack's testimony. Sadlack does not have any legal training. *See* Ex. 51 at 25:23-26:2. After Fagal was terminated—with Sadlack's assistance—she proposed a change to the PD Policy that explicitly provided the President to suspend a faculty member. *See* Ex. 74 at 14. In comments to the Executive Committee of Policy, Sadlack wrote: "Changed to reflect the power of the President to act in these circumstances. Before it was only the VPAA who was named with the authority to suspend." Ex. 74 at 14. Sadlack's proposal ended up in the new PD Policy. *See* Ex. 14. Under Rule 56(c)(2), Fagal objects to the use of only Sadlack's convey the beliefs of the entire committee. *See* F.R.E. 602; F.R.E. 801; F.R.E. 802.

**85.**   To the extent that Marywood is asserting the meaning of the Progressive Discipline Policy, Fagal objects that Fagal's testimony would be inadmissible for that purpose. *See* Fed. R. Civ. P. 56(c)(2). A pure legal opinion is prohibited from a lay and an expert witness. *See* F.R.E. 701(c); *Krys v. Aaron*, 112 F. Supp. 3d 181, 204, 2015 WL 3660332 (D.N.J. 2015); *FedEx Ground Package Sys., Inc. v. Applications Int'l Corp.*, 695 F. Supp. 2d 216, 221, 2010 WL 528467 (W.D. Pa. 2010). Without waiving the above objections: Admitted that, when Marywood's counsel asked "Does it say

that the faculty member can only be suspended by the vice president of academic affairs?", Fagal answered, "No." Ex. 16 at 299:11-14. Admitted that when Marywood's counsel asked "Does it say suspension is only justified if immediate harm to the faculty member or others is threatened by the person's continuance in the faculty position?", Fagal answered: "The word 'only' does not appear there....Though it looks like a declarative sentence." Ex. 16 at 299:16-300:1. Fagal has no legal training. *See* Ex. 15. The Progressive Discipline Policy repeatedly references roles for the "President" and the "Vice President for Academic Affairs" and also states:

> Having received a written recommendation for either suspension or dismissal from the Vice President for Academic Affairs, the President of the University sends a written communication to the faculty member, stating with reasonable particularity the basis for suspension or dismissal and offering, if requested by the faculty member within 10 days, to convene a tenured faculty ad hoc committee to consider the matter, to render confidential advice, and thereby to effect a remedy if possible.

Ex. 9 at DEF000250. After Fagal was terminated—with Sadlack's assistance—she proposed a change to the PD Policy that explicitly provided the President to suspend a faculty member. *See* Ex. 74 at 14. In a comment to the Executive Committee of Policy, Sadlack wrote: "Changed to reflect the power of the President to act in these circumstances. Before it

26

was only the VPAA who was named with the authority to suspend." Ex. 74

at 14. Sadlack's proposal ended up in the new PD Policy. *See* Ex. 14.

**86.**    Fagal objects to the following quoted testimony from Sadlack:

"a harm to the university community had happened....that's a form of

harm....there was also damage to the university." *See* Fed. R. Civ. P.

56(c)(2). Sadlack has no personal knowledge of the quoted testimony. *See*

F.R.E. 602. Without waiving the above objection: Fagal admits that Sadlack

testified to the stated facts with the qualification that she does not have any

legal training. *See* Ex. 51 at 25:23-26:2.

**87.**    Fagal objects to the statement about what the FGC

unanimously believed because Sadlack has no personal knowledge of

what the other FGC members believed. *See* Fed. R. Civ. P. 56(c)(2);

F.R.E. 602. Without waiving the above objection: Admitted that Sadlack

testified to the stated facts with the qualification that she does not have any

legal training. *See* Ex. 51 at 25:23-26:2. Notably, the PD Policy that was in

effect before October 12, 2011 diverted "personal problems which may be

rectified" into an "informal educational process" implicating oral warnings,

written warnings, and "special assistance," whereas "serious violations of

professional responsibilities implicating possible suspension or dismissal"

27

were covered by a "formal discipline process." *See* Ex. 21 at DEF3515-DEF3518. The "formal discipline process" did not implicate oral warnings, written warnings, or "special assistance." The PD Policy that came into effect on October 12, 2011 did away with the "informal educational process" and "formal discipline process" labels, suggesting that all problems were to be handled under the same process. *See* Ex. 9.

