# Exhibit 1

# Marywood

## U N I V E R S I T Y

Academics   Admissions   Campus Life   Faith & Service   About

Home » Policies and Procedures Manual »

## Marywood University Policy & Procedure Information

EXHIBIT 1

Table of Contents

Preliminaries

Board of Trustees

University-Wide

Presidential Area

Academic Affairs

Business Affairs

Student Life

University Advancement

Administrative Services

- Policy Development, Approval, and Dissemination
- Policy Format

Index

### Authority of the Board of Trustees

#### Policy Statement

The Board of Trustees of Marywood University, a governing board, exists as a body empowered by the sponsor, the Sisters, Servants of the Immaculate Heart of Mary, Scranton, PA, and by the state, the Commonwealth of Pennsylvania. The Board, recognizing itself as a body acting in trust, acknowledges that its corporate authority is matched by its corporate accountability. Its philosophy of leadership is based on principles of strategic direction and major policy making.

1. The Board is the guardian of institutional values. Its philosophy of leadership based on strategic direction and major policy making enables an outcome driven system that enforces mission as the central organizational focus.
2. The Board defines its leadership position as one that is more of governance than of management.
3. Delegation of authority to the President of the University as Chief Executive Officer coupled with pronouncements of explicit Board policies frees the Board to direct its attention to matters of enduring importance, to use board time efficiently, and to keep focused on the vision for the future.
4. Explicit major policies pronounced by the Board address areas of responsibility defined in the Bylaws.

### Related Policies

- Annual Meeting of the Board of Trustees
- Board Policy Dissemination
- Conferring Academic Degrees
- Conflict of Interest Policy for Trustees
- Cultural Diversity Efforts
- Delegation to the President
- Evaluation of Presidential Performance
- Minutes of Standing Committees of the Board of Trustees
- Mission Statement of Marywood University
- Monitoring Executive Performance
- New Academic Programs
- Presidential Succession
- Relationship of the Board to the Members of the Corporation
- Safe University Environment
- Selection of Trustees
- Strategic Planning
- Trustee Code of Conduct

### Related Committees

### History

1/23/99 - Adopted by the Board of Trustees and placed in Board of Trustees Manual

---

Secretary of the University & General Counsel | 108 Immaculata Hall

570-340-6018 | F: 570-340-6014 | paterson@marywood.edu

Please note, the materials presented on this website are provided for informational purposes only and may not be construed as legal advice from the Office of the Secretary of the University and General Counsel.

2300 Adams Avenue Scranton, PA 18509

570-348-6211 | toll free: 1-TO-MARYWOOD

 Apply    Visit    Request    Give    Social    News    Events    Jobs

©2016 Marywood University | Privacy Policy | Student Consumer | webber@marywood.edu | Sponsored by Sisters, Servants of Immaculate Heart of Mary

CAMPUS RESOURCES:   MarywoodYou   Portal Downtimes   Email   Library   Moodle   Directories   A-Z   Tech Help          STUDENTS   STAFF

# Exhibit 2

**Marywood**
UNIVERSITY

Academics   Admissions   Campus Life   Faith & Service   About

Home » Policies and Procedures Manual »

# Marywood University Policy & Procedure Information

EXHIBIT 2

Table of Contents

Preliminaries

Board of Trustees

University-Wide

Presidential Area

Academic Affairs

Business Affairs

Student Life

University Advancement

Administrative Services

- Policy Development, Approval, and Dissemination
- Policy Format

Index

## Delegation to the President

### Policy Statement

The intention of the Board of Trustees of Marywood University is to concentrate its efforts on governance through strategic direction and major policy making. It therefore affirms its expectation that the President as chief executive officer be responsible for the efficient operation of the institution while maintaining the integrity of Board policy.

The Board of Trustees delegates to that person now holding or subsequently appointed to the position of President of the University the authority to exercise all of the powers and duties required for the effective management of the University. Although accountability to the Board rests with the President alone, that person may designate other University employees to exercise specific powers and duties delegated to the President.

It is expected that the President will use good faith and judgment in bringing to the Board's attention any new areas of major institutional policy or strategic direction that may arise.

1. Delegation of authority extends to interpreting and implementing Board policy, and to establishing subsidiary policies and regulations for the proper governance of the University. Exclusions from delegation of authority include matters of major policy or strategic direction, those which are vested in or imposed upon the Board itself by law, and those powers and duties stated in Board policies that the Board shall expressly reserve for itself.
2. The President may not perform, allow, or cause to be performed any act which is unlawful or insufficient to meet commonly accepted business or professional ethics or a "prudent person" test, in violation of enactments of regulatory bodies, requirements of funding sources, or explicit Board restraints on executive authority.
3. The Board may, by extending its policies, "undelegate" areas of the President's authority, but it will respect the President's choices so long as the delegation continues. This does not prevent the Board from obtaining information about activities in delegated areas.
4. Only the Board by its majority vote has authority over the President of the University. Information may be requested by an individual trustee or committee, but if such request, in the President's judgment, requires a material amount of staff time, it may be refused.
5. Should it be deemed necessary to violate a Board policy, the President will inform the Board. Informing is simply to guarantee no violation is intentional, not to request approval after the fact. Board response, either approving or disapproving, does not exempt the President from subsequent Board judgment of the action.

## Related Policies

## Related Committees

## History

01/23/99 - Adopted by the Board of Trustees and placed in Board of Trustees Manual

Secretary of the University & General Counsel | 108 Immaculata Hall
570-340-6018 | F: 570-340-6014 | paterson@marywood.edu
Please note, the materials presented on this website are provided for informational purposes only and may not be construed as legal advice from the Office of the Secretary of the University and General Counsel.

       
pdfcrowd.com

# Exhibit 3

**Marywood**
U N I V E R S I T Y

Academics   Admissions   Campus Life   Faith & Service   About

Home » Policies and Procedures Manual »

## Marywood University Policy & Procedure Information

EXHIBIT 3

Table of Contents

Preliminaries

Board of Trustees

University-Wide

Presidential Area

Academic Affairs

Business Affairs

Student Life

University Advancement

Administrative Services

- Policy Development, Approval, and Dissemination
- Policy Format

Index

### Non-reappointment of Faculty Member

#### Policy Statement

Non-reappointment of a faculty member is the right of the President of Marywood University, so long as there is no violation of tenure policies, contractual agreements, or other policies stated in the Faculty Handbook. Notification of non-reappointment is made based on length of service as follows:

*not later than March 1 of the first academic year of service;*

*not later than December 15 of the second academic year of service; or*

*at least twelve months before the expiration of an appointment after two or more years at Marywood University.*

#### Related Policies

- Contractual Agreements with Faculty Members
- Tenure

#### Related Committees

#### History

07/01/89 - Reaffirmed with publication of Faculty Manual
07/01/03 - Editorial changes made to reflect academic restructuring

Secretary of the University & General Counsel | 108 Immaculata Hall
570-340-6018 | F: 570-340-6014 | paterson@marywood.edu

Please note, the materials presented on this website are provided for informational purposes only and may not be construed as legal advice from the Office of the Secretary of the University and General Counsel.

2300 Adams Avenue Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

 Apply    Visit    Request    Give    Social    News    Events    Jobs

©2016 Marywood University | Privacy Policy | Student Consumer | webber@marywood.edu | Sponsored by Sisters, Servants of Immaculate Heart of Mary

CAMPUS RESOURCES: MarywoodYou   Portal Downtimes   Email   Library   Moodle   Directories   A-Z   Tech Help                 STUDENTS   STAFF

# Exhibit 4

```
EXHIBIT
4
```

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FREDERICK F. FAGAL, JR. | : | |
| | : | |
| *Plaintiff,* | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 3:14-cv-02404-ARC |
| MARYWOOD UNIVERSITY, | : | |
| | : | ELECTRONICALLY FILED |
| *Defendant.* | : | |
| | : | |

## AMENDED COMPLAINT

Frederick F. Fagal, Jr., Plaintiff, hereby brings this Amended Complaint against Marywood University, Defendant, and avers as follows:

## PARTIES

**1.** Marywood University (hereinafter "Marywood" or the "University") is a university and a Pennsylvania domestic non-profit corporation located in Scranton, Pennsylvania.

**2.** Frederick F. Fagal, Jr. (hereinafter "Professor Fagal") is a natural person who has resided in New York State for more than 20 years and intends to remain there indefinitely. Professor Fagal is thus a citizen of New York State.

**3.** Professor Fagal earned a bachelor's degree in 1968 from Union College in Schenectady, New York, a Masters in Economics from Cornell

University in 1971, and a Ph.D. in Social Studies Education from Syracuse University in 1981.

**4.** Professor Fagal became a member of Marywood's faculty in the fall semester of 1987.

**5.** Professor Fagal attained tenure at Marywood in September 1994.

**6.** Marywood terminated Professor Fagal's tenure and employment on April 3, 2012.

## JURISDICTION AND VENUE

**7.** This Court has original jurisdiction over this action under 28 U.S.C. § 1332 as the matter in controversy exceeds the sum of $75,000.00 exclusive of interest and costs, and is between citizens of different states.

**8.** This Court has general personal jurisdiction over Marywood as the University has continuous and systematic contacts within the Commonwealth of Pennsylvania.

**9.** Venue is proper under 28 U.S.C. § 1391 as a substantial portion of the events giving rise to Professor Fagal's claim occurred within the Middle District of Pennsylvania.

## FACTUAL BACKGROUND

**10.**     In 1992, Professor Fagal entered into an Agreement and Appointment for Full-Time Faculty with Marywood. The agreement states that "[t]he policies and practices listed in the Faculty Manual are agreed upon by the parties hereto." A partially redacted copy of that agreement is attached hereto as Exhibit A.

**11.**     The "Faculty Manual" was also known as or later became known as the "Faculty Handbook."

**12.**     Professor Fagal and Marywood entered into written agreements for him to serve on the University's full-time faculty for each year between 1992 and 2012.

**13.**     Professor Fagal became a tenured faculty member of Marywood in September 1994.

**14.**     On July 1, 2010, Marywood issued an edition of its Faculty Handbook. The first four pages of the Faculty Handbook are attached hereto as Exhibit B. The third page states, in part: "This handbook is effective with the 2010-2011 faculty letters of agreement." The fourth page states, in part: "Policy changes require the approval of the President of the University and, when required, the Board of Trustees. Changes are disseminated by the Secretary of the University. They are

effective with formal approval and placement in the Marywood University Policies and Procedures Manual."

15.    In May 2011, Professor Fagal entered into an agreement with Marywood stating that he would serve as a tenured Associate Professor from August 22, 2011 to May 18, 2012 and earn a specific salary. A partially redacted copy of that agreement is attached hereto as Exhibit C.

16.    At the time that Professor Fagal and Marywood entered into the May 2011 agreement, Marywood's "Contractual Agreements with Faculty Members" policy stated that this type of agreement is a "binding contract covering a specific period of time and as a vehicle to renew, adjust and/or alter the terms of the original contract regarding appointment, rank, tenure, salary, benefits, etc." The same policy stated: "Tenure is a term designating guaranteed continuous appointment to full-time faculty members until retirement." A copy of that policy is attached hereto as Exhibit D.

17.    If Professor Fagal was ever an at-will employee of Marywood, he was no longer so upon attaining tenure. His tenure and employment could only be terminated in conformance with Marywood's Policies and Procedures Manual.

## Marywood Tears Down Professor Fagal's Posters Inviting Students to a Lecture on Free Speech

18.     In November 2011, Professor Fagal invited and paid for a speaker from the Philadelphia-based Foundation for Individual Rights in Education (hereinafter "FIRE") to give a presentation to his "Introduction to Social Science" course at the end of the month. The topic of the presentation was "Know Your Rights: Free Speech and Thought Reform on Campus," which was related to Professor Fagal's teaching of the United States Constitution.

19.     Professor Fagal received approval from Marywood to hang posters (which he arranged to have printed and he paid for) announcing the FIRE presentation and inviting any and all Marywood students to attend at the University's Comerford Auditorium.

20.     On or around November 28-29, 2011, Marywood personnel tore down almost all of the FIRE posters. A Marywood official confirmed that the University was responsible. Marywood did not provide any notice to Professor Fagal before or after the FIRE posters were torn down.

21.     When Professor Fagal complained about the poster tear-downs shortly thereafter, Marywood's Vice President for Academic Affairs could not identify any written policy statements by the University that warranted these actions.

5

22.     Professor Fagal attempted to secure an apology by Marywood as well as reimbursement for the posters that were torn down, but Marywood refused these requests.

23.     On January 13, 2012, Professor Fagal sent an email from his personal email address to Marywood faculty members about the removal of his posters. In that email, Professor Fagal criticized the Marywood administration for tearing down his posters and for its weak commitment to free speech generally.

24.     The January 13th email also contained hyperlinks to two related videos criticizing Sister Anne Munley, President of Marywood, and several other administrators for ordering or participating in the poster tear-downs and again for a weak commitment to free speech. The videos were posted to YouTube.

### Marywood Suspends Professor Fagal

25.     At approximately 8:45 AM on January 23, 2012, a Marywood dean visited Professor Fagal's office as he was preparing for his 9:00 AM class and stated that President Munley was summoning him to a meeting at the same time.

26.     At the 9:00 AM meeting, President Munley asked Professor Fagal whether he posted the two-part video on YouTube. Professor Fagal acknowledged posting the video. Professor Fagal was asked to explain his actions, but when he attempted to raise the issue of the poster tear-down, that topic was not allowed.

Permitted no context to "explain" his actions, Professor Fagal could "explain"

nothing. President Munley then told Professor Fagal that his employment was

suspended effective immediately and that he should return his keys and University

identification card to Marywood's Assistant Vice President for Human Resources.

27.     Several hours later, Marywood's Assistant Vice President for Human

Resources sent Professor Fagal an email confirming that he had been suspended

and directing him to clean out his University office.

28.     At the time of Professor Fagal's suspension, Marywood's

"Progressive Discipline" policy (attached hereto as Exhibit E) stated:

> Marywood University endorses a progressive discipline
> policy designed to promote resolution in a fair and
> orderly manner.  This policy applies to faculty members
> with tenure or whose terms of appointment have not yet
> expired.
>
> The policy is intended to provide an effective and flexible
> means of identifying problem areas, resolving complaints,
> and preventing repetitive incidents by prompt
> intervention and assistance.  It is designed to accomplish
> these ends by a series of gradual steps involving strategies
> such as personal conferences, oral and written warnings,
> and opportunities for monitored assistance where
> applicable.
>
> ….
>
> ***Suspension***.  The faculty member may be suspended by
> the Vice President for Academic Affairs at any time
> during the proceedings involving him or her.  Suspension

7

is justified if immediate harm to the faculty member or others is threatened by the person's continuance in the faculty position.

29.     Marywood's suspension of Professor Fagal was a breach of contract in several ways. First, there was nothing "progressive" about the discipline meted out to Professor Fagal. There was no oral or written warning—nor was any opportunity for monitored assistance provided.

30.     Second, President Munley—not the Vice President for Academic Affairs—suspended Professor Fagal.

31.     Third, at the time of the suspension, there was no immediate harm to Professor Fagal or to others threatened by Professor Fagal's continuance in his faculty position—and no Marywood official or representative has ever stated otherwise to him.

## Marywood Moves to Terminate Professor Fagal

32.     On January 24, 2012, approximately 28 hours after President Munley suspended Professor Fagal, she sent him a letter stating that she was "recommending that [his] tenure and employment with Marywood be terminated immediately."

33.     In the January 24th letter, President Munley provided a "Statement of Charges," which she was "prepared to send . . . to a duly appointed faculty

8

committee for review along with the emails and videos you forwarded to members of our community."

34.    The end of the second "charge" contained in the January 24th letter is missing, and therefore it was initially impossible for Professor Fagal to know the full extent of the "charges" against him.

35.    After Professor Fagal's attorney wrote to President Munley requesting an amended "Statement of Charges"—among other breaches that he identified—President Munley sent a second letter to Professor Fagal on February 8, 2012.

36.    In the February 8th letter, President Munley again stated that she was recommending that Professor Fagal's "tenure and employment with Marywood be terminated immediately" and offered a "Statement of Charges."

37.    In the second "charge" against Professor Fagal, President Munley accused him of violating Marywood's Civil Rights Policy.

38.    Near the end of the February 8th letter, President Munley wrote:

> As a result of this recommendation, I am prepared to
> send this statement of charges to a duly appointed faculty
> committee for review along with the emails and videos
> you forwarded to members of our community.  In order
> to do so and out of respect for your privacy, I would ask
> that you please sign and return to me the attached
> authorization granting the University permission to do so.
> That faculty committee may agree or disagree with my

recommendation. Once I receive the review committee's determination, I will finalize my decision. Should you choose to forego that faculty review, I will finalize my recommendation based upon my own findings and conclusions.

**39.** A document titled "Release of Personal Information" enclosed with

President Munley's February 8th letter states, in part:

> ____ I DO NOT grant permission for Marywood University to release Sister Anne Munley's Recommendation for Termination and Statement of Charges dated 1/24/12 to a faculty review committee comprised of tenured faculty. I understand that by refusing such permission that there will be no faculty committee review of Sister Anne Munley's decision to terminate my tenure and employment with the University prior to it being finalized.
>
> OR
>
> ____ I DO grant permission for Marywood University to release Sister Anne Munley's Recommendation for Termination and Statement of Charges dated 1/24/12 to a review committee comprised of tenured faculty.

**40.** President Munley's recommendation to terminate Professor Fagal's

employment and tenure violated the "Progressive Discipline" policy in effect at

the time. That policy contained one sentence addressing dismissal: "If remedial

actions(s) taken during the suspension does not sufficiently resolve the issues that

lead to the suspension, the university may move towards dismissal of the faculty

member."

10

**41.** Marywood took no "remedial actions" to "resolve the issues" that led to Professor Fagal's suspension. Professor Fagal's suspension began on the morning of January 23, 2012, and the first letter recommending his termination arrived in his inbox at 1:11 PM on the next day. Nor did Marywood attempt any "remedial actions" before sending the February 8th letter.

**42.** President Munley's February 8th letter also violated Marywood's "Civil Rights Complaint Procedures" policy in effect at the time. That policy required an individual allegedly aggrieved by a civil rights violation to file a complaint, among other procedures. Those procedures "must be followed any time a member of the Marywood University community believes s/he has been the victim of . . . discrimination, harassment, or assault by any member of the University community . . . ." A copy of that policy is attached hereto as Exhibit F.

**43.** No Marywood employee filed a civil rights complaint against Professor Fagal after his January 13, 2012 email, and thus President Munley's attempt to "charge" him with violating the University's Civil Rights Policy was a breach of Marywood policy as well as a breach of contract.

**Marywood Refuses to Allow Professor Fagal to Appeal His Suspension**

**44.** In President Munley's January 24th and February 8th letters, she asked Professor Fagal to authorize her to send the "statement of charges" against

him to a "duly appointed faculty committee for review" of her decision to terminate his employment and tenure.

45.     Nowhere in the letters or the authorizations did President Munley offer to convene a faculty committee to review her suspension of Professor Fagal.

46.     President Munley offered Professor Fagal two choices: a faculty review of her recommendation to terminate him or the "finalization" of her own decision to terminate him.

47.     The "Progressive Discipline" policy in effect at the time of President Munley's letters stated that faculty members "have the right to convene an ad hoc committee in order to appeal either a decision to suspend the faculty member or a decision to dismiss the faculty member."

48.     On February 2, 2012, Professor Fagal, through his attorney, elected in writing to convene two ad hoc faculty committees: one for President Munley's decision to suspend him and the other for her recommendation to terminate him.

49.     On February 9, 2012, Marywood, through its attorney, rejected Professor Fagal's request to convene an ad hoc committee to review his suspension. The letter stated, in part, that Professor Fagal had breached his contract with Marywood and thus the University "had no further contractual obligations to him."

**50.** Marywood's position—if accepted—would mean that any time that the University deemed—in its sole discretion—that a member of its community breached a contract with the University, then the University could disregard any of its own disciplinary policies. Such a position is absurd.

## Professor Fagal Files a Formal Grievance Against President Munley; she Retaliates by Terminating Him.

**51.** On February 22, 2012, Professor Fagal filed a formal grievance against President Munley under Marywood's "Faculty Grievances and Appeals" policy. A copy of that grievance is attached hereto as Exhibit G.

**52.** In the grievance, Professor Fagal alleged that President Munley violated Marywood policy by improperly suspending him, by improperly moving to terminate his employment and tenure, and by not accepting his request to convene an ad hoc committee to appeal the suspension.

**53.** On March 26, 2012, the Chair of Marywood's Faculty Grievance Committee sent a letter to Dr. Fagal summarizing his grievances and concluding: "I now write to inform you that in reviewing each of these grievances, we have found no evidence of improper action on President Munley's part which would constitute a legitimate grievance."

13

54.     On April 3, 2012, President Munley sent a letter to Professor Fagal stating in part: "Since the grievance process is now complete, I have decided to finalize my recommendation.  As a result, your employment with Marywood and your tenure are terminated effective today, April 3, 2012." A copy of that letter is attached hereto as Exhibit H.

55.     One paragraph after declaring Professor Fagal's relationship with Marywood at an end, however, President Munley offered to convene the two ad hoc faculty committees that he had been requesting for months. President Munley claimed: "I am doing this despite the fact that on two separate occasions you refused my offer and did not choose to convene an ad hoc committee to review my decision to suspend you and my recommendation to terminate your employment and tenure before I finalized my decision." President Munley's claim that Professor Fagal did not convene an ad hoc committee to review the suspension decision is verifiably false.

56.     Further, President Munley's offer to convene two ad hoc committees was effectively a dead letter because she had—in the very same writing—declared the termination of his employment and tenure to be final.

57.     The "Progressive Discipline" policy in effect at the time conveyed that before a faculty member may be dismissed, an ad hoc faculty committee must

recommend a formal action toward dismissal. Therefore, President Munley's termination of Professor Fagal's employment on April 3, 2012 was premature and in contravention of Marywood policy.

58.     President Munley's premature termination also violated the "Faculty Grievances and Appeals" policy (attached hereto as Exhibit G), which stated that "[g]rievants will not be adversely affected for exercising their right to file a grievance, regardless of outcome" and that "[g]rievants will not be subject to adverse consequences for either initiating a grievance or in presenting evidence on behalf of a grievant."

59.     On July 2, 2012, a group of Marywood faculty members calling themselves the "Faculty Senate Ad Hoc Hearing Committee" ("FSAHHC") issued a document titled "Review of Sister Anne Munley's Decision to Terminate the Employment and Tenure of Dr. Frederick Fagal."

60.     The FSAHHC did not concur with all of the charges lodged against Professor Fagal. Nonetheless, the FSAHHC concurred with President Munley's decision to revoke the tenure and terminate the employment of Professor Fagal.

61.     Contrary to Marywood's "Progressive Discipline" policy and President Munley's April 3rd letter, neither the FSAHHC nor any other ad hoc faculty committee reviewed Professor Fagal's suspension.

**62.** At the time of the FSAHHC's decision, Marywood's "Progressive Discipline" policy stated, in part:

> Faculty members have the right to convene an ad hoc committee in order to appeal either a decision to suspend the faculty member or a decision to dismiss the faculty member . . . . Should a faculty member request that such a committee be convened twice (i.e., once for suspension and once for dismissal), the membership of the committee may be similar or different, a determination which is made by the President of the University in consultation with the faculty member and the Vice President for Academic Affairs.

**63.** Accordingly, the failure of any Marywood ad hoc faculty committee to review Professor Fagal's suspension was a breach of Marywood's "Progressive Discipline" policy.

**64.** Had an ad hoc faculty committee actually reviewed Professor Fagal's suspension, it would have likely found that suspension improper given that he posed no harm to himself or to others. Such a finding would have logically caused the ad hoc faculty committee reviewing Professor Fagal's termination to rule in his favor given that the propriety of a dismissal depends on the propriety of a suspension under the "Progressive Discipline" policy.

**65.** On July 13, 2012, President Munley sent Professor Fagal a letter stating, in part: "My decision to terminate your employment with Marywood University and your tenure effective April 3, 2012 stands."

16

66.     Professor Fagal received his agreed-upon salary through August 2012, at which point Marywood ceased paying him.

### Postscript

67.     After terminating Professor Fagal, the University amended its disciplinary policies so as to allow it to handle future "Professor Fagals" in the same way—but without breaching such policies. Accordingly, Marywood is well-aware that it breached its own policies as alleged above.

### COUNT I
### (Breach of Contract)

68.     Professor Fagal adopts by reference each and every allegation stated above.

69.     Marywood's Faculty Manual, Faculty Handbook, Policies and Procedures Manual, and the letter agreements referenced above constitute binding contracts between Professor Fagal and the University.

70.     Marywood repeatedly breached duties owed to Professor Fagal under the above-referenced contracts.

71.     Marywood's breaches of its duties to Professor Fagal caused him to suffer damages, including but not limited to the loss of continued salary and other benefits owed to tenured faculty members.

## RELIEF REQUESTED

**WHEREFORE**, Professor Fagal demands judgment in his favor and against Marywood for:

A.    Back pay in an amount to be proved at trial;

B.    Reinstatement of Professor Fagal's employment  and tenure with Marywood;

C.    Front pay up to the reinstatement of Professor Fagal's employment with Marywood or—if reinstatement is not awarded—through the end of Marywood's spring semester in 2018 (when Professor Fagal would be 72 years old);

D.    Stock market foregone gains on 403(b) salary deductions not invested in Professor Fagal's Fidelity retirement account;

E.    Pre-judgment interest;

F.    Post-judgment interest;

G.    Reasonable attorneys' fees and court costs; and

H.    Such other and further relief to which Professor Fagal may be entitled at law or equity.

Respectfully,


By:     s/ Jonathan Z. Cohen
         Jonathan Z. Cohen (PA205941)
         175 Strafford Avenue, Suite 1
         Wayne, Pennsylvania 19087-3340
         (484) 253-1175
         (215) 839-8951 (fax)
         jzc@jzc-law.com

         *Attorney for Plaintiff Frederick F. Fagal, Jr.*

Date: January 15, 2015

EXHIBIT
A

**MARYWOOD COLLEGE**
Scranton, Pennsylvania
**AGREEMENT and APPOINTMENT**
for
**FULL-TIME FACULTY**

TERMS OF THIS AGREEMENT are offered on the ____ day of _____, A.D. 19____

to _____

_____

party of the first part, by Marywood College, a non-profit corporation, created and existing by and under the laws of the Commonwealth of Pennsylvania, party of the second part.

The parties witness that, in consideration of the mutual promises and agreements herein contained,

the following terms are in effect from _____ to _____ :

(1) Type of Appointment _____

   Rank                    _____

   Department              _____

   Responsibility to       _____

   Salary                  $_____ per _____

   Employee Benefits:

   Social Security (FICA)        $_____

   Retirement (TIAA-CREF)         _____

   Hosp. Ins. (B.C.-B.S.-M.M.)    _____

   Workers' Compensation          _____

   Total Disability Ins. (TIAA)   _____

   Life Insurance (TIAA)          _____      _____

   Total Compensation            $_____

(2) The policies and practices listed in the Faculty Manual are agreed upon by the parties hereto.
(3) Benefits other than Social Security must be applied for by the faculty member at the Office of Personnel Services. Failure to apply indicates waiver of the benefit.
(4) This signed Agreement must be returned to the President's office by the date specified.
(5) U.S. Government form W-4 must be on file in the Office of Personnel Services.

IN WITNESS WHEREOF, the said parties have hereunto agreed to the above terms and have set their hands at Marywood College, in said State, as follows:

_____     (Signed) _____
     Date Accepted                         First Party

_____     (Signed) _____
     Date Executed                          President

(2/86)

EXHIBIT
**B**



# Marywood

## U N I V E R S I T Y

# FACULTY HANDBOOK

## July 1, 2010

**Reap College of Education and Human Development**
**Insalaco College of Creative and Performing Arts**
**College of Health and Human Services**
**College of Liberal Arts and Sciences**
**School of Architecture**

Address comments or questions
to

Secretary of the University
Marywood University
Scranton, PA   18509-1598

# FACULTY  HANDBOOK

**This handbook is effective with
the 2010-2011 faculty letters of agreement.**

**Marywood  University**
**Scranton,  Pennsylvania**
**18509**

# INTRODUCTION

The faculty of Marywood University are dedicated professionals who have an important role in providing intellectual leadership. They are committed to the service of the University, their disciplines, and others. While the teaching role of the faculty is primary, they devote time and energy to a variety of activities. They serve on committees and contribute their talent to strategic planning, research, grant writing, and recruitment.

It would be impossible to capture in detail in one handbook all of the many issues that affect faculty. The *Faculty Handbook* is intended to be one of several sources of general guidance. It brings together brief descriptions of the privileges and obligations that are most central to membership on the faculty of Marywood University and selected other information of special interest.

Nothing contained in the *Faculty Handbook* negates the right of the University to augment, repeal, or revise its policies at any time. Policy changes require the approval of the President of the University and, when required, the Board of Trustees. Changes are disseminated by the Secretary of the University. They are effective with formal approval and placement in the *Marywood University Policies and Procedures Manual*.

The *Faculty Handbook* is maintained by the Secretary of the University, who is responsible for updating and editing it. This assumes the authority to make non-substantive changes that improve the precision of its language, and substantive changes that are necessary to conform to applicable laws. To the extent that modification and revision of Chapter Two constitute other substantive changes, the Faculty Senate will be consulted in the interest of collegiality.

EXHIBIT

C



# Marywood
## UNIVERSITY

Tenured Faculty
Letter of Agreement
2011-2012 Academic Year

May 10, 2011

Dr. Frederick F. Fagal, Jr.
17 East Lake Street
Skaneateles, NY 13152

Dear Dr. Fagal, Jr.,

This Letter of Agreement is offered to you for the 2011-2012 Academic Year.  In accord with the agreed upon Salary Plan, your salary reflects a 2.5% annual increase of $█████████.

Other terms of this agreement are as follows:

| | |
|---|---|
| Term: | 8/22/2011 to 5/18/2012 |
| Type of Appointment: | Full-Time (9 months) Tenure |
| Rank: | Associate Professor |
| College: | Liberal Arts & Sciences |
| Department: | Social Science |
| Responsible to: | Department Chairperson |
| Salary: | $██████████ |

Faculty members must apply for benefits other than Social Security and Worker's Compensation through the Human Resources Department.  Full-time faculty benefits include health, dental, long-term disability, group life, and accidental death and dismemberment under the Flexible Benefits Plan.  Elections are made by June 1 of each year for the subsequent fiscal year beginning July 1.  Retirement contributions by the University vary based on the contribution level selected by the faculty member.  The appropriate government forms, including Form W-4 and I-9, must be completed and on file in the Human Resources Department.

This agreement is valid for one month from the date of this letter.  The original copy of this Letter of Agreement must be signed and returned to my office by June 10, 2011.  If you do not return the original signed copy by June 10, it will be assumed that you are not returning to Marywood.  On behalf of the Board of Trustees and myself, I express our gratitude for your dedicated service and commitment to Marywood University.  May God continue to bless you.

Sincerely,

*Sister Anne Munley IHM*

Anne Munley, IHM, Ph.D.
President

Agreed this 25 day of May, 2011

Signature *Frederick J. Fagal,*





# Contractual Agreements with Faculty Members



## Policy Statement

### Full -Time Faculty

The *Letter of Agreement* is the official contract issued to a faculty member at the time of appointment or reappointment.  It is a statement of conditions and obligations mutually agreed to by the faculty member and Marywood University. It serves as a binding contract covering a specific period of time and as a vehicle to renew, adjust and/or alter the terms of the original contract regarding appointment, rank, tenure, salary, benefits, etc.

Faculty contracts are normally for a period of nine months or twelve months.

Ordinarily, the academic year will begin no earlier than two weeks before Labor Day and will end no later than nine months from that date.

A copy of the *Letter of Agreement* is retained by the faculty member.  Copies are also on file in the Office of Human Resources.

In general, any faculty member, who intends to be a long-term stakeholder in the University and who has the appropriate terminal academic degree, should have either a tenure appointment or an appointment probationary for tenure.

### *Categories of Full-Time Appointment*

Regular membership in a Faculty includes appointments with continuous tenure, appointments probationary for tenure, and contract appointments without tenure.

Membership in the Faculty of a School or Department is held by persons with valid appointments to one of the four generally recognized Faculty ranks, namely, Professor, Associate Professor, Assistant Professor, or Instructor.

The University, however, also requires the services of professionally competent individuals to meet teaching and service responsibilities in selected areas or positions in which assignments do not necessarily include research or creative work. To meet these responsibilities effectively and to be competitive in attracting and retaining needed professional personnel, the University has established and recognizes a third kind of Regular Faculty appointment: Regular Contracts Appointments without Tenure.

### Contract Appointments with Tenure

The probationary period shall not exceed seven years of full-time teaching at Marywood, with application for tenure being made in the sixth year. Faculty members on leave during the probationary period must follow the policy on Leaves of Absence. Prior service at Marywood University or at another regionally accredited, four-year college or university may be credited toward the fulfillment of the probationary period as indicated in the original *Letter of Agreement.*

Tenure is a term designating guaranteed continuous appointment to full-time faculty members until retirement. It implies a mutual commitment on the part of the faculty member and the University and cannot be taken lightly. The commitment of a faculty member who requests tenure is as deep and binding on the faculty member as it is on the University.  Just as the conferring of tenure by the University recognizes the competence of an individual faculty member, submission to the University of an application for tenure suggests a strong acceptance by that individual of the goals and objectives of the University.  The request represents commitment to work jointly with faculty, students, administrators, and members of the staff for the growth and welfare of the University.  It is a commitment to devote one's energies to continued personal development and continued high levels of achievement as a member of the Marywood academic community.  It is a definite assertion of career goals; it is expected that faculty will not lightly withdraw from this relationship.

Once tenure is granted, it will be discontinued only for grave reason, which may include moral turpitude, flagrant abuse of academic freedom, or lack of professional competency as demonstrated in instruction and/or research.  In addition, the University may be required to discontinue tenure because of severe financial exigencies of the University or reorganization of the department and/or curriculum resulting in lack of need as described in *Retrenchment of Faculty*.

A faculty member with an appointment probationary for tenure may apply for a Clinical or Per Annum appointment, if a vacancy exists, under normal procedures for recruitment and appointment.  However, a faculty member in probationary status is not eligible to apply for such a change of status if that faculty member has been reviewed for tenure with the result that tenure was not recommended.

### Contract Appointments without Tenure

Two types of full-time contract appointments without tenure are available: Clinical Faculty Appointments and Per Annum Faculty Appointments.

### Clinical Faculty

On the recommendation of the cognizant chairperson, or person acting in the capacity of a chair, with the approval of the Vice-President for Academic Affairs and based on a written description of the teaching and related duties, a Faculty position involving full-time teaching in a clinical or professional skills program may be designated as a non-tenure track clinical position.  Titles associated with clinical positions shall be appropriately distinguishing, such as "Clinical Assistant Professors" as determined by the Vice-President for Academic Affairs.

The initial appointment may be for one or two years and may be renewed for successive terms under the same procedures as those applying to faculty members with appointments probationary for tenure.  After six years of continuous service, subsequent reappointments may be for periods of up to five years but without tenure.

### Per Annum Faculty

With the approval of the Vice-President for Academic Affairs and based upon a written description of the teaching and related duties, a faculty position involving full-time teaching for a period of one year may also be designated as a non-tenured position (Per Annum).

Normally a Per Annum appointment may be renewed on an annual basis for up to an additional five years, followed by a terminal contract for the seventh year of employment. If an exception is made, it will be done by

the Vice-President for Academic Affairs in consultation with the appropriate dean and director or chairperson. Notification of non-renewal shall follow the notice requirements of the Non-Reappointment of Full-Time Faculty Member policy.

Clinical or Per Annum appointments may be made at the level of Instructor, Assistant Professor, Associate Professor or Professor.  A Faculty Member with a Clinical or Per Annum appointment is accorded parity of compensation, benefits and perquisites, and governance and voting rights, as with other Faculty members of comparable rank.

A Faculty member with a Clinical or Per Annum appointment may apply for an appointment probationary for tenure, if a vacancy exists, under normal procedures for recruitment and appointment. In such a case, time served in the Clinical or Per Annum position beyond the first year counts toward the maximum allowable period of probationary service. If time served in the Clinical or Per Annum position exceeds the maximum allowable period of probationary service, the Faculty member shall be considered to have completed five years of probationary service and shall be reviewed for tenure upon application for the change of status. In either case, in the event the outcome of the review is negative, the terms of the current Clinical or Per Annum appointment shall be honored but the Faculty member shall not be eligible for subsequent reappointment to the Clinical or Per Annum position.

## Pro - Rata Faculty

Pro-rata ranked faculty serve on nine-month or twelve-month contracts. Their contracts are processed and issued as are those of full-time faculty.

The initial appointment of pro-rata faculty determines their rank; their *Letters of Agreement* are awarded for one year at a time with no implied obligation of continuous appointment.

## Part -Time Faculty

Part-time faculty are those faculty members who ordinarily teach from one to six credit hours per semester and are not usually otherwise employed in the affairs of the University. They receive a formal appointment on a semester basis, provided enrollment justifies it at registration time.  Part- time faculty members are not eligible for tenure.

## Letters of Agreement

*Letters of Agreement* for continuing faculty members are issued on or before May 10. *Letters of Agreement* are distributed from the office of the President of the University.

## Appointment Procedures

Members of the faculty are appointed by the President of the University. Prospective faculty members are interviewed and recommended by the chairperson and faculty of the department in which a vacancy exists to the Dean and Vice-President for Academic Affairs.

The formal offer of employment made by the Vice President for Academic Affairs to a prospective faculty member contains the conditions of continued employment and promotion as described during the interview process and as outlined in the *Faculty Handbook.*

Offers to part-time faculty are made by department chairpersons or those acting in the capacity of a chair, and concluded by an agreement approved by the appropriate academic dean. A part-time faculty member receives a formal appointment on a semester basis, provided enrollment justifies it at registration time. A part- time faculty member is not eligible for tenure.

## Related Policies

- Promotion of Faculty Members
- Faculty Status

## History

07/01/89 - Reaffirmed with publication of Faculty Manual

02/24/99 - Revised, as recommended to the President by the Policy Committee of the University, to include possibility of opening the fall semester in August.

10/04/02 - Revised to change the reference to the opening date of the academic year, as recommended to the President of the University by the Policy Committee of the University.

03/28/08 - Revised to provide for permanent non-tenured faculty, as recommended to the President of the University by the Policy Committee of the University.

2/18/11 - Revision approved by the President of the University as recommended by the Policy Committee of the University.

 

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

2300 Adams Avenue, Scranton, PA 18509

570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu





# Progressive Discipline



## Policy Statement

Marywood University endorses a progressive discipline policy designed to promote resolution in a fair and orderly manner. This policy applies to faculty members with tenure or whose terms of appointment have not yet expired. Its objectives support the collegial relationships at Marywood University and are directed toward continual institutional improvement. Because the University regards disciplinary action as corrective and not punitive, the policy recognizes personal and professional problems that may be rectified by an informal educational process, as well as serious violations of professional responsibilities implicating possible recommendation for suspension or dismissal.

The policy is intended to provide an effective and flexible means of identifying problem areas, resolving complaints, and preventing repetitive incidents by prompt intervention and assistance. It is designed to accomplish these ends by a series of gradual steps involving strategies such as personal conferences, oral and written warnings, and opportunities for monitored assistance where applicable.

## Procedures

***Commencement.*** Disciplinary action may be initiated by a complaint, oral or written, which alleges violation of institutional policy, practice, procedure or other functions and responsibilities of the faculty member in pursuing his or her customary teaching and institutional role. The complaint, which may reflect an incident or incidents of misconduct or deficiency, may be communicated to the faculty member's immediate supervisor or to the appropriate dean.

***Meeting with Administrator.*** The administrator receiving the complaint shall discuss the matter with the faculty member in a confidential conference. If additional information from the faculty member provides a satisfactory explanation, the decision may be to close the matter then. If, however, additional light is not shed on the allegation or an explanation is not satisfactory, the administrator will specify corrective action to be taken, and the discussion will constitute an oral warning.

***Written Warning.*** If the alleged problem continues or additional complaints are received, the immediate supervisor or dean must notify the Vice President for Academic Affairs, who shall conduct a preliminary investigation concerning the merits of the complaint. A written warning to the faculty member may follow where circumstances indicate that the problem is not resolved. The written warning will become a part of the faculty member's personnel file, but will be expunged after three years if no other written warnings have occurred.

***Suspension***. The faculty member may be suspended by the Vice President for Academic Affairs at any time during the proceedings involving him or her. Suspension is justified if immediate harm to the faculty member or others is threatened by the person's continuance in the faculty position. Unless in direct violation of the law, any

such suspension should be with pay.

**Special Assistance.**  In those circumstances where it is evident that the faculty member is in need of special professional assistance, the Vice President for Academic Affairs may require in writing  any of the following remedial actions:

- counseling and/or another type of treatment program, such as Alcoholics Anonymous or Narcotics Anonymous;
- psychological counseling and/or treatment, including out-patient treatment prescribed by a duly credentialed and qualified professional;
- peer faculty monitoring to assist in resolving work-related performance problems;
- a specified number of periodic conferences with the faculty member's Dean to assist in resolving administrative or institutional problems.

Special professional assistance will be for a specific period of time.  Where the assistance necessitates in-patient treatment or time away from teaching, that temporary time-off shall be with pay.  During the period of assistance, the faculty member shall communicate weekly or at other intervals specified by the Vice President for Academic Affairs, who shall monitor the faculty member's progress to determine when and if the special assistance has achieved its objective.  Part of this monitoring function may involve the faculty member providing summary statements from treatment providers regarding compliance and prognosis. If the faculty member has refused to participate, or the remedial objective has not been reached during the specified period of time, a recommendation to terminate employment may be made to the President of the University.

## Dismissal

If remedial actions(s) taken during the suspension does not sufficiently resolve the issues that lead to the suspension, the university may move towards dismissal of the faculty member.

## Ad Hoc Faculty Committee

Faculty members have the right to convene an ad hoc committee in order to appeal either a decision to suspend the faculty member or a decision to dismiss the faculty member.

- Having received a written recommendation for either suspension or dismissal from the Vice President for Academic Affairs, the President of the University sends a written communication to the faculty member, stating with reasonable particularity the basis for suspension or dismissal and offering, if requested by the faculty member within 10 days, to convene a tenured faculty ad hoc committee to consider the matter, to render confidential advice, and thereby to effect a remedy if possible.
- Should the faculty member request a review by an ad hoc committee, it shall consist of three members selected in the following order:  (a) one tenured faculty member selected by the person seeking assistance, and (2) two tenured faculty members selected by the Executive Council of the Faculty Senate.  The choice of members should be on the basis of their objectivity and competence and of the regard in which they are held in the academic community.  The President of the University or his/her delegate has the option of attending the meetings of the Committee.  Should a faculty member request that such a committee be convened twice (i.e., once for suspension and once for dismissal), the membership of the committee may be similar or different, a determination which is made by the President of the University in consultation with the faculty member and the Vice President for Academic Affairs.  Normally the committee would make its

recommendation within 30 days of being convened.

- The Committee elects its own Chair, who sends the opinion of the committee in writing to the President of the University, copied to the faculty member and to the Vice President for Academic Affairs. If the opinion of the Faculty Committee is that the matter is successfully resolved or that there is no merit to the complaint, a recommendation shall be made to discontinue proceedings. If the problem has not been corrected and reason still exists to question the fitness of the faculty member, the recommendation shall be to either continue a suspension or initiate a formal action toward dismissal.

***Publicity.*** Public statements by the faculty member or others about possible or actual termination of employment should be avoided.

## Related Policies

- Teaching Responsibility
- Librarianship Responsibility
- Tenure
- Faculty Status
- Academic Workload

## History

07/01/89 - Reaffirmed with publication of Faculty Manual

12/12/97 - Addition of informal process approved by the President of the University as recommended by the Policy Committee of the University

07/01/03 - Editorial changes made to reflect academic restructuring

10/12/11 - Revision approved by the President of the University as recommended by the Policy Committee of the University

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu



**4.2**    **CIVIL RIGHTS COMPLAINT PROCEDURES**
(Revision approved by the President of the University 4/03/00, 7/21/03, 6/24/09)

The following process must be followed any time a member of the Marywood University community believes s/he has been the victim of or witness to discrimination, harassment, or assault by any member of the University community on University property or any property controlled by the University. Any individual who believes s/he has been subject to discrimination on the basis of disability should file a grievance consistent with Marywood's *Disability Grievance Procedures.* Confidentiality is expected of all persons involved in the process.

In furtherance of Marywood University's commitment to its duties and obligations, regular training on harassment, discrimination and related topics is provided for managers and supervisors in the Marywood community.

**Internal Process**

1.  As soon as possible, but not later than 30 working days, except in unusual circumstances, after the alleged incident(s) occurs, the complainant must present the complaint to the appropriate University administrator as listed below:

> Claims Against Faculty Members or Librarians
>      Contact: Academic Dean or Director of Library and/or Provost and Vice President for Academic Affairs

> Claims Against Administrators, Professional Staff, or Support Staff Members
>      Contact: Immediate supervisor and/or a vice president

> Claims Against Students
>      Contact: Dean of Students and/or Vice President for Student Life.

In all cases, individuals may contact the Assistant Vice President for Human Resources and Affirmative Action Officer if they feel they cannot contact the appropriate individual as noted.

In cases that involve two or more categories of Marywood community members, the University administrator first contacted will consult with the President of the University to determine the appropriate course of action.

2.  The initial discussion between the complainant and the University administrator will be kept confidential to every extent possible. The University administrator must contact the Assistant Vice President for Human Resources and Affirmative Action Officer in cases involving employees.

3.  If the complainant, after an initial meeting with the University administrator, decides to proceed, the complainant submits within 10 working days a formal complaint, preferably in writing, to the appropriate University administrator. The complaint must include detailed factual information concerning the incident(s), and should include what the victim feels will correct the situation.

In certain serious cases the University administrator may proceed even without a formal complaint.

Cases involving alleged discrimination, harassment, and sexual assault are particularly sensitive and demand special attention to issues of confidentiality. Dissemination of information relating to the case is to be limited, so as to insure, as fully as possible, the privacy of the individuals involved.

4. The University administrator must inform both parties of the need for confidentiality. Any individual who retaliates against the complainant will be subject to discipline up to and including discharge from employment and/or termination of student status.

5. Within 5 working days after receipt of a formal complaint, the University administrator must initiate the appropriate steps to effect an informal resolution of the complaint that will be acceptable to both the complainant and the alleged offender.

6. Within 10 working days after the initiation of the steps to effect an informal resolution, the University administrator must provide a written summary of the complaint and the proceedings to date to both the complainant and the alleged offender. Appropriate remedial action will be determined by the University administrator after consultation with executive officer(s) and/or legal counsel if deemed necessary. Action will be taken to eliminate the discriminatory or harassing conduct, including but not limited to warning, suspension, transfer, community service, discipline, discharge, or dismissal of the offender or anyone making a knowingly false complaint. The remedial action may also include offering assistance/training to the victim and/or the offender. The parties will be formally notified of the final decision, including punishment or sanctions, if any.

7. Either party, if not satisfied with the informal resolution proposed by the University administrator, will have 10 working days to file an appeal. Appeals must be in writing and submitted to the President of the University. Within 5 working days, the President will direct the appeal to the appropriate University body, described below. The appeals committee will have 30 working days to review and make a recommendation to the President of the University. The President of the University will provide a written response to the appellant within 10 working days of the receipt of the appeals committee's recommendation. The decision of the President of the University is final and binding internally.

> Claims against Faculty Members including Librarians, Administrators, Professional Staff, and Support Staff
> > The President of the University will appoint and convene a committee of 5 employees comprised of professional staff, administrators and/or faculty who are independent of the claim.
> >
> > Note: Claims by faculty members against faculty members may choose to contact the Faculty Grievance and Appeals Committee in lieu of this process.
>
> Claims against Students
> > The President of the University will refer the appeal to the Vice President for Student Life within 5 working days. The Vice President for Student Life will convene an Appeal Board within 3 working days of the President's notification. The Appeal Board will have 30 working days to review and make a recommendation to the Vice President for Student Life. The Vice President will notify the President of the recommendation within 3 working days. The President of the University will provide a written response to the appellant within 10 working days of the receipt of the appeals committee's recommendation. The decision of the President of the University is final and binding internally.

**External Process**

Victims may choose to file a report with the proper law enforcement authorities. Marywood University has personnel on staff who can explain criminal complaint procedures and assist victims in beginning the process. Police investigation and legal prosecution are conducted outside of and in addition to University procedures.

**Resources**

A list of Marywood University and community resources is available at the Human Resources Office and the Student Life Offices.

Students are encouraged to use the services of the Counseling and Student Development Center, the Student Health Services Office, and the Students with Disabilities Services Office.

**4.3     DISABILITY GRIEVANCE PROCEDURES**
(Approved by the President of the University 6/24/09)

**Students are strongly encouraged to contact the Office of Student Support Services
at the first sign of any difficulties obtaining
their approved academic accommodations from faculty,
or if they encounter difficulties related to their disabilities
from any Marywood University staff, administrators, or students.**

It is the policy of Marywood University not to discriminate on the basis of disability. The University has adopted an internal grievance procedure providing for prompt and equitable resolution of grievances by either students or employees alleging any action prohibited by Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794) or the relevant U.S. Department of Health and Human Services regulations implementing the Act (34 C.F.R. Part 104) (together, "Section 504"). Section 504 prohibits discrimination on the basis of disability in any program or activity receiving Federal financial assistance. The Law and Regulations may be examined in the office of the Section 504 Coordinator, Dr. Patricia E. Dunleavy, Assistant Vice President for Human Resources and Affirmative Action Officer, who has been designated to coordinate the efforts of the University to comply with Section 504.

Any person who believes she or he has been subjected to discrimination on the basis of disability may file a grievance under this procedure. It is against the law for the University to retaliate against anyone who files a grievance or cooperates in the investigation of a grievance. The University will make every effort to protect the grievant from retaliatory action. Any individual who retaliates against the grievant will be subject to discipline up to and including discharge from employment and/or termination of student status.

**Procedures**

All alleged incidents involving disability discrimination are to be dealt with immediately. When a Marywood University employee or student believes s/he has been the victim of disability discrimination or witnessed disability discrimination, the following procedures should be used:

1.  Grievances must be submitted to the Section 504 Coordinator, or her designee, within 30 calendar days of the date the person filing the grievance becomes aware of the alleged discriminatory action. (Special circumstances warranting later filings will be considered on a case-by-case basis.) A grievant may contact the Vice President for Enrollment Management if he or she feels he or she cannot contact the Section 504 Coordinator, who will designate an appropriate person to fulfill the Section 504 Coordinator's responsibilities under this policy.

2.  A grievance must be in writing and must contain the name, address and other contact information of the grievant, describe the problem or alleged action alleged to be discriminatory in sufficient detail to inform the Section 504 Coordinator of the nature and date of the alleged violation and permit an adequate investigation to be conducted, include the names of University employees or students involved and state the remedy or relief sought.

**Marywood**
U N I V E R S I T Y

# Faculty Grievances and Appeals



## Policy Statement

As an institution of higher education, Marywood University brings together a faculty, administration, and governing board united in a common bond of academic purpose. Essential to the fulfillment of this purpose is a mutual recognition of institutional integrity and individual human rights, along with an understanding of the respective roles of the several entities which constitute this educational organization.

Circumstances may arise at times, however, wherein a grievant--full-time, part-time, or pro-rata--may question decisions which affect his/her professional role in the institution. To assist in the resolution of these matters, a series of guidelines for grievances is herein set forth.

### Definitions

Grievance: A grievance refers to any disagreement between two parties. A grievance identifies a complaint one party has against another party for some alleged wrongful action on the part of the second party.

Grievant: A Grievant initiates a grievance.

### Types of Issues That Can Be Grieved

It is understood that procedural rather than substantive factors provide appropriate areas of review, and the Faculty Grievance Committee will not attempt to substitute its judgment for that of the decision-maker(s) involved in the case.

Thus, the Faculty Grievance Committee will hear grievances concerning:

1) Allegations of violation of academic freedom resulting in: denial of tenure, promotion, or sabbatical leave; non-reappointment.

2) Allegations of impermissible discrimination. Tenured and non-tenured faculty are protected against illegal or unconstitutional discrimination, or on any basis not relevant to job performance, and includes, but is not limited to, race, sex, religion, national origin, age, disability, marital status, or sexual orientation

3) Allegations of inadequate consideration resulting in: denial of tenure, promotion, or sabbatical leave; non-reappointment; or termination of employment due to retrenchment.

4) Allegations of violations of procedures used in rendering decisions in numbers 1 and 2 above as set forth in Chapter 2 of the *Faculty Handbook*.

Procedures regarding dismissal, suspension, and sanctions of faculty members are in the *Progressive Discipline*

policy.

Should a grievant allege cause for grievance in any matter not identified in the above guidelines, the grievant may consult the Faculty Grievance Committee. In such circumstances, the Committee's first decision is whether the complaint is appropriate and sufficiently serious to merit consideration.

**Persons Against Whom Grievances May be Directed**

Fundamentally, a grievance may arise from an allegation of improper implementation of a procedure or process leading to a decision. The person(s) or body who perform(s) that procedure or process is (are) the subject(s) of the grievance. Thus, a grievant may direct a grievance against the person(s) or body responsible for the decision identified herein.

The decisions or actions of the Faculty Grievance Committee or Ad Hoc Hearing Committee may not themselves be grieved.

# Procedures

### Informal Procedure

  1) A member of the faculty must initially discuss a complaint with the person or body responsible for the action to which the grievant takes exception in order to determine if a resolution is possible.

  2) A complaint must be presented within (10) calendar days of the occurrence or discovery of the alleged violation.

  3) No grievance may be filed without the initiation of this informal complaint procedure.

  4) If the grievance still exists after step one the grievant initiates a consultation with the Vice President for Academic Affairs in order to try to resolve the matter.

### Formal Procedure for Filing a Grievance

  1) The Faculty Grievance Committee is convened.

### Faculty Grievance  Committee

The Faculty Grievance Committee consisting of three tenured faculty members and two alternates (also tenured) is specifically charged with responsibility for resolving matters of grievance and appeal. The Faculty Senate conducts the election of this committee. Faculty currently serving on the Rank and Tenure Committee or the Faculty Development Committee are not eligible for election to this committee.

The term of each member extends for three years, with one person replaced each year. An alternate will be identified at each election. Any member of the Grievance Committee who has had any prior involvement in a case under consideration must recuse him/herself. The Grievance Committee shall annually elect a chair-elect who will succeed the Chair.

### Grievance  Process

The grievant may consult the President of Faculty Senate for assistance in contacting the Faculty Grievance Committee Chair. The Chair should be provided with a written statement setting forth, in detail, the nature of the grievance or appeal and identifying the person(s) or body against whom the grievance or appeal is directed; this document may also include a proposal for resolving the issue. A grievance must be filed within thirty (30) calendar days of the occurrence or discovery of the alleged violation but not fewer than five (5) calendar days after the initiation of the informal complaint.

In considering the grievance or appeal, the Faculty Grievance   Committee will take the following steps:

1) The Committee notifies the decision maker(s) that a grievance has been filed.

2) The Grievance Committee requests from the grievant written information regarding the issues. The Grievance Committee also requests from the decision maker(s) written statements describing the basis for the decision being appealed or grieved, as well as any attempts to settle the matter informally. This information shall be held in confidence by the Grievance Committee. At this point in the process, the information gathered is solely for review by the Committee and is not to be shared with either party involved.

3) At any point, the Grievance Committee may request additional information in writing from the grievant and from the decision-maker(s).

4) If after completing the above steps, the Committee determines that the grievance is improper or unsubstantial, or that sufficient time had not yet been allowed for its normal resolution, or that there is no evidence of improper action on the part of the decision maker(s) which would constitute a legitimate grievance, the Committee will communicate this determination to the grievant and the decision maker(s).

5) If the Grievance Committee determines that there was inadequate consideration or violation of procedures (see No. 3 and 4 under Types of Issues Which Can Be Grieved above), the Committee will return the case to the decision maker for reconsideration.

6) If the grievance is deemed appropriate for mediation, the Chair will appoint a Mediator from the University. The Mediator does not represent either party. Any party may object to the Mediator on the grounds of actual or apparent bias or conflict of interest and submit such objections to the Chair in writing. The Chair will review the objections and may replace the mediator.

7) The Offices of the Vice President for Academic Affairs or Human Resources may be consulted by the Mediator on mediation procedure or other matters involved in the grievance.

8) The Mediator shall try to resolve the grievance within thirty (30) calendar days of formal submission to the chair. With the consent of both parties, the period of mediation may be extended for a short period of time. If the grievance is not resolved within the thirty (30) calendar days, the mediator will advise the chair of the committee in writing that that the issue has not been resolved. If a mutually accepted agreement is reached, this will be communicated to the chair of the committee.

9) Grievances not appropriate for mediation or grievances not resolved through mediation shall be referred to the Ad Hoc Hearing Committee. All evidence collected will be passed on to the Ad Hoc Hearing Committee.

10) If the Faculty Grievance Committee recommends a formal hearing, in cases of violation of academic freedom or impermissible discrimination, an Ad Hoc Hearing Committee will be created to conduct a formal

investigation and to arrive at a recommendation for resolving the issue.

11) The Grievance Committee will make a summary report of its activities at the end of each academic year to the Faculty Senate. No details relevant to the privacy of the participants in any cases will be included in this report.

## Ad Hoc Hearing Committee

The Ad Hoc Hearing Committee shall consist of three members, selected by the Faculty Senate Executive Council, from a standing committee of fifteen tenured Faculty Members elected for one-year terms by the faculty at large. The Faculty Senate conducts the election of this committee.

Each party shall have two challenges without stated cause regarding membership of the Ad Hoc Hearing Committee. No member of the Ad Hoc Hearing Committee shall have had any prior involvement in the case.

If the three-person Ad Hoc Hearing Committee cannot be chosen from the fifteen members of the standing committee, the Executive Council of the Faculty Senate is empowered to conduct a special election to obtain fifteen additional members with terms of one year.

The Ad Hoc Hearing Committee must select a chairperson.

## Ad Hoc Hearing Procedures

1) The Ad Hoc Hearing Committee is empowered to gather information and documents specific to the case of the Grievant, conduct interviews, hold a hearing and take actions as are necessary to investigate the grievance to the extent that the law and University policy permit. The Ad Hoc Hearing Committee will provide recommendations in writing forty (40) calendar days from the date of its official appointment.

2) All Hearings are closed to anyone other than the parties and their advisors, members of the Ad Hoc Hearing Committee, and any witnesses invited to testify by the Committee. The hearing may be audio or video recorded and a written record will be maintained. The hearing is not a legal proceeding. At the beginning of the hearing, all procedures will be made known to the parties, and all information will be kept confidential.

3) Each party to the grievance may have one advisor during the hearing. The advisor may not participate in the hearing.

4) Strict rules of legal evidence will not be binding upon the Ad Hoc Hearing Committee and evidence of probative value in defining issues may be admitted.

5) The hearing record will be used exclusively as the basis for findings of fact and for arriving at a decision.

6) Upon reaching a decision on the issue and a recommendation for action, the Ad Hoc Hearing Committee will provide a summary written report to the petitioner, the person(s) named in the grievance, and the appropriate administrative officer and the President.

7) After receiving the recommendation of the Ad Hoc Hearing Committee, the appropriate administrative officer will review the recommendation and notify the Ad Hoc Hearing Committee and petitioner whether the recommendation has been accepted. If the recommendation of the Ad Hoc Hearing Committee is not

accepted by the appropriate administrative officer, the administrative officer will review it with the Ad Hoc Hearing Committee.

8) No details relevant to the privacy of the participants in the case will be included in the notice from the Hearing Committee. Public statements and publicity about the case by the participants will be avoided until the proceedings have been completed, including consideration by the President

## Action by the President of the University

Following the recommendation of the Ad Hoc Hearing Committee, should the petitioner desire further consideration of the issue beyond the immediate administrative channels of the University, the President may be requested, within twenty calendar days, to review the case.

This review will be based on the record from the committee hearing and may provide opportunity for argument, oral or written, or both, by the principals.  Then the President will then make the final decision.

## Responsibility for Expenses Incurred in Grievance and Appeal

Expenses incurred by the grievant are the responsibility of the individual. These include, but are not limited to, the following:

Cost of an advisor.

Travel expenses for advisor, witnesses, or others engaged by petitioner.

Cost of preparing any documents and copies thereof.

## Withdrawal of a Grievance

The grievance can be withdrawn at any point in the process.

## Non-Retaliation

Grievants will not be adversely affected for exercising their right to file a grievance, regardless of outcome.

Grievants will not be subject to adverse consequences for either initiating a grievance or in presenting evidence on behalf of a grievant.  Anyone who violates this mandate can be subject to disciplinary action, up to and including dismissal.

## Related Policies

- Academic Freedom
- Disability Grievance Procedures
- Civil Rights Policy
- Civil Rights Complaint Procedures
- Sabbatical Leave for Faculty Member
- Non-reappointment of Faculty Member

- Promotion of Faculty Members
- Evaluation of Faculty Members
- Retrenchment of Faculty
- Tenure
- Progressive Discipline

---

# History

10/02/92 - Proposal returned to committee of Faculty Senate by College Committee on Policy

11/13/92 - Proposed policy dated 3/13/92, as amended, recommended by College Committee on Policy to the President

04/26/93 - Presidential approval affirmed with publication of the President's Memo

03/20/98 - Revision proposed by Faculty Senate approved by the President of the University as recommended by the Policy Committee of the University

04/29/11 - Revision approved by the President of the University as recommended by the Policy Committee of the University

---

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

---

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu

EXHIBIT
H



**Marywood**

U N I V E R S I T Y

OFFICE OF THE PRESIDENT

MARYWOOD UNIVERSITY
SCRANTON, PA 18509-1598
TEL: (570) 348-6231
FAX: (570) 340-6014
EMAIL: ANNEMUNLEY@MARYWOOD.EDU
*www.marywood.edu*

April 3, 2012

Dr. Frederick F. Fagal, Jr.
17 East Lake Street
Skaneateles, NY 13152

Dear Dr. Fagal,

I have received your letter dated March 29, 2012. You chose to file a grievance under the Marywood University Faculty Grievance and Appeals Policy and chose not to convene an ad hoc committee to review my recommendation as I had offered to you on two occasions. The Faculty Grievance Committee reviewed your grievance and found no evidence of improper action on my part which would constitute a legitimate grievance.

Since the grievance process is now complete, I have decided to finalize my recommendation. As a result, your employment with Marywood and your tenure are terminated effective today, April 3, 2012.

Further, to provide you with a review of my decision, I will consider your letter dated March 29, 2012 as your authorization for me to convene two faculty ad hoc committees to appeal my decisions to suspend you and to terminate your employment and tenure. I am doing this despite the fact that on two separate occasions you refused my offer and did not choose to convene an ad hoc committee to review my decision to suspend you and my recommendation to terminate your employment and tenure before I finalized my decision.

According to the terms of the Progressive Discipline Policy, you must now select a tenured faculty member for the ad hoc committee. Please submit the name of your selection to Sr. Gail Cabral, President of the Faculty Senate, as soon as possible.

Sincerely,

*Sister Anne Munley IHM*

Sister Anne Munley, IHM
President

*An education inspired by the Sisters, Servants of the Immaculate Heart of Mary.*

# Exhibit 5

EXHIBIT

5

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FREDERICK F. FAGAL, JR., | : |
| | : |
| Plaintiff, | : |
| | : CIVIL ACTION NO. 3:14-cv-2404- |
| v. | : ARC |
| | : |
| MARYWOOD UNIVERSITY, | : |
| | : |
| Defendant. | : |
| | : |

## DEFENDANT'S ANSWER TO PLAINTIFF'S
## AMENDED COMPLAINT AND AFFIRMATIVE AND OTHER DEFENSES

Defendant Marywood University ("Defendant"), by and through its

undersigned counsel, hereby responds to the Amended Complaint of Frederick F.

Fagal, Jr. ("Plaintiff") as follows:

### PARTIES

1.    Admitted.

2.    Admitted in part, denied in part.  Defendant admits that Plaintiff is a

natural person.  Defendant is without knowledge or information sufficient to form

a belief as to the truth of the remainder of the allegations in Paragraph 2 and, thus,

they are denied.

3.    Defendant is without knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 3 and, thus, they are denied.

4.    Admitted.

5.     Admitted.

6.     Admitted.

## JURISDICTION AND VENUE

7.     The allegations in Paragraph 7 are legal conclusions to which no response is required.  To the extent the allegations in Paragraph 7 require a response, they are denied.

8.     The allegations in Paragraph 8 are legal conclusions to which no response is required.  To the extent the allegations in Paragraph 8 require a response, they are denied.

9.     The allegations in Paragraph 9 are legal conclusions to which no response is required.  To the extent the allegations in Paragraph 9 require a response, they are denied.

## FACTUAL BACKGROUND

10.     Admitted in part, denied in part.  Defendant admits only that Plaintiff received a document entitled "Agreement and Appointment for Full-Time Faculty," a partially redacted copy of which is attached to his Amended Complaint. The "Agreement and Appointment for Full-Time Faculty" is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.

11.     Denied.

12.     Admitted.

13.     Admitted.

14.     Admitted in part, denied in part.  Defendant admits only that on July 1, 2010, it issued an edition of its Faculty Handbook.  The Faculty Handbook is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.

15.     Admitted.

16.     Admitted in part, denied in part.  Defendant admits only that it had a "Contractual Agreements with Faculty Members" policy in May 2011.  The policy is a document that speaks for itself and, thus, all characterizations of it are denied.

17.     The allegations in Paragraph 17 are legal conclusions to which no response is required.  To the extent the allegations in Paragraph 17 require a response, they are denied.

18.     Admitted in part, denied in part.  Defendant admits only that in November 2011, Plaintiff scheduled a speaker from the Foundation for Individual Rights in Education ("FIRE") to come to the University in connection with one of Plaintiff's courses. Defendant is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 18, and thus they are denied.

19.     Admitted in part, denied in part.  Defendant admits only that Plaintiff received approval from Defendant to hang posters announcing the speaker from FIRE.  Defendant is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 19 and, thus, they are denied.

20.     Admitted in part, denied in part.  Defendant admits only that it removed some of Plaintiff's posters announcing the FIRE speaker.  The remainder of the allegations in Paragraph 20 are denied.

21.     Denied.

22.     Denied.

23.     Admitted.

24.     Admitted.  By way of further answer, Plaintiff's January 13, 2012 email to Defendant's faculty contained hyperlinks to vulgar and highly offensive YouTube videos depicting Defendant's personnel as Adolph Hitler and other members of the Nazi regime.

25.     Admitted in part, denied in part.  Defendant admits only that on January 23, 2012, one of Defendant's deans visited Plaintiff and advised that President Munley was requesting a meeting with him.  Defendant is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 25, and thus they are denied.

26.     Admitted in part, denied in part.  Defendant admits that on January 23, 2012, President Munley met with Plaintiff regarding whether he posted the YouTube video likening Defendant's faculty to Nazis, and that Plaintiff admitted doing so.  Defendant further admits that Plaintiff was suspended immediately and advised to return his keys and identification to Defendant's Human Resources Department.  The remainder of the allegations in Paragraph 26 are denied.

27.     Admitted.

28.     Admitted in part, denied in part.  Defendant admits only that it has a "Progressive Discipline" policy, a copy of which is attached to Plaintiff's Amended Complaint.  The policy is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.

29.     Denied.

30.     Admitted in part, denied in part.  Defendant admits that Plaintiff was suspended.  Defendant denies that this was a breach of contract and the remainder of the allegations in Paragraph 30.

31.     Denied.

32.     Admitted in part, denied in part.  Defendant admits that on January 24, 2012, President Munley sent Plaintiff a letter recommending Plaintiff be terminated.  Defendant denies the remainder of the allegations in Paragraph 32.

33.      Admitted in part, denied in part.  Defendant admits that President Munley sent a letter to Plaintiff on January 24, 2012.  The letter is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.

34.      Admitted in part, denied in part.  Defendant admits only that a portion of the second charge against Plaintiff was inadvertently omitted in President Munley's January 24, 2012 letter.  The remainder of the allegations in Paragraph 34 are denied.

35.      Admitted in part, denied in part.  Defendant admits only that Plaintiff, through his attorney, requested an amended Statement of Charges and that President Munley sent a letter to Plaintiff on February 8, 2012.  The remaining allegations in Paragraph 35 are denied.

36.      Admitted in part, denied in part.  Defendant admits that President Munley sent a letter to Plaintiff on February 8, 2012.  The letter is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.

37.      Admitted in part, denied in part.  Defendant admits that President Munley sent a letter to Plaintiff on February 8, 2012.  The letter is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.

38.     Admitted in part, denied in part.   Defendant admits that President Munley sent a letter to Plaintiff on February 8, 2012.  The letter is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.

39.     Admitted in part, denied in part.   Defendant admits that President Munley included a document entitled "Release of Personal Information" in her February 8, 2012 letter to Plaintiff.  The release is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.

40.     Admitted in part, denied in part.  Defendant admits only that it has a "Progressive Discipline" policy, which was in effect at the time of Plaintiff's termination.  The policy is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.   The remainder of the allegations in Paragraph 40 are denied.

41.     Admitted in part, denied in part.   Defendant admits only that Plaintiff's suspension began on January 23, 2012.  The remainder of the allegations in Paragraph 41 are denied.

42.     Admitted in part, denied in part.  Defendant admits only that it has a "Civil Rights Complaint Procedures" policy, which was in effect at the time of Plaintiff's termination.  The policy is a document that speaks for itself, and, thus,

all accurate quotations are admitted and all mischaracterizations of it are denied. The remainder of the allegations in Paragraph 42 are denied.

43.     The allegations in Paragraph 43 are legal conclusions to which no response is required.   To the extent the allegations in Paragraph 43 require a response, they are denied.

44.     Admitted in part, denied in part.  Defendant admits only that President Munley sent letters to Plaintiff on January 24, 2012 and February 8, 2012.  These letters are documents that speak for themselves and, thus, all accurate quotations are admitted and all mischaracterizations of them are denied.

45.     Admitted in part, denied in part.  Defendant admits only that President Munley sent letters to Plaintiff on January 24, 2012 and February 8, 2012.  These letters are documents that speak for themselves and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.

46.     Admitted in part, denied in part.  Defendant admits only that President Munley sent letters to Plaintiff on January 24, 2012 and February 8, 2012.  These letters are documents that speak for themselves and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.

47.     Admitted in part, denied in part.  Defendant admits only that it has a "Progressive Discipline" policy, which was in effect at the time of Plaintiff's

termination. The policy is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.

48. Admitted in part, denied in part. Defendant admits only that Plaintiff, through his attorney, communicated with Defendant on February 2, 2012. The communication is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.

49. Admitted in part, denied in part. Defendant admits only that its counsel sent a letter to Plaintiff's counsel on February 9, 2012. The letter is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.

50. Denied.

51. Admitted in part, denied in part. Defendant admits only that on February 22, 2012, Plaintiff filed a grievance against President Munley. The remainder of the allegations in Paragraph 51 are denied.

52. Admitted in part, denied in part. Defendant admits only that Plaintiff filed a grievance against President Munley. The grievance is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.

53. Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 53 and, thus, they are denied.

54.     Admitted in part, denied in part.  Defendant admits only that on April 3, 2012, President Munley sent a letter to Plaintiff.  The letter is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.

55.     Admitted in part, denied in part.  Defendant admits only that on April 3, 2012, President Munley sent a letter to Plaintiff.  The letter is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.  The remaining allegations in Paragraph 55 are denied.

56.     Denied.

57.     Admitted in part, denied in part.  Defendant admits only that it has a "Progressive Discipline" policy, which was in effect at the time of Plaintiff's termination.  The policy is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.  The remaining allegations in Paragraph 57 are denied.

58.     Admitted in part, denied in part.  Defendant admits only that it has a "Faculty Grievances and Appeals" policy, which was in effect at the time of Plaintiff's termination.  The policy is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.  The remaining allegations in Paragraph 58 are denied.

59. Admitted.

60. Admitted in part, denied in part. Defendant admits only that the Faculty Senate Ad Hoc Hearing Committee issued a document titled "Review of Sister Anne Munley's Decision to Terminate the Employment and Tenure of Dr. Frederick Fagal." This review is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.

61. Denied.

62. Admitted in part, denied in part. Defendant admits only that it had a "Progressive Discipline" policy, which was in effect at the time the Faculty Senate Ad Hoc Hearing Committee issued its "Review of Sister Anne Munley's Decision to Terminate the Employment and Tenure of Dr. Frederick Fagal." The policy is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.

63. Denied.

64. Denied.

65. Admitted in part, denied in part. Defendant admits only that on July 13, 2012, President Munley sent Plaintiff a letter. The letter is a document that speaks for itself, and, thus, all accurate quotations are admitted and all mischaracterizations of it are denied.

66. Admitted.

67. Denied.

## COUNT I
**Breach of Contract**

68. Defendant incorporates by reference its responses to Paragraphs 1-67 as if fully set forth herein.

69. To the extent the allegations contained in Paragraph 69 are legal conclusions, no response is required. The remainder of the allegations in Paragraph 69 are denied.

70. To the extent the allegations contained in Paragraph 70 are legal conclusions, no response is required. The remainder of the allegations in Paragraph 70 are denied.

71. To the extent the allegations contained in Paragraph 71 are legal conclusions, no response is required. The remainder of the allegations in Paragraph 71 are denied.

Defendant denies that Plaintiff is entitled to any relief requested in the WHEREFORE clause of the Amended Complaint.

Defendant denies any allegation not specifically admitted, denied, or referred to on information and belief.

WHEREFORE, Defendant respectfully requests that this Court:

a. Dismiss the Amended Complaint in its entirety;

b. Deny each and every demand, claim and prayer for relief contained in the Amended Complaint;

c. Award to Defendant reimbursement for reasonable attorneys' fees and costs incurred in defending this meritless and vexatious action; and

d. Grant such other and further relief as the Court may deem just and proper.

## AFFIRMATIVE AND OTHER DEFENSES

### FIRST DEFENSE

The Amended Complaint fails to state any claim upon which relief can be granted.

### SECOND DEFENSE

Plaintiff's claims for damages are barred or reduced by his failure to mitigate his alleged damages by using reasonable diligence to obtain subsequent employment.

### THIRD DEFENSE

Defendant acted reasonably and in good faith at all times.

### FOURTH DEFENSE

Defendant's Faculty Manual, Faculty Handbook, Policies and Procedures Manual, including all policies therein, and the letter agreements referenced in Plaintiff's Amended Complaint, do not constitute binding, enforceable contracts.

### FIFTH DEFENSE

To the extent Defendant and Plaintiff had an enforceable contract related to Plaintiff's employment and/or tenure, Plaintiff materially breached that agreement, Defendant provided notice of such breach, and Defendant was absolved of any obligations thereunder.

**SIXTH DEFENSE**

Each and every action taken by Defendant with respect to Plaintiff was justified by business necessity.

**SEVENTH DEFENSE**

The unclean hands doctrine applies and prohibits Plaintiff from judgment in his favor.

**EIGHTH DEFENSE**

Defendant did not breach any contract with Plaintiff.

**NINTH DEFENSE**

Defendant followed its applicable policies and procedures with respect to suspending and terminating Plaintiff.

Respectfully submitted,

*/s/ - Stephanie Peet*
Stephanie J. Peet (PA ID: 91744)
Katharine Thomas Batista (PA ID: 312366)
**JACKSON LEWIS P.C.**
Three Parkway
1601 Cherry Street, Suite 1350
Philadelphia, PA 19102
T: (267) 319-7802
F: (215) 399-2249
stephanie.peet@jacksonlewis.com
katharine.thomas@jacksonlewis.com

*ATTORNEYS FOR DEFENDANT*

Dated:  June 30, 2015

**CERTIFICATE OF SERVICE**

I, Katharine Thomas Batista, do hereby certify that on the 30th day of June, 2015, I caused a true and correct copy of Defendant's Answer to Plaintiff's Amended Complaint and Affirmative and Other Defenses to be served upon the following individuals by CM/ECF and U.S. First Class Mail:

Jonathan Z. Cohen, Esquire
175 Strafford Avenue
Suite 1 PMB 212
Wayne, PA 19087


**JACKSON LEWIS P.C.**


*/s/ - Katharine Thomas Batista*
Katharine Thomas Batista
Attorney ID #312366
Three Parkway
1601 Cherry Street
Suite 1350
Philadelphia, PA 19102-1317
T: (267) 319-7802
F: (215) 399-2249
katharine.thomas@jacksonlewis.com

*ATTORNEYS FOR DEFENDANT*

# Exhibit 6



EXHIBIT
6

## Policies and Procedures Manual: Academic Freedom

### Policy Statement

Marywood University affirms its commitment to academic freedom. In so doing, it reaffirms its commitment to the tradition of higher learning that is the heritage of both the Roman Catholic Church and the nation. It is a tradition grounded on respect for truth, social responsibility and individual rights. It is a tradition that posits freedom of inquiry, open discussion and unrestricted exchange of ideas as essential to the pursuit of knowledge.

Marywood University upholds academic freedom as a fundamental condition for research and dissemination of information. The University is a center of discourse where inquiry is encouraged and discoveries are verified and refined by the interaction of scholar with scholar. Marywood University respects the right and responsibility of its faculty and students to conduct research, to publish their findings, and to discuss ideas according to the principles, sources and methods of their academic disciplines. These principles, sources and methods, as they develop over time, are not external to their respective disciplines. The University sanctions and encourages investigation of unexplored phenomena, advancement of knowledge, and critical examination of ideas, old and new. The University accepts the responsibility of protecting both teacher and student from being forced to deny truth that has been discovered or to assert claims that have not been established in the discipline. Teachers are entitled to freedom in the classroom in discussing their subject, but they should be careful not to introduce into their teaching material matter that has no relation to their subject.

Where the faculty is concerned, academic freedom presupposes, first of all, personal integrity in dealing with students, peers and officers of the University. Second, it presumes scholarly competence, observance of the professional standards of one's discipline, commitment to the stated mission of the University, and openness to having one's ideas and findings subjected to the judgment of one's peers. Third, faculty members have a responsibility as professional scholars to be accurate and judicious in their public statements, and respectful of the opinions and responsibilities of others.

### Related Policies

- Professional Ethics
- Evaluation of Faculty Members
- Faculty Status

### Related Committees

Institutional Review Board for the Protection of Human Participants

## History

12/01/79 - Reaffirmed with publication of *Faculty Manual*
07/01/93 - Introduction and postscript added
07/01/03 - "Human Subejcts" changed to "Human Participants"
02/19/10 - Revision approved by the President of the University as recommended by the Policy Committee of the University

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu

# Exhibit 7



<div style="border:1px solid;">EXHIBIT 7</div>

# Policies and Procedures Manual: Professional Ethics



## Policy Statement

The American Association of University Professors recognizes that membership in the academic profession carries with it special responsibility. The Statement on Professional Ethics that follows sets forth general standards assumed by members of the profession.

Professors, guided by a deep conviction of the worth and dignity of the advancement of knowledge, recognize the special responsibilities placed upon them. Their primary responsibility to their subject is to seek and to state the truth as they see it. To this end, professors devote their energies to developing and improving their scholarly competence. They accept the obligation to exercise critical self-discipline and judgment in using, extending, and transmitting knowledge. They practice intellectual honesty. Although professors may follow subsidiary interests, these interests must never seriously hamper or compromise their freedom of inquiry.

As teachers, professors encourage the free pursuit of learning in their students. They hold before them the best scholarly and ethical standards of their discipline. Professors demonstrate respect for students as individuals and adhere to their proper roles as intellectual guides and counselors. Professors make every reasonable effort to foster honest academic conduct and to assure that their evaluations of students reflect each student's true merit. They respect the confidential nature of the relationship between professor and student. They avoid any exploitation, harassment, or discriminatory treatment of students. They acknowledge significant academic or scholarly assistance from them. They protect their academic freedom.

As colleagues, professors have obligations that derive from common membership in the community of scholars. Professors do not discriminate against or harass colleagues. They respect and defend the free inquiry of associates. In the exchange of criticism and ideas, professors show due respect for the opinions of others. Professors acknowledge academic debt and strive to be objective in their professional judgment of colleagues. Professors accept their share of faculty responsibilities for the governance of their institution.

As members of an academic institution, professors seek above all to be effective teachers and scholars. Although professors observe the stated regulations of the institution, provided the regulations do not contravene academic freedom, they maintain their right to criticize and seek revision. Professors give due regard to their paramount responsibilities within their institution in determining the amount and character of work done outside it. When considering the interruption or termination of their service, professors recognize the effect of their decision upon the program of the institution and give due notice of their intentions.

As members of their community, professors have the rights and obligations of other citizens. Professors measure the urgency of these obligations in the light of their responsibilities to their

subject, to their students, to their profession, and to their institution. When they speak or act as private persons, they avoid creating the impression of speaking or acting for their college or university. As citizens engaged in a profession that depends upon freedom for its health and integrity, professors have a particular obligation to promote conditions of free inquiry and to further public understanding of academic freedom.

## Related Policies

- Teaching Responsibility
- Librarianship Responsibility
- Faculty Status

## History

07/01/89 - Reaffirmed with publication of Faculty Manual

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu

# Exhibit 8



**EXHIBIT 8**

# President's Page: Marywood University's Goals & Objectives

**Provide a values based context for university experiences.**

- A majority of students will participate in service opportunities in an on-going way.
- Students will demonstrate an understanding of the ethical dimensions of their fields of study.
- A majority of students will participate in spiritual development activities.
- Employees will demonstrate core values in the work place.

**Foster an awareness and appreciation of the pluralistic nature of contemporary society.**

- Graduates will choose to study or work in multicultural settings either at home or abroad.
- Students will demonstrate a deeper appreciation for cultural diversity and an understanding of global issues.
- Enrolled students will travel abroad during their college years.
- Employee groups and governing bodies will reflect the pluralistic nature of contemporary society.

**Provide a supportive and welcoming environment to a diverse academic community.**

- Students enrolled in any program will fulfill their academic goals by successfully completing their degree work.
- An increasing number of racially and culturally diverse students and employees will choose Marywood as a welcoming community.
- Students from a cross-section of socio-economic groups will enroll in each incoming class.
- Campus constituencies will express satisfaction with all campus services.

**Prepare people for socially responsible leadership roles.**

- Students will participate in an internship or practicum experience.
- Students will demonstrate a significant level of co-curricular activities.
- Students will experience positive interactions with faculty members outside of class.
- Employees will serve as role models of socially responsible leaders.

**Provide a challenging instructional program.**

- Students will demonstrate achievement of cognitive skills at a level comparable to peers on standardized tests.
- Students will demonstrate the ability to think critically by engaging in research activities and by developing problem solving strategies.
- Students will demonstrate the ability to integrate the liberal arts tradition with their professional specializations.
- Students will demonstrate competence in both information literacy skills and communications skills.
- Faculty will provide evidence of ongoing scholarly activity.

**Inspire a sense of personal responsibility for responding to social justice issues.**

- Faculty, staff, and students will participate in projects designed to address social inequities.
- Students will demonstrate knowledge of both national and international social justice issues.
- Faculty, students, and staff will serve as advocates for justice in their personal and professional lives.

President's Office | Fran Ferrese, Executive Secretary | (570) 348-6231 | ferrese@marywood.edu

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

Marywood YOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu

# Exhibit 9

**EXHIBIT**

**9**

Not

provided

in staff

letter

# Marywood University
## Policies and Procedures Manual

**4.307.3**

**Progressive Discipline**

### Policy Statement

Marywood University endorses a progressive discipline policy designed to promote resolution in a fair and orderly manner. This policy applies to faculty members with tenure or whose terms of appointment have not yet expired. Its objectives support the collegial relationships at Marywood University and are directed toward continual institutional improvement. Because the University regards disciplinary action as corrective and not punitive, the policy recognizes personal and professional problems that may be rectified by an informal educational process, as well as serious violations of professional responsibilities implicating possible recommendation for suspension or dismissal.

The policy is intended to provide an effective and flexible means of identifying problem areas, resolving complaints, and preventing repetitive incidents by prompt intervention and assistance. It is designed to accomplish these ends by a series of gradual steps involving strategies such as personal conferences, oral and written warnings, and opportunities for monitored assistance where applicable.

### Procedures

*Commencement.* Disciplinary action may be initiated by a complaint, oral or written, which alleges violation of institutional policy, practice, procedure or other functions and responsibilities of the faculty member in pursuing his or her customary teaching and institutional role. The complaint, which may reflect an incident or incidents of misconduct or deficiency, may be communicated to the faculty member's immediate supervisor or to the appropriate dean.

*Meeting with Administrator.* The administrator receiving the complaint shall discuss the matter with the faculty member in a confidential conference. If additional information from the faculty member provides a satisfactory explanation, the decision may be to close the matter then. If, however, additional light is not shed on the allegation or an explanation is not satisfactory, the administrator will specify corrective action to be taken, and the discussion will constitute an oral warning.

*Written Warning.* If the alleged problem continues or additional complaints are received, the immediate supervisor or dean must notify the Vice President for Academic Affairs, who shall conduct a preliminary investigation concerning the merits of the complaint. A written warning to the faculty member may follow where circumstances indicate that the problem is not resolved. The written warning will become a part of the faculty member's personnel file, but will be expunged after three years if no other written warnings have occurred.

*Suspension.* The faculty member may be suspended by the Vice President for Academic Affairs at any time during the proceedings involving him or her. Suspension is justified if immediate harm to the faculty member or others is threatened by the person's continuance in the faculty position. Unless in direct violation of the law, any such suspension should be with pay.



Fagal v. Marywood University          February 26, 2016          DEF000249

*Special Assistance.* In those circumstances where it is evident that the faculty member is in need of special professional assistance, the Vice President for Academic Affairs may require in writing any of the following remedial actions:

- counseling and/or another type of treatment program, such as Alcoholics Anonymous or Narcotics Anonymous;
- psychological counseling and/or treatment, including out-patient treatment prescribed by a duly credentialed and qualified professional;
- peer faculty monitoring to assist in resolving work-related performance problems;
- a specified number of periodic conferences with the faculty member's Dean to assist in resolving administrative or institutional problems.

Special professional assistance will be for a specific period of time. Where the assistance necessitates in-patient treatment or time away from teaching, that temporary time-off shall be with pay. During the period of assistance, the faculty member shall communicate weekly or at other intervals specified by the Vice President for Academic Affairs, who shall monitor the faculty member's progress to determine when and if the special assistance has achieved its objective. Part of this monitoring function may involve the faculty member providing summary statements from treatment providers regarding compliance and prognosis. If the faculty member has refused to participate, or the remedial objective has not been reached during the specified period of time, a recommendation to terminate employment may be made to the President of the University.

*Dismissal*

If remedial actions(s) taken during the suspension does not sufficiently resolve the issues that lead to the suspension, the university may move towards dismissal of the faculty member.

*Ad Hoc Faculty Committee*

Faculty members have the right to convene an ad hoc committee in order to appeal either a decision to suspend the faculty member or a decision to dismiss the faculty member.

- Having received a written recommendation for either suspension or dismissal from the Vice President for Academic Affairs, the President of the University sends a written communication to the faculty member, stating with reasonable particularity the basis for suspension or dismissal and offering, if requested by the faculty member within 10 days, to convene a tenured faculty ad hoc committee to consider the matter, to render confidential advice, and thereby to effect a remedy if possible.

- Should the faculty member request a review by an ad hoc committee, it shall consist of three members selected in the following order: (a) one tenured faculty member selected by the person seeking assistance, and (2) two tenured faculty members selected by the Executive Council of the Faculty Senate. The choice of members should be on the basis of their objectivity and competence and of the regard in which they are held in the academic community. The President of the University or his/her delegate has the option of attending the meetings of the Committee. Should a faculty member request that such a committee be convened twice (i.e., once for suspension and once for dismissal), the membership of the committee may be similar or different, a determination which is made by the President of the University in consultation with the faculty member and the Vice

---

4.307.3                          Progressive Discipline.doc                     Print Date 02/28/12

President for Academic Affairs. Normally the committee would make its recommendation within 30 days of being convened.

- The Committee elects its own Chair, who sends the opinion of the committee in writing to the President of the University, copied to the faculty member and to the Vice President for Academic Affairs. If the opinion of the Faculty Committee is that the matter is successfully resolved or that there is no merit to the complaint, a recommendation shall be made to discontinue proceedings. If the problem has not been corrected and reason still exists to question the fitness of the faculty member, the recommendation shall be to either continue a suspension or initiate a formal action toward dismissal. .

*Publicity.* · Public statements by the faculty member or others about possible or actual termination of employment should be avoided.

**Related Policies**

4.302.1 – Contractual Agreements with Faculty
4.305.3 – Tenure
4.307.2 – Non-reappointment of Faculty Member

**History of Policy No. 4.307.3 – Progressive Discipline**

07/01/89 – Reaffirmed with publication of Faculty Manual
12/12/97 – Addition of informal process approved by the President
07/01/03 – Editorial changes made to reflect academic restructuring
10/12/11 – Revision approved by the President of the University as recommend by the Policy Committee of the University

MARYWOOD UNIVERSITY
POLICIES AND PROCEDURES MANUAL

Mary Theresa Gardier Paterson, Esquire
Secretary of the University
Phone: (570) 340-6018
E-mail: paterson@maryu.marywood.edu

| Print Date 02/28/12 | Progressive Discipline.doc | 4.307.3 |

# Exhibit 10

EXHIBIT

10

# Marywood University
## Policies and Procedures Manual                          4.312.1
### Faculty Grievances and Appeals

As an institution of higher education, Marywood University brings together a faculty, administration, and governing board united in a common bond of academic purpose. Essential to the fulfillment of this purpose is a mutual recognition of institutional integrity and individual human rights, along with an understanding of the respective roles of the several entities which constitute this educational organization.

Circumstances may arise at times, however, wherein a grievant—full-time, part-time, or pro-rata—may question decisions which affect his/her professional role in the institution. To assist in the resolution of these matters, a series of guidelines for grievances is herein set forth.

**Definitions**

Grievance: A grievance refers to any disagreement between two parties. A grievance identifies a complaint one party has against another party for some alleged wrongful action on the part of the second party.

Grievant: A Grievant initiates a grievance.

**Types of Issues That Can Be Grieved**

It is understood that procedural rather than substantive factors provide appropriate areas of review, and the Faculty Grievance Committee will not attempt to substitute its judgment for that of the decision-maker(s) involved in the case.

Thus, the Faculty Grievance Committee will hear grievances  concerning:

1) Allegations of violation of academic freedom resulting in: denial of tenure, promotion, or sabbatical leave; non-reappointment.

2) Allegations of impermissible discrimination. Tenured and non-tenured faculty are protected against illegal or unconstitutional discrimination, or on any basis not relevant to job performance, and includes, but is not limited to, race, sex, religion, national origin, age, disability, marital status, or sexual orientation

3) Allegations of inadequate consideration resulting in: denial of tenure, promotion, or sabbatical leave; non-reappointment; or termination of employment due to retrenchment.

4) Allegations of violations of procedures used in rendering decisions in numbers 1 and 2 above as set forth in Chapter 2 of the *Faculty Handbook.*

Procedures regarding dismissal, suspension, and sanctions of faculty members are in the *Progressive Discipline* policy.

Fagal v. Marywood University          February 26, 2016          DEF000252

Should a grievant allege cause for grievance in any matter not identified in the above guidelines, the grievant may consult the Faculty Grievance Committee. In such circumstances, the Committee's first decision is whether the complaint is appropriate and sufficiently serious to merit consideration.

### Persons Against Whom Grievances May be Directed

Fundamentally, a grievance may arise from an allegation of improper implementation of a procedure or process leading to a decision. The person(s) or body who perform(s) that procedure or process is (are) the subject(s) of the grievance. Thus, a grievant may direct a grievance against the person(s) or body responsible for the decision identified herein.

The decisions or actions of the Faculty Grievance Committee or Ad Hoc Hearing Committee may not themselves be grieved.

### Informal Procedure

1) A member of the faculty must initially discuss a complaint with the person or body responsible for the action to which the grievant takes exception in order to determine if a resolution is possible.

2) A complaint must be presented within (10) calendar days of the occurrence or discovery of the alleged violation.

3) No grievance may be filed without the initiation of this informal complaint procedure.

4) If the grievance still exists after step one the grievant initiates a consultation with the Vice President for Academic Affairs in order to try to resolve the matter.

### Formal Procedure for Filing a Grievance

1) The Faculty Grievance Committee is convened.

### Faculty Grievance Committee

The Faculty Grievance Committee consisting of three tenured faculty members and two alternates (also tenured) is specifically charged with responsibility for resolving matters of grievance and appeal. The Faculty Senate conducts the election of this committee. Faculty currently serving on the Rank and Tenure Committee or the Faculty Development Committee are not eligible for election to this committee.

The term of each member extends for three years, with one person replaced each year. An alternate will be identified at each election. Any member of the Grievance Committee who has had any prior involvement in a case under consideration must recuse him/herself. The Grievance Committee shall annually elect a chair-elect who will succeed the Chair.

---

Fagal v. Marywood University          February 26, 2016                    DEF000253

Grievance Process

The grievant may consult the President of Faculty Senate for assistance in contacting the Faculty Grievance Committee Chair. The Chair should be provided with a written statement setting forth, in detail, the nature of the grievance or appeal and identifying the person(s) or body against whom the grievance or appeal is directed; this document may also include a proposal for resolving the issue. A grievance must be filed within thirty (30) calendar days of the occurrence or discovery of the alleged violation but not fewer than five (5) calendar days after the initiation of the informal complaint.

In considering the grievance or appeal, the Faculty Grievance   Committee will take the following steps:

1) The Committee notifies the decision maker(s) that a grievance has been filed.

2) The Grievance Committee requests from the grievant written information regarding the issues. The Grievance Committee also requests from the decision maker(s) written statements describing the basis for the decision being appealed or grieved, as well as any attempts to settle the matter informally. This information shall be held in confidence by the Grievance Committee. At this point in the process, the information gathered is solely for review by the Committee and is not to be shared with either party involved.

3) At any point, the Grievance Committee may request additional information in writing from the grievant and from the decision-maker(s).

4) If after completing the above steps, the Committee determines that the grievance is improper or unsubstantial, or that sufficient time had not yet been allowed for its normal resolution, or that there is no evidence of improper action on the part of the decision maker(s) which would constitute a legitimate grievance, the Committee will communicate this determination to the grievant and the decision maker(s).

5) If the Grievance Committee determines that there was inadequate consideration or violation of procedures (see No. 3 and 4 under Types of Issues Which Can Be Grieved above), the Committee will return the case to the decision maker for reconsideration.

6) If the grievance is deemed appropriate for mediation, the Chair will appoint a Mediator from the University. The Mediator does not represent either party. Any party may object to the Mediator on the grounds of actual or apparent bias or conflict of interest and submit such objections to the Chair in writing. The Chair will review the objections and may replace the mediator.

7) The Offices of the Vice President for Academic Affairs or Human Resources may be consulted by the Mediator on mediation procedure or other matters involved in the grievance.

Fagal v. Marywood University              February 26, 2016                    DEF000254

8) The Mediator shall try to resolve the grievance within thirty (30) calendar days of formal submission to the chair. With the consent of both parties, the period of mediation may be extended for a short period of time. If the grievance is not resolved within the thirty (30) calendar days, the mediator will advise the chair of the committee in writing that that the issue has not been resolved. If a mutually accepted agreement is reached, this will be communicated to the chair of the committee.

9) Grievances not appropriate for mediation or grievances not resolved through mediation shall be referred to the Ad Hoc Hearing Committee. All evidence collected will be passed on to the Ad Hoc Hearing Committee.

10) If the Faculty Grievance Committee recommends a formal hearing, in cases of violation of academic freedom or impermissible discrimination, an Ad Hoc Hearing Committee will be created to conduct a formal investigation and to arrive at a recommendation for resolving the issue.

11) The Grievance Committee will make a summary report of its activities at the end of each academic year to the Faculty Senate. No details relevant to the privacy of the participants in any cases will be included in this report.

**Ad Hoc Hearing Committee**

The Ad Hoc Hearing Committee shall consist of three members, selected by the Faculty Senate Executive Council, from a standing committee of fifteen tenured Faculty Members elected for one-year terms by the faculty at large. The Faculty Senate conducts the election of this committee.

Each party shall have two challenges without stated cause regarding membership of the Ad Hoc Hearing Committee. No member of the Ad Hoc Hearing Committee shall have had any prior involvement in the case.

If the three-person Ad Hoc Hearing Committee cannot be chosen from the fifteen members of the standing committee, the Executive Council of the Faculty Senate is empowered to conduct a special election to obtain fifteen additional members with terms of one year.

The Ad Hoc Hearing Committee must select a chairperson.

**Ad Hoc Hearing Procedures**

1) The Ad Hoc Hearing Committee is empowered to gather information and documents specific to the case of the Grievant, conduct interviews, hold a hearing and take actions as are necessary to investigate the grievance to the extent that the law and University policy permit. The Ad Hoc Hearing Committee will provide recommendations in writing forty (40) calendar days from the date of its official appointment.

2) All Hearings are closed to anyone other than the parties and their advisors, members of the Ad Hoc Hearing Committee, and any witnesses invited to testify by the Committee. The hearing may be audio or video recorded and a written record will be maintained. The

Fagal v. Marywood University          February 26, 2016                    DEF000255

hearing is not a legal proceeding. At the beginning of the hearing, all procedures will be made known to the parties, and all information will be kept confidential.

3) Each party to the grievance may have one advisor during the hearing. The advisor may not participate in the hearing.

4) Strict rules of legal evidence will not be binding upon the Ad Hoc Hearing Committee and evidence of probative value in defining issues may be admitted.

5) The hearing record will be used exclusively as the basis for findings of fact and for arriving at a decision.

6) Upon reaching a decision on the issue and a recommendation for action, the Ad Hoc Hearing Committee will provide a summary written report to the petitioner, the person(s) named in the grievance, and the appropriate administrative officer and the President.

7) After receiving the recommendation of the Ad Hoc Hearing Committee, the appropriate administrative officer will review the recommendation and notify the Ad Hoc Hearing Committee and petitioner whether the recommendation has been accepted. If the recommendation of the Ad Hoc Hearing Committee is not accepted by the appropriate administrative officer, the administrative officer will review it with the Ad Hoc Hearing Committee.

8) No details relevant to the privacy of the participants in the case will be included in the notice from the Hearing Committee. Public statements and publicity about the case by the participants will be avoided until the proceedings have been completed, including consideration by the President

**Action by the President of the University**

Following the recommendation of the Ad Hoc Hearing Committee, should the petitioner desire further consideration of the issue beyond the immediate administrative channels of the University, the President may be requested, within twenty calendar days, to review the case.

This review will be based on the record from the committee hearing and may provide opportunity for argument, oral or written, or both, by the principals. Then the President will then make the final decision.

**Responsibility for Expenses Incurred in Grievance and Appeal**

Expenses incurred by the grievant are the responsibility of the individual. These include, but are not limited to, the following:

    Cost of an advisor.
    Travel expenses for advisor, witnesses, or others engaged by petitioner.
    Cost of preparing any documents and copies thereof.

**Withdrawal of a Grievance**
The grievance can be withdrawn at any point in the process.

Fagal v. Marywood University      February 26, 2016      DEF000256

## Non-Retaliation

Grievants will not be adversely affected for exercising their right to file a grievance, regardless of outcome.

Grievants will not be subject to adverse consequences for either initiating a grievance or in presenting evidence on behalf of a grievant. Anyone who violates this mandate can be subject to disciplinary action, up to and including dismissal.

## Related Policies

4.300.2 - Faculty Senate
4.304.1 - Evaluation of Faculty
4.305.1 - Promotion of Faculty
4.305.3 - Tenure
4.307.2 - Non-reappointment of Faculty Member
4.307.3 - Progressive Discipline
4.307.4 - Retrenchment of Faculty
4.308.1 - Academic Freedom
4.309.2 - Sabbatical Leave
5.350.4 - Complaint Procedures for Non-faculty Employees

## History of Policy No. 4.312.1 – Faculty Grievances and Appeals

10/02/92 – Proposal returned to committee of Faculty Senate by College Committee on Policy
11/13/92 – Proposed policy dated 3/13/92, as amended, recommended by College Committee on Policy to the President
04/26/93 – Presidential approval affirmed with publication of the President's Memo
07/01/93 – Reaffirmed with publication of the Faculty Manual 2.16
07/01/95 – Reaffirmed with publication of the Faculty Manual 2.16
03/20/98 - Revision proposed by Faculty Senate approved by the President of the University as recommended by the Policy Committee of the University
04/29/11 – Revision approved by the President of the University as recommended by the Policy Committee of the University.

MARYWOOD UNIVERSITY
POLICIES AND PROCEDURES MANUAL

Mary Theresa Gardier Paterson, Esquire
Secretary of the University and General Counsel
Phone: 570-340-6018
Fax: paterson@marywood.edu

4.312.1                    Faculty Grievances and Appeals.doc                    Print Date 02/28/12

# Exhibit 11

**EXHIBIT 11**

**Marywood**
U N I V E R S I T Y

# Policies and Procedures Manual: Violent Acts and Threats



## Policy Statement

Marywood University is committed to maintaining an environment that avoids exposure of staff, students, and visitors to foreseeable risks and prevents unnecessary damage to University property. If violent acts occur or threats of violence are perceived on campus or on other property controlled by the University, decisive action will be taken immediately to limit the potential for further development.

The Senior Director of Safety, Security and Environmental Compliance is responsible for ensuring that federal and state laws regarding crimes and offenses and University regulations related to a safe environment are enforced. She/he has the authority to determine whether circumstances surrounding the behavior constitute a credible threat or act of violence, and to inform law enforcement authorities in the case of an alleged violation of public law. Calls to 911 by others in obvious emergency situations must be reported to the Chief of Campus Safety and the Senior Director of Safety, Security and Environmental Compliance as soon as possible.

A Marywood University student, faculty, or staff member in violation of this policy will be subject to University disciplinary policies and procedures up to and including termination.

## Definitions

For purposes of this policy, threats and acts of violence include but are not limited to

- Repeatedly swearing or using abusive or offensive language toward others;
- Intentionally damaging property;
- Verbalizing a wish or intent to hurt others;
- Sending aggressive or threatening written, verbal, electronic, or visual communications;
- Engaging in felony property damage;
- Engaging in aggravated assault;
- Possession, whether open or concealed, storage in or on personal or University property, delivery, transportation, use, sale, purchase or receipt of a weapon on University property.

 

## Procedures

In the event of an act or threat of one that appears to be violent, the Chief of Campus Safety is to be notified as soon as possible. Threatening behavior is complex, and it is not expected that students, faculty, or staff will be experts in assessing it. If the Chief of Campus Safety is not available, the Director of Safety, Security and Environmental Compliance shall be notified.

The Emergency Response Plan and Personnel Manual for the Campus Safety Department are maintained in the Office of Campus Safety.

**Related Policies**

- Safe University Environment
- Drug-Free Workplace
- Civil Rights Policy
- Complaint Procedures for Administrators and Staff
- Civil Rights Complaint Procedures
- Institutional Property Policy
- Faculty Grievances and Appeals

---

**History**

12/07/01 - Approved by the President of the University as recommended by the University Committee on Policy
01/30/06 - Cyclical review approved
04/29/11 - Revision approved by the President of the University as recommended by The Policy Committee of the University

 

---

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

---

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu

Exhibit 12

# Marywood University Policy & Procedure Information

**EXHIBIT 12**

Home » Policies and Procedures Manual »

Table of Contents

Preliminaries

Board of Trustees

University-Wide

Presidential Area

Academic Affairs

Business Affairs

Student Life

University Advancement

Administrative Services

- Policy Development, Approval, and Dissemination
- Policy Format



**Index**

## Institutional Property Policy

### Policy Statement

Employees are expected to handle all Marywood University property with respect and care. They are prohibited from using Marywood University property for unauthorized personal use, and from stealing or destroying it.

To protect the Marywood community and the University from theft, Marywood University reserves the right to search employees and their personal property when there is reason to believe that such search may indicate whether the law or University policy is being violated. The University will exercise discretion in determining who will perform searches.

Marywood University also reserves the right to conduct unannounced searches of University facilities and property, e.g., University vehicles, desks, file cabinets, lockers, etc. Searches of University facilities and property, including University property in the possession of the employee, can be conducted at any time with the prior approval of an executive officer or his or her designee.

Employees are expected to cooperate in the conducting of all such searches.

Violations will be dealt with under the *Code of Conduct for Non-faculty Employees* policy or the *Progressive Discipline* policy for faculty, and may include warnings, suspension, termination, and/or legal prosecution.

Upon termination of employment, all Marywood University property must be returned to the University.

Marywood University is not responsible for personal property that employees bring to work.

### Definitions

The following list, although not exhaustive, is illustrative of what is considered to be Marywood University property when purchased by the University: infrastructure; furniture and office furnishings, office, lab, studio, or video equipment; tools; files; computers and attached peripherals, software, systems information; phones; data stored on Marywood University computers or phones; books; books and audio and visual tapes, records, and discs; and any other intellectual property owned or co-owned by Marywood University.

### Related Policies

- Conditions of Computer Use
- Printing Services

### Related Committees

### History

04/07/00 - Approved by the President of the University as recommended by the Policy Committee of the University

---

Secretary of the University & General Counsel | 108 Immaculata Hall
570-340-6018 | F: 570-340-6014 | paterson@marywood.edu
Please note, the materials presented on this website are provided for informational purposes only and may not be construed as legal advice from the Office of the Secretary of the University and General Counsel.

      

# Exhibit 13

**Marywood**
U N I V E R S I T Y

Academics  Admissions  Campus Life  Faith & Service  About

Home » Policies and Procedures Manual »

## Marywood University Policy & Procedure Information

<div style="border:1px solid black">

**EXHIBIT
13**

</div>

Table of Contents

Preliminaries

Board of Trustees

University-Wide

Presidential Area

Academic Affairs

Business Affairs

Student Life

University Advancement

Administrative Services

- Policy Development, Approval, and Dissemination
- Policy Format

 Index

## Deadly Weapons and Fireworks

### Policy Statement

Deadly weapons and fireworks may not be brought onto property owned or controlled by Marywood University. This prohibition is a proactive step toward reducing the risk of bodily injury or death due to intentional, accidental, inexpert or improper use. It applies equally to those carried by persons with a government-issued permit.

The policy regarding weapons does not apply to duly appointed/sworn law enforcement officers or members of the United States Armed Forces when on duty.

There may be activities such as physical fitness, theatrical productions, displays, trainings or educational workshops that may appear to violate the letter of the law but not the intent of this policy. In such cases, written approval from the Senior Director of Safety, Security and Environmental Compliance is required before that activity takes place.

A Marywood University student, faculty or staff member in violation of this policy will be subject to University disciplinary policies and procedures up to and including termination.

### Definitions

For purposes of this policy, reference Commonwealth of Pennsylvania law.

Deadly weapons are any firearm, whether loaded or unloaded, or any device designed as a weapon and capable of producing death or serious bodily injury, or any other device or instrumentality that, in the manner in which it is used or intended to be used, is calculated or likely to produce death or serious bodily injury.

Fireworks are any combustible or explosive composition or any article prepared for the purpose of producing a visible or an audible effect by combustion, explosion, deflagration, or detonation.

### Procedures

A person who is found to violate this policy may be required by the Chief of Campus Safety or Campus Safety Officer to remove him/herself and the weapon immediately from University property. Whether the person is asked to leave the property or not, the Chief will decide if circumstances surrounding the incident require notification to local law enforcement officials. Regardless, the Senior Director of Safety, Security and Environmental Compliance will be notified.

### Related Policies

- Violent Acts and Threats

### Related Committees

### History

12/07/01 - Approved by the President of the University as recommended by the Policy Committee of the University
01/27/06 - Cyclical review approved
04/29/11 - Revision approved by the President of the University as recommended by the Policy Committee of the University

---

Secretary of the University & General Counsel | 108 Immaculata Hall
570-340-6018 | F: 570-340-6014 | paterson@marywood.edu
Please note, the materials presented on this website are provided for informational purposes only and may not be construed as legal advice from the Office of the Secretary of the University and General Counsel.

2300 Adams Avenue Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

 Apply   Visit   Request   Give   Social   News  Events   Jobs

©2016 Marywood University | Privacy Policy | Student Consumer | webber@marywood.edu | Sponsored by Sisters, Servants of Immaculate Heart of Mary

CAMPUS RESOURCES:  MarywoodYou  Portal Downtimes  Email  Library  Moodle  Directories  A-Z  Tech Help          STUDENTS  STAFF

# Exhibit 14

**Marywood**
UNIVERSITY

Academics   Admissions   Campus Life   Faith & Service   About

Home » Policies and Procedures Manual »

# Marywood University Policy & Procedure Information



EXHIBIT
14

Table of Contents

Preliminaries

Board of Trustees

University-Wide

Presidential Area

Academic Affairs

Business Affairs

Student Life

University Advancement

Administrative Services

- Policy Development, Approval, and Dissemination
- Policy Format

**Index**

## Progressive Discipline

### Policy Statement

Marywood University endorses a progressive discipline policy designed to promote resolution in a fair and orderly manner. This policy applies to faculty members with tenure or whose terms of appointment have not yet expired. Its objectives support the collegial relationships at Marywood University and are directed toward continual institutional improvement. The primary goal of the progressive discipline policy is to recognize and resolve satisfactorily personal and professional problems that may be rectified through an informal educational process and to forestall their escalation into formal disciplinary action. However, the policy also covers the process governing serious violations of professional responsibilities that may lead to recommendation for suspension or dismissal.

The policy is intended to provide an effective and flexible means of identifying problem areas, resolving complaints, and preventing repetitive incidents by prompt intervention and assistance. It is designed to accomplish these ends by a series of gradual steps involving strategies such as personal conferences, oral and written warnings, and opportunities for monitored assistance where applicable.

Progressive discipline, however, is not guaranteed in every instance. In certain rare and extreme cases, the President has the authority to initiate procedures for suspension or dismissal of a tenured faculty member without that person first undergoing progressive discipline. However, the faculty member retains the right to keep working until the full procedures are completed as outlined below and in the Faculty Grievance Policy.

### Definitions

Faculty Grievance Committee: a committee elected by the faculty according to procedures outlined in the Faculty Grievance Policy. Their job is to review faculty grievances, including those that may arise in response to disciplinary action, such as suspension and dismissal. For more information about their selection and procedures, see the Faculty Grievance Policy.

Dismissal: The discharge of a faculty member from employment at Marywood University.

Progressive Discipline: a course of action tailored to each individual circumstance designed for the purpose of resolving a problem or issue with a faculty member through a series of gradual steps.

Suspension: The temporary barring of a faculty member from all work related to the University for a specified period of time. Unless in direct violation of the law, any such suspension will be with pay.

### Procedures

*Progressive Discipline*

1. Commencement: Disciplinary action may be initiated by a complaint, oral or written, which alleges violation of institutional policy, practice, procedure or other functions and responsibilities of the faculty member in pursuing his or her customary teaching and institutional role. The complaint, which may reflect an incident or incidents of misconduct or deficiency, may be communicated to the faculty member's immediate supervisor or to the appropriate dean.

2. Meeting with Administrator:  The administrator receiving the complaint shall discuss the matter with the faculty member in a confidential conference. If additional information from the faculty member provides a satisfactory explanation, the decision may be to close the matter.

However, if additional light is not shed on the allegation or if the explanation proves unsatisfactory, the administrator will specify corrective action to be taken, and the discussion will constitute an oral warning.

3. Written Warning: If the alleged problem continues or additional complaints are received, the immediate supervisor or dean must notify the Provost, who shall conduct a preliminary investigation concerning the merits of the complaint. A written warning to the faculty member may follow where circumstances indicate that the problem is not resolved.  The written warning will become a part of the faculty member's personnel file but will be expunged after three years if no other written warnings have occurred.

Should further written warnings follow, the Provost may confer with the faculty member's immediate supervisor and dean to discuss alternatives. The Provost will determine the next course of action, which might result in recommending to the President the faculty member's suspension and/or the termination of the faculty member's employment. Procedures are outlined below .

*Special Assistance*

assistance, the Provost should follow this process:

1. Give written warning of unacceptable behavior.

2. The Provost may suggest any of the following remedial actions:

- counseling and/or another type of treatment program, such as Alcoholics Anonymous or Narcotics Anonymous;
- psychological counseling and/or treatment, including out-patient treatment prescribed by a duly credentialed and qualified professional;
- peer faculty monitoring to assist in resolving work-related performance problems;
- a specified number of periodic conferences with the faculty member's dean to assist in resolving administrative or institutional problems.

3. The Provost should then monitor the situation for a specified amount of time determined on a case by case basis. Where the assistance necessitates in-patient treatment or time away from teaching, that temporary time-off shall be with pay.

During the period of assistance, the faculty member shall be encouraged to communicate regularly with the Provost, who shall monitor the faculty member's progress to determine when and if the special assistance has achieved its objective. The faculty member may elect to provide summary statements from treatment providers regarding compliance and prognosis. If the faculty member has refused to participate, or the remedial objective has not been reached during the specified period of time, a recommendation to terminate employment may be made to the President of the University.

**Grieving Progressive Discipline**

*Oral Warnings*
Should the faculty member disagree with the oral warnings given by the immediate supervisor, s/he may request to meet with his/her appropriate Dean or, if appropriate, the Provost to appeal the decision.

*Written Warnings/Discipline*
Should the faculty member disagree with a written warning or punitive action, s/he may elect to file a grievance with the Faculty Grievance Committee, following the procedures outlined in that policy, and bearing in mind that the Grievance Committee is empowered to review errors in procedure and offer the decision-maker its perspective on the issue, not to substitute its judgment for that of the decision-maker.

**Suspension or Dismissal Procedures**

*Exceptions to Progressive Discipline*
In most cases, it is expected that faculty members will be entitled to the processes of progressive discipline. However, in the rare event of an egregious breach of professional discipline or illegal activity, the President may elect to initiate suspension or dismissal procedures immediately. There is no obligation for the President or Provost to suspend the faculty member before moving to dismissal procedures given severe circumstances. However, whether suspension or dismissal is contemplated, the President will meet with the faculty member to discuss the issue in question, and then, if determined to proceed, will convene the Faculty Grievance Committee to review the case at hand before proceeding according to the procedures outlined below . The faculty member must be allowed to continue to work until the process is complete.

Only in an extreme situation, narrowly limited to the event of a faculty member threatening or causing physical harm to him or herself or members of the campus community, the President or Provost may opt to suspend the faculty member from his/her assigned duties immediately. Unless in direct violation of the law , any such suspension should be with pay. The President should then initiate formal procedures as outlined.

*Suspension*
Should progressive discipline or special assistance result in no change in the faculty member's actions, the Provost may opt to recommend to the President the suspension of the faculty member for a specified period of time. Alternately, in rare circumstances of an egregious breach of professional discipline or illegal activity, the President may elect to consider the suspension or dismissal of a faculty member for a specified period.

If the need for suspension is determined, the President will meet with the faculty member to discuss the issue at hand. If, after that meeting, the President resolves to continue with suspension, s/he should send a written communication to the faculty member, stating with reasonable particularity the basis for suspension and offering, if requested by the faculty member within 7 (seven) days, to convene the Faculty Grievance Committee to consider the matter, to render confidential advice, and thereby to effect a remedy if possible.

If the faculty member elects not to convene the Faculty Grievance Committee within 7 (seven) days, the suspension shall stand. If s/he elects to convene the committee, the faculty member will continue to perform usual assigned duties (unless such continuation would lead to

until the committee's findings have been published. Unless in direct violation of the law, any such suspension should be with pay.

*Dismissal*

Should progressive discipline or special assistance result in no change in the faculty member's actions, the Provost may opt to recommend to the President the termination of the faculty member's employment.

Before moving to termination, the President must meet with the faculty member to see if any possible remediation might occur or to see if the faculty member can provide any mitigating circumstances that might justify a less drastic course of action.

If the need for dismissal is determined, the President will send a written communication to the faculty member, stating with reasonable particularity the basis for dismissal and stating that the matter has been referred to the Faculty Grievance Committee to consider the matter, to render confidential advice, and thereby to effect a remedy if possible. The Faculty Grievance Committee Chair will immediately contact the faculty member as per the procedures outlined in the Faculty Grievance Policy.

Upon such notice, the faculty member may elect not to continue the Faculty Grievance Committee's hearing; if so, s/he should so notify the Faculty Grievance Committee and the President in writing and the dismissal shall stand.

While awaiting the Committee's findings, the faculty member will continue to perform usual assigned duties (unless such continuation would lead to immediate physical harm to the faculty member or other members of the university community).

The Faculty Grievance Committee shall follow its procedures as outlined in the Faculty Grievance Policy. Once the Committee has made its findings, the Chair will send in writing the Committee's opinion to the President of the University, copied to the faculty member and the Provost.

If the Committee's decision is that there is no merit to the complaint against the faculty member, they shall recommend discontinuing the proceedings for suspension or dismissal. If the Committee finds that reason exists to question the fitness of the faculty member, they shall recommend either to continue the suspension or dismissal proceedings.

If the President agrees with the Committee's findings, she will notify in writing the Board of Trustees and the faculty member of the findings and her decision to accept. If the President chooses to reject the Committee's findings, she will provide the Committee and the faculty member a detailed rationale in writing for her decision.

The Committee's recommendation should be taken very seriously by the President, especially in the case of a unanimous vote and clearly, logically written findings. In that case, the administration should consider very carefully the possible repercussions of rejecting the faculty Committee's findings. If the Committee were split in its vote, with both sides making compelling arguments, the President would be more justified in choosing to reject the recommendation.

Note: the Faculty Grievance Committee will only be convened twice (i.e., once for suspension and once for dismissal) in the event that progressive discipline procedures have been instituted and failed, and that a reasonable amount of time has taken place between suspension and dismissal. In this event, the membership of the Committee may be similar or different, a determination of which is made by the Faculty Grievance Committee Chair, after consultation with the Faculty Senate Executive Council. In the rarer event of a serious breach of professional discipline and/or illegal activity, if the President elects to proceed immediately with dismissal procedures (not suspension) after meeting with the faculty member, then the Faculty Grievance Committee will meet only once to appeal the dismissal.

*Publicity*

Public statements by the faculty member or others about possible or actual termination of employment should be avoided.

### Responsibility for Expenses Incurred in Grievance and Appeal

Expenses incurred by the grievant are the responsibility of the individual. These include, but are not limited to, the following:

- Cost of an advisor.
- Travel expenses for advisor, witnesses, or others engaged by petitioner.
- Cost of preparing any documents and copies thereof.

### Non-Retaliation

Grievants will not be adversely affected for exercising their right to file a grievance, regardless of outcome. Similarly, neither committee members nor witnesses will suffer adverse effects as a result of their participation in the process. Anyone who violates this mandate can be subject to disciplinary action, up to and including dismissal.

Related Policies

- Faculty Status
- Librarianship Responsibility
- Teaching Responsibility
- Tenure

---

## Related Committees

---

## History

07/01/89 - Reaffirmed with publication of Faculty Manual

12/12/97 - Addition of informal process approved by the President of the University as recommended by the Policy Committee of the University

07/01/03 - Editorial changes made to reflect academic restructuring

10/12/11 - Revision approved by the President of the University as recommended by the Policy Committee of the University

05/07/14 - Revision approved by the President of the University as recommended by the Policy Committee of the University

---

Secretary of the University & General Counsel | 108 Immaculata Hall

570-340-6018 | F: 570-340-6014 | paterson@marywood.edu

Please note, the materials presented on this website are provided for informational purposes only and may not be construed as legal advice from the Office of the Secretary of the University and General Counsel.

2300 Adams Avenue Scranton, PA 18509

570-348-6211 | toll free: 1-TO-MARYWOOD

©2016 Marywood University | Privacy Policy | Student Consumer | webber@marywood.edu | Sponsored by Sisters, Servants of Immaculate Heart of Mary

Apply   Visit   Request   Give   Social   News   Events   Jobs

CAMPUS RESOURCES:   MarywoodYou   Portal Downtimes   Email   Library   Moodle   Directories   A-Z   Tech Help          STUDENTS   STAFF

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

FREDERICK F. FAGAL, JR.,   :
          :
    *Plaintiff,*    :
          :  CIVIL ACTION
    v.      :
          :  NO. 3:14-cv-02404-ARC
MARYWOOD UNIVERSITY,  :
          :  (JUDGE CAPUTO)
    *Defendant.*   :
          :

## <u>SECOND DECLARATION OF FREDERICK F. FAGAL, JR.</u>

I, Frederick F. Fagal, Jr., declare as follows:

1.  I am the Plaintiff in the above-referenced case.

2.  I am making this declaration to oppose the Motion for Summary Judgment filed by Defendant Marywood University on November 21, 2016.

3.  I understand that this declaration will be filed as Exhibit 15 to Plaintiff's Exhibit Set in Opposition to Defendant's Motion for Summary Judgment.

4.  I have carefully read Plaintiff's Response to Statement of Material Facts in Support of Defendant's Motion for Summary Judgment ("Plaintiff's Response"). I verify the accuracy of each sentence in Plaintiff's Response in which Exhibit 15 is cited for support.

**5.**     I have also carefully read Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's Brief"). I verify the accuracy of each sentence in Plaintiff's Brief in which Exhibit 15 is cited for support.


I declare under penalty of perjury that the foregoing is true and correct. Executed on _____December 26_____, 2016.


FREDERICK F. FAGAL, JR.

2

# Exhibit 16

Page 1

<div style="border:1px solid black">

**EXHIBIT**

**16**

</div>

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF PENNSYLVANIA

- - -

FREDERICK F. FAGAL,      :   NO.
JR.,                         3:14-cv-02404-ARC
                         :
     Plaintiff,
                         :
  - vs -
                         :
MARYWOOD UNIVERSITY,
                         :
     Defendant.


               - - -
           June 7, 2016
               - - -


          Videotape Deposition of
FREDERICK F. FAGAL, JR., taken pursuant to
notice, was held at JACKSON LEWIS, P.C.,
Three Parkway, 1601 Cherry Street, Suite
1350, Philadelphia, Pennsylvania,
commencing at 9:35 a.m. on the above date,
before Edward J. Ruggeri, Registered
Professional Reporter, Certified Court
Reporter and Notary Public.

               - - -

          MAGNA LEGAL SERVICES
             (866) 624-6221
            www.MagnaLS.com



Page 2

1  A P P E A R A N C E S :
2
3
4  JONATHAN Z. COHEN, LTD
   BY:  JONATHAN Z. COHEN, ESQUIRE
5     175 Strafford Avenue
      Suite 1 PMB 212
6     Wayne, PA 19087
      (215) 874-0047
7        Counsel for the Plaintiff
8
9  JACKSON LEWIS, P.C.
   BY:  STEPHANIE J. PEET, ESQUIRE
10    ASIMA J. AHMAD, ESQUIRE
      Three Parkway
11    1601 Cherry Street, Suite 1350
      Philadelphia, PA 19102
12    (267) 319-7802
         Counsel for the Defendant
13
14
15
16  A L S O  P R E S E N T :
17
18  Patricia Dunleavy
19  Chelsea Lynch, Videographer
20
21
22
23
24

Page 4

1        E X H I B I T S
2
3
4  NUMBER    DESCRIPTION              PAGE
5
6  FAGAL-1   Amended Complaint          26
7  FAGAL-2   Objections and Answers to  28
8      Defendant's First Set of
9      Interrogatories to Plaintiff
10 FAGAL-3   DEF000005                  43
11 FAGAL-4   DEF3456 - 3696             47
12 FAGAL-5   DEF001447 - 1475           98
13 FAGAL-6   DEF000010 - 000012        110
14 FAGAL-7   DEF000159                 117
15 FAGAL-8   DEF002329 - 002331        124
16 FAGAL-9   000200747.00001 - 00003   152
17 FAGAL-10  DEF001480                 157
18 FAGAL-11  000200380.00001 - 00002   162
19 FAGAL-12  000200732.00001 - 00002   169
20 FAGAL-13  000200613.00001,          170
21     000200614.00001 - 00009,
22     000200615.00001 - 00003
23 FAGAL-14  000200328.00001           179
24

Page 3

1        I N D E X
2
3
4  WITNESS:                  PAGE
5
6  FREDERICK F. FAGAL, JR.
7
8  By:  Ms. Peet        9, 376
9  By:  Mr. Cohen          368
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 5

1        E X H I B I T S
2
3
4  NUMBER    DESCRIPTION              PAGE
5
6  FAGAL-15  DEF001443 - 001491        184
7  FAGAL-16  DEF000067 - 000142        213
8  FAGAL-17  000200324.00001 - 00002   222
9  FAGAL-18  000200091.00001 - 00004   224
10 FAGAL-19  000000172.00001 - 00018   226
11 FAGAL-20  000200378.00001 - 00005   230
12 FAGAL-21  000200209.00001 - 00004   235
13 FAGAL-22  000200439.00001 - 00004   245
14 FAGAL-23  DEF000143 - 000144        267
15 FAGAL-24  DEF000165 - 000187        273
16 FAGAL-25  DEF000249 - 000257        297
17 FAGAL-26  DEF000206 - 000226        304
18 FAGAL-27  DEF000269                 310
19 FAGAL-28  DEF000234 - 000237        311
20 FAGAL-29  DEF000272 - 000273        312
21 FAGAL-30  DEF000276                 314
22 FAGAL-31  DEF000283 - 000296        317
23 FAGAL-32  DEF000297 - 000298        320
24

2 (Pages 2 to 5)



EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| FAGAL-33 | DEF000302 | 321 |
| FAGAL-34 | DEF001496 | 324 |
| FAGAL-35 | DEF000306 - 000308 | 326 |
| FAGAL-36 | DEF001433 - 001442 | 327 |
| FAGAL-37 | DEF000350 - 000351 | 328 |
| FAGAL-38 | DEF000412 - 000415 | 331 |
| FAGAL-39 | DEF000416 - 000417 | 333 |
| FAGAL-40 | DEF000424 | 338 |
| FAGAL-41 | 000200541.00001 - 00002 | 349 |
| FAGAL-42 | 000200288.00001 | 350 |
| FAGAL-43 | 000000060.00001 | 353 |
| FAGAL-44 | 000000054.00001, | 354 |
|  | 000000055.00001, |  |
|  | 000000061.00001 |  |
| FAGAL-45 | 000200369.00001, | 357 |
|  | 000200370.00001 |  |
| FAGAL-46 | Photographs | 365 |

DEPOSITION SUPPORT INDEX

Direction To Witness Not To Answer
Page  Line
  361      1

Request For Production Of Documents
Page  Line
(None)

Stipulations
Page  Line
(None)

Questions Marked
Page  Line
(None)

1  THE VIDEOGRAPHER:  We are now
2  on the record.  My name is Chelsea
3  Lynch.  I'm a videographer from Magna
4  Legal Services.  This is a video
5  deposition of the United States
6  District Court, Middle District of
7  Pennsylvania.
8      Today's date is June 7, 2016,
9  and the time is 9:35 a.m.  This
10  deposition is being held at 1601
11  Cherry Street, Suite 1350 in
12  Philadelphia, Pennsylvania, in the
13  matter of Frederick Fagal, Jr.,
14  versus Marywood University.  The
15  deponent is Frederick Fagal, Jr.
16      This deposition is being taken
17  on behalf of the defendants, and
18  would all counsel please identify
19  themselves.
20      MR. COHEN:  I'm Jonathan Cohen.
21  I represent Plaintiff, Frederick F.
22  Fagal, Jr.
23      MS. PEET:  Stephanie Peet from
24  Jackson Lewis representing Marywood

1  University.
2      THE VIDEOGRAPHER:  The court
3  reporter is Edward Ruggeri who will
4  now swear in the witness.
5          - - -
6      FREDERICK F. FAGAL, JR., after
7  having been duly sworn by Edward J.
8  Ruggeri, a Notary Public within and
9  for the State of Pennsylvania, was
10  examined and testified as follows:
11          - - -
12          EXAMINATION
13          - - -
14  BY MS. PEET:
15      Q.   Good morning, Mr. Fagal.
16      A.   Good morning.
17      Q.   We had met last week at --
18      A.   Yes.
19      Q.   -- Sister Munley's deposition.
20      Again, my name is Stephanie
21  Peet and it's my pleasure to represent
22  Marywood University with reference to the
23  lawsuit that you have filed against it.
24  We are here today to take your deposition.



1    Have you ever been deposed
2  before?
3    A.   No.
4    Q.   Okay.
5    Although you were at Sister
6  Munley's deposition and did have the
7  opportunity to see how it went, I'm still
8  going to just discuss with you very
9  briefly the instructions for this
10  deposition so we make sure we're on the
11  same page.
12    Okay?
13    A.   Fine.
14    Q.   As you know, we have a court
15  reporter who is here taking down
16  everything that we say at today's
17  deposition.  For that reason, we're going
18  to ask that you keep your answers verbal.
19  So while I'll understand the nodding of
20  the head or the shrugging of the
21  shoulders, it won't appear on the record.
22  So your answers today do need to be
23  verbal.
24    Do you understand that?

1    A.   Yes, I do.
2    Q.   For that same reason, please
3  allow me to ask my questions in full
4  before you go ahead and start answering
5  the question, and I will grant you the
6  same courtesy.
7    Do you understand that?
8    A.   Yes.
9    Q.   If at any point in time I begin
10  to ask another question and you weren't
11  done answering the one I had already
12  asked, please let me know.  I'm sure it
13  was just inadvertent and I'll allow you to
14  go ahead and finish answering your
15  question.
16    Okay?
17    A.   Okay.
18    Q.   If at any point in time today
19  you don't understand a question -- I like
20  to think I ask good questions but I can't
21  promise you all of my questions today will
22  be good ones.  So if you don't understand
23  the question that I asked, please let me
24  know and I can do my best to rephrase the

1  question.  If you answer the question, I'm
2  going to assume you understood the
3  question I had asked you.
4    Do you understand that?
5    A.   Yes, I do.
6    Q.   Do you understand that you are
7  under oath and all of your testimony needs
8  to be truthful today?
9    A.   Yes.
10    Q.   While we're sitting here in a
11  conference room in our offices, we're
12  certainly not in the court, your testimony
13  does have the same full effect as if we
14  were in a court of law.
15    Do you understand that?
16    A.   I do understand.
17    Q.   Is there any reason today that
18  you wouldn't be able to provide complete
19  and truthful testimony?
20    A.   No.
21    Q.   Are you on any type of
22  medication or suffering from any sort of
23  impairment that would affect your ability
24  to testify truthfully today?

1    A.   No.
2    Q.   Is there anything that would
3  affect your ability to remember events
4  that happened four to five years ago?
5    A.   I'll do the best I can but
6  nothing specific to affect that.
7    Q.   It's my understanding that
8  other than a small claims court matter
9  that you had in the 1970s, you haven't
10  been involved in any other litigation
11  other than the one presently pending
12  against Marywood; is that correct?
13    A.   That's correct.
14    Q.   And the one in the 1970s, that
15  was a small claims matter?
16    A.   Yes, it was.
17    Q.   And you were the plaintiff?
18    A.   It might have been my wife
19  involved also.
20    Q.   Nonetheless, it was you and/or
21  you and your wife were --
22    A.   Correct.
23    Q.   -- the plaintiffs; is that
24  correct?

4 (Pages 10 to 13)



1      A.   Yes.
2      Q.   What was that matter over?
3      A.   It was about the return of a
4  security deposit from an apartment.  We
5  rented it in Ithaca when I was grad
6  student at Cornell.
7      Q.   Okay.
8           And were you successful in that
9  litigation?
10     A.   No.
11     Q.   What is your date of birth?
12     A.   ████████, 1946.
13     Q.   Where do you currently live?
14     A.   17 East Lake Street in
15  Skaneateles, New York.
16     Q.   How long have you lived at that
17  address?
18     A.   At that address, since November
19  of 1987.
20     Q.   Does your wife live at that
21  address with you?
22     A.   Yes.
23     Q.   I see that you look a little
24  pensive.  Are you --

1      A.   I'm just wondering if it was
2  November of 1988 on the -- when we moved
3  into that house.
4      Q.   Okay.
5           I didn't give you this
6  instruction earlier, but you did the right
7  thing.  If at any point in time you're not
8  sure about something --
9      A.   Right.
10     Q.   -- and unless your attorney
11  says otherwise, no one wants you to guess
12  today.
13     A.   Right.
14     Q.   So if you are going to be
15  approximating, or estimating, or guessing,
16  just let us know that you're doing that.
17          Okay?
18     A.   Right, uh-huh.
19     Q.   One other instruction I did not
20  give you but it is kind of important for
21  you to know.  This is not meant to be
22  torturous.  If at any point in time you do
23  need to have a break, you need to get
24  water, use the restroom, whatever it is,

1  that's perfectly fine.  All I ask is that
2  any question that I've already asked has
3  been answered.
4           Okay?
5      A.   Would you repeat that again?
6  I'm sorry.
7      Q.   Sure.
8           If you need to take a break,
9  that's fine.  Just let us know you want to
10  have a break.
11     A.   Right.
12     Q.   And we're going to have breaks
13  throughout the day, but if you need a
14  break while we're taking the deposition,
15  let us know.  As long as any question that
16  I've asked has been answered and there's
17  no question pending on the table --
18     A.   Yes.
19     Q.   -- we can take a break.
20     A.   I understand.
21     Q.   Okay.
22           Who lives at this home with
23  you?
24     A.   My wife, Janet.

1      Q.   Okay.
2           Anyone else?
3      A.   No.
4      Q.   Okay.
5           Do you have any intentions of
6  moving in the next one to two years?
7      A.   No.
8      Q.   Do you have children?
9      A.   Yes, yes.
10     Q.   How many?
11     A.   One.
12     Q.   And how old is your child?
13     A.   31.
14     Q.   Is your -- son or daughter?
15     A.   Son.
16     Q.   Is your son financially
17  dependent on you?
18     A.   No.
19     Q.   Congratulations.  That must
20  feel great.  I would like to know that one
21  day.
22           What is your -- any e-mail
23  addresses that you currently use, can you
24  state those on the record?



Page 18

1      A.   Yes. fffagal@yahoo.com, that's
2  my main address, and my backup address
3  which I use very seldom is
4  fffagal@gmail.com.
5      Q.   To the best of your abilities,
6  how long have you had the Yahoo e-mail
7  address?
8      A.   Oh, I'll guess 2001, but that's
9  an estimate.
10      Q.   What about the Gmail address?
11      A.   That'd be a little later, maybe
12  2002, 2003, but I'm -- that's -- again,
13  that's an estimate.
14      Q.   Okay.
15          It's my -- and we're going to
16  talk obviously about -- more about this
17  today, but you worked at Marywood and you
18  had a Marywood e-mail address as well; is
19  that correct?
20      A.   There were various addresses,
21  correct.
22      Q.   Okay.
23          Other than the Yahoo, the
24  Gmail, and, when you worked at Marywood,

Page 19

1  the Marywood e-mail address, have you had
2  any other e-mail addresses in the past
3  five years?
4      A.   No.
5      Q.   Do you use a cell phone?
6      A.   Yes.
7      Q.   Okay.
8          And what's your cell phone
9  number?
10      A.   Area code 315-406-8063.
11      Q.   And how long have you had this
12  number approximately?
13      A.   About 15 years.
14      Q.   Have you had any other cell
15  phone numbers other than the one you just
16  identified in the past five years?
17      A.   No.
18      Q.   I assume you graduated college;
19  is that correct?
20      A.   I graduated from college, yes.
21      Q.   And what college did you go to?
22      A.   Union College is Schenectady,
23  New York.
24      Q.   After you graduated college,

Page 20

1  did you attend any other educational
2  institutions?
3      A.   Yes.
4      Q.   And what was that?
5      A.   I went to Cornell University
6  right after graduating from Union.
7      Q.   When did you graduate Union?
8      A.   1968, June.
9      Q.   And what was your degree in?
10      A.   Economics.
11      Q.   You said after you graduated
12  Union, you went to Cornell University; is
13  that correct?
14      A.   Correct.
15      Q.   Did you receive a degree from
16  Cornell University?
17      A.   Yes.
18      Q.   And what was your degree?
19      A.   The degree I received was a
20  master's of arts in economics.
21      Q.   Pardon my ignorance.
22          Is that two separate degrees or
23  is that master's of arts and master's of
24  economics --

Page 21

1      A.   That's --
2      Q.   -- or is that one degree?
3      A.   It's master of arts in
4  economics, so it's one degree.
5      Q.   And when did you receive your
6  master's degree?
7      A.   1971.
8      Q.   Did you continue your education
9  thereafter?
10      A.   Yes, I did.
11      Q.   And what was that?
12      A.   I went to Syracuse University.
13      Q.   Did you receive any degrees
14  from Syracuse?
15      A.   Yes.
16      Q.   And what was that?
17      A.   I received a master of arts in
18  education and I received a Ph.D. in social
19  studies education.
20      Q.   When did you receive the
21  master's of arts in education from
22  Syracuse?
23      A.   That would have been in 1976.
24      Q.   Would that have been the same



MAGNA ▶
LEGAL SERVICES

Page 22

1    time you received your Ph.D. in social
2    studies education?
3        A.   No.
4        Q.   When did you receive that?
5        A.   1981.
6        Q.   Other than what we've
7    discussed, have you done any other
8    education --
9        A.   Yes.
10       Q.   -- following college?
11       A.   Yes.
12       Q.   Okay.
13            And what's that?
14       A.   I would audit, sit in on
15   graduate courses at Syracuse.  I also took
16   an electronics course at Cayuga Community
17   College.
18       Q.   Did you receive any degrees
19   with your electronics course?
20       A.   No.
21       Q.   When you said you audited
22   graduate courses at Syracuse, did that
23   come with a degree?
24       A.   No.  I already had a Ph.D.

Page 23

1        Q.   When you mean you were auditing
2    the graduate courses, what does that mean?
3        A.   I believe I paid -- it was in
4    the 1990s.  I was taking some courses.
5    Unix and the Internet was one course.  I
6    knew an econometrics professor.  I sat in
7    on an econometrics course.  I can't
8    remember exactly whether I paid tuition or
9    a low audit fee or whether the professor
10   just let me sit in.  I can't remember that
11   exactly.
12       Q.   Okay.
13            Other than the degrees that
14   we've already discussed, do you have any
15   other degrees?
16       A.   No.
17       Q.   Okay.
18            As we sit here today, what
19   types of subjects do you feel that you
20   could be a professor for?
21       A.   Teach introductory U.S. history
22   based on my experience at Marywood, and
23   based on my experience at Marywood,
24   introductory economics courses.  At

Page 24

1    Marywood I did teach for one semester a
2    course in statistics in the math
3    department, an introductory statistics
4    course.  That was an emergency basis fill
5    in.
6        Q.   Do you feel you'd be qualified
7    to teach an introductory to statistics
8    course today?
9        A.   I would need to review.  I
10   couldn't start tomorrow.
11       Q.   Okay.
12            But if you reviewed, do you
13   feel that that's something that you might
14   be able to do?
15       A.   Yes.
16       Q.   So we talked about U.S. --
17   introduction to U.S. history, introduction
18   to economics, introduction to statistics.
19       A.   Yes.
20       Q.   Are there any other subject
21   matters or courses that you believe you're
22   qualified to teach?
23       A.   Marywood had a course called
24   introduction to social science.

Page 25

1        Q.   Do you feel you are qualified
2    to teach that?
3        A.   Yes.
4        Q.   Okay.
5            Anything else as we sit here?
6        A.   No.
7        Q.   When did you first contact an
8    attorney regarding this matter?
9        A.   Well, I contacted the
10   Foundation for Individual Rights in
11   Education on the day I was suspended, and
12   they do have attorneys working for them
13   but that was not an attorney for me
14   personally.
15       Q.   The group that you just
16   mentioned, is that also known as FIRE?
17       A.   Yes.
18       Q.   For today's deposition, just
19   for ease of communication, can we refer to
20   that group as FIRE?
21       A.   Yes.
22       Q.   I'm not asking for the
23   communications that you had with the
24   attorneys, but did you speak with any



Page 26

```
 1    attorneys at FIRE?
 2        A.   I can't recall.
 3        Q.   Okay.
 4             When was the first time that
 5    you remember speaking to an attorney?
 6        A.   It was probably Jonathan Cohen
 7    within a few days of the suspension.
 8        Q.   How did you know of Jonathan
 9    Cohen?
10        A.   FIRE gave me his name as a
11    possible contact.
12        Q.   And you believe that would have
13    been within a few days after your
14    suspension of employment?
15        A.   Yes.
16        Q.   Did FIRE give you any other
17    names besides Mr. Cohen?
18        A.   No.
19             - - -
20             (At this time, a document was
21    marked for identification as Exhibit
22    Fagal-1.)
23             - - -
24             THE WITNESS:  Let me just
```

Page 27

```
 1    think.  I don't think FIRE gave me
 2    any other names.  I don't believe I
 3    had to make any choices.  I'm sorry.
 4    BY MS. PEET:
 5        Q.   Is it fair to say that you
 6    don't recall speaking with any other
 7    attorneys besides Mr. Cohen?
 8        A.   That's correct.
 9        Q.   Okay.
10             What has been placed before you
11    and marked as Fagal Exhibit-1 purports to
12    be the Amended Complaint that was filed in
13    the United States District Court for the
14    Middle District of Pennsylvania.
15             Do you recognize this?
16        A.   Yes.
17        Q.   And is this the Amended
18    Complaint that was filed on your behalf
19    against Marywood University?
20        A.   Yes.
21        Q.   Have you had an opportunity to
22    review this before it was filed with the
23    court?
24        A.   Yes.
```

Page 28

```
 1        Q.   Can you confirm that all of the
 2    information contained herein to the best
 3    of your knowledge is accurate and
 4    complete?
 5        A.   To the best of my knowledge,
 6    accurate and complete, yes.
 7             - - -
 8             (At this time, a document was
 9    marked for identification as Exhibit
10    Fagal-2.)
11             - - -
12    BY MS. PEET:
13        Q.   Mr. Fagal, what has been placed
14    before you is what has been marked as
15    Fagal Exhibit-2.  These purport to be
16    objections and answers to Defendant's
17    first set of interrogatories to Plaintiff.
18             Do you see that?
19        A.   Yes.
20        Q.   Okay.
21             And do you agree that these
22    were served on your behalf in response to
23    interrogatories served upon you by
24    Marywood University?
```

Page 29

```
 1        A.   Yes.
 2        Q.   Did you assist in providing
 3    these answers and objections?
 4        A.   I did.
 5        Q.   To the best of your knowledge,
 6    is all of the information contained in --
 7    herein accurate and complete?
 8        A.   Yes.
 9        Q.   If I can draw your attention to
10    what appears to be the third to the last
11    page.  The last two pages for whatever
12    reason are blank, at least on my copy.  It
13    has oath.  Turn to the next page.  My
14    apologies.  No, the other way.  Yes.
15        A.   Yes.
16        Q.   Do you see the page that says
17    oath?
18        A.   I do.
19        Q.   And it says I declare under the
20    penalty of perjury that the foregoing is
21    true and correct.
22             Do you see that?
23        A.   I do.
24        Q.   Is that your signature?
```

8 (Pages 26 to 29)



1     A.   Yes, it is.
2     Q.   If you can turn to page 25 of
3  this document, interrogatory number 11.
4          Do you see that?
5     A.   I do.
6     Q.   It asks you to identify other
7  tenured professors who you believe engaged
8  in similar conduct to you in sending out
9  an e-mail to faculty containing links to
10 two satirical videos.
11         Do you see that?
12    A.   Yes.
13    Q.   And your answer is Laurie
14 McMillan, Ph.D.
15         Do you see that?
16    A.   Yes.
17    Q.   What do you believe that
18 Ms. McMillan did that was similar to what
19 you did?
20    A.   Well, I was following
21 controversy on campus last fall via the
22 local newspaper, the Times Tribune and --
23 and The Wood Word, and I know that there
24 was some faculty concern and there was a

1  protest by faculty at -- I believe it was
2  one hundredth anniversary celebration, and
3  I believe Laurie McMillan was protesting
4  and carrying a sign in front of a crowd
5  protesting the president.
6     Q.   Anything else?
7     A.   No.
8     Q.   Okay.
9          Do you know what was -- if
10 there were any words on her sign or
11 pictures?
12    A.   Pardon me.
13    Q.   Do you know if there were any
14 words or pictures on the sign that you
15 believe she was carrying?
16    A.   There were words.
17    Q.   Okay.
18         What were those words?
19    A.   I can't recall.
20    Q.   Do you have any firsthand
21 knowledge?  Were you there?
22    A.   No.
23    Q.   So is it fair to say that all
24 of the knowledge that you have about the

1  McMillan event, for lack of better words,
2  is based on what you've read in the
3  newspaper; is that correct?
4     A.   That's correct.
5     Q.   Are you aware if Ms. McMillan
6  created any satirical videos?
7     A.   Not aware.
8     Q.   Okay.
9          Are you aware if Ms. McMillan
10 sent around any e-mails to folks in the
11 Marywood community talking about Sister
12 Munley as Hitler?
13    A.   No.
14    Q.   At the protest, did
15 Ms. McMillan, to your knowledge, equate
16 Sister Anne Munley with Adolf Hitler?
17    A.   No.
18    Q.   The McMillan incident, that
19 occurred after your termination of
20 employment, correct?
21    A.   Correct.
22    Q.   And I believe you said perhaps
23 last year.
24         Would that have been 2015?

1     A.   Yes.
2     Q.   As we sit here today, are you
3  aware of any tenured professor that
4  created satirical videos such as the ones
5  that you've created?
6     A.   No.
7     Q.   When did you first commence
8  employment with Marywood?
9     A.   I might be wrong on the dates
10 but while I was working at Wyoming
11 Seminary in Wilkes-Barre, I taught a
12 part-time course at Marywood.  It might
13 have been 1985 to '86 or one of those
14 semesters.
15    Q.   To the best of your knowledge,
16 what course were you teaching during that
17 time frame?
18    A.   That would have been an
19 introduction -- introductory -- pardon me
20 -- introduction to economics course.
21 Either -- it would have been either
22 probably micro or macro.
23    Q.   We discussed earlier about
24 courses that you believe you're qualified

9 (Pages 30 to 33)



1  to teach and we talked about intro to
2  economics being one of them.
3       Do you believe that you'd be
4  qualified to teach both intro to economics
5  micro and macro?
6       A.   Yes.
7       Q.   After you taught this course in
8  1985, 1986, did you have any other
9  employment relationship with Marywood?
10      A.   After I started full-time on a
11 tenure track position.
12      Q.   Okay.
13      And when was that?
14      A.   1987 in the fall.
15      Q.   Now, when you commenced
16 employment, fall of 1987, you were not a
17 tenured professor at that time; is that
18 correct?
19      A.   Correct.
20      Q.   But I believe it's your
21 testimony you were on a tenure track?
22      A.   Correct.
23      Q.   Okay.
24      What does it mean to you to be

1  a tenured professor?
2       A.   It means that in a sense you
3  have given up -- I won't say given up.
4  You have a commitment to -- from the
5  university to employ you as long as you
6  have fulfilled whatever requirements exist
7  for that university.
8       Q.   Do you believe that the
9  commitment is mutual in that the tenured
10 professor is making commitments to the
11 university as well as the university
12 making commitments to the tenured
13 professor?
14      A.   Yes.
15      Q.   When you commenced employment
16 with Marywood, fall of 1987, was that a
17 full-time position?
18      A.   Yes.
19      Q.   Were you in a certain
20 department?
21      A.   Let me go back.  Full-time
22 position -- usually considered a
23 nine-month academic year, a full-time
24 position.

1       Q.   Thank you.
2       Were you in a department?
3       A.   Yes.
4       Q.   And what department was that?
5       A.   The Department of Social
6  Sciences.
7       Q.   And how long were you in the
8  Department of Social Sciences?
9       A.   During my complete tenure at
10 Marywood.
11      Q.   Okay.
12      So until the time of your
13 termination in 2012?
14      A.   Correct.
15      Q.   At some point in time, did you
16 become a tenured professor?
17      A.   Yes, I did.
18      Q.   And when did that take place?
19      A.   I believe that was September of
20 1994.
21      Q.   As a professor at Marywood in
22 the Department of Social Sciences, to whom
23 would you report?  Generally, job
24 position.  I don't need the name of the

1  person yet.
2       A.   The chairperson of the
3  department.
4       Q.   Would that also be known as the
5  dean of the department?
6       A.   No.
7       Q.   Are those two different people,
8  two different positions?
9       A.   Yes.  There is no dean of the
10 department position.
11      Q.   Okay.
12      So the professor reports to the
13 chairperson of the department; is that
14 correct?
15      A.   Correct.
16      Q.   And who does the -- to your
17 knowledge, the chairperson of the
18 department report to by job position?
19      A.   I believe it might have
20 depended on the structure of the college
21 over the time, so that would be -- that
22 answer would have different answers.
23      Q.   Okay.
24      When -- from 1987 until 1994,



1  who was the chairperson of the department?
2  A.  That would have been Jack
3  Barrett for all those years.
4  Q.  Is he still with the
5  university, to your knowledge?
6  A.  No.
7  Q.  In 1994 when you became a
8  tenured professor, was Jack Barrett still
9  the chairperson of the department?
10  A.  Yes.
11  Q.  Do you remember when Jack
12  Barrett no longer was the chairperson of
13  the department?
14  A.  I can't recall the exact date.
15  Q.  Who was the next chairperson?
16  A.  I believe it was Kathleen
17  Munley.
18  Q.  To your knowledge, is there any
19  relation between Kathleen Munley and
20  Sister Anne Munley?
21  A.  No.
22  Q.  Do you know the time period in
23  which Kathleen Munley served as the
24  chairperson of the Department of Social

1  Sciences?
2  A.  Not the exact dates.
3  Q.  After Kathleen Munley, who was
4  the chairperson?
5  A.  I believe it was Sister
6  Margaret Gannon.
7  Q.  Do you recall the dates that
8  she served as the chairperson of the
9  department?
10  A.  No.
11  Q.  At some point in time, was
12  there a different chairperson after Sister
13  Margaret Gannon?
14  A.  After I left, there was.
15  Q.  Okay.
16  And who was that?
17  A.  I -- Alexander Vari.
18  Q.  At the time of your termination
19  in 2012, was Sister Margaret Gannon the
20  chairperson of the social sciences
21  department?
22  A.  Yes.
23  Q.  Does the name Michael Foley
24  ring -- familiar to you?

1  A.  Yes.
2  Q.  Was he employed at Marywood at
3  the time of your termination?
4  A.  Yes.
5  Q.  What was his position, to the
6  best of your knowledge?
7  A.  I believe his title is dean of
8  liberal arts college.
9  Q.  From an organizational
10  structure at the time of your termination
11  -- so I'm focussing on 2012.
12  As a tenured professor, is it
13  fair to say that you reported to Sister
14  Margaret Gannon?
15  A.  Yes.
16  Q.  Did Sister Margaret Gannon
17  report to Michael Foley, the dean of
18  liberal arts?
19  A.  I presume she did.
20  Q.  Do you know how long Michael
21  Foley was in that position?
22  A.  No.
23  Q.  Can you approximate?
24  A.  Six years perhaps.

1  Q.  So at least since 2010?
2  A.  Yes.
3  Q.  Okay.
4  A.  Excuse me.  When I said six
5  years, I meant six years prior to 2012.
6  Q.  Okay.
7  So we're talking maybe
8  2006-ish?
9  A.  Maybe 2006-ish.
10  Q.  Ish.
11  To the best of your
12  knowledge -- again, I'm just focussing,
13  trying to get an organizational picture.
14  So Dr. Fagal reports to Sister
15  Margaret Gannon at the time of your
16  termination, Sister Margaret Gannon
17  reports to Dr. Foley.
18  Who does Dr. Foley report to?
19  A.  I don't know.
20  Q.  Okay.
21  Who is the ultimate boss, for
22  lack of better words, at the university?
23  A.  I presume it would be Sister
24  Anne Munley.



Page 42

```
 1        Q.    The president of the
 2   university?
 3        A.    The president of the
 4   university.
 5        Q.    So if someone doesn't have a
 6   direct dotted -- direct line reporting to
 7   the president of the university, everyone
 8   that works at the university ultimately
 9   reports to the president of the
10   university; is that correct?
11        A.    Yes, indirectly.
12        Q.    Is there anyone higher on the
13   food chain than the president of the
14   university at Marywood?
15        A.    I'm not sure.
16        Q.    Can you identify anyone that's
17   higher up than Sister Anne Munley who was
18   president of the university at the time of
19   your termination as we sit here today?
20        A.    As a title, I might presume the
21   president of the Sisters of the Immaculate
22   Heart of Mary but I don't really know.
23        Q.    Okay.
24              So as far as you know, Sister
```

Page 43

```
 1   Munley, president of the university,
 2   was the boss of the university?
 3        A.    As far as I know, yes.
 4              - - -
 5              (At this time, a document was
 6        marked for identification as Exhibit
 7        Fagal-3.)
 8              - - -
 9   BY MS. PEET:
10        Q.    Mr. Fagal, what has been placed
11   before you marked as Fagal Exhibit-3 is a
12   Letter of Agreement between you and
13   Marywood University dated May 10, 2011.
14              Do you see that?
15        A.    Yes.
16        Q.    And if you look at the bottom
17   right of this page, it has signature.
18              Is that your signature?
19        A.    Yes.
20        Q.    And by signing this letter,
21   were you accepting the agreement -- the
22   tenured faculty agreement between you and
23   Marywood University?
24        A.    Yes.
```

Page 44

```
 1        Q.    And to the best of your
 2   knowledge, the terms and conditions that
 3   are set forth in this letter, are they
 4   accurate?
 5        A.    Well, let me read the letter.
 6        Q.    Take your time.
 7              - - -
 8              (At this time, the witness
 9        complies with request.)
10              - - -
11              THE WITNESS:  Okay.
12              Could you repeat the question,
13        please?
14   BY MS. PEET:
15        Q.    I sure can.
16              The -- as you can see that this
17   Letter of Agreement sets forth some of the
18   terms.
19              Do you see that?
20        A.    Yes.
21        Q.    To the best of your knowledge,
22   are these terms accurate?
23        A.    Yes.
24        Q.    Okay.
```

Page 45

```
 1              We discussed earlier about an
 2   incident involving Laurie McMillan.
 3              To your knowledge, was she
 4   disciplined by Marywood University?
 5        A.    No.
 6        Q.    Do you know one way or the
 7   other?
 8        A.    No.
 9        Q.    I just -- sometimes a question
10   can evoke a "no", but I'm not sure if it's
11   no, you don't know or no, she wasn't.
12        A.    I do not know if she was
13   disciplined or not disciplined.
14        Q.    And that's going to happen
15   throughout the deposition.  I'll try
16   and --
17        A.    I understand.
18        Q.    -- make sure we catch those
19   situations.
20              To your knowledge, did Marywood
21   University have missions and core values?
22        A.    Yes.
23        Q.    Okay.
24              Off the top of your head, do
```




Page 46

1    you know what those core values are?
2        A.   Well, I know one that they were
3    stressing recently was respect for the
4    individual.  Another one was I believe
5    something about stewardship of the earth.
6    I'm a little vague on that one.  That's
7    what I can surely recall at the moment.
8        Q.   Is Marywood University's
9    mission and core values -- is that written
10   down somewhere?
11       A.   Yes.
12       Q.   Is that made available to you
13   as -- was it made available to you as a
14   tenured professor?
15       A.   Yes.
16       Q.   Were the mission and core
17   values posted anywhere around the
18   university?
19       A.   I can't recall.
20       Q.   Okay.
21           And does that mean you can't
22   recall one way or the other?
23       A.   I can't recall one way or the
24   other whether there was a posting or not.

Page 47

1        Q.   Did you ever hear anyone at the
2    university discuss the missions or core
3    values?
4        A.   Yes.
5               - - -
6           (At this time, a document was
7        marked for identification as Exhibit
8        Fagal-4.)
9               - - -
10   BY MS. PEET:
11       Q.   Now, Dr. Fagal, I put before
12   you a rather sizable document.  The good
13   news is I'm not asking any questions about
14   it specifically or really asking you to go
15   through it with a fine-tooth comb.  All
16   I'm going to ask you to do is to identify
17   that this is the handbook that was in
18   existence at the time of your termination
19   of employment.  As you can see, the
20   handbook is dated July 1, 2010.
21           MR. COHEN:  I'm going to have
22       to object.  There's no way he can
23       know whether it's the same handbook.
24       This is like 200 pages.

Page 48

1           MS. PEET:  Well, if you look at
2    paragraph 14 of his Complaint, he
3    talks about on July 1, 2010, Marywood
4    issued an edition of its faculty
5    handbook, and then you attach the
6    first four pages as Exhibit-B to your
7    Complaint -- your Amended Complaint.
8    Pardon me.
9    BY MS. PEET:
10       Q.   Is the handbook that I've just
11   put before you the July 1, 2010, handbook
12   that you were referencing in your Amended
13   Complaint?
14       A.   I don't know.  I'm assuming
15   that this is it though one would have to
16   run a, you know, computer -- check some
17   test to test whether any secret changes
18   had been put in.  Do I think that any have
19   been put in?  No, I don't, but I cannot
20   testify as to whether this is in fact it.
21       Q.   Okay.
22           The July 1, 2010, handbook that
23   you reference in your Amended Complaint
24   and what I purport is in front of you as

Page 49

1    Exhibit-4, do you have any reason to
2    dispute that it applied to you as a
3    tenured professor at Marywood?
4        A.   No.
5        Q.   So is it fair to say that as a
6    tenured professor at Marywood, you had to
7    comply with the policies and procedures
8    contained in the handbook?
9           MR. COHEN:  Objection, legal
10       conclusion.  You can answer.
11          THE WITNESS:  To the extent
12       that they were clear and not vague,
13       yes.
14   BY MS. PEET:
15       Q.   Are there any policies that you
16   sought clarification because you believed
17   they were vague?
18       A.   When?
19       Q.   During your employment.
20       A.   Yes.
21       Q.   Okay.
22           And what policies do you
23   believe that you sought clarification
24   because they were vague?

13 (Pages 46 to 49)



Page 50

1    A.   I remember asking Dean Torell
2 some questions about what was okay or not
3 okay to do.
4    Q.   You asked Dean Torell what was
5 okay and not okay with reference to what?
6    A.   About postings on my office
7 door, news stories and things like that.
8    Q.   Other than asking Dean Torell
9 about what you can and cannot do with
10 postings on your office door, any other
11 policies that you thought were vague for
12 which you sought clarification?
13    A.   No.
14    Q.   Okay.
15       Did Dean Torell provide a
16 response to you --
17    A.   No.
18    Q.   -- about what you can or cannot
19 do with postings on your office door?
20    A.   He did not reply.
21    Q.   When you say he did not reply,
22 is it fair to say that you sent him an
23 e-mail?
24    A.   Yes.

Page 51

1    Q.   Did you follow up with Dean
2 Torell to nudge him to respond?
3    A.   No.
4    Q.   Did you seek clarification from
5 anyone else at Marywood other than Dean
6 Torell on this issue?
7    A.   I can't recall.
8    Q.   To the best of your
9 recollection, other than e-mailing Dean
10 Torell once, did you reach out to Dean
11 Torell in any other way to seek
12 clarification on this issue?
13    A.   I can't recall.
14    Q.   November of 2011, it's my
15 understanding that you invited a speaker
16 from FIRE to speak at the campus; is that
17 correct?
18    A.   I invited a speaker to come to
19 my class which is held on campus, so yes.
20    Q.   And what class was that at the
21 time?
22    A.   Introduction to social science.
23    Q.   Was this the first time you
24 ever had a FIRE speaker speak on your

Page 52

1 behalf either in a course or at the
2 university generally?
3    A.   No.
4    Q.   Can you identify the other
5 times in which you had a FIRE speaker come
6 to the university?
7    A.   Yes.  Luke Sheehan came to
8 speak on campus at an evening event, and I
9 believe that might have been in 2007 plus
10 or minus a year.
11    Q.   Anyone else?
12    A.   Do you mean anyone else from
13 FIRE?
14    Q.   Correct.
15    A.   No.
16    Q.   What was your role in getting
17 Luke Sheehan to speak at Marywood?
18    A.   I'm not sure what you mean by
19 role.
20    Q.   Sure.
21       Did you initiate the -- Luke
22 Sheehan to speak at Marywood?
23    A.   Luke.  I'm sorry.  Good.  Luke
24 Sheehan.  I was thinking of -- I can't

Page 53

1 recall who initiated it.
2    Q.   Is it possible it was you?
3    A.   It's possible it was me.
4    Q.   What was Mr. Sheehan's what did
5 he speak about at Marywood?
6    A.   Something to do with free
7 speech on college campuses around the
8 United States.
9    Q.   Did Mr. Sheehan in fact speak
10 at Marywood University?
11    A.   Yes, he did.
12    Q.   To the best of your
13 recollection, were posters hung with
14 reference to Mr. Sheehan's speaking
15 engagement?
16    A.   I can't recall exactly.  Could
17 have happened.
18    Q.   Do you know if there was an
19 attendance prize for attending the --
20 Mr. Sheehan's speaking engagement?
21    A.   There was no dollar attendance
22 prize but we might have given food away,
23 but I really can't recall the details.
24    Q.   Did anyone, to your knowledge,

14 (Pages 50 to 53)



Page 54

1    tear down any posters with reference to
2    the Mr. Sheehan speaking engagement?
3         A.   No.
4         Q.   In 2007, was Sister Anne Munley
5    the president of the university?
6         A.   I can't recall but I think so.
7         Q.   Did anyone at Marywood
8    University ask you to not have Mr. Sheehan
9    speak at the university?
10        A.   No.
11        Q.   Did you have any issues or
12   run-ins with anyone at Marywood
13   administration about the Mr. Sheehan
14   speaking engagement?
15        A.   No.
16        Q.   I believe I asked you if you
17   were aware if any posters were torn down
18   by Marywood administration with reference
19   to Mr. Sheehan, and I believe it was your
20   testimony that you don't know; is that
21   correct?
22        A.   My testimony is I don't know.
23   I can't recall if there were posters, and
24   if I can't recall there were posters, I

Page 55

1    certainly can't recall if any were torn
2    down or not.
3         Q.   Okay.
4              The -- when Mr. Sheehan spoke
5    at the university, was it in connection
6    with any course or class you were
7    teaching?
8         A.   No.
9         Q.   Did anyone besides you help
10   initiate and plan this speaking
11   engagement?
12        A.   Well, I was an advisor to the
13   Republican Club, and so there were
14   students involved with planning the event.
15        Q.   Is it fair to say that
16   Mr. Sheehan, who was a speaker from the
17   FIRE organization, came to Marywood
18   University, at least as part of your
19   initiation in 2007, spoke without issue?
20        A.   Mr. Sheehan spoke without
21   issue.
22        Q.   And he's connected with FIRE;
23   is that correct?
24        A.   At the time, he was.

Page 56

1         Q.   So back to November of 2011,
2    who was the speaker that you brought from
3    FIRE to your course?
4         A.   Will Creeley.
5         Q.   And what did Mr. Creeley speak
6    about?
7         A.   I believe he had a stock speech
8    and he had four different titles for it.
9    I believe it was pretty much the same but
10   he would speak about free speech on
11   college campuses and maybe thought control
12   or -- that might have been in the title.
13        Q.   So what Mr. Creeley spoke about
14   was similar to what Mr. Sheehan had spoken
15   about in 2007?
16        A.   Yes.
17        Q.   With Mr. Sheehan, did anyone at
18   the university tell you you could not hang
19   up posters?
20        A.   No.
21        Q.   Other than you initiating, are
22   you aware of any other speaker from FIRE
23   that spoke at the university?
24        A.   I can't recall.

Page 57

1         Q.   To your knowledge, is Marywood
2    University a public or private university?
3         A.   Officially a private university
4    but it does get public funds, of course.
5         Q.   Did you tell anyone at the
6    university that you wanted Will Creeley to
7    come speak?
8         A.   Yes.
9         Q.   Who did you tell?
10        A.   Well, I discussed with Sister
11   Margaret Gannon having a speaker from
12   FIRE.  At what point the name Will Creeley
13   emerged I'm not exactly sure, but I'm sure
14   it would have come out before the event
15   took place.  I contacted -- Sister
16   Margaret told me that there was no money
17   and she gave me a name, cultural affairs
18   person.  I'm drawing a blank on the name
19   now, but she said go and ask them if they
20   have any money for speakers.  When the
21   plans were made with FIRE, I contacted
22   Carl Oliveri and told him who was coming.
23   I can't recall any more right now.
24        Q.   When you told Sister Margaret



1 that you were -- you wanted to have a
2 speaker from FIRE come, what was her
3 response?
4      A.   I believe she -- I said
5 something -- she might have said well,
6 that ties into the course, right, and I
7 said yes, it's -- you know, it has to do
8 with the first amendment in the
9 Constitution.  It was very -- we were very
10 low key.
11      Q.   Did -- I assume she didn't tell
12 you no, that's not possible, that can't
13 happen, or we object?
14      A.   No objections on her part.
15      Q.   When she told you that she
16 didn't believe there were money for
17 speakers, was it there was -- to your
18 knowledge, was it we don't have money for
19 speakers from FIRE or we don't have money
20 for speakers generally?
21      A.   It was a question of
22 departmental budget, no more money for
23 speakers generally.
24      Q.   How much did FIRE want in terms

1 of money for a speaking engagement?
2      A.   A thousand dollars was the
3 usual fee.
4      Q.   I believe you testified that
5 Sister Margaret Gannon suggested that you
6 talk to someone from the cultural
7 department about seeking funds for the --
8      A.   Not a cultural department,
9 cultural affairs.  Cerda might have been
10 the name, C-E-R-D-A.  That name rings a
11 bell but I'm not sure.
12      Q.   Is Cerda affiliated with
13 Marywood University?
14      A.   She was if that was -- it was
15 just an e-mail contact.
16      Q.   Did you indeed contact Cerda to
17 determine whether --
18      A.   Yes.
19      Q.   -- there was money for this
20 speaking --
21      A.   I did go --
22      Q.   -- engagement?
23      A.   I'm sorry.  Go ahead.
24      Q.   Did you indeed contact Cerda to

1 determine whether there was money in the
2 budget for a speaker?
3      A.   I can't recall if I e-mailed
4 her directly or if there was another name
5 I e-mailed, too, but I did contact that
6 higher level.
7      Q.   And what was the response, to
8 the best of your memory?
9      A.   I know I was told by someone
10 there was no money there either.
11      Q.   Okay.
12           And did you believe that to be
13 no money in the budget for speakers
14 generally or did you attribute that to the
15 fact that the speaker was from FIRE?
16      A.   I believe it was no money
17 generally.
18      Q.   Was the FIRE speaker something
19 that was required by Marywood on you to
20 have at the university?
21      A.   No.
22      Q.   Did you decide to proceed
23 anyway knowing that Marywood wasn't going
24 to be able to fund a speaker?

1      A.   Yes.
2      Q.   Was that a voluntary choice
3 that you made?
4      A.   Yes.
5      Q.   You said you spoke to Carl
6 Oliveri.
7           Who is Carl?
8      A.   He was the director of what I
9 think was called the student activities --
10 SAL -- I called it student activities.
11      Q.   Can we call it student
12 activities for the purpose of this
13 deposition?
14      A.   That would be helpful.
15      Q.   Okay.
16           What did you and Mr. Oliveri
17 speak about with reference to you wanting
18 to have a FIRE speaker?
19      A.   I wanted to hang -- get some
20 posters to try to draw a crowd because I
21 wanted to open the presentation, open the
22 class to other Marywood students, and I
23 wasn't sure.  I never hung posters as a
24 faculty member before for my class or

16 (Pages 58 to 61)



1  anything like that, so I wasn't sure of
2  the protocol.
3          I did know that students groups
4  had to get permission to hang posters
5  because I would see posters around and I
6  would see them stamped approved by student
7  life, or student activities, or whatever
8  the stamp was. So I figured it couldn't
9  do any harm to get the posters stamped by
10 student activities.
11      Q.   And is that why you went to
12 Mr. Oliveri?
13      A.   That's why I went to
14 Mr. Oliveri, and I thought that maybe
15 because it was -- I was trying to reach
16 out to the broad student body that perhaps
17 he would be able to print a few posters
18 for me and I was going to print some
19 others on my own.
20      Q.   What was Mr. Oliveri's
21 response?
22      A.   He said okay. He said he could
23 print -- I believe it was 12 to 15
24 posters.

1       Q.   Did he say that there would be
2  a fee associated with the printing of
3  those 12 to 15 posters?
4       A.   No.
5       Q.   So to your understanding, for
6  him to print those 12 to 15 posters, you
7  would not be responsible for paying
8  anything; is that correct?
9       A.   That's correct.
10      Q.   And did you want to print more
11 posters than what Mr. Oliveri was able to
12 print?
13      A.   Yes.
14      Q.   And did you in fact print more
15 posters?
16      A.   Yes.
17      Q.   Was that something you
18 voluntarily chose to do?
19      A.   Yes.
20      Q.   And how many more posters did
21 you print?
22      A.   I believe the number was 46.
23      Q.   Where did you print these
24 posters?

1       A.   I had the UPS Store in
2  Skaneateles print the posters.
3       Q.   The posters that you printed,
4  were they the same posters that Carl was
5  printing as well?
6       A.   Yes. Let me clarify. FIRE --
7  this is Thanksgiving weekend. FIRE had
8  sent the sample poster announcing the
9  speech, and the title, and the date, and
10 the time and place, and Carl Oliveri said
11 that was fine.
12          Then -- this is before the
13 weekend of Thanksgiving weekend. Then
14 Carl Oliveri noticed that the posters did
15 not have contact information on them. The
16 PDF sample that FIRE had sent to me that I
17 sent to Carl, no contact information.
18 Carl Oliveri told me, Fred -- he says you
19 need to have contact information on them,
20 an e-mail address would do. You could
21 even handwrite it on because Carl knew
22 that I was bringing posters.
23          And so at that point I said
24 okay, the posters have to be modified.

1  This is maybe Friday and Saturday of
2  Thanksgiving weekend, and so I sent to
3  Carl Oliveri an e-mail saying, Carl,
4  here's a sample strip that's going to be
5  attached to each poster, and on that strip
6  is my e-mail address, fagal@marywood.edu,
7  for the contact information and also on
8  the poster was a notice for the $50.00
9  attendance prize drawing for a student who
10 came to the event. And I said that those
11 would all be attached to the posters that
12 would be delivered for stamping first
13 thing on Monday morning, and that was in
14 an e-mail.
15      Q.   What was Carl's response?
16      A.   I don't believe I got an e-mail
17 response from him that weekend.
18      Q.   Did you go back to Carl Monday
19 morning with the posters with the strips
20 on it for approval?
21      A.   No.
22      Q.   Why not?
23      A.   Because a student brought the
24 posters over with the strips attached.

17 (Pages 62 to 65)


MAGNA
LEGAL SERVICES

Page 66

1        Q.   Who was that student?
2        A.   Geri Smith and I believe
3   Samantha Cocoa was with her, and Ben
4   Harrington might have been with them also.
5   I'm not sure about him.
6        Q.   Are they all students?
7        A.   They were all students at the
8   time.
9        Q.   Okay.
10       To your knowledge, Geri Smith
11   and perhaps others went to Carl on Monday
12   morning with the posters which included
13   the strip that was to be added to the
14   poster for approval?
15       A.   No.
16       Q.   Okay.
17       What am I missing?
18       A.   When Geri Smith brought the
19   posters over, Carl -- she -- I was not
20   there.  This is what she -- Carl Oliveri
21   was not there.  In charge was a woman who
22   worked for the student activities office
23   and she is the one who stamped all of
24   those posters with the approval, and all

Page 67

1   of those posters had on them the prize
2   announcement and the contact information.
3        Q.   And you don't know who that
4   woman is?
5        A.   I believe her name is Katie
6   Aunchman but I do not know her.
7        Q.   Do you know what her job
8   position is with Marywood?
9        A.   I believe she was a graduate
10   student.  I think she was -- I'm not sure
11   of her title.  I was told it was advisor.
12   She worked for the clubs or something.
13   I'm not sure exactly what she worked for
14   at Marywood, but she worked for Marywood.
15       Q.   Okay.
16       Do you know one way or the
17   other whether she had approval to stamp
18   posters?
19       A.   I do not know.
20       Q.   And this information about Carl
21   not being there and Katie putting the
22   stamp of approval on it, you don't have
23   firsthand knowledge of that; is that
24   correct?

Page 68

1        A.   I do not.
2        Q.   And this is information that
3   was told to you by Geri Smith, a student,
4   correct?
5        A.   Yes.
6        Q.   Okay.
7        A.   I do know that posters were
8   stamped because Geri Smith brought back
9   some posters to give to me to hang up and
10   all of them were stamped.
11       Q.   The posters that were stamped,
12   did they have the strip -- the additional
13   strip that we've just discussed on the
14   posters before they were stamped?
15       A.   Yes, they did.  The strip was
16   on the posters before they were stamped.
17       Q.   Did you see the posters with
18   the strips on them before they were
19   stamped?
20       A.   Yes.  I made the posters.  I
21   taped all the strips on myself.
22       Q.   And before you taped the strips
23   on, were those posters stamped?
24       A.   No.

Page 69

1        Q.   Did -- I believe you testified
2   -- and I'm sorry to be repetitive -- that
3   Sister Margaret Gannon did not tell you
4   that the FIRE speaker couldn't come to the
5   university, correct?
6        A.   She did not tell me the FIRE
7   speaker could not come to the university.
8        Q.   What about Carl Oliveri?
9        A.   He didn't tell me anything
10   about the speaker.
11       Q.   Okay.
12       You said the speaker was slated
13   for Thanksgiving weekend; is that correct?
14       A.   Well, the speaker was slated
15   for November 30th, which was a Wednesday
16   after Thanksgiving weekend.
17       Q.   Was the university in session
18   at that time?
19       A.   Yes.  November 30th the
20   university was in session.
21       Q.   Who picked the date for the
22   speaker?
23       A.   Dr. Jackson and I were the
24   co-teachers for the course and we chose

18 (Pages 66 to 69)



1    the date.  It was getting near the end of
2    the semester and that was the most obvious
3    date.
4        Q.   Was this speaking engagement a
5    required element of the course you were
6    teaching?
7        A.   Yes, in the sense that it was
8    held during the class time and it was a
9    speaker during the class.
10        Q.   Was it held in the classroom
11    itself?
12        A.   No.
13        Q.   Okay.
14        Where was it held?
15        A.   Comerford Auditorium.
16        Q.   And who selected the location?
17        A.   I did.
18        Q.   Did anyone at the university
19    make any objection to holding the speaking
20    engagement in the auditorium?
21        A.   No.
22        Q.   You said Dr. Jackson; is that
23    Dr. Thomas Jackson?
24        A.   Yes.

1        Q.   To your knowledge, is he
2    currently a tenured professor at Marywood
3    University?
4        A.   Yes.
5        Q.   You said he was a co-teacher of
6    the course.
7        What did you mean by that?
8        A.   We split the duties and the
9    time.
10        Q.   Do you and Dr. Jackson get up
11    in front of the course and would you speak
12    together?
13        A.   Generally not.
14        Q.   Okay.
15        So would it be some days
16    Dr. Fagal would show up and teach the
17    class and some days --
18        A.   Yes.
19        Q.   -- Dr. Jackson would show up
20    and teach the class?
21        A.   Yes, sorry.
22        Q.   But it was one class with the
23    same students; is that correct?
24        A.   Will you repeat?  Was what?

1        Q.   One class with the same
2    students?
3        A.   Correct.
4        Q.   What were Dr. Jackson's
5    thoughts on having this FIRE speaker come
6    to campus?
7        A.   We didn't have any big
8    discussion.  He thought it was a good
9    idea.
10        Q.   Okay.
11        Is it fair to say it was your
12    idea and he supported it?
13        A.   Yes.
14        Q.   Did Dr. Jackson have an opinion
15    about the posters?
16        A.   I don't understand the
17    question.
18        Q.   Sure.
19        Did he have an opinion one way
20    or the other about posting posters on the
21    university for the speaking engagement?
22        A.   I don't recall any opinion.
23        Q.   Did Dr. Jackson participate in
24    making the posters?

1        A.   No.
2        Q.   Did Dr. Jackson participate in
3    hanging the posters?
4        A.   No.
5        Q.   Was he at all involved in the
6    poster incident, for lack of better words?
7        A.   No.
8        Q.   When, to your knowledge, in
9    relation to the November 30th speaking
10    engagement were the posters hung?
11        A.   The posters were hung the
12    morning of November 28th and a few were
13    hung early in the afternoon of November
14    28th.
15        Q.   So prior to November 28, 2011,
16    there were no posters hung for this event;
17    is that correct?
18        A.   That is correct.
19        Q.   And these posters were hung on
20    November 28th for a speaking engagement
21    that was occurring on November 30th; is
22    that correct?
23        A.   Yes.
24        Q.   Who hung the posters?

19 (Pages 70 to 73)



Page 74

1      A.    Geri Smith hung most of the
2   posters.  Samantha Cocoa told me in an
3   e-mail that she hung some posters.  I
4   don't know how many.  And I hung some
5   posters.
6      Q.    How many posters were hung
7   approximately generally?
8      A.    I'd say 46.
9      Q.    Now, you testified earlier that
10  you made 46 posters and Carl said he would
11  give you 12 to 15 posters?
12     A.    Correct.
13     Q.    Did Mr. Oliveri not give you
14  his 12 to 15 posters?
15     A.    I was not there.  Geri Smith
16  reported to me in an e-mail that -- she
17  said there were 12 or 15 posters -- I
18  forget the exact number -- that were not
19  stamped, but that of course makes sense
20  because those posters Mr. Oliveri had
21  printed out and they were the plain PDF
22  posters as we see from FIRE without any
23  contact information.  So he printed
24  posters without contact information and I

Page 75

1   guess I forgot.
2         I did not provide any strips --
3   contact or prize information strips
4   combined to hang on those posters.  So,
5   therefore, if the person in student
6   activities saw that there were posters but
7   the posters did not have contact
8   information on them, then she would
9   understandably not stamp them approved.
10     Q.    Is it fair to say that Carl
11  told you that in order for them to be
12  approved, they needed to have contact
13  information on them, correct?
14     A.    That is correct.
15     Q.    And is it also fair to say that
16  you were the one that needed to provide
17  the contact information to Carl, correct,
18  or someone on your behalf?
19     A.    Yeah.  If I was bringing
20  posters to get approved, it had to have
21  contact information, and Carl said that I
22  could actually write it on if I wanted to.
23     Q.    Okay.
24         But that was your

Page 76

1   responsibility, correct?
2      A.    Yes.
3      Q.    And is it fair to say that, for
4   whatever reason, whether you forgot or
5   whatever, you did not provide that
6   information to Carl either by a strip or
7   you didn't write on your contact
8   information on those 12 to 15 posters you
9   asked him to print out?
10     A.    No.
11         Could you repeat the question?
12     Q.    Sure.
13         So we've already set forth that
14  Carl told you in order for them to get
15  approved, they had to have contact
16  information on them, correct?
17     A.    Correct.
18     Q.    We've already, I believe,
19  solidified that Carl told you that you
20  needed to provide the contact information.
21         You could have done it by
22  strip, you could have written something
23  on, but that you had to do it, correct?
24     A.    He did not say that.

Page 77

1      Q.    Okay.
2      A.    We did not have any discussion
3   about whether I would like him to put
4   contact information on the strips.  I did
5   send him the sample of the strips with the
6   prize announcement and my e-mail address
7   and I said this is what would be on the
8   posters that I brought in on Monday.  If
9   Carl had chosen to print out those strips
10  himself, he could have easily done so and
11  taped them to the posters that he printed.
12  He chose not to do that or didn't think
13  about it, and I didn't think about it, and
14  that's what happened.
15     Q.    Okay.
16         Do you blame Carl for not
17  putting contact information on those
18  posters?
19     A.    No, because I believe those
20  were only 8 and a half by 11 small
21  posters, nothing big.
22     Q.    Okay.
23         How big were the posters that
24  you printed?

20  (Pages 74 to 77)



1     A.   I believe they were 11 by --
2  most of them were 11 by 17, but there were
3  some smaller ones.  I can't remember the
4  exact mix out of the 46.
5     Q.   Of the 46 posters that you
6  believe were hung, how many did you
7  personally hang?
8     A.   I probably hung seven or eight.
9     Q.   Were there specific places in
10 the university that you wanted these
11 posters hung or were you planning on
12 posting them throughout the university?
13    A.   I'm not sure if the question is
14 clear to me.
15    Q.   Sure.
16         Where in the university were
17 you hanging these posters?
18    A.   The general idea was to hang
19 them where students could see them and
20 maybe be inspired to come to the
21 presentation.
22    Q.   Now, November 28th would have
23 been a Monday, correct?
24    A.   That's correct.

1     Q.   Would that have been the first
2  day back at school following a
3  Thanksgiving break for the students?
4     A.   Yes.
5     Q.   Other than the seven to eight
6  posters you hung, did you ever see the
7  other posters that Geri or perhaps
8  Samantha hung?
9     A.   I certainly saw some of them.
10    Q.   Okay.
11         Approximately how many did you
12 see?
13    A.   I'm estimating here.  Including
14 my own, 30.
15    Q.   And can you identify the
16 buildings in which you saw these posters?
17    A.   I saw posters in the science
18 building.  I saw posters in the liberal
19 arts center.  I saw posters on the library
20 door.  I can't recall if I saw posters
21 elsewhere.  I might have.
22    Q.   I believe it's your position
23 that the posters were torn down; is that
24 correct?

1     A.   Most of them were torn down.
2     Q.   When you say most of them, does
3  that mean some posters were not torn down?
4     A.   Yes.
5     Q.   I understand this is going to
6  require an approximation.  If you can,
7  that would be helpful.
8         Of the 46 posters, how many
9  believe -- how many do you believe were
10 torn down?
11    A.   My approximation would be --
12 I'll say 38.
13    Q.   And where do you come up with
14 that number?
15    A.   Well, I walked around and
16 looked -- to look for posters and I found
17 some still hanging but not a lot, so that
18 would be my guess.  When I say 38, it
19 could have been 34.  That's a -- you know,
20 mid-thirties type number.
21    Q.   Okay.
22         When was it that you were
23 walking around and noticed that posters --
24 that all the posters that you believe were

1  hung up were not still hanging?
2     A.   Probably about 7:15 a.m.
3  Wednesday morning.
4     Q.   And that would have been
5  November 30th?
6     A.   November 30th.
7     Q.   And that would have been the
8  day of the speaking engagement?
9     A.   That's correct.
10    Q.   Do you have any knowledge when
11 any posters were allegedly taken down?
12    A.   I received an e-mail from Geri
13 Smith on -- it was dated on Tuesday
14 afternoon that she sent it around -- I'll
15 say 1:30 p.m., more or less, and the gist
16 of that e-mail was Professor Fagal, is the
17 FIRE speech cancelled, and I saw that
18 e-mail from Geri late in the afternoon,
19 perhaps around 5:00 p.m.  I wrote back and
20 I said what do you mean, and she said
21 well, the posters are all torn down, and I
22 was shocked.
23         And was there another part of
24 the question?  Have I answered the





1  question?
2      Q.   I believe you have answered the
3  question in full.  Thank you.
4          Is that the way that you
5  learned that posters were taken down by
6  getting an e-mail from Geri Smith?
7      A.   Yes.
8      Q.   When -- you've been using the
9  terminology throughout this litigation of
10  torn down; is that correct?
11      A.   That's correct.
12      Q.   Okay.
13          When I think of torn down, I
14  think of someone physically like tearing
15  something off the wall.
16      A.   Yes.
17      Q.   Did you have any -- did you
18  witness people taking the posters down?
19      A.   No.
20      Q.   Okay.
21          Do you know if in fact they
22  were torn down or just removed from the
23  wall?
24      A.   In some cases, I saw some

1  remnants, you know, like leftover tape or
2  whatever just on top.  So they were
3  removed quickly at least in some cases.
4      Q.   Is it fair to say that you
5  didn't witness any posters being removed;
6  is that correct?
7      A.   I did not witness any posters
8  being removed.
9      Q.   Did Geri Smith tell you that
10  she witnessed any posters being removed?
11      A.   I don't think she did.
12      Q.   Did anyone tell you they saw
13  the posters being removed?
14      A.   Not that I can recall.
15      Q.   As we sit here today, do you
16  know in fact who removed posters from the
17  walls?
18      A.   Could you rephrase that?
19      Q.   Sure.
20          As we sit here today, do you
21  know who removed posters that you believe
22  were removed about the FIRE speaker?
23      A.   I don't know individual names
24  of who actually performed the task.  I'm

1  presuming they could have been work study
2  students who were told to take them down
3  but I don't know any specific person who
4  specifically tore down posters.
5      Q.   Do you know who instructed
6  anyone to remove those posters?
7      A.   I have no firsthand knowledge
8  of who told anybody to do it, though Alan
9  Levine did tell me that posters had been
10  torn down.
11      Q.   Did Alan Levine tell you he
12  wanted the posters to be torn down?
13      A.   Alan Levine told me when I had
14  a meeting with him that the posters were
15  torn down because of the prize
16  announcement, and the way he told that to
17  me I drew the conclusion that he approved
18  that they were torn down because of the
19  prize announcement.
20      Q.   I believe you testified you
21  drew a conclusion.
22          Did Alan Levine tell you one
23  way or the other about his position --
24      A.   Well, yes.

1      Q.   Let me --
2      A.   I'm sorry.
3      Q.   -- finish asking the question.
4          Did Alan Levine tell you that
5  he approved of the posters being torn
6  down?
7      A.   I will say yes.
8      Q.   And what were his words?
9      A.   He said that I was pandering to
10  the students by offering prize money to
11  come to class.
12      Q.   You testified that the FIRE
13  speaker spoke Wednesday evening, November
14  30th; is that correct?
15      A.   No.
16      Q.   That the FIRE speaker was
17  scheduled to speak Wednesday evening,
18  November 30th?
19      A.   No.
20      Q.   What do I have wrong?
21      A.   The FIRE speaker spoke at my
22  2:00 p.m. class on Wednesday, November
23  30th.
24      Q.   Okay.



1        So the class that you normally
2   taught was 2:00 on Wednesdays during that
3   semester; is that correct?
4        A.   That's correct.
5        Q.   And as part of the class, it
6   was required that the students attend this
7   lecture, correct?
8        A.   No.
9        Q.   Did you take attendance?
10       A.   No.
11       Q.   Did you tell the students that
12   it was encouraged that they attend?
13       A.   Yes.
14       Q.   If the students didn't attend
15   the lecture, did that mean they missed the
16   class that day?
17       A.   Yes.
18       Q.   And I believe you testified
19   that Dr. Levine told you it was pandering
20   to offer prize money to come to the class;
21   is that correct?
22       A.   Yes.
23       Q.   You testified that Dr. Levine
24   told you that the posters were torn down

1   because of the prize announcement; is that
2   correct?
3        A.   Yes.
4        Q.   Did Dr. Levine tell you that
5   the posters were torn down because it was
6   a FIRE speaker?
7        A.   No.
8        Q.   Did Dr. Levine tell you that
9   the posters were being torn down because
10   the speaker was going to be talking about
11   free speech?
12       A.   No.
13       Q.   Did the posters actually offer
14   prize money?
15       A.   No.
16       Q.   Okay.
17            Tell me why not.
18       A.   Because the posters that
19   offered the prize money were torn down.
20   Most of them were torn down.
21       Q.   So --
22       A.   I --
23       Q.   I'm sorry.  Go ahead.
24       A.   I learned about the posters

1   being torn down and I did not think that
2   Marywood University tore them down.  I
3   assumed it was some student who didn't
4   like me or something about the topic tore
5   them down.  I did not assume the
6   university tore them down.
7        So I immediately went down to
8   the UPS Store on Tuesday, luckily before
9   they closed, and I got not 46 posters done
10   but maybe 20 or so and I had them printed,
11   and I sent an e-mail to Sister Anne Munley
12   and Carl Oliveri expressing surprise that
13   my posters had been torn down.  I said I
14   got them reprinted and I would show up on
15   Wednesday morning bright and early to get
16   them hung up and could the university
17   please send out a blast e-mail to students
18   saying something along the lines of, gee,
19   we had a terrible thing happen.  Professor
20   Fagal's posters were torn down.  We'd like
21   to let you know there is a presentation
22   speech you could attend on Wednesday
23   afternoon and wouldn't it be nice to go
24   to, you know, counteract the tearing down

1   of the posters.  So that's the e-mail I
2   sent.
3        So I showed up on Wednesday
4   morning with the newly-printed posters
5   with the prize announcement on them, as
6   had done on Monday morning, and I
7   personally went over to the student
8   activities office with the posters ready
9   to get stamped and would go quickly hang
10   them up to the best we could at getting
11   a crowd, and that's when I was told that,
12   no, the prize announcement could not be on
13   there and had to be cut off before the
14   posters could be stamped approved.
15       Q.   Okay.
16            Was it your understanding if
17   you took that prize money off that the
18   posters would be stamped and approved?
19       A.   Yes.
20       Q.   Did you take the prize money
21   off?
22       A.   Yes.
23       Q.   And the posters were stamped
24   and approved?

23  (Pages 86 to 89)



1     A.   Yes.
2     Q.   And were those posters hung?
3     A.   Yes.
4     Q.   Were those posters torn down?
5     A.   Some were.
6     Q.   Do you know who did that?
7     A.   No, I do not.
8     Q.   Do you know if it was the
9  administration?
10    A.   I do not know for sure.
11    Q.   You'd just be speculating?
12    A.   I could speculate.
13    Q.   Okay.
14         But it would be that
15  speculation, you don't know?
16    A.   I don't know.
17    Q.   You testified earlier that
18  before you posted another 20 posters that
19  of the posters that you believe were torn
20  down, it was the posters with the prize
21  money --
22    A.   Yes.
23    Q.   -- is that correct?
24    A.   Yes.

1     Q.   Posters that were not torn
2  down, did they have the prize money on it?
3     A.   Yes.
4     Q.   Okay.
5         So some posters with the prize
6  money stayed up, some posters with the
7  prize money were torn down?
8     A.   Yes.  Posters that remained
9  were mostly the small ones because I
10  printed some small ones that were 8 and a
11  half by 11.  And, for example, one of the
12  first ones I saw hanging was outside the
13  -- I think the second floor men's room in
14  the liberal arts center on a bulletin
15  board with a lot of other posters,
16  something that would be easy to overlook
17  in terms if somebody had gone on a
18  tear-down campaign.  So some posters were
19  not torn down.  They were missed by those
20  who were given the task of tearing down
21  the posters.
22    Q.   And it was up to you or people
23  that were working with you to decide where
24  those posters would be hung, correct?  No

1  one at the administration said these are
2  where you have to hang the posters,
3  correct?
4     A.   Correct.
5     Q.   You alluded to the fact that
6  perhaps it was a student who didn't like
7  you tore down the posters.
8     A.   Well, that's mere speculation.
9  I had no idea.
10    Q.   Do you know one way or the
11  other whether there were students that
12  didn't like you?
13    A.   No, not particularly.
14         MR. COHEN:  Stephanie, can we
15  take a five-minute bathroom break?
16         MS. PEET:  Sure.
17         ---
18         THE VIDEOGRAPHER:  We're now
19  off the record.  The time is 11:04
20  a.m.
21         ---
22         (At this time, a short break
23  was taken.)
24         ---

1         THE VIDEOGRAPHER:  We are now
2  on the record.  The time is 11:16
3  a.m.
4         ---
5  BY MS. PEET:
6     Q.   Dr. Fagal, are you okay to
7  continue?
8     A.   Yes.
9     Q.   Just a reminder, you are still
10  under oath and all of the testimony you
11  provide needs to be complete, accurate,
12  and truthful.
13         Do you understand?
14    A.   I understand.
15    Q.   Okay.
16         Right before we took a break,
17  you testified that you had another 20
18  posters printed for the purposes of
19  hanging them for the speaker.
20         Do you remember that testimony?
21    A.   Yes.
22    Q.   Were those 20 posters that you
23  printed -- were they ultimately hung?
24    A.   Yes.

24  (Pages 90 to 93)



1    Q.   To your knowledge, did anyone
2  tear those down?
3    A.   To my knowledge, there were
4  posters missing that should have been
5  hanging that day.
6    Q.   Do you have any knowledge as to
7  what happened with those posters?
8    A.   I have no personal knowledge as
9  to what happened to those posters.
10   Q.   Okay.
11       As of 2:00 p.m. Wednesday,
12  November 30th, were there posters hung at
13  Marywood University about the advertising
14  for the speaking engagement?
15   A.   Posters had been hung prior to
16  2:00 p.m. that day to announce the
17  speaking engagement.
18   Q.   Okay.
19       Between November 28th when the
20  posters first were hung by you and your
21  team until November 30, 2012 -- 2011, was
22  there always a poster -- at least one
23  poster hung at the university about this
24  speaking engagement?

1    A.   I presume, yes.
2    Q.   Did Mr. Creeley from FIRE come
3  to speak?
4    A.   Yes, he did.
5    Q.   How long did he speak for?
6    A.   Approximately 40 minutes.
7    Q.   And was that the scheduled
8  length of his presentation?
9    A.   Yes.  There was some discussion
10  time afterwards, so 40 minutes is an
11  estimate.
12   Q.   Is it fair to say that no one
13  from Marywood administration shut down the
14  speaker?
15   A.   Yes, it's fair to say that.
16   Q.   Is it fair to say that no one
17  from Marywood administration shortened the
18  speaker's discussion?
19   A.   No one from the Marywood
20  University administration shortened the
21  speaker's presentation or discussion.
22   Q.   Did anyone from Marywood
23  administration sensor or try to sensor
24  what it is that he was going to discuss?

1    A.   Do you mean of knowledge I had
2  at the time?
3    Q.   I'm asking you did anyone from
4  Marywood try and change the topic or tell
5  Mr. Creeley he couldn't speak about
6  specific topics?
7    A.   No.
8    Q.   How many people were in
9  attendance at this speaking engagement?
10   A.   Probably most of my class
11  members, and that might have been -- I'll
12  say -- I'm not sure what that number would
13  have been between Dr. Jackson and myself
14  but let me pick a number.  Say -- I'll say
15  33, and then I would say there were
16  probably roughly 12 to 15 more people who
17  showed up.
18   Q.   The 12 to 15 additional folks
19  that showed up, were they students?
20   A.   Some were students, I believe,
21  but I didn't know -- I don't know for
22  sure.
23   Q.   Do you know who the other
24  people were?

1    A.   One person I noticed was Frank
2  Falcone.
3    Q.   And who is Mr. Falcone?
4    A.   I think his title was -- had
5  something to do with graduate students and
6  he had been a student in my class some
7  years previously, and so he showed up.
8    Q.   Was he -- so I just want to
9  make sure I understand this correctly.
10       Was he part of the faculty or
11  administration at Marywood?
12   A.   Administration.
13   Q.   Okay.
14       Do you know how the 12 to 15
15  folks that were not part of your course
16  learned about this speaking engagement?
17   A.   I do not know how they learned
18  about the speaking engagement.
19   Q.   Do you have any knowledge of
20  anyone from Marywood administration
21  telling students, faculty or anyone, not
22  to attend the speaking engagement?
23   A.   I have no knowledge of anything
24  like that.



Page 98

```
 1              - - -
 2          (At this time, a document was
 3      marked for identification as Exhibit
 4      Fagal-5.)
 5              - - -
 6  BY MS. PEET:
 7      Q.   What has been marked and placed
 8  before you as Fagal Exhibit-5 are
 9  documents Bates stamped DEF001447 through
10  1475.  It's my understanding that this is,
11  for lack of better words, a chronology of
12  events regarding the FIRE speaker that was
13  prepared by you.
14          Is that an accurate
15  description?
16      A.   Yes.
17      Q.   So is it fair to say that what
18  has been marked as Exhibit-5 is a document
19  you prepared that, to the best of your
20  recollection and knowledge, put together
21  the chronology of the events that led to
22  the November 2011 FIRE incident, for lack
23  of better words?
24      A.   I did my best to compile this
```

Page 99

```
 1  accurately, and at the time I did.
 2      Q.   When did you prepare this?
 3      A.   According to my date here, it
 4  says December -- 12/21/2011 is the date on
 5  comment one.
 6      Q.   Does that seem about accurate
 7  as to when you put this together?
 8      A.   Yes.
 9      Q.   Why did you put this together?
10      A.   Well, I felt I had been
11  wronged, if you will say that -- if I can
12  say that, by the university.  I had tried
13  to find out what happened to my posters.
14  I inquired about the decision-making that
15  went into tearing down the posters.  I had
16  tried to get to the bottom of what had
17  happened.
18      Q.   Were you preparing this for you
19  or for you to give to someone else?
20      A.   I was preparing this.  I had
21  tried to, as they say, go through channels
22  and seek redress for what had happened.  I
23  got no redress for what had happened and
24  -- although I tried to work with the
```

Page 100

```
 1  administration, and so now I was thinking
 2  about perhaps going public in some way
 3  with what had happened.
 4      Q.   And by going public, what is it
 5  that you're referencing?
 6      A.   Well, at this point, I wasn't
 7  exactly sure.  It could have been sending
 8  out e-mails to people.  It could have been
 9  trying to say, hey, something is rotten in
10  the state of Denmark, to quote a phrase.
11      Q.   Did you ever ask to have a
12  meeting with Sister Munley to discuss
13  this?
14      A.   No.
15      Q.   If I'm doing my math right, is
16  it fair to say that approximately 45 to 50
17  people attended this event?
18      A.   That sounds about right.
19      Q.   Were you pleased with the
20  turnout?
21      A.   I wasn't displeased given the
22  situation.  In this day and age, crowds
23  form with a lot of social media, spur of
24  the moment type things, but I'm not a
```

Page 101

```
 1  social media expert.  But people can tweet
 2  and say, hey, what the heck, let's go to
 3  -- you know, last minute, let's go to that
 4  Fagal, you know, presentation and if one
 5  of us wins the 50 bucks, you know, we'll
 6  all buy pizza.
 7          So crowds -- you can read in
 8  any of the news, they can form almost
 9  instantaneously with, you know, Facebook
10  messages and tweets, and Snapchats, and
11  all these things I really don't use but
12  the students do, and so you never know
13  what will catch the spark.
14          So if one student sees one
15  poster and that student is, shall we say,
16  a tweeting ringleader, then she might be
17  the one who by herself causes a crowd of
18  one hundred students to come out, and if
19  she's that one student who doesn't see
20  that one poster, bingo, you don't get
21  those hundred students.
22          So it's a crap shoot, shall we
23  say, in gambling terms, and that's why the
24  posters were important because you never
```

26 (Pages 98 to 101)




Page 102

1   know which poster will catch which
2   person's eye and what that person might do
3   in this day and age with social media to
4   gather a crowd together.
5        Q.   Was Twitter popular in 2011?
6        A.   I don't know but there were
7   various instant message things going on
8   and that's why I tried to cover whatever
9   was going on.  I don't know.
10       Q.   Was Snapchat popular in 2011?
11       A.   I don't know.
12       Q.   Did you use social media to
13  advertise the event?
14       A.   No.
15       Q.   So you were hoping other people
16  used social media to advertise the event?
17       A.   Yes.  I sent an e-mail to class
18  members, you know, telling them about the
19  event.  I think in that -- I think in that
20  e-mail I mentioned that it was open to
21  other people.
22       Q.   Did the folks that you sent the
23  e-mail to -- did they attend?
24       A.   Most of them did.  Most of the

Page 103

1   class members attended.
2        Q.   Besides your class members, did
3   you send an e-mail out to anyone else?
4        A.   No, not that I recall.
5        Q.   Did anyone tell you you
6   couldn't?
7        A.   No.
8        Q.   Did anyone win the prize money?
9        A.   Yes.
10       Q.   Do you remember who won?
11       A.   I don't recall the name.
12       Q.   Was it a student?
13       A.   Yes.
14       Q.   Was it someone from your class?
15       A.   I believe it was.
16       Q.   Do you know if that person
17  attended the speaking engagement because
18  of the attendance prize?
19       A.   I don't know.
20       Q.   So whatever happened with the
21  posters, the event still went on, correct?
22       A.   Yes.
23       Q.   And people attended the event?
24       A.   Some people attended the event.

Page 104

1        Q.   And you're not aware of anyone
2   that was told they couldn't attend the
3   event, correct?
4        A.   Not aware of anyone who was
5   told they couldn't not attend the event.
6        Q.   Have we exhausted all of the
7   ways in which you chose to advertise the
8   event?
9        A.   (Indicating.)
10       Q.   And in summary, you posted
11  posters and you sent an e-mail out to
12  students in your class, correct?
13       A.   That's correct.
14       Q.   Were you told you couldn't
15  engage in any other ways to advertise or
16  promote the event?
17       A.   No.
18       Q.   The -- I believe you testified
19  that the posters that Mr. Oliveri printed
20  out, which ultimately you didn't use, no
21  one required you to pay for that, correct?
22       A.   That's correct.
23       Q.   The posters that you went to
24  UPS to print out, you paid for that,

Page 105

1   correct?
2        A.   That's correct.
3        Q.   Did you ever submit for
4   reimbursement to Marywood?
5        A.   No.
6        Q.   Why not?
7        A.   Because it was my donation to
8   academia.
9        Q.   I believe you testified earlier
10  this morning that at some point you
11  contacted FIRE.
12            Did you contact FIRE shortly
13  after the event on November 30th?
14       A.   Well, Will Creeley was from
15  FIRE, of course, and he knew that poster
16  -- he knew that day that posters had been
17  torn down because I told him.
18       Q.   Because you told him?
19       A.   Uh-huh.
20       Q.   Did you talk to anyone else at
21  FIRE about the incident?  And I'm calling
22  it an incident for lack of better words.
23       A.   Yes, later -- later in December
24  at some point I contacted FIRE and

27 (Pages 102 to 105)


MAGNA
LEGAL SERVICES

Page 106

1    explained to them how the events unfolded.
2        Q.   Okay.
3            Other than what we've already
4    discussed about the unfolding of events,
5    is there anything else that is relevant to
6    what happened with the speaker?
7        A.   I'm not sure I understand your
8    question.
9        Q.   Sure.
10           You said you contacted FIRE
11   sometime in December to explain to them
12   the events that transpired.
13           Have we exhausted all of the
14   events that transpired regarding this FIRE
15   poster incident?
16       A.   I don't know about specific
17   events.  At one point -- I'm trying to
18   remember when.  I think somebody said the
19   posters had not been stamped approved on
20   Monday and that's why they were torn down,
21   and I'm trying to refresh my memory who
22   said that but I was also told that.
23       Q.   Okay.
24           Anything else that you could

Page 107

1    think of that pertains to this speaker or
2    poster FIRE incident that we haven't
3    already discussed?
4        A.   Not right now.
5        Q.   What was FIRE's response to
6    you?
7        A.   I forget the exact response but
8    FIRE -- I did provide FIRE with
9    information about what had happened, and
10   FIRE contacted Sister Anne Munley about
11   the events.
12       Q.   Why did you contact FIRE?
13       A.   Well, it was their speaker
14   whose presentation I think had been
15   interfered with, not physically but in
16   terms of the publicity, and FIRE's
17   mission, as I understand it, is free
18   speech on college campuses.  And so I
19   thought that there might be a fit where
20   FIRE might contact Marywood and saying
21   perhaps there's a problem here that needs
22   looking at or fixing, so that's why FIRE
23   would be the people to contact.
24       Q.   Did you contact anyone outside

Page 108

1    of Marywood administration to discuss
2    this?
3        A.   I'm not sure what you mean by
4    outside Marywood administration.
5        Q.   Well, you contacted FIRE?
6        A.   Yes.
7        Q.   Did you contact any other group
8    or entity?
9        A.   No.
10       Q.   You said it was in December
11   when you contacted FIRE.
12           Do you remember when that was?
13       A.   I can't recall exactly.
14       Q.   Do you remember with whom you
15   spoke?
16       A.   I believe I had e-mails with
17   Peter Bonilla.
18       Q.   When you contacted FIRE, was
19   that by e-mail, phone, in person?  How did
20   you do that?
21       A.   E-mail.
22       Q.   So it's your testimony that you
23   e-mailed with Peter -- probably Peter
24   Bonilla at FIRE?

Page 109

1        A.   Yes.
2        Q.   Did you produce those e-mails
3    in this litigation?
4        A.   I can't recall.
5        Q.   I'm going to ask that to the
6    extent there's any e-mails that you have
7    with Peter Bonilla or anyone at FIRE
8    regarding the November 2011 incident that
9    you check for those and produce those.
10       A.   Yes.
11       Q.   Thank you.
12           MR. COHEN:  Stephanie, you're
13   saying that there are none in the
14   production?
15           MS. AHMAD:  I would have to
16   check.
17           MR. COHEN:  Okay.
18           MS. PEET:  For what it's worth,
19   there's been a very large production
20   and we'll talk about that, but that
21   doesn't -- that does not ring any
22   bells.
23           MR. COHEN:  Okay.
24           MS. PEET:  And if it has been



Page 110

```
1    produced, then please just let us
2    know.
3            MR. COHEN:  Okay.
4            - - -
5            (At this time, a document was
6    marked for identification as Exhibit
7    Fagal-6.)
8            - - -
9            THE WITNESS:  It's possible I
10   might have contacted Will Creeley at
11   FIRE and then I might be recalling
12   that Bonilla sent an e-mail to Sister
13   Anne.  It's possible, so...
14   BY MS. PEET:
15   Q.   I recognize we're going back --
16   A.   Yeah.
17   Q.   -- four to five years.
18   A.   Four and a half years, right.
19   Q.   And that's perfectly fine.  I
20   don't expect you --
21   A.   Right.
22   Q.   -- to have everything committed
23   to memory.  All I am suggesting and
24   telling you is to the extent there are any
```

Page 111

```
1    written communications which would include
2    e-mails between you and anyone at FIRE
3    about this incident, then they be
4    produced --
5    A.   Yes.
6    Q.   -- to the extent that they have
7    not.
8    A.   Uh-huh.
9    Q.   And if they have been produced,
10   just kindly direct us to those and all is
11   good.
12          You testified just a few
13   moments ago that after you contacted FIRE
14   to discuss the November 2011 incident,
15   FIRE then contacted Sister Munley.
16          This letter that has been
17   placed before you, is this what you mean
18   by FIRE contacting Sister Munley?
19   A.   Yes.
20   Q.   Did you have any part in
21   drafting this letter?
22   A.   No.
23   Q.   Did you see this letter before
24   it was sent to President Munley?
```

Page 112

```
1    A.   I can't recall.
2    Q.   Do you remember making any
3    edits, or suggestions, or comments to this
4    letter?
5    A.   No.
6    Q.   Did you receive a copy of the
7    letter after it was sent out?
8    A.   I can't recall for sure but I
9    think I received a copy.
10   Q.   Did you ask for FIRE to send
11   this letter to Sister Munley on your
12   behalf?
13   A.   I would say I didn't ask FIRE
14   to send the letter.  FIRE got the facts
15   and then they decided to send the letter.
16   Q.   The facts that FIRE received,
17   were those the facts that you gave to
18   FIRE?
19   A.   Yes.
20   Q.   Do you know if FIRE got the
21   facts from any other source?
22   A.   No.
23   Q.   Did you authorize or approve
24   this letter to be sent to President
```

Page 113

```
1    Munley?
2    A.   No.
3    Q.   Did Carl Oliveri tell you that
4    Alan Levine endorsed the action of tearing
5    down the posters?
6    A.   When I met with Carl Oliveri on
7    November 30th and I asked him what had
8    happened -- actually, I first started
9    saying, gee, wasn't it terrible that my
10   posters got torn down, geez, and then he
11   said we tore them down.  I was shocked.  I
12   said -- taken aback and I said why, and
13   then that's when he brought up, well, at
14   Marywood we don't pay students to go to
15   class.  I shook my head and I said what.
16   He said, well, you had the prize
17   announcement on the posters and that can't
18   happen, so that's why the posters were --
19   that's why we tore down the posters.
20          That's why they were torn down,
21   and I said well, why, and then he said
22   well -- and I said who -- you know,
23   basically I said who gave you the
24   directions because I thought he was not
```





1    the top person on the totem pole, and
2    that's when he mentioned Alan Levine and
3    he mentioned executive council had had a
4    meeting and had discussed this and had
5    approved tearing down the posters.
6        Q.   Did Mr. Oliveri tell you that
7    Dr. Levine endorsed the tearing down of
8    the posters?
9        A.   He did not use the word
10   "endorsed".  He just said that Alan Levine
11   -- that was the name brought up and then
12   he used the general term "executive
13   council".  So I assume that just like any
14   organization you might be in the minority
15   but if you're on the executive council and
16   if you're one of five and maybe you don't
17   agree with it but if the other four said
18   yes, then you might go ahead with it.  So
19   you might not approve but you might still
20   give the order.  So I don't know exactly
21   what Alan Levine thought.
22       Q.   Did Carl tell you that the
23   posters were being torn down because of
24   the fact that the speaker was from FIRE?

1        A.   No.
2        Q.   Did Carl tell you that the
3    posters were torn down because the speaker
4    was going to be talking about free speech
5    at a university?
6        A.   No.
7        Q.   The 20 new posters that you
8    posted on campus, did they have the
9    attendance prize language?
10       A.   No.
11       Q.   And is that because it was your
12   understanding that was not approved?
13       A.   I was told it was not approved.
14       Q.   Is that why you didn't include
15   that language in the posters?
16       A.   The language was on the posters
17   as I delivered them on Wednesday morning
18   because I knew nothing about any reasoning
19   behind that decision.  So with the 20
20   posters, Carl Oliveri and I together
21   snipped off with scissors the prize
22   announcement part of the posters leaving
23   the e-mail contact information, and then
24   those are the posters that got hung up as

1    soon as I left the office.
2        Q.   Okay.
3        A.   And some of those posters were
4    torn -- were missing later in the day.
5        Q.   And I believe you testified you
6    don't know the whereabouts of those
7    posters, correct?
8        A.   I do not know.
9        Q.   And do you have any idea how
10   many posters were missing, using your
11   words?
12       A.   Well, I know I took some
13   pictures of blank walls, so I would say
14   about at least seven or ten especially on
15   big areas like on a wall by the hallway or
16   the stairs come in from outside in LAC, so
17   some posters were missing that day.
18       Q.   Did anyone tell you what they
19   believed happened with those posters?
20       A.   I sent an e-mail to Carl
21   Oliveri that day and said, gee, Carl, even
22   those posters were torn down even though
23   they had had the prize announcement torn
24   off, and he wrote back saying he had no

1    knowledge of that, basically saying that
2    he did not direct those posters to be torn
3    down.
4        MS. PEET:  Okay.  Let's just
5    let her finish the tape.
6        - - -
7        THE VIDEOGRAPHER:  We are now
8    off the record.  The time is 11:45
9    a.m.  This ends disk number one.
10       - - -
11       (At this time, a short break
12   was taken.)
13       - - -
14       THE VIDEOGRAPHER:  We are now
15   on the record.  The time is 11:49
16   a.m.  This starts disk number two.
17       - - -
18       (At this time, a document was
19   marked for identification as Exhibit
20   Fagal-7.)
21       - - -
22   BY MS. PEET:
23       Q.   Dr. Fagal, have you ever seen
24   this document before?





1       A.   I believe I have as a quick --
2  long time ago.
3       Q.   Okay.
4            Is it fair to say that this is
5  Sister Munley's response to the letter
6  that Marywood received from Peter Bonilla
7  at FIRE?
8       A.   I assume that's correct.
9       Q.   Okay.
10           It says here please note that
11 the posters announcing the lecture but not
12 the offer of a monetary reward for
13 attendance were permitted to be posted
14 throughout the university campus.
15           Did I read that correctly?
16      A.   Let me see where this is now.
17 Let's see.
18      Q.   It's the fourth line of the
19 first paragraph.  It starts with please.
20      A.   I see what the second sentence
21 says.
22      Q.   All my question was do you see
23 that.
24      A.   What is your question?

1       Q.   Do you see that?
2       A.   I see that.
3       Q.   Okay.
4            Is it true that posters that
5  did not offer the monetary reward for
6  attendance were posted and allowed to be
7  posted at the university?
8       A.   Yes, subject to the
9  qualification that some of those posters
10 that were approved without the prize
11 announcement were torn down or went
12 missing on the day of the lecture, the day
13 they were hung.
14      Q.   And were those the posters that
15 you testified that Carl told you he didn't
16 know what happened?
17      A.   Yes.
18      Q.   And Carl told you that he did
19 not authorize, or approve, or tell anyone
20 to take down those posters?
21      A.   I believe he said something to
22 those -- he said something along those
23 lines.
24      Q.   Are you aware of anyone else at

1  Marywood that instructed or told anyone to
2  remove those posters?
3       A.   I don't know who gave the
4  directions to tear down the posters or --
5  nor do I know who tore down the posters.
6       Q.   You don't even know if a
7  direction was given, correct?
8       A.   I have no firsthand knowledge
9  that the direction was given.
10      Q.   Okay.
11      A.   Other than being told by Carl
12 Oliveri that we tore down the posters.
13      Q.   I'm talking about the 20 new
14 posters that you posted.
15      A.   No.
16      Q.   Do you have any knowledge that
17 anyone from Marywood instructed anyone to
18 take them down?
19      A.   I have no knowledge but I could
20 speculate.
21      Q.   Okay.
22           And the FIRE lecture took place
23 on the university, correct?
24      A.   FIRE took place at the

1  university.
2       Q.   Did you receive a copy of what
3  is marked as Exhibit-7?
4       A.   Yes.
5            May I point something out in
6  regard to the second sentence?
7       Q.   Sure.
8       A.   It says the alleged occurrence
9  is in regard to taking down a poster
10 announcing a lecture.  A poster is
11 singular.  We're talking about multiple
12 posters being taken down.
13      Q.   Okay.
14           So you take issue with the fact
15 that it says a poster, correct?
16      A.   Yes, I do.
17      Q.   Okay.
18           The posters that were taken
19 down, were they for the same event?
20      A.   Yes.
21      Q.   Okay.
22           And the posters were largely
23 identical except for maybe size?
24      A.   Yes.



1    Q.    Anything else that you take
2  issue with?
3    A.    Factually, let me see.  I don't
4  understand what both sets of posters might
5  be.  Try to help me here.  The sentence
6  that says moreover, the lecture announced
7  in the posters was conducted on the
8  university campus in the Comerford Theater
9  on November 30, 2011, as advertised in
10 both sets of posters.
11       So both -- the first set of
12 posters would be the set that had been
13 stamped approved with the prize
14 announcements and then were torn down, so
15 they were up for a brief while.  The
16 second set of posters -- when you say both
17 sets, I presume two.  The second set of
18 posters were those stamped approved on
19 Wednesday the 30th and they did not have
20 the prize announcement on them and many of
21 those were torn down.
22       If I may speculate here, I'm
23 assuming that perhaps a work study student
24 was originally told tear down the posters

1  that announce the speech and that -- at
2  that point, all the posters had on them
3  the FIRE announcement -- I mean the prize
4  announcement, and the student doing the
5  best he or she could tore down those
6  posters.
7        And then on Wednesday morning,
8  being a good work study student said oh,
9  my goodness, here are more posters.  Let
10 me do my job and tear them down even
11 though Carl Oliveri, if asked, would say
12 no, no, no, those posters are fine, leave
13 them up.
14       So what I believe is that those
15 posters were torn down by somebody like I
16 just described but not under the direction
17 of Carl Oliveri.  That's what I think but
18 I have no firsthand knowledge.
19    Q.    Do you believe Mr. Bonilla or
20 someone else from FIRE gave you this
21 letter?
22    A.    This response from Sister Reed
23 -- I mean Sister Munley?
24    Q.    Sister Munley.

1    A.    I can't recall.
2        - - -
3        (At this time, a document was
4  marked for identification as Exhibit
5  Fagal-8.)
6        - - -
7  BY MS. PEET:
8    Q.    Do you recognize this document?
9    A.    Yes.
10   Q.    Did you write this?
11   A.    Yes.
12   Q.    Did anyone help you write this?
13   A.    No.
14   Q.    Did you show it to anyone
15 before you sent it to Dr. Levine?
16   A.    I can't remember exactly.  I
17 might have shown it or parts of it to
18 Dr. Jackson.
19   Q.    Do you remember what his
20 reaction was, if anything?
21   A.    I believe he might have -- let
22 me say as I recall, he said -- I was
23 asking when I had my list of requests, he
24 said maybe I'm asking for too much and of

1  course that would be -- maybe I wouldn't
2  expect all those requests to be granted
3  but that would be a bargain point and one
4  could then say, okay, I'll give up the
5  apology for the speaker or whatever.  So
6  that was an opening list of things that I
7  thought should happen based on the past.
8    Q.    When Jackson told you maybe
9  you're asking for too much, did you make
10 any changes?
11   A.    I can't recall.  I don't think
12 so though.
13   Q.    Did you ever want to demand
14 more than what you demand in here?
15   A.    No.
16   Q.    How did you come up with this
17 list of demands?
18   A.    Marywood had held events that I
19 had been aware of where they would have
20 prize money and food and stuff like that
21 offered to the students to come to the
22 events, so I thought, well, that would be
23 good.
24   Q.    In those situations you just



1    described, was it ever associated with a
2    course?
3        A.   There were -- there were
4    associations with courses in the sense
5    that professors were encouraged to come
6    and bring their class and have it be part
7    of their class for that evening, so that
8    would be an official class.
9        Q.   What about instructors putting
10   a monetary prize for a lecture that's part
11   of a course syllabus?
12       A.   What about that?  What was the
13   question?
14       Q.   Are you aware of that
15   happening?
16       A.   I'm not aware of professors
17   offering monetary prizes to their class.
18   I know Alan Levine, for example, told me
19   about professors bringing pizza to class.
20       Q.   What about a monetary prize for
21   attending a course or a lecture affiliated
22   with a course?
23       A.   I don't recall any.
24       Q.   Okay.

1            At the time that you made these
2    list of demands, I assume you already knew
3    that there were -- it wasn't in the budget
4    for Marywood to pay a thousand dollars for
5    a speaker, correct?
6        A.   No.
7        Q.   Well, I think you testified
8    earlier that you were told that there was
9    no room in the budget to pay to have a
10   FIRE -- or any speaker come to campus,
11   correct?
12       A.   I -- no.  That was the fall
13   semester of 2011.  I'm not a budget person
14   but I assume that budgets for the
15   following semester would be different and
16   things had not been totally allocated
17   financially for that semester, and of
18   course one could also say, well, gee, you
19   know, there's no money in the 2011-2012
20   budget, Professor Fagal, but we can do the
21   fall of 2012.  So that's something that's
22   obviously to me anyway open to
23   negotiation.
24       Q.   Do you say anywhere in here

1    that you're willing to negotiate?
2        A.   I finish it by saying by
3    agreeing to the above, I will consider
4    this matter closed.  I do not say anywhere
5    that if you don't give me everything, then
6    nothing can happen.  So I think in any,
7    you know, economic negotiation like this
8    people will have their high offers and
9    people have their low offers, and then
10   there'll be negotiation in the normal
11   course of business as I believe lawyers do
12   all the time --
13       Q.   Okay.
14       A.   -- when they have settlements,
15   for example.
16       Q.   Did you make it known to
17   Dr. Levine that you wanted to negotiate?
18       A.   I believe that was the
19   implication by my discussion with him and
20   the fact that he sent -- he wanted to send
21   this letter on to Sister Anne Munley.  And
22   I believe you're probably going to come to
23   it, but he wrote later -- he said Sister
24   Anne Munley -- I might not be quoting

1    exactly.  She agrees to none of your
2    requests or demands, however he phrased
3    it.  So it was no movement by the other
4    side to talk.
5        Q.   Do you think you were
6    reasonable in this e-mail?
7        A.   I think I was reasonable in
8    terms of an opening offer or suggestion.
9        Q.   Do you think --
10       A.   If you would like to go through
11   these individually, go ahead.
12       Q.   Do you think it's reasonable to
13   tell a Catholic university that they
14   should atone for its sins?
15       A.   If they had -- if the
16   university can be considered to have
17   sinned, yes.
18       Q.   But you wrote that?
19       A.   Yes.
20       Q.   So you think that was
21   reasonable?
22       A.   Yes.
23       Q.   Okay.
24           Do you think it's reasonable



1    that they issue you a written public
2    apology?
3        A.   I think it's not unreasonable
4    because I think that will -- confession
5    might be good for the soul and will make
6    one think twice before doing such things
7    again in the future.
8        Q.   Okay.
9            And that that written public
10   apology be sent by e-mail to every faculty
11   member including adjuncts and every
12   student?
13       A.   That would be my wish.  I think
14   that would -- you know, if something is --
15   if people have made, shall we say,
16   mistakes, to own up to your mistakes I
17   think is a noble thing.
18       Q.   Do you think it was reasonable?
19       A.   What do you mean by reasonable?
20       Q.   I'm asking you; do you think it
21   was reasonable?
22       A.   Yes.
23       Q.   Okay.
24           Do you think it was reasonable

1    to ask Marywood to pay $2,000.00 to FIRE
2    to give two presentations on campus for
3    spring 2012 and also pay normal meal and
4    lodging expenses?
5        A.   Yes.  I believe when they
6    invite speakers to come, they pay lodging
7    expenses and meals.
8        Q.   Okay.
9            Do you think it was reasonable
10   to tell Marywood to host a $1,000.00 FIRE
11   session in -- probably in February for a
12   daytime class presentation to the social
13   science 201 class and the presentation
14   should be open to all of campus?
15       A.   Which number --
16       Q.   Do you think that was
17   reasonable?
18       A.   Which number are we on?
19       Q.   Five.
20       A.   Well, my idea here, yes, was to
21   have a daytime event because many students
22   might be on campus during the day and so
23   you would have a presentation during the
24   day, and then sometimes students are more

1    free to come to presentations at night
2    and, therefore, a presentation at night
3    would be good.
4        Q.   Do you think that demand was
5    reasonable?
6        A.   Yes.
7        Q.   Do you think it was reasonable
8    that you said a week before the event
9    Marywood will print ten 11 by 17 color
10   posters, ten 11 by 17 black and white
11   posters, ten 8 and a half by 14 color
12   posters, and ten 8 and a half by 14 black
13   and white posters advertising the event?
14       A.   Yes.
15       Q.   Do you think it was reasonable
16   to demand that Marywood use the other
17   $1,000.00 FIRE fee plus food and motel
18   bill to pay for an evening presentation
19   open to the whole community probably in
20   early April?  Reasonable?
21       A.   Yes, make it -- open it to the
22   public and to the community would be I
23   think not a bad idea.  Marywood does have
24   events where they invite -- make it clear

1    to the community they're invited.
2        Q.   Okay.
3            Reasonable for you to demand
4    that Marywood spend at least $1,000.00
5    documented on publicity to be coordinated
6    with you for the evening program which
7    would be open to the public and all
8    members of the campus community?
9        A.   I would say this one would be a
10   little -- a little more unreasonable given
11   that there be -- that posters might go up.
12   That would be a negotiating point, shall
13   we say.
14       Q.   Do you think it was reasonable
15   to demand that Marywood provide 1,000
16   thousand slices of free pizza and 500 cans
17   of cold soda at the evening presentation?
18       A.   Well, I think the soda might be
19   reasonable because that will not spoil.
20   So if only 200 people -- if 100 people
21   showed up, it might be 100 cans of soda if
22   everybody gets one and that would be it.
23       Q.   Do you think it was reasonable?
24       A.   The 500 cans of soda?



1      Q.   And the 1,000 slices of free
2  pizza for your evening presentation.
3      A.   I think that might be a bit of
4  a reach.  1,000 slices of pizza depending
5  on -- you know, two slices a person would
6  be 500 people.  That would be a pretty
7  full house, a crowd, but, again, that
8  could be -- instead of pizza one could
9  offer Snickers bars or something.  That's
10  a negotiating point.
11      Q.   You didn't demand Snickers
12  bars.
13           You demanded 1,000 slices of
14  pizza, correct?
15      A.   What do you mean by demand?
16      Q.   Aren't these demands?
17      A.   Well, if I look back, it says
18  -- let me read.  Do I use the word
19  "demand" anywhere and imply anywhere where
20  it's all or nothing?
21           At the top of DEF2330, I wrote
22  due to Marywood's actions, I request at
23  this stage, and then I ask -- preceding
24  number one, I ask that I immediately

1  receive by December 15th, and then I go on
2  to item number one.  I don't see -- help
3  me out -- if there's anything here that
4  says I'm going to stamp my feet and go
5  home if I don't get all 11.
6      Q.   Is it your position that these
7  are not -- cannot -- should not be
8  characterized as demands?
9      A.   They should not be
10  characterized as demands if by demands you
11  mean that it's all or nothing.
12      Q.   It's however you define
13  demands.
14      A.   That's how I define --
15      Q.   Is it you feel that these are
16  not demands?
17      A.   I believe any -- I believe
18  these are -- if by demands you mean all or
19  nothing, I will not talk about anything
20  else, I will not negotiate, this is it,
21  then I would say these are not demands.
22      Q.   Okay.  I'm not defining it.
23      A.   Okay.  I just --
24      Q.   It's however you define it.

1      A.   That's fine.
2      Q.   My question to you --
3      A.   Right.
4      Q.   -- is do you feel that calling
5  these demands is inappropriate, that
6  that's not what they're -- that's not what
7  you would call them?
8      A.   I don't know if the word is
9  inappropriate.  A lot of people use
10  demands in negotiation, these are my
11  demands, and everybody knows that by
12  demands you mean that the demands are open
13  to negotiation.
14      Q.   Okay.
15      A.   So you have to qualify demands
16  by saying that it's really all or nothing.
17      Q.   Okay.
18      A.   And these are not all or
19  nothing demands.
20      Q.   But these are demands
21  nonetheless?
22      A.   Some people call them demands.
23  I would not call them demands.  I don't
24  think I use the word "demands" in here.

1      Q.   Okay.
2           Do you think it was reasonable
3  to require that -- to ensure the publicity
4  for each event it must include two
5  separate e-mails, they have to be approved
6  by you, sent to the complete faculty list
7  including adjuncts and the student e-mail
8  list.  The e-mails will advertise the
9  upcoming FIRE event and these, probably in
10  April, evening event e-mails will include
11  the offer of free pizza.  For each FIRE
12  event that the first e-mail will be sent
13  one week before the event.  The remainder
14  e-mails also with complete information --
15      A.   Reminder.  Excuse me.
16      Q.   -- will be sent 24 hours before
17  each event.  Every e-mail must meet your
18  approval.
19           Is that reasonable?
20      A.   Yes, and let me explain.  Two
21  separate e-mails, one ahead of time so the
22  students have time to plan and then a
23  last-minute reminder.  I believe that
24  aspect is reasonable.  Sending e-mails



1   basically costs nothing but a small amount
2   of time for somebody to compose the
3   e-mail.  The free pizza business, whether
4   it's free pizza or a one cent Tootsie
5   Roll, that is obviously open to
6   negotiation from the previous discussion
7   we just had.
8           And every e-mail must meet my
9   approval, you know, one can couch an
10   e-mail announcement in terms of, let's
11   say, coloring the enthusiasm with which
12   the e-mail is sent out.  So I just was
13   trying to make sure it was a fair e-mail
14   that went out.  I did not say I would
15   write the e-mail.  I would just say the
16   e-mail would have my approval.
17       Q.   Okay.
18           And it's your position that
19   this --
20       A.   Is reasonable.
21       Q.   -- demand or request, whatever
22   you want to call it in number ten --
23       A.   I would call it reasonable.
24       Q.   -- is reasonable?

1       A.   I would call it reasonable.
2       Q.   Okay.
3           Just for clarification, you did
4   not send an e-mail ahead of time other
5   than to your own class about the November
6   30th speaker, correct?
7       A.   That's correct.
8       Q.   And you did not send any
9   reminder e-mail before the November 30th
10   event, correct?
11       A.   No.  I had no access to any
12   student e-mail lists.
13       Q.   Did you ask anyone to do that?
14       A.   I did.
15       Q.   Who did you ask?
16       A.   I asked -- I believe it was Amy
17   Paciej, one of the deans, to send out an
18   e-mail announcing the event.
19       Q.   And what was her response?
20       A.   I can't recall her response but
21   I know that she did not send it out.
22       Q.   Did you -- how did you ask Amy,
23   by e-mail?
24       A.   Yes.

1       Q.   Did you ask anyone else?
2       A.   I can't recall, but the e-mail
3   announcements about events like this would
4   generally come from her.
5       Q.   Do you think it was reasonable
6   that requesting or demanding, whatever
7   words you want, of Marywood that by
8   sponsoring a fall 2012 appearance on
9   campus by Robert Spencer of Jihad,
10   J-I-H-A-D, Watch that Mr. Spencer, based
11   on the jihadwatch.org Web site, will be
12   willing to debate anyone regarding aspects
13   of Islam but his appearance would not be
14   contingent on the existence of a debater
15   for the other side?
16           You continue that the event
17   shall be publicized by the number of
18   posters outlined in number five and by
19   single topic e-mails sent to the faculty
20   and student e-mail lists as outlined
21   above.  You continue that your friends and
22   you will hang the posters designed with
23   your approval.  The opposition side in the
24   proposed debate can of course hang its own

1   posters or participate in the poster
2   design.
3           Do you think that was
4   reasonable?
5       A.   Well, yes, in the sense that
6   it's easy to be for ideas one supports.
7   It's easy to be for free speech when it
8   supports your ideas.  It's hard to
9   sponsor, shall we say, a debate in which
10   one might hear two widely opposing views,
11   and as a university I think that would be
12   a -- it's a good thing to have happen to
13   have students exposed to wide range of
14   viewpoints.
15       Q.   For your demand number 11,
16   there's no requirement by you that there
17   be a debater on the other side, correct?
18       A.   Correct.
19       Q.   So it would be possible then
20   that it would only have one side on the
21   topic, correct?
22       A.   That's correct, and that's
23   because sometimes Mr. Spencer, as I
24   understand it, has had trouble getting



1    debaters.  So if you want to present a
2    side that says red is the favorite color
3    but we must have a debater on the other
4    side for a different color, well, if the
5    other -- if the other color says I won't
6    show up at the debate, then you don't get
7    the red point of view.
8          So one way to prevent the red
9    point of view would be to have the other
10   colors refuse to show up.  So I would want
11   -- the whole point of that is to have a
12   debate or a presentation of different
13   views.  That was the whole point.  That's
14   what I would want.  I would not want a
15   one-sided presentation.
16        Q.   But you didn't require two
17   different views, correct, for number 11?
18        A.   I didn't require it because --
19   but I would fully support it.  I would
20   even probably paid money to ensure that it
21   happened if it was a question of money.
22        Q.   Did you think the university
23   was going to accept your 11 demands?
24        A.   I would have been shocked and

1    pleasantly surprised if it accepted all 11
2    demands.  I would say I didn't expect all
3    11 demands to be accepted, but they
4    weren't really demands in the sense of all
5    or nothing.  They were negotiating let's
6    talk items.
7          Q.   What did you think Marywood's
8    reaction was going to be?
9          A.   I didn't know what it would be.
10   I would have been guessing on my part.  I
11   could guess.
12        Q.   I'm asking you at the time that
13   you drafted this, what did you think the
14   university's response was going to be?
15        A.   I thought that the university
16   would admit to me that it had wrongly torn
17   down the posters with the prize money,
18   and, by the way, they did not even inform
19   me of that.  They could have -- the
20   university could have simply scratched out
21   the prize announcement with a black magic
22   marker, and so I thought it was rather,
23   shall we say, bad behavior on the part of
24   the university with regard to the whole

1    posters incident.
2          I also thought that perhaps the
3    university had a way out in terms of
4    perhaps Sister Munley was, I thought at
5    the time, maybe not fully informed about
6    what had happened at the lower levels of
7    the tearing down, whether I believe at
8    some point there was a discussion that the
9    other posters that were torn down were not
10   stamped approved, which was totally wrong.
11   They were all stamped approved, but there
12   was that story out there among the
13   administration.
14        And so, therefore, if Sister
15   Munley had said to me, gee, Fred, you're
16   right, we goofed up, the posters shouldn't
17   have been torn down, we made a mistake,
18   but I can't do all these 11 things, and
19   then I would presume she should have said
20   you're right, we should reimburse you for
21   the FIRE speaker and your posters
22   expenses.  We should reimburse you the
23   $500.00 that you paid out to try to do a
24   good job for the university.  I will, you

1    know, do my best to make sure that this
2    doesn't happen again, but I would really
3    not issue a public apology but I will
4    invite some more FIRE speakers to come to
5    campus next weekend.
6          And so basically if Sister Anne
7    Munley had gone that route, then she would
8    have paid me $500.00, basically apologized
9    to me in private.  She would have invited
10   FIRE speakers, say, to come to an evening
11   presentation, something like that, and I
12   could have lived with that.  Of course, I
13   would have preferred, you know, a
14   full-blown let's go for some excitement on
15   campus with controversial debate but I'm
16   not unreasonable.  I thought that would
17   have been a good response and a correct
18   response.  If I was president, that's what
19   I would have done.
20        Q.   Do you -- can you see how
21   someone would find your 11 demands to be
22   unreasonable?
23        A.   I can see how somebody would
24   say that's way too much to ask for for a



Page 146

```
 1    case like this.  Yes, I can see that point
 2    of view.
 3        Q.    Did you ultimately meet with
 4    Dr. Levine regarding the posters?
 5        A.    Yes.
 6        Q.    And I believe that happened on
 7    or around December 5, 2011?
 8        A.    Yes.  I'd have to refresh --
 9    yes.  I sent this letter, Exhibit-8, on
10    December 2nd.  Was it -- at some point I
11    was told President Munley considered and
12    will give you nothing.
13        Q.    So you had a meeting with
14    Dr. Levine?
15        A.    Yes.
16        Q.    Who was at the meeting?
17        A.    I believe it was just
18    Dr. Levine and I.
19        Q.    And the meeting, just for
20    purposes of chronology, was after you sent
21    this letter, correct?
22        A.    Yes.  This letter is December
23    2nd, and December 5th meeting sounds
24    correct.
```

Page 147

```
 1        Q.    Just to refresh your
 2    recollection, if you can go through your
 3    stack there and pull out Exhibit-5, which
 4    is the chronology of events --
 5        A.    Yes.
 6        Q.    -- that you prepared.
 7        A.    Okay.
 8        Q.    If you can flip to the Bates
 9    stamp on the bottom is DEF001468.
10        A.    Okay.
11        Q.    You wrote those comments,
12    correct?
13        A.    Comment 15?
14        Q.    Yeah.  It says while driving
15    home after the December 5 meeting --
16        A.    Let's see.
17        Q.    -- with Alan Levine.
18            Does that refresh your memory
19    of when the meeting you had with
20    Dr. Levine was?
21        A.    Yeah.  Let me see here.  Okay.
22    So he was --
23            MR. COHEN:  What Bates stamp
24    are we looking at?
```

Page 148

```
 1            MS. PEET:  1468.
 2            THE WITNESS:  Yes.  So this was
 3    when I believe I had the discussion
 4    with Dr. Levine about the pandering.
 5    BY MS. PEET:
 6        Q.    Okay.
 7            And I believe you testified
 8    about that earlier.
 9            Have we exhausted what happened
10    at that meeting with Dr. Levine and what
11    was discussed?
12        A.    Yes.  He brought up the
13    pandering and he said the executive
14    council had discussed it and that was --
15    pandering was a bad thing.
16        Q.    Okay.
17            Anything else that was
18    discussed during that meeting?
19        A.    Checking here on the dates.
20    When did -- my December 2nd letter went
21    out and so he -- let's see.  I believe I
22    had met with Dr. Levine a bit earlier,
23    December 1st.
24        Q.    Would that have been before you
```

Page 149

```
 1    drafted the list of demands because that's
 2    dated December 2nd?
 3        A.    That's dated December 2nd.
 4    Check my chronology here.
 5        Q.    According to your chronology,
 6    you had a meeting with him on December
 7    5th.  That's what you --
 8        A.    Yes, I understand that.  Let me
 9    see here.  No.  If you look at -- let's
10    see here, 1461.  There's a
11    December 1st e-mail where I say I'm still
12    at loss to explain for what happened.
13        Q.    I'm just asking about your
14    meeting with Dr. Levine.
15        A.    Yeah.  I'm trying to remember
16    which meeting because I think there might
17    have been two.  I'm getting a little --
18        Q.    And I'm asking about the
19    meeting that you had with Dr. Levine about
20    your list of demands which was on December
21    -- sent on December 2nd, and we know you
22    met with him on December 5th.
23        A.    What I did was when I -- trying
24    to recall here.  I met with Alan Levine
```

38 (Pages 146 to 149)



Page 150

1    and I had printed out, I believe, the list
2    of demands, if you want to call them
3    demands, and Alan read that list at that
4    meeting where he first saw them, and then
5    he said would you please send them to me
6    by e-mail so that I could then send them
7    on to President Munley.  And so he saw
8    that letter by hand-printed copy before he
9    saw it by e-mail.
10       Q.   Okay.
11       A.   And so I'm trying to -- I'd
12   have to review here to figure out exactly
13   when in the chronology --
14       Q.   It's okay.
15       A.   Okay.
16       Q.   How did the meeting conclude?
17       A.   The first e-mail with -- I'm
18   trying to --
19       Q.   Meeting.  I'm sorry, meeting.
20       A.   Yeah.  The first -- the
21   meetings were all cordial.  The meeting
22   where I first showed Alan the letter he
23   said he would forward it on to Sister --
24   President Anne Munley, and we had that

Page 151

1    pandering discussion.  And so then you
2    referred me to -- that's when I told him
3    about the -- later that night I told him
4    about the Harvard professor.
5            And what page were we on for
6    that?  I'm sorry.
7        Q.   I'm not on a page.  I was just
8    trying to refresh --
9        A.   Okay.
10       Q.   -- your recollection about
11   December 5th.  That's all.
12       A.   I'd have to review.  I can't
13   recall exactly --
14       Q.   Okay.
15       A.   -- that exact date.
16       Q.   So did the meeting conclude
17   with Dr. Levine saying please send me the
18   e-mail of the demands and I'll present
19   them to Sister Munley?
20       A.   If that was the meeting when I
21   first showed him the picture, that's what
22   he said, yes.
23       Q.   Okay.
24            Were you satisfied with that

Page 152

1    meeting?
2        A.   Yes.  I didn't expect him to
3    have any power to grant any of my wishes.
4        Q.   And you think that it was the
5    president that would have the power to
6    grant those wishes, right?
7        A.   Yes.
8        Q.   Do you know Dr. Levine's
9    religion?
10       A.   Not for a fact.
11       Q.   What do you believe it to be?
12       A.   I assumed he was Jewish.
13       Q.   Did you assume he was Jewish
14   when you met with him in December of 2011?
15       A.   I think I had always assumed
16   it, just not as any big deal.
17            - - -
18            (At this time, a document was
19       marked for identification as Exhibit
20       Fagal-9.)
21            - - -
22   BY MS. PEET:
23       Q.   What has been placed before you
24   as Exhibit-9 seems to be an e-mail chain.

Page 153

1    If you look at the first page, there are
2    e-mails between you and Dr. Jackson.
3            Do you see that?
4        A.   I see.  I haven't seen these
5    lately.  Go ahead.
6        Q.   Okay.
7            Are these in fact e-mails that
8    you and Dr. Jackson were sending each
9    other in December of 2011?
10       A.   Yes, they appear to be.
11       Q.   And just for the record, these
12   are -- these three pages are documents
13   that you produced to Marywood in this
14   case?
15       A.   Yes.
16       Q.   Okay.
17            Who is Adolf Eichmann?
18       A.   He was a German in World War II
19   who was fairly low level functionary who
20   signed orders or, you know, did processing
21   sending Jews to the gas chamber and he was
22   captured by Israeli Mossad in 1960 in I
23   think -- I think it was Brazil, and there
24   was a trial in the early 1960s in Israel



1    and I believe he was executed.
2         Q.    Did you say he sent Jews to gas
3    chambers?
4         A.    I don't know that he had the
5    power to do that but, you know, he was --
6    I don't know the exact details of what his
7    powers were but he was functioning as
8    such.
9         Q.    On the top of page two, do you
10   write that Alan becomes the equivalent of
11   Adolf Eichmann?  Do you see that?
12        A.    Yes, I do.  And I would like to
13   point out my parenthetical comment, well,
14   comma, not quite the gas chambers, comma,
15   but the same idea.
16        Q.    Okay.
17            And when you say --
18        A.    Meaning -- meaning simply, as I
19   just explained, that Alan Levine -- I
20   viewed him as being a functionary.
21        Q.    And was Adolf Eichmann a
22   functionary of Adolf Hitler?
23        A.    Yes.
24        Q.    Okay.

1            So you're -- okay.
2            And the Alan in this e-mail, is
3    that Alan Levine?
4         A.    Yes.
5         Q.    If you look back to the first
6    page, there's an e-mail from Dr. Jackson
7    to you.  It says Eichmann slash Alan,
8    dash, get that meta out of your head
9    before it comes out at the wrong time.
10           Do you know what he meant by
11   that?
12        A.    In the very top first part?
13        Q.    The e-mail from --
14        A.    Where I say I thought the
15   Eichmann comparison might get him to wake
16   up but maybe it can be toned down?
17        Q.    I'm referring to -- if you look
18   down a little bit, there's an e-mail from
19   Dr. Jackson to you.
20        A.    What time of day?  Which one
21   are you looking at?
22        Q.    December 2, 2011, 9:19 p.m.
23        A.    Okay.
24        Q.    And Dr. Jackson writes Eichmann

1    slash Alan, dash, get that meta out of
2    your head before it comes out at the wrong
3    time.
4            Do you see that?
5         A.    Yes, I do.
6         Q.    What do you think he meant by
7    that?
8         A.    He's saying that some people
9    have, shall we say, gut reactions to even
10   the mention of that relationship to call
11   -- if you say somebody is a -- say a
12   lackey of somebody where they do their
13   bidding because it's their job to follow
14   orders, and if the orders are not, shall
15   we say, good orders, if I -- if somebody
16   says well, that would be Eichmann-like,
17   that might be, you know, you're saluting
18   and saying yes, ma'am, I'll do what you
19   say.
20           I personally don't see any
21   connotation where if you're saying
22   somebody is Eichmann-like that they are
23   actually anti-semitic or sending Jews to
24   the gas chamber or anything at all like

1    that.  It simply means that they are doing
2    the boss's -- boss's bidding in this
3    instance, nothing --
4         Q.    Do you -- do you see how if you
5    refer to someone as Alan Eichmann, how
6    they can -- how they can view that as
7    perhaps anti-semitic?
8         A.    Some people might view that.
9    People view things different ways.
10        Q.    Okay.
11           Do you think someone could be
12   offended if you refer to them as Alan
13   Eichmann who is in part responsible for
14   killing over six million Jews?
15        A.    They could be.  They could be.
16           - - -
17           (At this time, a document was
18           marked for identification as Exhibit
19           Fagal-10.)
20           - - -
21   BY MS. PEET:
22        Q.    Do you recognize this letter?
23        A.    Yes.  Let me read it quickly,
24   please.



1    Q.   Sure.
2            - - -
3            (At this time, the witness
4    complies with request.)
5            - - -
6            THE WITNESS:  Okay.
7    BY MS. PEET:
8    Q.   Okay.
9            Do you recall receiving this
10   letter from Dr. Levine?
11   A.   Yes.
12   Q.   What was your reaction?
13   A.   I was a little surprised and
14   disappointed.  I would say dis -- yes.
15   Q.   At the time that you received
16   this letter, December 15, 2011, did you
17   already have the idea of creating this
18   video?
19   A.   No, I don't believe I did.
20   Q.   Did you have any idea what you
21   were going to do if Marywood didn't agree
22   to your demands?
23   A.   No.  I thought about -- I
24   didn't have any specific ideas.  I thought

1    about maybe getting FIRE involved.
2    Q.   Anything else?
3    A.   The thought crossed my mind
4    that maybe I would contact Glenn Reynolds
5    perhaps at Instapundit which is a big
6    blog.
7    Q.   Anything else?
8    A.   Not that I can recall.
9    Q.   What about sitting down with
10   Sister Munley?
11   A.   Well, I already sent her -- she
12   already got the complete letter and I had
13   laid everything out as totally clearly as
14   possible.  I thought the letter -- it says
15   appears -- Alan wrote appears we have a
16   different understanding of what
17   transpired.
18           I thought Marywood is not
19   interested in finding out the truth about
20   the posters because I thought it was quite
21   clear and that Marywood could have
22   investigated, you know, was Carl Oliveri
23   not there, was the grad student who
24   stamped them approved -- was she

1    misinformed or not informed, you know.
2    Was there an out?  I had given all those
3    possibilities and this to me was just
4    saying done, President Munley is not
5    interested in talking to you at all,
6    period.
7    Q.   So is it fair to say you did
8    not request a meeting with her?
9    A.   I did not request a meeting
10   with her.
11   Q.   Did you get FIRE involved at
12   this point?
13   A.   Well, we discussed there was a
14   letter that went out.  We -- yes, FIRE
15   did --
16   Q.   Okay.
17   A.   -- was involved.
18   Q.   So other than -- anything other
19   than those letters for FIRE involvement?
20   A.   I did not contact the blog or
21   anything like that.
22   Q.   When you say the blog, would
23   that be Instapundit?
24   A.   Yes.

1    Q.   You did not contact them?
2    A.   No.
3    Q.   Did you post on
4    marywoodfreespeech.com about this?
5    A.   No.
6    Q.   When did you decide to create
7    these videos?
8    A.   I don't remember the exact
9    dates.  The Downfall movie parity videos
10   were and have been a huge event on
11   YouTube.  They're often used to get points
12   across and usually in a humorous way.  It
13   helps attract an audience and some of the
14   topics that are used by the videos on
15   YouTube on Downfall are humorous, some are
16   serious.
17           For example, there was one that
18   compared the New York State commissioner
19   of education and they had his, you know,
20   policy decisions, you know, evidenced in a
21   Downfall YouTube video.  So these are
22   very, very popular, their own Wikipedia
23   page, and so this is a way to maybe get
24   the message out.



1       Q.   What message?
2       A.   In this case, what had happened
3   in regard to the posters tear down
4   incident.
5                --- 
6            (At this time, a document was
7       marked for identification as Exhibit
8       Fagal-11.)
9                --- 
10  BY MS. PEET:
11      Q.   Exhibit-11, would you agree,
12  are e-mail communications between you and
13  Pamela Parsons --
14      A.   Yes.
15      Q.   -- on December 14, 2011?
16      A.   Yes.
17      Q.   Okay.
18           If you look at the bottom of
19  the first page, it's an e-mail from you to
20  Pam, December 13, 2011, at 6:30 p.m.
21           Do you see that?
22      A.   Yes.
23      Q.   And you -- I -- you say I
24  included the demand dash requests in this

1   version.
2       A.   Okay.
3       Q.   In the, quote, demand letter I
4   sent Alan Levine last week, I asked for
5   reimbursement by the 15th, so I guess I
6   will hang tight at least until then.
7            Do you see that?
8       A.   Yes.
9            May I point something out,
10  please.
11      Q.   Sure.
12      A.   The word "demand" is in quotes.
13      Q.   Okay.
14           Did you write the word
15  "demand"?
16      A.   Yes.
17      Q.   And the demand letter that
18  you're referring to that you sent to Alan
19  Levine, is that what we've already
20  discussed and has been marked as
21  Exhibit-8?
22      A.   Yes, it would be.
23      Q.   And those were your words,
24  correct?

1       A.   Which words?
2       Q.   Demand.
3       A.   Yes.
4       Q.   Above that Pam writes you back,
5   and one of the things she says or
6   questions is can you get legal advice
7   before commencing.
8            Do you see that?
9       A.   Yes.
10      Q.   Did you get legal advice before
11  commencing?
12      A.   No.
13      Q.   Why not?
14      A.   I wasn't thinking of this
15  really as a legal issue.  It was just an
16  issue I had to deal with.
17      Q.   But Pamela thought maybe you
18  should get legal advice?
19      A.   I don't know if she thought
20  that.  She asked -- she said -- she wrote
21  what she wrote.
22      Q.   Okay.
23           Right above that you send her
24  an e-mail, and one of the things you

1   write, I did write it in a way which might
2   suggest that I am ready to fight, open
3   parentheses, in court perhaps, closed
4   parentheses, period.
5            Were you still not thinking
6   litigation at that point?
7       A.   I was actually thinking suing
8   in small claims court for tearing down my
9   posters and making the publicity that way.
10  I wasn't thinking it was any giant legal
11  action.
12      Q.   If you read right above that,
13  you say don't know if my brother-in-law
14  lawyer will have time or inclination to
15  look at this.
16      A.   Right.
17      Q.   Not his area of the law.  I
18  will run it by a University of Chicago law
19  student to see what he thinks.
20           Are you referring to a small
21  claims court matter?
22      A.   No.  I was just seeing if they
23  had any ideas.  I wasn't thinking of any
24  action I was going to take.





1      Q.   Were you trying to prepare
2  yourself for action that might be taken
3  against you?
4      A.   I didn't know.  I was thinking
5  -- I was -- my brother-in-law is a good
6  lawyer.  If I -- at Christmastime if I
7  said to him, gee, Jim, you know, I've
8  gotten in a brouhaha with the university
9  and if he said what happened, Fred, and I
10  told him, I showed him the e-mail thread,
11  and, you know, I don't know what -- I
12  don't know what he'd think about that.  He
13  might -- he'd probably say well, you
14  know -- you know, he's too -- he wouldn't
15  want to get involved in the small stuff,
16  right, so not his area of the law.  I know
17  that.
18          The University of Chicago
19  student was a former Marywood student who
20  worked heavily on free speech issues and,
21  you know, if they thought there was
22  something I should be careful of, they
23  might tell me, Fred, be careful, don't do
24  this, but I had no plans to do any --

1  anything.
2      Q.   Okay.
3          Who was the University of
4  Chicago student to whom you're referring?
5      A.   Who was it?  William
6  Ziegelbauer.
7      Q.   Did you ever get the cartoon
8  drawn that you reference here?
9      A.   Pam sketched one real rough
10  quick cartoon of a nun unidentified
11  tearing -- I can't remember if it was
12  unidentified but a nun tearing down a
13  poster from a pillar, but I didn't use
14  that in anything.
15      Q.   Why not?
16      A.   We were thinking of making a
17  big montage sequence, shall we say, you
18  know, cartoon showing posters being torn
19  down around campus but it was just a mere,
20  you know, quick discussion, no big plans.
21  It didn't come to any fruition.
22      Q.   That cartoon that you just
23  referenced, was that what you produced
24  yesterday as a quick little video?

1      A.   It was a quick little -- it
2  just showed a picture of the pillar.
3      Q.   Correct.
4      A.   Yeah.  We produced it recently,
5  yes.
6          MS. PEET:  Why don't we take a
7  break here.
8          - - -
9          THE VIDEOGRAPHER:  We're now
10  off the record.  The time is 12:46
11  p.m.
12          - - -
13          (At this time, a luncheon
14  recess was taken.)
15          - - -
16          THE VIDEOGRAPHER:  We are now
17  on the record.  The time is 1:33 p.m.
18          - - -
19  BY MS. PEET:
20      Q.   Mr. Fagal, are you ready to
21  continue?
22      A.   Yes, I am.
23      Q.   Just a reminder, you're still
24  under oath, so all of the testimony you

1  give to the remainder of this deposition
2  must be truthful, accurate, and complete.
3          Do you understand that?
4      A.   Yes.
5          - - -
6          (At this time, a document was
7  marked for identification as Exhibit
8  Fagal-12.)
9          - - -
10  BY MS. PEET:
11      Q.   Mr. Fagal, what has been placed
12  before you is a two-page e-mail exchange
13  between you and Pam Parsons in December of
14  2011.
15          Do you see that?
16      A.   Yes.
17      Q.   Do you agree that that's what I
18  purported to be is what it is?
19      A.   Yes.
20      Q.   The top e-mail seems to be from
21  Pam to you.
22      A.   Yes.
23      Q.   Do you see that?
24      A.   Uh-huh.

43 (Pages 166 to 169)



1      Q.   And then in the middle there's
2  just two lines that seem to be from you to
3  Pam, and then the bottom is an e-mail from
4  Pam to you.
5           Do you see that?
6      A.   Yes.
7      Q.   What are you and Pam
8  discussing?
9      A.   I'm trying to think about how
10  if I didn't get a response from Marywood
11  about my 11 requests and some sort of
12  negotiation about going public in some
13  sense to a certain extent with what
14  happened, and so we were talking about
15  maybe some sort of cartoon poster.
16  Nothing came of it but...
17      Q.   Okay.
18           - - -
19           (At this time, a document was
20  marked for identification as Exhibit
21  Fagal-13.)
22           - - -
23  BY MS. PEET:
24      Q.   Exhibit-13 is an e-mail from

1  you to William Ziegelbauer dated
2  December 15, 2011, with attachments; is
3  that correct?
4      A.   Yes.  I believe he pronounces
5  his name Ziegelbauer, but that's okay,
6  yes.
7      Q.   I apologize.
8           Is this the person you
9  discussed earlier that's a University of
10  Chicago law student and a previous
11  Marywood University student?
12      A.   He was at the University of
13  Chicago as a law student at the time, yes.
14      Q.   And what is this first
15  attachment?  If you turn to the second
16  page, it says Marywood's shame, November
17  2000 -- November dash December 2011, and
18  it says something about Professor Fagal
19  again under attack.
20           What is this?
21      A.   This would be a draft of an
22  explanation as to what happened with --
23  you know, going along with the timeline
24  about being called a panderer and stuff

1  like that, so it's about the posters tear
2  down.
3      Q.   Okay.
4           If you turn -- keep on the
5  first page.  The end of the fourth
6  paragraph.  It's a very short paragraph.
7  It says I think Alan Levine is deep down
8  actually in my corner but no one but the
9  president has any real power.
10           Do you see that?
11      A.   No, I don't yet.
12      Q.   On the first page.
13      A.   Oh, the first -- not the
14  Marywood's shame but before that?
15      Q.   Yeah.
16      A.   Okay.
17      Q.   The cover e-mail.
18      A.   Yeah, uh-huh.  Fourth
19  paragraph; one, two, three -- yeah.
20      Q.   I think Alan Levine is deep
21  down actually in my corner but no one but
22  the president has any real power.
23           Do you see that?
24      A.   Yes.

1      Q.   Do you still agree with that?
2      A.   Do I still agree with that?
3      Q.   Uh-huh.
4      A.   Clarify the -- do you mean do I
5  agree today that Alan Levine is in my
6  corner?  Is that the question?
7      Q.   Yes.
8           Do you still agree with the
9  statement that you wrote here?
10      A.   No, not as much as I did then.
11      Q.   And what changed that position?
12      A.   In discovery I saw some e-mails
13  that Alan Levine was involved with that
14  implied that he wasn't happy with the
15  posters, the speaker coming to campus and
16  things like that.
17      Q.   Okay.
18           The next paragraph says in
19  bold, so unless I have grounds to sue the
20  bastards.
21           Do you see that?
22      A.   Uh-huh.
23      Q.   Who are the bastards?
24      A.   That would be the people who



1    tore down my posters.
2        Q.   Were you referring to Marywood
3    University?
4        A.   It was general statement that I
5    was angry and I wanted to do something
6    about it.  It wasn't a real intention
7    unless I have grounds, a violation of
8    contract.  I mean --
9        Q.   Well, you --
10       A.   -- as a professor, what rights
11   did I have?  So --
12       Q.   Well, you sued Marywood
13   for breach of contract?
14       A.   Yes.
15       Q.   So is Marywood University the
16   bastards in this e-mail?
17       A.   At least some people affiliated
18   with it.
19       Q.   Okay.
20            Who are the bastards?
21       A.   If I had to name names, it
22   would probably be -- I don't know -- Carl
23   Oliveri.  I didn't know who was involved.
24   I knew that the executive council was

1        A.   Carl Oliveri I was presuming.
2    I think anybody who did not pursue -- Alan
3    Levine I don't think pursued -- gave up
4    pursuing -- as far as I could tell from
5    his letter, gave up pursuing what happened
6    with the posters tear down.  This is
7    basically an offhanded comment.
8        Q.   Okay.
9            I'm just trying to have --
10       A.   Okay.
11       Q.   -- you identify who you
12   think --
13       A.   That's fine.
14       Q.   Did you exhaust that?
15       A.   Yeah.  I was assuming here that
16   Anne Munley was not directly involved in
17   the, you know, initial posters tear down
18   business.  So I was assuming it was at a
19   little lower level, but I didn't -- I
20   didn't know for sure.  That's why I was
21   trying to give her -- give Alan Levine an
22   out to say that there was
23   miscommunication.
24       Q.   You say here all I can do is

1    somehow involved but I didn't know to what
2    extent and who did what.  For instance, I
3    didn't know what any individual felt or
4    was -- you know, who was the ringleader,
5    for example.  I did not know.
6        Q.   Okay.
7            Do you think everyone in the
8    executive council is a bastard?
9        A.   That would depend on the term
10   "bastard".  I would say the traditional --
11   I would have no idea.  It depends on
12   the --
13       Q.   It's your wording, so however
14   you interpret it.
15       A.   Yeah.  My wording here is not
16   the son of an unmarried mother or daughter
17   of an unmarried mother bastard but just a
18   general term that people use all the time
19   when you say those people who, you know,
20   did me wrong or, you know, the team that
21   beat my team, you know.
22       Q.   Okay.
23            So who are the people that you
24   believe did you wrong, Carl Oliveri?

1    shame the hell out of them and hope a
2    little bad publicity.
3        A.   Uh-huh.
4        Q.   Who were you trying to shame
5    the hell out of?
6        A.   Well, that would be the
7    administrators and, in this case, it would
8    be Anne Munley.  She's in charge tearing
9    down a free speech poster.
10       Q.   The poster wasn't for free
11   speech, correct?  It was a poster
12   advertising a speaking engagement,
13   correct?
14       A.   Speaking engagement by somebody
15   from FIRE, and one of FIRE's main charges
16   is free speech on college campuses.
17       Q.   No one from the university or
18   administration told you that the reason
19   why the posters were removed were because
20   of it was associated with FIRE or free
21   speech, correct?
22       A.   They did not tell me that.
23       Q.   If you go down another
24   paragraph, you -- the last sentence says I



1    guess they will have to take comfort in
2    schadenfreude.
3             What is schadenfreude?
4        A.   Where is the -- what line is
5    it?
6        Q.   After you say hit them in the
7    solar plexus.  I guess they will have to
8    take comfort in schadenfreude.
9        A.   Let's see.  So unless -- I'm
10   looking in the bold.
11            Now how many lines down are we
12   going?
13       Q.   The next paragraph --
14       A.   The next paragraph.
15       Q.   -- starts to get --
16       A.   Okay.
17       Q.   -- info into the hands of
18   parents.
19       A.   Yes.  Schadenfreude, take
20   pleasure in the agony of others.  I
21   believe that's the definition of that
22   term.
23       Q.   So I guess they will have to
24   take comfort in the -- in the agony of

1    others is what --
2        A.   Yes.
3        Q.   -- you meant to write?
4        A.   Uh-huh.
5        Q.   Okay.
6             And whose agony were you trying
7    to take comfort in?
8        A.   Let me read the paragraph here.
9        Q.   Sure.
10       A.   That would be the
11   administration.  Here I was thinking
12   about -- again, just thinking about
13   passing out fliers to parents as they
14   drove their children to the dorms and say
15   here, here's what's going on at the
16   college, at the university.
17       Q.   As of December 15, 2001(sic),
18   have you decided to create the Hitler
19   videos?
20       A.   I don't think so.  I don't see
21   anything here.  I'm not sure when I got
22   that idea.
23            - - -
24            (At this time, a document was

1    marked for identification as Exhibit
2    Fagal-14.)
3             - - -
4    BY MS. PEET:
5        Q.   Do you agree that this is an
6    e-mail from you to Pam Parsons dated
7    December 19, 2011?
8        A.   Yes.
9        Q.   And, again, in this e-mail you
10   are talking to Pam about a possible comic
11   or cartoon about this FIRE incident,
12   correct?
13       A.   Correct.
14       Q.   And you talk about maybe
15   showing Sister Munley maybe wearing a
16   guarder belt with a little dog and the
17   female lawyer Paterson.
18            Are you referring to Sister
19   Mary Theresa Paterson?
20       A.   Is she a nun?
21       Q.   I said Mary Theresa Paterson.
22   She's not a nun.
23       A.   Right.
24       Q.   Okay.

1             Is that who you're referring
2    to?
3        A.   Let's see, yes.
4        Q.   Okay.
5             And you have a toy dog labeled
6    CO or Oliveri, so the dog would be labeled
7    for Carl Oliveri?
8        A.   Yes.
9        Q.   Okay.
10            And the dog lifts his leg to
11   pee on a poster which is on the ground?
12       A.   Yes.
13       Q.   The poster will be a little
14   crumpled and torn at the lying base of a
15   tree and the only word you can see is
16   FIRE, so the dog is pissing on FIRE to put
17   it out; is that right?
18       A.   Yes.
19       Q.   Okay.
20            And then you -- couple
21   paragraphs later you say to Pam but the
22   next best thing -- strike that.
23            You say meanwhile, I'm
24   beginning to learn how to use Windows

46 (Pages 178 to 181)


MAGNA
LEGAL SERVICES

1    Movie Maker just well enough so I can make
2    a Hitler parody video.
3         Do you see that?
4    A.   Yes, I do.
5    Q.   So is it fair to say around
6    December 19th you at least have the idea?
7    A.   Yes.
8    Q.   With luck, this will all come
9    together and the semester off to a rousing
10   start.
11        Do you see that?
12   A.   Yes.
13   Q.   What do you mean by rousing
14   start?
15   A.   Get students on campus
16   interested in the issue of free speech and
17   say what the heck's going on at this
18   university.
19   Q.   Okay.
20        If no one is roused, at least
21   I, in parentheses we with your help,
22   closed parentheses, will have tried and at
23   least caused some discomfort.
24        Do you see that?

1    A.   Yes.
2    Q.   Who were you trying to cause
3    discomfort to?
4    A.   The administration, hoping they
5    would change their policies.
6    Q.   And, again, this is all about
7    the poster?
8    A.   Yes.
9    Q.   Okay.
10        You write this is all good,
11   ideally policy changes, but next best is
12   to make them pay something, and then in
13   bold italicized, at least cause some
14   discomfiture.
15   A.   Uh-huh.
16   Q.   Again, discomfort to Marywood
17   administration?
18   A.   Yes.
19   Q.   And that would be the purpose
20   at least of this video?
21   A.   The main purpose of the video
22   would be to change policy.
23   Q.   And another purpose was to
24   create discomfort?

1    A.   If by discomfort that
2    encouraged them to change policy, then
3    that would be okay.
4         - - -
5         (At this time, a document was
6    marked for identification as Exhibit
7    Fagal-15.)
8         - - -
9    BY MS. PEET:
10   Q.   Okay.
11        This is a packet of documents.
12   It starts off with an e-mail with various
13   attachments.
14        Do you see this?
15   A.   Yes.
16   Q.   Now, the e-mail on the first
17   page where it says forwarded message, it's
18   from Fred Fagal to your Gmail account
19   dated January 13, 2012.
20        Do you see that?
21   A.   Yes, I see that.
22   Q.   Okay.
23        So you're sending an e-mail
24   from your Yahoo account to your Gmail

1    account, correct?
2    A.   Okay, yeah.
3    Q.   And then it says dear Marywood
4    University faculty colleague.
5         Do you see that?
6    A.   Uh-huh.
7    Q.   Are there -- are you blind
8    copying people on this e-mail?
9    A.   I don't recall if it was blind
10   copying or I had about -- I had access to
11   e-mail addresses and I was able to paste a
12   certain number of them in to send out as a
13   batch e-mail.  So these are faculty
14   members now, so that's what I did.
15   Q.   Okay.
16        So you agree you sent out this
17   e-mail to Marywood faculty members,
18   correct?
19   A.   Yes.
20   Q.   Did you send it to the faculty
21   members at their personal e-mail addresses
22   or at their Marywood e-mail addresses?
23   A.   Whatever e-mail addresses I
24   had, so it was probably mixed perhaps.  I



Page 186

1  don't know.
2      Q.   So for at least some faculty,
3  it went to their Marywood e-mail address?
4      A.   That's correct.
5      Q.   Did you send it to any
6  students?
7      A.   Geri Smith might have gotten a
8  copy because she was intimately involved.
9      Q.   And she would have been a
10 student, correct?
11     A.   She would have been a student.
12 I --
13     Q.   Would you have sent it to Geri
14 at her personal e-mail address or at her
15 Marywood e-mail address?
16     A.   Personal, I believe.
17     Q.   Do you know one way or the
18 other?
19     A.   I'm not sure.
20     Q.   So it's possible you sent it to
21 her at her Marywood e-mail address?
22     A.   I could give you a probability.
23     Q.   But you'd be guessing?
24     A.   But I'd be guessing.

Page 187

1      Q.   Okay.
2          So it's possible one way or the
3  other?
4      A.   It's possible one way or the
5  other.
6      Q.   Okay.
7          Where were you when you sent
8  this e-mail?
9      A.   I don't know for sure.
10     Q.   If it helps, it's 2:31 p.m. on
11 a Friday in January.
12     A.   Right.  So either -- I'm not
13 sure when my last class was.  It takes me
14 about two hours to drive home.  So if my
15 last class was at -- ended at 11:50, you
16 know, it's possible I could have sent this
17 from home.  It's possible I could have
18 sent this from my office.
19     Q.   Is your office at Marywood
20 University on the campus?
21     A.   Yes.  It's also possible I did
22 not use the Marywood, you know, Wi-Fi or
23 cable.
24     Q.   And do you know one way or the

Page 188

1  other?
2      A.   I'm not sure.  At the time, I
3  could tell you I had a tether program on
4  my computer and it was working pretty well
5  with my cell phone to get Internet access,
6  and sometimes I would -- so I would use
7  that sometimes in my office also.
8      Q.   Okay.
9          As we sit here today, do you
10 know one way or the other whether you
11 used --
12     A.   No.
13     Q.   -- a tether?  Okay.
14         Just to make sure we're clear,
15 this right here is the e-mail that you
16 sent to members of Marywood community
17 including the two hyperlink videos that
18 you created, correct?
19     A.   I'll say no.  Community -- I
20 would say faculty.
21     Q.   Well, Geri Smith is not
22 faculty, correct?
23     A.   True.
24     Q.   Okay.

Page 189

1          Did you post -- did you create
2  the Hitler videos?
3      A.   Yes.
4      Q.   Did you post them on YouTube?
5      A.   Yes.
6      Q.   Were they publically available
7  or did you need to enter a password to
8  view the videos?
9      A.   No password.  They were
10 publically available.
11     Q.   Did you have to receive your
12 e-mail in order to view the videos or
13 could anyone have viewed those videos?
14     A.   Anyone could have viewed them.
15 The question is would they have found them
16 without the information.
17     Q.   Okay.
18         But they did not need to be
19 invited to watch the videos, correct?
20     A.   Correct.
21     Q.   Did anyone help you draft this
22 e-mail?
23     A.   Draft this e-mail, no.
24     Q.   Okay.

48 (Pages 186 to 189)



1         You write towards the bottom,
2   it says based on the evidence.
3         Do you see that?
4    A.   Yes.
5    Q.   I expect most of you, if only
6   in private, will agree the Marywood
7   administration, real people here, not an
8   abstraction, exhibited egregious,
9   despicable, contemptible behavior.
10        What's the behavior you're
11  talking about here?
12   A.   Tearing down my posters.
13   Q.   And when you write this
14  poisoned and considered, exclamation mark,
15  behavior reflects badly on everyone
16  associated with Marywood, is that again
17  referring to the poster issue?
18   A.   Yes.
19   Q.   Okay.
20        If you turn to the second page,
21  you have number three.  You talk about the
22  letter that you sent to Dr. Levine dated
23  December 5th that we already talked about
24  earlier today.

1         Do you remember that?
2    A.   Yes.
3    Q.   And you mention in this twice
4   that you refer to these as demands.
5         Do you see that?
6    A.   Yes, but I would note there's a
7   question mark after demands and the first
8   word is "requests".  You see --
9    Q.   It says requests, open parens,
10  demands, question mark, end parens,
11  correct?
12   A.   Yes.
13   Q.   And then the second demand
14  doesn't have a question mark and it's not
15  in quotation marks, correct?
16   A.   Correct.
17   Q.   Okay.
18        Then if you go down a little
19  bit, you say Corynne McSherry, an attorney
20  specializing in intellectual property
21  stated, and then she said something about
22  the Downfall movie.
23        Do you see that?
24   A.   Let's see.  I'm looking.

1    Q.   It starts --
2    A.   Yes, I see that.
3    Q.   Did you reach out or speak with
4   Corynne McSherry?
5    A.   No.
6    Q.   Did you speak to any
7   intellectual property lawyer?
8    A.   No.
9    Q.   Did you ever get approval from
10  anyone to use the Downfall movie?
11   A.   No.
12   Q.   Next paragraph, you talk about
13  comments that you got from pre-release
14  viewers.
15        Do you see that?
16   A.   Yes.
17   Q.   Who are they?
18   A.   Rod Carveth I know saw them.
19  What's his name?  Let's see.  Bill
20  Ziegelbauer saw them.  I believe Geri
21  Smith saw them.  I'm trying to remember.
22  I'm drawing a blank, the name of the man
23  in our department who taught some
24  economics after I left, I think.  He saw

1   them.  Pam Parsons saw them.  I believe my
2   dental hygienist saw them.  I can't
3   remember anybody else right now.
4    Q.   Okay.
5         By the way, did you pay Geri
6   Smith to hang up the posters?
7    A.   No.
8    Q.   Did you pay anyone to hang up
9   the posters?
10   A.   Yes.
11   Q.   Who did you pay?
12   A.   I can't remember his name.  A
13  student in my -- I believe it was 12:00
14  economics class.
15   Q.   How much did you pay him?
16   A.   I believe it was $5.00.
17   Q.   How long did it take him?
18   A.   I don't know.
19   Q.   Was that approved by Marywood
20  University?
21   A.   Was what approved by Marywood
22  University?
23   Q.   The payment to a student.
24   A.   No.



1      Q.   You include various comments
2  from your -- the pre-release viewers.  One
3  of the comments is in quotations, it was
4  nice knowing you, Fred.
5      A.   Yes.
6      Q.   Who said that?
7      A.   Again, I'm drawing a blank on
8  the name.  I know -- I know the name.  He
9  worked in our social science department
10 but he saw the videos and -- Larry Walsh
11 is his name, so that's his comment.
12     Q.   Okay.
13          Fair to say that he thought it
14 was not a good idea?
15     A.   Yes.  Well, in terms of --
16     Q.   What it can do for your
17 career --
18     A.   What it could do for my
19 career --
20     Q.   -- at Marywood?
21     A.   -- at Marywood.
22     Q.   Was he trying to say that
23 perhaps this would be the end of your
24 career at Marywood?

1      A.   I think he was trying to say
2  that, yes.
3      Q.   Okay.
4          Who's Rod Carveth?
5      A.   Former professor at Marywood.
6      Q.   In January of 2012, was
7  Mr. Carveth a professor at Marywood?
8      A.   No.
9      Q.   Do you remember -- do you know
10 the name of your dental hygienist that you
11 sent it to?
12     A.   Yes.
13     Q.   What's her name?
14     A.   Kim Mingess(ph).
15     Q.   Why did you send it to her?
16     A.   Because I had a dentist
17 appointment for my checkup and I had a
18 tooth cleaning.  I saw my dentist that
19 same day, and so I was talking with my --
20 my dentist asked me how things are going
21 and I told him the quick story, and Kim
22 listened.  She seemed interested, and I
23 said I'll send you a copy of the video.
24     Q.   Did you send it to your dentist

1  as well?
2      A.   No.
3      Q.   If you can go to the next page,
4  there are two hyperlinks to YouTube.
5          Are those the videos?  If I
6  would click on link to video number one --
7      A.   Uh-huh.
8      Q.   If I clicked on that, would
9  that direct me to YouTube and direct me to
10 your video?
11     A.   When?
12     Q.   In January of 2012.
13     A.   Yes.
14     Q.   If I clicked on the link to
15 video number two, would that direct me to
16 YouTube in January 2012 with your video?
17     A.   Yes.
18     Q.   You then say a few colleagues
19 concerned for my welfare have told me they
20 fear the administration will try and fire
21 me over this.
22          Who are those few colleagues?
23     A.   Larry Walsh was one of them.  I
24 can't right now remember who the other one

1  was.
2      Q.   Is it possible there were more
3  since you wrote a few colleagues?
4      A.   We're talking two or three
5  here.  It may be, not many.
6      Q.   Okay.
7          You say -- and, again, these
8  are pre-release viewers, correct?
9      A.   Yes.
10     Q.   Then you say one colleague says
11 perhaps I should have asked for an
12 appointment with President Munley and made
13 a final appeal, that is I should have
14 pursued every last ditch channel possible.
15          You testified you did not do
16 that, correct?
17     A.   That's correct.  I did not
18 pursue an appointment with Professor
19 Munley -- or President Munley.
20     Q.   And what -- who -- what
21 colleague was the one that suggested you
22 do that?
23     A.   I don't know for sure.
24     Q.   Okay.



1        Who do you think it is?
2        A.   I think it was Larry Walsh but
3   I wouldn't testify to that.
4        Q.   Okay.
5        Then you said I did not want to
6   go into such a meeting and in essence have
7   as the only new point to raise, quote, a
8   blackmail, end quote, threat to go public
9   as I do here and in the videos.
10       Do you believe these videos are
11  blackmail?
12       A.   No.
13       Q.   Okay.
14       You say if the risk to me is
15  there, it is there, semicolon, and if the
16  worst does come to pass, I will have to
17  battle as best as I can with the support
18  of family, and friends, and colleagues,
19  and perhaps concerned outsiders.
20       What was the worst does come to
21  pass?  Would that be your termination of
22  employment from Marywood?
23       A.   Yes.
24       Q.   So you realized that that was a

1   possible alternative when you posted these
2   videos?
3        A.   I had been warned that it might
4   be, yes.
5        Q.   And you understood that by
6   doing this, this might be the end of your
7   employment with Marywood?
8        A.   I understood that it was a
9   risk.
10       Q.   Okay.
11       You then say, in all caps,
12  beware, dash, according to page 86 of the
13  faculty handbook, you then quote there are
14  no specific laws, comma, rules, comma, or
15  regulations that protect the privacy of a
16  user's files, comma, electronic mail
17  messages, comma, or any other information
18  retrieved as a result of person's session
19  on the Marywood system, period, end quote.
20       A.   Yes.
21       Q.   You then say thus, if you
22  e-mail me and want to protect yourself,
23  you might best use a backup e-mail address
24  such as your old youthful one,

1   coolcat@hotmail.com, and send it from
2   anywhere but Marywood.
3        Do you see that?
4        A.   Yes, I do.
5        Q.   And that's because Marywood has
6   a computer policy, correct?
7        A.   Correct.
8        Q.   If you turn to the next page
9   very much towards the end, it is
10  transparently obvious Marywood University
11  is discriminating against Professor Fagal;
12  Your Honor, I rest my case.
13       Do you see that?
14       A.   Yes.
15       Q.   So do you believe you're -- you
16  were being discriminated against?
17       A.   I don't know that -- I'm not
18  sure how we define the word
19  "discriminating" here.
20       Q.   You wrote this, right?
21       A.   Yes, I did.
22       Q.   Okay.
23       A.   I believe that at the time that
24  they were -- the administration was

1   perhaps looking to interfere with things I
2   might do on campus that they didn't like.
3        Q.   Okay.
4        Well, you wrote it is
5   transparently obvious --
6        A.   And so I would say -- yeah.
7   And so I would say that based -- based on
8   my recounting of the posters story and the
9   pandering phrase before that, when
10  Marywood itself was giving out Visa cards
11  and whatnot at events for people to come
12  to class that they were discriminating
13  against me as opposed to other professors
14  who would send students to an evening
15  class where students could get a prize or
16  food.
17       Q.   Okay.
18       Do you believe you were being
19  discriminated against?
20       A.   Yes, I did.
21       Q.   Based on what protective
22  status?
23       A.   I was not considering this as a
24  legal phrase.

51 (Pages 198 to 201)



1      Q.   Okay.
2           You didn't sue for
3    discrimination, correct?
4      A.   No.
5      Q.   Did you -- are the videos still
6    posted on YouTube?
7      A.   No.
8      Q.   Why not?
9      A.   Why not?
10          MR. COHEN:  Without disclosing
11   any attorney-client communication.
12          THE WITNESS:  What did you say
13   there?
14          MR. COHEN:  I said without
15   disclosing any attorney-client
16   communication.
17          THE WITNESS:  Without
18   disclosing any attorney-client
19   communication.
20          It was just a gesture to take
21   them down.  They -- I guess they had
22   served their purpose.  I made
23   certainly enough of a point to get
24   suspended and termination

1    recommended.
2    BY MS. PEET:
3      Q.   What purpose did they serve?
4      A.   What purpose did the videos
5    serve?  Is that --
6      Q.   You said they served their
7    purpose, so I'm saying what purpose did
8    they serve.
9      A.   They publicized the posters
10   events.
11     Q.   Did you post them on anything
12   other than YouTube?
13     A.   No.
14     Q.   When did you take them off of
15   YouTube?
16     A.   I can give an approximate date.
17   I would say it was around the end of
18   February 2012.
19     Q.   We're going to watch the
20   videos.
21             - - -
22          (At this time, videos were
23   played.)
24             - - -

1    BY MS. PEET:
2      Q.   Those videos you created?
3      A.   Yes.
4      Q.   Anyone help you?
5      A.   Yes.
6      Q.   Who?
7      A.   Bill Ziegelbauer helped a
8    little bit.
9      Q.   Anyone else?
10     A.   No.
11     Q.   As we sit here today, do you
12   have any remorse for doing that?
13     A.   I remorse that I lost my job.
14     Q.   Do you have any remorse for
15   creating those videos and depicting Sister
16   Anne Munley as Adolf Hitler who killed six
17   million Jews?
18     A.   I would say that instead of
19   depicting Anne Munley as Hitler -- in
20   other words, think of Anne Munley doing
21   Hitler stuff in the 1930s or '40s as being
22   -- let's say a newsreel.  You took the
23   newsreel and you superimposed Anne Munley
24   into that newsreel, then Anne Munley would

1    be portraying Hitler.
2           In this case, it's more a
3    question of an actor dressed as Adolf
4    Hitler portraying Anne Munley, and under
5    her direction some fascist type
6    activities, namely tearing down posters,
7    were done; therefore, the satire parody.
8    Absolutely no intention to cause anyone to
9    think that -- and I don't think anyone
10   would think that I was in any way implying
11   that Anne Munley would do horrible things
12   like Hitler did in terms of killing six
13   million Jews.
14     Q.   In the video, there's an actor
15   obviously portraying Adolf Hitler?
16     A.   Yes.
17     Q.   Is that Sister Munley in the
18   video?
19     A.   He is portraying Sister Munley,
20   again.
21     Q.   And other members of Marywood's
22   administration, they're being depicted as
23   members of the Nazi regime, correct?
24     A.   Mostly in a vague



1    unidentifiable sense.
2        Q.    Are they being identified as
3    members of the Nazi regime?
4        A.    No, because I would say again
5    that members of the Nazi regime are
6    portraying the Marywood personnel.
7        Q.    So the members of the Nazi
8    regime are various members of Marywood
9    administration, correct, in your video?
10       A.    The point of the satire is
11   to --
12       Q.    That's not my question.
13       A.    Okay.  Say it again.
14       Q.    Strike as nonresponsive.
15       A.    Okay.
16       Q.    This is a video --
17       A.    Yes.
18       Q.    -- correct?
19       A.    Correct.
20       Q.    And the original video depicts
21   Adolf Hitler and members of the Nazi
22   regime, correct?  They are actors
23   nonetheless because --
24       A.    The video Downfall -- the

1    Downfall movie depicts actors as members
2    of the Nazi regime.
3        Q.    Okay.
4              Various members of the Nazi
5    regime in the video are various members of
6    Marywood administration, correct, in your
7    video?
8        A.    In my video, those actors are
9    standing in for Marywood personnel.
10       Q.    When did you start creating
11   these videos?
12       A.    Right around that December -- I
13   was learning how to use the software and
14   whatnot.  Somewhere around December 20th,
15   21st, just before Christmas.
16       Q.    I'm not sure you responded to
17   the question, so if you did, my apologies.
18             But as we sit here today, are
19   you remorseful that you did that?  And by
20   that, I mean creating these two videos.
21       A.    No.
22       Q.    Okay.
23             How long did it take you to
24   create them?

1        A.    I would have to measure that
2    answer in hours and I would have to
3    estimate.  I'd have to think to come up
4    with a good answer.
5        Q.    Okay.
6        A.    Many hours.
7        Q.    Many?
8        A.    Yes.
9        Q.    More than 10?
10       A.    Yes.
11       Q.    More than 20?
12       A.    Yes.
13       Q.    More than 30?
14       A.    Probably.
15       Q.    More than 40?
16       A.    Probably not.
17       Q.    Did you ever work on it in your
18   office on campus?
19       A.    No.
20       Q.    Did you only work on it in your
21   home?
22       A.    Yes.
23       Q.    There's someone in the video
24   that's spelled L-E-V-I-N-E.

1        A.    Correct.
2        Q.    Is that supposed to be Alan
3    Levine?
4        A.    Yes and no.
5        Q.    Did you change his name?
6        A.    Yes.
7        Q.    Why did you do that?
8        A.    I wanted to make it be a French
9    name, Levine, that's why I emphasized the
10   V-I-N-E to make it clear that it was
11   nothing at all about what -- some people
12   might say Levine was a Jewish name, and
13   that's -- I wanted to make it clear that I
14   was not affiliating Alan Levine with any
15   connotation.
16       Q.    Well, do you think people would
17   be offended if they saw a Hitler movie and
18   a Jewish person was a member of a Nazi
19   regime or depicted as a member of a Nazi
20   regime?
21       A.    I realize that some people
22   could be offended and have the right to be
23   offended.
24       Q.    Do you understand how people



Page 210

1  that watch that video could be offended?
2      A.   That's -- I can't under -- I
3  mean I can understand that they are.  I
4  don't understand in the context here why
5  they would be.
6      Q.   Did you watch those videos?
7      A.   Yes, I did.
8      Q.   Okay.
9      A.   Uh-huh.
10      Q.   And you don't see how someone
11  that watches that could be offended by
12  what you just did?
13      A.   I do understand that they could
14  be offended.
15      Q.   For the people that watched it
16  pre-release, how did they get access to
17  it?
18      A.   Some I showed on my laptop and
19  a few people I e-mailed low quality video
20  files.
21      Q.   Where did you e-mail them?
22      A.   Can you rephrase the question?
23      Q.   Where was it that you -- how
24  was it that you e-mailed it to them?  Was

Page 211

1  it to their personal e-mail accounts or to
2  their Marywood e-mail accounts to those
3  that are affiliated with Marywood?
4      A.   I don't recall e-mailing it to
5  anybody at Marywood -- at a Marywood
6  account.
7      Q.   For the pre-release, correct?
8      A.   For the pre-release.
9      Q.   You talk in your video about
10  rape.
11          Are you suggesting that they
12  would try and frame you and have you
13  seduce a young woman and then have that
14  person call rape and then so they can fire
15  you?  Is that what you were implying?
16      A.   No.
17      Q.   What were you implying when you
18  were talking rape?
19      A.   I wasn't implying anything.
20      Q.   Okay.
21      A.   It was a humorous satire part
22  of the video.
23      Q.   The rape --
24      A.   A sub --

Page 212

1      Q.   The rape part?
2      A.   A substory.
3      Q.   Yeah.
4      A.   There was no rape.
5      Q.   So the rape part was meant to
6  be comical?
7      A.   The rape part was meant to be
8  comical.
9      Q.   Okay.
10          When you talk about the hot
11  young pretty thing --
12      A.   Excuse me.  Can I amplify a
13  little bit?
14          There was no rape.  There was
15  some supposed humorous non-existent plot
16  to have the Fagal character be seduced and
17  then claim rape.  So there was never a
18  rape, and of course there was never such a
19  plot, and there was never such a
20  seduction, and I don't think anybody would
21  have thought that to be the case.
22      Q.   Do you think when someone is
23  watching this video and they're talking
24  about rape, do you think someone can get

Page 213

1  offended by that or think it's
2  inappropriate?
3      A.   Anybody could be offended by
4  anything.
5      Q.   Including these videos,
6  correct?
7      A.   If they choose to be.
8      Q.   The hot young pretty thing that
9  you're referencing, would that be
10  Dr. Levine's wife?
11      A.   What was the exact quote?  I
12  don't know if that's the exact quote.  I
13  have the -- we had -- I had the scene by
14  scene.
15      Q.   Well, since you mention it, we
16  have the scene by scene as well.
17      A.   Where I made comments in each
18  scene.
19          ---
20          (At this time, a document was
21  marked for identification as Exhibit
22  Fagal-16.)
23          ---
24  BY MS. PEET:

54 (Pages 210 to 213)



Page 214

```
 1        Q.   First off, what has been marked
 2   as Exhibit-16, are these the frames from
 3   the video that we just showed?
 4        A.   They certainly appear to be.
 5        Q.   Okay.
 6        A.   Very grainy, but yes.
 7        Q.   If you flip to DEF136, it's
 8   towards the end.  Some member of the Nazi
 9   regime slash Marywood administrator is
10   saying so you wanted a hot young thing,
11   now you pay.
12             Do you see that?
13        A.   Yes, I do.
14        Q.   And they're directing this to
15   the character that's portraying
16   Dr. Levine, correct?
17        A.   Yes.
18        Q.   And is that referring to --
19   that hot young thing, would that be
20   Dr. Levine's wife that you're referring
21   to?
22        A.   Yes.
23        Q.   Do you think Dr. Levine might
24   find that offensive?
```

Page 215

```
 1        A.   I don't know whether he would.
 2   This is satire comedy parody.  If I may
 3   refer to the previous scene, the Levine
 4   character says I should quit as VP and be
 5   a professor again, but my young wife
 6   number two and one percent kids need
 7   money.  So here Dr. Levine is making a
 8   joke.  It's understood through common
 9   knowledge that Dr. Levine had been
10   divorced and married again.
11        Q.   When you say Dr. Levine is
12   making a joke, let's be abundantly clear
13   here.  It's Dr. Fagal --
14        A.   Yes, but in the --
15        Q.   -- making a joke about
16   Dr. Levine, correct?  Dr. Levine did not
17   make this joke, correct?
18        A.   That's correct.  The character
19   in the movie representing Dr. Levine is
20   making a joke about his situation.  He's
21   got a second family to support and all
22   this turmoil.  He could go back to be a
23   professor at a lower pay rate but his wife
24   might not appreciate the lower salary and
```

Page 216

```
 1   his one percent kids need money.  That's a
 2   joke reference to the Occupy Wall Street
 3   movement that was going on at the time,
 4   and so that I would say makes this, you
 5   know, be a joke.
 6             And the next scene where you
 7   say so you wanted a hot young thing, now
 8   you pay, you know, there's Hot in
 9   Cleveland, the television show that was
10   very popular at the time.  The term "hot"
11   is a very general term.  It means, you
12   know, attractive.
13             So could Dr. -- your question
14   is could Dr. Levine be offended?  He could
15   be if he wanted to.
16        Q.   Do you think this might be
17   offensive to Dr. Levine's second wife?
18        A.   I personally don't see why it
19   would be.
20        Q.   Have you ever posted anything
21   else on YouTube about Marywood University?
22        A.   No.
23        Q.   Did you ever consult with an
24   attorney about this video before you
```

Page 217

```
 1   posted it?
 2        A.   No.
 3        Q.   Ever consider not posting this
 4   video after you prepared it and watched
 5   it?
 6        A.   I don't recall.  I did listen
 7   to Larry Walsh if he offered his opinion.
 8        Q.   Was he the only person that
 9   provided commentary to the effect that you
10   could be terminated if you do this?
11        A.   He's the only one I can recall
12   at this moment.
13        Q.   Did you show it to your wife
14   before you posted it?
15        A.   Yes.
16        Q.   Was she in agreement that you
17   should do this?
18        A.   She was wondering if I would
19   get in trouble about it and she didn't
20   want all that, and I told her it's
21   something I had to do, and she said fine.
22        Q.   When you say you had to do it,
23   no one at Marywood asked you to do this,
24   correct?
```



1   A.   No.
2   Q.   When you had to do it, it was a
3   decision that you --
4   A.   My personal decision.
5   Q.   -- personally made --
6   A.   Right.
7   Q.   -- correct?
8   And when you say your wife
9   didn't want any trouble, would that imply
10  a termination of your employment?
11  A.   It could be anything.  Just
12  being called in on the carpet, just the
13  stress of ongoing back and forth that had
14  already been going on for months.  So...
15  Q.   What is your personal opinion
16  of Adolf Hitler?
17  MR. COHEN:  Can you repeat
18  that?
19  MS. PEET:  What is his personal
20  opinion of Adolf Hitler?
21  THE WITNESS:  A horrible human
22  being.
23  BY MS. PEET:
24  Q.   Why is he a horrible human

1   being in your opinion?
2   A.   He was a ruthless dictator who
3   did all sorts of bad things.
4   Q.   Such as?
5   A.   Such as Kristallnacht, such as
6   putting Jews in concentration camps, such
7   as going after anybody who spoke out
8   against him, such as mentioned in the
9   video beheading the white -- what is it,
10  the white flower protesters, concentration
11  camps, war crimes.
12  Q.   In your opinion, do you think
13  someone would be fond of being associated
14  with Adolf Hitler?
15  A.   Fond, no.
16  Q.   Do you think someone would be
17  fond or think favorably if they were being
18  associated with a Nazi?
19  A.   No, but let me -- not all Nazi
20  behaviors were equivalently bad.  So if
21  somebody said you tore down the posters
22  like a Nazi would, well, that's a
23  descriptive term.  That's -- if you did
24  it, you did it.  It's a comparison.

1   Q.   Did it ever cross your mind
2   that you were depicting a member of the
3   Jewish faith as a Nazi?
4   MR. COHEN:  Can you repeat
5   that?
6   BY MS. PEET:
7   Q.   Did it ever cross your mind
8   that you were depicting a member of the
9   Jewish faith as a Nazi?
10  A.   Well, it crossed my mind
11  because I changed the name to Levine and I
12  wanted to make it clear that Alan Levine
13  -- I didn't really consider him to be my,
14  quote/unquote, enemy.
15  Q.   Although you changed the name,
16  the person that you're depicting is
17  Dr. Alan Levine, correct?
18  A.   Yes.
19  Q.   Okay.
20  A.   I mean -- yes.
21  Q.   Do you think the videos are
22  professional?
23  A.   What do you mean by
24  professional?

1   Q.   Do you think it was a
2   professional thing to do as a tenured
3   professor at Marywood University?
4   A.   Well, as part of my professor's
5   job is to seek, you know, open expression
6   and free inquiry, and I was inquiring as
7   to what had happened.  And so I didn't
8   think it was out of the ordinary for some
9   college professors to speak up in a case
10  like this.
11  Q.   Do you think it was
12  professional?
13  A.   I don't have an opinion really.
14  Q.   Can you understand how some
15  people would find it to be unprofessional?
16  A.   Again, I'm not sure what you
17  mean by unprofessional.  You say, oh, that
18  wasn't a polite thing to do.  I could
19  understand why some people wouldn't think
20  it was polite.  Unprofessional, I really
21  don't have a good answer for that.
22  Q.   What about inappropriate
23  conduct from a tenured professor?
24  A.   I wouldn't say what I did was



1   inappropriate given the circumstances.
2     Q.  And the circumstances being --
3  you're talking about the posters?
4     A.  That's correct.
5     MS. PEET:  Why don't you change
6  the video.
7       ---
8     THE VIDEOGRAPHER:  We're now
9  off the record.  The time is 2:36
10  p.m.  This ends disk number two.
11       ---
12     (At this time, a short break
13  was taken.)
14       ---
15     THE VIDEOGRAPHER:  We are now
16  on the record.  The time is 2:43 p.m.
17  This starts disk number three.
18       ---
19     (At this time, a document was
20  marked for identification as Exhibit
21  Fagal-17.)
22       ---
23  BY MS. PEET:
24     Q.  Exhibit-17 seems to be e-mail

1  exchange between you and Benjamin
2  Harrington.
3     Do you see that?
4     A.  Yes.
5     Q.  Was Benjamin Harrington at this
6  time, January of 2012, a student at
7  Marywood?
8     A.  I believe he was registered for
9  the spring semester though I don't know
10  that for sure.
11     Q.  Well, you sent it to him at his
12  Marywood --
13     A.  That's correct.
14     Q.  -- .edu e-mail address --
15     A.  That's correct.
16     Q.  -- is that correct?
17     A.  That's correct.
18     Q.  So he's not a faculty member,
19  correct?
20     A.  No.
21     Q.  He was a student, correct?
22     A.  Correct.
23     Q.  And you were telling him to go
24  to YouTube to look at those videos,

1  correct?
2     A.  Let me see.
3     Q.  Down at the bottom.
4     A.  Yes.  He -- yes.  Uh-huh.
5     And, yes, I see that -- I say
6  what is your best time for Republican
7  Conservative Club meeting, so he was -- he
8  would have been a student.
9     Q.  Thank you.
10       ---
11     (At this time, a document was
12  marked for identification as Exhibit
13  Fagal-18.)
14       ---
15  BY MS. PEET:
16     Q.  Is one of the people that you
17  sent the e-mail to with the videos Kevin
18  Wyllie?
19     A.  I presume he's on that e-mail
20  list, yes.
21     Q.  Okay.
22     And who is Kevin?
23     A.  I don't know for sure, but I
24  looked him up after I got this and he was

1  on the member of the faculty on arc --
2  school of architecture.
3     Q.  Kevin wrote to you that he
4  understands your concern, but this type of
5  mass e-mail seems a little inflammatory
6  and unprofessional.
7     Do you see that?
8     A.  Yes.
9     Q.  Do you disagree with what he
10  wrote?
11     A.  I would -- I would agree with
12  the a little inflammatory part and I would
13  disagree with the unprofessional part.
14     Q.  Okay.
15     But, nonetheless, it's a
16  colleague of yours at Marywood telling you
17  that he found it to be unprofessional,
18  correct?
19     A.  He said it seems
20  unprofessional.
21     Q.  Okay.
22     A.  Right.
23     Q.  And he also said it seems like
24  you're having a tantrum.



Page 226

```
 1        A.   He said that it seems to be a
 2   tantrum.
 3        Q.   He writes although the freedom
 4   to protest is a valuable democratic
 5   exercise, it should not become a source of
 6   fashionable entertainment.
 7        Do you see that?
 8        A.   I do.
 9        Q.   Do you disagree with what he
10   wrote?
11        A.   Yes.
12        Q.   Did you receive this e-mail
13   from Kevin?
14        A.   Yes.
15             - - -
16        (At this time, a document was
17   marked for identification as Exhibit
18   Fagal-19.)
19             - - -
20   BY MS. PEET:
21        Q.   Did you prepare Exhibit-19?
22        A.   Yes.
23        Q.   What is it?
24        A.   I believe that I prepared this
```

Page 227

```
 1   in the -- after January 23rd after I had
 2   been suspended and after I had heard the
 3   concerns expressed by President Munley and
 4   about how terrible the video was, and so I
 5   decided I would go through each screen and
 6   copy the words exactly -- all the words in
 7   the video exactly as they were and I would
 8   try to, shall we say, footnote each set of
 9   comments that were in the video to explain
10   further where they came from, what the
11   relationship to, say, a history reference
12   was and things like that.
13        Q.   Did anyone help you prepare
14   this?
15        A.   No.
16        Q.   Did you share it with anyone?
17             MR. COHEN:  Without disclosing
18   any -- other than --
19             MS. PEET:  I didn't ask about
20   communications.  I just said did you
21   share it with anyone, and that would
22   include counsel.
23             THE WITNESS:  I --
24             MR. COHEN:  Wait, you're asking
```

Page 228

```
 1   if he shared it with counsel?
 2             MS. PEET:  It would include
 3   counsel.
 4             MR. COHEN:  Okay.
 5             MS. PEET:  Sure.
 6   BY MS. PEET:
 7        Q.   I'm not -- I didn't ask for
 8   what any attorney's views are or what they
 9   spoke about, but my question was did you
10   share this document with anyone after you
11   created it?
12        A.   I sent it to the -- I believe
13   -- quite sure I recall that I sent it to
14   the -- one of the committees, like the ad
15   hoc committee that was considering my
16   case, the faculty committee, and I sent it
17   to them but I did not distribute this to
18   the faculty or anything like that.
19        Q.   Did you share it with anyone
20   else other than the ad hoc committee?
21        A.   I might have sent it to Bill
22   Ziegelbauer and a few people but not -- I
23   can't recall right now.
24        Q.   Who were the other few people?
```

Page 229

```
 1        A.   I might have sent it to my
 2   sisters.  I can't recall.  I don't
 3   remember sending it to anybody other than
 4   the committee.
 5        Q.   And was the purpose of creating
 6   this to give it to the ad hoc committee?
 7        A.   I believe the original purpose
 8   was for myself.  I wanted to, shall we
 9   say, convince myself that I wasn't crazy
10   and -- but I really wanted to explain to
11   anybody who wanted to know why this scene,
12   why that, I wanted to be able to have a
13   record -- complete record of what I did,
14   so that's why I created this really for
15   myself.
16        Q.   Did you convince yourself that
17   you're not crazy?
18        A.   Yes.
19        Q.   Do you think other people think
20   you're crazy?
21        A.   I don't know.
22        Q.   Do you think it would be
23   reasonable for other people to think
24   you're crazy?
```




1      A.   No.
2      Q.   Have you ever been treated with
3  a psychiatrist or psychologist or other
4  mental health provider?
5      A.   No.
6      Q.   Had anyone ever suggested that
7  you treat with a psychologist,
8  psychiatrist, or any other type of mental
9  health provider?
10     A.   No.
11     Q.   Have you ever been diagnosed
12  with any sort of mental health disease or
13  illness?
14     A.   No.
15     Q.   Have you ever been diagnosed
16  with OCD?
17     A.   No.
18            - - -
19      (At this time, a document was
20  marked for identification as Exhibit
21  Fagal-20.)
22            - - -
23  BY MS. PEET:
24     Q.   You're e-mailing here with a

1  Lindsay, correct?
2      A.   Yes.
3      Q.   Who's Lindsay?
4      A.   Lindsay Groves is a cellist
5  with the Syracuse Symphony Orchestra.  She
6  lives in Skaneateles, New York.
7      Q.   She's one of the folks that you
8  sent the e-mail to with the videos,
9  correct?
10     A.   Yes, I did.
11     Q.   Okay.
12            And her response to that is on
13  the bottom of the first page.
14            Do you see that, January 15,
15  2012?
16     A.   Yes.
17     Q.   Okay.
18            And she writes, Fred, the real
19  estate portfolio slash young wife stuff is
20  really personal, exclamation mark.
21            Do you see that?
22     A.   Yes.
23     Q.   Geez, I'm wondering if the
24  students, who are transients, can get into

1  this as much as you want and convince
2  their parents to write.  I think you
3  should take down the second video with
4  three exclamation marks.
5            Do you see that?
6      A.   I see that, uh-huh.
7      Q.   Why did you send it to Lindsay?
8      A.   She's a good friend and I
9  valued her opinion.
10     Q.   Okay.
11            What did you think when she
12  sent you her opinion?
13     A.   I understood her point to a
14  short extent, a small extent.  I didn't
15  think it was really personal.  The real
16  estate portfolio I thought was a joke
17  about the real estate market, et cetera,
18  so I disagreed with her opinion.
19     Q.   Okay.
20            And she's not a Marywood
21  administration, correct?
22     A.   No.
23     Q.   Did you in fact take down the
24  second video after she told you to do

1  that?
2      A.   No.  Again, she did not tell me
3  to do that.
4      Q.   On the top, you write back to
5  Lindsay.
6            Do you see that?
7      A.   Yes.
8      Q.   And in part you write only
9  those in the know know that Levine, open
10  parens, written Levine, all capital, as a
11  joke because as a Jewish guy working for
12  Hitler, his name cannot be Levine,
13  exclamation point, closed parens, is on a
14  second family --
15     A.   Right.
16     Q.   -- period.
17     A.   Uh-huh.
18     Q.   So do you agree that it would
19  be outlandish for a Jewish person to be
20  portrayed working for Hitler?
21     A.   I don't know if outlandish is
22  the word I would use, but I was trying to
23  make a point about free speech and didn't
24  want to get anything in there about


MAGNA
LEGAL SERVICES

Page 234

1  raising some subsidiary issue about what
2  religion anybody was in administration, so
3  that's why I changed the name.
4      Q.   Were you concerned about
5  offending people?
6      A.   I was not willing to offend
7  people just gratuitously.  If it had to be
8  done to make a point if they would be
9  offended by the video, unhappy with it,
10  shall we say, then that was part of the
11  price.  No one would appreciate being
12  criticized, I don't think, in public.
13      Q.   And this was public, correct?
14      MR. COHEN:  Excuse me.  Say
15  that again.
16  BY MS. PEET:
17      Q.   This was public, correct?
18      A.   It was available on YouTube, so
19  the public could access it.
20      Q.   Do you think this video or the
21  videos do anything to further a supportive
22  or welcoming environment at Marywood
23  University?
24      A.   Yes.

Page 235

1      Q.   How is that?
2      A.   Because it might tell people,
3  look, if you come to Marywood University,
4  you can speak your mind and have free
5  speech, an open honest debate, and tackle
6  big issues, and this is a university that
7  does that.
8              - - -
9          (At this time, a document was
10  marked for identification as Exhibit
11  Fagal-21.)
12              - - -
13  BY MS. PEET:
14      Q.   These are e-mails between you
15  and Geri Smith, correct?
16      A.   Yes.
17      Q.   And Geri is the student that
18  you testified about earlier today?
19      A.   Yes.
20      Q.   And if you can look on the
21  second page, you can see that it's at her
22  Marywood e-mail address.
23      A.   I see that.
24      Q.   Do you see that?

Page 236

1      A.   She has a private e-mail
2  address, too, but I see the Marywood
3  address there.  That's correct.
4      Q.   Okay.
5          Does this refresh your memory
6  that you sent it to her as a pre-release
7  at her Marywood e-mail address?
8      A.   Let me read.  Let's see.  Yes.
9      Q.   If you look on -- at the time
10  that you were e-mailing with Geri, you did
11  not yet make these videos public, correct?
12      A.   That's correct.
13      Q.   You write on the first page I
14  do not think -- and "not" being all
15  capitals -- they will try to fire me over,
16  quote, all this, end quote.  If by, quote,
17  this, end quote, you mean over what
18  happened so far, then absolutely not,
19  underlined.
20          But, again, at this point you
21  haven't made the videos public?
22      A.   That's correct.
23      Q.   All right.
24          You then say assuming the

Page 237

1  videos are released, open parens, and at
2  this point I would say they will be with
3  -- I guess 95 percent.
4          Is that what you're trying to
5  say?
6      A.   Probability equals point 95,
7  which is 95 percent, yes.
8      Q.   Closed parentheses, comma,
9  there will be some very pissed off
10  administrators.
11          Do you see that?
12      A.   Yes.
13      Q.   Why do you think there were
14  going to be pissed off administrators?
15      A.   Because they're being publicly
16  criticized in a satirical funny way that
17  might get a lot of attention.
18      Q.   Okay.
19          And who are the administrators
20  that you think would be pissed off?
21      A.   Well, the ones mentioned in the
22  video.
23      Q.   Who are they?
24      A.   As I recall, the names that

**60 (Pages 234 to 237)**



1   were mentioned were Paterson, and Munley,
2   and Garvey, and Heath, and Oliveri, and
3   Levine or Levine, if you will.
4       Q.   Okay.
5            You then write in essence I
6   have called President Anne Munley a
7   fascist.
8            See that?
9       A.   Yes, uh-huh.
10      Q.   You then go on to write tenure
11  is on my side --
12      A.   Yes.
13      Q.   -- period.
14      A.   Uh-huh.
15      Q.   To fire me, they would have to
16  go through procedures, comma, set up a
17  committee, comma, have hearings, and then
18  you can continue.
19           You see that?
20      A.   Yes, uh-huh.
21      Q.   So you gave thought about
22  whether or not they were going to
23  terminate you over this?  It crossed your
24  mind?

1       A.   It crossed my mind.
2       Q.   And you gave some thought to
3   it?
4       A.   Yes, I did.
5       Q.   You then wrote they know I
6   would raise a big stink and they would
7   look foolish, game not worth the candle.
8            Are you trying to say that
9   Marywood probably wouldn't terminate you
10  because it's not worth it to them?  You're
11  just going to raise a big stink and it's
12  just not worth it?
13      A.   As I said, better for them to
14  grimace and wait it out until I retire,
15  and then I give them a suggestion how they
16  could make me retire early with a five day
17  a week crazy teaching schedule.
18           But as I said in the video, the
19  way I was thinking at the time was it's
20  the older professors who have to stand up
21  because the younger professors who don't
22  have tenure are too scared to speak out,
23  and the middle-aged professors who have a
24  family and kids, generally speaking, and

1   they got their careers and whatnot and
2   they've got -- they're very busy and they
3   don't maybe have time for all the stuff,
4   and I think too many older professors just
5   say well, I'll just not rock the boat and
6   cruise to retirement, and so I felt it was
7   my duty to speak up at some possible cost
8   to myself.
9       Q.   Were you calling Marywood's
10  bluff when you posted those videos?
11      A.   Bluff?
12           MR. COHEN:  Object to the form.
13  BY MS. PEET:
14      Q.   You're saying, you know, I
15  don't think they're going to terminate me.
16  I'm going to raise a big stink.  They have
17  to go through this whole procedure.  They
18  might as well just wait it out until I
19  retire.
20           Were you just kind of pressing
21  their boundaries and see what they were
22  going to do to you, stir the pot a little
23  bit?
24      A.   What I was thinking, as I

1   recall back then, was that I would have
2   made the video splash.  I presume that
3   that would not go on forever but it would
4   make a -- say a two-week or so hot topic
5   on campus and would be, shall we say,
6   embarrassing to the administration to have
7   been found out for what it did, and my
8   hope would be that even if they didn't
9   publically do anything that they would
10  mend their ways and that life would go on.
11  I would continue teaching.
12           If it came to being called in
13  on the carpet and trying to be escalated
14  into firing me for some presumed violation
15  of something, then depending how that was
16  handled publicity-wise one could either,
17  you know, keep it all quite and let the
18  committees do their work or one could --
19  which I did not do, one could go down
20  battling raising a public outcry, Fagal up
21  on charges, blah, blah, blah, blah, blah,
22  you know, students march, if any would,
23  you know, for free speech, you know.  It
24  could have been a huge semester-long cause

61 (Pages 238 to 241)



1    celebre.
2    Q.   So you did them a favor?
3         MR. COHEN:  Excuse me.
4    BY MS. PEET:
5    Q.   So you did --
6    A.   Yes.
7    Q.   -- them a favor?
8    A.   I did them a favor.
9    Q.   Do you think that these videos
10   warranted any type of discipline?
11   A.   I would say no.
12   Q.   And why do you say that?
13   A.   I would say -- I would assume
14   that I would perhaps have been called on
15   the carpet and told something along the
16   lines of, gee, Dr. Fagal, I wish you
17   hadn't gone that far.  I wish you had -- I
18   wish we had contacted you earlier.  I wish
19   we made a settlement before.  I wish --
20   you know, I wish you'd come to see
21   President Munley and make a -- and shown
22   her the videos ahead of time.
23        I mean something like that
24   maybe could have happened, and obviously

1    in that case I would have known that she
2    was very upset about the videos going
3    public but that -- and I would be told,
4    gee, please always come to see me before
5    you do anything major like this and, you
6    know, that would have been not a
7    comfortable conversation but it would have
8    been a conversation and that would have
9    been it.
10   Q.   Did you try to show the video
11   to Sister Munley before you posted it
12   publicly?
13   A.   No, I did not.
14   Q.   Did you try to show the video
15   to Dr. Levine before you posted it
16   publicly?
17   A.   No.
18   Q.   Why not?
19   A.   Because I had already tried so
20   very, very hard to find out what had
21   happened.  I had made proposals and I
22   thought that was enough.  I had done
23   enough.
24   Q.   Okay.

1         In this Exhibit-21, you mention
2    something about not supporting the
3    mission's core values, and we talked about
4    core values earlier.
5         Do you see that?
6    A.   Not yet.
7         Whereabouts?
8    Q.   It's in the middle of the page
9    in the paragraph that starts --
10   A.   The first page?
11   Q.   -- tenure is on my side,
12   correct.
13   A.   Yes, yes.  I see what you're
14   saying.
15   Q.   Okay.
16        To your knowledge, when you
17   were a tenured professor in January of
18   2012, were you expected to uphold
19   Marywood's missions and core values?
20   A.   Yes.
21   Q.   Did you ever apologize to
22   Sister Munley or Dr. Levine about these
23   videos?
24   A.   At the meeting -- Dr. Levine

1    was not at the termination meeting, so I
2    did not see Dr. Levine at all after the
3    videos were posted.  I did not make an
4    explicit apology at the January 23rd
5    meeting.
6    Q.   Did you ever apologize to
7    Sister Munley about those videos?
8    A.   No.
9    Q.   Did you ever apologize to
10   Dr. Levine about those videos?
11   A.   No.
12   Q.   Did you ever apologize to any
13   member of the Marywood administration
14   about those videos?
15   A.   No.
16        - - -
17        (At this time, a document was
18   marked for identification as Exhibit
19   Fagal-22.)
20        - - -
21   BY MS. PEET:
22   Q.   What's been marked as Exhibit-2
23   seems to be e-mails between -- 22 --
24   between you and Rod Carveth dated early



1   January 2012.
2        Do you see that?
3        A.   Yes.
4        Q.   And I believe you testified
5   earlier that he was one of the folks that
6   saw the pre-release of the videos.
7        A.   Yes.
8        Q.   If you look at the bottom of
9   the first page --
10       A.   Yes.
11       Q.   -- Rod writes to you honestly I
12  think it is a brilliant satire.  If it was
13  released, however, I think you would catch
14  an incomparable amount of grief.  Anytime
15  Hitler gets raised, no one pays attention
16  to the message but the symbolism of Hitler
17  as a murderer and butcher.  I think the
18  university would try and find some
19  loophole to undo your tenure and fire you.
20  It's not what you -- what you are saying
21  here but how you are saying it that puts
22  you at risk.
23       Do you see that?
24       A.   Yes, I do.

1        Q.   Did you understand what Rod was
2   trying to say to you?
3        A.   Yes, I did.
4        Q.   Okay.
5        And what was he trying to say
6   to you?
7        A.   He was trying to say I was
8   taking a risk by posting those videos.
9        Q.   And you understood that was a
10  risk?
11       A.   I understood it was a risk.
12       Q.   And then you -- the top of the
13  page is an e-mail that you wrote back to
14  Rod, and then you write to him you sound
15  like my wife.
16       A.   Yes.
17       Q.   Did your wife make similar
18  comments to you?
19       A.   As I mentioned before, she was
20  worried that I would upset some people and
21  get in trouble of some sort.
22       Q.   And perhaps lose your job?
23       A.   Well, losing the job -- just
24  had been an ongoing brouhaha and that

1   would, you know, continue in some fashion.
2        Q.   You then wrote and I know the
3   Hitler link is considered by many to be
4   out of bounds.
5        A.   Yes.
6        Q.   I would have to face that
7   possibility.
8        A.   Uh-huh.
9        Q.   I am going to rethink this but
10  I think I won't change my mind about the
11  release.  I will look over the faculty
12  manual again, heh.
13       Do you see that?
14       A.   Yes, uh-huh.
15       Q.   Okay.
16       So is it fair to say that you
17  didn't change your mind?
18       A.   That's correct.
19       Q.   Okay.
20       You then wrote down assuming
21  the videos are released, if Marywood
22  considered going after my job, they will
23  probably realize that I would not -- all
24  caps -- go quietly.  If I were a tenured

1   42-year-old likely to cause trouble for
2   another 20 to 25 years, then the game
3   might be worth their votive candle, but I
4   will be 66 years old in a month.  If --
5   all caps -- they are rational, they will
6   think I can't be around that -- bold
7   italicized -- much longer and they will
8   take a big publicity hit for trying to get
9   rid of me.
10       Do you see that?
11       A.   Yes, I do.
12       Q.   So were you -- did you consider
13  the fact that because you were 66 years
14  old and you probably didn't have that much
15  longer of a tenure at Marywood University
16  that that weighed in your favor?
17       A.   What do you mean by weighed in
18  my favor?
19       Q.   That they more likely will not
20  terminate your tenure than had you been
21  younger?
22       A.   Yes, because I think that if a
23  younger person were to do what I did --
24  big if there because when I said they were



Page 250

1    younger, I don't think they would tend to
2    do it because of the trade-offs.  Because
3    if the younger person did in fact lose
4    their tenured job, it'd be very difficult
5    for that person to find work.  It would
6    cause much family turmoil.
7         But I -- as I just recently
8    explained, if one is older, then I
9    considered it my duty to do what I did
10   given my position and, again, as we just
11   discussed, if Marywood had to make the
12   decision what to do about the videos, if
13   it was a 42-year-old, to be rid of that,
14   quote/unquote, troublemaker, they'd be rid
15   of that troublemaker for at least 25
16   years, and so the game would be worth the
17   candle.  For me being older, it might be
18   more -- have been more rational for them
19   to take the -- shall we call it a two-week
20   publicity hit and tolerate me for what
21   would not be another 25 years.
22        Q.   How many years at that point?
23        A.   I had no particular plans to
24   retire.  If I was going to retire that

Page 251

1    year, I would have filed earlier for the
2    bonus.  I was thinking of going at least
3    to age 70 and maybe longer depending how
4    things went.
5         Q.   At that point, have you spoken
6    to anyone about retirement?
7         A.   No.
8         Q.   Did you meet with a financial
9    advisor?
10        A.   No, not about retirement.  Now,
11   maybe briefly I might have talked to a
12   TIAA-CREF guy once about investments but
13   nothing retirement per se.
14        Q.   Do you agree or disagree with
15   Rod's comment that Hitler is a symbolism
16   of murder and -- of a murderer and a
17   butcher?
18        A.   Hitler is often used as a
19   symbol that way, yes, but he's also used
20   in movies like Mel Brooks as a comedy
21   figure.
22        Q.   The videos, were they connected
23   to your intro to social sciences course?
24        A.   No.

Page 252

1         Q.   Were they -- what other courses
2    were you teaching that semester?
3         A.   In the spring of 2012, I
4    believe I was teaching two sections of
5    economics, a U.S. history class, and I
6    think I had the social science class also.
7    I'm not sure.
8         Q.   Was the video connected to any
9    of those courses?
10        A.   No.
11        Q.   Was it part of some academic
12   research?
13        A.   I follow the news on American
14   campuses quite closely in terms of what's
15   going on, in terms of social justice
16   protests, Occupy Wall Street protests,
17   free speech protests, all sorts of Black
18   Lives Matter protests, whatever might be
19   going on on any different campus, or not
20   going on, or not allowed to go on.
21        So I was always -- and plus I
22   always had -- I had that contact with
23   FIRE, so I was aware of what was going on
24   and I was also aware that, you know, part

Page 253

1    of what had happened to me was not unique
2    perhaps to Marywood and so, therefore, if
3    it came out what had happened to me, that
4    might very well get picked up by other,
5    shall we see, researchers or academics,
6    you know, studying, you know, what's going
7    on on campus.
8         Q.   Were you a researcher?
9         A.   I was not doing official
10   research for journal article about free
11   speech on campus.
12        Q.   So this article -- this video
13   -- these videos were not connected to any
14   sort of official research for any journal
15   articles, correct?
16        A.   That's correct.
17        Q.   Were they -- were these videos
18   part of some scholarly pursuit?
19        A.   Well, I was pursuing this in a
20   -- for intellectual free speech purposes
21   if you want to call that a scholarly
22   pursuit.  I think I would.
23        Q.   Okay.
24        Was it part of the curriculum?



1      A.   Well, when we do introduction
2  to social science, there's usually a
3  student who'd study the Constitution,
4  maybe read a few federalist papers, and
5  there'd be a discussion about how it might
6  relate to current events, and so something
7  like this could be used as an example.
8      Q.   Could in the hypothetical
9  sense, correct?
10     A.   Yes.  I had no specific plans
11 to incorporate it in the course content
12 for that semester.
13     Q.   Okay.
14          When you made the videos and
15 then posted those videos on YouTube, you
16 knew why you did it, right?
17     A.   Would you repeat the question,
18 please?
19     Q.   When you made the videos and
20 then you posted them on YouTube, you know
21 why you did it, right?
22     A.   Yes.
23     Q.   And as of January 13, 2012,
24 when they were officially posted and you

1  e-mailed them around, you knew at that
2  time why you had done this, correct?
3      A.   Yes.
4      Q.   And prior to January 13, 2012,
5  you had already consulted with a lawyer,
6  correct?
7      A.   No.
8      Q.   I thought you testified earlier
9  that you had consulted with a lawyer
10 perhaps in December of 2011.
11          Is that not true?
12     A.   I mentioned to my
13 brother-in-law, who's a lawyer, that, you
14 know, I was involved with a dispute on
15 campus.  I had written to FIRE and lawyers
16 at FIRE, but that was about the incident
17 and publicity.  It was not a consulting
18 for a lawyer for me, so I did no
19 consulting.
20     Q.   In your opinion, can a tenured
21 professor say or do anything they want?
22     A.   I don't know.
23     Q.   Can a tenured professor use the
24 N word?

1      A.   That's a good question.
2          MR. COHEN: I'm going to
3  object, legal conclusion.  You can
4  answer.
5  BY MS. PEET:
6      Q.   Is your answer I don't know?
7      A.   The answer would be I would
8  hope a professor could use the N word, as
9  you phrase it, in an academic setting, for
10 instance, talking about the use of the
11 word in Huckleberry Finn and what it means
12 and how it was often used as a
13 vituperative term and as an academic
14 discussion.
15          For example, there was a
16 professor, I believe, at the University of
17 Oklahoma who just basically got driven out
18 of class because she was trying to use it
19 in that type of context.  So in that
20 sense, I think it should be allowed to be
21 used.
22     Q.   What about in a satirical
23 video?
24          MR. COHEN:  Objection, legal

1  conclusion and to form.
2          THE WITNESS:  I'm sorry.
3          MR. COHEN:  You can answer.
4          THE WITNESS:  I can answer.
5  I've never used the word in
6  class.  I would -- I have not
7  contemplated using the word.  I would
8  imagine somebody could make some sort
9  of -- there are rap videos that use
10 the word all the time that are out
11 there from what I understand.
12 BY MS. PEET:
13     Q.   Are you aware of any rap video
14 artist that's a tenured professor at a
15 university?
16     A.   I couldn't name one.
17     Q.   Okay.
18          So my question to you is do you
19 feel if it's appropriate for a tenured
20 professor to use the N word in a satirical
21 video?
22     A.   I would have to see the
23 satirical video.  I don't know.
24     Q.   When was the first time you



1  heard from anyone in Marywood
2  administration after you posted these
3  videos?
4      A.   I believe it would have been
5  Mike Foley Monday morning, January 23rd.
6      Q.   Okay.
7          And how did Michael Foley get
8  in contact with you?
9      A.   He came to my office at 8:45
10  a.m.
11      Q.   And what did he tell you he was
12  -- did he talk to you then?  What
13  happened?
14      A.   He came to me and he said that
15  Sister Anne Munley or President Munley,
16  however he used the term, wanted to see me
17  at 9 o'clock.
18      Q.   Did he tell you why?
19      A.   I asked him -- I asked him.  I
20  said well, why, and he said well, we can
21  -- you can probably figure it out.
22      Q.   And did you figure it out?
23      A.   I assumed it had something to
24  do with the videos.

1      Q.   Do you think she was going to
2  be happy with you?
3      A.   No.
4      Q.   Were you surprised that up
5  until January 23rd you didn't hear from
6  anyone at Marywood about the videos?
7      A.   I was a little surprised but I
8  thought maybe they were thinking it was
9  better to let them, as I discussed before,
10  lie low, take -- take the publicity hit.
11      Q.   Okay.
12          Did you in fact go to that 9
13  o'clock meeting?
14      A.   Yes, I did.
15      Q.   And where did that meeting take
16  place?
17      A.   It was in President Munley's
18  office complex in a room with a conference
19  table.
20      Q.   And this meeting was exactly
21  ten days after you posted the videos,
22  correct, or at least e-mailed it to
23  Marywood that you posted it?
24      A.   Yes.  The meeting was the 23rd

1  and I e-mailed to the faculty on January
2  13th.
3      Q.   Were you surprised that
4  President Munley wanted to speak with you?
5      A.   No.  A little surprised but not
6  -- not totally.
7      Q.   Why weren't you totally
8  surprised?
9      A.   Only because I knew that she
10  would be unhappy with the videos.
11      Q.   Because you depict her as
12  Hitler?
13      A.   I wasn't thinking so much about
14  that really as -- in fact, I wasn't
15  thinking about that at all.
16      Q.   What were you thinking about?
17      A.   I was thinking about the -- the
18  fact that the Hitler -- the parody videos
19  might be seen as funny and, therefore, get
20  a lot of views and raise the issue that I
21  was concerned about raising about what
22  happened to the posters.
23      Q.   You were present at Sister
24  Munley's deposition last week, correct?

1      A.   Yes.
2      Q.   And you heard Sister Munley
3  discuss at length what her background and
4  experiences are and have been, correct?
5      A.   Yes.
6      Q.   After hearing that, do you have
7  a different opinion on what you did and
8  perhaps have a little bit of remorse that
9  you depicted her as Adolf Hitler?
10      A.   Again, I wouldn't say that I
11  depicted her as Adolf Hitler.  I would say
12  it was -- somebody in a Hitler costume was
13  playing Anne Munley's role.  Anne Munley
14  was not playing a Hitler role.  So she was
15  dressed, if you will, in a Hitler costume
16  to make the point that there was what I
17  would consider bad behavior tearing down
18  the posters as the fascists would do.  I
19  point out in the video I never use the
20  word Nazi, not once.
21      Q.   There are swastikas on those
22  people's arms, correct?
23      A.   Yes.
24      Q.   There's no -- there can be no

66 (Pages 258 to 261)



1 debate or room for a question whether or
2 not those people depicted Nazi member --
3 Nazi members, correct?
4     A.   The people in the Downfall
5 video were depicting Nazis.
6     Q.   Okay.
7          Who was present at this
8 meeting?
9     A.   Mike Foley was present and
10 Patricia Dunleavy was present.
11     Q.   Back to my question.
12          After hearing Sister Munley's
13 testimony about her experience, and her
14 background --
15     A.   Yes.
16     Q.   -- and her beliefs, has your
17 views on the videos changed?
18     A.   My views on the video haven't
19 changed.  I certainly am sorry if
20 President Munley took them what I would
21 consider the wrong way as being accused of
22 being like Adolf Hitler's worst traits as
23 if I was calling her a murderer of Jews.
24 That was absolutely no intent and I don't

1 think anybody seeing the video -- I won't
2 say anybody.  I don't think most people
3 seeing the video would take it in that
4 sense.
5     Q.   Do you have any remorse after
6 hearing Sister Munley's deposition about
7 those videos?
8     A.   I feel sad that she feels that
9 way.
10     Q.   Do you wish you didn't do it?
11     A.   No.
12     Q.   Knowing how she felt, you would
13 still do it again?
14     A.   Knowing how she felt, I might
15 have gone in and showed her the video
16 ahead of time.
17     Q.   So you may have changed
18 strategy a little bit?
19     A.   That's correct.  But at the
20 time, if I was put back in a time machine
21 given the same circumstances, given who I
22 was at the time, I presume I would have
23 made the same decision.
24     Q.   Do you believe that Sister

1 Munley wasn't sincere about what she was
2 saying, that she was making it up, or did
3 you feel that she really felt that way
4 when she was describing it during her
5 deposition?
6     A.   I don't know.  Sometimes people
7 will play the victim card, so I don't
8 know.
9     Q.   Tell us everything that
10 happened during that meeting.
11     A.   Well, I was called in and, as I
12 recall, Sister Anne Munley was at the head
13 of the table about where the videographer
14 is and Mike Foley was approximately where
15 that empty chair is, the first empty
16 chair.  I believe Patricia Dunleavy was
17 not at the table but sitting in a chair
18 just to the back maybe with a little
19 notebook in her lap of some sort, and I
20 was sitting approximately where you are
21 sitting.
22          And the discussion -- I was
23 asked if I posted the videos and I really
24 post -- I posted them to YouTube -- if I

1 sent the e-mail and posted the videos and
2 I agreed to that, and then I was asked, I
3 believe, to explain the videos in terms of
4 how they fit into the core values or
5 something, and so I started to explain --
6 remember, the videos are all about the
7 poster tear downs.  So I wanted to go back
8 and explain the poster tear downs and how
9 those led to the video and all the things
10 I had done and to, you know, set the
11 stage, and when I began to explain about
12 the posters, again, leading up to the
13 videos, I was cut off and told no, I could
14 not discuss that.  And then I believe I
15 said well, I would like to answer in
16 writing; no, you can't do that, and Sister
17 Anne Munley wanted to hear about the
18 videos.
19          And so I couldn't explain -- as
20 I saw it, I couldn't explain the videos
21 without the context of the whole posters
22 history, and so it was a 15-minute
23 meeting.  It ended at 9:15 and I was
24 probably suspended I'll say six -- maybe



Page 266

1    six or seven minutes into the meeting.
2    And after that, as far as I was concerned,
3    well, the hammer has dropped and it was a
4    simple question of, okay, what's next, and
5    then Sister Anne Munley was saying she
6    wanted an explanation about the videos.
7        So I was explaining -- I tried
8    to explain how I had tried to cooperate
9    and seek some sort of agreement through
10   Alan Levine and whatnot, and so I got, you
11   know, that off my chest. So I explained
12   some of the videos even though I hadn't
13   been allowed to before I got suspended,
14   and Sister Anne wanted me to justify --
15   explain the videos, and I really -- at
16   that point the game was over and the
17   questions were vague, and I said -- I was
18   talking about justice. The videos -- I
19   tried to, you know, get justice for the
20   free speech cause basically, and so
21   there's some, should I say, dumping out by
22   me of some of those concerns I had but I
23   -- philosophically, you know, explaining
24   the videos. I'd been suspended already

Page 267

1    and at that point it was what's your
2    e-mail address and turn in the keys to Pat
3    Dunleavy.
4        - - -
5        (At this time, a document was
6        marked for identification as Exhibit
7        Fagal-23.)
8        - - -
9    BY MS. PEET:
10   Q.   Mr. Fagal, have you ever seen
11   this document before? It's a two-page
12   document.
13   A.   Yes.
14   Q.   And it appears to be notes from
15   the meeting that you just described that
16   took place on January 23, 2012.
17       Is this a fairly accurate
18   description of the -- a summary of what
19   took place at the meeting?
20   A.   Well, I remember reading this
21   and I had some problems with some of these
22   notes because these were written up after
23   the raw notes. I'd have to go over this
24   in some detail here, review it.

Page 268

1        MR. COHEN:  Can you give him
2    some time to read it?
3        MS. PEET:  Sure.
4        - - -
5        (At this time, the witness
6    complies with request.)
7        - - -
8        THE WITNESS:  Okay.
9        So in the third paragraph
10   here --
11   BY MS. PEET:
12   Q.   The one that starts Sister Anne
13   asked Dr. Fagal?
14   A.   Yes.
15       If we went down to where it
16   says Sister Anne asked Dr. Fagal how the
17   videos upheld those values, and then your
18   next sentence says Dr. Fagal says he
19   wouldn't answer any more questions.
20   Well...
21   Q.   Do you dispute that?
22   A.   If we go down -- yes. Just
23   jump down a minute. Next to last
24   paragraph, Sister Anne -- okay. The

Page 269

1    middle there, Sister Anne told Dr. Fagal
2    that she was suspending him with pay.
3        There's nothing here after it
4    says Sister Anne asked Dr. Fagal how the
5    videos upheld those values, that is when I
6    started to explain the videos controversy
7    leading up -- pardon me -- the posters
8    controversy leading up to the videos, and
9    as soon as I started to do that to set the
10   context for the videos, I was summarily
11   cut off and told that I could not do that.
12       I could not discuss the
13   posters, that she wanted to know about the
14   videos, and basically I was -- I can't --
15   like Hamlet without the prince of Denmark
16   or whatever it is. I needed to explain
17   the videos in terms of the posters and I
18   was not allowed to do that.
19   Q.   Okay.
20   A.   And so when I stopped talking
21   and was told to discuss the videos and I
22   said the word "justice", and then that was
23   it. I mean I couldn't -- I was not
24   allowed to explain, and at that point I

MAGNA
LEGAL SERVICES

Page 270

1  was suspended.
2      Q.   Okay.
3          Were you surprised you were
4  suspended?
5      A.   I was a little bit surprised,
6  yes.
7      Q.   Why?
8      A.   Because I thought there might
9  be a different conversation.  I mean there
10 wasn't...
11     Q.   Were you -- to your knowledge,
12 were you suspended over those videos?
13     A.   I presume that's what it was
14 for, yes.
15     Q.   You were suspended with pay,
16 correct?
17     A.   Correct.
18     Q.   So the meeting happened on a
19 Monday.
20          Did you call Alan Levine at his
21 home that prior Saturday?
22     A.   Yes.
23     Q.   Did you speak with Alan?
24     A.   No.

Page 271

1      Q.   Did you leave him a voice mail?
2      A.   Yes.
3      Q.   Did you tell him you wanted to
4  have a conversation off the record?
5      A.   Yes.
6      Q.   Why?
7      A.   Because I was wondering.  As
8  you said, a week had gone by and I hadn't
9  heard anything.  So I was just wondering
10 what -- what had happened and if there was
11 any -- I wouldn't say anything I could do
12 but anything to -- I assumed something
13 might be happening but I didn't know.  I
14 just wanted to touch base and see what was
15 going on.
16     Q.   Do you know what Dr. Levine's
17 reaction was to the videos?
18     A.   Not at the time I did not.  I
19 did not know.
20     Q.   As we sit here today, do you
21 know what Dr. Levine's reaction was?
22     A.   In some e-mail discovery, I
23 learned that he said he was upset.
24     Q.   Do you know whether or not he

Page 272

1  agreed with the decision to suspend your
2  employment?
3      A.   At the time, I didn't know.  I
4  thought maybe he didn't support it because
5  he was not the one who suspended me.
6      Q.   Okay.
7          As we sit here today, do you
8  have any reason to believe that Dr. Levine
9  supported the decision to suspend your
10 employment?
11     A.   I can't remember the exact --
12 when I was looking at some of the
13 discovery e-mails, I believe -- I know
14 there was administration meetings about
15 having the meeting with me on the 23rd
16 and, as I recall, he seemed to be all in
17 favor of that.
18     Q.   Of that being suspension?
19     A.   I recall that -- I believe
20 suspension was on the table in one of
21 those agendas that I read.
22     Q.   And when you say you learned
23 Dr. Levine was in favor of that, of that,
24 did you mean suspension?

Page 273

1      A.   I know he was in favor of the
2  meeting.  I don't know exactly what
3  punishment, shall we say, he was in favor
4  of.
5      Q.   Okay.
6          You were ultimately terminated,
7  correct?
8      A.   Correct.
9      Q.   And is it your understanding
10 you were terminated based on those videos
11 you created?
12     A.   Yes, that's the -- that's the
13 basic charge.
14     Q.   Both suspension and termination
15 are forms of discipline, correct?
16     A.   Well, yes.  Suspension I would
17 call discipline and termination would be
18 execution.
19     Q.   So would you agree that
20 suspension is a lesser form of discipline
21 than termination?
22     A.   Yes.
23          - - -
24          (At this time, a document was



1     marked for identification as Exhibit
2     Fagal-24.)
3           - - -
4     BY MS. PEET:
5         Q.    Do you know who Frances Ferrese
6     -- and I apologize if I'm mispronouncing
7     that -- is?
8         A.    Yes, I do know Fran Ferrese.
9         Q.    And was she the administrative
10    assistant to President Munley?
11        A.    That sounds like a good title
12    these days.  Executive secretary to the
13    president it says here.
14        Q.    Okay.
15              And you received this e-mail
16    from her on January 24, 2012; is that
17    correct?
18        A.    Yes.
19        Q.    And it included various
20    attachments, correct?
21        A.    Do I remember?
22        Q.    Just for --
23        A.    Okay.  Yeah.
24        Q.    -- for the last two policies,

1     249 through 257, I will tell you were not
2     provided with the letter.  The rest were,
3     and those would be the progressive
4     discipline policy and the faculty
5     grievances and appeals policy, but the
6     other letter -- the other policies you
7     were provided with.
8         A.    Okay.  So...
9         Q.    Is this how you learned that
10    Sister Munley was recommending your
11    termination of employment?
12        A.    Yes.
13        Q.    And it was -- these were the
14    issues that you were discussing the
15    previous day in the meeting with President
16    Munley, correct?
17        A.    Which issues?  On the letter on
18    page --
19        Q.    Yeah, what's contained in the
20    letter.
21        A.    Do you mean where it says as
22    you know, our values include?  Does
23    that --
24        Q.    Yes.

1         A.    Okay.
2         Q.    This was the same idea that was
3     discussed with you the day before,
4     correct, in the meeting?
5         A.    Let me read here.  I see what
6     she wrote.
7               And what's the question?
8         Q.    The issue that's being
9     addressed in this letter, namely how she
10    viewed your behavior, that was discussed
11    the day before with you in the meeting,
12    correct?  This is not the first time
13    you're hearing that Sister Munley --
14        A.    Yes.  I can't recall all the
15    terms such as sexually explicit.  I don't
16    recall all those terms being used.  I knew
17    there was unhappiness with the --
18        Q.    Okay.
19        A.    -- videos but not all those
20    terms.
21        Q.    What did you do when you
22    received this letter?
23        A.    Right around this time, if not
24    the day, I would have called -- I believe

1     I called FIRE.  I might have been in
2     contact with them the day before thinking
3     perhaps I needed -- I should have a
4     lawyer.
5               And so your question was what
6     did I do that day?
7         Q.    When you received this letter.
8         A.    Yes.  So I believe I called
9     FIRE.  That would have been my first call.
10        Q.    Okay.
11              And is that when they gave you
12    Jonathan Cohen as a referral?
13        A.    Yes.
14        Q.    Did you do anything else after
15    you received this letter?
16        A.    I can't recall.  I told my
17    wife.
18        Q.    What did your wife say?
19        A.    I can't remember exactly what
20    she said but she didn't cry or throw
21    dishes or anything.
22        Q.    Were there some expletives?
23        A.    No, no.
24        Q.    Was she happy?  Was she



1 pleased?
2 A. I would say she was not pleased
3 but she understood.
4 Q. Okay.
5 If you look at DEF187, which
6 was the last page of the actual packet
7 that was sent to you.
8 A. 187, okay.
9 Q. Do you see it has a release of
10 personal information document and then a
11 place for you to sign and date?
12 A. Yes.
13 Q. Do you remember receiving this?
14 A. Yes.
15 Q. Did you check one of the boxes,
16 sign, date it, and return it by
17 February 3, 2012?
18 A. No.
19 Q. Why not?
20 MR. COHEN: Without disclosing
21 attorney-client communications.
22 THE WITNESS: Without
23 disclosing attorney-client --
24 MR. COHEN: Yes.

1 THE WITNESS: I'm not sure what
2 would -- it was suggested that I not.
3 BY MS. PEET:
4 Q. Let's look at DEF169 and it
5 goes through 174. It's the tenure policy.
6 A. Okay.
7 Q. Did you understand that tenured
8 professors, nonetheless, still have to
9 abide by the tenure policy?
10 MR. COHEN: Objection, legal
11 conclusion. You can answer.
12 THE WITNESS: If you have
13 obligations, you should comply with
14 those as you understand them. There
15 might be disagreements as to
16 interpreting a policy.
17 BY MS. PEET:
18 Q. Okay.
19 Did you understand, as of
20 January of 2012, that this tenure policy
21 applied to you?
22 A. Yes.
23 Q. And prior to January of 2005,
24 have you seen this policy, the tenure

1 policy?
2 A. Would you repeat the question?
3 Q. Prior to January of 2012, have
4 you seen --
5 A. You said 2005. Okay. I'm
6 sorry.
7 Q. Oh, my apologies.
8 A. Okay. So --
9 Q. It's been a long day.
10 A. -- just repeat it one more
11 time.
12 Q. Sure, of course.
13 Prior to January of 2012, had
14 you ever seen this tenure policy?
15 A. I had seen it. I don't know if
16 I read every single word of it because it
17 does change over the years.
18 Q. But the policy was made
19 available to you nonetheless?
20 A. Yes.
21 Q. Okay.
22 If you go to the next policy,
23 which is the civil rights policy, 175
24 through 176.

1 A. Okay.
2 Q. Did you understand in January
3 of 2012 that this policy applied to you?
4 MR. COHEN: Objection, legal
5 conclusion. You can answer.
6 THE WITNESS: Okay.
7 I knew if policies were -- you
8 know, as part of the official
9 Marywood policies that I would be
10 subject to the policies.
11 BY MS. PEET:
12 Q. Did you have -- did you
13 understand in January of 2012 that you had
14 to comply with various Marywood policies
15 including the civil rights policy?
16 MR. COHEN: Objection, legal
17 conclusion.
18 THE WITNESS: Well, I
19 understood I had to follow -- follow
20 the law in terms of -- you know.
21 BY MS. PEET:
22 Q. Okay.
23 My question is not about the
24 law. My question is about Marywood's

71 (Pages 278 to 281)



1   civil rights policy.
2       A.   Yeah, civil rights policy.  I
3   would assume I'd have to follow it, yes.
4       Q.   Okay.
5            So you agree it applied to you?
6            MR. COHEN:  Same objection.
7            THE WITNESS:  Yeah.
8            MS. PEET:  Okay.
9            THE WITNESS:  Yes.
10  BY MS. PEET:
11      Q.   Do you agree that it --
12  Marywood did not condone and will not
13  tolerate discrimination, harassment, or
14  assault by any member of the Marywood
15  community, and then it lists different
16  protective statuses?
17           MR. COHEN:  Objection, legal
18  conclusion.
19           MS. PEET:  It's not a legal
20  conclusion.  I'm reading what the
21  policy says.
22           THE WITNESS:  Yes.  Okay.
23  BY MS. PEET:
24      Q.   Do you see how someone could

1   have found the video to be discriminatory
2   or harassing?
3       A.   I can understand how some
4   people would be offended by it.  Whether
5   that would be defined as harassing
6   somebody or discriminating against
7   somebody, in my case I would say no.
8       Q.   Okay.
9            Do you understand how one could
10  have found the policies to be an abuse of
11  academic freedom?
12      A.   No, I don't understand.
13      Q.   Do you understand how people
14  that watch the videos could have saw them
15  to be -- or you to have exhibited
16  professional incompetence?
17      A.   No, I don't.
18      Q.   If you turn to the next policy,
19  177 through 180, it's Marywood's
20  conditions of computer use policy.
21           Do you see that?
22      A.   Yes.
23      Q.   Did you have any reason to
24  believe in January of 2012 that this

1   policy did not apply to you?
2       A.   No.
3       Q.   And in fact you knew about this
4   policy because you reference this policy
5   in your January 13, 2012, e-mail, correct?
6       A.   I can't recall specifically
7   referencing it.  I'd have to look at it.
8       Q.   Okay.  We can do that.  It is
9   Exhibit-15, and if you look at DEF1445.
10      A.   I do remember referring to that
11  Marywood could monitor one's e-mail.  I do
12  remember that discussion.
13      Q.   Do you remember referring to,
14  in words or substance, a -- that Marywood
15  had a computer policy and beware --
16      A.   Yes.
17      Q.   -- is the words you used?
18      A.   Yes.
19      Q.   Okay.
20      A.   Yes.
21      Q.   Do you feel that with the
22  videos, you were respecting the civil
23  rights of others?
24           MR. COHEN:  Can you repeat

1   that?
2   BY MS. PEET:
3       Q.   Do you feel that with those
4   videos, you were respecting the civil
5   rights of others to an open and hospitable
6   environment?
7       A.   So are we referring to a
8   specific phrase here?  Where is this?
9       Q.   It comes from the second page,
10  number eleven, but I'm asking you if do
11  you believe that those videos respected
12  the civil rights of others to an open and
13  hospitable environment?
14      A.   Yes.
15      Q.   Okay.
16           Turn to the next policy, 181
17  through 182, the academic freedom policy.
18           Do you believe that your videos
19  were in furtherance of academic freedom?
20      A.   Yes.
21      Q.   And how's that?
22      A.   Trying to open up discussion,
23  and the videos themselves criticized the
24  forces that would reduce discussion and

72 (Pages 282 to 285)



Page 286

1    free speech.
2         Q.   Okay.
3              The policy talks about teachers
4    being entitled to freedom in the
5    classroom.
6              Were the videos shown in the
7    classroom?
8         A.   No, they were not.
9         Q.   And the videos had nothing to
10   do with the classroom, correct?
11        A.   I might have shown them in the
12   class later that semester if we got --
13   when we got to the Constitution and free
14   speech.  I might have chosen to say, hey,
15   here's something that happened on campus
16   last semester and I might have talked
17   about first amendment briefly, talked
18   about first amendment issues in public
19   universities versus private, et cetera,
20   and that would have been -- videos don't
21   take long.  So I did not have -- plan -- I
22   did not plan to show them but I might
23   have.
24        Q.   Okay.

Page 287

1              MR. COHEN:  Do you mind if I
2    take a five-minute break?
3              MS. PEET:  Sure.
4                   - - -
5              THE VIDEOGRAPHER:  We're now
6    off the record.  The time is 3:57
7    p.m.
8                   - - -
9              (At this time, a short break
10   was taken.)
11                  - - -
12             THE VIDEOGRAPHER:  We are back
13   on the record.  The time is 4:05 p.m.
14                  - - -
15   BY MS. PEET:
16        Q.   Just another reminder that
17   you're still under oath and your testimony
18   needs to be truthful, accurate, and
19   complete.
20             Do you understand?
21        A.   I do understand.
22        Q.   183 to 184 is the Marywood's
23   policy on professional ethics.
24             Do you see that?

Page 288

1         A.   Yes.
2         Q.   Do you have any reason to
3    dispute that in January of 2012 this
4    policy applied to you?
5              MR. COHEN:  Objection, legal
6    conclusion.  Go ahead.
7              THE WITNESS:  No.
8    BY MS. PEET:
9         Q.   Okay.
10             Do you believe that with your
11   videos you were exercising critical
12   self-discipline and judgment?
13        A.   I thought about what I did.  It
14   was a tough choice.
15        Q.   What was your choice?
16        A.   The choice was to -- since I
17   was warned by Rod Carveth and Lindsay, and
18   I think they were the ones who explicitly
19   raised the issue that some people have
20   what I might call a knee jerk reaction to
21   a Hitler reference, that there was a risk
22   I was running by doing that.  So I had to
23   think about whether I would do it that way
24   or not and I chose to do it.

Page 289

1         Q.   Okay.
2              Do you believe that those
3    videos -- strike that.
4              Do you believe that with those
5    videos you were exercising critical
6    self-discipline and judgment?
7         A.   Yes.
8         Q.   Okay.
9              Do you believe that with those
10   videos you showed due respect for the
11   opinions of others?
12        A.   Yes.
13        Q.   Okay.
14             The next 185 through 186 is
15   Marywood's mission and core values.
16             We discussed this earlier
17   today, correct?
18        A.   Yes.
19        Q.   And you have seen this before,
20   right, Marywood's mission statement and
21   core values?
22        A.   Yes.
23        Q.   And was it -- I believe you
24   already testified that you understood as a

73 (Pages 286 to 289)




1    tenured professor at Marywood you were
2    committed to abiding by Marywood's mission
3    and core values, correct?
4         MR. COHEN:  Objection, legal
5    conclusion.
6         THE WITNESS:  Yes.
7    BY MS. PEET:
8    Q.    Okay.
9         The first core value is
10   Catholic identity.
11        Do you see that?
12   A.    Yes.
13   Q.    Do you feel that those videos
14   upheld Marywood's Catholic identity?
15   A.    I would say the one sentence
16   there is vague to the extent that my
17   videos tried to promote intellectual
18   discourse and criticize what Marywood did
19   to not encourage intellectual values that
20   that would be part of -- that that could
21   be seen as part of the Catholic identity,
22   and I do realize that other people would
23   say no.
24   Q.    Okay.

1         Do you believe that your videos
2    upheld Marywood's respect for each person
3    core value?
4    A.    Again, respect is a vague term.
5    I can respect -- people have rights, and
6    as a human being they have certain rights.
7    On the other hand, that doesn't mean
8    there's a right not to be criticized, and
9    if one is criticized, one might be
10   offended that they're criticized.  That I
11   would say comes with the territory of
12   being a human being.
13   Q.    Okay.
14        Do you believe that with those
15   videos you were upholding Marywood's core
16   value of respect for each person?
17   A.    Yes.
18   Q.    Okay.
19        Do you believe that with your
20   videos you were upholding Marywood's core
21   value of empowerment?
22   A.    Yes.  Certainly I was the one
23   trying to empower people to be exposed to
24   ideas.

1    Q.    And do you see how other folks
2    might have watched the video and have
3    believed that the videos did not uphold
4    Marywood's core value of empowerment?
5    A.    Well, let me just read the one
6    sentence.  Empowerment says education to
7    enable access and to empower the
8    underserved to take a full role in the
9    life of the broader society.  I would say
10   that the videos -- by criticizing what
11   Marywood did with respect to the posters,
12   they were encouraging empowerment on the
13   part of students to be exposed to, in this
14   case, the speaker.
15   Q.    Okay.
16        My question to you is do you
17   see how folks that have watched those
18   videos may have concluded that they did
19   not uphold Marywood's commitment to
20   empowerment?
21   A.    No.
22   Q.    Do you believe that your videos
23   upheld Marywood's commitment to service?
24   A.    Let me read the sentence.

1    Well, rooted in the deep belief that
2    learning and scholarship serve the global
3    community is the belief in the value of
4    the diverse types of work that support
5    that service, and the preparation of
6    students for leadership by participation
7    in that service.
8         One way people got exposed to
9    ideas these days is through YouTube videos
10   and sometimes you can use comedy and
11   satire to make a point, and so you can
12   show the unempowered how they can be
13   powerful by making a video with cheap
14   software.  So I would say yes.
15   Q.    Depicting their boss as a
16   fascist Adolf Hitler?
17   A.    I wouldn't say as a fascist
18   Adolf Hitler but I would say as -- there
19   is some behavior that -- such as the
20   tearing down of posters that was
21   paralleled by behavior of the fascist.
22   Q.    Do you remember sending an
23   e-mail in which you said essentially you
24   are depicting Sister Munley as a fascist?



1      A.   She -- I can't remember the
2  exact phrase, but I think we just saw that
3  I did use that term.  I would note that I
4  did not use the term "Nazi".
5      Q.   Okay.
6          Do you believe that with your
7  videos you were upholding Marywood's core
8  value of commitment to excellence?
9      A.   Well, the videos certainly did
10  get a lot of views and certainly some
11  people did think they were excellent.
12  That's a matter of opinion as to whether
13  they were excellent or not.
14      Q.   I'll ask the question again.
15          Do you believe that the videos
16  uphold Marywood's core value of commitment
17  to excellence?
18      A.   Yes.
19      Q.   Okay.
20          You said that the videos got a
21  number of views.
22          How many views did it get?
23      A.   I believe the first video got
24  somewhere near 2,000 views, and perhaps

1  100 of them or 50 of them were by me just
2  checking to see how many views there were.
3  The second video probably got about half
4  that.
5      Q.   Did you hear from folks outside
6  the Marywood community, other than we've
7  talked about today, people that you don't
8  know that viewed the videos that reached
9  out to you?
10      A.   Let me think.
11          Would you repeat the question,
12  please?
13      Q.   Sure.
14          Did you ever hear from anyone
15  that's not affiliated with Marywood that
16  saw the videos that reached out to you,
17  other than what we have already discussed
18  today, to give you their opinion about the
19  videos?
20      A.   I believe some ex-Marywood
21  students, through the Marywood grapevine,
22  learned about the videos and saw them and
23  made a comment, and I don't recall anybody
24  without a Marywood connection contacting

1  me --
2      Q.   Okay.
3      A.   -- saying they had seen the
4  videos.
5      Q.   What kind of comments did they
6  make?
7      A.   Supportive.
8      Q.   How did they do that, by
9  e-mail?
10      A.   Was it the videos?  Let's see.
11  Let me think.  I can't remember whether it
12  was the videos now that I think about it
13  or whether it was the reaction to the
14  lawsuit.  That might have been -- I might
15  be wrong on the videos.
16      Q.   Did you send an e-mail out to
17  folks that you filed a lawsuit against
18  Marywood?
19      A.   No.  I told some friends of
20  mine that I had but I did not send out any
21  blast e-mail to anybody.
22      Q.   Again, I will tell you that the
23  next policy, 249 through 251, was not
24  provided.

1          MS. PEET:  Actually, can we
2  change this and make -- off the
3  record.
4          - - -
5          (At this time, a discussion was
6  held off the record.)
7          - - -
8          (At this time, a document was
9  marked for identification as Exhibit
10  Fagal-25.)
11          - - -
12  BY MS. PEET:
13      Q.   What has been placed before you
14  is Marywood's progressive discipline
15  policy.
16          Do you see that?
17      A.   Yes.
18      Q.   Have you seen this before?
19      A.   Yes.
20      Q.   Is it your contention that
21  Marywood violated this policy?
22      A.   Yes.
23      Q.   Why is that?
24      A.   Because the procedures weren't





Page 298

```
 1    followed as outlined in the policy.
 2        Q.   Okay.
 3            What procedures weren't
 4    followed?
 5        A.   Well, it says Marywood
 6    University endorses a progressive
 7    discipline policy designed to promote
 8    resolution in a fair and orderly manner
 9    because the university regards
10    disciplinary action is corrective and not
11    punitive, and then it talks about
12    procedures and how they commence, and meet
13    with administrator, suspension.  The
14    faculty member may be suspended by the
15    vice president for academic affairs.
16    Suspension is justified if immediate harm
17    to the faculty member or others is
18    threatened by the person's continuance.
19            So there are various procedures
20    that I don't think were followed.  No
21    remedial -- let's see.  Where's the phrase
22    here?  My suspension wasn't reviewed by a
23    committee.  As I recall, we -- various
24    issues that we raised pertaining to this
```

Page 299

```
 1    set of policies.
 2        Q.   Okay.
 3            The vice president for academic
 4    affairs, that would have been Alan Levine,
 5    correct?
 6        A.   Yes.
 7        Q.   Do you know to whom he
 8    reported?
 9        A.   I presume President Munley.
10        Q.   Okay.
11            Does it say that the faculty
12    member can only be suspended by the vice
13    president of academic affairs?
14        A.   No.
15        Q.   Okay.
16            Does it say suspension is only
17    justified if immediate harm to the faculty
18    member or others is threatened by the
19    person's continuance in the faculty
20    position?
21        A.   The word "only" does not appear
22    there.
23        Q.   Okay.
24        A.   Though it looks like a
```

Page 300

```
 1    declarative sentence.
 2        Q.   Have we exhausted all the
 3    reasons why you believe the progressive
 4    discipline policy has been violated?
 5        A.   No, because my memory is not
 6    perfect.
 7        Q.   Okay.
 8            What are the other reasons?
 9        A.   I would have to review the
10    Complaint to refresh my memory.
11        Q.   Okay.
12            So anything that's included in
13    the Complaint would you like to
14    incorporate here today for the reasons why
15    you believe the progressive discipline
16    policy was violated?
17        A.   I believe the Complaint would
18    cover these issues.
19        Q.   And by Complaint, just so we're
20    on the same page, we're referring to the
21    Amended Complaint, correct?
22        A.   That's correct.
23        Q.   Would your position at all
24    change if Dr. Levine was the one that
```

Page 301

```
 1    advised you of your suspension versus
 2    Sister Munley?
 3        A.   I believe that that would have
 4    been, shall we say, in Marywood's favor if
 5    he had been the one who had done it.
 6        Q.   Okay.
 7            How would that have impacted
 8    you?  When I mean that, who advised you of
 9    your suspension.
10        A.   Well, if Dr. Levine had been at
11    the meeting, to put this position in here
12    as being the one, the position person who
13    actually does the suspension, then that
14    would seem to follow that that would be
15    the one who would have been at the meeting
16    to do the suspending.
17        Q.   Is there a requirement that a
18    meeting like that take place prior to a
19    suspension?
20            MR. COHEN:  Objection, legal
21    conclusion.  You can answer.
22            THE WITNESS:  It says -- let's
23    see.  It says here the administrator
24    receiving the complaint shall discuss
```



1    the matter with the faculty member in
2    a confidential conference. So to me
3    that says there should be a
4    meeting --
5         MS. PEET: Okay.
6         THE WITNESS: -- with the
7    administrator.
8    BY MS. PEET:
9         Q.   And a meeting took place,
10   correct?
11        A.   We did have a meeting, yes.
12        Q.   Okay.
13             The next policy is 252 through
14   257, faculty grievances and appeals.
15             Do you see that?
16        A.   262 to 260 --
17        Q.   252. Pardon me.
18        A.   I'm sorry. 252.
19        Q.   Okay. 257.
20        A.   Okay.
21        Q.   The faculty grievances and
22   appeals.
23             Do you see that?
24        A.   Yes.

1         Q.   Do you allege that this policy
2    was violated?
3         A.   Yes.
4         Q.   And on what basis?
5         A.   There was supposed to be a
6    separate committee to hear an appeal for
7    suspension, and that meeting would have
8    been solely to deal with suspension.
9         Q.   Where does it say that there's
10   supposed to be a separate committee to
11   hear the suspension versus termination?
12        A.   Let me see. Where does it say
13   -- this is the grievances and appeals
14   section. Is there a section about the
15   suspension? I don't see where that would
16   be. Would that be under progressive
17   discipline somewhere?
18             I know it's -- I recall reading
19   somewhere that one gets a committee for
20   suspension and termination and that the
21   policy says that the committee members for
22   each committee may or may not be the same,
23   that the president of the university
24   determines whether the members of the

1    committee would be the same or not, but I
2    don't have it in front of me. I recall
3    that it's explicit that there are two
4    committees, one for suspension and one for
5    termination.
6         Q.   Okay.
7              Any other basis for your belief
8    that the faculty grievances and appeals
9    policy was violated?
10        A.   Well, the grievance committee
11   was grieving whether the procedures were
12   followed and the grievance committee said
13   they were, but we disputed that in terms
14   of there was no committee for the
15   suspension.
16        Q.   Okay.
17             Anything else?
18        A.   Not that I can recall right
19   now.
20        Q.   Okay.
21                  - - -
22             (At this time, a document was
23   marked for identification as Exhibit
24   Fagal-26.)

1                  - - -
2    BY MS. PEET:
3         Q.   After you received the first
4    letter from Sister Munley, you then
5    received another statement of charges,
6    correct?
7         A.   Yes, I believe on February 8th.
8         Q.   And I believe it was in part
9    because perhaps something was missing and
10   your attorney advised Sister Munley that
11   and she --
12        A.   Yes.
13        Q.   -- provided a more full
14   context --
15        A.   Correct.
16        Q.   -- is that correct? Okay.
17             And that's what Exhibit-26 is,
18   correct, the revised statement of charges,
19   for lack of better words?
20        A.   I see the February 8th, yes.
21        Q.   Okay. On this policy there --
22   on this packet there's a policy that was
23   not attached to the last one which is on
24   224 through 225 towards the end of your





Page 306

1   packet, Marywood University's goals and
2   objectives.
3          Do you see that?
4      A.   President's page, Marywood
5   University's goals and objectives.  Okay.
6   I see it.
7      Q.   Okay.
8          Do you believe that your videos
9   upheld what is provided here in Marywood
10  University's goals and objectives?
11     A.   I can't remember reading this.
12         May I read it now, please?
13     Q.   Of course.
14               - - -
15         (At this time, the witness
16  complies with request.)
17               - - -
18         THE WITNESS:  Okay.  I read the
19  goals and objectives.
20  BY MS. PEET:
21     Q.   Okay.
22         My question to you was do you
23  believe that the videos upheld Marywood's
24  -- Marywood University's goals and

Page 307

1   objectives?
2      A.   I don't know because, as I read
3   these, almost all of them pertain to
4   outcomes such as a majority of the
5   students who participate in service
6   opportunities in an ongoing way.  I mean
7   how the videos would support, for
8   instance, that goal, I don't know.  Maybe
9   the students would be inspired to say,
10  hey, maybe I can make a video some day and
11  maybe that would be a public service
12  video, maybe I too can use whatever.
13     Q.   Are you suggesting the Hitler
14  videos would be a PSA, a public service
15  announcement?
16     A.   No, but I'm suggesting that
17  once students see what can be done with
18  videos, they might be inspired to try it
19  themselves.  The only thing I see it
20  implies to -- the fourth bullet says
21  employer -- employees will demonstrate
22  core values in the workplace, and we've
23  already discussed those.
24     Q.   And you believe you upheld the

Page 308

1   core values in the workplace?
2      A.   I -- we went through all those
3   just a short while ago.
4      Q.   Right.
5          And the question is you believe
6   that you upheld the core values in the
7   workplace with those videos?
8      A.   Yes.  I -- yes, that's correct.
9      Q.   Okay.
10     A.   And the second set of bullets
11  there about the awareness, I don't -- I
12  just see that as being irrelevant.  The
13  next four bullet points, I don't see
14  really the relevance there.
15     Q.   Okay.
16     A.   The last bullet point on the
17  page, employees will serve as role models
18  as socially responsible leaders.  Again,
19  however one defines a socially responsible
20  leader, but I certainly tried to carry the
21  fire torch and do something I thought was
22  worthwhile.  Others might not have agreed.
23     Q.   Pun intended?
24     A.   Yes, absolutely.

Page 309

1      Q.   Okay.
2          On pages 209 --
3      A.   And -- excuse me.
4      Q.   Oh, you're not done?
5      A.   No, no.  Let me go to the last
6   one.  Challenging instructional program.
7   I just want to say that I was a
8   challenging professor.
9      Q.   Okay.
10         On pages 209 to -- bottom of
11  209 and top of 210, Sister Munley again
12  talks about that release document that she
13  attached and asked you to sign it if you
14  wanted to by Friday, February 17, 2012.
15         Do you see that?
16     A.   As I recall, it was a Hobson's
17  choice where she was trying to speed up
18  the process of terminating me, which is
19  why I was advised not to sign that.
20     Q.   Okay.
21         So is it fair to say that you
22  did not sign and return that document?
23     A.   That's correct.
24     Q.   And that document I'm referring

78 (Pages 306 to 309)


MAGNA
LEGAL SERVICES

Page 310

```
 1    to is the release of personal information
 2    authorization form.
 3         A.   Yes, yes.
 4         Q.   You talked about the fact that
 5    you had a -- you grieved your decision --
 6    the decision, correct?
 7         A.   Yes.  Excuse me.
 8         The decision to do what?
 9         Q.   The suspension and
10    recommendation to terminate your
11    employment.
12         A.   Yes.
13              - - -
14         (At this time, a document was
15    marked for identification as Exhibit
16    Fagal-27.)
17              - - -
18    BY MS. PEET:
19         Q.   Did you ever see this letter
20    before?
21         A.   I think -- I'm not sure.  I
22    believe I saw this in discovery e-mails.
23         Q.   Okay.
24         Do you have any reason to
```

Page 311

```
 1    dispute that Dr. Sadlack was the chair of
 2    the Faculty Grievance Committee?
 3         A.   No.
 4         Q.   Do you have any reason to
 5    dispute that she advised President Munley
 6    on or around March 19, 2012, that you
 7    filed a grievance and that a committee has
 8    been convened to review your complaint?
 9         A.   Yeah, that's what the letter --
10    yes.
11         Q.   Okay.
12         You have no reason to dispute
13    that, correct?
14         A.   No, no reason to disagree with
15    it.
16         Q.   And to your knowledge, a
17    committee was ultimately formed?
18         A.   To my knowledge, a committee
19    was ultimately formed.
20              - - -
21         (At this time, a document was
22    marked for identification as Exhibit
23    Fagal-28.)
24              - - -
```

Page 312

```
 1    BY MS. PEET:
 2         Q.   On this document that has been
 3    placed before you, is this set forth the
 4    grievance that -- against President Munley
 5    that you submitted to the committee?
 6         A.   Yes.
 7         Q.   Did you draft this grievance
 8    that's contained on Exhibit-28?
 9         A.   I worked on this with my
10    attorney.
11         Q.   Okay.
12         And this is the final product,
13    what you submitted?
14         A.   Yes.
15         Q.   Anyone else between -- besides
16    you and your attorney work on this?
17         A.   No.
18              - - -
19         (At this time, a document was
20    marked for identification as Exhibit
21    Fagal-29.)
22              - - -
23    BY MS. PEET:
24         Q.   Do you remember receiving this
```

Page 313

```
 1    e-mail from Dr. Sadlack informing you that
 2    they received your official grievance
 3    regarding your suspension and termination?
 4         A.   Yes, I recall this.
 5         Q.   Did -- she says if there's any
 6    additional information you would like us
 7    to consider, please let me know.
 8         Did you contact Dr. Sadlack
 9    with additional information?
10         A.   I can't recall for sure but I
11    think I did.
12         Q.   What did you provide?
13         A.   At some point, I believe I
14    submitted the explanation of the
15    scene-by-scene videos.
16         Q.   And that's what we discussed
17    earlier today, right?
18         A.   What we discussed earlier, at
19    least you had a copy of it, but I cannot
20    remember exactly whether it was this
21    committee or another committee that got
22    those.
23         Q.   Okay.
24         Do you know whether or not the
```

79 (Pages 310 to 313)





1    grievance committee met to discuss your
2    grievance?
3        A.   I don't know for a fact.  I was
4    told they met and discussed the grievance.
5    I got a report that they discussed the
6    grievance.
7        Q.   Were you involved at all in
8    their decision-making or thought process?
9        A.   I wasn't involved in their
10   thought process or decision-making, no.
11       Q.   Okay.
12            To your knowledge, did the
13   grievance committee ultimately make a
14   decision with reference to your grievance?
15       A.   The grievance committee
16   informed me by an e-mail that they
17   examined the grievance and found it
18   wanting and...
19                 - - -
20            (At this time, a document was
21       marked for identification as Exhibit
22       Fagal-30.)
23                 - - -
24   BY MS. PEET:

1        Q.   Is this the e-mail that you
2    received from Dr. Sadlack with reference
3    to the grievance committee's findings?
4        A.   Yes.  This is what I was just
5    referring to.
6        Q.   Okay.
7            And she writes we have found no
8    evidence of improper action on President
9    Munley's part which would constitute a
10   legitimate grievance.
11            Do you see that?
12       A.   I see that.
13       Q.   Do you disagree with
14   Dr. Sadlack and the committee's decision?
15       A.   Yes.
16       Q.   Okay.
17            And what do you disagree with?
18       A.   Well, she mentions the five
19   things here; the issue of which individual
20   was doing the suspending, whether I was a
21   cause of immediate harm to myself or
22   others, whether there was no progressive
23   discipline in the sense of a chance for
24   any remediation, and then the last one is

1    about there being no specific committee to
2    deal with the appropriateness of the
3    suspension.
4        Q.   Okay.
5            So you disagreed with the
6    grievance committee's findings?
7        A.   Yes.
8        Q.   Did Sister Munley sit on the
9    grievance committee, to your knowledge?
10       A.   I don't know.
11       Q.   Do you have any --
12       A.   I don't -- I don't --
13       Q.   -- knowledge that she did?
14       A.   No knowledge that she did.  I
15   don't know if there's any contact.  I
16   don't know.
17       Q.   Do you -- same question for
18   Dr. Levine.
19            Do you have any knowledge of
20   whether or not he sat on the committee?
21       A.   No knowledge.  I presume he did
22   not.
23       Q.   Okay.
24            Likewise, do you presume Sister

1    Munley did not sit on the committee?
2        A.   I presume she was not an
3    official committee member.
4        Q.   Is it fair to say that Sister
5    Munley did not stop you from filing a
6    grievance?
7        A.   That would -- Sister Munley did
8    not stop me from filing a grievance.
9                 - - -
10            (At this time, a document was
11       marked for identification as Exhibit
12       Fagal-31.)
13                 - - -
14   BY MS. PEET:
15       Q.   What has been marked as
16   Exhibit-31 is -- are e-mail exchanges
17   between you and Dr. Sadlack about your
18   grievance.
19            Do you see that?
20       A.   Yes.
21       Q.   Do you remember having these
22   e-mails with Dr. Sadlack?
23       A.   Let me look at them.  Yes, on
24   the first page here.

80 (Pages 314 to 317)



1      Q.   If you look at document DEF295,
2    which is towards the end.
3      A.   295, okay.
4      Q.   Which is an e-mail -- the top
5    one is an e-mail from Erin to you dated
6    March 29, 2012, at 5:03 p.m.
7           Do you see that?
8      A.   It's from Sister Gail Cabral to
9    me.  Oh, wait, wait.  I'm sorry.
10     Q.   She's copied on the letter.
11     A.   Wait, wait.  I'm sorry.  I'm
12   sorry.  That was -- right.  From the
13   bottom of the previous page, it's from
14   Sadlack to me with a copy to Cabral,
15   right.
16     Q.   Okay.
17     A.   So dear Fred, okay.
18     Q.   She says -- she being Erin says
19   all I can do is say what I did in the
20   letter, that we checked the policy wording
21   carefully and did not find a violation of
22   procedure in any of the five instances you
23   grieved.
24          Do you see that?

1      A.   Yes.
2      Q.   She also wrote in addition, the
3    policy manual states that the findings of
4    the grievance committee cannot themselves
5    be grieved.
6           Do you see that?
7      A.   Yes.
8      Q.   Do you disagree with that?
9      A.   No.
10     Q.   And then she then writes please
11   note that our findings do not preclude
12   your appealing the termination itself
13   through an ad hoc committee as outlined in
14   the progressive discipline policy.
15          Do you see that?
16     A.   I see that.
17     Q.   And then it says if you want to
18   do that, you need to contact Sister Gail
19   Cabral as faculty senate president to
20   exercise that option.
21          Do you see that?
22     A.   Yes.
23     Q.   And in fact Sister Cabral is
24   copied on that e-mail, correct?

1      A.   Yes.
2      Q.   Did you then request an ad hoc
3    committee be put together to review Sister
4    Munley's decision?
5      A.   Sister Munley's decision to?
6      Q.   Suspend and term -- and
7    recommend your termination of employment.
8      A.   Yes.
9           - - -
10          (At this time, a document was
11    marked for identification as Exhibit
12    Fagal-32.)
13          - - -
14   BY MS. PEET:
15     Q.   Exhibit-32 is an e-mail from
16   you to Sister Munley regarding your
17   request for an ad hoc faculty committee,
18   correct?
19     A.   Correct.
20     Q.   And it's dated March 29, 2012,
21   correct?
22     A.   Correct.
23     Q.   Was your request granted?
24     A.   Yes.

1      Q.   Did anyone assist you in
2    drafting that letter?
3      A.   This letter here?  I believe my
4    -- consulted with my attorney.
5      Q.   Okay.
6           - - -
7           (At this time, a document was
8    marked for identification as Exhibit
9    Fagal-33.)
10          - - -
11   BY MS. PEET:
12     Q.   Do you recall receiving this
13   letter from Sister Munley dated April 3,
14   2012?
15     A.   Yes.  I recall receiving this
16   letter.
17     Q.   Okay.
18          And she has agreed to convene
19   an ad hoc committee to appeal the
20   decisions, correct?
21     A.   Let me see here now.  This is
22   April 3rd and the second sentence says
23   chose to file a grievance under the
24   Marywood University grievance and appeals



Page 322

1   policy.  That part of the statement is
2   true.
3       Q.   Okay.
4       A.   Chose not to convene an ad hoc
5   committee to review my recommendations as
6   I had offered you on two occasions.  I
7   presume there's talking about those
8   two cases where, as I put it, she was
9   trying to speed up the policy.
10      Q.   The release documents?
11      A.   Speed up the release documents,
12  that's correct.
13      Q.   And you agree you did not --
14      A.   I did not --
15      Q.   -- sign and submit them?
16      A.   -- sign those, that's correct.
17      Q.   Okay.
18      A.   Faculty Grievance Committee
19  reviewed your grievance, found no evidence
20  of improper action on my part.  Okay.  And
21  she said the grievance process is now
22  complete, decide to finalize my
23  recommendation.  As a result, your
24  employment with Marywood and your tenure

Page 323

1   are terminated effective today, April 3,
2   2012.
3       Q.   Okay.
4       A.   Okay.
5            So at this point I am done.
6       Q.   Okay.
7            She tells --
8       A.   And then she offers a chance to
9   review what has been said is a -- really a
10  final recommendation.
11      Q.   Okay.
12      A.   But she did terminate me.  She
13  says I am terminated as of April 3rd.
14      Q.   Okay.
15           Did you select a tenured
16  faculty member to be included on the ad
17  hoc committee?
18      A.   Yes.
19      Q.   And did you submit a name to
20  Sister Cabral?
21      A.   Yes.
22      Q.   And did you choose Ed O'Brien?
23      A.   Yes.
24      Q.   And was Ed O'Brien indeed

Page 324

1   selected to the committee?
2       A.   Yes.
3       Q.   Why did you choose Ed O'Brien?
4       A.   I'd known him for many years.
5   I knew he was intelligent and I knew he
6   had -- we worked together on the academic
7   commuting -- computing committee, and so I
8   had worked with Ed before and I knew that
9   he would probably be -- because of his
10  status he would be allowed to be chosen.
11           - - -
12           (At this time, a document was
13           marked for identification as Exhibit
14           Fagal-34.)
15           - - -
16  BY MS. PEET:
17      Q.   Did you receive this e-mail
18  from Sister Cabral on April 30, 2012?
19      A.   Let me see.  I -- yes, I did
20  receive this.
21      Q.   Did you assert any objection to
22  Dr. Bittel and Mr. Povse being selected as
23  the other individuals on the committee?
24      A.   I did not, but at the time I --

Page 325

1   looking back, I might wish I had grieved
2   one of them.
3       Q.   Okay.
4            Why is that?
5       A.   Mr. Povse, who I do not know --
6   I believe he's a tenured professor, of
7   course, but his wife has a -- had a
8   nontenured position at Marywood.  And so
9   looking back after I learned that, I
10  thought there might have been a little
11  conflict of interest there because if the
12  committee didn't come up with the approved
13  decision and President Munley, let's say,
14  found out that Mr. Povse had supported me,
15  that might not have been good for his
16  wife.  I'm not saying that would have
17  happened.  I'm just saying there would be
18  what they call a potential conflict of
19  interest.
20      Q.   Okay.
21           And, again, you didn't assert
22  any objection, correct?
23      A.   I did not, no.  I did not know
24  that relationship at the time.

82 (Pages 322 to 325)



Page 326

1    MS. PEET: Okay. Let's change
2 the tape.
3    THE VIDEOGRAPHER: We're now
4 off the record. The time is 4:52
5 p.m. This ends disk number three.
6    - - -
7    (At this time, a short break
8 was taken.)
9    - - -
10    THE VIDEOGRAPHER: We are now
11 on the record. The time is 4:57 p.m.
12 This starts disk number four.
13    - - -
14    (At this time, a document was
15 marked for identification as Exhibit
16 Fagal-35.)
17    - - -
18 BY MS. PEET:
19    Q.   Did you prepare this e-mail to
20 Alan Levine dated April 25, 2012?
21    A.   Did I prepare? Would you
22 rephrase the question?
23    Q.   Did you draft this e-mail?
24    A.   I believe I worked on this with

Page 327

1 my lawyer.
2    Q.   Okay.
3       Anyone else?
4    A.   No.
5    - - -
6    (At this time, a document was
7 marked for identification as Exhibit
8 Fagal-36.)
9    - - -
10 BY MS. PEET:
11    Q.   Did you draft this e-mail and
12 the document to be sent to the ad hoc
13 committee?
14    A.   This is the May 6, 2012, one,
15 Exhibit --
16    Q.   Correct.
17    A.   -- 36?
18    Q.   Uh-huh.
19    A.   Yes.
20    Q.   Okay.
21       And you write that the
22 progressive discipline policy doesn't
23 provide for the person charged with the
24 chance to present a defense but,

Page 328

1 nonetheless, you decided to submit a
2 written defense to the charges, agreed?
3    A.   Yes. I thought it was -- yes.
4    Q.   Okay.
5       Did anyone help you draft this?
6    A.   Yes.
7    Q.   All right.
8       And who was that?
9    A.   It would have been Jonathan
10 Cohen, my lawyer.
11    Q.   Anyone else?
12    A.   No.
13    - - -
14    (At this time, a document was
15 marked for identification as Exhibit
16 Fagal-37.)
17    - - -
18 BY MS. PEET:
19    Q.   Why did you e-mail the ad hoc
20 committee on May 23, 2012, about your
21 personnel file?
22    A.   As I read here, it says I've
23 given Patricia Dunleavy permission to
24 release the new documents in my personnel

Page 329

1 file. As I recall, my personnel file was
2 released earlier in the semester or in the
3 year and later on Marywood discovered that
4 not all relevant items that they found,
5 wherever they found them, had been turned
6 over. And so Patricia Dunleavy sent me an
7 e-mail asking if she could release those
8 documents.
9    Q.   Did you have any concern that
10 the committee would consider previous
11 disputes that you had with the university
12 in making its decision?
13    A.   I was only concerned in the
14 sense that I would hope they would look
15 at, you know, the surrounding details of
16 what had occurred and not just say, oh, he
17 got called on the carpet three times, so
18 he must be a bad boy.
19    Q.   Do you agree that you had
20 previous disputes with Marywood
21 administration involving the issue of free
22 speech?
23    A.   Yes.
24    Q.   And would you agree that with

83 (Pages 326 to 329)



1   those previous issues you've had, you were
2   never terminated?
3       A.   Correct.
4       Q.   Would you agree that the
5   previous disputes that you had with
6   Marywood about free speech but they never
7   suspended you?
8       A.   That's correct.
9       Q.   To your knowledge, was an ad
10  hoc committee -- I believe you testified
11  the ad hoc committee was ultimately
12  formed --
13      A.   Yes.
14      Q.   -- per your request, correct?
15      A.   An ad hoc committee was formed
16  to examine my -- I believe the phrase was
17  termination and suspension.
18      Q.   Okay.
19           And, to your knowledge, did the
20  committee make a decision?
21      A.   Yes.
22      Q.   And what was that decision?
23      A.   That I should be terminated.
24      Q.   To your knowledge, did Sister

1   Munley sit on that ad hoc committee?
2       A.   Not to my knowledge.
3       Q.   To your knowledge, did
4   Dr. Levine sit on that committee?
5       A.   Not to my knowledge.
6       Q.   There were three members on
7   that committee, correct?
8       A.   Correct.
9       Q.   And you selected one of those
10  members, correct?
11      A.   Correct.
12           - - -
13           (At this time, a document was
14      marked for identification as Exhibit
15      Fagal-38.)
16           - - -
17  BY MS. PEET:
18      Q.   Did you ever see the ad hoc
19  committee's findings with reference to
20  your employment and tenure at Marywood?
21      A.   I saw them recently in
22  discovery.
23      Q.   Okay.
24           Would you agree that this is

1   the second committee that was formed about
2   your suspension and termination and they
3   found no wrongdoing on Munley's part?
4       A.   I recall a grievance committee
5   and the ad hoc committee but not a
6   committee for the suspension.
7       Q.   Okay.
8            Both the grievance committee
9   and the ad hoc committee both concluded no
10  wrongdoing on Sister Munley's part,
11  correct?
12      A.   I believe the charge for the
13  grievance committee was to see whether
14  procedures had been followed correctly and
15  there was found no wrongdoing by President
16  Munley's part.  The ad hoc committee was
17  not, I believe, examining whether Anne
18  Munley did anything wrong but whether I
19  did anything wrong.  So...
20      Q.   And did the ad hoc committee
21  find that you did anything wrong?
22      A.   Yes.  They terminated -- they
23  agreed with her decision to terminate me.
24      Q.   Okay.

1            And the folks on the ad hoc
2   committee were different people than were
3   on the grievance committee?
4       A.   I believe they were all
5   different, yes.
6            - - -
7            (At this time, a document was
8       marked for identification as Exhibit
9       Fagal-39.)
10           - - -
11  BY MS. PEET:
12      Q.   Did you send this e-mail to the
13  ad hoc faculty committee on July 6, 2012?
14      A.   I sent this, yes.
15      Q.   If the ad hoc committee agreed
16  that you should have been terminated, what
17  does it matter whether or not your
18  suspension was justified?
19      A.   Well, procedures say first
20  things first.  As part of the sequence,
21  you do the suspension and then you see if
22  there's any hope for remediation or any
23  change that would maybe be satisfactory to
24  the university from their point of view



1  and then go on from there.
2      Q.   If a committee who was formed
3  to determine whether or not your behavior
4  warranted termination determined that your
5  behavior in fact warranted termination,
6  wouldn't a committee to review the
7  suspension based on the exact same conduct
8  be moot?
9      A.   I don't know if it'd be moot
10  because if -- you might have somebody --
11  if I could -- let's say somebody was
12  accused of -- being a faculty member, they
13  were accused of absconding funds from
14  clubs treasury, and so there's enough
15  evidence that came out and somebody says
16  well, let's suspend professor -- this
17  professor for doing this.
18         So let's say there was some
19  evidence of irregularities on that
20  committee.  I might say, okay, this person
21  is not a harm to anybody.  We don't see
22  this is going to affect the teaching.
23  Let's see where it goes.  And so the
24  professor does not get suspended and then

1  it comes out that he or she had in fact
2  squirrelled away not just 50 bucks that he
3  forgot about recording but had been taking
4  a lot off the top for years, then that
5  could be grounds for terminating even
6  though the person was not suspended
7  initially.
8         And you could have -- of course
9  if it says do the suspension and do the
10  termination, if it was an egregious case
11  you could say we'll have a suspension
12  hearing today and a termination hearing in
13  the afternoon, so we'll go morning,
14  afternoon.  We'll suspend and then we'll
15  terminate and we'll follow our laws on the
16  same -- our procedures on the same
17  evidence, but at least you would follow
18  procedures of doing the suspension first
19  and then the termination.
20      Q.   If a -- if a committee
21  determines that your termination was
22  justified on the same conduct for which
23  you were suspended, why would a committee
24  need to be formed to review your

1  suspension?  What substantively and --
2      A.   There was no --
3      Q.   -- purpose would that serve?
4      A.   -- committee to -- I was
5  suspended and I was not allowed to have a
6  committee to review the suspension.
7      Q.   If a committee -- and that's
8  not my question.
9      A.   Okay.
10      Q.   If a committee substantively
11  looks at your termination and concludes
12  that your termination was appropriate --
13      A.   Okay.
14      Q.   -- which has happened here,
15  correct?
16      A.   Okay.
17      Q.   Agreed?
18      A.   Agreed.
19      Q.   Then why have a committee
20  review your suspension which is a lesser
21  offense based on the exact same conduct?
22  What purpose would that serve?
23      A.   The purpose it would serve
24  would be following the agreed procedures.

1      Q.   Any other purpose?
2      A.   I'll say no.
3      Q.   Okay.
4         What damages did you incur from
5  a committee that upheld a termination of
6  employment but, in your opinion, didn't
7  look at your suspension?
8      A.   The damages would be somebody
9  thinking they did not get a fair -- a fair
10  deal.  They did not have the -- should we
11  say the law it followed which by itself is
12  -- is not -- not right.
13      Q.   Any other damages?
14      A.   Do you mean financial damages?
15      Q.   I'm asking you.
16      A.   I don't know.
17      Q.   Okay.
18      A.   If I might say -- can I amend
19  my answer a little bit?
20      Q.   Sure.
21      A.   By not having a suspension,
22  there was no chance for remediation and
23  that -- with remediation then perhaps an
24  agreement could have been -- you know,



1  then maybe I would not have been
2  terminated.
3          - - -
4          (At this time, a document was
5  marked for identification as Exhibit
6  Fagal-40.)
7          - - -
8  BY MS. PEET:
9      Q.   Did you receive this July 13,
10  2012, letter from Sister Munley to you?
11     A.   Yes.
12     Q.   She says here that this was the
13  second independent tenured faculty review
14  accorded to you.  Both faculty committees
15  concurred with my decision.
16          Is that a true statement?
17     A.   I -- the two committees we're
18  presuming here are the grievance committee
19  and the ad hoc committee on the
20  termination, yes.
21     Q.   And is that an accurate
22  statement?
23     A.   Yes.
24     Q.   Okay.

1          She then says my decision to
2  terminate your employment with Marywood
3  University and your tenure effective
4  April 3, 2012, stands.
5      A.   Yes.
6      Q.   Do you see that?
7      A.   Uh-huh.
8      Q.   Are you currently employed?
9      A.   No.
10     Q.   Have you looked for a job since
11  your termination of employment at
12  Marywood?
13     A.   Yes.
14     Q.   Okay.
15          When was the first time you
16  looked for a job?
17     A.   I was looking at newspaper
18  advertisements in the Syracuse newspaper
19  in the fall of 2012.
20     Q.   Did you apply for any jobs?
21     A.   No.  I didn't see any that were
22  applicable.
23     Q.   Other than in the Syracuse
24  newspaper, did you look at any other

1  newspapers, Web sites?
2      A.   My son was in the job market at
3  the time, so I knew that there were Web
4  sites.  So I would go to the -- I think
5  Inside Higher Education had some and the
6  Chronicle of Higher Education had some job
7  things, and I would look through -- look
8  through those and there were big -- big
9  listings, and then at some point in 2013 I
10  saw the Chronicle of Higher Education had
11  a service where you could -- you would
12  sign up, you would say you were, let's
13  say, an art professor looking for jobs in
14  the Rochester, New York, vicinity within a
15  certain radius.  So I signed up to get the
16  Chronicle of Higher Education job
17  announcements.
18     Q.   Okay.
19          Did you -- you have produced
20  documents in this case about job postings
21  that I guess you saw following your
22  termination of employment.
23          Have you produced, to the best
24  of your knowledge, all documents that

1  evidence job search efforts that you've
2  undergone since your employment at
3  Marywood was terminated?
4      A.   Yeah.  I don't -- I don't have
5  -- when I would look through the
6  classified ads in the Syracuse newspaper,
7  I did not keep a record of that, but since
8  2013 there's a record.
9      Q.   Okay.
10          And everything that you have
11  has been produced?
12     A.   Yes.
13     Q.   Okay.
14          Approximately how many -- how
15  much time per week beginning in the fall
16  of 2012 did you spend trying to find a
17  job?
18     A.   Those e-mail announcements
19  would come out probably weekly.  Sometimes
20  you get two a week.  It would depend
21  perhaps on the season, and I would read
22  those and scroll down the list depending
23  how long the list was and that was
24  probably -- to look at that list and I'd




Page 342

1  open the e-mail, you know, five or ten
2  minutes, read -- read the description, see
3  if anything looked promising.
4      Q.   Did you spend more or less than
5  one hour a week since the fall of 2012
6  looking for a job?
7      A.   It would probably be about --
8  it would be less than one hour.
9      Q.   Okay.
10         What were you doing with all of
11 your spare time?
12     A.   I did have some employment at
13 the YMCA as a lifeguard instructor and
14 teaching even swim classes.  That's
15 tapered off recently with a different
16 aquatics director.
17     Q.   Approximately how much money
18 did you earn from the YMCA?
19     A.   Depending on the year, I'd have
20 to look.  I think I have maybe -- maybe
21 about $500.00.
22     Q.   You're an avid swimmer,
23 correct?
24     A.   Yeah.  I swim regularly to try

Page 343

1  to stay in shape.
2      Q.   Did you ever refer to students
3  as thunder thighs and in words or
4  substance tell them that they probably
5  should spend more time in the pool than in
6  your class?
7      A.   I saw that, and the answer
8  would be I would have to say I never told
9  a student that they should do that.
10         Would you repeat the question,
11 please?
12     Q.   Sure.
13         Did you ever call any students
14 thunder thighs?
15     A.   No.
16     Q.   Did you ever use the word
17 "thunder thighs"?
18     A.   I don't recall but I really
19 don't think so.
20     Q.   Okay.
21         So if a student said that you
22 did, they would be lying?
23     A.   Depends how they told the
24 story.  I could tell you how I can

Page 344

1  conceive how I could have said it.
2      Q.   Why don't you tell us.
3      A.   The Complaint I read just
4  recently -- and I was surprised to read it
5  -- was from two students, one name was
6  Callahan and I can't remember the other.
7      Q.   You don't need to mention the
8  students on the record.
9      A.   Okay.
10         And there was a complaint along
11 the lines you said, and I'm thinking this
12 is during the -- this is in August.  It
13 would be the first week of class.  I
14 wouldn't even know any students, and I
15 said could I have said that.  Number one,
16 I'd say I would never have said that to a
17 student.
18         Number two, if I had said that,
19 it could have been -- and I don't say -- I
20 don't think I did this, but it would have
21 been along the lines of this is
22 introduction to social science, we're
23 going to examine human behavior, and it
24 comes from many different sources, shall

Page 345

1  we say.  One of those sources that people
2  might have their behavior changed would be
3  by economic incentives, and I'm trying to
4  conceive how I could possibly have said
5  such a thing.
6          I might have said some
7  employers now even have wellness plans
8  where they will subsidize your gym
9  membership.  Again, this would be me
10 speaking in front of a whole class, and I
11 can conceive of myself as saying so the
12 incentive -- you know, the employers want
13 employees to lower health costs, and lose
14 weight, and lose -- you know, lose your
15 thunder thighs.  So you go to the -- you
16 know, you're pool membership would be
17 subsidized.
18         So it would have been -- if I
19 had said such a thing, it would have been
20 a very general context such as that.  I
21 would never have said to a student, you
22 have thunder thighs, you should go
23 swimming and not come to class.  That --
24 no.



1     Q.   Do you dispute that students
2  made that complaint to the university?
3     A.   The little bit I read seemed to
4  me as if the students were in some sort --
5  had been in some sort of trouble
6  themselves, that they had violated some
7  university rules and were consulting with
8  somebody, I think, from student activities
9  and there's some sort of conversation.  So
10  whether -- what the motives of the
11  students to say such a -- such a thing was
12  I have no idea.
13     Q.   Do you know whether or not the
14  university had problems enrolling students
15  in your class?
16     A.   Yes.
17     Q.   Okay.
18         Why do you think that was?
19     A.   Well, I was probably the
20  hardest grader on campus, perhaps the
21  hardest grader, and so sometimes if one
22  can take a course and avoid -- you know,
23  get a better grade off campus than on
24  campus then I understand that incentive.

1     Q.   Are you aware of a Muslim
2  student complaining -- filing a civil
3  complaint against you about a cartoon that
4  you posted on your door?
5     A.   Yes.
6     Q.   And what was the cartoon about?
7     A.   The cartoon -- well, there was
8  -- there as a famous cartoon about the
9  Muhammad bomb cartoon where the Danish
10  embassies were bombed because
11  Jyllands-Posten had posted a -- had
12  published drawings of Muhammad, and over
13  the years I would often have news stories
14  on my door of various -- various kinds,
15  and this was a news story.  I had that on
16  my door.
17         I had -- in terms of cartoons,
18  there was another one I might have had --
19  I don't know which -- I can't remember
20  which cartoon he was complaining about
21  specifically at this point.  That might
22  have been it.
23     Q.   Is there a lot of them?
24     A.   At one point, I might have had

1  a -- again, a newsworthy cartoon by
2  another European person.  I had a joke I
3  think he was -- Akhar(ph) was complaining
4  about.  It was a -- it wasn't a cartoon.
5  It was a photograph of about eight nuns
6  from 1958 or so, based on their hats, and
7  they were all carrying 22 rifles.  They
8  had been to the rifle range or something,
9  and so I had a joke up there about Islamic
10  terrorists, radical Muslim committed a
11  suicide bombing and died himself.  These
12  would be the 72 virgins he would see in
13  heaven.
14     Q.   Do you understand how a Muslim
15  could be offended by that?
16     A.   Yes, I guess I do.
17     Q.   In your complaint, part of the
18  relief that you ask for is to be returned
19  to Marywood.
20         Is that something you want?
21     A.   As I get older -- you know, if
22  I did go back, it would be for probably a
23  couple of years because I'm 70 years old
24  now, but I would do it.

1             - - -
2         (At this time, a document was
3     marked for identification as Exhibit
4     Fagal-41.)
5             - - -
6  BY MS. PEET:
7     Q.   Who's Linda Rose?
8     A.   Linda Rose is my -- one of my
9  two sisters.
10     Q.   Okay.
11         And you're e-mailing with her
12  on June 6, 2012.
13         Do you see that?
14     A.   Uh-huh.
15     Q.   And sort of in the middle of
16  the page you write to her I don't really
17  want the job back but part of me would
18  love to go back to work for even just a
19  year just to say -- in caps -- fuck you, I
20  won.
21         Do you see that?
22     A.   Let me see.
23         Now, where are we?
24     Q.   The middle of the page.



Page 350

1      A.   Yes.  I don't really want the
2  job but part of me -- right.  You know,
3  with all the hassles, there's certain bad
4  parts about going back to work but part of
5  me would love to go back to work for even
6  just a year just to say what I -- what's
7  here.
8      Q.   The fuck you, I won?
9      A.   Fuck you, I won.
10     Q.   And the job that you're talking
11 about there, that would be the Marywood
12 University job --
13     A.   Yes.
14     Q.   -- correct?
15     A.   That's correct.
16               - - -
17          (At this time, a document was
18     marked for identification as Exhibit
19     Fagal-42.)
20               - - -
21 BY MS. PEET:
22     Q.   Who is Jeffy Benedict?
23     A.   She's my other sister.
24     Q.   Okay.

Page 351

1          You e-mail Jeffy on
2  December 25, 2011, at 9:40 p.m., so
3  Christmas 2011.
4          Do you see that?
5      A.   Yes.
6      Q.   The bottom e-mail, and you
7  write to her, hi, Jeffy, just in case I
8  need or want one, please see if Jim can
9  come up with a few names of good labor,
10 dash, employment law lawyers, dash, firms
11 in PA, period.
12     A.   Yes.
13     Q.   Do you see that?
14     A.   I do see that.
15     Q.   Okay.
16          And who is Jim?
17     A.   Jim is Jim Benedict.
18     Q.   Would that be her husband?
19     A.   That's her husband, yes.
20     Q.   Your brother-in-law?
21     A.   My brother-in-law.
22     Q.   Okay.
23          And then her response is right
24 above that.

Page 352

1          Do you see that?
2      A.   Yes.
3      Q.   And she wrote, Fred, I asked
4  Jim -- her husband, correct?
5      A.   Yes.
6      Q.   And he has no clue about any
7  labor lawyers in Penn --
8      A.   Right.
9      Q.   -- period.
10          And Penn I would assume is
11 Pennsylvania --
12     A.   Pennsylvania, uh-huh.
13     Q.   -- correct?  Okay.
14          And then she -- and I know he
15 thinks this is a little nuts at your age,
16 period.
17     A.   Right.
18     Q.   Okay.
19          He does not want to get
20 involved in any way in this one.
21     A.   Right.
22     Q.   See that?
23     A.   Uh-huh.
24               - - -

Page 353

1          (At this time, a document was
2     marked for identification as
3     Exhibit-43.)
4               - - -
5  BY MS. PEET:
6      Q.   Why were you inquiring about a
7  labor or employment lawyer in December of
8  2011?
9      A.   Because I had started to work
10 on the videos and I realized that they
11 might be problematic.
12     Q.   And you might need a lawyer?
13     A.   If worse came to worst.
14     Q.   Okay.
15          Exhibit-43 seems to be a letter
16 that you sent to Onondaga Community
17 College --
18     A.   Yes.
19     Q.   -- on January 11, 2013.
20          Do you see that?
21     A.   Correct.
22     Q.   Okay.
23          And in the first introductory
24 paragraph, you tell the community college

89 (Pages 350 to 353)


MAGNA
LEGAL SERVICES

Page 354

1  that you got fired last year over a free
2  speech issue and then direct them to your
3  resume for more information.
4        Do you see that?
5     A.   Yes.
6     Q.   Was that your practice to tell
7  any college or university to whom you were
8  seeking employment about this free speech
9  issue for which you got fired over at
10  Marywood, in your opinion?
11     A.   Well, this is a sample of one,
12  so this was my practice because this was
13  the only application that got this far.
14     Q.   Okay.
15        Would you agree with -- that
16  this is the only application you submitted
17  to any university or college since April
18  of 2012?
19     A.   Yes.
20                 - - -
21        (At this time, a document was
22    marked for identification as Exhibit
23    Fagal-44.)
24                 - - -

Page 355

1  BY MS. PEET:
2     Q.   Would you agree that this is
3  the resume that you submitted to Onondaga
4  Community College?
5     A.   Yes.  This seems to be part of
6  their online application form as I recall.
7     Q.   Okay.
8        And on the third page of this
9  document, it's a one-page resume from you.
10        Do you see that?
11     A.   Yes.
12     Q.   And the second to last
13  paragraph is called other perhaps of
14  interest.
15     A.   Yes.
16     Q.   Do you see that?
17     A.   Uh-huh.
18     Q.   And then you talk about the
19  poster, and this YouTube videos, and your
20  firing.
21        Do you see that?
22     A.   Yes.
23     Q.   Do you think it's a good
24  practice to include that in a resume for

Page 356

1  employment?
2     A.   I think it shows honesty and it
3  doesn't hide anything.  If I was an
4  employer and somebody applied and they did
5  not include that, and then the employer
6  Googles the person and says what the heck
7  is going on here, why didn't you tell me
8  about that.  I thought it was better to be
9  honest and straightforward.
10     Q.   Okay.
11        Did you receive any call back
12  or interview from the community college?
13     A.   Not to go in for an interview.
14  I think it might have been some form.  I
15  can't recall anything special.
16     Q.   Okay.
17        Do you know why it is that they
18  didn't pursue you further?
19     A.   I was really looking for a
20  full-time job and this might -- they might
21  have gone with adjuncts cheaper.  I don't
22  know.  Because I had worked there before,
23  so I figured they knew me.  So that was...
24                 - - -

Page 357

1        (At this time, a document was
2    marked for identification as Exhibit
3    Fagal-45.)
4                 - - -
5  BY MS. PEET:
6     Q.   Would you agree this is an
7  e-mail between you and Bill Ziegelbauer,
8  February 5, 2015?
9     A.   Yes.
10     Q.   Okay.
11        And if you look down at the
12  bottom of the first page, the paragraph
13  says I am probably overdoing this, Rule 26
14  damages stuff.
15        Do you see that?
16     A.   Yeah, bottom of the first --
17     Q.   First page.
18     A.   -- page.  Oh, yeah.
19     Q.   I'm going to read --
20     A.   The paragraph, yes.  I'm
21  probably overdoing this, uh-huh.  I see
22  that.
23     Q.   I am probably overdoing this
24  Rule 26 damages stuff, but at the worst I



Page 358

1    will make the other side spend a lot of
2    hours poring through what I have done.
3    What's the old phrase?  Baffle them with
4    bullshit and bury them in paper.
5        A.   Yes.
6        Q.   Was that your litigation
7    strategy here?
8        A.   No.
9        Q.   Were you trying to bury them in
10   paper and baffle them with bullshit to
11   increase Marywood's litigation costs?
12       A.   No.
13       Q.   Were you trying to make the
14   other side spend a lot of hours poring
15   through what they have done so we can --
16   Marywood can spend more money on this
17   litigation?
18       A.   No.
19       Q.   What were you saying here?
20       A.   I was developing a
21   comprehensive report about the damages and
22   I was using every economist skill I had to
23   make spreadsheets that clearly were
24   commented and explained all the details of

Page 359

1    each calculation of damages, and the basic
2    report, you know, with revisions is about
3    42 pages not including appendixes, but the
4    reference here to baffle them with
5    bullshit is -- it's a joke, obviously, but
6    it refers -- I'm really referring to the
7    fact that probably most lawyers are not
8    economists and when they read my Rule 26
9    damages computation report, if they wanted
10   to truly understand it -- but I tried to
11   make it as clear as possible, but if they
12   wanted to truly understand where each
13   figure came from, they would need good
14   spreadsheet skills and that would take a
15   lot of good effort on their part, and
16   that's what I was referring to.
17       Q.   Do you understand how people
18   just might not get your humor?
19       A.   Yes.  If you look at the next
20   sentence, but on the other hand, I want to
21   early on put the best foot forward.
22       Q.   Right.
23            But if you read the sentence
24   before, it says I want to make the other

Page 360

1    side spend a lot of hours poring through
2    what I have done.
3        A.   Right.  Because the way I
4    understand litigation on this end, it
5    would be if it comes toward trial, let's
6    say, then when it comes to economic
7    damages one would be hiring forensic
8    economics experts and they're not cheap.
9    I know that.
10           And so I wanted to do all the
11   heavy duty forensic economic type work
12   that could possibly be done by me, get it
13   done early, and so the Rule 26 damages
14   computation report would be as complete as
15   possible, really complete.  And then I was
16   hoping further on down the road that
17   perhaps a forensic expert might look at
18   what I did and say, oh, Fagal has done
19   most of my homework.  It will take me many
20   fewer hours, therefore, to write up a
21   report that I can present as something I
22   would testify to as my analysis.  And so I
23   was trying to do huge amounts of work
24   ahead of time.

Page 361

1        Q.   How much have you spent in
2    litigation fees to date?
3            MR. COHEN:  No, don't answer
4    that.
5            MS. PEET:  Are you instructing
6    him not to answer?
7            MR. COHEN:  Can we go off the
8    record for a second?
9            MS. PEET:  Sure.
10           - - -
11           THE VIDEOGRAPHER:  We are now
12   off the record.  The time is 5:35
13   p.m.
14           - - -
15           MR. COHEN:  Can I just get a
16   sense of what the purpose of your --
17   this question is?
18           MS. PEET:  Which question?
19           MR. COHEN:  How much have you
20   spent on litigation fees.
21           MS. PEET:  Because it goes --
22   if you read the thousands of
23   documents he's produced, he talks
24   about the fact that he's -- what his

91 (Pages 358 to 361)



Page 362

1    budget is going to be in order to
2    make Marywood spend as much as
3    possible; hence, baffle them with
4    bullshit and bury them in paper.
5         If you're instructing him not
6    to answer, that's fine. We can take
7    it up with the court if necessary.
8    That's up to you.
9         MR. COHEN: I'm instructing you
10   not to answer for now.
11              - - -
12        THE VIDEOGRAPHER: We are now
13   on the record. The time is 5:36 p.m.
14              - - -
15   BY MS. PEET:
16        Q.   I've asked you what you have
17   spent on litigation fees to date and your
18   attorney has instructed you not to answer.
19        A.   Right.
20        Q.   And I assume you're going to
21   take your attorney's instruction.
22        A.   I'll take my attorney's advice.
23        Q.   Okay.
24             Do you know Tony Spinillo?

Page 363

1        A.   Yes.
2        Q.   And is he chief intelligence
3    officer at Marywood University?
4        A.   I believe the title is chief
5    information officer.
6        Q.   At Marywood?
7        A.   Yes.
8        Q.   Did you ever tell him to keep
9    his eyes and ears open?
10       A.   That sounds like something I
11   would have written in an e-mail.
12       Q.   Why did you do that?
13       A.   Oh, if he heard anything, any
14   chatter about the case or something or
15   whatever is going on at Marywood that
16   might be of interest to me. That's all.
17       Q.   Why would you do that -- e-mail
18   that to Tony at his private e-mail
19   account, not his Marywood University
20   e-mail account?
21       A.   We often e-mailed each other
22   back and forth on, you know, short quick
23   things about whatever we were doing.
24       Q.   Any reason you wouldn't have

Page 364

1    e-mailed him that at his Marywood e-mail
2    account?
3        A.   I hadn't thought about it. We
4    always had e-mail conversations or back
5    and forth with his personal account.
6        Q.   Did you ever e-mail Tony since
7    you have left at his Marywood e-mail
8    account?
9        A.   Since I left Mary -- could you
10   repeat the question, please?
11       Q.   Have you ever e-mailed Tony
12   Spinillo at his Marywood e-mail account
13   since you've left Marywood?
14       A.   I'll say I don't know but I
15   don't think so.
16       Q.   Has Tony provided you with any
17   documentation or information about this
18   case?
19       A.   No.
20       Q.   Who, if anyone, do you speak to
21   that is employed at Marywood?
22       A.   I have e-mail contact with
23   Marty O'Connor.
24       Q.   Anyone else?

Page 365

1        A.   Who's currently employed at --
2    currently employed at Marywood? Is that
3    the question? Nobody -- nobody regularly.
4    I might -- I might say if there's a story
5    in the newspaper about Africa, I might
6    have e-mailed Jeremy Rich in the past year
7    or so and said, you know, how are the kids
8    doing, but nothing -- I believe that's it.
9        Q.   Have you --
10       A.   Oh, wait. Excuse me, one more.
11   Chris Troiani who works at the Regina
12   desk. I'll have an occasional friendly
13   e-mail with her.
14       Q.   Have you spoken to Chris,
15   Marty, or anyone else at Marywood about
16   this case?
17       A.   No.
18              - - -
19        (At this time, photographs were
20   marked for identification as Exhibit
21   Fagal-46.)
22              - - -
23   BY MS. PEET:
24       Q.   Mr. Fagal, these pictures were



Page 366

1    just produced to us.
2        A.   Yes.
3        Q.   What are they?
4        A.   I was going through my -- I was
5    getting a new phone or my phone died.  My
6    Note 3 died and I was looking for Note 3
7    and I found my old Droid X phone.  I had a
8    backup file from there from years ago, and
9    so I had forgotten that I took these
10   pictures, and these were quickly taken, I
11   guess, on November 28th showing where some
12   posters I had hung that were no longer
13   there on November 28th.  I had gone
14   around.  I had always planned to after the
15   speech was over.  I had always planned to
16   take down the posters just to clean up and
17   not have them up any longer than they
18   needed to be.  That's why I used the blue
19   painter's tape, so it'd be easy to take
20   off.
21       And so as I was going around to
22   take off posters that had been hung up
23   that morning, I was finding that -- and
24   any others that might, you know, be

Page 367

1    evidence that had not been torn down
2    before, I found that posters where I had
3    hung them were missing.  So -- from where
4    I had hung them that very day.  So I just
5    took quick pictures.
6        MS. PEET:  I have no further
7        questions, but I do want to put on
8        the record that we just received an
9        additional document production from
10       you.  It was sent to us over the
11       weekend which we couldn't access
12       until Monday for technical reasons;
13       one of which was a 141-page damages
14       analysis.
15       We obviously haven't gone
16       through it in fine detail yet but we
17       reserve the right to bring you back
18       if we need to given the obvious late
19       production and your deposition being
20       deposed -- being noticed for today.
21       THE WITNESS:  Yes.  That would
22       be an updated Rule 26 from January
23       25th, I believe.
24       MR. COHEN:  How much time do we

Page 368

1    have left?
2        - - -
3        THE VIDEOGRAPHER:  We're now
4    off the record.  The time is 5:42
5    p.m.
6        - - -
7        (At this time, a short break
8    was taken.)
9        - - -
10       THE VIDEOGRAPHER:  We are now
11   on the record.  The time is 5:46 p.m.
12       - - -
13   BY MR. COHEN:
14       Q.   Okay.
15       Fred, we know each other.  I'm
16   Jonathan Cohen. I'm your attorney.  I
17   just have a few questions for you.
18       And earlier today, do you
19   remember being asked -- you were shown a
20   copy of your interrogatory answers, and
21   one of the questions was something to the
22   effect of are you aware of any other
23   Marywood tenured professor who --
24       A.   Had done something similar to

Page 369

1    what I did?
2        Q.   -- who had done things similar
3    to what you had done, and you had written
4    Laurie McMillan, correct?
5        A.   Correct.
6        Q.   And Ms. Peet had asked you a
7    little bit about it.
8        And do you have any more
9    information to provide about why
10   Ms. McMillan's case is similar to your
11   case?
12       A.   Well, besides the public
13   protest in her case of carrying a sign, a
14   gathering I think for the 100th
15   anniversary, I remember reading in -- I
16   think one of the -- either The Wood Word
17   or -- I believe it was The Wood Word or
18   the Scranton Times, but I think it was The
19   Wood Word about Laurie McMillan was upset
20   with decision-making at the university in
21   terms of finances and the money spent on
22   learning commons, and the Scranton School
23   for the Deaf property, and various
24   expensive renovations to the president's

93 (Pages 366 to 369)




1   house.
2         And so there's general worry
3   about what was seen by Ms. McMillan and I
4   understand from others about financial
5   mismanagement, and so Ms. McMillan had
6   some fliers that she placed in the rotunda
7   and in public places around campus, and in
8   one case Ann Boland-Chase, who is an
9   administrator, again, according to the
10  news story went around and picked up those
11  fliers and confiscated them, if you will.
12        And I guess there was a quote
13  -- a story in that news story about how
14  faculty members were quite upset, many of
15  them.  They -- according to the news
16  story, there had been attempts through the
17  faculty senate to work with the
18  administration, but there were many
19  professors who were not happy with what
20  had happened.  And Alan Levine was quoted
21  something to the effect of, well, if
22  anybody was upset, they could come in and
23  we could have ways of discussing that in
24  private.

1         And so in that sense,
2   Ms. McMillan had protested decision-making
3   by the president and I believe Joe Garvey
4   and had not gotten any satisfaction, and
5   so she turned to fliers, or handouts, or
6   something similar placed around campus
7   which had been gathered up, at least some
8   of them by -- from what I read -- again, I
9   was not there, by Ann Boland-Chase.  So I
10  think the similarities are to be drawn by
11  somebody who looks at both cases.
12        Q.   Okay.
13        Also, earlier today Ms. Peet
14  asked you, I think in sum and substance,
15  do you have any evidence that anyone in
16  the Marywood administration took down your
17  posters because they didn't like the FIRE
18  organization or its principles.
19        Do you remember something like
20  that?
21        A.   Yes.  I remember the --
22        MS. PEET:  Objection,
23  mischaracterization of question.
24        THE WITNESS:  Pardon me.

1         MS. PEET:  I'm just asserting
2   an objection for the record.
3   BY MR. COHEN:
4         Q.   I didn't ask a question yet
5   either.
6         A.   Okay.
7         Q.   I just said do you remember
8   that.
9         A.   Yes.
10        Q.   Yeah.
11        Do you have Exhibit-10 in front
12  of you still?  Can you turn to that?
13        A.   I'd have to dig and have luck
14  finding it some sort of way.  I did find
15  10.
16        Q.   Okay.
17        And, briefly, what is this
18  document again?
19        A.   I had met with Alan Levine and
20  tried to understand who tore down the
21  posters and why, and I had -- we
22  disagreed.  We couldn't come to agreement
23  about what had happened, and that's why
24  Alan wrote we have a different

1   understanding of what transpired.
2         Q.   And so you and Dr. Levine had a
3   meeting about the removal of the FIRE
4   posters, correct?
5         A.   Yes.  I tried to clear that up.
6         Q.   And you had made a number of
7   requests, you know, including to be
8   reimbursed?
9         A.   Yes.
10        Q.   Do you remember that?
11        A.   Yes.
12        Q.   We talked --
13        A.   I showed him that -- that
14  letter and he asked for the e-mail copy,
15  and I sent it to him and he forwarded that
16  to President Munley.
17        Q.   Right.
18        And do you see in this
19  Exhibit-10, this letter from Dr. Levine,
20  in the second paragraph, first sentence,
21  it says Sister Anne Munley and I remain
22  open to future presentations that are not
23  in conflict with our mission statement or
24  core values and are organized according to




1    our policies and practices?
2        A.   Yes.
3        Q.   From that sentence, did you
4    understand that Dr. Levine was suggesting
5    that presentations from FIRE are not in
6    line -- not in -- are not in line with
7    Marywood's mission statement or core
8    values?
9            MS. PEET:  Objection, absolute
10       leading.  Why don't you rephrase
11       that.
12           MR. COHEN:  Excuse me.
13           MS. PEET:  I think you should
14       rephrase that.
15   BY MR. COHEN:
16       Q.   First sentence of paragraph
17   two, why don't you explain to me -- do you
18   understand Dr. Levine to have been making
19   any characterizations about FIRE?
20           MS. PEET:  Objection, leading.
21   BY MR. COHEN:
22       Q.   You can answer.
23       A.   I did not take this as
24   necessary -- I took this more as

1    boilerplate university, shall I say,
2    reason for not allowing a debate on
3    something where the other side of the
4    debate would be against what were
5    perceived as the university's core values.
6            So it could be in some
7    instances if there was an abortion debate,
8    pro and anti-abortion, perhaps if the
9    university -- I'm not saying Marywood --
10   said we can't have that discussion even
11   raised on our campus because it's against
12   our core values, so, therefore, we will
13   not allow a debate.
14           Or I know that the university
15   -- I know there was a case of a student a
16   few years ago who tried to start an
17   atheist club at the university.  That was
18   denied.  So I didn't -- when I read this,
19   I did not think it necessarily pertained
20   to FIRE but it could have, you know.  They
21   didn't -- certainly they did not like FIRE
22   I don't think.  I think there's evidence
23   of that by e-mails in the discovery where
24   they're talking about Will Creeley and

1    trying to keep the attendance down.
2            And so there was certain animus
3    shown in those e-mails I read in discovery
4    against FIRE.  Whether they would actually
5    step up publicly and not allow FIRE to
6    come in the future, I would assume they
7    wouldn't have done that but they might not
8    have given any money.
9            MR. COHEN:  I have no further
10       questions.
11           MS. PEET:  Just a couple of
12       follow-ups.
13               - - -
14   BY MS. PEET:
15       Q.   With reference to the McMillan
16   incident that your attorney just talked to
17   you --
18       A.   Yes.
19       Q.   -- about, again, you have all
20   of this information from what you read in
21   a newspaper, correct?
22       A.   That's correct.
23       Q.   Are you aware, either from
24   reading the newspaper or otherwise, that

1    after Ms. McMillan protested and Ann Chase
2    took down the fliers, whether or not she
3    made a video depicting Sister Munley as
4    Hitler?
5        A.   I have no knowledge.
6            MS. PEET:  No further
7        questions.
8                - - -
9            THE VIDEOGRAPHER:  We are now
10       off the record.  The time is 5:56
11       p.m.  This ends disk number four and
12       today's deposition.
13               - - -
14
15
16
17
18
19
20
21
22
23
24




Page 378

1      C E R T I F I C A T I O N
2
3
4            I, Edward J. Ruggeri,
5      Registered Professional Reporter,
6      Certified Court Reporter and Notary
7      Public, do hereby certify that the
8      foregoing is a true and accurate
9      transcript of the stenographic notes taken
10     by me in the aforementioned matter.
11
12            - - -
13
14
15
16
17
18
19
20
21
22
23     DATE: _____
24          Edward J. Ruggeri, RPR, CCR

Page 379

1            - - - - - - - -
2            LAWYER'S NOTES
3            - - - - - - - -
4      PAGE  LINE
5      - - - - - - - - - - - - - - - - - - - -
6      - - - - - - - - - - - - - - - - - - - -
7      - - - - - - - - - - - - - - - - - - - -
8      - - - - - - - - - - - - - - - - - - - -
9      - - - - - - - - - - - - - - - - - - - -
10     - - - - - - - - - - - - - - - - - - - -
11     - - - - - - - - - - - - - - - - - - - -
12     - - - - - - - - - - - - - - - - - - - -
13     - - - - - - - - - - - - - - - - - - - -
14     - - - - - - - - - - - - - - - - - - - -
15     - - - - - - - - - - - - - - - - - - - -
16     - - - - - - - - - - - - - - - - - - - -
17     - - - - - - - - - - - - - - - - - - - -
18     - - - - - - - - - - - - - - - - - - - -
19     - - - - - - - - - - - - - - - - - - - -
20     - - - - - - - - - - - - - - - - - - - -
21     - - - - - - - - - - - - - - - - - - - -
22     - - - - - - - - - - - - - - - - - - - -
23     - - - - - - - - - - - - - - - - - - - -
24     - - - - - - - - - - - - - - - - - - - -

96 (Pages 378 to 379)



# Exhibit 17

**EXHIBIT**

**17**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FREDERICK F. FAGAL, JR.     :
                                 :
         Plaintiff,       :
                                 :     **CIVIL ACTION**
         v.           :
                                 :     **NO.: 3:14-cv-02404-ARC**
MARYWOOD UNIVERSITY,    :
                                 :
         Defendant.     :

## DEFENDANT'S ANSWERS AND OBJECTIONS TO PLAINTIFF'S FIRST
## SET OF INTERROGATORIES DIRECTED TO DEFENDANT

Defendant, Marywood University ("Defendant") hereby submits its answers

and objections to Plaintiff, Frederick F. Fagal, Jr.'s (hereinafter "Plaintiff"), First

Set of Interrogatories ("Interrogatories").

## GENERAL OBJECTIONS

1.    Defendant objects to all interrogatories to the extent that they seek

information which is beyond the scope of the Federal Rules of Civil Procedure.

2.    Defendant objects to these interrogatories to the extent that they

purport to be "contention" interrogatories and otherwise attempt to assert, restate

or summarize the facts, claims or defenses of Defendant.

3.    Defendant objects to all interrogatories to the extent that they are not

described with reasonable particularity, are overly broad, are unduly burdensome,

or are not reasonably calculated to lead to the discovery of admissible evidence. More particularly, Defendant objects to any interrogatory to the extent that it is not reasonably limited in time, place or overly broad, not reasonably calculated to lead to the discovery of admissible evidence and are unduly burdensome.

4.     Defendant objects to all interrogatories to the extent that they seek confidential information, proprietary information and/or trade secrets.

5.     Defendant objects to each of these interrogatories to the extent they purport to impose any duty to supplement responses greater than that required by Fed. R. Civ. P. 26(e).  Pursuant to ongoing discovery in this matter, Defendant reserves the right to supplement these responses subsequent to the forwarding of these answers and objections.

6.     Defendant reserves the right to incorporate all or any portion of one answer by reference into another answer.

7.     Defendant objects to Plaintiff's interrogatories to the extent that they seek the discovery of information protected by the attorney/client privilege, the attorney work-product doctrine or other applicable privilege.

8.     Defendant incorporates by reference each and every objection set forth above into each response to each interrogatory as fully as though set forth therein at length.

2

## INTERROGATORIES

1.      In Paragraph No. 20 of Defendant's Answer to Plaintiff's Amended Complaint and Affirmative and Other Defenses (hereinafter your "Answer"), you admitted to removing some of Plaintiff's posters announcing the FIRE speaker. Did you or anybody working for you instruct or suggest that these posters be removed? If so, who made this instruction or suggestion? If the instruction or suggestion was oral, please state its content in as close to verbatim form as possible.

**ANSWER:**   Defendant is unaware of the identity of the individual(s) who removed Plaintiff's posters announcing the FIRE speaker, other than Dr. Alan Levine, who removed one poster.   Additionally, Defendant is unaware of anyone who instructed or suggested that Plaintiff's FIRE speaker posters be removed.

2.      Do you contend that Professor Fagal was an at-will employee of Marywood at any time between November 1, 2011 and August 31, 2012? If so, explain the basis for this contention in detail.

**ANSWER:** No.

3.      Prior to January 23, 2012, did you or anybody who worked for you provide to Professor Fagal any oral warning, written warning, or any opportunity for monitored assistance relating to the email and videos referenced in Paragraph Nos. 23 and 24 of the Amended Complaint? If so, please provide a detailed

3

description of each such oral warning, written warning, and opportunity for monitored assistance.

**ANSWER:** Defendant objects to this interrogatory as ambiguous and vague because Defendant is unable to determine the meaning of "monitored assistance." Defendant is willing to respond to a clearer and narrower interrogatory request.

4.    Did your Vice President for Academic Affairs, Dr. Alan Levine, participate in any way in the decision to suspend Professor Fagal or to maintain this suspension thereafter? If so, please describe Dr. Levine's participation in as much detail as possible.

**ANSWER:**    Dr. Levine supported President Munley's decision to suspend Professor Fagal and was aware of – and helped orchestrate – the January 23, 2012 meeting where Professor Fagal was suspended, as outlined in DEF002760.

5.    If Dr. Levine has made any statements—oral or written—relating to the email or videos referenced in Paragraph Nos. 23 and 24 of the Amended Complaint, please describe the content of these statements in as close to verbatim form as possible, including the date and recipients of such statements.

**ANSWER:** Defendant objects to this interrogatory as unduly burdensome and overly broad in time and scope.  Defendant cannot possibly know all statements, oral or written, that Dr. Levine has made in the past four years regarding the e-mail or videos referenced in Paragraph Nos. 23 and 24 of the Amended Complaint.

Subject to and without waiver of these objections, see documents previously produced by Defendant, including various e-mails from Dr. Levine.

6.      In Paragraph No. 31 of your Answer, you denied that there was no immediate harm to Professor Fagal or to others threatened by Professor Fagal's continuance in his faculty position. Please explain the basis for your denial in as much detail as possible.

**ANSWER:**  Defendant denies that there was no immediate harm to others as Plaintiff's continued employment would create emotional harm to members of the administration, faculty, and student body who were offended and impacted by Plaintiff's actions. Additionally, Defendant sought to prevent further reputational harm to the University after Plaintiff, a tenured professor, made a mockery of the President, the University's executive staff, and the University community as a whole by drafting and creating the e-mail and videos referenced in Paragraph Nos. 23 and 24 of the Amended Complaint.

7.      In Paragraph No. 31 of your Answer, you denied that no Marywood official or representative had ever stated to Professor Fagal that there was no immediate harm to him or to others threatened by his continuance in his faculty position. Please explain the basis for your denial in as much detail as possible, including the date and substance of each and every such statement by a Marywood official or representative.

**ANSWER:** On or about January 23, 2012, President Munley informed Plaintiff that his actions caused harm to the University, faculty members, and was in direct conflict with the University's core values.

    8.    For each academic year, please provide the actual amount of extra dollars that your primary provider of health insurance would have charged (or is predicted to charge) you to add Plaintiff and his wife (born         , 1946 and ▮▮▮▮▮▮▮▮, 1958, respectively) to the standard family health insurance plan provided by the insurer had he been employed by you between September 1, 2012 and August 31, 2018.

**ANSWER:** Defendant objects to this interrogatory to the extent that it requires a calculation of future health care costs. Subject to and without waiver of this objection, Defendant's annual fee for an employee and spouse on an HMO plan for 2011-2012 was $12,983.88; for 2012-2013 was $13,503.24; for 2013-2014 was $13,503.24; for 2014-2015 was $14,043.36; and for 2015-2016 was $15,377.52. This option was discontinued for the 2016-2017 year and has been replaced by an EPO plan.

    9.    Identify any and all fact witnesses that you intend to call at trial.

**ANSWER:** Defendant objects to this interrogatory as premature and because it seeks to elicit the mental impressions, conclusions, opinions and legal theories of Defendant's attorneys and seeks disclosure of Defendant's attorneys' work

6

product.   Subject to and without waiver of these objections, Defendant will provide a list of witness at the appropriate time.   Defendant reserves the right to call as witnesses all individuals identified in either parties' Initial Disclosures or discovery responses.

10.   Identify any and all expert witnesses that you intend to call at trial.

**ANSWER:**   Defendant objects to this interrogatory as premature and because it seeks to elicit the mental impressions, conclusions, opinions and legal theories of Defendant's attorneys and seeks disclosure of Defendant's attorneys' work product.   Subject to and without waiver of these objections, as of the date of these responses, Defendant has not retained an expert.   If and when Defendant retains an expert, a response to this request will be provided.

11.   Identify any and all exhibits that you intend to introduce at trial.

**ANSWER:**   Defendant objects to this interrogatory because it seeks to elicit the mental impressions, conclusions, opinions and legal theories of Defendant's attorneys and seeks disclosure of Defendant's attorneys' work product.   Subject to and without waiver of this objection, Defendant has not decided what documents it intends to introduce as exhibits at the time of trial.   Defendant will identify its exhibits in accordance with the Court's scheduling order.

12.   Identify any and all facts that you believe to support your affirmative defenses.

7

**ANSWER:** Defendant objects to this interrogatory as repetitive and duplicative of Request No. 25 in Plaintiff's First Request for Production of Documents. Subject to and without waiver of this objection, see documents previously produced by Defendants.

13.    Did any attorney or other representative of Jackson Lewis LLP communicate—in writing or orally—with any members of Marywood's Faculty Grievance Committee while that committee was deliberating on Plaintiff's grievance filed on February 22, 2012? If so, please identify all individuals participating in each communication, the time and date of each such communication, and—if the communication was oral—describe the content of such communication in as much detail as possible.

**ANSWER:**    Defendant objects to this interrogatory because it requests information protected by attorney-client privilege and/or seeks to elicit the mental impressions, conclusions, opinions and legal theories of Defendant's attorneys and seeks disclosure of Defendant's attorneys' work product.

14.    Did any attorney or other representative of Jackson Lewis LLP communicate—in writing or orally—with any members of Marywood's Faculty Senate Ad Hoc Hearing Committee while that committee was deliberating on President Munley's recommendation to terminate and/or suspend Plaintiff? If so, please identify each and every individual that participated in each communication,

8

the time and date of each such communication, and—if the communication was oral—describe the content of such communication in as much detail as possible.

**ANSWER:**   Defendant objects to this interrogatory because it requests information protected by attorney-client privilege and/or seeks to elicit the mental impressions, conclusions, opinions and legal theories of Defendant's attorneys and seeks disclosure of Defendant's attorneys' work product.

15.   Please provide the exact times and dates that each word processing file or Google Docs file used to generate President Munley's letter to Plaintiff dated January 24, 2012 was first created and last modified.

**ANSWER:**   Defendant objects to this interrogatory as unduly burdensome and irrelevant.

16.   Please provide the exact times and dates that each word processing file used to generate Patricia Dunleavey's typewritten notes (DEF000143) about the January 23, 2012 meeting between Plaintiff, President Munley, herself, and Michael Foley, was first created and last modified.

**ANSWER:**   Defendant objects to this interrogatory as unduly burdensome and irrelevant.

17.   With as much precision as possible, state the time and date that President Munley decided (in her own mind) to recommend Professor Fagal's termination and suspension.

**ANSWER:**  Defendant objects to this interrogatory because it seeks information in Plaintiff's possession and/or equally available.  Subject to and without waiver of this objection, Defendant refers Plaintiff to President Munley's deposition testimony at 47:8-48:18.

**JACKSON LEWIS P.C.**

Stephanie J. Peet. (PA I.D. 91744)
Asima J. Ahmad (PA I.D. 316001)
Three Parkway
1601 Cherry Street, Suite 1350
Philadelphia, PA 19102
T: (267) 319-7802
F: (215) 399-2249
stephanie.peet@jacksonlewis.com
asima.ahmad@jacksonlewis.com

*ATTORNEYS FOR DEFENDANT*

DATED:  August 5, 2016

## VERIFICATION

I, Patricia E. Dunleavy, Ph.D., Associate Vice President for Human Resources for Marywood University, hereby declare, under penalty of perjury, that I signed the foregoing Defendant's Answers to Plaintiff's First Set of Interrogatories for and on behalf of Defendant, and that I am duly authorized to do so; that all of the matters stated above are not within my personal knowledge and that I have been informed that there is no single officer or employee of Defendant who has personal knowledge of all such matters; that the facts stated above have been assembled by counsel for Defendant, and that to the best of my knowledge, the facts stated in the foregoing Answers are true and represent the best information available at the time that the Answers were prepared.


_____
Patricia Dunleavy


Dated: _8/2/2016_____

## CERTIFICATE OF SERVICE

I, Asima J. Ahmad, hereby certify that I caused to be served, a true and correct copy of *Defendant's Answers and Objections to Plaintiff's First Set of Interrogatories and Defendant's Response to Plaintiff's Second Request for Production of Documents and Electronically Stored Information* via electronic mail and/or U.S. First Class Mail, postage prepaid, upon the following counsel of record:

> Jonathan Z. Cohen, Esquire
> 175 Strafford Avenue, Suite 1 #212
> Wayne, PA  19087
> jzc@jzc-law.com

### JACKSON LEWIS P.C.

Stephanie J. Peet. (PA I.D. 91744)
Asima J. Ahmad (PA I.D. 316001)
Three Parkway
1601 Cherry Street, Suite 1350
Philadelphia, PA 19102
T: (267) 319-7802
F: (215) 399-2249
stephanie.peet@jacksonlewis.com
asima.ahmad@jacksonlewis.com

*ATTORNEYS FOR DEFENDANT*

DATED: August 5, 2016

4825-1907-9219, v. 1

12

# Exhibit 18

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**EXHIBIT**
**18**

- - -

FREDERICK F. FAGAL, JR.          : CIVIL ACTION
                                 :
              Plaintiff,          : NO. 3:14-cv-02404-ARC
                                 :
       vs.                        : (JUDGE CAPUTO)
                                 :
MARYWOOD UNIVERSITY,              :
                                 :
              Defendant.          :


—   —   —

September 6, 2016
- - -


            Oral deposition of Alan M.
Levine, taken pursuant to notice, was
held at the Radisson Lackawanna Station
Hotel, Suite 206, 700 Lackawanna Avenue,
Scranton, Pennsylvania, commencing at
9:30 a.m., on the above date, before Judy
A. Black, a Registered Professional Court
Reporter and Notary Public in and for the
Commonwealth of Pennsylvania.




- - -


MAGNA LEGAL SERVICES
Seven Penn Center, 8th Floor

1635 Market Street

Philadelphia, Pennsylvania 19103

(866) 624-6221



Page 2

A P P E A R A N C E S:
JONATHAN Z. COHEN, LTD
BY:  JONATHAN Z. COHEN, ESQUIRE
175 Strafford Avenue
Suite 1 PMB 212
Wayne, PA 19087
(215) 874-0047
Attorneys for Plaintiff

JACKSON LEWIS, P.C.
BY:  STEPHANIE J. PEET, ESQUIRE
Three Parkway
1601 Cherry Street, Suite 1350
Philadelphia, PA 19102
(267) 319-7802
Attorneys for the Defendant

ALSO PRESENT:

FREDERICK F. FAGAL, JR.

MAGNA LEGAL SERVICES

---

Page 4

Levine-6   E-mail chain dated Tuesday,      27
     January 17, 2012, Bates Nos.
     DEF002743-2746
Levine-7   E-mail chain dated Tuesday,      28
     January 17, 2012, Bates Nos.
     DEF002734-2735
Levine-8   E-mail chain dated Sunday,      30
     January 22, 2012, Bates Nos.
     DEF002759-2760
Levine-9   Letter dated January 24, 2012,   44
     with attachments, Bates Nos.
     DEF000166-187
Levine-10   Document headed "Talking Points  46
     for Board," Bates Nos.
     DEF000145-146
Levine-11   Document headed "Talking Points  48
     for Meeting," Bates No.
     DEF000147
Levine-12   E-mail dated Monday,      48
     January 30, 2012, Bates No.
     DEF002756
Levine-13   E-mail dated Monday, April 2,   49
     2012, Bates No. DEF002380

MAGNA LEGAL SERVICES

---

Page 3

I N D E X
– – –

Testimony of:  Alan M. Levine

DIRECT  CROSS  REDIRECT  RECROSS

By Mr. Cohen     6
By Ms. Peet       53

E X H I B I T S
– – –

NUMBER     DESCRIPTION           PAGE
Levine-1   5-page document headed      10
     "Marywood University
     Progressive Discipline
Levine-2   E-mail dated Wednesday,      11
     November 9, 2011, Bates No.
     DEF002392
Levine-3   E-mail chain dated Monday,      14
     November 28, 2011, Bates Nos.
     DEF002703-2705
Levine-4   E-mail chain dated Wednesday,   20
     November 30, 2011, Bates Nos.
     DEF002713-2714
Levine-5   E-mail chain dated Thursday,   24
     December 1, 2011, Bates No.
     DEF002416

MAGNA LEGAL SERVICES

---

Page 5

- - -
DEPOSITION SUPPORT INDEX
- - -

Direction to Witness Not to Answer
Page Line     Page Line     Page Line
None

Request for Production of Documents
Page Line     Page Line     Page Line
None

Stipulations
Page Line     Page Line     Page Line
6     1

Question Marked
Page Line     Page Line     Page Line
None

MAGNA LEGAL SERVICES

---



1                    - - -
2          STIPULATIONS
3                    - - -
4        IT IS STIPULATED by and between counsel
5    that the Deposition of Alan M. Levine, is being
6    taken pursuant to agreement and that all
7    objections, except as to form, are reserved
8    until the time of trial.  Alan M. Levine does
9    not waive the reading, signing, and filing of
10   the Deposition.
11                   - - -
12        A L A N   M.  L E V I N E, having
13   been duly sworn, was examined and testified as
14   follows:
15                   - - -
16   DIRECT EXAMINATION BY MR. COHEN:
17        Q.    Good morning, Dr. Levine.
18        A.    Good morning.
19        Q.    My name is Jonathan Cohen.  I represent
20   the plaintiff in this litigation, Frederick F. Fagal,
21   Jr.  Do you understand that you're under oath today,
22   the same as if you were in a courtroom?
23        A.    I do.
24        Q.    And have you ever had your deposition

1    taken?
2        A.    Nope.
3        Q.    Okay.  So the way this works is I just
4    ask you questions, and unless your attorney instructs
5    you not to answer, you're supposed to answer them.
6    If you don't understand the question, please just say
7    so and I'll rephrase it.  If you need to take a
8    break, that's fine, too.
9            As I'm asking a question, you might
10   think that you know what I'm about to ask and you
11   might start answering it, but that's hard for the
12   court reporter to take everything down, so if you can
13   just wait until I finish the question, it's easier
14   for everybody.
15           Is there anything that would prevent you
16   from thinking clearly or testifying truthfully today?
17       A.    Nope.
18       Q.    What is your full name including any
19   middle name?
20       A.    Alan Michael Levine.
21       Q.    And could you tell me a little bit about
22   your educational background, Dr. Levine?
23       A.    I could.
24       Q.    Could you?

1        A.    I could.
2        Q.    Could you explain -- did you go to
3    college, did you go to grad school?
4        A.    Yes.
5        Q.    Tell me where you went.
6        A.    I went to college at Hofstra University.
7        Q.    Okay.  Did you attend graduate school?
8        A.    I did.
9        Q.    And where did you go to graduate school?
10       A.    New York University.
11       Q.    And what were your degrees in?
12       A.    Where?
13       Q.    Both places.
14       A.    Psychology undergrad, nutrition and
15   dietetics master's, nutrition and dietetics Ph.D.
16       Q.    Okay.  When did you first begin working
17   for Marywood University?
18       A.    1978.
19       Q.    And what did you do before then
20   professionally?
21       A.    Lots of things.
22       Q.    Okay.  And, today, are you still
23   employed by Marywood University?
24       A.    Yes.

1        Q.    And what's your position there?
2        A.    Professor.
3        Q.    And it's true that at one point you were
4    vice president, correct, of academic affairs?
5        A.    Correct.
6        Q.    When did you first meet my client,
7    Professor Fagal?
8        A.    I don't remember.
9        Q.    Would it be fair to say that Professor
10   Fagal has had a number of run-ins with Marywood's
11   administration?
12           MS. PEET:  Objection to the form.  You
13   can answer.
14           THE WITNESS:  Yes, I can answer?
15           MS. PEET:  You can answer.
16       A.    Would you repeat the question?
17       Q.    Would it be fair to say that Professor
18   Fagal has had a number of run-ins with Marywood's
19   administration?
20           MS. PEET:  Objection.  You can answer.
21       A.    I don't know what run-ins means.
22       Q.    Confrontations?
23       A.    You'd have to define that term for me.
24       Q.    You don't understand what a



1  confrontation is?
2      A.    There's all levels of confrontation.
3      Q.    Okay.  We'll move on.  We're going to
4  mark this as exhibit Levine-1, please.
5          (Levine-1, 5-page document headed
6  "Marywood University Progressive Discipline Policy
7  Statement," is received and marked for
8  identification.)
9      Q.    Now, Dr. Levine, are you familiar with
10  that document?  And you can briefly review it,
11  please.
12     A.    Yes.
13     Q.    Okay.  And what is it?
14     A.    Marywood University progressive
15  discipline policy statement.
16     Q.    And could you turn to the last page?  Do
17  you see the section where it says "History"?
18     A.    Yes.
19     Q.    And this section covers, you know, when
20  various versions of this policy became effective,
21  correct?
22          MS. PEET:  Objection, lack of
23  foundation.  You can answer.
24     A.    I believe that to be true.

1      Q.    And do you know if this is a policy that
2  was in effect when Professor Fagal departed Marywood
3  University?
4      A.    I don't know.
5      Q.    Did you have any role in helping to
6  formulate the policy that we're looking at?
7          I'm sorry, did you say something?
8      A.    I'm looking.  I didn't say anything yet.
9          I don't believe the policy -- no, I
10  don't believe so.
11     Q.    Did you serve on the policy committee at
12  Marywood?
13     A.    Yes.
14     Q.    Okay.  Have you ever read this policy in
15  full?
16     A.    Yes.
17     Q.    Let's move on.
18          I'm going to have this marked as Levine
19  Exhibit 2?
20          (Levine-2, E-mail dated Wednesday,
21  November 9, 2011, Bates No. DEF002392, is received
22  and marked for identification.)
23     Q.    And could you, Dr. Levine, read this to
24  yourself, let me know when you're finished?

1      A.    I'm finished.
2      Q.    Do you recognize this document,
3  Dr. Levine?
4      A.    Yes.
5      Q.    And what is this?
6      A.    An e-mail document.
7      Q.    That's correct.  Is it an e-mail from
8  you to -- from Dr. Foley to you dated November 8,
9  2011, at 8:25 p.m.?
10     A.    No.
11          MS. PEET:  November 9th.
12     Q.    November 9, 2011?
13     A.    Yes.
14     Q.    Who is Dr. Michael Alan Foley?
15     A.    Who is he?
16     Q.    Yes.
17     A.    He's a man.  I don't understand your
18  question.
19     Q.    Did he have a position at Marywood
20  University?
21     A.    Yes.
22     Q.    What was his position?
23     A.    When?
24     Q.    At the time this e-mail was written.

1      A.    Dean, College of Liberal Arts and
2  sciences.
3      Q.    Did you ever respond to this e-mail?  I
4  know this was a long time ago.
5      A.    I don't remember.
6      Q.    Okay.  At the time this e-mail was
7  written, was it, in fact, becoming more and more
8  difficult to staff Professor Fagal's courses?
9      A.    The e-mail says it was.
10     Q.    I'm aware of that.  I'm asking you if,
11  in fact, that was true.
12     A.    As I read the e-mail, it appears to be
13  true.
14     Q.    Okay.  Why was it becoming more
15  difficult to staff Professor Fagal's courses?
16          MS. PEET:  Objection, lack of
17  foundation.  You can answer, if you know.
18     A.    I'm not sure.
19     Q.    Was this e-mail the first time that this
20  issue came to your attention, difficulty in staffing
21  Professor Fagal's courses?
22     A.    I don't remember.
23     Q.    Do you remember if you or Dr. Foley came
24  to a solution to the problem of the difficulty in



1  staffing Professor Fagal's courses?
2      MS. PEET: Objection to the form. You
3  can answer.
4      A.   I don't believe so.
5      Q.   Okay. If fewer and fewer students were
6  taking Professor Fagal's classes, would it be fair to
7  say Professor Fagal was becoming a more expensive
8  employee to keep around?
9      MS. PEET: Objection to the form, lack
10  of foundation. Calls for speculation.
11      You can answer, if you know.
12      A.   Would you repeat the question?
13      Q.   If it was becoming harder and harder to
14  enroll students in Professor Fagal's classes, would
15  it be fair to say that it became more and more
16  expensive to keep Professor Fagal around?
17      MS. PEET: Objection.
18      A.   Same salary. There's no change in the
19  expense.
20      I'm going to get some water.
21      MS. PEET: Sure.
22      MR. COHEN: Okay. We're going to make
23  this Levine Exhibit 3.
24      (Levine-3, E-mail chain dated Monday,

1  November 28, 2011, Bates Nos. DEF002703-2705, is
2  received and marked for identification.)
3  BY MR. COHEN:
4      Q.   And can you review this entire e-mail
5  chain and let me know when you're finished, please?
6      A.   Finished.
7      Q.   Do you recognize this document,
8  Dr. Levine?
9      A.   Yes.
10      Q.   Okay. It begins with an e-mail from
11  Professor Fagal on November 23rd, 2011, correct, to
12  Mr. Oliveri?
13      A.   Correct.
14      Q.   And then Sister Margaret Gannon forwards
15  you that e-mail, correct, on November -- on the same
16  day?
17      A.   Correct.
18      Q.   And at the time, what position did
19  Sister Margaret Gannon have with Marywood?
20      A.   I believe she was chair.
21      Q.   Of Professor Fagal's department?
22      A.   Of the social science department.
23      Q.   Okay.
24      A.   I believe. I believe that.

1      Q.   And so she forwards you Professor
2  Fagal's e-mail, and then on November 24, 2011, you
3  respond, correct?
4      A.   Yes.
5      Q.   And you say, "Thanks for the heads-up."
6  That's your first line, correct?
7      A.   Correct.
8      Q.   Why did you thank her for the heads-up?
9      A.   I was being polite.
10      Q.   Well, what is it about the situation
11  that even needed your input?
12      A.   I'm not sure anything needed my input.
13      Q.   Do you have any idea why Sister Gannon
14  forwarded this to you?
15      MS. PEET: Objection to the form. Calls
16  for speculation. You can answer, if you know.
17      A.   I was vice president academic affairs.
18  It was an academic issue.
19      Q.   Anytime a professor wanted to bring a
20  speaker to class, it became an issue for you?
21      MS. PEET: Objection to the form. You
22  can answer.
23      A.   No.
24      Q.   Okay. What is it about this particular

1  class -- what is it about this particular attempt to
2  call an outside speaker to class that it rose to your
3  level and it became an issue?
4      MS. PEET: Objection to the form. You
5  can answer.
6      A.   Movement to a venue that was not normal
7  class -- not the normal place for the class and
8  inviting the entire community to class, that's very
9  unusual.
10      Q.   Is it problematic?
11      A.   Problematic? Not if a venue is
12  available and the class is run the way classes are
13  normally run.
14      Q.   And your second sentence reads, "I'm in
15  Michigan, so I'm less able to check out some things
16  which I believe to be germane to the situation,"
17  correct?
18      A.   Yes.
19      Q.   What things did you think were germane
20  to the situation?
21      A.   Movement to a different venue, whether
22  or not that class is being scheduled at a time the
23  class is normally scheduled or whether students were
24  being asked to attend the class at a time other than



1 our regularly scheduled class.

2  Q. Why did you -- further down in your

3 e-mail, you mentioned that you'd be interested in

4 knowing whether anyone in social sciences had ever

5 opened their class to the entire campus, correct?

6  A. Yes, that's what the e-mail says, yes.

7  Q. Why did you care whether anyone in

8 social sciences had ever opened their class to the

9 entire campus?

10  A. Seemed unusual to have a change in venue

11 and invite the entire campus. That is generally not

12 done at Marywood, although I don't know it's ever been done,

13 although I don't know that for sure. Seemed odd.

14  Q. The fact that it was odd to you, did

15 that make it a problem?

16  A. It makes it something, as VPAA, I should

17 investigate.

18  Q. After your e-mail, Sister Gannon replied

19 to you, correct, on November 26th?

20  A. Yes.

21  Q. And then you forwarded Sister Gannon's

22 e-mail to Sister Anne Munley, correct?

23  A. I don't know. Obviously I wrote an

24 e-mail to Sister Anne Munley, but whether I forwarded

1 this, I'm not sure.

2  Q. Okay.

3  A. Did I?

4  Q. Now, to Sister Munley, you were --

5 you're mentioning that there will be posters

6 advertising the event, and -- correct?

7  A. Let's see.

8  MS. PEET: Is the question does the

9 e-mail say there will be posters advertising the

10 event?

11  MR. COHEN: Yes.

12  A. Yes.

13  Q. And the last sentence in your e-mail

14 says, "It seems to me that Fred and Tom are simply

15 trying to circumvent our guidelines concerning

16 outside speakers who have a political agenda,"

17 correct?

18  A. That's what it says, yes.

19  Q. So the real issue to you was not so much

20 that the entire campus was invited or that it was in

21 a different room, it was that you thought the speaker

22 had a political agenda, correct?

23  MS. PEET: Object to the form.

24 Mischaracterization of testimony. You can answer.

1  A. The real issue to me was what I told

2 you. Additionally, Marywood has a policy wherein if

3 a speaker comes representing one side of an issue,

4 the university invites at the same time a speaker

5 representing the other side.

6  Q. Is that a written policy, or was it a

7 written policy?

8  A. I don't know.

9  Q. What was the political agenda that you

10 thought that the speaker that Professor Fagal had

11 proposed to bring had?

12  A. I don't remember. I don't remember back

13 at the time.

14  Q. It's okay.

15  Do you remember if Sister Munley

16 responded to your e-mail?

17  A. I don't remember.

18  Q. Okay.

19  MR. COHEN: Let's make this exhibit

20 Levine-4, please.

21  (Levine-4, E-mail chain dated Wednesday,

22 November 30, 2011, Bates Nos. DEF002713-2714is

23 received and marked for identification.)

24  Q. And could you read this to yourself, as

1 well, and let me know when you're finished?

2  A. I'm finished.

3  Q. Raymond P. Heath, he was vice president

4 for student life at the time?

5  A. Yes.

6  Q. And in Dr. Heath's e-mail to you, the

7 most recent one in the exchange on November 30, 2011,

8 his first sentence is, "Without all of the details

9 now, Fred Fagal's poor behavior has continued."

10 Correct?

11  A. That's what the e-mail says.

12  Q. Do you know what Dr. Heath meant by

13 "Fred Fagal's poor behavior"?

14  MS. PEET: Objection to the form, calls

15 for speculation. You can answer if you know.

16  A. No, I don't know.

17  Q. Later on in the e-mail, Dr. Heath

18 states, "After enabling him for so long, isn't a

19 similar session overdue? If you agree, could a

20 conversation with him, the dean, you, me, and anyone

21 else you suggest be scheduled soon?" Did I read that

22 correctly?

23  A. Yes.

24  Q. Did you agree that Professor Fagal was



1  being enabled?
2      A.    I don't remember if I agreed with him.
3      Q.    Did you agree with Dr. Heath that a
4  conversation with Professor Fagal was in order
5  regarding his behavior?
6      A.    I don't remember for sure.
7      Q.    Do you know whether this was ever done,
8  whether someone had a talk with Professor Fagal about
9  his behavior?
10     A.    Define "someone."
11     Q.    Any administrators at Marywood
12  University, including you?
13           MS. PEET:  I'm sorry.  Could you repeat
14  the question?
15  BY MR. COHEN:
16     Q.    At some point, did you, did any other
17  administrators have a conversation with Professor
18  Fagal regarding the poor behavior referenced in this
19  e-mail?
20           MS. PEET:  Objection to the form.  You
21  can answer.
22     A.    Yeah, I can't speak for what other
23  administrators did.  I'm not privy to that.
24     Q.    How about you?

1      A.    I don't remember if I had a conversation
2  concerning this e-mail, but I have had conversations
3  with Fagal.
4      Q.    About behavior?
5      A.    I don't remember.
6      Q.    Okay.  Do you remember if you ever
7  responded to Dr. Heath's e-mail here?
8      A.    I believe I did.
9      Q.    Do you remember what you said?
10     A.    No.
11     Q.    Okay.
12           MR. COHEN:  Stephanie, if indeed
13  Dr. Levine replied to this e-mail, I don't think we
14  saw it in production.  Maybe it doesn't exist.
15           MS. PEET:  To the extent it exists, it's
16  been produced.  I can confirm that for sure.  And you
17  can trust me, it's been.
18           MR. COHEN:  I understand it's been a
19  large document production.
20           MS. PEET:  Yes, we're not holding
21  anything back.  So to the extent there was a
22  response, it's been produced.
23           MR. COHEN:  Let's have this marked as
24  exhibit Levine-5.

1           (Levine-5, E-mail chain dated Thursday,
2  December 1, 2011, Bates No. DEF002416, is received
3  and marked for identification.)
4      Q.    And could you read this exchange to
5  yourself and let me know when you're finished?
6      A.    Finished.
7      Q.    The latest e-mail in the chain is again
8  from Dr. Heath to you on December 1st, 2011, correct?
9      A.    Correct.
10     Q.    He references Peter's staff here.  Do
11  you know who he's referring to, which Peter?
12     A.    Yes.
13     Q.    Who is that?
14     A.    Who is Peter?
15     Q.    Yes.
16     A.    Peter Kilcullen.
17     Q.    In this e-mail, Dr. Heath is telling
18  that Professor Fagal is attempting to intimidate, if
19  not bully, Carl Oliveri and Peter's staff.  Would you
20  agree with that?
21     A.    I agree that the e-mail says, "I do
22  think a conversation with Fred Fagal to discuss his
23  attempts to intimidate, if not bully, Carl Oliveri
24  and Peter's staff is overdue."  That's what it says.

1      Q.    I understand that.  Do you agree that,
2  in fact, Professor Fagal was attempting to intimidate
3  or bully Carl Oliveri?
4           MS. PEET:  Objection to the form.
5      A.    I don't know.
6      Q.    Did you investigate this?
7      A.    No.
8      Q.    Did you agree with Raymond Heath that a
9  conversation with Professor Fagal was necessary to
10  address the alleged bullying and intimidation?
11           MS. PEET:  Objection to the form.  You
12  could answer.
13     A.    Probably.  Probably it was necessary.
14     Q.    Okay.  Did you ever have a conversation
15  with Professor Fagal about this?
16     A.    No.
17     Q.    Why was it necessary?
18     A.    It was a student-life issue that Ray
19  Heath felt that a conversation was necessary.  As a
20  fellow vice president, I didn't disagree.
21     Q.    I'm sorry, what was the last thing you
22  said?
23     A.    I said, as a fellow vice president.  I
24  was a fellow vice president.  I didn't disagree that



1  a conversation wasn't necessary.
2      Q.    In the same e-mail, Dr. Heath references
3  Professor Fagal's other agenda.  Do you see that?
4      A.    Yes.
5      Q.    Do you know what agenda he was referring
6  to?
7      A.    No.
8      Q.    Did you agree that Professor Fagal's
9  behavior was affecting individual's outside of his
10 department?
11     A.    Yes.
12     Q.    How was he affecting them?
13     A.    He was causing difficulty for some
14 students.
15     Q.    What type of difficulty?
16     A.    Emotional difficulty.
17     Q.    How was he causing emotional difficulty?
18     A.    By putting a cartoon demeaning Muslims
19 on his door, he was causing difficulty for Muslim
20 students who didn't agree with him.  Emotional
21 difficulty, or emotional pain.
22     Q.    Is that the only way that you know of
23 that he was affecting these students?
24     A.    As far as I remember now.

MAGNA LEGAL SERVICES

1      Q.    And do you remember responding to this
2  e-mail?
3      A.    I don't remember, but I'm sure you have
4  a response if there is one.
5            MR. COHEN:  Let's have this marked as
6  Levine Exhibit 6, please.
7            (Levine-6, E-mail chain dated Tuesday,
8  January 17, 2012, Bates Nos. DEF002743-2746, is
9  received and marked for identification.)
10     Q.    And could you read this to yourself and
11 let me know when you're finished, please?
12     A.    Finished.
13     Q.    Okay.  These e-mails reference Mary
14 Theresa.  That's Marywood's inside attorney, correct?
15     A.    Correct.
16     Q.    Now, I don't want to know what you asked
17 her, but --
18            MS. PEET:  That would also go to what
19 she said to you, to the extent she said anything.
20     Q.    Yes, I'm not trying to ask you anything
21 that's privileged.  But what I am interested in is
22 you're saying to Pat Dunleavy, you're trying to find
23 out what your -- what our options are.  What type of
24 options did you have in mind?

MAGNA LEGAL SERVICES

1      A.    Whether I can sue this bastard for the
2  egregious, what he called, Hitler parody.  That was
3  the main thing I was interested in personally.
4      Q.    What about options not for you
5  personally but for the university?
6      A.    Whether the university had to allow that
7  parody, what this bastard called a parody, to be out
8  on YouTube.
9      Q.    Were you specifically interested in
10 possible discipline for Professor Fagal?
11     A.    Specifically what do you mean?
12     Q.    Written warning, oral warning,
13 suspension, termination.  You know what discipline
14 means, right?
15     A.    All of those things should have been on
16 the table.
17     Q.    Okay.
18            MR. COHEN:  Let's mark this as Levine
19 Exhibit 7.
20            (Levine-7, E-mail chain dated Tuesday,
21 January 17, 2012, Bates Nos. DEF002734-2735, is
22 received and marked for identification.)
23     Q.    And, again, Dr. Levine, could you read
24 this to yourself and let me know when you're

MAGNA LEGAL SERVICES

1  finished?
2      A.    Finished.
3      Q.    Okay.  Again, here you're asking Pat for
4  possible responses for you and Marywood, correct?
5      A.    Correct.
6      Q.    And Dr. Dunleavy responds that
7  internally you can file a formal complaint under the
8  civil rights policy, correct?
9      A.    Correct.
10     Q.    Did you ever do that?
11     A.    No.
12     Q.    Why not?
13     A.    I'm not sure.  It is a mistake.  I
14 should have sued the bastard for defamation of
15 character.  I'm told I can't do that now, but I
16 should have gotten that bastard for that.
17     Q.    Well, I'm not referring to any possible
18 suit.  I'm specifically referring to the civil rights
19 policy.  You said you didn't file one and you regret
20 it?
21     A.    I don't regret not filing a civil
22 rights.  I regret not suing this bastard for
23 defamation of character.  That's what I said.
24     Q.    And why didn't you file a complaint

MAGNA LEGAL SERVICES

1 under the civil rights policy?
2    A.   I don't remember why.
3    MR. COHEN:  Let's make this Levine
4 Exhibit 8, please.
5    (Levine-8, E-mail chain dated Sunday,
6 January 22, 2012, Bates Nos. DEF002759-2760, is
7 received and marked for identification.)
8    Q.   And could you read this to yourself, as
9 well, and let me know when you're finished?
10    A.   Finished.
11    Q.   Do you recognize this exchange of
12 e-mails, Dr. Levine?
13    A.   Yes.
14    Q.   Now, the first e-mail in the exchange is
15 from is from Patricia Dunleavy and I'm guessing Mike
16 Foley, correct?
17    A.   Correct.
18    Q.   And here you're kind of -- you're
19 discussing plans for bringing Professor Fagal in to
20 meet with President Munley, correct?
21    A.   Correct.
22    Q.   And the first line in this e-mail says,
23 "I just finished chatting with Sister Anne," right?
24    A.   Correct.

1    Q.   So that's, in fact, true.  You did chat
2 with her?
3    A.   Obviously.
4    Q.   For how long?
5    A.   For how long did we have a chat?
6    Q.   Yes.
7    A.   I don't know.
8    Q.   Do you remember the substance of your
9 conversation?
10    A.   Yes.
11    Q.   Could you convey it to me in as much
12 detail as possible?
13    A.   Yes.
14    Q.   Please do so.
15    A.   Sister Anne was interested in having
16 Fagal brought into the office to discuss disciplinary
17 action concerning the video.  She wanted my input, as
18 was appropriate being that I was vice president of
19 academic affairs at the time, and we discussed the
20 strategy to have Fagal come in and be interviewed.
21    Q.   What was your input?
22    A.   My input was that was appropriate to
23 have him come in to be interviewed.  I was not there
24 because of the angst and anxiety that I felt as a

1 result of this bastard's Nazi video, portraying me as
2 a Nazi, as well as involving my family members.
3 Sister Anne, out of the kindness of her heart,
4 decided it would be appropriate not to have me there
5 to spare me that.  Shalom.  Mother fucker.
6    Q.   Dr. Levine, I understand you're upset.
7 Is it really necessary to continue calling him
8 bastard throughout the entire deposition, calling me
9 a mother fucker?  Or are you calling him a mother
10 fucker?
11    A.   I don't understand how you can defend
12 this bastard.
13    Q.   Well, I am, and you're here, and do we
14 have to continue with, you know, berating him?
15    A.   It's my option, isn't it?
16    MS. PEET:  He's very emotional about
17 this.
18    MR. COHEN:  I know.
19    MS. PEET:  As well as if I were in a
20 video, you were in a video.  We can't control how
21 people are going to feel.  And this brings up all
22 sorts of emotion again.
23    If you can refrain from using the
24 language.  We all understand how you feel, by all

1 means, but if -- I get that you're emotional.
2 BY MR. COHEN:
3    Q.   So my question is:  Do you think you
4 could refrain from continuing to call my client
5 bastard, calling me and/or my client mother fucker,
6 throughout the rest of the deposition?
7    A.   I'm not sure.
8    Q.   Do we really need to get the judge
9 involved?
10    A.   I don't know.
11    Q.   Okay.  So do you want to take a break?
12    A.   I'm good.
13    Q.   You're good?  All right.
14    So we just finished talking about
15 various plans for bringing in Dr. Fagal.  You talked
16 about how you had a conversation with President
17 Munley about it before sending this e-mail.  Did you
18 communicate about your plans to bring Professor Fagal
19 in to meet with President Munley with anyone other
20 than President Munley, Patricia Dunleavy, or
21 Dr. Foley?
22    A.   I don't believe so.
23    Q.   Okay.  Ultimately do you remember, in
24 fact -- I know you weren't there, but are you aware



1  that on January 23rd, 2012, Professor Fagal was
2  brought in to meet with President Munley, Dr. Foley
3  and Patricia Dunleavy?
4      A.    Yes, I'm aware of it.
5      Q.    Okay.  Are you aware at that meeting
6  Professor Fagal was suspended?
7      A.    Yes.
8      Q.    Prior to that meeting on January 23rd,
9  2012, do you know whether President Munley had a --
10  was planning to suspend Professor Fagal?
11      MS. PEET:  Objection to the form.  Calls
12  for speculation.  You can answer.
13      A.    I don't know.
14      Q.    Did she tell you that?
15      A.    Could you repeat the question?
16      Q.    Sure.  Prior to the January 23rd, 2012
17  meeting with Professor Fagal, President Munley,
18  Dr. Foley and Patricia Dunleavy, did President Munley
19  tell you that she intended to suspend Professor
20  Fagal?
21      A.    She told me that that was one of the
22  options.
23      Q.    Did anyone else in Marywood's
24  administration tell you that that was an option,

1  suspending Professor Fagal?
2      A.    I don't remember.
3      Q.    Again, prior to this meeting, had you
4  recommended that Professor Fagal be suspended?
5      A.    In my conversation with President
6  Munley, that came up.
7      Q.    Do you remember any more detail other
8  than suspending him came up?
9      A.    I was certainly on board with it knowing
10  what I knew, but I knew there was more that would
11  come out of the interview.
12      Q.    So you were on board with it, the
13  suspension, prior to the meeting?
14      A.    From what -- yes.
15      Q.    Now, prior to the January 23rd, 2012
16  meeting, were you also aware of a plan to seek the
17  termination of Professor Fagal?
18      MS. PEET:  Objection,
19  mischaracterization of testimony.  It implies that
20  there was such a plan.  You can answer.
21      A.    That was certainly a possibility.
22      Q.    In your mind or did you discuss it with
23  someone?
24      A.    Both, in my mind and in discussions with

1  President Munley.
2      Q.    Okay.  What exactly did you or President
3  Munley say about possible termination of Professor
4  Fagal?
5      A.    I can't answer exactly from your
6  question.
7      Q.    In as much detail as possible?
8      A.    We talked about the possibility of Fagal
9  being suspended and/or terminated.  I was certainly
10  on board with either/or both.  I thought what he did
11  was so egregious that that was a legitimate outcome
12  pending the conversation with the meeting on Monday.
13      Q.    Do you recall anybody else in Marywood's
14  administration or cabinet other than yourself and
15  President Munley recommending that Professor Fagal be
16  terminated?  This is prior to the January 23rd
17  meeting.
18      A.    I don't remember for sure.
19      Q.    We're going to come back to this e-mail
20  from you to Dr. Dunleavy and Dr. Foley, the first
21  e-mail in this chain, and in the second paragraph,
22  first sentence, you wrote, "Mike, at about 8:45 you
23  will go down to Fred's office to let him know that
24  Sister Anne would like to meet with him at 9:00 in

1  her office."  Did I read that correctly?
2      A.    Correct.
3      Q.    What was the reason for providing
4  Professor Fagal only 15 minutes' notice of the
5  meeting with President Munley?
6      MS. PEET:  Objection to the form.  You
7  can answer.
8      A.    I don't know.  I don't remember.
9      Q.    Now, you said earlier that President
10  Munley spared you from the meeting, correct?
11      A.    Correct.
12      Q.    Did you want to attend?
13      A.    Yes and no.
14      Q.    Ultimately why did you decide not to
15  attend the meeting?
16      MS. PEET:  Objection to the form.  You
17  can answer.
18      A.    She asked me not to.  I also thought
19  with the wound much fresher than it is right now --
20  do you think my responses at this time are
21  problematic?  I lost people in the fucking Holocaust.
22      Q.    We'll move on to the next e-mail in the
23  chain.  This is just Dunleavy saying, "Sounds good,"
24  and then the next e-mail from you to Patricia



1  Dunleavy, January 21st, 2012, at 10:33 p.m.  Do you
2  see that?
3      A.    Yes, I do.
4      Q.    And here you tell Dr. Dunleavy that
5  Professor Fagal attempted to call you at home.  You
6  didn't pick up.  He left a message, correct?
7      A.    That's what the e-mail says, yes.
8      Q.    And then Patricia Dunleavy says, "That's
9  interesting.  Save the message or at least keep a
10 record," correct?
11     A.    Yes, that's what the e-mail says, yes.
12     Q.    Did you save the message?
13     A.    I may have saved it but I don't anymore
14 have it.  Phones go the way they go.
15     Q.    As phones --
16     A.    As phones go the way they go, new
17 machines, and it's gone.
18     Q.    So this was a -- was it like a digital
19 voicemail or an answering machine?
20     A.    Answering machine.
21     Q.    So was it stored on a tape or was it
22 stored digitally?
23     A.    You know, I don't remember what I had at
24 the time.  It's not my current phone.

1  did you make a written recommendation that Professor
2  Fagal be suspended?
3      A.    I don't remember, but as I said before,
4  if I did, I'm sure you have it.
5      Q.    Did you make a written recommendation of
6  any other type of discipline other than suspension
7  prior to the January 23rd, 2012 meeting?
8      A.    I don't remember, but, again, if I did,
9  I'm sure you have it.
10     Q.    So your role, if any, in the decision to
11 suspend Professor Fagal, would it be fair to say
12 would be limited to your conversation with President
13 Munley before the January 23rd, 2012 meeting?
14     A.    No.
15          MS. PEET:  Objection to the form.  Go
16 ahead.
17     A.    No, it would not be fair to say that.
18     Q.    Why not?
19     A.    We had a conversation before the
20 meeting.  We had a conversation after the meeting,
21 and so that my role was both before -- pre and post
22 meeting.
23     Q.    You had a conversation with President
24 Munley after the January 23rd, 2012 meeting?

1      Q.    Do you remember the substance of the
2  message that Professor Fagal left?
3      A.    I remember the substance because I'm
4  reading the e-mail, and it reminds me that the
5  substance was that your client wanted to talk off the
6  record.
7      Q.    You didn't call him back, correct?
8      A.    Correct.
9      Q.    Other than actually having the message
10 itself, did you record the content in some way.
11 Like, did you write down what he said anywhere, other
12 than this e-mail?
13     A.    I don't believe so.
14     Q.    Now, coming back to the January 23rd,
15 2012 meeting, you said before the meeting you had
16 discussed possible discipline for Professor Fagal
17 with President Munley, correct?
18     A.    Correct.
19     Q.    The issue of a suspension came up in
20 that conversation, correct?
21     A.    Yes.
22     Q.    You said that you supported it, correct?
23     A.    Yes, but I supported also termination.
24     Q.    Prior to the January 23rd, 2012 meeting,

1      A.    Yes.
2      Q.    Okay.  Provide to me the detail of that
3  conversation to the best of your ability.
4      A.    As I remember it, we talked about what
5  transpired at the meeting and we talked about
6  suspension and/or termination.  I was on board with
7  termination after the meeting.  I was good with
8  termination.  I thought he should have been
9  terminated.  I agreed with her, with that
10 recommendation or that idea.
11     Q.    How soon after the January 23rd, 2012
12 meeting did you have this conversation?
13     A.    I can only speculate in answer to that.
14     Q.    All right.
15          THE WITNESS:  I'm getting more water.
16 Feel free to continue.
17          MS. PEET:  Do you need a break?
18          THE WITNESS:  No, I'm good.
19 BY MR. COHEN:
20     Q.    So we established that President Munley
21 suspended Professor Fagal.  You were on board with
22 it, correct?
23     A.    Suspended, terminated, as well, I think.
24     Q.    We'll get to the termination.



1    A.   Yes, I was on board.
2    Q.   Did you object to President Munley that
3 it was your job to suspend Professor Fagal?
4         MS. PEET:  Objection to form.  You can
5 answer.
6    A.   I don't remember objecting.
7    Q.   Did you tell President Munley that it
8 was your job to suspend Professor Fagal?
9         MS. PEET:  Objection to the form.
10 Assumes facts not in evidence.  You can answer.
11   A.   I believe we discussed it.
12   Q.   Okay.  Can you elaborate on your
13 discussion?
14   A.   We agreed that the situation was so
15 egregious that she as -- that as president
16 certainly had the ability to do that with my input,
17 as I gave it.
18   Q.   But on more routine, less egregious
19 cases, would you agree that it was your job and your
20 job alone to suspend employees?
21        MS. PEET:  Objection to the form.  You
22 can answer.
23   A.   Under normal -- yes, yes.  Answer it
24 that way.

1    Q.   Prior to Professor Fagal's suspension on
2 January 23rd, 2012, did you believe that Professor
3 Fagal posed an immediate harm to himself or to
4 others?
5    A.   Yes.
6    Q.   Okay.  What type of harm?
7    A.   Emotional harm.  He harmed me and
8 probably others.
9    Q.   Do you remember exactly when Professor
10 Fagal sent his e-mail, you know, with the links to
11 the videos?  I think it was among the exhibits.
12   A.   Yeah.
13        MS. PEET:  Do you just want to point him
14 to it?
15   A.   January 13, 2012, it appears.
16   Q.   And when did you learn of it?
17   A.   I believe I learned of it when Margaret
18 Gannon sent me an e-mail with the link.  That may
19 well be here.
20   Q.   January 16, 2012?
21   A.   Yes, correct.
22   Q.   So if you saw Professor Fagal's videos
23 on January 16, 2012, and you thought that he posed an
24 immediate harm, why didn't you just suspend him right

1 then and there?
2         MS. PEET:  Objection to the form.  You
3 can answer.
4    A.   I was in a car driving back from
5 Michigan.  My wife was driving.  I was shocked.  She
6 was shocked.
7    Q.   Okay.  As soon as you finished your car
8 ride -- let me put it this way.  When did you get
9 back to Marywood's campus, if you remember?
10   A.   I'm speculating the next day.
11   Q.   So that would be approximately
12 January 17, 2012?
13   A.   I believe that's correct.
14        MR. COHEN:  Let's make this Levine
15 Exhibit 9.
16        (Levine-9, Letter dated January 24,
17 2012, with attachments, Bates Nos. DEF000166-187, is
18 received and marked for identification.)
19 BY MR. COHEN:
20   Q.   I don't want you to read this whole
21 thing.  Do you recognize it?
22   A.   I do recognize it.
23   Q.   Okay.  This is a letter that President
24 Munley sent to Professor Fagal on January 24, 2012,

1 correct?
2    A.   Correct.
3    Q.   And here is recommending his
4 termination, correct?
5    A.   Correct.
6    Q.   And this is a day after the meeting,
7 January -- which was on January 23rd, 2012, correct?
8    A.   Yes.  Is that correct?  Yes, correct.
9    Q.   Did you contribute or provide any input
10 into this letter before it was sent?
11   A.   Yes.
12   Q.   What was your contribution?
13   A.   I thought we discussed that.
14   Q.   Well, we discussed you had several
15 conversations.  I'm wondering if there was more.
16   A.   I believe the conversation that I had
17 with Sister Anne after the meeting, which was
18 discussed, was some input, and as I recall, I saw
19 this letter before it was sent and was final.  I
20 believe that.
21   Q.   Did you write any part of this letter?
22   A.   I don't believe I wrote or edited any
23 part of this letter.
24   Q.   Do you know when President Munley began



1  generating this letter?
2      A.   No.
3      Q.   Prior to this letter going out, did you
4  make any written recommendation to terminate
5  Professor Fagal?
6      A.   I don't believe so, but if I did, I'm
7  sure you'd have it.
8           MR. COHEN:  Let's have this marked as
9  Levine Exhibit 10.
10          (Levine-10, Document headed "Talking
11  Points for Board," Bates Nos. DEF000145-146, is
12  received and marked for identification.)
13     Q.   And do you recognize this document?
14     A.   Not immediately.  Give me a second.
15  Yes.
16     Q.   These are "talking points for the
17  board," correct?
18     A.   Correct.
19     Q.   Did you have any input into drafting
20  these talking points?
21     A.   I don't believe so.
22     Q.   But you have seen this before?
23     A.   Yes.
24     Q.   In reference to this litigation or
          MAGNA LEGAL SERVICES

1  before that?
2           MS. PEET:  Just by way of clarification,
3  I think what he's trying to get at is did you see it
4  in preparing for this deposition or parts of this
5  litigation or in January or thereabouts 2012?
6      A.   I believe I saw it in January 2012.
7      Q.   If you look down towards the middle of
8  the first page, it says Thursday, January 19, 2012,
9  and then there's a black block, and then there's a
10  second bullet point that says, "Dr. Levine and
11  Dr. Dunleavy reviewed AAUP policies," right?
12     A.   Right.
13     Q.   Is that accurate?  I know it says that.
14  I want to know if that actually happened.
15     A.   Yes.
16     Q.   Why would you review AAUP policies?
17     A.   To make sure we were not doing anything
18  that was -- could be sanctioned by AAUP.
19     Q.   Did you review the progressive
20  discipline policy that Marywood had in place at the
21  time?
22     A.   I don't remember but I suspect we did.
23          MR. COHEN:  Let's have this marked as
24  Levine Exhibit 11.
          MAGNA LEGAL SERVICES

1           (Levine-11, Document headed "Talking
2  Points for Meeting," Bates No. DEF000147, is received
3  and marked for identification.)
4      Q.   Do you recognize this document?
5      A.   No, I don't recognize this document.  I
6  may have seen it, I just -- I don't recognize it.
7      Q.   Well, that's all I need to know about
8  that.
9           MR. COHEN:  Let's have this marked as
10  Levine Exhibit 12, please.
11          (Levine-12, E-mail dated Monday,
12  January 30, 2012, Bates No. DEF002756, is received
13  and marked for identification.)
14     Q.   Could you read this to yourself and let
15  me know when you're finished, please?
16     A.   Finished.
17     Q.   What did you mean when you said to
18  Joseph Garvey, "I await the massive flare-up to
19  come"?
20     A.   This.
21     Q.   You expected there would be litigation?
22     A.   Mine or his.
23          MR. COHEN:  Let's mark this as Levine
24  Exhibit 13.
          MAGNA LEGAL SERVICES

1           (Levine-13, E-mail dated Monday,
2  April 2, 2012, Bates No. DEF002380, is received and
3  marked for identification.)
4      Q.   And could you read this to yourself?
5      A.   Finished.
6      Q.   Barbara McNally was your assistant at
7  the time?
8      A.   She was one of -- yes, yes.
9      Q.   Did you tell Miss McNally Professor
10  Fagal would be leaving Marywood before the date of
11  this e-mail?
12     A.   Probably.
13     Q.   You thought that before Professor
14  Fagal's disciplinary procedures were over, it was a
15  foregone conclusion he would be out of Marywood?
16          MS. PEET:  Objection to the form.  You
17  can answer.
18     A.   I thought that was a distinct
19  possibility, yeah.
20     Q.   Do you know what an interrogatory is?
21     A.   No.
22     Q.   As far as legal proceedings go?
23     A.   No.
24     Q.   Let me just explain briefly.  An
          MAGNA LEGAL SERVICES



Page 50

1  interrogatory is just a question in writing that one
2  party in litigation can send to another and it has to
3  be answered under oath, kind of like the written
4  version of what we're doing here.
5       So before today I had sent Marywood an
6  interrogatory -- several interrogatories, and they
7  had been answered, and some of them pertain to you
8  and I want to see whether they're accurate.
9       So question number one, paragraph
10  number 20 of defendant's answer to plaintiff's
11  amended complaint and affirmative and other defenses,
12  hereinafter your answer -- and I realize you probably
13  haven't seen these documents --
14    A.    Correct.
15    Q.    -- you admitted, I'm talking about
16  Marywood admitted, to removing some of plaintiff's
17  posters announcing the FIRE speaker. "Did you or
18  anyone working for you instruct or suggest that these
19  posters be removed?  If so, who made this instruction
20  or suggestion?  If instruction or suggestion was
21  oral, please state its content in as close to
22  verbatim form as possible."
23       The answer that we received, and I want
24  you to let me know if it's accurate, is: "Defendant

MAGNA LEGAL SERVICES

Page 51

1  Marywood is unaware of the identity of the individual
2  who removed plaintiff's posters announcing the FIRE
3  speaker other than Dr. Alan Levine who removed one
4  poster.  Additionally, defendant is unaware of anyone
5  who instructed or suggested that plaintiff's FIRE
6  speaker posters be removed."
7    A.    I believe that's correct.  I did remove
8  a poster.
9    Q.    Okay.  Question number four is: "Did
10  your vice president for academic affairs, Dr. Alan
11  Levine, participate in any way in the decision to
12  suspend Professor Fagal or to maintain the suspension
13  thereafter?  If so, please describe Dr. Levine's
14  participation in as much detail as possible."
15       The answer that was provided is:
16  "Dr. Levine supported President Munley's decision to
17  suspend Professor Fagal and was aware of and helped
18  orchestrate the January 23rd, 2012, meeting where
19  Professor Fagal was suspended."  Is that accurate?
20    A.    Accurate.
21    Q.    Do you have anything more to add to
22  that?
23    A.    No.
24    Q.    The poster that you removed, was it

MAGNA LEGAL SERVICES

Page 52

1  stamped approved?
2    A.    I don't remember.  Probably it was.
3    Q.    Why would you remove an approved poster?
4       MS. PEET:  Objection.  He said he's not
5  sure, is the appropriate testimony, so you're making
6  assumptions.
7       MR. COHEN:  You can answer.
8       THE WITNESS:  Should I answer that?
9       MS. PEET:  If you can.
10  BY MR. COHEN:
11    Q.    If you can.
12    A.    So would you just repeat it one more
13  time?
14    Q.    Why would you remove an approved poster?
15       MS. PEET:  Same objection, but you can
16  answer.
17    A.    I wanted to bring it to cabinet so we
18  could have a discussion.
19       MR. COHEN:  Okay.  I'm finished,
20  Dr. Levine.  But, Stephanie, do you have any
21  questions?  Stephanie?
22       MS. PEET:  I'm thinking.
23       MR. COHEN:  I didn't know whether you
24  heard me.

MAGNA LEGAL SERVICES

Page 53

1  CROSS-EXAMINATION BY MS. PEET:
2    Q.    Dr. Levine, why did you want to discuss
3  the poster at cabinet?
4    A.    The $50 raffle was something I had never
5  seen nor was it something that Marywood does.  We
6  don't give money to have people attend classes.
7    Q.    Did your bringing the poster to the
8  cabinet have anything to do with the fact the speaker
9  was from the organization called FIRE?
10    A.    No, I could care less.  What do I care
11  about that?
12    Q.    I assume you viewed the videos at that
13  Dr. Fagal posted on YouTube?
14    A.    I'm sorry.  Did you say have I seen
15  them?
16    Q.    Did you view them?
17    A.    I viewed them.
18    Q.    And what was your reaction?
19    A.    I was horrified.  They not only defamed
20  me, they defamed my wife.  They brought my wife into
21  this fucking thing.  And I lost people in the
22  Holocaust.  I'm Jewish.  I was horrified that this
23  was going out to the world.  Are you -- are you
24  fucking kidding me?

MAGNA LEGAL SERVICES



14 (Pages 50 to 53)

Page 54

```
1      Q.     Did you share your -- these sentiments
2  with Sister Munley?
3      A.     Yeah.
4      Q.     Prior to the suspension of Dr. Fagal?
5      A.     Yes.
6      Q.     As we sit here today, are you -- I
7  assume you're aware that Dr. Fagal was ultimately
8  terminated from his employment at Marywood
9  University, correct?
10     A.     Yes, I am.
11     Q.     And as we sit here today, do you find
12 that decision to be appropriate?
13     A.     Very much so.
14     Q.     Did you support the decision to
15 terminate Dr. Fagal's employment with Marywood?
16     A.     I did then and I do now.
17            MS. PEET:  No other questions.
18            MR. COHEN:  I have no follow-up.
19            (Whereupon, at 11:05 a.m., the
20 deposition of Alan Michael Levine concluded.)
21
22
23
24
```

MAGNA LEGAL SERVICES

Page 56

```
1           INSTRUCTIONS TO WITNESS
2
3          Please read your deposition over
4  carefully and make any necessary corrections.  You
5  should state the reason in the appropriate space on
6  the errata sheet for any corrections that are made.
7          After doing so, please sign the errata
8  sheet and date it.
9          You are signing same subject to the
10 changes you have noted on the errata sheet, which will
11 be attached to your deposition.
12          It is imperative that you return the
13 original errata sheet to the deposing attorney within
14 thirty (30) days of receipt of the deposition
15 transcript by you.  If you fail to do so, the
16 deposition transcript may be deemed to be accurate and
17 may be used in court.
18
19
20
21
22
23
24
```

Page 55

```
1            CERTIFICATE
2
3          I HEREBY CERTIFY that the witness was
4  duly sworn by me and that the deposition is a
5  true record of the testimony given by the
6  witness.
7
8
9
10         Judy A. Black
           Registered Professional Reporter
11         Dated:  September 16, 2016
12
13
14
15
16         (The foregoing certification of this
17 transcript does not apply to any reproduction of
18 the same by any means, unless under the direct
19 control and/or supervision of the certifying
20 reporter.)
21
22
23
24
```

MAGNA LEGAL SERVICES

Page 57

```
1            - - - - - -
              E R R A T A
2            - - - - - -
3  PAGE  LINE  CHANGE
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```



Page 58

1   ACKNOWLEDGMENT OF DEPONENT
2
3    I, Alan M. Levine, do hereby certify
that I have read the foregoing pages and that the same
4 is a correct transcription of the answers given by me
to the questions therein propounded, except for the
5 corrections or changes in form or substance, if any,
noted in the attached Errata Sheet.
6
7
8 Alan M. Levine   Date
9
10
  Subscribed and sworn
11 to before me this
   day of   , 2016
12
  My commission expires:
13
14
  Notary Public
15
16
17
18
19
20
21
22
23
24

Page 59

1    LAWYER'S NOTES
2 PAGE
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



# Exhibit 19

**EXHIBIT**

**19**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| FREDERICK F. FAGAL, JR. | : | |
| | : | |
| *Plaintiff,* | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 3:14-cv-02404-ARC |
| MARYWOOD UNIVERSITY, | : | |
| | : | (HON. A. RICHARD CAPUTO) |
| *Defendant.* | : | |
| | : | |

## OBJECTIONS AND ANSWERS TO DEFENDANT'S FIRST SET OF INTERROGATORIES TO PLAINTIFF

Plaintiff Frederick F. Fagal, Jr. hereby submits these Objections and

Answers to Defendant's First Set of Interrogatories to Plaintiff.

## INTERROGATORY NO. 1

Identify each and every person who assisted you in preparing your Answers to these Interrogatories.

## ANSWER

Jonathan Z. Cohen, Esq.
Male
Manager
175 Strafford Avenue
Suite 1 # 212
(215) 874-0047
Jonathan Z. Cohen Ltd.

My Cohen is my attorney.

## INTERROGATORY NO. 2

Identify each and every person, including telephone number and last known address, who you believe has knowledge of any facts relating to this matter and give a detailed description of the knowledge possessed by each individual.

## ANSWER

Please see Plaintiff's Initial Disclosures Under Federal Rule of Civil Procedure 26(a)(1) ("Plaintiff's Initial Disclosures"). I also believe that the following persons may have knowledge of facts related to "this matter." The facts or listed knowledge areas are those known or likely to be known by each cited person. The facts or knowledge known by each person only include facts known or likely to be known because the person was a participant in the events. I do not include in this answer any person who "has knowledge of any facts relating to this matter" if their "knowledge" is in no way original but merely based on hearsay.

3

| Name | Sex | Telephone # | Last Known Address | Knowledge of Facts Which May Be Possessed By The Individual (see below) |
|---|---|---|---|---|
| Carl Oliveri | M | Unknown | 179 Longwood Avenue, Boston, MA 02115 | |

Carl Oliveri knows that I arranged with him to have the Marywood University Student Activities office, on November 28, 2011, stamp posters announcing the 2:00 pm November 30, 2011 speech by Will Creeley of FIRE.

| Name | Sex | Telephone # | Last Known Address | Knowledge of Facts Which May Be Possessed By The Individual (see below) |
|---|---|---|---|---|
| Alan Levine | M | Unknown | | |

Alan Levine was Marywood University's Vice President for Academic Affairs at all times relevant to the events of this matter. In addition to all facts alleged in the Amended Complaint in this matter, Levine knew or likely knew of the following:

- The scheduled speech by FIRE;
- Marywood's Executive Committee had approved the tear-down of the FIRE posters;
- He told Oliveri to tear down the FIRE posters;
- There was no valid reason to tear down the FIRE posters;
- He did not suspend me even though only he had the right to perform suspensions;
- He made statements to the Marywood University newspaper, The Wood Word, on February 22, 2015, about this matter. Specifically, Levine stated: "What we try to do is follow the AAUP [American Association of University Professors] guidelines….In my time as [VPAA], I don't believe we have done anything but follow the AAUP guidelines that are in our faculty handbook."

| Name | Sex | Telephone # | Last Known Address | Knowledge of Facts Which May Be Possessed By The Individual (see below) |
|---|---|---|---|---|
| Geri Smith | F | (570) 899-9439 | 19 E Kirmar Ave Nanticoke, PA 18634-3607 | |

Geri Smith knew that on November 28, 2011 the posters announcing the FIRE speech were stamped for approval for hanging. She also knew by observation that the posters had been torn down.

| Name | Sex | Telephone # | Last Known Address | Knowledge of Facts Which May Be Possessed By The Individual (see below) |
|---|---|---|---|---|
| Katie M. Aunchman | F | (518) 745-1203 | 21 Uncas Street Glens Falls, NY 12801-3118 | |

Katie M. Aunchman was the person in charge of stamping the posters approved on the morning of November 28, 2011. She was a graduate student and worked in the Student Activities office under Carl Oliveri and she oversaw the Council of Clubs. Several work study students there that morning helped Aunchman stamp the posters approved. Aunchman should know the names of the work-study students who helped her with the stamping.

| Name | Sex | Telephone # | Last Known Address | Knowledge of Facts Which May Be Possessed By The Individual (see below) |
|---|---|---|---|---|
| Benjamin Harrington | M | Unknown | Unknown | |

Benjamin Harrington was a Marywood student who said he would be at the Student Activities office Wednesday Nov 30 to get new (approved) posters to hang. He may have witnessed Carl Oliveri tell me that Marywood University tore down the posters that had been stamped approved on Monday Nov 28 2011.

| Name | Sex | Telephone # | Last Known Address | Knowledge of Facts Which May Be Possessed By The Individual (see below) |
|---|---|---|---|---|
| Samantha Coco | F | Unknown | Unknown | |

Samantha Coco was a Marywood student who on November 28 2011 helped hang approved posters. She may have witnessed them being stamped approved. She later noticed that some posters she hung were missing.

| Name | | Telephone # | Last Known Address | Knowledge of Facts Which May Be Possessed By The Individual (see below) |
|---|---|---|---|---|
| Nicholas A. Pesarcik | M | Unknown | Unknown | |

Nicholas Pesarcik was a work study student in the Student Activities office. He is likely to have witnessed the posters being stamped approved and may have stamped some. He likely knows that the posters stamped approved on Monday November 28 were torn down by Marywood personnel and knows who did it.

| Name | Sex | Telephone # | Last Known Address | Knowledge of Facts Which May Be Possessed By The Individual (see below) |
|---|---|---|---|---|
| Anne Munley | F | (570) 348-6231 | 2300 Adams Avenue Scranton, PA 18509 | |

Sister Anne Munley, who was President of Marywood University at all times relevant to this matter, knew or likely knew of all facts alleged in the Amended Complaint filed in this matter.

| Name | Sex | Telephone # | Last Known Address | Knowledge of Facts Which May Be Possessed by The Individual (see below) |
|---|---|---|---|---|
| Raymond P. Heath | M | Unknown | Unknown | |

Heath was a member of Marywood's Executive Committee at all times relevant to this matter. He knew or likely knew that the Executive Committee approved the tear-down of the FIRE posters.

6

| Name | Sex | Telephone # | Last Known Address | Knowledge of Facts Which May Be Possessed by The Individual (see below) |
|---|---|---|---|---|
| Clayton N. Pheasant | M | (814) 669-9003 | 301 6th Street, Alexandria, PA 16611-3338 | |

Pheasant was a member of Marywood's Executive Committee at all times relevant to this matter. He knew or likely knew that the Executive Committee approved the tear-down of the FIRE posters.

| Name | Sex | Telephone # | Last Known Address | Knowledge of Facts Which May Be Possessed by The Individual (see below) |
|---|---|---|---|---|
| Mary Theresa Gardier Paterson | F | (570) 340-6018 | Unknown | |

Paterson was a member of Marywood's Executive Committee at all times relevant to this matter. She knew or likely knew that the Executive Committee approved the tear-down of the FIRE posters. As Marywood's General Counsel, she also knew or likely knew the content of all written policies applicable to my discipline.

| Name | Sex | Telephone # | Last Known Address | Knowledge of Facts Which May Be Possessed by The Individual (see below) |
|---|---|---|---|---|
| Michael A. Foley | M | Unknown | 17 Canyoncreek Lane Fuquay Varina, NC 27526-5222 | |

Foley was present at the meeting referenced in Paragraph No. 26 of the Amended Complaint. Therefore, he knows or likely knows what was said and not said at that meeting.

| Name | Sex | Telephone # | Last Known Address | Knowledge of Facts Which May Be Possessed By The Individual (see below) |
|---|---|---|---|---|
| Sr. Margaret Gannon | F | | Unknown | |
| Gannon knew the FIRE speaker was scheduled and she observed that some posters remained up after I had announced that posters had been torn down. She may have made inquiries about what had happened and learned that my posters had in fact been torn down. | | | | |

| Name | Sex | Telephone # | Last Known Address | Knowledge of Facts Which May Be Possessed by The Individual (see below) |
|---|---|---|---|---|
| Amy Paciej-Woodruff | F | Unknown | Unknown | |
| Dean Paciej-Woodruff was aware that I had arranged for a FIRE speaker to speak on campus prior to my posters going up and that I had asked her to publicize the event. | | | | |

| Name | Sex | Telephone # | Last Known Address | Knowledge of Facts Which May Be Possessed By The Individual (see below) |
|---|---|---|---|---|
| Helen Bittel, Ph.D. | F | Unknown | Unknown | |
| Helen Bittel was a member of the  Faculty Senate Ad Hoc Hearing Committee and should be familiar with the details regarding my suspension and dismissal. | | | | |

| Name | Sex | Telephone # | Last Known Address | Knowledge of Facts Which May Be Possessed by The Individual (see below) |
|---|---|---|---|---|
| Sr. Gail Cabral | F | Unknown | Unknown | |

Sr. Gail Cabral was president of Marywood's Faculty Senate. She was aware that I had arranged for a FIRE speaker to speak on campus prior to my posters going up. Because she was President of the Faculty Senate she was informed when I filed a grievance against President Munley. She also likely knew the content of the grievance that I filed against President Munley. Finally, Sr. Gail Cabral was likely familiar with the Ad Hoc Hearing Committee process which led to the confirmation of my dismissal.

| Name | Sex | Telephone # | Last Known Address | Knowledge of Facts Which May Be Possessed by The Individual (see below) |
|---|---|---|---|---|
| Patricia E. Dunleavy, Ph.D. | F | Unknown | Unknown | |

Dunleavy, Marywood's Associate Vice President for Human Resources, was present at the meeting referenced in Paragraph No. 26 of the Amended Complaint. Therefore, she knows or likely knows what was said and not said at that meeting. Dunleavy also knew that I was permitted to clean out my office without supervision. Thus she likely knew I was not perceived as a threat.

| Name | Sex | Telephone # | Last Known Address | Knowledge of Facts Which May Be Possessed by The Individual (see below) |
|---|---|---|---|---|
| Frederick F. Fagal, Jr. | M | (315) 685-0429 | 17 East Lake Street Skaneateles, NY 13152 | |

I am the Plaintiff, and I am familiar with all claims made in the Amended Complaint.

| Name | Sex | Telephone # | Last Known Address | Knowledge of Facts Which May Be Possessed by The Individual (see below) |
|------|-----|-------------|--------------------|-------------------------------------------------------------------------|
| Joseph X. Garvey, Jr. | M | Unknown | Unknown | |

Garvey, Marywood's Vice President for Business Affairs and Treasurer, was a member of Marywood's Executive Committee at all times relevant to this matter. He knew or likely knew that the Executive Committee approved the tear-down of the FIRE posters. If he was present at the meeting referenced in Paragraph No. 26 of the Amended Complaint, then he knows or likely knows what was said and not said at that meeting.

| Name | Sex | Telephone # | Last Known Address | Knowledge of Facts Which May Be Possessed by The Individual (see below) |
|------|-----|-------------|--------------------|-------------------------------------------------------------------------|
| Edward J. O'Brien, Ph.D. | M | Unknown | Unknown | |

O'Brien was a Marywood professor and he served on the Faculty Senate Ad Hoc Hearing Committee. Professor O'Brien will likely be familiar with the details regarding my suspension and dismissal.

| Name | Sex | Telephone # | Last Known Address | Knowledge of Facts Which May Be Possessed by The Individual (see below) |
|------|-----|-------------|--------------------|-------------------------------------------------------------------------|
| Mathew Povse | M | Unknown | Unknown | |

Povse was a member of the Faculty Senate Ad Hoc Hearing Committee. He should be familiar with the details regarding my suspension and dismissal.

| <u>Name</u> | <u>Sex</u> | <u>Telephone #</u> | <u>Last Known Address</u> | Knowledge of Facts Which May Be Possessed by The Individual (see below) |
|---|---|---|---|---|
| Erin A. Sadlack, Ph.D. | F | Unknown | Unknown | |
| Sadlack chaired the Grievance Committee which examined my grievance against President Munley. She would know the details leading to the committee's decision to dismiss my complaint. | | | | |

11

## INTERROGATORY NO. 3

State with particularity the nature, basis, amount and manner of computation of all monetary relief and/or damages that you are seeking from Defendants and identify each and every document that reflects or relates to the information requested in this Interrogatory.

## OBJECTIONS

This interrogatory is not reasonably particular with regard to the documents required to be identified. This interrogatory calls for disclosure of information protected by the attorney-client privilege and/or as trial-preparation material; no such information will be disclosed.

## ANSWER

Please see Part III of Plaintiff's Initial Disclosures. Please also see the documents produced contemporaneously in the electronic folder labeled "Damages."

12

## INTERROGATORY NO. 4

Please state your full name, present address, your date and place of birth, your Social Security number, your driver's license number and, if you have ever been known by any other name, please state all names by which you have been known, the dates of use of each such name, and the reasons for any change of name.

## ANSWER

My full name is Frederick Franklin Fagal, Jr. I was born on ███████, 1946 in Boston, Massachusetts. My social security number is ████-9022. My New York driver's license number is ██████ 119.

## INTERROGATORY NO. 5

If you have ever been charged with, pleaded guilty to, or been convicted of a crime, please state the date of each prosecution or conviction, the name of each court and the location of each court where the charge, prosecution or conviction took place, and a full description of any and all sentences imposed.

## ANSWER

I am not sure whether this constitutes a "crime" or merely an infraction under New York law: On September 12 or 13, 1968, I was arrested for driving while intoxicated. However, that charge was never introduced in court and instead the charge became Driving Under the Influence or DUI, which was less serious. I instead pled guilty to the charge of Driving Under the Influence (now called "driving while ability-impaired") in Ithaca City Court, New York on September 13, 1968. I had to pay either a $50.00 or $100.00 fine.

## INTERROGATORY NO. 6

If you have ever been involved in any civil legal action (workers'
compensation claims included), either as defendant or plaintiff, or filed a charge or
complaint with any administrative agency, state the date and place of each such
action, including the name of the court or agency, and parties involved, the court or
agency docket number of all such actions, the names of attorneys representing each
party, a description of the nature of each such action, including the disposition of
each such action, whether or not there was an appeal and, if so, the result thereof
including the name and citation of each case reported, and the amount of any
settlement or judgment obtained in each such case.

## ANSWER

In October 1973, I filed a small-claims action against Lansing West
Apartments and Gerald Talandis for the return of a $235.00 security deposit. I
believe that my wife, Janet S. Fagal, was a co-plaintiff. The name of the court was
the Ithaca City Court. I do not know the docket number. I believe that the
Defendants had an attorney, but I cannot recall a name. I lost this action. There was
no appeal.

## INTERROGATORY NO. 7

State whether any investigation been conducted by you or by anybody else with regard to your claim against Defendant.  If so, as to each investigation state the date and reason for such investigation; whether any record or report was made of it; the name, address and telephone number of the person or organization conducting the investigation; and the verbatim contents of any record or report made, or attach copies thereof to your answers to these Interrogatories.

## OBJECTIONS

This interrogatory calls for disclosure of information and documents protected by the attorney-client privilege and as trial-preparation materials. No such information or documents will be disclosed. This interrogatory is also vague as it fails to explain what type of "investigation" is contemplated.

## ANSWER

My attorney, Mr. Cohen, has performed an investigation into the facts and law regarding this matter. That investigation began in January or February 2012 and has been ongoing since then. The purpose of this investigation has been to

16

defend me from Marywood's bogus disciplinary proceedings and to seek a legal

remedy from the resulting discipline.

## INTERROGATORY NO. 8

Set forth whether you have obtained a statement from any person concerning this matter and, if so, state the name and address of the person who gave the statement and the date the statement was obtained; if written, whether signed by this person; if oral, the name and address of the person who obtained the statement, and the date the statement was obtained; and attach a copy of all written statements; or if oral, set forth completely the substance of said statements.

## OBJECTIONS

This interrogatory is vague and ambiguous, as it fails to explain what type of "statement" is contemplated.

## ANSWER

No.

## INTERROGATORY NO. 9

If you contend that any party to this action has, at any time, made any admissions, state the date of the admission; the name and address of the person making it; the name and address of the person or persons to whom it was made; set forth the nature of the admission in detail; state whether it was reduced to writing; the place where the admission was made; and names and addresses of the persons present when it was made.


## ANSWER

On December 1, 2011, Dean Levine suggested in an email that Marywood personnel removed at least some of my FIRE posters. Mr. Levine's address is 2300 Adams Avenue, Scranton, Pennsylvania 18509. I do not know where Dean Levine was when he wrote the email or whether anybody else was in his presence.

On January 24, 2012, President Munley sent a letter to me. In that letter, she repeatedly stated that Marywood had an "agreement" with me. She also enclosed a "Letter of Agreement" executed by both us as well as written policy indicating that successful candidates for tenure receive a "tenure contract." President Munley's address is at 2300 Adams Avenue, Scranton, Pennsylvania 18509. I do

19

not know where President Munley was when she wrote the letter or whether anybody else was in her presence.

On February 8, 2012, President Munley sent me another letter. In that letter, President Munley repeatedly stated that Marywood had an "agreement" with me. President Munley referred to a "breach of a material term." She also enclosed a "Letter of Agreement" executed by both us as well as written policy indicating that successful candidates for tenure receive a "tenure contract." I do not know where President Munley was when she wrote the letter or whether anybody else was in her presence.

On February 9, 2012, Marywood's attorney, William J. Anthony, sent my attorney a letter. In that letter, Mr. Anthony repeatedly admitted that Marywood and I had a "contract." Mr. Anthony's addresses are at 18 Corporate Woods Boulevard, Third Floor, Albany, New York 12211 and 90 State House Square, 8th Floor, Hartford, Connecticut 06103. Mr. Anthony's letter was copied to Stephanie Peet, an attorney from the same law firm. I do not know whether anybody else was in Mr. Anthony's presence when he wrote this letter.

On February 28, 2012, Mr. Anthony sent another letter to my attorney. In that letter, Mr. Anthony admitted that Marywood and I had an "agreement" and a

"contract." That letter was copied to President Munley and Ms. Dunleavey. I do not know whether anybody else was in Mr. Anthony's presence when he wrote this letter.

On or around February 22, 2015, Dean Levine made the following statements to Marywood's student newspaper, The Wood Word, in an article about this lawsuit: "What we try to do is follow the AAUP [American Association of University Professors] guidelines....We try very hard to follow this policy. It is in our handbook as well." Dean Levine's address is 2300 Adams Avenue, Scranton, PA 18509. The statements were presumably made to the article's authors, Rachel Looker and Satara Dickey. Dean Levine's statements were reduced to writing in the above-referenced article. I do not know the place where the admission was made or who else was present at the time of the admission.

On April 9, 2015, Marywood's attorney, Ms. Peet, electronically filed Defendant's Reply Brief in Support of its Motion to Dismiss Plaintiff's Complaint. On page 27 of that brief, Defendant's attorney stated: "On the contrary, Marywood did not accept any further performance from Plaintiff upon learning of his breach, notified him of the breach and continued limited performance only to protect itself from potential liability for immaterial breaches." Thus, Defendant has admitted that it breached its contract with Plaintiff. Ms. Peet's address is 1601

21

Cherry Street, Suite 1350, Philadelphia, Pennsylvania 19102. I do not know where Ms. Peet was when she filed the brief or whether she was with anybody else.

On June 30, 2015, Defendant, through Ms. Peet, electronically filed Defendant's Answer to Plaintiff's Amended Complaint and Affirmative and Other Defenses. In Paragraph No. 15, Defendant admitted that it entered into an agreement with me in May 2011. In Paragraph No. 19, Defendant admitted that I received approval to hang posters announcing the speaker from FIRE. In Paragraph No. 20, Defendant admitted that it removed some of my posters announcing the FIRE speaker. I do not know where Ms. Peet was when she filed the brief or whether she was with anybody else.

On September 17, 2015, Defendant's attorney, Katherine Thomas Batista, electronically filed a Joint Case Management Plan with the Court. Ms. Peet also apparently approved of this document. In that document, Marywood admits that it had an "agreement" with me and—at one time—"contractual obligations" to me. Ms. Batista's address is 1601 Cherry Street, Suite 1350, Philadelphia, Pennsylvania 19102. I do not know where Ms. Batista or Ms. Peet were when this document was filed, or whether they were with anybody else.

## INTERROGATORY NO. 10

Please describe all Internet social media sites including, but not limited to, Facebook, Twitter, LinkedIn, Pinterest, MyLife, MySpace, Reunion, YouTube, Foursquare, Tumblr, Reddit, StumbleUpon, Instagram and Digg, that you have, or have had an account with from November 2011 to the present, including your user name, html address of main page, approximate frequency of postings, and approximate date range you have had the account.

## ANSWER

My Facebook username is frederick.fagal. The HTML address is https://www.facebook.com/frederick.fagal. I post on Facebook on rare occasion. I have been a Facebook member since December 14, 2006.

My LinkedIn username is fffagal@yahoo.com. The HTML address is https://www.linkedin.com/in/fffagal. I post on LinkedIn rarely if ever. I have been a LinkedIn member since May 6, 2008.

My YouTube account is connected to the Google account associated with fffagal@gmail.com. There is also a separate username of freespeech1946. The HTML address is https://www.youtube.com/channel/UC-

23

8KIeRktob33_LKca5VG3Q. I rarely post on YouTube. I have had a YouTube account since September 11, 2011.

My classmates username is fffagal@yahoo.com. The HTML address is http://www.classmates.com/people/Fred-Fagal/8679740058. I rarely if ever post on classmates. I have had an account on classmates since approximately 2013.

**INTERROGATORY NO. 11**

Identify any other tenured professor who you believe engaged in similar conduct to Plaintiff's in sending out an email to faculty containing links to two satirical videos.

**ANSWER:**

Laurie McMillan, Ph.D.
Female
Associate Professor
Marywood University
2300 Adams Avenue
Scranton, PA 18509

## INTERROGATORY NO. 12

In Paragraphs 29-31 of the Amended Complaint, Plaintiff identifies three ways in which Marywood allegedly breached Plaintiff's employment contract.  If you contend that Marywood breached Plaintiff's employment agreement in any other ways, or based on any other theories, please identify and explain them.

## ANSWER

Yes, I do contend that Marywood breached my employment agreement in other ways. Please see my Amended Complaint at Paragraph Nos. 40-43, 58, and 63. These paragraphs fully explain the other ways in which Marywood breached my employment agreement.

## INTERROGATORY NO. 13

Please list all email addresses that you have, or have had from November 2011 to the present and identify the one(s) that are your primary addresses.

## ANSWER

My primary email address is fffagal@yahoo.com. The other email addresses covered by this interrogatory are fffagal@gmail.com, fagal@marywood.edu, fagal@es.marywood.edu, and fagal@maryu.marywood.edu.

## INTERROGATORY NO. 14

Please describe the actions you have taken, if any, to preserve ESI in your possession or control that might be relevant to any of the claims or defenses made in this case, and for each such action state: the date or dates on which the action was taken; and, the names and complete contact information of any persons other than yourself involved in the actions, specifying the action taken by these third parties.

## ANSWER

I have a portable backup hard drive, which continuously backs up my desktop computer. I have had this portable backup drive for over a year. I also have a clone of the hard drive that is in my desktop computer. I bought this clone drive in July 2015. I also have a portable backup hard drive that continuously backs up my laptop computer. I bought this in 2014. My email accounts are all cloud-based such that Yahoo! and Google maintain the messages on their servers. My attorney has retained Capsicum Group LLC to preserve the entire contents of my fffagal@yahoo.com and fffagal@gmail.com email accounts. Capsicum's address is 2929 Arch Street, Suite 1525, Philadelphia, Pennsylvania 19104. Many of my files related to this case are also stored on Dropbox, another cloud-based service. On

November 17, 2015, I downloaded the entire contents of my Facebook account. On

November 3 and 17, 2015, I downloaded the entire contents of my LinkedIn

account. Today, I downloaded the entire contents of my Google account.

Respectfully,


By:   *Jonathan Z. Cohen*
      Jonathan Z. Cohen (PA205941)
      175 Strafford Avenue
      Suite 1 # 212
      Wayne, PA 19087-3340
      (215) 874-0047
      (215) 839-8951 (fax)
      jzc@jzc-law.com

      *Attorney for Plaintiff Frederick F. Fagal, Jr.*

Date: November 20, 2015

## **OATH**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November _20_, 2015.


_Frederick F. Fagal, Jr._
FREDERICK F. FAGAL, JR.

# Exhibit 20

**EXHIBIT**
**20**



MARYWOOD UNIVERSITY
SCRANTON, PA 18509-1598
TEL: (570) 348-6232
FAX: (570) 961-4743
LEVINE@MARYWOOD.EDU
*www.marywood.edu*

**Marywood**
U N I V E R S I T Y
OFFICE OF ACADEMIC AFFAIRS

December 15, 2011

Dr. Frederick F. Fagal, Jr
Department of Social Sciences
Marywood University
2300 Adams Ave.
Scranton, PA 18509

Dear Fred,

It appears we have a different understanding of what transpired around the issue of the posters that advertised the presentation by Will Creeley of the Foundation for Individual Rights in Education (FIRE). Whether we will ever come to complete agreement concerning the exact timeframe for approval, or lack thereof, remains to be seen, but at any rate I do want to respond to your letter of December 5, 2011.

Sr. Anne Munley and I remain open to future presentations that are not in conflict with our mission statement or core values, and are organized according to our policies and practices. However, we are not willing to undertake any of the specific requests that are contained in your letter.

Please feel free to be in touch if you want to further discuss this issue.

Sincerely,

Alan M. Levine, PhD
Vice President for Academic Affairs

Cc:     Sr. Anne Munley, IHM, President
        Michael Foley, Ph.D., Dean, College of Liberal Arts and Sciences
        File

*An education inspired by the Sisters, Servants of the Immaculate Heart of Mary.*

**EXHIBIT**
Fagal-10
6/7/16

DEF001480