# Exhibit 22

**EXHIBIT**

**22**

154

## MARYWOOD UNIVERSITY PLANNING ADVISORY COUNCIL

(Approved by the President 11/5/02, 1/27/05)

**Title**

Marywood University Planning Advisory Council

**Purpose and Function**

The Marywood University Planning Advisory Council is an advisory group to the President of the University on strategic planning. The Council may create ad hoc committees from the Marywood University community to assist in its work.

**Membership and Selection**

President of the University (Chair)
Provost and Vice President for Academic Affairs
Vice President for Business Affairs
Vice President for University Advancement
Vice President for Student Life
Vice President for Enrollment Management
Chief Planning Officer
All academic deans
Executive Director of Marketing Communications
One full-time or pro rata faculty member from each college
One professional staff member
One support staff member
One undergraduate student
One graduate student

The faculty members are elected from the full-time and pro rata faculty of each college. Elections are conducted by the Election Committee for Primary University Standing Committees.

The professional staff member is elected by the Election Committee of the Professional Staff Senate. The support staff member is appointed by the President of the University.

The undergraduate student is appointed by the Executive Board of the Student Government Association in consultation with the Vice President for Student Life.

The graduate student is appointed by the President of the Graduate Student Council in consultation with the Vice President for Student Life.

**Term**

Faculty members – three years, eligibility for election limited to one additional, three-year term
Professional staff member – three years, eligible for reelection to one additional three-year term
Support staff member – three years, eligible for reappointment to one additional three-year term
Students – one year, eligible for reappointment

**Meetings**

Meetings are held at least once a semester at the call of the President of the University.

**Reports to**

President of the University

## Marywood University Faculty Handbook 2010

# POLICY COMMITTEE OF THE UNIVERSITY

(Revision approved by the President 11/8/02, 4/17/04)

**Title**
Policy Committee of the University

**Purpose and Function**
The Policy Committee is the final recommending body to the President of the University on
   policies affecting more than one major area of the University;
   policies limited to one college or area but having implications for the total University, another major
   area, or another college;
   policies affecting the objectives of the University;
   policies affecting the long-range development of the University;
   establishing or abolishing a University Standing Committee;
   merging or reconfiguring two or more committees when at least one of them is a University Standing
   Committee.

The office of Secretary of the University serves to provide administrative support as outlined in
established guidelines for Policy Development, Approval, and Dissemination.

The Executive Committee
   exercises all of the powers of the Policy Committee of the University when it is not possible to
   convene the entire committee, and it reports its interim actions at the next regular meeting of the full
   committee;

   meets with the President of the University and the Secretary of the University about two weeks prior
   to a full committee meeting to prepare the agenda for the meeting.

**Membership and Selection**
To assure maximum effectiveness, the members should have a total University viewpoint.

President of the University (non-voting)
Provost and Vice President for Academic Affairs
Vice President for Business Affairs
Vice President for University Advancement
Vice President for Student Life
Academic deans
President of the Faculty Senate
One full-time faculty member from each college
Three full-time faculty members at large
Assistant Vice President for Human Resources
Chair of the Professional Staff Senate
One representative of the Professional Staff Senate at large
Chair of the Support Staff Senate
One representative of the Support Staff Senate at large
One undergraduate student
One graduate student

Faculty members are elected by the Election Committee for Primary University Standing Committees.

**Marywood University Faculty Handbook  2010**

156

Representatives at large of the Professional Staff Senate and the Support Staff Senate are elected by their respective senates.

The undergraduate student is appointed by the Executive Board of the Student Government Association in consultation with the Vice President for Student Life.

The graduate student is appointed by the President of the Graduate Student Council in consultation with the Vice President for Student LIfe.

The election of the Chair and the Vice Chair is conducted annually at the last meeting in the spring semester, whether or not the election is the only agenda item.
- The slate is made up of current members who are eligible for membership for the following year.
- All current voting members may cast a vote.
- The election process is the prerogative of the sitting Chair.

The Executive Committee includes
> Chair of the Policy Committee
> Vice Chair of the Policy Committee
> Provost and Vice President for Academic Affairs
> one academic dean chosen among themselves,
> one representative from the faculty representatives chosen among themselves
> Assistant Vice President for Human Resources
> Chair of the Professional Staff Senate
> Chair of the Support Staff Senate.

**Term**
Elected faculty and senate representatives serve a term of three years with possibility of re-election to one three-year term, but not for a third term until one year has elapsed.

Student representatives serve for a one-year term.

The term of office for the Chair and the Vice Chair is one year, beginning with July 1.

**Meetings**
The committee meets at the call of the Chair.

**Reports to**
President of the University

**Marywood University Faculty Handbook  2010**

# MISSION INTEGRATION COMMITTEE

(Approved by the President of the University 3/20/09)

**Title**
Mission Integration Committee

**Purpose and Function**
The Mission Integration Committee assists the Marywood community to create a mission-driven environment by
- promoting integration of the Marywood mission and core values into the everyday life of the University;
- providing ongoing mission-related orientation to administrators, faculty and staff members, and students;
- participating in orientation of new hires to the mission and core values of the University;
- immersing the Marywood community in the heritage and mission of the Congregation of the Sisters, Servants of the Immaculate Heart of Mary;
- assisting administrators, faculty and staff members in nurturing, advancing, and passing on the legacy of the founding Sisters of IHM to future generations;
- assisting in developing leaders who will carry forward the Catholic identity, mission and values of Marywood.

**Membership and Selection**
The Committee consists of not fewer than ten persons from the Marywood University Community. The membership is made up of at least one representative of every presidential and vice presidential area and should include
- at least one representative of the full-time Faculty;
- at least one representative of the Administrative or Professional Staff;
- at least one representative of the Support Staff;
- at least one representative of each college and school;
- at least one member of the IHM Congregation serving at the University;
- at least one student;

The Chair and the Vice Chair are appointed by the President of the University.
Other representatives are appointed by the Chair of the Committee with the approval of their respective vice presidents.

**Term**
Students – one year with possibility of reappointment
Other representatives – three years with possibility of reappointment
The terms of the Chair and the Vice Chair are for three years with the possibility of reappointment.

**Meetings**
Meetings are called by the Chair at least three times a year.

**Reports to**
President of the University

**Marywood University Faculty Handbook 2010**

158

# BUDGET COMMITTEE OF THE UNIVERSITY

(Approved by the President of the University 2/7/03, effective 7/1/03)

**Title**
Budget Committee of the University

**Purpose and Function**
The Budget Committee of the University advises the Administration about broad issues that impact the annual institutional budget.  It is

a forum for discussion of budgetary issues of interest to the University community;

an avenue of communication to the campus community about the budgetary process and related issues;

a means of evaluating the budget process;

an opportunity for representatives of the University community to recommend annual budget priorities.

**Membership and Selection**
To assure maximum effectiveness, the members should have a keen interest in fiscal affairs with a total University viewpoint.

Vice President for Business Affairs (Chair)
Assistant Treasurer
Director of Fiscal Affairs and Controller
Director of Budgets and Grants
One member of the Academic Council
One full-time member of the Faculty Senate
One member of the Professional Staff Senate
One member of the Support Staff Senate
Dean of Students

The member of the Academic Council is appointed by the Provost and Vice President for Academic Affairs.
Faculty, Professional Staff, and Support Staff representatives are elected by their respective senates.

**Term**
Elections and appointments are for three years, with possibility of reelection or reappointment for one consecutive term.

**Meetings**
Meetings are called by the Chair  at least twice per fiscal year.

**Reports to**
President of the University
through the Vice President for Business Affairs

## Marywood University Faculty Handbook  2010

# HONORARY DEGREES COMMITTEE

(Established by the President of the University 2009)

**Title**
Honorary Degree Committee

**Purpose and Function**
The Honorary Degrees Committee assists the President of the University in the process of identifying noteworthy nominees for Marywood University honorary degrees.  It solicits names of potential honorees from the entire Marywood community, reviews them, and makes recommendations of meritorious candidates for consideration of the President of the University and subsequent approval of the Board of Trustees.

**Membership and Selection**
Provost and Vice President for Academic Affairs (Chair)
All academic deans
President of the Faculty Senate
One full-time faculty members from each college and school

**Term**
Faculty members serve  three-year terms with possibility of reappointment

The terms of the Chair and the Vice Chair are for three years with the possibility of reappointment.

**Meetings**
Meetings are called by the Chair at least once each academic year.

**Reports to**
President of the University

**Marywood University Faculty Handbook  2010**

160

## COMMENCEMENT AND ACADEMIC CONVOCATIONS COMMITTEE

(Revision approved by the President of the University 2/02/03, effective 7/01/03)

**Title**
Commencement and Academic Convocations Committee

**Purpose and Function**
The Commencement and Academic Convocations Committee

  plans and coordinates the University's commencement exercises,
  assists the colleges with commencement related activities,
  coordinates special academic convocations and celebrations upon request,
  acts as a communication forum for related issues,
  solves related logistical concerns,
  makes related recommendations..

**Membership and Selection**
Membership is drawn as the need arises from support services, campus ministry, grounds, maintenance, technology services, student activities, disability advisement, security, public relations, physical plant and special events office.

The Chair of the committee is appointed by the President of the University.

**Term**
The Chair appoints members as the need arises.

**Meetings**
Meetings are held at the call of the Chair.

**Reports to**
President of the University

**Marywood University Faculty Handbook  2010**

# COMMENCEMENT AND CONVOCATIONS SPEAKERS COMMITTEE

(Revision approved by the President of the University 2009)

**Title**
Commencement and Convocations Speakers Committee

**Purpose and Function**
The *Commencement and Convocations Speakers Committee* serves to assist the President of the University to bring noteworthy speakers to the University.

The Committee develops an ongoing list of potential speakers for the Commencement ceremony and University convocations, reviews their credentials, and recommends to the President of the University those persons who, to the Committee's best judgment, would be best able to meet the criteria set forth in Marywood's *Commencement and Convocations Speakers Policy.* Its recommendations are based on concurrence of committee members, availability of potential speakers, and budget.

**Membership and Selection**
Vice President for University Advancement (Chair)
All academic deans
President of the Faculty Senate
One full-time faculty member from each college and school
Two senior undergraduate students
Two graduate students

Faculty members are appointed by their respective deans.

The undergraduate students are appointed by the Executive Board of the Student Government Association in consultation with the Vice President for Student Life.

The graduate students are appointed by the President of the Graduate Student Council in consultation with the Vice President for Student Life.

**Term**
Faculty members serve three-year terms with possibility of reappointment.
Students are appointed annually.

**Meetings**
Meetings are held at the call of the Chair.

**Reporting Authority**
President of the University

162

# COR MARIAE BOARD OF DIRECTORS

(Revision approved by the President 11/5/02, effective 7/1/03

**Title**
Cor Mariae Board of Directors

**Purpose and Function**
The Order Cor Mariae-Pro Fide et Cultura, the University vicennial order, is governed by a five-person Board of Directors elected by and from the current full-time employees of Marywood University who are medalists.

The Board of Directors
   recommends new members for the Order to the President of the University;
   plans and organizes the investiture ceremonies for the Order;
   considers petitions presented by the Assistant Vice President for Human Resources for membership where technical requirements are not met, but fairness and appropriateness argue for approval.

The President of the Board of Directors exercises administrative oversight of this Marywood vicennial order.

**Membership and Selection**
Election is by and from the current Marywood full-time Marywood vicennial medalists.

The President of Marywood University serves as an ex officio, non-voting member of the Board.

The Assistant Vice President for Human Resources acts as a staff officer and consultant.

The current Cor Mariae Board of Directors conducts the election of new members.  Ballots are mailed to the Office of the President of the University, who announces election results.

**Term**
Directors serve for three-year terms. There are no limits to the number of times a board member can be selected.

The President of the Board of Directors is chosen annually by and from the elected Board members on the basis of seniority, i.e. the faculty person with the greatest number of years of continuous service will become the President of the Board.  If more than one Board member qualifies, the tie is broken by higher rank; i.e., the person holding the higher academic rank will become President.  If the tie continues further, the candidates draw for the position.

**Meetings**
Meetings are held at the call of the President of the Board of Directors.

**Reports to**
President of the University

---

**Marywood University Faculty Handbook  2010**

## OUTCOMES ASSESSMENT COMMITTEE

(Revision approved by the President 11/5/02, effective 7/1/03)

**Title**
Outcomes Assessment Committee

**Purpose and Function**
The Outcomes Assessment Committee serves as the campus coordinating body for outcomes assessment activities with oversight responsibility for the outcomes assessment plan.

The committee's recommendations to the President of the University are based on concurrence of committee members, consistency with the outcomes assessment plan, and available budget for assessment activities.

**Membership and Selection**
Director of Institutional Research and Assessment (Chair)
Academic dean of each college
Provost and Vice President for Academic Affairs
One full-time faculty member from each college
Vice President for Student Life
Two other representatives of the Student Life area
One representative of the University Advancement area
One representative of the Business Affairs area

Faculty members are appointed by the deans of their respective colleges.
Staff representatives are appointed by the vice presidents of their respective areas.

**Term**
Appointed representatives -- three years with possibility of reappointment for one additional consecutive term

**Meetings**
Meetings are held at least twice a year.

**Reports to**
President of the University
through the Chief Planning and Research Officer

**Marywood University Faculty Handbook 2010**

164

## TECHNOLOGY ADVISORY COMMITTEE

(Revision approved by the President 2003, 2005, 2008)

**Title**
Technology Advisory Committee

**Purpose and Function**
The Technology Advisory Committee is the primary planning group for campus-level technology including but not limited to the integrated campus network and infrastructure, campus-wide information resources available with the infrastructure, technology for new buildings and renovations and related activities.  It acts as the primary governance structure for advising Marywood University on the business and academic value of all information technology projects, the cost of implementation, and the impact to the resources of the University.

The Committee advises the President of the University on areas relating to the acquisition and maintenance of campus-level technology resources. The major areas of responsibility are

- to develop long-range plans for maintaining and updating technology with an annual recommendation;
- to document existing technology as support for decisions at the executive level;
- to review and make recommendations of technology acquisitions and activities across offices;
- to advise on the feasibility and appropriateness of acquiring new technology;
- to plan for the integration of externally funded resources with existing technical functionality to maximize effective use of the University technology infrastructure.

The framework for this information technology governance is to provide a mechanism for the review and advisement on IT projects that meet the following criteria:

- Adequate planning has been provided for and communicated to the constituency being affected; also, that the constituency has communicated to project planners.
- A strategic and tactical planning process has been followed that supports the strategic plan of the University.
- Compliance and control processes of the project are being met.
- Assurance that risks have been identified and mitigated.
- Assurance that identified variances from the plan are corrected.

**Membership and Selection**
Chief Information Officer (Chair with vote only in case of a tie)
Director of OIT Projects Office
Director of the Physical Plant
Chair of the Academic Computing Advisory Committee
Technical Director
Manager of Network and Systems Administration
Webmaster
Registrar
Director of Library Services
Manager of Academic Computing
Director of User Support Services
Manager of Application Programming

**Marywood University Faculty Handbook  2010**

President of the Faculty Senate
Provost and Vice President for Academic Affairs
One full-time faculty member from each college
One representative of the School of Architecture
Vice President for Business Affairs
Vice President for Student Life
Vice President for University Advancement
Vice President for Enrollment Management
One undergraduate student
One graduate student

Faculty members are elected from the full-time faculty members of their colleges. The coordination of the elections is managed by the Dean's office of each college.

The undergraduate student is appointed by the Executive Board of the Student Government Association in consultation with the Vice President for Student Life.

The graduate student is appointed by the President of the Graduate Student Council in consultation with the Vice President for Student Life.

**Term**
Faculty - three years with possibility of reelection
Students - one year with possibility of reappointment

**Meetings**
Meetings are held at least six times a year, three in the fall semester and three in the spring semester.

**Reports to**
President of the University

**Marywood University Faculty Handbook  2010**

166

# CALENDAR COMMITTEE

(Approved by the President of the University 3/12/04)

**Title**
Calendar Committee

**Purpose and Function**
The Calendar Committee serves to propose annually by October 31 a basic University calendar, for the academic year three years hence, to the Vice President for Student Life, who, in turn, will present it with comment to the President of the University for approval. It includes, for example,

> orientation dates,
> starting and ending dates for semesters and sessions,
> breaks and holidays,
> study days and examination dates,
> commencement dates.

**Membership and Selection**
Vice President for Student Life (Chair)
Provost and Vice President for Academic Affairs
Vice President for Enrollment Management
All academic deans
Registrar
President of the Faculty Senate
Assistant Vice President for Human Resources
Director of Dining Services
Director of Constituency Relations and the Marywood Fund
Undergraduate student
Graduate student

The undergraduate student is appointed by the Executive Board of the Student Government Association in consultation with the Vice President for Student Life.

The graduate student is appointed by the President of the Graduate Student Council in consultation with the Vice President for Student Life.

**Term**
Students – one year, eligible for reappointment

**Meetings**
Meetings are held at least once each September. Additional meetings are held throughout the year at the call of the Chair.

**Reports to**
President of the University

**Marywood University Faculty Handbook  2010**

# SPACE ADVISORY COMMITTEE

(Established by the President of the University 2009)

**Purpose and Function**

The Space Advisory Committee makes recommendations to the President of the University regarding space allocation, with due regard for the overall priorities and needs of the institution. The committee

- formulates policies for space allocation;
- reviews and prioritizes space requests;
- recommends space modifications and changes in response to requests;
- plans for short term reallocation of space when required;
- tracks use of existing space, e.g., classroom and lab utilization;
- analyzes use of existing space and makes recommendations for change based on usage patterns.

**Membership and Selection**

Chief Planning Officer (Chair)
Vice President for Business Affairs
Director of the Physical Plant
Provost and Vice President for Academic Affairs
Vice President for Student Life
Vice President for Enrollment Management
Director of Conferencing and Special Events
Representative of the academic deans
Chief Information Officer

Other non-voting members are invited to selected meetings, at the discretion of the Chair, for their interest and expertise.

**Term**

The Chair serves at the discretion of the President of the University.

Appointed members serve one-year terms with possibility of reappointment.

**Meetings**

The Committee meets at least once each semester.

**Reports to**

President of the University

168

# WEBSITE MANAGEMENT COMMITTEE

**Title**

Website Management Committee

**Purpose and Function**

The Website Management Committee provides organizational guidance for the University's website, enabling the University to present a comprehensive, branded, consistent, user-centered, and interactive experience.  The committee

> focuses on technological and educational web resources that support the student experience while reflecting the Mission and Core Values of the University;

> develops protocols, procedures, and presentation formats for all departmental websites;

> assures a quality experience for the Marywood University community, its off-campus constituents, and other visitors to the website;

> attends to emerging interactive opportunities, with a view to moving the University forward in an increasingly competitive environment.

**Membership and Selection**

Executive Director of Marketing and Communications
Representative of Academic Affairs
Representative of Business Affairs
Representative of Student Life
Representative of University Advancement
Representative of Enrollment Management
Web Content Director
Web Developer

The Chair is appointed by the President of the University.
Representatives are appointed by the vice presidents of their respective areas.

**Term**

Representatives – three years with possibility of reappointment

**Meetings**

At least four times per year

**Reports to**

President of the University

**Marywood University Faculty Handbook  2010**

# UNIVERSITY STANDING COMMITTEES

### reporting to

## PROVOST AND VICE PRESIDENT FOR ACADEMIC AFFAIRS

### Academic Council

### Rank and Tenure Committee

### Faculty Development Committee

### Institutional Review Board for the Protection of Human Participants

### Undergraduate Admissions Committee

### Undergraduate Curriculum Committee
Subcommittee:  Undergraduate Program Subcommittee
Subcommittee:  Undergraduate Core Subcommittee

### Undergraduate Grades and Academic Standing Committee

### Undergraduate Honors and Fellowships Board

### Undergraduate Scholarships and Fellowships Committee

### Undergraduate Research Review Committee

### Graduate Curriculum Committee

### Graduate Scholarship Committee

### Academic Computing Advisory Committee

### Teacher Education Committee

### Cultural Diversity Committee
Subcommittee:  Women's Issues Committee

### Election Committee for Primary University Standing Committees

**Marywood University Faculty Handbook  2010**

170

# ACADEMIC COUNCIL

(Revision approved by the Vice President for Academic Affairs 1903, 2009)

**Title**
Academic Council

**Purpose and Function**
The Academic Council serves to provide

a forum for communication, mutual support and coordination among academic deans and others who are directly responsible to the Provost and Vice President for Academic Affairs;

a means for the Provost and Vice President for Academic Affairs to relate information from the President of the University or the President's Cabinet to the members;

an assembly for consideration of the advancement of part-time faculty.

Decisions are made, recommendations formulated, and counsel given.

**Membership and Selection**
Provost and Vice President for Academic Affairs (Chair)
Vice President for Enrollment Management
Academic Deans
Assistant Vice President for Academic Affairs for Research and Community Collaboration

**Term**
All members are ex officio.

**Meetings**
Meetings are held at the call of the Provost and Vice President for Academic Affairs.

**Reports to**
Provost and Vice President for Academic Affairs

**Marywood University Faculty Handbook  2010**

172

# RANK AND TENURE COMMITTEE

(Revision approved by the Provost and Vice President for Academic Affairs 3/27/09)

**Title**
Rank and Tenure Committee

**Purpose and Function**
The Rank and Tenure Committee is charged with evaluation and affirmation of faculty achievement in teaching, scholarship, and service in order to develop and maintain a level of excellence that will enable the University most effectively to fulfill its mission.

The Committee

- reviews applications for promotion and/or tenure in accord with established criteria;
- submits recommendations to the Provost and Vice President for Academic Affairs to be presented to the President of the University;
- reviews the criteria for promotion and/or tenure and makes recommendations for change;
- approves departmental standards for evaluating members' scholarship/creative activity. These standards are also approved by the appropriate dean and the Provost and Vice President for Academic Affairs.

The Committee acts on applications for promotion in the fall and spring semesters; it acts on applications for tenure in the fall semester only.  It reviews pre-tenure files in the fall semester only.

A committee member from the same department as an applicant must recuse himself/herself from the committee's work of discussing, reviewing, and evaluating the applicant's pre-tenure, tenure, and/or promotion materials. However, the committee member will participate in the review of the application at the department level in the same ways that any other member of the department would do, including voting on the application.

Positive recommendation for Assistant Professor requires a simple majority, four out of seven.  Positive recommendation for Tenure, Associate Professor, and full Professor require five out of seven.

If a candidate applies for tenure and Associate Professor at the same time, the vote on tenure will be taken first.  The outcome of the vote will be announced to the committee members prior to any consideration for promotion. An unsuccessful candidate for tenure may be awarded Associate Professor.

In the general business of the committee, four members constitute a quorum and a simple majority is required for committee action.

Confidentiality regarding all matters discussed in meetings of the Rank and Tenure Committee is an important responsibility of each member.  Any member who violates this confidentiality is subject to removal from the committee by the Provost and Vice President for Academic Affairs.

**Membership and Selection**
One full-time faculty member from each college of the University
Three full-time faculty members at large

---

**Marywood University Faculty Handbook  2010**

A single department may not be represented on the committee by more than one committee member.

At-large representatives
      are elected from the full-time faculty of the entire University;
      are full-time, tenured associate and/or full professors;
      are present and vote on all business of the committee, including all applications for promotion
      and/or tenure.
College representatives
      are elected by and from the full-time faculty of their respective colleges;
      are full-time, tenured associate and/or full professors;
      are present and vote on all business of the committee, including all applications for promotion
      and/or tenure.

In the event of a vacancy on the committee, the most recently elected alternate to that position will complete that term.

**Term**
Three years, with possibility of re-election for one consecutive three-year term.
The committee elects its Chair annually.

**Meetings**
Meetings are held at the call of the Chair.

**Reports to**
Provost and Vice President for Academic Affairs

**Marywood University Faculty Handbook  2010**

174

## FACULTY DEVELOPMENT COMMITTEE
(Revision approved by the Vice President for Academic Affairs 1/21/03, effective 7/1/03)

**Title**
Faculty Development Committee

**Purpose and Function**
Faculty development is a broad term describing any of the various activities carried out by faculty for their personal and professional enrichment. Certain of these activities may be financially supported by Marywood University.

The major responsibilities of the committee are

to advise, if requested, in the design or renewal of individual faculty development *Profiles, Plans, and Proposals;*

to accept or reject individual faculty development *Plans* on the basis of established objective criteria;

to make recommendations to the Provost and Vice President for Academic Affairs on individual faculty *Proposals*;

to make recommendations to the Provost and Vice President for Academic Affairs on departmental and University-wide *Proposals* for faculty development money;

to maintain sufficient records to make possible a thorough evaluation of the program;

to do ongoing evaluation and updating of Faculty Development Committee policies and procedures;

to submit an annual report of the program to the Provost and Vice President for Academic Affairs, copied to the President of the University;

to plan and conduct faculty workshops on aspects of the program;

to make recommendations to the President of the University, copied to the Provost and Vice President for Academic Affairs, on requests for sabbatical leaves and on other presidential faculty development initiatives.

**Membership and Selection**
Academic deans
One full-time faculty member from each college
Two full-time faculty members at large

**Term**
Faculty – three years, eligibility for election limited to one additional three-year term

**Meetings**
Meetings are held at the call of the Chair.

**Reports to**
Provost and Vice President for Academic Affairs

**Marywood University Faculty Handbook  2010**

## INSTITUTIONAL REVIEW BOARD FOR THE PROTECTION OF HUMAN PARTICIPANTS

(Revision approved by the Vice President for Academic Affairs 11/8/02, effective 7/1/03)

**Title**
Institutional Review Board for the Protection of Human Participants

**Purpose and Function**
The purpose of the Institutional Review Board for the Protection of Human Participants (IRB) is the safeguarding of the rights and welfare of individuals participating in research. The Board reviews, approves, and monitors all research involving human participants conducted at Marywood University or elsewhere under Marywood University sponsorship. The Board may establish policies that allow research posing minimal risk to subjects to be exempt from full review and may delegate some reviews to the department, school or college level.

The Board is a decision-making group to approve applications for research involving human participants based on established policies and federal regulations. It serves as the liaison between the University and federal agencies regarding the protection of human particpants.

**Membership and Selection**
Members represent the interests of the University and the community. There are at least seven members with various backgrounds and fields of expertise, including, at least

> one physician,
> one representative from outside the University,
> one representative from each college,
> one member at large
> Assistant Vice President for Academic Affairs for Research and Community
> > > > Collaboration, ex officio.

The non-voting Director of Human Participants Protection staffs the committee.

The Provost and Vice President for Academic Affairs appoints members, with a view to ensuring cultural, professional and academic diversity. Membership is contingent on year-round availability. When the Board reviews research that involves a vulnerable category, such as children, prisoners, pregnant women, or persons with mental disabilities, consideration is given to the inclusion of one or more individuals who are experienced or knowledgeable about working with these participants.

The Provost and Vice President for Academic Affairs appoints the Chair.

**Term**
An appointed member's term is three years, with possibility of reappointment for one additional term. In order to ensure the availability of a physician to the IRB, the term of the physician member is not limited to two three-year terms.

**Meetings**
The Board meets once a month in formal session. In exceptional cases, business may be conducted via telephone or mail. Times of monthly meetings are announced to academic deans and academic department chairpersons.

**Reports to**
Provost and Vice President for Academic Affairs

**Marywood University Faculty Handbook  2010**

176

## UNDERGRADUATE ADMISSIONS COMMITTEE

(Revision approved by the Vice President for Academic Affairs 11/15/02, effective 7/1/03

**Title**
Undergraduate Admissions Committee

**Purpose and Function**
The Undergraduate Admissions Committee advises the Director of Undergraduate Admissions regarding

continuing studies of standards of admission;

admission of those who show evidence of meeting academic standards and who show promise of making a satisfactory adjustment to Marywood University;

admission of a sufficient number of qualified students to allow for proposed enrollments;

progress toward recruitment goals and strategies to achieve them

**Membership and Selection**
Director of Undergraduate Admissions (Chair)
Assistant Director of Admissions for Recruitment
Two faculty members from each college
Registrar
Director of Act 101 Program
Director, Center for Adult Credit Programs

Non-voting resource persons:  Admissions counselors

Faculty members are appointed by their respective deans

**Term**
Faculty members – two years with possibility of reappointment

**Meetings**
Meetings are called by the Director of Undergraduate Admissions, usually twice per month

**Reports to**
Provost and Vice President for Academic Affairs

# UNDERGRADUATE CURRICULUM COMMITTEE

(Revision approved by the Vice President for Academic Affairs 6/06/05)

**Title**
Undergraduate Curriculum Committee

**Purpose and Function**
The Undergraduate Curriculum Committee, an advisory body to the Administration on undergraduate curricular issues,

1. reviews all new undergraduate courses and substantial changes to existing ones;
2. evaluates the appropriate designation of course numbers on the undergraduate level
3. coordinates the work of its Program Subcommittee and Core Subcommittee;
4. channels proposals and other materials to the appropriate subcommittee or retains them for its own action;
5. reviews and approves proposals that will change the general education or program requirements for the entire undergraduate student body; before reaching a final recommendation, presents the proposal and distributes a ballot to the faculty members whose teaching responsibility is at least one-half on the undergraduate level;
6. reviews matters that require a wider perspective than either the Program Subcommittee or the Core Subcommittee alone can provide;
7. resolves differences that may arise between the Program Subcommittee and the Core Subcommittee.

**Membership and Selection**
Four faculty members drawn from the Program Subcommittee, including the chairperson, assistant chairperson, and two others elected by and from the subcommittee membership
Four faculty members drawn from the Core Subcommittee, including the chairperson, assistant chairperson, and two others elected by and from the subcommittee membership
Four academic deans (non-voting)
One student

Faculty membership is determined each spring once subcommittee elections have been completed. The student is elected by and from the student representatives to the subcommittees.

The Committee elects its chairperson each spring from among its faculty membership.

**Term**
Faculty – one year with possibility of reelection
Student – one year with possibility of reelection.

**Meetings**
A meeting is held at the beginning of each semester. Additional meetings are scheduled as needed.

**Reports to**
Provost and Vice President for Academic Affairs

**Marywood University Faculty Handbook  2010**

178

**Undergraduate Curriculum Committee** (continued)

### Undergraduate Program Subcommittee

#### Purpose and Function
The Undergraduate Program Subcommittee reviews and makes recommendations related to academic programs on the undergraduate level.

#### Membership and Selection
Two faculty members from each college
One undergraduate student from each college
Chairperson of the Undergraduate Core Subcommittee
Associate Vice President for Enrollment Management
Registrar (non-voting)
One person from the Learning Resources Center (non-voting)

Academic deans are invited to meetings when their advice or information may be helpful regarding a specific issue before the subcommittee.

Faculty are elected by and from the faculty in their respective colleges.
Students are appointed by the deans of their respective colleges.

The subcommittee elects its Chairperson from among the faculty members.

#### Term
Faculty – three years with possibility of reelection for a second term
Students – one year with possibility of reappointment

#### Meetings
Meetings are held three times per semester.  Additional meetings are scheduled as needed.

#### Reports to
Provost and Vice President for Academic Affairs
through the Chairperson of the Undergraduate Curriculum Committee

**Marywood University Faculty Handbook  2010**

**Undergraduate Curriculum Committee** (continued)

## Undergraduate Core Subcommittee

### Purpose and Function

The Undergraduate Core Subcommittee reviews and makes recommendations related to the liberal arts core and to the general electives and competencies in the undergraduate curriculum.

### Membership and Selection

One faculty member from each of the following departments that support the general education curriculum:  Art or Music, Communication Arts, English, Foreign Languages, Health and Physical Education, Mathematics, Philosophy, Psychology, Religious Studies, Science, and Social Sciences
One faculty member from each of the following:  College of Health and Human Services, College of Creative Arts and Management, College of Education and Human Development
Two undergraduate students
Chairperson of the Undergraduate Program Subcommittee
Academic Dean of the College of Liberal Arts and Sciences (non-voting)
Registrar (non-voting)
One person from the Learning Resources Center (non-voting)

Faculty representatives of departments are elected by faculty in their respective departments.
Faculty representatives of colleges are elected by and from the faculty in their respective colleges.
Students are appointed by the Provost and Vice President for Academic Affairs.

The subcommittee elects its Chairperson from among the faculty members.

### Term

Faculty – three years with possibility of reelection for a second term
Students – one year with possibility of reappointment

### Meetings

Meetings are held three times per semester.  Additional meetings are scheduled as needed.

### Reports to

Provost and Vice President for Academic Affairs
through the Chairperson of the Undergraduate Curriculum Committee

**Marywood University Faculty Handbook  2010**

180

## UNDERGRADUATE GRADES AND ACADEMIC STANDING COMMITTEE

(Revision approved by the Provost and Vice President for Academic Affairs 11/15/02, 10/09/03)

**Title**
Undergraduate Grades and Academic Standing Committee

**Purpose and Function**
The committee reviews students' achievements, and makes recommendations to the academic dean(s) regarding
   academic probation,
   dismissal for academic reasons,
   academic performance for continued eligibility for Marywood University scholarships and grants.

**Membership and Selection**
Associate Director of Retention and Advising (Chair)
Two faculty members from each college
Vice President for Enrollment Management
Registrar
Director of Admissions
Director of Housing and Residence Life
Assistant Director of Academic Advisement
Director of Act 101 Program

Faculty members are appointed by the deans of their respective colleges.

**Term**
Faculty – two years with possibility of reappointment

**Meetings**
Meetings are called by the Chair, usually three times a year.

**Reports to**
Provost and Vice President for Academic Affairs
through the Associate Vice President for Enrollment Management

## UNDERGRADUATE HONORS AND FELLOWSHIPS BOARD

(Revision approved by the Vice President for Academic Affairs 11/25/02, effective 7/1/03)

**Title**
Undergraduate Honors and Fellowships Board

**Purpose and Function**
The Undergraduate Honors And Fellowships Board meets with the Director of Honors and Fellowships

> to promote the identification of potential honors students,
> to provide experiences for honors students that will enhance their opportunities after graduation,
> to link faculty and students for mentoring and collaborative research,
> to oversee and develop the honors degree program,
> to select membership in the Kappa Gamma Pi honor society,
> to select recipient of the Kappa Gamma Pi medal for excellence.

**Membership and Selection**
Director of Honors and Fellowships (Chair)
One full time faculty member from each college
Dean of Students
One representative of the Registrar's Office
One representative of the Undergraduate Admissions Office
One honors student from each of the sophomore, junior and senior classes

Faculty are appointed by their respective deans.
Representative of the Registrar's Office is appointed by the Registrar
Representative of the Undergraduate Admissions Office is appointed by the Director of Admissions
Students are appointed by the Undergraduate Honors and Fellowships Board.

**Term**
Faculty – three years with possibility of reappointment
Other appointments – one year with possibility of reappointment

**Meetings**
Meetings are held at least three times per year.
Student representatives do not participate in the selection of Kappa Gamma Pi membership and medallist.

**Reports to**
Provost and Vice President for Academic Affairs

**Marywood University Faculty Handbook  2010**

## UNDERGRADUATE SCHOLARSHIPS AND FELLOWSHIPS COMMITTEE

(Revision approved by the Vice President for Academic Affairs 11/18/02, effective 7/1/03

### Title
Undergraduate Scholarships and Fellowships Committee

### Purpose and Function
The Undergraduate Scholarships and Fellowships Committee

actively promotes dissemination of information on national and international scholarships and fellowships;

encourages academically capable students to compete for scholarships and fellowships;

screens applications and selects Marywood University's candidates for scholarship and fellowship programs;

maintains a file of opportunities for financial aid to graduate and professional schools;

identifies sources of non-government aid that will be available to undergraduate students, and disseminates this information.

### Membership and Selection
Director of Honors and Fellowships (Chair)
Advisors re major national and international scholarships and fellowships
Advisors re law schools and medical schools
Assistant Director of Career Services

### Term
All members are ex officio.

### Meetings
Meetings are held at least six times per year.

### Reports to
Provost and Vice President for Academic Affairs

**Marywood University Faculty Handbook  2010**

# UNDERGRADUATE RESEARCH REVIEW COMMITTEE

(Revision approved by the Vice President for Academic Affairs 11/18/02, effective 7/1/03

**Title**
Undergraduate Research Review Committee

**Purpose and Function**
The goal of the Undergraduate Research Committee is to promote and support undergraduate research and scholarly activity by providing funding for undergraduates to conduct and present their research and scholarly activity, and by providing a forum in which undergraduates can present and be recognized for their scholarly activity.  The committee

    solicits student proposals for funding;
    reviews and evaluates student proposals and budgets;
    submits approved projects to the academic Director of Honors and Fellowships for funding;
    coordinates the annual Marywood University Undergraduate Research Forum;
    provides annual reports to the academic deans

**Membership and Selection**
One full-time faculty member from each college
One representative from the Institutional Review Board for the Protection of Human Participants
Director of Honors and Fellowships

Faculty members are appointed by their respective deans.

The representative of the Institutional Review Board for the Protection of Human Subjects is appointed by the Provost and Vice President for Academic Affairs.

The Chair of the committee is elected by and from the faculty representatives.

**Term**
Faculty – three years with possibility of reappointment
Representative of IRB – three years with possibility of reappointment

**Meetings**
Meetings are held at least four times per year.

**Reports to**
Provost and Vice President for Academic Affairs
through the Director of Honors and Fellowships

184

# GRADUATE CURRICULUM COMMITTEE

(Revision approved by the Vice President for Academic Affairs 12/17/02, effective 7/1/03)

## Title
Graduate Curriculum Committee

## Purpose and Function
The Graduate Curriculum Committee

reviews proposals and makes recommendations for new graduate programs;

approves graduate level curriculum changes proposed by each college including new programs, new courses, and substantive modifications of current courses;

examines existing programs and courses to minimize duplication of course content;

coordinates and reviews as necessary the internal program or college evaluation process, including outcomes and assessment plans;

provides input into joint degree programs;

investigates and provides input into joint graduate level ventures among the colleges.

## Membership and Selection
Academic deans
One faculty representative of each academic department with a graduate program
One representative from the University Library

Faculty representatives are appointed by their respective chairs.
The Library representative is appointed by the Director of the Library.

The Chair is elected annually by the committee members.

## Term
Faculty and Library representatives – two years, renewable for one consecutive term

## Meetings
Meetings are held monthly during the academic year.

## Reports to
Provost and Vice President for Academic Affairs

**Marywood University Faculty Handbook  2010**

## GRADUATE SCHOLARSHIP COMMITTEE

(Revision approved by the Provost and Vice President for Academic Affairs 3/26/09)

**Title**
Graduate Scholarship Committee

**Purpose and Function**
The Graduate Scholarship Committee

>   establishes criteria for eligibility for Marywood graduate level IHM scholarships as incentives
>   for achieving recruitment and admission goals;

>   selects recipients of Marywood graduate level IHM scholarships;

>   investigates the need for increased scholarships support to maintain graduate enrollment;

>   recommends financial and policy changes as appropriate.

**Membership and Selection**
Director of Financial Aid
Two faculty members from each college
Assistant to the Director, School of Social Work
One faculty member from the School of Social Work
One faculty member from the School of Architecture

Resource persons:
Director of University Admissions
Assistant Director of Graduate Admissions
Coordinator of Graduate Affairs
Vice President for Enrollment Management

Subcommittee for doctoral programs:
>   Directors of doctoral programs
>   Director of Financial Aid
>   Two faculty members from the full committee

Faculty representation of colleges is determined by the Dean of each college.
Faculty representation of the School of Social Work is determined by the Director.

The Chair is elected by the members of the Committee.

**Term**
Faculty members serve three-year terms with possibility of reappointment.

**Meetings**
Meetings are held monthly during peak recruitment seasons.  Additional meetings may be called by the
Chair.

**Reports to**
Provost and Vice President for Academic Affairs

**Marywood University Faculty Handbook  2010**

186

## ACADEMIC COMPUTING ADVISORY COMMITTEE

(Revision approved by the Provost and Vice President for Academic Affairs 2009)

**Title**
Academic Computing Advisory Committee

**Purpose and Function**
The committee is the major vehicle for faculty involvement in planning for the diverse applications of computer technology across the campus.  It advises the Provost and Vice President for Academic Affairs as well as the Chief Information Officer by

> encouraging faculty self-development and awareness of the role of computer technology in higher education;

> evaluating and recommending proposals for development of computer resources;

> encouraging the purchase of compatible hardware and software solutions to meet the academic computer needs of faculty and students in a cost-effective manner;

> supporting faculty members throughout the grant writing and award process to select appropriate computer hardware and software and to ensure the researcher's technology requirements are fully met;

> examining associated legal issues, e.g., those .related to intellectual property.

**Membership and Selection**
Chair of the Committee
Director of Library Services
Director of User Support Services
Manager of Academic Computing
Chief Information Officer
One full-time faculty member from each college
Two full-time faculty members at large

Students work with the Committee on specific issues.

Chair of the Committee is appointed by the Provost and Vice President for Academic Affairs.
Faculty members are appointed by the Provost and Vice President for Academic Affairs.

**Term**
Chair of the Committee – three years with possibility of reappointment
Faculty – three years with possibility of reappointment

**Meetings**
Meetings are held at least twice per year.

**Reports to**
Provost and Vice President for Academic Affairs

### Marywood University Faculty Handbook  2010

# TEACHER EDUCATION COMMITTEE

(Revision approved by the Vice President for Academic Affairs 3/3/03, effective 7/1/03

**Title**
Teacher Education Committee

**Purpose and Function**
The Teacher Education Committee

provides a forum for disseminating information regarding teacher education

considers curricular implications of educational theory and certification regulations

advises the Education Department re implementation of procedures such as admission screening, clearance for student teaching, and testing.

**Membership and Selection**
Academic Dean, College of Education and Human Development
All faculty from the education and special education departments
One faculty representative of each certification program area
Director of the Office of Professional Education Field Experience
Certification officer

Faculty are appointed by the chairs of their respective departments.

**Term**
Two years with possibility of reappointment

**Meetings**
Meetings are held at least once a semester.

**Reports to**
Provost and Vice President for Academic Affairs

188

# CULTURAL DIVERSITY COMMITTEE

(Revision approved by the President of the University 11/8/02, effective 7/1/03)

**Title**
Cultural Diversity Committee

**Purpose and Function**
The committee promotes appreciation of diversity and intergroup accord on campus, and provides assistance to the regional community in addressing diversity concerns and developing intercultural awareness.

The **Women's Issues Committee**, a subcommittee, serves to educate the campus and the larger community about the variety of issues that women face and to act as an advocate for women's issues.

**Membership and Selection**
Director of Diversity Services (Chair)
Volunteers from administration, faculty, staff, and students

**Term**
Term is unlimited.

**Meetings**
Meetings are held monthly during the academic year.

**Reports to**
Provost and Vice President for Academic Affairs

## ELECTION COMMITTEE FOR PRIMARY UNIVERSITY STANDING COMMITTEES

(Revision approved by the President 2002, 2005)

**Title**
Election Committee for Primary University Standing Committees

**Purpose and Function**
The Election Committee for Primary University Standing Committees is responsible for conducting elections of faculty representatives for the subsequent academic year to the four major University standing committees in the following sequence:

> during the fall semester
> > 1. Rank and Tenure Committee
> > 2. Policy Committee of the University

> during the spring semester
> > 3. Faculty Development Committee
> > 4. Marywood University Planning Advisory Council.

The committee interprets the eligibility requirements for the various committees, assembles eligibility lists, conducts the elections, distributes and counts election ballots, informs the President of the University of the results, and maintains the list of alternates.

Each committee member who represents a particular college works with the Chair to prepare and count ballots for elections within that college.  The faculty librarian works with the Chair to prepare and count ballots for at-large election, which are determined before individual college elections.

**Membership and Selection**
One full-time faculty representative from each college
One faculty librarian
One full-time faculty member at large.

All members are appointed by the President of the University.

The faculty member at large serves as Chair of the committee.

**Term**
Members serve a three-year term with possibility of reappointment to one additional consecutive term.

**Meetings**
One regular meeting is held in the spring and one in the fall.  Others are called by the Chair when necessary.

Faculty should serve on only one major, University standing committee at a time.  Elections are conducted by secret ballot.  The first ballot is a nomination from an alphabetical list of full-time eligible persons.

Twice the number of those to be elected constitutes the second ballot.  These names are listed according to the number of votes received.  The required number of members are elected on the second ballot by a plurality vote.  If there is a tie in the number of votes needed for election, a run-off ballot is taken.

**Marywood University Faculty Handbook  2010**

190

In each election the three persons in each category having the next highest number of votes after the elected members are named alternates.

If a vacancy occurs among the elected members of any of these committees, the first alternate from the appropriate most recent election shall complete the term.  If necessary, the second alternate from the most recent election shall complete the term, etc.

**Reports to**
Provost and Vice President for Academic Affairs

Fagal v. Marywood                    June 6, 2016                    DEF3661

## UNIVERSITY STANDING COMMITTEES

### reporting to

## VICE PRESIDENT FOR BUSINESS AFFAIRS

**Administrative and Professional Staff Development Committee**

**Arboretum Committee**

**Dining Services Committee**

**Employee Benefits Committee**

**Employee Health and Safety Committee**

**Parking Committee**

192

Fagal v. Marywood                          June 6, 2016                          DEF3663

## ADMINISTRATIVE AND PROFESSIONAL STAFF DEVELOPMENT COMMITTEE

(Revision approved by the Vice President for Business Affairs 10/30/02, effective 7/1/03)

### Title
Administrative and Professional Staff Development Committee

### Purpose and Function
Professional development is a broad term describing any of the various activities carried out by the professional staff for their personal and professional enrichment.  Certain of these activities may be financially supported by Marywood University.

The major responsibilities of the committee are
- to advise, if requested, in the design or renewal of individual administrative or professional staff development *Profiles, Plans, and Proposals*;
- to accept or reject individual development plans on the basis of established objective criteria;
- to make recommendations to the Vice President for Business Affairs on proposals for Administrative and Professional Staff Development plans;
- to maintain sufficient records for at least five years, for evaluation purposes;
- to do ongoing evaluation and updating of Administrative and Professional Staff Development Committee policies and procedures;
- to submit an annual report of the program to the  Vice President for Business Affairs, copied to the President of the University;
- to plan and conduct informational sessions and workshops concerning the program;
- to make recommendations to the President of the University, copied to the Vice President for Business Affairs, on requests for sabbatical leaves and on other presidential staff development initiatives.

### Membership and Selection
One Presidential professional staff member
One Academic Affairs professional staff member
One Business Affairs professional staff member
One Student Affairs professional staff member
One University Advancement professional staff member
Two at large representatives, one from University directors and one from the professional staff

Members are elected by the Professional Staff Senate from those in their respective employment classifications.

### Term
Three years, with possibility of election for one additional consecutive term.

### Meetings
Much of the business of the committee is done electronically.  However, the committee should meet in person at least once a semester.

### Reports to
Vice President for Business Affairs

**Marywood University Faculty Handbook  2010**

194

# ARBORETUM COMMITTEE

(Approved by the President of the University 11/8/02, effective 7/1/03)

**Title**
Arboretum Committee

**Purpose and Function**
The Arboretum Committee

> makes recommendations for the ongoing physical enhancement of the Marywood University Arboretum;

> concerns itself with the development of educational programs for students and others in the community;

> promotes the Arboretum at Marywood University as a living example of responsible stewardship to the world in which we live.

**Membership and Selection**
One faculty member from the Science Department
One representative from the Grounds staff
One representative from Corporate and Foundation Relations
One representative from University Relations
Arboretum pagemaster
One student from the Pugwash student organization
Three other members from among faculty, students, and staff

Appointments are made at the invitation of the Vice President for Business Affairs with advice from cognizant administrators.

**Term**
Faculty and Staff - three years with possibility of reappointment
Student - one year with possibility of reappointment

**Meetings**
Meetings are usually held monthly.

**Reports to**
Vice President for Business Affairs

**Marywood University Faculty Handbook  2010**

# DINING SERVICES COMMITTEE

(Revision approved by the Vice President for Business Affairs 10/31/02, effective 7/1/03)

**Title**
Dining Services Committee

**Purpose and Function**
The committee serves to provide direction to Dining Services and to gather feedback in an effort to maximize customer satisfaction.

**Membership and Selection**
Director of Dining Services (Chair)
Executive Chef and Associate Director
Retail Manager
Director of Housing and Residence Life
One international resident student
One other resident student
One commuting student

Students are appointed by the Executive Board of the Student Government Association in consultation with the Vice President for Student Life.

**Term**
Students – one year with possibility of reappointment

**Meetings**
Meetings are called by the Chair at least four times a year.

**Reports to**
Vice President for Business Affairs

**Marywood University Faculty Handbook  2010**

196

## EMPLOYEE BENEFITS COMMITTEE

(Approved by the President of the University 11/8/02, effective 1/1/03)

**Title**
Employee Benefits Committee

**Purpose and Function**
The Employee Benefits Committee advises the Vice President for Business Affairs and ultimately the President of the University on employment benefit issues that affect the University community.

**Membership and Selection**
Members should have a total University viewpoint and interest to assure that recommendations will contribute to the accomplishment of the objectives of the University.

Care should be taken to ensure that the group is representative of various demographics, such as age, gender, family status, etc.

Assistant Vice President for Human Resources (non-voting Chair)
Vice President for Business Affairs
One representative of the Faculty Senate
One representative of the Professional Staff Senate
One representative of the Support Staff Senate
One full-time faculty member at large
One administrative or professional staff member at large
One support staff member at large

Representatives of the senates are elected by their respective senates.
At-large representatives are appointed by the President of the University.

**Term**
Elected and appointed members – three years with possibility of renewal for one additional, consecutive term

**Meetings**
Meetings are held at least twice a year.

**Reports to**
Vice President for Business Affairs

**Marywood University Faculty Handbook  2010**

# EMPLOYEE HEALTH AND SAFETY COMMITTEE

(Revision approved by the Vice President for Business Affairs 2002, 2007)

**Title**
Employee Health and Safety Committee

**Purpose and Function**
The Employee Health and Safety Committee has three main functions:

1. Detect hazards
2. Analyze and solve problems related to safety and health
3. Assist in the management of safety

In addition, the Committee

strives to create a campus-wide awareness of the importance of safety;
provides opportunities for discussion of issues related to accidents;
reviews existing accident and illness prevention programs and plans education campaigns;
establishes procedures for conducting and documenting the findings of periodic workplace inspection;
accepts suggestions from the campus community related to a safe working environment;
makes recommendations to correct hazards;
reviews, in a timely manner, incidents resulting in work-related deaths, injuries, illnesses, and complaints;
conducts evaluations on the effectiveness of new safety equipment;
evaluates health and safety procedures.

**Membership and Selection**
Managers (total not to exceed total non-supervisory staff):
        Assistant Vice President for Human Resources
        Superintendent of Trades or Superintendent of Building Services
        Director of Student Health Services
        Chief of Security and Safety
        Manager responsible for insurance issues
        Additional manager(s)

Non-supervisory Staff:
        Two full-time faculty members
        At least one professional staff employee
        One employee from the maintenance or grounds staff
        At least one other employee from any hourly classification.

Guest:  One liaison from Chartwells

Employees are appointed by the Vice President for Business Affairs.

Faculty members are appointed by the Provost and Vice President for Academic Affairs.

**Marywood University Faculty Handbook  2010**

198

Training is provided at least annually to members of the committee by a qualified accident and illness prevention person.  Training includes a review of committee responsibilities, hazard identification and accident investigations.

**Term**
Employees  –  three years with possibility of reappointment.
> An appointment to fill a vacancy in an unexpired term is made from the same employment classification.

Faculty – one year with possibility of reappointment

The Chair and the Secretary are elected annually with possibility of re-election.

**Meetings**
Meetings are called by the Chair at least once a month.  A quorum (1/2+1) must be maintained at every meeting.

Agendas and minutes are distributed to committee members, the Vice President for Business Affairs, and are kept on file.  An annual report is filed and retained by the Secretary of the University.

**Committee Members' Responsibilities**
Members are required to attend monthly meetings, participate in monthly inspections, and attend the required annual training.  In addition, members attend and assist with monthly fire drills.

**Reports to**
Vice President for Business Affairs

**Marywood University Faculty Handbook  2010**

# PARKING COMMITTEE

(Revision approved by the Vice President for Business Affairs 10/31/02, effective 7/1/03)

**Title**
Parking Committee

**Purpose and Function**
The Parking Committee
    assesses the parking needs of various constituencies;
    formulates suggested policies;
    recommends changes to existing parking rules and regulations.

**Membership and Selection**
Vice President for Business Affairs
Chief of Safety and Security
Superintendent of Grounds
Chair of the Professional Staff Senate
Chair of the Support Staff Senate
Director of Housing and Residence Life
One faculty member
One undergraduate and one graduate resident student
One undergraduate and one graduate commuting student

The faculty member is selected by the Executive Committee of the Faculty Senate.

The undergraduate students are appointed by the Executive Board of the Student Council in consultation with the Vice President for Student Life.

The graduate students are appointed by the President of the Graduate Student Council in consultation with the Vice President for Student Life.

**Term**
Faculty – two years with possibility of reappointment
Students – one year with possibility of reappointment

**Meetings**
Meetings are held at least twice each academic year.

**Reports to**
Vice President for Business Affairs

**Marywood University Faculty Handbook  2010**

200

**Marywood University Faculty Handbook  2010**

# UNIVERSITY STANDING COMMITTEES

### reporting to

## VICE PRESIDENT FOR STUDENT LIFE

### Student Life Committee

### Wellness and Health Promotion Committee
Subcommittee:  **Students with Disabilities Committee**

### Conduct Board

**Marywood University Faculty Handbook  2010**

202

**Marywood University Faculty Handbook  2010**

# STUDENT LIFE COMMITTEE

(Revision approved by the Vice President for Student Life 11/5/02, effective 7/1/03)

**Title**
Student Life Committee

**Purpose and Function**
The Student Life Committee advises the Vice President for Student Life on

> policies governing student life outside the classroom;
> services, activities, and regulations in the Student Life area;
> matters in the Student Life area that require attention;
> matters about which the Vice President for Student life seeks advice.

**Membership and Selection**
Vice President for Student Life (Chair)
Dean of Students
Two Student Life directors
Two faculty members
Four undergraduate students
Two graduate students

Student Life directors are appointed by the Vice President for Student Life.

Faculty members are appointed by the President of the Faculty Senate

Undergraduate students are appointed by the Executive Board of the Student Government Association in consultation with the Vice President for Student Life.

Graduate students are appointed by the President of the Graduate Student Council in consultation with the Vice President for Student Life.

**Term**
Student Life directors – one year with possibility of reappointment
Faculty – two years with possibility of reappointment
Students -- one year with possibility of reappointment

**Meetings**
Meetings are held at least four times a year.

**Reports to**
Vice President for Student Life

**Marywood University Faculty Handbook  2010**

204

## WELLNESS AND HEALTH PROMOTION COMMITTEE

(Revision approved by the Vice President for Student Life 11/5/02, 8/27/04, 5/07/05)

**Title**
Wellness and Health Promotion Committee

**Purpose and Function**
The Wellness and Health Promotion Committee
assists the Director of Student Health Services develop and provide a comprehensive wellness and health education promotion program;

recommends policies and procedural revisions regarding health services;

recommends programs related to wellness and health care concerns within the University community.

The **Students with Disabilities Committee**, a subcommittee, develops campus awareness of the needs of students with disabilities and identifies ways through which the University can serve them.

**Membership and Selection**
Director of Student Health Services (Chair)
Associate Director for Student Support Services
Director of Counseling and Student Development Center
Director of Athletics and Recreation
Director of Residence Life
Director of Human Performance Lab
Chief of Safety and Security
One faculty member from each health related academic program
One student from each health related academic program

Faculty members are appointed by the deans of their respective colleges.
Students are appointed by their respective academic deans.

The subcommittee is constructed by invitation of the Chair.

**Term**
Faculty – two years with possibility of reappointment
Students – one year with possibility of reappointment

**Meetings**
Meetings are held at least twice per year.

**Reports to**
Vice President for Student Life

**Marywood University Faculty Handbook 2010**

# CONDUCT BOARD

(Revision approved by the Vice President for Student Life 4/30/03, 8/26/04)

**Title**
Conduct Board

**Purpose and Function**
The Conduct Board

hears a case when a student has been accused of a violation of conduct and the student has requested adjudication by the Board;

interprets rules and regulations as they relate to individual incidents and community values;

decides responsibility for alleged violations;

determines sanctions up to and not including suspension or dismissal from the University;

recommends suspension or dismissal from the University to the Dean of Students when determined necessary;

files records of disciplinary hearings with the Dean of Students.

**Membership and Selection**
Dean of Students (Chair)
Six full-time faculty members
Six full-time undergraduate students
Three full-time graduate students

Faculty members are appointed by the Executive Committee of the Faculty Senate.

Undergraduate students are appointed by the Executive Committee of the Student Government Association in consultation with the Vice President for Student Life.

Graduate students are appointed by the Graduate Student Council in consultation with the Vice President for Student Life.

A student is selected as the Chair for each hearing.
One member is selected to serve as recorder for each hearing.

**Term**
Faculty – three years with possibility of reappointment
Students – one year with possibility of reappointment

**Meetings**
Meetings are held at the request of the Dean of Students.

A panel of two faculty members and three students is drawn for a hearing. If the case in question involves a graduate level student, it is appropriate that graduate level students sit on the panel. Two faculty members and two students constitute a quorum.

**Reports to**
Vice President for Student Life
through the Dean of Students

**Marywood University Faculty Handbook  2010**

206

Marywood University Faculty Handbook  2010

# UNIVERSITY STANDING COMMITTEES

### reporting to

## VICE PRESIDENT FOR UNIVERSITY ADVANCEMENT

### Cultural Affairs Committee

208

**Marywood University Faculty Handbook  2010**

# CULTURAL AFFAIRS COMMITTEE

(Revision approved by the Vice President for University Advancement 11/19/02, effective 7/1/03)

**Title**
Cultural Affairs Committee

**Purpose and Function**
The Cultural Affairs Committee supports cultural enrichment and entertainment to the Marywood University campus community. The Committee encourages greater student involvement in University life, manifests Marywood's active commitment to the cultural enrichment of the surrounding community, and enhances the public image of the University.

The Cultural Affairs Committee

plans and executes an annual program of lectures, cultural offerings, and workshops for the benefit of students and the community during the fall and spring terms;

maintains an updated mailing list;

organizes an effective promotional program, promotional pieces, and coverage for each program;

attempts to attract nationally renowned speakers as part of the cultural affairs offerings.

**Membership and Selection**
Vice President for University Advancement
Three full-time faculty members
Two undergraduate students
Two graduate students

Faculty members are selected by the Provost and Vice President for Academic Affairs..

The undergraduate students are appointed by the Executive Board of the Student Government Association in consultation with the Vice President for Student Life.

The graduate students are appointed by the President of the Graduate Student Council in consultation with the Vice President for Student Life.

**Term**
Faculty – three years
Students – one year

**Meetings**
Meetings are held at the call of the Chair. Special meetings are called particularly during the planning stages for the annual program of events.

**Reports to**
Vice President for University Advancement

**Marywood University Faculty Handbook 2010**

210

**Marywood University Faculty Handbook  2010**

APPENDIX

Appendix 1

_____

### THE ORGANIZATION OF MARYWOOD UNIVERSITY

MEMBERS OF THE MARYWOOD UNIVERSITY CORPORATION

BOARD OF TRUSTEES

PRESIDENT OF THE UNIVERSITY

ACADEMIC AFFAIRS AREA
BUSINESS AFFAIRS AREA
STUDENT LIFE AREA
UNIVERSITY ADVANCEMENT AREA

SECRETARY OF THE UNIVERSITY AND GENERAL COUNSEL

FACULTY SENATE
PROFESSIONAL STAFF SENATE
SUPPORT STAFF SENATE

_____

### ORGANIZATION OF THE PRESIDENTIAL AREA

President of the University

    Vice President for Academic Affairs
    Vice President for Business Affairs and Treasurer
    Vice President for Student Life
    Vice President for University Advancement

    Secretary of the University and General Counsel

    Chief Planning Officer
        Director of Research and Assessment
        Data Coordinator and Analyst

As of 6/01/10

_____

**Marywood University Faculty Handbook  2010**

## ORGANIZATION OF THE BUSINESS AFFAIRS AREA

**Vice President for Business Affairs and Treasurer**

    **Assistant Vice President for Human Resources**
        Human Resources Manager
        Benefits Manager

    **Controller and Assistant Treasurer**
        Assistant Controller and Director of Fiscal Affairs
            Accounting Manager
            Manager of Cashier's Office

            Bookstore Manager
            Manager of Printing and Mailing
            Postmaster
            Dining Services

    **Director of Budgets, Grants, and Marywood Aviation, Inc.**
        Assistant to the Director of Budgets, Grants, and Marywood Aviation, Inc.
         University Grants Accountants

    **Chief Information Officer**
        Technical Director
        Director of User Support Services
        Director of Application Programming Services
        Manager of Academic Computing
        Manager of Network and Systems Administration

    **Director of Buildings and Grounds**
        Assistant Director of Buildings and Grounds
        Chief of Safety and Security
        Superintendent of Grounds
        Superintendent of Building Services

As of 6/01/10

**Marywood University Faculty Handbook  2010**

## ORGANIZATION OF THE STUDENT LIFE DIVISION

**Vice President for Student Life**

    **Dean of Students**
        Director of Student Activities and Leadership Development
           *Class and Club Advisors*
           *Student Activities Crew and Commuter Assistants*
        Director of Housing and Residence Life
           *Assistant Director of Housing and Residence Life*
           *Residence Directors and Resident Assistants*

    **Director of Athletics and Recreation**
        Assistant Directors of Athletics and Recreation
        Director of Sports Information and Athletics Promotions
        Coordinator of Intramurals and Recreation
        Athletics Facilities Manager
        Supervisor – Lynett-Haggerty Fitness Center
        Athletic Trainers
        Athletics Administration Intern
        Coaches

    **Director of Campus Ministry**
        Assistant Director of Campus Ministry and Chaplain
        Assistant Directors of Campus Ministry

    **Director of Career Services**
        Assistant Director of Career Services
        Career Associate

    **Director of Counseling and Student Development Center**
        Assistant Director of Counseling and Student Development Center
        Staff Counselor
        Consulting Psychiatrist

    **Director of Student Health Services**
        Certified Registered Nurse Practitioner
        Consulting Nutritionist
        Consulting Physicians

As of August 28, 2009

## ORGANIZATION OF THE UNIVERSITY ADVANCEMENT AREA

**Vice President for University Advancement**

**Director of Government/Corporate/Foundation Relations**
Corporate/Foundation Relations Writer / Researcher

**Assistant Vice President for Development**
Director of Advancement Services
*Prospect Researcher*
*Advancement Data Management Coordinator*
Director of Planned Giving
Director of Capital Resources
Director of Constituency Relations and The Marywood Fund
Assistant Director of Constituency Relations
*Coordinator of Communication*
Director of Alumni Development

**Executive Director of Marketing Communications**

Director of Public Relations
*Public Relations Coordinator*

Director of Publications
*Senior Writer and Editor*

Art Director
*Graphic Designer*

Web Content Director

Director of Conference and Event Services

Director of Continued Professional Education
Director of Workforce Education

Secretary of the University
12/03/09

**Marywood University Faculty Handbook  2010**

## ORGANIZATION OF INSTRUCTIONAL PROGRAMS

**Vice President for Academic Affairs**

### Dean, Reap College of Education and Human Development

Department Heads
*Faculty and Program Directors*

Communication Sciences and Disorders
Psychology and Counseling
Education and Special Education
Ph.D. in Human Development
Two Clinics
Fricchione Day Care Center
Tony Domiano Day Care Center

### Dean, Insalaco College of Creative and Performing Arts

Department Heads
*Faculty and Program Directors*

Art
Music, Theatre, Dance
Communication Arts
Galleries
Radio and TV Station

### Dean, College of Health and Human Services

Department Heads
*Faculty and Program Directors*

Health and Physical Education
Nursing and Public Administration
Nutrition and Dietetics
Physician Assistant
Human Performance Lab

Director, School of Social Work
*Faculty*

**Marywood University Faculty Handbook  2010**

**Vice President for Academic Affairs (continued)**

**Dean, College of Liberal Arts and Sciences**

Chairpersons
*Faculty and Program Directors*

Business and Managerial Science
English Language and Literature
Foreign Languages
Mathematical Sciences
Philosophy
Religious Studies
Science
Social Sciences
Honors Program
Program for Undeclared Students

**Dean, School of Architecture**

Chairpersons
*Faculty and Program Directors*

Architecture
Interior Design

**Graduate Curriculum Committee**

**Undergraduate Curriculum Committee**

Secretary of the University
5/17/10

**Marywood University Faculty Handbook  2010**

# INDEX

Absence, Department Chairperson --------------------- 6
Absence from class, Faculty member ------------------ 75
Absences for University Events, Undergraduate ---- 75
Academic Affairs Administrators, Other ------------- 9
Academic Computing Advisory Committee ------- 186
Academic Council----------------------------------- 171
Academic Freedom -------------------------------- 47
Academic Grievance, Student -------------------- 82
Academic Honesty ------------------------------- 77
Academic Meetings and Functions ----------------- 56
Academic Records of Students, Faculty ------------ 80
Academic Records of Students, Registrar---------- 80
Accidental Death
    and Dismemberment Insurance -------------------- 62
Accreditations and Approvals ----------------------------4
Act 101 Program -------------------------------------- 133
Additional Contracted Work Policy for Faculty --- 56
Adjunct Faculty Members ---------------------------- 19
Administrative Meetings ----------------------------- 11
Administrative and Professional Staff Development
    Committee----------------------------------------- 193
Administrators with Rank and Tenure --------------- 19
Advancement in Lecturer Level Criteria ------------ 98
Advances, Travel------------------------------------- 117
Advertising --------------------------------------- 141
Affiliate Faculty Members ---------------------------- 19
Airfare------------------------------------------- 115, 116
Alumni Support ---------------------------------- 141
Animal Subjects in Research and Teaching--------- 92
Appeals, Faculty Grievances --------------------------66
Appeals, Grade ------------------------------- 80, 81
Appointment, department chairpersons---------------- 6
Appointment Procedures ---------------------------- 24
Appointment to Rank, Qualifications --------------- 21
Appointments with Tenure, Contract ---------------- 23
Appointments without Tenure, Contract ------------- 23
Arboretum Committee------------------------------- 194
Archives --------------------------------------- 88
Assault, Sexual---------------------------------------- 103
Assistant Professor -------------------------------- 21, 28
Associate Professor ------------------------------ 22, 28
Athletics and Recreation ----------------------------- 133
Availability, Department Chairperson -----------------9


Background Checks------------------------------- 122
Bloodborne Pathogens------------------------------- 109
Board of Trustees --------------------------------- 5
Bookstore ------------------------------------ 65, 121
Budget ------------------------------------------- 114
Budget Committee of the University --------------- 158
Business Expenses, Travel and ---------------------- 115


Calendar Committee ------------------------------- 166
Calendar of Events, annual ------------------------- 133
Calendar of Events, monthly ------------------------ 145

Campus Ministry---------------------------------- 133
Cancellation of Courses ------------------------------ 76
Car Rental------------------------------------- 117
Career Services --------------------------------- 134
Cash Deposits and Reimbursements --------------- 115
Catholic Identity Statement ----------------------- xiv
Chairpersons, Department ------------------------- 6
Charges, Personal---------------------------------- 119
Cheating, see Academic Honesty ----------------------77
Civil Rights Complaint Procedures ---------------- 104
Civil Rights Policy ----------------------------------- 103
Class Attendance --------------------------------- 75
Class Meetings ----------------------------------- 75
Clean Air Policy --------------------------------- 108
Code of Conduct for Federal Contracts----------- 110
Collegiate Volunteers ----------------------------- 133
Commencement and Academic Convocations
    Committee ------------------------------------- 160
Commencement and Convocations Speakers
    Committee-------------------------------------- 161
Commencement and Convocations Speakers Policy98
Commencement Walking Policy ----------------------- 99
Committees Policy, University Standing ------------ 12
Confidential Information --------------------------- 126
Conflict of Interest in Research -----------------------95
Compensation, Department Chairperson -------------- 8
Compensation during Sabbatical Leave ------------- 52
Compensation Policy for Faculty --------------------- 66
Conditions of Computer Use ------------------------- 84
Conduct Board ----------------------------------- 205
Congratulatory Notes ---------------------------- 147
Consulting -----------------------------------------55
Contract Appointments with Tenure ----------------- 23
Contract Appointments without Tenure -------------23
Contracted Work Policy for Faculty, Additional--- 56
Contracts and Other Legal Documents ------------ 110
Contracts, Faculty --------------------------------- 22
Contractors, Independent---------------------------- 120
Contractual Agreements with Faculty --------------- 22
Controlled Substances in Research -------------------- 93
Convocations , Commencement speakers  policy---98
Copiers ----------------------------------------- 120
Cor Mariae Board of Directors --------------------- 162
Cor Mariae-Pro Fide et Cultura ----------------------- 66
Core Values of Marywood University ----------------- 3
Counseling and Student Development Center ----- 134
Course Syllabi -----------------------------------76
Creativity and Scholarship ------------------------ 25, 33
Crime Statistics ----------------------------------- 109
Criteria, Advancement in Lecturer Level----------- 98
Criteria for Sabbatical Leave ------------------------ 52
Cultural Affairs Committee ------------------------ 208
Cultural Diversity Committee ---------------------- 188


Day Care Center Benefit ------------------------------ 126
Deadly Weapons and Fireworks --------------------- 127

**Marywood University Faculty Handbook  2010**

# Index

Dean of Students------------------------------10 , 124
Deans ------------------------------------------------- 5
Deductions, Payroll----------------------------- 115
Dental Insurance ------------------------------- 62
Department Chairpersons --------------------------- 6
Development ------------------------------------- 139
Dining Services ------------------------------- 110
Dining Services Committee ------------------------- 195
Direct Deposit----------------------------------114
Director of Act 101 Program -------------------- 10
Director of Athletics and Recreation --------------- 10
Director of Campus Ministry ------------------- 10
Director of Career Services --------------------- 10
Director of Counseling and Student Development- 11
Director of Financial Aid----------------------- 9
Director of Housing and Residence Life------------10
Director of Library Services ------------------- 9
Director of Student Activities and Leadership
                          Development--10
Director of Student Health Services ----------------- 11
Disability Grievance Procedures --------------------- 106
Disability of Faculty Member, Short-term ---------- 57
Disability Insurance, Long-term------------------- 61
Disability Insurance, Voluntary Short-term ----------63
Distribution of Payroll Checks ----------------------- 114
Doctoral Equivalency ------------------------------- 35
Domiano Early Childhood Center ------------------ 125
Drug-Free Workplace------------------------------- 108
Duties, Department Chairpersons --------------------- 7

Early Childhood Centers ----------------------------- 125
Early Childhood/Day Care Centers Benefit ------- 126
Early Retirement Plan----------------------------- 125
Educational Consideration, Retrenchment due to ---45
Educational Training in Animal Research----------- 93
Educational Training in Human Subject Protection
  for IRB Members and IRB Administrative
  Personnel -------------------------------------- 91
Educational Training in Animal Research------------93
Educational Training in Human Subjects Protection
  for Investigators ------------------------------- 92
Educational Training in Responsible Conduct
  in Research------------------------------------94
Election Committee for Primary University
  Standing Committees ------------------------- 189
Employee Assistance Program ----------------------- 63
Employee Benefits Committee --------------------- 196
Employee Health and Safety Committee ---------- 197
Employee Training ----------------------------------- 123
Enterprise and Relt4ed Auxiliary Information
  Systems, training ----------------------------- 124
Entertainment of University employees------------ 118
Entertainment of University guests------------------ 118
Equipment, Furnishings----------------------------- 111
Equipment, use by students ----------------------- 112
Ethics, Professional------------------------------ 48

Evaluation, Department Chairperson ----------------- 8
Evaluation of Faculty Members --------------------- 25
Examinations --------------------------------------- 76
Excused Absences for University Events, Student - 75

Faculty and Academic Records of Students--------- 80
Faculty, Adjunct --------------------------------- 19
Faculty, Affiliate ------------------------------- 19
Faculty, Compensation Policy ---------------------- 66
Faculty Definition ------------------------------ 12
Faculty Development ----------------------------- 51
Faculty Development Budgeting -------------------- 51
Faculty Development Committee -------------------- 174
Faculty, Evaluation ------------------------------- 25
Faculty, Full-time ------------------------------- 19, 22
Faculty Grievances and Appeals ---------------------- 66
Faculty Librarians -------------------------------- 21
Faculty Meetings, General------------------------- 12
Faculty Members, New ---------------------------- 90
Faculty, Non-reappointment of Full-time Member- 40
Faculty Offices -------------------------------- 56
Faculty, Part Time ------------------------------- 19
Faculty, Peer Evaluation -------------------------- 26
Faculty, Personnel Records ------------------------ 24
Faculty, Pro rata -------------------------------- 24
Faculty, Promotion ------------------------------- 26
Faculty, Ranked --------------------------------- 19
Faculty, Resignation ----------------------------- 39
Faculty, Retrenchment ---------------------------- 43
Faculty Secretarial Staff ------------------------- 57
Faculty, Self Evaluation -------------------------- 26
Faculty Senate ----------------------------------- 12
Faculty Service, Interruption ---------------------- 58
Faculty, Student Evaluation ---------------------- 26
Family and Medical Leave ------------------------ 58
Financial Aid, Director -------------------------- 9
Financial Exigency , Retrenchment due to ---------- 44
Fireworks ---------------------------------------- 127
Flexible Benefits ------------------------------- 60
Flexible Benefits Plan ---------------------------- 60
Flexible Spending Accounts ------------------------ 60
Fricchione Day Care Center------------------------ 125
Full Time Faculty ------------------------------- 22
Fund Raising-Policy Statement--------------------- 139
Fundraising, student organizations ---------------- 135
Furnishings and Equipment ------------------------- 111

General Faculty Meetings -------------------------- 12
Gift Giving and Remembrances --------------------- 118
Gifts to the University --------------------------- 119
Goals and Objectives of Marywood University------- 3
Grade Appeals ----------------------------------- 80, 81
Grading System ---------------------------------- 78
Graduate Admissions, Director --------------------- 9
Graduate Curriculum Committee ------------------- 184

**Marywood University Faculty Handbook  2010**

Graduate Level Grading System ---------------------- 79
Graduate Scholarship Committee--------------------- 185
Grants Administration ----------------------------- 139
Grievance Procedures, Disability--------------------- 106
Grievance, Faculty ----------------------------------- 66
Grievance, Student Academic-------------------------- 82
Group Term Life Insurance --------------------------- 62
Guests ----------------------------------------------- 118
Guide to Grade Appeals Process
   for Faculty and Administrators --------------------- 81
Guidelines for Faculty Grievance
   and Appeals -------------------------------------- 66

Harassment, Sexual --------------------------------- 103
Hazardous Substances ------------------------------- 108
Health Insurance Continuation Coverage ----------- 61
Health Plans ----------------------------------------- 61
Health Services -------------------------------------- 65
HIPAA Privacy Practices --------------------------- 109
Hiring Marywood doctoral graduates as faculty,
   see Qualifications for Appointment to Rank ------ 21
History of the University----------------------------- xi
Holidays, Vacations and ----------------------------- 57
Home Page Policy------------------------------------- 86
Honorary Degrees------------------------------------- 99
Honorary Degrees Committee ----------------------- 159
Housekeeping, Maintenance-------------------------- 111
Housing and Residence Life-------------------------- 134

Identification Cards -------------------------------- 65
Identity Theft Policy--------------------------------- 109
Independent Contractors ---------------------------- 120
Information Technology Services --------------------- 84
Institutional Property Policy------------------------- 112
Institutional Review Board for the Protection
   of Human Participants ------------------------- 175
Institutional Review of Research Involving Human
   Participants -------------------------------------- 91
Instructor -------------------------------------------- 21
Insurance, Accidental Death and Dismemberment  62
Insurance, Dental ----------------------------------- 62
Insurance, Group Term Life -------------------------- 62
Insurance, Long-term Disability --------------------- 61
Insurance, Voluntary--------------------------------- 63
Insurance, Voluntary Short-term Disability --------- 63
Interdepartmental Charges -------------------------- 120
Interruption of Faculty Service----------------------- 58

Keys ------------------------------------------------- 111

Late for class, procedure --------------------------- 75
Leave, Family and Medical---------------------------- 58
Lecturers -------------------------------------------- 19
Lecturers, Advancement criteria --------------------- 98

Legal Documents, Contracts ------------------------ 110
Letters of Agreement ------------------------------- 24
Librarians, Faculty ---------------------------------- 21
Librarianship --------------------------------------- 25, 31
Librarianship Responsibility------------------------- 49
Library Faculty-------------------------------------- 21
Library Services ------------------------------------ 83
Library Services, Director --------------------------- 9
Lodging ----------------------------------------- 116, 117
Logo, University ------------------------------------- 121
Long-term Disability Insurance ---------------------- 61

Mailing Center ------------------------------------- 119
Maintenance and Housekeeping --------------------- 111
Marketing and Communications -------------- 119, 141
Marywood Fund ------------------------------------- 140
Marywood University Planning Advisory Council-154
Master Schedule ------------------------------------ 75
Media Inquiries, Answering ------------------------- 147
Medical Leave, Family and --------------------------- 58
Medicare and Social Security------------------------ 63
Meetings and Functions, Academic ----------------- 56
Meetings and Memberships -------------------------- 53
Meetings, Class ------------------------------------- 75
Members of the Marywood University Corporation- 4
Memberships, Meetings and ------------------------- 53
Mileage Reimbursement ----------------------------- 118
Military Family Leave Entitlement -------------------- 58
Mission Integration Committee --------------------- 157
Mission of Student Life Division ------------------- 133
Mission Statement of Marywood University---------- 3
Moving Expenses for New Hires -------------------- 123

Nepotism----------------------------------------------- 121
New Faculty Member, Orientation --------------------- 90
New Hires, Moving Expenses ------------------------ 123
Non-credit Courses ---------------------------------- 65
News and Information -------------------------------- 144
Non-reappointment of Full-Time Faculty Member  40

Occupational Exposure to
   Bloodborne Pathogens --------------------------- 109
Offices, Faculty ------------------------------------- 56
Office of Information Technology--------------------- 84
Order Cor Mariae-Pro Fide et Cultura -------------- 66
Organization of Instructional Programs---------- App 2
Organization of the University ------------------- App 1
Orientation of New Faculty Member ---------------- 90
Outcomes Assessment Committee ------------------- 163
Overload teaching ----------------------------------- 56

Parking ---------------------------------------------- 65
Parking Committee ---------------------------------- 199

**Marywood University Faculty Handbook  2010**

## Index

Part-time Faculty----------------------------------- 24
Payroll ------------------------------------- 66, 114
Payroll Deductions --------------------------------- 115
Peer Evaluation ------------------------------------ 26
Personal Changes ---------------------------------- 123
Personal Charges --------------------------------- 119
Personal Computers, University Plan -------------- 128
Personal Vehicles----------------------------- 115, 117
Personnel Records of Faculty Members ------------- 24
Photographs, publicity ----------------------------- 146
Plagiarism, see Academic Honesty ------------------ 78
Policy Committee of the University ---------------- 155
Political Activity ----------------------------------- 48
President of the University ------------------------- 5
President's Cabinet --------------------------------- 153
Pre-Tenure Review ---------------------------------38
Printing Services ---------------------------------- 119
Printing and Mail Center --------------------------- 119
Pro rata Faculty ----------------------------------- 24
Procedures for Pre-Tenure Review ------------------ 38
Procedures for Tenure Consideration ------------------36
Professional Ethics -------------------------------- 48
Professional Leave of Absence----------------------53
Professional Staff Senate ------------------------- 12
Professor ----------------------------------- 22, 34
Progressive Discipline ----------------------------- 40
Promotion of Faculty Members ---------------------- 26
Property Policy, Institutional ---------------------- 112
Provost and Vice President for Academic Affairs --- 5
Publications --------------------------------------- 142
Publicity------------------------------------------ 142
Purchasing --------------------------------------- 120

Qualifications for Appointment to Rank------------- 21

Rank and Tenure Committee ------------------------ 172
Ranked Faculty------------------------------------19
Receipt Requirements------------------------------ 116
Recognition of Student Organizations ------------- 135
Record Keeping, Academic ------------------------ 80
Records Management and Archives ----------------- 88
Recreation, Athletics ----------------------------- 133
Recreational Facilities ----------------------------65
Registrar ----------------------------------------- 9
Registrar and Academic Records
   of Students----------------------------------- 80
Reimbursements, Cash Deposits --------------------- 115
Remembrances, Gift Giving ------------------------ 118
Rental of Vehicles -------------------------------- 116
Reporting, Travel --------------------------------- 117
Research and Teaching, Animal Subjects ----------- 92
Research, Controlled Substances----------------------- 93
Research, Institutional Review of Research
   Involving Human Participants----------------------- 91
Research Misconduct Policy------------------------96

Reservations for Use of Facilities ------------------ 112
Resignation of Faculty Member ----------------------- 39
Retirement Plan ----------------------------------- 63
Retirement Plan, Early -------------------------- 125
Retrenchment of Faculty ---------------------------- 43
Role and Responsibility of an Advisor
   of a Student Organization ------------------------ 135

Sabbatical Leave for Faculty Member -------------- 52
Safety and Security, employee training ------------ 124
Safety Practices ----------------------------------- 124
Scholarship and Creativity ------------------------ 25, 33
Seal of the University ---------------------------- 121, 147
Search Committee Procedures – Affirmative
   Action Office----------------------------------- 122
Search Procedures for Faculty Positions------------- 89
Secretarial Staff, Faculty --------------------------- 57
Secretary of the University -------------------------- 11
Self Evaluation ------------------------------------ 26
Self-Study of Programs and
   Student Services ------------------------------- 87
Semester------------------------------------------- 75
Senate, Faculty ----------------------------------- 12
Senate, Professional Staff --------------------------- 12
Senate, Support Staff ------------------------------- 12
Service --------------------------------------------- 25
Service and Leadership --------------------------- 30, 31
Sexual Assault ------------------------------------ 103
Sexual Harassment -------------------------------- 103
Short-term Disability of Faculty Member----------- 57
Social Security and Medicare------------------------ 63
Smoking ------------------------------------------- 108
Space Advisory Committee ------------------------- 167
Space Policy -------------------------------------113
Speakers Bureau ---------------------------------- 147
Special Events------------------------------------ 147
Sponsorship --------------------------------------- xiii
Stationery, Standardized --------------------------- 147
Student Academic Grievance ----------------------- 82
Student Activities and
   Leadership Development -------------------- 10, 134
Student Assistants---------------------------------- 57
Student Evaluation of Faculty Member -------------- 26
Student Health Records Policy --------------------- 136
Student Health Services --------------------------- 136
Student Life Committee --------------------------- 203
Students with Disabilities Committee --------------204
Summer School Courses, Teaching ----------------- 56
Support Staff Senate------------------------------- 12
Syllabi, Course ----------------------------------- 76

Teacher Education Committee----------------------- 187
Teaching ----------------------------------- 25, 28
Teaching Responsibility --------------------------- 49
Teaching Summer School courses ------------------- 56

**Marywood University Faculty Handbook  2010**

Technology Advisory Committee -------------------- 164
Telephones ------------------------------------------ 111
Tenure ----------------------------------------------- 35
Tenure and administrative positions ---------------- 19
Tenure, Pre-Tenure Review --------------------------- 38
Tenure, Procedures for Tenure Consideration ------ 35
Term of Office, Department Chairpersons ----------- 7
Textbooks ------------------------------------------- 121
Threats, Violent Acts ------------------------------- 127
Tony Domiano Early Childhood Center ----------- 125
Training, Employee --------------------------------- 123
Training in Animal Research -------------------------- 93
Training in Human Participants Protection for IRB
    Members and IRB Administrative Personnel----- 91
Training in Human Participants Protection
    for Investigators --------------------------------- 92
Travel and Business Expenses ----------------------- 115
Travel Advances ------------------------------------ 117
Travel Reporting ------------------------------------ 117
Treasurer -------------------------------------------- 11
Tuition Exchange Programs -------------------------- 83
Tuition Loans --------------------------------------- 54
Tuition Remission Benefit --------------------------- 64

Unallowable Expenses------------------------------- 116
Undergraduate Admissions Committee------------- 176
Undergraduate Admissions, Director -------------------9
Undergraduate Core Subcommittee ---------------- 179
Undergraduate Curriculum Committee ------------- 177
Undergraduate Excused Absences
    for University Events ----------------------------- 75
Undergraduate Grades and
    Academic Standing Committee -------------------- 180
Undergraduate Honors and Fellowships Board --- 181
Undergraduate Level Grading System -------------- 78
Undergraduate Program Subcommittee ------------ 178
Undergraduate Research Review Committee ----- 183
Undergraduate Scholarships and Fellowship
    Committee------------------------------------------ 182
Unallowable Expenses------------------------------- 116
Unemployment Compensation ----------------------- 64

University Advancement ----------------------------- 139
University Events, Excused Absences ---------------- 75
University Guests and Employees, Entertainment 118
University Logo -------------------------------------- 147
University Plan for Personal Computers ---------- 128
University Seal -------------------------------------- 147
University Standing Committees Policy ------------- 12
University Standing Committees reporting to
    President of the University -------------------------- 151
    Provost and Vice President
        for Academic Affairs ------------------------- 169
    Vice President for Business Affairs
        and Treasurer ------------------------------- 191
    Vice President for Student Life -------------------- 201
    Vice President for University Advancement---- 206
Use of the University Seal,
    Symbol, and Standardized Stationery ----------- 147


Vacations and Holidays ---------------------------- 57
Vehicle Rental------------------------------------- 116
Vice President for Academic Affairs, Provost and -- 5
Vice President for Business Affairs
    and Treasurer --------------------------------- 11
Vice President for Enrollment Management ---------- 9
Vice President for Student Life ------------------------10
Vice President for University Advancement --------11
Violent Acts and Threats ----------------------- 127
Voluntary Insurance ----------------------------- 63
Voluntary Short-term Disability Insurance --------- 63


Weapons and Fireworks ----------------------------- 127
Web Pages ----------------------------------------- 86
Website Management Committee ------------------- 168
Website Privacy Policy----------------------------- 129
Wellness and Health Promotion Committee ------ 204
Workers' Compensation --------------------------- 63
Workload ------------------------------------------- 54


Years of Service Awards ----------------------------- 124

**Marywood University Faculty Handbook  2010**

# Exhibit 23

EXHIBIT
23

**Date:** Fri, 13 Jan 2012 11:37:01 -0800 (PST)

**From:** Frederick Fagal <fffagal@yahoo.com>

**To:** "fffagal@yahoo.com" <fffagal@yahoo.com>

**Subject:** Marywood Administration Tears Down Approved Free Speech Posters

**Attachments:** Synoposis Free Speech Poster tear-down Marywood 2011.pdf
Free Speech Marywood Poster Tear-Down Email Exchange sent to FIRE.pdf
Letter to Alan Levine Dec 2 2011 re compensation for poster tear down.pdf
Levine responds to Fagal requests 2011 12-15.pdf

Dear Marywood University Faculty Colleague ,                               January  13, 2012

We deserve better. Our students deserve better.  In November 2011 I spent my own money to get a speaker from the Foundation for Individual Rights in Education (FIRE) to give a presentation to an Introduction to Social Science class on November 30, 2011. The topic was "Know Your Rights: Free Speech and Thought Reform on Campus," and the speech tied into our study of the United States  Constitution. I also spent my own money to pay for posters advertising the speech in Comerford Auditorium which was to be announced as open to all.  Total cost to me about $500. Given my previous run-ins with the administration,

http://www.marywoodfreespeech.com/History%20Page/Fagal%20History/adminVSfagal.htm

just to be safe (ha), I had my posters stamped with the Student Life poster approval stamp. The Marywood Administration, without telling me, then decided to tear down the posters. No, I am not kidding…. laughable yet sad.

This letter ends with a fuller but still brief summary abstract of what occurred. I hope you read the attachments which tell the complete story. For fun and insight as to "how it all went down" you must view the Hitler Parody *satire* videos on YouTube (see later below for links).

Based on the evidence, I expect most of you (if only in private), will agree the Marywood administration (real people here...not an abstraction) exhibited egregious, despicable, contemptible behavior.  This poisonous and ***considered!*** behavior reflects badly on *everyone* associated with Marywood.  I am ashamed for the institution and hope it mends its ways.  At this point I think publicity is the only tool which might affect the Administration and inspire "hope and change" J on this campus. Perhaps the Board of Trustees could at least discuss this type of behavior behind closed doors or in private emails and conversations. One can hope…, nay pray….. Attached to this email are four items which I hope some (many?) of you read (#2 similar to #1 but even more complete):

A rather complete synopsis of the events surrounding the tearing down (circa Nov 29, 2011) of my "approved" posters announcing a speech about free speech (irony anyone?)

A complete record of what I sent to the Foundation for Individual Rights in Education (FIRE) to document how the situation unfolded. Learn about FIRE here: http://thefire.org/about/mission/. This big document includes (3.) below, my letter to Levine (and President Munley by agreed-to forwarding)

A copy of my (at first on paper) December 5, 2011 letter to VP Alan Levine. In that letter and in the December 5 meeting with Alan Levine I proposed a resolution of the "free speech poster tear down" controversy. Mr. Levine asked me for an electronic copy (which I sent) and he said he would forward it to President Anne Munley. In my  negotiation list of requests (demands?) such as I submitted there is obviously a possibility for a meeting of the minds and compromise – e.g. perhaps I would give up my demand for pizza for students (heh) or a public apology or one of the requested FIRE visits. A copy of the December 15, 2011 letter to me from  Alan Levine [VP for Academic Affairs] which responds to my letter of December 5, 2011. In the response letter Mr. Levine, speaking for the administration (i.e. President Anne Munley), writes "…we are not willing to undertake any (*emphasis added-fff*) of the specific requests that are contained in your letter."

Perhaps you have heard of Hitler Parody videos. From Wikipedia regarding the movie *Downfall*, http://en.wikipedia.org/wiki/Downfall_%28film%29 the film about Adolph Hitler's last days, which provided selected snippets so I could create the Marywood free speech poster tear-down parodies:

"In October 2010, YouTube stopped blocking any *Downfall*-derived parodies.[18] and is now placing advertisements on some of them. Corynne McSherry, an attorney specializing in intellectual property and free speech issues[19] for the Electronic Frontier Foundation, stated, "All the [*Downfall* parody videos] that I've seen are very strong fair use cases and so they're not infringing, and they shouldn't be taken down."[20]  "

I made two short satire videos. Part 1 deals with the events of November 28, Part 2 deals with the events of November 30. Comments from (pre-release) viewers:

"Brilliant!" …. "Love these!" …. "SO funny"… "It's definitely funny and I think it will appeal to students and faculty alike." … "IT DOES HAVE ITS MOMENTS, ESP THE SCRATCHING PART!" …"It was nice knowing you, Fred." …"I think you will get a positive response from your video…too funny to not."…"OMG!  Funny as hell.  Pretty powerful stuff. Keep fighting the good fight." …."The videos were definitely very amusing and certainly got the point across"  …"Wow Fred.... Great job on the video.... what a brilliant way to get your point across!!!! I hope it helps open their eyes!!!!! very creative and well done!!!!"

On YouTube just search for Hitler parody Marywood, I imagine it will show up…

## LINK to VIDEO #1 http://www.youtube.com/watch?v=1naxKnNc06o&

Fagal v. Marywood University              February 26, 2016                    DEF000014

1/18/2012 1:39 PM

**feature=youtu.be**

## LINK to VIDEO #2
**http://www.youtube.com/watch?v=4hzvy5sTqUw&**
**context=C3c1bc55ADOEgsToPDskIZsi1t3K7AqlLR-ci2V9HK**

I can send anyone low definition versions of the videos suitable (each is under 20 MB) for email attachments. Just ask…

A few colleagues concerned for my welfare have told me they fear the administration will try to fire me over this. One colleague says perhaps I should have asked for an appointment with President Munley and made a final appeal – i.e. I should have pursued every last ditch channel possible. I did not want to go into such a meeting and in essence have as the only new point to raise a "blackmail" threat to go public as I do here and in the videos. I did not want that. If the risk to me is there it is there; and if the worst does come to pass I will have to battle as best I can with the support of family and friends and colleagues and perhaps concerned outsiders.

I will of course be pleased to hear from any of you – from the grizzled veteran to the first-year hire. BEWARE – according to page 86 of the Faculty Handbook "…there are no specific laws, rules, or regulations that protect the privacy of a user's files, electronic mail messages, or any other information retrieved as a result of a person's session on the Marywood system."

Thus, if you *email* me and want to protect yourself, you might best *use a backup email address such as your old youthful one* coolcat@hotmail.*com and send it from anywhere but Marywood.* Also, if you are my friend, or will soon be, you need not say hello to me in public (heh). My home phone is 315-685-0429. Even a regular mail anonymous "good luck" note sent to me at home (address below) would be very appreciated…

**Abstract**: On November 28-29 2011 Marywood University tore down "stamped approved" posters announcing an open to all presentation by Will Creeley of FIRE (Foundation for Individual Rights in Education) titled "Know Your Rights: Free Speech and Thought Reform on Campus." On December 5 Alan Levine, VP for Academic Affairs, told me there were no written policy statements which justified Marywood's action, but that my offer of a $50 random prize to a student for attending was, in the eyes of the administration's Executive Council which met on November 29, "pandering" to students to get them to come to class, and that this justified tearing down the posters (without even the mere common courtesy of notifying me about the supposed problem). Even if a problem did exist a magic marker could have solved it, poster tear-downs were not necessary. Later that day (Dec. 5) I sent Mr. Levine two emails, one showing that Professor N. Gregory Mankiw of Harvard (former Chairman of the President's Council of Economic Advisers, author of today's largest selling economics textbook) recently pandered to his students by inviting ten select quick email responders (first come, first served) to join him as his guest for lunch after class at a Chinese restaurant in Harvard Square. *I suggested that Marywood University warn Harvard that it has a panderer in its midst* ! Finally, also on December 5, I forwarded to Mr. Levine an email from spring 2011 wherein the Marywood Administration encouraged professors to send students to a speech about sexual assault. Raffle prizes galore, including food and TWO $50 VISA cards. Quotation from the email "We hope faculty will offer students extra credit for attending, or *use some of your class time to attend the event with your students* [emphasis added]." Laughable! Talk about "pandering!" It is transparently obvious Marywood University is discriminating against Professor Fagal…Your Honor, I rest my case. Full details below.
   By Frederick F. Fagal. Jr. (Ph.D.) Associate Professor of Economics, Marywood University, Scranton, PA
Thank you for reading…..

Sincerely,
Fred Fagal
(Frederick F. Fagal, Jr. Associate Professor of Economics)…at Marywood 1987 –
Home address:
Fred Fagal
17 East Lake Street
Skaneateles, NY 13152

# Exhibit 27

EXHIBIT
27

# BBC NEWS

---

# The rise, rise and rise of the Downfall Hitler parody

By Finlo Rohrer
BBC News Magazine

**Five years ago Downfall's release saw the German film acclaimed for its portrayal of Hitler's last days. But since then it has become almost as famous for a wave of internet parodies of its climactic scene.**

Hitler is angry.

Very angry indeed. Angry enough to order all but his most senior generals out of the room so he can vent his rage.

> **WHAT IS A MEME?**
> • Coined by Richard Dawkins in 1976, and roughly meaning the cultural equivalent of a gene
> • He described: "A unit of cultural transmission, or a unit of imitation... Examples of memes are tunes, ideas, catch-phrases, clothes fashions, ways of making pots or of building arches."
> • Internet meme: An idea that spreads through the internet, or the spread of that idea

He is angry because Cristiano Ronaldo has been sold to Real Madrid. Or because the ending of Watchmen has been changed. Or that Hillary Clinton has lost the Democratic presidential nomination. Or that Kanye West interrupted Taylor Swift at an awards show.

It's become one of the best known "internet memes" around, a comic construct that has spread inexorably on YouTube and other platforms like a cultural version of Japanese knotweed.

In the original movie, the climax for many viewers might be the moment in the bunker when Hitler is told of the failure of General Felix Steiner to gather enough troops for an attack to ward off the Soviet advance on Berlin.

> " **It is by word of mouth, or word of tweet** "
> Bill Thompson On the spread of the Downfall parody meme

In this three-minute, 50 second scene, Hitler, played by Bruno Ganz, plunges between frothing vitriol and terrifying suppressed emotion as he confronts his top generals. The rest of the staff, standing in the corridor outside, listen rapt to the exchange.

But the parody makers have taken this clip, put it through a programme like Movie Maker or iMovie, and added their own subtitles, synced as closely as possible to the audio.

In some parodies, Hitler is being the public figure that is lampooned - Hitler becomes Hillary Clinton losing the nomination, or BBC chief Mark Thompson having to face Jeremy Paxman. But in many of the parodies, Hitler is simply reacting to events, the relegation of Sheffield Utd or Usain Bolt breaking the 100m record.

It is not an obvious subject for humour. Yet for millions of internet users there is something hilarious about this scene being turned on its head.

There is no clear explanation why this category of parody should have proved such a hardy internet meme, says technology writer Bill Thompson.

"It was just lucky. There is no particular reason why Downfall should have taken off."

## YouTube launch

Every day in bedrooms all over the world there are bedroom comedians dreaming of creating something that will spread like wildfire. Most of their work goes unregarded, but to Thompson, they are the inheritors of the punk ethos.

"Maybe Downfall was in the right place at the right time. It coincided with the launch of YouTube.

> FIVE POPULAR DOWNFALL PARODIES
> - Hitler gets banned from Xbox Live: 4,260,975
> - Hitler finds out Kanye West Disses Taylor Swift: 1,067,024
> - Usain Bolt Breaks 100m World Record: 1,096,241
> - Ronaldo leaves Utd: 1,439,671
> - Hitler Finds Out Sarah Palin Resigns: 497,903 Stats taken on 13 April. Source: YouTube

"Once it becomes successful it is unstoppable. It is by word of mouth, or word of tweet. The internet does what it was designed to do. It enables two-way communication."

As with any internet meme, the precise origins are unclear. But the credit for perhaps the most popular version, Hitler gets banned from Xbox Live, which has racked up more than 4.2 million users, was claimed by British student Chris Bowley.

Since then the range of topics covered has been too numerous to list.

And the film company behind Downfall, perhaps understandably, prefers to focus on the acclaim for the movie and the $100m it grossed at the box office.

"The impact of the movie has been tremendous, both on a commercial and on an artistic level," says Martin Moszkowicz, an executive at Constantin Film.

## Ambivalent view

The parodies have caused some issues.

"We as a corporation have a bit of an ambivalent view of it. On the one hand we are proud the picture has such a huge fanbase and that people are using it for parody. On the other hand we are trying to protect the artists."

As such Constantin Film has caused many of the parodies to be removed from YouTube and elsewhere.

"It is a task that can never be completed. They are popping up whenever we are taking one down," Mr Moszkowicz admits.

But while many people who have seen the parodies before seeing the film may have a strange feeling of deja vu when they get to the climactic scene, it won't ruin things for them, says Daily Telegraph film critic David Gritten.

"Some of them [the parodies] are absolutely wonderful. [But] I can't imagine it would ruin anyone's enjoyment of it.

"Ganz's portrayal of Hitler is so entirely full-on, so entirely convincing. He sears himself on your eyeballs."

And the Downfall parody meme has gone so far, that there are numerous versions sending up the whole meme itself.

In What does Hitler think of the Downfall meme?, Hitler rants: "This joke stopped being funny in 2008. This was only half-way clever the first time around."

"It's really the nature of the internet that once something reaches a critical mass it starts perpetuating itself out of its own momentum," says creator Andy Nordvall, who uses the name Masters of Humility. "The sheer randomness and seeming arbitrary nature of what goes viral becomes part of the viral-ness itself."

And at the heart of the craze is the ease of joining the bandwagon.

"Just find the clip online, subtitle it, and voila, you're a filmmaker. It's intoxicating just how easy it is to make your own Downfall parody."

Of course, some of the parodies are inevitably controversial.

### International appeal

A Hebrew-subtitle version bemoaning the lack of parking in Tel Aviv caused some consternation in Israel last year. But it shows the international appeal of the meme.

There have been parodies everywhere from Poland to Malaysia.

And some may draw positive conclusions from the idea of young people now feeling comfortable lampooning Hitler.

Downfall director Oliver Hirschbiegel told a magazine earlier this year that he had seen many of the parodies and could see the merits of the idea.

In many ways the parodies take things full circle. Allied propagandists at the beginning of World War II tried to paint Hitler as an undignified, cartoonish and flawed character, thinking this would better serve morale than the image of a remorseless, evil mastermind.

And the creation of a human but still evil Hitler is what Downfall was setting out to achieve.

### Below is a selection of your comments.

There are two levels that the meme's humour works on. The first and most obvious is seeing a once-feared man reacting to seemingly banal news with intense emotion. The one where he finds out Pokemon aren't real is really very good fun. The second level is seeing a video reflecting on modern issues put together with good timing. There's one about scientific peer review where Hitler rages about the third reviewer on a journal article he's trying to submit. It's funny to anyone who understands the topic because you can easily imagine the vitriol from any professor, and there aren't many research students who haven't made the dictator analogy to their own professor at some time or another. **Sen, Edinburgh**

This meme is so popular because it can be attached to so many events. The leader asks a question about progress, the supporters give him the bad news, the leader expresses concern about what he thought was happening, the supporters repeat the bad news, the leader realises that the challenge has been lost and describes all the opportunities they will now never achieve. The original happens to be about a dark period in history but the key story sequence occurs every day for all of us. I am so looking forward to a few UK Election versions. **Martin, Milton Keynes, UK**

BBC - come on. The best parody (in my opinion) is Hitler hearing about the Oasis split. 700,000+ views. Who does your research? Hilarious. **Dazzla, London**

There are two main types of this meme - the long one showing Hitler exploding with rage when he's told Steiner's attack didn't happen, and a shorter one where Gunsche tells Hitler they can't find Fegelein. The first works because we can all identify with someone raging at something not going as planned, and the second works because all of those are just surreal - using such themes as Hitler discussing the pros and cons of Wii Sports Resort etc. **Bruce Antell, Newmarket, England**

As a German teacher I understand everything the actor is saying in the original film so its hard for me to appreciate the subtitled jokes. Mostly I am just sick of seeing the same thing done over and over again. **Vernon, Atlanta, USA**

The popularity of this clip is a clear indication of how access to technology has led to the democratization of the dissemination of information, and our ability to now make OUR voices heard in a way that frightens politicians, big business, teachers, institutions, and the established media industry. This clip is often a valuable and far-reaching tool for social commentary, while being an entertaining way of publicising one's position on any number of issues. **David Green, St John's, Canada**

Taking two polar opposites and joining them seamlessly is a standard source of humour. Hitler represents the very depths of human depravity, but when joined with utter triviality like the lack of features on the iPhone or a lukewarm response from the local WI, and the conjunction is always likely to be very funny. **KD, Guildford**

Well that's finally killed off this meme for good. The only thing that can kill a well established meme is mainstream publicity. **Jingo, Yorkshire**

Story from BBC NEWS:
http://news.bbc.co.uk/go/pr/fr/-/2/hi/uk_news/magazine/8617454.stm

Published: 2010/04/13 10:59:14 GMT

© BBC 2016

# Exhibit 28

EXHIBIT
28

# Hitler Downfall parodies: 25 worth watching

Subtitled parodies of Adolf Hitler's last days in the Berlin bunker, as depicted in the 2004 Second World War film Downfall, have become one of the web's most enduring memes.

7:00AM BST 06 Oct 2009

The Nazi dictator's spittle-flecked rants have proved their remarkable versatility in hundreds of spoof clips, from sporting rages to economic polemics to video game reviews.

ADVERTISING

 Replay

inRead invented by Teads

The parodies are so ubiquitous on YouTube that they have even spawned self-referential meta-parodies - jokes about Hitler learning about his internet fame.

In celebration of the success of the parodies - and with half a hope that their popularity may at last be fading - we have selected what we believe are the 25 funniest versions. If you disagree, let us know in the box at the bottom.

Anyone unfamiliar with the clips should be warned that many of the "translations" contain strong language.

## <u>Meta-parodies</u>

### 1) Hitler finds out about the Downfall meme
**Best line:** "I slaughtered millions, cut a bloody path of destruction across Europe, and for what? So I could be the latest juvenile web fad, no better than YouTube Fred or that stupid f-----g hamster?"

### 2) Hitler rants about being stuck in slow motion

**Best line:** "Why me? I have done nothing to justify this. I'm the least amusing person around, dammit."

### 3) Hitler finds out that 'Hitler' has become a throwaway term of abuse

**Best line:** "I have been wearing this ridiculous thing for years so that it might be the very symbol of evil. Not some convenient talisman for unthinking Americans."

### 4) Hitler phones 'fake' Hitler

**Best line:** "Go to Wikipedia, it clearly says that he died on the 30th April 1945."

### 5) Hitler orders removal of Downfall parodies for breach of copyright

**Best line:** "Fair use! Don't give me fair use! This is OUR movie!"

## Technology and gaming

### 6) Hitler finds out there will be no camera in the iPod Touch

**Best line:** "El Jobso goes away for how many months? Comes back and f---s everything up!"

### 7) Hitler laments the decline of Second Life

**Best line:** "I tried to go there last night, to reassure myself. I still like it, I rode the segway... BUT I COULD NOT FIGURE OUT HOW TO GET OFF IT! THEN I GOT STUCK IN THE GROUND!"

### 8) Hitler finds out he has been banned from Xbox Live

**Best line:** "I'm left only with my s----y N64. I am truly f----d now. God dammit! I mean how much fun can you have with Super f-----g Mario!!!"

### 9) Hitler finds out he has been banned from RuneScape

**Best line:** "The Russians are a bunch of noobs."

### 10) Hitler finds out Twitter has gone down again

**Best line:** "Don't they care about their users? Don't they care about us Tweeple?"

## Sport

### 11) Hitler finds out Frank Lampard is signing for Inter

**Best line:** "If you supported the signings of Boulahrouz, Anelka and especially Crespo, leave."

### 12) Hitler finds out Sheffield United have been relegated

**Best line:** "And to make matters worse, it's Unsworth who scores. IT'S UNSWORTH WHO SCORES."

### 13) Hitler finds out Newcastle United have been relegated

**Best line:** "How about this, we have a different manager for each game next season? We couldn't do any f-----g worse. Maybe get the deluded fans in? We'll hold a lottery, draw a f-----g ticket each week for the deluded fools. Offer a platinum seat if they manage a win."

## Politics

### 14) Hitler reacts to the sub-prime mortgage crisis

**Best line:** "I had a 'liar's loan', bogus appraisal, and was on the path to riches!"

### 15) Hitler finds out about Sarah Palin's resignation

**Best line:** "Every time she winked, I thought it was just for me."

### 16) Hitler plans to heckle Barack Obama

**Best line:** "You should disguise yourself as John McCain. We still have that John McCain Hallowe'en mask"

## Internet culture

### 17) Hitler denies that the cake is a lie

**Best line:** "The cake is not a lie, I have eaten it. Yep that's right. It was very nice. Nom nom."

### 18) Hitler phones the talking cat

**Best line:** "I don't know why I bothered calling that cat. He was so drunk he could not speak properly."

### 19) Hitler finds out about the 'NHS food bingo' blog

**Best line:** "I didn't run up the biggest budget deficit in the history of this country so that some provincial hack could take the piss out of good, wholesome NHS food, food which the ungrateful b-----d is getting for free."

### 20) Hitler plans to start trolling forums

**Best line:** "I'm going to post any crap to any other users. I will be disrupting normal on-topic discussion."

## Miscellaneous

### 21) Hitler attacks grammar 'Nazis'

**Best line:** "You guys are like some kind of grammar authorities or some, some kind of grammar... strict police... dammit! What's the word I'm looking for? I'm thinking of an authoritarian regime or something with the streets filled with like uniformed soldiers that arrest people for the slightest offence. It was on the tip of my tongue, god damn it. Well, you know what I mean."

## 22) Hitler can't find Wally

**Best line:** "Everyone tells me to keep looking. But that's what I try to f-----g do and yet I still f-----g fail to find that sodding Wally. F-----g morons. F--- I want to find Wally."

## 23) Hitler finds out his friends aren't going to Burning Man festival

**Best line:** "And what about Bill? He claims he likes camping. So what's the problem, no bistros on the playa?"

## 24) Hitler finds out about changes to Oktoberfest

**Best line:** "That beer redefined the Bavarian purity law!"

## 25) Hitler finds out Oasis have split up

**Best line:** "This is a f---g joke. Their last album was brilliant! A real return to form after two admittedly under-par recordings. And my tickets were for the mosh-pit too."

Sponsored



Save money when sending funds back to the UK with our money transfer service

# Enjoy bank–beating exchange rates and your first transfer free with Telegraph International Money Transfers

How we moderate

© Copyright of Telegraph Media Group Limited 2016

# Exhibit 30


EXHIBIT
30

# The *Atlantic*

## Führer Humor: The Art of the Nazi Comedy

Many parodies of Adolf Hitler and the Third Reich focus on getting laughs at the expense of reflection.



Constantin Films

**DANIEL A. GROSS**

**DEC 20, 2015**  |  CULTURE

f Share    🐦 Tweet

TEXT SIZE

−   +

Like *The Atlantic*   LinkedIn   o the Daily, our free weekday email newsletter.
            Email
Email       Print        GN UP

At the beginning of the recent German film *Look Who's Back*, Adolf Hitler wakes up in a courtyard from a long and uncomfortable sleep. He staggers to his feet. Then

he wanders the streets of Berlin, nearly colliding with a Segway tour and eventually arriving at a drab newspaper stand. Here he learns that it's 2014, that Poland still exists, and that bars of plastic-wrapped corn syrup are sold for a currency called the Euro. It's a strange time to be a Nazi.

**RELATED STORY**

 The Almost-Forgotten Jewish Artist Who Propagandized Against Hitler

Seventy years after the end of World War II, Nazi comedies have evolved into a bizarre and thriving genre of their own. Most of these films reuse the same basic joke: An impossibly powerful man does a series of impossibly silly things. In *Look Who's Back*, which is based on the 2012 novel by Timur Vermes, Hitler slips into a pair of mom jeans and a sunflower-yellow sweater. In *Mein Führer: The Really Truest Truth About Adolf Hitler* (2007), he takes a bubble bath with a toy battleship. In a spoof music video called *Ich hock' in meinem Bonker* (2006), he sits naked on the toilet, singing: "World War II isn't fun any more!"

It can be comforting to laugh at Hitler. Laughter helps audiences feel that they've overcome evil—that a mass murderer is not only safely locked away in the history books, but also somehow defanged. During World War II, anti-Nazi propaganda aimed to make Hitler look either incredibly evil or utterly ridiculous. Modern-day Nazi comedies have adopted the same basic tactics, from silly costumes to "Heil" jokes to caricatures of the German language. The problem with most contemporary Nazi comedies isn't that they're offensive or humorless. It's that they tend to be humorous and not much else.

While it takes courage to laugh in the face of evil, most Hitler parodies leave the audience laughing *instead* of facing evil. Comedies that borrow from history— whether from dictators (*The Interview*), entire cultures (*The Ridiculous Six*), or religious figures (*South Park*, *Black Jesus*)—have to reckon with historical baggage, too. These works could make audiences feel more connected to the past, more aware of injustice. But to do that, they need to aim for more than just laughter.

* * *

When Charlie Chaplin released *The Great Dictator* in 1940, he declared grandly that his parody had a purpose. "Pessimists say I may fail—that dictators aren't funny anymore, that the evil is too serious," he told *The New York Times*. "That is wrong. If there is one thing I know it is that power can always be made ridiculous." *The Great Dictator* wasn't pandering to an audience of Hitler-haters, however. At the time, despite German aggression in Europe, American politicians wanted to stay out of the war. Chaplin's studio warned him that the government might censor the film; he received letters from people who threatened to cause riots or attack screenings with stink bombs. He later recalled that at the film's opening "the laughter was there, but divided. It was challenging laughter against the hissing faction in the theater."



The Great Dictator- Globe Scene

Yet the resistance to *The Great Dictator* was exactly what made the film necessary. In one scene, Chaplin's stand-in for Hitler dances like a greasy-haired ballerina. He accidentally pops a balloon globe, which makes him cry. "He is one little man with the whole wide, vast unconquerable world, and he thinks the world is his," Chaplin told *The Times*.

Chaplin's defense of *The Great Dictator* amounts to a simple theory of political satire. When his version of Hitler cries, viewers laugh, because there's such an absurd dissonance between the historical and the hysterical Hitler. And by making viewers laugh, the film invites them to question the status quo, turning reverence for a powerful man into irreverence. With each laugh, the audience can perhaps become more resilient.

Chaplin came to believe that satire has boundaries, however. Some reviewers argued that it was irresponsible to make light of dictatorship—and he eventually agreed with that critique. "The laughter chokes suddenly and is reluctant to start again," wrote Otis Ferguson in *The New Republic*. More than 20 years later, in 1964, Chaplin wrote in his autobiography: "Had I known of the German concentration camps, I could not have made *The Great Dictator;* I could not have made fun of the homicidal insanity of the Nazis." In his view, certain topics are simply too horrifying to ridicule.

The arguments for and against *The Great Dictator* can serve as a yardstick for the uses and abuses of satire. Chaplin articulated a good reason why filmmakers shouldn't make fun of mass murderers—but he also found a relatively elegant way to do just that. The question is whether Nazi parodies in peacetime, particularly those made in Germany, succeed at the same challenge.

\* \* \*

In 2004, the German production company Constantin Films released *Downfall* (*Der Untergang*), a film about the final days of Adolf Hitler's life. Like many German war movies, it's bleak, self-effacing, and sincere enough to seem clichéd. For most of the film, Hitler (played by Bruno Ganz) looks weary and broken. Then his advisers inform him that the shattered German military cannot protect Berlin, and Hitler erupts in a fury that echoes through his bunker.

Even if you've never seen the film, chances are good that you've at least seen this scene—or rather, this meme. Some parodists added subtitles that made it seem like Hitler was enraged by the late delivery of a pizza, or the break up of the Britpop

band Oasis, or the parking situation in Tel Aviv. (This kind of clever editing wasn't new—it was actually used to parody Nazis as early as 1941—but in 2009 it was infectious.) In the same way that the word "Nazi" can serve as shorthand for tyrannical people, Hitler is an easy target because he's such a powerful, global, and simple symbol. When the character of Hitler screams about pizza, it's as if evil itself is throwing a tantrum.

By taking an intensely serious subject and making it silly, *Downfall* parodies use the same basic formula as other Nazi comedies. As Chaplin showed, it's possible to feel a twisted satisfaction in watching a dictator squirm. In one parody, Hitler complains about all the parodies: "I'm stuck endlessly complaining and complaining, like some whiny-ass bitch!"

On the other hand, you don't have to look far to find echoes of Chaplin's concern that certain topics shouldn't be laughed at. In 2010, Constantin Films launched a legal campaign to remove "Untergänger" parodies from YouTube, claiming they simply wanted to protect their copyright, but also citing groups that considered the videos offensive. Abraham Foxman, then national head of the Anti-Defamation League, told the *Associated Press*: "We feel that they trivialize not only the Holocaust but World War II. Hitler is not a cartoon character."

The company didn't have much luck keeping *Downfall* parodies off the Internet. "It is a task that can never be completed. They are popping up whenever we are taking one down," one executive told the BBC. Comedy is persistent, which might be why it's so comforting. Hitler was defeated in 1945, but the onslaught of Hitler jokes is like a ritual celebration of his defeat.

Strangely enough, some of the videos actually echoed Chaplin's and Foxman's objections. In the same meta-parody where Hitler complains about *Downfall* parodies, Hitler shakes his fists and declares: "I thought my legacy was secure! I slaughtered millions. Cut a bloody path of destruction across Europe. And for what? So I could be the latest juvenile web fad?" By making fun of Hitler, the video suggests, we run the risk of associating him with YouTube instead of Auschwitz— with mass media instead of mass murder.

Constantin Films, like Charlie Chaplin, eventually changed its tune. In a puzzling reversal, the company signed on to produce and distribute *Look Who's Back*—in which Hitler takes off his underwear at the dry cleaner's, shoots a puppy because its yap annoys him, and becomes a YouTube star. While Chaplin moved from irreverence of the Nazis to reverence for their victims, Constantin moved from a straight-faced Nazi drama to a slapstick Nazi comedy. *Look Who's Back* even parodies the very *Downfall* scene that the company tried to scrub from the Internet.

There are a few ways to interpret this shift. Maybe by participating in a joke they once denounced, they're hoping to prove that they're not a bunch of killjoys. Or, more likely, maybe they just saw an opportunity to make money from what's become one of 2015's most successful German films. The most interesting explanation, though, is that *Look Who's Back* isn't really a comedy about Hitler. It's a comedy about the way Germans *remember* Hitler. The film is Germany's version of *Borat*—a film that mixes fact and fiction, inviting real discrimination in order to lampoon it. In spite of its silliness, it makes an important argument about Germany's relationship to its past.

The premise of *Look Who's Back* is that, in 2014, Hitler comes back to life—but he seems so out of place that ordinary Germans assume he's a kooky comedian instead of a brutal dictator. That's a sign that World War II has receded in collective memory: Today, Nazi Germany can seem like a costume drama instead of a terrifying historical period. Early in the film, he walks through crowds of tourists at the Brandenburg Gate. Some of them giggle and take selfies with him; others act nostalgic for the 1930s.

---

## *Look Who's Back* isn't really a comedy about Hitler. It's a comedy about the way Germans *remember* Hitler.

---

These documentary-style scenes, which slot into the fictional scaffolding of the story, hint at a purpose behind the parody. When Hitler visits a dog breeder and muses that humans should also have breeders, the dog breeder enthusiastically

agrees. When he visits members of Germany's strongest far right-wing party, they think his costume is a hoot. Maybe it's not such a strange time to be a Nazi.

During the climax of the film, the TV producer who discovered Hitler finally realizes that his collaborator isn't a comedian. He's the genuine article, the Führer himself. After a moment of horror, he decides to assassinate Hitler. But when the moment finally comes, the producer fails miserably. Hitler rubs it in. "You can't get rid of me," he says. "I'm a part of you."

\* \* \*

Germany can't get rid of Hitler, not because most Germans support or miss him, but because they define themselves *against* him. Maybe that's the best defense of Nazi comedies. Every time Hitler dies on a movie screen, every time he's reduced to a pathetic and bumbling fool, society reasserts its loathing for Nazism. Films that ridicule past injustice can help distance society from a history we'd rather not repeat. But that distance is also the key disadvantage of Nazi slapstick. When audience members laugh at *The Great Dictator* or parodies of *Downfall*, it can become harder to imagine the thoughts or motivations of actual Nazis.

There's a place for that kind of irreverent humor. But as the world loses the last generation that actually remembers World War II, there's also a place for humor that doesn't take history for granted. Unexpectedly, *Look Who's Back* tries to do just that. It ends with a reel of bystanders who wave cheerfully at the modern-day reincarnation of Hitler. As the credits roll, so do clips of neo-Nazi parades, as if to highlight how little progress the world has made.

## Germany really can't get rid of Hitler, because Germans define themselves *against* him.

At the beginning and end of *Downfall*, there's a brief clip from an interview with Traudl Junge, who worked as Hitler's secretary until the day he killed himself. She recalls learning after the war about the mass murder of Roma, Sinti, Jews,

homosexuals, and the disabled. "But I wasn't able to see the connection with my own past," she says. "I was satisfied that I wasn't personally to blame." This, of course, is a recurring theme in German history—the alibi of the bystander, the argument that we have no responsibility for what we don't know or can't change.

"But one day, I went past the memorial plaque which had been put up for Sophie Scholl," Junge continues. Scholl was executed for handing out anti-Nazi leaflets in 1943—the same year Junge started working for Hitler. "In that moment I actually sensed that it was no excuse to be young. That maybe it would have been possible to find things out," she says.

This is the kind of intimacy and complexity that parodies of *Downfall*—and Nazi comedies in general—tend to edit out. And it's of course the parodies of *Downfall*, not the original film, that have attracted tens of millions of views. At their best, Nazi comedies can help audiences look to the past and reinterpret the present, so that they ultimately see injustice more clearly. But at their worst, they just allow viewers to look away.

f  Share      Tweet      Comments

**ABOUT THE AUTHOR**

**DANIEL A. GROSS** is a writer and public radio producer based in Boston.

Twitter

**From The Web**                ‹        ›              Ads by Revcontent



Why Doctors in the Know No Longer Prescribe Metformin
V brant Health Network

They've Pretty Much Given Up On Their Kid At This Point
Ok! Celebrity

Soiled Doves: Rare Photos of the Old Wild West
Detonate.com

25 Celebs Who Support Trump #19 Will Surprise You
Your Daily Dish

# Exhibit 31

EXHIBIT
31

**The New York Times**

---

PERSONAL TECH

# Video Mad Libs With the Right Software

By PAUL BOUTIN    FEB. 24, 2010

It is April 1945. In his underground bunker, Hitler huddles over a map with his top generals. The room is insufferably tense. Members of the German high command, sweating in their uniforms, wonder who will dare to break the terrible news to Der Führer.

"The iPad won't support multitasking," one general confesses. Hitler erupts in impotent rage, "I wanted to watch videos of lolcats while laying on the couch. But no, they won't even give it Flash support."

This four-minute video, available on YouTube, is one of hundreds of goofy edits to the English subtitles of a powerful scene from a 2004 German-language movie titled "Downfall" in the United States. In various home-subtitled remakes over the last few years, Hitler explodes when told that the McMansion he was trying to flip is in foreclosure, that the band Oasis has split up, that the Colts lost the Super Bowl or that people keep making more "Downfall" parodies. When Hitler learns Sarah Palin has resigned as governor of Alaska, he pounds his chest. "Every time she winked," he moans, "I thought it was just for me."

Making your own Hitler video turns out to be refreshingly easy, which is why so many of them can be found on YouTube. All you need is a PC and Microsoft's Movie Maker, a program included with both Windows XP and Vista. (If you run the new

Windows 7, you will need to **download the old Movie Maker 2.6**, rather than the new but less powerful Windows Live Movie Maker. If you're a Mac user, Apple's built-in iMovie application will handle the job.)

Once Movie Maker is running, download a scene from "Downfall" at **www.mediafire.com/downfallscenes**. "Original bunker scene" is the most popular. Save it to the desktop, then choose File->Import from Movie Maker to load it for editing. It appears in Movie Maker as a series of consecutive clips. At the bottom of Movie Maker's window is what's called a timeline. Drag each clip, from first to last, into the timeline, keeping them in the same order.

To add a subtitle, click the magnifying glass button to zoom in on a clip. The audio soundtrack is represented as sound waves, so you can see exactly where each speaker's lines begin.

Align your subtitle's appearance onscreen to the start of each spoken sentence, so viewers aren't left hanging. To do this, drag the vertical location bar in the clip's window until it matches the left-hand starting point of an actor's sound bite. It's your call how long to leave the subtitle onscreen. Give people time to read it.

Next, select the menu item Tools->Titles and Credits->Add Title. Go to the selected clip and choose Change Title->Animation->Select Subtitles. Click "Edit the title text" and type in your dialogue. Then use the font controls — the A button onscreen — to shrink the text size. Make the letters white, for contrast against the movie.

Once you have added one subtitle, the easy way to add the rest is to cut and paste your first one over and over. Then you won't have to redo the font settings each time, you just change the words.

When you are finished, choose File->Save Movie File and save the edited movie in WMV format. Play it on your desktop with Windows Media Player, to be sure it works.

Ready for your worldwide premiere? Go to YouTube and create a free personal account if you don't have one. You can then upload your Hitler remix to YouTube for

everyone on the Internet to watch. For more help and ideas, join the Downfall Parodies Forum at s1.zetaboards.com/downfallparodies.

Once you have mastered editing Adolf, you may want to tackle the more time-consuming Internet hobby of remixing movie trailers from one type of movie into something totally, hilariously different. By changing the music, inserting shots out of context, and adding a bit of titles or voiceover, it's possible to concoct a trailer that makes "Mary Poppins" seem like a Stephen King scarefest, or to spin King's macabre "The Shining" as a heartwarming family tale.

In fact, these are the genre's two classics. Shining is a **mock trailer** buoyed by an uplifting Peter Gabriel tune, in which the thwarted novelist played by Jack Nicholson regains his self-esteem because of the patient love of a little boy. (In the real movie, Nicholson goes insane and dies trying to kill the child.) **Scary Mary** goes the other way, splicing together scenes that display Julie Andrews' telekinetic powers with her most menacing scowls from the film. Spooky music makes the shots from Disney's musical seem like sheer terror.

To create a trailer, it is best to turn to semi-pro software like Vegas Movie Studio 9 from Sony, available for around $50 online. (Apple users, splurge on Final Cut Express, closer to $150.) There's no magic here. It's work. Prepare to spend a weekend building your own one-minute timeline from scratch, cutting and pasting scenes from the full movie into your program, adding a music track and creating titles.

Some trailer buffs even record a voiceover in the style of the late **Don LaFontaine**: "In a world … ruled by fear … one man … dared to stand up." But unless you've got experience recording voices, stick to using text titles to set up your reimagined story.

Be forewarned: turning jubilant comedies like Jack Black's "School of Rock" into horror flicks has been done to death. Try for something original, like the auteur who recast "Willy Wonka and the Chocolate Factory" as the story of an **international drug kingpin**.

A brief word about "fair use." When you are playing with copyrighted material, you have to be aware that all your hard work can be for naught. While you may be well within your rights to use a portion of copyrighted material in a parody — the law is murky on how much material and in what fashion constitutes fair use — your parody might get squashed. Downfall's copyright holder, Constantin Film, had a dozen remixes removed from YouTube earlier this year. But the company seems to have since yielded to the phenomenon. And YouTube recently removed the clip that began the 2007 fad of rickrolling, long after the meme had worn itself out.

These techniques can be used to create parodies of other video memes that come and go, like the keyboard-playing cat or the little boy after a visit to the dentist. (One video replaces the little boy with Darth Vader.) Mashing up two or more clips is easy as all the videos with the Keyboard Cat — so last year — attest to. (The cat, in this meme, was inserted at the end of another video to signal a person's time in the limelight was over with a vaudeville-style playoff.)

Import each clip into Movie Maker. They'll appear as a menu of Collections at the top of the window. Drag the parts you want in whatever order into the timeline at the bottom. You can record new audio over them. It's easy to splice together Hitler having, say, an angry phone call with a talking cat.

Practice mashing movies to get a leg up on the next Internet meme — one that hopefully will not involve cats.

A version of this article appears in print on February 25, 2010, on page B10 of the New York edition with the headline: Video Mad Libs With the Right Software.

© 2016 The New York Times Company

Exhibit 32

EXHIBIT
32

The New York Times Magazine

# The Hitler Meme

By VIRGINIA HEFFERNAN    OCT. 24, 2008

**On YouTube**, we're in a bunker, and the enemies are always, always closing in. The ceilings are low. The air is stifling. A disheveled leader is delusional.

This is the premise of more than 100 videos on the Web — the work of satirists who for years have been snatching video and audio from "Downfall," the 2004 German movie of Hitler's demise, and doctoring it to tell a range of stories about personal travails and world politics. By adding new English-language subtitles, they transform the movie's climactic scene, in which Hitler (played by Bruno Ganz) rails against his enemies and reluctantly faces his defeat, into the generic story of a rabid blowhard brought low.

In the original scene, Hitler is told that his reign of power is over; he then deafens himself to reality, eloquently savages everyone who cost him his dreams, vows revenge and finally resigns himself to private grief. The homemade spoofs plug into this transformation just about any hubristic entity that might come undone: the subtitles speak to the plight of governments, soccer teams, football teams, Hillary Clinton, John McCain, Adam Sandler.

The meme of the parodies — the cultural kernel of them, the part that's contagious and transmissible — has proved surprisingly hardy, almost unnervingly so. It seems that late-life Hitler can be made to speak for almost anyone in the midst of a crisis.

Fire up YouTube. There you can see the Hitler figure erupt in frustration over his Xbox. He flips out because his friends aren't going to Burning Man. And, recently, he

loses it because Sarah Palin isn't working out as a running mate. Something in the spectacle of an autocrat falling to pieces evidently has widespread appeal.

When "Downfall" first appeared in German and Austrian theaters, critics charged that it humanized Hitler beyond recognition and sapped the historical horror by turning Hitler and his henchmen into soap-operatic archetypes, transforming their undoing into an ordinary human tragedy.

In fact, the lesson of the parodies seems to be that "Downfall" was a closeted Hitler *comedy*. Having seen the spoofs before seeing the movie, I find it virtually impossible now to watch the film with a straight face. Ganz, the Swiss actor, takes his performance seriously. But something in the character name "Adolf Hitler" also seems to have liberated Ganz to play flat-out melodrama. His goofy, trembling, hopeless rage — in which is wedged a vituperative aria aimed at the traitors he perceives everywhere — recalls nothing so much as Jeremy Piven's raving meltdowns as the jerk agent Ari on the HBO comedy "Entourage."

While Americans might prefer the spoof "Downfall" videos that have American themes, the ones with foreign subjects have somewhat more bite. Last month, a blogger scripted a loyalist to Abdullah Ahmad Badawi, the Malaysian prime minister, in the Hitler role. The loyalist is told that Badawi has turned to martial law and suppression of the press, and he freaks out at the thought that Badawi has gone too far. Like all the "Downfall" parodies, this one is filled with regional jargon, but you don't have to know much about Malaysian party politics to imagine the exasperation of an adviser whose champ keeps making missteps. "Doesn't he know the rakyat are sick of his shenanigans?" read the subtitles, as Ganz raves. "He thinks the I.S.A. will wipe out his problem? Perhaps all that sleep has put too much drool in his brain!" And later, "The whole world will laugh at that idiotic chromedome!"

Interestingly, many of the "Downfall" parodies choose not to have Ganz-as-Hitler directly ventriloquize another politician or figure of derision. Instead, as with the Malaysian parody, the spoofs often make the new speaker a disappointed supporter of a public figure. This move may be an attempt to sidestep the moral issues that should dog any satirist who draws a Hitler mustache on anyone but Hitler himself. Or it's possible that by not making the central character in the

parodies Hitler or anyone like him, the parodists free up their protagonist to be (in good conscience) as funny, raw and sympathetic as he comes across in Ganz's performance.

For those of us who grew up in America with the word "Hitler" having a meaning as fixed as that of a black hole and the epithet "Hitler" being used only by sloppy teenagers and overheated ideologues, this slippery appropriation of Hitler's image for satirical purposes can be hard to take. In a video called "Barack Obama Downfall Satire," Hitler is just Hitler (in the program notes), but he's also a foe of Obama and ultimately someone like Dreyfus in the original "Pink Panther" comedies — a lone debunker who loses his mind trying to bring down a nitwit. The new subtitles are also presumably not written by an American, as the Hitler in this parody dismisses (initially) the participants in an Obama rally as "a gathering for a few student mingers in Che Guevara T-shirts." Mingers?

In any case, like nearly every one of the overwritten Hitlers, this one builds up a rhetorical head of steam. "He's still wearing his Senate diapers!" Hitler shouts. "Hillary Clinton should have been breast-feeding him!" One henchman robotically volunteers that, no, Obama will bring peace and prosperity. That's where I paused. I know that the enemy of Obama in this parody is no less than Hitler himself. But when Hitler gets all the good lines — like Milton's Satan — it seems fair to ask, Is this video for Obama or against him?

Since the advent of online video, people have made remixes and mashups by bolting together spare digital parts and soldering on freshly forged ones. In 2006, the soundtrack, shutter speed and graphic scheme of the "Brokeback Mountain" trailer, for example, were superimposed on old film from "Back to the Future" to create a video that suggested a gay love story between the characters Marty and Doc.

Taken together, the anthology of "Brokeback" spoofs made a larger point about American mythmaking and Hollywood clichés. It turns out you could play make-out music, show slow-mo clips of any two male actors interacting, throw up suggestive title cards ("a truth they couldn't deny") and — presto — any American blockbuster could be shown to chronicle love between two men.

But what's the larger point of the "Downfall" remixes? "Hillary's Downfall," from May, has Ganz in his Hitler garb speak for Hillary Clinton. Desperately denying that Obama will be the Democratic nominee, she says: "These little state primaries are not important. The superdelegates will secure my victory."

That's when Ganz takes off his glasses, his left hand shaking. In the best parodies — and "Hillary's Downfall" is a good one — Ganz embodies the role assigned him by the parodist by the time his glasses come off. This is the moment in the original film after Hitler has been informed that he cannot win; as he eases up on denial, he's coming down on fury. In "Hillary's Downfall," you can't believe how quickly the haircut and costume recede and the Hitler factor fades, eclipsed by Ganz's tough old fork-tongued grandpa performance. Hitler becomes not the author of the Holocaust but a salty dog who, though all is lost, doesn't stop piercing pretense and speaking in slangy, heartfelt language, expressing the most deeply felt needs of the human id. We may have repressed that speak-for-the-people Hitler, the one he decided to be in "Mein Kampf"; but in the form of these videos, he has returned.

Isn't that the outcome that Adolf Hitler, the historical figure, sought? Didn't he see himself as the brute voice of the everyman unconscious?

How grim — how perplexing, how unsettling — that after more than 60 years of trying to cast and recast Hitler to make sense of him, we may have arrived at a version of Hitler that takes him exactly at his word.

Post a Comment at The Medium

_____

**Points of Entry**

THIS WEEK'S RECOMMENDATIONS

**DOWNFALL OF THE UPLOADS:** The "Downfall" production company — constantin-film.de — hasn't exactly stood up and cheered to see its film's great bunker scene spoofed all over YouTube. Pursue a link to one, and you're likely to learn, "This video is no longer available due to a copyright claim by Constantin Film

Produktion GmbH." Copyright claims are serious business, but if you happen to do some creative searching on YouTube itself, you might stumble onto some of the versions that have made their way back to the site.

**GANZ MESHUGENEH:** Forget Al Pacino in "Scarface" or Jeremy Piven on "Entourage." **Bruno Ganz** tears it up in "Downfall." If you watch it as a fiction film and stop worrying that it pretends to comment on history, "Downfall" is memorable camp. The DVD is cheap on Amazon.

**SPOOF THE SPOOFS:** It had to happen: a meta-take on the Hitler parodies. In the video " **Hitler Is a Meme** ," Hitler learns that he's an Internet laughingstock. As in, he's the new "Star Wars" kid or Sarah Palin. He doesn't take it well. (To a henchman: "I can't believe I ever friended you!") Watch at the invaluable Break.com. (This superb parodist, a Web developer in Philadelphia, can be found at sean-o.com.)

A version of this article appears in print on , on page MM20 of the Sunday Magazine with the headline: THE WAY WE LIVE NOW: THE MEDIUM: THE HITLER MEME.

© 2016 The New York Times Company

# Exhibit 36

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**EXHIBIT 36**

- - -

FREDERICK F. FAGAL, JR.   ) CIVIL ACTION
  )
      Plaintiff   )
  )
  v.   ) No.: 3:14-cv-02404-ARC
  )
MARYWOOD UNIVERSITY,   )
  ) JUDGE CAPUTO
      Defendant   )

- - -

Deposition of Helen Bittel, Ph.D.

Thursday, September 29, 2016

- - -


The deposition of Helen Bittel, Ph.D., called as
a witness by the Plaintiff, pursuant to notice and
the Pennsylvania Rules of Civil Procedure
pertaining to the taking of depositions, taken
before me, the undersigned, Christine A. Messner, a
Notary Public in and for the Commonwealth of
Pennsylvania, at 700 Lackawanna Avenue, Scranton,
Pennsylvania 18503, commencing at 10:04 a.m., the
day and date above set forth.

- - -




MAGNA LEGAL SERVICES
Seven Penn Center
1635 Market Street, 8th Floor

Philadelphia, Pennsylvania 19103

www.MagnaLS.com

866-624-6221



Page 2

1  APPEARANCES:
2  On behalf of the Plaintiff:
   JONATHAN Z. COHEN, LTD
3  JONATHAN Z. COHEN, ESQUIRE
   175 Strafford Avenue, Suite 1
4  Wayne, Pennsylvania 19087
5
   On behalf of the Defendant:
6  JACKSON LEWIS, P.C.
   STEPHANIE J. PEET, ESQUIRE
7  Three Parkway, 1601 Cherry Street, Suite 1350
   Philadelphia, Pennsylvania 19102
8
9           - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1           I-N-D-E-X  P-A-G-E
2  DEPOSITION EXHIBIT MARKED          PAGE
   Bittel 1 - February 8, 2012 letter        10
3  Bittel 2 - Response to charges            11
   Bittel 3 - Draft of minutes              12
4  Bittel 4 - January 23, 2012 document        16
   Bittel 5 - Progressive Discipline         17
5  Bittel 6 - May 17, 2012 e-mail           17
   Bittel 7 - May 17, 2012 minutes          22
6  Bittel 8 - May 17, 2012 notes            32
   Bittel 9 - May 18, 2012 e-mail           39
7  Bittel 10 - June 2, 2012 e-mail          40
   Bittel 11 - E-mails                     42
8  Bittel 12 - June 19, 2012 minutes        46
   Bittel 13 - June 26, 2012 e-mail         54
9  Bittel 14 - E-mails                     58
   Bittel 15 - E-mail                      60
10 Bittel 16 - E-mail                      70
   Bittel 17 - E-mail                      71
11 Bittel 18 - E-mail                      72
12
13
14
   EXAMINATION BY                   PAGE
15 Helen Bittel, Ph.D.
   By Mr. Cohen                      4-72
16
17
18
19           - - -
20
21
22
23
24

Page 4

1  HELEN BITTEL, Ph.D., was called, and having been
2  duly sworn, was examined and testified as follows:
3           EXAMINATION
4  BY MR. COHEN:
5     Q   Would you like to be called Doctor Bittel or
6  Helen?
7     A   Helen is fine.
8     Q   Good morning, Helen.  My name is Jonathan Cohen.
9  I represent the plaintiff in this case Fred F. Fagal,
10 Jr.  Do you understand that you are under the same oath
11 today as if you were in a courtroom?
12    A   That is correct.
13    Q   And the way this -- have you ever had a
14 deposition?
15    A   I have not.
16    Q   Okay.  The way this works I just ask you
17 questions and you try to answer them.
18    A   Okay.
19    Q   If you don't understand the question, please
20 just let me know and I'll rephrase it.  If you need to
21 take a break, that's fine just not in the middle of the
22 question.
23    A   Right.
24    Q   Is there anything that would prevent you from

Page 5

1  thinking clearly and testifying truthfully today?
2     A   No.
3     Q   Can you tell me a little bit about your
4  educational background before Marywood?
5     A   Sure.  Just prior to Marywood I was a visiting
6  assistant professor in Oswego State, which is part of
7  the SUNY system.  I did my Ph.D. at the University of
8  Rochester and I also taught as part-time -- as graduate
9  assistant or graduate instructor and also as a -- later
10 as an adjunct at the University of Rochester, the
11 Eastman School of Music and SUNY Brockport.  Before
12 that I was at Rutgers, I did a B.A. in English.
13    Q   Okay.  Currently you're employed by Marywood
14 University?
15    A   I am.
16    Q   For how long?
17    A   I started working there in the fall semester
18 2002, so 14 years and change.  This is my 15th year.
19    Q   Okay.  And when you came to Marywood, what was
20 your first title?
21    A   My first title was assistant professor of
22 English.
23    Q   And now you're a full professor?
24    A   No, I'm not a full professor.  I'm an associate



Page 6

1  professor.
2    Q  Are you tenured?
3    A  I am tenured.
4    Q  Okay.  Have you ever met my client Professor
5  Fagal before?
6    A  Yes, I have.
7    Q  And when did you first meet him?
8    A  Sometime in my early years at Marywood, no
9  particular date comes to mind.  We worked in the same
10  building, so we go downstairs to get a cup of coffee.
11    Q  At some point in 2012 you participated in a
12  committee regarding certain disciplinary measures that
13  the administration was trying to bring against my
14  client, correct?
15    A  Correct.
16    Q  And before that --
17    A  Okay.
18    Q  -- what were your general impressions of
19  Professor Fagal?
20       MS. PEET:  Objection to the form.  You can
21  answer.
22  BY MR. COHEN:
23    Q  So unless your attorney objects and instructs
24  you not to answer, you have to try to answer, but --

Page 7

1  and also after I ask a question, you might want to give
2  your attorney like a few seconds so that she can
3  interpose an objection.
4       MS. PEET:  Thanks, Mr. Cohen.
5       MR. COHEN:  I'm sorry.  It's useful advice,
6  right?
7       MS. PEET:  Yeah.
8  BY MR. COHEN:
9    Q  Do you need me to rephrase the question?
10    A  I had no strong opinions either way.
11    Q  Okay.
12    A  Someone I would see in the building and see at
13  general faculty meetings.
14    Q  Okay.  Did you prepare at all for today's
15  deposition?
16    A  For today's deposition, yes.  I met with
17  Stephanie this summer.
18    Q  Okay.
19    A  And I reviewed documents relative to my part and
20  my role in this process.
21    Q  When was --
22       MS. PEET:  I'm just going to instruct you,
23  and I know Mr. Cohen didn't ask you any questions about
24  it, but you are not to discuss any substantive

Page 8

1  discussions you and I had --
2       THE WITNESS:  Right.
3       MS. PEET:  -- at any point.
4       THE WITNESS:  That's our privilege.
5       MS. PEET:  That would be specific to the
6  attorney/client privilege, that's correct.
7  BY MR. COHEN:
8    Q  Do you remember what documents you did review in
9  preparation for this?
10    A  E-mail exchanges between members of my
11  committee, drafts of the statement we ultimately
12  prepared, other general e-mails we presented along the
13  way including Doctor Fagal's statement and request for
14  appeal.  We did receive the findings of the Faculty
15  Grievance Committee who adjudicated the procedural
16  aspects.
17    Q  So eventually in 2012 you did serve on what's
18  called an Ad Hoc Faculty Committee?
19    A  That is correct.
20    Q  What was, in your own words, what was the
21  purpose of that committee?
22    A  We were convened following the meeting --
23  following the meeting of the Faculty Grievance
24  Committee.  The Faculty Grievance Committee functions

Page 9

1  as a grand jury and decides whether a grievance --
2  whether procedure has been followed and whether the
3  grievant should go forward.  If the person appeals,
4  then the head of faculty senate calls a committee from
5  a pool of I think it's 15 tenured faculty members and
6  we are appointed to adjudicate the substance of the
7  case.
8       In this case responding to -- I guess we all
9  obviously saw, you know, as part of our review process
10  Sister Anne's documents to -- Fred Fagal's appeal to
11  Anne Munley, Anne Munley's written responses, all of
12  the back and forth.
13    Q  Okay.
14    A  But we -- bottom line we were supposed to
15  adjudicate the substance of Fred's grievance.
16    Q  And you were supposed to adjudicate the
17  substance of his grievance or the administration's
18  requested of discipline of him?
19    A  Of his appeal which was -- his appeal which was
20  his response, his grievance against Sister Anne's
21  statement of charges.
22    Q  Okay.
23    A  So we had to look at Sister Anne's statement of
24  charges and also why Fred said that those were not



MAGNA
LEGAL SERVICES

1   valid.
2      Q   Okay.  And --
3      A   We had to ultimately decide and we saw in our
4   final document was based on the same format that Sister
5   Anne used, which was the same format that he followed a
6   list of charges and whether we believed they were
7   justified or not.
8      Q   And did you view your role, the committee's role
9   as deciding on the appropriateness of Professor Fagal's
10  suspension?
11     A   Yes, we did.
12     Q   As well as his termination?
13     A   As well as his termination, correct.  And as
14  well as his revocation of tenure, we also talked a
15  great deal about that.
16     Q   And there were two other individuals on the
17  committee, Matt Povse and --
18     A   Ed O'Brien.
19     Q   -- Ed O'Brien.  I'm going to show you a
20  document, let's have this marked as Bittel 1 please.
21         (Whereupon Bittel Exhibit 1 was marked for
22  identification.)
23  BY MR. COHEN:
24     Q   And do you recognize this document?  You can

1   take a few moments.
2      A   Yes, I do recognize this.
3      Q   And what is that?
4      A   This is the letter that Sister Anne sent to Fred
5   Fagal to detail her reasons for his termination.
6      Q   And did you consider that letter during your
7   committee deliberations?
8      A   We did because this is the -- we answered, we
9   evaluated each of these charges and found in favor of
10  Sister Anne on some of them but not on all of them.
11     Q   Okay.  There weren't any other charges that you
12  decided on?  It was just the ones in that letter,
13  correct?
14     A   We did that, we did that.
15         MS. PEET:  Don't talk out loud.
16         THE WITNESS:  I believe there may have been
17  something else considered in part one beyond breach of
18  tenure.  No, part one was about revocation of tenure,
19  so that would be correct.
20         MR. COHEN:  Can we mark this as Bittel 2
21  please.
22         (Whereupon Bittel Exhibit 2 was marked for
23  identification.)
24                    - - -

1   BY MR. COHEN:
2      Q   And can you take a few moments and review this
3   and let me know if you recognize it.
4      A   I do recognize these.
5      Q   And what is the document that you're looking at?
6      A   This is Fred Fagal's response to Anne Munley's
7   letter detailing charges against him.
8      Q   And this isn't the first time you're seeing
9   this?
10     A   No.  This was forwarded, this was one of the
11  documents that our committee did consider.
12     Q   Okay.  That was my question.
13         MR. COHEN:  Can we have this marked as
14  Bittel 3 please.
15         (Whereupon Bittel Exhibit 3 was marked for
16  identification.)
17  BY MR. COHEN:
18     Q   Can you take a few moments and let me know if
19  you recognize this.
20     A   This is a draft of minutes of our first full
21  committee meeting.
22     Q   Okay.  And the comments on the right side of the
23  paper, do you know whose comments they are, the ones
24  that are like in little boxes?

1      A   Yes.  My -- I don't remember for certain, but my
2   guess is Ed O'Brien because it looks like his writing
3   style.
4      Q   In the first paragraph the last line, correct me
5   if I'm wrong, says -- the last two lines, Helen knows
6   F.F. casually from working in the same building.  Some
7   of her conversations with him have been strange, but
8   their relationship has been collegial.  Matt has had
9   very little contact with Fred at all.  Did I read that
10  correctly?
11     A   You did read that correctly, yes.
12     Q   Is that true that you told the committee that
13  some of your conversations with Professor Fagal had
14  been strange?
15     A   Strange in the sense of eccentric.
16     Q   Okay.  And what do you mean by eccentric?
17     A   A conversation that I had in mind was a
18  conversation we were going out with a couple -- my
19  friends and I were going downstairs to get lunch and we
20  ran into Fred and he referred to us as a coven.
21     Q   As a coven?
22     A   Yeah.  It was just eccentric.  It was an
23  eccentric thing to say, and that's what was meant by
24  that.



Page 14

1   Q  If you go down to the bottom of the first page
2   it says 5/3 AHC meets with HR and Sister Gail, do you
3   see that?
4   A  Yes, I do.
5   Q  AHC stands for Ad Hoc Committee?
6   A  Correct.
7   Q  And obviously HR stands for human resources?
8   A  Yes.
9   Q  And were you part of this meeting?
10  A  I was part of this meeting, the three of us and
11  Pat Dunleavy and Sister Gail.
12  Q  And that's Sister Gail Cabral?
13  A  Correct.
14  Q  What was discussed at that meeting?
15  A  Why they had summoned the committee and what we
16  would be charged with doing and here's the documents
17  that you need.
18  Q  And you said that Patricia Dunleavy was there?
19  A  I believe so.
20  Q  Did you ask Doctor Dunleavy whether there would
21  be two committees, one to review Professor Fagal's
22  suspension and one for termination?
23  A  I don't recall asking that.
24  Q  Do you remember her saying anything about that?

Page 15

1   A  I don't recall.
2   Q  Do you remember anyone at the meeting saying
3   anything about that?
4   A  I don't.
5   Q  Okay.  And would you say having reviewed this
6   document this is an accurate representation of what
7   occurred at Ad Hoc Committee meeting one on May 11,
8   2012?
9   A  We decided -- the full disclosure was to make
10  sure also that none of us had anything that would --
11  any cause to recuse ourselves and we found out no one
12  did.  We selected a chair.  We constructed a timeline
13  based on the documents we had received to make
14  everything easier to understand.  And then we
15  considered the three issues on the back page as things
16  that we would need to investigate or consider before we
17  started to discuss the charges proper.
18  Q  So what's in this document, would you say that's
19  an accurate representation of what you guys did in the
20  first meeting?
21  A  To the best of my recollection, yes, but it was
22  four-and-a-half years ago.
23  Q  Right.  Do you remember anything, any
24  significant omissions that should be here that aren't?

Page 16

1         MS. PEET:  Objection to the form.  You can
2   answer.
3   BY MR. COHEN:
4   Q  Any omission whatsoever?
5   A  I don't recognize any.  It was a long time ago.
6   Q  Right.
7         MR. COHEN:  Can we make this Bittel 4
8   please.
9         (Whereupon Bittel Exhibit 4 was marked for
10  identification.)
11  BY MR. COHEN:
12  Q  Ma'am, can you read this to yourself and let me
13  know if you recognize it please.
14  A  I think I recognize it, I'm not positive.  We
15  reviewed a lot of documents.
16  Q  There's another side to it.
17  A  Oh, there is another side.  I don't remember
18  whether I saw this document or not.  The events
19  described are familiar.  I can't say for sure, I may
20  have seen the actual document but I can't say for sure
21  either way.
22  Q  You mean you may have considered it as part of
23  your deliberations?
24  A  Correct.

Page 17

1   Q  Do you know one way or another whether you
2   reviewed this document for preparing for today?
3   A  I don't know one way or another.
4         MR. COHEN:  Okay.  Can we have this marked
5   as Bittel 5 please.
6         (Whereupon Bittel Exhibit 5 was marked for
7   identification.)
8   BY MR. COHEN:
9   Q  And do you recognize this document?
10  A  This, I do.  Yes, I do recognize this document.
11  Q  Did you consider this during your committee
12  deliberations?
13  A  Definitely.  This was one of the first documents
14  we were given.
15  Q  Okay.
16  A  And we looked very carefully at the language of
17  this document.
18        MR. COHEN:  Let's mark this as Bittel 6
19  please.
20        (Whereupon Bittel Exhibit 6 was marked for
21  identification.)
22  BY MR. COHEN:
23  Q  Can you read this to yourself and let me know
24  when you're finished please.


MAGNA
LEGAL SERVICES

1    A   I'm done.

2    Q   Okay.  So the first part of this e-mail is from

3  you to Doctor Erin A. Sadlack dated May 17, 2012;

4  right?

5    A   That's correct.

6    Q   And this was later forwarded on to Patricia

7  Dunleavy, right?

8    A   Correct.

9    Q   Now, your message to Doctor Sadlack you

10  mentioned here that discussing the -- talking with

11  Doctor Sadlack and her committee, you expressed some

12  concern about whether that would compromise the

13  independence of your investigation; correct?

14    A   Correct.

15    Q   Why would potentially talking with Erin Sadlack

16  compromise the independence of your investigation?

17    A   We didn't want to know the reasons behind their

18  findings because we wanted to be able to know that our

19  own findings came from our own deliberations.

20    Q   Okay.

21    A   Findings as to the -- related to the substance

22  of the case.

23    Q   And in general you thought that was important

24  that your Ad Hoc Committee conduct an independent

1  investigation?

2    A   Correct.

3    Q   Later in the e-mail you mention that you have a

4  call in to the attorney to get a little more detail

5  from him.  Again I'm not going to ask you what you

6  discussed, but you're referring to Marywood's attorney?

7    A   Correct.

8    Q   Will Anthony?

9    A   That is correct.

10    Q   What did you view his role as?

11    A   Our understanding is that we could contact him

12  if we had questions or concerns about the process.

13    Q   Who did you think that Mr. Anthony represented?

14    A   That he --

15        MS. PEET:  Objection to form, lack of

16  foundation.

17  BY MR. COHEN:

18    Q   Did you think that Mr. Anthony represented

19  anyone in particular?

20    A   Not an individual, no.

21    Q   You don't think he had any client?

22    A   Marywood University as a corporate university,

23  but not Sister Anne Munley or any one individual.

24    Q   Okay.  As of the date that you were writing this

1  e-mail, you had already conducted your first Ad Hoc

2  Committee meeting; right?

3    A   Yes, correct.

4    Q   And so did you know at this point that Mr.

5  Anthony and I had been exchanging letters about

6  disciplinary process?

7    A   I'm pulling up document 3 here, we did have a

8  timeline.  So we were aware on the 11th that you sent a

9  letter to Sister Anne Munley challenging the charges

10  and we were also aware that on February 9th Anthony

11  sent a letter to you; we specify not included in our

12  packet by mentioned by Fred Fagal in his grievance.

13    Q   Mr. Anthony's letter wasn't -- you don't have

14  that?

15    A   I don't think so.  We just know that there was

16  one because he referenced it in his grievance.

17    Q   Okay.  Were you aware that Mr. Anthony and I

18  were having a dispute about the appropriateness of

19  Professor Fagal's discipline and the procedure

20  regarding it?

21        MS. PEET:  Objection to the form.

22        THE WITNESS:  Yes.

23  BY MR. COHEN:

24    Q   Did it ever occur to you that discussing any

1  part of your deliberations with Mr. Anthony might

2  compromise the independence of your investigation?

3        MS. PEET:  Objection to the form.  You can

4  answer.

5        THE WITNESS:  At that stage we were not

6  seeking any clarification on the substance of the case.

7        MS. PEET:  I just want to instruct you not

8  to disclose any communications that you have had either

9  with myself, with Mr. Anthony, with any other counsel

10  for Marywood, for Doctor Fagal, for Sister Munley

11  pursuant to attorney/client privilege.

12  BY MR. COHEN:

13    Q   Also I don't want to know anything Mary Theresa

14  Patterson said or might not have had said to you.  I

15  just want to know if the thought had ever crossed your

16  mind that talking with Mr. Anthony could compromise the

17  independence of the Ad Hoc Faculty Committee's

18  investigation?

19    A   No, because --

20    Q   I don't want to know what anyone said to you,

21  any attorney.  But you were about to say because;

22  unless the answer was someone told you, some attorney

23  told you that it wouldn't then I don't want to know.

24    A   That was not.



Page 22

1    Q  So what were you going to say?
2    A  I was going to say because our question was
3    procedural, we were not calling him about a substantive
4    aspect of the case.
5        MS. PEET:  I don't want you to talk about
6    anything else.
7        MR. COHEN:  Can we have this marked as
8    Bittel 7 please.
9        (Whereupon Bittel Exhibit 7 was marked for
10   identification.)
11   BY MR. COHEN:
12   Q  Could you read this to yourself and let me know
13   when you're finished.
14   A  All right.
15   Q  Do you recognize this?
16   A  I do recognize it.
17   Q  And what is it?
18   A  It is the minutes from our second meeting.
19   Q  And did you generate this, these minutes or did
20   another committee member do that?
21   A  I believe that I generated them.
22   Q  Okay.  During your actual -- during your
23   meetings, your Ad Hoc Committee meetings, were you
24   taking contemporaneous written notes or did you later

Page 23

1    just type this out from memory?
2    A  No, I took minutes on my iPad.
3    Q  Okay.  Do you know whether --
4        MR. COHEN:  Could we just go off the record
5    for a second.
6        (Whereupon an off-the-record discussion
7    took place.)
8    BY MR. COHEN:
9    Q  These notes that you took on your iPad, do they
10   exist any longer?
11   A  Probably.  I think that I sent them to Pat
12   Dunleavy at some point at that January 2015 when we had
13   a meeting and they let us know that this might be going
14   to a deposition.
15   Q  Okay.
16   A  I don't remember for sure.
17   Q  Okay.
18       MS. PEET:  For what it's worth, I will
19   check.
20       MR. COHEN:  Thank you.
21   BY MR. COHEN:
22   Q  Do you still have the iPad that you took the
23   notes on?
24   A  Yes.

Page 24

1    Q  So you don't feel the need to upgrade your iPad
2    every year like Apple wants you to?
3    A  No.  This is a five-year-old iPad with a crack
4    across the screen.  Nobody is going to steal it.
5    Q  After having read these minutes, do they
6    accurately reflect what occurred during the second Ad
7    Hoc Committee meeting on May 17, 2012 to the best of
8    your memory?
9    A  They reflect what we understood at that moment,
10   at the moment of that meeting.  But as all of our
11   minutes indicate, this is a new process that had never
12   been, to our knowledge, been used at Marywood before
13   and there were some anomalies in that we did not have
14   authorization to go to Ad Hoc Committee between
15   suspension and termination.
16       So the bottom line there is that we were coming
17   to understand the process as we -- as it evolved.  But
18   this is what we understood that day, although later we
19   did in our actual deliberations we did consider three
20   things.  We considered suspension, we considered
21   termination and we considered revocation of tenure.
22   Q  Okay.  So there's a lot to unpack from all of
23   that.  You understood that the process that the
24   committee was engaged in was the first time that the

Page 25

1    progressive discipline policy had ever been used at
2    Marywood?
3    A  No, I didn't --
4        MS. PEET:  Objection, mischaracterization
5    of testimony.  You can answer.
6    BY MR. COHEN:
7    Q  What was it that --
8    A  None of us had any --- the three of us on the
9    committee who had been there a long time had no memory
10   of such a committee being convened.
11   Q  Ever?
12   A  We wouldn't know if one ever was because other
13   people in the university don't know that this is
14   happening.  We didn't have -- faculty said Executive
15   Committee was not able to say, oh, yeah, this has
16   happened before and this is what was done.
17   Q  And you mentioned that -- you mentioned the word
18   anomalies in the process.  What did you mean by that?
19   A  That we would have expected to have been
20   convened following suspension, but that because Fred
21   didn't sign off on the authorization to convene the
22   committee that we were not convened until later.
23   Q  Were you aware that Fred through his attorney,
24   me, had requested that a committee review his


MAGNA ▶
LEGAL SERVICES

1 suspension?
2       MS. PEET:  Objection; lack of foundation,
3 mischaracterization of evidence.  You can go ahead and
4 answer if you know.
5       THE WITNESS:  By this point.
6       MS. PEET:  You don't need to look at
7 anything, he's asking you if you know.
8       THE WITNESS:  I don't remember.  We know
9 that Sister Anne Munley had received papers from you.
10 BY MR. COHEN:
11   Q   When you were using your iPad to take notes at
12 this committee meeting, what program on your iPad were
13 you using?
14   A   Notability.
15       MS. PEET:  Can we go off the record for a
16 second.
17       MR. COHEN:  Sure.
18       (Whereupon an off-the-record discussion
19 took place.)
20 BY MR. COHEN:
21   Q   On the first page of these minutes towards the
22 bottom, do you see where it says first page?
23   A   First page towards the bottom.
24   Q   Do you see where it says after Erin left we

1 concluded?
2   A   Mm-mm.
3   Q   We concluded that we, the AHC, are in charge of
4 reviewing the substance of the termination charge, in
5 parentheses, dismissal and revocation of tenure.  Did I
6 read that correctly?
7       MS. PEET:  There's no question.  Did he
8 read it correctly?
9       THE WITNESS:  Yes.
10 BY MR. COHEN:
11   Q   So is it true that you didn't view the role of
12 the committee as reviewing any of the procedural
13 aspects of the recommended discipline against Fred?
14   A   Our understanding at this moment in time was
15 that the procedural aspects had already been decided by
16 the FGC and could not themselves be appealed, that
17 their decision was final.
18   Q   Let's turn to the next page.  You wrote some of
19 the questions we will consider going forward include
20 and the second point says did F.F. in essence reject or
21 refuse remediation especially in his meeting with
22 S.A.M. on January 23rd when he refused to discuss the
23 video, correct?
24   A   Yes.

1   Q   Why did you want to know whether Professor Fagal
2 rejected or refused remediation?
3   A   Because he was claiming in his documents that he
4 should have had the opportunity for remediation.
5   Q   And did you think that -- scratch that.  Two
6 points down then you ask does the video, in
7 parentheses, understood as an escalation of
8 inappropriate behavior represent a failure of the
9 discipline system at Marywood; correct?
10   A   Yes.
11   Q   What did you mean by that question?
12   A   Part of what was happening there is that
13 someone, I think that may have been Ed's point, was
14 that we wanted to make sure that we were considering
15 all angles; that we were -- that we were considering
16 the ways that Sister Anne might be correct or incorrect
17 in her charges and the way that Fred may have been
18 correct or incorrect in his charges.  We wanted to make
19 sure that we were judicious and that we did our due
20 diligence in weighing both sides fairly.  And so this
21 was on the table as -- just on the table as a question
22 to be assessed.
23   Q   Right.  But why would the video potentially
24 represent a failure of progressive discipline at

1 Marywood?
2       MS. PEET:  Objection to the form.  You can
3 answer.
4       THE WITNESS:  This was a very -- I mean
5 this was a very hard question to answer because you
6 would only see it as a failure of progressive
7 discipline if there had been a record of progressive
8 discipline, and that was not information that we were
9 given at this moment.  So we couldn't know either way,
10 right, we couldn't know had there been previous
11 progressive discipline and it failed or had there not
12 been.  We just didn't know at that point.
13 BY MR. COHEN:
14   Q   Later on did you later learn whether there had
15 been a history of progressive discipline against Fred?
16   A   I know we inquired about it, inquired about
17 whether we could have access to personnel records.  I
18 believe, if I'm remembering correctly, that Fred signed
19 off on it and we were given some information about
20 things that had happened previously concerning a
21 cartoon but that did not result in formal discipline.
22   Q   And if we keep going down the page under the
23 heading actions, the first point says Helen will e-mail
24 P.D. and let her know that we understand our charge to



1    be the review of substance, the termination and denial
2    of tenure charges.  We understand that the issues of
3    suspension and procedure were resolved by the FGC.  Did
4    I read that correctly?
5        A  You did read it correctly.
6        Q  And P.D. stands for Patricia Dunleavy, right?
7        A  That's correct.
8        Q  And FGC stands for Faculty Grievance Committee,
9    right?
10       A  Correct.
11       Q  Now, earlier today I think you said that your
12   committee, one of the purposes was to consider
13   Professor Fagal's suspension; correct?
14       A  We later came to consider that in our
15   deliberations, but at this moment in the process of
16   figuring out who does what and what our role was in the
17   judicial process at this moment we were less sure.
18       Q  So what made you sure later that you were
19   supposed to consider the suspension?
20       A  We just -- because the same action precipitated
21   the suspension and the dismissal.  And so we did not
22   prepare a separate statement on the suspension because
23   if you found -- since our findings upheld a greater
24   charge on the same action, it doesn't make any sense

1    that they wouldn't uphold a lesser charge on the same
2    action.
3        Q  So did you consider that -- did you think that
4    reviewing the suspension; if you had already determined
5    that Professor Fagal's termination was appropriate, did
6    that lead you to think that you did not need to
7    consider whether the suspension was appropriate?
8        MS. PEET:  Objection to the form.
9        THE WITNESS:  We discussed the suspension,
10   but we did not prepare a formal -- we did not prepare a
11   statement on it because if termination is justified,
12   why wouldn't a suspension be justified unless there
13   were a procedural problem and the FGC had already
14   adjudicated that there was not a procedural issue.
15   BY MR. COHEN:
16       Q  So why would you discuss the suspension at all
17   if you thought that the termination was appropriate?
18       A  Because it was on the table.  I mean we did have
19   to ask ourselves first could suspension be justified by
20   the actions and then termination and revocation
21   of tenure be justified by the actions.
22       Q  But you didn't make any formal finding about
23   whether the suspension was appropriate?
24       A  No, because termination and especially

1    revocation of tenure, which in some ways is the more
2    serious issue were found to be justified.
3        MR. COHEN:  Okay.  Can we have this marked
4    as Bittel 8 please.
5        (Whereupon Bittel Exhibit 8 was marked for
6    identification.)
7    BY MR. COHEN:
8        Q  And could you read this to yourself and let me
9    know when you're finished please.
10       A  Okay.
11       Q  Do you recognize this?
12       A  It appears to -- I vaguely recognize it.  It
13   looks like my writing.
14       Q  Are these notes that you took about a telephone
15   conversation that you had with Pat Dunleavy?
16       A  Yes.
17       MS. PEET:  And for the record, can we
18   describe the blackouts so she understands.
19   BY MR. COHEN:
20       Q  Yes.  The blackouts no one is saying that you
21   did that.  Marywood's attorneys have to redact certain
22   things --
23       A  Okay.
24       Q  -- because they may be privileged.

1        A  Okay.
2        Q  So ignore that please.
3        A  Okay.
4        Q  So based on these notes, Doctor Dunleavy told
5    you that your committee needed to provide an
6    independent review?
7        A  Yes, that word was used several times.
8        Q  And that your committee needed to come to a
9    decision independently from the administration?
10       A  That was made very clear to us from the first
11   meeting.  The first time we met with Sister Gail and
12   Pat Dunleavy, we were told that there's no punitive
13   action against you if you find against the
14   administration.  There's no -- you know, that you need
15   to be an independent review or an independent review of
16   the substance of the charges.
17       Q  Point five here you're taking notes on advice
18   that Doctor Dunleavy gave you about when the
19   progressive discipline policy applies and when it
20   doesn't apply, right?
21       A  Correct.
22       Q  So you understood that there are some cases in
23   which the progressive discipline policy does not apply?
24       A  Yes.  And we came to the conclusion prior to



Page 34

1  this conversation with Pat that we wanted to verify
2  with her as well.  This was a conclusion that we came
3  to based on our reading of the progressive discipline
4  policy that she gave me previously.
5      Q   How did you come to the conclusion that the
6  progressive discipline policy sometimes doesn't apply?
7      A   The word may, it's a verb.
8          MS. PEET:  Do you need to look at
9  something?
10         THE WITNESS:  Should I look in the --
11  BY MR. COHEN:
12     Q   I'm not asking you to look at the exhibit yet.
13     A   Okay.  It was the wording and the language of
14  the policy particularly, the verbs like may and might
15  as opposed to will or should.
16     Q   Let's turn back to Bittel 5.  This is the
17  progressive discipline policy, right?
18     A   Yes, it is.
19     Q   Now, can you tell me again how you came to the
20  conclusion that in some cases this policy does not
21  apply?
22         MS. PEET:  Just for clarification, that the
23  policy didn't apply generally or the policy doesn't
24  apply in this situation?

Page 35

1  BY MR. COHEN:
2      Q   In this situation.
3      A   Because paragraph one; one, two, three, four
4  lines down; because the university regards disciplinary
5  action as corrective and not punitive, the policy
6  recognizes personal and professional problems that may
7  be rectified by an informal educational process as well
8  as serious violations and professional responsibility
9  is implicating possible recommendations for suspension
10  or dismissal.
11     Q   And the word may is what --
12     A   Yes.
13     Q   -- led you to believe that in this case
14  progressive discipline wasn't appropriate?
15     A   Right.
16     Q   Anything else in the policy that led you to that
17  conclusion?
18     A   On top of page two special assistance; in those
19  circumstances where it is evident that the faculty
20  member is in need of special professional assistance,
21  the vice president for academic affairs may require any
22  one of these remedial actions.  Where it is evident
23  that the faculty member is in need of special
24  professional assistance, we did not think it was

Page 36

1  evident in this case.
2          Similarly, in the first paragraph of the policy
3  statement may be rectified by an informal education
4  process, we did not see this as a -- we considered
5  whether this was a situation where an educational
6  process, an informal education process -- whether
7  personal and professional problems that may be
8  rectified by an informal educational process applied to
9  this case, and we determined that it did not apply to
10  this case.
11     Q   So if the progressive discipline policy didn't
12  apply to this case, what written rules were you
13  supposed to follow, if any?
14     A   Well, we looked here the justification for
15  suspension; the faculty member may be suspended by the
16  VPA at any time during the proceedings.  Suspension is
17  justified if immediate harm to the faculty members or
18  others is threatened by the person's continuance in a
19  faculty position.  And we debated whether such harm was
20  present in this situation and ultimately determined
21  that it was.
22     Q   But the suspension paragraph is part of the
23  progressive discipline policy, right?
24     A   Yes.

Page 37

1      Q   Okay.
2      A   But we didn't see any -- but the bottom line is
3  that when it says the policy recognizes personal and
4  professional problems that may be rectified, and we saw
5  may be rectified as not applying, as written in a way
6  that does not apply to every case; that you don't
7  automatically get progressive discipline because it
8  says may be rectified, not will be rectified.
9      Q   So if the progressive discipline policy didn't
10  apply in this case, I guess my question is were there
11  any other written rules that you thought the university
12  was bound by --
13         MS. PEET:  Objection to the form.
14  BY MR. COHEN:
15     Q   -- regarding discipline?
16     A   Yeah.  I don't think I understand the form.  I
17  don't think I understand the phrasing.
18     Q   Okay.  If you concluded that the progressive
19  discipline policy, and by that I'm talking about the
20  entire document that we're looking at now, did not
21  apply --
22     A   Okay.  I was not talking about the entire
23  document.  I was talking about the opportunity for
24  remediation --



1    Q   Okay.
2    A   -- did not apply to these circumstances.  The
3  policy applies but the opportunity for remediation, I
4  guess I was not clear in speaking before.  The
5  opportunity for remediation is not guaranteed by this
6  policy.
7    Q   Okay.
8    A   I would also point out in the end of the policy
9  statement it ends by saying is designed to be a series
10  of gradual steps involved, da, da, da, where applicable
11  and that means not every step is applicable to every
12  case and remediation in particular is not applicable to
13  every case.
14    Q   If someone in the administration like Pat
15  Dunleavy had told you that -- this is hypothetical --
16  had told you that the progressive discipline policy
17  applies in every case and that remediation applies in
18  every case, would you have come to the conclusion that
19  President Munley's termination of Professor Fagal was
20  appropriate?
21          MS. PEET:  Objection; calls for
22  speculation, assumes facts not in evidence.  If you can
23  somehow answer that, you can answer.
24          THE WITNESS:  That's too speculative for me

1  to answer.
2          MR. COHEN:  Okay.  Can we have this marked
3  as Bittel 9 please.
4          (Whereupon Bittel Exhibit 9 was marked for
5  identification.)
6  BY MR. COHEN:
7    Q   Can you read this to yourself and let me know
8  when you're finished please.
9    A   Yes.
10    Q   This is an e-mail from you to Patricia Dunleavy
11  dated May 18, 2012 at 4:03 p.m., right?
12    A   Mm-mm.
13          MS. PEET:  Is that a yes?
14          THE WITNESS:  Yes, that is.
15  BY MR. COHEN:
16    Q   And here again you're saying to Doctor Dunleavy
17  we agreed that our charge should be the review of
18  substance, the termination and denial of tenure and
19  that you understood that the issues of suspension and
20  procedure were resolved by the Faculty Grievance
21  Committee; is that correct?
22    A   That is what we understood at that moment.  This
23  is basically our followup to her on the May 17th
24  meeting.

1    Q   Can we take a ten-minute break?
2    A   Sure.
3          (Whereupon a recess took place.)
4          (Whereupon Bittel Exhibit 10 was marked for
5  identification.)
6  BY MR. COHEN:
7    Q   Could you go through this and let me know when
8  you're finished please.
9    A   Sure.  I'm done.
10    Q   Okay.  So first page there's an e-mail from
11  Doctor O'Brien to you and Matt dated June 2, 2012 at
12  9:52 a.m., do you see that?
13    A   Yes.
14    Q   And Doctor O'Brien in the second paragraph he
15  say his current inclination is that it will be useful
16  to interview Sister Anne about a few narrow questions
17  and then he goes on to list them, right?
18    A   Mm-mm.
19          MS. PEET:  Is that a yes?
20          THE WITNESS:  Yes, it is.
21  BY MR. COHEN:
22    Q   Do you know whether the committee ever did get
23  the opportunity to ask these questions?
24          MS. PEET:  Objection to the form.

1          MR. COHEN:  What is it about the question?
2          MS. PEET:  Whether or not they had the
3  opportunity.
4  BY MR. COHEN:
5    Q   Let me rephrase it.  Did the committee ever
6  actually ask these questions of Sister Anne?
7    A   To the best of my recollection we did meet with
8  her, but I don't remember if these were the questions
9  that we discussed or what the final form of the
10  questions we discussed was.
11    Q   But you do know that you met with her, but you
12  just don't remember the exact questions?
13    A   I'm fairly certain we met with her, but I don't
14  remember for sure.  If I had to guess, I would guess --
15    Q   Don't guess.
16    A   Okay.
17    Q   In the next paragraph Doctor O'Brien says that
18  he also thinks that we may want to interview Fred by
19  phone, do you see that?
20    A   Yeah.
21    Q   And that never happened, right?
22    A   I don't believe that happened.
23    Q   Just take my word for it, it didn't happen.  Do
24  you know why you guys didn't interview Fred by phone?

MAGNA
LEGAL SERVICES

1   MS. PEET:  Objection, it assumes facts not
2   in evidence.  You can go ahead and answer.
3   THE WITNESS:  Again this is four-and-a-half
4   years ago.  I'm relying on, you know; a lot of time has
5   passed since then.  I believe that there was an e-mail
6   exchange with Fred rather than a phone call.
7   BY MR. COHEN:
8   Q   You believe there was an e-mail exchange in lieu
9   of a phone call?
10  A   Yes, correct.
11  MR. COHEN:  Okay.  Call this Bittel 11.
12  (Whereupon Bittel Exhibit 11 was marked for
13  identification.)
14  BY MR. COHEN:
15  Q   Can you read this to yourself and let me know
16  when you're finished please.
17  A   I'm done.
18  Q   Okay.  On the second page there's an e-mail from
19  Doctor O'Brien to you and Matt Povse dated June 7, 2012
20  at 12:46 p m., do you see that?
21  A   Yes, I do.
22  Q   Third paragraph down that begins I like the
23  open-ended format, do you see that?
24  A   Mm-mm.

1   Q   Does this paragraph refresh your recollection
2   about whether or not Sister Anne Munley was interviewed
3   by your committee?
4   A   It does refresh my recollection that we did meet
5   with her.
6   Q   Okay.
7   A   I don't remember offhand the substance of that
8   conversation.
9   Q   Okay.  On the first page there's an e-mail from
10  you to at least Doctor O'Brien dated June 11, 2012 at
11  10:57 a m., do you see that?
12  A   Yes.
13  Q   And three paragraphs down it begins I definitely
14  agree?
15  A   Mm-mm, I see that.
16  MS. PEET:  Is that a yes?
17  THE WITNESS:  Yes, I see that.
18  BY MR. COHEN:
19  Q   Here you're saying that you're reluctant to ask
20  to interview Fred because you fear that that would be
21  opening the door to a gigantic rant, do you see that?
22  A   Yes, I see that.
23  Q   What do you mean by a gigantic rant?
24  A   That I was fearful that instead of answering our

1   question, he would just tell us what's on his mind
2   regarding the unjustice of what happened with the fire
3   posters.
4   Q   Why do you think he would do that?
5   A   Because in what we know and the records we
6   eventually received regarding the January 23rd meeting,
7   he didn't -- he kept coming back to that when Sister
8   Anne asked him about explaining the video.
9   Q   So you didn't actually think he would answer
10  your questions?
11  A   Correct, that particular.  I didn't think that
12  he -- I had reservations that he might not answer,
13  answer the question as asked.
14  Q   What would have been the big deal, that would
15  have been if you wasted minutes, right?
16  MS. PEET:  Objection to form.  You can
17  answer.
18  THE WITNESS:  I don't remember.
19  BY MR. COHEN:
20  Q   Okay.  At the bottom of that paragraph you said
21  and it would parallel the second questions we have for
22  Sister Anne, do you see that?
23  A   It would parallel the second questions we had
24  for Sister Anne, on the other hand if we did have to

1   uphold Sister Anne --
2   MS. PEET:  Don't read out loud.
3   THE WITNESS:  I do see that.
4   BY MR. COHEN:
5   Q   What did you mean by -- did you mean the second
6   round of questions or like a second question, what did
7   you mean by that?
8   A   A second question, that's a typo.
9   Q   You mean a second question?
10  A   Yes.
11  Q   And by second question you're referring to what
12  actual question?
13  A   I don't remember, presumably the questions that
14  we were planning to ask her in the meeting that are not
15  included in this e-mail.
16  Q   Ask --
17  A   Ask of Sister Anne.
18  Q   Okay.  But based on the date of the e-mail from
19  Doctor O'Brien on June 7th, is it your impression by
20  that point that you had already interviewed Sister Anne
21  or rather you were planning to?
22  A   I think we had not yet interviewed her.
23  MR. COHEN:  Okay.  Let's mark this as
24  Bittel 12 please.



MAGNA
LEGAL SERVICES

1      (Whereupon Bittel Exhibit 12 was marked for
2  identification.)
3  BY MR. COHEN:
4      Q   Do you recognize this document?
5      A   It's meeting minutes, June 18th -- June 19th.
6      Q   And again you generated these minutes?
7      A   I did.
8      Q   Okay.  Is there any reason to doubt the accuracy
9  of these minutes?
10     A   Let me take a look.  I would like to read it
11 closer.
12     Q   Sure.
13     A   Okay.  I'm done.
14     Q   Okay.  Based on your reading, is there any
15 reason to doubt the accuracy of these minutes?
16     A   I don't see any.
17     Q   So it's clear from these minutes that you did
18 meet with Sister Anne on June 18th, right?
19     A   That's correct.
20     Q   And you don't remember what was discussed?
21     A   No.
22     Q   Do you remember whether President Munley ever
23 informed you that Professor Fagal had asked for an
24 opportunity to answer her questions in writing?

1      A   I don't recall that.
2      Q   Other than the fact that you don't recall her
3  saying it to you, did you know if Professor Fagal had
4  asked for an opportunity to answer President Munley's
5  questions in writing?
6      A   I don't think so.  Meaning President Munley's
7  questions with regard to the original questions she
8  asked on January 23th with respect to the video?
9      Q   Right.
10     A   I don't think so.
11     Q   Okay.  If you had done that, would that have
12 changed any of your conclusions about -- any of the
13 conclusions that you made and adjudicated the
14 discipline that was imposed on Fred?
15         MS. PEET:  Objection.  She said she doesn't
16 think so, but she doesn't know.  And secondly, it calls
17 for speculation, it assumes facts not in evidence.  You
18 can answer.
19         THE WITNESS:  I can't guess what the -- we
20 came to our decision as a committee, not as a -- we
21 thought about the issue individually, but we came --
22 our decision and our deliberations were collective and
23 I can't speculate as to what other people would say.
24             - - -

1  BY MR. COHEN:
2      Q   Yeah.  But I asked about would it have changed
3  your opinion.
4          MS. PEET:  Same objection.
5          THE WITNESS:  Would it have changed my mind
6  to know that he had requested that?
7  BY MR. COHEN:
8      Q   Yes.
9      A   And would it have changed my mind about what
10 specifically?
11     Q   About whether remediation was appropriate.
12     A   It would not have changed my mind on the
13 remediation question because the policy does not
14 require remediation to be offered.
15     Q   Now, at the bottom of -- do you see the
16 paragraph that begins we then took our first vote?
17     A   Yes.
18     Q   And the bottom of that paragraph it says he also
19 had multiple opportunities to make amends, show remorse
20 and explain his actions; do you see that?
21     A   Yes.
22     Q   Does that imply that you felt that he never took
23 any of those opportunities?
24     A   That's referring to when Anne Munley asked him

1  to explain his actions on January 23rd and he did not
2  and did not subsequently in the period to our knowledge
3  and did not subsequently after that explain his reasons
4  to Anne Munley.
5      Q   Right.  But I'm now bringing to your attention
6  if he had said at that meeting with President Munley
7  can I put my -- can I answer your questions in writing,
8  that would sort of conflict with the view that he --
9      A   Had multiple opportunities?
10     Q   Yes.
11         MS. PEET:  Objection to form, calls for
12 speculation.  That's your opinion, doesn't necessarily
13 means it's her opinion and it assumes that he would
14 have put in writing that he was remorseful, which there
15 is no evidence that he would have done such a thing.
16 BY MR. COHEN:
17     Q   I'm looking for your answer.
18     A   You're looking for my answer.
19     Q   If he had asked for an opportunity to answer
20 President Munley's questions in writing, that would
21 make this statement not very accurate; right; he also
22 had multiple opportunities to make amends, show remorse
23 and explain his actions?
24         MS. PEET:  Objection to the form.

**MAGNA**
LEGAL SERVICES

1      THE WITNESS:  If we knew that that was the
2  case, yes, that would make my statement there, it would
3  problematize my statement there.  It may not have
4  changed the outcome.
5  BY MR. COHEN:
6      Q   On the second page it says charge two, the
7  bottom of that paragraph it says while Fagal is correct
8  in saying that he was not getting a review in this
9  point, there might have been one if he had answered
10 Munley's questions on January 23rd.  Do you see that?
11     A   Yes.
12     Q   And again that would -- if he had asked for an
13 opportunity to answer her questions in writing, that
14 would sort of conflict with the statement here; right?
15     MS. PEET:  Objecting to the form, it calls
16 for speculation.  You can answer.
17     THE WITNESS:  It would object, it would --
18 yes, it would conflict with that point, but that's not
19 the -- as with the previous case, the point that is
20 potentially invalidated is not the only point that was
21 made or the only reason on the table.
22 BY MR. COHEN:
23     Q   On the last page under action items it says
24 Povse -- how do you pronounce his name by the way?

1      A   Povse.
2      Q   Povse will contact Anne Munley and apprise her
3  of her progress, is that right?
4      A   That is correct.  He was not indicating --
5      MS. PEET:  There's no question on the
6  table.  Let him ask.
7  BY MR. COHEN:
8      Q   Why did -- why was it important that Povse keep
9  President Munley apprised of the progress of the
10 committee?
11     MS. PEET:  Objection to the form.
12     THE WITNESS:  By progress he meant
13 timeline.  This was -- these deliberations largely
14 occurred over the summer when we were all off contract
15 and had various travel plans.  So it took a lot longer
16 to get through it than we had expected because one of
17 us would be away and then the other would be away.  And
18 there's three people, you know, who did not plan their
19 summer expecting this.  So he was apprising her of --
20 by progress he means of our timeline and we are at the
21 stage of drafting a decision.
22 BY MR. COHEN:
23     Q   But nobody wanted to keep Professor Fagal
24 informed of the progress of the committee, is that

1  correct?
2      A   I believe that's correct.
3      Q   Why?
4      A   Because our -- Anne Munley is the person who
5  asked us keep her apprised of the timeline and she's
6  the one who said can you -- she's the one who said when
7  are you going to be finished, I need to know what the
8  date is.
9      Q   She said that?
10     A   I mean I can't say with 100 percent certainty,
11 but I know that she asked us when our expected date of
12 completion would be because she didn't want it to drag
13 out too long either.  But this was in -- as far as I
14 can remember, it was in response to her inquiry about
15 when we would submit a final decision.
16     Q   How many inquiries did she make about the
17 timetable?
18     A   I don't remember, obviously at least one.
19     Q   Did she say why it was important that this not
20 drag out?
21     A   I don't remember.  I mean I'm guessing that
22 there's -- you're supposed to complete --
23     MS. PEET:  Don't guess.
24                 - - -

1  BY MR. COHEN:
2      Q   She didn't say?
3      A   I don't remember her saying.
4      Q   Okay.  Did you in any way feel time pressured?
5      A   No.
6      Q   Did you in any way feel that she was pressuring
7  you to rule in her way?
8      A   Not at all.  And again we were assured by Pat
9  Dunleavy and -- we were assured by Pat Dunleavy on the
10 first day that nobody in the administration can take
11 any action against you if your decision disagrees with
12 theirs.  We were promised that protection.
13     Q   The last paragraph says after we workshop our
14 draft, we will send it to Will Anthony for comment, is
15 he an independent voice or does he work for
16 Munley/Marywood?
17     A   Yes.
18     Q   Did you ever get an answer to your question is
19 he an independent voice?
20     A   I don't recall.
21     Q   Well, why did you think that he might work for
22 Munley/Marywood?
23     MS. PEET:  Objection to the form, assumes
24 facts not in evidence.



1    THE WITNESS:  Because Marywood is paying
2  for him.
3    MR. COHEN:  Okay.  May I have this marked
4  as Bittel 13 please.
5    (Whereupon Bittel Exhibit 13 was marked for
6  identification.)
7  BY MR. COHEN:
8    Q  Could you read this to yourself and let me know
9  when you're finished, just the e-mail not the
10  attachment.
11    A  So not the attachment?
12    Q  Right.
13    A  Yes, I read it.
14    Q  Okay.  Now, this is an e-mail from you to
15  Matthew Povse and Doctor O'Brien?
16    A  Yes.
17    Q  Dated June 26, 2012 at 12:24 p.m.?
18    A  Correct.
19    Q  Other than this block redaction, do you remember
20  writing this?
21    A  It's my e-mail account, it's my signature.
22    Q  I'm trying to get you to authenticate it.  This
23  is in fact an e-mail that you sent?
24    A  This is an e-mail that I sent, yes.

1    Q  And you remember sending your draft, the
2  committee's draft to Will Anthony for his input.  And
3  I'm not asking you what he said, don't tell me.  You
4  did send it to him for seeking his input?
5    MS. PEET:  Objection to the form.
6    THE WITNESS:  I did.
7  BY MR. COHEN:
8    Q  And he did provide input?
9    A  Correct.
10    Q  Did it ever occur to you that if you were asking
11  Will Anthony for his input, that he might be
12  communicating with Sister Munley or Pat Dunleavy about
13  your deliberations?
14    A  No, that never occurred to us.  We understood
15  that our conversations with him were privileged.
16    Q  Why did you think that, that your conversations
17  with Will Anthony were not to be provided to the
18  administration?
19    A  Because he's the attorney and we were contacting
20  him as a client.
21    Q  But again earlier today you said that he
22  represented the university, right?
23    A  That was what -- we understood that the
24  university was paying him and that that was who he has

1  a -- his contract was with them.  But we also
2  understood that he was available as a resource to us.
3  On our first meeting Pat Dunleavy gave us his contact
4  information and said if you need to contact him,
5  contact him.  She didn't say if you want to contact
6  him, let me know or if you want to contact him, let
7  Sister Anne know.  She just gave us his card.
8    Q  Okay.  Let me ask you this, in your committee
9  deliberations did you actually view the videos that
10  Professor Fagal made and posted to You Tube?
11    A  They were given the videos on a flash drive.  We
12  viewed them individually, but not as a -- we
13  individually each borrowed the flash drive and watched
14  the video.
15    Q  Okay.  So it wasn't like a screen shot?
16    A  No, it was not a screen shot.  It was the actual
17  video on a flash.
18    Q  Would you say that you did a scene-by-scene
19  analysis of the video?
20    MS. PEET:  Objection.
21  BY MR. COHEN:
22    Q  To examine the validity of the charges?
23    A  To examine the validity of the charges, no.
24  That's not a format for making charges.

1    Q  What's not a format?
2    A  A You Tube video is not a vehicle for making
3  formal charges.
4    Q  I guess I don't understand.  I'm not asking you
5  whether anyone was making charges by -- through a You
6  Tube video.  I'm asking as part of your analysis of
7  whether President Munley's charges were appropriate,
8  did you do a scene-by-scene analysis of the video?
9    MS. PEET:  Same objection.  I don't
10  understand what it is you're seeking.  If you do, then
11  by all means you can answer the question.  I just don't
12  know what you mean by scene-by-scene analysis.
13  BY MR. COHEN:
14    Q  Do you understand?
15    A  We made a list of who he said what about.
16    Q  Okay.  Did you know that this video was in the
17  format of like a popular parody that people were doing?
18    A  Yes, we did.
19    Q  Okay.  Did you see any other parodies based on
20  that movie?
21    A  No.
22    Q  Okay.  Did you believe that Professor Fagal was
23  actually likening President Munley to Hitler?
24    MS. PEET:  I'm sorry, can you repeat that?



1   BY MR. COHEN:
2      Q   Did you believe that Professor Fagal was
3   actually likening President Munley to Adolph Hitler?
4      A   In the context of satire, yes.  We understood
5   that the video was a parody and the context was a
6   satire.
7      Q   Right.  Okay.
8          (Whereupon Bittel Exhibit 14 was marked for
9   identification.)
10  BY MR. COHEN:
11     Q   Could you read this to yourself and let me know
12  when you're finished please.
13     A   Okay.
14     Q   And we're looking at an e-mail from Matthew
15  Povse to Sister Anne and you are CC'd as well as Doctor
16  O'Brien, right?
17     A   Yes.
18     Q   And Matthew Povse says we wanted you to know
19  that our report is in support of your actions in this
20  case, correct?
21     A   Yes.
22     Q   But at this point you were still, the committee
23  was still drafting its response, it wasn't finished
24  yet; right?

1      A   We drafted the response.  We did not submit it
2   to Sister Anne Munley as our formal response.
3      Q   Right.  Did you tell -- or before Matthew Povse
4   sent this e-mail, were you aware, did you discuss with
5   him that he would inform President Munley that your
6   decision was going to be in support of her actions?
7      A   I don't recall.
8      Q   Okay.  Were you surprised that Mr. Povse told
9   Sister Anne in advance that they were going to rule,
10  the committee was going to rule in favor of her
11  actions?
12     A   I guess not.  I mean I understand draft at this
13  point as we've already made a decision and articulated
14  our decision and we're fine-tuning it, you know, that's
15  the point.  We did not understand it as we're still
16  drafting, we're deliberating.  The deliberations were
17  finished.  We were fine-tuning the document that
18  explained our conclusions.
19     Q   Did the committee inform Professor Fagal in
20  advance of the final decision that they were going to
21  rule in favor of Sister Munley?
22     A   I don't believe so, but I don't recall for sure.
23  My understanding again going back to what we said
24  before is that Sister Anne wanted to know the timeline.

1      Q   Right.  Did she ask for the final result before
2   you were finished?
3      A   She did not ask for the final result before we
4   were finished, no.  She was concerned about the
5   timeline.
6          MR. COHEN:  Let's make this Bittel 15
7   please.
8          (Whereupon Bittel Exhibit 15 was marked for
9   identification.)
10  BY MR. COHEN:
11     Q   Could you view this, let me know when you are
12  finished including the attachment.
13     A   Review the e-mail and the attachment?
14     Q   Yes, please.
15     A   Okay.  I've read the document.
16     Q   Do you recognize it?
17     A   I do recognize it.
18     Q   And on the first page there's a series of
19  exchange of e-mails between you and Sister Anne --
20     A   Yes.
21     Q   -- correct?
22     A   Correct.
23     Q   And you first tried to give her the committee's
24  review and it turns out there's changes and she asked

1   for a final copy, right?
2      A   Yes.  She didn't -- I had never used track
3   changes before and didn't know that the comments would
4   appear in the document.
5      Q   And this attachment is the version without tract
6   changes?
7      A   Correct.
8      Q   Is this the final version of the committee's
9   review and Sister Anne Munley's decision?
10     A   I believe so.
11     Q   And do you know if -- in the first e-mail it
12  says hopefully this one will work, I'll ask Matt and Ed
13  to sign a hard copy as well.  Do you know if there was
14  a copy ever signed?
15     A   I don't remember.
16     Q   Having read this just now, would it be fair to
17  say that the Ad Hoc Committee did not review whether
18  Professor Fagal's suspension was appropriate?
19         MS. PEET:  Objection to the form;
20  mischaracterization of testimony, asked and answered.
21  You can go ahead.
22         THE WITNESS:  We discussed whether the
23  suspension was justifiable, but our ruling was on the
24  termination because if you are -- I mean the revocation



Page 62

1    of tenure because if we find the higher, the more
2    serious charges are found to be justifiable, it doesn't
3    make sense that a lesser charge would not be
4    justifiable.
5    BY MR. COHEN:
6        Q   And the committee's review -- let me ask you
7    this:  Were you primarily responsible for generating a
8    draft of this, is this mostly your writing?
9        A   Yes.  Yes.  It started with the notes that we
10   took in a meeting when we were together and then we --
11   then I put them into a document and made them, made
12   full sentences and things like that and then gave it to
13   the others for comment.
14       Q   And they provided some comments?
15       A   Yes.
16       Q   In paragraph A of the actual review --
17       A   Yes.  And some of the language did come directly
18   from conversations or from other people because I know
19   some of the phrasing here is Ed's.
20       Q   Okay.  In paragraph A the one that begins that
21   we acknowledge that revocation, do you see that?
22       A   Mm-mm.
23       Q   There's a sentence in that paragraph that says
24   we are mindful of the potential or perceived threat to

Page 63

1    academic freedoms when a speech violation leads to
2    revocation of tenure, do you see that?
3        A   Yes.
4        Q   What do you mean by that?
5        A   That academic freedom is the -- academic freedom
6    protects the integrity of faculty work.  And so any
7    time that -- and I think what was meant here by -- we
8    were very, very careful that we considered the larger
9    ramifications; does ruling in favor of Sister Anne
10   Munley's decision potentially compromise the academic
11   freedom of others, does it set a precedent.
12       We ultimately, as you see in the statement,
13   determined that that was not the case because this is
14   not a case of academic freedom.  Academic freedom did
15   not apply to this particular situation.  But as tenure
16   faculty we were very aware of how important it is to
17   protect true academic freedom.
18       Q   I want to turn back to Bittel 5, it's the
19   progressive discipline policy.
20       A   Yes.
21       Q   A few minutes ago, correct me if I'm wrong, you
22   mentioned that if the committee had determined that
23   termination was appropriate, then there really would be
24   no point in deciding whether suspension was

Page 64

1    appropriate; correct?
2            MS. PEET:  Objection, mischaracterization
3    of testimony.
4    BY MR. COHEN:
5        Q   You can still answer if you understand.
6        A   That the event that led to suspension and
7    termination are the event, was the same event in both
8    cases.  So there was no need to prepare a second, a
9    separate document determining that as far as whether
10   the procedural elements that led to suspension were in
11   place, that's determined by the other committee.
12       The Faculty Grievance Committee determines
13   whether procedure was followed in moving to suspend and
14   then moving later from suspension to termination.  So
15   they already adjudicated the procedural aspect.  We
16   were adjudicating whether the event, the action
17   itself --
18           (Whereupon there was an interruption during
19   the deposition.)
20           THE WITNESS:  We were adjudicating whether
21   the action itself warranted those actions.
22   BY MR. COHEN:
23       Q   Okay.  So if you -- but it was your thought
24   process that if you had determined that the event

Page 65

1    itself warranted termination, that there was no point
2    in reviewing whether the event also warranted
3    suspension?
4            MS. PEET:  Objection, mischaracterization
5    of testimony.
6            THE WITNESS:  I guess I don't know.
7    BY MR. COHEN:
8        Q   You don't understand my question?
9        A   No, I don't.
10       Q   Okay.  You would agree that your committee did
11   not determine whether Professor Fagal's suspension was
12   appropriate, correct?
13           MS. PEET:  Objection, mischaracterization
14   of testimony.  Go ahead.
15           THE WITNESS:  We discussed the suspension,
16   but we did -- but the event itself; if the event itself
17   we determined warranted -- we discussed the event
18   itself, the substantive aspects of the case.  Whether
19   Sister Anne was out of line in suspending him in the
20   first place, that was the other committee because they
21   are responsible for procedural elements.
22   BY MR. COHEN:
23       Q   So who -- which committee, if any, determined
24   whether Professor Fagal's suspension was substantively

MAGNA ▶
LEGAL SERVICES

Page 66

1  appropriate as opposed to procedurally appropriate?
2    A   That was ours.  But if it was substantively
3  appropriate for suspension -- if it was substantively
4  appropriate; if a case was substantively appropriate
5  for suspension, it may not be substantively appropriate
6  for termination.  But if a case is appropriate for
7  termination, then of course the lesser charge applies
8  as well; or it meets the lower standard for suspension
9  if it meets the higher required for termination and the
10  highest standard required for revocation of tenure
11  which is an even higher standard.
12    Q   And is that why your review of President
13  Munley's decision does not address whether the
14  suspension was appropriate?
15       MS. PEET:  Asked and answered.  You can go
16  ahead one more time.
17       THE WITNESS:  Correct.
18  BY MR. COHEN:
19    Q   Okay.  If you look at Bittel 5.
20    A   Okay.
21    Q   Do you see at the bottom that there's a
22  paragraph called suspension?
23    A   Yes.
24    Q   It says the faculty member may be suspended by

Page 67

1  the vice president for academic affairs at any time
2  during the proceedings involving him or her, suspension
3  is justified if immediate harm to the faculty member or
4  others is threatened by person's continuance of the
5  faculty position; right?
6    A   Yes.
7    Q   And then below that there's a paragraph it says
8  dismissal, right?
9    A   Mm-mm.
10       MS. PEET:  Is that a yes?
11       THE WITNESS:  Yes, it is a yes.
12  BY MR. COHEN:
13    Q   It says if remedial actions taken during the
14  suspension does not sufficiently resolve the issues
15  that lead to the suspension, the university may move
16  towards dismissal of the faculty member; right?
17    A   Yes.
18    Q   So doesn't that suggest that if a suspension is
19  not appropriate, that the university cannot even try to
20  terminate an employee?
21       MS. PEET:  Objection to the form.  You can
22  answer if you know.
23       THE WITNESS:  I don't know.  We do say
24  here, we do say that the -- we do say in the final

Page 68

1  sentence Doctor Fagal's egregious violation of our core
2  values especially the value of respect has caused grave
3  and irreparable harm to our community.  And above in --
4  under charge one; we are in agreement that Sister Anne
5  Munley is justified in saying that Doctor Fagal's
6  actions constitute such an injury.
7  BY MR. COHEN:
8    Q   Okay.  Now, going back to this dismissal
9  paragraph in Bittel Exhibit 5.
10    A   Okay.
11    Q   It mentions if remedial action is taken during
12  the suspension, right?
13    A   Right.
14    Q   Now, your committee could not have determined
15  whether remedial actions taken during the suspension
16  resolved any issues that led to the suspension, right?
17       MS. PEET:  Objection.  This is a complete
18  mischaracterization of testimony.  She already
19  testified that they confirmed that remediation was not
20  appropriate here.  So what you're asking her is you're
21  assuming what she said I think forgetting about it.
22  She clearly talked about the remediation and how it
23  impacts this case.
24       THE WITNESS:  Yes.  We determined that

Page 69

1  remediation, though the policy makes it possible does
2  not say it has to be offered in every situation and we
3  determined that this was not a situation where
4  remediation was a fruitful avenue or was justified.
5  BY MR. COHEN:
6    Q   So based on that view it was the committee's
7  opinion that President Munley could move directly from
8  suspension to termination?
9    A   She did not need to offer remediation before
10  moving to termination, no, because remediation is not a
11  guarantee.
12    Q   We're coming back to Bittel 15, paragraph C
13  begins Doctor Fagal is given the opportunity to explain
14  his video; do you see that?
15    A   Yes.  This is the section where we give the
16  background to our discussion of charges.
17    Q   And again this paragraph doesn't account,
18  couldn't account for the fact that Doctor Fagal had
19  asked for an opportunity to explain himself in writing;
20  correct?
21    A   Correct.
22    Q   Because you didn't know that?
23    A   We did not know that.
24    Q   On the second page under charge two, again it



1  says at the bottom the charge two it says while Doctor
2  Fagal is correct in saying that he was not given an
3  opportunity to respond to this point, there might have
4  been one if he had answered Sister Anne Munley's
5  questions on 23 January 2012 or if he had sought out
6  additional opportunities to explain his actions in a
7  subsequent meeting; right?
8    A  Correct.
9    Q  And again this is not correct because -- let me
10  rephrase.  If it is true that Doctor Fagal had asked
11  for an opportunity to explain his -- himself in
12  writing, this would not be correct; right?
13    A  That last sentence would not be correct, but the
14  other pieces of the evaluation would still stand;
15  right.  The first piece that says we didn't think that
16  all insults qualify as Civil Rights violations and then
17  our explanation of why it might apply in one case.  So
18  that point only applies to his charge that he didn't
19  get an opportunity to respond to that point.
20    MR. COHEN:  Let's call this Bittel 16
21  please.
22    (Whereupon Bittel Exhibit 16 was marked for
23  identification.)
24    - - -

1  BY MR. COHEN:
2    Q  And can you read this to yourself and let me
3  know when you're finished.
4    A  I've read it.
5    Q  Do you recognize this?
6    A  I do recognize it.
7    Q  And you received this document?
8    A  Yes, I did.
9    Q  In this e-mail, this is an e-mail from Professor
10  Fagal to you and the other committee members.  He's
11  essentially requesting that your committee convene to
12  review the appropriateness of his suspension, right?
13    A  Correct.
14    Q  Following your receipt of this e-mail, you did
15  not in fact reconvene to review the appropriateness of
16  the suspension; right?
17    A  No, we did not.
18    Q  Do you need to take a break?
19    A  I'm good.
20    MR. COHEN:  Let's make this Bittel 17.
21    (Whereupon Bittel Exhibit 17 was marked for
22  identification.)
23  BY MR. COHEN:
24    Q  Could you read this to yourself please and let

1  me know when you're finished.
2    A  Yes.  Okay.  I've read this.
3    Q  On the second page there's -- it appears to be
4  an e-mail from you to Doctor Dunleavy dated July 10,
5  2012 at 10:04 a.m., correct?
6    A  Yes.
7    Q  This is in fact an e-mail that you wrote,
8  correct?
9    A  Yes.
10    MR. COHEN:  Can you make this Bittel 18.
11    (Whereupon Bittel Exhibit 18 was marked for
12  identification.)
13  BY MR. COHEN:
14    Q  I just want to know if you can confirm that this
15  is your e-mail?
16    A  This is my e-mail.
17    Q  That's all I have.
18    MS. PEET:  I have no questions for you.
19  Thank you very much.
20    (Whereupon the deposition of Helen Bittel
21  concluded at 12:39 p.m.)
22
23
24

1              CERTIFICATE
2  COMMONWEALTH OF PENNSYLVANIA
          ) SS:
3  COUNTY OF WYOMING        )
4    I, Christine A  Messner, do hereby certify that
   before me, a Notary Public in and for the
5  Commonwealth aforesaid, personally appeared Helen
   Bittel, Ph D , who then was by me first duly cautioned
6  and sworn to testify the truth, the whole truth, and
   nothing but the truth in the taking of his oral
7  deposition in the cause aforesaid; that the testimony
   then given by him as above set forth was by me reduced
8  to stenotypy in the presence of said witness, and
   afterwards transcribed by means of computer-aided
9  transcription
     I do further certify that this deposition
10  was taken at the time and place in the foregoing
   caption specified, and was completed without
11  adjournment
     I do further certify that I am not a relative,
12  counsel or attorney of either party, or
   otherwise interested in the event of this action
13
   IN WITNESS WHEREOF, I have hereunto set my hand and
14  affixed my seal of office at Factoryville,
   Pennsylvania, on this ___ day of _____, 2016
15
16  _____
   Christine A  Messner, Notary Public
17  In and for the Commonwealth of Pennsylvania
   My commission expires April 10, 2017
18
         - - -
19
20
21
22
23
24



Page 74

```
 1      COMMONWEALTH OF PENNSYLVANIA )      E R R A T A
        COUNTY OF WYOMING          )       S H E E T
 2
            I, Helen Bittel, Ph.D., have read the foregoing
 3      pages of my deposition given and wish to make the
        following, if any, amendments, additions, deletions or
 4      corrections:
 5      Page/Line   Should Read       Reason for Change
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19      In all other respects, the transcript is true and
        correct.
20
        _____
21      Helen Bittel
22      Subscribed and sworn to before me this _____ day of
        _____, 2016.
23
        _____
24              Notary Public
```

Page 75

```
 1      October 10, 2016
 2      Jackson Lewis
        Three Parkway, 1601 Cherry Street, Suite 1350
 3      Philadelphia, Pennsylvania 19102
        ATTN:  Stephanie J. Peet, Esquire
 4
                NOTICE OF NON-WAIVER OF SIGNATURE
 5
        Please have the deponent read his deposition
 6      transcript.  All corrections are to be noted on the
        preceding Errata Sheet.  Upon completion of the above,
 7      the deponent must affix his signature on the Errata
        Sheet, and it is to then be notarized.  Please forward
 8      the signed original of the Errata Sheet to Jonathan Z.
        Cohen, Esquire, for attachment to the original
 9      transcript, which is in his possession, copying all
        other counsel and myself.
10
        As per the rules, if the witness does not sign the
11      signature page within 30 days after receipt of the
        transcript, signature is deemed waived.
12
13
        Christine A. Messner
14      Court Reporter
15
16
17
18
19
20
21
22
23
24
```



# Exhibit 37

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

> **EXHIBIT**
>
> **37**

- - -

FREDERICK F. FAGAL, JR.        : CIVIL ACTION
                               :
          Plaintiff,           : NO. 3:14-cv-02404-ARC
                               :
     vs.                       : (JUDGE CAPUTO)
                               :
MARYWOOD UNIVERSITY,           :
                               :
          Defendant.           :

— — —

June 28, 2016

- - -

        Oral deposition of Edward Joseph
O'Brien, taken pursuant to notice, was held at
the Radisson Lackawanna Station Hotel, Suite
206, 700 Lackawanna Avenue, Scranton,
Pennsylvania, commencing at 12 p.m., on the
above date, before Judy A. Black, a Registered
Professional Court Reporter and Notary Public in
and for the Commonwealth of Pennsylvania.

- - -

MAGNA LEGAL SERVICES

Seven Penn Center, 8th Floor

1635 Market Street

Philadelphia, Pennsylvania 19103

(866) 624-6221



Page 2

A P P E A R A N C E S :
JONATHAN Z. COHEN, LTD
BY:  JONATHAN Z. COHEN, ESQUIRE
175 Strafford Avenue
Suite 1 PMB 212
Wayne, PA 19087
(215) 874-0047
Attorneys for Plaintiff

JACKSON LEWIS, P.C.
BY:  STEPHANIE J. PEET, ESQUIRE
Three Parkway
1601 Cherry Street, Suite 1350
Philadelphia, PA 19102
(267) 319-7802
Attorneys for the Defendant


ALSO PRESENT:

FREDERICK F. FAGAL, JR.
PATRICIA DUNLEAVY

MAGNA LEGAL SERVICES

---

Page 4

O'Brien-7   Minutes for Ad Hoc Committee      20
    Meeting #2, May 17, 2012, Bates
    Nos  DEF000322-32319
O'Brien-8   E-mail dated May 22, 2012, with   25
    attachments, Bates Nos
    DEF000337-342
O'Brien-9   E-mail chain, Bates Nos           26
    DEF000353-356

O'Brien-10   E-mail chain, Bates Nos          29
    DEF000357-359
O'Brien-11   Document, Bates Nos              30
    DEF000143-144

O'Brien-12   Faculty Grievance Committee      31
    Meeting, June 19, 2012, Bates
    Nos  DEF001510-512

O'Brien-13   E-mail dated June 25, 2012,      35
    Bates No  DEF000393
O'Brien-14   E-mail dated July 2, 2012, with  36
    attachment, Bates Nos
    DEF001515-521
O'Brien-15   E-mail dated July 5, 2012, with  37
    attachment, Bates Nos
    DEF001585-590
O'Brien-16   E-mail dated July 6, 2012, with  40
    attachment, Bates Nos
    DEF001494-496
O'Brien-17   E-mail chain, Bates Nos          45
    DEF001611-615

O'Brien-18   E-mail dated July 15, 2012,      46
    Bates No  DEF001513

MAGNA LEGAL SERVICES

---

Page 3

– – –
I N D E X
– – –

Testimony of:  Edward Joseph O'Brien

DIRECT  CROSS  REDIRECT  RECROSS

By Mr Cohen    6        55
By Ms Peet     52

– – –
E X H I B I T S
– – –

NUMBER      DESCRIPTION              PAGE
O'Brien-1   E-mail, Bates Nos          9
    DEF0003079-30808

O'Brien-2   E-mail, Bates Nos         11
    DEF002978-980
O'Brien-3   E-mail, Bates Nos         12
    DEF003126-127

O'Brien-4   Letter dated February 8, 2012,  13
    with attachments, Bates Nos
    DEF000207-226

O'Brien-5   E-mail dated May 6, 2012, with  15
    attachments, Bates Nos
    DEF001433-442

O'Brien-6   Minutes for Ad Hoc Committee  16
    Meeting #1, May 11, 2012, Bates
    Nos  DEF001408-50915

MAGNA LEGAL SERVICES

---

Page 5

– – –
DEPOSITION SUPPORT INDEX
– – –

Direction to Witness Not to Answer
Page Line     Page Line     Page Line
None


Request for Production of Documents
Page Line     Page Line     Page Line
None


Stipulations
Page Line     Page Line     Page Line
6  1


Question Marked
Page Line     Page Line     Page Line
None

MAGNA LEGAL SERVICES



```
1              - - -
2          STIPULATIONS
3              - - -
4       IT IS STIPULATED by and between counsel
5  that the Deposition of Edward Joseph O'Brien, is
6  being taken pursuant to agreement and that all
7  objections, except as to form, are reserved
8  until the time of trial.  Edward Joseph O'Brien
9  does not waive the reading, signing, and filing
10 of the Deposition.
11             - - -
12 E D W A R D   J O S E P H   O ' B R I E N,
13 having been duly sworn, was examined and
14 testified as follows:
15             - - -
16 DIRECT EXAMINATION BY MR. COHEN:
17     Q.   Good morning, Mr. -- Dr. O'Brien?
18 Should I call you Dr. O'Brien or --
19     A.   Okay.
20     Q.   My name is Jonathan Cohen.  I represent
21 the plaintiff in this litigation, Frederick F. Fagal,
22 Jr., and do you understand that you're under the same
23 oath today as if you were in a courtroom?
24     A.   Yes.
```

```
1      Q.   And have you ever been -- have you ever
2  had a deposition before?
3      A.   No.
4      Q.   So I'm going to be asking questions and
5  you're going to try to answer them.  Sometimes you
6  might be tempted to, you know, anticipate my
7  question, but I would ask that you let me finish
8  because it's difficult for the court reporter to take
9  everything down.  If you don't understand the
10 question, please just say so and I'll try to
11 rephrase.  Also, you might want to wait a second or
12 two before answering a question because your attorney
13 might want to pose an objection.
14          Is there anything like medication that
15 would prevent you from thinking clearly and
16 testifying truthfully today?
17     A.   No.
18     Q.   And if you need a break at any time
19 during the deposition, just please let me know.
20     A.   Okay.
21     Q.   Dr. O'Brien, what is your educational
22 background?
23     A.   I have a doctorate from the University
24 of Massachusetts at Amherst, a master's degree from
```

```
1  the same school, and undergraduate degree from the
2  University of Kansas.
3      Q.   Okay.  And are you currently employed by
4  Marywood University?
5      A.   Yes.
6      Q.   And when did you start your employment
7  with Marywood?
8      A.   1983 -- no.  1983.  Long enough ago
9  where I'm not sure I remember all the time.
10     Q.   And currently you're a tenured
11 professor?
12     A.   Yes.
13     Q.   And when were you -- when did you first
14 earn tenure?
15     A.   That, I would have to look at my resumé.
16 It would have been the late '80s, I would say.
17     Q.   Okay.  And is it fair to say that you
18 know my client, Professor Fagal?
19     A.   Yes.
20     Q.   And when did you first meet Professor
21 Fagal?
22     A.   I don't know.  I mean, it would have
23 been -- I'm guessing, it would have been sometime
24 around our involvement on committees.  We were on
```

```
1  several different committees together.
2      Q.   Okay.
3      A.   But in the 1980s.
4      Q.   Okay.
5      A.   That's a bit of a guess.
6      Q.   Okay.  Did you prepare at all for
7  today's deposition?
8      A.   I -- yes.
9      Q.   Did you review any papers before coming
10 in today?
11     A.   I reviewed the materials with the
12 committee that I was on, the ad hoc committee.  I
13 reviewed notes from Fred to that committee.  I
14 reviewed sections of the faculty handbook and policy
15 and procedures manual.  Those are the things I
16 reviewed.
17         MR. COHEN:  I'd like to make this
18 exhibit O'Brien-1, please.
19         (O'Brien-1, E-mail, Bates Nos.
20 DEF0003079-3080, is received and marked for
21 identification.)
22     Q.   Dr. O'Brien, could you please review
23 this and let me know when you're finished?
24     A.   The font here is too small for me to
```



Page 10

1    read.  I'm assuming this is the memo from --
2        MS. PEET: I don't want you to assume
3    anything.  If you have trouble reading it --
4        A.   I'm having a hard time reading the font
5    here.
6        Q.   Okay.  So at what point on the first
7    page does it become difficult for you to read?
8        A.   After the "to" print, "to Fred Fagal."
9        MS. PEET: For the record, he's pointing
10   towards -- there's the header on the forwarded
11   message and then before the substance of the e-mail.
12       Q.   Okay.  In general, though, is this an
13   e-mail that you're sending to someone named Jean
14   O'Brien dated January 13, 2012?
15       A.   Yes.
16       Q.   And who is Jean O'Brien?
17       A.   My wife.
18       Q.   Okay.  And you're essentially kind of
19   forwarding Fred's -- an e-mail that Fred sent on
20   January 13, 2012, to your wife?
21       A.   Yes.
22       Q.   And you say, "Hold on to your chair
23   while you take this ride."  Are you suggesting that
24   it's -- this is an interesting read or -- what are

MAGNA LEGAL SERVICES

Page 11

1    you suggesting, if anything?
2        A.   I thought she would find it of interest.
3        Q.   Okay.
4        A.   She's also a university professor.
5        Q.   Oh, she is?  At Marywood?
6        A.   No.
7        MR. COHEN:  Make this O'Brien-2, please.
8        (O'Brien-2, E-mail, Bates Nos.
9    DEF002978-980, is received and marked for
10   identification.)
11       Q.   And if you could review this,
12   Dr. O'Brien, and let me know if you recognize this
13   document.
14       A.   Yes.
15       Q.   And is this an e-mail from you to Donald
16   Myers dated January 13, 2012?
17       A.   Yes.
18       Q.   Who is Donald Myers?
19       A.   Don is former department chair at
20   Marywood and a longstanding colleague who had retired
21   at that point and -- but still follows things at
22   Marywood.
23       Q.   He's the chair of your department?
24       A.   Yes.

MAGNA LEGAL SERVICES

Page 12

1        Q.   So you're forwarding Fred's January 13,
2    2012, e-mail outside of Marywood?
3        A.   Yes.
4        Q.   And --
5        A.   Yes.
6        MR. COHEN:  Okay.  Let's mark this as
7    O'Brien-3, please.
8        (O'Brien-3, E-mail, Bates Nos.
9    DEF003126-127, is received and marked for
10   identification.)
11       Q.   Dr. O'Brien, could you please review and
12   let me know if you recognize this document?
13       A.   Yes.
14       Q.   And is eobrien105@gmail.com yourself?
15       A.   Yes.
16       Q.   So did you then forward the e-mail that
17   Fred had sent on January 13th, 2012, on to other
18   people from your personal account?
19       A.   I don't recall.
20       Q.   Okay.  So why did you forward it to
21   yourself?
22       A.   I realized that, you know, this might be
23   the subject of ongoing activity.  I don't even know
24   when this is exactly in terms of the process.  It

MAGNA LEGAL SERVICES

Page 13

1    would be the very beginning.  Seemed to me like it
2    was something that was liable to raise issues, so I,
3    you know, sent it to myself rather than, you know,
4    corresponding through Marywood e-mail.
5        Q.   Okay.  Do you recall serving on a
6    faculty senate ad hoc hearing committee regarding
7    Professor Fagal in 2012?
8        A.   Yes.
9        Q.   And what was the purpose of that
10   committee?
11       A.   To adjudicate disposition of Fred's
12   suspension and dismissal from Marywood.
13       MR. COHEN:  Let's mark this as
14   O'Brien-4.
15       (O'Brien-4, Letter dated February 8,
16   2012, with attachments, Bates Nos. DEF000207-226, is
17   received and marked for identification.)
18       Q.   Do you recognize this document,
19   Dr. O'Brien?  You could take a few moments to review
20   it.
21       A.   It appears to be a letter to Fred from
22   Sister Anne Munley.
23       Q.   A letter from Fred to Sister Anne Munley
24   or the other way around?

MAGNA LEGAL SERVICES



4  (Pages 10 to 13)

1    A.   To Fred from Sister Anne Munley.

2    Q.   Have you seen that document before?

3    A.   I don't recall.  I assume -- well, I --

4  I don't recall.

5    Q.   Okay.  This faculty ad hoc -- faculty

6  senate ad hoc committee that was convened in 2012

7  that you were a part of, who else was part of that?

8    A.   Helen Bittel and -- a senior moment.  A

9  faculty member from the art department.

10    Q.   And is it your recollection that

11  President Munley had issued a statement of charges

12  to --

13    A.   Yes.

14    Q.   -- Professor Fagal, and your committee

15  was -- its job was to adjudicate whether they could

16  support these charges, correct?

17    A.   Yes, yes.

18    Q.   And do you remember whether these

19  charges were in writing somewhere?

20    A.   Sitting here today, I don't -- I don't

21  remember the chain of comments that were available at

22  that time.

23    Q.   Okay.  But the document that was placed

24  in front of you a moment ago -- what exhibit is that,

1  O'Brien-4?  That's not something you reviewed today?

2  I mean in preparation for your deposition.

3    A.   No.

4    MR. COHEN:  Let's make this O'Brien-5,

5  please.

6    (O'Brien-5, E-mail dated May 6, 2012,

7  with attachments, Bates Nos. DEF001433-442, is

8  received and marked for identification.)

9    Q.   If you could take a moment to review and

10  let me know whether you recognize this document.

11    A.   Yes, I do.

12    Q.   And what is this?

13    A.   It's an e-mail from Fred to the

14  committee outlining his defense against the charges.

15    Q.   Okay.  And when you say the committee,

16  you mean --

17    A.   Ad hoc.

18    Q.   The ad hoc senate committee?

19    A.   Yes.

20    Q.   And you remember receiving this?

21    A.   No, but I --

22    Q.   But you remember seeing it?

23    A.   Yes.

24    Q.   Okay.  Before we move on to the next

1  exhibit, do you remember having any reaction to

2  having seen that document before today?

3    A.   In what way?  I don't know what you

4  mean.

5    Q.   Amusement, disgust, interest?

6    MS. PEET:  When you're talking about the

7  document, you're talking about O'Brien-5?

8    MR. COHEN:  Yes.

9    Q.   If you don't remember, that's --

10    A.   Well, it would have been part of our

11  committee work, so --

12    Q.   So, no, you don't remember having any

13  particular reaction to reading this?

14    A.   Other than I would have taken it very

15  serious.

16    Q.   Okay.

17    MR. COHEN:  Let's mark this O'Brien-6.

18    (O'Brien-6, Minutes for Ad Hoc Committee

19  Meeting #1, May 11, 2012, Bates Nos. DEF001408-509,

20  is received and marked for identification.)

21    Q.   And, Dr. O'Brien, could you review this

22  and let me know whether you recognize it?  It's

23  double-sided.

24    A.   Again, the font size is small.  My wife

1  keeps telling me I need to get glasses, and this

2  suggests to me that that might be a good argument.

3  My eye doctor, though, says I don't need glasses,

4  so --

5    It appears to be comments that -- that

6  related to minutes from the ad hoc committee meeting

7  number one.

8    Q.   Are they your comments on the right?

9    A.   I'm not sure.

10    Q.   You're not sure because you can't read

11  them?

12    A.   Because I can't read them.

13    Q.   Okay.  And just to be clear, you can't

14  read anything on this page?

15    A.   I can mainly read the document itself.

16  It's the comments that I have particular trouble

17  with.

18    Q.   Okay.  In the first paragraph, last

19  sentence, do you see where it says, "Helen knows FF

20  casually from working in the same building"?

21    A.   Yes.

22    Q.   And it says, "Some of her conversations

23  with him have been, quote, strange, but their

24  relationship has been collegial."  Do you remember



1    whether Helen told you what she meant by "strange"?
2        A.    No.
3        Q.    At the bottom of the first page, it says
4    "5/3," for May 3rd, "AHC meets with HR and Sister
5    Gail."
6            Do you recall your committee meeting
7    with HR and Sister Gail at some point?
8        A.    Yes.
9        Q.    And do you remember what was discussed
10   at this meeting?
11       A.    I don't actually recall if Sister Gail
12   was at the meeting or if it was two separate
13   meetings.  The meeting with HR, I believe, was with
14   Dr. Dunleavy essentially giving our charge to the
15   committee, why you're meeting, here's some
16   guidelines, confidentiality, things that you should
17   look at in adjudicating this.
18       Q.    Do you remember asking or do you
19   remember anybody on your committee asking
20   Dr. Dunleavy whether there would be two committees,
21   one to review Professor Fagal's suspension and one
22   for reviewing the termination?
23       A.    No, I don't --
24            MS. PEET:  Object to the form.

1        Q.    You don't remember?
2        A.    I don't remember that being part of that
3    meeting.
4        Q.    Oh, you don't?  Okay.
5        A.    I don't remember much about that
6    meeting.  That was a general charge to us and giving
7    some background.
8        Q.    Do you remember at that meeting
9    discussing the possibility of talking to someone
10   named Will Anthony?
11       A.    No.
12       Q.    Does that name ring a bell?
13       A.    I believe that he was an attorney
14   involved.
15       Q.    A minute ago I asked you if you
16   remembered discussing at this meeting with HR the
17   possibility of talking to Will Anthony, and I think
18   you said no.  Do you remember ever talking to Will
19   Anthony?
20       A.    I'm not certain.  If we did -- I know we
21   talked about it, but I don't recall if we did.
22       Q.    Okay.
23       A.    One of the things that happened, I
24   believe, was that Helen was the chair of the

1    committee, and some of the work of the committee
2    involved her being a liaison with Dr. Dunleavy, and
3    possibly with Will Anthony but, again --
4        Q.    But you don't know?
5        A.    I don't remember specifically in this
6    case.
7            MR. COHEN:  Let's mark this O'Brien-7,
8    please.
9            (O'Brien-7, Minutes for Ad Hoc Committee
10   Meeting #2, May 17, 2012, Bates Nos. DEF000322-323,
11   is received and marked for identification.)
12       Q.    Now, I'd like you to actually review
13   this document, actually read it to yourself instead
14   of just briefly, and I'm going to ask you about it.
15           And, Dr. O'Brien, do you recognize this
16   document?
17       A.    Yes.
18       Q.    Did you have any role in actually
19   generating this document?
20       A.    I'm not certain.  I mean, I -- I'm not
21   certain.  I would have read it and reacted to it.
22       Q.    To be clear --
23       A.    Whether I had comments about it, I don't
24   know.

1        Q.    To be clear, this document consists of
2    minutes of an ad hoc committee meeting that took
3    place on May 17, 2012, right?
4        A.    Yes.
5        Q.    And do you remember whose job it was, if
6    anybody's, to take minutes of these meetings?
7        A.    I believe Helen took the minutes.  I'm
8    not -- I'm not positive, though.
9        Q.    Do you remember taking any handwritten
10   notes or any type of notes at these meetings?
11       A.    I could have taken some notes but not
12   ones that I -- that I kept or did anything with,
13   other than in the process of commenting on, on the
14   minutes.
15       Q.    But you don't know whether you kept any
16   notes, right?
17       A.    I would not have kept those handwritten
18   scribbles, I would call them.
19       Q.    All right.  Do you actually have any
20   memory of -- having read this document, do you have
21   any memory of this particular meeting?
22       A.    Yes, I do.
23       Q.    And do you take issue in any way with
24   the accuracy of these minutes?



1    A.    Well, I have a bit of a question about
2  termination versus suspension, exactly how that was
3  understood at the time.
4    Q.    Let's back up.  Which area?  And point
5  to me or direct me to the place on this document, if
6  you have some questions about the accuracy.
7    A.    It would be the fourth paragraph from
8  the bottom of the first page.
9    Q.    Starting with, "The FGC informally"?
10    A.    Yes.
11    Q.    What is it about this paragraph that you
12  question the accuracy?
13    A.    My recollection is that -- that we were
14  paying attention to both suspension and termination,
15  but the substance of the termination charge was the
16  most important.  That was the focus, but -- it says,
17  "The FGC informally via Sister Gail advised" -- it
18  seems a little confusing, that paragraph.  I don't
19  recall how that was -- how that was reflected in the
20  meeting discussion.
21    Q.    And a minute ago, I think you said that
22  you recall your committee's role as reviewing the
23  substance of Professor Fagal's discipline, and you
24  mean as opposed to the procedure?

MAGNA LEGAL SERVICES

1    A.    Yes.
2    Q.    And what led you to believe that that --
3  that your committee's role was reviewing the
4  substance and not the procedure?
5    A.    Our discussions, our review of
6  university policy documents, discussion with Erin
7  Sadlack in this meeting.  That was part of the
8  process of delineation of what were the overlapping
9  responsibilities of the committees, what were the
10  separate responsibilities of the committees.  One of
11  the purposes of this meeting was to just clarify how
12  these two processes would relate to one another,
13  preserving their independence but also trying to not
14  duplicate one another's work if that wasn't
15  necessary.
16        And I assume there's documentation about
17  what Dr. Sadlack's committee -- we were not privy to
18  their, nor did we ask for their process or their --
19  their notes and working documents.  We didn't want to
20  be unduly influenced by their deliberations.  So that
21  was part of the differentiation, separation of the
22  two committees.  We didn't want our committee to just
23  repeat what their committee had reviewed, so we
24  wanted to do our own independent work.

MAGNA LEGAL SERVICES

1    Q.    Okay.  Do you ever recall yourself or
2  anyone on your committee communicating to Professor
3  Fagal this view of the role of your committee being
4  only a substantive review as opposed to procedural
5  review?
6        MS. PEET:  Objection to the form.
7    Q.    You can answer.  Unless your attorney
8  says --
9        MR. FABER:  I'm sorry, yes.  You can go
10  ahead and answer.  I'll tell you when you can't
11  answer.
12    A.    Okay.  Can you repeat the question?  I'm
13  not sure what you're asking.
14    Q.    Sure.  A minute ago I think you
15  testified that your view of the role of your
16  committee was to review the substance of Professor
17  Fagal's discipline, not the procedure.  Am I correct?
18    A.    I'd say it was more primary to focus on
19  the substance, define the disposition of the charges
20  and --
21    Q.    Do you know whether Professor Fagal was
22  made aware by anyone on the committee of that
23  limitation, that the committee would only review --
24  or primarily review substantive -- the substantive

MAGNA LEGAL SERVICES

1  discipline?
2    A.    No, I don't know.
3    Q.    Okay.
4        MR. COHEN:  Could you have this marked
5  as O'Brien-8, please?
6        (O'Brien-8, E-mail dated May 22, 2012,
7  with attachments, Bates Nos. DEF000337-342, is
8  received and marked for identification.)
9    Q.    Dr. O'Brien, do you recognize the
10  document that has just been placed before you?
11    A.    It appears to be a note from me to Helen
12  regarding minutes from the first two meetings.
13    Q.    And attached to this note are these
14  minutes with comments, correct?
15    A.    Yes.
16    Q.    And do you know whether any of these
17  comments were ever formally adopted into, like, a
18  final version of the minutes?
19        MS. PEET:  Objection to the form.
20    A.    No.  I would -- well, I would assume
21  we -- in a subsequent meeting or by e-mail we would
22  have discussed these and approved revised minutes, I
23  believe.  So I don't have any reason to think they
24  weren't considered.  Which ones were accepted or not

MAGNA LEGAL SERVICES



1    accepted, I don't know.
2         MR. COHEN:  Mark this as O'Brien-9,
3    please.
4              (O'Brien-9, E-mail chain, Bates Nos.
5    DEF000353-356, is received and marked for
6    identification.)
7         Q.    And do you recognize this document?
8         A.    Not clearly.
9         Q.    You don't recognize it?
10        A.    I don't recognize what it is exactly.
11   There seems to be a lot of back and forth.  Where it
12   actually came from, where it went to at what point is
13   not clear to me.
14        Q.    Okay.  On the first page -- I realize
15   this is a chain of e-mail, but on the first page, do
16   you see where it says on Saturday June 2nd, 2012, at
17   9:52 a.m., Dr. Edward J. O'Brien?
18        A.    Okay, down at the bottom.  Yes, I do.
19        Q.    And do you recognize what follows to be,
20   in fact, an e-mail that you sent?
21        A.    Yes, I recognize this as what I sent.
22        Q.    This paragraph that begins, "My current
23   inclination," do you see that?
24        A.    Yes.
MAGNA LEGAL SERVICES

1         Q.    And you list four questions or topics
2    that you want to talk to Sister Anne about.  Am I
3    correct?
4         A.    Yes.
5         Q.    Do you remember actually asking those
6    questions of Sister Anne or whether anyone on the
7    committee asked these questions of Sister Anne?
8         A.    I'm not certain.  I don't think our
9    committee met with Sister Anne.  Whether Helen met
10   with her, I just don't recall.  Like I said before,
11   part of the way the committee worked was that because
12   she was chair of the committee, Helen would be
13   liaison with different individuals.
14        Q.    Okay.
15        A.    Whether she informed them in this case
16   or not, I don't recall sitting here today.
17        Q.    And in the next paragraph, you see where
18   it says, "I also think we may want to interview"?
19        A.    Yes.
20        Q.    And you're suggesting interviewing
21   Professor Fagal by phone here, correct?
22        A.    Yes.
23        Q.    Do you remember actually doing that?
24        A.    No.
MAGNA LEGAL SERVICES

1         Q.    Do you remember whether there was
2    just -- do you remember whether anyone interviewed
3    Fred over the phone, Fred Fagal?
4         A.    I don't -- I don't know, but I -- I
5    don't know.  I don't believe so.
6         Q.    Do you know why?
7         A.    My recollection is that in the
8    discussion of the committee, we came to the consensus
9    that we had the answers to these questions as part of
10   our -- Fred's written response to the committee, and
11   exactly why we didn't interview him, I -- I think we
12   felt like we had sufficient information to make our
13   determination.
14              Would you locate this in time?  Where is
15   this in relation to the meetings of the committee?
16   Do you have a list of the dates of the meetings of
17   the committee?
18        Q.    I did.
19        A.    Would this have been --
20        Q.    Well, I'll get to that.
21        A.    Okay.  In my mind, that's part of what
22   I'm not certain about, is exactly where this happened
23   in the context of the discussions we had.
24        Q.    Do you remember whether your committee
MAGNA LEGAL SERVICES

1    kept Dr. Dunleavy up to date about the progress you
2    were making?
3         A.    Not in any exact way.
4              MR. COHEN:  Mark this O'Brien-10.
5              (O'Brien-10, E-mail chain, Bates Nos.
6    DEF000357-359, is received and marked for
7    identification.)
8         Q.    Specifically, Dr. O'Brien, I'd like you
9    to pay attention to what's on page 2.  They're
10   double-sided.  There's an e-mail from you dated
11   June 7, 2012, at 12:46 p m.  Do you see that?
12        A.    Yes.
13        Q.    And could you read this to yourself and
14   let me know when you're finished?
15        A.    Okay.  Okay.
16        Q.    Now, in the paragraph that begins with
17   the word, "Second, I think that we should contact
18   Fred," do you see that?
19        A.    Yes.
20        Q.    And then it goes on to say,
21   "Hopefully Pat Dunleavy provided him with the minutes
22   from that meeting and we can just ask him to offer
23   any additional comments or reactions to these
24   minutes."  Correct?
MAGNA LEGAL SERVICES



Page 30

1    A.    Yes.
2    Q.    I'm going to pass you an exhibit. It's
3 already marked as Sadlack-5, but let's also mark it
4 as O'Brien-11.
5         (O'Brien-11, Document, Bates Nos.
6 DEF000143-144, is received and marked for
7 identification.)
8    Q.    Are these the minutes you're referring
9 to? That's double-sided, too.
10   A.    I believe so.
11   Q.    You believe so?
12   A.    Yes.
13   Q.    And why would you be concerned if
14 Professor Fagal was not given a copy of those
15 minutes?
16        MS. PEET: Objection to the form.
17   Q.    You can answer.
18   A.    Just what was Fred's perception of the
19 meeting and do these minutes accurately reflect his
20 perception of the meeting.
21   Q.    Well, I'm not sure if that answers the
22 question. Why would you be concerned if he didn't
23 have a copy of those minutes? I understand what the
24 purpose of showing him the minutes would be, but
                MAGNA LEGAL SERVICES

Page 31

1 correct me if I'm wrong, in this -- in your e-mail
2 dated June 7th, you say, "Hopefully Pat Dunleavy
3 provided him with the minutes from that meeting. If
4 he was not provided with copy of these minutes, I
5 would be a bit concerned."
6         My question is: Why would you be a bit
7 concerned?
8    A.    Just the accuracy of the minutes would
9 be a question we'd have.
10        MR. COHEN: Mark this as O'Brien-12.
11        (O'Brien-12, Faculty Grievance Committee
12 Meeting, June 19, 2012, Bates Nos. DEF001510-512, is
13 received and marked for identification.)
14   Q.    And, Dr. O'Brien, I'd like you to read
15 this to yourself and let me know when you're
16 finished.
17   A.    Okay.
18   Q.    And do you recognize this document?
19   A.    Yes.
20   Q.    What is it?
21   A.    It's essentially minutes of our
22 June 19th meeting and kind of an outline of what
23 would be in the final report of the committee.
24   Q.    Do you have any reason to doubt the
                MAGNA LEGAL SERVICES

Page 32

1 accuracy of these minutes?
2    A.    No.
3    Q.    In the first sentence that begins,
4 "First we reviewed the minutes," do you see that?
5    A.    Yes.
6    Q.    Does this refresh your recollection at
7 all about whether your committee met with Sister
8 Munley?
9    A.    Apparently we did.
10   Q.    Do you remember what was discussed at
11 that meeting?
12        MS. PEET: Objection to the form.
13   A.    I don't remember the meeting. I don't
14 remember the meeting.
15   Q.    On the third paragraph, the one that
16 begins, "We then took our first vote," do you see
17 that?
18   A.    Yes.
19   Q.    The last sentence of that paragraph says
20 "Povse" -- is that how you pronounce his name?
21   A.    Povse.
22   Q.    "Povse expressed agreement with these
23 but also wondered whether the administration has
24 since had any second thoughts about their decision."
                MAGNA LEGAL SERVICES

Page 33

1 Did I read that correctly?
2    A.    Yes.
3    Q.    And do you remember anything more about
4 Povse's statements in this regard?
5    A.    No.
6    Q.    On the last page, second to last
7 paragraph, it says, "Povse will contact Anne Munley
8 and apprise her of our progress." Do you see that?
9    A.    Yes.
10   Q.    Was there any decision to keep Professor
11 Fagal apprised of your committee's progress?
12   A.    I don't recall.
13   Q.    Did you see your role -- did you see the
14 role of your committee as simply going through the
15 motions of sort of rubber-stamping President Munley's
16 decision?
17   A.    No.
18   Q.    Did you see your role as more
19 independent, that you were going to rule the way you
20 felt regardless of how President Munley felt?
21   A.    Yes.
22   Q.    Last sentence says, "After we workshop
23 our draft, we will send it to Will Anthony for
24 comment. Is he an independent voice or does he work
                MAGNA LEGAL SERVICES



1  for Munley/Marywood."  Do you see that?
2      A.   Yes.
3      Q.   Did you, in fact, send a draft to Will
4  Anthony?
5      A.   I don't know.  That would be something
6  that Helen would have been the liaison with him.  I
7  don't know if he saw it or not.
8      Q.   If your committee is supposed to be
9  independent, why would you want to give the
10  university's lawyer a chance to review, you know, the
11  draft of what you were doing first?
12      MS. PEET:  Objection to form.
13      Q.   You can answer.
14      A.   What it says here is we were asking for
15  comment.
16      Q.   Do you remember asking me for comment on
17  the draft?
18      A.   No.
19      Q.   Well, why would you want the
20  university's lawyer to comment on a draft of what you
21  were doing but not the other side?
22      MS. PEET:  Objection to the form.
23      A.   I don't know.  I don't have an answer to
24  that.

1      MR. COHEN:  Let's have this marked as
2  O'Brien-13.
3      (O'Brien-13, E-mail dated June 25, 2012,
4  Bates No. DEF000393, is received and marked for
5  identification.)
6      Q.   Dr. O'Brien, could you take a moment to
7  review this and let me know when you're finished?
8      A.   Okay.
9      Q.   And this is an e-mail from Mathew Povse
10  to Sister Anne Munley dated June 25th, 2012, correct?
11      A.   Yes.
12      Q.   And you and Helen Bittel are copied on
13  the e-mail, correct?
14      A.   Yes.
15      Q.   Do you remember receiving this?
16      A.   Not specifically, but I did.
17      Q.   Does this refresh your recollection at
18  all about whether Will Anthony received a draft of
19  your response?
20      A.   Apparently he did receive a copy, or was
21  asked to comment.
22      Q.   Do you remember whether he did, in fact,
23  comment?
24      A.   No.  Today, I don't recall.

1      Q.   Do you know whether Mathew Povse or
2  anyone else on the committee sent, you know, a
3  similar e-mail to Frederick Fagal providing this kind
4  of update and saying, by the way, we're going to rule
5  in favor of President Munley?
6      A.   No, I don't know.
7      Q.   You know that you didn't send an e-mail
8  like this, right, to Professor Fagal?
9      A.   No.  No.  Not that I recall.
10      Q.   Why didn't you send a similar e-mail to
11  Professor Fagal stating essentially the same as what
12  professor -- about what President Munley was told?
13      A.   I don't recall the reasoning for that at
14  the time.
15      MR. COHEN:  Can we take a 5-, 10-minute
16  break?
17      MS. PEET:  Sure.
18      (A recess is taken.)
19      (O'Brien-14, E-mail dated July 2, 2012,
20  with attachment, Bates Nos. DEF001515-521, is
21  received and marked for identification.)
22      Q.   Dr. O'Brien, could you briefly review
23  and let me know whether you recognize this document
24  and the attachment, as well?

1      A.   Yes.  I'm not quite sure what the
2  markings are on the left-hand side.
3      Q.   Are you talking about in the attachment?
4      A.   No.  The document I have, there are,
5  like, markings on the left-hand side that look like
6  they're comments, but the comments aren't there.  I
7  don't know whether it's a draft or a final.
8      Q.   That's a question I'm going to ask you,
9  if you know whether this was a draft or final,
10  because it looks like from the first page, from
11  Ms. Bittel to Munley, that she intended it to be
12  final, but it doesn't look final, so do you know
13  whether this was final?
14      A.   No.  I have a copy of the final but I
15  just -- I wouldn't know just from looking at it.  The
16  markings on the left make me think there might have
17  been some comments, comments that were in an earlier
18  draft that maybe had been taken out or addressed
19  somehow.
20      Q.   Okay.
21      MR. COHEN:  Let's mark this as
22  O'Brien-15.
23      (O'Brien-15, E-mail dated July 5, 2012,
24  with attachment, Bates Nos. DEF001585-590, is



1  received and marked for identification.)
2      Q.   Do you recognize this e-mail and the
3  attachment?
4      A.   This looks like the final version with
5  Helen's explanation of what happened.
6      Q.   Helen says to Sister Munley here,
7  "Hopefully this one will work. I'll ask Mat to edit
8  it and sign the hard copy, as well."
9           Do you remember actually signing a hard
10 copy?
11     A.   No.
12     Q.   No, you didn't, or you don't remember?
13     A.   I don't remember.
14     Q.   Do you remember whether your committee
15 reviewed whether Professor Fagal's suspension was
16 proper?
17     A.   My recollection was that we reviewed
18 both the suspension and the termination kind of as
19 one event. They were so close in proximity, but,
20 again, I defer to whatever we said in the document as
21 whenever the termination was.
22     Q.   Coming back to this -- the final version
23 of the faculty senate ad hoc hearing committee
24 review, you see paragraph A begins, "We acknowledge

1  that revocation of tenure"?
2      A.   Yes.
3      Q.   And further down the paragraph, it says,
4  "We are mindful of the potential or perceived threat
5  to academic freedoms when a speech violation leads to
6  revocation of tenure." Do you see that?
7      A.   Yes.
8      Q.   What did you mean by this sentence?
9           MS. PEET: Objection to the form.
10     A.   That faculty have a right to, in terms
11 of academic freedom, speak freely, and any limitation
12 to that is something to be took very seriously. And
13 that's the reason for tenure, that people can speak
14 freely.
15     Q.   In paragraph C, it says, "Dr. Fagal was
16 given the opportunity to explain his video in his
17 meeting with Sister Anne Munley." Do you see that?
18     A.   Yes.
19     Q.   Was your committee informed that
20 Dr. Fagal had asked for an opportunity to respond in
21 writing to President Munley?
22     A.   I don't recall.
23     Q.   Also in paragraph C, the last sentence,
24 it says, "The faculty grievance committee has already

1  determined that Sister Anne Munley followed
2  appropriate procedure in moving directly to
3  termination." Do you see that?
4      A.   Yes.
5      Q.   Does this sentence refresh your
6  recollection over whether your committee actually did
7  consider the suspension or whether they just
8  considered termination?
9           MS. PEET: Objection to form,
10 mischaracterization of testimony. You can answer.
11     A.   The procedure -- procedural issue is one
12 thing. The substantive issue was what I think we
13 were focused on, and I think the substantive issue
14 was essentially the same with regard to suspension
15 and revocation or termination. So the timing of the
16 two, I think, is what's being referenced there, that
17 determined had followed appropriate procedure, that
18 she could have done things in that order
19 procedurally. We didn't adjudicate that, but the
20 substance of her decision was more the focus of our
21 work. The timing of when she did things was less the
22 focus of what of what we attended to.
23          MR. COHEN: Let's mark this O'Brien-16.
24          (O'Brien-16, E-mail dated July 6, 2012,

1  with attachment, Bates Nos. DEF001494-496, is
2  received and marked for identification.)
3      Q.   If you could read this to yourself and
4  let me know when you're finished, Dr. O'Brien.
5      A.   Is this final page part of what I'm
6  reading now?
7      Q.   Um-hum.
8      A.   Okay.
9      Q.   So in this first document, this e-mail,
10 this is from Professor Fagal to your committee dated
11 July 6, 2012, correct?
12     A.   Yes.
13     Q.   Do you remember receiving this?
14     A.   Yes.
15     Q.   And in this e-mail, Dr. Fagal requested
16 that your committee convene to review the
17 appropriateness of his suspension, correct?
18     A.   He raises a number of different issues,
19 but that was one of them.
20     Q.   Your committee did not, in fact, convene
21 to review the suspension, correct?
22          MS. PEET: Objection to the form,
23 mischaracterization of testimony.
24     A.   I don't know if we met after this. I'd



Page 42

1  have to look at the record and I don't have that in
2  front of me.  Whether we met or talked, e-mailed, I
3  don't, sitting here, remember what we had -- what
4  deliberations we did.  We did discuss it.
5      Q.   Discuss what?
6      A.   The reaction to his -- his message.
7      Q.   And what was -- what specifically was
8  said during that discussion?
9      A.   I need something to refresh my memory.
10  I don't have an independent memory of what that
11  discussion was, other than that we were not persuaded
12  by, you know, Fred's e-mail message.
13      Q.   And were you aware that Sister Cabral
14  and Sister Anne had determined that the committee be
15  convened, once to review the suspension, once
16  the termination?
17      MS. PEET:  Objection to the form, lack
18  of foundation.
19      You can answer.
20      A.   Can you repeat the question?
21      Q.   Were you aware that Sister Cabral and
22  Sister Anne had determined that the committee be
23  convened twice, once to review the suspension and
24  once to review the termination?

MAGNA LEGAL SERVICES

Page 43

1      MS. PEET:  Same objection.
2      A.   My recollection is that those two
3  issues, the substance of those two issues was part of
4  our deliberation.  Exactly how that was communicated
5  to us and by whom, I don't, sitting here today,
6  remember exactly how that was communicated to us.
7      Q.   So you do know that -- you said that
8  someone did communicate to you that the committee was
9  to be convened twice, once for the --
10      A.   Well, not that -- we considered both,
11  the suspension and the termination.
12      Q.   I know that.  My specific question is:
13  Do you have any recollection of anyone, Sister Cabral
14  or Sister Anne, telling your committee that it was to
15  be convened twice, once for the suspension and once
16  for the termination?
17      MS. PEET:  The way you asked the
18  question, it assumed that it actually happened and
19  that you're just asking him if he remembers that
20  happened.  It's a very inappropriate question.  It's
21  going to be very poorly received on the record, so
22  I'm going to ask that you rephrase that question in a
23  way that it doesn't assume facts not in evidence and
24  it has some foundation to it.

MAGNA LEGAL SERVICES

Page 44

1      Q.   Did you understand that question,
2  Dr. O'Brien?
3      A.   No.  Specifically what you're asking,
4  I'm not sure.  I mean, we were -- we were discussing
5  as a committee both the suspension and the
6  termination.  They were so closely related in time
7  that I don't know that we had a formal, now we're
8  talking about this and we're going to have a separate
9  convening of the committee.  We were discussing both
10  as part of our deliberation process, the substance of
11  both, not the procedures.  That was the other
12  committee -- Erin's committee had evaluated the
13  procedural parts of that.  The substantive parts of
14  that is what I understood we were adjudicating.
15      Q.   I understand your testimony.  My
16  question is different, and I think it's clear, but
17  I'll restate it.
18      Do you remember anybody telling your
19  committee that it was to convene twice, once for
20  Professor Fagal's suspension and once for the
21  termination?
22      MS. PEET:  Objection to the form, lack
23  of foundation.  Same objection.  You can answer.
24      A.   I don't -- I don't recall.

MAGNA LEGAL SERVICES

Page 45

1      MR. COHEN:  Let's call this O'Brien
2  Exhibit 17.
3      (O'Brien-17, E-mail chain, Bates Nos.
4  DEF001611-615, is received and marked for
5  identification.)
6      Q.   Specifically I'd like you to look at
7  page 3.  There's an e-mail from you dated Monday,
8  July 9, 2012, at 1:10 p.m.  Do you see that?
9      A.   Yes.
10      Q.   Can you read that to yourself and let me
11  know when you're finished?
12      A.   Okay.
13      Q.   When you refer to the university
14  attorney, did you mean Will Anthony?
15      A.   I believe so.  I'm not sure.
16      Q.   And why did you think that you would be
17  wise to contact the university attorney?
18      A.   I think I'm addressing next steps, what
19  the next steps of the committee process would be.
20  What are the next steps?
21      Q.   Do you remember after sending this
22  e-mail whether the university attorney was ultimately
23  contacted by the committee?
24      A.   No.  I don't recall.

MAGNA LEGAL SERVICES



1    Q.   Okay.
2         MR. COHEN:  Let's make this O'Brien-18.
3         (O'Brien-18, E-mail dated July 15, 2012,
4    Bates No. DEF001513, is received and marked for
5    identification.)
6    Q.   Do you recognize this document?
7    A.   Yes.
8    Q.   And this is an e-mail you received
9    from -- well, you were copied on from Helen Bittel
10   dated July 15, 2012?
11   A.   Yes.
12   Q.   And this is essentially you're
13   explaining to President Munley how you would respond
14   to Professor Fagal's July 6, 2012, e-mail request,
15   correct?
16   A.   Yes.
17   Q.   And the decision was really not to
18   respond to him at all, right?
19   A.   I decided against responding to his
20   request, yes.
21   Q.   And you have five bullet points here
22   containing determinations, correct?
23   A.   Yes.
24   Q.   And did anybody other than the committee

1    members themselves provide guidance to the committee
2    in reaching these determinations?  For example --
3    A.   I don't -- I don't recall.
4    Q.   Okay.
5    A.   These seem to be reiterations of things
6    that were in our adjudication, and we already
7    discussed them, so they seem to be reiterations of
8    what we had already concluded.
9    Q.   Having reviewed today some documents
10   showing that Marywood's administration and attorneys
11   were updated with your progress, the committee's
12   progress along the way, and ultimately saw a draft of
13   your decision, do you still feel that your committee
14   was independent?
15        MS. PEET:  Objection to the form,
16   mischaracterization of testimony.  You can answer.
17   A.   Yes.
18   Q.   You wouldn't do anything differently?
19   A.   With regard to that, I don't -- I don't
20   think so.  We weren't asking for review or permission
21   or -- our questions were more procedural kind of
22   questions rather than you, know, here's where we are
23   in the process.  There's --
24        MS. PEET:  To the extent you had any

1    communications with attorneys -- and I think you've
2    already testified to you don't recall having any -- I
3    don't want you to disclose those communications for
4    this.  If it's without attorneys, you can absolutely
5    and should speak further.
6    Q.   So just to be clear, your testimony is
7    that -- we'll start with you.  You don't remember
8    talking with any university attorney.  Even if you
9    did, I'm not asking what was said.  The question is:
10   You don't remember personally communicating with any
11   university attorney?
12   A.   If there was communication, it would
13   have been through Helen and could have been in a
14   conference call, but I don't recall details outside
15   of committee meetings or --
16   Q.   Outside or inside, you don't remember?
17   A.   No.  I remember that I didn't have
18   contact with attorneys outside.
19   Q.   But you seem to remember that Helen
20   Bittel did?
21   A.   I'm describing that as a general
22   principal, her role as chair of the committee, as I
23   said before, involved being a liaison with, you know,
24   Pat Dunleavy, with Sister Anne at times.  That was

1    part of her role, was to be the conduit of
2    communication back and forth.  And a lot of it had to
3    do with timing.  There's a timing as to the process
4    that we were all concerned with.
5    Q.   In your committee, were you shown
6    letters that Will Anthony and I had exchanged about
7    Professor Fagal?
8    A.   I don't recall.
9    Q.   Were you aware that at that time
10   Professor Fagal had an attorney and was essentially
11   telling President Munley that her actions were
12   unauthorized?
13   A.   I believe so.  I think in some of Fred's
14   communications to the committee, that was -- that was
15   referenced.
16   Q.   And were you aware that president --
17   that Marywood's attorney, Will Anthony, had disagreed
18   with Fred's arguments in letters to me?
19        MS. PEET:  Objection to form.
20   A.   I don't have a recollection of any
21   particular letters like that.  But, I mean, I -- I'm
22   happy to have these things recollected to me.  This
23   happened several years ago.  I find I can react more
24   specifically when I have rec -- you know, these kind



1  of documents refreshing my memory.
2      Q.   This is a hypothetical question. I
3  realize it might not have happened. If your
4  committee had received legal guidance to the effect
5  that progressive discipline at Marywood was required
6  in every case and that you could not simply skip
7  directly to termination and that remediation was
8  required, attempted remediation was required in every
9  instance, would you have voted the way you did to
10  support President Munley's actions?
11         MS. PEET: Objection to the form. Calls
12  for speculation, assumes tons of facts not in
13  evidence, including the fact that he got legal
14  advice, that progressive discipline is required in
15  every case, that you can't skip progressive
16  discipline, and that remediation is required. But
17  given -- assuming that the sun and Mars -- the sun
18  and the moon and Pluto line up and you know the
19  hypothetical answer --
20     Q.   That's what a hypothetical is. A
21  hypothetical is asking you to make certain
22  assumptions.
23         Do you need me to rephrase?
24     A.   Yeah.

1      Q.   Okay. Hypothetically, if your committee
2  had received legal guidance stating that progressive
3  discipline was required in every case and that the
4  university had to make an attempt to offer
5  remediation to the disciplined professor, would you
6  have voted the way you did to support President
7  Munley's actions?
8         MS. PEET: Same objections.
9     A.   I don't know.
10     Q.   What would you -- do you need to know
11  more information or are you just -- you just don't
12  know how you would have voted?
13     A.   I don't. It's not what happened, so I
14  don't have an opinion about, you know --
15         MR. COHEN: Let me just take a
16  one-minute break. I'll be right back.
17         (A recess is taken.)
18     Q.   Back on the record.
19         Did Helen Bittel ever tell you that she
20  had communicated with Marywood's attorneys?
21     A.   I believe so. I believe she did.
22         MR. COHEN: Okay. I have nothing
23  further.
24         MS. PEET: I have some questions.

1  CROSS-EXAMINATION BY MS. PEET:
2      Q.   Dr. O'Brien, if you can look at
3  Exhibit 7, if you don't mind, in the middle of the
4  page with the paragraph that starts, "She explained."
5     A.   Yes.
6      Q.   And the "she," I believe, is Erin
7  Sadlack. Is that correct?
8     A.   Yes.
9      Q.   Okay. It says here, and I'm just
10  reading what it says, "Their charge was to review
11  whether procedure was properly followed, not to
12  review the substance of SAM's decision to suspend and
13  to later terminate." Do you see that?
14     A.   Yes.
15     Q.   It then continues to say, "Their
16  procedural review was limited to the charges to
17  suspension, not termination, revocation of tenure."
18  Do you see that?
19     A.   Yes.
20     Q.   Is that your understanding? Do you
21  believe that to be correct?
22     A.   I don't know what they thought they were
23  doing, but I think our understanding from our
24  committee was that they had reviewed the termination

1  and the revocation of tenure.
2      Q.   Okay. So it was your understanding that
3  the faculty grievance committee --
4     A.   From a procedural point of view.
5      Q.   Okay. So it's your understanding that
6  from a procedural point of view, the faculty
7  grievance committee reviewed both the suspension and
8  termination, correct?
9     A.   I think that was my understanding.
10     Q.   So as written here would not be correct.
11  Correct?
12     A.   Yes.
13     Q.   Okay. Anyone either in Marywood
14  University or outside of Marywood University tell you
15  how you had to vote?
16     A.   No.
17     Q.   Did anyone either in Marywood University
18  or outside Marywood University suggest to you how you
19  should vote on this decision?
20     A.   No. No.
21     Q.   Did you fear that your job would be in
22  jeopardy if you didn't support President Munley's
23  decision?
24     A.   No.



14  (Pages 50 to 53)

Page 54

1    Q.    Did anyone other than the committee
2  itself influence your decision to vote in support of
3  President Munley's decision?
4    A.    No.
5    Q.    Do you believe that you served on the
6  committee in an impartial fashion?
7    A.    Yes.
8    Q.    Do you believe that ultimately the
9  committee made the right decision?
10   A.    Yes.
11   Q.    Do you support the decision that you and
12  the committee made?
13   A.    Yes.
14   Q.    Do you know how you were selected to be
15  on the committee?
16   A.    Not exactly. I believe that -- that
17  Fred had the right to request one member of the
18  committee and that I was someone he requested to be
19  on the committee.
20   Q.    As of the time --
21   A.    I don't know the process of that, but
22  that's my understanding of -- I don't know the
23  specific process he went through, was I the first
24  person, the second person, but I believe that's how I

MAGNA LEGAL SERVICES

Page 55

1  ended up on that committee.
2    Q.    As of the time that you served on the
3  committee, would you have considered yourself friends
4  with Dr. Fagal?
5    A.    We were friendly acquaintances, fellow
6  faculty members, colleagues.
7        MS. PEET:  No further questions.
8    A.    Not people that socialized outside
9  Marywood, but we've been on a number of committees
10  and, you know, I had a positive view of Fred and
11  valued him as a colleague.
12       MS. PEET:  No further questions.
13       MR. COHEN:  Follow-up.
14  REDIRECT EXAMINATION BY MR. COHEN:
15   Q.    You said, Dr. O'Brien, that you had a
16  positive view of Fred?
17   A.    Um-hum.
18   Q.    Can you elaborate on that?
19   A.    We served on a number of committees
20  together, in technology or other committees, and, you
21  know, I thought he was very up to date in technology,
22  practical about what -- you know, what were next
23  steps for the university to move forward in a way
24  that was practical and keeping -- keeping the

MAGNA LEGAL SERVICES

Page 56

1  university up to speed; thought he spoke well, is
2  knowledgeable.
3    Q.    Okay.  That's all you meant?
4    A.    (Nodding head.)
5        MR. COHEN:  No further questions.
6        (Whereupon, at 2:05 p.m., the deposition
7  of Edward Joseph O'Brien concluded.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

MAGNA LEGAL SERVICES

Page 57

1        CERTIFICATE
2
3    I HEREBY CERTIFY that the witness was
4  duly sworn by me and that the deposition is a
5  true record of the testimony given by the
6  witness.
7
8
9
10       Judy A. Black
         Registered Professional Reporter
11       Dated:  July 13, 2016
12
13
14
15
16   (The foregoing certification of this
17  transcript does not apply to any reproduction of
18  the same by any means, unless under the direct
19  control and/or supervision of the certifying
20  reporter.)
21
22
23
24

MAGNA LEGAL SERVICES



Page 58

1    INSTRUCTIONS TO WITNESS
2
3         Please read your deposition over
4    carefully and make any necessary corrections.
5    You should state the reason in the appropriate
6    space on the errata sheet for any corrections
7    that are made.
8         After doing so, please sign the
9    errata sheet and date it.
10        You are signing same subject to
11   the changes you have noted on the errata sheet,
12   which will be attached to your deposition.
13        It is imperative that you return
14   the original errata sheet to the deposing
15   attorney within thirty (30) days of receipt of
16   the deposition transcript by you.  If you fail
17   to do so, the deposition transcript may be
18   deemed to be accurate and may be used in court.
19
20
21
22
23
24
MAGNA LEGAL SERVICES

Page 60

1    ACKNOWLEDGMENT OF DEPONENT
2
3         I, Edward Joseph O'Brien, do
     hereby certify that I have read the
4    foregoing pages and that the same is a
     correct transcription of the answers
5    given by me to the questions therein
     propounded, except for the corrections or
6    changes in form or substance, if any,
     noted in the attached Errata Sheet.
7
8
9    Edward Joseph O'Brien        Date
10
11
     Subscribed and sworn
12   to before me this
        day of          , 2016
13
     My commission expires:
14
15
     Notary Public
16
17
18
19
20
21
22
23
24
MAGNA LEGAL SERVICES

Page 59

1         - - - - - -
          E R R A T A
2         - - - - - -
3    PAGE  LINE  CHANGE
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
MAGNA LEGAL SERVICES

Page 61

1         LAWYER'S NOTES
2    PAGE  LINE
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
MAGNA LEGAL SERVICES



# Exhibit 38

**EXHIBIT**

**38**

EXHIBIT

O'BRIEN-1
6/28/10 896

| From: | Dr Edward J O'Brien |
|---|---|
| Sent: | Friday, January 13, 2012 10:15 PM |
| To: | Jean O'Brien |
| Subject: | Fwd: Marywood Administration Tears Down Approved Posters |
| Attachments: | Synoposis Free Speech Poster tear-down Marywood 2011.pdf; Free Speech Marywood Poster Tear-Down Email Exchange sent to FIRE.pdf; Letter to Alan Levine Dec 2 2011 re compensation for poster tear down.pdf; Levine responds to Fagal requests 2011 12-15.pdf |

I thought you might enjoy this one. Hold onto your chair while you take this ride!

---------- Forwarded message ----------
From: **Frederick Fagal** <fffagal@yahoo.com>
Date: Fri, Jan 13, 2012 at 2:33 PM
Subject: Marywood Administration Tears Down Approved Posters
To: "fffagal@gmail.com" <fffagal@gmail.com>

Dear Marywood University Faculty Colleague ,                         January 13, 2012

We deserve better. Our students deserve better. In November 2011 I spent my own money to get a speaker from the Foundation for Individual Rights in Education (FIRE) to give a presentation to an Introduction to Social Science class on November 30. 2011. The topic was "Know Your Rights: Free Speech and Thought Reform on Campus," and the speech tied into our study of the United States Constitution. I also spent my own money to pay for posters advertising the speech in Comerford Auditorium which was to be announced as open to all. Total cost to me about $500. Given my previous run-ins with the administration, http://www.marywoodfreespeech.com/History%20Page/Fagal%20History/adminVSfagal.htm

just io be safe (ha), **I had my posters stamped with the Student Life poster approval stamp. The Marywood Administration, without telling me, then decided to tear down the posters.** No, I am not kidding.... laughable yet sad.

This letter ends with a fuller but still brief summary abstract of what occurred. I hope you read the attachments which tell the complete story. For fun and insight as to "how it all went down" you must view the Hitler Parody *satire* videos on YouTube (see later below for links).

**Based on the evidence,** I expect most of you (if only in private), will agree the **Marywood administration (real people here...not an abstraction) exhibited**

**egregious, despicable, contemptible behavior.** This poisonous and *considered!* behavior reflects badly on *everyone* associated with **Marywood.** I am ashamed for the institution and hope it mends its ways. At this point I think publicity is the only tool which might affect the Administration and inspire "hope and change" ☺ on this campus. Perhaps the Board of Trustees could at least discuss this type of behavior behind closed doors or in private emails and conversations. One can hope..., nay pray..... Attached to this email are four items which I hope some (many?) of you read (#2 similar to #1 but even more complete):
1.    A rather complete synopsis of the events surrounding the tearing down (circa Nov 29, 2011) of my "approved" posters announcing a speech about free speech (irony anyone?)

2.    A complete record of what I sent to the Foundation for Individual Rights in Education (FIRE) to document how the situation unfolded. Learn about FIRE here: http://thefire.org/about/mission/. This big document includes (3.) below, my letter to Levine (and President Munley by agreed-to forwarding)

3.    A copy of my (at first on paper) December 5, 2011 letter to VP Alan Levine. In that letter and in the December 5 meeting with Alan Levine I proposed a resolution of the "free speech poster tear down" controversy. Mr. Levine asked me for an electronic copy (which I sent) and he said he would forward it to President Anne Munley. In any negotiation list of requests (demands?) such as I submitted there is obviously a possibility for a meeting of the minds and compromise – e.g. perhaps I would give up my demand for pizza for students (heh) or a public apology or one of the requested FIRE visits.
4.    A copy of the December 15, 2011 letter to me from Alan Levine [VP for Academic Affairs] which responds to my letter of December 5, 2011. In the response letter Mr. Levine, speaking for the administration (i.e. President Anne Munley), writes "...we are not willing to undertake any (*emphasis added-ff*) of the specific requests that are contained in your letter."

Perhaps you have heard of Hitler Parody videos. From Wikipedia regarding the movie *Downfall*, http://en.wikipedia.org/wiki/Downfall_%28film%29  the film about Adolph Hitler's last days, which provided selected snippets so I could create the Marywood free speech poster tear-down parodies:

"In October 2010, YouTube stopped blocking any *Downfall*-derived parodies,[18] and is now placing advertisements on some of them. Corynne McSherry, an attorney specializing in intellectual property and free speech issues[19] for the Electronic Frontier Foundation, stated, "All the [*Downfall* parody videos] that I've seen are very strong fair use cases and so they're not infringing, and they shouldn't be taken down."[20] "

I made two short satire videos. Part 1 deals with the events of November 28, Part 2 deals with the events of November 30. Comments from (pre-release) viewers: "Brilliant!" …. "Love these!" …. "SO funny"… "It's definitely funny and I think it will appeal to students and faculty alike." … "IT DOES HAVE ITS MOMENTS, ESP THE SCRATCHING PART!" …"It was nice knowing you, Fred." …"I think you will get a positive response from your video...too funny to not."…"OMG! Funny as hell. Pretty powerful stuff. Keep fighting the good fight." …."The videos were definitely very amusing and certainly got the point across" …"Wow Fred…. Great job on the video.... what a brilliant way to get your point across!!!! I hope it helps open their eyes!!!!! very creative and well done!!!!"

On YouTube just search for Hitler parody Marywood, I imagine it will show up…
# LINK to VIDEO #1 http://www.youtube.com/watch?v=1naxKnNc06o&feature=youtu.be

# LINK to VIDEO #2

DEF003079

## http://www.youtube.com/watch?v=4hzvy5sTqUw&context=C3c1bc55ADOEgsToPDskIZs i1t3K7AqlLR-ci2V9HK

I can send anyone low definition versions of the videos suitable (each is under 20 MB) for email attachments. Just ask ..

A few colleagues concerned for my welfare have told me they fear the administration will try to fire me over this. One colleague says perhaps I should have asked for an appointment with President Munley and made a final appeal – i e  I should have pursued every last ditch channel possible. I did not want to go into such a meeting and in essence have as the only new point to raise a "blackmail" threat to go public as I do here and in the videos. I did not want that. If the risk to me is there it is there; and if the worst does come to pass I will have to battle as best I can with the support of family and friends and colleagues and perhaps concerned outsiders.

I will of course be pleased to hear from any of you – from the grizzled veteran to the first-year hire.  BEWARE  – according to page 86 of the Faculty Handbook

"…there are no specific laws, rules, or regulations that protect the privacy of a user's files, electronic mail messages, or any other information retrieved as a result of a person's session on the Marywood system."

Thus, if you *email* me and want to protect yourself, you might best *use a backup email address such as your old youthful one* coolcat@hotmail.*com and send it from anywhere but Marywood.* Also, if you are my friend, or will soon be, you need not say hello to me in public (heh). My home phone is 315-685-0429. Even a regular mail anonymous "good luck" note sent to me at home (address below) would be very appreciated…

**Abstract**: On November 28-29 2011 Marywood University tore down "stamped approved" posters announcing an open to all presentation by Will Creeley of FIRE (Foundation for Individual Rights in Education) titled "Know Your Rights: Free Speech and Thought Reform on Campus." On December 5 Alan Levine, VP for Academic Affairs, told me there were no written policy statements which justified Marywood's action, but that my offer of a $50 random prize to a student for attending was, in the eyes of the administration's  Executive Council which met on November 29, "pandering" to students to get them to come to class, and that this justified tearing down the posters (without even the mere common courtesy of notifying me about the supposed problem) Even if a problem did exist a magic marker could have solved it, poster tear-downs were not necessary. Later that day (Dec- 5) I sent Mr. Levine two emails, one showing that Professor N. Gregory Mankiw of Harvard (former Chairman of the President's Council of Economic Advisers, author of today's largest selling economics textbook) recently pandered to his students by inviting ten select quick email responders (first come, first served) to join him as his guest for lunch after class at a Chinese restaurant in Harvard Square. *I suggested that Marywood University warn Harvard that it has a panderer in its midst* ! Finally, also on December 5, I forwarded to Mr. Levine an email from spring 2011 wherein the Marywood Administration encouraged professors to send students to a speech about sexual assault. Raffle prizes galore, including food and **TWO $50 VISA cards**. Quotation from the email "We hope faculty will offer students extra credit for attending, or *use some of your class time to attend the event with your students* [emphasis added]." Laughable! Talk about "pandering!" It is transparently obvious Marywood University is discriminating against Professor Fagal…Your Honor, I rest my case. Full details below.

By Frederick F. Fagal. Jr. (Ph.D.) Associate Professor of Economics, Marywood University, Scranton, PA
Thank you for reading…..

Sincerely,
Fred Fagal
(Frederick F. Fagal, Jr.  Associate Professor of Economics)…at Marywood 1987 –
Home address:
Fred Fagal
17 East Lake Street
Skaneateles, NY 13152


--
Edward J. O'Brien, Ph.D., Professor
Department Chair (1995-2008)
Psychology & Counseling Department
Marywood University
2300 Adams Avenue
Scranton, PA 18509
Phone: 570-348-6270 or 570-348-6226

2

# Exhibit 39



**EXHIBIT** O'BRIEN - **39**

| | |
|---|---|
| **From:** | Dr Edward J O'Brien |
| **Sent:** | Saturday, January 14, 2012 4:10 PM |
| **To:** | Donald Myers |
| **Subject:** | Fwd: Marywood Administration Tears Down Approved Posters |
| **Attachments:** | Synoposis Free Speech Poster tear-down Marywood 2011.pdf; Free Speech Marywood Poster Tear-Down Email Exchange sent to FIRE.pdf; Letter to Alan Levine Dec 2 2011 re compensation for poster tear down.pdf; Levine responds to Fagal requests 2011 12-15.pdf |

Hi Don,

In case you thought that all drama left Marywood when you retired! Fagal at one point references me as the "Psych Guy" in the Hitler parody films (depicting Marywood senior staff executive meetings). Thankfully I am not named, but I did work with him to help Marywood pursue a physician assistant program over a program linked to chiropractic.

The best place to start is to look at the two videos attached to the message. The text is quite long and involved.

Enjoy! Hope all is well down your way. I may even be making my first trip to Florida (never yet set foot in the state) if a proposal with student co-author to the APA convention gets accepted.

Take Care,

Ed

---------- Forwarded message ----------
From: **Frederick Fagal** <fffagal@yahoo.com>
Date: Fri, Jan 13, 2012 at 2:33 PM
Subject: Marywood Administration Tears Down Approved Posters
To: "fffagal@gmail.com" <fffagal@gmail.com>

Dear Marywood University Faculty Colleague ,                                    January 13, 2012

We deserve better. Our students deserve better. In November 2011 I spent my own money to get a speaker from the Foundation for Individual Rights in Education (FIRE) to give a presentation to an Introduction to Social Science class on November 30, 2011. The topic was "Know Your Rights: Free Speech and Thought Reform on Campus," and the speech tied into our study of the United States Constitution. I also spent my own money to pay for posters advertising the speech in Comerford Auditorium which was to be announced as open to all. Total cost to me about $500. Given my previous run-ins with the administration, http://www.marywoodfreespeech.comIHistory%20Page/Fagal%20History/adminVSfagal.htm

just to be safe (ha), **I had my posters stamped with the Student Life poster approval stamp. The Marywood Administration, without telling me, then decided to tear down the posters**. No, I am not kidding.... laughable yet sad.

This letter ends with a fuller but still brief summary abstract of what occurred. I hope you read the attachments which tell the complete story. For fun and insight as to "how it all went down" you must view the Hitler Parody *satire* videos on YouTube (see later below for links).

**Based on the evidence**, I expect most of you (if only in private), will agree the **Marywood administration (real people here...not an abstraction) exhibited egregious, despicable, contemptible behavior. This poisonous and *considered!* behavior reflects badly on *everyone* associated with Marywood.** I am ashamed for the institution and hope it mends its ways. At this point I think publicity is the only tool which might affect the Administration and inspire "hope and change" ☺ on this campus. Perhaps the Board of Trustees could at least discuss this type of behavior behind closed doors or in private emails and conversations. One can hope..., nay pray..... Attached to this email are four items which I hope some (many?) of you read (#2 similar to #1 but even more complete):
1.    A rather complete synopsis of the events surrounding the tearing down (circa Nov 29, 2011) of my "approved" posters announcing a speech about free speech (irony anyone?)

2.    A complete record of what I sent to the Foundation for Individual Rights in Education (FIRE) to document how the situation unfolded. Learn about FIRE here: http://thefire.org/about/mission/. This big document includes (3.) below, my letter to Levine (and President Munley by agreed-to forwarding)

3.    A copy of my (at first on paper) December 5, 2011 letter to VP Alan Levine. In that letter and in the December 5 meeting with Alan Levine I proposed a resolution of the "free speech poster tear down" controversy. Mr. Levine asked me for an electronic copy (which I sent) and he said he would forward it to President Anne Munley. In any negotiation list of requests (demands?) such as I submitted there is obviously a possibility for a meeting of the minds and compromise – e.g. perhaps I would give up my demand for pizza for students (heh) or a public apology or one of the requested FIRE visits.

DEF002978

4.   A copy of the December 15, 2011 letter to me from Alan Levine [VP for Academic Affairs] which responds to my letter of December 5, 2011. In the response letter Mr. Levine, speaking for the administration (i.e. President Anne Munley), writes "... we are not willing to undertake any (*emphasis added-fff*) of the specific requests that are contained in your letter."

Perhaps you have heard of Hitler Parody videos. From Wikipedia regarding the movie *Downfall*, http://en.wikipedia.org/wiki/Downfall_%28film%29 the film about Adolph Hitler's last days, which provided selected snippets so I could create the Marywood free speech poster tear-down parodies:

"In October 2010, YouTube stopped blocking any *Downfall*-derived parodies,[18] and is now placing advertisements on some of them. Corynne McSherry, an attorney specializing in intellectual property and free speech issues[19] for the Electronic Frontier Foundation, stated, "All the [*Downfall* parody videos] that I've seen are very strong fair use cases and so they're not infringing, and they shouldn't be taken down."[20] "

I made two short satire videos. Part 1 deals with the events of November 28, Part 2 deals with the events of November 30. Comments from (pre-release) viewers: "Brilliant!" .... "Love these!" .... "SO funny"... "It's definitely funny and I think it will appeal to students and faculty alike." ... "IT DOES HAVE ITS MOMENTS, ESP THE SCRATCHING PART!" ..."It was nice knowing you, Fred." ..."I think you will get a positive response from your video...too funny to not."..."OMG! Funny as hell. Pretty powerful stuff. Keep fighting the good fight." ...."The videos were definitely very amusing and certainly got the point across"  ..."Wow Fred.... Great job on the video.... what a brilliant way to get your point across!!!! I hope it helps open their eyes!!!!! very creative and well done!!!!"

On YouTube just search for Hitler parody Marywood, I imagine it will show up...

# LINK to VIDEO #1 http://www.youtube.com/watch?v=1naxKnNc06o&feature=youtu.be

# LINK to VIDEO #2
# http://www.youtube.com/watch?v=4hzvy5sTqUw&context=C3c1bc55ADOEgsToPDskIZs i1t3K7AqlLR-ci2V9HK

I can send anyone low definition versions of the videos suitable (each is under 20 MB) for email attachments. Just ask ...

A few colleagues concerned for my welfare have told me they fear the administration will try to fire me over this. One colleague says perhaps I should have asked for an appointment with President Munley and made a final appeal – i.e. I should have pursued every last ditch channel possible. I did not want to go into such a meeting and in essence have as the only new point to raise a "blackmail" threat to go public as I do here and in the videos. I did not want that. If the risk to me is there it is there; and if the worst does come to pass I will have to battle as best I can with the support of family and friends and colleagues and perhaps concerned outsiders.

I will of course be pleased to hear from any of you – from the grizzled veteran to the first-year hire. **BEWARE** – according to page 86 of the Faculty Handbook "...there are no specific laws, rules, or regulations that protect the privacy of a user's files, electronic mail messages, or any other information retrieved as a result of a person's session on the Marywood system."

Thus, if you *email* me and want to protect yourself, you might best *use a backup email address such as your old youthful one* coolcat@hotmail.*com and send it from anywhere but Marywood.* Also, if you are my friend, or will soon be, you need not say hello to me in public (heh). My home phone is 315-685-0429. Even a regular mail anonymous "good luck" note sent to me at home (address below) would be very appreciated...

**Abstract**: On November 28-29 2011 Marywood University tore down "stamped approved" posters announcing an open to all presentation by Will Creeley of FIRE (Foundation for Individual Rights in Education) titled "Know Your Rights: Free Speech and Thought Reform on Campus." On December 5 Alan Levine, VP for Academic Affairs, told me there were no written policy statements which justified Marywood's action, but that my offer of a $50 random prize to a student for attending was, in the eyes of the administration's Executive Council which met on November 29, "pandering" to students to get them to come to class, and that this justified tearing down the posters (without even the mere common courtesy of notifying me about the supposed problem) Even if a problem did exist a magic marker could have solved it, poster tear-downs were not necessary. Later that day (Dec. 5) I sent Mr. Levine two emails, one showing that Professor N. Gregory Mankiw of Harvard (former Chairman of the President's Council of Economic Advisers, author of today's largest selling economics textbook) recently pandered to his students by inviting ten select quick email responders (first come, first served) to join him as his guest for lunch after class at a Chinese restaurant in Harvard Square. *I suggested that Marywood University warn Harvard that it has a panderer in its midst* ! Finally, also on December 5, I forwarded to Mr. Levine an email from spring 2011 wherein the Marywood Administration encouraged professors to send students to a speech about sexual assault. Raffle prizes galore, including food and **TWO $50 VISA cards**. Quotation from the email "We hope faculty will offer students extra credit for attending, or *use some of your class time to attend the event with your students* [emphasis added]." Laughable! Talk about "pandering!" It is transparently obvious Marywood University is discriminating against Professor Fagal...Your Honor, I rest my case. Full details below.

By Frederick F. Fagal. Jr. (Ph.D.) Associate Professor of Economics, Marywood University, Scranton, PA
Thank you for reading.....

Sincerely,
Fred Fagal
(Frederick F. Fagal, Jr.  Associate Professor of Economics)...at Marywood 1987 –
Home address:
Fred Fagal
17 East Lake Street
Skaneateles, NY 13152

--

DEF002979

Edward J. O'Brien, Ph.D., Professor
Department Chair (1995-2008)
Psychology & Counseling Department
Marywood University
2300 Adams Avenue
Scranton, PA 18509
Phone: 570-348-6270 or 570-348-6226

3

DEF002980

# Exhibit 40

**EXHIBIT 40**

3

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FREDERICK F. FAGAL,    )  CIVIL ACTION - LAW
JR.,    )
     )
   Plaintiff    )
     )
-vs-    )
     )
     )
MARYWOOD UNIVERSITY,    )
     )
   Defendant    )  NO. 3:14-CV-02404
_____ x

DEPOSITION TESTIMONY OF

**SISTER ANNE MUNLEY, IHM, Ph.D.**

THURSDAY, JUNE 2, 2016

RADISSON HOTEL
700 LACKAWANNA AVENUE
SCRANTON, PA

MARY ANN RUANE
COURT REPORTER
NOTARY PUBLIC

**KEYSTONE COURT REPORTING AGENCY, INC.**
**4099 BIRNEY AVENUE, SUITE 9**
**MOOSIC, PA 18507**
**(570) 558-3011   (800) 570-3773**
**FAX (570) 558-3014**

---

**INDEX OF EXHIBITS**

DEPOSITION

EXHIBIT    DESCRIPTION    MARKED

Exhibit 1    5/10/11 Letter of Agreement. . . 21
Exhibit 2    11/28/11 E-Mail Chain. . . . . . 22
Exhibit 3    12/2/11 Fagal Letter . . . . . . 27
Exhibit 4    12/5/11 E-Mail . . . . . . . . . 29
Exhibit 5    12/15/11 Levine Letter . . . . . 37
Exhibit 6    1/17/12 E-Mail . . . . . . . . . 42
Exhibit 7    Talking Points for Meeting . . . 69
Exhibit 8    Handwritten Notes. . . . . . . . 95
Exhibit 9    1/23/12 E-Mail . . . . . . . . .104
Exhibit 10    1/23/12 Meeting Notes. . . . .105
Exhibit 11    1/24/12 E-Mail w/ Attachments. .108
Exhibit 12    Talking Points for Board . . . .113
Exhibit 13    2/2/12 Cohen Letter. . . . . . .122
Exhibit 14    2/3/12 Handwritten Note. . . . .123
Exhibit 15    2/9/12 E-Mail w/ Attachments . .124
Exhibit 16    2/9/12 Anthony Letter. . . . . .132
Exhibit 17    2/20/12 E-Mail . . . . . . . . .134
Exhibit 18    3/7/12 E-Mail. . . . . . . . . .137
Exhibit 19    3/26/12 Sadlack Letter . . . . .140
Exhibit 20    4/3/12 Munley Letter . . . . . .141
Exhibit 21    4/25/12 E-Mail Chain . . . . . .147
Exhibit 22    4/30/12 E-Mail . . . . . . . . .148
Exhibit 23    5/3/12 E-Mail Chain. . . . . . .151
Exhibit 24    6/5/12 E-Mail. . . . . . . . . .152
Exhibit 25    Faculty Grievance Committee
     Meeting Notes, 6/19/12 . . . . .152
Exhibit 26    1/9/15 E-Mail. . . . . . . . . .154
Exhibit 27    1/18/12 Handwritten Notes. . . .156
Exhibit 28    1/20/12 Handwritten Notes. . . .157

-o0o-

---

2

**COUNSEL PRESENT:**

**On behalf of the Plaintiff:**
LAW OFFICE OF JONATHAN Z. COHEN, ESQ.
BY: JONATHAN Z. COHEN, ESQ.
175 Strafford Avenue
Wayne, PA 19087

**On behalf of the Defendant:**
JACKSON LEWIS
BY: STEPHANIE JILL PEET, ESQ.
ASIMA J. AHMAD, ESQ.
1601 Cherry Street, Suite 1350
Philadelphia, PA 19102

**Also Present:** Frederick F. Fagal, Jr. Ph.D,
Patricia E. Dunleavy, Ph.D

**STIPULATIONS**

It was agreed by and between counsel that all
objections, except as to the form of the question,
will be reserved until the time of trial.
It was further agreed that the sealing and
filing of the deposition transcript will be waived.

**INDEX OF WITNESSES**

EXAMINATION      PAGE NUMBER
**SISTER ANNE MUNLEY, IHM, Ph.D**
By Mr. Cohen. . . . . . . . . . . . . . . 4

-o0o-

---

4

1    **S I S T E R  A N N E  M U N L E Y**, IHM, Ph.D

2    WAS CALLED, AND HAVING BEEN DULY SWORN,

3    WAS EXAMINED AND TESTIFIED AS FOLLOWS:

4    (9:36 a.m.)

5

6    **EXAMINATION BY MR. COHEN:**

7      Q.    Sister Munley, my name is Jonathan

8    Cohen, and I represent the Plaintiff in this case

9    Frederick F. Fagal, Jr.

10      How would you like to be called today,

11    Sister or President Munley or --

12      A.    **Sister Anne is just fine.**

13      Q.    Sister Anne, okay.  And you understand

14    today that you're under the same oath as if you were

15    in a courtroom, correct?

16      A.    **I do understand.**

17      Q.    And let me just go over some of the

18    ground rules.  Have you ever had a deposition before?

19      A.    **No, I haven't.**

20      Q.    Okay.  So the idea is that I ask you

21    the questions and you provide the answers.  But if

22    you don't understand a question, please feel free to

23    say so, and I'll try to rephrase.

24      A.    **Okay.**

25      Q.    Because if you do answer, then I'm just

5

1  going to assume that you understand.  If you need a
2  break at all, that's fine, just wait until the end of
3  your answer; like it can't be after I ask the
4  question, but before your answer.
5          If you could -- even if you think that
6  you know what I'm about to ask, if you could just
7  wait until I get to the end, because the Court
8  Reporter has to take everything down, and also
9  depending on the question your Attorney might want to
10 object.
11     A.    Um-hum.
12     Q.    Is there anything that would prevent
13 you from thinking clearly and testifying truthfully
14 today, and that includes like medications or --
15     A.    No.
16     Q.    Okay.  What is your full name,
17 including your middle name?
18     A.    I'm Sister Anne Munley.  My middle name
19 is Margaret, I do not use it.
20     Q.    Okay.
21     A.    And my complete name includes IHM.  I'm
22 a Sister Servant of the Immaculate Heart of Mary.
23     Q.    Okay.  And what is -- Could you
24 summarize your educational background from after high
25 school on?

6

1      A.    I'd be happy to do that.  After high
2  school -- well, actually right after high school I
3  entered the Congregation of the Sister Servants of
4  the Immaculate Heart of Mary.  I've been educated by
5  them my entire life.  And I went -- while I was in
6  religious formation I also began study at Marywood
7  then College, now it is the University.
8          After my religious profession I began
9  to teach.  I was -- my background at Marywood was
10 that I was a sociology, history and government major,
11 and I had a psychology -- almost a double major in
12 psychology.  As soon as I finished Marywood College
13 at that time, I was enrolled in Catholic University
14 of America in Washington D.C., and there I completed
15 over the course of several summers a Master's Degree
16 in Sociology.
17         After that I came back to Marywood.  I
18 taught at high school level in two places in those
19 years that I was doing the work on my Master's in the
20 summers.  And then I went to Marywood for two years.
21 And the Congregation asked me to see my interest in
22 serving in higher education.  And I taught in the
23 Department of Social Science.  I taught sociology and
24 various other courses related to that.
25         And then I went to study for my

7

1  Doctorate full time.  And so I studied at Boston
2  College, and was part kind of a consortium
3  arrangement where I could also study at Brandeis and
4  at B.U.  So my program was focused on qualitative
5  research emphasizing gerontology.  And I wrote my
6  dissertation on hospice.
7          And after that I came back to Marywood,
8  and I taught for a couple years.  And during that
9  time I taught some courses at both the graduate and
10 undergraduate level.  And I did work with both
11 sociological theory and research with the students at
12 the undergraduate level.  And I did some courses on
13 the graduate level on nursing home administration,
14 care of the aging, death and dying, that kind of
15 thing.
16         Part of my work brought me to England,
17 where I studied the original form of the hospice, and
18 that was the basis which I then converted into a
19 book.
20         After I completed a couple years I got
21 elected to serve as Vice-President of the IHM
22 Congregation in my capacity of being responsible for
23 all the ministries of the Sisters, including their
24 multiple sponsored works.  Marywood is one of their
25 sponsored works.  At that time we had -- we were

8

1  heavily involved in work in hospitals, and St.
2  Joseph's Center, which cares for severely
3  neurologically impaired children.  And we had Sisters
4  serving in, I believe at that time 19 states, three
5  or four countries.  And so that was the work that I
6  did, which was all related to mission and service.
7          After I completed eight years as
8  Vice-President -- in fact the term in religious life
9  at that time was Assistant to the Superior General --
10 I came back to Marywood as Director of Institutional
11 Research and Planning.  And part of my work was to
12 develop a methodology to create a strategic plan for
13 Marywood University.  So it was a comprehensive
14 program where I had 42 different committees with
15 direct input in shaping the strategic, and then for
16 the strategic plan develop various operational plans.
17 I did that for four years.
18         And then I got elected President of the
19 IHM Congregation.  And that meant that I was the
20 leader of the Congregation.  And a big part of that
21 role is the emphasis in all of the decisions that are
22 made based on what the IHM mission is, and what our
23 spirit of charism is.  And so those years I was very
24 focused on developing a Congregation and it's
25 mission, ministries and sponsored works in accordance

9

1   with our charism, which is very deeply rooted in the
2   spirit of St. Alphonsus Liguori, which is about God's
3   unconditional love for everyone, and also a sense
4   that gifts are God given. And the responsibility of
5   our charism and mission is to help people overcome
6   obstacles to develop their God-given gifts and
7   potential. And so that was very much my emphasis in
8   those years.
9           At the same time I became very much
10  involved in religious life in broader circles in the
11  United States. I did -- I was a member of the
12  Leadership Conference of Women Religious. I was
13  elected President of the Leadership Conference of
14  Women Religious. And in those years I also did a
15  national study of the ministry of Catholic Sisters
16  throughout the United States, both looking at their
17  sponsored works and the magnitude of their impact on
18  developing this country in terms of their various
19  forms of service.
20          I also at that time became very
21  involved in the International Union of Superiors
22  General, and that's based in Rome, Italy. And while
23  I was serving as President of the Congregation I was
24  elected as a delegate of that body, so that brought
25  me into a great deal of global contact with the

10

1   missions and ministries of women religious throughout
2   the world.
3           And our charism, our spirit is all
4   around the notion of, you know, realizing the
5   giftedness of others, and we did that through the
6   ministry of education.
7           And so part of the work that I then got
8   into was the international exposure to women
9   religious in Africa led me to work with other
10  congregations to start a program called the African
11  Sisters Educational Collaborative, which has now
12  evolved into direct service and education of Catholic
13  Sisters in 10 sub-Saharan countries on leadership,
14  on, you know, financial management, on how to write
15  grants. And it ties into the charism, which is all
16  about that sense of empowerment and service and
17  excellence.
18          So then after I completed my -- I did
19  two terms. I was re-elected. I did two terms. And
20  the whole time that I was President of the
21  Congregation -- President of the Congregation is also
22  the Chair of the Corporation of Marywood. We have a
23  dual tiered form of governance at the Board level,
24  and is also an ex officio member of the Board. So I
25  was always in direct contact with the mission, and,

11

1   you know, the actual goals, purpose and spirit of the
2   charism as expressed in the mission and core values
3   of the University.
4           So after I completed my service as
5   President I took a couple months and studied Spanish.
6   And then I went to work in Rome at the International
7   Union of Superiors General. And then that brought me
8   -- I was Director of Social Missions worldwide. And
9   so as a result of that out of the charism, that is
10  IHM charism, which is around service, excellence and
11  empowerment, and especially looking toward the needs
12  of women and children, a lot of the programs that we
13  involved were extensions of that spirit. So I worked
14  on programs that were educating Catholic Sisters in
15  different parts of the world to counter trafficking
16  of human beings, especially women and children. And
17  so I did some work in Thailand, and also worked in
18  Nigeria. We were trying to develop networks of
19  Sisters that would identify potential women to be
20  trafficked in countries of origin, link up Sisters in
21  countries of origin, countries of transit, and
22  countries of destination. And so that was another
23  part of the experience of where I directly -- Much of
24  my life has been directly encountering people who are
25  experiencing oppression of some form, or suffering of

12

1   some form.
2           The work in Africa, also when we were
3   working on developing programs for Sisters in Africa
4   -- and I did some of that as part of my work in UISG
5   as well -- I worked with the International
6   Organization of Migration, who partnered with UISG in
7   this counter-trafficking type of activity.
8           And I also facilitated a number of
9   large gatherings of Superiors General from all over
10  the world; I did some in Africa, I did some in
11  Warsaw. I would say for about 30 years of my life I
12  did extensive work with women religious about how to
13  take their mission, and how to take it to confront
14  the needs of the contemporary world, and to continue
15  to be true to that spirit and charism.
16          So after working with USIG, this
17  African Sisters education movement was developing.
18  We got -- I wrote a large grant, which I received
19  from the Conrad N. Hilton Foundation, that enabled us
20  to begin to set up computer centers for the Sisters
21  so that they could be educated.
22          And so after that started to really
23  develop -- and in my time there I was in Uganda,
24  Kenya, Tanzania, Nigeria, Ghana, and saw the direct
25  impact of the Sisters in working with extremely poor

**13**

1    persons they served.  And also I was in Uganda at the
2    time when, you know, the war was still in action, and
3    I saw how they were a force for good in the presence
4    of that.
5           So this was so in keeping with the IHM
6    charism and our Congregation, along with three other
7    congregations were the sponsors of this African
8    Sisters Education Collaborative.  And Marywood was a
9    key factor in it.  Marywood received the grant.  So I
10   came back.  I concluded my work in Rome, came back
11   because I wanted to establish this African Sisters
12   Education Collaborative as a 501(c)(3) entity, and
13   with corporate bylaws, incorporated in the State of
14   Pennsylvania so it could continue to grow.  Now it
15   has grown, and it touches 10 -- you know, women
16   religious in 10 sub-Saharan countries.
17          So after I came back and I did that, I
18   was the first Executive Director of that.  And I, you
19   know, got it incorporated, and I continued to raise
20   funds, and continued to go back and forth to Africa.
21          My predecessor Sister Mary Reap, IHM,
22   was retiring as President of Marywood.  So several
23   people approached me.  I knew many people in the
24   Marywood community, I had been there many years,
25   asked me to consider applying, so I did.  I went

**14**

1    through all the interview process, and I was selected
2    as Marywood's 11th President.  And then I have served
3    as the President of Marywood.  I am concluding, I am
4    retiring now at the conclusion of this year after
5    nine years as President.  My total service at
6    Marywood, either as a faculty member, or as Director
7    of Institutional Research and Planning, or as
8    President totals 20 years.  And this year I received
9    the Cor Mariae Medal, which comes after 20 years of
10   direct service.
11          That's sort of like a little rundown of
12   what my life has been like.  It's been very -- I've
13   been very graced in the experiences I've had.
14      Q.      Thank you.  And so I understand that
15   you will be leaving Marywood and Pennsylvania for
16   Texas soon; am I right?
17      A.      That's correct, I am going to take a
18   sabbatical.
19      Q.      So during that time you'll still be
20   associated with Marywood?
21      A.      No, I'm really retiring as President of
22   Marywood.  And I'm going to spend some time just --
23   you know, the notion of a sabbatical is you light out
24   to let the new light come forward and your next path.
25   Before I select my next ministry I'm going to take

**15**

1    some time for prayer and reflection.
2       Q.      Okay.  When did you -- You, obviously,
3    know my client Professor Fagal, correct?
4       A.      I do.
5       Q.      And when did you first meet him?
6       A.      You know, I wouldn't be able to give
7    you an exact year.
8       Q.      Approximately?
9       A.      When I came back to Marywood after
10   serving as Vice-President, I pretty much had a
11   general knowledge of the faculty, because I was
12   Director of Institutional Research and Planning, and
13   I facilitated numerous meetings across campus.  And I
14   had been a faculty member earlier there from '74 to
15   '76, and then '80 to '81 or '82 when I got elected
16   President.  So, yeah, I probably would have
17   encountered him in those times.
18      Q.      Okay.  And you're, obviously, aware
19   that around January 2012 Professor Fagal sent an
20   e-mail containing video links.  And then that's been
21   the subject of this litigation, which ultimately led
22   to his suspension and termination, correct?
23      A.      Yes.
24      Q.      And prior to that day, and that was
25   January 13th, 2012, did you consider Professor Fagal

**16**

1    to be a problematic employee for Marywood?
2               MS. PEET:  Objection to the form.
3           You can answer.
4               THE WITNESS:  I'm sorry?
5               MS. PEET:  You can answer.
6               THE WITNESS:  I had no direct
7           dealings with Dr. Fagal, or any I would
8           say encounter that would be of that
9           nature.
10   BY MR. COHEN:
11      Q.      So you had no direct dealings.  But had
12   you heard from others in Marywood's administration,
13   or Professors that Professor Fagal was a problematic
14   employee?
15      A.      I really didn't have an opinion of Dr.
16   Fagal.
17      Q.      I understand that.  But had you heard
18   from others that they had a problem with Professor
19   Fagal?
20      A.      I don't recall conversations about Dr.
21   Fagal.
22      Q.      Okay.  So your interactions with
23   Professor Fagal prior to January 2012 were limited?
24      A.      I would say so; perhaps at faculty
25   meetings, or passing by in the hall.

19

1    Q.   Okay.  And Marywood has a set of core

2  values, correct?

3    A.   Yes, they do.  And they are very

4  related to the mission of the University.  And they

5  are Catholic identity.  And they are rooted in our

6  Catholic identity and our Catholic tradition.  We're

7  a faith-based institution of service, respect,

8  excellence and empowerment.

9    Q.   And did you -- would you say that these

10  core values are just symbolic, or do they play a

11  genuine role in the life of the University?

12    A.   I think they play a very genuine role

13  in the life of the University, which goes deeply into

14  the founding vision of the IHM Sisters when they

15  founded Marywood in 1915, because there was no

16  education available for women at all.  And they're

17  also directly related to the IHM charism, which I

18  mentioned before, which is about developing God-given

19  gifts and potential wherever it's found.

20         And so, you know, the mission of

21  Marywood talks -- and it's an enduring mission across

22  time -- helping our students, our faculty, and the

23  whole member of the Marywood community to live

24  responsibly in a diverse and interdependent world.

25  It's all about the common good.

18

1    Q.   And prior to the -- I'm just going to

2  call -- the e-mail and the videos that are the

3  subject of this litigation, I'm going to --

4  throughout this deposition I'm going to call it the

5  January 13th, 2012 incident.  Is that around the time

6  when you thought it happened?

7    A.   I mean, I'm not -- this is four and a

8  half years ago, so I wouldn't say a date would be in

9  my mind.

10    Q.   Right.

11    A.   But a very significant part of this for

12  me, of course, is the matter of the videos, that's

13  the substance of it for me.

14    Q.   And the e-mail -- and I'll just

15  represent to you that the e-mail that Professor Fagal

16  sent containing these links to the videos was sent on

17  January 13th, 2012.  And when I say the January 13th,

18  2012 incident, that's what I'm referring to.

19    A.   All right.

20    Q.   And prior to the January 13th, 2012

21  incident, would you say that Professor Fagal fit into

22  the University's core values?

23         MS. PEET:  Objection to the form.

24  You can answer.

25         THE WITNESS:  I do not recall

19

1  having an opinion specifically regarding

2  Dr. Fagal in that manner.

3  BY MR. COHEN:

4    Q.   So you didn't have an opinion.  But did

5  he -- Did Professor Fagal have a reputation as

6  someone that prior to the January 13th, 2012

7  incident, as someone that didn't necessarily tow the

8  University line?

9         MS. PEET:  Objection to

10  competency.  You can answer, if you

11  know.

12         THE WITNESS:  Again, I cannot, you

13  know, say that I've had any

14  conversations of that nature regarding

15  Dr. Fagal.

16  BY MR. COHEN:

17    Q.   Okay.  So prior to the January 13th,

18  2012 incident, did you have any knowledge of various

19  run-ins that Professor Fagal had with the Marywood

20  administration?

21         MS. PEET:  Objection to the form.

22  You can answer.

23         THE WITNESS:  Again, I would say

24  that is -- that was not, you know,

25  something that as I look back that I

20

1  ever was very involved in or recall

2  discussions of.

3  BY MR. COHEN:

4    Q.   Okay.  Specifically prior to the

5  January 13th, 2012 incident, were you aware that

6  Professor Fagal had a very strong -- had very strong

7  opinions on free speech at Marywood?

8         MS. PEET:  Objection to the form.

9         THE WITNESS:  I'd like you to

10  rephrase that, and just give me the

11  sense of what it is your question is

12  dealing with.

13  BY MR. COHEN:

14    Q.   Prior to the incident involving the

15  videos and the e-mail, were you aware that Professor

16  Fagal had a strong -- had strong feelings about free

17  speech at Marywood University?

18         MS. PEET:  Objection to the form.

19         THE WITNESS:  I guess I would say

20  I was minimally aware.

21  BY MR. COHEN:

22    Q.   Minimally aware?

23    A.   Um-hum.

24    Q.   Okay.  Were you aware in and around

25  2007 Professor Fagal -- Let me scratch that.  I'll

21

23

1    move on.

1            Exhibit 2 was marked for

2            Are you aware of the organization

2            identification.)

3    called the Foundation for Individual Rights and

3    BY MR. COHEN:

4    Education, also known as FIRE?

4        Q.    And, Sister, could you briefly review

5        A.    At some point I did have a letter, and

5    this document, and let me know if you recognize it?

6    I did respond to a letter from that organization.

6        A.    Yes, this is -- okay, this is

7        Q.    Okay. I'm going to pass you some

7    November 28, 2011, almost five years ago, a memo to

8    documents.

8    me e-mailed from Dr. Levine. And it talks about an

9            MR. COHEN: I would like to have

9    outside speaker, and it refers to posters advertising

10           this marked as we'll call it Munley 1.

10   the event, and moving the class to a larger room.

11           (At this time, Munley Deposition

11   And it talks about political agenda, and it mentions

12           Exhibit 1 was marked for

12   two Professors. And it mentions guidelines

13           identification.)

13   concerning outside speakers.

14   BY MR. COHEN:

14       Q.    Okay. I know this was a long time ago.

15       Q.    Sister, could you briefly review this,

15       A.    It was almost five years ago.

16   and let me know if you recognize this document?

16       Q.    Do you remember responding to this

17       A.    Of course. Yes, this is our Letter of

17   e-mail?

18   Agreement. And this is the Letter of Agreement

18       A.    I really -- I don't have any memory of

19   offered to Dr. Frederick Fagal for the '11-'12

19   responding to this at all.

20   academic year. And it specifies the salary, the

20       Q.    But it seems like, and correct me if

21   rank, the college, the responsibility. And then

21   I'm wrong, he says, "I'd like to speak

22   there are a couple paragraphs additionally that talk

22   with you about this." Correct, the first line?

23   about various benefits, and talks about the original

23       A.    All that I know is that the speaker

24   copy being signed and returned to my office by a

24   came and the speaker spoke.

25   specific date.

25       Q.    Right.

22

24

1        Q.    And that's your signature in the bottom

1        A.    And that's all I can remember.

2    left, correct?

2        Q.    I understand that he spoke. But do you

3        A.    That is correct, yes.

3    remember having a conversation with Dr. Levine in

4        Q.    Okay. In November of 2011 do you

4    response to his request to speak with you about this

5    recall Professor Fagal inviting a speaker from the

5    FIRE speaker?

6    FIRE organization to speak on campus?

6            MS. PEET: Objection, asked and

7        A.    Yes, and -- yes.

7            answered. You can go ahead.

8        Q.    And how did you first learn about this?

8            THE WITNESS: I don't have

9        A.    I believe it was -- I'm not sure at

9            anything different to say, other than I

10   what point in November, but there are speakers --

10           know that the speaker came, and I know

11   many of our Professor have outside speakers in their

11           that as with any other situation faculty

12   classes, and I was aware that this was occurring.

12           do have outside speakers.

13       Q.    And were you at all concerned that

13   BY MR. COHEN:

14   someone from FIRE might be coming to speak on campus?

14       Q.    I understand, but the question is more

15       A.    I would have to say that we have many

15   simple. The speaker came, but -- and it's fine if

16   speakers of -- We're a University, and we have

16   you have no memory. But do you remember, or do you

17   outside speakers. This was one outside speaker who

17   not remember having a conversation about Dr. Levine

18   was coming.

18   about this in response to his e-mail?

19       Q.    Right, I understand. But my question

19           MS. PEET: Do you mean with Dr.

20   was; were you at all concerned with a FIRE speaker

20           Levine or about Dr. Levine?

21   coming to speak on campus?

21   BY MR. COHEN:

22       A.    I don't recall concern.

22       Q.    Yes, with Dr. Levine in response to his

23           MR. COHEN: I'm going to make this

23   request to speak with you?

24   Munley 2.

24       A.    I really -- I don't recall it. It

25           (At this time, Munley Deposition

25   would not be out of character for me to have

25

1  conversations, but I don't recall this.

2      Q.    And correct me I'm wrong, Dr. Levine is

3  suggesting that the speaker from FIRE has a political

4  agenda; am I right?

5          MS. PEET:  Objection, the document

6      speaks for itself.  It calls for

7      speculation.  She can't possibly know

8      what Dr. Levine meant or said.  You can

9      answer to the best that you can.

10         THE WITNESS:  All that I could

11     speak to would be that, you know,

12     guidelines when we have outside

13     speakers, it's always our expectation

14     that if something is being discussed

15     that all dimensions of it are discussed.

16     That's the only thing I can relate to in

17     that e-mail.

18 BY MR. COHEN:

19     Q.    Well, let me ask you so you don't have

20 to speculate about what Dr. Levine thought, but did

21 you think that FIRE had a political agenda?

22     A.    I was not really familiar with, you

23 know, all of the aspects of the organization.  And, I

24 mean, it's title is about free speech, so, you know,

25 I'm not certainly opposed to free speech.

26

1      Q.    Okay.  And did you agree with Dr.

2  Levine that Professor Fagal was trying to circumvent

3  Marywood's guidelines concerning outside speakers?

4      A.    I can't speak to that.  I have no

5  recollection of that at all.

6      Q.    Okay.  Did you issue any advice or

7  instructions to Dr. Levine, or anyone else at

8  Marywood's administration, about how the FIRE speech

9  would be handled?

10     A.    I would say that having the speaker

11 would be in character with what we would have happen.

12 And I would be in favor of the speaker coming and

13 give whatever -- you know, speaking to whatever group

14 was involved.  I would not have stopped that.  So I

15 would -- to the best of my recollection that would

16 have been what I would've --

17     Q.    Did you advise or order that any

18 posters advertising the FIRE event be removed from

19 Marywood's walls?

20     A.    Absolutely no recollection of that.

21     Q.    Do you know whether anybody else at

22 Marywood's administration ordered that the posters

23 advertising the FIRE speech be removed from

24 Marywood's walls?

25     A.    That was not a part of my -- I was not

27

1  involved in that order.  That was not anything that I

2  was directly involved in in any way.  I would not

3  have any awareness of that.

4          MR. COHEN:  Okay.  Let's move on

5      to a new document.  We're going to make

6      this -- We're going to mark this as

7      Munley 3.

8          (At this time, Munley Deposition

9          Exhibit 3 was marked for

10         identification.)

11 BY MR. COHEN:

12     Q.    Sister, do you recognize the document?

13     A.    I do recognize this document.

14     Q.    And this is a letter that Professor

15 Fagal sent to Dr. Levine --

16     A.    Right.

17     Q.    -- dated December 2nd, 2011, correct?

18     A.    Right.  I do recognize this.

19     Q.    And in this letter Professor Fagal

20 expresses some disappointment about the removal of

21 his FIRE posters; am I right?

22     A.    That's what the letter says, yes.

23     Q.    I'm sorry?

24     A.    Yes, that is what this letter says,

25 yes.

28

1      Q.    Okay.  And Professor Fagal requested

2  reimbursement for his expenses and time in arranging

3  for the FIRE posters, as well as an apology, correct?

4      A.    Um-hum.

5          MS. PEET:  Objection to the form.

6      The document speaks for itself.  You can

7      go ahead and answer.

8          THE WITNESS:  Um-hum.

9  BY MR. COHEN:

10     Q.    Do you remember -- Outside of the

11 context of this litigation, do you remember seeing

12 this letter?

13     A.    What do you mean outside the context of

14 this litigation?

15     Q.    What I mean is --

16     A.    Please clarify that.

17     Q.    What I mean is -- okay, so it appears

18 that Professor Fagal sent this to Dr. Levine.

19     A.    Yes.

20     Q.    Did you then see it soon after that?

21     A.    This is all after the fact I did see

22 this letter.  And I did see the various demands that

23 are on the second page of this.  I did see this

24 letter.

25         MR. COHEN:  And let's move on to

29

31

1    the next document.

2         THE WITNESS:  And I think, you

3    know, if you look at this letter, it's

4    requiring various elements of

5    reimbursement, apologies, payments to

6    FIRE, hosting events, providing food and

7    motel bill, publicity payments, free

8    pizza and soda to students, publicity.

9    It's quite an extensive list of demands.

10        MR. COHEN:  We're going to make

11   this document Munley 4.

12        (At this time, Munley Deposition

13        Exhibit 4 was marked for

14        identification.)

15   BY MR. COHEN:

16        Q.   Before you look at that, do you recall

17   a meeting of the -- of Marywood's Executive Committee

18   regarding Professor Fagal's FIRE posters?

19        A.   First of all, I think I have to

20   clarify, the only Executive Committee that we have

21   that uses that title is the Executive Committee in

22   the Board of Directors, and that's -- I think that's

23   not what you're referring to.

24        Q.   I'm not referring to the Board.  I'm

25   referring --

1    because that impacted every single one of the

2    Executive Officers.

3         Q.   Do you remember a meeting with the

4    Executive Cabinet in which the issue of whether the

5    posters should be removed came up in discussion?

6         A.   No, that would not have been a thing

7    that I would recall.

8         Q.   Okay.  So a document has been placed

9    before you.  I think we've called it Munley 4.  Do

10   you recognize this?

11        A.   Actually, I don't, but it has my name

12   on it.  And it's December 5th, 2011 so.

13        Q.   And this is an e-mail from Dr. Levine

14   to you dated December 5th, 2011, at 8:47 p.m.

15   correct?

16        A.   That's what it says.

17        Q.   And Dr. Levine is forwarding you a copy

18   of the letter that we just discussed?

19        A.   Oh, so this is the cover page from that

20   letter?

21        Q.   Yes.

22        A.   Okay.

23        MS. PEET:  Objection, lack of

24        foundation.  You can answer.

25   BY MR. COHEN:

30

32

1         A.   If you're referring to the President's

2    Cabinet that's --

3         Q.   Yes.

4         A.   -- the group of the Executive Officers

5    with whom I meet.  But the term Executive Committee

6    is a body of the Chairs of the various Board

7    committees, or Executive Council, it's a different --

8         Q.   I'm referring to the President's

9    Cabinet.  Do you remember a meeting involving the

10   Executive Cabinet about Professor Fagal's posters?

11        A.   Not explicitly about the posters.  You

12   know, this is five years ago so like timing

13   everything it's hard to recall.  I do remember all

14   that happened after the fact once the video occurred,

15   that's when the posters became more of a discussion.

16        Q.   So you don't remember a meeting

17   explicitly about the posters.  But I'm not referring

18   to just meeting explicitly just for the purpose of

19   the posters.  Do you remember a meeting of the

20   Executive Cabinet in which, let's say, the topic of

21   the FIRE posters came up in discussion?

22        A.   I don't explicitly remember, but it's

23   highly likely as this thing continued to grow that it

24   would have in some way be dealt with in Cabinet

25   discussions.  Especially when it got to the videos,

1         Q.   The subject line reads, "Letter to Alan

2    Levine December 5th, 2011 re compensation for poster

3    tear down."  Do you see that, or the attachments?

4         A.   Yes, I see that, yes.

5         Q.   Do you remember discussing a response

6    with Dr. Levine to the attachment to this e-mail?

7         A.   Now, can you just tell me what you're

8    referring to?  Are you talking now about Exhibit 3?

9         Q.   Yes.

10        A.   Is that the attachment you're talking

11   about?

12        Q.   Yes.

13        A.   I would say that my response to reading

14   these, what I'm going to refer to as demands,

15   actually I thought that they were, for want of a

16   better term, absurd.

17        Q.   So you thought it was absurd for

18   Professor Fagal to request any reimbursement for his

19   posters?

20        MS. PEET:  Objection,

21        mischaracterization of the testimony.

22        THE WITNESS:  I think that I'm

23        referring to this entire letter that

24        includes reimbursement.  I -- that whole

25        -- whatever you're referring to with

33

35

1  regard to posters, that's not the realm
2  in which I live and spend my days.
3  As I see this, "$500 reimbursement
4  check for my expenses and wasted time."
5  "In addition, besides making me
6  merely financially whole regarding this
7  matter, I think it is only fair that
8  Marywood atone for its sins -- in quotes
9  -- and show its willingness to support
10  free speech by inviting FIRE to campus
11  for two spring 2012 presentations and
12  hosting a presentation by Robert Spencer
13  and anyone who cares to join him in
14  debate [see item (11) below].  The ideal
15  way to show commitment to free speech is
16  by action with respect to sponsoring a
17  presentation by someone with whom you
18  vehemently disagree."
19  And then the next line is, "By
20  issuing to me a written public apology
21  which indicates the actions [outlined
22  below] Marywood will take to remedy the
23  damages done to its reputation."
24  It goes on further, "By having the
25  apology in (2) to me also sent by e-mail

1  pay for an evening presentation open to
2  the whole community (probably in early
3  April).
4  (7) --
5  BY MR. COHEN:
6  Q.  Sister --
7  A.  I need to continue this because you
8  asked me my reaction to it.
9  Q.  Well --
10  MS. PEET:  Mr. Cohen, your
11  question to her was so you thought it
12  was absurd that he asked for
13  reimbursement.
14  MR. COHEN:  Yes.
15  MS. PEET:  There are -- This is
16  his demand.  His demand is not even
17  close to just the reimbursement.  She is
18  telling you what the demand is.  She has
19  to finish what she has testified to.
20  BY MR. COHEN:
21  Q.  It includes -- To be fair, I did not
22  ask you to read the entire letter.  We can all read.
23  But would it be correct to say that among the demands
24  that Professor Fagal made was reimbursement for the
25  posters?  That's not the only thing he requested; am

34

36

1  to every faculty member (including
2  adjuncts) and every student."
3  "(4) By paying FIRE $2,000 (its
4  normal rate) to give two presentations
5  on campus during the Spring 2012
6  semester.  Marywood will also pay normal
7  meal and lodging expenses."
8  "(5) By hosting one $1,000 FIRE
9  session (probably in February) for a
10  daytime class presentation to the Social
11  Science 201 class (presentation to be
12  open to all on campus).  A large room
13  will be provided (at least the size of
14  Comerford).  A week before the event
15  Marywood will also print ten 11x17 color
16  posters, ten 11x17 black and white
17  posters, ten 8.5x14 color posters, and
18  ten 8.5x14 black and white posters
19  advertising the event.  I, perhaps with
20  others, will hang the posters.  Each
21  poster will announce a $50 random door
22  prize to a student attending the
23  lecture.  (I will pay the prize money)."
24  "(6) By using the other $1,000
25  FIRE fee (plus food and motel bill) to

1  I right?
2  A.  It was one of 11 demands, many of the
3  demands being quite substantial.
4  Q.  Okay.  And do you agree that posters --
5  these posters advertising the FIRE event were hung
6  and then removed?
7  A.  That's the assertion.  Did I see
8  posters removed, or was I -- you know, can I say they
9  were there and they were not there, I had no visual
10  experience of that.
11  Q.  Did someone tell you that they were
12  removed, other than Professor Fagal?
13  A.  It's in the -- it's in this
14  documentation.
15  Q.  Yes.  My question is; did you think it
16  was unreasonable for Professor Fagal to request some
17  reimbursement for the posters that were taken down?
18  MS. PEET:  Objection to the form,
19  lack of foundation.
20  BY MR. COHEN:
21  Q.  You can answer.
22  MS. PEET:  Well, she just
23  testified she doesn't know if the
24  posters were taken down.  All she knows
25  is Professor Fagal's assertion in this

37

1 letter that the posters were taken down,
2 she doesn't know.
3 BY MR. COHEN:
4     **Q.**    Sister, have you heard from anyone
5 other than Professor Fagal that the posters had been
6 taken down?
7     **A.**    **This is, you know, five years ago.  And**
8 **it's -- you know, for me to recall conversations, I**
9 **can't answer that I had any conversations regarding**
10 **this specifically.**
11     **Q.**    Do you remember seeing any FIRE posters
12 on the wall?
13     **A.**    **No.**
14         MR. COHEN:  Let's make this Munley
15     5.
16         (At this time, Munley Deposition
17         Exhibit 5 was marked for
18         identification.)
19 BY MR. COHEN:
20     **Q.**    Sister, do you recognize this document?
21     **A.**    **Yes, I do.**
22     **Q.**    And this is a letter from --
23     **A.**    **This is copied to me from Dr. Levine,**
24 **yes.**
25     **Q.**    It's a letter from Dr. Levine to

38

1 Professor Fagal and you're copied, correct?
2     **A.**    **December 15, 2011.**
3     **Q.**    Correct.  And this is a response to
4 Professor Fagal's demand letter, correct?
5     **A.**    **Let me just read.**
6         MS. PEET:  Take your time.
7         THE WITNESS:  Right, okay, in the
8     second paragraph it reiterates the --
9     yeah, we were not going to honor the
10     requests contained in the letter, or
11     demands I should say.
12 BY MR. COHEN:
13     **Q.**    And did you assist Dr. Levine in
14 crafting this letter?
15     **A.**    **I have no recollection of that.**
16     **Q.**    Did you discuss the issue of Professor
17 Fagal's December 5th, 2011 letter to Dr. Levine with
18 Dr. Levine?
19     **A.**    **Is that the -- wait a minute.**
20 **December 5th is where?  Are you talking about**
21 **December 2nd?**
22     **Q.**    Well, if you look at the end of the
23 first paragraph he says, "but at any rate I do want
24 to respond to your letter of December 5, 2011."
25         MS. PEET:  I think just by way of

39

1 clarification, the e-mail is dated
2 December 5th, but the letter itself is
3 dated December 2nd.  I think that's
4 causing some confusion.
5         THE WITNESS:  Oh, I see, okay.
6         So would you repeat your question
7     then, because I did get caught up in the
8     dates there.
9 BY MR. COHEN:
10     **Q.**    Sure.  Do you remember discussing
11 Professor Fagal's letter dated December 5th, 2011
12 with Dr. Levine?
13         MS. PEET:  The letter is December
14     2nd.
15         MR. COHEN:  Oh, I'm sorry.
16 BY MR. COHEN:
17     **Q.**    The letter dated December 2nd, 2011?
18     **A.**    **I remember discussing the demands, yes.**
19     **Q.**    Okay.  And, correct me if I'm wrong,
20 but the second paragraph of the December 15th, 2011
21 letter from Dr. Levine says, "Sister Anne Munley and
22 I remain open to future presentations that are not in
23 conflict with our mission statement or core values,
24 and are organized according to our policies and
25 practices." Did I read that correctly?

40

1     **A.**    **That is correct.**
2     **Q.**    So would it be correct to say that you
3 believed that the FIRE presentation was not in
4 conflict with Marywood's mission statement and core
5 values?
6     **A.**    **I cannot agree with your interpretation**
7 **of that.  You're putting words in my mouth.**
8     **Q.**    Okay.  So when Dr. Levine states that,
9 "Sister Anne Munley and I remain open," in essence
10 he's putting words in your mouth then, is that what
11 you're saying?
12         MS. PEET:  Objection to the form.
13         THE WITNESS:  I think that's a
14     general statement that reiterates the
15     practice that we have that, you know,
16     you can have presentations.  I think
17     that's what that says.
18 BY MR. COHEN:
19     **Q.**    So --
20     **A.**    **And I think the statement that I think**
21 **is a distinctive element of that paragraph that says,**
22 **you know, was the response to this list of the 11**
23 **demands.**
24     **Q.**    So is it your testimony that the FIRE
25 -- the proposed FIRE presentation was not in conflict

41

1  with Marywood's mission statement and core values?

2  MS. PEET: Objection to the form.

3  I don't understand what you mean by

4  proposed FIRE presentation.

5  BY MR. COHEN:

6  Q.    The presentation that -- I don't mean

7  proposed -- but the presentation that was given by

8  FIRE on campus, is it your testimony that that was

9  not in conflict with Marywood's mission and core

10  values?

11  **A.    I think when there are -- We're a**

12  **University. And at Universities there are**

13  **presentations occurring on a regular basis. That's**

14  **what I see in that paragraph, that we are open to**

15  **future presentations.**

16  MR. COHEN: Okay. Let's move on

17  to a new document.

18  BY MR. COHEN:

19  Q.    Let me ask you this; the fact that

20  Professor Fagal wanted a speaker from FIRE to make a

21  presentation on campus, did that make you question

22  whether Professor Fagal was a good fit with

23  Marywood's core values?

24  MS. PEET: Objection to the form.

25  THE WITNESS: I think that I -- it

42

1  is not my practice to categorize people

2  as -- the framework that you're putting

3  around this, I don't put people in

4  boxes. It's not my nature, or my

5  professional practice to categorize

6  people in the way that you referred in

7  that question.

8  BY MR. COHEN:

9  Q.    Okay. Well, my question was not

10  whether you put Professor Fagal in a box. Did you

11  have any thoughts at all -- Did you wonder at all

12  whether the fact that Professor Fagal wanted to have

13  a FIRE speaker reflected on his adherence to the core

14  values of the University?

15  **A.    I think that how I -- The core values**

16  **and the mission are the ones which, you know, I make**

17  **the decision. I would not recall making a direct**

18  **application in this particular case at this time.**

19  **You know, the incident in the videos is a far**

20  **different matter.**

21  Q.    I know, we'll get to that.

22  MR. COHEN: We'll mark this as

23  Munley 6.

24  (At this time, Munley Deposition

25  Exhibit 6 was marked for

43

1  identification.)

2  BY MR. COHEN:

3  Q.    And if you could briefly review this,

4  Sister, and let me know whether you recognize this

5  document?

6  **A.    Okay. Yes, I do recognize this**

7  **document. It's from Dr. Levine to me. And I was**

8  **away at the time. It references Dr. Fagal's e-mail,**

9  **and the links to videos embedded with the e-mail.**

10  Q.    And was this the first time that you

11  had Professor Fagal's January 13th, 2012 e-mail and

12  the videos were brought to your attention?

13  **A.    I would say, yes. I mean, this is**

14  **dated the 17th. I was obviously traveling, because**

15  **it indicates that. But this mentions the videos,**

16  **which I looked at.**

17  Q.    What was your first reaction to reading

18  Professor Fagal's January 13th, 2012 e-mail and the

19  videos that the e-mail linked to?

20  **A.    You know, may I see those? I mean,**

21  **that helps me to -- I know my reaction to the videos.**

22  **I don't remember, you know --**

23  Q.    Okay, let me rephrase.

24  **A.    This is, again, five years ago.**

25  Q.    Let me rephrase it. I don't have the

44

1  video here. I'm not going to play it, but you

2  remember it?

3  **A.    Oh, it is embedded in my memory.**

4  Q.    What was your first reaction to seeing

5  the video? Forget about the e-mail.

6  **A.    Okay. I was absolutely and totally**

7  **appalled. And I, first of all, was highly offended**

8  **to be personally depicted as Hitler, and to see the**

9  **members, the Executive members of -- Officers of**

10  **Marywood University depicted as Hitler's aides. And**

11  **I was absolutely distressed, especially because Dr.**

12  **Alan Levine is of the Jewish faith. And I thought it**

13  **was anti-Semitic to even involve Dr. Levine in**

14  **something of this nature. And virtually every member**

15  **of the Cabinet was in some way directly insulted, as**

16  **well as their family members. And the IHM Sisters**

17  **were characterized as SS.**

18  **And, you know, I think of the founding**

19  **charism of the IHM Congregation, it's emphasis on,**

20  **you know, empowerment, and service, and excellence.**

21  **And I think of Hitler as a dictator responsible for**

22  **the annihilation of six million innocent people. And**

23  **I think of my direct experiences in working in very**

24  **poor countries, and seeing victims of trafficking,**

25  **and the boy soldiers, and the war that was going on**

45

47

1  in Uganda; and trafficking of children and women in

2  Asia, and in South Africa the experience of the

3  apartheid that I had an opportunity to understand

4  Mandela's work. I was disgusted, appalled, repulsed.

5  And everything -- I thought it was a personal attack

6  on everything that Marywood stands for, as well as an

7  egregious assault to our mission and core values.

8       And our mission is about an educational

9  program that really is involved in enabling students

10  to live responsibly in a diverse and interdependent

11  world. And the whole essence of a Marywood education

12  is to respect, basically respect every single person,

13  every culture, every ethnicity. I was sickened by

14  it. I could not -- I couldn't even believe that I

15  was -- and it was vulgar. It was sexually explicit.

16  It mentioned, you know, the spouses and family of

17  some of our Executive Officers. It demeaned them.

18  It mentioned -- it mentioned someone's wife. I was

19  totally appalled, disgusted.

20       And I have to say that in my entire

21  lifetime, and I've been in very difficult situations,

22  so I've seen great human suffering, I could not

23  believe that in a context like Marywood University

24  that this, you know, Hitler -- I can't -- the video

25  was incomprehensible to me that anybody who would be

1       And this to me violated everything that

2  Marywood stands for. And it was the core of who we

3  are was being affronted by this. And I decided that

4  this was -- this was a major violation of what it is

5  to be considered a member, a tenured faculty member

6  of Marywood University, it violates everything that's

7  involved in that.

8       Q.    After viewing these videos did you feel

9  like Professor Fagal should be suspended or fired?

10      A.    I have to say that this was such an

11  egregious offense of not only of what my

12  understanding of the responsibility of a tenured

13  faculty member at Marywood is, that this was

14  something for which there should be a suspension.

15  And I wanted to have a direct conversation with Dr.

16  Fagal.

17       This was something that, you know,

18  because it affected every member of the Cabinet,

19  because it was directly involved with our mission, as

20  leader of the institution I felt a great

21  responsibility to directly engage with Dr. Fagal

22  about this matter.

23      Q.    Okay. So you testified that you

24  thought he should be suspended. My question was did

25  you also believe after seeing this video that he

46

48

1  a tenured Professor at Marywood University where we

2  are so explicit in what our mission and values are

3  would produce something of this nature.

4       And I found it, you know -- as soon as

5  I saw it I was especially sensitive to Dr. Levine,

6  who was very, very much affected by this, because it

7  was his wife that was mentioned in the video. And he

8  is Jewish, and he was very much emotionally impacted

9  by it, as were the other Cabinet members. We just

10  don't operate like that as a people. We emphasize

11  respect.

12       And I found the Congregation -- you

13  know, we have Sister missionaries in various

14  countries, who lived in all sorts of circumstances.

15  They welcome the sacrifice, it's who we are. We

16  teach this mission to our students. We have a Hope

17  course, University 100, that emphasizes the heritage,

18  why we have these values. And, you know, we have

19  worked very hard as an institution.

20       I, personally, because of my global

21  opportunities to be in so many parts of the world

22  have emphasized global education and the importance

23  of that. And so, you know, I'm a sociologist. I've

24  taught anthropology. I believe in the value of

25  multiple cultures. I was sickened by this.

1  should be terminated?

2       A.    I wanted to talk to him. I wanted to

3  personally sit down with Dr. Fagal. This to me --

4  suspension was the first thing on my mind, but I

5  wanted to have the opportunity to directly talk to

6  Dr. Fagal.

7       Q.    Understood. Whether you wanted to

8  discuss this with Dr. Fagal at all or not, did the

9  thought after seeing this video of terminating him

10  come to your mind?

11       MS. PEET: Objection, asked and

12       answered.

13       THE WITNESS: I can't give you an

14       answer directly to that. I just know

15       that I was severely offended and wanted

16       to immediately deal with the situation

17       because it rose to the level of the

18       President of the University.

19  BY MR. COHEN:

20      Q.    Okay. So the document that's in front

21  of you --

22      A.    Yes.

23      Q.    -- again, this was January 17th, 2012,

24  this e-mail from Dr. Levine to you where he informs

25  you of the videos. Do you see this?

49

51

**A.**   That's right, I'm looking at it.

**Q.**   So you say that you wanted to immediately deal with the situation.  But isn't it true that you did not in fact deal immediately with the situation, it waited until at least January 23rd, 2012?

MS. PEET:  Objection to the form.

THE WITNESS:  I was traveling.  I was -- you know, the work of the Presidency involves traveling, Board meetings in other locations.  I don't know exactly, I would have to revisit my calendar, but I was also at that time on the ACCU Board of Directors, the Association of Catholic Colleges and Universities, so I don't know where I was at this time, I would have to revisit.  You know, but this -- if I got this on the 17th and I was somewhere else -- I don't remember what date you said I dealt with this, but my goal was to deal with it.

BY MR. COHEN:

**Q.**   You do have people on your staff on the Cabinet that you occasionally delegate

50

responsibilities to, am I correct?

**A.**   I think that each of the -- yes.  I would say this: Each of the Cabinet Officers is a direct report to the President, and they have certain responsibilities, and then they report directly to the President, yes.

**Q.**   Did you -- Even though you were away when you received this e-mail January 17, 2012, did you think about delegating the handling of this situation to anybody on your staff?

**A.**   I would never delegate anything of this magnitude.  I would discuss it with the staff, because each of them were directly affected by it.  But I was away at the time.  I knew this was something that I was going to deal with.

**Q.**   When you were away did you have access to e-mail?

**A.**   I always have access to e-mail, right.

**Q.**   Did you feel -- After having viewed these videos that Dr. Fagal posted, did you feel that Dr. Fagal posed an immediate harm to himself?

**A.**   I think that, you know, the first thing I thought was this is totally contrary to what it means to be a tenured Professor at Marywood University.  And then I began to think about all the

other elements of policy that were a part of it.  And I think that when you talk about the harm, I think my sense of harm was harm to the University and all that it stands for; harm to the people who were being defamed in this.  And, you know, distortion of things like basic collegial relationships toward the people with whom you work; administrative Officers.  Civil rights in the sense of, you know, identifying a particular group that then is looked upon in a discriminatory way.  I think professional standards of professional behavior.  I mean, these are the thoughts that, you know, were going through my mind then, and they are the thoughts that go through my mind now as this is brought back to me.  And I can experience it vividly, it affected me because it distorted everything we stand for.

**Q.**   Did you feel like the videos after you first saw them posed an immediate harm to the Marywood community?

MS. PEET:  Objection, asked and answered.

THE WITNESS:  I think I already answered that question.

BY MR. COHEN:

**Q.**   Well, I think you testified --

52

**A.**   I think it was highly offensive, and actually in a sense defamed the essence of what we're all about.

**Q.**   Did you feel like it had to be dealt with immediately?

**A.**   I felt it had to be dealt with, but, you know, I don't know where I was at the time.  And I knew that that was going to be something personally that I would deal with as President.  When you're President, the buck stops there.

**Q.**   Did you feel like this -- the creation and posting of the videos was an emergency, created an emergency for Marywood?

**A.**   I don't know that I would put that word on it.  It's something very serious, something offensive, something that had to be dealt with, and dealt with in a very strong and direct manner.

**Q.**   But not necessarily immediately?

MS. PEET:  Objection, asked and answered.

BY MR. COHEN:

**Q.**   You can answer.

MS. PEET:  She already answered.

MR. COHEN:  So are you not going to answer again?

53

1    THE WITNESS:  Well, I was away.
2  This is, again, five years ago.  I can't
3  say day by day by day.  I know that the
4  first chance that I had to deal with it,
5  I dealt with it.
6  BY MR. COHEN:
7      Q.    Did you feel that Professor Fagal posed
8  any physical threat to himself or to others after
9  viewing this video?
10     MS. PEET:  Objection, lack of
11  competency.  She's not an expert.  But
12  you can answer, if you know.
13     THE WITNESS:  I wouldn't know how
14  to answer that question.  For me the
15  harm was that the thing was done in the
16  first place, that it was made public,
17  that, you know, it attacks everything we
18  stand for.
19  BY MR. COHEN:
20     Q.    What more do you need in order to
21  answer that question?  You said you don't know how to
22  answer it.  Did it occur to you -- whether you're
23  qualified to say it or not -- but did it occur to you
24  that Professor Fagal had become a physical threat to
25  himself or others after viewing the video?

54

1      A.    I don't recall thinking about that in
2  the way in which you're asking the question.
3      Q.    Okay.  Do you recall -- I want you to
4  describe what your response -- not your thought
5  process, but what was your first response in terms of
6  handling these videos once you returned to campus?
7      A.    Well, there are a few things.
8  Regularly when I'm on campus we have a Cabinet
9  meeting.  So I knew there would be a Cabinet meeting
10  at which this would be discussed.  I also sought
11  appropriate legal advice.
12     MS. PEET:  I'm going to instruct
13  you not at all at this question or any
14  other time during the deposition today
15  to discuss what you discussed with
16  Counsel.
17  BY MR. COHEN:
18     Q.    Do you remember the date that you first
19  returned to campus?
20     A.    I really don't, sir.  This is five
21  years ago.  And, you know, I traveled extensively.  I
22  was on multiple Boards, been to multiple meetings,
23  visited donors at alumni events all over the country.
24  I couldn't give you explicitly.  And, you know, when
25  you come back -- when you're President and you come

55

1  back, you have many, many things to deal with all at
2  once.  So I can't give you a date.
3      Q.    Did you review -- and I'm not asking
4  you to reveal the content of any attorney/client
5  conversations, or any documents that were provided --
6  may or may not have been provided to you, but in
7  preparing for this deposition did you review any
8  documents?  Don't tell me what they were, just kind
9  of a yes or no.
10     A.    In preparing for this --
11     Q.    Deposition.
12     A.    -- deposition I looked at a few things,
13  yes.
14     Q.    Did you review -- Do you keep a
15  personal calendar?
16     A.    I have a calendar that my secretary
17  keeps of appointments that I have, and -- I have a
18  calendar, yes.
19     Q.    Does it go back to January 2012?
20     A.    I have a yearly calendar of all of the
21  appointments that I have that my secretary maintains.
22  It might not, you know -- Are you asking me -- I
23  would say, yes, there would be a calendar that my
24  secretary would have maintained, yeah.
25     Q.    And you know that this litigation is, a

56

1  large part of it involves a meeting that you held
2  with Professor Fagal around January 23rd, 2012, where
3  he was suspended.  Do you remember that?
4      A.    I do.  Oh, I recall that very much.
5      Q.    So you know that you first got this
6  e-mail in front of you on January 17, 2012?
7      A.    I'm seeing that now.  I mean, it
8  certainly wasn't on the top of my mind.
9      Q.    Right.  And you know that he was
10  suspended on January 23rd, 2012, correct?
11     A.    If that's the date that you're telling
12  me.
13     Q.    Did you think it was important to
14  review, you know, your calendar of events in
15  January 2012 in preparing for this deposition?
16     A.    I did not do anything like that, no.
17     Q.    So, again, without revealing the
18  content of any attorney/client conversations, when in
19  fact you did return to campus, if you could to the
20  best of your memory tell me chronologically the steps
21  you took to handle this situation involving Professor
22  Fagal's e-mails.
23     MS. PEET:  Without disclosing any
24  attorney/client privilege.
25  BY MR. COHEN:

1    Q.    Yes.

2    A.    The only thing, I'm not sure that

3    chronologically I can say A, B, C, D, E.  I can tell

4    you that the event that is in my mind is the Cabinet

5    meeting that I had at which the -- everybody by this

6    point had seen this video.  It was sent to various

7    members of the Marywood community to their Marywood

8    e-mail address.  I know there were students who saw

9    it.  And so when we had the Cabinet meeting every

10   Cabinet member there virtually was either directly in

11   it, or offended by it because of the colleagues who

12   were offended by it.  And it was a very emotional

13   Cabinet meeting.  It was very --

14          I remember, for example, Dr. Levine was

15   highly affected by it on a number of levels.  And,

16   you know, especially around mentioning of his wife in

17   the context in which she was mentioned.  And Mr.

18   Garvey, who is our Vice-President of Fiscal Affairs,

19   a reference to a business.  There were things here --

20   and then I, personally, I was -- you know, we operate

21   on the basis of respect, you know, and to be -- I,

22   personally, felt to be characterized as Hitler, and

23   then the whole rather -- the vulgar, inappropriate

24   reference to, you know, I have to leave to go to the

25   ladies' room, et cetera.  The whole thing was highly

1    -- I remember that that meeting -- I have never had a

2    Cabinet meeting like that, because we all felt this

3    was an affront to everything that Marywood stands

4    for, to the founding vision of the Sisters, to all

5    the values that we hold dear, and to what we teach

6    our students, and what we expect of our members of

7    the Marywood community, including our Professors.

8    And a violation of just so many of the elements of

9    what civil, professional, ethical behavior involves.

10   And that's my memory, that is a very strong memory

11   that I have of that Cabinet meeting.  And the

12   importance of my -- since it affected everybody, it

13   became without question for me it was my

14   responsibility to deal with it.

15   Q.    And do you remember the date of that

16   meeting that you're referring to?

17   A.    I don't.

18   Q.    Okay.  And so I think you have

19   testified that Dr. Levine was at the meeting?

20   A.    Yes, he's on the Cabinet.

21   Q.    And Mr. Garvey?

22   A.    I can tell you who the members of the

23   Cabinet are.  They're all the Executive Officers,

24   many of whom were -- many of whom were in the video,

25   referenced in the video.

1    Q.    I'm sure you can tell me that.  But do

2    you remember exactly who was at that meeting?

3    A.    No, it's five years ago.  I mean, it's

4    a rare thing that people miss a Cabinet meeting.  But

5    I wouldn't be able to say that everybody was there,

6    but most likely people were.

7    Q.    And you didn't review your notes before

8    this deposition to refresh your recollection on who

9    might've been at that meeting?

10   A.    No, I didn't reference anything on the

11   Cabinet meeting.

12   Q.    Okay.

13   A.    But the memory is very much with me,

14   because it was a very -- you know, it was a very sad

15   meeting, you know, to the point that some people felt

16   so affronted they were considering litigation.  It

17   was a very intense meeting.

18   Q.    Was the topic of potential discipline

19   of Professor Fagal raised at that meeting?

20   A.    I don't recall that specifically, but I

21   know that I had -- I know that everybody at the

22   meeting just felt this was just crossing the line of

23   what we stood for.

24   Q.    Okay, so you don't remember explicitly

25   the topic of discipline coming up.  Do you remember

1    anyone even hinting at it, or suggesting that

2    Professor Fagal should be disciplined over the video?

3    A.    I would -- you know, I can't say

4    exactly what was said, but I'm sure I said that this

5    is serious, and there will be consequences.  But I

6    don't remember what I said five years ago.  I just

7    know myself well enough to know that at this meeting,

8    that was the nature of the meeting, part of the

9    meeting.  We probably had a big agenda of a lot of

10   things.  We never talked just about one thing, you

11   know, we had standard agendas.

12   Q.    When you say someone -- I think a

13   moment ago you testified that somebody at the meeting

14   was considering litigation?

15   A.    Yes.

16   Q.    And, again, I'm not asking about any

17   attorney/client communications.  But who was it that

18   suggested litigation that you remember?

19   A.    I think -- well, I think the people who

20   felt highly offended because their families were

21   involved were angry enough to do that.

22   Q.    Do you remember the specific people

23   that contemplated litigation?

24   A.    I do.

25   Q.    Who were they?

1    A.    I think that Dr. Levine was very
2  offended.
3    Q.    Did anyone else express interest in
4  litigation at that meeting?
5    A.    I think that Mr. Garvey was offended,
6  too.  You know, it was a very emotional meeting.  It
7  could've been even a nod of the head, I don't recall,
8  except I remember that that stuck in my head, and it
9  gave me a sense of how offended.  When one feels
10  discriminated against, one reacts intensely.  I've
11  seen lots of examples of that in my life.
12    Q.    Okay.  So I asked you about the steps
13  that were taken by you after your return to campus
14  regarding the videos.  We just discussed a meeting of
15  the Executive Cabinet, right?
16    A.    Um-hum.
17    Q.    And we talked a little bit about Dr.
18  Levine's reactions to the videos.  Did Dr. Levine
19  recommend that Professor Fagal be suspended?
20    A.    I don't remember a specific statement,
21  but we were in accord that this needed to be dealt
22  with, and that this was very serious, and I would
23  deal with the consequences.  Everybody agreed with
24  that.
25    Q.    You keep saying you don't remember

1    A.    I would recall that Dr. Levine, and
2  everybody else there, was in accord with me for doing
3  -- making sure that the consequences of such action
4  would be pursued.  That's my recollection of the
5  meeting.
6    Q.    And nobody specifically explained what
7  those consequences would be?
8        MS. PEET:  Objection.  She just
9        said this happened five years ago, she
10        doesn't remember.  That's the take away
11        that she remembers.
12        THE WITNESS:  Right.  I remember
13        the intensity of my awareness that there
14        would be consequences, and suspension
15        was a consequence.  What I said at that
16        meeting, I don't recall.
17  BY MR. COHEN:
18    Q.    Right, and I wasn't just -- I don't
19  want to know just what you said at the meeting.
20    A.    Well, everybody was pretty much in
21  support of -- everybody was highly offended by this.
22    Q.    Everybody was pretty much in support of
23  what?
24    A.    Of whatever action would be taken for
25  this egregious offense.

1  explicitly, but did anyone --
2    A.    Well, in my mind -- you know, you're
3  asking me to remember conversations five years ago,
4  which is very difficult, and I'm very -- I want to be
5  as thoughtful as possible, and as accurate as
6  possible, which is what I'm trying to do here.  I
7  just know that this was so serious to me that this
8  was going to be a suspension.  Do I remember the
9  exact words that may have taken place in our
10  discussion of this, I can't give you an exact sense
11  of it.  But I know that this for me was so serious,
12  and so egregious that it was going to have
13  consequences of a serious nature.
14    Q.    Okay.  So you can't remember the exact
15  words verbatim?
16    A.    Right.  But I had come to the
17  conclusion that this was -- this is something for
18  which the individual concerned should be suspended.
19  But I wanted to talk to that person with every
20  benefit of the doubt to give Dr. Fagal the
21  opportunity to talk to me about why these videos were
22  done.
23    Q.    So just to be clear, you don't remember
24  explicitly whether Dr. Levine recommended the
25  suspension of Dr. Fagal, correct?

1    Q.    Everyone was in support of whatever you
2  wanted to do with regard to discipline, or -- I'm
3  trying to get at specifics.  And I realize this is a
4  long time ago.
5    A.    Sir, this is five years ago, and it's
6  very hard for me to try to -- I mean, I have 10
7  people that I'm meeting on the Cabinet level, 9
8  people.  And I just know that I had -- that everyone
9  on the Cabinet, Executive Officers who were highly
10  offended by this, saw it as an egregious affront to
11  what Marywood stands for, and that it needed to be
12  dealt with accordingly.
13    Q.    So I understand you were the President,
14  and there are Executive Cabinet Officers beneath you.
15  Did anyone on that Cabinet have the authority to
16  discipline Professors without a green light from you?
17  I'm not talking just about Professor Fagal.  But does
18  anyone on the Executive Cabinet have the authority to
19  discipline Professors without seeking you out first?
20    A.    Okay.  In University, in academe, okay,
21  there are a lot of layers.  And there are cases, for
22  example, where let's say a Professor's teaching
23  performance is very, very poor.  Well, you know, a
24  lot of that doesn't rise to the President.  Like a
25  Dean will make an appropriate judgment, the Academic

65

1   Vice-President will make an appropriate judgment.
2           There are all sorts of matters.  You
3   know, there's the whole advancement area of the
4   University.  There's the whole student life
5   enrollment management.  You know, there's the
6   academic area.  There's a physical area.  And there
7   are many, many situations where, you know, because of
8   the policies and procedures involved that there are
9   decisions made within areas where that is within the
10  scope and competence of the area concerned.
11          And so, I mean, that's an ordinary,
12  every day operational practice within a University.
13  So there are many things that -- for example, we have
14  committees that make huge decisions on rank and
15  tenure, for example, or curriculum, that's the
16  competence that they have.  And how the President
17  enters into it is only when, you know, I get a
18  recommendation, and then, you know, I typically
19  follow the recommendation of that entity.  So there
20  are things of that nature that go on every single
21  day.
22      Q.      At the time in January 2012, who were
23  Professor Fagal's superiors at the University?  There
24  was, obviously, you; but between you and Professor
25  Fagal, who had supervisory authority over him?

66

1       A.      Well, there's the Department Chair.
2       Q.      And who was that?
3       A.      I believe that would have been Sister
4   Margaret at that time, Sister Margaret Gannon.
5       Q.      Let's go up the levels.
6       A.      You know, okay, I will be glad do that,
7   but I also want to say that, you know, there's a
8   collegial relationship, and there's a team
9   relationship.  So I'm not necessarily always in a
10  hierarchical mode here in discussing people's
11  authority levels and responsible levels.  But there
12  is a Department Chair, there is a Dean.  The Dean at
13  that time would have been Dr. Michael Foley.
14      Q.      Dean of what?
15      A.      The College of Liberal Arts and
16  Sciences.
17      Q.      Let's keep going.
18      A.      Dr. Alan Levine was the Vice-President
19  of Academic Affairs, and I was President at that
20  time.
21      Q.      So would it be fair to say that at
22  least three people beneath you had the ability to
23  discipline Professor Fagal over these videos?
24          MS. PEET:  Objection to the form.
25          THE WITNESS:  You know, I'm saying

67

1   that there are certain responsibilities
2   within the scope and role discretion of
3   a Department Chair.  There are certain
4   responsibilities within the scope and
5   discretion of what a Dean does.  And
6   there's certain scope and
7   responsibilities for an AVP; however,
8   AVP is a direct report to the President;
9   the Dean is a direct report to the AVP;
10  and the Chairs report to the Dean.  So
11  there is a flow of information.
12          The situation with this particular
13  incident of the videos rose to the level
14  of the Presidency because it involved
15  the whole institution, the total
16  institution, it involved the entire
17  Executive Officer body, it involved the
18  essence of our mission and core values.
19  And it involved a number of policies
20  which are directly something that
21  ultimately the President has the
22  responsibility for seeing that the
23  institution is compliant with.
24  BY MR. COHEN:
25      Q.      Okay.

68

1       A.      So if this were a case of poor
2   teaching, you know, because of student evaluations
3   coming in, the Chair would deal with that, the Deans
4   would deal with that, the Vice-President would deal
5   with that.  And the Vice-President in this case was
6   the person who perhaps was most egregiously offended.
7       Q.      So eventually, and specifically I mean
8   January 23rd, 2012, you had a meeting with Professor
9   Fagal in which he was suspended; am I right?
10      A.      That is correct.
11      Q.      Before that meeting would it be fair to
12  say that Professor Fagal had not been disciplined
13  over the videos?
14      A.      I think that's fair to say, yes,
15  because this was my first opportunity to talk to him
16  directly.
17          MR. COHEN:  Does anyone need to
18  take a break?
19          MS. PEET:  Do you want to take a
20  few minutes?
21          THE WITNESS:  I suppose I could.
22          MR. COHEN:  I'm thinking like 10
23  minutes.
24          MS. PEET:  Sure.
25          (At this time, 11:14 a.m., there

69

71

| | |
|---|---|
| 1   was a brief break taken.) | 1   this document was generated? |
| 2        MR. COHEN:  (11:28 a.m.)  Back on | 2        A.   I couldn't tell you exactly when, but |
| 3   the record.  We'll mark this as Munley | 3   it would have been in preparation for the meeting. |
| 4   7, please. | 4        Q.   Right.  And this is not the first time |
| 5        (At this time, Munley Deposition | 5   you're seeing this document? |
| 6        Exhibit 7 was marked for | 6        A.   No, it's not. |
| 7        identification.) | 7        Q.   Okay.  And so you would have approved |
| 8   BY MR. COHEN: | 8   these talking points, if not created some of them |
| 9        Q.   Sister, do you recognize -- | 9   yourself, correct? |
| 10        A.   I do. | 10        A.   Some of it was like informational |
| 11        Q.   -- the document in front of you?  And, | 11   pieces.  We have multiple policies, you know, so like |
| 12   just briefly, what are we looking at here? | 12   whenever I had to deal with any kind of a situation I |
| 13        A.   These are thought processes, talking | 13   always reference all the policies, particularly all |
| 14   points, things that -- sort of like guidelines for | 14   the policies that are -- you know, if it's a faculty |
| 15   the meeting that was to occur. | 15   matter, I review the policies in the Faculty |
| 16        Q.   And you're referring to the | 16   Handbook.  So, I mean, this is an approach that when |
| 17   January 23rd, 2012 meeting involving Professor Fagal, | 17   you get down to the bottom it's like looking at some |
| 18   Michael Foley, Patricia Dunleavy? | 18   of the matters regarding policies; what we would do |
| 19        A.   Dr. Fagal and I were the ones meeting. | 19   if A, B or C were to occur.  This is just sort of |
| 20   Dr. Foley was the Dean, and that's why he was | 20   like a prep sheet.  This is like something that I |
| 21   appropriately to be there.  And Dr. Dunleavy is | 21   typically would do in collaboration drawing on the |
| 22   Associate Vice-President for H.R. | 22   expertise both within the house, and if I needed to |
| 23        Q.   And so these were -- | 23   go beyond that in terms of conversation with Counsel, |
| 24        A.   These are my thinking points. | 24   I would have done so. |
| 25        Q.   And so it's correct to say that you | 25        Q.   Do you remember specifically adding or |

70

72

| | |
|---|---|
| 1   generated this document? | 1   changing any of these talking points prior to the |
| 2        A.   Some of this was in consultation. | 2   January 23rd, 2012 meeting? |
| 3        Q.   I was going to say it looks like -- | 3        A.   Again, that was five years ago, I can't |
| 4   some of the wording it looks like someone else may | 4   say that I recall anything that I could say |
| 5   have generated it.  And I'm specifically referring to | 5   specifically. |
| 6   Ms. Dunleavy, but I don't know.  But you're not sure | 6        Q.   If you look at the 7th bullet point |
| 7   whether you did it? | 7   down, it begins with, "Tell Fagal," do you see that? |
| 8        A.   Well, I know I work with Dr. Dunleavy | 8        A.   Um-hum. |
| 9   about H.R. steps, because that's her role, you know. | 9        Q.   Can you read that briefly to yourself, |
| 10   But this document is very familiar to me. | 10   and let me know when you're finished? |
| 11        Q.   I'm sorry? | 11        A.   (Witness complies.)  Um-hum. |
| 12        A.   This document is very familiar to me, | 12        Q.   So it seems to me, and correct me if |
| 13   because it was the guidelines for the meeting that we | 13   I'm wrong, but the way that that is written, it's |
| 14   were having. | 14   almost as if you were not supposed to preside over |
| 15        Q.   And so you think that these talking | 15   this meeting, someone else was; because you're |
| 16   points were -- this was like a collaborative endeavor | 16   referred to in the third person, am I right? |
| 17   between you and Dr. Dunleavy? | 17        MS. PEET:  That's a compound |
| 18        A.   Yes, I think Dr. Dunleavy -- Dr. | 18        question, so why don't you break it |
| 19   Dunleavy's role as Associate Vice-President for H.R., | 19        down. |
| 20   she is the person who has all of the H.R. related | 20   BY MR. COHEN: |
| 21   policies, she works with all the time.  So, you know, | 21        Q.   Initially was the meeting with |
| 22   I work with her frequently on these matters.  And she | 22   Professor Fagal supposed to just be with Dr. Dunleavy |
| 23   also assists me with personnel matters that aren't of | 23   and not you? |
| 24   a legal nature. | 24        A.   Oh, no.  This, you know, "Ask Fagal," |
| 25        Q.   Okay.  And do you know exactly when | 25   that was -- I recall talking a lot of this out with |

1  Dr. Dunleavy.

2     Q.    So even though this bullet point says,

3  "Tell Fagal that Sister views this conduct to be a

4  serious breach," even those it's written in the third

5  person, it was you that was going -- that planned to

6  say that?

7     A.    I was the one who was going to meet

8  with Dr. Fagal, yes.  I had decided that earlier on,

9  it goes with office of the President.  And, you know,

10  often when I have meetings and work through processes

11  somebody takes the notes, it's not where me.

12     Q.    Right, right.  Okay.  The next bullet

13  point reads, "Ask Fagal to leave campus; wait for

14  Sister's decision," am I right?

15     A.    Um-hum.

16     Q.    And then there's like a sub-bullet

17  point underneath that, it says, "Suspended with pay,"

18  correct?

19     A.    These are all the things to think

20  about, yes.  These are elements to think about.

21     Q.    But I did read that correctly, correct?

22     A.    You read -- I'm sorry, you read --

23     Q.    It says, "Ask Fagal to leave campus;

24  wait for Sister's decision."  And then there's a

25  sub-bullet point saying, "Suspended with pay,"

1  answer that.

2     Q.    Okay.

3     A.    And I asked him multiple times, about

4  three or four times, trying to see if there was any

5  more enlightenment he could give me, because I was so

6  appalled by it.

7     Q.    Okay.  We're going to talk more about

8  that in a minute or so, but I just want to get

9  through this document.  Do you see on the first page

10  there's also a bullet point that says, "Post

11  Suspension"?

12     A.    Um-hum, that's a contingency thing.  I

13  always review -- if I may, I always review what are

14  the pertinent policies, and what are the steps,

15  because when you deal with, you know, various -- We

16  have a whole series of policies.  I always -- some of

17  them are time related, some say within a certain

18  period of time.  So this was like the elements of if

19  we would go this path, these are some of the steps.

20     Q.    And underneath that, underneath, "Post

21  Suspension," it says, "Sister recommends termination

22  and prepares notice of charges," correct?

23     A.    That's in the policies.

24     Q.    Okay.  Was your plan going into this

25  meeting on January 23rd, 2012 to move from -- well,

1  correct?

2     A.    Right, that's what the document says.

3     Q.    Okay.  So leading up to the meeting

4  with Professor Fagal on January 23rd, 2012, was it

5  your plan to suspend him regardless of what was said

6  at the meeting?

7     A.    Yes.

8     Q.    Okay.

9     A.    I wanted to give him an opportunity to

10  address the video as a tenured Professor and the

11  responsibilities of a tenured Professor.  And then,

12  you know, I was looking for information that would

13  help me to see further down the line.  But this

14  warranted suspension in my opinion.

15     Q.    What type of information were you

16  hoping to hear from Dr. Fagal?

17     A.    When I met with Dr. Fagal I asked him

18  directly, you know, was he responsible for the

19  videos, and immediately he said yes.  And then I

20  asked him, you know, how these videos -- in what way

21  did these videos support his role as a tenured

22  Professor at Marywood University.  Because, you know,

23  the whole policy on tenure talks about upholding the

24  mission and values of the institution, it's a mutual

25  agreement.  And he did not answer.  He chose not to

1  first of all, you already testified it was to suspend

2  Professor Fagal, correct?

3     A.    I felt this was very serious.  And if

4  you don't stand up for what is the essence of your

5  institution, what are you opening the future to?  I

6  thought it was very serious, it rose to the level of

7  the President; and, yes, it deserved consequences,

8  that was where I was.

9     Q.    Was the plan also to not only suspend

10  him, but to move directly to termination regardless

11  of what occurred during the meeting?

12     A.    In the meeting I was intentionally

13  giving Dr. Fagal the opportunity to really give me

14  some sort of explanation, which I asked for

15  repeatedly and didn't get.

16     Q.    Right, I understand what you --

17     A.    This document reflects the whole range

18  of potential developments in looking down the line as

19  to depending on contingencies.

20     Q.    Okay.  Now, I know what you believe was

21  asked at the meeting, what was said or not said.  And

22  I know we can both read this document.  But my

23  question was a little more simple.  Was your plan to

24  move directly from suspension to termination

25  regardless of what occurred at the meeting?

77

1     A.    I would have to say that I was very
2  interested in hearing from Dr. Fagal why he did these
3  videos and how that related to his responsibilities
4  as a tenured Professor at Marywood.
5     Q.    I understand.
6     A.    And, you know, depending on the kind of
7  answers, that would then affect my next thoughts on
8  it.  But this is a preparation of all of the various
9  things I would have to take into consideration for
10 whatever direction this case took.  But I had
11 determined that suspension was going to be the
12 outcome of this meeting.
13    Q.    Okay.  I don't think --
14    A.    And the next steps were yet to be
15 determined.
16    Q.    Other than this document in front of
17 you, these talking points, was there -- are you aware
18 of another set of talking points to help prepare you
19 for this meeting, the January 23rd, 2012 meeting?
20    A.    I know that I had -- typically, when I
21 have things of this nature I have bullet points.  So,
22 yes, I'm sure that there was something modified,
23 because this was like a whole range of potential
24 outcomes.  I think that I -- I think as a way of just
25 giving me some guidelines I think I had another

78

1  document, too.
2     Q.    Do you think it was handwritten or
3  typed out?  Do you remember?
4     A.    I don't remember actually.  I usually
5  work from typed documents.
6           MR. COHEN:  Stephanie, if there
7           was another document, I don't think -- I
8           may have missed it, but if there is we
9           would --
10          MS. PEET:  We'll check, but I can
11          confidently say everything that we have
12          that is not privileged that's relevant
13          has been produced.
14          THE WITNESS:  I may just have
15          taken this apart, I don't know, it's
16          five years ago, sir.
17          MR. COHEN:  Okay, I understand.
18 BY MR. COHEN:
19    Q.    Do you remember having this document in
20 front of you at the meeting, the January 3rd, 2012
21 meeting?
22    A.    I probably did.
23    Q.    But you're not sure?
24    A.    I'm not sure, because sometimes in my
25 mind, you know, like I have a sequence of some

79

1  thoughts that -- you know, when I meet with people I
2  don't -- you know, I don't always have a document in
3  front of me; but I may have had.
4     Q.    Okay.
5     A.    I don't recall.
6     Q.    So let's talk a little bit about this
7  meeting on January 23rd, 2012; the meeting, you were
8  there?
9     A.    Yes.
10    Q.    Professor Fagal was there, correct?
11    A.    That's correct.
12    Q.    Patricia Dunleavy was there?
13    A.    That's correct.
14    Q.    And Michael Foley was there, correct?
15    A.    Right, right.
16    Q.    Was there anyone else there?
17    A.    No.
18    Q.    And would it be fair to say that there
19 was a plan for Dr. Foley to visit Professor Fagal at,
20 approximately, 8:45 a.m. that day, and tell him to
21 appear at your office at 9:00?
22    A.    Yes, yes.
23    Q.    Okay.  And so it would be correct to
24 say that Professor Fagal received 15 minutes notice
25 of this meeting?

80

1     A.    Yes.
2     Q.    Was there any reason that he was
3  provided with only 15 minutes notice?
4           MS. PEET:  Objection to the form.
5           THE WITNESS:  I don't recall any
6           -- I couldn't give any answer to that.
7           I just knew that this was the date I was
8           going to deal with this situation.
9  BY MR. COHEN:
10    Q.    And would it be fair to say that in
11 your mind the content of this meeting could determine
12 whether Professor Fagal was going to remain at the
13 University?
14    A.    Yes.
15    Q.    So it was an important meeting?
16          MS. PEET:  Objection to the form.
17          THE WITNESS:  I'm sorry?
18          MS. PEET:  I objected to the form,
19          but you can go ahead and answer.
20          THE WITNESS:  I think any meeting
21          that I have -- you know, any meeting
22          that I would have with a faculty member
23          over something so serious in my mind was
24          an important meeting.
25 BY MR. COHEN:

81

1    **Q.**    And at the time of this meeting,
2  Professor Fagal, he had been a tenured Professor for
3  a long time, correct?
4            MS. PEET:  Objection to the form.
5    You can answer.
6            THE WITNESS:  I don't know when he
7            was tenured.  But he's at Marywood for a
8            number of years, so I know he's tenured,
9            but I don't know when.
10  BY MR. COHEN:
11    **Q.**    But you knew he had been an employee of
12  the University for many years before the meeting?
13    **A.**    **Yes.**
14    **Q.**    Did you think it was reasonable for a
15  long-time, tenured Professor to be given 15 minutes
16  notice of a meeting that was so important to his
17  future with Marywood?
18            MS. PEET:  Objection to the form.
19            THE WITNESS:  I thought it was an
20            important meeting.  I wanted to have an
21            opportunity to speak with Dr. Fagal, and
22            I set up an opportunity to do so.
23  BY MR. COHEN:
24    **Q.**    But you don't remember having any
25  thoughts about the reasonableness one way or the

82

1  other of --
2    **A.**    **No.**
3    **Q.**    -- of the 15 minutes notice?
4    **A.**    **No.**
5    **Q.**    Okay.  Do you think it would have been
6  more reasonable to send Professor Fagal an advanced
7  note stating that you would like to meet with him
8  about the video; you know, provide it more in advance
9  than 15 minutes?
10            MS. PEET:  Objection to the form.
11            THE WITNESS:  I can't put myself
12            back in a moment of time five years ago
13            and answer a hypothetical question.
14  BY MR. COHEN:
15    **Q.**    Okay.  In your history as President of
16  the University, Professor Fagal is not the first
17  employee that has been disciplined, correct?
18            MS. PEET:  Objection.
19  BY MR. COHEN:
20    **Q.**    I'm not asking for names.  But he's not
21  the first employee you can ever remember
22  disciplining, correct?
23            MS. PEET:  That she personally
24            disciplined --
25            MR. COHEN:  Yes.

83

1            MS. PEET:  -- or Marywood
2            University disciplined?
3  BY MR. COHEN:
4    **Q.**    Either one.
5    **A.**    **There are cases and there are**
6  **processes.  There are all sorts of different elements**
7  **within a University that reach the President in very**
8  **different ways.**
9    **Q.**    Okay.  But even as this was going on
10  there was disciplinary -- there were disciplinary
11  proceedings with a Professor named Palmiter, right?
12    **A.**    **I really -- we're talking about --**
13            MS. PEET:  Yeah, I'm going to
14            object to this line of questioning,
15            outside the scope of discovery.  This is
16            a breach of contract issue between Dr.
17            Fagal and Marywood University.  What
18            happened or didn't happen with other
19            Professors of the University bear no
20            relevance.
21  BY MR. COHEN:
22    **Q.**    Well, let me ask you this; was it
23  common -- and I do need an answer to this question.
24  I don't need names.  But would it be fair to say that
25  Professor Fagal was not the first Professor that

84

1  you'd have met with regarding a disciplinary matter
2  of that Professor?
3            MS. PEET:  Same objection.  You
4            can answer.
5            THE WITNESS:  Can you say that
6            again?  I didn't really hear the last
7            part of that question.  Is it fair to
8            say what?
9  BY MR. COHEN:
10    **Q.**    Let me -- I can make it more clear.
11            Have you ever met -- Prior to the
12  meeting with Professor Fagal on January 23rd, 2012,
13  had you ever met personally with another Professor
14  regarding whether that Professor should be
15  disciplined?
16            MS. PEET:  Again, objection.  This
17            is completely outside the scope of
18            discovery.  This is a breach of contract
19            issue between -- the contract at issue
20            is between Dr. Fagal and Marywood
21            University.  What had or had not
22            happened with other Professors at the
23            University bear no relevance on the
24            claims, damages or defense in this
25            matter.

85

1    MR. COHEN:  Are you directing your
2    client not to answer?
3        MS. PEET:  I am.  At this point I
4    am.
5    BY MR. COHEN:
6        **Q.**    Was it common or routine to provide an
7    employee that you were considering disciplining
8    approximately 15 minutes notice before meeting with
9    them?
10       MS. PEET:  Objection to the
11   question.  You can answer.
12       THE WITNESS:  I wanted to talk to
13   Dr. Fagal, and this was the way in which
14   it was arranged so that I could meet
15   with him directly because of the
16   importance of this matter, and that was
17   the circumstances under which it
18   occurred.
19   BY MR. COHEN:
20       **Q.**    I understand that that's what happened.
21   My question was different.  Was it -- Was this
22   standard operating procedure to provide a Professor
23   that you were considering disciplining with only
24   15 minutes notice of meeting with you?
25       MS. PEET:  Objection to the form.

86

1    BY MR. COHEN:
2        **Q.**    I don't think you've answered yet, I
3    mean.
4        **A.**    **I guess what I would say is, is in my**
5    **experience as President, this was a circumstance that**
6    **rose to a level that I had not experienced.  And I**
7    **was attempting to deal with it in a proactive way**
8    **that would enable me to deal with something of this**
9    **magnitude.  And that's what this refers to.**
10       **Q.**    I understand that.  But I still don't
11   think you've answered the question, and I think I'm
12   entitled to an answer.
13       **A.**    **Well, then can you rephrase it in a way**
14   **that I'm able to understand what it is you're trying**
15   **to evoke as a response?**
16       **Q.**    I'm not looking for any particular
17   response.  I just want an answer to the question,
18   which is was it routine or standard to provide only
19   15 minutes notice to an employee of a meeting with
20   you, who you were considering disciplining?
21       MS. PEET:  Objection to the form,
22       asked and answered.  She already said
23       this was a very unique experience she
24       never dealt with before.
25   BY MR. COHEN:

87

1        **Q.**    I believe it was asked, it wasn't
2    answered.
3        **A.**    **It was an event that was -- I've never**
4    **had an event like this, this was a one-time event.**
5        **Q.**    So the answer would be no, not --
6        MS. PEET:  It's asked and
7        answered.  You might not like what she
8        testified to, but the question has been
9        asked and answered to its completion.
10   BY MR. COHEN:
11       **Q.**    Did you deliberately give Professor
12   Fagal only 15 minutes notice of the meeting, as
13   opposed to a longer period of time; was that like a
14   specific thing you were planning?
15       MS. PEET:  Objection to the form.
16       You can answer.
17       THE WITNESS:  It was appropriate
18       for Dr. Foley to contact Dr. Levine[sic]
19       to ask him to come to see me, that's how
20       it worked out.
21   BY MR. COHEN:
22       **Q.**    Okay, that's still not an answer to the
23   question.  Do you remember specifically choosing to
24   only give a short amount of notice to Professor Fagal
25   of this meeting?

88

1        MS. PEET:  Objection to the form
2        of the question, but you can go ahead
3        and answer.
4        THE WITNESS:  You know, honestly,
5        I don't remember all of the nuances of
6        timing here.  I just knew my goal was to
7        spend time with Dr. Fagal, and that, you
8        know, the appropriate person to let him
9        know I wanted to see him was Dr. Foley.
10       And, you know, I don't remember spending
11       time thinking about time elements.
12   BY MR. COHEN:
13       **Q.**    Okay.  Can you state in as much detail
14   as you can what was stated at that meeting, including
15   you, Professor Fagal, anyone else at that meeting?
16       **A.**    **Well, I know that when I asked Dr.**
17   **Foley and Dr. Dunleavy to come to that meeting, it**
18   **was not really to participate in the meeting.  I just**
19   **felt that as Dean, you know, Dr. Foley's presence was**
20   **important.  And Dr. Dunleavy as Associate**
21   **Vice-President for H.R. was present, and then I asked**
22   **her to take notes so I would have a record of the**
23   **meeting.**
24       **Q.**    I understand.  But you were at the
25   meeting?

1    **A.**    I was at the meeting, and I led the
2    meeting.
3    **Q.**    So, presumably, you know in some part
4    at least what was said and what wasn't said at the
5    meeting?
6    **A.**    Oh, I definitely do, yes.
7    **Q.**    Can you --
8    **A.**    I can do that.
9    **Q.**    Can you recount that as best you can?
10   **A.**    Yes.
11   **Q.**    And preferably in chronological order.
12   I realize --
13   **A.**    I shall try.  I shall try.  This is
14   five years ago, but I shall try.
15   **Q.**    And I'm not asking you -- I do not
16   expect verbatim -- a verbatim accounting.
17   **A.**    I'll give you my memory.
18   **Q.**    Okay.
19   **A.**    Dr. Fagal came into the meeting, and I
20   greeted him.  And it was held in my conference room,
21   which is right off the President's office.  And I got
22   -- I introduced the topic of the videos, and I asked
23   him -- I remember asking him if he had been the
24   author of these videos, and he said yes.
25   And then I -- you know, for me these

1    videos were a violation of the responsibilities of a
2    tenured Professor.  So I asked him to explain to me
3    how these videos related to or supported his role as
4    a tenured Professor at Marywood University, and he
5    did not answer that.  And I know that I waited.  I
6    think I asked the question a few different ways, and,
7    you know, he didn't answer that.
8    I remember that he started at one point
9    to talk about posters.  I said, I'm not here to talk
10   about posters, this is about the videos.  I am
11   wanting to know about these videos.  And, you know,
12   again he didn't answer.
13   I said -- I remember, you know, because
14   I had prepared for this meeting, and I looked at a
15   lot of the policies that are related to the faculty
16   and the personnel.  And to me this was a violation, a
17   breach of what it means to be a tenured Professor at
18   Marywood, and that doing this violated -- because it
19   talks about upholding the mission and values of the
20   institution very clearly in the description of what
21   that tenure means.
22   And when I related that question
23   again -- there were several times that, you know, I
24   gave him the opportunity to talk about that.  I
25   mentioned that -- again, I started to talk about the

1    violation, that I felt in addition to the tenure that
2    for me this was a violation of the civil rights of my
3    colleagues, especially Dr. Levine, who is Jewish.
4    And, you know, implicating family members; I spoke to
5    discrimination and collegiality.
6    I referenced academic freedom, because
7    in our academic freedom policy it's very, very clear
8    that one exercises academic freedom in accord with
9    the propriety of the discipline professionally, with
10   due respect to the opinions of others.  And, you
11   know, there certainly wasn't anything scholarly about
12   these videos, they were defaming people.
13   So I was trying to just say just look
14   at all of the things that are involved here.  I
15   talked about the professional ethics policy that we
16   have at the University that talks about, you know,
17   non-discrimination and collegiality, and various
18   other elements.
19   I was also concerned about our computer
20   use, use of computers, because this video was sent to
21   faculty members at their Marywood address.  And I
22   believe there were students, because I know students
23   had also seen it.
24   And then, you know, when you think
25   about the mission and the core values, you know,

1    foundational to all of our core values is respect,
2    and I talked about that at that meeting.  And, you
3    know, I remember at one point just saying, "Why did
4    you do this?"  And the only answer I remember was Dr.
5    Fagal said, "Justice."  And I thought well, you know,
6    look at all these other areas, you know.  When you're
7    talking about tenure, civil rights, or professional
8    ethics, or use of computers, appropriate use of
9    computers, you know, for something that flies in the
10   face of what we stand for.  I was just trying to have
11   a basic conversation about that.
12   At one point I know Dr. Fagal was
13   getting ready to leave, and I said, "I'm not
14   finished."  "This is our opportunity to talk about
15   this."  And he did not leave, you know, he stayed
16   there.
17   And when I didn't get, you know,
18   anything -- there was no, you know, I'm sorry I did
19   it, or I wish I didn't do this, or, you know, no
20   effort to say, oh, I didn't think about the impact
21   this might have on Alan Levine, or on anybody else,
22   there was none of that.
23   There was this, you know, continued
24   resistance to giving me any explanation that would
25   carry any sway as to in any way make me think that

93

1  this wasn't, you know, a spur of the moment, or
2  ill-conceived, or something that I really didn't mean
3  to do, or none of that ever -- there was nothing like
4  that that came out in that meeting.
5          So I went on and I said, all right,
6  you're suspended. And that means that you turn in
7  your keys. And, you know, I asked to verify as this,
8  you know, says, your home address, a way in which I
9  could reach him, and that there would be follow-up.
10      Q.    Okay.
11      A.    That's the basis probably of my -- but
12  there was at no time in any way, any effort on Dr.
13  Fagal's part to any way say that he regretted doing
14  it, or that he thought -- you know, would look at it
15  another way, or would do anything in the future to
16  make up for this, or anything like that, anything of
17  that nature. So he left after I said that.
18      Q.    At what point in the meeting did you
19  actually state that to Professor Fagal, you're
20  suspended; was it towards the end, middle, beginning?
21      A.    Oh, it certainly wasn't at the
22  beginning, because in the beginning I was trying to,
23  you know -- it was probably at the end, you know. I
24  can't give you an absolute sequence, again, five
25  years ago, but I know that's where I got to, because

94

1  that's what I felt this action -- I think it was of
2  such magnitude that this was the -- there needed to
3  be a consequence for it.
4      Q.    Isn't it true that -- okay. So you
5  testified that you provided Professor Fagal with an
6  opportunity to explain the nature of the video,
7  correct?
8      A.    Several times.
9      Q.    And isn't it true that Professor Fagal
10  did attempt to explain the larger context of the
11  video, but he was cut off?
12      A.    I don't think that's a fair
13  characterization. Dr. Fagal started to talk about
14  posters. And I said, we're not here to talk about
15  the posters. This is what we're here to talk about,
16  the videos. And the videos are what was done that
17  was a total affront to all that Marywood stands for,
18  that's what I was there to talk about.
19      Q.    But wasn't it true that the video was
20  related to the posters?
21          MS. PEET: Objection, lack of
22  competency.
23          THE WITNESS: The videos were a
24  gratuitous extension of whatever was the
25  rationale for whatever Doctor's behavior

95

1  was. I don't know, I can't get guess
2  that. I was reacting to the videos as
3  President, because of the impact on the
4  total University, the impact on our
5  students, the impact on our Cabinet, and
6  the impact on all that we stand for.
7  BY MR. COHEN:
8      Q.    Isn't it also true that Professor Fagal
9  at the meeting stated that he would like an
10  opportunity to craft a written response to your
11  questions?
12      A.    That may have happened, yes.
13          MR. COHEN: Can we mark this as
14  Munley 8.
15          (At this time, Munley Deposition
16          Exhibit 8 was marked for
17          identification.)
18  BY MR. COHEN:
19      Q.    And, Sister, do you recognize this
20  document that is in front of you?
21      A.    I don't think so. They're notes,
22  obviously.
23      Q.    Is this your handwriting?
24      A.    No.
25      Q.    Do you recognize this as Dr. Dunleavy's

96

1  handwriting?
2      A.    It's probably that, yes; dot the I's.
3  Okay.
4      Q.    I'm sorry?
5      A.    Yeah, I think it is Dr. Dunleavy's,
6  yes.
7      Q.    But you've never seen this before?
8      A.    I don't recall this.
9      Q.    Okay. Does this appear to you to be
10  Dr. Dunleavy's, you know, contemporaneous notes of
11  the January 23rd, 2012 meeting?
12          MS. PEET: Objection, that would
13          call for speculation. She just
14          testified she doesn't recall this. But
15          you can go ahead an answer, if you know.
16          THE WITNESS: It looks like the
17          flow of the meeting.
18  BY MR. COHEN:
19      Q.    Okay. Do you see on the first page,
20  about three-quarters of the way down it says, "F -
21  writing - he'll craft response"?
22      A.    See, I don't know what that means,
23  he'll craft that, because I don't recall the elements
24  of that.
25          MR. COHEN: Okay. In that case,

97

1     let's move on to a new document.

2 BY MR. COHEN:

3     **Q.**     Do you know if there is any audio or

4 video recording of the meeting?

5     **A.**     **No, I never do that.**

6     **Q.**     You never do that you said?

7     **A.**     **I don't. I know there would not have**

8 **been an audio or video recording.**

9     **Q.**     And is it true that there was another

10 individual named David Elliott in the Presidential

11 suite at the time of this meeting?

12     **A.**     **Yes, there was.**

13     **Q.**     Was he listening in?

14     **A.**     **No.**

15     **Q.**     Was he just like in the next room?

16     **A.**     **I don't know exactly where he was.**

17 **But, you know, when I have meetings of this nature I**

18 **never know what dynamic is going to occur. So I**

19 **think that was standard, you know, policy of having**

20 **somebody accessible in the event that any assistance**

21 **would be needed; and I didn't, no.**

22     **Q.**     So other than you, Mr. Foley --

23     **A.**     **Dr. Foley.**

24     **Q.**     -- Dr. Foley, Dr. Dunleavy and

25 Professor Fagal, you don't know of any other

98

1 witnesses to the meeting?

2     **A.**     **Absolutely nobody else, no.**

3     **Q.**     And I'm not suggesting any, I just want

4 to -- for discovery purposes I want to make sure I

5 cover all the bases.

6     **A.**     **Yes, right.**

7     **Q.**     So the suspension happened -- This

8 meeting happened in the morning of January 23rd,

9 2012, right?

10     **A.**     **Yes, 9 o'clock, yes.**

11     **Q.**     And at the time -- and you did suspend

12 him during the meeting?

13     **A.**     **I did. And I suspended him with pay.**

14     **Q.**     Right. At the time that you suspended

15 Professor Fagal, did you feel like he posed immediate

16 harm to himself or to others if he continued to serve

17 in his position?

18     **A.**     **The harm for me was the harm to the**

19 **institution, to its mission, to the values, to the**

20 **identity, the whole purpose for which we exist; I**

21 **felt it was egregiously offended, that was the harm.**

22     **And I think I said earlier that, you**

23 **know, like harm to Dr. Fagal, that he would harm**

24 **himself did not enter into my mind, that's not in my**

25 **realm of memory.**

99

1     **Q.**     Did it occur to you that he might be --

2 that he might be a physical threat to someone else

3 other than himself? Do you remember thinking about

4 that?

5     **A.**     **You know, I don't explicitly recall**

6 **that. But, you know, I know that I did take the**

7 **precaution of having somebody available in the event**

8 **that there would be any action.**

9     **Q.**     Okay. So the harm that you think was

10 created by Professor Fagal's video was more of a --

11 you would characterize it as an assault on the values

12 of the University?

13     **A.**     **I think on everything we stand for.**

14 **That was from my first moment I felt this is just**

15 **totally a gratuitous, egregious assault on everything**

16 **that Marywood stands for, and thus affects everybody**

17 **in the institution. And explicitly I was very, very**

18 **upset because of the, you know, personal nature of**

19 **the attacks, which were not professional in any way,**

20 **shape or form. It's not the role model. It's not**

21 **what we expect of a tenured Professor at Marywood.**

22 **And that to me was very harmful. It's harmful to the**

23 **profession. It's harmful to the discipline. I'm a**

24 **social scientist. I think it's harmful to all the**

25 **disciplines related to, you know, the professional**

100

1 **level of what is expected.**

2     **Q.**     Did you think that the harm was

3 irreparable, or maybe with time it would pass to the

4 institution?

5     **A.**     **I saw no indication in the time of this**

6 **meeting that there was anything on Dr. Fagal's part**

7 **that would indicate a desire to relook at the**

8 **situation, to say I'm sorry I did it, or, you know,**

9 **this is not what I intended. There was nothing that**

10 **absolutely. And so much so that at the very end**

11 **I remember -- it's always my nature when I'm in a**

12 **dialogue such as this to go back, "Is there anything**

13 **further that you want to say?" I do that repeatedly**

14 **in meetings. And there was never anything that**

15 **indicated to me in the course of that meeting that**

16 **there was any sense even that -- nothing was**

17 **communicated to me that there was even awareness that**

18 **anything that had been done had been offensive. I**

19 **found that also quite shocking.**

20     **Q.**     Between the posting of the videos, the

21 time that the videos were posted and the time you

22 suspended Professor Fagal, are you aware of anybody

23 at Marywood taking special security precautions with

24 regard to him, other than Mr. Elliott in the next

25 room during the meeting?

1      **A.    I don't recall anything like that.**

2      **Q.**    Do you know whether Professor Fagal was

3    under some type of monitoring or surveillance?

4          MS. PEET:  Objection to the form.

5          THE WITNESS:  I'm not aware of

6      anything like that.

7    BY MR. COHEN:

8      **Q.**    Do you know whether his University

9    office was searched prior to the suspension?

10      **A.    I'm not at all aware of that.**

11      **Q.**    Do you know whether -- Did he have a

12    University computer, do you know?

13      **A.    Every -- yeah, every faculty, all the**

14    **offices are University.**

15      **Q.**    Do you know whether Professor Fagal's

16    computer was searched?

17      **A.    Nothing to my knowledge like that ever**

18    **happened.**

19      **Q.**    Do you know if anyone at the University

20    informed the police about Dr. Fagal?

21      **A.    I'm not aware of that.  I don't recall**

22    **anything like that.**

23      **Q.**    Do you remember on the next day -- The

24    suspension happened on January 23rd, correct?

25      **A.    Um-hum.**

1      **Q.**    On the next day, January 24th, do you

2    remember sending through your secretary a statement

3    of the charges to Professor Fagal?

4      **A.    Yes.**

5      **Q.**    And in that statement of charges, do

6    you remember stating that you were recommending that

7    Professor Fagal be terminated?

8      **A.    Um-hum.**

9          MS. PEET:  Your answer is yes.

10          THE WITNESS:  Oh, pardon me, yes.

11      I'm sorry.

12          MS. PEET:  That's okay.

13          THE WITNESS:  Yes, I do.  I

14      remember that letter, because that was

15      deeply considered.  I mean, I didn't --

16      it reflected the elements that I felt

17      were very important, yes.  And it was my

18      recommendation knowing that, you know,

19      that I was open to having that reviewed.

20    BY MR. COHEN:

21      **Q.**    Do you know when that first statement

22    of charges was drafted?

23      **A.    I can't tell you exactly, but it would**

24    **-- it was -- I know that the letter was prepared the**

25    **next day.  I did it the next day.**

1      **Q.**    Was it begun -- Was the letter begun

2    before the January 23rd, 2012 meeting?

3      **A.    I don't recall that.**

4      **Q.**    Okay.  Is there anything in your mind

5    that Professor Fagal could have said at the

6    January 23rd, 2012 meeting that could have led to you

7    not pursuing termination?

8          MS. PEET:  Objection, calls for

9          speculation.  You can answer.

10          THE WITNESS:  It's hard for me to

11      revisit that.  The reason that I had the

12      meeting was to give him an opportunity

13      to speak to it, and repeatedly asked him

14      to do it, but he didn't.

15    BY MR. COHEN:

16      **Q.**    But, again, you said you think that he

17    asked to draft a written response to your questions;

18    am I right?

19          MS. PEET:  Objection, asked and

20          answered.  You don't have to answer it

21          again.

22          MR. COHEN:  Are you directing her

23          not to answer?

24          MS. PEET:  Yeah, it's already on

25          the transcript.

1          THE WITNESS:  I already answered

2      that.

3          MR. COHEN:  Let's mark this as

4      Munley 8 -- 9.

5          (At this time, Munley Deposition

6          Exhibit 9 was marked for

7          identification.)

8    BY MR. COHEN:

9      **Q.**    Briefly could you review this and let

10    me know if you recognize it?

11      **A.    What date is this?  The 23rd, okay.**

12    **This talks about --**

13          MS. PEET:  There's no question.

14          THE WITNESS:  Oh, I'm sorry, I

15      thought you asked a question.

16    BY MR. COHEN:

17      **Q.**    You do recognize this document?

18      **A.    Yes, it was sent to me.**

19      **Q.**    This is an e-mail from Patricia

20    Dunleavy to you, dated January 23rd, 2012 --

21      **A.    Right.**

22      **Q.**    -- at 6:22 p.m., right?

23      **A.    That's the time that's on here, yes.**

24      **Q.**    Okay.  And Dr. Dunleavy states, "Will

25    had an appointment over lunch; we will finish up the

1  Fagal statement of charges and the response to
2  Palmiter re his appeals and the appointment of the
3  committee when he gets back this afternoon." So does
4  this refresh your recollection of the approximate
5  time when the statement of charges began the drafting
6  stage? I mean, this is 6:22 p.m.
7      **A.    Well, it says it's after the meeting.**
8  **We met at 9 o'clock in the morning, so it indicates**
9  **that it was after the meeting. I know that I did the**
10 **letter the next day.**
11     **Q.    Right. Was your plan to terminate**
12 Professor Fagal no matter what he said at the
13 January 23rd, 2012 meeting?
14         MS. PEET: Objection, asked and
15     answered.
16         THE WITNESS: You've asked me that
17     several ways.
18 BY MR. COHEN:
19     **Q.    Excuse me?**
20     **A.    You've asked me that several ways. I**
21 **had determined to suspend. I had that meeting. Then**
22 **I began to move toward termination.**
23         MR. COHEN: Can you mark this
24     Munley 10, please.
25         (At this time, Munley Deposition

1      Exhibit 10 was marked for
2      identification.)
3  BY MR. COHEN:
4      **Q.    And, Sister, do you recognize this**
5  document?
6      **A.    Yes. Yes, these are the notes of the**
7  **meeting.**
8      **Q.    Whose notes are these?**
9      **A.    These are Dr. Dunleavy's notes. I**
10 **asked her to take notes.**
11     **Q.    And at the end there are two**
12 signatures, right?
13     **A.    That's correct.**
14     **Q.    Yours is not among them, correct?**
15     **A.    That's right. Dr. Dunleavy and Dr.**
16 **Foley.**
17     **Q.    Okay. Why didn't you sign this as**
18 well?
19     **A.    I don't know. It reflects my memory of**
20 **the meeting.**
21     **Q.    On the first page do you see the**
22 paragraph that begins, "Dr. Fagal said he was leaving
23 the meeting"?
24     **A.    Um-hum.**
25     **Q.    And then it says, "Sister Anne said she**

1  was not done; and told Dr. Fagal that this was his
2  opportunity to address the issue as she considers her
3  response. Dr. Fagal said that if she would put her
4  questions in writing he would craft his response."
5  Does that refresh your recollection of whether --
6      **A.    I didn't agree to put questions in**
7  **writing. This was the context in which this dialogue**
8  **was to occur.**
9      **Q.    There would be no other opportunity?**
10         MS. PEET: Objection.
11 BY MR. COHEN:
12     **Q.    You can answer.**
13     **A.    I was asking for the information at**
14 **this meeting.**
15     **Q.    Given the short notice that was**
16 provided to Professor Fagal, did you think it was
17 reasonable for him to address your questions in
18 writing?
19         MS. PEET: Objection to the form
20     of the question. You may answer.
21         THE WITNESS: I felt that Dr.
22     Fagal as a Professor, and as an
23     extremely well-educated, and articulate
24     person, would in a direct conversation
25     be more than adequately able to address

1  questions and answer them appropriately.
2  He is an academic.
3         MR. COHEN: Can we have this
4     marked as Munley 11, please.
5         (At this time, Munley Deposition
6      Exhibit 11 was marked for
7      identification.)
8  BY MR. COHEN:
9      **Q.    And, Sister, do you recognize this**
10 document?
11     **A.    Yes, this is my letter of January 24 of**
12 **2012 to Dr. Fagal.**
13     **Q.    The first page, that is an e-mail from**
14 --
15     **A.    Something is cut off on the bottom of**
16 **the first page.**
17     **Q.    We'll get there.**
18     **A.    Oh, okay.**
19     **Q.    The first page is an e-mail, though,**
20 from your secretary to Dr. Fagal, correct?
21     **A.    That's my secretary, yes. And it**
22 **included all of the things that I had referred to.**
23     **Q.    And so this is your first statement of**
24 charges, correct, to Dr. Fagal?
25     **A.    Yes.**

1    Q.    And it was sent to him on January 24th,
2  2012, at 1:11 p.m.?
3    A.    That's what it says, yes.
4    Q.    And in the letter you are recommending
5  Professor Fagal's -- that he be terminated
6  immediately?
7    A.    Um-hum.
8    Q.    Correct?
9    A.    It says, "Your tenure and employment be
10 terminated immediately," yes.
11   Q.    Between the time that Professor Fagal
12 was suspended and the time that this letter was sent,
13 did Marywood take any remedial actions with regard to
14 Professor Fagal?
15        MS. PEET:  Objection to the form
16   of the question.
17        THE WITNESS:  There were -- There
18   was nothing in the conversation with Dr.
19   Fagal that indicated there was any
20   looking toward remediating -- What do I
21   want to say?  What's the word?  There
22   was no remorse.  There was no desire to
23   seem to, you know, look at it another
24   way, nothing occurred of that nature.
25   So, no, this was a matter of the next

1    day.
2  BY MR. COHEN:
3    Q.    So you said, no, this was a matter of
4  the next day?
5    A.    The letter was on the 24th.
6    Q.    Yes.  And no, you're referring to no
7  there was no remedial actions taken with regard to
8  Professor Fagal?
9    A.    There was no indication at the meeting
10 that I had with him that there was any possibility of
11 our moving toward anything that was remediation.
12   Q.    I understand that.  But the question --
13 Whether there was an opportunity for remediation,
14 that's a different question.  I want to just be
15 clear.  There was no remedial action taken by
16 Marywood University from the time of the suspension
17 to the time of this letter, correct?
18   A.    The answer to that is no.
19   Q.    Do you remember at the end of all the
20 proceedings with Professor Fagal, the last letter you
21 wrote to him terminating him, do you remember that as
22 being around July 2012?
23   A.    You know, I don't.  I can't give you
24 months.  I know that it took -- there were various
25 correspondence, because you sent correspondence, and

1  we sent correspondence.  There was a lot of back and
2  forth.  So, you know, if there's a document that is
3  dated July and has my signature, I would say it came
4  from me.
5    Q.    Ultimately you did write him a letter
6  at some time saying it's over, you're done, right?
7        MS. PEET:  Object to the
8   characterization.  You can answer.
9  BY MR. COHEN:
10   Q.    I mean, he's no longer employed by
11 Marywood University, correct?
12   A.    There were many intermediary steps.  I
13 offered the possibility of, you know, having my
14 decision reviewed, this offer was made.  I believe
15 that in this January 24th document one of the items
16 listed here was a release.  And that in addition to
17 all the policies that are indicated here included --
18 okay, yeah, on the very last page, in order to give
19 -- I also believe in due process, and so I was giving
20 Dr. Fagal an opportunity to have my recommendation
21 reviewed appropriately.  And sent a release so that I
22 would be authorized to give a faculty review
23 committee, comprised of tenured faculty, you know,
24 the documentation involved in this.  And this was
25 never signed (indicating).

1        And so I did this on the 24th, but then
2  later I know there was another letter in February
3  that I wrote.  I'm not sure of the sequencing of all
4  these letters.
5    Q.    But in this letter that you're looking
6  at now, you're just recommending that he be
7  terminated.  He hadn't been terminated yet as of the
8  date of that letter, right?
9    A.    And he was still being paid all the way
10 through August.  He was suspended, and I was
11 recommending the next step.
12   Q.    Am I correct that in that letter you
13 were not terminating him yet, you were just
14 recommending it, correct?
15   A.    "I am writing to inform you that I am
16 recommending that your tenure and employment be
17 terminated immediately."  And I talk about payment,
18 and benefits, all of that.
19   Q.    Between the time that Professor Fagal
20 was suspended and the time that he was actually
21 terminated, whenever that was, did Marywood take any
22 remedial actions with regard to him?
23        MS. PEET:  Objection to the form.
24   Answer if you understand the question.
25        THE WITNESS:  We did not.

113

1    MR. COHEN:  Okay.  Should we take
2    a break so that we can order?
3    MS. PEET:  Why don't we just take
4    a quick break, look at the lunch menu
5    and we'll order.
6    THE WITNESS:  Can we finish with
7    this document before we break?
8    MR. COHEN:  I might be finished
9    with it -- I am finished with it, yes.
10   (At this time, 12:37 p.m., a brief
11   break was taken.)
12   MR. COHEN:  (12:43 p.m.)  Can we
13   have this marked as Munley 12.
14   (At this time, Munley Deposition
15   Exhibit 12 was marked for
16   identification.)
17   BY MR. COHEN:
18   Q.    And, Sister, do you recognize this
19   document?
20   **A.    I do.  This was -- one of the things**
21   **that I do, because it's -- you know, the nature of**
22   **this, termination of a tenured faculty member, I**
23   **reported it to the Board, and this was -- these were**
24   **the things that guided my conversation.  Actually, I**
25   **think this was to inform them about the video**

114

1    **basically, and then subsequently how it unfolded.**
2    Q.    I know there are several dates on this
3    document.  The last date is January 24th?
4    **A.    Yeah, I think that would have been --**
5    **well, I'm not sure when -- this was the chronological**
6    **piece of what -- you know, sort of what was my**
7    **talking to explain what happened from the 17th**
8    **through the 24th, yes.**
9    Q.    I'm just curious about whether you
10   remember the date of this Board meeting?
11   **A.    I don't, but I could probably find out.**
12   **I don't remember when it was, but I know that I had**
13   **gone to the Board.**
14   Q.    And this document, did you draft this?
15   **A.    Yes.**
16   Q.    And was it with help from anybody else?
17   **A.    I'm sorry, when you say was it**
18   **withheld --**
19   Q.    No, did you have anyone's assistance in
20   drafting this, or was it just you?
21   **A.    You know, I work so closely with Dr.**
22   **Dunleavy, I may have asked her to review this with**
23   **me.  But I know that I -- I remember working on this.**
24   **But, you know, it would be typical of me to have**
25   **assistance in Dr. Dunleavy working with me.**

115

1    Q.    Okay.  When you met -- When you did
2    meet with the Board, whenever that was --
3    **A.    Yes.**
4    Q.    -- did you have this document with you?
5    Would you have been referring to it as you're
6    speaking?
7    **A.    Yes, yes.**
8    Q.    Okay.  And --
9    **A.    Anything I call talking points, that**
10   **means it's something that I -- so I stay focused,**
11   **yes.**
12   Q.    So at this Board meeting, obviously the
13   Board was there?
14   **A.    Yes.**
15   Q.    You're a member of the Board, too?
16   **A.    I am an ex officio member of the Board.**
17   Q.    Was there anyone else at the meeting
18   that you remember, the Board meeting?
19   **A.    The total Board was there.**
20   Q.    Other than the Board and you, for
21   example, was Dr. Dunleavy there?
22   **A.    No.**
23   Q.    Would you say that these talking points
24   represent an accurate summary of what occurred with
25   regard to the University's handling of Professor

116

1    Fagal's videos between January 17th, 2012 and
2    January 24th, 2012?
3    **A.    I would say, yes, if -- yes.**
4    Q.    And I take it that these redactions,
5    you didn't do this, correct?
6    **A.    I didn't take them out, but that**
7    **probably, you know --**
8    Q.    Probably your Lawyers did?
9    **A.    Well, most likely because also as part**
10   **of what I did going forward, as I mentioned earlier,**
11   **I sought appropriate legal counsel.**
12   Q.    Right, and I don't want to -- I'm not
13   asking what's underneath these redactions, or at
14   least not yet.
15   MS. PEET:  For purposes of the
16   record, it was redacted by defense
17   counsel as part of attorney/client
18   privileged communication.
19   BY MR. COHEN:
20   Q.    Okay.  Is it -- When you spoke to the
21   Board about this, did you stick to your talking
22   points?
23   **A.    I typically do, yeah.  You know, I try**
24   **to be concise.  I mean, Board meetings are very comprehensive, and you want to make**

117                                                              119

1  sure that in the time you have that you convey the
2  information. And the Board was really very receptive
3  to the information that I gave them.
4       Q.    Do you know if someone takes like
5  minutes of Board meetings?
6       A.    We do have minutes of Board meetings.
7  If this was -- if this were an Executive session,
8  there would not have been minutes of this.
9       Q.    Who normally takes these minutes?
10      A.    The recording secretary is the Attorney
11 of the University and the secretary of the
12 University. But I don't recall if this was an
13 Executive session; it probably was, I don't know.
14      Q.    And the University's internal Counsel
15 is Ms. Patterson?
16      A.    That's Mary Theresa Patterson, Attorney
17 Mary Theresa Patterson.
18      Q.    Okay. Other than stating that the
19 Board was very receptive to your information, do you
20 remember any other responses they gave to you?
21      A.    Yes, I do indeed. The Board was just
22 appalled, astounded, offended; totally agreeing that
23 this was an egregious, counterproductive measure,
24 discriminatory. I mean, they were really -- they
25 were taken back that a Professor at Marywood out of

1       A.    I know that I was -- My goal in the
2  meeting with the Trustees was just to give them what
3  had occurred and what my actions were and why.
4       Q.    On Friday, January 20th, 2012, there's
5  a series of bullet points?
6       A.    Yes.
7       Q.    And one of them says, "Dr. Dunleavy
8  reviewed plan with Mr. Elliott (Senior Director for
9  Security & Safety)." Do you see that?
10      A.    I do see that.
11      Q.    What plan was that?
12      A.    The only plan that I was aware of was
13 that he would be available in the event that we
14 needed somebody.
15      Q.    Available at the January 23rd
16 meeting --
17      A.    Yeah.
18      Q.    -- or available generally?
19      A.    Strikes me as the 23rd, I don't know
20 that there was anything beyond that. You know, once
21 again, it's hard for me to recall all these details.
22      Q.    At the bottom of the first page there's
23 a sub bullet point, it says, "Sister Anne gave Dr.
24 Fagal repeated opportunities to explain his actions
25 with regard to the videos and how they supported his

118                                                              120

1  our core values and identity and mission, just
2  thought it was also highly inappropriate. They were
3  very offended.
4       Q.    Did the Board direct you to terminate
5  Dr. Fagal, or take any other disciplinary steps?
6       A.    I don't recall that. I just know I had
7  the support for what I was doing from the Board.
8       Q.    Okay. In these talking points that are
9  in front of you, on the third bullet point do you see
10 where it says, "Dr. Dunleavy began collecting
11 information"?
12      A.    Yeah, policy information.
13      Q.    And then the second sub point, "History
14 of Dr. Fagal's performance issues," correct?
15      A.    I didn't get into any -- I wasn't -- My
16 focus was on the videos. I didn't deal with that.
17      Q.    So you didn't -- At this Board meeting
18 you didn't discuss performance issues?
19      A.    No, this is just detailing the steps.
20      Q.    When you drafted these talking points,
21 what performance issues were you referring to, other
22 than the video sent on January 12th, 2012, if any?
23      A.    Well, I wouldn't recall what that would
24 be, that would be a Dr. Dunleavy question.
25      Q.    Okay.

1  University policy." And then you said, "Dr. Fagal's
2  only response was to review a November incident re
3  posters for a speaker." Is that correct?
4       A.    Yes, he wanted to talk about the
5  posters. And I said, look it, I'm here to talk about
6  the videos.
7       Q.    That's not -- This is not completely
8  accurate, though, because he ask for an opportunity
9  to craft a written response, correct?
10           MS. PEET: Objection to the form.
11           THE WITNESS: What I understood
12      Dr. Fagal was asking me is, give me your
13      questions in writing and I'll answer
14      them. And I was saying, here I am,
15      let's talk.
16 BY MR. COHEN:
17      Q.    Now?
18      A.    Here I am, let's talk. You're an
19 articulate person.
20      Q.    Okay. So when you said Dr. Fagal's
21 only response, you meant his only response like at
22 the meeting itself contemporaneously?
23      A.    His only response when I would ask him
24 for an explanation the one time was to try to talk
25 about the posters. And I said, look it, the

121

1  substance of this meeting is the videos.  I'm asking
2  you about the videos, that's what that line means.
3    Q.  You didn't want him to talk about the
4  posters?
5    A.  Well, you know, at that point what we
6  were there -- what I found was really the matter that
7  was at hand were those videos.
8    Q.  Okay.
9    A.  That to me was very serious, that's why
10  -- that's why it rose to the level of what it rose
11  to.
12    Q.  And on the next page, about halfway
13  down the page there's a sub bullet that says, "Sister
14  Anne reiterated that her concern was with the videos,
15  not the posters, and again asked Dr. Fagal if he had
16  an explanation for the videos; Dr. Fagal had nothing
17  to say."
18    A.  That's right.
19    Q.  But, again, that's not completely
20  correct, because he did ask for at least an
21  opportunity to draft a written response, correct?
22    MS. PEET:  Objection to the form,
23    mischaracterization of testimony.  You
24    can answer, if you can.
25    THE WITNESS:  That's not the

122

1    dynamic of the meeting.  The dynamic of
2    the meeting was around we're here, let's
3    talk.
4  BY MR. COHEN:
5    Q.  Okay.
6    A.  Repeatedly.
7    MR. COHEN:  Can we have this
8    marked as Munley 13, please.
9    (At this time, Munley Deposition
10    Exhibit 13 was marked for
11    identification.)
12  BY MR. COHEN:
13    Q.  Do you recognize this document, Sister?
14    A.  Yes, I do.  It's a letter from you to
15  me, right?
16    Q.  It looks like that to me.  You received
17  this from me, correct?
18    A.  Yes.
19    Q.  And this was on February 2nd, 2012?
20    A.  Right.
21    Q.  And in this letter, I'm essentially in
22  summary saying Professor Fagal is entitled to
23  progressive discipline.  This isn't progressive
24  discipline, blah, blah, blah, blah.  Is that
25  basically what I'm saying?

123

1    MS. PEET:  Objection, the letter
2    speaks for itself, but you can answer.
3    THE WITNESS:  I think this letter
4    speaks to your interpretation of what
5    you were advancing.
6  BY MR. COHEN:
7    Q.  Okay.  And did you actually read that
8  letter, or did someone on your staff read it?  How
9  does that work?
10    A.  I read the letter.  It's addressed to
11  me.
12    Q.  Right.
13    MR. COHEN:  And can we have this
14    marked as Munley 14.
15    (At this time, Munley Deposition
16    Exhibit 14 was marked for
17    identification.)
18  BY MR. COHEN:
19    Q.  And, Sister, do you recognize this
20  document?
21    A.  I really don't.
22    Q.  This is not your handwriting?
23    A.  No.
24    Q.  Again, do you think this is Dr.
25  Dunleavy's handwriting?

124

1    A.  Yes, I would think so.
2    Q.  So before today have you seen this --
3  had you seen this?
4    A.  I don't recall ever seeing this, no.
5    MR. COHEN:  Okay, let's move on to
6    -- We'll have this marked as Munley 14
7    -- 15, please.
8    (At this time, Munley Deposition
9    Exhibit 15 was marked for
10    identification.)
11  BY MR. COHEN:
12    Q.  And, Sister, do you recognize this
13  document?
14    A.  I do.  This is -- yes, this was the
15  February 8th letter to Dr. Fagal, and it indicates
16  all of the charges.
17    Q.  This is a revised statement of charges,
18  correct, Sister?
19    A.  It's a follow-up to that other January
20  letter that we made reference to earlier, and this
21  lays everything out, and the policies are attached.
22    Q.  At the end --
23    A.  And, again, the form is to allow me to
24  bring in a review committee.  This was the second
25  time it was offered.  Yeah, it's on the back.

125

1     Q.     And this is your signature on the
2  letter, right?
3     A.     **Of course, yes.**
4     Q.     And on the first page of the letter --
5  the first page is the e-mail attachment letter,
6  right?
7     A.     **Yes, that would be my secretary's**
8  **reference.**
9     Q.     And so the next page is the first page
10 of your actual letter?
11    A.     **Correct.**
12    Q.     The second sentence says, "As a result
13 of your breach of a material term of your obligations
14 as a tenured Professor, I am recommending that your
15 tenure and employment with Marywood be terminated
16 immediately." Did I read that correctly?
17    A.     **That is correct.**
18    Q.     And what did you mean by a material
19 term?
20           MS. PEET:  Objection.  You can
21 answer.
22           THE WITNESS:  I think that's a
23 legal expression.  What it means to me
24 is that the responsibility of being a
25 tenured Professor at Marywood was

126

1  violated; that in fact that Dr. Fagal
2  violated what's expected of a tenured
3  Professor.  That's the breach of the
4  tenure agreement, and it talks about the
5  mutual commitment deep and binding on
6  the faculty member as much as it is on
7  the University.  Suggests a strong
8  acceptance by that individual of the
9  mission, and core values and objectives.
10 I mean, this alone could have been
11 grounds for termination; however, I
12 added all of the other elements of the
13 policy that were violated, and
14 indicating why.
15           And then, you know, also, once
16 again, offering the opportunity to give
17 -- I had come to the conclusion of
18 termination, offering Dr. Fagal the
19 opportunity to have my decision reviewed
20 by appropriate tenured faculty, and that
21 was attached to this.
22 BY MR. COHEN:
23    Q.     And which material term precisely did
24 you think that Dr. Fagal was violating?
25           MS. PEET:  Objection, calls for a

127

1  legal conclusion.  You can answer, if
2  you know.
3           THE WITNESS:  I would have that
4  defined by legal counsel, defer to legal
5  counsel for elaboration of that.
6  BY MR. COHEN:
7     Q.     Okay.  On Page 2 of the letter --
8     A.     **Yes.**
9     Q.     -- you write, "Depicting the
10 University's President," do you see that line?
11    A.     **I do.**
12    Q.     "Depicting the University's President
13 as Adolf Hitler, a man who is responsible for
14 torturing and killing in excess of 6 million people
15 simply because they are Jewish is an intentional,
16 malicious and blatant violation of your tenure
17 commitments.  Portraying other University officials
18 as Nazi leaders, using crude and vulgar language and
19 belittling University officials also violates your
20 agreement with Marywood." Did I read that correctly?
21    A.     **Yes, that's exactly what that says.**
22 **"You gravely injured our community by your actions."**
23    Q.     Having watched the video, did you
24 really believe that Professor Fagal was actually
25 depicting you as Adolf Hitler?

128

1     A.     **Yes.**
2     Q.     That he was --
3     A.     **It said you're a -- you know,**
4  **repeatedly I was the Führer.**
5     Q.     But did you actually think that he was
6  in any way likening you to Adolf Hitler?
7     A.     **What would one think when you saw the**
8  **video?**
9     Q.     Well, I'm asking you.
10    A.     **Well, of course I thought, I mean, you**
11 **know, my name was attached to it, certainly.**
12    Q.     Did you think that Professor Fagal was
13 saying that like Hitler you would kill 6 million
14 people?
15    A.     **To compare me to Hitler I thought was**
16 **an extreme violation of anything to do with the**
17 **mission and core values of Marywood, and I took great**
18 **exception to it.  And, again, the whole**
19 **discriminatory aspect with regard to Dr. Levine was**
20 **of grave concern to me.**
21           **Remember, I have spent much of my life**
22 **working directly with people who have been on the**
23 **other end of dictatorships.  And so, you know, I**
24 **found it extremely offensive to be compared to Hitler**
25 **in any way, shape or form.  And as an IHM Sister, I**

129

1 thought it was an affront to our Congregation. We
2 have served the poor since we were created in 1845,
3 and established institutions to educate and develop
4 potential, because we're about empowering, not about
5 tearing down and destroying. And certainly value of
6 life, the value of life is a prime value.
7     So, yes, I feel that for a tenured
8 Professor at Marywood University to compare the
9 President of the University to Adolf Hitler, and to
10 take the Executive Officers and to portray them as
11 collaborators in an atrocity is certainly a violation
12 of anything that it means to be a professional
13 academic with tenured status in a Catholic
14 faith-based institution.
15     Q.    Your interpretation of the video is
16 that Professor Fagal accused various members in the
17 Marywood administration as having collaborated in an
18 atrocity?
19     A.    He belittled --
20         MS. PEET: Objection,
21     mischaracterization of testimony.
22 BY MR. COHEN:
23     Q.    Did you in any way recognize, or
24 consider, let's say that, that this video was satire?
25     A.    This was not -- for me this was not

130

1 satire. This was a blatant affront to what all we
2 stand for.
3     Q.    And at some point did you come to learn
4 that this video was actually an adaptation of a real
5 movie that other people had made satires about?
6     A.    I don't recall even, you know, pursuing
7 any thought about satire. I know it was on YouTube.
8 I know people were looking at it, but to me the video
9 was the video.
10     Q.    I guess my question is; did you know
11 that apart from what you think about the video, that
12 many people have taken -- had taken that film and
13 added their own subtitles to it? And there are many
14 Hitler parodies just like this on YouTube, did you
15 know that?
16     A.    It has no bearing on what we're talking
17 about.
18         MS. PEET: Objection, lack of
19     foundation.
20         MR. COHEN: I'm asking if she
21     knows.
22         MS. PEET: No, the question was
23     there are many Hitler videos out there.
24     That's your testimony. There is no
25     foundation for that.

131

1 BY MR. COHEN:
2     Q.    I'm asking if she is aware that this is
3 one of many Hitler parodies?
4     A.    I don't -- I don't follow Hitler
5 whatever, anything to do with Hitler, sorry.
6     Q.    Okay. Let's stay on Page 2 of this
7 letter. There's a heading where it says, "2.
8 Violation of Civil Rights Policy."
9     A.    Right.
10     Q.    And here you're charging Professor
11 Fagal with what it says, a violation of civil rights,
12 correct?
13     A.    Discrimination. Marywood does not
14 condone and will not tolerate discrimination,
15 harassment, et cetera. That's from our policy.
16     Q.    And did you really believe that
17 Professor Fagal's video was a civil rights issue?
18     A.    I think it was harassment. It was an
19 example of discrimination and harassment.
20     Q.    How was it an example of
21 discrimination?
22     A.    Dr. Levine is Jewish. And I think
23 that, you know, to have a colleague belittled in that
24 way to me is harassment.
25     Q.    Does --

132

1     A.    And, you know, again, it also goes on
2 further to talk about personal attacks. I felt there
3 were personal attacks. And it was really to bring in
4 the family members in the way in which that was done,
5 I thought that was demeaning, discriminating,
6 harassing behavior.
7     Q.    Okay. Do you know whether anybody at
8 Marywood filed a complaint under the University Civil
9 Rights Complaint Procedure Policy about these videos?
10     A.    I'm not aware of that.
11     Q.    Did you propose that anyone do that?
12     A.    No.
13         MR. COHEN: Let's move on to --
14     Can we have this marked as Munley 16,
15     please.
16         (At this time, Munley Deposition
17         Exhibit 16 was marked for
18         identification.)
19 BY MR. COHEN:
20     Q.    Do you recognize this document, Sister?
21     A.    I have seen this document, yes.
22     Q.    And this is a letter from Will Anthony
23 to me dated February 9th, 2012, right?
24     A.    Yes.
25     Q.    And on the first page it says after the

1  No. 2, "As a result of his first breach, he is not

2  entitled to pick and choose which policies and

3  procedures he believes will suit him best," correct?

4      **A.    That's what it says, yes.**

5      **Q.    Okay.  And on the next page, Mr.**

6  Anthony says, "As a result of Dr. Fagal's breach of

7  contract, Marywood had no further contractual

8  obligations to him," correct?

9      **A.    That's what legal counsel indicated.**

10     **Q.    Mr. Anthony is speaking on Marywood's**

11  behalf, right?

12     **A.    Yes.**

13     **Q.    This argument if one party to a**

14  contract breaches first, then the other party has no

15  further obligations under the contract, is that

16  something that you've used in other cases of

17  discipline with Professors?

18         MS. PEET:  Objection.  This goes

19     to the heart of the legal defense in

20     this case.  And she is not a lawyer, and

21     she is not Mr. Anthony.  And I don't

22     believe she is in a position to testify

23     about that.

24         MR. COHEN:  You're instructing her

25     not to answer?

1         MS. PEET:  If she knows, she can

2     answer.

3         THE WITNESS:  I can't speak to

4     that, that's a legal question.  I would

5     defer to the attorneys.

6         MR. COHEN:  All right.  Why don't

7     we take a break now.

8         (1:18 p.m., lunch recess taken.)

9         (1:56 p.m., deposition resumed.)

10         MR. COHEN:  We'll mark this as

11  Munley 17, please.

12         (At this time, Munley Deposition

13         Exhibit 17 was marked for

14         identification.)

15  BY MR. COHEN:

16     **Q.    And do you recognize this document,**

17  Sister?

18     **A.    Yes, I do.**

19     **Q.    And the first part of it is an e-mail**

20  from Dr. Levine to you, dated February 20th, 2012, at

21  2:20 p.m., and then your response is above that,

22  correct?

23     **A.    That's correct.**

24     **Q.    And so my understanding of this**

25  document is that Fred could have been recognized for

1  service, 25 years of service, but Dr. Levine is not

2  inclined to honor him, and then you agreed with that,

3  correct?

4      **A.    I agreed, yeah.**

5      **Q.    And this is February 20th, 2012, so**

6  that's after his suspension, but before all of the

7  disciplinary proceedings were completed, right?

8         MS. PEET:  Objection to the form.

9     You can answer.

10         THE WITNESS:  I'm not sure of all

11     the dates, okay; but, yes, this -- I did

12     agree with this decision.

13  BY MR. COHEN:

14     **Q.    Were you trying to convey to Dr. Levine**

15  that -- Well, let me back up a little bit.

16         This 25 years of service, is this just

17  a tradition that Marywood honors faculty members with

18  how many years of service?

19     **A.    It's the years of service event where**

20  **we list, you know, in 5-year increments, and we have**

21  **a, you know, coffee, tea, some food.  I thank people**

22  **for their service, and for their support of the**

23  **mission and values publically.**

24     **Q.    So here you don't want Professor Fagal**

25  honored for 25 years of service.  Are you trying to

1  convey that as of this date he is no longer working

2  for the University?

3         MS. PEET:  Objection to the form.

4         THE WITNESS:  I wasn't trying to

5     convey anything other than --

6  BY MR. COHEN:

7      **Q.    He doesn't deserve it?**

8      **A.    Well, that I agreed with his decision.**

9      **Q.    Okay.  At some point do you remember**

10  Professor Fagal initiating a faculty grievance

11  against you?

12     **A.    Oh, yes.  And that was one of the**

13  **reviews that was open to him.  We have a specific**

14  **policy on faculty and grievance it entails.**

15     **Q.    And to your memory he alleged,**

16  Professor Fagal alleged -- I'm not saying this is

17  true, this is just what he alleged -- that you

18  violated Marywood policy by improperly suspending

19  him, by improperly moving to terminate his employment

20  and tenure, and that he had not had an opportunity to

21  convene an ad hoc committee to appeal the suspension,

22  is that what he has essentially alleged?

23     **A.    If that's what's on the document that**

24  **he sent, then I would say that's what he alleged,**

25  **yes.**

137

1    **Q.**   What was your reaction to receiving --
2    to learning that a grievance had been filed against
3    you?
4         **A.**   I immediately set into motion, you
5    know, that that's his right, that's our process, it's
6    our policy. And so it happened. And there is within
7    the policy itself, within the policy it's exactly
8    spelled out how that goes forward, and who the people
9    are that are on that committee. They are tenured
10   faculty members that are elected by the faculty.
11        **Q.**   Were you angry with Dr. Fagal for
12   initiating this grievance against you?
13        **A.**   I felt that that was his right. That's
14   why repeatedly in those other letters I asked -- I
15   made him aware of the fact that he had these rights;
16   so, no, I was not angry.
17        **Q.**   Okay. In any way would you say you
18   were exasperated?
19        **A.**   I rarely get exasperated. I would say
20   this was his right, and he had a right to do it, and
21   that's what was done.
22        MR. COHEN: All right. Can I have
23   this marked, please.
24        (At this time, Munley Deposition
25        Exhibit 18 was marked for

138

1        identification.)
2    BY MR. COHEN:
3         **Q.**   Do you recognize this document, Sister?
4         **A.**   It was sent to me so -- I don't really
5    remember, but I can see it was sent to me, so I would
6    assume, yes, from Pat.
7         **Q.**   From Pat Dunleavy to you --
8         **A.**   Right.
9         **Q.**   -- dated March 7th, 2012, right?
10        **A.**   That's right, yes.
11        **Q.**   And can you briefly review this e-mail,
12   and let me know when you're finished?
13        **A.**   (Witness complies.) Okay.
14        **Q.**   Do you know, did you and Dr. Dunleavy
15   meet with Sister Gail? And here it says, "We should
16   be able to meet tomorrow." I'm asking did you
17   ultimately meet with her?
18        **A.**   I don't recall that I met with Sister
19   Gail. But I know that Dr. Dunleavy got all the
20   materials. I may have met with her, but I don't
21   specifically recall meeting with her myself.
22        **Q.**   Ever about Dr. Fagal, or just with
23   reference to this e-mail?
24        **A.**   You know, I can't say with certainty.
25   I really don't recall. I may have met with her. But

139

1    my concern was that Dr. Fagal would have the
2    opportunity to appeal. So whatever was necessary --
3    I may have met with her.
4         **Q.**   But you do think that Dr. Dunleavy did
5    meet?
6         **A.**   I would expect, because it says, "I'll
7    let you know how the meeting goes. Thank you."
8         **Q.**   Did Dr. Dunleavy ultimately let you
9    know how the meeting went?
10        **A.**   You know, I don't recall the details of
11   that, but I'm sure it was something that -- you know,
12   that would be the pattern.
13        **Q.**   Do you know, approximately, how many
14   times Dr. Dunleavy met with the Faculty Grievance
15   Committee?
16        **A.**   No.
17        **Q.**   And you don't remember whether you ever
18   met with them, do you?
19        **A.**   I don't recall. I may have -- you
20   know, I got the correspondence in the end. I don't
21   know if I met with them in the beginning. I really
22   don't recall whether I met with them or not. It's
23   five years ago, and I've had a lot of meetings with a
24   lot of people. I don't remember one meeting.
25        **Q.**   Would it refresh your recollection if I

140

1    said that Erin Sadlack was on this committee and Bill
2    Conway --
3         **A.**   Bill Conway.
4         **Q.**   -- and Ms. Carter?
5         **A.**   And Patricia Carter. I don't think I
6    met with all of them, no. I don't remember only
7    meeting with -- I've met with some of them about
8    other matters, but I don't remember on this matter;
9    it may have been by mail.
10        **Q.**   Okay. Do you know whether Will
11   Anthony, or anybody else from Jackson Lewis,
12   communicated with the Faculty Grievance Committee?
13        **A.**   I don't know.
14        MR. COHEN: Can we please have
15   this marked.
16        (At this time, Munley Deposition
17        Exhibit 19 was marked for
18        identification.)
19   BY MR. COHEN:
20        **Q.**   And do you recognize this document,
21   Sister?
22        **A.**   Yes, I do.
23        **Q.**   And this is the letter from Erin
24   Sadlack to you, dated March 26th, 2012, right?
25        **A.**   That's correct.

1    **Q.**    And this is the letter you received

2  advising that the Faculty Grievance Committee had

3  ruled in your favor, right?

4        **A.    Right.  It says here, "We have found no**

5  **evidence of improper action on your part which would**

6  **constitute a legitimate grievance."**

7        **Q.**    Did you have any advance notice that

8  this would be the result?

9        **A.    No.**

10       **Q.**    Do you know -- Do you remember if

11 anyone was meeting with or communicating with the

12 Faculty Grievance Committee, and kind of updating you

13 on their progress?

14       **A.    No, I don't have any memory of that.**

15            MR. COHEN:  Could we please have

16       this marked.

17            (At this time, Munley Deposition

18            Exhibit 20 was marked for

19            identification.)

20 BY MR. COHEN:

21       **Q.**    And, Sister, do you recognize this

22 letter?

23       **A.    No.**

24       **Q.**    This is a letter to Professor Fagal

25 from you, dated April 3rd, 2012?

1        **A.    Right.**

2        **Q.**    And that's your signature?

3        **A.    Yes, it is.**

4        **Q.**    And you state here in the second

5  paragraph, "Since the grievance process is now

6  complete, I have decided to finalize my

7  recommendation.  As a result, your employment with

8  Marywood and your tenure are terminated effective

9  today, April 3, 2012."  Did I read that correctly?

10       **A.    That's right, because this was the**

11 **result of the grievance filed according to the**

12 **grievance and appeals policy, and that was the**

13 **outcome of it.**

14       **Q.**    When you say the outcome --

15       **A.    There was a committee, they reviewed my**

16 **recommendation, and sought to follow my**

17 **recommendation.  This is under that policy which is**

18 **grievance and appeals.**

19       **Q.**    Okay.  But then in the next paragraph,

20 correct me if I'm wrong, you're offering an

21 opportunity to have your decision reviewed and to

22 convene two faculty ad hoc committees, correct?

23       **A.    That was because, you know, to give Dr.**

24 **Fagal every effort since he had not chosen to do that**

25 **before this.  This was one last effort to allow that**

1  to occur.

2        **Q.**    So as of the date of this letter, was

3  he terminated or not?

4        **A.    He was terminated as of April 3rd,**

5  **2012, that's what the letter says.**

6        **Q.**    And that's -- that recommendation was

7  finalized?

8        **A.    On my part I finalized my**

9  **recommendation, but I was giving him the opportunity**

10 **to have it reviewed.**

11       **Q.**    But if you had already terminated him,

12 what was the purpose of the review?

13       **A.    To give him every possible opportunity,**

14 **since, you know, he had decided early on, on**

15 **progressive discipline.  And in my mind it was not a**

16 **matter of progressive discipline, but to give him**

17 **every opportunity.**

18       **Q.**    Okay.  But if you had already

19 terminated him, then the review would just be

20 symbolic and just for show, right?

21       **A.    I don't do anything for show, sir.  I**

22 **did it as I believe in the process.  I believe in**

23 **giving an individual every opportunity.  This was**

24 **another opportunity.  I was trying to go above and**

25 **beyond in giving Dr. Fagal the opportunity to have**

1  **his peers review the decisions that I had made,**

2  **that's why I did this.**

3        **Q.**    If these ad hoc committees that you

4  were permitting to now review your decision had said

5  that the suspension and termination were unfounded,

6  would you have changed your mind, or were you

7  prepared to overrule the committee?

8        **A.    I would have given it serious**

9  **consideration.**

10       **Q.**    Is that all?

11       **A.    That's all I could say.  I would give**

12 **it very serious consideration.  If I asked a**

13 **committee -- you know, if a committee does very**

14 **serious work, I would give it very serious**

15 **consideration.  Any committee -- When we have**

16 **committees of tenured faculty studying something, I**

17 **mean, the input that they give I give very serious**

18 **consideration to it, that is my practice.**

19       **Q.**    Prior to this letter of April

20 3rd -- dated April 3rd, 2012, had any Ad Hoc Faculty

21 Committee made any recommendation regarding your

22 recommendation to terminate Dr. Fagal?

23       **A.    I think the only thing that happened**

24 **was the response to the Grievance and Appeals**

25 **Committee.**

1    **Q.**    Why did you choose to terminate Dr.
2  Fagal on April 3rd, 2012, prior to the ad hoc faculty
3  review?
4        **A.**    Because the grievance that was filed,
5  the letter that came to me on March 26th said, you
6  know, we found no evidence of improper action on your
7  part, so I followed through.
8        **Q.**    Okay.  But isn't it true that the
9  Faculty Grievance Committee didn't review the
10 termination and suspension itself, it reviewed
11 procedural aspects?
12       **A.**    That's what our policy is.  They
13 followed the policy.
14       **Q.**    Okay.  So they reviewed the procedure?
15       **A.**    They followed exactly what is indicated
16 in the policy for grievance and appeals.
17       **Q.**    The committee, the Faculty Grievance
18 Committee never said, yes, there is just cause to
19 terminate Dr. Fagal; that was up to the next
20 committee, right?
21       MS. PEET:  Objection, lack of
22   competency.  To the extent you can
23   answer, you can go ahead and answer.
24       THE WITNESS:  I know that we have
25   multiple, multiple policies.  And I know

1    that the Faculty Grievance Committee
2    followed that policy that was applied to
3    faculty grievance exactly.
4        When I gave Dr. Fagal the
5    opportunity to have it reviewed yet
6    again, then that committee followed the
7    policy exactly as they're stated.
8  BY MR. COHEN:
9        **Q.**    Well, let's go back to the letter from
10 Ms. Sadlack to you dated March 26, 2012.  What
11 Exhibit was that?
12       **A.**    It's Exhibit 19.
13       **Q.**    19.  I'm sorry, scratch that.
14       The decision on April 3rd, 2012, to
15 terminate Dr. Fagal, did you do that because he filed
16 a grievance against you?
17       **A.**    I got the recommendation from the
18 Faculty Grievance Committee.  I felt that I had taken
19 that policy, that process through.  And I enacted
20 what my decision was, which was termination.
21       **Q.**    Right, understood.  But my question is;
22 did you decide to terminate Dr. Fagal because he had
23 filed a grievance?
24       **A.**    I wanted Dr. Fagal to have every
25 opportunity to have my decisions reviewed.  So when

1  he chose to use the, you know, grievance -- file a
2  grievance, that was his right.  And, I mean,
3  certainly I would support that.  So if you're saying
4  I decided this because of that; no.
5        **Q.**    No, I'm asking.
6        **A.**    I felt that he should have every avenue
7  open to him to have my decision reviewed.  My
8  decisions were very carefully reflected upon.  And I
9  felt that he had a right to have my decisions
10 reviewed.
11       MR. COHEN:  Could we have this
12   marked, please.
13       (At this time, Munley Deposition
14       Exhibit 21 was marked for
15       identification.)
16 BY MR. COHEN:
17       **Q.**    Do you recognize this document, Sister?
18       **A.**    I don't.  But I don't recall this,
19 because this is so long ago.  I'll need to take a
20 minute just to read it.
21       **Q.**    Sure, review it briefly, and let me
22 know when you're finished.
23       MS. PEET:  For the record, certain
24   parts have been redacted from the e-mail
25   based on attorney/client privileged

1    communications.
2        THE WITNESS:  I don't recall any
3    of this, but, I mean, it basically was
4    sent to me.
5  BY MR. COHEN:
6        **Q.**    The language that you use, "Just let me
7  know when the committee is convened and the clock
8  starts ticking."  You don't remember what you meant
9  by the clock starts ticking?
10       **A.**    Well, I really don't.  You know some of
11 these policies have a certain number of days to
12 inform people.  And then when a committee gets its
13 charge it has a certain number of days to complete
14 it.  There's so many policies that we have, and some
15 say 10 business days, some say -- some are 30 days.
16 We have all sorts of different types of committees
17 acting on different things.  So I probably just
18 wanted to make sure that anything that I was
19 responsible for I was observing the timeline for.
20 But I don't have any specific recollection of this at
21 all.
22       MR. COHEN:  Okay.  Can we have
23   this marked, please.
24       (At this time, Munley Deposition
25       Exhibit 22 was marked for

149

1    identification.)

2    BY MR. COHEN:

3        Q.    Do you recognize this document, Sister?

4        A.    **Let me just take a look.  Yes, I**

5    **believe I saw this.**

6        Q.    In the last paragraph that begins,

7    "According to the Progressive Discipline Policy," the

8    next sentence says, "The President has received your

9    e-mail, and after review and consultation, Sister

10   Anne has determined that the membership will be the

11   same."  So was Sister Gail, is she accurately

12   conveying your thoughts on the matter, too?  Because

13   you're not cc.'d here.

14       A.    **Yeah, you know, termination -- when**

15   **you're talking about suspension and you're talking**

16   **about termination, termination is the bigger thing**

17   **than suspension is.  And so the membership of the**

18   **committee could be the same.  So, yeah, I don't -- I**

19   **mean, I'm looking at this, and, I mean, that would be**

20   **my interpretation.**

21       Q.    But did you also agree -- was it also

22   your understanding that the committee would be

23   convened twice to determine -- to review the

24   suspension and the termination?

25       A.    **It's hard for me to remember exactly.**

150

1    **You know, again, this is five years ago.  But the**

2    **same committee had the competence to look at the**

3    **whole issue.**

4        Q.    Okay.

5        A.    **The people picked on these committees,**

6    **I don't have anything to do with picking who they**

7    **are, you know.  So the criteria are that they are**

8    **objective and competent and tenured.**

9        Q.    Let's talk a little about the Ad Hoc

10   Faculty Committee that ultimately reviewed Professor

11   Fagal's termination.  And the people on that

12   committee were Helen Bittel, Matt Povse --

13       A.    **Povse.**

14       Q.    -- and Ed O'Brien, right?

15       A.    **Correct.**

16       Q.    So are you saying that you didn't

17   select Bittel and Povse?

18       A.    **They come from the Faculty Senate.  And**

19   **I believe that Dr. Fagal selected Dr. O'Brien.**

20       Q.    Did you ever communicate with the Ad

21   Hoc Faculty Committee?

22       A.    **Again, I don't recall if I did or not.**

23   **If I asked them to serve, or express gratitude for**

24   **service or not, you know, again, it's a long time**

25   **ago, and I can't specify a detailed answer to that.**

151

1        MR. COHEN:  Could we have this

2    marked, please.

3        (At this time, Munley Deposition

4        Exhibit 23 was marked for

5        identification.)

6    BY MR. COHEN:

7        Q.    Sister, do you recognize this e-mail?

8        A.    **I have to take a look.**

9        Q.    Sure.

10       A.    **Okay.**

11       Q.    This is an e-mail from --

12       A.    **From Pat Dunleavy to me.  I think that**

13   **was an update.**

14       Q.    It's dated May 3rd, 2012, right?

15       A.    **That's correct.**

16       Q.    And Dr. Dunleavy here is saying that

17   she and Sister Gail met with the committee.  And at

18   some point she says that you were very willing to

19   talk to them.  Does that refresh your recollection of

20   whether you ultimately did talk to them?

21       A.    **I don't believe I talked to them, no.**

22   **No, I don't remember talking to them.  I'm fairly**

23   **certain I didn't.**

24       Q.    And Dr. Dunleavy also says that she

25   gave the committee Will's contact information.  Did

152

1    you take that to mean Will Anthony?

2        A.    **That must be who it is, I would**

3    **imagine.**

4        Q.    Do you know if Will Anthony actually

5    ever communicated with the committee?

6        A.    **I have no idea.  I don't know.**

7        MR. COHEN:  Can we please have

8    this marked.

9        (At this time, Munley Deposition

10       Exhibit 24 was marked for

11       identification.)

12   BY MR. COHEN:

13       Q.    And could you briefly review, Sister,

14   and let me know when you're finished.

15       A.    **Yeah, I read this, but I don't recall**

16   **it.  I really don't recall answering questions.  I**

17   **may have, but I don't remember.  I really don't**

18   **remember.**

19       Q.    Okay, that's what I was going to ask

20   you.

21       MR. COHEN:  Can we have this

22   marked, please.

23       (At this time, Munley Deposition

24       Exhibit 25 was marked for

25       identification.)

153

BY MR. COHEN:

Q.   And have you ever seen this document before, Sister?

A.   I may have.  I must have met with them then, because this is minutes from our June 18th meeting.  Yeah, I just don't recall it.

Q.   Okay.  Do you know whether -- I might've asked this already --

A.   I'm sorry?

Q.   I might've asked this already, but do you know whether Patricia Dunleavy ever met with the Ad Hoc Faculty Committee?

A.   I don't know if she met with them to give them materials or not, you know.  You know, that's usually how they get materials.

Q.   Okay, but you're not absolutely sure?

A.   I'm not positive.

Q.   So if you don't remember actually -- you don't remember actually meeting with the committee, then surely I guess you don't remember what was said?

A.   No.  And, you know, I really don't remember meeting with them.  I believe I did, there were minutes.  But, typically, I thank people for their service, and tell them that they can get the

154

materials from Dr. Dunleavy.  I mean, that's usually just a -- but I don't remember this actually.

Q.   Okay.  Do you know whether Will Anthony, or any other Jackson Lewis Attorneys communicated with the Ad Hoc Faculty Committee?

A.   I don't know.

Q.   Did you recommend or suggest that the committee speak to anybody from Jackson Lewis?

A.   I'm sure that I did not.  That would not have been my -- I don't -- I try to just stay at the end of these committee actions when some recommendation comes to me.  You know, I thank people, and then I wait to see what they do, and stay out of the way.

Q.   Do you know whether the Ad Hoc Faculty Committee once they produced a draft of their decision, do you know whether they provided that draft to anybody at Jackson Lewis?

A.   I have no idea.  I don't know.

MR. COHEN:  Could we have this marked, please.

(At this time, Munley Deposition Exhibit 26 was marked for identification.)

BY MR. COHEN:

155

Q.   And could you briefly review this, and let me know when you're finished, please?

A.   I just read it, okay.  It indicates that --

MS. PEET:  No question yet.

MR. COHEN:  Yeah, I didn't ask you a question yet.

THE WITNESS:  Oh, no question, okay.

BY MR. COHEN:

Q.   But this appears to be -- it looks like there's a little chain.  And the first part of the chain is an e-mail from Matthew Povse to you, dated June 25th, 2012, correct?

A.   Am I looking at the same thing you are?  This says January 9th.  Oh, I'm sorry, I beg your pardon.

Q.   So the first part of this chain is an e-mail from Matthew Povse to you, dated June 25th, 2012, right?

A.   Okay.  I don't remember this, but, you know, it was sent to me, yes.

Q.   I'm trying to understand why Mr. Povse is communicating, you know, the decision to you in advance of it actually being made.  I mean, did you

156

request that?

A.   No, I know I didn't request that.

Q.   Do you remember --

A.   Not my style.

Q.   Do you remember if Mr. Povse e-mailed you before about the Fagal matter?

A.   No.

Q.   And does this refresh your recollection over whether Will Anthony did, in fact, receive a draft of the final response?

A.   See, I really -- I really don't know that.  You know, as I said, I was waiting for the end of the -- This is June 25th, right?

Q.   That appears to be the first e-mail, and then it looks like it was forwarded to Dr. Dunleavy on January 9th, 2015.

A.   I don't --

MS. PEET:  No question.

(At this time, Munley Deposition Exhibit 27 was marked for identification.)

BY MR. COHEN:

Q.   Sister, do you recognize this document?

A.   No.

Q.   That's not your handwriting?

157

1    A.    That's not my handwriting.

2    Q.    Does this look like Dr. Dunleavy's

3    handwriting?

4    A.    It may be.  I don't recognize this

5    document.

6    Q.    Is there someone named Tony on your

7    staff?

8    A.    There is, the Chief Information

9    Officer's name is Tony.

10    MR. COHEN:  And let's have this

11    marked, please.

12    (At this time, Munley Deposition

13    Exhibit 28 was marked for

14    identification.)

15    BY MR. COHEN:

16    Q.    And do you recognize this document,

17    Sister?

18    A.    No.

19    Q.    Not your handwriting?

20    A.    It's not my handwriting.

21    Q.    Dave Elliott is the head of Security?

22    A.    At the time, yes.

23    Q.    The last line, can you make that out?

24    I mean, I know you didn't write this, but I'm trying

25    to -- I think it says, Will check --

158

1    A.    Sister's office for -- I'm not sure, is

2    that layout, layout Friday okay, Fran -- I can't get

3    this word (indicating).

4    Q.    Okay.

5    A.    Okay with Fran -- I don't know.

6    Q.    All right.

7    A.    It's not my writing.

8    Q.    Do you remember taking any handwritten

9    notes at all about Professor Fagal's video?

10    A.    No, I don't.  I watched it a few times.

11    I didn't take notes.  I remember it.

12    Q.    Right.  I don't just mean the video,

13    but about the video and all the disciplinary

14    proceedings involving Dr. Fagal.

15    A.    No.

16    Q.    Did you take any notes on a computer

17    about it?

18    A.    The only thing I would have done would

19    be the things we already talked about, which would be

20    those talking points.  I don't typically do that.

21    Q.    Okay.  Is it true that after Professor

22    Fagal left Marywood that the Progressive Discipline

23    Policy was revised?

24    MS. PEET:  Objection to the form,

25    outside the scope of discovery.  You can

159

1    answer.

2    THE WITNESS:  Well, what I would

3    say is that, you know, policies are

4    living documents, so we always -- if you

5    refer to our policies you'll see that a

6    number of them have revisions.  And

7    sometimes we streamline them, you know,

8    we put clearer language, so that would

9    not be unusual.

10    BY MR. COHEN:

11    Q.    When a new policy is -- When a policy

12    is revised or created --

13    A.    Right.

14    Q.    -- ultimately the President of the

15    University signs off on it, correct?

16    A.    This is how it happens, the Secretary

17    of the University is in charge of all the policies

18    and keeping the ongoing records.  There is a

19    standardized template, you know, format, which

20    indicates the origin of the policy, it shows -- if

21    it's a revision of a policy one column says what it

22    said and the other column shows the statements as

23    revised.  After this is prepared and put into the

24    correct format, there is a meeting of the Executive

25    Committee and of the Policy Committee.  The Policy

160

1    Committee has members from the entire University,

2    it's like a representative body.  I attend the

3    Executive Committee meeting of that where they look

4    for any questions or concerns by the representatives

5    who are there, and then if there are none, they then

6    send it to the entire Policy Committee, which is a

7    very large group of people.  And then I go to that

8    meeting, it's chaired by a member of the Policy

9    Committee, an elected Chair, and then they will

10    present the policy.

11    The person who was responsible for

12    developing the policy, say that it's a student life

13    policy, okay, the Vice-President for Student Life

14    would be there to explain the nature of it.  If it's

15    something -- for example, all the legislation

16    regarding the safety and security of children, you

17    know, Dr. Dunleavy regularly handed comments re

18    revised policy in accordance with legal changes.

19    That person presents the changes, the Chair asks are

20    there clarifying questions, they discuss it.  And

21    sometimes if it's not ready for action it's tabled.

22    Sometimes they decide this is ready to go, and so

23    they will -- someone will call for a vote, it's

24    Roberts Rules.  If it gets passed, I sign it, approve

25    it, it's promulgated immediately.  I do that action

161

1  **right at the end of the meeting, all the things that**
2  **were passed by the University Policy Committee,**
3  **because I've already been a part of the discussion.**
4       **Q.**   Do you have the option not to sign
5  that, and then the policy wouldn't go through?
6       **A.   You know, I have never not acted**
7  **favorably toward a policy that was passed by the**
8  **entire -- it's one of the most prestigious and**
9  **powerful committees on campus.**
10      **Q.**   But, ultimately, before a proposed
11  policy becomes a real policy, you have to sign off on
12  it, correct?
13      **A.   Oh, yes, that's the Executive Office of**
14  **the Presidency.**
15           MR. COHEN:  Okay.  I have no
16  further questions.
17           MS. PEET:  No questions.
18           (At this time, 2:55 p.m., the
19           deposition in the above-captioned
20           matter was concluded.)
21
22
23
24
25

# Exhibit 41

**EXHIBIT**

**41**

| From: | Frederick Fagal [fffagal@yahoo.com] |
|---|---|
| Sent: | Tuesday, January 03, 2012 1:46:49 PM |
| To: | Rod Carveth |
| Subject: | Re: Happy New Year -- Keep smiling |

Hi Rod,

I really do appreciate your thoughtful comments after a night's sleep. You sound like my wife... (heh). And I know the Hitler link is considered by many to be out of bounds. I would have to face that possibility. I am going to rethink this, but I *think* I won't change my mind about the release. I will look over the faculty manual again (heh).

Go to YouTube. In the search box type Hitler parody. There are tons of them out there....helps my case.

I always thought countries like Germany were wrong pass to laws which provide criminal penalties for saying that the Holocaust did not exist. Let a fool be a fool. Recently in France a law was proposed/passed which states that no one in France could claim that there was **not** a massacre/genocide/holocaust of Armenians in World War I. So now the Turks are upset. Pox on the Turks, pox on France for passing/considering such law. If I want to claim Unicorns or God or whatever so what...

Assuming the videos are released, if Marywood considers going after my job they will probably realize that I would NOT go quietly. If I were a tenured 42 year old likely to cause trouble for another 20-25 years then the game might be worth their votive candle. But I will be 66 years old in a month! IF they are rational they will think I can't be around *that* much longer and they would take a big publicity hit for trying to get rid of me.

Will keep you informed Rod..thanks.... Fred

---

**From:** Rod Carveth <rodcarveth@hotmail.com>
**To:** Frederick Fagal <fffagal@yahoo.com>
**Sent:** Tuesday, January 3, 2012 7:50 AM
**Subject:** RE: Happy New Year -- Keep smiling

Fred,

Honestly, I think it is a brilliant satire. If it was released, however, I think you would catch an incomparable amount of grief. Any time Hitler gets raised, no one pays attention to the message, but the symbolism of Hitler as a murderer and butcher. I think the university would try and find some loophole to undo your tenure and fire you.

It's not what you are saying hear, but how you are saying it that puts you at risk.

Is that right? No. But, when does something have to be "right" when it comes to an academic institution, esp,. one that espouses "core values," yet will redefine them at the drop of a hat.

Just my two cents.

Rod

---

Date: Mon, 2 Jan 2012 19:49:23 -0800



000200439.00001

From: fffagal@yahoo.com
Subject: Re: Happy New Year -- Keep smiling
To: rodcarveth@hotmail.com

I worked hard on 'em. Had some input from a Marywood graduate who worked with me on this stuff before. He had some idea for getting more student-oriented issues into it. But mostly me!

And what do you predict will happen should these be made public? Heh....Glad a communications guy like you says "Funny as hell" and "pretty powerful stuff" Thanks for watching....Fred

**From:** Rod Carveth <rodcarveth@hotmail.com>
**To:** Frederick Fagal <fffagal@yahoo.com>
**Sent:** Monday, January 2, 2012 10:28 PM
**Subject:** RE: Happy New Year -- Keep smiling

Fred,

OMG! Funny as hell. Pretty powerful stuff.

Keep fighting the good fight.

Rod

Date: Mon, 2 Jan 2012 17:40:21 -0800
From: fffagal@yahoo.com
Subject: Re: Happy New Year -- Keep smiling
To: rodcarveth@hotmail.com

Video #2 !

**From:** Rod Carveth <rodcarveth@hotmail.com>
**To:** Frederick Fagal <fffagal@yahoo.com>
**Sent:** Monday, January 2, 2012 8:07 PM
**Subject:** RE: Happy New Year -- Keep smiling

Fred,

Love to see the video -- and, no, I don't have any problems with my name being used in that manner. Should be funny.

Rod

Date: Mon, 2 Jan 2012 14:07:49 -0800
From: fffagal@yahoo.com
Subject: Re: Happy New Year -- Keep smiling
To: rodcarveth@hotmail.com

Hi Rod,

Glad to hear your daughter is fine. One thing I recall wrt her was you were teaching her to drive --- or something to do with a car !

Would you like to see my (still quarantined in possible revision) videos regarding the latest Marywood situation?> Hitler parody, I put your name in it on one screen (Munley or some other Marywood fascist calls you a jerk, but will take it out if you like !). Let me know....again, on the QT for now...no leaking!

Glad to hear you're better settled...Fred

**From:** Rod Carveth <rodcarveth@hotmail.com>
**To:** Frederick Fagal <fffagal@yahoo.com>
**Sent:** Monday, January 2, 2012 4:48 PM
**Subject:** RE: Happy New Year -- Keep smiling

Fred,

The more things change, the more they stay the same.

Really glad I don't have to deal with that crap anymore.

What hypocrisy!

My daughter is doing very well. She's a second-semester sophomore at Central CT State, majoring in biology.

I moved to take over the Communication Program at Goodwin College. Fitchburg State was two hours away. Goodwin is 15 minutes. Pay sucks, but I make that up through moonlighting.

Keep fighting the good fight.

Rod

Date: Mon, 2 Jan 2012 13:12:47 -0800
From: fffagal@yahoo.com
Subject: Happy New Year
To: rodcarveth@hotmail.com

Hi Rod,

Hope this finds you well and glad to be out of the rat race I endure ! More baloney (to be polite) thrown my way. **Abstract below for you but please do not for release/share to/with anyone**, but trusting you I thought I would clue you in and you could reflect on how lucky you are ![:) happy]. Deciding on a course of action.... I asked for reimbursement of the $350 speaker *I paid* plus the cost of posters *I purchased* plus a public apology (right) and invite FIRE to come back twice in the spring (day and night) and also Marywood to sponsor a **debate** with Robert Spencer re Islam in the Fall 2012 semester. All denied, no negotiation... I think FIRE might write a letter...we'll see what happens. Hope all is well with your daughter(s?) etcetera,--- and how is the job (and pay?)??....best... Fred (cell 315-406-8063)

**Abstract**: On November 28-29 2011 Marywood University tore down "stamped approved" posters announcing an open to all presentation by Will Creeley of FIRE (Foundation for Individual Rights in Education) titled "Know Your Rights: Free Speech and Thought Reform on Campus." On December 5 Alan Levine, VP for Academic Affairs, told me there were no written policy statements which justified Marywood's action, but that my offer of a $50 random prize to a student for attending was, in the eyes of the administration's Executive Council which met on November 29, "pandering" to students to get them to come to class, and that this justified tearing down the posters. Later that day I sent Mr. Levine two emails, one showing that Professor Mankiw of Harvard (former Chairman of the President's Council of Economic Advisers, author of today's largest selling economics textbook) recently pandered to his students by inviting ten select quick email responders (first come, first served) to join him as his guest for lunch after class at a Chinese restaurant in Harvard Square. *I suggested that Marywood University warn Harvard that it has a panderer in its midst*. Finally, also on December 5, I forwarded to Mr. Levine an email from spring 2011 wherein the Marywood Administration encouraged professors to send students to a speech about sexual assault. Raffle prizes galore, including food and **TWO $50 VISA cards**. Quotation from the email "We hope faculty will offer students extra credit for attending, or *use some of your class time to attend the event with your students* [emphasis added]." Laughable! Talk about "pandering!" It is transparently obvious Marywood University is discriminating against Professor Fagal... Your Honor, I rest my case. Full details below.

By Frederick F. Fagal. Jr. (Ph.D.) Associate Professor of Economics, Marywood University, Scranton, PA

000200439.00004

# Exhibit 42

> **EXHIBIT**
> **42**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FREDERICK F. FAGAL, JR.,   )   CIVIL ACTION
                           )
        Plaintiff          )
                           )
-vs-                       )
                           )
MARYWOOD UNIVERSITY,       )
                           )
        Defendant          )   NO. 3:14-cv-02404-ARC


- - -

Deposition of Patricia E. Dunleavy, Ph.D.

Thursday, August 11, 2016

- - -

    The deposition of PATRICIA E. DUNLEAVY, Ph.D.,
called as a witness by the Plaintiff, pursuant to
notice and the Pennsylvania Rules of Civil
Procedure pertaining to the taking of depositions,
taken before me, the undersigned, Karin E. Volpitta,
a Notary Public in and for the Commonwealth of
Pennsylvania, at the Radisson Lackawanna Station
Hotel, 700 Lackawanna Avenue, Scranton,
Pennsylvania 18503, commencing at 9:01 a.m., the
day and date above set forth.


- - -



Page 2

```
 1   APPEARANCES
 2   On behalf of the Plaintiff:
 3   JONATHAN Z. COHEN, LTD.
     BY:  JONATHAN Z. COHEN, ESQ.
 4   175 Strafford Avenue , Suite 1, #212
     Wayne, Pennsylvania 19087
 5
 6   On behalf of the Defendant:
 7   JACKSON LEWIS, P.C.
     BY:  STEPHANIE J. PEET, ESQ.
 8   1601 Cherry Street, Suite 1350
     Philadelphia, Pennsylvania 19102
 9
10
11          STIPULATIONS
12
13
14     It was agreed by and between counsel that all
     objections, except as to the form of the question,
     will be reserved until the time of trial.
15
16     It was further agreed that the sealing and
     filing of the deposition transcript will be waived.
17
18
19
20
21          WITNESS INDEX
22   EXAMINATION BY              PAGE
22   Mr. Cohen                    4
23
24
```

Page 3

```
 1
 2          EXHIBIT INDEX
 3   DEPOSITION EXHIBIT MARKED              PAGE
     1 - Progressive Discipline Policy        7
     2 - 1/17/12 e-mail chain                 9
 4   3 - 1/17/12 e-mail chain                14
     4 - 1/18/12 handwritten note            16
 5   5 - 1/20/12 handwritten note            17
     6 - 1/22/12 e-mail chain                18
 6   7 - Typewritten Talking Points          21
     8 - Handwritten notes of 1/23/12 meeting    51
 7   9 - 1/23/12 e-mail                      59
     10 - 1/23/12 e-mail                     63
 8   11 - Typewritten notes of 1/23/12 meeting   64
     12 - 1/23/12 e-mail                     66
 9   13 - 1/24/12 e-mail with attachments    67
     14 - Typewritten Talking Points for Board    72
10   15 - 1/26/12 handwritten note           78
     16 - 1/27/12 e-mail                     79
11   17 - 1/30/12 e-mail                     81
     18 - 2/3/12 handwritten note            82
12   19 - 2/3/12 handwritten note            83
     20 - 2/22/12 e-mail                     86
13   21 - 2/29/12 e-mail                     87
     22 - 3/6/12 handwritten note            88
14   23 - 3/7/12 e-mail                      89
     24 - 3/12/12 Grievance Committee notes      90
15   26 - 4/17/12 e-mail chain               96
     27 - 4/25/12 handwritten note           97
16   28 - 4/26/12 e-mail                     99
     29 - 4/30/12 handwritten note           100
17   30 - 5/3/12 e-mail                      103
     31 - 5/15/12 e-mail chain               103
18   32 - 5/17/12 minutes of Ad Hoc Committee   105
     33 - 5/17/12 handwritten note           106
19   34 - 5/21/12 e-mail                     107
     35 - 5/24/12 e-mail                     108
20   36 - 6/5/12 handwritten note            113
     37 - 6/25/12 e-mail                     114
21   38 - 6/26/12 e-mail chain               115
     39 - 7/2/12 e-mail                      116
22   40 - 7/18/12 e-mail                     116
     41 - Handwritten note                   118
23   42 - Defendant's Answers and Objections to
        Plaintiff's First Set of Interrogatories
24      Directed to Defendant                119
```

Page 4

```
 1   P A T R I C I A  E.  D U N L E A V Y, Ph.D.,
 2   WAS CALLED, AND HAVING BEEN DULY SWORN,
 3   WAS EXAMINED AND TESTIFIED AS FOLLOWS:
 4
 5          EXAMINATION
 6   BY MR. COHEN:
 7   Q  Good morning, Dr. Dunleavy.
 8   A  Good morning.
 9   Q  Do you want me to call you Dr. Dunleavy or
10   Patricia?
11   A  Dr. Dunleavy is fine, thank you.
12   Q  So you know that I'm Jonathan Cohen, and I
13   represent the Plaintiff, Frederick F. Fagal, Jr.;
14   correct?
15   A  Yes, I do.
16   Q  And you understand that you're under the
17   same oath today as if you were in a courtroom,
18   correct?
19   A  Yes, I do.
20   Q  And I'm going to ask you questions and I'm
21   going to assume that you understand them, but if
22   you don't, feel free to -- you could let me know.
23   A  I will.
24   Q  And I'll try to rephrase.  You should wait
```

Page 5

```
 1   until I finish the question because that helps the
 2   court reporter and your attorney might want to
 3   object and that wouldn't give her any time.
 4        Is there anything that would prevent you
 5   from thinking clearly and testifying truthfully
 6   today?
 7   A  No.
 8   Q  And if at any time you need to take a break
 9   during the deposition, let me know.
10   A  I will.
11   Q  So, Dr. Dunleavy, what is your full name
12   including middle name?
13   A  Patricia Elizabeth Dunleavy.
14   Q  And could you describe your educational
15   background, please.
16   A  Certainly.  I have a Ph.D. in Higher Ed.
17   Administration from Marywood University.  I have a
18   Master of Science in Industrial Management from
19   Marywood University.  I have a Master of Arts in
20   Music from Marywood University, and I have a
21   Bachelor of Arts in Music and English from
22   Mansfield University.
23   Q  Mansfield?
24   A  Yes.
```



2 (Pages 2 to 5)

Page 6

1    Q   And I'm assuming you got all of those
2   degrees before you actually started working for
3   Marywood, correct?
4    A   No.
5    Q   Okay.  So you have met my client before,
6   Professor Fagal; correct?
7    A   Yes.
8    Q   And when did you meet him first?
9    A   I don't remember.
10   Q   How long have you been employed by Marywood?
11   A   I started at Marywood in March of 1980.
12   Q   And he would not have been there then,
13   right; do you remember?
14   A   I don't remember.
15   Q   I think he started in '85.  So this case is
16  about, you know, certain incidents that happened in
17  2011 involving a few e-mails and videos that he
18  posted on YouTube.  You're obviously familiar with
19  that?
20   A   Yes.
21   Q   Before those incidents, would it be fair to
22  say that Dr. Fagal had had a number of run-ins with
23  Marywood's administration?
24   A   I know that there were some incidents.  I

Page 7

1   don't know a lot about them.
2           MS. PEET:  For the record, when you say
3   events in 2011, I do believe that the videos are early
4   2012.
5           MR. COHEN:  Actually, you're right, yes.
6           MS. PEET:  I just want to make sure we're
7   clear.
8           (Dunleavy Exhibit No. 1 was marked
9            for identification.)
10  BY MR. COHEN:
11   Q   Dr. Dunleavy, could you briefly skim this
12  and let me know whether you're familiar with this
13  document?
14   A   (Witness reviews document.)  Yes, I am
15  familiar with it.
16   Q   And what is it?
17   A   It is a copy of the Marywood University
18  Progressive Discipline Policy.
19   Q   Well, is there an effective date to that
20  policy at the end?
21   A   The latest revision that's noted on this
22  copy is 10/12/11, Revision approved by the
23  President of the University as recommended by the
24  Policy Committee of the University.

Page 8

1    Q   Did you have any role in helping to
2   formulate the Progressive Discipline Policy that
3   we're looking at now?
4    A   No.  I do sit on the Policy Committee so
5   policies in general come to that body to vote on
6   but formulate, no.
7    Q   Well, maybe that's too broad a word.  I
8   mean, did you give any input into the substance of
9   the Progressive Discipline Policy?
10   A   No.
11   Q   Do you know, who did have input into this
12  Progressive Discipline Policy?
13   A   No, I do not.
14   Q   It is approved by the President, correct?
15   A   Yes.
16   Q   Do you know if any attorneys working for
17  Marywood or outside of Marywood had any role in
18  formulating the policy?
19   A   I don't know.
20   Q   Now, this isn't the first time you've seen
21  this policy; correct?
22   A   That's correct.
23   Q   Would it be fair to say you've read it
24  pretty thoroughly given the nature of these

Page 9

1   proceedings, what led up to them?
2           MS. PEET:  Objection to the form.  You can
3   answer.
4           THE WITNESS:  Actually, no.
5   BY MR. COHEN:
6    Q   No?
7    A   No, it's not a policy I deal with a lot so,
8   no.
9    Q   Well, have you ever read the entire policy?
10  I don't mean the entire policies and procedures
11  manual, just what we're looking at.
12   A   I don't recall.
13          MR. COHEN:  We'll call this Dunleavy 2.
14          (Dunleavy Exhibit No. 2 was marked
15           for identification.)
16  BY MR. COHEN:
17   Q   Now, I tried to put these exhibits in
18  chronological order so it makes sense to everybody.
19  Do you recognize the document before you?
20   A   No.
21   Q   It appears to be an e-mail, though; correct?
22   A   Yes.
23   Q   And it's from Joseph X. Garvey, Jr. to
24  Dr. Alan Levine?



Page 10

1   A  Yes.
2      MS. PEET:  Just for the record, it's an
3   e-mail chain.  You're focusing only on the top?
4      MR. COHEN:  Yes.
5   BY MR. COHEN:
6   Q  This is an e-mail chain and the top e-mail
7   is from Joseph X. Garvey, Jr. to Dr. Alan Levine
8   dated January 17th, 2012, 2:48 p.m.; correct?
9   A  Yes, correct.
10  Q  And if you could since this is so short,
11  could you briefly read this to yourself and let me
12  know when you're finished.
13  A  (Witness reviews document.)  I read it,
14  thank you.
15  Q  And who is Joseph X. Garvey, Jr.?
16  A  Joseph X. Garvey, Jr. was the Vice President
17  for Business Affairs at this time.
18  Q  And who is Dr. Alan Levine?
19  A  Dr. Alan Levine was the Vice President for
20  Academic Affairs at this time.
21  Q  And based on the date of these e-mails, the
22  chain before you, it appears that these were sent
23  soon after Dr. Fagal's videos were posted on
24  YouTube; correct?

Page 11

1      MS. PEET:  Objection to the form.
2      THE WITNESS:  I don't remember the date of
3   the videos.
4   BY MR. COHEN:
5   Q  Well, the first e-mail in the chain, it's
6   from Sister Margaret Gannon; correct?
7   A  Yes.
8   Q  And she says, "Alan, the texts don't offer
9   anything new but look at the two videos."  Correct?
10  A  Yes.
11  Q  And then Mr. Garvey is commenting on the
12  videos, correct?
13  A  Yes.
14  Q  So it would be fair to say that these
15  e-mails were sent after the videos, we just don't
16  know exactly when?
17  A  Yes.
18  Q  And Dr. Garvey no longer works for Marywood
19  or he's in a different position now?
20  A  Mr. Garvey retired in March of 2016.
21  Q  Okay.  Based on your reading of Dr. Garvey's
22  e-mail, would it be fair to say that he was of the
23  view that Marywood had a protocol for faculty
24  dismissal but he thought that Professor Fagal

Page 12

1   should be at least suspended?
2      MS. PEET:  Objection to the form; calls for
3   speculation.  Answer the question if you understand it.
4      THE WITNESS:  That's what Mr. Garvey's
5   e-mail says.
6   BY MR. COHEN:
7   Q  I think I asked this before but let me make
8   sure.  The e-mail itself does not reflect that you
9   were a recipient, but do you know whether you
10  received it as maybe a blind carbon copy?
11  A  I don't believe I've ever seen this e-mail
12  before.
13  Q  Had Mr. Garvey ever expressed the views that
14  he's expressing in this e-mail to you in any other
15  way, orally, in a separate e-mail?
16  A  I don't remember.
17  Q  Did you share the views that Mr. Garvey is
18  making in his e-mail?
19     MS. PEET:  Objection to the form.  It's a
20  mischaracterization of testimony.  She's testified that
21  she's never seen this e-mail before.
22     THE WITNESS:  Could you clarify that.  I'm
23  not sure what you're asking me.
24  BY MR. COHEN:

Page 13

1   Q  Let me rephrase.  Regardless of whether
2   you've seen this e-mail before or communicated with
3   Mr. Garvey about the videos, did you have after the
4   videos were posted the same opinion as Dr. Garvey
5   about whether an exception should be made to
6   Marywood's protocol for faculty dismissal?
7      MS. PEET:  Objection to the form;
8   mischaracterization of testimony.  You can answer.
9      THE WITNESS:  I don't believe anything I
10  thought then would have been an exception to policy.
11  BY MR. COHEN:
12  Q  Do you recall whether any other members of
13  Marywood's cabinet had a similar view as the one
14  that's expressed by Mr. Garvey in this e-mail?
15  A  I remember that other members of cabinet
16  were very upset by the videos, but I don't remember
17  whether they shared the sentiments that are
18  expressed here in this e-mail.
19  Q  Now, Mr. Garvey in the e-mail suggests a
20  meeting with Dr. Levin, Mary Theresa, you and the
21  VPs; correct?
22  A  Yes.
23  Q  Was there ever this meeting that he
24  suggested?



1    A   I don't recall.
2        MR. COHEN:  Let's make this Dunleavy 3.
3        (Dunleavy Exhibit No. 3 was marked
4         for identification.)
5    BY MR. COHEN:
6    Q   It's double-sided but most of the backside
7    is redacted.  If you could briefly review this
8    because it's so short and let me know when you're
9    finished.
10   A   (Witness reviews document.)
11   Q   And do you recognize this document?
12   A   Yes.
13       MR. COHEN:  Wait a second, we have different
14   documents.
15       (At this time there was a brief
16        discussion held off the record.)
17   BY MR. COHEN:
18   Q   Do you recognize this document?
19   A   Yes, I do.
20   Q   And this is an e-mail chain first.  The
21   first e-mail is from Dr. Levine to you dated
22   January 17th, 2012 at 12:11 p.m.; right?
23   A   Yes.
24   Q   And the second e-mail is from you to

1    Dr. Levine the same day, 8:45 p.m.; right?
2    A   Yes.
3    Q   Now, you wrote to Dr. Levine, "Internally
4    you can file a formal complaint under the Civil
5    Rights Policy."  Correct?
6    A   That's correct.
7    Q   Do you know if Dr. Levine ultimately did
8    file a formal complaint under Marywood's Civil
9    Rights Policy?
10   A   He did not.
11   Q   And then the next sentence from you is,
12   "We're exploring options from the University
13   perspective with or without a formal complaint from
14   any individual."  Did I read that correctly?
15   A   Yes.
16   Q   Now, what options was the University
17   exploring at this time?
18   A   I don't remember.
19   Q   Do you know what Dr. Levine meant when he
20   asked you about possible responses for him
21   personally?
22   A   Yes.  He was so offended and angry by the
23   videos that he wanted to sue Dr. Fagal himself.
24   Q   But he wasn't so offended that he didn't

1    just file a civil rights complaint, right?
2        MS. PEET:  Objection to the form.
3        THE WITNESS:  I can't speak for Dr. Levine.
4        MR. COHEN:  Let's make this Dunleavy 4.
5        (Dunleavy Exhibit No. 4 was marked
6         for identification.)
7    BY MR. COHEN:
8    Q   Do you recognize this document?
9    A   Yes, that's my handwriting.
10   Q   Now, I found a lot of notes in Marywood's
11   production which are the same handwriting and I
12   couldn't always read it so I'm going to ask you
13   today for you to read it to me and/or explain.  Can
14   you read this aloud?
15   A   Yes.  This is notes I took from what would
16   have been probably a phone call with Tony Spinillo,
17   who was -- or is the CIO at Marywood.  The date is
18   January 8th, 2012.  And the information that Tony
19   gave me was about e-mails and how far back we save
20   them.
21       So he told me that ten years were backed up
22   and can't be deleted.  If something was sent to
23   Marywood, it's saved or if it's sent from here,
24   meaning from Marywood's e-mail, that would also be

1    saved.  The last line, I believe, says "e-mail gets
2    archive."
3        MR. COHEN:  Let's make this Dunleavy 5.
4        (Dunleavy Exhibit No. 5 was marked
5         for identification.)
6    BY MR. COHEN:
7    Q   And do you recognize this document?
8    A   Yes, that's my handwriting.
9    Q   And could you read this aloud, please.
10   A   Certainly.  This is dated January 20 of 2012
11   and it's a note saying that I called Dave Elliott
12   at 7:25 in the morning and that he will -- "WCB" is
13   will call back.  I believe this means he called at
14   8:39 and that he told me he is generally on campus
15   by 8:20 and that he would check Sister's office --
16   that would be Sister Anne Munley's office -- for
17   the layout of her conference room area on Friday
18   and that -- then I have "Ok with Fran."  That would
19   be Sister Anne's secretary.  She'll tell Sister
20   Anne Munley, SAM, that Dave Elliott would come up
21   and check the office for the layout.
22   Q   And who is Dave Elliott?
23   A   He was the Senior Director for Campus
24   Safety.  I don't remember his exact title.



1    Q   Why would he check the layout of Sister
2   Munley's office?
3    A   Sister wanted him to be outside the office
4   when she met with Dr. Fagal because she wasn't sure
5   what Dr. Fagal might do so she was concerned about
6   a potential threat and wanted security presence
7   outside of the meeting.
8    Q   So this note again is dated January 20,
9   2012; right?
10   A   Yes.
11   Q   So it would be fair to say that as early as
12  January 20th, 2012 President Munley was planning to
13  bring Professor Fagal in for a meeting about the
14  videos?
15   A   Yes.
16   Q   And that meeting ultimately happened on
17  January 23rd, 2012; right?
18   A   Yes.
19       MR. COHEN:  Let's have this marked as
20  Dunleavy 6.
21       (Dunleavy Exhibit No. 6 was marked
22        for identification.)
23  BY MR. COHEN:
24   Q   This is double-sided also.  Could you just

1   read this to yourself and let me know when you're
2   finished.
3    A   (Witness reviews the document.)  Okay.
4    Q   Do you recognize this document?
5    A   Yes.
6    Q   And the first e-mail in the chain is from
7   Dr. Levine to you and someone named Mike.  I assume
8   that's Mike Foley?
9    A   I would assume that as well.
10   Q   And here Dr. Levine is sort of laying out a
11  script for bringing Professor Fagal in to speak
12  with President Munley about the videos; correct?
13       MS. PEET:  Objection to the form.
14       THE WITNESS:  That's what it appears to be,
15  yes.
16  BY MR. COHEN:
17   Q   Now, before Dr. Levine sent this first
18  e-mail in this chain, did you meet with him or
19  communicate with him about how Professor Fagal
20  would be handled the next day?
21   A   I don't remember.
22   Q   And then there's an e-mail in this chain
23  sent on January 21st, 2012 at 10:33 p.m. where
24  Dr. Levine is e-mailing you; correct?

1    A   Yes.
2    Q   And Dr. Levine mentions that Professor Fagal
3   left him a telephone message, right?
4    A   Yes, that's what the e-mail says.
5    Q   And then at 1:04 p.m. you responded and the
6   first thing you said was, "Oh, yes, very."
7   Correct?
8    A   Yes.
9    Q   And by that you meant, Oh, yes, very
10  interesting?
11   A   Yes.
12   Q   And why did you think that was interesting?
13   A   It just was that Dr. Fagal would call Alan
14  Levine at home.
15   Q   And you told Dr. Levine to save the message,
16  right?
17   A   I did.
18   Q   Do you know whether Dr. Levine did, in fact,
19  save the message?
20   A   I have no idea.
21       MR. COHEN:  And this is more for Stephanie,
22  but if it exists, do you think that we could try to
23  obtain that message?
24       MS. PEET:  It is my understanding it has not

1   been saved.
2        MR. COHEN:  Let's make this Dunleavy 7.
3        (Dunleavy Exhibit No. 7 was marked
4         for identification.)
5   BY MR. COHEN:
6    Q   This is double-sided as well.  You don't
7   have to read the whole thing but let me know
8   whether you recognize this.
9    A   I do.
10   Q   And what is this document?
11   A   These are talking points that I typed up for
12  Sister Anne based on points that she raised and
13  asked me to just put them in writing for her, and
14  then she reviewed and -- but it was based on
15  conversations and her directive and they were
16  talking points for her meeting with Dr. Fagal.
17   Q   Now, there's no date on this document but do
18  you have any idea when you might have -- if the
19  meeting with Dr. Fagal was held on the morning of
20  January 23, 2012, when do you think you might have
21  generated this?
22   A   I don't remember.
23   Q   Now, the seventh bullet point down begins,
24  "Tell Fagal that."  Do you see that?



Page 22

1    A   Yes.
2    Q   And the full sentence is "Tell Fagal that
3  Sister views this conduct to be a serious breach of
4  his tenure agreement and Marywood's mission and
5  values."  Correct?
6    A   Yes.
7    Q   So when you wrote this, were you suggesting
8  that President Munley should express this view to
9  Dr. Fagal because it seems almost like originally
10  maybe you had planned to tell him because Sister is
11  in the third person.  Do you see what I mean?
12    A   Yes, I do but, no, your assumption is not
13  correct.  These were notes that I wrote for Sister.
14  Because I wrote them, I wanted clear that she was
15  doing the talking, I was not.  She knew that and I
16  knew that.  So this was for her based on these were
17  the notes that she talked about and asked me simply
18  to write out for her.
19    Q   So the contents of this document were
20  President Munley's ideas and you simply just typed
21  them up?
22    A   Yes.
23    Q   And did President Munley convey these views
24  to you in a meeting or --

Page 23

1    A   I don't remember.
2    Q   Now, the eighth bullet point down begins
3  "Ask Fagal to leave campus."  Do you see that?
4    A   Yes, I do.
5    Q   And then there's a sub-bullet point
6  underneath that that says, "Suspended with pay."
7  Do you see that?
8    A   Yes, I do.
9    Q   So would it be fair to say that going into
10  the meeting with Professor Fagal that it was
11  President Munley's plan to suspend him regardless
12  of what occurred during the meeting?
13    A   No.  If you look at the next two large
14  bullets, there was an alternate plan.  There was a
15  post -- these were just all the different things
16  that could happen, which she had no idea what would
17  transpire in meeting.  None of us did.
18       If you look at the very first bullet, she
19  wanted to know if he authored and sent the e-mail
20  and then ask him why.  And then these were just
21  possible scenarios that could play out based on the
22  conversation.
23    Q   Well, you mentioned, you know, the bullet
24  point called Alternate Plans.  Do you see that?

Page 24

1    A   Yes.
2    Q   And that says, "Sister could ask if he has a
3  resolution for her to consider (retirement on the
4  spot.)"  Right?
5    A   Yes.
6    Q   Now, ultimately President Munley and you and
7  Dr. Foley did meet with Professor Fagal on
8  January 23rd, 2012; correct?
9    A   Yes.
10    Q   Did the topic of -- do you remember whether
11  President Munley ever asked Professor Fagal whether
12  he had a resolution for her to consider?
13       MS. PEET:  Are you talking about at that
14  meeting?
15       MR. COHEN:  Yes.
16       THE WITNESS:  Sister Anne asked Dr. Fagal if
17  he authored the video, if he sent the video and why and
18  the conversation more or less died there.  She asked him
19  several times about the video and he wouldn't respond,
20  so the meeting didn't run in that direction.  It just
21  sort of stopped.
22  BY MR. COHEN:
23    Q   So President Munley did not raise any
24  alternate plans other than suspension, correct?

Page 25

1       MS. PEET:  Objection to the form.
2       THE WITNESS:  That's correct, Sister did not
3  get answers to her questions.
4  BY MR. COHEN:
5    Q   So apart from what this document says, did
6  President Munley tell you before the meeting with
7  Professor Fagal that she intended to suspend
8  Professor Fagal?
9    A   I don't remember.
10    Q   Now, let's forget about the words "suspend"
11  or "suspension."  The eighth bullet point again
12  says, "Ask Fagal to leave campus; wait for Sister's
13  decision."  Right?
14    A   Yes.
15    Q   Now, was this going to be something definite
16  that President Munley was going to do, to ask him
17  to leave campus or is that one of several alternate
18  resolutions?
19    A   This is one of several alternates.  These
20  were just talking points and they were just
21  possibilities to consider.
22    Q   But again, there's an alternate -- there's a
23  bullet point that says "Alternate Plans;" correct?
24    A   Yes.



Page 26

```
 1      Q   And one of those plans was Sister could ask
 2   if he has a resolution for her to consider; for
 3   example, retiring on the spot, right?
 4      A   Yes.
 5      Q   And then the next sub-bullet point says, "If
 6   Fagal refuses to leave, tell him we'll consider it
 7   trespassing." Right?
 8      A   Yes.
 9      Q   So based on what I'm reading, the options
10   for Professor Fagal were he could retire on the
11   spot or he could leave campus; correct?
12         MS. PEET:  Objection to the form;
13   mischaracterization of testimony.  You can answer.
14         THE WITNESS:  That would depend on the
15   answers to her first few questions, so they were still
16   all just options at that point.
17   BY MR. COHEN:
18      Q   Let me ask you this:  Under the eighth
19   bullet point where it says, "Ask Fagal to leave
20   campus; wait for Sister's decision," there's a
21   sub-bullet point that says, "Classes will be
22   covered."  Correct?
23      A   Yes.
24      Q   In going into this meeting with Professor
```

Page 27

```
 1   Fagal, had someone already arranged for Professor
 2   Fagal's classes to be covered?
 3      A   That would have been an option if needed.
 4   It was not a definite.
 5      Q   Now, is there anywhere on this document that
 6   conveys whether Professor Fagal was going to be
 7   asked to leave the campus or be suspended depended
 8   on his responses to previous questions?
 9         MS. PEET:  Objection to the form.
10         THE WITNESS:  No, but this is not an
11   all-inclusive document.  These are talking points so if
12   the conversation needed to go down these routes, these
13   were some of the details that would have to be
14   considered.
15         Sister Anne Munley was perfectly capable of
16   making decisions and other choices.  These are just
17   simply talking points.
18   BY MR. COHEN:
19      Q   Do you know if during the meeting with
20   Professor Fagal on January 23rd, whether President
21   Munley had these talking points before her?
22      A   I don't remember.
23      Q   Now, going further down the document there's
24   a bullet point that just says "Post Suspension."
```

Page 28

```
 1   Correct?
 2      A   Yes.
 3      Q   And right underneath that there is a
 4   sub-bullet point that says, "Sister recommends
 5   termination and prepares notice of charges."
 6   Correct?
 7      A   Yes.
 8      Q   So based on what we're reading here, would
 9   it be fair to say that if President Munley
10   suspended Professor Fagal, that she would then
11   definitely follow up with a recommendation for
12   termination?
13      A   No.  I think it's simply listed as another
14   option.
15      Q   What are some of the other options?
16   Assuming that President suspended Professor Fagal,
17   what are some of the other options other than
18   terminating him that you see on this document?
19      A   There aren't any others listed on this
20   document.
21      Q   Now, you've attended all of the other
22   depositions in this case except for the first one
23   where Dr. Foley was in North Carolina; right?
24      A   Yes.  I was on the phone for that.
```

Page 29

```
 1      Q   But you've either been present or present
 2   over the phone, right?
 3      A   Yes, yes.
 4      Q   So you've heard me ask several witnesses --
 5   let me rephrase.
 6         You've heard several witnesses testify that
 7   progressive discipline really was not an option for
 8   Professor Fagal because he did not really express
 9   any remorse or regrets at this meeting with
10   President Munley; correct?
11         MS. PEET:  Objection to the form;
12   mischaracterization of testimony.  You can go ahead and
13   answer.
14         THE WITNESS:  I don't remember the specifics
15   of other testimony.
16   BY MR. COHEN:
17      Q   Okay.  Well, apart from whatever testimony
18   you heard or remember, was one of the reasons that
19   President Munley suspended Professor Fagal and then
20   shortly thereafter recommended his termination,
21   that he did not express any remorse at this meeting
22   with President Munley?
23         MS. PEET:  Objection; calls for speculation.
24         THE WITNESS:  I can't speak for Sister Anne.
```



Page 30

BY MR. COHEN:
1 
2    Q   Well, did she ever say that to you?
3    A   Not that I recall.
4    Q   So you testified that President Munley --
5 these bullet points were her ideas, you just kind
6 of typed them out; right?
7    A   Yes.
8    Q   Did anyone else other than you and President
9 Munley see these bullet points prior to the
10 January 23rd, 2012 meeting with Professor Fagal,
11 to your knowledge?
12    A   Not to my knowledge.
13    Q   Did Dr. Levine have any input into these
14 talking points?
15    A   Not that I'm aware of.
16    Q   Now, going into the January 23rd, 2012
17 meeting with President Munley, you, Dr. Foley and
18 Professor Fagal, did you have any doubt about
19 whether Professor Fagal authored and sent the
20 e-mail and the videos posted on YouTube?
21    A   Before the meeting?
22    Q   Yes.
23    A   I did not know.  I don't go into those
24 meetings assuming.  That's why the first question

Page 31

1 is did he author it.  That's what Sister was going
2 to do.  That's what I would have done if it was my
3 meeting.  I don't want to assume.
4    Q   Now, you recall that these events all
5 started with an e-mail that Professor Fagal sent to
6 many members of Marywood's community in November of
7 2011; right?
8       MS. PEET:  Objection to the form.  That's
9 not the testimony of record.
10       THE WITNESS:  I don't know that.
11 BY MR. COHEN:
12    Q   Well, you're aware of an e-mail that he did
13 send to many members of Marywood's community in
14 November of 2011 criticizing President Munley and
15 the decision to remove certain posters; right?
16    A   I don't remember an e-mail from November.
17    Q   Well, you did see the videos posted on
18 YouTube, that Professor Fagal posted on YouTube;
19 correct?
20    A   Yes.
21    Q   Now, how did you know where to look for
22 them?
23       MS. PEET:  Can I help you for a second.  Are
24 you talking about the January 2012 e-mail?

Page 32

1       MR. COHEN:  I think you're right.
2       MS. PEET:  Because there's no -- as I'm
3 sitting here, I don't know anything about a November of
4 2011 e-mail.
5       MR. COHEN:  I think you're right.  Let me
6 rephrase.
7 BY MR. COHEN:
8    Q   You're aware of an e-mail that Professor
9 Fagal sent to the University community in January
10 of 2012 criticizing President Munley and what he
11 perceived as the administration's teardown of his
12 FIRE posters; correct?
13       MS. PEET:  Objection to the form.  You can
14 answer.
15       THE WITNESS:  I remember an e-mail from
16 January that had links to the videos and a lot of other
17 stuff.
18 BY MR. COHEN:
19    Q   And you know that that e-mail purported to
20 come from Professor Fagal, right?
21    A   Yes, it did, yeah.
22    Q   So why would you -- why did you have any
23 doubt about whether he had authored the video if he
24 sent an e-mail with links to those videos?

Page 33

1    A   I never assumed that until I hear it from
2 the individual that they authored it and they sent
3 it.  It's possible somebody hacked his account so I
4 always ask first did you do this.  That's what I
5 do.  That's clearly what Sister wanted to do here
6 as well.
7    Q   Okay.  Let's move back to Dunleavy
8 Exhibit 6.  Just so I know we're looking at the
9 same document, is this an e-mail from you to
10 Dr. Levine dated January 22nd, 2012 at 1:04 p.m.?
11    A   Yes, it is.
12    Q   And again, it's actually a chain --
13    A   Yes.
14    Q   -- of e-mails between you and
15 Dr. Levine; correct?
16    A   Yes.
17    Q   And the most recent e-mail in the chain is
18 you to Dr. Levine saying, "Oh, yes very.  He may be
19 wondering why he's heard nothing yet."  And that's
20 just part of your e-mail, right?
21    A   Yes.
22    Q   And when you say, "He may be wondering why
23 he's heard nothing yet," are you referring to
24 Professor Fagal?



1    A   Yes.
2    Q   And by this statement, you meant Professor
3  Fagal may be wondering why he's heard nothing yet
4  from Marywood's administration about his e-mail and
5  the videos; right?
6    A   Yes.
7    Q   So here in this e-mail would it be fair to
8  say you were pretty sure that he sent the e-mail on
9  January and posted the videos on YouTube; correct?
10      MS. PEET:  Objection to the form.
11      THE WITNESS:  It appeared from the e-mail
12  that he sent it, but I would not -- I would not say I
13  was certain until he had the opportunity to answer the
14  question.
15  BY MR. COHEN:
16    Q   Okay. So let's finally get to this meeting
17  between Professor Fagal, President Munley, you and
18  Dr. Foley on January 23rd, 2012, that morning.  You
19  remember there was a meeting, right?
20    A   Yes, I do.
21    Q   And the plan, again we discussed there was
22  kind of a plan for the meeting was to get him at
23  8:45 a.m.; right?
24    A   Yes.

1    Q   And if he said no, then Dr. Foley was going
2  to suggest another time; correct?
3    A   Yes.
4    Q   Now, the first part of that plan was for
5  Dr. Foley to visit Professor Fagal at approximately
6  8:45 a.m.; right?
7    A   Yes.
8    Q   And for Dr. Foley to tell Professor Fagal to
9  come to President Munley's office at 9 a.m.,
10  correct?
11    A   Yes.
12    Q   What was the reason for providing Professor
13  Fagal with only 15 minutes' notice of this meeting,
14  if any?
15    A   There was no reason and nothing that he
16  would have had to prep for.  The questions that
17  Sister was going to ask him were pretty simple and
18  wouldn't have required any kind of prep on his part
19  to answer.
20    Q   Let me ask you this:  Isn't it correct that
21  Professor Fagal had class scheduled for 9 a.m.?
22    A   I don't know.
23    Q   So you said that there was not really any
24  reason to provide more notice because the questions

1  that President Munley was planning to ask him were
2  pretty simple, right?
3      MS. PEET:  Mischaracterization of testimony.
4  You can answer.
5      THE WITNESS:  Yes, the questions that Sister
6  Anne Munley planned to ask Dr. Fagal that I knew about
7  didn't -- wouldn't have required any research or prep on
8  his part.
9  BY MR. COHEN:
10    Q   So based on the talking points that you
11  jotted down for this meeting, some of the
12  alternatives mentioned for Professor Fagal included
13  retirement, suspension, later on a recommendation
14  for termination; correct?
15    A   Yes.
16    Q   So would it be fair to say that this meeting
17  with Professor Fagal, whatever was said at the
18  meeting or not said at the meeting had the
19  potential to end Professor Fagal's position at
20  Marywood?
21      MS. PEET:  Objection to the form.
22      THE WITNESS:  The talking points were simply
23  options that were available.
24  BY MR. COHEN:

1    Q   So they were options.  Some of those options
2  included suspension, retirement, possibly
3  termination; correct?
4    A   Yes.
5    Q   So would it be fair to say that what
6  occurred at this meeting had the potential to
7  terminate Professor Fagal's position voluntarily or
8  involuntary at Marywood?
9      MS. PEET:  Objection.  Dr. Dunleavy lacks
10  competence to answer the question.  But if she knows the
11  answer, then she can go ahead and answer the question.
12      THE WITNESS:  No, I can't get into Sister
13  Anne's head and answer that.
14  BY MR. COHEN:
15    Q   Well, let's go back to Dunleavy Exhibit 7.
16  Again, these are the talking points for the
17  meeting; correct?
18    A   Yes.
19    Q   And we talked today about how these bullet
20  points were really President Munley's ideas and you
21  just kind of put them into writing, correct?
22    A   That's correct.
23    Q   So you say that you don't really know what
24  President Munley was thinking, which is obvious,



Page 38

1 but you do know what she told you to write down;
2 right?
3     A   Yes.
4     Q   And among the things she told you to write
5 down were possibilities that Professor Fagal would
6 be suspended, that he could retire, ultimately that
7 President Munley could recommend his termination;
8 correct?
9     A   Yes.
10     Q   So you knew, at least from what President
11 Munley was telling you, that this meeting with
12 Professor Fagal could end his career at Marywood;
13 correct?
14         MS. PEET:  Objection to the form.
15         THE WITNESS:  The creation and distribution
16 of the videos, if Dr. Fagal admitted to those, would
17 have been what resulted in his suspension.  He freely
18 chose to do that.
19 BY MR. COHEN:
20     Q   Okay.  But I thought you just testified that
21 going to the meeting you weren't absolutely sure
22 that he even generated the videos, correct?
23     A   Correct, if he admitted.  That's why the
24 first question was did you author and did you send.

Page 39

1 If he admitted to it then and that was his choice
2 to have done that, that would have resulted in a
3 suspension or any of the other options.
4     Q   Would it have been more reasonable to
5 provide Professor Fagal with more than 15 minutes
6 notice of this meeting on January 23rd, 2012?
7         MS. PEET:  Objection to the form.
8         THE WITNESS:  I don't think so.
9 BY MR. COHEN:
10     Q   Let me ask you this, and this is a
11 hypothetical, I know that, but if you had sent the
12 e-mail that Professor Fagal had and generated the
13 videos that he posted on YouTube, would you have
14 preferred more than 15 minutes' notice of a meeting
15 with the President, was asking you questions that
16 the answers to which could lead to termination?
17         MS. PEET:  Objection; calls for speculation.
18 You can answer.
19         THE WITNESS:  First of all, I want it on the
20 record I would never, ever send an e-mail or videos like
21 that.  But, no, if I did that kind of a thing, I
22 wouldn't expect any notice.
23 BY MR. COHEN:
24     Q   So going into this meeting of Professor

Page 40

1 Fagal on January 23rd, 2012, at that time how long
2 had you been -- at that time you were Vice
3 President for Human Resources; correct?  Is that
4 the exact terminology?
5     A   No.  I think I was still Assistant Vice
6 President.  I think I became Associate Vice
7 President in 2013, but I'm not positive.
8     Q   Would it be fair to say that you were
9 essentially in charge of HR at Marywood at that
10 time?
11     A   Yes.
12     Q   And at that time, the meeting on
13 January 23rd, 2012, how long had you been
14 essentially in charge of Marywood's HR?
15     A   Since 19 -- no, I'm sorry, since 1984.
16     Q   So a long time?
17     A   A long time.
18     Q   And Professor Fagal was certainly not the
19 first Marywood employee that you saw being
20 disciplined, correct?
21     A   That's correct.
22     Q   And the meeting with Professor Fagal on
23 January 23rd, 2012 wasn't the first meeting that
24 you had with an employee where President Munley or

Page 41

1 a previous President wanted more information from
2 an employee about whether he did something and, if
3 so, what explanations he or she could provide;
4 correct?
5     A   I don't remember because you specified a
6 President.  It may have been other administrators.
7     Q   Any other administrator.
8     A   So rephrase the question so I can answer it
9 correctly, I'm sorry.
10     Q   The meeting that you held with Professor
11 Fagal on January 23rd, 2012 was not the first
12 meeting that you participated in with a Marywood
13 employee where he or she was asked whether he or
14 she did something and, if so, why?
15         MS. PEET:  Just for classification, there's
16 no testimony that Dr. Dunleavy held the meeting on
17 January 23rd.  You can answer.
18 BY MR. COHEN:
19     Q   Participated.
20     A   That's correct.
21     Q   Now, prior to the January 23rd, 2012 meeting
22 with Professor Fagal, was it your practice to offer
23 only 15 minutes' notice of a meeting where
24 discipline could potentially be meted out?



1  A  Sometimes less.  Sometimes it would be an
2  immediate call, please come down or please -- yeah.
3  Q  What about other times?
4  A  I think 15 minutes was generous notice for
5  those kind of situations.
6  Q  So the meeting between you, Professor Fagal,
7  President Munley and Dr. Foley started at around
8  9 a.m. on January 23rd, 2012; right?
9  A  Yes.
10  Q  And could you state in as much detail as you
11  can what was said at that meeting by all of the
12  participants.  I realize it's been a while.
13  A  Sister Anne conducted the meeting.  I was
14  there simply as note taker.  Dr. Foley was there as
15  a witness.  He was the Dean of the college in which
16  Dr. Fagal taught.  Neither of us spoke at the
17  meeting, and Dr. Fagal was there.
18     Sister Anne opened with the question of
19  whether he authored the video.  I believe Dr. Fagal
20  said, "Yes."  She asked him if he sent it.  I
21  believe he said "Yes" to that.  She asked him why
22  and that's where he stopped.  He didn't want to
23  answer anymore.
24     She asked him repeatedly about the videos.

1  He kept referencing a prior incident from several
2  months earlier about posters.  Sister kept saying,
3  "I'm talking about the videos."  And I think the
4  meeting lasted about 20 minutes.
5  Q  Now, this prior incident that you mentioned
6  about posters, didn't you think that that was
7  relevant to the videos?
8  A  I did not.
9  Q  Okay.  Isn't it clear from what you know now
10  that Professor Fagal posted the videos in part at
11  least because he was angry about the poster
12  incident?
13     MS. PEET:  Objection to the form.
14     THE WITNESS:  From sitting in other
15  depositions, it seems he tries to link that.  At the
16  time I didn't know that at all.
17  BY MR. COHEN:
18  Q  Okay.
19  A  They were entirely separate incidents.
20  Q  Well, again, the videos -- I keep saying
21  videos but it's one video, a two-part video on
22  YouTube; right?
23  A  There were two different links, yes.
24  Q  And those links were provided by Professor

1  Fagal in an e-mail that he sent in January of 2012
2  to many members of the Marywood community; correct?
3     MS. PEET:  Objection; asked and answered.
4     THE WITNESS:  Yes.
5  BY MR. COHEN:
6  Q  And in that e-mail he discussed at length
7  this incident involving FIRE posters that happened
8  in November of 2011, correct?
9  A  I focused on the videos.  I don't remember
10  reading a lot of the detail of the e-mail.  It
11  wasn't relevant to me or anything I had to deal
12  with.  That was done.
13  Q  So President Munley asked Professor Fagal
14  whether he authored the videos, correct?
15  A  Yes.
16  Q  Asked him why, correct?
17  A  Yes.
18  Q  And is it your testimony that he didn't
19  answer or that he tried to answer but he starts
20  speaking about a poster incident first?
21  A  I would have to look at my notes.  I know
22  that he talked about posters.  I don't remember the
23  exact order of what he said.  I know at some point
24  he said he didn't want to answer any more

1  questions.
2  Q  Isn't it true that Professor Fagal stated at
3  this meeting that he wanted President Munley to put
4  her questions in writing and he would like the
5  opportunity to craft a written response?
6  A  Yes, I do remember that.
7  Q  Do you remember whether President Munley
8  responded to that request that he be given an
9  opportunity to craft a written response?
10     MS. PEET:  At the meeting?
11     MR. COHEN:  Yes.
12     THE WITNESS:  I believe that Sister asked
13  him again and said she wanted to talk about it there at
14  the meeting.
15  BY MR. COHEN:
16  Q  So essentially his request to respond in
17  writing was denied?
18     MS. PEET:  Objection to the form.
19     THE WITNESS:  I don't remember.
20  BY MR. COHEN:
21  Q  Well, you do remember, correct, that the
22  meeting was on the morning of January 23rd, 2012
23  and then the next morning President Munley had
24  e-mailed or a secretary had e-mailed Professor



1  Fagal a letter with a statement of charges
2  recommending termination; correct?
3    A  Yes.
4    Q  Okay.  At what point in this January 23rd,
5  2012 meeting did President Munley inform Professor
6  Fagal that he was being suspended?
7    A  I don't remember without looking at my
8  notes.
9    Q  Going into the meeting, did Dr. Levine have
10  any role in suggesting or recommending that
11  Professor Fagal be suspended?
12    A  Not that I'm aware of.
13    Q  Was there any audio or video recording of
14  the January 23rd, 2012 meeting?
15    A  No.
16    Q  Was David Elliott listening or watching the
17  meeting from like another room?
18    A  No.  David Elliott was stationed out by the
19  secretary's desk.
20    Q  So there were no other witnesses to the
21  meeting other than the actual people in the room?
22    A  That's correct.
23    Q  And ultimately at some point, you're not
24  sure when, President Munley told Professor Fagal

1  that he was suspended; correct?
2    A  Yes.
3    Q  Did that shock you?
4       MS. PEET:  Objection to the form.
5       THE WITNESS:  No.
6  BY MR. COHEN:
7    Q  At the time that President Munley stated to
8  Professor Fagal that he was suspended, did you
9  believe that Professor Fagal posed an immediate
10  harm to himself or to others?
11    A  Could you repeat the question.
12    Q  At the time that President Munley told
13  Professor Fagal that he was suspended, did you
14  believe that Professor Fagal posed an immediate
15  harm to himself or to others?
16    A  Tying it to that specific time, I don't
17  remember.  The fact that those videos were created
18  and disseminated and put on YouTube and the fact
19  that we felt it important to have Dave Elliott
20  nearby because we at that point didn't know how
21  Dr. Fagal would respond, yeah, imminent threat if
22  not to himself to others and to University and its
23  reputation.
24    Q  An imminent physical threat to himself or to

1  others?
2    A  I don't know.  That was probably in the
3  range of possibility at that point.  Those videos
4  were outrageous.
5    Q  Did the videos or the e-mail that linked to
6  the videos, in either did Professor Fagal, you
7  know, advise or incite any violence?
8    A  I don't recall.
9    Q  So if you thought that Professor Fagal
10  possibly posed a threat of imminent harm to himself
11  or to others, why didn't you recommend that he be
12  brought in immediately after the video was sent as
13  opposed to several days after?
14    A  This wasn't my meeting.
15    Q  Right.
16    A  This was Sister Anne Munley's.  I believe
17  she was out of town.
18    Q  But you were the head of HR, right?
19    A  Yes.
20    Q  Was Marywood incapable of making a decision
21  without President Munley actually being there?
22    A  Certainly not.
23    Q  If you had really thought that Professor
24  Fagal posed a threat, a physical threat to himself

1  or to others, you would have attempted to take
2  steps to have him removed from campus immediately;
3  right?
4       MS. PEET:  Objection; mischaracterization of
5  testimony.  You can answer.
6       THE WITNESS:  I'm not sure why we're focused
7  on just physical harm.  Harm can take many,
8  many --
9  BY MR. COHEN:
10    Q  We'll get to that.  My question is about
11  physical harm.
12    A  I don't know -- I don't recall if I thought
13  he posed physical harm prior to the meeting.
14    Q  Okay.  Are you aware of -- well, apart from
15  what you thought, did anyone else, in particular
16  members of Marywood's cabinet, tell you that they
17  thought that Professor Fagal posed an immediate
18  threat of harm to themselves or to others?  This is
19  prior to the meeting where he was suspended.
20    A  I don't recall.
21    Q  Prior to the January 23rd, 2012 meeting with
22  Professor Fagal, are you aware of anybody at
23  Marywood taking special security precautions with
24  regard to Professor Fagal?

1    A  I don't recall.
2    Q  Do you remember yourself or any other member
3  of the Marywood cabinet informing Marywood's
4  security department prior to January 23rd, 2012
5  that Professor Fagal could be a threat to himself
6  or to others?
7    A  I testified earlier on my notes with that
8  conversation I had with Dave Elliott, and that
9  happened prior to the meeting so that was us
10  preparing for that meeting. That's all I remember,
11  though.
12    Q  Do you know whether Professor Fagal was
13  under any type of surveillance or monitoring prior
14  to the January 23rd meeting?
15    A  I don't know.
16    Q  Do you know whether his office was searched
17  prior to the meeting?
18    A  I don't know.
19    Q  Do you know whether his University computer
20  was searched prior to the meeting?
21    A  I don't know.
22    Q  Do you know whether police were informed
23  about Professor Fagal prior to the meeting?
24    A  I don't know.

1        MR. COHEN:  Can we take a brief break.
2        (At this time a brief recess
3          was taken.)
4        MR. COHEN:  Let's make this Dunleavy 8.
5        (Dunleavy Exhibit No. 8 was marked
6          for identification.)
7  BY MR. COHEN:
8    Q  And this is your handwriting. Do you
9  recognize this?
10    A  Yes, I do.
11    Q  And would it be fair to say that these are
12  your contemporaneous notes of the January 23rd,
13  2012 meeting with Professor Fagal?
14    A  Yes.
15    Q  And you were taking these notes as the
16  meeting occurred?
17    A  Yes.
18    Q  Now, I think we can save a lot of time
19  because I've tried to read these many times and I
20  understand some of it but not all of it. If you
21  could read it line for line so that it's clear to
22  everybody, I would appreciate it.
23    A  Sure. On the top left I have the
24  participants in the room, Sister Anne, Mike -- it

1  would be Mike Foley -- me and Fred Fagal and the
2  date is 1/23/12. At 8:45, this would have been
3  before the meeting, Mike Foley went to Fred Fagal,
4  asked -- he asked why. That would be Fred asked
5  why. Mike Foley said we can both probably guess.
6  And so Mike came up to the meeting before 9 and
7  told Sister Anne this and said that Mike assumed
8  he, being Fagal, would be here at 9.
9        The double lines mean that's the break.
10  That was the pre-meeting. The meeting started.
11  "FF" is Fred Fagal. Surprised three here. Sister
12  Anne -- the SAM is Sister Anne Munley -- asked are
13  you the author? He responded, "Yes, I am." She
14  asked "Sent to whom?" How disseminated?"
15        Then the next line would be Fagal's
16  response, not sure why he would answer that. Can
17  figure out for yourself. Won't answer.
18        F is Fagal. Purpose of meeting?
19        Then SAM, Sister, tenure responsibility,
20  mission, core values, how?
21        Next line, F:  Won't answer anymore.
22    Q  I'm sorry, let me just stop you right there.
23  When she said "how," are you trying to say that she
24  says how did your videos comport with --

1    A  Yes.
2    Q  -- mission and core values?
3    A  Yes.
4    Q  Okay. Go on.
5    A  And then Fagal says he won't answer anymore.
6  A is Sister Anne. What did you want to accomplish?
7  Fred said "Justice." Sister said, "Please
8  elaborate." Fagal said, "Don't choose to
9  elaborate." Sister went back to the policies,
10  tenure --
11    Q  CR?
12    A  I'm not sure what that is. I would have to
13  look at the typed notes. I might have spelled it
14  out better there. Academic freedom, professional
15  ethics, all appropriate support in the mission or
16  support the mission.
17        Fred said he was leaving. Sister said she
18  wasn't done with the meeting, that it was his
19  chance to address and that she would consider her
20  response. And Fred asked -- this is where Fred
21  asked for her questions in writing and he'll craft
22  a response.
23        Sister asked him, "Nothing else to say?" He
24  said, "No." And then Sister told him he was

Page 54

1   suspended with pay, asked him to return his keys
2   and I.D. to me, Pat, and to take his personal stuff
3   and leave.
4       Fred brought up the faculty manual, mortal
5   danger it looks like, moral turpitude at all his
6   questions, I believe.  Sister Anne said look at
7   those policies that she had mentioned.  Fred said
8   he had lots in his office and it wouldn't fit
9   today.
10      Next page, Sister verified his home address,
11  e-mail and his Yahoo account and his phone number,
12  asked for his cell and he provided it.  And Sister
13  said she would pursue with her determination and he
14  could arrange to get his other stuff with me or
15  with Campus Safety.
16      Sister asked him again if there was --
17      Q   Wait a second, I'm sorry.  You said "She
18  will pursue with her determination"?
19      A   That's what that says.
20      Q   What did you mean, determination of what?
21          MS. PEET:  What did Pat mean or what -- Pat
22  was just the note taker.
23  BY MR. COHEN:
24      Q   What did you mean when you wrote that?

Page 55

1       A   With her determination of what would happen
2   next is what I presume.
3       Q   With regard to Professor Fagal's employment?
4       A   Yes.  She had already told him he was
5   suspended so she would go then further.
6       Q   Okay.
7       A   Sister Anne asked if Dr. Fagal had other
8   information or input to consider.  Dr. Fagal -- I'm
9   not sure if he read something or wanted Sister to
10  read it.  He said he called AL -- is Alan Levine --
11  on Saturday at his house and he left a message to
12  talk off the record.
13      He wrote to FIRE, but I don't know if that
14  means he wrote when, and he was trying to give
15  Sister Anne Munley an out re: the posters.  He
16  went to -- this is still Dr. Fagal -- went to Alan
17  Levine, AL, on 12/5.  Said Carl O. -- that would be
18  Carl Oliveri who was then the Director of Student
19  Activities, said the posters didn't have prize on
20  then, and then it says "That's a lie."  I don't
21  remember if that was Fred's comment or if he said
22  Carl said that.
23      Carl was not there Monday, whatever Monday
24  that was.  His -- that would be Carl's assistant

Page 56

1   lied, question mark.  If executive council lied to
2   about that, could explain actions."  I'm not sure
3   what that references.
4       Fagal wrote to -- I think that's the name of
5   somebody at FIRE and another friend.  Munley's only
6   narrowing escape, if false information -- I'm
7   sorry, I don't know what that little arrow is, that
8   little caret word.  It might be "saw" but I'm not
9   sure.  I type things up very quickly because my
10  writing is so bad.
11      FIRE response was flawed.  Maybe that's your
12  FIRE response or her, I don't know.  Evidence - see
13  if there's a way out to explain what I observed.
14      Drafted a response to Sister Anne - amend
15  response to FIRE.  Give Sister Anne his response to
16  FIRE in her response.  Try to give Sister Anne
17  Munley more time to rescue herself from depths.
18  Feels she's not doing best for University in this
19  case.
20      Posters - e-mailed Carl Friday about posters
21  with prize money.  Could get affidavit about
22  posters.  Sister Anne said this is all input about
23  the posters.  I want input about the videos.  And
24  Fred said they were satire.

Page 57

1       Sister Anne asked him if that was
2   appropriate and talked about the foundational value
3   of respect.  Fred said, "Um...said in faculty
4   report not everybody deserves respect; i.e.,
5   Hitler, Bin Laden."
6       Sister said, "What do you mean?"  Fred said,
7   "I don't want to get philosophical."  Talked about
8   dancing, angels on the head of a pin.  Sister asked
9   him if the content was not offensive.  Fred said
10  people could be offended all the time, living in
11  dictatorship soon.  Shows willingness to find way
12  out.  1. FIRE; 2. Called Alan; 3. Lies in student
13  life office.
14      Sister Anne wanted a response to the nature
15  of the video.  Very clear.  And then Fred left at
16  9:15 pulling out his keys.
17      Q   Now, at 9:15 when Fred left, do you remember
18  whether everyone else in the room remained there to
19  talk about what had just transpired?
20      A   I don't remember -- Fred left first but I
21  don't remember anybody staying for any length of
22  time so, no.
23      Q   Were you surprised at what Fred said during
24  the meeting, at anything he said?



Page 58

1     A   No.
2     Q   Did anyone after he left express any
3   surprise?
4     A   Not that I remember.
5     Q   Well, did you find his -- scratch that.
6         Is there another set of handwritten notes
7   that you made, not necessarily contemporaneous
8   about this meeting but soon after the meeting?
9     A   No, not that I'm aware of.  I typed up those
10  notes, these notes later -- probably later that
11  morning because, as you see, I can't read my own
12  handwriting so --
13    Q   I'm not criticizing your handwriting.
14    A   You can, that's okay.
15    Q   Fred and I could have sworn that there was
16  another set of handwritten notes other than what
17  you wrote contemporaneously and not what you typed
18  up, but you don't think that's true?
19    A   No.
20        MS. PEET:  Off the record.
21        (At this time there was a brief
22          discussion held off the record.)
23  BY MR. COHEN:
24    Q   Now, on the next day, January 24th, 2012,

Page 59

1   you recall that President Munley e-mailed a
2   statement of charges to Professor Fagal; right?
3     A   Yes.
4     Q   Do you know who drafted that statement of
5   charges?
6     A   No, I don't.
7     Q   Do you know when that statement of charges
8   was when someone started drafting it?
9     A   No, I don't.
10        MR. COHEN:  Let's make this Dunleavy 9.  It
11  also happens to be Munley 9.
12        (Dunleavy Exhibit No. 9 was marked
13          for identification.)
14  BY MR. COHEN:
15    Q   And if you could briefly read this to
16  yourself and let me know when you finish.
17    A   (Witness reviews document.)
18    Q   So this is an e-mail from you to Sister Anne
19  dated January 23rd, 2012 at 6:22 p.m., correct?
20    A   Yes, that's correct.
21    Q   And you mention in the second paragraph that
22  begins "Will have an appointment over lunch."
23    A   Yes.
24    Q   And there's a semi-colon and then it says,

Page 60

1   We will finish up the Fagal statement of charges
2   and the response to Palmiter and it just goes on.
3   Correct?
4     A   Yes.
5         MS. PEET:  For the record, the Palmiter
6   stuff has nothing to do with this lawsuit.
7         MR. COHEN:  Right.  I wasn't going to ask
8   about Palmiter.
9         MS. PEET:  Okay.
10  BY MR. COHEN:
11    Q   Now, the Fagal statement of charges they are
12  referring to here, is that the same statement of
13  charges that Professor Fagal was sent the next day?
14    A   I don't know.
15    Q   Well, was there another statement of charges
16  sent?
17    A   No, but I don't know.
18    Q   Okay.  So when you say, "We will finish up
19  the Fagal statement of charges," does that refresh
20  your recollection of who drafted it or who
21  participated in drafting?
22    A   Not really.  My goal really was a conduit at
23  that point so whether Sister and Will -- Will would
24  be Will Anthony -- so whether Sister and Will had

Page 61

1   started and Will was -- I don't remember that.  And
2   I may have just been Will would have been back to
3   me and I would have given them to Sister.
4         MS. PEET:  Dr. Dunleavy, just an instruction
5   for the remainder of the deposition, anything that you
6   had discussed with Will Anthony is protected by the
7   attorney/client privilege and you are not to disclose
8   any communications that you had with Mr. Anthony or any
9   other lawyer including anyone from Jackson Lewis.
10        THE WITNESS:  Okay.
11  BY MR. COHEN:
12    Q   Now, recently I drafted a set of
13  interrogatories which you signed.  Do you recall
14  signing some Answers to Interrogatories?
15    A   Yes.
16    Q   And one of the questions that I asked was
17  about the file containing the statement of charges
18  and whether you knew when it was created and there
19  was an objection to that question.  But do you
20  know?
21    A   No, I don't.
22    Q   Have you tried to research this?  Have you
23  looked for the file and looked at the metadata?  Do
24  you even know who has the file?



1     A   No.
2     Q   Now, in the same paragraph, the second
3   paragraph, you mention your recommendation to
4   dismiss, you're writing to President Munley so
5   you're referring to her recommendation to dismiss;
6   correct?
7     A   Yes.
8     Q   So as of 6:22 p.m. on January 23rd, 2012,
9   would it be fair to say that President Munley had
10  already made a decision that she was going to
11  recommend dismissal of Professor Fagal?
12    A   I can't speak for where Sister was at that
13  point.
14    Q   Could you think of any reason why you would
15  reference President Munley's recommendation to
16  dismiss if she hadn't told you that she was
17  recommending dismissal?
18    A   It would probably have been in the realm of
19  possibility but, again, these were her decisions,
20  not mine.
21    Q   Okay.  Now, in the next paragraph you write,
22  "Dr. Fagal has requested a statement regarding his
23  suspension."  Correct?
24    A   Yes.

1     Q   Now, I don't think I've ever seen this
2   e-mail.  Do you know whether it exists because I
3   don't think it's been produced.  I don't have it.
4     A   I did send him an e-mail.
5     Q   Right, I know you did but what I'm wondering
6   is whether you have his secretary's e-mail
7   requesting a statement regarding his suspension?
8     A   No.  It is possible, I don't know, that it
9   could have gone to someone else but, no.
10        MR. COHEN:  Let's call this Dunleavy 10.
11        (Dunleavy Exhibit No. 10 was marked
12          for identification.)
13  BY MR. COHEN:
14    Q   Do you recognize this document?
15    A   It's an e-mail that I sent to Sister Anne on
16  Monday, January 23rd, 2012.
17    Q   And the time is 8:52 p.m., right?
18    A   Yes.
19    Q   Were you actually working in the office at
20  that time or did you send this from home?
21    A   I don't remember.  It is possible that I
22  sent it from home.
23    Q   Now, regarding Fagal in this e-mail, you
24  wrote, "Will's draft of the statement of charges

1   will follow."  Right?
2     A   Yes.
3     Q   So as of this time, the sending of the
4   e-mail, it would be fair to say that a draft of the
5   statement of charges was complete or nearly
6   complete; correct?
7     A   There was a draft that would follow.  I
8   don't know what state it was in at this point.
9     Q   Do you remember whether there was some kind
10  of rush to get the statement of charges done as
11  soon as possible?
12    A   I didn't recall.
13    Q   Did President Munley tell you that she
14  wanted it sent out the next day?
15    A   I don't recall.
16        MR. COHEN:  Let's mark this Dunleavy 11.
17        (Dunleavy Exhibit No. 11 was marked
18          for identification.)
19  BY MR. COHEN:
20    Q   And do you recognize this document?
21    A   Yes.
22    Q   And this is a typewritten set of notes that
23  you made explaining what had occurred at the
24  meeting on January 23, 2012 with Professor Fagal;

1   right?
2     A   Yes, that's correct.
3     Q   And in generating this document, you used
4   your contemporaneous notes; correct?
5     A   Yes.
6     Q   Did you use any other sources, someone
7   else's notes or someone else's memory?
8     A   No.
9     Q   How soon after January 23rd, 2012 did you
10  generate this document?  I know it's dated
11  January 23rd, 2012, but did you go right into your
12  office and start this right away?
13    A   I don't remember exactly what time, but I
14  believe it was that morning.
15    Q   When you have a meeting with a Marywood
16  employee that was going to be disciplined, is this
17  common for you to make a set of contemporaneous
18  notes and then follow it up with a set of
19  typewritten notes?
20    A   Yes.
21    Q   And it's signed by you and Michael Foley,
22  correct?
23    A   Yes, it is.
24    Q   Did you ask President Munley to sign it?



Page 66

1    A   No.
2    Q   Any reason why?
3    A   Sister Anne asked me to take notes.  She had
4  asked Mike Foley to sit in on the meeting as a
5  witness so he was the eyes and ears and I was the
6  note taker.  I wanted to make sure he concurred
7  that my depiction was accurate and I gave the notes
8  to Sister Anne.  That's all.
9    Q   And this document that we're looking at,
10  Dunleavy 11, is this an accurate representation of
11  what occurred at the January 23rd, 2012 meeting?
12    A   Yes.
13        MR. COHEN: Let's make this Dunleavy 12.
14        (Dunleavy Exhibit No. 12 was marked
15        for identification.)
16  BY MR. COHEN:
17    Q   And do you recognize this document?
18    A   Yes, I do.
19    Q   And here you're forwarding an e-mail that
20  you had sent to Dr. Fagal at 2:14 p.m. on
21  January 23rd, 2012; correct?
22    A   Yes.
23    Q   You're forwarding it to President Munley?
24    A   Yes.

Page 67

1    Q   And you wrote, "Sister Anne Munley provided
2  you with several opportunities to explain your
3  actions or to provide any information you thought
4  she should consider regarding your actions
5  concerning the videos.  You declined her
6  invitation."  Correct?
7    A   Yes.
8    Q   But that's not really completely accurate,
9  though, because Professor Fagal did ask for an
10  opportunity to respond in writing; correct?
11    A   Yes, he did.
12        MR. COHEN:  Let's make this Dunleavy 13.
13        (Dunleavy Exhibit No. 13 was marked
14        for identification.)
15  BY MR. COHEN:
16    Q   Dunleavy 13, do you recognize this document?
17    A   Yes, I do.
18    Q   And the first page is an e-mail that
19  President Munley's executive secretary sent to
20  Dr. Fagal, correct?
21    A   That's correct.
22    Q   On January 24th, 2012 at 1:11 p.m., correct?
23    A   Yes.
24    Q   And it looks like you're bcc'd on this

Page 68

1  e-mail, right?
2    A   That's correct.
3    Q   Now, looking at this, after the e-mail are
4  the attachments to the e-mail, does that appear to
5  be correct to you?
6    A   Yes.
7    Q   And the first attachment is a letter from
8  President Munley to Dr. Fagal and he or she is
9  recommending his termination, correct?
10    A   Yes.
11    Q   I might have asked this before, but did you
12  play any role in drafting this letter or providing
13  any input into this letter?
14    A   I would have pulled copies of the policies
15  that Sister requested to enclose with a letter.
16    Q   But you don't know whether you actually put
17  any other input into the wording of the letter?
18    A   I don't believe I did.
19    Q   Now, between the time that Dr. Fagal was
20  suspended on the morning of January 23rd, 2012 and
21  the time that this e-mail we're looking at was sent
22  to him, are you aware of any remedial actions that
23  Marywood took to resolve the issues that led to
24  Professor Fagal's suspension?

Page 69

1        MS. PEET:  Objection to the form.  You can
2  answer.
3        THE WITNESS:  I don't know.
4  BY MR. COHEN:
5    Q   Well, you were head of HR at the time;
6  correct?
7    A   Yes.
8    Q   So wouldn't it be your job to know whether
9  any remedial actions are taken to resolve issues
10  that led to his suspension?
11        MS. PEET:  Objection to the form.
12        THE WITNESS:  Not with tenured faculty, no.
13  BY MR. COHEN:
14    Q   Between the time that Professor Fagal was
15  suspended and the time that this e-mail was sent to
16  him, did you work pretty closely with President
17  Munley about her plans for Professor Fagal?
18        MS. PEET:  Objection to the form.
19        THE WITNESS:  I don't remember specifically.
20  I do remember pulling copies of policies as she
21  requested them.
22  BY MR. COHEN:
23    Q   Between the time of the meeting on
24  January 23rd and the time that this e-mail was



1    sent, were you in contact with Will Anthony without
2    saying -- I'm not asking what was said, if
3    anything, but were you in touch with any Marywood
4    attorney?
5       A  I don't remember.
6       Q  Is your office located close to President
7    Munley's?
8       A  Our offices are in adjoining buildings.
9       Q  So when I asked you if between the time of
10   this suspension and the time of this e-mail whether
11   Marywood had taken any remedial actions with regard
12   to Professor Fagal, I think you said you don't
13   know?
14      A  That's correct.
15      Q  And then I asked you, well, isn't it your
16   job to know and you said, Well, not necessarily;
17   right?
18      A  I said not with tenured faculty.
19      Q  Well, whose job would it be to know?
20      A  It would be either the Vice President for
21   Academic Affairs and/or President, perhaps a Dean
22   depending on what the issue was.
23      Q  And the Vice President for Academic Affairs
24   at the time was Dr. Levine, right?

1       A  Correct.
2       Q  And what was the other position you
3    mentioned?
4       A  The President.
5       Q  Other than that, there was Dean?
6       A  Depending on the level, and I don't work
7    with the Progressive Discipline Policy a lot, but I
8    believe there are initial steps depending on the
9    circumstances where a Dean might take a role, not
10   in this particular case but in some.
11      Q  And the Dean that was -- who were the Deans
12   that supervised Professor Fagal at this time, like
13   who were his superiors?
14      A  He would have had a department chairperson,
15   I have no idea who that would have been at the
16   time.  Dr. Foley would have been the Dean of that
17   college, Dr. Levine was the Vice President over the
18   Dean and then Sister Anne would have been
19   President.
20          MR. COHEN:  I need to take a ten-minute
21   break.
22          (At this time a brief recess
23           was taken.)
24          MR. COHEN:  Let's make this Dunleavy 14.

1          (Dunleavy Exhibit No. 14 was marked
2           for identification.)
3    BY MR. COHEN:
4       Q  And do you recognize this document?
5       A  Yes.
6       Q  And what is it?
7       A  These are talking points again for Sister
8    Anne that she would have requested me to have typed
9    up for her to take to her board meeting about the
10   Fagal incident.
11      Q  Now, was there a special board meeting just
12   for this incident or were there like regularly
13   scheduled board meetings?
14      A  There are regularly scheduled board
15   meetings.  To my recollection, that's what this
16   was.
17      Q  Do you know when this document was created?
18      A  No.  The board meeting is generally the end
19   of January and the last thing on this -- the first
20   piece of paper on Page 2, I guess, is dated
21   January 24th so probably on or after that.
22      Q  On Tuesday, January 17th, 2012, the third
23   bullet point down it says, "Dr. Dunleavy began
24   collecting information."  Do you see that?

1       A  Yes, I do.
2       Q  And there's three sub-bullets:  "Policy
3    review, history of Dr. Fagal's performance issues
4    and insurance coverage."  Did I read that
5    correctly?
6       A  Yes, you did.
7       Q  And what does policy review mean?
8       A  They would have been policies that might
9    have applied so that would have been a review of
10   any policies that might have been violated by the
11   videos.
12      Q  What about any policies about disciplinary
13   procedure?
14      A  Probably, so policy review could be anything
15   about this incident, anything that I might have
16   felt would have applied to give to Sister for her
17   review.
18      Q  And this history of Dr. Fagal's performance
19   issues, what performance issues are you referring
20   to?
21      A  What I believe I was doing at that point was
22   looking to see -- that's standard what I would do
23   in any kind of a complaint of this nature, look to
24   see was there a history, is any of it relevant,

1  look at policies that might apply.
2    Q   Well, was there a history that was relevant?
3    A   No.  There were, as I recall, a few
4  incidents but they were not related, no.
5    Q   And what is insurance coverage?
6    A   That would have been to check with our
7  insurance carrier and see what kind of coverage we
8  had under what kind of policies in case this became
9  a big issue.  So these were all just standard
10 things that I would do in any complaint.
11   Q   Now, on Wednesday, January 18th, 2012, the
12 first bullet point underneath that, it says,
13 "Dr. Dunleavy briefed Sister Anne Munley on actions
14 to date."  Correct?
15   A   Yes.
16   Q   And is that true?
17   A   It says I did so.  I assume I did.
18   Q   And what actions had been taken to date?
19   A   The actions from Tuesday, the 17th.
20   Q   Now, when you briefed Sister Anne, how did
21 that occur, in person?  Over the phone?
22   A   I don't recall other than I believe Sister
23 was out of town so it was probably over the phone.
24   Q   Okay.  Now, on Thursday, January 19th, 2012,

1  there's a bullet point that's entirely redacted.
2  And then the next one says, "Dr. Levine and
3  Dr. Dunleavy reviewed AAUP policies."  Right?
4    A   Yes.
5    Q   And is that, in fact, true that you did
6  that?
7    A   It says I did so I assume I did.
8    Q   Do you remember doing that?
9    A   No.
10   Q   And what is the AAUP?
11   A   American Association of University
12 Professors.
13   Q   And does it make sense to you that you would
14 have reviewed AAUP policies?
15       MS. PEET:  Objection to the form.
16       THE WITNESS:  Yes.
17 BY MR. COHEN:
18   Q   Why would you review those policies?
19   A   This was all part of data collection so we
20 would look at anything that might be relevant.
21   Q   But why were AAUP policies relevant?
22       MS. PEET:  Objection to the form.
23       THE WITNESS:  AAUP policies are often times
24 guidelines and they deal with faculty issues and

1  Dr. Fagal was faculty.
2  BY MR. COHEN:
3    Q   But the AAUP policies were not like
4  governing for Marywood's purposes, they were just,
5  like you said, guiding; right?
6        MS. PEET:  Objection to the form; lack of
7  foundation.  You can answer if you know.
8        THE WITNESS:  Marywood has its own policies
9  that it uses to govern.  AAUP are guidelines.
10 BY MR. COHEN:
11   Q   On the next day Friday -- well, before I get
12 to there, do you know whether the text underneath
13 these redactions is attorney/client privilege or is
14 it you just -- was it irrelevant?  Do you happen to
15 know?  And I don't know even know who made these
16 redactions.
17       MS. PEET:  I can put it on the record
18 Dr. Dunleavy actually didn't make the redactions.  It
19 was getting ready for production.  It's attorney/client
20 privilege.
21 BY MR. COHEN:
22   Q   On Friday, January 20th, 2012, the second
23 bullet point, it says, "Dr. Dunleavy and
24 Mr. Kilcullen drafted statements."  Do you see

1  that?
2    A   Yes.
3    Q   What statements?
4    A   Peter Kilcullen is the -- I don't know what
5  his title was then but he was in charge of
6  marketing and communications and he still is.  He
7  and I would have talked about statements to be
8  prepared in case the videos went public and hit the
9  news media and concern over other kinds of harm,
10 like reputational damage.
11       So Peter Kilcullen's responsibility would
12 have been to draft the media responses to be ready
13 in case those questions came, and I would have
14 provided him with whatever facts I knew at that
15 point.
16   Q   And then the next bullet point says,
17 "Dr. Dunleavy reviewed plan with Mr. Elliott."
18 Right?
19   A   Yes.
20   Q   And what plan is referred to here?
21   A   That would have been the plan to have him
22 stationed outside the conference room for the
23 meeting on the 23rd, again because of the potential
24 for some kind of harm or threat.

1    Q   Did you attend the board meeting that these
2   notes were taken for?
3    A   No.
4    Q   I assume that President Munley did, though?
5        MS. PEET:  Object to the form; calls for
6   speculation.
7        THE WITNESS:  She always attends board
8   meetings.
9   BY MR. COHEN:
10    Q   Did she tell you what happened at this board
11   meeting?
12    A   No.
13        MR. COHEN:  Let's make this Dunleavy 15.
14        (Dunleavy Exhibit No. 15 was marked
15          for identification.)
16   BY MR. COHEN:
17    Q   And do you recognize this document?
18    A   Yes.
19    Q   And these are your handwritten notes?
20    A   Yes.
21    Q   Dated January 26th, 2012; right?
22    A   Yes.
23    Q   Can you read these aloud?
24    A   Sure.  January 26th, 2012 around 9:30 a.m.,

1   "Bob Shaw -- Bob Shaw is the Director of our
2   Student Counseling Center -- "called me regarding
3   Fred Fagal.  He -- meaning Bob Shaw -- saw the
4   video.  Just wanted to let me know he supports our
5   taking this seriously."
6        And then he must have mentioned that he
7   thought it was a threat potential.  "Bob did not
8   ask me to comment and I did not other than to thank
9   him for the call."
10        MR. COHEN:  Let's make this Dunleavy 16.
11        (Dunleavy Exhibit No. 16 was marked
12          for identification.)
13   BY MR. COHEN:
14    Q   And do you recognize this document?
15    A   Yes, I do.
16    Q   It's an e-mail from you to Sister Munley
17   dated January 27th, 2012 at 1:24 p.m.; right?
18    A   Yes.
19    Q   And you're kind of updating Sister Munley
20   about the videos and how many hits there were,
21   right?
22    A   Correct.
23    Q   You also told her that you were checking the
24   FIRE site and Marywood Free Speech site that

1   Dr. Fagal created, right?
2    A   Yes.
3    Q   Did you make it a habit to check up on
4   Professor Fagal's statements online?
5        MS. PEET:  Objection to the form.
6   BY MR. COHEN:
7    Q   I'm not just talking about the videos.
8    A   No.
9    Q   So it was because of the videos that you
10   were kind of --
11    A   Yes.
12    Q   -- checking online to see if he was doing
13   more or --
14    A   Yes.
15    Q   Okay.  Did someone direct you to monitor the
16   videos and any statements on FIRE's website or the
17   Marywood Free Speech site?
18    A   Not that I recall.  I was worried about
19   reputational damage, potential reputational damage.
20    Q   Well, let me ask you this:  Do you know
21   whether anyone -- I certainly know that you and
22   Marywood's cabinet was very upset at these videos,
23   but do you know if anyone asked Professor Fagal to
24   take them down?

1        MS. PEET:  Objection to the form.
2        THE WITNESS:  I don't know.
3   BY MR. COHEN:
4    Q   You don't remember asking certainly?
5    A   No.
6    Q   And you don't remember it coming up at the
7   meeting with Professor Fagal on January 23rd?
8    A   I don't remember.
9    Q   Would that have made sense to ask him to
10   take them down?
11        MS. PEET:  Objection to the form.
12        THE WITNESS:  I was in that meeting as a
13   note taker.
14   BY MR. COHEN:
15    Q   Right.
16    A   That was not my role.
17    Q   Do you know whether someone, whether you or
18   anyone else at Marywood told YouTube that these
19   videos were defamatory and they should be taken
20   down?
21    A   I don't recall.
22        MR. COHEN:  Let's make this Dunleavy 17.
23        (Exhibit No. 17 was marked
24          for identification.)


MAGNA
LEGAL SERVICES

1  BY MR. COHEN:
2      Q   Do you recognize this document?
3      A   Yes.
4      Q   And this is another e-mail you sent to
5  Sister Anne dated January 30th, 2012 at 4:38 p.m.;
6  right?
7      A   That's correct.
8      Q   And again, you're updating her on, you know,
9  how often the videos had been viewed and the
10  Marywood Free Speech site and the FIRE site; right?
11     A   Yes.
12     Q   You refer to Mary Theresa Paterson.  That's
13  Marywood's inside counsel, right?
14     A   Yes.
15         MR. COHEN: Let's make this Dunleavy 18.
16         (Exhibit No. 18 was marked
17          for identification.)
18  BY MR. COHEN:
19     Q   And these are again your handwritten notes,
20  right?
21     A   That's correct.
22     Q   And can you read these aloud?
23     A   Sure.  It's my notes of a meeting or a phone
24  call, I don't know which, with Sister Anne on

1  February 3rd, 2012 and it would have been regarding
2  Fagal.  And I have written "Progressive discipline,
3  n/a and talk to Sister and Will together Monday."
4      Q   Again, don't tell me what Will said.
5      A   I don't remember.  And then I have 4700 and
6  I don't know what that is either.
7      Q   I was wondering that, too.  And "n/a" here
8  means non-applicable?
9      A   Yes.
10     Q   And was that your conclusion or was that
11  something that somebody told you?  Again, I don't
12  want to know anything about attorney/client
13  communications but you are saying here -- you're
14  writing here that progressive discipline was not
15  applicable; right?
16     A   Yes, yes.
17     Q   How did you come to that conclusion?
18     A   I don't know that I came to that conclusion.
19  What I do when I'm on a phone call is I write what
20  I hear, that maybe that Sister said that.  I don't
21  recall.  I just write.
22         MR. COHEN:  Make this Dunleavy 19.
23         (Dunleavy Exhibit No. 19 was marked
24          for identification.)

1  BY MR. COHEN:
2      Q   These are more handwritten notes by you,
3  right?
4      A   Yes.
5      Q   And could you read these aloud?
6      A   Up at the top I have written "Copies" and
7  then I have "Ask Will:  Medical applications, FSA
8  claims, other benefits apps."  I don't know what
9  that squiggle is and then there's 3/12.  I don't
10  know what the -- it looks like "el" but I don't
11  know what that is.
12         Then I have "Ask:  Does separate out mean
13  copy?  Medical apps/changes to -- that would be to
14  medical benefits -- FSA.  Will to check PA law.
15  Payroll screens?
16         "Other issues, FIRE, cartoons, survey,
17  deans.  Never in his personnel file.  Other files -
18  Sister Anne.  Dean's.  Question mark."
19     Q   And does everything on this piece of paper
20  relate to Fagal or just the part where you begin
21  "Other issues"?
22     A   This was all related to pulling the
23  personnel file for -- one of the committees, I
24  believe, requested it.  And so these were just as

1  we went through to see what other things I have to
2  make sure that I look because not everything is in
3  the same place.
4      Q   When you write "cartoon" here, what are you
5  referring to?
6      A   There was an incident, oh, several years
7  prior where Dr. Fagal posted a cartoon, I think it
8  was that Danish cartoonist and we had several
9  Muslim students, one in particular I think filed a
10  complaint that was handled by the Dean.
11     Q   And the survey, what survey is that?
12     A   I don't remember.
13     Q   And you called them issues but in quotation
14  marks.  Did you think they were issues or did
15  someone else?
16         MS. PEET:  Objection to the form.
17         THE WITNESS:  I wrote "issues."  They were
18  issues at some point in time.  I don't know -- I don't
19  think I had any comment on whether they were relevant to
20  the videos.
21  BY MR. COHEN:
22     Q   Why was FIRE an issue?
23         MS. PEET:  Objection to the form.
24         THE WITNESS:  FIRE would have referred



1    probably to the poster incident which, again, was a
2    separate incident to me.
3    BY MR. COHEN:
4        Q   And underneath "Survey," does that say
5    "Deans"?
6        A   Yes.
7        Q   Do you know what that refers to?
8        A   Most of these things -- in fact, I have
9    written on the right that these issues, my word,
10    were never in his personnel file.  So just
11    checking, were there other things in the Dean's
12    file and would they be part of this request, would
13    it be fair or not fair to provide those.
14            MR. COHEN:  Let's make this Dunleavy 20.
15            (Dunleavy Exhibit No. 20 was marked.
16             for identification.)
17    BY MR. COHEN:
18        Q   This is an e-mail from your personal address
19    to your work address, right?
20        A   Yes.
21        Q   And what does CJ mean?
22        A   I have no idea.  I know at the time I would
23    have known.
24        Q   And how does this relate to Qing cabinet?

1        A   I don't know.  These could all have been
2    very distinct issues.  What happens to me sometimes
3    when I get home at night, I think of a thousand
4    things and I'll send myself the briefest of notes
5    knowing that in the morning it will trigger, but it
6    doesn't trigger anything today.
7            MR. COHEN:  Let's make this Dunleavy 21.
8            (Dunleavy Exhibit No. 21 was marked
9             for identification.)
10    BY MR. COHEN:
11        Q   Do you recognize this document?
12        A   Yes.
13        Q   And this is an e-mail from you to Sister
14    Anne dated February 29th, 2012.  Who is John Coval?
15        A   John Coval is the Director of Conferences
16    and Special Events.
17        Q   And this dinner that is referred to in this
18    e-mail, is this just an informal thing for people
19    who have worked 25 years or longer at Marywood?
20        A   There's a dinner every year for faculty and
21    administrators who are honored at 20, 25, 30, etc.
22    There's another event for staff that's always held
23    that same week, so there's the Cor Mariae dinner.
24        Q   And Professor Fagal was going to be excluded

1    from that dinner, correct?
2        A   That's correct.
3        Q   And was this because he was suspended or
4    because you felt he didn't deserve it or all of the
5    above?
6        A   Because he was suspended.
7            MR. COHEN:  Let's make this Dunleavy 22.
8            (Dunleavy Exhibit No. 22 was marked.
9             for identification.)
10    BY MR. COHEN:
11        Q   These are more of your handwritten notes,
12    right?
13        A   Yes.
14        Q   And could you read this aloud?
15        A   Certainly.  It's notes from again either a
16    call or a meeting with Sister Anne dated March 6th,
17    2012 regarding Fagal.  It says "Sister Gail Cabral
18    e-mail.  Then Conlogue, Arter, Sadlack.  Copy
19    video, question mark.
20            "Sister Anne will send Sister Gail to me.
21    Meeting notes from 1/23/12, video and other
22    documents, question mark."
23        Q   And who is Sister Gail Cabral.
24        A   Sister Gail Cabral is a tenured faculty

1    member who I believe was President of the Faculty
2    Senate that year.
3            MR. COHEN:  Let's make this Dunleavy 23.
4            (Dunleavy Exhibit No. 23 was marked
5             for identification.)
6    BY MR. COHEN:
7        Q   Do you recognize this document?
8        A   Yes.
9        Q   And this is an e-mail from you to Sister
10    Anne dated March 7th, 2012 at 1:23 a.m.?
11        A   That's what it says.  The time stamp seems
12    very odd to me.  I work late but not that late.
13        Q   And again, you're referring to a Sister
14    Gail.  Is this Sister Gail Cabral?
15        A   Yes.
16        Q   And you say "I received an e-mail from
17    Sister Gail this evening.  We should be able to
18    meet tomorrow afternoon.  I'm waiting for her to
19    confirm the time."
20            What was the purpose of the meeting referred
21    to here?
22        A   This was the meeting that was referenced in
23    the Dunleavy 22 exhibit where Sister Anne told
24    Sister Gail to contact me.  Sister Gail, I think,



1   as President of the Faculty Senate was in charge of
2   convening whatever committee came first.  And so my
3   role really was to hand documents to her to then
4   give to the committee to do their work.
5       Q   And did you, in fact, meet with Sister
6   Cabral?
7       A   Yes.
8       Q   Did President Munley?
9       A   I don't know.  This meeting was just me and
10  Sister Gail in my office, that I do remember.
11      Q   And do you remember this meeting?
12      A   I do.
13      Q   And what was discussed at the meeting?
14      A   I gave Sister the documents that I listed
15  and I don't know if we discussed anything else.
16  Probably not.
17          MR. COHEN:  We'll call this Dunleavy 24.
18          (Dunleavy Exhibit No. 24 was marked
19          for identification.)
20  BY MR. COHEN:
21      Q   And do you recognize this document?
22      A   Vaguely.
23      Q   And what is your vague understanding of this
24  document?

1       A   I probably received a copy and put it in the
2   file.
3       Q   These appear to be Grievance Committee notes
4   from the Faculty Grievance Committee, right?
5       A   That's what it says, yes.
6       Q   Now, if you turn to the second page, on
7   March 21st, it says, "Met with Dr. Pat Dunleavy in
8   HR conference room."  Do you see that?
9       A   Yes, I do.
10      Q   And read the five bullet points to yourself
11  and let me know when you finish.
12      A   (Witness reviews document.)  Okay.
13      Q   And do you, in fact, remember this meeting
14  with the Faculty Grievance Committee?
15      A   Vaguely.  I have no reason to dispute that
16  it happened.
17      Q   Is this an accurate summary of what occurred
18  at this meeting?
19          MS. PEET:  Objection.  She just testified
20  she vaguely remembers the meeting but she has no reason
21  to dispute it.  But you can answer if you know.
22  BY MR. COHEN:
23      Q   Based on your vague recollection.
24      A   This sounds, yeah, like things I would have

1   said.
2       Q   And do you recall telling the Faculty
3   Grievance Committee that remediation is not always
4   appropriate?
5       A   Yes, that's something I would say.
6       Q   And how did you come to that conclusion?
7       A   I would have cited examples where if
8   something so egregious happened, there would be no
9   need for any kind of progressive discipline, if
10  someone brings a gun to work, someone brings a box
11  cutter to work, porn.  Ages ago we had an employee
12  and there was some personal dispute and he tried to
13  run over another employee, no remediation.
14      Q   There was an employee that tried to run
15  over --
16      A   Yeah.  He didn't get that far but neither of
17  them work there any longer.
18      Q   And he or she was fired right away?
19      A   As I recollect, yeah.  That was a very long
20  time ago, probably 30 years.
21      Q   So you cited that case?
22      A   I probably would have.  Those are vivid
23  memories.
24      Q   What other cases would you have cited where

1   remediation was not appropriate?
2       A   Other than the few I just rattled off?
3       Q   I thought you just rattled off --
4       A   Some of those -- the gun was hypothetical.
5   The box cutter, the porn and the running over were
6   not hypotheticals.
7       Q   The gun --
8       A   The gun was hypothetical, if someone brought
9   a gun to work.  The box cutter was not
10  hypothetical.  The porn on Marywood computers was
11  not hypothetical, and the car incident was not
12  hypothetical.
13      Q   The non-hypothetical cases where remediation
14  was not appropriate, did they involve tenured
15  professors?
16      A   No, they were support staff and professional
17  staff.
18      Q   Now, when you said remediation is not always
19  appropriate and you support that with, you know,
20  possible cases of violence or threatened violence,
21  is this just your personal opinion or is this
22  reflected somewhere in Marywood policy that
23  remediation is not always appropriate?
24          MS. PEET:  Objection to the form.

MAGNA
LEGAL SERVICES

1           THE WITNESS:  I don't know what policy it
2  might be stated in or implicit in, and these are not my
3  notes.  These are --
4  BY MR. COHEN:
5      Q   Someone's --
6      A   Someone else's character -- yes.
7      Q   But you do remember telling the Faculty
8  Grievance Committee that remediation is not always
9  appropriate, though; right?
10     A   I tell every group this kind of information.
11 Do I remember exactly telling them that, no, but I
12 can't dispute it, it's here so I probably did.
13     Q   Did you tell the Faculty Grievance Committee
14 that Fred Fagal requested an opportunity to respond
15 in writing to President Munley?
16     A   I don't recall, but I believe they got my
17 notes from that meeting of January 23rd.
18     Q   Further down in this document also on
19 March 21st, it says, "Mary Theresa Paterson
20 e-mailed Erin that on reflection we were
21 misinformed.  We should not speak to Pat Dunleavy,
22 Will Anthony or herself and that we should make the
23 decision on our own."  Correct?
24     A   That's what that says, yes.

1      Q   Did you receive the same e-mail from Mary
2  Theresa Paterson?
3      A   I don't recall ever receiving that, no.
4      Q   Did you find out some other way that Mary
5  Theresa Patterson had told Erin this information
6  that she shouldn't meet with you and Will Anthony?
7      A   I don't recall it at the time at all.
8      Q   Are you surprised that Mary Theresa Paterson
9  would have this view?
10     A   I don't understand what her perception -- I
11 didn't speak to her at the time.  That may have
12 been in reference to content.
13     Q   To content?
14     A   To content, that they needed to make the
15 decision on their own based on the content they
16 had.  I don't know.  I can't speak for Mary
17 Theresa, though.
18         MR. COHEN:  Off the record.
19         (At this time there was a brief
20          discussion held off the record.)
21         (Dunleavy Exhibit No. 25 was marked
22          for identification.)
23 BY MR. COHEN:
24     Q   And these appear to be more of your

1  handwritten notes, right?
2      A   Yes.
3      Q   And could you read these aloud?
4      A   It says -- I believe that says Will and it's
5  dated 4/2/12.
6          MS. PEET:  I'm going to cut you off.  I
7  don't know if anyone understood what it said at this
8  time.  If this reflects conversations that you had with
9  Will Anthony, then we're going to pull this back.  Is
10 that what this is?
11         THE WITNESS:  I assume so.  I could read it.
12         MS. PEET:  Read it to yourself but if this
13 appears to be --
14         THE WITNESS:  Yes, yeah.
15         MS. PEET:  Don't discuss it and we're going
16 to pull this back into our disclosure.
17         MR. COHEN:  Let's make this Dunleavy 26.
18         (Dunleavy Exhibit No. 26 was marked
19          for identification.)
20 BY MR. COHEN:
21     Q   And do you recognize this document?
22     A   Yes.
23     Q   And this is an e-mail from Sister Anne to
24 you dated April 17th, 2012; correct?

1      A   Yes.
2      Q   And actually it's a chain, two e-mails.  The
3  first is from you to Sister Anne on April 17th at
4  1:43 p.m., right?
5      A   Yes.  And that pertains to a conversation
6  with the attorney Will.
7      Q   With Dr. Fagal's attorney?
8      A   No.  It says "Will's draft."  Will would
9  have been --
10         MS. PEET:  You can talk about this because
11 it doesn't disclose conversations with an attorney.
12 BY MR. COHEN:
13     Q   In President Munley's e-mail to you she
14 says, "I would like to see you for a few minutes
15 about this.  Please bring the Progressive
16 Discipline Policy or whatever policy describes the
17 hearing."  Correct?
18     A   Yes.
19     Q   And did you, in fact, meet with Sister Anne
20 as she is instructing?
21     A   I don't recall.
22         MR. COHEN:  Let's make this Dunleavy 27.
23         (Dunleavy Exhibit No. 27 was marked
24          for identification.)



1    BY MR. COHEN:
2        Q   And these are more of your handwritten
3    notes, right?
4        A   Yes.
5        Q   And could you read these aloud?
6        A   Sure.  It's a meeting or a call with Sister
7    Anne dated 4/25/12.  The first part appears to be
8    totally unrelated.  Do you still want me to read
9    that?  ASEC is a whole different function at
10   Marywood.
11       Q   Don't worry about that.
12       A   And then the dash means that now we're
13   talking about Fagal.  "Review committee, meet with
14   them, give them Will's contact materials, check
15   with Will, video plus materials.  Will's letter,
16   question mark.  Fagal's e-mail to Alan today.
17   Respond to Fred.  Do we tell -- I don't know what
18   that next part is -- who the committee is or work
19   through Sister Gail, question mark."
20       Q   That's what I really wanted to know that
21   word, do we tell --
22       A   It may be Fred Fagal, FF.  I change the way
23   I make my F's now that I look at it.  It looks like
24   FA but I think it's FF.

1        MR. COHEN:  This will be Dunleavy 28.
2        (Dunleavy Exhibit No. 28 was marked.
3            for identification.)
4    BY MR. COHEN:
5        Q   Do you recognize this document?
6        A   Yes.
7        Q   And this is actually two e-mails.  The first
8    is from Linda -- how do you pronounce her last
9    name?
10       A   Pochis.
11       Q   -- Pochis to you dated April 26th, 2012 and
12   she's asking you whether Dr. Fagal is entitled to
13   his years of service payment; correct?
14       A   That's correct.
15       Q   And you say, "No, he is not."  Right?
16       A   Yes.
17       Q   What is this years of service payment?
18       A   This is part of that Cor Mariae 25 year
19   award so because Dr. Fagal was suspended, he didn't
20   get any of that recognition.  Linda worked in our
21   office and did payroll and just was checking to see
22   if she should cut that small payment.
23       Q   Isn't it true that Dr. Fagal was suspended
24   with pay, though?

1        A   Yes, he received his pay.
2        Q   So he probably should have gotten his years
3    of service payment, shouldn't he?
4            MS. PEET:  Objection to the form.
5            THE WITNESS:  I would say no.  I said no at
6    the time.  I don't remember.
7    BY MR. COHEN:
8        Q   How much money are we talking about?
9        A   Probably about $100, somewhere around there.
10       (Dunleavy Exhibit No. 29 was marked
11           for identification.)
12   BY MR. COHEN:
13       Q   And it's more of your handwritten notes,
14   right?
15       A   Yes.
16       Q   And could you read this aloud?
17       A   Sure.  This is a meeting or a phone call
18   with Sister Gail -- that would have been Sister
19   Gail Cabral -- dated April 30th, 2012 where we
20   discussed the Progressive Discipline Policy.
21       Then I have written "Ed O'Brien, Linda P.,
22   Annette F - tenured on ex com.  Will tell ex com
23   with names.  Helen Bittel okay with ex com.  Matt
24   Povse."

1        Then "Sent e-mail to Fred.  Hold Wednesday.
2    All but 2 to 4 open for Sister Gail.  Hold Thursday
3    until 2:30 open for Sister Gail."
4        And then there was a sticky note that was
5    attached, "If Alan wants this, okay to give him."
6    And P" is me.
7        Q   You said somewhere "ex com"?
8        A   That's what I have written.
9        Q   What does that mean?
10       A   I don't know.
11       Q   And do you know what this is when you write
12   "If Alan wants this, okay to give him"?
13       A   No.  I believe this was a conversation about
14   people to be on one of the committees and that's
15   all this was and so if Alan wanted a copy of who
16   those names were, that's all.
17       (At this time there was a luncheon
18           recess taken.)
19       MR. COHEN:  We can make this Dunleavy
20   Exhibit 30.
21       (Dunleavy Exhibit No. 30 was marked
22           for identification.)
23   BY MR. COHEN:
24       Q   And do you recognize this document?

1    A   Yes.
2    Q   It's an e-mail from you to Sister Anne dated
3  May 3rd, 2012 at 3:59 p m.?
4    A   That's correct.
5    Q   And you say in the e-mail that you did meet
6  with the committee this afternoon.  Which committee
7  are you referring to?
8    A   I don't remember.
9    Q   But you did, in fact, meet with a committee?
10    A   Yes.
11    Q   And the committee members asked you a number
12  of questions, which you have listed here; correct?
13    A   Yes.
14    Q   And the third one down is:  "Did you follow
15  process as per the policy; and if not, did you have
16  to?"  Did I read that correctly?
17    A   Yes.
18    Q   Did you answer that question?
19    A   I don't recall specifically but I don't
20  believe I answered any questions, direct questions
21  at that meeting.  That wasn't my role.
22    Q   Okay.  But the last bullet point says, "Were
23  there going to be two committees (I referenced the
24  policy and your decision that one body would review

1  both actions.)"  You did tell the committee that?
2    A   It appears I did.
3        MR. COHEN:  Why don't we make this
4  Dunleavy 31.
5        (Dunleavy Exhibit No. 31 was marked
6          for identification.)
7  BY MR. COHEN:
8    Q   Why don't you take a few moments, read this
9  to yourself, the whole chain and let me know when
10  your finished?
11    A   (Witness complies.)  Okay.
12    Q   The e-mail in the middle from you to Helen
13  Bittel dated May 15th, 2012 at 8:40 a.m., do you
14  see that?
15    A   Yes.
16    Q   And you're responding to Helen's e-mail in
17  which she's asking you several questions; right?
18    A   Yes.
19    Q   And the last sentence in your e-mail is,
20  "Thanks, Helen.  Sorry to be vague.  We all want to
21  make sure we don't overstep our reach."  Right?
22    A   Yes.
23    Q   What did you mean by "We all want to make
24  sure we don't overstep our reach"?

1    A   I was willing and happy to give either
2  committee whatever documentation I had and whatever
3  broad process information I had.  I was not going
4  to interpret policy for them, especially these
5  policies.  These are not policies I deal with.  So
6  that in my mind would have been overstepping my
7  reach and I wasn't going to do that.
8    Q   But earlier we talked about how you told one
9  committee that remediation is not always
10  appropriate, right?
11    A   Yes.
12    Q   Isn't that in a way interpreting policy?
13        MS. PEET:  Objection to the form.
14        THE WITNESS:  No, I think that's just best
15  practices and just information for them.
16  BY MR. COHEN:
17    Q   So sometimes you're saying that whatever is
18  best practices could trump policy?
19        MS. PEET:  Objection to the form;
20  mischaracterization of testimony.  You can answer.
21        THE WITNESS:  No.  I was giving them
22  examples.  I don't -- I would not interpret these
23  policies for these committees.  That was their job.
24  BY MR. COHEN:

1    Q   And why wouldn't you interpret policies?
2        MS. PEET:  Asked and answered.
3        THE WITNESS:  These are policies --
4  BY MR. COHEN:
5    Q   Even if it's their job.
6    A   These are policies I don't deal with
7  regularly.  They were the ones in the weeds of all
8  the documentation, not me.  At this point I'm
9  pretty much a gopher handing materials back and
10  forth.  I'm not making decisions on this case.
11        MR. COHEN:  Let's move on to Dunleavy 32.
12        (Dunleavy Exhibit No. 32 was marked
13          for identification.)
14  BY MR. COHEN:
15    Q   Do you recognize this document?  It's
16  double-sided.
17    A   Vaguely.  I believe I've seen it.  I don't
18  believe I saw it at the time.
19    Q   Your understanding of this document is that
20  it's minutes of Ad Hoc Committee meeting?
21    A   That's what it says, yes.
22    Q   And on the second page there's a heading
23  that says "Actions."  Do you see that?
24    A   Yes.

1    Q  It says, "Helen will e-mail PD and let her
2  know what we understand our charge -- and let her
3  know that we understand our charge to be the review
4  of substance, determination and denial of tenure
5  charges.  We understand that the issues of
6  suspension and procedure will resolve by the FGC."
7        Now, your initials are PD; right?
8    A  Yes.
9    Q  Whoever wrote this document, when they said,
10 "We understand that the issues of suspension and
11 procedure will resolve by the FGC," did you tell
12 the Ad Hoc Committee that?
13   A  No.
14   Q  Did the Ad Hoc Committee tell you that that
15 was their understanding?  It says that "Helen will
16 e-mail you."
17   A  I don't recall.
18        MR. COHEN:  Let's make this Dunleavy 33.
19        (Dunleavy Exhibit No. 33 was marked
20        for identification.)
21 BY MR. COHEN:
22   Q  Do you recognize this?
23   A  I think I have seen it but not at the time.
24   Q  So it looks like it's notes from a phone

1  conversation with you or somebody named Pat.  If
2  you look at No. 3, it says, "Pat thought that
3  asking Erin about the scope of the FGA's work
4  sounded reasonable but again stressed that we
5  needed to be an independent review, and that's in
6  quotation marks, and come to a decision
7  independently from the administration and from the
8  FGA."  Was that your view?
9    A  I don't remember this exactly, but I don't
10 dispute that is says that and that sounds somewhat
11 reasonable so --
12   Q  And I guess you don't remember who this
13 telephone conversation is with?
14   A  No, I don't, I'm sorry.
15        MR. COHEN:  Let's make this Dunleavy 34.
16        (Dunleavy Exhibit No. 34 was marked
17        for identification.)
18 BY MR. COHEN:
19   Q  And do you recognize this document?
20   A  Yes.
21   Q  And what is it?
22   A  It appears to be an exchange from Matt Povse
23 to Helen Bittel and Ed O'Brien, that that part is
24 dated May 21st, 2012 at 2:50 p.m. and there's an

1  earlier, I guess, e-mail, so e-mails back and
2  forth.  I think that was the composition of one of
3  the committees.  Helen sent this to me in January
4  of 2015, I believe, as part of data collection.
5    Q  Did you ever tell anything informally about
6  the history of progressive discipline in Fred's
7  case to Matt Povse?
8    A  It says I did.  I don't recall.
9    Q  To your knowledge, was there a history of
10 progressive discipline in Fred's case?
11   A  I wouldn't characterize it as progressive
12 discipline because I don't know if progressive
13 discipline was taken.  I would think very formally
14 about that phrase, but there were incidents in
15 Fred's past, the cartoon, the things that I have
16 testified about earlier, that as far as I know were
17 isolated incidents.
18        MR. COHEN:  Let's make this Dunleavy 35.
19        (Dunleavy Exhibit No. 35 was marked
20        for identification.)
21 BY MR. COHEN:
22   Q  And do you recognize this document?
23   A  Yes.
24   Q  And this is two e-mails, one from Ann

1  Boland-Chase to you and the response; correct?
2    A  Yes.
3    Q  Dated May 24th, 2012?
4    A  Yes.
5    Q  Who is Ann Boland-Chase?
6    A  Ann Boland-Chase is the Vice President for
7  Enrollment Services and Student Success.  I believe
8  at that point she was the Vice President for
9  Enrollment Management.
10   Q  And who is David Crisci?
11   A  David Crisci is no longer at Marywood.  He
12 was -- I don't remember his exact title, but he
13 worked in the International Affairs office.  He was
14 the director or the coordinator, whatever his title
15 was.
16   Q  And Ann Boland-Chase is telling you about an
17 alleged interaction between Professor Fagal and a
18 student?
19   A  Yes.
20   Q  And your response was, "Oh, boy, thanks.
21 We'll have to see how this fits in with
22 everything."
23   A  Yes.
24   Q  What did you mean by that?

Page 110

1      A   Simply that we would have to see if there
2    was an investigation if there was anything
3    warranted and what happened with this.  Dr. Fagal
4    at this point, I believe, was still on suspension
5    so if there was another incident, I don't know what
6    would happen.  We would have to see what happened
7    with it.
8      Q   So you weren't trying to see how this
9    alleged incident fit in with the videos or
10   something like that?
11     A   No.
12     Q   I'm still trying to understand what did you
13   wonder what this incident would fit into?
14          MS. PEET:  Objection; asked and answered.
15   BY MR. COHEN:
16     Q   Is it related to something else?
17     A   The only thing it would be related to is the
18   fact there was an employee, Dr. Fagal, who was
19   already on suspension for something serious.  If
20   this ended up being something serious, we would
21   have to figure out how that worked in with the fact
22   that he was already on suspension.  It was not
23   related to the videos in any direct way, just the
24   fact that here was an employee who was on

Page 111

1    suspension.
2      Q   Well, to even see if this incident fit in
3    with anything else, wouldn't you have to verify
4    whether it's true?
5          MS. PEET:  Objection to the form.
6          THE WITNESS:  Yeah.  This was an initial
7    report, that's all.
8    BY MR. COHEN:
9      Q   Right.  Because if it never happened, it
10   wouldn't fit in with anything; right?
11     A   That's right.
12     Q   What is the SSW student?  I'm not asking you
13   to identify the student, but is this the same
14   student that Dr. Fagal allegedly touched?
15     A   No.  SSW of School of Social Work.  I don't
16   remember what that was, but that student was a he
17   and this student that Dave Crisci discusses is a
18   she, so they are not the same.
19     Q   Do you know if someone instructed Ann
20   Boland-Chase and other Marywood employees to find
21   additional instances of wrongdoing that Professor
22   Fagal could be accused of?
23     A   No.
24     Q   You don't know or you know it didn't happen?

Page 112

1      A   I don't know.  I cannot imagine that it
2    would have happened.
3      Q   Was it common for Ms. Boland-Chase to send
4    you e-mails about, hey, this student alleged that
5    this professor did this without any kind of formal
6    investigation of it?
7          MS. PEET:  Objection to the form.
8          THE WITNESS:  Administrators know that
9    I -- part of my role is as Title 9 coordinator, and the
10   two policies -- well, there are two now but at the time
11   the policy that I did know and work with a lot was the
12   civil rights policy.  So whenever there was an
13   allegation or even a hint that there was harassment or
14   discrimination or bullying or any kind of disrespectful
15   treatment, people would let me know.
16          Sometimes it went someplace, sometimes it
17   didn't.  But, yeah, that would be common for any
18   administrator to let me know.
19   BY MR. COHEN:
20     Q   After receiving this e-mail from Ann
21   Boland-Chase, did you do any investigation into the
22   alleged incident involving Professor Fagal?
23     A   No, I did not.  The e-mail from Ann
24   indicates that she was going to do that.

Page 113

1      Q   Do you know whatever came of that
2    investigation?
3      A   No, I do not.
4          MR. COHEN:  Let's mark this Dunleavy 36.
5          (Dunleavy Exhibit No. 36 was marked
6           for identification.)
7    BY MR. COHEN:
8      Q   And this is another one of your handwritten
9    notes, right?
10     A   Yes.
11     Q   Can you read that aloud, please.
12     A   Sure.  It says, "Helen, 6/5/12, re:  Fred
13   Fagal.  Scheduled time away, delays.  6/6, then
14   6/18-19 should be end.  Do have questions for
15   Sister Anne."
16     Q   Do you know what any of this means?  I know
17   what it says but --
18     A   I believe this is Helen Bittel telling me --
19   just giving me a progress report on whatever
20   committee she was on and where they were with time
21   lines and that they did have questions for Sister
22   Anne.
23     Q   Did you ask Helen Bittel to keep you updated
24   about Fred Fagal's case?

1    A  I don't recall doing that.
2        MR. COHEN:  Let's mark this Dunleavy 37.
3        (Dunleavy Exhibit No. 37 was marked
4          for identification.)
5    BY MR. COHEN:
6    Q  Do you recognize this?
7    A  Yes.
8    Q  Did you ask anyone in the Ad Hoc Faculty
9    Committee to keep Sister Munley or you or anyone
10   else in Marywood's cabinet informed about the
11   status of Fred Fagal's matter?
12   A  I don't recall.  I may have asked them to
13   let Sister know where they were time wise.  That
14   would have been the extent of it if I did, but I
15   don't recall.
16   Q  And here Matthew Povse says that they were
17   drafting a final response to their charge, which
18   will go to Will Anthony for comments very soon.
19   "We wanted you to know now that our report is in
20   support of your actions in this case."
21       Do you know whether, in fact, the Ad Hoc
22   Faculty Committee submitted their response to Will
23   Anthony prior to it being finalized?
24   A  I do not know.

1    Q  Did you ask that it be submitted to Will
2    Anthony for comments?
3    A  No.
4    Q  Do you know whether anyone did?
5    A  I don't know.
6        MR. COHEN:  I need ten minutes.
7        (At this time there was a brief
8          recess taken.)
9        MR. COHEN:  Let's make this Dunleavy 38.
10       (Dunleavy Exhibit No. 38 was marked
11         for identification.)
12   BY MR. COHEN:
13   Q  This is a multi-page document.  Do you
14   recognize it?
15   A  It's a series of e-mails.
16   Q  And the most recent one is -- I'm sorry, the
17   oldest one is an e-mail to you from Helen Bittel
18   dated June 26th, 2012.  She says, "Dear Pat, our
19   Ad Hoc Hearing Committee is very close -- then I
20   think there was maybe a white-out error or
21   something -- finishing our work.  And then there's
22   a redaction.
23       And it says, "Now I am awaiting final
24   approval (of the document with notice changes) from

1    Matt and Ed then and then will be done?"
2        When Helen Bittel says she's awaiting final
3    approval of the document with those changes, whose
4    changes is she referring to, do you know?
5    A  No, I don't know.
6        MR. COHEN:  Let's make this Dunleavy 39.
7        (Dunleavy Exhibit No. 39 was marked.
8          for identification.)
9    BY MR. COHEN:
10   Q  Do you recognize this document?
11   A  Yes.
12   Q  You're responding here to Matt Povse, right?
13   A  Yes.
14   Q  In an e-mail dated July 2nd, 2012,
15   12:31 p.m., and he wrote, "Alan is listed by title
16   as getting one but since he's not been involved,
17   I'm not sure."  Involved in what, what did you
18   mean?
19   A  Alan was not involved in this progressive
20   discipline procedure.
21       MR. COHEN:  Dunleavy 40.
22       (Dunleavy Exhibit No. 40 was marked
23         for identification.)
24   BY MR. COHEN:

1    Q  Why don't you read this to the bottom and
2    let me know when you're finished.
3    A  (Witness reviews document.)  Okay.
4    Q  At the very end the last bullet point it
5    says -- well, first of all, this is an e-mail from
6    you to Sister Ann dated July 18th, 2012; correct?
7    A  Yes.
8    Q  Subject on Cabinet Retreat -- Possible
9    topics.  Last bullet point it says, "Faculty
10   grievance and appeals and progressive discipline
11   for faculty - post Fagal.  We probably want to
12   revise these (perhaps using some of the faculty who
13   sat on Review Committees)."  Is that right?
14   A  Yes.
15   Q  Why did you think that these policies needed
16   revision post Fagal?
17   A  Because while the two committees were
18   working through their work, they seemed to have
19   several procedural questions and it seemed that
20   maybe some of that could be clarified and tightened
21   up in policy language.
22   Q  Do you also think that the Progressive
23   Discipline Policy as written could potentially --
24   let me rephrase.

**MAGNA** ▶
LEGAL SERVICES

Page 118

1        Did you also believe that the Progressive
2   Discipline Policy as written could allow someone
3   like Fred Fagal to do something outrageous but be
4   protected from immediate firing?
5        MS. PEET:  Objection to the form.
6        THE WITNESS:  I'm not familiar with -- I
7   wasn't then and I am not now with this policy and I'm
8   not comfortable making any kind of an interpretation of
9   the policy.
10       Can I just say this is the document you gave
11  me earlier that was out of order so you probably do have
12  another copy somewhere.
13       MR. COHEN:  Let's make this Dunleavy 41.
14       (Dunleavy Exhibit No. 41 was marked
15        for identification.)
16  BY MR. COHEN:
17   Q   This is your handwritten note, right?
18   A   Yes.
19   Q   Could you read this aloud, please.
20   A   It says, "Fagal - grievances not just
21  justified, keeps contacting Erin - first - why.
22  E and then in brackets, proceedings confidential,
23  our finding can't be grieved, could an Ad Hoc
24  Progressive Discipline Policy.  2nd, not yet ter'd,

Page 119

1   recommend, but suspended.  No. 3, Done by faculty
2   grievance suspension."
3    Q   When you say not yet ter'd, do you think
4   maybe you meant terminated?
5    A   Yes.
6    Q   Do you think this was notes you made based
7   on the telephone call with Erin maybe?
8    A   I would assume so.  I can't confirm that,
9   but I would assume so based on what's there.
10       MR. COHEN:  Let's make this Dunleavy 42.
11       (Dunleavy Exhibit No. 42 was marked
12        for identification.)
13  BY MR. COHEN:
14   Q   Do you recognize this document?
15   A   Yes.
16   Q   These are interrogatory answers that you
17  recently signed off on, right?
18   A   Yes.
19   Q   I just want to ask you a little bit about
20  your answers.  Let's move to No. 3, which begins on
21  Page 3.  The question was: "Prior to January 23rd,
22  2012, did you or anybody who worked for you provide
23  to Professor Fagal any oral warning, written
24  warning or any opportunity for monitored assistance

Page 120

1   relating to the e-mail and videos referenced in
2   paragraph Nos. 23 and 24 of the Amended Complaint?
3   If so, please provide a detailed description of
4   each such oral warning, written warning and
5   opportunity for monitored assistance."
6        And I think there was an objection because
7   you're not able to determine the meeting of
8   monitored assistance.  You don't know what that
9   means?
10   A   No.
11   Q   Let's move back to the first exhibit,
12  Dunleavy 1.  Now, this again is the Progressive
13  Discipline Policy; right?
14   A   Yes.
15   Q   And the second paragraph that begins, "The
16  policy is intended to provide."
17   A   Yes.
18   Q   The next sentence, it says, "It is designed
19  to accomplish these ends by a series of gradual
20  steps involving strategies such as personal
21  conferences, oral and written warnings and
22  opportunities for monitored assistance where
23  applicable."
24       Does that at all enlighten you as to the

Page 121

1   meaning of monitored assistance?
2    A   No.  This is a policy that I don't deal
3   with.
4    Q   Okay.  Well, let's take "opportunity for
5   monitored assistance" out of the question and let's
6   just ask, Prior to January 23rd, 2012, did you or
7   anybody who worked for you provide to Professor
8   Fagal any oral warning or written warning relating
9   to the e-mail and videos referenced in paragraph
10  Nos. 23 and 24 of the Amended Complaint?
11   A   Not that I'm aware of.
12   Q   Let's move to the next Interrogatory, No. 4.
13  It says: "Did your Vice President for Academic
14  Affairs, Dr. Alan Levine, participate in any way in
15  the decision to suspend Professor Fagal or to
16  maintain this suspension thereafter?  If so, please
17  describe Dr. Levine's participation in as much
18  detail as possible."
19       And your answer or Marywood's answer was:
20  "Dr. Levine supported President Munley's decision
21  to suspend Professor Fagal and was aware of and
22  helped orchestrate the January 23rd, 2012 meeting
23  where Professor Fagal was suspended as outlined in
24  DEF002760."

MAGNA
LEGAL SERVICES

Page 122

1      My question is how did Dr. Levine support
2  President Munley's decision to suspend Professor
3  Fagal?
4          MS. PEET:  Objection to competency.  You can
5  answer if you know.
6          THE WITNESS:  All I know is that Dr. Levine
7  was so upset and outraged that he questioned me about
8  filing his own personal lawsuit against Dr. Fagal, so I
9  am sure he supported that decision to suspend.
10 BY MR. COHEN:
11     Q  In answering this question, did you talk to
12 Dr. Levine and ask him directly, you know, whether
13 he participated in any way in the decision to
14 suspend Professor Fagal?
15         MS. PEET:  Objection to the form.
16         THE WITNESS:  No.
17 BY MR. COHEN:
18     Q  Any particular reason why?  I mean, don't
19 tell me anything your attorney told you to do or
20 not to do but, I mean, you don't think it would
21 have been helpful given that the question was about
22 Dr. Levine to ask him?
23         MS. PEET:  Objection.  She signed the
24 Verification and it clearly says she might not have

Page 123

1  personal information about everything that's in here but
2  she's signing it on behalf of the company.  It doesn't
3  say that she answered every question on behalf of the
4  company.
5          MR. COHEN:  I would still like --
6          MS. PEET:  You can go ahead and answer.
7          THE WITNESS:  Could you ask the question
8  again, please.
9  BY MR. COHEN:
10     Q  Did you think it was important in answering
11 this question to talk to Dr. Alan Levine and ask
12 him simply whether he participated in any way in
13 the decision to suspend Professor Fagal or to
14 maintain the suspension afterwards?
15     A  No.  This would be one of those questions
16 that I didn't have personal information about when
17 I signed on behalf of.
18     Q  Well, precisely because you don't have
19 personal knowledge, I thought it might be useful to
20 ask the person who does have personal knowledge but
21 you don't think so?
22         MS. PEET:  Objection to the form.
23         THE WITNESS:  I didn't think it was my role.
24 BY MR. COHEN:

Page 124

1      Q  If we move to No. 6, No. 6 reads:  "In
2  paragraph No. 31 of your Answer you denied that
3  there was no immediate harm to Professor Fagal or
4  to others threatened by Professor Fagal's
5  continuance in his faculty position.  Please
6  explain the basis for your denial in as much detail
7  as possible."
8          And then your answer is or Marywood's answer
9  is:  "Defendant denies that there was no immediate
10 harm to others as Plaintiff's continued employment
11 would create emotional harm to members of the
12 administration, faculty and student body who were
13 offended and impacted by Plaintiff's actions.
14     "Additionally, Defendant sought to prevent
15 further reputational harm to the University after
16 Plaintiff, a tenured professor, made a mockery of
17 the President, the University's executive staff and
18 the University community as a whole by drafting and
19 creating the e-mail and videos referenced in
20 paragraph Nos. 23 and 24 of the Amended Complaint."
21     Have I read that correctly?
22     A  Yes.
23     Q  What did you mean by emotional harm?
24     A  The videos were outrageous.  They portrayed

Page 125

1  Sister Anne Munley as Hitler and other members of
2  her cabinet as SS officers.  They mocked different
3  members of cabinet and in some cases family
4  members.  That's emotional harm.
5          And then they are public for everybody to
6  view and join in the mockery if they want out in
7  the world and the reputational harm to the
8  University to think that a tenured faculty member
9  at Marywood would create that and put that out
10 there, what does that say to students, to other
11 faculty, to administrators, to prospective students
12 and their families.
13     Q  And how would suspending Professor Fagal
14 alleviate the emotional harm?  The video was still
15 up, right?
16         MS. PEET:  Objection to the form; lack of
17 competency.  You can answer if you know.
18         MR. COHEN:  Well, let me backtrack.
19 BY MR. COHEN:
20     Q  At the time that he was suspended, you know
21 that the video, the two-part video was still up on
22 YouTube; correct?
23     A  Yes.
24     Q  In fact, you were monitoring it?

1    A  Yes.
2    Q  So how does the act of suspending Professor
3  Fagal, how did that at all alleviate or cure any
4  emotional harm that was caused by the video?  It
5  was still up until we took it down.
6        MS. PEET:  Compound question.  You can
7  answer if you know.
8        THE WITNESS:  Our responsibility, I think,
9  under our Civil Rights Policy at the time and continuing
10  today is to stop behavior that is offensive, to prevent
11  it from recurring and to mitigate any damages.  To the
12  extent we could, we stopped it from recurring by
13  suspending Dr. Fagal.  He would no longer have access to
14  the Marywood e-mail.  Could we stop him from creating
15  videos, probably not.
16  BY MR. COHEN:
17    Q  Isn't it true, he didn't even use his
18  Marywood e-mail address to distribute the videos;
19  correct?
20        MS. PEET:  Objection; competency.
21        THE WITNESS:  I don't know.
22  BY MR. COHEN:
23    Q  And, again, you don't remember whether
24  anybody in Marywood's administration asked

1  Professor Fagal to take the video down?
2    A  I don't know.
3    Q  So if you were really concerned about -- if
4  the University was really concerned about emotional
5  harm caused by the video, wouldn't it make sense if
6  someone had asked him that?
7        MS. PEET:  Objection to the form.
8        THE WITNESS:  I don't know that anybody did
9  or did not.
10  BY MR. COHEN:
11    Q  And further, how did suspending Professor
12  Fagal alleviate or prevent any reputational harm to
13  Marywood given that the video was still up?
14        MS. PEET:  Objection.  The testimony very
15  clearly demonstrates Dr. Dunleavy was not the
16  decisionmaker in any way, shape, or form.
17        You can answer if you know.
18        THE WITNESS:  Suspending Dr. Fagal says to
19  the Marywood community that this is serious and we take
20  it seriously.  If we allow that to continue without
21  consequence, we might as well throw everything, the
22  mission, the core values, everything out the window.
23  BY MR. COHEN:
24    Q  Did Marywood make a public statement to its

1  members that Professor Fagal had been suspended?
2    A  No.
3    Q  In fact, it was kept pretty quiet, wasn't
4  it?
5        MS. PEET:  Objection to the form.
6        THE WITNESS:  Personnel matters always are.
7  BY MR. COHEN:
8    Q  So how would it make a statement if his
9  suspension, if Marywood didn't publicize it?
10    A  Dr. Fagal was no longer on campus.  We don't
11  say why.  We just say, Dr. Fagal is no longer on
12  campus.
13    Q  Did Marywood have plans on how to handle the
14  video if it was to remain online and we hadn't
15  taken it down?
16    A  I don't know.
17    Q  When you saw the video, did you believe that
18  Professor Fagal was actually comparing Marywood's
19  President and certain members of the cabinet to
20  Nazis?
21    A  Yes.
22    Q  You believed that he was maybe equating, you
23  know, the moral character of Marywood's
24  administrators with Nazis?

1        MS. PEET:  Objection to the form.  Can you
2  repeat the question.
3  BY MR. COHEN:
4    Q  What aspects -- a moment ago I asked you did
5  you believe that Professor Fagal was comparing
6  President Munley and certain Marywood cabinet
7  members to Nazis and I think you said yes.
8    A  Yes.
9    Q  And my next question is what aspects of both
10  groups of people, Marywood's cabinet and Nazis did
11  you think he was saying were similar?
12        MS. PEET:  Objection.  I don't understand it
13  but if you do, go ahead.
14        THE WITNESS:  I don't know that I
15  understand.  I don't know that I parsed it that deeply.
16  It was very clear as I watched the video that Sister
17  Anne, and I don't remember the words in the video, but
18  that Sister Anne was portrayed as Hitler and I don't
19  know how you make that anything good.
20  BY MR. COHEN:
21    Q  Let me drill down a little bit more deeply.
22  Did you think that Professor Fagal was saying that
23  President Munley looks like Adolf Hitler?
24        MS. PEET:  Objection to the form.



MAGNA
LEGAL SERVICES

1          THE WITNESS:  No.  I think it was more that
2   he was saying that in his mind she reminds somehow, I
3   don't know, that would be in his mind, but not in
4   physical appearance, maybe in everything else.  I don't
5   know what he was thinking.  It was offensive.
6   BY MR. COHEN:
7       Q  Did you know that after seeing the video,
8   did you recognize it as a -- did you recognize what
9   Professor Fagal was doing was just making another
10  parody of a well-known movie?
11      A  No.
12      Q  Were you aware that other parodies had been
13  made of that movie?
14      A  No.
15      Q  Do you know that today?
16      A  Yes.
17      Q  Have you seen any of these other parodies?
18      A  No.
19      Q  Was there any part of the two-part video
20  that Professor Fagal posted that you thought was
21  even a little bit humorous?
22      A  No, not at all.
23      Q  Is it Marywood's policy that faculty and
24  students, other members of the Marywood community

1   should never criticize the administration, the
2   University administration?
3       A  No.
4       Q  Now, you wrote in this interrogatory answer
5   that "Continued employment would create emotional
6   harm to members of the administration, faculty and
7   student body who were offended and impacted by
8   Plaintiff's actions."
9          Now, I understand that you know that
10  Dr. Levine was highly offended and President Munley
11  was highly offended, but do you actually know --
12  and it sounds like you were highly offended, even
13  though you weren't in the video; right?
14      A  Yes.
15      Q  Do you actually know any other members of
16  Marywood's administration, faculty or student body
17  who told you that they were offended?
18         MS. PEET:  Other than the two e-mails we saw
19  earlier with Mr. Garvey and Bill or Bob?
20         THE WITNESS:  Bob Shaw.
21         MR. COHEN:  Yes.
22         THE WITNESS:  Those two.
23  BY MR. COHEN:
24      Q  Other than those?

1       A  Dr. Heath at a cabinet meeting when we
2   discussed this briefly, other faculty.  The
3   faculty, I don't remember specific names, in
4   reading the responses from the faculty committees,
5   it was clear they were also offended.
6       Q  So we're talking about between five and ten
7   individuals in the Marywood community?  I mean, do
8   you know of anybody else?
9          MS. PEET:  Objection to the form; lack of
10  competency.  She can only testify to what she knows, but
11  she's also identified various people and says that
12  there's a lot of other people.  She just can't remember
13  the names so it's a mischaracterization of testimony.
14  BY MR. COHEN:
15      Q  You did say that, that there were a lot of
16  other people?
17      A  There -- yeah, there were other faculty.  I
18  don't remember who, but please remember people
19  weren't coming to me with this directly.  That was
20  not my role, so I don't know how many but I
21  wouldn't have been normally -- the reason that
22  people reached out to me, that they were extra.  I
23  wasn't the decisionmaker in this at all.
24      Q  Now, in the deposition of my client -- which

1   you attended that one, right?
2       A  Yes.
3       Q  Do you remember there were a few questions,
4   I think, by Ms. Peet about whether my client was
5   aware of any other faculty member that had done
6   something similar and was not accorded the same
7   discipline.  Do you remember that?
8       A  Vaguely.
9       Q  And my client mentioned something about an
10  employee named Lori -- do you remember this at all?
11      A  It's sort of all blurs.  I'm sorry, I wasn't
12  taking notes, I don't think, at that point.
13      Q  Lori McMillen, does that ring a bill?
14      A  Lori McMillen, okay, she was a faculty
15  member, yeah.
16      Q  Are you aware of an incident where she was
17  going around secretly distributing flyers that were
18  highly critical of President Munley's financial
19  administration of the university?
20         MS. PEET:  Objection to the form.  You can
21  answer.
22         THE WITNESS:  I knew of anonymous flyers
23  that were placed around campus.  I never knew who wrote
24  them.

Page 134

```
1    BY MR. COHEN:
2       Q   I think she admitted it.  I think it was in
3    the newspaper but --
4           MS. PEET:  Are you testifying?
5    BY MR. COHEN:
6       Q   Do you know whether she was ever
7    disciplined?
8       A   I don't know.
9           MR. COHEN:  We're finished.
10          MS. PEET:  I have no questions for you.
11
12          (At this time the deposition in the
13          above-captioned matter was concluded at
14          2:20 p.m.)
15
16
17
18
19
20
21
22
23
24
```

Page 136

```
1              - - -
2
3
     COMMONWEALTH OF PENNSYLVANIA    )  E R R A T A
4    COUNTY OF LACKAWANNA           )  S H E E T
5    I, _____, have read the
     foregoing pages of my deposition given and wish to
6    make the following, if any, amendments, additions,
     deletions or corrections:
7
     Page/Line   Should Read        Reason for Change
8
9
10
11
12
13
14
15
16
17
18
19
     In all other respects, the transcript is true and
20   correct.
21   _____
              Signature
22
23   Subscribed and sworn to before me this _____ day
     of _____, 2016.
24    Notary Public
```

Page 135

```
1
2
3              CERTIFICATE
4
     COMOMNWEALTH OF PENNSYLVANIA,)
5                     ) SS:
     COUNTY OF LACKAWANNA        )
6
7
       I, Karin E  Volpitta, do hereby certify that
8    before me, a Notary Public in and for the
     Commonwealth aforesaid, personally appeared
9    PATRICIA E  DUNLEAVY, who then was by me first duly
     cautioned and sworn to testify the truth, the whole
10   truth, and nothing but the truth in the taking of
     the oral deposition in the cause aforesaid; that
11   the testimony then given by her as above set forth
     was by me reduced to stenotype in the presence of
12   said computer-aided transcription
13     I do further certify that this deposition was
     taken at the time and place in the foregoing
14   caption specified and was completed without
     adjournment
15
       I do further certify that I am not a relative,
16   counsel or attorney of either party, or otherwise
     interested in the event of this action
17
       IN WITNESS WHEREOF, I have hereunto set my hand
18   and affixed my seal of office at Scranton,
     Pennsylvania, on this
19   _____ day of _____, 2016
20
21
22   _____
     Karin E  Volpitta
23   In and for the Commonwealth of Pennsylvania
     My commission expires January 20, 2017
24
```

Page 137

```
1
2    August 18, 2016
3
4    Jackson Lewis
5    1601 Cherry Street, Suite 1350
6    Philadelphia, Pennsylvania 19102
7    ATTN:  Stephanie J. Peet, Esquire
8
        NOTICE OF NON-WAIVER OF SIGNATURE
9
10   Please have the deponent read her deposition
     transcript.  All corrections are to be noted on the
     preceding Errata Sheet.
11
     Upon completion of the above, the deponent must
12   affix her signature on the Errata Sheet, and it is
     to then be notarized.
13
     Please forward the signed original of the Errata
14   Sheet to Jonathan Z. Cohen, Esquire, for attachment
     to the original transcript, which is in his
15   possession, copying all other counsel and myself.
     As per the rules, if the witness does not sign the
16   signature page within 30 days after receipt of the
17   transcript, signature is deemed waived.
18
19
     Karin E. Volpitta
20   Court Reporter
21
22
23
24
```



# Exhibit 43

**EXHIBIT**

**43**

Re: Dr. Fred Fagal's authorship and distribution of videos depicting the executive officers as Nazis

Meeting 1/23/12, Sr. Anne's conference room, 9:00 am
Sr. Anne Munley
Dr. Michael Foley
Dr. Pat Dunleavy
Dr. Fred Fagal

Before Dr. Fagal arrived Dr. Foley told Sr. Anne that he went to Dr. Fagal's office at 8:45 to tell him that Sr. Anne wanted to see him at 9. Dr. Fagal asked what the purpose of the meeting was; Dr. Foley said he responded that "we can both probably guess."

Dr. Fagal arrived at 9:00 am. Dr. Fagal commented that he was surprised to see three of us; that he only "expected you" talking to Sr. Anne.

Sr. Anne asked Dr. Fagal if he was the author of the videos. Dr. Fagal responded "Yes, I am." Sr. Anne asked who Dr. Fagal sent the video to, how it was disseminated. Dr. Fagal appeared hesitant, then said he wasn't sure why he would want to answer that, that we could figure it out for ourselves, and then said that he wouldn't answer. Dr. Fagal asked what the purpose of the meeting was. Sr. Anne stated that Dr. Fagal is a tenured faculty member and that he has an obligation as tenured faculty to uphold the mission and core values of the University. Sr. Anne asked Dr. Fagal how the videos upheld those values. Dr. Fagal said he wouldn't answer any more questions. Sr. Anne asked what he hoped to accomplish. Dr. Fagal said "justice." Sr. Anne asked him to elaborate; Dr. Fagal said he didn't "choose to elaborate."

Sr. Anne cited other University policies including Civil Rights, Academic Freedom, and Professional Ethics, all of which cite supporting mission as integral.

Dr. Fagal said he was leaving the meeting. Sr. Anne said she was not done; and told Dr. Fagal that this was his opportunity to address the issue as she considers her response. Dr. Fagal said that if she would put her questions in writing he would craft his response. Sr. Anne asked if he had anything else to say. Dr. Fagal said "no."

Sr. Anne told Dr. Fagal that she was suspending him with pay and asked him to return his keys and ID to Dr. Dunleavy; that he should collect his personal items and leave campus.

Dr. Fagal asked about the Faculty Manual and whether suspension was reserved for issues like mortal danger and moral turpitude. Sr. Anne suggested to Dr. Fagal that he review all the University policies. Dr. Fagal said he had lots of personal items in his office and they wouldn't all fit in his car today.

Sr. Anne asked Dr. Fagal to verify his home address and preferred home email. He confirmed his home address, said he uses the yahoo account, and confirmed his home phone. Dr. Fagal gave us his cell – 315-406-8063. Sr. Anne said she will continue with her determination. Sr. Anne told Dr. Fagal that he could make arrangements to gather the remainder of his personal items with Dr. Dunleavy.

Sr. Anne asked Dr. Fagal if there was anything else, any other information or input he would like her to consider.



Dr. Fagal said yes, and open up a folded piece of paper. (From my chair I could see that he had clipped out what appeared to be address lines from the top of the first paper.) Dr. Fagal said he called Alan Levine at his house on Saturday and left a message that he wanted to talk off the record. Dr. Fagal said he also wrote to FIRE, that he was trying to give Sr. Anne "an out" re the posters.

Dr. Fagal said he went to Alan Levine on December 5, and that in that meeting Dr. Levine said that Carl Oliveri told Alan that the posters that were approved did not have the prize listed on them. Dr. Fagal said that's a lie. Dr. Fagal added that Carl was not in the office the following Monday when additional posters were requested, and said that perhaps Carl's assistant lied about the posters not including the prize. Dr. Fagal said that if the "executive council" was lied to that could explain their actions. Dr. Fagal said he wrote to Mannia (FIRE?) and "another friend" and they agreed that "Munley's only narrowing escape" was if she was given false information. Dr. Fagal said he saw Sr. Anne's response to FIRE and considers it flawed. Dr. Fagal said these actions are evidence that he's been trying to see if there's a way out that would explain what he observed. Dr. Fagal said he had drafted a response to Sr. Anne, but had not sent it, suggesting she amend her response to FIRE. Dr. Fagal gave Sr. Anne a copy of her response and his response to FIRE. Dr. Fagal said that he was trying to give Sr. Anne more time to "rescue herself from the depths," and added that he does not believe she's doing the best for the University in this matter. Dr. Fagal continued to talk about the posters, noting that he sent an email to Carl Oliveri on Friday (Thanksgiving weekend) and that he could get affidavits about all of that.

Sr. Anne noted that Dr. Fagal was providing input about the posters. Sr. Anne said "I want input regarding the videos." Dr. Fagal responded "Satire." Sr. Anne asked if he thought it was appropriate given the University's foundational value of respect. Dr. Fagal hesitated, then said that as he noted in his last faculty activity report "not everyone deserves respect; for example Hitler, Bin Laden." Sr. Anne asked Dr. Fagal "what do you mean Fred?" Dr. Fagal said he did not want to get "all philosophical" and commented that we could discuss dancing angels on the head of a pin.

Sr. Anne asked Dr. Fagal if he thought the content was not offensive. Dr. Fagal replied that "people can be offended all the time, that soon we'll be living in a dictatorship." Dr. Fagal said that he has shown a willingness to find a way out by contacting FIRE after Sr. Anne responded; by calling Alan Levine and pointing out the lies in the Student Activities office. Dr. Fagal said this was a good place for him to stop talking.

Sr. Anne said she will respond to the nature of the videos, and she wanted that made very clear.

Dr. Fagal stood up, started pulling his keys out, presumably to give them to me, but left as Sister Anne told him he could give them to me after he took his personal belongings today.

The meeting ended at 9:15 am.

*[signatures]* 1/23/12
1/23/12

# Exhibit 44

JoAnne | 8:45 MF went to FF; he asked why, M F - we can both
Mike | probably guess. Assume he'll be here @ 9.

**EXHIBIT**
**44**

Pat Fred  FF suggested 3 here

1/23/12  SAM — author? Yes Sam

Sent to whom? — how disseminated

not sure why he'd no answer that

can figure out for yourself)

won't answer —

F — purpose of mtg? —

SAM — tenure resp. — mission / CV's

how?

F — won't answer any more

A — what to accomplish

F — justice.

A — elaborate

F — don't choose to elaborate

A — tenure, CR, acad freed, prof ethics — all approp

support mission

F — I'm leaving

A — not done —, your chance to address, she'll

consider response

F — writing — he'll nept response

A — nothing else?

F — no.

A — suspend w/ pay —

Keys / ID to me, take personal stuff. leave

F — Fac Man —? moral danger?

moral turpitude — ?

A — look at policies —

F lots in my office, won't fit today —

**EXHIBIT**
Dunleavy 8
8/11/16   KV
PENGAD 800-631-6989

2) A - verify home address / email / phone

cell ? — 315 - 406 - 8063

will pursue of her determination

arrange — other stuff of me (C. Safety)

A - other info / input to consider ?

F - need something —

called AL Sat - (house) left msg. talk off record

wrote to FIRE —

trying to give SAM out (w/ posters)

went to AL 12/5 —

Y said Carl said posters didn't have prize on

them — that's a lie.

Carl not here Monday — his asst. lied — ?

if exec. council lied to @ that. could explain actions

F wrote to Maaria (Fire) & another friend

Monday's only resourcing escape — if false info

[1] FIRE response ~ flawed

evidence — see if there's a way out to explain what A

observed.

drafted response to SAM — amend response to FIRE;

gave SAM her response to FIRE re her response

tried to give SAM more time to rescue herself from reptas

feels she's not doing best for U that in this case

posters — emailed Carl Friday @ posters "prize &

would get affidavit e posters

A — input re posters. I want input re videos

F soften.

3)

A - appropriate? found value of respect?
F - Um... said in you report - not everyone deserves
    respect - i.e. Hitler, Bin Laden...
A - what did you mean?
F - doesn't want to get philosophical ~
    dance angels on head of pin
A - could not offensive?
F - people can be offended all the time
    living in dictatorship soon...
    shown willingness to find way out
    1) Fire
    2) called AL
    3) lies in Sh office
A - resp. to nature of video, v. clear
9:15 left (pulling our keys)

# Exhibit 45

EXHIBIT

45

```
1              UNITED STATES DISTRICT COURT

2         FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

3

4    FREDERICK F. FAGAL, JR.,      )
                                   )
5                   Plaintiff,     )
                                   )
6         vs.                      )  No. 3:14-cv-02404-ARC
                                   )
7    MARYWOOD UNIVERSITY,          )
                                   )
8                   Defendant.     )
     _____)
9

10

11

12         DEPOSITION OF MICHAEL A. FOLEY, Ph.D.

13                (Taken by Plaintiff)

14               Raleigh, North Carolina

15              Friday, February 26, 2016

16

17

18

19

20

21

22

23

24              Reported in Stenotype by
              Joan Daly Snover, RMR/CRR
25   Transcript produced by computer-aided transcription
```

02/26/2016 Michael A. Foley, PhD

Page 2

```
 1          A P P E A R A N C E S
 2
   ON BEHALF OF PLAINTIFF:
 3
        JONATHAN Z. COHEN, ESQUIRE
 4      Law Office of Jonathan Z. Cohen
        175 Strafford Avenue
 5      Suite 1, # 212
        Wayne, Pennsylvania 19087
 6      215.874.0047
        jzc@jzc-law.com
 7
 8 ON BEHALF OF DEFENDANT:
 9      ASIMA J. AHMAD, ESQUIRE
        Jackson Lewis, P.C.
10      1601 Cherry Street
        Suite 1350
11      Philadelphia, Pennsylvania 19102
        267.319.7802
12      asima.ahmad@jacksonlewis.com
13
14
   ALSO PRESENT:
15
        Frederick Fagal, Ph.D.
16      Patricia Dunleavy
17
18
19
20   Deposition of MICHAEL A. FOLEY, Ph.D., a witness called
21 on behalf of the Plaintiff before Joan Daly Snover, RMR/CRR,
22 Reporter and Notary Public, in and for the State of North
23 Carolina, at CaseWorks, Inc., REGUS, 8601 Six Forks Road,
24 Raleigh, North Carolina, on Friday, February 26, 2016,
25 commencing at 10:00 a.m.
```

Page 3

```
 1          INDEX OF EXAMINATION
 2 WITNESS: Michael A. Foley, Ph.D.          PAGE
 3   By Mr. Cohen.................................    4
 4   By Ms. Ahmad.................................   41
 5   By Mr. Cohen.................................   43
 6
 7
 8
 9          INDEX OF EXHIBITS
10 NUMBER      EXHIBIT                    MARKED
11
   Exhibit 1     Subpoena.....................    5
12
   Exhibit 2     Letter requesting apology......  10
13
   Exhibit 3     E-mail dated 1/13/12...........  12
14
```
```
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1          P R O C E E D I N G S
 2          * * * * * * * * * * * * * * * * * * *
 3          MICHAEL A. FOLEY, Ph.D.
 4 A witness called on behalf of Plaintiff being duly
 5 sworn testified before me as follows:
 6          EXAMINATION
 7 BY MR. COHEN:
 8   Q.  Dr. Foley, my name is Jonathan Cohen again.
 9   A.  Yes.
10   Q.  You're aware that I represent Frederick
11 Fagal, right?
12   A.  Yes.
13   Q.  And you understand that you're under the
14 same oath today as if you were in a courtroom?
15   A.  Yes.
16   Q.  I'm going to assume that you understand my
17 questions unless you tell me that you don't understand
18 them.  Is that fair?
19   A.  Yes.
20   Q.  Is there anything that would prevent you
21 from thinking clearly and testifying truthfully today?
22   A.  No.
23   Q.  If at any time during the deposition you
24 need to take a break, just say so, and we'll
25 accommodate you.  All right?
```

Page 5

```
 1   A.  Okay.
 2   Q.  Are you here today because you received a
 3 subpoena from me?
 4   A.  Yes.
 5      (Exhibit 1 marked for identification.)
 6      MR. COHEN:  Joan, could you pass
 7 Dr. Foley, Exhibit 1.
 8 BY MR. COHEN:
 9   Q.  Is this the subpoena that you received,
10 Dr. Foley?
11   A.  Yes, it is.
12   Q.  What is your middle name by the way?
13   A.  Alan, A-L-A-N.
14   Q.  Okay.  And what is your birthday?
15   A.  ███/46.
16   Q.  And would you list all of your physical
17 addresses, please?
18   A.  Current physical address?
19   Q.  Yes.
20   A.  817 Canyoncreek, that's all one word,
21 Canyoncreek Lane in Fuquay, F-U-Q-U-A-Y, Varina,
22 V-A-R-I-N-A, North Carolina, 27526.
23   Q.  And do you have any other physical
24 addresses?
25   A.  No.
```

Page 6

1    Q.  Can you list all of your telephone numbers,
2  please?
3        A.  One cell phone.  570-954-1202.
4    Q.  Any land lines?
5        A.  There is a land line I never use.  My wife
6  knows the number.  I do not.  I'm sorry.
7    Q.  That's all right.  How about e-mail address?
8        A.  E-mail address is mafjazz817@gmail.com.
9    Q.  And any other e-mail addresses?
10       A.  No.
11   Q.  Do you have a driver's license?
12       A.  Yes.
13   Q.  And what state issued that driver's license?
14       A.  North Carolina.
15   Q.  And I assume you have it on you?
16       A.  Yes.
17   Q.  Could you read the number on the driver's
18  license, please.
19       A.  Number 31874377.
20   Q.  Dr. Foley, you previously worked for
21  Marywood University, right?
22       A.  Yes.
23   Q.  And for how long?
24       A.  Total 34 years.
25   Q.  Can you list all of the job titles that you

Page 7

1  had at Marywood?
2        A.  In addition to professor of philosophy, I
3  mean I was assistant, then associate and then full
4  professor of philosophy.  I was director of the Honors
5  Program for nine years, chair of the Philosophy
6  Department for almost 11 years, and then Dean of the
7  College of Arts and Sciences for four years.
8    Q.  So your last title was Dean of the College
9  of Arts and Sciences you said?
10       A.  Yes.
11   Q.  And have you ever served on the policy
12  committee of Marywood?
13       A.  Yes.
14   Q.  And what did you do on the policy committee?
15       A.  Attended policy committee meetings on Friday
16  afternoons when they occurred.  I chaired the policy
17  committee once in the mid to late '80s.  And other
18  than that I served a number of years on policy where
19  we would receive an agenda and discuss new policies
20  that should be adopted or could be adopted by the
21  university.
22   Q.  And were you on the policy committee when
23  you retired?
24       A.  By virtue of my position, yes.
25   Q.  Okay.  When exactly did you retire?

Page 8

1        A.  June 30, 2012, was my last day.
2    Q.  I'm sorry.  I missed the first part.  You
3  said 2012 --
4        A.  Oh.  June 30.
5    Q.  Okay.  Dr. Foley, do you know my client
6  Frederick Fagal?
7        A.  Yes.
8    Q.  How long have you known him?
9        A.  As many years as he was at Marywood.
10   Q.  Okay.  Were you ever Professor Fagal's
11  superior at Marywood?
12       A.  As Dean I would be considered a superior.
13   Q.  Do you recall in November of 2007 when
14  Professor Fagal invited a speaker from the Foundation
15  For Individual Rights in Education to give a
16  presentation on campus?
17       A.  Yes.
18   Q.  And from now on I'm just going to call the
19  Foundation For Individual Rights and Education FIRE.
20  Okay?
21       A.  Okay.
22   Q.  Do you recall Professor Fagal hanging
23  posters announcing the FIRE speaker?
24       A.  Yes.
25   Q.  Do you recall communicating with anybody

Page 9

1  from the Marywood administration about the FIRE
2  presentation or the FIRE posters?
3        A.  No.
4    Q.  Okay.  Do you recall in late November 2011
5  that almost all of the FIRE posters were removed?
6        A.  Yes.
7    Q.  Do you know the circumstances of which they
8  were removed?
9        A.  Not specifically.
10   Q.  Well, do you know whether Marywood personnel
11  ordered the removal of the FIRE posters?
12       A.  What I remember was I believe they did not
13  contain the proper stamp from the office for
14  student -- Vice President For Student Affairs.  I
15  think all posters had to be cleared.  My recollection
16  is that was the reason, but that was four and a half
17  years ago.
18   Q.  Right.  I understand.  I understand the
19  reason.  My question is did Marywood administration
20  order the removal of the FIRE posters.
21       A.  I can't say.  No, I don't know for sure.  I
22  just know what I heard.
23   Q.  What did you hear?
24       A.  Basically that there was no appropriate
25  stamp on the posters.

Page 10

1    Q.  Okay.  So you weren't involved in any
2  discussions with Marywood administrators over whether
3  to remove the FIRE posters?
4    **A.  No.**
5    Q.  Okay.  And do you know who was?
6    **A.  Not specifically.**
7    Q.  I'm sorry.  I missed what you said?
8    **A.  I would say not specifically.  I made an**
9  **assumption.**
10    Q.  Okay.  What's your assumption?
11    **A.  Vice President For Student Life Ray Heath**
12  **would have.  He was vice president for that area, and**
13  **it was his office through which those kinds of things**
14  **were cleared.  That would be my assumption that it**
15  **would be at his level.**
16    Q.  Okay.  At some point do you recall Professor
17  Fagal attempting to secure an apology from Marywood
18  and to seek reimbursement for the posters?
19    **A.  I don't recall, no.**
20    MR. COHEN:  Joan, could you pass the
21  witness Exhibit 2, please.
22    (Exhibit 2 marked for identification.)
23  BY MR. COHEN:
24    Q.  Dr. Foley, if you could read this very short
25  letter briefly and let me know when you're finished.

Page 11

1    **A.  Okay.  I've read.  I see that I was copied**
2  **on it.**
3    MS. AHMAD:  I'm sorry.  I just want to
4  place one objection on the record that this
5  letter referencing Dr. Fagal, December 5, 2011,
6  letter, which is not included as an exhibit.
7    MR. COHEN:  That's true.  Okay.
8  BY MR. COHEN:
9    Q.  So Dr. Foley, you're saying that you see
10  that you're copied on this letter?
11    **A.  I see that I was copied.  I do not remember**
12  **receiving the letter.**
13    Q.  Okay.
14    **A.  I had just had a total hip replacement maybe**
15  **three weeks before.  I really did not return to work**
16  **until early January.**
17    Q.  Does this letter refresh your recollection
18  at all as to whether Professor Fagal attempted to
19  secure an apology or get reimbursed for the posters?
20    **A.  No.**
21    Q.  Okay.  You have no recollection that
22  Professor Fagal had discussions with Alan Levine about
23  this?
24    **A.  No.**
25    Q.  Okay.  Did you have any discussions about

Page 12

1  this with Dean Levine?
2    **A.  Vice President Levine?**
3    Q.  Yes.
4    **A.  No.**
5    Q.  Just curious.  Why would Vice President
6  Levine have copied you on this letter?
7    MS. AHMAD:  Objection.
8  BY MR. COHEN:
9    Q.  You can answer.
10    **A.  Oh, okay.**
11    MS. AHMAD:  I'm sorry.  Yes.  You can
12  answer.
13    **A.  I would assume because I was Dean of the**
14  **college in which he taught.**
15  BY MR. COHEN:
16    Q.  Okay.  Do you recall Professor Fagal sending
17  an e-mail to Marywood's faculty about the removal of
18  the FIRE posters in January of 2012?
19    **A.  I can't recall, no.**
20    Q.  Okay.
21    MR. COHEN:  Joan, could you pass the
22  witness Exhibit 3, please.
23    (Exhibit 3 marked for identification.)
24  BY MR. COHEN:
25    Q.  If you could just skim this e-mail,

Page 13

1  Dr. Foley, and let me know when you're finished.
2    **A.  Okay.**
3    MS. AHMAD:  Dr. Foley, feel free to read
4  the entire e-mail if you want to.
5    **THE WITNESS:  Okay.**
6    MS. AHMAD:  If you don't, then just let us
7  know if you skimmed it.
8    **A.  Okay.  I have finished reading it.  I forgot**
9  **that there was a stamp.  I didn't recall that.  I do**
10  **not recall this memo.**
11  BY MR. COHEN:
12    Q.  You don't recall what?  I'm sorry.
13    **A.  I do not recall the memo.**
14    Q.  Okay.  Do you recall reading this e-mail
15  before today?
16    **A.  No.**
17    Q.  What's the date on this e-mail.
18    **A.  January 13, 2012.**
19    Q.  Do you remember visiting Professor Fagal on
20  the morning of January 23, 2012, and telling him that
21  he had to attend a meeting with the President in about
22  15 minutes?
23    **A.  Yes.**
24    Q.  Okay.  What exactly did you tell Professor
25  Fagal when you first visited him and told him he had

Page 14

1 this meeting to get to?  I realize it's a long time
2 ago, and you can only do the best that your memory
3 serves to.
4    A.  Basically what you just said.  I went to
5 Dr. Fagal's office, and I said that he was to report
6 to Sister Anne's office in 15 minutes.  And he asked
7 me what this was about, and my recollection is I said
8 I think you know what it's about.  That was the most
9 that I said to my recollection.
10       We did not discuss anything further, and I
11 wasn't exactly sure what it was about.  I mean, I knew
12 what it was about, but Sister Anne asked me as dean to
13 go talk to Dr. Fagal to report to her office in 15
14 minutes, and that's what I did.
15    Q.  Okay.  Just curious.  If you had never seen
16 the e-mail that you just read that was Exhibit 3, why
17 would you assume that Dr. Fagal would know what the
18 meeting was about?
19    A.  I had seen the video.  I had seen the first
20 video.
21    Q.  All right.  I understand.  Do you remember
22 that when you visited Dr. Fagal he was preparing for a
23 class that was about to begin 15 minutes later?
24    A.  Yes.
25    Q.  Okay.  And whose decision was it to summon

Page 15

1 Professor Fagal 15 minutes before his class was to
2 begin?
3    A.  Sister Anne Munley.
4    Q.  Okay.  Did you consider providing Professor
5 Fagal with 15 minutes advanced notice was appropriate?
6    A.  Did I think it was appropriate?
7    Q.  Yes.
8    A.  Honestly I never thought about it.
9    Q.  Okay.  When you worked for Marywood, did you
10 ever participate in the discipline of any employee
11 other than Professor Fagal?
12    A.  Yes.
13    Q.  In your experience was it typical to give an
14 employee only 15 minutes notice of a meeting when he
15 had class in 15 minutes, a meeting with the President?
16    A.  No.  When I served on, did not involve the
17 President directly at the point in time that I served.
18    Q.  Okay.  So before you visited Professor Fagal
19 and told him he had this meeting, you never had to
20 summon another faculty member this way?
21    A.  No.
22    Q.  Okay.  Do you know for how long this meeting
23 with the President had been planned?
24    A.  No.
25    Q.  Can you explain the circumstances of

Page 16

1 President Munley telling you to summon Dr. Fagal?  Did
2 she say anything the night before, five minutes
3 before?  Do you remember?
4    A.  I was called to Sister Anne's office some
5 time between 7:30 and maybe 20 until.  I think that
6 was the time.  But it was maybe 15 minutes before I
7 went and told Fred.  It was that morning.
8    Q.  And what exactly did President Munley say to
9 you?
10    A.  She said for me to go and tell Fred that he
11 was supposed to report at her office at I believe 8:00
12 was the time.
13    Q.  Okay.  Are you sure it wasn't 9?
14    A.  No, I'm not sure.  It could have been 9.
15    Q.  All right.
16    A.  It was 15 minutes before his first class of
17 the day.
18    Q.  Right.  Do you recall whether President
19 Munley was -- did she appear angry?
20    A.  No.
21    Q.  So just a few minutes ago you said
22 that when you visited Professor Fagal that morning you
23 said something about, "I think you know what this is
24 about".
25    A.  He asked me what it was about, and I said I

Page 17

1 think you know.  I was making the assumption that it
2 was about the video.
3    Q.  So the President didn't mention that to you?
4    A.  No.
5    Q.  Okay.  So why did you assume it was about
6 the video?
7    A.  Because it was a hot topic of conversation.
8 The video seemed to be public knowledge.
9    Q.  Okay.  You say it was a hot topic of
10 conversation.  Who specifically were you conversing
11 about this e-mail with, do you remember?
12    A.  About the e-mail or the video?
13    Q.  Well, actually the video because you said
14 you never saw --
15    A.  Yes.  The video, faculty who once the video
16 was posted and people saw it, faculty would come by my
17 office and make comments.  Just general conversation.
18 I don't remember specifically faculty members who
19 dropped by.
20    Q.  And do you remember what they said?
21    A.  I can't say for sure, no.
22    Q.  Okay.  So let's move on to the meeting with
23 President Munley that occurred on the morning of
24 January 23.  Where was it held?
25    A.  In her board room.

Page 18

1    Q.   And who attended the meeting?
2    A.   Pat Dunleavy and I attended the meeting.
3    Q.   And President Munley?
4    A.   Well, yes.
5    Q.   And Dr. Fagal of course?
6    A.   Yes.
7    Q.   Nobody else?
8    A.   No.
9    Q.   Okay.  Do you know whether the meeting was
10   recorded in some way?
11   A.   Pat Dunleavy took minutes.
12   Q.   Do you know if there was an audio recording
13   or video recording?
14   A.   I do not know.  I do not believe so.
15   Q.   Okay.  Did anybody other than Pat Dunleavy
16   take notes at the meeting?
17   A.   No.  I mean Sister Anne might have.  I don't
18   recall.  I don't recall.  I know Pat took minutes and
19   wrote up a report after the meeting that I signed off
20   on.  I signed off on Pat's reporting of what
21   transpired at that meeting.
22   Q.   Okay.  Let's talk about Ms. Dunleavy's
23   report.  What do you mean by "report"?  Did she write
24   a memo?
25   A.   It was just putting the notes together so

Page 19

1    that there would be a record of what occurred.  And I
2    read her -- she brought it to my office if I remember
3    correctly.  I read it and thought that that captured
4    the essence of the meeting, and I signed off.
5    Q.   What do you mean by signing off?  Did you
6    literally sign it?
7    A.   I believe I literally signed it to say that,
8    yes, I was in attendance, and this reflects what I
9    heard.
10   Q.   Okay.  Did you say not literally?  I'm
11   sorry.  I have a bad connection.
12        THE COURT REPORTER:  I'll read it back for
13   you, counsel.
14        (The reporter read back as was requested.)
15   BY MR. COHEN:
16   Q.   Did you take any notes after the meeting
17   about what had occurred during the meeting?
18   A.   No.
19   Q.   Okay.  I want you to tell me in as much
20   detail as you can remember about what was stated at
21   the meeting starting from the beginning until the end.
22   Can you do that?
23   A.   Sister Anne began her questions with -- I
24   think the very first question was, "Did you post the
25   videos?" to Dr. Fagal.  Dr. Fagal acknowledged that he

Page 20

1    indeed had posted the videos.  Then Sister Anne went
2    on to ask the why and the wherefore.  I don't recall
3    specifically after that until the end of the meeting
4    at which time she told him that he was being
5    dismissed.
6        MR. COHEN:  Joan, can you read Dr. Foley's
7    answer back into the record again.
8        (The reporter read back as was requested.)
9    BY MR. COHEN:
10   Q.   So it sounds like you're telling me exactly
11   what you remember the President saying, but do you
12   remember anything that Professor Fagal said except to
13   admit that he made the videos?
14   A.   No.
15   Q.   A minute ago you stated that President
16   Munley asked Professor Fagal the why and the
17   wherefore, right?
18   A.   Yes.
19   Q.   And by that did you mean she asked Professor
20   Fagal why did you post the video?
21   A.   Yes.
22   Q.   And do you remember Professor Fagal's
23   response?
24   A.   No, I do not.
25   Q.   Okay.  Do you remember Professor Fagal

Page 21

1    attempting to answer and then President Munley cutting
2    him off?
3    A.   I don't recall that, no.
4    Q.   Do you remember Professor Fagal making a
5    comment something to the effect of, "Well, if I can't
6    talk about the posters, then I can't really explain
7    myself.  It would be like trying to find out how many
8    angels can dance on the head of a pin."
9        Does that ring a bell?
10   A.   No, it does not.
11   Q.   Okay.  A moment ago you said that President
12   Munley told Professor Fagal he was dismissed, right?
13   A.   I don't know if dismissed was the exact
14   word, but that was the -- that was the bottom line.
15   He was no longer on the faculty.
16   Q.   Okay.
17   A.   Yes, told to clear out his office.
18   Q.   Okay.  So before this meeting, do you know
19   whether President Munley was prepared to dismiss
20   Professor Fagal?
21   A.   No.
22   Q.   You didn't discuss any discipline of
23   Professor Fagal before the meeting started?
24   A.   No.
25   Q.   And were you aware of any such discussions?

Page 22

1    A.  No.
2    Q.  Let me ask you this:  What was your role at
3  the meeting?  Why would you have been there?  Why were
4  you invited?
5    A.  I think because I was dean of the college.
6    Q.  Okay.  Do you remember whether Patricia
7  Dunleavy said anything at the meeting?
8    A.  No, she did not.
9    Q.  And what about you?
10   A.  No.
11   Q.  Approximately how long was the meeting?
12   A.  Going back four years.  I don't know.  25
13  minutes, 30.
14   Q.  Okay.  Do you remember what you did
15  immediately after the meeting?
16   A.  As far as I remember I returned to my
17  office.
18   Q.  But you didn't remain in the room to discuss
19  what had just transpired?
20   A.  My recollection is that I did remain in the
21  room, but no real discussion occurred.  I just wanted
22  to take a minute and then return to my office.  I
23  can't remember any discussion --
24   Q.  I'm sorry.  I missed what you said there.
25   A.  I can't remember any discussion after

Page 23

1  Dr. Fagal left the room.
2    Q.  Okay.  But he did leave the room leaving
3  you, Patricia Dunleavy and Professor Munley in the
4  room without him?
5    A.  Yes.  Yes.
6    Q.  Okay.  Do you remember approximately how
7  long you were there after Professor Fagal left?
8    A.  No more than a couple minutes.
9    Q.  Okay.  So a few minutes ago I had you read
10  the e-mail dated January 13, 2012.  That was
11  Exhibit 3.
12   A.  Yes.
13   Q.  And we just talked about a meeting that
14  occurred on January 23; is that right?
15   A.  Yes.
16   Q.  So about ten days.  Do you recall during
17  that 10-day period any discussions between Marywood
18  administrators about how to handle the videos?
19   A.  No.
20   Q.  Do you remember any discussion by any
21  Marywood administrators about how the university's
22  written policies and procedures might apply to
23  Professor Fagal's conduct?
24   A.  No.
25   Q.  Do you remember any Marywood administrator

Page 24

1  stating that -- in those 10 days do you remember any
2  Marywood administrator stating that Professor Fagal
3  should be disciplined?
4    A.  No.
5    Q.  Okay.  Do you know whether Vice President
6  Levine approved the -- strike that.  Never mind.
7        Do you recall talking to Vice President
8  Levine about the meeting on January 23, 2012?
9    A.  No.
10   Q.  Was it unusual that Vice President Levine
11  wasn't at that meeting?
12   A.  Did I find it unusual?
13   Q.  Yes.
14   A.  I never thought about it.
15   Q.  Okay.  Well, thinking about it now, given
16  Vice President Levine's position, do you find it
17  unusual that he wasn't at the meeting?
18   A.  I'm really not sure.
19   Q.  I'm sorry.  Go ahead.
20   A.  I just don't recall.  I mean, right now I
21  haven't thought about it until you just asked this
22  question.  And I'm a philosopher by training, and I
23  can see thinking about it in terms of reasons for him
24  to be there and reasons for him not to be there.
25       So at the moment I really can't answer that.

Page 25

1  I never even thought about it, what was appropriate or
2  inappropriate or who should or should not be present.
3    Q.  What are some reasons that he should have
4  been there?
5    A.  Umm, he was vice president for academic
6  affairs, and as such oversaw all faculty in all five
7  colleges or schools.
8    Q.  Okay.  Is that it?
9    A.  Yes.  As far as if I'm thinking about it
10  now.  But I also think that I was there because I was
11  dean, and it was going to affect my college and what
12  would have to be done to get those courses that Fred
13  taught covered.
14   Q.  Okay.
15   A.  That's the first thing I had to do when I
16  got back to my office.  I had to figure out how to get
17  those courses covered.
18   Q.  At the time of the January 23 meeting when
19  you said that Professor Fagal had been dismissed, did
20  you believe that Professor Fagal had posed an
21  immediate harm to himself?
22   A.  No.
23   Q.  How about to any others?
24   A.  No.
25   Q.  Okay.  Do you recall any statements made by

Page 26

1  Marywood administrators about whether Professor Fagal
2  posed an immediate harm to himself or to others?
3     A.  No, I do not.
4     Q.  Okay.  Do you recall a day after the
5  January 23 meeting that President Munley sent a letter
6  to Professor Fagal stating that she was recommending
7  that his tenure and employment be terminated?
8     A.  I do not remember, no.
9     Q.  Okay.  Do you recall any letter President
10 Munley sent Professor Fagal about the discipline that
11 was imposed?
12    A.  I'm trying to recall and I can't.  But I
13 don't recall that December 15 letter from Alan to
14 Fred, but as I noted I was copied on that.  So if
15 there was a letter, it wouldn't surprise me that I was
16 copied on that as well.  If I was, it would be in my
17 files which are in the Dean's office at Marywood.
18    Q.  Okay.  After the January 23, 2012, meeting
19 with President Munley, do you recall any statements
20 from Marywood personnel about potentially amending the
21 university's disciplinary rules to give more latitude
22 in disciplining employees?
23    A.  I don't recall, no.
24    Q.  In your time at Marywood, do you recall the
25 termination of any tenured professor other than

Page 27

1  Professor Fagal?
2       MS. AHMAD:  Objection.  Relevance.  You
3  can answer.
4     A.  In 1985, '86, in that timeframe I served on
5  a committee that recommended that a case proceed
6  against a faculty member filed by a student that
7  involved sexual harassment.  I believe that faculty
8  member was indeed tenured, and that he was dismissed.
9  BY MR. COHEN:
10    Q.  Do you remember that employee's name?
11    A.  Murali Nair.
12    Q.  And you said 1986?
13    A.  It was in around 1985, '86, '87.  In the mid
14 '80s.
15    Q.  Other than Professor Nair and Professor
16 Fagal, you don't remember any other tenured professor
17 being terminated?
18    A.  Again I think the professor was tenured, but
19 there was an art professor who was dismissed over
20 sexual harassment of a secretary.
21    Q.  This is someone other than Professor Nair?
22    A.  Yes.
23    Q.  Do you remember the art professor's name?
24    A.  That I do not, no.
25    Q.  And do you remember when this happened?

Page 28

1     A.  I don't remember that either.  What I do
2  remember is I actually ran into that professor at an
3  outlet in East Strasburg, and I didn't know anything
4  was going on with him or about it.  We talked for
5  maybe 5-10 minutes, and that was on Saturday or
6  Sunday.  And then I arrive back to school on Monday,
7  and I find out he's no longer on the faculty.
8       I thought I just had a conversation with
9  him, he didn't say anything about it.  So he had been
10 dismissed maybe just recently, but I didn't know any
11 of the specifics about that case.  I did know some of
12 the specifics about the Murali Nair case because I
13 served on the initial committee that recommended the
14 university move forward with potentially disciplinary
15 actions against him.
16    Q.  Okay.  In your time at Marywood, can you
17 recall any tenured professor publicly criticizing the
18 administration in a way that was similar to Professor
19 Fagal?
20    A.  No.
21    Q.  Did President Munley ever express any
22 dislike for Professor Fagal prior to the videos that
23 he posted?
24    A.  Not to my knowledge, no.
25    Q.  How about Vice President Levine?

Page 29

1     A.  No.
2     Q.  Do you remember any other Marywood
3  administrators expressing any dislike or contempt for
4  Professor Fagal before -- this is before January 2012.
5     A.  No.
6     Q.  What about you?
7     A.  What about me?
8     Q.  Yes.
9     A.  As dean I certainly had some concerns about
10 what Fred would do in class because I would have
11 students come and report to me.
12    Q.  Okay.  What were those concerns?
13    A.  Well, he would make comments that really
14 were not appropriate for a classroom and created what
15 could be called a hostile learning environment.  I had
16 two students in my office one time from a comment that
17 he made in class about people with thunder thighs,
18 specifically women with thunder thighs, and that they
19 should be in a swimming pool, not in a classroom.
20      I asked the students if I could go -- or if
21 they would go on record.  I said I really can't talk
22 to Dr. Fagal about this unless you give me permission.
23 I said would you go see Pat Dunleavy to at least file
24 a complaint.  I think I may have even mentioned Ray
25 Heath's office or Dr. Levine's office, but I certainly

Page 30

1 mentioned Pat Dunleavy because I had other students
2 that had come forward with specific comments made in
3 class. That is one that I remember specifically. But
4 no one would go on record.
5       So as I told the students I said I will take
6 note, but I can't really do anything unless you're
7 willing to make a formal statement. And over the
8 years -- I mean, there were a couple of other
9 encounters with Fred that I had to address indirectly.
10      Sister Patricia Matthews back in 2003, 2004,
11 2005, somewhere in that area, I was President of
12 Senate, Faculty Senate at the time. I guess that was
13 another hat that I wore for a couple of years. But as
14 President of the Faculty Senate, Sister Patricia
15 called me into her office and said that Fred had
16 circulated an e-mail that made one of our Muslim
17 faculty very uneasy. And this faculty member was not
18 tenured. I think she was in her second or third year.
19      Patricia had talked to her, but the faculty
20 member was very uneasy, asked me to go down and talk
21 with her and tell her that his e-mail certainly did
22 not reflect the mission, goals, or objectives of
23 Marywood or even the general attitude among faculty.
24 But again the specifics of the e-mail I don't
25 remember.

Page 31

1       I remember I met with that faculty member
2 and assured her that those views were Fred's views and
3 not the views of the university and not the views of
4 any other faculty member of which I was aware. I was
5 also called to the vice president Peter Cimbolic
6 office because of some cartoons that Fred had posted
7 on his door.
8       I had to verify, in fact, that those
9 cartoons were there, and that they were unacceptable
10 for an institution or to be posted at least at
11 Marywood. Again because they created what could be
12 called a hostile learning environment.
13      My concern was as dean what can I say that
14 would say, you know, you're beginning to step over the
15 line. We can't have a classroom -- because I did have
16 at least one other faculty member or students came to
17 me about -- actually two I can remember. They were
18 willing to go on record, and one of them I was able to
19 call in and say these kinds of things can't be said in
20 class again.
21   Q. Mm-hmm. Okay. Over the past few minutes
22 you just recounted a number of complaints that various
23 students and faculty members made about Professor
24 Fagal.
25   A. Yes.

Page 32

1   Q. My question for you, though, is did you
2 personally dislike him.
3   A. It's not an easy question to answer. Fred
4 and I had a lot of good conversations in probably the
5 first ten years he was at Marywood. We didn't
6 continue those conversations maybe for a variety of
7 reasons, none of which I recall at the moment. But I
8 always found him a good conversationalist, but I did
9 not like some of his thoughts on education.
10  Q. Okay.
11  A. And especially some of his thoughts on
12 students. So as a colleague I found him okay. But as
13 a faculty member in charge of student learning, I had
14 some difficulty.
15  Q. Mm-hmm.
16  A. None of which was ever expressed. I was
17 never asked for my thoughts.
18  Q. Okay. Do you remember President Mary Reep?
19  A. Yes.
20  Q. Would you say she ever expressed any dislike
21 for Professor Fagal?
22  A. Not to my knowledge.
23  Q. A few minutes ago I think you said that
24 before the January 23, 2012, meeting that you had
25 arranged for Professor Fagal's 9 a.m. class to be

Page 33

1 covered?
2   A. I did not.
3   Q. You didn't say that?
4   A. I did not. I said -- I may have said it
5 will be cancelled. The class was cancelled. It was
6 not covered.
7   Q. Did you take care of cancelling it?
8   A. I don't recall. I'm pretty sure I did not,
9 but I certainly probably asked someone to go and do
10 that.
11  Q. All right. Can you just give me one moment?
12  A. Yes.
13  Q. Did any faculty member or student that ever
14 visited your office in Marywood ever suggest that
15 Professor Fagal be disciplined?
16  A. No, not to my knowledge.
17  Q. And how about any administrators that came
18 to your office --
19  A. No.
20  Q. -- and suggest that?
21  A. No.
22  Q. The report that you said you signed off on
23 after the January 23 meeting, that was in writing,
24 right?
25  A. Yes.

Page 34

1    Q.   Do you remember whether Professor Fagal got
2  that report?
3    A.   No, I don't recall.  I --
4    Q.   What's that?
5    A.   I don't think so.
6    Q.   Okay.  But did you get a copy of the report?
7    A.   I signed off on it if I did get it.  I don't
8  recall getting a copy.  I knew Pat would keep a copy.
9  If there is a copy, it would again be in Dr. Fagal's
10  folder that would be in my office.
11    Q.   You also mentioned that you had seen the
12  videos that Professor Fagal had posted in January of
13  2012.
14    A.   I saw the first video.
15    Q.   Okay.  Do you remember the circumstances of
16  you seeing it?  Who gave you the link for the video?
17    A.   That I don't recall.  Someone sent me an
18  e-mail.  It could have been Dr. Fagal.  It could have
19  been another faculty member.  At any rate it said
20  "check this out".  So I checked it out.
21    Q.   Okay.  Just a few more questions.  In the
22  past ten years have you been convicted of a felony?
23    A.   No.
24    Q.   And what educational degrees do you have?
25    A.   I have a Ph.D. in philosophy.  Do you want

Page 35

1  me to go back to bachelors?
2    Q.   Yes, sure.
3    A.   I have a bachelors degree.
4    Q.   And where did you get it from?
5    A.   I got a bachelors degree with a double
6  major, German and Philosophy, from Eastern Illinois
7  University; a masters degree and a Ph.D. in Philosophy
8  from Southern Illinois University; and a masters in
9  Public Administration from New York University.
10    Q.   Okay.  Did you review any documents to
11  prepare for this deposition?
12    A.   No.  Other than what you sent me, I don't
13  have any documents.  I left everything at Marywood.
14    Q.   You mean other than the subpoena I sent you?
15    A.   Other than that, no, I did not review
16  anything.  I don't have any folders from Marywood.  I
17  left everything in my office.
18    Q.   Do you still have access to your Marywood
19  e-mail account?
20    A.   I don't think so.  I haven't used it since I
21  left Marywood.
22    Q.   Okay.  Do you still receive e-mails from
23  Marywood?  I mean, is it possible that you had your
24  Marywood e-mails forwarded to a personal account?
25    A.   Oh, I can't imagine doing that, no.  I do

Page 36

1  not receive any internal e-mails from Marywood.  I
2  thought my account was probably terminated on July 1
3  of 2012.  I didn't think I would have access to my
4  e-mail account at Marywood.  I was retired.
5    Q.   Okay.  Did you discuss this deposition with
6  anybody before today?
7    A.   Stephanie and Asima, we talked on Monday
8  just in general about what might happen.  I mean, when
9  I received your deposition, to go back a few weeks
10  before, I was served at 7:30 in the evening and
11  somewhat shocked.  I knew I was going to be asked for
12  a deposition.  I just didn't know it would arrive as
13  it did at 7:30.
14    The person serving the subpoena said -- my
15  wife answered the door.  I was coming down some steps
16  and I heard him say, don't worry, your husband is not
17  in trouble.  And I said, well, I'm the husband, what's
18  this about.  And he said I have a subpoena for you
19  here.
20    So that evening I sent an e-mail to Pat
21  Dunleavy, and I said basically what's this about, can
22  we talk.  I believe that was a Thursday, and maybe she
23  and I talked on a Friday.  We talked around I think it
24  was 11:00 in the morning, and she said she was unaware
25  that the subpoena was being served at that moment, the

Page 37

1  night before.  She said that, yes, I am asked to give
2  a deposition.  And I said, Pat, I don't remember
3  anything basically.
4    I mean, it was four years ago.  As Dean you
5  have a lot of things on your plate.  This isn't the
6  only issue that was on my desk.  She said, well, not
7  to worry.  She said that she would be talking to
8  Jackson Lewis, some attorneys from Jackson Lewis or an
9  attorney from Jackson Lewis, on that afternoon and let
10  them know that I received a subpoena; and that they
11  would, in fact, contact me and talk about the
12  deposition to assure me that they would be there or
13  someone from Jackson Lewis would be there in case I
14  had any questions.
15    And they asked me some questions very
16  similar to what you asked.  But in general they simply
17  told me to be as truthful as I could be in terms of
18  what I could recollect from four years ago.
19    Q.   Are you represented by an attorney?
20    A.   No.
21    Q.   Okay.  Then in that case do you remember
22  anything else that Asima and Stephanie told you?
23    A.   Other than to be truthful?
24    Q.   Yes.
25    A.   No.  I mean, I don't think there was

Page 38

1  anything that was said that hasn't been said here
2  today.  More has been said here today than it was the
3  other day.  They just wanted to assure me that I would
4  be okay.  I mean I was a little --
5      Q.  All right.  Were you worried?
6      A.  Was I worried?  No.  No.  I wasn't, but I
7  did want to talk to somebody about something that
8  happened four years ago or at least what would be
9  expected from me.  I have no folders here.  I have no
10  notes.
11          As I said, I don't even recall the Exhibits
12  2 and 3 that you told me, and the odds are I probably
13  received them.  But in terms of what I recollect, no,
14  I don't remember especially that memo in which I was
15  copied.
16      Q.  Okay.  Do you remember what you told
17  Stephanie or Asima?
18      A.  What I told them?
19      Q.  Yes.
20      A.  Some of the same things what I said here,
21  about what I knew, when I knew it, did I know what was
22  going to happen at that meeting on the 23rd.  And I
23  didn't.  I wasn't involved at that level.  And they
24  just said -- Stephanie and Asima just said, well, tell
25  the truth, tell what you know.

Page 39

1      Q.  Okay.  You mentioned you sent an e-mail to
2  Patricia Dunleavy about this subpoena?
3      A.  Yes.
4      Q.  Do you still have that e-mail?
5      A.  I might have.  It was a very short e-mail.
6  I just wanted to talk.  I said "subpoena" was the, I
7  think, the topic, and I said I have some questions,
8  can we talk.  And the next morning was when she got to
9  her office and got my e-mail and contacted me and said
10  she would be free at 11, would I be free at 11.  And I
11  said yes, I would.
12          That was the extent of the e-mail.  I just
13  wanted to know -- well, the other thing, there was a
14  check attached for $83.91 or something like that.  I
15  didn't understand that because I hadn't read the
16  entire subpoena at that point where it does make clear
17  that you will be paid, but I wanted to know what that
18  was about, why would I receive a check.  Although now
19  that I've driven 40 miles one way, I understand why I
20  received the check.
21      Q.  You can deposit that check.
22      A.  You know, just would I just be giving a
23  deposition without ever -- without any kind of what
24  was going to be -- any way to know what kinds of
25  questions might be asked.

Page 40

1      In my opinion my role was relatively minor.
2  And I couldn't imagine why what I would have to say
3  would be important, but I now see why it's important
4  in terms of trying to get the entire picture of what
5  was going on.  But again I obviously don't know the
6  entire picture, everything that was happening outside
7  my office.
8      Q.  Okay.  Would you mind sending me and Jackson
9  Lewis a copy of the e-mail that you sent to Patricia
10  later?
11      A.  Yes.  I can do that if I can find it.  I
12  will also e-mail you if it has been deleted.  I don't
13  know why I would delete it, but I will check, yes.
14  And I can send a copy to both of you.
15      MS. AHMAD:  I have a copy of that e-mail,
16  and we'll be producing it today along with --
17      MR. COHEN:  Okay.
18      THE WITNESS:  Oh, okay.
19      MR. COHEN:  Okay.  All right, Dr. Foley, I
20  have nothing further.
21      THE WITNESS:  Okay.
22      MR. COHEN:  But if Asima has anything,
23  it's her turn.
24      MS. AHMAD:  Thank you.  I just have a few
25  quick follow up questions, Dr. Foley.

Page 41

1          EXAMINATION
2  BY MS. AHMAD:
3      Q.  First, thank you again for taking the time
4  to come here today.  I know that you mentioned that
5  you don't recall the specifics of who came to your
6  office and what comments were made once this video was
7  posted and went around campus.  But do you recall the
8  general feelings people had towards the video?
9      A.  The general feelings?
10      MR. COHEN:  Objection to form.  You can
11  answer.  You can answer.  I just made an
12  objection.
13      A.  Okay.  I don't know anyone who was happy
14  about it.  Everyone was pretty much disgusted.  They
15  found it offensive, disrespectful.
16  BY MS. AHMAD:
17      Q.  Okay.  And did you ever hear any complaints?
18  I know you mentioned a few earlier.  Do you recall the
19  specific complaints about this cartoon that was posted
20  on Dr. Fagal's door and what the cartoon was?
21      A.  The cartoon -- the one cartoon that I
22  recall, and I think there were several, but the one I
23  recall that had come to my office from somewhere, a
24  student expressing concern, if not outrage, it
25  pictured an Islamic terrorist at the gates of heaven

Page 42

1 waiting for his 72 virgins. And the 72 virgins were
2 depicted as about 10 or 12 nuns, all of whom had
3 shotguns. And that was going to be, I guess, the
4 terrorist's future.
5      Q.   Okay. And what was the complaint you
6 received from the student?
7      A.   The student, that it created, well, a
8 hostile learning environment; that it was offensive;
9 that he was, in fact, Muslim; and seeing that cartoon
10 made him uneasy at Marywood, uncomfortable, and
11 uncertain about where we were as an institution.
12      Q.   Did you speak to Dr. Fagal about the
13 cartoon?
14      A.   I think Peter Cimbolic told me to tell Fred
15 to take it down. That was my recollection, but then I
16 think Peter said he was going to go do it. That was
17 several months even before this situation. I'm not
18 exactly sure of the timeline there.
19           So I may have been the one who was asked to
20 go tell Fred to remove it. And it might have been
21 Dr. Cimbalic himself, who was Vice President For
22 Academic Affairs when that happened, which would have
23 been a couple years before what transpired in November
24 and December of 2011.
25      Q.   Okay. And I think my last question would be

Page 43

1 regarding what transpired in November, December 2011,
2 did you agree with the decision of Sister Munley to
3 terminate Professor Fagal?
4      A.   Yes.
5           MS. AHMAD: That's all I have.
6           RE-EXAMINATION
7 BY MR. COHEN:
8      Q.   One follow up question, Dr. Foley.
9      A.   Yes.
10      Q.   A few moments ago I think you said that you
11 don't know anybody that wasn't disgusted by the video
12 that Professor Fagal posted.
13      A.   I recall the general sentiment being one of
14 disgust.
15      Q.   Okay. Did you talk to every faculty member
16 on campus about the video?
17      A.   No.
18      Q.   Approximately how many?
19      A.   A dozen maybe.
20      Q.   Okay. And approximately how many professors
21 were on staff at Marywood at the time?
22      A.   150 full time, maybe 145. Between 140 and
23 150 full time faculty members.
24      Q.   Okay. So would it be fair to say that you
25 don't really know what the general consensus of

Page 44

1 professors was if you only spoke to 12 out of 150?
2      A.   In terms of the 150, no, I can't say what
3 150 people thought. I don't even know if 150 people
4 saw the video.
5      Q.   Okay. Thank you for coming in today. I'm
6 finished. I think under the rules that you will get a
7 copy of the transcript, and you'll have 30 days to
8 review the transcript of today's deposition and to
9 make any corrections. Am I right, Joan?
10           THE COURT REPORTER: Only if he chooses to
11 read and sign. He can waive that as well.
12           MR. COHEN: All right. You're free to go.
13           THE COURT REPORTER: What would you like
14 for your transcripts?
15           MR. COHEN: The cheapest option. I don't
16 need an expedited. I don't need a hard copy. An
17 electronic copy is fine. Best if we can get it
18 on PDF.
19           MS. AHMAD: The Minuscript version as well
20 and electronic.
21           (Signature is reserved.)
22           (DEPOSITION CONCLUDED AT 11:26 A.M.)
23
24
25

Page 45

1 CERTIFICATE OF NOTARY - COURT REPORTER
2 STATE OF NORTH CAROLINA      )
3 COUNTY OF WAKE               )
4           I, JOAN DALY SNOVER, RMR/CRR, Notary
5 Public in and for the above county and state, do
6 hereby certify that the deposition of the person
7 hereinbefore named was taken before me at the time and
8 place hereinbefore set forth; that the witness was by
9 me first duly sworn to testify to the truth, the whole
10 truth and nothing but the truth; that thereupon the
11 foregoing questions were asked and foregoing answers
12 made by the witness which were duly recorded by me by
13 means of stenotype; which is reduced to written form
14 under my direction and supervision, and that this is,
15 to the best of my knowledge and belief, a true and
16 correct transcript.
17      I further certify that I am neither of counsel
18 to either party nor interested in the events of this
19 case. Today is the 12th day of March 2016.
20
21
22           Joan Daly Snover, RMR/CRR
             Notary Public, Wake County,
23           North Carolina.
             Notary No. 201214400003
24           Expiration Date:  5/17/2017
25

02/26/2016 Michael A. Foley, PhD

Pages 46..48

**Page 46**

```
 1              WITNESS'S CERTIFICATE
 2
 3           I, MICHAEL A. FOLEY, do hereby certify
 4    that I have read and understand the foregoing
 5    transcript and believe it to be a true, accurate, and
 6    complete transcript of my testimony, subject to
 7    the attached list of changes, if any.
 8
                    _____
 9                    MICHAEL A. FOLEY
10
11        This deposition was signed in my presence by
12    _____, on the _____ day of
13    _____, 2016.
14
15
                    _____
16                    Notary Public
17
18    My commission expires:
19
20
21
22
23
24
25
```

**Page 47**

```
 1    CaseWorks, Inc.
      7622 Bentley Rd                    (Page 1 of 2)
 2    Greensboro, North Carolina 27409
 3         E R R A T A   S H E E T
 4    Re: Frederick F. Fagal, Jr. v. Marywood University
 5    Deposition of: MICHAEL A. FOLEY
 6         Please read this transcript with care, and if
      you find any corrections or changes you wish made, list
 7    them by page and line number below.   DO NOT WRITE IN
      THE TRANSCRIPT ITSELF.  Return the
 8    Certificate and Errata Sheet to this office after
      it is signed.  We would appreciate your prompt
 9    attention to this matter.
             To assist you in making any such corrections,
10    please use the form below.  If supplemental or
      additional pages are necessary, please furnish same and
11    attach them to the errata sheet.
12    Page _____ Line _____ should
13    read:_____
14    Page _____ Line _____ should
15    read:_____
16    Page _____ Line _____ should
17    read:_____
18    Page _____ Line _____ should
19    read:_____
20    Page _____ Line _____ should
21    read:_____
22    Page _____ Line _____ should
23    read:_____
24    Page _____ Line _____ should
25    read:_____
```

**Page 48**

```
 1    Page _____ Line _____ should      (Page 2 of 2)
 2    read:_____
 3    Page _____ Line _____ should
 4    read:_____
 5    Page _____ Line _____ should
 6    read:_____
 7    Page _____ Line _____ should
 8    read:_____
 9    Page _____ Line _____ should
10    read:_____
11    Page _____ Line _____ should
12    read:_____
13    Page _____ Line _____ should
14    read:_____
15    Page _____ Line _____ should
16    read:_____
17    Page _____ Line _____ should
18    read:_____
19    Page _____ Line _____ should
20    read:_____
21    Page _____ Line _____ should
22    read:_____
23    Page _____ Line _____ should
24    read:_____
25
```