# Exhibit 49

EXHIBIT
49

| | |
|---|---|
| **From:** | Sr. Gail Cabral IHM PhD |
| **Sent:** | Tuesday, March 6, 2012 4:27 PM |
| **To:** | Dr Patricia Sullivan Arter; Bill Conlogue; Dr Erin A Sadlack; Sr. Gail Cabral |
| **Subject:** | Fwd: Fred Fagal Grievance |
| **Attachments:** | E-mail_from_F.D._Ferrese_to_F.F._Fagal_dated_1-24-2012[1].pdf; E-mail_from_F.F._Fagal_to_Marywood_Faculty_dated_1-13-2012[1].pdf; Letter_from_J.Z._Cohen_to_President_Anne_Munley_dated_2-2-2012[1].pdf; Letter_from_W.J._Anthony_to_J.Z._Cohen_dated_2-9-2012[1].pdf; Grievance_of_Dr._Frederick_F._Fagal,_Jr._-_Final[1].docx |

---------- Forwarded message ----------
From: **Frederick Fagal** <fffagal@yahoo.com>
Date: Wed, Feb 22, 2012 at 4:37 PM
Subject: Fred Fagal Grievance
To: "cabral@marywood.edu" <cabral@marywood.edu>


Dear Sr. Gail:

I received your e-mail of February 17, 2012. I have not heard from you with regard to making contact with the Faculty Grievance Committee Chair. The next step, I understand from the Faculty Grievances and Appeals policy, is that "[t]he Chair should be provided with a written statement setting forth, in detail, the nature of the grievance or appeal and identifying the person(s) or body against whom the grievance or appeal is directed; this document may also include a proposal for resolving the issue." Below I have written such a statement. I ask that you kindly forward it to the Faculty Grievance Committee Chair. If you have any questions or require additional information, please do not hesitate to ask.
Sincerely,

Fred

Frederick F. Fagal, Jr.
Associate Professor of Economics
Marywood University


**Grievance of Dr. Frederick F. Fagal, Jr. Against President Anne Munley**
    I am hereby filing a formal grievance against President Anne Munley pursuant to Marywood University's Faculty Grievances and Appeals ("FGA") policy. The most current version of all of Marywood's policies are available on the University's web site. See Policies and Procedures Manual – Marywood University, http://www.marywood.edu/policy ("PPM").
    My grievance is based on the following violations of Marywood's Progressive Discipline policy.
    **1.** *President Munley improperly suspended me.* At 8:45 am the morning of January 23, 2012, Dean Michael Foley of the College of Liberal Arts and Sciences stopped by my office. He told me that President Munley was summoning me to her office for a 9:00 am meeting. Barely time to catch my breath. Once in her office, she asked me if I was responsible for posting a two-part video on YouTube. My answer was "yes." This was clear as I had linked to the videos in an e-mail to Marywood's faculty dated January 13, 2012. At the end of my meeting with President Munley, she told me that I was

DEF003295

suspended with pay; that I should turn in my University ID and keys to Pat Dunleavy; and that I should clean out my office. President Munley's suspension was improper on at least two procedural grounds:

    **a.**  Marywood's Progressive Discipline Policy states that "[t]he faculty member may be suspended by the Vice President for Academic Affairs at any time during the proceedings involving him or her." PPM, "Progressive Discipline." Nowhere does the Progressive Discipline Policy authorize Marywood's President to suspend a faculty member. To my knowledge, the Vice President for Academic Affairs (Dr. Alan M. Levine) had nothing to do with my suspension. He was not at the meeting. My attorney, Jonathan Z. Cohen, Esquire, wrote a letter to President Munley dated February 2, 2012 pointing this out. In response, President Munley and her/Marywood's outside counsel, William J. Anthony, Esquire, wrote letters on February 8 and 9, respectively. Neither letter denied what Mr. Cohen pointed out.

    **b.**  Marywood's Progressive Discipline Policy further states that "[s]uspension is justified if immediate harm to the faculty member or others is threatened by the person's continuance in the faculty position." PPM, "Progressive Discipline." To my knowledge, President Munley has never alleged that I have ever been an "immediate harm" to anybody. Mr. Cohen's letter of February 2, 2012 pointed this out. In response, neither President Munley nor Mr. Anthony disputed this.

**2.**  *President Munley improperly moved to terminate my employment and tenure.* At 1:11 PM on January 24, 2012, I received an e-mail from Frances D. Ferrese. As you know, Ms. Ferrese is President Munley's assistant. Ms. Ferrese's e-mail attached a letter from President Munley and five (5) other documents. The first sentence of President Munley's letter begins: "In follow up to our meeting yesterday, I am writing to inform you that I am recommending that your tenure and employment with Marywood be terminated immediately..." President Munley's move to terminate my employment and tenure was improper for at least two procedural reasons:

    **a.**  Marywood's Progressive Discipline Policy contains one sentence addressing dismissal: "If remedial actions(s) taken during the suspension does not sufficiently resolve the issues that lead to the suspension, the university may move towards dismissal of the faculty member." PPM, "Progressive Discipline." To my knowledge, no "remedial actions" were taken during my suspension. As stated above, my suspension commenced at some point during the morning of January 23, 2012. President Munley's letter moving to terminate me arrived at 1:11 PM on the following day. Again, Mr. Cohen's letter of February 2, 2012 points this out. In response, neither President Munley nor Mr. Anthony disputed this fact that no remedial actions were proposed or taken.

    **b.**  Marywood's Progressive Discipline Policy suggests that only the Vice President for Academic Affairs may recommend dismissal: "Having received a written recommendation for either suspension or dismissal *from the Vice President for Academic Affairs*, the President of the University sends a written communication to the faculty member, stating with reasonable particularity the basis for suspension or dismissal and offering, if requested by the faculty member within 10 days, to convene a tenured faculty ad hoc committee to consider the matter, to render confidential advice, and thereby to effect a remedy if possible." PPM, "Progressive Discipline" (emphasis added). I am not aware of any evidence that Dr. Levine played a role in recommending my dismissal.

**3.**  *My request to convene an ad hoc committee to appeal the suspension has not been accepted.* Marywood's Progressive Discipline policy states that "[f]aculty members have the right to convene an ad hoc committee in order to appeal either a decision to suspend the faculty member or a decision to dismiss the faculty member." PPM, "Progressive Discipline." This policy also states: "Should a faculty member request that such a committee be convened twice (i.e., once for suspension and once for dismissal), the membership of the committee may be similar or different..." PPM, "Progressive Discipline." By my attorney's letter of February 2, 2012, I elected to convene an ad hoc committee to appeal President Munley's decision to suspend me. President Munley's letter in response dated February 8, 2012 ignored my request. Mr. Anthony's letter to my attorney dated the next day states that

DEF003296

"as a result of [Dr. Fagal's] first breach, he is not entitled to pick and choose which policies and procedures he believes will suit him best." Mr. Anthony more than confirmed President Munley's ignoring of my request. Mr Anthony made this stunning assertion: "As a result of Dr. Fagal's breach of contract Marywood had no further contractual obligations to him."

I would ask that you closely consider Marywood's assertion that it owes no further contractual obligations to me. In effect, this means that Marywood has suspended its entire Policies and Procedures Manual—including its detailed disciplinary apparatus—with respect to me. The natural consequence of Marywood's bald assertion is, of course, that the University believes that the Faculty Grievance Committee need not fulfill its function with respect to me either. Every faculty member should find this consequence as offensive as I do. Given the conflicting messages that you are likely receiving, I strongly recommend that the Faculty Grievance Committee hire its own independent counsel.

My proposal for resolving this issue is that the Faculty Grievance Committee strongly recommend that President Munley comply with the Progressive Discipline policy, which she personally revisited and approved in October 2011. Under that policy, President Munley should rescind her suspension and her letters recommending the termination of my employment and tenure—as she lacked the authority to take either step. Short of this, President Munley should permit me to convene an ad hoc committee to appeal her decision to suspend me. That appeal should obviously take place prior to any hearing regarding President Munley's recommendation to terminate me given that the propriety of this recommendation depends upon the propriety of my suspension. See PPM, "Progressive Discipline."

For your convenience, I have attached PDF copies of my e-mail of January 13, 2012 (with all attachments); Ms. Ferrese's e-mail of January 24, 2012 (with all attachments); my attorney's letter to President Munley dated February 2, 2012; and Mr. Anthony's letter dated February 9, 2012 (which attached President Munley's letter of February 8, 2012.).

DEF003297

**Subject:**  Important Information from Sister Anne

**From:**  Frances D Ferrese (ferrese@maryu.marywood.edu)

**To:**  fffagal@yahoo.com;

**Date:**  Tuesday, January 24, 2012 1:11 PM

Dr. Fagal,

Please see attached documents from Sister Anne

--
Frances D. Ferrese
Executive Secretary to the President
Marywood University
Immaculata Hall #107
2300 Adams Avenue
Scranton, PA  18509-1598
Phone:  570-348-6231
FAX:  570-340-6014
E-mail:  ferrese@marywood.edu

DEF003298



MARYWOOD UNIVERSITY
SCRANTON, PA 18509-1598
TEL: (570) 348-6231
FAX: (570) 340-6014
ANNEMUNLEY@MARYWOOD.EDU
www.marywood.edu

OFFICE OF THE PRESIDENT

January 24, 2012

Dr. Frederick Fagal
17 East Lake Street
Skaneateles NY 13152

Sent via email (fffagal@yahoo.com), certified mail, regular mail

Re: Recommendation for Termination

Dear Dr. Fagal:

In follow up to our meeting yesterday, I am writing to inform you that I am recommending that your tenure and employment with Marywood be terminated immediately; the University will, however, pay you the remainder of your 2011-12 Agreement and keep you on benefits through August, 2012. This recommendation comes after much consideration of and reflection on your actions which I find to be highly offensive and directly contrary to Marywood's Mission and Values, your tenure agreement and your obligation as an employee of this University to conduct yourself in accordance with our policies and values.

As you know, our values include:

- A commitment to spiritual, ethical and intellectual values in the context of a faith community.
- Respect for the value of each human being, for diversity in the context of vibrant community, and for the earth and all creation.

After reviewing the subtitles you authored and transposed onto a film depicting Adolf Hitler and the Nazi regime, I find that you deliberately and maliciously violated our principles and your commitment to this University by: 1) depicting Executive Officers and me in an offensive and hostile light, including making highly inappropriate comments about family members of these individuals; 2) used sexually explicit, offensive and insulting language; and 3) portrayed an image of Marywood in a manner that was an affront to the University community as a whole. As a result, I am recommending that your tenure and employment be terminated and provide you the following Statement of Charges:

- Violation of Tenure Policy which includes "a strong acceptance by the individual (requesting tenure) of the mission, goals and objective of the University";
- Violation of Civil Rights Policy (re in particular harassment of Dr. Levine and his family and other personal attacks on executive officers) which states that "Marywood

*An education inspired by the Sisters, Servants of the Immaculate Heart of Mary.*

DEF003299

- Violation of Professional Ethics Policy which states that professors "do not discriminate against or harass colleagues"; and
- Violation of the University's Mission and Values as well as the principles of collegiality.

I have attached a copy of your 2011-12 Letter of Agreement and the above policies so that you have them. They can also be found on our website.

As a result of this recommendation, I am prepared to send this statement of charges to a duly appointed faculty committee for review along with the emails and videos you forwarded to members of our community. In order to do so, I would ask that you please sign and return to me the attached authorization granting the University permission to do so.

Please respond no later than Friday, February 3, 2012. Should you choose not to grant permission or would like to decline the offer to have a faculty committee review my recommendation, I will finalize my recommendation.

If you have any questions regarding this matter, you may direct them to me or to Dr. Dunleavy.

Very truly yours,

Sister Anne Munley IHM

Sister Anne Munley, IHM
President

Enclosures:
2011-12 Letter of Agreement
Tenure Policy
Civil Rights Policy
Conditions of Computer Use Policy
Academic Freedom Policy
Professional Ethics Policy
Marywood University Mission and Core Values
Release of Personal Information Authorization Form



# Marywood
U N I V E R S I T Y

Tenured Faculty
Letter of Agreement
2011-2012 Academic Year

May 10, 2011

Dr. Frederick F. Fagal, Jr.
17 East Lake Street
Skaneateles, NY 13152

Dear Dr. Fagal, Jr.,

This Letter of Agreement is offered to you for the 2011-2012 Academic Year.  In accord
with the agreed upon Salary Plan, your salary reflects a 2.5% annual increase of
$1,858.00.

Other terms of this agreement are as follows:

| | |
|---|---|
| Term: | 8/22/2011 to 5/18/2012 |
| Type of Appointment: | Full-Time (9 months) Tenure |
| Rank: | Associate Professor |
| College: | Liberal Arts & Sciences |
| Department: | Social Science |
| Responsible to: | Department Chairperson |
| Salary: | $76,196.00 |

Faculty members must apply for benefits other than Social Security and Worker's
Compensation through the Human Resources Department.  Full-time faculty benefits include
health, dental, long-term disability, group life, and accidental death and dismemberment
under the Flexible Benefits Plan.  Elections are made by June 1 of each year for the
subsequent fiscal year beginning July 1.  Retirement contributions by the University vary
based on the contribution level selected by the faculty member.  The appropriate
government forms, including Form W-4 and I-9, must be completed and on file in the Human
Resources Department.

This agreement is valid for one month from the date of this letter.  The original copy of
this Letter of Agreement must be signed and returned to my office by June 10, 2011.  If
you do not return the original signed copy by June 10, it will be assumed that you are
not returning to Marywood.  On behalf of the Board of Trustees and myself, I express our
gratitude for your dedicated service and commitment to Marywood University.  May God
continue to bless you.

Sincerely,

*Sister Anne Munley IHM*

Anne Munley, IHM, Ph.D.
President

Agreed this _25_ day of _May_, 2011

Signature _Frederick F. Fagal, Jr._

DEF003301



# Marywood
UNIVERSITY

# Policies and Procedures Manual: Tenure

⊡

## Policy Statement

Tenure is a term designating permanent and continuous appointment for a full-time faculty member. It implies a mutual commitment on the part of the faculty member and the University and cannot be taken lightly.

Once tenure is granted, it will be discontinued only for grave reason, which may include moral turpitude, flagrant abuse of academic freedom, or professional incompetence. In addition, as expressed in its *Retrenchment of Faculty* policy, the University may be required to discontinue tenure because of severe financial exigencies or reorganization of the department and/or curriculum resulting in lack of need.

The commitment of a faculty member who requests tenure is as deep and binding on the faculty member as it is on the University. Just as the conferring of tenure by the University recognizes the competence of an individual faculty member, submission to the University of an application for tenure suggests a strong acceptance by that individual of the mission, goals and objectives of the University. The request represents a commitment to work jointly with faculty, students, administrators and staff for the growth and welfare of the University. It is a commitment to devote one's energies to continued personal development and continued high levels of achievement as a member of the Marywood academic community. It is an assertion of career goals; it is expected that a faculty member will not lightly withdraw from this relationship.

The probationary period shall not exceed seven years of full-time teaching/librarianship at Marywood, with application for tenure being made in the sixth year. Successful candidates receive a tenure contract for the seventh year; unsuccessful candidates receive a one-year terminal contract for the seventh year. Faculty members on leave during the probationary period must follow the University's policy on leaves. Interrupted service at Marywood University and also prior service at another regionally accredited, four-year college or university may be credited toward the fulfillment of the probationary period. Such credit will be determined by the Vice President for Academic Affairs.

Tenure occurs by action of the President of the University.

## Definitions

This revised *Tenure* policy is effective January 1, 2012. Faculty members whose date of hire as full time is before January 1, 2012, may choose the policy in effect prior to that date if they wish.

## Procedures

*Procedures for Tenure Consideration*

DEF003302

A candidate for tenure must submit a *Notification of Application for Tenure* form and submit relevant data and documentation in the sixth year of the probationary period, according to the deadline dates noted below. The candidate for tenure is encouraged to meet with the dean and chairperson during the summer prior to submission to discuss the application. The intent of this review is to afford the dean and chairperson the opportunity to offer the candidate informal guidance that will help the candidate to make the strongest case possible for tenure. The candidate is also encouraged to meet with the tenured members of the department one year before submission of the application to identify areas of strength and weakness in meeting the tenure criteria. In applying these tenure procedures for faculty librarians, the Director of Library Services acts in place of both dean and department head. If the candidate decides to withdraw the application, he/she must do so by October 17 or February 21.

(A faculty member who is hired to begin work at Marywood in the spring semester submits a tenure application in the spring of his/her sixth year. For the spring semester dates of submission of the application, refer to the procedures in the *Promotion of Faculty Members* policy.)

If a due date below falls on a weekend or a holiday, the due date becomes the next business day.

1. By September 1 or January 3, the faculty member initiates the process by submitting the *Notification of Application for Tenure* form to the Chair of the Rank and Tenure Committee. The Chair will be responsible for providing a list of candidates who are applying for tenure to the Vice President for Academic Affairs, the appropriate dean(s), and the head of the applicant's academic department.

2. By September 21 or January 21, the applicant submits paper copies of the *Application for Tenure* form, together with an up-to-date curriculum vitae and a narrative not to exceed an equivalent of 100 printed pages in 12-point font to the head of the applicant's department. (If the applicant is the department head, the senior member of the department functions as the department head during these procedures.) The candidate may submit supplementary materials in the form of appendices. The application must be structured based on how the tenure criteria section of the handbook is organized. The document must be numbered sequentially, include definitions of terms related to one's discipline, and carefully proofread. All annual evaluations of the candidate written by the appropriate dean and the department head must be included in the application materials. The Vice President's report to the candidate on the results of his/her 3 year pre-tenure review must be included.

3. The department head notifies the department's full-time, tenured and tenure-track faculty members that the application is available for their review. The Chair of the Rank and Tenure Committee notifies the tenured members of the applicant's department of their responsibility to complete the *Confidential Colleague Evaluation Form*. Each tenured faculty member is to submit the *Confidential Colleague Evaluation Form* to the Chair of the Rank and Tenure Committee by September 28 or January 28.

If a candidate for tenure is the chair of a department, the most senior tenured member of the department acts as chair during the tenure process. If no senior tenured faculty member is available, the Rank and Tenure Committee, in consultation with the appropriate dean and the candidate, chooses a senior tenured faculty member from another department to act as chair.

Once an untenured faculty member submits a pre-tenure file to the Rank and Tenure Committee, he/she completes by September 28 or January 28 the *Confidential Colleague Evaluation* form for tenure applications that originate in his/her department.

4. By October 7 or February 7, the department head submits to the dean of the appropriate college all application materials and a recommendation letter that is based on a thorough review of the

DEF003303

application documents. By this date, the department head also submits to the applicant a copy of the same recommendation letter.

5. By October 17 or February 21, the appropriate dean or the Director of Library Services reviews the evaluation of the department head when applicable and submits to the Chair of the Rank and Tenure Committee a recommendation letter and all application materials. The recommendation letter is to be based on a thorough review of the application materials.

6. The Rank and Tenure Committee evaluates the application and submits its recommendation, vote, and materials upon which the recommendation was based to the Vice President for Academic Affairs.

7. Having received all materials by November 21 or March 20, the Vice President for Academic Affairs evaluates the application with its accompanying documents, and submits a recommendation with the materials on which it is based to the President of the University. This includes the Rank and Tenure Committee's recommendation and vote, all other recommendations, and all application and evaluative documentation.

8. Having received the documents by January 10 or April 15, the President of the University reviews them and renders a final decision. The President or the Vice President for Academic Affairs informs the faculty member of the status of the application, including the recommendations of all reviewing bodies. In the case of a negative decision, the criteria not met are communicated to the applicant.

All materials submitted by the applicant will be returned at the conclusion of the process.

### *Criteria*

The candidate for tenure must:

1. have completed all formal educational requirements in the relevant academic field, judged necessary to meet the needs of the department and the University;
2. have achieved at least the rank of Associate Professor or, if currently an Assistant Professor, must apply for promotion to Associate Professor and Tenure at the same time and may do so with the submission of a single document using the tenure criteria;
3. have evidenced an expertise needed by one's department or a related department, which may include developing new courses and teaching a diversity of courses as needed, or in the case of faculty librarians by developing new library services and initiatives;
4. have demonstrated consistently effective teaching/librarianship ability as attested to by the evaluation procedures of the University;
5. have provided service to students extending beyond the teaching/librarianship function to student advisement and direction;
6. have evidenced accomplishment and promise in research, scholarship, publication, and/or creative achievement;
7. have evidenced membership and involvement in the activities of professional societies;
8. have demonstrated significant involvement in community service related to the mission, goals or core values of the University, and the University community's academic, cultural, administrative, and student affairs.

### *Procedures for Pre-Tenure Review*

A pre-tenure review system evaluates the first three years of each tenure-track faculty member's

DEF003304

progress toward tenure.

The candidate submits pre-tenure review materials in the fall of his/her fourth year. The candidate must notify the Chair of the Rank and Tenure Committee by September 1 or January 3 of his/her intent to submit materials. The candidate must submit the materials to the appropriate department chairperson by September 10 or January 12. By September 20 or January 22 the department chair submits to the appropriate dean all pre-tenure materials and an evaluation letter based on a thorough review of the pre-tenure documents. By October 1 or February 1 the Dean submits all materials to the Chair of Rank and Tenure along with an evaluation letter based on a thorough review of all pre-tenure materials.

Pre-tenure review materials should be no more than 35 pages (12-point font). The document should be numbered sequentially, include definitions of terms related to one's discipline, be proofread carefully and contain no appendices.

The pre-tenure portfolio should include:

1. a description of the pre-tenure candidate's progress to date in fulfilling each of the criteria for tenure (organized according to the tenure criteria section above);
2. the dean's detailed evaluation, or in the case of library faculty, the Director of the Library's evaluation of the pre-tenure candidate's portfolio, which must include a summative statement of the pre-tenure candidate's progress toward tenure;
3. the department chairperson's detailed evaluation of the pre-tenure candidate's portfolio, which must include a summative statement of the pre-tenure candidate's progress toward tenure;
4. tables that compile the pre-tenure candidate's teaching evaluations, including department, college, and University teaching evaluation means;
5. a self-assessment of the pre-tenure candidate's scholarly/creative work (e.g., selectivity of venues, impact of articles, citations);
6. the pre-tenure candidate's reflection on his/her teaching/librarianship;
7. the pre-tenure candidate's reflection on his/her service;
8. the pre-tenure candidate's description of his/her scholarship/creative activity agenda/plan.

Pre-tenure faculty members must structure their annual self-evaluations based on guidelines for the tenure application portfolio as described in the *Tenure* policy.

Deans and chairs must organize their responses to pre-tenure faculty members' self-evaluations and pre-tenure portfolios based on how the tenure section of handbook is organized. These responses must take into account departmental standards for scholarship/creative activity.

Model pre-tenure files are available in the office of the Vice President for Academic Affairs for the pre-tenure candidate's review.

### *Pre-Tenure Review Procedures*

If a due date below falls on a weekend or a holiday, the due date becomes the next business day.

1. By September 1 or January 3, the faculty member initiates the process by submitting the Notification of Submission of Pre-Tenure Materials form to the Chair of the Rank and Tenure Committee. The Chair will be responsible for providing a list of faculty members who are submitting pre-tenure materials to the Vice President for Academic Affairs, the appropriate dean(s), and the head of the individual faculty member's academic department.

DEF003305

2. By September 10 or January 12, the faculty member submits to the department chairperson · pre-tenure review materials of no more than 35 pages (12-point font). (If the applicant is the department head, the senior member of the department functions as the department head during these procedures.) The submitted materials must be structured based on how the tenure criteria section of the handbook is organized. The document must be numbered sequentially, include definitions of terms related to one's discipline, and carefully proofread. All annual evaluations of the candidate written by the appropriate dean and the department head must be included as part of the 35-page application.

3. By September 20 or January 22, the department head submits to the dean of the appropriate college all pre-tenure materials and an evaluation letter that is based on a thorough review of the pre-tenure documents.

4. By October 1 or February 1, the appropriate dean or the Director of Library Services reviews the evaluation of the department head when applicable and submits to the Chair of the Rank and Tenure Committee an evaluation letter and all pre-tenure materials. The evaluation letter is to be based on a thorough review of the pre-tenure materials.

5. The Rank and Tenure Committee evaluates the pre-tenure materials and submits its evaluation and the materials upon which the evaluation was based to the Vice President for Academic Affairs.

6. Having received all materials by October 21 or February 21, the Vice President for Academic Affairs evaluates the pre-tenure materials and accompanying documents.

7. By November 15 or March 15, the Vice President for Academic Affairs responds to the faculty member with an evaluation letter that is based on a thorough review of the pre-tenure material.

## Related Policies

- Promotion of Faculty Members
- Evaluation of Faculty Members
- Contractual Agreements with Faculty Members

## History

07/01/89 - Reaffirmed with publication of Faculty Manual

04/16/99 - Sentence re degrees from various institutions moved to *Qualifications for Appointment to Rank* policy as recommended by the Policy Committee of the University

03/22/00 - Reference to retirement age deleted at Executive Committee meeting of the Policy Committee of the University

07/01/03 - Editorial changes made to reflect academic restructuring

04/20/04 - Revision approved by the President of the University as recommended by the Policy Committee of the University to include faculty librarians

12/02/05 - Revision approved by the President of the University as recommended by the Policy Committee of the University

01/19/08 - Amended to reflect that decisions on rank and tenure are made by the President of the University

05/02/08 and 5/05/08 - Revision approved by the President of the University as recommended by the Policy Committee of the University

06/24/09 - Revision approved by the President of the University as recommended by the Executive Committee of the Policy Committee of the University.

DEF003306

09/09/09 - Change in Procedure No. 4 recommended by the Provost and Vice President for Academic Affairs and approved.

05/04/10 - Revision approved by the President of the University as recommended by the Executive Committee of the Policy Committee of the University. 12/09/11 - Revision approved by the President of the University as recommended by the Policy Committee of the University.

12/09/11 - Revision approved by the President of the University as recommended by the Policy Committee of the University.

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu

DEF003307



# Policies and Procedures Manual: Civil Rights Policy

## Policy Statement

Marywood University declares and reaffirms a policy of equal educational and employment opportunity and non-discrimination in the provision of educational and other services to the public. Marywood University does not condone and will not tolerate discrimination, harassment, or assault by any member of the Marywood community upon another individual, regardless of whether the action is based on race, sex, color, national or ethnic origin, age, creed, ancestry, religion, disability, or any other legally protected status. Marywood University will make reasonable accommodations to known physical or mental limitations of otherwise qualified individuals with disabilities unless doing so would impose an undue hardship on the University. Any person who believes he or she may require such accommodation should contact the Assistant Vice President for Human Resources and Affirmative Action Officer.

Marywood University is committed to take all necessary steps to comply with any obligations it may have under Section 504 of the Rehabilitation Act, the Americans with Disabilities Act, and Title IX of the Civil Rights Act of 1964, as amended. These are explicit civil and legal applications of the formulation of beliefs already cherished in Marywood's religious commitment, objectives, and practices.

## Definitions

### *Sexual Harassment*

Marywood University adopts the following definition of sexual harassment based on the statement endorsed by the American Association of University Professors, revised June 1995, and considers it applicable to the entire Marywood community:

Sexual advances, requests for sexual favors, and other conduct of a sexual nature constitute sexual harassment when:

1. such advances or requests are made under circumstances implying that one's response might affect academic or personnel decisions that are subject to the influence of the person making the proposal; or
2. such speech or conduct is directed against another and is either abusive or severely humiliating and/or persists despite objection of the person targeted by the speech or conduct; or
3. such speech or conduct is reasonably regarded as offensive and substantially impairs the academic or work opportunity of students, colleagues, or co-workers. If it takes place in the teaching context, it must also be severe, pervasive, and not germane to the subject matter. The academic setting is distinct from the workplace in that wide latitude is required for professional judgment in determining the appropriate content and presentation of academic material.

### *Sexual Assault*

DEF003308

Sexual assault is defined as threats of, or deliberate physical contact of a sexual nature that is against another person's will or without consent. Examples of such behavior include, but are not limited to the following:

1. deliberate physical contact of a lewd type, including brushing, touching, grabbing, pinching, patting, hugging and kissing;
2. deliberate or reckless threats, actual or implied, of physical contact of a sexual nature that results in reasonable fear of sexual assault or physical harm;
3. coerced sexual activities, including rape. Rape, the most severe type of sexual assault, is legally defined in Pennsylvania as sexual intercourse that is coerced through force or threats of force, or with someone who is unconscious or with someone who is so mentally deranged or deficient as to be incapable of consent.

## Procedures

In furtherance of Marywood University's commitment to its duties and obligations, regular training on harassment, discrimination and related topics is provided for managers and supervisors in the Marywood community.

A list of Marywood University and community resources is available at the Human Resources Office.

## History

11/03/97 - Reaffirmed by Board of Trustees and Members of the Corporation
04/15/00 - Revision approved by the Board of Trustees

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu

DEF003309


# Marywood
U N I V E R S I T Y

## Policies and Procedures Manual: Conditions of Computer Use

## Policy Statement

Users of Marywood University computing facilities and services are held to high ethical standards. These conditions of use are based on the "spiritual, ethical and religious values and a tradition of service" expressed in the Mission Statement of the University. They underscore responsible, ethical, legal, and secure use of the campus-wide information system, and they derive from standards of common sense and common decency that apply to any shared resource. Responsibility extends to access, use of information, and distribution of data.

Marywood University administrators, faculty members, staff, and students may use the computers in all public computing facilities for research work and classroom assignments. Within the limitations of lab scheduling, students have priority over others for use of the facilities. Anyone who is not a currently enrolled student or employee may use the public facilities only at the discretion of University staff. Marywood University does not assume any liability for data loss. Those who use its computers do so at their own risk. Use of administrative computers is authorized with the permission of the appropriate department head.

Access to the Marywood computer system is not a right, but a privilege. When individuals log on to the University's computer system, they become responsible for adhering to University policy and state and federal laws governing individual privacy rights and confidentiality. The following list is not all-inclusive:

1. They respect the privacy of others by not attempting to access their accounts or tampering with their data.

2. They honor the intellectual rights of others by avoiding copyright infringement. This includes all Marywood University-owned computers, i.e., computers purchased with University funds.

3. They respect the policies and procedures of external networks, such as the Internet and systems that can be accessed via the Internet.

4. They do not make or use unauthorized copies of copyrighted or licensed programs or data. They only use authorized copies in full accord with the license agreement and national and international laws.

5. They do not attempt to bypass any security system in order to access privileged information or alter existing interfaces.

6. They do not develop or use programs, transactions, data, or processes that harass other users, infiltrate the system, or damage or alter data or software.

7. They do not develop or use mechanisms to alter University records.

DEF003310

8. They do not load or use personal or existing programs that affect the stability of systems, or use programs in an attempt to hinder or harass others.

9. They do not load software in classroom or computer labs, drop-in facilities, or other University-owned computers.

10. They use only their own User ID and password; rights to individual accounts are not transferable. All members of the University community are responsible for securing their passwords. All passwords are to be treated as confidential University information.

11. They respect the civil rights of others to an open and hospitable environment, regardless of race, sex, color, national or ethnic origin, age, creed, ancestry, religion, disability, or any other legally protected status, and with respect to sexual harassment including e-mailing inappropriate messages.

12. They do not use University owned or operated computers for a personal business.

13. They do not open or download pornographic materials or other materials that violate the Mission Statement of the University.

14. They use resources efficiently, avoiding printing large amounts of unnecessary information or downloading files for long periods of time.

15. They do not damage or alter equipment or software either physically or with a virus. They do not bring food or drink into computer labs, drop-in areas, near computers or computer-related equipment.

16. They abide by an instructor's requirements for computer use, including participation in an on-line course or in a listserv. They honor an instructor's right to allow or disallow use of a computer while the room is in use for instructional purposes. They do not disrupt a class that is being held in a computer lab or other technologically oriented facility, such as broadcast studio or video conferencing room.

Marywood University reserves the right to monitor and record any action performed while using the computer system. An audit trail is kept by system management software. If it is determined that use is contrary to Marywood policy, the appropriate department may examine the user's actions. If computing staff members suspect that any of these conditions are being violated, staff will initiate an investigation through the appropriate agency on campus. During the investigation, the account in question and all computing services may be suspended.

Privacy is neither a goal nor a condition of the University's computing system. There is not an expectation of privacy with regard to the information stored on University-owned or operated computers or, when applicable, other computers attached to the Marywood University network; and there are no specific laws, rules, or regulations that protect the privacy of a user's files, electronic mail messages, or any other information retrieved as a result of a person's session on the Marywood system.

While Marywood University respects an individual's privacy whenever possible, it does have and will exercise its right to examine a University-owned or operated computer and its contents if there is a reasonable indication that it has been used to download or store illegal materials, such as pornography or illegal software.

DEF003311

Marywood University reserves the right to report suspected criminal offenses to civil authorities. Institutional disciplinary charges may be filed in addition to civil actions.

These conditions of use have been established for the protection of all users but provide neither absolute security nor unqualified privacy.

## Definitions

**System** is used in a generic sense to refer to the aggregate of all hardware and software owned or licensed by Marywood University, including the network.

As a general matter, **copyright** infringement occurs when a copyrighted work is reproduced, distributed, performed, publicly displayed, or made into a derivative work without the permission of the copyright owner.

## Procedures

Contact the Office of Information Technology with questions about

- computer network support of instructional, research, and service activities;
- computer network support of administrative activities;
- voice and data network design and maintenance, desk-top computer repairs and installations.

## Related Policies

- Website Policy
- University Website Policy

## Related Committees

Technology Advisory Committee
Academic Computing Advisory Committee

## History

01/10/97 - Recommended to the President by the College Committee on Policy
02/06/97 - Approved by the President of the University with publication of The President's Memo
04/17/04 - Revision approved by the President of the University as recommended by the Policy Committee of the University
02/20/09 - Procedures changed in order to direct all questions to the Office of Information Technology

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

DEF003312

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu

DEF003313



# Policies and Procedures Manual: Academic Freedom

## Policy Statement

Marywood University affirms its commitment to academic freedom. In so doing, it reaffirms its commitment to the tradition of higher learning that is the heritage of both the Roman Catholic Church and the nation. It is a tradition grounded on respect for truth, social responsibility and individual rights. It is a tradition that posits freedom of inquiry, open discussion and unrestricted exchange of ideas as essential to the pursuit of knowledge.

Marywood University upholds academic freedom as a fundamental condition for research and dissemination of information. The University is a center of discourse where inquiry is encouraged and discoveries are verified and refined by the interaction of scholar with scholar. Marywood University respects the right and responsibility of its faculty and students to conduct research, to publish their findings, and to discuss ideas according to the principles, sources and methods of their academic disciplines. These principles, sources and methods, as they develop over time, are not external to their respective disciplines. The University sanctions and encourages investigation of unexplored phenomena, advancement of knowledge, and critical examination of ideas, old and new. The University accepts the responsibility of protecting both teacher and student from being forced to deny truth that has been discovered or to assert claims that have not been established in the discipline. Teachers are entitled to freedom in the classroom in discussing their subject, but they should be careful not to introduce into their teaching material matter that has no relation to their subject.

Where the faculty is concerned, academic freedom presupposes, first of all, personal integrity in dealing with students, peers and officers of the University. Second, it presumes scholarly competence, observance of the professional standards of one's discipline, commitment to the stated mission of the University, and openness to having one's ideas and findings subjected to the judgment of one's peers. Third, faculty members have a responsibility as professional scholars to be accurate and judicious in their public statements, and respectful of the opinions and responsibilities of others.

## Related Policies

- Professional Ethics
- Evaluation of Faculty Members
- Faculty Status

## Related Committees

DEF003314

Institutional Review Board for the Protection of Human Participants

## History

12/01/79 - Reaffirmed with publication of *Faculty Manual*
07/01/93 - Introduction and postscript added
07/01/03 - "Human Subjects" changed to "Human Participants"
02/19/10 - Revision approved by the President of the University as recommended by the Policy
Committee of the University

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu

DEF003315



# Policies and Procedures Manual: Professional Ethics

Ｐ]

## Policy Statement

The American Association of University Professors recognizes that membership in the academic profession carries with it special responsibility. The Statement on Professional Ethics that follows sets forth general standards assumed by members of the profession.

Professors, guided by a deep conviction of the worth and dignity of the advancement of knowledge, recognize the special responsibilities placed upon them. Their primary responsibility to their subject is to seek and to state the truth as they see it. To this end, professors devote their energies to developing and improving their scholarly competence. They accept the obligation to exercise critical self-discipline and judgment in using, extending, and transmitting knowledge. They practice intellectual honesty. Although professors may follow subsidiary interests, these interests must never seriously hamper or compromise their freedom of inquiry.

As teachers, professors encourage the free pursuit of learning in their students. They hold before them the best scholarly and ethical standards of their discipline. Professors demonstrate respect for students as individuals and adhere to their proper roles as intellectual guides and counselors. Professors make every reasonable effort to foster honest academic conduct and to assure that their evaluations of students reflect each student's true merit. They respect the confidential nature of the relationship between professor and student. They avoid any exploitation, harassment, or discriminatory treatment of students. They acknowledge significant academic or scholarly assistance from them. They protect their academic freedom.

As colleagues, professors have obligations that derive from common membership in the community of scholars. Professors do not discriminate against or harass colleagues. They respect and defend the free inquiry of associates. In the exchange of criticism and ideas, professors show due respect for the opinions of others. Professors acknowledge academic debt and strive to be objective in their professional judgment of colleagues. Professors accept their share of faculty responsibilities for the governance of their institution.

As members of an academic institution, professors seek above all to be effective teachers and scholars. Although professors observe the stated regulations of the institution, provided the regulations do not contravene academic freedom, they maintain their right to criticize and seek revision. Professors give due regard to their paramount responsibilities within their institution in determining the amount and character of work done outside it. When considering the interruption or termination of their service, professors recognize the effect of their decision upon the program of the institution and give due notice of their intentions.

As members of their community, professors have the rights and obligations of other citizens. Professors measure the urgency of these obligations in the light of their responsibilities to their

DEF003316

subject, to their students, to their profession, and to their institution. When they speak or act as private persons, they avoid creating the impression of speaking or acting for their college or university. As citizens engaged in a profession that depends upon freedom for its health and integrity, professors have a particular obligation to promote conditions of free inquiry and to further public understanding of academic freedom.

## Related Policies

- Teaching Responsibility
- Librarianship Responsibility
- Faculty Status

## History

07/01/89 - Reaffirmed with publication of Faculty Manual

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu

DEF003317



# President's Page: Marywood University Mission & Core Values

## Mission Statement

A Catholic university sponsored by the Congregation of the Sisters, Servants of the Immaculate Heart of Mary, Marywood University roots itself in the principle of justice and a belief that education empowers people. Enacting its ideals, Marywood offers students a welcoming and supportive community that encourages men and women of all backgrounds to shape their lives as leaders in service to others. Proud of its liberal arts tradition and host of professional disciplines, Marywood challenges students to broaden their understanding of global issues and to make decisions based on spiritual, ethical, and religious values. Marywood calls upon students to seek their full potential and invites all to engage in a lifelong process of learning. Witnessing the efficacy of teaching and scholarship, Marywood educates students to live responsibly in a diverse and interdependent world.

## Core Values

### Catholic Identity

A commitment to spiritual, ethical and intellectual values in the context of a faith community.

### Respect for Each Person

Respect for the value of each human being, for diversity in the context of vibrant community, and for the earth and all creation.

### Empowerment

Education to enable access and to empower the underserved to take a full role in the life of the broader society.

### Service

Rooted in the deep belief that learning and scholarship serve the global community is the belief in the value of the diverse types of work that support that service, and the preparation of students for leadership by participation in service.

### Commitment to Excellence

The belief that the work of education has the capacity to forward the kingdom of God, in broad and varied ways, leads us to care passionately for the quality of the mission of Marywood.

---

President's Office | Fran Ferrese, Executive Secretary | (570) 348-6231 | ferrese@marywood.edu

DEF003318

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu

DEF003319

Release of Personal Information
*Please check one box below; sign, date, and return by February 3, 2012*

___ I DO NOT grant permission for Marywood University to release Sister Anne Munley's Recommendation for Termination and Statement of Charges dated 1/24/12 to a faculty review committee comprised of tenured faculty. I understand that by refusing such permission that there will be no faculty committee review of Sister Anne Munley's decision to terminate my tenure and employment with the University prior to it being finalized.

OR

___ I DO grant permission for Marywood University to release Sister Anne Munley's Recommendation for Termination and Statement of Charges dated 1/24/12 to a review committee comprised of tenured faculty.

This authorization is valid until rescinded by me in writing.

_____          _____
Frederick F. Fagal, Jr.                                        Date

DEF003320

**Subject:**   Marywood Administration Tears Down Approved Posters

**From:**   Frederick Fagal (fffagal@yahoo.com)

**To:**   fffagal@gmail.com;

**Bcc:**   czigler@marywood.edu; golden@marywood.edu; graham@marywood.edu; griffer@marywood.edu; griffith@marywood.edu;
dhaleem@marywood.edu; harrisonl@marywood.edu; khealy-karabell@marywood.edu; hwalters@maryu.marywood.edu;
rhoffenberg@marywood.edu; hoffer@marywood.edu; hokien@marywood.edu; hongm@marywood.edu;
bhutchings@marywood.edu; jacksont@marywood.edu; jaeger@marywood.edu; jfeckler@gmail.com;
frutchey@marywood.edu; jvalis@maryu.marywood.edu; janey@marywood.edu; pjenkins@marywood.edu;
jbachman@maryu.marywood.edu; john.depoe@gmail.com; johnsonc@marywood.edu; jcabrera@email.arizona.edu;
jgluba@maryu.marywood.edu; donohue@marywood.edu; julie.barnofski@gmail.com; kmedeiros@maryu.marywood.edu;
arscott@marywood.edu; kellymr@marywood.edu; sbkenehan@gmail.com; kenny@marywood.edu; tfkent@marywood.edu;
ktobin@maryu.marywood.edu; kessen@marywood.edu; koneill@marywood.edu; kwyllie@maryu.marywood.edu;
mkiel@marywood.edu; lawrence@marywood.edu; leadougherty@maryu.marywood.edu; lemoncelli@marywood.edu;
lipinski@marywood.edu; bernicelukus@marywood.edu; marcinek@marywood.edu; sitko@marywood.edu;
mnmacdonald@marywood.edu; markshaffer@maryu.marywood.edu; lmattei@marywood.edu; mcdonnell@marywood.edu;
lmcmillan@marywood.edu; cmedley@marywood.edu; meza@marywood.edu; mevans@maryu.marywood.edu;
wnash@maryu.marywood.edu; mgonzalez@maryu.marywood.edu; mmindrup@marywood.edu; mirabito@marywood.edu;
fisher@marywood.edu; munleyk@marywood.edu; jlmuse-burke@marywood.edu; nneal@maryu.marywood.edu;
obrien@marywood.edu; olfano@marywood.edu; palmiter@marywood.edu;

**Date:**   Friday, January 13, 2012 2:33 PM

Dear Marywood University Faculty Colleague ,                                    January  13, 2012

We deserve better.  Our students deserve better.  In November 2011 I spent my own money to get a speaker from the
Foundation for Individual Rights in Education (FIRE) to give a presentation to an Introduction to Social Science class on
November 30, 2011.  The topic was "Know Your Rights: Free Speech and Thought Reform on Campus," and the speech
tied into our study of the United States  Constitution.  I also spent my own money to pay for posters advertising the
speech in Comerford Auditorium which was to be announced as open to all.  Total cost to me about $500.  Given my
previous run-ins with the administration,

http://www.marywoodfreespeech.com/History%20Page/Fagal%20History/adminVSfagal.htm

**just to be safe (ha), I had my posters stamped with the Student Life poster approval stamp. The Marywood
Administration, without telling me, then decided to tear down the posters. No, I am not kidding…. laughable yet
sad.**

This letter ends with a fuller but still brief summary abstract of what occurred.  I hope you read the attachments which
tell the complete story.  For fun and insight as to "how it all went down" you must view the Hitler Parody *satire* videos
on YouTube (see later below for links).

**Based on the evidence, I expect most of you (if only in private), will agree the Marywood administration (real
people here…not an abstraction) exhibited egregious, despicable, contemptible behavior.  This poisonous and
*considered!* behavior reflects badly on *everyone* associated with Marywood.**  I am ashamed for the institution and
hope it mends its ways.  At this point I think publicity is the only tool which might affect the Administration and inspire
"hope and change" J on this campus. Perhaps the Board of Trustees could at least discuss this type of behavior behind
closed doors or in private emails and conversations. One can hope…, nay pray…..  Attached to this email are four
items which I hope some (many?) of you read (#2 similar to #1 but even more complete):

1.    A rather complete synopsis of the events surrounding the tearing down (circa Nov 29, 2011) of my
"approved" posters announcing a speech about free speech (irony anyone?)

2.    A complete record of what I sent to the Foundation for Individual Rights in Education (FIRE) to document
how the situation unfolded. Learn about FIRE here: http://thefire.org/about/mission/. This big document includes
(3.) below, my letter to Levine (and President Munley by agreed-to forwarding)

3.   A copy of my (at first on paper) December 5, 2011 <u>letter to VP Alan Levine</u>. In that letter and in the December 5 meeting with Alan Levine <u>I proposed a resolution</u> of the "free speech poster tear down" controversy. <u>Mr. Levine</u> asked me for an electronic copy (which I sent) and he <u>said he would forward it to President Anne Munley</u>. In any negotiation list of requests (demands?) such as I submitted there is <u>obviously a</u> possibility for a meeting of the minds and compromise – e.g. perhaps I would <u>give up my demand for pizza for students</u> (hch) or a public apology or one of the requested FIRE visits.

4.   A copy of the December 15, 2011 <u>letter to me from  Alan Levine</u> [VP for Academic Affairs] which responds to my letter of December 5, 2011. In the response letter Mr. Levine, <u>speaking for the administration</u> <u>(i.e. President Anne Munley)</u>, writes "…<u>we are not willing to undertake any</u> (*emphasis added-fff*) of the specific requests that are contained in <u>your letter</u>."

Perhaps you have heard of Hitler Parody videos. From Wikipedia regarding the movie *Downfall*, http://en.wikipedia.org /wiki/Downfall_%28film%29 the film about Adolph Hitler's last days, which provided selected snippets so I could create the Marywood free speech poster tear-down parodies:

"In October 2010, YouTube stopped blocking any *Downfall*-derived parodies,[18] and is now placing advertisements on some of them. Corynne McSherry, an attorney specializing in intellectual property and free speech issues[19] for the <u>Electronic Frontier Foundation</u>, stated, "All the [*Downfall* parody videos] that I've seen are very strong <u>fair use</u> cases and so they're not infringing, and they shouldn't be taken down."[20] "

I made two short satire videos. Part 1 deals with the events of November 28, Part 2 deals with the events of November 30. Comments from (pre-release) viewers:

"Brilliant!" …. "<u>Love</u> these!" …. "SO funny"… "It's definitely funny and I think it will appeal to students and faculty alike." … "IT DOES HAVE ITS MOMENTS, ESP THE SCRATCHING PART!" …"It was nice knowing you, Fred." …"I think you will get a positive response from your video…too funny to not."…"OMG! Funny as hell. Pretty powerful stuff. Keep fighting the good fight." …."The videos were definitely very amusing and certainly got the point across" …"Wow Fred…. Great job on the video…. what a brilliant way to get your point across!!!! I hope it helps open their eyes!!!!! very creative and well done!!!!"

On YouTube just search for Hitler parody Marywood, I imagine it will show up…

## LINK to VIDEO #1 http://www.youtube.com/watch?v=1naxKnNc06o&feature=youtu.be

## LINK to VIDEO #2
## http://www.youtube.com/watch?v=4hzvv5sTqUw&
## context=C3c1bc55ADOEgsToPDskIZsi1t3K7AqlLR-ci2V9HK

I can send anyone  low definition versions of the videos suitable (each is under 20 MB) for email attachments. Just ask…

A few colleagues concerned for my welfare have told me they fear the administration will try to fire me over this. One colleague says perhaps I should have asked for an appointment with President Munley and made a final appeal – i.e. I should have pursued every last ditch channel possible. I did not want to go into such a meeting and in essence have as the only new point to raise a "blackmail" threat to go public as I do here and in the videos. I did not want that. If the risk to me is there it is there; and if the worst does come to pass I will have to battle as best I can with the support of family and friends and colleagues and perhaps concerned outsiders.

I will of course be pleased to hear from any of you – from the grizzled veteran to the first-year hire. BEWARE – according to page 86 of the Faculty Handbook "…there are no specific laws, rules, or regulations that protect the privacy of a user's files, electronic mail messages, or any other information retrieved as a result of a person's session on the Marywood system."

Thus, if you *email* me and want to protect yourself, you might best *use a backup email address such as your old youthful one*  coolcat@hotmail.*com and send it from anywhere but Marywood.* Also, if you are my friend,

or will soon be, you need not say hello to me in public (heh). My home phone is 315-685-0429. Even a regular mail anonymous "good luck" note sent to me at home (address below) would be very appreciated…

**Abstract**: On November 28-29 2011  Marywood University tore down "stamped approved" posters announcing an open to all presentation by Will Creeley of FIRE (Foundation for Individual Rights in Education) titled "Know Your Rights: Free Speech and Thought Reform on Campus." On December 5 Alan Levine, VP for Academic Affairs, told me there were no written policy statements which justified Marywood's action, but that my offer of a $50 random prize to a student for attending was, in the eyes of the administration's Executive Council which met on November 29, "pandering" to students to get them to come to class, and that this justified tearing down the posters (without even the mere common courtesy of notifying me about the supposed problem). Even if a problem did exist a magic marker could have solved it, poster tear-downs were not necessary. Later that day (Dec. 5) I sent Mr. Levine two emails, one showing that Professor N. Gregory Mankiw of Harvard (former Chairman of the President's Council of Economic Advisers, author of today's largest selling economics textbook) recently pandered to his students by inviting ten select email responders (first come, first served) to join him as his guest for lunch after class at a Chinese restaurant in Harvard Square. *I suggested that Marywood University warn Harvard that it has a panderer in its midst* ! Finally, also on December 5, I forwarded to Mr. Levine an email from spring 2011 wherein the Marywood Administration encouraged professors to send students to a speech about sexual assault. Raffle prizes galore, including food and **TWO $50 VISA cards**. Quotation from the email "We hope faculty will offer students extra credit for attending, or ***use some of your class time to attend the event with your students*** [emphasis added]." Laughable! Talk about "pandering!" It is transparently obvious Marywood University is discriminating against Professor Fagal…Your Honor, I rest my case. Full details below.

By Frederick F. Fagal. Jr. (Ph.D.) Associate Professor of Economics, Marywood University, Scranton, PA

Thank you for reading…..

Sincerely,
Fred Fagal
(Frederick F. Fagal, Jr.  Associate Professor of Economics)…at Marywood  1987 –
Home address:
Fred Fagal
17 East Lake Street
Skaneateles, NY 13152

DEF003323

# Marywood's Shame

November - December 2011

# Marywood University's Administration Tears Down Previously Approved Posters Advertising A Speech Before Students-----

## *A Speech About Free Speech on Campus* !!

*-Professor Frederick Fagal again the target ⸺*

### *But who is next ? You perhaps?*

**For immediate wide release – share as you will**          **Date: January 13, 2012**

**Contact: Frederick Fagal fffagal@yahoo.com**

DEF003324

**Abstract**: On November 28-29 2011 Marywood University tore down "stamped approved" posters announcing an open to all presentation by Will Creeley of FIRE (Foundation for Individual Rights in Education) titled "Know Your Rights: Free Speech and Thought Reform on Campus." On December 5 Alan Levine, VP for Academic Affairs, told me there were no written policy statements which justified Marywood's action, but that my offer of a $50 random prize to a student for attending was, in the eyes of the administration's Executive Council which met on November 29, "pandering" to students to get them to come to class, and that this justified tearing down the posters. Later that day (Dec. 5) I sent Mr. Levine two emails, one showing that Professor N. Gregory Mankiw of Harvard (former Chairman of the President's Council of Economic Advisers, author of today's largest selling economics textbook) recently pandered to his students by inviting ten select quick email responders (first come, first served) to join him as his guest for lunch after class at a Chinese restaurant in Harvard Square. *I suggested that Marywood University warn Harvard that it has a panderer in its midst* ! Finally, also on December 5, I forwarded to Mr. Levine an email from spring 2011 wherein the Marywood Administration encouraged professors to send students to a speech about sexual assault. Raffle prizes galore, including food and **TWO $50 VISA cards**. Quotation from the email "We hope faculty will offer students extra credit for attending, or *use some of your class time to attend the event with your students* [emphasis added]." Laughable! Talk about "pandering!" It is transparently obvious Marywood University is discriminating against Professor Fagal...Your Honor, I rest my case. Full details below.

By Frederick F. Fagal. Jr. (Ph.D.) Associate Professor of Economics, Marywood University, Scranton, PA

## [Students – Faculty – Parents:  See the last page for **"What Can You Do?"**]

During the Fall 2011 semester I wanted to invite an "outside speaker" to give a presentation to the SSCI 201 Introduction to Social Science class I teach with Dr. Tom Jackson. I wanted the presentation to the class to be open to all members of the Marywood University end even open to the public. The chosen topic, relevant to the course and the United States constitution, was related to free speech. The very respected Foundation for Individual Rights in Education (FIRE) http://www.thefire.org  agreed to send a speaker.

> *I hope that anyone who reads this does so with an open mind and asks himself or herself: "What if I wanted to express, or even be exposed to, some views which others find objectionable? Would I want those views silenced? Who does the silencing- the most easily offended? Do I want to be part of a society where there is, in essence, a "dictatorship by the most easily offended" ? I will be sixty-six years old in February 2012. It would be easiest for me to "cruise to retirement" and not get "all riled up." But I think about young untenured faculty too scared to speak out, I think of students brow-beaten with politically correct notions of what is allowable thought and speech, and I think about the future world my son (and eventual grandchildren?) will either revel in or endure in silent desperation. If I do not speak out, who will?*

DEF003325

I sought funding from the Social Science Department but there was no money. At Sr. Margaret Gannon's suggestion I contacted Clayton Pheasant's Cultural Affairs Committee office, but was told no funds were available. FIRE, being based in Philadelphia, kindly offered to provide a speaker for only $350 because I would cover the cost from my own funds.

FIRE sent me a pdf file which, when printed, advertised the time and place and topic of the presentation. The topic title which appeared on the poster was "Know Your Rights: Free Speech and Thought Reform on Campus." The listed and actual presenter was Will Creeley, FIRE's Director of Legal and Public Advocacy. The place was the Comerford Auditorium (which I had reserved for this special occasion), and the announced time was November 30 at 2 pm.

Before Thanksgiving I contacted Carl Oliveri (Director of Student Activities and Leadership Development) by email to see if he could print some posters. The pdf poster files (color and black and white) were attached to that email. I wanted to get the posters stamped with the Student Life "seal of approval" so there would be no issues raised about the posters which were to be hung/posted (as I explained to Mr. Oliveri in one of the emails). Mr. Oliveri said he could print 15 black and white posters. Early on Wednesday morning November 23, the day before Thanksgiving, the university community was notified by email that there was a water main break and that the university would close for the day.

Because the university closed on November 23 due to the water emergency I assumed that there might be a problem printing the posters and getting them ready to be hung around campus on Monday November 28. On Friday evening November 25 I sent an email to Mr. Oliveri stating that I would print the posters myself and that I or someone else would show up first thing Monday morning November 28 to get the posters stamped. I also wrote (on Friday Nov 25 ) that besides the contact information the proposed posters needed, the revised posters would have an announcement on them which read

$50 Attendance Prize Draw to a Student !

At 8:30 am Monday November 28 a student, acting on my behalf, delivered 46 posters to the Student Activities office and that student waited and observed while all 46 posters got stamped with the Student Life stamp of approval. Upon submission, *each of the 46 posters had the $50 prize announcement taped to the top as a ~2 inch wide strip of white paper with yellow highlighting on the black printed announcement.* I personally taped the announcements to each of the posters on the weekend of November 26-27 in Skaneateles, NY.

## Posters Hung Monday Nov. 28 Were Torn Down by 2:38 pm Tuesday November 29

The student who got the posters stamped on Monday morning Nov. 28 immediately returned to my office in LAC 82 circa 9:15-9:30 am with all 46 stamped posters. One of Mr. Oliveri's staff had stamped the posters. I then hung posters in the Liberal Arts Center (LAC), and the student hung posters in the Science Building and the Library and the Art building. Later that morning (about 10:40 am) the student returned and I showed the student where I had hung some of the posters in the LAC. Soon after 1 pm on Monday November 28 another student (from my noon economics class) hung posters in McGowan and other buildings on the north side of campus.

The student who'd gotten the posters stamped and hung sent me an email at 2:38 PM the next afternoon [see below] announcing that posters were "gone." I replied immediately after opening the email [see below].

DEF003326

**From:** [redacted-fff]
**To:** Frederick Fagal <fffagal@yahoo.com>
**Sent:** Tuesday, November 29, 2011 2:38 PM
**Subject:**

Dr. Fagal,

Did something happen with having the FIRE speaker? As I noticed today that all the posters are gone.

TO: [redacted-fff]
Tuesday, November 29, 2011 4:29 PM

You're kidding, right? No, nothing happened on this end.
More later....

## My Immediate Reaction to Learning the Posters Were Torn Down

I sent an email after immediately getting some of the posters reprinted (at my expense) ! :

> **To:** "annemunley@marywood.edu" <annemunley@marywood.edu>
> **Cc:** "coliveri@marywood.edu" <coliveri@marywood.edu>; "cabral@marywood.edu" <cabral@marywood.edu>;
> "gannon@marywood.edu" <gannon@marywood.edu>; Will Creeley <will@thefire.org>; "foley@marywood.edu"
> <foley@marywood.edu>
> **Sent:** Tuesday, November 29, 2011 5:37 PM
> **Subject:** Posters Torn Down
>
> Dear Sr. Anne - below fyi....
>
> Dear Carl,
>
> The email report below is from [2:38 PM email above from the student, name redacted]. I just got some more
> posters printed and will have them at your office at 8:30 ready for quick stamping. The posters that were torn
> down were identical to the attached except that, as you know, the contact information fagal@marywood.edu was
> printed on a white strip of paper taped to the top of the posters. Also appearing on that white strip was yellow
> highlighted text announcing that a random student would win a $50 attendance prize.
>
> I certainly would appreciate it if tomorrow morning someone could email the student and faculty lists
> announcing/denouncing the removal of posters and at the same time publicize the 2 pm appearance by Mr.
> Creeley (speaking on **Know Your Rights: Free Speech and Thought Reform on Campus**)
>
> Thank you very much.
>
> Sincerely,
>
> Frederick F. Fagal, Jr.

During the evening of November 29 my son and I cut and pasted prize announcement and contact information
strips of paper to the top of the twenty newly printed posters. We yellow highlighted the $50 random student
draw prize information. On Wednesday November 30 at 8:30 am I was at the Student Activities Office door and
it was not open. I left, then returned at 8:45 am and the office was open and I entered and almost immediately

DEF003327

Carl Oliveri appeared. I had the new posters with me, and I started the conversation by mentioning the poster tear-down. Mr. Oliveri immediately said "We tore them down." Of course I asked **"WHY?"** Mr. Oliveri mentioned Alan Levine's name as an authority {Levine is the Vice President for Academic Affairs}, and said that the offer of the random $50 attendance prize was the problem because it amounted to *"paying students to attend class"* and that *"we do not do that at Marywood."* Mr. Oliveri said the rest of the poster was fine, and he offered to help me cut off the offending prize announcement strips from the newly printed posters so I could hang them. Together we cut; then I did some poster hanging in the next hour or so from about 9:15 am to 10:15 am.

> N.B. :When Mr. Oliveri said "We tore them down." I did not (and do not) necessarily take that to mean that he or his minions had torn down the posters or instigated the tear-down. Rather, I assumed the "We" meant the Marywood administration – especially after the Vice-President for Academic Affair's name (Alan Levine) was invoked by Mr. Oliveri.

**No one in the administration had the *mere common courtesy* to inform me** by telephone or email on Nov. 28-29 that **there was a perceived problem with my posters**. No one seems to have considered the possibility that the supposedly offending strips of paper with the prize announcement could (1) have been easily torn from the posters or (2) easily and merely modified (i.e. blacked out) with a black magic marker....Instead what can only be described as **brown-shirt Nazi SA or Gestapo-like tactics ruled the day**. You don't like the Nazi comparison ? Try East German **Stasi** or the Soviet Union's **NKVD**.....Very sad....in fact scary....and if you really think the $50 prize announcement was the issue keep reading...

## Communication with Alan Levine, VP Academic Affairs

On Thursday, December 1, 2011 8:53 PM I sent an email to Alan Levine:

> Dear Alan,
>
> I am still at a loss as to an explanation for what happened. I have gone through the Faculty Handbook with some care, and can find nothing [e.g. pertaining to my $50 Attendance Prize Draw notice on the posters] that allows the university to tear down my posters that were approved for hanging. **Please direct me to the Marywood rule/policy you claim I have violated. I assume you can do this right away if such a rule exists so I would appreciate a very quick reply.**
>
>
> Thank you very much.
>
> Fred

I did *not* get a quick reply to my request for a citation of the Marywood rule/policy I had supposedly violated....

On Monday December 5 I met with Alan Levine in his office at 1:15 pm. Alan told me that he too had pored through the Faculty Handbook and could find nothing in it to substantiate any charges against me. Alan also said he had also spent time searching through "policies and procedures" and could find nothing that would uphold the idea that I had done *anything* in the way of violating any policy.

DEF003328

At the meeting Alan said that the Executive Council (or Committee?) (see below the list of "Executive Officers") had met on Tuesday (Nov. 29) and discussed my case. Alan Levine did not say, nor did I ask, when on Tuesday this meeting had occurred. The student email informing me of the poster tear-down was sent at 2:38 PM on Tuesday (Nov.29). Later the student told me s/he had observed some posters were missing on Monday evening Nov. 28....Were any posters torn down *before* the Executive Council meeting? I wonder **who "rang the fire alarm" regarding the posters?** Was it a student? If so, what was his/her complaint? Given my history, naturally I *suspected* that all this ***perhaps might be*** related to the possibility that FIRE was the issue because it had supported me in the past regarding the posting on my office door of the infamous free speech icon "Mohammed Bomb Cartoon" and quotes from the Koran (see www.marywoodfreespeech.com and click on History)? Was Marywood's president Anne Munley the instigator? Was it Mr. Oliveri or another administrator? Why the desperation ? I did not press Alan regarding the deliberations of the "Executive Council" or when the meeting had been called to discuss me or who instigated the meeting. I did not ask Alan for a list of who was at the meeting. Alan did mention that Ray Heath (*Vice President for Student Life* ) was at the meeting [Heath is on the list or Executive Officers printed below]. Alan did say that the magic word most bandied about during the meeting regarding my (supposed) transgression was **PANDERING**. By offering the $50 random draw attendance prize to a student, members of the Executive Council said I was **PANDERING** to students. I asked Alan if he thought a poster advertising a "liberal" speech and advertising a $50 random attendance prize would also get torn down, or whether I was a victim of [viewpoint] discrimination. Alan told me he ***"hoped"*** that would be the case [that the posters would be torn down]. I admit I chuckled more than a little bit....

From the Marywood web page http://www.marywood.edu/president/executive_admin.htm

the  list of names. I assume that the persons below are what Alan Levine meant by the phrase "The Executive Council":

### Executive Officers

**Sister Anne Munley**, I.H.M., Ph.D.
*President of the University*

**Alan M. Levine**, Ph.D.
*Vice President for Academic Affairs*

**Joseph X. Garvey**, M.S., C.P.A.
*Vice President for Business Affairs and Treasurer*

**Clayton N. Pheasant**, D.Min.
*Vice President for University Advancement*

**Raymond P. Heath**, Ph.D.
*Vice President for Student Life*

**Mary T. Gardier Paterson**, Esquire
*Secretary of the University*

At the meeting I gave Alan a letter (and sent him a copy by email) where I requested that Marywood do certain things to atone for its *outrageous* behavior.

DEF003329

(1) Marywood issue me a public apology
(2) Marywood reimburse me $500 for my expenses,
(3) Marywood invite FIRE to speak twice on campus during the Spring of 2011 (Before a daytime class open to all, and at an evening lecture open to all) and
(4) Marywood to fully sponsor a Fall 2012 **debate** (i.e. both sides represented) over Islam involving Robert Spencer of www.jihadwatch.org and an opposition debate opponent to be chosen later. To show you stand up for free speech sponsor a very controversial debate!

### *Amusing Yet Important "Aside"*

*Following my December 5, 2011 meeting with Alan Levine I drove home and did some thinking. I remembered that a famous Harvard professor had recently bought lunch for some of his students. I recalled that Marywood's Administration had recently offered prizes for attending certain lectures and/or presentations and urged that student attendance count as class time (i.e. "pandering"!). After I got home I found the evidence, and gleefully submitted it (see below) to Mr. Levine via email that very evening.* **May you the reader please forgive me for expressing my personal glee and satisfaction in the two emails (below) sent to Mr. Levine.** *Going through this is stressful, a little levity helps me keep going.* **Ultimately *the issue for you* is NOT me.** *(but I hope you understand and maybe laugh to yourself at the "glee" I express below)*

## Harvard University - Home of Panderers — Marywood Must Warn Harvard !

**To:** "levine@marywood.edu" <levine@marywood.edu>
**Sent:** Monday, December 5, 2011 6:48 PM
**Subject:** Pandering at Harvard !!

Hello Allen [sic, should be Alan! –fff]

I talked to a senior faculty member. She said that what I did and similar has often been done. Generally speaking I don't think Marywood wants to go down the pandering route.

If it does Marywood needs to get in touch with Harvard. **Professor Greg Mankiw (former chair of the president's Council of Economic Advisors), very highly respected** [emphasis added-fff].....I think I could get him to support me on the "pandering charge." The below from his blog. Again, does Marywood REALLY want to go down this road? I can't imagine that the Marywood faculty would deem it wise. Upon reflecting further, professors who bring students pizza on evaluation day *[Alan had mentioned this as an example of pandering –fff]* might well get laughed at in the [course evaluation –fff 1/6/2012] comments. And me having only one lottery winner might very well make more enemies (after the fact) than friends. After all I would have created an "occupy worthy" 1%....

Best... Fred

DEF003330

**Greg Mankiw's Blog**
Random Observations for Students of Economics

**Monday, November 28, 2011**

## Have lunch with me
## To current ec 10 students (only):

**I will take up to ten students out to lunch after Wednesday's lecture at Yenching, my favorite Chinese restaurant in Harvard Square. Email me if you are interested in joining the group. First come, first served.**

*permanent link* ✉

# Marywood's  Administration – PANDERERS ! Egg on face much ?

The email below should be dispositive. I was laughing almost uncontrollably when I hit the Send button on December 5, 2011 as I sent the following email to Alan Levine, Marywood's Vice President for Academic Affairs:

> **From:** Frederick Fagal <fffagal@yahoo.com>
> **To:** "levine@marywood.edu" <levine@marywood.edu>
> **Sent:** Monday, December 5, 2011 7:14 PM
> **Subject:** PANDERING ALERT !! Fw: [MWADMIN] request your SUPPORT of Release the Light on April 13th

Alan,

See Yellow Highlighted and bolded. Extra credit ! Class time! Prizes at the door!  Enough Said ! I rest my case....not that I

couldn't come up with more evidence.  I am

DEF003331

# laughing....This is like shooting fish in a barrel....Fred

----- Forwarded Message -----
**From:** "Decker, Barbara" <bdecker@marywood.edu>
**To:** mwadmin@mail.marywood.edu
**Sent:** Tuesday, April 5, 2011 12:30 AM
**Subject:** [MWADMIN] request your SUPPORT of Release the Light on April 13th

**Announcing!  Announcing!**  The 10th annual **Release the Light** sexual assault awareness program will be held on **Wed. April 13th** from **11:30am to 1:00pm** in the Fireplace Lounge.  Like last year, the program will include a **Let Your Feet Speak mile March** through campus from 11:30 to 12:00 noon, beginning and ending at Nazareth.  Then from noon to 1pm, we will hold a **Food and Information Fair**, with written materials and speakers available to cover topics on a variety of sexual and physical violence topics.  Speakers will include David Elliott, Senior Director  for Marywood University Safety, Erika Del Rosso, M.Ed, Teen Advocate of the Women's Resource Center, and Sr. Gail Cabral I.H.M., Ph.D.,Full Professor Psychology at Marywood.  There will be an assortment of food donated from Chartwells and community businesses.  Also, **raffles** will include two $50 VISA gift cards and more.

Thus far, the following groups and organizations will be participating: Counseling/Student Development Center, Peers on Wellness, Women's Studies, Diversity United, Psychological Services, Active Minds, Music Therapy Department, Chi Sigma, Graduate Student Council, RAE (Relationship Awareness and Empowerment Task Force), Criminal Justice Club, and the Women's Resource Center.  This year's program will again include a **clothesline project**, which will involve participants writing messages on a variety of colored t-shirts representing different types of violence.  In addition, we will again take a **community wide pledge against sexual violence**, which will involve participants leaving their hand stamp and signature on a large bed sheet that contains our pledge.  During the fair, we will have music and an open mike available to those who would like to address the subject of violence with a poem, readings, or songs.

In conjunction with Release the Light will be a tree planting ceremony for Caitlin McGuire at 11am near the Schwartz Center, to which we  welcome faculty, staff, and students in memorializing

Caitlin.

**I am writing to you** to ask that you help to make this a campus wide event by becoming involved in the following ways:  **First**, if you would take a minute in your classes and club meetings to announce that April is **National Sexual Assault Awareness Month** and share with them the information in this email about the fair.  **Secondly**, we encourage you to attend the event yourselves along with your

students.  **We hope faculty will offer students extra credit for attending, or use some of your class time to attend the event with your students.**  Also, if you are an advisor of a student group (athletics, student life, academics), we ask that you consider requiring your entire group to attend the program, starting with the march at 11:30am and the fair 12pm.

Looking forward to all of us uniting together on the 13th in taking a community wide pledge against sexual violence!  I thank you in advance for your support of this important  cause!

Sincerely,  Barb Decker

DEF003332

Barbara B. Decker, M.A., LPC, NCC
Associate Director and Peers on Wellness Advisor
Counseling/Student Development Center
Marywood University
570-348-6245
bdecker@marywood.edu

# What can you do?

**News media** – think there's a story here? Contact me for latest updates  fffagal@yahoo.com

**Members of the Board of Trustees** – are you independent thinkers? Aren't there questions you should raise? Should you perhaps communicate with each other about this matter?

**Parents** – write a polite email and/or letter expressing your concern to Marywood's president, Sr. Anne Munley.  A telephone call is possible too...

**Sr. Anne Munley's Contact Information:  Telephone:  570-348-6231      Email: annemunley@marywood.edu**

**Sr. Anne Munley**
**Immaculata Hall 107C**
**Marywood Univesity**
**2300 Adams Avenue**
**Scranton, PA 18509**

You might also contact members of the Board of Trustees.  Please email me for some contact information. Tell the board members you are concerned about the administration's oppressive behavior and lack of support for free speech at Marywood.  Let the trustees know what you think. For some historical background go to http://www.marywoodfreespeech.com/History%20Page/Fagal%20History/adminVSfagal.htm and scroll down to 02/22/06 and begin reading. Tell President Munley that you will encourage other parents to talk to their teens, and together take free speech concerns into family decision making when it comes time to choose a college or university – or even considering whether to transfer from Marywood. Consider writing a brief letter to your local newspaper, mention this Marywood incident, and urge students and parents to visit the Foundation for Individual Rights in Education (FIRE) at  http://thefire.org/  for information about free speech policies at various colleges and universities.

DEF003333

**Faculty** – first, any communication I receive from any of you I will hold in the strictest of confidence. My email address is fffagal@yahoo.com . Warning, Marywood reserves the right to monitor your email. Consider sending from home from an alternate email address. Let me know what you are thinking. Thank you for your support.  Again, please think of the big issues involved.

**Students** – I am much older than you are. When I am dead most of you will be vibrantly alive! What kind of world do *you* want ? Stuff like this is easy to ignore. But you have more power than you think. Marywood is a tuition-driven institution so you and potential students have *much* more power than you know...If you would like to help form a student group (even just a Facebook page) please contact me – be a leader! If you merely wish to express your support please shoot me an email with "Student Supporter!" in the Subject line.  If you'd be willing to have me share your name and email with a student leader for free speech let me know in the body of the email...THANKS !--- and good luck...

DEF003334

January 13, 2012  as attached in an email sent to the Marywood University faculty by Fred Fagal

Below are the late November- mid December 2011 email exchanges I (Fred Fagal, Assoc. Prof. Economics, Marywood University, Scranton, PA)) had with Carl Oliveri and then Alan Levine. The emails were forwarded to FIRE (The Foundation for Individual Rights In Education). The emails reprinted below in their entirety (but for redacting a student's name so it appears as StudentX) are the result of clicking on Yahoo email's Print tab and then copying and pasting the individual results into the cells of a Microsoft Word table. Explanatory comments appear in separate cells and are clearly indicated as comments.

---

#1 COMMENT: The email below had attached to it the publicity posters [Will-BW-Marywood.pdf and Will-Color-Marywood.pdf] FIRE had sent to me. One poster was in black and white, the other in color. The posters had time and date and place and topic information for Will Creeley's speech but did not have "contact information" on the poster. [Fred Fagal 12/21/2011]

---

Subject: Posters
From:   Frederick Fagal (fffagal@yahoo.com)
To:     coliveri@marywood.edu;
Cc:     jacksont@maryu.marywood.edu; gannon@marywood.edu;
Date:   Wednesday, November 23, 2011 8:50 AM


Dear Carl,

As part of the SSCI201 Introduction to Social Science class Professor Tom Jackson and I have arranged for an outside speaker to make a presentation to the class. This session of the class and the discussion period following the presentation are open to all members of the Marywood community. I just sent the following blurb to to Dean Paciej:

**On Wednesday November 30, at 2 PM in the Comerford Auditorium in the Science Building, the SSCI 201 Introduction to Social Science class will have a guest speaker, and the presentation is open to all members of the Marywood community. Mr. Will Creeley, Director of Legal and Public Advocacy for the Foundation for Individual Rights in Education (FIRE) will deliver a speech**
       **"Know Your Rights: Free Speech and Thought Reform on Campus."**
**An open question and discussion period will follow Mr. Creeley's presentation.**

This presentation is NOT a club sponsored activity. Because the event is open to all, are you able to print publicity posters today (see attached)? Either I or some

DEF003335

students can pick them up first thing on  Monday morning November 28 assuming you can print them today (**I apologize for the short notice**).

Would you please let me know by 2 pm today if you can do the posters or not? If the posters cannot be done I will print them myself. I presume that to post such posters they will need the "hanging approved" Marywood stamp. Either I or some students will bring the posters ready for stamping first thing Monday morning. I just wanted to give you a "heads up" and check in. If my posters do not need a stamp from your office (e.g. because of the academic classroom nature of the event) please let me know.

Thank you very much. If you need to call me my cell phone number is 315-406-8063 and I should be available but NOT between 10 am and 11 am when I will be in the YMCA swimming pool.

Sincerely,

Frederick F. Fagal, Jr. (Ph.D.)
Associate Professor of Economics
Marywood University

#2 COMMENT: Mr. Oliveri responded a little over an hour later so a copy of my email [above] to which he responded is included to initiate a "thread." No mention of any problem with the posters other than he did not want to or could not print any color posters.

Print - Close Window

Subject:Re: Posters
From:   Carl Oliveri (coliveri@maryu.marywood.edu)
To:     fffagal@yahoo.com;
Date:   Wednesday, November 23, 2011 9:58 AM


i can print black and white for you, I can do about 15 if that works.

On Wed, Nov 23, 2011 at 8:50 AM, Frederick Fagal <fffagal@yahoo.com> wrote:
Dear Carl,

As part of the SSCI201 Introduction to Social Science class Professor Tom Jackson and I have arranged for an outside speaker to make a presentation to the class. This session of the class and the discussion period following the presentation are open to all members of the Marywood community. I just sent the following

blurb to to Dean Paciej:

**On Wednesday November 30, at 2 PM in the Comerford Auditorium in the Science Building, the SSCI 201 Introduction to Social Science class will have a guest speaker, and the presentation is open to all members of the Marywood community. Mr. Will Creeley, Director of Legal and Public Advocacy for the Foundation for Individual Rights in Education (FIRE) will deliver a speech**
       **"Know Your Rights: Free Speech and Thought Reform on Campus."**
**An open question and discussion period will follow Mr. Creeley's presentation.**

This presentation is NOT a club sponsored activity. Because the event is open to all, are you able to print publicity posters today (see attached)? Either I or some students can pick them up first thing on  Monday morning November 28 assuming you can print them today (**I apologize for the short notice**).

Would you please let me know by 2 pm today if you can do the posters or not? If the posters cannot be done I will print them myself. I presume that to post such posters they will need the "hanging approved" Marywood stamp. Either I or some students will bring the posters ready for stamping first thing Monday morning. I just wanted to give you a "heads up" and check in. If my posters do not need a stamp from your office (e.g. because of the academic classroom nature of the event) please let me know.

Thank you very much. If you need to call me my cell phone number is 315-406-8063 and I should be available but NOT between 10 am and 11 am when I will be in the YMCA swimming pool.

Sincerely,

Frederick F. Fagal, Jr. (Ph.D.)
Associate Professor of Economics
Marywood University


--
Carl Oliveri
Director, Student Activities and Leadership Development
Marywood University
Scranton, PA 18509

(570) 340-6016
www.marywood.edu/studentactivities

#3 COMMENT: I responded eleven minutes later mid-morning the day before Thanksgiving. The thread continues with the previous emails in the thread appearing below. I said I would get some color posters printed.

Print - Close Window

Subject:Re: Posters
From:    Frederick Fagal (fffagal@yahoo.com)
To:      coliveri@maryu.marywood.edu;
Date:    Wednesday, November 23, 2011 10:09 AM


Thank you Carl. Service even with no water main. Much appreciate. I will get some color ones done....Happy Thanksgiving.....Fred Fagal

---

**From:** Carl Oliveri <coliveri@maryu.marywood.edu>
**To:** Frederick Fagal <fffagal@yahoo.com>
**Sent:** Wednesday, November 23, 2011 9:58 AM
**Subject:** Re: Posters

i can print black and white for you, I can do about 15 if that works.

On Wed, Nov 23, 2011 at 8:50 AM, Frederick Fagal <fffagal@yahoo.com> wrote:
Dear Carl,

As part of the SSCI201 Introduction to Social Science class Professor Tom Jackson and I have arranged for an outside speaker to make a presentation to the class. This session of the class and the discussion period following the presentation are open to all members of the Marywood community. I just sent the following blurb to to Dean Paciej:

**On Wednesday November 30, at 2 PM in the Comerford Auditorium in the Science Building, the SSCI 201 Introduction to Social Science class will have a guest speaker, and the presentation is open to all members of the Marywood community. Mr. Will Creeley, Director of Legal and Public Advocacy for the Foundation for Individual Rights in Education (FIRE) will deliver a speech**
      **"Know Your Rights: Free Speech and Thought Reform on Campus."**
**An open question and discussion period will follow Mr. Creeley's presentation.**

DEF003338

This presentation is NOT a club sponsored activity. Because the event is open to all, are you able to print publicity posters today (see attached)? Either I or some students can pick them up first thing on Monday morning November 28 assuming you can print them today (**I apologize for the short notice**).

Would you please let me know by 2 pm today if you can do the posters or not? If the posters cannot be done I will print them myself. I presume that to post such posters they will need the "hanging approved" Marywood stamp. Either I or some students will bring the posters ready for stamping first thing Monday morning. I just wanted to give you a "heads up" and check in. If my posters do not need a stamp from your office (e.g. because of the academic classroom nature of the event) please let me know.

Thank you very much. If you need to call me my cell phone number is 315-406-8063 and I should be available but NOT between 10 am and 11 am when I will be in the YMCA swimming pool.

Sincerely,


Frederick F. Fagal, Jr. (Ph.D.)
Associate Professor of Economics
Marywood University



--
Carl Oliveri
Director, Student Activities and Leadership Development
Marywood University
Scranton, PA 18509
(570) 340-6016
www.marywood.edu/studentactivities

---

#4 COMMENT: Fifty-seven minutes later Mr. Oliveri had noticed that that poster did not have a contact [phone] number on it or a contact email. I would be allowed to "right"[sic] the contact information on the [printed] poster(s).

Print - Close Window

DEF003339

Subject:Re: Posters
From:   Carl Oliveri (coliveri@maryu.marywood.edu)
To:     fffagal@yahoo.com;
Date:   Wednesday, November 23, 2011 11:06 AM


Fred,

I was looking at the poster, and it needs to have a contact number or email on it.  you can right it on if you want, but it needs to be on there somewhere.

On Wed, Nov 23, 2011 at 10:09 AM, Carl Oliveri <coliveri@maryu.marywood.edu> wrote:
happy thanksgiving


On Wed, Nov 23, 2011 at 10:09 AM, Frederick Fagal <fffagal@yahoo.com> wrote:

# Thank you Carl. Service even with no water main. Much appreciate. I will get some color ones done....Happy Thanksgiving.....Fred Fagal

---

**From:** Carl Oliveri <coliveri@maryu.marywood.edu>
**To:** Frederick Fagal <fffagal@yahoo.com>
**Sent:** Wednesday, November 23, 2011 9:58 AM
**Subject:** Re: Posters

i can print black and white for you, I can do about 15 if that works.

On Wed, Nov 23, 2011 at 8:50 AM, Frederick Fagal <fffagal@yahoo.com> wrote:
Dear Carl,

As part of the SSCI201 Introduction to Social Science class Professor Tom Jackson and I have arranged for an outside speaker to make a presentation to the class. This session of the class and the discussion period following the presentation are open to all members of the Marywood community. I just sent the following blurb to to Dean Paciej:

**On Wednesday November 30, at 2 PM in the Comerford Auditorium in the Science Building, the SSCI 201 Introduction to Social Science class will have a guest speaker, and the presentation is open to all members of the Marywood community. Mr. Will Creeley, Director of Legal and Public Advocacy for the Foundation for Individual Rights in Education (FIRE) will deliver a speech**

DEF003340

**"Know Your Rights: Free Speech and Thought Reform on Campus."**
**An open question and discussion period will follow Mr. Creeley's**
**presentation**.

This presentation is NOT a club sponsored activity. Because the event is open to all, are you able to print publicity posters today (see attached)? Either I or some students can pick them up first thing on Monday morning November 28 assuming you can print them today (**I apologize for the short notice**).

Would you please let me know by 2 pm today if you can do the posters or not? If the posters cannot be done I will print them myself. I presume that to post such posters they will need the "hanging approved" Marywood stamp. Either I or some students will bring the posters ready for stamping first thing Monday morning. I just wanted to give you a "heads up" and check in. If my posters do not need a stamp from your office (e.g. because of the academic classroom nature of the event) please let me know.

Thank you very much. If you need to call me my cell phone number is 315-406-8063 and I should be available but NOT between 10 am and 11 am when I will be in the YMCA swimming pool.

Sincerely,

Frederick F. Fagal, Jr. (Ph.D.)
Associate Professor of Economics
Marywood University


--
Carl Oliveri
Director, Student Activities and Leadership Development
Marywood University
Scranton, PA 18509
(570) 340-6016
www.marywood.edu/studentactivities

DEF003341

--
Carl Oliveri
Director, Student Activities and Leadership Development
Marywood University
Scranton, PA 18509
(570) 340-6016
www.marywood.edu/studentactivities

--
Carl Oliveri
Director, Student Activities and Leadership Development
Marywood University
Scranton, PA 18509
(570) 340-6016
www.marywood.edu/studentactivities

#5 COMMENT: Late Friday afternoon, the day after Thanksgiving, I sent Carl Oliveri an email informing him that on Monday morning a student would show up at his office with 46 posters which **each INCLUDED a taped-on announcement of a "$50 Attendance Prize Draw to a Student"**

Print - Close Window

Subject: Posters Done + stamping
From:   Frederick Fagal (fffagal@yahoo.com)
To:     coliveri@maryu.marywood.edu;
Date:   Friday, November 25, 2011 5:54 PM

Hello Carl,

I printed (I think) 46 posters to add to any you have done.

16 color 11x17
10 color 8.5x14
20 b&w 11x17

On each poster I will have taped a strip reading:

-----------------------------------------------------------------------------------------------

# $50 Attendance Prize Draw to a Student ! Contact: fagal@marywood.edu

-----------------------------------------------------------------------------------------------

On Monday November 28 when your office opens at 8:30 am (or soon thereafter) some student(s) will bring the posters to you to get the "hanging stamp." The student(s) will wait while this is done so the posters can be hung around campus on Monday morning.

DEF003342

With luck we'll draw a crowd and of course you are welcome....

Sincerely,

Fred Fagal
Assoc. Prof. of Economics
Marywood University

---

#6 COMMENT: I sent the following email to the Marywood University President, Sr. Anne Munley because I thought the tearing down of approved posters was a horrible thing and that the leader at the top should know what happened and condemn it. I figured that if the administration would condemn the action AND via a publicity blast email to all students and faculty nip such actions in the bud – i.e. tear down posters and CREATE more publicity for the person or viewpoint you dislike. Seemed logical to me. Cabral is Sr. Gail Cabral, a leader in the faculty senate. Gannon is Sr. Margaret Gannon, the chair of the Department of Social Sciences. Foley is the Dean of Liberal Arts. Will is Will Creeley of the Foundation for Individual Rights in Education – he was the scheduled speaker. Student X is an undergraduate student. S/he was the one who brought the 46 posters to Mr. Oliveri's office at ~8:30 am on Monday November 28, 2011. S/he waited and observed each of the 46 posters receive the stamp of approval – and EACH of the posters had the $50 attendance draw prize announcement and contact information strip of paper taped to the top of each poster.

**NOTE** that by this point in time (5:37 PM on Tuesday November 29) I had sent an email on Nov. 25 which told Mr. Oliveri that the posters **would** have the prize announcement strip of paper attached to the posters. In the 5:37 PM Tuesday November 29 email below in the third and fourth sentences affirm and essentially confirm that the posters stamped for approval on Monday were as I described in the Nov. 25 email to Mr. Oliveri. The posters that were torn down were identical to the attached except that, as you know, the contact information fagal@marywood.edu was printed on a white strip of paper taped to the top of the posters. Also appearing on that white strip was yellow highlighted text announcing that a random student would win a $50 attendance prize. **NOTE** that by this time (5:37 PM Tuesday Nov. 29 ) I had no inkling that the prize money was (supposedly) an issue. *Heck, I did not even know that the administration had torn down the posters !!!!*

---

Print - Close Window

Subject: Posters Torn Down
From:    Frederick Fagal (fffagal@yahoo.com)
To:      annemunley@marywood.edu;
Cc:      coliveri@marywood.edu; cabral@marywood.edu; gannon@marywood.edu;
         will@thefire.org; foley@marywood.edu;
Date:    Tuesday, November 29, 2011 5:37 PM


Dear Sr. Anne - below fyi....

DEF003343

Dear Carl,

The email report below is from Student X. I just got some more posters printed and will have them at your office at 8:30 ready for quick stamping. The posters that were torn down were identical to the attached except that, as you know, the contact information fagal@marywood.edu was printed on a white strip of paper taped to the top of the posters. Also appearing on that white strip was yellow highlighted text announcing that a random student would win a $50 attendance prize.

I certainly would appreciate it if tomorrow morning someone could email the student and faculty lists announcing/denouncing the removal of posters and at the same time publicize the 2 pm appearance by Mr. Creeley (speaking on **Know Your Rights: Free Speech and Thought Reform on Campus**)

Thank you very much.

Sincerely,

Frederick F. Fagal, Jr.

----- Forwarded Message -----
**From:** Student X<StudentX@m.marywood.edu>
**To:** Frederick Fagal <fffagal@yahoo.com>
**Sent:** Tuesday, November 29, 2011 4:59 PM
**Subject:** Re:

Last night I noticed that there weren't any posters in the Rotunda, which I thought was odd since you mentioned that you hung a couple in there. This morning I noticed that basically all the ones I had seen in the LAC the day before were gone; when I went over to the Science Center, all the ones I had hung up were gone. The library had posted one on the exit door yesterday, but it was gone today. No other group's/event's posters were gone, I noticed that. I still saw all the same posters that were around where I hung all of ours, so it wasn't like someone went around just to clean up the walls. It seems like someone really wanted to get rid of our posters. Is someone really trying to censor free speech when we're trying to advocate for free speech?

Interestingly though, I remember at the conference I recall hearing that schools just requiring groups or people to have their posters stamped or reviewed before posting was an infringement on free speech and a form of speech code.

On Tue, Nov 29, 2011 at 4:29 PM, Frederick Fagal <fffagal@yahoo.com> wrote:
You're kidding, right? No, nothing happened on this end.
More later....

DEF003344

**From:** Student X <StudentX@m.marywood.edu>
**To:** Frederick Fagal <fffagal@yahoo.com>
**Sent:** Tuesday, November 29, 2011 2:38 PM
**Subject:**

Dr. Fagal,

Did something happen with having the FIRE speaker? As I noticed today that all the posters are gone.

-StudentX

#7 COMMENT: Wednesday morning Nov. 29, 2011, the day for Mr. Creeley's speech. As I announced in the email of the previous evening written to Mr. Oliveri, I showed up at his office at 8:30 am. The office was closed, when I returned 15 minutes later it was open and he was there. He saw me immediately {I with newly printed posters in hand including taped-on prize announcements for each poster). I of course immediately mentioned the tear down and the reply was a confession/admission that the administration had torn down the posters and Alan Levine's name was mentioned [i.e. a "higher up" who was involved in and knew about the decision]. I do admit that the Subject line "Thanks for helping me cut" does carry the flavor of a hint of sarcasm..."You save me" should of course be "You saved me"

Print - Close Window

Subject:Thanks for helping me cut
From:    Frederick Fagal (fffagal@yahoo.com)
To:      coliveri@marywood.edu;
Date:    Wednesday, November 30, 2011 10:49 AM

Dear Carl,

Thank you for explaining why my Nov. 28 approved posters regarding Will Creely of FIRE's visit to campus and 2 pm speech were torn down. It would have been civil if someone had told me...or even offered to reprint and rehang posters without the offending offer.  You said that the yellow highlighted poster heading

## $50 Attendance Prize Draw to a Student

DEF003345

was not allowed because "we" [Marywood] do not pay students to come to class, and hence what I was doing was not allowed. You cited Dr. Alan Levine, the Vice President for Academic Affairs, as the person who told you this.

You save me some time as you helped me cut off the offending phrase from about half my new posters so that I could re-hang them around campus (using blue painter's tape). Thank you.

Sincerely,

Frederick F. Fagal, Jr

#8 COMMENT: On Wednesday morning Nov. 30, 2011 the newly printed posters with the announcement were presented to Mr. Oliveri for hanging approval stamps. As described above, we cut off the "offending" strips at the top which included the prize draw announcement. We cut off the prize part and left my email contact information. I then spent about one hour hanging posters in buildings before I taught my 11 am and noon classes and then prepared to meet Mr. Creeley at 1:45 PM at the Science Building (location of Comerford Auditorium, the site for his presentation). Near the end of the day (circa 6 pm) I decided to (as always) be conscientious and REMOVE the now moot posters I had hung that morning. As I went around to my morning hanging locations I was shocked to find that most of my posters (each 17x11 color) in major locations had been removed ! Were the posters removed after the speech? Mr. Creeley had finished with questions at ~3:15  pm. Or had the posters been removed soon after I hung them and before the speech? Someone who knew I taught from 11-1 and would surely be busy before 2 pm might have removed the posters. I figured I would at least ask....

Print - Close Window

Subject: Posters removed yesterday from LAC
From:    Frederick Fagal (fffagal@yahoo.com)
To:      levine@marywood.edu;
Cc:      coliveri@marywood.edu;
Date:    Thursday, December 1, 2011 10:29 AM


Dear Alan and Carl,
Yesterday someone removed from LAC **at least** 5 posters promoting Mr. Will Creeley's speech "Know Your Rights: Free Speech and Thought Reform on Campus." These posters were approved and stamped yesterday morning by Carl Oliveri and hung by me in LAC; these posters did not mention a $50 attendance prize drawing for a student. Locations form which the posters

DEF003346

were removed included the tile wall opposite the Regina driveway entrance to LAC, east and west Terrace floor stairwells, 1st floor outside elevator, and east third floor top of stairs doorway entry right side.

Am I right in assuming that someone under your control removed these posters, perhaps mistakenly based on that person's or persons' poster removal activity(ies) conducted on Monday and/or Tuesday Nov. 28 and 29th?

Sincerely,

Frederick F. Fagal, Jr.

Associate Professor of Economics

Marywood Univeristy

---

#9 COMMENT: Nineteen minutes after I sent the inquiry Alan Levine responds that he knows nothing about the Wednesday Nov. 30, 2011 tear-down. I was alarmed by Mr. Levine's reference to "...other issues surrounding Mr. Creeley's speech,". In a Wednesday Nov. 23, 2011 email to my co-teacher (Dr. Thomas Jackson) of the Introduction to Social Science course I wrote **"I will make sure Creeley mentions the constitution so that if anyone bitches we can easily say the topic is relevant to the course.... I do not anticipate a problem. We have a little academic freedom leg to stand on or swing as in the jawbone of an ass."** I do not trust the Marywood administration. I suspected that if they thought they could make the case that an outside speaker was a mere propagandist discussing something outside the realm of the course the Marywood administration would go after me. The Creeley topic certainly tied into the constitution and the course so we were covered. I could only assume that the "other issues" comment by Levine referred to the topic of the speech and the relevance of the speaker to the course. I was not worried but a bit peeved at the audacity....

Print - Close Window

Subject:Re: Posters removed yesterday from LAC
From:   Dr Alan Levine (levine@maryu.marywood.edu)
To:     fffagal@yahoo.com;
Date:   Thursday, December 1, 2011 10:48 AM


Fred,

The only posters that were removed, as far as I know, were the ones that mentioned a $50 Attendance prize drawing, something that was not approved by the Carl Oliveri's office. If you would like to make an appointment to discuss this or other issues surrounding Mr. Creeley's speech, please feel free to contact me or Jamie Strong to set up an appointment.

Alan


Alan M. Levine, PhD
Vice President for
    Academic Affairs
Marywood University

2300 Adams Ave
Scranton, PA 18509
(t) 570 348-6290
(f) 570 961-4743
e-mail: levine@marywood.edu

On Thu, Dec 1, 2011 at 10:29 AM, Frederick Fagal <fffagal@yahoo.com> wrote:
Dear Alan and Carl,
Yesterday someone removed from LAC **at least** 5 posters promoting Mr. Will Creeley's speech
"Know Your Rights: Free Speech and Thought Reform on Campus." These posters were
approved and stamped yesterday morning by Carl Oliveri and hung by me in LAC; these posters
did not mention a $50 attendance prize drawing for a student. Locations form which the posters
were removed included the tile wall opposite the Regina driveway entrance to LAC, east and
west Terrace floor stairwells, 1st floor outside elevator, and east third floor top of stairs doorway
entry right side.
Am I right in assuming that someone under your control removed these posters, perhaps
mistakenly based on that person's or persons' poster removal activity(ies) conducted on Monday
and/or Tuesday Nov. 28 and 29th?
Sincerely,
Frederick F. Fagal, Jr.
Associate Professor of Economics
Marywood Univeristy

#10 COMMENT: Twenty-three minutes after my inquiry regarding the previous day's tear-down of
posters Mr. Oliveri claims that he did not inform his students to remove the posters and that if the
posters were removed it was not by his doing. A little hint here that his students HAD done the pre-
Creeley speech tear-downs. Also note that Oliveri's statement does NOT say that he knew or knows
nothing about the second tear-down, but only that "...it was not by my doing."....over-zealous work
study students could have taken it upon themselves to tear down what they had been told the previous
day were unapproved posters. I wonder if the (student) tearer-downers were told that the reason they
were given the job was because of the prize money strip on the posters or whether they were just
shown a sample poster and told to "go get 'em!". hmm....This is great. Federal student work-study
dollars paying students to tear down posters advertising a speech-presentation about free speech on
campuses....

Print - Close Window

Subject:Re: Posters removed yesterday from LAC
From:   Carl Oliveri (coliveri@maryu.marywood.edu)
To:     fffagal@yahoo.com;
Date:   Thursday, December 1, 2011 10:52 AM

I did not inform my students to remove the posters, so if they were removed, it was not by my
doing.

DEF003348

On Thu, Dec 1, 2011 at 10:29 AM, Frederick Fagal <fffagal@yahoo.com> wrote:

Dear Alan and Carl,

Yesterday someone removed from LAC **at least** 5 posters promoting Mr. Will Creeley's speech "Know Your Rights: Free Speech and Thought Reform on Campus." These posters were approved and stamped yesterday morning by Carl Oliveri and hung by me in LAC; these posters did not mention a $50 attendance prize drawing for a student. Locations form which the posters were removed included the tile wall opposite the Regina driveway entrance to LAC, east and west Terrace floor stairwells, 1st floor outside elevator, and east third floor top of stairs doorway entry right side.

Am I right in assuming that someone under your control removed these posters, perhaps mistakenly based on that person's or persons' poster removal activity(ies) conducted on Monday and/or Tuesday Nov. 28 and 29th?

Sincerely,

Frederick F. Fagal, Jr.
Associate Professor of Economics
Marywood Univeristy

--
Carl Oliveri
Director, Student Activities and Leadership Development
Marywood University
Scranton, PA 18509
(570) 340-6016
www.marywood.edu/studentactivities

---

#11 COMMENT: Thursday evening December 1, 2011 asking Alan Levine for a rule/policy citation (note typo in subject line ☺ )

Print - Close Window

Subject: Rule Citatation Please
From:   Frederick Fagal (fffagal@yahoo.com)
To:     levine@maryu.marywood.edu;
Date:   Thursday, December 1, 2011 8:53 PM

Dear Alan,

I am still at a loss as to an explanation for what happened. I have gone through the Faculty Handbook with some care, and can find nothing [e.g. pertaining to my $50 Attendance Prize Draw notice on the posters] that allows the university to tear down my posters that were approved for hanging. **Please direct me to the Marywood rule/policy you claim I have violated. I assume you can do this right away if such a rule exists so I would appreciate a very quick reply.**

DEF003349

# Thank you very much.

# Fred

#12 COMMENT: Friday afternoon seeking a meeting for Monday to clarify "other issues" [but note how I pre-emptively make clear Mr. Creeley was relevant to the course] and pointing out no rule/policy violation citation given to me.

Print - Close Window

Subject: "or other issues surrounding Mr. Creeley's speech"
From:   Frederick Fagal (fffagal@yahoo.com)
To:     levine@marywood.edu;
Date:   Friday, December 2, 2011 3:03 PM


Hello Alan,

In your email Dec. 1 (yesterday) you mentioned "other issues surrounding Mr. Creeley's speech" [see indented below] and I wonder what those issues might be. For the life of me I can't imagine what. Intro to Social Science course SSCI201, includes government and political science, speaker dealt with a practical relevant constitutional issue. Still no citation regarding claimed poster hanging transgression on my part...Perhaps we can meet on Monday morning. As usual, I will be in early. I teach from 11 to 1 so before 10 am would be best. I could meet with you after 1 pm, the earlier the better. ..

Best... Fred

"The only posters that were removed, as far as I know, were the ones that mentioned a $50 Attendance prize drawing, something that was not approved by the Carl Oliveri's office.  If you would like to make an appointment to discuss this or other issues surrounding Mr. Creeley's speech, please feel free to contact me or Jamie Strong to set up an appointment."

#13 COMMENT: Alan Levine responds very quickly and backs off the "other issues surrounding Mr. Creeley's speech" red herring and claims the phrase merely an invitation to talk about stuff in general. I did meet with Mr. Levine on the following Monday at 1:15 pm and at that meeting when I broached the "other issues surrounding Mr. Creeley's speech" Mr. Levine in a very friendly manner indicated that he simply meant to issue an invitation to chat about other issues. Still, what he wrote is what he wrote, and the reader with have to draw his or her own conclusions.

**Mr. Levine does raise an interesting issue** (and one I raised in a Nov. 23 email to a colleague), and that is **what gives "Student Life" ["the group who stamps the posters"] ANY power over the posting of ACADEMIC posters** !

Print - Close Window

DEF003350

Subject: Re: "or other issues surrounding Mr. Creeley's speech"
From:   Dr Alan Levine (levine@maryu.marywood.edu)
To:     fffagal@yahoo.com;
Date:   Friday, December 2, 2011 3:59 PM


Fred,

The "other issues" was an opening for you to chat about anything else you wanted to discuss.  I have left a message with folks from Student Activities, the group who stamps the posters to see from where they derive their authority.  So, without an answer from them, I'm not sure meeting on Monday would be productive, but if you do want to get together, I'm available at 1 or after 3.

Alan


Alan M. Levine, PhD
Vice President for
    Academic Affairs
Marywood University
2300 Adams Ave
Scranton, PA  18509
(t) 570 348-6290
(f) 570 961-4743
e-mail: levine@marywood.edu


On Fri, Dec 2, 2011 at 3:03 PM, Frederick Fagal <fffagal@yahoo.com> wrote:
Hello Alan,

In your email Dec. 1 (yesterday) you mentioned "other issues surrounding Mr. Creeley's speech" [see indented below] and I wonder what those issues  might be. For the life of me I can't imagine what. Intro to Social Science course SSCI201, includes government and political science, speaker dealt with a practical relevant constitutional issue. Still no citation regarding claimed poster hanging transgression on my part...Perhaps we can meet on Monday morning. As usual, I will be in early. I teach from 11 to 1 so before 10 am would be best. I could meet with you after 1 pm, the earlier the better. ..

Best... Fred

"The only posters that were removed, as far as I know, were the ones that mentioned a $50 Attendance prize drawing, something that was not approved by the Carl Oliveri's office.  If you would like to make an appointment to discuss this or other issues surrounding Mr. Creeley's speech, please feel free to contact me or Jamie Strong to set up an appointment."

DEF003351

#14 COMMENT: Monday December 5, 2011, from 1:15 pm to approximately 2:10 PM, I met with Alan Levine, VP for Academic Affairs. At the meeting Alan said that he had rather carefully gone through the Faculty Handbook and that he had done a lot of searching through Marywood's "Policies and Procedures" but that he could NOT find anything pertaining to me offering a random attendance prize to a student who came to class.

When asked about the "other issues surrounding Mr. Creeley's speech" Mr. Levine said there were **no** issues pertaining to the speech, and in a friendly manner said that he merely meant that he wanted me to feel free to raise any issue pertaining to Marywood that was on my mind.

Alan did mention the meeting of the Executive Council (maybe he said Committee). I took the meeting to have occurred on Tuesday Nov. 29, but on Dec. 21, in an email from the student who got the posters approved on Nov. 28, learned that posters were seen to be missing as early as Monday evening Nov. 28. So maybe the meeting took place on Monday (afternoon?) November 28. Mr. Levine was at the meeting and he mentioned Mr. Heath as being in attendance. I did not ask for a roster of those attending.

Perhaps Mr. Levine's most interesting comment was that the big word at the meeting was PANDERING. Bad old me (Fagal), by offering the $50 attendance prize random draw, was accused of *pandering* to the students. I basically shook my head in disbelief. Mr. Levine mentioned professor(s) who brought in pizza for the class on course evaluation day. We agreed that was not too cool.

Finally, Mr. Levine seemed truly shocked when I told him that **each and every** poster which had been stamped "approved" on Monday morning in fact had on it, taped to the top, a strip of paper announcing the prize (and my contact information). Each prize announcement strip had been personally highlighted by me with a yellow highlighter before I gave them to student Student X to take to Student Life on Monday Nov. 28 at 8:30 am. Mr. Levine said that is not what he had been told by Mr. Oliveri; that Mr. Oliveri had told him that the posters which were torn down did NOT have the prize information on them.

I showed Mr. Levine a printed copy of what I thought Marywood should do to atone for its outrageous behavior. Mr. Levine asked if I could send him a copy by email and I said I would. See ATTACHMENT below for the full text of the letter. Of course I knew that Mr. Levine would have to send the letter "to the top."

Print - Close Window

Subject: Letter attached
From:   Frederick Fagal (fffagal@yahoo.com)
To:     levine@marywood.edu;
Date:   Monday, December 5, 2011 2:36 PM

# Hello Alan,

DEF003352

Please find attached the letter I shared with you earlier this afternoon.

I will not be available to see anyone until Monday December 12.

Thank you for what the diplomats call a "full and frank discussion."

Best,

Fred

ATTACHMENT To above December 5, 2011 2:36 PM email to Alan Levine. In the attached letter [printed here] I make some requests....

December 5, 2011 [10:39 am]

Alan Levine, Ph.D.
VP for Academic Affairs
Marywood University
Scranton, PA 18509

Dear Alan,

I am still at a loss as to an explanation for what happened. I have gone through the Faculty Handbook with some care and can find nothing that allows the university to tear down my posters that were approved for hanging. I asked you to direct me to the Marywood rule/policy Mr. Oliveri claims you said I have violated, but I have yet to hear from you.

The posters advertised that a speaker (Will Creeley of The Foundation for Individual Rights in Education [FIRE]) would give a presentation before Dr. Jackson's and my SSCI 201 Introduction to Social Science class. Dr. Jackson and I decided to open this special class presentation to all comers, and so reserved the Comerford Auditorium and advertised the event.

*I paid* for the speaker. *I paid* for the posters. To induce attendance (I am an economist) and give Marywood students a little fun [in short supply if you believe the Princeton Review] *I offered a $50 lecture attendance prize* (random drawing) to some lucky student. *The fifty dollars was mine. I also paid a few students my money to hang some posters* to save me time.

I knew (don't ask me how) that for posters to be hung around campus the hanger supposedly needed to have the "Marywood Unversity Approved by Student Life" stamp on the poster. I am

DEF003353

not sure why this would apply to faculty academically oriented posters, but I figured "better safe than sorry at the last minute," and so got the posters stamped. On November 28, 2011 (Monday morning) at 8:30 AM the 46 original posters were delivered to the Student Activities/Student Life office by a Marywood student. She waited while the 46 posters received the stamp of approval. Each approved poster had a paper strip taped onto the top of the poster which read "$50 Attendance Prize Draw to a Student!" Just because one of Mr. Oliveri's authorized underlings stamped the poster is not my problem. No one in the Marywood University Administration contacted me to inform me of a potential problem/issue relating to the offer on the poster of a prize drawing. Late Tuesday afternoon I learned via email from a student that my posters had been torn down. I immediately went to the UPS store to get more posters printed. *I paid to reprint the approved posters* torn down by Marywood University! Finally, at least five of these new posters were torn down on Wednesday (see below) for which you claim no knowledge.

Even if you still claim justification [source?] for tearing down the original posters the Marywood Administration comes off poorly --- certainly in my eyes, and I think when and if widely publicized the eyes of all neutral observers. Why not just chase away a few prospective students?! Some Marywood administrators (dare I say the Administration if the culprit has a big title?) showed an incredibly rude and crude and vindictive side by not even contacting me to inform me of the perceived problem. If not rude or crude or vindictive then perhaps obliviously stupid would be an alternative explanation…. I would prefer the oblivious explanation, I too can be oblivious….

As Dr. Jackson wrote in an email to Mr. Oliveri:

1) Dr. Fagal deserved an immediate call that the posters were taken down by school authorities.
2) The common sense solution to the problem identified as to the poster transgression was merely to remove the offending part of the posters. The lack of the call and the overreactive response clearly points to an effort to deny Dr. Fagal an opportunity to implement the common sense remedy for the situation.

Due to Marywood's actions I request, at this stage, fair compensation for financial damages you have imposed on me.
I ask that I immediately receive (by December 15, 2011)
**(1)** A $500 reimbursement check for my expenses and wasted time

**In addition, besides making me merely financially whole regarding this matter, I think it is only fair that Marywood "atone for its sins" and show its willingness to support free speech and inquiry** by inviting FIRE to campus for two Spring 2012 presentations and hosting a presentation by Robert Spencer of jihadwatch.org and anyone who cares to join him in debate [see item **(11)** below]. The ideal way to show commitment to free speech and open inquiry is by *action* with respect to sponsoring a presentation by someone with whom you vehemently disagree.

**(2)** By issuing to me a written public apology which indicates the actions [further outlined below] Marywood will take to remedy the damages done to its reputation.

DEF003354

**(3)** By having the apology in (2) to me also sent by email to every faculty member (including adjuncts) and every student.

**(4)** By paying FIRE $2000 (its normal rate) to give two presentations on campus during the Spring 2012 semester. Marywood will also pay normal meal and lodging expenses.

**(5)** By hosting [see (4)] one $1000 FIRE session (probably in February) for a daytime class presentation to the Social Science 201 class (presentation to be open to all on campus). A large room will be provided (at least the size of Comerford). A week before the event Marywood will also print ten 11x17 color posters, ten 11x17 black and white posters, ten 8.5x14 color posters, and ten 8.5x14 black and white posters advertising the event. I, perhaps with others, will hang the posters. Each poster will announce a $50 random door prize to a student attending the lecture. (I will pay the prize money).

**(6)** By using the other $1000 FIRE fee (plus food and motel bill) to pay for an evening presentation open to the whole community (probably in early April).

**(7)** By Marywood  spending at least $1000 [documented] on publicity (to be coordinated with me) for the evening program which will be open to the public and all members of the campus community. This can be switched to the event in (11) if I so decide.

**(8)** By Marywood providing "free pizza and soda" (1000 slices of pizza and 500 cold cans of soda) at the evening presentation. The advertising and free food is an effort to draw a large crowd. This could be switched to the event in (11) if I choose to do so.

**(9)** By including as part of every publicity notice for any evening event, the fact (prominently displayed)  that a randomly chosen person will win a $50 attendance prize (which I will provide).

**(10)** By ensuring the publicity for **each** event [including the event in (11)] will include two separate emails [to be approved by me] sent to the complete faculty list (including adjuncts) and the student email list. The emails will advertise the upcoming FIRE event or event (11), and  one of these  evening event emails (probably in April if FIRE, and Fall 2012 for Spencer)  will include the offer of "Free Pizza and Soda." For each  event the first email will be sent one week before the event, the reminder emails (also with complete information) will be sent 24 hours before each event. Every email must meet my approval.

**(11)** By sponsoring a Fall 2012 appearance on campus by Robert Spencer of Jihad Watch. Mr. Spencer, based on the jihadwatch.org website, will be willing to debate anyone regarding aspects of Islam, but his appearance is not contingent on the existence of a debater for the other side. This event shall be publicized by the number of posters outlined in (5) and by single topic emails sent to the faculty and student email lists as outlined above. The event will be open to the community and receive normal Marywood publicity for such an event. My friends and I will hang the posters designed with my approval. The opposition side in the proposed debate can of course hang its own posters or participate in the poster design.

By agreeing to the above I will consider this matter closed.

DEF003355

Sincerely,

Frederick F. Fagal, Jr.

#15 COMMENT: While driving home after the December 5 meeting with Alan Levine I did some thinking. I recalled the Harvard Professor of Economics Greg Mankiw, former chairman of president's Council of Economic Advisors, had just offered to take out to lunch (right after class) at a Chinese Restaurant in Harvard Square the first ten members of his large Ec 10 (introductory) economics class to respond to his email. Knowing that Marywood can teach Harvard a thing or two [heh], I sent an email to Mr. Levine pointing out the panderer at Harvard and suggested the Marywood administration warn Harvard of the panderer in its midst. Professor Mankiw is the author of best-selling economics textbooks and has a blog which is widely read.

Print - Close Window

Subject: Pandering at Harvard !!
From:   Frederick Fagal (fffagal@yahoo.com)
To:     levine@marywood.edu;
Date:   Monday, December 5, 2011 6:48 PM

Hello Allen,

I talked to a senior faculty member. She said that what I did and similar has often been done. Generally speaking I don't think Marywood wants to go down the pandering route.

If it does Marywood needs to get in touch with Harvard. Professor Greg Mankiw (former chair of the president's Council of Economic Advisors), very highly respected.....I think I could get him to support me on the "pandering charge." The below from his blog. Again, does Marywood REALLY want to go down this road? I can't imagine that the Marywood faculty would deem it wise. Upon reflecting further, professors who bring students pizza on evaluation day might well get laughed at

in the comments. And me having only one lottery winner might very well make more enemies (after the fact) than friends. After all I would have created an "occupy worthy" 1%....

Best... Fred

# Greg Mankiw's Blog

Random Observations for Students of Economics

## Monday, November 28, 2011

**Have lunch with me**

To current ec 10 students (only):

I will take up to ten students out to lunch after Wednesday's lecture at Yenching, my favorite Chinese restaurant in Harvard Square. Email me if you are interested in joining the group. First come, first served.

*permanent link* ✉

---

#16 COMMENT: While driving home after the December 5 meeting with Alan Levine another fact jumped into my mind. The Marywood administration itself [**Subject:** [MWADMIN] request your SUPPORT of Release the Light on April 13th} sponsored speeches and other events for which it encouraged professors to give "extra credit" to student who attended such favored events. The administration also encouraged professor to let such events substitute for class time. But to top it off, random PRIZES including $50 VISA card were offered to students who attended the favored event. I must admit to showing much glee as I sent these emails to Mr. Levine the same day we met....

---

Print - Close Window

Subject: PANDERING ALERT !! Fw: [MWADMIN] request your SUPPORT of Release the Light on April 13th
From:   Frederick Fagal (fffagal@yahoo.com)
To:     levine@marywood.edu;
Date:   Monday, December 5, 2011 7:14 PM

DEF003357

Alan,

See Yellow Highlighted and bolded. Extra credit ! Class time!
Prizes at the door!  Enough Said ! I rest my case....not that I

couldn't come up with more evidence. I am

laughing....This is like shooting

fish in a barrel....Fred

----- Forwarded Message -----
**From:** "Decker, Barbara" <bdecker@marywood.edu>
**To:** mwadmin@mail.marywood.edu
**Sent:** Tuesday, April 5, 2011 12:30 AM
**Subject:** [MWADMIN] request your SUPPORT of Release the Light on April 13th

Announcing!  Announcing!  The 10th annual **Release the Light** sexual assault awareness program will
be held on Wed. **April 13th from 11:30am to 1:00pm in the Fireplace Lounge.**  Like last year, the
program will include a **Let Your Feet Speak mile March** through campus from 11:30 to 12:00 noon,
beginning and ending at Nazareth.  Then from noon to 1pm, we will hold a **Food and Information Fair**,
with written materials and speakers available to cover topics on a variety of sexual and physical violence
topics.  Speakers will include David Elliott, Senior Director  for Marywood University Safety, Erika Del
Rosso, M.Ed, Teen Advocate of the Women's Resource Center, and Sr. Gail Cabral I.H.M., Ph.D.,Full
Professor Psychology at Marywood.  There will be an assortment of food donated from Chartwells and
community businesses.  Also, **raffles** will include two $50 VISA gift cards and more.
Thus far, the following groups and organizations will be participating: Counseling/Student Development
Center, Peers on Wellness, Women's Studies, Diversity United, Psychological Services, Active Minds,
Music Therapy Department, Chi Sigma, Graduate Student Council, RAE (Relationship Awareness and
Empowerment Task Force), Criminal Justice Club, and the Women's Resource Center.  This year's
program will again include a **clothesline project**, which will involve participants writing messages on a
variety of colored t-shirts representing different types of violence.  In addition, we will again take a
**community wide pledge against sexual violence**, which will involve participants leaving their hand
stamp and signature on a large bed sheet that contains our pledge.  During the fair, we will have music
and an open mike available to those who would like to address the subject of violence with a poem,
readings, or songs.
In conjunction with Release the Light will be a tree planting ceremony for Caitlin McGuire at 11am
near the Schwartz Center, to which we  welcome faculty, staff, and students in memorializing

Caitlin.
**I am writing to you** to ask that you help to make this a campus wide event by becoming involved in the

DEF003358

following ways:  **First,** if you would take a minute in your classes and club meetings to announce that April is **National Sexual Assault Awareness Month** and share with them the information in this email about the fair.  **Secondly,** we encourage you to attend the event yourselves along with your students.  **We hope faculty will offer students extra credit for attending, or use some of your class time to attend the event with your students.**  Also, if you are an advisor of a student group (athletics, student life, academics), we ask that you consider requiring your entire group to attend the program, starting with the march at 11:30am and the fair 12pm.

Looking forward to all of us uniting together on the 13th in taking a community wide pledge against sexual violence!  I thank you in advance for your support of this important  cause!

Sincerely,  Barb Decker

Barbara B. Decker, M.A., LPC, NCC
Associate Director and Peers on Wellness Advisor
Counseling/Student Development Center
Marywood University
570-348-6245
bdecker@marywood.edu

---

#17 COMMENT: It is now December 13 and in my letter of December 5 I had asked for, among other things, $500 reimbursement for my expenses. With no reply yet I sent a a concise reminder email..

Print - Close Window

Subject:?

From:   Frederick Fagal (fffagal@yahoo.com)

To:      levine@marywood.edu;

Date:   Tuesday, December 13, 2011 12:21 PM

?

---

#18 COMMENT: On December 15 I received the email below from Alan Levine. A letter was attached to the email, and in this letter Mr. Levine responded to the requests I laid out in my letter of December 5. The attached letter, denying all requests, is reproduced below following the email.

Print - Close Window

DEF003359

Subject: Response to 12-5-11 letter

From:   Dr Alan Levine (levine@maryu.marywood.edu)

To:     fffagal@yahoo.com;

Date:   Thursday, December 15, 2011 1:23 PM


Fred,

Please see the attached response to your 12-5-2011 letter to me.

Alan


--
Alan M. Levine, PhD
Vice President for
   Academic Affairs
Marywood University
2300 Adams Ave
Scranton, PA  18509
(t) 570 348-6290
(f) 570 961-4743
e-mail: levine@marywood.edu

DEF003360



**Marywood**
UNIVERSITY
OFFICE OF ACADEMIC AFFAIRS

MARYWOOD UNIVERSITY
SCRANTON, PA 18509-1598
TEL: (570) 348-6232
FAX: (570) 961-4743
LEVINE@MARYWOOD.EDU
www.marywood.edu

December 15, 2011

Dr. Frederick F. Fagal, Jr
Department of Social Sciences
Marywood University
2300 Adams Ave.
Scranton, PA 18509

Dear Fred,

It appears we have a different understanding of what transpired around the issue of the posters that advertised the presentation by Will Creeley of the Foundation for Individual Rights in Education (FIRE). Whether we will ever come to complete agreement concerning the exact timeframe for approval, or lack thereof, remains to be seen, but at any rate I do want to respond to your letter of December 5, 2011.

Sr. Anne Munley and I remain open to future presentations that are not in conflict with our mission statement or core values, and are organized according to our policies and practices. However, we are not willing to undertake any of the specific requests that are contained in your letter.

Please feel free to be in touch if you want to further discuss this issue.

Sincerely,

Alan M. Levine, PhD
Vice President for Academic Affairs

Cc:     Sr. Anne Munley, IHM, President
        Michael Foley, Ph.D., Dean, College of Liberal Arts and Sciences
        File

---

#19 COMMENT : Friday December 16, 2011 8:43 AM I ask Alan Levine if he could clarify by what he meant by "...we have a different understanding of what transpired..."   "you email" obvious typo ☺ as is "transpried" for transpired in the subject line.

<u>Print</u> - <u>Close Window</u>

DEF003361

Subject:Is the "what trasnpired" issue to which you refer?

From:   Frederick Fagal (fffagal@yahoo.com)

To:     levine@marywood.edu;

Date:   Friday, December 16, 2011 8:43 AM

Hello Alan,

Based on our December 2 meeting and you email of December15 am I correct in assuming that when you wrote yesterday

"we have a different understanding of what transpired around the issue of the posters that advertised the presentation by Will Creeley."

you are referring solely to what (as I recall) you said Mr. Oliveri told you, *namely that the 46 posters which  received the stamp of approval did **not** have attached to them the prize offer?*

Thank you.

Sincerely,

Fred Fagal

---

#20 COMMENT: Much appreciated clarification from Mr. Levine. As outlined above in COMMENT #14, at our December 5 meeting Mr. Levine had shown surprise when I told him that ALL the posters approved on Monday morning November 28 did in fact have attached to them the strip of white paper announcing the $50 prize draw for attendance. Also on that strip was my email address as Contact information. At the December 5 meeting Mr. Levine said that Mr. Oliveri had told him a different story. Below is the first time that Mr. Heath's name has come up regarding this matter where Mr. Levine claims that Mr. Heath had also said the Monday posters when approved did NOT have on them the prize (or contact!) information.

<u>Print</u> - <u>Close Window</u>

Subject:Re: Is the "what trasnpired" issue to which you refer?

From:   Dr Alan Levine (levine@maryu.marywood.edu)

To:      fffagal@yahoo.com;

Date:    Monday, December 19, 2011 9:10 AM


Fred,

Yes, I was referring to information that I received from Carl Oliveri
and Ray Heath.

Alan



On 12/16/11, Frederick Fagal <fffagal@yahoo.com> wrote:
> Hello Alan,
>
> Based on our December 2 meeting and you email of December15 am I correct in
> assuming that when you wrote yesterday
>
>
> "we have a different
> understanding of what transpired around the issue of the posters that
> advertised the presentation by Will Creeley."
>
> you are referring solely to what (as I recall) you said Mr. Oliveri told
> you, namely that the 46 posters which received the stamp of approval did
> not have attached to them the prize offer?
>
> Thank you.
>
> Sincerely,
>
> Fred Fagal
>


--
Alan M. Levine, PhD
Vice President for
   Academic Affairs
Marywood University
2300 Adams Ave
Scranton, PA 18509
(t) 570 348-6290
(f) 570 961-4743
e-mail: levine@marywood.edu

DEF003363

DEF003364

December 2,  2011

Alan Levine, Ph.D.
VP for Academic Affairs
Marywood University
Scranton, PA 18509

Dear Alan,

I am still at a loss as to an explanation for what happened. I have gone through the Faculty
Handbook with some care and can find nothing that allows the university to tear down my
posters that were approved for hanging. I asked you to direct me to the Marywood rule/policy
you claim I have violated [i.e. the fact that I offered a random drawing prize to an attendee] but I
have yet to hear from you.

The posters advertised that a speaker (Will Creeley of The Foundation for Individual Rights in
Education [FIRE]) would give a presentation before Dr. Jackson's and my SSCI 201 Introduction
to Social Science class. Dr. Jackson and I decided to open the class to all comers and so reserved
the Comerford Auditorium and advertised the event.

*I paid* **for the speaker.** *I paid* **for the posters**. To induce attendance (I am an economist) and
give Marywood students a little fun [in short supply if you believe the Princeton Review] *I
offered a $50 lecture attendance prize* (random drawing) to some lucky student. ***The fifty
dollars was mine. I also paid a few students my money to hang some posters*** to save me time.

I knew (don't ask me how) that for posters to be hung around campus the hanger needed to have
the "Marywood Unversity Approved by Student Life" stamp on the poster. On November 28,
2011 (Monday morning) at 8:30 am the 46 original posters were delivered to the Student
Activities/Student Life office by a Marywood student. She waited while the 46 posters received
the stamp of approval. Each approved poster had a paper strip taped onto the top of the poster
which read "$50 Attendance Prize Draw to a Student!" Just because one of Mr. Oliveri's
authorized underlings stamped the poster is not my problem. No one in the Marywood
University Administration contacted me to inform me of a potential problem/issue. Late Tuesday
afternoon I learned via email from a student that my posters had been torn down. I immediately
went to the UPS store to get more posters printed. *I paid to reprint the approved posters* torn
down by Marywood University! Finally, some of these new posters were torn down on
Wednesday (see below) for which you claim no knowledge.

Even if you claim justification {which **you** have not yet done} for tearing down the posters,
Marywood's Administration comes off poorly --- certainly in my eyes, and I think when and if
widely publicized the eyes of all neutral observers. Why not just become a pathetic
laughingstock while chasing away a few prospective students ?! Certainly some Marywood
administrator(s) showed an incredibly rude and crude and vindictive side by not even contacting
me to inform me of the perceived problem.

As Dr. Jackson wrote in an email to Mr. Oliveri:

DEF003365

1) Dr. Fagal deserved an immediate call that the posters were taken down by school authorities.
2) The common sense solution to the problem identified as to the poster transgression was merely to remove the offending part of the posters. The lack of the call and the overreactive response clearly points to an effort to deny Dr. Fagal an opportunity to implement the common sense remedy for the situation.

Due to Marywood's actions I request, at this stage, fair compensation for financial damages you have imposed on me.
I ask that I immediately receive (by December 15, 2011)
**(1)** A $500 reimbursement check for my expenses and wasted time

**In addition, besides making me merely financially whole regarding this matter, I think it is only fair that Marywood "atone for its sins" and show its willingness to support free speech** by inviting FIRE to campus for two Spring 2012 presentations and hosting a presentation by Robert Spencer and anyone who cares to join him in debate [see item **(11)** below]. The ideal way to show commitment to free speech is by action with respect to sponsoring a presentation by someone with whom you vehemently disagree.

**(2)** By issuing to me a written public apology which indicates the actions [outlined below] Marywood will take to remedy the damages done to its reputation.

**(3)** By having the  apology in (2) to me also sent by email to every faculty member (including adjuncts) and every student.

**(4)** By paying FIRE $2000 (its normal rate) to give two presentation on campus during the Spring 2012 semester. Marywood will also pay normal meal and lodging expenses.

**(5)** By hosting [see (4)] one $1000 FIRE session (probably in February) for a daytime class presentation to the Social Science 201 class (presentation to be open to all on campus). A large room will be provided (at least the size of Comerford).  A week before the event Marywood will also print ten 11x17 color posters, ten 11x17 black and white posters, ten 8.5x14 color posters, and ten 8.5x14 black and white posters advertising the event. I, perhaps with others, will hang the posters. Each poster will announce a $50 random door prize to a student attending the lecture. (I will pay the prize money).

**(6)** By using the other $1000 FIRE fee (plus food and motel bill) to pay for an evening presentation open to the whole community (probably in early April).

**(7)** By Marywood  spending at least $1000 [documented] on publicity (to be coordinated with me) for the evening program which will be open to the public and all members of the campus community.

**(8)** By Marywood providing "free pizza and soda" (1000 slices of pizza and 500 cold cans of soda) at the evening presentation. The advertising and free food is an effort to draw a large crowd.

DEF003366

**(9)** By including as part of every publicity notice for the evening event, the fact (prominently displayed) that a randomly chosen person will win a $50 attendance prize (which I will provide).

**(10)** By ensuring the publicity for **each** event will include two separate emails [to be approved by me] sent to the complete faculty list (including adjuncts) and the student email list. The emails will advertise the upcoming FIRE event, and these (probably April) evening event emails will include the offer of "Free Pizza." For each FIRE event the first email will be sent one week before the event, the reminder emails (also with complete information) will be sent 24 hours before each event. Every email must meet my approval.

**(11)** By sponsoring a Fall 2012 appearance on campus by Robert Spencer of Jihad Watch. Mr. Spencer, based on the jihadwatch.org website, will be willing to debate anyone regarding aspects of Islam, but his appearance is not contingent on the existence of a debater for the other side. This event shall be publicized by the number of posters outlined in (5) and by single topic emails sent to the faculty and student email lists as outlined above. My friends and I will hang the posters designed with my approval. The opposition side in the proposed debate can of course hang its own posters or participate in the poster design.

By agreeing to the above I will consider this matter closed.

Sincerely,


Frederick F. Fagal, Jr.

DEF003367



**Marywood**
U N I V E R S I T Y
OFFICE OF ACADEMIC AFFAIRS

MARYWOOD UNIVERSITY
SCRANTON, PA 18509-1598
TEL: (570) 348-6232
FAX: (570) 961-4743
LEVINE@MARYWOOD.EDU
www.marywood.edu

December 15, 2011

Dr. Frederick F. Fagal, Jr
Department of Social Sciences
Marywood University
2300 Adams Ave.
Scranton, PA  18509

Dear Fred,

It appears we have a different understanding of what transpired around the issue of the posters that advertised the presentation by Will Creeley of the Foundation for Individual Rights in Education (FIRE). Whether we will ever come to complete agreement concerning the exact timeframe for approval, or lack thereof, remains to be seen, but at any rate I do want to respond to your letter of December 5, 2011.

Sr. Anne Munley and I remain open to future presentations that are not in conflict with our mission statement or core values, and are organized according to our policies and practices. However, we are not willing to undertake any of the specific requests that are contained in your letter.

Please feel free to be in touch if you want to further discuss this issue.

Sincerely,

Alan M. Levine, PhD
Vice President for Academic Affairs

Cc:   Sr. Anne Munley, IHM, President
      Michael Foley, Ph.D., Dean, College of Liberal Arts and Sciences
      File

*An education inspired by the Sisters, Servants of the Immaculate Heart of Mary.*

DEF003368

Dear Sr. Gail:

I received your e-mail of February 17, 2012. I have not heard from you with regard to making contact with the Faculty Grievance Committee Chair. The next step, I understand from the Faculty Grievances and Appeals policy, is that "[t]he Chair should be provided with a written statement setting forth, in detail, the nature of the grievance or appeal and identifying the person(s) or body against whom the grievance or appeal is directed; this document may also include a proposal for resolving the issue." Below I have written such a statement. I ask that you kindly forward it to the Faculty Grievance Committee Chair. If you have any questions or require additional information, please do not hesitate to ask.

Sincerely,

Frederick F. Fagal, Jr.

## Grievance of Dr. Frederick F. Fagal, Jr. Against President Anne Munley

I am hereby filing a formal grievance against President Anne Munley pursuant to Marywood University's Faculty Grievances and Appeals ("FGA") policy. The most current version of all of Marywood's policies are available on the University's web site. See Policies and Procedures Manual – Marywood University, http://www.marywood.edu/policy ("PPM").

My grievance is based on the following violations of Marywood's Progressive Discipline policy.

1. *President Munley improperly suspended me.* At 8:45 am the morning of January 23, 2012, Dean Michael Foley of the College of Liberal Arts and Sciences stopped by my office. He told me that President Munley was summoning me to her office for a 9:00 am meeting. Barely time to catch my breath. Once in her office, she asked me if I was responsible for posting a two-part video on YouTube. My answer was "yes." This was clear as I had linked to the videos in an e-mail to Marywood's faculty dated January 13, 2012. At the end of my meeting with President Munley, she told me that I was suspended with pay; that I should turn in my University ID and keys to Pat Dunleavy; and that I should clean out my office. President Munley's suspension was improper on at least two procedural grounds:
   a. Marywood's Progressive Discipline Policy states that "[t]he faculty member may be suspended by the Vice President for Academic Affairs at any time during the proceedings involving him or her." PPM, "Progressive Discipline." Nowhere does the Progressive Discipline Policy authorize Marywood's President to suspend a faculty member. To my knowledge, the Vice President for Academic Affairs (Dr. Alan M. Levine) had nothing to do with my suspension. He was not at the meeting. My attorney, Jonathan Z. Cohen, Esquire, wrote a letter to President Munley dated February 2, 2012 pointing this out. In response, President Munley and her/Marywood's outside counsel, William J. Anthony,

DEF003369

Esquire, wrote letters on February 8 and 9, respectively.  Neither letter denied what Mr. Cohen pointed out.

    **b.**  Marywood's Progressive Discipline Policy further states that "[s]uspension is justified if immediate harm to the faculty member or others is threatened by the person's continuance in the faculty position." PPM, "Progressive Discipline." To my knowledge, President Munley has never alleged that I have ever been an "immediate harm" to anybody.  Mr. Cohen's letter of February 2, 2012 pointed this out.  In response, neither President Munley nor Mr. Anthony disputed this.

**2.**  *President Munley improperly moved to terminate my employment and tenure.*  At 1:11 PM on January 24, 2012, I received an e-mail from Frances D. Ferrese.  As you know, Ms. Ferrese is President Munley's assistant.  Ms. Ferrese's e-mail attached a letter from President Munley and five (5) other documents.  The first sentence of President Munley's letter begins:  "In follow up to our meeting yesterday, I am writing to inform you that I am recommending that your tenure and employment with Marywood be terminated immediately…"  President Munley's move to terminate my employment and tenure was improper for at least two procedural reasons:

    **a.**  Marywood's Progressive Discipline Policy contains one sentence addressing dismissal:  "If remedial actions(s) taken during the suspension does not sufficiently resolve the issues that lead to the suspension, the university may move towards dismissal of the faculty member." PPM, "Progressive Discipline." To my knowledge, no "remedial actions" were taken during my suspension.  As stated above, my suspension commenced at some point during the morning of January 23, 2012.  President Munley's letter moving to terminate me arrived at 1:11 PM on the following day.  Again, Mr. Cohen's letter of February 2, 2012 points this out.  In response, neither President Munley nor Mr. Anthony disputed this.

    **b.**  Marywood's Progressive Discipline Policy suggests that only the Vice President for Academic Affairs may recommend dismissal:  "Having received a written recommendation for either suspension or dismissal *from the Vice President for Academic Affairs*, the President of the University sends a written communication to the faculty member, stating with reasonable particularity the basis for suspension or dismissal and offering, if requested by the faculty member within 10 days, to convene a tenured faculty ad hoc committee to consider the matter, to render confidential advice, and thereby to effect a remedy if possible." PPM, "Progressive Discipline" (emphasis added).  I am not aware of any evidence that Dr. Levine played a role in recommending my dismissal.

**3.**  *My request to convene an ad hoc committee to appeal the suspension has not been accepted.*  Marywood's Progressive Discipline policy states that "[f]aculty members have the right to convene an ad hoc committee in order to appeal either a decision to suspend the faculty member or a decision to dismiss the faculty member." PPM, "Progressive Discipline."  This policy also states:  "Should a faculty member request that such a committee be convened twice (i.e., once for suspension and once for dismissal), the membership of the committee may be similar or different…" PPM, "Progressive Discipline."  By my attorney's letter of February 2, 2012, I elected to convene an ad hoc committee to appeal President Munley's decision to suspend me.  President Munley's letter in response dated February 8, 2012 ignored my request.  Mr. Anthony's letter to

my attorney dated the next day states that "as a result of [Dr. Fagal's] first breach, he is not entitled to pick and choose which policies and procedures he believes will suit him best." Mr. Anthony more than confirmed President Munley's ignoring of my request. Mr Anthony made this stunning assertion: "As a result of Dr. Fagal's breach of contract Marywood had no further contractual obligations to him."

I would ask that you closely consider Marywood's assertion that it owes no further contractual obligations to me. In effect, this means that Marywood has suspended its entire Policies and Procedures Manual—including its detailed disciplinary apparatus—with respect to me. The natural consequence of Marywood's bald assertion is, of course, that the University believes that the Faculty Grievance Committee need not fulfill its function with respect to me either. Every faculty member should find this consequence as offensive as I do. Given the conflicting messages that you are likely receiving, I strongly recommend that the Faculty Grievance Committee hire its own independent counsel.

My proposal for resolving this issue is that the Faculty Grievance Committee strongly recommend that President Munley comply with the Progressive Discipline policy, which she personally revisited and approved in October 2011. Under that policy, President Munley should rescind her suspension and her letters recommending the termination of my employment and tenure—as she lacked the authority to take either step. Short of this, President Munley should permit me to convene an ad hoc committee to appeal her decision to suspend me. That appeal should obviously take place prior to any hearing regarding President Munley's recommendation to terminate me given that the propriety of this recommendation depends upon the propriety of my suspension. See PPM, "Progressive Discipline."

For your convenience, I have attached PDF copies of my e-mail of January 13, 2012 (with all attachments); Ms. Ferrese's e-mail of January 24, 2012 (with all attachments); my attorney's letter to President Munley dated February 2, 2012; and Mr. Anthony's letter dated February 9, 2012 (which attached President Munley's letter of February 8, 2012.).

DEF003371

LAW OFFICES *of*

# DAVID G. CONCANNON, LLC

February 2, 2012

<u>Via E-Mail, Facsimile & FedEx</u>

President Anne Munley, Ph.D., IHM
Marywood University
2300 Adams Avenue
Scranton, Pennsylvania 18509

  **Re:** Employment status of Dr. Frederick F. Fagal, Jr.

Dear President Munley:

  I am legal counsel to Dr. Frederick F. Fagal, Jr. The purpose of this letter is to: (1) remind you of Dr. Fagal's contractual relationship to Marywood University; (2) respond to your suspension of Dr. Fagal on January 23rd, 2012; (3) respond to your letter dated January 24th, 2012 informing Dr. Fagal of your recommendation to terminate his tenure and employment; and (4) inform you of the legal consequences of punishing Dr. Fagal further.

  **1.** <u>**The legal relationship between Dr. Fagal and Marywood**</u>

  Marywood University and Dr. Fagal are parties to a contract. The Letter of Agreement that you signed on May 10th, 2011 "serves as a binding contract . . . and as a vehicle to renew, adjust and/or alter the terms of [Dr. Fagal's] original contract regarding appointment, rank, tenure, salary, benefits, etc." <u>Policies and Procedures Manual – Marywood University</u>, http://www.marywood.edu/policy ("<u>PPM</u>"). Dr. Fagal's original contract incorporates the policies and procedures of Marywood's Faculty Handbook.

  Changes to Marywood's Faculty Handbook "are effective with formal approval and placement in the *Marywood University Policies and Procedures Manual.*" Marywood University Faculty Handbook, Introduction (July 1, 2010). Marywood's policies are "binding on members of the University community" and they become operational with your personal approval. <u>See</u> <u>PPM</u>.

  **2.** <u>**Your suspension of Dr. Fagal was a breach of policy and contract.**</u>

  Marywood's Policies and Procedures Manual contains a section called "Progressive Discipline," which is obviously relevant to this matter despite your failure to cite it. Under that policy, suspension "is justified if immediate harm to the faculty member or others is threatened

DEF003372

LAW OFFICES *of*

# DAVID G. CONCANNON, LLC

by the person's continuance in the faculty position." The decision to suspend is left to the Vice President for Academic Affairs (Dr. Alan M. Levine)—not you.

Dr. Fagal is not aware of any allegation by a Marywood official that his presence on campus threatens "immediate harm" to any individual. Nor could such hypothetical allegations be taken seriously under the circumstances: Dr. Levine has not required that Dr. Fagal participate in counseling or any other type of treatment pursuant to the Progressive Discipline policy; Dr. Fagal has not been barred from campus to his knowledge; and he is not aware of any report to law enforcement authorities regarding any "immediate harm."

Your suspension of Dr. Fagal is not justified under Marywood policy and is therefore a breach of contract. Marywood's Progressive Discipline policy states that "[f]aculty members have the right to convene an ad hoc committee in order to appeal either a decision to suspend the faculty member or a decision to dismiss the faculty member." PPM. Dr. Fagal hereby elects to convene an ad hoc committee to appeal his suspension.

### 3.   Your January 24th letter to Dr. Fagal was another breach of policy and contract.

In your letter dated January 24, you informed Dr. Fagal of your recommendation to terminate his tenure and employment immediately. Marywood's Progressive Discipline policy, which you personally revisited and approved on October 12, 2011, contains one sentence specifically addressing dismissal:

> If remedial actions(s) taken during the suspension does not
> sufficiently resolve the issues that lead to the suspension, the
> university may move towards dismissal of the faculty member.

PPM. Dr. Fagal is not aware of any "remedial actions" taken by Marywood to "resolve the issues" that led to his suspension. As you know, Dr. Fagal's suspension began on the morning of January 23; your letter regarding termination arrived in his inbox at 1:11 PM on the next day.

Your move toward dismissal of Dr. Fagal was another clear breach of Marywood policy and contract. The letter should be rescinded immediately. In the meantime, Dr. Fagal hereby elects to convene a separate ad hoc committee pursuant to Marywood's Progressive Discipline policy. See PPM.

### 4.   Legal consequences of proceeding further.

Assuming that your letter was a proper step toward Dr. Fagal's dismissal—and it surely was not—the idea that you would recommend termination under these circumstances is troubling. The first three sentences of Marywood's Tenure policy read as follows:

2

LAW OFFICES *of*
# DAVID G. CONCANNON, LLC

> Tenure is a term designating permanent and continuous
> appointment for a full-time faculty member. It implies a mutual
> commitment on the part of the faculty member and the University
> and cannot be taken lightly. Once tenure is granted, it will be
> discontinued only for grave reason, which may include moral
> turpitude, flagrant abuse of academic freedom, or professional
> incompetence.

PPM (emphasis added). Dr. Fagal is not aware of any allegations of "moral turpitude," "flagrant abuse of academic freedom," "professional incompetence," or other form of "grave" misconduct directed against him. Moreover, the videos that he posted on YouTube are satirical exercises. While we accept at face value that you were offended by Dr. Fagal's videos, you are not the Universal Arbiter of the line between offensive and humorous expression. No "grave reason" has arisen to terminate Dr. Fagal's tenure. I am confident that a committee of tenured Marywood faculty or a federal jury, if necessary, will agree.

Your letter concludes with an incomplete "Statement of Charges" relating to your recommendation to terminate Dr. Fagal but sidestepping the issue of his suspension entirely. The end of the second charge is literally missing; no reader could know the full substance of the charges or even the number of charges against Dr. Fagal, let alone defend against the charges. The remaining charges lack the "reasonable particularity" required by Marywood's Progressive Discipline policy, see PPM, and are otherwise fundamentally flawed for the following reasons:

- *"Violation of Tenure Policy."* Only the first four sentences of this policy pertain to the circumstances in which a tenured faculty member may lose his or her tenure. The remainder of the policy, including the text quoted in your letter, addresses the policies and criteria by which a faculty member may attain tenure.
- *"Violation of Civil Rights Policy."* Again, part of this charge is missing. In any case, Dr. Fagal has not received any complaint pursuant to Marywood's Civil Rights Complaint Procedures. See PPM. Those procedures "must be followed any time a member of the Marywood University community believes s/he has been the victim of...discrimination, harassment, or assault by any member of the University community...." PPM.
- *"Violation of Professional Ethics Policy."* Allegations of discrimination or harassment must be handled pursuant to Marywood's Civil Rights Complaint Procedures, as mentioned above. See PPM.
- *"Violation of the University's Mission and Values as well as the principles of collegiality."* This charge is far too vague to be of any use. To the extent that you are alleging that Dr. Fagal has not been sufficiently collegial, this charge is simply an end-run around Marywood's Civil Rights Complaint Procedures. See PPM.

3

DEF003374

LAW OFFICES *of*

# DAVID G. CONCANNON, LLC

Next, your letter presents Dr. Fagal with two concocted choices: You ask Dr. Fagal to indicate whether he grants permission for Marywood "to release Sister Anne Munley's Recommendation for Termination and Statement of Charges dated 1/24/12" to a faculty committee. The alternative choice, refusing such permission, requires Dr. Fagal to acknowledge "that there will be no faculty committee review of Sister Anne Munley's decision to terminate [his] tenure and employment with the University prior to it being finalized." In other words, you invite Dr. Fagal to ratify a recommendation for termination and a "Statement of Charges" that breach multiple contractual obligations by Marywood *or* ratify a termination decision by you alone that likewise breaches multiple contractual obligations by Marywood. My client will not waive either breach.

As stated above, Dr. Fagal elects to convene two separate ad hoc committees pursuant to Marywood's Progressive Discipline policy: one for your decision to suspend him and the other for your recommendation to terminate him. Dr. Fagal makes these elections pursuant to Marywood's Progressive Discipline policy. See PPM. Please confirm that I will be permitted to represent Dr. Fagal at any such hearings.

In the event that you proceed solely with your recommendation to terminate Dr. Fagal, then I request that you at least send me an amended, more detailed "Statement of Charges" rectifying all of the problems that I have described above.

If you have any questions about this matter, please do not hesitate to contact me.

Sincerely,

Jonathan Z. Cohen, Esquire

4

DEF003375

Representing Management Exclusively in Workplace Law and Related Litigation



| | | | |
|---|---|---|---|
| Jackson Lewis LLP | ALBANY, NY | DETROIT, MI | MILWAUKEE, WI | PORTLAND, OR |
| 90 State House Square | ALBUQUERQUE, NM | GREENVILLE, SC | MINNEAPOLIS, MN | PORTSMOUTH, NH |
| 8th Floor | ATLANTA, GA | HARTFORD, CT | MORRISTOWN, NJ | PROVIDENCE, RI |
| Hartford, Connecticut 06103 | BALTIMORE, MD | HOUSTON, TX | NEW ORLEANS, LA | RALEIGH-DURHAM, NC |
| Tel 860 522-0404 | BIRMINGHAM, AL | INDIANAPOLIS, IN | NEW YORK, NY | RICHMOND, VA |
| Fax 860 247-1330 | BOSTON, MA | JACKSONVILLE, FL | NORFOLK, VA | SACRAMENTO, CA |
| www.jacksonlewis.com | CHICAGO, IL | LAS VEGAS, NV | OMAHA, NE | SAN DIEGO, CA |
| | CINCINNATI, OH | LONG ISLAND, NY | ORANGE COUNTY, CA | SAN FRANCISCO, CA |
| | CLEVELAND, OH | LOS ANGELES, CA | ORLANDO, FL | SEATTLE, WA |
| | DALLAS, TX | MEMPHIS, TN | PHILADELPHIA, PA | STAMFORD, CT |
| | DENVER, CO | MIAMI, FL | PHOENIX, AZ | WASHINGTON, DC REGION |
| | | | PITTSBURGH, PA | WHITE PLAINS, NY |

MY EMAIL ADDRESS IS: ANTHONYW@JACKSONLEWIS.COM

February 9, 2012

**VIA ADVANCE EMAIL**
Jonathan Z. Cohen, Esquire
Law Offices of David G. Concannon, LLC
200 Eagle Road, Suite 116
Wayne, PA 19087

> Re:   Marywood University

Dear Attorney Cohen:

We reviewed your February 2, 2012 letter and write in response to same.  As explained more fully below:  1) Dr. Frederick F. Fagal breached his contract with Marywood University resulting in Sister Anne Munley's recommendation which she forwarded to him on January 23, 2012; 2) as a result of his first breach, he is not entitled to pick and choose which policies and procedures he believes will suit him best; and 3) his reprehensible conduct in depicting Marywood's President as Adolf Hitler and disseminating it to members of the Marywood community led to the University's action against Dr. Fagal, which it intends to stand by and defend should the need arise.

### Dr. Fagal Breached His Contract With Marywood

By entering into his contract with Marywood, Dr. Fagal agreed to the following which is outlined in Marywood's tenure policy:

> The commitment of a faculty member who requests tenure is as deep and binding on the faculty member as it is on the University.  Just as the conferring of tenure by the University recognizes the competence of an individual faculty member, submission to the University of an application for tenure suggests a strong acceptance by that individual of the mission, goals and objectives of the University.  The request represents a commitment to work jointly with faculty, students, administrators and staff for the growth and welfare of the University.  It is a commitment to devote one's energies to continued personal development and continued high levels of achievement as a member of the Marywood academic community.

DEF003376



Attorneys at Law

As you apparently are not familiar with Marywood's mission, goals and objectives, we have attached them to this letter for your review. As you will see, disseminating a message and video to the Marywood Community which uses vulgar language, depicts the University's leaders as Nazis and belittles its leaders through personal insults have no place at Marywood University. More importantly, this conduct breaches a material term of Dr. Fagal's commitment to the University as a tenured faculty member.

As a result of Dr. Fagal's breach of contract, Marywood had no further contractual obligations to him. See, e.g., Sylvester v. Southwestern Energy Prod. Co., 2009 U.S. Dist. LEXIS 101788, at *5 (M.D. Pa. 2009) (a material breach of contract by one party discharges the other party's duties); Triad Retail Partners v. Diemer, 1989 U.S. Dist. LEXIS 2406, at *9 (E.D. Pa. 1989) (the first material breach discharges the other party's remaining obligations under the contract); Widmer Engineering, Inc. v. Dufalla, 2003 PA Super 391, 837 A.2d 459, 467 (Pa. Super. 2003) (noting "settled principle of contract law: a material breach by one party to a contract entitles the non-breaching party to suspend performance").

### Marywood's President Acted Properly in Suspending Dr. Fagal and Recommending Termination

Contrary to your assertion, Marywood's President determined that Dr. Fagal's attempt to use the Nazi regime and all it stands for was extremely disturbing and demonstrated a depraved indifference to moral behavior consistent with Marywood University and the fundamental values upon which it and the Catholic church are founded. Whether you choose to view your client's actions as "satirical", comical or appropriate is of no significance to Marywood. Neither you nor your client has the responsibility for preserving Marywood's mission, values and healthy environment. See Murphy v Duquesne University of the Holy Ghost, 777 A.2d 418 (Pa. 2001) (finding that the university did not breach the terms of the faculty handbook when it terminated a tenured professor of law for "serious misconduct" after it determined he had violated its sexual harassment policy). Moreover, a tenured professor has no breach of contract claim against a university for allegedly making a wrong decision when it terminated his employment. See Murphy, 777 A.2d at 433 ("while [a professor] is free to assert in a court of law that the process of forfeiture that was afforded him did not comply with the contract terms, he is not free to demand that a jury re-consider and re-decide the merits of his termination"); Baker v. Lafayette College, 516 Pa. 291, 532 A.2d 399, 403 (Pa. 1987) ("This Court has no jurisdiction to review the factual determinations of a college's governing body unless it can be clearly demonstrated that body violated its own procedures."); Robertson v. Drexel Univ., 2010 PA Super 22, 991 A.2d 315, 320 (Pa. Super. 2010) (private parties, including religious and educational institutions, may draft employment contracts which restrict review of professional employees' qualifications to an internal process that, if conducted in good faith, is final within the institution and precludes or prohibits review in a court of law); Shepard v. Temple Univ., 2008 PA Super 93 (Pa. Super. 2008) (where assistant professor claimed that the denial of her application for tenure constituted a breach of her employment contract with the university, the court concluded that the decision regarding the assistant professor's tenure was not a proper judicial function since the evaluation of her suitability to the university's educational needs, goals, and philosophies necessarily involved many subjective, nonquantifiable factors, which were best performed by the university and not judges). Accordingly, your client has neither a claim for breach of contract nor a claim that will result in a second-guessing of Marywood's decision.

Jonathan Z. Cohen, Esquire
February 9, 2012
Page 3



Attorneys at Law

### Dr. Fagal Waived His Right to a Review of the President's Recommendation

You appear to have advised your client to waive his right to have a review of Sister Anne Munley's recommendation prior to her finalizing it. That certainly is your client's prerogative to do so, but Marywood will provide that opportunity one last time. Enclosed is a revised Statement of Charges which you requested. While Marywood does not believe this revised statement is necessary, in the spirit of cooperation, it will provide it as requested. Marywood will forward it to your client as well.

Should your client choose to seek a review of the President's recommendation, you will not be a part of the process other than as an outside advisor to your client. It is a closed process and will remain that way.

Finally, rest assured that Marywood University intends to vigorously defend itself against this significant assault on its Mission, Core Values and guiding principles.

Should you have any questions, please contact me.

Very truly yours,
JACKSON LEWIS LLP

William J. Anthony

WJA/amj

cc:    Stephanie Peet, Esq.



MARYWOOD UNIVERSITY
SCRANTON, PA 18509-1598
TEL: (570) 348-6231
FAX: (570) 340-6014
ANNEMUNLEY@MARYWOOD.EDU
www.marywood.edu

OFFICE OF THE PRESIDENT

February 8, 2012

Dr. Frederick Fagal
17 East Lake Street
Skaneateles NY 13152

Sent via email (fffagal@yahoo.com), certified mail, regular mail

Re: Recommendation for Termination

Dear Dr. Fagal:

Pursuant to your attorney's request, the following is a revised statement of charges. As a result of your breach of a material term of your obligations as a tenured professor, I am recommending that your tenure and employment with Marywood be terminated immediately. The University will, however, pay you the remainder of your 2011-12 Agreement and keep you on benefits through August, 2012. This recommendation comes after much consideration of and reflection on your actions which I find to be highly offensive and directly contrary to Marywood's Mission and Values, your tenure agreement and your obligation as an employee of this University to conduct yourself in accordance with our policies and values.

As you know, our values include, among others:

- A commitment to spiritual, ethical and intellectual values in the context of a faith community.
- Respect for the value of each human being, for diversity in the context of vibrant community, and for the earth and all creation.

After reviewing the subtitles you authored and transposed onto a film depicting Adolf Hitler and the Nazi regime, I find that you deliberately and maliciously violated our principles and your commitment to this University by:  1) depicting Executive Officers and me in an offensive and hostile light, including making highly inappropriate comments about family members of these individuals; 2) using sexually explicit, offensive and insulting language; and 3) portraying an image of Marywood in a manner that was an affront to the University community as a whole. As a result, I am recommending that your tenure and employment be terminated and provide you the following Statement of Charges:

### 1.  Breach of Tenure Agreement

Marywood's tenure policy provides in relevant part:

> It implies a <u>mutual commitment</u> on the part of the faculty member and the University and cannot be taken lightly...Once tenure is granted, it will be discontinued only for grave reason, which may include moral turpitude, flagrant abuse of academic freedom, or professional incompetence...<u>The commitment of a faculty member who requests tenure is as deep and binding on the faculty member as it is on the University.</u> Just as

*An education inspired by the Sisters, Servants of the Immaculate Heart of Mary.*

DEF003379

the conferring of tenure by the University recognizes the competence of an individual faculty member, submission to the University of an application for tenure suggests a strong acceptance by that individual of the mission, goals and objectives of the University. The request represents a commitment to work jointly with faculty, students, administrators and staff for the growth and welfare of the University.

(Emphasis added).

Your decision to author and disseminate the above described video is a breach of your commitment to Marywood and is in direct contravention of the letter and spirit of Marywood's Mission, Core Values and Objectives. To be clear, however, enclosed is a copy of Marywood's Mission, Core Values and Objectives. Depicting the University's President as Adolf Hitler, a man who is responsible for torturing and killing in excess of 6 million people simply because they are Jewish is an intentional, malicious and blatant violation of your tenure commitments. Portraying other University officials as Nazi leaders, using crude and vulgar language and belittling University officials also violates your agreement with Marywood. You gravely injured our community by your actions.

## 2. Violation of Civil Rights Policy

Marywood's Civil Rights Policy provides in relevant part:

Marywood University does not condone and will not tolerate discrimination, harassment, or assault by any member of the Marywood community upon another individual, regardless of whether the action is based on race, sex, color, national or ethnic origin, age, creed, ancestry, religion, disability, or any other legally protected status.

In your video, not only do you attempt to make light of the Nazi regime, which evokes deep personal reminders of the extreme hate of members of the Jewish faith, but you also demean and belittle Dr. Levine and his family and launch other personal attacks on executive officers. Harassment of this type directly violates our Civil Rights Policy and will not be tolerated.

## 3. Violation of Marywood's Conditions of Computer Use Policy

Marywood's Conditions of Computer Use policy provides in relevant part:

Users of Marywood University computing facilities and services are held to high ethical standards. These conditions of use are based on the "spiritual, ethical and religious values and a tradition of service" expressed in the Mission Statement of the University. They underscore responsible, ethical, legal, and secure use of the campus-wide information system, and they derive from standards of common sense and common decency that apply to any shared resource. Responsibility extends to access, use of information, and distribution of data.

Marywood University administrators, faculty members, staff, and students may use the computers in all public computing facilities for research work and classroom assignments...

Access to the Marywood computer system is not a right, but a privilege. When individuals log on to the University's computer system, they become responsible for adhering to University policy and state and federal laws governing individual privacy rights and confidentiality. The following list is not all-inclusive: [and includes the following:

- They honor the intellectual rights of others by avoiding copyright infringement. This includes all Marywood University-owned computers, i.e., computers purchased with University funds.
- They do not make or use unauthorized copies of copyrighted or licensed programs or data. They only use authorized copies in full accord with the license agreement and national and international laws.
- They respect the civil rights of others to an open and hospitable environment, regardless of race, sex, color, national or ethnic origin, age, creed, ancestry, religion, disability, or any other legally protected status, and with respect to sexual harassment including e-mailing inappropriate messages.

Clearly you used Marywood's system by emailing to members of its community the above described video using their Marywood email accounts. In doing so, it appears that you used violated copyright laws associated with the use of a copyrighted video, although you are free to prove to us that you obtained permission from the owners of that copyright to publish the video. Even if you did obtain the requisite permission, you failed to respect the civil rights of others by your conduct. I believe I have sufficiently described this conduct above.

4. **Violation of Academic Freedom Policy; Professional Ethics Policy and University's Mission and Values as well as the principles of collegiality.**

I have attached a copy of your 2011-12 Letter of Agreement and the above policies so that you have them. They can also be found on our website. As an initial matter, your video is not in furtherance of any scholarly pursuit and was clearly not intended to be part of an academic exercise. Nevertheless, even if it were, our policy provides that academic freedom "presupposes, first of all, personal integrity in dealing with students, peers and officers of the University. Second, it presumes scholarly competence, observance of the professional standards of one's discipline, commitment to the stated mission of the University..." As detailed above, your email and video is devoid of personal integrity, has no scholarly competence and is in total disregard of the stated mission of the University.

I hope you will take the time to read the Professional Ethics Policy. In it you will find that you had a "special responsibility," "obligations" to the Marywood community and the obligation to not discriminate or harass your colleagues. Once again, you violated these policies and instead chose to invoke images of hatred and to ridicule your colleagues. Further, as set forth in detail above, you violated Marywood's Mission and Values which are at the core of what this University and all for which this community stands.

As a result of this recommendation, I am prepared to send this statement of charges to a duly appointed faculty committee for review along with the emails and videos you forwarded to members of our community. In order to do so and out of respect for your privacy, I would ask that you please sign and return to me the attached authorization granting the University permission to do so. That faculty

DEF003381

committee may agree or disagree with my recommendation. Once I receive the review committee's determination, I will finalize my decision. Should you choose to forego that faculty review, I will finalize my recommendation based upon my own findings and conclusions.

Please respond no later than Friday, February 17, 2012.

If you have any questions regarding this matter, you may direct them to me or to Dr. Dunleavy.

Very truly yours,

*Sister Anne Munley letter*

Sister Anne Munley, IHM
President

Enclosures:
2011-12 Letter of Agreement
Tenure Policy
Civil Rights Policy
Conditions of Computer Use Policy
Academic Freedom Policy
Professional Ethics Policy
Marywood University Mission and Core Values
Release of Personal Information Authorization Form



**Marywood**

U N I V E R S I T Y

Tenured Faculty
Letter of Agreement
2011-2012 Academic Year

May 10, 2011

Dr. Frederick F. Fagal, Jr.
17 East Lake Street
Skaneateles, NY 13152

Dear Dr. Fagal, Jr.,

This Letter of Agreement is offered to you for the 2011-2012 Academic Year.  In accord with the agreed upon Salary Plan, your salary reflects a 2.5% annual increase of $1,858.00.

Other terms of this agreement are as follows:

| | |
|---|---|
| Term: | 8/22/2011 to 5/18/2012 |
| Type of Appointment: | Full-Time (9 months) Tenure |
| Rank: | Associate Professor |
| College: | Liberal Arts & Sciences |
| Department: | Social Science |
| Responsible to: | Department Chairperson |
| Salary: | $76,196.00 |

Faculty members must apply for benefits other than Social Security and Worker's Compensation through the Human Resources Department.  Full-time faculty benefits include health, dental, long-term disability, group life, and accidental death and dismemberment under the Flexible Benefits Plan.  Elections are made by June 1 of each year for the subsequent fiscal year beginning July 1.  Retirement contributions by the University vary based on the contribution level selected by the faculty member.  The appropriate government forms, including Form W-4 and I-9, must be completed and on file in the Human Resources Department.

This agreement is valid for one month from the date of this letter.  The original copy of this Letter of Agreement must be signed and returned to my office by June 10, 2011.  If you do not return the original signed copy by June 10, it will be assumed that you are not returning to Marywood.  On behalf of the Board of Trustees and myself, I express our gratitude for your dedicated service and commitment to Marywood University.  May God continue to bless you.

Sincerely,

*Sister Anne Munley, IHM*

Anne Munley, IHM, Ph.D.
President

Agreed this _25_ day of _May_, 2011

Signature _Frederick F. Fagal, Jr._

DEF003383



Marywood
UNIVERSITY

# Policies and Procedures Manual: Tenure

## Policy Statement

Tenure is a term designating permanent and continuous appointment for a full-time faculty member. It implies a mutual commitment on the part of the faculty member and the University and cannot be taken lightly.

Once tenure is granted, it will be discontinued only for grave reason, which may include moral turpitude, flagrant abuse of academic freedom, or professional incompetence. In addition, as expressed in its *Retrenchment of Faculty* policy, the University may be required to discontinue tenure because of severe financial exigencies or reorganization of the department and/or curriculum resulting in lack of need.

The commitment of a faculty member who requests tenure is as deep and binding on the faculty member as it is on the University. Just as the conferring of tenure by the University recognizes the competence of an individual faculty member, submission to the University of an application for tenure suggests a strong acceptance by that individual of the mission, goals and objectives of the University. The request represents a commitment to work jointly with faculty, students, administrators and staff for the growth and welfare of the University. It is a commitment to devote one's energies to continued personal development and continued high levels of achievement as a member of the Marywood academic community. It is an assertion of career goals; it is expected that a faculty member will not lightly withdraw from this relationship.

The probationary period shall not exceed seven years of full-time teaching/librarianship at Marywood, with application for tenure being made in the sixth year. Successful candidates receive a tenure contract for the seventh year; unsuccessful candidates receive a one-year terminal contract for the seventh year. Faculty members on leave during the probationary period must follow the University's policy on leaves. Interrupted service at Marywood University and also prior service at another regionally accredited, four-year college or university may be credited toward the fulfillment of the probationary period. Such credit will be determined by the Vice President for Academic Affairs.

Tenure occurs by action of the President of the University.

## Definitions

This revised *Tenure* policy is effective January 1, 2012. Faculty members whose date of hire as full time is before January 1, 2012, may choose the policy in effect prior to that date if they wish.

## Procedures

*Procedures for Tenure Consideration*

DEF003384

A candidate for tenure must submit a *Notification of Application for Tenure* form and submit relevant data and documentation in the sixth year of the probationary period, according to the deadline dates noted below. The candidate for tenure is encouraged to meet with the dean and chairperson during the summer prior to submission to discuss the application. The intent of this review is to afford the dean and chairperson the opportunity to offer the candidate informal guidance that will help the candidate to make the strongest case possible for tenure. The candidate is also encouraged to meet with the tenured members of the department one year before submission of the application to identify areas of strength and weakness in meeting the tenure criteria. In applying these tenure procedures for faculty librarians, the Director of Library Services acts in place of both dean and department head. If the candidate decides to withdraw the application, he/she must do so by October 17 or February 21.

(A faculty member who is hired to begin work at Marywood in the spring semester submits a tenure application in the spring of his/her sixth year. For the spring semester dates of submission of the application, refer to the procedures in the *Promotion of Faculty Members* policy.)

If a due date below falls on a weekend or a holiday, the due date becomes the next business day.

1. By September 1 or January 3, the faculty member initiates the process by submitting the *Notification of Application for Tenure* form to the Chair of the Rank and Tenure Committee. The Chair will be responsible for providing a list of candidates who are applying for tenure to the Vice President for Academic Affairs, the appropriate dean(s), and the head of the applicant's academic department.

2. By September 21 or January 21, the applicant submits paper copies of the *Application for Tenure* form, together with an up-to-date curriculum vitae and a narrative not to exceed an equivalent of 100 printed pages in 12-point font to the head of the applicant's department. (If the applicant is the department head, the senior member of the department functions as the department head during these procedures.) The candidate may submit supplementary materials in the form of appendices. The application must be structured based on how the tenure criteria section of the handbook is organized. The document must be numbered sequentially, include definitions of terms related to one's discipline, and carefully proofread. All annual evaluations of the candidate written by the appropriate dean and the department head must be included in the application materials. The Vice President's report to the candidate on the results of his/her 3 year pre-tenure review must be included.

3. The department head notifies the department's full-time, tenured and tenure-track faculty members that the application is available for their review. The Chair of the Rank and Tenure Committee notifies the tenured members of the applicant's department of their responsibility to complete the *Confidential Colleague Evaluation Form*. Each tenured faculty member is to submit the *Confidential Colleague Evaluation Form* to the Chair of the Rank and Tenure Committee by September 28 or January 28.

   If a candidate for tenure is the chair of a department, the most senior tenured member of the department acts as chair during the tenure process. If no senior tenured faculty member is available, the Rank and Tenure Committee, in consultation with the appropriate dean and the candidate, chooses a senior tenured faculty member from another department to act as chair.

   Once an untenured faculty member submits a pre-tenure file to the Rank and Tenure Committee, he/she completes by September 28 or January 28 the *Confidential Colleague Evaluation* form for tenure applications that originate in his/her department.

4. By October 7 or February 7, the department head submits to the dean of the appropriate college all application materials and a recommendation letter that is based on a thorough review of the

DEF003385

application documents. By this date, the department head also submits to the applicant a copy of the same recommendation letter.

5. By October 17 or February 21, the appropriate dean or the Director of Library Services reviews the evaluation of the department head when applicable and submits to the Chair of the Rank and Tenure Committee a recommendation letter and all application materials. The recommendation letter is to be based on a thorough review of the application materials.

6. The Rank and Tenure Committee evaluates the application and submits its recommendation, vote, and materials upon which the recommendation was based to the Vice President for Academic Affairs.

7. Having received all materials by November 21 or March 20, the Vice President for Academic Affairs evaluates the application with its accompanying documents, and submits a recommendation with the materials on which it is based to the President of the University. This includes the Rank and Tenure Committee's recommendation and vote, all other recommendations, and all application and evaluative documentation.

8. Having received the documents by January 10 or April 15, the President of the University reviews them and renders a final decision. The President or the Vice President for Academic Affairs informs the faculty member of the status of the application, including the recommendations of all reviewing bodies. In the case of a negative decision, the criteria not met are communicated to the applicant.

All materials submitted by the applicant will be returned at the conclusion of the process.

### *Criteria*

The candidate for tenure must:

1. have completed all formal educational requirements in the relevant academic field, judged necessary to meet the needs of the department and the University;
2. have achieved at least the rank of Associate Professor or, if currently an Assistant Professor, must apply for promotion to Associate Professor and Tenure at the same time and may do so with the submission of a single document using the tenure criteria;
3. have evidenced an expertise needed by one's department or a related department, which may include developing new courses and teaching a diversity of courses as needed, or in the case of faculty librarians by developing new library services and initiatives;
4. have demonstrated consistently effective teaching/librarianship ability as attested to by the evaluation procedures of the University;
5. have provided service to students extending beyond the teaching/librarianship function to student advisement and direction;
6. have evidenced accomplishment and promise in research, scholarship, publication, and/or creative achievement;
7. have evidenced membership and involvement in the activities of professional societies;
8. have demonstrated significant involvement in community service related to the mission, goals or core values of the University, and the University community's academic, cultural, administrative, and student affairs.

### *Procedures for Pre-Tenure Review*

A pre-tenure review system evaluates the first three years of each tenure-track faculty member's

DEF003386

progress toward tenure.

The candidate submits pre-tenure review materials in the fall of his/her fourth year. The candidate must notify the Chair of the Rank and Tenure Committee by September 1 or January 3 of his/her intent to submit materials. The candidate must submit the materials to the appropriate department chairperson by September 10 or January 12. By September 20 or January 22 the department chair submits to the appropriate dean all pre-tenure materials and an evaluation letter based on a thorough review of the pre-tenure documents. By October 1 or February 1 the Dean submits all materials to the Chair of Rank and Tenure along with an evaluation letter based on a thorough review of all pre-tenure materials.

Pre-tenure review materials should be no more than 35 pages (12-point font). The document should be numbered sequentially, include definitions of terms related to one's discipline, be proofread carefully and contain no appendices.

The pre-tenure portfolio should include:

1. a description of the pre-tenure candidate's progress to date in fulfilling each of the criteria for tenure (organized according to the tenure criteria section above);
2. the dean's detailed evaluation, or in the case of library faculty, the Director of the Library's evaluation of the pre-tenure candidate's portfolio, which must include a summative statement of the pre-tenure candidate's progress toward tenure;
3. the department chairperson's detailed evaluation of the pre-tenure candidate's portfolio, which must include a summative statement of the pre-tenure candidate's progress toward tenure;
4. tables that compile the pre-tenure candidate's teaching evaluations, including department, college, and University teaching evaluation means;
5. a self-assessment of the pre-tenure candidate's scholarly/creative work (e.g., selectivity of venues, impact of articles, citations);
6. the pre-tenure candidate's reflection on his/her teaching/librarianship;
7. the pre-tenure candidate's reflection on his/her service;
8. the pre-tenure candidate's description of his/her scholarship/creative activity agenda/plan.

Pre-tenure faculty members must structure their annual self-evaluations based on guidelines for the tenure application portfolio as described in the *Tenure* policy.

Deans and chairs must organize their responses to pre-tenure faculty members' self-evaluations and pre-tenure portfolios based on how the tenure section of handbook is organized. These responses must take into account departmental standards for scholarship/creative activity.

Model pre-tenure files are available in the office of the Vice President for Academic Affairs for the pre-tenure candidate's review.

### *Pre-Tenure Review Procedures*

If a due date below falls on a weekend or a holiday, the due date becomes the next business day.

1. By September 1 or January 3, the faculty member initiates the process by submitting the Notification of Submission of Pre-Tenure Materials form to the Chair of the Rank and Tenure Committee. The Chair will be responsible for providing a list of faculty members who are submitting pre-tenure materials to the Vice President for Academic Affairs, the appropriate dean(s), and the head of the individual faculty member's academic department.

DEF003387

2. By September 10 or January 12, the faculty member submits to the department chairperson ·
   pre-tenure review materials of no more than 35 pages (12-point font). (If the applicant is the
   department head, the senior member of the department functions as the department head during
   these procedures.) The submitted materials must be structured based on how the tenure criteria
   section of the handbook is organized. The document must be numbered sequentially, include
   definitions of terms related to one's discipline, and carefully proofread. All annual evaluations of
   the candidate written by the appropriate dean and the department head must be included as part of
   the 35-page application.
3. By September 20 or January 22, the department head submits to the dean of the appropriate
   college all pre-tenure materials and an evaluation letter that is based on a thorough review of the
   pre-tenure documents.
4. By October 1 or February 1, the appropriate dean or the Director of Library Services reviews the
   evaluation of the department head when applicable and submits to the Chair of the Rank and
   Tenure Committee an evaluation letter and all pre-tenure materials. The evaluation letter is to be
   based on a thorough review of the pre-tenure materials.
5. The Rank and Tenure Committee evaluates the pre-tenure materials and submits its evaluation and
   the materials upon which the evaluation was based to the Vice President for Academic Affairs.
6. Having received all materials by October 21 or February 21, the Vice President for Academic
   Affairs evaluates the pre-tenure materials and accompanying documents.
7. By November 15 or March 15, the Vice President for Academic Affairs responds to the faculty
   member with an evaluation letter that is based on a thorough review of the pre-tenure material.

## Related Policies

- Promotion of Faculty Members
- Evaluation of Faculty Members
- Contractual Agreements with Faculty Members

## History

07/01/89 - Reaffirmed with publication of Faculty Manual
04/16/99 - Sentence re degrees from various institutions moved to *Qualifications for Appointment to
Rank* policy as recommended by the Policy Committee of the University
03/22/00 - Reference to retirement age deleted at Executive Committee meeting of the Policy
Committee of the University
07/01/03 - Editorial changes made to reflect academic restructuring
04/20/04 - Revision approved by the President of the University as recommended by the Policy
Committee of the Univesrity to include faculty librarians
12/02/05 - Revision approved by the President of the University as recommended by the Policy
Committee of the University
01/19/08 - Amended to reflect that decisions on rank and tenure are made by the President of the
University
05/02/08 and 5/05/08 - Revision approved by the President of the University as recommended by the
Policy Committee of the University
06/24/09 - Revision approved by the President of the University as recommended by the Executive
Committee of the Policy Committee of the University.

DEF003388

09/09/09 - Change in Procedure No. 4 recommended by the Provost and Vice President for Academic Affairs and approved.

05/04/10 - Revision approved by the President of the University as recommended by the Executive Committee of the Policy Committee of the University. 12/09/11 - Revision approved by the President of the University as recommended by the Policy Committee of the University.

12/09/11 - Revision approved by the President of the University as recommended by the Policy Committee of the University.

---

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

---

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu

DEF003389



# Marywood
U N I V E R S I T Y

# Policies and Procedures Manual: Civil Rights Policy

🖼

## Policy Statement

Marywood University declares and reaffirms a policy of equal educational and employment opportunity and non-discrimination in the provision of educational and other services to the public. Marywood University does not condone and will not tolerate discrimination, harassment, or assault by any member of the Marywood community upon another individual, regardless of whether the action is based on race, sex, color, national or ethnic origin, age, creed, ancestry, religion, disability, or any other legally protected status. Marywood University will make reasonable accommodations to known physical or mental limitations of otherwise qualified individuals with disabilities unless doing so would impose an undue hardship on the University. Any person who believes he or she may require such accommodation should contact the Assistant Vice President for Human Resources and Affirmative Action Officer.

Marywood University is committed to take all necessary steps to comply with any obligations it may have under Section 504 of the Rehabilitation Act, the Americans with Disabilities Act, and Title IX of the Civil Rights Act of 1964, as amended. These are explicit civil and legal applications of the formulation of beliefs already cherished in Marywood's religious commitment, objectives, and practices.

## Definitions

### *Sexual Harassment*

Marywood University adopts the following definition of sexual harassment based on the statement endorsed by the American Association of University Professors, revised June 1995, and considers it applicable to the entire Marywood community:

Sexual advances, requests for sexual favors, and other conduct of a sexual nature constitute sexual harassment when:

1. such advances or requests are made under circumstances implying that one's response might affect academic or personnel decisions that are subject to the influence of the person making the proposal; or
2. such speech or conduct is directed against another and is either abusive or severely humiliating and/or persists despite objection of the person targeted by the speech or conduct; or
3. such speech or conduct is reasonably regarded as offensive and substantially impairs the academic or work opportunity of students, colleagues, or co-workers. If it takes place in the teaching context, it must also be severe, pervasive, and not germane to the subject matter. The academic setting is distinct from the workplace in that wide latitude is required for professional judgment in determining the appropriate content and presentation of academic material.

### *Sexual Assault*

DEF003390

Sexual assault is defined as threats of, or deliberate physical contact of a sexual nature that is against another person's will or without consent. Examples of such behavior include, but are not limited to the following:

1. deliberate physical contact of a lewd type, including brushing, touching, grabbing, pinching, patting, hugging and kissing;
2. deliberate or reckless threats, actual or implied, of physical contact of a sexual nature that results in reasonable fear of sexual assault or physical harm;
3. coerced sexual activities, including rape. Rape, the most severe type of sexual assault, is legally defined in Pennsylvania as sexual intercourse that is coerced through force or threats of force, or with someone who is unconscious or with someone who is so mentally deranged or deficient as to be incapable of consent.

## Procedures

In furtherance of Marywood University's commitment to its duties and obligations, regular training on harassment, discrimination and related topics is provided for managers and supervisors in the Marywood community.

A list of Marywood University and community resources is available at the Human Resources Office.

## History

11/03/97 - Reaffirmed by Board of Trustees and Members of the Corporation
04/15/00 - Revision approved by the Board of Trustees

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu

DEF003391



# Policies and Procedures Manual: Conditions of Computer Use

## Policy Statement

Users of Marywood University computing facilities and services are held to high ethical standards. These conditions of use are based on the "spiritual, ethical and religious values and a tradition of service" expressed in the Mission Statement of the University. They underscore responsible, ethical, legal, and secure use of the campus-wide information system, and they derive from standards of common sense and common decency that apply to any shared resource. Responsibility extends to access, use of information, and distribution of data.

Marywood University administrators, faculty members, staff, and students may use the computers in all public computing facilities for research work and classroom assignments. Within the limitations of lab scheduling, students have priority over others for use of the facilities. Anyone who is not a currently enrolled student or employee may use the public facilities only at the discretion of University staff. Marywood University does not assume any liability for data loss. Those who use its computers do so at their own risk. Use of administrative computers is authorized with the permission of the appropriate department head.

Access to the Marywood computer system is not a right, but a privilege. When individuals log on to the University's computer system, they become responsible for adhering to University policy and state and federal laws governing individual privacy rights and confidentiality. The following list is not all-inclusive:

1. They respect the privacy of others by not attempting to access their accounts or tampering with their data.

2. They honor the intellectual rights of others by avoiding copyright infringement. This includes all Marywood University-owned computers, i.e., computers purchased with University funds.

3. They respect the policies and procedures of external networks, such as the Internet and systems that can be accessed via the Internet.

4. They do not make or use unauthorized copies of copyrighted or licensed programs or data. They only use authorized copies in full accord with the license agreement and national and international laws.

5. They do not attempt to bypass any security system in order to access privileged information or alter existing interfaces.

6. They do not develop or use programs, transactions, data, or processes that harass other users, infiltrate the system, or damage or alter data or software.

7. They do not develop or use mechanisms to alter University records.

DEF003392

8. They do not load or use personal or existing programs that affect the stability of systems, or use programs in an attempt to hinder or harass others.

9. They do not load software in classroom or computer labs, drop-in facilities, or other University-owned computers.

10. They use only their own User ID and password; rights to individual accounts are not transferable. All members of the University community are responsible for securing their passwords. All passwords are to be treated as confidential University information.

11. They respect the civil rights of others to an open and hospitable environment, regardless of race, sex, color, national or ethnic origin, age, creed, ancestry, religion, disability, or any other legally protected status, and with respect to sexual harassment including e-mailing inappropriate messages.

12. They do not use University owned or operated computers for a personal business.

13. They do not open or download pornographic materials or other materials that violate the Mission Statement of the University.

14. They use resources efficiently, avoiding printing large amounts of unnecessary information or downloading files for long periods of time.

15. They do not damage or alter equipment or software either physically or with a virus. They do not bring food or drink into computer labs, drop-in areas, near computers or computer-related equipment.

16. They abide by an instructor's requirements for computer use, including participation in an on-line course or in a listserv. They honor an instructor's right to allow or disallow use of a computer while the room is in use for instructional purposes. They do not disrupt a class that is being held in a computer lab or other technologically oriented facility, such as broadcast studio or video conferencing room.

Marywood University reserves the right to monitor and record any action performed while using the computer system. An audit trail is kept by system management software. If it is determined that use is contrary to Marywood policy, the appropriate department may examine the user's actions. If computing staff members suspect that any of these conditions are being violated, staff will initiate an investigation through the appropriate agency on campus. During the investigation, the account in question and all computing services may be suspended.

Privacy is neither a goal nor a condition of the University's computing system. There is not an expectation of privacy with regard to the information stored on University-owned or operated computers or, when applicable, other computers attached to the Marywood University network; and there are no specific laws, rules, or regulations that protect the privacy of a user's files, electronic mail messages, or any other information retrieved as a result of a person's session on the Marywood system.

While Marywood University respects an individual's privacy whenever possible, it does have and will exercise its right to examine a University-owned or operated computer and its contents if there is a reasonable indication that it has been used to download or store illegal materials, such as pornography or illegal software.

DEF003393

Marywood University reserves the right to report suspected criminal offenses to civil authorities. Institutional disciplinary charges may be filed in addition to civil actions.

These conditions of use have been established for the protection of all users but provide neither absolute security nor unqualified privacy.

## Definitions

**System** is used in a generic sense to refer to the aggregate of all hardware and software owned or licensed by Marywood University, including the network.

As a general matter, **copyright** infringement occurs when a copyrighted work is reproduced, distributed, performed, publicly displayed, or made into a derivative work without the permission of the copyright owner.

## Procedures

Contact the Office of Information Technology with questions about

- computer network support of instructional, research, and service activities;
- computer network support of administrative activities;
- voice and data network design and maintenance, desk-top computer repairs and installations.

## Related Policies

- Website Policy
- University Website Policy

## Related Committees

Technology Advisory Committee
Academic Computing Advisory Committee

## History

01/10/97 - Recommended to the President by the College Committee on Policy
02/06/97 - Approved by the President of the University with publication of The President's Memo
04/17/04 - Revision approved by the President of the University as recommended by the Policy Committee of the University
02/20/09 - Procedures changed in order to direct all questions to the Office of Information Technology

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

DEF003394

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail] Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu

DEF003395



# Policies and Procedures Manual: Academic Freedom

₽]

## Policy Statement

Marywood University affirms its commitment to academic freedom. In so doing, it reaffirms its commitment to the tradition of higher learning that is the heritage of both the Roman Catholic Church and the nation. It is a tradition grounded on respect for truth, social responsibility and individual rights. It is a tradition that posits freedom of inquiry, open discussion and unrestricted exchange of ideas as essential to the pursuit of knowledge.

Marywood University upholds academic freedom as a fundamental condition for research and dissemination of information. The University is a center of discourse where inquiry is encouraged and discoveries are verified and refined by the interaction of scholar with scholar. Marywood University respects the right and responsibility of its faculty and students to conduct research, to publish their findings, and to discuss ideas according to the principles, sources and methods of their academic disciplines. These principles, sources and methods, as they develop over time, are not external to their respective disciplines. The University sanctions and encourages investigation of unexplored phenomena, advancement of knowledge, and critical examination of ideas, old and new. The University accepts the responsibility of protecting both teacher and student from being forced to deny truth that has been discovered or to assert claims that have not been established in the discipline. Teachers are entitled to freedom in the classroom in discussing their subject, but they should be careful not to introduce into their teaching material matter that has no relation to their subject.

Where the faculty is concerned, academic freedom presupposes, first of all, personal integrity in dealing with students, peers and officers of the University. Second, it presumes scholarly competence, observance of the professional standards of one's discipline, commitment to the stated mission of the University, and openness to having one's ideas and findings subjected to the judgment of one's peers. Third, faculty members have a responsibility as professional scholars to be accurate and judicious in their public statements, and respectful of the opinions and responsibilities of others.

## Related Policies

- Professional Ethics
- Evaluation of Faculty Members
- Faculty Status

## Related Committees

DEF003396

Institutional Review Board for the Protection of Human Participants

## History

12/01/79 - Reaffirmed with publication of *Faculty Manual*
07/01/93 - Introduction and postscript added
07/01/03 - "Human Subjcts" changed to "Human Participants"
02/19/10 - Revision approved by the President of the University as recommended by the Policy
Committee of the University

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu

DEF003397



UNIVERSITY

# Policies and Procedures Manual: Professional Ethics

ⓔ

## Policy Statement

The American Association of University Professors recognizes that membership in the academic profession carries with it special responsibility. The Statement on Professional Ethics that follows sets forth general standards assumed by members of the profession.

Professors, guided by a deep conviction of the worth and dignity of the advancement of knowledge, recognize the special responsibilities placed upon them. Their primary responsibility to their subject is to seek and to state the truth as they see it. To this end, professors devote their energies to developing and improving their scholarly competence. They accept the obligation to exercise critical self-discipline and judgment in using, extending, and transmitting knowledge. They practice intellectual honesty. Although professors may follow subsidiary interests, these interests must never seriously hamper or compromise their freedom of inquiry.

As teachers, professors encourage the free pursuit of learning in their students. They hold before them the best scholarly and ethical standards of their discipline. Professors demonstrate respect for students as individuals and adhere to their proper roles as intellectual guides and counselors. Professors make every reasonable effort to foster honest academic conduct and to assure that their evaluations of students reflect each student's true merit. They respect the confidential nature of the relationship between professor and student. They avoid any exploitation, harassment, or discriminatory treatment of students. They acknowledge significant academic or scholarly assistance from them. They protect their academic freedom.

As colleagues, professors have obligations that derive from common membership in the community of scholars. Professors do not discriminate against or harass colleagues. They respect and defend the free inquiry of associates. In the exchange of criticism and ideas, professors show due respect for the opinions of others. Professors acknowledge academic debt and strive to be objective in their professional judgment of colleagues. Professors accept their share of faculty responsibilities for the governance of their institution.

As members of an academic institution, professors seek above all to be effective teachers and scholars. Although professors observe the stated regulations of the institution, provided the regulations do not contravene academic freedom, they maintain their right to criticize and seek revision. Professors give due regard to their paramount responsibilities within their institution in determining the amount and character of work done outside it. When considering the interruption or termination of their service, professors recognize the effect of their decision upon the program of the institution and give due notice of their intentions.

As members of their community, professors have the rights and obligations of other citizens. Professors measure the urgency of these obligations in the light of their responsibilities to their

DEF003398

subject, to their students, to their profession, and to their institution. When they speak or act as private persons, they avoid creating the impression of speaking or acting for their college or university. As citizens engaged in a profession that depends upon freedom for its health and integrity, professors have a particular obligation to promote conditions of free inquiry and to further public understanding of academic freedom.

## Related Policies

- Teaching Responsibility
- Librarianship Responsibility
- Faculty Status

## History

07/01/89 - Reaffirmed with publication of Faculty Manual

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu

DEF003399



# President's Page: Marywood University Mission & Core Values

## Mission Statement

A Catholic university sponsored by the Congregation of the Sisters, Servants of the Immaculate Heart of Mary, Marywood University roots itself in the principle of justice and a belief that education empowers people. Enacting its ideals, Marywood offers students a welcoming and supportive community that encourages men and women of all backgrounds to shape their lives as leaders in service to others. Proud of its liberal arts tradition and host of professional disciplines, Marywood challenges students to broaden their understanding of global issues and to make decisions based on spiritual, ethical, and religious values. Marywood calls upon students to seek their full potential and invites all to engage in a lifelong process of learning. Witnessing the efficacy of teaching and scholarship, Marywood educates students to live responsibly in a diverse and interdependent world.

## Core Values

### Catholic Identity

A commitment to spiritual, ethical and intellectual values in the context of a faith community.

### Respect for Each Person

Respect for the value of each human being, for diversity in the context of vibrant community, and for the earth and all creation.

### Empowerment

Education to enable access and to empower the underserved to take a full role in the life of the broader society.

### Service

Rooted in the deep belief that learning and scholarship serve the global community is the belief in the value of the diverse types of work that support that service, and the preparation of students for leadership by participation in service.

### Commitment to Excellence

The belief that the work of education has the capacity to forward the kingdom of God, in broad and varied ways, leads us to care passionately for the quality of the mission of Marywood.

President's Office | Fran Ferrese, Executive Secretary | (570) 348-6231 | ferrese@marywood.edu

DEF003400

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu

DEF003401



# President's Page: Marywood University's Goals & Objectives

**Provide a values based context for university experiences.**

- A majority of students will participate in service opportunities in an on-going way.
- Students will demonstrate an understanding of the ethical dimensions of their fields of study.
- A majority of students will participate in spiritual development activities.
- Employees will demonstrate core values in the work place.

**Foster an awareness and appreciation of the pluralistic nature of contemporary society.**

- Graduates will choose to study or work in multicultural settings either at home or abroad.
- Students will demonstrate a deeper appreciation for cultural diversity and an understanding of global issues.
- Enrolled students will travel abroad during their college years.
- Employee groups and governing bodies will reflect the pluralistic nature of contemporary society.

**Provide a supportive and welcoming environment to a diverse academic community.**

- Students enrolled in any program will fulfill their academic goals by successfully completing their degree work.
- An increasing number of racially and culturally diverse students and employees will choose Marywood as a welcoming community.
- Students from a cross-section of socio-economic groups will enroll in each incoming class.
- Campus constituencies will express satisfaction with all campus services.

**Prepare people for socially responsible leadership roles.**

- Students will participate in an internship or practicum experience.
- Students will demonstrate a significant level of co-curricular activities.
- Students will experience positive interactions with faculty members outside of class.
- Employees will serve as role models of socially responsible leaders.

DEF003402

**Provide a challenging instructional program.**

- Students will demonstrate achievement of cognitive skills at a level comparable to peers on standardized tests.
- Students will demonstrate the ability to think critically by engaging in research activities and by developing problem solving strategies.
- Students will demonstrate the ability to integrate the liberal arts tradition with their professional specializations.
- Students will demonstrate competence in both information literacy skills and communications skills.
- Faculty will provide evidence of ongoing scholarly activity.

**Inspire a sense of personal responsibility for responding to social justice issues.**

- Faculty, staff, and students will participate in projects designed to address social inequities.
- Students will demonstrate knowledge of both national and international social justice issues.
- Faculty, students, and staff will serve as advocates for justice in their personal and professional lives.

President's Office | Fran Ferrese, Executive Secretary | (570) 348-6231 | ferrese@marywood.edu

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
**Comments** to Marywood University Web Development Office: webber@marywood.edu

DEF003403

Release of Personal Information
*Please check one box below; sign, date, and return by February 3, 2012*


____ I DO NOT grant permission for Marywood University to release Sister Anne Munley's Recommendation for Termination and Statement of Charges dated 1/24/12 to a faculty review committee comprised of tenured faculty.  I understand that by refusing such permission that there will be no faculty committee review of Sister Anne Munley's decision to terminate my tenure and employment with the University prior to it being finalized.

OR

____ I DO grant permission for Marywood University to release Sister Anne Munley's Recommendation for Termination and Statement of Charges dated 1/24/12 to a review committee comprised of tenured faculty.

This authorization is valid until rescinded by me in writing.


_____          _____
Frederick F. Fagal, Jr.                                    Date

DEF003404

| | |
|---|---|
| **From:** | Sr. Gail Cabral IHM PhD |
| **Sent:** | Tuesday, March 6, 2012 4:36 PM |
| **To:** | Dr Erin A Sadlack; Dr Patricia Sullivan Arter; Bill Conlogue |
| **Subject:** | Fwd: Fred Fagal videos down |

---------- Forwarded message ----------
From: **Sr. Gail Cabral IHM PhD** <cabral@maryu.marywood.edu>
Date: Sat, Mar 3, 2012 at 11:47 AM
Subject: Re: Fred Fagal videos down
To: Frederick Fagal <fffagal@yahoo.com>

Dear Fred,
Thank you for updating me about the attached letter. The reason I have not responded is because we had not yet had an elected Grievance and Appeals Committee in place. That election was held this week, and the committee will be able to begin its work.

Gail

On Tue, Feb 28, 2012 at 4:32 PM, Frederick Fagal <fffagal@yahoo.com> wrote:
Dear Gail:

Please see the attached. Thanks again.....Fred

Frederick F. Fagal, Jr
Associate Professor of Economics
Marywood University
Scranton, PA

1

DEF003405

| | |
|---|---|
| **From:** | Dr Erin A Sadlack |
| **Sent:** | Thursday, March 22, 2012 12:03 AM |
| **To:** | Dr William P Conlogue; Dr Patricia Sullivan Arter |
| **Subject:** | Fwd: Notice of Grievance Committee's receipt of materials |

Here is Fred's response.

---------- Forwarded message ----------
From: **Frederick Fagal** <fffagal@yahoo.com>
Date: Mon, Mar 19, 2012 at 10:10 PM
Subject: Re: Notice of Grievance Committee's receipt of materials
To: Dr Erin A Sadlack <easadlack@maryu.marywood.edu>

Hello Erin,

Thanks for keeping me informed. I am suspended (I am surely not teaching) but at this point/stage President Munley has only *recommended* my termination. I can think of nothing more you and the others should know at the moment, but will let you know if something comes up.

Sincerely,

Fred

Frederick F. Fagal, Jr., Ph.D.
Associate Professor of Economics, Social Science Department
Marywood University
2300 Adams Avenue
Scranton, PA 18509


**From:** Dr Erin A Sadlack <easadlack@maryu.marywood.edu>
**To:** fffagal@yahoo.com
**Sent:** Monday, March 19, 2012 5:52 PM
**Subject:** Notice of Grievance Committee's receipt of materials

Dear Fred,

This email is just to inform you that the Faculty Grievance Committee has received your official grievance regarding your suspension and termination and to tell you that we have begun the process of reviewing your arguments. If there is any additional information you would like us to consider, please let me know. Otherwise we will be in touch when we have our findings ready.

Sincerely,
Erin

~~~~~~~~~~~~~~~~~~~~~~~~

1

DEF003406

Erin A. Sadlack, Ph.D.
Associate Professor, English Department
Honors Program Director
Marywood University
2300 Adams Avenue
Scranton, PA 18509
<u>570-348-6211, x2344</u>

--
~~~~~~~~~~~~~~~~~~~~~~~
Erin A. Sadlack, Ph.D.
Associate Professor, English Department
Honors Program Director
Marywood University
2300 Adams Avenue
Scranton, PA 18509
570-348-6211, x2344

2

DEF003407

LAW OFFICES *of*

# DAVID G. CONCANNON, LLC

February 17, 2012

<u>Via E-Mail, Facsimile & USPS First-Class Mail</u>

William J. Anthony, Esquire
Jackson Lewis LLP
90 State House Square, 8th Floor
Hartford, Connecticut 01603

> **Re:**   Employment status of Dr. Frederick F. Fagal, Jr.

Dear Mr. Anthony:

I have closely considered your letter of February 9, 2012 and President Munley's letter dated the day prior. I have also reviewed the cases that you cited, among many others. My conclusions are that:

> **(1)**   Marywood cannot, at least under these circumstances, undo the contractually incorporated policies and procedures that it alone has drafted and reaffirmed;
>
> **(2)**   Marywood remains vulnerable to a breach-of-contract action alleging at least the procedural irregularities listed in my letter to President Munley dated February 2, 2012;
>
> **(3)**   Your letter of February 9, 2012 and President Munley's letter dated the day prior added additional grounds for such a breach-of-contract claim, namely a denial of Dr. Fagal's right to convene an ad hoc committee to review the propriety of President Munley's suspension of him commencing on January 23, 2012; and
>
> **(4)**   Marywood's denial of Dr. Fagal's right to convene an ad hoc committee to review the propriety of his suspension as well as its implied denial of a Statement of Charges regarding the same provide him with independent claims that the University has failed to apply fundamentally fair procedures to him. <u>See</u> <u>PSI Upsilon of Phila. v. Univ. of Pa.</u>, 591 A.2d 755, 758 (Pa. Super. Ct. 1991) (citing <u>Boehm v. Univ. of Pa. Sch. of Veterinary Med.</u>, 573 A.2d 575 (Pa. Super. Ct. 1990)).

To repeat, Dr. Fagal has elected to convene two separate ad hoc committees pursuant to Marywood's official policy: one for President Munley's decision to suspend him and the other, if necessary, for her recommendation to terminate him. <u>See</u> <u>Policies and Procedures Manual – Marywood University</u>, "Progressive Discipline," http://www.marywood.edu/policy ("<u>PPM</u>"). As I have already explained, the propriety of a faculty member's termination depends, in part, upon

DEF003408

LAW OFFICES *of*

# DAVID G. CONCANNON, LLC

the propriety of his preceding suspension.  See id.  Therefore, Dr. Fagal will not sign the "Release of Personal Information" proffered by President Munley or any other document that would permit her to circumvent a review of the propriety of his suspension.  If President Munley drafts a separate Statement of Charges for Dr. Fagal's suspension, Dr. Fagal will consider signing an appropriate "Release of Personal Information."

In the meantime, Dr. Fagal will pursue all internal remedies available to him prior to filing a lawsuit.  Dr. Fagal accordingly intends to file a faculty grievance against President Munley.  I enclose a copy of Marywood's Faculty Grievances and Appeals policy for your convenience.[*]  As suggested therein, Dr. Fagal has begun consulting the President of Marywood's Faculty Senate for assistance in contacting the Faculty Grievance Committee Chair. Please be advised of the Non-Retaliation provisions of Marywood's Faculty Grievances and Appeals policy.  If and when President Munley chooses to follow Marywood's Progressive Discipline policy, Dr. Fagal will consider withdrawing his grievance against her.

Finally, Marywood's position that its disciplinary process is "closed" and that I cannot participate "other than as an outside advisor" to Dr. Fagal finds no support in Marywood's Progressive Discipline policy.  See id.

Sincerely,

Jonathan Z. Cohen, Esquire

---

[*] Given that the President of Marywood may be called upon to review an Ad Hoc Hearing Committee's recommendation under this policy, Dr. Fagal may request that the University's Board of Trustees intervene.  See PPM, "Delegation to the President."  President Munley has already violated the authority delegated to her by the Board in this matter, necessitating Dr. Fagal's grievance in the first place.



# Faculty Grievances and Appeals



## Policy Statement

As an institution of higher education, Marywood University brings together a faculty, administration, and governing board united in a common bond of academic purpose. Essential to the fulfillment of this purpose is a mutual recognition of institutional integrity and individual human rights, along with an understanding of the respective roles of the several entities which constitute this educational organization.

Circumstances may arise at times, however, wherein a grievant--full-time, part-time, or pro-rata--may question decisions which affect his/her professional role in the institution. To assist in the resolution of these matters, a series of guidelines for grievances is herein set forth.

### Definitions

Grievance: A grievance refers to any disagreement between two parties. A grievance identifies a complaint one party has against another party for some alleged wrongful action on the part of the second party.

Grievant: A Grievant initiates a grievance.

### Types of Issues That Can Be Grieved

It is understood that procedural rather than substantive factors provide appropriate areas of review, and the Faculty Grievance Committee will not attempt to substitute its judgment for that of the decision-maker(s) involved in the case.

Thus, the Faculty Grievance Committee will hear grievances   concerning:

  1) Allegations of violation of academic freedom resulting in: denial of tenure, promotion, or sabbatical leave; non-reappointment.

  2) Allegations of impermissible discrimination. Tenured and non-tenured faculty are protected against illegal or unconstitutional discrimination, or on any basis not relevant to job performance, and includes, but is not limited to, race, sex, religion, national origin, age, disability, marital status, or sexual orientation

  3) Allegations of inadequate consideration resulting in: denial of tenure, promotion, or sabbatical leave; non-reappointment; or termination of employment due to retrenchment.

  4) Allegations of violations of procedures used in rendering decisions in numbers 1 and 2 above as set forth in Chapter 2 of the *Faculty Handbook*.

Procedures regarding dismissal, suspension, and sanctions of faculty members are in the *Progressive Discipline*

DEF003410

policy.

Should a grievant allege cause for grievance in any matter not identified in the above guidelines, the grievant may consult the Faculty Grievance Committee. In such circumstances, the Committee's first decision is whether the complaint is appropriate and sufficiently serious to merit consideration.

**Persons Against Whom Grievances May be Directed**

Fundamentally, a grievance may arise from an allegation of improper implementation of a procedure or process leading to a decision. The person(s) or body who perform(s) that procedure or process is (are) the subject(s) of the grievance. Thus, a grievant may direct a grievance against the person(s) or body responsible for the decision identified herein.

The decisions or actions of the Faculty Grievance Committee or Ad Hoc Hearing Committee may not themselves be grieved.

# Procedures

### Informal Procedure

1) A member of the faculty must initially discuss a complaint with the person or body responsible for the action to which the grievant takes exception in order to determine if a resolution is possible.

2) A complaint must be presented within (10) calendar days of the occurrence or discovery of the alleged violation.

3) No grievance may be filed without the initiation of this informal complaint procedure.

4) If the grievance still exists after step one the grievant initiates a consultation with the Vice President for Academic Affairs in order to try to resolve the matter.

### Formal Procedure for Filing a Grievance

1) The Faculty Grievance Committee is convened.

### Faculty Grievance Committee

The Faculty Grievance Committee consisting of three tenured faculty members and two alternates (also tenured) is specifically charged with responsibility for resolving matters of grievance and appeal. The Faculty Senate conducts the election of this committee. Faculty currently serving on the Rank and Tenure Committee or the Faculty Development Committee are not eligible for election to this committee.

The term of each member extends for three years, with one person replaced each year. An alternate will be identified at each election. Any member of the Grievance Committee who has had any prior involvement in a case under consideration must recuse him/herself. The Grievance Committee shall annually elect a chair-elect who will succeed the Chair.

### Grievance Process

DEF003411

The grievant may consult the President of Faculty Senate for assistance in contacting the Faculty Grievance Committee Chair. The Chair should be provided with a written statement setting forth, in detail, the nature of the grievance or appeal and identifying the person(s) or body against whom the grievance or appeal is directed; this document may also include a proposal for resolving the issue. A grievance must be filed within thirty (30) calendar days of the occurrence or discovery of the alleged violation but not fewer than five (5) calendar days after the initiation of the informal complaint.

In considering the grievance or appeal, the Faculty Grievance   Committee will take the following steps:

1) The Committee notifies the decision maker(s) that a grievance has been filed.

2) The Grievance Committee requests from the grievant written information regarding the issues. The Grievance Committee also requests from the decision maker(s) written statements describing the basis for the decision being appealed or grieved, as well as any attempts to settle the matter informally. This information shall be held in confidence by the Grievance Committee. At this point in the process, the information gathered is solely for review by the Committee and is not to be shared with either party involved.

3) At any point, the Grievance Committee may request additional information in writing from the grievant and from the decision-maker(s).

4) If after completing the above steps, the Committee determines that the grievance is improper or unsubstantial, or that sufficient time had not yet been allowed for its normal resolution, or that there is no evidence of improper action on the part of the decision maker(s) which would constitute a legitimate grievance, the Committee will communicate this determination to the grievant and the decision maker(s).

5) If the Grievance Committee determines that there was inadequate consideration or violation of procedures (see No. 3 and 4 under Types of Issues Which Can Be Grieved above), the Committee will return the case to the decision maker for reconsideration.

6) If the grievance is deemed appropriate for mediation, the Chair will appoint a Mediator from the University. The Mediator does not represent either party. Any party may object to the Mediator on the grounds of actual or apparent bias or conflict of interest and submit such objections to the Chair in writing. The Chair will review the objections and may replace the mediator.

7) The Offices of the Vice President for Academic Affairs or Human Resources may be consulted by the Mediator on mediation procedure or other matters involved in the grievance.

8) The Mediator shall try to resolve the grievance within thirty (30) calendar days of formal submission to the chair. With the consent of both parties, the period of mediation may be extended for a short period of time. If the grievance is not resolved within the thirty (30) calendar days, the mediator will advise the chair of the committee in writing that that the issue has not been resolved. If a mutually accepted agreement is reached, this will be communicated to the chair of the committee.

9) Grievances not appropriate for mediation or grievances not resolved through mediation shall be referred to the Ad Hoc Hearing Committee. All evidence collected will be passed on to the Ad Hoc Hearing Committee.

10) If the Faculty Grievance Committee recommends a formal hearing, in cases of violation of academic freedom or impermissible discrimination, an Ad Hoc Hearing Committee will be created to conduct a formal

DEF003412

investigation and to arrive at a recommendation for resolving the issue.

11) The Grievance Committee will make a summary report of its activities at the end of each academic year to the Faculty Senate. No details relevant to the privacy of the participants in any cases will be included in this report.

## Ad Hoc Hearing Committee

The Ad Hoc Hearing Committee shall consist of three members, selected by the Faculty Senate Executive Council, from a standing committee of fifteen tenured Faculty Members elected for one-year terms by the faculty at large. The Faculty Senate conducts the election of this committee.

Each party shall have two challenges without stated cause regarding membership of the Ad Hoc Hearing Committee. No member of the Ad Hoc Hearing Committee shall have had any prior involvement in the case.

If the three-person Ad Hoc Hearing Committee cannot be chosen from the fifteen members of the standing committee, the Executive Council of the Faculty Senate is empowered to conduct a special election to obtain fifteen additional members with terms of one year.

The Ad Hoc Hearing Committee must select a chairperson.

## Ad Hoc Hearing Procedures

1) The Ad Hoc Hearing Committee is empowered to gather information and documents specific to the case of the Grievant, conduct interviews, hold a hearing and take actions as are necessary to investigate the grievance to the extent that the law and University policy permit. The Ad Hoc Hearing Committee will provide recommendations in writing forty (40) calendar days from the date of its official appointment.

2) All Hearings are closed to anyone other than the parties and their advisors, members of the Ad Hoc Hearing Committee, and any witnesses invited to testify by the Committee. The hearing may be audio or video recorded and a written record will be maintained. The hearing is not a legal proceeding. At the beginning of the hearing, all procedures will be made known to the parties, and all information will be kept confidential.

3) Each party to the grievance may have one advisor during the hearing. The advisor may not participate in the hearing.

4) Strict rules of legal evidence will not be binding upon the Ad Hoc Hearing Committee and evidence of probative value in defining issues may be admitted.

5) The hearing record will be used exclusively as the basis for findings of fact and for arriving at a decision.

6) Upon reaching a decision on the issue and a recommendation for action, the Ad Hoc Hearing Committee will provide a summary written report to the petitioner, the person(s) named in the grievance, and the appropriate administrative officer and the President.

7) After receiving the recommendation of the Ad Hoc Hearing Committee, the appropriate administrative officer will review the recommendation and notify the Ad Hoc Hearing Committee and petitioner whether the recommendation has been accepted. If the recommendation of the Ad Hoc Hearing Committee is not

DEF003413

accepted by the appropriate administrative officer, the administrative officer will review it with the Ad Hoc Hearing Committee.

8) No details relevant to the privacy of the participants in the case will be included in the notice from the Hearing Committee. Public statements and publicity about the case by the participants will be avoided until the proceedings have been completed, including consideration by the President

**Action by the President of the University**

Following the recommendation of the Ad Hoc Hearing Committee, should the petitioner desire further consideration of the issue beyond the immediate administrative channels of the University, the President may be requested, within twenty calendar days, to review the case.

This review will be based on the record from the committee hearing and may provide opportunity for argument, oral or written, or both, by the principals.   Then the President will then make the final decision.

**Responsibility for Expenses Incurred in Grievance and Appeal**

Expenses incurred by the grievant are the responsibility of the individual. These include, but are not limited to, the following:

> Cost of an advisor.

> Travel expenses for advisor, witnesses, or others engaged by petitioner.

> Cost of preparing any documents and copies thereof.

**Withdrawal of a Grievance**

The grievance can be withdrawn at any point in the process.

**Non-Retaliation**

Grievants will not be adversely affected for exercising their right to file a grievance, regardless of outcome.

Grievants will not be subject to adverse consequences for either initiating a grievance or in presenting evidence on behalf of a grievant.  Anyone who violates this mandate can be subject to disciplinary action, up to and including dismissal.

## Related Policies

- Academic Freedom
- Disability Grievance Procedures
- Civil Rights Policy
- Civil Rights Complaint Procedures
- Sabbatical Leave for Faculty Member
- Non-reappointment of Faculty Member

DEF003414

- Promotion of Faculty Members
- Evaluation of Faculty Members
- Retrenchment of Faculty
- Tenure
- Progressive Discipline

## History

10/02/92 - Proposal returned to committee of Faculty Senate by College Committee on Policy

11/13/92 - Proposed policy dated 3/13/92, as amended, recommended by College Committee on Policy to the President

04/26/93 - Presidential approval affirmed with publication of the President's Memo

03/20/98 - Revision proposed by Faculty Senate approved by the President of the University as recommended by the Policy Committee of the University

04/29/11 - Revision approved by the President of the University as recommended by the Policy Committee of the University

Mary T. Gardier Paterson, Esquire | Secretary of the University | mtgpaterson@marywood.edu

2300 Adams Avenue, Scranton, PA 18509
570-348-6211 | toll free: 1-TO-MARYWOOD

MarywoodYOU| E-Mail| Tech Help| Privacy Policy | Student Consumer

Copyright © 2012 by Marywood University. All rights reserved.
Sponsored by Sisters, Servants of Immaculate Heart of Mary
Comments to Marywood University Web Development Office: webber@marywood.edu

DEF003415

LAW OFFICES *of*
# DAVID G. CONCANNON, LLC

February 28, 2012

<u>Via E-Mail</u>

William J. Anthony, Esquire
Jackson Lewis LLP
90 State House Square, 8th Floor
Hartford, Connecticut 01603

**Re:**   Marywood University / Dr. Frederick F. Fagal, Jr.

Dear Mr. Anthony:

This letter is to inform Marywood University that Dr. Fagal has removed from YouTube the two-part video referenced in President Munley's letters of January 24 and February 8, 2012 and your letter of February 9, 2012. The video is no longer accessible on the internet to Dr. Fagal's knowledge. In the event that Marywood requires an "offline" copy of the video, please let me know.

Please note that Dr. Fagal does not admit any of the charges or allegations—formal or informal—lodged against him in any of the above-referenced letters. The video has been removed from YouTube as a gesture of good faith.

Sincerely,

Jonathan Z. Cohen, Esquire

DEF003416

| | |
|---|---|
| **From:** | Dr Erin A Sadlack |
| **Sent:** | Monday, March 26, 2012 7:26 PM |
| **To:** | Dr William P Conlogue; Dr Patricia Sullivan Arter |
| **Subject:** | notes re grievance 1 decision plus letter draft--please give feedback! |
| **Attachments:** | committee notes.doc; findings letter to dr fagal.docx; letter to sr anne findings.docx |

Hi Bill and Trish,

I am attaching a copy of our notes as well as a draft of my letters to Sr. Anne and Fred. Please give feedback, especially about our notes!

Best,
Erin

--
~~~~~~~~~~~~~~~~~~~~
Erin A. Sadlack, Ph.D.
Associate Professor, English Department
Honors Program Director
Marywood University
2300 Adams Avenue
Scranton, PA 18509
570-348-6211, x2344

DEF003417

Dr. Frederick Fagal
17 East Lake Street
Skaneateles, NY, 13152

Sent via email to fffagal@yahoo.com, as well as regular mail.

March 26, 2012

Dear Dr. Fagal,

As Chair of the Faculty Grievance Committee, I write to inform you that the committee has reviewed thoroughly your grievance about your recent suspension and recommendation for termination of employment and tenure, namely, your arguments:

1. That you were improperly suspended by President Munley; the action should have originated with Dr. Levine.
2. That you were improperly suspended because you have not been a cause of immediate harm to yourself or to others.
3. That President Munley moved improperly to terminate your employment and tenure because you should have had a chance for remediation.
4. That President Munley moved improperly to terminate your employment and tenure because only the Vice President can take such action.
5. That you have not had an opportunity to convene an ad hoc committee to appeal the suspension.

I now write to inform you that in reviewing each of these grievances, we have found no evidence of improper action on President Munley's part which would constitute a legitimate grievance.

I will notify President Munley of the decision as well.

Sincerely,

Erin A. Sadlack, Ph.D.
Chair, Faculty Grievance Committee

cc:     Sr. Gail Cabral, IHM, Ph.D., Faculty Senate President

DEF003418

Sr. Anne Munley, IHM, Ph.D.
President, Marywood University
2300 Adams Avenue
Scranton, PA 18509

March 26, 2012

Dear President Munley,

As Chair of the Faculty Grievance Committee, I had written earlier to inform you that Dr. Frederick Fagal had submitted a grievance regarding his suspension and termination. He listed five causes of complaint in his memo:

1. That he was improperly suspended by you; the action should have originated with Dr. Levine.
2. That suspension was not justified because he has not been a cause of immediate harm to himself or to others.
3. That you moved improperly to terminate his employment and tenure because he should have had a chance for remediation.
4. That you moved improperly to terminate his employment and tenure because only the Vice President for Academic Affairs can take such action.
5. That he has not had an opportunity to convene an ad hoc committee to appeal the suspension.

I now write to inform you that in reviewing each of these grievances, we have found no evidence of improper action on your part which would constitute a legitimate grievance.

I will also communicate this decision to Dr. Fagal. Thank you for your cooperation with the Committee in this matter.

Sincerely,

Erin A. Sadlack, Ph.D.
Chair, Faculty Grievance Committee

cc:     Sr. Gail Cabral, IHM, Ph.D., Faculty Senate President

DEF003419

Grievance Committee Notes
Re: Complaint of Dr. Frederick Fagal
Committee Members: Erin Sadlack (committee chair), Trish Arter, Bill Conlogue

3/12, 9:00-9:30 McGowan 1073

First convened with Sr. Gail Cabral. Received full documentation of complaint, were advised that we were entitled to speak with anyone to gain more facts, including Sr. Anne Munley, Will Anthony, the Marywood attorney, Dr. Patricia Dunleavy, or Dr. Fagal himself. We were also advised that our job is to determine whether legitimacy of complaint sufficient to justify convening a hearing. We could not meet longer; found the only available time that week for our schedules to mesh was Friday.

3/16, 3:00-5, Bill Conlogue's house

We had to settle a few preliminary issues, the first being to clarify further the scope of our authority and the proper steps we were to take because there was a slight discrepancy between the policy wording and what Sr. Gail had told us Monday (that is, reading the policy we believe that we are to determine if complaint valid or invalid and if valid, there are a few different steps we can take before sending it on to an ad hoc hearing committee (i.e, return decision to decision maker with our findings, appoint mediator, etc.). We tried to phone Sr. Gail but were unable to reach her; we did reach Pat Dunleavy to ask questions about which policies were the most recent, those in the Policy Manual or the Faculty Handbook, as well as some general Human Resources principles about whether termination can occur without progressive discipline, etc. We also elected Erin Sadlack chair of the committee.

We discussed Dr. Fagal's first point of contention, that as President, Sr. Anne Munley is not authorized to act in this instance; it should have been the AVP: Dr. Levine. However, the Progressive Discipline Policy states that "The complaint…may be communicated to the faculty member's immediate supervisor or to the appropriate dean." Later, if the complaint not resolved, the dean consults with the AVP. In each case, it is clear that the chain of command is followed up to the top, that if the immediate supervisor is not appropriate, then cases progress to the dean, and thence to the AVP. In this case, those most affected by the offending video include several Vice Presidents, in particular the AVP, so it is logical for their supervisor, the President, to handle the complaint. Certainly we would not expect the matter to move down the chain of command. We therefore found no justification for Dr. Fagal's first cause of complaint.

We also began discussing Dr. Fagal's second contention regarding the issue of harm and agreed that in addition to the portrayal of President Munley and the other IHM sisters as Nazis, in particular, casting Dr. Levine, a man openly known to be of Jewish faith, as a Nazi SS officer is a malicious form of harassment and discrimination.

We noted that the faculty handbook seemed to indicate that there exists both formal and informal disciplinary hearings, one that would lead to progressive discipline and the former allowing for immediate suspension (albeit still with a hearing afterward). We didn't know whether this policy should accompany the policies and procedures manual, so we adjourned, having decided to seek the advice of Mary Theresa Paterson as Secretary for the University and Pat Dunleavy as head of Human Resources.

3/19 Erin Sadlack emailed Sr. Gail Cabral to update her on our understanding of the steps we are to take and let her know that we have begun the review process.

Note, on 3/23, Sr. Gail responded that she reviewed our interpretation and agreed.

3/19 Erin also emailed Pat Dunleavy and Mary Theresa Paterson to set up a meeting. Pat agreed, but Mary Theresa in a series of emails said that she is not able to meet with us because she represents the university.

DEF003420

3/21, 8:30-9, Met with Dr. Pat Dunleavy in HR Conference Room
Clarified several questions, including:

- relationship of faculty handbook to policies and procedures manual; should go with online Policies manual because handbook often out of date.
- Remediation is not always appropriate; Pat cited several cases where that did not happen before employee fired.
- That Sr. Anne asked Fred several times to explain his behavior during their meeting and he refused to explain his motives, saying only that the videos were satire.
- This is the only case of tenured faculty dismissal Pat is aware of, so there are no precedents from Marywood history
- If we need to talk with a lawyer, she will help us get in touch with Will Anthony.

3/21, 9-9:50, Liguori 1,
Committee discussed 2a of Dr. Fagal's claim, coming up against the issue of whether remediation is possible in this instance and whether the harm done is enough to justify immediate termination. More discussion needed.

3/21, Mary Theresa Paterson emailed Erin that on reflection, we were misinformed, we should not speak to Pat Dunleavy, Will Anthony, or herself and that we should make the decision on our own.

3/22, 5:00-7:00 Liguori 1
The Committee finished considering the matter, concluding ultimately that there is no evidence of improper action that would constitute a legitimate grievance in the matter of Dr. Fagal's complaints.

Our reasoning follows in each matter:

1a, That "President Munley improperly suspended Dr. Fagal"
I repeat from our earlier notes: the Progressive Discipline Policy states that "The complaint...may be communicated to the faculty member's immediate supervisor or to the appropriate dean." Later, if the complaint not resolved, the dean consults with the AVP. In each case, it is clear that the chain of command is followed up to the top, that if the immediate supervisor is not appropriate, then cases progress to the dean, and thence to the AVP. In this case, those most affected by the offending video include several Vice Presidents, in particular the AVP, so it is logical for their supervisor, the President, to handle the complaint. Certainly we would not expect the matter to move down the chain of command. We therefore found no justification for Dr. Fagal's first cause of complaint.

1b, That "suspension is justified if immediate harm to the faculty member or others is threatened."
We found that the definition of harm might take many forms, not just physical, and that Dr. Fagal's portrayal of Dr. Levine, a member of the Jewish faith, as a Nazi SS officer, to be an act of particularly malicious discrimination against Dr. Levine, who would be justified in considering himself the victim of religious prejudice. The movie highlights Dr. Levine's Jewish faith by capitalizing his last name alone in a list of other current Vice Presidents and by stereotypical references to his fears about losing his wealth. The vulgar references to Dr. Levine's family constitute a further attack.

We also found that Dr. Fagal's other portrayals of his colleagues and the administration, from Sister Anne Munley as Hitler, to the IHM Sisters as the SS, and to the various Vice Presidents Ray Heath, Clayton Pheasant, and Joseph Garvey, as Nazi officers to be a similarly repugnant attack in direct violation of the code

DEF003421

of professional ethics Dr. Fagal agreed to respect. We quote in particular the policy on Professional Ethics: "Professors do not discriminate against or harass colleagues."

We also find that Dr. Fagal, by posting such a negative portrayal of Marywood on a public forum such as YouTube, deliberately caused harm to the university community by trying to damage its reputation and inducing students to transfer elsewhere.

2a. "President Munley moved improperly to terminate my employment and tenure" because "no remedial actions were taken during the suspension."
We agreed that the procedures do not mandate remedial action be taken in each instance. The opening paragraph of the Progressive Discipline policy reads "the policy recognizes personal and professional problems that *may* be rectified by an informal educational process, *as well as* serious violations of professional responsibilities implicating possible recommendation for suspension or dismissal" [emphasis ours]. These words suggest leeway in dealing with different situations.

Moreover, we agreed that there are some instances in which there is no possible remediation. For instance, if a faculty member were to shoot a student or stalk a student, there could be no counseling offered. While Dr. Fagal's actions do not sink to that level, the fact remains that the committee does not see any evidence that there is a guaranteed right to remediation.

Furthermore, we see no evidence that Dr. Fagal desired remediation, nor can we imagine a reasonable type of remediation that would be appropriate. We remember that Dr. Fagal was present at Title IX training at last year's General Faculty meeting so he cannot claim ignorance that such remarks constitute harassment. In addition, he knows that his actions go counter to the Core Values he disparages in his film, values he promised to uphold when he applied for tenure. As the Tenure policy states, "submission to the University of an application for tenure suggests a strong acceptance by that individual of the mission, goals, and objectives of the University." Given that the procession of application for tenure requires lengthy demonstration of meeting the core values, as does each year's Faculty Activity Report, Dr Fagal cannot claim ignorance that the core values include "respect for each person."

In addition, according to the transcript of their meeting, Dr. Fagal refused to give President Munley any justification for the videos that might suggest remediation was possible. President Munley told Dr. Fagal after she suspended him that this was his opportunity to explain the videos while she considered the next course of action, and then again specifically directed his attention back to the issue of the videos but all he responded was that they were satire.

Ultimately, we find that remediation is not guaranteed, nor in this instance was there anything to warrant such remediation. Therefore we find Dr. Fagal's complaint to be without justification.

2b. That "only the Vice President may recommend suspension or dismissal"
We use the same reasoning as in 1a.

3. That "My request to convene an ad hoc committee to appeal the suspension has not been accepted."
We found that the language in the Progressive Discipline Policy gives President Munley the right to dismiss an employee given "serious violations of professional responsibilities," and that the faculty member has a right to

DEF003422

convene an ad hoc committee to review that decision. We find that Dr. Fagal did engage in such a serious violation.

Where Dr. Fagal argues that he has a right to two hearings, we find the contrary:  the policy does not guarantee a series of steps—suspension, review, suspension confirmed, remediation, termination, review—but rather gives that as a possibility where remediation warranted. We note particularly the language under the heading "Ad Hoc Faculty Committee" "Having received a written recommendation for *either* suspension *or* dismissal…the President sends a written communication to the faculty member, stating with reasonable particularity the basis for suspension *or* dismissal and offering, if requested by the faculty member within 10 days, to convene tenured faculty ad hoc committee to consider the matter…" (emphasis ours). This implies that whatever decision is reached, that decision may be appealed.

We therefore find that President Munley is obligated to give Dr. Fagal a chance to have his case reviewed by an ad hoc committee and that she did so on multiple occasions. Therefore, Dr. Fagal's complaint is without justification.

As found by us:


_____          _____
Dr. Erin A. Sadlack (Committee Chair)            Date


_____          _____
Dr. Patricia Sullivan Arter                            Date


_____          _____
Dr. William Conlogue                               Date

| | |
|---|---|
| **From:** | Dr Erin A Sadlack |
| **Sent:** | Tuesday, March 6, 2012 10:49 PM |
| **To:** | Sr. Gail Cabral IHM PhD |
| **Cc:** | Dr Patricia Sullivan Arter; Bill Conlogue |
| **Subject:** | Re: Meeting, Grievance and Appeals Committee |

I'm sorry; I should have been more clear; I will be away on Thursday and Friday of this week. I only mentioned Friday before because that was the time we were forecasting. If Trish is coming back tomorrow and feels up to it, I could do a late meeting Wednesday.

Best,
Erin

On Tue, Mar 6, 2012 at 5:42 PM, Sr. Gail Cabral IHM PhD <cabral@maryu.marywood.edu> wrote:
How about Thursday afternoon this week? 2 PM? When I know a time that is manageable to all, I'll get a room.
Gail

On Tue, Mar 6, 2012 at 3:53 PM, Patricia Arter <psarter@maryu.marywood.edu> wrote:
Yes, I will head back tomorrow. What time?

Sent from my iPhone

On Mar 6, 2012, at 3:25 PM, "Sr. Gail Cabral IHM PhD" <cabral@maryu.marywood.edu> wrote:

> Trish, can you meet on Thursday of this week? Erin is not available on Friday.
> Gail
>
> On Tue, Mar 6, 2012 at 2:09 PM, Patricia Arter <psarter@maryu.marywood.edu> wrote:
> I can meet Friday at 10
>
> Sent from my iPhone
>
> On Mar 6, 2012, at 11:24 AM, "Sr. Gail Cabral IHM PhD" <cabral@maryu.marywood.edu> wrote:
>
>> Hi,
>> Trish Arter is out of town until Thursday or Friday. How about 10 AM Friday morning?
>>
>> In the meantime, I will forward the grievance materials I received from Fred Fagal by forwarding to you his emails. When we meet on Friday, I may have information about another grievance. I plan to meet with you briefly just to clarify the process.
>>
>> Thank you again.
>> Gail
>>
>> On Sat, Mar 3, 2012 at 11:13 AM, Sr. Gail Cabral IHM PhD <cabral@maryu.marywood.edu> wrote:

1

DEF003424

Dear Folks,

I know we are on spring break but I wonder if I could meet with the three of you this coming week. I can make myself available any time except during the services for Sr. Felice Hickey. I can be available on Monday any time, on Tuesday until 4 PM, on Wed., after 12 N. There are actually a few things I'd like to discuss.

Thanks again for your willingness to serve on this important committee.

Gail

--
~~~~~~~~~~~~~~~~~~~~
Erin A. Sadlack, Ph.D.
Associate Professor, English Department
Honors Program Director
Marywood University
2300 Adams Avenue
Scranton, PA 18509
570-348-6211, x2344

DEF003425

| | |
|---|---|
| **From:** | Patricia Arter [psarter@maryu.marywood.edu] |
| **Sent:** | Wednesday, March 07, 2012 1:29:01 AM |
| **To:** | Dr Erin A Sadlack |
| **CC:** | Sr. Gail Cabral IHM PhD; Bill Conlogue |
| **Subject:** | Re: Meeting, Grievance and Appeals Committee |

I am coming back early but won't be available tomorrow since it will be a long travel day

Sent from my iPhone

On Mar 6, 2012, at 5:48 PM, Dr Erin A Sadlack <easadlack@maryu.marywood.edu> wrote:

> I'm sorry; I should have been more clear; I will be away on Thursday and Friday of this week. I only mentioned Friday before because that was the time we were forecasting. If Trish is coming back tomorrow and feels up to it, I could do a late meeting Wednesday.
>
> Best,
> Erin
>
> On Tue, Mar 6, 2012 at 5:42 PM, Sr. Gail Cabral IHM PhD <cabral@maryu.marywood.edu> wrote:
>> How about Thursday afternoon this week? 2 PM? When I know a time that is manageable to all, I'll get a room.
>> Gail
>>
>> On Tue, Mar 6, 2012 at 3:53 PM, Patricia Arter <psarter@maryu.marywood.edu> wrote:
>>> Yes, I will head back tomorrow. What time?
>>>
>>> Sent from my iPhone
>>>
>>> On Mar 6, 2012, at 3:25 PM, "Sr. Gail Cabral IHM PhD" <cabral@maryu.marywood.edu> wrote:
>>>
>>>> Trish, can you meet on Thursday of this week? Erin is not available on Friday.
>>>> Gail
>>>>
>>>> On Tue, Mar 6, 2012 at 2:09 PM, Patricia Arter <psarter@maryu.marywood.edu> wrote:
>>>>> I can meet Friday at 10
>>>>>
>>>>> Sent from my iPhone
>>>>>
>>>>> On Mar 6, 2012, at 11:24 AM, "Sr. Gail Cabral IHM PhD" <cabral@maryu.marywood.edu> wrote:
>>>>>
>>>>>> Hi,
>>>>>> Trish Arter is out of town until Thursday or Friday. How about 10 AM Friday morning?
>>>>>>
>>>>>> In the meantime, I will forward the grievance materials I received from Fred Fagal by forwarding to you his emails. When we meet

DEF003426

on Friday, I may have information about another grievance. I plan to meet with you briefly just to clarify the process.

Thank you again.
Gail

On Sat, Mar 3, 2012 at 11:13 AM, Sr. Gail Cabral IHM PhD <cabral@maryu.marywood.edu> wrote:

Dear Folks,
I know we are on spring break but I wonder if I could meet with the three of you this coming week. I can make myself available any time except during the services for Sr. Felice Hickey. I can be available on Monday any time, on Tuesday until 4 PM, on Wed., after 12 N. There are actually a few things I'd like to discuss.

Thanks again for your willingness to serve on this important committee.

Gail

--
~~~~~~~~~~~~~~~~~~~~~~
Erin A. Sadlack, Ph.D.
Associate Professor, English Department
Honors Program Director
Marywood University
2300 Adams Avenue
Scranton, PA 18509
570-348-6211, x2344

DEF003427

| | |
|---|---|
| **From:** | Sr. Gail Cabral IHM PhD |
| **Sent:** | Tuesday, March 6, 2012 4:24 PM |
| **To:** | Bill Conlogue; Dr Erin A Sadlack; Dr Patricia Sullivan Arter |
| **Subject:** | Re: Meeting, Grievance and Appeals Committee |

Hi,

Trish Arter is out of town until Thursday or Friday. How about 10 AM Friday morning?

In the meantime, I will forward the grievance materials I received from Fred Fagal by forwarding to you his emails. When we meet on Friday, I may have information about another grievance. I plan to meet with you briefly just to clarify the process.

Thank you again.
Gail

On Sat, Mar 3, 2012 at 11:13 AM, Sr. Gail Cabral IHM PhD <cabral@maryu.marywood.edu> wrote:
Dear Folks,
I know we are on spring break but I wonder if I could meet with the three of you this coming week. I can make myself available any time except during the services for Sr. Felice Hickey. I can be available on Monday any time, on Tuesday until 4 PM, on Wed., after 12 N. There are actually a few things I'd like to discuss.

Thanks again for your willingness to serve on this important committee.

Gail

1

DEF003428

| | |
|---|---|
| **From:** | Dr Erin A Sadlack |
| **Sent:** | Tuesday, March 6, 2012 5:51 PM |
| **To:** | Sr. Gail Cabral IHM PhD |
| **Subject:** | Re: Meeting, Grievance and Appeals Committee |

Sr. Gail,

I'm sorry to interfere with the Friday time, but I have plans to be away that day. Can we push until Monday? I'm completely open that day.

I've taken a quick look at what you've sent us so far. Will we have access to the letters from Sr. Anne and the Marywood attorneys too?
Also, do you need us to print out what you've sent or will you have a packet for us when we meet?

I'm sorry to cause a problem with the timing!

Best,
Erin

On Tue, Mar 6, 2012 at 11:24 AM, Sr. Gail Cabral IHM PhD <cabral@maryu.marywood.edu> wrote:
Hi,
Trish Arter is out of town until Thursday or Friday. How about 10 AM Friday morning?

In the meantime, I will forward the grievance materials I received from Fred Fagal by forwarding to you his emails. When we meet on Friday, I may have information about another grievance. I plan to meet with you briefly just to clarify the process.

Thank you again.
Gail

On Sat, Mar 3, 2012 at 11:13 AM, Sr. Gail Cabral IHM PhD <cabral@maryu.marywood.edu> wrote:
Dear Folks,
I know we are on spring break but I wonder if I could meet with the three of you this coming week. I can make myself available any time except during the services for Sr. Felice Hickey. I can be available on Monday any time, on Tuesday until 4 PM, on Wed., after 12 N. There are actually a few things I'd like to discuss.

Thanks again for your willingness to serve on this important committee.

Gail


--
~~~~~~~~~~~~~~~~~~~~~~~~~~~
Erin A. Sadlack, Ph.D.
Associate Professor, English Department
Honors Program Director

1

DEF003429

Marywood University
2300 Adams Avenue
Scranton, PA 18509
570-348-6211, x2344

DEF003430

| | |
|---|---|
| **From:** | Sr. Gail Cabral IHM PhD |
| **Sent:** | Tuesday, March 6, 2012 10:43 PM |
| **To:** | Dr Patricia Sullivan Arter; Bill Conlogue; Dr Erin A Sadlack |
| **Subject:** | Re: Meeting, Grievance and Appeals Committee |

How about Thursday afternoon this week? 2 PM? When I know a time that is manageable to all, I'll get a room.
Gail

On Tue, Mar 6, 2012 at 3:53 PM, Patricia Arter <psarter@maryu.marywood.edu> wrote:
Yes, I will head back tomorrow. What time?

Sent from my iPhone

On Mar 6, 2012, at 3:25 PM, "Sr. Gail Cabral IHM PhD" <cabral@maryu.marywood.edu> wrote:

> Trish, can you meet on Thursday of this week? Erin is not available on Friday.
> Gail
>
> On Tue, Mar 6, 2012 at 2:09 PM, Patricia Arter <psarter@maryu.marywood.edu> wrote:
> I can meet Friday at 10
>
> Sent from my iPhone
>
> On Mar 6, 2012, at 11:24 AM, "Sr. Gail Cabral IHM PhD" <cabral@maryu.marywood.edu>
> wrote:
>
>> Hi,
>> Trish Arter is out of town until Thursday or Friday. How about 10 AM Friday
>> morning?
>>
>> In the meantime, I will forward the grievance materials I received from Fred
>> Fagal by forwarding to you his emails. When we meet on Friday, I may have
>> information about another grievance. I plan to meet with you briefly just to clarify
>> the process.
>>
>> Thank you again.
>> Gail
>>
>> On Sat, Mar 3, 2012 at 11:13 AM, Sr. Gail Cabral IHM PhD
>> <cabral@maryu.marywood.edu> wrote:
>> Dear Folks,
>> I know we are on spring break but I wonder if I could meet with the three of you
>> this coming week. I can make myself available any time except during the
>> services for Sr. Felice Hickey. I can be available on Monday any time, on
>> Tuesday until 4 PM, on Wed., after 12 N. There are actually a few things I'd like
>> to discuss.
>>
>> Thanks again for your willingness to serve on this important committee.

1

DEF003431

Gail

DEF003432

| | |
|---|---|
| **From:** | Frederick Fagal [fffagal@yahoo.com] |
| **Sent:** | Tuesday, March 20, 2012 2:10:35 AM |
| **To:** | Dr Erin A Sadlack |
| **Subject:** | Re: Notice of Grievance Committee's receipt of materials |

Hello Erin,

Thanks for keeping me informed. I am suspended (I am surely not teaching) but at this point/stage President Munley has only *recommended* my termination. I can think of nothing more you and the others should know at the moment, but will let you know if something comes up.

Sincerely,

Fred

Frederick F. Fagal, Jr., Ph.D.
Associate Professor of Economics, Social Science Department
Marywood University
2300 Adams Avenue
Scranton, PA 18509

---

**From:** Dr Erin A Sadlack <easadlack@maryu.marywood.edu>
**To:** fffagal@yahoo.com
**Sent:** Monday, March 19, 2012 5:52 PM
**Subject:** Notice of Grievance Committee's receipt of materials

Dear Fred,

This email is just to inform you that the Faculty Grievance Committee has received your official grievance regarding your suspension and termination and to tell you that we have begun the process of reviewing your arguments. If there is any additional information you would like us to consider, please let me know. Otherwise we will be in touch when we have our findings ready.

Sincerely,
Erin

~~~~~~~~~~~~~~~~~~~~~
Erin A. Sadlack, Ph.D.
Associate Professor, English Department
Honors Program Director
Marywood University
2300 Adams Avenue
Scranton, PA 18509
570-348-6211, x2344

DEF003433



COLLEGE OF LIBERAL ARTS AND SCIENCES

MARYWOOD UNIVERSITY
SCRANTON, PA 18509-1598
TEL: (570) 348-6219
*www.marywood.edu/english*

DEPARTMENT OF ENGLISH

Dr. Frederick Fagal
17 East Lake Street
Skaneateles, NY, 13152

Sent via email to fffagal@yahoo.com, as well as regular mail.

March 26, 2012

Dear Dr. Fagal,

As Chair of the Faculty Grievance Committee, I write to inform you that the committee has reviewed thoroughly your grievance about your recent suspension and recommendation for termination of employment and tenure, namely, your arguments:

1. That you were improperly suspended by President Munley; the action should have originated with Dr. Levine.
2. That you were improperly suspended because you have not been a cause of immediate harm to yourself or to others.
3. That President Munley moved improperly to terminate your employment and tenure because you should have had a chance for remediation.
4. That President Munley moved improperly to terminate your employment and tenure because only the Vice President can take such action.
5. That you have not had an opportunity to convene an ad hoc committee to appeal the suspension.

I now write to inform you that in reviewing each of these grievances, we have found no evidence of improper action on President Munley's part which would constitute a legitimate grievance.

I will notify President Munley of the decision as well.

Sincerely,

Erin A. Sadlack, Ph.D.
Chair, Faculty Grievance Committee

cc:     Sr. Gail Cabral, IHM, Ph.D., Faculty Senate President

*An education inspired by the Sisters, Servants of the Immaculate Heart of Mary.*

DEF003434

| | |
|---|---|
| **From:** | Dr Erin A Sadlack |
| **Sent:** | Wednesday, March 28, 2012 8:18 PM |
| **To:** | fffagal@yahoo.com |
| **Subject:** | Faculty Grievance Committee Findings |
| **Attachments:** | dr fagal.pdf |

Dear Fred,

I am attaching a letter with the Faculty Senate Grievance Committee's findings. A hard copy is in the mail as well.

Best,
Erin

--
~~~~~~~~~~~~~~~~~~~~~
Erin A. Sadlack, Ph.D.
Associate Professor, English Department
Honors Program Director
Marywood University
2300 Adams Avenue
Scranton, PA 18509
570-348-6211, x2344

DEF003435

COLLEGE OF LIBERAL ARTS AND SCIENCES



## Marywood
UNIVERSITY

MARYWOOD UNIVERSITY
SCRANTON, PA 18509-1598
TEL: (570) 348-6219
www.marywood.edu/english

DEPARTMENT OF ENGLISH

Dr. Frederick Fagal
17 East Lake Street
Skaneateles, NY, 13152

Sent via email to fffagal@yahoo.com, as well as regular mail.

March 26, 2012

Dear Dr. Fagal,

As Chair of the Faculty Grievance Committee, I write to inform you that the committee has reviewed thoroughly your grievance about your recent suspension and recommendation for termination of employment and tenure, namely, your arguments:

1. That you were improperly suspended by President Munley; the action should have originated with Dr. Levine.
2. That you were improperly suspended because you have not been a cause of immediate harm to yourself or to others.
3. That President Munley moved improperly to terminate your employment and tenure because you should have had a chance for remediation.
4. That President Munley moved improperly to terminate your employment and tenure because only the Vice President can take such action.
5. That you have not had an opportunity to convene an ad hoc committee to appeal the suspension.

I now write to inform you that in reviewing each of these grievances, we have found no evidence of improper action on President Munley's part which would constitute a legitimate grievance.

I will notify President Munley of the decision as well.

Sincerely,

Erin A. Sadlack, Ph.D.
Chair, Faculty Grievance Committee

cc:     Sr. Gail Cabral, IHM, Ph.D., Faculty Senate President

*An education inspired by the Sisters, Servants of the Immaculate Heart of Mary.*

DEF003436

**From:**         Dr Erin A Sadlack
**Sent:**         Monday, April 2, 2012 3:47 PM
**To:**           Patricia Dunleavy
**Subject:**      Fwd: Faculty Grievance Committee Findings
**Attachments:**  dr fagal.pdf

Dear Pat,

Here is my initial letter/email.

Thanks again!

Best,
Erin

---------- Forwarded message ----------
From: **Dr Erin A Sadlack** <easadlack@maryu.marywood.edu>
Date: Wed, Mar 28, 2012 at 4:17 PM
Subject: Faculty Grievance Committee Findings
To: fffagal@yahoo.com

Dear Fred,

I am attaching a letter with the Faculty Senate Grievance Committee's findings. A hard copy is in the mail as well.

Best,
Erin

--
~~~~~~~~~~~~~~~~~~~~~~~~~
Erin A. Sadlack, Ph.D.
Associate Professor, English Department
Honors Program Director
Marywood University
2300 Adams Avenue
Scranton, PA 18509
570-348-6211, x2344

--
~~~~~~~~~~~~~~~~~~~~~~~~~
Erin A. Sadlack, Ph.D.
Associate Professor, English Department
Honors Program Director
Marywood University

1

DEF003437

2300 Adams Avenue
Scranton, PA 18509
570-348-6211, x2344

DEF003438



COLLEGE OF LIBERAL ARTS AND SCIENCES

MARYWOOD UNIVERSITY
SCRANTON, PA 18509-1598
TEL: (570) 348-6219
www.marywood.edu/english

DEPARTMENT OF ENGLISH

Dr. Frederick Fagal
17 East Lake Street
Skaneateles, NY, 13152

Sent via email to fffagal@yahoo.com, as well as regular mail.

March 26, 2012

Dear Dr. Fagal,

As Chair of the Faculty Grievance Committee, I write to inform you that the committee has reviewed thoroughly your grievance about your recent suspension and recommendation for termination of employment and tenure, namely, your arguments:

1. That you were improperly suspended by President Munley; the action should have originated with Dr. Levine.
2. That you were improperly suspended because you have not been a cause of immediate harm to yourself or to others.
3. That President Munley moved improperly to terminate your employment and tenure because you should have had a chance for remediation.
4. That President Munley moved improperly to terminate your employment and tenure because only the Vice President can take such action.
5. That you have not had an opportunity to convene an ad hoc committee to appeal the suspension.

I now write to inform you that in reviewing each of these grievances, we have found no evidence of improper action on President Munley's part which would constitute a legitimate grievance.

I will notify President Munley of the decision as well.

Sincerely,

Erin A. Sadlack, Ph.D.
Chair, Faculty Grievance Committee

cc:    Sr. Gail Cabral, IHM, Ph.D., Faculty Senate President

*An education inspired by the Sisters, Servants of the Immaculate Heart of Mary.*

DEF003439

**From:**         Dr Erin A Sadlack
**Sent:**          Monday, April 2, 2012 3:52 PM
**To:**            Patricia Dunleavy
**Subject:**       Fwd: Faculty Grievance Committee Findings

This is the latest email from Fred.

---------- Forwarded message ----------
From: **Frederick Fagal** <fffagal@yahoo.com>
Date: Fri, Mar 30, 2012 at 1:45 PM
Subject: Re: Faculty Grievance Committee Findings
To: Dr Erin A Sadlack <easadlack@maryu.marywood.edu>

Dear Erin,

Thank you for getting back to me as soon as you did. Because I am not teaching and my office is cleared out it is clear I am suspended. I have not actually been terminated but termination has been recommended. My first order of business is to appeal the *suspension*, so when you wrote

"…our findings do not preclude your appealing the termination itself through an ad hoc committee…"

am I correct in assuming that you meant to write something like "…our findings do not preclude your appealing the suspension [or subsequently a/the recommendation for termination] itself through an ad hoc committee…"

Thank you for any clarification(s) you can furnish.

Best,

Fred

**From:** Dr Erin A Sadlack <easadlack@maryu.marywood.edu>
**To:** Frederick Fagal <fffagal@yahoo.com>
**Cc:** "cabral@marywood.edu" <cabral@marywood.edu>
**Sent:** Thursday, March 29, 2012 5:03 PM
**Subject:** Re: Faculty Grievance Committee Findings

Dear Fred,

I'm afraid that the committee proceedings are confidential. All I can do is say what I did in the letter, that we checked the policy wording carefully and did not find a violation of procedure in any of the 5 instances you grieved. In addition, the Policy Manual states that the findings of a grievance committee cannot themselves be grieved. Please note that our findings do not preclude your appealing the termination itself through an ad hoc committee as outlined in the Progressive Discipline Policy. You retain that right and if you wish to do so, I believe you need to contact Sr. Gail Cabral as Faculty Senate President to exercise that option.

1

DEF003440

Best,
Erin

On Wed, Mar 28, 2012 at 5:50 PM, Frederick Fagal <fffagal@yahoo.com> wrote:
Dear Erin,

Thanks for getting back to me. Of course I'd hoped for a different set of set of responses. I'd really appreciate it if you could share the reasoning of the committee regarding the various points I tried to make. Thanks very much.

Sincerely,

Fred

**From:** Dr Erin A Sadlack <easadlack@maryu.marywood.edu>
**To:** fffagal@yahoo.com
**Sent:** Wednesday, March 28, 2012 4:17 PM
**Subject:** Faculty Grievance Committee Findings

Dear Fred,

I am attaching a letter with the Faculty Senate Grievance Committee's findings. A hard copy is in the mail as well.

Best,
Erin

--
~~~~~~~~~~~~~~~~~~~~~~~~~~
Erin A. Sadlack, Ph.D.
Associate Professor, English Department
Honors Program Director
Marywood University
2300 Adams Avenue
Scranton, PA 18509
570-348-6211, x2344

--
~~~~~~~~~~~~~~~~~~~~~~~~~~
Erin A. Sadlack, Ph.D.
Associate Professor, English Department
Honors Program Director
Marywood University
2300 Adams Avenue

2

DEF003441

Scranton, PA 18509
570-348-6211, x2344

--
~~~~~~~~~~~~~~~~~~~~~
Erin A. Sadlack, Ph.D.
Associate Professor, English Department
Honors Program Director
Marywood University
2300 Adams Avenue
Scranton, PA 18509
570-348-6211, x2344

DEF003442

| | |
|---|---|
| **From:** | Dr Erin A Sadlack |
| **Sent:** | Monday, April 2, 2012 3:48 PM |
| **To:** | Patricia Dunleavy |
| **Subject:** | Fwd: Faculty Grievance Committee Findings |

---------- Forwarded message ----------
From: **Dr Erin A Sadlack** <easadlack@maryu.marywood.edu>
Date: Thu, Mar 29, 2012 at 5:03 PM
Subject: Re: Faculty Grievance Committee Findings
To: Frederick Fagal <fffagal@yahoo.com>
Cc: "cabral@marywood.edu" <cabral@marywood.edu>

Dear Fred,

I'm afraid that the committee proceedings are confidential. All I can do is say what I did in the letter, that we checked the policy wording carefully and did not find a violation of procedure in any of the 5 instances you grieved. In addition, the Policy Manual states that the findings of a grievance committee cannot themselves be grieved. Please note that our findings do not preclude your appealing the termination itself through an ad hoc committee as outlined in the Progressive Discipline Policy. You retain that right and if you wish to do so, I believe you need to contact Sr. Gail Cabral as Faculty Senate President to exercise that option.

Best,
Erin

On Wed, Mar 28, 2012 at 5:50 PM, Frederick Fagal <fffagal@yahoo.com> wrote:
Dear Erin,

Thanks for getting back to me. Of course I'd hoped for a different set of set of responses. I'd really appreciate it if you could share the reasoning of the committee regarding the various points I tried to make. Thanks very much.

Sincerely,

Fred

**From:** Dr Erin A Sadlack <easadlack@maryu.marywood.edu>
**To:** fffagal@yahoo.com
**Sent:** Wednesday, March 28, 2012 4:17 PM
**Subject:** Faculty Grievance Committee Findings

Dear Fred,

I am attaching a letter with the Faculty Senate Grievance Committee's findings. A hard copy is in the mail as

1

DEF003443

well.

Best,
Erin

--
~~~~~~~~~~~~~~~~~~~~~~
Erin A. Sadlack, Ph.D.
Associate Professor, English Department
Honors Program Director
Marywood University
2300 Adams Avenue
Scranton, PA 18509
570-348-6211, x2344

--
~~~~~~~~~~~~~~~~~~~~~~
Erin A. Sadlack, Ph.D.
Associate Professor, English Department
Honors Program Director
Marywood University
2300 Adams Avenue
Scranton, PA 18509
570-348-6211, x2344

--
~~~~~~~~~~~~~~~~~~~~~~
Erin A. Sadlack, Ph.D.
Associate Professor, English Department
Honors Program Director
Marywood University
2300 Adams Avenue
Scranton, PA 18509
570-348-6211, x2344

DEF003444

| | |
|---|---|
| **From:** | Dr Erin A Sadlack |
| **Sent:** | Monday, April 2, 2012 3:48 PM |
| **To:** | Patricia Dunleavy |
| **Subject:** | Fwd: Faculty Grievance Committee Findings |

---------- Forwarded message ----------
From: **Frederick Fagal** <fffagal@yahoo.com>
Date: Wed, Mar 28, 2012 at 5:50 PM
Subject: Re: Faculty Grievance Committee Findings
To: Dr Erin A Sadlack <easadlack@maryu.marywood.edu>
Cc: "cabral@marywood.edu" <cabral@marywood.edu>

Dear Erin,

Thanks for getting back to me. Of course I'd hoped for a different set of set of responses. I'd really appreciate it if you could share the reasoning of the committee regarding the various points I tried to make. Thanks very much.

Sincerely,

Fred

---

**From:** Dr Erin A Sadlack <easadlack@maryu.marywood.edu>
**To:** fffagal@yahoo.com
**Sent:** Wednesday, March 28, 2012 4:17 PM
**Subject:** Faculty Grievance Committee Findings

Dear Fred,

I am attaching a letter with the Faculty Senate Grievance Committee's findings. A hard copy is in the mail as well.

Best,
Erin

--
~~~~~~~~~~~~~~~~~~~~~~~
Erin A. Sadlack, Ph.D.
Associate Professor, English Department
Honors Program Director
Marywood University
2300 Adams Avenue
Scranton, PA 18509
570-348-6211, x2344

1

DEF003445

--
~~~~~~~~~~~~~~~~~~~~~~~~~
Erin A. Sadlack, Ph.D.
Associate Professor, English Department
Honors Program Director
Marywood University
2300 Adams Avenue
Scranton, PA 18509
570-348-6211, x2344

DEF003446

| | |
|---|---|
| **From:** | Frederick Fagal [fffagal@yahoo.com] |
| **Sent:** | Wednesday, March 28, 2012 9:50:28 PM |
| **To:** | Dr Erin A Sadlack |
| **CC:** | cabral@marywood.edu |
| **Subject:** | Re: Faculty Grievance Committee Findings |

Dear Erin,

Thanks for getting back to me. Of course I'd hoped for a different set of set of responses. I'd really appreciate it if you could share the reasoning of the committee regarding the various points I tried to make. Thanks very much.

Sincerely,

Fred

---

**From:** Dr Erin A Sadlack <easadlack@maryu.marywood.edu>
**To:** fffagal@yahoo.com
**Sent:** Wednesday, March 28, 2012 4:17 PM
**Subject:** Faculty Grievance Committee Findings

Dear Fred,

I am attaching a letter with the Faculty Senate Grievance Committee's findings. A hard copy is in the mail as well.

Best,
Erin

--
~~~~~~~~~~~~~~~~~~~~~
Erin A. Sadlack, Ph.D.
Associate Professor, English Department
Honors Program Director
Marywood University
2300 Adams Avenue
Scranton, PA 18509
570-348-6211, x2344

DEF003447

| | |
|---|---|
| **From:** | Dr Erin A Sadlack |
| **Sent:** | Thursday, March 29, 2012 9:04 PM |
| **To:** | Frederick Fagal |
| **Cc:** | cabral@marywood.edu |
| **Subject:** | Re: Faculty Grievance Committee Findings |

Dear Fred,

I'm afraid that the committee proceedings are confidential. All I can do is say what I did in the letter, that we checked the policy wording carefully and did not find a violation of procedure in any of the 5 instances you grieved. In addition, the Policy Manual states that the findings of a grievance committee cannot themselves be grieved. Please note that our findings do not preclude your appealing the termination itself through an ad hoc committee as outlined in the Progressive Discipline Policy. You retain that right and if you wish to do so, I believe you need to contact Sr. Gail Cabral as Faculty Senate President to exercise that option.

Best,
Erin

On Wed, Mar 28, 2012 at 5:50 PM, Frederick Fagal <fffagal@yahoo.com> wrote:
Dear Erin,

Thanks for getting back to me. Of course I'd hoped for a different set of set of responses. I'd really appreciate it if you could share the reasoning of the committee regarding the various points I tried to make. Thanks very much.

Sincerely,

Fred

---

**From:** Dr Erin A Sadlack <easadlack@maryu.marywood.edu>
**To:** fffagal@yahoo.com
**Sent:** Wednesday, March 28, 2012 4:17 PM
**Subject:** Faculty Grievance Committee Findings

Dear Fred,

I am attaching a letter with the Faculty Senate Grievance Committee's findings. A hard copy is in the mail as well.

Best,
Erin

--
~~~~~~~~~~~~~~~~~~~~~~
Erin A. Sadlack, Ph.D.
Associate Professor, English Department
Honors Program Director

1

DEF003448

Marywood University
2300 Adams Avenue
Scranton, PA 18509
570-348-6211, x2344

--
~~~~~~~~~~~~~~~~~~~~~~~
Erin A. Sadlack, Ph.D.
Associate Professor, English Department
Honors Program Director
Marywood University
2300 Adams Avenue
Scranton, PA 18509
570-348-6211, x2344

2

DEF003449

| | |
|---|---|
| **From:** | Dr Erin A Sadlack |
| **Sent:** | Monday, April 2, 2012 7:10 PM |
| **To:** | Frederick Fagal |
| **Cc:** | Sr. Gail Cabral IHM PhD |
| **Subject:** | Re: Faculty Grievance Committee Findings |

Dear Fred,

I am happy to get back to you quickly; I understand that this is a very serious matter. However, you are incorrect in assuming that I left out the issue of your suspension. In your grievance letter, you made it clear that one of your grievances is that you have not been allowed to convene a committee to appeal your suspension; I quote your point #3, which states: "My request to convene an ad hoc committee to appeal the suspension has not been accepted." Therefore that issue was part of our decision.

In considering your grievances, the Grievance Committee found that there was no evidence of improper action in the process of the President's recommending termination, and that includes the issue of convening an ad hoc committee to appeal the suspension.

According to the Policy Manual, the Committee's decision may not be grieved.

Sincerely,
Erin


On Fri, Mar 30, 2012 at 1:45 PM, Frederick Fagal <fffagal@yahoo.com> wrote:
> Dear Erin,
>
> Thank you for getting back to me as soon as you did. Because I am not teaching and my office is cleared out it is clear I am suspended. I have not actually been terminated but termination has been recommended. My first order of business is to appeal the *suspension*, so when you wrote
>
>> "…our findings do not preclude your appealing the termination itself through an ad hoc committee…"
>
> am I correct in assuming that you meant to write something like "…our findings do not preclude your appealing the suspension [or subsequently a/the recommendation for termination] itself through an ad hoc committee…"
>
> Thank you for any clarification(s) you can furnish.
>
> Best,
>
> Fred

---

**From:** Dr Erin A Sadlack <easadlack@maryu.marywood.edu>
**To:** Frederick Fagal <fffagal@yahoo.com>
**Cc:** "cabral@marywood.edu" <cabral@marywood.edu>

1

DEF003450

**Sent:** Thursday, March 29, 2012 5:03 PM
**Subject:** Re: Faculty Grievance Committee Findings

Dear Fred,

I'm afraid that the committee proceedings are confidential. All I can do is say what I did in the letter, that we checked the policy wording carefully and did not find a violation of procedure in any of the 5 instances you grieved. In addition, the Policy Manual states that the findings of a grievance committee cannot themselves be grieved. Please note that our findings do not preclude your appealing the termination itself through an ad hoc committee as outlined in the Progressive Discipline Policy. You retain that right and if you wish to do so, I believe you need to contact Sr. Gail Cabral as Faculty Senate President to exercise that option.

Best,
Erin

On Wed, Mar 28, 2012 at 5:50 PM, Frederick Fagal <fffagal@yahoo.com> wrote:
Dear Erin,

Thanks for getting back to me. Of course I'd hoped for a different set of set of responses. I'd really appreciate it if you could share the reasoning of the committee regarding the various points I tried to make. Thanks very much.

Sincerely,

Fred

---

**From:** Dr Erin A Sadlack <easadlack@maryu.marywood.edu>
**To:** fffagal@yahoo.com
**Sent:** Wednesday, March 28, 2012 4:17 PM
**Subject:** Faculty Grievance Committee Findings

Dear Fred,

I am attaching a letter with the Faculty Senate Grievance Committee's findings. A hard copy is in the mail as well.

Best,
Erin

--
~~~~~~~~~~~~~~~~~~~~~~~~~~~
Erin A. Sadlack, Ph.D.
Associate Professor, English Department
Honors Program Director
Marywood University
2300 Adams Avenue
Scranton, PA 18509
570-348-6211, x2344

DEF003451

--
~~~~~~~~~~~~~~~~~~~~~~~~~

Erin A. Sadlack, Ph.D.
Associate Professor, English Department
Honors Program Director
Marywood University
2300 Adams Avenue
Scranton, PA 18509
570-348-6211, x2344

--
~~~~~~~~~~~~~~~~~~~~~~~~~

Erin A. Sadlack, Ph.D.
Associate Professor, English Department
Honors Program Director
Marywood University
2300 Adams Avenue
Scranton, PA 18509
570-348-6211, x2344

3

DEF003452

| | |
|---|---|
| **From:** | Frederick Fagal [fffagal@yahoo.com] |
| **Sent:** | Friday, March 30, 2012 5:45:58 PM |
| **To:** | Dr Erin A Sadlack |
| **Subject:** | Re: Faculty Grievance Committee Findings |

Dear Erin,

Thank you for getting back to me as soon as you did. Because I am not teaching and my office is cleared out it is clear I am suspended. I have not actually been terminated but termination has been recommended. My first order of business is to appeal the *suspension*, so when you wrote

> "...our findings do not preclude your appealing the termination itself through an ad hoc committee..."

am I correct in assuming that you meant to write something like "...our findings do not preclude your appealing the suspension [or subsequently a/the recommendation for termination] itself through an ad hoc committee..."

Thank you for any clarification(s) you can furnish.

Best,

Fred

---

**From:** Dr Erin A Sadlack <easadlack@maryu.marywood.edu>
**To:** Frederick Fagal <fffagal@yahoo.com>
**Cc:** "cabral@marywood.edu" <cabral@marywood.edu>
**Sent:** Thursday, March 29, 2012 5:03 PM
**Subject:** Re: Faculty Grievance Committee Findings

Dear Fred,

I'm afraid that the committee proceedings are confidential. All I can do is say what I did in the letter, that we checked the policy wording carefully and did not find a violation of procedure in any of the 5 instances you grieved. In addition, the Policy Manual states that the findings of a grievance committee cannot themselves be grieved. Please note that our findings do not preclude your appealing the termination itself through an ad hoc committee as outlined in the Progressive Discipline Policy. You retain that right and if you wish to do so, I believe you need to contact Sr. Gail Cabral as Faculty Senate President to exercise that option.

Best,
Erin

On Wed, Mar 28, 2012 at 5:50 PM, Frederick Fagal <fffagal@yahoo.com> wrote:
Dear Erin,

Thanks for getting back to me. Of course I'd hoped for a different set of set of responses. I'd really appreciate it if you could share the reasoning of the committee regarding the various points I tried to make. Thanks very much.

Sincerely,

Fred

DEF003453

**From:** Dr Erin A Sadlack <easadlack@maryu.marywood.edu>
**To:** fffagal@yahoo.com
**Sent:** Wednesday, March 28, 2012 4:17 PM
**Subject:** Faculty Grievance Committee Findings

Dear Fred,

I am attaching a letter with the Faculty Senate Grievance Committee's findings. A hard copy is in the mail as well.

Best,
Erin

--
~~~~~~~~~~~~~~~~~~~~
Erin A. Sadlack, Ph.D.
Associate Professor, English Department
Honors Program Director
Marywood University
2300 Adams Avenue
Scranton, PA 18509
570-348-6211, x2344

--
~~~~~~~~~~~~~~~~~~~~
Erin A. Sadlack, Ph.D.
Associate Professor, English Department
Honors Program Director
Marywood University
2300 Adams Avenue
Scranton, PA 18509
570-348-6211, x2344

DEF003454

| | |
|---|---|
| **From:** | Patricia Arter [psarter@maryu.marywood.edu] |
| **Sent:** | Tuesday, March 27, 2012 1:19:45 PM |
| **To:** | Dr Erin A Sadlack |
| **Subject:** | Re: notes re grievance 1 decision plus letter draft--please give feedback! |

The notes and letters look fine Erin

Sent from my iPhone

On Mar 26, 2012, at 3:26 PM, Dr Erin A Sadlack <easadlack@maryu.marywood.edu> wrote:

> Hi Bill and Trish,
>
> I am attaching a copy of our notes as well as a draft of my letters to Sr. Anne and Fred. Please give feedback, especially about our notes!
>
> Best,
> Erin
>
> --
> ~~~~~~~~~~~~~~~~~~~~
> Erin A. Sadlack, Ph.D.
> Associate Professor, English Department
> Honors Program Director
> Marywood University
> 2300 Adams Avenue
> Scranton, PA 18509
> 570-348-6211, x2344
>
> <committee notes.doc>
>
> <findings letter to dr fagal.docx>
>
> <letter to sr anne findings.docx>

DEF003455

# Exhibit 50

**EXHIBIT**
**50**

COLLEGE OF LIBERAL ARTS AND SCIENCES



# Marywood
## U N I V E R S I T Y

MARYWOOD UNIVERSITY
SCRANTON, PA 18509-1598
TEL: (570) 348-6219
*www.marywood.edu/english*

DEPARTMENT OF ENGLISH



Dr. Frederick Fagal
17 East Lake Street
Skaneateles, NY, 13152

Sent via email to fffagal@yahoo.com, as well as regular mail.

March 26, 2012

Dear Dr. Fagal,

As Chair of the Faculty Grievance Committee, I write to inform you that the committee has reviewed thoroughly your grievance about your recent suspension and recommendation for termination of employment and tenure, namely, your arguments:

1. That you were improperly suspended by President Munley; the action should have originated with Dr. Levine.
2. That you were improperly suspended because you have not been a cause of immediate harm to yourself or to others.
3. That President Munley moved improperly to terminate your employment and tenure because you should have had a chance for remediation.
4. That President Munley moved improperly to terminate your employment and tenure because only the Vice President can take such action.
5. That you have not had an opportunity to convene an ad hoc committee to appeal the suspension.

I now write to inform you that in reviewing each of these grievances, we have found no evidence of improper action on President Munley's part which would constitute a legitimate grievance.

I will notify President Munley of the decision as well.

Sincerely,

Erin A. Sadlack, Ph.D.
Chair, Faculty Grievance Committee

cc:    Sr. Gail Cabral, IHM, Ph.D., Faculty Senate President

*An education inspired by the Sisters, Servants of the Immaculate Heart of Mary.*

DEF002088

# Exhibit 51

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

EXHIBIT
51

- - -

FREDERICK F. FAGAL, JR.        :  CIVIL ACTION
                               :
              Plaintiff,       :  NO. 3:14-cv-02404-ARC
                               :
       vs.                     :  (JUDGE CAPUTO)
                               :
MARYWOOD UNIVERSITY,           :
                               :
              Defendant.       :


—  —  —

June 28, 2016

- - -


          Oral deposition of Erin Ann Sadlack,
taken pursuant to notice, was held at the
Radisson Lackawanna Station Hotel, Suite 206, 700
Lackawanna Avenue, Scranton, Pennsylvania,
commencing at 9:35 a.m., on the above date,
before Judy A. Black, a Registered Professional
Court Reporter and Notary Public in and for the
Commonwealth of Pennsylvania.




- - -

MAGNA LEGAL SERVICES

Seven Penn Center, 8th Floor

1635 Market Street

Philadelphia, Pennsylvania 19103

(866) 624-6221



Page 2

A P P E A R A N C E S :
JONATHAN Z. COHEN, LTD
BY:  JONATHAN Z. COHEN, ESQUIRE
175 Strafford Avenue
Suite 1 PMB 212
Wayne, PA 19087
(215) 874-0047
Attorneys for Plaintiff

JACKSON LEWIS, P.C.
BY:  STEPHANIE J. PEET, ESQUIRE
Three Parkway
1601 Cherry Street, Suite 1350
Philadelphia, PA 19102
(267) 319-7802
Attorneys for the Defendant

ALSO PRESENT:

FREDERICK F. FAGAL, JR.
PATRICIA DUNLEAVY

MAGNA LEGAL SERVICES

Page 4

- - -
DEPOSITION SUPPORT INDEX
- - -
Direction to Witness Not to Answer
Page Line     Page Line     Page Line
None

Request for Production of Documents
Page Line     Page Line     Page Line
None

Stipulations
Page Line     Page Line     Page Line
5    1

Question Marked
Page Line     Page Line     Page Line
None

MAGNA LEGAL SERVICES

Page 3

_ _ _
I N D E X
_ _ _

Testimony of:  Erin Ann Sadlack

DIRECT  CROSS  REDIRECT  RECROSS

By Mr. Cohen      5
By Ms. Peet            55

_ _ _
E X H I B I T S
_ _ _

NUMBER      DESCRIPTION                PAGE
Sadlack-1  E-Mail chain, Bates Nos.      10
      DEF003295-297

Sadlack-2  Letter dated March 26, 2012,   12
      Bates No. DEF002088
Sadlack-3  Multipage document, Bates Nos.  15
      DEF003417-423

Sadlack-4  E-mail chain, Bates Nos.       26
      DEF003448
Sadlack-5  Document, Bates Nos.           27
      DEF000143-144

Sadlack-6  Marywood University Progressive  31
      Discipline Policy Statement
MAGNA LEGAL SERVICES

Page 5

1              - - -
2          STIPULATIONS
3              - - -
4        IT IS STIPULATED by and between counsel
5    that the Deposition of Erin Ann Sadlack, is
6    being taken pursuant to agreement and that all
7    objections, except as to form, are reserved
8    until the time of trial.  Erin Ann Sadlack does
9    not waive the reading, signing, and filing of
10   the Deposition.
11             - - -
12       E R I N   A N N   S A D L A C K, having
13   been first duly sworn, was examined and
14   testified as follows:
15             - - -
16   DIRECT EXAMINATION BY MR. COHEN:
17       Q.    Good morning.  I'm Jonathan Cohen.  I
18   represent Frederick F. Fagal in this lawsuit.
19            Should I call you Dr. Sadlack or
20   Ms. Sadlack?
21       A.    Dr. Sadlack.
22       Q.    Okay.  So you understand that today
23   you're under the same oath as if you were in a
24   courtroom, correct?

MAGNA LEGAL SERVICES



1     A.    I do.
2     Q.    And have you ever had your deposition
3   taken?
4     A.    No.
5     Q.    Okay.  So the way this works is I ask
6   the questions and you try to answer them, and if you
7   don't understand my question, then you should just
8   let me know and I'll try to rephrase it.  If you
9   don't, then I'll just assume that you understand it.
10  Does that sound fair?
11    A.    Yes.
12    Q.    Okay.  Is there anything like medication
13  that would prevent you from thinking clearly and
14  testifying truthfully today?
15    A.    No.
16    Q.    And if at any time you need to take a
17  break during the deposition, please let me know.
18  We're not, like, on a very strict schedule.
19    A.    Thank you.
20    Q.    Now, when I'm asking a question, it's
21  very tempting sometimes to -- you probably think you
22  might know what I'm going to ask, so you might start
23  answering, but it's hard for the court reporter to
24  take everything down, and also your attorney might

1   want to pose an objection before you answer the
2   question, so if you can just wait until I'm finished,
3   that would be helpful.
4         What is your full name, including any
5   middle name?
6     A.    Erin Ann Sadlack.
7     Q.    Okay.  And what is your educational
8   background, Dr. Sadlack?
9     A.    I have a Ph.D. in English literature
10  from the University of Maryland.  I did my master's
11  there, as well, and my undergraduate at the College
12  of New Jersey.
13    Q.    And what's your professional background
14  before you started working for Marywood University?
15    A.    Just to clarify, my complete
16  professional background?  You don't mean my summer
17  jobs.  You just mean my full-time?
18    Q.    Right.
19    A.    At the University of Maryland, I worked
20  as a financial aid counselor and then as a teaching
21  assistant, a fellow, and other similar kinds of work
22  while I was a graduate student there.
23    Q.    And when did you first start working for
24  Marywood University?

1     A.    In 2005.
2     Q.    And have you worked there continuously
3   since 2005?
4     A.    Yes.
5     Q.    And are you currently a tenured
6   professor?
7     A.    Yes.
8     Q.    And you teach English?
9     A.    Um-hum, yes.
10    Q.    So you know my client, Professor Fagal,
11  correct?
12    A.    Yes.
13    Q.    When did you first meet Professor Fagal?
14    A.    My first year, in 2005.  My office was
15  in the social sciences suite, so I met him then.
16    Q.    And what were your general impressions
17  of Dr. Fagal before you had any exposure to the other
18  discipline that's at issue in this case?
19        MS. PEET:  Objection to the form.  You
20  can answer.
21    A.    So my general impressions of Dr. Fagal?
22    Q.    He's got thick skin.  Don't worry.
23    A.    I would say that there were certainly
24  things that he said that I did not agree with or care

1   for, but he was a colleague and we always treated
2   each other -- or certainly I always treated him with
3   courtesy.
4     Q.    Okay.  How often would you talk to him
5   typically?
6     A.    I honestly don't remember.  I would say
7   I saw him on a weekly basis, so -- for that first
8   year, but after that, my office moved out of that
9   suite.  I was able to join the whole English
10  department, and then months might go by without my
11  seeing him, or I might see him three times in a day.
12  It sort of just depended.
13    Q.    And did you prepare at all for today's
14  deposition?
15    A.    Only in the sense of meeting with the
16  attorneys to -- yeah.
17    Q.    Okay.  That's what I meant.  And I'm
18  not --
19        MS. PEET:  I'm just putting the
20  instruction on the record, and this goes for your
21  entire deposition, it's okay to say that we met, but
22  you are not allowed to disclose what we discussed
23  during the meeting.  Okay?
24    Q.    And in preparing for today's deposition,



1  did you review any documents, without telling me what
2  they were?
3      A.   Yes.
4      Q.   Okay.  Now, at some point in 2012, do
5  you recall serving on a faculty grievance committee
6  to adjudicate a grievance that Professor Fagal had
7  filed against President Munley?
8      A.   Yes.
9      Q.   And do you recall the general substance
10  of Professor Fagal's grievance?
11      A.   Yes.
12      Q.   And what was that, to your
13  understanding?
14      A.   Professor Fagal had several aspects of
15  his grievance, that he -- ultimately it's that he was
16  terminated by Marywood University, but he had several
17  procedural complaints about how that process had come
18  to be.
19      Q.   Okay.
20          MR. COHEN:  I'd like to have this marked
21  as exhibit Sadlack-1, please.
22          (Sadlack-1, E-Mail chain, Bates Nos.
23  DEF003295-297, is received and marked for
24  identification.)

1      Q.   And if you could just take a look at
2  this for a moment and let me know when you're
3  finished.
4      A.   Yes.
5      Q.   And do you recognize this document?
6      A.   Yes.
7      Q.   And what are we looking at?
8      A.   This was the substance of Dr. Fagal's
9  grievance.  These were the charges that he asked us
10  to look into to investigate as a grievance committee.
11      Q.   And when you say the grievance
12  committee, who -- you were part of that committee,
13  correct?
14      A.   Yes.
15      Q.   And who else?
16      A.   Dr. Bill Conlogue and Dr. Trish Arter.
17      Q.   And did Sister Cabral have any role with
18  regard to the committee?
19      A.   Only in the sense that she was the
20  president of faculty senate, and when a person has a
21  grievance, they typically contact the head of faculty
22  senate to let them know that a grievance is going to
23  be filed if the grievance committee is not in
24  existence, which it wasn't at the time, because

1  grievance is a subcommittee of faculty senate, so
2  they had to run an election to convene the committee.
3          So that was -- so she met with us --
4  once we had been elected, she met with us to give us
5  the grievance, but after that, no.
6      Q.   Okay.  And the three professors that
7  were chosen for the committee, what were they -- how
8  large in general was the faculty grievance committee?
9  I mean, did they select three from a larger group
10  or --
11      A.   No, the way it works is that the only
12  people who were eligible for the committee -- you
13  must be tenured, and you cannot serve on rank and
14  tenure or on the faculty development committee, and
15  so they issue a list of all of the names of people
16  who are eligible for the committee.  They do a
17  SurveyMonkey, and then people are elected by all the
18  campus faculty, and then -- so the three of us were
19  elected.
20      Q.   So there was just you three?
21      A.   Correct, to my knowledge.
22          MR. COHEN:  Okay.  Let's mark this as
23  Sadlack-2.
24          (Sadlack-2, Letter dated March 26, 2012,

1  Bates No. DEF002088, is received and marked for
2  identification.)
3      Q.   And if you could briefly review this and
4  let me know when you're finished, Dr. Sadlack.
5      A.   Yes.
6      Q.   And do you recognize this document?
7      A.   Yes.
8      Q.   And what is this?
9      A.   This is the letter that I sent to
10  Dr. Fagal at the conclusion of the grievance
11  committee's investigation.
12      Q.   And it's dated March 26, 2012?
13      A.   Yes.
14      Q.   And in this document, you sort of
15  summarized five complaints or arguments that
16  Professor Fagal made in his grievance, and you were
17  informing him that in the committee's view, they
18  lacked merit?
19      A.   Correct.
20      Q.   And in this letter, you did not provide
21  any reasoning for the committee's decision, right?
22      A.   Correct.
23      Q.   And why not?
24      A.   The -- according to the grievance



Page 14

```
 1  policies, the actions of the grievance committee are
 2  not themselves grievable, and it seemed it would only
 3  invite further argumentation.  It was better to be
 4  succinct.
 5       Q.    And was that your decision or did you --
 6  was this a matter for discussion that you were just
 7  going to announce your decision without any
 8  reasoning?
 9       A.    The committee felt that -- the other
10  members of the committee, we agreed that this was how
11  we wanted to communicate.
12       Q.    Okay.  And, by the way, were you -- was
13  there a chair of the committee?
14       A.    I was the chair of the committee.
15       Q.    And as the chair, did you have -- what
16  was the role of the chair?
17       A.    Frankly, I would say I was elected the
18  chair by showing up five minutes late to our first
19  meeting.  This was not something that we took that
20  seriously in terms of anyone desiring the position.
21  It's more additional paperwork.  It was my job as
22  chair to communicate with Dr. Fagal and with the
23  decision maker, but beyond that, that was the -- that
24  was pretty much the extent of my role.
```

MAGNA LEGAL SERVICES

Page 15

```
 1       Q.    So it didn't give you extra voting
 2  authority or --
 3       A.    Absolutely not.
 4       MR. COHEN:  Could we mark this as
 5  Sadlack-3, please.
 6       (Sadlack-3, Multipage document, Bates
 7  Nos. DEF003417-423, is received and marked for
 8  identification.)
 9       Q.    Could you review this and let me know
10  when you're finished?
11       A.    Yes.
12       Q.    And, Dr. Sadlack, do you recognize this
13  document and its attachments?
14       A.    Yes.
15       Q.    And what is the document that I just
16  handed to you?
17       A.    These were -- as I said before, the
18  whole committee was the one that -- we all agreed
19  what our findings were going to be, and so once I had
20  written those up, I wanted to make sure that I had
21  their approval for the letters that I was going to be
22  sending to Dr. Fagal, to Sister Anne Munley, and a
23  record of our notes of what we had done in the
24  committee.
```

MAGNA LEGAL SERVICES

Page 16

```
 1       Q.    Okay.  Now, in one of the -- let me ask
 2  this:  One of the attachments is labeled "Grievance
 3  Committee Notes," and it's typewritten.  Do you
 4  recall taking any written, like, handwritten notes
 5  about the meetings that you had or the deliberations
 6  that you had?
 7       A.    I don't remember.
 8       Q.    When you were deliberating over
 9  Professor Fagal's grievance, do you remember sitting
10  with a laptop or --
11       A.    I don't remember.
12       Q.    Do you remember whether someone was --
13  someone on your committee was designated to take
14  minutes?
15       A.    No, there was no one.
16       Q.    Okay.  So this typewritten document
17  labeled "Grievance Committee Notes," did you generate
18  this?
19       A.    I did.
20       Q.    Okay.  And did you generate it from
21  memory or --
22       A.    It was a mixture of my calendar to get
23  the dates and then memory for what we had said.
24       Q.    Okay.  Now, at the bottom of -- if you
```

MAGNA LEGAL SERVICES

Page 17

```
 1  see on the bottom right of each page, there's a
 2  number, and it usually begins with DEF00.  Do you see
 3  that?
 4       A.    Um-hum, yes.
 5       Q.    We call that a Bates number.  Lawyers
 6  put that there.  It's just for us to identify the
 7  documents, the many documents that have been turned
 8  over in this case.  But I'm looking at the page that
 9  is marked DEF003420.
10       A.    Yes.
11       Q.    And at the bottom of that page, it says,
12  March 19th, and it begins, "Erin also e-mailed."  Do
13  you see that?
14       A.    Yes.
15       Q.    And it later says, "Pat agreed, but Mary
16  Theresa in a series of e-mails said that she was not
17  able to meet with us because she represents the
18  university."  Do you see that?
19       A.    Yes.
20       Q.    Have I read that correctly?
21       A.    Yes.
22       Q.    And Mary Theresa is the university's
23  general counsel, correct?
24       A.    Yes.
```

MAGNA LEGAL SERVICES



Page 18

1    Q.    So is this, in fact, accurate?  I mean,
2  is it -- Mary Theresa did claim in an e-mail to you
3  that she couldn't meet with you?
4    A.    Yes.
5    Q.    And was that ultimately the reality?
6  Did --
7    A.    Ultimately we determined we didn't need
8  to meet with her, so we did not pursue it further.
9    Q.    Now, correct me if I'm wrong, but it
10  sounds like although ultimately you decided you
11  didn't need to meet with her, but at some point were
12  you interested in meeting with her?
13    A.    We had -- we were a brand-new committee,
14  and it was a committee that had not been convened in
15  I don't know how many years.  Typically at Marywood
16  when you have a changeover in leadership, you meet
17  with the prior committee chair and discover what some
18  of the committee's precedents are, what its practice
19  had been.  We didn't have that, and since we were a
20  new committee, we wanted to make sure that we were
21  doing our due diligence in understanding what we
22  needed to do.  We just had very basic questions
23  making sure that we had the most up-to-date of the
24  policies.

MAGNA LEGAL SERVICES

Page 19

1         When we met with Pat Dunleavy, she
2  confirmed what we needed to know, and that's what we
3  had wanted to ask Mary Theresa Paterson.  So once we
4  had the answer, we no longer needed to meet with her.
5    Q.    Okay.  Now, if you turn to the next
6  page, it's labeled DEF003421.
7    A.    Yes.
8    Q.    At the top of the page, it says, "March
9  21st, 8:30 to 9:00, met with Dr. Pat Dunleavy."  Do
10  you see that?
11    A.    Yes.
12    Q.    And there are five bullet points,
13  correct?
14    A.    Yes.
15    Q.    And, in fact, on March 21st, 2012, you
16  did meet with Dr. Dunleavy, correct?
17    A.    Yes.
18    Q.    And the second bullet point says,
19  "Remediation is not always appropriate.  Pat cited
20  several cases where that did not happen before
21  employee fired."  Did I read that correctly?
22    A.    Yes.
23    Q.    I realize this was several years ago,
24  but do you remember the precise language that -- and

MAGNA LEGAL SERVICES

Page 20

1  by the way, Pat is Dr. Dunleavy?
2    A.    Yes, yes.
3    Q.    Do you remember the precise language
4  that Dr. Dunleavy used in conveying that remediation
5  is not always appropriate?
6    A.    I do not.
7    Q.    And do you remember which cases
8  Dr. Dunleavy cited where remediation did not occur?
9    A.    All I remember is that none of them are
10  faculty and it was very general.  We truly were
11  seeking general HR kind of procedural things.
12    Q.    And the last bullet point, it says, "If
13  we need to talk with a lawyer, she will help us get
14  in touch with Will Anthony," correct?
15    A.    Yes.
16    Q.    And did you or your committee ever get
17  in touch with Will Anthony?
18    A.    We did not feel we needed to.
19    Q.    Okay.  And then on March 21st, on the
20  same page, there's an item that says, "Mary Theresa
21  Paterson e-mailed Erin that on reflection -- "
22         Do you see that?
23    A.    Yes.
24    Q.    " -- we were misinformed.  We should not

MAGNA LEGAL SERVICES

Page 21

1  speak to Pat Dunleavy, Will Anthony or herself, and
2  that we should make the decision on our own."  Did I
3  read that correctly?
4    A.    Yes.
5    Q.    So just to clarify, your committee did
6  not speak to Ms. Paterson or Mr. Anthony anyway?
7    A.    Correct, we did not speak with them.
8    Q.    Okay.  And after receiving this e-mail
9  from Mary Theresa Paterson, did you then -- it seems
10  like you had already spoken with Dr. Dunleavy,
11  though, correct?
12    A.    Correct.
13    Q.    Did you attempt to disregard anything
14  that Dr. Dunleavy stated?
15    A.    No.
16    Q.    Okay.  Let's turn to page DEF003422.
17  Near the bottom of the page, it says, "Ultimately we
18  find."  Do you see that paragraph?
19    A.    Yes.
20    Q.    "Ultimately we find that remediation is
21  not guaranteed nor in this instance was there
22  anything to warrant such remediation; therefore, we
23  find Dr. Fagal's complaint to be without
24  justification."  Did I read that correctly?

MAGNA LEGAL SERVICES



Page 22

1    A.   Yes.
2    Q.   And in reaching that conclusion -- let's
3  just step back a little bit.  How did you reach the
4  conclusion that remediation is not guaranteed?
5    A.   If you look above just under the very
6  first paragraph in 2A, we quote the actual
7  progressive discipline policy, which reads, "The
8  policy recognizes personal and professional problems
9  that may be rectified by an informal educational
10  process, as well as serious violations of
11  professional responsibilities implicating possible
12  recommendation for suspension or dismissal."
13        If you note those words in particular,
14  "may" and "as well as," suggest leeway.
15    Q.   And that's -- this language is the only
16  language and guidance you're relying on in coming to
17  the conclusion that remediation is not guaranteed?
18    A.   That was the opening of the entire
19  policy.  That sets the tone for everything that
20  follows.
21    Q.   Let me ask you this.  This is
22  hypothetical.  I know this didn't happen.  But let's
23  assume that you -- you and the committee had
24  discussed the progressive discipline policy with Mary

Page 23

1  Theresa Paterson or Will Anthony.  And, again,
2  hypothetical.  I know this didn't happen.  And one of
3  them -- let's say both of them told you that, in
4  fact, progressive discipline is guaranteed in all
5  cases.  Would you have listened to that guidance and
6  then ruled, well, Dr. Fagal did not get progressive
7  discipline so his grievance is well founded?
8        MS. PEET:  Objection, calls for
9  speculation.  She is but one of three committee
10  members.  She can't possibly speak for the entire
11  committee.
12    Q.   All right.  Would you have voted that
13  way?
14        MS. PEET:  Same objection.
15        If you can possibly, based on that, then
16  go ahead.
17    Q.   Do you understand my question?
18    A.   May I clarify?  I think that what you
19  are asking is did we -- could we have seen an avenue
20  in which remediation should have occurred?  Is that
21  what you --
22    Q.   No, that's not my question.
23        A few minutes ago, you already testified
24  that your committee did not seek out, you know, the

MAGNA LEGAL SERVICES

Page 24

1  guidance of Ms. Paterson or Mr. Anthony because you
2  didn't feel you needed it.  My question is:  If you
3  had and you had asked for their interpretation of the
4  policy and they said, well, in our legal judgment,
5  remediation and progressive discipline is guaranteed,
6  and, you know, you have to go from an oral warning to
7  a written warning and then to a suspension, and only
8  then to termination, would you have -- I know you
9  can't speak for the committee.  Would you have come
10  to the conclusion that they were, in fact, correct?
11        MS. PEET:  Objection.  It assumes
12  various facts not in evidence as you suggested she
13  already testified that they didn't speak with
14  Mr. Anthony or Ms. Paterson.  Number two, she already
15  testified how she described and interpreted the
16  remediation language, so all of this is purely
17  hypothetical, purely speculative.  There's no
18  relevance to the lawsuit.
19        If you have any way of answering the
20  question or you know how you would have done that of
21  all those factors that are lined up in the sky, go
22  right ahead, but if you don't know, you don't know.
23    A.   I think I would have wondered what
24  possible remediation could there have been.

Page 25

1  Dr. Fagal certainly knew what the core values of
2  respect were.  He refers to them in a letter, and
3  also every year as faculty members will write a
4  faculty activity report in which we outline what our
5  activities were for the year and how we relate to the
6  core values.  So there's certainly not a case of
7  ignorance of the core values; and, moreover, we also
8  recalled that Dr. Fagal had been present at the
9  general faculty meeting there before when we had a
10  Title IX harassment training, so it wasn't even as
11  though you could say, well, you should attend some
12  kind of training.  So I think that I would have
13  questioned what possible remediation there could have
14  been.
15    Q.   And would you then have ignored the
16  legal advice given?
17        MS. PEET:  Objection.  Again, purely
18  hypothetical.
19    Q.   Yes, understood, this is purely
20  hypothetical.
21    A.   I cannot possibly say what I would have
22  done under those circumstances.
23    Q.   And do you have any legal training,
24  Dr. Sadlack?

MAGNA LEGAL SERVICES



Page 26

```
1        A.    I took a common law class in undergrad.
2   That does not constitute any formal legal training.
3        MR. COHEN:  Sadlack-4, please.
4        (Sadlack-4, E-mail chain, Bates Nos.
5   DEF003448, is received and marked for
6   identification.)
7        Q.    And if you could just take a moment to
8   review this and let me know when you're finished.
9        A.    Yes.
10       Q.    And do you recognize this document?
11       A.    I do.
12       Q.    And what are we looking at?
13       A.    This was an e-mail that Dr. Fagal sent
14  to me after I sent him the grievance committee
15  finding, and then I responded back to him.
16       Q.    So to be clear, on March 28, 2012, you
17  sent Dr. Fagal an e-mail attaching the faculty
18  grievance committee's findings, and we already talked
19  about that today, correct?
20       A.    Yes.
21       Q.    And then Dr. Fagal wrote to you on the
22  same day essentially stating that he -- well,
23  suggesting that he would like to know the reasoning
24  of the committee.  Am I correct?
```

MAGNA LEGAL SERVICES

Page 27

```
1        A.    Yes.
2        Q.    And you state that there -- the
3   committee proceedings are confidential.
4        Was it your understanding from the way
5   the policy was worded -- I mean, do you remember it
6   actually saying that the committee proceedings were
7   confidential, or was that just your understanding?
8        A.    I don't recall.
9        MR. COHEN:  Okay.  Let's have this
10  marked as Sadlack-5, please.
11       (Sadlack-5, Document, Bates Nos.
12  DEF000143-144, is received and marked for
13  identification.)
14       Q.    And just take a moment to briefly review
15  this and let me know whether you recognize it.
16       A.    Yes.
17       Q.    Now, do you recognize this document
18  because you were given this while you were in
19  committee, or do you recognize it from some other
20  time?
21       A.    This was part of the packet of materials
22  we were given as part of the committee.
23       Q.    Okay.  So you knew then that -- if we
24  look at the first page, DEF000143, looking in about
```

MAGNA LEGAL SERVICES

Page 28

```
1   the middle of the page, the paragraph starts,
2   "Dr. Fagal said he was leaving the meeting."  Do you
3   see that?
4        A.    Yes.
5        Q.    It says, "Sister Anne said she was not
6   done and told Dr. Fagal that this was his opportunity
7   to address the issue as she considers her response.
8   Dr. Fagal said that if she would put her questions in
9   writing, he would craft his response."  Did I read
10  that correctly?
11       A.    Yes.
12       Q.    And so it's fair to say that you knew
13  that -- you and your committee knew that Dr. Fagal
14  had requested an opportunity to explain himself in
15  writing?
16       MS. PEET:  Objection to the form.
17       A.    I think I'm confused by what you're
18  asking.
19       Q.    So you testified earlier, a few minutes
20  ago, that you had seen this document as part of your
21  materials -- your committee materials, correct?
22       A.    Yes.
23       Q.    So if this was part of your committee
24  materials, then you must have known, correct, that
```

MAGNA LEGAL SERVICES

Page 29

```
1   Dr. Fagal had requested an opportunity to respond in
2   writing to President Munley, correct?
3        A.    We saw this -- yes, we certainly read
4   this document.
5        Q.    Okay.  That's all I wanted to know.
6        Now, earlier today you testified that
7   your committee did speak with Dr. Dunleavy, correct?
8        A.    Correct.
9        Q.    Do you recall whether you and your
10  committee communicated with anybody else from
11  Marywood's administration regarding Dr. Fagal's
12  grievance?
13       MS. PEET:  Other than Dr. Cabral that
14  she already testified to?
15       MR. COHEN:  Yes.
16       A.    No, we did not.
17       Q.    You did not with President Munley?
18       A.    No.  Actually, let me -- as chair, I
19  notified President Munley that a grievance was being
20  filed.  Beyond that, certainly we didn't meet with
21  anyone else.
22       Q.    I know that earlier you testified that
23  you don't remember whether you took handwritten
24  notes, correct?
```

MAGNA LEGAL SERVICES



1  A.   No.
2  Q.   Do you remember whether anyone else on
3  your committee took handwritten notes?
4  A.   It was too long ago.  I have no idea.
5  MR. COHEN:  I'd like to take just a few
6  minutes' break.  Okay?
7  (A recess is taken.)
8  Q.   All right.  Let's go back to the exhibit
9  containing Professor Fagal's initial grievance.  I
10  don't know what exhibit number that is, but --
11  A.   Number 1.  This one?
12  Q.   Yes.
13  Let's start on the page that reads
14  DEF003296.  And Professor Fagal is arguing that
15  President Munley improperly suspended him, and part
16  A, he says that the -- a faculty member may be
17  suspended by the present vice for academic affairs at
18  any time during the proceedings involving him or her.
19  Do you see that?
20  A.   Yes.
21  Q.   And, further, he goes on that in his
22  view, the vice president of academic affairs had no
23  involvement in the suspension and that only the
24  president did.  Is that right?

1  A.   Yes, he states that, right.
2  Q.   And your committee came to the
3  conclusion that Professor Fagal was wrong about the
4  vice president for academic affairs needing to have
5  been the one to do the suspension, correct?
6  A.   Correct.
7  Q.   And what was your -- what was the
8  reasoning of the committee?  I realize you didn't
9  tell Professor Fagal, but what was your reasoning?
10  A.   The policy which is quoted here includes
11  the word "may," "may be suspended."  That doesn't
12  mean only the vice president of academic affairs, and
13  we concluded it was illogical to suggest that the
14  president wouldn't be involved -- the president
15  couldn't be involved, that all power essentially does
16  go back to her.
17  Q.   Do you remember whether the progressive
18  discipline policy -- well, I made that an exhibit.
19  Let's -- I think we're up to 6, correct?  Let's make
20  this Sadlack-6.
21  (Sadlack-6, Marywood University
22  Progressive Discipline Policy Statement, is received
23  and marked for identification.)
24  Q.   Do you recognize this document,

1  Dr. Sadlack?
2  A.   Yes.
3  Q.   And is this the progressive discipline
4  policy?
5  A.   Yes.
6  Q.   And if you look on the last page, where
7  it says "History," the last revision, it says,
8  "October 12, 2011," correct?
9  A.   Yes.
10  Q.   And on the first page, the bottom of the
11  first page, there's a paragraph that starts
12  "Suspension."  Do you see that in bold?
13  A.   Yes.
14  Q.   And it says, "The faculty member may be
15  suspended by the vice president for academic affairs
16  at any time during the proceedings involving him or
17  her."  Do you see that?
18  A.   Yes.
19  Q.   Is there anywhere in this policy where
20  it says that the president of Marywood can be the one
21  to suspend the faculty member?
22  A.   Not explicitly, but if you look at the
23  "may be suspended," it doesn't say only the vice
24  present for academic affairs.

1  Q.   So the school cafeteria workers, they
2  could do it, too?
3  A.   That's just not logical.
4  Q.   So the -- you interpreted the policy
5  based on your view of what was logical?
6  MS. PEET:  Objection.  You can go ahead
7  and answer.
8  A.   We looked at the language of the actual
9  policy.  It says "may be suspended."  It does not
10  imply that this is the only person that can be
11  suspended.  If you also look above that, you can have
12  people -- you know, you can start with the supervisor
13  or dean.  Things move up the chain of command.  It's
14  logical that they could move up the chain of command.
15  Q.   So, in your view, the president was
16  authorized to conduct a suspension because she had a
17  higher -- she had higher authority than the vice
18  president?
19  A.   Correct.
20  Q.   Okay.  So under this policy, would it be
21  your view that a member of the board or the board of
22  trustees in general, they could also do it, do a
23  suspension?
24  A.   I wouldn't know.  I don't know how



1  that -- I don't know enough of how that
2  relationship -- the board is an advisory body, so I
3  wouldn't see that as necessarily the same kind of
4  thing.
5      Q.   Okay.  And the next sentence in the
6  suspension paragraph says, "Suspension is justified
7  if immediate harm to the faculty member or others is
8  threatened by the person's continuance in the faculty
9  position."
10     And it's true that Professor Fagal
11 contested his suspension on this basis, too; that, to
12 his knowledge, no one had deemed him to be a threat
13 to himself or to any other faculty members, correct?
14 I'm saying, that was his argument?
15     A.   That he mentioned in his -- yes.
16     Q.   Yes.
17     And the committee rejected that
18 argument, as well, correct?
19     A.   Correct.
20     Q.   And what was the basis for the
21 committee's rejection of that argument?
22     A.   There are two reasons.  One is that we
23 actually didn't think that "harm" did not necessarily
24 mean only physical harm; that, in fact, a harm to the

1  university community had happened.  We thought that
2  in particular, by characterizing Dr. Levine, a member
3  that everyone knows is Jewish, a member of the
4  committee, as a Nazi, causes -- that's a form of
5  harassment that causes harm.  The fact that the
6  videos were public meant that there was also damage
7  to the university's public reputation.  However, we
8  also, for the second reason -- that's not the only
9  reason why suspension may be justified.  That is one
10 possible reason, but that's not the only reason why
11 someone might be suspended.
12     Q.   So --
13     A.   That's not a laundry list.  That's just
14 one instance of what could merit suspension.
15     Q.   So, in your view, the university could
16 simply -- assuming a suspension was not justified by
17 immediate harm, however that's defined, the
18 administration could find another rationale to
19 suspend someone other than immediate harm?
20     MS. PEET:  Object to the form.  You can
21 answer.
22     A.   Yes.
23     Q.   And your view is that it's just left
24 open-ended and the university could simply choose a

1  rationale?
2      MS. PEET:  Objection to the form.
3      THE WITNESS:  Should I go ahead?
4      MS. PEET:  Um-hum.
5      A.   I think that it's impossible to codify
6  all the possible reasons, but that's precisely why
7  you have a grievance committee.  If a suspension is
8  unfair, then you have someone who will review it.
9  But if you try to prescribe in advance everything
10 that might possibly happen, it would be impossible to
11 do.
12     Q.   So you think that this paragraph on
13 suspension was -- couldn't be more clear about the
14 grounds for suspension than it already is?
15     MS. PEET:  Objection to the form.  You
16 can answer.
17     A.   I think that there are -- I think
18 policies can always be a little clearer, you know,
19 but in this particular case, this was one possible --
20 and that was the judgment of our entire committee.
21     Q.   So in your view, the role of your
22 committee was -- let me ask you this:  In your view,
23 was the role of the committee to adjudicate
24 procedural grievances or substantive grievances or

1  both?
2      A.   In this particular instance, our role
3  was procedural, were these particular procedures
4  violated unreasonably.
5      Q.   Okay.  That being said, you also
6  determined, correct me if I'm wrong, that Professor
7  Fagal's suspension was justified?
8      A.   There -- Professor Fagal would have the
9  right to appeal the actual judgment of what had
10 happened.  That would be a separate committee that
11 would review that particular one.  What we ruled on
12 were the different specific violations that he
13 alleged procedurally.
14     Q.   Now, your view that suspension under
15 this progressive discipline policy could be justified
16 by immediate harm that wasn't necessarily physical,
17 that was your view, correct?
18     A.   Correct.
19     Q.   What other types of immediate harm in
20 your view could the policy cover?
21     MS. PEET:  Objection.  Already asked and
22 answered, but if you have any more you want to add to
23 that.
24     A.   I don't know -- what you're asking me to



Page 38

1   do is far beyond what we ever discussed. We were
2   looking at the specifics of this particular case.
3       Q.    And your judgment was that what
4   Professor Fagal did constituted immediate harm?
5       A.    Well, that's not -- that's not what --
6   that there was some -- that there was a right for him
7   to have been suspended is what we had decided.
8       Q.    That there was a right for him to be
9   suspended?
10      A.    I'm sorry, that -- that caused to. That
11  he was improperly suspended because he has not been a
12  cause of immediate harm to yourself or others, we
13  thought that there were no grounds for that
14  particular complaint.
15      Q.    Yes, I understand that. And was it your
16  testimony today that Dr. Fagal's specific argument
17  that his suspension was not grounded in immediate
18  harm had no merit but that he could -- he was free to
19  appeal that suspension? Or is that --
20      A.    Correct, that he could convene an ad hoc
21  committee to review the actual substance.
22      Q.    Okay. Let's move back to the first
23  exhibit, which was Professor Fagal's grievance, and
24  I'm on the page where it says DEF003296 at the bottom

MAGNA LEGAL SERVICES

Page 39

1   right. Paragraph 2, it begins, "President Munley
2   improperly moved to terminate my employment and
3   tenure," Do you see that?
4       A.    Yes.
5       Q.    And, here, Professor Fagal is
6   essentially arguing that he was terminated
7   prematurely. I'm not asking you to agree with it.
8   I'm asking you whether that's what he's arguing: He
9   was terminated prematurely and there were no remedial
10  actions taken during his suspension that could have
11  led to -- that could have led to termination.
12          MS. PEET: Objection, lack of
13  foundation. She can't possibly know what was in his
14  mind, but she can know what she interpreted it to be.
15      Q.    I'm asking for your interpretation.
16      A.    Yes, that's my understanding.
17      Q.    And if we go back to the progressive
18  discipline policy, on the second page -- second page,
19  you see the paragraph that says "Dismissal"?
20      A.    Yes.
21      Q.    And that says, "If remedial actions," in
22  parentheses, another S, "taken during the suspension
23  does not sufficiently resolve the issues that lead to
24  the suspension, the university may move towards

MAGNA LEGAL SERVICES

Page 40

1   dismissal of the faculty member." Did I read that
2   correctly?
3       A.    Yes.
4       Q.    And so the view of the committee was
5   that essentially it was -- it was okay for the
6   president to move directly to termination even though
7   there were no remedial actions taken?
8       A.    It was our unanimous view, if you look
9   at the opening of the progressive discipline policy,
10  the statement -- the third statement in there that
11  the university -- "the policy recognizes professional
12  and personal" -- "personal and professional problems
13  that may be rectified by informal educational
14  process, as well as serious violations of
15  professional responsibilities." That language,
16  again, suggests that remedial action is not
17  appropriate in every instance.
18      Q.    So that initial prefatory language that
19  you just read, that indicates to you that progressive
20  discipline is optional in some cases but that the
21  university could just immediately move to suspension
22  or termination?
23          MS. PEET: Objection to form.
24      Q.    In some circumstances, correct?

MAGNA LEGAL SERVICES

Page 41

1       A.    It was the view of our entire committee
2   that there is leeway in that policy.
3       Q.    So the language under "Dismissal" where
4   it says, "If remedial actions taken during the
5   suspension does not sufficiently resolve the issues
6   that lead to the suspension, the university may move
7   towards dismissal of the faculty member," that's
8   just -- did you just ignore that language?
9          MS. PEET: Objection to form.
10      A.    No, it's -- again, you cannot isolate
11  one part of the policy from another part of the
12  policy.
13      Q.    Isn't that what you did, though?
14      A.    No, we looked at -- there are cases
15  where -- there are times when you can have
16  progressive discipline and there are times where it's
17  not guaranteed.
18      Q.    And who decides that?
19      A.    The decision maker. The role of the
20  grievance committee is to give a decision maker
21  advice on their decision if they feel that there is a
22  problem. We did not feel in this particular case
23  that there was a problem that merited reconsideration
24  by the decision maker.

MAGNA LEGAL SERVICES



Page 42

1    Q.    Okay.  So in your view, there were no
2  remedial actions taken by the university prior to
3  Professor Fagal's termination but that that was okay,
4  correct?
5        MS. PEET:  Objection to the form.
6    A.    Correct.  As I said before, we did not
7  understand what possible remediation there could be.
8    Q.    So how did you come to that conclusion
9  that there was no possible remediation?  Did you --
10  can you predict the future?
11        MS. PEET:  Objection to the form.
12    A.    We certainly discussed, you know, this
13  whole matter at length, and as I said before, we knew
14  that Professor Fagal was very familiar with the core
15  values, that there's not a case of -- that he could
16  claim that he was ignorant of what he was doing.  We
17  saw no remorse in his letter to the grievance
18  committee, and we knew that he had been present at
19  harassment training, so we're not -- we could not
20  have envisioned a further one.  That doesn't mean
21  there aren't possible other things, but we did not
22  see anything possible that we could come up with.
23    Q.    And you testified earlier that you did
24  meet with Dr. Dunleavy as part of your committee

MAGNA LEGAL SERVICES

Page 43

1  deliberations.
2    A.    Correct.
3        May I correct that?
4    Q.    Sure.
5    A.    Not as part of our deliberations but
6  just general fact seeking about policy and things
7  like that.
8    Q.    And Dr. Dunleavy was head of Marywood's
9  human resources department, correct?
10    A.    Correct.
11    Q.    Do you remember asking Dr. Dunleavy what
12  forms of remediation are sometimes offered to
13  disciplined employees of the university?
14    A.    I don't remember.
15    Q.    But you do remember deciding on your own
16  that no possible remediation was warranted in
17  Professor Fagal's case, correct?
18    A.    Not that it wasn't -- we certainly
19  didn't feel that there were grounds for overturning
20  what he was asking us to overturn.
21    Q.    Okay.  And you didn't interview
22  Dr. Fagal, correct?
23    A.    No, we relied on his statement.
24    Q.    On just his grievance statement?

MAGNA LEGAL SERVICES

Page 44

1    A.    Yes.
2    Q.    Okay.  But you also relied on several --
3  on a set of written notes from Dr. Dunleavy, correct,
4  about what had occurred at the meeting between
5  Dr. Fagal, the president, Dr. Dunleavy?
6        MS. PEET:  Objection to the form.
7    Q.    You did rely on that?
8    A.    That was part of it.
9    Q.    Do you remember what other materials,
10  written materials, you considered as part of your
11  deliberations?
12    A.    We were given a packet of -- it had the
13  different policies included, it had Professor Fagal's
14  e-mails, and then his -- and his grievance.
15    Q.    Do you remember --
16    A.    I can't recall -- there may have been
17  others, but that's -- I think -- I cannot remember --
18  we had some kind of access to the videos, screen
19  shots or transcripts or something.  I don't remember.
20  Maybe it might have been the actual videos
21  themselves.  I don't recall.
22    Q.    So coming back to the first exhibit,
23  Professor Fagal's grievance, and we're still on the
24  second page, at the bottom, Dr. Fagal had argued that

MAGNA LEGAL SERVICES

Page 45

1  his request to convene a committee to appeal his
2  suspension had not been accepted.  And he quoted the
3  progressive discipline policy stating that it could
4  be convened twice, once for suspension and once for
5  dismissal, and that that had not occurred.  And I'm
6  not asking you to agree with what he's saying, but
7  that's your interpretation of what he's arguing,
8  correct?
9    A.    Yes.
10    Q.    And ultimately you ruled that that
11  argument had no merit, either, correct?
12    A.    Correct.
13    Q.    And what was your reasoning for that?
14    A.    I have to look back in here.
15        Again, it came back to the logic of what
16  was happening here.  We found that the policy doesn't
17  guarantee that series of steps, but rather it's a
18  possibility wherever remediation is warranted; and in
19  particular, we had noted that if you got a
20  recommendation for either suspension or dismissal,
21  you would have the right to have a committee consider
22  the matter, but, again, we didn't think it was
23  logical or even a use of resources -- why would you
24  have a different committee look at the exact same

MAGNA LEGAL SERVICES



1  circumstances?  That just didn't make sense either.
2  We thought it was very important that Professor Fagal
3  have a committee to review the substance of the
4  matter.  We absolutely believed that he was entitled
5  to that, but we didn't see it as the suspension --
6  you know, appeal the suspension and appeal the
7  termination, that those were connected.  There was no
8  reason for those to be separate.
9       Q.    Okay.  So to be clear, you did believe
10  that Professor Fagal had a right to appeal his
11  suspension, just not as a separate -- just not have
12  two separate committees, one for suspension and one
13  for termination.  Is that what you're saying?
14       A.    We believed he had the right to a
15  committee that's going to review the entire matter.
16       Q.    Okay.  Coming back to the progressive
17  discipline policy.  I think that's Sadlack Exhibit 6.
18  Am I right about that, Exhibit 6?
19       A.    Yes.
20       Q.    If you look on page 2, do you see where
21  it says "Ad Hoc Faculty Committee" in bold?
22       A.    Um-hum.  Yes.
23       Q.    And at the very bottom of the page, it
24  says, "Should a faculty member request that such a

1  committee be convened twice," in parentheses, "i.e.,
2  once for suspension and once for dismissal, the
3  membership of the committee may be similar."  Do you
4  see that sentence?
5       A.    Yes.
6       Q.    So, in essence, did you ignore that
7  statement in coming to the conclusion that Professor
8  Fagal was not entitled to a separate committee to
9  review his suspension?
10       MS. PEET:  Objection to the form.
11       A.    No.  Again, there's -- this is not an
12  absolute.  There is an element -- there is this
13  element of should the committee -- if you look at the
14  very beginning of that, "Should the faculty member
15  request a review by the ad hoc committee," at that
16  point, that was a separate committee that would have
17  then -- would have to then be convened.  And if you
18  look at the very beginning, "You have the right to
19  convene the ad hoc committee to appeal the decision
20  or the decision to dismiss," so he has the right --
21  so dealing with that together made sense.
22       Q.    I don't understand.  So your view was
23  that a professor in Dr. Fagal's position had a right
24  to appeal his suspension but not necessarily that --

1  not necessarily to have a separate committee,
2  separate from the committee reviewing his
3  termination, review his suspension, as well, correct?
4       MS. PEET:  Objection to form.  Lack of
5  foundation.
6       A.    I have to rely on what our notes were.
7  I don't remember -- this is so many years ago, but
8  what we had said here was, in particular, that the
9  language is that if you get a recommendation for
10  either suspension or dismissal, you then send that
11  written communication stating with reasonable
12  particularity to convene the committee to consider
13  the matter.  Whatever decision is reached, that
14  decision may be appealed.  That's what we thought.
15  We thought that was a reasonable interpretation.
16       Q.    And you thought that it wouldn't be
17  logical for Professor Fagal to have two separate
18  committees, one to review his suspension, one to
19  review his termination?
20       MS. PEET:  Are we talking about an ad
21  hoc committee or a faculty grievance committee?
22       MR. COHEN:  Ad hoc.
23       MS. PEET:  Lack of foundation.
24       A.    They -- that is correct.  There's

1  nothing that it would be illogical.  It would be the
2  exact same matter under consideration, so it would
3  just be an instance of the entire substance of
4  everything was exactly the same, nothing would have
5  changed in between them, so that that wasn't logical.
6       Q.    So your interpretation of what was
7  logical could sometimes override what the policy
8  states?
9       MS. PEET:  Objection to the form,
10  mischaracterization of testimony and complete lack of
11  foundation.
12       A.    Again, it is our job as the committee to
13  determine what we think -- you know, what is --
14  that's exactly what Professor Fagal was asking us to
15  do, was to look and see had he been treated fairly,
16  and we felt unanimously that he was.
17       Q.    Your view was that Dr. Fagal was asking
18  you to see if he was treated fairly or whether he was
19  treated according to the actual policy?
20       A.    None of the grounds of his complaint
21  were justified.
22       Q.    I don't understand.
23       A.    He asked us to look into several
24  specific things and that we found that none of those



1  complaints were grounded in what was reasonable
2  according to the language of the policy and our own
3  logic.
4      Q.   Coming back to Professor Fagal's
5  grievance.  Again, we're on the second page, and
6  paragraph 2, it says, "President Munley improperly
7  moved to terminate my employment and tenure."  Do you
8  see that?
9      A.   Yes.
10     Q.   Part B, Professor Fagal argues that only
11  a vice president could recommend dismissal, and he
12  quotes from the progressive discipline policy,
13  "Having received a written recommendation for either
14  suspension or dismissal from the vice president for
15  academic affairs."  Do you see that?
16     A.   Yes.
17     Q.   And you determined that he was --
18  Professor Fagal was wrong about that, too?
19     A.   We applied the same logic that we had in
20  the earlier instance, that the authority ultimately
21  stems from the president; and, again, the language
22  was ambiguous to -- where it says "may," it
23  doesn't -- it's not ambiguous, but it doesn't
24  allow -- it doesn't suggest that the president

1  cannot.
2      Q.   Let's turn back to the progressive
3  discipline policy, then.  Again, page 2, do you see
4  where it says "Ad Hoc Faculty Committee"?
5      A.   Yes.
6      Q.   And the first bullet point says, "Having
7  received a written recommendation for either
8  suspension or dismissal."  This is the language that
9  Professor Fagal was quoting, correct?
10     A.   Yes.
11     Q.   Where does it say "may" here?
12     A.   Again, we had gone back to the earlier
13  suspension, that this may be and, again, applying the
14  same kind of logic all the way through.  The
15  president is ultimately the one who has say over all
16  the faculty.  She is the one who ultimately rules on
17  faculty tenure.  All of these policies, she's
18  ultimately our boss, so to suggest that she is not --
19  that it should only come from someone who's below her
20  is illogical.
21     Q.   At the time that you were -- that you
22  served on the faculty grievance committee for
23  Professor Fagal's particular grievance, at that time
24  were you a tenured professor?

1      A.   Yes.
2      Q.   And everyone on the committee was also
3  tenured?
4      A.   Correct.
5      Q.   While you were serving on this faculty
6  grievance committee, did you feel any pressure to
7  rule in one way or the other?
8      A.   Absolutely not, only the pressure to do
9  right by everyone.
10     Q.   Okay.  At some point do you remember
11  being contacted by members of an ad hoc committee
12  regarding what exactly the faculty grievance
13  committee did with regard to Professor Fagal?
14     A.   Yes.
15     Q.   And who contacted you?
16     A.   Dr. Helen Bittel.
17     Q.   And ultimately did you actually meet
18  with the ad hoc committee?
19     A.   I did.
20     Q.   And do you remember what questions were
21  asked of you?
22     A.   Not in detail.  We were trying to sort
23  out the purview of each committee.  We had looked at
24  the procedural elements, and they were looking at the

1  substantive.  So we were just clarifying it.
2      Q.   When you say clarifying it, you were
3  looking into -- you mean the faculty grievance
4  committee was considering the procedural aspects of
5  Professor Fagal's discipline; the ad hoc faculty
6  committee was just reviewing it substantively?
7      A.   Yes.
8      Q.   And how did you reach that conclusion,
9  that the ad hoc faculty committee should not consider
10  procedure?
11     A.   Because the actions of the grievance
12  committee cannot be grieved.  It doesn't make sense
13  to have an entire group of faculty then rereview
14  everything that had been already filed.
15     Q.   And in reaching that conclusion, you
16  were just relying on common sense?
17     A.   And the language of the policy that says
18  the actions of the grievance committee cannot
19  themselves be grieved.
20     Q.   Do you know whether any of the language
21  regarding the ad hoc faculty committee says that they
22  can't also consider procedure?
23     A.   That was not my committee.
24     Q.   But, nonetheless, you advised the ad hoc



1  faculty committee that they should just consider
2  substance?
3          MS. PEET: Objection,
4  mischaracterization of testimony. You can answer.
5      A.    That was our overall consensus.
6      Q.    So let me ask this: If a professor does
7  not file a faculty grievance and just moved straight
8  to an ad hoc faculty committee, is it your view that
9  he has kind of waived any procedural arguments?
10     A.    You would not actually -- you would
11 always start with the faculty grievance committee.
12     Q.    Really?
13     A.    Yes.
14     Q.    Okay. The language of the progressive
15 discipline policy, did you find it to be vague in any
16 way, or ambiguous?
17     A.    There were -- as we first looked at it,
18 in particular, it looked like a series of steps that
19 all had to be taken. We just had to sort out that
20 aspect of things.
21     Q.    So at first --
22     A.    When we first read through the policy,
23 it was you could do this, you could do this, you
24 could do that. We didn't have to do all of those

1  particular steps.
2      Q.    Okay.
3      A.    But that was easily clarified.
4          MS. PEET: Could we take a quick break?
5          MR. COHEN: Sure.
6          (A recess is taken.)
7      Q.    After your faculty grievance committee
8  ruled in Professor Fagal's case, do you remember
9  discussing your deliberations after the fact with
10 anyone other than attorneys in this case?
11     A.    No. Our deliberations, no.
12     Q.    Not the president?
13     A.    No.
14     Q.    Nobody else?
15     A.    No one.
16         MR. COHEN: Okay. I think I'm finished.
17         MS. PEET: Can I just ask --
18         MR. COHEN: Sure.
19 CROSS-EXAMINATION BY MS. PEET:
20     Q.    I believe all of us in the room,
21 Dr. Sadlack, understood what you meant earlier, but
22 I'm not quite sure it's going to come clear on the
23 record, so I just want to ask clarification.
24         When Mr. Cohen was asking you earlier

1  about how you were selected as chairman of the
2  committee and you talked about the fact that no one
3  took it too seriously, I just want to make sure it's
4  clear on the record. You weren't talking about the
5  fact that you weren't taking the committee seriously,
6  correct?
7      A.    No. In fact, honestly, all of us -- I
8  remember us talking about that. We felt we had been
9  honored by being elected by our fellow faculty
10 members to serve in this role, that they trusted us
11 with that. No, it was purely just the role of being
12 chair sounds very prestigious, but what it actually
13 tends to be is paperwork, and so no one thinks of
14 that as anything more than just an onerous duty.
15     Q.    And that comment was specifically about
16 the chair position, correct?
17     A.    Right. Not the committee, absolutely
18 not, right.
19         MS. PEET: That's all I have.
20         (Whereupon, at 11:10 a.m., the
21 deposition of Erin Ann Sadlack concluded.)
22
23
24

1              CERTIFICATE
2
3      I HEREBY CERTIFY that the witness was
4  duly sworn by me and that the deposition is a
5  true record of the testimony given by the
6  witness.
7
8
9
10         Judy A. Black
           Registered Professional Reporter
11         Dated: July 13, 2016
12
13
14
15
16     (The foregoing certification of this
17 transcript does not apply to any reproduction of
18 the same by any means, unless under the direct
19 control and/or supervision of the certifying
20 reporter.)
21
22
23
24



Page 58

INSTRUCTIONS TO WITNESS

1
2
3          Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the appropriate
6  space on the errata sheet for any corrections
7  that are made.
8          After doing so, please sign the
9  errata sheet and date it.
10         You are signing same subject to
11  the changes you have noted on the errata sheet,
12  which will be attached to your deposition.
13         It is imperative that you return
14  the original errata sheet to the deposing
15  attorney within thirty (30) days of receipt of
16  the deposition transcript by you.  If you fail
17  to do so, the deposition transcript may be
18  deemed to be accurate and may be used in court.
19
20
21
22
23
24

MAGNA LEGAL SERVICES

Page 60

ACKNOWLEDGMENT OF DEPONENT

1
2
3          I, Erin Ann Sadlack, do hereby
   certify that I have read the foregoing
4  pages and that the same is a correct
   transcription of the answers given by me
5  to the questions therein propounded,
   except for the corrections or changes in
6  form or substance, if any, noted in the
   attached Errata Sheet.
7
8
9  Erin Ann Sadlack          Date
10
11
   Subscribed and sworn
12  to before me this
       day of          , 2016
13
   My commission expires:
14
15
   Notary Public
16
17
18
19
20
21
22
23
24

MAGNA LEGAL SERVICES

Page 59

1         - - - - - -
          E R R A T A
2         - - - - - -
3  PAGE  LINE  CHANGE
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

MAGNA LEGAL SERVICES

Page 61

1          LAWYER'S NOTES
2  PAGE  LINE
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

MAGNA LEGAL SERVICES



16 (Pages 58 to 61)

# Exhibit 52

**EXHIBIT**

**52**

| | |
|---|---|
| **From:** | Frederick Fagal [fffagal@yahoo.com] |
| **Sent:** | Sunday, May 06, 2012 12:42:01 PM |
| **To:** | bittel@marywood.edu; povse@marywood.edu; obrien@marywood.edu |
| **CC:** | cabral@marywood.edu |
| **Subject:** | Fagal's defense attached for Ad Hoc Committee |
| **Attachments:** | Fagal Defense to Ad Hoc Committee May 6 2012.pdf |

Dear Dr. Fagal Ad Hoc Committee Members (Dr. Edward O'Brien, Dr. Helen Bittel, Mr. Mathew Povse) and Sr. Gail Cabral:

Attached please find my brief defense against the charges brought against me by President Anne Munley. I had earlier asked about the chance to present a defense and got no reply regarding that question. The Progressive Discipline section of the Policies and Procedures Manual does not provide for the person charged the chance to present a defense. But, being a bit contrarian, I have decided to submit (again, see attached) a brief written defense to the charges.

Sincerely,

Frederick F. Fagal, Jr



EXHIBIT
FAGAL-36
6/7/16

DEF001433

To the Ad Hoc Faculty Committee:

Sister Gail Cabral has informed me that you have been selected to serve on the Ad Hoc Faculty Committee convened for the purpose of reviewing my suspension and termination of employment and tenure. Since Marywood's Progressive Discipline policy does not provide any details on how or even whether a faculty member may offer a defense to disciplinary charges, I have taken it upon myself to simply offer my defense in writing here. Obviously, I cannot force you to read or consider this e-mail—but having sent it provides me with some reassurance that I have done all that I could.

As you likely know, I was suspended by President Munley on January 23, 2012. On the next day, President Munley sent a letter notifying me that she was "recommending that [my] tenure and employment with Marywood be terminated immediately." On February 9, President Munley e-mailed a revised letter (dated the day prior) notifying me of this recommendation again. On April 3, President Munley notified me that she had decided to "finalize" her recommendation—that my employment and tenure with Marywood were "terminated effective today, April 3, 2012." Below I offer my defenses to the suspension and the termination.

## Suspension

At approximately 8:45 AM on January 23, Dr. Michael A. Foley, Dean of Marywood's College of Liberal Arts and Sciences, visited me in my office in LAC 82. Dr. Foley stated that President Munley had summoned me to her office for a 9:00 AM meeting on the same day. At that meeting, President Munley asked me whether I had posted a two-part video on YouTube. I acknowledged posting the video. At the end of the meeting, President Munley told me that I was suspended with pay; that I should turn in my Marywood ID and keys to Patricia Dunleavy; and that I should clean out my office.

At 1:11 PM on the following day, I received an e-mail from Frances D. Ferrese, Executive Secretary to President Munley. That e-mail attached a letter from President Munley and five (5) other documents. That letter begins: "In follow up to our meeting yesterday, I am writing to inform you that that I am recommending that your tenure and employment with Marywood be terminated immediately..." President Munley then purported to offer a "Statement of Charges." Neither the word "suspension" nor any form or synonym for it appears in President Munley's letter of January 24; this will become more important below.

On February 2, my attorney, Jonathan Z. Cohen, sent a letter to President Munley on my behalf. In that letter, Mr. Cohen addressed my suspension as follows:

> Under [the Progressive Discipline] policy, suspension "is justified if immediate harm to the faculty member or others is threatened by the person's continuance in the faculty position." The decision to suspend is left to the Vice President for Academic Affairs (Dr. Alan M. Levine)—not you.

> Dr. Fagal is not aware of any allegation by a Marywood
> official that his presence on campus threatens "immediate harm" to
> any individual. Nor could such hypothetical allegations be taken
> seriously under the circumstances: Dr. Levine has not required that
> Dr. Fagal participate in counseling or any other type of treatment
> pursuant to the Progressive Discipline policy; Dr. Fagal has not
> been barred from campus to his knowledge; and he is not aware of
> any report to law enforcement authorities regarding any
> "immediate harm."

On April 4, Mr. Cohen sent a letter to William J. Anthony, Marywood's outside counsel on this
matter. In that letter, Mr. Cohen stated:

> In anticipation of the ad hoc faculty committee hearing(s),
> Dr. Fagal requests that an authorized representative of Marywood
> promptly answer the following questions as comprehensively as
> possible:
>
> • Prior to President Munley's suspension of Dr. Fagal on
>   January 23, 2012, did she or Dr. Levine make any
>   determination that immediate harm to Dr. Fagal or others
>   would be threatened by Dr. Fagal's continuance in his
>   faculty position? If so, please elaborate on this "immediate
>   harm" in as much detail as possible
>
>   ....
>
> • Prior to President Munley's letter to Dr. Fagal dated
>   January 24, 2012, did Dr. Levine issue any written
>   recommendation that Dr. Fagal be suspended or dismissed?
>
> In addition to answering these questions, please produce any and
> all unprivileged documents that support Marywood's answers.
> Please also produce any and all unprivileged documents related to
> the decisions to suspend Dr. Fagal, to recommend the termination
> of his employment and tenure, and to "finalize" such termination
> recommendations.

Despite Mr. Cohen's letters, neither President Munley, nor any other Marywood administrator,
nor Mr. Anthony has alleged that my continuance in my position would have threatened
"immediate harm" to any individual. Nor have any of these individuals alleged that Dr. Levine
had any involvement in the decision to suspend me. Nobody has answered the bullet-pointed
questions above—nor provided any related documents.

Thus, my defenses to my suspension are based on procedure and substance.
Procedurally, I was never suspended by Marywood's Vice President for Academic Affairs.
Marywood's Progressive Discipline policy states: "The faculty member may be suspended by
the Vice President for Academic Affairs at any time during the proceedings involving him or

DEF001435

her." See Marywood University, Policies and Procedures Manual, "Progressive Discipline," http://www.marywood.edu/policy ("PPM"). This policy mentions the "President of the University" of Marywood five (5) times, but it never authorizes her to suspend a Marywood faculty member unilaterally. See PPM, "Progressive Discipline." Thus it would have been improper for President Munley to suspend me on any ground.

In substance, the suspension was improper because no Marywood official has ever alleged that my continuance in my position would have threatened "immediate harm" to any individual. Nor is there any actual evidence that I ever posed an "immediate harm."

In the event that President Munley or a delegate attends any meetings of the Committee, I would invite the Committee to seek answers on the issues where Marywood has remained silent. If no reasonable answers surface, then I would ask the Committee to draw any reasonable inferences.

The Committee can and should recommend that "there is no merit to the complaint[1]" with regard to Dr. Fagal's suspension. See PPM, "Progressive Discipline."

**Termination**

President Munley's recommendation to terminate my employment and tenure, followed recently by the "finalization" of her own recommendation prior to any Ad Hoc Faculty Committee, were also improper.

Dismissal is the step following suspension under Marywood's Progressive Discipline policy. See PPM, "Progressive Discipline." Specifically: "If remedial actions(s) taken during the suspension does not sufficiently resolve the issues that lead to the suspension, the university may move towards dismissal of the faculty member." PPM, "Progressive Discipline." This policy also strongly suggests that the Vice President for Academic Affairs must recommend the faculty member's dismissal before the President can act. See PPM, "Progressive Discipline."

In the approximately 28 hours between the commencement of my suspension and the arrival of President Munley's letter recommending my termination, there is no evidence that Marywood officials directed any remedial efforts toward me. In Mr. Cohen's February 2 letter to President Munley, he wrote: "Dr. Fagal is not aware of any 'remedial actions' taken by Marywood to 'resolve the issues' that led to his suspension. As you know, Dr. Fagal's suspension began on the morning of January 23; your letter regarding termination arrived in his inbox at 1:11 PM on the next day." In Mr. Cohen's letter of April 4 directed to Mr. Anthony, he asked:

> What remedial actions, if any, were taken by Marywood officials to resolve the issues that allegedly led to Dr. Fagal's suspension? If

---

[1] Assuming that President Munley's "revised statement of charges" dated February 8, 2012 constitutes a "complaint" under the Progressive Discipline policy, such a "complaint" would be inherently meritless on the point of my suspension because it does not actually mention my suspension—let alone any reasons that the suspension was proper.

DEF001436

any such remedial actions were taken, did President Munley or Dr.
Levine make any determination that the remedial actions failed to
resolve the issues that allegedly led to Dr. Fagal's suspension?

Mr. Cohen requested documentary proof on this subject as well.  Again, no information or
documents from Marywood officials or Mr. Anthony on the subject of "remedial actions" have
arrived.  Of course, untaken remedial actions can never resolve any alleged problem.  Nor is
there any evidence that Marywood's Vice President for Academic affairs recommended my
dismissal in writing.  Therefore, President Munley had no right to pursue my dismissal.

Even if President Munley had the right to pursue my dismissal, she did not have the right
to "finalize" it prior to the Committee's review.  Under the Progressive Discipline policy, an ad
hoc faculty committee may recommend that disciplinary proceedings against a faculty member
be "discontinued," to "continue a suspension," or to "initiate a formal action toward dismissal."
See PPM, "Progressive Discipline."  In President Munley's statement of charges, she writes at
the end that "[o]nce I receive the review committee's determination, I will finalize my decision."
That "finalization" has already occurred, however; the statement of charges is a dead letter.  I
urge the Committee to respond by rejecting all of the charges against me.

Even if President Munley had the right to pursue my dismissal and then to "finalize" it,
President Munley's asserted, retroactive grounds for doing so would be insufficient.  All such
alleged grounds for dismissal are presumably laid out in President Munley's letter dated
February 8, 2012.  I address each such ground below:

1.  *"Breach of Tenure Agreement"*

President Munley first alleges a breach of Marywood's Tenure policy.  The Tenure policy
begins as follows:

Tenure is a term designating permanent and continuous
appointment for a full-time faculty member.  It implies a mutual
commitment on the part of the faculty member and the University
and cannot be taken lightly.

Once tenure is granted, it will be discontinued only for grave
reason, which may include moral turpitude, flagrant abuse of
academic freedom, or professional incompetence.  In addition, as
expressed in its *Retrenchment of Faculty* policy, the University
may be required to discontinue tenure because of severe financial
exigencies or reorganization of the department and/or curriculum
resulting in lack of need.

The commitment of a faculty member who requests tenure is as
deep and binding on the faculty member as it is on the University.
Just as the conferring of tenure by the University recognizes the
competence of an individual faculty member, submission to the

DEF001437

> University of an application for tenure suggests a strong
> acceptance by that individual of the mission, goals and objectives
> of the University.  The request represents a commitment to work
> jointly with faculty, students, administrators and staff for the
> growth and welfare of the University.

PPM, "Tenure."

My dissemination to Marywood's faculty of text hyperlinks to parodied movie scenes is not a "grave reason" within the meaning of Marywood's Tenure policy.  My parody is one of many made from scenes from the 2004 motion picture, "Downfall."  See Finlo Rohrer, The rise, rise and rise of the Downfall Hitler Parody, BBC News Magazine (Apr. 13, 2010), http://news.bbc.co.uk/2/hi/8617454.stm; Hitler Downfall parodies: 25 worth watching, The Telegraph (Oct. 6, 2009), http://www.telegraph.co.uk/technology/news/6262709/Hitler-Downfall-parodies-25-worth-watching.html; Virginia Heffernan, The Hitler Meme, N.Y. Times, Oct. 24, 2008, (Magazine) at MM20, available at http://www.nytimes.com/2008/10/26/magazine/26wwln-medium-t.html.

President Munley has characterized my parody in the inflammatory rhetoric of the Holocaust:

> Depicting the University's President as Adolf Hitler, a man who is
> responsible for torturing and killing in excess of 6 million people
> simply because they are Jewish is an intentional, malicious and
> blatant violation of your tenure commitments.  Portraying other
> University officials as Nazi leaders, using crude and vulgar
> language and belittling University officials also violates your
> agreement with Marywood.  You gravely injured our community
> by your actions.

Letter from Sister Anne Munley to Frederick F. Fagal (Feb. 8, 2012).  One purpose of my parody was to convey what I believed to be terrible behavior by a heavy-handed and narrow-minded university administration when it tore down my approved posters announcing a speech about free speech on college campuses.  Implying or even directly proclaiming that a person has certain traits of a "Person H" does not logically lead to the conclusion that the person has all the traits of "Person H."  Simple logic.  It is ironic in the extreme that President Munley has responded to my parody by trampling over Marywood's disciplinary process in order to force me out of my job.

Specific examples of "crude and vulgar language" are not cited by President Munley, probably because the language in the video is quite tame—at worst a PG-13 rating if not a G for General Audiences rating.  Merely claiming "crude and vulgar" language was used is not evidence that such language was used.

    2.     *"Violation of Civil Rights Policy"*

Again, President Munley dresses up my parody as something that it is not—a "violation of civil rights." What President Munley does not do is cite the Civil Rights Complaint Procedures policy that was in effect until February 27, 2012. That policy required an aggrieved individual to file a complaint, among other procedures. Those procedures "must be followed any time a member of the Marywood University community believes s/he has been the victim of...discrimination, harassment, or assault by any member of the University community...." The old Civil Rights Complaint Procedures policy can be viewed at Section 4.2 of the Faculty Handbook.

I have never received any complaint pursuant to the Civil Rights Complaint Procedures policy. Not from Dr. Levine or from any other Marywood administrator. If any Marywood administrators felt that their civil rights had been violated by me, one would expect them to have filed a complaint. Even after Mr. Cohen informed President Munley on February 2 that I had never received a complaint, no action was taken in this regard. By charging Dr. Fagal with violating Marywood's Civil Rights Policy without following the corresponding enforcement provisions, President Munley has made an end-run around the Civil Rights Policy.

Even assuming that this is the proper vehicle for a civil rights complaint, this charge would be weak. "Harassment" means "aggressive pressure or intimidation." Oxford Dictionaries defines "harassment" as "aggressive pressure or intimidation." Oxford Dictionaries, "Definition for harassment," http://oxforddictionaries.com/definition/harassment (accessed May 6, 2012). Further, Marywood's Civil Rights policy only bans harassment "based on race, sex, color, national or ethnic origin, age, creed, ancestry, religion, disability, or any other legally protected status." PPM, "Civil Rights Policy." President Munley has not alleged any "legally protected status" targeted by me, although she alludes to the Jewish faith. If President Munley is alleging that I harassed Dr. Levine or other Marywood officers for being Jewish, that allegation would not make any sense. Dr. Levine and other Marywood officials are depicted in my parody as actors from the movie "Downfall," who in turn depict Nazi-Fascist figures.

    *3.    "Violation of Marywood's Conditions of Computer Use Policy"*

I am not aware of any evidence that I used "Marywood's system" as President Munley alleges. The Conditions of Computer Use policy contains the following relevant definition: "**System** is used in a generic sense to refer to the aggregate of all hardware and software owned or licensed by Marywood University, including the network." See PPM, "Conditions of Computer Use."

First, when I sent the January 13 e-mail containing links to the "Downfall" parody, I was not using a Marywood-owned computer. I was using my own Lenovo T61p laptop computer. Second, I cannot recall whether I was using Marywood's network. Occasionally, I connected to the internet while on campus by "tethering" my laptop computer to my Android smartphone. On those occasions, I was using the network of my mobile phone provider. I cannot recall for certain how I was connected to the internet when I sent the January 13 e-mail. It is Marywood's practice to keep an "audit trail," and thus the university would be in a better position to provide evidence on this point. See PPM, "Conditions of Computer Use." Marywood has charged me with disciplinary offenses, and it should be the University's burden to provide evidence.

I did not, as President Munley asserts, actually e-mail any video to the Marywood community. I e-mailed hyperlinks to a video, which was previously posted by me on YouTube. Anyone who viewed the video made a conscious decision to click on the hyperlink. I also sent the e-mail from my Yahoo! Mail e-mail account—not from my official Marywood e-mail address. If I was using "Marywood's system" by sending e-mails *to* official Marywood e-mail addresses, then the inverse would have to be true: President Munley was "using Yahoo's system" when she e-mailed her statement of charges to me on February 9, 2012. Both propositions are nonsense.

President Munley also alleges that "it *appears* that you...violated copyright laws associated with the use of a copyrighted video...." (emphasis added). It is further suggested that I could have complied with copyright law only by obtaining permission to publish from the owner of the video. If President Munley is going to charge me with violating the law, she should just do so—not dance around it by alleging what "appears" to be the case. This qualifier suggests a weakness in President Munley's position.

Furthermore, it is important to recognize that the question of whether a faculty member has violated copyright law is not suitable for a committee that has no formal legal credentials or training. Copyright law can be highly subjective. Even the Conditions of Computer Use policy hints at this: "As a *general matter*, copyright infringement occurs when a copyrighted work is reproduced, distributed, performed, publicly displayed, or made into a derivative work without the permission of the copyright owner." See PPM, "Conditions of Computer Use" (emphasis added). This is not a "general matter," however. This is a very specific matter, the resolution of which could terminate my connection to Marywood. Yet President Munley has not cited a single provision of copyright provision law or any case law on the subject. The Committee can and should reject President Munley's allegations based on (apparent) copyright violations for this reason alone.

Should the Committee wish to delve into the substance of copyright law anyway, it should start with the "fair use" doctrine. This doctrine has been codified in federal law, and provides as follows in relevant part:

> [T]he fair use of a copyrighted work, including such use by
> reproduction in copies or phonorecords or by any other means
> specified by that section, for purposes such as criticism, comment,
> news reporting, teaching (including multiple copies for classroom
> use), scholarship, or research, is not an infringement of copyright.
> In determining whether the use made of a work in any particular
> case is a fair use the factors to be considered shall include—
>
> (1) the purpose and character of the use, including whether such
> use is of a commercial nature or is for nonprofit educational
> purposes;
> (2) the nature of the copyrighted work;

> (3) the amount and substantiality of the portion used in relation to
> the copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of
> the copyrighted work.

17 U.S.C. § 107. The U.S. Supreme Court has held that parody, "like other comment or criticism, may claim fair use" under the provision quoted above. *See Campbell v. Acuff-Rose Music*, 510 U.S. 569, 579 (1994). An attorney for the Electronic Freedom Foundation has stated that all of the "Downfall" parodies she has seen "are very strong fair use cases and so they're not infringing." See Laura Sydell, YouTube Pulls Hitler 'Downfall' Parodies (Apr. 23, 2010), http://www.npr.org/templates/story/story.php?storyId=126225405.

   4.   *"Violation of Academic Freedom Policy; Professional Ethics Policy and University's Mission and Values as well as the principles of collegiality."*

President Munley's allegations here—and the policies that she relies upon—are hopelessly vague. Marywood's Academic Freedom policy encourages *"unrestricted* exchange of ideas," for example. See PPM, "Academic Freedom." (emphasis added). The Professional Ethics policy even suggests that Marywood faculty members are protected by the First Amendment. See PPM, "Professional Ethics" ("As members of their community, professors have the rights and obligations of other citizens.") The same policy ends as follows: "As citizens engaged in a profession that depends upon freedom for its health and integrity, professors have a particular obligation to promote conditions of free inquiry and to further public understanding of academic freedom." PPM, "Professional Ethics."

Where President Munley has alleged violations of these policies, I can find support for my e-mail and parody: I was protesting the University administration's removal of posters notifying students of a visit by Will Creeley, from the Foundation for Individual Rights in Education ("FIRE"), to my course. At the time, I was teaching SSCI210, "Introduction to Social Science." The topic was the First Amendment to the United States Constitution. FIRE is the leading non-profit organization that promotes freedom of expression on college campuses. See FIRE, "Mission – The Foundation for Individual Rights in Education – FIRE," http://thefire.org/about/mission.

It is important to note that Marywood's Tenure policy conveys that not just any violation of academic freedom—should the Committee find any—warrants termination of tenure. "Once tenure is granted, it will be discontinued only for grave reason, which may include moral turpitude, *flagrant abuse of academic freedom,* or professional incompetence." PPM, "Tenure." (emphasis added). "Flagrant" means "conspicuously or obviously offensive." Oxford Dictionaries, "Definition for flagrant," http://oxforddictionaries.com/definition/flagrant (accessed May 6, 2012).

President Munley also alleges that I violated Marywood's "Mission and Values." Those documents are not attached to President Munley's statement of charges, and I think she should forfeit such allegations. In any case, the "Mission" and "Core Values" are even more vague than Marywood's Academic Freedom and Professional Ethics policies. See PPM, "Mission," "Core

DEF001441

Values." Arguably, the Committee would have to divine the intentions of God to determine whether a faculty member has violated Marywood's Mission and Values.

Sincerely,


Frederick F. Fagal, Jr.

DEF001442