# Exhibit 53




**EXHIBIT 53**

Minutes. Ad Hoc Committee Meeting #2. May 17, 2012. 2-4p

**Guest:** Erin Sadlack, Chair of the Faculty Grievance Committee, with permission from PD and WJA.

Erin was invited to the meeting so that she could explain the scope of the work already done by the FGC. She opening by saying that when their group was convened, they were given the analogy of a grand jury, charged with determining whether a grievance is justifiable and worth moving forward. That group spent hours going over the documentation and understood that their decision was supposed to be final.

Helen asked Erin to explain more directly what the charge of the committee was and what questions they were supposed to answer.

EAS referred us to the PPM/FGA Section #4. The FGC notified SAM that a grievance was filed. They were charged with finding whether the grievance was justified and should go forward. They didn't meet with SAM or FF.

She explained that the FGC responded to 5 points made by FF in claiming that his suspension was improper because procedure was not followed. **Their charge was to review whether procedure was properly followed,** not to review the substance of SAM's decisions to suspend and to later terminate. **Their procedural review was limited to the charge of suspension,** not termination and revocation of tenure.

The committee's decision addressed points of procedure and affirmed that, in the case of FF's suspension:

- The President (and not only the VPAA) can suspend and can recommend dismissal

- "Harm" can take many forms

- The PPM does not guarantee the right to remedial action (prior to suspension)

- The PPM does not guarantee the right to appeal suspension, only termination

The FGC informally (via Sr. Gail) advised FF to ask the ad hoc committee to review the substance of the termination charge. FF was very clearly told by EAS that the suspension was no longer appealable according to the PPM.

Erin understands that the decisions of the two committees cannot themselves be grieved.

After Erin left, we concluded that we (the AHC) are charged with reviewing the substance of the termination charge (dismissal and revocation of tenure).

Looking at the PPM: Progressive Discipline, we agreed that the policy recognizes problems that MAY BE remediated but does not imply that all problems can be remediated. That i

**Fagal v. Marywood University**    February 26, 2016    DEF000322

the right to remediation is not guaranteed.

**Some of the questions we will consider going forward include:**

- Can and should FF's problem (re: the video) be remediated? Who gets to decide whether a particular problem is remediable?

- Did FF in essence reject or refuse remediation, especially in his meeting with SAM on 1/23, when he refused to discuss the video?

- Should FF's production and dissemination of the video be understood as a personal problem (e.g. anger management) analogous to the kind of potentially remediable problems described in the Progressive Discipline policy (e.g. addiction, mental health crisis)?

- Does the video (understood as an escalation of inappropriate behavior) represent a failure of the progressive discipline system at Marywood?

- Where does what happened fit or not fit with the causes for revocation of tenure outlined in the Faculty Manual?

**Actions:**

- Helen will email PD and let her know that we understand our charge to be the review of substance the termination and denial of tenure charges. We understand that the issues of suspension and procedure were resolved by the FGC.

- After some discussion, we decided that it would be very helpful to see FF's personnel file because the question of whether there is a history of progressive discipline (or whether this is a "first offense") are germane. Helen will ask PD for access.

- Because the guidelines around revoking tenure are very sparse and out of sync with AAUP recommendations, we will, after we have resolved this case, ask Faculty Senate to ask for a revision to that section of the Faculty Manual.

# Exhibit 54




EXHIBIT
54

**Redacted:**
**Attorney Client Privilege**

From: **Bittel, Helen** <bittel@maryu.marywood.edu>
Date: Fri, May 18, 2012 at 4:03 PM
Subject: Ad Hoc Business
To: Dr Patricia E Dunlcavy <dunlcavy@maryu.marywood.edu>


Dear Pat,

I just wanted to let you know (in case you need to know and to make sure we are moving appropriately) that, during yesterday's meeting, we agreed that our charge should be the review of substance the termination and denial of tenure charges. We understood that the issues of suspension and procedure were resolved by the FGC.

We would also like to see Fred's personnel file, if that is not privileged. We agreed, following our discussion, that the issue of whether there is a history of progressive discipline is germane to the termination charge (though not necessarily to the suspension).

Thank you for your support and consideration.

Best,
helen




--
Helen M. Bittel, Ph.D.
Associate Professor and Chair
Department of English
Marywood University
2300 Adams Ave.
Scranton, PA 18509


--
Patricia E. Dunleavy, Ph.D.
Assistant Vice President for Human Resources
Title IX Coordinator
Marywood University
2300 Adams Avenue

DEF001749

Scranton PA 18509
dunleavy@marywood.edu
570-348-6220 phone
570-961-4740 fax

--
Patricia E. Dunleavy, Ph.D.
Assistant Vice President for Human Resources
Title IX Coordinator
Marywood University
2300 Adams Avenue
Scranton PA 18509
dunleavy@marywood.edu
570-348-6220 phone
570-961-4740 fax

**Redacted:
Attorney Client Privilege**

--
Patricia E. Dunleavy, Ph.D.
Assistant Vice President for Human Resources
Title IX Coordinator
Marywood University
2300 Adams Avenue
Scranton PA 18509
dunleavy@marywood.edu
570-348-6220 phone
570-961-4740 fax

--
Patricia E. Dunleavy, Ph.D.
Assistant Vice President for Human Resources
Title IX Coordinator
Marywood University
2300 Adams Avenue
Scranton PA 18509
dunleavy@marywood.edu
570-348-6220 phone
570-961-4740 fax

--

Patricia E. Dunleavy, Ph.D.
Assistant Vice President for Human Resources
Title IX Coordinator
Marywood University
2300 Adams Avenue
Scranton PA 18509
dunlcavy@marywood.cdu
570-348-6220 phone
570-961-4740 fax

DEF001751

# Exhibit 55



EXHIBIT

55

| | |
|---|---|
| **From:** | Frederick Fagal [fffagal@yahoo.com] |
| **Sent:** | Friday, July 06, 2012 7:00:47 PM |
| **To:** | bittel@marywood.edu; obrien@marywood.edu; povse@marywood.edu |
| **CC:** | annemunley@marywood.edu; levine@marywood.edu; cabral@marywood.edu |
| **Subject:** | Ad Hoc Committee report re Fred Fagal |
| **Attachments:** | Sr Gail Cabral to Fagal April 30 2012.pdf |

To the Ad Hoc Faculty Committee:

I have received and considered your Review of Sister Anne Munley's Decision to Terminate the Employment and Tenure of Dr. Frederick Fagal, dated July 2, 2012. Except for your decision as to Charge No. 3, "Violation of Marywood's Conditions of Computer Use Policy," I respectfully disagree with the conclusions drawn by the Ad Hoc Faculty Committee.

The purpose of this e-mail is not to re-argue the same points contained in my written defense to President Munley's charges, dated May 6, 2012. I merely point out several troublesome omissions in your Review, and ask that the Committee remedy them.

First, the Review fails to mention—let alone discuss—the propriety of President Munley's suspension of me, which commenced on January 23, 2012. It does not appear from the Review that the Committee was separately convened to review the suspension. Marywood's Progressive Discipline Policy states, in relevant part: "The faculty member may be suspended by the Vice President for Academic Affairs at any time during the proceedings involving him or her. Suspension is justified if immediate harm to the faculty member or others is threatened by the person's continuance in the faculty position." See Marywood University, Policies and Procedures Manual, "Progressive Discipline," http://www.marywood.edu/policy ("PPM").

Moreover, a faculty member has the "*right* to convene an ad hoc committee in order to *appeal either a decision to suspend* the faculty member or a decision to dismiss the faculty member," and to have "such a committee be convened *twice* (i.e., *once for suspension and once for dismissal*)." PPM, "Progressive Discipline" (emphasis added). On April 30, 2012, Sister Gail Cabral confirmed that the Ad Hoc Faculty Committee should be convened twice for this case, and apparently President Munley concurred with my selection of Dr. O'Brien to review the suspension and termination [but she did not consult me about the composition of the second committee]. See E-Mail from Sr. Gail Cabral IHM to Frederick Fagal (Apr. 30, 2012), attached hereto.

The Review states that the "Faculty Grievance Committee has already determined that Sister Anne Munley followed appropriate procedure in moving directly to termination," but this is irrelevant. The Progressive Discipline Policy states that the Ad Hoc Faculty Committee must review my suspension; there is no exception for cases in which the Faculty Grievance Committee previously reviewed a suspension. The reason that I filed a faculty grievance in addition to requesting an Ad Hoc Faculty Committee review was to exhaust all remedies available to me. Marywood's Policies and Procedures Manual does not compel a choice of one or the other, and neither should the Committee.

Second, I must object to your statement that I "left little room for pursuing progressive discipline or a mediated solution to this situation." Until your Review, I was not made aware of any Marywood administrator or representative having ever defended the lack of remedial action taken on the basis that there had been "little room" for it. On the contrary, the Progressive Discipline Policy states: "*If*

DEF001494

*remedial actions(s) taken during the suspension* does not sufficiently resolve the issues that lead to the suspension, the university may move towards dismissal of the faculty member." PPM, "Progressive Discipline" (emphasis added). In other words, remedial actions must actually be taken before the University can pursue dismissal. Respectfully, the responsibility of an ad hoc faculty committee is not to prognosticate on whether remedial action would have succeeded had Marywood taken it. Your responsibilities in reviewing my dismissal, among others, were to first determine whether Marywood had taken remedial action, and, if so, whether such remedial actions had "sufficiently resolve[d] the issues" that allegedly led to my suspension. A move to dismiss a faculty member may not even be considered without an affirmative answer to both questions.

In light of the facts above, I respectfully request that the Committee convene to review the propriety of my suspension and that it reconsider the issue of Marywood's failure to take any remedial action prior to pursuing dismissal.

Sincerely,

Frederick F. Fagal, Jr.

7/5/12                                         Print

Subject:  Re: Any Fred Fagal ad hoc committee information?

From:     Sr. Gail Cabral IHM PhD (cabral@maryu.marywood.edu)

To:       fffagal@yahoo.com;

Date:     Monday, April 30, 2012 5:03 PM


Dear Fred,

Sr. Anne Munley and Dr. Levine asked me to respond to your question about the status of the ad hoc committee. The committee has not yet been convened but I expect that to take place this week. I am currently working to schedule the meeting.

Your suggestion to include Dr. Ed O'Brien on the committee has been accepted. The other two members of the ad hoc committee are Dr. Helen Bittel and Mr. Matt Povse. The choice of these two individuals was made in accordance with the Progressive Discipline Policy, on the basis "of their objectivity and competence and of the regard in which they are held in the academic community."

According to the Progressive Discipline Policy, when a faculty member requests that a committee be convened twice, the President determines whether the membership of the committee is similar or different. The President has received your email, and after review and consultation, Sr. Anne has determined that the membership will be the same.

I hope this is helpful.

Gail

On Thu, Apr 19, 2012 at 2:52 PM, Frederick Fagal <fffagal@yahoo.com> wrote:
Dear Sr. Gail,

Would you please give me an update regarding any progress in selecting an ad hoc committee and what the future "schedule of events? may be?

Thanks very much.

Sincerely,

Fred

DEF001496

# Exhibit 56



EXHIBIT
56

EXHIBIT
Bittel
17
_____
9/29/16 CRM

From: **Bittel, Helen** <bittel@maryu.marywood.edu>
Date: Fri, Jan 9, 2015 at 11:50 AM
Subject: Fwd: Our Mutual Friend
To: Dr Patricia E Dunleavy <dunleavy@maryu.marywood.edu>


---------- Forwarded message ----------
From: **Matthew R Povse** <povse@maryu.marywood.edu>
Date: Tue, Jul 10, 2012 at 11:26 AM
Subject: Re: Our Mutual Friend
To: "Bittel, Helen" <bittel@maryu.marywood.edu>
Cc: Dr Edward J O'Brien <obrien@maryu.marywood.edu>


Hi Helen,

Will you call Will ? I think that Pat is right about not having to respond, but it might be good for us to get together to review and answer some questions for ourselves.

Matt


On Tue, Jul 10, 2012 at 10:25 AM, Bittel, Helen <bittel@maryu.marywood.edu> wrote:


---------- Forwarded message ----------
From: **Patricia Dunleavy** <dunleavy@maryu.marywood.edu>
Date: Tue, Jul 10, 2012 at 10:08 AM
Subject: Re: Our Mutual Friend
To: "Bittel, Helen" <bittel@maryu.marywood.edu>


Hi Helen,

I'd suggest you talk to Will.  My thought would be you don't need to respond since the recommendation you made went to the President with others cc'ed.  I think it'd be up to Sr. Anne to respond if she chooses to.  But I'd check with Will, he'll know.

Thanks, and good luck,

1

Pat

On Tue, Jul 10, 2012 at 10:04 AM, Bittel, Helen <bittel@maryu.marywood.edu> wrote:
Dear Pat,

On Friday afternoon, our committee received a response from Dr. F.  He has found several problems/omissions with our report and has asked us to review and resubmit.  Mostly, he objects to the fact that we did not separately adjudicate his suspension; we, however, understood that this was adjudicated by the prior committee and that their findings were supposed to be final.

Do you have an advice going forward?  We are planning to meet on Friday as a committee.  Do you think we should also be conferring with Will, Sr. Anne, or Sr. Gail at this point?

Thank you for your consideration.

Best,
Helen


--
Helen M. Bittel, Ph.D.
Associate Professor
Department of English
Marywood University
2300 Adams Ave.
Scranton, PA  18509


--
Patricia E. Dunleavy, Ph.D.
Assistant Vice President for Human Resources
Title IX Coordinator
Marywood University
2300 Adams Avenue
Scranton PA 18509
dunleavy@marywood.edu
570-348-6220 phone
570-961-4740 fax


--
Helen M. Bittel, Ph.D.
Associate Professor
Department of English
Marywood University

2

2300 Adams Ave.
Scranton, PA  18509


--
Mathew R. Povse
Chair
Art Department



--
Helen M. Bittel, Ph.D.
Associate Professor
Interim Writing Coordinator
Department of English
Marywood University
2300 Adams Ave.
Scranton, PA  18509



--
Patricia E. Dunleavy, Ph.D.
Associate Vice President for Human Resources
Title IX Coordinator
Marywood University
2300 Adams Avenue
Scranton PA 18509
dunleavy@marywood.edu
570-348-6220 phone
570-961-4740 fax

3

# Exhibit 57



EXHIBIT
57

EXHIBIT
BiHel
15
9|29|16 CHM

**From:** Bittel, Helen
**Sent:** Thursday, July 5, 2012 6:29 PM
**To:** Sr Anne Munley
**Subject:** Re: Findings of the Faculty Senate Ad Hoc Committee
**Attachments:** Ad Hoc Comm Report 7.2.12.docx

I'm so sorry.  I've never used "track changes" and didn't realize that changing the view to "final" did not remove the inserts.

Hopefully this one will work.  I'll ask Matt and Ed to sign a hard copy as well, though I believe that Ed is out of town at the moment.

Thank you,
Helen

On Mon, Jul 2, 2012 at 2:15 PM, Sr Anne Munley <annemunley@maryu.marywood.edu> wrote:
        Yes, Helen and the copy that you sent was a working copy with inserts in red. Thank you.
                                        Sr. Anne

On Mon, Jul 2, 2012 at 1:24 PM, Bittel, Helen <bittel@maryu.marywood.edu> wrote:
Sure.  Do you mean a hard copy?

Best,
Helen


On Monday, July 2, 2012, Sr Anne Munley <annemunley@maryu.marywood.edu> wrote:
> Thank you, Helen.  Will you please send me the final copy as well.
> Sister Anne
>
> On Mon, Jul 2, 2012 at 12:11 PM, Bittel, Helen <bittel@maryu.marywood.edu> wrote:
>>
>> Dear Sister Anne,
>>
>> I have attached the Ad Hoc Hearing Committee's review of your decision to terminate Dr. Fagal's employment and tenure.
>>
>> Sincerely,
>> Dr. Helen Bittel, Committee Chair
>>
>> --
>> Helen M. Bittel, Ph.D.
>> Associate Professor and Chair
>> Department of English
>> Marywood University
>> 2300 Adams Ave.
>> Scranton, PA  18509
>

1

DEF001585

```
>
>
> --
> Sister Anne Munley IHM
> President
> Marywood University
> 2300 Adams Avenue
> Scranton, PA 18509
> (570) 348-6231
>
```

--
Helen M. Bittel, Ph.D.
Associate Professor and Chair
Department of English
Marywood University
2300 Adams Ave.
Scranton, PA  18509


--
Sister Anne Munley IHM
President
Marywood University
2300 Adams Avenue
Scranton, PA 18509
(570) 348-6231


--
Helen M. Bittel, Ph.D.
Associate Professor and Chair
Department of English
Marywood University
2300 Adams Ave.
Scranton, PA  18509

DEF001586

**Faculty Senate Ad Hoc Hearing Committee (Dr. Helen Bittel, Dr. Edward O'Brien, Mr. Mathew Povse)**

**Review of Sister Anne Munley's Decision to Terminate the Employment and Tenure of Dr. Frederick Fagal**

**2 July 2012**

After thorough investigation, reflection, and deliberation, we----the Faculty Senate Ad Hoc Hearing Committee---are in agreement with Sister Anne Munley's decision to revoke the tenure and terminate the employment of Dr. Frederick Fagal.

A.  We acknowledge that revocation of tenure is one of the most extreme actions that an academic administrator can take and that it has very serious implications both for the individual whose employment is terminated and for the entire university community.  The traditions of academic freedom require a strong defense of the rights of tenured faculty members to speak openly, explore their work, and participate in faculty governance without fearing reprisal.  We maintain that academic freedom is the cornerstone of our work as faculty members and have, throughout our deliberations, sought to ensure that its principles are upheld, both in Dr. Fagal's case and for all Marywood faculty in years to come.  We are mindful of the potential or perceived threat to academic freedoms when a speech violation leads to revocation of tenure.  Thus in rendering our decision, we maintain that Dr. Fagal's is an extreme case and that his words and actions (specifically, his producing and sending out links to two YouTube videos to colleagues at Marywood) are not protected by the principles of academic freedom, as detailed below.

B.  In coming to this decision, we have taken our charge very seriously, thoroughly researching the events leading to Dr. Fagal's dismissal, Dr. Fagal's personnel record over his years at Marywood, the Marywood *Policies and Procedures Manual (PPM)*, and relevant AAUP guidelines during our deliberations (see Appendix A for a listing of the AAUP documents we reviewed).  We believe that we gave this case the open-minded, careful consideration and thorough investigation that we would want for ourselves or for any of our colleagues.

C.  Dr. Fagal was given the opportunity to explain his video in his meeting with Sister Anne Munley and Drs. Patricia Dunleavy and Michael Foley on 23 January 2012.  Dr. Fagal appears to have not acknowledged any errors in judgment on his part at this meeting and left little room for pursuing progressive discipline or a mediated solution to this situation. The Faculty Grievance Committee has already determined that Sister Anne Munley followed appropriate procedure in moving directly to termination.

D.  In rendering our decision, we carefully considered the four charges outlined by Sister Anne Munley in her Recommendation for Termination memo (8 February 2012) as well as Dr. Fagal's response to those charges (Letter to the Ad Hoc Committee, 6 May 2012).

**Charge #1: Breach of Tenure Agreement.**  The Tenure policy outlined in the *PPM* states that tenure "will be discontinued only for grave reason, which may include moral turpitude, flagrant abuse of academic freedom, or professional incompetence."  We agree that Dr. Fagal's action does constitute "a

[Page]

DEF001587

flagrant abuse of academic freedom" because it includes gratuitous and malicious personal attacks well beyond the spirit and limits of academic freedom. We discuss this at greater length below, under "Charge #4"

We also agree, however, that according to the policy, these are not the only three reasons why tenure may be revoked. The wording of the policy pointedly uses the phrase *may* include" [Italics ours] in order to allow for other rare and extreme---but very "grave"---circumstances in which an individual's actions seriously injure the community.  We are in agreement that Sister Anne Munley is justified in saying that Dr. Fagal's actions constitute such an injury.

While it is difficult to precisely define what constitutes a violation of Core Values at Marywood, the egregious nature of Dr. Fagal's video parodies and their gratuitous personal attacks are, in the view of this committee, sufficiently extreme to justify the actions taken by Sister Anne Munley.

