**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| FREDERICK F. FAGAL, JR., : | |
| : | |
| *Plaintiff,* : | |
| : | CIVIL ACTION |
| v. : | |
| : | NO. 3:14-cv-02404-ARC |
| MARYWOOD UNIVERSITY, : | |
| : | (JUDGE CAPUTO) |
| *Defendant.* : | |
| : | <u>ORAL ARGUMENT REQUESTED</u> |

<u>**REPLY BRIEF IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**</u>

JONATHAN Z. COHEN LTD.
Jonathan Z. Cohen, Esq.
175 Strafford Avenue
Suite 1 # 212
Wayne, PA 19087-3340
(215) 874-0047
(215) 839-8951 (fax)
jzc@jzc-law.com

*Attorney for Plaintiff*

Date: December 27, 2016

Plaintiff Frederick F. Fagal, Jr. ("Fagal"), through counsel, hereby submits this reply brief in support of his Motion for Summary Judgment.

## I. MARYWOOD'S PROGRESSIVE DISCIPLINE POLICY APPLIES IN ALL CASES.

Marywood argues that its Progressive Discipline ("PD") Policy does not require progressive discipline in cases involving "egregious conduct." Def. Br. 3. For support, Marywood quotes part of a sentence from the PD Policy. However, that sentence is still consistent with the progressive application of warnings or monitored/special assistance for "serious violations of professional responsibility." Under the PD Policy, before a recommendation for suspension or termination is made, an ad hoc committee determines whether the problem has been "successfully resolved" or has "not been corrected and reasons still exists to question the fitness of the faculty member." *See* Ex. 1 at Ex. E. Thus, the PD Policy requires that Marywood attempt to correct the problem before pursuing suspension or termination.

Notably, the PD Policy that was in effect before October 12, 2011 diverted "personal problems which may be rectified" into an "informal educational process" implicating oral warnings, written warnings, and "special assistance," whereas "serious violations of professional responsibilities implicating possible suspension or dismissal" were covered

by a "formal discipline process." *See* Ex. 5(a) at DEF3515-DEF3518. The "formal discipline process" did not implicate oral warnings, written warnings, or "special assistance." *See id.* The PD Policy that came into effect on October 12, 2011 did away with the "informal educational process" and "formal discipline process" labels, suggesting that all problems were to be handled under the same process. *See* Ex. 1 at Ex. E.

II. **THE COMMITTEE FINDINGS ABOUT THE SUITABILITY OF PROGRESSIVE DISCIPLINE IN PLAINTIFF'S CASE ARE NOT RELEVANT OR ACCURATE.**

Marywood argues that two committees concluded that progressive discipline was "not appropriate" in Plaintiff's cases. *See* Def. Br. 3. Of course, if the PD Policy requires progressive discipline, it does not matter whether the committees thought it "not appropriate."

Helen M. Bittel, Ph.D., chair of the Ad Hoc Faculty ("AHC") Committee, also testified that "[w]e did not know" that Fagal had asked for an opportunity to answer President Munley's January 23, 2012 questions in writing and that Paragraph C of the AHC's final decision (Ex. 54 at DEF00516) (ECF No. 66-5 at 46) could not account for that fact. *See* Ex. 47 at 69:12-23 (ECF No. 66-6 at 49).

### III. ONLY MARYWOOD'S VICE PRESIDENT FOR ACADEMIC AFFAIRS COULD SUSPEND PLAINTIFF.

The PD Policy is clear about who is entitled to suspend a faculty member:

> The faculty member may be suspended by the <u>Vice President for Academic Affairs</u> at any time during the proceedings involving him or her.
>
> ....
>
> Having received a written recommendation for either suspension or dismissal from the <u>Vice President for Academic Affairs</u>, the President of the University sends a written communication to the faculty member....

Ex. 1 at Ex. E (emphasis added).

Still, Marywood argues that the President is entitled to suspend a faculty member since the PD Policy does not explicitly state that "only" the Vice President for Academic Affairs ("VPAA") could suspend and because the President outranks the VPAA. *See* Def. Br. 4.

Marywood's interpretation is wrong. First, the PD Policy fails to provide suspension authority to the President even though it specifically addresses her role in other aspects of the disciplinary process—sometimes addressing the VPAA's role in the same sentence. *See generally* Ex. 1 at Ex. E. Clearly the PD Policy is designed to provide the President and VPAA with different and separate authorities in the disciplinary process.

4

Second, the President does not always outrank the VPAA. The VPAA has final authority in a number of contexts at Marywood. *See* Ex. 5(a) at DEF3480, DEF3494, DEF3553, DEF3571. Most importantly, he or she is the "chief academic officer with direct responsibility for the proper functioning of the academic programs of the University." *Id.* at DEF3480. This role is consistent with the VPAA exercising sole authority to suspend a professor.

