**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| FREDERICK F. FAGAL, JR., | |
| Plaintiff, | CIVIL ACTION NO. 3:14-cv-02404 |
| v. | (JUDGE CAPUTO) |
| MARYWOOD UNIVERSITY, | |
| Defendant. | |

## **MEMORANDUM**

Presently before this Court are Cross Motions for Summary Judgment filed by Plaintiff Dr. Frederick Fagal ("Fagal") (Doc. 61) and Defendant Marywood University ("Marywood") (Doc. 62). Additionally, Fagal has filed a Motion for Leave to File a Second Amended Complaint. (Doc. 91). Both Motions for Summary Judgment will be denied because there is a genuine dispute of material fact regarding the materiality of Fagal's breach of contract. Finally, Fagal's Motion for Leave to File a Second Amended Complaint will be denied as moot because Fagal's current complaint provides for nominal damages.

### **I. Factual Background**[1]

**A.     The Parties**

Defendant Marywood is a Catholic university sponsored by the Congregation of the Sisters, Servants of the Immaculate Heart of Mary, and a Pennsylvania non-profit corporation located in Scranton, Pennsylvania. (Plaintiff's Statement of Material Facts ("PSMF") ¶ 3, Doc. 66; Defendant's Statement of Material Facts ("DSMF") ¶ 1, Doc. 69.) Marywood has adopted a set of "Core Values," which include respect for the value of each human being, diversity in the context of vibrant community, and the earth and all creation. (DSMF ¶ 4.) In the Fall semester of 1987, Plaintiff Fagal[2] became a member of

---

[1]     The facts described herein are undisputed unless otherwise noted.

[2]     Fagal earned a bachelor's degree from Union College in 1968, a master's degree in Economics from Cornell University in 1971, and a Ph.D. in

Marywood's faculty. (PSMF ¶ 4.) Fagal attained tenure at Marywood in September 1994. (PSMF ¶ 5.) Throughout his employment at Marywood, Fagal was a professor in the Department of Social Sciences and reported to the Chairperson of the Department. (DSMF ¶ 7.) At all relevant times to this litigation, Marywood's President was Sister Anne Munley, IHM ("Munley"). (DSMF ¶ 5.)

In 1992, Fagal signed a document entitled "Agreement and Appointment for Full-Time Faculty." (PSMF ¶ 7; Ex. 4, Doc. 66; Ex. 12, Doc. 66.) This document states that the "TERMS OF THIS AGREEMENT are offered . . . to Dr. Frederick Fagal Jr. . . . by Marywood College." (Ex. 4.) The document further states that "[t]he policies and practices listed in the Faculty Manual are agreed upon by the parties hereto." (*Id.*) Fagal and Marywood entered into written agreements for Fagal to serve on Marywood's full-time faculty for each year between 1992 and 2012. (PSMF ¶ 8.) For the 2010-2011 academic year, the parties entered into such an agreement, which was entitled "Tenured Faculty Letter of Agreement 2010-2011 Academic Year." (Ex. 39, Doc. 66.) The parties do not dispute that they entered into this agreement.

## B. Relevant Marywood Policies[3]

Marywood maintains a Faculty Handbook (the "Handbook"), which contains policies on, *inter alia*, contractual agreements with faculty members, faculty grievances and appeals, discipline, tenure, civil rights, computer use, academic freedom, and professional ethics. (DSMF ¶ 10; *see* Exs. 5(a)-5(b), Doc. 66.) On July 1, 2010, Marywood issued a new edition of its Handbook. (PSMF ¶ 11.) The third page of the Handbook states: "This handbook is effective with the 2010-2011 faculty letters of agreement." (Ex. 5(a), at DEF3458, Doc. 66.)

## C. The Underlying Controversy

---

Social Studies Education from Syracuse University in 1981. (PSOF ¶ 2.)

[3] Where relevant, the specific policy language has been provided in the Discussion to follow.

In May 2011, Fagal and Munley signed a document titled "Tenured Faculty Letter of Agreement 2011-2012 Academic Year," which stated that Fagal would serve as a tenured Associate Professor from August 22, 2011 to May 18, 2012 and earn a salary of $76,196.00 (PSMF ¶ 15; Ex. 6, Doc. 66.) The parties agree that Fagal was not an at-will employee during the relevant times. (PSMF ¶ 18; Defendant's Response ("DR") ¶ 18.)

