1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FREDERICK F. FAGAL, JR.,      )
                              )
            Plaintiff         )
                              )
         vs                   )    14cv2404
                              )
MARYWOOD UNIVERSITY,          )
                              )
            Defendant         )
_____)

TRANSCRIPT OF PROCEEDINGS - ORAL ARGUMENT
BEFORE THE HONORABLE A. RICHARD CAPUTO
WEDNESDAY, OCTOBER 4, 2017; 10:30 A.M.
WILKES-BARRE, PENNSYLVANIA

FOR THE PLAINTIFF:
    Jonathan Zachary Cohen, Esq.
    175 Strafford Avenue, Suite 1, #212
    Scranton, Pennsylvania 19087-3340

FOR THE DEFENDANT:
    Jackson Lewis LLP
    By: Stephanie J. Peet, Esq.
    Three Parkway
    1601 Cherry Street, Suite 1350
    Philadelphia, Pennsylvania 19103

    Proceedings recorded by machine shorthand, transcript produced by computer-aided transcription.
_____

KRISTIN L. YEAGER, RMR, CRR
CERTIFIED REALTIME REPORTER
235 N. WASHINGTON AVENUE
SCRANTON, PENNSYLVANIA 18503

1  THE COURT: Okay, we're here on Cross Motions for Summary
2  Judgment. And there's a motion, also, to amend the pleading.
3      Mr. Cohen, I think you should go first, since you have
4  Plaintiff and your motion has more things in it than does the
5  Defendant. So let's hear from you.
6      MR. COHEN: Sure. May I approach the podium?
7      THE COURT: Sure.
8      MR. COHEN: Your Honor, I re-read the summary judgment
9  papers yesterday, and I realized that Your Honor must be very
10 familiar with the issues already, and that's why I'm going to
11 be very brief today, but I'll be happy to answer any questions.
12     I want to remind the Court that we're only arguing that the
13 procedure in which Plaintiff was terminated was improper, and
14 we are entitled to argue that under Murphy v. Duquesne
15 University of the Holy Ghost.
16     In short, Marywood drafted and implemented a policy that
17 requires a system of progressive discipline, beginning with an
18 oral warning and ending in termination. Professor Fagal had no
19 input into that policy. Under its own terms, the Progressive
20 Discipline Policy appears to apply in all cases, as this Court
21 found when it denied Marywood's Motion to Dismiss.
22     Marywood could have included exceptions, but they did not.
23 We are here today because Marywood breached its own written
24 policies. We think the policies are clearly written in a way
25 that favors our position and that summary judgment should be

granted to us.

But if the Court finds that Marywood's policy are ambiguous, then, it is required to hold a trial. And that's under American Eagle Outfitters v. Lyle and Scott Limited, 584 F3d. 575 Third Circuit.

I do want to address Marywood's -- Marywood made its own Summary Judgment Motion, and we responded, and then Marywood filed a reply and I want to respond to that.

On Page 5 of Marywood's reply, Marywood states that;

"Further, while the policy outlines gradual steps for intervention and assistance, such as personal conferences, oral and written warnings and opportunities for monitored assistance, it explicitly states that they come into play where applicable, and by no means require that each outline strategy be implemented in every instance."

I think that's simply incorrect. I think there's one area of the Progressive Discipline Policy that says it applies only where applicable, and that's, I think, for monitored assistance. But it's incorrect to say that the policy only requires oral warnings or written warnings, when applicable. It simply doesn't say that.

Lastly, the parties have argued over a case involving a waiver of material breach, and that case is the Norfolk case and it's referred to on Page 11 of Marywood's reply.

