# Exhibit A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FREDERICK F. FAGAL, JR. | : | |
| *Plaintiff,* | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 3:14-cv-02404-ARC |
| MARYWOOD UNIVERSITY, | : | |
| | : | (JUDGE CAPUTO) |
| *Defendant.* | : | |

## JOINT PROPOSED COMPREHENSIVE STATEMENT OF UNDISPUTED FACTS

Pursuant to the Court's Revised Pretrial Scheduling Order and LR 16.3(b), Plaintiff and Defendant propose the following joint statement of undisputed facts:

**1.** Defendant Marywood University ("Marywood") is a Catholic university sponsored by the Congregation of the Sisters, Servants of the Immaculate Heart of Mary, and a Pennsylvania non-profit corporation located in Scranton, Pennsylvania.

**2.** Marywood has adopted a set of "Core Values," which include respect for the value of each human being, diversity in the context of vibrant community, and the earth and all creation.

3. Fagal had earned a bachelor's degree from Union College in 1968, a master's degree in Economics from Cornell University in 1971, and a Ph.D. in Social Studies Education from Syracuse University in 1981.

4. In the Fall semester of 1987, Plaintiff Frederick F. Fagal, Jr. ("Fagal") became a member of Marywood's faculty.

5. Fagal attained tenure at Marywood in September 1994.

6. Throughout his employment at Marywood, Fagal was a professor in the Department of Social Sciences and reported to the Chairperson of the Department.

7. At all relevant times to this litigation, Marywood's President was Sister Anne Munley, IHM ("Munley").

8. In 1992, Fagal signed a document entitled "Agreement and Appointment for Full- Time Faculty. This document states that the "TERMS OF THIS AGREEMENT are offered . . . to Dr. Frederick Fagal Jr. . . . by Marywood College." The document further states that "[t]he policies and practices listed in the Faculty Manual are agreed upon by the parties hereto."

9. Fagal and Marywood entered into written agreements for Fagal to serve on Marywood's full-time faculty for each year between 1992 and 2012. For the 2010-2011 academic year, the parties entered into such an agreement, which was entitled "Tenured Faculty Letter of Agreement 2010-2011 Academic Year."

**10.** Marywood maintains a Faculty Handbook (the "Handbook"), which contains policies on, *inter alia*, contractual agreements with faculty members, faculty grievances and appeals, discipline, tenure, civil rights, computer use, academic freedom, and professional ethics.

**11.** On July 1, 2010, Marywood issued a new edition of its Handbook. The third page of the Handbook states: "This handbook is effective with the 2010-2011 faculty letters of agreement."

**12.** In May 2011, Fagal and Munley signed a document titled "Tenured Faculty Letter of Agreement 2011-2012 Academic Year," which stated that Fagal would serve as a tenured Associate Professor from August 22, 2011 to May 18, 2012 and earn a salary of $76,196.00. The parties agree that Fagal was not an at-will employee during the relevant times.

**13.** In November 2011, Fagal invited a speaker from the Foundation for Individual Rights in Education ("FIRE") to speak at Marywood later that month, in connection with Fagal's Introduction to Social Science class regarding free speech on college campuses. The topic of the FIRE presentation was "Know Your Rights: Free Speech and Thought Reform on Campus," which was related to Fagal's teachings on the U.S. Constitution. Fagal paid for the FIRE speaker.

**14.** Approximately two days before the presentation, Fagal and some students, one of whom Fagal paid, hung posters around campus advertising the event and announcing a $50 attendance prize. Fagal personally paid for some of these posters.

**15.** Fagal attempted to secure an apology and reimbursement from Marywood, but Marywood refused.

**16.** No one from Marywood prevented the FIRE speaker from speaking, shortened the length of his speech, or otherwise tried to change or influence the topic of his discussion.

**17.** The FIRE speaker spoke at Marywood as scheduled.

**18.** On January 13, 2012, Fagal sent an email from his personal email address to Marywood faculty members, at their Marywood University email accounts, concerning the removal of the posters.

**19.** The email contained an "abstract" purporting to describe events that transpired, which stated in part:

> On November 28-29, 2011, Marywood University tore down "stamped approved" posters announcing an open to all [FIRE] presentation....On December 5[,] Alan Levine, VP for Academic Affairs, told me [Fagal] there were no written policy statements which justified Marywood's action, but that my offer of a $50 random prize to a student for attending was, in the eyes of the administration's Executive Council which met on November 29, "pandering" to students to get them to come to class, and that this justified tearing down the

>posters....It is transparently obvious Marywood
>University is discriminating against Professor Fagal.

