# Exhibit E

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FREDERICK F. FAGAL, JR. | : | |
| | : | |
| *Plaintiff,* | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 3:14-cv-02404-ARC |
| MARYWOOD UNIVERSITY, | : | |
| | : | (JUDGE CAPUTO) |
| *Defendant.* | : | |
| | : | |

## REQUEST FOR FINDINGS OF FACT AND LAW BY PLAINTIFF FREDERICK F. FAGAL, JR.

Plaintiff Frederick F. Fagal, Jr. ("Fagal") hereby submits the following request for findings of fact and law pursuant to Local Rule 48.2.

**1.** Fagal is a natural person residing in New York State, and he intends to remain there indefinitely.

**2.** Fagal earned a bachelor's degree in 1968 from Union College in Schenectady, NY, a Master's degree in Economics from Cornell University in 1971, and a Ph.D. in Social Studies Education from Syracuse University in 1981.

**3.** Defendant Marywood University ("Marywood" or the "University") is a university and a Pennsylvania domestic non-profit corporation located in Scranton, Pennsylvania.

**4.**    Fagal became a member of Marywood's faculty in the fall semester of 1987. He attained tenure at Marywood in September 1994.

**5.**    In 1992, Fagal signed an "Agreement and Appointment for Full-Time Faculty." This document states that "[t]he policies and practices listed in the Faculty Manual are agreed upon by the parties hereto."

**6.**    Fagal and Marywood entered into written agreements for him to serve on the University's full-time faculty for each year between 1992 and 2012.

**7.**    In 2000, Marywood issued an "Institutional Property" policy that prohibits stealing or destroying University property. Such violations by faculty would be dealt with under the "Progressive Discipline" policy. See Pl.'s Ex. 70.

**8.**    As of July 1, 2003, Marywood had a written policy titled "Non-reappointment of Faculty Member." That policy states: "Non-reappointment of a faculty member is the right of the President of Marywood University, so long as there is no violation of tenure policies, contractual agreements, or other policies stated in the Faculty Handbook." Pl. Ex. 45.

**9.**    As of February 24, 2006, Marywood had a written policy titled "Employment At-will Relationship with Administrators and Staff." That policy

2

stated, in part: "Some jobs require a contractual relationship with the University, and they have a fixed term of employment." Pl. Ex. 44. The policy distinguishes between those jobs requiring a "contractual relationship" and others that were deemed to be "at-will." *See id.*

10.    On July 1, 2010, Marywood issued an edition of its Faculty Handbook. *See* Joint Ex. 3. The third page of that Faculty Handbook states: "This handbook is effective with the 2010-2011 faculty letters of agreement." *Id.* at DEF3458. The fourth page states, in part: "Policy changes require the approval of the President of the University and, when required, the Board of Trustees. Changes are disseminated by the Secretary of the University. They are effective with formal approval and placement in the Marywood University Policies and Procedures Manual." *Id.* at 3459.

11.    The Faculty Handbook states that the "primary" role of the faculty is to teach. *See id.* at DEF3460.

12.    On February 18, 2011, Marywood's then president, Sr. Anne Munley, IHM, Ph.D. ("Munley"), approved a revision of the University's "Contractual Agreements with Faculty Members" policy. *See* Pl. Ex. 7. That policy stated that a "Letter of Agreement" is a "binding contract covering a

3

specific period of time and as a vehicle to renew, adjust and/or alter the

terms of the original contract regarding appointment, rank, tenure, salary,

benefits, etc." *Id.* The same policy also stated: "Tenure is a term

designating guaranteed continuous appointment to full-time faculty

members until retirement." *Id.*

**13.**   Since 1989, Marywood's "Professional Ethics" policy has stated

that professors have a "right to criticize" and:

> As members of their community, professors have
> the rights and obligations of other citizens....As
> citizens engaged in a profession that depends upon
> freedom for its health and integrity, professors have
> a particular obligation to promote conditions of free
> inquiry....

Joint Ex. 7.

**14.**   Since 1993, Marywood's "Academic Freedom" policy has

claimed a "tradition grounded on...individual rights"—a tradition that

"posits...open discussion and unrestricted exchange of ideas." Joint Ex. 3

at DEF3522.

**15.**   On April 29, 2011, Munley approved a revision to the

University's "Faculty Grievances and Appeals" policy. *See* Joint Ex. 9. That

policy stated that "[g]rievants will not be adversely affected for exercising

their right to file a grievance, regardless of outcome" and that "[g]rievants

4

will not be subject to adverse consequences for either initiating a grievance or in presenting evidence on behalf of a grievant." *Id.* at DEF453. It also stated: "Procedures regarding dismissal, suspension, and sanctions of faculty members are in the *Progressive Discipline* policy." *Id.* at DEF450.

16.    Also on April 29, 2011, Munley approved a revision to the University's "Violent Acts and Threats" policy. *See* Pl. Ex. 43. That policy obviously addresses acts of violence, including "aggravated assault." *Id.* at FFF001460. It further states that "a Marywood University student, faculty, or staff member in violation of this policy will be subject to University disciplinary policies and procedures up to and including termination." *Id.*

17.    Also on April 29, 2011, Munley approved a revision to a policy prohibiting "deadly weapons" on campus. *See* Pl. Ex. 71. Violations of that policy also would be "subject to University disciplinary policies and procedures up to and including termination." *Id.*

18.    In May 2011, Fagal and Munley signed a "Letter of Agreement." *See* Joint Ex. 2. That document states that Fagal would serve as a tenured Associate Professor from August 22, 2011 to May 18, 2012 and earn a salary of $76,196.00. *Id.*

**19.** Between October 12, 2011 and May 7, 2014, Marywood had

the "Progressive Discipline" policy ("PDP") found at Joint Exhibit 8. That

policy stated, in part:

> Marywood University endorses a progressive discipline policy designed to promote resolution in a fair and orderly manner. This policy applies to all faculty members with tenure or whose terms of appointment have not yet expired. Its objectives support the collegial relationships at Marywood University and are directed toward continual institutional improvement. Because the University regards disciplinary action as corrective and not punitive, the policy recognizes personal and professional problems that may be rectified by an informal educational process, as well as serious violations of professional responsibilities implicating possible recommendation for suspension or dismissal.
>
> The policy is intended to provide an effective and flexible means of identifying problem areas, resolving complaints, and preventing repetitive incidents by prompt intervention and assistance. It is designed to accomplish these ends by a series of gradual steps involving strategies such as personal conferences, oral and written warnings, and opportunities for monitored assistance where applicable.
>
> **Procedures**
>
> ***Commencement.*** Disciplinary action may be initiated by a complaint, oral or written, which alleges violation of institutional policy, practice, procedure or other functions and responsibilities of

6

the faculty member in pursuing his or her customary teaching and institutional role.  The complaint, which may reflect an incident or incidents of misconduct or deficiency, may be communicated to the faculty member's immediate supervisor or to the appropriate dean.

