1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2

 3  FREDERICK FAGAL, JR.      :
                             :
 4                           :
                             :
 5      vs                   :    3:14-CV-2404
                             :
 6                           :
                             :
 7  MARYWOOD UNIVERSITY       :

 8
        BEFORE:      THE HONORABLE A. RICHARD CAPUTO
 9
        PLACE:       COURTROOM NO. 3
10
        PROCEEDINGS: JURY TRIAL
11
        DATE:        MONDAY, APRIL 23, 2018
12

13  APPEARANCES:

14  For the Plaintiff:

15  JONATHAN ZACHARY COHEN, ESQ.
    JONATHAN Z. COHEN LTD.
16  175 STRAFFORD AVENUE
    SUITE 1 # 212
17  WAYNE, PA 19087-3340

18  For the Defendant:

19  KATHLEEN A. MCGINLEY, ESQ.
    DONALD E. ENGLISH, JR., ESQ.
20  JACKSON LEWIS, PC
    2800 QUARRY LAKE DRIVE
21  SUITE 200
    BALTIMORE, MD 21209
22
    STEPHANIE JILL PEET, ESQ.
23  JACKSON LEWIS, LLP
    THREE PARKWAY
24  1601 CHERRY STREET
    SUITE 1350
25  PHILADELPHIA, PA 19103
```

2

## INDEX TO WITNESSES

| FOR PLAINTIFF: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FREDERICK F. FAGAL, JR. | 18 | 60 | 165 | |
| KRISTIN KUCSMA (Q) | 136 | 139 | | |
| | 142 | 153 | | |

1      THE COURT:  Good morning.  All right.  We're here for

2  a bench trial in the case of Fagal versus Marywood University.

3  And before we begin, we had a conference regarding an

4  evidentiary matter, and counsel will come to sidebar.  We will

5  place on the record the determination that was made regarding

6  that evidentiary matter.

7           (The following discussion occurred at sidebar:)

8      THE COURT:  There was a motion to admit a document

9  labeled D. 43 into evidence, which is a series of e-mails or

10 just one?

11      MR. ENGLISH:  E-mail chain.

12      THE COURT:  E-mail chain on the theory that it was

13 not work product.  Briefs were filed, memorandum filed by both

14 sides, one in support by defendant of admitting it, and one in

15 opposition to admitting it by plaintiff asserting that it was

16 work product, the latter.  We had a conference and arguments

17 made by both sides.  And my ruling is it was -- that the chain

18 of e-mails is not work product.

19           However, there is a portion of -- which will be

20 deleted on the basis of that it may well be attorney/client

21 privilege material and that will be deleted.  Otherwise, the

22 document if relevant which we didn't determine at the moment,

23 that will be argued at the time it's raised will be admitted.

24 Okay.

25           (The discussion at sidebar concluded.)

4

1          THE COURT:  Mr. Cohen?

2          MR. COHEN:  May it please the Court, my name is

3   Jonathan Cohen.  I represent Frederick Fagal, the plaintiff in

4   this case.  I'm just going to call him Fred here.  Having

5   presided over this case since 2014, I believe that Your Honor

6   is well acquainted with the facts and legal issues present in

7   this matter.  We know that Fred has alleged that defendant

8   Marywood University breached a contract with him in suspending

9   him and terminating his tenure and employment in early 2012.

10          I'm going to offer an outline of what the evidence

11   will show.  Fred will testify to the following:  He began

12   working on the faculty of the defendant Marywood University in

13   1997.  In 1994, he attained tenure.  Fred will testify that he

14   believes strongly that universities and private ones like

15   Marywood should encourage free speech.  Between '95 and 2008,

16   Fred and Marywood administration and several run-ins relating

17   to the issue of free speech.

18          In November 2011, Fred will testify that he scheduled

19   a speaker from the Foundation For Individual Rights in

20   Education to speak at Marywood in connection with one of his

21   curses.  That organization is usually known by the acronym

22   FIRE.  Fred paid for the speaker.  The topic of the FIRE

23   presentation was, quote, know your rights, free speech and

24   thought reform on campus which was related to Fred's teaching

25   of the U.S. Constitution.  Fred will testify that he hung more

than 40 posters announcing the FIRE presentation, the posters

approved by Marywood but then the university administration

removed them and in some cases tearing them down.  Fred will

testify he attempted to secure an apology by Marywood as well

as reimbursement for the posters that were removed, but

Marywood refused those requests.

He felt betrayed by the university.  Fred will

testify that he posted a two-part video criticizing the

Marywood administration's weak commitment to free speech.

Fred's video was on the latest in a poplar adaptation of a

movie called Downfall.  Fred will testify that his two videos

-- Downfall is a 2004 German language movie depicting the last

days of Adolf Hitler's rule.

The scenes adapted by Fred show Hitler chastising

several of his lieutenants over setbacks suffered by the Nazis

during World War II.  Fred like many before him, replaced

English subtitles appearing in the Downfall scenes with his own

subtitles satirizing the Marywood administration's conduct

surrounding the FIRE speaker.

Fred will testify that many other Downfall parodies

appeared on YouTube and they have appeared in poplar media.

Ten days after Fred published this Downfall parody on January

23, 2012, Fred will testify the he was summoned to President

Anne Munley's office for an explanation of the video.  At this

meeting Fred will testify he was suspended.  No oral warning or

1  written warning preceded that suspension.

2          Less than 24 hours later, Fred will testify that he

3  received a letter from President Munley recommending the

4  termination of his tenure and employment.  Fred will testify

5  that he received a letter from a Marywood attorney on February

6  9, 2012.  In that letter Marywood's attorney stated the

7  university had no further contractual obligations to Fred on

8  the ground that Fred committed a material a breach of contract.

9          Several days after filing a grievance, internal

10  grievance, against President Munley, and that grievance was

11  denied, Fred will testify that he received a letter from

12  President Munley terminating him but also allowing him to

13  appeal his termination and suspension.

14          A faculty committee decided Fred's termination was

15  proper, but it made no findings regarding the suspension.  On

16  July 13, 2012, Fred will testify that President Munley sent him

17  a letter that her decision to terminate his employment and

18  tenure stands.  The Court will also be presented with joint

19  exhibits showing parts of Fred's contract with the university

20  and incorporated written policies.  The Court will see that

21  Marywood's tenure policy provided that tenure is a term

22  designated permanent and continuous appointment for a full-time

23  faculty member that could only be discontinued for grave

24  reason.

25          I will show the Court Marywood's progressive

1  discipline policy.  And, Brian, can you put up joint exhibit 8,

2  please?  This policy states that disciplinary action is, quote,

3  corrective and not punitive and it provides a series of, quote,

4  gradual steps involving strategies such as personal

5  conferences, oral warnings, written warnings, suspension and

6  then dismissal.  It states that, quote, suspension is justified

7  if immediate harm is threatened by the person's continuance in

8  the faculty position.

9         It states a faculty member may be suspended by the

10  vice president for academic affairs.  It states that, quote, if

11  remedial action is taken during the suspension does not

12  sufficiently resolve the issues that led to the suspension, the

13  university may then move towards dismissal of the faculty

14  member.  It gives faculty members the right to convene a

15  faculty committee to appeal either a decision to suspend the

16  faculty member or a decision to dismiss the faculty member.

17         Prior to actual dismissal, it provides a process in

18  which a faculty committee recommends dismissal.  We will also

19  present the Court with Marywood's faculty grievances and

20  appeals policy which states that grievance will not be

21  adversely affected for exercising their right to file a

22  grievance regardless of outcome and that, quote, grievance will

23  not be subject to adverse consequences for either initiating a

24  grievance or in presenting evidence on behalf of a grievance.

25         We will also offer the testimony of current and

1  former Marywood employees in our case in chief.  Sister Munley

2  is now the former president of Marywood and resides in Texas.

3  Therefore, we will be offering portions of her deposition into

4  evidence.  Munley testified under oath that even before she

5  could discuss the video with Fred she thought Fred should be

6  suspended.  She testified that she refused to permit Fred to

7  explain in writing why he created the video.  She also

8  testified between the time Fred was suspended and the time she

9  first recommended his termination Marywood took no remedial

10  actions with regard to Fred.

11         Dr. Alan Levine, the vice president for academic

12  affairs at the time in question, will testify that he never

13  made a written recommendation that Fred be suspended or

14  terminated.  Dr. Michael Foley, Marywood's former dean of the

15  college of and sciences testified under oath that he was at the

16  January 23, 2012 meeting and that Munley told Fred he was

17  being, quote, dismissed.  Foley also testified he did not

18  believe Fred posed an immediate harm to himself or others at

19  that time.

20         As Dr. Foley no longer works to Marywood and he lives

21  in North Carolina, we will be offering his deposition into

22  evidence.  Dr. Patricia Dunleavy, who was Marywood's vice

23  president for human resources, will testify that she jointly

24  created with President Munley a set of talking points to

25  discuss at the January 23rd, 2012 meeting.  The Court will see

1 that suspension and termination had been planned even before

2 the January 23rd 2012 meeting.  Dunleavy will testify that Fred

3 requested at the meeting an opportunity to explain himself in

4 writing to President Munley but that request was denied.

5      Dr. Erin Sadlack will appear in plaintiff's case in

6 chief.  She served on the faculty committee that denied Fred's

7 internal grievance.  She will testify about the steps that Fred

8 -- the steps that the committee took under Marywood's faculty

9 grievances and appeals policy to adjudicate Fred's grievance

10 even after the university had stated that it owed no

11 contractual obligation to Fred.

12      Plaintiff will also call the three professors who

13 served on the committee that ultimately upheld President

14 Munley's termination of Fred.  These professors are Dr. Helen

15 Bittel, who led the committee, Dr. Edward O'Brien and Matthew

16 Povse.  These witnesses testify about the steps their committee

17 took under the progressive discipline policy in reaching its

18 decision.

19      Again, all after the university claimed Fred was in

20 material breach.  All three of them will cast doubt on the

21 notion that Fred's suspension was reviewed.  Fred has also

22 retained a professional economist named Kristin Kucsma.  Kucsma

23 will testify to a reasonable degree of economic certainty that

24 Fred's firing by Marywood caused him to lose at least seven

25 hundred fifty-five thousand three hundred ninety-five dollars.

1  In summary, Fred intends to show Marywood had made written

2  commitments to Fred, that Marywood violated these commitments

3  over and over again that he has borne substantial economic cost

4  because of those commitments.  The thank you.

5          THE COURT:  Thank you.

6          MS. PEET:  Good morning, Your Honor.

7          THE COURT:  Good morning.

8          MS. PEET:  My name is Stephanie Pete.  And along with

9  my colleagues, Donnie English and Kathleen McGinley, we are

10 pleased to represent Marywood University.  We all know why

11 we're here.  Dr. Fagal created, disseminated and posted on

12 YouTube videos depicting the president of the university, a

13 nun, as Adolf Hitler and other Marywood administrators

14 including a Jewish individual as Nazis.  Quoting Dr. Fagal on

15 January 3rd, 2012 in essence, I've called President Anne Munley

16 a fascist.  Alan Levine who was the vice president of academic

17 affairs, he was another subject in these videos, but so is his

18 family with references to his young wife number two and his one

19 percent kids.

20          And then there's the false plot of rape.  As to why

21 he created these videos, well, according to Dr. Fagal, I did

22 this to shame the hell out of them and give the university an

23 embarrassing publicity hit.  Before we go any further, Your

24 Honor, it makes sense for us to watch Dr. Fagal's videos so we

25 have a foundation for the actions that follow.

1          (The video was played at this time.)

2          MS. PEET:  So Dr. Fagal claims that Marywood breached

3  its agreement to him when it suspended and terminated his

4  employment and tenure following the postings of these Hitler

5  videos.  The evidence is going to show that Dr. Fagal's claims

6  are factually and legally wrong for three reasons.  No. 1, the

7  evidence will demonstrate that Dr. Fagal materially breached

8  his tenure agreement with the university when he decided to

9  portray Sister Munley as Adolf Hitler and a Jewish man as a

10 Nazi referring his fears of losing his wealth, mocking his

11 family and more.

12          Second, even if Dr. Fagal didn't materially breach

13 the agreement or such a breach was waived, both disputed by the

14 university, the evidence is going to show Marywood followed its

15 policies.  And, third, to the extent there was a technical

16 defect, again the university disputes that.  Such a defect is

17 immaterial because end the result would have been just the

18 same.  Let's discuss each of those reasons.

19          The evidence will demonstrate Dr. Fagal materially

20 breached his tenure agreement when he created, circulated and

21 disseminated these photos.  You will hear in addition to Sister

22 Munley and Dr. Levine, all six committee members tasked with

23 reviewing Sister Munley's decisions found Dr. Fagal's actions

24 to be egregious and in breach of his obligations to the

25 university.  But this wasn't a surprise to Dr. Fagal.  As some

1  of his own friends and colleagues warned him not to release the

2  videos given their content and possible ramifications, in fact,

3  Fagal himself recognized that he could be fired for posting

4  these videos.

5         Dr. Fagal on January 3, 2012, I know the Hitler link

6  is considered by many to be out of bounds.  I would have to

7  face that possibility.  If Marywood considers going after my

8  job, they'll probably realize I would not go quietly.  If I

9  were a tenured 42-year-old likely to cause trouble for another

10  20 to 25 years, then the game might be worth it, but I'll be 66

11  years old in a month.  If they are rational, they will think I

12  can't be around that much longer and they would take a

13  publicity hit for trying to get rid of me.  This is ten days

14  before he even posted the videos.

15         When he sends out the links to the videos in e-mail

16  he writes, a few colleagues concerned for my welfare have told

17  me they fear the administration will try to fire me over this.

18  If the risk to me is there, it is there, and if the worst does

19  come to pass, I will have to battle as best I can.  He's

20  talking about a battle for his job even before Marywood

21  University takes any action even before Marywood University

22  knows about the videos.

23         The evidence will show that Sister Munley put Dr.

24  Fagal on notice of his material breach, but, nonetheless,

25  allowed him to have six different tenured faculty review her

1    recommendations and decisions.  That's not a waiver.  This

2    demonstrates the university's commitment to giving Dr. Fagal

3    every opportunity to have Sister Munley's decisions reviewed

4    and considered.  The evidence will show that even if Dr. Fagal

5    didn't breach the agreement or if there was some waiver, both

6    of which are denied, Marywood followed its policies.

7           The evidence will show that Sister Munley's

8    recommendation and decisions were reviewed and upheld by two

9    separately convened committee members composed of tenured

10   faculty members none of who felt pressured or compelled to rule

11   in any certain manner.  You just heard from Mr. Cohen, and he

12   articulated various breaches allegedly that Marywood University

13   took place in.  You will hear while Dr. Fagal wishes that the

14   policy included certain language of constraints, the actual

15   policy contained no such language.  The progressive discipline

16   policy.  The evidence will show that contrary to Dr. Fagal's

17   contentions, progressive discipline not required in every

18   instance.

19          It was meant to be flexible and corrective in nature.

20   Here's the policy.  Because the university regards disciplinary

21   action as corrective and not punitive, the policy recognizes

22   personal and professional problems that may be rectified by an

23   informal educational process as well as serious violations of

24   professional responsibilities implicating possible

25   recommendation for suspension or dismissal.  And it goes on.

1   The policy is intended to provide an effective and flexible

2   means of identifying problem areas, resolving complaints,

3   preventing repetitive incidents by prompt intervention and

4   assistance.   It is designed to accomplish these ends by a

5   series of gradual steps involving strategies such as personal

6   conferences, oral and written warnings and opportunity for

7   monitored assistance where applicable.

8           The university found that this was a serious

9   violation of the professional responsibility implicating

10  possible recommendation for suspension or dismissal.

11  Progressive discipline didn't apply.  Now, again Dr. Fagal knew

12  this.  He knew this before he posted the videos.  You will hear

13  when he was contemplating whether or not to release those

14  videos, he writes ten days earlier, to fire me they would have

15  to go through procedures, set up a committee, have hearings.

16          He doesn't write they are going to have to give me an

17  oral warning, a written warning, remedial measures.  And, in

18  fact, the university did exactly what he believed it was

19  required for it to do.  It went through procedures.  It set up

20  committees.  The committees deliberated.  He talked about the

21  fact the vice president of academic affairs was the one that

22  needed to suspend.  It's not what the policy says.  The policy

23  says a faculty member may be suspended by the vice president of

24  academic affairs.  No requirement.  He talks about immediate

25  harm.  The evidence is going to show that it was determined

1  that Dr. Fagal's actions, indeed, presented a risk of immediate

2  harm to the university's reputation, to the community generally

3  and individuals specifically, including Alan Levine.  You heard

4  and talked about remediation.  But the progressive discipline

5  policy doesn't require remediation prior to termination in

6  every instance, and it was determined in this case with these

7  facts remediation wasn't warranted or quite frankly even

8  possible.  The evidence will show that Dr. Fagal -- he didn't

9  believe those videos constituted inappropriate conduct.  He

10  didn't have remorse for creating those videos.  And, in fact,

11  he has never apologized to the individuals depicted in those

12  videos or to any member of the Marywood administration about

13  those videos.

14         There's discussion about the fact that the ad hoc

15  committee failed because it didn't meet twice once for

16  suspension and once for termination.  But the evidence will

17  show fatal flaws in this argument as well.  As an initial

18  matter the right to an ad hoc committee for suspension, not

19  triggered.  Again, progressive discipline didn't apply.  But

20  although not required, Sister Munley, she did convene ad hoc

21  committee.  The policy doesn't require that the composition of

22  the members be different.

23         She found that, one, since progressive discipline

24  didn't apply and, No. 2, since the faculty grievance already

25  reviewed the suspension the pension the committee members were

1   going to be the same.  As I just said, the faculty grievance

2   committee, another committee, had already reviewed the

3   suspension, and they found it was appropriate.  The suspension

4   decision was before the ad hoc committee which ultimately

5   determined that Fagal's termination was appropriate.

6         We can all agree termination is a greater offense

7   than suspension and it was based on the same conduct.  Perhaps

8   most important, the evidence is going to show that the ad hoc

9   committee did convene separately to review suspension and the

10  ad hoc upheld the decision.  Marywood didn't breach any

11  agreement to Dr. Fagal.  But even if this Court were to find a

12  breach, the evidence will show that any breach was immaterial.

13  One, the evidence will show that the ad hoc committee, it was

14  advisory only, that its charge was to make a recommendation to

15  Sister Munley, but she was not required to adopt its findings.

16        No. 2, you're going to hear in any event with these

17  facts Sister Munley was going to proceed with Fagal's

18  termination anyway.  The same outcome.  You're going to hear

19  Dr. Fagal knew this.  He knew the ad hoc committee's findings

20  were binding.  He knew Sister Munley would have terminated him

21  in any event.  Simply stated, even if Marywood's policies were

22  followed in the manner under which Dr. Fagal believed were

23  correct, the evidence would show the end result would have been

24  the same.  He would have been terminated.

25        Let's talk about damages or better well said, lack

1  thereof.  Since 2012, Dr. Fagal has applied for three jobs.

2  One in 2013, one years later in late 2016 and one just last

3  year in 2017.  The evidence will show that he has spent less

4  than one hour a week looking for a job.  Why?  Well, according

5  to Dr. Fagal, I don't really want the job back, but part of me

6  would have to go back to work for even just a year just to say

7  fuck you, I won.  And then he says, so who knows, if I get this

8  all done maybe I can work on my golf game when the snow melts.

9          In fact, on his Linked In page he referred to himself

10 as a refired associate professor playing on the word retired.

11 As the evidence will show if Dr. Fagal had seriously tried to

12 mitigate, he would have realized there were dozens and dozens

13 of jobs in higher education in his subject matter in his

14 geographic scope.

15         In the six months following the termination, there

16 were approximately 50 jobs available, 2013, over 80 jobs and

17 following year, over 50.  Dr. Fagal knew the university's core

18 values.  He knew that references to Adolf Hitler would be

19 considered out of bounds.  Dr. Fagal knew he can very well get

20 fired over this.  But he chose to proceed anyway.  At the end

21 of the day, Dr. Fagal got what he bargained for, two separately

22 convened committees, six tenured professors reviewed the

23 president's recommendation and suspension and decision and all

24 six agreed his suspension, termination and revocation of tenure

25 were appropriate under the circumstances.  Marywood agrees

1  there is a breaching party here, but it's not Marywood.  What

2  is this about?  According to Dr. Fagal, I'm probably overdoing

3  this rule 26 damages stuff, but at the worst I will make the

4  other side spend a lot of hours pouring through what I have

5  done.  What's the old phrase, baffle 'em with bullshit and bury

6  them in paper.  The evidence will show Dr. Fagal has failed to

7  establish a breach of contract claim against Marywood

8  University and Marywood University is entitled to a defense

9  verdict as a matter of law.  Thank you.

10              THE COURT:  Thank you.  Mr. Cohen?

11              MR. COHEN:  I call Frederick Fagal.

12              FREDERICK F. FAGAL, JR., called as a witness, being

13  duly sworn, testified as follows:

14  DIRECT EXAMINATION

15  BY MR. COHEN:

16  Q.    Good morning, Fred.

17  A.    Good morning.

18  Q.    Fred, how old are you?

19  A.    Could be speak up a little bit?

20  Q.    I'm sorry.  Fred, how old are you?

21  A.    72 years old.

22  Q.    And where do you reside right now?

23  A.    Skaneatles, New York, 17 East Lake Street.

24  Q.    Are you married?

25  A.    Yes.

1  Q.    Do you have children?

2  A.    Yes, one.

3  Q.    Can you tell me about your educational background?

4  A.    I graduated 1968 from Union College in Schenectady, New

5  York, bachelor's degree in economics.  From there I went to

6  Cornell University and studied economics and got a master's

7  degree in 1971.  Then in 1976, a master's in education, social

8  studies.  And then from there I went on and got a Ph.D. in

9  social studies education from Syracuse, and that was awarded in

10 1981.

11 Q.    And when did you start your employment with Marywood

12 University?

13 A.    I taught one course in -- I think it was 1986.  Then I

14 began a full-timed tenured track position in September of 1987.

15 Q.    Did you ever attain tenure at Marywood?

16 A.    Yes, I did, and the official start date for that was in

17 September of 1994.

18 Q.    Which department did you teach in at Marywood?

19 A.    Social sciences department.

20 Q.    Brian, can you bring up joint exhibit 1, please?  Fred, do

21 you recognize this document?

22 A.    Well, it not a good copy, but, yes, I do.

23 Q.    And what is it?

24 A.    Well, it's an agreement for appointment to full-time

25 faculty.  And if you look closely, looks like it's from five

1  lines down, the following terms in effect from September 1 and

2  then it says 199 -- looks like you can see the one there with a

3  little look on the top.  Then right next to it you can see the

4  last digit is a two.  So this would have been the 1991 to 1992

5  academic year contract.  Down there on the signature line, I

6  can barely make out the way I make an F., but that's good

7  enough.

8  Q.    You did sign it?

9  A.    Yes, I signed it.

10  Q.    Was this the only written agreement that you entered into

11  with Marywood?

12  A.    No, every year one get a similar piece of paper to sign

13  for the coming year.  In May was the month you get the -- I

14  signed those every year through -- the last one I signed was in

15  May 2011.

16  Q.    Okay.  Brian, can you bring up joint exhibit 2, please?

17  I'm sorry.  Before we --

18  A.    Mr. Cohen, it's hard to hear you.

19  Q.    I'm sorry.

20        MR. COHEN:  Your Honor, I move to have joint exhibit

21  1 admitted into evidence.

22        MR. ENGLISH:  No objection, Your Honor.

23        THE COURT:  Admitted.

24        MR. COHEN:  Brian, bring up joint exhibit 2, please?

25  BY MR. COHEN:

1  Q.    Fred, do you recognize this document?

2  A.    Yes.

3  Q.    And what is it?

4  A.    Again, this is the letter of agreement for the 2011, 2012

5  academic year between me and Marywood University.

6  Q.    Is that your signature near the bottom right?

7  A.    Yes, it is.

8  Q.    To your knowledge, is President Munley's signature on the

9  bottom left?

10  A.    Yes, to my knowledge.  Of course, I did not see her

11  actually sign it, but I accepted it's her signature.

12  Q.    Is the salary stated accurate?

13  A.    Yes.

14         MR. COHEN:  Your Honor, I move to have joint exhibit

15  2 admitted into evidence.

16         MR. ENGLISH:  No objection, Your Honor.

17         THE COURT:  Admitted.

18  BY MR. COHEN:

19  Q.    Fred, what classes, if any, were you teaching at Marywood

20  November 2011?

21  A.    During the fall semester, I had two sessions of basic

22  economics, a section of principles of economics I co-taught

23  with Dr. Jackson, the introduction to social sciences course.

24  Q.    And what are some of the topics you covered in the

25  introduction to social science course?

22

1   A.    Well, start out with the notion of scientific method,

2   testing theories, statistical significance, sometimes

3   contrasted with practical significance, introduction to

4   multiple regression, the idea of it, and then, let's see, we

5   move on to different studies, such as class size study.  Many

6   of the students in the -- the education students, this was a

7   topic, effect of class size.  We get into statistics on that.

8        We do some economics, supply and demand, production

9   possibilities, frontier, notion of scarcity, and I had a

10  computer simulated classroom I had the students use to allocate

11  scarce time.  They see the outcome and the result from their

12  different behaviors in allocating that time.  We will study the

13  notion of nature versus nurture and some of the genetics stuff,

14  gene, social biology.  We would do, let's see, wizard of oz as

15  a monetary allegory in politics of economics of the 1890s.  We

16  would study the constitution.  We do three fifths clause,

17  enumerated powers, composition of congress with the house and

18  senate.  We discuss --

19  Q.    U.S. Constitution?

20  A.    U.S. Constitution.  We talked about the First Amendment as

21  related to enumerated powers.  I also go over voting rules and

22  how different voting rules could lead to different outcomes

23  through the median voter idea.

24  Q.    That's enough, Fred.

25  A.    Okay.

1  Q.    Pursuant to your teaching about the U.S. Constitution, did

2  you invite an outside speaker to come to your class?

3  A.    Yes, I contacted the Foundation For Individual Rights in

4  Education known as FIRE and asked them if they can maybe work

5  with getting me a speaker to come to the class, and I suggested

6  we can open the class to the rest of the campus to make the

7  speaker available to more members of the Marywood community.

8  And then FIRE suggested, well, Will Creeley would be able to

9  come.

10 Q.    Okay.  And why did you invite FIRE to speak to your

11 course?  How was it relevant?

12 A.    Well, FIRE was certainly the best known for having

13 colleges especially public colleges live up to the First

14 Amendment speech rights and also prepare -- they go to private

15 colleges to encourage free speech on campus and talk about

16 contractual issues there.  FIRE was very supportive of

17 individual rights of the association in seeing that students on

18 campuses got due process, and so it seemed like a very good fit

19 for the course.

20 Q.    Was free speech at universities important to you

21 personally?

22 A.    Yes, had been for many years.

23 Q.    And what day exactly did you plan for the FIRE

24 presentation to occur?

25 A.    Wednesday, November 30 at 2 p.m.

1  Q.    Did you attempt to advertise the FIRE presentation?

2  A.    Yes, planned on doing that by hanging posters around

3  campus notifying the community of the availability of attending

4  the lecture.

5  Q.    And who paid for the posters?

6  A.    I paid for the posters, and I paid for the speaker.

7  Q.    Did you attempt to obtain Marywood's before hanging the

8  posters?

9  A.    Yes, at a departmental meeting I approached the idea to

10  Sister Margaret Gannon.  She said there was no money in the

11  budget and maybe try cultural affairs to see if they had money.

12  They said they didn't either, so I paid.

13  Q.    Did you get approval?

14  A.    Approval of?

15  Q.    For the posters, to hang the posters?

16  A.    Well, yeah, the posters hung around campus.  You would see

17  the stamp of approval by student life.  As a faculty member

18  it's not clear there's any Marywood policy pertaining to me

19  hanging posters.  But I figured I might as well go to student

20  life and get their stamp.  So I arrange with Carl Oliveri who

21  was the student activities director -- and this is just before

22  the Thanksgiving weekend, and we got the sample posters from

23  FIRE.  I e-mailed and sent him a copy of the posters, and he

24  said they were fine and we can get them stamped on Monday.  He

25  sent another e-mail maybe Wednesday or Thursday of Thanksgiving

25

1  -- maybe it was Friday.  At any rate, he said, oh, those

2  posters don't have contact information on them, we need a

3  telephone number and e-mail address and so that has to get on.

4  I said, I will take care of that.

5      And then on that Thanksgiving weekend I sent Mr. Oliveri

6  an e-mail saying, here's the sample of the contact information,

7  and we're also -- my e-mail address would be on there but also

8  a $50 prize announcement to give to a student at random who'd

9  show up at the lecture or just a member of my class.  I said we

10 would have the posters there Monday morning.  Either I'd bring

11 them or a student, and all those posters would have that

12 document on the posters ready to get signed.  So on Monday,

13 November 28th, a student -- shall I name her name?

14 Q.   No, don't worry about it.

15 A.   A Marywood student got the posters from me.  And because I

16 was going to teach my class -- and she brought them over to

17 student activities, and she got them all stamped with the

18 approval signed.  And then she brought them back to the office,

19 and she hung up all the posters.  I believe another student

20 might have helped her, and I hung up posters also.  I believe

21 46 posters because I remember that number from the U. P. S.

22 bill.

23 Q.   Did the posters stay up?

24 A.   Well, I drove home to Skaneatles on Monday, and on Tuesday

25 afternoon, the student notified by e-mail, Dr. Fagal, is the

26

1   event cancelled.  And I wrote back why.  And she said, all the

2   posters are missing or -- torn down or whatever she said.  I

3   said, wow, and then she said other posters were remaining up.

4   It wasn't a general things of the posters.  So I did not know

5   who torn down the posters.  Of course, I was not happy.  So I

6   went down to the -- the U. P. S. store and got more posters

7   printed.  I sent an e-mail to President Munley and Carl Oliveri

8   and I think Sister Gail Cabral a who was head of the faculty,

9   and I informed them the posters had been torn down and it was a

10  horrible thing and could administration please send out a blast

11  e-mail to the students and faculty saying something happened to

12  the posters, they were torn down, wouldn't it be nice if you

13  listened to this announcement and perhaps attend Mr. Creeley's

14  speech.  I thought that would cause behavior people getting

15  posters torn town -- it would get more publicity against what

16  they were trying to do.

17      So I showed up on Wednesday morning with the posters I

18  preprinted and had the prize announcement on them, and I went

19  over myself to Mr. Oliveri's office.  And I first -- terrible

20  these posters were torn down.  He replied, we did it.  I was

21  shocked.  He said, we did it.  And he said, yes, posters had

22  prize money announcement, and we don't pay Marywood students to

23  attend class.  And I figured Mr. Oliveri was not that high up

24  in administrative food chain that it would have been his

25  decision to do that.  So I asked him who authorized this, and

27

1  he said Alan Levine, who was the vice president for academic

2  affairs.  He mentioned the word executive council had met.  And

3  so I thought wow, and so my posters that had the prize

4  announcement on them had to have -- to get hung had to have the

5  prize announcement cut off so Mr. Oliveri and I sat there at

6  the table with scissors and cut off the prize announcements.

7  And at that point those posters were stamped approved and went

8  to get hung up.

9  Q.   Were you upset at the posters' removal?

10 A.   Yes, I felt betrayed as a faculty member.  More

11 importantly I thought the Marywood students had -- they are

12 paying tuition.  I thought they were betrayed and lost an

13 opportunity.

14 Q.   Ultimately did you complain to Marywood about the removal

15 of your posters?

16 A.   Yes, I followed almost immediately with Alan Levine

17 December 1.  I went talk to him.  And he said, yes, the

18 meeting, the executive council meeting, there was much talk and

19 the word pandering was used --

20         MR. ENGLISH:  Your Honor, objection, we are getting

21 into hearsay now.

22         THE WITNESS:  I just --

23         THE COURT:  There's no jury.  I am going to hear it.

24         THE WITNESS:  I'm just reporting --

25         THE COURT:  Go ahead.  Continue.

1      THE WITNESS:  So he said the word pandering and

2  Marywood we don't -- Alan Levine said, at Marywood we don't pay

3  students to go to class, that's pandering.  So I thought, well,

4  that's strange, okay.  I don't know that rule.  And I asked him

5  in an e-mail can he cite that rule for me about not paying

6  students to go to a class.  I did get a reply, Mr. Levine even

7  said no, he said he couldn't find such a rule.  I then pointed

8  out to Mr. Levine even in an e-mail -- I said -- we in the

9  spring of 2011, there was a sexual assault workshop sponsored

10 by Marywood in the evening.  There was official Marywood e-mail

11 that went out saying, professors, could you please bring your

12 class to that meeting, or could you perhaps offer extra credit

13 for students to attend the class.

14      It was a daytime class.  Students could go to that

15 evening session and get extra credit.  And not only that, if --

16 for students attending that evening sexual assault awareness

17 workshop, they were two $50 Visa cards offered as raffle prizes

18 which I thought was amusing seeing I offered $50 in cash.

19 Q.   Did you feel that Marywood -- did you feel Marywood was

20 personally targeting you?

21 A.   Well, it seemed like they were certainly signaling me out,

22 certain topics were publicized and prize money and get extra

23 credit, et cetera, et cetera, and for me it was tear down

24 posters and try to keep the crowd size down and not be allowed

25 to offer any prize money.

1  Q.   Did you ever request compensation for the removal of your

2  posters?

3  A.   Yes, I did.  The normal FIRE speaker fee was a thousand

4  dollars.  I was paying -- they were kind enough to charge me

5  $350.  I spent quite a bit of money on posters, and many of

6  them were color, rather large, and there was time running

7  around dealing with this stuff.  I asked for $500

8  reimbursement, and I also asked for an apology -- a public

9  apology.

10 Q.   Did you ask for anything else?

11 A.   Well, yes, I -- to try to have Marywood show it was really

12 willing to support free speech, I asked that they pay for FIRE

13 to come and give a presentation to my class the following

14 semester, which was a day class and pay the normal rate of a

15 thousand dollars and then they also have a FIRE speaker come in

16 the evening because some students can't come in the day session

17 and the thousand dollars -- it might be a charge or something

18 and -- of course, for that evening program, I also asked to

19 provide a thousand slices of pizza and 500 cans of soda.  And I

20 also said, well, free speech is -- the tough case with free

21 speech are you willing to support free speech you don't agree

22 with.  I suggested -- I requested that Robert Spencer at Jihad

23 Watch come in the fall 2012 for a debate with somebody who'd

24 oppose him, opposing views.  And I think that was about it.

25 Looking back, I do think the pizza demand was a bit over the

1  top because if you did get a big crowd, that would be wonderful

2  but know the pizza can go to waste whereas the soda wouldn't.

3  So that was -- I wouldn't make that demand again, and not

4  knowing what the cost of the Robert Spencer debate would be, I

5  probably would have been willing to say, you know, that we

6  share the cost or something like that.  So I mean, I was open

7  minded in terms of talking about these things that I made a

8  request.

9  Q.    Brian, can you put up joint exhibit 10, please?  Fred, do

10  you recognize this document?

11  A.    Yes, I do.

12  Q.    And what is it?  Can you blow it up a little bit, Brian?

13  What is this?

14  A.    Okay.  That's better.  Again, my discussion with Alan

15  Levine.  I tried to find out just exactly what happened with

16  the posters tear down.

17  Q.    And I'm sorry.  Who was Alan Levine?

18  A.    Alan Levine was the vice president of academic affairs.

19  Q.    Okay.

20  A.    At one point during my discussions with Alan, he said that

21  he had been told that the posters that were hung up on Monday

22  the 28th did not have the prize event on them.  He said Carl

23  Oliveri told him that and that somehow I had the prize

24  announcements, you know, taped on afterwards.  And my feeling

25  along those lines was, well, the only rational idea that made

1  sense to me he didn't what Carl Oliveri to say that that, I

2  thought, well, if Marywood could get Mr. Oliveri to say that,

3  then the entire administration could say, gee, we tore down the

4  posters but we were given wrong information, and so it would

5  give the upper levels of the administration an out.  I was

6  trying to press Alan to find out what the truth was.

7       He said, well, we have a different understanding what

8  transpired, and we will never come to a complete agreement

9  concerning these exact timeframe for approval or lack thereof.

10  Then the next paragraph is Sister Ann Munley and I remain open

11  to future presentations that are not in conflict with our

12  mission statement or core values and are organized according to

13  our policies and practices.  However, we are not willing to

14  undertake any of the specific requests that are contained in

15  your letter.

16       So I thought that was a rather weak response, and that

17  paragraph also maybe imply that perhaps administration didn't

18  think that my having FIRE come is -- that they -- I thought

19  maybe Marywood thought FIRE was in conflict with Marywood's

20  mission.

21  Q.   Okay.  I move to have joint exhibit ten admitted into

22  evidence.

23            MR. ENGLISH:  No objection, Your Honor.

24            THE COURT:  It will be admitted.

25  BY MR. COHEN:

1  Q.    Brian, bring up joint exhibit 11, please.  Fred, do you

2  recognize this document?

3  A.    Yes, I do.

4  Q.    What is it?

5  A.    Well, it's the beginning of a letter I wrote to the

6  Marywood faculty on January 13, 2012 where after I'd gone

7  through all of the poster discussions with Alan Levine and

8  trying to find out the truth, trying to get Marywood to

9  apologize for what it did and make some amends or atone, if you

10  will, and I was getting nothing.  And so in order to support

11  the idea of free speech on campus, you know, lack thereof in

12  this case, I gave a detailed explanation to the faculty of what

13  had transpired.

14        So this letter is fairly long and included records of

15  e-mail exchanges that I had with the Marywood folks like

16  Levine.

17  Q.    Who did you --

18  A.    Pardon me?

19  Q.    Who did you send this e-mail to?

20  A.    I sent it to the Marywood faculty from my G. mail address,

21  which was my private address, not my school address.

22  Q.    And in your -- in this e-mail you included links to a

23  two-part video, correct?

24  A.    That's correct.

25  Q.    And, Brian, can you turn the page?  So you are providing

1 links to this video, correct?

2 A.   Yeah, links -- I am not filling up their mailbox with, you

3 know, video files or anything.

4 Q.   Would you explain what these videos are?

5 A.   You mean the videos in general or the one I made?

6 Q.   The one you made.

7 A.   Yeah.   Well, the ones I made were made to try to publicize

8 what happened in order to get the spree speech issue publicity

9 about the state of affairs regarding free speech at Marywood's

10 campus in the hopes of promoting behavior changes by the

11 administration with respect to their attitudes and their

12 policies towards free speech.

13 Q.   And I understand that the movie you created was -- you

14 adapted scenes from the movie Downfall; is that correct?

15 A.   Yes, there's information out there on the internet about

16 how easy it was to make such videos, and the Downfall videos

17 were very, very, very poplar.   Even at the time thousands of

18 them were out, and there were news stories in the media about

19 this phenomenon called the Downfall parody videos.   And so by

20 me making a Downfall parody video I thought it would get them a

21 lot of information for the cause that I was interested in, the

22 free speech issue at Marywood.

23 Q.   And, Fred, did you actually -- have you ever bought a copy

24 of the actual movie Downfall?

25 A.   Yes.

34

1  Q.    And you provided it to Brian, our technician, right?

2  A.    Yes, I did.

3  Q.    Okay.

4        MR. COHEN:  Brian, can you bring up Fagal exhibit 16

5  -- I'm sorry.  Your Honor, I would like to move for the

6  admission of this joint exhibit 11 into evidence.

7        MS. PEET:  No objection.

8        THE COURT:  Admitted.

9        MR. COHEN:  Play the video from the f minute 42

10 second mark.

11       MR. ENGLISH:  Which exhibit is this?

12       MR. COHEN:  Fagal exhibit 16.

13       MR. ENGLISH:  Your Honor, we have an objection to

14 showing a movie getting that admitted into evidence.  It has

15 nothing to do with this case.  The actual -- I assume this is

16 the actual movie, the Downfall parody.  And it's not relevant

17 under 401.  The video at issue here is not the actual Downfall

18 movie, it's the movie that the Hitler video that was made by

19 Dr. Fagal as already been shown.

20       MR. COHEN:  Well, I have a possible compromise.  All

21 I was going to show is that, in fact, this is an adaptation of

22 the movie and exact scenes.  If we can stipulate that --

23       MR. ENGLISH:  I think we already have.

24       MR. COHEN:  This is, in fact adaptation of the movie,

25 not something he created.

35

1        THE COURT:  That seemed obvious to me.

2        MR. ENGLISH:  I think that's in our stipulations.  We

3    don't have to show the movie.

4        THE COURT:  I think we all understand that.  Most

5    importantly I understand it.

6        MR. COHEN:  So -- I would like to still move that

7    exhibit into evidence unless we can stipulate.  We already did.

8        MR. ENGLISH:  I think so.

9        MR. COHEN:  All right.  Never mind then.

10        THE COURT:  All right.

11    BY MR. COHEN:

12    Q.   Fred, were you the first person that ever created a

13    Downfall parody?

14    A.   No.

15    Q.   Have you seen others?

16    A.   Yes.

17    Q.   Approximately how many have you seen?

18    A.   I mean, I watched personally?

19    Q.   Yeah.

20    A.   50 perhaps.

21    Q.   There's hundreds online, would you agree?

22    A.   Thousands, multiple thousands online.

23    Q.   And just give me an example of some of the topics that you

24    have seen Downfall parody's made about.

25    A.   If the Philadelphia Eagles win an important football game

1   or lose an important football game, some Eagles fans might make

2   a video celebrating that or if a coach makes a mistake in the

3   decision of a football game, they might show Hitler from the

4   video as the coach ranting and raving against his assistant

5   coaches for giving the real coach wrong information.  There are

6   many sports videos, political oriented videos where if a

7   candidate loses a race, there might be some ranting and raving

8   about, you know, why did we go to the state, not another state

9   in the campaign.  Again, I am giving you the general idea here.

10  Q.    That's enough.

11  A.    Yeah.

12  Q.    Brian, could you bring up joint exhibit 12, please?  Fred,

13  this is the actual video that you created.  I just want to go

14  through it and have you explain some of the content.  So I am

15  going to ask Brian to stop at various parts so you can explain.

16  Start at the beginning, Brian, and stop at 13 seconds into it.

17  You referenced student life earlier in the video.  What are you

18  referring to?

19  A.    Would you please repeat the question?

20  Q.    You reference student life in the video .  What were you

21  referring to?

22  A.    Student life would be the office run by Carl Oliveri,

23  student life, student activities.  It went by various names.

24  They would be the ones that get the rubber stamp to stamp any

25  posters approved by student life.

1  Q.   Brian, hit play.  Stop it.  Okay.  Here you're mentioning

2  core value and capitalize it.  What are you referring to?  What

3  is a core value?

4  A.   Well, Marywood has core values, utmost respect for another

5  person would be one of them.  Something about the environment

6  and, you know, saving the world, something along those lines

7  and -- your aspirational goals in terms of, you know, specific

8  -- what is required to live up to those core values,

9  aspirations is I think rather vague.

10  Q.   Okay.  Brian, hit play.  Who is Mary Paterson?

11  A.   Secretary of the university and general counsel.

12  Q.   Who is Pheasant, Heath, Garvey and Levine?

13  A.   Clayton Pheasant is retired now.  He was chief fundraiser

14  or some such title for the university.  Ray Heath was the --

15  say, the upper boss director of student affairs.  I think that

16  was his title.  He's now retired.  So he would have been, I

17  believe, Carl Oliveri's supervisor.  Joe Garvey was the chief

18  financial officer for the university at the time.  And here the

19  names Levine, capital V. I. N. E. as in grapevine.  He was the

20  vice president of academic affairs.

21  Q.   How do you normally capitalize that name, that last name?

22  A.   I believe Alan Levine, L. E. V. I. N. E. except all the

23  letters for the L. in lower case.

24  Q.   Why did you capitalize the lower last -- V. I. N. E.?

25  A.   Because I -- I didn't know for a fact, but I assume Alan

1  Lavine was Jewish.  I do know this video creating people say

2  that doesn't seem right a Jewish guy in any semblance working

3  for Adolf Hitler, and so I decided to make the name what I call

4  French-ified, Levine.  So that's why I did that.

5  Q.    Okay.  Hit play, Brian.  Hit stop.  What is reap?

6  A.    Reference to Sister May Reap, former president of

7  Marywood.

8  Q.    What are you trying to say here in this scene?

9  A.    Well, when I first started working it was not Marywood

10  University but Marywood College, and in 1995, there was a move

11  toward the idea of changing the name from Marywood College to

12  Marywood University and officially somehow becoming a

13  university, and President Reap formed the committee to examine

14  that idea.  I was on that committee.  I was a young faculty

15  member.  I was not chair of the committee.  There were two

16  other people on the committee.

17      We had quite a few meetings and tried to do research and

18  make a recommendation to the best of our work we can do as a

19  committee, and I would have to say I was -- I would say I was

20  the leader in terms of giving ideas to the committee, and I

21  suggested that Marywood stay a college and try to become a

22  great college and so the committee basically -- we all agreed,

23  and we sent our report to Sister May Reap.  She was the

24  president.  I gather she did not like the recommendation.  A

25  new committee was soon formed and recommended Marywood College

1  become Marywood University.  I believe sister Mary Reap knew I

2  was -- shall we say the prime mover within that committee that

3  gave the bad recommendation from her point of view.

4  Q.   Hit play.  What do you mean the bureaucratic web and nun

5  casino?

6  A.   Back when this was created, I know a college in New

7  Rochelle, New York, which happens to be a Catholic college and

8  they had a vice president who embezzled $850,000 so she can

9  gamble at casinos in Atlantic City, and the bureaucratic web,

10  you know, bureaucracies tend to grow in college campuses all

11  around the United States.  And it's been noticed that college

12  administrations have become very large and expensive and

13  Marywood was part of the crowd to expand the size of the

14  administration.  That's what that means.

15          MR. COHEN:  Can you bring up joint exhibit 13?  And I

16  move to have joint exhibit 12 moved into evidence.

17          MR. ENGLISH:  No objection, Your Honor.

18          THE COURT:  Admitted.

19  BY MR. COHEN:

20  Q.   Hit stop.  What's the Marywood free speech Facebook page?

21  A.   Well, back in the earlier speech controversies around 2008

22  or so, 2007, Bill Ziegelbauer, one of my students -- and he's

23  the one who created the web page or Facebook page Marywood Free

24  Speech, and it was -- I would say interest of my Marywood

25  students and more than half the students signed up to be

1  members of that Facebook page.

2  Q.    Keep going.  What's the Wood Word?

3  A.    Wood Word is the Marywood University student newspaper.

4  Q.    Who is Carveth?

5  A.    Rod Carveth is a former professor of communications, and I

6  know he had been an advisor at Wood Ward.  He tried to get some

7  pro and con opinions about free speech published in the

8  newspaper, and he had some dealings with Sister Margaret

9  Gannon, and she said, no, she couldn't offer an opinion.  And

10 so he was -- he was I would say on the free speech side, and he

11 no longer works at Marywood.  I believe his contract was not

12 renewed.

13         MR. COHEN:  You can stop.

14 BY MR. COHEN:

15 Q.    So what was the date that you published these videos

16 again?

17 A.    January 13th was when -- I uploaded them to YouTube on

18 January 12th or something, but within that day they were

19 publically available the 13th when I sent the e-mail to the

20 faculty.

21 Q.    Okay.  And I want to take you to the date January 23rd,

22 2012, ten days after you sent the e-mail.  Do you remember what

23 you were doing around 8:45 a.m.?

24 A.    Yes.

25 Q.    What were you doing?

1  A.   I was sitting in my office getting ready for my 9 a.m.

2  class.

3  Q.   And what happened?

4  A.   Well, Dean Michael Foley came into my office and told me

5  that President Reap prior to President Munley would like to see

6  me at 9 a.m., and I was to report to her office.  So I did.

7  Q.   And to the best of your recollection, tell me what

8  happened in President Munley's office.

9  A.   Well, I got there 9:00 a.m. sharp, and President Munley

10 was at the one end of the conference table.  And Pat Dunleavy

11 off to the side -- she was sitting in a chair, and she had a

12 notebook or something in her hand.  And Dean Michael Foley was

13 sitting -- say, a few chairs away from President Munley.  And

14 then I sat down a little further down the two-thirds of the way

15 the conference table, and President Munley started asking me

16 questions, such as did I -- were those my videos, was I

17 responsible for those.  I said, yes, I was and.  Then she said,

18 did you send the e-mail, and pretty obvious I did because --

19          MR. ENGLISH:  Your Honor, I will renew my hearsay

20 objection.

21          THE COURT:  About?

22          MR. ENGLISH:  He's talking about what Sister Munley

23 said, which is hearsay.

24          MR. COHEN:  She's a party.  She's an officer of

25 Marywood.

42

1          THE COURT:  Isn't she an officer?

2          MR. ENGLISH:  Yes, Your Honor.

3          THE COURT:  I am going to hear it.

4   BY MR. COHEN:

5   Q.    Continue.

6   A.    So she asked me did I send the e-mails.  And, you know, an

7   e-mail is -- it was from Fagal, and it was to the members.  It

8   was pretty obvious I sent something along the lines of, well, I

9   don't think I said yes, but I think I said you can tell.  And

10  she started to ask me, would you please explain the videos.

11  And so I started to go back to, you know, the reason why the

12  videos came to be in terms of the poster tear downs and that

13  background and my discussions with Alan Levine.  As I started

14  to just barely started to talk about that, I was told no, no,

15  no, you can't -- you can't do that, I just want to hear about

16  the videos.  And so then -- I said, well, I started to try to

17  again -- I tried to go back and give some context and build up

18  to the videos.  She had, no, she wanted to know about the

19  videos themselves and were they appropriate.  And so I really

20  couldn't explain that without, you know, giving context.  And

21  so then there was frustration there on my part, and she said,

22  are you going to answer the question.  I said, well, I can't,

23  you know, without giving context but I will be glad to answer

24  any of your questions in writing.  She said, no, you can't do

25  that.  And so then we're only about six or seven minutes into

1  the meeting, and she said, well, she said, you're suspended

2  from your job.

3       As a practical matter, it's a practical matter the meeting

4  was over, but it wasn't.  It went on for a few more minutes and

5  in the sense things were relaxed because the hammer had fallen.

6  And so I did talk a little bit how I tried to, you know, seek

7  some understanding about what had happened in the videos and

8  how I discussed with Alan Levine, you know, who -- whether the

9  posters were approved or not, and I truly tried to find out.

10      So I was able to say that.  And then at one point I

11 started to talk a little bit again about the posters, the

12 videos.  And I was not allowed to do that.  And at that point I

13 made a little -- professor Foley being a philosophy professor

14 making a joke -- I said, this is trying to explain how many

15 angels could dance on the head of a pin.  I remember seeing Mr.

16 Foley do a little chuckle down against his chest.

17      And at that point, there was nothing more to be said.  And

18 it was a question of me getting up and returning my keys to Pat

19 Dunleavy and making arrangements to clean out my office.  So

20 the meeting was over by 9:15 a.m.

21 Q.    Did anyone at the meeting ask you to take the video down?

22 A.    No.

23 Q.    Did anyone mention an oral warning?

24 A.    No.

25 Q.    How about a written warning?

44

1  A.    No.

2  Q.    Did anyone at the meeting state that you posed an

3  immediate harm to yourself or to others?

4  A.    No.

5  Q.    Prior to this lawsuit, had anyone from Marywood's

6  administration ever told you you posed an immediate harm to

7  yourself or to others?

8  A.    No.

9  Q.    Did anyone in this meeting apologize for the university's

10  removal of your posters?

11  A.    No.

12  Q.    Was Dr. Levine present in the meeting?

13  A.    No.

14  Q.    Brian, can you put up joint exhibit 18, please?  Just blow

15  up the body.  Do you recognize this, Fred?

16  A.    Yes, I do.

17  Q.    What is it?

18  A.    I received this later that day, January 23rd in the early

19  afternoon.  And this is Patricia Dunleavy's version of what

20  happened and trying to confirm the conversation I had with

21  Sister Munley this morning is what she wrote.  In that meeting

22  you admitted to Sister Anne Munley you authored the videos.

23  That's true.  And then she says depicting the executive

24  officers of Marywood University as Nazi officers.  I did not

25  specifically agree to that that I was portraying them as Nazis.

1  Q.    What about the phrase she says Sister Munley provided you

2  with several opportunities to explain your actions or to

3  provide any information you thought she should consider

4  regarding your actions concerning the videos.  You declined to

5  her invitation.  Do you believe that's a fair statement?

6  A.    No, I do not.  Again, as I tried to explain, I was cut

7  off.  I offered to answer in writing and was told, no, I

8  couldn't.  And so I would say that's not an accurate statement.

9          MR. COHEN:  I would like to move joint exhibit 18

10  into evidence.

11          MR. ENGLISH:  No objection, Your Honor.

12          THE COURT:  Admitted.

13          MR. COHEN:  Brian, pull up exhibit 20, please.

14  BY MR. COHEN:

15  Q.    Fred, do you recognize this document?

16  A.    Yes, it says important information from Sister Anne.

17  Q.    What is this?

18  A.    Well, Fran Fereese who sent the e-mail, she's Sister Ann

19  Munley's -- President Munley's secretary.  She says, please see

20  the attached documents.  There are nine attachments to this

21  e-mail sent on January 24th at 1:11 p.m.

22  Q.    Flip the page.  This is the beginning of one of the

23  attachments.  What is this?

24  A.    This is also dated January 24th.  Dear Dr. Fagal from --

25  Q.    You don't have to read it .  Tell me generally what it is.

46

1  A.    It's the letter next day I'm informed that President

2  Munley is recommending my tenure and employment be terminated

3  immediately.  This is barely one day after our morning meeting.

4  Q.    Okay.  Between the time that President Munley suspended

5  you and the time you received this e-mail, had anyone from

6  Marywood reached out to you to discuss remedial actions,

7  progressive discipline policy?

8  A.    No.

9  Q.    To your knowledge, did Dr. Levine make a written

10 recommendation for your termination?

11 A.    No.

12 Q.    In the letter does President Munley offer you an

13 opportunity to have the faculty committee review your

14 suspension?

15 A.    No.

16 Q.    Did you ever ask for such an opportunity?

17 A.    Yes.

18 Q.    And how did you do that?

19 A.    Well, I had you, my lawyer, contact the university and

20 formally request these.  I requested in e-mails.  So the

21 request for a committee for the review of my suspension, that's

22 my suspension, that request was made multiple times.

23 Q.    Brian, pull up exhibit Fagal 26, please.  Flip to the next

24 page.  Is this the letter that I wrote to President Munley?

25 A.    Yes.

1 Q.    Having the faculty committee review your suspension?

2 A.    Yes, I am looking for where it is in this letter here.

3 Q.    Flip the page.

4          MR. ENGLISH:  Your Honor, objection to this document.

5 This isn't Dr. Fagal's document.  This is a letter from an

6 attorney.  Unless we are going to be able to cross-examine Mr.

7 Cohen on this letter, it's improper to have Dr. Fagal testify

8 about the words of Mr. Cohen.

9          THE COURT:  What's the purpose of the letter?

10          MR. COHEN:  The purpose of the letter is just to show

11 that Dr. Fagal through me requested a committee to review his

12 suspension.  That's all.

13          MR. ENGLISH:  Your Honor, to the extent we are able

14 to cross-examine the author of this letter, I guess I wouldn't

15 have a problem.

16          THE COURT:  I don't know you need to cross-examine

17 him because the only purpose it's being offered for is to show

18 that there was a request for a committee.

19          MR. COHEN:  Yes.

20          MR. ENGLISH:  Okay.

21          THE COURT:  Is there any dispute that's what this

22 letter purports to be?

23          MR. ENGLISH:  There is a dispute, Your Honor, because

24 there was an authorization form that was provided to Dr. Fagal

25 that he refused to sign.

1   THE COURT:  No, I am asking about the letter.  That's

2   a different issue.

3   MR. ENGLISH:  The letter says what it says.  We don't

4   dispute what the letter says.

5   THE COURT:  Okay.  I think it's appropriate.

6   MR. ENGLISH:  Thank you, Your Honor.

7   THE COURT:  All right.

8   BY MR. COHEN:

9   Q.   I didn't think you got an opportunity to answer it.  Is

10  this the letter in which you requested an opportunity to

11  convene a committee to review your suspension?

12  A.   Yes.

13  Q.   Through me.

14  MR. COHEN:  I am going to move joint exhibit 26 into

15  evidence.

16  THE COURT:  I don't think that's a joint exhibit.

17  MR. COHEN:  Oh, Fagal exhibit 26.

18  MR. ENGLISH:  Same objection, Your Honor.

19  THE COURT:  All right.  It will be admitted for the

20  purpose we discussed.  That is to say that it was a request for

21  a -- what was it -- request for an opportunity to convene a

22  committee.

23  MR. COHEN:  A request to convene a committee to

24  review his suspension.

25  THE COURT:  Right.

49

1       MR. COHEN:  Brian, pull up joint exhibit 24.

2   BY MR. COHEN:

3   Q.    And, Fred, do you recognize this document?

4   A.    Yes.

5   Q.    Flip to the next page, Brian.  What is this?

6   A.    Pardon me?

7   Q.    What is this document?

8   A.    This is a letter I received on February 8th, 2012.  It's a

9   revised statement of the charges against me sent by President

10  Munley.  2012.

11  Q.    And in the -- Brian, focus in on the second sentence of

12  the letter that begins as a result.  Second sentence of the

13  letter.  Here it says, as a result of your breach of material

14  term of your obligations as a tenured professor, is this -- do

15  you know if this is the first time that anyone from Marywood

16  accused you of a material breach of contract?

17  A.    Yes, I had not seen that before.

18  Q.    Okay.

19  A.    Or told it.

20  Q.    Brian, flip the page, please.  Focus on this paragraph

21  two, violation of civil rights policy.  To your knowledge,

22  Fred, had anyone at Marywood actually filed a complaint against

23  you under Marywood's civil rights policy?

24  A.    No.

25  Q.    And in this letter does President Munley offer to convene

1  a faculty committee to review your suspension?

2  A.   No.

3         MR. COHEN:  I move joint exhibit 24 into evidence.

4         MR. ENGLISH:  No objection, Your Honor.

5         THE COURT:  Admitted.

6         MR. COHEN:  Pull up joint exhibit 23.

7  BY MR. COHEN:

8  Q.   Fred, do you recognize this letter?

9  A.   Yes.

10 Q.   What is it?

11 A.   Well, it's the Marywood's attorney's response, Mr. Anthony

12 responding to your letter of I think it was the previous day.

13 Q.   And, Brian, turn to page two.  Fred, can you read aloud

14 the first sentence of the second paragraph?

15 A.   As a result of Dr. Fagal's breach of contract, Marywood

16 had to no further contractual obligations to him.  And --

17 Q.   Was --

18 A.   I won't bother reading the rest of the citations.

19 Q.   Was this the first time anyone from Marywood advised you

20 no one at Marywood had no further contractual obligations to

21 you?

22 A.   Yes.

23 Q.   After this letter, did you seek again to have two faculty

24 committees convene, one to review your termination and one for

25 your suspension?

1  A.    Yes.

2  Q.    And when did you do that?

3  A.    Well, I did that, I believe, in an e-mail as I recall.

4  Q.    Okay.

5  A.    Or I had you to do it.

6  Q.    Brian, bring up Fagal exhibit 41.  Is this another letter

7  from me requesting two faculty committees?

8  A.    Yes, at the bottom it says, to repeat Dr. Fagal has

9  elected to convene two separate ad hoc committees pursuant to

10 Marywood's official policy, one for President Munley's decision

11 to suspend him and the other, if necessary, for her

12 recommendation to terminate him.

13         MR. COHEN:  Your Honor, I move Fagal exhibit 41 into

14 evidence.

15         MR. ENGLISH:  I will restate my prior objection.

16         THE COURT:  It will be admitted for the purpose of

17 demonstrating as evidence of request for convening of two

18 committees as stated.

19 BY MR. COHEN:

20 Q.    Fred, are you familiar with Marywood's faculty grievances

21 and appeals policy?

22 A.    Yes.

23 Q.    And what is it generally?

24 A.    Generally the grievance committee we set up -- the person

25 who is making the grievance would say that the committee would

1  be examining if the administrator in question or the person in

2  question had actually followed procedures.  From what I

3  understand, it would not be examining the substance of the

4  case, which is whether the procedures themselves or followed

5  them correctly.

6  Q.    Have you ever filed a faculty grievance?

7  A.    Yes.

8  Q.    Do you recall the date?

9  A.    I can't remember the exact date, no.

10  Q.    Do you remember who you filed the faculty grievance

11  against?

12  A.    President Munley.

13  Q.    Brian, pull up joint exhibit 25, please.  Do you recognize

14  this document, Fred?

15  A.    Yes.

16  Q.    What is it?  I am referring to the e-mail from you to Gail

17  Cabral?

18  A.    E-mail is to Sister Gail Cabral.

19  Q.    Who is that?

20  A.    She's a faculty member at Marywood, and she's, I believe,

21  the president of the faculty senates or something like that.

22  Q.    Is this the grievance you filed against President Munley?

23  A.    Yes, it is.  I sent it to Sister Gail.  She's the go to

24  person for this and asked her to forward it to the faculty

25  grievance committee chair.  And then about three fourths of the

53

1   way down it begins the details of my grievance.

2   Q.   Can you briefly summarize the grounds of your grievance?

3   A.   Yes, I was saying I didn't think I was -- the procedures

4   were followed correctly in suspending me and offering

5   progressive discipline and recommendation for termination, that

6   that procedure was not followed correctly.

7   Q.   I want to come back to the videos you posted on YouTube --

8   A.   I'm sorry.  And also I was improperly suspended.  I don't

9   know if I mentioned that or not.

10  Q.   Regarding the videos you posted to YouTube, did you ever

11  remove them?

12  A.   Yes, I did.

13  Q.   When?

14  A.   Sometime before the last day in February.

15  Q.   Brian, pull up Fagal 56, please.  Do you recognize this,

16  Fred?

17  A.   Yes, this is a letter you wrote to Marywood's lawyer, Mr.

18  Anthony from Jackson Lewis informing him I removed the YouTube

19  videos dated February 28th, 2012.

20        MR. COHEN:  I move to have Fagal exhibit 56 -- I move

21  it into evidence.

22        MR. ENGLISH:  Your Honor, no objection.

23        THE COURT:  All right.  It will be admitted.

24  BY MR. COHEN:

25  Q.   Brian, pull up joint exhibit 28, please.  Fred , do you

1   recognize this document?

2   A.   Yes.

3   Q.   What is it?

4   A.   A letter to me dated March 26, 2012, and Erin Sadlack is

5   chair of the faculty grievance committee wrote the letter and

6   informed me the committee had examined my arguments and in

7   reviewing the grievance found no evidence of improper action by

8   President Munley which would constitute generally the

9   grievance.

10          MR. COHEN:  Your Honor, I move joint exhibit 28 into

11  evidence.

12          MR. ENGLISH:  No objection, Your Honor.

13          THE COURT:  Admitted.

14          MR. COHEN:  Brian, pull up joint exhibit 30.

15  BY MR. COHEN:

16  Q.   Fred, do you recognize this?

17  A.   Yes, I do.

18  Q.   And what is it?

19  A.   It's a letter from me to President Munley dated March

20  29th, 2012 informing her she would be surprised that I received

21  Erin Sadlack's letter with results, and I said I disagree with

22  the finding, but that I was again trying to exercise my right

23  to have an ad hoc committee appeal my suspension to the -- to

24  have an ad hoc committee for my suspension set up.

25  Q.   Was this the third time you made that --

1  A.    Yeah, at least.

2         MR. COHEN:  Your Honor, I move to have joint exhibit

3  30 placed into evidence.

4         MR. ENGLISH:  No objection, Your Honor.

5         THE COURT:  Admitted.

6         MR. COHEN:  Brian, let's go to joint exhibit 31.

7  BY MR. COHEN:

8  Q.    Fred, do you recognize this?

9  A.    Yes, I certainly do.  It's the April 3rd, 2012 letter to

10 me from Sister Anne Munley telling me the grievance process is

11 complete.  She says, I decided to finalize my recommendation as

12 a result of your employment at Marywood with your tenure are

13 effective today April 3rd, 2012.

14 Q.    Brian, can you focus in on the last sentence of the third

15 paragraph?  Here Sister Munley is saying, I am doing this

16 despite the fact that on two separate occasions you refused my

17 offer to not choose to convene an ad hoc committee to review my

18 decision to suspend you and my recommendation to terminate your

19 employment and tenure before I finalized my decision.  Is this

20 statement by President Munley true?

21 A.    I would say blatantly not true.

22 Q.    Prior to receiving this letter, Fred, to your knowledge

23 had any faculty committee made any recommendation regarding

24 President Munley's recommendation to terminate you?

25 A.    No, the committee had not convened yet and taken action.

56

1  Q.    Did the university ultimately convene at least one

2  committee to review your discipline?

3  A.    There was an ad hoc committee that reviewed my

4  termination.

5  Q.    And who was on that committee?

6  A.    Helen Bittel was on the committee.  She was the

7  chairperson, and Ed O'Brien was on the committee.  I believe

8  he's from psychology.  And Matt Povse from the art department

9  was on the committee.

10        MR. COHEN:  Your Honor, I move joint exhibit 31 into

11  evidence.

12        MR. ENGLISH:  No objection.

13        THE COURT:  Admitted.

14        MR. COHEN:  Brian, pull up joint exhibit 36.  No --

15  you pulled up joint exhibit 32.  I meant joint exhibit 34.

16  BY MR. COHEN:

17  Q.    Fred, do you recognize this document?

18  A.    Yes, I do.

19  Q.    And what is it?

20  A.    Well, it's an e-mail from me on May 6, 2012 to the ad hoc

21  committee members and also a C. C. copy to Sister Gail Cabral.

22  I knew the ad hoc committee was going to soon be meeting, and I

23  had no information from -- about presenting a defense, but I

24  decided to on my behalf present a brief defense.

25  Q.    Okay.

57

1        MR. COHEN:  Your Honor, I move joint exhibit 34.

2        MR. ENGLISH:  No objection, Your Honor.

3        THE WITNESS:  I sent --

4        THE COURT:  Just a minute.

5        MR. ENGLISH:  No objection.

6        THE COURT:  All right.  Admitted.

7        MR. COHEN:  Brian, joint exhibit 36.

8  BY MR. COHEN:

9  Q.    Fred, do you recognize this document?

10 A.    Yes, I do.  It's the report of the ad hoc hearing

11 committee, Bittel, O'Brien and Povse to me July 2nd, 2012 and

12 they are informing me they are in agreement with Sister

13 Munley's decision to revoke my tenure and terminate my

14 employment.

15       MR. COHEN:  I move joint exhibit 36 into evidence.

16       MR. ENGLISH:  No objection, Your Honor.

17       THE COURT:  Admitted.

18       MR. COHEN:  Brian, pull up joint exhibit 37.

19 BY MR. COHEN:

20 Q.    Fred, do you recognize this document?

21 A.    Yes, I do.

22 Q.    What is it?

23 A.    Well, it's a letter by me July 6th to the ad hoc faculty

24 committee, and I said I respectfully disagreed with their

25 conclusions and I wasn't interested in arguing the same points

1   but I wanted to point out some troublesome admissions.  And I

2   point out the review failed to mention that -- does not appear

3   from review the committee was separately -- no separate

4   committee to convene -- was convened to review the suspension.

5   Q.    Okay.

6   A.    So again I am raising the lack of a committee for the

7   suspension issue.

8   Q.    Did you ever receive a response to this e-mail?

9   A.    No response.

10  Q.    I move joint exhibit 37 into evidence.

11        MR. ENGLISH:  No objection, Your Honor.

12        THE COURT:  Admitted.

13  BY MR. COHEN:

14  Q.    Brian, pull up joint exhibit 38, please.  Fred, do you

15  recognize this?

16  A.    It's July 13, 2012 letter to me from Sister Anne Munley.

17  She says she received and reviewed the report and of the

18  independent faculty committee, and she said it was convened at

19  your request under the progressive discipline policy to appeal

20  my decision to suspend you and to terminate your employment and

21  tenure.  And I point out that the committee -- there was no

22  separate committee that examined my suspension and -- nor did

23  the ad hoc committee that considered my termination

24  independently examine my suspension.

25        She says the second independent tenured faculty reviewed

1  according to you -- and I will point out that the grievance

2  committee did not examine -- they examined, and the other

3  committee was the committee about my termination and firing,

4  there should have been a third committee to review my

5  suspension.

6  Q.   Between the time of your suspension and the time -- and

7  the date of this letter, did anyone from Marywood direct any

8  remedial actions towards you?

9  A.   No.

10 Q.   Did you eventually cease receiving your salary from

11 Marywood?

12 A.   Yes, my last paycheck was the middle of August, 2012.

13 Q.   And did you receive any further yearly appointments to

14 Marywood's faculty?

15 A.   No.

16          MR. COHEN:  I have no further questions, Your Honor.

17          THE COURT:  All right.  Cross-examine.  We will go

18 for a little bit.

19          MR. ENGLISH:  Okay, Your Honor.

20          THE COURT:  Well, unless you all want a break now --

21          MR. ENGLISH:  I have -- a five minute break?

22          THE COURT:  We will break for lunch.  It's almost

23 five minutes to 12.  Well, we will come back at 20 after one,

24 okay.

25          MR. ENGLISH:  That's fine.

60

1          THE COURT:  We're adjourned.

2          (A brief recess was taken.)

3          THE COURT:  Cross-examine.  Take the stand, please.

4          FREDERICK F. FAGAL, JR., resumed the witness stand.

5   CROSS EXAMINATION

6   BY MR. ENGLISH:

7   Q.    Mr. Fagal, good afternoon.

8   A.    Good afternoon.

9   Q.    By name is Donnie English.  I think we met before.  I

10  represent Marywood University.  I have a few questions for you.

11  A.    Okay.

12  Q.    I think you testified that you read the faculty handbook,

13  is that correct?

14  A.    Yes, I have, and it's been a long time ago.  But it's very

15  long, but I read it.

16  Q.    You understood it when you read it?

17  A.    Well, some things are rather vague, of course.  So that

18  means it might be a difference of opinion as to what something

19  means.

20  Q.    Okay.  You didn't ask anybody about any questions about

21  the policies, did you?

22  A.    Yes, I did.  I actually at one point when Dean Torrell --

23  he will was a dean.  And there was a question of what hang on

24  my door at least -- I used to hang a lot of newspaper stories

25  on my door, and I got into some trouble for one of the stories

1  that I hung, and I had to take that story down.  But I wasn't

2  sure what I can hang up.  I sent him an e-mail with a bench of

3  examples, could I hang this or that or hang that.  And I asked

4  him for guidance, and I got none.

5  Q.    And you're referring to an incident where you had hung up

6  cartoon of 17 nuns who were supposedly in heaven and those were

7  the virgins that were waiting on Muslims as they entered

8  heaven?

9  A.    No, this is -- the incident you're talking about I had a

10  few things on my door.  And there was about -- a story about

11  Islamic Danish embassies being bombed and things like that,

12  terrorist bombers.  I had a picture that I found that was seven

13  nuns from about the 1950s and they were carrying target rifles

14  at a rifle range.  And the caption under there -- it said,

15  these might be the 72 virgins that the terrorist bomber would

16  see when he got to heaven.  I made a hand note, radical

17  Islamist I think it was.  It was not a general comment about

18  Muslims or anything like that.

19  Q.    And you didn't think it was a general comment about

20  Muslims, right?

21  A.    No, I specified.  I said radical.

22  Q.    There was a student who filed a civil rights complaint

23  against you for that incident, right?

24            MR. COHEN:  Objection.  Irrelevant.

25            THE COURT:  I can't hear you.

1      MR. COHEN:  Irrelevant.

2      MR. ENGLISH:  Your Honor, he brought it up.

3      THE COURT:  Just a minute.  This is cross

4 examination.  Overruled.

5 BY MR. ENGLISH:

6 Q.   A student found it offensive, right?

7 A.   That's what I was told, never met the student, never saw

8 the student.

9 Q.   He wasn't the first that one told you this, right?  You

10 were asked several times by several faculty members or

11 administration to take that -- that particular comic down

12 representing the nuns as the virgins waiting in heaven for

13 Muslims?

14 A.   I don't recall that.

15 Q.   Okay.  We will go over that -- you don't recall that you

16 were ever asked to take it down and you refused to take it

17 down?

18 A.   I took down -- I am not sure what incident you're talking

19 about.

20 Q.   I am talking about the comic of the cartoon of the virgins

21 waiting in heaven who were dressed as nuns with rifles who were

22 waiting on Muslims.

23 A.   There are no cartoon.

24      MR. ENGLISH:  Can we pull that up that cartoon,

25 please?

63

1  BY MR. ENGLISH:

2  Q.    There we go.  Is this the cartoon we're talking about?

3  A.    That's a photograph.

4  Q.    Was this what was in -- on your door?

5  A.    This photograph had been on my door.

6  Q.    And there was a Muslim student of yours who was offended

7  by it, right?

8  A.    No.

9  Q.    He didn't file a complaint -- civil rights complaint about

10 this?

11 A.    No student of mine.

12 Q.    Were you ever asked to take this down?

13 A.    Yes.

14 Q.    Okay.  Who asked you to take it down?

15 A.    It must have been -- I am trying to recall -- it would

16 have been a dean.

17 Q.    You refused to take it down, right?

18 A.    No, I took it down.

19 Q.    After the first time you were asked to take it down you

20 took it down?

21 A.    I can't recall.

22 Q.    Okay.  You didn't tell anybody that you're not going to

23 take it down unless everyone else removed everything else off

24 their doors as well?

25 A.    I do remember raising that point, but I don't know if it

1  was in regard to this --

2  Q.   Okay.  There was another incident, right, where you

3  represented Mohammed in what was considered to be offensive to

4  Muslim students at Marywood, correct?  This wasn't the only

5  incident?  There was another incident, right?

6  A.   Yes.

7  Q.   We already talked about that a student filed a civil

8  rights policy complaint against you in connection with this

9  cartoon, the one with the nuns, right?

10 A.   This is not a cartoon.

11 Q.   The picture.

12 A.   Yes, that's -- that student wrote a letter to the

13 administration.

14 Q.   Okay.  You consider this to be satire?

15 A.   Yes.

16 Q.   Okay.  You know that satire can cross the line, you were

17 told this time this crossed the line, right?

18 A.   I don't recall those terms being used.

19 Q.   What number is this?

20      MR. ENGLISH:  Your Honor, we move joint exhibit 38

21 into evidence.

22      THE COURT:  Is that this?

23      MR. ENGLISH:  Yes.

24      MR. COHEN:  Okay.

25      MR. ENGLISH:  I'm sorry.  Defendant's Exhibit 38.

65

1    MR. COHEN:  I object.

2    MR. ENGLISH:  You object?

3    THE COURT:  On what basis?

4    MR. COHEN:  Relevance.

5    THE COURT:  Overruled.  It will be admitted.

6  BY MR. ENGLISH:

7  Q.   You knew you can be fired over the Hitler videos you made,

8  right?

9  A.   I knew that the administration might be unhappy enough to

10  attempt that, but I knew I wasn't sure they would.

11  Q.   You knew you could be fired, correct?

12  A.   I'm not sure what you mean by could be fired.  You mean if

13  they would attempt to or could actually get the job done?

14  Q.   Did you know -- it's a simple question whether you can be

15  fired for --

16    THE COURT:  I think he answered the question.  Move

17  on.

18  BY MR. ENGLISH:

19  Q.   Let's look at an exhibit.  This is Defendant's Exhibit 10,

20  an e-mail from you to Rod Carveth.  Who is Rod Carveth?

21  A.   As I explained earlier, he was a former communications

22  professor at Marywood.

23  Q.   He's familiar with -- you assume he was familiar with

24  Marywood policies, right?

25  A.   I don't know.

1 Q. Okay. At the bottom of the first page here, I will zoom

2 in.

3 A. When Mr. Carveth is writing this he's not employed at

4 Marywood.

5 Q. The bottom of the first page right here, he says, anytime

6 that Hitler gets raised no one pays attention to the message

7 but symbolism of Hitler as a murderer -- but the symbolism of

8 Hitler as a murderer and butcher, I think the university would

9 try to find some loophole to undo your tenure and fire you.

10 He's telling you right there that you could be fired, right?

11 A. He didn't say I could be. He said they could --

12      THE COURT: Just a minute. Just a minute. It says

13 what it says.

14      MR. ENGLISH: Yes.

15      THE COURT: You are asking him to interpret what's in

16 this man's mind or how he took it. So you ask him the question

17 you think he could be fired. He answered the question.

18      MR. ENGLISH: I will get into what his response was

19 to that, okay.

20 BY MR. ENGLISH:

21 Q. So then you say in the beginning here, you sound like my

22 wife, and I know that Hitler link is considered to be by many

23 to be out of bounds. You knew that the Hitler video could be

24 out of bounds, right?

25 A. In the eyes of some.

1  Q.    You say, I would have to face that possibility.  Is that

2  in response to his suggestion you could be fired?

3  A.    Yes.

4  Q.    So you knew it was a possibility you could be fired?

5  A.    I knew there's a possibility they could attempt to fire

6  me.

7  Q.    Then you say, I am going to rethink this, but I think I

8  won't change my mind about the release.  Did you end up

9  thinking about it again whether or not you should release it?

10  A.    Merely by reading this I was thinking about it, yes.

11  Q.    You didn't change your mind, did you?

12  A.    No, I did not.

13  Q.    I will look over the faculty manual again, and I guess you

14  are laughing about it.  Did you end up looking at the faculty

15  manual again?

16  A.    I can't recall in this.

17  Q.    Regardless you never changed your mind even if you did

18  think about it?

19  A.    Correct.

20  Q.    Then you go on to say, assuming that the videos are

21  released down here at the highlighted portion -- assuming that

22  the videos are released if Marywood considers going after my

23  job they will probably realize that I will not go quietly.  If

24  I were a tenured 42-year-old likely to cause trouble for

25  another 20 to 25 years, then the game play not be worth their

1  votive candle.  You think Marywood may not go after you because

2  you were 66 years old at that time?

3  A.    You misread to that and led to a totally opposite

4  conclusion.

5  Q.    What did I misread?

6  A.    You say might not -- just read it again.

7  Q.    If I were a tenured 42-year-old likely to cause trouble

8  for another 20 to 25, then the game might not be --

9  A.    There's no word not in there.

10  Q.    Oh, might be worth -- the game might be worth their votive

11  candle.  So you're saying there if you were younger they may

12  fire you but since you're older you don't think they'll do it,

13  right?

14  A.    I didn't know if they'd do it, but a cost benefit analysis

15  the gains to them would be less than the cost would be high.

16  Q.    And you also say they knew you were going to not -- you

17  weren't going quietly.  You thought maybe they would back down

18  because you may raise a big stink about it, right?

19  A.    Yes.

20  Q.    Let's look at exhibit 9.  Okay.  Here's an e-mail --

21        MR. ENGLISH:  Your Honor, I move Defendant's Exhibit

22  10 into evidence.

23        MR. COHEN:  Talking about this one right here?

24        MR. ENGLISH:  The one before I just talked about.

25        MR. COHEN:  No objection.

1    MR. ENGLISH:  Okay.

2    THE COURT:  Admitted.

3  BY MR. ENGLISH:

4  Q.   Now, we're on exhibit Defendant's Exhibit 9.  This is an

5  e-mail from you to Geri Lynn Smith.  Who is Geri Lynn Smith?

6  A.   She was a Marywood student.

7  Q.   Okay.  And in this e-mail, you tell her about your plan to

8  -- you can take a moment to read it -- tell about your plan to

9  e-mail faculty students and non-faculty, non-students the

10  videos, right?

11  A.   Let me read this to answer your question.

12  Q.   Okay.  Dr. Fagal, I will hand you a copy of this if it

13  makes it easier.

14  A.   It might be easier since I can't scroll.  Thank you.  I

15  finished reading the letter.

16  Q.   If you go a few pages into what's up on the screen at the

17  bottom here it says, I would also e-mail my old student class

18  and tell them what happened and ask them to share the

19  outrageous situation with anyone and everyone.  Did you plan on

20  e-mailing your class -- your old class list and also ask them

21  to share the videos?

22  A.   I said here I was considering e-mailing my old student

23  class lists because I wouldn't want to -- I don't think it

24  would be appropriate to get any current students involved and

25  tell them what happened and ask them to share the outrageous

1  situation with anyone and everyone.  I say nothing here about

2  sending them any videos.

3  Q.    What were you asking them to share, and what were you

4  going to share with them?

5  A.    I would have told them about the posters being torn down

6  and even though they were approved.  Again, I did not do any of

7  this.

8  Q.    You did not share it with your old class?

9  A.    No, I did not.

10  Q.    Above in the highlighted area, I would like to have a

11  publicity barrage hit Marywood very close to the beginning of

12  the semester.  Were you planing to use the videos to hit

13  Marywood with a publicity barrage at the beginning of the

14  semester?

15  A.    Let me review here.  I didn't use the word video in this

16  letter.  Let's see.  Do I talk about e-mailing the video?  I

17  haven't even mailed it to the faculty.

18  BY MR. ENGLISH:

19  Q.    Here's an e-mail from you to Geri Lynn.  She says the

20  videos were very amusing and certainly got the point across.

21  Had you e-mailed the videos to Geri Lynn?

22  A.    Yes.

23  Q.    And then at the end she says after what has happened

24  though should I be worried about the administration going after

25  me for wherever reason?  Can they really try to fire you over

1  this?  She's referring to the videos, right?

2  A.    I think the whole situation you have to ask her but --

3  what she was referring to.

4  Q.    Then here your response is, I do not think --

5  A.    When I got the chance to read her e-mail to me so --

6  Q.    All right.  Then at the top here you say, I do not think

7  they will fire me over all this.  If by this you mean over what

8  happened so far, then absolutely not.  I have done nothing

9  other than complain about and ask for recompense for their

10 tearing down my approved posters.  A joke.  Here you don't

11 think they are going to fire you, right?

12 A.    At that point this is January 3rd.  No videos have been

13 released.  I only had a few people see them for commentary

14 purposes.  So I said they are not going to fire me over what

15 happened so far to January 3rd.

16 Q.    Right here you say in essence I have called President

17 Munley a fascist, and she has supporters perhaps some

18 reluctant, well, based on her slash/their behavior, if the shoe

19 fits wear it.  So you're admitting here you're calling Sister

20 Munley a fascist in the video?

21 A.    I said she behaved -- she tore down posters.  She -- she

22 or her people work for her, and fascists are known to tear down

23 posters.  It's a certain interception with fascist behavior

24 with her behavior.  That doesn't mean she has all the traits of

25 the worst fascist in the world.

1  Q.    You say, tenure is on my side.  To fire me they would have

2  to go through procedures, set up a committee, have hearings on

3  some charge but what, some bologna about not supporting the

4  mission of core values.  They know I'd raise a big stink and

5  the would look foolish, game not worth the candle -- for them

6  to grimace and wait out until I retire.  They can try other

7  things like giving me a horrible teaching schedule five days a

8  week, but I don't think they will do that either.

9        So here you're saying that you don't think that they are

10 going to fire you because of your situation because of all of

11 the trouble that it would cause for them to go through the

12 process of firing you?

13 A.    I don't know what you mean by situation other than my age,

14 which I talked about before.

15 Q.    Is that what you're referring to here?

16 A.    Yes.

17 Q.    But you acknowledge here that they could fire you?

18 A.    I acknowledge here they would try to fire me or could try

19 to fire me.

20 Q.    Okay.  Nowhere in there do you mention a verbal warning or

21 written warning, right?

22 A.    For what?  I haven't done anything.  I hadn't posted the

23 videos at this point.  What would the warnings be about?

24        MR. ENGLISH:  Your Honor, I would like to move in

25 Defendant's Exhibit 9.

73

1      MR. COHEN:  No objection.

2      THE COURT:  Admitted.

3  BY MR. ENGLISH:

4  Q.    Joint exhibit 11, which I think has already been admitted.

5  Here on the second page --

6  A.    Who is this exhibit to?  I don't --

7  Q.    I'm sorry.  I will make sure you know what exhibit it is.

8  Joint exhibit 11, which is the e-mail -- that January 13th,

9  2012 e-mail from you basically sending the videos and your

10 recollection -- your account of what has happened, okay.

11 A.    Yes.

12 Q.    On the second page, paragraph 30 here, you say, I made two

13 satire videos.  Part one with deals with the events of November

14 28th.  Part two deals with the events of November 3rd, and

15 these are comments from prereleased viewers.  You sent this to

16 other people to view before you released them, right?

17 A.    Yes.

18 Q.    And one of those viewers said it was nice knowing you,

19 Fred.

20 A.    I don't know.  Could I explain?  Some of the prerelease

21 viewers actually got the videos through e-mail.  I believe I

22 sent those to -- I think three people, and two of them were

23 non-Marywood related people.  I was looking for advice, and one

24 was a Marywood student.  The other reviewer who saw this, I

25 actually showed to it them in person with my laptop.  So I had

1  not sent them the video.

2  Q.    Someone says it was nice knowing you, Fred?

3  A.    Yes.

4  Q.    They are referring to the fact you're going to get fired

5  over this, correct?

6  A.    They thought -- they thought that would be the result.

7  That person thought that would be the result.

8  Q.    Then here if we go down to the next highlighted portion, a

9  few colleagues concerned for my welfare tell me they fear the

10  administration will try to fire me over this.  So you were told

11  by some of your colleagues who were concerned for your welfare

12  you can get fired over this?  This was before you released the

13  video?

14  A.    Yes, that's correct.

15  Q.    But you published it anyway, right?

16  A.    Yes.

17  Q.    Here's an e-mail dated December 29, 2011 from Jeffy

18  Benedict do you.  Who is Jeffy Benedict?

19  A.    My younger -- my younger sister.

20  Q.    And there at the top, are you asking your -- I'm sorry.

21  There at the bottom you say, just in case I need or want one,

22  please see if I can come up with a few names of a good -- if

23  Jim can come up with a good labor, slash, employment law

24  lawyers, slash, firms in P.A., if not this is okay, thanks.

25  You're asking for whether Jeffy can find you a lawyer in

1 connection with these videos?

2 A.   At this point December 19th I was in the process of

3 creating the videos.

4 Q.   You knew there could be some legal issue?

5 A.   I knew there would be some unhappiness, and I knew that

6 administration might want to try, you know, to do something

7 about it, might take some sort of action again me, I wasn't

8 sure what, but I wanted to be prepared just in case something

9 happened.

10 Q.   And your sister's husband -- is his name Jim?  Is that the

11 Jim you're referring to?

12 A.   Yes.

13 Q.   He's a lawyer?

14 A.   Yes.

15 Q.   Okay.  And she writes back and says, he does not want to

16 get involved in any way in this one.  So I take it he declined

17 to give you names of lawyers?

18 A.   She said, I believe -- I believe she said he didn't know

19 any, and that was it.

20        MR. ENGLISH:  Your Honor, this is Defendant's Exhibit

21 7.  I move to admit.  Defendant's Exhibit 7.

22        MR. COHEN:  I object based on relevance.

23        THE COURT:  Pardon?

24        MR. COHEN:  I object based on relevance, Your Honor.

25        THE COURT:  Put that back up.

76

1          MR. ENGLISH:  Yes, Your Honor.

2          THE COURT:  He's already testified what was in it.

3  Isn't that right?

4          MR. COHEN:  Excuse me?

5          THE COURT:  He already testified to what was in it.

6          MR. COHEN:  True.

7          THE COURT:  Did he not?

8          MR. COHEN:  He did.

9          THE COURT:  All right.  I'm going to allow it.

10  BY MR. ENGLISH:

11  Q.   Quickly, here's an e-mail string from you to Benjamin

12  Harrington.  Who is Ben Harrington?

13  A.   He was a Marywood student.

14  Q.   Okay.  Here at the bottom of Defendant's Exhibit 14 here

15  at the bottom you tell Benjamin that I am raising a ruckus,

16  more later, feel free to share the links, best, Fred.  You

17  wanted this to go viral, didn't you, the videos?

18  A.   More -- yes, I wanted -- once I sent it out to all of the

19  faculty, I figured word would spread, and I had no problem with

20  that.

21  Q.   Well, not only did you not have a problem, but you wanted

22  --

23  A.   Yes, I wanted Marywood students to be informed.

24          MR. ENGLISH:  I move to admit Defendant's Exhibit 14.

25          MR. COHEN:  No objection.

1    THE COURT:   Admitted.

2 BY MR. ENGLISH:

3 Q. Here's Defendant's Exhibit 15, which is an e-mail from

4 Kevin Wyllie to you.   Who is Kevin Wyllie?

5 A. I believe he's a professor in the architecture school.   I

6 never met him and do not know him.

7 Q. He writes you and said this type of mass e-mail seems a

8 little inflammatory and unprofessional.   Is that consistent

9 with what other professors told you as well?

10 A. I don't recall anywhere anyone say the word unprofessional

11 or the word inflammatory.   They said I would get in trouble,

12 people would be upset.

13 Q. Defendant's Exhibit 43.   This is e-mail between yourself

14 and Will Creeley.   I think you have copied Peter Bonilla.   Who

15 is Will Creeley?

16 A. Will Creeley works for FIRE.   He's a lawyer, and he gave

17 his speech on November 30th.

18 Q. Here in the body of the e-mail, you say that your firing

19 is ensured, right?

20 A. Yes.

21 Q. You say your loss of tenure is ensured, correct?

22 A. Yes.

23 Q. Okay.   And you admit that even if a faculty committee

24 recommended in your favor that Sister Munley would override

25 that decision, correct?

1  A.    Yes.

2  Q.    And you acknowledge that Sister Munley is the final

3  decision maker in determining whether or not you're terminated

4  or not, right?

5  A.    I don't see anything here unless I am missing about final

6  decision.

7  Q.    Here you say, even if a faculty committee recommends me --

8  stands up, slash, recommends for me, Munley will surely

9  override the decision.  So Sister Munley is the final decision

10  maker, correct?

11  A.    I'm not sure of that.

12  Q.    Okay.  The ad hoc committee is only advisory, correct?

13  That's your understanding, right?

14  A.    Yes.

15  Q.    And they didn't have a final decision making authority,

16  correct?

17  A.    Correct, I'm assuming the board of trustees might get

18  involved here.

19  Q.    Then you say, so why bother and put forth the defense,

20  effort, I have fired my salvos and the faculty should know the

21  main the deal if they care and can read, I guess I see no

22  benefit from going before what will turn out to be a kangaroo

23  court with zero chance of success.  The kangaroo court you're

24  referring to is the ad hoc committee?

25  A.    Yes, assuming your statement that Anne Munley has the

1 final decision, then it would be pretty obvious based on what

2 she already recommended that it would be done if she was the

3 final person.

4 Q.   You say unless it provides grounds for a court case?

5 A.   I wrote that.

6 Q.   So here the only reason to challenge it is to perhaps

7 create some type of issue for a future court case, right?

8 A.   No.

9 Q.   Okay.  Here you say that you see no benefit from going

10 before what will turn out to be a kangaroo court unless it

11 provides grounds for a court case?

12 A.   No benefit to me but to raise the issue of the free speech

13 and make it public so the whole campus that would bring benefit

14 to the Marywood students if policies got more in tune with free

15 speech.

16 Q.   Here you talk about a court case.  You're saying that the

17 only reason to challenge it provide grounds for a court case,

18 correct?

19          THE COURT:  I think he's answered the question.

20 Let's move on.

21          MR. ENGLISH:  Okay.

22 BY MR. ENGLISH:

23 Q.   Then you say harassment is an ongoing thing and not a

24 one-time deal, and you say not to say -- on the next page --

25 not to say I harassed anyone.  So there -- you have a smiley

80

1   face.  There you are saying that you only did it once so it's

2   not harassment.  Is that what you're saying?

3   A.   I had read that, and so I was tossing that idea out.

4   Q.   But you kind -- you have a smiley face because you know

5   that it actually was harassment, right?  You had been told

6   that?

7   A.   No, I -- I don't think I harassed anybody.

8   Q.   Okay.  You went through harassment training at the

9   university, right?

10  A.   I went to meetings.  I don't recall any details about

11  harassment training.

12  Q.   You didn't attend the annual required training for

13  harassment?

14  A.   I didn't say that.

15  Q.   Okay.

16  A.   I said I go to required meetings.  I said I don't recall

17  any details.

18  Q.   But do you remember going through harassment training?

19  A.   I don't remember going to any specific harassment training

20  session.

21  Q.   Okay.  Is it your position, Dr. Fagal -- well, first of

22  all, you're familiar with the progressive discipline policy

23  that was in effect in 2012, right?

24  A.   I read it.

25  Q.   Okay.  And it's my understanding that your position is

1  that no matter how serious the misconduct that a tenured

2  professor must get a verbal or written warning before

3  termination.  Is that your position?

4  A.    My position now then -- what?  You say it's my decision --

5  Q.    Your position is that you had to get a verbal or written

6  warning before being terminated, correct?

7  A.    I assumed -- yeah, as I read the material, I recall the

8  progressive policy, you have a warning and then things could

9  progress from there.

10 Q.    No matter what you did, no matter how serious the conduct?

11 A.    I don't know that I thought through anything that I would

12 have done wouldn't have been what I considered serious enough

13 to lead to any drastic immediate measures.

14 Q.    But you acknowledge there are things that can be done that

15 can lead directly to termination without having to give a

16 written or verbal warning first?

17          MR. COHEN:  Objection.

18          THE COURT:  Sustained.

19 BY MR. ENGLISH:

20 Q.    Okay.  So let's talk about the FIRE speaker.  The speaking

21 event was -- that was actually a class.  That was actually in

22 connection with a class you taught, right?

23 A.    Yes.

24 Q.    And students in your class were required to attend,

25 correct?

1   A.    No.

2   Q.    They got credit for attending though, correct?

3   A.    No.   My policy was I would give a quiz every day in class

4   which was enough of an attendance policy I got excellent

5   attendance and I'd drop the two lowest quizzes.   Essentially

6   they got two free cuts.   I did not take attendance at every

7   class other than through the quizzes I would give.

8   Q.    You initially offered a chance to win money if they

9   attended, right?

10  A.    Any student who attended that one particular class was

11  eligible to get the random draw of 50 bucks trying no make

12  things a little fun.

13  Q.    You were told that was not proper, right?

14  A.    After the posters have been torn down I was told that was

15  a problem.

16  Q.    Let's talk about the Hitler videos.   The purpose of your

17  videos were -- was to shame Marywood, right?

18  A.    No.

19  Q.    The purpose of your videos was to humiliate them, right?

20  You -- the purpose wasn't to shame them?

21  A.    The purpose of my videos was to cause Marywood University

22  to change its behavior.   That's the goal.   The tactic might

23  have been to cause them some humiliation to change to have them

24  rethink their policies.

25  Q.    The tactic was to cause them some embarrassment and shame?

83

1  A.    Yes.

2  Q.    And if we go to some of these slides, here you admit

3  you're depicting Sister Munley as Hitler, correct?

4  A.    Not quite.  If I was depicting Sister Munley as Hitler, I

5  would say superimpose her into a 1940 or 1939 news reel where I

6  have Sister Munley acting as Hitler.  Here you have actors from

7  the Downfall movie representing Hitler in the bunker.  When you

8  transfer those scenes over to -- in this case the Marywood

9  situation or my earlier testimony this morning, it might be

10  where it's some football coach or something, then I think the

11  context changes a bit.

12  Q.    Okay.  But the person who was representing Hitler in the

13  video was supposed to be Sister Munley.  You call Fuhrer Munley

14  in the video?

15  A.    I do, that's correct.

16  Q.    That's correct.  Here you say, okay, we get a pretty

17  secretary to seduce him in the comments.  She cries rape with a

18  preponderance of the evidence.  We execute him.  The core

19  values allow that.  You're setting up a scene here where Sister

20  Munley is going to use one of her secretaries to seduce you and

21  falsely accuse you of rape, right?

22  A.    This is satire here.  I think any -- I would say large

23  percentage shall we say of the people looking at this scene

24  would realize this was not going to happen, this is pure

25  satire.

1   Q.    That's your view of it?

2   A.    That's my view of it, yes.

3   Q.    And you had mentioned that you had viewed other videos --

4   other parody videos of the Downfall movie, right?

5   A.    Yes.

6   Q.    And the topics that you said that you've seen were

7   football, political satire, but you didn't mention that there

8   were any -- that were raised where an employee had made a video

9   depicting their leadership as Nazis, which is what you did?

10  A.    I wouldn't say I depicted them as Nazis.

11  Q.    You just said that you were -- the video depicted Hitler

12  or depicted Sister Munley as Hitler?

13  A.    The Hitler role -- the Nazi role they were acting in the

14  Marywood scene, and the behaviors such as tearing down posters,

15  of fascist behavior -- I never used the word Nazi in the

16  videos.

17  Q.    If you look here the next slide, these two women are

18  saying, you can steal Fagal, he will love you.  These are

19  supposed to be -- one of them is supposed to be the secretary

20  that is supposed to seduce you?

21  A.    That's the quick presumption, yes.

22  Q.    You go on to say, if a rape charge is too brazen switch

23  gears, bribe him.  Use the old S. S. sisters of subversion.  So

24  here you're equating the sisterhood to the S. S.?

25  A.    What sisterhood?

1 Q.    The Catholic sisterhood.

2 A.    Well, the international hearts of Marys are the sisters,

3 that was Anne Munley -- here I am suggesting that to bribe me

4 some different group -- sisters of subversion, whoever they

5 are, they do not exist, but I was thinking here Marywood -- I

6 was thinking the word sisters, of course, and the notion S. S.

7 came up, so sisters of subversion and so some -- maybe retired

8 nuns, maybe somebody would slip me some dollars to stop.

9 Q.    Here we talked about this.  But you say in this slide,

10 this screen shot Sister Munley saying, he had the balls to put

11 a world famous cartoon of Mohammed on his door.  Here you're

12 acknowledging you -- the cartoons that you put on your door

13 that were a problem to Marywood.

14 A.    This cartoon here was the one related to the Danish

15 newspaper that published as a free speech exercise 12 cartoon

16 drawings of Mohammed, it being known that some Muslims did not

17 like to see Mohammed depicted in any way.  So the Danish

18 newspapers said, well, we think we can do that, and they --

19 that Danish newspaper did it.  And the result around the world

20 was massive burning of Danish embassies and about 200 people

21 killed in terrorist attacks, and the cartoon published in that

22 newspaper that was famous.  It was one with the kind of curly

23 headed cartoon figure, not a photograph, of -- representing

24 supposedly Mohammed with a round bowling ball and this bomb

25 from 1888 with a fuse sticking out of it, and that was a

1  representative cartoon.  I posted an associated press news

2  story on my door that had that cartoon with it.  I used to

3  publish a lot of news stories on my door.  That's the cartoon

4  we are talking about.

5  Q.    Next we got Dr. Levine represented in the video, correct?

6  A.    You said represented by Levine, correct.

7  Q.    That is clearly supposed to be Dr. Levine --

8  A.    Yes, I would assume that that would be drawn as a

9  conclusion.

10  Q.    You knew -- you assumed that he was Jewish, right?

11  A.    I assumed that.  I did not know it.

12  Q.    Here you're depicting him by saying I should quit as V. P.

13  and be a professor again but my young wife No. 2 and one

14  percent kids need money.  So here you're bringing his --

15  talking about his family in this video that you're posting

16  publically and you intend to go viral?

17  A.    It is what it is here.

18  Q.    And then you talk about his wife.  You wanted a hot young

19  thing, now you pay.  There you are saying he has to pay for

20  what you call his hot young thing of a wife.

21  A.    Well, a television show hot young thing in Cincinnati is

22  very is a common term.  And I am not sure who this person is in

23  the video, some administrator is telling Levine, well, you

24  wanted -- you know, get married again, you have all these

25  financial responsibilities and you get very high pay in your

1  position, and you're getting a lot of stress and turmoil in

2  this position, you wish to back to being a professor at lower

3  pay, you have to trade off if you want to keep the big pay

4  bucks, the one percent earnings like the Wall Street issue is

5  what I am referring to there and you have to live with your

6  troubles.

7  Q.   Okay.  There's an e-mail from December 19th, 2011.  This

8  is Defendant's Exhibit --

9  A.   Can I see the top of the e-mail or the whole thing?

10  Q.   Yeah, from you to Pam Parsons.  Who is Pam Parsons?

11  A.   She's an -- a professor at Marywood in the art department.

12  Q.   Okay.  And here you're asking her to draft a cartoon for

13  you.  Is that right?

14  A.   Yes, that was an idea that crossed my mind.

15  Q.   And you say here, have a little short Anne Munley leading

16  the parade perhaps with some of her goose stepping leg showing

17  a little skin, maybe a garter belt showing.  You wanted to

18  humiliate Sister Munley, didn't you?

19  A.   No, not for the purpose of humiliation, but again with the

20  goal of free speech.  If it took a little funny cartoon to draw

21  attention to that, fine.

22  Q.   But having a sister, a Catholic nun showing a little leg

23  and a garter belt, you agree that could humiliate?

24  A.   Depend on where the garter belt was.  It could be worn

25  very low.

1  Q.    Your Honor, I would like to admit Defendant's Exhibit 6.

2           MR. COHEN:  No objection.

3           MR. ENGLISH:  Defendant's Exhibit 16.  An e-mail from

4  you to Lindsey Grove.  Who is Lindsey Grove?

5           THE WITNESS:  She's the lead cellist in the Syracuse

6  Symphony Orchestra which is now the Symphoria.

7  BY MR. ENGLISH:

8  Q.    Just to set the context of your response, she says the

9  real estate portfolio, slash, young wife stuff is really

10 personal.  I think you should take down the second video.  Your

11 response is, oh, well, only those in the know know that Levine

12 written as Levine as a joke because as a Jewish guy working for

13 Hitler his name cannot be Levine and that he is on his second

14 family.  You knew this was a personal attack on Dr. Levine,

15 didn't you?

16 A.    What is the personal attack?  Just because most -- many

17 viewers think that Alan Levine is Jewish and he was -- is that?

18 Q.    The personal attack is representing a Jewish person as a

19 Nazi talking about his hot young wife who he had to buy and

20 talking about his one percent kids in a video that you want to

21 go viral.  That's the personal attack.

22 A.    I think people if they see this as satire they would not

23 think it's a personal attack but using the humor of a human

24 situation, high pay job and you have to, you know, make some

25 tough choices you whether you want keep that job or not if you

1 have -- you know, people have wives and husband and kids, and

2 they have to support them.  And there are tradeoffs that can be

3 made.  I don't see that as a real attack on a family or

4 anything.

5 Q.    You say up here, oh, well, that's your attitude about it,

6 right?

7 A.    No, the oh, well refers to the hair dye joke lines

8 previous to that.

9           THE COURT:  That was moved with no objection, right?

10          MR. ENGLISH:  If I didn't I will do it now.

11 Defendant's Exhibit 16.

12          THE COURT:  That will be admitted.

13 BY MR. ENGLISH:

14 Q.    Now, we are on Defendant's Exhibit 5.  E-mail between

15 yourself and William Ziegelbauer?

16 A.    Yes.

17 Q.    Who is William Ziegelbauer?

18 A.    At this point a law student at the University of Chicago

19 and former Marywood student.

20 Q.    At the bottom here quickly, you say hit him in the solar

21 plexus, I guess I will have to take comfort in -- I -- forgive

22 my pronunciation -- schadenfreude?

23 A.    Schadenfreude.  That's how I pronounce it.

24 Q.    Schadenfreude means you will feel enjoyment from

25 witnessing the humiliation of another, right?

1   A.   I believe the word would -- whatever -- take comfort in

2   the discomfort of others, yes.

3   Q.   You mentioned agony, right?

4   A.   Yes.

5   Q.   You would take comfort in seeing the agony of Marywood as

6   their reaction to the videos that you were posting?

7   A.   Yes, let me read the full paragraph here, please.  To get

8   info into the hands of parents who'd be having guys like me --

9   the info is related to the poster teardowns would mean having

10  guys like me on public property, sidewalks and dorm driveways

11  handing out fliers to car occupants, right, fliers to have a

12  summary and the cartoon and links to the website for full

13  version.  Hit them in the solar plexus.  We are trying to get

14  the information out to as many people as possible about the

15  free speech situation.  And I guess I will have to take comfort

16  in, you know -- if I lose my job -- if I lose my job then I --

17  all I can say, well, the administration -- the administration

18  at Marywood suffered some, too, because they got some bad

19  publicity.

20          MR. ENGLISH:  Your Honor, I will move exhibit 5 --

21  Defendant's Exhibit 5.

22          MR. COHEN:  No objection.

23          THE COURT:  Admitted.

24          MR. ENGLISH:  Exhibit 32 , which is an e-mail from

25  you to Will Ziegelbauer again.  February 5th, 2015.  Here in

1  the highlighted portion you say, I am probably overdoing this

2  rule 26 damages stuff, but at worst I will make the other side

3  spend a lot of hours pouring through what I have done.  What's

4  the old phrase, baffle them with bull -- blank -- and bury them

5  in paper.  You wanted to run up the costs of Marywood's defense

6  of this lawsuit as retribution, didn't you?

7              THE WITNESS:  Absolutely not.

8  BY MR. ENGLISH:

9  Q.   You ended up producing almost five thousand pages of

10  documents in this litigation, didn't you?

11  A.   I don't know how many pages.  But could we read past what

12  you read?

13  Q.   Dr. Fagal, isn't it true that the lawsuit is -- this

14  lawsuit is an extension of your attempt to shame Marywood?

15  A.   No.  I am not that rich, and it's a lot of time I rather

16  not be spending.

17  Q.   Let's talk about the January 23 meeting with --

18  A.   Excuse me.  Can I --

19  Q.   I don't have a question pending.

20  A.   Okay, fine.

21  Q.   Let's talk about the January 23rd meeting with Sister

22  Munley that you testified about.  You didn't apologize when

23  Sister Munley met with you, did you?

24  A.   No, I did not.

25  Q.   You didn't explain your actions during the meeting in

92

1  connection with the Hitler videos, did you?

2  A.    I wasn't allowed to explain.

3  Q.    Okay.  She asked you for an explanation as to why you

4  posted videos?

5  A.    No.

6  Q.    You deny that?

7  A.    Yes.

8  Q.    Okay.  You didn't apologize to Dr. Levine or anyone else

9  depicted in the videos?

10  A.    I did not see Dr. Levine after I posted the video.

11  Q.    Never saw him once after the you posted the video?

12  A.    Only at his deposition.

13  Q.    You saw Sister Munley though, right, at the meeting?

14  A.    Yes.

15  Q.    Okay.  You didn't apologize to her, did you?

16  A.    No.

17  Q.    Sister Munley told you during the meeting that what you

18  did was a serious violation of the policies, right?

19  A.    She -- yes.

20  Q.    Okay.  And after the meeting you didn't take down the

21  videos, did you?

22  A.    I did take down the videos.

23  Q.    Took them down over a month later February 28th, right?

24  A.    By February 28th, yes.

25  Q.    And wasn't -- it wasn't your idea to take down the videos,

1  was it?

2  A.   Yes, it was.

3  Q.   But you left them up for, you know, a month and a half

4  after this meeting, right, a month and a week after the

5  meeting?

6  A.   Yes, that's right.

7  Q.   You wanted them to spread, you wanted the public to see

8  them, right?

9  A.   Yes, by this time, of course, I was involved with getting

10  a lawyer and stuff like that.  So I was very busy.

11  Q.   Let's talk about the notification of the decision to

12  suspend.  You agree that the decision to suspend would not have

13  been changed had Dr. Levine notified you himself, correct?  You

14  are not contenting Dr. Levine would not have suspended you for

15  the Hitler videos?

16  A.   I won't contend that.

17  Q.   You don't dispute that Dr. Levine reported to Sister

18  Munley?

19  A.   Yes, but the -- all I can think of here is Watergate when

20  Nixon wanted to fire Archbald Cox, he did not do so directly.

21  He had to go through a bunch of in order to get it done.  The

22  president could not do it directly.  So I do not know just

23  because somebody is quote/unquote the boss they have total

24  procedural power to skip a line of administration.

25  Q.   We have joint exhibit 20, which I think is admitted.  This

1  was Sister Munley's initial letter to you notifying you of

2  suspension and her recommendation for termination.  You've

3  already testified about this document.  But it tells you in

4  this document what policies have been violated, right?

5  A.    Well, some are listed.

6  Q.    It was cut off.  She had to send you another letter?

7  A.    That's correct.

8  Q.    A week or so later.  But at the back page, last page of

9  this document, last page of this document, there was an

10 authorization, release of personal information authorization

11 that was presented to you on that date.  You saw that?

12 A.    Yes.

13 Q.    Okay.  And at the top there, it says, I do not grant

14 permission for Marywood to release Sister Munley's

15 recommendation for termination and statement of charges dated

16 1/24/12.  I understand by refusing such permission that there

17 will be no faculty committee review of Sister Munley's decision

18 to terminate my tenure and employment with the university prior

19 to it being finalized.  You refused to sign this authorization,

20 didn't you?

21 A.    Yes.

22 Q.    And she sent you another letter that was kind of a

23 correction of the January 24th letter.  She sent that February

24 8th letter, joint exhibit 24, which I think has been admitted,

25 which you already testified about.  Is that right?

1  A.    Yes.

2  Q.    Dr. Fagal, okay.  That letter included -- wasn't cut off

3  and had a more expansive list of charges and explanation for

4  the charges, right?

5  A.    Correct.

6  Q.    At the end of that document is the same authorization,

7  this is a second time that says you understand that by refusing

8  such permission that there will be faculty review of her

9  decision prior to it being finalized.

10 A.    I view this as a Hobson's choice that was skipping over

11 procedures that I should have received.  That's why I did not

12 sign it.

13 Q.    You refused to sign it?

14 A.    Yes.

15 Q.    And we talked about -- your counsel went over with you

16 some letters that he sent where you testified that your lawyer

17 authorized the ad hoc committees to go forward.  And one of

18 those letters is dated February 9th, exhibit 26, which I think

19 has been admitted.  This was your -- Mr. Cohen's initial letter

20 back to Sister Munley.  In there --

21 A.    What's the date on that letter there?  You're flipping it

22 around.  I can't see it.

23 Q.    February 2nd, 2012.

24 A.    Okay.

25 Q.    And at the end of the letter, it reads here you asked Dr.

1  Fagal to indicate whether he grants permission for Marywood to

2  release Sister Anne Munley's recommendation for termination and

3  statement of charges dated --

4  A.    What paragraph?

5  Q.    Top paragraph here.

6  A.    Okay.

7  Q.    The alternative choice refusing such permission requires

8  Dr. Fagal to acknowledge there will be no faculty review of

9  Sister Anne Munley's decision to terminate prior to being

10 finalized.  In other words, you invite Fagal to ratify

11 recommendation for termination and statement of charges that

12 breach multiple contractual obligations by Marywood.  At the

13 end, you say my client will not waive either breach.  So here

14 your lawyer is telling Sister Munley you're not going to sign

15 the authorization, correct?

16 A.    Correct.

17 Q.    There's another letter from your lawyer that was in

18 response to Sister Munley's second letter, February 8th letter.

19 This was dated February 17, 2012.  You testified about this

20 letter.  In here right here at the top it says, Dr. Fagal will

21 not sign the release of personal information proffered by

22 President Munley or any other document that would permit her to

23 circumvent the review of the propriety of his suspension.

24 There your lawyer is telling Sister Munley again you are not

25 going to sign the authorization, correct?

1   A.   Correct.

2   Q.   If we look at the policy from the faculty handbook, this

3   is joint exhibit 3, paragraph 4.37 says in the highlighted

4   portion, it is the policy of the university to consider all

5   personal information strictly confidential.  Written

6   authorization by the employee is required for disclosure of any

7   personal information to anyone other than the employee except

8   as required by law.  You the employee never signed that

9   authorization at that point, correct?

10  A.   At that point.

11  Q.   Okay.

12  A.   Correct.

13  Q.   There's a point where you did authorize it, right?

14  A.   Yes.

15  Q.   Okay.  Here's that document, March 29th, 2012.  This is a

16  letter from you, not your attorney, but from you authorizing in

17  the second paragraph, I grant permission for Marywood

18  University to release your recommendation for termination and

19  statement of charges.  So at that point you decided to go ahead

20  and authorize the release of your information.

21  A.   Well, reading here, I grant permission for the university

22  to release to the ad hoc committee her recommendation regarding

23  my tenure and employment.  I don't see anything here about --

24  help me if I am wrong -- I don't see anything here about my

25  personal information.

1  Q.   Right.  But you didn't -- this is a release -- you grant

2  permission to release your recommendation for termination and

3  statement of charges.  Here you are now authorizing -- you are

4  authorizing her to release your information so the ad hoc

5  committee would -- could receive your information so they can

6  review your case.

7  A.   All I said here -- I am just reading the letter that I

8  authorized President Munley to release her recommendation to

9  the committee.  If, in fact, that recommendation -- I don't

10 know what it had in there about my personal information.  I

11 know at some point I did release it, but I don't see that here.

12 Q.   If we go back to the February 8th letter from Sister

13 Munley to you, she says at the end here, should you choose to

14 forego that faculty review, I will finalize my recommendation

15 based upon my own findings and conclusions.  Please respond no

16 later than Friday, February 17th, 2012.  Do you see that?

17 A.   I'd have to see the previous part of the letter to see

18 what faculty review we are talking about.

19 Q.   First here the paragraph before said, as a result of this

20 recommendation I'm prepared to send this statement of charges

21 to a dually appointed faculty committee for review along with

22 the e-mails and videos you forwarded to members of our

23 community.  In order to do so, out of respect for your privacy,

24 I would ask that you please sign and return to me the attached

25 authorization granting the university permission to do so.

1  That faculty -- it goes on.

2  A.    I'm sorry.  Could you go back?  It would help if I had a

3  piece of paper.  You're flipping around, and it's partial.

4  Thank you.  I am reading to catch up here on page --

5  Q.    My question is simple.  You didn't respond -- you didn't

6  sign the authorization by February 17, 2012 as requested in

7  that letter, right?  You didn't do it until March 29th, 2012.

8  A.    Right.

9  Q.    That's the only question him asking.

10  A.    All right.  I didn't sign it.

11  Q.    So here eventually instead of going forward with the ad

12  hoc committee, you filed a grievance instead, right, initially?

13  A.    Yes.

14  Q.    Okay.  And there this is -- I'm sorry.  Wrong document.

15  And here is -- I think this document has already been admitted.

16  This is joint exhibit 25.  This is the e-mail from you to

17  Sister Cabral.  This contains the basis of your grievance,

18  right?

19  A.    Yes.

20  Q.    If you look at paragraph 1 B., you say Marywood's

21  progressive decline policy further states that suspension is

22  justified if immediate harm to the faculty member or others is

23  threatened by the person's continuance in the faculty position.

24  To my knowledge, President Munley has never alleged I've ever

25  been immediate harm to anybody.  Mr. Cohen's letter of February

1   2nd, 2012 points this out.  In response neither President

2   Munley nor Mr. Anthony disputed this.  So here you want the

3   faculty grievance committee to look at whether or not you were

4   a harm to anyone at Marywood, right?

5   A.    That would be one of the things to consider.

6   Q.    Okay.  It's your position that there was no threat of

7   harm, that Sister Munley was incorrect it was her determination

8   you were a threat of harm.  You wanted the grievance committee

9   to review that?

10          MR. COHEN:  Objection.

11          THE COURT:  Pardon?  I am not hearing you very well.

12          MR. COHEN:  I'm sorry.  He asked a question that kind

13  of assumes facts in evidence.  He said something about

14  President Munley told you you were immediate harm.  I don't

15  think that ever happened.

16          THE COURT:  That's a question.  I don't know.

17  BY MR. ENGLISH:

18  Q.    My question -- I will restate --

19          THE COURT:  It's cross examination.  He can ask a

20  leading question.  If he doesn't know it, if the answer is no,

21  he can say so.

22  BY MR. ENGLISH:

23  Q.    I will reask my question.  We just read paragraph B.  It

24  was your position there was no threat of harm?

25  A.    Yes.

1  Q.    Okay.  And you were asking the faculty grievance committee

2  to review Sister Munley's determination to suspend you on the

3  basis that you were a threat of harm?

4  A.    No, as I understand the grievance committee's job is to

5  determine whether the administrator, in this case Professor

6  Munley followed procedures not whether -- it was not the

7  grievance committee's job to examine for example whether I was

8  a harm or not or whether I got a suspension -- a committee to

9  review the suspension or whether the vice president for

10 academic affairs had to suspend me.

11     These were procedural issues to be considered by the

12 grievance committee, and the grievance committee had no role in

13 looking at my quote/unquote behavior.

14 Q.    Okay.  But you asked them to look at -- in paragraph one

15 B. I think you just testified that you asked them to look at

16 the harm issue.

17 A.    As to whether that would be considered reason to suspend

18 me and whether it was -- whether it was considered, not whether

19 there was any harm.

20 Q.    Joint exhibit 28, which is a March 26 letter from you from

21 Dr. Sadlack -- I think you have already testified about this

22 document.  But this gives you the decision of a grievance

23 committee on the issues that you raise, right?

24 A.    Yes, the first one whether I was improperly suspended by

25 President Munley as opposed to Dr. Levine.

1  Q.   The second one says you were improperly suspended because

2  you have not been a cause of immediate harm to yourself or to

3  others.  And in the bottom -- I won't read all these because

4  the document speaks for itself.  She's says, I now write to

5  inform you in reviewing each of these grievances we have found

6  no evidence of improper action on President Munley's part which

7  would constitute a legitimate grievance.  They considered your

8  grievance and didn't find there was any wrongdoing by President

9  Munley, is that fair to say?

10 A.   Yes.

11 Q.   Is to let's talk about the ad hoc committees.  You told me

12 earlier that the ad hoc committee only can make a

13 recommendation, correct?

14 A.   Yes.  Review, that's right.

15 Q.   You admit in that document between -- e-mail between you

16 yourself and Mr. Creeley that Sister Munley would not have

17 changed even if her mind even if the ad hoc committee disagreed

18 with her, right?

19 A.   Based on my interpretation of Sister Munley's behavior and

20 actions, that's what I believed.

21 Q.   Okay.  And joint exhibit 33, I don't know if it's been

22 admitted.  If it's not, I move to admit it.  This is the e-mail

23 between Sister Cabral and Fred Fagal.

24          MR. COHEN:  No objection.

25 BY MR. ENGLISH:

1 Q.    I think it's admitted.  Here this is an e-mail to you

2 dated April 30th -- and here it said according the progressive

3 disciplinary policy when a faculty member requests a committee

4 be convened twice, the president determines whether membership

5 of the committee is similar or different.  The president has

6 received your e-mail, and after review and consultation Sister

7 Anne has determined that the membership will be the same.  Here

8 you're being told you don't get two ad hoc committees that will

9 have different membership, that your ad hoc committee -- same

10 ad hoc committee to consider your case, right?

11 A.    If so the committee would have to convene twice, and I

12 would also like to point out here if you look in the

13 dictionary, Websters Second International they have in

14 libraries similar does not mean the same.  Similar implies

15 there are differences.  Things can be similar.  They can't be

16 the same.

17 Q.    May means may.

18 A.    Pardon me?

19 Q.    May doesn't mean shall?

20 A.    It says here the president determines whether the

21 membership of committee is similar or different.  Similar if

22 you look it up implies there are differences.  Similar cannot

23 be the same.  They are similar, close, but they are not same.

24 If you have a committee of five members let's say, you can have

25 four be the same, but you have to have one different one.

1  Q.   We can't pick and choose when we look at a policy which

2  terms are going to give their plain meaning to and which terms

3  we're not going to give --

4           MR. COHEN:  Objection.

5           THE WITNESS:  Similar is not the same as same.  But

6  at any rate, the committee would have to be convened twice.

7  BY MR. ENGLISH:

8  Q.   When we look at the policy provision that we're talking

9  about because we talked about similar -- so here where I am

10  pointing -- it says, should a faculty member request that such

11  a committee be convened twice, the membership of the committee

12  may be similar or different, right?  May doesn't mean shall,

13  does it if we look at in that dictionary you were telling us

14  about?

15  A.   Shall.

16  Q.   It means there's discretion.  It doesn't have to be

17  similar or --

18  A.   I don't agree with that interpretation offhand.

19           MR. COHEN:  Objection.

20           MR. ENGLISH:  Your Honor, to the extent -- to the

21  extent joint exhibit 33 hasn't been moved into evidence, I move

22  it into evidence.

23           MR. COHEN:  No objection.

24           THE COURT:  It will be admitted.

25  BY MR. ENGLISH:

1  Q.    July 13, this is a letter admitted into evidence, joint

2  exhibit 38.   You receive a letter July 13th from Sister Munley

3  telling you that her decision to terminate your employment with

4  Marywood University is effective April 3rd, 2012, you received

5  that letter?

6  A.    Yes.

7  Q.    We opened this -- you started talking about the cartoons

8  that were offensive.   Here's a letter dated October 6, 2006,

9  and it says in my opinion -- this is to Dean Torrell you were

10 referring to in the beginning of this?

11 A.    Yes, I mentioned that name before.

12          THE COURT:   Wait a minute.   What is this?

13          THE WITNESS:   What is this?

14          THE COURT:   Is this Mr. Fagal's letter.

15          MR. ENGLISH:   No, this is a letter from Kurt Torrell

16 to Sister May Reap that was testified to by Dr. Fagal.   Your

17 Honor, I can move on.   He just brought it up.   So --

18          THE COURT:   Proceed.

19 BY MR. ENGLISH:

20 Q.    Because you told me that you took it down when you were

21 asked to take down the offensive -- what others considered to

22 be offensive postings on your wall, and here it says in my

23 opinion this -- the cartoon is a type of hate speech.   Its

24 presence on his faculty door violates our value of respect for

25 each member of our community and our mission and our welcoming

1 community for diverse individuals.  When this incident was

2 going on, you were told that cartoon violated the core value of

3 respect, right?

4 A.    I can't recall that term being used exactly.  I know that

5 I was told the cartoon caused problems.  I took the cartoon

6 down, and then I contacted FIRE and explained what all had

7 happened.  FIRE wrote a letter to President Reap I guess you

8 would say inquired -- laying out my version of events and

9 asking her to respond and to try to -- you know, see what the

10 policy might change to with FIRE's help.  Mary Reap did not

11 respond for months.  And in order to elicit a response from her

12 to get things moving again, that's when I reposted the cartoon.

13 Q.    I just want to refresh your recollection.  The opening

14 paragraph here --

15         THE COURT:  Wait a minute.  He didn't say he had no

16 recollection.  He didn't get this letter, did he?  What are we

17 doing?

18         MR. ENGLISH:  He testified in the beginning he

19 doesn't remember being told that he had to remove the --

20         THE COURT:  How does this prove he did?

21         MR. ENGLISH:  In the beginning paragraph Dr. Fagal

22 informed me via e-mail he had again put up on his door a copy

23 of the cartoon which had offended some of the Muslim community.

24 This happened despite the request of his supervisor to remove

25 it.

1          THE COURT:  This happened despite the request.  It

2    doesn't say --

3          THE WITNESS:  I had removed the cartoon.

4          THE COURT:  He's already testified to this.  This

5    letter -- please take it down.

6          MR. ENGLISH:  Okay.

7    BY MR. ENGLISH:

8    Q.   Exhibit 23.  February 9th, letter joint exhibit 23.  This

9    is a letter from Will Anthony to you -- I'm sorry -- to

10   Jonathan Cohen.  Here look at the paragraph here at the top, it

11   says, as you apparently are not familiar with Marywood's

12   mission, goals and objectives, we have attached them to this

13   letter for your review.

14        As you will see, disseminating a message and video to the

15   Marywood community which uses vulgar language, depicts the

16   university's leaders as Nazis and belittles its leaders through

17   personal insults have no place at Marywood University.  More

18   importantly, the conduct breaches a material term of Dr.

19   Fagal's commitment to the university as a tenured faculty

20   member.  Here you're being told you have violated the faculty

21   -- the faculty -- tenured faculty handbook in a material way,

22   correct?

23   A.   Yes.

24   Q.   Okay.  And he goes on to say that as a result of the

25   breach of contract Marywood has no further contractual

1  obligations to him.  So at this point you're being expressly

2  told on February 9, 2012 that the university doesn't have any

3  further contractual obligations to you?

4  A.    Yes.

5  Q.    Just going back on this point on the authorization, here

6  Will Anthony says you appear to have advised your client to

7  waive his right to have a review of Sister Anne Munley's

8  recommendation prior to her finalizing it.  That certainly is

9  your client's prerogative to do so, but Marywood will provide

10 that opportunity one last time.  Enclosed is a revised

11 statement of charges, charges which you requested.  While

12 Marywood does not believe this revised statement is necessary,

13 in the spirit of cooperation, it will be provided.  It will be

14 provided.  Marywood will forward to your client as well.  So

15 you're getting another opportunity to sign the authorization

16 here, right?

17 A.    I was given another choice that would speed up the process

18 and benefit President Munley but it would require me to give up

19 my rights over the contract.

20 Q.    You were further advised should your client choose to seek

21 a review of President Munley's recommendation, you will not be

22 a part of the process other than as an outside advisor to your

23 client.  So that's to Jonathan Cohen.  But at the end of the

24 day you were advised that it's your choice if you choose not to

25 sign the authorization you won't -- she will finalize her

1  determination, her recommendation of termination?

2  A.   I didn't know what she was going to do exactly if I didn't

3  sign it.

4  Q.   He said it right there.

5  A.   Yes, okay.

6  Q.   Let's move to damages.  You remember being deposed by my

7  colleague here Stephanie Peet?

8  A.   Yes.

9  Q.   A couple years ago?

10  A.   Yes.

11  Q.   Okay.  And you remember telling her that you were

12  qualified to teach history; is that right?

13  A.   I taught introduction to U.S. history.  I'm not a history

14  major.

15  Q.   Economics?

16  A.   Principles types courses.

17  Q.   Statistics?

18  A.   I taught the introductory course at Marywood.

19  Q.   Social science?

20  A.   Introduction to social science.

21  Q.   Okay.  And here's an e-mail dated June 6, 2012 from Linda

22  Rose to Fred Fagal.  Next June 6 there's an e-mail to you to

23  Linda dated June 6, 2012.  In the highlighted portion, you say

24  I don't really want the job back, but part of me would love to

25  go back to work for even just a year just to say F. you, I won.

1  A.    I wrote that.

2  Q.    You didn't want your job back, did you?

3  A.    I did want my job back.

4  Q.    You said here you didn't?

5  A.    To go back to work with, you know, administration such as

6  it was, that part says I don't really want the job back.  The

7  other part says, I would really love to go back to work.

8  Q.    For what reason just to say F. you, I won, right?

9  A.    Partly to -- probably -- my presence would be an

10 indication that -- shall we say free speech won and that would

11 be beneficial to me.  And then of course when you are working,

12 you see how it goes every year.  If you are still having fun

13 teaching, you see how it goes.  Remember I am writing this

14 right about when I am about to lose my job.

15 Q.    When you are about to lose your job in the middle of 2012

16 you say you just want your job back just for a year, right?

17 A.    Even forward -- I didn't say just for a year.

18 Q.    You drove four hours roundtrip to get to and from work

19 when you were working at Marywood?

20 A.    That's correct.  I did that for 25 years.

21 Q.    You were willing to drive that distance from your home if

22 you found another job?

23 A.    That would be the absolute maximum.

24 Q.    So had you -- if you found a job within two hours of your

25 home one way, that would have been the maximum distance you

1  would travel for that job?

2  A.   Yes, that's correct.  Let me explain.  Living up near

3  Syracuse, New York, once you're talking about any jobs, you

4  know -- we get a lot of snow.  And so what might be two hours

5  in good weather could be a lot more in bad weather.  So me

6  driving south to Pennsylvania, that was like going on a

7  vacation comparing to where I live in the wintertime.

8  Q.   You were notified in January of 2012 that you were being

9  recommended to be terminated?

10  A.   Yes.

11  Q.   Okay.  And that decision was finalized in July of 2012.

12  A.   Yes.

13  Q.   Okay.  And you didn't apply for a job until January 2013,

14  did you?

15  A.   That's correct.

16  Q.   And professors are usually hired before the start of the

17  school year?

18  A.   Professors are usually hired -- job announcements usually

19  go out for a full-time position, usually go out in the fall for

20  the following year.

21  Q.   The hiring is done before the academic year.  So if you

22  were going to apply for a job to start in the fall of 2012, you

23  would have had to have applied obviously before that semester

24  started.

25  A.   You would have had to apply probably in the fall of 2012

1  for a job to begin the following September.

2  Q.    And you didn't apply for any job until January 2013?

3  A.    You have to find jobs to apply to.  I was looking, and you

4  don't apply to jobs that aren't suited for you.  That's a waste

5  of time on both ends.

6  Q.    And let's look at your -- the application you did submit.

7         MR. ENGLISH:  Your Honor, by the way, I don't know if

8  it got moved into evidence, exhibit 29, F. U. I. 1 document --

9         MR. COHEN:  No objection.

10        THE COURT:  Admitted.

11  BY MR. ENGLISH:

12  Q.    Let's talk about the application.  That application --

13  excuse my pronunciation -- but Onondaga Community College?

14  A.    That's correct.

15  Q.    This is exhibit 31.  And that application -- it looks like

16  upper left-hand corner here it says 1/11/13.  Is that around

17  the time you applied January 11, 2013?

18  A.    Yes.

19  Q.    You submit a resume, and on that resume you list other

20  perhaps of interests.  And there you say in your application I

21  have fought for free speech on college campuses, I have paid a

22  price including losing my tenured faculty position in 2012.

23  Earlier examples of my battle seen and list the -- your

24  website.  The most recent case which led to my firing,

25  Marywood's administration tore down my approved for hanging

1  posters, announced a speech presentation about free speech by a

2  speaker from FIRE.  I paid for the speaker and the posters.  I

3  sought an apology and restitution and got neither.  I then

4  wrote a letter to the faculty where I castigated the

5  administration, proved my case and posted a link to two YouTube

6  Hitler parody satire videos featuring the president of the

7  university at as Fuhrer Munley.  These activities caused me to

8  lose my job, FIRE the organization knows my case.  You put that

9  in your application to try to get this community college to

10 hire you, right.

11 A.    Yes, I worked for this community college while I was a

12 graduate in Syracuse probably three semesters, and this was an

13 adjunct job which I was applying -- ultimately they can make it

14 a full-time job.  That was my goal.  Not an adjunct job.  I --

15 I did write what you said, and I contemplated it.  And I

16 thought that anybody these days would Google somebody and they

17 find out, you know, their background.  And so I had to think

18 hard to get it up front or they can found out later.  And I

19 figured, well, cut to the chase.  That's why I put that here.

20 Q.    Cut to the chase told them you castigated the

21 administration and got fired for it, right?

22 A.    I said what I said here.

23 Q.    So in 2013, that's the only job that you applied for in

24 that year, right?

25 A.    Right.

114

1   Q.    You didn't apply for any job in 2012?

2   A.    Correct.

3   Q.    And then let's fast forward, 2014 you didn't apply to any

4   job?

5   A.    Right.

6   Q.    2015 you didn't apply for any job?

7   A.    Correct.

8   Q.    And then we get to 2016.  You apply for one job?

9   A.    Yes, I found a job where I might stand a chance of getting

10  it.

11  Q.    And that job was -- you applied in November of 2000 --

12  November of 2016; is that right?

13  A.    Yes.

14  Q.    Cazenovia?

15  A.    Cazenovia, yes.

16  Q.    That was late 2016.  You apply for one more job.  That was

17  to SUNY Oswego?

18  A.    That's correct.  A job announcement when I read it with

19  care looked like I might fill the bill, and so -- I had worked

20  there for one year in the early 1980s.  So, you know,

21  presumably they would know me or somebody might know me or had

22  a record.  So I thought I can apply for that job.

23  Q.    That was in May 2017?

24  A.    Yes, I guess it was.

25  Q.    2018 you haven't applied for any jobs?

1  A.    Correct.

2  Q.    Dr. Fagal, would you consider yourself retired?  Is that

3  correct?

4  A.    No, not working so, you know, there's -- you can be not

5  working and -- but you are still looking for a job.  If you're

6  retired it might be different.  I know --

7  Q.    Here's your Linked In page.  Defendant's Exhibit 46.  And

8  in your Linked In page at the highlighted portion it says,

9  refired associate professor of economics with Marywood

10 University.  You put refired on your Linked In page, right?

11 A.    Yes, I did.

12 Q.    You understand your potential employers when you are

13 looking for a job and when they are looking for potential

14 candidates, they look at your Linked In page to see what's on

15 it?

16 A.    I never used Linked in.  Students asked me to be on it so

17 I can provide them with recommendations.  I wasn't using Linked

18 In has a job search tool.

19 Q.    You realize employers -- potential employers used Linked

20 In in connection with --

21 A.    I don't know that universities do.

22 Q.    Here you put refired, which is play on a word which is

23 retired.  Is that what you meant by that?

24 A.    It was a joke fit, yeah.  You can say that.  Some people

25 say retired.  I say refired.

1  Q.    You agree that when you put refired on your Linked In page

2  that doesn't necessarily put you in the best optimal position

3  to appear to be an attractive potential employee in higher

4  education?

5  A.    If it had to be higher education looking at that, they

6  probably say, what is this, this is a strange phrase.  Maybe it

7  would get attention.  Maybe they would like it, check me out.

8  Q.    Okay.  We talked about the three jobs you applied for.

9  Other than that, you didn't actively search for any jobs, did

10 you?

11 A.    I did.

12 Q.    You didn't go any networking events, did you?

13 A.    I relied -- higher education has a job search where you

14 sign up and get notifications for -- that say economics jobs in

15 your area.  So I relied on the Chronicle of Higher Education,

16 which is a very respected publication.

17 Q.    Okay.  Did you look at higheredjobs.com?

18 A.    No.

19 Q.    Inside higher ed career --

20 A.    Yes, I would look at Inside Hire.  I would do that early

21 on in 2012, 13 -- before I -- I think I started the Chronicle

22 in 2013 where I got the weekly announcements.

23 Q.    You got weekly announcements.  Did you do anything else in

24 searching Chronicles?

25 A.    I would look sometimes inside higher ed as I said early on

1  and Chronicle.  Before I got the subscriptions I would see ads

2  in the -- saw an ad in the newspaper.  I remember seeing an ad

3  at Hobart for an economist.

4  Q.    Other than those two websites, did you use any other

5  websites to search for jobs?

6  A.    No.

7  Q.    You didn't send resumes or letters to potential employers,

8  right, other than the three we talked about?

9  A.    Not only sent them.  I only applied to jobs where I

10 thought I could stand a chance.  One that required a Ph.D. in

11 economics and I don't have one, there was no sense in applying

12 for that job.

13 Q.    You didn't call or visit any potential employers?

14 A.    No.

15 Q.    You didn't respond to advertisements in newspapers or

16 trade journals?

17 A.    I had a trade journal, but I would look in the newspapers

18 and look for ads.  Cazenovia might be there.  I saw a Hobart ad

19 that they wanted a Marxist economist.  So I did not apply for a

20 that job.

21 Q.    You didn't engage any private search firm?

22 A.    Did not engage a private search firm.

23 Q.    Did you go to the Pennsylvania or New York Department of

24 Labor for any assistance?

25 A.    No, I did not.

1  Q.    Didn't look through any internet job banks other than two

2  websites I guess we talked about?

3  A.    The two we talked about, right.

4  Q.    Didn't go to job fairs or annual conferences?

5  A.    No.

6  Q.    Okay.  Let's do exhibit -- I will hand you exhibits 47 and

7  48.  Okay.  I am showing you what's been marked as Defendant's

8  Exhibit 47 and 48.  I will represent to you that this is --

9  these are 425 job listings in your area of specialty from

10  January 2, 2012 through April 9th, 2018.  And if we look

11  through a few of them because we are not going to go through

12  them all --

13  A.    I have them.

14  Q.    Yeah, I am not going to go through all of them with you.

15  We'd be here all day.  Job postings of mathematic science

16  teachers, post secondary economics teachers, post secondary

17  history teachers.

18             THE COURT:  Are you testifying to this?

19             MR. ENGLISH:  No, Your Honor, I'm just telling him

20  what it's -- what the areas are.

21             THE COURT:  I understand that.  Where did they come

22  from?  Where are they from?  Are they authenticated?

23             MR. ENGLISH:  These are from --

24             THE COURT:  I know where you are saying.  If I would

25  listen to you attentively.  But we're in court.  But --

1    MR. ENGLISH: He just testified that --

2    THE COURT: Does he identify these? Did you ask him

3  to identify them.

4  BY MR. ENGLISH:

5  Q.   I will ask you to look through them. And these are job

6  postings for math, economics and history teachers from various

7  websites. I think you've testified that you didn't look

8  through many of these websites. And I was going to ask you

9  about some of the jobs that are listed here that you did not

10  apply for.

11    THE COURT: Look, you've been -- ask him the right

12  questions. Can he identify them?

13  BY MR. ENGLISH:

14  Q.   Can you identify these web pages like Best Local Jobs

15  Syracuse?

16  A.   What do you mean can I identify them?

17  Q.   Have you heard of the ad or --

18    THE COURT: Have you seen those documents?

19  BY MR. ENGLISH:

20  Q.   Have you seen those documents?

21  A.   I actually went through every single page of these

22  documents right after I got these just recently from you last

23  week. I looked through every announcement. I looked at the

24  qualifications for each job. And I put every single one into a

25  spreadsheet. And, for example, every job I would category it

1  as -- for example, many of the jobs required Ph.D. in

2  economics, required Ph.D. in economics, in that cell I would

3  put a one.  Many of the jobs that are history related required

4  a master's degree or higher in history.

5       If a Ph.D. was required in history, something I would

6  need, I do not have, I put a one.  I look at the specific

7  requirements, lets say, for an economics job that have all that

8  but the dissertation, and I go through the required fields,

9  might be advanced econometrics, grad school course, upper

10 division courses.  Why waste time applying for job you know

11 you're not going to get and waste their time?  Adjunct jobs

12 where you are getting $3,500 or something or part-time jobs, I

13 put -- categorize those.  And then I did some Excel sorting,

14 categorizing.  And I came up with 400 -- many of the job

15 announcements are repeats, so it came out as a -- say April 4th

16 ad you might see the same posting for April 6th.  So many of

17 these jobs you have are multiple jobs that are not a total

18 number of jobs.  I went through every single one of these and

19 immediately knocked out 397 of them.  And plus I hadn't

20 finished going through it, but there are more that would be

21 knocked out because of duplicates or something like that.  So

22 the number is -- that were possible for me a very low number.

23 Q.    Okay.  But there were more than three, right?  We agree on

24 that.  What are the three you applied for?

25 A.    I haven't looked at the details from the ones that might

1  have been possible.

2  Q.   Let's look at one of them since you said you looked at

3  this document.  Let's look at page two of exhibit 37 in here.

4  This is the big thick one.  This is page 2.

5  A.   Yes, mathematics instructor adjunct.  Introductory

6  statistics?

7  Q.   Here is from Lemoyne College.  Is that in Syracuse?

8  A.   Yes, it is.

9  Q.   Near your home?

10  A.   Close enough, 25 miles or so.

11  Q.   And when you -- Mrs. Peet deposed you, you said you were

12  qualified to teach introductory statistics, right?

13  A.   I taught it once.  Whether a mathematics department would

14  consider me able, I don't know.  I would have to see -- I don't

15  know here whether it was -- a math degree was required.

16  Q.   You did not apply for this job, correct?

17  A.   It's an adjunct job, not a full-time job.  So it would be

18  a low pay one course job.  I would not have applied for it

19  anyway.  I am looking for a full-time job.

20  Q.   But -- but you admit that you could have applied for this

21  job, you were qualified?

22  A.   I was qualified -- I would consider myself qualified

23  enough in that I taught this course once on an emergency basis

24  at Marywood.  Whether Lemoyne, you know, had further

25  requirements, I don't know.  But I would not apply for an

1  adjunct job anyway.

2  Q.   None of the three jobs you applied for was an adjunct job?

3  A.   In my Onondaga application I applied and told them I was

4  looking for a full-time job.

5  Q.   But that job was for an adjunct?

6  A.   It was for adjunct.  But I told them I was looking

7  full-time job because sometimes -- again I had experience at

8  that place.  They can say, oh, we can -- instead of having four

9  adjuncts, we can have one full-time job if the budget allowed.

10  Q.   You could have done the same thing here, but you didn't?

11  The posting was the same --

12  A.   I didn't, but the Onondaga job, they knew me so I figured

13  there might be a chance.

14  Q.   If you look at page 29 of exhibit 47.  Here's a job

15  posting for a visiting assistant professor in economics at SUNY

16  Oswego teaching introductory macroeconomics.  You would be

17  qualified for this job, wouldn't you?

18          MR. COHEN:  I will object on hearsay.

19          MR. ENGLISH:  He said he looked through these

20  documents --

21          MR. COHEN:  He looked at it, but -- he looked at what

22  you presented to him.  Just because it says here there's a job

23  posting doesn't mean there is one.

24          THE WITNESS:  Yes, that's the point --

25          THE COURT:  Wait a minute.  He said he looked through

1  it.  Now, I understand he didn't look at these at the time he

2  was looking for a job.  He only looked at him since they were

3  delivered in preparation of this trial.

4          MR. COHEN:  Yes.

5          THE COURT:  I don't understand your objection.  What

6  is the hearsay objection, that there's no job?

7          MR. COHEN:  What I'm saying is, Mr. English is using

8  this for the truth of what it is saying.  He's claiming --

9          THE COURT:  Here's a job you found on the -- in the

10  data, could you have applied for this job as it appears.  He's

11  prepared to answer that.  I'm going to allow him to.

12          THE WITNESS:  The answer here is, no, they talk about

13  the introduction to economics, but money banking, I never

14  taught that.  The other person -- introduction to economics and

15  the other economics and gender.  I never taught that and not

16  qualified.  I will not apply for jobs where I don't meet the

17  requirements.  It's a waste of time.  I would have not applied

18  for this job.

19  BY MR. ENGLISH:

20  Q.   I thought you said you taught intro to macroeconomics?

21  A.   Yes, this is the teaching lode.  The teaching lode also

22  includes either money and banking or gender economics.  I am

23  not qualified for either one.

24  Q.   But you are qualified for intro to macroeconomics?

25  A.   Yes.

1   Q.    You didn't apply for this one?

2   A.    No, because it doesn't just call for introductory

3   economics.  You either need to have money and banking also or

4   gender economics also.  I have neither.  I would not -- waste

5   of time to apply for this job.

6   Q.    Look at page 38.  Another job at Syracuse faculty intro,

7   statistics, econometrics.  This job is posted July 15, 2012.

8   You didn't apply for this one either, right?

9   A.    Right, that's introductory statistics.  But I wouldn't

10  necessarily say -- econometrics would be a stretch.  Again,

11  it's one course.

12  Q.    When you say a stretch, what do you mean by --

13          THE COURT:  You know, it's also part time.  He said

14  he wanted a full-time job.  Why are we doing this?

15          MR. ENGLISH:  Your Honor, because he has a duty to

16  mitigate.

17          THE COURT:  That's fine.  He also told you you he

18  wants a full-time job.

19          MR. ENGLISH:  The fact --

20          THE COURT:  Do we know what the salary is on these

21  jobs?

22          MR. ENGLISH:  Our expert will testify to the mean

23  salary for these type positions.

24          THE COURT:  I think we have heard enough of this.  If

25  you have some specific other ones, I will let you go a little

1 bit.  We're engaging in just speculation here.  This is

2 speculation as far as I'm concerned.  Go ahead.

3 BY MR. ENGLISH:

4 Q.   Okay.  If we look at page 41, there is another job at

5 Syracuse, faculty economic ideas, issues, posted August 3rd,

6 2012.  You didn't apply for this one?

7 A.   I did not.

8 Q.   You were qualified to teach this one, right?

9 A.   I believe so.

10         THE COURT:  Just a minute, again I just mentioned

11 part time.  This says the same thing, part time.

12         MR. ENGLISH:  Your Honor, respectfully, what he wants

13 and what he's required to do under the law are two different

14 things.  He's required to mitigate.  And yet while he may want

15 a job that has, you know -- the perfect fit for him, he still

16 is required to mitigate and get any job that he can -- he's

17 qualified for.  And this is a job that he just testified he's

18 qualified.  He would have made income.  That would have been --

19 that would have met his -- perhaps met his duty to mitigate.

20         THE COURT:  All right.  I understand.

21         MR. ENGLISH:  Thank you, Your Honor.

22         THE COURT:  You're going to show me now what this job

23 paid?

24         MR. ENGLISH:  Your Honor, our expert is going to

25 testify as to the average of what these jobs would pay.

1    THE COURT:  This job?  He's going to tell us what the

2  salary was?

3    MR. ENGLISH:  Your Honor, I don't think he will tell

4  you what the salary is for this job.

5    THE COURT:  Okay.  All right.  We will deal with that

6  when we get to it.

7    MR. ENGLISH:  Yes, Your Honor.

8    THE COURT:  All right.

9  BY MR. ENGLISH:

10  Q.    Look at page 66.  And, Dr. Fagal, you agree that salary is

11  negotiable, correct, you don't know your salary until you

12  actually apply and get the job?

13  A.    Sometimes I guess salary would be listed.  It's a general

14  rule if they don't announce it, yeah, you have to inquire to

15  find out.

16  Q.    So here at page 66 is a job posting two lecture positions

17  in microeconomics, statistics at SUNY, the College of

18  Brockport, which is 88 miles from your home.  These jobs posted

19  November -- November 2012.  You're qualified for this job,

20  right?

21  A.    One to two courses in introductory statistics I would say

22  so.  I wouldn't rule myself out.

23  Q.    You didn't apply, did you?

24  A.    No, I did not, but it's a -- it's a one semester job.

25  It's not full-time.

1  Q.    All right.  Now, I will move on from this exhibit.  You

2  had access to the internet during this time frame where you

3  could have done job searches, yes?

4  A.    Yes.

5  Q.    And I think you testified that you spent less than -- you

6  haven't testified yet but at your deposition you spent less

7  than an hour per week looking for a job; is that right?

8  A.    I believe I testified to that, yes.

9  Q.    You also had job listings that were e-mailed to you, is

10 that right, from Vitae?

11 A.    From the Chronicle of Higher Education.

12 Q.    Yeah, Chronicles of Higher Education.  You're right.

13 These are documents that you produced.  You had those e-mailed

14 to you, right?

15 A.    Yes.

16 Q.    And you didn't apply to any of the jobs that were listed

17 in those e-mails to you identifying jobs?

18 A.    I'm not sure.  I might have found the Oswego job listing

19 through them.  I am not sure the Cazenovia, but I -- I looked

20 at the jobs when they came -- I did not ignore the e-mails.  I

21 looked at them.

22 Q.    This is plaintiff's trial exhibit 113.  These are

23 documents produced by you, new positions on Vitae for job

24 search economics.  You've seen this document before?

25 A.    Yes.

1  Q.    If we turn to page 21, it's a job at Union College in New

2  York for teaching economics.

3  A.    I don't see it on the screen.

4  Q.    Sorry.

5  A.    No. 1, that's too far away.

6  Q.    I'll get it for you.  Oh, the next page, okay.  Union

7  College in New York.  Do you see that listing?

8  A.    Yes.

9  Q.    Posted November 20th?

10  A.    Yes.

11  Q.    Okay.  And just so you can see the first page, it's

12  full-time visiting positions economics is the title under the

13  next page?

14  A.    Visiting would be at most one year, yes.

15  Q.    Okay.  You didn't apply for that job?

16  A.    That's in Schenectady New York, certainly more than two

17  hours away from my house.

18  Q.    In your opinion that was too far?

19  A.    Yes, plus I'm sure -- well, I don't know.  You had have to

20  check the requirements listing.

21  Q.    Here on page 26 you received an e-mail from Vitae November

22  25, 2015 which included job postings for a job at Pace

23  University.  Do you see that here, assistant professor in

24  economics?

25  A.    Yes, I do.

1  Q.    You didn't apply for that one either?

2  A.    No, I didn't.

3  Q.    Why?

4  A.    Way too far, West Chester County New York, far away from

5  Syracuse.

6  Q.    My understanding that's about 41 miles from your home.

7  A.    That's wrong.

8          THE COURT:  I will take judicial notice of the fact

9  it's in White Plains, New York, which is substantial distance

10 from Syracuse.

11 BY MR. ENGLISH:

12 Q.    All right, lastly, another exhibit -- Your Honor, I move

13 to admit plaintiff's trial exhibit 113.

14          MR. COHEN:  No objection.

15          THE COURT:  Admitted.

16 BY MR. ENGLISH:

17 Q.    Here's 136.  You've seen this document before?

18 A.    I assume I did.  I got e-mailed.  I have to look at it.

19 Q.    This is to F. Fagal?

20 A.    Yes.

21 Q.    November 23, 2016?

22 A.    Yes, that's correct.

23 Q.    Here it lists a job at --

24 A.    SUNY.

25 Q.    Professor of economics.  You didn't apply for that one,

1  did you?

2  A.    No, but I would -- I would have probably clicked on the

3  link when it came out and tried to find out what information it

4  had.  I can't recall what it had.

5  Q.    For some reason you didn't apply for it?

6  A.    I didn't apply for it.

7  Q.    Lastly here on page 21, you got an e-mail January 17, 2017

8  which included three postings for economic professors at

9  Syracuse.  Do you see those?

10 A.    Yes.

11 Q.    You didn't apply for those, did you?

12 A.    No, but public economics is not my field and econometrics

13 are not my field.  Those two are surely out.  The last one,

14 assistant teaching professor, I am not sure what the

15 requirements are for that of what the requirements were to

16 teach would be.  I can't tell by looking at this.

17 Q.    Did you click it to figure --

18 A.    I probably would have clicked that one.

19 Q.    Do you know if you did?

20 A.    I can't recall.

21 Q.    You didn't apply for it though, right?

22 A.    No.

23        MR. ENGLISH:  Your Honor, if we can take a quick

24 break, I will see if I have anything else.

25        THE COURT:  Oh, sure.  We will take ten minutes.

1  Come back in ten minutes.

2            (A brief recess was taken.)

3            FREDERICK F. FAGAL, JR., resumed the witness stand.

4  BY MR. ENGLISH:

5  Q.    Dr. Fagal, you testified that when Mr. Cohen was asking

6  you questions you testified that you expected an apology at the

7  January 23rd meeting with Sister Munley with respect to the

8  posters that had been removed.  Am I correct that you feel like

9  you don't owe anyone an apology for the videos but you expected

10 an apology for the taking down of those posters?

11 A.    I did not say I expected an apology.  I never said that.

12 Q.    Okay.

13            MR. ENGLISH:  The record says what it says, Your

14 Honor.

15            THE WITNESS:  I did not get an apology.

16            MR. ENGLISH:  Your Honor, there's some exhibits I

17 didn't move into evidence, Defendant's Exhibit -- I will list

18 them and try to move them in -- Defendant's Exhibit 11,

19 Defendant's Exhibit 15, Defendant's Exhibit 43, Defendant's

20 Exhibit 44, Defendant's Exhibit 6, Defendant's Exhibit 32,

21 joint exhibit 20, joint exhibit 24, plaintiff's exhibit 55,

22 joint exhibit 25, joint exhibit 8, joint exhibit 38, joint

23 exhibit 23, Defendant's Exhibit 31, Defendant's Exhibit 46,

24 Defendant's Exhibit 47, Defendant's Exhibit 48 and joint

25 exhibit 3.

1          THE COURT:  Were these -- other than joint exhibits,

2   were these identified?

3          MR. ENGLISH:  Yes, Your Honor.

4          MR. COHEN:  As Mr. English was reading those out, I

5   was looking for the exhibit list.  And I'm sorry, but I am

6   going to need --

7          MR. ENGLISH:  Read them again?

8          MR. COHEN:  Yeah, hold on one second.  Okay.

9          MR. ENGLISH:  Defendant's Exhibit 11, Defendant's

10  Exhibit 15, Defendant's Exhibit 43, Defendant's Exhibit 44,

11  Defendant's Exhibit 6, Defendant's Exhibit 32, joint exhibit

12  20, joint exhibit 24, Plaintiff's Exhibit 55, joint exhibit 25,

13  joint exhibit 8, joint exhibit 38, joint exhibit 23,

14  Defendant's Exhibit 31, Defendant's Exhibit 46, Defendant's

15  Exhibit 47, Defendant's Exhibit 48 and joint exhibit 3.

16         MR. COHEN:  I don't have any problem -- no objection

17  to the joint exhibits.

18         THE COURT:  Joints will be admitted.

19         MR. COHEN:  I'm just -- I don't have any objections

20  to the plaintiff's exhibits for sure.

21         THE COURT:  All right.  Let's see.  That's

22  Plaintiff's Exhibit 55.

23         MR. ENGLISH:  I think that's the only one, Your

24  Honor.

25         THE COURT:  Yes.

1        MR. COHEN:  Defendant's Exhibit 11?

2        MR. ENGLISH:  11.

3        MR. COHEN:  No problem.

4        THE COURT:  Defendant's Exhibit 11 will be admitted.

5        MR. ENGLISH:  15.

6        MR. COHEN:  15 no objection.

7        THE COURT:  Admitted.

8        MR. ENGLISH:  43.

9        MR. COHEN:  Which one was that?

10       MR. ENGLISH:  43 is January 24th 2012 e-mail from

11  Will Creeley to Fagal, the one that we --

12       MR. COHEN:  No objection.

13       THE COURT:  Admitted.

14       MR. ENGLISH:  44.  These are the screen shots of the

15  Marywood parody.

16       MR. COHEN:  No objection.

17       THE COURT:  Admitted.

18       MR. ENGLISH:  6, December 19, 2011 e-mail, Fagal to

19  Parsons.

20       MR. COHEN:  No objection.

21       THE COURT:  Admitted.

22       MR. ENGLISH:  32 is February 5 e-mails between

23  plaintiff and William Ziegelbauer.

24       MR. COHEN:  No objection.

25       THE COURT:  Admitted.

134

1        MR. ENGLISH:  20 -- I'm sorry.

2        MR. COHEN:  You said 20?

3        MR. ENGLISH:  No, 31.  Plaintiff's work application

4  to the community college.

5        MR. COHEN:  No objection.

6        THE COURT:  Admitted.

7        MR. ENGLISH:  46, which is the Linked In page.

8        MR. COHEN:  No objection.

9        THE COURT:  Admitted.

10        MR. ENGLISH:  47 and 48, which are the job postings.

11        MR. COHEN:  No objection.

12        THE COURT:  Admitted.

13        MR. ENGLISH:  And I think -- Defendant's Exhibit 10.

14  Sorry about that.  Ten is January 3rd, 2012 e-mails between

15  plaintiff and Rod Carveth.

16        MR. COHEN:  No objection.

17        THE COURT:  Admitted.

18        MR. ENGLISH:  No further questions, Your Honor.

19        THE COURT:  Thank you.

20        THE CLERK:  Did you want defendant's 15 --

21        MR. ENGLISH:  Defendant's 15?  I thought you said no

22  objection.  15 is the January 13th e-mail from Wyllie to

23  plaintiff.

24        MR. COHEN:  No objection.

25        THE COURT:  Admitted.  Redirect?  Are you finished?

1          MR. ENGLISH:  Yes, Your Honor.  Thank you.

2          MR. COHEN:  Your Honor, I was wondering -- it took me

3  quite a lot of effort to get my expert here today because of a

4  scheduling issue.  And I was wondering if everyone would

5  consent to having her go and then doing Dr. Fagal's redirect

6  later?

7          THE COURT:  Have you discussed this with the

8  opposition?

9          MR. COHEN:  No.  I did discuss with Kathy.

10          MR. ENGLISH:  Yeah, I did not -- this was the first

11  time I am hearing of it.  I guess I would like to know how long

12  he has with Dr. Fagal and maybe if we cannot -- I would prefer

13  not to, Your Honor, quite frankly to finish the witness while

14  he's still on the stand since he's going to be here and allowed

15  to listen to the expert's testimony while he's still, you know,

16  just finished cross.  So I don't know how much longer -- how

17  long you have with him.  Maybe you can knock him out --

18          MR. COHEN:  Probably 45 minutes.

19          THE COURT:  Your expert is --

20          MR. COHEN:  Ms. Kucsma.

21          THE COURT:  Pardon?

22          MR. COHEN:  Ms. Kucsma.

23          THE COURT:  That's on damages?

24          MR. COHEN:  Yes.

25          THE COURT:  Projected income.

1        MR. COHEN:  Necessity, Your Honor.

2        THE COURT:  I don't like to do that.  But there's no

3  reason not to accommodate this.  I am going to do it.  I

4  understand it is a little unorthodox.  I've done it before, and

5  don't like to do it, but I am going to grant your request.

6        MR. COHEN:  I appreciate that, Your Honor.

7        THE COURT:  Do you want to step down?

8        THE WITNESS:  Thank you.

9        THE COURT:  Okay.

10        MR. COHEN:  Plaintiff calls Kristin Kucsma.

11        KRISTIN KUCSMA, called as a witness, being duly

12  sworn, testified as follows:

13        MR. ENGLISH:  Your Honor, just before we get started,

14  there's just one scheduling issue.  We have two witnesses that

15  were subpoenaed to be here today.  Dr. Alan Levine and Matt

16  Povse, who are waiting.  Given the time -- it's almost 4:00.

17  Could you --

18        THE COURT:  You can excuse them.

19        MR. ENGLISH:  Thank you, Your Honor.

20        THE COURT:  Sure.

21  DIRECT EXAMINATION

22  ON QUALIFICATIONS

23  BY MR. COHEN:

24  Q.   Good afternoon, Ms. Kucsma.

25  A.   Good afternoon.

1   Q.    Did I have the pronunciation right?

2   A.    You did.  Thank you.

3   Q.    What is your educational background?

4   A.    I have a bachelor of arts degree in economics that I

5   received from Seton Hall University where I was graduated with

6   highest honors, a masters of arts degree in economics I

7   received from Rutgers University.  And in addition to my master

8   of arts degree in economics, I completed all of my course work

9   in the doctoral program, passed my qualifying examinations and

10  had written part of my thesis.

11  Q.    Have you ever taught economics?

12  A.    Yes.

13  Q.    Where?

14  A.    I was a number of the full-time faculty at Seton Hall

15  University and also at Drew University.  I was adjunct

16  professor at Rutgers University and Saint Peters College.  I

17  taught from approximately 1991, 1992 through the summer of

18  2006.

19  Q.    Are you currently employed?

20  A.    I am, yes.  I am currently the managing director and chief

21  economist of the Sobel Tinari Economics Group.

22  Q.    Prior to your work at Sobel Tinari, had you held any other

23  jobs related to the field of economics and except for the

24  teaching positions?

25  A.    Before I joined the Sobel Tinari Economics Group, my first

1  career was as a college professor.  I taught primarily in the

2  department of economics, both the graduate and undergraduate

3  levels.  On occasion I taught finance and statistics.  It was

4  about a nine or ten month period between my career as a

5  professor and my current career where I did some very limited

6  consulting work.

7  Q.    Have you ever belonged to any professional organizations

8  related to economics?

9  A.    Yes, I am an active member or contributing member of the

10  Eastern Economics Association as well as the National

11  Association of Forensic Economics.  I recently become a more

12  active member in the A. S. S. A., which is the Allied Social

13  Sciences Association that includes organizations related to the

14  field of economics.

15  Q.    Have you authored any published articles or books related

16  to economics?

17  A.    I have, yes.

18  Q.    Approximately how many?

19  A.    I have approximately a half dozen, I would say, articles

20  to date that had been published.

21  Q.    Have you presented any papers related to economics?

22  A.    Yes, many.

23  Q.    Have you had any speaking engagements related to

24  economics?

25  A.    Yes, after I left academics, I continued to be very

1  involved in the field of educating people about economics.  I

2  teach members of the legal community by teaching legal

3  education courses.  I also work with law schools to participate

4  in and create or design mock trials.  I participate in support.

5  I am a mentor for Seton Hall University for the women's

6  leadership study program.  Those are just some of the ways I

7  continue to be involved in presentations.

8  Q.    Have you previously testified in court as an expert

9  witness on the issue of economic damages?

10  A.    Yes, many times.

11  Q.    Can you say approximately how many?

12  A.    To date I testified in federal and state courts

13  approximately 270, 280 times.

14          MR. COHEN:  Your Honor, I move to qualify Kristin

15  Kucsma as an expert in economic damages.

16          THE COURT:  Any voir dire?

17          MR. ENGLISH:  Just one or two questions, Your Honor.

18  CROSS EXAMINATION

19  ON QUALIFICATIONS

20  BY MR. ENGLISH:

21  Q.    Just quick, you're not an attorney, correct?

22  A.    That is correct I'm not.

23  Q.    But in your report you express some legal opinions.  Is

24  that right?

25  A.    No, absolutely not.  I certainly reference some case law

140

1  and legal opinions, but I do not offer any legal opinions in my

2  report.

3  Q.   And you mention that you reference case law and legal

4  opinions.  You refer to those legal opinions in connection with

5  making your report?

6  A.   These are cited in my reports simply as examples of case

7  law that is consistent with the long standing practice of

8  economists to calculate a tax gross up in matters like this.

9  Q.   You're expressing a legal opinion in your -- in citing

10  cases you're citing legal a opinion to support your opinions.

11  Is that right?

12  A.   No, not at all.  No. 1, I am not offering any legal

13  opinions.  No. 2, as I just said, the case law that is

14  referenced in my report is there for one reason and one reason

15  only, to educate the reader of my report who typically consists

16  of attorneys about case law that is consistent with the

17  generally accepted practice of economics, and that is to

18  calculate the tax gross up.  The reason I calculate a tax gross

19  up in this case is because from an economic perspective that is

20  necessary in order to make the plaintiff whole.

21  Q.   You made a determination based on the case law that would

22  be appropriate , right?

23  A.   No.  I made that determination based on the fact that from

24  an economic perspective it is necessary to make the plaintiff

25  whole.  Again, the case law is simply provided to indicate to

1  the reader that there are Courts that have also acknowledged

2  this.  But I've included it for one reason and one reason only

3  because it is necessary from an economic perspective to make a

4  plaintiff whole.

5         MR. ENGLISH:  Your Honor, just to the extent there's

6  legal citations here for the purpose of making the reader aware

7  that there's support for her position, I would -- I move to

8  exclude that portion of her report.  We don't challenge what

9  she's being offered for in terms of as an economist.

10         THE COURT:  Well, the report doesn't come in anyway.

11  She's going to testify.  She's here.

12         MR. ENGLISH:  Right.

13         THE COURT:  I am sure somebody will be referring to

14  the report here and there.

15         MR. ENGLISH:  Yes, Your Honor.

16         THE COURT:  But that will be it unless there's some

17  particular passage or something that is used for a particular

18  reason.  So I understand your point.

19         MR. ENGLISH:  Yes, Your Honor.

20         THE COURT:  Certainly not going to express any legal

21  opinions.

22         MR. ENGLISH:  Yes, Your Honor.

23         THE COURT:  Not qualified as such according to the

24  motion by counsel.

25         MR. ENGLISH:  That's my only objection, Your Honor.

1          THE COURT:  Fine.  Proceed.

2          MR. COHEN:  So has Your Honor made a decision on

3   qualifying Ms. Kucsma as an expert?

4          THE COURT:  Well, I don't need to do that, but you

5   can proceed.

6          MR. COHEN:  All right.

7   DIRECT EXAMINATION

8   BY MR. COHEN:

9   Q.   Ms. Kucsma, did you prepare an expert damages report in

10  this case?

11  A.   Yes, I did.

12  Q.   And, Brian, pull up Fagal exhibit 63, please.  Does this

13  appear to be the expert report you prepared?

14  A.   That is my original report, yes.

15  Q.   Did you review any documents in preparation of your expert

16  report?

17  A.   I did, yes.

18  Q.   And which ones?

19  A.   I reviewed several legal documents that included the

20  deposition transcript of the plaintiff.  I also reviewed a copy

21  of the complaint.  I believe there may have been some other

22  legal documents.  Yes, there was an amended complaint I have

23  reviewed as well.  I also reviewed responses to our fact

24  finding questionnaire.  That provided me with some basic

25  information about the plaintiff.

1     I also reviewed some documentation of Dr. Fagal's

2  earnings, W. 2 wage and tax statements, tax returns.  I have

3  reviewed a letter of agreement to Frederick Fagal from Anne

4  Munley dated May 10, 2011.  I have reviewed Dr. Fagal's resume

5  or C. V.  I also reviewed several documents specifically

6  related to his benefits at Marywood.  I have reviewed, for

7  example, an agreement for pretax salary reduction under section

8  403 B. effective April 23rd, 2012.

9     I also reviewed some information about the early

10 retirement benefits.  Specifically I reviewed some items from

11 the Marywood University faculty handbook dated July 1, 2012.

12 And I also reviewed some information related to Medicare

13 premiums, and I also reviewed the statement of earnings for Dr.

14 Fagal that is accessible through the Social Security

15 administration.  I believe those are most if not all of the

16 documents I have reviewed.

17 Q.    In preparation of your expert report, did you use methods

18 and procedures you believe are normal and customary for experts

19 in the economist's profession?

20 A.    Yes.

21 Q.    Just to save us some time, as this is a bench trial, could

22 you walk us through the steps that you took at arriving in

23 preparing your expert report?

24 A.    Yes, the first thing I did was review the documents that

25 were provided to me.  And based on my review of those

1   documents, I determined that I would be calculating several

2   elements of economic damages.  For example, I determined I

3   would be calculating the loss of earnings, the additional money

4   that Dr. Fagal would have earned if he had continued to be

5   employed with Marywood.

6       I also calculated the impact that his separation had on

7   his early retirement benefit income as well as the impact that

8   any award in this matter may have on his Medicare premiums.

9   And lastly as I alluded to before, I also calculated a

10  compensation for excess taxes or a tax gross up.

11  Q.   What is your professional opinion of the total present

12  value of the economic loss sustained by Dr. Fagal?

13  A.   I should mention before I answer your question that I did

14  prepare some updated calculations to reflect today's date.  My

15  original report, of course, was written in November of 2016.

16  At that point all of 2017 was in the future.  It's now in the

17  past.  So I have updated my calculations to reflect that and I

18  --

19  Q.   Why don't you start with the original assessment?

20  A.   Sure.  In the original report, as I said, the first thing

21  I needed to do was calculate the loss of earnings, the

22  additional earnings that Dr. Fagal would have received had he

23  continued his employment with Marywood.  In order for me to do

24  that, one of the first things I needed to do was determine how

25  many more years Dr. Fagal would have been employed with

1  Marywood but for this incident.  And in order for me to do

2  that, I did some research, and I was able to determine that Dr.

3  Fagal's projected retirement age is 73.05 years.

4       The way I did that was by looking at U.S. government data.

5  I looked very specifically at the actual experience of 66, 67

6  year old males with a Ph.D.  Based on the actual experience of

7  men in that group, I was able to determine that on average they

8  retire at or around the age of 73.05 years.  Dr. Fagal would

9  have turned 73.05 during the 2018, 2019 academic year.  So I

10 determined that but for the incident Dr. Fagal would have

11 continued his employment with Marywood through the end of the

12 academic year 2018, 2019.

13      The next thing I have to determine in order to calculate

14 how much Dr. Fagal would have earned through the end of the

15 2018, 2019 academic year, is I had to determine on average how

16 much he would have earned each year.  And in order for me to do

17 that, I used as my starting point that letter of agreement I

18 referenced earlier, the letter of agreement to Frederick Fagal

19 from Anne Munley dated May 10, 2011.  In that document Dr.

20 Fagal's salary was identified at $76,196 for the 2011, 2012

21 academic year.  So I used that figure of $76,196 as my starting

22 point in order to calculate how much Dr. Fagal would have

23 earned if he had continued working through the end of the '18,

24 '19 academic year.

25      In addition to that, once I determined what Dr. Fagal's

1  starting salary was from my calculations, I then needed to take

2  into account that if Dr. Fagal had continued his employment

3  with Marywood, his salary would have likely increased each

4  year.  One of the reasons I made that assumption is because

5  when I reviewed that document, that letter of agreement to

6  Frederick Fagal, there was reference to the fact the salary of

7  $76,196 dollars represented a 2.5 percent increase over what he

8  had received the previous year.

9       In addition to that though, I also reviewed benchmarks

10 statistical data published by the U.S. Department of Labor, and

11 I looked very specifically at how much earnings had increased

12 on average for people employed in the education training and

13 library occupations.  Based on my review of those two, sources

14 that letter as well as the benchmarks statistical data I was

15 able to determine on average how much Dr. Fagal's earnings

16 would have increased year over year from 2012 through the end

17 of the academic year 2018, 2019.

18      Now, once I had done that, there were just two other

19 things I needed to do before I can actually calculate the loss

20 of earnings in past years, and that is, No. 1, I needed to take

21 into account the fringe benefits that Dr. Fagal had been

22 receiving through his employment with Marywood.

23      It is my understanding that Dr. Fagal had received health

24 insurance through his employment with Marywood, that he also

25 received an employer contribution into a 403 B. plan and that

1  he also was eligible for early retirement pension benefits.  My

2  understanding is that Dr. Fagal became or received I should say

3  health insurance through his wife's employment.  So I did not

4  include any loss of health insurance in my analysis other than

5  the impact that an award in this matter may have on his

6  Medicare premium.

7      I did take into account that fact though if Dr. Fagal had

8  continued his employment through Marywood, he would have

9  continued to receive employer or institution contributions into

10  his 403 B. plan.  Based on the documents that I reviewed, I was

11  able to determine that through December 2014 the matching

12  contribution to the 403 B. plan was equal to ten percent of Dr.

13  Fagal's earnings.

14      Thereafter, based on the agreement for pretax salary

15  reduction under section 403 B. effective April 23, 2012, I

16  determined that the employer contribution from that point on

17  was five percent, not ten percent.  So when I calculate how

18  much Mr. -- Dr. Fagal would have earned through the end of

19  2014, I include that ten percent employer match on top of his

20  lost earnings, and thereafter I add five percent on top of his

21  lost earnings to account for the employer contribution into his

22  403 B. plan.

23      Last but not least, I made a downward adjustment to my

24  calculation for lost earnings.  That was to take into account

25  various job related expenses.  In order for me to determine the

1 appropriate adjustment to make for the job related or the job

2 maintenance expenses, I considered several sources of

3 information.

4      I considered information provided by the plaintiff

5 himself, and specifically that information was with respect to

6 the distance that he lived from the university.  So I took into

7 account, of course, the fact that he did have a rather lengthy

8 commute to and from the university.  I also took into account

9 information that's published by the I. R. S. about un

10 reimbursed business expenses.  And I also took into account

11 data that's published through the consumer expenditure survey.

12 Based on all those sources, I ultimately determined on average

13 the appropriate downward adjustment to make for job related or

14 job maintenance expenses was equal to five percent of Dr.

15 Fagal's earnings.

16      And once I combined all this information -- so I started

17 with the figure of $76,196, I took into account how that figure

18 would increase through the present time.  I added ten percent

19 to that through the end of 2014 to reflect the 403 B.

20 contributions, reduced that increase to five percent thereafter

21 , made a deduction for the job related expenses, and based on

22 my calculations in my original report I was able to determine

23 that the lost earnings in past years from 2012 through the end

24 of the 2016, '17 academic year were in the amount of $356,972.

25 That represents the additional money including the

1  contributions to the 403 B. plan that Dr. Fagal would have

2  earned through the end of the 2016, 2017 academic year had he

3  not become separated from Marywood.

4      I then continued my calculations into the future back in

5  November of 2016.  The future consisted of the academic year,

6  rest of the academic year 2016, 2017 as well as the academic

7  years 2017, '18 and '18, '19.  Based on my original report, I

8  was able to calculate that had Dr. Fagal continued to work for

9  the rest of the academic year through the end of 2016, 2017,

10  and he worked for two more academic years through his projected

11  retirement, he would have earned in present value amounts an

12  additional $198,381.

13      And I did have to reduce those figures to present value.

14  When I prepared my original report I did assume that any award

15  that Dr. Fagal may have gotten at that time in 2016 if he could

16  have invested that for about two and a half years, he would

17  have on earned an average 2.75 percent each year.  That was

18  based on my review of fixed income securities, primarily U.S.

19  treasury securities, high grade municipal bonds and was based

20  on my review of not only of what interest rates had been

21  historically but greater significance in this case since I'm

22  only looking at about a two and a half feature year period, I

23  needed to consider what interest rates on those types of

24  securities were at the time I prepared my original report.

25  Q.   What was the total amount that you arrived at in your

1  original report?

2  A.    In my original report again I determined that had Dr.

3  Fagal had not become separated from Marywood he would have

4  earned an additional $356,972 through the middle of the 2016,

5  2017 academic year, and present value terms he would have

6  received an additional $198,381 through his projected

7  retirement.   In addition to that, I also took into account the

8  impact that the incident had on Dr. Fagal's early retirement

9  benefit income.

10        Very specifically, in this case, I had reviewed

11  information provided by Marywood, information that explained

12  how the early retirement benefit was calculated.   And the early

13  retirement benefit according to the Marywood handbook is

14  calculated by taking one percent of a person's current salary

15  times their years of service.   There were some other criteria.

16  The plaintiff would be eligible to elect a early retirement

17  benefit once the sum of his age and years of service at that

18  date of retirement totaled 80.   Once that criteria was met,

19  then that formula of one percent times the current salary times

20  the year of service would kick in.

21        In this case I assumed that at the time of his separation

22  Dr. Fagal had been eligible for an early retirement benefit.

23  Having said that, had he stayed with Marywood and not separated

24  from Marywood in 2012, I estimated that he would have been

25  eligible for a higher early retirement benefit.   That was

1  simply because of the fact that if Dr. Fagal had continued his

2  employment with Marywood, his current salary at the time of his

3  retirement, of course, would have been higher, and he also

4  would have had a greater number of years of service.

5      So when I use that formula, I was able to determine in

6  present value amounts if Dr. Fagal had continued to work with

7  Marywood through his projected retirement he would have

8  received an additional $5,587 payment on top of any lump sum

9  early retirement benefit to which he was eligible at the time

10  of his separation.

11  Q.   Brian, can you turn to page 4 of this document?  Where it

12  says opinion of economic losses, is this the total amount of --

13  as of the date of this report that you estimated in your

14  professional opinion that Dr. Fagal lost?

15  A.   Yes, as of November 2016, that's correct.

16  Q.   That amount is $755,395?

17  A.   Yes.

18  Q.   Is your opinion within a reasonable degree of economic

19  certainty?

20  A.   Yes.

21  Q.   And does your opinion of the total present value include

22  prejudgment interest?

23  A.   No.

24  Q.   Have you examined the report -- expert report provided by

25  defendant's economist in this case?

1  A.    Yes.

2  Q.    Do you have any criticisms or objections to defendant's

3  expert report?

4  A.    Yes, many.

5  Q.    Can you elaborate?

6         MR. ENGLISH:  Your Honor, I object to this testimony.

7  We haven't received any supplemental report regarding the

8  criticisms of the report of our expert Chad Staller, and that

9  would have been required to be provided to us to the extent

10 there was -- this expert is going to express opinions about his

11 report.  Her report doesn't address Chad Staller, our expert

12 report at all.  So this would be the first time we're hearing

13 this.

14         MR. COHEN:  That's fair.

15         THE COURT:  Pardon?

16         MR. COHEN:  I agree.

17         THE COURT:  Okay.

18         MR. COHEN:  Thank you, Ms. Kucsma.  I have no further

19 questions.

20         THE COURT:  Cross-examine.  Before you do that, I

21 want to understand the 755,395 is through what date?

22         THE WITNESS:  That is through the end of the 2018,

23 2019 academic year.

24         THE COURT:  Thank you.

25         THE WITNESS:  You're welcome.

1    CROSS EXAMINATION

2    BY MR. ENGLISH:

3    Q.    Good afternoon.

4    A.    Good afternoon.

5    Q.    Just a couple of questions.  Your assignment in this

6    matter was to calculate what you believe to be the lost backpay

7    and the lost front pay as a result of Dr. Fagal's termination

8    from Marywood.  Is that correct?

9    A.    I know backpay and front pay are sometimes legal terms.

10   But I did calculate how much additional money Dr. Fagal would

11   have earned in the past had he remained employed with Marywood

12   as well as what he would have earned going forward through his

13   projected retirement date.

14   Q.    And you have no opinion -- express no opinion regarding

15   Dr. Fagal's mitigation efforts, correct?

16   A.    I have no opinion on that, and it would not be appropriate

17   for me to add one.

18   Q.    Your report assumes Dr. Fagal had no earning capacity from

19   the time of termination until the date of your report?

20   A.    Not at all.  I make no such assumption at all.  I am not

21   an employability expert or trier of fact.  It would not be

22   appropriate for me as an economic expert to have an opinion Dr.

23   Fagal's earning capacity, mitigation efforts, employability, so

24   on.

25   Q.    That wasn't a factor -- what we could have made during

1  that time frame wasn't factored in this number you came up, the

2  $755,000 number?

3  A.    It couldn't be.  I'm not an employability expert.  So

4  that's correct.

5  Q.    On pages five -- page five of your report, paragraph 7,

6  you say you reserve the right to supplement the report should

7  plaintiff experience a meaningful change in his post

8  termination employment or earnings.  You haven't supplemented

9  your report, correct?

10 A.    That's correct, I have not.

11 Q.    And so you don't have an opinion or have not expressed an

12 opinion as to any meaningful changes in his post termination

13 employment or earnings?

14 A.    Well, again I'm not sure I understand your question.  This

15 phrase here simply indicates that had the plaintiff gotten a

16 job if he had worked and I've been provided with a paycheck or

17 W. 2, I certainly would have recalculated my loss figures.  But

18 again, I'm an economic expert, not an employability expert, so

19 for me to determine whether or not there should have been a

20 meaningful change, what it may have been simply would not have

21 been appropriate.

22 Q.    Okay.  In terms of excess taxes, you provided an estimate

23 of excess taxes on a potential award to Dr. Fagal, right?

24 A.    That's correct.

25 Q.    Okay.  But that assumes that that number is correct?

1  A.    What number?

2  Q.    The -- the number -- the excess taxes that you have

3  calculated, that is based on the wages that you assume that Dr.

4  Fagal would be awarded in this litigation?

5  A.    That's correct.  My calculation of the tax gross up

6  certainly is based on the award I calculated in my report.

7  That's correct.

8  Q.    And that represents $191,239 of the total estimated award

9  in your expert report?

10  A.    Yes.

11  Q.    Okay.  And you agree that your estimate of excess taxes

12  would have only been valid assuming the Court awards damages

13  equal to that exact amount?

14  A.    That is true if the award differs than the methodology I

15  described in my report certainly would need to be revised to

16  reflect the new award.

17  Q.    You're aware of the federal tax laws underwent a

18  significant change in the last year; is that right?

19  A.    Yes, that's actually one of the reasons why I brought with

20  me today updated calculations of my economic damages in this

21  case.  My updated calculations do reflect the change in the tax

22  law.

23  Q.    Okay.  And but you never produced a supplemental report

24  updating your tax analysis, have you?

25  A.    My standard practice is to update my calculations at or

1   around the time of trial.  Otherwise, I would be updating them

2   every time something changed.  Once I knew I would be coming to

3   testify today, at that point I did update my calculations.

4   Q.   Now, $191,239, that's the -- that's the total tax

5   liability that Dr. Fagal would have to pay based on your

6   calculations, correct?

7   A.   No, that is the excess tax.  So that's the additional tax

8   Dr. Fagal would need to pay because assuming he got the award

9   indicated in my report he would be getting an award that would

10  include earnings for a total of eight academic years.  He would

11  be getting eight years of earnings in one lump sum.  So my

12  calculations of excess taxes looks at or determines how much

13  more in taxes he would pay because he received all those

14  earnings in one lump sum compared to what he would have paid in

15  each of the eight years that he continued his employment.

16  Q.   You subtracted out the amount he would have been paying

17  anyway from that number?

18  A.   Yes.

19  Q.   Okay.  And you -- I don't know -- I don't remember your

20  testimony.  But had you looked at his most recent tax returns?

21  A.   When I prepared my original report , yes, I had reviewed

22  -- it's indicated here in my report that I had reviewed his

23  2015 tax returns which, of course, in November of 2016 were the

24  most recently available.

25  Q.   But he has since I assume filed tax returns since then,

1  and you haven't reviewed those tax returns, right?

2  A.    I have not reviewed the 2017 returns.  That's correct.  I

3  don't recall whether I reviewed the '16 ones or not.

4  Q.    You need to know which tax bracket he was already in in

5  order to do your analysis on excess taxes, right?

6  A.    Certainly.  That's why I review, of course, his tax

7  returns.

8  Q.    Okay.  Let's talk about the job maintenance expenses.  You

9  reduced Dr. Fagal's lost income by job maintenance expenses,

10  right?

11  A.    Yes.

12  Q.    Okay.  And you define job maintenance expenses as expenses

13  that plaintiff would have continued to incur in maintaining his

14  employment which typically include transportation expenses,

15  clothing, meals outside the home and other costs.  Is that

16  right?

17  A.    That's correct.

18  Q.    And you only list five percent of the earnings as the

19  estimated job expenses, right?

20  A.    That's what I used, yes.

21  Q.    Why do you use that number five percent?

22  A.    As I said earlier, that's based on information provided by

23  Dr. Fagal as well as my review of data published through the

24  consumer expenditure survey about the proportion of a person's

25  earnings they spend on job related expenses.  It's also based

1  on my review of I. R. S. information, information about, for

2  example, un reimbursed business expenses, information about how

3  you can report your milage on your tax returns and so on.  So

4  based on my review of all that information.

5  Q.    So you were aware that Dr. Fagal traveled 126 miles one

6  way from his home to Marywood, right?

7  A.    Yes.

8  Q.    Okay.  And assuming a daily commute to and from work four

9  days a week, 40 weeks a year, Dr. Fagal drove approximately

10 40,000 each year to and from work, would you agree to that?

11 A.    I don't recall whether I did that specific math, but that

12 sounds as it could be correct.

13 Q.    In 2012 at least the federal mileage reimbursement rate

14 was 55.5 cents per mile.  Does that sound right?

15 A.    That's correct.

16 Q.    Therefore, his annual commuting costs to and from Marywood

17 were approximately $22,000 a year give or take?

18 A.    I'm not following your math.

19 Q.    In terms of his commuting costs since he would drive

20 approximately 40,000 miles per year, the federal milage

21 reimbursement rate at 55.5 cents per mile, his expenses

22 traveling to and from work were about $22,000.  Would you agree

23 with that?

24 A.    I wouldn't agree with that simply because in my

25 professional opinion, the federal reimbursement rate is not

1  necessarily an indication of the actual costs someone incurs

2  from traveling.

3  Q.   Would you agree that the actual cost would be higher than

4  the federal rate?

5  A.   No, I actually in many cases have found the cost much

6  lower depending on gas milage and so on.  Keep in mind as well

7  if one were going to use the 55.5 cents that you're referencing

8  there, you would also need to take into account the fact that a

9  person can report some of those miles on their tax returns.

10 You have to take into account how that impacts their tax rate

11 and so on.  So in my professional opinion, that is not a

12 correct calculation of the job related expenses in this case.

13 Q.   You disagree with the federal rate.

14 A.   No, I disagree with the application of the federal rate

15 for this purpose.

16 Q.   What did you calculate his expenses relate -- yearly

17 expenses as it related to his travel costs to and from

18 Marywood?

19 A.   Well, again I estimated his job related expenses at five

20 percent, which means that I estimated those at about $3,500 or

21 $4,000 a year.

22 Q.   You don't think he spent more than $3,500 a year on gas

23 traveling 126 miles one way?

24 A.   I didn't see any indication in either records that I have

25 reviewed to indicate that that was not a represent ive average

1  figure for Dr. Fagal.

2  Q.   You wouldn't agree -- you said 3500 to $4,000 for his

3  expenses.   It's your testimony here today that you factor in

4  his travel expenses you think including everything that would

5  include his travel expenses as well when he lives two hours

6  away from Marywood?

7  A.   Based on my research, yes, I determined that was an

8  average estimate for his un reimbursed expenses.

9  Q.   How did you determine his travel expenses?

10  A.   I think I already described this.  I have reviewed data

11  published by the consumer expenditure survey as well as

12  information published by the I. R. S.

13  Q.   Did you look at the calculation to the mileage and the

14  costs per mile would be for his commuting expenses?

15  A.   No, not specifically, no.

16  Q.   Would be important someone traveling four hours to get to

17  work roundtrip?

18  A.   The proper calculation would be to consider how many

19  gallons of gas Dr. Fagal purchased at what price, whether or

20  not he was reimbursed for any of them.

21  Q.   Do you look at any of that?

22  A.   No, I did not review.

23  Q.   You agree that Dr. Fagal's gas expenses at least were

24  fairly significant given that he had a four-hour roundtrip?

25  A.   I wouldn't agree with that because to be fair I did not

1  review any receipts of his for the purchase of gas.

2  Q.    Fair enough.  Let's talk about wage growth, page 11 of

3  exhibit 63 of your report you outline wage growth from 2012 to

4  2016 based upon historic wage growth for the education,

5  training and library occupations, right?

6  A.    That's correct.

7  Q.    Okay.  Your wage growth from 2012 to 2017 range from zero

8  to percent to a high of 1.2 percent?

9  A.    That is correct, yes.

10  Q.    So for future growth you don't rely upon the same

11  methodology as you did for past growth.  Is that correct?

12  A.    That's not exactly correct.  When I determined the wage

13  growth in the future, I do consider what wage growth was in the

14  recent past, and I do describe that in a footnote on page 11 of

15  my report.  So I make it very clear that I considered wage

16  growth in the recent past.  Having said that though, I also do

17  consider projections of future page growth as well.  So I

18  consider an additional source when I am calculating how much

19  wages are likely to increase going forward.

20  Q.    Future growth instead of looking at specific occupations

21  which is what you did for wage growth , you did for the past,

22  now you rely on the same source but look at all occupations for

23  future growth; is that right?

24  A.    That's correct.

25  Q.    By changing your methodology in looking now at all

1    occupations instead of the specific occupations related to Dr.

2    Fagal, the future growth rate is -- you calculate at 3.5

3    percent per year?

4    A.    Just two comments to that.  First of all to be clear for

5    the record, there was no change at all of methodology.  So I

6    continued to look at U.S. Department of Labor data, and I also

7    considered projections to future wage growth.  I certainly did

8    look at additional data published through the U.S. Department

9    of Labor, but I did not alter my methodology in any way.

10        Secondly though, in my original report, you are correct.

11   In my original report in future years, I determined that wages

12   would increase by 3.5 percent a year.  In my original report

13   though, I also determined that or estimated I should say the

14   yearly increase for the 2016, 2017 academic year at .6 percent.

15        Now in April of 2018, I have updated data available.  When

16   I used the same methodology and I look back and I review the

17   data published by the U.S. Department of Labor for education,

18   training and library occupations, I now know that it was, in

19   fact, 1.7 percent, not .6 percent.  So when I updated my

20   calculations, I certainly reflected the fact that growth was

21   higher in the past than I had estimated it would be.

22        Likewise, when I updated my calculations, I also took into

23   account the fact that as I sit here today, there's only one

24   year in the future, not two and a half years.  And when I

25   updated my calculations, I did not use the 3.5 percent any

1  longer, but rather used a yearly increase of 1.4 percent, same

2  methodology, but now I have updated data so my updated

3  calculations reflect that.

4  Q.    You testified in a lot of personal injury cases; is that

5  correct?

6  A.    I do, yes.

7  Q.    And in doing that work you routinely estimate what people

8  can earn based upon their skill set; is that correct?

9  A.    What do you mean?

10 Q.    When you're giving opinions in the personal injury cases

11 you estimate the earning capacity based -- of these individuals

12 based on their skill set?

13 A.    No.  That is what a vocational expert or employability

14 expert does.  Certainly if I have a personal injury case where

15 I have, let's say, an injured electrician who can no longer

16 work, if he had been earning 80,000 in union wages I certainly

17 do assume that if he hadn't been injured he would have

18 continued to earn $80,000 as a union electrician.  That's not

19 based on any review of mine of his skill set.  It's based on

20 fact that's what he had been doing at the time of injury.

21 Q.    You didn't make that assumption here in this case that Dr.

22 Fagal could have earned the same amount that he would have

23 earned had he not been terminated somewhere else?

24 A.    My methodology here is exactly consistent with what I do

25 on a personal injury case.  In this case instead of an injured

1 union electrician, I have an injured college professor.  The

2 injury in this case, of course, is a different type of injury.

3 It's not a physical injury.  But in each case, but for the

4 incident, what would Dr. Fagal have earned but for the incident

5 he would have continued to earn his salary at Marywood.  But

6 for the personal injury, what would the union electrician have

7 earned, what he was earning as a union electrician.

8 Q.   We talked about injured.  An example of an electrician

9 you're dealing with a person with a trade that can no longer

10 perform in that trade because they are, in fact, injured, they

11 are incapacitated and no longer earn that amount.  Did you make

12 any determination whether Dr. Fagal had -- had you made a

13 determination whether Dr. Fagal had lost any skills where he

14 could no longer be employed?

15 A.   I'm not an employability expert or vocational expert, no

16 economic expert has the proper credentials, training or

17 expertise to offer that sort of opinion.  So it would not be

18 appropriate for me or them to do so.

19 Q.   A couple last questions.  You talked about retirement

20 contributions.  Were you aware that in 2015 that Marywood

21 lowered their retirement contributions to five percent and it

22 wasn't ten percent?

23 A.   I think I said that in my direct testimony that I used ten

24 percent through December of 2014.  And if you look at page ten

25 of my report, you'll see that I indicate that there.  I use ten

1  percent through December of 2014, and I reduce that to five

2  percent thereafter.  So that is clearly stated on page ten of

3  my report.

4  Q.   Did you take into account the fact that professors at

5  Marywood have not received a raise since 2014, 2015 year?

6  A.   I did not review any sort of salary guides from Marywood

7  professors.  So that I would not be aware.

8  Q.   With respect to that in your chart on page nine, the

9  assumption of the yearly increase beyond the 2014, 2015 year,

10  those number would be incorrect?

11  A.   Certainly if I had the salary guides, I need to review it.

12  It's possible I need to revise my calculations.

13          MR. ENGLISH:  No further questions, Your Honor.

14  Thank you.

15          THE COURT:  Redirect?

16          MR. COHEN:  No, Your Honor.

17          THE COURT:  All right.  Thank you very much.  You may

18  step down.

19          THE WITNESS:  Thank you, Your Honor.

20          THE COURT:  Mr. Cohen?  This will be redirect.

21          MR. COHEN:  Yes.

22          FREDERICK F. FAGAL, JR., resumed the witness stand.

23  REDIRECT EXAMINATION

24  BY MR. COHEN:

25  Q.   Fred, during the cross examination, Mr. English asked you

1  series of questions about whether you thought that Marywood

2  could fire you.  Do you recall those questions?

3  A.   Yes.

4  Q.   Did you think that Marywood could properly or legally fire

5  you under the circumstances in this case?

6           MR. ENGLISH:  Objection, Your Honor, calls for a

7  legal conclusion.

8           THE COURT:  Overruled.

9           THE WITNESS:  I would say my assumption was that --

10 whenever I was making the videos in early January that if

11 Marywood followed all its internal rules, all the procedures

12 there was due or given and follow through to the letter all the

13 way to the end, and even if the ad hoc committee had -- to

14 examine the termination had said they agreed -- or let's say

15 they disagreed with President Munley, that president had the

16 power to overturn that decision -- not overturn just to reject

17 that advice and I, in fact, I would be fired.  So if all the

18 steps had been taken correctly except for some perhaps volatile

19 board of trustees, then I would have been gone.  So I really

20 don't understand why all these procedures maybe should have

21 been -- or should have been -- not maybe -- should have been

22 implemented weren't, but that's why we're here today.

23          MR. COHEN:  Brian, could you bring up joint exhibit

24 3?  Actually before I forget, Your Honor, your assistant

25 informed me I forgot to move into evidence certain joint

167

1  exhibits during my direct examination.  I want to try to get

2  that done now.  So I would like to move into evidence joint

3  exhibits 13, 20, 23, 25 --

4            MR. ENGLISH:  Can we go slow so I can check them off?

5            THE CLERK:  We already took care of those.

6            MR. COHEN:  You did, all of them?  Including 38?

7            THE CLERK:  Yes.

8            THE COURT:  Wait a minute.  Wait a minute.  That's

9  not on the record.  13.

10            MR. ENGLISH:  13 --

11            THE COURT:  Video, part two.

12            MR. ENGLISH:  That has not been admitted, Your Honor.

13  He's asking it be admitted.  No objection, Your Honor.

14            THE COURT:  Joint exhibit 20.

15            MR. ENGLISH:  I think it's admitted, but we have no

16  objection to the extent it has not.

17            THE COURT:  I noted it hasn't been.  Joint exhibit

18  25?

19            MR. ENGLISH:  We have that admitted, Your Honor.  No

20  objection to the extent it has not.

21            THE COURT:  On the record.  Admitted.  Joint exhibit

22  38.

23            MR. ENGLISH:  We also have that down as admitted, but

24  no objection.

25            THE COURT:  You might have moved.  I don't know.  All

1  right.  That will be admitted.  Is that it?

2         MR. COHEN:  Did we cover 23, joint exhibit 23?

3         THE COURT:  23?

4         MR. ENGLISH:  We have that being admitted, but we

5  have no objection.

6         THE COURT:  It will be admitted.

7         MR. ENGLISH:  I think many are from the list I did

8  initially.

9         THE COURT:  Okay.

10        MR. ENGLISH:  But --

11        THE COURT:  Admitted.

12        MR. COHEN:  Brian, put -- pull up joint exhibit 3,

13 please.  And could you turn to the 23rd page of the actual P.

14 D. F.?

15 BY MR. COHEN:

16 Q.    Fred, have you seen this document?

17 A.    Yes.

18 Q.    And what is it?

19 A.    It is the faculty handbook dated July 2010 for Marywood

20 University.

21 Q.    And, Brian, turn to the 23rd page, please.  And I'm sorry

22 I have it marked as D. E. F. 3498.  Okay.  Do you recognize

23 this as Marywood's tenured policy?

24 A.    Is that a question?  I couldn't hear you.

25 Q.    Do you recognize this as Marywood's tenure policy?

1  A.    Yes, if it's in the handbook, I can't say I read it

2  recently, but I will agree to that, yes.

3  Q.    On the third paragraph where it says -- I'm sorry --

4  fourth paragraph where it says, once tenure is granted it will

5  be discontinued only for grave reason which may include moral,

6  interpreted flagrant abuse of act and a freedom or lack of

7  professional competency as demonstrated in instruction and/or

8  research.   Do you recall reading that policy?

9  A.    Yes, I read that.

10 Q.    Do you recall thinking that your posting the videos met

11 this standard of discontinuation of tenure?

12 A.    I didn't think it did.

13 Q.    Let's go in the same exhibit go to the page Bates Stamp D.

14 E. F. 2534.   3524.   Okay.   The last sentence before section 219

15 that begins as citizens engaged in a profession.   Could you

16 highlight that?   Do you ever recall reading this, Fred, as

17 citizens --

18 A.    Yes, I have read this before.

19 Q.    Let's then go to D. E. F. 3522.   The first paragraph of

20 section 216, last sentence, beginning it is a tradition, do you

21 recall reading this, Fred?

22 A.    Yes, I have read this before.

23 Q.    Okay.   Let's go to Defendant's Exhibit 32.   Now, Mr.

24 English asked you some questions about this document.   Do you

25 remember that?

1   A.    Yes, I do.

2   Q.    Okay.  And a sentence that begins, I am probably overdoing

3   this rule 26 damages stuff, at the worst -- do you see that?

4   A.    I see it.

5   Q.    We're not relying on your rule 26 damages report in this

6   case.  Am I correct?

7   A.    Yes.

8   Q.    And do you think this first sentence I am probably

9   overdoing this rule 26 damages stuff as maybe taking it a

10  little bit out of context?  Is that how you really feel about

11  your report?

12          MR. ENGLISH:  Objection, Your Honor, he's leading.

13          THE COURT:  Pardon?

14          MR. ENGLISH:  Leading.

15          THE COURT:  I agree with that.

16  BY MR. COHEN:

17  Q.    How do you feel about your rule 26 damages report?

18  A.    I am an economist.  I read the rule 26 part that we had to

19  rely on in the case, provide the phrase computation of damages.

20  And I had read a case where if you didn't provide a specific

21  commutation of damages, your case could get tossed out of

22  court.  So I figured I would use every bit of my skills to draw

23  up a damages report along the lines of but for my dismissal

24  what would have happened.

25          And so I created a very, very complete report, complete

1  with multiple spreadsheets linking in everything, salaries, 403

2  B. considerations, changes in the stock market.  I had a

3  complete 41-page report that explained things like tax gross

4  up.  I explained everything, every single category of damages.

5  It was a complete report.  Anybody who read that report I think

6  would say it was an honest, huge effort, and I think they would

7  say -- they might say you aren't an expert but it was a well

8  done honest report.

9       That when I talk about the bullshit, I would imagine most

10  lawyers understandably are not trained economists, they are not

11  trained spreadsheet wizard -- I am not calling myself a wizard,

12  but I do have certain skills.  For let's say Stephanie Peet or

13  somebody to get up to speed would require a lot of homework by

14  them or spending a lot of money to hire an expert, so it would

15  take initially quite a bit of time to understand my report.

16  But again, I claim it was a very well done report.  The other

17  side could say, oh, okay, what does he come up with for a

18  number.  Then they can judge, for example, where they go from

19  there.  So I said here on the other hand when I said -- on the

20  other hand I want early on to put the best foot forward, best

21  -- ideally generally the best offense is a good offense.  Perry

22  Mason surprise stuff not allowed.  I get my analysis of

23  computation of damages early.  In general anyone should want to

24  convince the other side of their damages claim.

25       In other words, I was trying to convince the other side of

1  the damages where they would have to deal with my logic, and it

2  makes good sense.  It would be hard to dispute except around

3  the edges.  If the plaintiff has a strong legal argument, then

4  both sides they say, oh -- Marywood will say Mr. Cohen got a

5  pretty good legal argument and not only that, the computation

6  of damages is awfully strong and maybe we try to settle and get

7  this case over with early.  You do that when you got

8  information.

9      I was giving the maximum possible information to try to

10 speed things along.  I was not trying -- I would have not

11 worked this hard to make them spend money.  My time is

12 valuable.

13 Q.   Okay.

14      MR. COHEN:  I forgot to move into -- I would like to

15 move into evidence joint exhibit 3.  I forgot to do that.

16      MR. ENGLISH:  I think we moved that in.

17      THE COURT:  I think you did.  If it wasn't it is.

18 BY MR. COHEN:

19 Q.   Fred, Mr. English also asked you about two letters that

20 President Munley had sent to you.  First one January 24th,

21 2012.  The second I believe was February 8th or 9th.  These

22 were the letters where President Munley was recommending your

23 termination, and they had these releases at the end.  Do you

24 remember this line of questioning?

25 A.   Yes.

1  Q.    Okay.  Do you remember seeing anything in that progressive

2  discipline policy that stated that you had to sign a release to

3  obtain a faculty committee?

4  A.    No.

5  Q.    Okay.  Fred, let's say hypothetically that Onondaga

6  Community College which you applied for a job at had asked you,

7  Fred, why were you fired from Marywood, would you have been

8  honest?

9  A.    Yes.

10 Q.    Okay.

11        MR. COHEN:  I have no further questions.

12        MR. ENGLISH:  There was one more exhibit we realized

13 wasn't admitted, Defendant's Exhibit 20, which is a January

14 25th, 2012, e-mail from Dr. Fagal with Mr. or Mrs. Harrington

15 we talked about raising a ruckus.

16        MR. COHEN:  No objection.

17        THE COURT:  No objection?

18        MR. COHEN:  No objection.

19        THE COURT:  It will be admitted.  Is there any

20 recross -- actually no recross.  I don't allow recross.  All

21 right.  I guess we will conclude for the day.  So tomorrow what

22 can I expect by way of witness?

23        MR. COHEN:  Your Honor, tomorrow, the first thing is

24 I am going to call Dr. Alan Levine.

25        THE COURT:  All right.

1          MR. COHEN:  And after Mr. -- after Dr. Levine, I

2     would like to handle two deposition transcripts for witnesses

3     that I cannot subpoena here, and I don't know whether Your

4     Honor wants them read in or just provided to be read in

5     chambers.  I am happy to do either.  I also want to call Dr.

6     Sadlack, who is here today, and Dr. Bittel, head of the second

7     faculty committee, Dr. Povse and Dr. O'Brien who were the other

8     two members of the second faculty committee.  And I think then

9     I would be finished with my case.

10          THE COURT:  How long are the depositions you're

11     talking about?

12          MR. COHEN:  Well, President Munley's deposition is

13     long, but the actual designations I don't think are long and --

14          THE COURT:  You talked about the designations among

15     each other?

16          MR. COHEN:  Yes.

17          MR. ENGLISH:  We have talked about that.  Sister

18     Munley is going to testify in our case probably most likely

19     Wednesday.  So, you know --  I know you're putting on your case

20     your deposition testimony.

21          MR. COHEN:  I would be happy to take her direct.

22          MR. ENGLISH:  She's not going to show up until

23     Wednesday.  She's from Texas.

24          THE COURT:  You only have designated portions of her

25     deposition?

175

1          MR. COHEN:  Yes, Your Honor.

2          THE COURT:  Are they lengthy?

3          MR. COHEN:  I don't believe so, Your Honor.

4          THE COURT:  How long -- I'm happy to take them any

5    way you want to present them.

6          MR. COHEN:  I think that I would roughly estimate

7    that it would take 20 minutes to read them into the record.

8          MR. ENGLISH:  I was going to suggest, Your Honor,

9    maybe get these witnesses on and off at the end of his case,

10   read into the deposition testimony because it may change and

11   you may not need --

12         THE COURT:  I don't want to disrupt his order.

13         MR. COHEN:  I am trying to keep it chronological.

14         THE COURT:  I understand.  I'm signing on to that.

15   So why don't you -- why don't you do that, read in the

16   portions?  What about the other deposition?

17         MR. COHEN:  Dr. Michael Foley.  That's very short.

18         THE COURT:  Why don't you read them in?

19         MR. ENGLISH:  We will probably have short counter

20   designations we have identified.  They won't be lengthy.

21   Dunleavy?

22         MR. COHEN:  I totally forgot.  And Ms. Dunleavy.

23         THE COURT:  All right.  Okay.  We will see everybody

24   at 9:30.  Thank you.

25         MR. ENGLISH:  Thank you, Your Honor.

REPORTER'S CERTIFICATE

I, Laura Boyanowski, RMR, CRR, Official Court Reporter for the United States District Court for the Middle District of Pennsylvania, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a true and correct transcript of the within-mentioned proceedings had in the above-mentioned and numbered cause on the date or dates hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared by me or under my supervision.

_____
Laura Boyanowski, RMR, CRR
Official Court Reporter

REPORTED BY:

    LAURA BOYANOWSKI, RMR, CRR
    Official Court Reporter
    United States District Court
    Middle District of Pennsylvania
    235 N. Washington Avenue
    Scranton, PA  18503

        (The foregoing certificate of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)

1

## $

**$191,239** [2] - 155:8, 156:4
**$198,381** [2] - 149:12, 150:6
**$22,000** [2] - 158:17, 158:22
**$3,500** [3] - 120:12, 159:20, 159:22
**$350** [1] - 29:5
**$356,972** [2] - 148:24, 150:4
**$4,000** [2] - 159:21, 160:2
**$5,587** [1] - 151:8
**$50** [3] - 25:8, 28:17, 28:18
**$500** [1] - 29:7
**$755,000** [1] - 154:2
**$755,395** [1] - 151:16
**$76,196** [4] - 145:20, 145:21, 146:7, 148:17
**$80,000** [1] - 163:18
**$850,000** [1] - 39:8

## '

**'16** [1] - 157:3
**'17** [1] - 148:24
**'18** [3] - 145:23, 149:7
**'19** [2] - 145:24, 149:7
**'95** [1] - 4:15
**'em** [1] - 18:5

## 1

**1** [12] - 1:16, 11:6, 19:20, 20:1, 20:21, 27:17, 99:20, 112:8, 128:5, 140:12, 143:11, 146:20
**1.2** [1] - 161:8
**1.4** [1] - 163:1
**1.7** [1] - 162:19
**1/11/13** [1] - 112:16
**1/24/12** [1] - 94:16
**10** [6] - 30:9, 65:19, 68:22, 134:13, 143:4, 145:19
**11** [12] - 32:1, 34:6, 73:4, 73:8, 112:17, 131:18, 132:9, 133:1, 133:2, 133:4, 161:2, 161:14
**113** [2] - 127:22, 129:13
**12** [4] - 36:12, 39:16, 59:23, 85:15

**126** [2] - 158:5, 159:23
**12th** [1] - 40:18
**13** [10] - 6:16, 32:6, 36:16, 39:15, 58:16, 105:1, 116:21, 167:3, 167:9, 167:10
**1350** [1] - 1:24
**136** [2] - 2:6, 129:17
**139** [1] - 2:6
**13th** [5] - 40:17, 40:19, 73:8, 105:2, 134:22
**14** [2] - 76:14, 76:24
**142** [1] - 2:6
**15** [9] - 77:3, 124:7, 131:19, 132:10, 133:5, 133:6, 134:20, 134:21, 134:22
**153** [1] - 2:6
**16** [4] - 34:4, 34:12, 88:3, 89:11
**1601** [1] - 1:24
**165** [1] - 2:4
**17** [5] - 18:23, 61:6, 96:19, 99:6, 130:7
**175** [1] - 1:16
**17th** [1] - 98:16
**18** [3] - 2:4, 44:14, 45:9
**18503** [1] - 176:19
**1888** [1] - 85:25
**1890s** [1] - 22:15
**19** [1] - 133:18
**19087-3340** [1] - 1:17
**19103** [1] - 1:25
**1939** [1] - 83:5
**1940** [1] - 83:5
**1950s** [1] - 61:13
**1968** [1] - 19:4
**1971** [1] - 19:7
**1976** [1] - 19:7
**1980s** [1] - 114:20
**1981** [1] - 19:10
**1986** [1] - 19:13
**1987** [1] - 19:14
**199** [1] - 20:2
**1991** [2] - 20:4, 137:17
**1992** [2] - 20:4, 137:17
**1994** [2] - 4:13, 19:17
**1995** [1] - 38:10
**1997** [1] - 4:13
**19th** [2] - 75:2, 87:7
**1:11** [1] - 45:21

## 2

**2** [12] - 15:24, 16:16, 20:16, 20:24, 21:15, 23:25, 86:13, 118:10, 121:4,

**140**:13, 143:2, 154:17
**2.5** [1] - 146:7
**2.75** [1] - 149:17
**20** [14] - 12:10, 45:13, 59:23, 67:25, 68:8, 93:25, 131:21, 132:12, 134:1, 134:2, 167:3, 167:14, 173:13, 175:7
**200** [2] - 1:21, 85:20
**2000** [1] - 114:11
**2004** [1] - 5:12
**2006** [2] - 105:8, 137:18
**2007** [1] - 39:22
**2008** [2] - 4:15, 39:21
**2010** [1] - 168:19
**2011** [11] - 4:18, 20:15, 21:4, 21:20, 28:9, 74:17, 87:7, 133:18, 143:4, 145:19, 145:20
**2012** [64] - 4:9, 5:23, 6:6, 6:16, 8:16, 8:25, 9:2, 10:15, 12:5, 17:1, 21:4, 29:23, 32:6, 40:22, 49:8, 49:10, 53:19, 54:4, 54:20, 55:9, 55:13, 56:20, 57:11, 58:16, 59:12, 73:9, 80:23, 95:23, 96:19, 97:15, 98:16, 99:6, 99:7, 100:1, 105:4, 108:2, 109:21, 109:23, 110:15, 111:8, 111:11, 111:22, 111:25, 112:22, 114:1, 116:21, 118:10, 124:7, 125:6, 126:19, 133:10, 134:14, 143:8, 143:11, 145:20, 146:16, 147:15, 148:23, 150:24, 158:13, 161:3, 161:7, 172:21, 173:14
**2013** [7] - 17:2, 17:16, 111:13, 112:2, 112:17, 113:23, 116:22
**2014** [9] - 4:5, 114:3, 147:11, 147:19, 148:19, 164:24, 165:1, 165:5, 165:9
**2015** [7] - 90:25, 114:6, 128:22,

**156**:23, 164:20, 165:5, 165:9
**2016** [17] - 17:2, 114:8, 114:12, 114:16, 129:21, 144:15, 148:24, 149:2, 149:5, 149:6, 149:9, 149:15, 150:4, 151:15, 156:23, 161:4, 162:14
**2017** [12] - 17:3, 114:23, 130:7, 144:16, 149:2, 149:6, 149:7, 149:9, 150:5, 157:2, 161:7, 162:14
**2018** [9] - 1:11, 114:25, 118:10, 145:9, 145:12, 145:15, 146:17, 152:22, 162:15
**2019** [5] - 145:9, 145:12, 145:15, 146:17, 152:23
**20th** [1] - 128:9
**21** [2] - 128:1, 130:7
**212** [1] - 1:16
**21209** [1] - 1:21
**216** [1] - 169:20
**219** [1] - 169:14
**23** [15] - 1:11, 5:23, 8:16, 50:6, 91:17, 107:8, 129:21, 131:23, 132:13, 147:15, 167:3, 168:2, 168:3
**235** [1] - 176:19
**23rd** [9] - 8:25, 9:2, 40:21, 44:18, 91:21, 131:7, 143:8, 168:13, 168:21
**24** [6] - 6:2, 49:1, 50:3, 94:24, 131:21, 132:12
**24th** [5] - 45:21, 45:24, 94:23, 133:10, 172:20
**25** [12] - 12:10, 52:13, 67:25, 68:8, 90:16, 110:20, 121:10, 128:22, 131:22, 132:12, 167:3, 167:18
**2534** [1] - 169:14
**25th** [1] - 173:14
**26** [14] - 18:3, 46:23, 48:14, 48:17, 54:4, 91:2, 95:18, 101:20, 128:21, 170:3, 170:5, 170:9,

**170**:17, 170:18
**270** [1] - 139:13
**28** [4] - 53:25, 54:10, 101:20, 176:5
**280** [1] - 139:13
**2800** [1] - 1:20
**28th** [6] - 25:13, 30:22, 53:19, 73:14, 92:23, 92:24
**29** [3] - 74:17, 112:8, 122:14
**29th** [3] - 54:20, 97:15, 99:7
**2nd** [2] - 57:11, 95:23, 100:1

## 3

**3** [8] - 1:9, 12:5, 97:3, 131:25, 132:15, 166:24, 168:12, 172:15
**3.5** [3] - 162:2, 162:12, 162:25
**30** [4] - 23:25, 54:14, 55:3, 73:12
**30th** [2] - 77:17, 103:2
**31** [6] - 55:6, 56:10, 112:15, 131:23, 132:14, 134:3
**32** [6] - 56:15, 90:24, 131:20, 132:11, 133:22, 169:23
**33** [2] - 102:21, 104:21
**34** [2] - 56:15, 57:1
**3498** [1] - 168:22
**3500** [1] - 160:2
**3522** [1] - 169:19
**3524** [1] - 169:14
**36** [3] - 56:14, 57:7, 57:15
**37** [3] - 57:18, 58:10, 121:3
**38** [9] - 58:14, 64:20, 64:25, 105:2, 124:6, 131:22, 132:13, 167:6, 167:22
**397** [1] - 120:19
**3:14-CV-2404** [1] - 1:5
**3rd** [9] - 10:15, 55:9, 55:13, 71:12, 71:15, 73:14, 105:4, 125:5, 134:14

## 4

**4** [1] - 151:11
**4.37** [1] - 97:3
**40** [2] - 5:1, 158:9
**40,000** [2] - 158:10,

158:20
**400** [1] - 120:14
**401** [1] - 34:17
**403** [9] - 143:8,
146:25, 147:10,
147:12, 147:15,
147:22, 148:19,
149:1, 171:1
**41** [4] - 51:6, 51:13,
125:4, 129:6
**41-page** [1] - 171:3
**42** [1] - 34:9
**42-year-old** [3] - 12:9,
67:24, 68:7
**425** [1] - 118:9
**43** [6] - 3:9, 77:13,
131:19, 132:10,
133:8, 133:10
**44** [3] - 131:20,
132:10, 133:14
**45** [1] - 135:18
**46** [5] - 25:21, 115:7,
131:23, 132:14,
134:7
**47** [6] - 118:6, 118:8,
122:14, 131:24,
132:15, 134:10
**48** [5] - 118:7, 118:8,
131:24, 132:15,
134:10
**4:00** [1] - 136:16
**4th** [1] - 120:15

**5**

**5** [4] - 89:14, 90:20,
90:21, 133:22
**50** [4] - 17:16, 17:17,
35:20, 82:11
**500** [1] - 29:19
**55** [3] - 131:21,
132:12, 132:22
**55.5** [3] - 158:14,
158:21, 159:7
**56** [2] - 53:15, 53:20
**5th** [1] - 90:25

**6**

**6** [11] - 56:20, 88:1,
105:8, 109:21,
109:22, 109:23,
131:20, 132:11,
133:18, 162:14,
162:19
**60** [1] - 2:4
**63** [2] - 142:12, 161:3
**66** [5] - 12:10, 68:2,
126:10, 126:16,
145:5

**67** [1] - 145:5
**6th** [2] - 57:23, 120:16

**7**

**7** [3] - 75:21, 154:5
**72** [2] - 18:21, 61:15
**73.05** [3] - 145:3,
145:8, 145:9
**753** [1] - 176:6
**755,395** [1] - 152:21

**8**

**8** [3] - 7:1, 131:22,
132:13
**80** [2] - 17:16, 150:18
**80,000** [1] - 163:16
**88** [1] - 126:18
**8:45** [1] - 40:23
**8th** [5] - 49:8, 94:24,
96:18, 98:12, 172:21

**9**

**9** [7] - 6:6, 41:1, 41:6,
68:20, 69:4, 72:25,
108:2
**9:00** [1] - 41:9
**9:15** [1] - 43:20
**9:30** [1] - 175:24
**9th** [4] - 95:18, 107:8,
118:10, 172:21

**A**

**a.m** [5] - 40:23, 41:1,
41:6, 41:9, 43:20
**able** [12] - 23:8, 43:10,
47:6, 47:13, 121:14,
145:2, 145:7,
146:15, 147:11,
148:22, 149:8, 151:5
**above-mentioned** [1]
- 176:8
**absolute** [1] - 110:23
**absolutely** [3] - 71:8,
91:7, 139:25
**abuse** [1] - 169:6
**academic** [29] - 7:10,
8:11, 10:16, 14:21,
14:24, 20:5, 21:5,
27:1, 30:18, 37:20,
101:10, 111:21,
145:9, 145:12,
145:15, 145:21,
145:24, 146:17,
148:24, 149:2,
149:5, 149:6, 149:9,
149:10, 150:5,

152:23, 156:10,
162:14
**academics** [1] -
138:25
**accepted** [2] - 21:11,
140:17
**access** [1] - 127:2
**accessible** [1] -
143:14
**accommodate** [1] -
136:3
**accomplish** [1] - 14:4
**according** [8] - 10:21,
17:4, 18:2, 31:12,
59:1, 103:2, 141:23,
150:13
**account** [15] - 73:10,
146:2, 146:21,
147:7, 147:21,
147:24, 148:7,
148:8, 148:10,
148:17, 150:7,
159:8, 159:10,
162:23, 165:4
**accurate** [2] - 21:12,
45:8
**accuse** [1] - 83:21
**accused** [1] - 49:16
**acknowledge** [5] -
72:17, 72:18, 78:2,
81:14, 96:8
**acknowledged** [1] -
141:1
**acknowledging** [1] -
85:12
**acquainted** [1] - 4:6
**acronym** [1] - 4:21
**act** [1] - 169:6
**acting** [2] - 83:6,
84:13
**action** [8] - 7:2, 7:11,
12:21, 13:21, 54:7,
55:25, 75:7, 102:6
**actions** [10] - 8:10,
10:25, 11:23, 15:1,
45:2, 45:4, 46:6,
59:8, 91:25, 102:20
**active** [2] - 138:9,
138:12
**actively** [1] - 116:9
**activities** [4] - 24:21,
25:17, 36:23, 113:7
**actors** [1] - 83:6
**actual** [13] - 7:17,
13:14, 33:24, 34:15,
34:16, 34:17, 36:13,
145:5, 145:6, 159:1,
159:3, 168:13,
174:13
**ad** [36] - 15:14, 15:18,

15:20, 16:4, 16:8,
16:10, 16:13, 16:19,
51:9, 54:23, 54:24,
55:17, 56:3, 56:20,
56:22, 57:10, 57:23,
58:23, 78:12, 78:24,
95:17, 97:22, 98:4,
99:11, 102:11,
102:12, 102:17,
103:8, 103:9,
103:10, 117:2,
117:18, 119:17,
120:16, 166:13
**adaptation** [5] - 5:10,
34:21, 34:24
**adapted** [2] - 5:14,
33:14
**add** [2] - 147:20,
153:17
**added** [1] - 148:18
**addition** [5] - 11:21,
137:7, 145:25,
146:9, 150:7
**additional** [11] -
144:3, 144:22,
148:25, 149:12,
150:4, 150:6, 151:8,
153:10, 156:7,
161:18, 162:8
**address** [6] - 25:3,
25:7, 32:20, 32:21,
152:11
**adjourned** [1] - 60:1
**adjudicate** [1] - 9:9
**adjunct** [10] - 113:13,
113:14, 120:11,
121:5, 121:17,
122:1, 122:2, 122:5,
122:6, 137:15
**adjuncts** [1] - 122:9
**adjustment** [3] -
147:23, 148:1,
148:13
**administration** [25] -
4:16, 5:2, 12:17,
15:12, 26:10, 31:3,
31:5, 31:17, 33:11,
39:14, 44:6, 62:11,
64:13, 65:9, 70:24,
74:10, 75:6, 90:17,
93:24, 110:5,
112:25, 113:5,
113:21, 143:15
**administration's** [2] -
5:9, 5:18
**administrations** [1] -
39:12
**administrative** [1] -
26:24
**administrator** [3] -

52:1, 86:23, 101:5
**administrators** [1] -
10:13
**admission** [1] - 34:6
**admissions** [1] - 58:1
**admit** [10] - 3:8, 75:21,
76:24, 77:23, 83:2,
88:1, 102:15,
102:22, 121:20,
129:13
**admitted** [63] - 3:23,
20:21, 20:23, 21:15,
21:17, 31:21, 31:24,
34:8, 34:14, 39:18,
44:22, 45:12, 48:19,
50:5, 51:16, 53:23,
54:13, 55:5, 56:13,
57:6, 57:17, 58:12,
65:5, 69:2, 73:2,
73:4, 77:1, 89:12,
90:23, 93:25, 94:24,
95:19, 99:15,
102:22, 103:1,
104:24, 105:1,
112:10, 129:15,
132:18, 133:4,
133:7, 133:13,
133:17, 133:21,
133:25, 134:6,
134:9, 134:12,
134:17, 134:25,
167:12, 167:13,
167:15, 167:19,
167:21, 167:23,
168:1, 168:4, 168:6,
168:11, 173:13,
173:19
**admitting** [3] - 3:14,
3:15, 71:19
**Adolf** [5] - 5:13, 10:13,
11:9, 17:18, 38:3
**adopt** [1] - 16:15
**ads** [2] - 117:1, 117:18
**advanced** [1] - 120:9
**adverse** [1] - 7:23
**adversely** [1] - 7:21
**advertise** [1] - 24:1
**advertisements** [1] -
117:15
**advice** [2] - 73:23,
166:17
**advised** [4] - 50:19,
108:6, 108:20,
108:24
**advisor** [2] - 40:6,
108:22
**advisory** [2] - 16:14,
78:12
**affairs** [12] - 7:10,
8:12, 10:17, 14:21,

14:24, 24:11, 27:2,
30:18, 33:9, 37:15,
37:20, 101:10
**affected** [1] - 7:21
**afternoon** [8] - 25:25,
44:19, 60:7, 60:8,
136:24, 136:25,
153:3, 153:4
**afterwards** [1] - 30:24
**age** [4] - 72:13, 145:3,
145:8, 150:17
**ago** [2] - 60:14, 109:9
**agony** [2] - 90:3, 90:5
**agree** [21] - 16:6,
29:21, 35:21, 44:25,
87:23, 93:12,
104:18, 116:1,
120:23, 126:10,
152:16, 155:11,
158:10, 158:22,
158:24, 159:3,
160:2, 160:23,
160:25, 169:2,
170:15
**agreed** [3] - 17:24,
38:22, 166:14
**agreement** [17] - 11:3,
11:8, 11:13, 11:20,
13:5, 16:11, 19:24,
20:10, 21:4, 31:8,
57:12, 143:3, 143:7,
145:17, 145:18,
146:5, 147:14
**agrees** [1] - 17:25
**ahead** [3] - 27:25,
97:19, 125:2
**Alan** [19] - 8:11, 10:16,
15:3, 27:1, 27:16,
28:2, 30:14, 30:17,
30:18, 30:20, 31:6,
32:7, 37:22, 37:25,
42:13, 43:8, 88:17,
136:15, 173:24
**alleged** [2] - 4:7, 99:24
**allegedly** [1] - 13:12
**allegory** [1] - 22:15
**Allied** [1] - 138:12
**allocate** [1] - 22:10
**allocating** [1] - 22:12
**allow** [4] - 76:9, 83:19,
123:11, 173:20
**allowed** [7] - 12:25,
28:24, 43:12, 92:2,
122:9, 135:14,
171:22
**allowing** [1] - 6:12
**alluded** [1] - 144:9
**almost** [4] - 27:16,
59:22, 91:9, 136:16
**aloud** [1] - 50:13

**alter** [1] - 162:9
**alternative** [1] - 96:7
**amended** [1] - 142:22
**Amendment** [2] -
22:20, 23:14
**amends** [1] - 32:9
**amount** [8] - 148:24,
149:25, 151:12,
151:16, 155:13,
156:16, 163:22,
164:11
**amounts** [2] - 149:11,
151:6
**amusing** [1] - 28:18,
70:20
**analysis** [5] - 68:14,
147:4, 155:24,
157:5, 171:22
**angels** [1] - 43:15
**Ann** [2] - 31:10, 45:18
**Anne** [15] - 5:24,
10:15, 44:22, 45:16,
55:10, 58:16, 78:25,
85:3, 87:15, 96:2,
96:9, 103:7, 108:7,
143:3, 145:19
**announce** [1] - 126:14
**announced** [1] - 113:1
**announcement** [8] -
25:8, 26:13, 26:18,
26:22, 27:4, 27:5,
114:18, 119:23
**announcements** [6] -
27:6, 30:24, 111:18,
116:22, 116:23,
120:15
**announcing** [1] - 5:1
**annual** [3] - 80:12,
118:4, 158:16
**answer** [9] - 42:22,
42:23, 45:7, 48:9,
69:11, 100:20,
123:11, 123:12,
144:13
**answered** [3] - 65:16,
66:17, 79:19
**Anthony** [5] - 50:11,
53:18, 100:2, 107:9,
108:6
**anytime** [1] - 66:5
**anyway** [7] - 16:18,
17:20, 74:15,
121:19, 122:1,
141:10, 156:17
**apologize** [5] - 32:9,
44:9, 91:22, 92:8,
92:15
**apologized** [1] - 15:11
**apology** [9] - 5:4,
29:8, 29:9, 113:3,

131:6, 131:9,
131:10, 131:11,
131:15
**appeal** [4] - 6:13, 7:15,
54:23, 58:19
**appeals** [3] - 7:20, 9:9,
51:21
**appear** [5] - 9:5, 58:2,
108:6, 116:3, 142:13
**APPEARANCES** [1] -
1:13
**appeared** [2] - 5:21
**appearing** [1] - 5:17
**applicable** [1] - 14:7
**application** [9] -
112:6, 112:12,
112:15, 112:20,
113:9, 122:3, 134:3,
159:14
**applied** [16] - 17:1,
111:23, 112:17,
113:23, 114:11,
114:25, 116:8,
117:9, 120:24,
121:18, 121:20,
122:2, 122:3,
123:10, 123:17,
173:6
**apply** [35] - 14:11,
15:19, 15:24,
111:13, 111:22,
111:25, 112:2,
112:3, 112:4, 114:1,
114:3, 114:6, 114:8,
114:16, 114:22,
117:19, 119:10,
121:16, 121:25,
123:16, 124:1,
124:5, 124:8, 125:6,
126:12, 126:23,
127:16, 128:15,
129:1, 129:25,
130:5, 130:6,
130:11, 130:21,
176:21
**applying** [3] - 113:13,
117:11, 120:10
**appointed** [2] - 98:21,
176:5
**appointment** [2] -
6:22, 19:24
**appointments** [1] -
59:13
**appreciate** [1] - 136:6
**approached** [1] - 24:9
**appropriate** [13] -
16:3, 16:5, 17:25,
42:19, 48:5, 69:24,
140:22, 148:1,
148:13, 153:16,

153:22, 154:21,
164:18
**approval** [5] - 24:13,
24:14, 24:17, 25:18,
31:9
**approved** [7] - 5:2,
27:7, 36:25, 43:9,
70:6, 71:10, 112:25
**APRIL** [1] - 1:11
**April** [10] - 55:9,
55:13, 103:2, 105:4,
118:10, 120:15,
120:16, 143:8,
147:15, 162:15
**Archbald** [1] - 93:20
**architecture** [1] - 77:5
**area** [3] - 70:10,
116:15, 118:9
**areas** [2] - 14:2,
118:20
**argued** [1] - 3:23
**arguing** [1] - 57:25
**argument** [3] - 15:17,
172:3, 172:5
**arguments** [2] - 3:16,
54:6
**arrange** [1] - 24:20
**arrangements** [1] -
43:19
**arrived** [1] - 149:25
**arriving** [1] - 143:22
**art** [2] - 56:8, 87:11
**articles** [2] - 138:15,
138:19
**articulated** [1] - 13:12
**arts** [3] - 137:4, 137:6,
137:8
**aspirational** [1] - 37:7
**aspirations** [1] - 37:9
**assault** [2] - 28:9,
28:16
**asserting** [1] - 3:15
**assessment** [1] -
144:19
**assignment** [1] -
153:5
**assistance** [3] - 14:4,
14:7, 117:24
**assistant** [5] - 36:4,
122:15, 128:23,
130:14, 166:24
**associate** [2] - 17:10,
115:9
**associated** [1] - 86:1
**Association** [3] -
138:10, 138:11,
138:13
**association** [1] -
23:17
**assume** [9] - 34:15,

37:25, 65:23, 86:8,
129:18, 149:14,
155:3, 156:25,
163:17
**assumed** [4] - 81:7,
86:10, 86:11, 150:21
**assumes** [1] - 100:13,
153:18, 154:25
**assuming** [7] - 67:20,
67:21, 78:17, 78:25,
155:12, 156:8, 158:8
**assumption** [5] -
146:4, 153:20,
163:21, 165:9, 166:9
**Atlantic** [1] - 39:9
**atone** [1] - 32:9
**attached** [3] - 45:20,
98:24, 107:12
**attachments** [2] -
45:20, 45:23
**attack** [6] - 88:14,
88:16, 88:18, 88:21,
88:23, 89:3
**attacks** [1] - 85:21
**attain** [1] - 19:15
**attained** [1] - 4:13
**attempt** [6] - 24:1,
24:7, 65:10, 65:13,
67:5, 91:14
**attempted** [1] - 5:4
**attend** [5] - 26:13,
26:23, 28:13, 80:12,
81:24
**attendance** [3] - 82:4,
82:5, 82:6
**attended** [2] - 82:9,
82:10
**attending** [3] - 24:3,
28:16, 82:2
**attention** [3] - 66:6,
87:21, 116:7
**attentively** [1] -
118:25
**attitude** [1] - 89:5
**attitudes** [1] - 33:11
**attorney** [5] - 6:5, 6:6,
47:6, 97:16, 139:21
**attorney's** [1] - 50:11
**attorney/client** [1] -
3:20
**attorneys** [1] - 140:16
**attractive** [1] - 116:3
**August** [2] - 59:12,
125:5
**authenticated** [1] -
118:22
**author** [1] - 47:14
**authored** [2] - 44:22,
138:15
**authority** [1] - 78:15

**authorization** [14] - 47:24, 94:10, 94:19, 95:6, 96:15, 96:25, 97:6, 97:9, 98:25, 99:6, 108:5, 108:15, 108:25
**authorize** [2] - 97:13, 97:20
**authorized** [3] - 26:25, 95:17, 98:8
**authorizing** [3] - 97:16, 98:3, 98:4
**availability** [1] - 24:3
**available** [5] - 17:16, 23:7, 40:19, 156:24, 162:15
**Avenue** [1] - 176:19
**AVENUE** [1] - 1:16
**average** [9] - 125:25, 145:7, 145:15, 146:12, 146:15, 148:12, 149:17, 159:25, 160:8
**award** [10] - 144:8, 147:5, 149:14, 154:23, 155:6, 155:8, 155:14, 155:16, 156:8, 156:9
**awarded** [2] - 19:9, 155:4
**awards** [1] - 155:12
**aware** [5] - 141:6, 155:17, 158:5, 164:20, 165:7
**awareness** [1] - 28:16
**awfully** [1] - 172:6

**B**

**bachelor** [1] - 137:4
**bachelor's** [1] - 19:5
**background** [4] - 19:3, 42:13, 113:17, 137:3
**backpay** [1] - 153:6, 153:9
**bad** [3] - 39:3, 90:18, 111:5
**baffle** [2] - 18:5, 91:4
**ball** [1] - 85:24
**balls** [1] - 85:10
**BALTIMORE** [1] - 1:21
**banking** [3] - 123:13, 123:22, 124:3
**banks** [1] - 118:1
**barely** [2] - 20:6, 42:14, 46:3
**bargained** [1] - 17:21
**barrage** [2] - 70:11, 70:13

**based** [32] - 16:7, 71:18, 75:22, 75:24, 79:1, 98:15, 102:19, 140:21, 140:23, 143:25, 145:6, 146:13, 147:10, 147:14, 148:12, 148:21, 149:7, 149:18, 149:19, 155:3, 155:6, 156:5, 157:22, 157:25, 158:4, 160:7, 161:4, 163:8, 163:11, 163:12, 163:19
**basic** [2] - 21:21, 142:24
**basis** [5] - 3:20, 65:3, 99:17, 101:3, 121:23
**Bates** [1] - 169:13
**battle** [3] - 12:19, 12:20, 112:23
**became** [1] - 147:2
**become** [6] - 38:21, 39:1, 39:12, 138:11, 149:3, 150:3
**becoming** [1] - 38:12
**BEFORE** [1] - 1:8
**began** [2] - 4:11, 19:14
**begin** [2] - 3:3, 112:1
**beginning** [10] - 32:5, 36:16, 45:22, 66:21, 70:11, 70:13, 105:10, 106:18, 106:21, 169:20
**begins** [4] - 49:12, 53:1, 169:15, 170:2
**behalf** [2] - 7:24, 56:24
**behaved** [1] - 71:21
**behavior** [9] - 26:14, 33:10, 71:18, 71:23, 71:24, 82:22, 84:15, 101:13, 102:19
**behaviors** [2] - 22:12, 84:14
**believes** [1] - 4:14
**belittles** [1] - 107:16
**belonged** [1] - 138:7
**belt** [3] - 87:17, 87:23, 87:24
**Ben** [1] - 76:12
**bench** [3] - 3:2, 61:2, 143:21
**benchmarks** [2] - 146:9, 146:14
**Benedict** [1] - 74:18
**beneficial** [1] - 110:11
**benefit** [14] - 68:14, 78:22, 79:9, 79:12,

79:13, 108:18, 144:7, 150:9, 150:12, 150:13, 150:17, 150:22, 150:25, 151:9
**benefits** [4] - 143:6, 143:10, 146:21, 147:1
**Benjamin** [2] - 76:11, 76:15
**Best** [1] - 119:14
**best** [9] - 12:19, 23:12, 38:18, 41:7, 76:16, 116:2, 171:20, 171:21
**betrayed** [3] - 5:7, 27:10, 27:12
**better** [2] - 16:25, 30:14
**between** [13] - 4:15, 8:8, 21:5, 46:4, 59:6, 77:13, 89:14, 102:15, 102:23, 133:22, 134:14, 138:4
**beyond** [1] - 165:9
**big** [5] - 30:1, 68:18, 72:4, 87:3, 121:4
**Bill** [1] - 39:22
**bill** [2] - 25:22, 114:19
**binding** [1] - 16:20
**biology** [1] - 22:14
**bit** [12] - 18:19, 29:5, 29:25, 30:12, 43:6, 43:11, 59:18, 83:11, 125:1, 170:10, 170:22, 171:15
**Bittel** [4] - 9:15, 56:6, 57:11, 174:6
**blank** [1] - 91:4
**blast** [1] - 26:10
**blatantly** [1] - 55:21
**blow** [2] - 30:12, 44:14
**board** [2] - 78:17, 166:19
**body** [2] - 44:15, 77:18
**bologna** [1] - 72:3
**bomb** [1] - 85:24
**bombed** [1] - 61:11
**bomber** [1] - 61:15
**bombers** [1] - 61:12
**bonds** [1] - 149:19
**Bonilla** [1] - 77:14
**books** [1] - 138:15
**borne** [1] - 10:3
**boss** [2] - 37:15, 93:23
**bother** [2] - 50:18, 78:19
**bottom** [11] - 21:6, 21:9, 51:8, 66:1,

66:5, 69:17, 74:21, 76:14, 76:15, 89:20, 102:3
**bought** [1] - 33:23
**bounds** [4] - 12:6, 17:19, 66:23, 66:24
**bowling** [1] - 85:24
**Boyanowski** [2] - 176:3, 176:14
**BOYANOWSKI** [1] - 176:17
**bracket** [1] - 157:4
**brazen** [1] - 84:22
**breach** [17] - 6:8, 9:20, 11:12, 11:13, 11:24, 12:24, 13:5, 16:10, 16:12, 18:7, 49:13, 49:16, 50:15, 96:12, 96:13, 107:25
**breached** [4] - 4:8, 11:2, 11:7, 11:20
**breaches** [2] - 13:12, 107:18
**breaching** [1] - 18:1
**break** [4] - 59:20, 59:21, 59:22, 130:24
**Brian** [40] - 7:1, 19:20, 20:16, 20:24, 30:9, 30:12, 32:1, 32:25, 34:1, 34:4, 36:12, 36:15, 36:16, 37:1, 37:10, 38:5, 44:14, 45:13, 46:23, 49:1, 49:5, 49:11, 49:20, 50:13, 51:6, 52:13, 53:15, 53:25, 54:14, 55:6, 55:14, 56:14, 57:7, 57:18, 58:14, 142:12, 151:11, 166:23, 168:12, 168:21
**bribe** [2] - 84:23, 85:3
**brief** [3] - 56:24, 60:2, 131:2
**briefly** [1] - 53:2
**briefs** [1] - 3:13
**bring** [12] - 19:20, 20:16, 20:24, 25:10, 28:11, 32:1, 34:4, 36:12, 39:15, 51:6, 79:13, 166:23
**bringing** [1] - 86:14
**Brockport** [1] - 126:18
**brought** [5] - 25:16, 25:18, 62:2, 105:17, 155:19
**bucks** [2] - 82:11, 87:4
**budget** [2] - 24:11, 122:9
**build** [1] - 42:17

**bull** [1] - 91:4
**bullshit** [2] - 18:5, 171:9
**bunch** [1] - 93:21
**bunker** [1] - 83:7
**bureaucracies** [1] - 39:10
**bureaucratic** [2] - 39:4, 39:9
**burning** [1] - 85:20
**bury** [2] - 18:5, 91:4
**business** [2] - 148:10, 158:2
**busy** [1] - 93:10
**butcher** [1] - 66:8
**buy** [1] - 88:19
**BY** [62] - 18:15, 20:25, 21:18, 31:25, 35:11, 39:19, 40:14, 42:4, 45:14, 48:8, 49:2, 50:7, 51:19, 53:24, 54:15, 55:7, 56:16, 57:8, 57:19, 58:13, 60:6, 62:5, 63:1, 65:6, 65:18, 66:20, 69:3, 70:18, 73:3, 76:10, 77:2, 79:22, 81:19, 88:7, 89:13, 91:8, 100:17, 100:22, 102:25, 104:7, 104:25, 105:19, 107:7, 112:11, 119:4, 119:13, 119:19, 123:19, 125:3, 126:9, 129:11, 129:16, 131:4, 136:23, 139:20, 142:8, 153:2, 165:24, 168:15, 170:16, 172:18, 176:16

**C**

**Cabral** [6] - 26:8, 52:17, 52:18, 56:21, 99:17, 102:23
**calculate** [13] - 140:8, 140:18, 144:21, 145:13, 145:22, 146:19, 147:17, 149:8, 153:6, 153:10, 159:16, 162:2
**calculated** [6] - 144:6, 144:9, 150:12, 150:14, 155:3, 155:6
**calculating** [3] - 144:1, 144:3, 161:18

**calculation** [5] - 147:24, 155:5, 159:12, 160:13, 160:18
**calculations** [16] - 144:14, 144:17, 146:1, 148:22, 149:4, 155:20, 155:21, 155:25, 156:3, 156:6, 156:12, 162:20, 162:22, 162:25, 163:3, 165:12
**campaign** [1] - 36:9
**campus** [8] - 4:24, 23:6, 23:15, 24:3, 24:16, 32:11, 33:10, 79:13
**campuses** [3] - 23:18, 39:10, 112:21
**cancelled** [1] - 26:1
**candidate** [1] - 36:7
**candidates** [1] - 115:14
**candle** [3] - 68:1, 68:11, 72:5
**cannot** [4] - 88:13, 103:22, 135:12, 174:3
**cans** [1] - 29:19
**capacity** [3] - 153:18, 153:23, 163:11
**capital** [1] - 37:19
**capitalize** [3] - 37:2, 37:21, 37:24
**caption** [1] - 61:14
**CAPUTO** [1] - 1:8
**car** [1] - 90:11
**cards** [1] - 28:17
**care** [4] - 25:4, 78:21, 114:19, 167:5
**career** [4] - 116:19, 138:1, 138:4, 138:5
**Carl** [6] - 24:20, 26:7, 30:22, 31:1, 36:22, 37:17
**Carolina** [1] - 8:21
**carrying** [1] - 61:13
**cartoon** [25] - 61:6, 62:20, 62:23, 62:24, 63:2, 64:9, 64:10, 85:11, 85:14, 85:15, 85:21, 85:23, 86:1, 86:2, 86:3, 87:12, 87:20, 90:12, 105:23, 106:2, 106:5, 106:12, 106:23, 107:3
**cartoons** [2] - 85:12, 105:7

**Carveth** [6] - 40:4, 40:5, 65:20, 66:3, 134:15
**case** [56] - 3:2, 4:4, 4:5, 8:1, 9:5, 15:6, 29:20, 32:12, 34:15, 37:23, 52:4, 74:21, 75:8, 79:4, 79:7, 79:11, 79:16, 79:17, 83:8, 98:6, 101:5, 103:10, 112:24, 113:5, 113:8, 139:25, 140:3, 140:6, 140:13, 140:16, 140:19, 140:21, 140:25, 142:10, 149:21, 150:10, 150:21, 151:25, 155:21, 159:12, 163:14, 163:21, 163:25, 164:2, 164:3, 166:5, 170:6, 170:19, 170:20, 170:21, 172:7, 174:9, 174:18, 174:19, 175:9
**cases** [5] - 5:3, 140:10, 159:5, 163:4, 163:10
**cash** [1] - 28:18
**casino** [1] - 39:5
**casinos** [1] - 39:9
**cast** [1] - 9:20
**castigated** [2] - 113:4, 113:20
**catch** [1] - 99:4
**categorize** [1] - 120:13
**categorizing** [1] - 120:14
**category** [2] - 119:25, 171:4
**Catholic** [3] - 39:7, 85:1, 87:22
**caused** [2] - 9:24, 106:5, 113:7
**Cazenovia** [4] - 114:14, 114:15, 117:18, 127:19
**cease** [1] - 59:10
**celebrating** [1] - 36:2
**cell** [1] - 120:2
**cellist** [1] - 88:5
**cents** [3] - 158:14, 158:21, 159:7
**certain** [6] - 13:11, 13:14, 28:22, 71:23, 166:25, 171:12
**certainly** [17] - 23:12,

28:21, 55:9, 70:20, 108:8, 128:16, 139:25, 141:20, 154:17, 155:6, 155:15, 157:6, 162:7, 162:20, 163:14, 163:16, 165:11
**certainty** [2] - 9:23, 151:19
**CERTIFICATE** [1] - 176:1
**certificate** [1] - 176:21
**certify** [2] - 176:6, 176:10
**certifying** [1] - 176:22
**cetera** [2] - 28:23
**Chad** [2] - 152:8, 152:11
**chain** [4] - 3:11, 3:12, 3:17, 26:24
**chair** [4] - 38:15, 41:11, 52:25, 54:5
**chairperson** [1] - 56:7
**chairs** [1] - 41:13
**challenge** [3] - 79:6, 79:17, 141:8
**chambers** [1] - 174:5
**chance** [6] - 71:5, 78:23, 82:8, 114:9, 117:10, 122:13
**change** [11] - 67:8, 67:11, 82:22, 82:23, 106:10, 154:7, 154:20, 155:18, 155:21, 162:5, 175:10
**changed** [4] - 67:17, 93:13, 102:17, 156:2
**changes** [4] - 33:10, 83:11, 154:12, 171:2
**changing** [2] - 38:11, 161:25
**charge** [5] - 16:14, 29:4, 29:17, 72:3, 84:22
**charges** [11] - 49:9, 94:15, 95:3, 95:4, 96:3, 96:11, 97:19, 98:3, 98:20, 108:11
**chart** [1] - 165:8
**chase** [2] - 113:19, 113:20
**chastising** [1] - 5:14
**check** [3] - 116:7, 128:20, 167:4
**CHERRY** [1] - 1:24
**chest** [1] - 43:16
**Chester** [1] - 129:4
**Chicago** [1] - 89:18

**chief** [5] - 8:1, 9:6, 37:13, 37:17, 137:20
**children** [1] - 19:1
**choice** [4] - 95:10, 96:7, 108:17, 108:24
**choices** [1] - 88:25
**choose** [5] - 55:17, 98:13, 104:1, 108:20, 108:24
**chose** [1] - 17:20
**Chronicle** [4] - 116:15, 116:21, 117:1, 127:11
**Chronicles** [2] - 116:24, 127:12
**chronological** [1] - 175:13
**chuckle** [1] - 43:16
**Cincinnati** [1] - 86:21
**circulated** [1] - 11:20
**circumstances** [2] - 17:25, 166:5
**circumvent** [1] - 96:23
**citations** [2] - 50:18, 141:6
**cite** [1] - 28:5
**cited** [1] - 140:6
**citing** [2] - 140:9, 140:10
**citizens** [2] - 169:15, 169:17
**City** [1] - 39:9
**civil** [5] - 49:21, 49:23, 61:22, 63:9, 64:7
**claim** [3] - 18:7, 171:16, 171:24
**claimed** [1] - 9:19
**claiming** [1] - 123:8
**claims** [2] - 11:2, 11:5
**class** [27] - 22:5, 22:7, 23:2, 23:5, 23:6, 25:9, 25:16, 26:23, 28:3, 28:6, 28:12, 28:13, 28:14, 29:13, 29:14, 41:2, 69:17, 69:20, 69:23, 70:8, 81:21, 81:22, 81:24, 82:3, 82:7, 82:10
**classes** [1] - 21:19
**classroom** [1] - 22:10
**clause** [1] - 22:16
**clayton** [1] - 37:13
**clean** [1] - 43:19
**clear** [3] - 24:18, 161:15, 162:4
**clearly** [2] - 86:7, 165:2
**CLERK** [3] - 134:20, 167:5, 167:7
**click** [1] - 130:17

**clicked** [2] - 130:2, 130:18
**client** [5] - 96:13, 108:6, 108:14, 108:20, 108:23
**client's** [1] - 108:9
**close** [3] - 70:11, 103:23, 121:10
**closely** [1] - 19:25
**clothing** [1] - 157:15
**co** [1] - 21:22
**co-taught** [1] - 21:22
**coach** [4] - 36:2, 36:4, 36:5, 83:10
**coaches** [1] - 36:5
**Code** [1] - 176:6
**Cohen** [12] - 4:1, 4:3, 13:11, 18:10, 20:18, 47:7, 47:8, 107:10, 108:23, 131:5, 165:20, 172:4
**COHEN** [149] - 1:15, 1:15, 4:2, 18:11, 18:15, 20:20, 20:24, 20:25, 21:14, 21:18, 31:25, 34:4, 34:9, 34:12, 34:20, 34:24, 35:6, 35:9, 35:11, 39:15, 39:19, 40:13, 40:14, 41:24, 42:4, 45:9, 45:13, 45:14, 47:10, 47:19, 48:8, 48:14, 48:17, 48:23, 49:1, 49:2, 50:3, 50:6, 50:7, 51:13, 51:19, 53:20, 53:24, 54:10, 54:14, 54:15, 55:2, 55:6, 55:7, 56:10, 56:14, 56:16, 57:1, 57:7, 57:8, 57:15, 57:18, 57:19, 58:13, 59:16, 61:24, 62:1, 64:24, 65:1, 65:4, 68:23, 68:25, 73:1, 75:22, 75:24, 76:4, 76:6, 76:8, 76:25, 81:17, 88:2, 90:22, 100:10, 100:12, 102:24, 104:4, 104:19, 104:23, 112:9, 122:18, 122:21, 123:4, 123:7, 129:14, 132:4, 132:8, 132:16, 132:19, 133:1, 133:3, 133:6, 133:9, 133:12, 133:16, 133:20, 133:24, 134:2, 134:5, 134:8,

134:11, 134:16, 134:24, 135:2, 135:9, 135:18, 135:20, 135:22, 135:24, 136:1, 136:6, 136:10, 136:23, 139:14, 142:2, 142:6, 142:8, 152:14, 152:16, 152:18, 165:16, 165:21, 165:24, 166:23, 167:6, 168:2, 168:12, 168:15, 170:16, 172:14, 172:18, 173:11, 173:16, 173:18, 173:23, 174:1, 174:12, 174:16, 174:21, 175:1, 175:3, 175:6, 175:13, 175:17, 175:22

**Cohen's** [2] - 95:19, 99:25

**colleague** [1] - 109:7

**colleagues** [5] - 10:9, 12:1, 12:16, 74:9, 74:11

**College** [11] - 19:4, 38:10, 38:11, 38:25, 112:13, 121:7, 126:17, 128:1, 128:7, 137:16, 173:6

**college** [13] - 8:15, 38:21, 38:22, 39:6, 39:7, 39:10, 39:11, 112:21, 113:9, 113:11, 134:4, 138:1, 164:1

**colleges** [3] - 23:13, 23:15

**color** [1] - 29:6

**combined** [1] - 148:16

**comfort** [4] - 89:21, 90:1, 90:5, 90:15

**comic** [2] - 62:11, 62:20

**coming** [2] - 20:13, 156:2

**comment** [2] - 61:17, 61:19

**commentary** [1] - 71:13

**comments** [3] - 73:15, 83:17, 162:4

**commitment** [3] - 5:9, 13:2, 107:19

**commitments** [3] - 10:2, 10:4

**committed** [1] - 6:8

**committee** [103] - 6:14, 7:15, 7:18, 9:6, 9:8, 9:13, 9:15, 9:16, 11:22, 13:9, 14:15, 15:15, 15:18, 15:21, 15:25, 16:2, 16:4, 16:9, 16:13, 38:13, 38:14, 38:15, 38:16, 38:19, 38:20, 38:22, 38:25, 39:2, 46:13, 46:21, 47:1, 47:11, 47:18, 48:11, 48:22, 48:23, 50:1, 51:24, 51:25, 52:25, 54:5, 54:6, 54:23, 54:24, 55:17, 55:23, 55:25, 56:2, 56:3, 56:5, 56:6, 56:7, 56:9, 56:21, 56:22, 57:11, 57:24, 58:3, 58:4, 58:6, 58:18, 58:21, 58:22, 58:23, 59:2, 59:3, 59:4, 72:2, 77:23, 78:7, 78:12, 78:24, 94:17, 97:22, 98:5, 98:9, 98:21, 99:12, 100:3, 100:8, 101:1, 101:8, 101:12, 101:23, 102:12, 102:17, 103:3, 103:5, 103:9, 103:10, 103:11, 103:21, 103:24, 104:6, 104:11, 166:13, 173:3, 174:7, 174:8

**committee's** [3] - 16:19, 101:4, 101:7

**committees** [10] - 14:20, 17:22, 50:24, 51:7, 51:9, 51:18, 95:17, 102:11, 103:8

**common** [1] - 86:22

**communications** [2] - 40:5, 65:21

**Community** [2] - 112:13, 173:6

**community** [12] - 15:2, 23:7, 24:3, 98:23, 105:25, 106:1, 106:23, 107:15, 113:9, 113:11, 134:4, 139:2

**commutation** [1] - 170:21

**commute** [2] - 148:8, 158:8

**commuting** [3] - 158:16, 158:19, 160:14

**compared** [1] - 156:14

**comparing** [1] - 111:7

**compelled** [1] - 13:10

**compensation** [2] - 29:1, 144:10

**competency** [1] - 169:7

**complain** [2] - 27:14, 71:9

**complaint** [7] - 49:22, 61:22, 63:9, 64:8, 142:21, 142:22

**complaints** [1] - 14:2

**complete** [6] - 31:8, 55:11, 170:25, 171:3, 171:5

**completed** [1] - 137:8

**composed** [1] - 13:9

**composition** [2] - 15:21, 22:17

**compromise** [1] - 34:20

**computation** [3] - 170:19, 171:23, 172:5

**computer** [1] - 22:10

**con** [1] - 40:7

**concerned** [4] - 12:16, 74:9, 74:11, 125:2

**concerning** [2] - 31:9, 45:4

**conclude** [1] - 173:21

**concluded** [1] - 3:25

**conclusion** [3] - 68:4, 86:9, 166:7

**conclusions** [2] - 57:25, 98:15

**conduct** [5] - 5:18, 15:9, 16:7, 81:10, 107:18

**conference** [4] - 3:3, 3:16, 41:10, 41:15

**conferences** [7] - 7:5, 14:6, 118:4

**confidential** [1] - 97:5

**confirm** [1] - 44:20

**conflict** [2] - 31:11, 31:19

**congress** [1] - 22:17

**connection** [7] - 4:20, 64:8, 75:1, 81:22, 92:1, 115:20, 140:4

**consent** [1] - 135:5

**consequences** [1] - 7:23

**consider** [13] - 45:3, 64:14, 97:4, 100:5, 103:10, 115:2, 121:14, 121:22, 149:23, 160:18,

161:13, 161:17, 161:18

**considerations** [1] - 171:2

**considered** [16] - 12:6, 13:4, 17:19, 58:23, 64:3, 66:22, 81:12, 101:11, 101:17, 101:18, 102:7, 105:21, 148:2, 148:4, 161:15, 162:7

**considering** [1] - 69:22

**considers** [2] - 12:7, 67:22

**consisted** [1] - 149:5

**consistent** [4] - 77:8, 140:7, 140:16, 163:24

**consists** [1] - 140:15

**constitute** [2] - 54:8, 102:7

**constituted** [1] - 15:9

**constitution** [1] - 22:16

**Constitution** [4] - 4:25, 22:19, 22:20, 23:1

**constraints** [1] - 13:14

**consultation** [1] - 103:6

**consulting** [1] - 138:6

**consumer** [3] - 148:11, 157:24, 160:11

**contact** [3] - 25:2, 25:6, 46:19

**contacted** [2] - 23:3, 106:6

**contained** [2] - 13:15, 31:14

**contains** [1] - 99:17

**contemplated** [1] - 113:15

**contemplating** [1] - 14:13

**contend** [1] - 93:16

**content** [2] - 12:2, 36:14

**contenting** [1] - 93:14

**contentions** [1] - 13:17

**context** [6] - 42:17, 42:20, 42:23, 83:11, 88:8, 170:10

**continuance** [2] - 7:7, 99:23

**continue** [3] - 27:25, 42:5, 139:7

**continued** [17] - 138:25, 144:4, 144:23, 145:11, 145:23, 146:2, 147:8, 147:9, 149:4, 149:8, 151:1, 151:6, 156:15, 157:13, 162:6, 163:18, 164:5

**continuous** [1] - 6:22

**contract** [10] - 4:8, 6:8, 6:19, 18:7, 20:5, 40:11, 49:16, 50:15, 107:25, 108:19

**contractual** [8] - 6:7, 9:11, 23:16, 50:16, 50:20, 96:12, 107:25, 108:3

**contrary** [1] - 13:16

**contrasted** [1] - 22:3

**contributing** [1] - 138:9

**contribution** [4] - 146:25, 147:12, 147:16, 147:21

**contributions** [5] - 147:9, 148:20, 149:1, 164:20, 164:21

**control** [1] - 176:22

**controversies** [1] - 39:21

**convene** [13] - 7:14, 15:20, 16:9, 48:11, 48:21, 48:23, 49:25, 50:24, 51:9, 55:17, 56:1, 58:4, 103:11

**convened** [8] - 13:9, 17:22, 55:25, 58:4, 58:18, 103:4, 104:6, 104:11

**convening** [1] - 51:17

**conversation** [1] - 44:20

**convince** [2] - 171:24, 171:25

**cooperation** [1] - 108:13

**copied** [1] - 77:14

**copy** [7] - 19:22, 24:23, 33:23, 56:21, 69:12, 106:22, 142:20

**core** [9] - 17:17, 31:12, 37:2, 37:3, 37:4, 37:8, 72:4, 83:18, 106:2

**Cornell** [1] - 19:6

**corner** [1] - 112:16

**correct** [78] - 16:23, 32:23, 32:24, 33:1,

33:14, 60:13, 64:4, 65:11, 67:19, 74:5, 74:14, 77:21, 77:25, 78:10, 78:12, 78:16, 78:17, 79:18, 81:6, 81:25, 82:2, 83:3, 83:15, 83:16, 86:5, 86:6, 93:13, 94:7, 95:5, 96:15, 96:16, 96:25, 97:1, 97:9, 97:12, 102:13, 107:22, 110:20, 111:2, 111:15, 112:14, 114:2, 114:7, 114:18, 115:1, 115:3, 121:16, 126:11, 129:22, 131:8, 139:21, 139:22, 151:15, 153:8, 153:15, 154:4, 154:9, 154:10, 154:24, 154:25, 155:5, 155:7, 156:6, 157:2, 157:17, 158:12, 158:15, 159:12, 161:6, 161:9, 161:11, 161:12, 161:24, 162:10, 163:5, 163:8, 170:6, 176:7

**correction** [1] - 94:23
**corrective** [3] - 7:3, 13:19, 13:21
**correctly** [4] - 52:5, 53:4, 53:6, 166:18
**cost** [7] - 10:3, 30:4, 30:6, 68:14, 68:15, 159:3, 159:5
**costs** [7] - 91:5, 157:15, 158:16, 158:19, 159:1, 159:17, 160:14
**council** [2] - 27:2, 27:18
**counsel** [4] - 3:4, 37:11, 95:15, 141:24
**counter** [1] - 175:19
**County** [1] - 129:4
**couple** [3] - 109:9, 153:5, 164:19
**course** [24] - 19:13, 21:10, 21:23, 21:25, 23:11, 23:19, 26:5, 29:18, 60:17, 85:6, 93:9, 109:18, 110:11, 120:9, 121:18, 121:23, 124:11, 137:8, 144:15, 148:7,

151:3, 156:23, 157:6, 164:2
**courses** [4] - 109:16, 120:10, 126:21, 139:3
**court** [11] - 78:23, 79:4, 79:7, 79:10, 79:11, 79:16, 79:17, 118:25, 139:8, 170:22
**Court** [11] - 4:2, 6:18, 6:20, 6:25, 7:19, 8:25, 16:11, 155:12, 176:3, 176:4, 176:15, 176:17, 176:18
**COURT** [169] - 1:1, 3:1, 3:8, 3:12, 4:1, 10:5, 10:7, 18:10, 20:23, 21:17, 27:23, 27:25, 31:24, 34:8, 35:1, 35:4, 35:10, 39:18, 41:21, 42:1, 42:3, 45:12, 47:9, 47:16, 47:21, 48:1, 48:5, 48:7, 48:16, 48:19, 48:25, 50:5, 51:16, 53:23, 54:13, 55:5, 56:13, 57:4, 57:6, 57:17, 58:12, 59:17, 59:20, 59:22, 60:1, 60:3, 61:25, 62:3, 64:22, 65:3, 65:5, 65:16, 66:12, 66:15, 69:2, 73:2, 75:23, 75:25, 76:2, 76:5, 76:7, 76:9, 77:1, 79:19, 81:18, 89:9, 89:12, 90:23, 100:11, 100:16, 100:19, 104:24, 105:12, 105:14, 105:18, 106:15, 106:20, 107:1, 107:4, 112:10, 118:18, 118:21, 118:24, 119:2, 119:11, 119:18, 122:25, 123:5, 123:9, 124:13, 124:17, 124:20, 124:24, 125:10, 125:20, 125:22, 126:1, 126:5, 126:8, 129:8, 129:15, 130:25, 132:1, 132:18, 132:21, 132:25, 133:4, 133:7, 133:13, 133:17, 133:21, 133:25, 134:6,

134:9, 134:12, 134:17, 134:19, 134:25, 135:7, 135:19, 135:21, 135:23, 135:25, 136:2, 136:7, 136:9, 136:18, 136:20, 139:16, 141:10, 141:13, 141:16, 141:20, 141:23, 142:1, 142:4, 152:15, 152:17, 152:20, 152:24, 165:15, 165:17, 165:20, 166:8, 167:8, 167:11, 167:14, 167:17, 167:21, 167:25, 168:3, 168:6, 168:9, 168:11, 170:13, 170:15, 172:17, 173:17, 173:19, 173:25, 174:10, 174:14, 174:24, 175:2, 175:4, 175:12, 175:14, 175:18, 175:23
**COURTROOM** [1] - 1:9
**Courts** [1] - 141:1
**courts** [1] - 139:12
**cover** [1] - 168:2
**covered** [1] - 21:24
**Cox** [1] - 93:20
**create** [2] - 79:7, 139:4
**created** [12] - 8:7, 8:24, 10:11, 10:21, 11:20, 33:13, 34:25, 35:12, 36:13, 39:6, 39:23, 170:25
**creating** [3] - 15:10, 38:1, 75:3
**credentials** [1] - 164:16
**credit** [4] - 28:12, 28:15, 28:23, 82:2
**Creeley** [6] - 23:8, 77:14, 77:15, 77:16, 102:16, 133:11
**Creeley's** [1] - 26:13
**cries** [1] - 83:17
**criteria** [2] - 150:15, 150:18
**criticisms** [2] - 152:2, 152:8
**criticizing** [1] - 5:8
**cross** [11] - 47:6, 47:14, 47:16, 59:17, 60:3, 62:3, 64:16, 100:19, 135:16,

152:20, 165:25
**CROSS** [4] - 2:2, 60:5, 139:18, 153:1
**cross-examine** [6] - 47:6, 47:14, 47:16, 59:17, 60:3, 152:20
**crossed** [2] - 64:17, 87:14
**crowd** [3] - 28:24, 30:1, 39:13
**CRR** [3] - 176:3, 176:14, 176:17
**cultural** [1] - 24:11
**curly** [1] - 85:22
**current** [6] - 7:25, 69:24, 138:5, 150:14, 150:19, 151:2
**curses** [1] - 4:21
**customary** [1] - 143:18
**cut** [7] - 27:5, 27:6, 45:6, 94:6, 95:2, 113:19, 113:20
**cuts** [1] - 82:6

# D

**daily** [1] - 158:8
**damages** [23] - 16:25, 18:3, 91:2, 109:6, 135:23, 139:9, 139:15, 142:9, 144:2, 155:12, 155:20, 170:3, 170:5, 170:9, 170:17, 170:19, 170:21, 170:23, 171:4, 171:23, 171:24, 172:1, 172:6
**dance** [1] - 43:15
**Danish** [5] - 61:11, 85:14, 85:17, 85:19, 85:20
**data** [12] - 123:10, 145:4, 146:10, 146:14, 148:11, 157:23, 160:10, 162:6, 162:8, 162:15, 162:17, 163:2
**date** [17] - 19:16, 40:15, 40:21, 52:8, 52:9, 59:7, 94:11, 95:21, 138:20, 139:12, 144:14, 150:18, 151:13, 152:21, 153:13, 153:19, 176:9
**DATE** [1] - 1:11

**dated** [17] - 45:24, 53:19, 54:4, 54:19, 74:17, 94:15, 95:18, 96:3, 96:19, 103:2, 105:8, 109:21, 109:23, 143:4, 143:11, 145:19, 168:19
**dates** [1] - 176:9
**days** [9] - 5:13, 5:22, 6:9, 12:13, 14:14, 40:22, 72:7, 113:16, 158:9
**daytime** [1] - 28:14
**deal** [4] - 78:21, 79:24, 126:5, 172:1
**dealing** [1] - 29:7, 164:9
**dealings** [1] - 40:8
**deals** [2] - 73:13, 73:14
**dean** [3] - 8:14, 60:23, 63:16
**Dean** [4] - 41:4, 41:12, 60:22, 105:9
**dear** [1] - 45:24
**debate** [2] - 29:23, 30:4
**December** [8] - 27:17, 74:17, 75:2, 87:7, 133:18, 147:11, 164:24, 165:1
**decided** [6] - 6:14, 11:8, 38:3, 55:11, 56:24, 97:19
**decision** [32] - 6:17, 7:15, 7:16, 9:18, 16:4, 16:10, 17:23, 26:25, 36:3, 51:10, 55:18, 55:19, 57:13, 58:20, 77:25, 78:3, 78:6, 78:9, 78:15, 79:1, 81:4, 93:11, 93:12, 94:17, 95:9, 96:9, 101:22, 105:3, 111:11, 142:2, 166:16
**decisions** [4] - 11:23, 13:1, 13:3, 13:8
**decline** [1] - 99:21
**declined** [2] - 45:4, 75:16
**deduction** [1] - 148:21
**defect** [2] - 11:16
**Defendant** [1] - 1:18
**defendant** [3] - 3:14, 4:7, 4:12
**Defendant's** [45] - 64:25, 65:19, 68:21, 69:4, 72:25, 75:20,

75:21, 76:14, 76:24, 77:3, 77:13, 87:8, 88:1, 88:3, 89:11, 89:14, 90:21, 115:7, 118:7, 131:17, 131:18, 131:19, 131:20, 131:23, 131:24, 132:9, 132:10, 132:11, 132:14, 132:15, 133:1, 133:4, 134:13, 169:23, 173:13

**defendant's** [4] - 134:20, 134:21, 151:25, 152:2

**defense** [5] - 18:8, 56:23, 56:24, 78:19, 91:5

**define** [1] - 157:12

**degree** [9] - 9:23, 19:5, 19:7, 120:4, 121:15, 137:4, 137:6, 137:8, 151:18

**deleted** [2] - 3:20, 3:21

**deliberated** [1] - 14:20

**delivered** [1] - 123:3

**demand** [3] - 22:8, 29:25, 30:3

**demonstrate** [2] - 11:7, 11:19

**demonstrated** [1] - 169:7

**demonstrates** [1] - 13:2

**demonstrating** [1] - 51:17

**denied** [4] - 6:11, 9:4, 9:6, 13:6

**deny** [1] - 92:6

**Department** [5] - 117:23, 146:10, 162:6, 162:8, 162:17

**department** [6] - 19:18, 19:19, 56:8, 87:11, 121:13, 138:2

**departmental** [1] - 24:9

**depicted** [6] - 15:11, 84:10, 84:11, 84:12, 85:17, 92:9

**depicting** [7] - 5:12, 10:12, 44:23, 83:3, 83:4, 84:9, 86:12

**depicts** [1] - 107:15

**deposed** [2] - 109:6, 121:11

**deposition** [11] - 8:3, 8:21, 92:12, 127:6,

142:20, 174:2, 174:12, 174:20, 174:25, 175:10, 175:16

**depositions** [1] - 174:10

**describe** [1] - 161:14

**described** [2] - 155:15, 160:10

**design** [1] - 139:4

**designated** [2] - 6:22, 174:24

**designations** [3] - 174:13, 174:14, 175:20

**designed** [1] - 14:4

**despite** [3] - 55:16, 106:24, 107:1

**detailed** [1] - 32:12

**details** [4] - 53:1, 80:10, 80:17, 120:25

**determination** [8] - 3:5, 100:7, 101:2, 109:1, 140:21, 140:23, 164:12, 164:13

**determine** [14] - 3:22, 101:5, 144:24, 145:2, 145:7, 145:13, 145:15, 146:15, 147:11, 147:25, 148:22, 151:5, 154:19, 160:9

**determined** [15] - 14:25, 15:6, 16:5, 103:7, 144:1, 144:2, 145:10, 145:25, 147:16, 148:12, 150:2, 160:7, 161:12, 162:11, 162:13

**determines** [3] - 103:4, 103:20, 156:12

**determining** [1] - 78:3

**dictionary** [2] - 103:13, 104:13

**difference** [1] - 60:18

**differences** [2] - 103:15, 103:22

**different** [17] - 12:25, 15:22, 22:5, 22:12, 22:22, 31:7, 48:2, 85:4, 103:5, 103:9, 103:21, 103:25, 104:12, 115:6, 125:13, 164:2

**differs** [1] - 155:14

**digit** [1] - 20:4

**dire** [1] - 139:16

**DIRECT** [4] - 2:2, 18:14, 136:21, 142:7

**direct** [5] - 59:7, 164:23, 167:1, 174:21, 176:22

**directly** [3] - 81:15, 93:20, 93:22

**director** [3] - 24:21, 37:15, 137:20

**disagree** [3] - 54:21, 159:13, 159:14

**disagreed** [3] - 57:24, 102:17, 166:15

**disciplinary** [3] - 7:2, 13:20, 103:3

**discipline** [14] - 7:1, 9:17, 13:15, 13:17, 14:11, 15:4, 15:19, 15:23, 46:7, 53:5, 56:2, 58:19, 80:22, 173:2

**disclosure** [1] - 97:6

**discomfort** [1] - 90:2

**discontinuation** [1] - 169:11

**discontinued** [2] - 6:23, 169:5

**discretion** [1] - 104:16

**discuss** [6] - 8:5, 8:25, 11:18, 22:18, 46:6, 135:9

**discussed** [3] - 43:8, 48:20, 135:7

**discussion** [4] - 3:7, 3:25, 15:14, 30:14

**discussions** [3] - 30:20, 32:7, 42:13

**dismiss** [1] - 7:16

**dismissal** [7] - 7:6, 7:13, 7:17, 7:18, 13:25, 14:10, 170:23

**dismissed** [1] - 8:17

**dispute** [5] - 47:21, 47:23, 48:4, 93:17, 172:2

**disputed** [2] - 11:13, 100:2

**disputes** [1] - 11:16

**disrupt** [1] - 175:12

**disseminated** [2] - 10:11, 11:21

**disseminating** [1] - 107:14

**dissertation** [1] - 120:8

**distance** [4] - 110:21, 110:25, 129:9, 148:6

**DISTRICT** [2] - 1:1, 1:1

**District** [4] - 176:4, 176:18, 176:18

**diverse** [1] - 106:1

**division** [1] - 120:10

**doctoral** [1] - 137:9

**document** [38] - 3:8, 3:22, 19:21, 21:1, 25:12, 30:10, 32:2, 45:15, 47:4, 47:5, 49:3, 49:7, 52:14, 54:1, 56:17, 57:9, 57:20, 94:3, 94:4, 94:9, 95:6, 96:22, 97:15, 99:14, 99:15, 101:22, 102:4, 102:15, 112:8, 121:3, 127:24, 129:17, 145:19, 146:5, 151:11, 168:16, 169:24

**documentation** [1] - 143:1

**documents** [16] - 45:20, 91:10, 119:18, 119:20, 119:22, 122:20, 127:13, 127:23, 142:15, 142:19, 142:22, 143:5, 143:16, 143:24, 144:1, 147:10

**dollars** [6] - 9:25, 29:4, 29:15, 29:17, 85:8, 146:7

**DONALD** [1] - 1:19

**done** [18] - 17:8, 18:5, 65:13, 71:8, 72:22, 79:2, 81:12, 81:14, 91:3, 93:21, 111:21, 122:10, 127:3, 136:4, 146:18, 167:2, 171:8, 171:16

**Donnie** [2] - 10:9, 60:9

**door** [11] - 60:24, 60:25, 61:10, 63:4, 63:5, 85:11, 85:12, 86:2, 86:3, 105:24, 106:22

**doors** [1] - 63:24

**dorm** [1] - 90:10

**doubt** [1] - 9:20

**down** [53] - 5:3, 20:1, 20:5, 26:2, 26:5, 26:6, 26:9, 26:12, 26:20, 28:23, 28:24, 30:16, 31:3, 41:14, 43:16, 43:21, 53:1, 61:1, 62:11, 62:16, 62:17, 62:18, 63:12, 63:14, 63:17, 63:18, 63:19, 63:20, 63:23, 67:21, 68:17, 70:5,

71:10, 71:21, 71:22, 74:8, 82:14, 84:14, 88:10, 92:20, 92:22, 92:23, 92:25, 105:20, 105:21, 106:6, 107:5, 112:25, 131:10, 136:7, 165:18, 167:23

**Downfall** [16] - 5:11, 5:12, 5:17, 5:20, 5:22, 33:14, 33:16, 33:19, 33:20, 33:24, 34:16, 34:17, 35:13, 35:24, 83:7, 84:4

**downs** [1] - 42:12

**downward** [2] - 147:23, 148:13

**dozen** [1] - 138:19

**dozens** [2] - 17:12

**Dr** [138] - 8:11, 8:14, 8:20, 8:22, 9:5, 9:14, 9:15, 10:11, 10:14, 10:21, 10:24, 11:2, 11:5, 11:7, 11:12, 11:19, 11:22, 11:23, 11:25, 12:5, 12:23, 13:2, 13:4, 13:13, 13:16, 14:11, 15:1, 15:8, 16:11, 16:19, 16:22, 17:1, 17:5, 17:11, 17:17, 17:19, 17:21, 18:2, 18:6, 21:23, 25:25, 34:19, 44:12, 45:24, 46:9, 47:5, 47:7, 47:11, 47:24, 50:15, 51:8, 69:12, 80:21, 86:5, 86:7, 88:14, 91:13, 92:8, 92:10, 93:13, 93:14, 93:17, 95:2, 95:25, 96:8, 96:20, 101:21, 101:25, 105:16, 106:21, 107:18, 115:2, 126:10, 131:5, 135:5, 135:12, 136:15, 143:1, 143:4, 143:13, 144:4, 144:12, 144:22, 144:25, 145:2, 145:8, 145:10, 145:14, 145:19, 145:22, 145:25, 146:2, 146:15, 146:21, 146:23, 147:2, 147:7, 147:12, 147:18, 148:14, 149:1, 149:8,

149:15, 150:2,
150:8, 150:22,
151:1, 151:6,
151:14, 153:7,
153:10, 153:15,
153:18, 153:22,
154:23, 155:3,
156:5, 156:8, 157:9,
157:23, 158:5,
158:9, 160:1,
160:19, 160:23,
162:1, 163:21,
164:4, 164:12,
164:13, 173:14,
173:24, 174:1,
174:5, 174:6, 174:7,
175:17
**draft** [1] - 87:12
**drastic** [1] - 81:13
**draw** [3] - 82:11,
87:20, 170:22
**drawings** [1] - 85:16
**drawn** [1] - 86:8
**dressed** [1] - 62:21
**Drew** [1] - 137:15
**DRIVE** [1] - 1:20
**drive** [2] - 110:21,
158:19
**driveways** [1] - 90:10
**driving** [1] - 111:6
**drop** [1] - 82:5
**drove** [3] - 25:24,
110:18, 158:9
**dually** [1] - 98:21
**due** [2] - 23:18, 166:12
**duly** [2] - 18:13,
136:11
**Dunleavy** [6] - 8:22,
9:2, 41:10, 43:19,
175:21, 175:22
**Dunleavy's** [1] - 44:19
**duplicates** [1] -
120:21
**during** [11] - 5:16,
7:11, 21:21, 30:20,
91:25, 92:17, 127:2,
145:9, 153:25,
165:25, 167:1
**duty** [2] - 124:15,
125:19
**dye** [1] - 89:7

### E

**e-mail** [65] - 3:11,
3:12, 12:15, 24:25,
25:3, 25:6, 25:7,
25:25, 26:7, 26:11,
28:5, 28:8, 28:10,
32:15, 32:19, 32:22,

40:19, 40:22, 41:18,
42:7, 45:18, 45:21,
46:5, 51:3, 52:16,
52:18, 56:20, 58:8,
61:2, 65:20, 68:20,
69:5, 69:7, 69:9,
69:17, 70:19, 71:5,
73:8, 73:9, 73:21,
74:17, 76:11, 77:3,
77:7, 77:13, 77:18,
87:7, 87:9, 88:3,
89:14, 90:24, 99:16,
102:15, 102:22,
103:1, 103:6,
106:22, 109:21,
109:22, 128:21,
130:7, 133:10,
133:18, 134:22,
173:14
**e-mailed** [5] - 24:23,
70:21, 127:9,
127:13, 129:18
**e-mailing** [3] - 69:20,
69:22, 70:16
**e-mails** [9] - 3:9, 3:18,
42:6, 46:20, 98:22,
127:17, 127:20,
133:22, 134:14
**Eagles** [2] - 35:25,
36:1
**early** [19] - 4:9, 44:18,
114:20, 116:20,
116:25, 143:9,
144:7, 147:1, 150:8,
150:12, 150:16,
150:22, 150:25,
151:9, 166:10,
171:20, 171:23,
172:7
**earn** [4] - 163:8,
163:18, 164:5,
164:11
**earned** [15] - 144:4,
145:14, 145:16,
145:23, 147:18,
149:2, 149:11,
149:17, 150:4,
153:11, 153:12,
163:22, 163:23,
164:4, 164:7
**earning** [2] - 153:18,
153:23, 163:11,
163:16, 164:7
**earnings** [22] - 87:4,
143:2, 143:13,
144:3, 144:21,
144:22, 146:11,
146:15, 146:20,
147:13, 147:20,
147:21, 147:24,

148:15, 148:23,
154:8, 154:13,
156:10, 156:11,
156:14, 157:18,
157:25
**easier** [2] - 69:13,
69:14
**East** [1] - 18:23
**Eastern** [1] - 138:10
**easy** [1] - 33:16
**econometrics** [4] -
120:9, 124:7,
124:10, 130:12
**economic** [17] - 9:23,
10:3, 125:5, 130:8,
139:9, 139:15,
140:19, 140:24,
141:3, 144:2,
144:12, 151:12,
151:18, 153:22,
154:18, 155:20,
164:16
**economics** [41] - 19:5,
19:6, 21:22, 22:8,
22:15, 109:15,
115:9, 116:14,
117:11, 118:16,
119:6, 120:2, 120:7,
122:15, 123:13,
123:14, 123:15,
123:22, 124:3,
124:4, 127:24,
128:2, 128:12,
128:24, 129:25,
130:12, 137:4,
137:6, 137:8,
137:11, 137:23,
138:2, 138:8,
138:14, 138:16,
138:21, 138:24,
139:1, 140:17
**Economics** [4] -
137:21, 137:25,
138:10, 138:11
**economist** [7] - 9:22,
117:3, 117:19,
137:21, 141:9,
151:25, 170:18
**economist's** [1] -
143:19
**economists** [2] -
140:8, 171:10
**ed** [2] - 116:19, 116:25
**Ed** [1] - 56:7
**edges** [1] - 172:3
**educate** [1] - 140:15
**educating** [1] - 139:1
**Education** [5] - 4:20,
23:4, 116:15,
127:11, 127:12

**education** [11] - 17:13,
19:7, 19:9, 22:6,
116:4, 116:5,
116:13, 139:3,
146:12, 161:4,
162:17
**educational** [3] -
13:23, 19:3, 137:3
**Edward** [1] - 9:15
**effect** [3] - 20:1, 22:7,
80:23
**effective** [5] - 14:1,
55:13, 105:4, 143:8,
147:15
**effort** [3] - 78:20,
135:3, 171:6
**efforts** [2] - 153:15,
153:23
**egregious** [1] - 11:24
**eight** [3] - 156:10,
156:11, 156:15
**either** [13] - 7:15, 7:23,
24:12, 25:10, 72:8,
96:13, 123:22,
123:23, 124:3,
124:8, 129:1,
159:24, 174:5
**elaborate** [1] - 152:5
**elect** [1] - 150:16
**elected** [1] - 51:9
**electrician** [6] -
163:15, 163:18,
164:1, 164:6, 164:7,
164:8
**elements** [1] - 144:2
**elicit** [1] - 106:11
**eligible** [6] - 82:11,
147:1, 150:16,
150:22, 150:25,
151:9
**embarrassing** [1] -
10:23
**embarrassment** [1] -
82:25
**embassies** [2] - 61:11,
85:20
**embezzled** [1] - 39:8
**emergency** [1] -
121:23
**employability** [6] -
153:21, 153:23,
154:3, 154:18,
163:13, 164:15
**employed** [7] - 66:3,
137:19, 144:5,
144:25, 146:12,
153:11, 164:14
**employee** [5] - 84:8,
97:6, 97:7, 97:8,
116:3

**employees** [1] - 8:1
**employer** [5] - 146:25,
147:9, 147:16,
147:19, 147:21
**employers** [5] -
115:12, 115:19,
117:7, 117:13
**employment** [26] -
4:9, 6:4, 6:17, 11:4,
19:11, 46:2, 55:12,
55:19, 57:14, 58:20,
74:23, 94:18, 97:23,
105:3, 144:23,
145:11, 146:2,
146:22, 146:24,
147:3, 147:8, 151:2,
154:8, 154:13,
155:16, 157:14
**enclosed** [1] - 108:10
**encourage** [2] - 4:15,
23:15
**end** [25] - 11:17,
16:23, 17:20, 41:10,
67:8, 67:14, 70:23,
95:6, 95:25, 96:13,
98:13, 108:23,
145:11, 145:14,
145:23, 146:16,
147:18, 148:19,
148:23, 149:2,
149:9, 152:22,
166:13, 172:23,
175:9
**ended** [1] - 91:9
**ends** [2] - 14:4, 112:5
**engage** [2] - 117:21,
117:22
**engaged** [1] - 169:15
**engagements** [1] -
138:23
**engaging** [1] - 125:1
**ENGLISH** [162] - 1:19,
3:11, 20:22, 21:16,
27:20, 31:23, 34:11,
34:13, 34:23, 35:2,
35:8, 39:17, 41:19,
41:22, 42:2, 45:11,
47:4, 47:13, 47:20,
47:23, 48:3, 48:6,
48:18, 50:4, 51:15,
53:22, 54:12, 55:4,
56:12, 57:2, 57:5,
57:16, 58:11, 59:19,
59:21, 59:25, 60:6,
62:2, 62:5, 62:24,
63:1, 64:20, 64:23,
64:25, 65:2, 65:6,
65:18, 66:14, 66:18,
66:20, 68:21, 68:24,
69:1, 69:3, 70:18,

72:24, 73:3, 75:20, 76:1, 76:10, 76:24, 77:2, 79:21, 79:22, 81:19, 88:3, 88:7, 89:10, 89:13, 90:20, 90:24, 91:8, 100:17, 100:22, 102:25, 104:7, 104:20, 104:25, 105:15, 105:19, 106:18, 106:21, 107:6, 107:7, 112:7, 112:11, 118:19, 118:23, 119:1, 119:4, 119:13, 119:19, 122:19, 123:19, 124:15, 124:19, 124:22, 125:3, 125:12, 125:21, 125:24, 126:3, 126:7, 126:9, 129:11, 129:16, 130:23, 131:4, 131:13, 131:16, 132:3, 132:7, 132:9, 132:23, 133:2, 133:5, 133:8, 133:10, 133:14, 133:18, 133:22, 134:1, 134:3, 134:7, 134:10, 134:13, 134:18, 134:21, 135:1, 135:10, 136:13, 136:19, 139:17, 139:20, 141:5, 141:12, 141:15, 141:19, 141:22, 141:25, 152:6, 153:2, 165:13, 166:6, 167:4, 167:10, 167:12, 167:15, 167:19, 167:23, 168:4, 168:7, 168:10, 170:12, 170:14, 172:16, 173:12, 174:17, 174:22, 175:8, 175:19, 175:25
**English** [8] - 5:17, 10:9, 60:9, 123:7, 132:4, 165:25, 169:24, 172:19
**enjoyment** [1] - 89:24
**ensured** [2] - 77:19, 77:21
**entered** [2] - 20:10, 61:7
**entire** [1] - 31:3
**entitled** [1] - 18:8

**enumerated** [2] - 22:17, 22:21
**environment** [1] - 37:5
**equal** [3] - 147:12, 148:14, 155:13
**equating** [1] - 84:24
**Erin** [3] - 9:5, 54:4, 54:21
**especially** [1] - 23:13
**ESQ** [4] - 1:15, 1:19, 1:19, 1:22
**essence** [2] - 10:15, 71:16
**essentially** [1] - 82:5
**establish** [1] - 18:7
**estate** [1] - 88:9
**estimate** [6] - 154:22, 155:11, 160:8, 163:7, 163:11, 175:6
**estimated** [8] - 150:24, 151:13, 155:8, 157:19, 159:19, 159:20, 162:13, 162:21
**et** [2] - 28:23
**evening** [5] - 28:10, 28:15, 28:16, 29:16, 29:18
**event** [5] - 16:16, 16:21, 26:1, 30:22, 81:21
**events** [4] - 73:13, 73:14, 106:8, 116:12
**eventually** [2] - 59:10, 99:11
**evidence** [55] - 3:9, 4:10, 7:24, 8:4, 8:22, 11:5, 11:7, 11:14, 11:19, 12:23, 13:4, 13:7, 13:16, 14:25, 15:8, 15:16, 16:8, 16:12, 16:13, 16:23, 17:3, 17:11, 18:6, 20:21, 21:15, 31:22, 34:6, 34:14, 35:7, 39:16, 45:10, 48:15, 50:3, 51:14, 51:17, 53:21, 54:7, 54:11, 55:3, 56:11, 57:15, 58:10, 64:21, 68:22, 83:18, 100:13, 102:6, 104:21, 104:22, 105:1, 112:8, 131:17, 166:25, 167:2, 172:15
**evidentiary** [2] - 3:4, 3:6
**exact** [4] - 31:9, 34:22, 52:9, 155:13

**exactly** [7] - 14:18, 23:23, 30:15, 106:4, 109:2, 161:12, 163:24
**examination** [4] - 62:4, 100:19, 165:25, 167:1
**EXAMINATION** [7] - 18:14, 60:5, 136:21, 139:18, 142:7, 153:1, 165:23
**examinations** [1] - 137:9
**examine** [11] - 38:13, 47:6, 47:14, 47:16, 58:24, 59:2, 59:17, 60:3, 101:7, 152:20, 166:14
**examined** [4] - 54:6, 58:22, 59:2, 151:24
**examining** [2] - 52:1, 52:3
**example** [9] - 35:23, 101:7, 119:25, 120:1, 143:7, 144:2, 158:2, 164:8, 171:18
**examples** [3] - 61:3, 112:23, 140:6
**Excel** [1] - 120:13
**excellent** [1] - 82:4
**except** [5] - 37:22, 97:7, 137:23, 166:18, 172:2
**excess** [8] - 144:10, 154:22, 154:23, 155:2, 155:11, 156:7, 156:12, 157:5
**exchanges** [1] - 32:15
**exclude** [1] - 141:8
**excuse** [4] - 76:4, 91:18, 112:13, 136:18
**execute** [1] - 83:18
**executive** [3] - 27:2, 27:18, 44:23
**exercise** [2] - 54:22, 85:15
**exercising** [1] - 7:21
**exhibit** [103] - 7:1, 19:20, 20:16, 20:20, 20:24, 21:14, 30:9, 31:21, 32:1, 34:4, 34:6, 34:11, 34:12, 35:7, 36:12, 39:15, 39:16, 44:14, 45:9, 45:13, 46:23, 48:14, 48:16, 48:17, 49:1, 50:3, 50:6, 51:6, 51:13, 52:13, 53:20, 53:25, 54:10, 54:14,

55:2, 55:6, 56:10, 56:14, 56:15, 57:1, 57:7, 57:15, 57:18, 58:10, 58:14, 64:20, 65:19, 68:20, 69:4, 73:4, 73:6, 73:7, 73:8, 90:20, 90:24, 93:25, 94:24, 95:18, 97:3, 99:16, 101:20, 102:21, 104:21, 105:2, 107:8, 112:8, 112:15, 118:6, 121:3, 122:14, 127:1, 127:22, 129:12, 129:13, 131:21, 131:22, 131:23, 131:25, 132:5, 132:11, 132:12, 132:13, 132:15, 142:12, 161:3, 166:23, 167:14, 167:17, 167:21, 168:2, 168:12, 169:13, 172:15, 173:12
**Exhibit** [47] - 64:25, 65:19, 68:21, 69:4, 72:25, 75:20, 75:21, 76:14, 76:24, 77:3, 77:13, 87:8, 88:1, 88:3, 89:11, 89:14, 90:21, 115:7, 118:8, 131:17, 131:18, 131:19, 131:20, 131:23, 131:24, 132:9, 132:10, 132:11, 132:12, 132:14, 132:15, 132:22, 133:1, 133:4, 134:13, 169:23, 173:13
**exhibits** [8] - 6:19, 118:6, 131:16, 132:1, 132:17, 132:20, 167:1, 167:3
**exist** [1] - 85:5
**expand** [1] - 39:13
**expansive** [1] - 95:3
**expect** [1] - 173:22
**expected** [3] - 131:6, 131:9, 131:11
**expenditure** [3] - 148:11, 157:24, 160:11
**expenses** [25] - 147:25, 148:2, 148:10, 148:14, 148:21, 157:8, 157:9, 157:12, 157:14, 157:19,

157:25, 158:2, 158:21, 159:12, 159:16, 159:17, 159:19, 160:3, 160:4, 160:5, 160:8, 160:9, 160:14, 160:23
**expensive** [1] - 39:12
**experience** [4] - 122:7, 145:5, 145:6, 154:7
**expert** [30] - 124:22, 125:24, 135:3, 135:19, 139:8, 139:15, 142:3, 142:9, 142:13, 142:15, 143:17, 143:23, 151:24, 152:3, 152:8, 152:10, 152:11, 153:21, 153:22, 154:3, 154:18, 155:9, 163:13, 163:14, 164:15, 164:16, 171:7, 171:14
**expert's** [1] - 135:15
**expertise** [1] - 164:17
**experts** [1] - 143:18
**explain** [14] - 8:7, 9:3, 33:4, 36:14, 36:15, 42:10, 42:20, 43:14, 45:2, 45:6, 73:20, 91:25, 92:2, 111:2
**explained** [5] - 65:21, 106:6, 150:11, 171:3, 171:4
**explanation** [4] - 5:24, 32:12, 92:3, 95:3
**express** [4] - 139:23, 141:20, 152:10, 153:14
**expressed** [1] - 154:11
**expressing** [1] - 140:9
**expressly** [1] - 108:1
**extension** [1] - 91:14
**extent** [8] - 11:15, 47:13, 104:20, 104:21, 141:5, 152:9, 167:16, 167:20
**extra** [3] - 28:12, 28:15, 28:22
**eyes** [1] - 66:25

**F**

**face** [4] - 12:7, 67:1, 80:1, 80:4

**Facebook** [3] - 39:20, 39:23, 40:1
**fact** [29] - 12:2, 14:18, 14:21, 15:10, 15:14, 17:9, 34:21, 34:24, 37:25, 55:16, 74:4, 98:9, 124:19, 129:8, 140:23, 142:23, 146:6, 147:7, 148:7, 151:1, 153:21, 159:8, 162:19, 162:20, 162:23, 163:20, 164:10, 165:4, 166:17
**factor** [2] - 153:25, 160:3
**factored** [1] - 154:1
**facts** [4] - 4:6, 15:7, 16:17, 100:13
**factually** [1] - 11:6
**faculty** [86] - 4:12, 6:14, 6:23, 7:8, 7:9, 7:13, 7:14, 7:15, 7:16, 7:18, 7:19, 9:6, 9:8, 12:25, 13:10, 14:23, 15:24, 16:1, 19:25, 24:17, 26:8, 26:11, 27:10, 32:6, 32:12, 32:20, 38:14, 40:20, 46:13, 47:1, 50:1, 50:23, 51:7, 51:20, 52:6, 52:10, 52:20, 52:21, 52:24, 54:5, 55:23, 57:23, 58:18, 58:25, 59:14, 60:12, 62:10, 67:13, 67:14, 69:9, 70:17, 76:19, 77:23, 78:7, 78:20, 94:17, 95:8, 96:8, 97:2, 98:14, 98:18, 98:21, 99:1, 99:22, 99:23, 100:3, 101:1, 103:3, 104:10, 105:24, 107:19, 107:20, 107:21, 112:22, 113:4, 124:6, 125:5, 137:14, 143:11, 168:19, 173:3, 174:7, 174:8
**FAGAL** [6] - 1:3, 2:3, 18:12, 60:4, 131:3, 165:22
**Fagal** [111] - 3:2, 4:3, 10:11, 10:14, 10:21, 11:2, 11:7, 11:12, 11:19, 11:25, 12:3, 12:5, 12:24, 13:2, 13:4, 13:13, 14:11, 15:8, 16:11, 16:19,

16:22, 17:1, 17:5, 17:11, 17:17, 17:19, 17:21, 18:2, 18:6, 18:11, 25:25, 34:4, 34:12, 34:19, 42:7, 45:24, 46:23, 47:7, 47:11, 47:24, 48:17, 51:6, 51:8, 51:13, 53:15, 53:20, 60:7, 69:12, 80:21, 84:18, 91:13, 95:2, 96:1, 96:8, 96:10, 96:20, 102:23, 105:16, 106:21, 109:22, 115:2, 126:10, 129:19, 131:5, 133:11, 133:18, 135:12, 142:12, 143:3, 143:14, 144:4, 144:12, 144:22, 144:25, 145:8, 145:10, 145:14, 145:18, 145:22, 146:2, 146:6, 146:21, 146:23, 147:2, 147:7, 147:18, 149:1, 149:8, 149:15, 150:3, 150:22, 151:1, 151:6, 151:14, 153:10, 153:18, 154:23, 155:4, 156:5, 156:8, 157:23, 158:5, 158:9, 160:1, 160:19, 162:2, 163:22, 164:4, 164:12, 164:13, 173:14
**Fagal's** [26] - 10:24, 11:5, 11:23, 13:16, 15:1, 16:5, 16:17, 47:5, 50:15, 105:14, 107:19, 135:5, 143:1, 143:4, 145:3, 145:20, 145:25, 146:15, 147:13, 148:15, 150:8, 153:7, 153:15, 153:23, 157:9, 160:23
**failed** [3] - 15:15, 18:6, 58:2
**fair** [5] - 45:5, 102:9, 152:14, 160:25, 161:2
**fairly** [2] - 32:14, 160:24
**fairs** [1] - 118:4

**fall** [5] - 21:21, 29:23, 111:19, 111:22, 111:25
**fallen** [1] - 43:5
**false** [1] - 10:20
**falsely** [1] - 83:21
**familiar** [5] - 51:20, 65:23, 80:22, 107:11
**family** [5] - 10:18, 11:11, 86:15, 88:14, 89:3
**famous** [2] - 85:11, 85:22
**fans** [1] - 36:1
**far** [7] - 71:8, 71:15, 125:2, 128:5, 128:18, 129:4
**fascist** [6] - 10:16, 71:17, 71:20, 71:23, 71:25, 84:15
**fascists** [1] - 71:22
**fast** [1] - 114:3
**fatal** [1] - 15:17
**favor** [1] - 77:24
**fear** [2] - 12:17, 74:9
**fears** [1] - 11:10
**feature** [1] - 149:22
**featuring** [1] - 113:6
**February** [20] - 6:5, 49:8, 53:14, 53:19, 90:25, 92:23, 92:24, 94:23, 95:18, 95:23, 96:18, 96:19, 98:12, 98:16, 99:6, 99:25, 107:8, 108:2, 133:22, 172:21
**federal** [8] - 139:12, 155:17, 158:13, 158:20, 158:25, 159:4, 159:13, 159:14
**fee** [1] - 29:3
**felt** [3] - 5:7, 13:10, 27:10
**Fereese** [1] - 45:18
**few** [11] - 12:16, 38:17, 41:13, 43:4, 60:10, 61:10, 69:16, 71:13, 74:9, 74:22, 118:11
**field** [5] - 130:12, 130:13, 137:23, 138:14, 139:1
**fields** [1] - 120:8
**fifths** [1] - 22:16
**fifty** [1] - 9:25
**fifty-five** [1] - 9:25
**figure** [6] - 85:23, 130:17, 145:21, 148:17, 160:1
**figured** [6] - 24:19,

26:23, 76:19, 113:19, 122:12, 170:22
**figures** [2] - 149:13, 154:17
**file** [2] - 7:21, 63:9
**filed** [10] - 3:13, 49:22, 52:6, 52:10, 52:22, 61:22, 64:7, 99:12, 156:25
**files** [1] - 33:3
**filing** [1] - 6:9
**fill** [1] - 114:19
**filling** [1] - 33:2
**final** [6] - 78:2, 78:5, 78:9, 78:15, 79:1, 79:3
**finalize** [3] - 55:11, 98:14, 108:25
**finalized** [5] - 55:19, 94:19, 95:9, 96:10, 111:11
**finalizing** [1] - 108:8
**finance** [1] - 138:3
**financial** [2] - 37:18, 86:25
**findings** [4] - 6:15, 16:15, 16:19, 98:15
**fine** [6] - 24:24, 59:25, 87:21, 91:20, 124:17, 142:1
**finish** [1] - 135:13
**finished** [6] - 69:15, 120:20, 134:25, 135:16, 174:9
**FIRE** [23] - 4:22, 5:1, 5:19, 23:4, 23:8, 23:10, 23:12, 23:16, 23:23, 24:1, 24:23, 29:3, 29:12, 29:15, 31:18, 31:19, 77:16, 81:20, 106:6, 106:7, 113:2, 113:8
**fire** [18] - 12:17, 14:14, 66:9, 67:5, 68:12, 70:25, 71:7, 71:11, 71:14, 72:1, 72:10, 72:17, 72:18, 72:19, 74:10, 93:20, 166:2, 166:4
**FIRE's** [1] - 106:10
**fired** [16] - 12:3, 17:20, 65:7, 65:11, 65:12, 65:15, 66:10, 66:17, 67:2, 67:4, 74:4, 74:12, 78:20, 113:21, 166:17, 173:7
**firing** [5] - 9:24, 59:3, 72:12, 77:18, 112:24

**firm** [2] - 117:21, 117:22
**firms** [1] - 74:24
**First** [2] - 22:20, 23:13
**first** [27] - 8:9, 26:19, 35:12, 38:9, 49:15, 50:14, 50:19, 62:9, 63:19, 66:1, 66:5, 80:21, 81:16, 98:19, 101:24, 128:11, 135:10, 137:25, 143:24, 144:20, 144:24, 152:12, 162:4, 169:19, 170:8, 172:20, 173:23
**fit** [3] - 23:18, 115:24, 125:15
**fits** [1] - 71:19
**five** [19] - 9:25, 19:25, 59:21, 59:23, 72:7, 91:9, 103:24, 147:17, 147:20, 148:14, 148:20, 154:5, 157:18, 157:21, 159:19, 164:21, 165:1
**fixed** [1] - 149:18
**flagrant** [1] - 169:6
**flaws** [1] - 15:17
**flexible** [2] - 13:19, 14:1
**fliers** [2] - 90:11
**flip** [5] - 45:22, 46:23, 47:3, 49:5, 49:20
**flipping** [2] - 95:21, 99:3
**focus** [3] - 49:11, 49:20, 55:14
**Foley** [8] - 8:14, 8:17, 8:20, 41:4, 41:12, 43:13, 43:16, 175:17
**folks** [1] - 32:15
**follow** [2] - 10:25, 166:12
**followed** [10] - 11:14, 13:6, 16:22, 27:16, 52:2, 52:4, 53:4, 53:6, 101:6, 166:11
**following** [10] - 3:7, 4:11, 11:4, 17:15, 17:17, 20:1, 29:13, 111:20, 112:1, 158:18
**follows** [2] - 18:13, 136:12
**food** [1] - 26:24
**foolish** [1] - 72:5
**foot** [1] - 171:20
**football** [5] - 35:25,

36:1, 36:3, 83:10, 84:7
**footnote** [1] - 161:14
**FOR** [2] - 1:1, 2:2
**forego** [1] - 98:14
**foregoing** [3] - 176:7, 176:10, 176:21
**Forensic** [1] - 138:11
**forget** [1] - 166:24
**forgive** [1] - 89:21
**forgot** [4] - 166:25, 172:14, 172:15, 175:22
**form** [1] - 47:24
**formally** [1] - 46:20
**formed** [2] - 38:13, 38:25
**former** [7] - 8:1, 8:2, 8:14, 38:6, 40:5, 65:21, 89:19
**formula** [2] - 150:19, 151:5
**forth** [2] - 78:19, 176:9
**forward** [9] - 52:24, 95:17, 99:11, 108:14, 110:17, 114:3, 153:12, 161:19, 171:20
**forwarded** [1] - 98:22
**fought** [1] - 112:21
**foundation** [1] - 10:25
**Foundation** [2] - 4:19, 23:3
**four** [6] - 103:25, 110:18, 122:8, 158:8, 160:16, 160:24
**four-hour** [1] - 160:24
**fourth** [1] - 169:4
**fourths** [1] - 52:25
**frame** [2] - 127:2, 154:1
**Fran** [1] - 45:18
**frankly** [2] - 15:7, 135:13
**Fred** [80] - 4:4, 4:7, 4:11, 4:13, 4:16, 4:18, 4:22, 4:25, 5:3, 5:7, 5:11, 5:14, 5:16, 5:20, 5:22, 5:23, 5:25, 6:2, 6:4, 6:7, 6:8, 6:11, 6:16, 8:5, 8:6, 8:8, 8:10, 8:13, 8:16, 8:18, 9:2, 9:7, 9:11, 9:14, 9:19, 9:21, 10:1, 10:2, 18:16, 18:18, 18:20, 19:20, 21:1, 21:19, 22:24, 30:9, 32:1, 33:23, 35:12, 36:12,

44:15, 45:15, 49:3, 49:22, 50:8, 50:13, 51:20, 52:14, 53:16, 53:25, 54:16, 55:8, 55:22, 56:17, 57:9, 57:20, 58:14, 73:19, 74:2, 76:16, 102:23, 109:22, 165:25, 168:16, 169:16, 169:21, 172:19, 173:5, 173:7
**Fred's** [8] - 4:24, 5:10, 6:14, 6:19, 9:6, 9:9, 9:21, 9:24
**FREDERICK** [6] - 1:3, 2:3, 18:12, 60:4, 131:3, 165:22
**Frederick** [5] - 4:3, 18:11, 143:3, 145:18, 146:6
**free** [27] - 4:15, 4:17, 4:23, 5:9, 23:15, 23:20, 29:12, 29:20, 29:21, 32:11, 33:9, 33:12, 33:22, 39:20, 40:7, 40:10, 76:16, 79:12, 79:14, 82:6, 85:15, 87:20, 90:15, 110:10, 112:21, 113:1
**Free** [1] - 39:23
**freedom** [1] - 169:6
**French** [1] - 38:4
**French-ified** [1] - 38:4
**Friday** [2] - 25:1, 98:16
**friends** [1] - 12:1
**fringe** [1] - 146:21
**front** [3] - 113:18, 153:7, 153:9
**frontier** [1] - 22:9
**frustration** [1] - 42:21
**fuck** [1] - 17:7
**Fuhrer** [2] - 83:13, 113:7
**full** [17] - 6:22, 19:14, 19:24, 90:7, 90:12, 111:19, 113:14, 121:17, 121:19, 122:4, 122:7, 122:9, 124:14, 124:18, 126:25, 128:12, 137:14
**full-time** [14] - 6:22, 19:24, 111:19, 113:14, 121:17, 121:19, 122:4, 122:7, 122:9, 124:14, 124:18, 126:25, 128:12,

137:14
**full-timed** [1] - 19:14
**fun** [2] - 82:12, 110:12
**fundraiser** [1] - 37:13
**funny** [1] - 87:20
**fuse** [1] - 85:25
**future** [14] - 31:11, 79:7, 144:16, 149:4, 149:5, 161:10, 161:13, 161:17, 161:20, 161:23, 162:2, 162:7, 162:11, 162:24

## G

**Gail** [5] - 26:8, 52:16, 52:18, 52:23, 56:21
**gains** [1] - 68:15
**gallons** [1] - 160:19
**gamble** [1] - 39:9
**game** [9] - 12:10, 17:8, 35:25, 36:1, 36:3, 67:25, 68:8, 68:10, 72:5
**Gannon** [2] - 24:10, 40:9
**garter** [3] - 87:17, 87:23, 87:24
**Garvey** [2] - 37:12, 37:17
**gas** [5] - 159:6, 159:22, 160:19, 160:23, 161:1
**gather** [1] - 38:24
**gears** [1] - 84:23
**gee** [1] - 31:3
**gender** [3] - 123:15, 123:22, 124:4
**gene** [1] - 22:14
**general** [8] - 26:4, 33:5, 36:9, 37:11, 61:17, 61:19, 126:13, 171:23
**generally** [7] - 15:2, 45:25, 51:23, 51:24, 54:8, 140:17, 171:21
**genetics** [1] - 22:13
**geographic** [1] - 17:14
**Geri** [4] - 69:5, 70:19, 70:21
**German** [1] - 5:12
**given** [6] - 12:2, 31:4, 108:17, 136:16, 160:24, 166:12
**glad** [1] - 42:23
**goal** [3] - 82:22, 87:20, 113:14
**goals** [2] - 37:7, 107:12

**golf** [1] - 17:8
**Google** [1] - 113:16
**goose** [1] - 87:16
**government** [1] - 145:4
**grad** [1] - 120:9
**grade** [1] - 149:19
**gradual** [2] - 7:4, 14:5
**graduate** [2] - 113:12, 138:2
**graduated** [2] - 19:4, 137:5
**grant** [5] - 94:13, 97:17, 97:21, 98:1, 136:5
**granted** [1] - 169:4
**granting** [1] - 98:25
**grants** [1] - 96:1
**grapevine** [1] - 37:19
**grave** [2] - 6:23, 169:5
**great** [1] - 38:22
**greater** [3] - 16:6, 149:21, 151:4
**grievance** [37] - 6:9, 6:10, 7:20, 7:22, 7:24, 9:7, 9:9, 15:24, 16:1, 51:24, 51:25, 52:6, 52:10, 52:22, 52:25, 53:1, 53:2, 54:5, 54:7, 54:9, 55:10, 59:1, 99:12, 99:17, 100:3, 100:8, 101:1, 101:4, 101:7, 101:12, 101:22, 102:7, 102:8
**grievances** [4] - 7:19, 9:9, 51:20, 102:5
**grimace** [1] - 72:6
**gross** [6] - 140:8, 140:18, 144:10, 155:5, 171:3
**ground** [1] - 6:8
**grounds** [4] - 53:2, 79:4, 79:11, 79:17
**group** [2] - 85:4, 145:7
**Group** [2] - 137:21, 137:25
**Grove** [2] - 88:4
**grow** [1] - 39:10
**growth** [16] - 161:2, 161:3, 161:4, 161:7, 161:10, 161:11, 161:13, 161:16, 161:17, 161:20, 161:21, 161:23, 162:2, 162:7, 162:20
**guess** [11] - 47:14, 67:13, 78:21, 89:21, 90:15, 106:7, 114:24, 118:2,

126:13, 135:11, 173:21
**guidance** [1] - 61:4
**guides** [2] - 165:6, 165:11
**guy** [2] - 38:2, 88:12
**guys** [2] - 90:8, 90:10

## H

**hair** [1] - 89:7
**half** [6] - 39:25, 93:3, 138:19, 149:16, 149:22, 162:24
**Hall** [3] - 137:5, 137:14, 139:5
**hammer** [1] - 43:5
**hand** [7] - 41:12, 61:16, 69:12, 112:16, 118:6, 171:19, 171:20
**handbook** [7] - 60:12, 97:2, 107:21, 143:11, 150:13, 168:19, 169:1
**handing** [1] - 90:11
**handle** [1] - 174:2
**hands** [1] - 90:8
**hang** [6] - 24:15, 60:23, 60:24, 61:2, 61:3
**hanging** [4] - 24:2, 24:7, 24:19, 112:25
**happy** [4] - 26:5, 174:5, 174:21, 175:4
**harassed** [2] - 79:25, 80:7
**harassment** [8] - 79:23, 80:2, 80:5, 80:8, 80:11, 80:13, 80:18, 80:19
**hard** [4] - 20:18, 113:18, 172:2, 172:11
**harm** [18] - 7:7, 8:18, 14:25, 15:2, 44:3, 44:6, 99:22, 99:25, 100:4, 100:7, 100:8, 100:14, 100:24, 101:3, 101:8, 101:16, 101:19, 102:2
**Harrington** [3] - 76:12, 173:14
**hate** [1] - 105:23
**head** [3] - 26:8, 43:15, 174:6
**headed** [1] - 85:23
**health** [3] - 146:23, 147:3, 147:4

**hear** [1] - 11:21, 13:13, 14:12, 16:16, 16:18, 20:18, 27:23, 42:3, 42:15, 61:25, 168:24
**heard** [4] - 13:11, 15:3, 119:17, 124:24
**hearing** [4] - 57:10, 100:11, 135:11, 152:12
**hearings** [2] - 14:15, 72:2
**hearsay** [5] - 27:21, 41:19, 41:23, 122:18, 123:6
**hearts** [1] - 85:2
**Heath** [2] - 37:12, 37:14
**heaven** [5] - 61:6, 61:8, 61:16, 62:12, 62:21
**held** [1] - 137:22
**Helen** [2] - 9:14, 56:6
**hell** [1] - 10:22
**help** [3] - 97:24, 99:2, 106:10
**helped** [1] - 25:20
**hereby** [1] - 176:6
**hereinbefore** [1] - 176:9
**high** [6] - 26:23, 68:15, 86:25, 88:24, 149:19, 161:8
**Higher** [3] - 116:15, 127:11, 127:12
**higher** [11] - 17:13, 116:3, 116:5, 116:13, 116:19, 116:25, 120:4, 150:25, 151:3, 159:3, 162:21
**higheredjobs.com** [1] - 116:17
**highest** [1] - 137:6
**highlight** [1] - 169:16
**highlighted** [7] - 67:21, 70:10, 74:8, 91:1, 97:3, 109:23, 115:8
**himself** [6] - 8:18, 9:3, 12:3, 17:9, 93:13, 148:5
**Hire** [1] - 116:20
**hire** [2] - 113:10, 171:14
**hired** [2] - 111:16, 111:18
**hiring** [1] - 111:21
**historic** [1] - 161:4
**historically** [1] -

149:21
**history** [8] - 109:12, 109:13, 118:17, 119:6, 120:3, 120:4, 120:5
**hit** [12] - 10:23, 12:13, 37:1, 37:10, 38:5, 39:4, 39:20, 70:11, 70:12, 89:20, 90:13
**Hitler** [28] - 5:14, 10:13, 11:4, 11:9, 12:5, 17:18, 34:18, 36:3, 38:3, 65:7, 66:6, 66:7, 66:8, 66:22, 66:23, 82:16, 83:3, 83:4, 83:6, 83:7, 83:12, 84:11, 84:12, 84:13, 88:13, 92:1, 93:15, 113:6
**Hitler's** [1] - 5:13
**Hobart** [2] - 117:3, 117:18
**Hobson's** [1] - 95:10
**hoc** [31] - 15:14, 15:18, 15:20, 16:4, 16:8, 16:10, 16:13, 16:19, 51:9, 54:23, 54:24, 55:17, 56:3, 56:20, 56:22, 57:10, 57:23, 58:23, 78:12, 78:24, 95:17, 97:22, 98:4, 99:12, 102:11, 102:12, 102:17, 103:8, 103:9, 103:10, 166:13
**hold** [1] - 132:8
**home** [8] - 25:24, 110:21, 110:25, 121:9, 126:18, 129:6, 157:15, 158:6
**homework** [1] - 171:13
**honest** [3] - 171:6, 171:8, 173:8
**Honor** [91] - 4:5, 10:6, 10:24, 20:20, 20:22, 21:14, 21:16, 27:20, 31:23, 34:5, 34:13, 39:17, 41:19, 42:2, 45:11, 47:4, 47:13, 47:23, 48:6, 48:18, 50:4, 51:13, 53:22, 54:10, 54:12, 55:2, 55:4, 56:10, 57:1, 57:2, 57:16, 58:11, 59:16, 59:19, 62:2, 64:20, 68:21, 72:24, 75:20, 75:24, 76:1, 88:1, 90:20, 104:20, 105:17, 112:7,

118:19, 124:15, 125:12, 125:21, 125:24, 126:3, 126:7, 129:12, 130:23, 131:14, 131:16, 132:3, 132:24, 134:18, 135:1, 135:2, 135:13, 136:1, 136:6, 136:13, 136:19, 139:14, 139:17, 141:5, 141:15, 141:19, 141:22, 141:25, 142:2, 152:6, 165:13, 165:16, 165:19, 166:6, 166:24, 167:12, 167:13, 167:19, 170:12, 173:23, 174:4, 175:1, 175:3, 175:8, 175:25
**HONORABLE** [1] - 1:8
**honors** [1] - 137:6
**hopes** [1] - 33:10
**horrible** [2] - 26:10, 72:7
**hot** [4] - 86:18, 86:20, 86:21, 88:19
**hour** [3] - 17:4, 127:7, 160:24
**hours** [9] - 6:2, 18:4, 91:3, 110:18, 110:24, 111:4, 128:17, 160:5, 160:16
**house** [2] - 22:17, 128:17
**huge** [1] - 171:6
**human** [2] - 8:23, 88:23
**humiliate** [3] - 82:19, 87:18, 87:23
**humiliation** [3] - 82:23, 87:19, 89:25
**humor** [1] - 88:23
**hundred** [2] - 9:25
**hundreds** [1] - 35:21
**hung** [9] - 4:25, 24:16, 25:19, 25:20, 27:4, 27:8, 30:21, 61:1, 61:5
**husband** [2] - 75:10, 89:1
**hypothetically** [1] - 173:5

# I

**idea** [11] - 22:4, 22:23,

24:9, 30:25, 32:11, 36:9, 38:11, 38:14, 80:3, 87:14, 92:25
**ideally** [1] - 171:21
**ideas** [2] - 38:20, 125:5
**identified** [3] - 132:2, 145:20, 175:20
**identify** [5] - 119:2, 119:3, 119:12, 119:14, 119:16
**identifying** [2] - 14:2, 127:17
**ified** [1] - 38:4
**ignore** [1] - 127:20
**II** [1] - 5:16
**imagine** [1] - 171:9
**immaterial** [2] - 11:17, 16:12
**immediate** [11] - 7:7, 8:18, 14:24, 15:1, 44:3, 44:6, 81:13, 99:22, 99:25, 100:14, 102:2
**immediately** [3] - 27:16, 46:3, 120:19
**impact** [4] - 144:6, 144:7, 147:5, 150:8
**impacts** [1] - 159:10
**implemented** [1] - 166:22
**implicating** [2] - 13:24, 14:9
**implies** [2] - 103:14, 103:22
**imply** [1] - 31:17
**important** [6] - 16:8, 23:20, 35:25, 36:1, 45:16, 160:16
**importantly** [3] - 27:11, 35:5, 107:18
**improper** [3] - 47:7, 54:7, 102:6
**improperly** [3] - 53:8, 101:24, 102:1
**IN** [1] - 1:1
**inappropriate** [1] - 15:9
**incapacitated** [1] - 164:11
**incident** [13] - 61:5, 61:9, 61:23, 62:18, 64:2, 64:5, 106:1, 145:1, 145:10, 150:8, 164:4
**incidents** [1] - 14:3
**include** [7] - 147:4, 147:19, 151:21, 156:10, 157:14, 160:5, 169:5

**included** [8] - 13:14, 32:14, 32:22, 95:2, 128:22, 130:8, 141:2, 142:19
**includes** [2] - 123:22, 138:13
**including** [6] - 10:14, 15:3, 112:22, 148:25, 160:4, 167:6
**income** [6] - 125:18, 135:25, 144:7, 149:18, 150:9, 157:9
**incorporated** [1] - 6:20
**incorrect** [2] - 100:7, 165:10
**increase** [8] - 146:7, 148:18, 148:20, 161:19, 162:12, 162:14, 163:1, 165:9
**increased** [2] - 146:3, 146:11, 146:16
**incur** [1] - 159:1
**incurs** [1] - 159:1
**indeed** [1] - 15:1
**independent** [2] - 58:18, 58:25
**independently** [1] - 58:24
**INDEX** [1] - 2:1
**indicate** [4] - 96:1, 140:25, 159:25, 164:25
**indicated** [2] - 156:9, 156:22
**indicates** [1] - 154:15
**indication** [3] - 110:10, 159:1, 159:24
**Individual** [2] - 4:19, 23:3
**individual** [2] - 10:14, 23:17
**individuals** [4] - 15:3, 15:11, 106:1, 163:11
**inflammatory** [2] - 77:8, 77:11
**info** [2] - 90:8, 90:9
**inform** [1] - 102:5
**informal** [1] - 13:23
**information** [38] - 25:2, 25:6, 31:4, 33:15, 33:21, 36:5, 45:3, 45:16, 56:23, 90:14, 94:10, 96:21, 97:5, 97:7, 97:20, 97:25, 98:4, 98:5, 98:10, 130:3, 142:25, 143:9, 143:12, 148:3,

148:4, 148:5, 148:9,
148:16, 150:11,
157:22, 158:1,
158:2, 158:4,
160:12, 172:8, 172:9
**informed** [6] - 26:9,
46:1, 54:6, 76:23,
106:22, 166:25
**informing** [3] - 53:18,
54:20, 57:12
**initial** [3] - 15:17, 94:1,
95:19
**initiating** [1] - 7:23
**injured** [6] - 163:15,
163:17, 163:25,
164:1, 164:8, 164:10
**injury** [9] - 163:4,
163:10, 163:14,
163:20, 163:25,
164:2, 164:3, 164:6
**inquire** [1] - 126:14
**inquired** [1] - 106:8
**inside** [2] - 116:19,
116:25
**Inside** [1] - 116:20
**instance** [2] - 13:18,
15:6
**instead** [6] - 99:11,
99:12, 122:8,
161:20, 162:1,
163:25
**institution** [1] - 147:9
**instruction** [1] - 169:7
**instructor** [1] - 121:5
**insults** [1] - 107:17
**insurance** [3] -
146:24, 147:3, 147:4
**intend** [1] - 86:16
**intended** [1] - 14:1
**intends** [1] - 10:1
**interception** [1] -
71:23
**interest** [4] - 39:24,
149:20, 149:23,
151:22
**interested** [2] - 33:21,
57:25
**interests** [1] - 112:20
**internal** [3] - 6:9, 9:7,
166:11
**International** [1] -
103:13
**international** [1] -
85:2
**internet** [3] - 33:15,
118:1, 127:2
**interpret** [1] - 66:15
**interpretation** [2] -
102:19, 104:18
**interpreted** [1] - 169:6

**intervention** [1] - 14:3
**intro** [3] - 123:20,
123:24, 124:6
**introduction** [7] -
21:23, 21:25, 22:3,
109:13, 109:20,
123:13, 123:14
**introductory** [7] -
109:18, 121:5,
121:12, 122:16,
124:2, 124:9, 126:21
**invested** [1] - 149:16
**invitation** [1] - 45:5
**invite** [3] - 23:2, 23:10,
96:10
**involved** [6] - 69:24,
75:16, 78:18, 93:9,
139:1, 139:7
**involving** [2] - 7:4,
14:5
**irrelevant** [2] - 61:24,
62:1
**Islamic** [1] - 61:11
**Islamist** [1] - 61:17
**issue** [14] - 4:17, 33:8,
33:22, 34:17, 48:2,
58:7, 75:4, 79:7,
79:12, 87:4, 101:16,
135:4, 136:14, 139:9
**issues** [6] - 4:6, 7:12,
22:16, 101:11,
101:23, 125:5
**items** [1] - 143:10
**itself** [1] - 102:4

## J

**Jackson** [2] - 21:23,
53:18
**JACKSON** [2] - 1:20,
1:23
**January** [32] - 5:22,
8:16, 8:25, 9:2,
10:15, 12:5, 32:6,
40:17, 40:18, 40:21,
44:18, 45:21, 45:24,
71:12, 71:15, 73:8,
91:17, 91:21, 94:23,
111:8, 111:13,
112:2, 112:17,
118:10, 130:7,
131:7, 133:10,
134:14, 134:22,
166:10, 172:20,
173:13
**Jeffy** [3] - 74:17,
74:18, 74:25
**Jewish** [8] - 10:14,
11:9, 38:1, 38:2,
86:10, 88:12, 88:17,

88:18
**Jihad** [1] - 29:22
**JILL** [1] - 1:22
**Jim** [3] - 74:23, 75:10,
75:11
**job** [121] - 12:8, 12:20,
17:4, 17:5, 43:2,
65:13, 67:23, 88:24,
88:25, 90:16, 101:4,
101:7, 109:24,
110:2, 110:3, 110:6,
110:14, 110:15,
110:16, 110:22,
110:24, 111:1,
111:13, 111:18,
111:22, 112:1,
112:2, 113:8,
113:13, 113:14,
113:23, 114:1,
114:4, 114:6, 114:8,
114:9, 114:11,
114:16, 114:18,
114:22, 115:5,
115:13, 115:18,
116:13, 117:12,
117:20, 118:1,
118:4, 118:9,
118:15, 119:5,
119:24, 119:25,
120:7, 120:10,
120:14, 121:16,
121:17, 121:18,
121:19, 121:21,
122:1, 122:2, 122:4,
122:5, 122:7, 122:9,
122:12, 122:14,
122:17, 122:22,
123:2, 123:6, 123:9,
123:10, 123:18,
124:5, 124:6, 124:7,
124:14, 124:18,
125:4, 125:15,
125:16, 125:17,
125:22, 126:1,
126:4, 126:12,
126:16, 126:19,
126:24, 127:3,
127:7, 127:9,
127:18, 127:23,
128:1, 128:15,
128:22, 129:23,
134:10, 147:25,
148:1, 148:13,
148:14, 148:21,
154:16, 157:8,
157:9, 157:12,
157:19, 157:25,
159:12, 159:19,
173:6
**Jobs** [1] - 119:14

**jobs** [30] - 17:1, 17:13,
17:16, 111:3, 112:3,
112:4, 114:25,
116:8, 116:9,
116:14, 117:5,
117:9, 119:9, 120:1,
120:3, 120:11,
120:12, 120:17,
120:18, 122:2,
123:16, 124:21,
125:25, 126:18,
127:16, 127:17,
127:20, 137:23
**Joe** [1] - 37:17
**joined** [1] - 137:25
**joint** [74] - 6:18, 7:1,
19:20, 20:16, 20:20,
20:24, 21:14, 30:9,
31:21, 32:1, 34:6,
36:12, 39:15, 39:16,
44:14, 45:9, 48:14,
48:16, 49:1, 50:3,
50:6, 52:13, 53:25,
54:10, 54:14, 55:2,
55:6, 56:10, 56:14,
56:15, 57:1, 57:7,
57:15, 57:18, 58:10,
58:14, 64:20, 73:4,
73:8, 93:25, 94:24,
97:3, 99:16, 101:20,
102:21, 104:21,
105:1, 107:8,
131:21, 131:22,
131:24, 132:1,
132:11, 132:12,
132:13, 132:15,
132:17, 166:23,
166:25, 167:2,
167:14, 167:17,
167:21, 168:2,
168:12, 172:15
**jointly** [1] - 8:23
**joints** [1] - 132:18
**joke** [5] - 43:14, 71:10,
88:12, 89:7, 115:24
**Jonathan** [3] - 4:3,
107:10, 108:23
**JONATHAN** [2] - 1:15,
1:15
**journal** [1] - 117:17
**journals** [1] - 117:16
**JR** [7] - 1:3, 1:19, 2:3,
18:12, 60:4, 131:3,
165:22
**judge** [1] - 171:18
**judicial** [1] - 129:8
**July** [10] - 6:16, 57:11,
57:23, 58:16, 105:1,
105:2, 111:11,
124:7, 143:11,

168:19
**June** [3] - 109:21,
109:22, 109:23
**JURY** [1] - 1:10
**jury** [1] - 27:23
**justified** [2] - 7:6,
99:22

## K

**kangaroo** [3] - 78:22,
78:23, 79:10
**Kathleen** [1] - 10:9
**KATHLEEN** [1] - 1:19
**Kathy** [1] - 135:9
**keep** [6] - 28:24, 40:2,
87:3, 88:25, 159:6,
175:13
**Kevin** [2] - 77:4
**keys** [1] - 43:18
**kick** [1] - 150:20
**kids** [4] - 10:19, 86:14,
88:20, 89:1
**killed** [1] - 85:21
**kind** [5] - 29:4, 80:4,
85:22, 94:22, 100:12
**knock** [1] - 135:17
**knocked** [2] - 120:19,
120:21
**knowing** [3] - 30:4,
73:18, 74:2
**knowledge** [6] - 21:8,
21:10, 46:9, 49:21,
55:22, 99:24
**known** [5] - 4:21, 23:4,
23:12, 71:22, 85:16
**knows** [3] - 12:22,
17:7, 113:8
**Kristin** [3] - 9:22,
136:10, 139:14
**KRISTIN** [2] - 2:6,
136:11
**Kucsma** [10] - 9:22,
135:20, 135:22,
136:10, 136:24,
139:15, 142:3,
142:9, 152:18
**KUCSMA** [2] - 2:6,
136:11
**Kurt** [1] - 105:15

## L

**labeled** [1] - 3:9
**labor** [1] - 74:23
**Labor** [5] - 117:24,
146:10, 162:6,
162:9, 162:17
**lack** [5] - 16:25, 31:9,
32:11, 58:6, 169:6

**Lake** [1] - 18:23
**LAKE** [1] - 1:20
**language** [4] - 5:12, 13:14, 13:15, 107:15
**laptop** [1] - 73:25
**large** [3] - 29:6, 39:12, 83:22
**last** [19] - 5:12, 17:2, 20:4, 20:14, 37:21, 37:24, 53:14, 55:14, 59:12, 94:8, 94:9, 108:10, 119:22, 130:13, 147:23, 155:18, 164:19, 169:14, 169:20
**lastly** [3] - 129:12, 130:7, 144:9
**late** [2] - 17:2, 114:16
**latest** [1] - 5:10
**latter** [1] - 3:16
**laughing** [1] - 67:14
**Laura** [2] - 176:3, 176:14
**LAURA** [1] - 176:17
**Lavine** [1] - 38:1
**law** [14] - 18:9, 74:23, 89:18, 97:8, 125:13, 139:3, 139:25, 140:3, 140:7, 140:13, 140:16, 140:21, 140:25, 155:22
**laws** [1] - 155:17
**lawsuit** [4] - 44:5, 91:6, 91:13, 91:14
**lawyer** [10] - 46:19, 53:17, 74:25, 75:13, 77:16, 93:10, 95:16, 96:14, 96:17, 96:24
**lawyers** [3] - 74:24, 75:17, 171:10
**laying** [1] - 106:8
**lead** [4] - 22:22, 81:13, 81:15, 88:5
**leader** [1] - 38:20
**leaders** [2] - 107:16
**leadership** [2] - 84:9, 139:6
**leading** [4] - 87:15, 100:20, 170:12, 170:14
**least** [7] - 9:24, 55:1, 56:1, 60:24, 147:23, 158:13, 160:23
**lecture** [3] - 24:4, 25:9, 126:16
**led** [4] - 7:12, 9:15, 68:3, 112:24
**left** [4] - 21:9, 93:3, 112:16, 138:25

**left-hand** [1] - 112:16
**leg** [2] - 87:16, 87:22
**legal** [20] - 4:6, 75:4, 139:2, 139:23, 140:1, 140:3, 140:4, 140:9, 140:10, 140:12, 141:6, 141:20, 142:19, 142:22, 153:9, 166:7, 172:3, 172:5
**legally** [2] - 11:6, 166:4
**legitimate** [1] - 102:7
**Lemoyne** [2] - 121:7, 121:24
**lengthy** [3] - 148:7, 175:2, 175:20
**less** [5] - 6:2, 17:3, 68:15, 127:5, 127:6
**letter** [83] - 6:3, 6:5, 6:6, 6:11, 6:17, 21:4, 31:15, 32:5, 32:14, 41:1, 46:12, 46:24, 47:2, 47:5, 47:7, 47:9, 47:10, 47:14, 47:22, 48:1, 48:3, 48:4, 48:10, 49:8, 49:12, 49:13, 49:25, 50:8, 50:12, 50:23, 51:6, 53:17, 54:4, 54:5, 54:19, 54:21, 55:9, 55:22, 57:23, 58:16, 59:7, 64:12, 69:15, 70:16, 94:1, 94:6, 94:22, 94:23, 94:24, 95:2, 95:19, 95:21, 95:25, 96:17, 96:18, 96:20, 97:16, 98:7, 98:12, 98:17, 99:7, 99:25, 101:20, 105:1, 105:2, 105:5, 105:8, 105:14, 105:15, 106:7, 106:16, 107:5, 107:8, 107:9, 107:13, 113:4, 143:3, 145:17, 145:18, 146:5, 146:14, 166:12
**letters** [6] - 37:23, 95:16, 95:18, 117:7, 172:19, 172:22
**levels** [2] - 31:5, 138:3
**Levine** [40] - 8:11, 10:16, 11:22, 15:3, 27:1, 27:16, 28:2, 28:6, 28:8, 30:15, 30:17, 30:18, 32:7, 32:16, 37:12, 37:19, 37:22, 38:4, 42:13,

43:8, 44:12, 46:9, 86:5, 86:6, 86:7, 86:23, 88:11, 88:12, 88:13, 88:14, 88:17, 92:8, 92:10, 93:13, 93:14, 93:17, 101:25, 136:15, 173:24, 174:1
**LEWIS** [2] - 1:20, 1:23
**Lewis** [1] - 53:18
**liability** [1] - 156:5
**libraries** [1] - 103:14
**library** [3] - 146:13, 161:5, 162:18
**lieutenants** [1] - 5:15
**life** [7] - 24:17, 24:20, 36:17, 36:20, 36:22, 36:23, 36:25
**likely** [6] - 12:9, 67:24, 68:7, 146:3, 161:19, 174:18
**likewise** [1] - 162:22
**limited** [1] - 138:5
**Linda** [2] - 109:21, 109:23
**Lindsey** [1] - 88:4
**line** [5] - 20:5, 64:16, 64:17, 93:24, 172:24
**lines** [6] - 20:1, 30:25, 37:6, 42:8, 89:7, 170:23
**link** [4] - 12:5, 66:22, 113:5, 130:3
**Linked** [10] - 17:9, 115:7, 115:8, 115:10, 115:14, 115:16, 115:17, 115:19, 116:1, 134:7
**linking** [1] - 171:1
**links** [6] - 12:15, 32:22, 33:1, 33:2, 76:16, 90:12
**list** [8] - 69:20, 95:3, 112:19, 112:23, 131:17, 132:5, 157:18, 168:7
**listed** [4] - 94:5, 119:9, 126:13, 127:16
**listen** [2] - 118:25, 135:15
**listened** [1] - 26:13
**listing** [3] - 127:18, 128:7, 128:20
**listings** [2] - 118:9, 127:9
**lists** [2] - 69:23, 129:23
**litigation** [2] - 91:10, 155:4
**live** [4] - 23:13, 37:8,

87:5, 111:7
**lived** [1] - 148:6
**lives** [2] - 8:20, 160:5
**living** [1] - 111:2
**LLP** [1] - 1:23
**Local** [1] - 119:14
**lode** [2] - 123:21
**logic** [1] - 172:1
**look** [46] - 19:25, 20:3, 65:19, 67:13, 68:20, 72:5, 84:17, 97:2, 99:20, 100:3, 101:14, 101:15, 103:12, 103:22, 104:1, 104:8, 104:13, 107:10, 112:6, 115:14, 116:17, 116:20, 116:25, 117:17, 117:18, 118:1, 118:10, 119:5, 119:7, 119:11, 120:6, 121:2, 121:3, 122:14, 123:1, 124:6, 125:4, 126:10, 129:18, 160:13, 160:21, 161:22, 162:6, 162:8, 162:16, 164:24
**looked** [15] - 114:19, 119:23, 120:25, 121:2, 122:19, 122:21, 122:25, 123:2, 127:19, 127:21, 145:5, 146:11, 156:20
**looking** [23] - 17:4, 29:25, 47:2, 67:14, 73:23, 83:23, 101:13, 112:3, 115:5, 115:13, 116:5, 121:19, 122:4, 122:6, 123:2, 127:7, 130:16, 132:5, 145:4, 149:22, 161:20, 161:25
**looks** [4] - 19:25, 20:2, 112:15, 156:12
**loophole** [1] - 66:9
**lose** [7] - 9:24, 36:1, 90:16, 110:14, 110:15, 113:8
**loses** [1] - 36:7
**losing** [2] - 11:10, 112:22
**loss** [7] - 77:21, 144:3, 144:12, 144:21, 146:19, 147:4,

154:17
**losses** [1] - 151:12
**lost** [10] - 27:12, 147:20, 147:21, 147:24, 148:23, 151:14, 153:6, 153:7, 157:9, 164:13
**love** [3] - 84:18, 109:24, 110:7
**low** [3] - 87:25, 120:22, 121:18
**lower** [4] - 37:23, 37:24, 87:2, 159:6
**lowered** [1] - 164:21
**lowest** [1] - 82:5
**LTD** [1] - 1:15
**lump** [3] - 151:8, 156:11, 156:14
**lunch** [1] - 59:22
**Lynn** [4] - 69:5, 70:19, 70:21

**M**

**macroeconomics** [3] - 122:16, 123:20, 123:24
**mail** [66] - 3:11, 3:12, 12:15, 24:25, 25:3, 25:6, 25:7, 25:25, 26:7, 26:11, 28:5, 28:8, 28:10, 32:15, 32:19, 32:20, 32:22, 40:19, 40:22, 41:18, 42:7, 45:18, 45:21, 46:5, 51:3, 52:16, 52:18, 56:20, 58:8, 61:2, 65:20, 68:20, 69:5, 69:7, 69:9, 69:17, 70:19, 71:5, 73:8, 73:9, 73:21, 74:17, 76:11, 77:3, 77:7, 77:13, 77:18, 87:7, 87:9, 88:3, 89:14, 90:24, 99:16, 102:15, 102:22, 103:1, 103:6, 106:22, 109:21, 109:22, 128:21, 130:7, 133:10, 133:18, 134:22, 173:14
**mailbox** [1] - 33:2
**mailed** [6] - 24:23, 70:17, 70:21, 127:9, 127:13, 129:18
**mailing** [3] - 69:20, 69:22, 70:16
**mails** [9] - 3:9, 3:18, 42:6, 46:20, 98:22,

127:17, 127:20, 133:22, 134:14
**main** [1] - 78:21
**maintaining** [1] - 157:13
**maintenance** [5] - 148:2, 148:14, 157:8, 157:9, 157:12
**major** [1] - 109:14
**maker** [2] - 78:3, 78:10
**males** [1] - 145:6
**man** [1] - 11:9
**man's** [1] - 66:16
**managing** [1] - 137:20
**manner** [2] - 13:11, 16:22
**manual** [2] - 67:13, 67:15
**March** [5] - 54:4, 54:19, 97:15, 99:7, 101:20
**Margaret** [2] - 24:10, 40:8
**mark** [1] - 34:10
**marked** [2] - 118:7, 168:22
**market** [1] - 171:2
**married** [2] - 18:24, 86:24
**Marxist** [1] - 117:19
**Mary** [3] - 37:10, 39:1, 106:10
**Marys** [1] - 85:2
**MARYWOOD** [1] - 1:7
**Marywood** [164] - 3:2, 4:8, 4:12, 4:15, 4:16, 4:20, 5:2, 5:4, 5:6, 5:9, 5:18, 6:5, 8:1, 8:2, 8:9, 8:20, 9:24, 10:1, 10:2, 10:10, 10:13, 11:2, 11:14, 12:7, 12:20, 12:21, 13:6, 13:12, 15:12, 16:10, 17:25, 18:1, 18:7, 18:8, 19:11, 19:15, 19:18, 20:11, 21:5, 21:19, 23:7, 24:18, 25:15, 26:22, 27:11, 27:14, 28:2, 28:10, 28:19, 29:11, 31:2, 31:19, 32:6, 32:8, 32:15, 32:20, 33:22, 37:4, 38:7, 38:9, 38:10, 38:11, 38:12, 38:21, 38:25, 39:1, 39:13, 39:20, 39:23, 39:24, 40:3, 40:11, 41:25, 44:24, 46:6, 49:15, 49:22, 50:15, 50:19, 50:20,

52:20, 55:12, 59:7, 59:11, 60:10, 64:4, 65:22, 65:24, 66:4, 67:22, 68:1, 69:6, 70:11, 70:13, 73:23, 73:24, 76:13, 76:23, 79:14, 82:17, 82:21, 83:8, 84:14, 85:5, 85:13, 87:11, 89:19, 90:5, 90:18, 91:14, 94:14, 96:1, 96:12, 97:17, 100:4, 105:4, 107:15, 107:17, 107:25, 108:9, 108:12, 108:14, 109:18, 110:19, 115:9, 121:24, 133:15, 143:6, 143:11, 144:5, 144:23, 145:1, 145:11, 146:3, 146:22, 146:24, 147:8, 149:3, 150:3, 150:11, 150:13, 150:23, 150:24, 151:2, 151:7, 153:8, 153:11, 158:6, 158:16, 159:18, 160:6, 164:5, 164:20, 165:5, 165:6, 166:1, 166:4, 166:11, 168:19, 172:4, 173:7
**Marywood's** [24] - 6:6, 6:21, 6:25, 7:19, 8:14, 8:22, 9:8, 16:21, 24:7, 31:19, 33:9, 44:5, 49:23, 50:11, 51:10, 51:20, 53:17, 59:14, 91:5, 99:20, 107:11, 112:25, 168:23, 168:25
**Mason** [1] - 171:22
**mass** [1] - 77:7
**massive** [1] - 85:20
**master** [1] - 137:7
**master's** [3] - 19:6, 19:7, 120:4
**masters** [1] - 137:6
**match** [1] - 147:19
**matching** [1] - 147:11
**material** [9] - 3:21, 6:8, 9:20, 12:24, 49:13, 49:16, 81:7, 107:18, 107:21
**materially** [3] - 11:7, 11:12, 11:19
**math** [4] - 119:6, 121:15, 158:11,

158:18
**mathematic** [1] - 118:15
**mathematics** [2] - 121:5, 121:13
**Matt** [2] - 56:8, 136:15
**matter** [14] - 3:4, 3:6, 4:7, 15:18, 17:13, 18:9, 43:3, 81:1, 81:10, 144:8, 147:5, 153:6
**matters** [1] - 140:8
**Matthew** [1] - 9:15
**maximum** [3] - 110:23, 110:25, 172:9
**MCGINLEY** [1] - 1:19
**McGinley** [1] - 10:9
**MD** [1] - 1:21
**meals** [1] - 157:15
**mean** [18] - 30:6, 33:5, 35:18, 39:4, 65:12, 71:7, 71:24, 72:13, 90:9, 103:14, 103:19, 104:12, 119:16, 122:23, 124:12, 124:22, 163:9
**meaning** [1] - 104:2
**meaningful** [3] - 154:7, 154:12, 154:20
**means** [9] - 14:2, 39:14, 60:18, 60:19, 89:24, 103:17, 104:16, 159:20, 176:21
**meant** [3] - 13:19, 56:15, 115:23
**measures** [2] - 14:17, 81:13
**media** [2] - 5:21, 33:18
**median** [1] - 22:23
**Medicare** [3] - 143:12, 144:8, 147:6
**meet** [2] - 15:15, 123:16
**meeting** [28] - 5:25, 8:16, 8:25, 9:2, 9:3, 24:9, 27:18, 28:12, 43:1, 43:3, 43:20, 43:21, 44:2, 44:9, 44:12, 44:21, 46:3, 56:22, 91:17, 91:21, 91:25, 92:13, 92:17, 92:20, 93:4, 93:5, 131:7
**meetings** [3] - 38:17, 80:10, 80:16
**melts** [1] - 17:8

**member** [20] - 6:23, 7:9, 7:14, 7:16, 14:23, 15:12, 24:17, 25:9, 27:10, 38:15, 52:20, 99:22, 103:3, 104:10, 105:25, 107:20, 138:9, 138:12
**members** [15] - 7:14, 11:22, 13:9, 13:10, 15:22, 15:25, 23:7, 40:1, 42:7, 56:21, 62:10, 98:22, 103:24, 139:2, 174:8
**membership** [5] - 103:4, 103:7, 103:9, 103:21, 104:11
**memorandum** [1] - 3:13
**men** [1] - 145:7
**mention** [6] - 43:23, 58:2, 72:20, 84:7, 140:3, 144:13
**mentioned** [8] - 27:2, 53:9, 84:3, 90:3, 105:11, 125:10, 176:8
**mentioning** [1] - 37:1
**mentor** [1] - 139:5
**merely** [1] - 67:10
**message** [2] - 66:6, 107:14
**met** [7] - 27:2, 60:9, 62:7, 77:6, 91:23, 125:19, 150:18, 169:10
**method** [1] - 22:1
**methodology** [8] - 155:14, 161:11, 161:25, 162:5, 162:9, 162:16, 163:2, 163:24
**methods** [1] - 143:17
**Michael** [4] - 8:14, 41:4, 41:12, 175:17
**microeconomics** [1] - 126:17
**MIDDLE** [1] - 1:1
**Middle** [2] - 176:4, 176:18
**middle** [3] - 59:12, 110:15, 150:4
**might** [34] - 12:10, 24:19, 25:20, 29:17, 36:1, 36:3, 36:7, 60:18, 61:15, 65:9, 68:6, 68:8, 68:10, 69:14, 75:6, 75:7, 78:17, 82:22, 83:9, 106:10, 111:4,

114:9, 114:19, 114:21, 115:6, 117:18, 120:9, 120:16, 120:25, 122:13, 127:18, 167:25, 171:7
**milage** [3] - 158:3, 158:20, 159:6
**mile** [3] - 158:14, 158:21, 160:14
**mileage** [2] - 158:13, 160:13
**miles** [7] - 121:10, 126:18, 129:6, 158:5, 158:20, 159:9, 159:23
**mind** [8] - 35:9, 66:16, 67:8, 67:11, 67:17, 87:14, 102:17, 159:6
**minded** [1] - 30:7
**mine** [2] - 63:11, 163:19
**minute** [12] - 34:9, 57:4, 59:21, 62:3, 66:12, 105:12, 106:15, 122:25, 125:10, 167:8
**minutes** [7] - 42:25, 43:4, 59:23, 130:25, 131:1, 135:18, 175:7
**misconduct** [1] - 81:1
**misread** [2] - 68:3, 68:5
**missing** [2] - 26:2, 78:5
**mission** [5] - 31:12, 31:20, 72:4, 105:25, 107:12
**mistake** [1] - 36:2
**mitigate** [5] - 17:12, 124:16, 125:14, 125:16, 125:19
**mitigation** [2] - 153:15, 153:23
**mock** [1] - 139:4
**mocking** [1] - 11:10
**Mohammed** [5] - 64:3, 85:11, 85:16, 85:17, 85:24
**moment** [2] - 3:22, 69:8
**Monday** [5] - 24:24, 25:10, 25:12, 25:24, 30:21
**MONDAY** [1] - 1:11
**monetary** [1] - 22:15
**money** [16] - 24:10, 24:11, 26:22, 28:22, 28:25, 29:5, 82:8, 86:14, 123:13,

123:22, 124:3, 144:3, 148:25, 153:10, 171:14, 172:11

**monitored** [1] - 14:7

**month** [6] - 12:11, 20:13, 92:23, 93:3, 93:4, 138:4

**months** [2] - 17:15, 106:11

**moral** [1] - 169:5

**morning** [10] - 3:1, 10:6, 10:7, 18:16, 18:17, 25:10, 26:17, 44:21, 46:3, 83:9

**most** [10] - 16:8, 35:4, 88:16, 112:24, 128:14, 143:15, 156:20, 156:24, 171:9, 174:18

**motion** [2] - 3:8, 141:24

**move** [43] - 7:13, 20:20, 21:14, 22:5, 31:21, 34:5, 35:6, 38:10, 39:16, 45:9, 48:14, 50:3, 51:13, 53:20, 54:10, 55:2, 56:10, 57:1, 57:15, 58:10, 64:20, 65:16, 68:21, 72:24, 75:21, 76:24, 79:20, 90:20, 102:22, 104:21, 105:17, 109:6, 127:1, 129:12, 131:17, 131:18, 139:14, 141:7, 166:25, 167:2, 172:14, 172:15

**moved** [6] - 39:16, 89:9, 104:21, 112:8, 167:25, 172:16

**mover** [1] - 39:2

**movie** [14] - 5:11, 5:12, 33:13, 33:14, 33:24, 34:14, 34:16, 34:18, 34:22, 34:24, 35:3, 83:7, 84:4

**moving** [1] - 106:12

**MR** [308] - 3:11, 4:2, 18:11, 18:15, 20:20, 20:22, 20:24, 20:25, 21:14, 21:16, 21:18, 27:20, 31:23, 31:25, 34:4, 34:9, 34:11, 34:12, 34:13, 34:20, 34:23, 34:24, 35:2, 35:6, 35:8, 35:9, 35:11, 39:15, 39:17, 39:19, 40:13, 40:14,

41:19, 41:22, 41:24, 42:2, 42:4, 45:9, 45:11, 45:13, 45:14, 47:4, 47:10, 47:13, 47:19, 47:20, 47:23, 48:3, 48:6, 48:8, 48:14, 48:17, 48:18, 48:23, 49:1, 49:2, 50:3, 50:4, 50:6, 50:7, 51:13, 51:15, 51:19, 53:20, 53:22, 53:24, 54:10, 54:12, 54:14, 54:15, 55:2, 55:4, 55:6, 55:7, 56:10, 56:12, 56:14, 56:16, 57:1, 57:2, 57:5, 57:7, 57:8, 57:15, 57:16, 57:18, 57:19, 58:11, 58:13, 59:16, 59:19, 59:21, 59:25, 60:6, 61:24, 62:1, 62:2, 62:5, 62:24, 63:1, 64:20, 64:23, 64:24, 64:25, 65:1, 65:2, 65:4, 65:6, 65:18, 66:14, 66:18, 66:20, 68:21, 68:23, 68:24, 68:25, 69:1, 69:3, 70:18, 72:24, 73:1, 73:3, 75:20, 75:22, 75:24, 76:1, 76:4, 76:6, 76:8, 76:10, 76:24, 76:25, 77:2, 79:21, 79:22, 81:17, 81:19, 88:2, 88:3, 88:7, 89:10, 89:13, 90:20, 90:22, 90:24, 91:8, 100:10, 100:12, 100:17, 100:22, 102:24, 102:25, 104:4, 104:7, 104:19, 104:20, 104:23, 104:25, 105:15, 105:19, 106:18, 106:21, 107:6, 107:7, 112:7, 112:9, 112:11, 118:19, 118:23, 119:1, 119:4, 119:13, 119:19, 122:18, 122:19, 122:21, 123:4, 123:7, 123:19, 124:15, 124:19, 124:22, 125:3, 125:12, 125:21, 125:24, 126:3, 126:7, 126:9, 129:11, 129:14, 129:16, 130:23,

131:4, 131:13, 131:16, 132:3, 132:4, 132:7, 132:8, 132:9, 132:16, 132:19, 132:23, 133:1, 133:2, 133:3, 133:5, 133:6, 133:8, 133:9, 133:10, 133:12, 133:14, 133:16, 133:18, 133:20, 133:22, 133:24, 134:1, 134:2, 134:3, 134:5, 134:7, 134:8, 134:10, 134:11, 134:13, 134:16, 134:18, 134:21, 134:24, 135:1, 135:2, 135:9, 135:10, 135:18, 135:20, 135:22, 135:24, 136:1, 136:6, 136:10, 136:13, 136:19, 136:23, 139:14, 139:17, 139:20, 141:5, 141:12, 141:15, 141:19, 141:22, 141:25, 142:2, 142:6, 142:8, 152:6, 152:14, 152:16, 152:18, 153:2, 165:13, 165:16, 165:21, 165:24, 166:6, 166:23, 167:4, 167:6, 167:10, 167:12, 167:15, 167:19, 167:23, 168:2, 168:4, 168:7, 168:10, 168:12, 168:15, 170:12, 170:14, 170:16, 172:14, 172:16, 172:18, 173:11, 173:12, 173:16, 173:18, 173:23, 174:1, 174:12, 174:16, 174:17, 174:21, 174:22, 175:1, 175:3, 175:6, 175:8, 175:13, 175:17, 175:19, 175:22, 175:25

**MS** [4] - 10:6, 10:8, 11:2, 34:7

**multiple** [6] - 22:4, 35:22, 46:22, 96:12, 120:17, 171:1

**municipal** [1] - 149:19

**Munley** [88] - 6:3,

6:10, 6:12, 6:16, 8:1, 8:4, 8:16, 8:24, 9:4, 10:15, 11:9, 11:22, 12:23, 15:20, 16:15, 16:17, 16:20, 26:7, 31:10, 41:5, 41:9, 41:13, 41:15, 41:22, 44:21, 44:22, 45:1, 46:2, 46:4, 46:12, 46:24, 49:10, 49:25, 52:12, 52:22, 54:8, 54:19, 55:10, 55:15, 55:20, 58:16, 71:17, 71:20, 77:24, 78:2, 78:8, 78:9, 78:25, 83:3, 83:4, 83:6, 83:13, 83:20, 84:12, 85:3, 85:10, 87:15, 87:18, 91:22, 91:23, 92:13, 92:17, 93:18, 95:20, 96:14, 96:22, 96:24, 98:8, 98:13, 99:24, 100:2, 100:7, 100:14, 101:6, 101:25, 102:9, 102:16, 105:2, 108:18, 113:7, 131:7, 143:4, 145:19, 166:15, 172:20, 172:22, 174:18

**Munley's** [24] - 5:24, 9:14, 11:23, 13:3, 13:7, 21:8, 41:8, 45:19, 51:10, 55:24, 57:13, 94:1, 94:14, 94:17, 96:2, 96:9, 96:18, 101:2, 102:6, 102:19, 108:7, 108:21, 174:12

**murderer** [2] - 66:7, 66:8

**Muslim** [1] - 63:6, 64:4, 106:23

**Muslims** [6] - 61:7, 61:18, 61:20, 62:13, 62:22, 85:16

**must** [2] - 63:15, 81:2

## N

**name** [12] - 4:2, 10:8, 25:13, 37:21, 38:3, 38:11, 60:9, 75:10, 88:13, 105:11

**named** [1] - 9:22

**names** [4] - 36:23, 37:19, 74:22, 75:17

**National** [1] - 138:10

**nature** [2] - 13:19,

22:13

**Nazi** [5] - 11:10, 44:24, 84:13, 84:15, 88:19

**Nazis** [6] - 5:15, 10:14, 44:25, 84:9, 84:10, 107:16

**near** [3] - 21:6, 111:2, 121:9

**necessarily** [3] - 116:2, 124:10, 159:1

**necessary** [5] - 51:11, 108:12, 140:20, 140:24, 141:3

**necessity** [1] - 136:1

**need** [15] - 25:2, 47:16, 74:21, 86:14, 120:6, 124:3, 132:6, 142:4, 155:15, 156:8, 157:4, 159:8, 165:11, 165:12, 175:11

**needed** [7] - 14:22, 144:21, 144:24, 146:1, 146:19, 146:20, 149:23

**negotiable** [1] - 126:11

**networking** [1] - 116:12

**never** [17] - 8:12, 15:11, 31:8, 35:9, 62:7, 67:17, 77:6, 84:15, 92:11, 97:8, 99:24, 115:16, 123:13, 123:15, 131:11, 155:23

**New** [11] - 18:23, 19:4, 39:6, 39:7, 111:3, 117:23, 128:1, 128:7, 128:16, 129:4, 129:9

**new** [3] - 38:25, 127:23, 155:16

**news** [4] - 33:18, 83:5, 86:1, 86:3

**newspaper** [7] - 40:3, 40:8, 60:24, 85:15, 85:19, 85:22, 117:2

**newspapers** [3] - 85:18, 117:15, 117:17

**next** [13] - 20:3, 31:10, 46:1, 46:23, 49:5, 74:8, 79:24, 84:17, 86:5, 109:22, 128:6, 128:13, 145:13

**nice** [3] - 26:12, 73:18, 74:2

**nine** [3] - 45:20, 138:4, 165:8

**ninety** [1] - 9:25
**ninety-five** [1] - 9:25
**Nixon** [1] - 93:20
**NO** [1] - 1:9
**non** [3] - 69:9, 73:23
**non-faculty** [1] - 69:9
**non-Marywood** [1] - 73:23
**non-students** [1] - 69:9
**none** [3] - 13:10, 61:4, 122:2
**nonetheless** [1] - 12:24
**normal** [3] - 29:3, 29:14, 143:18
**normally** [1] - 37:21
**North** [1] - 8:21
**note** [1] - 61:16
**notebook** [1] - 41:12
**noted** [1] - 167:17
**nothing** [5] - 32:10, 34:15, 43:17, 70:1, 71:8
**notice** [2] - 12:24, 129:8
**noticed** [1] - 39:11
**notification** [1] - 93:11
**notifications** [1] - 116:14
**notified** [3] - 25:25, 93:13, 111:8
**notifying** [2] - 24:3, 94:1
**notion** [5] - 9:21, 22:1, 22:9, 22:13, 85:6
**November** [18] - 4:18, 21:20, 23:25, 25:13, 73:13, 73:14, 77:17, 114:11, 114:12, 126:19, 128:9, 128:21, 129:21, 144:15, 149:5, 151:15, 156:23
**nowhere** [1] - 72:20
**number** [18] - 10:18, 25:3, 25:21, 64:19, 120:18, 120:22, 137:14, 151:4, 154:1, 154:2, 154:25, 155:1, 155:2, 156:17, 157:21, 165:10, 171:18
**numbered** [1] - 176:9
**nun** [3] - 10:13, 39:4, 87:22
**nuns** [6] - 61:6, 61:13, 62:12, 62:21, 64:9, 85:8

**nurture** [1] - 22:13

## O

**O'Brien** [4] - 9:15, 56:7, 57:11, 174:7
**oath** [2] - 8:4, 8:15
**object** [6] - 65:1, 65:2, 75:22, 75:24, 122:18, 152:6
**objection** [61] - 20:22, 21:16, 27:20, 31:23, 34:7, 34:13, 39:17, 41:20, 45:11, 47:4, 48:18, 50:4, 51:15, 53:22, 54:12, 55:4, 56:12, 57:2, 57:5, 57:16, 58:11, 61:24, 68:25, 73:1, 76:25, 81:17, 88:2, 89:9, 90:22, 100:10, 102:24, 104:4, 104:19, 104:23, 112:9, 123:5, 123:6, 129:14, 132:16, 133:6, 133:12, 133:16, 133:20, 133:24, 134:5, 134:8, 134:11, 134:16, 134:22, 134:24, 141:25, 166:6, 167:13, 167:16, 167:20, 167:24, 168:5, 170:12, 173:16, 173:17, 173:18
**objections** [2] - 132:19, 152:2
**objectives** [1] - 107:12
**obligation** [1] - 9:11
**obligations** [8] - 6:7, 11:24, 49:14, 50:16, 50:20, 96:12, 108:1, 108:3
**obtain** [2] - 24:7, 173:3
**obvious** [4] - 35:1, 41:18, 42:8, 79:1
**obviously** [1] - 111:23
**occasion** [1] - 138:3
**occasions** [1] - 55:16
**occupants** [1] - 90:11
**occupations** [7] - 146:13, 161:5, 161:20, 161:22, 162:1, 162:18
**occur** [1] - 23:24
**occurred** [1] - 3:7
**October** [1] - 105:8
**OF** [1] - 1:1

**offended** [2] - 63:6, 106:23
**offense** [3] - 16:6, 171:21
**offensive** [5] - 62:6, 64:3, 105:8, 105:21, 105:22
**offer** [10] - 4:10, 7:25, 28:12, 28:25, 40:9, 46:12, 49:25, 55:17, 140:1, 164:17
**offered** [6] - 28:17, 28:18, 45:7, 47:17, 82:8, 141:9
**offering** [4] - 8:3, 8:21, 53:4, 140:12
**offhand** [1] - 104:18
**office** [9] - 5:24, 25:18, 26:19, 36:22, 41:1, 41:4, 41:6, 41:8, 43:19
**officer** [3] - 37:18, 41:24, 42:1
**officers** [2] - 44:24
**official** [3] - 19:16, 28:10, 51:10
**Official** [2] - 176:3, 176:15, 176:17
**officially** [1] - 38:12
**old** [13] - 12:11, 18:5, 18:18, 18:20, 18:21, 68:2, 69:17, 69:20, 69:22, 70:8, 84:23, 91:4, 145:6
**older** [1] - 68:12
**Oliveri** [9] - 24:20, 25:5, 26:7, 26:23, 27:5, 30:23, 31:1, 31:2, 36:22
**Oliveri's** [2] - 26:19, 37:17
**ON** [2] - 136:22, 139:19
**once** [15] - 15:15, 15:16, 76:18, 80:1, 92:11, 111:3, 121:13, 121:23, 145:25, 146:18, 148:16, 150:17, 150:18, 156:2, 169:4
**one** [114] - 3:10, 3:14, 4:20, 10:18, 14:21, 15:23, 16:13, 17:2, 17:4, 19:2, 19:13, 20:2, 20:12, 20:14, 30:20, 33:5, 33:6, 37:5, 39:22, 39:23, 41:10, 43:10, 45:22, 46:3, 50:20, 50:24, 51:10, 56:1, 59:23,

60:22, 60:25, 62:9, 64:9, 66:6, 68:23, 68:24, 73:13, 73:18, 73:23, 74:21, 75:16, 79:24, 82:10, 83:20, 84:19, 85:14, 85:22, 86:13, 87:4, 88:20, 95:17, 100:5, 101:14, 101:24, 102:1, 103:25, 108:10, 110:25, 114:8, 114:16, 114:20, 117:10, 117:11, 119:24, 120:3, 120:6, 120:18, 121:2, 121:4, 121:18, 122:9, 122:23, 123:23, 124:1, 124:8, 124:11, 125:6, 125:8, 126:21, 126:24, 128:14, 129:1, 129:25, 130:13, 130:18, 132:8, 132:23, 133:9, 133:11, 136:14, 139:17, 140:14, 141:2, 144:24, 146:4, 150:14, 150:19, 153:17, 155:19, 156:11, 156:14, 158:5, 159:7, 159:23, 162:23, 172:20, 173:12
**one-time** [1] - 79:24
**ones** [7] - 4:14, 33:7, 36:24, 120:25, 124:25, 142:18, 157:3
**ongoing** [1] - 79:23
**online** [3] - 35:21, 35:22
**Onondaga** [4] - 112:13, 122:3, 122:12, 173:5
**open** [3] - 23:6, 30:6, 31:10
**opened** [1] - 105:7
**opening** [1] - 106:13
**opinion** [21] - 40:9, 60:18, 105:9, 105:23, 128:18, 140:9, 140:10, 144:11, 151:12, 151:14, 151:18, 151:21, 153:14, 153:16, 153:22, 154:11, 154:12,

158:25, 159:11, 164:17
**opinions** [11] - 40:7, 139:23, 140:1, 140:4, 140:10, 140:13, 141:21, 152:10, 163:10
**opportunities** [1] - 45:2
**opportunity** [11] - 9:3, 13:3, 14:6, 27:13, 46:13, 46:16, 48:9, 48:10, 48:21, 108:10, 108:15
**oppose** [1] - 29:24
**opposed** [1] - 101:25
**opposing** [1] - 29:24
**opposite** [1] - 68:3
**opposition** [2] - 3:15, 135:8
**optimal** [1] - 116:2
**oral** [5] - 5:25, 7:5, 14:6, 14:17, 43:23
**Orchestra** [1] - 88:6
**order** [14] - 32:10, 33:8, 93:21, 98:23, 106:11, 140:20, 144:23, 145:1, 145:13, 145:16, 145:22, 147:25, 157:5, 175:12
**organization** [2] - 4:21, 113:8
**organizations** [2] - 138:7, 138:13
**organized** [1] - 31:12
**oriented** [1] - 36:6
**original** [14] - 142:14, 144:15, 144:19, 144:20, 148:22, 149:7, 149:14, 149:24, 150:1, 150:2, 156:21, 162:10, 162:11, 162:12
**Oswego** [3] - 114:17, 122:16, 127:18
**otherwise** [2] - 3:21, 156:1
**outcome** [3] - 7:22, 16:18, 22:11
**outcomes** [1] - 22:22
**outline** [2] - 4:10, 161:3
**outrageous** [2] - 69:19, 69:25
**outside** [3] - 33:2, 108:22, 157:15
**overdoing** [4] - 18:2, 91:1, 170:2, 170:9

**override** [2] - 77:24, 78:9
**overruled** [3] - 62:4, 65:5, 166:8
**overturn** [2] - 166:16
**owe** [1] - 131:9
**owed** [1] - 9:10
**own** [3] - 5:17, 12:1, 98:15
**oz** [1] - 22:14

## P

**P.A** [1] - 74:24
**p.m** [2] - 23:25, 45:21
**PA** [3] - 1:17, 1:25, 176:19
**Pace** [1] - 128:22
**page** [52] - 17:9, 32:25, 39:20, 39:23, 40:1, 45:22, 46:24, 47:3, 49:5, 49:20, 50:13, 66:1, 66:5, 73:5, 73:12, 79:24, 94:8, 94:9, 99:4, 115:7, 115:8, 115:10, 115:14, 116:1, 119:21, 121:3, 121:4, 122:14, 124:6, 125:4, 126:10, 126:16, 128:1, 128:6, 128:11, 128:13, 128:21, 130:7, 134:7, 151:11, 154:5, 161:2, 161:14, 161:17, 164:24, 165:2, 165:8, 168:13, 168:21, 169:13
**pages** [5] - 69:16, 91:9, 91:11, 119:14, 154:5
**paid** [9] - 4:22, 24:5, 24:6, 24:12, 112:21, 113:2, 125:23, 156:14
**Pam** [2] - 87:10
**pandering** [3] - 27:19, 28:1, 28:3
**paper** [4] - 18:6, 20:12, 91:5, 99:3
**papers** [1] - 138:21
**parade** [1] - 87:16
**paragraph** [22] - 31:10, 31:17, 49:20, 50:14, 55:15, 73:12, 90:7, 96:4, 96:5, 97:3, 97:17, 98:19,

99:20, 100:23, 101:14, 106:14, 106:21, 107:10, 154:5, 169:3, 169:4, 169:19
**pardon** [8] - 32:18, 49:6, 75:23, 100:11, 103:18, 135:21, 152:15, 170:13
**parents** [1] - 90:8
**PARKWAY** [1] - 1:23
**parodies** [1] - 5:20
**parody** [8] - 5:22, 33:19, 33:20, 34:16, 35:13, 84:4, 113:6, 133:15
**parody's** [1] - 35:24
**Parsons** [3] - 87:10, 133:19
**part** [20] - 5:8, 17:5, 32:23, 39:13, 42:21, 73:13, 73:14, 98:17, 102:6, 108:22, 109:24, 110:6, 110:7, 120:12, 124:13, 125:11, 137:10, 167:11, 170:18
**part-time** [1] - 120:12
**partial** [1] - 99:3
**participate** [2] - 139:3, 139:4
**particular** [4] - 62:11, 82:10, 141:17
**partly** [1] - 110:9
**parts** [2] - 6:19, 36:15
**party** [2] - 18:1, 41:24
**pass** [1] - 12:19
**passage** [1] - 141:17
**passed** [1] - 137:9
**past** [10] - 91:11, 144:17, 146:20, 148:23, 153:11, 161:11, 161:14, 161:16, 161:21, 162:21
**Pat** [2] - 41:10, 43:18
**Paterson** [1] - 37:10
**Patricia** [2] - 8:22, 44:19
**pay** [17] - 26:22, 28:2, 29:12, 29:14, 86:19, 86:25, 87:3, 88:24, 121:18, 125:25, 153:7, 153:9, 156:5, 156:8, 156:13
**paycheck** [2] - 59:12, 154:16
**paying** [4] - 27:12, 28:5, 29:4, 156:16

**payment** [1] - 151:8
**pays** [1] - 66:6
**PC** [1] - 1:20
**Peet** [3] - 109:7, 121:11, 171:12
**PEET** [5] - 1:22, 10:6, 10:8, 11:2, 34:7
**pending** [1] - 91:19
**Pennsylvania** [4] - 111:6, 117:23, 176:5, 176:18
**PENNSYLVANIA** [1] - 1:1
**pension** [2] - 15:25, 147:1
**people** [18] - 26:14, 38:1, 38:16, 71:13, 71:22, 73:16, 73:22, 73:23, 77:12, 83:23, 85:20, 88:22, 89:1, 90:14, 115:24, 139:1, 146:12, 163:7
**per** [6] - 127:7, 158:14, 158:20, 158:21, 160:14, 162:3
**percent** [33] - 10:19, 86:14, 87:4, 88:20, 146:7, 147:12, 147:17, 147:19, 147:20, 148:14, 148:18, 148:20, 149:17, 150:14, 150:19, 157:18, 157:21, 159:20, 161:8, 162:3, 162:12, 162:14, 162:19, 162:25, 163:1, 164:21, 164:22, 164:24, 165:1, 165:2
**percentage** [1] - 83:23
**perfect** [1] - 125:15
**perform** [1] - 164:10
**perhaps** [11] - 16:7, 26:13, 28:12, 31:17, 35:20, 71:17, 79:6, 87:16, 112:20, 125:19, 166:18
**period** [2] - 138:4, 149:22
**permanent** [1] - 6:22
**permission** [9] - 94:14, 94:16, 95:8, 96:1, 96:7, 97:17, 97:21, 98:2, 98:25
**permit** [2] - 8:6, 96:22
**perry** [1] - 171:21
**person** [14] - 35:12, 37:5, 51:24, 52:1,

52:24, 73:25, 74:7, 79:3, 83:12, 86:22, 88:18, 123:14, 159:9, 164:9
**person's** [4] - 7:7, 99:23, 150:14, 157:24
**personal** [21] - 7:4, 13:22, 14:5, 88:10, 88:14, 88:16, 88:18, 88:21, 88:23, 94:10, 96:21, 97:5, 97:7, 97:25, 98:10, 107:17, 163:4, 163:10, 163:14, 163:25, 164:6
**personally** [3] - 23:21, 28:20, 35:18
**perspective** [3] - 140:19, 140:24, 141:3
**pertaining** [1] - 24:18
**Pete** [1] - 10:8
**Peter** [1] - 77:14
**Peters** [1] - 137:16
**Ph.D** [6] - 19:8, 117:10, 120:1, 120:2, 120:5, 145:6
**Pheasant** [2] - 37:12, 37:13
**phenomenon** [1] - 33:19
**PHILADELPHIA** [1] - 1:25
**Philadelphia** [1] - 35:25
**philosophy** [1] - 43:13
**photograph** [3] - 63:3, 63:5, 85:23
**photos** [1] - 11:21
**phrase** [6] - 18:5, 45:1, 91:4, 116:6, 154:15, 170:19
**physical** [1] - 164:3
**pick** [1] - 104:1
**picture** [2] - 61:12, 64:11
**piece** [2] - 20:12, 99:3
**pin** [1] - 43:15
**pizza** [3] - 29:19, 29:25, 30:2
**place** [4] - 3:5, 13:13, 107:17, 122:8
**PLACE** [1] - 1:9
**placed** [1] - 55:3
**plain** [1] - 104:2
**Plains** [1] - 129:9
**Plaintiff** [1] - 1:14
**plaintiff** [18] - 3:15, 4:3, 9:12, 133:23,

134:15, 134:23, 136:10, 140:20, 140:24, 141:4, 142:20, 142:25, 148:4, 150:16, 154:7, 154:15, 157:13, 172:3
**PLAINTIFF** [1] - 2:2
**plaintiff's** [6] - 9:5, 127:22, 129:13, 131:21, 132:20, 134:3
**Plaintiff's** [2] - 132:12, 132:22
**plan** [9] - 23:23, 69:7, 69:8, 69:19, 146:25, 147:10, 147:12, 147:22, 149:1
**planing** [1] - 70:12
**planned** [2] - 9:1, 24:2
**play** [7] - 34:9, 37:1, 37:10, 38:5, 39:4, 67:25, 115:22
**played** [1] - 11:1
**playing** [1] - 17:10
**pleased** [1] - 10:10
**plexus** [2] - 89:21, 90:13
**plot** [1] - 10:20
**plus** [2] - 120:19, 128:19
**point** [32] - 27:7, 30:20, 39:3, 43:10, 43:12, 43:17, 58:1, 58:2, 58:21, 59:1, 60:22, 63:25, 70:20, 71:12, 72:23, 75:2, 89:18, 97:9, 97:10, 97:13, 97:19, 98:11, 103:12, 108:1, 108:5, 122:24, 141:18, 144:16, 145:17, 145:22, 147:16, 156:3
**pointed** [1] - 28:7
**pointing** [1] - 104:10
**points** [3] - 8:24, 57:25, 100:1
**policies** [12] - 6:20, 11:15, 13:6, 16:21, 31:13, 33:12, 60:21, 65:24, 79:14, 82:24, 92:18, 94:4
**policy** [39] - 6:21, 7:1, 7:2, 7:20, 9:9, 9:17, 13:14, 13:15, 13:16, 13:20, 13:21, 14:1, 14:22, 15:5, 15:21, 24:18, 46:7, 49:21, 49:23, 51:10, 51:21,

58:19, 64:8, 80:22, 81:8, 82:3, 82:4, 97:2, 97:4, 99:21, 103:3, 104:1, 104:8, 106:10, 168:23, 168:25, 169:8, 173:2

**political** [2] - 36:6, 84:7

**politics** [1] - 22:15

**poplar** [3] - 5:10, 5:21, 33:17

**portfolio** [1] - 88:9

**portion** [8] - 3:19, 67:21, 74:8, 91:1, 97:4, 109:23, 115:8, 141:8

**portions** [3] - 8:3, 174:24, 175:16

**portray** [1] - 11:9

**portraying** [1] - 44:25

**posed** [3] - 8:18, 44:2, 44:6

**position** [16] - 7:8, 19:14, 80:21, 80:25, 81:3, 81:4, 81:5, 87:1, 87:2, 99:23, 100:6, 100:24, 111:19, 112:22, 116:2, 141:7

**positions** [5] - 124:23, 126:16, 127:23, 128:12, 137:24

**possibilities** [1] - 22:9

**possibility** [4] - 12:7, 67:1, 67:4, 67:5

**possible** [10] - 12:2, 13:24, 14:10, 15:8, 34:20, 90:14, 120:22, 121:1, 165:12, 172:9

**post** [4] - 118:16, 154:7, 154:12

**posted** [16] - 5:8, 10:11, 12:14, 14:12, 53:7, 53:10, 72:22, 86:1, 92:4, 92:10, 92:11, 113:5, 124:7, 125:5, 126:18, 128:9

**poster** [3] - 32:7, 42:12, 90:9

**posters** [56] - 5:1, 5:5, 24:2, 24:5, 24:6, 24:8, 24:15, 24:16, 24:19, 24:22, 24:23, 25:2, 25:10, 25:11, 25:12, 25:15, 25:19, 25:20, 25:21, 25:23, 26:2, 26:3, 26:4, 26:5, 26:6, 26:9, 26:12, 26:15, 26:17,

26:20, 26:21, 27:3, 27:7, 27:15, 28:24, 29:2, 29:5, 30:16, 43:9, 43:11, 44:10, 70:5, 71:10, 71:21, 71:23, 82:14, 84:14, 113:1, 113:2, 131:8, 131:10

**posters'** [1] - 27:9

**posting** [9] - 12:3, 86:15, 90:6, 120:16, 122:11, 122:15, 122:23, 126:16, 169:10

**postings** [7] - 11:4, 105:22, 118:15, 119:6, 128:22, 130:8, 134:10

**potential** [7] - 115:12, 115:13, 115:19, 116:3, 117:7, 117:13, 154:23

**pouring** [2] - 18:4, 91:3

**Povse** [5] - 9:16, 56:8, 57:11, 136:16, 174:7

**power** [2] - 93:24, 166:16

**powers** [2] - 22:17, 22:21

**practical** [3] - 22:3, 43:3

**practice** [3] - 140:7, 140:17, 155:25

**practices** [1] - 31:13

**preceded** [1] - 6:1

**prefer** [1] - 135:12

**prejudgment** [1] - 151:22

**premium** [1] - 147:6

**premiums** [2] - 143:13, 144:8

**preparation** [3] - 123:3, 142:15, 143:17

**prepare** [3] - 23:14, 142:9, 144:14

**prepared** [8] - 75:8, 98:20, 123:11, 142:13, 149:14, 149:24, 156:21, 176:11

**preparing** [1] - 143:23

**preponderance** [1] - 83:18

**preprinted** [1] - 26:18

**prerelease** [1] - 73:20

**prereleased** [1] - 73:15

**prerogative** [1] - 108:9

**presence** [2] - 105:24, 110:9

**present** [12] - 4:6, 7:19, 44:12, 56:24, 144:11, 148:18, 149:11, 149:13, 150:5, 151:6, 151:21, 175:5

**presentation** [6] - 4:23, 5:1, 23:24, 24:1, 29:13, 113:1

**presentations** [2] - 31:11, 139:7

**presented** [5] - 6:18, 15:1, 94:11, 122:22, 138:21

**presenting** [2] - 7:24, 56:23

**presided** [1] - 4:5

**President** [48] - 5:23, 6:3, 6:10, 6:12, 6:16, 8:24, 9:4, 9:13, 10:15, 21:8, 26:7, 38:13, 41:5, 41:8, 41:9, 41:13, 41:15, 45:19, 46:1, 46:4, 46:12, 46:24, 49:9, 49:25, 51:10, 52:12, 52:22, 54:8, 54:19, 55:20, 55:24, 71:16, 96:22, 98:8, 99:24, 100:1, 100:14, 101:25, 102:6, 102:8, 106:7, 108:18, 108:21, 166:15, 172:20, 172:22, 174:12

**president** [22] - 7:10, 8:2, 8:11, 8:23, 10:12, 10:16, 14:21, 14:23, 27:1, 30:18, 37:20, 38:6, 38:24, 39:8, 52:21, 93:22, 101:9, 103:4, 103:5, 103:20, 113:6, 166:15

**president's** [1] - 17:23

**press** [2] - 31:6, 86:1

**pressured** [1] - 13:10

**presumably** [1] - 114:21

**presumption** [1] - 84:21

**pretax** [2] - 143:7, 147:14

**pretty** [5] - 41:18, 42:8, 79:1, 83:16, 172:5

**preventing** [1] - 14:3

**previous** [4] - 50:12, 89:8, 98:17, 146:8

**previously** [1] - 139:8

**price** [2] - 112:22, 160:19

**primarily** [2] - 138:1, 149:18

**prime** [1] - 39:2

**principles** [2] - 21:22, 109:16

**printed** [1] - 26:7

**privacy** [1] - 98:23

**private** [4] - 4:14, 23:14, 32:21, 117:21, 117:22

**privilege** [1] - 3:21

**prize** [10] - 25:8, 26:18, 26:22, 27:3, 27:5, 27:6, 28:22, 28:25, 30:22, 30:23

**prizes** [1] - 28:17

**pro** [1] - 40:7

**problem** [8] - 14:2, 47:15, 76:19, 76:21, 82:15, 85:13, 132:16, 133:3

**problems** [2] - 13:22, 106:5

**procedural** [2] - 93:24, 101:11

**procedure** [1] - 53:6

**procedures** [11] - 14:15, 14:19, 52:2, 52:4, 53:3, 72:2, 95:11, 101:6, 143:18, 166:11, 166:20

**proceed** [5] - 16:17, 17:20, 105:18, 142:1, 142:5

**PROCEEDINGS** [1] - 1:10

**proceedings** [1] - 176:8

**process** [8] - 7:17, 13:23, 23:18, 55:10, 72:12, 75:2, 108:17, 108:22

**produced** [3] - 127:13, 127:23, 155:23

**producing** [1] - 91:9

**product** [3] - 3:13, 3:16, 3:18

**production** [1] - 22:8

**profession** [2] - 143:19, 169:15

**professional** [10] - 9:22, 13:22, 13:24, 14:9, 138:7, 144:11, 151:14, 158:25,

159:11, 169:7

**Professor** [1] - 101:5

**professor** [20] - 17:10, 40:5, 43:13, 49:14, 65:22, 77:5, 81:2, 86:13, 87:2, 87:11, 115:9, 122:15, 128:23, 129:25, 130:14, 137:16, 138:1, 138:5, 164:1

**professors** [10] - 9:12, 9:14, 17:22, 28:11, 77:9, 111:16, 111:18, 130:8, 165:4, 165:7

**proffered** [1] - 96:21

**program** [3] - 29:18, 137:9, 139:6

**progress** [1] - 81:9

**progressive** [16] - 6:25, 9:17, 13:15, 13:17, 14:11, 15:4, 15:19, 15:23, 46:7, 53:5, 58:19, 80:22, 81:8, 99:21, 103:2, 173:1

**projected** [6] - 135:25, 145:3, 149:10, 150:6, 151:7, 153:13

**projections** [2] - 161:17, 162:7

**promoting** [1] - 33:10

**prompt** [1] - 14:3

**pronounce** [1] - 89:23

**pronunciation** [3] - 89:22, 112:13, 137:1

**proper** [4] - 6:15, 82:13, 160:18, 164:16

**properly** [1] - 166:4

**property** [1] - 90:10

**proportion** [1] - 157:24

**propriety** [1] - 96:23

**prove** [1] - 106:20

**proved** [1] - 113:5

**provide** [8] - 14:1, 29:19, 45:3, 79:17, 108:9, 115:17, 170:19, 170:20

**provided** [17] - 6:21, 34:1, 45:1, 47:24, 108:13, 108:14, 140:25, 142:24, 143:25, 148:4, 150:11, 151:24, 152:9, 154:16, 154:22, 157:22, 174:4

**provides** [4] - 7:3,

7:17, 79:4, 79:11
**providing** [1] - 32:25
**provision** [1] - 104:8
**provisions** [1] - 176:5
**psychology** [1] - 56:8
**public** [6] - 23:13,
  29:8, 79:13, 90:10,
  93:7, 130:12
**publically** [2] - 40:19,
  86:16
**publication** [1] -
  116:17
**publicity** [7] - 10:23,
  12:13, 26:15, 33:8,
  70:11, 70:13, 90:19
**publicize** [1] - 33:7
**publicized** [1] - 28:22
**publish** [1] - 86:3
**published** [16] - 5:22,
  40:7, 40:15, 74:15,
  85:15, 85:21,
  138:15, 138:20,
  146:10, 148:9,
  148:11, 157:23,
  160:11, 160:12,
  162:8, 162:17
**pull** [14] - 45:13,
  46:23, 49:1, 50:6,
  52:13, 53:15, 53:25,
  54:14, 56:14, 57:18,
  58:14, 62:24,
  142:12, 168:12
**pulled** [1] - 56:15
**punitive** [2] - 7:3,
  13:21
**purchase** [1] - 161:1
**purchased** [1] -
  160:19
**pure** [1] - 83:24
**purports** [1] - 47:22
**purpose** [12] - 47:9,
  47:10, 47:17, 48:20,
  51:16, 82:16, 82:19,
  82:20, 82:21, 87:19,
  141:6, 159:15
**purposes** [1] - 71:14
**pursuant** [3] - 23:1,
  51:9, 176:5
**put** [21] - 7:1, 12:23,
  30:9, 44:14, 75:25,
  78:19, 85:10, 85:12,
  106:22, 113:8,
  113:19, 115:10,
  115:22, 116:1,
  116:2, 119:24,
  120:3, 120:6,
  120:13, 168:12,
  171:20
**putting** [1] - 174:19

# Q

**QUALIFICATIONS** [2]
  - 136:22, 139:19
**qualifications** [1] -
  119:24
**qualified** [14] - 109:12,
  121:12, 121:21,
  121:22, 122:17,
  123:16, 123:23,
  123:24, 125:8,
  125:17, 125:18,
  126:19, 141:23
**qualify** [1] - 139:14
**qualifying** [2] - 137:9,
  142:3
**QUARRY** [1] - 1:20
**questioning** [1] -
  172:24
**questionnaire** [1] -
  142:24
**questions** [17] - 41:16,
  42:24, 59:16, 60:10,
  60:20, 119:12,
  131:6, 134:18,
  139:17, 152:19,
  153:5, 164:19,
  165:13, 166:1,
  166:2, 169:24,
  173:11
**quick** [3] - 84:21,
  130:23, 139:21
**quickly** [2] - 76:11,
  89:20
**quietly** [3] - 12:8,
  67:23, 68:17
**quit** [1] - 86:12
**quite** [7] - 15:7, 29:5,
  38:17, 83:4, 135:3,
  135:13, 171:15
**quiz** [1] - 82:3
**quizzes** [2] - 82:5,
  82:7
**quote** [7] - 4:23, 7:2,
  7:3, 7:6, 7:10, 7:22,
  8:17
**quote/unquote** [2] -
  93:23, 101:13
**quoting** [1] - 10:14

# R

**race** [1] - 36:7
**radical** [2] - 61:16,
  61:21
**raffle** [1] - 28:17
**raise** [5] - 68:18, 72:4,
  79:12, 101:23, 165:5
**raised** [3] - 3:23, 66:6,
  84:8

**raising** [4] - 58:6,
  63:25, 76:15, 173:15
**ramifications** [1] -
  12:2
**random** [2] - 25:8,
  82:11
**range** [2] - 61:14,
  161:7
**ranting** [2] - 36:4, 36:7
**rape** [4] - 10:20,
  83:17, 83:21, 84:22
**rate** [11] - 25:1, 29:14,
  104:6, 158:13,
  158:21, 158:25,
  159:4, 159:10,
  159:13, 159:14,
  162:2
**rates** [2] - 149:20,
  149:23
**rather** [7] - 29:6,
  31:16, 37:9, 60:17,
  91:15, 148:7, 163:1
**ratify** [1] - 96:10
**rational** [2] - 12:11,
  30:25
**raving** [2] - 36:4, 36:7
**ray** [1] - 37:14
**reached** [1] - 46:6
**reaching** [1] - 9:17
**reaction** [1] - 90:6
**read** [33] - 45:25,
  50:13, 60:12, 60:15,
  60:16, 68:6, 69:8,
  69:11, 71:5, 78:21,
  80:3, 80:24, 81:7,
  90:7, 91:11, 91:12,
  100:23, 102:3,
  114:18, 132:7,
  169:1, 169:9,
  169:18, 169:22,
  170:18, 170:20,
  171:5, 174:4, 175:7,
  175:10, 175:15,
  175:18
**reader** [3] - 140:15,
  141:1, 141:6
**reading** [10] - 50:18,
  67:10, 69:15, 97:21,
  98:7, 99:4, 132:4,
  169:8, 169:16,
  169:21
**reads** [1] - 95:25
**ready** [2] - 25:12, 41:1
**real** [3] - 36:5, 88:9,
  89:3
**realize** [4] - 12:8,
  67:23, 83:24, 115:19
**realized** [2] - 17:12,
  173:12
**really** [10] - 17:5,

29:11, 42:19, 70:25,
  88:9, 109:24, 110:6,
  110:7, 166:19,
  170:10
**reap** [1] - 38:5
**Reap** [8] - 38:6, 38:13,
  38:23, 39:1, 41:5,
  105:16, 106:7,
  106:10
**reask** [1] - 100:23
**reason** [16] - 6:24,
  42:11, 70:25, 79:6,
  79:17, 101:17,
  110:8, 130:5, 136:3,
  140:14, 140:18,
  141:2, 141:18, 169:5
**reasonable** [2] - 9:23,
  151:18
**reasons** [4] - 11:6,
  11:18, 146:4, 155:19
**recalculated** [1] -
  154:17
**receipts** [1] - 161:1
**receive** [5] - 58:8,
  59:13, 98:5, 105:2,
  147:9
**received** [24] - 6:3,
  6:5, 6:11, 44:18,
  46:5, 49:8, 54:20,
  58:17, 95:11, 103:6,
  105:4, 128:21,
  137:5, 137:7,
  144:22, 146:8,
  146:23, 146:25,
  147:2, 150:6, 151:8,
  152:7, 156:13, 165:5
**receiving** [3] - 55:22,
  59:10, 146:22
**recent** [4] - 112:24,
  156:20, 161:14,
  161:16
**recently** [4] - 119:22,
  138:11, 156:24,
  169:2
**recess** [2] - 60:2,
  131:2
**recognize** [19] - 19:21,
  21:1, 30:10, 32:2,
  44:15, 45:15, 49:3,
  50:8, 52:13, 53:15,
  54:1, 54:16, 55:8,
  56:17, 57:9, 57:20,
  58:15, 168:22,
  168:25
**recognized** [1] - 12:3
**recognizes** [1] - 13:21
**recollection** [4] - 41:7,
  73:10, 106:13,
  106:16
**recommendation** [31]

- 8:13, 13:8, 13:25,
  14:10, 16:14, 17:23,
  38:18, 38:24, 39:3,
  46:10, 51:12, 53:5,
  55:11, 55:18, 55:23,
  55:24, 94:2, 94:15,
  96:2, 96:11, 97:18,
  97:22, 98:2, 98:8,
  98:9, 98:14, 98:20,
  102:13, 108:8,
  108:21, 109:1
**recommendations** [2]
  - 13:1, 115:17
**recommended** [5] -
  8:9, 38:25, 77:24,
  79:2, 111:9
**recommending** [3] -
  6:3, 46:2, 172:22
**recommends** [3] -
  7:18, 78:7, 78:8
**recompense** [1] - 71:9
**record** [7] - 3:5,
  114:22, 131:13,
  162:5, 167:9,
  167:21, 175:7
**records** [2] - 32:14,
  159:24
**recross** [3] - 173:20
**RECROSS** [1] - 2:2
**rectified** [1] - 13:22
**REDIRECT** [2] - 2:2,
  165:23
**redirect** [4] - 134:25,
  135:5, 165:15,
  165:20
**reduce** [2] - 149:13,
  165:1
**reduced** [2] - 148:20,
  157:9
**reduction** [2] - 143:7,
  147:15
**reel** [1] - 83:5
**refer** [1] - 140:4
**reference** [5] - 36:20,
  36:24, 139:25, 140:3,
  146:6
**referenced** [3] - 36:17,
  140:14, 145:18
**references** [2] - 10:18,
  17:18
**referencing** [1] - 159:7
**referred** [1] - 17:9
**referring** [15] - 11:10,
  36:18, 36:21, 37:2,
  52:16, 61:5, 71:1,
  71:3, 72:15, 74:4,
  75:11, 78:24, 87:5,
  105:10, 141:13
**refers** [1] - 89:7
**refired** [6] - 17:10,

115:9, 115:10, 115:22, 115:25, 116:1
**reflect** [6] - 144:14, 144:17, 148:19, 155:16, 155:21, 163:3
**reflected** [1] - 162:20
**reform** [1] - 4:24
**refresh** [1] - 106:13
**refused** [8] - 5:6, 8:6, 47:25, 55:16, 62:16, 63:17, 94:19, 95:13
**refusing** [3] - 94:16, 95:7, 96:7
**regard** [2] - 8:10, 64:1
**regarding** [10] - 3:3, 3:5, 6:15, 33:9, 45:4, 53:10, 55:23, 97:22, 152:7, 153:14
**regardless** [2] - 7:22, 67:17
**regards** [1] - 13:20
**regression** [1] - 22:4
**reimbursed** [4] - 148:10, 158:2, 160:8, 160:20
**reimbursement** [5] - 5:5, 29:8, 158:13, 158:21, 158:25
**reject** [1] - 166:16
**relate** [1] - 159:16
**related** [23] - 4:24, 22:21, 73:23, 85:14, 90:9, 120:3, 137:23, 138:8, 138:13, 138:15, 138:21, 138:23, 143:6, 143:12, 147:25, 148:1, 148:13, 148:21, 157:25, 159:12, 159:17, 159:19, 162:1
**relating** [1] - 4:16
**relaxed** [1] - 43:5
**release** [17] - 12:1, 14:13, 67:8, 67:9, 94:10, 94:14, 96:2, 96:21, 97:18, 97:20, 97:22, 98:1, 98:2, 98:4, 98:8, 98:11, 173:2
**released** [5] - 67:21, 67:22, 71:13, 73:16, 74:12
**releases** [1] - 172:23
**relevance** [3] - 65:4, 75:22, 75:24
**relevant** [3] - 3:22, 23:11, 34:16

**relied** [2] - 116:13, 116:15
**reluctant** [1] - 71:18
**rely** [3] - 161:10, 161:22, 170:19
**relying** [1] - 170:5
**remain** [1] - 31:10
**remained** [1] - 153:11
**remaining** [1] - 26:3
**remedial** [5] - 7:11, 8:9, 14:17, 46:6, 59:8
**remediation** [3] - 15:4, 15:5, 15:7
**remember** [17] - 25:21, 40:22, 43:15, 52:9, 52:10, 63:25, 80:18, 80:19, 106:19, 109:6, 109:11, 110:13, 117:2, 156:19, 169:25, 172:24, 173:1
**remorse** [1] - 15:10
**removal** [4] - 27:9, 27:14, 29:1, 44:10
**remove** [3] - 53:11, 106:19, 106:24
**removed** [6] - 5:3, 5:5, 53:18, 63:23, 107:3, 131:8
**renew** [1] - 41:19
**renewed** [1] - 40:12
**repeat** [2] - 36:19, 51:8
**repeats** [1] - 120:15
**repetitive** [1] - 14:3
**replaced** [1] - 5:16
**replied** [1] - 26:20
**reply** [1] - 28:6
**report** [67] - 38:23, 41:6, 57:10, 58:17, 139:23, 140:2, 140:5, 140:14, 140:15, 141:8, 141:10, 141:14, 142:9, 142:13, 142:14, 142:16, 143:17, 143:23, 144:15, 144:20, 148:22, 149:7, 149:14, 149:24, 150:1, 150:2, 151:13, 151:24, 152:3, 152:7, 152:8, 152:11, 152:12, 153:18, 153:19, 154:5, 154:6, 154:9, 155:6, 155:9, 155:15, 155:23,

156:9, 156:21, 156:22, 158:3, 159:9, 161:3, 161:15, 162:10, 162:11, 162:12, 164:25, 165:3, 170:5, 170:11, 170:17, 170:23, 170:25, 171:3, 171:5, 171:8, 171:15, 171:16
**REPORTED** [1] - 176:16
**reported** [1] - 93:17
**Reporter** [3] - 176:3, 176:15, 176:17
**reporter** [1] - 176:22
**REPORTER'S** [1] - 176:1
**reporting** [1] - 27:24
**reports** [1] - 140:6
**reposted** [1] - 106:12
**represent** [5] - 4:3, 10:10, 60:10, 118:8, 159:25
**representative** [1] - 86:1
**represented** [4] - 64:3, 86:5, 86:6, 146:7
**representing** [5] - 62:12, 83:7, 83:12, 85:23, 88:18
**represents** [2] - 148:25, 155:8
**reproduction** [1] - 176:21
**reputation** [1] - 15:2
**request** [16] - 9:4, 29:1, 30:8, 46:20, 46:21, 46:22, 47:18, 48:20, 48:21, 48:23, 51:17, 58:19, 104:10, 106:24, 107:1, 136:5
**requested** [7] - 9:3, 29:22, 46:20, 47:11, 48:10, 99:6, 108:11
**requesting** [1] - 51:7
**requests** [3] - 5:6, 31:14, 103:3
**require** [4] - 15:5, 15:21, 108:18, 171:13
**required** [21] - 13:17, 14:19, 15:20, 16:15, 37:8, 80:12, 80:16, 81:24, 97:6, 97:8, 117:10, 120:1, 120:2, 120:3, 120:5, 120:8, 121:15,

125:13, 125:14, 125:16, 152:9
**requirement** [1] - 14:24
**requirements** [6] - 120:7, 121:25, 123:17, 128:20, 130:15
**requires** [1] - 96:7
**research** [4] - 38:17, 145:2, 160:7, 169:8
**reserve** [1] - 154:6
**reside** [1] - 18:22
**resides** [1] - 8:2
**resolve** [1] - 7:12
**resolving** [1] - 14:2
**resources** [1] - 8:23
**respect** [8] - 33:11, 37:4, 98:23, 105:24, 106:3, 131:7, 148:5, 165:8
**respected** [1] - 116:16
**respectfully** [2] - 57:24, 125:12
**respond** [5] - 98:15, 99:5, 106:9, 106:11, 117:15
**responding** [1] - 50:12
**response** [12] - 31:16, 50:11, 58:8, 58:9, 66:18, 67:2, 71:4, 88:8, 88:11, 96:18, 100:1, 106:11
**responses** [1] - 142:23
**responsibilities** [2] - 13:24, 86:25
**responsibility** [1] - 14:9
**responsible** [1] - 41:17
**rest** [4] - 23:6, 50:18, 149:6, 149:9
**restate** [2] - 51:15, 100:18
**restitution** [1] - 113:3
**result** [13] - 11:17, 16:23, 22:11, 49:12, 49:13, 50:15, 55:12, 74:6, 74:7, 85:19, 98:19, 107:24, 153:7
**results** [1] - 54:21
**resume** [3] - 112:19, 143:4
**resumed** [3] - 60:4, 131:3, 165:22
**resumes** [1] - 117:7
**retained** [1] - 9:22
**rethink** [2] - 67:7,

82:24
**retire** [2] - 72:6, 145:8
**retired** [8] - 17:10, 37:13, 37:16, 85:7, 115:2, 115:6, 115:23, 115:25
**retirement** [19] - 143:10, 144:7, 145:3, 147:1, 149:11, 150:7, 150:8, 150:12, 150:13, 150:16, 150:18, 150:22, 150:25, 151:3, 151:7, 151:9, 153:13, 164:19, 164:21
**retribution** [1] - 91:6
**return** [1] - 98:24
**returning** [1] - 43:18
**returns** [9] - 143:2, 156:20, 156:23, 156:25, 157:1, 157:2, 157:7, 158:3, 159:9
**review** [49] - 12:25, 16:9, 46:13, 46:21, 47:1, 47:11, 48:11, 48:24, 50:1, 50:24, 55:17, 56:2, 58:2, 58:3, 58:4, 59:4, 70:15, 94:17, 95:8, 96:8, 96:23, 98:6, 98:14, 98:18, 98:21, 100:9, 101:2, 101:9, 102:14, 103:6, 107:13, 108:7, 108:21, 142:15, 143:24, 143:25, 146:13, 149:18, 149:20, 157:6, 157:23, 158:1, 158:4, 160:22, 161:1, 162:16, 163:19, 165:6, 165:11
**reviewed** [34] - 9:21, 13:3, 13:8, 15:25, 16:2, 17:22, 56:3, 58:17, 58:25, 142:19, 142:20, 142:23, 143:1, 143:3, 143:4, 143:5, 143:6, 143:9, 143:10, 143:12, 143:13, 143:16, 146:5, 146:9, 147:10, 150:10, 156:21, 156:22, 157:1, 157:2, 157:3,

159:25, 160:10
**reviewer** [1] - 73:24
**reviewing** [3] - 11:23,
54:7, 102:5
**revise** [1] - 165:12
**revised** [4] - 49:9,
108:10, 108:12,
155:15
**revocation** [1] - 17:24
**revoke** [1] - 57:13
**rich** [1] - 91:15
**RICHARD** [1] - 1:8
**rid** [1] - 12:13
**rifle** [1] - 61:14
**rifles** [2] - 61:13,
62:21
**Rights** [2] - 4:19, 23:3
**rights** [9] - 4:23,
23:14, 23:17, 49:21,
49:23, 61:22, 63:9,
64:8, 108:19
**risk** [2] - 12:18, 15:1
**RMR** [3] - 176:3,
176:14, 176:17
**Robert** [2] - 29:22,
30:4
**Rochelle** [1] - 39:7
**Rod** [3] - 65:20,
134:15
**rod** [1] - 40:5
**role** [3] - 84:13,
101:12
**Rose** [1] - 109:22
**roughly** [1] - 175:6
**round** [1] - 85:24
**roundtrip** [3] - 110:18,
160:17, 160:24
**routinely** [1] - 163:7
**rubber** [1] - 36:24
**ruckus** [2] - 76:15,
173:15
**rule** [14] - 5:13, 13:10,
18:3, 28:4, 28:5,
28:7, 91:2, 126:14,
126:22, 170:3,
170:5, 170:9,
170:17, 170:18
**rules** [3] - 22:21,
22:22, 166:11
**ruling** [1] - 3:17
**run** [3] - 4:16, 36:22,
91:5
**run-ins** [1] - 4:16
**running** [1] - 29:6
**Rutgers** [2] - 137:7,
137:16

**S**

**Sadlack** [4] - 9:5,

54:4, 101:21, 174:6
**Sadlack's** [1] - 54:21
**Saint** [1] - 137:16
**salaries** [1] - 171:1
**salary** [21] - 21:12,
59:10, 124:20,
124:23, 126:2,
126:4, 126:10,
126:11, 126:13,
143:7, 145:20,
146:1, 146:3, 146:6,
147:14, 150:14,
150:19, 151:2,
164:5, 165:6, 165:11
**salvos** [1] - 78:20
**sample** [2] - 24:22,
25:6
**sat** [2] - 27:5, 41:14
**satire** [4] - 64:14,
64:16, 73:13, 83:22,
83:25, 84:7, 88:22,
113:6
**satirizing** [1] - 5:18
**save** [1] - 143:21
**saving** [1] - 37:6
**saw** [7] - 62:7, 73:24,
92:11, 92:13, 94:11,
117:2, 117:18
**scarce** [1] - 22:11
**scarcity** [1] - 22:9
**scene** [4] - 38:8,
83:19, 83:23, 84:14
**scenes** [5] - 5:14,
5:17, 33:14, 34:22,
83:8
**schadenfreude** [3] -
89:22, 89:23, 89:24
**schedule** [1] - 72:7
**scheduled** [1] - 4:18
**scheduling** [2] -
135:4, 136:14
**Schenectady** [2] -
19:4, 128:16
**school** [4] - 32:21,
77:5, 111:17, 120:9
**schools** [1] - 139:3
**science** [4] - 21:25,
109:19, 109:20,
118:15
**sciences** [3] - 8:15,
19:19, 21:23
**Sciences** [1] - 138:13
**scientific** [1] - 22:1
**scissors** [1] - 27:6
**scope** [1] - 17:14
**Scranton** [1] - 176:19
**screen** [4] - 69:16,
85:10, 128:3, 133:14
**scroll** [1] - 69:14
**search** [7] - 115:18,

116:9, 116:13,
117:5, 117:21,
117:22, 127:24
**searches** [1] - 127:3
**searching** [1] - 116:24
**second** [18] - 11:12,
34:10, 49:11, 49:12,
50:14, 58:25, 73:5,
73:12, 88:10, 88:13,
95:7, 96:18, 97:17,
102:1, 132:8,
172:21, 174:6, 174:8
**Second** [1] - 103:13
**secondary** [2] -
118:16
**secondly** [1] - 162:10
**seconds** [1] - 36:16
**secretaries** [1] - 83:20
**secretary** [4] - 37:11,
45:19, 83:17, 84:19
**section** [5] - 21:22,
143:7, 147:15,
169:14, 169:20
**Section** [1] - 176:6
**secure** [1] - 5:4
**securities** [3] -
149:18, 149:19,
149:24
**Security** [1] - 143:14
**seduce** [3] - 83:17,
83:20, 84:20
**see** [52] - 6:20, 8:25,
20:2, 20:3, 21:10,
22:4, 22:11, 22:14,
24:11, 24:16, 41:5,
45:19, 61:16, 70:16,
71:13, 74:22, 78:5,
78:21, 79:9, 85:17,
87:9, 88:22, 89:3,
92:10, 93:7, 95:22,
97:23, 97:24, 98:11,
98:16, 98:17, 106:9,
107:14, 110:12,
110:13, 115:14,
117:1, 120:16,
121:14, 128:3,
128:7, 128:11,
128:23, 130:9,
130:24, 132:21,
159:24, 164:25,
170:3, 170:4, 175:23
**seeing** [6] - 23:17,
28:18, 43:15, 90:5,
117:2, 173:1
**seek** [3] - 43:6, 50:23,
108:20
**seem** [1] - 38:2
**semblance** [1] - 38:2
**semester** [6] - 21:21,
29:14, 70:12, 70:14,

111:23, 126:24
**semesters** [1] -
113:12
**senate** [1] - 22:18
**senates** [1] - 52:21
**send** [7] - 26:10,
32:19, 41:18, 42:6,
94:6, 98:20, 117:7
**sending** [2] - 70:2,
73:9
**sends** [1] - 12:15
**sense** [5] - 10:24,
31:1, 43:5, 117:11,
172:2
**sent** [25] - 6:16, 24:23,
24:25, 25:5, 26:7,
32:20, 38:23, 40:19,
40:22, 42:8, 45:18,
45:21, 49:9, 52:23,
57:3, 61:2, 73:15,
73:22, 74:1, 76:18,
94:22, 94:23, 95:16,
117:9, 172:20
**sentence** [8] - 49:11,
49:12, 50:14, 55:14,
169:14, 169:20,
170:2, 170:8
**separate** [4] - 51:9,
55:16, 58:3, 58:22
**separated** [3] - 149:3,
150:3, 150:23
**separately** [4] - 13:9,
16:9, 17:21, 58:3
**separation** [3] - 144:6,
150:21, 151:10
**September** [4] - 19:14,
19:17, 20:1, 112:1
**series** [4] - 3:9, 7:3,
14:5, 166:1
**serious** [6] - 13:23,
14:8, 81:1, 81:10,
81:12, 92:18
**seriously** [1] - 17:11
**served** [2] - 9:6, 9:13
**service** [4] - 150:15,
150:17, 150:20,
151:4
**session** [3] - 28:15,
29:16, 80:20
**sessions** [1] - 21:21
**set** [11] - 8:24, 14:15,
14:19, 51:24, 54:24,
72:2, 88:8, 163:8,
163:12, 163:19,
176:9
**setbacks** [1] - 5:15
**Seton** [3] - 137:5,
137:14, 139:5
**setting** [1] - 83:19
**settle** [1] - 172:6

**seven** [3] - 9:24,
42:25, 61:12
**several** [4] - 4:16,
5:15, 6:9, 45:2,
62:10, 142:19,
143:5, 144:1, 148:2
**sexual** [2] - 28:9,
28:16
**shall** [7] - 25:13, 39:2,
83:23, 103:19,
104:12, 104:15,
110:10
**shame** [5] - 10:22,
82:17, 82:20, 82:25,
91:14
**share** [8] - 30:6,
69:18, 69:21, 69:25,
70:3, 70:4, 70:8,
76:16
**sharp** [1] - 41:9
**shocked** [1] - 26:21
**shoe** [1] - 71:18
**short** [3] - 87:15,
175:17, 175:19
**shot** [1] - 85:10
**shots** [1] - 133:14
**show** [30] - 4:11, 5:14,
6:25, 10:1, 11:5,
11:14, 12:23, 13:4,
13:7, 13:16, 14:25,
15:8, 15:17, 16:8,
16:12, 16:13, 16:23,
17:3, 17:11, 18:6,
25:9, 29:11, 34:21,
35:3, 36:3, 47:10,
47:17, 86:21,
125:22, 174:22
**showed** [2] - 26:17,
73:25
**showing** [6] - 6:19,
34:14, 87:16, 87:17,
87:22, 118:7
**shown** [1] - 34:19
**side** [8] - 18:4, 40:10,
41:11, 72:1, 91:2,
171:17, 171:24,
171:25
**sidebar** [3] - 3:4, 3:7,
3:25
**sides** [3] - 3:14, 3:17,
172:4
**sidewalks** [1] - 90:10
**sign** [18] - 20:8, 20:12,
21:11, 47:25, 94:19,
95:12, 95:13, 96:14,
96:21, 96:25, 98:24,
99:6, 99:10, 108:15,
108:25, 109:3,
116:14, 173:2
**signaling** [1] - 28:21

**signature** [4] - 20:5, 21:6, 21:8, 21:11
**signed** [7] - 20:9, 20:14, 25:12, 25:18, 39:25, 97:8
**significance** [3] - 22:2, 22:3, 149:21
**significant** [2] - 155:18, 160:24
**signing** [1] - 175:14
**similar** [13] - 20:12, 103:5, 103:14, 103:15, 103:21, 103:22, 103:23, 104:5, 104:9, 104:12, 104:17
**simple** [2] - 65:14, 99:5
**simply** [7] - 16:21, 140:6, 140:25, 151:1, 154:15, 154:20, 158:24
**simulated** [1] - 22:10
**single** [4] - 119:21, 119:24, 120:18, 171:4
**Sister** [69] - 8:1, 11:9, 11:21, 11:23, 12:23, 13:3, 13:7, 15:20, 16:15, 16:17, 16:20, 24:10, 26:8, 31:10, 38:6, 38:23, 40:8, 41:22, 44:21, 44:22, 45:1, 45:16, 45:18, 52:18, 52:23, 55:10, 55:15, 56:21, 57:12, 58:16, 71:19, 77:24, 78:2, 78:9, 83:3, 83:4, 83:6, 83:13, 83:19, 84:12, 85:10, 87:18, 91:21, 91:23, 92:13, 92:17, 93:17, 94:1, 94:14, 94:17, 95:20, 96:2, 96:9, 96:14, 96:18, 96:24, 98:12, 99:17, 100:7, 101:2, 102:16, 102:19, 102:23, 103:6, 105:2, 105:16, 108:7, 131:7, 174:17
**sister** [3] - 39:1, 74:19, 87:22
**sister's** [1] - 75:10
**sisterhood** [3] - 84:24, 84:25, 85:1
**sisters** [5] - 84:23, 85:2, 85:4, 85:6, 85:7
**sit** [1] - 162:23

**sitting** [3] - 41:1, 41:11, 41:13
**situation** [8] - 69:19, 70:1, 71:2, 72:10, 72:13, 83:9, 88:24, 90:15
**six** [6] - 11:22, 12:25, 17:15, 17:22, 17:24, 42:25
**size** [4] - 22:5, 22:7, 28:24, 39:13
**Skaneatles** [2] - 18:23, 25:24
**skill** [3] - 163:8, 163:12, 163:19
**skills** [3] - 164:13, 170:22, 171:12
**skin** [1] - 87:17
**skip** [1] - 93:24
**skipping** [1] - 95:10
**slash** [4] - 74:23, 74:24, 78:8, 88:9
**slash/their** [1] - 71:18
**slices** [1] - 29:19
**slide** [2] - 84:17, 85:9
**slides** [1] - 83:2
**slip** [1] - 85:8
**slow** [1] - 167:4
**smiley** [2] - 79:25, 80:4
**Smith** [2] - 69:5
**snow** [2] - 17:8, 111:4
**Sobel** [3] - 137:21, 137:22, 137:25
**social** [8] - 19:7, 19:9, 19:19, 21:23, 21:25, 22:14, 109:19, 109:20
**Social** [2] - 138:12, 143:14
**soda** [2] - 29:19, 30:2
**solar** [2] - 89:20, 90:13
**someone** [3] - 74:2, 159:1, 160:16
**sometime** [1] - 53:14
**sometimes** [5] - 22:2, 116:25, 122:7, 126:13, 153:9
**somewhere** [1] - 163:23
**soon** [2] - 38:25, 56:22
**sorry** [19] - 18:20, 20:17, 20:19, 30:17, 34:5, 53:8, 64:25, 73:7, 74:20, 99:2, 99:14, 100:12, 107:9, 128:4, 132:5, 134:1, 134:14,

168:21, 169:3
**sort** [3] - 75:7, 164:17, 165:6
**sorting** [1] - 120:13
**sought** [1] - 113:3
**sound** [2] - 66:21, 158:14
**sounds** [1] - 158:12
**source** [2] - 161:18, 161:22
**sources** [3] - 146:13, 148:2, 148:12
**south** [1] - 111:6
**speaker** [12] - 4:19, 4:22, 5:19, 23:2, 23:5, 23:7, 24:6, 29:3, 29:15, 81:20, 113:2
**speaking** [2] - 81:20, 138:23
**speaks** [1] - 102:4
**specialty** [1] - 118:9
**specific** [9] - 31:14, 37:7, 80:19, 120:6, 124:25, 158:11, 161:20, 162:1, 170:20
**specifically** [9] - 15:3, 44:25, 143:5, 143:10, 145:5, 146:11, 148:5, 150:10, 160:15
**specified** [1] - 61:21
**speculation** [2] - 125:1, 125:2
**Speech** [1] - 39:24
**speech** [32] - 4:15, 4:17, 4:23, 5:9, 23:14, 23:15, 23:20, 26:14, 29:12, 29:20, 29:21, 32:11, 33:8, 33:9, 33:12, 33:22, 39:20, 39:21, 40:7, 40:10, 77:17, 79:12, 79:15, 85:15, 87:20, 90:15, 105:23, 110:10, 112:21, 113:1
**speed** [3] - 108:17, 171:13, 172:10
**Spencer** [2] - 29:22, 30:4
**spend** [4] - 18:4, 91:3, 157:25, 172:11
**spending** [2] - 91:16, 171:14
**spent** [5] - 17:3, 29:5, 127:5, 127:6, 159:22
**spirit** [1] - 108:13
**sponsored** [1] - 28:9

**sports** [1] - 36:6
**spread** [2] - 76:19, 93:7
**spreadsheet** [2] - 119:25, 171:11
**spreadsheets** [1] - 171:1
**spree** [1] - 33:8
**spring** [1] - 28:9
**Staller** [2] - 152:8, 152:11
**Stamp** [1] - 169:13
**stamp** [4] - 24:17, 24:20, 36:24
**stamped** [3] - 24:24, 25:17, 27:7
**stand** [7] - 60:3, 60:4, 114:9, 117:10, 131:3, 135:14, 165:22
**standard** [2] - 155:25, 169:11
**standing** [1] - 140:7
**stands** [2] - 6:18, 78:8
**start** [7] - 19:11, 19:16, 22:1, 36:16, 111:16, 111:22, 144:19
**started** [3] - 38:9, 41:15, 42:10, 42:11, 42:13, 42:14, 42:16, 43:11, 105:7, 111:24, 116:21, 136:13, 148:16
**starting** [3] - 145:17, 145:21, 146:1
**state** [5] - 33:9, 36:8, 44:2, 139:12
**statement** [15] - 31:12, 45:5, 45:8, 49:9, 55:20, 78:25, 94:15, 96:3, 96:11, 97:19, 98:3, 98:20, 108:11, 108:12, 143:13
**statements** [1] - 143:2
**STATES** [1] - 1:1
**states** [6] - 7:2, 7:6, 7:9, 7:10, 7:20, 99:21
**States** [4] - 39:11, 176:4, 176:6, 176:18
**statistical** [2] - 22:2, 146:10, 146:14
**statistics** [9] - 22:7, 109:17, 121:6, 121:12, 124:7, 124:9, 126:17, 126:21, 138:3
**stay** [2] - 25:23, 38:21
**stayed** [1] - 150:23

**steal** [1] - 84:18
**step** [2] - 136:7, 165:18
**Stephanie** [3] - 10:8, 109:7, 171:12
**STEPHANIE** [1] - 1:22
**stepping** [1] - 87:16
**steps** [7] - 7:4, 9:7, 9:8, 9:16, 14:5, 143:22, 166:18
**sticking** [1] - 85:25
**still** [6] - 35:6, 110:12, 115:5, 125:15, 135:14, 135:15
**stink** [2] - 68:18, 72:4
**stipulate** [2] - 34:22, 35:7
**stipulations** [1] - 35:2
**stock** [1] - 171:2
**stop** [7] - 36:15, 36:16, 37:1, 38:5, 39:20, 40:13, 85:8
**store** [1] - 26:6
**stories** [4] - 33:18, 60:24, 60:25, 86:3
**story** [3] - 61:1, 61:10, 86:2
**STRAFFORD** [1] - 1:16
**strange** [2] - 28:4, 116:6
**strategies** [2] - 7:4, 14:5
**STREET** [1] - 1:24
**Street** [2] - 18:23, 87:4
**stress** [1] - 87:1
**stretch** [2] - 124:10, 124:12
**strictly** [1] - 97:5
**string** [1] - 76:11
**strong** [2] - 172:3, 172:6
**strongly** [1] - 4:14
**student** [34] - 24:17, 24:19, 24:21, 25:8, 25:11, 25:13, 25:15, 25:17, 25:19, 25:25, 36:17, 36:20, 36:22, 36:23, 36:25, 37:15, 40:3, 61:22, 62:6, 62:7, 62:8, 63:6, 63:11, 64:7, 64:12, 69:6, 69:17, 69:22, 73:24, 76:13, 82:10, 89:18, 89:19
**students** [24] - 22:6, 22:10, 23:17, 26:11, 26:22, 27:11, 28:3, 28:6, 28:13, 28:14, 28:16, 29:16, 39:22,

39:25, 64:4, 69:9, 69:24, 76:23, 79:14, 81:24, 115:16
**studied** [1] - 19:6
**studies** [3] - 19:8, 19:9, 22:5
**study** [4] - 22:5, 22:12, 22:16, 139:6
**stuff** [9] - 18:3, 22:13, 29:7, 88:9, 91:2, 93:10, 170:3, 170:9, 171:22
**subject** [3] - 7:23, 10:17, 17:13
**submit** [2] - 112:6, 112:19
**subpoena** [1] - 174:3
**subpoenaed** [1] - 136:15
**subscriptions** [1] - 117:1
**substance** [1] - 52:3
**substantial** [2] - 10:3, 129:9
**subtitles** [2] - 5:17, 5:18
**subtracted** [1] - 156:16
**subversion** [3] - 84:23, 85:4, 85:7
**success** [1] - 78:23
**suffered** [2] - 5:15, 90:18
**sufficiently** [1] - 7:12
**suggest** [1] - 175:8
**suggested** [4] - 23:5, 23:8, 29:22, 38:21
**suggesting** [1] - 85:3
**suggestion** [1] - 67:2
**SUITE** [3] - 1:16, 1:21, 1:24
**suited** [1] - 112:4
**sum** [4] - 150:17, 151:8, 156:11, 156:14
**summarize** [1] - 53:2
**summary** [2] - 10:1, 90:12
**summer** [1] - 137:17
**summoned** [1] - 5:23
**SUNY** [4] - 114:17, 122:15, 126:17, 129:24
**superimpose** [1] - 83:5
**supervision** [2] - 176:11, 176:22
**supervisor** [2] - 37:17, 106:24
**supplement** [1] -

154:6
**supplemental** [2] - 152:7, 155:23
**supplemented** [1] - 154:8
**supply** [1] - 22:8
**support** [8] - 3:14, 29:12, 29:21, 32:10, 89:2, 139:4, 140:10, 141:7
**supporters** [1] - 71:17
**supporting** [1] - 72:3
**supportive** [1] - 23:16
**supposed** [5] - 83:13, 84:19, 84:20, 86:7
**supposedly** [2] - 61:6, 85:24
**surely** [2] - 78:8, 130:13
**surprise** [2] - 11:25, 171:22
**surprised** [1] - 54:20
**surrounding** [1] - 5:19
**survey** [3] - 148:11, 157:24, 160:11
**suspend** [10] - 7:15, 14:22, 51:11, 55:18, 58:20, 93:12, 101:2, 101:10, 101:17
**suspended** [13] - 5:25, 7:9, 8:6, 8:8, 8:13, 11:3, 14:23, 43:1, 46:4, 53:8, 93:14, 101:24, 102:1
**suspending** [2] - 4:8, 53:4
**suspension** [42] - 6:1, 6:13, 6:15, 7:5, 7:6, 7:11, 7:12, 9:1, 9:21, 13:25, 14:10, 15:16, 15:18, 15:25, 16:3, 16:7, 16:9, 17:23, 17:24, 46:14, 46:21, 46:22, 47:1, 47:12, 48:11, 48:24, 50:1, 50:25, 54:23, 54:24, 58:4, 58:7, 58:22, 58:24, 59:5, 59:6, 94:2, 96:23, 99:21, 101:8, 101:9
**sustained** [2] - 81:18, 144:12
**switch** [1] - 84:22
**sworn** [2] - 18:13, 136:12
**symbolism** [2] - 66:7
**Symphony** [1] - 88:6
**Symphoria** [1] - 86:21
**Syracuse** [1] - 19:9, 88:5, 111:3, 113:12,

119:15, 121:7, 124:6, 125:5, 129:5, 129:10, 130:9

### T

**table** [3] - 27:6, 41:10, 41:15
**tactic** [2] - 82:22, 82:25
**talks** [1] - 14:24
**taped** [1] - 30:24
**target** [1] - 61:13
**targeting** [1] - 28:20
**tasked** [1] - 11:22
**taught** [14] - 19:13, 21:22, 81:22, 109:13, 109:18, 121:13, 121:23, 123:14, 123:15, 123:20, 137:11, 137:17, 138:1, 138:3
**tax** [23] - 140:8, 140:18, 143:2, 144:10, 155:5, 155:17, 155:21, 155:24, 156:4, 156:7, 156:20, 156:23, 156:25, 157:1, 157:4, 157:6, 158:3, 159:9, 159:10, 171:3
**taxes** [8] - 144:10, 154:22, 154:23, 155:2, 155:11, 156:12, 156:13, 157:5
**teach** [7] - 19:18, 25:16, 109:12, 121:12, 125:8, 130:16, 139:2
**teachers** [4] - 118:16, 118:17, 119:6
**teaching** [12] - 4:24, 21:19, 23:1, 72:7, 110:13, 122:16, 123:21, 128:2, 130:14, 137:24, 139:2
**tear** [4] - 28:23, 30:16, 42:12, 71:22
**teardowns** [1] - 90:9
**tearing** [3] - 5:3, 71:10, 84:14
**technical** [1] - 11:15
**technician** [1] - 34:1
**telephone** [1] - 25:3
**television** [1] - 86:21
**ten** [18] - 5:22, 12:13, 14:14, 31:21, 40:22,

130:25, 131:1, 134:14, 138:4, 147:12, 147:17, 147:19, 148:18, 164:22, 164:23, 164:24, 164:25, 165:2
**tend** [1] - 39:10
**tenure** [24] - 4:9, 4:13, 6:4, 6:18, 6:21, 11:4, 11:8, 11:20, 17:24, 19:15, 46:2, 55:12, 55:19, 57:13, 58:21, 66:9, 72:1, 77:21, 94:18, 97:23, 168:25, 169:4, 169:11
**tenured** [1] - 12:9, 12:25, 13:9, 17:22, 19:14, 49:14, 58:25, 67:24, 68:7, 81:1, 107:19, 107:21, 112:22, 168:23
**term** [5] - 6:21, 49:14, 86:22, 106:4, 107:18
**terminate** [6] - 6:17, 51:12, 55:18, 55:24, 57:13, 58:20, 94:18, 96:9, 105:3
**terminated** [9] - 8:14, 11:3, 16:20, 16:24, 46:2, 78:3, 81:6, 111:9, 163:23
**terminating** [2] - 4:9, 6:12
**termination** [34] - 6:4, 6:13, 6:14, 8:9, 9:1, 9:14, 15:5, 15:16, 16:5, 16:6, 16:18, 17:15, 17:24, 46:10, 50:24, 53:5, 56:4, 58:23, 59:3, 81:3, 81:15, 94:2, 94:15, 96:2, 96:11, 97:18, 98:2, 109:1, 153:7, 153:19, 154:8, 154:12, 166:14, 172:23
**terms** [13] - 20:1, 30:7, 37:7, 38:20, 42:12, 64:18, 104:2, 141:9, 150:5, 153:9, 154:22, 158:19
**terrible** [1] - 26:19
**terrorist** [3] - 61:12, 61:15, 85:21
**testified** [31] - 8:4, 8:6, 8:8, 8:15, 8:17, 18:13, 60:12, 76:2, 76:5, 91:22, 94:3,

94:25, 95:16, 96:19, 101:15, 101:21, 105:16, 106:18, 107:4, 119:1, 119:7, 125:17, 127:5, 127:6, 127:8, 131:5, 131:6, 136:12, 139:8, 139:12, 163:4
**testify** [26] - 4:11, 4:13, 4:18, 4:25, 5:4, 5:8, 5:11, 5:20, 5:23, 5:25, 6:2, 6:4, 6:11, 6:16, 8:12, 8:23, 9:2, 9:7, 9:16, 9:23, 47:7, 124:22, 125:25, 141:11, 156:3, 174:18
**testifying** [1] - 118:18
**testimony** [9] - 7:25, 83:9, 135:15, 152:6, 156:20, 160:3, 164:23, 174:20, 175:10
**testing** [1] - 22:2
**Texas** [2] - 8:2, 174:23
**Thanksgiving** [3] - 24:22, 24:25, 25:5
**THE** [191] - 1:1, 1:1, 1:8, 3:1, 3:8, 3:12, 4:1, 10:5, 10:7, 18:10, 20:23, 21:17, 27:22, 27:23, 27:24, 27:25, 28:1, 31:24, 34:8, 35:1, 35:4, 35:10, 39:18, 41:21, 42:1, 42:3, 45:12, 47:9, 47:16, 47:21, 48:1, 48:5, 48:7, 48:16, 48:19, 48:25, 50:5, 51:16, 53:23, 54:13, 55:5, 56:13, 57:3, 57:4, 57:6, 57:17, 58:12, 59:17, 59:20, 59:22, 60:1, 60:3, 61:25, 62:3, 64:22, 65:3, 65:5, 65:16, 66:12, 66:15, 69:2, 73:2, 75:23, 75:25, 76:2, 76:5, 76:7, 76:9, 77:1, 79:19, 81:18, 88:5, 89:9, 89:12, 90:23, 91:7, 100:11, 100:16, 100:19, 104:5, 104:24, 105:12, 105:13, 105:14, 105:18, 106:15, 106:20, 107:1, 107:3, 107:4, 112:10, 118:18,

118:21, 118:24, 119:2, 119:11, 119:18, 122:24, 122:25, 123:5, 123:9, 123:12, 124:13, 124:17, 124:20, 124:24, 125:10, 125:20, 125:22, 126:1, 126:5, 126:8, 129:8, 129:15, 130:25, 131:15, 132:1, 132:18, 132:21, 132:25, 133:4, 133:7, 133:13, 133:17, 133:21, 133:25, 134:6, 134:9, 134:12, 134:17, 134:19, 134:20, 134:25, 135:7, 135:19, 135:21, 135:23, 135:25, 136:2, 136:7, 136:8, 136:9, 136:18, 136:20, 139:16, 141:10, 141:13, 141:16, 141:20, 141:23, 142:1, 142:4, 152:15, 152:17, 152:20, 152:22, 152:24, 152:25, 165:15, 165:17, 165:19, 165:20, 166:8, 166:9, 167:5, 167:7, 167:8, 167:11, 167:14, 167:17, 167:21, 167:25, 168:3, 168:6, 168:9, 168:11, 170:13, 170:15, 172:17, 173:17, 173:19, 173:25, 174:10, 174:14, 174:24, 175:2, 175:4, 175:12, 175:14, 175:18, 175:23

**themselves** [2] - 42:19, 52:4
**theories** [1] - 22:2
**theory** [1] - 3:12
**thereafter** [4] - 147:14, 147:20, 148:20, 165:2
**therefore** [2] - 8:3, 158:16
**thereof** [3] - 17:1, 31:9, 32:11
**thesis** [1] - 137:10

**thick** [1] - 121:4
**thinking** [5] - 67:9, 67:10, 85:5, 85:6, 169:10
**third** [5] - 11:15, 54:25, 55:14, 59:4, 169:3
**thirds** [1] - 41:14
**thousand** [6] - 9:25, 29:3, 29:15, 29:17, 29:19, 91:9
**thousands** [3] - 33:17, 35:22
**threat** [4] - 100:6, 100:8, 100:24, 101:3
**threatened** [2] - 7:7, 99:23
**three** [15] - 9:12, 9:20, 9:25, 11:6, 17:1, 22:16, 52:25, 73:22, 113:12, 116:8, 117:8, 120:23, 120:24, 122:2, 130:8
**THREE** [1] - 1:23
**Thursday** [1] - 24:25
**timed** [1] - 19:14
**timeframe** [1] - 31:9
**Tinari** [3] - 137:21, 137:22, 137:25
**Title** [1] - 176:5
**title** [3] - 37:14, 37:16, 128:12
**TO** [1] - 2:1
**today** [9] - 55:13, 135:3, 136:15, 155:20, 156:3, 160:3, 162:23, 166:22, 174:6
**today's** [1] - 144:14
**tomorrow** [2] - 173:21, 173:23
**took** [21] - 8:9, 9:8, 9:17, 13:13, 62:18, 63:18, 63:20, 66:16, 87:20, 92:23, 105:20, 106:5, 135:2, 143:22, 148:6, 148:8, 148:10, 148:17, 150:7, 162:22, 167:5
**tool** [1] - 115:18
**top** [12] - 20:3, 30:1, 71:6, 74:20, 87:9, 94:13, 96:5, 96:20, 107:10, 147:19, 147:20, 151:8
**topic** [2] - 4:22, 22:7
**topics** [4] - 21:24, 28:22, 35:23, 84:6
**tore** [3] - 31:3, 71:21,

112:25
**torn** [8] - 26:2, 26:5, 26:9, 26:12, 26:15, 26:20, 70:5, 82:14
**Torrell** [3] - 60:22, 105:9, 105:15
**tossed** [1] - 170:21
**tossing** [1] - 80:3
**total** [9] - 93:23, 120:17, 144:11, 149:25, 151:12, 151:21, 155:8, 156:4, 156:10
**totaled** [1] - 150:18
**totally** [2] - 68:3, 175:22
**tough** [2] - 29:20, 88:25
**toward** [1] - 38:11
**towards** [3] - 7:13, 33:12, 59:8
**town** [1] - 26:15
**track** [1] - 19:14
**trade** [5] - 87:3, 117:16, 117:17, 164:9, 164:10
**tradeoffs** [1] - 89:2
**tradition** [1] - 169:20
**trained** [2] - 171:10, 171:11
**training** [9] - 80:8, 80:11, 80:12, 80:18, 80:19, 146:12, 161:5, 162:18, 164:16
**traits** [1] - 71:24
**transcript** [4] - 142:20, 176:7, 176:10, 176:21
**transcripts** [1] - 174:2
**transfer** [1] - 83:8
**transpired** [2] - 31:8, 32:13
**transportation** [1] - 157:14
**travel** [5] - 111:1, 159:17, 160:4, 160:5, 160:9
**traveled** [1] - 158:5
**traveling** [4] - 158:22, 159:2, 159:23, 160:16
**treasury** [1] - 149:19
**TRIAL** [1] - 1:10
**trial** [6] - 3:2, 123:3, 127:22, 129:13, 143:21, 156:1
**trials** [1] - 139:4
**tried** [9] - 17:11, 30:15, 38:17, 40:6,

42:17, 43:6, 43:9, 45:6, 130:3
**trier** [1] - 153:21
**triggered** [1] - 15:19
**trouble** [6] - 12:9, 60:25, 67:24, 68:7, 72:11, 77:11
**troubles** [1] - 87:6
**troublesome** [1] - 58:1
**true** [7] - 44:23, 55:20, 55:21, 76:6, 91:13, 155:14, 176:7
**truly** [1] - 43:9
**trustees** [2] - 78:17, 166:19
**truth** [3] - 31:6, 32:8, 123:8
**try** [20] - 12:17, 24:11, 28:24, 29:11, 33:7, 38:21, 42:16, 66:9, 70:25, 72:6, 72:18, 74:10, 75:6, 106:9, 113:9, 131:18, 167:1, 172:6, 172:9
**trying** [15] - 12:13, 26:16, 31:6, 32:8, 38:8, 43:14, 44:20, 54:22, 63:15, 82:11, 90:13, 171:25, 172:10, 175:13
**Tuesday** [1] - 25:24
**tuition** [1] - 27:12
**tune** [1] - 79:14
**turmoil** [1] - 87:1
**turn** [8] - 32:25, 50:13, 78:22, 79:10, 128:1, 151:11, 168:13, 168:21
**turned** [1] - 145:9
**twice** [5] - 15:15, 103:4, 103:11, 104:6, 104:11
**two** [51] - 5:8, 5:11, 10:18, 13:8, 17:21, 20:4, 21:21, 28:17, 32:23, 38:15, 41:14, 49:21, 50:13, 50:23, 51:7, 51:9, 51:17, 55:16, 73:12, 73:14, 73:22, 82:5, 82:6, 84:17, 103:8, 110:24, 111:4, 113:5, 117:4, 118:1, 118:3, 121:3, 125:13, 126:16, 126:21, 128:16, 130:13, 136:14, 139:17, 146:13, 146:18, 149:10,

149:16, 149:22, 160:5, 162:4, 162:24, 167:11, 172:19, 174:2, 174:8
**two-part** [2] - 5:8, 32:23
**two-thirds** [1] - 41:14
**type** [5] - 77:7, 79:7, 105:23, 124:23, 164:2
**types** [2] - 109:16, 149:23
**typically** [2] - 140:15, 157:14

## U

**U.S** [11] - 4:25, 22:19, 22:20, 23:1, 109:13, 145:4, 146:10, 149:18, 162:6, 162:8, 162:17
**ultimately** [6] - 9:13, 16:4, 27:14, 56:1, 113:13, 148:12
**under** [17] - 8:4, 8:15, 9:8, 9:17, 16:22, 17:25, 34:17, 49:23, 58:19, 61:14, 125:13, 128:12, 143:7, 147:15, 166:5, 176:11, 176:21
**undergraduate** [1] - 138:2
**understandably** [1] - 171:10
**understood** [1] - 60:16
**undertake** [1] - 31:14
**underwent** [1] - 155:17
**undo** [1] - 66:9
**unhappiness** [1] - 75:5
**unhappy** [1] - 65:9
**union** [6] - 128:6, 163:16, 163:18, 164:1, 164:6, 164:7
**Union** [2] - 19:4, 128:1
**United** [4] - 39:11, 176:4, 176:6, 176:18
**UNITED** [1] - 1:1
**universities** [4] - 4:14, 23:20, 115:21
**University** [33] - 3:2, 4:8, 4:12, 10:10, 12:21, 13:12, 18:8, 19:6, 19:12, 21:5, 38:10, 38:12, 39:1,

40:3, 44:24, 60:10,
82:21, 89:18, 97:18,
105:4, 107:17,
115:10, 128:23,
137:5, 137:7,
137:15, 137:16,
139:5, 143:11,
168:20
**university** [33] - 5:2,
5:7, 6:7, 6:19, 7:13,
9:10, 9:19, 10:12,
10:22, 11:8, 11:14,
11:16, 11:25, 13:20,
14:8, 14:18, 37:11,
37:14, 37:18, 38:13,
46:19, 56:1, 66:8,
80:9, 94:18, 97:4,
97:21, 98:25,
107:19, 108:2,
113:7, 148:6, 148:8
**UNIVERSITY** [1] - 1:7
**university's** [5] - 13:2,
15:2, 17:17, 44:9,
107:16
**unless** [9] - 35:7, 47:6,
59:20, 63:23, 78:5,
79:4, 79:10, 141:16,
176:21
**unorthodox** [1] -
136:4
**unprofessional** [2] -
77:8, 77:10
**up** [87] - 7:1, 14:15,
14:19, 18:19, 19:20,
20:16, 20:24, 23:13,
25:9, 25:19, 25:20,
25:23, 26:3, 26:17,
26:23, 27:8, 30:9,
30:12, 30:21, 32:1,
33:2, 34:4, 36:12,
37:8, 39:15, 39:25,
42:17, 43:18, 44:14,
44:15, 45:13, 46:23,
49:1, 50:6, 51:6,
51:24, 52:13, 53:15,
53:25, 54:14, 54:24,
56:14, 56:15, 57:18,
58:14, 61:2, 61:5,
62:2, 62:24, 67:8,
67:14, 69:16, 72:2,
74:22, 74:23, 75:25,
78:8, 83:19, 85:7,
89:5, 91:5, 91:9,
93:3, 99:4, 103:22,
105:17, 106:22,
108:17, 108:18,
111:2, 113:18,
116:14, 120:14,
140:8, 140:18,
140:19, 142:12,

144:10, 154:1,
155:5, 166:23,
168:12, 170:23,
171:4, 171:13,
171:17, 174:22
**update** [2] - 155:25,
156:3
**updated** [10] - 144:14,
144:17, 155:20,
155:21, 162:15,
162:19, 162:22,
162:25, 163:2
**updating** [2] - 155:24,
156:1
**upheld** [3] - 9:13,
13:8, 16:10
**uploaded** [1] - 40:17
**upper** [4] - 31:5,
37:15, 112:16, 120:9
**upset** [2] - 27:9, 77:12
**uses** [1] - 107:15
**utmost** [1] - 37:4

## V

**vacation** [1] - 111:7
**vague** [2] - 37:9, 60:17
**valid** [1] - 155:12
**valuable** [1] - 172:12
**value** [10] - 37:2, 37:3,
105:24, 106:2,
144:12, 149:11,
149:13, 150:5,
151:6, 151:21
**values** [6] - 17:18,
31:12, 37:4, 37:8,
72:4, 83:19
**various** [5] - 13:12,
36:15, 36:23, 119:6,
147:25
**verbal** [4] - 72:20,
81:2, 81:5, 81:16
**verdict** [1] - 18:9
**version** [3] - 44:19,
90:13, 106:8
**versus** [2] - 3:2, 22:13
**via** [1] - 106:22
**vice** [11] - 7:10, 8:11,
8:22, 10:16, 14:21,
14:23, 27:1, 30:18,
37:20, 39:8, 101:9
**video** [39] - 5:8, 5:10,
5:24, 8:5, 8:7, 11:1,
32:23, 33:1, 33:3,
33:20, 34:9, 34:17,
34:18, 36:2, 36:4,
36:13, 36:17, 36:20,
38:1, 43:21, 66:23,
70:15, 70:16, 71:20,
74:1, 74:13, 83:13,

83:14, 84:8, 84:11,
86:5, 86:15, 86:23,
88:10, 88:20, 92:10,
92:11, 107:14,
167:11
**videos** [76] - 5:11,
10:12, 10:17, 10:21,
10:24, 11:5, 12:2,
12:4, 12:14, 12:15,
12:22, 14:12, 14:14,
15:9, 15:10, 15:12,
15:13, 33:4, 33:5,
33:16, 33:19, 36:6,
40:15, 41:16, 42:10,
42:12, 42:16, 42:18,
42:19, 43:7, 43:12,
44:22, 45:4, 53:7,
53:10, 53:19, 65:7,
67:20, 67:22, 69:10,
69:21, 70:2, 70:12,
70:20, 70:21, 71:1,
71:12, 72:23, 73:9,
73:13, 73:21, 75:1,
75:3, 76:17, 82:16,
82:17, 82:19, 82:21,
84:3, 84:4, 84:16,
90:6, 92:1, 92:4,
92:9, 92:21, 92:22,
92:25, 93:15, 98:22,
113:6, 131:9,
166:10, 169:10
**view** [5] - 39:3, 73:16,
84:1, 84:2, 95:10
**viewed** [1] - 84:3
**viewers** [4] - 73:15,
73:18, 73:21, 88:17
**views** [1] - 29:24
**violated** [4] - 10:2,
94:4, 106:2, 107:20
**violates** [1] - 105:24
**violation** [3] - 14:9,
49:21, 92:18
**violations** [1] - 13:23
**viral** [3] - 76:17, 86:16,
88:21
**virgins** [4] - 61:7,
61:15, 62:12, 62:20
**Visa** [1] - 28:17
**visit** [1] - 117:13
**visiting** [3] - 122:15,
128:12, 128:14
**Vitae** [3] - 127:10,
127:23, 128:21
**vocational** [2] -
163:13, 164:15
**voir** [1] - 139:16
**volatile** [1] - 166:18
**voter** [1] - 22:23
**voting** [2] - 22:21,
22:22

**votive** [2] - 68:1, 68:10
**vs** [1] - 1:5
**vulgar** [1] - 107:15

## W

**wage** [10] - 143:2,
161:2, 161:3, 161:4,
161:7, 161:12,
161:13, 161:15,
161:21, 162:7
**wages** [4] - 155:3,
161:19, 162:11,
163:16
**wait** [6] - 72:6, 105:12,
106:15, 122:25,
167:8
**waiting** [5] - 61:7,
62:12, 62:21, 62:22,
136:16
**waive** [2] - 96:13,
108:7
**waived** [1] - 11:13
**waiver** [2] - 13:1, 13:5
**walk** [1] - 143:22
**wall** [1] - 105:22
**Wall** [1] - 87:4
**wants** [3] - 124:18,
125:12, 174:4
**War** [1] - 5:16
**Ward** [1] - 40:6
**warned** [1] - 12:1
**warning** [12] - 5:25,
6:1, 14:17, 43:23,
43:25, 72:20, 72:21,
81:2, 81:6, 81:8,
81:16
**warnings** [4] - 7:5,
14:6, 72:23
**warranted** [1] - 15:7
**Washington** [1] -
176:19
**waste** [6] - 30:2,
112:4, 120:10,
120:11, 123:17,
124:4
**watch** [1] - 10:24
**Watch** [1] - 29:23
**watched** [1] - 35:18
**Watergate** [1] - 93:19
**WAYNE** [1] - 1:17
**ways** [1] - 139:6
**weak** [2] - 5:9, 31:16
**wealth** [1] - 11:10
**wear** [1] - 71:19
**weather** [1] - 111:5
**web** [4] - 39:4, 39:9,
39:23, 119:14
**website** [2] - 90:12,
112:24

**websites** [5] - 117:4,
117:5, 118:2, 119:7,
119:8
**Websters** [1] - 103:13
**Wednesday** [5] -
23:25, 24:25, 26:17,
174:19, 174:23
**week** [7] - 17:4, 72:8,
93:4, 94:8, 119:23,
127:7, 158:9
**weekend** [2] - 24:22,
25:5
**weekly** [2] - 116:22,
116:23
**weeks** [1] - 158:9
**welcome** [1] - 152:25
**welcoming** [1] -
105:25
**welfare** [3] - 12:16,
74:9, 74:11
**West** [1] - 129:4
**whereas** [1] - 30:2
**White** [3] - 129:9
**who'd** [3] - 25:8,
29:23, 90:8
**whole** [6] - 71:2,
79:13, 87:9, 140:20,
140:25, 141:4
**wife** [7] - 10:18, 66:22,
86:13, 86:18, 86:20,
88:9, 88:19
**wife's** [1] - 147:3
**William** [3] - 89:15,
89:17, 133:23
**willing** [5] - 29:12,
29:21, 30:5, 31:13,
110:21
**win** [2] - 35:25, 82:8
**wintertime** [1] - 111:7
**wish** [1] - 87:2
**wishes** [1] - 13:13
**within-mentioned** [1]
- 176:8
**WITNESS** [17] - 27:22,
27:24, 28:1, 57:3,
88:5, 91:7, 104:5,
105:13, 107:3,
122:24, 123:12,
131:15, 136:8,
152:22, 152:25,
165:19, 166:9
**witness** [8] - 18:12,
60:4, 131:3, 135:13,
136:11, 139:9,
165:22, 173:22
**WITNESSES** [1] - 2:1
**witnesses** [4] - 9:16,
136:14, 174:2, 175:9
**witnessing** [1] - 89:25
**wives** [1] - 89:1

**wizard** [3] - 22:14, 171:11
**women** [1] - 84:17
**women's** [1] - 139:5
**won** [4] - 17:7, 109:25, 110:8, 110:10
**wonderful** [1] - 30:1
**wondering** [2] - 135:2, 135:4
**Wood** [2] - 40:2, 40:6
**wood** [1] - 40:3
**word** [13] - 17:10, 27:2, 27:19, 28:1, 68:9, 70:15, 76:19, 77:10, 77:11, 84:15, 85:6, 90:1, 115:22
**Word** [2] - 40:2, 40:3
**words** [3] - 47:8, 96:10, 171:25
**works** [3] - 8:20, 40:11, 77:16
**workshop** [2] - 28:9, 28:17
**World** [1] - 5:16
**world** [4] - 37:6, 71:25, 85:11, 85:19
**worn** [1] - 87:24
**worried** [1] - 70:24
**worry** [1] - 25:14
**worst** [5] - 12:18, 18:3, 71:25, 91:2, 170:3
**worth** [5] - 12:10, 67:25, 68:10, 72:5
**wow** [2] - 26:3, 27:3
**write** [3] - 14:16, 102:4, 113:15
**writes** [4] - 12:16, 14:14, 75:15, 77:7
**writing** [6] - 8:7, 9:4, 42:24, 45:7, 66:3, 110:13
**written** [18] - 6:1, 6:20, 7:5, 8:13, 10:1, 14:6, 14:17, 20:10, 43:25, 46:9, 72:21, 81:2, 81:5, 81:16, 88:12, 97:5, 137:10, 144:15
**wrongdoing** [1] - 102:8
**wrote** [11] - 26:1, 32:5, 44:21, 46:24, 53:17, 54:5, 64:12, 79:5, 106:7, 110:1, 113:4
**Wyllie** [3] - 77:4, 134:22

**Y**

**year** [53] - 17:3, 17:6,

17:17, 20:5, 20:12, 20:13, 20:14, 21:5, 109:25, 110:12, 110:16, 110:17, 111:17, 111:20, 111:21, 113:24, 114:20, 128:14, 145:6, 145:9, 145:12, 145:15, 145:16, 145:21, 145:24, 146:4, 146:8, 146:16, 146:17, 148:24, 149:2, 149:5, 149:6, 149:9, 149:17, 149:22, 150:5, 150:20, 152:23, 155:18, 158:9, 158:10, 158:17, 158:20, 159:21, 159:22, 162:3, 162:12, 162:14, 162:24, 165:5, 165:9
**yearly** [5] - 59:13, 159:16, 162:14, 163:1, 165:9
**years** [25] - 12:10, 12:11, 17:2, 18:21, 23:22, 67:25, 68:2, 109:9, 110:20, 144:25, 145:3, 145:8, 146:20, 148:23, 149:7, 149:10, 149:16, 150:15, 150:17, 151:4, 156:10, 156:11, 156:15, 162:11, 162:24
**York** [10] - 18:23, 19:5, 39:7, 111:3, 117:23, 128:2, 128:7, 128:16, 129:4, 129:9
**young** [8] - 10:18, 38:14, 86:13, 86:18, 86:20, 86:21, 88:9, 88:19
**younger** [3] - 68:11, 74:19
**yourself** [7] - 44:3, 44:7, 77:13, 89:15, 102:2, 102:16, 115:2
**YouTube** [7] - 5:21, 10:12, 40:17, 53:7, 53:10, 53:18, 113:5

**Z**

**ZACHARY** [1] - 1:15
**zero** [2] - 78:23, 161:7
**Ziegelbauer** [5] -

39:22, 89:15, 89:17, 90:25, 133:23
**zoom** [1] - 66:1