1

1

2               IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
3

4  FREDERICK FAGAL, JR.      :
                            :
5                           :
                            :
6      vs                   :    3:14-CV-2404
                            :
7                           :
                            :
8  MARYWOOD UNIVERSITY      :

9

      BEFORE:      THE HONORABLE A. RICHARD CAPUTO
10

      PLACE:       COURTROOM NO. 3
11

      PROCEEDINGS:  JURY TRIAL
12

      DATE:        TUESDAY, APRIL 24, 2018
13

14  APPEARANCES:

15  For the Plaintiff:

16  JONATHAN ZACHARY COHEN, ESQ.
   JONATHAN Z. COHEN LTD.
   175 STRAFFORD AVENUE
17  SUITE 1 # 212
   WAYNE, PA 19087-3340
18
   For the Defendant:
19
   KATHLEEN A. MCGINLEY, ESQ.
20  DONALD E. ENGLISH, JR., ESQ.
   JACKSON LEWIS, PC
21  2800 QUARRY LAKE DRIVE
   SUITE 200
22  BALTIMORE, MD 21209

23  STEPHANIE JILL PEET, ESQ.
   JACKSON LEWIS, LLP
24  THREE PARKWAY
   1601 CHERRY STREET
25  SUITE 1350
   PHILADELPHIA, PA 19103

2

1

## INDEX TO WITNESSES

2

3  FOR PLAINTIFF:    DIRECT   CROSS   REDIRECT   RECROSS

4  ALAN LEVINE          3        12        34

5  MICHEAL FOLEY
   (Dep. Designations) 44
6
   ANNE MUNLEY
7  (Dep. Designations) 59

8  PATRICIA DUNLEAVY   103   114        116

9  EDWARD O'BRIEN      119   123

10  MATTHEW POVSE      131   137

11  HELEN BITTEL       139   155

12  ERIN SADLACK       159

13

14

15

16

17

18

19

20

21

22

23

24

25

1     ALAN LEVINE, called as a witness, being duly sworn,

2  testified as follows:

3  DIRECT EXAMINATION

4  BY MR. COHEN:

5  Q.    Good morning, Dr. Levine.

6  A.    Good morning.

7  Q.    As you know, I am Jonathan Cohen, attorney for Mr. Fagal.

8  We met at your deposition.  Do you still work for Marywood

9  University?

10  A.    Yes, I do.

11  Q.    And you're a member of the Marywood faculty; is that

12  correct?

13  A.    Correct.

14  Q.    And how long have you worked for Marywood?

15  A.    Come May it will be 40 years.

16  Q.    40?

17  A.    40.

18  Q.    You are a professor of nutrition and dietetics?

19  A.    Professor of nutrition, right.

20  Q.    Could you briefly summarize your educational background?

21  A.    Certainly.  I have a bachelor of arts in psychology from

22  Hofstra University.  I have a master in science in food and

23  nutrition from New York University.  And I have a Ph.D. in

24  nutrition from New York University.

25  Q.    Okay.  And in late 2011 and early 2012, is it true you you

4

1  were a vice president for academic affairs at Marywood?

2  A.    That's true.

3  Q.    And what were your responsibilities in that role?

4  A.    Well, lots of responsibilities.  But to summarize I was

5  the chief academic officer.  So all faculty, ultimately through

6  the dean reported to me.

7  Q.    Okay.  Brian, pull up Fagal exhibit 115, please.  Dr.

8  Levine, do you recognize this document?  Take a little bit to

9  recognize it.

10 A.    It has my name at the bottom as a signatory.

11 Q.    Can you identify it?

12 A.    Give me a second while I read it.

13 Q.    There's several pages.  When you finish the first page,

14 you can just ask.

15 A.    Yeah, I finished the first page.  I do recognize the

16 document.

17 Q.    Okay.  And -- this is an authentic e-mail you sent?

18 A.    This is an authentic e-mail I sent.

19       MR. COHEN:  Your Honor, I move Fagal exhibit 115.

20       MR. ENGLISH:  No objection, Your Honor.

21       THE COURT:  It will be admitted.

22 BY MR. COHEN:

23 Q.    Now, in late 2011, it would be fair to say you were aware

24 of an incident where Professor Fagal hung up posters and he

25 alleges they were removed.  Do you recall that?

1  A.    I recall that Fagal hung up some posters, yes.

2  Q.    It's true you removed one of them, isn't that correct?

3  A.    Well, removed is a very strong word.  I did take a poster

4  down to bring to President Munley and the cabinet.

5  Q.    And why did you do that?

6  A.    I did that because I found the idea that Fagal was --

7  appeared to be giving an attendance bonus for a class,

8  something -- I taught 40 years.  I know a lot of people taught

9  at other universities, never heard of -- seemed absurd, beyond

10  absurd.  It seemed crazy.  I wanted to have the president to

11  have her two cents as well as the cabinet as well whether it

12  was appropriate at Marywood.

13  Q.    And what they did they say?

14  A.    I don't recall exactly what they said.

15  Q.    And the poster you removed was probably marked approved by

16  the university, wasn't it?

17  A.    You know what, I don't remember if it was marked approved.

18  Generally speaking, posters do need to get an approval by

19  student affairs.  Whether this got that, I really don't

20  remember.

21  Q.    Brian, could you pull up the deposition of Dr. Levine,

22  please, and could you turn to page 51, please?  And focus in on

23  lines 7 to 8.  I'm sorry.  Let's just skip that.  My mistake.

24  Brian, pull up joint exhibit 10, please.  And do you recognize

25  this document, Dr. Levine?  Could you blow up the text, Brian?

1  A.    Yes, I recognize the document as it has my signature.

2  Q.    Could we -- Brian, pull up joint exhibit 14.  Dr. Levine,

3  do you recognize this?

4  A.    I do.

5  Q.    And what is it?

6  A.    Let me take a second to read it.  I recognize it because

7  it has my name at the bottom.  Give me a second.

8  Q.    Sure.  I think there's several pages so you can say when

9  you want to it to turn.

10  A.    I read the first document and first page at least, and

11  what this tells me is that it appears that Fagal had posted a

12  video, which to say the very least I found offensive both

13  professionally and personally.  It offended me personally.  If

14  offended my family to tell you the truth.  That's what I

15  recognize here on this one.

16  Q.    Okay.  Is Ms. Gannon's e-mail to you January 16, 2012 the

17  first time you were made aware of Dr. Fagal's videos?

18  A.    That's a good question.  I don't remember the dates per

19  se.  No, no, they were not.  I saw these videos -- I was

20  driving home from vacation, and I got an e-mail with the video

21  embedded in it.  Yes, to say the least I was disturbed.  I

22  pulled over to watch the video -- I will not tell you what I

23  said because we're in federal court here.  But, yeah, I seen

24  the video before this came.

25  Q.    But was this the first time you informed Sister Munley

1  about the videos?

2  A.    You're asking me for timelines from six years ago.  I

3  think --

4  Q.    If you don't remember that's okay.

5  A.    I'm going to try to answer to -- give me a sec.  I believe

6  what happened was I got the e-mail, and it appears it showed me

7  there was a video.  I looked at the video, and I don't remember

8  whether I immediately contacted Anne Munley or not.

9  Q.    Okay.  It's safe to say that -- strike that.  Your Honor,

10  I move joint exhibit 14 into evidence.

11          MR. ENGLISH:  No objection, Your Honor.

12          THE COURT:  All right.  It shall be admitted.

13  BY MR. COHEN:

14  Q.    Now, Dr. Levine, after you received Ms. Gannon's e-mail to

15  you January 16th, 2012, did you immediately suspend Professor

16  Fagal?

17  A.    I did not immediately suspend Professor Fagal.  I was

18  driving back in a car from a vacation.

19  Q.    How about when you -- when you got back to campus?

20  A.    When I got back to campus, I thought the appropriate thing

21  to do was to talk to the president, Sister Munley.  That's what

22  I did.

23  Q.    So the answer is, no, you didn't suspend him?

24  A.    I am trying to explain what I did.  What I did was contact

25  the president as we were always responsible for the president,

8

1  thought she would have something to say about this.  As far as

2  I was concerned -- as far as I was concerned, it crossed the

3  line.  It crossed five or six lines.  What I did was contact

4  the president.

5  Q.    I understand you were upset, Dr. Levine.  I just you want

6  to simply answer, did you suspend Dr. Fagal?

7  A.    I did not suspend Fagal.

8  Q.    Thank you.  Did you ever tell Professor Fagal that you

9  objected to his videos?

10  A.    I am sure I made that very clear to Fagal whether it was

11  on the telephone or via e-mail or even in person, but, yeah, I

12  -- if he didn't know that I was upset, then he's more evil than

13  I think.

14  Q.    Well, did you ask Professor Fagal to remove the videos?

15  A.    I did not ask him to remove the video.

16  Q.    Why not?

17  A.    I thought Marywood would do what had to be done.  I didn't

18  want to overstep my bounds.  That's why I contacted Sister Anne

19  and in a sense -- in a sense threw the case to her.

20  Q.    But didn't you just tell us you were the chief academic

21  officer?  You had the authority to tell him to remove the

22  videos, didn't you?

23  A.    I was the chief academic officer.  I'm not sure that I had

24  the authority to remove the videos.  But as I said now three

25  times, I thought it was important that the president weigh in

9

1  on this, and I wanted to give her the opportunity to do that

2  before I did anything which could have been construed as

3  problematic.

4  Q.    I understand.  Now, you're aware that Professor Fagal was

5  suspended by -- ultimately suspended by President Munley on

6  January 23, 2012, right?

7  A.    Yes, I am aware that he was suspended.

8  Q.    And did you make a written recommendation that Professor

9  Fagal be suspended?

10  A.    No, what actually happened -- again, this is not a yes or

11  no although I suspect you're looking for one -- after Sister

12  Anne looked at the video she found so distasteful and so

13  emotional for me as a Jewish person having been portrayed as a

14  Nazi that she basically said, look, I'm going to handle this,

15  it's too emotional for you, and so she basically took over.

16  She was not the janitor.  The president took over.  She was

17  above me.  So I -- no, I didn't suspend Fagal.  I would have.

18  He deserved to be suspended.  He damn well deserved to be

19  terminated, so which I was happy to see happen ultimately.

20  Q.    Well, I think I already asked you did you suspend him.

21  You said no.  My question was just, did you make a written

22  recommendation and -- I am not sure you said yes or no.

23  Written recommendation to suspend Dr. Fagal.

24  A.    I thought I answered that.  Let me try again.  What we did

25  was the case -- if you want to call it that -- was -- I was

1  removed actually because being as emotional as I was and as I

2  am about to get here as I refused to be damaged by this

3  stupidity.  So, no, I did not because I wasn't in a position to

4  do so having been in a sense removed from the situation.  So I

5  did not.  If you're looking for a no, no, I did not.

6  Q.   Okay.  You didn't suspend him.  You didn't make a written

7  recommendation to suspend him.  Did you tell Professor Fagal

8  that his suspension was justified because he posted an

9  immediate harm to himself or to others?

10  A.   Yes, he did pose immediate threat of harm to himself or

11  others.  He certainly presented harm to Marywood University.  I

12  felt threatened personally by it.  It presented harm to me.

13  Hell, if I ran into him in the hallway, I would have done

14  something.  So again I think you're trying to put me to some

15  kind of a corner here.  And no, I was not part of the deal at

16  that point.  Sister Anne removed me.  I was happy she did that.

17  My emotions would have gotten in the way.  But I think what she

18  did was completely appropriate and I supported a hundred

19  percent.

20  Q.   I don't think got a clear answer to that.  Did you ever

21  tell Professor Fagal his suspension was justified because he

22  posed an immediate harm to himself or others?  I know you

23  believed he was.  Did you tell him?

24  A.   I didn't tell him.  I will tell him your suspension and

25  termination was justified.  You were acting in an unbelievable

1  manner.  You are evil.

2  Q.    Did you make a written recommendation Professor Fagal be

3  dismissed?

4  A.    As I said --

5           MR. ENGLISH:  Your Honor, asked and answered.

6           THE COURT:  Pardon?

7           MR. ENGLISH:  He's already answered the question,

8  Your Honor.

9           MR. COHEN:  No, I --

10          THE COURT:  I think he did.

11          MR. COHEN:  Dismissed?  I'm asking did you --

12          MR. ENGLISH:  If he wants to keep asking --

13          THE COURT:  Wait a minute.  The question was, did you

14  ask him about a --

15          MR. COHEN:  I'm sorry.  Did you make a written

16  recommendation Professor Fagal be dismissed?

17          MR. ENGLISH:  Fair enough, Your Honor.

18          THE COURT:  Fair enough.

19          THE WITNESS:  Okay.  Here we go.  So, no, I did not

20  make a written recommendation, but had I been on the case I

21  damn well would have.

22          MR. COHEN:  Brian, pull up Fagal exhibit 58, please.

23  BY MR. COHEN:

24  Q.    Dr. Levine, do you recognize this document?

25  A.    Yes, I do.

1  Q.    Who was Barbara McNally?

2  A.    As the bottom of the e-mail suggests, Barbara McNally was

3  executive assistant to me at the time that the e-mail was

4  written.

5  Q.    Okay.  It appears from the e-mail that Ms. McNally

6  believes that Fred Fagal was leaving Marywood -- did you tell

7  Ms. McNally that Professor Fagal was leaving?

8  A.    I don't remember whether we had that conversation.

9          MR. COHEN:  Your Honor, I move Fagal exhibit 58 into

10 evidence.

11         MR. ENGLISH:  No objection, Your Honor.

12         THE COURT:  Admitted.

13         MR. COHEN:  Thank you, Dr. Levine.  I have no further

14 questions.

15 CROSS EXAMINATION

16 BY MR. ENGLISH:

17 Q.    Good morning, Dr. Levine.

18 A.    Good morning, attorney.

19 Q.    Just a few questions.

20         MR. ENGLISH:  Your Honor, before we get started, Dr.

21 Levine was here most of the day yesterday.  He had to come back

22 today because we didn't get to him.  I would ask just for some

23 leeway so we don't have to call him back in our case to perhaps

24 go beyond the scope of the direct examination so we don't have

25 to bring him back.

1          MR. COHEN:  I have no objection.

2          THE COURT:  That's fine.  Go ahead.

3          MR. ENGLISH:  Thank you, Your Honor.

4   BY MR. ENGLISH:

5   Q.   Dr. Levine, Mr. Cohen asked you about your position at

6   Marywood.  Can you describe while you were the vice president

7   of academic affairs who reported to you?

8   A.   Quite a people actually.  The deans.  There were four

9   colleges and school of architecture at the time, so there were

10  five deans, direct reports also will /KHRULD the director of

11  the Ph.D. program, the director of the library, and I believe

12  the person who was the director of the research co-April at

13  Marywood, and, of course, all the faculty reported.

14  Q.   You were in the chain of command for all faculty members?

15  A.   That's right, faculty members report to the dean.  Deans

16  report to me.  I report to the president Sister Anne.

17  Q.   Did Fagal ultimately report to you?

18  A.   By all means.

19  Q.   Okay.  And who did you report to?

20  A.   Sister Anne, president of the university.

21  Q.   Did you know Dr. Fagal prior to this video incident?

22  A.   Yes, I did.

23  Q.   How long had you known him?

24  A.   I've been a long there.  I've been there 40 years.  This

25  is year 40.  I think Fagal was there probably more than 20.

1  And so I knew him.  I knew of him, knew him, ran into him

2  occasionally in the swimming pool.  I wouldn't call him a

3  friend.  I call him an acquaintance.  I certainly know him a

4  long time.  If I had to guess I would say 15 to 20 years

5  probably right.

6  Q.   How would you describe your relationship?  Were you

7  colleagues, professional colleagues?

8  A.   We were colleagues cordial enough.  We would chat in

9  passing in the pool.  He was a great swimmer.  I looked for

10  tips.

11  Q.   Prior to the videos being posted, did you have a negative

12  opinion of Dr. Fagal?

13  A.   Well, it's tricky.  I didn't really have a negative

14  opinion, but certainly I knew there was difficulty in filling

15  his classes.  That doesn't make me have a negative opinion, but

16  it makes me wonder what's going on if students weren't really

17  taking work -- his classes weren't filling up.

18  Q.   Did you know why his classes weren't filling up?  Did you

19  have a sense?

20  A.   You know, I'm -- I don't have a memory of that.

21  Q.   Okay.  Did you know in general what his reputation was

22  amongst students and faculty members at Marywood?

23  A.   Yeah, I think I can say that.

24  Q.   What was that?

25  A.   Fagal was the kind of right wing person and was not

1  necessarily an easy person for students and faculty to engage

2  with unless, of course, they were right wing as well.

3  Q.    Okay.  You mentioned -- this is Defendant's Exhibit 41.

4  And this is an e-mail from Michael Foley to you dated November

5  9, 2011.  And if you take a moment to read that e-mail and let

6  me know when you're done, I will ask you a couple questions

7  about it.

8  A.    Okay.

9  Q.    So you testified that you remember that it was hard to

10 fill Dr. Fagal's courses.  Do you know -- as to this e-mail

11 from Dr. Foley to you, is there any indication why it was hard

12 to fill his classes?

13 A.    Well, I don't think it says that they are particularly --

14 there's a particular reason.  It does suggest that it was a

15 problem.

16 Q.    Okay.

17        MR. ENGLISH:  Your Honor, I would like to move

18 Defendant's Exhibit 41 into evidence.

19        MR. COHEN:  No objection.

20        THE COURT:  Admitted.

21 BY MR. ENGLISH:

22 Q.    During your course -- during your 40 years at Marywood,

23 have you become aware that there were any issues with Dr. Fagal

24 with students or faculty members?

25 A.    Yes.

1  Q.    What issues had you become aware of as the vice president

2  of academic affairs?

3  A.    The biggest issue -- and I believe it occurred before I

4  was vice president of academic affairs.  The one that sticks

5  out of my mind is that Fagal posted a cartoon -- anti-Muslim

6  cartoon on his door.  I think that was a year or two, maybe

7  three before I became V. P. A.  I was dean before that but not

8  dean of the college.  I was probably just a faculty member.  It

9  was an anti-Muslim cartoon.  It was offensive not only to

10 Muslims but those who believed this kind of thing shouldn't

11 really be posted.

12      So Fagal was told to take it down.  He refused.  I know it

13 got to the point where a day came and he was being told his

14 door would be removed if he didn't take the cartoon down.  I am

15 told he took it down.

16 Q.    Okay.  So let's talk about the posters.  You were asked

17 about that.  And in the fall of 2011, do you remember Dr. Fagal

18 arranging for a speaker to come?

19 A.    Yes.

20 Q.    Okay.  And did you have any issue with that speaker coming

21 to speak?

22 A.    No.

23 Q.    And was it your -- what was your understanding where the

24 speaker was from, what organization?

25 A.    FIRE, I believe.

1  Q.    Okay.  And was this going to be kind of a right wing

2  speaker?

3  A.    I think it was a free speech right wing kind of speaker.

4  It wasn't that important really.

5  Q.    I think you testified that you were aware there were

6  posters that Dr. Fagal had arranged to be placed around the

7  campus advertising the event?

8  A.    Yes.

9  Q.    Did you become aware there was ever a problem with these

10  posters?  I think you described you saw the poster and just --

11  if you can get into what you did when you saw the poster.

12  A.    Yeah, a couple problems.  But I think the one you're

13  referring to was after the poster was actually put up, at least

14  the one that I -- the one we're talking about was put up.  And

15  in that poster Fagal -- first off, he moved the normal

16  classroom to the auditorium I guess to accommodate more people.

17  That was fine.  It was during regular class time.  It wasn't a

18  big deal.  It was odd one would move their class just to

19  accommodate a speaker.  But there it was, okay.

20        The odd part was that he was offering an attendance bonus

21  -- I think it was $50 for students to attend.  That is just

22  very odd.  That's just -- I mentioned it earlier, I never heard

23  of such a thing.

24  Q.    And is that something that -- you said you never heard of

25  such a thing.  Is that something maybe student organizations

1  may do if they host an event?

2  A.   Lots of times people -- students have -- students do

3  giveaways, several of the committees have a giveaway for

4  attendance at an event, not a class event -- an event.  So they

5  may pull a name or number, and there's a giveaway.  But as I

6  say, it's been a long time I've been there.  My memory is not

7  as good as it was 20 years.  An attendance bonus to attend

8  class, bizarre.

9  Q.   Was there a time you became aware Dr. Fagal was upset

10 because some of the posters were taken down?

11 A.   Yes.

12 Q.   Okay.  And what was your recollection of that?

13 A.   Well, Fagal was upset that the posters were taken down

14 although as I said earlier on, I took down that one poster,

15 brought it to President Munley and the cabinet.  I don't know

16 who took down the others or how many others were taken down.

17 But I know that Fagal was distressed posters were down.  In

18 fact, he communicated that to me.  I think it was in an e-mail.

19 Q.   Were you or anyone else that you knew of in the

20 administration involved in taking down those posters?

21 A.   I took down the one poster that I mentioned earlier.  I am

22 not aware of anyone else in the administration or on the

23 faculty side that was taking anything down.

24 Q.   So I am showing you what's been marked joint exhibit 11,

25 which I think has already been admitted into evidence.  This is

1  a December 5th, 2011 letter from Dr. Fagal to you.  Without

2  studying it, do you remember receiving this letter from Dr.

3  Fagal to you?

4  A.   Yes, I do.

5  Q.   And in this letter he makes a series of requests.

6        MR. COHEN:  What exhibit is this.

7        MR. ENGLISH:  Exhibit 11.  This is January 13th

8  e-mail with all of the attachments.

9  BY MR. ENGLISH:

10 Q.   So I want to go through those requests.  In general when

11 you got -- when you got these requests did you think the

12 requests were reasonable?

13 A.   No, they were completely ridiculous.

14 Q.   And they are numbered here starting with the bold number

15 one right here.  He says, I ask that I immediately receive by

16 December 1, 2011 a $500 reimbursement check for his expenses

17 and wasted time.  What was your response to that?

18 A.   Well, I didn't respond directly to Fagal, but my thinking

19 on that was that is ridiculous.

20 Q.   And his next request issuing a written public apology to

21 me which indicates the actions further outlined below Marywood

22 would take to remedy the damages done to its reputation, did

23 you feel like a public apology as vice president of academic

24 affairs was merited here?

25 A.   No, I did not.  In fact, I'm sorry -- I have to jump in

1  here, above No. 2 when he said only fair Marywood atone for its

2  sins and show its willingness, come on, atone for its sins,

3  ridiculous.

4  Q.    The next request made No. 3 here says, by having the

5  apology in No. 2 to me also sent by e-mail to every faculty

6  member including adjuncts and every student, what was your

7  reaction to that?

8  A.    I keep using the same word, it's ridiculous.

9  Q.    He also wanted Marywood to pay FIRE two thousand dollars

10 its normal rate to give two presentations on campus during the

11 spring 2012 semester.  Marywood will also pay normal meal and

12 lodging expenses.  Was it the practice of Marywood to pay

13 organizations to come speak and pay their meal and lodging

14 expenses?

15 A.    No, I am not under that impression at all.  I don't know

16 that Marywood pays anything for graduation speakers.  I am sure

17 someone can tell you about that, but certainly not what is

18 implied No. 4.

19 Q.    Five, by hosting -- see number four, one, one thousand

20 dollar FIRE session probably in February or a daytime class

21 presentation, goes on to say, you know, specifications of the

22 rooms and things that he wants to be provided.  He says each

23 poster will announce a $50 random door prize to a student

24 attending the lecture.  It says, I will pay the prize money.

25 What was your reaction to that?

1  A.    I thought that ridiculous as well.

2  Q.    Okay.  Then in then we got No. 6.  By using the other

3  thousand dollars fee plus food and motel bill to pay for an

4  evening presentation open to the whole community probably in

5  April.  Would Marywood have done this?

6  A.    No, Marywood doesn't do that thing at least in the 40

7  years I've been there.

8  Q.    No. 7, it says Marywood spending a thousand dollars for

9  the evening program which will be open to the public and

10 members of the campus community, this could be switched.  I

11 think that's just a carry on of the last one.  Is it your

12 testimony Marywood would dot do this?

13 A.    I don't believe Marywood would do that.

14 Q.    Then we have No. 8.  He says he wants Marywood to provide

15 free pizza and soda, one thousand slices of pizza and 500 cold

16 cans of soda at the evening presentation.  The advertising and

17 free food is an effort to draw a large crowd.  This would be

18 switched to the event in No. 11 if I choose to do so.  What did

19 you think about this?

20 A.    I thought it ridiculous although I guess probably could

21 have taken the 950 pieces of pizza that were leftover to give

22 to the soup kitchen.

23 Q.    What about the cold soda?

24 A.    I like my soda warm, but I could have given that away as

25 well.

1  Q.    Then he wants -- by December 15th he wants to include has

2  part of the public notice for an evening event the fact

3  displayed that a randomly chosen person will win a $50

4  attendance, which I provides I provide.  It was your testimony

5  we don't pay students to attend class.  Is that correct?

6  A.    We do not pay students to attend class.  Students pay us

7  to teach and present material in class.  I think he had it

8  backwards.

9  Q.    Okay.  No. 10, by ensuring publicity for each event

10  including the event in 11 will include two separate e-mails to

11  be approved by him, sent to the complete faculty list including

12  adjuncts and the student mail list, the e-mails will advertise

13  up coming event.  He talks about the free pizza and soda again

14  and for each event the e-mail will be sent one week before the

15  event and reminder e-mails.  Is that something you would have

16  taken on as vice president of academic affairs?

17  A.    No, I would not have.

18  Q.    He closes every e-mail must meet his approval.  Would you

19  have gone to him get to get approval for something like this?

20  A.    No, we don't do that.  Maybe he was looking to get fired

21  so he can find us in court today, but this is just bizarre.

22  Q.    He says by sponsoring a fall 2012 appearance on campus by

23  Robert Spencer of Jihad Watch, Mr. Spencer based on the

24  Gihadwatch.org website will be willing to debate anyone

25  regarding aspects of Islam.  At the end he says my friends and

1  I will hang posters to designed -- posters designed with my

2  approval.  The opposition in the proposed debate can of course

3  hang its own posters or participate in the poster design.  Is

4  that something you would have agreed to?

5  A.    Not only wouldn't I agree to it, but that would really go

6  against policy wherein the student activities office would have

7  to okay the posters.

8  Q.    He says, if you agree to agree to all this, he will

9  consider the matter closed.  Did you agree to agree to all

10  that?

11  A.    I didn't agree to any of that.

12  Q.    Okay.  I think you documented that in joint exhibit ten,

13  which I think has been moved into evidence and -- you testified

14  about.  Is this your letter to Dr. Fagal in response?

15  A.    Yes, it is.

16  Q.    And there you say, it appears we have a different

17  understanding of what transpired around the issue of posters

18  that were advertised and -- you say you will remain open to

19  future presentations that are not in conflict with your mission

20  statement or core value and organized according to our policies

21  and practice.  However, we are not willing to undertake any of

22  the specific requests that are contained in your letter.  Were

23  you -- were you attempting to politely tell Dr. Fagal that what

24  he was requesting was unreasonable?

25  A.    Yeah, that's a good way to put it.  I was trying to be

24

1  polite unlike what was displayed to me.

2  Q.    Okay.  Let's talk a little bit about you.

3  A.    Okay.

4  Q.    I think you testified about this.  But what is your faith,

5  Dr. Levine?

6  A.    I don't know -- maybe I did testify, but I am Jewish.

7  Q.    Is this a fact that is generally known by your colleagues

8  at Marywood?

9  A.    I think pretty much everyone knows I am Jewish.

10  Q.    I don't want to pry into your personal life.  Were you

11  married in 2012?

12  A.    I was.

13  Q.    Okay.  And was that your first marriage?

14  A.    No, it was not.

15  Q.    Okay.  And you had children in 2012?

16  A.    Yes, I did, from that marriage one child.

17  Q.    Okay.  Do you have any other children?

18  A.    I do, two.

19  Q.    Okay.  --

20  A.    Five grandchildren as well.

21  Q.    Congratulations.

22  A.    Thank you.

23  Q.    All right.  And was -- to your knowledge, was Dr. Fagal

24  aware of the fact you've been previously married?

25  A.    I would imagine so, but I couldn't say with a hundred

1  percent certainty.

2  Q.    Are you married now, Dr. Levine?

3  A.    I am not.

4  Q.    You're not?

5  A.    No.

6  Q.    We will talk about these Hitler videos.

7  A.    Okay.

8  Q.    Did those videos impact your marriage, your former

9  marriage?

10  A.    They certainly impacted my life.  If they impacted my

11  life.  And since my then wife was maligned, as was my child, I

12  would say, yeah, I think they impacted my marriage, certainly

13  didn't help my marriage.

14  Q.    I think you testified that you were on a trip around the

15  time that you received the videos.  Let me just refresh your

16  recollection real fast.  We talked about joint exhibit 11.  And

17  to your knowledge, were you -- this is the e-mail sending the

18  video to the -- to students and faculty members from Dr. Fagal.

19  You're on this list.  Does this refresh your recollection as to

20  when you may have received the videos which -- the date of this

21  document is Friday, January 13, 2012?

22  A.    I believe I received those videos from Margaret Gannon two

23  days before or a day or two before.  Now, if you say I'm on the

24  list, I am sure I am on.  I would like to see I'm there.  But I

25  don't actually see myself on this list.

1  Q.    I think you are there.  You end up getting the videos at

2  some point?

3  A.    I got the videos before that e-mail went out.

4  Q.    Okay.

5  A.    I am pretty sure.

6  Q.    And that was Martin Luther King day weekend?

7  A.    Yeah.

8  Q.    You were on vacation?

9  A.    Right.  I think when I those videos I got -- you have to

10 put up that e-mail from Margaret Gannon when I got the videos.

11 I don't know if it was the 13th.  It's -- just to clarify.

12 Q.    And --

13 A.    Let me say for sure I didn't get a preview of the videos.

14 So I don't want a misunderstanding here.

15 Q.    So --

16 A.    Okay.

17 Q.    This is joint exhibit 14.

18 A.    It appears I got the videos on the 16th when Margaret sent

19 me this letter.  That was -- I imagine I was on my way back

20 from vacation.  I think I was in Michigan.

21 Q.    You get the videos on January 16th from Margaret Gannon.

22 And then Monday, January 16th is Martin Luther King day.  I

23 assume you weren't working?

24 A.    No, like I said, I was driving back.

25 Q.    The next day you forward the e-mails to Dr. -- Sister

1  Munley?

2  A.    Correct.  The video was very disturbing.  We had to at

3  least have a conversation as to deal with them.

4  Q.    And let's talk about the videos.  What was your reaction

5  to them?

6  A.    My reaction -- I was horrified.  I was horrified.  I'll

7  tell you what it did.  I'm sorry.  I am getting emotional here.

8  Q.    That's okay.

9  A.    Portraying me, a Jewish person, as a Nazi, forgetting

10 about Sister Anne, who was portrayed as Hitler, but portraying

11 me as a Nazi, it made me think about Sophie's Choice because

12 that's what Nazis do, don't they, Fagal?  You know what else it

13 did?  I grew up in a house where we talked in my family loss of

14 the Holocaust.  So -- I apologize for the image I am about to

15 create.  But I know this happened because it was discussed when

16 I was a child.  It made me think about babies being tossed in

17 the air and having them come being impaled on bayonets.  That's

18 what it made me do.  It made me think about Jewish boys and

19 young men put into ice water until they died just to see how

20 long a German pilot can survive in the North Atlantic.

21      Real funny, Fagal , real funny parody, Fagal.  He will

22 made me unsafe in this country to know like people like Fagal

23 exist.  That's what it did.

24 Q.    Let me go over some of these screen shots.  I apologize

25 for putting you through this, but, Dr. Levine, this is you, the

1  Nazi?

2  A.    It felt great to see my wife maligned and my kids.  Great

3  job, Fagal, malign me maybe, but my family, you are an evil

4  human being.  You had no damn right to malign my family.  And

5  whether this contributed to the end of my marriage because life

6  was a little more difficult after we looked at these things, I

7  don't know for sure.  I am not going to curse at you in this

8  Court, but damn, you're evil.  It wasn't funny.  Call it

9  parody.  Call it satire, but it was quite hurtful.

10 Q.    Brings your kids into it calling them one percent kids.

11 A.    Yeah.

12 Q.    How did that make you and your wife feel?

13 A.    It was hurtful obviously.  It was hurtful.

14 Q.    Did you recognize this video was intended to go viral and

15 was intentionally spread by Dr. Fagal to as many people as

16 possible?

17 A.    When I first saw it, I didn't have that immediate thought,

18 obviously having seen the -- later on the e-mail that he sent

19 out to other faculty, students -- and knowing YouTube, I'm not

20 a technology advanced person, but I do understand videos going

21 viral.  This would have had many, many hits .  I'm sure it did.

22 Q.    Did you also feel insulted this was perpetuating

23 stereotypes about Jewish people and their stereotypes relating

24 to money and your one percent kids needing money?

25 A.    Of course it offended me.  Jewish people have to fight

1  these kinds of battles -- you know, we all do.  You fought your

2  battles.  I fight mine because of who we are.  And nobody likes

3  to have a stereotype thrown up to make those battles hard to

4  fight.

5  Q.    Speaking of stereotypes, so you wanted a hot young thing,

6  so now you have to pay for her.  What did you think him

7  suggesting that you had to pay for your hot wife?

8  A.    Right, well, what I thought was he was a real bastard.  I

9  apologize, Judge.  For him to go and malign my family and call

10 my wife a hot young thing and suggest that I had to pay, he's

11 an evil person, only an evil person would do this.  He should

12 be apologizing to me.  In fact, he should take the time to

13 apologize to me right now although you can't walk back.  The

14 damage that was done.

15 Q.    Did there come an opportunity he had an opportunity to

16 apologize to me?

17 A.    He damn well had the time when he was at his office, and I

18 know he remembers this.  When it was clearing out his office

19 his car was backed up to the door near the liberal arts

20 building.  My car is there.  And so he was loading the back of

21 his car.  I think it was a station wagon, and I was getting

22 into my car.  And so we looked at each other.  I was waiting

23 for him to say something.  I certainly wasn't going to say

24 something to him because I didn't want to get into a physical

25 altercation.  He said nothing.  He just looked at me.

1  Q.    Do you know how long the video stayed up?

2  A.    No, I really don't.  I think it was -- no, I couldn't say.

3  I will give you a number.  I would be wrong.

4  Q.    That is Defendant's Exhibit 17.  This is an e-mail from

5  Pat Dunleavy to you dated January 17, 2012.  At the bottom of

6  this there's an e-mail from you to Pat Dunleavy dated January

7  17 as well and there you say, I also like to know about

8  possible external responses for both Marywood as well as me

9  personally.  Now, this is the same day that you first -- your

10  first day back to work after seeing the videos on the 16th; is

11  that correct?

12  A.    Correct.

13  Q.    And did you end up filing a civil rights complaint against

14  Dr. Fagal?

15  A.    I did not.

16  Q.    She responds and says that internally you can file a

17  formal complaint under the civil rights policy.  We're

18  exploring options from the university perspective with or

19  without a formal complaint from any individual.  As for your

20  personal options I can't be of much help there.  You'd have to

21  pursue that on your own if you chose to.  Why didn't you pursue

22  a civil rights complaint?

23  A.    You know, I had a lot of faith in the idea that Marywood

24  would do what needed to be done.  And at that point I hadn't

25  had a conversation with Sister Anne as to what Marywood's

1  response would be.  I was -- I hate to use the word happy,

2  contents of what we're talking about -- but I was happy to let

3  Marywood move forward in the action without me filing a

4  complaint.  I had trust in the system.

5      I trusted the right thing would take place with Marywood

6  moving things forwards forward.

7  Q.   What would you have done if Dr. Fagal was not immediately

8  terminated -- I'm sorry -- let me back up.  Wasn't immediately

9  suspended after posting those videos?

10 A.   Well, I think you're asking what would I done had I ran

11 across Fagal in the hallway, would I have stayed in my job at

12 Marywood.  I would have been uncomfortable seeing Fagal on

13 campus.  I think there might have been physical altercation had

14 that happened.  I don't know that I can keep working at

15 Marywood knowing he was two floors down in the social science

16 department.  I probably would have quit.  I would probably

17 would have filed a lawsuit against Marywood for not taking

18 action.

19 Q.   Would that be the same if they had not terminated him?

20 A.   If he was suspended and then brought back as a faculty

21 member?  Damn right.  I couldn't work there.  I think he

22 created a hostile environment for me.

23 Q.   You testified about this, but I want to ask you again why

24 you were not involved in the disciplinary process of Dr. Fagal.

25 A.   Yeah, I believe I may have answered that.  I'm happy to

1   again to clarify.

2   Q.    Yeah.

3   A.    My role as V. P. A. A. under normal circumstances -- this

4   was anything but normal -- would have been to be involved in

5   disciplinary action because the video maligned both me, my wife

6   -- well, all of us, me, my wife and my child.  Sister Anne I

7   think was incredibly gracious in saying that she would take

8   over and I didn't have to bear the responsibility in dealing

9   with this situation.  And so I am grateful to her that she did

10  that.  But let me be pretty clear here.  I guess it's already

11  as well, if I was involved I would have suspended you and I

12  would have terminated you.  Now, I say that without knowing all

13  of the facts that came back because I wasn't in the meetings.

14  I was removed from the case so to speak.  But knowing what I

15  know now, I would have never allowed him to teach another

16  course at Marywood and spew his hatred.

17  Q.    I am showing you joint exhibit 8.  These are -- this is a

18  collection of the policies, the Marywood policies.  And at the

19  bottom here where it talks about suspension, there it says --

20  this is from the progressive discipline policy.  It says, the

21  faculty member may be suspended by the vice president for

22  academic affairs.  What is your understanding of whether only

23  you as the vice president of academic affairs could suspend a

24  faculty member?

25  A.    It's very clear.  It doesn't say a faculty member may only

1  be suspended by the V. P. A. A.  I think that had Fagal been

2  suspended by somebody lesser than my office that might have

3  been problematic.  That wasn't the case, as I said.  A janitor

4  didn't suspend him.  A fellow faculty member didn't suspend

5  him.  A dean didn't suspend him.  The president of the

6  university stepped in, removing me from the emotional --

7  emotionality of the situation and did what should have been

8  done.  I thank her for that.

9          MR. ENGLISH:  Your Honor, I move joint exhibit 8 into

10  evidence if it hasn't already been admitted.

11          MR. COHEN:  It has.

12          MR. ENGLISH:  It has.  My mistake.  Just a couple

13  more questions.

14  BY MR. ENGLISH:

15  Q.    Showing you Defendant's Exhibit 22.  This is an e-mail

16  between yourself and Joseph Garvey dated January 30th, 2012.

17  At the bottom there's an e-mail from Joseph Garvey to you, and

18  you respond to it.  Have you seen this e-mail before?

19  A.    Yes, I have.

20  Q.    Okay.  And what happened to Dr. Fagal's class after he was

21  suspended?

22  A.    Where we could we found folks to come take over the class.

23  This one we couldn't.  And so Joe Garvey -- Joe is vice

24  president of business affairs at the time, the money man so to

25  speak.  And he kindly of placed the credit for the students

1 that purchased since they weren't -- they weren't using that

2 class.

3 Q.   Did the college incur costs associated with Dr. Fagal's

4 termination?

5 A.   Yes, it did.  I couldn't tell you the cost on the books

6 but certainly incurred costs.  I suspected a books cost 80, a

7 hundred bucks a pop.

8 Q.   Did it incur some inconvenience in terms of having to get

9 professors to fill the classes that he could no longer teach?

10 A.   Yes, it did.

11        MR. ENGLISH:  Your Honor, I have no further

12 questions.  I want to make sure I have admitted everything.  I

13 think there are a couple I have not.  So we have got

14 Defendant's Exhibit 17 and Defendant's Exhibit 22 I would like

15 to move into evidence.  They both been identified.

16        MR. COHEN:  I have no objection.

17        THE COURT:  They'll be admitted.  22 is what?

18        MR. ENGLISH:  The last document I asked about, the

19 e-mail from Dr. Levine to Joseph Garvey dated January 30, 2012.

20        THE COURT:  Redirect?

21        MR. COHEN:  Yes, Your Honor.

22        THE COURT:  Go ahead.

23 REDIRECT EXAMINATION

24 BY MR. COHEN:

25 Q.   Dr. Levine, Mr. English asked you a few questions.  I

1  believe one of them was did you have a problem at all with the

2  speaker that Dr. Fagal had invited to come to Marywood.  And

3  you said you didn't.  Do you remember that?

4  A.    I do remember saying that.

5  Q.    Can we pull up Fagal exhibit 115, please?  We have talked

6  about this e-mail already today, right?

7  A.    Yes.

8  Q.    And in your e-mail to Sister Anne -- you say the last

9  sentence it seems to me Fred and Tom are simply trying to

10 circumvent our guidelines concerning outside speakers through

11 our political agenda.  So you did a problem with the speaker,

12 didn't you?

13 A.    Please don't put words in my mouth.  What I want to say

14 here is that, no, I did not have a problem with the speaker per

15 se.  What this is about is a -- not a policy but Sister Anne --

16 I think in her wisdom really wanted to make sure that when we

17 are bringing a political speaker on to campus both sides would

18 be represented.  I think Fagal actually spoke to that in his

19 letter about having another person from the other side of

20 things in what he asked those rather bizarre things that we

21 looked at earlier.  So, no, I didn't have a problem with

22 speaker.  The problem that I had was that it was being done in

23 a way such that there couldn't be anyone from the opposing side

24 so to speak.  I kind of am pretty good having people say what

25 they want to say.  I think it's -- I think that is what is

1  college is about, don't you?  Having people be able to express

2  their opinions.  But Marywood in a statement by Sister Anne

3  wanted to ensure that both sides of an argument were heard by

4  the students, and that's the issue that I had.

5  Q.    Can you tell me which of the exhibits -- which of

6  defendant's exhibits you tell Dr. Fagal or President Munley, I

7  don't have a problem you know, with the speaker, as long as,

8  you know, have someone from the opposing side represented?

9  Where is that exhibit?

10          MR. ENGLISH:  Your Honor, objection.  He's asking

11  about all of the exhibits and where something exists.

12          MR. COHEN:  Fair enough.

13          MR. ENGLISH:  He's not aware of the exhibit.

14          THE COURT:  Rephrase the question.

15  BY MR. COHEN:

16  Q.    Did you ever tell Fred or President Munley, this is okay,

17  as long as we have an opposing speaker?

18  A.    That was not the conversation I had with Sister Anne.  The

19  conversation I had with Sister Anne had to do with the

20  attendance prize.  That was the conversation.

21  Q.    Let's talk about that.

22  A.    Okay.

23  Q.    Who cares if there was an attendance prize?  Why did you

24  care?

25  A.    It seemed inappropriate at a college to have attendance

1  prize for people to come to class.  It sets a precedent which

2  is kind of silly.  Anyhow, that's my opinion.  That's not what

3  counts.  So simply I wanted to share that with the president

4  and the cabinet to see how they felt about it.  Had things gone

5  differently, maybe things would have played out differently.

6  But I think people -- well, I can't speak for other people.

7  For myself it seemed absurd to offer an attendance prize to

8  come to class.

9  Q.   Why is that absurd?

10  A.   Did you ever get an attendance prize to come to class?

11  Q.   I am asking the questions.

12  A.   I understand that.  I'm asking a rhetorical question.

13  That's not something done at the university level.

14  Q.   Why is it absurd?  Why isn't it encouraged actually?

15  A.   Excuse me?

16  Q.   Why isn't it encouraged by professors for students to want

17  to come to the classes?

18  A.   We want students to come to the classes.  Sometimes we

19  have an attendance policy, but no one gives a $50 prize for

20  them to attend a particular class.  There may be an attendance

21  policy for the entire year where students may be allowed two or

22  three cuts or maybe one cut per credit.  But to have a prize to

23  come to class with a random drawing.  Maybe you don't want to

24  answer my question.  That probably hasn't happened to you, and

25  I suspect it hasn't happened to any of the other attorneys in

1 the room.

2 Q.   Pull up joint exhibit 3, please.  Do you recognize this

3 Dr. Levine?

4 A.   I do.

5 Q.   It's obviously the faculty handbook July 1, 2010.  Can you

6 show us where the policy that says professors can't offer a

7 prize for students to come to class?

8 A.   No, I couldn't tell you that.  I don't believe it's in

9 that handbook.

10 Q.   There's no policy, right, you just made it up?

11 A.   No, I didn't say there was a policy.  I didn't make

12 anything up.  I simply said that I thought that was a

13 ridiculous way to get students to come to a scheduled class.

14 Q.   So whatever Dr. Levine thinks is absurd, that becomes

15 Marywood policy, right?

16 A.   Marywood policy doesn't say anything about having a prize.

17 Simply as I suggested earlier, I said that this seemed absurd

18 to me and I think it would be appropriate to share it with the

19 president and the president's cabinet as to what our course of

20 action would be.

21 Q.   Okay.  Let's go back to joint exhibit 10.  Turn the page,

22 please.  Can you blow up the text, please?  We talked about

23 this already, right, Dr. Levine, this letter?

24 A.   Yeah , we did.

25 Q.   Okay.  And in the second paragraph, first sentence, you

1  say Sister Anne Munley remained open to future presentations

2  that are not conflict with our mission statement or core values

3  and are organized according to our policies and practices.

4  Which core value did free speech violate at Marywood?

5  A.    I'm sorry.  I am not sure I understand what you're trying

6  to get at here.

7  Q.    Isn't it true Dr. Fagal was simply inviting a speaker to

8  give a presentation about free speech at universities?

9  A.    Well, I didn't hear the speaker.  So --

10  Q.    You tore down one of the posters though?

11  A.    I -- tore down is really beyond the scope of what I did.

12  I removed the poster so that the president and the cabinet

13  could take a look at it to decide if they wanted to take any

14  action.

15  Q.    But you know -- you knew what the expected content would

16  be because you saw the poster, right?

17  A.    What I thought was -- what I thought was the speaker was

18  going to do was to present one side of an issue, a far right

19  side.  It's a legitimate side but certainly a far right side of

20  an issue.  And it seemed to me that as the second paragraph

21  suggests is the practice is, not policies -- but the practices

22  at Marywood are such that when a political speaker does come to

23  campus we present both sides.

24  Q.    How did you come to the conclusion that a speaker from

25  FIRE who was merely going to talk about free speech at

1  universities was right wing?

2  A.   At the time I am not sure that I knew for certain.  That's

3  why I thought the cabinet should take a look at this thing.

4  FIRE does have a reputation of being far right, but I thought

5  it would be wise to get president's counsel and the president's

6  counsel was the cabinet's counsel as to whether or not this is

7  something -- you know, whether it's something that should be

8  encouraged.  And even if it was, the way it was being done was

9  the problem for me.

10        You know, if this hadn't been a regular class and Fagal

11  had asked the speaker to come and we brought another speaker

12  and maybe gave a prize because it was an evening presentation

13  on a Thursday for people to attend, that's different than

14  having a class, a class of, well, of Fagal's track record

15  probably a small class but a class of a few people to come and

16  give a prize to attend the presentation.

17  Q.   Brian, let's pull up joint 11.  I'm sorry.  Mr. English

18  asked you several questions about a series of -- I think it was

19  11 requests that Dr. Fagal made of the administration.  It's

20  not in this e-mail.  I'm sorry.  You can take this down ,

21  Brian.  But Mr. English was asking you about an e-mail where

22  Dr. Fagal had made a series of requests to the administration

23  after the poster removals.  And as I recall your testimony was

24  that I think you used the words absurd and ridiculous, correct?

25  A.   Correct.

1  Q.    Okay.

2  A.    Used the word crazy as well.

3  Q.    Crazy too, okay.  Why was it crazy for Professor Fagal to

4  get an apology after 46 of his posters had been removed?

5           MR. ENGLISH:  Objection, Your Honor.  There's no

6  foundation for this notion that 46 posters were removed.

7  BY MR. COHEN:

8  Q.    Okay.  Any of them were removed.  Why is that crazy?

9  A.    I think that Fagal should be apologizing to me and the

10  faculty of Marywood.

11  Q.    This is non-responsive.  Just answer my question.

12  A.    Why don't you ask it again?  Let me see if I can.

13  Q.    Why is it crazy or ridiculous or absurd for Professor

14  Fagal to request an apology for any of his posters being

15  removed?

16           MR. ENGLISH:  Objection, asked and answered.  He did

17  answer that question, Your Honor.

18           THE COURT:  Just a minute.  It wasn't answered, but

19  -- go ahead.  Answer it if you can.

20           THE WITNESS:  You want to ask it one more time?

21  BY MR. COHEN:

22  Q.    Was it crazy or ridiculous or absurd for Professor Fagal

23  to get an apology for having his posters removed?

24  A.    Depending upon who he asked that apology from, it might

25  not have been crazy.  It's kind of crazy to ask me.  I didn't

42

1  take down any of his posters.  I removed one poster so we can

2  look for further -- if he had -- that's what I did.  That's

3  what I have to say.  I think what he asked for in his letter

4  was bizarre.  Thousands of dollars -- bizarre.  It doesn't

5  sound like -- doesn't like a person with a sound mind.  It

6  doesn't.

7  Q.    Now, earlier Mr. English asked you did Professor Fagal

8  ever apologize to you, and you said no.  Do you remember that?

9  A.    I do remember that.

10  Q.    Isn't it true that several days after the videos went

11  online Dr. Fagal called you?

12  A.    That is true.

13  Q.    You didn't call him back, did you?

14  A.    He did not offer me an apology.

15  Q.    He left you a message.  He said he wanted to speak off the

16  record?

17  A.    There's no such thing as off the record.

18  Q.    Okay.  The bottom line is he called you.  You didn't call

19  him back.  Am I right?

20  A.    You are correct.

21  Q.    Okay.

22  A.    He could have called me and apologized over the phone.  He

23  might have gotten a call back.  Of course, that didn't happen.

24  Q.    Did you ever -- Mr. English asked you a series of

25  questions.  You said if Dr. Fagal hadn't been terminated, you

1  might have considered leaving Marywood.  Do you remember that?

2  A.    I do remember that.

3  Q.    Okay.

4  A.    I am not sure I could have worked at a place where he was

5  working and run into him.

6  Q.    Okay.  Which of the e-mails produced in discovery show you

7  telling Marywood that you weren't going to work there anymore

8  if Dr. Fagal wasn't dismissed?

9  A.    There was no e-mail that said that.  That was my own

10  thinking.

11  Q.    You never told Marywood?

12  A.    I don't recall telling Marywood that if Fagal was not

13  terminated I would leave, no.  I don't recall saying that to

14  anybody at Marywood.

15          MR. COHEN:  No further questions.

16          THE COURT:  You may step down.

17          THE WITNESS:  Thank you.

18          THE COURT:  Next witness.

19          MR. COHEN:  Your Honor, at this point my plan was to

20  read in the deposition testimony of Dr. Michael Foley.

21          THE COURT:  All right.  Are there counter -- they'll

22  do that after -- whole deposition?

23          MR. COHEN:  No, it's a very short designation.  We

24  are going to do the Foley deposition.

25          MR. ENGLISH:  Okay.  That's fine.

1          MR. COHEN:  Brian, call up the deposition up of

2     Foley.

3          MR. ENGLISH:  We have counter designations to yours

4     as well.  It will not take us long.

5          MR. COHEN:  Can you turn to page 4, please?  Okay.

6     Proceedings, Michael A. Foley, Ph.D., a witness called on

7     behalf of plaintiff being dually sworn testified before me as

8     follows:  Examination.  By Mr. Cohen.  Question, Dr. Foley, my

9     name is Jonathan Cohen again.  Answer, yes.  Question, you're

10    aware that I represent Frederick Fagal, right.  Answer, yes.

11    And you understand that you're under the same oath today as you

12    were in a courtroom.  Answer, yes.

13         Question, I'm going to assume that you understand my

14    questions unless you tell me that you don't understand them.

15    Is that fair.  Answer, yes.  Question, is there anything that

16    would prevent you from thinking clearly and testifying

17    truthfully today.  Answer, no.  Question, if at any time during

18    the depositions you need to take a break, just say so, and we

19    will accommodate you.  All right.  Answer, okay.

20         Then line 16.  Question, and would you list all of

21    your physical addresses, please.  Answer, current physical

22    address.  Question, yes.  Answer, 817 Canyoncreek -- that's all

23    one word, Canyoncreek in --

24         MR. ENGLISH:  We will stipulate to the background

25    information if that's what -- in order to save time.  We're

45

1  fine with that.

2          MR. COHEN:  Okay.

3          THE COURT:  All right.

4          MR. COHEN:  Let's move on to the next page.  Line 20.

5  Question, Dr. Foley, you previously worked for Marywood

6  University.  Answer, yes.  Question, and for how long.  Answer,

7  a total 34 years.  Question, can you list all of the job titles

8  that you had at Marywood.  Answer, in addition to professor of

9  philosophy, I mean, I was assistant and then associate and full

10  professor of philosophy.  I was director of the honors program

11  for nine years, chair of the philosophy department for almost

12  11 years and then dean of the college of arts and sciences for

13  four years.  Question, so your last title was dean of the

14  college of arts and sciences you said.  Answer, yes.

15          Then line 22, question, and you were on the policy

16  committee when you retired.  Answer, by virtue of my position,

17  yes.  Question, okay.  When exactly did you retire.  Answer,

18  June 30, 2012 was my last day.  Question, I'm sorry I missed

19  the first part.  You said 2012.  Answer, oh, June 30.

20  Question, okay Dr. Foley, do you know my client Frederick Fagal

21  .  Answer, yes.  Question, how long have you known him.

22  Answer, as many years as he was at Marywood.  Question, okay.

23  Were you ever Professor Fagal's superior at Marywood.  Answer,

24  as dean I would be considered a superior.  Question, do you

25  recall in November of 2007 when Professor Fagal invited a

1  speaker from the Foundation For Individual Rights in Education

2  to give a presentation on campus.  Answer, yes.  Question, from

3  now on I'm just going to call the Foundation For Individual

4  Rights and Education FIRE, okay.  Answer, okay.  Question, do

5  you recall Professor Fagal hanging posters announcing the FIRE

6  speak.  Answer, yes.

7           Question, do you recall communicating with anybody

8  from the Marywood administration about the FIRE presentation or

9  the FIRE posters.  Answer, no.  Question, okay, do you recall

10 in late November 2011 that almost all of the FIRE posters were

11 removed.  Answer, yes.

12          I will turn to page 13, line 19.  Question, do you

13 remember visiting Professor Fagal on the morning of January 23,

14 2012 and telling him that he had to attend a meeting with the

15 president in about 15 minutes.  Answer, yes.  Question, okay.

16 What exactly did you tell Professor Fagal when you first

17 visited him and told him he had this meeting to get to?  I

18 realize it's a long time, and you can only do the best that

19 your memory serves you.  Answer, basically what you just said.

20 I went to Dr. Fagal's office, and I said that he was to report

21 to Sister Anne's office in 15 minutes, and he asked me what

22 this was about, and my recollection as I said, I think you know

23 what it's about.  That was the most I said to my recollection.

24 We did not discuss anything further, and I wasn't exactly sure

25 what it was about.  I mean, I knew what it was about, but

1  Sister Anne asked me as dean to go talk to Dr. Fagal to report

2  to her office in 15 minutes, and that's what I did.  Question,

3  just curious.  I've never seen the e-mail that you just read

4  that was exhibit 3.  Why would you assume Dr. Fagal would know

5  what the meeting was about.  Answer, I had seen the video.  I

6  had seen the first video.  Question, all right, I understand.

7  Do you remember when you visited Dr. Fagal he was preparing for

8  a class that was about to begin 15 minutes later.  Answer, yes.

9  Question, okay, whose decision was it to summon Professor Fagal

10 15 minutes before his class was to begin.  Answer, Sister Anne

11 Munley.  Question, okay.  Did you consider providing Professor

12 Fagal with 15 minutes advanced notice was appropriate.  Answer,

13 did I think it was appropriate?  Question, yes.  Answer,

14 honestly I never thought about it.  Question, okay, when you

15 worked for Marywood, did you ever participate in the discipline

16 of any employee other than Professor Fagal.  Answer, yes.

17 Question, in your experience, was it typical to give an

18 employee only 15 minutes notice of a meeting when he had class

19 in 15 minutes, a meeting with the president.  Answer, no, when

20 I served on -- did not involve the president directly at the

21 point in time that I served.  Question, okay.  So before you

22 visited Professor Fagal and told him that he had this meeting,

23 you never had to summon another faculty member this way.

24 Answer, no.  Question.  Okay.  Do you know for how long this

25 meeting with the president had been planned.  Answer, no.

1  Question, can you explain the circumstances of President Munley

2  telling you to summon Dr. Fagal?  Did she say anything the

3  night before, five minutes before?  Do you remember?  Answer, I

4  was called to Sister Anne's office sometime between 7:30 and

5  maybe 20 until.  I think that was the time.  But it was maybe

6  15 minutes before I went and told Fred.  It was that morning.

7  Question, and what exactly did President Munley say to you.

8  Answer, she said for me to go tell Fred that he was supposed to

9  report at her office at I believe 8 was the time.  Question,

10 okay.  Are you sure it wasn't 9.  Answer, no, I'm not sure.  It

11 could have been 9.  Question, all right.  Answer, it was 15

12 minutes before his first class of the day.  Question, right.

13 Do you recall whether President Munley was -- did she appear

14 angry.  Answer, no.  Question.  Okay.  Just a few minutes ago

15 you said when you visited Professor Fagal that morning you said

16 something about I think you know what this is about.  Answer,

17 he asked me what it was about, and I said I think you know.  I

18 was making the assumption it was about the video.  Question, so

19 the president didn't mention that to you.  Answer, no.

20        Let me go to line 15.  Answer, yes.  The video --

21 faculty who once the video is posted and people saw it, faculty

22 would come by my office and make comments.  Just general

23 conversation.  I don't remember specifically faculty members

24 who dropped by.  Question, and do you remember what they said.

25 Answer, I can't say for sure, no.  Question, okay, let's move

1  on to the meeting of President Munley that occurred on the

2  morning January 23.  Where was it held.  Answer, in her board

3  room.  Question, and who attended the meeting.  Answer, Pat

4  Dunleavy and I attended the meeting.  Question, and President

5  Munley.  Answer, well, yes.  Question, and Dr. Fagal of course.

6  Answer, yes.  Question, nobody else.  Answer, no.  Question,

7  okay.  Do you know whether the meeting was recorded in some

8  way.  Answer, Pat Dunleavy took minutes.  Question, do you know

9  if there was an audio recording or video recording.  Answer, I

10  do not know.  I do not believe so.  Question, okay.  Did

11  anybody other than Pat Dunleavy take notes at the meeting.

12  Answer, no I mean, Sister Anne might have.  I don't recall.  I

13  don't recall.  I know Pat took minutes and wrote up a report

14  after the meeting that I signed off on.  I signed off on Pat's

15  reporting of what transpired at that meeting.  Question, okay.

16  Let's talk about Ms. Dunleavy's report.  What do you mean by

17  quote, report?  Did she write a memo?

18          Answer, it was just putting the notes together so --

19  that there would be a record of what occurred.  And I read her

20  -- she brought it to my office if I remember correctly.  I read

21  it and thought that that captured the essence of the meeting

22  and I signed off.  Question, what do you mean by signing off.

23  Did you literally sign it.  Answer, I believe I literally

24  signed it to say that, yes.  I was in attendance, and this

25  reflects what I heard.  Question, did you say not literally.

1  I'm sorry.  I have a bad connection.  The court reporter.  I

2  will read it back for you, counsel.  The reporter read back as

3  was requested.  By Mr. Cohen, question, did you take any notes

4  after the meeting about what had occurred during the meeting.

5  Answer, no.

6          Question, I want you to tell me as much detail as you

7  can remember about what was stated at the meeting starting from

8  the beginning until the end.  Can you do that.  Answer, Sister

9  Anne began her questions with -- I think the very first

10 question was, did you post the videos to Dr. Fagal.  Dr. Fagal

11 acknowledged that he, indeed, had posted the videos.  Then

12 Sister Anne went on to ask the why and the wherefore.  I don't

13 recall specifically after that until the end of the meeting at

14 which time she told him that he was being dismissed.  Mr.

15 Cohen, Joan, can you read Dr. Foley's answer back into the

16 record again.  The reporter read back as was requested.

17         By Mr. Cohen.  Question, so it sounds like you're

18 telling me exactly what you remember the president saying, but

19 do you remember anything that Professor Fagal said except to

20 admit that he made the videos.  Answer, no.  Question, a minute

21 ago you stated that President Munley asked Professor Fagal the

22 why and the wherefore, right.  Answer, yes.  Question, and by

23 that did you mean she asked Professor Fagal why did you post

24 the videos.  Answer, yes.  Question, and do you remember

25 Professor Fagal's response.  Answer, no, I do not.  Question,

1    okay.  Do you remember Professor Fagal attempting to answer and
2    then President Munley cutting him off.  Answer, I don't recall
3    that, no.  Question, do you remember Professor Fagal making a
4    comment something to the effect, well, if I can't about the
5    posters, then I can't really explain myself.  It would be like
6    trying to found out how many angels can dance on the head of a
7    pin.  Does that ring a bell.  Answer, no, it does not.
8    Question, okay, a moment ago you said President Munley told
9    Professor Fagal he was dismissed, right.  Answer, I don't know
10   if dismissed was the exact word but that was the -- that was
11   the bottom line.  He was no longer on the faculty.  Question,
12   okay.  Answer, yes, told to clear out his office.

13           Page 25, please.  Line 18.  Question, at the time of
14   the January 23 meeting when you said that Professor Fagal had
15   been dismissed, did you believe that Professor Fagal had posed
16   an immediate harm to himself.  Answer, no.  Question, how about
17   to any others.  Answer, no.  Question, okay.  Do you recall any
18   statements made by Marywood administrators about whether
19   Professor Fagal posed an immediate harm to himself or to
20   others.  Answer, no, I do not.  Turn to page 34, please.  Go to
21   line 24.  Question, and what educational degrees do you have.
22   Answer, I have a Ph.D. in philosophy.  Do you want me to go
23   back to bachelors.  Question, yes, sure.  Answer, I have a
24   bachelor's degree.  Question, where did you get it from.
25   Answer, I got a bachelor's degree with a double major, German

52

1  and philosophy from Eastern Illinois University, a master's

2  degree and Ph.D. in philosophy from Southern Illinois

3  University, and a masters in public administration from New

4  York University.  My designations are complete.

5          MR. ENGLISH:  Your Honor, we have some counter

6  designations.

7          THE COURT:  I understand that.

8          MR. ENGLISH:  We are bringing it up on the computer.

9          MR. COHEN:  Your Honor, I did make some objections to

10  the counter designations.

11          THE COURT:  You did.

12          MR. COHEN:  Yes.

13          THE COURT:  Well, I ought to know what they are I

14  suppose.  There's no jury here, so you can --

15          MR. COHEN:  I am just looking for them.  Would you

16  like them in writing or make the objections as they are being

17  --

18          THE COURT:  No.  What are the objections?

19          MR. COHEN:  Lines 29, 6 to 32, 20, no personal

20  knowledge inadmissible hearsay, irrelevant, page 32 lines one

21  to 17, irrelevant, page 41, lines 4 through 15, no personal

22  knowledge, page 41, line 18 through page 42 line 11, irrelevant

23  and page 43 lines 10 through 14, no personal knowledge.

24          MS. McGINLEY:  I am not going to read the last

25  designations.  We have to address that.  But page 32, lines --

 1  was it line 6 through 17?

 2          THE COURT:  One through 17.

 3          MS. McGINLEY:  One through 17, no personal knowledge.

 4  It said half way down I had two students come in my office and

 5  tell me this.

 6          THE COURT:  He said irrelevant.

 7          MR. COHEN:  Which pages and lines?

 8          THE COURT:  Page 32 lines 1 through 17, irrelevant.

 9          MR. COHEN:  Yes, that was my objection.

10          MS. McGINLEY:  Oh, irrelevant.

11          MR. ENGLISH:  Bring them up.

12          MS. McGINLEY:  Page 32.  These are his personal

13  thoughts about Dr. Fagal.  He's not available to be here today,

14  and I think it's relevant that he -- what he thought of him as

15  a colleague.

16          THE COURT:  Who asked the question?

17          MS. McGINLEY:  This is the deposition.  So Mr. Cohen

18  asked the question of Dr. Foley.

19          THE COURT:  You asked him whether he liked him?

20          MR. COHEN:  Yes.

21          THE COURT:  Why wouldn't that go to bias or non-bias?

22  You asked the question.

23          MR. COHEN:  You know what, I retract my objection.

24          THE COURT:  Okay.

25          MS. McGINLEY:  Okay.  And then did you object to page

1  29?

2          MR. COHEN:  29 --

3          THE COURT:  What line is that?

4          MR. COHEN:  6 through the end of the page through 31

5  line 20.

6          MS. McGINLEY:  You said no personal knowledge.  He

7  explains in line 15 I had two students come in my office one

8  time from a comment that he made in class and he goes on to

9  explain how --

10         THE COURT:  What they said?

11         MS. McGINLEY:  What they said.

12         THE COURT:  Isn't that hearsay?

13         MS. McGINLEY:  He's unavailable to be here today

14  because he's out of subpoena power.

15         THE COURT:  Even if he were --

16         MS. McGINLEY:  That they said it to him and he heard

17  it.

18         THE COURT:  It's hearsay.

19         MS. McGINLEY:  It's an exception because he's not --

20  he's unavailable.

21         THE COURT:  No, it's not.  If he was on the witness

22  stand he would be testifying of this.  If he's telling the

23  Court what somebody else told him and asked him -- it's

24  hearsay.

25         MS. McGINLEY:  Okay.  Okay.

55

1          MR. ENGLISH:  Could I add?  It's not there to

2    establish the truth of the matter.

3          THE COURT:  What's it there for?

4          MR. ENGLISH:  His knowledge of the policies when he

5    said things like calling -- this is the student's thunder

6    thighs in class, he was reprimanded when you make jokes or make

7    comments that it crosses the line.

8          THE COURT:  It's a statement that he said somebody

9    had thunder thighs, isn't it?

10          MR. ENGLISH:  Yes, Your Honor.

11          THE COURT:  Thank you.  It's hearsay.

12          MS. McGINLEY:  The next one is page 41.

13          MR. COHEN:  Wait a second.  I think my objection went

14    from 29, 6, to --

15          MS. McGINLEY:  It's the same conversation.

16          MR. COHEN:  That whole thing is excluded?

17          MS. McGINLEY:  Yes.  The next one, 41 --

18          MR. ENGLISH:  What line?

19          MR. COHEN:  Four through 15.

20          MS. McGINLEY:  What's the objection, no personal

21    knowledge?

22          MR. COHEN:  Yes.

23          MS. McGINLEY:  It says here, do you recall you asked

24    him -- do you recall the general or did you recall the general

25    feelings people had towards the videos and then he explains.

1          MR. COHEN:  He doesn't know what everyone on campus

2    thinks.

3          MS. McGINLEY:  I don't think that's what you asked

4    him.  It's what the general feeling was based on his knowledge

5    --

6          MR. COHEN:  He doesn't know that either.  He

7    couldn't.

8          THE COURT:  I don't know anyone that was happy about

9    it.  I have some experience with this.  Once -- this is not on

10   the record.

11         (A discussion was held off the record.)

12         THE COURT:  This is objectionable and the objection

13   is sustained.

14         MS. McGINLEY:  Did you have any other objections?

15         MR. COHEN:  41, 18 through 42, 11.

16         MS. McGINLEY:  The objection is the -- this goes to

17   the Muslim cartoon posting on his door which he testified about

18   during his examination and Dr. Foley gives additional

19   information about students expressing concern to him.

20         THE COURT:  Again, these are complaints made by

21   students about again -- I don't think it's appropriate.

22         MS. McGINLEY:  Okay.  So I will start with page --

23         MR. COHEN:  There was one more.

24         MS. McGINLEY:  I am not reading that.  Page nine.  I

25   will start with line 7.  This is talking about the FIRE posters

1  mentioned.  Do you know the circumstances of which they were

2  removed.  Answer, not specifically.  Question, well, do you

3  know whether Marywood personnel ordered the removal of the FIRE

4  posters.  Answer, what I remember was I believe they did not

5  contain the proper stamp from the office for student -- vice

6  president for student affairs.  I think all posters had to be

7  cleared.  My recollection is that that was the reason, but that

8  was four and a half years ago.  Right, I understand.  I

9  understand the reason.  My question is, did Marywood

10  administration order the removal of the FIRE posters.  Answer,

11  I can't say.  No, I don't know for sure.  I just know what I

12  heard.  What did you hear.  Basically there was no appropriate

13  stamp on the posters.

14         Turning to page 17, line 5, this is about the January

15  23 meeting.  Okay.  Why did you assume it was about the video.

16  Answer, because it was a hot topic of conversation.  The video

17  seemed to be public knowledge.  Question, okay.  You say it was

18  a hot topic of conversation.  Who specifically were you

19  conversing about this e-mail with.  Do you remember.  Answer,

20  about the e-mail or the video.  Question, well, actually the

21  video because you said you never saw.  Answer, yes, the video,

22  faculty who once saw the video was posted and the people saw

23  it, faculty would come by my office and make comments.  Just

24  general conversation.  I don't remember specific faculty

25  members who dropped by.

1       And turning to page 21 line 18, this is also about

2   that same meeting.  Okay.  So before this meeting, do you know

3   whether President Munley was prepared to dismiss Professor

4   Fagal.  No.  Question, you didn't discuss any discipline of

5   Professor Fagal before the meeting started.  No.  And were you

6   aware of such discussions -- turning to the next page --

7   answer, no.  Question, let me ask you this.  What was your role

8   at the meeting.  Why would you have been there.  Why were you

9   invited.  Answer, I think because I was dean of the college.

10      And then page 28, line 16, question, okay, in your

11  time at Marywood, can you recall any tenured professor

12  publically criticizing the administration in any way similar to

13  Professor Fagal.  Answer, no.  Question, did President Munley

14  ever express any dislike for Professor Fagal prior to the

15  videos that he posted.  Answer, not to my knowledge, no.  How

16  about vice president Levine.  Answer, no.  Do you remember any

17  other Marywood administrators expressing dislike or contempt

18  for Professor Fagal before -- this is before January 2012.

19  Answer, no.

20      Turning to the last counter designation on 32, line

21  one, my question for you though is, did you personally dislike

22  him.  Answer, it's not an easy question to answer.  Fred and I

23  had a lot of good conversations in probably the first ten years

24  he was at Marywood.  We didn't continue those conversations for

25  maybe for a variety of reasons, none of which I recall at the

1  moment.  But I always found him a good conversationalist, but I

2  did not like some of his thoughts on education.  Answer,

3  especially some of his thoughts on students.  So as a colleague

4  I found him okay.  But as a faculty member in charge of student

5  learning, I had some difficulty.  Answer, none of which I ever

6  expressed.  I was never asked for my thoughts.

7           THE COURT:  All right.  Is that it?  Is that it for

8  the --

9           MR. COHEN:  I was going to read the deposition

10  transcript for Sister Munley.

11           THE COURT:  Let's take a ten-minute break.  We've had

12  been at it almost two hours.  Take ten minutes.  Then we will

13  adjourn for lunch after Sister Munley.  How long is Sister

14  Munley?

15           MR. COHEN:  I would estimate 30 minutes.

16           THE COURT:  I just want a general idea, okay.  Let's

17  take ten.  I take it there won't be any counter designation

18  because Sister Munley is going to be a witness; is that right?

19           MR. ENGLISH:  Since this is his case and we will move

20  for directed verdict, we want to put in a few designations.

21           THE COURT:  Oh, sure, absolutely.  Okay.

22           (A brief recess was taken.)

23           MR. COHEN:  Pull up the deposition of Anne Munley,

24  please.  And go to page 4.  Okay.  Starting with line 6,

25  examination by Mr. Cohen.  Sister Munley, my name is Jonathan

1 Cohen.  I represent the plaintiff in this case, Frederick F.

2 Fagal, Junior.  How would you like to be called today, sister

3 or President Munley.  Answer, Sister Anne is just fine.

4 Question, Sister Anne, okay.

5       And you understand today that you're under the same

6 oath as if you were in a courtroom, correct.  Answer, I do

7 understand.  Question, let me just go over some of the ground

8 rules.  Have you had a deposition before.  Answer, no, I

9 haven't.

10       MR. ENGLISH:  Sorry, we will stipulate to the

11 background just to save time.

12       MR. COHEN:  That's fine.

13       THE COURT:  That's fine.

14       MR. COHEN:  Turn the page, please.  Keep going.  I'm

15 sorry.  Go to page 14.  14, line 1.  Through all of the

16 interview process, and I was selected as Marywood's 11th

17 president.  And then I have served as the president of

18 Marywood.  I am concluding.  I am retiring now at the

19 conclusion of this year after nine years as president.  My

20 total service at Marywood either as a faculty member or as

21 director of institutional research and planning or as president

22 totals 20 years.  And this year I received the Cormarier Medal,

23 which comes after 20 years of direct service.  Page 17.  Line

24 one, and Marywood has set of core values, correct.  Answer, yes

25 they do.  And they are very related to the mission of the

1  university and their Catholic identity and they are rooted in

2  the Catholic identity and our Catholic tradition.  We are a

3  faith based institution of service, respect, excellence and

4  empowerment.

5          And did you -- did you say these core values are just

6  symbolic or do they play a genuine role in the life of the

7  university.  I think they pay a very genuine role in the life

8  of the university which goes deeply into the founding vision of

9  the I. H. M. sisters when they founded Marywood in 1915 because

10 there was no education available for women at all.  And they're

11 also directly related to the I. H. M. charism which I mentioned

12 before which is about developing God given gifts and potential

13 wherever it's found.  And so, you know, the mission of Marywood

14 talks -- and it's an enduring mission across time, helping our

15 students, our faculty and the whole member of the Marywood

16 community to live responsibly in a diverse and interdependent

17 world.  It's all about the common good.

18         Question, and prior to the -- I'm just call the

19 e-mail and the videos that are the subject of this litigation.

20 I'm going to -- throughout this deposition I'm going to call it

21 the January 13th, 2012 incident.  Is that around the time when

22 you thought it happened.  Answer, I mean, I'm not -- this is

23 four and a half years ago, so I wouldn't say a date would be in

24 my mind.  Question, right.  Answer, but a very significant part

25 of this for me, of course, is the matter of the videos.  That's

1  the substance of it for me.  Question, and the e-mail -- I will

2  just present to you the e-mail that Professor Fagal sent

3  containing these links to the videos was sent January 13th,

4  2012.  And when I say the January 13th, 2012 incident, that's

5  what I'm referring to.

6          Go to page 44, please, line 4.  Question, what was

7  your first reaction to seeing the video.  Forget about the

8  e-mail.  Answer, okay.  I was absolutely and totally appalled.

9  And I, first of all, was highly offended to be personally

10  depicted as Hitler and to see the members, the exclusive

11  members of, officers of Marywood University depicted as Hitler

12  aides.  I was absolutely distressed especially because Dr. Alan

13  Levine is of the Jewish faith.  And I thought it was

14  anti-Semitic to even involve Dr. Levine in something of this

15  nature, and virtually every member of the cabinet was in some

16  way directly insulted as well as their family members, and the

17  I. H. M. sisters were characterized as S. S.

18          And, you know, I think it of the founding charism of

19  the I. H. M. congregation, its emphasis on empowerment and

20  service and excellence .  I think of Hitler as a dictator

21  responsible for the annihilation of six million innocent

22  people, and I think of my direct experience in working in very

23  poor countries and seeing victims of trafficking and the boy

24  soldiers and the war that was going on in Uganda and

25  trafficking of children and women in Asia and in South Africa,

1   the experience of the apartheid that I had an opportunity to

2   understand Mandela's work.  I was disgusted, appalled, repulsed

3   and everything.  I thought it was a personal attack on

4   everything Marywood stands for as well as an egregious assault

5   to our mission and core values.

6          And our mission is about an educational program that

7   really is involved in enabling students to live responsibly in

8   a diverse and interdependent world.  The whole essence of a

9   Marywood education is to respect, basically respect every

10  single person, every culture, every ethnicity.  I was sickened

11  by it.  I could not believe that I was -- and it was vulgar.

12  It was sexually explicit.  It mentioned spouses and family of

13  some of our executive officers.  It demeaned them.  It

14  mentioned someone's wife.  I was totally appalled, disgusted.

15  I have to say in my entire lifetime -- and I've been in very

16  difficult situations, so I have great human suffering -- I

17  could not believe that in an context like Marywood that this,

18  you know, Hitler -- I can't -- the video was incomprehensible

19  to me that anybody who would be a tenured professor at Marywood

20  University where we are so explicit in what our mission and

21  values are would produce something of this nature.  And I found

22  it, you know, as soon as I saw it, I was especially sensitive

23  to Dr. Levine, who was very, very much affected by this because

24  it was his wife that was mentioned in the video, and he is

25  Jewish and he was very much emotionally impacted by it as were

1   the other cabinet members.  We just don't operate like that as

2   a people.  We emphasize respect.  I found the congregation, you

3   know, we have sister missionaries in various countries who

4   lived in all sorts of circumstances.  They welcome the

5   sacrifice.  It's who we are.  We teach this mission to our

6   students.  We have hope course, university 100 that emphasizes

7   the heritage why we have these values.  And, you know, we have

8   worked have hard as an institution.  I personally because of my

9   global opportunities to be in so many parts of the world have

10  emphasized global education and the importance of that.  And,

11  so you know, I'm a sociologist.  I taught anthropology.  I

12  believe in the value of multiple cultures.  I was sickened by

13  this.  And this to me violated everything that Marywood stands

14  for.

15          It was core of who we are was being affronted by this

16  and I decided that this was -- this was a major violation of

17  what it is to be considered a member, a tenured faculty member

18  of Marywood University.  It violates everything that's involved

19  in that.  Question, after viewing these videos, did you feel

20  like Professor Fagal should be suspended for fired.  Answer, I

21  have to say this was such an egregious offense of not only of

22  what my understanding of the responsibility of a tenured

23  faculty member at Marywood is, that this was something for

24  which there should be a suspension.  And I wanted to have a

25  direct conversation with Dr. Fagal.  This was something that,

1  you know, because it affected every member of the cabinet,

2  because it was directly involved with our mission.  As leader

3  of the institution I felt a great responsibility to directly

4  engage with Dr. Fagal about this matter.

5           Question, okay.  So you testified that you thought he

6  should be suspended.  My question was, did you also believe

7  that after seeing this video he should be terminated.  Answer,

8  I wanted to talk to him.  I wanted to personally sit down with

9  Dr. Fagal.  This to me -- suspension was the first thing on my

10 mind, but I wanted to have the opportunity to directly talk to

11 Dr. Fagal.

12          We will go down to line 20.  Question, okay.  So the

13 document that's in front of you -- and can we bring up

14 deposition exhibit six at the same time?  Back to line 20.

15 Okay.  The document that's in front of you.  Answer, yes.

16 Question, again, this was January 17, 2012 this e-mail from Dr.

17 Levine to you where he informs you of the videos.  Do you see

18 this.  Answer, that's right.  I'm looking at it.  Question, so

19 you say you wanted to immediately deal with the situation.  But

20 isn't it true that you did not, in fact, deal immediately with

21 the situation, it waited until at least January 23rd, 2012.

22 Skip to line eight.  The witness, I was traveling.  I was --

23 you know, to work of the presidency involves traveling, board

24 meetings in other locations.  I don't know exactly.  I would

25 have to revisit my calender, but I was also at the time on the

1 A. C. C. U. board of directors, the Association of Catholic

2 Colleges and Universities.  So I don't know where I was at the

3 time.  I would have to revisit.  You know, but this -- if I got

4 this on the 17th and I was somewhere else, I don't remember

5 what date you said I dealt with this, but my goal was to deal

6 with it.

7         Question, do you have people on your staff on the

8 cabinet you occasionally delegate responsibilities to.  Am I

9 correct?  Answer, I think that each of the -- yes.  I would say

10 yes.  Each of the cabinet members -- each of the cabinet

11 officers is a direct report to the president, and they have

12 certain responsibilities, and then they report directly to the

13 president, yes.

14         Question, did you -- even though you were away when

15 you received this e-mail January 17th, 2012, did you think

16 about delegating the handling of this situation to anybody on

17 your staff.  Answer, I would never delegate anything of this

18 magnitude.  I would discuss it with the staff because each of

19 them were directly affected by it.  But I was away at the time.

20 I knew this was something that I was going to deal with.

21         Page 51, please.  You can take the other exhibit

22 down, please.

23         Page 51, line 17 through 19.  Question, did you feel

24 like the videos after you first saw them posed an immediate

25 harm to the Marywood community.  We skip to line 22.  The

1  witness, I think I already answered that question.  Mr. Cohen,

2  question, well, I think you testified -- I think -- answer, I

3  think it was highly offensive and actually in a sense defamed

4  the essence of what we're all about.  Question, did you feel

5  like it had to be dealt with immediately.  Answer, I felt like

6  it had to be dealt with, but, you know, I don't know where I

7  was at the time, and I knew that this was going to be something

8  personally that I would deal with as president.  When you're

9  president, the buck stops there.  Question, did you feel like

10  this, the creation of the videos was an emergency, created an

11  emergency for Marywood.  Answer, I don't know that I would put

12  that word on it.  It's something very serious, something

13  offensive, something that had to be dealt with, and I dealt

14  with in a very strong and direct manner.  Question, but not

15  necessarily immediately.  Ms. Peet, objection, asked and

16  answered.  By Mr. Cohen, question, you can answer.  I think I

17  accidentally read the -- past what I was supposed.  I was only

18  supposed to read to line 18.  Is this page -- yes.

19          MR. ENGLISH:  I think we have a question and no

20  answer to what you read.

21          MR. COHEN:  Turn to page 53, line 1.  Well, I was

22  away, this is again, five years ago.  I can't say day by day by

23  day.  I know that the first chance that I had to deal with it I

24  dealt with it.  By Mr. Cohen, question, did you feel that

25  Professor Fagal posed any physical threat to himself or to

1  others after viewing this video.  Skip to line 13.  The

2  witness, I wouldn't know how to answer that question.  For me,

3  the harm was that the thing was done in the first place, and it

4  was made public, that, you know, it attacks everything we stand

5  for.  Mr. Cohen, question, what more do you need in order to

6  answer that question.  You said you don't know how to answer

7  it.  Did it occur to you whether you're qualified to say it or

8  not, but it did it occur to you that Professor Fagal had become

9  a physical threat to himself or others after viewing the video.

10  Answer, I don't recall thinking about that in the way in which

11  you are asking the question.

12          Page 55, line 25.  Question, and you know that this

13  litigation is -- a large part of it involves a meeting that you

14  held with Professor Fagal around January 23rd, 2012 where he

15  was suspended.  Do you remember that.  Answer, I do, oh, I

16  recall that very much.

17          Page 61, please, line 17.  Question, and we talked a

18  little bit about Dr. Levine's reaction to the videos.  Did Dr.

19  Levine recommend that Professor Fagal be suspended.  Answer, I

20  don't remember a specific statement, but we were in accord that

21  this needed to be dealt with, and that this was very serious

22  and I would deal with the consequences.  Everybody agreed with

23  that.  Question, you keep saying you don't remember explicitly.

24  But did anyone -- answer, well, in my mind, you know, you're

25  asking me to remember conversations five years ago, which is

1  very difficult and I'm very -- I want to be as thoughtful as

2  possible and as accurate as possible, which is what I am trying

3  to do here.  I just know this was so serious to me that this

4  was going to be a suspension.  Do I remember the exact words

5  that may have taken place in our discussion of this, I can't

6  give you an exact sense of it.  But I know that this for me was

7  that serious and so egregious it was going to have consequences

8  of a serious nature.

9           Question, okay.  So you can't remember the exact

10 words verbatim.  Answer, right.  But I had come to the

11 conclusion that this was -- this is something for which the

12 individual concerned should be suspended.

13          Page 66, please, line 25.  The witness, you know, I'm

14 saying that there are certain responsibilities within the scope

15 and sole discretion of a department chair.  There are certain

16 responsibilities within the scope and discretion of what a dean

17 does, and there's certain scope and responsibilities for an A.

18 V. P.  However, A. V. P. is a direct report to the president,

19 the dean is a direct report to the A. V. P. and the chairs

20 report to the dean.  So there is a flow of information.  The

21 situation with this particular incident of the videos rose to

22 the level of the presidency because if involved the whole

23 institution, the total institution.  It involved the entire

24 executive officer body.  It involved the essence of our mission

25 and core values, and it involved a number of policies which are

1  directly something that ultimately the president has the

2  responsibility for seeing that the institution is compliant

3  with.

4          Page 68, line 7.  This is page 68, line 7.  And

5  specifically, I mean, January 23rd, 2012 you had a meeting with

6  Professor Fagal in which he was suspended, am I right.  Answer,

7  that is correct.  Question, before that meeting, would it be

8  fair to say that Professor Fagal had not been disciplined over

9  the videos.  Answer, I think that's fair to say yes, because

10 this was my first opportunity to talk to him directly.

11         Page 69, line 5.  At this time, Munley deposition

12 exhibit 7 was marked for identification.  Could you put that up

13 on the other half of the screen, Brian?  By Mr. Cohen,

14 question, sister, do you recognize -- answer, I do.  Question,

15 the document in front of you.  And just briefly what are we

16 looking at here.  Answer, these are thought processes talking

17 points, things that -- sort of like guidelines for the meeting

18 that was to occur.  Question, and you're referring to the

19 January 23, 2012 meeting involving Professor Fagal, Michael

20 Foley and Patricia Dunleavy.  Answer, Dr. Fagal and I were the

21 ones meeting.  Dr. Foley was the dean, and that's why he was

22 appropriately to be there.  And Dr. Dunleavy is associate vice

23 president for H. R.  Question, and so these were -- answer,

24 these were my thinking points.  Question, and so it's correct

25 to say that you generated this document.  Answer, some of this

1  was in consultation.  Question, I was going to say it looks

2  like -- some of the wording it looks like someone else may have

3  generated.  And I'm specifically referring to Ms. Dunleavy, but

4  I don't know.  But you're not sure whether you did it.  Answer,

5  well, I know I work with Dr. Dunleavy about H. R. steps because

6  that's her role, you know.  But this document is very familiar

7  to me.  Question, I'm sorry.  Answer, this document is very

8  familiar to me because it was the guidelines for the meeting

9  that we were having.

10          Question, and so you think that these talking points

11  were -- that was like a collaborative endeavor between you and

12  Dr. Dunleavy.  Answer, yes, I think Dr. Dunleavy -- Dr.

13  Dunleavy's role as associate vice president for H. R., she is

14  the person who has all of the H. R. related policies.  She

15  works with all the time.  So, you know, I work with her

16  frequently on these matters.  She also assists me with

17  personnel matters that aren't of a legal nature.  Question,

18  okay.  And do you know exactly when this document was

19  generated.  Answer, I couldn't you exactly when, but it would

20  have been in preparation for the meeting.  Question, right.

21  And this is not the first time you're seeing this document.

22  Answer, no, it's not.  Question, okay.  And so you would have

23  had approved these talking points if not created some of them

24  yourself, correct.  Answer, some of it was like informational

25  pieces.  We have multiple policies, you know, so like whenever

1  I had to deal with any kind of a situation, I always reference

2  all the policies, particularly all the policies that are -- you

3  know, if it's a faculty matter, I review the policies in the

4  faculty handbook.  So I mean, this is an approach when you get

5  down to the bottom it's like looking at some of the matters

6  regarding policies, what we would do if A., B. or C. were to

7  occur.  This is just sort of like a prep sheet.  This is

8  something that I typically would do in collaboration drawing on

9  the expertise both within the house and if I needed to go

10  beyond that in terms of conversation with counsel, I would have

11  done so.

12        Question, do you remember specifically adding or

13  changing any of these talking points prior to January 23rd,

14  2012 meeting.  Answer, again, that was five years ago, I can't

15  say that I recall anything that I could say specifically.

16  Question, if you look at the 7th bullet point down, it begins

17  with, quote, tell Fagal, end quote, do you see that.  Answer,

18  um-hum.  Question, can you read that briefly to yourself and

19  let me know when you're finished .  Answer, witness complies,

20  um-hum.

21        Go to line 21.  Question, initially was the meeting

22  with Professor Fagal supposed to be -- supposed to just be with

23  Dr. Dunleavy and not you.  Answer, oh, no, this, you know, ask

24  Fagal, that was -- I recall talking that was -- I recall

25  talking a lot with Dr. Dunleavy.  Question, so even though this

1  bullet point says, quote, tell Fagal that sister views this

2  conduct to be a serious breach, end of quote, even though it's

3  written in the third person, it was you that was going -- that

4  planned to say that.  Answer, I was the one who was going to

5  meet with Dr. Fagal, yes.  I had decided that earlier on it

6  goes with office of the president.  And, you know, often when I

7  have meetings and work through processes somebody takes the

8  notes.  It's not always me.  Question, right, okay.  The next

9  bullet point reads, quote, ask Fagal to leave campus, wait for

10  sister's decision, end of quote.  Am I right.  Answer, um-hum.

11  Question, then there's like a sub bullet point under that it

12  says, quote, suspended with pay.  End of quote.  Correct.

13  Answer, these are all things to think about, yes.  These are

14  elements to think about.

15        Question, but I did read that correctly, correct.

16  Answer, you read -- I'm sorry.  You read -- question, it says,

17  quote, ask Fagal to leave campus, wait for sister's decision.

18  And then there's a sub bullet point saying, quote, suspended

19  with pay, end of quote.  Correct.  Right, that's what the

20  document says.  Question, okay.  So leading up to the meeting

21  with Professor Fagal on January 23, 2012, was it your plan to

22  suspend him regardless of what was said at the meeting.

23  Answer, yes.  Question, okay.  Answer, I wanted to give him an

24  opportunity to address the video as a tenured professor and the

25  responsibilities of a tenured professor.  And then, you know, I

74

1  was looking for information that would help me to see further

2  down the line.  But this warranted suspension in my opinion.

3          Question, what type of information were you hoping to

4  go hear from Dr. Fagal.  Answer, when I met with Dr. Fagal, I

5  asked him directly, you know, was he responsible for the

6  videos, and immediately he said yes.  Then I asked him, you

7  know, how these videos -- in what way did these videos support

8  his role as a tenured professor at Marywood University because,

9  you know, the whole policy on tenure talks about upholding the

10 mission and values of the institution.  It's a mutual

11 agreement, and he did not answer.  He chose not to answer that.

12 Question, okay.  And I asked him multiple times about three or

13 four times trying to see if there was any enlightenment he can

14 give me because I was appalled by it.

15         Question, okay, we are going to talk about more about

16 that in a minute or so, but I just want to get through this

17 document.  Do you see on the first page there's a bullet point

18 that says, quote, post suspension.  Answer, um-hum, that's a

19 contingency thing.  I always review -- if I may I always review

20 what are the pertinent policies and what are the steps because

21 when you deal with, you know, various -- we have a whole series

22 of policies.  I always -- some of them are time related.  Some

23 say within a certain period of time.  So this was, like, the

24 elements of it we would go this path.  These are some of the

25 steps.  Question, and underneath that, underneath, quote, post

1   suspension, end of quote, it says -- quote, sister recommends

2   termination and prepares notice of charges, end of quote,

3   correct.  Answer, that's in the policies.  Question, okay.  Was

4   your plan going into this meeting on January 23rd, 2012 to move

5   from -- well -- first of all, you already testified it was to

6   suspend Professor Fagal, correct.  Answer, I felt this was very

7   serious.  And if you don't stand up for what is the essence of

8   your institution, what are you opening the future to.  I

9   thought it was very serious.  It rose to the level of the

10  president, and, yes, it deserves consequences.  That's where I

11  was.

12          Question, was the plan also not only suspend him but

13  to move directly to termination regardless of what occurred

14  during the meeting?  Answer, in the meeting I was intentionally

15  giving Dr. Fagal the opportunity to really give me some sort of

16  explanation, which I asked for repeatedly and didn't get.

17  Question, right.  I understand what you -- answer, this

18  document reflects the whole range of potential developments in

19  looking down the line as to depending on contingencies.

20  Question, okay, now, I know what you believe was asked at the

21  meeting, what was said or not said.  And I know we can both

22  read this document.  But my question was a little more simple.

23  Was your plan to move directly from suspension to termination

24  regardless of what occurred at the meeting.  Answer, I would

25  have to say that I was very interested in hearing from Dr.

1  Fagal why he did these videos and how they related to his

2  responsibilities as a tenured professor at Marywood.

3          Question, I understand.  Answer, and, you know,

4  depending on the kind of answers, that would then affect my

5  next thoughts on it.  But this is a preparation of all of the

6  various things I would have to take into consideration for

7  whatever direction this case and place took.  But I had

8  determined that suspension was going to be the outcome of this

9  meeting.  Question, okay.  I don't think -- answer, and the

10  next steps were yet to be determined.

11          Turn to page 79, please.  Take the other exhibit

12  down, please.  79.  Start with line six.  Question, so let's

13  talk a little about this meeting on January 23, 2012, the

14  meeting, you were there.  Answer, yes.  Question, Fagal was

15  there, correct.  Answer, that's correct.  Question, Patricia

16  Dunleavy was there.  Answer, that's correct.  Question, and

17  Michael Foley was there, correct.  Answer, right, right.

18  Question, was there anyone else there.  Answer, no.

19          Question, would it be fair to say there was a plan

20  for Dr. Foley to visit Professor Fagal at approximately 8:45

21  a.m. that day and tell him to appear at your office at 9:00.

22  Answer, yes, yes.  Question, okay.  And so it would be correct

23  to say that Professor Fagal received 15 minutes' notice of this

24  meeting.  Answer, yes.  Question, was there any reason he was

25  provided with only 15 minutes notice.

1      Skip to line 5.  The witness, I don't recall any -- I

2  couldn't give any answer to that.  I just knew this was the

3  date I was going to deal with the situation.  By Mr. Cohen,

4  question, and would it be fair to say that in your mind the

5  content of this meeting could determine whether Professor Fagal

6  was going to remain at the university.  Answer, yes.  Question,

7  so it was an important meeting.

8      Skip to line 17.  The witness, I'm sorry.  Then we

9  skip to line 20.  The witness, I think any meeting that I have,

10  you know, any meeting I would have at -- with a faculty member

11  of something so serious in mind was an important meeting.  Mr.

12  Cohen, question, and at the time of this meeting, Professor

13  Fagal he had been a tenured professor for a long time, correct.

14  Let me skip to line six.  The witness, I don't know what -- I

15  don't know when he was tenured, but he was at Marywood for a

16  number of years.  I know he was tenured, but I don't know when.

17  By Mr. Cohen, question, but you knew he had been an employee of

18  the university for many years before the meeting.  Answer, yes.

19      Skip to page 88.  Line 13.  Question, okay.  Can you

20  state in as much detail as you can what was stated at that

21  meeting including you, Professor Fagal and anyone else at that

22  meeting.  Answer, well, I don't know that when I asked Dr.

23  Foley and Dr. Dunleavy to come to that meeting it was not

24  really to participate in the meeting.  I just felt as dean, you

25  know, Dr. Foley's presence was importance and Dr. Dunleavy as

1  associate vice president for H. R. was present and then I asked

2  her to take notes so I would have a record of the meeting.

3  Question, I understand.  But you were at the meeting.  Answer,

4  I was at the meeting and I led the meeting.  Question, so

5  presumably you know in some part at least what was said and

6  what wasn't said at the meeting.  Answer, oh, I definitely do,

7  yes.  Question, could you -- answer, I can do that.  Question,

8  could you recount that as best you can.  Answer, yes.

9  Question, and preferably in chronological order.  I realize.

10  Answer, I shall try.  This is five years ago, but I shall try.

11  Question, I'm not asking -- I do expect verbatim, a verbatim

12  accounting.  Answer, I'll give you my memory.  Question, okay.

13          Answer, Dr. Fagal came into the meeting, and I

14  greeted him.  It was held in my conference room, which was

15  right off the president's office.  And I got -- I introduced

16  the topic of the videos, and I asked him, I remember asking him

17  if he had been the author of these videos, and he said yes.

18  And then I -- you know, for me these videos were a violation of

19  the responsibilities of a tenured professor.  So I asked him to

20  explain to me how these videos related to or supported his role

21  as a tenured professor at Marywood University and he did not

22  answer that.  And I know that I waited.  I think I asked the

23  question a few different ways, and, you know, he didn't answer

24  that.  I remember that he started at one point to talk about

25  posters.  I said, I'm not here to talk about posters, this is

1   about the videos.  I am wanting to know about these videos, and

2   you know, again he didn't answer.

3           I said, I remember, you know, because I had prepared

4   for this meeting, and I looked at a lot of the policies that

5   were related to the faculty and the personnel.  And to me this

6   was a violation, a breach of what it means to be a tenured

7   professor at Marywood and that doing this violated -- because

8   it talks about upholding the mission and values of institution

9   very clearly in the description of what that tenure means.

10  When I related that question again, there were several times

11  that, you know, I gave him the opportunity to talk about that.

12  I mentioned it again.  I started that talk about the violation

13  that I felt in addition to the tenure that for me this was a

14  violation of the civil rights of my colleagues, especially Dr.

15  Levine who was Jewish.  And, you know, implicating family

16  members, I spoke to discrimination and collegiality.  I

17  referenced academic freedom because in our academic freedom

18  policy it's very, very clear that one exercises academic

19  freedom in accord with the propriety of the discipline

20  professionally with due respect to the opinions of others, and

21  you know, there certainly wasn't anything scholarly about these

22  videos.  They were defaming people.  So I was trying to just

23  say, just look at all of the things that are involved here.  I

24  talked about the professional ethics policy that we have at the

25  university that talks about, you know, non-discrimination and

1   collegiality and various other elements.  I was also concerned

2   about our computer use, use of computers, because this video

3   was sent to faculty members at their Marywood address, and I

4   believe there were students because I know students have also

5   seen it.  And then, you know, when you think about the mission

6   and the core values, you know, videos were a violation of the

7   responsibilities of a tenured professor.

8          So I asked him to explain to me how these videos

9   related or supported his role as a tenured professor at

10  Marywood University, and he did not answer that.  And I know

11  that I waited.  I think I asked the question a few different

12  ways, and, you know, he didn't answer that.  I remember that he

13  started at one point to talk about posters.  I said, I'm not

14  here to talk about posters, this is about the videos.  I am

15  wanting to know about the videos.  You know, again he didn't

16  answer.  I said -- I remember, you know, because I had prepared

17  for this meeting and I looked at a lot of the policies that are

18  related to the faculty and personnel.  And to me this was a

19  violation, a breach of what it means to be a tenured professor

20  at Marywood and that doing this violated -- because it talks

21  about upholding the mission and values of the institution very

22  clearly in the description of what tenure means.

23          And when I related that question again, there were

24  several times that, you know, I gave him the opportunity to

25  talk about that.  I -- page 91.  A violation that I felt in

1    addition to the tenure for me this was a violation of civil

2    rights of my colleagues, especially Dr. Levine, who is Jewish.

3    And, you know, implicating family members.  I spoke to

4    discrimination and collegiality.  I referenced academic freedom

5    because in our academic freedom policy it's very, very clear

6    that one exercises academic freedom in accord with the

7    proprietary of the discipline professionally with due respect

8    to the opinions of others.  And, you know, there certainly

9    wasn't anything scholarly about these videos.  They were

10   defaming people.

11          So I was trying to just say that I just look at all

12   of the things that are involved here.  I talked about the

13   professional ethics policy that we have at the university that

14   talks about, you know, non-discrimination and collegiality and

15   various other elements.  I was also concerned about our

16   computer use, use of computers because this video was sent to

17   faculty members at their Marywood address, and I believe there

18   were students, because I know students had also seen it.  And

19   then, you know, when you think about the mission and core

20   values, you know, foundational to all of our core values is

21   respect, and I talked about that at the meeting.  And, you

22   know, I remember at one point just saying, why did you do this.

23   And the only answer I remember was Dr. Fagal said justice.  And

24   I thought well, you know, look at all these other areas, you

25   know.  When you're talking about tenure, civil rights or

1  professional ethics or use of computers, appropriate use of

2  computers, you know, for something that flies in the face of

3  what we stand for.  I was just trying to have a basic

4  conversation about that.

5           At one point I know Dr. Fagal was getting ready to

6  leave, and I said, I'm not finished.  This is our opportunity

7  to talk about this.  And he did not leave, you know.  He stayed

8  there.  And when I didn't get, you know, anything -- there was,

9  no, you know, I'm sorry I did it or wish I didn't do this, or

10 you know, no effort to say, oh, I didn't think about the impact

11 this might have on Alan Levine or anyone else, there was none

12 of that.  There was this, you know, continued resistance to

13 giving me any explanation that would carry any sway as to in

14 any way make me think that this wasn't, you know, a

15 spur-of-the-moment or ill conceived or something that I didn't

16 really mean to do or none of that ever.  There was nothing like

17 that that came out in that meeting.

18          So I went on and I said, all right, you're suspended

19 and that means that you turn in your keys.  You know, I asked

20 to verify is this, you know, this says your home address the

21 way in which I can reach him and there would be a follow up.

22 Question, okay.  Answer, that's the basis probably of my -- but

23 there was at no time in any way any effort on Dr. Fagal's part

24 to in any way say that he regretted doing it or that he thought

25 -- you know, would look at it just another way or would do

1 something in the future to make up for this or anything like

2 that, anything of that nature.  So he left after I said that.

3            Question, at what point did the meeting did you

4 actually state that to Professor Fagal you are suspended, was

5 it towards the end, middle, beginning.  Answer, oh, it

6 certainly wasn't at the beginning, because in the beginning I

7 was trying to, you know, it was probably at the end, you know.

8 I can't give you an absolute consequence again five years ago,

9 but I know that's where I got to because that's what I felt

10 this action -- I think it was such magnitude that this was the

11 -- there needed to be a consequence for it.  Question, isn't it

12 true that -- okay.  So you testified that you provided

13 Professor Fagal with an opportunity to explain of the video,

14 correct.  Answer, several times.

15            Question, and isn't it true that Professor Fagal did

16 attempt to explain the larger context of the video but he was

17 cut off.  Answer, I don't think that's a fair characterization.

18 Dr. Fagal started to talk about posters, and I said we're not

19 here to talk about the posters.  This is what we're here to

20 talk about, videos and the videos are what was done that was a

21 total affront to all that Marywood stands for.  That's what I

22 was there to talk about.  Question, wasn't it true the video

23 was related to the posters.

24            Skip to line 23.  The witness, the videos were a

25 gratuitous extension of whatever was the rational for whatever

1  the doctor's behavior was.  I don't know -- I can't guess that.

2  I was reacting to the videos as president because of the impact

3  on the total university, the impact on our students, impact on

4  our cabinet and the impact on all that we stand for.

5            By Mr. Cohen, question, isn't it also true that

6  Professor Fagal at the meeting stated that he would like an

7  opportunity to craft a written response to your questions.

8  Answer, that may have happened, yes.

9            Go to page 98.  Start at line 7.  Question, so the

10 suspension happened.  This meeting happened in the morning

11 January 23, 2012, right.  Answer, yes 9:00, yes.  Question, and

12 at the time -- and you did suspend him during that meeting.

13 Answer, I did.  And I suspended him with pay.  Question, right.

14 And at the time you suspended Professor Fagal, did you feel

15 like he posed immediate harm to himself or to others if he

16 continued to serve in his position.  Answer, the harm for me

17 was the harm to the institution, to its mission, to the values,

18 to the identity, the whole purpose of which we exist.  I felt

19 it was egregiously offended.  That was the harm.  I think I

20 said earlier that, you know, like harm to Dr. Fagal, that he

21 would harm himself and did not enter into my mind, that's not

22 in my realm of memory.  Did it occur to you -- question, did it

23 occur to you he might -- he might be a physical threat to

24 someone else other than himself.  Do you remember thinking

25 about that.  Answer, you know, I don't explicitly recall that

1  but, you know, I did know I did take precaution of having

2  somebody available in the event there would be any action.

3          Question, okay.  So the harm that you think was

4  created by Professor Fagal's video was more of a -- you would

5  characterize it as an assault on the values of the university.

6  Answer, I think on everything we stand for.  That was from my

7  first moment I felt this was just totally a gratuitous,

8  egregious assault on everything Marywood stands for and thus

9  affects everybody in the institution.  Explicitly I was very,

10 very upset because of, you know, the personal nature of the

11 attacks which were not professional in any way, shape or form.

12 It's not the role model.  It's not what we expect of a tenured

13 professor at Marywood.  That to me was very harmful.  It's

14 harmful to the profession.  It's harmful to the discipline.

15 I'm a social scientist.  Think it's harmful to all the

16 disciplines related to, you know, the professional level of

17 what is expected.

18          Question, did you think that the harm was irreparable

19 or maybe the time it would pass to the institution.  Answer, I

20 saw no indication in the time of this meeting that there was

21 anything on Dr. Fagal's part that would indicate a desire to

22 relook at the situation to say, I'm sorry, I did it or, you

23 know, this is not what I intended.  There was nothing like that

24 absolutely.  So much -- and so much so that at the very end I

25 remember -- it's always my nature when I am in a dialog such as

1  this to go back, quote, is there anything further that you want

2  to say, end of quote.  I do that repeatedly in meetings, and

3  there was never anything that indicated to me in the course of

4  that meeting that there was any sense even that -- nothing was

5  communicated to me that there was even awareness that anything

6  had been done that had been offensive.  I found that also quite

7  shocking.

8         Question, between the posting of the videos, the time

9  the videos were posted and the time you suspended Professor

10  Fagal, are you aware of anybody at Marywood taking special

11  security precautions with regard to him other than Mr. Elliott

12  in the next room during the meeting.  Answer, I don't recall

13  anything like that.

14         Skip to line 8, question, do you know whether at the

15  university office was searched prior the suspension.  Answer,

16  I'm not at all aware of that.  Question, do you know whether --

17  did he have a university computer, do you know.  Answer, every

18  -- yeah, every faculty, all the offices are university.

19  Question, do you know whether Professor Fagal's computer was

20  searched.  Answer, nothing to my knowledge like that ever

21  happened.  Question, do you know if anybody -- anyone at the

22  university informed the police about Dr. Fagal.  Answer, I'm

23  not aware of that.  I don't recall anything like that.

24  Question, do you remember on the next day -- the suspension

25  happened January 23rd, correct.  Answer, um-hum.  On the next

1  day, January 24th, do you remember sending through your

2  secretary a statement of the charges to Professor Fagal.

3  Answer, yes.

4           Question, and in that statement of charges, do you

5  remember stating that you were recommending that Professor

6  Fagal be terminated.  Answer, um-hum.  Ms. Peet, your answer is

7  yes.  The witness, oh, pardon me, yes.  I'm sorry.  Ms. Peet,

8  that's okay.  The witness, yes, I do.  I remember that letter

9  because that was deeply considered.  I mean, I didn't -- it

10  reflected the elements that I felt were very important, yes.

11  And it was my recommendation knowing that.  You know, that I

12  was open to having that reviewed.  By Mr. Cohen, question, do

13  you know when that first statement of charges was drafted.

14  Answer, I can't tell you exactly, but it would -- it was -- I

15  know that the letter was prepared the next day.  I did it the

16  next day.  Question, was it begun -- was the letter begun

17  before the January 23rd, 2012 meeting.  Answer, I don't recall

18  that.  Question, okay.  Is there anything in your mind that

19  Professor Fagal could have said at the January 23rd, 2012

20  meeting that could have led to you not pursuing termination.

21  Skip to line 10.

22           The witness, it's hard for me to revisit that.  The

23  reason that I had the meeting was to give him an opportunity to

24  speak to it and repeatedly asked him to do it, but he didn't.

25  By Mr. Cohen, question, but again, you said you think that he

1  asked to draft a written response to your questions, am I

2  right.  Go to page 105.  Starting at line 11.  Right.

3  Question, right.  Was your plan to terminate Professor Fagal no

4  matter what he said at the January 23, 2012 meeting.  Skip to

5  line 16.  The witness, you asked me that several ways.  By Mr.

6  Cohen, question, excuse me.  You've asked me that several ways.

7  I had determined to suspend.  I had that meeting.  Then I began

8  to move toward termination.  Page 108, please.  And could you

9  bring up exhibit 11, please, at the same time?  Everyone

10  waiting for me to just stop?  I don't know -- I am reading on,

11  and people are hungry for lunch.

12          MR. ENGLISH:  I encourage you to keep going.  It's up

13  to Your Honor, of course.

14          THE COURT:  I have no problem.  How much more do you

15  have time-wise?

16          MR. COHEN:  Probably 15 minutes.

17          THE COURT:  Proceed.  At this time Munley's

18  deposition exhibit 11 was marked for identification.  By Mr.

19  Cohen, question, sister, do you recognize this document.

20  Answer, yes, this is my letter of January 24 of 2012 to Dr.

21  Fagal.  Question , the first page, that is an e-mail from --

22  answer, something is cut off on the bottom of the first page.

23  Question, we'll get there.  Answer, oh, okay.  Question, the

24  first page is an e-mail from your secretary to Dr. Fagal,

25  correct.  Answer, that's my secretary, yes.  And it included

1  all of the things that I had referred to.  Question, and so

2  this is your first statement of charges, correct, to Dr. Fagal.

3  Answer, yes.  Question, it was sent to him on January 24, 2012

4  at 1:11 p.m.  Answer, that's what it says, yes.  Question, and

5  in the letter you are recommending Professor Fagal's -- that he

6  be terminated immediately.  Answer, um-hum.  Question, correct.

7  Answer, it says your tenure and employment be terminated

8  immediately, yes.

9         Question, between the time that Professor Fagal was

10 suspended and the time that this letter was sent, did Marywood

11 take any remedial actions with regard to Professor Fagal.  Skip

12 to line 17.  The witness, there were -- there was nothing in

13 the conversation with Dr. Fagal that indicated there was any

14 looking toward a meeting -- what do I want to say?  What's the

15 word?  There was no remorse.  There was no desire to seem, you

16 know -- to look at it another way.  Nothing occurred of that

17 nature.  So, no, this was a matter of the next day.

18        Mr. Cohen, question, you said, no, there was a matter

19 of the next day.  Answer, the letter was on the 24th.

20 Question, yes.  And no, you're referring to -- no, there was no

21 remedial actions taken with regard to Professor Fagal.  Answer,

22 there was no indication at the meeting that I had with him that

23 there was any possibility of our moving toward anything that

24 was remediation.  Question, I understand that.  But the

25 question whether there was an opportunity for remediation,

1  that's a different question.  I want to just be clear.  There

2  was no remedial action taken by Marywood University from the

3  time of the suspension to the time of this letter, correct.

4  Answer, the answer to that is no.

5          Question, do you remember at the end of all of all

6  the proceedings with Professor Fagal the last letter you wrote

7  to him terminating, do you remember that as being around July

8  2012.  You know, I don't.  I can't give you months.  I know

9  that it took -- there were various correspondence because you

10  sent correspondence and we sent correspondence.  There was a

11  lost of back and forth.  So, you know, if there was a document

12  that's dated July and has my signature I would say it came from

13  me.  Question, ultimately you did write him a letter at some

14  time saying it's over, you're done, right.  Skip to line ten.

15  Question, he's no longer employed by Marywood University,

16  correct.  Answer, there were many intermediary steps.  I

17  offered the possibility of, you know, having my decision

18  reviewed, this offer was made.  I believe that in January 24th

19  document one of the items listed here was a release and that in

20  addition to all of the policies that are indicated here

21  included -- okay, yeah, on the very last page, in order to give

22  -- I also believe in due process.  And so I was giving Dr.

23  Fagal an opportunity to have my recommendation reviewed

24  appropriately and sent a release so I can be -- would be

25  authorized to give a faculty review committee comprised of

1  tenured faculty, you know, documentation involved in this.  And

2  this was never signed.

3          So I took this on the 24th but then later I know

4  there was another letter in February I wrote.  I'm not sure of

5  the sequencing of all these letters.  Question, but in this

6  letter that you're looking at now you're just recommending that

7  he be terminated.  He hadn't been terminated yet as of the date

8  of the letter, right.  Answer, and he was still being paid all

9  the way through August.  He was suspended and I was

10 recommending the next step.  Question, am I correct in that

11 letter you were not terminating him yet, you were just

12 recommending it, correct.  Answer, quote, I am writing to

13 inform you that I am recommending that your tenure and

14 employment be terminated immediately, end quote.  And I talk

15 about the payment and benefits, all of that.  Question, between

16 the time that Professor Fagal was suspended and the time he was

17 actually terminated whenever that was, did Marywood take any

18 remedial actions with regard to him.  Ms. Peet, objection to

19 the form.  Answer if you understand the question.  The witness,

20 we did not.

21         Skip to page 124, please.  Start at line eight.  At

22 this time Munley deposition exhibit 15 was marked for

23 identification.  Brian, pull up exhibit 15, line eight.  At

24 this time, Munley deposition exhibit 15 was marked for

25 identification.

1        Mr. Cohen, question, and, sister, do you recognize

2   this document.  Answer, I do.  This is, yes, this was the

3   February 8th letter to Dr. Fagal and it indicates all of the

4   charges.  Question, this is a revised statement of charges,

5   correct, sister.  Answer, it's a follow-up to that other

6   January letter that we made reference to earlier.  This lays

7   everything out and the policies are attached.  Question, at the

8   end -- answer, and again the forum is to allow me to bring in a

9   review committee.  This was the second time this was offered.

10  Yeah, it's on the back.  Question, and this is your signature

11  on the letter, right.  Answer, of course, yes.

12        Question, and the first page of the letter, the first

13  page is the e-mail attachment letter, right.  Answer, yes, that

14  would be the my secretary's reference.  Question, and so the

15  next page is the first page of your actual letter.  Answer,

16  correct.  Question, the second sentence says, quote, as a

17  result of your breach of a material term of your obligations as

18  a tenured professor, I am recommending that your tenure and

19  employment with Marywood be terminated immediately.  End of

20  quote.  Did I read that correctly.  Answer, that is correct.

21  Question, and what did you mean by a material term.  Skip to

22  line 23.  I'm sorry.  I lost my place.

23        THE COURT:  Line 22.  Isn't that where you want to

24  go?

25        MR. COHEN:  Yes, line 22.  The witness, I think

1   that's a legal expression.  What it means to me is that the

2   responsibility of a being tenured professor was violated, that,

3   in fact, that Dr. Fagal violated what's expected of a tenured

4   professor.  That's the breach of the tenure agreement and it

5   talks about the mutual commitment deep, and binding on the

6   faculty member as much as it is on the university.  Suggests a

7   strong acceptance by that individual of the mission and core

8   values and objectives.  I mean, this alone could have been

9   grounds for termination.  However, I added all of the other

10  elements of the policy that were violated and indicating why.

11  And then, you know, also once again offering the opportunity to

12  give -- I had come to the conclusion of termination, offering

13  Dr. Fagal the opportunity to have my decision reviewed by

14  appropriate tenured faculty, and that was attached to this.

15          Go to page 127, please.  Starting line 23.  Having

16  watched the -- you can take this exhibit on the right down,

17  please.

18          Line 23, question, having watched the video, did you

19  really believe that Professor Fagal was actually depicting you

20  as Adolf Hitler .  Answer, yes.  Question, that he was --

21  answer, it says you're a -- you know, repeatedly I was the

22  fuhrer.  Question, but did you absolutely think he was in any

23  way likening you to Adolf Hitler.  Answer, what would one think

24  when you saw the video.  Question, well, I am asking you.

25  Answer, well, of course my name was attached to it certainly.

1  Question, did you think that Professor Fagal was saying that

2  like Hitler you would kill 6 million people.  Answer, to

3  compare me to Hitler was I think an extreme violation of

4  anything to do the mission and core values of Marywood, and I

5  took great exception to it.  And again, the whole

6  discriminatory aspect with regard to Dr. Levine was of grave

7  concern to me.

8          MR. ENGLISH:  Line 21.

9          MR. COHEN:  That wasn't part of my designation, but

10 --

11         MR. ENGLISH:  Yes, it was, yeah, absolutely.

12         MR. COHEN:  I saw 128, 19.  I'm sorry.  Remember I

13 have spent much of my life working directly with people who

14 have been on the other end of dictatorships.  So, you know, I

15 found it extremely offensive to be compared to Hitler in any

16 way, shape or form.  And as an I. M. H. sister, I thought it

17 was an affront to our congregation.  We have served the poor

18 since we were created in 1845 and established institutions to

19 educate and develop potential because we're about empowering

20 not about tearing down and destroying.  And certainly value of

21 life, the value of life is a prime value.  So yes , I feel that

22 for a tenured professor at Marywood University to compare the

23 president of the university as Adolf Hitler and to take the

24 executive officers and to portray them collaborators in

25 atrocity is certainly a violation of anything that it means to

1  be a professional academic with tenured status in a Catholic

2  faith based institution.

3         Question, your interpretation of the video is that

4  professor Professor Fagal accused various members in the

5  Marywood administration as having collaborated in atrocity.

6  Answer, he belittled.  Skip to line 23.  Question, did you in

7  any way recognize or consider let's say that this video was

8  satire.  Answer, that was not -- for me this was not satire.

9  This was a blatant affront to all we stand for.  And at some

10 point did you come to learn that this video was actually an

11 adaptation of a real movie other people had made satires about.

12 Answer, I don't recall even, you know, pursuing any thought

13 about satire.  I know it was on YouTube.  I know people were

14 looking at it, but to me the video was the video.  Question, I

15 guess my question is, did you know that apart from what you

16 think about the video that many people have taken -- had taken

17 that film and added their own subtitles to it, there are many

18 other Hitler parodies on like this on YouTube.  Did you know

19 that.  Answer, it has no bearing on what we are talking about.

20        Turn to page 131.  And could you bring up exhibit 15

21 on the right side, please?  Starting with line two.  Question,

22 I'm asking if she is aware this is one of many other Hitler

23 parodies.  Answer, I don't follow Hitler, anything to do

24 whatever, anything to do with Hitler, sorry.  Question, okay

25 let's stay on page two of this letter.  There's a heading where

1  it says, quote, two, period, violation of civil rights policy.

2  End of quote.  Answer, right.  Question, and here you're

3  charging Professor Fagal with what it says a violation of civil

4  rights, correct.  Answer, discrimination.  Marywood does not

5  condone and will not tolerate discrimination, harassment, et

6  cetera.  That's from our policy.  Question, and did you really

7  believe that Professor Fagal's video was a civil rights issue.

8  Answer, I think it was harassment.  It was an example of

9  discrimination and harassment.  Question, how was it an example

10 of discrimination.

11        Answer, Dr. Levine is Jewish, and I think that, you

12 know, to have a colleague belittled in that way to me is

13 harassment.  Question, does -- and, you know, again it also

14 goes on further to talk about personal attacks.  I felt there

15 were personal attacks.  And it was really -- to bring in the

16 family members in the way in which that was done, I thought

17 that was demeaning, discriminating, harassing behavior.

18 Question, okay.  Do you know whether anybody at Marywood filed

19 a complaint under the university civil rights complaint

20 procedure policy about these videos.  Answer, I'm not aware of

21 that.  Question, did you propose that anyone do that.  Answer,

22 no.  Page 136, please.  You can take the exhibit on the right

23 down, please.

24        Okay.  Starting with line nine.  Question, at some

25 point do you remember Professor Fagal initiating a faculty

grievance against you.  Answer, yes, that was one of the

reviews that was open to him.  We have a specific policy on

faculty and grievance it entails.  Question, and to your memory

he alleged -- Professor Fagal alleged -- I am not saying this

is true, that is just what I alleged -- you violated Marywood

policy by improperly suspending him being by improperly moving

to terminate his employment and tenure and that he had not an

opportunity to convene an ad hoc committee to appeal the

suspension.  Is that what he has essentially alleged.  Answer,

if that's what's on the document that he sent, then I would say

that's what he alleged, yes.

Question, what was your reaction to receiving -- to

learning that grievance had been filed against you.  Answer

immediately set into motion, you know, that that's his right,

that's our process, it's our policy, and so it happened.  And

there is within the policy itself -- within the policy it's

exactly spelled out how this goes forward and who the people

are that are on that committee.  They are tenured faculty

members that are elected by the faculty.  Question, were you

angry with Dr. Fagal for initiating this grievance against you.

Answer, I felt that was his right.  That's why repeatedly in

those other letters I asked, I made him aware of the fact that

he had these rights.  So, no, I was not angry.  Question, okay.

In any way would you say you were exasperated.  Answer, I

rarely get exasperated.  I would say this was his right, and he

1   had a right to do it, and that's what it was done.  Turn to

2   page 141, please.

3          Bring up exhibit 20 on the right side.  Line 17.  At

4   this time Munley deposition 20 was marked for identification.

5   By Mr. Cohen, question, and, sister, do you recognize this

6   letter.  Answer, no.  Question, this is a letter to Professor

7   Fagal from you dated April 3rd, 2012.  Answer, right.

8   Question, and that's your signature.  Answer, yes, it is.  And

9   you state here in the second paragraph, quote, since the

10  grievance process is now complete, I have decided to finalize

11  my recommendation.  As a result, your employment with Marywood

12  and your tenure is terminated effective today April 3, 2012,

13  end of quote.  Did I read that correctly.  Answer, that's right

14  because this was the result of the grievance filed according to

15  the grievance and appeals policy, and that was the outcome of

16  it.

17         Question, when you say the outcome.  Answer, there

18  was a committee, they reviewed my recommendation and sought to

19  follow my recommendation.  This is under that policy which is

20  grievance and appeals.  Question, okay.  But then in the next

21  paragraph, correct me if I'm wrong, you're offering an

22  opportunity to have your decision reviewed and to convene two

23  faculty ad hoc committees, correct.  Answer, that was because,

24  you know, to give Dr. Fagal every effort since he had not

25  chosen to do that before this.  This was one last effort to

1    allow that to occur.  Question, so as of the date of this

2    letter was he terminated or not.  Answer, he was terminated as

3    of April 3rd, 2012.  That's what the letter says.  Question,

4    and that's -- that recommendation was finalized.  Answer, on my

5    part I finalized my recommendation, but I was giving him the

6    opportunity to have it reviewed.  Question, but if you had

7    already terminated him, what was the purpose of the review.

8    Answer, to give him every possible opportunity, since, you

9    know, he had decided early on, on progressive discipline.  In

10   my mind it was not a matter of progressive discipline but to

11   give him every opportunity.  Question, okay.  But if you had

12   already terminated him, then the review would just be symbolic

13   and just for show, right.  Answer, I don't do anything for

14   show, sir.  I did it because I believe in the process.  I

15   believe in giving an individual every opportunity.  This was

16   another opportunity.  I was trying to go above and beyond in

17   giving Dr. Fagal the opportunity to have his peers review the

18   decisions that I had made.  That's why I did this .  Question,

19   if these ad hoc committees that you we were permitting to now

20   review your decision had said that the suspension and

21   termination were unfounded, would you have changed your mind or

22   were you prepared to overrule the committee.  Answer, I would

23   have given it serious consideration.  Question, is that all.

24   Answer, that's all I could say.  I would give it very serious

25   consideration.  If I asked a committee, you know, if a

1  committee does very serious work, I would give it very serious

2  consideration.  Any committee -- when we have committees of

3  tenured faculty studying something, I mean the input I give

4  very serious consideration to it.  That's my practice.

5          Question, say, prior to this letter of April 3rd --

6  dated April 3rd, 2012, had any ad hoc faculty committee made

7  any recommendation regarding your recommendation to terminate

8  Dr. Fagal.  Answer, I think the only thing that happened was

9  the response to the grievance and appeals committee.  Question,

10 why did you choose to terminate Dr. Fagal on April 3rd, 2012

11 prior to the ad hoc faculty review.  Answer, because the

12 grievance that was filed, the letter that came to me on March

13 26 said, you know, we found no evidence of improper action on

14 your part, so I followed through.  Question, okay.  But isn't

15 it true the faculty grievance committee didn't review the

16 termination and suspension itself, it reviewed procedural

17 aspects.  Answer, that's what our policy is.  They followed the

18 policy.  Question, okay.  So they reviewed the procedure.

19 Answer, they followed exactly what is indicated on the policy

20 for grievance and appeals.  Question, the committee, the

21 faculty grievance committee never said, yes, there is just

22 cause to terminate Dr. Fagal, that was up to the next

23 committee, right.

24          Skip to line 24.  The witness, I know that we have

25 multiple, multiple policies, and I know that the faculty

1  grievance committee followed their policy that was applied to

2  faculty grievance exactly.  When I gave Dr. Fagal the

3  opportunity to have it reviewed yet again, then that committee

4  followed the policy exactly as they've stated.  By Mr. Cohen,

5  question, well, let's go back to the letter from Ms. Sadlack to

6  you dated March 26, 2012.  What exhibit was that.  Answer, it's

7  exhibit 19.  Bring that up, Brian.  Exhibit 19.

8          You want to go back to 147.  You want -- on the right

9  you want exhibit 19.  He chose to use this, you know,

10 grievance, file a grievance that was his right.  And I mean,

11 certainly I would have supported that.  So if you're saying I

12 decided this because of that, no.  Question, no, I'm asking.

13 Answer, I felt that he should have every avenue open to him to

14 have my decision reviewed.  My decisions were very carefully

15 reflected upon, and I felt that he had the right to have my

16 decisions reviewed.  Go to page 148.  And could you bring up

17 exhibit 22 on the right?

18         So we start at line 24.  At this time Munley

19 deposition exhibit 22 was marked for identification.  Mr.

20 Cohen, question, do you recognize this document, sister.

21 Answer, let me just take a look.  Yes, I believe I saw this.

22 Question, in the last paragraph that begins, quote, according

23 to the progressive discipline policy, end of quote, the next

24 sentence says, quote, the president has received your e-mail,

25 and after review and consultation, Sister Anne has determined

1  that the membership will be same, end of quote.  So was Sister

2  Gail -- is she accurately conveying your thoughts on the

3  matter, too, because you're not cc'd here.  Answer, yeah, you

4  know, termination -- when you're talking about suspension and

5  you're talking about termination, termination is the bigger

6  thing than suspension is.  And so the membership of the

7  committee could be the same.  So, yeah, I don't -- I mean, I'm

8  looking at this, and I mean that would be my interpretation.

9  Question, you did you also agree -- was it also your

10 understanding that the committee be convened twice to determine

11 -- to review suspension and the termination.  Answer, it's hard

12 for me to remember exactly.  You know, again, this is five

13 years ago.  But the same committee had the competence to look

14 at the whole issue.

15         Go to page 158, please.  You can take the exhibit on

16 the right down.  Start on line 21.  Question, okay.  Is it true

17 that after Professor Fagal left Marywood that the progressive

18 discipline policy was revised.  The next page, 159.  The

19 witness, well, what I would say is that, you know, policies are

20 living documents so we always -- if you refer to our policies

21 you'll see a number of them have revisions.  And sometimes we

22 streamline them, you know, we put clearer language so that

23 would not be unusual.  That's the end.

24         THE COURT:  All right.  How much do you have?

25         MR. ENGLISH:  Your Honor, I think with our

1   materiality in fairness have been covered.  We don't have

2   anything.

3             THE COURT:  Well, good.  We will break for lunch.  We

4   will come back at -- suppose we come back at in an hour and ten

5   minutes.  How's is that?  Come back at 1:15 -- 2:15.  We're

6   adjourned.

7             (A lunch recess was taken.)

8             THE COURT:  Good afternoon, Mr. Cohen.  Next witness.

9             MR. COHEN:  Plaintiff calls Dr. Patricia Dunleavy.

10            PATRICIA DUNLEAVY, called as a witness, being duly

11   sworn, testified as follows:

12   DIRECT EXAMINATION

13   BY MR. COHEN:

14   Q.    Good afternoon, Dr. Dunleavy.

15   A.    Good afternoon.

16   Q.    As you know, I'm Jonathan Cohen.  We met at your

17   deposition.  I represent Dr. Fagal.  Do you still work for

18   Marywood University?

19   A.    Yes, I do.

20   Q.    How long have you worked for Marywood?

21   A.    I've been at Marywood since March of 1980, so a little

22   over 38 years.

23   Q.    Are you still the associate vice president of human

24   resources?

25   A.    Yes, I am.

1  Q.    And what are your responsibilities in that position?

2  A.    I oversee all of H. R. and payroll.  I also have oversight

3  over the university's day care center so that encompasses

4  everything from budgets to analysis to administering and

5  developing plan design for benefits through the whole employee

6  cycle of running background checks, preparing visas for

7  international faculty and administrators and staff recruiting,

8  performance reviews, retirement incentves at the end of that

9  employment cycle.

10        I am responsible for drafting and reviewing and

11 implementing H. R. related policies.  I serve as the Title Nine

12 coordinator.  I oversee training and development, work study

13 program, wellness program.  I think that's it.  And then I sit

14 on various university level committees including the policy

15 committee, president's council, the calender committee, the 403

16 B. fiduciary committee and benefits committee, which I chair.

17 Q.    Did you have the same position in late 2011 and early

18 2012?

19 A.    Yes, I have been in charge of human resources at Marywood

20 since 1984.  My title has changed a few times but basically the

21 same duties.

22 Q.    Briefly summarize your educational background.

23 A.    Sure.  I have a Ph.D. in higher ed administration, an M.

24 S. industrial management and M. A. in music all from Marywood

25 University and B. A. in music and English.  That's from

1  Mansfield University.

2  Q.    And do you recall an incident in January of 2012 in which

3  my client, Professor Fagal, published a two-part video

4  criticizing the Marywood administration?

5  A.    Yes, I do.

6  Q.    And do you recall a meeting January 23rd, 213 between

7  Professor Fagal, President Munley, Michael Foley and you?

8  A.    Yes.

9  Q.    It was to discuss the two-part video, right?

10 A.    That's correct.

11 Q.    Put up Fagal exhibit 48, please.  Dr. Dunleavy, do you

12 recognize this document?

13 A.    Yes, I do.

14 Q.    Could you identify it?

15 A.    Sure.  It's talking points that Sister Anne was given that

16 I typed up for her that she was given to use at that meeting if

17 she wanted to.  They are simply talking points, various options

18 for her to consider.

19 Q.    And if you count eight bullet points down from the top, it

20 says -- I'll read this, ask Fagal to leave campus, wait for

21 sister's decision?

22 A.    Yes.

23 Q.    And suspended with pay?

24 A.    Yes, it was an option.  That's all these were, were

25 talking points and options.

1  Q.   Okay.  What were some of the other options then other than

2  suspension?

3  A.   Can you move that back?  Whatever would have happened

4  would have depended on the conversation at the meeting.

5  Q.   Did your talking points say that?

6  A.   They don't need to.  They are just talking points.  Sister

7  was perfectly capable of using these as she thought

8  appropriate.  It was her meeting, her decisions.

9  Q.   And further down the document -- let me back up.  So in

10 that eighth bullet point, ask Fagal to leave campus, wait for

11 sister's decision.  Then you have a series of sub bullet

12 points.  Last one is classes will be covered.  Let me ask you

13 this.  At the time that Professor Fagal was summoned to this

14 January 23 meeting, did you arrange to cover his classes?

15 A.   I would not have done that, no.

16 Q.   Do you know if anyone else did?

17 A.   I don't know.

18 Q.   Is there anyplace in the talking points document in which

19 it indicates there could be an outcome to the meeting that was

20 not suspension?

21 A.   I don't see that, but these were not inclusive.  So

22 whenever the meeting went the meeting went.  These were just

23 talking points.  If any of these things happened, they were

24 just talking points for sister to consider.  That's all they

25 were.  It was not meant to be an exhaustive list by any means.

1  Q.    And further down on the document there's a bullet point

2  that says post suspension and then a sub bullet point, sister

3  recommends termination and prepares a notice of charges.  Do

4  you see that?

5  A.    Yes, I do.

6  Q.    Had you already started preparing the notice of charges?

7  A.    No, again these were talking points.  If the conversation

8  went there, those were things for sister to consider.  That's

9  all.

10  Q.    Let's talk about the January 23rd, 2012 meeting.  You took

11  notes at that meeting, right?

12  A.    Yes, I did.

13  Q.    Pull up joint exhibit 16.  Do you recognize this document?

14  A.    Yes, those are my notes.

15  Q.    Several pages, right?  Turn the page, Brian.  Now, Brian

16  go to the last page, please.  Can you highlight the handwriting

17  on the second to last line of the text?  Can you read that line

18  aloud?

19  A.    It says A., and then it says R. E. S. P.  I believe that

20  probable means responsible or response to nature of video; very

21  clear, the V. would be very.

22  Q.    A. is what?

23  A.    Sister Anne.  The only two speakers at the meeting were

24  Sister Anne and Dr. Fagal.

25  Q.    Professor Fagal was told he was suspended at that meeting,

1 wasn't he?

2 A.   Yes.

3         MR. COHEN:  Your Honor, I move joint exhibit 16 into

4 evidence.

5         MS. PEET:  No objection, Your Honor.

6         THE COURT:  Admitted.

7 BY MR. COHEN:

8 Q.   Look at joint exhibit 17, please.  Dr. Dunleavy, do you

9 recognize this document?

10 A.   Yes, I do.

11 Q.   And what is it?

12 A.   This is my typewritten summary of those notes that we just

13 looked at.

14 Q.   Okay.  And when did you prepare the typewritten version?

15 A.   That same day.

16 Q.   Okay.  And can we go to the last page, Brian?  And is your

17 signature the second to last?

18 A.   Yes.

19         MR. COHEN:  Your Honor, I move joint exhibit 17 into

20 evidence.

21         MS. PEET:  No objection, Your Honor.

22         THE COURT:  Admitted.

23 BY MR. COHEN:

24 Q.   Can we look at joint exhibit 22, please?  Dr. Dunleavy, do

25 you recognize this?

1  A.    That's my handwriting.

2  Q.    And it's only your handwriting on this document, right?

3  A.    Pardon me?

4  Q.    It's only your handwriting on this document?

5  A.    Yes.

6  Q.    Could you please read it aloud?

7  A.    Up at the top it says, Sister Anne and the date of

8  February 3rd, 2012.  There's a dash.  It says Fagal.  That

9  means the conversation was one I had with Sister Anne about

10 Fagal.  Then in the second line it says progressive discipline,

11 N., A. and then talk to sister and Will together Monday.  The

12 progressive discipline would have been probably about the

13 policy.  This was just a conversation Sister Anne and I

14 probably had and I was jotting down notes.

15 Q.    By N. slash A., you mean not applicable, right?

16 A.    Yes.

17         MR. COHEN:  Your Honor, I move joint exhibit 22 into

18 evidence.

19         MS. PEET:  No objection.

20         THE COURT:  Admitted.

21 BY MR. COHEN:

22 Q.    Let's look at Fagal exhibit 124, please.  Instead let's do

23 Fagal exhibit 54.  Do you recognize this, Ms. Dunleavy?

24 A.    Yes.

25 Q.    This is an e-mail to you to President Munley July 18th,

1   2012, right?

2   A.    Yes, it is.

3   Q.    And by this date, Professor Fagal had been terminated,

4   right?

5   A.    I don't recall specifically, but I believe yes.

6   Q.    And, Brian, see the last bullet point begins faculty

7   grievances and appeals?

8   A.    Yes.

9   Q.    Can you read that aloud?

10  A.    It says faculty grievance and appeals and progressive

11  discipline for faculty, post Fagal, we probably want to revise

12  these, parenthesis, perhaps using some of the faculty who sat

13  on the review committees.

14          MS. PEET:   Objection, Your Honor.  This is going to

15  be inadmissible evidence pursuant to rule 407, subsequent

16  remedial measures talking about changes to contracts or

17  policies after the fact.

18          THE COURT:   What's your purpose in offering it?

19          MR. COHEN:   My purpose I was going to ask Dr.

20  Dunleavy did she think that the policies should be clarified

21  and tightened up because that's what she said in her

22  deposition.

23          So all I want to show is that even Marywood thought

24  the policies were vague and ambiguous.

25          MS. PEET:   Your Honor, the Third Circuit ruled on

1    this issue in 2012, Rule 407 applies to breach of contract

2    cases and to allow this type of evidence which prohibit or

3    prevent a defendant from going ahead and clarifying the

4    contractual obligations for fear of this kind of admissible

5    evidence.

6              THE COURT:  Except there was testimony from Sister

7    Munley that this was done, and there was no objection leveled

8    at that point.

9              MS. PEET:  That doesn't open the door, Your Honor.

10   The fact --

11             THE COURT:  I understand that.  But okay.  Go ahead.

12             MR. COHEN:  The rule on post subsequent remedial

13   measures -- would prohibit me from introducing a new policy in

14   order to show that Marywood did something wrong with the first

15   policy.

16             THE COURT:  Why are you offering it for?

17             MR. COHEN:  Just to show they thought the first

18   policy needed clarification.  If they thought that, then --

19             THE COURT:  Then what?

20             MR. COHEN:  Then there's a contra proferentem

21   doctrine that says the contract has to be construed against

22   Marywood.

23             THE COURT:  What's your response to that?

24             MS. PEET:  The Third Circuit case dealt with this

25   exact issue.  And it's the exact reason why Mr. Cohen is trying

 1   to get it is why the Third Circuit said it's inadmissible.  In

 2   that case they were trying to admit meetings and policies done

 3   after the fact, and the Third Circuit said that to allow this

 4   type of evidence would discourage those in pen situations from

 5   clarifying contractual obligations and thus would perpetuate

 6   confusing.  The Third Circuit followed the other circuit courts

 7   -- 7th circuit as well found same thing where they are not

 8   going to allow additional evidence to come in to show

 9   clarification or ambiguity.

10          THE COURT:  I think the objection is well taken.

11   There's evidence some in.  You can argue it may -- whether they

12   thought if was vague or not.  I don't think it particularly

13   matters.

14          MR. COHEN:  Can I ask counsel for the citation of

15   that case?

16          MS. PEET:  It's Reynolds versus University of

17   Pennsylvania, 483 Fed Appendix 726, and it's Third Circuit

18   2012.

19          THE COURT:  Okay.

20          MR. COHEN:  Not even a precedential case, but I will

21   move on.

22          THE COURT:  Move on.

23          MR. COHEN:  Excuse me?

24          THE COURT:  Move on.

25          MR. COHEN:  Yes.

1        MS. PEET:   Thank you, Your Honor.

2   BY MR. COHEN:

3   Q.   Isn't it true, Ms. Dunleavy, you thought that the old

4   progressive discipline policy needed to be clarified and

5   tightened up?

6   A.   No.   The progressive discipline policy as written, that

7   version, is very clear, it's very flexible, but it's very clear

8   in that flexibility.   The pieces that I believe the faculty had

9   questions about were procedural.   But the core piece of the

10  policy and what it covered and the kinds of violations that it

11  could cover ranging from those that could be remediated to

12  those that could not be remediated.   There's an as well as

13  clause in that sentence.   So the range is a whole continuum,

14  and where offenses fell would be up to the people on the

15  committees making those determinations.

16  Q.   Can we look at Ms. Dunleavy's deposition, please?   Go to

17  page 116.   You may also bring up Dunleavy 40, please.

18        MS. PEET:   Your Honor, we ask that be taken down.

19  It's the same objection.   It talks about subsequent remedial

20  measures.

21        THE COURT:   Which exhibit?

22        MS. PEET:   The deposition transcript.

23        THE COURT:   I can't see it.

24        MS. PEET:   Thanks.

25        MR. COHEN:   All right.

1           MS. PEET:  Your Honor, it's the same -- this is the

2    same.  Thank you.

3    BY MR. COHEN:

4    Q.    Let's move to joint exhibit 41, please.

5           THE COURT:  41.

6    BY MR. COHEN:

7    Q.    Dr. Dunleavy, do you recognize this document?

8    A.    Yes, I do.

9    Q.    What are these?

10   A.    These are the interrogatories.

11   Q.    Can you turn to the last page, Brian?  Page 11.  Is that

12   your signature, Dr. Dunleavy?

13   A.    Yes, it is.

14          MR. COHEN:  Your Honor, I move joint exhibit 41 into

15   evidence.

16          MS. PEET:  No objection.

17          THE COURT:  Okay.  Admitted.

18          MR. COHEN:  That's all I have.

19          THE COURT:  Questions?

20          MS. PEET:  Yes, sorry it takes ten extra seconds.

21   CROSS EXAMINATION

22   BY MS. PEET:

23   Q.    Good afternoon, Dr. Dunleavy.  How are you?

24   A.    I'm fine.  How are you?

25   Q.    Good.  Mr. Cohen showed you a written document where it

1  had your notes progressive discipline, and then next to it had

2  N. slash A.  Do you remember that?

3  A.    Yes, I do.

4  Q.    What do you mean by N. slash A.?

5  A.    That's a conversation Sister Anne and I would have been

6  having, and I would have just written down that it was our

7  conversation at that point that progressive discipline probably

8  didn't apply, but there -- those very vague notes, so that's

9  all.

10  Q.    And we were saying progressive didn't apply, didn't apply

11  to what?

12  A.    To the videos that Dr. Fagal posted and distributed.

13  Q.    Okay.  Did you arrange for security to be available at

14  that meeting?

15  A.    I did.

16  Q.    Why?

17  A.    Those videos were so outrageous and so offensive that at

18  that point we really didn't know what Dr. Fagal would be

19  capable of.  We wanted to make sure we took every precaution we

20  needed to.

21  Q.    During that meeting, did he apologize?

22  A.    No, there was no remorse.

23  Q.    Did he recognize that perhaps the video constituted

24  inappropriate conduct?

25  A.    No, in fact, he seemed to be offering Sister Anne some

1    kind of out as if she had done something wrong.  He was the one

2    who created the videos, not sister.

3    Q.    Did you think that Dr. Fagal posed a threat of harm?

4    A.    Oh, yeah.  Yeah.  The interrogatory aggressive discipline

5    policy talks about immediate harm.  It doesn't specify is need

6    be physical that was realm of possibility, but there was

7    incredible amount of immediate harm.  The executive officers

8    who were so viscously mocked in those videos, those -- that was

9    emotional harm to them.  The faculty who all of a sudden get an

10   e-mail and open up get this trash, this garbage, that's almost

11   a creation of a hostile work environment.  Those videos were on

12   YouTube.  Their students, their families, prospective students,

13   their families, the whole community, Marywood -- for a Marywood

14   professor to put that out and that would be accepted?  No.

15   Deplorable.

16            MS. PEET:  No further questions.

17            THE COURT:  Redirect?

18            MR. COHEN:  Yes, just one question.

19   REDIRECT EXAMINATION

20   BY MR. COHEN:

21   Q.    Brian, can we pull up Ms. Dunleavy's deposition again?

22   Page 47?

23            MS. PEET:  I'm sorry.  What page?

24            MR. COHEN:  47.

25   BY MR. COHEN:

1  Q.    Okay.  Now, Ms. Peet just asked you a question or two

2  about whether you thought that Dr. Fagal was a security risk.

3  You said that's why we had security at the January 23rd

4  meeting.  Do you remember that?

5  A.    Uh-huh.

6  Q.    And here in your deposition, I asked, at the time that

7  President Munley stated Professor Fagal -- he was suspended did

8  he believe that Professor Fagal posed an immediate harm to

9  himself or others.  You asked me to repeat the question.  I

10  did.  And then your answer is tying it to specific time I don't

11  remember.  So why is your memory different today?

12  A.    You didn't read my whole answer there.  It says, the fact

13  those videos were created and disseminated and put on YouTube,

14  and the fact we felt it important to have Dave Elliott nearby,

15  we didn't know how Dr. Fagal would respond, yes, immediate

16  threat.

17  Q.    If you thought he was such an immediate threat, did you

18  recommend the day he posted the videos, say the 13th, did you

19  recommend that Dr. Fagal be booted off campus or there be -- he

20  be monitored in some way or no?

21  A.    I didn't know about the videos.  I was not sent the videos

22  when they first went out.  I found out about them several days

23  later just to clarify that.  The decision what to do with Dr.

24  Fagal was not mine to make.

25  Q.    Wait a second.  I thought you arranged for the security?

1  A.    I arranged for the security at Sister Anne's request.

2  This was her meeting, her decisions.

3  Q.    So, okay.  It wasn't the within your authority -- did you

4  make any recommendation after you first saw the video on --

5  couple days after it was published, did you say to anyone, I

6  think this guy is nuts, we should boot him off campus and call

7  security?

8  A.    I wouldn't respond that way no matter what I thought of

9  someone.  I wouldn't say things like that.

10  Q.    Wait a second.  You think he's a security threat.

11         MS. PEET:  Objection, Your Honor.  That's a

12  mischaracterization of testimony.  The question was, did you

13  arrange for security to be present.  The answer was yes.

14         THE COURT:  Overruled.

15  BY MR. COHEN:

16  Q.    You just testified that you thought he was a security

17  threat.  So you had security appear at the meeting on January

18  23rd.  You saw the videos several days before that, I think the

19  16th, and between the 16th and the 23rd, you were just kind of

20  a wall flower, no idea about security, didn't ask for security

21  to be put in place, not my authority; is that right?

22  A.    No, no.  It's not my authority to make the decision.  What

23  I thought personally was that those were incredibly offensive.

24  Did we think there was a possibility of a security issue, yes.

25  Did we know that that physical security issue was imminent, it

1  was in the realm of possibility.  But the decision maker was

2  Sister Anne, not me.

3  Q.    You thought it was within the realm of possibility, it

4  could happen, and you were just totally okay with subjecting

5  everyone to this possible security threat?

6  A.    I didn't say that.  I wasn't the decision maker in this

7  situation.

8  Q.    You had no idea -- you didn't want to tell anyone that?

9          MS. PEET:  Objection, Your Honor, asked and answered.

10          THE COURT:  True.

11          MR. COHEN:  I'm finished.

12          THE COURT:  Thank you.  You may step down.  Thank

13  you.

14          MR. ENGLISH:  We have a couple people waiting here,

15  Your Honor.

16          EDWARD J. O'BRIEN, called as a witness, being duly

17  sworn, testified as follows:

18  DIRECT EXAMINATION

19  BY MR. COHEN:

20  Q.    Good afternoon, Dr. O'Brien.

21  A.    Good afternoon.

22  Q.    I said good afternoon.

23  A.    Hi.

24  Q.    Hi.  As you know, I am Jonathan Cohen, attorney for

25  Frederick Fagal.  Do you still work at Marywood?

1  A.    Yes, I do.

2  Q.    How long have you worked there?

3  A.    This is my 35th year.

4  Q.    You're on the faculty?

5  A.    Yes.

6  Q.    What department?

7  A.    Psychology and counseling.

8  Q.    Can you summarize your educational background very

9  briefly?

10  A.    I have my undergraduate from the University of Kansas and

11  my masters and doctoral degrees from the University of

12  Massachusetts.

13  Q.    Do you recall serving on an ad hoc faculty committee

14  convened to review certain charges made against Professor Fagal

15  in 2012?

16  A.    Yes, I do.

17  Q.    I didn't hear your response.

18  A.    Yes, I do.

19  Q.    Look at joint exhibit 24, please.

20  A.    I'm sorry.  I didn't hear you.

21         MR. COHEN:  I'm talking to my technician.

22  BY MR. COHEN:

23  Q.    Do you recognize this document?  There are several pages.

24  You can ask for them to be turned.

25  A.    No, I am not sure I know this document.

1   Q.    Turn the page, Brian.  How about this?

2   A.    I believe I did see this document or something like it.

3   Q.    These are the charges that President Munley made against

4   Professor Fagal, right?

5   A.    Yes.  We saw that as part of the committee.

6   Q.    Okay.  And you and the other ad hoc faculty committee

7   members adjudicated these charges, correct?

8   A.    Yes.

9          MR. COHEN:  Your Honor, I would like to move this

10  into evidence if it hasn't already.

11         MR. ENGLISH:  It's already in.

12         THE COURT:  All right.  If it's not, it's admitted.

13  BY MR. COHEN:

14  Q.    Bring up joint exhibit 34, please.  Do you recognize this

15  document?  And again there are attachments.  You can ask for

16  the page to be turned.

17  A.    Yes, I have seen this.

18  Q.    And what is it?

19  A.    What is it?  It's a letter or e-mail from Fred to the

20  committee offering a defense against the charges of Sister Anne

21  Munley.

22  Q.    And it was sent to you and Dr. Bittel and Mr. Povse?

23  A.    Yes.

24  Q.    You were one of the three committee members?

25  A.    Yes.

122

1  Q.    Did you and the other committee members consider Professor

2  Fagal's written defenses in adjudicating President Munley's

3  charges?

4  A.    Yes.

5         MR. COHEN:  Your Honor, I move joint exhibit 34 into

6  evidence if it's not already.

7         MS. PEET:  No objection.

8         THE COURT:  Admitted.

9         MR. COHEN:  Joint exhibit 37, please.

10 BY MR. COHEN:

11 Q.    Do you recognize this document?

12 A.    Yes.

13 Q.    What is it?

14 A.    It's his statement to the ad hoc committee after he had

15 been informed of the decision of the ad hoc committee raising

16 issues that he thought we should consider.

17 Q.    So you did, in fact, receive this e-mail?

18 A.    Yes.

19 Q.    Okay.  Did you ever respond to it?

20 A.    We reviewed it as part of the work of the committee.

21 Q.    Did you respond to the e-mail?  Did you respond to Fred?

22 A.    No.

23 Q.    Okay.  Thank you, Dr. O'Brien.  I have no further

24 questions.

25         THE COURT:  Cross examination.

1          MS. McGINLEY:  Your Honor, we are not going to call

2    Mr. O'Brien back tomorrow if we have so -- like with Dr.

3    Levine.  So if we can ask him some more additional questions.

4          MR. COHEN:  I couldn't hear.

5          MS. McGINLEY:  We are not going to call Mr. O'Brien

6    back tomorrow if we can avoid it so if we can have some leeway

7    to go outside of your direct.

8          MR. COHEN:  No objection.

9          THE COURT:  Proceed.

10   CROSS EXAMINATION

11   BY MS. McGINLEY:

12   Q.   Hi, Dr. O'Brien, my name is Kathleen McGinley.  Nice to

13   see you again.  Can you tell me when did you receive the Hitler

14   video?

15   A.   I have to -- sometime in January of 2012.

16   Q.   Uh-huh.  And what did you think at first?

17   A.   I thought it was, you know, kind of outrageous and funny

18   -- you know, I was surprised to see it.

19   Q.   Were you surprised that it was from Dr. Fagal and created

20   by him?

21   A.   I don't know that I had an opinion about that.

22   Q.   Did your thoughts evolve on the video particularly after

23   you served on the committee?

24   A.   Yes, they did.  You know, I think as I thought about the

25   video and particularly in the work of the committee, you know,

1  I would say my initial reaction was kind of casual, not well

2  thought out.  The more I thought about it and read about it and

3  kind of immersed myself in it, I -- I get so many e-mails every

4  day, I can't keep track of them.  So this is just sort of a

5  blip on the radar screen.  When I went and looked and thought

6  about it, I came to have a different opinion of the meaning of

7  the videos.

8  Q.   Was there a time when you were on campus and you saw Dr.

9  Levine on campus that it may have resonated with you

10  differently?

11  A.    It was kind of an emotional moment for me.  I -- it's

12  happenstance.  It was shortly after we had made our

13  adjudication, maybe right in the middle of the adjudication, I

14  don't remember the exact date, but I just happened to see Alan

15  Levine with his young son, maybe six years old, seven years old

16  or something like that, and it recalled to my mind when my kids

17  were little I would bring them to campus and they would help

18  out with various things.  And it occurred to me just how

19  painful it must be for somebody like Alan to have a video like

20  this out there and, you know, with -- what seemed to be

21  anti-Semitic implications in the video.  These things once they

22  get on the internet, I don't know his son would see it

23  directly.  But who knows who might have seen it.  It sort of

24  brought home the reality of this -- something that was really

25  not really funny at all.

1  Q.   That was about what time period?  Do you remember what

2  month it was?

3  A.   I would have to look.  It was in -- I believe it was -- it

4  was either as or shortly after we were making the adjudication

5  of the case.  So I was immersed in the materials and had done a

6  lot of thinking about it.

7  Q.   So you served on the ad hoc committee that reviewed Dr.

8  Fagal's discipline as a result of the termination or --

9  A.   Yes.

10  Q.   Over the videos?

11  A.   Yes.

12  Q.   Was the ad hoc committee the final decision maker on his

13  discipline?

14        MR. COHEN:  Objection.  Calls for a legal conclusion.

15        THE COURT:  It does.  Sustained.

16        MS. McGINLEY:  Okay.

17  BY MS. McGINLEY:

18  Q.   Dr. O'Brien, as part of the ad hoc committee deliberations

19  prior to the July 2nd decision, was -- actually let me back up.

20  Was Dr. Fagal suspended and then terminated for the same

21  conduct, the videos?

22  A.   I wouldn't say necessarily yes, but it was around the

23  issue of the videos.

24  Q.   And is termination a greater offense than suspension?

25  A.   Yes.

1  Q.    So if the committee upheld the termination based on the

2  videos, would you say that they also upheld the lesser offense

3  of suspension?

4           MR. COHEN:   Objection.   Seems like she's asking for

5  another legal conclusion.

6           THE COURT:   Restate it some other way.

7           MS. McGINLEY:   Yes.

8           THE COURT:   Okay.

9  BY MS. McGINLEY:

10 Q.    Did the committee review suspension as part of its July

11 2nd decision?

12 A.    Yes.

13 Q.    How so?

14 A.    Well, we discussed all aspects of the case from the

15 beginning to the end, and the suspension was part of the

16 process for its reaction to the suspension, was part of the

17 process.   So I mean, it was considered all the way through our

18 discussions.

19 Q.    So just because it may not have been mentioned in the

20 final decision doesn't mean that it wasn't considered?

21 A.    No, it was -- definitely was considered.

22 Q.    Did the committee meet a separate time to consider

23 suspension?

24 A.    Yes, we did.

25 Q.    When was that?

1  A.    It would have been after we received an e-mail from Fred

2  and raising questions, I believe, about suspension, and so we

3  went back just to -- I think the stance of the committee was to

4  kind of bend over backwards and make sure we considered

5  everything as best we could, and so we met at -- one final time

6  to just directly consider the issue of suspension by itself.

7  Q.    I'm going to show you what's been marked as joint exhibit

8  39.  Do you recognize this e-mail?

9  A.    Yes.

10  Q.    Can you tell me what it is?

11  A.    It's a summary of the committee meeting on Friday, July

12  13th, 2012, where we responded to Fred's request for additional

13  review around the issue of suspension.

14  Q.    Looking at the bullet points, this is a summary -- you

15  testified a summary of what you discussed at that meeting?

16  A.    Yes.

17  Q.    The first bullet the committee discussed immediate harm.

18  And what did it find?

19  A.    That the notion of harm doesn't just mean some kind of

20  physical threat but also is -- you know, can have different

21  meanings that are more inner personal or harm to the reputation

22  of people in the institution.

23  Q.    And, Doctor, did you find that Dr. Fagal posed this type

24  of harm?

25  A.    We agreed with -- that it was reasonable on Sister Anne's

128

1  Munley's part to come to that conclusion.

2  Q.   Looking at the third bullet, you considered Dr. Fagal's

3  reaction to the videos in the -- is this in the January 23rd

4  meeting with Sister Munley?

5  A.   Yes.

6  Q.   What did you find?

7  A.   Well, that from what we knew of that meeting that there

8  wasn't an admission of any wrongdoing nor was there an attempt

9  to seek out remediation or that something can be done to change

10 this.  My recollection -- I'd have to go back and read the

11 summary of that meeting, but it didn't seem like there was much

12 room that Dr. Fagal left for saying he felt bad or wanted to

13 make recompense.  If anything, it seemed like he wanted to

14 continue making his case rather than admit there was anything

15 incorrect in what he had done.

16 Q.   Uh-huh.  So there was no way to remediate what --

17 A.   It seemed reasonable to assume that, you know.  Again, we

18 were reviewing the decisions and actions of the president as

19 based on the information we had and that seemed a reasonable

20 inference.

21 Q.   Uh-huh.  And bullet No. 4, it says you reviewed the

22 policies and procedures manual, specifically the progressive

23 discipline policy.  And what did the committee find?

24 A.   Well, you find this throughout the policy and procedures

25 manual that there are guidelines in there, general principles.

1  I think the assumption when people write these kind of things

2  is that you can't cover everything and you try and provide

3  prototypic examples to spell out that things that ordinarily

4  will happen, you find the word ordinarily or typically, other

5  words that are used in the faculty procedures manual, and I

6  think in this case, may -- may is used rather than must to

7  suggest that it's not necessarily the case that progressive

8  discipline must be followed.

9       I think one of the examples we used is if somebody came to

10  class with a gun and threatened people, that would obviously

11  not be something that would lead to a must have progressive

12  discipline, not to say what Dr. Fagal did was directly like

13  that, but that's why the wording is there that's may rather

14  than must.

15  Q.    To give the university flexibility?

16  A.    Yes, to deal with unanticipated circumstances you couldn't

17  spell out or detail in a general handbook like it is.

18  Q.    Or the handbook would be as big as of this room, right?

19  A.    And it still wouldn't take care of everything.

20  Q.    So the committee on July 2nd upheld Sister Munley 's

21  decision to terminate Dr. Fagal's tenure.  Can you tell me why

22  it did that?

23  A.    There were four charges that we reviewed, and three of

24  them we found were -- would be endorsed, three of the four.

25  Q.    This is joint exhibit 36.  Do you recognize this document?

```
 1  A.   Yes.
 2  Q.   What is it?
 3  A.   It's I believe a final copy of the adjudication of the
 4  committee about Dr. Fagal's termination.
 5  Q.   And do you agree with everything -- did you agree with
 6  this decision?
 7  A.   Yes.
 8  Q.   Do you still agree with it today?
 9  A.   Yes.
10  Q.   Can I move to admit joint exhibit 39?  It's the July 15th
11  e-mail.  It's a joint exhibit.
12            MR. COHEN:  No objection.
13            MS. McGINLEY:  Then joint exhibit 36.
14            THE COURT:  Admitted.
15  BY MS. McGINLEY:
16  Q.   Would you tell me how you came to serve on the ad hoc
17  committee?
18  A.   I don't know exactly how, but I received a phone call from
19  Fred asking if I would be willing to be on the committee, and
20  then I was contacted by Sister Gail Cabral subsequent to that,
21  I believe, asking if I'd serve on the committee.
22  Q.   So Dr. Fagal chose you to serve as one of the committee
23  members?
24  A.   I believe so.
25  Q.   Okay.
```

1          MS. McGINLEY:  No further questions.

2          MR. COHEN:  I have no redirect, Your Honor.

3          THE COURT:  You may step down.

4          MATTHEW POVSE, called as a witness, being duly sworn,

5    testified as follows:

6    DIRECT EXAMINATION

7    BY MR. COHEN:

8    Q.    Good afternoon, Mr. Povse.  I'm sorry you were called

9    yesterday and I didn't get to you.

10   A.    That's all right.

11   Q.    As you know, I am Jonathan Cohen.  We met at your

12   deposition.  I represent Professor Fagal.  Do you still work

13   for Marywood?

14   A.    No.

15   Q.    You were previously a member of the Marywood faculty,

16   right?

17   A.    Yes.

18   Q.    And how long had you worked for Marywood?

19   A.    I'm going to guess around 27 to 28 years.

20   Q.    And you were a professor in what department?

21   A.    I was assistant professor in the art department.

22   Q.    Can you briefly summarize your educational background?

23   A.    I went to undergraduate school at Ohio University, B. F.

24   A., M. F. A., (unintelligible) F. M. A. from Cranburg Academy

25   of Art in Bloomfield Hills, Michigan.

1  Q.    Do you recall serving on the ad hoc faculty committee to

2  review certain charges that President Munley made against

3  Professor Fagal?

4  A.    Yes.

5  Q.    And you, Dr. O'Brien and Dr. Bittle on that committee,

6  right?

7  A.    Right.

8  Q.    Bring up joint exhibit 24, please.  Next page.  Mr. Povse,

9  do you recognize this document?  This is just the first page.

10  A.    I must warn you to begin with my memory of this whole

11  event is six years behind me.  I'm going to say that this was

12  probably part of the information that was given to me.

13  Q.    Do you think these were the charges that President Munley

14  brought against Professor Fagal.

15  A.    Yes.

16  Q.    And you and the other ad hoc faculty members adjudicated

17  these charges, didn't you?

18  A.    Yes.

19  Q.    Pull up joint exhibit 34.  And, Mr. Povse, do you

20  recognize this document?

21  A.    Yes.

22  Q.    And what is it?

23  A.    Pardon me?

24  Q.    What is it?

25  A.    It is the information that Dr. Fagal had sent the

president.  I'm reading from the memo.

Q.   Okay.  Do you remember receiving that?

A.   I don't remember, but my -- I see my name is on there.

Q.   Do you remember -- do you remember considering written defenses that Professor Fagal sent to your committee?

A.   Vaguely.

Q.   Let's pull up Fagal exhibit 83, please.  And, Mr. Povse, do you recognize this?

A.   Yes.

Q.   And what is it?

A.   Well, it's a note to Sister Anne telling her that we were going to send our draft to Will Anthony.

Q.   Who is that?

A.   He was a lawyer for Marywood.  I never met him.  I don't know him.

Q.   Why did you send your draft to Mr. Anthony?

A.   I guess -- I don't know to be honest with you.  It was part of the process that we were supposed to follow.

Q.   Did you think of your committee as being independent?

A.   Yes.

Q.   So why would you send a draft of your decision -- an advanced draft of your decision to one of the litigant's attorneys?

A.   I can't answer that.  All I remember is that it seemed as though this was part of the process that we would go through.

1  Q.    Did you share an advanced copy of your draft with me?

2  A.    No.

3  Q.    And why are you telling President Munley in advance how

4  your committee was going to support her actions?

5  A.    Well, this was our final draft, and so we pretty much knew

6  exactly what our decision was going to be.

7  Q.    And did you give me an advanced warning about what it was

8  going to be?

9  A.    No.  I -- we were answering at that point to the

10 president.

11 Q.    I thought you said you were supposed to be independent?

12 A.    Well, we were independent.  We were simply reviewing the

13 events and giving her our opinion whether or not we supported

14 her.

15 Q.    Let's look at joint exhibit 37, please.  Actually, I move

16 Fagal exhibit 83 into evidence.

17             MS. McGINLEY:  No objection.

18             THE COURT:  Admitted.

19 BY MR. COHEN:

20 Q.    Let's look at joint exhibit 37.  Do you recognize this,

21 Mr. Povse?

22 A.    Yeah.

23 Q.    And what is it?

24 A.    It's a -- this is a -- a note from Fred.

25 Q.    He's asking you to, you know, reconsider certain aspects

135

1  of your decision, correct?

2  A.   Right.

3  Q.   Okay.  And you did, in fact, receive this e-mail?

4  A.   Pardon me?

5  Q.   You did, in fact, receive this e-mail, right?

6  A.   I believe so, yes.

7  Q.   And but you didn't respond to it, correct?

8  A.   I don't remember.  I don't remember -- I really don't

9  remember if we responded to this.

10 Q.   Following your receipt of this e-mail, would it be fair to

11 say you didn't think that you had reconvened to re -- to

12 consider his suspension?

13 A.   Repeat that question.

14 Q.   Okay.  After you received this e-mail, would it be fair to

15 say you did not reconvene to consider the suspension?

16 A.   We did --

17        MS. McGINLEY:  Objection, Your Honor.  I think he's

18 mischaracterizing the testimony of Dr. Povse and leading him in

19 a way --

20        THE COURT:  I didn't hear anything about anybody

21 else.  He just asked him a question.  Overruled.  Proceed.

22 Answer the question.

23        MR. COHEN:  Do you want me to repeat?

24        THE WITNESS:  Yes.

25 BY MR. COHEN:

1  Q.    After you received this e-mail from Dr. Fagal, isn't it

2  true you did not reconvene as a committee to consider Professor

3  Fagal's suspension?

4             MS. McGINLEY:  Objection.  He testified they met

5  again on July 13th, and I think this is mischaracterizing

6  putting words in his mouth.

7             THE COURT:  He didn't put any words.  He asked a

8  question.  There's no answer contained in that question.  Go

9  ahead.

10            THE WITNESS:  One more time.

11 BY MR. COHEN:

12 Q.    Following your receipt of this e-mail on your screen --

13 A.    Right.

14 Q.    Isn't it true you did not reconvene to consider Professor

15 Fagal's suspension?

16 A.    No, we did reconvene on July 13th.

17 Q.    Can we take a look at Mr. Povse's deposition, please?

18 Okay.  Let's turn to page 40 and line 7 to 11.  Well, starting

19 with line five, I say, did you convene again to review the

20 suspension.  You say I don't think so.

21 A.    Right.

22 Q.    I say do you know why.  I don't remember?

23 A.    Right.

24 Q.    So -- did your memory get better?

25 A.    Well, what I did was -- obviously when I found out that I

1  was coming to court I reviewed some of the paper trail, and I

2  did, in fact, see that -- that we did get together on July 13th

3  and, in fact, I sent out the e-mail.

4  Q.   Didn't you prepare for your deposition, too?

5  A.   Obviously not as -- at least I didn't read one e-mail.

6  Q.   Thank you, Mr. Povse.  I have no further questions.

7          THE WITNESS:  Okay.

8  CROSS EXAMINATION

9  BY MS. McGINLEY:

10  Q.   Hi, Dr. Povse.  I am Kathleen McGinley.  We met before.

11  A.   Yes.

12  Q.   I am going to ask you some questions.  We're also not

13  going to be calling him tomorrow if possible.  When did you

14  receive the Hitler videos?

15  A.   I have no idea.

16  Q.   Okay.

17  A.   I was at home.  That's all I remember.  I was at home

18  checking my e-mail.

19  Q.   When you first saw the video, what did you think?

20  A.   It was total disbelief for the most part, just couldn't

21  believe a faculty member would send that around.

22  Q.   Why, because he was --

23  A.   It was outrageous, absolutely positively outrageous,

24  suicidal.

25  Q.   What do you mean by suicidal?

1  A.    Well, it was just -- it was so destructive that it was --

2  I don't know -- just blind rage and totally negative, and, you

3  know, I can go on for half an hour.

4  Q.    And you served on the ad hoc committee that reviewed Dr.

5  Fagal's discipline as a result of the videos?

6  A.    Yes.

7  Q.    And did you feel any bias towards Dr. Fagal at all?

8  A.    No, I -- I really didn't know him.  I recognized at the --

9  the last meeting we had.

10  Q.    I am showing you joint exhibit 39, what's already been

11  admitted into evidence.  Do you recognize this e-mail?

12  A.    Yes.

13  Q.    Can you tell me what it is?

14  A.    Well, this was -- this is what Helen sent to the president

15  after that last meeting that we had.

16  Q.    Does this refresh your recollection of the meeting on July

17  13th?

18  A.    Yeah.

19  Q.    Okay.  And this is joint exhibit 36, which has already

20  been admitted into evidence.  Do you recognize this document?

21  A.    Yeah, that's our -- that was our initial review.

22  Q.    The decision of the ad hoc committee?

23  A.    Yes, yes, the complete.

24  Q.    Did you agree with this decision?

25  A.    A hundred percent.

1 Q.   Did you still agree with it today?

2 A.   Yes, by all means.

3 Q.   Did you feel any pressure from the university to uphold

4 the decision of Sister Munley?

5 A.   No.

6 Q.   Any pressure from Sister Munley to uphold her decision?

7 A.   No.  If -- to be honest with you, if anything I would have

8 felt pressure from the other side because we were talking about

9 a faculty member, and I was a faculty member, and so if

10 anything, that's where I would have leaned and/or felt some

11 sort of pressure, but no.

12 Q.   Because you are a tenured faculty member?

13 A.   Exactly.

14        MS. McGINLEY:  I don't have any further questions.

15 Thank you.

16        THE WITNESS:  All right.

17        THE COURT:  Any further questions?

18        MR. COHEN:  No, Your Honor.

19        THE COURT:  You can step down.

20        THE WITNESS:  All right.  Thank you.

21        HELEN BITTEL, called as a witness, being duly sworn,

22 testified as follows:

23 DIRECT EXAMINATION

24 BY MR. COHEN:

25 Q.   Good afternoon, Dr. Bittle.

1  A.    Hi.

2  Q.    Nice to see you again.  Do you still work for Marywood

3  University?

4  A.    I do.

5  Q.    And you are a member of Marywood faculty?

6  A.    Yes, I am.

7  Q.    And what department did you teach in?

8  A.    I am associate professor of English, and I'm also -- I

9  also direct the center for teaching and learning.

10  Q.    And how long have you worked for Marywood?

11  A.    Since 2002.  So almost 16 years.

12  Q.    Can you briefly summarize your educational background?

13  A.    Sure.  I have a bachelor's degree in English from Rutgers,

14  1993.  I have a doctorate from the University of Rochester,

15  2000.  I worked as a graduate instructor at Rochester.  I then

16  had a two-year sabbatical replacement position at Oswego State

17  where I was visiting assistant professor of English.  And then

18  2002 I landed at Marywood, again working there as assistant

19  professor of English, earned tenure in 2009.  And was promoted

20  to associate professor at that time, served as chair for three

21  years.

22  Q.    In approximately February of 2012, do you recall chairing

23  an ad hoc faculty committee that was convened to review certain

24  charges made against Professor Fagal?

25  A.    I did chair an ad hoc faculty committee, but we did not

1  convene in February.

2  Q.    I'm sorry.  What's your recollection?

3  A.    My recollection is that we were convened in April or May,

4  late April, early May.

5  Q.    And you served with Mr. Povse and Dr. O'Brien?

6  A.    I did.

7  Q.    And let's look at joint exhibit 24.  Do you recognize this

8  document?

9  A.    I do recognize this document.

10  Q.    And what is it?

11  A.    This is the document -- Sister Anne Munley's list of

12  reasons for suspending Fred Fagal.

13  Q.    And terminating?

14  A.    And terminating, that's correct.

15  Q.    And you and the other ad hoc faculty committee members

16  adjudicated these charges, right?

17  A.    We were the faculty review committee.

18  Q.    Yes.  Joint exhibit 34, please.  Do you recognize this,

19  Dr. Bittel?

20  A.    Yes, I do.

21  Q.    And what is it?

22  A.    This is Fred Fagal's response -- the response to charges

23  that he wanted the ad hoc committee to have.  I believe there's

24  an attachment.

25  Q.    And you and the other committee members considered

1  Professor Fagal's written defenses?

2  A.    Absolutely.

3  Q.    Let's look at Fagal exhibit 119, please.  Do you recognize

4  this document, Dr. Bittel?

5  A.    Yes, I do.

6  Q.    What are we looking at?

7  A.    The minutes from the first ad hoc committee meeting, the

8  first time we met to discuss our charge as a committee as well

9  as well as the charges against Fred and Fred's responses to the

10 charges.

11 Q.    This first meeting happened May 11th?

12 A.    Yes, it did.

13 Q.    2012?

14 A.    Correct.

15 Q.    You said it was the first meeting, right?

16 A.    Yes.

17 Q.    How many other meetings were there?

18 A.    Between four and six.

19 Q.    Brian, can you turn the page, please?  Can you highlight

20 the last paragraph, please?  First of all, are you the author

21 of these notes?

22 A.    I drafted them and then responded to feedback from the

23 committee from the other members who were present.

24 Q.    Okay.

25 A.    So they also reviewed them and made comments.

1  Q.    Now, when you or them said we looked very closely at the

2  two P. P. M. documents in our packets and found them vague and

3  confusing -- first of all, what did you mean by P. P. M.?

4  A.    Procedures and policies manual.

5  Q.    Which two P. P. M. documents did you find vague and

6  confusing if you recall?  You might need to look at the rest of

7  the document.

8  A.    Yeah, I may need to because this was six years ago.

9  Q.    Why do you want you turn to the first page?  Next page.

10 No hints?

11 A.    More than likely one of them is the progressive discipline

12 policy.  I don't know what the other would have been.

13 Q.    Let me ask you this.  Did you find the progressive

14 discipline policy vague and confusing?

15 A.    We had never -- a piece of context I want to provide.

16 Revocation of tenure is extremely rare.  I know it has not

17 happened at my 16 years at Marywood.  I don't know how long it

18 has been since it happened.  We had to -- this was a policy

19 that is rarely invoked.  And so we had to sit down and figure

20 out what does this really mean.

21 Q.    Okay.  I understand all that.  But I'm not sure that you

22 answered the question.  Did you find the progressive discipline

23 policy vague or confusing?

24 A.    We did need to ask for clarification.

25 Q.    So yes?

144

1  A.   We asked for clarification.

2  Q.   I think I'm entitled to a yes or no.

3          MS. PEET:  Objection, Your Honor.  She asked and

4  answered.

5          THE COURT:  I don't follow what you're asking.

6          MR. COHEN:  I just want to know whether she found the

7  progressive discipline policy vague or confusing.  And I -- I

8  haven't got a straight answer.

9          THE COURT:  She answered.

10         MS. PEET:  She responded.

11         THE COURT:  I thought you did answer.

12         THE WITNESS:  I thought I answered as well.  We found

13 we -- we asked -- we felt we needed to ask for clarification.

14         THE COURT:  He's asking you whether you thought it

15 was vague and/or confusing.  Can you answer that yes or no?

16         THE WITNESS:  Yes.

17         THE COURT:  Yes, you can answer.

18         THE WITNESS:  Yes, I can answer.  Initially we found

19 it confusing, but then we asked for some consultation.  We

20 spent some time with the documents.  We continued to work

21 through the process.

22         THE COURT:  That's her answer.

23         MR. COHEN:  Your Honor, I move Fagal exhibit 119 into

24 evidence.

25         MS. PEET:  No objection.  Admitted.

1  BY MR. COHEN:

2  Q.    Let's look at Fagal exhibit 87.  Dr. Bittel, do you

3  recognize this document?

4  A.    I do.

5  Q.    And what is it?

6  A.    This is an e-mail from me as chair of the ad hoc committee

7  to the chair of the faculty grievance committee.

8  Q.    That would be Dr. Sadlack?

9  A.    Dr. Sadlack, yes.

10  Q.   This is authentic, you did write this?

11  A.   I did write this.

12         MR. COHEN:  Your Honor, I move Fagal exhibit 87 into

13  evidence.

14         MS. PEET:  No objection.

15         THE COURT:  Admitted.

16  BY MR. COHEN:

17  Q.    Let's look at Fagal exhibit 43.  Do you recognize this

18  document, Dr. Bittel?

19  A.    Yes, I recognize it.

20  Q.    What are we looking at?

21  A.    Minutes of committee meeting No. 2.

22  Q.    Okay.  That occurred on May 17th, 2012.

23  A.    Correct.

24  Q.    Did you authorize these minutes or more of a collaborative

25  thing if you recall?

1  A.    I don't recall.  I would have drafted them.  It's highly

2  likely I would have received feedback from the other committee

3  -- of the committee members before they were finalized, but I

4  don't recall for sure.

5  Q.    During the meeting of the ad hoc faculty committee, did

6  you take notes?

7  A.    I took notes, yes.  I was a note taker.

8  Q.    Why don't you just briefly flip through the pages?  I

9  think there's only one or two -- and let me know when you're

10  finished.

11  A.    Okay.

12  Q.    You can just tell Brian to turn the page.

13  A.    Okay.

14  Q.    To the best of your recollection, do these notes

15  accurately convey what occurred at the ad hoc committee meeting

16  May 17, 2012?

17  A.    It conveyed our discussion and understanding at that

18  moment.

19  Q.    Okay.  And I'm hoping because the Court might have to rely

20  on this later -- I hope you can decipher some of the acronyms

21  here.  Some of these are obvious, but I need to take a belt and

22  suspenders approach.  P. D., Patricia Dunleavy?

23  A.    Correct.

24  Q.    W. J. A. is William J. Anthony?

25  A.    Yes.

1   Q.   F.G.C., faculty grievance committee?

2   A.   Yes.

3   Q.   E.A.S, Erin A. Sadlack?

4   A.   Yes.

5   Q.   P. P. M., policies and procedures manual?

6   A.   Yes.

7   Q.   F. G. A. is faculty grievances and appeals policy?

8   A.   Yes.

9   Q.   S. A. M., Sister Anne Munley?

10  A.   Yes.

11  Q.   F. F. is Fred Fagal?

12  A.   Yes.

13  Q.   V.P.A. A., vice president for academic affairs?

14  A.   Yes.

15  Q.   A. H. C. ad hoc committee?

16  A.   Yes.

17  Q.   A. A. U. P., American Association of University

18  Professors?

19  A.   Yes.

20  Q.   Your Honor, I move Fagal exhibit 43 into evidence.

21           MS. PEET:  No objection.

22           THE COURT:  Admitted.

23  BY MR. COHEN:

24  Q.   Let's look at Fagal exhibit 42.  Do you recognize this

25  document?

148

1  A.    Yes.

2  Q.    And what is it?

3  A.    It's an e-mail that I sent to Pat Dunleavy following our

4  May 17th meeting.

5  Q.    Okay.  Here again F. G. C., faculty grievance committee?

6  A.    Yes, it does.

7  Q.    Authentic e-mail you sent?

8  A.    It is an authentic e-mail, yes.

9         MR. COHEN:  Your Honor, I move Fagal exhibit 42 into

10  evidence.

11         MS. PEET:  No objection.

12         THE COURT:  Admitted.

13  BY MR. COHEN:

14  Q.    Let's look at Fagal exhibit 81, please.  Do you recognize

15  this?

16  A.    I do.

17  Q.    What are we looking at?

18  A.    These are the minutes of the June 19th meeting.

19  Q.    Okay.  And now, at the top of the document it says in

20  bold, faculty grievance committee.  Is that an error?

21  A.    Where?

22  Q.    At the top.

23  A.    Yes, that's an error.

24  Q.    You meant ad hoc faculty committee?

25  A.    I absolutely did.  Where it says present that was -- that

1  was the ad hoc committee.

2  Q.   Sure.  Your Honor, I move Fagal exhibit 81 into evidence.

3       MS. PEET:  No objection, Your Honor.

4       THE COURT:  Admitted.

5  BY MR. COHEN:

6  Q.   Let's look at Fagal exhibit 84, please.  Is this an e-mail

7  you sent?

8  A.   Yes.

9  Q.   What is it?

10  A.   E-mail to the other members of my committee updating them

11  on where -- where we were in the process of drafting our final

12  report.

13  Q.   And here you're telling Mr. Povse and Dr. O'Brien that Mr.

14  Anthony had input into the committee's findings?

15  A.   He did not have input in the findings.  He reviewed the

16  draft for procedural reasons.

17  Q.   So let's turn the page.  Now, the redacted parts -- those

18  are all Mr. Anthony's thoughts about your draft, right?

19  A.   They may have been his thoughts or they may have -- some

20  of them may have been my paraphrase of his thoughts based on

21  our conversation.

22       MS. PEET:  Your Honor, with all respect, I redrafted

23  the documents.  She probably does not know what is behind those

24  black marks.  I don't want her to guess or assume.

25       MR. COHEN:  If you think at the first page, if you go

1  back, she says -- my questions are him highlighted in blue,

2  responses highlighted in green, somewhere on that second page,

3  he's got something there, right, he has some comments.

4            THE WITNESS:  He has comments but not necessarily

5  comments on the substance of our findings.

6  BY MR. COHEN:

7  Q.   So you're claiming that he had input into the -- he didn't

8  have input into the findings but he -- what role did he play?

9  A.   Well, we were preparing a document, a final report.  We

10  knew there was a possibility that this could go up the chain,

11  that it could be eventually end up in court.  And so we wanted

12  a lawyer's eyeballs on it to tell us, you know, yes, is this a

13  worthy document.

14  Q.   You wanted President Munley's lawyers, isn't that it?

15  A.   They are not President Munley.  They were -- my

16  understanding they were acting independently.  They were hired

17  by Marywood but not working for her per se.

18  Q.   Okay.  Can we look at the deposition of Ms. Bittel,

19  please?  Let's turn to page 32.  Could you read from lines 5 to

20  page 33 line 16?

21  A.   Whereupon exhibit eight was marked for identification.  By

22  Mr. Cohen, could you read this to yourself and let me know when

23  you finish, please, okay.  Do you recognize this.  It appears

24  to -- I vaguely recognize it.  It looks like my writing.  Are

25  these notes that you took about a telephone conversation that

1  you had with Pat Dunleavy.  Yes.  And for the record can we

2  describe the blackouts so she understands.  Yes, the blackouts

3  no one is saying that you did that.  Marywood's attorneys had

4  to redact certain things, okay, because they may be privileged,

5  okay.  So ignore that please, okay.  So based on these notes,

6  Dr. Dunleavy told you that your committee needed to provide an

7  independent review.  Is that where I am supposed to stop?  Did

8  you say line six?

9           MR. COHEN:  16.

10           THE WITNESS:  Yes, that word was used several times

11  and that your committee needed to come to a decision

12  independently from the administration.  That was made very

13  clear to us from the first meeting.  The first time met with

14  sister and Pat Dunleavy we were told there was no punitive

15  action against you if you find against the administration.

16  There's no -- you know, that you need to be an independent

17  review or independent review of the substance of the charges.

18  BY MR. COHEN:

19  Q.    You believed by consulting Mr. Anthony that you were

20  staying independent?

21  A.    Yes, because we were not consulting him about the

22  substance of our findings.  We were consulting him to -- we

23  wanted a lawyer's pair of eyes on our document to say is this

24  the correct amount of detail, is it the right genre for a

25  document that may go forward in court.

1    Q.    Let's come back to exhibit Fagal 84.

2             MR. COHEN:  I move Fagal exhibit 84 into evidence.

3             MS. PEET:  No objection, Your Honor.

4             THE COURT:  Admitted.

5    BY MR. COHEN:

6    Q.    Let's look at joint exhibit 36, please.  And do you

7    recognize this?

8    A.    I do.

9    Q.    And this is your final decision -- final decision of your

10   committee, right?

11   A.    This is the decision of our committee.

12   Q.    Okay.  This is -- this has been admitted, right?  Joint

13   exhibit 36, I would like to move that into admission if it

14   hasn't been.

15            MS. PEET:  I think it has been.  It's fine.

16   BY MR. COHEN:

17   Q.    Let's look at joint exhibit 37.  Do you recognize this

18   document?

19   A.    I do recognize this.

20   Q.    And this is an e-mail from Fred Fagal to your committee on

21   July 6, 2012, right?

22   A.    Yes.

23   Q.    And you did, in fact, receive this?

24   A.    We did.

25   Q.    And Professor Fagal makes two critiques of your

1  committee's decision.  And correct me if I'm wrong, first he

2  thinks that your committee didn't review his suspension?

3  A.   But we did discuss this -- we discussed the suspension we

4  did not include in our final report because we found a more --

5  much more serious charge was warranted.

6  Q.   I'm not asking you to defend it.  I'm just asking what

7  your understanding of what his allegations were about --

8  A.   We did understand that was his allegation and that's why

9  we subsequently met to dot all the I.s and cross the T.s and

10  let's review the suspension separately.

11  Q.   Did you ever respond to Professor Fagal to say, we did

12  review the suspension?

13  A.   I can't remember whether we copied him on -- on our notes

14  after we met.  We did meet on July 13th.  We discussed the

15  suspension.  We decided that the suspension, too, was warranted

16  and we did send that verdict in writing to Sister Anne.

17  Q.   Did you intend to send your findings about the suspension

18  to Fred Fagal, too, or was it just for President Munley?

19  A.   I don't recall.

20  Q.   Okay.  You would agree though that -- and you didn't

21  really make any formal findings regarding Professor Fagal's

22  suspension, right?

23  A.   We did.  We submitted a document to Sister Ann Munley July

24  15th following our summary of our meeting July 13 where we

25  said, yes, we know we don't -- we don't have to separately

1  adjudicate the suspension, but let's consider it.  And we did,

2  and we found that it was justified that further harm was

3  present and we did return that to Sister Anne.

4  Q.    Can we look at Ms. Bittel's deposition again?  Page 31.

5  Lines 22 through 24.  I'm asking you, but you didn't make any

6  formal finding about whether the suspension was appropriate,

7  and you say, no, because termination and especially revocation

8  of tenure, which in some ways is the more serious issue were

9  found to be justified.  Why is your answer different today?

10 A.    Two things.  One, our formal findings we -- the formal

11 findings about whether suspension was appropriate were not in

12 our official report.  It came in a later subsequent addendum.

13 The other thing is that the deposition occurred four and a half

14 years after all of these deliberations.

15       I had forgotten that we met again, and I went back into my

16 e-mail and I found record of it.

17 Q.    Okay.  So let's go back to joint exhibit 37.  Actually,

18 I'm a little bit confused.  Isn't it true that you thought that

19 the -- it's not on this document.  I have a general question.

20 Isn't it true that you thought that whether President Munley

21 was out of line in suspending Fred Fagal, didn't you think that

22 had been addressed by the faculty grievance committee?

23 A.    We think that was the case after we received Fred's memo

24 July 6th.  We reconvened the committee just to make sure we

25 dotted the I.s and crossed the T.s.  We thought this was not

155

1  necessary, this was us in being diligent.

2  Q.   Let's look at -- I think I forgot to move something into

3  evidence, joint exhibit 37.  Can we move that into evidence?

4            MS. PEET:  No objection.

5            THE COURT:  Admitted.

6  BY MR. COHEN:

7  Q.   Then I was going to go to Fagal exhibit 62.  And do you

8  recognize this, Dr. Bittel?

9  A.   Yes.

10  Q.   Actually let's turn to the last page.  Move back one page.

11  Okay.  So here you're writing an e-mail to Pat Dunleavy?

12  A.   Yes.

13  Q.   Okay.  This is authentic?

14  A.   Yes, it is.

15  Q.   And again, Will is Will Anthony?

16  A.   Yes.

17  Q.   Your Honor, I move Fagal exhibit 62 into evidence.

18            MS. PEET:  No objection, Your Honor.

19            THE COURT:  Admitted.

20            MR. COHEN:  Thank you, Dr. Bittel.  I have no further

21  questions.

22  CROSS EXAMINATION

23  BY MS. PEET:

24  Q.   Good afternoon, Dr. Bittel.  Stephanie Pete.  Good to see

25  you again.

1    A.    Good to see you as well.

2    Q.    I am going to show what has been marked as joint exhibit

3    8.

4    A.    Okay.

5    Q.    I will -- do you recognize this again as the progressive

6    discipline policy?

7    A.    I do.

8    Q.    If you can read for us the highlighted portion policy

9    statement of that policy.

10   A.    Because the university regards disciplinary action as

11   preventive and not punitive, the policy recognizes personal and

12   professional problems that may be rectified by an informal

13   educational process, as well as serious violations of

14   professional responsibilities implicating possible

15   recommendation for suspension or dismissal.

16         The policy is intended to provide an effective and

17   flexible means of identifying problem areas, resolving

18   complaints and preventing repetitive incidents by prompt

19   intervention and assistance.  It is designed to accomplish

20   these ends by a series of gradual steps involving strategies

21   such as personal conferences, oral and written warnings and

22   opportunities for monitored assistance where applicable.

23   Q.    Did you understand from the progressive discipline policy

24   that progressive discipline wasn't required in every instance?

25              MR. COHEN:   Objection, conclusion.

1          MS. PEET:  I am asking for her interpretation of the

2     policy.

3          MR. COHEN:  I retract it.

4          THE COURT:  Pardon?

5          MR. COHEN:  I retract it.

6          THE WITNESS:  So we looked in particular at the

7     auxiliary for the word may which is used for -- to indicate

8     possibility or permission.

9     BY MS. PEET:

10    Q.   So is it your understanding the progressive discipline

11    policy that not every discipline or violation would have to

12    start with an oral or written warning?  Was that your

13    understanding?

14    A.   That's correct.

15    Q.   Did you find that part of the policy to be vague or

16    confusing?

17    A.   No.

18    Q.   Did you find the part of the policy where progressive

19    discipline isn't required in every instance to be vague or

20    confusing?

21    A.   No, that was pretty clear.

22    Q.   So you understood that?

23    A.   We did understand that.

24    Q.   You understood that at the time when you were adjudicating

25    Dr. Fagal's grievance and statement of charges?

1  A.    We did.  We discussed that at length.

2  Q.    Further down on the policy, it talks about suspension.  Do

3  you see that?

4  A.    Yes, I do.

5  Q.    And did you have an understanding as to whether the vice

6  president of academic affairs was required to be the one to

7  suspend the faculty member?

8  A.    No.

9  Q.    What was your understanding?

10  A.    Well, the verb again is may be suspended.  It's not will

11  be suspended or shall be suspended.  And the hierarchy on

12  academic affairs division of the university goes chair to dean

13  to V. P. A. to president.  Someone higher on the chain of

14  command can act in instead of the person below them.

15  Q.    If I understand your testimony correctly then you

16  understood that it did not need to be the vice president of

17  academic fairs to suspend the faculty member; is that correct?

18  A.    Correct.

19  Q.    You understood that at the time you were adjudicating Dr.

20  Fagal's -- statement of charges against him?

21  A.    That's correct.

22  Q.    What about remedial measures, did you understand at the

23  time whether remedial measures were required to be implemented

24  before dismissal took place?

25  A.    We understood according to the policy that they were not

1  required.  Again that verb may indicates that it -- it may go

2  that route and there are some kinds of problems that can be

3  rectified through remediation but it doesn't necessarily apply

4  to all cases.

5  Q.    Did you find that part of the policy to be vague or

6  confusing?

7  A.    No.

8  Q.    At the time you were adjudicating Dr. Fagal's statement of

9  charges in the grievance you understood that remedial measures

10 were not required in every instance prior to dismissal?

11 A.    Correct.

12 Q.    No further questions for you.

13        MR. COHEN:  I have no redirect.

14        THE COURT:  All right.  Thank you.  You may step

15 down.  Thank you.

16        MR. COHEN:  Plaintiff calls Dr. Erin Sadlack.

17        ERIN SADLACK, called as a witness, being duly sworn,

18 testified as follows:

19 DIRECT EXAMINATION

20 BY MR. COHEN:

21 Q.    Good afternoon, Dr. Sadlack.

22 A.    Good afternoon.

23 Q.    Sorry to hear about your loss.

24 A.    Thank you very much.

25 Q.    Do you still work for Marywood University?

1    A.    I do.

2    Q.    Okay.  And you're a member of Marywood faculty?

3    A.    I am.

4    Q.    And how long have you worked for Marywood?

5    A.    Since 2005.

6    Q.    And you're a professor of English?

7    A.    I am, associate professor of English.

8    Q.    And could you briefly summarize your educational

9    background?

10   A.    Uh-huh.  I received my bachelors from the College of New

11   Jersey and then my masters and my doctorate in English

12   literature from the University of Maryland, College Park.  I

13   began working for Marywood University.  I am currently the

14   chair of the department of English and foreign languages and

15   also its honors program director.

16   Q.    And in late 2011 and early 2012, you were on Marywood's

17   faculty grievance committee?

18   A.    Yes.

19   Q.    What is the faculty grievance committee?

20   A.    The faculty grievance committee exists in cases where a

21   faculty member feels there might be some kind of difficulty in

22   a decision that's been made.  We provide feedback to the

23   decision maker, asking sometimes the decision maker to

24   reconsider a point -- decision that had been made or not.  But

25   our decisions are intended to be procedural and not

1  substantive.

2  Q.    Okay.  Can we look at joint exhibit 25, please?  And do

3  you recognize this, Dr. Sadlack?

4  A.    Yes.

5  Q.    And what is this?  I said do you recognize this document.

6  A.    Yes, this is the e-mail -- or part of the documents we

7  were given outlining Fred Fagal's grievance.

8  Q.    His grievance under the faculty grievance?

9  A.    Under the grievance policy, yes.

10 Q.    And the full name of the faculty grievances and appeals

11 policy?

12 A.    Yes, I believe so.

13 Q.    I move joint exhibit 25 into evidence.

14        MS. PEET:  I believe it's already been admitted.  To

15 the extent it hasn't, no objection.

16        THE COURT:  Pardon?

17        MS. PEET:  I think it's admitted, but if it's not no

18 objection.

19        THE COURT:  It will be admitted if it's not.

20 BY MR. COHEN:

21 Q.    Would it be fair to say, Dr. Sadlack you, and two other

22 Marywood faculty members adjudicated a grievance by Professor

23 Fagal?

24 A.    Yes.

25 Q.    And I want to ask you a little bit about the process that

162

1  you took in adjudicating that grievance.  Can we bring up joint

2  exhibit 9, please?  Do you recognize this?

3  A.    Yes, I do.

4  Q.    What are we looking at?

5  A.    Faculty grievances and appeals policy.

6  Q.    In adjudicating Professor Fagal's grievance, you were

7  attempting to follow this policy?

8  A.    Yes.

9  Q.    Your Honor, I move joint exhibit 9 into evidence.

10         MS. PEET:  No objection, Your Honor.

11         THE COURT:  Admitted.

12 BY MR. COHEN:

13 Q.    Did you hold meetings with two other faculty grievance

14 committee members?

15 A.    Yes, we did.

16 Q.    This is for Professor Fagal's grievance?

17 A.    Yes.

18 Q.    Who were those faculty members?

19 A.    Dr. Bill Conlogue and Dr. Trish Arner.

20 Q.    Approximately how many meetings did you hold?

21 A.    We had, I believe, five meetings in total.

22 Q.    And let's look at joint exhibit 26, please.  Do you

23 recognize this document, Dr. Sadlack?

24 A.    Yes, these are notes I took -- I put together at the

25 conclusion of our findings and which I then shared with the

1   members of our committee for their back.  This is the final

2   draft we all signed and agreed upon.

3   Q.   Would it be fair to say this document accurately conveys

4   the steps you and the faculty grievance committee took in

5   adjudicating Dr. Fagal's grievance?

6   A.   Yes.

7   Q.   The top signature is yours, right?

8   A.   Yes.

9           MR. COHEN:  I move joint exhibit 26 into evidence.

10          MS. PEET:  No objection, Your Honor.

11          THE COURT:  Admitted.

12  BY MR. COHEN:

13  Q.   Let's look at joint exhibit 27, please.  Do you recognize

14  this document?

15  A.   Yes.

16  Q.   What is this?

17  A.   This is the letter that we sent to Sister Munley.  This

18  was the one letting her know -- that we received a grievance.

19  That's part of the procedures the committee has to take is

20  notifying the decision maker that a grievance has been filed.

21  Q.   Okay.  And, Your Honor, I move joint exhibit 27 into

22  evidence.

23          MS. PEET:  No objection, Your Honor.

24          THE COURT:  Admitted.

25  BY MR. COHEN:

1 Q.    Let's look at joint exhibit 28.  Do you recognize this Dr.

2 Sadlack?

3 A.    Yes, I do.

4 Q.    What is this?

5 A.    This is the letter that I sent to Fred Fagal as a result

6 of informing him of the committee's findings.

7 Q.    Your Honor, I move joint exhibit 28 into evidence.

8         MS. PEET:  No objection.

9         THE COURT:  Admitted.

10 BY MR. COHEN:

11 Q.    Joint exhibit 29.  Okay.  Dr. Sadlack, do you -- I think

12 it is multi-page.  And do you recognize this, Dr. Sadlack?

13 A.    Yes, I wanted to expedite -- I'm certain Fred was anxious

14 about the results of his hearing, and I wanted to expedite.  We

15 sent a hard copy in the mail, and I sent a copy by e-mail as

16 well.

17 Q.    So in summary this is an e-mail chain between you and Fred

18 Fagal?

19 A.    Yes.

20 Q.    Okay.  Your Honor, I move joint exhibit 29 into evidence.

21         MS. PEET:  No objection.

22         THE COURT:  Admitted.

23         MR. COHEN:  Thank you, Dr. Sadlack.  I have no

24 further questions.

25         MS. PEET:  Your Honor, I have no questions.

1          THE COURT:  Thank you.

2          MR. COHEN:  Your Honor, I am finished with witnesses.

3  But I'm not finished with my case quite yet.  I have some

4  exhibits that I forgot to move in, and I would like to try to

5  move them in.  And could you give me one moment, please?

6          THE COURT:  Why don't we take a brief -- let's take

7  seven minutes.  We will come back at -- take ten minutes.  Come

8  back in ten minutes.  Then we will go over this.  Is that going

9  to be it for you after that?

10          MR. COHEN:  Well --

11          THE COURT:  I am not holding you to it.  Let me check

12  my witness list.  I want to make sure I didn't forget anyone.

13          MR. ENGLISH:  Your Honor, how would you like to

14  handle joint stipulations of fact?  I don't know if you want us

15  to read them in or you're okay with what we have submitted.

16          THE COURT:  I don't know you need to read -- well,

17  how many are there?

18          MR. ENGLISH:  A few pages -- it's a lot.  It's a lot,

19  Your Honor.  We submitted them with our pretrial memos.

20          THE COURT:  The only thing I want them -- if you are

21  going to do it --

22          MR. ENGLISH:  Maybe admit them as an exhibit.

23          THE COURT:  I think rather than expect they will find

24  themselves into the record via pretrial memos --

25          MR. ENGLISH:  If we can agree --

1          THE COURT:  It's up to you all.  If you agree on it,

2    I will be -- I will be okay with that.

3          MR. COHEN:  I have no objection.  But since that was

4    filed, I think that Mr. English and I have made a few changes.

5    They haven't made it into writing yet.  I can address this with

6    you later.

7          MR. ENGLISH:  Okay.

8          MR. COHEN:  Very minor things.  I'm just saying it's

9    not -- I don't think it's quite ready yet.

10         MR. ENGLISH:  Okay.  Why don't we -- we will figure

11   out how to address it.  I don't think we need to read in

12   stipulated facts.  We will save the court reporter's hands.  I

13   have a Rule 50 motion, too.

14         THE COURT:  We will see you in ten minutes.

15         (A brief recess was taken.)

16         THE COURT:  Okay.  Do you have some exhibits?

17         MR. COHEN:  Yes, Your Honor.

18         THE COURT:  All right.  What do you think you have?

19         MR. COHEN:  Okay.  There's at least three that we

20   agree on.  Plaintiff's Exhibit 29, Plaintiff's Exhibit 31, and

21   joint exhibit 33.

22         THE COURT:  29, who identified that?

23         MR. COHEN:  Plaintiff.

24         MR. ENGLISH:  To help Mr. Cohen, out, I don't think

25   the exhibit -- the exhibits you just mentioned were identified.

167

1  But we had an agreement that I would not object to those

2  exhibits.

3          THE COURT:  Oh, all right.  So say them again.

4          MR. COHEN:  Yes.

5          THE COURT:  29.

6          MR. COHEN:  29.

7          THE COURT:  Yeah.

8          MR. COHEN:  31.

9          THE COURT:  Yeah.

10          MR. COHEN:  And joint exhibit 33.

11          THE COURT:  You agree they are admissible?

12          MR. ENGLISH:  Yes, Your Honor.

13          THE COURT:  They'll be admitted.  29, 31 and joint

14  33.

15          MR. COHEN:  Now, I have some others.  Plaintiff's

16  exhibit list -- normally I would agree pleadings are not

17  evidence.  But when there's admissions, I do think those can

18  come in.  And there are some important admissions in

19  defendant's answer that -- they are just judicial admissions.

20  I move to have -- to have them Plaintiff's Exhibit 1 and 2 --

21  admitted.

22          MR. ENGLISH:  We will object.  Those pleadings are

23  not evidence.

24          MR. COHEN:  Admissions are.

25          THE COURT:  Well, admissions are.

1          MR. COHEN:  I would not ask for the complaint for the

2     truth of anything, just what I am alleging and then your

3     answers some admission.

4          THE COURT:  If there's an admission in the pleading,

5     of course, it's admissible.

6          MR. ENGLISH:  Your Honor, he -- we didn't get a

7     chance to examine a witness on the alleged admissions.

8          THE COURT:  I don't know if they are admissions or

9     not.

10          MR. ENGLISH:  Nor do I.

11          THE COURT:  Anything you say in a pleading is an

12     admission.  It's a statement of an adverse party.

13          MR. ENGLISH:  Yes, Your Honor, but it's not

14     necessarily evidence.

15          THE COURT:  What you're saying to me is contextually

16     there may be some issue as to what the question or what the

17     allegation is and what the response is to that allegation, it

18     may not be -- it's still an admission for what it's worth.

19          MR. COHEN:  If they want to change their answers at

20     any time, their option was to amend their answer.

21          MR. ENGLISH:  Your Honor, he's also asking for

22     complaint which isn't an admission by Marywood, and a complaint

23     or just allegations --

24          THE COURT:  But when it involves an answer to the

25     allegation by an adverse party, it's an admission.

1    MR. ENGLISH:  Your Honor, all I can do is stand on

2  our objection.

3    THE COURT:  I don't know what you're talking about

4  frankly in terms of what -- how many are there?

5    MR. COHEN:  I think three or four.  But they are

6  important to us, and they have been subsequently denied I think

7  inappropriately because an admission in an answer is the best

8  admission you can get.

9    THE COURT:  If they've been denied, how are they

10  being subsequently denied?

11    MR. COHEN:  Well, for example, in the answer they

12  admit that they did -- Marywood did, in fact, remove some of

13  the posters.  I think there's been some challenge to that at

14  trial.  I thought that you guys were contesting that.

15    MR. ENGLISH:  I think it's your job to prove up

16  whatever your allegations are in your case.  And as we sit here

17  today, you want the entire answer to be admitted as admissions,

18  and we don't know what specific admissions -- I don't know what

19  --

20    MR. COHEN:  You do.  You drafted -- you filed the

21  answers.

22    THE COURT:  Let's cut to the chase.  You have what

23  you think are admissions.

24    MR. COHEN:  Yes.

25    THE COURT:  They require the complaint because they

1  answer is something that's in the complaint.  And you say

2  they've subsequently denied them.  I'm confused.

3          MR. COHEN:  I think they have taken positions

4  inconsistent with some of the admissions.  And I think that

5  it's inappropriate and their admissions in their pleadings, you

6  know, trump anything unless --

7          THE COURT:  Well, that's another question.  Tell me

8  what you propose to do.

9          MR. COHEN:  Well, I'm just making a motion to admit

10  exhibit 1, not for the truth of the allegations in the amended

11  complaint.  And I move to admit Plaintiff's Exhibit 2 just for

12  the purpose of the admissions and I --

13          THE COURT:  What is that, the answer?

14          MR. COHEN:  Yes.

15          THE COURT:  So you are going to give me the whole

16  complaint and whole answer for four admissions?

17          MR. COHEN:  Okay.  If you want to -- I can --

18          THE COURT:  What I suggest you do is call out the

19  allegation and the response.

20          MR. COHEN:  Sure --

21          THE COURT:  That you think are germane and show them

22  to counsel.  You may get some agreement on it.  If you don't,

23  I'll deal with it.

24          MR. COHEN:  That's fair.

25          MR. ENGLISH:  Your Honor, just to the extent that it

1 isn't being put on through a witness, it would be one thing if

2 he handed the answer to a witness and went through that --

3      THE COURT:  I agree with you.

4      MR. ENGLISH:  Yes, Your Honor.

5      THE COURT:  How is he going to do that?  Is he going

6 to call Sister Munley from Texas?

7      MR. ENGLISH:  He called six officers.

8      THE COURT:  Are they responsible for the pleading?

9      MR. ENGLISH:  They are officers for Marywood.

10      THE COURT:  Why don't you recall somebody then?  I

11 totally agree with you, but I assumed he didn't do that because

12 maybe they weren't authorized.  I don't know.

13      MR. ENGLISH:  I just -- first of all, I don't know

14 what you're -- you want us to admit, what you're alleging are

15 admissions.

16      MR. COHEN:  I am not alleging anything.  They are

17 what they are, okay.  We can talk about this later.

18      THE COURT:  An admission is anything an adverse party

19 says.

20      MR. COHEN:  Yes.  But I think Your Honor has a good

21 point.  We don't need to admit the whole thing if we can -- if

22 I can just call out and discuss with counsel and --

23      THE COURT:  All right.  There are two other exhibits

24 before we get where you're going.  There's exhibit 48 and 54

25 that were not moved.

172

1           MR. ENGLISH:  Plaintiff or joint?

2           THE COURT:  Plaintiff with Dr. Dunleavy.  I don't

3    know whether you want to move them or you don't.

4           MR. COHEN:  Absolutely.

5           THE COURT:  I assume when somebody doesn't move they

6    don't want them.  Are you moving those?

7           MR. COHEN:  Yes.

8           THE COURT:  Any objection?

9           MR. ENGLISH:  Your Honor, you ruled on 54.  That's

10   the subsequent policy.  You --

11          THE COURT:  Oh, 54.

12          MR. ENGLISH:  That was an e-mail discussing the

13   subsequent policy.  You ruled on that.

14          THE COURT:  Okay.  That's done.

15          MR. ENGLISH:  You said 48, Your Honor.  I am fine

16   with 48.

17          THE COURT:  My notes were confused because originally

18   you put up -- wait a minute - 124 and changed to 54.  Yes,

19   that's not admitted.  48 will be admitted, okay.  Do you have

20   any others?

21          MR. COHEN:  I do, Your Honor.  Certainly Plaintiff's

22   Exhibit 36.

23          MR. ENGLISH:  I think exhibit 36 wasn't -- never

24   identified.

25          MR. COHEN:  Stephanie Pete.

1          MR. ENGLISH:  She's not on your witness list.

2          MR. COHEN:  The point is what happened here is -- I

3   asked Stephanie to supplement interrogatory answers, and this

4   is where she did that, okay.  I mean, she should have just had

5   the interrogatory answer changed and have the witness sign it,

6   but I assume that a letter from counsel saying this is what the

7   interrogatory answer is, you know, you're not going to

8   backtrack on that.

9          MR. ENGLISH:  A letter from a lawyer years into the

10  litigation into the dispute is not proper for -- is not

11  relevant and is not proper for -- as evidence to be admitted in

12  this trial.  And in order to admit a document I need a witness

13  for that, and you can't --

14         MR. COHEN:  Are you denying it's authentic?

15         THE COURT:  No, we are not getting into that.  You

16  didn't present it.  You didn't present it.  That's that.  Those

17  are all the ones we have on the master list, the ones that --

18  two I just mentioned, 48, of course 45 I didn't allow.  Those

19  are the only two that were vacant on our list as far as not

20  having been admitted.  So anything that was identified and

21  moved is done is on the list.  You're not missing anything

22  there.  So I don't know if -- what you're talking about now are

23  things that have not been identified in which case I don't know

24  how you're going to move for their admission unless there's an

25  agreement.

1          MR. COHEN:  Would Your Honor mind if I saw the

2    official list of what has been admitted and what's not?

3          THE COURT:  No, I don't mind at all.  We always do

4    that.  People can look at it, sure.

5          MR. COHEN:  I wish I had taken better notes during

6    the trial, but I think I missed a lot.

7          THE COURT:  Before we get there, what else do we have

8    other than this?  I am not pushing you because I am not

9    suggesting you rest or anything.  I'm just trying to figure out

10   -- it's 20 minutes to five.  If you just want to see the list,

11   take your time, go over the list.  I'm going to adjourn.  You

12   can do that.  And then tomorrow morning we'll listen to you on

13   any exhibit questions.

14         MR. COHEN:  I appreciate that, Your Honor.

15         THE COURT:  You have a motion?

16         MR. ENGLISH:  At the end of his case, Your Honor.

17         THE COURT:  Okay.  All right.  Well, let's do that.

18   Otherwise we will be sitting here with nothing to do.

19         MR. COHEN:  I appreciate that.

20         MR. ENGLISH:  You're not going to rest at this stage,

21   you're going to look at that?

22         MR. COHEN:  Not yet.  Come back tomorrow and either I

23   will try to move them or not.  If it's denied, then I'll rest.

24         MR. ENGLISH:  Okay.

25         MR. COHEN:  Then you can make your motion.

175

1          THE COURT:  All right.  We will be adjourned.  You

2    can look at the list.

REPORTER'S CERTIFICATE

    I, Laura Boyanowski, RMR, CRR, Official Court Reporter for
the United States District Court for the Middle District of
Pennsylvania, appointed pursuant to the provisions of Title 28,
United States Code, Section 753, do hereby certify that the
foregoing is a true and correct transcript of the
within-mentioned proceedings had in the above-mentioned and
numbered cause on the date or dates hereinbefore set forth; and
I do further certify that the foregoing transcript has been
prepared by me or under my supervision.


                              _____
                              Laura Boyanowski, RMR, CRR
                              Official Court Reporter

REPORTED BY:

    LAURA BOYANOWSKI, RMR, CRR
    Official Court Reporter
    United States District Court
    Middle District of Pennsylvania
    235 N. Washington Avenue
    Scranton, PA  18503

        (The foregoing certificate of this transcript does not
apply to any reproduction of the same by any means unless under
the direct control and/or supervision of the certifying
reporter.)

1

## $

**$50** [4] - 17:21, 20:23, 22:3, 37:19
**$500** [1] - 19:16

## /

**/KHRULD** [1] - 13:10

## 1

**1** [8] - 1:17, 19:16, 38:5, 53:8, 60:15, 67:21, 167:20, 170:10
**10** [5] - 5:24, 22:9, 38:21, 52:23, 87:21
**100** [1] - 64:6
**103** [1] - 2:8
**105** [1] - 88:2
**108** [1] - 88:8
**11** [15] - 18:24, 19:7, 21:18, 22:10, 25:16, 40:17, 40:19, 45:12, 52:22, 56:15, 88:2, 88:9, 88:18, 114:11, 136:18
**114** [1] - 2:8
**115** [3] - 4:7, 4:19, 35:5
**116** [2] - 2:8, 113:17
**119** [3] - 2:9, 142:3, 144:23
**11th** [2] - 60:16, 142:11
**12** [1] - 2:4
**123** [1] - 2:9
**124** [3] - 91:21, 109:22, 172:18
**127** [1] - 93:15
**128** [1] - 94:12
**13** [5] - 25:21, 46:12, 68:1, 77:19, 153:24
**131** [2] - 2:10, 95:20
**1350** [1] - 1:25
**136** [1] - 96:22
**137** [1] - 2:10
**139** [1] - 2:11
**13th** [12] - 19:7, 26:11, 61:21, 62:3, 62:4, 117:18, 127:12, 136:5, 136:16, 137:2, 138:17, 153:14
**14** [6] - 6:2, 7:10, 26:17, 52:23, 60:15
**141** [1] - 98:2
**147** [1] - 101:8
**148** [1] - 101:16

**15** [22] - 14:4, 46:15, 46:21, 47:2, 47:8, 47:10, 47:12, 47:18, 47:19, 48:6, 48:11, 48:20, 52:21, 54:7, 55:19, 76:23, 76:25, 88:16, 91:22, 91:23, 91:24, 95:20
**155** [1] - 2:11
**158** [1] - 102:15
**159** [2] - 2:12, 102:18
**15th** [3] - 22:1, 130:10, 153:24
**16** [10] - 6:16, 44:20, 58:10, 88:5, 107:13, 108:3, 140:11, 143:17, 150:20, 151:9
**1601** [1] - 1:24
**16th** [7] - 7:15, 26:18, 26:21, 26:22, 30:10, 118:19
**17** [20] - 30:4, 30:5, 30:7, 34:14, 52:21, 53:1, 53:2, 53:3, 53:8, 57:14, 60:23, 65:16, 66:23, 68:17, 77:8, 89:12, 98:3, 108:8, 108:19, 146:16
**175** [1] - 1:16
**17th** [4] - 66:4, 66:15, 145:22, 148:4
**18** [5] - 51:13, 52:22, 56:15, 58:1, 67:18
**1845** [1] - 94:18
**18503** [1] - 176:19
**18th** [1] - 109:25
**19** [6] - 46:12, 66:23, 94:12, 101:7, 101:9
**19087-3340** [1] - 1:17
**19103** [1] - 1:25
**1915** [1] - 61:9
**1980** [1] - 103:21
**1984** [1] - 104:20
**1993** [1] - 140:14
**19th** [1] - 148:18
**1:11** [1] - 89:4
**1:15** [1] - 103:5

## 2

**2** [5] - 20:1, 20:5, 145:21, 167:20, 170:11
**20** [15] - 13:25, 14:4, 18:7, 45:4, 48:5, 52:19, 54:5, 60:22, 60:23, 65:12, 65:14, 77:9, 98:3, 98:4,

174:10
**200** [1] - 1:21
**2000** [1] - 140:15
**2002** [2] - 140:11, 140:18
**2005** [1] - 160:5
**2007** [1] - 45:25
**2009** [1] - 140:19
**2010** [1] - 38:5
**2011** [9] - 3:25, 4:23, 15:5, 16:17, 19:1, 19:16, 46:10, 104:17, 160:16
**2012** [58] - 3:25, 6:16, 7:15, 9:6, 20:11, 22:22, 24:11, 24:15, 25:21, 30:5, 33:16, 34:19, 45:18, 45:19, 46:14, 58:18, 61:21, 62:4, 65:16, 65:21, 66:15, 68:14, 70:5, 70:19, 72:14, 73:21, 75:4, 76:13, 84:11, 87:17, 87:19, 88:4, 88:20, 89:3, 90:8, 98:7, 98:12, 99:3, 100:6, 100:10, 101:6, 104:18, 105:2, 107:10, 109:8, 110:1, 111:1, 112:18, 120:15, 123:15, 127:12, 140:22, 142:13, 145:22, 146:16, 152:21, 160:16
**2018** [1] - 1:12
**21** [4] - 58:1, 72:21, 94:8, 102:16
**212** [1] - 1:17
**21209** [1] - 1:22
**213** [1] - 105:6
**22** [12] - 33:15, 34:14, 34:17, 45:15, 66:25, 92:23, 92:25, 101:17, 101:19, 108:24, 109:17, 154:5
**235** [1] - 176:19
**23rd** [14] - 65:21, 68:14, 70:5, 72:13, 75:4, 86:25, 87:17, 87:19, 105:6, 107:10, 117:3, 118:18, 118:19,

128:3
**24** [10] - 1:12, 51:21, 88:20, 89:3, 100:24, 101:18, 120:19, 132:8, 141:7, 154:5
**24th** [4] - 87:1, 89:19, 90:18, 91:3
**25** [5] - 51:13, 68:12, 69:13, 161:2, 161:13
**26** [4] - 100:13, 101:6, 162:22, 163:9
**27** [3] - 131:19, 163:13, 163:21
**28** [5] - 58:10, 131:19, 164:1, 164:7, 176:5
**2800** [1] - 1:21
**29** [11] - 52:19, 54:1, 54:2, 55:14, 164:11, 164:20, 166:20, 166:22, 167:5, 167:6, 167:13
**2:15** [1] - 103:5
**2nd** [3] - 125:19, 126:11, 129:20

## 3

**3** [6] - 1:10, 2:4, 20:4, 38:2, 47:4, 98:12
**30** [4] - 34:19, 45:18, 45:19, 59:15
**30th** [1] - 33:16
**31** [5] - 54:4, 154:4, 166:20, 167:8, 167:13
**32** [7] - 52:19, 52:20, 52:25, 53:8, 53:12, 58:20, 150:19
**33** [4] - 150:20, 166:21, 167:10, 167:14
**34** [7] - 2:4, 45:7, 51:20, 121:14, 122:5, 132:19, 141:18
**35th** [1] - 120:3
**36** [7] - 129:25, 130:13, 138:19, 152:6, 152:13, 172:22, 172:23
**37** [6] - 122:9, 134:15, 134:20, 152:17, 154:17, 155:3
**38** [1] - 103:22
**39** [3] - 127:8, 130:10, 138:10
**3:14-CV-2404** [1] - 1:6
**3rd** [6] - 98:7, 99:3, 100:5, 100:6, 100:10, 109:8

128:3
**4**
**4** [6] - 20:18, 44:5, 52:21, 59:24, 62:6, 128:21
**40** [10] - 3:15, 3:16, 3:17, 5:8, 13:24, 15:22, 21:6, 113:17, 136:18
**403** [1] - 104:15
**407** [2] - 110:15, 111:1
**41** [10] - 15:3, 15:18, 52:21, 52:22, 55:12, 55:17, 56:15, 114:4, 114:5, 114:14
**42** [4] - 52:22, 56:15, 147:24, 148:9
**43** [3] - 52:23, 145:17, 147:20
**44** [2] - 2:5, 62:6
**45** [1] - 173:18
**46** [2] - 41:4, 41:6
**47** [2] - 116:22, 116:24
**48** [6] - 105:11, 171:24, 172:15, 172:16, 172:19, 173:18
**483** [1] - 112:17

## 5

**5** [4] - 57:14, 70:11, 77:1, 150:19
**50** [1] - 166:13
**500** [1] - 21:15
**51** [3] - 5:22, 66:21, 66:23
**53** [1] - 67:21
**54** [5] - 109:23, 171:24, 172:9, 172:11, 172:18
**55** [1] - 68:12
**58** [2] - 11:22, 12:9
**59** [1] - 2:7
**5th** [1] - 19:1

## 6

**6** [8] - 21:2, 52:19, 53:1, 54:4, 55:14, 59:24, 94:2, 152:21
**61** [1] - 68:17
**62** [2] - 155:7, 155:17
**66** [1] - 69:13
**68** [2] - 70:4
**69** [1] - 70:11
**6th** [1] - 154:24

## 7

**7** [8] - 5:23, 21:8, 56:25, 70:4, 70:12, 84:9, 136:18
**726** [1] - 112:17
**753** [1] - 176:6
**79** [2] - 76:11, 76:12
**7:30** [1] - 48:4
**7th** [2] - 72:16, 112:7

## 8

**8** [7] - 5:23, 21:14, 32:17, 33:9, 48:9, 86:14, 156:3
**80** [1] - 34:6
**81** [2] - 148:14, 149:2
**817** [1] - 44:22
**83** [2] - 133:7, 134:16
**84** [3] - 149:6, 152:1, 152:2
**87** [2] - 145:2, 145:12
**88** [1] - 77:19
**8:45** [1] - 76:20
**8th** [1] - 92:3

## 9

**9** [5] - 15:5, 48:10, 48:11, 162:2, 162:9
**91** [1] - 80:25
**950** [1] - 21:21
**98** [1] - 84:9
**9:00** [2] - 76:21, 84:11

## A

**a.m** [1] - 76:21
**able** [1] - 36:1
**above-mentioned** [1] - 176:8
**absolute** [1] - 83:8
**absolutely** [10] - 59:21, 62:8, 62:12, 85:24, 93:22, 94:11, 137:23, 142:2, 148:25, 172:4
**absurd** [10] - 5:9, 5:10, 37:7, 37:9, 37:14, 38:14, 38:17, 40:24, 41:13, 41:22
**academic** [22] - 4:1, 4:5, 8:20, 8:23, 13:7, 16:2, 16:4, 19:23, 22:16, 32:22, 32:23, 79:17, 79:18, 81:4, 81:5, 81:6, 95:1, 147:13, 158:6, 158:12, 158:17

**Academy** [1] - 131:24
**acceptance** [1] - 93:7
**accepted** [1] - 116:14
**accidentally** [1] - 67:17
**accommodate** [3] - 17:16, 17:19, 44:19
**accomplish** [1] - 156:19
**accord** [3] - 68:20, 79:19, 81:6
**according** [5] - 23:20, 39:3, 98:14, 101:22, 158:25
**accounting** [1] - 78:12
**accurate** [1] - 69:2
**accurately** [3] - 102:2, 146:15, 163:3
**accused** [1] - 95:4
**acknowledged** [1] - 50:11
**acquaintance** [1] - 14:3
**acronyms** [1] - 146:20
**act** [1] - 158:14
**acting** [2] - 10:25, 150:16
**action** [11] - 31:3, 31:18, 32:5, 38:20, 39:14, 83:10, 85:2, 90:2, 100:13, 151:15, 156:10
**actions** [6] - 19:21, 89:11, 89:21, 91:18, 128:18, 134:4
**activities** [1] - 23:6
**actual** [1] - 92:15
**ad** [28] - 97:8, 98:23, 99:19, 100:6, 100:11, 120:13, 121:6, 122:14, 122:15, 125:7, 125:12, 125:18, 130:16, 132:1, 132:16, 138:4, 138:22, 140:23, 140:25, 141:15, 141:23, 142:7, 145:6, 146:5, 146:15, 147:15, 148:24, 149:1
**adaptation** [1] - 95:11
**add** [1] - 55:1
**added** [2] - 93:9, 95:17
**addendum** [1] - 154:12
**adding** [1] - 72:12
**addition** [4] - 45:8, 79:13, 81:1, 90:20

**additional** [4] - 56:18, 112:8, 123:3, 127:12
**address** [8] - 44:22, 52:25, 73:24, 80:3, 81:17, 82:20, 166:5, 166:11
**addressed** [1] - 154:22
**addresses** [1] - 44:21
**adjourn** [2] - 59:13, 174:11
**adjourned** [2] - 103:6, 175:1
**adjudicate** [1] - 154:1
**adjudicated** [4] - 121:7, 132:16, 141:16, 161:22
**adjudicating** [7] - 122:2, 157:24, 158:19, 159:8, 162:1, 162:6, 163:5
**adjudication** [4] - 124:13, 125:4, 130:3
**adjuncts** [2] - 20:6, 22:12
**administering** [1] - 104:4
**administration** [13] - 18:20, 18:22, 40:19, 40:22, 46:8, 52:3, 57:10, 58:12, 95:5, 104:23, 105:4, 151:12, 151:15
**administrators** [3] - 51:18, 58:17, 104:7
**admissible** [3] - 111:4, 167:11, 168:5
**admission** [12] - 128:8, 152:13, 168:3, 168:4, 168:12, 168:18, 168:22, 168:25, 169:7, 169:8, 171:18, 173:24
**admissions** [15] - 167:17, 167:18, 167:19, 167:24, 167:25, 168:7, 168:8, 169:17, 169:18, 169:23, 170:4, 170:5, 170:12, 170:16, 171:15
**admit** [11] - 50:20, 112:2, 128:14, 130:10, 165:22, 169:12, 170:9, 170:11, 171:14, 171:21, 173:12
**admitted** [43] - 4:21,

7:12, 12:12, 15:20, 18:25, 33:10, 34:12, 34:17, 108:6, 108:22, 109:20, 114:17, 121:12, 122:8, 130:14, 134:18, 138:11, 138:20, 144:25, 145:15, 147:22, 148:12, 149:4, 152:4, 152:12, 155:5, 155:19, 161:14, 161:17, 161:19, 162:11, 163:11, 163:24, 164:9, 164:22, 167:13, 167:21, 169:17, 172:19, 173:11, 173:20, 174:2
**Adolf** [3] - 93:20, 93:23, 94:23
**advance** [1] - 134:3
**advanced** [5] - 28:20, 47:12, 133:22, 134:1, 134:7
**adverse** [3] - 168:12, 168:25, 171:18
**advertise** [1] - 22:12
**advertised** [1] - 23:18
**advertising** [2] - 17:7, 21:16
**affairs** [14] - 4:1, 5:19, 13:7, 16:2, 16:4, 19:24, 22:16, 32:22, 32:23, 33:24, 57:6, 147:13, 158:6, 158:12
**affect** [1] - 76:4
**affected** [3] - 63:23, 65:1, 66:19
**affects** [1] - 85:9
**affront** [3] - 83:21, 94:17, 95:9
**affronted** [1] - 64:15
**Africa** [1] - 62:25
**afternoon** [12] - 103:8, 103:14, 103:15, 114:23, 119:20, 119:21, 119:22, 131:8, 139:25, 155:24, 159:21, 159:22
**agenda** [1] - 35:11
**aggressive** [1] - 116:4
**ago** [13] - 7:2, 48:14, 50:21, 51:8, 57:8, 61:23, 67:22, 68:25, 72:14, 78:10, 83:8, 102:13, 143:8

**agree** [20] - 23:5, 23:8, 23:9, 23:11, 102:9, 130:5, 130:8, 138:24, 139:1, 153:20, 165:25, 166:1, 166:20, 167:11, 167:16, 171:3, 171:11
**agreed** [4] - 23:4, 68:22, 127:25, 163:2
**agreement** [5] - 74:11, 93:4, 167:1, 170:22, 173:25
**ahead** [6] - 13:2, 34:22, 41:19, 111:3, 111:11, 136:9
**aides** [1] - 62:12
**air** [1] - 27:17
**ALAN** [2] - 2:4, 3:1
**Alan** [4] - 62:12, 82:11, 124:14, 124:19
**allegation** [5] - 153:8, 168:17, 168:25, 170:19
**allegations** [4] - 153:7, 168:23, 169:16, 170:10
**alleged** [6] - 97:4, 97:5, 97:9, 97:11, 168:7
**alleges** [1] - 4:25
**alleging** [3] - 168:2, 171:14, 171:16
**allow** [6] - 92:8, 99:1, 111:2, 112:3, 112:8, 173:18
**allowed** [2] - 32:15, 37:21
**almost** [5] - 45:11, 46:10, 59:12, 116:10, 140:11
**alone** [1] - 93:8
**aloud** [3] - 107:18, 109:6, 110:9
**altercation** [2] - 29:25, 31:13
**ambiguity** [1] - 112:9
**ambiguous** [1] - 110:24
**amend** [1] - 168:20
**amended** [1] - 170:10
**American** [1] - 147:17
**amount** [2] - 116:7, 151:24
**analysis** [1] - 104:4
**angels** [1] - 51:6
**angry** [3] - 48:14, 97:20, 97:23
**Ann** [1] - 153:23

**ANNE** [1] - 2:6
**Anne** [39] - 7:8, 8:18,
9:12, 10:16, 13:16,
13:20, 27:10, 30:25,
32:6, 35:8, 35:15,
36:2, 36:18, 36:19,
39:1, 47:1, 47:10,
49:12, 50:9, 50:12,
59:23, 60:3, 60:4,
101:25, 105:15,
107:23, 107:24,
109:7, 109:9,
109:13, 115:5,
115:25, 119:2,
121:20, 133:11,
141:11, 147:9,
153:16, 154:3
**Anne's** [4] - 46:21,
48:4, 118:1, 127:25
**annihilation** [1] -
62:21
**announce** [1] - 20:23
**announcing** [1] - 46:5
**answer** [292] - 7:5,
7:23, 8:6, 10:20,
37:24, 41:11, 41:17,
41:19, 44:9, 44:10,
44:12, 44:15, 44:17,
44:19, 44:21, 44:22,
45:6, 45:8, 45:14,
45:16, 45:17, 45:19,
45:21, 45:22, 45:23,
46:2, 46:4, 46:6,
46:9, 46:11, 46:15,
46:19, 47:5, 47:8,
47:10, 47:12, 47:13,
47:16, 47:19, 47:24,
47:25, 48:3, 48:8,
48:10, 48:11, 48:14,
48:16, 48:19, 48:20,
48:25, 49:2, 49:3,
49:5, 49:6, 49:8,
49:9, 49:12, 49:18,
49:23, 50:5, 50:8,
50:15, 50:20, 50:22,
50:24, 50:25, 51:1,
51:2, 51:7, 51:9,
51:12, 51:16, 51:17,
51:20, 51:22, 51:23,
51:25, 57:2, 57:4,
57:10, 57:16, 57:19,
57:21, 58:7, 58:9,
58:13, 58:15, 58:16,
58:19, 58:22, 59:2,
59:5, 60:3, 60:6,
60:8, 60:24, 61:22,
61:24, 62:8, 64:20,
65:7, 65:15, 65:18,
66:9, 66:17, 67:2,
67:5, 67:11, 67:16,

67:20, 68:2, 68:6,
68:10, 68:15, 68:19,
68:24, 69:10, 70:6,
70:9, 70:14, 70:16,
70:20, 70:23, 70:25,
71:4, 71:7, 71:12,
71:19, 71:22, 71:24,
72:14, 72:17, 72:19,
72:23, 73:4, 73:10,
73:13, 73:16, 73:23,
74:4, 74:11, 74:18,
75:3, 75:6, 75:14,
75:17, 75:24, 76:3,
76:9, 76:14, 76:15,
76:16, 76:17, 76:18,
76:22, 76:24, 77:2,
77:6, 77:18, 77:22,
78:3, 78:6, 78:7,
78:8, 78:10, 78:12,
78:13, 78:22, 78:23,
79:2, 80:10, 80:12,
80:16, 81:23, 82:22,
83:5, 83:14, 83:17,
84:8, 84:11, 84:13,
84:16, 84:25, 85:6,
85:19, 86:12, 86:15,
86:17, 86:20, 86:22,
86:25, 87:3, 87:6,
87:14, 87:17, 88:20,
88:22, 88:23, 88:25,
89:3, 89:4, 89:6,
89:7, 89:19, 89:21,
90:4, 90:16, 91:8,
91:12, 91:19, 92:2,
92:5, 92:8, 92:11,
92:13, 92:15, 92:20,
93:20, 93:21, 93:23,
93:25, 94:2, 95:6,
95:8, 95:12, 95:19,
95:23, 96:2, 96:4,
96:8, 96:11, 96:20,
96:21, 97:1, 97:9,
97:13, 97:21, 97:24,
98:6, 98:7, 98:8,
98:13, 98:17, 98:23,
99:2, 99:4, 99:8,
99:13, 99:22, 99:24,
100:8, 100:11,
100:17, 100:19,
101:6, 101:13,
101:21, 102:3,
102:11, 117:10,
117:12, 118:13,
133:24, 135:22,
136:8, 144:8,
144:11, 144:15,
144:17, 144:18,
144:22, 154:9,
167:19, 168:20,
168:24, 169:7,
169:11, 169:17,

170:1, 170:13,
170:16, 171:2,
173:5, 173:7
**answered** [13] - 9:24,
11:5, 11:7, 31:25,
41:16, 41:18, 67:1,
67:16, 119:9,
143:22, 144:4,
144:9, 144:12
**answering** [1] - 134:9
**answers** [5] - 76:4,
168:3, 168:19,
169:21, 173:3
**Anthony** [6] - 133:12,
133:16, 146:24,
149:14, 151:19,
155:15
**Anthony's** [1] - 149:18
**anthropology** [1] -
64:11
**anti** [4] - 16:5, 16:9,
62:14, 124:21
**anti-Muslim** [2] - 16:5,
16:9
**anti-Semitic** [2] -
62:14, 124:21
**anxious** [1] - 164:13
**anyhow** [1] - 37:2
**anyplace** [1] - 106:18
**apart** [1] - 95:15
**apartheid** [1] - 63:1
**apologize** [7] - 27:14,
27:24, 29:9, 29:13,
29:16, 42:8, 115:21
**apologized** [1] - 42:22
**apologizing** [2] -
29:12, 41:9
**apology** [8] - 19:20,
19:23, 20:5, 41:4,
41:14, 41:23, 41:24,
42:14
**appalled** [4] - 62:8,
63:2, 63:14, 74:14
**appeal** [1] - 97:8
**appeals** [9] - 98:15,
98:20, 100:9,
100:20, 110:7,
110:10, 147:7,
161:10, 162:5
**appear** [3] - 48:13,
76:21, 118:17
**appearance** [1] -
22:22
**APPEARANCES** [1] -
1:13
**appeared** [1] - 5:7
**Appendix** [1] - 112:17
**applicable** [2] -
109:15, 156:22
**applied** [1] - 101:1

**applies** [1] - 111:1
**apply** [5] - 115:8,
115:10, 159:3,
176:21
**appointed** [1] - 176:5
**appreciate** [2] -
174:14, 174:19
**approach** [2] - 72:4,
146:22
**appropriate** [13] -
5:12, 7:20, 10:18,
38:18, 47:12, 47:13,
56:21, 57:12, 82:1,
93:14, 106:8, 154:6,
154:11
**appropriately** [2] -
70:22, 90:24
**approval** [4] - 5:18,
22:18, 22:19, 23:2
**approved** [4] - 5:15,
5:17, 22:11, 71:23
**APRIL** [1] - 1:12
**April** [10] - 13:12,
21:5, 98:7, 98:12,
99:3, 100:5, 100:6,
100:10, 141:3, 141:4
**architecture** [1] - 13:9
**areas** [2] - 81:24,
156:17
**argue** [1] - 112:11
**argument** [1] - 36:3
**Arner** [1] - 162:19
**arrange** [3] - 106:14,
115:13, 118:13
**arranged** [3] - 17:6,
117:25, 118:1
**arranging** [1] - 16:18
**art** [1] - 131:21
**Art** [1] - 131:25
**arts** [4] - 3:21, 29:19,
45:12, 45:14
**Asia** [1] - 62:25
**aspect** [1] - 94:6
**aspects** [4] - 22:25,
100:17, 126:14,
134:25
**assault** [3] - 63:4,
85:5, 85:8
**assistance** [2] -
156:19, 156:22
**assistant** [5] - 12:3,
45:9, 131:21,
140:17, 140:18
**assists** [1] - 71:16
**associate** [8] - 45:9,
70:22, 71:13, 78:1,
103:23, 140:8,
140:20, 160:7
**associated** [1] - 34:3
**Association** [2] - 66:1,

147:17
**assume** [8] - 26:23,
44:13, 47:4, 57:15,
128:17, 149:24,
172:5, 173:6
**assumed** [1] - 171:11
**assumption** [2] -
48:18, 129:1
**Atlantic** [1] - 27:20
**atone** [2] - 20:1, 20:2
**atrocity** [2] - 94:25,
95:5
**attached** [2] - 92:7,
93:14, 93:25
**attachment** [2] -
92:13, 141:24
**attachments** [2] -
19:8, 121:15
**attack** [1] - 63:3
**attacks** [4] - 68:4,
85:11, 96:14, 96:15
**attempt** [2] - 83:16,
128:8
**attempting** [3] - 23:23,
51:1, 162:7
**attend** [8] - 17:21,
18:7, 22:5, 22:6,
37:20, 40:13, 40:16,
46:14
**attendance** [13] - 5:7,
17:20, 18:4, 18:7,
22:4, 36:20, 36:23,
36:25, 37:7, 37:10,
37:19, 37:20, 49:24
**attended** [2] - 49:3,
49:4
**attending** [1] - 20:24
**attorney** [3] - 3:7,
12:18, 119:24
**attorneys** [3] - 37:25,
133:23, 151:3
**audio** [1] - 49:9
**auditorium** [1] - 17:16
**August** [1] - 91:9
**authentic** [7] - 4:17,
4:18, 145:10, 148:7,
148:8, 155:13,
173:14
**author** [2] - 78:17,
142:20
**authority** [5] - 8:21,
8:24, 118:3, 118:21,
118:22
**authorize** [1] - 145:24
**authorized** [2] - 90:25,
171:12
**auxiliary** [1] - 157:7
**available** [4] - 53:13,
61:10, 85:2, 115:13
**avenue** [1] - 101:13

**AVENUE** [1] - 1:16
**Avenue** [1] - 176:19
**avoid** [1] - 123:6
**aware** [20] - 4:23,
6:17, 9:4, 9:7, 15:23,
16:1, 17:5, 17:9,
18:9, 18:22, 24:24,
36:13, 44:10, 58:6,
86:10, 86:16, 86:23,
95:22, 96:20, 97:22
**awareness** [1] - 86:5

**B**

**babies** [1] - 27:16
**bachelor** [1] - 3:21
**bachelor's** [3] - 51:24,
51:25, 140:13
**bachelors** [2] - 51:23,
160:10
**backed** [1] - 29:19
**background** [9] -
3:20, 44:24, 60:11,
104:6, 104:22,
120:8, 131:22,
140:12, 160:9
**backtrack** [1] - 173:8
**backwards** [2] - 22:8,
127:4
**bad** [2] - 50:1, 128:12
**BALTIMORE** [1] - 1:22
**Barbara** [2] - 12:1,
12:2
**based** [8] - 22:23,
56:4, 61:3, 95:2,
126:1, 128:19,
149:20, 151:5
**basic** [1] - 82:3
**basis** [1] - 82:22
**bastard** [1] - 29:8
**battles** [3] - 29:1,
29:2, 29:3
**bayonets** [1] - 27:17
**bear** [1] - 32:8
**bearing** [1] - 95:19
**became** [2] - 16:7,
18:9
**become** [4] - 15:23,
16:1, 17:9, 68:8
**becomes** [1] - 38:14
**BEFORE** [1] - 1:9
**began** [3] - 50:9, 88:7,
160:13
**begin** [3] - 47:8,
47:10, 132:10
**beginning** [5] - 50:8,
83:5, 83:6, 126:15
**begins** [3] - 72:16,
101:22, 110:6
**begun** [1] - 87:16

**behalf** [1] - 44:7
**behavior** [2] - 84:1,
96:17
**behind** [2] - 132:11,
149:23
**believes** [1] - 12:6
**belittled** [1] - 95:6,
96:12
**bell** [1] - 51:7
**below** [2] - 19:21,
158:14
**belt** [1] - 146:21
**bend** [1] - 127:4
**benefits** [3] - 91:15,
104:5, 104:16
**best** [5] - 46:18, 78:8,
127:5, 146:14, 169:7
**better** [2] - 136:24,
174:5
**between** [10] - 33:16,
48:4, 71:11, 86:8,
89:9, 91:15, 105:6,
118:19, 142:18,
164:17
**beyond** [5] - 5:9,
12:24, 39:11, 72:10,
99:16
**bias** [3] - 53:21, 138:7
**big** [2] - 17:18, 129:18
**bigger** [1] - 102:5
**biggest** [1] - 16:3
**bill** [2] - 21:3, 162:19
**binding** [1] - 93:5
**bit** [5] - 4:8, 24:2,
68:18, 154:18,
161:25
**bittel** [1] - 121:22
**Bittel** [8] - 141:19,
142:4, 145:2,
145:18, 150:18,
155:8, 155:20,
155:24
**BITTEL** [2] - 2:11,
139:21
**Bittel's** [1] - 154:4
**bittle** [2] - 132:5,
139:25
**bizarre** [5] - 18:8,
22:21, 35:20, 42:4
**black** [1] - 149:24
**blackouts** [2] - 151:2
**blatant** [1] - 95:9
**blind** [1] - 138:2
**blip** [1] - 124:5
**Bloomfield** [1] -
131:25
**blow** [2] - 5:25, 38:22
**blue** [1] - 150:1
**board** [3] - 49:2,
65:23, 66:1

**body** [1] - 69:24
**bold** [2] - 19:14,
148:20
**bonus** [3] - 5:7, 17:20,
18:7
**books** [2] - 34:5, 34:6
**boot** [1] - 118:6
**booted** [1] - 117:19
**bottom** [10] - 4:10,
6:7, 12:2, 30:5,
32:19, 33:17, 42:18,
51:11, 72:5, 88:22
**bounds** [1] - 8:18
**boy** [1] - 62:23
**BOYANOWSKI** [1] -
176:17
**Boyanowski** [2] -
176:3, 176:14
**boys** [1] - 27:18
**breach** [6] - 73:2,
79:6, 80:19, 92:17,
93:4, 111:1
**break** [3] - 44:18,
59:11, 103:3
**Brian** [21] - 4:7, 5:21,
5:24, 5:25, 6:2,
11:22, 40:17, 40:21,
44:1, 70:13, 91:23,
101:7, 107:15,
108:16, 110:6,
114:11, 116:21,
121:1, 142:19,
146:12
**brief** [3] - 59:22,
165:6, 166:15
**briefly** [9] - 3:20,
70:15, 72:18,
104:22, 120:9,
131:22, 140:12,
146:8, 160:8
**bring** [16] - 5:4, 12:25,
53:11, 65:13, 88:9,
92:8, 95:20, 96:15,
98:3, 101:7, 101:16,
113:17, 121:14,
124:17, 132:8, 162:1
**bringing** [2] - 35:17,
52:8
**brings** [1] - 28:10
**brought** [6] - 18:15,
31:20, 40:11, 49:20,
124:24, 132:14
**buck** [1] - 67:9
**bucks** [1] - 34:7
**budgets** [1] - 104:4
**building** [1] - 29:20
**bullet** [16] - 72:16,
73:1, 73:9, 73:11,
73:18, 74:17,
105:19, 106:10,

106:11, 107:1,
107:2, 110:6,
127:14, 127:17,
128:2, 128:21
**business** [1] - 33:24
**BY** [57] - 3:4, 4:22,
7:13, 11:23, 12:16,
13:4, 15:21, 19:9,
33:14, 34:24, 36:15,
41:7, 41:21, 103:13,
108:7, 108:23,
109:21, 113:2,
114:3, 114:6,
114:22, 116:20,
116:25, 118:15,
119:19, 120:22,
121:13, 122:10,
123:11, 125:17,
126:9, 130:15,
131:7, 134:19,
135:25, 136:11,
137:9, 139:24,
145:1, 145:16,
147:23, 148:13,
149:5, 150:6,
151:18, 152:5,
152:16, 155:6,
155:23, 157:9,
159:20, 161:20,
162:12, 163:12,
163:25, 164:10,
176:16

**C**

**cabinet** [14] - 5:4,
5:11, 18:15, 37:4,
38:19, 39:12, 40:3,
62:15, 64:1, 65:1,
66:8, 66:10, 84:4
**cabinet's** [1] - 40:6
**Cabral** [1] - 130:20
**calender** [2] - 65:25,
104:15
**campus** [20] - 7:19,
7:20, 17:7, 20:10,
21:10, 22:22, 31:13,
35:17, 39:23, 46:2,
56:1, 73:9, 73:17,
105:20, 106:10,
117:19, 118:6,
124:8, 124:9, 124:17
**cans** [1] - 21:16
**Canyoncreek** [2] -
44:22, 44:23
**capable** [2] - 106:7,
115:19
**captured** [1] - 49:21
**CAPUTO** [1] - 1:9
**car** [5] - 7:18, 29:19,

29:20, 29:21, 29:22
**care** [3] - 36:24, 104:3,
129:19
**carefully** [1] - 101:14
**cares** [1] - 36:23
**carry** [2] - 21:11,
82:13
**cartoon** [5] - 16:5,
16:6, 16:9, 16:14,
56:17
**case** [23] - 8:19, 9:25,
11:20, 12:23, 32:14,
33:3, 59:19, 60:1,
76:7, 111:24, 112:2,
112:15, 112:20,
125:5, 126:14,
128:14, 129:6,
129:7, 154:23,
165:3, 169:16,
173:23, 174:16
**cases** [3] - 111:2,
159:4, 160:20
**casual** [1] - 124:1
**Catholic** [5] - 61:1,
61:2, 66:1, 95:1
**cc'd** [1] - 102:3
**center** [2] - 104:3,
140:9
**cents** [1] - 5:11
**certain** [12] - 40:2,
66:12, 69:14, 69:15,
69:17, 74:23,
120:14, 132:2,
134:25, 140:23,
151:4, 164:13
**certainly** [18] - 3:21,
10:11, 14:3, 14:14,
20:17, 25:10, 25:12,
29:23, 34:6, 39:19,
79:21, 81:8, 83:6,
93:25, 94:20, 94:25,
101:11, 172:21
**certainty** [1] - 25:1
**certificate** [1] - 176:21
**CERTIFICATE** [1] -
176:1
**certify** [2] - 176:6,
176:10
**certifying** [1] - 176:22
**cetera** [1] - 96:6
**chain** [4] - 13:14,
150:10, 158:13,
164:17
**chair** [9] - 45:11,
69:15, 104:16,
140:20, 140:25,
145:6, 145:7,
158:12, 160:14
**chairing** [1] - 140:22
**chairs** [1] - 69:19

**challenge** [1] - 169:13
**chance** [2] - 67:23, 168:7
**change** [2] - 128:9, 168:19
**changed** [4] - 99:21, 104:20, 172:18, 173:5
**changes** [2] - 110:16, 166:4
**changing** [1] - 72:13
**characterization** [1] - 83:17
**characterize** [1] - 85:5
**characterized** [1] - 62:17
**charge** [4] - 59:4, 104:19, 142:8, 153:5
**charges** [27] - 75:2, 87:2, 87:4, 87:13, 89:2, 92:4, 107:3, 107:6, 120:14, 121:3, 121:7, 121:20, 122:3, 129:23, 132:2, 132:13, 132:17, 140:24, 141:16, 141:22, 142:9, 142:10, 151:17, 157:25, 158:20, 159:9
**charging** [1] - 96:3
**charism** [2] - 61:11, 62:18
**chase** [1] - 169:22
**chat** [1] - 14:8
**check** [2] - 19:16, 165:11
**checking** [1] - 137:18
**checks** [1] - 104:6
**CHERRY** [1] - 1:24
**chief** [3] - 4:5, 8:20, 8:23
**child** [4] - 24:16, 25:11, 27:16, 32:6
**children** [3] - 24:15, 24:17, 62:25
**Choice** [1] - 27:11
**choose** [2] - 21:18, 100:10
**chose** [4] - 30:21, 74:11, 101:9, 130:22
**chosen** [2] - 22:3, 98:25
**chronological** [1] - 78:9
**circuit** [2] - 112:6, 112:7
**Circuit** [6] - 110:25, 111:24, 112:1,

112:3, 112:6, 112:17
**circumstances** [5] - 32:3, 48:1, 57:1, 64:4, 129:16
**circumvent** [1] - 35:10
**citation** [1] - 112:14
**civil** [10] - 30:13, 30:17, 30:22, 79:14, 81:1, 81:25, 96:1, 96:3, 96:7, 96:19
**claiming** [1] - 150:7
**clarification** [5] - 111:18, 112:9, 143:24, 144:1, 144:13
**clarified** [2] - 110:20, 113:4
**clarify** [3] - 26:11, 32:1, 117:23
**clarifying** [2] - 111:3, 112:5
**class** [31] - 5:7, 17:17, 17:18, 18:4, 18:8, 20:20, 22:5, 22:6, 22:7, 33:20, 33:22, 34:2, 37:1, 37:8, 37:10, 37:20, 37:23, 38:7, 38:13, 40:10, 40:14, 40:15, 47:8, 47:10, 47:18, 48:12, 54:8, 55:6, 129:10
**classes** [9] - 14:15, 14:17, 14:18, 15:12, 34:9, 37:17, 37:18, 106:12, 106:14
**classroom** [1] - 17:16
**clause** [1] - 113:13
**clear** [13] - 8:10, 10:20, 32:10, 32:25, 51:12, 79:18, 81:5, 90:1, 107:21, 113:7, 151:13, 157:21
**cleared** [1] - 57:7
**clearer** [1] - 102:22
**clearing** [1] - 29:18
**clearly** [3] - 44:16, 79:9, 80:22
**client** [2] - 45:20, 105:3
**closed** [1] - 23:9
**closely** [1] - 143:1
**closes** [1] - 22:18
**co** [1] - 13:12
**co-April** [1] - 13:12
**Code** [1] - 176:6
**cohen** [1] - 68:5
**Cohen** [35] - 3:7, 13:5, 44:8, 44:9, 50:3, 50:15, 50:17, 53:17, 59:25, 60:1, 67:1,

67:16, 67:24, 70:13, 77:3, 77:12, 77:17, 84:5, 87:12, 87:25, 88:6, 88:19, 89:18, 92:1, 98:5, 101:4, 101:20, 103:8, 103:16, 111:25, 114:25, 119:24, 131:11, 150:22, 166:24
**COHEN** [178] - 1:15, 1:16, 3:4, 4:19, 4:22, 7:13, 11:9, 11:11, 11:15, 11:22, 11:23, 12:9, 12:13, 13:1, 15:19, 19:6, 33:11, 34:16, 34:21, 34:24, 36:12, 36:15, 41:7, 41:21, 43:15, 43:19, 43:23, 44:1, 44:5, 45:2, 45:4, 52:9, 52:12, 52:15, 52:19, 53:7, 53:9, 53:20, 53:23, 54:2, 54:4, 55:13, 55:16, 55:19, 55:22, 56:1, 56:6, 56:15, 56:23, 59:9, 59:15, 59:23, 60:12, 60:14, 67:21, 88:16, 92:25, 94:9, 94:12, 103:9, 103:13, 108:3, 108:7, 108:19, 108:23, 109:17, 109:21, 110:19, 111:12, 111:17, 111:20, 112:14, 112:20, 112:23, 112:25, 113:2, 113:25, 114:3, 114:6, 114:14, 114:18, 116:18, 116:20, 116:24, 116:25, 118:15, 119:11, 119:19, 120:21, 120:22, 121:9, 121:13, 122:5, 122:9, 122:10, 123:4, 123:8, 125:14, 126:4, 130:12, 131:2, 131:7, 134:19, 135:23, 135:25, 136:11, 139:18, 139:24, 144:6, 144:23, 145:1, 145:12, 145:16, 147:23, 148:9, 148:13, 149:5, 149:25, 150:6, 151:9, 151:18,

152:2, 152:5, 152:16, 155:6, 155:20, 156:25, 157:3, 157:5, 159:13, 159:16, 159:20, 161:20, 162:12, 163:9, 163:12, 163:25, 164:10, 164:23, 165:2, 165:10, 166:3, 166:8, 166:17, 166:19, 166:23, 167:4, 167:6, 167:8, 167:10, 167:15, 167:24, 168:1, 168:19, 169:5, 169:11, 169:20, 169:24, 170:3, 170:9, 170:14, 170:17, 170:20, 170:24, 171:16, 171:20, 172:4, 172:7, 172:21, 172:25, 173:2, 173:14, 174:1, 174:5, 174:14, 174:19, 174:22, 174:25
**cold** [2] - 21:15, 21:23
**collaborated** [1] - 95:5
**collaboration** [1] - 72:8
**collaborative** [2] - 71:11, 145:24
**collaborators** [1] - 94:24
**colleague** [3] - 53:15, 59:3, 96:12
**colleagues** [6] - 14:7, 14:8, 24:7, 79:14, 81:2
**collection** [1] - 32:18
**college** [7] - 16:8, 34:3, 36:1, 36:25, 45:12, 45:14, 58:9
**College** [2] - 160:10, 160:12
**Colleges** [1] - 66:2
**colleges** [1] - 13:9
**collegiality** [4] - 79:16, 80:1, 81:4, 81:14
**coming** [3] - 16:20, 22:13, 137:1
**command** [2] - 13:14, 158:14
**comment** [2] - 51:4, 54:8
**comments** [7] - 48:22,

55:7, 57:23, 142:25, 150:3, 150:4, 150:5
**commitment** [1] - 93:5
**committee** [98] - 45:16, 90:25, 92:9, 97:8, 97:18, 98:18, 99:22, 99:25, 100:1, 100:2, 100:6, 100:9, 100:15, 100:20, 100:21, 100:23, 101:1, 101:3, 102:7, 102:10, 102:13, 104:15, 104:16, 120:13, 121:5, 121:6, 121:20, 121:24, 122:1, 122:14, 122:15, 122:20, 123:23, 123:25, 125:7, 125:12, 125:18, 126:1, 126:10, 126:22, 127:3, 127:11, 127:17, 128:23, 129:20, 130:4, 130:17, 130:19, 130:21, 130:22, 132:1, 132:5, 133:5, 133:19, 134:4, 136:2, 138:4, 138:22, 140:23, 140:25, 141:15, 141:17, 141:23, 141:25, 142:7, 142:8, 142:23, 145:6, 145:7, 145:21, 146:2, 146:3, 146:5, 146:15, 147:1, 147:15, 148:5, 148:20, 148:24, 149:1, 149:10, 151:6, 151:11, 152:10, 152:11, 152:20, 153:2, 154:22, 154:24, 160:17, 160:19, 160:20, 162:14, 163:1, 163:4, 163:19
**committee's** [3] - 149:14, 153:1, 164:6
**committees** [7] - 18:3, 98:23, 99:19, 100:2, 104:14, 110:13, 113:15
**common** [1] - 61:17
**communicated** [2] - 18:18, 86:5
**communicating** [1] - 46:7

**community** [5] - 21:4, 21:10, 61:16, 66:25, 116:13
**compare** [2] - 94:3, 94:22
**compared** [1] - 94:15
**competence** [1] - 102:13
**complaint** [14] - 30:13, 30:17, 30:19, 30:22, 31:4, 96:19, 168:1, 168:22, 169:25, 170:1, 170:11, 170:16
**complaints** [2] - 56:20, 156:18
**complete** [4] - 22:11, 52:4, 98:10, 138:23
**completely** [2] - 10:18, 19:13
**compliant** [1] - 70:2
**complies** [1] - 72:19
**comprised** [1] - 90:25
**computer** [5] - 52:8, 80:2, 81:16, 86:17, 86:19
**computers** [4] - 80:2, 81:16, 82:1, 82:2
**conceived** [1] - 82:15
**concern** [2] - 56:19, 94:7
**concerned** [5] - 8:2, 69:12, 80:1, 81:15
**concerning** [1] - 35:10
**concluding** [1] - 60:18
**conclusion** [9] - 39:24, 60:19, 69:11, 93:12, 125:14, 126:5, 128:1, 156:25, 162:25
**condone** [1] - 96:5
**conduct** [3] - 73:2, 115:24, 125:21
**conference** [1] - 78:14
**conferences** [1] - 156:21
**conflict** [2] - 23:19, 39:2
**confused** [3] - 154:18, 170:2, 172:17
**confusing** [11] - 112:6, 143:3, 143:6, 143:14, 143:23, 144:7, 144:15, 144:19, 157:16, 157:20, 159:6
**congratulations** [1] - 24:21
**congregation** [3] - 62:19, 64:2, 94:17

**Conlogue** [1] - 162:19
**connection** [1] - 50:1
**consequence** [2] - 83:8, 83:11
**consequences** [3] - 68:22, 69:7, 75:10
**consider** [15] - 23:9, 47:11, 95:7, 105:18, 106:24, 107:8, 122:1, 122:16, 126:22, 127:6, 135:12, 135:15, 136:2, 136:14, 154:1
**consideration** [5] - 76:6, 99:23, 99:25, 100:2, 100:4
**considered** [10] - 43:1, 45:24, 64:17, 87:9, 126:17, 126:20, 126:21, 127:4, 128:2, 141:25
**considering** [1] - 133:4
**constituted** [1] - 115:23
**construed** [2] - 9:2, 111:21
**consultation** [3] - 71:1, 101:25, 144:19
**consulting** [3] - 151:19, 151:21, 151:22
**contact** [2] - 7:24, 8:3
**contacted** [3] - 7:8, 8:18, 130:20
**contain** [1] - 57:5
**contained** [2] - 23:22, 136:8
**containing** [1] - 62:3
**contempt** [1] - 58:17
**content** [2] - 39:15, 77:5
**contents** [1] - 31:2
**contesting** [1] - 169:14
**context** [3] - 63:17, 83:16, 143:15
**contextually** [1] - 168:15
**contingencies** [1] - 75:19
**contingency** [1] - 74:19
**continue** [2] - 58:24, 128:14
**continued** [3] - 82:12, 84:16, 144:20
**continuum** [1] - 113:13
**contra** [1] - 111:20

**contract** [2] - 111:1, 111:21
**contracts** [1] - 110:16
**contractual** [2] - 111:4, 112:5
**contributed** [1] - 28:5
**control** [1] - 176:22
**convene** [4] - 97:8, 98:22, 136:19, 141:1
**convened** [4] - 102:10, 120:14, 140:23, 141:3
**conversation** [23] - 12:8, 27:3, 30:25, 36:18, 36:19, 36:20, 48:23, 55:15, 57:16, 57:18, 57:24, 64:25, 72:10, 82:4, 89:13, 106:4, 107:7, 109:9, 109:13, 115:5, 115:7, 149:21, 150:25
**conversationalist** [1] - 59:1
**conversations** [3] - 58:23, 58:24, 68:25
**conversing** [1] - 57:19
**convey** [1] - 146:15
**conveyed** [1] - 146:17
**conveying** [1] - 102:2
**conveys** [1] - 163:3
**coordinator** [1] - 104:12
**copied** [1] - 153:13
**copy** [4] - 130:3, 134:1, 164:15
**cordial** [1] - 14:8
**core** [14] - 23:20, 39:2, 39:4, 60:24, 61:5, 63:5, 64:15, 69:25, 80:6, 81:19, 81:20, 93:7, 94:4, 113:9
**Cormarier** [1] - 60:22
**corner** [1] - 10:15
**correct** [58] - 3:12, 3:13, 5:2, 22:5, 27:2, 30:11, 30:12, 40:24, 40:25, 42:20, 60:6, 60:24, 66:9, 70:7, 70:24, 71:24, 73:12, 73:15, 73:19, 75:3, 75:6, 76:15, 76:16, 76:17, 76:22, 77:13, 83:14, 86:25, 88:25, 89:2, 89:6, 90:3, 90:16, 91:10, 91:12, 92:5, 92:16, 92:20, 96:4, 98:21, 98:23, 105:10, 121:7, 135:1, 135:7,

141:14, 142:14, 145:23, 146:23, 151:24, 153:1, 157:14, 158:17, 158:18, 158:21, 159:11, 176:7
**correctly** [5] - 49:20, 73:15, 92:20, 98:13, 158:15
**correspondence** [3] - 90:9, 90:10
**cost** [2] - 34:5, 34:6
**costs** [2] - 34:3, 34:6
**council** [1] - 104:15
**counsel** [9] - 40:5, 40:6, 50:2, 72:10, 112:14, 170:22, 171:22, 173:6
**counseling** [1] - 120:7
**count** [1] - 105:19
**counter** [6] - 43:21, 44:3, 52:5, 52:10, 58:20, 59:17
**countries** [2] - 62:23, 64:3
**country** [1] - 27:22
**counts** [1] - 37:3
**couple** [6] - 15:6, 17:12, 33:12, 34:13, 118:5, 119:14
**course** [17] - 13:13, 15:2, 15:22, 23:2, 28:25, 32:16, 38:19, 42:23, 49:5, 61:25, 64:6, 86:3, 88:13, 92:11, 93:25, 168:5, 173:18
**courses** [1] - 15:10
**COURT** [161] - 1:2, 4:21, 7:12, 11:6, 11:10, 11:13, 11:18, 12:12, 13:2, 15:20, 34:17, 34:20, 34:22, 36:14, 41:18, 43:16, 43:18, 43:21, 45:3, 52:7, 52:11, 52:13, 52:18, 53:2, 53:6, 53:8, 53:16, 53:19, 53:21, 53:24, 54:3, 54:10, 54:12, 54:15, 54:18, 54:21, 55:3, 55:8, 55:11, 56:8, 56:12, 56:20, 59:7, 59:11, 59:16, 59:21, 60:13, 88:14, 88:17, 92:23, 102:24, 103:3, 103:8, 108:6, 108:22, 109:20, 110:18, 111:6, 111:11, 111:16,

111:19, 111:23, 112:10, 112:19, 112:22, 112:24, 113:21, 113:23, 114:5, 114:17, 114:19, 116:17, 118:14, 119:10, 119:12, 121:12, 122:8, 122:25, 123:9, 125:15, 126:6, 126:8, 130:14, 131:3, 134:18, 135:20, 136:7, 139:17, 139:19, 144:5, 144:9, 144:11, 144:14, 144:17, 144:25, 145:15, 147:22, 148:12, 149:4, 152:4, 155:5, 155:19, 157:4, 159:14, 161:16, 161:19, 162:11, 163:11, 163:24, 164:9, 164:22, 165:1, 165:6, 165:11, 165:16, 165:20, 165:23, 166:1, 166:14, 166:16, 166:18, 166:22, 167:3, 167:5, 167:7, 167:9, 167:11, 167:13, 167:25, 168:4, 168:8, 168:11, 168:15, 168:24, 169:3, 169:9, 169:22, 169:25, 170:7, 170:13, 170:15, 170:18, 170:21, 171:3, 171:5, 171:8, 171:10, 171:18, 171:23, 172:2, 172:5, 172:8, 172:11, 172:14, 172:17, 173:15, 174:3, 174:7, 174:15, 174:17, 175:1
**Court** [8] - 28:8, 54:23, 146:19, 176:3, 176:4, 176:15, 176:17, 176:18
**court** [7] - 6:23, 22:21, 50:1, 137:1, 150:11, 151:25, 166:12
**COURTROOM** [1] - 1:10
**courtroom** [2] - 44:12,

60:6
**courts** [1] - 112:6
**cover** [3] - 106:14, 113:11, 129:2
**covered** [3] - 103:1, 106:12, 113:10
**craft** [1] - 84:7
**Cranburg** [1] - 131:24
**crazy** [9] - 5:10, 41:2, 41:3, 41:8, 41:13, 41:22, 41:25
**create** [1] - 27:15
**created** [8] - 31:22, 67:10, 71:23, 85:4, 94:18, 116:2, 117:13, 123:19
**creation** [2] - 67:10, 116:11
**credit** [1] - 33:25, 37:22
**criticizing** [2] - 58:12, 105:4
**critiques** [1] - 152:25
**CROSS** [6] - 2:3, 12:15, 114:21, 123:10, 137:8, 155:22
**cross** [2] - 122:25, 153:9
**crossed** [3] - 8:2, 8:3, 154:25
**crosses** [1] - 55:7
**crowd** [1] - 21:17
**CRR** [3] - 176:3, 176:14, 176:17
**culture** [1] - 63:10
**cultures** [1] - 64:12
**curious** [1] - 47:3
**current** [1] - 44:21
**curse** [1] - 28:7
**cut** [4] - 37:22, 83:17, 88:22, 169:22
**cuts** [1] - 37:22
**cutting** [1] - 51:2
**cycle** [2] - 104:6, 104:9

## D

**damage** [1] - 29:14
**damaged** [1] - 10:2
**damages** [1] - 19:22
**damn** [6] - 9:18, 11:21, 28:4, 28:8, 29:17, 31:21
**dance** [1] - 51:6
**dash** [1] - 109:8
**date** [10] - 25:20, 61:23, 66:5, 77:3, 91:7, 99:1, 109:7,

110:3, 124:14, 176:9
**DATE** [1] - 1:12
**dated** [9] - 15:4, 30:5, 30:6, 33:16, 34:19, 90:12, 98:7, 100:6, 101:6
**dates** [2] - 6:18, 176:9
**Dave** [1] - 117:14
**days** [5] - 25:23, 42:10, 117:22, 118:5, 118:18
**daytime** [1] - 20:20
**deal** [15] - 10:15, 17:18, 27:3, 65:19, 65:20, 66:5, 66:20, 67:8, 67:23, 68:22, 72:1, 74:21, 77:3, 129:16, 170:23
**dealing** [1] - 32:8
**dealt** [8] - 66:5, 67:5, 67:6, 67:13, 67:24, 68:21, 111:24
**dean** [16] - 4:6, 13:15, 16:7, 16:8, 33:5, 45:12, 45:13, 45:24, 47:1, 58:9, 69:16, 69:19, 69:20, 70:21, 77:24, 158:12
**deans** [2] - 13:8, 13:10, 13:15
**debate** [2] - 22:24, 23:2
**December** [3] - 19:1, 19:16, 22:1
**decide** [1] - 39:13
**decided** [6] - 64:16, 73:5, 98:10, 99:9, 101:12, 153:15
**decipher** [1] - 146:20
**decision** [39] - 47:9, 73:10, 73:17, 90:17, 93:13, 98:22, 99:20, 101:14, 105:21, 106:11, 117:23, 118:22, 119:1, 119:6, 122:15, 125:12, 125:19, 126:11, 126:20, 129:21, 130:6, 133:21, 133:22, 134:6, 135:1, 138:22, 138:24, 139:4, 139:6, 151:11, 152:9, 152:11, 153:1, 160:22, 160:23, 160:24, 163:20
**decisions** [7] - 99:18, 101:14, 101:16, 106:8, 118:2,

128:18, 160:25
**deep** [1] - 93:5
**deeply** [2] - 61:8, 87:9
**defamed** [1] - 67:3
**defaming** [2] - 79:22, 81:10
**defend** [1] - 153:6
**Defendant** [1] - 1:18
**defendant** [1] - 111:3
**defendant's** [2] - 36:6, 167:19
**Defendant's** [6] - 15:3, 15:18, 30:4, 33:15, 34:14
**defense** [1] - 121:20
**defenses** [12] - 122:2, 133:5, 142:1
**definitely** [2] - 78:6, 126:21
**degree** [4] - 51:24, 51:25, 52:2, 140:13
**degrees** [2] - 51:21, 120:11
**delegate** [2] - 66:8, 66:17
**delegating** [1] - 66:16
**deliberations** [2] - 125:18, 154:14
**demeaned** [1] - 63:13
**demeaning** [1] - 96:17
**denied** [5] - 169:6, 169:9, 169:10, 170:2, 174:23
**denying** [1] - 173:14
**Dep** [2] - 2:5, 2:7
**department** [8] - 31:16, 45:11, 69:15, 120:6, 131:20, 131:21, 140:7, 160:14
**depended** [1] - 106:4
**depicted** [2] - 62:10, 62:11
**depicting** [1] - 93:19
**deplorable** [1] - 116:15
**deposition** [30] - 3:8, 5:21, 43:20, 43:22, 43:24, 44:1, 53:17, 59:9, 59:23, 60:8, 61:20, 65:14, 70:11, 88:18, 91:22, 91:24, 98:4, 101:19, 103:17, 110:22, 113:16, 113:22, 116:21, 117:6, 131:12, 136:17, 137:4, 150:18, 154:4, 154:13
**depositions** [1] -

44:18
**describe** [3] - 13:6, 14:6, 151:2
**described** [1] - 17:10
**description** [2] - 79:9, 80:22
**deserved** [2] - 9:18
**deserves** [1] - 75:10
**design** [2] - 23:3, 104:5
**designation** [4] - 43:23, 58:20, 59:17, 94:9
**Designations** [2] - 2:5, 2:7
**designations** [6] - 44:3, 52:4, 52:6, 52:10, 52:25, 59:20
**designed** [3] - 23:1, 156:19
**desire** [2] - 85:21, 89:15
**destroying** [1] - 94:20
**destructive** [1] - 138:1
**detail** [4] - 50:6, 77:20, 129:17, 151:24
**determinations** [1] - 113:15
**determine** [2] - 77:5, 102:10
**determined** [4] - 76:8, 76:10, 88:7, 101:25
**develop** [1] - 94:19
**developing** [2] - 61:12, 104:5
**development** [1] - 104:12
**developments** [1] - 75:18
**dialog** [1] - 85:25
**dictator** [1] - 62:20
**dictatorships** [1] - 94:14
**died** [1] - 27:19
**dietetics** [1] - 3:18
**different** [9] - 23:16, 40:13, 78:23, 80:11, 90:1, 117:11, 124:6, 127:20, 154:9
**differently** [3] - 37:5, 124:10
**difficult** [3] - 28:6, 63:16, 69:1
**difficulty** [3] - 14:14, 59:5, 160:21
**diligent** [1] - 155:1
**direct** [12] - 12:24, 13:10, 60:23, 62:22, 64:25, 66:11, 67:14, 69:18, 69:19, 123:7,

140:9, 176:22
**DIRECT** [7] - 2:3, 3:3, 103:12, 119:18, 131:6, 139:23, 159:19
**directed** [1] - 59:20
**direction** [1] - 76:7
**directly** [18] - 19:18, 47:20, 61:11, 62:16, 65:2, 65:3, 65:10, 66:12, 66:19, 70:1, 70:10, 74:5, 75:13, 75:23, 94:13, 124:23, 127:6, 129:12
**director** [6] - 13:10, 13:11, 13:12, 45:10, 60:21, 160:15
**directors** [1] - 66:1
**disbelief** [1] - 137:20
**disciplinary** [3] - 31:24, 32:5, 156:10
**discipline** [34] - 32:20, 47:15, 58:4, 79:19, 81:7, 85:14, 99:9, 99:10, 101:23, 102:18, 109:10, 109:12, 110:11, 113:4, 113:6, 115:1, 115:7, 116:4, 125:8, 125:13, 128:23, 129:8, 129:12, 138:5, 143:11, 143:14, 143:22, 144:7, 156:6, 156:23, 156:24, 157:10, 157:11, 157:19
**disciplined** [1] - 70:8
**disciplines** [1] - 85:16
**discourage** [1] - 112:4
**discovery** [1] - 43:6
**discretion** [2] - 69:15, 69:16
**discriminating** [1] - 96:17
**discrimination** [8] - 79:16, 79:25, 81:4, 81:14, 96:4, 96:5, 96:9, 96:10
**discriminatory** [1] - 94:6
**discuss** [7] - 46:24, 58:4, 66:18, 105:9, 142:8, 153:3, 171:22
**discussed** [7] - 27:15, 126:14, 127:15, 127:17, 153:3, 153:14, 158:1
**discussing** [1] -

172:12
**discussion** [3] -
56:11, 69:5, 146:17
**discussions** [2] -
58:6, 126:18
**disgusted** [2] - 63:2,
63:14
**dislike** [3] - 58:14,
58:17, 58:21
**dismiss** [1] - 58:3
**dismissal** [3] - 156:15,
158:24, 159:10
**dismissed** [8] - 11:3,
11:11, 11:16, 43:8,
50:14, 51:9, 51:10,
51:15
**displayed** [2] - 22:3,
24:1
**dispute** [1] - 173:10
**disseminated** [1] -
117:13
**distasteful** [1] - 9:12
**distressed** [2] - 18:17,
62:12
**distributed** [1] -
115:12
**DISTRICT** [2] - 1:2, 1:2
**District** [4] - 176:4,
176:18, 176:18
**disturbed** [1] - 6:21
**disturbing** [1] - 27:2
**diverse** [2] - 61:16,
63:8
**division** [1] - 158:12
**Doctor** [1] - 127:23
**doctor's** [1] - 84:1
**doctoral** [1] - 120:11
**doctorate** [2] - 140:14,
160:11
**doctrine** [1] - 111:21
**document** [66] - 4:8,
4:16, 5:25, 6:1, 6:10,
11:24, 25:21, 34:18,
65:13, 65:15, 70:15,
70:25, 71:6, 71:7,
71:18, 71:21, 73:20,
74:17, 75:18, 75:22,
88:19, 90:11, 90:19,
92:2, 97:10, 101:20,
105:12, 106:9,
106:18, 107:1,
107:13, 108:9,
109:2, 109:4, 114:7,
114:25, 120:23,
120:25, 121:2,
121:15, 122:11,
129:25, 132:9,
132:20, 138:20,
141:8, 141:9,
141:11, 142:4,

143:7, 145:3,
145:18, 147:25,
148:19, 150:9,
150:13, 151:23,
151:25, 152:18,
153:23, 154:19,
161:5, 162:23,
163:3, 163:14,
173:12
**documentation** [1] -
91:1
**documented** [1] -
23:12
**documents** [6] -
102:20, 143:2,
143:5, 144:20,
149:23, 161:6
**dollar** [1] - 20:20
**dollars** [4] - 20:9,
21:3, 21:8, 42:4
**DONALD** [1] - 1:20
**done** [29] - 8:17,
10:13, 15:6, 19:22,
21:5, 29:14, 30:24,
31:7, 31:10, 33:8,
35:22, 37:13, 40:8,
68:3, 72:11, 83:20,
86:6, 90:14, 96:16,
98:1, 106:15, 111:7,
112:2, 116:1, 125:5,
128:9, 128:15,
172:14, 173:21
**door** [6] - 16:6, 16:14,
20:23, 29:19, 56:17,
111:9
**dot** [2] - 21:12, 153:9
**dotted** [1] - 154:25
**double** [1] - 51:25
**down** [44] - 5:4, 16:12,
16:14, 16:15, 18:10,
18:13, 18:14, 18:16,
18:17, 18:20, 18:21,
18:23, 31:15, 39:10,
39:11, 40:20, 42:1,
43:16, 53:4, 65:8,
65:12, 66:22, 72:5,
72:16, 74:2, 75:19,
76:12, 93:16, 94:20,
96:23, 102:16,
105:19, 106:9,
107:1, 109:14,
113:18, 115:6,
119:12, 131:3,
139:19, 143:19,
158:2, 159:15
**Dr** [196] - 3:5, 4:7,
5:21, 5:25, 6:2, 6:17,
7:14, 8:5, 8:6, 9:23,
11:24, 12:13, 12:17,
12:20, 13:5, 13:21,

14:12, 15:10, 15:11,
15:23, 16:17, 17:6,
18:9, 19:1, 19:2,
23:14, 23:23, 24:5,
24:23, 25:2, 25:18,
26:25, 27:25, 28:15,
30:14, 31:7, 31:24,
33:20, 34:3, 34:19,
34:25, 35:2, 36:6,
38:3, 38:14, 38:23,
39:7, 40:19, 40:22,
42:11, 42:25, 43:8,
43:20, 44:8, 45:5,
45:20, 46:20, 47:1,
47:4, 47:7, 48:2,
49:5, 50:10, 50:15,
53:13, 53:18, 56:18,
62:12, 62:14, 63:23,
64:25, 65:4, 65:9,
65:11, 65:16, 68:18,
70:20, 70:21, 70:22,
71:5, 71:12, 72:23,
72:25, 73:5, 74:4,
75:15, 75:25, 76:20,
77:22, 77:23, 77:25,
78:13, 79:14, 81:2,
81:23, 82:5, 82:23,
83:18, 84:20, 85:21,
86:22, 88:20, 88:24,
89:2, 89:13, 90:22,
92:3, 93:3, 93:13,
94:6, 96:11, 97:20,
98:24, 99:17, 100:8,
100:10, 100:22,
101:2, 103:9,
103:14, 103:17,
105:11, 107:24,
108:8, 108:24,
110:19, 114:7,
114:12, 114:23,
115:12, 115:18,
116:3, 117:2,
117:15, 117:19,
117:23, 119:20,
121:22, 122:23,
123:2, 123:12,
123:19, 124:8,
125:7, 125:18,
125:20, 127:23,
128:2, 128:12,
129:12, 129:21,
130:4, 130:22,
132:5, 132:25,
135:18, 136:1,
137:10, 138:4,
138:7, 139:25,
141:5, 141:19,
142:4, 145:2, 145:8,
145:9, 145:18,
149:13, 151:6,
155:8, 155:20,

155:24, 157:25,
158:19, 159:8,
159:16, 159:21,
161:3, 161:21,
162:19, 162:23,
163:5, 164:1,
164:11, 164:12,
164:23, 172:2
**draft** [10] - 88:1,
133:12, 133:16,
133:21, 133:22,
134:1, 134:5,
149:16, 149:18,
163:2
**drafted** [4] - 87:13,
142:22, 146:1,
169:20
**drafting** [2] - 104:10,
149:11
**draw** [1] - 21:17
**drawing** [2] - 37:23,
72:8
**DRIVE** [1] - 1:21
**driving** [3] - 6:20,
7:18, 26:24
**dropped** [2] - 48:24,
57:25
**dually** [1] - 44:7
**due** [3] - 79:20, 81:7,
90:22
**duly** [6] - 3:1, 103:10,
119:16, 131:4,
139:21, 159:17
**Dunleavy** [35] - 30:5,
30:6, 49:4, 49:8,
49:11, 70:20, 70:22,
71:3, 71:5, 71:12,
72:23, 72:25, 76:16,
77:23, 77:25, 103:9,
103:14, 105:11,
108:8, 108:24,
109:23, 110:20,
113:3, 113:17,
114:7, 114:12,
114:23, 146:22,
148:3, 151:1, 151:6,
151:14, 155:11,
172:2
**DUNLEAVY** [2] - 2:8,
103:10
**Dunleavy's** [4] -
49:16, 71:13,
113:16, 116:21
**during** [13] - 15:22,
17:17, 20:10, 44:17,
50:4, 56:18, 75:14,
84:12, 86:12,
115:21, 146:5, 174:5
**duties** [1] - 104:21

**E**

**e-mail** [77] - 4:17,
4:18, 6:16, 6:20, 7:6,
7:14, 8:11, 12:2,
12:3, 12:5, 15:4,
15:5, 15:10, 18:18,
19:8, 20:5, 22:14,
22:18, 25:17, 26:3,
26:10, 28:18, 30:4,
30:6, 33:15, 33:17,
33:18, 34:19, 35:6,
35:8, 40:20, 40:21,
43:9, 47:3, 57:19,
57:20, 61:19, 62:1,
62:2, 62:8, 65:16,
66:15, 88:21, 88:24,
92:13, 101:24,
109:25, 116:10,
121:19, 122:17,
122:21, 127:1,
127:8, 130:11,
135:3, 135:5,
135:10, 135:14,
136:1, 136:12,
137:3, 137:5,
137:18, 138:11,
145:6, 148:3, 148:7,
148:8, 149:6,
149:10, 152:20,
154:16, 155:11,
161:6, 164:15,
164:17, 172:12
**e-mails** [6] - 22:10,
22:12, 22:15, 26:25,
43:6, 124:3
**E.A.S** [1] - 147:3
**early** [5] - 3:25, 99:9,
104:17, 141:4,
160:16
**earned** [1] - 140:19
**Eastern** [1] - 52:1
**easy** [2] - 15:1, 58:22
**ed** [1] - 104:23
**educate** [1] - 94:19
**education** [4] - 59:2,
61:10, 63:9, 64:10
**Education** [2] - 46:1,
46:4
**educational** [9] - 3:20,
51:21, 63:6, 104:22,
120:8, 131:22,
140:12, 156:13,
160:8
**EDWARD** [2] - 2:9,
119:16
**effect** [1] - 51:4
**effective** [2] - 98:12,
156:16
**effort** [5] - 21:17,

82:10, 82:23, 98:24, 98:25
**egregious** [4] - 63:4, 64:21, 69:7, 85:8
**egregiously** [1] - 84:19
**eight** [5] - 65:22, 91:21, 91:23, 105:19, 150:21
**eighth** [1] - 106:10
**either** [4] - 56:6, 60:20, 125:4, 174:22
**elected** [1] - 97:19
**elements** [6] - 73:14, 74:24, 80:1, 81:15, 87:10, 93:10
**Elliott** [2] - 86:11, 117:14
**embedded** [1] - 6:21
**emergency** [2] - 67:10, 67:11
**emotional** [7] - 9:13, 9:15, 10:1, 27:7, 33:6, 116:9, 124:11
**emotionality** [1] - 33:7
**emotionally** [1] - 63:25
**emotions** [1] - 10:17
**emphasis** [1] - 62:19
**emphasize** [1] - 64:2
**emphasized** [1] - 64:10
**emphasizes** [1] - 64:6
**employed** [1] - 90:15
**employee** [4] - 47:16, 47:18, 77:17, 104:5
**employment** [6] - 89:7, 91:14, 92:19, 97:7, 98:11, 104:9
**empowering** [1] - 94:19
**empowerment** [2] - 61:4, 62:19
**enabling** [1] - 63:7
**encompasses** [1] - 104:3
**encourage** [1] - 88:12
**encouraged** [3] - 37:14, 37:16, 40:8
**end** [32] - 22:25, 26:1, 28:5, 30:13, 50:8, 50:13, 54:4, 72:17, 73:2, 73:10, 73:12, 73:19, 75:1, 75:2, 83:5, 83:7, 85:24, 86:2, 90:5, 91:14, 92:8, 92:19, 94:14, 96:2, 98:13, 101:23, 102:1, 102:23, 104:8, 126:15,

150:11, 174:16
**endeavor** [1] - 71:11
**endorsed** [1] - 129:24
**ends** [1] - 156:20
**enduring** [1] - 61:14
**engage** [2] - 15:1, 65:4
**English** [15] - 34:25, 40:17, 40:21, 42:7, 42:24, 104:25, 140:8, 140:13, 140:17, 140:19, 160:6, 160:7, 160:11, 160:14, 166:4
**ENGLISH** [74] - 1:20, 4:20, 7:11, 11:5, 11:7, 11:12, 11:17, 12:11, 12:16, 12:20, 13:3, 13:4, 15:17, 15:21, 19:7, 19:9, 33:9, 33:12, 33:14, 34:11, 34:18, 36:10, 36:13, 41:5, 41:16, 43:25, 44:3, 44:24, 52:5, 52:8, 53:11, 55:1, 55:4, 55:10, 55:19, 59:19, 60:10, 67:19, 88:12, 94:8, 94:11, 102:25, 119:14, 121:11, 165:13, 165:18, 165:22, 165:25, 166:7, 166:10, 166:24, 167:12, 167:22, 168:6, 168:10, 168:13, 168:21, 169:1, 169:15, 170:25, 171:4, 171:7, 171:9, 171:13, 172:1, 172:9, 172:12, 172:15, 172:23, 173:1, 173:9, 174:16, 174:20, 174:24
**enlightenment** [1] - 74:13
**ensure** [1] - 36:3
**ensuring** [1] - 22:9
**entails** [1] - 97:3
**enter** [1] - 84:21
**entire** [4] - 37:21, 63:15, 69:23, 169:17
**entitled** [1] - 144:2
**environment** [2] - 31:22, 116:11
**ERIN** [2] - 2:12, 159:17
**Erin** [2] - 147:3,

159:16
**error** [2] - 148:20, 148:23
**especially** [6] - 59:3, 62:12, 63:22, 79:14, 81:2, 154:7
**ESQ** [4] - 1:15, 1:19, 1:20, 1:23
**essence** [5] - 49:21, 63:8, 67:4, 69:24, 75:7
**essentially** [1] - 97:9
**establish** [1] - 55:2
**established** [1] - 94:18
**estimate** [1] - 59:15
**et** [1] - 96:5
**ethics** [3] - 79:24, 81:13, 82:1
**ethnicity** [1] - 63:10
**evening** [5] - 21:4, 21:9, 21:16, 22:2, 40:12
**event** [14] - 17:7, 18:1, 18:4, 21:18, 22:2, 22:9, 22:10, 22:13, 22:14, 22:15, 85:2, 132:11
**events** [1] - 134:13
**eventually** [1] - 150:11
**evidence** [42] - 7:10, 12:10, 15:18, 18:25, 23:13, 33:10, 34:15, 100:13, 108:4, 108:20, 109:18, 110:15, 111:2, 111:5, 112:4, 112:8, 112:11, 114:15, 121:10, 122:6, 134:16, 138:11, 138:20, 144:24, 145:13, 147:20, 148:10, 149:2, 152:2, 155:3, 155:17, 161:13, 162:9, 163:9, 163:22, 164:7, 164:20, 167:17, 167:23, 168:14, 173:11
**evil** [6] - 8:12, 11:1, 28:3, 28:8, 29:11
**evolve** [1] - 123:22
**exact** [7] - 51:10, 69:4, 69:6, 69:9, 111:25, 124:14
**exactly** [18] - 5:14, 45:17, 46:16, 46:24, 48:7, 50:18, 65:24, 71:18, 71:19, 87:14,

97:17, 100:19, 101:2, 101:4, 102:12, 130:18, 134:6, 139:13
**EXAMINATION** [13] - 3:3, 12:15, 34:23, 103:12, 114:21, 116:19, 119:18, 123:10, 131:6, 137:8, 139:23, 155:22, 159:19
**examination** [5] - 12:24, 44:8, 56:18, 59:25, 122:25
**examine** [1] - 168:7
**example** [4] - 96:8, 96:9, 169:11
**examples** [2] - 129:3, 129:9
**exasperated** [2] - 97:24, 97:25
**excellence** [2] - 61:3, 62:20
**except** [2] - 50:19, 111:6
**exception** [2] - 54:19, 94:5
**excluded** [1] - 55:16
**exclusive** [1] - 62:10
**excuse** [3] - 37:15, 88:6, 112:23
**executive** [5] - 12:3, 63:13, 69:24, 94:24, 116:7
**exercises** [2] - 79:18, 81:6
**exhaustive** [1] - 106:25
**Exhibit** [11] - 15:3, 15:18, 30:4, 33:15, 34:14, 166:20, 167:20, 170:11, 172:22
**exhibit** [115] - 4:7, 4:19, 5:24, 6:2, 7:10, 11:22, 12:9, 18:24, 19:6, 19:7, 23:12, 25:16, 26:17, 32:17, 33:9, 35:5, 36:9, 36:13, 38:2, 38:21, 47:4, 65:14, 66:21, 70:12, 76:11, 88:9, 88:18, 91:22, 91:23, 91:24, 93:16, 95:20, 96:22, 98:3, 101:6, 101:7, 101:9, 101:17, 101:19, 102:15, 105:11, 107:13, 108:3, 108:8, 108:19,

108:24, 109:17, 109:22, 109:23, 113:21, 114:4, 114:14, 120:19, 121:14, 122:5, 122:9, 127:7, 129:25, 130:10, 130:11, 130:13, 132:8, 132:19, 133:7, 134:15, 134:16, 134:20, 138:10, 138:19, 141:7, 141:18, 142:3, 144:23, 145:2, 145:12, 145:17, 147:20, 147:24, 148:9, 148:14, 149:2, 149:6, 150:21, 152:1, 152:2, 152:6, 152:13, 152:17, 154:17, 155:3, 155:7, 155:17, 156:2, 161:2, 161:13, 162:2, 162:9, 162:22, 163:9, 163:13, 163:21, 164:1, 164:7, 164:11, 164:20, 165:22, 166:21, 166:25, 167:10, 167:16, 170:10, 171:24, 172:23, 174:13
**exhibits** [8] - 36:5, 36:6, 36:11, 165:4, 166:16, 166:25, 167:2, 171:23
**exist** [2] - 27:23, 84:18
**exists** [2] - 36:11, 160:20
**expect** [3] - 78:11, 85:12, 165:23
**expected** [2] - 39:15, 85:17, 93:3
**expedite** [2] - 164:13, 164:14
**expenses** [3] - 19:16, 20:12, 20:14
**experience** [4] - 47:17, 56:9, 62:22, 63:1
**expertise** [1] - 72:9
**explain** [8] - 7:24, 48:1, 51:5, 54:9, 78:20, 80:8, 83:13, 83:16
**explains** [2] - 54:7, 55:25
**explanation** [2] -

75:16, 82:13
**explicit** [2] - 63:12, 63:20
**explicitly** [3] - 68:23, 84:25, 85:9
**exploring** [1] - 30:18
**express** [2] - 36:1, 58:14
**expressed** [1] - 59:6
**expressing** [2] - 56:19, 58:17
**expression** [1] - 93:1
**extension** [1] - 83:25
**extent** [2] - 161:15, 170:25
**external** [1] - 30:8
**extra** [1] - 114:20
**extreme** [1] - 94:3
**extremely** [2] - 94:15, 143:16
**eyeballs** [1] - 150:12
**eyes** [1] - 151:23

**F**

**F.G.C** [1] - 147:1
**face** [1] - 82:2
**fact** [23] - 18:18, 19:25, 22:2, 24:7, 24:24, 29:12, 65:20, 93:3, 97:22, 110:17, 111:10, 112:3, 115:25, 117:12, 117:14, 122:17, 135:3, 135:5, 137:2, 137:3, 152:23, 165:14, 169:12
**facts** [2] - 32:13, 166:12
**faculty** [103] - 3:11, 4:5, 13:13, 13:14, 13:15, 14:22, 15:1, 15:24, 16:8, 18:23, 20:5, 22:11, 25:18, 28:19, 31:20, 32:21, 32:24, 32:25, 33:4, 38:5, 41:10, 47:23, 48:21, 48:23, 51:11, 57:22, 57:23, 57:24, 59:4, 60:20, 61:15, 64:17, 64:23, 72:3, 72:4, 77:10, 79:5, 80:3, 80:18, 81:17, 86:18, 90:25, 91:1, 93:6, 93:14, 96:25, 97:3, 97:18, 97:19, 98:23, 100:3, 100:6, 100:11, 100:15, 100:21, 100:25, 101:2, 104:7, 110:6,

110:10, 110:11, 110:12, 113:8, 116:9, 120:4, 120:13, 121:6, 129:5, 131:15, 132:1, 132:16, 137:21, 139:9, 139:12, 140:5, 140:23, 140:25, 141:15, 141:17, 145:7, 146:5, 147:1, 147:7, 148:5, 148:20, 148:24, 154:22, 158:7, 158:17, 160:2, 160:17, 160:19, 160:20, 160:21, 161:8, 161:10, 161:22, 162:5, 162:13, 162:18, 163:4
**FAGAL** [1] - 1:4
**Fagal** [255] - 3:7, 4:7, 4:19, 4:24, 5:1, 5:6, 6:11, 7:16, 7:17, 8:6, 8:7, 8:8, 8:10, 8:14, 9:4, 9:9, 9:17, 9:23, 10:7, 10:21, 11:2, 11:16, 11:22, 12:6, 12:7, 12:9, 13:17, 13:21, 13:25, 14:12, 14:25, 15:23, 16:5, 16:12, 16:17, 17:6, 17:15, 18:9, 18:13, 18:17, 19:1, 19:3, 19:18, 23:14, 23:23, 24:23, 25:18, 27:12, 27:21, 27:22, 28:3, 28:15, 30:14, 31:7, 31:11, 31:12, 31:24, 33:1, 35:2, 35:5, 35:18, 36:6, 39:7, 40:10, 40:19, 40:22, 41:3, 41:9, 41:14, 41:22, 42:7, 42:11, 42:25, 43:8, 43:12, 44:10, 45:20, 45:25, 46:5, 46:13, 46:16, 47:1, 47:4, 47:7, 47:9, 47:12, 47:16, 47:22, 48:2, 48:15, 49:5, 50:10, 50:19, 50:21, 50:23, 51:1, 51:3, 51:9, 51:14, 51:15, 51:19, 53:13, 58:4, 58:5, 58:13, 58:14, 58:18, 60:2, 62:2, 64:20, 64:25, 65:4, 65:9, 65:11, 67:25, 68:8, 68:14, 68:19, 70:6, 70:8,

70:19, 70:20, 72:17, 72:22, 72:24, 73:1, 73:5, 73:9, 73:17, 73:21, 74:4, 75:6, 75:15, 76:1, 76:14, 76:20, 76:23, 77:5, 77:13, 77:21, 78:13, 81:23, 82:5, 83:4, 83:13, 83:15, 83:18, 84:6, 84:14, 84:20, 86:10, 86:22, 87:2, 87:6, 87:19, 88:3, 88:21, 88:24, 89:2, 89:9, 89:11, 89:13, 89:21, 90:6, 90:23, 91:16, 92:3, 93:3, 93:13, 93:19, 94:1, 95:4, 96:3, 96:25, 97:4, 97:20, 98:7, 98:24, 99:17, 100:8, 100:10, 100:22, 101:2, 102:17, 103:17, 105:3, 105:7, 105:11, 105:20, 106:10, 106:13, 107:24, 107:25, 109:8, 109:10, 109:22, 109:23, 110:3, 110:11, 115:12, 115:18, 116:3, 117:2, 117:7, 117:8, 117:15, 117:19, 117:24, 119:25, 120:14, 121:4, 123:19, 125:20, 127:23, 128:12, 129:12, 130:22, 131:12, 132:3, 132:14, 132:25, 133:5, 133:7, 134:16, 136:1, 138:7, 140:24, 141:12, 142:3, 144:23, 145:2, 145:12, 145:17, 147:11, 147:20, 147:24, 148:9, 148:14, 149:2, 149:6, 152:1, 152:2, 152:20, 152:25, 153:11, 153:18, 154:21, 155:7, 155:17, 161:23, 164:5, 164:18
**Fagal's** [32] - 6:17, 15:10, 33:20, 34:3, 40:14, 45:23, 46:20, 50:25, 82:23, 85:4, 85:21, 86:19, 89:5, 96:7, 122:2, 125:8,

128:2, 129:21, 130:4, 136:3, 136:15, 138:5, 141:22, 142:1, 153:21, 157:25, 158:20, 159:8, 161:7, 162:6, 162:16, 163:5
**fair** [16] - 4:23, 11:17, 11:18, 20:1, 36:12, 44:15, 70:8, 70:9, 76:19, 77:4, 83:17, 135:10, 135:14, 161:21, 163:3, 170:24
**fairness** [1] - 103:1
**fairs** [1] - 158:17
**faith** [5] - 24:4, 30:23, 61:3, 62:13, 95:2
**fall** [2] - 16:17, 22:22
**familiar** [2] - 71:6, 71:8
**families** [2] - 116:12, 116:13
**family** [10] - 6:14, 27:13, 28:3, 28:4, 29:9, 62:16, 63:12, 79:15, 81:3, 96:16
**far** [6] - 8:1, 8:2, 39:18, 39:19, 40:4, 173:19
**fast** [1] - 25:16
**fear** [1] - 111:4
**February** [6] - 20:20, 91:4, 92:3, 109:8, 140:22, 141:1
**Fed** [1] - 112:17
**federal** [1] - 6:23
**fee** [1] - 21:3
**feedback** [3] - 142:22, 146:2, 160:22
**feelings** [1] - 55:25
**fell** [1] - 113:14
**fellow** [1] - 33:4
**felt** [22] - 10:12, 28:2, 37:4, 65:3, 67:5, 75:6, 77:24, 79:13, 80:25, 83:9, 84:18, 85:7, 87:10, 96:14, 97:21, 101:13, 101:15, 117:14, 128:12, 139:8, 139:10, 144:13
**few** [10] - 12:19, 34:25, 40:15, 48:14, 59:20, 78:23, 80:11, 104:20, 165:18, 166:4
**fiduciary** [1] - 104:16
**fight** [3] - 28:25, 29:2,

29:4
**figure** [3] - 143:19, 166:10, 174:9
**file** [2] - 30:16, 101:10
**filed** [8] - 31:17, 96:18, 97:13, 98:14, 100:12, 163:20, 166:4, 169:20
**filing** [2] - 30:13, 31:3
**fill** [3] - 15:10, 15:12, 34:9
**filling** [3] - 14:14, 14:17, 14:18
**film** [1] - 95:17
**final** [11] - 125:12, 126:20, 127:5, 130:3, 134:5, 149:11, 150:9, 152:9, 153:4, 163:1
**finalize** [1] - 98:10
**finalized** [3] - 99:4, 99:5, 146:3
**findings** [1] - 149:14, 149:15, 150:5, 150:8, 151:22, 153:17, 153:21, 154:10, 154:11, 162:25, 164:6
**fine** [10] - 13:2, 17:17, 43:25, 45:1, 60:3, 60:12, 60:13, 114:24, 152:15, 172:15
**finish** [2] - 4:13, 150:23
**finished** [7] - 4:15, 72:19, 82:6, 119:11, 146:10, 165:2, 165:3
**FIRE** [13] - 16:25, 20:9, 20:20, 39:25, 40:4, 46:4, 46:5, 46:8, 46:9, 46:10, 56:25, 57:3, 57:10
**fired** [2] - 22:20, 64:20
**first** [57] - 4:13, 4:15, 6:10, 6:17, 6:25, 17:15, 24:13, 28:17, 30:9, 30:10, 38:25, 45:19, 46:16, 47:6, 48:12, 50:9, 58:23, 62:7, 62:9, 65:9, 66:24, 67:23, 68:3, 70:10, 71:21, 74:17, 75:5, 85:7, 87:13, 88:21, 88:22, 88:24, 89:2, 92:12, 92:15, 111:14, 111:17, 117:22, 118:4, 123:16, 127:17, 132:9, 137:19,

142:7, 142:8,
142:11, 142:15,
142:20, 143:3,
143:9, 149:25,
151:13, 153:1,
171:13
**five** [14] - 8:3, 13:10,
20:19, 24:20, 48:3,
67:22, 68:25, 72:14,
78:10, 83:8, 102:12,
136:19, 162:21,
174:10
**flexibility** [2] - 113:8,
129:15
**flexible** [2] - 113:7,
156:17
**flies** [1] - 82:2
**flip** [1] - 146:8
**floors** [1] - 31:15
**flow** [1] - 69:20
**flower** [1] - 118:20
**focus** [1] - 5:22
**Foley** [17] - 15:4,
15:11, 43:20, 43:24,
44:2, 44:6, 44:8,
45:5, 45:20, 53:18,
56:18, 70:20, 70:21,
76:17, 76:20, 77:23,
105:7
**FOLEY** [1] - 2:5
**Foley's** [2] - 50:15,
77:25
**folks** [1] - 33:22
**follow** [7] - 82:21,
92:5, 95:23, 98:19,
133:18, 144:5, 162:7
**follow-up** [1] - 92:5
**followed** [7] - 100:14,
100:17, 100:19,
101:1, 101:4, 112:6,
129:8
**following** [4] - 135:10,
136:12, 148:3,
153:24
**follows** [7] - 3:2, 44:8,
103:11, 119:17,
131:5, 139:22,
159:18
**food** [3] - 3:22, 21:3,
21:17
**FOR** [2] - 1:2, 2:3
**foregoing** [3] - 176:7,
176:10, 176:21
**foreign** [1] - 160:14
**forget** [2] - 62:7,
165:12
**forgetting** [1] - 27:9
**forgot** [2] - 155:2,
165:4
**forgotten** [1] - 154:15

**form** [3] - 85:11,
91:19, 94:16
**formal** [6] - 30:17,
30:19, 153:21,
154:6, 154:10
**former** [1] - 25:8
**forth** [2] - 90:11, 176:9
**forum** [1] - 92:8
**forward** [5] - 26:25,
31:3, 31:6, 97:17,
151:25
**forwards** [1] - 31:6
**fought** [1] - 29:1
**Foundation** [2] - 46:1,
46:3
**foundation** [1] - 41:6
**foundational** [1] -
81:20
**founded** [1] - 61:9
**founding** [2] - 61:8,
62:18
**four** [13] - 13:8, 20:19,
45:13, 55:19, 57:8,
61:23, 74:13,
129:23, 129:24,
142:18, 154:13,
169:5, 170:16
**frankly** [1] - 169:4
**Fred** [22] - 12:6, 35:9,
36:16, 48:6, 48:8,
58:22, 121:19,
122:21, 127:1,
130:19, 134:24,
141:12, 141:22,
142:9, 147:11,
152:20, 153:18,
154:21, 161:7,
164:5, 164:13,
164:17
**Fred's** [3] - 127:12,
142:9, 154:23
**FREDERICK** [1] - 1:4
**Frederick** [4] - 44:10,
45:20, 60:1, 119:25
**free** [7] - 17:3, 21:15,
21:17, 22:13, 39:4,
39:8, 39:25
**freedom** [6] - 79:17,
79:19, 81:4, 81:5,
81:6
**frequently** [1] - 71:16
**Friday** [2] - 25:21,
127:11
**friend** [1] - 14:3
**friends** [1] - 22:25
**front** [3] - 65:13,
65:15, 70:15
**fuhrer** [1] - 93:22
**full** [2] - 45:9, 161:10
**funny** [5] - 27:21,

28:8, 123:17, 124:25
**future** [4] - 23:19,
39:1, 75:8, 83:1

## G

**Gail** [2] - 102:2,
130:20
**Gannon** [3] - 25:22,
26:10, 26:21
**Gannon's** [2] - 6:16,
7:14
**garbage** [1] - 116:10
**Garvey** [4] - 33:16,
33:17, 33:23, 34:19
**general** [11] - 14:21,
19:10, 48:22, 55:24,
56:4, 57:24, 59:16,
128:25, 129:17,
154:19
**generally** [2] - 5:18,
24:7
**generated** [3] - 70:25,
71:3, 71:19
**genre** [1] - 151:24
**genuine** [2] - 61:6,
61:7
**German** [2] - 27:20,
51:25
**germane** [1] - 170:21
**gifts** [1] - 61:12
**Gihadwatch.org** [1] -
22:24
**giveaway** [2] - 18:3,
18:5
**giveaways** [1] - 18:3
**given** [7] - 21:24,
61:12, 99:23,
105:15, 105:16,
132:12, 161:7
**global** [2] - 64:9,
64:10
**goal** [1] - 66:5
**God** [1] - 61:12
**gracious** [1] - 32:7
**gradual** [1] - 156:20
**graduate** [1] - 140:15
**graduation** [1] - 20:16
**grandchildren** [1] -
24:20
**grateful** [1] - 32:9
**gratuitous** [2] - 83:25,
85:7
**grave** [1] - 94:6
**great** [6] - 14:9, 28:2,
63:16, 65:3, 94:5
**greater** [1] - 125:24
**green** [1] - 150:2
**greeted** [1] - 78:14
**grew** [1] - 27:13

**grievance** [41] - 97:1,
97:3, 97:13, 97:20,
98:10, 98:14, 98:15,
98:20, 100:9,
100:12, 100:15,
100:20, 100:21,
101:1, 101:2,
101:10, 110:10,
145:7, 147:1, 148:5,
148:20, 154:22,
157:25, 159:9,
160:17, 160:19,
160:20, 161:7,
161:8, 161:9,
161:22, 162:1,
162:6, 162:13,
162:16, 163:4,
163:5, 163:18,
163:20
**grievances** [4] -
110:7, 147:7,
161:10, 162:5
**ground** [1] - 60:7
**grounds** [1] - 93:9
**guess** [9] - 14:4,
17:16, 21:20, 32:10,
84:1, 95:15, 131:19,
133:17, 149:24
**guidelines** [4] - 35:10,
70:17, 71:8, 128:25
**gun** [1] - 129:10
**guy** [1] - 118:6
**guys** [1] - 169:14

## H

**half** [6] - 53:4, 57:8,
61:23, 70:13, 138:3,
154:13
**hallway** [2] - 10:13,
31:11
**handbook** [5] - 38:5,
38:9, 72:4, 129:17,
129:18
**handed** [1] - 171:2
**handle** [2] - 9:14,
165:14
**handling** [1] - 66:16
**hands** [1] - 166:12
**handwriting** [4] -
107:16, 109:1,
109:2, 109:4
**hang** [2] - 23:1, 23:3
**hanging** [1] - 46:5
**happenstance** [1] -
124:12
**happy** [6] - 9:19,
10:16, 31:1, 31:2,
31:25, 56:8
**harassing** [1] - 96:17

**harassment** [4] - 96:5,
96:8, 96:9, 96:13
**hard** [7] - 15:9, 15:11,
29:3, 64:8, 87:22,
102:11, 164:15
**harm** [27] - 10:9,
10:10, 10:11, 10:12,
10:22, 51:16, 51:19,
66:25, 68:3, 84:15,
84:16, 84:17, 84:19,
84:20, 84:21, 85:3,
85:18, 116:3, 116:5,
116:7, 116:9, 117:8,
127:17, 127:19,
127:21, 127:24,
154:2
**harmful** [4] - 85:13,
85:14, 85:15
**hate** [1] - 31:1
**hatred** [1] - 32:16
**head** [1] - 51:6
**heading** [1] - 95:25
**hear** [8] - 39:9, 57:12,
74:4, 120:17,
120:20, 123:4,
135:20, 159:23
**heard** [7] - 5:9, 17:22,
17:24, 36:3, 49:25,
54:16, 57:12
**hearing** [2] - 75:25,
164:14
**hearsay** [5] - 52:20,
54:12, 54:18, 54:24,
55:11
**held** [4] - 49:2, 56:11,
68:14, 78:14
**HELEN** [2] - 2:11,
139:21
**Helen** [1] - 138:14
**hell** [1] - 10:13
**help** [5] - 25:13, 30:20,
74:1, 124:17, 166:24
**helping** [1] - 61:14
**hereby** [1] - 176:6
**hereinbefore** [1] -
176:9
**heritage** [1] - 64:7
**hi** [5] - 119:23, 119:24,
123:12, 137:10,
140:1
**hierarchy** [1] - 158:11
**higher** [2] - 104:23,
158:13
**highlight** [2] - 107:16,
142:19
**highlighted** [3] -
150:1, 150:2, 156:8
**highly** [2] - 62:9, 67:3,
146:1
**Hills** [1] - 131:25

**himself** [11] - 10:9, 10:10, 10:22, 51:16, 51:19, 67:25, 68:9, 84:15, 84:21, 84:24, 117:9
**hints** [1] - 143:10
**hired** [1] - 150:16
**Hitler** [18] - 25:6, 27:10, 62:10, 62:11, 62:20, 63:18, 93:20, 93:23, 94:2, 94:3, 94:15, 94:23, 95:18, 95:22, 95:23, 95:24, 123:13, 137:14
**hits** [1] - 28:21
**hoc** [28] - 97:8, 98:23, 99:19, 100:6, 100:11, 120:13, 121:6, 122:14, 122:15, 125:7, 125:12, 125:18, 130:16, 132:1, 132:16, 138:4, 138:22, 140:23, 140:25, 141:15, 141:23, 142:7, 145:6, 146:5, 146:15, 147:15, 148:24, 149:1
**Hofstra** [1] - 3:22
**hold** [2] - 162:13, 162:20
**holding** [1] - 165:11
**Holocaust** [1] - 27:14
**home** [5] - 6:20, 82:20, 124:24, 137:17
**honest** [2] - 133:17, 139:7
**honestly** [1] - 47:14
**Honor** [82] - 4:19, 4:20, 7:9, 7:11, 11:5, 11:8, 11:17, 12:9, 12:11, 12:20, 13:3, 15:17, 33:9, 34:11, 34:21, 36:10, 41:5, 41:17, 43:19, 52:5, 52:9, 55:10, 88:13, 102:25, 108:3, 108:5, 108:19, 108:21, 109:17, 110:14, 110:25, 111:9, 113:1, 113:18, 114:1, 114:14, 118:11, 119:9, 119:15, 121:9, 122:5, 123:1, 131:2, 135:17, 139:18, 144:3, 144:23, 145:12,

147:20, 148:9, 149:2, 149:3, 149:22, 152:3, 155:17, 155:18, 162:9, 162:10, 163:10, 163:21, 163:23, 164:7, 164:20, 164:25, 165:2, 165:13, 165:19, 166:17, 167:12, 168:6, 168:13, 168:21, 169:1, 170:25, 171:4, 171:20, 172:9, 172:15, 172:21, 174:1, 174:14, 174:16
**HONORABLE** [1] - 1:9
**honors** [2] - 45:10, 160:15
**hope** [2] - 64:6, 146:20
**hoping** [2] - 74:3, 146:19
**horrified** [2] - 27:6
**host** [1] - 18:1
**hostile** [2] - 31:22, 116:11
**hosting** [1] - 20:19
**hot** [5] - 29:5, 29:7, 29:10, 57:16, 57:18
**hour** [2] - 103:4, 138:3
**hours** [1] - 59:12
**house** [2] - 27:13, 72:9
**hum** [7] - 72:18, 72:20, 73:10, 74:18, 86:25, 87:6, 89:6
**human** [4] - 28:4, 63:16, 103:23, 104:19
**hundred** [4] - 10:18, 24:25, 34:7, 138:25
**hung** [2] - 4:24, 5:1
**hungry** [1] - 88:11
**hurtful** [3] - 28:9, 28:13

---

**I**

**I.s** [2] - 153:9, 154:25
**ice** [1] - 27:19
**idea** [6] - 5:6, 30:23, 59:16, 118:20, 119:8, 137:15
**identification** [7] - 70:12, 88:18, 91:23, 91:25, 98:4, 101:19, 150:21
**identified** [6] - 34:15,

166:22, 166:25, 172:24, 173:20, 173:23
**identify** [2] - 4:11, 105:14
**identifying** [1] - 156:17
**identity** [3] - 61:1, 61:2, 84:18
**ignore** [1] - 151:5
**ill** [1] - 82:15
**Illinois** [2] - 52:1, 52:2
**image** [1] - 27:14
**imagine** [2] - 24:25, 26:19
**immediate** [14] - 10:9, 10:10, 10:22, 28:17, 51:16, 51:19, 66:24, 84:15, 116:5, 116:7, 117:8, 117:15, 117:17, 127:17
**immediately** [16] - 7:8, 7:15, 7:17, 19:15, 31:7, 31:8, 65:19, 65:20, 67:5, 67:15, 74:6, 89:6, 89:8, 91:14, 92:19, 97:14
**immersed** [2] - 124:3, 125:5
**imminent** [1] - 118:25
**impact** [6] - 25:8, 82:10, 84:2, 84:3, 84:4
**impacted** [2] - 25:10, 25:12, 63:25
**impaled** [1] - 27:17
**implemented** [1] - 158:23
**implementing** [1] - 104:11
**implicating** [3] - 79:15, 81:3, 156:14
**implications** [1] - 124:21
**implied** [1] - 20:18
**importance** [2] - 64:10, 77:25
**important** [8] - 8:25, 17:4, 77:7, 77:11, 87:10, 117:14, 167:18, 169:6
**impression** [1] - 20:15
**improper** [1] - 100:13
**improperly** [2] - 97:6
**IN** [1] - 1:2
**inadmissible** [3] - 52:20, 110:15, 112:1
**inappropriate** [3] - 36:25, 115:24, 170:5
**inappropriately** [1] -

169:7
**incentives** [1] - 104:8
**incident** [6] - 4:24, 13:21, 61:21, 62:4, 69:21, 105:2
**incidents** [1] - 156:18
**include** [3] - 22:1, 22:10, 153:4
**included** [2] - 88:25, 90:21
**including** [5] - 20:6, 22:10, 22:11, 77:21, 104:14
**inclusive** [1] - 106:21
**incomprehensible** [1] - 63:18
**inconsistent** [1] - 170:4
**inconvenience** [1] - 34:8
**incorrect** [1] - 128:15
**incredible** [1] - 116:7
**incredibly** [2] - 32:7, 118:23
**incur** [2] - 34:3, 34:8
**incurred** [1] - 34:6
**indeed** [1] - 50:11
**independent** [7] - 133:19, 134:11, 134:12, 151:7, 151:16, 151:17, 151:20
**independently** [2] - 150:16, 151:12
**INDEX** [1] - 2:1
**indicate** [2] - 85:21, 157:7
**indicated** [4] - 86:3, 89:13, 90:20, 100:19
**indicates** [4] - 19:21, 92:3, 106:19, 159:1
**indicating** [1] - 93:10
**indication** [3] - 15:11, 85:20, 89:22
**individual** [4] - 30:19, 69:12, 93:7, 99:15
**Individual** [2] - 46:1, 46:3
**industrial** [1] - 104:24
**inference** [1] - 128:20
**inform** [1] - 91:13
**informal** [1] - 156:12
**information** [8] - 44:25, 56:19, 69:20, 74:1, 74:3, 128:19, 132:12, 132:25
**informational** [1] - 71:24
**informed** [3] - 6:25, 86:22, 122:15

**informing** [1] - 164:6
**informs** [1] - 65:17
**initial** [2] - 124:1, 138:21
**initiating** [2] - 96:25, 97:20
**inner** [1] - 127:21
**innocent** [1] - 62:21
**input** [5] - 100:3, 149:14, 149:15, 150:7, 150:8
**instance** [3] - 156:24, 157:19, 159:10
**instead** [2] - 109:22, 158:14
**institution** [15] - 61:3, 64:8, 65:3, 69:23, 70:2, 74:10, 75:8, 79:8, 80:21, 84:17, 85:9, 85:19, 95:2, 127:22
**institutional** [1] - 60:21
**institutions** [1] - 94:18
**instructor** [1] - 140:15
**insulted** [2] - 28:22, 62:16
**intend** [1] - 153:17
**intended** [4] - 28:14, 85:23, 156:16, 160:25
**intentionally** [2] - 28:15, 75:14
**interdependent** [2] - 61:16, 63:8
**interested** [1] - 75:25
**intermediary** [1] - 90:16
**internally** [1] - 30:16
**international** [1] - 104:7
**internet** [1] - 124:22
**interpretation** [3] - 95:3, 102:8, 157:1
**interrogatories** [1] - 114:10
**interrogatory** [4] - 116:4, 173:3, 173:5, 173:7
**intervention** [1] - 156:19
**interview** [1] - 60:16
**introduced** [1] - 78:15
**introducing** [1] - 111:13
**invited** [3] - 35:2, 45:25, 58:9
**inviting** [1] - 39:7
**invoked** [1] - 143:19
**involve** [2] - 47:20,

62:14
**involved** [14] - 18:20,
31:24, 32:4, 32:11,
63:7, 64:18, 65:2,
69:22, 69:23, 69:24,
69:25, 79:23, 81:12,
91:1
**involves** [3] - 65:23,
68:13, 168:24
**involving** [2] - 70:19,
156:20
**irrelevant** [6] - 52:20,
52:21, 52:22, 53:6,
53:8, 53:10
**irreparable** [1] - 85:18
**Islam** [1] - 22:25
**issue** [17] - 16:3,
16:20, 23:17, 36:4,
39:18, 39:20, 96:7,
102:14, 111:1,
111:25, 118:24,
118:25, 125:23,
127:6, 127:13,
154:8, 168:16
**issues** [3] - 15:23,
16:1, 122:16
**issuing** [1] - 19:20
**items** [1] - 90:19
**itself** [3] - 97:16,
100:16, 127:6

**J**

**JACKSON** [2] - 1:20,
1:23
**janitor** [2] - 9:16, 33:3
**January** [47] - 6:16,
7:15, 9:6, 19:7,
25:21, 26:21, 26:22,
30:5, 30:6, 33:16,
34:19, 46:13, 49:2,
51:14, 57:14, 58:18,
61:21, 62:3, 62:4,
65:16, 65:21, 66:15,
68:14, 70:5, 70:19,
72:13, 73:21, 75:4,
76:13, 84:11, 86:25,
87:1, 87:17, 87:19,
88:4, 88:20, 89:3,
90:18, 92:6, 105:2,
105:6, 106:14,
107:10, 117:3,
118:17, 123:15,
128:3
**Jersey** [1] - 160:11
**Jewish** [12] - 9:13,
24:6, 24:9, 27:9,
27:18, 28:23, 28:25,
62:13, 63:25, 79:15,
81:2, 96:11

**Jihad** [1] - 22:23
**JILL** [1] - 1:23
**Joan** [1] - 50:15
**job** [4] - 28:3, 31:11,
45:7, 169:15
**Joe** [2] - 33:23
**joint** [60] - 5:24, 6:2,
7:10, 18:24, 23:12,
25:16, 26:17, 32:17,
33:9, 38:2, 38:21,
40:17, 107:13,
108:3, 108:8,
108:19, 108:24,
109:17, 114:4,
114:14, 120:19,
121:14, 122:5,
122:9, 127:7,
129:25, 130:10,
130:11, 130:13,
132:8, 132:19,
134:15, 134:20,
138:10, 138:19,
141:7, 141:18,
152:6, 152:12,
152:17, 154:17,
155:3, 156:2, 161:2,
161:13, 162:1,
162:9, 162:22,
163:9, 163:13,
163:21, 164:1,
164:7, 164:11,
164:20, 165:14,
166:21, 167:10,
167:13, 172:1
**jokes** [1] - 55:6
**Jonathan** [6] - 3:7,
44:9, 59:25, 103:16,
119:24, 131:11
**JONATHAN** [2] - 1:15,
1:16
**Joseph** [3] - 33:16,
33:17, 34:19
**jotting** [1] - 109:14
**JR** [2] - 1:4, 1:20
**Judge** [1] - 29:9
**judicial** [1] - 167:19
**July** [18] - 38:5, 90:7,
90:12, 109:25,
125:19, 126:10,
127:11, 129:20,
130:10, 136:5,
136:16, 137:2,
138:16, 152:21,
153:14, 153:23,
153:24, 154:24
**jump** [1] - 19:25
**June** [3] - 45:18,
45:19, 148:18
**Junior** [1] - 60:2
**jury** [1] - 52:14

**JURY** [1] - 1:11
**justice** [1] - 81:23
**justified** [5] - 10:8,
10:21, 10:25, 154:2,
154:9

**K**

**Kansas** [1] - 120:10
**KATHLEEN** [1] - 1:19
**Kathleen** [2] - 123:12,
137:10
**keep** [7] - 11:12, 20:8,
31:14, 60:14, 68:23,
88:12, 124:4
**keys** [1] - 82:19
**kids** [5] - 28:2, 28:10,
28:24, 124:16
**kill** [1] - 94:2
**kind** [21] - 10:15,
14:25, 16:10, 17:1,
17:3, 35:24, 37:2,
41:25, 72:1, 76:4,
111:4, 116:1,
118:19, 123:17,
124:1, 124:3,
124:11, 127:4,
127:19, 129:1,
160:21
**kindly** [1] - 33:25
**kinds** [3] - 29:1,
113:10, 159:2
**King** [2] - 26:6, 26:22
**kitchen** [1] - 21:22
**knowing** [5] - 28:19,
31:15, 32:12, 32:14,
87:11
**knowledge** [13] -
24:23, 25:17, 52:20,
52:22, 52:23, 53:3,
54:6, 55:4, 55:21,
56:4, 57:17, 58:15,
86:20
**known** [3] - 13:23,
24:7, 45:21
**knows** [2] - 24:9,
124:23

**L**

**LAKE** [1] - 1:21
**landed** [1] - 140:18
**language** [1] - 102:22
**languages** [1] -
160:14
**large** [2] - 21:17,
68:13
**larger** [1] - 83:16
**last** [22] - 21:11,
34:18, 35:8, 45:13,

45:18, 52:24, 58:20,
90:6, 90:21, 98:25,
101:22, 106:12,
107:16, 107:17,
108:16, 108:17,
110:6, 114:11,
138:9, 138:15,
142:20, 155:10
**late** [6] - 3:25, 4:23,
46:10, 104:17,
141:4, 160:16
**Laura** [2] - 176:3,
176:14
**LAURA** [1] - 176:17
**lawsuit** [1] - 31:17
**lawyer** [2] - 133:14,
173:9
**lawyer's** [2] - 150:12,
151:23
**lawyers** [1] - 150:14
**lays** [1] - 92:6
**lead** [1] - 129:11
**leader** [1] - 65:2
**leading** [2] - 73:20,
135:18
**leaned** [1] - 139:10
**learn** [1] - 95:10
**learning** [3] - 59:5,
97:13, 140:9
**least** [10] - 6:10, 6:12,
6:21, 17:13, 21:6,
27:3, 65:21, 78:5,
137:5, 166:19
**leave** [7] - 43:13, 73:9,
73:17, 82:6, 82:7,
105:20, 106:10
**leaving** [3] - 12:6,
12:7, 43:1
**lecture** [1] - 20:24
**led** [2] - 78:4, 87:20
**leeway** [2] - 12:23,
123:6
**left** [4] - 42:15, 83:2,
102:17, 128:12
**leftover** [1] - 21:21
**legal** [4] - 71:17, 93:1,
125:14, 126:5
**legitimate** [1] - 39:19
**length** [1] - 158:1
**lesser** [2] - 33:2, 126:2
**letter** [42] - 19:1, 19:2,
19:5, 23:14, 23:22,
26:19, 35:19, 38:23,
42:3, 87:8, 87:15,
87:16, 88:20, 89:5,
89:10, 89:19, 90:3,
90:6, 90:13, 91:4,
91:6, 91:8, 91:11,
92:3, 92:6, 92:11,
92:12, 92:13, 92:15,

95:25, 98:6, 99:2,
99:3, 100:5, 100:12,
101:5, 121:19,
163:17, 164:5,
173:6, 173:9
**letters** [2] - 91:5,
97:22
**letting** [1] - 163:18
**level** [5] - 37:13,
69:22, 75:9, 85:16,
104:14
**leveled** [1] - 111:7
**LEVINE** [2] - 2:4, 3:1
**Levine** [34] - 3:5, 4:8,
5:21, 5:25, 6:2, 7:14,
8:5, 11:24, 12:13,
12:17, 12:21, 13:5,
24:5, 25:2, 27:25,
34:19, 34:25, 38:3,
38:14, 38:23, 58:16,
62:13, 62:14, 63:23,
65:17, 68:19, 79:15,
81:2, 82:11, 94:6,
96:11, 123:3, 124:9,
124:15
**Levine's** [1] - 68:18
**LEWIS** [2] - 1:20, 1:23
**liberal** [1] - 29:19
**library** [1] - 13:11
**life** [9] - 24:10, 25:10,
25:11, 28:5, 61:6,
61:7, 94:13, 94:21
**lifetime** [1] - 63:15
**likely** [2] - 143:11,
146:2
**likening** [1] - 93:23
**line** [81] - 8:3, 42:18,
44:20, 45:4, 45:15,
46:12, 48:20, 51:11,
51:13, 51:21, 52:22,
53:1, 54:3, 54:5,
54:7, 55:7, 55:18,
56:25, 57:14, 58:1,
58:10, 58:20, 59:24,
60:15, 60:23, 62:6,
65:12, 65:14, 65:22,
66:23, 66:25, 67:18,
67:21, 68:1, 68:12,
68:17, 69:13, 70:4,
70:11, 72:21, 74:2,
75:19, 76:12, 77:1,
77:8, 77:9, 77:14,
77:19, 83:24, 84:9,
86:14, 87:21, 88:2,
88:5, 89:12, 90:14,
91:21, 91:23, 92:22,
92:23, 92:25, 93:15,
93:18, 94:8, 95:6,
95:21, 96:24, 98:3,
100:24, 101:18,

102:16, 107:17,
109:10, 136:18,
136:19, 150:20,
151:8, 154:21
**lines** [11] - 5:23, 8:3,
52:19, 52:20, 52:21,
52:23, 52:25, 53:7,
53:8, 150:19, 154:5
**links** [1] - 62:3
**list** [19] - 22:11, 22:12,
25:19, 25:24, 25:25,
44:20, 45:7, 106:25,
141:11, 165:12,
167:16, 173:1,
173:17, 173:19,
173:21, 174:2,
174:10, 174:11,
175:2
**listed** [1] - 90:19
**listen** [1] - 174:12
**literally** [3] - 49:23,
49:25
**literature** [1] - 160:12
**litigant's** [1] - 133:22
**litigation** [3] - 61:19,
68:13, 173:10
**live** [2] - 61:16, 63:7
**lived** [1] - 64:4
**living** [1] - 102:20
**LLP** [1] - 1:23
**loading** [1] - 29:20
**locations** [1] - 65:24
**lodging** [2] - 20:12,
20:13
**look** [41] - 9:14, 39:13,
40:3, 42:2, 72:16,
79:23, 81:11, 81:24,
82:25, 89:16,
101:21, 102:13,
108:8, 108:24,
109:22, 113:16,
120:19, 125:3,
134:15, 134:20,
136:17, 141:7,
142:3, 143:6, 145:2,
145:17, 147:24,
148:14, 149:6,
150:18, 152:6,
152:17, 154:4,
155:2, 161:2,
162:22, 163:13,
164:1, 174:4,
174:21, 175:2
**looked** [13] - 7:7, 9:12,
14:9, 28:6, 29:22,
29:25, 35:21, 79:4,
80:17, 108:13,
124:5, 143:1, 157:6
**looking** [19] - 9:11,
10:5, 22:20, 52:15,

65:18, 70:16, 72:5,
74:1, 75:19, 89:14,
91:6, 95:14, 102:8,
127:14, 128:2,
142:6, 145:20,
148:17, 162:4
**looks** [3] - 71:1, 71:2,
150:24
**loss** [2] - 27:13,
159:23
**lost** [2] - 90:11, 92:22
**LTD** [1] - 1:16
**lunch** [4] - 59:13,
88:11, 103:3, 103:7
**Luther** [2] - 26:6,
26:22

---

# M

**magnitude** [2] - 66:18,
83:10
**mail** [79] - 4:17, 4:18,
6:16, 6:20, 7:6, 7:14,
8:11, 12:2, 12:3,
12:5, 15:4, 15:5,
15:10, 18:18, 19:8,
20:5, 22:12, 22:14,
22:18, 25:17, 26:3,
26:10, 28:18, 30:4,
30:6, 33:15, 33:17,
33:18, 34:19, 35:6,
35:8, 40:20, 40:21,
43:9, 47:3, 57:19,
57:20, 61:19, 62:1,
62:2, 62:8, 65:16,
66:15, 88:21, 88:24,
92:13, 101:24,
109:25, 116:10,
121:19, 122:17,
122:21, 127:1,
127:8, 130:11,
135:3, 135:5,
135:10, 135:14,
136:1, 136:12,
137:3, 137:5,
137:18, 138:11,
145:6, 148:3, 148:7,
148:8, 149:6,
149:10, 152:20,
154:16, 155:11,
161:6, 164:15,
164:17, 172:12
**mails** [6] - 22:10,
22:12, 22:15, 26:25,
43:6, 124:3
**major** [2] - 51:25,
64:16
**maker** [6] - 119:1,
119:6, 125:12,
160:23, 163:20

**malign** [3] - 28:3,
28:4, 29:9
**maligned** [3] - 25:11,
28:2, 32:5
**man** [1] - 33:24
**management** [1] -
104:24
**Mandela's** [1] - 63:2
**manner** [2] - 11:1,
67:14
**Mansfield** [1] - 105:1
**manual** [5] - 128:22,
128:25, 129:5,
143:4, 147:5
**March** [3] - 100:12,
101:6, 103:21
**Margaret** [4] - 25:22,
26:10, 26:18, 26:21
**marked** [12] - 5:15,
5:17, 18:24, 70:12,
88:18, 91:22, 91:24,
98:4, 101:19, 127:7,
150:21, 156:2
**marks** [1] - 149:24
**marriage** [7] - 24:13,
24:16, 25:8, 25:9,
25:12, 25:13, 28:5
**married** [3] - 24:11,
24:24, 25:2
**Martin** [2] - 26:6,
26:22
**Maryland** [1] - 160:12
**Marywood** [130] - 3:8,
3:11, 3:14, 4:1, 5:12,
8:17, 10:11, 12:6,
13:6, 13:13, 14:22,
15:22, 19:21, 20:1,
20:9, 20:11, 20:12,
20:16, 21:5, 21:6,
21:8, 21:12, 21:13,
21:14, 24:8, 30:8,
30:23, 31:3, 31:5,
31:12, 31:15, 31:17,
32:16, 32:18, 35:2,
36:2, 38:15, 38:16,
39:4, 39:22, 41:10,
43:1, 43:7, 43:11,
43:12, 43:14, 45:5,
45:8, 45:22, 45:23,
46:8, 47:15, 51:18,
57:3, 57:9, 58:11,
58:17, 58:24, 60:18,
60:20, 60:24, 61:9,
61:13, 61:15, 62:11,
63:4, 63:9, 63:17,
63:19, 64:13, 64:18,
64:23, 66:25, 67:11,
74:8, 76:2, 77:15,
78:21, 79:7, 80:3,
80:10, 80:20, 81:17,

83:21, 85:8, 85:13,
86:10, 89:10, 90:2,
90:15, 91:17, 92:19,
94:4, 94:22, 95:5,
96:4, 96:18, 97:5,
98:11, 102:17,
103:18, 103:20,
103:21, 104:19,
104:24, 105:4,
110:23, 111:14,
111:22, 116:13,
119:25, 131:13,
131:15, 131:18,
133:14, 140:2,
140:5, 140:10,
140:18, 143:17,
150:17, 159:25,
160:2, 160:4,
160:13, 161:22,
168:22, 169:12,
171:9
**MARYWOOD** [1] - 1:8
**Marywood's** [4] -
30:25, 60:16, 151:3,
160:16
**Massachusetts** [1] -
120:12
**master** [2] - 3:22,
173:17
**master's** [1] - 52:1
**masters** [3] - 52:3,
120:11, 160:11
**material** [3] - 22:7,
92:17, 92:21
**materiality** [1] - 103:1
**materials** [1] - 125:5
**matter** [11] - 23:9,
55:2, 61:25, 65:4,
72:3, 88:4, 89:17,
89:18, 99:10, 102:3,
118:8
**matters** [4] - 71:16,
71:17, 72:5, 112:13
**MATTHEW** [2] - 2:10,
131:4
**MCGINLEY** [1] - 1:19
**McGinley** [39] - 52:24,
53:3, 53:10, 53:12,
53:17, 53:25, 54:6,
54:11, 54:13, 54:16,
54:19, 54:25, 55:12,
55:15, 55:17, 55:20,
55:23, 56:3, 56:14,
56:16, 56:22, 56:24,
123:1, 123:5,
123:11, 123:12,
125:16, 125:17,
126:7, 126:9,
130:13, 130:15,
131:1, 134:17,

135:17, 136:4,
137:9, 137:10,
139:14
**McNally** [4] - 12:1,
12:2, 12:5, 12:7
**MD** [1] - 1:22
**meal** [2] - 20:11, 20:13
**mean** [26] - 45:9,
46:25, 49:12, 49:16,
49:22, 50:23, 61:22,
70:5, 72:4, 82:16,
87:9, 92:21, 93:8,
100:3, 101:10,
102:7, 102:8,
109:15, 115:4,
126:17, 126:20,
127:19, 137:25,
143:3, 143:20, 173:4
**meaning** [1] - 124:6
**meanings** [1] - 127:21
**means** [14] - 13:18,
79:6, 79:9, 80:19,
80:22, 82:19, 93:1,
94:25, 106:25,
107:20, 109:9,
139:2, 156:17,
176:21
**meant** [2] - 106:25,
148:24
**measures** [6] -
110:16, 111:13,
113:20, 158:22,
158:23, 159:9
**Medal** [1] - 60:22
**meet** [4] - 22:18, 73:5,
126:22, 153:14
**meeting** [116] - 46:14,
46:17, 47:5, 47:18,
47:19, 47:22, 47:25,
49:1, 49:3, 49:4,
49:7, 49:11, 49:14,
49:15, 49:21, 50:4,
50:7, 50:13, 51:14,
57:15, 58:2, 58:5,
58:8, 68:13, 70:5,
70:7, 70:17, 70:19,
70:21, 71:8, 71:20,
72:14, 72:21, 73:20,
73:22, 75:4, 75:14,
75:21, 75:24, 76:9,
76:13, 76:14, 76:24,
77:5, 77:7, 77:9,
77:10, 77:11, 77:12,
77:18, 77:21, 77:22,
77:23, 77:24, 78:2,
78:3, 78:4, 78:6,
78:13, 79:4, 80:17,
81:21, 82:17, 83:3,
84:6, 84:10, 84:12,
85:20, 86:4, 86:12,

87:17, 87:20, 87:23, 88:4, 88:7, 89:14, 89:22, 105:6, 105:16, 106:4, 106:8, 106:14, 106:19, 106:22, 107:10, 107:11, 107:23, 107:25, 115:14, 115:21, 117:4, 118:2, 118:17, 127:11, 127:15, 128:4, 128:7, 128:11, 138:9, 138:15, 138:16, 142:7, 142:11, 142:15, 145:21, 146:5, 146:15, 148:4, 148:18, 151:13, 153:24

**meetings** [9] - 32:13, 65:24, 73:7, 86:2, 112:2, 142:17, 162:13, 162:20, 162:21

**member** [29] - 3:11, 16:8, 20:6, 31:21, 32:21, 32:24, 32:25, 33:4, 47:23, 59:4, 60:20, 61:15, 62:15, 64:17, 64:23, 65:1, 77:10, 93:6, 131:15, 137:21, 139:9, 139:12, 140:5, 158:7, 158:17, 160:2, 160:21

**members** [34] - 13:14, 13:15, 14:22, 15:24, 21:10, 25:18, 48:23, 57:25, 62:10, 62:11, 62:16, 64:1, 66:10, 79:16, 80:3, 81:3, 81:17, 95:4, 96:16, 97:19, 121:7, 121:24, 122:1, 130:23, 132:16, 141:15, 141:25, 142:23, 146:3, 149:10, 161:22, 162:14, 162:18, 163:1

**membership** [2] - 102:1, 102:6

**memo** [3] - 49:17, 133:1, 154:23

**memory** [9] - 14:20, 18:6, 46:19, 78:12, 84:22, 97:3, 117:11, 132:10, 136:24

**memos** [2] - 165:19,

165:24
**men** [1] - 27:19
**mention** [1] - 48:19
**mentioned** [14] - 15:3, 17:22, 18:21, 57:1, 61:11, 63:12, 63:14, 63:24, 79:12, 126:19, 166:25, 173:18, 176:8
**merely** [1] - 39:25
**merited** [1] - 19:24
**message** [1] - 42:15
**met** [13] - 3:8, 74:4, 103:16, 127:5, 131:11, 133:14, 136:4, 137:10, 142:8, 151:13, 153:9, 153:14, 154:15
**Michael** [6] - 15:4, 43:20, 44:6, 70:19, 76:17, 105:7
**MICHEAL** [1] - 2:5
**Michigan** [2] - 26:20, 131:25
**middle** [2] - 83:5, 124:13
**Middle** [2] - 176:4, 176:18
**MIDDLE** [1] - 1:2
**might** [13] - 31:13, 33:2, 41:24, 42:23, 43:1, 49:12, 82:11, 84:23, 124:23, 143:6, 146:19, 160:21
**million** [2] - 62:21, 94:2
**mind** [14] - 16:5, 42:5, 61:24, 65:10, 68:24, 77:4, 77:11, 84:21, 87:18, 99:10, 99:21, 124:16, 174:1, 174:3
**mine** [2] - 29:2, 117:24
**minor** [1] - 166:8
**minute** [6] - 11:13, 41:18, 50:20, 59:11, 74:16, 172:18
**minutes** [28] - 46:15, 46:21, 47:2, 47:8, 47:10, 47:12, 47:18, 47:19, 48:3, 48:6, 48:12, 48:14, 49:8, 49:13, 59:12, 59:15, 76:25, 88:16, 103:5, 142:7, 145:21, 145:24, 148:18, 165:7, 165:8, 166:14, 174:10
**minutes'** [1] - 76:23

**mischaracterization** [1] - 118:12
**mischaracterizing** [2] - 135:18, 136:5
**missed** [2] - 45:18, 174:6
**missing** [1] - 173:21
**mission** [19] - 23:19, 39:2, 60:25, 61:13, 61:14, 63:5, 63:6, 63:20, 64:5, 65:2, 69:24, 74:10, 79:8, 80:5, 80:21, 81:19, 84:17, 93:7, 94:4
**missionaries** [1] - 64:3
**mistake** [2] - 5:23, 33:12
**misunderstanding** [1] - 26:14
**mocked** [1] - 116:8
**model** [1] - 85:12
**moment** [8] - 15:5, 51:8, 59:1, 82:15, 85:7, 124:11, 146:18, 165:5
**Monday** [2] - 26:22, 109:11
**money** [4] - 20:24, 28:24, 33:24
**monitored** [2] - 117:20, 156:22
**month** [1] - 125:2
**months** [1] - 90:8
**morning** [10] - 3:5, 3:6, 12:17, 12:18, 46:13, 48:6, 48:15, 49:2, 84:10, 174:12
**most** [3] - 12:21, 46:23, 137:20
**motel** [1] - 21:3
**motion** [5] - 97:14, 166:13, 170:9, 174:15, 174:25
**mouth** [2] - 35:13, 136:6
**move** [53] - 4:19, 7:10, 12:9, 15:17, 17:18, 31:3, 33:9, 34:15, 45:4, 48:25, 59:19, 75:4, 75:13, 75:23, 88:8, 106:3, 108:3, 108:19, 109:17, 112:21, 112:22, 112:24, 114:4, 114:14, 121:9, 122:5, 130:10, 134:15, 144:23, 145:12, 147:20, 148:9, 149:2, 152:2,

152:13, 155:2, 155:3, 155:10, 155:17, 161:13, 162:9, 163:9, 163:21, 164:7, 164:20, 165:4, 165:5, 167:20, 170:11, 172:3, 172:5, 173:24, 174:23
**moved** [4] - 17:15, 23:13, 171:25, 173:21
**movie** [1] - 95:11
**moving** [4] - 31:6, 89:23, 97:6, 172:6
**MR** [249] - 3:4, 4:19, 4:20, 4:22, 7:11, 7:13, 11:5, 11:7, 11:9, 11:11, 11:12, 11:15, 11:17, 11:22, 11:23, 12:9, 12:11, 12:13, 12:16, 12:20, 13:1, 13:3, 13:4, 15:17, 15:19, 15:21, 19:6, 19:7, 19:9, 33:9, 33:11, 33:12, 33:14, 34:11, 34:16, 34:18, 34:21, 34:24, 36:10, 36:12, 36:13, 36:15, 41:5, 41:7, 41:16, 41:21, 43:15, 43:19, 43:23, 43:25, 44:1, 44:3, 44:5, 44:24, 45:2, 45:4, 52:5, 52:8, 52:9, 52:12, 52:15, 52:19, 53:7, 53:9, 53:11, 53:20, 53:23, 54:2, 54:4, 55:1, 55:4, 55:10, 55:13, 55:16, 55:18, 55:19, 55:22, 56:1, 56:6, 56:15, 56:23, 59:9, 59:15, 59:19, 59:23, 60:10, 60:12, 60:14, 67:19, 67:21, 88:12, 88:16, 92:25, 94:8, 94:9, 94:11, 94:12, 102:25, 103:9, 103:13, 108:3, 108:7, 108:19, 108:23, 109:17, 109:21, 110:19, 111:12, 111:17, 111:20, 112:14, 112:20, 112:23, 112:25, 113:2, 113:25, 114:3, 114:6, 114:14, 114:18, 116:18,

116:20, 116:24, 116:25, 118:15, 119:11, 119:14, 119:19, 120:21, 120:22, 121:9, 121:11, 121:13, 122:5, 122:9, 122:10, 123:4, 123:8, 125:14, 126:4, 130:12, 131:2, 131:7, 134:19, 135:23, 135:25, 136:11, 139:18, 139:24, 144:6, 144:23, 145:1, 145:12, 145:16, 147:23, 148:9, 148:13, 149:5, 149:25, 150:6, 151:9, 151:18, 152:2, 152:5, 152:16, 155:6, 155:20, 156:25, 157:3, 157:5, 159:13, 159:16, 159:20, 161:20, 162:12, 163:9, 163:12, 163:25, 164:10, 164:23, 165:2, 165:10, 165:13, 165:18, 165:22, 165:25, 166:3, 166:7, 166:8, 166:10, 166:17, 166:19, 166:23, 166:24, 167:4, 167:6, 167:8, 167:10, 167:12, 167:15, 167:22, 167:24, 168:1, 168:6, 168:10, 168:13, 168:19, 168:21, 169:1, 169:5, 169:11, 169:15, 169:20, 169:24, 170:3, 170:9, 170:14, 170:17, 170:20, 170:24, 170:25, 171:4, 171:7, 171:9, 171:13, 171:16, 171:20, 172:1, 172:4, 172:7, 172:9, 172:12, 172:15, 172:21, 172:23, 172:25, 173:1, 173:2, 173:9, 173:14, 174:1, 174:5, 174:14, 174:16, 174:19,

174:20, 174:22, 174:24, 174:25
**MS** [81] - 52:24, 53:3, 53:10, 53:12, 53:17, 53:25, 54:6, 54:11, 54:13, 54:16, 54:19, 54:25, 55:12, 55:15, 55:17, 55:20, 55:23, 56:3, 56:14, 56:16, 56:22, 56:24, 108:5, 108:21, 109:19, 110:14, 110:25, 111:9, 111:24, 112:16, 113:1, 113:18, 113:22, 113:24, 114:1, 114:16, 114:20, 114:22, 116:16, 116:23, 118:11, 119:9, 122:7, 123:1, 123:5, 123:11, 125:16, 125:17, 126:7, 126:9, 130:13, 130:15, 131:1, 134:17, 135:17, 136:4, 137:9, 139:14, 144:3, 144:10, 144:25, 145:14, 147:21, 148:11, 149:3, 149:22, 152:3, 152:15, 155:4, 155:18, 155:23, 157:1, 157:9, 161:14, 161:17, 162:10, 163:10, 163:23, 164:8, 164:21, 164:25
**multi** [1] - 164:12
**multi-page** [1] - 164:12
**multiple** [5] - 64:12, 71:25, 74:12, 100:25
**Munley** [53] - 5:4, 6:25, 7:8, 7:21, 9:5, 18:15, 27:1, 36:6, 36:16, 39:1, 47:11, 48:1, 48:7, 48:13, 49:1, 49:5, 50:21, 51:2, 51:8, 58:3, 58:13, 59:10, 59:13, 59:14, 59:18, 59:23, 59:25, 60:3, 70:11, 91:22, 91:24, 98:4, 101:18, 105:7, 109:25, 111:7, 117:7, 121:3, 121:21, 128:4, 129:20, 132:2,

132:13, 134:3, 139:4, 139:6, 147:9, 150:15, 153:18, 153:23, 154:20, 163:17, 171:6
**MUNLEY** [1] - 2:6
**Munley's** [5] - 88:17, 122:2, 128:1, 141:11, 150:14
**music** [2] - 104:24, 104:25
**Muslim** [3] - 16:5, 16:9, 56:17
**Muslims** [1] - 16:10
**must** [7] - 22:18, 124:19, 129:6, 129:8, 129:11, 129:14, 132:10
**mutual** [2] - 74:10, 93:5

## N

**name** [9] - 4:10, 6:7, 18:5, 44:9, 59:25, 93:25, 123:12, 133:3, 161:10
**nature** [9] - 62:15, 63:21, 69:8, 71:17, 83:2, 85:10, 85:25, 89:17, 107:20
**Nazi** [4] - 9:14, 27:9, 27:11, 28:1
**Nazis** [1] - 27:12
**near** [1] - 29:19
**nearby** [1] - 117:14
**necessarily** [7] - 15:1, 67:15, 125:22, 129:7, 150:4, 159:3, 168:14
**necessary** [1] - 155:1
**need** [15] - 5:18, 44:18, 68:5, 106:6, 116:5, 143:6, 143:8, 143:24, 146:21, 151:16, 158:16, 165:16, 166:11, 171:21, 173:12
**needed** [10] - 30:24, 68:21, 72:9, 83:11, 111:18, 113:4, 115:20, 144:13, 151:6, 151:16, 176:11
**needing** [1] - 28:24
**negative** [4] - 14:11, 14:13, 14:15, 138:2
**never** [17] - 5:9, 17:22, 17:24, 32:15, 43:11, 47:3, 47:14, 47:23, 57:21, 59:6, 66:17,

86:3, 91:2, 100:21, 133:14, 143:15, 172:23
**new** [1] - 111:13
**New** [4] - 3:23, 3:24, 52:3, 160:10
**next** [28] - 19:20, 20:4, 26:25, 43:18, 45:4, 55:12, 55:17, 58:6, 73:8, 76:5, 76:10, 86:12, 86:24, 86:25, 87:15, 87:16, 89:17, 89:19, 91:10, 92:15, 98:20, 100:22, 101:23, 102:18, 103:8, 115:1, 132:8, 143:9
**nice** [2] - 123:12, 140:2
**night** [1] - 48:3
**nine** [4] - 45:11, 56:24, 60:19, 96:24
**Nine** [1] - 104:11
**NO** [1] - 1:10
**nobody** [2] - 29:2, 49:6
**non** [4] - 41:11, 53:21, 79:25, 81:14
**non-bias** [1] - 53:21
**non-discrimination** [2] - 79:25, 81:14
**non-responsive** [1] - 41:11
**none** [4] - 58:25, 59:5, 82:11, 82:16
**normal** [5] - 17:15, 20:10, 20:11, 32:3, 32:4
**normally** [1] - 167:16
**North** [1] - 27:20
**note** [3] - 133:11, 134:24, 146:7
**notes** [21] - 49:11, 49:18, 50:3, 73:8, 78:2, 107:11, 107:14, 108:12, 109:14, 115:1, 115:8, 142:21, 146:6, 146:7, 146:14, 150:25, 151:5, 153:13, 162:24, 172:17, 174:5
**nothing** [8] - 29:25, 82:16, 85:23, 86:4, 86:20, 89:12, 89:16, 174:18
**notice** [8] - 22:2, 47:12, 47:18, 75:2, 76:23, 76:25, 107:3,

107:6
**notifying** [1] - 163:20
**notion** [2] - 41:6, 127:19
**November** [3] - 15:4, 45:25, 46:10
**number** [7] - 18:5, 19:14, 20:19, 30:3, 69:25, 77:16, 102:21
**numbered** [2] - 19:14, 176:9
**nutrition** [4] - 3:18, 3:19, 3:23, 3:24
**nuts** [1] - 118:6

## O

**O'BRIEN** [2] - 2:9, 119:16
**O'Brien** [9] - 119:20, 122:23, 123:2, 123:5, 123:12, 125:18, 132:5, 141:5, 149:13
**oath** [2] - 44:11, 60:6
**object** [3] - 53:25, 167:1, 167:22
**objected** [1] - 8:9
**objection** [55] - 4:20, 7:11, 12:11, 13:1, 15:19, 34:16, 36:10, 41:5, 41:16, 53:9, 53:23, 55:13, 55:20, 56:12, 56:16, 67:15, 91:18, 108:5, 108:21, 109:19, 110:14, 111:7, 112:10, 113:19, 114:16, 118:11, 119:9, 122:7, 123:8, 125:14, 126:4, 130:12, 134:17, 135:17, 136:4, 144:3, 144:25, 145:14, 147:21, 148:11, 149:3, 152:3, 155:4, 155:18, 156:25, 161:15, 161:18, 162:10, 163:10, 163:23, 164:8, 164:21, 166:3, 169:2, 172:8
**objectionable** [1] - 56:12
**objections** [4] - 52:9, 52:16, 52:18, 56:14
**objectives** [1] - 93:8
**obligations** [3] - 92:17, 111:4, 112:5

**obvious** [1] - 146:21
**obviously** [6] - 28:13, 28:18, 38:5, 129:10, 136:25, 137:5
**occasionally** [2] - 14:2, 66:8
**occur** [7] - 68:7, 68:8, 70:18, 72:7, 84:22, 84:23, 99:1
**occurred** [11] - 16:3, 49:1, 49:19, 50:4, 75:13, 75:24, 89:16, 124:18, 145:22, 146:15, 154:13
**odd** [3] - 17:18, 17:20, 17:22
**OF** [1] - 1:2
**offended** [5] - 6:13, 6:14, 28:25, 62:9, 84:19
**offense** [3] - 64:21, 125:24, 126:2
**offenses** [1] - 113:14
**offensive** [8] - 6:12, 16:9, 67:3, 67:13, 86:6, 94:15, 115:17, 118:23
**offer** [4] - 37:7, 38:6, 42:14, 90:18
**offered** [2] - 90:17, 92:9
**offering** [8] - 17:20, 93:11, 93:12, 98:21, 110:18, 111:16, 115:25, 121:20
**office** [20] - 23:6, 29:17, 29:18, 33:2, 46:20, 46:21, 47:2, 48:4, 48:9, 48:22, 49:20, 51:12, 53:4, 54:7, 57:5, 57:23, 73:6, 76:21, 78:15, 86:15
**officer** [4] - 4:5, 8:21, 8:23, 69:24
**officers** [7] - 62:11, 63:13, 66:11, 94:24, 116:7, 171:7, 171:9
**offices** [1] - 86:18
**official** [2] - 154:12, 174:2
**Official** [3] - 176:3, 176:15, 176:17
**often** [1] - 73:6
**Ohio** [1] - 131:23
**old** [3] - 113:3, 124:15
**once** [5] - 48:21, 56:9, 57:22, 93:11, 124:21
**one** [69] - 5:2, 6:15, 9:11, 16:4, 17:12,

17:14, 17:18, 18:14, 18:21, 19:15, 20:19, 21:11, 21:15, 22:14, 24:16, 28:10, 28:24, 33:23, 35:1, 37:19, 37:22, 39:10, 39:18, 41:20, 42:1, 44:23, 52:20, 53:2, 53:3, 54:7, 55:12, 55:17, 56:23, 58:21, 60:24, 73:4, 78:24, 79:18, 80:13, 81:6, 81:22, 82:5, 90:19, 93:23, 95:22, 97:1, 98:25, 106:12, 109:9, 116:1, 116:18, 121:24, 127:5, 129:9, 130:22, 133:22, 136:10, 137:5, 143:11, 146:9, 151:3, 154:10, 155:10, 158:6, 163:18, 165:5, 171:1
**ones** [3] - 70:21, 173:17
**online** [1] - 42:11
**open** [9] - 21:4, 21:9, 23:18, 39:1, 87:12, 97:2, 101:13, 111:9, 116:10
**opening** [1] - 75:8
**operate** [1] - 64:1
**opinion** [8] - 14:12, 14:14, 14:15, 37:2, 74:2, 123:21, 124:6, 134:13
**opinions** [3] - 36:2, 79:20, 81:8
**opportunities** [2] - 64:9, 156:22
**opportunity** [27] - 9:1, 29:15, 63:1, 65:10, 70:10, 73:24, 75:15, 79:11, 80:24, 82:6, 83:13, 84:7, 87:23, 89:25, 90:23, 93:11, 93:13, 97:8, 98:22, 99:6, 99:8, 99:11, 99:15, 99:16, 99:17, 101:3
**opposing** [3] - 35:23, 36:8, 36:17
**opposition** [1] - 23:2
**option** [2] - 105:24, 168:20
**options** [5] - 30:18, 30:20, 105:17, 105:25, 106:1
**oral** [2] - 156:21,

157:12
**order** [7] - 44:25, 57:10, 68:5, 78:9, 90:21, 111:14, 173:12
**ordered** [1] - 57:3
**ordinarily** [2] - 129:3, 129:4
**organization** [1] - 16:24
**organizations** [2] - 17:25, 20:13
**organized** [2] - 23:20, 39:3
**originally** [1] - 172:17
**Oswego** [1] - 140:16
**otherwise** [1] - 174:18
**ought** [1] - 52:13
**outcome** [4] - 76:8, 98:15, 98:17, 106:19
**outlined** [1] - 19:21
**outlining** [1] - 161:7
**outrageous** [4] - 115:17, 123:17, 137:23
**outside** [2] - 35:10, 123:7
**overrule** [1] - 99:22
**overruled** [2] - 118:14, 135:21
**oversee** [2] - 104:2, 104:12
**oversight** [1] - 104:2
**overstep** [1] - 8:18
**own** [4] - 23:3, 30:21, 43:9, 95:17

**P**

**p.m** [1] - 89:4
**PA** [3] - 1:17, 1:25, 176:19
**packets** [1] - 143:2
**page** [92] - 4:13, 4:15, 5:22, 6:10, 38:21, 44:5, 45:4, 46:12, 51:13, 51:20, 52:20, 52:21, 52:22, 52:23, 52:25, 53:8, 53:12, 53:25, 54:4, 55:12, 56:22, 56:24, 57:14, 58:1, 58:6, 58:10, 59:24, 60:14, 60:15, 60:23, 62:6, 66:21, 66:23, 67:18, 67:21, 68:12, 68:17, 69:13, 70:4, 70:11, 74:17, 76:11, 77:19, 80:25, 84:9, 88:2, 88:8, 88:21, 88:22, 88:24,

90:21, 91:21, 92:12, 92:13, 92:15, 93:15, 95:20, 95:25, 96:22, 98:2, 101:16, 102:15, 102:18, 107:15, 107:16, 108:16, 113:17, 114:11, 116:22, 116:23, 121:1, 121:16, 132:8, 132:9, 136:18, 142:19, 143:9, 146:12, 149:17, 149:25, 150:2, 150:19, 150:20, 154:4, 155:10, 164:12
**pages** [7] - 4:13, 6:8, 53:7, 107:15, 120:23, 146:8, 165:18
**paid** [1] - 91:8
**painful** [1] - 124:19
**pair** [1] - 151:23
**paper** [1] - 137:1
**paragraph** [6] - 38:25, 39:20, 98:9, 98:21, 101:22, 142:20
**paraphrase** [1] - 149:20
**pardon** [7] - 11:6, 87:7, 109:3, 132:23, 135:4, 157:4, 161:16
**parenthesis** [1] - 110:12
**Park** [1] - 160:12
**PARKWAY** [1] - 1:24
**parodies** [2] - 95:18, 95:23
**parody** [2] - 27:21, 28:9
**part** [30] - 10:15, 17:20, 22:2, 45:19, 61:24, 68:13, 78:5, 82:23, 85:21, 94:9, 99:5, 100:14, 105:3, 105:9, 121:5, 122:20, 125:18, 126:10, 126:15, 126:16, 128:1, 132:12, 133:18, 133:25, 137:20, 157:15, 157:18, 159:5, 161:6, 163:19
**participate** [2] - 23:3, 47:15, 77:24
**particular** [4] - 15:14, 37:20, 69:21, 157:6
**particularly** [5] - 15:13, 72:2, 112:12,

123:22, 123:25
**parts** [2] - 64:9, 149:17
**party** [3] - 168:12, 168:25, 171:18
**pass** [1] - 85:19
**passing** [1] - 14:9
**past** [1] - 67:17
**Pat** [10] - 30:5, 30:6, 49:3, 49:8, 49:11, 49:13, 148:3, 151:1, 151:14, 155:11
**Pat's** [1] - 49:14
**path** [1] - 74:24
**PATRICIA** [2] - 2:8, 103:10
**Patricia** [4] - 70:20, 76:15, 103:9, 146:22
**pay** [17] - 20:9, 20:11, 20:12, 20:13, 20:24, 21:3, 22:5, 22:6, 29:6, 29:7, 29:10, 61:7, 73:12, 73:19, 84:13, 105:23
**payment** [1] - 91:15
**payroll** [1] - 104:2
**pays** [1] - 20:16
**PC** [1] - 1:20
**peers** [1] - 99:17
**Peet** [5] - 67:15, 87:6, 87:7, 91:18, 117:1
**PEET** [45] - 1:23, 108:5, 108:21, 109:19, 110:14, 110:25, 111:9, 111:24, 112:16, 113:1, 113:18, 113:22, 113:24, 114:1, 114:16, 114:20, 114:22, 116:16, 116:23, 118:11, 119:9, 122:7, 144:3, 144:10, 144:25, 145:14, 147:21, 148:11, 149:3, 149:22, 152:3, 152:15, 155:4, 155:18, 155:23, 157:1, 157:9, 161:14, 161:17, 162:10, 163:10, 163:23, 164:8, 164:21, 164:25
**pen** [1] - 112:4
**PENNSYLVANIA** [1] - 1:2
**Pennsylvania** [3] - 112:17, 176:5, 176:18

**people** [36] - 5:8, 13:8, 17:16, 18:2, 27:22, 28:15, 28:23, 28:25, 35:24, 36:1, 37:1, 37:6, 40:13, 40:15, 48:21, 55:25, 57:22, 62:22, 64:2, 66:7, 79:22, 81:10, 88:11, 94:2, 94:13, 95:11, 95:13, 95:16, 97:17, 113:14, 119:14, 127:22, 129:1, 129:10, 174:4
**per** [4] - 6:18, 35:14, 37:22, 150:17
**percent** [5] - 10:19, 25:1, 28:10, 28:24, 138:25
**perfectly** [1] - 106:7
**performance** [1] - 104:8
**perhaps** [3] - 12:23, 110:12, 115:23
**period** [3] - 74:23, 96:1, 125:1
**permission** [1] - 157:8
**permitting** [1] - 99:19
**perpetuate** [1] - 112:5
**perpetuating** [1] - 28:22
**person** [16] - 8:11, 9:13, 13:12, 14:25, 15:1, 22:3, 27:9, 28:20, 29:11, 35:19, 42:5, 63:10, 71:14, 73:3, 158:14
**personal** [16] - 24:10, 30:20, 52:19, 52:21, 52:23, 53:3, 53:12, 54:6, 55:20, 63:3, 85:10, 96:14, 96:15, 127:21, 156:11, 156:21
**personally** [10] - 6:13, 10:12, 30:9, 58:21, 62:9, 64:8, 65:8, 67:8, 118:23
**personnel** [1] - 57:3, 71:17, 79:5, 80:18
**perspective** [1] - 30:18
**pertinent** [1] - 74:20
**Pete** [2] - 155:24, 172:25
**Ph.D** [6] - 3:23, 13:11, 44:6, 51:22, 52:2, 104:23
**PHILADELPHIA** [1] - 1:25
**philosophy** [6] - 45:9,

45:10, 45:11, 51:22,
52:1, 52:2
**phone** [2] - 42:22,
130:18
**physical** [10] - 29:24,
31:13, 44:21, 67:25,
68:9, 84:23, 116:6,
118:25, 127:20
**piece** [2] - 113:9,
143:15
**pieces** [3] - 21:21,
71:25, 113:8
**pilot** [1] - 27:20
**pin** [1] - 51:7
**pizza** [4] - 21:15,
21:21, 22:13
**place** [8] - 31:5, 43:4,
68:3, 69:5, 76:7,
92:22, 118:21,
158:24
**PLACE** [1] - 1:10
**placed** [2] - 17:6,
33:25
**plaintiff** [7] - 44:7,
60:1, 103:9, 159:16,
166:23, 172:1, 172:2
**PLAINTIFF** [1] - 2:3
**Plaintiff** [1] - 1:14
**Plaintiff's** [5] - 166:20,
167:20, 170:11,
172:21
**plaintiff's** [1] - 167:15
**plan** [8] - 43:19, 73:21,
75:4, 75:12, 75:23,
76:19, 88:3, 104:5
**planned** [2] - 47:25,
73:4
**planning** [1] - 60:21
**play** [2] - 61:6, 150:8
**played** [1] - 37:5
**pleading** [3] - 168:4,
168:11, 171:8
**pleadings** [3] -
167:16, 167:22,
170:5
**plus** [1] - 21:3
**point** [30] - 10:16,
16:13, 26:2, 30:24,
43:19, 47:21, 72:16,
73:1, 73:9, 73:11,
73:18, 74:17, 78:24,
80:13, 81:22, 82:5,
83:3, 95:10, 96:25,
106:10, 107:1,
107:2, 110:6, 111:8,
115:7, 115:18,
134:9, 160:24,
171:21, 173:2
**points** [17] - 70:17,
70:24, 71:10, 71:23,

72:13, 105:15,
105:17, 105:19,
105:25, 106:5,
106:6, 106:12,
106:18, 106:23,
106:24, 107:7,
127:14
**police** [1] - 86:22
**policies** [31] - 23:20,
32:18, 39:3, 39:21,
55:4, 69:25, 71:14,
71:25, 72:2, 72:3,
72:6, 74:20, 74:22,
75:3, 79:4, 80:17,
90:20, 92:7, 100:25,
102:19, 102:20,
104:11, 110:17,
110:20, 110:24,
112:2, 128:22,
143:4, 147:5
**policy** [71] - 23:6,
30:17, 32:20, 35:15,
37:19, 37:21, 38:6,
38:10, 38:11, 38:15,
38:16, 45:15, 74:9,
79:18, 79:24, 81:5,
81:13, 93:10, 96:1,
96:6, 96:20, 97:2,
97:6, 97:15, 97:16,
98:15, 98:19,
100:17, 100:18,
100:19, 101:1,
101:4, 101:23,
102:18, 104:14,
109:13, 111:13,
111:15, 111:18,
113:4, 113:6,
113:10, 116:5,
128:23, 128:24,
143:12, 143:14,
143:18, 143:23,
144:7, 147:7, 156:6,
156:8, 156:9,
156:11, 156:16,
156:23, 157:2,
157:11, 157:15,
157:18, 158:2,
158:25, 159:5,
161:9, 161:11,
162:5, 162:7,
172:10, 172:13
**polite** [1] - 24:1
**politely** [1] - 23:23
**political** [3] - 35:11,
35:17, 39:22
**pool** [2] - 14:2, 14:9
**poor** [2] - 62:23, 94:17
**pop** [1] - 34:7
**portion** [1] - 156:8
**portray** [1] - 94:24

**portrayed** [2] - 9:13,
27:10
**portraying** [2] - 27:9,
27:10
**pose** [1] - 10:10
**posed** [9] - 10:22,
51:15, 51:19, 66:24,
67:25, 84:15, 116:3,
117:8, 127:23
**position** [7] - 10:3,
13:5, 45:16, 84:16,
104:1, 104:17,
140:16
**positions** [1] - 170:3
**positively** [1] - 137:23
**possibility** [8] - 89:23,
90:17, 116:6,
118:24, 119:1,
119:3, 150:10, 157:8
**possible** [8] - 28:16,
30:8, 69:2, 99:8,
119:5, 137:13,
156:14
**post** [7] - 50:10,
50:23, 74:18, 74:25,
107:2, 110:11,
111:12
**posted** [12] - 6:11,
10:8, 14:11, 16:5,
16:11, 48:21, 50:11,
57:22, 58:15, 86:9,
115:12, 117:18
**poster** [14] - 5:3, 5:15,
17:10, 17:11, 17:13,
17:15, 18:14, 18:21,
20:23, 23:3, 39:12,
39:16, 40:23, 42:1
**posters** [38] - 4:24,
5:1, 5:18, 16:16,
17:6, 17:10, 18:10,
18:13, 18:17, 18:20,
23:1, 23:3, 23:7,
23:17, 39:10, 41:4,
41:6, 41:14, 41:23,
42:1, 46:5, 46:9,
46:10, 51:5, 56:25,
57:4, 57:6, 57:10,
57:13, 78:25, 80:13,
80:14, 83:18, 83:19,
83:23, 169:13
**posting** [3] - 31:9,
56:17, 86:8
**potential** [2] - 61:12,
75:18, 94:19
**POVSE** [2] - 2:10,
131:4
**Povse** [11] - 121:22,
131:8, 132:8,
132:19, 133:7,
134:21, 135:18,

137:6, 137:10,
141:5, 149:13
**Povse's** [1] - 136:17
**power** [1] - 54:14
**practice** [4] - 20:12,
23:21, 39:21, 100:4
**practices** [2] - 39:3,
39:21
**precaution** [2] - 85:1,
115:19
**precautions** [1] -
86:11
**precedent** [1] - 37:1
**precedential** [1] -
112:20
**preferably** [1] - 78:9
**prep** [1] - 72:7
**preparation** [2] -
71:20, 76:5
**prepare** [2] - 108:14,
137:4
**prepared** [6] - 58:3,
79:3, 80:16, 87:15,
99:22, 176:11
**prepares** [1] - 75:2,
107:3
**preparing** [4] - 47:7,
104:6, 107:6, 150:9
**presence** [1] - 77:25
**present** [11] - 22:7,
39:18, 39:23, 62:2,
78:1, 118:13,
142:23, 148:25,
154:3, 173:16
**presentation** [8] -
20:21, 21:4, 21:16,
39:8, 40:12, 40:16,
46:2, 46:8
**presentations** [3] -
20:10, 23:19, 39:1
**presented** [2] - 10:11,
10:12
**presidency** [1] -
65:23, 69:22
**president** [57] - 4:1,
5:10, 7:21, 7:25, 8:4,
8:25, 9:16, 13:6,
13:16, 13:20, 16:1,
16:4, 19:23, 22:16,
32:21, 32:23, 33:5,
33:24, 37:3, 38:19,
39:12, 46:15, 47:19,
47:20, 47:25, 48:19,
50:18, 57:6, 58:16,
60:17, 60:19, 60:21,
66:11, 66:13, 67:8,
67:9, 69:18, 70:1,
70:23, 71:13, 73:6,
75:10, 78:1, 84:2,
94:23, 101:24,

103:23, 128:18,
133:1, 134:10,
138:14, 147:13,
158:6, 158:13,
158:16
**President** [28] - 5:4,
9:5, 15:6, 18:15, 36:6,
36:16, 48:1, 48:7,
48:13, 49:1, 49:4,
50:21, 51:2, 51:8,
58:3, 58:13, 60:3,
105:7, 109:25,
117:7, 121:3, 122:2,
132:2, 132:13,
134:3, 150:14,
150:15, 153:18,
154:20
**president's** [5] -
38:19, 40:5, 78:15,
104:15
**pressure** [4] - 139:3,
139:6, 139:8, 139:11
**presumably** [1] - 78:5
**pretrial** [2] - 165:19,
165:24
**pretty** [6] - 24:9, 26:5,
32:10, 35:24, 134:5,
157:21
**prevent** [2] - 44:16,
111:3
**preventing** [1] -
156:18
**preventive** [1] -
156:11
**preview** [1] - 26:13
**previously** [3] - 24:24,
45:5, 131:15
**prime** [1] - 94:21
**principles** [1] - 128:25
**privileged** [1] - 151:4
**prize** [13] - 20:23,
20:24, 36:20, 36:23,
37:1, 37:7, 37:10,
37:19, 37:22, 38:7,
38:16, 40:12, 40:16
**probable** [1] - 107:20
**problem** [11] - 15:15,
17:9, 35:1, 35:11,
35:14, 35:21, 35:22,
36:7, 40:9, 88:14,
156:17
**problematic** [2] - 9:3,
33:3
**problems** [3] - 17:12,
156:12, 159:2
**procedural** [4] -
100:16, 113:9,
149:16, 160:25
**procedure** [2] - 96:20,
100:18

**procedures** [6] - 128:22, 128:24, 129:5, 143:4, 147:5, 163:19
**proceed** [3] - 88:17, 123:9, 135:21
**proceedings** [3] - 44:6, 90:6, 176:8
**PROCEEDINGS** [1] - 1:11
**process** [14] - 31:24, 60:16, 90:22, 97:15, 98:10, 99:14, 126:16, 126:17, 133:18, 133:25, 144:21, 149:11, 156:13, 161:25
**processes** [2] - 70:16, 73:7
**produce** [1] - 63:21
**produced** [1] - 43:6
**proferentem** [1] - 111:20
**profession** [1] - 85:14
**professional** [9] - 14:7, 79:24, 81:13, 82:1, 85:11, 85:16, 95:1, 156:12, 156:14
**professionally** [3] - 6:13, 79:20, 81:7
**Professor** [109] - 4:24, 7:15, 7:17, 8:8, 8:14, 9:4, 9:8, 10:7, 10:21, 11:2, 11:16, 12:7, 41:3, 41:13, 41:22, 42:7, 45:23, 45:25, 46:5, 46:13, 46:16, 47:9, 47:11, 47:16, 47:22, 48:15, 50:19, 50:21, 50:23, 50:25, 51:1, 51:3, 51:9, 51:14, 51:15, 51:19, 58:3, 58:5, 58:13, 58:14, 58:18, 62:2, 64:20, 67:25, 68:8, 68:14, 68:19, 70:6, 70:8, 70:19, 72:22, 73:21, 75:6, 76:20, 76:23, 77:5, 77:12, 77:21, 83:4, 83:13, 83:15, 84:6, 84:14, 85:4, 86:9, 86:19, 87:2, 87:5, 87:19, 88:3, 89:5, 89:9, 89:11, 89:21, 90:6, 91:16, 93:19, 94:1, 95:4, 96:3, 96:7, 96:25, 97:4, 98:6, 102:17, 105:3, 105:7, 106:13,

107:25, 110:3, 117:7, 117:8, 120:14, 121:4, 122:1, 131:12, 132:3, 132:14, 133:5, 136:2, 136:14, 140:24, 142:1, 152:25, 153:11, 153:21, 161:22, 162:6, 162:16
**professor** [32] - 3:18, 3:19, 45:8, 45:10, 58:11, 63:19, 73:24, 73:25, 74:8, 76:2, 77:13, 78:19, 78:21, 79:7, 80:7, 80:9, 80:19, 85:13, 92:18, 93:2, 93:4, 94:22, 95:4, 116:14, 131:20, 131:21, 140:8, 140:17, 140:19, 140:20, 160:6, 160:7
**Professors** [1] - 147:18
**professors** [3] - 34:9, 37:16, 38:6
**program** [7] - 13:11, 21:9, 45:10, 63:6, 104:13, 160:15
**progressive** [25] - 32:20, 99:9, 99:10, 101:23, 102:17, 109:10, 109:12, 110:10, 113:4, 113:6, 115:1, 115:7, 115:10, 128:22, 129:7, 129:11, 143:11, 143:13, 143:22, 144:7, 156:5, 156:23, 156:24, 157:10, 157:18
**prohibit** [2] - 111:2, 111:13
**promoted** [1] - 140:19
**prompt** [1] - 156:18
**proper** [3] - 57:5, 173:10, 173:11
**propose** [2] - 96:21, 170:8
**proposed** [1] - 23:2
**proprietary** [1] - 81:7
**propriety** [1] - 79:19
**prospective** [1] - 116:12
**prototypic** [1] - 129:3
**prove** [1] - 169:15
**provide** [7] - 21:14,

22:4, 129:2, 143:15, 151:6, 156:16, 160:22
**provided** [3] - 20:22, 76:25, 83:12
**provides** [1] - 22:4
**providing** [1] - 47:11
**provisions** [1] - 176:5
**pry** [1] - 24:10
**psychology** [2] - 3:21, 120:7
**public** [7] - 19:20, 19:23, 21:9, 22:2, 52:3, 57:17, 68:4
**publically** [1] - 58:12
**publicity** [1] - 22:9
**published** [2] - 105:3, 118:5
**pull** [15] - 4:7, 5:21, 5:24, 6:2, 11:22, 18:5, 35:5, 38:2, 40:17, 59:23, 91:23, 107:13, 116:21, 132:19, 133:7
**pulled** [1] - 6:22
**punitive** [2] - 151:14, 156:11
**purchased** [1] - 34:1
**purpose** [5] - 84:18, 99:7, 110:18, 110:19, 170:12
**pursuant** [2] - 110:15, 176:5
**pursue** [2] - 30:21
**pursuing** [2] - 87:20, 95:12
**pushing** [1] - 174:8
**put** [19] - 10:14, 17:13, 17:14, 23:25, 26:10, 27:19, 35:13, 59:20, 67:11, 70:12, 102:22, 105:11, 116:14, 117:13, 118:21, 136:7, 162:24, 171:1, 172:18
**putting** [3] - 27:25, 49:18, 136:6

---

**Q**

**qualified** [1] - 68:7
**QUARRY** [1] - 1:21
**questions** [31] - 12:14, 12:19, 15:6, 33:13, 34:12, 34:25, 37:11, 40:18, 42:25, 43:15, 44:14, 50:9, 84:7, 88:1, 113:9, 114:19, 116:16, 122:24,

123:3, 127:2, 131:1, 137:6, 137:12, 139:14, 139:17, 150:1, 155:21, 159:12, 164:24, 164:25, 174:13
**quit** [1] - 31:16
**quite** [5] - 13:8, 28:9, 86:6, 165:3, 166:9
**quote** [31] - 49:17, 72:17, 73:1, 73:2, 73:9, 73:10, 73:12, 73:17, 73:18, 73:19, 74:18, 74:25, 75:1, 75:2, 86:1, 86:2, 91:12, 91:14, 92:16, 92:20, 96:1, 96:2, 98:9, 98:13, 101:22, 101:23, 101:24, 102:1

---

**R**

**radar** [1] - 124:5
**rage** [1] - 138:2
**raising** [2] - 122:15, 127:2
**ran** [3] - 10:13, 14:1, 31:10
**random** [2] - 20:23, 37:23
**randomly** [1] - 22:3
**range** [2] - 75:18, 113:13
**ranging** [1] - 113:11
**rare** [1] - 143:16
**rarely** [2] - 97:25, 143:19
**rate** [1] - 20:10
**rather** [5] - 35:20, 128:14, 129:6, 129:13, 165:23
**rational** [1] - 83:25
**re** [1] - 135:11
**reach** [1] - 82:21
**reacting** [1] - 84:2
**reaction** [10] - 20:7, 20:25, 27:4, 27:6, 62:7, 68:18, 97:12, 124:1, 126:16, 128:3
**read** [38] - 4:12, 6:6, 6:10, 15:5, 43:20, 47:3, 49:19, 49:20, 50:2, 50:15, 50:16, 52:24, 59:9, 67:17, 67:18, 67:20, 72:18, 73:15, 73:16, 75:22, 92:20, 98:13, 105:20, 107:17, 109:6, 110:9,

117:12, 124:2, 128:10, 137:5, 150:19, 150:22, 156:8, 165:15, 165:16, 166:11
**reading** [3] - 56:24, 88:10, 133:1
**reads** [1] - 73:9
**ready** [2] - 82:5, 166:9
**real** [5] - 25:16, 27:21, 29:8, 95:11
**reality** [1] - 124:24
**realize** [2] - 46:18, 78:9
**really** [24] - 5:19, 14:13, 14:16, 16:11, 17:4, 23:5, 30:2, 35:16, 39:11, 51:5, 63:7, 75:15, 77:24, 82:16, 93:19, 96:6, 96:15, 115:18, 124:24, 124:25, 135:8, 138:8, 143:20, 153:21
**realm** [4] - 84:22, 116:6, 119:1, 119:3
**reason** [6] - 15:14, 57:7, 57:9, 76:24, 87:23, 111:25
**reasonable** [4] - 19:12, 127:25, 128:17, 128:19
**reasons** [3] - 58:25, 141:12, 149:16
**recalled** [1] - 124:16
**receipt** [2] - 135:10, 136:12
**receive** [7] - 19:15, 122:17, 123:13, 135:3, 135:5, 137:14, 152:23
**received** [16] - 7:14, 25:15, 25:20, 25:22, 60:22, 66:15, 76:23, 101:24, 127:1, 130:18, 135:14, 136:1, 146:2, 154:23, 160:10, 163:18
**receiving** [1] - 19:2, 97:12, 133:2
**recess** [3] - 59:22, 103:7, 166:15
**recognize** [58] - 4:8, 4:9, 4:15, 5:24, 6:1, 6:3, 6:6, 6:15, 11:24, 28:14, 38:2, 70:14, 88:19, 92:1, 95:7, 98:5, 101:20, 105:12, 107:13,

108:9, 108:25, 109:23, 114:7, 115:23, 120:23, 121:14, 122:11, 127:8, 129:25, 132:9, 132:20, 133:8, 134:20, 138:11, 138:20, 141:7, 141:9, 141:18, 142:3, 145:3, 145:17, 145:19, 147:24, 148:14, 150:23, 150:24, 152:7, 152:17, 152:19, 155:8, 156:5, 161:3, 161:5, 162:2, 162:23, 163:13, 164:1, 164:12
**recognized** [1] - 138:8
**recognizes** [1] - 156:11
**recollection** [11] - 18:12, 25:16, 25:19, 46:22, 46:23, 57:7, 128:10, 138:16, 141:2, 141:3, 146:14
**recommend** [3] - 68:19, 117:18, 117:19
**recommendation** [18] - 9:8, 9:22, 9:23, 10:7, 11:2, 11:16, 11:20, 87:11, 90:23, 98:11, 98:18, 98:19, 99:4, 99:5, 100:7, 118:4, 156:15
**recommending** [7] - 87:5, 89:5, 91:6, 91:10, 91:12, 91:13, 92:18
**recommends** [2] - 75:1, 107:3
**recompense** [1] - 128:13
**reconsider** [2] - 134:25, 160:24
**reconvene** [4] - 135:15, 136:2, 136:14, 136:16
**reconvened** [2] - 135:11, 154:24
**record** [11] - 40:14, 42:16, 42:17, 49:19, 50:16, 56:10, 56:11, 78:2, 151:1, 154:16, 165:24
**recorded** [1] - 49:7
**recording** [2] - 49:9
**recount** [1] - 78:8

**RECROSS** [1] - 2:3
**recruiting** [1] - 104:7
**rectified** [2] - 156:12, 159:3
**redact** [1] - 151:4
**redacted** [1] - 149:17
**REDIRECT** [3] - 2:3, 34:23, 116:19
**redirect** [4] - 34:20, 116:17, 131:2, 159:13
**redrafted** [1] - 149:22
**refer** [1] - 102:20
**reference** [3] - 72:1, 92:6, 92:14
**referenced** [2] - 79:17, 81:4
**referred** [1] - 89:20
**referring** [5] - 17:13, 62:5, 70:18, 71:3, 89:20
**reflected** [2] - 87:10, 101:15
**reflects** [1] - 49:25, 75:18
**refresh** [3] - 25:15, 25:19, 138:16
**refused** [2] - 10:2, 16:12
**regard** [5] - 86:11, 89:11, 89:21, 91:18, 94:6
**regarding** [4] - 22:25, 72:6, 100:7, 153:21
**regardless** [3] - 73:22, 75:13, 75:24
**regards** [1] - 156:10
**regretted** [1] - 82:24
**regular** [2] - 17:17, 40:10
**reimbursement** [1] - 19:16
**related** [14] - 60:25, 61:11, 71:14, 74:22, 76:1, 78:20, 79:5, 79:10, 80:9, 80:18, 80:23, 83:23, 85:16, 104:11
**relating** [1] - 28:23
**relationship** [1] - 14:6
**release** [2] - 90:19, 90:24
**relevant** [2] - 53:14, 173:11
**relook** [1] - 85:22
**rely** [1] - 146:19
**remain** [2] - 23:18, 77:6
**remained** [1] - 39:1
**remedial** [10] - 89:11,

89:21, 90:2, 91:18, 110:16, 111:12, 113:19, 158:22, 158:23, 159:9
**remediate** [1] - 128:16
**remediated** [2] - 113:11, 113:12
**remediation** [4] - 89:24, 89:25, 128:9, 159:3
**remedy** [1] - 19:22
**remember** [73] - 5:17, 5:20, 6:18, 7:4, 7:7, 12:8, 15:9, 16:17, 19:2, 35:3, 35:4, 42:8, 42:9, 43:1, 43:2, 46:13, 47:7, 48:3, 48:23, 48:24, 49:20, 50:7, 50:18, 50:19, 50:24, 51:1, 51:3, 57:4, 57:19, 57:24, 58:16, 66:4, 68:15, 68:20, 68:23, 68:25, 69:4, 69:9, 72:12, 78:16, 78:24, 79:3, 80:12, 80:16, 81:22, 81:23, 84:24, 85:25, 86:24, 87:1, 87:5, 87:8, 90:5, 90:7, 94:12, 96:25, 102:12, 115:2, 117:4, 117:11, 124:14, 125:1, 133:2, 133:3, 133:4, 133:24, 135:8, 135:9, 136:22, 137:17, 153:13
**remembers** [1] - 29:18
**reminder** [1] - 22:15
**remorse** [2] - 89:15, 115:22
**removal** [2] - 57:3, 57:10
**removals** [1] - 40:23
**remove** [5] - 8:14, 8:15, 8:21, 8:24, 169:12
**removed** [18] - 4:25, 5:2, 5:3, 5:15, 10:1, 10:4, 10:16, 16:14, 32:14, 39:12, 41:4, 41:6, 41:8, 41:15, 41:23, 42:1, 46:11, 57:2
**removing** [1] - 33:6
**repeat** [3] - 117:9, 135:13, 135:23
**repeatedly** [5] - 75:16, 86:2, 87:24, 93:21, 97:21

**repetitive** [1] - 156:18
**rephrase** [1] - 36:14
**replacement** [1] - 140:16
**report** [20] - 13:15, 13:16, 13:17, 13:19, 46:20, 47:1, 48:9, 49:13, 49:16, 49:17, 66:11, 66:12, 69:18, 69:19, 69:20, 149:12, 150:9, 153:4, 154:12
**reported** [3] - 4:6, 13:7, 13:13
**REPORTED** [1] - 176:16
**Reporter** [3] - 176:3, 176:15, 176:17
**reporter** [4] - 50:1, 50:2, 50:16, 176:22
**reporter's** [1] - 166:12
**REPORTER'S** [1] - 176:1
**reporting** [1] - 49:15
**reports** [1] - 13:10
**represent** [4] - 44:10, 60:1, 103:17, 131:12
**represented** [2] - 35:18, 36:8
**reprimanded** [1] - 55:6
**reproduction** [1] - 176:21
**repulsed** [1] - 63:2
**reputation** [4] - 14:21, 19:22, 40:4, 127:21
**request** [5] - 19:20, 20:4, 41:14, 118:1, 127:12
**requested** [2] - 50:3, 50:16
**requesting** [1] - 23:24
**requests** [7] - 19:5, 19:10, 19:11, 19:12, 23:22, 40:19, 40:22
**require** [1] - 169:25
**required** [6] - 156:24, 157:19, 158:6, 158:23, 159:1, 159:10
**research** [2] - 13:12, 60:21
**resistance** [1] - 82:12
**resolving** [1] - 156:17
**resonated** [1] - 124:9
**resources** [2] - 103:24, 104:19
**respect** [8] - 61:3, 63:9, 64:2, 79:20, 81:7, 81:21, 149:22

**respond** [9] - 19:18, 33:18, 117:15, 118:8, 122:19, 122:21, 135:7, 153:11
**responded** [4] - 127:12, 135:9, 142:22, 144:10
**responds** [1] - 30:16
**response** [14] - 19:17, 23:14, 31:1, 50:25, 84:7, 88:1, 100:9, 107:20, 111:23, 120:17, 141:22, 168:17, 170:19
**responses** [3] - 30:8, 142:9, 150:2
**responsibilities** [13] - 4:3, 4:4, 66:8, 66:12, 69:14, 69:16, 69:17, 73:25, 76:2, 78:19, 80:7, 104:1, 156:14
**responsibility** [5] - 32:8, 64:22, 65:3, 70:2, 93:2
**responsible** [6] - 7:25, 62:21, 74:5, 104:10, 107:20, 171:8
**responsibly** [2] - 61:16, 63:7
**responsive** [1] - 41:11
**rest** [4] - 143:6, 174:9, 174:20, 174:23
**restate** [1] - 126:6
**result** [6] - 92:17, 98:11, 98:14, 125:8, 138:5, 164:5
**results** [1] - 164:14
**retire** [1] - 45:17
**retired** [1] - 45:16
**retirement** [1] - 104:8
**retiring** [1] - 60:18
**retract** [3] - 53:23, 157:3, 157:5
**return** [1] - 154:3
**review** [28] - 72:3, 74:19, 90:25, 92:9, 99:7, 99:12, 99:17, 99:20, 100:11, 100:15, 101:25, 102:11, 110:13, 120:14, 126:10, 127:13, 132:2, 136:19, 138:21, 140:23, 141:17, 151:7, 151:17, 153:2, 153:10, 153:12
**reviewed** [20] - 87:12, 90:18, 90:23, 93:13,

98:18, 98:22, 99:6,
100:16, 100:18,
101:3, 101:14,
101:16, 122:20,
125:7, 128:21,
129:23, 137:1,
138:4, 142:25,
149:15
**reviewing** [3] -
104:10, 128:18,
134:12
**reviews** [2] - 97:2,
104:8
**revise** [1] - 110:11
**revised** [2] - 92:4,
102:18
**revisions** [1] - 102:21
**revisit** [3] - 65:25,
66:3, 87:22
**revocation** [2] -
143:16, 154:7
**Reynolds** [1] - 112:16
**rhetorical** [1] - 37:12
**RICHARD** [1] - 1:9
**ridiculous** [10] -
19:13, 19:19, 20:3,
20:8, 21:1, 21:20,
38:13, 40:24, 41:13,
41:22
**rights** [11] - 30:13,
30:17, 30:22, 79:14,
81:2, 81:25, 96:1,
96:4, 96:7, 96:19,
97:23
**Rights** [2] - 46:1, 46:4
**ring** [1] - 51:7
**risk** [1] - 117:2
**RMR** [3] - 176:3,
176:14, 176:17
**Robert** [1] - 22:23
**Rochester** [2] -
140:14, 140:15
**role** [12] - 4:3, 32:3,
58:7, 61:6, 61:7,
71:6, 71:13, 74:8,
78:20, 80:9, 85:12,
150:8
**room** [6] - 38:1, 49:3,
78:14, 86:12,
128:12, 129:18
**rooms** [1] - 20:22
**rooted** [1] - 61:1
**rose** [2] - 69:21, 75:9
**route** [1] - 159:2
**rule** [2] - 110:15,
111:12
**Rule** [2] - 111:1,
166:13
**ruled** [3] - 110:25,
172:9, 172:13

**rules** [1] - 60:8
**run** [1] - 43:5
**running** [1] - 104:6
**Rutgers** [1] - 140:13

## S

**sabbatical** [1] -
140:16
**sacrifice** [1] - 64:5
**sadlack** [3] - 101:5,
145:8, 145:9
**SADLACK** [2] - 2:12,
159:17
**Sadlack** [10] - 147:3,
159:16, 159:21,
161:3, 161:21,
162:23, 164:2,
164:11, 164:12,
164:23
**safe** [1] - 7:9
**sat** [1] - 110:12
**satire** [4] - 28:9, 95:8,
95:13
**satires** [1] - 95:11
**save** [3] - 44:25,
60:11, 166:12
**saw** [21] - 6:19, 17:10,
17:11, 28:17, 39:16,
48:21, 57:21, 57:22,
63:22, 66:24, 85:20,
93:24, 94:12,
101:21, 118:4,
118:18, 121:5,
124:8, 137:19, 174:1
**scheduled** [1] - 38:13
**scholarly** [2] - 79:21,
81:9
**school** [2] - 13:9,
131:23
**science** [2] - 3:22,
31:15
**sciences** [2] - 45:12,
45:14
**scientist** [1] - 85:15
**scope** [5] - 12:24,
39:11, 69:14, 69:16,
69:17
**Scranton** [1] - 176:19
**screen** [4] - 27:24,
70:13, 124:5, 136:12
**se** [3] - 6:19, 35:15,
150:17
**searched** [2] - 86:15,
86:20
**sec** [1] - 7:5
**second** [15] - 4:12,
6:6, 6:7, 38:25,
39:20, 55:13, 92:9,
92:16, 98:9, 107:17,

108:17, 109:10,
117:25, 118:10,
150:2
**seconds** [1] - 114:20
**secretary** [3] - 87:2,
88:24, 88:25
**secretary's** [1] - 92:14
**Section** [1] - 176:6
**security** [16] - 86:11,
115:13, 117:2,
117:3, 117:25,
118:1, 118:7,
118:10, 118:13,
118:16, 118:17,
118:20, 118:24,
118:25, 119:5
**see** [32] - 9:19, 20:19,
25:24, 25:25, 27:19,
28:2, 37:4, 41:12,
62:10, 65:17, 72:17,
74:1, 74:13, 74:17,
102:21, 106:21,
107:4, 110:6,
113:23, 121:2,
123:13, 123:18,
124:14, 124:22,
133:3, 137:2, 140:2,
155:24, 156:1,
158:3, 166:14,
174:10
**seeing** [7] - 30:10,
31:12, 62:7, 62:23,
65:7, 70:2, 71:21
**seek** [1] - 128:9
**seem** [2] - 89:15,
128:11
**selected** [1] - 60:16
**semester** [1] - 20:11
**Semitic** [2] - 62:14,
124:21
**send** [6] - 133:12,
133:16, 133:21,
137:21, 153:16,
153:17
**sending** [2] - 25:17,
87:1
**sense** [7] - 8:19, 10:4,
14:19, 67:3, 69:6,
86:4
**sensitive** [1] - 63:22
**sent** [30] - 4:17, 4:18,
20:5, 22:11, 22:14,
26:18, 28:18, 62:2,
62:3, 80:3, 81:16,
89:3, 89:10, 90:10,
90:24, 97:10,
117:21, 121:22,
132:25, 133:5,
137:3, 138:14,
148:3, 148:7, 149:7,

163:17, 164:5,
164:15
**sentence** [5] - 35:9,
38:25, 92:16,
101:24, 113:13
**separate** [2] - 22:10,
126:22
**separately** [2] -
153:10, 153:25
**sequencing** [1] - 91:5
**series** [7] - 19:5,
40:18, 40:22, 42:24,
74:21, 106:11,
156:20
**serious** [17] - 67:12,
68:21, 69:3, 69:7,
69:8, 73:2, 75:7,
75:9, 77:11, 99:23,
99:24, 100:1, 100:4,
153:5, 154:8, 156:13
**serve** [5] - 84:16,
104:11, 130:16,
130:21, 130:22
**served** [9] - 47:20,
47:21, 60:17, 94:17,
123:23, 125:7,
138:4, 140:20, 141:5
**serves** [1] - 46:19
**service** [4] - 60:20,
60:23, 61:3, 62:20
**serving** [2] - 120:13,
132:1
**session** [1] - 20:20
**set** [3] - 60:24, 97:14,
176:9
**sets** [1] - 37:1
**seven** [2] - 124:15,
165:7
**several** [15] - 4:13,
6:8, 18:3, 40:18,
42:10, 79:10, 80:24,
83:14, 88:5, 88:6,
107:15, 117:22,
118:18, 120:23,
151:10
**sexually** [1] - 63:12
**shall** [4] - 7:12, 78:10,
158:11
**shape** [2] - 85:11,
94:16
**share** [3] - 37:3,
38:18, 134:1
**shared** [1] - 162:25
**sheet** [1] - 72:7
**shocking** [1] - 86:7
**short** [1] - 43:23
**shortly** [2] - 124:12,
125:4
**shots** [1] - 27:24
**show** [12] - 20:2, 38:6,

43:6, 99:13, 99:14,
110:23, 111:14,
111:17, 112:8,
127:7, 156:2, 170:21
**showed** [2] - 7:6,
114:25
**showing** [4] - 18:24,
32:17, 33:15, 138:10
**sickened** [2] - 63:10,
64:12
**side** [11] - 18:23,
35:19, 35:23, 36:8,
39:18, 39:19, 95:21,
98:3, 139:8
**sides** [3] - 35:17, 36:3,
39:23
**sign** [2] - 49:23, 173:5
**signatory** [1] - 4:10
**signature** [7] - 6:1,
90:12, 92:10, 98:8,
108:17, 114:12,
163:7
**signed** [6] - 49:14,
49:22, 49:24, 91:2,
163:2
**significant** [1] - 61:24
**signing** [1] - 49:22
**silly** [1] - 37:2
**similar** [1] - 58:12
**simple** [1] - 75:22
**simply** [8] - 8:6, 35:9,
37:3, 38:12, 38:17,
39:7, 105:17, 134:12
**single** [1] - 63:10
**sins** [2] - 20:2
**Sister** [59] - 6:25, 7:21,
8:18, 9:11, 10:16,
13:16, 13:20, 26:25,
27:10, 30:25, 32:6,
35:8, 35:15, 36:2,
36:18, 36:19, 39:1,
46:21, 47:1, 47:10,
48:4, 49:12, 50:8,
50:12, 59:10, 59:13,
59:18, 59:25, 60:3,
60:4, 101:25, 102:1,
105:15, 107:23,
107:24, 109:7,
109:9, 109:13,
111:6, 115:5,
115:25, 118:1,
119:2, 121:20,
127:25, 128:4,
129:20, 130:20,
133:11, 139:4,
139:6, 141:11,
147:9, 153:16,
153:23, 154:3,
163:17, 171:6
**sister** [18] - 60:2, 64:3,

70:14, 73:1, 75:1,
88:19, 92:1, 92:5,
94:16, 98:5, 101:20,
106:6, 106:24,
107:2, 107:8,
109:11, 116:2,
151:14
**sister's** [4] - 73:10,
73:17, 105:21,
106:11
**sisters** [2] - 61:9,
62:17
**sit** [4] - 65:8, 104:13,
143:19, 169:16
**sitting** [1] - 174:18
**situation** [11] - 10:4,
32:9, 33:7, 65:19,
65:21, 66:16, 69:21,
72:1, 77:3, 85:22,
119:7
**situations** [2] - 63:16,
112:4
**six** [12] - 7:2, 8:3,
62:21, 65:14, 76:12,
77:14, 124:15,
132:11, 142:18,
143:8, 151:8, 171:7
**skip** [19] - 5:23, 65:22,
66:25, 68:1, 77:1,
77:8, 77:9, 77:14,
77:19, 83:24, 86:14,
87:21, 88:4, 89:11,
90:14, 91:21, 92:21,
95:6, 100:24
**slash** [3] - 109:15,
115:2, 115:4
**slices** [1] - 21:15
**small** [1] - 40:15
**social** [2] - 31:15,
85:15
**sociologist** [1] - 64:11
**soda** [5] - 21:15,
21:16, 21:23, 21:24,
22:13
**soldiers** [1] - 62:24
**sole** [1] - 69:15
**someone** [6] - 20:17,
36:8, 71:2, 84:24,
118:9, 158:13
**sometime** [2] - 48:4,
123:15
**sometimes** [3] -
37:18, 102:21,
160:23
**somewhere** [2] - 66:4,
150:2
**son** [2] - 124:15,
124:22
**soon** [1] - 63:22
**Sophie's** [1] - 27:11

**sorry** [27] - 5:23,
11:15, 19:25, 27:7,
31:8, 39:5, 40:17,
40:20, 45:18, 50:1,
60:10, 60:15, 71:7,
73:16, 77:8, 82:9,
85:22, 87:7, 92:22,
94:12, 95:24,
114:20, 116:23,
120:20, 131:8,
141:2, 159:23
**sort** [6] - 70:17, 72:7,
75:15, 124:4,
124:23, 139:11
**sorts** [1] - 64:4
**sought** [1] - 98:18
**sound** [2] - 42:5
**sounds** [1] - 50:17
**soup** [1] - 21:22
**South** [1] - 62:25
**Southern** [1] - 52:4
**speaker** [21] - 16:18,
16:20, 16:24, 17:2,
17:3, 17:19, 35:2,
35:11, 35:14, 35:17,
35:22, 36:7, 36:17,
39:7, 39:9, 39:17,
39:22, 39:24, 40:11,
46:1
**speakers** [3] - 20:16,
35:10, 107:23
**speaking** [2] - 5:18,
29:5
**special** [1] - 86:10
**specific** [6] - 23:22,
57:24, 68:20, 97:2,
117:10, 169:18
**specifically** [10] -
48:23, 50:13, 57:2,
57:18, 70:5, 71:3,
72:12, 72:15, 110:5,
128:22
**specifications** [1] -
20:21
**specify** [1] - 116:5
**speech** [4] - 17:3,
39:4, 39:8, 39:25
**spell** [2] - 129:3,
129:17
**spelled** [1] - 97:17
**Spencer** [2] - 22:23
**spending** [1] - 21:8
**spent** [2] - 94:13,
144:20
**spew** [1] - 32:16
**sponsoring** [1] -
22:22
**spouses** [1] - 63:12
**spread** [1] - 28:15
**spring** [1] - 20:11

**spur** [1] - 82:15
**spur-of-the-moment**
[1] - 82:15
**staff** [4] - 66:7, 66:17,
66:18, 104:7
**stage** [1] - 174:20
**stamp** [2] - 57:5,
57:13
**stance** [1] - 127:3
**stand** [8] - 54:22,
68:4, 75:7, 82:3,
84:4, 85:6, 95:9,
169:1
**stands** [4] - 63:4,
64:13, 83:21, 85:8
**start** [8] - 56:22,
56:25, 76:12, 84:9,
91:21, 101:18,
102:16, 157:12
**started** [7] - 12:20,
58:5, 78:24, 79:12,
80:13, 83:18, 107:6
**starting** [8] - 19:14,
50:7, 59:24, 88:2,
93:15, 95:21, 96:24,
136:18
**state** [3] - 77:20, 83:4,
98:9
**State** [1] - 140:16
**statement** [16] - 23:20,
36:2, 39:2, 55:8,
68:20, 87:2, 87:4,
87:13, 89:2, 92:4,
122:14, 156:9,
157:25, 158:20,
159:8, 168:12
**statements** [1] - 51:18
**States** [3] - 176:4,
176:6, 176:18
**STATES** [1] - 1:2
**stating** [1] - 87:5
**station** [1] - 29:21
**status** [1] - 95:1
**stay** [1] - 95:25
**stayed** [3] - 30:1,
31:11, 82:7
**staying** [1] - 151:20
**step** [6] - 43:16, 91:10,
119:12, 131:3,
139:19, 159:14
**STEPHANIE** [1] - 1:23
**Stephanie** [3] -
155:24, 172:25,
173:3
**stepped** [1] - 33:6
**steps** [7] - 71:5, 74:20,
74:25, 76:10, 90:16,
156:20, 163:4
**stereotype** [1] - 29:3
**stereotypes** [3] -

28:23, 29:5
**sticks** [1] - 16:4
**still** [12] - 3:8, 91:8,
103:17, 103:23,
119:25, 129:19,
130:8, 131:12,
139:1, 140:2,
159:25, 168:18
**stipulate** [2] - 44:24,
60:10
**stipulated** [1] - 166:12
**stipulations** [1] -
165:14
**stop** [2] - 88:10, 151:7
**stops** [1] - 67:9
**STRAFFORD** [1] -
1:16
**straight** [1] - 144:8
**strategies** [1] - 156:20
**streamline** [1] -
102:22
**STREET** [1] - 1:24
**strike** [1] - 7:9
**strong** [3] - 5:3, 67:14,
93:7
**student** [9] - 5:19,
17:25, 20:6, 20:23,
22:12, 23:6, 57:5,
57:6, 59:4
**student's** [1] - 55:5
**students** [34] - 14:16,
14:22, 15:1, 15:24,
17:21, 18:2, 22:5,
22:6, 25:18, 28:19,
33:25, 36:4, 37:16,
37:18, 37:21, 38:7,
38:13, 53:4, 54:7,
56:19, 56:21, 59:3,
61:15, 63:7, 64:6,
80:4, 81:18, 84:3,
116:12
**study** [1] - 104:12
**studying** [2] - 19:2,
100:3
**stupidity** [1] - 10:3
**sub** [4] - 73:11, 73:18,
106:11, 107:2
**subject** [1] - 61:19
**subjecting** [1] - 119:4
**submitted** [3] -
153:23, 165:15,
165:19
**subpoena** [1] - 54:14
**subsequent** [7] -
110:15, 111:12,
113:19, 130:20,
154:12, 172:10,
172:13
**subsequently** [4] -
153:9, 169:6,

169:10, 170:2
**substance** [4] - 62:1,
150:5, 151:17,
151:22
**substantive** [1] -
161:1
**subtitles** [1] - 95:17
**sudden** [1] - 116:9
**suffering** [1] - 63:16
**suggest** [4] - 15:14,
29:10, 129:7, 170:18
**suggested** [1] - 38:17
**suggesting** [2] - 29:7,
174:9
**suggests** [3] - 12:2,
39:21, 93:6
**suicidal** [2] - 137:24,
137:25
**SUITE** [3] - 1:17, 1:21,
1:25
**summarize** [7] - 3:20,
4:4, 104:22, 120:8,
131:22, 140:12,
160:8
**summary** [7] - 108:12,
127:11, 127:14,
127:15, 128:11,
153:24, 164:17
**summon** [3] - 47:9,
47:23, 48:2
**summoned** [1] -
106:13
**superior** [2] - 45:23,
45:24
**supervision** [2] -
176:11, 176:22
**supplement** [1] -
173:3
**support** [2] - 74:7,
134:4
**supported** [5] - 10:18,
78:20, 80:9, 101:11,
134:13
**suppose** [2] - 52:14,
103:4
**supposed** [8] - 48:8,
67:17, 67:18, 72:22,
133:18, 134:11,
151:7
**surprised** [2] - 123:18,
123:19
**survive** [1] - 27:20
**suspect** [2] - 9:11,
37:25
**suspected** [1] - 34:6
**suspend** [21] - 7:15,
7:17, 7:23, 8:6, 8:7,
9:17, 9:20, 9:23,
10:6, 10:7, 32:23,
33:4, 33:5, 73:22,

75:6, 75:12, 84:12, 88:7, 158:7, 158:17
**suspended** [35] - 9:5, 9:7, 9:9, 9:18, 31:9, 31:20, 32:11, 32:21, 33:1, 33:2, 33:21, 64:20, 65:6, 68:15, 68:19, 69:12, 70:6, 73:12, 73:18, 82:18, 83:4, 84:13, 84:14, 86:9, 89:10, 91:9, 91:16, 105:23, 107:25, 117:7, 125:20, 158:10, 158:11
**suspenders** [1] - 146:22
**suspending** [3] - 97:6, 141:12, 154:21
**suspension** [52] - 10:8, 10:21, 10:24, 32:19, 64:24, 65:9, 69:4, 74:2, 74:18, 75:1, 75:23, 76:8, 84:10, 86:15, 86:24, 90:3, 97:9, 99:20, 100:16, 102:4, 102:6, 102:11, 106:2, 106:20, 107:2, 125:24, 126:3, 126:10, 126:15, 126:16, 126:23, 127:2, 127:6, 127:13, 135:12, 135:15, 136:3, 136:15, 136:20, 153:2, 153:3, 153:10, 153:12, 153:15, 153:17, 153:22, 154:1, 154:6, 154:11, 156:15, 158:2
**sustained** [2] - 56:13, 125:15
**sway** [1] - 82:13
**swimmer** [1] - 14:9
**swimming** [1] - 14:2
**switched** [2] - 21:10, 21:18
**sworn** [7] - 3:1, 44:7, 103:11, 119:17, 131:4, 139:21, 159:17
**symbolic** [2] - 61:6, 99:12
**system** [1] - 31:4

**T**

**T.s** [2] - 153:9, 154:25
**taker** [1] - 146:7
**talks** [12] - 22:13, 32:19, 61:14, 74:9, 79:8, 79:25, 80:20, 81:14, 93:5, 113:19, 116:5, 158:2
**taught** [3] - 5:8, 64:11
**teach** [5] - 22:7, 32:15, 34:9, 64:5, 140:7
**teaching** [1] - 140:9
**tearing** [1] - 94:20
**technician** [1] - 120:21
**technology** [1] - 28:20
**telephone** [2] - 8:11, 150:25
**ten** [11] - 23:12, 58:23, 59:11, 59:12, 59:17, 90:14, 103:4, 114:20, 165:7, 165:8, 166:14
**ten-minute** [1] - 59:11
**tenure** [16] - 74:9, 79:9, 79:13, 80:22, 81:1, 81:25, 89:7, 91:13, 92:18, 93:4, 97:7, 98:12, 129:21, 140:19, 143:16, 154:8
**tenured** [28] - 58:11, 63:19, 64:17, 64:22, 73:24, 73:25, 74:8, 76:2, 77:13, 77:15, 77:16, 78:19, 78:21, 79:6, 80:7, 80:9, 80:19, 85:12, 91:1, 92:18, 93:2, 93:3, 93:14, 94:22, 95:1, 97:18, 100:3, 139:12
**term** [2] - 92:17, 92:21
**terminate** [6] - 88:3, 97:7, 100:7, 100:10, 100:22, 129:21
**terminated** [22] - 9:19, 31:8, 31:19, 32:12, 42:25, 43:13, 65:7, 87:6, 89:6, 89:7, 91:7, 91:14, 91:17, 92:19, 98:12, 99:2, 99:7, 99:12, 110:3, 125:20
**terminating** [4] - 90:7, 91:11, 141:13, 141:14
**termination** [21] - 10:25, 34:4, 75:2, 75:13, 75:23, 87:20,

88:8, 93:9, 93:12, 99:21, 100:16, 102:4, 102:5, 102:11, 107:3, 125:8, 125:24, 126:1, 130:4, 154:7
**terms** [3] - 34:8, 72:10, 169:4
**testified** [21] - 3:2, 15:9, 17:5, 23:13, 24:4, 25:14, 31:23, 44:7, 56:17, 65:5, 67:2, 75:5, 83:12, 103:11, 118:16, 119:17, 127:15, 131:5, 136:4, 139:22, 159:18
**testify** [1] - 24:6
**testifying** [2] - 44:16, 54:22
**testimony** [8] - 21:12, 22:4, 40:23, 43:20, 111:6, 118:12, 135:18, 158:15
**Texas** [1] - 171:6
**text** [3] - 5:25, 38:22, 107:17
**THE** [177] - 1:2, 1:2, 1:9, 4:21, 7:12, 11:6, 11:10, 11:13, 11:18, 11:19, 12:12, 13:2, 15:20, 34:17, 34:20, 34:22, 36:14, 41:18, 41:20, 43:16, 43:17, 43:18, 43:21, 45:3, 52:7, 52:11, 52:13, 52:18, 53:2, 53:6, 53:8, 53:16, 53:19, 53:21, 53:24, 54:3, 54:10, 54:12, 54:15, 54:18, 54:21, 55:3, 55:8, 55:11, 56:8, 56:12, 56:20, 59:7, 59:11, 59:16, 59:21, 60:13, 88:14, 88:17, 92:23, 102:24, 103:3, 103:8, 108:6, 108:22, 109:20, 110:18, 111:6, 111:11, 111:16, 111:19, 111:23, 112:10, 112:19, 112:22, 112:24, 113:21, 113:23, 114:5, 114:17, 114:19, 116:17, 118:14, 119:10, 119:12, 121:12, 122:8, 122:25, 123:9, 125:15,

126:6, 126:8, 130:14, 131:3, 134:18, 135:20, 135:24, 136:7, 136:10, 137:7, 139:16, 139:17, 139:19, 139:20, 144:5, 144:9, 144:11, 144:12, 144:14, 144:16, 144:17, 144:18, 144:22, 145:15, 147:22, 148:12, 149:4, 150:4, 151:10, 152:4, 155:5, 155:19, 157:4, 157:6, 159:14, 161:16, 161:19, 162:11, 163:11, 163:24, 164:9, 164:22, 165:1, 165:6, 165:11, 165:16, 165:20, 165:23, 166:1, 166:14, 166:16, 166:18, 166:22, 167:3, 167:5, 167:7, 167:9, 167:11, 167:13, 167:25, 168:4, 168:8, 168:11, 168:15, 168:24, 169:3, 169:9, 169:22, 169:25, 170:7, 170:13, 170:15, 170:18, 170:21, 171:3, 171:5, 171:8, 171:10, 171:18, 171:23, 172:2, 172:5, 172:8, 172:11, 172:14, 172:17, 173:15, 174:3, 174:7, 174:15, 174:17, 175:1
**themselves** [1] - 165:24
**they've** [3] - 101:4, 169:9, 170:2
**thighs** [2] - 55:6, 55:9
**thinking** [7] - 19:18, 43:10, 44:16, 68:10, 70:24, 84:24, 125:6
**thinks** [3] - 38:14, 56:2, 153:2
**third** [2] - 73:3, 128:2
**Third** [6] - 110:25, 111:24, 112:1, 112:3, 112:6, 112:17

**thoughtful** [1] - 69:1
**thoughts** [10] - 53:13, 59:2, 59:3, 59:6, 76:5, 102:2, 123:22, 149:18, 149:19, 149:20
**thousand** [5] - 20:9, 20:19, 21:3, 21:8, 21:15
**thousands** [1] - 42:4
**threat** [11] - 10:10, 67:25, 68:9, 84:23, 116:3, 117:16, 117:17, 118:10, 118:17, 119:5, 127:20
**threatened** [2] - 10:12, 129:10
**THREE** [1] - 1:24
**three** [10] - 8:24, 16:7, 37:22, 74:12, 121:24, 129:23, 129:24, 140:20, 166:19, 169:5
**threw** [1] - 8:19
**throughout** [2] - 61:20, 128:24
**thrown** [1] - 29:3
**thunder** [2] - 55:5, 55:9
**Thursday** [1] - 40:13
**tightened** [2] - 110:21, 113:5
**time-wise** [1] - 88:15
**timelines** [1] - 7:2
**tips** [1] - 14:10
**title** [2] - 45:13, 104:20
**Title** [2] - 104:11, 176:5
**titles** [1] - 45:7
**TO** [1] - 2:1
**today** [15] - 12:22, 22:21, 35:6, 44:11, 44:17, 53:13, 54:13, 60:2, 60:5, 98:12, 117:11, 130:8, 139:1, 154:9, 169:17
**together** [4] - 49:18, 109:11, 137:2, 162:24
**tolerate** [1] - 96:5
**Tom** [1] - 35:9
**tomorrow** [5] - 123:2, 123:6, 137:13, 174:12, 174:22
**took** [20] - 9:15, 9:16, 16:15, 18:14, 18:16, 18:21, 49:8, 49:13, 76:7, 90:9, 91:3, 94:5, 107:10,

115:19, 146:7, 150:25, 158:24, 162:1, 162:24, 163:4
**top** [5] - 105:19, 109:7, 148:19, 148:22, 163:7
**topic** [3] - 57:16, 57:18, 78:16
**tore** [2] - 39:10, 39:11
**tossed** [1] - 27:16
**total** [7] - 45:7, 60:20, 69:23, 83:21, 84:3, 137:20, 162:21
**totally** [6] - 62:8, 63:14, 85:7, 119:4, 138:2, 171:11
**totals** [1] - 60:22
**toward** [2] - 88:8, 89:14, 89:23
**towards** [3] - 55:25, 83:5, 138:7
**track** [2] - 40:14, 124:4
**tradition** [1] - 61:2
**trafficking** [2] - 62:23, 62:25
**trail** [1] - 137:1
**training** [1] - 104:12
**transcript** [5] - 59:10, 113:22, 176:7, 176:10, 176:21
**transpired** [2] - 23:17, 49:15
**trash** [1] - 116:10
**traveling** [2] - 65:22, 65:23
**trial** [3] - 169:14, 173:12, 174:6
**TRIAL** [1] - 1:11
**tricky** [1] - 14:13
**trip** [1] - 25:14
**Trish** [1] - 162:19
**true** [21] - 3:25, 4:2, 5:2, 39:7, 42:10, 42:12, 65:20, 83:12, 83:15, 83:22, 84:5, 97:5, 100:15, 102:16, 113:3, 119:10, 136:2, 136:14, 154:18, 154:20, 176:7
**trump** [1] - 170:6
**trust** [1] - 31:4
**trusted** [1] - 31:5
**truth** [4] - 6:14, 55:2, 168:2, 170:10
**truthfully** [1] - 44:17
**try** [7] - 7:5, 9:24, 78:10, 129:2, 165:4, 174:23
**trying** [16] - 7:24,

10:14, 23:25, 35:9, 39:5, 51:6, 69:2, 74:13, 79:22, 81:11, 82:3, 83:7, 99:16, 111:25, 112:2, 174:9
**TUESDAY** [1] - 1:12
**turn** [22] - 5:22, 6:9, 38:21, 44:5, 46:12, 51:20, 60:14, 67:21, 76:11, 82:19, 95:20, 98:1, 107:15, 114:11, 121:1, 136:18, 142:19, 143:9, 146:12, 149:17, 150:19, 155:10
**turned** [2] - 120:24, 121:16
**turning** [4] - 57:14, 58:1, 58:6, 58:20
**twice** [1] - 102:10
**two** [32] - 5:11, 16:6, 20:9, 20:10, 22:10, 24:18, 25:22, 25:23, 31:15, 37:21, 53:4, 54:7, 59:12, 95:21, 95:25, 96:1, 98:22, 105:3, 105:9, 107:23, 117:1, 140:16, 143:2, 143:5, 146:9, 152:25, 154:10, 161:21, 162:13, 171:23, 173:18, 173:19
**two-part** [2] - 105:3, 105:9
**two-year** [1] - 140:16
**tying** [1] - 117:10
**type** [4] - 74:3, 111:2, 112:4, 127:23
**typed** [1] - 105:16
**typewritten** [2] - 108:12, 108:14
**typical** [1] - 47:17
**typically** [2] - 72:8, 129:4

**U**

**Uganda** [1] - 62:24
**ultimately** [6] - 4:5, 9:5, 9:19, 13:17, 70:1, 90:13
**um-hum** [7] - 72:18, 72:20, 73:10, 74:18, 86:25, 87:6, 89:6
**unanticipated** [1] - 129:16
**unavailable** [2] -

54:13, 54:20
**unbelievable** [1] - 10:25
**uncomfortable** [1] - 31:12
**under** [12] - 20:15, 30:17, 32:3, 44:11, 60:5, 73:11, 96:19, 98:19, 161:8, 161:9, 176:11, 176:21
**undergraduate** [2] - 120:10, 131:23
**underneath** [2] - 74:25
**understood** [6] - 157:22, 157:24, 158:16, 158:19, 158:25, 159:9
**undertake** [1] - 23:21
**unfounded** [1] - 99:21
**unintelligible** [1] - 131:24
**United** [3] - 176:4, 176:6, 176:18
**UNITED** [1] - 1:2
**Universities** [1] - 66:2
**universities** [3] - 5:9, 39:8, 40:1
**University** [31] - 3:9, 3:22, 3:23, 3:24, 10:11, 45:6, 52:1, 52:3, 52:4, 62:11, 63:20, 64:18, 74:8, 78:21, 80:10, 90:2, 90:15, 94:22, 103:18, 104:25, 105:1, 112:16, 120:10, 120:11, 131:23, 140:3, 140:14, 147:17, 159:25, 160:12, 160:13
**UNIVERSITY** [1] - 1:8
**university** [27] - 5:16, 13:20, 30:18, 33:6, 37:13, 61:1, 61:7, 61:8, 64:6, 77:6, 77:18, 79:25, 81:13, 84:3, 85:5, 86:15, 86:17, 86:18, 86:22, 93:6, 94:23, 96:19, 104:14, 129:15, 139:3, 156:10, 158:12
**university's** [1] - 104:3
**unless** [5] - 15:2, 44:14, 170:6, 173:24, 176:21
**unlike** [1] - 24:1

**unreasonable** [1] - 23:24
**unsafe** [1] - 27:22
**unusual** [1] - 102:23
**up** [70] - 4:7, 4:24, 5:1, 5:21, 5:24, 5:25, 6:2, 11:22, 14:17, 14:18, 17:13, 17:14, 22:13, 26:1, 26:10, 27:13, 29:3, 29:19, 30:1, 30:13, 31:8, 35:5, 38:2, 38:10, 38:12, 38:22, 40:17, 44:1, 49:13, 52:8, 53:11, 59:23, 65:13, 70:12, 73:20, 75:7, 82:21, 83:1, 88:9, 88:12, 91:23, 92:5, 95:20, 98:3, 100:22, 101:7, 101:16, 105:11, 105:16, 106:9, 107:13, 109:7, 110:21, 113:5, 113:14, 113:17, 116:10, 116:21, 121:14, 125:19, 132:8, 132:19, 133:7, 150:10, 150:11, 162:1, 166:1, 169:15, 172:18
**updating** [1] - 149:10
**upheld** [3] - 126:1, 126:2, 129:20
**uphold** [2] - 139:3, 139:6
**upholding** [3] - 74:9, 79:8, 80:21
**upset** [5] - 8:5, 8:12, 18:9, 18:13, 85:10

**V**

**V.P.A** [1] - 147:13
**vacant** [1] - 173:19
**vacation** [4] - 6:20, 7:18, 26:8, 26:20
**vague** [12] - 10:24, 112:12, 115:8, 143:2, 143:5, 143:14, 143:23, 144:7, 144:15, 157:15, 157:19, 159:5
**vaguely** [2] - 133:6, 150:24
**value** [8] - 23:20, 39:4, 64:12, 94:20, 94:21
**values** [17] - 39:2, 60:24, 61:5, 63:5,

63:21, 64:7, 69:25, 74:10, 79:8, 80:6, 80:21, 81:20, 84:17, 85:5, 93:8, 94:4
**variety** [1] - 58:25
**various** [10] - 64:3, 74:21, 76:6, 80:1, 81:15, 90:9, 95:4, 104:14, 105:17, 124:18
**verb** [2] - 158:10, 159:1
**verbatim** [3] - 69:10, 78:11
**verdict** [2] - 59:20, 153:16
**verify** [1] - 82:20
**version** [2] - 108:14, 113:7
**versus** [1] - 112:16
**via** [2] - 8:11, 165:24
**vice** [18] - 4:1, 13:6, 16:1, 16:4, 19:23, 22:16, 32:21, 32:23, 33:23, 57:5, 58:16, 70:22, 71:13, 78:1, 103:23, 147:13, 158:5, 158:16
**victims** [1] - 62:23
**video** [59] - 6:12, 6:20, 6:22, 6:24, 7:7, 8:15, 9:12, 13:21, 25:18, 27:2, 28:14, 30:1, 32:5, 47:5, 47:6, 48:18, 48:20, 48:21, 49:9, 57:15, 57:16, 57:20, 57:21, 57:22, 62:7, 63:18, 63:24, 65:7, 68:1, 68:9, 73:24, 80:2, 81:16, 83:13, 83:16, 83:22, 85:4, 93:18, 93:24, 95:3, 95:7, 95:10, 95:14, 95:16, 96:7, 105:3, 105:9, 107:20, 115:23, 118:4, 123:14, 123:22, 123:25, 124:19, 124:21, 137:19
**videos** [82] - 6:17, 6:19, 7:1, 8:9, 8:14, 8:22, 8:24, 14:11, 25:6, 25:8, 25:15, 25:20, 25:22, 26:1, 26:3, 26:9, 26:10, 26:13, 26:18, 26:21, 27:4, 28:20, 30:10, 31:9, 42:10, 50:10, 50:11, 50:20, 50:24,

55:25, 58:15, 61:19,
61:25, 62:3, 64:19,
65:17, 66:24, 67:10,
68:18, 69:21, 70:9,
74:6, 74:7, 76:1,
78:16, 78:17, 78:18,
78:20, 79:1, 79:22,
80:6, 80:8, 80:14,
80:15, 81:9, 83:20,
83:24, 84:2, 86:8,
86:9, 96:20, 115:12,
115:17, 116:2,
116:8, 116:11,
117:13, 117:18,
117:21, 118:18,
124:7, 125:10,
125:21, 125:23,
126:2, 128:3,
137:14, 138:5
**viewing** [3] - 64:19,
68:1, 68:9
**views** [1] - 73:1
**violate** [1] - 39:4
**violated** [7] - 64:13,
79:7, 80:20, 93:2,
93:3, 93:10, 97:5
**violates** [1] - 64:18
**violation** [14] - 64:16,
78:18, 79:6, 79:12,
79:14, 80:6, 80:19,
80:25, 81:1, 94:3,
94:25, 96:1, 96:3,
157:11
**violations** [2] -
113:10, 156:13
**viral** [2] - 28:14, 28:21
**virtually** [1] - 62:15
**virtue** [1] - 45:16
**visas** [1] - 104:6
**viscously** [1] - 116:8
**vision** [1] - 61:8
**visit** [1] - 76:20
**visited** [4] - 46:17,
47:7, 47:22, 48:15
**visiting** [2] - 46:13,
140:17
**vs** [1] - 1:6
**vulgar** [1] - 63:11

### W

**wagon** [1] - 29:21
**wait** [9] - 11:13, 55:13,
73:9, 73:17, 105:20,
106:10, 117:25,
118:10, 172:18
**waited** [3] - 65:21,
78:22, 80:11
**waiting** [3] - 29:22,
88:10, 119:14

**walk** [1] - 29:13
**wall** [1] - 118:20
**wants** [5] - 11:12,
20:22, 21:14, 22:1
**war** [1] - 62:24
**warm** [1] - 21:24
**warn** [1] - 132:10
**warning** [2] - 134:7,
157:12
**warnings** [1] - 156:21
**warranted** [3] - 74:2,
153:5, 153:15
**Washington** [1] -
176:19
**wasted** [1] - 19:17
**Watch** [1] - 22:23
**watch** [1] - 6:22
**watched** [2] - 93:16,
93:18
**water** [1] - 27:19
**WAYNE** [1] - 1:17
**ways** [5] - 78:23,
80:12, 88:5, 88:6,
154:8
**website** [1] - 22:24
**week** [1] - 22:14
**weekend** [1] - 26:6
**weigh** [1] - 8:25
**welcome** [1] - 64:4
**wellness** [1] - 104:13
**wherefore** [2] - 50:12,
50:22
**wherein** [1] - 23:6
**whole** [20] - 21:4,
43:22, 55:16, 61:15,
63:8, 69:22, 74:9,
74:21, 75:18, 84:18,
94:5, 102:14, 104:5,
113:13, 116:13,
117:12, 132:10,
170:15, 170:16,
171:21
**wife** [9] - 25:11, 28:2,
28:12, 29:7, 29:10,
32:5, 32:6, 63:14,
63:24
**William** [1] - 146:24
**willing** [3] - 22:24,
23:21, 130:19
**willingness** [1] - 20:2
**win** [1] - 22:3
**wing** [5] - 14:25, 15:2,
17:1, 17:3, 40:1
**wisdom** [1] - 35:16
**wise** [2] - 40:5, 88:15
**wish** [2] - 82:9, 174:5
**within-mentioned** [1]
- 176:8
**witness** [37] - 3:1,
43:18, 44:6, 54:21,

59:18, 65:22, 67:1,
68:2, 69:13, 72:19,
77:1, 77:8, 77:9,
77:14, 83:24, 87:7,
87:8, 87:22, 88:5,
89:12, 91:19, 92:25,
100:24, 102:19,
103:8, 103:10,
119:16, 131:4,
139:21, 159:17,
165:12, 168:7,
171:1, 171:2, 173:1,
173:5, 173:12
**WITNESS** [14] - 11:19,
41:20, 43:17,
135:24, 136:10,
137:7, 139:16,
139:20, 144:12,
144:16, 144:18,
150:4, 151:10, 157:6
**WITNESSES** [1] - 2:1
**witnesses** [1] - 165:2
**women** [2] - 61:10,
62:25
**wonder** [1] - 14:16
**word** [11] - 5:3, 20:8,
31:1, 41:2, 44:23,
51:10, 67:12, 89:15,
129:4, 151:10, 157:7
**wording** [2] - 71:2,
129:13
**words** [7] - 35:13,
40:24, 69:4, 69:10,
129:5, 136:6, 136:7
**works** [1] - 71:15
**world** [3] - 61:17,
63:8, 64:9
**worth** [1] - 168:18
**worthy** [1] - 150:13
**write** [5] - 49:17,
90:13, 129:1,
145:10, 145:11
**writing** [6] - 52:16,
91:12, 150:24,
153:16, 155:11,
166:5
**written** [20] - 9:8, 9:21,
9:23, 10:6, 11:2,
11:15, 11:20, 12:4,
19:20, 73:3, 84:7,
88:1, 113:6, 114:25,
115:6, 122:2, 133:4,
142:1, 156:21,
157:12
**wrongdoing** [1] -
128:8
**wrote** [3] - 49:13,
90:6, 91:4

### Y

**year** [7] - 13:25, 16:6,
37:21, 60:19, 60:22,
120:3, 140:16
**years** [38] - 3:15, 5:8,
7:2, 13:24, 14:4,
15:22, 18:7, 21:7,
45:7, 45:11, 45:12,
45:13, 45:22, 57:8,
58:23, 60:19, 60:22,
60:23, 61:23, 67:22,
68:25, 72:14, 77:16,
77:18, 78:10, 83:8,
102:13, 103:22,
124:15, 131:19,
132:11, 140:11,
140:21, 143:8,
143:17, 154:14,
173:9
**yesterday** [2] - 12:21,
131:9
**York** [3] - 3:23, 3:24,
52:4
**young** [4] - 27:19,
29:5, 29:10, 124:15
**yourself** [4] - 33:16,
71:24, 72:18, 150:22
**YouTube** [5] - 28:19,
95:13, 95:18,
116:12, 117:13

### Z

**ZACHARY** [1] - 1:15