**88.**     Pursuant to Fed. R. Civ. P. 56(c)(2), Fagal objects to everything in this paragraph except he "showed no remorse in his letters to the grievance committee." Sadlack has no personal knowledge of what the other FGC members believed or whether Fagal was "very familiar with the core values." *See* F.R.E. 602. Admitted that Fagal's letter to the FGC did not show "remorse." The purpose of Fagal's letter was merely to comply with the Faculty Grievances and Appeals Policy, which states:

> The Chair should be provided with a written statement setting forth, in detail, the nature of the grievance or appeal and identifying the person(s) or body against whom the grievance or appeal is directed; this document may also include a proposal for resolving the issue.

Ex. 10 at DEF000254; Ex. 15. Further, the Faculty Grievances and Appeals Policy states: "A grievance identifies a complaint one party has against

28

<u>another party for some alleged wrongful action on the part of the second party</u>." Ex. 10 at DEF000252 (emphasis added).

**89.**     Denied. Marywood's citations do not support this. *See* Def. Ex. O at 40:18-41:17. The FGC's determinations are contained in Sadlack's letter to Fagal dated March 26, 2012. *See* Ex. 50. Notably, the PD Policy that was in effect before October 12, 2011 diverted "personal problems which may be rectified" into an "informal educational process" implicating oral warnings, written warnings, and "special assistance," whereas "serious violations of professional responsibilities implicating possible suspension or dismissal" were covered by a "formal discipline process." *See* Ex. 21 at DEF3515-DEF3518. The "formal discipline process" did not implicate oral warnings, written warnings, or "special assistance." The PD Policy that came into effect on October 12, 2011 did away with the "informal educational process" and "formal discipline process" labels, suggesting that all problems were to be handled under the same process. *See* Ex. 9.

**90.**     Pursuant to Fed. R. Civ. P. 56(c)(2), Fagal objects to the contents of this because Sadlack lacks personal knowledge of what the other FGC members believed or "determined." *See* F.R.E. 602. Further, the Progressive Discipline Policy states:

***Suspension.*** The faculty member may be suspended by the Vice President for Academic Affairs at any time during the proceedings involving him or her. Suspension is justified if immediate harm to the faculty member or others is threatened by the person's continuance in the faculty position.

....

### Dismissal

If remedial actions(s) taken during the suspension does not sufficiently resolve the issues that lead to the suspension, the university may move towards dismissal of the faculty member.

### Ad Hoc Faculty Committee

Faculty members have the right to convene an ad hoc committee in order to appeal either a decision to suspend the faculty member or a decision to dismiss the faculty member.

....

Should a faculty member request that such a committee be convened twice (i.e., once for suspension and once for dismissal), the membership of the committee may be similar or different a determination which is made by the President of the University in consultation with the faculty member and the Vice President for Academic Affairs.

Ex. 9 at DEF000250-DEF000251. It would not be "illogical" to convene two

separate committees to review a suspension and a termination given that

the propriety of a termination depends on the propriety of a suspension. *See* Ex. 9.

**91.**   Admitted.

**92.**   Admitted that Fagal testified as stated. Fagal has no legal training. *See* Ex. 15. Fagal was mistaken because the propriety of a termination depends on the propriety of a suspension; in other words, a termination could not be proper if the suspension preceding it was not proper. *See* Ex. 9.

**93.**   Pursuant to Fed. R. Civ. P. 56(c)(2), Fagal objects to the contents of this paragraph because Sadlack lacks personal knowledge of the beliefs, feelings, or understandings of the other FGC members. *See* F.R.E. 602. Denied that Sadlack testified that the FGC understood the ramifications of their decision, and denied that Marywood's citations support this. *See* Def. Ex. O at 52:5-9, 55:20-56:18; Ex. 51. Further, Sadlack testified: "Frankly, I would say I was elected the chair by showing up five minutes late to our first meeting. This was not something that we took that seriously in terms of anyone desiring the position." Ex. 51 at 14:17-20.