The AAUP, which fiercely opposes campus speech codes, acknowledges that "[t]he governing board and the administration have a special duty not only to set an outstanding example of tolerance but also to challenge boldly and condemn immediately serious breaches of civility." ("On Freedom of Expression and Campus Speech Codes, 10/26/06, p.38)  Dr. Fagal's video, in both its general premise and in the specific insults directed at individual Executive Officers, is, in the opinion of this committee, indeed such a breach.

**Charge #2: Violation of Civil Rights Policy**.  We question whether all of the insults to Executive Officers qualify as Civil Rights violations in terms of how the Civil Rights Policy relates to specific protected groups.  However, we do think that Dr. Fagal's portrayal of Alan Levine, a Jewish man, as a Nazi officer might be interpreted as anti-Semitic, regardless of whether this was Dr. Fagal's intention. It is, for example, analogous to portraying an African American as a Klansman in a video or document intended to insult that person.   Thus it could qualify as a violation of our Civil Rights Policy, since religion and ethnicity are protected categories.  While Dr. Fagal is correct in saying that he was not given an opportunity to respond to this point, there might have been one if he had answered Sister Anne Munley's questions on 23 January 2012 or if he had sought out additional opportunities to explain his actions in a subsequent meeting.

**Charge #3: Violation of Marywood's Conditions of Computer Use Policy.**  The committee does not have sufficient information from Sister Anne Munley's complaint to adjudicate this violation, nor is determining copyright infringement within our expertise.  The onus for providing evidence here rests with the administration in needing to prove that such violations occurred and not with Dr. Fagal in terms of proving that he did not engage in such violations.  We therefore cannot support this statement of violation.

**Charge #4: Violation of Academic Freedom Policy, Professional Ethics Policy, and the University's Mission and Core Values as well as the principles of collegiality.**

As we have indicated above, under "Charge #1," we do not believe that Dr. Fagal's video is protected by academic freedom because it is neither part of an academic exercise (teaching- or research-related) nor produced and disseminated in the context of such a scholarly pursuit.  Moreover, it is not informed by legitimate academic research and does not abide by the professional and scholarly standards of Dr.

[Page]

Fagal's discipline (or any other academic discipline). While the initial FIRE incident (the posters being taken down last fall) that sparked Dr. Fagal's anger did take place alongside and with relevance to his course (SSCI 201), this is not the case with the Jan 13 video. Dr. Fagal has the right to protest Marywood administrative actions, but to receive the protection of academic freedom, he would need to limit his analysis to an examination of the FIRE incident rather than bringing in personal attacks on individual Executive Officers. His critique of the Marywood administration could have been achieved without these attacks on the videos with their gratuitous and malicious elements that speak to his anger but do not illuminate our understanding of the issue of free speech and constitutionality. Moreover, Dr. Fagal could have pursued his complaint through other channels and could have criticized the university's actions in appropriate ways that would be protected under academic freedom.

Joan DelFattore, author of *Knowledge in the Making: Academic Freedom and Free Speech in America's Schools and Universities*, makes a clear distinction between academic freedom and speech protected under the first amendment: "Academic freedom as a professional norm upholds the authority of the faculty as a whole to establish and maintain academic standards and to share in institutional governance. It poses no obstacle to penalizing individual faculty members for scholarly speech that is judged to be professionally incompetent, even if the First Amendment would protect the expression of those same ideas by a citizen on the street. The applications are different because the fundamental purposes are different." (*Chronicle of Higher Education*, "To Protect Academic Freedom, Look Beyond the First Amendment," 31 Oct 2010)

We agree that the videos constitute harassment of the individuals who are impugned therein and therefore agree that Dr. Fagal has violated our Professional Ethics policy (*PPM*) as well as our mission and values.

In keeping with the recommendations of the AAUP, we do not, however, think that violating principles of collegiality in itself should be a criterion for revoking tenure. (See "On Collegiality as a Criterion for Faculty Evaluation).

**Conclusion:** We believe that Sister Anne Munley's termination of Dr. Fagal's employment and tenure is an extreme decision justified by the extreme nature of Dr. Fagal's behavior. We maintain that revocation of tenure at Marywood has been and ought to continue to be a very rare event. Tenure serves to ensure that faculty can speak their truths without reprisal, whether in the context of academic freedom or of faculty governance. This is critically important to the health of a university. However, Dr. Fagal was not operating in either of these contexts, and his video is outside the bounds of legitimate academic purpose. Moreover, Dr. Fagal's egregious violation of our core values, especially the value of respect, has caused grave and irreparable harm to our community.


Dr. Helen Bittel, Chair of Committee, Associate Professor

Dr. Edward O'Brien, Professor

Mr. Mathew Povse, Assistant Professor


[Page]

DEF001589

Appendix A.  AAUP Documents Consulted in Our Review

The committee initially identified a number of AAUP documents that seemed relevant to our deliberations and then contacted AAUP with this listing of documents and asked if there were other AAUP documents that might be relevant to our charge.  In our contact with AAUP we identified the nature of our committee review in general terms and not with reference to any specific details of the current case.  Below is a listing of the final list of AAUP documents reviewed as part of our committee deliberations.

1940 Statement of Principles on Academic Freedom and Tenure with 1970 Interpretive Comments

1958 Statement on Procedural Standards in Faculty Dismissal Proceedings

Ensuring Academic Freedom in Politically Controversial Academic Personnel Decisions (2011, full report and executive summary)

On Collegiality as a Criterion for Faculty Evaluation (1999)

On Freedom of Expression and Campus Speech Codes (1994)

On the Relationship of Faculty Governance to Academic Freedom (1994)

Post-Tenure Review: An AAUP Response (1999)

Procedural Standards in the Renewal or Nonrenewal of Faculty Appointments (1989 revision)

Recommended Institutional Regulations on Academic Freedom and Tenure (1940-2009)

[Page]

DEF001590

# Exhibit 58



**EXHIBIT
58**

**Faculty Grievance Committee Meeting. June 19, 2012. 2-4p**
Present: Bittel, Povse, O'Brien

First we reviewed the minutes from our June 18 meeting with Sister Anne Munley.

Then O'Brien distributed additional AAUP documents:   We will review these prior to our next meeting, though we are cognizant that the Marywood Faculty Manual is guided by but ultimately supersedes AAUP guidelines.  We also discussed the AAUP's emphasis on distinguishing speech from behavior/action.

We then took our first vote.  All three of us support Munley's decision to revoke Fagal's tenure. O'Brien, in giving his vote, pointed out that Fagal essentially "hanged himself." Such an action would never be permissible in any other workplace; the perpetrator would be terminated immediately.  He also noted that Fagal did not try to circumvent dismissal by going straight to appeal (by refusing to sign the release).  Bittel, in giving her vote, asserted that Fagal's controversial material ceased to be an exercise of academic freedom the moment he started making gratuitous personal attacks.  He also had multiple opportunities to make amends, show remorse, and explain his actions.  Povse expressed agreement with these but also wondered whether the administration has since had any second thoughts about their decision.

From here, we started to brainstorm the kinds of things we want to include in our statement to Fred.

**Below are some of our general ideas** that we will likely use in the introduction or conclusion:

We want to acknowledge that revocation of tenure is the most extreme thing you can do in academe.  We are aware of the dangers of a slippery slope if we affirm that a speech violation can lead to revocation of tenure and maintain that this is an extreme case and should not be a precedent.  We believe that this is an extreme decision justified by the extreme nature of Fagal's behavior and maintain that revocation of tenure ought to remain extremely rare. The reason for tenure is to ensure that faculty can speak their truths without reprisal, whether in the context of academic freedom or of faculty governance.  This is critically important to the health of a university.  However, Fagal was not operating in either of these contexts.

We want to demonstrate, in our document, that we have taken our charge seriously, thoroughly researching the events leading to Fagal's dismissal, the Faculty Manual and Policy and Procedures manual, and AAUP guidelines before beginning our deliberations.

We considered whether this is an example of offensive speech or a behavioral offense and the role of academic context in making this determination.

We need to give further thought to how we might most effectively reference AAUP guidelines, using these as an outside "touchstone" for our decision-making.  AAUP is very strong on free speech, taking a purist approach.  However, Fagal's actions are outside the bounds of legitimate academic purpose.  Further, the AAUP documents are focused on public colleges, though they say that they might be relevant to private ones as well.  A private university such as ours has a

stated set of core principles and values; this is not the same as it would be in a public university.

It would be hard to argue that Marywood faculty wouldn't know that the core values and mission are paramount.

Do we have to address Fagal's concerns about progressive discipline if these have been adjudicated elsewhere? Progressive discipline would have required him asking for assistance and accepting responsibility. Fagal did not give Munley reason to believe that progressive discipline would be a fruitful intervention

We may want to point out that the manual says (in relation to revocation of tenure) that "Grave reason MAY include..." but is not limited to those three offenses. We may want to say that Fagal's actions could be considered an abuse of academic freedom, one of the three example reasons listed.

**Below are some of our responses to the four charges that Munley** outlined in her dismissal memo (and that Fagal used to structure his own responses)

**Charge #1.** We agree that Fagal's action was a flagrant abuse of academic freedom, because it includes gratuitous personal attacks beyond what academic freedom protects. We also agree that Munley is justified is saying that his actions gravely injure our community.

**Charge #2.** We question whether all of the insults to Executive Officers qualify as Civil Rights violations. However, we do think that Fagal's portrayal of Alan Levine, a Jewish man, as a Nazi officer might be interpreted as anti-Semitic, regardless of whether this was Fagal's intention. It is, for example, analogous to portraying an African American as a Klansman in a video or document intended to insult that person. Thus it could qualify as a violation of our Civil Rights Policy, since religion and ethnicity are protected categories. While Fagal is correct is saying that he was not given a review on this point, there might have been one if he had answered Munley's questions on Jan. 23.

**Charge #3.** We don't have enough information to adjudicate this point. To determine copyright infringement is beyond our expertise.

**Charge #4.** Fagal's video was not an exercise of academic freedom because it is neither part of an academic exercise or produced/disseminated in the context of a scholarly pursuit. It reflects anger but not legitimate academic research. The video does not demonstrate personal integrity and, more importantly, it doesn't abide by standards of Fagal's discipline (or any other academic discipline). His critique of the administration could have been achieved without personalized attacks, gratuitous and malicious elements that speak to his anger but do not illuminate our understanding of the issue of free speech and constitutionality.

While the FIRE incident took place alongside and with relevance to his course (SSCI 201), this is not the case with the Jan 13 video. Fagal has the right to protest, but to fall under "academic freedom," he would need to limit his analysis to an examination of the FIRE incident rather than bringing in personal attacks on individual Executive Officers. Fagal could have pursued his

DEF001511

complaint through other channels and could have criticized the university's actions in appropriate ways that would be protected academic freedom.

**Action Items:**

Bittel will aim to have a first draft ready to workshop for Monday, 6/25. She will also ask Erin Sadlack for guidance as to the length of the documents and to confirm that her committee's statement already adjudicated, in their document, that Fagal is not entitled to progressive discipline.

Povse will contact Anne Munley and apprise her of our progress.

After we workshop our draft, we will send it to Will Anthony for comment. Is he an independent voice, or does he work for Munley / Marywood?

DEF001512

# Exhibit 59

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**EXHIBIT 59**

- - -

FREDERICK F. FAGAL, JR.     : CIVIL ACTION
                            :
            Plaintiff,      : NO. 3:14-cv-02404-ARC
                            :
      vs.                   : (JUDGE CAPUTO)
                            :
MARYWOOD UNIVERSITY,        :
                            :
            Defendant.      :


—  —  —

June 28, 2016

- - -


          Oral deposition of Mathew R.
Povse, taken pursuant to notice, was held at
the Radisson Lackawanna Station Hotel, Suite
206, 700 Lackawanna Avenue, Scranton,
Pennsylvania, commencing at 3 p.m., on the
above date, before Judy A. Black, a Registered
Professional Court Reporter and Notary Public
in and for the Commonwealth of Pennsylvania.



- - -


MAGNA LEGAL SERVICES

Seven Penn Center, 8th Floor

1635 Market Street

Philadelphia, Pennsylvania 19103

(866) 624-6221



Page 2

A P P E A R A N C E S:
JONATHAN Z. COHEN, LTD
BY:  JONATHAN Z. COHEN, ESQUIRE
175 Strafford Avenue
Suite 1 PMB 212
Wayne, PA 19087
(215) 874-0047
Attorneys for Plaintiff

JACKSON LEWIS, P.C.
BY:  STEPHANIE J. PEET, ESQUIRE
Three Parkway
1601 Cherry Street, Suite 1350
Philadelphia, PA 19102
(267) 319-7802
Attorneys for the Defendant

ALSO PRESENT:

FREDERICK F. FAGAL, JR.
PATRICIA DUNLEAVY

MAGNA LEGAL SERVICES

---

Page 3

‾ ‾ ‾
I N D E X
‾ ‾ ‾

Testimony of:  Mathew R. Povse

DIRECT  CROSS  REDIRECT  RECROSS

By Mr. Cohen  5        47

By Ms. Peet       44        49

‾ ‾ ‾ ‾ ‾ ‾ ‾ ‾
E X H I B I T S
‾ ‾ ‾

NUMBER   DESCRIPTION                    PAGE
Povse-1  Letter dated February 8, 2012,   10
         with attachments, Bates Nos.
         DEF000207-226
Povse-2  E-mail dated May 6, 2012, with   11
         attachments, Bates Nos.
         DEF001433-442
Povse-3  Minutes for Ad Hoc Committee     12
         Meeting #1, May 11, 2012, Bates
         Nos. DEF001408-509
Povse-4  Minutes for Ad Hoc Committee     16
         Meeting #2, May 17, 2012, Bates
         Nos. DEF000322-323
Povse-5  E-mail dated May 22, 2012, with  18
         attachments, Bates Nos.
         DEF000337-342

MAGNA LEGAL SERVICES

---

Page 4

Povse-6  Document, Bates Nos.             19
         DEF000143-144

Povse-7  E-mail chain, Bates Nos.         20
         DEF000353-356
Povse-8  Faculty Grievance Committee      22
         Meeting, June 19, 2012, Bates
         Nos. DEF001510-512
Povse-9  E-mail dated June 25, 2012, Bated 28
         No. DEF000393

Povse-10 E-mail Bates No. DEF0024530      30

Povse-11 E-mail dated July 2, 2012, with  31
         attachment, Bates Nos.
         DEF001515-521

Povse-12 E-mail dated July 5, 2012, with  31
         attachment, Bates Nos.
         DEF001585-590

Povse-13 E-mail dated July 6, 2012, with  38
         attachment, Bates Nos.
         DEF001494-496

Povse-14 E-mail chain, Bates Nos.         42
         DEF001611-615
Povse-15 E-mail dated July 15, 2012, Bates 44
         No. DEF001513

MAGNA LEGAL SERVICES

---

Page 5

- - -
DEPOSITION SUPPORT INDEX
- - -

Direction to Witness Not to Answer
Page Line    Page Line    Page Line
None

Request for Production of Documents
Page Line    Page Line    Page Line
None

Stipulations
Page Line    Page Line    Page Line
5   1

Question Marked
Page Line    Page Line    Page Line
None

MAGNA LEGAL SERVICES



2 (Pages 2 to 5)

```
 1              - - -
 2          STIPULATIONS
 3              - - -
 4      IT IS STIPULATED by and between counsel
 5  that the Deposition of Mathew R. Povse, is
 6  being taken pursuant to agreement and that all
 7  objections, except as to form, are reserved
 8  until the time of trial.  Mathew R. Povse does
 9  not waive the reading, signing, and filing of
10  the Deposition.
11              - - -
12          M A T H E W   R.   P O V S E,
13  having been duly sworn, was examined and
14  testified as follows:
15              - - -
16  DIRECT EXAMINATION BY MR. COHEN:
17      Q.    Mr. Povse, my name is Jonathan Cohen.  I
18  represent Frederick F. Fagal, Jr.
19          Have you ever had your deposition taken?
20      A.    No.
21      Q.    Okay.  The way it works, as I'm sure
22  Stephanie has explained to you, is that I ask you
23  questions and you're supposed to answer to the best
24  of your ability and to the best of your knowledge and
```

MAGNA LEGAL SERVICES

```
 1  memory.  If my question is not clear to you, feel
 2  free to tell me that and I'll try to rephrase.  If
 3  you think you can anticipate my question, I would
 4  still ask that you wait until I'm finished, because
 5  the court reporter has to take everything down.  Two
 6  people talking at once is a mess.
 7          Also, your attorney, you know, once I'm
 8  finished asking a question, Ms. Peet over here may
 9  want to make an objection, and she may or may not
10  want you to answer the question.
11          Is all that clear to you?
12      A.    Um-hum.
13      Q.    And you understand today that you're
14  under the same oath today that you would be in a
15  courtroom?
16      A.    Yeah.
17      Q.    Is there anything that would prevent you
18  from thinking clearly and testifying truthfully
19  today, such as medication?
20      A.    No.
21      Q.    And if at any time you need to take a
22  break during the deposition, just let me know.
23      A.    Yeah.
24      Q.    What is your educational background,
```

MAGNA LEGAL SERVICES

```
 1  Mr. Povse?
 2          Do you want me to call you Mr. Povse or
 3  Mat?
 4      A.    Mat is fine.
 5          What is my educational background?
 6      Q.    Yes.
 7      A.    I have one bachelor's degree in fine
 8  arts and two MFAs, graduate degrees, in fine arts.
 9      Q.    And what are those degrees?
10      A.    They specialize in ceramics and
11  sculpture.
12      Q.    I mean, is it like a master's degree?
13      A.    Yeah, BFA, bachelor of fine arts, and
14  two master's of fine arts, which is considered a
15  terminal degree in the visual arts area.
16      Q.    And you are currently employed by
17  Marywood University?
18      A.    I am ending -- I am currently employed
19  and close to the end.  I'm retiring.
20      Q.    Oh, really?
21      A.    Yes.
22      Q.    For how long have you worked for
23  Marywood?
24      A.    I believe it's around 27 years,
```

MAGNA LEGAL SERVICES

```
 1  approximately.
 2      Q.    And are you a tenured professor?
 3      A.    Yes.
 4      Q.    When did you attain tenure?
 5      A.    I can't really tell you that.  I don't
 6  remember.
 7      Q.    So long ago --
 8      A.    I have a bad memory, I have to warn you.
 9      Q.    Okay.  Is this the first time you are
10  seeing my client, Professor Fagal?
11      A.    Well, I think, actually I -- up to this
12  point I did not put together the face and the name.
13  Now that I've seen you walk in, I remember seeing you
14  on campus, but I -- that's about it.
15      Q.    So you had never spoken to him?
16      A.    I may have said hello.
17      Q.    Okay.  And prior to what you learned as
18  serving in the committee regarding Professor Fagal,
19  you really knew nothing about him?
20      A.    Very little.
21      Q.    Did you prepare at all for today's
22  deposition?
23      A.    I looked at some of the files, notes,
24  that were accessible to me, try to refresh my memory.
```

MAGNA LEGAL SERVICES



1    Q.    And what documents did you review?
2    A.    Oh --
3    Q.    If any?
4    A.    I don't know.  Lots of letters, lots of
5    memos.  Whatever I had accessible to me.
6          MR. COHEN:  Can we also have this marked
7    as Povse-1.
8          (Povse-1, Letter dated February 8, 2012,
9    with attachments, Bates Nos. DEF000207-226, is
10   received and marked for identification.)
11   Q.    And, Mr. Povse, can you briefly review
12   this and let me know whether you recognize it?
13   A.    I -- this is from -- I think I've seen
14   it.
15   Q.    Is this the statement of charges that
16   President Munley made against Professor Fagal and
17   that your committee was asked to review?
18   A.    I would say -- I would say yes.
19   Q.    Okay.  And you served on what's called
20   an ad hoc committee, correct?
21   A.    Yes.
22   Q.    And that committee consisted of you,
23   Edward O'Brien and Helen Bittel, correct?
24   A.    Yes.