Third, providing the VPAA with the exclusive authority to suspend faculty members would be consistent with his or her explicit role in the "written warning" phase of the PD Policy. During that phase, which immediately precedes the suspension phase, the VPAA "shall conduct a preliminary investigation concerning the merits of the complaint." Ex. 1 at Ex. E. Presumably a VPAA who conducted such an investigation would be in the best position to suspend a faculty member.

### IV. MARYWOOD COULD SUSPEND PLAINTIFF ONLY IF "IMMEDIATE HARM" WAS THREATENED.

The PD Policy states that suspension "is justified if <u>immediate harm</u> to the faculty member or others is <u>threatened</u> by the person's continuance in the faculty position." *Id.* (emphasis added). The policy provides no other criteria for determining whether a suspension is appropriate. *See id.* Nor is "immediate harm" defined. *See id.* Given the word "immediate" and the

context in which "immediate harm" appears—the removal of a faculty member from campus—the phrase likely refers only to <u>physical</u> harm. An interpretation allowing for emotional, reputational, or any other subjective form of harm would grant Marywood virtually limitless discretion to bar a faculty member from campus.

Marywood also contends that the PD Policy does not state that a suspension is "only" justified by a threat of "immediate harm." *See* Def. Mem. 4-5. Still, the wording, structure, and purpose of the policy suggest that "immediate harm" is the only justification for a suspension. No other justification is listed. Marywood would have the Court believe that it could suspend a professor on a whim. Of course, this would strip the PD Policy of any claim to being "progressive."

**V.    MARYWOOD COULD NOT RECOMMEND THE TERMINATION OF PLAINTIFF'S EMPLOYMENT AND TENURE IN THE ABSENCE OF ANY EFFORTS AT REMEDIATION.**

The PD Policy states: "If remedial actions(s) taken during the suspension does not sufficiently resolve the issues that lead to the suspension, the university may move towards dismissal of the faculty member." Ex. 1 at Ex. E. Marywood argues that its policy "did not require remediation prior to termination in every instance." Def. Br. 5.

Marywood's argument that remediation is optional is inconsistent with the wording and purpose of the PD Policy, and it is unworkable. The PD Policy states:

> If the opinion of the Faculty Committee is that the matter is successfully <u>resolved</u> or that there is no merit to the complaint, a recommendation shall be made to discontinue proceedings. If the problem <u>has not been corrected and reason still exists to question the fitness of the faculty member</u>, the recommendation shall be to either continue a suspension or initiate a formal action toward dismissal.

Ex. 1 at Ex. E. Of course, this passage along with the "Dismissal" section in the PD Policy contemplate that Marywood must at least attempt to remediate a problem prior to initiating dismissal.

Marywood's argument also leaves itself, faculty members, faculty committees, and this Court with no criteria by which to determine the procedural propriety of some dismissals. Marywood is essentially arguing that it has the right to dismiss a professor any time that it prognosticates— without attempting remediation at all—that there is no hope for remediation.

## VI. MARYWOOD BREACHED ITS CIVIL RIGHTS COMPLAINT PROCEDURES.

Plaintiff alleges that Marywood breached its Civil Rights Complaint Procedures ("CRCP") when it charged him with violating the Civil Rights Policy in the absence of any civil rights complaint. *See* Ex. 1 at ¶¶ 42, 43.

Marywood counters that the CRCP states that "[i]n certain serious cases the University administrator may proceed even without a formal complaint." *See* Def. Br. 5.

Marywood is misreading the CRCP. The CRCP states that it "must be followed any time a member of the Marywood University community believes s/he has been the victim of or witness to discrimination, harassment, or assault by any member of the University community on University property or any property controlled by the University." Ex. 5(a) at DEF3579. The CRCP states that the complainant "must present the complaint to the appropriate University administrator." *Id.* The complainant may submit a "formal complaint" later. *Id.* While Marywood is correct that "[i]n certain serious cases the University administrator may proceed even without a formal complaint," the process still must begin with a "complaint." *See id.*

## VII. PLAINTIFF HAS ESTABLISHED DAMAGES.

Marywood argues that Plaintiff has not shown that he suffered damages "as a result of" Marywood's conduct. *See* Def. Br. 6. For many years, the controlling case law has reflected that even if a plaintiff cannot show actual damages resulting from a breach, he or she is entitled to recover nominal damages. *See Wolfe v. Allstate Prop. & Cas. Ins. Co.*, 790

8

F.3d 487, 497 (3d Cir. 2015); *Norwood Lumber Corp. v. McKean*, 153 F.2d 753, 757 (3d Cir. 1946); *Freedom Oil Works Co. v. Williams*, 302 Pa. 51, 56, 152 A. 741, 743 (Pa. 1930). Marywood has not attempted to distinguish the law.