In November 2011, Fagal invited a speaker from the Foundation for Individual Rights in Education ("FIRE") to speak at Marywood later that month, in connection with Fagal's Introduction to Social Science class regarding free speech on college campuses. (PSMF ¶ 19; DSMF ¶ 29.) The topic of the FIRE presentation was "Know Your Rights: Free Speech and Thought Reform on Campus," which was related to Fagal's teachings on the U.S. Constitution. (PSMF ¶ 21.) Fagal paid for the FIRE speaker. (PSMF ¶ 20.) Fagal received approval from Marywood to hang posters announcing the FIRE speaker. (PSMF ¶ 22.) Approximately two days before the presentation, Fagal and some students, one of whom Fagal paid, hung posters around campus advertising the event and announcing a $50 attendance prize. (DSMF ¶ 30.) Fagal personally paid for some of these posters. (PSMF ¶ 22; DR ¶ 22.) Subsequently, Marywood personnel removed at least some of Fagal's posters without providing Fagal with any notice. (PSMF ¶ 23.) The parties dispute the reason(s) for why some of Fagal's posters were removed. (*See* DSMF ¶ 32; Plaintiff's Response ("PR") ¶ 32, Doc. 84.) Fagal attempted to secure an apology and reimbursement from Marywood, but Marywood refused. (PSMF ¶ 24; DR ¶ 24.) No one from Marywood prevented the FIRE speaker from speaking, shortened the length of his speech, or otherwise tried to change or influence the topic of his discussion. (DSMF ¶ 33.) The FIRE speaker spoke at Marywood as scheduled. (DSMF ¶ 34.)

On January 13, 2012, Fagal sent an email from his personal email address to Marywood faculty members concerning the removal of the posters.[4] (PSMF ¶ 26.) The

---

[4] The parties dispute whether this email was also sent to students. (PSMF ¶ 26; DR ¶ 26.)

3

email contained an "abstract" purporting to describe events that transpired, which stated in part:

> On November 28-29, 2011, Marywood University tore down "stamped approved" posters announcing an open to all [FIRE] presentation. . . . On December 5[,] Alan Levine, VP for Academic Affairs, told me [Fagal] there were no written policy statements which justified Marywood's action, but that my offer of a $50 random prize to a student for attending was, in the eyes of the administration's Executive Council which met on November 29, "pandering" to students to get them to come to class, and that this justified tearing down the posters . . . . It is transparently obvious Marywood University is discriminating against Professor Fagal.

(Ex. 9, Doc. 66.) The email also contained hyperlinks to two related YouTube videos created by Fagal, which criticized Munley and several other Marywood administrators for their involvement in the decision to remove the posters. (PSMF ¶¶ 27, 29; DSMF ¶¶ 36, 39.) The two videos are adaptations of scenes in *Downfall*, a 2004 German-language movie depicting the last days of Adolf Hitler's rule. (PSMF ¶ 29.) The scenes adapted by Fagal show Hitler chastising several of his lieutenants over setbacks suffered by the Nazis during World War II. (PSMF ¶ 29.) Fagal replaced the English subtitles with his own subtitles, which mocked the administration's conduct surrounding the FIRE speaker. (PSMF ¶ 29.) In Fagal's parody, the Hitler character is referred to as "FuhrMunley," and other members of the Marywood administration are depicted as members of the Nazi regime. (DSMF ¶ 39; *see* Exs. 10-11, Doc. 66.) One of the administrators depicted as a Nazi character in the video was Alan M. Levine, Ph.D. ("Levine"), Marywood's Vice President for Academic Affairs ("VPAA"), who is Jewish and who Fagal assumed was Jewish. (DSMF ¶ 40; PR ¶ 40.) Among other things, the video included a reference to a non-existent plot to have the Fagal character seduced and then accused of rape. (DSMF ¶ 41.) The Hitler character, "FuhrMunley," is depicted as saying, "If a rape charge is too brazen switch gears! BRIBE him! Use the old SS sisters of Subversion!" (DSMF ¶ 42.) Additionally, the Nazi character referred to as "LeVINE" is depicted as saying, "I should quit as VP and be a professor again but my young wife #2 and 1% kids need money." (DSMF ¶ 43.) It was common knowledge that Dr. Levine had been divorced and remarried. (DSMF ¶ 44.) Fagal's email included hyperlinks to these videos, and they were

4

also publically available on YouTube. (DSMF ¶ 45.) Other "*Downfall* videos," wherein the subtitles have been changed by the party posting the video, have appeared on YouTube.[5] (PSMF ¶ 31.) In his email, Fagal also advised the recipients about Marywood's Computer Use Policy and suggested that they respond to him using their personal email addresses. (DSMF ¶ 38.) Fagal signed this email in his capacity as an Associate Professor at Marywood. (DSMF ¶ 37.) These videos were not connected to any of Fagal's courses, research, or curriculum. (DSMF ¶ 47.) Fagal never apologized to Munley, Levine, or any other member of the Marywood administration. (DSMF ¶ 57; PR ¶ 57.)