Plaintiff's position is that that case simply does require

1  the party arguing material breach, that party is required to
2  treat the contract as if there's a total breach and take legal
3  action, and it has to risk the possibility that a Court finds
4  that the breach is non-material. And the reason that the Court
5  did not find that Norfolk Southern waived a material breach
6  argument is that Norfolk took legal action shortly after it
7  indicated that the Defendant was subvert in the contract.
8  Marywood didn't do that and has never done that.
9      There is no counterclaim for breach of contract, and they
10 can't do that now. We think it's simply too late to argue that
11 there's been a material breach. That's clearly been waived.
12     And those are really the only points I wanted to highlight
13 today, Your Honor. I'm happy to answer any questions, and I'll
14 respond to Marywood's attorney, if permitted.
15     THE COURT: Well, I'm curious on the question of the
16 warnings and the progressive discipline. Are you saying you
17 could never discipline someone the way they disciplined this
18 Plaintiff for an initial transgression?
19     MR. COHEN: The way the agreement is written, I think the
20 answer is yes. I could imagine a circumstance where, for
21 example, you know, a Plaintiff brought a gun on campus and
22 started assaulting people, and there was an emergency. And, in
23 fact, the agreement allows a suspension in cases of immediate
24 harm.
25     But there simply seems to be no exceptions provided in the

policy, except now there is, because Marywood adopted a new policy after Professor Fagal's case, but the way it's written, it seems there are no exceptions, there should have been an oral and written warning here, and that wasn't done. And that's our position.

THE COURT: So in other words, the first transgression, unless it would be harmful to either the actor or someone else, you can't be, let me say, graphically disciplined, such as have a termination?

MR. COHEN: I think that's our position, Your Honor.

THE COURT: Okay, thank you. Ms. Peet.

MS. PEET: Yes, Your Honor. Good morning. We're here today because there's no genuine issue of material fact in dispute. In fact, the parties quite agree on many of the facts at issue here.

1. Plaintiff emailed, hosted and disseminated two You Tube videos where he depicted the president of Marywood University as Adolf Hitler wearing a Swastika, and various members of the Nazi regime, Marywood administrators as members of the Nazi regime.

After President Munley gave Plaintiff an opportunity to be heard, during which he refused to apologize and expressed no remorse, she notified him that he was being suspended and that she was recommending his termination.

The president's decisions were reviewed by his peers. The

1  university convened two separate committees, each comprised of
2  three tenured faculty members, one of which was hand-selected
3  by the Plaintiff. Although, Plaintiff doesn't think he engaged
4  in inappropriate conduct and he feels he can engage in this
5  hateful type of behavior, all of his peers unanimously
6  disagreed, and they feel that, although, in their mind,
7  termination is an extreme result, they felt it was wholly
8  appropriate under the circumstances, given Mr. Fagal's totally
9  inappropriate and extreme conduct.
10     THE COURT: Don't you have a problem with the termination
11  having occurred before the committee said anything?
12     MS. PEET: It was a recommendation to term. So he engaged in
13  this conduct, they had the meeting with him where he admitted
14  to doing these actions, he refused to be remorseful, refused to
15  be apologetic or accept responsibility, in any way.
16     She then notified him that he was being suspended and
17  recommending termination. She sent him a statement of charges,
18  which attached a document which asked him, "If you would like
19  to us convene a committee to review this decision before making
20  it final, you have 10 days to do so, per the policy."
21     He didn't do that.
22     They sent a revised statement of charges, per his counsel's
23  request, that a page was missing. Not that page, but a page
24  nonetheless, and he was given another opportunity to sign off
25  and convene these committees.

1  He did not do that.

2  Ultimately, down the line, President Munley said, although
3  you haven't done so and you only had 10 days to do it, you are
4  now telling us that you want us to convene a committee and
5  we're going to do that. And, in fact, she did.

6  They convened the Faculty Grievance Committee, which looked
7  at the procedure of the suspension, the termination and the
8  revocation of tenure. That decision itself is not appealable,
9  but they do have the opportunity to convene an ad hoc
10 committee. He requested that. At that time, they then convened
11 it at that time, as well.