20. The email also contained hyperlinks to two YouTube videos created by Fagal.

21. The two videos are adaptations of scenes in *Downfall*, a 2004 German-language movie depicting the last days of Adolf Hitler's rule. The scenes adapted by Fagal show Hitler chastising several of his lieutenants over setbacks suffered by the Nazis during World War II. Fagal replaced the English subtitles with his own subtitles.

22. The videos were publicly available to anyone that had access to YouTube.

23. In his email on January 13, 2012, Fagal advised the recipients about Marywood's Computer Use Policy and suggested that they respond to him using their personal email addresses. Fagal signed this email in his capacity as an Associate Professor at Marywood.

24. Prior to sending the January 13, 2012 email, he sent the videos to some other individuals, including Geri Lynn Smith and Rod Carveth on January 3, 2012.

25. When Smith asked "[c]an they really try to fire you over all this?" Fagal responded, "I do NOT think they will try to fire me over 'all this.'" He then stated:

> I do NOT think they will try to fire me over "all this." If by "this" you mean what has happened so far, then absolutely not. I have done *nothing* other than complain about and ask for recompense for their tearing down my approved posters ! *A joke.*
>
> ....
>
> Tenure is on my side. To fire me they would have to go through procedures, set up a committee, have hearings [on some charge -- but what? Some baloney about not supporting the mission's core values?]. They know I would raise a big stink and they would look foolish. Game not worth the candle. Better for them to grimace and wait it out until I retire.

26. Carveth stated that he thought the videos were "brilliant satire," but that "[a]nytime Hitler gets raised, no one pays attention to the message, but the symbolism of Hitler as a murderer and butcher.  I think the university would try and find some loophole to undo your tenure and fire you."  In response, Fagal stated

> [a]nd I know the Hitler link is considered by many to be out of bounds. I would have to face that possibility. I am going to rethink this, but I *think* I won't change my mind about the release. I will look over the faculty manual again (heh).
>
> Go to YouTube. In the search box type Hitler parody. There are tons of them out there…helps my case.
>
> ....
>
> Assuming the videos are released, if Marywood considers going after my job they will probably realize that I would NOT go quietly. If I were a tenured 42 year

6

> old likely to cause trouble for another 20-25 years then the game might be worth their votive candle. But I will be 66 years old in a month! IF they are rational they will think I can't be around *that* much longer and they would take a big publicity hit for trying to get rid of me.

27. On February 15, 2012, Fagal exchanged emails with an individual by the name of Lindsay, last name unknown, about the videos. She said "[t]he real-estate portfolio/young wife stuff is really personal! Geez!...I think you should take down the second video!!!" In response, Fagal stated:

> Only those in the know know that Levine (written LeVINE as a joke because as a Jewish guy working for Hitler his name cannot be Levine!) is on his second family. Nothing wrong with that – but it does get expensive ! Levine actually not a horrible guy, he might even laugh. I think he finds himself in a tough position carrying out orders he does not like....

28. On January 17, 2012, Munley received an email from Levine informing her about Fagal's email and videos. This was the first time that Munley was made aware of the email and videos.

29. At approximately 8:45 AM on January 23, 2012, former Marywood Dean of the College of Arts and Sciences Michael A. Foley, Ph.D. ("Foley"), visited Fagal's office and informed him that Munley was summoning him to a meeting at 9:00 AM.

30. Fagal, Munley, Dunleavy, and Foley attended the meeting.

31. At the meeting, Munley asked Fagal whether he posted the videos on YouTube. Fagal acknowledged that he had created and posted the videos. Munley asked Fagal to explain his actions, but when Fagal attempted to raise the issue of the poster removals, Munley indicated that she wanted to discuss the videos, not the poster incident. Fagal requested that Munley put her questions in writing so that he could craft a response, but Munley did not agree to do so. At the meeting, Munley told Fagal that his employment was suspended effective immediately and that he should return his keys and University identification card.

32. Levine was not present at this meeting. At no time did Levine tell Fagal that he was suspended. However, Levine testified that he agreed with Munley that the videos warranted Fagal's suspension.

33. At 2:24 PM on that same day, Dunleavy sent an email to Fagal confirming that he had been suspended and directing him to clean out his office.