***Meeting with Administrator.***  The administrator receiving the complaint shall discuss the matter with the faculty member in a confidential conference.  If additional information from the faculty member provides a satisfactory explanation, the decision may be to close the matter then.  If, however, additional light is not shed on the allegation or an explanation is not satisfactory, the administrator will specify corrective action to be taken, and the discussion will constitute an oral warning.

***Written Warning.***  If the alleged problem continues or additional complaints are received, the immediate supervisor or dean must notify the Vice President for Academic Affairs, who shall conduct a preliminary investigation concerning the merits of the complaint.  A written warning to the faculty member may follow where circumstances indicate that the problem is not resolved. The written warning will become a party of the faculty member's personnel file, but will be expunged after three years if no other written warnings have occurred.

***Suspension.*** The faculty member may be suspended by the Vice President for Academic Affairs at any time during the proceedings involving him or her. Suspension is justified if immediate harm to the faculty member or others is threatened by the person's continuance in the faculty position.

....

7

### Dismissal

If remedial actions(s) taken during the suspension does not sufficiently resolve the issues that lead to the suspension, the university may move towards dismissal of the faculty member.

### Ad Hoc Faculty Committee

Faculty members have the right to convene an ad hoc committee in order to appeal either a decision to suspend the faculty member or a decision to dismiss the faculty member.

- Having received a written recommendation for either suspension or dismissal from the Vice President for Academic Affairs, the President of the University sends a written communication to the faculty member, stating with reasonable particularity the basis for suspension or dismissal and offering, if requested by the faculty member within 10 days, to convene a tenured faculty ad hoc committee to consider the matter, to render confidential advice, and thereby to effect a remedy if possible.
- Should the faculty member request a review by an ad hoc committee, it shall consist of three members selected in the following order: (a) one tenured faculty member selected by the person seeking assistance, and (2) two tenured faculty members selected by the Executive Council of the Faculty Senate. The choice of members should be on the basis of their objectivity and competence and of the regard in which they are held in the academic community. The President of the University or his/her delegate has the option of attending the meetings of the

8

Committee. Should a faculty member request that such a committee be convened twice (i.e., once for suspension and once for dismissal), the membership of the committee may be similar or different, a determination which is made by the President of the University in consultation with the faculty member and the Vice President for Academic Affairs. Normally the committee would make its recommendation within 30 days of being convened.

● The Committee elects its own Chair, who sends the opinion of the committee in writing to the President of the University, copied to the faculty member and to the Vice President for Academic Affairs. If the opinion of the Faculty Committee is that the matter is successfully resolved or that there is no merit to the complaint, a recommendation shall be made to discontinue proceedings. If the problem has not been corrected and reason still exists to question the fitness of the faculty member, the recommendation shall be to either continue a suspension or initiate a formal action toward dismissal.

*Id.* That PDP does not list any explicit exceptions. *See id.*

20.    The PDP that came into effect on October 12, 2011 differed from the previous policy in several ways. The first policy diverted "personal problems which may be rectified" into an "informal educational process" implicating oral warnings, written warnings, and "special assistance," whereas "serious violations of professional responsibilities implicating possible suspension or dismissal" were covered by a "formal discipline

9

process." *See* Joint Ex. 3 at DEF3515. The "formal discipline process" did not implicate oral warnings, written warnings, or "special assistance." *See id.* at DEF3516-DEF3518. The PDP implemented on October 12, 2011 did away with the "informal educational process" and "formal discipline process" labels, however. *See* Joint Ex. 8.

**21.**   The PDP implemented on October 12, 2011 referenced a position called the "Vice President of Academic Affairs" ("VPAA"). The VPAA is a "chief academic officer with direct responsibility for the proper functioning of the academic programs of the University." Joint Ex. 3 at DEF3480.

**22.**   Marywood does not contend that Fagal was an at-will employee at any time between November 1, 2011 and August 31, 2012. *See* Joint Ex. 41 at 3.

**23.**   In November 2011, Fagal scheduled a speaker from the Foundation for Individual Rights in Education ("FIRE") to speak at the University in connection with one of his courses. *See* Pl. Ex. 1 at ¶ 18; Pl. Ex. 2 at ¶ 18; Joint Proposed Comprehensive Statement of Undisputed Facts ("SUF") ¶ 13. Fagal paid for the FIRE speaker. *See* SUF ¶ 13.

**24.**   The topic of the FIRE presentation was "Know Your Rights:

Free Speech and Thought Reform on Campus," which was related to

Fagal's teaching of the U.S. Constitution. *See id.*

**25.**   Fagal received approval from Marywood to hang posters

announcing the FIRE speaker. *See* Pl. Ex. 1 at ¶ 19; Pl. Ex. 2 at ¶ 19.

Fagal paid for these posters. *See* SUF ¶ 14.

**26.**   Subsequently, Marywood personnel removed at least some of

Fagal's posters. *See* Pl. Ex. 1 at ¶ 20; Pl. Ex. 2 at ¶ 20. Marywood did not

provide any notice to Fagal before or after the FIRE posters were torn

down.

**27.**   Fagal attempted to secure an apology by Marywood as well as

reimbursement for the posters that were removed, but Marywood refused

these requests. *See* SUF ¶ 15.