**94.** Admitted that Fagal disagreed with the FGC's decision. Pursuant to Fed. R. Civ. P. 56(c)(2), Fagal objects to the remainder because it states a pure legal opinion. *See* F.R.E. 701(c); *Krys*, 112 F. Supp. 3d 181, 204, 2015 WL 3660332 (D.N.J. 2015); *FedEx Ground Package Sys., Inc. v. Applications Int'l Corp.*, 695 F. Supp. 2d 216, 221, 2010 WL 528467 (W.D. Pa. 2010).

**95.** Admitted.

**96.** Admitted.

**97.** Admitted.

**98.** Admitted. The Progressive Discipline Policy does not explicitly provide the faculty member with the right to object to the two tenured faculty members selected by the Executive Council of the Faculty Senate. *See* Ex. 9.

**99.** Admitted that Fagal submitted a written defense to the Ad Hoc Committee on May 6, 2012, which is attached here as Exhibit 52. *See* Ex. 15; Ex. 16 at 327:6-328:4; Ex. 52. Admitted that the Ad Hoc Committee (singular) that considered Fagal's discipline focused on whether there were any substantive—as opposed to procedural—issues with Plaintiff's termination. Denied that the Ad Hoc Committee focused on Fagal's

suspension at all. *See* Ex. 36 at 30:2-3, 31:22-24, 39:4-22, 60:8-61:10, 63:21-64:11, 65:18-20, 70:22-71:18, 71:21-72:9; Ex. 53 at DEF000323; Ex. 54 at DEF001749; Ex. 55 at DEF001494-DEF001495; Ex. 56 at DEF3733; Ex. 57 at DEF001587-DEF001590. The document containing the Ad Hoc Committee's final adjudication of the charges against Fagal does not mention his suspension at all. *See* Ex. 57 at DEF001587-DEF001590. After Fagal wrote to the Ad Hoc Committee objecting to their final adjudication, Bittel wrote the following to Marywood's Associate Vice President for Human Resources, Patricia Dunleavy:

> On Friday afternoon, our committee received a response from Dr. F. He has found <u>several problems/omissions</u> with our report and has asked us to review and resubmit. Mostly, he objects to <u>the fact that we did not separately adjudicate his suspension; we, however, understood that this was adjudicated by the prior committee</u>....

Ex. 56 at DEF3733 (emphasis added)

**100.**   Admitted that the Ad Hoc Committee issued "its decision" on July 2, 2012, that "it" did not agree with all of Munley's findings, and that the quoted text appears in that decision. The Ad Hoc Committee's decision was not solely a product of its own deliberations. The Ad Hoc Committee provided a draft of the decision to Marywood's attorney "for comment" and

received his "input" and "responses" despite questioning whether he was an "independent voice...or does he work for Munley/Marywood" and despite being instructed that it "needed to be an 'independent review' and come to [its] decision independently from the university." *See* Ex. 36 at 32:5-33:16, 46:1-16, 53:13-17; Ex. 58 at DEF001512; Ex. 59 at 28:22-29:7; Ex. 60; Ex. 61; Ex. 63. This was the same attorney whom Fagal's counsel had been corresponding with beginning in February 2012. *See* Ex. 48; Ex. 62.

**101.**   Admitted that the quoted text appears in the Ad Hoc Committee's decision. Denied that the Ad Hoc Committee's written decision supports the finding of "harm" with any evidence. *See* Ex. 57 at DEF001587-DEF001590.