MAGNA LEGAL SERVICES

1    Q.    And the job of your committee was to
2    adjudicate the charges that President Munley lodged
3    against Professor Fagal, correct?
4    A.    To an extent.
5    Q.    What do you mean by "to an extent"?
6    A.    We were to look at the substantive
7    portion of the charge, not the procedural, so --
8    Q.    Okay.
9    A.    That's what we were looking at.
10         MR. COHEN:  Can you mark O'Brien-5 also
11   as Povse-2.
12         (Povse-2, E-mail dated May 6, 2012, with
13   attachments, Bates Nos. DEF001433-442, is received
14   and marked for identification.)
15   Q.    And can you briefly review this and let
16   me know whether you recognize this document?
17   A.    It looks familiar.
18   Q.    Would you say that this is Professor
19   Fagal's written defense to President Munley's
20   charges?
21   A.    Well, it's his explanation.
22   Q.    Okay.  Did you review this document in
23   preparing for today's deposition?
24   A.    I've seen it.  I don't know -- I didn't

MAGNA LEGAL SERVICES

1    review much of anything for this --
2    Q.    But you're --
3    A.    -- for this meeting.  But I've seen
4    this.
5    Q.    Do you remember reading the whole thing
6    at any time?
7    A.    Well, I prob -- I'm sure that I read it
8    when we were meeting.  And, again, you know, there
9    was so much information that we had that I can't
10   recall.  But I would -- whatever information we were
11   given, I could assure you that I read at the time we
12   were meeting for that committee.
13   Q.    Okay.
14         MR. COHEN:  Let's take O'Brien-6 and
15   call it also Povse-3.
16         (Povse-3, Minutes for Ad Hoc Committee
17   Meeting #1, May 11, 2012, Bates Nos. DEF001408-509,
18   is received and marked for identification.)
19   Q.    Mr. Povse, do you recognize this
20   document?
21   A.    It looks familiar.  Yeah.
22   Q.    What is it?
23   A.    Minutes from our -- looks like our first
24   meeting.

MAGNA LEGAL SERVICES

1    Q.    Do you know who made the comments on the
2    right side of the page?
3    A.    No.  Let me -- no.
4    Q.    Okay.  But you know that it wasn't you?
5    A.    No, I can't really say.
6    Q.    Okay.  On the first paragraph, last
7    sentence, there's a sentence that begins, "Helen
8    knows FF casually."  Do you see that?
9    A.    Yeah.  Yeah.
10   Q.    And then it says, "Some of her
11   conversations with him have been, quote, strange, but
12   the relationship has been collegial."  Do you
13   remember Helen explaining what she meant by having
14   strange conversations with Professor Fagal?
15   A.    No, I don't remember.  I don't remember
16   if she expounded on that.
17   Q.    If you look down at the bottom of this
18   page, it says, "5/3," which I guess is for May 3rd,
19   "AHC meets with HR and Sister Gail."  Do you -- and
20   AHC means ad hoc committee, correct?
21   A.    Correct.
22   Q.    And do you remember meeting with HR and
23   Sister Gail?
24   A.    I know we did.  That's about all I

MAGNA LEGAL SERVICES



Page 14

1  remember.
2      Q.   Do you remember what was discussed at
3  that meeting?
4      A.   No.
5      Q.   And you know that Patricia Dunleavy is
6  head of HR for Marywood, right?
7      A.   Yes.
8      Q.   And was at that time, right?
9      A.   Yes.
10     Q.   Do you remember asking Dr. Dunleavy
11 whether there would be two committees for Professor
12 Fagal, one to review his suspension and one for
13 termination?
14         MS. PEET:  As stated, I think it's
15 confusing and implies facts not in evidence.
16         If you understand the question, you can
17 go ahead and answer it.
18     A.   Repeat your question again.
19     Q.   At any time do you recall asking
20 Dr. Dunleavy whether there would be two committees to
21 review the discipline imposed on Professor Fagal, one
22 of them to review his suspension and the other for
23 termination?
24         MS. PEET:  Same objection.  You can
MAGNA LEGAL SERVICES

Page 15

1  answer.
2      Q.   Unless your attorney says -- instructs
3  you not to answer, you pretty much have to answer.
4  To the best of your ability.
5          MS. PEET:  Yes.
6      A.   Okay.  I don't --
7      Q.   You don't remember?
8      A.   I don't remember.  That's the problem.
9      Q.   Do you remember --
10     A.   If this was a meeting right at the very
11 start of this committee, I doubt very much if I asked
12 that question, since I knew so very little in the
13 beginning.
14     Q.   Do you remember anybody else on the
15 committee asking that question?
16     A.   No.
17     Q.   Do you remember the name Will Anthony?
18     A.   Yeah.
19     Q.   Did you -- at this meeting with HR and
20 Sister Gail, did you discuss the possibility of
21 talking to Will Anthony?
22     A.   I'm not sure his name came up at that
23 meeting.  I know -- I'm aware that he was an attorney
24 associated with Marywood, and I know that his name
MAGNA LEGAL SERVICES

Page 16

1  was mentioned somewhere along the line.
2      Q.   How did his name first come up for you?
3      A.   I don't know.
4      Q.   This meeting with Dr. Dunleavy and
5  Sister Gail, did the name Jackson Lewis come up?
6      A.   Jackson Lewis?
7      Q.   Yes.
8      A.   Doesn't sound familiar.
9      Q.   Okay.
10         MR. COHEN:  We'll take O'Brien-7 and
11 mark this as Povse-4, please.
12         (Povse-4, Minutes for Ad Hoc Committee
13 Meeting #2, May 17, 2012, Bates Nos. DEF000322-323,
14 is received and marked for identification.)
15     Q.   Mr. Povse, can you -- why don't you read
16 this entire document to yourself and let me know when
17 you're finished.
18     A.   All right.  Okay.
19     Q.   Have you ever seen this before?
20     A.   Yeah.  Yeah, looks familiar.
21     Q.   Did you review this document for today's
22 deposition?
23     A.   No.
24     Q.   Do you think this accurately reflects
MAGNA LEGAL SERVICES

Page 17

1  what occurred during the May 17, 2012 meeting?
2          MS. PEET:  Objection to form.  You can
3  answer.
4      A.   I could -- I would -- you know, trying
5  to reach back that far, I'm going to say yeah.
6      Q.   Let me ask it this way:  Do you have any
7  reason to doubt the accuracy of any part of this?  Is
8  there any part of it that stands out as unlikely or
9  inaccurate to you?
10     A.   No.
11     Q.   Now, on the second page -- scratch that.
12         On the second page, do you see the
13 heading "Actions"?
14     A.   Yeah.
15     Q.   And then there's several bullet points
16 under each.  The first bullet point says, "Helen will
17 e-mail TD."  Do you see that?
18     A.   Um-hum.
19     Q.   Does this bullet point also reflect your
20 understanding of the role of your committee?
21     A.   Yeah.
22     Q.   And how did you form that understanding?
23     A.   How did I form that?  How did I -- I
24 guess it was based -- and, again, I'm trying to
MAGNA LEGAL SERVICES



Page 18

1  recall all this, but I would assume it was based on
2  all of the information of -- that we were given as
3  far as our charge is concerned.
4      Q.   Was it also based partly on advice you
5  received from Erin Sadlack?
6      MS. PEET:  Objection to --
7      A.   I don't remember.
8      MS. PEET:  Objection to form.
9      Q.   Do you know who Erin Sadlack is?
10     A.   Yeah.
11     Q.   And she was a guest --
12     A.   Right.
13     Q.   -- at this meeting, correct?
14     A.   Right, right.
15     Q.   Do you actually remember her being
16 there?
17     A.   Well, I remember her being there, yeah.
18 That's probably about it.  I do remember I met with
19 her.
20     MR. COHEN:  O'Brien-8, could we have
21 this marked, please, as Povse-5, as well.
22     (Povse-5, E-mail dated May 22, 2012,
23 with attachments, Bates Nos. DEF000337-342, is
24 received and marked for identification.)

MAGNA LEGAL SERVICES

Page 19

1      Q.   Do you recognize this document,
2  Mr. Povse, as well as the attachments?
3      A.   Yeah.
4      Q.   Yes?
5      A.   Yes.
6      Q.   In these attachments -- these
7  attachments appear to be minutes for ad hoc committee
8  meetings, correct?
9      A.   Um-hum.
10     Q.   And there are comments on the right side
11 of each --
12     A.   Yes.
13     Q.   -- document.
14         Do you know whether these comments were
15 ever adopted into the final version of these minutes?
16     A.   No.
17     Q.   Okay.
18     MR. COHEN:  Let's take O'Brien-11 and
19 also mark it as Povse-6, please.
20     (Povse-6, Document, Bates Nos.
21 DEF000143-144, is received and marked for
22 identification.)
23     Q.   Do you recognize this document,
24 Mr. Povse?

MAGNA LEGAL SERVICES

Page 20

1      MS. PEET:  Is that also a Sadlack
2  document?
3      MR. COHEN:  Yes.
4      MS. PEET:  And it's Povse what?
5      MR. COHEN:  6.
6      A.   I don't -- I don't recall it, to be
7  honest with you.  I may have seen it.  If it was
8  given to us, I saw it, but I don't remember it.
9      Q.   Okay.
10     MR. COHEN:  Can we take O'Brien-9 and
11 mark this as Povse-7, as well, please?
12     (Povse-7, E-mail chain, Bates Nos.
13 DEF000353-356, is received and marked for
14 identification.)
15     Q.   Do you recognize any part of this
16 document, Mr. Povse?  You might have to take some
17 time to review it.
18     A.   It looks familiar.
19     Q.   Part of this on the first page, there's
20 an e-mail from Dr. O'Brien to you and Helen dated
21 June 2nd, 2012, right?
22     A.   Um-hum.  Um-hum.
23     Q.   Do you remember receiving this?
24     A.   Yeah.

MAGNA LEGAL SERVICES

Page 21

1      Q.   And the second paragraph that begins,
2  "My current inclination," could you read that to
3  yourself and let me know when you've finished?
4      A.   Okay.
5      Q.   So this paragraph has four questions or
6  topics that Dr. O'Brien wanted to raise with
7  President Munley, correct?
8      A.   Um-hum.
9      MS. PEET:  Objection to the form.
10     Q.   And do you know whether, in fact,
11 anybody on your committee ever asked these questions
12 of President Munley?
13     A.   I know I didn't.  I really -- again, I
14 apologize, but I cannot remember.  I -- I can't
15 remember.  I know I didn't.  I know these were issues
16 that we talked about, and I would think that -- that
17 someone did.
18     Q.   Do you remember whether President Munley
19 ever met with your committee?
20     A.   I don't remember -- I know she didn't
21 meet with me.
22     Q.   Not with you?
23     A.   Not with me, no.
24     Q.   But you don't know whether she met with

MAGNA LEGAL SERVICES



1    someone --
2        A.    I don't.  I swear I don't.
3        Q.    That's okay.  But you don't know if she
4    met with someone else on the committee without you
5    there?
6        A.    I don't remember.
7        Q.    And on the next paragraph, it begins, "I
8    also think we may want to interview Fred by phone."
9        A.    Um-hum.
10       Q.    You don't remember ever interviewing
11   Fred by phone, right?
12       A.    No.  No.
13       Q.    And no one else on the committee did,
14   either, right?
15       A.    That, I don't know.  I know I never
16   talked to Fred.
17       Q.    You don't remember a decision ultimately
18   being made on whether to interview him, Fred, at all?
19       A.    No.
20             MR. COHEN:  Okay.  Can we make
21   O'Brien-12 Povse-8.
22             (Povse-8, Faculty Grievance Committee
23   Meeting, June 19, 2012, Bates Nos. DEF001510-512, is
24   received and marked for identification.)

1        Q.    And could you read this to yourself and
2    let me know when you're finished?
3        A.    All right.
4        Q.    Have you ever seen this document before?
5        A.    Yes, it looks familiar.
6        Q.    Did you generate this document?
7        A.    Did I generate it?  I don't know.
8        Q.    You're not sure if you did?
9        A.    Hmm?
10       Q.    You're not sure if you did?
11       A.    No, I don't know.  I may have been the
12   note taker that day.
13       Q.    And on the third paragraph, the one that
14   begins, "We then took our first vote," and the last
15   sentence of that paragraph says, "Povse expressed
16   agreement with these but also wondered whether the
17   administration has since had any second thoughts
18   about their decision."  Did I read that correctly?
19       A.    Yes.
20       Q.    Do you remember expressing those
21   sentiments?
22       A.    I -- the minute I read this, I realized
23   that it's -- in my opinion, it's out of context.  I
24   have no idea right now why I said that.  I have no

1    idea what that was based on.  I don't remember.  I
2    have no idea.
3        Q.    Well, as you sit here today, do you
4    wonder whether Marywood's administration has had any
5    second thoughts about terminating Fred?
6        A.    No, no, and I certainly have no second
7    thoughts as far as my personal vote.  So, again, I
8    don't know what that referred to and I cannot
9    remember.
10       Q.    Okay.  On the last page, last two
11   paragraphs say, "Povse will contact Anne Munley and
12   apprise her of our progress."
13       A.    Um-hum.
14       Q.    Do you remember actually contacting Anne
15   Munley?
16       A.    Yes.  Yeah.
17       Q.    Why was that something you wanted -- or
18   the committee wanted to do, keep President Munley
19   apprised of the progress?
20       A.    I'm not sure.  We might have -- I don't
21   know.  I don't know what -- if there was a deadline
22   we were working towards or what.  I don't know.
23       Q.    Did you think it was important at all --
24   did you think about keeping Professor Fagal apprised

1    of the progress of the committee?
2        A.    I would have to say I don't -- I don't
3    know what I was thinking of at the time, but I would
4    say I wouldn't have thought it was appropriate at
5    that point.
6        Q.    Why was it appropriate to keep President
7    Munley advised at that point of the committee's
8    progress?
9        A.    I guess it was just to notify her that
10   we had more or less come to a decision for what our
11   committee was charged.
12       Q.    Did you come to a decision before
13   actually issuing a formal decision?
14       A.    Yeah.  Well, whatever was here.
15       Q.    Did you view your -- the committee's
16   role as simply a formality that you had to go through
17   before President Munley could get the decision she
18   wanted, or no?
19       A.    I didn't consider it to be a mere
20   formality at all.  I mean, I realize the seriousness
21   of this whole event, so -- I mean, it was a process
22   that was part of the whole thing.
23       Q.    Then the next sentence, it says, "After
24   we workshop our draft, we will send it to Will



1  Anthony for comment."  Do you know if the committee
2  did, in fact, send the draft to Will Anthony for
3  comment?
4      A.    I don't remember.
5      Q.    Do you remember receiving anything from
6  Will Anthony in writing in response to the draft?
7      A.    No.
8      Q.    And why did you think it was important
9  or useful to send Will Anthony -- or to even plan on
10 sending Will Anthony a draft for comment?
11     MS. PEET:  Objection to the form.
12     THE WITNESS:  Pardon me?
13     MS. PEET:  Objection to the form.  I'm
14 just noting it for the record.  You can answer.
15     A.    I can answer.  Well, I guess he was the
16 school attorney.  You know, I guess that he was part
17 of the whole process.
18     Q.    The next sentence, or it's more of a
19 question, says, "Is he an independent voice or does
20 he work for Munley/Marywood?"  Is that a thought that
21 occurred to you, whether he was an independent?
22     A.    That seems -- that's curious, that
23 sentence there.  I -- I -- I don't understand that
24 question.  My understanding was that Will Anthony was

1  an attorney for the school.
2      Q.    Did you know at the time before your
3  deliberations -- before your committee deliberations
4  began, did you know that Mr. Anthony and an attorney
5  for Professor Fagal were kind of arguing out this
6  procedure in writing?
7      MS. PEET:  Objection to form.
8      A.    No.
9      Q.    So you don't know that there was, like,
10 an adversarial --
11     A.    No.  No, I didn't know anything about
12 that.
13     Q.    You knew that there was a possibility in
14 any committee review of a president -- of a
15 president's decision, there was possibility that you
16 may not agree with the president, right?
17     A.    Sure.
18     Q.    So wouldn't you agree that the interests
19 of the committee were not necessarily in line with
20 the interests of the president?
21     MS. PEET:  Objection to the form.
22     A.    Ask me that question again.
23     Q.    Wouldn't you agree that the interest of
24 your committee or any ad hoc committee reviewing a

1  professor's discipline is not necessarily the same
2  interest as the president has?
3      A.    Yeah.
4      MS. PEET:  Objection to the form.
5      Q.    You would agree?
6      A.    Yeah.
7      Q.    So that in that case, you didn't cite as
8  part of a -- of a conflict of interest for your
9  committee to be showing a draft of your deliberations
10 to the university's attorney?
11     MS. PEET:  Objection to the form.
12     A.    No.
13     Q.    Did you think the university's attorney
14 was sharing what he learned with President Munley?
15     MS. PEET:  Objection to the form.  Calls
16 for speculation, lack of foundation, calls for
17 consideration of evidence not on the record.
18     A.    I don't know.  I may not have been
19 considering that.
20     MR. COHEN:  Okay, let's take O'Brien-13
21 and mark it whatever we're up to in Povse.
22     (Povse-9, E-mail dated June 25, 2012,
23 Bated No. DEF000393, is received and marked for
24 identification.)

1      Q.    Mr. Povse, do you recognize this
2  document?  I'll give you a chance to review it.
3      A.    It looks familiar.
4      Q.    And do you remember, in fact, providing
5  a draft of your response to Mr. Anthony?
6      A.    No, I don't, but I have to assume that
7  we did.
8      Q.    And why did you feel the need to advise
9  Sister Anne that your committee's report would be in
10 support of her actions in Professor Fagal's case?
11     MS. PEET:  Objection to form.
12     A.    Common courtesy.
13     Q.    What about common courtesy to Professor
14 Fagal?
15     MS. PEET:  Object to the form.
16     A.    Again, I -- I was under the impression
17 that we -- you know, we were working for the school.
18 In a way, we were charged, and in our charge, we
19 weren't told to keep Dr. Fagal in the loop.
20     Q.    Were you told to keep President Munley
21 in the loop?
22     A.    I don't think so.  I think this was just
23 keeping the administration apprised of where we were.
24     MR. COHEN:  Let's have this marked as



1 Povse-10.
2      (Povse-10, E-mail Bates No. DEF00245, is
3 received and marked for identification.)
4      Q.    Why don't you briefly review this,
5 Mr. Povse, and let me know if you recognize it.
6      A.    Yeah, I guess I recognize it. It's --
7 I'm sure.
8      Q.    Do you remember sending the e-mail on
9 June 29, 2012, at 12:08 p.m. to Dr. Dunleavy?
10     A.    No, I don't remember it, but I'm sure I
11 did.
12     Q.    Do you remember receiving the e-mail
13 above it from Dr. Dunleavy?
14     A.    I don't remember, but, again, it's in
15 front of me.
16     Q.    You don't have any reason to doubt that
17 this is authentic?
18     A.    Right, right.
19     MR. COHEN: I'd like to take O'Brien-14
20 and also mark this as Povse Exhibit 11.
21     (Povse-11, E-mail dated July 2, 2012,
22 with attachment, Bates Nos. DEF001515-521, is
23 received and marked for identification.)
24     Q.    Do you recognize this e-mail and the

1 attachment?
2      A.    Yeah, I recognize it.
3      Q.    And the attachment is your committee's
4 review of Sister Anne's decision to terminate
5 Professor Fagal's employment, correct?
6      A.    This attachment here?
7      Q.    Yes.
8      A.    Yes.
9      Q.    And do you know if this is the final
10 version? Because it appears to me that there's still
11 track changes here. Do you know what I mean by track
12 changes?
13     A.    No.
14     Q.    If you see the edits, like the lines on
15 the left?
16     A.    Um-hum.
17     Q.    Do you know if this was the final
18 version?
19     A.    I can't tell you.
20     MR. COHEN: Okay, let's take O'Brien-15
21 and mark this as Povse-12, please.
22     (Povse-12, E-mail dated July 5, 2012,
23 with attachment, Bates Nos. DEF001585-590, is
24 received and marked for identification.)