Further, Plaintiff has shown <u>actual</u> damages flowing from Marywood's breaches. Before terminating Plaintiff, the PD Policy required Marywood to: (1) provide Fagal with at an oral warning; (2) provide him with a written warning if Marywood still did not believe that Fagal was conducting himself properly; (3) satisfy itself that Fagal was an "immediate harm" after a written warning failed; (4) attempt remediation; and (5) wait for remediation to fail. None of those events occurred, and Fagal has lost several years of salary as an inevitable result.

Marywood incorrectly argues that Fagal's termination was a "direct result of *his* actions and *his* decision." Def. Br. 6-7. Obviously Fagal did not resign from Marywood or leave voluntarily. He was involuntarily terminated by Marywood after the University violated its contractually obligated disciplinary procedures. In general, the object of contract damages is to place the injured party in the same position that it would have been in but for the other party's breach. *See ATACS Corp. v. Trans World Commc'ns, Inc.*, 155 F.3d 659, 669 (3d Cir. 1998); *Trosky v. Civil Serv. Comm'n*, 539

Pa. 356, 363, 652 A.2d 813, 817 (Pa. 1995). But for Marywood's breaches, Plaintiff would still be earning a salary at the University.

## VIII. BITTEL CONVEYED THAT HER COMMITTEE DID NOT KNOW ABOUT PLAINTIFF'S ATTEMPT TO ANSWER PRESIDENT MUNLEY'S QUESTIONS ON JANUARY 23, 2012.

Marywood asserts that if Bittel had known that Plaintiff had requested an opportunity to explain himself in writing, this would only "problematize" a statement that she made—"not her understanding of the relevant events." *See* Def. Br. 11. While it is true that Bittel testified that "it would problematize my statement there," the statement she was referring to was: "He also had multiple opportunities to make amends, show remorse, and explain his actions." Ex. 47 at 46:1-50:3; Ex. 71 at DEF001510.[1] That statement implies that Fagal did not attempt to use those opportunities, which is incorrect. If the Court considers the entirety of Paragraph No. 79 in Plaintiff's Statement of Material Facts—and the record evidence cited—it is clear that Bittel's committee never knew or overlooked the fact that Plaintiff had requested an opportunity to explain himself to Munley in writing.

---

[1] Exhibit 71 is attached to this reply brief. This is a continuation of the exhibits provided with Plaintiff's initial moving papers, which ended at Exhibit 70.

10

## IX. CONCLUSION

For the foregoing reasons and those presented in Plaintiff's initial moving papers, Plaintiff respectfully requests that the Court grant his Motion for Summary Judgment.[2]

Respectfully,

By: s/ Jonathan Z. Cohen
Jonathan Z. Cohen (PA 205941)
175 Strafford Avenue
Suite 1 # 212
Wayne, PA 19087-3340
(215) 874-0047
(215) 839-8951 (fax)
jzc@jzc-law.com

*Attorney for Plaintiff*

Date: December 27, 2016

---

[2] On page 6 of Defendant's Response to Plaintiff's Statement of Material Facts, Marywood states in a footnote that it did not receive copies of certain DVDs that Plaintiff provided to the Court. That statement was mistaken (inadvertently), and Marywood's counsel later confirmed this in writing to Plaintiff's counsel. *See* Ex. 72.

## **CERTIFICATE REGARDING BRIEF LENGTH**

I, Jonathan Z. Cohen, attorney for Plaintiff, certify that this document contains 2,201 words.

Respectfully,

By: s/ Jonathan Z. Cohen
Jonathan Z. Cohen (PA 205941)
175 Strafford Avenue
Suite 1 # 212
Wayne, PA 19087-3340
(215) 874-0047
(215) 839-8951 (fax)
jzc@jzc-law.com

*Attorney for Plaintiff*

Date: December 27, 2016

## **CERTIFICATE OF SERVICE**

I, Jonathan Z. Cohen, attorney for Plaintiff, certify that the foregoing document has been filed electronically and is available for viewing and downloading from the ECF system. The following parties have consented to electronic service:

**Asima J. Ahmad**
asima.ahmad@jacksonlewis.com, Philadelphia-Secretaries@jacksonlewis.com, PhiladelphiaDocketing@jacksonlewis.com

**Katharine Thomas Batista**
katharine.thomas@jacksonlewis.com, Philadelphia-Secretaries@jacksonlewis.com, PhiladelphiaDocketing@jacksonlewis.com

**Jonathan Zachary Cohen**
jzc@jzc-law.com

**Stephanie Jill Peet**
Stephanie.Peet@jacksonlewis.com, PhiladelphiaDocketing@JacksonLewis.com, Philadelphia-Secretaries@jacksonlewis.com

> Respectfully,
>
> By: s/ Jonathan Z. Cohen
> Jonathan Z. Cohen (PA 205941)
> 175 Strafford Avenue
> Suite 1 # 212
> Wayne, PA 19087-3340
> (215) 874-0047
> (215) 839-8951 (fax)
> jzc@jzc-law.com
>
> *Attorney for Plaintiff*

Date: December 27, 2016