On January 17, 2012, Munley received an email from Levine informing her about Fagal's email and videos. (PSMF ¶ 32.) This was the first time that Munley was made aware of the email and videos. (PSMF ¶ 32.) Munley testified that, before discussing the email and videos with Fagal, she "had come to the conclusion that this was–this is something for which the individual concerned should be suspended." (PSMF ¶ 32.) Before meeting with Fagal to discuss his email and videos, Munley and Marywood's Assistant Vice President for Human Resources, Patricia E. Dunleavy, Ph.D. ("Dunleavy") worked together to create a list of "talking points." (PSMF ¶ 34; DSMF ¶ 59.) Leading up to that meeting, it was Munley's plan to suspend Fagal regardless of what was said at the meeting. (PSMF ¶ 34.) Munley's "talking points" document included a bullet point which reads: "Ask Fagal to leave campus" and, underneath, "suspended with pay." (Ex. 55, Doc. 66.) The document also included a bullet point titled "Alternate Plans," which included asking Fagal if he had a resolution in mind, such as retirement on the spot or a buyout of the remainder of his contract. (*Id.*) Additionally, the document included a bullet

---

[5] Examples include: a parody of NFL Commissioner Roger Goodell (depicted as Hitler); a parody regarding the sub-prime mortgage crisis; and a parody in which New York Commissioner of Education John King (depicted as Hitler) becomes upset about complaints regarding standardized testing. (PSMF ¶ 31.)

5

point titled "Post Suspension" and, underneath, stated that "Sister recommends termination and prepares notice of charges." (*Id.*)

At approximately 8:45 AM on January 23, 2012, former Marywood Dean of the College of Arts and Sciences Michael A. Foley, Ph.D. ("Foley"), visited Fagal's office and informed him that Munley was summoning him to a meeting at 9:00 AM. (PSMF ¶ 37.) Fagal, Munley, Dunleavy, and Foley attended the meeting. (PSMF ¶ 38.) At the meeting, Munley asked Fagal whether he posted the videos on YouTube. (PSMF ¶ 39.) Fagal acknowledged that he had created and posted the videos. (PSMF ¶ 39; DSMF ¶ 64.) Munley asked Fagal to explain his actions, but when Fagal attempted to raise the issue of the poster removals, Munley indicated that she wanted to discuss the videos, not the poster incident. (PSMF ¶ 39; DSMF ¶ 66.) Fagal requested that Munley put her questions in writing so that he could craft a response, but Munley did not agree to do so. (PSMF ¶ 40.) At the meeting, Munley told Fagal that his employment was suspended effective immediately and that he should return his keys and university identification card. (PSMF ¶ 41.) Levine was not present at this meeting. (PSMF ¶ 42; DR ¶ 42; DSMF ¶ 62; PR ¶ 62.) At no time did Levine tell Fagal that he was suspended. (PSMF ¶ 42.) However, Levine testified that he agreed with Munley that the videos warranted Fagal's suspension. (DSMF ¶ 63.)

At 2:24 PM on that same day, Dunleavy sent an email to Fagal confirming that he had been suspended and directing him to clean out his office. (PSMF ¶ 44.) At no time before Fagal's suspension did Marywood personnel tell Fagal that he posed an immediate harm to himself or others. (PSMF ¶ 46.) Additionally, Marywood did not provide Fagal with an oral or written warning, or an opportunity for monitored assistance relating to the email and videos. (PSMF ¶ 48.)

On January 24, 2012, Frances D. Ferrese, Executive Secretary to Munley, sent an email to Fagal, which included as an attachment, *inter alia*, a letter to Fagal from Munley. (PSMF ¶ 49.) In that letter, Munley stated that she was "recommending that [Fagal's] tenure and employment with Marywood be terminated immediately; the University will,

6

however, pay you the remainder of your 2011-12 Agreement and keep you on benefits through August, 2012." (Ex. 15, Doc. 66.) The letter also provided the following Statement of Charges:

> [Charge 1] Violation of Tenure Policy[,] which includes "a strong acceptance by the Individual (requesting tenure) of the mission, goals and objective of the University";
>
> [Charge 2][6] Violation of the Civil Rights Policy (re in particular harassment of Dr. Levine and his family and other personal attacks on executive officers) . . . ;
>
> [Charge 3] Violation of Professional Ethics Policy[,] which states that professors "do not discriminate against or harass colleagues"; and
>
> [Charge 4] Violation of the University's Mission and Values as well as the principles of collegiality.

(*Id.*) Munley also stated in the letter that she was "prepared to send this statement of charges to a duly appointed faculty committee for review along with the emails and videos you forwarded to members of our community." (*Id.*) Munley requested Fagal to sign and return an attached authorization form granting Marywood the permission to do so. (*Id.*) Prior to this letter, Marywood personnel took no remedial actions to resolve whatever issues they believed had led to Fagal's suspension. (PSMF ¶ 52.)