12 At that point is when they officially terminated his
13 employment and paid him through August of 2012, although, his
14 services were no longer needed.

15 Does that address your concern, Your Honor?

16 THE COURT: I thought he was notified he was terminated
17 before the committee said anything?

18 MS. PEET: After the first committee approved, they notified
19 that he was being terminated, and then he requested the other
20 ad hoc committee. So throughout the course of the process,
21 Plaintiff was somewhat combative and a little bit
22 obstructionist, quite frankly.

23 If you see his emails from before he even posted these
24 videos, before Marywood even had notice of these videos, he
25 discussed a possible termination of his employment. His

1 colleagues expressed his possible termination of employment,
2 and his response in every situation was, I'm just going to
3 battle it. He was going to fight this, before he even did it.
4     THE COURT: Okay, but factually, can the president terminate
5 him before the committee recommends it?
6     MS. PEET: It's the president of the university, she can.
7 But as long as her decision is to give him due process, an
8 orderly hearing and a Judicial-like proceeding, and they can
9 overturn it, but they didn't, they solidified and determined
10 that her decision was appropriate.
11     THE COURT: What about the suspension? What about that issue
12 about whether or not the committee considered a suspension?
13     MS. PEET: The evidence of record is unequivocal and
14 undisputed. They considered both the suspension, the
15 termination and the revocation of tenure during those meetings
16 and when they were preparing the report.
17     The testimony from Helen Biddle, Ed Belian(phonetic) and
18 Matt Posky(phonetic) all said it was an exercise in futility to
19 meet twice for the same reason, to prepare two separate reports
20 for the same reason. The president reserves the right to have
21 the same committee to be on both -- to discuss both, so it was
22 just agreed that they would all serve on one committee, and
23 they prepared the report addressing all of the issues.
24     There's no question, and, you know, you can look at Helen
25 Biddle's testimony, that she said, Our process is kind of

1 ongoing, we have never done this before, but we absolutely
2 considered the suspension, we considered the termination and we
3 considered revocation of tenure.
4     THE COURT: Did the report make any findings about the
5 suspension?
6     MS. PEET: Yes, they addressed the suspension, but it was
7 more focused on the termination and revocation of tenure, for
8 obvious reasons. There's no question that all of these three
9 kind of disciplinary issues revolved around the same conduct,
10 the posting of these hateful videos.
11     So the question is, what's the most extreme of these
12 circumstances? I mean, it's more obvious -- if we find it's
13 under the most extreme circumstance that the discipline is
14 appropriate, obviously, a lesser offense would be similarly
15 appropriate, as well, and that's the way they addressed it.
16     So Mr. Fagal's case, the entire case is premised on his
17 contention there was some procedural defect in the way that
18 Marywood applied its contractual obligations. Obviously,
19 Marywood disagrees, for the reasons set forth in the motion,
20 and I'm happy to discuss them today.
21     But more importantly, what Mr. Fagal doesn't address and
22 which is the third element of a breach of contract claim is
23 resultant damages. So from our perspective, Your Honor, this is
24 a big case of no harm, no foul.
25     Even if Alan Levine, Vice-president of Academic Affairs,

1  who is Jewish and was conveyed as a Nazi and was infuriated
2  with his behavior, even if he communicated the suspension
3  decision to Plaintiff instead of Sister Munley. So what?
4       Even if Mr. Levine actually filed the formal complaint,
5  pursuant to the Civil Rights policy. So what? Mr. Fagal has the
6  burden of proof in this case, and there's not a scintilla of
7  evidence which establishes the outcome at the end of this case,
8  the termination and revocation of tenure would have been any
9  different. That's not what he's arguing.
10      What this case is all about is he got what he bargained
11 for. He got the due process, he got the notice and opportunity
12 to be heard, the Judicial-like process, an orderly proceeding.
13 He's not arguing he didn't get a bargain for a value, he's
14 arguing he doesn't like how he got there.
15      Now, this case -- and it's clear in Murphy v. Duquesne that
16 a contract between a professor and a university is no different
17 than any breach of contract between private parties. So if we
18 take a contract for the sale of goods. No different. If you and
19 I contract for a sale of widgets, we have a contract that talks
20 about how many widgets I'm going to sell you and what the
21 quality of those widgets are going to be, and how they're going
22 to get delivered and the price and so forth.
23      Let's say the contract says they're going to be delivered
24 to you by FedEx in four boxes. And they come to you in a timely
25 fashion, in good quality and the right price, but it's not a