34. On January 24, 2012, Frances D. Ferrese, Executive Secretary to Munley, sent an email to Fagal, which included as an attachment, *inter alia*, a letter to Fagal from Munley. In that letter, Munley stated that she was "recommending that [Fagal's] tenure and employment with Marywood be terminated immediately; the University will, however, pay you the remainder of your 2011-12 Agreement and keep you on benefits through August, 2012."

35. The letter also provided the following Statement of Charges:

>[Charge 1] Violation of Tenure Policy[,] which includes "a strong acceptance by the Individual (requesting tenure) of the mission, goals and objective of the University";
>
>[Charge 2][1] Violation of the Civil Rights Policy (re in particular harassment of Dr. Levine and his family and other personal attacks on executive officers) . . . ;
>
>[Charge 3] Violation of Professional Ethics Policy[,] which states that professors "do not discriminate against or harass colleagues"; and
>
>[Charge 4] Violation of the University's Mission and Values as well as the principles of collegiality.

36. Munley also stated in the letter that she was "prepared to send this statement of charges to a duly appointed faculty committee for review along with the emails and videos you forwarded to members of our community." Munley requested that Fagal sign and return an attached authorization form granting Marywood permission to do so.

37. On February 2, 2012, Fagal's attorney, Jonathan Z. Cohen ("Cohen"), sent a letter to Munley. The letter expressed his opinion that Marywood was in breach of its contract with Fagal and requested that the University convene two ad hoc faculty committees pursuant to Marywood's Progressive Disciplinary Policy

---

[1] The remainder of the second charge was missing in Munley's original letter.

("PDP"): one for the decision to suspend Fagal, and the other for Munley's recommendation to terminate Fagal. Cohen also advised that the end of the second charge in Munley's letter was missing.

38. On February 8, 2012, Munley sent a second letter to Fagal, in which she again stated that she was recommending Fagal's tenure and employment be terminated immediately. The letter also included a "revised statement of charges" and additional attachments.

39. Charge 1, now labeled "Breach of Tenure Agreement," was revised to note that Fagal's "decision to author and disseminate the above video is a breach of your commitment to Marywood and is in direct contravention of the letter and spirit of Marywood's Mission, Core Values and Objectives." This revised charge further stated: "[d]epicting the University's President as Adolf Hitler . . . is an intentional, malicious and blatant violation of your tenure commitments. Portraying other University officials as Nazi leaders, using crude and vulgar language and belittling University officials also violates your agreement with Marywood. You gravely injured our community by your actions."

40. Charge 2, "Violation of Civil Rights Policy," was revised to note that the videos "demean[ed] and belittle[d] Dr. Levine and his family and launch[ed] personal attacks on executive officers. Harassment of this type directly violates our Civil Rights Policy and will not be tolerated."

41. Munley raised a new violation in Charge 3, "Violation of Marywood's Conditions of Computer Use Policy," which noted that Fagal used Marywood's email system and claimed that Fagal might have violated copyright laws and, regardless, failed to respect the civil rights of others by his conduct.

42. Charge 4, "Violation of Academic Freedom Policy; Professional Ethics Policy and University's Mission and Values as well as the principles of collegiality," was revised to claim that Fagal contravened Marywood's Academic Freedom Policy in that the videos were "not in furtherance of any scholarly pursuit and w[ere] clearly not intended to be part of an academic exercise. . . . [the email and videos were] devoid of personal integrity, ha[ve] no scholarly competence and [are] in total disregard of the stated mission of the University." The revised charge further asserted that Fagal violated Marywood's Professional Ethics Policy by invoking "images of hatred" and "ridicul[ing] your colleagues."

43. Munley again stated that she was prepared to send this statement of charges to a duly appointed faculty committee for review, and requested that Fagal sign and return an attached authorization form. Finally, Munley noted that the faculty committee "may agree or disagree with my recommendation," and that she would finalize her decision after receiving the committee's determination.

44. Fagal did not execute and return either of the authorization forms attached to Munley's letters.

45. On February 22, 2012, Fagal filed a written grievance against Munley. In his grievance, Fagal alleged that: (1) he was improperly suspended because Munley, not Levine (the Vice President for Academic Affairs), informed Fagal of the suspension; (2) he was improperly suspended because he was not an immediate harm to himself or to others; (3) Munley improperly moved to terminate his employment and tenure without remedial measures; and (4) he did not have an opportunity to convene an ad hoc committee to appeal his suspension.

46. On February 28, 2012, Cohen sent a letter to Marywood's attorney advising that Fagal had removed the videos in question from YouTube.