**28.**   On December 9, 2011, Marywood approved a new version of

its "Tenure" policy. The policy stated:

> Tenure is a term designating permanent and
> continuous appointment for a full-time faculty
> member. It implies a mutual commitment on the part
> of the faculty member and the University and cannot
> be taken lightly. Once tenure is granted, it will be
> discontinued only for grave reason, which may
> include moral turpitude, flagrant abuse of academic
> freedom, or professional incompetence.

11

Joint Ex. 5 at DEF000431.

**29.** On January 13, 2012, Fagal sent an email from his personal email address to Marywood faculty members about the removal of his posters. *See* SUF ¶¶ 18-19. In the email, Fagal criticized the Marywood administration for removing his posters and for its weak commitment to free speech generally. *See* Joint Ex. 11; Pl. Ex. 1 at ¶ 23; Pl. Ex. 2 at ¶ 23.

**30.** Fagal's January 13, 2012 email also contained hyperlinks to two related videos criticizing Munley and several other administrators for ordering or participating in the poster removals and again for a weak commitment to free speech. *See* Pl. Ex. 1 at ¶ 24; Pl. Ex. 2 at ¶ 24; Joint Ex. 12; Joint Ex. 13.

**31.** At no time did anybody at Marywood ask Fagal to remove the videos from YouTube.  However, Fagal did so by February 28, 2012. *See* Pl. Ex. 56.

**32.** Fagal's two videos are adaptations of scenes in *Downfall*, a 2004 German-language movie depicting the last days of Adolf Hitler's rule. Specifically, the scenes adapted by Fagal show actor Bruno Ganz (playing Hitler) chastising several other actors (playing Hitler's lieutenants) over setbacks suffered by the Nazis during World War II. *See* SUF ¶ 21. Fagal

replaced the English subtitles appearing in these *Downfall* scenes with his own subtitles satirizing the Marywood administration's conduct surrounding the FIRE speaker. *See id.*; Joint Exs. 11-13; Pl. Ex. 16.

**33.**     References to *Downfall* parodies have appeared in *BBC News Magazine*, *The Telegraph*, *The Atlantic*, and the *New York Times*. *See* Pl.'s Exs. 17-21.

**34.**     "Downfall" parodies were very popular on YouTube at the time that Fagal created his videos, and they remain popular now. *See* Joint Ex. 11 at FFF001618; Pl.'s Exs. 17-21, 128, 129. Examples of other "*Downfall*" parodies appearing on YouTube include: a parody in which NFL Commissioner Roger Goodell (depicted as Ganz's Hitler) is upset upon learning that the New England Patriots continue to win games despite the suspension of quarterback Tom Brady; a parody regarding the sub-prime crisis; and a parody in which New York Commissioner of Education John King (depicted as Ganz's Hitler) is upset about complaints regarding the Common Core and standardized testing. *See* Pl.'s Exs. 22-24.

**35.**     On January 17, 2012, Munley received an email from Alan M. Levine, Ph.D., Marywood's Vice President for Academic Affairs, informing her about Fagal's January 13, 2012 email and videos. *See* Joint Ex. 14.

This was the first time that Munley was made aware of Fagal's January 13, 2012 email and videos. *See* SUF ¶ 28. Munley testified that "suspension was the first thing on my mind." *See* Munley Dep. 48:3-4. Before discussing the January 13, 2012 email and videos with Fagal, Munley "had come to the conclusion that this was – this is something for which the individual concerned should be suspended." *Id.* at 62:16-18.

**36.**   Sr. Munley did not recall thinking that Fagal had become a physical threat to himself or others. *See id.* at 53:22-54:2.

**37.**   Before meeting with Fagal to discuss his email and videos, Munley and Marywood's Vice President for Human Resources, Patricia E. Dunleavy, Ph.D. ("Dunleavy"), worked together to create a typewritten list of "talking points." *See* Munley Dep. 69:5-70:21; Pl.'s Ex. 48. Leading up to that meeting, it was Sr. Munley's plan to suspend Fagal regardless of what was said at the meeting. *See* Munley Dep. 73:23-74:7; Pl.'s Ex. 48 at 1.

**38.**   Sr. Munley's "talking points" contain a bullet point titled "Post-Suspension." *See* Pl.'s Ex. 48 at 1. Directly beneath that bullet point is a sub-bullet point stating: "Sister recommends termination and prepares notice of charges." *Id.*

14

**39.**   Levine had no input into the "talking points" document. *See* Levine Dep. 46:10-21.

**40.**   At approximately 8:45 AM on January 23, 2012, former Marywood Dean of the College of Arts and Sciences, Michael A. Foley, Ph.D. ("Dr. Foley"), visited Fagal's office as Fagal was preparing for his 9:00 AM class and stated that Sr. Munley was summoning him to a meeting at the same time (15 minutes' notice). *See* SUF ¶ 29.

**41.**   Only Fagal, Munley, Dunleavy, and Foley attended the 9:00 AM meeting. *See* SUF ¶ 30. Dunleavy was asked to take notes at the meeting, and she did so. *See* Joint Ex. 16; Munley Dep. 88:20-23, 95:15-96:6; Dunleavy Dep. 51:5-17.

**42.**   At the meeting, Munley asked Fagal whether he had posted the two-part video on YouTube. *See* SUF ¶ 31. Fagal acknowledged posting the video. *See id.*   Munley asked Fagal to explain his actions, but when he attempted to raise the issue of the poster removals, that topic was not allowed. *See id.*; Joint Ex. 16 at DEF000163, Joint Ex. 17 at DEF000144; Fagal Dep. 269:5-18.

**43.**   At the meeting, Fagal also requested that Munley put her questions in writing so that he could craft a response. *See* SUF ¶ 31; Joint

15

Ex. 16 at DEF000162, Joint Ex. 17 at DEF000143. Munley did not agree to do so. *See id.*

**44.**   At the meeting, Sr. Munley told Fagal that his employment was suspended effective immediately and that he should return his keys and University identification card. *See* SUF ¶ 31. Dr. Foley testified that Munley told Fagal that he was being "dismissed." *See* Foley Dep. 20:2-5. Foley testified about Fagal: "He was no longer on the faculty." *See id.* at 21:11-15.

**45.**   Levine was not present at the January 23, 2012 meeting. *See* SUF ¶ 30. At no time did Levine tell Fagal that he was to be suspended.