**102.**   Denied that the AHC made the stated determinations. *See* Ex. 57 at DEF001587-DEF001590. Fagal objects to the quoted testimony on the following grounds: First, Bittel could not speak to the beliefs or determinations of the other AHC members. *See* F.R.E. 602. Second, Bittel's testimony that this "was not a situation where remediation...was justified" is an inadmissible pure legal opinion. *See* F.R.E. 701(c); *Krys v. Aaron*, 112 F. Supp. 3d 181, 204, 2015 WL 3660332 (D.N.J. 2015); *FedEx Ground Package Sys., Inc. v. Applications Int'l Corp.*, 695 F. Supp. 2d 216,

221, 2010 WL 528467 (W.D. Pa. 2010). Further, Bittel's legal opinion

contradicted the opinion of at least one other Marywood administrator. *See*

Ex. 64. A document produced by Marywood titled "Talking points re Fagal's

videos" reads:

- o Progressive Discipline Policy
  - <u>Corrective</u>, not punitive
  - Policy recognizes...serious violations of professional responsibilities implicating possible recommendations for suspension or dismissal.
  - Policy...designed to accomplish (identify problem, resolve, prevent repetition) by a <u>series of gradual steps involving strategies such as personal conferences, oral and written warnings</u>...
  - Written Warning — VPAA conducts investigation, warning follows where circumstances indicate that the problem is not resolved.
  - Suspension — by VPAA at any time during proceedings; justified if immediate harm to the faculty member or others is threatened by the person's continuance in the position.
  - Dismissal — <u>if remedial actions taken during suspension don't resolve issues</u>

Ex. 64 (emphasis added). Notably, the PD Policy that was in effect before

October 12, 2011 diverted "personal problems which may be rectified" into

an "informal educational process" implicating oral warnings, written

warnings, and "special assistance," whereas "serious violations of

professional responsibilities implicating possible suspension or dismissal"
were covered by a "formal discipline process." *See* Ex. 21 at DEF3515-
DEF3518. The "formal discipline process" did not implicate oral warnings,
written warnings, or "special assistance." The PD Policy that came into
effect on October 12, 2011 did away with the "informal educational
process" and "formal discipline process" labels, suggesting that all
problems were to be handled under the same process. *See* Ex. 9.

**103.** Admitted that the AHC's findings include the quoted statement.
Denied that the quoted statement is a fair representation of what transpired
on January 23, 2012. Fagal was not permitted to fully explain himself at
that meeting or to respond in writing to Munley. *See* Ex. 15; Ex. 16 at
264:9-266:13, 267:5-269:24; Ex. 40 at 90:8-11, 94:13-16,107:3-8, 120:4-
121:7; Ex. 42 at 45:2-14, 51:4-14, 53:20-22, 56:22-23, 67:1-11; Ex. 43 at
DEF000143, DEF000144; Ex. 44 at DEF000163. It is also important to note
that Marywood deliberately chose to advise Fagal of this 9:00 AM meeting
at 8:45 AM on the same day as he was preparing for a 9:00 AM class. *See*
Ex. 15; Ex. 16 at 257:24-258:17; Ex. 18 at 30:5-7, 36:19-37:2; Ex. 42 at
34:16-35:11; Ex. 43 at DEF000143; Ex. 44 at DEF000162; Ex. 45 at 13:19-
23, 14:4-24, 16:16-17; Ex. 65.

**104.** Admitted that the quoted words appear in the cited testimony of

Bittel only; denied that they appear in the cited testimony of O'Brien or

Povse. *See* Def. Ex. T at 31:9-14; Def. Ex. U at 38:14-21, 42:21-43:11,

53:5-9; Def. Ex. V at 32:22-33:5. Admitted that each of the AHC members

testified—at specific times in their depositions—that Fagal's suspension

and termination were discussed and reviewed. However, other evidence

indicates that the AHC did not consider Fagal's suspension. *See* Ex. 36 at

30:2-3, 31:22-24, 39:4-22, 60:8-61:10, 63:21-64:11, 65:18-20, 70:22-71:18,

71:21-72:9; Ex. 53 at DEF000323; Ex. 54 at DEF001749; Ex. 55 at

DEF001494-DEF001495; Ex. 56 at DEF3733; Ex. 57 at DEF001587-

DEF001590. The document containing the AHC's final adjudication of the

charges against Fagal does not mention his suspension at all. *See* Ex. 57

at DEF001587-DEF001590.  After Fagal wrote to the Ad Hoc Committee

objecting to their final adjudication, Bittel wrote the following to Dunleavy:

> On Friday afternoon, our committee received a
> response from Dr. F. He has found <u>several
> problems/omissions</u> with our report and has asked
> us to review and resubmit. Mostly, he objects to <u>the
> fact that we did not separately adjudicate his
> suspension; we, however, understood that this was
> adjudicated by the prior committee</u>....