1      Q.    Do you recognize this document and the
2 attachment to it?
3      A.    Yeah.
4      Q.    This is another copy of your committee's
5 review, correct?
6      A.    Um-hum.
7      Q.    But there are no edits here. Do you see
8 that?
9      A.    Um-hum.
10     Q.    Do you know whether this was the final
11 version of your review or not?
12     A.    No.
13     Q.    Do you know if -- do you remember
14 signing a hard copy version of your review, your
15 committee's review?
16     A.    I don't remember. I would think that I
17 did, but I don't remember. I would think that we
18 signed off on it.
19     MS. PEET: If you don't know, the answer
20 is you don't know.
21     A.    I don't know.
22     Q.    Would it be fair to say, Mr. Povse, that
23 your committee reviewed whether Professor Fagal's
24 termination was proper?

1      A.    Yes.
2      Q.    Would it also be fair to say that your
3 committee reviewed whether Professor Fagal's
4 suspension was proper?
5      A.    Yes.
6      Q.    In this document that we were just
7 looking at, the review of President Munley's
8 decision, do you know whether it mentions your
9 analysis of Professor Fagal's suspension?
10     MS. PEET: Objection to the form.
11     A.    What's the question?
12     Q.    Does this review contain any analysis
13 about whether Professor Fagal's suspension was
14 appropriate?
15     A.    I don't know. I'd have to look through
16 this. I'd have to read it thoroughly.
17     Q.    Okay. If it's not in there, would it be
18 fair to say that it wasn't memorialized?
19     MS. PEET: Objection.
20     A.    No.
21     Q.    If the suspension was reviewed, would it
22 be odd for it not to be mentioned in your review?
23     MS. PEET: Objection,
24 mischaracterization of testimony. He just testified



1   that it was reviewed.
2       A.    I'm getting confused here.
3           MS. PEET:  Exactly.  That's what he's
4   trying to do and I don't want you to get confused.
5       A.    Ask me that question.
6       Q.    We'll skip ahead.
7           Before your committee convened to review
8   Professor Fagal's discipline, do you recall that
9   there was another committee, a faculty grievance
10  committee, that also reviewed parts of Professor
11  Fagal's discipline?
12      A.    Yeah.
13          MS. PEET:  Objection to the form.
14      Q.    And what was your understanding of what
15  the first committee did?
16      A.    It was the procedure that they were
17  looking at the events, and I can't really say
18  that, first of all, I have a memory of exactly what
19  their job was or duties were.  I know that we did
20  meet with Erin and got more information as to their
21  committee and what they were charged with.
22      Q.    Coming back to this last exhibit with
23  the review of President Munley's decision --
24          MS. PEET:  I'm sorry, which exhibit is

1   it again, Povse-12?
2           MR. COHEN:  Yes.
3       Q.    Can you turn to part A of the decision,
4   the one that begins with, "We acknowledge that"?  Do
5   you see that?
6       A.    Um-hum.
7       Q.    And further down, do you see the
8   sentence that says, "We are mindful of the potential
9   or perceived threat to academic freedoms when a
10  speech violation leads to revocation of tenure"?
11      A.    Um-hum.
12      Q.    And you had a role in -- would it be
13  fair to say you had a role in generating this
14  document?
15      A.    Um-hum.
16      Q.    What did --
17          MS. PEET:  Keep your answers verbal,
18  make sure.  Is that a yes or a no?
19      A.    Yes.
20      Q.    Yes, you did have a role?
21      A.    Yes.
22      Q.    What did you mean by this sentence, "We
23  are mindful of the potential" --
24      A.    I would -- first of all, I would have to

1   say that the words were probably created, formulated,
2   by both Helen and Ed, because they had more talent in
3   that department, but I certainly agreed with anything
4   and everything that's -- that's in this document.  We
5   are mindful of the potential perceived threat to
6   academic freedom when a speech violation leads to
7   revocation of tenure.  I mean, it's pretty obvious
8   that, you know, that's pretty thin ice.  That's scary
9   stuff right there.  And we were certainly mindful of
10  it.
11      Q.    Would you say that Drs. Bittel and
12  O'Brien were more heavily involved in the committee's
13  deliberations than you were?
14          MS. PEET:  Objection to the form.
15      A.    They put it into words, I think, better
16  than I did, but our sentiments were the same.  We
17  were in full agreement with each other.
18      Q.    Did you feel -- let me ask it this way:
19  Do you wish that you had never served on this ad hoc
20  committee?
21          MS. PEET:  Objection to form.
22      A.    No.  No.
23      Q.    Do you feel like you were under pressure
24  to make a particular decision?

1       A.    No.  No.
2       Q.    And is that because you were already
3   tenured at the time?
4       A.    No, no.  No, I -- no.
5       Q.    You had no fear that a decision
6   against -- even if it did not support President
7   Munley's decision would lead to adverse consequences?
8       A.    No.
9       Q.    Why not?
10      A.    I don't know.  It didn't -- it didn't
11  enter my mind.  I don't know.  Fearless.
12      Q.    You were fearless?  That's a good
13  answer.
14          Looking back on it, do you think it
15  would have been appropriate to have more fear that
16  deciding -- making a decision that did not support
17  President Munley would have adverse consequences?
18          MS. PEET:  Objection.
19      A.    No.  And it really never entered my
20  mind.
21      Q.    You're aware that your committee had to
22  consist -- was required to consist of tenured
23  professors, right?
24      A.    Yes.



Page 38

1    Q.   And why do you think that was?
2         MS. PEET:  Objection, calls for
3    speculation.
4         THE WITNESS:  Can I answer that?
5         MS. PEET:  Absolutely.
6    A.   That's really the process that
7    everything is decided by at a university.  I mean,
8    the tenured faculty are the most respected faculty.
9    I mean, most faculty members, if they were faced with
10   any kind of committee and decisions being made about
11   them would, I assume, prefer to have tenured faculty
12   because of their experience, dedication to the
13   school.  And that's law of the land, really, when it
14   comes to committees and all, for the most part.
15        MR. COHEN:  Okay.  This is O'Brien-16.
16   Can we mark this as the next Povse exhibit?
17        (Povse-13, E-mail dated July 6, 2012,
18   with attachment, Bates Nos. DEF001494-496, is
19   received and marked for identification.)
20        Q.   Just if you could briefly review this
21   and let me know whether you recognize it.
22        A.   Yes, I recognize it.
23        Q.   You do recognize it?
24        A.   Yes.
          MAGNA LEGAL SERVICES

Page 39

1    Q.   And what is it?
2    A.   What is it?
3    Q.   Yes.
4    A.   It's a letter to the ad hoc committee
5    from Fred.
6    Q.   You mean it's an e-mail, right?
7    A.   Or an e-mail.
8    Q.   Dated July 6, 2012?
9    A.   Yeah.
10   Q.   And essentially Professor Fagal is
11   disappointed in your decision and he'd like you to
12   review certain aspects again, correct?
13   A.   Yeah.
14   Q.   Specifically on the last page, do you
15   see the paragraph that begins, "In light of the facts
16   above"?
17   A.   Um-hum.
18   Q.   Do you see that?
19   A.   Yes.
20   Q.   It says, "I respectfully request that
21   the committee convene to review the propriety of my
22   suspension and that it consider the issue of
23   Marywood's failure to take any remedial action prior
24   to pursuing dismissal."  Have I read that correctly?
          MAGNA LEGAL SERVICES

Page 40

1    A.   Yes.
2    Q.   And you don't remember -- did the
3    committee respond to Professor Fagal's e-mail?
4    A.   I don't remember.
5    Q.   Did you convene again to review the
6    suspension?
7    A.   I don't think so.
8    Q.   Do you know why?
9    A.   We -- no, I don't remember.  But I would
10   say that we felt as though it wasn't necessary for
11   our committee to do that.
12   Q.   There's an -- actually there's an
13   attachment to this e-mail.
14   A.   Yeah.
15   Q.   And -- on the last page.  Do you see
16   that?  It's from Sister Cabral to Professor Fagal.
17   A.   Um-hum.
18   Q.   Do you remember reading this e-mail,
19   this attachment?
20   A.   No, I don't remember this.
21   Q.   You don't?  You don't remember receiving
22   this?
23   A.   Again, I -- it's pretty obvious that --
24   no, I don't remember.  I don't remember receiving it,
          MAGNA LEGAL SERVICES

Page 41

1    but it --
2    Q.   Do you have any doubt that Gail Cabral
3    actually sent this e-mail to Professor Fagal?
4    A.   No.
5    Q.   Are you surprised she stated in the last
6    paragraph that the committee be convened twice?
7         MS. PEET:  Objection to the form.
8    A.   No.
9    Q.   Did your committee convene twice?
10   A.   No.
11   Q.   So do you think you were supposed to
12   convene twice or you don't know?
13   A.   I don't know.
14        MS. PEET:  Objection.
15   Q.   You don't know?
16   A.   No, I -- I was never under the
17   impression that we were supposed to convene twice,
18   never.
19   Q.   Nobody told your committee that they
20   should convene twice, once for suspension and once
21   for termination?
22        MS. PEET:  Objection to the form, lack
23   of foundation.  You can go ahead and answer.
24   A.   No, I don't remember.
          MAGNA LEGAL SERVICES



Page 42

```
 1        MR. COHEN:  Let's mark this as the next
 2   exhibit, please.  This is O'Brien-17.
 3        (Povse-14, E-mail chain, Bates Nos.
 4   DEF001611-615, is received and marked for
 5   identification.)
 6     Q.   Mr. Povse, why don't you review this.
 7   It's a whole chain of e-mails.  Let me know whether
 8   you recognize any of them.
 9     A.   Okay.
10     Q.   Do you remember any part of -- well,
11   first of all, this is an e-mail exchange between you
12   and the other committee members, correct?
13     A.   Um-hum.
14     Q.   And it begins on July 9, 2012, right?
15     A.   July 12th?
16     Q.   July 9th.
17     A.   Oh, okay.  Yeah.
18     Q.   And the first e-mail in the chain is
19   from you to Helen and Ed, and you say, "No surprise
20   that we heard back from Dr. Fagal."  Do you remember
21   writing that e-mail?
22     A.   No, but I'm sure I did.
23     Q.   Why was it no surprise that you heard
24   back from Dr. Fagal?
```

MAGNA LEGAL SERVICES

Page 43

```
 1     A.   Well, because of the importance of this
 2   whole decision.
 3     Q.   And then the most recent e-mail in the
 4   chain is one from you to Helen and Ed stating, "I
 5   would prefer to get together even for a short time to
 6   clarify a few things."  Do you remember --
 7     A.   I don't remember what those "few things"
 8   were.
 9     Q.   Do you even remember meeting?
10     A.   No, I don't remember.
11        MR. COHEN:  Can you mark this as the
12   next Povse exhibit, please.
13        (Povse-15, E-mail dated July 15, 2012,
14   Bates No. DEF001513, is received and marked for
15   identification.)
16     Q.   Do you recognize this document,
17   Mr. Povse?
18     A.   Yes.
19     Q.   And this is an e-mail that Helen Bittel
20   sent to Sister Munley in which you were copied,
21   right?
22     A.   Yeah.
23     Q.   On July 15, 2012?
24     A.   Yeah.
```

MAGNA LEGAL SERVICES

Page 44

```
 1     Q.   And there's a paragraph that says, "In
 2   coming to this decision, we made the following
 3   determinations," and then there's, like, five bullet
 4   points.
 5     A.   Um-hum.
 6     Q.   Do you know how you arrived at these
 7   determinations?
 8        MS. PEET:  Objection to the form.
 9     Q.   Well, let me ask you this:  Dr. Bittel
10   is essentially stating that your committee met on
11   Friday, July 13th, correct?
12     A.   Um-hum.
13        MS. PEET:  Is that a yes?
14        Is that a yes?
15     A.   Yes.  Yes, I'm sorry.  Yes.
16     Q.   And in essence, Dr. Bittel is
17   explaining, you know, the view of the committee when
18   she's writing this e-mail, right?
19     A.   Um-hum, yep.
20     Q.   So do you know how the committee arrived
21   at these bulleted determinations?
22     A.   I'm sure based on a lot of information
23   that we had and a lot of discussion.
24     Q.   Do you remember whether your committee
```

MAGNA LEGAL SERVICES

Page 45

```
 1   ever communicated with the university's own inside
 2   counsel, Maria Theresa Paterson?
 3     A.   I don't remember.  I -- I don't
 4   remember.
 5     Q.   Do you know whether they -- whether your
 6   attorney consulted with any other attorney other than
 7   possibly Will Anthony?
 8     A.   I don't think so.
 9        MR. COHEN:  I have nothing further.
10   CROSS-EXAMINATION BY MS. PEET:
11     Q.   I just have a few questions for you.
12        Mat, did anyone tell you either
13   in Marywood University or outside of Marywood
14   University how you needed to vote with reference to
15   the charges?
16     A.   No.
17     Q.   Did -- that's a no?
18     A.   No.
19     Q.   Okay.  Did anyone from Marywood or
20   outside of Marywood suggest to you the way that you
21   should vote with reference to these charges?
22     A.   No.
23     Q.   Did you feel that you needed to vote in
24   support of Sister Munley's position in order to keep
```

MAGNA LEGAL SERVICES



1  your job or to avoid any adverse consequences?
2      A.    No.
3      Q.    Did you fear that your job was in
4  jeopardy if you had voted in support -- against
5  Sister Munley?
6      A.    No.
7      Q.    Did you believe that you served
8  objectively and impartially?
9      A.    Yes.
10     Q.    Do you feel that your vote was
11  appropriate under the circumstances?
12     A.    Yes.
13     Q.    As we sit here today, do you still
14  support the way that you voted, which was to uphold
15  the suspension and termination of Dr. Fagal's
16  employment and tenure?
17     A.    Yes.  Yes.
18     Q.    You testified earlier about the
19  committee's responsibility, and in short you
20  testified that you had to review whether Dr. Fagal's
21  suspension and termination was appropriate from a
22  substantive standpoint, correct?
23     A.    Yes.
24     Q.    Was it your understanding that the

1  faculty grievance committee's responsibility was the
2  same, that is, reviewing the suspension and
3  termination but just from a procedural perspective?
4      A.    Yes.  Yes.
5      Q.    And was that your understanding at the
6  time you were selected to be on the committee?
7      A.    Yes, from what I could remember.
8      Q.    And this is four years ago, correct?
9      A.    Right.
10     Q.    If you can take a look at what has been
11  marked as Povse Exhibit 4.  You just testified that
12  it was your understanding that the faculty grievance
13  committee -- that was the one on which Erin Sadlack
14  chaired -- they reviewed from a procedural
15  perspective both the suspension and termination of
16  Dr. Fagal, correct?
17     A.    Yes.
18     Q.    If I can draw your attention to the
19  paragraph where it starts, "She explained."
20     A.    Um-hum.
21     Q.    And it reads, "Their charge was to
22  review whether" -- "their charge" being the faculty
23  grievance committee -- "was to review whether
24  procedure was properly followed, not to review the

1  substance of Sister Anne Munley's decisions to
2  suspend and later terminate."  That's not correct,
3  correct?
4      A.    Right.
5      Q.    In other words, what is stated in this
6  document is an incorrect statement, correct?
7      A.    Right.
8      Q.    Likewise, where it says, "Their
9  procedural review was limited to the charge of
10  suspension, not termination or revocation of tenure,"
11  that's also an inaccurate statement, correct?
12     A.    Um-hum.
13     Q.    Is that a yes?
14     A.    Yes.  Yes.  Sorry.
15         MS. PEET:  I have no other questions.
16         MR. COHEN:  A few more.
17         Can I see that exhibit?
18         THE WITNESS:  Yes.
19  REDIRECT EXAMINATION BY MR. COHEN:
20     Q.    A few minutes ago Ms. Peet asked you if
21  you had any fear for your job if your committee ruled
22  against President Munley, and you said no, right?
23     A.    Yeah.
24     Q.    Isn't it also true that your wife is

1  not -- she serves as a professor at Marywood but
2  she's not tenured?
3      A.    My wife is the director of the
4  galleries, so she's not a teaching member, so
5  there -- there is no such thing as tenure in those
6  positions.
7      Q.    Would it be fair to say that your wife
8  has less job security than you do, given that you're
9  tenured?
10     A.    I guess you might say that.  Actually,
11  she does her job better than I do.  She's probably
12  more valuable than I have ever been.
13     Q.    You know she's not going to see a copy
14  of this.
15     A.    She's retiring, too, so none of this
16  really matters all that much.
17     Q.    All right.  Let's go back to this
18  Povse-4 exhibit.  Now, this is minutes of one of your
19  committee's meetings, correct?
20     A.    Yes.
21     Q.    And before -- had you seen -- I might
22  have asked this before.  Had you seen these minutes
23  before today?
24     A.    I would say that I must have seen them



1   at some point in time.
2       Q.    And a minute or two ago, Ms. Peet asked
3   you about several statements that were made in these
4   minutes and asked you whether they were accurate, and
5   I think you said no.  Correct?
6       A.    Yeah.  Yes.
7       Q.    Do you have any idea how a statement
8   that wasn't accurate can nonetheless make it
9   through three committee members and wind up on this
10  document?
11          MS. PEET:  Objection to the form.
12      A.    No.  I don't know.
13          MR. COHEN:  Okay.  I have no further
14  questions.
15          MS. PEET:  I just have a couple
16  follow-ups.
17          We tend to do that.
18  RECROSS-EXAMINATION BY MS. PEET:
19      Q.    Did you ever fear that your wife's job
20  would be in jeopardy had you voted against Sister
21  Munley?
22      A.    No.
23      Q.    Did that thought of your wife's job even
24  cross your mind when you were voting whether or not

1   to uphold Sister Munley's decision?
2       A.    No.
3       Q.    As we sit here today, do you feel that
4   Sister Munley would have taken any action against
5   your wife had you voted against her?
6       A.    No.
7           MS. PEET:  No further questions.  I
8   believe you are all done.
9           (Whereupon, at 4:38 p.m., the deposition
10  of Mathew R. Povse concluded.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1                CERTIFICATE
2
3       I HEREBY CERTIFY that the witness was
4   duly sworn by me and that the deposition is a
5   true record of the testimony given by the
6   witness.
7
8
9
10          Judy A. Black
            Registered Professional Reporter
11          Dated:  July 13, 2016
12
13
14
15
16      (The foregoing certification of this
17  transcript does not apply to any reproduction
18  of the same by any means, unless under the
19  direct control and/or supervision of the
20  certifying reporter.)
21
22
23
24

1           INSTRUCTIONS TO WITNESS
2
3           Please read your deposition
4   over carefully and make any necessary
5   corrections.  You should state the reason in
6   the appropriate space on the errata sheet for
7   any corrections that are made.
8           After doing so, please sign the
9   errata sheet and date it.
10          You are signing same subject to
11  the changes you have noted on the errata sheet,
12  which will be attached to your deposition.
13          It is imperative that you
14  return the original errata sheet to the
15  deposing attorney within thirty (30) days of
16  receipt of the deposition transcript by you.
17  If you fail to do so, the deposition transcript
18  may be deemed to be accurate and may be used in
19  court.
20
21
22
23
24



Page 54

1      - - - - - -
        E R R A T A
2      - - - - - -
3      PAGE  LINE  CHANGE
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

MAGNA LEGAL SERVICES

Page 55

1          ACKNOWLEDGMENT OF DEPONENT
2
3       I, Mathew R. Povse, do hereby
certify that I have read the foregoing
4   pages and that the same is a correct
transcription of the answers given by me
5   to the questions therein propounded,
except for the corrections or changes in
6   form or substance, if any, noted in the
attached Errata Sheet.
7
8
9   Mathew R. Povse          Date
10
11
        Subscribed and sworn
12   to before me this
          day of            , 2016
13
        My commission expires:
14
15
        Notary Public
16
17
18
19
20
21
22
23
24

MAGNA LEGAL SERVICES

Page 56

1              LAWYER'S NOTES
2   PAGE  LINE
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

MAGNA LEGAL SERVICES

Page 57

1   Povse-1, Letter dated February    10
     8, 2012, with attachments,
2   Bates Nos. DEF000207-226
     Povse-2, E-mail dated May 6,     11
3   2012, with attachments, Bates
     Nos. DEF001433-442
4   Povse-3, Minutes for Ad Hoc      12
     Committee Meeting #1, May 11,
5   2012, Bates Nos. DEF001408-509
     Povse-4, Minutes for Ad Hoc      16
6   Committee Meeting #2, May 17,
     2012, Bates Nos. DEF000322-323
7   Povse-5, E-mail dated May 22,     18
     2012, with attachments, Bates
8   Nos. DEF000337-342
     Povse-6, Document, Bates Nos.    19
9   DEF000143-144
     Povse-7, E-mail chain, Bates     20
10  Nos. DEF000353-356
     Povse-8, Faculty Grievance       22
11  Committee Meeting, June 19,
     2012, Bates Nos. DEF001510-512
12  Povse-9, E-mail dated June 25,    28
     2012, Bated No. DEF000393
13  Povse-10, E-mail Bates No.        30
     DEF00245
14  Povse-12, E-mail dated July 5,    31
     2012, with attachment, Bates
15  Nos. DEF001585-590
     Povse-13, E-mail dated July 6,   38
16  2012, with attachment, Bates
     Nos. DEF001494-496
17  Povse-14, E-mail chain, Bates     42
     Nos. DEF001611-615
18  Povse-15, E-mail dated July 15,
     2012, Bates No. DEF001513
19
20
21
22
23
24

MAGNA LEGAL SERVICES



15  (Pages 54 to 57)

# Exhibit 60



**EXHIBIT**

**60**



Dr Patricia E Dunleavy <dunleavy@maryu.marywood.edu>

## Fwd: Ad Hoc committee
1 message

**Bittel, Helen** <bittel@maryu.marywood.edu>                                    Fri, Jan 9, 2015 at 11:54 AM
To: Dr Patricia E Dunleavy <dunleavy@maryu.marywood.edu>



--------- Forwarded message ----------
From: **Matthew R Povse** <povse@maryu.marywood.edu>
Date: Mon, Jun 25, 2012 at 4:20 PM
Subject: Ad Hoc committee
To: Sr Anne Munley <annemunley@maryu.marywood.edu>
Cc: Dr Helen Bittel <bittel@maryu.marywood.edu>, Dr Edward J O'Brien <obrien@maryu.marywood.edu>

Sr. Anne,

The committee met today to draft a final response to our charge which will go to Will Anthony for comments very soon. We wanted you to know now that our report is in support of your actions in this case.