On February 2, 2012, Fagal's attorney, Jonathan Cohen, sent a letter to Munley. (PSMF ¶ 54.) The letter expressed Plaintiff's opinion that Marywood was in breach of its contract with Fagal and requested the University to convene two ad hoc faculty committees pursuant to Marywood's PDP: one for the decision to suspend Fagal, and the other for Munley's recommendation to terminate Fagal. (Ex. 27, at DEF000193-196, Doc. 66.) Counsel also advised that the end of the second charge in Munley's letter was missing. (PSMF ¶ 54.) The next day, Dunleavy made a handwritten note regarding a meeting or phone conversation that she had with Munley regarding Fagal. (PSMF ¶ 55.) The note reads in part: "Progressive Discipline–n/a." (Ex. 60, Doc. 66.) Dunleavy testified

---

[6] The remainder of the second charge was missing in Munley's original letter. (PSMF ¶ 51; DR ¶ 51.)

that she was conveying that progressive discipline was not applicable. (PSMF ¶ 55.)

On February 8, 2012, Munley sent a second letter to Fagal, in which she again stated that she was recommending Fagal's tenure and employment be terminated immediately. (PSMF ¶¶ 56-57.) The letter also included a "revised statement of charges" and additional attachments. (PSMF ¶ 57; DSMF ¶ 74; Ex. 16, at DEF000207, Doc. 66.)

Charge 1, now labeled "Breach of Tenure Agreement," was revised to note that Fagal's "decision to author and disseminate the above video is a breach of your commitment to Marywood and is in direct contravention of the letter and spirit of Marywood's Mission, Core Values and Objectives." (*Id.* at DEF 000208.) This revised Charge further stated, "[d]epicting the University's President as Adolf Hitler . . . is an intentional, malicious and blatant violation of your tenure commitments. Portraying other University officials as Nazi leaders, using crude and vulgar language and belittling University officials also violates your agreement with Marywood. You gravely injured our community by your actions." (*Id.*)

Charge 2, "Violation of Civil Rights Policy," was revised to note that the videos "demean[ed] and belittle[d] Dr. Levine and his family and launch[ed] personal attacks on executive officers. Harassment of this type directly violates our Civil Rights Policy and will not be tolerated." (*Id.*) Notably, no Marywood employee had filed a civil rights complaint against Fagal after he sent the email in question on January 13, 2012. (PSMF ¶ 61.)

Munley raised a new violation in Charge 3, "Violation of Marywood's Conditions of Computer Use Policy," which noted that Fagal used Marywood's email system and claimed that Fagal might have violated copyright laws and, regardless, failed to respect the civil rights of others by his conduct. (*Id.* at DEF000209.)

Charge 4, "Violation of Academic Freedom Policy; Professional Ethics Policy and University's Mission and Values as well as the principles of collegiality," was revised to claim that Fagal contravened Marywood's Academic Freedom Policy in that the videos were "not in furtherance of any scholarly pursuit and w[ere] clearly not intended to be part of an academic exercise. . . . [the email and videos were] devoid of personal integrity,

8

ha[ve] no scholarly competence and [are] in total disregard of the stated mission of the University." (*Id.*) The revised Charge further asserted that Fagal violated Marywood's Professional Ethics Policy by invoking "images of hatred" and "ridicul[ing] your colleagues." (*Id.*)

Munley again stated that she was prepared to send this statement of charges to a duly appointed faculty committee for review, and requested Fagal to sign and return an attached authorization form. (DSMF ¶ 75.) Finally, Munley noted that the faculty committee "may agree or disagree with my recommendation," and that she would finalize her decision after receiving the committee's determination. (Ex. 5(a), at DEF000210.) Neither Munley's January 24, 2012 letter nor her February 8, 2012 letter contained an offer to convene a faculty committee to review the suspension of Fagal. (PSMF ¶ 60.) Fagal did not execute and return either of the authorization forms attached to Munley's letters. (DSMF ¶ 76; PR ¶ 76.)

On February 9, 2012, Marywood's attorney, William Anthony, sent a letter to Cohen. (PSMF ¶ 62.) Among other assertions, Anthony contended that Fagal breached his contract with Marywood and, as a result, Fagal was not entitled to "pick and choose which policies and procedures he believes will suit him best." (Ex. 28, at FFF000163, Doc. 66.) Anthony further stated that Marywood was providing Fagal with "one last" opportunity to have Munley's recommendation reviewed prior to her finalizing it. (*Id.* at FFF000165.) On February 17, 2012, Cohen responded to Anthony's letter, which stated in part: "To repeat, Dr. Fagal has elected to convene two separate ad hoc committees pursuant to Marywood's official policy: one for President Munley's decision to suspend him and the other, if necessary, for her recommendation to terminate him." (Ex. 62, at FFF001686, Doc. 66.)