1  FedEx truck that shows up at your house, it's UPS. Although, we
2  didn't think we could get it into -- four boxes into three, in
3  fact, they all fit into three boxes.
4      So the contract says four, they show up and they're three.
5  Okay, so maybe there's some technical defect in the contract,
6  maybe they weren't applied to the letter, as Plaintiff
7  suggests, but so what? Again, a case of no harm, no foul.
8      There's no resultant damages here. The outcome would have
9  been the same. He got the value. He's not arguing against that.
10 He's just saying maybe there was a different way we could have
11 got him there. But without the resultant damages, he cannot, as
12 a matter of law, establish a breach of contract claim.
13     And I want to direct Your Honor to a case that's not cited
14 in the brief, but I think it's helpful to show the resultant
15 damages and how this technical defect can be viewed.
16     It's Giacone v. Virtual Officeware, LLC, it's a Western
17 District of Pennsylvania case, and it is Lexis 2014 U.S.
18 District Lexis 172633.
19     This is a breach of contract. It happens to be in the
20 employment relationship, although, not between a professor and
21 the university.
22     In this case, there was a dispute over whether the company
23 followed the notice provision of the person's employment
24 contract when they were terminating his employment. And the
25 Court says;

1    "Well, the manner of "notice" was not technically
2  consistent with the employment agreement, Defendants have
3  failed to prove that the breach was material. Specifically, the
4  manner in which Plaintiff's notice of termination was delivered
5  did not technically comply in one respect with the notices
6  paragraph of the employment agreement."
7    Then it cites the agreement;
8    "However, there was no legitimate contention that Defendant
9  didn't receive actual notice of Plaintiff's termination letter.
10 Rather, the form of the delivery does not constitute a material
11 breach by Plaintiff under the facts of this case, and it does
12 not evidence that Plaintiff was attempting to skirt his good
13 faith and fair dealing obligation, with regard to notice.
14   "When a party has honestly and faithfully performed all
15 material elements of the obligation of the contract but failed
16 to fulfill certain technical obligations, causing no serious
17 detriment to the injured party, it would be odious and
18 inequitable to compel the forfeiture of the entire contract.
19   "Instead, our Courts apply the Equitable Doctrine of
20 Substantial Performance."
21   Then it cites two cases, both in Pennsylvania.
22   "If a breach is an immaterial failure of performance and
23 the contract was substantially performed, the contract remains
24 effective. No breach."
25   THE COURT: So you're saying there's no material breach, or

1  if there were -- you're saying, as a matter of law, there was
2  no material breach.
3       MS. PEET: I think my argument is a little bit more
4  two-fold. From our perspective -- actually, three-fold. There
5  was no breach, material or otherwise. The contract gave us
6  leeway to do what it is that we did.
7       Two. To the extent there's found to be some sort of a
8  deviant, that yes, it's, immaterial versus material.
9       But three, and this is where Plaintiff's motion kind of
10 falls away, and he doesn't address in our opposition is the
11 resultant damages piece.
12      I understand that he was out of a job and that now he had
13 to look for a job, and he spent one hour per week and sent one
14 application in a matter of four years, I understand that. But
15 that would have happened, anyway, because he would have been
16 terminated. Even if President Levine -- Vice-president Levine
17 communicated the decision. Even if they had two separate
18 committees with the same committee members, and they prepared
19 two separate reports. The result would have been the same, and
20 he hasn't proved otherwise, and, quite frankly, he has the
21 burden of proof in this case.
22      So, Your Honor, with all of that being said, we submit that
23 there is no genuine issue of material fact. Plaintiff has not
24 met his burden of proof in a breach of contract case, for all
25 of the reasons I have mentioned, and judgment is entitled to