47. A Faculty Grievance Committee ("FGC") was formed and was comprised of three tenured professors: Dr. Erin Sadlack, Dr. Patricia Arter, and Dr. William Conlogue.

48. On March 26, 2012, Dr. Sadlack, the Chair of the FGC, following its deliberation, sent a letter to Fagal summarizing his arguments in support of his grievance and concluding, "we have found no evidence of improper action on President Munley's part which would constitute a legitimate grievance."

49. On March 29, 2012, Fagal sent a letter to Munley in which he granted Marywood permission to release Munley's revised "Recommendation for

Termination and Statement of Charges" to an ad hoc faculty committee ("AHFC") to be convened once to appeal Munley's decision to suspend Fagal and once to appeal Munley's recommendation to terminate his employment and tenure.

50.     On May 6, 2012, Fagal emailed the members of the AHFC a written defense to the revised charges made by Munley. On May 17, 2012, the AHFC held its first of several meetings about Fagal's case. On July 2, 2012, the AHFC issued its decision.  In a document titled "Review of Sister Anne Munley's Decision to Terminate the Employment and Tenure of Dr. Frederick Fagal," the AHFC did not agree with all of the charges raised against Fagal, but concurred with Munley's decision to revoke tenure and terminate his employment. The AHFC concluded that that "Sister Anne Munley's termination of Dr. Fagal's employment and tenure is an extreme decision justified by the extreme nature of Dr. Fagal's behavior" because, among other reasons, the Committee found Dr. Fagal's actions were a breach of the tenure policy because the videos were "a flagrant abuse of academic freedom' because [the videos] include[] gratuitous and malicious personal attacks well beyond the spirit and limits of academic freedom" and that "the videos constitute harassment of the individuals who are impugned therein."

51. On July 6, 2012, Fagal sent an email to the AHFC members, objecting that they had not reviewed his suspension and requesting that they do so.

52. On July 13, 2012, Munley sent Fagal a letter advising Fagal that she received and reviewed the report of the AHFC and stating in part: "My decision to terminate your employment with Marywood University and your tenure effective April 3, 2012 stands."

53. Though Fagal's employment was terminated effective April 3, 2012, the University paid him during his suspension beginning January 23, 2012 through the end of the 2011-2012 Letter Agreement. Fagal remained eligible for Marywood's benefits through August 2012.

54. As of December 26, 2017, Fagal had applied to a total of two universities or colleges.

55. On January 11, 2013, Fagal sent a cover letter expressing an interest in a full- or part-time position at Onondaga Community College in Syracuse, New York, and stated "[f]or almost twenty years I held a tenured position as an Associate Professor of Economics at Marywood University in Scranton PA until I got fired last year over a free speech issue. See my resume for some information, and I would of course be *more* than willing to explain the fracas in detail..."

56. In his resume, which he also submitted with the cover letter, under a section titled "Other Perhaps of Interest," Fagal detailed his separation from

Marywood including that he lost his job after posting "a link to two YouTube 'Hitler Parody' satire videos featuring the president of the university as FuhrMunley."

57. On May 7, 2017, Fagal applied for a position as a one year Visiting Assistant Professor in economics at SUNY Oswego.

58. Fagal estimates that he has spent, on average, less than one hour per week seeking other employment. He began seeking other employment prior to his separation in the fall of 2012.

59. Since his separation from Marywood he was worked as a lifeguard and swimming instructor at the YMCA.

60. Fagal believes that he is qualified to teach introductory United States History, introductory micro/macroeconomics, introductory statistics and introductory social science.

61. Fagal's LinkedIn page, at one time, referenced his position with Marywood as a "ReFired Associate Professor of Economics."

Respectfully,

By: s/ Jonathan Z. Cohen
Jonathan Z. Cohen, Esq. (PA 205941)
Jonathan Z. Cohen Ltd.
175 Strafford Avenue
Suite 1 # 212
Wayne, PA 19087-3340
(215) 874-0047
(215) 839-8951 (fax)
jzc@jzc-law.com

*Attorney for Plaintiff*

Date: March 30, 2018

s/ Stephanie J. Peet
Stephanie J. Peet, Esq. (PA91744)
Jackson Lewis P.C.
Three Parkway
1601 Cherry Street
Suite 1350
Philadelphia, PA 19102
(267) 319-7802
(215) 399-2249 (fax)
stephanie.peet@jacksonlewis.com

*Attorneys for Defendant*

Date: March 30, 2018