**46.**   The January 23, 2012 meeting was the first time that Fagal had heard from anybody in the Marywood administration after he posted the videos.

**47.**   At 2:14 PM on the same day, Dunleavy sent an email to Fagal confirming that he had been suspended and directing him to clean out his University office. *See* SUF ¶ 33; Joint Ex. 18.

**48.**   At some point after the January 23, 2012 meeting, Dunleavy created a typewritten summary of what she believed had occurred at that meeting based on her contemporaneous written notes. *See* Joint Ex. 17.

16

Dunleavy and Foley signed off on this summary. *See id.*; Foley Dep. 18:18-
21.

**49.** At no time before Fagal's suspension did Marywood personnel

tell Fagal that he posed an immediate harm to himself or to others. Foley

testified that he did not believe that Fagal posed an immediate harm to

himself or to others at the time of the January 23, 2012 meeting. *See* Foley

Dep. 25:18-24.

**50.** Prior to this lawsuit, Marywood personnel never advised Fagal

that his suspension was justified on the ground that that he posed an

immediate harm to himself or to others.

**51.** Prior to January 23, 2012, Marywood did not provide Fagal with

an oral warning, written warning, or any opportunity for monitored

assistance relating to the "*Downfall*" videos.

**52.** At 1:11 PM on January 24, 2012, Frances D. Ferrese,

Executive Secretary to Sr. Munley, sent an email to Fagal. *See* SUF ¶ 34;

Joint Ex. 20. One attachment to the email was a letter from Sr. Munley to

Fagal dated January 24, 2012. *See* Joint Ex. 20 at DEF000166-

DEF000167. In that letter, Sr. Munley stated that she was "recommending

that [Fagal's] tenure and employment with Marywood be terminated

17

immediately." *Id.* at DEF000166. Munley's letter repeatedly references an "agreement" between Fagal and Marywood. *See id.*

**53.**   In the January 24th letter, Munley provided a "Statement of Charges," which she was "prepared to send...to a duly appointed faculty committee for review along with the emails and videos you forwarded to members of our community." *See* Joint Ex. 20 at DEF000166-DEF000167.

**54.**   The end of the second "charge" contained in Sr. Munley's January 24th letter was missing, and therefore it was initially impossible for Fagal to know the full "charges" against him. *See id.*

**55.**   Prior to Sr. Munley's January 24, 2012 letter, Marywood personnel took no remedial actions to resolve whatever issues they believed had led to Fagal's suspension. *See* Munley Dep. 109:11-110:18.

**56.**   Prior to Sr. Munley's January 24, 2012 letter, Dr. Levine did not believe that he had made a written recommendation to terminate Fagal.

**57.**   On February 2, 2012, Fagal's attorney, Jonathan Z. Cohen, Esq. ("Cohen"), sent a letter to Munley advising that Marywood was in breach of its contract and requesting that the University convene two ad hoc faculty committees: one for her decision to suspend Fagal and the other for her recommendation to terminate him. *See* Pl.'s Ex. 26. Mr.

18

Cohen also advised that the end of the second "charge" in Munley's
January 24, 2012 letter was missing. *See id.* at 4.

58.     On February 3, 2012, Dunleavy made a handwritten note
regarding a meeting or a telephone conversation that she had had with Sr.
Munley regarding Fagal. *See* Joint Ex. 22. The note reads, in part:
"Progressive Discipline- n/a -." *Id.* Dunleavy was conveying that
progressive discipline was not applicable.

59.     On February 8, 2012, Munley sent a second letter to Fagal. *See*
Joint Ex. 24. In this letter, Sr. Munley stated again that she was
recommending that Fagal's "tenure and employment with Marywood be
terminated immediately" and offered a "Statement of Charges." *Id.* Once
again, Munley's letter repeatedly referenced an "agreement" between Fagal
and Marywood and alleged a "breach" of that "agreement." *Id.*

60.     In the second "charge" against Fagal, Sr. Munley accused him
of violating Marywood's "Civil Rights" policy. *See id.* at DEF000208.

61.     At the time of Munley's February 8, 2012 letter, Marywood had
a "Civil Rights Complaint Procedures" policy in effect. *See* Joint Ex. 3 at
DEF3579-DEF3581. The policy stated in part that it "must be followed any
time a member of the Marywood University community believes s/he has

19

been the victim of...discrimination, harassment, or assault by any member of the University community." *Id.* at DEF3579.

**62.** Nowhere in Munley's January 24, 2012 letter or February 8, 2012 letter—or in any attachments to either letter—did she offer to convene a faculty committee to review her suspension of Fagal. *See* Joint Exs. 20, 24.

**63.** Although Munley's letters of January 24, 2012 and February 8, 2012 reference Marywood's "Civil Rights" policy and the second letter charges Fagal with violating that policy, no Marywood employee had filed a civil rights complaint against Fagal.

**64.** On February 9, 2012, Marywood's attorney, William J. Anthony, Esq. ("Anthony"), sent a letter to Cohen. *See* Joint Ex. 23. In that letter, Anthony stated that Fagal had breached a "material term" of his contract, that he was "not entitled to pick and choose which policies and procedures he believes will suit him best," and that Marywood "had no further contractual obligations to him." *Id.* Anthony repeatedly referenced a "contract" between Fagal and Marywood. *See id.*

**65.** On February 17, 2012, Cohen sent a letter to Anthony. *See* Pl.'s Ex. 41. Mr. Cohen stated in part: "To repeat, Fagal has elected to

convene two separate ad hoc committees pursuant to Marywood's official policy: one for President Munley's decision to suspend him and the other, if necessary, for her recommendation to terminate him." *Id.* at 1.

**66.**   On February 22, 2012, Fagal filed a grievance against Munley. *See* SUF ¶ 40; Joint Ex. 25. In the grievance, Fagal alleged that Munley violated Marywood policy by improperly suspending him, by improperly moving to terminate his employment and tenure, and by not accepting his request to convene an ad hoc committee to appeal the suspension. *See id.*

**67.**   On February 28, 2012, Cohen sent a letter to Anthony advising that Fagal had removed the videos that he had posted to YouTube. *See* Pl.'s Ex. 56. Nobody at Marywood had asked Fagal to remove the videos.