Ex. 56 at DEF3733 (emphasis added).

**105.**   Admitted that the AHC made the stated determinations, in sum and substance. Denied that the FGC made the stated determinations. *See* Ex. 50. Under Rule 56(c)(2), Fagal objects to the cited testimony on the following grounds: First, Bittel could not speak to the beliefs or determinations of the other AHC members. *See* F.R.E. 602. Second, Sadlack could not speak to the beliefs or determinations of the other FGC members. *See* F.R.E. 602. Third, inasmuch as Marywood is offering a pure legal opinion, it is inadmissible. *See* F.R.E. 701(c); *Krys v. Aaron*, 112 F. Supp. 3d 181, 204, 2015 WL 3660332 (D.N.J. 2015); *FedEx Ground Package Sys., Inc. v. Applications Int'l Corp.*, 695 F. Supp. 2d 216, 221, 2010 WL 528467 (W.D. Pa. 2010). Further, this legal opinion contradicted the opinion of at least one other Marywood administrator. *See* Ex. 64. A document produced by Marywood titled "Talking points re Fagal's videos" reads:

- o Progressive Discipline Policy
  - <u>Corrective</u>, not punitive
  - Policy recognizes...serious violations of professional responsibilities implicating possible recommendations for suspension or dismissal.
  - Policy...designed to accomplish (identify problem, resolve, prevent repetition) by a <u>series of gradual steps involving strategies</u>

> <u>such as personal conferences, oral and written warnings</u>...
> - Written Warning — VPAA conducts investigation, warning follows where circumstances indicate that the problem is not resolved.
> - Suspension — by VPAA at any time during proceedings; justified if immediate harm to the faculty member or others is threatened by the person's continuance in the position.
> - Dismissal — <u>if remedial actions taken during suspension don't resolve issues</u>

Ex. 64 (emphasis added). Notably, the PD Policy that was in effect before October 12, 2011 diverted "personal problems which may be rectified" into an "informal educational process" implicating oral warnings, written warnings, and "special assistance," whereas "serious violations of professional responsibilities implicating possible suspension or dismissal" were covered by a "formal discipline process." *See* Ex. 21 at DEF3515-DEF3518. The "formal discipline process" did not implicate oral warnings, written warnings, or "special assistance." The PD Policy that came into effect on October 12, 2011 did away with the "informal educational process" and "formal discipline process" labels, suggesting that all problems were to be handled under the same process. *See* Ex. 9.

**106.** Admitted that the committee members deposed testified as stated.

**107.**   Denied that the second committee reviewed Munley's decision to suspend Fagal. *See* Ex. 36 at 30:2-3, 31:22-24, 39:4-22, 60:8-61:10, 63:21-64:11, 65:18-20, 70:22-71:18, 71:21-72:9; Ex. 53 at DEF000323; Ex. 54 at DEF001749; Ex. 55 at DEF001494-DEF001495; Ex. 56 at DEF3733; Ex. 57 at DEF001587-DEF001590. The document containing the AHC's final adjudication of the charges against Fagal does not mention his suspension at all. *See* Ex. 57 at DEF001587-DEF001590. After Fagal wrote to the Ad Hoc Committee objecting to their final adjudication, Bittel wrote the following to Dunleavy:

> On Friday afternoon, our committee received a response from Dr. F. He has found several problems/omissions with our report and has asked us to review and resubmit. Mostly, he objects to the fact that we did not separately adjudicate his suspension; we, however, understood that this was adjudicated by the prior committee....