Sincerely,

Matt, Helen and Ed

--
Mathew R. Povse
Chair
Art Department


--
Helen M. Bittel, Ph.D.
Associate Professor
Interim Writing Coordinator
Department of English
Marywood University
2300 Adams Ave.
Scranton, PA 18509

**Fagal v. Marywood University**                    **February 26, 2016**                    **DEF000393**

# Exhibit 61

EXHIBIT
61



Dr Patricia E Dunleavy <dunleavy@maryu.marywood.edu>

## Fwd: Feedback from Will Anthony
1 message

Bittel, Helen <bittel@maryu.marywood.edu>                          Fri, Jan 9, 2015 at 11:53 AM
To: Dr Patricia E Dunleavy <dunleavy@maryu.marywood.edu>

---------- Forwarded message ----------
From: Bittel, Helen <bittel@maryu.marywood.edu>
Date: Tue, Jun 26, 2012 at 12:24 PM
Subject: Feedback from Will Anthony
To: Matthew R Povse <povse@maryu.marywood.edu>, Dr Edward J O'Brien <obrien@maryu.marywood.edu>

Dear Matt and Ed,

I sent out our draft to Will Anthony this morning, and he called me right away with his input. ██████████████████████████████████████████

███████████████████████████ My questions to him are highlighted in blue; his verbal responses are highlighted in green.

LMK if you have any further thoughts, and I'll contact Pat after lunch about the next steps.

Best,
Helen

--
Helen M. Bittel, Ph.D.
Associate Professor and Chair
Department of English
Marywood University
2300 Adams Ave.
Scranton, PA  18509

--
Helen M. Bittel, Ph.D.
Associate Professor
Interim Writing Coordinator
Department of English
Marywood University
2300 Adams Ave.
Scranton, PA  18509

📎 statementdraft062612.docx
     19K

DEF001370

DEF001371

Faculty Senate Ad Hoc Hearing Committee (Dr. Helen Bittel, Dr. Edward O'Brien, Mr. Matthew Povse)

Review of Sister Anne Munley's Decision to Terminate the Employment and Tenure of Dr. Frederick Fagal

26 June 2012

After thorough investigation, reflection, and deliberation, we---Faculty Senate Ad Hoc Hearing Committee---are in agreement with Sister Anne Munley's decision to revoke the tenure and terminate the employment of Dr. Frederick Fagal.

A.  We acknowledge that revocation of tenure is one of the most extreme actions than an academic administrator can take and that it has very serious implications both for the individual whose employment is terminated and for the entire university community.  The traditions of academic freedom require a strong defense of the rights of tenured faculty members to speak openly, explore their work, and participate in faculty governance without fearing reprisal.  We maintain that academic freedom is the cornerstone of our work as faculty members and have, throughout our deliberations, sought to ensure that its principles are upheld, both in Dr. Fagal's case and for all Marywood faculty in years to come.  We are mindful of the potential or perceived threat to academic freedoms when a speech violation leads to revocation of tenure.  Thus in rendering our decision, we maintain that Dr. Fagal's is an extreme case and that his words and actions are not protected by the principles of academic freedom, as detailed below. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

B.  In coming to this decision, we have taken our charge very seriously, thoroughly researching the events leading to Dr. Fagal's dismissal, the Marywood *Policies and Procedures Manual (PPM)*, and relevant AAUP guidelines during our deliberations.  We believe that we gave this case the open-minded, careful consideration and thorough investigation that we would want for ourselves or for any of our colleagues. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

C.  Dr. Fagal was given the opportunity to explain his video in his meeting with Sister Anne Munley and Drs. Patricia Dunleavy and Michael Foley on 23 January 2012.  Dr. Fagal appears to have not acknowledged any errors in judgement on his part at this meeting and left little room for pursuing progressive discipline or a mediated solution to this situation.  Moreover, a procedural review has already been conducted by the Faculty Grievance Committee. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

DEF001372

D.  In rendering our decision, we carefully considered the four charges outlined by Sister Anne Munley in her Recommendation for Termination memo (8 February 2012) as well as Dr. Fagal's response to those charges (Letter to the Ad Hoc Committee, 6 May 2012).

**Charge #1: Breach of Tenure Agreement.**  The Tenure policy outlined in the *PPM* states that tenure "will be discontinued only for grave reason, which may include moral turpitude, flagrant abuse of academic freedom, or professional incompetence." We agree that Dr. Fagal's action does constitute "a flagrant abuse of academic freedom" because it includes gratuitous and malicious personal attacks well beyond the spirit and limits of academic freedom. We discuss this at greater length below, under "Charge #4"

We also agree, however, that according to the policy, these are not the only three reasons why tenure may be revoked; the wording of the policy pointedly uses the phrase "*may include*" [Italics ours] in order to allow for other rare and extreme---but very "grave"---circumstances in which an individual's actions seriously injure the community.  We are in agreement that Sister Anne Munley is justified is saying that Dr. Fagal's actions constitute such an injury. ▨▨▨▨▨▨ ▨▨▨▨▨▨▨▨▨▨▨▨▨▨

While it is difficult to precisely define what constitutes a violation of Core Values at Marywood, the egregious nature of Dr. Fagal's video parodies and their gratuitous personal attacks are, in the view of this committee, sufficiently extreme to justify the actions taken by Sister Anne Munley.

The AAUP, which fiercely opposes campus speech codes, acknowledges that "[t]he governing board and the administration have a special duty not only to set an outstanding example of tolerance but also to challenge boldly and condemn immediately serious breaches of civility." ("On Freedom of Expression and Campus Speech Codes, 10/26/06, p.38) Dr. Fagal's video, in both its general premise and in the specific insults directed at individual Executive Officers, is, in the opinion of this committee, indeed such a breach.

**Charge #2: Violation of Civil Rights Policy.**  We question whether all of the insults to Executive Officers qualify as Civil Rights violations in terms of how the Civil Rights Policy relates to specific protected groups.  However, we do think that Dr. Fagal's portrayal of Alan Levine, a Jewish man, as a Nazi officer might be interpreted as anti-Semitic, regardless of whether this was Dr. Fagal's intention.  It is, for example, analogous to portraying an African American as a Klansman in a video or document intended to insult that person.  Thus it could qualify as a violation of our Civil Rights Policy, since religion and ethnicity are protected categories.   While Dr. Fagal is correct is saying that he was not given an opportunity to respond to this point, there might have been one if he had answered Sister Anne Munley's questions on 23 January 2012.

**Charge #3: Violation of Marywood's Conditions of Computer Use Policy.**  The committee does not have sufficient information from Sister Anne Munley's complaint to adjudicate this violation, nor is determining copyright infringement within our expertise.

DEF001373

**Charge #4: Violation of Academic Freedom Policy, Professional Ethics Policy, and the University's Mission and Core Values as well as the principles of collegiality.**

As we have indicated above, under "Charge #1," we do not believe that Dr. Fagal's video is protected by academic freedom because it is neither part of an academic exercise (teaching- or research-related) nor produced and disseminated in the context of such a scholarly pursuit. Moreover, it is not informed by legitimate academic research and does not abide by the professional and scholarly standards of Dr. Fagal's discipline (or any other academic discipline). While the initial FIRE incident (the posters being taken down last fall) that sparked Dr. Fagal's anger did take place alongside and with relevance to his course (SSCI 201), this is not the case with the Jan 13 video.  Dr. Fagal has the right to protest Marywood administrator's actions, but to receive the protection of academic freedom, he would need to limit his analysis to an examination of the FIRE incident rather than bringing in personal attacks on individual Executive Officers. His critique of the Marywood administration could have been achieved without these attacks, gratuitous and malicious elements that speak to his anger but do not illuminate our understanding of the issue of free speech and constitutionality. Moreover, Dr. Fagal could have pursued his complaint through other channels and could have criticized the university's actions in appropriate ways that would be protected under academic freedom.

Joan DelFattore, author of *Knowledge in the Making: Academic Freedom and Free Speech in America's Schools and Universities*, makes a clear distinction between academic freedom and speech protected under the first amendment: "Academic freedom as a professional norm upholds the authority of the faculty as a whole to establish and maintain academic standards and to share in institutional governance. It poses no obstacle to penalizing individual faculty members for scholarly speech that is judged to be professionally incompetent, even if the First Amendment would protect the expression of those same ideas by a citizen on the street. The applications are different because the fundamental purposes are different." (*Chronicle of Higher Education*, "To Protect Academic Freedom, Look Beyond the First Amendment," 31 Oct 2010)

We agree that the videos constitute harassment of the individuals who are impugned therein and therefore agree that Dr. Fagal has violated our Professional Ethics policy (*PPM*) as well as our mission and values.

In keeping with the recommendations of the AAUP, we do not, however, think that violating principles of collegiality in itself should be a criterion for revoking tenure. (See "On Collegiality as a Criterion for Faculty Evaluation).

**Conclusion:** We believe that Sister Anne Munley's termination of Dr. Fagal's employment and tenure is an extreme decision justified by the extreme nature of Dr. Fagal's behavior; and we maintain that revocation of tenure ought to be a rare event. Tenure serves to ensure that faculty can speak their truths without reprisal, whether in the context of academic freedom or of faculty governance. This is critically important to the health of a university. However, Fagal was not operating in either of these contexts, and his video is outside the bounds of legitimate academic purpose. Moreover, Dr. Fagal's egregious violation of our core values---especially the value of respect---has caused grave and irreparable harm to our community.

Dr. Helen Bittel [too we need full titles, i.e. Associate Professor of English?] ███

Dr. Edward O'Brien

Mr. Matthew Povse

DEF001375

# Exhibit 62

Representing Management Exclusively in Workplace Law and Related Litigation

# jackson lewis

Attorneys at Law

| | | | |
|---|---|---|---|
| Jackson Lewis LLP | ALBANY, NY | DETROIT, MI | MILWAUKEE, WI | PORTLAND, OR |
| 90 State House Square | ALBUQUERQUE, NM | GREENVILLE, SC | MINNEAPOLIS, MN | PORTSMOUTH, NH |
| 8th Floor | ATLANTA, GA | HARTFORD, CT | MORRISTOWN, NJ | PROVIDENCE, RI |
| Hartford, Connecticut 06103 | BALTIMORE, MD | HOUSTON, TX | NEW ORLEANS, LA | RALEIGH-DURHAM, NC |
| Tel 860 522-0404 | BIRMINGHAM, AL | INDIANAPOLIS, IN | NEW YORK, NY | RICHMOND, VA |
| Fax 860 247-1330 | BOSTON, MA | JACKSONVILLE, FL | NORFOLK, VA | SACRAMENTO, CA |
| www.jacksonlewis.com | CHICAGO, IL | LAS VEGAS, NV | OMAHA, NE | SAN DIEGO, CA |
| | CINCINNATI, OH | LONG ISLAND, NY | ORANGE COUNTY, CA | SAN FRANCISCO, CA |
| | CLEVELAND, OH | LOS ANGELES, CA | ORLANDO, FL | SEATTLE, WA |
| | DALLAS, TX | MEMPHIS, TN | PHILADELPHIA, PA | STAMFORD, CT |
| | DENVER, CO | MIAMI, FL | PHOENIX, AZ | WASHINGTON, DC REGION |
| | | | PITTSBURGH, PA | WHITE PLAINS, NY |

MY EMAIL ADDRESS IS: ANTHONYW@JACKSONLEWIS.COM

```
┌─────────────┐
│   EXHIBIT   │
│     62      │
└─────────────┘
```

February 9, 2012

**VIA ADVANCE EMAIL**
Jonathan Z. Cohen, Esquire
Law Offices of David G. Concannon, LLC
200 Eagle Road, Suite 116
Wayne, PA 19087

Re:   Marywood University

Dear Attorney Cohen:

We reviewed your February 2, 2012 letter and write in response to same.  As explained more fully below:  1) Dr. Frederick F. Fagal breached his contract with Marywood University resulting in Sister Anne Munley's recommendation which she forwarded to him on January 23, 2012; 2) as a result of his first breach, he is not entitled to pick and choose which policies and procedures he believes will suit him best; and 3) his reprehensible conduct in depicting Marywood's President as Adolf Hitler and disseminating it to members of the Marywood community led to the University's action against Dr. Fagal, which it intends to stand by and defend should the need arise.

### Dr. Fagal Breached His Contract With Marywood

By entering into his contract with Marywood, Dr. Fagal agreed to the following which is outlined in Marywood's tenure policy:

> The commitment of a faculty member who requests tenure is as deep and binding on the faculty member as it is on the University.  Just as the conferring of tenure by the University recognizes the competence of an individual faculty member, submission to the University of an application for tenure suggests a strong acceptance by that individual of the mission, goals and objectives of the University.  The request represents a commitment to work jointly with faculty, students, administrators and staff for the growth and welfare of the University.  It is a commitment to devote one's energies to continued personal development and continued high levels of achievement as a member of the Marywood academic community.



Attorneys at Law

As you apparently are not familiar with Marywood's mission, goals and objectives, we have attached them to this letter for your review. As you will see, disseminating a message and video to the Marywood Community which uses vulgar language, depicts the University's leaders as Nazis and belittles its leaders through personal insults have no place at Marywood University. More importantly, this conduct breaches a material term of Dr. Fagal's commitment to the University as a tenured faculty member.

As a result of Dr. Fagal's breach of contract, Marywood had no further contractual obligations to him. See, e.g., Sylvester v. Southwestern Energy Prod. Co., 2009 U.S. Dist. LEXIS 101788, at *5 (M.D. Pa. 2009) (a material breach of contract by one party discharges the other party's duties); Triad Retail Partners v. Diemer, 1989 U.S. Dist. LEXIS 2406, at *9 (E.D. Pa. 1989) (the first material breach discharges the other party's remaining obligations under the contract); Widmer Engineering, Inc. v. Dufalla, 2003 PA Super 391, 837 A.2d 459, 467 (Pa. Super. 2003) (noting "settled principle of contract law: a material breach by one party to a contract entitles the non-breaching party to suspend performance").

### Marywood's President Acted Properly in Suspending Dr. Fagal and Recommending Termination

Contrary to your assertion, Marywood's President determined that Dr. Fagal's attempt to use the Nazi regime and all it stands for was extremely disturbing and demonstrated a depraved indifference to moral behavior consistent with Marywood University and the fundamental values upon which it and the Catholic church are founded. Whether you choose to view your client's actions as "satirical", comical or appropriate is of no significance to Marywood. Neither you nor your client has the responsibility for preserving Marywood's mission, values and healthy environment. See Murphy v Duquesne University of the Holy Ghost, 777 A.2d 418 (Pa. 2001) (finding that the university did not breach the terms of the faculty handbook when it terminated a tenured professor of law for "serious misconduct" after it determined he had violated its sexual harassment policy). Moreover, a tenured professor has no breach of contract claim against a university for allegedly making a wrong decision when it terminated his employment. See Murphy, 777 A.2d at 433 ("while [a professor] is free to assert in a court of law that the process of forfeiture that was afforded him did not comply with the contract terms, he is not free to demand that a jury re-consider and re-decide the merits of his termination"); Baker v. Lafayette College, 516 Pa. 291, 532 A.2d 399, 403 (Pa. 1987) ("This Court has no jurisdiction to review the factual determinations of a college's governing body unless it can be clearly demonstrated that that body violated its own procedures."); Robertson v. Drexel Univ., 2010 PA Super 22, 991 A.2d 315, 320 (Pa. Super. 2010) (private parties, including religious and educational institutions, may draft employment contracts which restrict review of professional employees' qualifications to an internal process that, if conducted in good faith, is final within the institution and precludes or prohibits review in a court of law); Shepard v. Temple Univ., 2008 PA Super 93 (Pa. Super. 2008) (where assistant professor claimed that the denial of her application for tenure constituted a breach of her employment contract with the university, the court concluded that the decision regarding the assistant professor's tenure was not a proper judicial function since the evaluation of her suitability to the university's educational needs, goals, and philosophies necessarily involved many subjective, nonquantifiable factors, which were best performed by the university and not judges). Accordingly, your client has neither a claim for breach of contract nor a claim that will result in a second-guessing of Marywood's decision.



Attorneys at Law

### Dr. Fagal Waived His Right to a Review of the President's Recommendation

You appear to have advised your client to waive his right to have a review of Sister Anne Munley's recommendation prior to her finalizing it. That certainly is your client's prerogative to do so, but Marywood will provide that opportunity one last time. Enclosed is a revised Statement of Charges which you requested. While Marywood does not believe this revised statement is necessary, in the spirit of cooperation, it will provide it as requested. Marywood will forward it to your client as well.

Should your client choose to seek a review of the President's recommendation, you will not be a part of the process other than as an outside advisor to your client. It is a closed process and will remain that way.

Finally, rest assured that Marywood University intends to vigorously defend itself against this significant assault on its Mission, Core Values and guiding principles.

Should you have any questions, please contact me.

Very truly yours,
JACKSON LEWIS LLP

William J. Anthony

WJA/amj

cc:    Stephanie Peet, Esq.

FFF000165

# Exhibit 63



EXHIBIT

63

May 17.  Notes from phone conversation with Pat, 10:30a



3)  Pat thought that asking Erin about the scope of the FGA's work sounded reasonable but again stressed that we needed to be an "independent review" and come to our decision independently from the administration and from the FGA.

4)  Pat said that the AAUP policy is meant to be guiding  but not set in stone/binding

5)  Pat and I talked about the progressive discipline policy and the fact that "remediation" is discussed in ways most applicable to an employee's personal problem (e.g. addiction)  From an HR perspective, it is possible to have remedial steps (i.e. verbal and written warnings) for other kinds of disciplinary situations (inappropriate behavior, attendance, sloppy performance). However, within the context of HR, a warning system does not necessarily always apply, even if you have such a policy in place; extreme circumstances may call for an override. [If someone has an absentee problem, the warning system applies, but if they show up to work pointing a gun, they don't get off with a warning.]