On February 22, 2012, Fagal filed a written grievance against Munley. (PSMF ¶ 64.) In his grievance, Fagal alleged that (1) he was improperly suspended because Munley, not Levine (the Vice President for Academic Affairs), informed Fagal of the suspension; (2) he was improperly suspended because he was not a cause of immediate

9

harm to himself or to others; (3) Munley improperly moved to terminate his employment and tenure without remedial measures; and (4) he had not had an opportunity to convene an ad hoc committee to appeal his suspension. (DSMF ¶ 81; PR ¶ 81.) On February 28, 2012, Cohen sent a letter to Anthony advising that Fagal had removed the videos in question from YouTube. (PSMF ¶ 65.) The Marywood administration never asked Fagal to remove the videos. (PSMF ¶¶ 28, 65.)

On March 26, 2012, Erin A. Sadlack, Ph.D ("Sadlack"), the Chair of Marywood's Faculty Grievance Committee ("FGC"),[7] sent a letter to Fagal summarizing his arguments in support of his grievance and concluding, "we have found no evidence of improper action on President Munley's part which would constitute a legitimate grievance." (PSMF ¶ 66.) On March 29, 2012, Fagal sent a letter to Munley in which he granted Marywood permission to release Munley's revised "Recommendation for Termination and Statement of Charges" to an ad hoc committee in order to appeal Munley's decision to suspend Fagal and her recommendation to terminate his employment and tenure. (PSMF ¶ 67.)

On April 3, 2012, Munley sent a letter to Fagal. (PSMF ¶ 69.) The letter noted that the FGC found no evidence of improper action on Munley's part which would constitute a legitimate grievance, and further stated in part:

> Since the grievance process is now complete, I have decided to finalize my recommendation. As a result, your employment with Marywood and your tenure are terminated effective today, April 3, 2012.
>
> Further, to provide you with a review of my decision, I will consider your letter dated March 29, 2012 as your authorization for me to convene two faculty ad hoc committees to appeal my decisions to suspend you and to terminate your employment and tenure. I am doing this despite the fact that on two separate occasions you refused my offer and did not choose to convene an ad hoc committee to review my decision to suspend you and my recommendation to terminate your employment and tenure before I finalized my decision.

(Ex. 32, Doc. 66.) Prior to Munley's April 3rd letter, no ad hoc faculty committee had made any recommendation regarding Munley's recommendation to terminate Fagal. (PSMF ¶

---

[7] The FGC was comprised of three tenured professors. (DSMF ¶ 78.)

10

70.)

On April 30, 2012, Sr. Gail Cabral of Marywood sent an email to Fagal, which informed Fagal that the ad hoc faculty committee reviewing his case (the "AHFC") had not yet been convened. (Ex. 58, Doc. 66.) Cabral stated that she expected the AHFC to convene some time that week. (*Id.*) Cabral further informed Fagal that his suggestion to include Dr. Ed O'Brien on the AHFC had been accepted, and that the other two faculty members on the AHFC were selected "in accordance with the Progressive Discipline Policy, on the basis 'of their objectivity and competence and of the regard in which they are held in the academic community.'" (*Id.*) Additionally, Cabral noted that: "According to the [PDP], when a faculty member requests that a committee be convened twice, the President determines whether the membership of the committee is similar or different. . . . [Munley] has determined that the membership will be the same." (*Id.*)

On May 6, 2012, Fagal emailed the members of the AHFC a written defense to the revised charges made by Munley. (PSMF ¶ 73.) On May 17, 2012, the AHFC held a meeting about Fagal's case. (PSMF ¶ 74.) On May 18, 2012, Dr. Helen Bittel, a member of the AHFC, sent an email to Dunleavy, in which she stated in part: "[D]uring yesterday's meeting, we agreed that our charge should be the review of substance the termination and denial of tenure charges. We understood that the issues of suspension and procedure were resolved by the FGC." (Ex. 48, Doc. 66.)

On July 2, 2012, the AHFC issued a document titled "Review of Sister Anne Munley's Decision to Terminate the Employment and Tenure of Dr. Frederick Fagal." (PSMF ¶ 76.) The AHFC did not agree with all of the charges raised against Fagal, but concurred with Munley's decision to revoke tenure and terminate his employment. (PSMF ¶ 77.) The AHFC's report concluded that Fagal violated Marywood's Core Values and "caused grave and irreparable harm to [the Marywood] community." (Ex. 34, at DEF001518, Doc. 66.) The report did not mention Fagal's suspension, except to note that "[t]he Faculty Grievance Committee has already determined that Sister Anne Munley followed appropriate procedure in moving directly to termination." (PSMF ¶ 77; Ex. 34, at

11

DEF001516.)

On July 6, 2012, Fagal sent an email to the AHFC members, objecting that they had not reviewed his suspension and requesting that they do so. (PSMF ¶ 81.) The AHFC did not reconvene to review Fagal's suspension. (PSMF ¶ 81. XXX see DR is this real?) On July 10, 2012, Bittel sent an email to Dunleavy stating in part:

> On Friday afternoon, our committee received a response from [Fagal]. He has found several problems/omissions with our report and has asked us to review and resubmit. Mostly, he objects to the fact that we did not separately adjudicate his suspension; we, however, understood that this was adjudicated by the prior committee and that their findings were supposed to be final.