1 Marywood University as a matter of law.

2 THE COURT: All right, thank you. Mr. Cohen. Before you say
3 anything, what is your position about Ms. Peet's position
4 regarding damages?

5 MR. COHEN: Your Honor, our position is the following:

6 For many years, the position of the Pennsylvania Courts is
7 that a party who has had a contract breached does not need to
8 have monetary damages. He or she or it can have nominal
9 damages. And that goes back a long way.

10 And, you know, we think that our original complaint covers
11 that, you know, in its prayer for relief, but in a belt and
12 suspenders approach, we move to amend and, specifically, ask
13 for nominal damages. So we think that Marywood is wrong about
14 that.

15 We also think that the no harm, no foul argument, we think
16 that's a weak argument, because what the Plaintiff was entitled
17 to here was, first, an oral warning to come into compliance. No
18 one said to him, Professor Fagal, this is a violation of the
19 core values, you need to take this down immediately. If you
20 don't, we're going to proceed to a written warning.

21 None of that happened. If that had happened -- and we don't
22 know that because Marywood never tried it -- it's very likely
23 that the video would have been taken down, which it was, and
24 that's our position on that matter.

25 I also want to address, Ms. Peet said that the report of

1  the committee mentioned suspension. I don't think it does. If
2  you look at the report, it simply doesn't mention suspension.
3      So those are all the points I wanted to make, Your Honor.
4      THE COURT: All right, thank you.
5      MS. PEET: May I, briefly?
6      THE COURT: I'll give you the last word.
7      MS. PEET: Thank you. I do like the last word.
8      THE COURT: Doesn't everybody.
9      MS. PEET: Your Honor, with all due respect, Mr. Cohen is
10 missing the point on the damages argument. We're not saying
11 there's no monetary value at issue here, we don't get there
12 because the damages have to be -- it's resultant damages. We're
13 not talking about actual or nominal.
14     The breach of contract, since decades, has said resultant
15 damages, meaning, he had to have been damaged as a result of
16 Marywood's conduct. What we're saying is, even if those alleged
17 procedural defects didn't take place and they were followed,
18 the end result would have been the same.
19     He was given his opportunity and notice of being heard. He
20 was given the opportunity to have two separate committees
21 convene, hear what he had to say, review all of the evidence
22 and make their determinations. All of that happened.
23     So whether or not he was given an oral or written warning
24 first or if, again, if Mr. Levine communicated the decision, it
25 wouldn't have impacted the end result, which is termination and

1  revocation of tenure. No resultant damages.
2      THE COURT: How do you deal with the progressive discipline
3  thing? I asked him about the idea that it doesn't appear, at
4  least, not in his interpretation, if I'm reading it right, that
5  you can do what you did on the first transgression or first
6  offense, I hate to use that word, because it's not an offense,
7  but the first breach of the disciplinary standards, let's say.
8  How do you respond to that?
9      MS. PEET: Sure. If you actually see the policy -- may I
10 just grab it, Your Honor?
11     THE COURT: Sure.
12     MS. PEET: In short, it has two separate categories for
13 conduct. Mr. Fagal's would fall in the second. So it recognizes
14 two different types of situations, one being personal or
15 professional problems that may be rectified by informal
16 educational process.
17     Then, the second, the serious violation of professional
18 responsibilities implicating possible recommendation for
19 suspension or dismissal.
20     So from our perspective, it absolutely allows the
21 university to go straight to a suspension, even dismissal,
22 under extreme and appropriate circumstances, which were the
23 circumstances that were addressed here.
24     In the next paragraph, it uses the word that this policy is
25 meant to be a flexible means, a guide, something to use as a