**68.**   On March 26, 2012, Erin A. Sadlack, Ph.D. ("Sadlack"), the Chair of Marywood's Faculty Grievance Committee sent a letter to Fagal summarizing his grievances and concluding: "I now write to inform you that in reviewing each of these grievances, we have found no evidence of improper action on President Munley's part which would constitute a legitimate grievance." Joint Ex. 26.

**69.**   On March 29, 2012, Fagal sent a letter to Munley objecting to the Faculty Grievance Committee's decision and stating:

> I grant permission for Marywood University to release your "Recommendation for Termination and Statement of Charges" dated February 8, 2012 to an ad hoc committee in order to appeal your decision to suspend me as well as your recommendation to terminate my employment and tenure. To be clear, I am requesting that the ad hoc committee be convened twice—once to appeal my suspension and once to appeal your recommendation to terminate my employment and tenure.

Joint Ex. 30.

**70.**   On April 2, 2012, Barbara McNally, an assistant for Dr. Levine, sent an email to Dr. Levine stating that Fagal was on her list of faculty members "leaving" Marywood after that year or leaving their position in the capacity that they were hired. *See* Pl.'s Ex. 58. Levine probably told Ms. McNally that Fagal would be leaving. When Fagal's counsel asked Levine, "You thought that before Professor Fagal's disciplinary procedures were over, it was a foregoing conclusion that he would be out of Marywood?", Dr. Levine stated: "I thought that was a distinct possibility, yeah."

**71.**   On April 3, 2012, Munley sent a letter to Fagal. The letter states, in part:

> Since the grievance process is now complete, I have decided to finalize my recommendation. As a result, your employment with Marywood and your tenure are terminated effective today, April 3, 2012.

22

>Further, to provide you with a review of my decision,
>I will consider your letter dated March 29, 2012 as
>your authorization for me to convene two faculty ad
>hoc committees to appeal my decisions to suspend
>you and to terminate your employment and tenure. I
>am doing this despite the fact that on two separate
>occasions you refused my offer and did not choose
>to convene an ad hoc committee to review my
>decision to suspend you and my recommendation to
>terminate your employment and tenure before I
>finalized my decision.

Joint Ex. 31. Munley's claim that Fagal did not request that the University

convene an ad hoc committee to review his suspension was untrue. *See*

Pl.'s Exs. 26, 41.

**72.**   When Cohen asked Munley whether—prior to her letter of April

3, 2012—any ad hoc faculty committee had made any recommendation

regarding her recommendation to terminate Fagal, she testified: "I think the

only thing that happened was the response to the Grievance and Appeals

Committee." Munley Dep. 144:19-25. To Fagal's knowledge, prior to

Munley's letter of April 3, 2012, no ad hoc faculty committee had made any

recommendation regarding Munley's recommendation to terminate him.

**73.**   On April 4, 2012, Cohen sent a letter to Anthony advising that

Munley had no right to terminate Fagal prior to considering any

23

recommendation of an ad hoc faculty committee under the PDP. *See* Pl.'s

Ex. 59.

**74.** On April 30, 2012, Sr. Gail Cabral ("Cabral") of Marywood sent

the email to Fagal. *See* Joint Ex. 33. Sr. Cabral stated:

> Sr. Anne Munley and Dr. Levine asked me to
> respond to your question about the status of the ad
> hoc committee. The committee has not yet
> convened but I expect that to take place this week. I
> am currently working to schedule the meeting.
>
> Your suggestion to include Dr. Ed O'Brien on the
> committee has been accepted. The other two
> members of the ad hoc committee are Dr. Helen
> Bittel and Mr. Matt Povse. The choice of these two
> individuals was made in accordance with the
> Progressive Discipline Policy, on the basis "of their
> objectivity and competence and of the regard in
> which they are held in the academic community."
>
> According to the Progressive Discipline Policy,
> when a faculty member requests that a committee
> be convened twice, the President determines
> whether the membership of the committee is similar
> or different. The President has received your email,
> and after review and consultation, Sr. Anne has
> determined that the membership will be the same.

*Id.*

**75.** On May 6, 2012, Fagal sent an email to Bittel, O'Brien, and

Povse attaching a written defense to the charges made by Munley on

February 8, 2012. *See* Joint Ex. 34.

24

**76.**   On May 17, 2012, the ad hoc faculty committee held a meeting about Fagal's case. *See* Pl.'s Ex. 43. Minutes taken by Bittel about that meeting state, in part: "[W]e concluded that we (the AHC) are charged with reviewing the substance of the termination charge (dismissal and revocation of tenure)....we understand our charge to be the review of substance the termination and denial of tenure charges. We understand that the issues of suspension and procedure were resolved by the FGC." *Id.* at DEF000323.

**77.**   On May 18, 2012, Bittel sent an email to Dunleavy stating: "I just wanted to let you know...that, during yesterday's meeting, we agreed that our charge should be the review of substance the termination and denial of tenure charges.  We understand that the issues of suspension and procedure were resolved by the FGC." Pl.'s Ex. 42 at 1.

**78.**   On July 2, 2012, the ad hoc faculty committee issued a document titled "Review of Sister Anne Munley's Decision to Terminate the Employment and Tenure of Dr. Frederick Fagal." SUF ¶ 50; Joint Ex. 36.

**79.**   The ad hoc faculty committee did not concur with all of the charges lodged against Fagal. *See id.* Nonetheless, the committee concurred with Sr. Munley's decision to revoke the tenure and terminate

25

the employment of Fagal. *See id.* The FSAHHC's document did not mention Fagal's suspension. *See* Joint Ex. 36.

**80.**   Bittel acknowledges that she did not make any formal findings about whether Fagal's suspension was appropriate.

**81.**   Bittel also testified that she did not think that Munley had ever informed her that Fagal had asked for an opportunity to answer Munley's questions in writing. She acknowledged that—had she known that Fagal had asked for that opportunity—that would "problematize" her understanding that Fagal had declined multiple opportunities to make amends, to show remorse, and to explain his actions. Bittel further stated that Fagal's request to answer Munley's questions in writing conflicted with her committee's findings and that these findings could not account for Fagal's request.