Ex. 56 at DEF3733 (emphasis added). The remainder is admitted.

**108.**   Denied that Marywood has offered evidence of the stated admission.

**109.**   Admitted. At the present time, Fagal has submitted two applications to universities or colleges. *See* Ex. 15.

**110.**   Under Rule 56(c)(2), Fagal objects to Marywood's economic report on the following grounds: The "expert" is not qualified as an expert on the best ways to find employment; whether a particular job search is "diligent," "minimal," "reasonable," or "exhaustive"; or whether Fagal "should have secured alternate employment with comparable compensation" by the beginning of 2013. *See* F.R.E. 702. The "expert's" statements that "approximately 248 postsecondary teaching positions in Business, Mathematical Science, Economic and History were available and subsequently filled in the metropolitan areas shown in Table B in 2012" and that Fagal "should have secured alternate employment with comparable compensation by the beginning" of 2013 are not based on reliable principles or methods. *See id.* The "expert's" report is also inadmissible hearsay. *See* F.R.E. 801; F.R.E. 802. Further, none of the positions that Marywood's "expert" claims were available to Fagal would have been suitable for him: Fagal's Ph.D. is in Social Studies Education and he has a Master's degree in Economics from Cornell University. *See* Ex. 15. His undergraduate degree from Union College was in economics. Fagal does not have advanced degrees in statistics or history even though he taught basic courses in those areas at Marywood. *See* Ex. 15. Although Fagal

41

taught introductory courses at Marywood in economics, social science,

U.S. history, and statistics, he has never claimed to be qualified to be a

professor able to teach advanced courses is all of those areas. *See* Ex. 15.

Fagal researched each of the jobs listed in Table C of Defendant's "expert"

report. *See* Ex. 15. But for a part-time job at Syracuse, he was able to find

the stated job requirements for each position. *See* Ex. 15. Of the 24 listed

jobs with found requirements, Fagal is qualified for none of them; in

addition 14 of them are outside of a two-hour one-way commuting distance

from his residence. *See* Ex. 15. Disabling factors range from not having a

Master's Degree in History to not having a Ph.D. in economics or a Ph.D. in

Statistics or Mathematics. *See* Ex. 15. Finally, Defendant's report is

contradicted by that of Plaintiff, which estimates Plaintiff's damages at

$755,395.00. *See* Ex. 75 at 2.

Respectfully,


By:   s/ Jonathan Z. Cohen
Jonathan Z. Cohen (PA 205941)
175 Strafford Avenue
Suite 1 # 212
Wayne, PA 19087-3340
(215) 874-0047
(215) 839-8951 (fax)
jzc@jzc-law.com

*Attorney for Plaintiff*

Date: December 26, 2016

43

## CERTIFICATE OF SERVICE

I, Jonathan Z. Cohen, attorney for Plaintiff, certify that the foregoing document has been filed electronically and is available for viewing and downloading from the ECF system. The following parties have consented to electronic service:

**Asima J. Ahmad**
asima.ahmad@jacksonlewis.com, Philadelphia-Secretaries@jacksonlewis.com, PhiladelphiaDocketing@jacksonlewis.com

**Katharine Thomas Batista**
katharine.thomas@jacksonlewis.com, Philadelphia-Secretaries@jacksonlewis.com, PhiladelphiaDocketing@jacksonlewis.com

**Jonathan Zachary Cohen**
jzc@jzc-law.com

**Stephanie Jill Peet**
Stephanie.Peet@jacksonlewis.com, PhiladelphiaDocketing@JacksonLewis.com, Philadelphia-Secretaries@jacksonlewis.com

Respectfully,


By:   s/ Jonathan Z. Cohen
Jonathan Z. Cohen (PA 205941)
175 Strafford Avenue
Suite 1 # 212
Wayne, PA 19087-3340
(215) 874-0047
(215) 839-8951 (fax)
jzc@jzc-law.com

*Attorney for Plaintiff*

Date: December 26, 2016