**Notes from WJA Phone Conversation, 2:05, 5/17**





# Exhibit 64

EXHIBIT

64

Talking Points re Fagal's Videos:
- Sr. Anne conducts meeting, Mike Foley in attendance, Pat Dunleavy notetaker
- Mission/Values - framework
- What was Fagal's purpose in doing what he did?
- Who did Fagal send the link to?
- What does Fagal want?
- (Not necessary to do anything but gather information at this point; actions can follow meeting)
- University's position and actions to be taken will be based on several policies
- Key points that Fagal has violated by his actions:
  - Tenure Policy
    - Strong acceptance by the individual of the mission, goals and objectives of the University
    - Commitment to work jointly...for the growth and welfare of the University
  - Civil Rights Policy
    - Marywood does not condone and will not tolerate discrimination, harassment, or assault by any member of the Marywood community upon another individual...
  - Academic Freedom Policy
    - Commitment to the tradition of higher learning that is the heritage of both the Roman Catholic Church and the nation
    - Grounded on respect for truth, social responsibility and individual rights
    - Presupposes personal integrity in dealing with...peers and officers of the University
    - Presumes commitment to the stated mission of the University
    - Faculty have a responsibility as professional scholars to be accurate and judicious in their public statements, and respectful of the opinions and responsibilities of others.
  - Professional Ethics Policy
    - Faculty practice intellectual honesty
    - Faculty hold before them the best scholarly and ethical standards of their discipline
    - Professors do not discriminate against or harass colleagues.
    - Professors show due respect for the opinions of others
  - Progressive Discipline Policy
    - Corrective, not punitive
    - Policy recognizes...serious violations of professional responsibilities implicating possible recommendations for suspension or dismissal.
    - Policy...designed to accomplish (identify problem, resolve, prevent repetition) by a series of gradual steps involving strategies such as personal conferences, oral and written warnings...
    - Written Warning – VPAA conducts investigation, warning follows where circumstances indicate that the problem is not resolved.
    - Suspension – by VPAA at any time during proceedings; justified if immediate harm to the faculty member or others is threatened by the person's continuance in the position.
    - Dismissal – if remedial actions taken during suspension don't resolve issues
    - Appeal process – faculty committee of 3; recommends to President

# Exhibit 65

EXHIBIT
65

DEPOSITION
EXHIBIT
LEVINE-8
9/6/16
PENGAD 800-631-6989



**From:**      Patricia Dunleavy [dunleavy@maryu.marywood.edu]
**Sent:**       Sunday, January 22, 2012 1:04:26 PM
**To:**          Dr Alan Levine
**Subject:**   Re: Monday Morning

Oh yes, very.  He may be wondering why he's heard nothing yet.  Save the message, or at least keep a record of the date and time and content written down.

Tomorrow should be interesting,

Pat

Sent from my iPhone

On Jan 21, 2012, at 10:33 PM, Dr Alan Levine <levine@maryu.marywood.edu> wrote:

> Pat,
>
> Interesting piece of info.  Fred Fagal called me at home this afternoon.  I have the one of those phones that lets me know who is calling so I decided to see if he would leave a message.  He did.  Asked me to give him a call to speak "off the record" if I wanted.
>
> I decided not to; at this point I don't trust "off the record", since it may really mean nothing, except when talking to the press.
>
> Interesting, eh!
>
> Alan
>
>
> Alan M. Levine, PhD
> Vice President for
>    Academic Affairs
> Marywood University
> 2300 Adams Ave
> Scranton, PA  18509
> (t) 570 348-6290
> (f) 570 961-4743
> e-mail: levine@marywood.edu
>
>
>
>
> On Sat, Jan 21, 2012 at 3:24 PM, Patricia Dunleavy <dunleavy@marywood.edu> wrote:
>> Thanks Alan, this sounds good.  Dave will be at Marywood early as well, I spoke to him late yesterday.  Sounds like weather may get in the way - I heard ice overnight to rain.  We'll hope for the best,
>>
>> Pat
>>
>> On Fri, Jan 20, 2012 at 5:09 PM, Dr Alan Levine <levine@maryu.marywood.edu> wrote:

EXHIBIT
Dunleavy 6
8/11/16      KJ
PENGAD 800-631-6989



**DEF002759**

Pat and Mike,

I just finished chatting with Sr. Anne about our plans for Monday morning. Just to make sure we are all on the same page, this is what we envision.

Mike - at about 8:45 you will go down to Fred's office to let him know that Sr. Anne would like to meet with him at 9 in her office. You do not have to accompany him to the meeting, but if he says he is available, you should then go directly to Sr. Anne's office to be "stationed" in the correct place. If Fred is unable to meet at 9, please ask him to meet at 10, and if not that 11, and if not that noon. Please get a commitment from Fred as to the time he can meet. Also, please let Sr. Anne know when the meeting will take place, as she has a number of other things that need to be completed that morning.

Pat - as I understand it, you will be in Sr. Anne's office a few minutes before the meeting, also to be correctly "stationed". I believe that you will make the necessary arrangement with Dave Elliot, after finding out what time the meeting will take place, although it seems that we should anticipate a 9 AM meeting until told differently.

Possibly the two of you should communicate with each other earlier in the morning just to make sure that you agree on how this will play out.

I think that does it. Please feel free to contact me over the weekend if any questions arise. I plan to be at Marywood no later than 8:30 on Monday morning.

Thanks

Alan

Alan M. Levine, PhD
Vice President for
    Academic Affairs
Marywood University
2300 Adams Ave
Scranton, PA  18509
(t) 570 348-6290
(f) 570 961-4743
e-mail: levine@marywood.edu

--
Patricia E. Dunleavy, Ph.D.
Assistant Vice President for Human Resources
Marywood University
2300 Adams Avenue
Scranton PA 18509
dunleavy@marywood.edu
570-348-6220 phone
570-961-4740 fax

DEF002760

# Exhibit 66



**EXHIBIT 66**

Representing Management Exclusively in Workplace Law and Related Litigation

Jackson Lewis P.C.
Three Parkway
1601 Cherry Street, Suite 1350
Philadelphia, PA 19102-1317
Tel 267 319-7802
Fax 215 399-2249
www.jacksonlewis.com

Attorneys at Law

| | | |
|---|---|---|
| ALBANY, NY | GREENVILLE, SC | MONMOUTH COUNTY, NJ | RALEIGH, NC |
| ALBUQUERQUE, NM | HARTFORD, CT | MORRISTOWN, NJ | RAPID CITY, SD |
| ATLANTA, GA | HONOLULU, HI* | NEW ORLEANS, LA | RICHMOND, VA |
| AUSTIN, TX | HOUSTON, TX | NEW YORK, NY | SACRAMENTO, CA |
| BALTIMORE, MD | INDIANAPOLIS, IN | NORFOLK, VA | SALT LAKE CITY, UT |
| BIRMINGHAM, AL | JACKSONVILLE, FL | OMAHA, NE | SAN DIEGO, CA |
| BOSTON, MA | KANSAS CITY REGION | ORANGE COUNTY, CA | SAN FRANCISCO, CA |
| CHICAGO, IL | LAS VEGAS, NV | ORLANDO, FL | SAN JUAN, PR |
| CINCINNATI, OH | LONG ISLAND, NY | PHILADELPHIA, PA | SEATTLE, WA |
| CLEVELAND, OH | LOS ANGELES, CA | PHOENIX, AZ | ST. LOUIS, MO |
| DALLAS, TX | MADISON, WI | PITTSBURGH, PA | STAMFORD, CT |
| DAYTON, OH | MEMPHIS, TN | PORTLAND, OR | TAMPA, FL |
| DENVER, CO | MIAMI, FL | PORTSMOUTH, NH | WASHINGTON, DC REGION |
| DETROIT, MI | MILWAUKEE, WI | PROVIDENCE, RI | WHITE PLAINS, NY |
| GRAND RAPIDS, MI | MINNEAPOLIS, MN | | |

*through an affiliation with Jackson Lewis P.C., a Law Corporation

STEPHANIE J. PEET
E-MAIL ADDRESS: STEPHANIE.PEET@JACKSONLEWIS.COM

September 1, 2016

**VIA FIRST CLASS MAIL AND EMAIL**
Jonathan Z. Cohen, Esquire
JONATHAN Z. COHEN LTD.
175 Strafford Avenue
Suite 1 PMB 212
Wayne, PA 19087-3340

   **RE:**  **Fagal v. Marywood University**
       **U.S. District Court, MDPA; Case No.:  3:14-cv-02404-ARC**

Dear Jonathan:

   Please accept this letter in response to your correspondence of August 25, 2016.  To address your first point, and as you were previously advised, Defendant is preparing a privilege log which outlines the various redactions in its document production and the reasons that DEF001359-DEF001628 have been withheld.  We apologize for the delay in providing this log to you. Unfortunately, due to the voluminous production, as well as issues with our e-discovery vendor, preparing the privilege log has taken significantly longer than expected.  We are enclosing the privilege log as it currently stands.  This version will be supplemented once complete. As the final version of the privilege log will be lengthy, we have no objection to requesting an extension if you find one necessary, and we are amenable to making a joint request to the court.

   In addition to the privilege log, please find redacted versions of DEF001370-71, DEF001372-75, DEF001376, DEF001377, DEF001380-82, DEF001384-86, DEF001387-88 and DEF001429-31, which were mistakenly withheld.  Please note that other than DEF001370-71 and DEF001429-31, all of these documents have already been produced to you in their redacted form as reflected in the chart below.

| Previously Withheld: | Later Produced As: |
|---|---|
| DEF001372-75 | DEF000396-400; DEF000407-411 |
| DEF001376 | DEF002819; DEF002827 |
| DEF001377 | DEF002819; DEF002823 |
| DEF001380-82 | DEF002795 |
| DEF001384-86 | DEF002792-DEF002794 |
| DEF001387-88 | DEF002799 |



Jonathan Z. Cohen, Esquire
JONATHAN Z. COHEN LTD.
September 1, 2016
Page | 2

Second, regarding your assertion that Defendant's discovery responses are deficient, Defendant maintains that it provided detailed answers to Plaintiff's interrogatories and fully responsive documents to Plaintiff's requests to produce, where appropriate, and that any objections they raised to Plaintiff's discovery demands were also appropriate. Nevertheless, in a good faith effort to address your concerns, we have reviewed your letter and provide the following responses.

**Interrogatory No. 3**
Prior to January 23, 2012, Defendant did not provide Professor Fagal with an oral warning, written warning, or any opportunity for monitored assistance relating to the e-mail and videos referenced in Paragraph Nos. 23 and 24 of the Amended Complaint.

**Interrogatory Nos. 13 and 14**
Defendant maintains that its objections to these interrogatories were proper.   Any correspondence between an attorney or representative of Jackson Lewis P.C. with members of Marywood's Faculty Grievance Committee or Faculty Senate Ad Hoc Hearing Committee are protected by attorney-client privilege and/or work-product doctrine.   To the extent that these interrogatories seek attorney work-product, the request is clearly improper.   However, William J. Anthony of Jackson Lewis P.C. spoke to Helen Bittel.

**Interrogatory No. 15 and Document Request No. 1**
Defendant maintains that its objections to these requests were proper. Providing the exact times and dates that each word processing file or Google Docs file used to generate President Munley's letter to Plaintiff dated January 24, 2012 was first created and last modified remains irrelevant. The date the termination letter was created is not germane given the fact that there is no dispute that 1) Dr. Munley recommended Plaintiff's termination by letter dated January 24, 2012 and 2) that Plaintiff was ultimately terminated.

Finally, to follow up on our August 12, 2016 letter regarding privileged documents which were inadvertently produced, attached please find redacted versions of DEF000280, DEF000396-400 and DEF000407-411.  If you wish to discuss any of these issues, please contact us at your earliest convenience.

Sincerely,

**JACKSON LEWIS P.C.**

Stephanie J. Peet
Asima J. Ahmad

Enclosures

4814-2509-6757, v. 1

# Exhibit 67



**EXHIBIT**

**67**



MARYWOOD UNIVERSITY
SCRANTON, PA 18509-1598
TEL: (570) 348-6231
FAX: (570) 340-6014
EMAIL: ANNEMUNLEY@MARYWOOD.EDU
www.marywood.edu



**Marywood**
UNIVERSITY

OFFICE OF THE PRESIDENT

April 3, 2012

Dr. Frederick F. Fagal, Jr.
17 East Lake Street
Skaneateles, NY 13152

Dear Dr. Fagal,

I have received your letter dated March 29, 2012. You chose to file a grievance under the Marywood University Faculty Grievance and Appeals Policy and chose not to convene an ad hoc committee to review my recommendation as I had offered to you on two occasions. The Faculty Grievance Committee reviewed your grievance and found no evidence of improper action on my part which would constitute a legitimate grievance.

Since the grievance process is now complete, I have decided to finalize my recommendation. As a result, your employment with Marywood and your tenure are terminated effective today, April 3, 2012.

Further, to provide you with a review of my decision, I will consider your letter dated March 29, 2012 as your authorization for me to convene two faculty ad hoc committees to appeal my decisions to suspend you and to terminate your employment and tenure. I am doing this despite the fact that on two separate occasions you refused my offer and did not choose to convene an ad hoc committee to review my decision to suspend you and my recommendation to terminate your employment and tenure before I finalized my decision.

According to the terms of the Progressive Discipline Policy, you must now select a tenured faculty member for the ad hoc committee. Please submit the name of your selection to Sr. Gail Cabral, President of the Faculty Senate, as soon as possible.

Sincerely,

*Sister Anne Munley IHM*

Sister Anne Munley, IHM
President

*An education inspired by the Sisters, Servants of the Immaculate Heart of Mary.*

# Exhibit 68

Case 3:14-cv-02404-ARC   Document 85-7   Filed 03/03/16   Page 69 of 111

EXHIBIT
68



1/9/2015                    Marywood University Gmail Mail - Fwd: Around this afternoon?



Dr Patricia E Dunleavy <dunleavy@maryu.marywood.edu>

## Fwd: Around this afternoon?
1 message

**Bittel, Helen** <bittel@maryu.marywood.edu>                    Fri, Jan 9, 2015 at 12:02 PM
To: Dr Patricia E Dunleavy <dunleavy@maryu.marywood.edu>

---------- Forwarded message ----------
From: **Bittel, Helen** <bittel@maryu.marywood.edu>
Date: Thu, May 17, 2012 at 11:15 AM
Subject: Around this afternoon?
To: Dr Erin A Sadlack <easadlack@maryu.marywood.edu>

Hi Erin,

Just wanted to confirm, per our conversation yesterday, that you are around this afternoon and would be willing
to speak to the ad hoc committee. Pat talked to the attorney, and there is nothing in the policy that would
prevent us from speaking to you, though we (the AHC) need to discern what we could and couldn't ask without
compromising the independence of our investigation. Pat did agree with me that, at the very least, we could ask
about the scope of your investigation (and how you understood the charge of your committee)—and I think that
would be enormously helpful.

I have a call in to the attorney to get a little more detail from him. But tentatively, are you free around 2:30ish?

Thanks,
Helen

--

Helen M. Bittel, Ph.D.
Associate Professor and Chair
Department of English
Marywood University
2300 Adams Ave.
Scranton, PA  18509

--

Helen M. Bittel, Ph.D.
Associate Professor
Interim Writing Coordinator
Department of English
Marywood University
2300 Adams Ave.
Scranton, PA  18509

Fagal v. Marywood University          February 26, 2016          DEF000317

# Exhibit 69

LAW OFFICES *of*

# DAVID G. CONCANNON, LLC

EXHIBIT

69

February 28, 2012

<u>Via E-Mail</u>

William J. Anthony, Esquire
Jackson Lewis LLP
90 State House Square, 8th Floor
Hartford, Connecticut 01603

    **Re:**   Marywood University / Dr. Frederick F. Fagal, Jr.

Dear Mr. Anthony:

    This letter is to inform Marywood University that Dr. Fagal has removed from YouTube the two-part video referenced in President Munley's letters of January 24 and February 8, 2012 and your letter of February 9, 2012.  The video is no longer accessible on the internet to Dr. Fagal's knowledge.  In the event that Marywood requires an "offline" copy of the video, please let me know.

    Please note that Dr. Fagal does not admit any of the charges or allegations—formal or informal—lodged against him in any of the above-referenced letters.  The video has been removed from YouTube as a gesture of good faith.

    Sincerely,

*Jonathan Cohen*

    Jonathan Z. Cohen, Esquire

FFF001748

# Exhibit 70

EXHIBIT

**70**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FREDERICK F. FAGAL, JR.,                :
                                        :
        *Plaintiff,*                    :
                                        :        CIVIL ACTION
        v.                              :
                                        :        NO. 3:14-cv-02404-ARC
MARYWOOD UNIVERSITY,                    :
                                        :        (JUDGE CAPUTO)
        *Defendant.*                    :
                                        :        ORAL ARGUMENT REQUESTED

## STATEMENT OF MATERIAL FACTS IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT BY PLAINTIFF

JONATHAN Z. COHEN LTD.
Jonathan Z. Cohen, Esq.
175 Strafford Avenue
Suite 1 # 212
Wayne, PA 19087-3340
(215) 874-0047
(215) 839-8951 (fax)
jzc@jzc-law.com

*Attorney for Plaintiff*

Plaintiff Frederick F. Fagal, Jr. ("Fagal") hereby submits this Statement of Material Facts in Support of his Motion for Summary Judgment.

1.     Fagal is a natural person residing in New York State, and he intends to remain there indefinitely. *See* Ex. 1 at 1 (¶ 2); Ex. 2 at 1 (¶ 2); Ex. 3 at 14:13-19; Ex. 12.

2.     Fagal earned a bachelor's degree in 1968 from Union College in Schenectady, NY, a Master's degree in Economics from Cornell University in 1971, and a Ph.D. in Social Studies Education from Syracuse University in 1981. *See* Ex. 3 at 19:18-22:5; Ex. 12.

3.     Defendant Marywood University ("Marywood" or the "University") is a university and a Pennsylvania domestic non-profit corporation located in Scranton, PA. *See* Ex. 1 at 1 (¶ 1); Ex. 2 at 1 (¶ 1).

4.     Fagal became a member of Marywood's faculty in the fall semester of 1987. *See* Ex. 1 at 2 (¶ 4); Ex. 2 at 1 (¶ 4); Ex. 12.

5.     Fagal attained tenure at Marywood in September 1994. *See* Ex. 1 at 2 (¶ 5); Ex. 2 at 2 (¶ 5); Ex. 12.

2

**6.** Marywood terminated Fagal's tenure and employment on April 3, 2012. *See* Ex. 1 at 2 (¶ 6); Ex. 2 at 2 (¶ 6); Ex. 12.

**7.** In 1992, Fagal signed an "Agreement and Appointment for Full-Time Faculty." *See* Ex. 1 at 3 (¶ 10); Ex. 2 at 2 (¶ 10); Ex. 4; Ex. 12. This document states that "[t]he policies and practices listed in the Faculty Manual are agreed upon by the parties hereto." *See* Ex. 1 at 3 (¶ 10); Ex. 4.

**8.** Fagal and Marywood entered into written agreements for him to serve on the University's full-time faculty for each year between 1992 and 2012. *See* Ex. 1 at 3 (¶ 12); Ex. 2 at 2 (¶ 12); Ex. 12. The agreement that the parties entered into for the 2010-2011 academic year is attached as Exhibit 39. *See* Ex. 12; Ex. 39.

**9.** As of July 1, 2003, Marywood had a written policy titled "Non-reappointment of Faculty Member." *See* Ex. 52. That policy states: "Non-reappointment of a faculty member is the right of the President of Marywood University, so long as there is no violation of tenure policies, contractual agreements, or other policies stated in the Faculty Handbook." Ex. 52 at FFF001445.

3

**10.** As of February 24, 2006, Marywood had a written policy titled "Employment At-will Relationship with Administrators and Staff." *See* Ex. 51. That policy stated, in part: "Some jobs require a contractual relationship with the University, and they have a fixed term of employment." Ex. 51 at FFF001199. The policy distinguishes between those jobs requiring a "contractual relationship" and others that were deemed to be "at-will." *See* Ex. 51.

**11.** On July 1, 2010, Marywood issued an edition of its Faculty Handbook. *See* Ex. 1 at 3 (¶ 14); Ex. 2 at 3 (¶ 14). A copy of that Faculty Handbook produced by Marywood in discovery is attached as Exhibits 5(a) and 5(b). *See* Ex. 5(a); Ex. 5(b). The third page of that Faculty Handbook states: "This handbook is effective with the 2010-2011 faculty letters of agreement." Ex. 5(a) at DEF3458. The fourth page states, in part: "Policy changes require the approval of the President of the University and, when required, the Board of Trustees. Changes are disseminated by the Secretary of the University. They are effective with formal approval and placement in the Marywood University Policies and Procedures Manual." Ex. 5(a) at DEF3460.