(Ex. 69, at DEF3733, Doc. 66.)

On July 13, 2012, Munley sent Fagal a letter stating in part: "My decision to terminate your employment with Marywood University and your tenure effective April 3, 2012 stands." (PSMF ¶ 84.) Between the time that Fagal was suspended and the time that he was terminated, Marywood took no remedial actions directed toward him. (PSMF ¶ 85.) Fagal received his agreed-upon salary through August 2012, at which point Marywood ceased paying him. (PSMF ¶ 87.)

## II. Legal Standards

### A. Summary Judgment

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. *See Edelman v. Comm'r of Soc. Sec.*, 83 F.3d 68, 70 (3d Cir. 1996). Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Anderson*, 477 U.S. at 247-48. An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 251 (3d Cir. 2010). The moving party may present its own evidence or, where the non-moving party has the burden of proof, simply point out to the court that "the nonmoving party has failed to make a sufficient showing on an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When considering whether there are genuine issues of material fact, the court is required to "examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256-57. The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

In order to prevail on a motion for summary judgment, the non-moving party must show "specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial." *Galli v. N.J. Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir. 2007) (citing Fed. R. Civ. P. 56(e)). Although the non-moving

13

party's evidence may be either direct or circumstantial, and "need not be as great as a preponderance, the evidence must be more than a scintilla." *Id*. (quoting *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005)). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

Finally, "[t]he summary judgment standard does not change when, as here, the parties have filed cross-motions for summary judgment." *Wimberly Allison Tong & Goo, Inc. v. Travelers Prop. Cas. Co. of Am.*, 559 F. Supp. 2d 504, 509 (D.N.J. 2008) (citing *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987)), *aff'd*, 352 Fed. Appx. 642 (3d Cir. 2009). "Such motions are no more than a claim by each side that it alone is entitled to summary judgment. . . ." *Transportes Ferreos de Venez. II CA v. NKK Corp.*, 239 F.3d 555, 560 (3d Cir. 2001) (internal quotations omitted). Thus, "when presented with cross motions for summary judgment, the Court must consider the motions separately, and view the evidence presented for each motion in the light most favorable to the nonmoving party." *Borrell v. Bloomsburg Univ.*, 63 F. Supp. 3d. 418, 433 (M.D. Pa. 2014) (internal citations omitted).

**B.    Breach of Contract**

In order to prevail on a breach of contract claim under Pennsylvania law, a plaintiff must demonstrate: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages. *Haywood v. Univ. of Pittsburgh*, 976 F. Supp. 2d 606, 645 (W.D. Pa. 2013). "The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties." *Murphy v. Duquesne Univ. of The Holy Ghost*, 777 A.2d 418, 429 (Pa. 2001) (citing *Felte v. White*, 302 A.2d 347, 351 (Pa. 1973)). "Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed." *Id.* (citing *Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982)). "Under ordinary principles of contract

interpretation, the agreement is to be construed against its drafter." *Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 480-81 (Pa. 2006) (citing *Shovel Transfer & Storage, Inc. v. PLCB*, 739 A.2d 133, 139 (Pa. 1999)). "The meaning of an unambiguous written instrument presents a question of law for resolution by the court." *Murphy*, 777 A.2d at 430 (citing *Cmty. Coll. v. Cmty. Coll., Soc'y of the Faculty*, 375 A.2d 1267, 1275 (Pa. 1977)).

"When performance of a duty under a contract is due, any nonperformance is a breach." *Widmer Eng'g, Inc. v. Dufalla*, 837 A.2d 459, 467 (Pa. Super. Ct. 2003) (quoting Restatement (Second) of Contracts § 235(2)); *see Grudkowski v. Foremost Ins. Co.*, 556 Fed. Appx. 165, 168 (3d Cir. 2014) (citing *Dufalla*, 837 A.2d at 467-68) ("At its core, a breach of contract involves the nonperformance of any duty imposed by a contract between parties."). Thus, if a party is able to prove a breach of contract but can show no damages flowing from the breach, the party is nevertheless able to recover nominal damages under Pennsylvania law. *Wolfe v. Allstate Prop. & Cas. Ins. Co.*, 790 F.3d 487, 497 (3d Cir. 2015) (citing *Thorsen v. Iron & Glass Bank*, 476 A.2d 928, 931 (Pa. Super. Ct. 1984)). Accordingly, it is generally inappropriate for a court to grant summary judgment based solely on a failure to prove damages flowing from a demonstrated breach of contract. *See Haywood*, 976 F. Supp. 2d 606, 645 (citing *Zeno v. Ford Motor Co., Inc.*, 480 F. Supp. 2d 825, 834 (W.D. Pa. 2007) ("In light of the law of Pennsylvania allowing nominal damages for a breach of contract, summary judgment cannot be granted for failure to show damages.")).