1  template for the parties to kind of transgress through the
2  process.
3      As it relates to suspension and termination. What they're
4  saying is a professor can go ahead and rape a student -- I'm
5  saying horrible things -- but under their theory, it's true,
6  that he could steal from students, he can do totally horribly
7  inappropriate things, and yet he would still need to go through
8  progressive discipline and getting an oral or written warning
9  first? It just doesn't make sense, and it's not what the policy
10 requires.
11     He took to mention a little bit about immediate harm. The
12 past several weeks have, I believe, highlighted how severe the
13 words Adolf Hitler and Nazis and Swastikas, what they do to
14 people. They evoke emotions, and people do react harshly to
15 that type of symbol, to those types of feelings, and to not
16 think there was going to be some sort of a harm, when a
17 professor of a university is putting that out in the public,
18 how that's going to make people feel and how people are going
19 to react?
20     What does the university have to do? Wait for someone to
21 get harmed? Wait for someone to file a lawsuit against them for
22 keeping the professor in their employ. If it can't terminate a
23 professor in these circumstances, putting hateful speech about
24 the Marywood professor, about other members of the Marywood
25 administration, sending it to people at their Marywood email

1  accounts, students and professors alike, posting it for the
2  public to see, the times have told us that this is serious, and
3  there is a significant threat of harm, because we don't know
4  how people are going to respond, because people will respond
5  pretty seriously.
6     THE COURT: That may or may not be any of my business, but
7  isn't that a slippery slope?
8     MS. PEET: No, I just think it goes to the point of, we're
9  not here to talk about the substance of the termination nor can
10 he, but when you're talking about there's no immediate harm,
11 and his whole position was just some comical joke, it was a
12 parity of a satire, that's not how a lot of people view this.
13 And this case, quite frankly, is very timely, in that we're in
14 an environment where we're dealing with these type of issues,
15 and there's a lot of people that don't think this type of
16 discussion is funny and comical, and some of those people just
17 so happened to be the ones that were attacked, and the
18 university acted appropriately.
19     But in all due respect, substance aside, it followed
20 procedure, in our position it followed it to the T, because it
21 was given flexibility in various instances. They have a very
22 different interpretation. Doesn't mean that Marywood had to
23 follow their interpretation of its policies.
24     And, again, even if there was a breach, immaterial, but
25 probably most important, no resultant damages.

1   THE COURT: All right, thank you. Thank you all very much.
2   MS. PEET: Thank you, Your Honor.
3   MR. COHEN: Thank you, Your Honor.
4   THE COURT: You'll hear from us shortly. We're adjourned.
5   (At this time the proceedings were adjourned.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                          C E R T I F I C A T E

2

3         I, KRISTIN L. YEAGER, Official Court Reporter for the

4  United States District Court for the Middle District of

5  Pennsylvania, appointed pursuant to the provisions of

6  Title 28, United States Code, Section 753, do hereby certify

7  that the foregoing is a true and correct transcript of the

8  within-mentioned proceedings had in the above-mentioned and

9  numbered cause on the date or dates hereinbefore set forth; and

10 I do further certify that the foregoing transcript has

11 been prepared by me or under my supervision.

12

13                          S/Kristin L. Yeager
                            KRISTIN L. YEAGER, RMR,CRR
14                          Official Court Reporter

15
   REPORTED BY:
16
       KRISTIN L. YEAGER, RMR,CRR
17     Official Court Reporter
       United States District Court
18     Middle District of Pennsylvania
       P.O. Box 5
19     Scranton, Pennsylvania  18501

20

21

22         (The foregoing certificate of this transcript
   does not apply to any reproduction of the same by any means
23 unless under the direct control and/or supervision of the
   certifying reporter.)
24

25