**82.**   Bittel also testified that Munley had asked for the ad hoc faculty committee's expected date of completion because "she didn't want it to drag out too long."

**83.**   On July 6, 2012, Fagal sent an email to the ad hoc faculty committee members objecting that they had not reviewed his suspension

and requesting that they do so. *See* SUF ¶ 51; Joint Ex. 37. Subsequently,

the committee failed to review the propriety of Fagal's suspension.

**84.** On July 10, 2012, Bittel sent an email to Dr. Dunleavy stating,

in part:

> On Friday afternoon, our committee received a
> response from Dr. F. He has found several
> problems/omissions with our report and has asked
> us to review and resubmit. Mostly he objects to the
> fact that we did not separately adjudicate his
> suspension; we, however, understood that this was
> adjudicated by the prior committee and that their
> findings were supposed to be final.

Pl.'s Ex. 62 at 2.

**85.** Members of the ad hoc faculty committee have repeatedly

stated or suggested that their committee did not review Fagal's suspension.

*See* Pl.'s Ex. 42 at 1; Pl.'s Ex. 43 at 2; Pl.'s Ex. 62 at 2.

**86.** On July 13, 2012, Munley sent Fagal a letter stating, in part:

"My decision to terminate your employment with Marywood University and

your tenure effective April 3, 2012 stands." SUF ¶ 52; Joint Ex. 38.

**87.** Between the time that Fagal was suspended and the time that

he was terminated, Marywood took no remedial actions directed to him.

*See* Munley Dep. 109:11-110:18, 112:19-25; Pl.'s Ex. 8 at 3-4; Pl.'s Ex. 36

at 2.

27

**88.** On July 18, 2012, Dunleavy sent an email to Munley stating, in part: "I'd like to suggest the following topics for your consideration for Cabinet Retreat....Faculty Grievance and Appeals and Progressive Discipline for Faculty - post Fagal, we probably want to revise these (perhaps using some of the faculty who sat on the review committees)." Pl.'s Ex. 54 at 1.

**89.** Fagal received his agreed-upon salary through August 2012, at which point Marywood ceased paying him. *See* SUF ¶ 53; Pl.'s Ex. 1 at 17 (¶ 66); Pl.'s Ex. 2 at 11 (¶ 66).

**90.** On May 7, 2014, a new version of Marywood's "Progressive Discipline" policy took effect. Unlike the previous version, this one states:

> Progressive discipline, however, is not guaranteed in every instance. In certain rare and extreme cases, the President has the authority to initiate procedures for suspension or dismissal of a tenured faculty member without that person first undergoing progressive discipline.
>
> ...
>
> *Exceptions to Progressive Discipline*
>
> In most cases, it is expected that faculty members will be entitled to the processes of progressive discipline. However, in the rare event of an egregious breach of professional discipline or illegal activity, the President may elect to initiate

28

suspension or dismissal procedures immediately.
There is no obligation for the President or VPAA to
suspend the faculty member before moving to
dismissal procedures given severe circumstances.

Pl.'s Ex. 25 at 1, 2.

**91.** According to Marywood officials, the new PDP was necessary,

in part, to bring "clarity" and "clarification" to the old one. *See* Pl.'s Ex. 112

at 1, 2, 5.

## II.   <u>Findings of Law</u>

**92.** Fagal's sole cause of action is for breach of contract. "To state

a breach of contract claim under Pennsylvania law, a plaintiff must allege

'(1) the existence of a contract, including its essential terms, (2) a breach of

a duty imposed by the contract and (3) resultant damages.'" *Borrell v.*

*Bloomsburg Univ.*, 955 F. Supp. 2d 390, 407 (M.D. Pa. 2013) (quoting

*CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct.

1999)).

**93.** Even if a plaintiff cannot show actual damages resulting from a

breach, he is entitled to recover nominal damages. *See Wolfe v. Allstate*

*Prop. & Cas. Ins. Co.*, 790 F.3d 487, 497 (3d Cir. 2015) (citing *Thorsen v.*

*Iron & Glass Bank*, 328 Pa. Super. 135, 141, 476 A.2d 928, 931 (Pa.

Super. Ct. 1984)).

29

**94.**    The Third Circuit and the Supreme Court of Pennsylvania have

summarized the principles of contract interpretation:

> The fundamental rule in interpreting the meaning of
> a contract is to ascertain and give effect to the intent
> of the contracting parties. The intent of the parties to
> a written agreement is to be regarded as being
> embodied in the writing itself. The whole instrument
> must be taken together in arriving at contractual
> intent. Courts do not assume that a contract's
> language was chosen carelessly, nor do they
> assume that the parties were ignorant of the
> meaning of the language they employed. When a
> writing is clear and unequivocal, its meaning must
> be determined by its contents alone.

*Great Am. Ins. Co. v. Norwin Sch. Dist.*, 544 F.3d 229, 243 (3d Cir. 2008)

(quoting *Murphy v. Duquesne Univ. Of The Holy Ghost*, 565 Pa. 571, 590-

91, 777 A.2d 418, 429-30 (Pa. 2001)).

**95.**    Ambiguities in a contract are construed against the drafter. *See*

*Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995);

*Camp Ne'er Too Late, LP v. Swepi, LP*, 185 F. Supp. 3d 517, 549 (M.D.

Pa. 2016); *Shovel Transfer & Storage, Inc. v. Pa. Liquor Control Bd.*, 559

Pa. 56, 67, 739 A.2d 133, 139 (Pa. 1999).

**96.**    An employee handbook will be deemed a contract of

employment "if a reasonable person in the employee's position would

interpret its provisions as evidencing the employer's intent to supplant the

at-will rule and be bound legally by its representations in the handbook."
*Braun v. Wal-Mart Stores, Inc.*, 2011 PA Super 121, 24 A.3d 875, 941 (Pa.
Super. Ct. 2011) (quoting *Caucci v. Prison Health Servs., Inc.*, 153 F.
Supp. 2d 605, 611 (E.D. Pa. 2001)).