4

**12.** On February 18, 2011, Marywood's president, Sr. Anne Munley, IHM, Ph.D. ("Munley"), approved a revision of the University's "Contractual Agreements with Faculty Members" policy. *See* Ex. 7. That policy stated that a "Letter of Agreement" is a "binding contract covering a specific period of time and as a vehicle to renew, adjust and/or alter the terms of the original contract regarding appointment, rank, tenure, salary, benefits, etc." Ex. 7. The same policy also stated: "Tenure is a term designating guaranteed continuous appointment to full-time faculty members until retirement." Ex. 7.

**13.** On April 29, 2011, Munley approved a revision to the University's "Faculty Grievances and Appeals" policy. *See* Ex. 29. That policy stated that "[g]rievants will not be adversely affected for exercising their right to file a grievance, regardless of outcome" and that "[g]rievants will not be subject to adverse consequences for either initiating a grievance or in presenting evidence on behalf of a grievant." Ex. 29 at FFF000113. It also stated: "Procedures regarding dismissal, suspension, and sanctions of faculty members are in the *Progressive Discipline* policy." Ex. 29 at FFF000109-FFF000110.

**14.** Also on April 29, 2011, Munley approved a revision to the University's "Violent Acts and Threats" policy, which is attached as Exhibit 53. *See* Ex. 53. That policy obviously addresses acts of violence, including "aggravated assault." Ex. 53 at FFF001460. It further states that "a Marywood University student, faculty, or staff member in violation of this policy will be subject to University disciplinary policies and procedures up to and including termination." Ex. 53 at FFF001460.

**15.** In May 2011, Fagal and Munley signed the "Letter of Agreement" attached as Exhibit 6. *See* Ex. 1 at 4 (¶ 15); Ex. 2 at 3 (¶ 15); Ex. 6. That document states that Fagal would serve as a tenured Associate Professor from August 22, 2011 to May 18, 2012 and earn a salary of $76,196.00.

**16.** Beginning on October 12, 2011, Marywood had the "Progressive Discipline" policy attached as Exhibit E to the Amended Complaint. *See* Ex. 1 at 7-8 (¶ 28) and Ex. E (ECF No. 7-4); Ex. 2 at 5 (¶ 28). That policy was not revised again until May 7, 2014. *See* Ex. 26.

**17.** The "Progressive Discipline" policy effective on October 12, 2011 stated, in part:

> Marywood University endorses a progressive
> discipline policy designed to promote resolution in a

6

fair and orderly manner. This policy applies to all faculty members with tenure or whose terms of appointment have not yet expired. Its objectives support the collegial relationships at Marywood University and are directed toward continual institutional improvement. Because the University regards disciplinary action as corrective and not punitive, the policy recognizes personal and professional problems that may be rectified by an informal educational process, as well as serious violations of professional responsibilities implicating possible recommendation for suspension or dismissal.

The policy is intended to provide an effective and flexible means of identifying problem areas, resolving complaints, and preventing repetitive incidents by prompt intervention and assistance. It is designed to accomplish these ends by a series of gradual steps involving strategies such as personal conferences, oral and written warnings, and opportunities for monitored assistance where applicable.

....

***Suspension.*** The faculty member may be suspended by the Vice President for Academic Affairs at any time during the proceedings involving him or her. Suspension is justified if immediate harm to the faculty member or others is threatened by the person's continuance in the faculty position.

....

***Dismissal***

If remedial actions(s) taken during the suspension does not sufficiently resolve the issues that lead to

the suspension, the university may move towards dismissal of the faculty member.

### Ad Hoc Faculty Committee

Faculty members have the right to convene an ad hoc committee in order to appeal either a decision to suspend the faculty member or a decision to dismiss the faculty member.

- Having received a written recommendation for either suspension or dismissal from the Vice President for Academic Affairs, the President of the University sends a written communication to the faculty member, stating with reasonable particularity the basis for suspension or dismissal and offering, if requested by the faculty member within 10 days, to convene a tenured faculty ad hoc committee to consider the matter, to render confidential advice, and thereby to effect a remedy if possible.
- Should the faculty member request a review by an ad hoc committee, it shall consist of three members selected in the following order: (a) one tenured faculty member selected by the person seeking assistance, and (2) two tenured faculty members selected by the Executive Council of the Faculty Senate. The choice of members should be on the basis of their objectivity and competence and of the regard in which they are held in the academic community. The President of the University or his/her delegate has the option of attending the meetings of the Committee. Should a faculty member request that such a committee be convened twice (i.e., once for suspension and once for dismissal), the membership of the committee may be similar or different, a determination which is made by the

8

President of the University in consultation with the faculty member and the Vice President for Academic Affairs. Normally the committee would make its recommendation within 30 days of being convened.

- The Committee elects its own Chair, who sends the opinion of the committee in writing to the President of the University, copied to the faculty member and to the Vice President for Academic Affairs. If the opinion of the Faculty Committee is that the matter is successfully resolved or that there is no merit to the complaint, a recommendation shall be made to discontinue proceedings. If the problem has not been corrected and reason still exists to question the fitness of the faculty member, the recommendation shall be to either continue a suspension or initiate a formal action toward dismissal.

Ex. 1 at 7-8 (¶ 28) and Ex. E (ECF No. 7-4); Ex. 2 at 5 (¶ 28). The

"Progressive Discipline" policy does not list any explicit exceptions. *See* Ex.

1 at Ex. E.

**18.** Marywood does not contend that Fagal was an at-will employee

at any time between November 1, 2011 and August 31, 2012. *See* Ex. 8 at

3.

**19.** In November 2011, Fagal scheduled a speaker from the

Foundation for Individual Rights in Education ("FIRE") to speak at the

9

University in connection with one of his courses. *See* Ex. 1 at 5 (¶ 18); Ex.

2 at 3 (¶ 18).

**20.** Fagal paid for the FIRE speaker. *See* Ex. 12.

**21.** The topic of the FIRE presentation was "Know Your Rights:

Free Speech and Thought Reform on Campus," which was related to

Fagal's teaching of the U.S. Constitution. *See* Ex. 3 at 57:24-58:10; Ex. 12.

**22.** Fagal received approval from Marywood to hang posters

announcing the FIRE speaker. *See* Ex. 1 at 5 (¶ 19); Ex. 2 at 4 (¶ 19).

Fagal paid for these posters. *See* Ex. 12.

**23.** Subsequently, Marywood personnel removed at least some of

Fagal's posters. *See* Ex. 1 at 5 (¶ 20); Ex. 2 at 4 (¶ 20); Ex. 3 at 84:5-85:7,

86:23-87:3, 113:6-114:5, 120:11-12; Ex. 43 at 51:7-8, 51:24-52:18.

Marywood did not provide any notice to Fagal before or after the FIRE

posters were torn down. *See* Ex. 12.

**24.** Fagal attempted to secure an apology by Marywood as well as

reimbursement for the posters that were removed, but Marywood refused

these requests. *See* Ex. 3 at 99:20-23; Ex. 12.

**25.** On December 9, 2011, Marywood approved a new version of

its "Tenure" policy. *See* Ex. 13. The policy stated:

10

> Tenure is a term designating permanent and continuous appointment for a full-time faculty member. It implies a mutual commitment on the part of the faculty member and the University and cannot be taken lightly. Once tenure is granted, it will be discontinued only for grave reason, which may include moral turpitude, flagrant abuse of academic freedom, or professional incompetence.

Ex. 13.

26.     On January 13, 2012, Fagal sent an email from his personal email address to Marywood faculty members about the removal of his posters. *See* Ex. 1 at 6 (¶ 23); Ex. 2 at 4 (¶ 23); Ex. 9; Ex. 12. In the email, Fagal criticized the Marywood administration for removing his posters and for its weak commitment to free speech generally. *See* Ex. 1 at 6 (¶ 23); Ex. 2 at 4 (¶ 23); Ex. 9; Ex. 12.

27.     Fagal's January 13, 2012 email also contained hyperlinks to two related videos criticizing Munley and several other administrators for ordering or participating in the poster removals and again for a weak commitment to free speech. *See* Ex. 1 at 6 (¶ 24); Ex. 2 at 4 (¶ 24); Ex. 12.

28.     A copy of the first video can be found on the DVD-R at Exhibit 10. *See* Ex. 10; Ex. 12. A copy of the second video can be found on the DVD-R at Exhibit 11. *See* Ex. 11; Ex. 12. At no time did anybody at

11

Marywood ask Fagal to remove the videos from YouTube. *See* Ex. 12.

However, Fagal did so by February 28, 2012. *See* Ex. 12; Ex. 63.

**29.** Fagal's two videos are adaptations of scenes in *Downfall*, a 2004 German-language movie depicting the last days of Adolf Hitler's rule. *See* Ex. 10; Ex. 11; Ex. 17. Specifically, the scenes adapted by Fagal show actor Bruno Ganz (playing Hitler) chastising several other actors (playing Hitler's lieutenants) over setbacks suffered by the Nazis during World War II. *See* Ex. 10; Ex. 11; Ex. 17 at 40:32-44:29 and 126:15-129:13.[1] Fagal replaced the English subtitles appearing in these *Downfall* scenes with his own subtitles satirizing the Marywood administration's conduct surrounding the FIRE speaker. *See* Ex. 10; Ex. 11; Ex. 12; Ex. 17 at 40:32-44:29 and 126:15-129:13.

**30.** References to *Downfall* parodies have appeared in *BBC News Magazine*, *The Telegraph*, *The Atlantic*, and the *New York Times*. *See* Ex. 12; Ex. 18; Ex. 19; Ex. 20; Ex. 21; Ex. 22.

**31.** "Downfall" parodies are very popular on YouTube. *See* Ex. 3 at 161:9-24. Examples of other "Downfall" parodies appearing on YouTube

---

[1] The citations corresponding to Exhibit 17 are in the form of minutes:seconds on the DVD.

include: a parody in which NFL Commissioner Roger Goodell (depicted as Ganz's Hitler) is upset upon learning that the New England Patriots continue to win games despite the suspension of quarterback Tom Brady (Exhibit 23); a parody regarding the sub-prime crisis (Exhibit 24); and a parody in which New York Commissioner of Education John King (depicted as Ganz's Hitler) is upset about complaints regarding the Common Core and standardized testing (Exhibit 25). *See* Ex. 12.[2]

**32.** On January 17, 2012, Munley received an email from Alan M. Levine, Ph.D., Marywood's Vice President for Academic Affairs, informing her about Fagal's January 13, 2012 email and videos. *See* Ex. 33 at 42:22-43:16; Ex. 54 at DEF002418. This was the first time that Munley was made aware of Fagal's January 13, 2012 email and videos. *See* Ex. 33 at 43:10-

---

[2] Plaintiff believes that Exhibits 10, 11, 17, and 23-25—if they are copyrighted works—constitute fair use in this litigation. *See* 17 U.S.C. § 107; *Bond v. Blum*, 317 F.3d 385, 394-95 (4th Cir. 2003) (use of entire copyrighted work for its evidentiary value in a child-custody proceeding fell within the scope of fair use); *Denison v. Larkin*, 64 F. Supp. 3d 1127, 1133 (N.D. Ill. 2014) ("The House Committee on the Judiciary explicitly listed 'reproduction of a work in legislative or judicial proceedings or reports' as an example of a fair use") (quoting H.R. Rep. No. 94-1476, 65 (1976)); *Stern v. Does*, 978 F. Supp. 2d 1031, 1047-48 (CD. Cal. 2011) ("Reproduction of copyrighted material in litigation or potential litigation is generally fair use...."); *Healthcare Advocates, Inc. v. Harding, Earley, Follmer & Frailey*, 497 F. Supp. 2d 627, 638, 2007 WL 2085358 (E.D. Pa. 2007).

15. Munley testified that "suspension was the first thing on my mind." Ex. 33 at 48:4. Before discussing the January 13, 2012 email and videos with Fagal, Munley "had come to the conclusion that this was – this is something for which the individual concerned should be suspended." Ex. 33 at 62:16-22.

**33.** When Plaintiff's counsel asked Munley whether it occurred to her that Fagal had become a physical threat to himself or others, she testified: "I don't recall thinking about that in the way in which you're asking the question." Ex. 33 at 53:22-54:2.

**34.** Before meeting with Fagal to discuss his email and videos, Munley and Marywood's Vice President for Human Resources, Patricia E. Dunleavy, Ph.D. ("Dunleavy"), worked together to create a typewritten list of "talking points." *See* Ex. 33 at 69:5-70:21; Ex. 40 at 21:2-16; Ex. 55; Ex. 59. Leading up to that meeting, it was Munley's plan to suspend Fagal regardless of what was said at the meeting. *See* Ex. 33 at 73:12-74:7, 75:24-76:8, 77:6-12; Ex. 55 at DEF002898; Ex. 59 at DEF000147.

**35.** Munley's "talking points" contain a bullet point titled "Post-Suspension." Ex. 55 at DEF002898. Directly beneath that bullet point is a

14

sub-bullet point stating: "Sister recommends termination and prepares notice of charges." *Id.*

**36.** To Dunleavy's knowledge, Levine had no input into the "talking points" document. *See* Ex. 40 at 30:8-15.

**37.** At approximately 8:45 AM on January 23, 2012, former Marywood Dean of the College of Arts and Sciences, Michael A. Foley, Ph.D. ("Foley"), visited Fagal's office as Fagal was preparing for his 9:00 AM class and stated that President Munley was summoning him to a meeting at the same time (15 minutes' notice). *See* Ex. 1 at 6 (¶ 25); Ex. 2 at 4 (¶ 25); Ex. 3 at 257:24-258:17; Ex. 12; Ex. 33 at 79:18-80:14; Ex. 40 at 34:15-35:10; Ex. 41 at 7:2-7, 13:19-14:14; Ex. 42; Ex. 43 at 30:3-20, 36:19-37:8.

**38.** Fagal, Munley, Dunleavy, and Foley—and nobody else—attended the 9:00 AM meeting. *See* Ex. 33 at 79:6-17. Dunleavy was asked to take notes at the 9:00 AM meeting on January 23, 2012, and she did so. *See* Ex. 33 at 88:20-23; Ex. 40 at 51:4-17; Ex. 56.

**39.** At the meeting, Munley asked Fagal whether he posted the two-part video on YouTube. *See* Ex. 1 at 6 (¶ 26); Ex. 2 at 5 (¶ 26). Fagal acknowledged posting the video. *See* Ex. 1 at 6 (¶ 26); Ex. 2 at 5 (¶ 26).

15

Munley asked Fagal to explain his actions, but when he attempted to raise the issue of the poster removals, that topic was not allowed. *See* Ex. 3 at 265:7-14, 269:3-11; Ex. 12.

**40.** At the meeting, Fagal also requested that Munley put her questions in writing so that he could craft a response. *See* Ex. 3 at 265:14-16; Ex. 33 at 120:7-15; Ex. 40 at 45:2-6, 53:20-22, 67:8-10; Ex. 56 at DEF000162; Ex. 57 at DEF000143. Munley did not agree to do so. *See* Ex. 33 at 106:25-107:14.

**41.** At the meeting, Munley told Fagal that his employment was suspended effective immediately and that he should return his keys and University identification card. *See* Ex. 1 at 6 (¶ 26); Ex. 2 at 5 (¶ 26). Foley testified that Munley told Fagal that he was being "dismissed." Ex. 41 at 20:2-5. Then Foley testified: "I don't know if dismissed was the exact word, but that was the – that was the bottom line. He was no longer on the faculty." Ex. 41 at 21:13-15.

**42.** Levine was not present at the January 23, 2012 meeting with Fagal and Munley. *See* Ex. 12. At no time did Levine tell Fagal that he was to be suspended. *See* Ex. 12. Dunleavy was not aware of any role played by Levine in suggesting that Fagal be suspended. *See* Ex. 40 at 46:9-12.

16

**43.**     The January 23, 2012 meeting was the first time that Fagal had

heard from anybody in the Marywood administration after he posted the

videos. *See* Ex. 3 at 257:24-258:5.

**44.**     At 2:14 PM on the same day, Dunleavy sent an email to Fagal

confirming that he had been suspended and directing him to clean out his

University office. *See* Ex. 1 at 7 (¶ 27); Ex. 2 at 5 (¶ 27); Ex. 12; Ex. 14.

**45.**     At some point after the January 23, 2012 meeting, Dunleavy

created a typewritten summary of what she believed occurred at that

meeting based on her contemporaneous written notes. *See* Ex. 33 at

105:23-106:9; Ex. 40 at 64:16-65:8; Ex. 57. Dunleavy and Foley signed off

on this summary. *See* Ex. 40 at 65:21-23; Ex. 41 at 18:18-19:9; Ex. 57.

**46.**     At no time before Fagal's suspension did Marywood personnel

tell Fagal that he posed an immediate harm to himself or to others. *See* Ex.

12. Foley testified that he did not believe that Fagal posed an immediate

harm to himself or to others at the time of the January 23, 2012 meeting.

*See* Ex. 41 at 25:18-24.

**47.**     Prior to this lawsuit, Marywood personnel never advised Fagal

that his suspension was justified on the ground that he posed an immediate

harm to himself or to others. *See* Ex. 12.

17

**48.** Prior to January 23, 2012, Marywood did not provide Fagal with an oral warning, written warning, or any opportunity for monitored assistance relating to the emails and videos referenced in Paragraph Nos. 23 and 24 of the Amended Complaint. *See* Ex. 12; Ex. 37 at 7; Ex. 38 at 2; Ex. 40 at 121:4-11.

**49.** At 1:11 PM on January 24, 2012, Frances D. Ferrese, Executive Secretary to Munley, sent an email to Fagal. *See* Ex. 15. One attachment to the email was a letter from Munley to Fagal dated January 24, 2012. *See* Ex. 1 at 8 (¶ 32); Ex. 2 at 5 (¶ 32); Ex. 15 at DEF000166-DEF000167. In that letter, Munley stated that she was "recommending that [Fagal's] tenure and employment with Marywood be terminated immediately." *See* Ex. 15 at DEF000166. Munley's letter repeatedly references an "agreement" between Fagal and Marywood. *See* Ex. 15 at DEF000166, DEF000167.

**50.** In the January 24th letter, Munley provided a "Statement of Charges," which she was "prepared to send...to a duly appointed faculty committee for review along with the emails and videos you forwarded to members of our community." Ex. 15 at DEF000167.

18

**51.**     The end of the second "charge" contained in Munley's January 24th letter was missing, and therefore it was initially impossible for Fagal to know the full "charges" against him. *See* Ex. 1 at 9 (¶ 34); Ex. 2 at 6 (¶ 34); Ex. 15 at DEF000166-DEF000167.

**52.**     Prior to Munley's January 24, 2012 letter, Marywood personnel took no remedial actions to resolve whatever issues they believed had led to Fagal's suspension. *See* Ex. 12; Ex. 33 at 110:12-18.

**53.**     Prior to Munley's January 24, 2012 letter, Levine did not believe that he had made a written recommendation to terminate Fagal. *See* Ex. 43 at 44:23-46:7.

**54.**     On February 2, 2012, Fagal's attorney, Jonathan Z. Cohen, Esq. ("Cohen"), sent a letter to Munley advising that Marywood was in breach of its contract and requesting that the University convene two ad hoc faculty committees: one for her decision to suspend Fagal and the other for her recommendation to terminate him. *See* Ex. 1 at 12 (¶ 48); Ex. 2 at 9 (¶ 48); Ex. 27 at DEF000194, DEF000196. Cohen also advised that the end of the second "charge" in Munley's January 24, 2012 letter was missing. *See* Ex. 27 at DEF000195.

19

**55.** On February 3, 2012, Dunleavy made a handwritten note regarding a meeting or a telephone conversation that she had had with Munley regarding Fagal. *See* Ex. 40 at 82:15-83:2; Ex. 60. The note reads, in part: "Progressive Discipline- n/a -." Ex. 60. Dunleavy testified that she was conveying that progressive discipline was not applicable. *See* Ex. 40 at 83:7-16.