"[T]he standard of review for an action for breach of a tenure contract is the same as that applicable to a contract between private parties." *Waggaman v. Villanova Univ.*, No. 04-4447, 2008 WL 4091015, at *20 (E.D. Pa. Sept. 4, 2008) (citing *Murphy*, 777 A.2d at 429). The Pennsylvania Supreme Court expressly declined to apply a deferential standard of review in contractual disputes between a private university and its professors. *See Murphy*, 777 A.2d at 428-29. However, the Pennsylvania Supreme Court has also distinguished claims for breach of contract contesting the merits of a private university's

15

decision to terminate a tenured professor, which are generally unreviewable if the contract exclusively reserves such decisions to the university, from claims that allege a university failed to adhere to the procedural protections afforded to tenured professors per the terms of their employment contract, which are subject to judicial scrutiny. *See Ferrer v. Trs. of Univ. of Pa.*, 573 Pa. 310, 339-40 (2002); *Murphy*, 777 A.2d at 428-29, 443-44; *see also Chen v. Pa. State Univ.*, No. 2-235, 2015 WL 9259395, at *2 (M.D. Pa. Dec. 18, 2015); *Waggaman*, 2008 WL 4091015, at *20; *Reardon v. Allegheny Coll.*, 926 A.2d 477, 483 (Pa. Super. Ct. 2007). As the *Ferrer* court explained:

> [A] breach of contract claim may be brought by a tenured professor when it is asserted that the University failed to comply with the procedures established by the parties' contractual agreement. This cause of action is distinguishable from a tenured professor's claim that a university that has followed the established procedures for termination has made the wrong decision. We stated that "while [a professor] is free to assert in a court of law that the process of forfeiture that was afforded him did not comply with the [c]ontract's terms, he is not free to demand that a jury re-consider and re-decide the merits of his termination."

*Ferrer*, 573 Pa. at 340 (quoting *Murphy*, 777 A.2d at 433).

### III. Discussion

First, the Court notes that the parties do not dispute that Fagal was not an at-will employee and that a contract existed between Fagal and Marywood. (PSMF ¶¶ 18, 49, 57; DR ¶¶ 18, 49, 57.) Additionally, there is not a genuine dispute about the contract's essential terms. (*See* PSMF ¶¶ 7, 9-13, 15-18, 25; DR. ¶¶ 7, 9-13, 15-18, 25; DSMF ¶¶ 11-22, 24-27; PR ¶¶ 11-22, 24-27.) Thus, the first element of Fagal's claim–the existence of a contract containing essential terms–is satisfied. Further, the third element of Fagal's claim, resultant damages, is satisfied for the purposes of summary judgment. It is well settled that "under Pennsylvania law, if a party is able to prove a breach of contract but can show no damages flowing from the breach, the party is entitled to recover nominal damages." *Wolfe*, 790 F.3d at 497 (citing *Thorsen*, 476 A.2d at 931; *Scobell Inc. v. Schade*, 688 A.2d 715, 719 (Pa. Super. Ct. 1997) ("any breach of contract entitles the injured party at least to nominal damages")); *see Zeno*, 480 F. Supp. 2d at 834 ("In light of the law of Pennsylvania allowing nominal damages for a breach of contract, summary

16

judgment cannot be granted for failure to show damages.")).[8] Thus, the only question remaining is one of breach.

## A. Marywood's Motion for Summary Judgment

Marywood moves for summary judgment arguing that: (1) the University was able to suspend its performance under the contract after Fagal materially breached the contract; (2) the University did not procedurally breach its contract with Fagal; and (3) Fagal is unable to establish resultant damages. As noted above, Fagal has established sufficient, potential damage to survive a Motion for Summary Judgment.

### 1. Material Breach

Marywood relies heavily on its argument that Fagal materially breached the contract when he sent the email with accompanying YouTube videos on January 13, 2012. Thus, Marywood contends that since Fagal was in material breach of his employment contract, Marywood was permitted to suspend its performance under the contract. If true, it follows that Marywood could not have procedurally breached the contract. Fagal disagrees, suggesting that "it is a stretch to argue that Plaintiff's video parody was so substantial a breach as to permit Marywood to bypass its own disciplinary rules. (Doc. 84, at 23).

The parties do not contest that the question of materiality is generally an issue of fact. It is for this reason, that "determining whether a breach is material on summary judgment is inherently problematic where, as here, the materiality analysis may well turn on subjective assessments as to the state of mind of the respective parties." *Norfolk S.*

---

[8] At oral argument, Defense counsel disputed that nominal damages were insufficient to allow this action to proceed and cited *Giacone v. Virtual Officeware, LLC.*, No. 13-1558, 2014 WL 7070205 (W.D. Pa. Dec. 12, 2014). There, a court held a bifurcated non-jury trial and found that there was no liability for a breach of a restrictive covenant when Plaintiff was unable to show damages. The instant action is quite different. Procedurally, this court is considering a motion for summary judgment, not conducting a bench trial on liability. Further, Fagal has sufficiently established that nominal damages follow if he is able to show breach.