97.     A professor alleges a breach of contract by a private university
by pleading that the university did not comply with its own procedural rules.
*See Waggaman v. Villanova Univ.*, No. 04-4447, 2008 WL 4091015, at *20
(E.D. Pa. Sept. 4, 2008); *Ferrer v. Trs. of Univ. of Pa.*, 573 Pa. 310, 340,
825 A.2d 591, 609 (Pa. 2002); *Murphy*, 777 A.2d at 433. The university
must follow the procedures detailed in its contract "to the letter" and must
fulfill these obligations "with good faith." *See Murphy*, 777 A.2d at 434.

98.     A university is not entitled to use its discretion in interpreting its
own policies and procedures. In *Murphy*, a case involving the termination of
a professor by a private university, the Supreme Court of Pennsylvania
rejected a deferential standard of review. *See* 777 A.2d at 424, 428-29.

99.     Fagal alleges that Marywood breached its contractual duties
when: (1) Munley suspended Fagal on January 23, 2012 without any oral
or written warning or any opportunity for monitored assistance; (2)
Marywood suspended Fagal when there was no immediate harm to himself

31

or to others threatened by his continuance in his faculty position; (3)

Munley--not the VPAA--suspended Fagal; (4) on January 24, 2012, Munley

recommended the termination of Fagal's employment and tenure without

taking any remedial actions to resolve any issues that she believed had led

to his suspension; (5) Munley charged Fagal with violating Marywood's

"Civil Rights" policy even though nobody at Marywood had filed a complaint

under the University's "Civil Rights Complaint Procedures" policy; (6)

Marywood failed to convene an ad hoc committee to review Fagal's

suspension despite his multiple requests that Marywood do so; and (7)

Marywood terminated Fagal's employment on April 3, 2012 before any ad

hoc faculty committee recommended that she do so. The record is clear

that Marywood did breach its contractual duties precisely as Fagal alleges.

**100.**  Marywood argues that neither progressive discipline nor an

opportunity for remediation were required. Marywood is mistaken. As

stated in the operative PDP, discipline imposed by Marywood is

"progressive," "corrective," "gradual," "educational," and "remedial." After a

complaint occurs, the first disciplinary measure is an "oral warning." *See*

Joint Ex. 8 at DEF000455. Following that is a "written warning." *See id.* And

following that is "monitored assistance" or "special assistance," where

"applicable." *See id.* at DEF000455, DEF000456. Before a recommendation for suspension or termination is made, an ad hoc committee must determine whether the problem has been "successfully resolved" or has "not been corrected and reasons still exists to question the fitness of the faculty member." *See id.* at DEF000456-DEF000457.

**101.**   That certain committee members convened to review Fagal's case concluded that progressive discipline was not required or appropriate is irrelevant. As stated above, a university is not entitled to deference in interpreting its own procedures. *See Murphy*, 777 A.2d at 424, 428-29.

**102.**   Under Marywood's operative PDP, Fagal could have received an oral or written warning—at most—for publishing the "*Downfall*" parodies. Further discipline could only follow if Fagal then failed to meet Marywood's expectations again. Marywood could not simply skip directly to suspension, followed by a recommendation for termination less than 24 hours later. Before terminating Fagal, the PDP required Marywood to: (1) provide Fagal with at an oral warning; (2) provide him with a written warning if Marywood still did not believe that Fagal was conducting himself properly; (3) satisfy itself that Fagal was an "immediate harm" after a written warning failed; (4) attempt remediation; and (5) wait for remediation to fail. Marywood's failure

33

to follow its written procedures led to a permanent cessation of his salary in August 2012.

**103.**   Marywood's primary defense to Fagal's allegations is to claim that he committed a material breach of contract. A material breach by one party to a contract entitles the "nonbreaching" party to suspend performance of the contract. *See LJL Transp., Inc. v. Pilot Air Freight Corp.*, 599 Pa. 546, 962 A.2d 639, 648 (Pa. 2009) (citation omitted). Consequently, a party who has committed a material breach may not insist upon performance of the contract. *Id.* (quotation omitted). But an immaterial breach will not excuse the non-breaching party's performance. *Cimina v. Bronich*, 517 Pa. 378, 537 A.2d 1355, 1358 (Pa.1988) (citation omitted).

**104.**   Materiality requires a "substantial showing" of several factors, including "the extent to which the injured party will be deprived of the benefit which he reasonably expected," "the extent to which the party failing to perform or to offer to perform will suffer forfeiture" and "the likelihood that the party failing to perform or offer to perform will cure his failure." *Int'l Diamond Importers, Ltd. v. Singularity Clark, L.P.*, 2012 PA Super 71, 40 A.3d 1261, 1271 (Pa. Super. Ct. 2012).

**105.** A party alleging that it can suspend performance under a contract because another party materially breached that contract cannot, however, continue performance without waiving the breach. *Cf. Raddison Design Mgmt., Inc. v. Cummins*, No. 07-92, 2011 WL 818668, at *6-7 (W.D. Pa. Mar. 2, 2011); *Fuller Co. v. Brown Minneapolis Tank & Fabricating Co.*, 678 F. Supp. 506, 509 (E.D. Pa. 1987); *Gillard v. Martin*, 2010 PA Super 238,13 A.3d 482, 487-88 (Pa. Super. Ct. 2010); 13 R. Lord, *Willison on Contracts* (4th) § 39.32[1]; 14 R. Lord, *Willison on Contracts* (4th) § 43:15.

**106.** Waiver is generally an issue of fact, but it can be decided as a matter of law "where only one reasonable conclusion can be drawn from the undisputed facts." *See Cedrone v. Unity Sav. Ass'n*, 609 F. Supp. 250, 254 (E.D. Pa. 1985) (citing cases).

**107.** Faced with an alleged material breach of contract, the "non-breaching" party has only the following options:

> When one party commits a material breach of contract, the other party has a choice between two inconsistent rights—he or she can either elect to

---

[1] *Willison* states that an "election of remedies"—as opposed to a "waiver"— has occurred when one party to a contract continues performance knowing of a material breach by the other party. Regardless of the name of the doctrine, after electing to perform the contract, the "non-breaching" party cannot subsequently argue that it had no obligation to perform on the ground of a material breach.