**56.** On February 8, 2012, Munley sent a second letter to Fagal. *See* Ex. 1 at 9 (¶ 35); Ex. 2 at 6 (¶ 35); Ex. 16 at DEF000206-DEF000210.

**57.** In the February 8th letter, Munley stated again that she was recommending that Fagal's "tenure and employment with Marywood be terminated immediately" and offered a "Statement of Charges." Ex. 16 at DEF000206-DEF000210. Once again, Munley's letter repeatedly referenced an "agreement" between Fagal and Marywood and alleged a "breach" of that "agreement." *See* Ex. 16 at DEF000207-DEF000209.

**58.** In the second "charge" against Fagal, Munley accused him of violating Marywood's "Civil Rights" policy. *See* Ex. 16 at DEF000208.

**59.** At the time of Munley's February 8, 2012 letter, Marywood had a "Civil Rights Complaint Procedures" policy in effect. *See* Ex. 1 at 11 (¶ 42); Ex. 2 at 7-8 (¶ 42). A copy of that policy can be found at Exhibit 5 at

20

DEF3579-DEF3581. The policy stated in part that it "must be followed any time a member of the Marywood University community believes s/he has been the victim of...discrimination, harassment, or assault by any member of the University community." Ex. 5(a) at DEF3579.

60.     Nowhere in Munley's January 24, 2012 letter or February 8, 2012 letter—or in any attachments to either letter—did she offer to convene a faculty committee to review her suspension of Fagal. *See* Ex. 15; Ex. 16.

61.     Although Munley's letters of January 24, 2012 and February 8, 2012 reference Marywood's "Civil Rights" policy and the latter letter charges Fagal with violating that policy, no Marywood employee had filed a civil rights complaint against Fagal after his January 13, 2012 email. *See* Ex. 12; Ex. 33 at 132:7-12; Ex. 40 at 15:7-10; Ex. 43 at 29:6-12.

62.     On February 9, 2012, Marywood's attorney, William J. Anthony, Esq. ("Anthony"), sent a letter to Cohen. *See* Ex. 1 at 12 (¶ 49); Ex. 2 at 9 (¶ 49); Ex. 28. In that letter, Anthony stated that Fagal was "not entitled to pick and choose which policies and procedures he believes will suit him best" and that Marywood "had no further contractual obligations to him." *See* Ex. 28 at FFF000163, FFF000164. Anthony repeatedly referenced a

"contract" between Fagal and Marywood. *See* Ex. 28 at FFF000163, FFF000164.

**63.** On February 17, 2012, Cohen sent a letter to Anthony, which is attached as Exhibit 62. *See* Ex. 62. Cohen stated in part: "To repeat, Dr. Fagal has elected to convene two separate ad hoc committees pursuant to Marywood's official policy: one for President Munley's decision to suspend him and the other, if necessary, for her recommendation to terminate him." Ex. 62 at FFF001686.

**64.** On February 22, 2012, Fagal filed a grievance against Munley. *See* Ex. 1 at 13 (¶ 51); Ex. 2 at 9 (¶ 51); Ex. 12; Ex. 30; Ex. 31. In the grievance, Fagal alleged that Munley violated Marywood policy by improperly suspending him, by improperly moving to terminate his employment and tenure, and by not accepting his request to convene an ad hoc committee to appeal the suspension. *See* Ex. 30; Ex. 31.

**65.** On February 28, 2012, Cohen sent a letter to Anthony advising that Fagal had removed the videos that he had posted to YouTube. *See* Ex. 63. Nobody at Marywood had asked Fagal to remove the videos. *See* Ex. 12.

**66.**     On March 26, 2012, Erin A. Sadlack, Ph.D. ("Sadlack"), the

Chair of Marywood's Faculty Grievance Committee sent a letter to Fagal

summarizing his grievances and concluding: "I now write to inform you that

in reviewing each of these grievances, we have found no evidence of

improper action on President Munley's part which would constitute a

legitimate grievance." *See* Ex. 12; Ex. 35 at 12:22-13:19; Ex. 44.

**67.**     On March 29, 2012, Fagal sent a letter to Munley objecting to

the Faculty Grievance Committee's decision and stating:

> I grant permission for Marywood University to
> release your "Recommendation for Termination and
> Statement of Charges" dated February 8, 2012 to
> an ad hoc committee in order to appeal your
> decision to suspend me as well as your
> recommendation to terminate my employment and
> tenure. To be clear, I am requesting that the ad hoc
> committee be convened twice—once to appeal my
> suspension and once to appeal your
> recommendation to terminate my employment and
> tenure.

*See* Ex. 12; Ex. 45.

**68.**     On April 2, 2012, Barbara McNally, an assistant for Levine, sent

an email to Levine stating that Fagal was on her list of faculty members

"leaving" Marywood after that year or leaving their position in the capacity

that they were hired. *See* Ex. 43 at 49:1-19; Ex. 65. Levine testified that he

23

probably told McNally that Fagal would be leaving. *See* Ex. 43 at 49:9-12.

When Plaintiff's counsel asked Levine, "You thought that before Professor

Fagal's disciplinary procedures were over, it was a foregoing conclusion

that he would be out of Marywood?", Levine stated: "I thought that was a

distinct possibility, yeah." Ex. 43 at 49:13-19.

**69.**  On April 3, 2012, Munley sent a letter to Fagal. *See* Ex. 1 at 14

(¶ 54); Ex. 2 at 10 (¶ 54); Ex. 12. The letter stated, in part:

> Since the grievance process is now complete, I
> have decided to finalize my recommendation. As a
> result, your employment with Marywood and your
> tenure are terminated effective today, April 3, 2012.
>
> Further, to provide you with a review of my decision,
> I will consider your letter dated March 29, 2012 as
> your authorization for me to convene two faculty ad
> hoc committees to appeal my decisions to suspend
> you and to terminate your employment and tenure. I
> am doing this despite the fact that on two separate
> occasions you refused my offer and did not choose
> to convene an ad hoc committee to review my
> decision to suspend you and my recommendation to
> terminate your employment and tenure before I
> finalized my decision.

Ex. 32; Ex. 33 at 141:17-143:10. Munley's claim that Fagal did not request

that the University convene an ad hoc committee to review his suspension

was untrue. *See* Ex. 12; Ex. 27; Ex. 45; Ex. 46 at FFF001686.

24

**70.** When Plaintiff's counsel asked Munley whether—prior to her letter of April 3, 2012—any ad hoc faculty committee had made any recommendation regarding her recommendation to terminate Fagal, she testified: "I think the only thing that happened was the response to the Grievance and Appeals Committee." Ex. 33 at 144:19-25. To Fagal's knowledge, prior to Munley's letter of April 3, 2012, no ad hoc faculty committee had made any recommendation regarding Munley's recommendation to terminate him. *See* Ex. 12.

**71.** On April 4, 2012, Cohen sent a letter to Anthony advising that Munley had no right to terminate Fagal prior to considering any recommendation of an ad hoc faculty committee under the "Progressive Discipline" policy. *See* Ex. 66.

**72.** On April 30, 2012, Sr. Gail Cabral of Marywood sent the email to Fagal that is attached as Exhibit 58. *See* Ex. 12; Ex. 58. Sr. Cabral stated:

> Sr. Anne Munley and Dr. Levine asked me to respond to your question about the status of the ad hoc committee. The committee has not yet convened but I expect that to take place this week. I am currently working to schedule the meeting.
>
> Your suggestion to include Dr. Ed O'Brien on the committee has been accepted. The other two

25

> members of the ad hoc committee are Dr. Helen
> Bittel and Mr. Matt Povse. The choice of these two
> individuals was made in accordance with the
> Progressive Discipline Policy, on the basis "of their
> objectivity and competence and of the regard in
> which they are held in the academic community."
>
> According to the Progressive Discipline Policy,
> when a faculty member requests that a committee
> be convened twice, the President determines
> whether the membership of the committee is similar
> or different. The President has received your email,
> and after review and consultation, Sr. Anne has
> determined that the membership will be the same.

Ex. 58.

**73.** On May 6, 2012, Fagal sent an email to Bittel, O'Brien, and Povse attaching a written defense to the charges made by Munley on February 8, 2012. A copy of that email is attached as Exhibit 67. *See* Ex. 12; Ex. 67. A copy of the attachment is attached as Exhibit 68. *See* Ex. 12; Ex. 68.

**74.** On May 17, 2012, the ad hoc faculty committee held a meeting about Fagal's case. *See* Ex. 47 at 22:9-24:15; Ex. 49. Minutes taken by Bittel about that meeting state, in part: "[W]e concluded that we (the AHC) are charged with reviewing the substance of the termination charge (dismissal and revocation of tenure)....we understand our charge to be the review of substance the termination and denial of tenure charges. We

understand that the issues of suspension and procedure were resolved by the FGC." Ex. 49.

**75.** On May 18, 2012, Bittel sent an email to Dunleavy stating: "I just wanted to let you know...that, during yesterday's meeting, we agreed that our charge should be the review of substance the termination and denial of tenure charges. We understand that the issues of suspension and procedure were resolved by the FGC." *See* Ex. 47 at 39:4-22; Ex. 48.

**76.** On July 2, 2012, the ad hoc faculty committee issued a document titled "Review of Sister Anne Munley's Decision to Terminate the Employment and Tenure of Dr. Frederick Fagal." *See* Ex. 1 at 15 (¶ 59); Ex. 2 at 11 (¶ 59); Ex. 34.

**77.** The ad hoc faculty committee did not concur with all of the charges lodged against Professor Fagal. *See* Ex. 34. Nonetheless, the committee concurred with Munley's decision to revoke the tenure and terminate the employment of Fagal. *See* Ex. 34. The FSAHHC's document did not mention Fagal's suspension. *See* Ex. 34.

**78.** Bittel later acknowledged that she did not make any formal findings about whether Fagal's suspension was appropriate. *See* Ex. 47 at 31:22-24, 66:12-17. She testified: "Whether Sister Anne was out of line in

27

suspending him in the first place, that was the other committee because they are responsible for procedural elements." Ex. 47 at 65:19-21.

**79.**     Bittel also testified that she did not think that Munley had ever informed her that Fagal had asked for an opportunity to answer Munley's questions in writing. *See* Ex. 47 at 46:22-47:10. She acknowledged that— had she known that Fagal had asked for that opportunity—that would "problematize" her understanding that Fagal had declined multiple opportunities to make amends, to show remorse, and to explain his actions. *See* Ex. 47 at 49:19-50:3. Bittel further stated that Fagal's request to answer Munley's questions in writing conflicted with her committee's findings and that these findings could not account for Fagal's request. *See* Ex. 47 at 50:12-18, 69:17-70:13

**80.**     Bittel also testified that Munley had asked for the ad hoc faculty committee's expected date of completion because "she didn't want it to drag out too long." Ex. 47 at 50:12-18.

**81.**     On July 6, 2012, Fagal sent an email to the ad hoc faculty committee members objecting that they had not reviewed his suspension and requesting that they do so. *See* Ex. 12; Ex. 64. The committee did not

28

reconvene to review Fagal's suspension. *See* Ex. 47 at 71:14-17; Ex. 50 at

40:7-11.

**82.** On July 10, 2012, Bittel sent an email to Dunleavy stating, in

part:

> On Friday afternoon, our committee received a
> response from Dr. F. He has found several
> problems/omissions with our report and has asked
> us to review and resubmit. Mostly he objects to the
> fact that we did not separately adjudicate his
> suspension; we, however, understood that this was
> adjudicated by the prior committee and that their
> findings were supposed to be final.

*See* Ex. 47 at 71:20-72:9; Ex. 69 at DEF3733.

**83.** Members of the ad hoc faculty committee have stated or

suggested that their committee did not review Fagal's suspension. *See* Ex.

47 at 22:7-21, 24:5-10, 29:22-30:10, 39:4-21; Ex. 48 at DEF001749; Ex. 49

at DEF000323; Ex. 50 at 16:10-17:21.

**84.** On July 13, 2012, Munley sent Fagal a letter stating, in part:

"My decision to terminate your employment with Marywood University and

your tenure effective April 3, 2012 stands." *See* Ex. 1 at 16 (¶ 65); Ex. 2 at

11 (¶ 65); Ex. 12; Ex. 35 at 338:4-11; Ex. 36.

**85.** Between the time that Fagal was suspended and the time that he was terminated, Marywood took no remedial actions directed to him. *See* Ex. 33 at 112:19-25.

**86.** On July 18, 2012, Dunleavy sent an email to Munley stating, in part: "I'd like to suggest the following topics for your consideration for Cabinet Retreat....Faculty Grievance and Appeals and Progressive Discipline for Faculty - post Fagal, we probably want to revise these (perhaps using some of the faculty who sat on the review committees)." Ex. 40 at 116:22-117:14; Ex. 61 at DEF002781.

**87.** Fagal received his agreed-upon salary through August 2012, at which point Marywood ceased paying him. *See* Ex. 1 at 17 (¶ 66); Ex. 2 at 11 (¶ 66).

**88.** On May 7, 2014, a new version of Marywood's "Progressive Discipline" policy took effect. *See* Ex. 26. Unlike the previous version, this one states:

> Progressive discipline, however, is not guaranteed in every instance. In certain rare and extreme cases, the President has the authority to initiate procedures for suspension or dismissal of a tenured faculty member without that person first undergoing progressive discipline.
> ...

30

*Exceptions to Progressive Discipline*

> In most cases, it is expected that faculty members
> will be entitled to the processes of progressive
> discipline. However, in the rare event of an
> egregious breach of professional discipline or illegal
> activity, the President may elect to initiate
> suspension or dismissal procedures immediately.
> There is no obligation for the President or VPAA to
> suspend the faculty member before moving to
> dismissal procedures given severe circumstances.

Ex. 1 at Ex. E; Ex. 26.

**89.** On November 2, 2016, Cohen served an expert economic report on Marywood's counsel. *See* Ex. 70. That report, by the Sobel Tinari Economics Group, states: "With a reasonable degree of economic certainty, based on the information received and the analysis contained in this report, it is our professional opinion that the total present value of the economic loss sustained by Frederick Fagal amounts to...**$755,395**." Ex. 70.

Respectfully,


By:   s/ Jonathan Z. Cohen

Jonathan Z. Cohen (PA 205941)
175 Strafford Avenue
Suite 1 # 212
Wayne, PA 19087-3340
(215) 874-0047
(215) 839-8951 (fax)
jzc@jzc-law.com

*Attorney for Plaintiff*

Date: November 21, 2016

# CERTIFICATE OF SERVICE

I, Jonathan Z. Cohen, attorney for Plaintiff, certify that the foregoing document has been filed electronically and is available for viewing and downloading from the ECF system. The following parties have consented to electronic service:

**Asima J. Ahmad**
asima.ahmad@jacksonlewis.com, Philadelphia-
Secretaries@jacksonlewis.com,
PhiladelphiaDocketing@jacksonlewis.com

**Katharine Thomas Batista**
katharine.thomas@jacksonlewis.com, Philadelphia-
Secretaries@jacksonlewis.com,
PhiladelphiaDocketing@jacksonlewis.com

**Jonathan Zachary Cohen**
jzc@jzc-law.com

**Stephanie Jill Peet**
Stephanie.Peet@jacksonlewis.com,
PhiladelphiaDocketing@JacksonLewis.com, Philadelphia-
Secretaries@jacksonlewis.com

Respectfully,


By:  s/ Jonathan Z. Cohen
     Jonathan Z. Cohen (PA 205941)
     175 Strafford Avenue
     Suite 1 # 212
     Wayne, PA 19087-3340
     (215) 874-0047
     (215) 839-8951 (fax)
     jzc@jzc-law.com

     *Attorney for Plaintiff*

Date: November 21, 2016

34

# Exhibit 71



**EXHIBIT 71**

# Marywood
UNIVERSITY

OFFICE OF THE PRESIDENT

MARYWOOD UNIVERSITY
SCRANTON, PA 18509-1598
TEL: (570) 348-6231
FAX: (570) 340-6014
EMAIL: ANNEMUNLEY@MARYWOOD.EDU
*www.marywood.edu*

July 13, 2012

Dr. Frederick F. Fagal, Jr.
17 East Lake Street
Skaneateles, NY 13152

Dear Dr. Fagal,

I have received and reviewed the report of the independent tenured faculty committee that was convened at your request under the Progressive Discipline Policy to appeal my decision to suspend you and to terminate your employment and tenure.   This was the second independent tenured faculty review accorded to you; both faculty committees concurred with my decisions.

My decision to terminate your employment with Marywood University and your tenure effective April 3, 2012 stands.

I wish you good luck in your future endeavors.

Sincerely,

*Sister Anne Munley, IHM*

Sister Anne Munley, IHM
President

*An education inspired by the Sisters, Servants of the Immaculate Heart of Mary.*

# Exhibit 72

EXHIBIT
72

**jackson | lewis**

Attorneys at Law

Representing Management Exclusively in Workplace Law and Related Litigation

Jackson Lewis LLP
90 State House Square
8th Floor
Hartford, Connecticut 06103
Tel 860 522-0404
Fax 860 247-1330
www.jacksonlewis.com

| | | | |
|---|---|---|---|
| ALBANY, NY | DETROIT, MI | MINNEAPOLIS, MN | PORTSMOUTH, NH |
| ALBUQUERQUE, NM | GREENVILLE, SC | MORRISTOWN, NJ | PROVIDENCE, RI |
| ATLANTA, GA | HARTFORD, CT | NEW ORLEANS, LA | RALEIGH-DURHAM, NC |
| AUSTIN, TX | HOUSTON, TX | NEW YORK, NY | RICHMOND, VA |
| BALTIMORE, MD | INDIANAPOLIS, IN | NORFOLK, VA | SACRAMENTO, CA |
| BIRMINGHAM, AL | JACKSONVILLE, FL | OMAHA, NE | SAINT LOUIS, MO |
| BOSTON, MA | LAS VEGAS, NV | ORANGE COUNTY, CA | SAN DIEGO, CA |
| CHICAGO, IL | LONG ISLAND, NY | ORLANDO, FL | SAN FRANCISCO, CA |
| CINCINNATI, OH | LOS ANGELES, CA | PHILADELPHIA, PA | SEATTLE, WA |
| CLEVELAND, OH | MEMPHIS, TN | PHOENIX, AZ | STAMFORD, CT |
| DALLAS, TX | MIAMI, FL | PITTSBURGH, PA | WASHINGTON, DC REGION |
| DENVER, CO | MILWAUKEE, WI | PORTLAND, OR | WHITE PLAINS, NY |

MY EMAIL ADDRESS IS: ANTHONYW@JACKSONLEWIS.COM

April 26, 2012

**VIA ADVANCE EMAIL**
Jonathan Z. Cohen, Esquire
Law Offices of David G. Concannon, LLC
200 Eagle Road, Suite 116
Wayne, PA 19087

Re:   Marywood University

Dear Attorney Cohen:

We reviewed your April 4, 2012 letter and write in response to same. As you continue to misrepresent certain important facts, we will clarify them here. First, Sister Anne Munley does have the right to terminate your client's employment. Despite that, Sister Anne first made a recommendation of termination and offered your client an opportunity to have an ad hoc committee of tenured faculty review that decision prior to it being finalized. Not only did Sister Anne provide that opportunity to your client on two occasions, but I advised you of that offer on two occasions. For reasons that you and your client are aware and we are not, your client chose not to avail himself of that opportunity. To now call Sister Anne's statements regarding this issue "demonstrably false" simply reflects the continued inappropriate and unprofessional nature with which you and your client have chosen to proceed.

Your client did, however, choose to pursue a grievance under the Faculty Grievance policy. That process is complete and Sister Anne received word from the review committee that it found no evidence of wrongdoing on her part in suspending or recommending termination of Dr. Fagal's tenure or employment with Marywood. As a result of that review, the recommendation has been finalized. Despite the decision to finalize her recommendation, Sister Anne has convened the ad hoc committee under the University's Progressive Discipline policy to review her decision. The committee will decide what process to follow in reviewing Sister Anne's decision.



As I understand it, your client has been in contact with the University regarding the review committee.  If he has any questions, he can direct them to the University.  If you have any questions, please contact me.

Very truly yours,
JACKSON LEWIS LLP

William J. Anthony

WJA/amj

cc:    Stephanie Peet, Esq.

FFF001698