17

*Ry. Co. v. Basell USA Inc.*, 512 F.3d 86, 96 (3d Cir. 2008). Thus, the Third Circuit has noted in the past that a "court should be reluctant to grant a motion for summary judgment when resolution of the dispositive issues requires a determination of state of mind, for in such cases much depends upon the credibility of witnesses testifying as to their own states of mind, and assessing credibility is a delicate matter best left to the fact finder." *Metzger v. Osbeck*, 841 F.2d 518, 521 (3d Cir. 1988); *see Fedex Ground Package Sys. v. Applications Int'l Corp.*, No. 03-1512, 2008 WL 4279751, at *6 (W.D. Pa. Sept. 12, 2008) (deciding that even when the court found that a party breached a contract as a matter of law, the materiality determination would "still be best left to the trier of fact.").

Here, there is a genuine dispute regarding the expectations of the parties related to the contract at issue. On one hand, Fagal seems to believe that the primary purpose of his contract, and thus the primary expectation of Marywood, was for him to teach. (Doc. 83, at 22). In that vein, he believed that the University wanted him to speak out against the administration to support an "open discussion and unrestricted exchange of ideas." (Doc 83, at 21-22). Thus, Plaintiff posits that since the video in question did not relate to or interfere with his role as a teacher, and the video exemplified his ability to actively speak his mind on campus, he was not materially breaching his contract. Conversely, Marywood suggests that it had greater expectations from its faculty. For example, Marywood points to the core values and mission of the University to construct the primary purpose of the contract. This dispute, illustrating the subjective understandings of the contract, and the expectations flowing from it, are the reason why assessments of materiality are "inherently problematic" on summary judgment. *See Norfolk S. Ry. Co.*, 512 F.3d at 96.

This issue is dispositive for both parties' Motions for Summary Judgment. Any determination of procedural breach–requested by Plaintiff–would have to follow a determination of whether or not Marywood was able to suspend performance under the contract due to Fagal's breach. Since such an inquiry is inappropriate for this Court to

18

entertain at this time, Marywood's Motion for Summary Judgment will be denied. Similarly, Fagal's Motion for Summary Judgment will be denied because "even were we to have determined that [Defendant] breached the contract, as a matter of law, the materiality determination would still be best left to the trier of fact." *Fedex*, No. 03-1512, 2008 WL at *6.

**B.** **Fagal's Motion for Summary Judgment:**

As noted above, Fagal's Motion for Summary Judgment will be denied because there are genuine issues of material fact related to whether or not he had materially breached his contract with Marywood. As such, this Court is unable to determine whether procedural breach has occurred.

**C.** **Motion for Leave to File Second Complaint:**

Plaintiff seeks leave to file a Second Amended Complaint. Plaintiff believes such amendment is necessary to properly include a request for nominal damages in his prayer for relief. However, such amendment is not required.

Federal Rule of Civil Procedure 56(c) states in part that: a "final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." FED.R.CIV.P 56(c). This "rule requires that a court ascertain whether the plaintiffs are entitled to *any* remedy. As long as the plaintiffs have stated a claim for relief, it is the court's obligation to grant the relief to which the prevailing party is entitled whether it has been specifically demanded or not." *Kirby v. United States Gov't, Dep't of Hous. and Urban Dev.*, 745 F.2d 204, 207 (3d Cir. 1984) (emphasis in original); *see, e.g.*, *Reschini v. First Fed. Sav. & Loan*, 46 F.3d 246, 249 (3d Cir. 1995).

Here, Fagal's Amended Complaint contains a sufficient request for damages as to encompass a potential recovery of nominal damages. In part, his prayer for relief states, "Professor Fagal demands judgment in his favor and against Marywood for . . . [s]uch other and further relief to which Professor Fagal may be entitled at law or equity." This statement, in conjunction with Federal Rule of Civil Procedure 56(c), moots the need for a Second Amended Complaint. *See Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F.

19

Supp. 2d 1084, 1100 (N.D. Cal. 2007) (general prayer for "such other and further relief as the Court may deem appropriate" was sufficient). For this reason, Plaintiff's Motion for Leave to File Second Amended Complaint will be denied as moot.

## IV. Conclusion

For the reasons expressed above, Fagal's Motion for Summary Judgment (Doc. 61) will be denied. Further, Marywood's Motion for Summary Judgment (Doc. 62) will be denied. Finally, Fagal's Motion for Leave to File a Second Amended Complaint (Doc. 91) will be denied as moot because his Amended Complaint as drafted is capable of providing nominal damages.

An appropriate order follows.

October 11, 2017  /s/ A. Richard Caputo
Date  A. Richard Caputo
 United States District Judge