> allege a total breach, terminate the contract and
> bring an action, or, instead, elect to keep the
> contract in force, declare the default only a partial
> breach, and recover those damages caused by that
> partial breach—but the nonbreaching party, by
> electing to continue receiving benefits pursuant to
> the agreement, cannot then refuse to perform his or
> her part of the bargain.

*Gillard*, 13 A.3d at 487 (quoting 13 R. Lord, *Williston on Contracts* (4th Ed. 1990), § 39:32, p. 645 (in pertinent part) (footnotes omitted)).

**108.** Even if Fagal breached the contract, there can be no question that Marywood waived that breach. After Marywood alleged that Fagal was in "material breach" through Anthony's letter dated February 12, 2012, Marywood did not terminate the contract or bring an action against Fagal. Instead, Marywood elected to do all of the following (albeit deficiently):

**a.** offered to convene the ad hoc faculty committee to review Munley's recommendation to terminate Fagal;

**b.** convened the faculty grievance committee to adjudicate Fagal's grievance;

**c.** permitted Fagal to select a faculty member for the ad hoc faculty committee;

**d.** convened the ad hoc faculty committee;

36

    **e.** permitted the ad hoc faculty committee to deliberate over the course of several months and to reach a decision;

    **f.** repeatedly referenced the written policies that it is now repudiating as if they remained in force; and

    **g.** continued to pay Fagal through August 2012.

These facts dispositively show that Marywood has waived any alleged breach by Fagal. After Marywood declared that it owed Fagal no contractual duties, it then went to great lengths to perform—albeit deficiently—under the contract.

**109.** Marywood cites *Norfolk Southern Railway, Co. v. Basell USA, Inc.*, an unpublished decision decided under Delaware law, for the proposition that a non-breaching party need not suspend performance of its duties after a breach of contract and risk exposure to liability should the breach be found to be immaterial. In fact, *Norfolk Southern* states that the non-breaching party must take that risk. *See Norfolk S. Ry., Co. v. Basell USA, Inc.*, No. 05-3419, 2008 WL 3832518, at *6 (E.D. Pa. Aug. 15, 2008). A comment to the suggested jury charge on materiality confirms: "[I]f the non-breaching party erroneously treats an immaterial breach as a material breach and treats the contract as ended, that non-breaching [sic] may,

37

itself, be in material breach of the contract." Pa. Suggested Standard Civil Jury Instructions § 19.110 (4th Ed.).

**110.**   Even if Marywood had not waived the right to invoke the material breach defense—which it has—the defense of material breach would fail here. Marywood essentially argues that it was entitled to suspend the procedures that it created for the very purpose of addressing even "serious violations" of University policy because Fagal's alleged violations were "material breaches" of University policy. This argument is almost perfectly circular. By creating an express disciplinary procedure to address misconduct without stating anywhere that such a procedure could be bypassed if the misconduct is serious enough, the University has rendered a "material breach" defense inconsistent with the terms of the contract.

**111.**   Further, if a material breach defense is available, the circumstances of this case suggest that any breach by Fagal was immaterial. Marywood represents in its Faculty Handbook that its professors have the "rights and obligations of other citizens" and reminds them that "[a]s citizens engaged in a profession that depends upon freedom for its health and integrity," they have a "particular obligation to promote conditions of free inquiry...." Marywood claims a commitment to a

38

"tradition grounded on...individual rights"—a tradition that "posits...open discussion and unrestricted exchange of ideas." Professors "maintain their right to criticize." The Faculty Handbook also notes that the "primary" role of the faculty is to teach. The University has a liberal disciplinary policy, making even violent acts and threats, theft against the institution, and carrying deadly weapons "subject to University disciplinary policies and procedures" or the PDP. The PDP contemplates "immediate harm."

112.   Moreover, it must be emphasized that Fagal's videos were familiar parodies. The fact that these parodies reference Hitler should not necessarily make them a firing offense. *Cf. Grant David Vincent Williams v. Jefferies Hong Kong Ltd.* [2013] HCA 320/2011 at 18-22 (¶¶ 47-59), HKEC 1084 (C.F.I.) (finding defendant employer in breach for firing plaintiff over "*Downfall*" parody; allegation of anti-Semitism was "utter nonsense"; criticizing defendant's "panic stricken, hypersensitive corporate reaction").

113.   Here, a professor in his 25th year of service to Marywood and his 18th year of tenure was terminated for publishing video parodies of the Marywood administration's heavy-handed seizure of approved posters that Fagal had hung to inform the student body of a free speech event. The videos were easily recognizable satire; Fagal even pointed the recipients to

the back story behind "*Downfall*" parodies. *See* Joint Ex. 11 at FFF001618

(noting the Wikipedia page for "Downfall"). No member of the Marywood

community filed a civil rights complaint against Fagal. Nor did anybody ask

Fagal to remove the video, which he did anyway. There is no objective

evidence that Marywood's reputation suffered because of Fagal's videos.

There is no allegation that Fagal abandoned his primary role as a teacher

or that his teaching skills suffered in any way. Given these considerations,

the alleged breach by Fagal was immaterial and could not justify the

University circumventing its own disciplinary rules.

**114.**   Accordingly, Marywood's defense that Fagal materially

breached the contract fails. The only issue that remains is the amount of

Fagal's damages.

**115.**   At trial, Plaintiff offered the testimony of Kristin K. Kucsma, M.A.

of the Sobel Tinari Economics Group ("STEG"). Kucsma used well-

recognized methods to calculate Fagal's damages at $755,395. The Court

finds Kucsma's damages calculations to be well-supported by record

evidence.

**116.**   Accordingly, the Court finds in favor of Plaintiff on the breach of

contract claim pled in the Amended Complaint. We will award

compensatory damages of $755,395 to Plaintiff.[2] An appropriate order shall issue.

Respectfully,


By:    s/ Jonathan Z. Cohen
       Jonathan Z. Cohen (PA 205941)
       175 Strafford Avenue
       Suite 1 # 212
       Wayne, PA 19087-3340
       (215) 874-0047
       (215) 839-8951 (fax)
       jzc@jzc-law.com

       *Attorney for Plaintiff*

Date: March 30, 2018

---

[2] This figure does not include pre-judgment or post-judgment interest.