1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2

 3   FREDERICK FAGAL, JR.      :
                               :
 4                             :
                               :
 5       vs                    :    3:14-CV-2404
                               :
 6                             :
                               :
 7   MARYWOOD UNIVERSITY       :

 8
          BEFORE:      THE HONORABLE A. RICHARD CAPUTO
 9
          PLACE:       COURTROOM NO. 3
10
          PROCEEDINGS:  NONJURY TRIAL
11
          DATE:        WEDNESDAY, APRIL 25, 2018
12

13   APPEARANCES:

14   For the Plaintiff:

15   JONATHAN ZACHARY COHEN, ESQ.
     JONATHAN Z. COHEN LTD.
16   175 STRAFFORD AVENUE
     SUITE 1 # 212
17   WAYNE, PA 19087-3340

18   For the Defendant:

19   KATHLEEN A. MCGINLEY, ESQ.
     DONALD E. ENGLISH, JR., ESQ.
20   JACKSON LEWIS, PC
     2800 QUARRY LAKE DRIVE
21   SUITE 200
     BALTIMORE, MD 21209
22
     STEPHANIE JILL PEET, ESQ.
23   JACKSON LEWIS, LLP
     THREE PARKWAY
24   1601 CHERRY STREET
     SUITE 1350
25   PHILADELPHIA, PA 19103
```

1                            <u>INDEX TO WITNESSES</u>

2

3    FOR PLAINTIFF:   DIRECT  CROSS  REDIRECT  RECROSS

4    FREDERICK F. FAGAL, JR.
                          6

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. COHEN:  Good morning, Your Honor.

2          THE COURT:  Okay.  Mr. Cohen.

3          MR. COHEN:  Yes.  Your Honor, I did ask defendant's

4    counsel to agree to a motion to admit several exhibits, more

5    than several to be honest.  They said no.  But I realize that

6    four of them don't need any witness to identify them.  They are

7    self-authenticating.  For the others, there's no rule that

8    prohibits me from recalling my client.  Your Honor has full

9    discretion over the mode and order of calling witnesses.  I

10   haven't rested my case.

11          The only downside is that the case will run ten

12   minutes later.  I'm not going to ask him any substantive

13   questions.  I'm just asking ask him to identify some exhibits

14   and that's -- that's my position on this, Your Honor.

15          THE COURT:  So I am not sure I understand what you're

16   telling me.  You want to put your client back on the stand to

17   identify certain exhibits?

18          MR. COHEN:  Yes, Your Honor.

19          THE COURT:  Okay.  What's the problem?

20          MS. PEET:  The problem is some of the documents that

21   he wants admitted into evidence you already ruled are

22   inadmissible.  Three of them are subsequent remedial measures

23   inadmissible impermissible pursuant to rule 407, the same

24   document he tried to use yesterday.  He's trying to admit his

25   expert's report.  As, you know, the expert testified here at

4

1   trial, the report is not admissible.  I would like to go over

2   each exhibit that he wants to introduce because I don't believe

3   they are appropriate.

4          MR. COHEN:  Okay.

5          THE COURT:  Is that right?

6          MR. COHEN:  First, some of those that counsel

7   mentioned I wasn't going to have my client authenticate.  Some

8   of them I am just going to let go.  I was only going to call my

9   client to authenticate the exhibits that he can authenticate.

10  Those don't include the ones objected to --

11         THE COURT:  Something has been objected to and not

12  admissible, I can't imagine that he's going to try to do that.

13         MS. PEET:  In fairness, Your Honor, last night we got

14  an e-mail around midnight asking us to agree to admit those

15  documents into evidence today.  That's what I am responding to.

16  I haven't received any further communication.

17         MR. COHEN:  Look, they pretty much made it clear

18  yesterday they weren't going to allow anything.  I tried again.

19  They said no.  They provided no reason.  I just think that --

20         THE COURT:  You're confusing me.  Trying to put in,

21  for example, subsequent immediate remedial measures.

22         MR. COHEN:  Yes, that's not true.

23         THE COURT:  I am confused.  Do you have a problem

24  with him putting his client witness on the witness stand?

25         MR. ENGLISH:  For the limited purpose of identifying

5

1  documents, I do.  He got his shot.  I mean --

2          THE COURT:  Is that the best you can do for me?

3          MR. ENGLISH:  Your Honor, I understand if he wants to

4  put him on to identify these exhibits, then --

5          THE COURT:  Yeah.  Recall your witness.  Doctor,

6  you're still under oath.

7          FREDERICK F. FAGAL, JR., was recalled.

8          MR. COHEN:  I do apologize for the short delay, Your

9  Honor.  Brian, pull up Plaintiff's Exhibit 17, please.  Fred,

10  do you recognize this document?

11          MR. ENGLISH:  Your Honor, before we get into the

12  document, I object to this document.  This is a newspaper

13  article that is not evidence, and it's just talking about how

14  these videos in other contexts are a.  Joke and it has nothing

15  to do with this case because this isn't discussing how these

16  videos are a joke when an employer -- when an employee makes a

17  video to humiliate his employer by depicting them as Hitler.

18          THE COURT:  What's the purpose of this?

19          MR. COHEN:  Your Honor, not to show -- not to admit

20  them for the truth of what they are saying but simply to prove

21  the public exposure of this type of parody, you know, to show

22  that these were well known by the public.  It wasn't something

23  out of the blue that my client just created for the first time.

24  It's just to show how publically exposed these Downfall

25  parodies are.

1          THE COURT:  You can have him identify it.

2          MR. COHEN:  Okay.

3          THE COURT:  All right.  When it comes time to ask to

4  for it to be admitted, we will hash that out.

5  DIRECT EXAMINATION

6  BY MR. COHEN:

7  Q.    Fred, what is this document?

8  A.    Well, this would be a B. B. C. News article.  Looks like

9  the link is down below.  I read the article on my computer, and

10  it explains the popularity of Downfall videos and parodies.

11          MR. COHEN:  Your Honor, I move to admit Plaintiff's

12  Exhibit 17 into evidence.

13          MR. ENGLISH:  Your Honor, for the same reason we will

14  object.

15          THE COURT:  I understand your point.  How is it

16  relevant?  It shows the popularity, right?  Is that what you

17  say --

18          MR. COHEN:  The public knowledge of it, public

19  exposure of it.

20          THE COURT:  You had a number of people from Marywood

21  on the witness stand.  You never asked anyone if they were

22  familiar with it.  What difference does it make what someone in

23  New York City thought about that?  How is it germane to this

24  case?

25          MR. COHEN:  I am not showing it for what someone said

7

1  in New York City --

2          THE COURT:  You're said there was public awareness of

3  if.  You're suggesting that the people in the Marywood

4  community would have been aware of it.  You could have

5  presented evidence of that.  I am not going to allow it.

6          MR. COHEN:  Brian, pull up exhibit plaintiff 46.

7  BY MR. COHEN:

8  Q.   Do you recognize this document?

9  A.   Yes, I do.

10 Q.   What is it?

11 A.   It's part of the Marywood policies and procedures manual

12 regarding violent acts and threats.

13 Q.   And what's the date on it?  Can you turn the page all the

14 way to the end?

15 A.   Last revision in the history says it was revised 4/29/11,

16 April 29th, 2011.

17         MR. COHEN:  Your Honor, I move to have this exhibit

18 admitted.

19         MR. ENGLISH:  No objection, Your Honor.

20         THE COURT:  It will be admitted.

21         MR. COHEN:  Brian, pull up exhibit plaintiff 59,

22 please.

23 BY MR. COHEN:

24 Q.   Fred, do you recognize this document?

25 A.   Yes, I've seen this before.  It's a letter from you to

8

1  Marywood attorney at the time, Mr. Anthony, about President

2  Munley's letter saying I was terminated and lost my tenure.

3          MR. COHEN:  Your Honor, I move to have plaintiff's

4  trial exhibit 59 admitted.

5          MR. ENGLISH:  Your Honor, I will restate my

6  objections to the other letters that, you know, this is really

7  testimony from the lawyer and not from Dr. Fagal.  With that in

8  mind, I understand you've allowed in similar letters from Mr.

9  Cohen.

10         THE COURT:  I will admit this.

11         MR. ENGLISH:  Okay.

12         MR. COHEN:  Brian, could you pull up exhibit P. 90?

13 BY MR. COHEN:

14 Q.    Fred, do you recognize this document?

15 A.    Yes, I do.

16 Q.    And could you identify it, please?

17 A.    Pardon me?

18 Q.    Could you identify it, please?

19 A.    Yes, it's a letter from attorney Anthony to you on

20 February 28, 2012.

21 Q.    Okay.  And --

22         MR. COHEN:  Your Honor, I move to have plaintiff's

23 trial exhibit 90 moved into evidence.

24         MR. ENGLISH:  No objection, Your Honor.

25         THE COURT:  Admitted.

1    MR. COHEN:  Brian, pull up Plaintiff's Exhibit 130.

2 BY MR. COHEN:

3 Q.    Fred, could you identify this document?

4 A.    Yes, it's the letter I wrote November 18th, 2016 to the

5 economic search committee at Cazenovia College as part of the

6 job application.

7    MR. COHEN:  Your Honor, I move to have plaintiff's

8 trial exhibit 130 admitted.

9    MR. ENGLISH:  No objection, Your Honor.

10    THE COURT:  It's admitted.

11    MR. COHEN:  Brian, pull up Plaintiff's Exhibit 135.

12 BY MR. COHEN:

13 Q.    Fred, do you recognize this document?

14 A.    Yes, it's an e-mail from me to the economic search

15 committee at Cazenovia College in Cazenovia, New York.  It

16 says, attached please find my letter of application for the

17 tenure track economics job.

18    MR. COHEN:  Your Honor, I move to have plaintiff's

19 trial exhibit 135 admitted.

20    MR. ENGLISH:  No objection, Your Honor.

21    THE COURT:  Admitted.

22    MR. COHEN:  Brian, pull up Plaintiff's Exhibit 144.

23 BY MR. COHEN:

24 Q.    Fred, do you recognize this document?

25 A.    Yes, I do.

1  Q.    What is this?

2  A.    Well, it's an e-mail to me from State University of New

3  York, Oswego, New York dated June 20th, 2017, and it's a

4  follow-up letter regarding my application for the position

5  assistant visiting professor of economics at SUNY Oswego.

6              MR. COHEN:  Your Honor, I plaintiff to have

7  plaintiff's trial exhibit 144 admitted.

8              MR. ENGLISH:  No objection, Your Honor.

9              THE COURT:  Admitted.

10             MR. COHEN:  Brian, pull up joint exhibit 5, please.

11 BY MR. COHEN:

12 Q.    Fred, do you recognize this document?

13 A.    Yes, I do.

14 Q.    And what is this?

15 A.    This is a -- part of the policies and procedures manual

16 relating to tenure at Marywood University.

17 Q.    Turn to the last page, Brian.  And what's the date on

18 this, Fred?

19 A.    Latest revision date is 12/09/11, which would be December

20 9th, 2011.

21             MR. COHEN:  Your Honor, I move to have joint exhibit

22 5 admitted.

23             MR. ENGLISH:  No objection, Your Honor.

24             THE COURT:  Admitted.

25             MR. COHEN:  Last one is joint exhibit 40, please.

1  BY MR. COHEN:

2  Q.    Fred, do you recognize this document?

3  A.    Yes, this is a -- from the Chronicle of Higher Education,

4  the job search e-mails I would get, and this is related to a

5  visiting assistant professor of economics, Oswego, April 28th,

6  2017.

7            MR. COHEN:  Your Honor, I move to have joint exhibit

8  40 admitted into evidence.

9            MR. ENGLISH:  No objection, Your Honor.

10            THE COURT:  Admitted.  Any questions?

11            MR. ENGLISH:  No, Your Honor.

12            THE COURT:  You can step down.  Do you have all your

13  exhibits squared away?

14            MR. COHEN:  Yes, I do.  Plaintiff rests.

15            THE COURT:  All right.  Thank you, Your Honor.

16            MR. ENGLISH:  Your Honor, are we going to do

17  stipulations?

18            MR. COHEN:  Yes, are you talking about the undisputed

19  facts that we have --

20            MR. ENGLISH:  Yes.  We worked it out last night with

21  the undisputed facts rather.  Than read them in, I think we

22  have something ready to submit, or we will have something.

23            MR. COHEN:  I didn't get back -- could I simply file

24  it with the Court?  It's just a statement of undisputed facts.

25  It's an amended version of what was submitted with the pretrial

12

1  memo.

2          THE COURT:  All right.

3          MR. COHEN:  Thank you, Your Honor.

4          MR. ENGLISH:  Rather than read them, I think we

5  agreed to submit them.  I think we agree on everything, okay.

6  Just to be clear, Your Honor, I think we came to an agreement

7  on the answer.  And so we ended up stipulating to what he

8  wanted us to stipulate so those two exhibits, they'll need to

9  be admitted.

10          THE COURT:  Okay.  What are the admissions?

11          MR. COHEN:  One was that Marywood removed some of the

12  posters that were hung, and the other was that the posters had

13  been approved by Marywood.  That's all.

14          THE COURT:  Okay.

15          MS. McGINLEY:  Your Honor, we are going to make a

16  motion for a directed verdict.

17          THE COURT:  I understand.

18          MS. McGINLEY:  Judgment should be entered for

19  defendant now because Dr. Fagal has not proven a breach of the

20  tenure agreement by Marywood.  The testimony established was to

21  the contrary that Dr. Fagal materially breached the tenure

22  agreement and because of that material breach he cannot insist

23  on further performance of the contract by Marywood.  In your

24  opinion denying the motion for summary judgment, you said you

25  needed to hear from the parties about their expectations of the

1  contract, and you did yesterday and on Monday, particularly

2  from Dr. Fagal and also from Sister Munley in her deposition

3  transcript.

4          She expected and as did other -- as did Marywood, the

5  university, a contributing professor who would uphold its core

6  values and not discriminate and harass other colleagues.  That

7  expectation was clearly communicated to Dr. Fagal in the

8  policies that he admits he received, that is the professional

9  ethics policy, academic freedom policy and the tenure policy

10  and the civil rights policy.  Five tenured professors testified

11  in plaintiff's case as did Sister Munley that his actions in

12  posting that video were outrageous, unbelievable and completely

13  out of line for a tenured professor.

14          He could not unpost or undistribute the videos.  He

15  showed uncompromised, unrepairable judgment that could not be

16  undone.  Marywood cannot be compensated by him for that loss of

17  a tenured professor.  Dr. Fagal's testimony was clear that in

18  the January 23rd meeting even today he shows no remorse.  He

19  doesn't believe what he did was wrong and he still believes

20  that it was a joke even after we heard from Dr. Levine that it

21  wasn't a joke to hear those things about his family and

22  himself.

23          There's no likelihood now or then that Dr. Fagal was

24  going to repair or remedy the breach even if it could be done.

25  And further, his testimony and his e-mails from before and

1  after posting the videos demonstrate his bad faith in doing so.

2  He intended to shame, embarrass and cause pain to Marywood.

3          For these reasons he materially breached the

4  agreement.  Marywood did not waive that breach.  It notified

5  him twice by Sister Munley and then by a letter to his attorney

6  that he materially breached, and Marywood didn't owe him

7  anything.  Even though -- so waiver is an intentional act.  And

8  by notifying him of his breaches, it didn't waive that material

9  breach by continuing to perform its end of the bargain, which

10  was just to end the tenure agreement.

11          It did not continue to accept teaching performance

12  from him.  He was immediately suspended, and the Eastern

13  District of Pennsylvania has held that it did not find a waiver

14  where a party informed the breaching party over that the breach

15  was a material breach but kept performing its end if only to

16  mitigate its own damages.  Marywood cannot be expected to stop

17  performance to prove a material breach.  That would be a an

18  unreasonable catch 22.  Aside from Dr. Fagal's material breach,

19  the evidence before the Court is not -- is that Marywood

20  complied with its policies.

21          The progressive discipline policy did not require Dr.

22  Levine to notify Dr. Fagal of his suspension.  The policy says

23  that a faculty member may be notified by the V. P. of academic

24  affairs, not that it's required.  He -- Dr. Levine and Sister

25  Munley testified that Dr. Levine was a victim of the videos and

1  it would be inappropriate to involve him in Dr. Fagal's

2  suspension and discipline.  Suspension of Dr. Fagal was proper

3  because the university found he posed an immediate threat of

4  harm.  The Court is not deciding whether Marywood made the

5  right decision in finding immediate harm or made the right

6  decision in terminating him.  The Court is deciding whether it

7  followed its policies in executing those decisions.  As Sister

8  Munley testified as did Dr. Levine, Helen Bittel, Edward

9  O'Brien and Erin Sadlack, the university found he was a threat

10 of immediate to Marywood's community and his coworkers,

11 particularly Dr. Levine.

12        Title 7 requires the university to take immediate

13 prompt, remedial action to end harassing conduct of coworkers,

14 and Marywood did that by suspending Dr. Fagal.  Even so, the

15 policy does not state that suspension is appropriate only if

16 there's a threat of immediate harm, and the policy certainly

17 doesn't state that immediate harm is physical.  The progressive

18 discipline policy is discretionary for serious violations.  The

19 language of the policy makes that clear.

20        The university regards disciplinary actions as

21 corrective and not punitive.  The policy recognizes personal

22 and professional problems that may be rectified in an informal

23 educational process as well as serious violations of

24 professional responsibilities implicating possible

25 recommendation for suspension or dismissal making clear that

1  there are two tracks and that suspension is not a prerequisite

2  to dismiss.

3         In interpreting the language of a contract, the Court

4  attempts to ascertain the intent of the parties.  In his

5  e-mails prior to release of the videos Dr. Fagal did not say,

6  well, they're only going to give me an oral warning or only a

7  written warning.  He said, they may terminate me and they'll

8  have to form committees and have hearings.  Those are processes

9  of termination.  He understood for serious violations dismissal

10 was the appropriate action.

11        Dr. Fagal's suspension was reviewed several times by

12 the grievance committee as testified by Dr. Sadlack, by the ad

13 hoc committee as part of the termination and then separately as

14 on July 13th.  And each time the suspension was upheld.  The

15 April effective date of the termination was correct.  Dr. Fagal

16 admits he did not timely authorize the release of his personal

17 information to the committee.  He had ten days to do so under

18 the progressive discipline policy.

19        He testified he never signed the agreement, and his

20 lawyer notified Marywood twice that he was not going to sign

21 it.  When he did finally authorize the release on March 29th,

22 two months after he received the second recommendation of

23 termination, he was still granted the ad hoc committee review.

24 It doesn't matter that review came after the finalization of

25 his termination because that review is only a recommendation to

1  the final decision maker, who is Sister Munley.  And there was

2  no indication as testified by Ed O'Brien that Dr. -- that

3  Sister Munley was not going to take their recommendation into

4  effect.

5          She did not have to convene that committee, but she

6  did.  For these reasons, Marywood did not breach the agreement.

7  Even if this Court finds that there's some technical breach,

8  that is all it is.  Dr. Fagal received the benefit of his

9  bargain.  He knew he can be terminated for his conduct.  He

10 received actual notice of his suspension and termination.  He

11 received multiple reviews of his suspension and his termination

12 and the opportunity to raise his defense to two committees.

13 The order of the review as I said it's immaterial.  The ad hoc

14 committee is advisory only.

15         If a breach is found, the evidence before the Court

16 is that Dr. Fagal has not reasonably and diligently searched

17 for a job.  He admits to applying to only three jobs in six

18 years he that was qualified for more jobs during that time.  He

19 retired after being separated from Marywood, and he should not

20 be rewarded for that.  Thank you.

21         THE COURT:  Thank you.

22         MR. COHEN:  Your Honor, I am responding to

23 plaintiff's motion for directed verdict.  I am going to address

24 each of the arguments in approximately the order they were

25 given.  The first argument that I heard is that Marywood did

1  not waive a material breach.  This is an issue that's been

2  present in this case from the beginning, and Marywood has never

3  really had a response to it.

4           The law is clear, and it's been clear for many years

5  and that is that a party alleging that it could suspend

6  performance under contract because another party materially

7  breached that contract cannot then continue performance without

8  waiving the breach.  Those cases are Radisson Design

9  Management, Inc., versus Cummins.  That's 2011 West Law 818

10  668, WESTERN district of Pennsylvania, Fuller Company versus

11  Brown Minneapolis Tank and Fabricating Company, 678 F. Supp.

12  506, Eastern District of Pennsylvania, Gillard versus Martin,

13  which is a Pennsylvania Superior Court case, that's 13 A3.d

14  482.

15           And Gillard has the clearest explanation of this

16  concept, and it is citing the well known Williston treatise on

17  contracts.  When one party commits a material breach of

18  contract, the other party has a choice between two inconsistent

19  rights.  He or she can either elect to allege a total breach,

20  terminate the contract and bring an objection or instead elect

21  the keep the contract in force, declare the default, only a

22  partial breach and recover those damages caused by that partial

23  breach.

24           But the non-breaching party by electing to continue

25  receiving benefits pursuant to the agreement cannot then refuse

to perform his or her end of the bargain.  Now, in all of the
cases I have looked at involving this concept, I never -- I
never seen a waiver so clear.  And by the way, the concept is
not just called waiver.  Waiver does -- it sort of depends on
the intent of the party, but the other analogous concept is
called election of remedies which does not require us to prove
the intent of the defendant.

And to listen to the steps taken after they gave
notice of material breach, it is just to acknowledge that there
was a waiver.  For example, after defendant's counsel advised
of a material breach, the next thing that happened is that they
offered to convene an ad hoc committee to review President
Munley's recommendation for Fred's termination.  They convened
a faculty grievance committee to adjudicate Fred's grievance.
And then I think we heard testimony from Ms. -- Dr. Sadlack
yesterday that there were multiple meetings involving three
professors of the faculty grievance committee.

Then they permitted Fred to select a faculty member
for the ad hoc committee, Dr. O'Brien.  The ad hoc committee
was convened, multiple meetings involving three professors all
acting as if the contract is in force.  They permitted at ad
hoc committee to deliberate over the course of several months
and to reach a decision.  If you recall, the initial notice
that Professor Fagal received that he had materially breached
which was from defendant's counsel came I think February 8th or

1   9th, 2012.  I believe at least five months passed of all these

2   procedures and involving multiple professors, tons of man

3   hours, all acting as if the contract is still in force.

4        Then the obvious thing -- by the way, while they are

5   doing this, while they are giving him these procedures, they're

6   continuing to explicitly reference, well, we are doing this

7   pursuant to the progressive discipline policy.  I asked Dr.

8   Sadlack, did you think you were following the faculty

9   grievances and appeals policy.  She said yes.  They are

10  continuing to follow to perform under the contract that their

11  own attorney said was no longer in force.

12       The most obvious thing they simply continued to pay

13  him through August of 2012.  I can't envision a greater waiver

14  than this or election of remedies.  The case that they cite out

15  of the Eastern District of Pennsylvania, unpublished case,

16  actually decided under Delaware law, I think that their

17  argument is it says a party shouldn't have to guess whether the

18  breach is material or non-material and risk litigating this.

19       And I think the case simply doesn't say that.  I

20  think they are misinterpreting it.  The Pennsylvania jury

21  instructions on this concept says that in the -- in the

22  materiality section if the party alleging material breach ends

23  up being wrong and the breach is proved to be non-material,

24  that's on them.  They have to take that risk.

25       Not only do we have this concept that has been

1  enforced for many, many years, this is a sophisticated party

2  and while this was going on they were represented by skilled

3  counsel.  They knew what they were doing.  They did it anyway.

4  And now they want would have their cake and eat it, too.  They

5  want to say, oh, no, there was never any contract because we

6  terminated it.  But by the way, we followed it anyway.  You

7  simply can't have both of those under the law.  I haven't heard

8  defendant offer a single case on point case about this.

9         As far as I'm concerned, after their case in chief, I

10  could make a motion for judgment that their material beach

11  argument should be precluded because it's so obviously waived.

12  So that's the first argument.

13         By the way, this issue was disposed of very early on

14  day one of this case, and, in fact, defendant's counsel in her

15  opening statement says for some reason the evidence will show

16  that Sister Munley put Dr. Fagal on notice of his material

17  breach, but, nonetheless, allowed him to have six different

18  tenured faculty review her recommendations and decisions.  Game

19  over.  They admitted it from the first step.

20         Okay.  Now, secondly, I was wondering why this

21  argument of material breach has bothered me so much from

22  beginning of this case.  I finally figured it out last night.

23  This case can only be brought because of a seminal Pennsylvania

24  Supreme Court case called Murphy versus Duquesne University.

25  It's from 2001.  And what that case was about was a tenured

1  professor at a Pennsylvania -- private Pennsylvania university,

2  just like this one.  And basically I think the professor -- his

3  tenure was terminated and his employment was terminated.  I

4  think his case involved sexual harassment or assault.

5      That professor went through the Pennsylvania courts,

6  went all the way to the Pennsylvania Supreme Court all the way

7  he's arguing what I did wasn't bad enough, substantively it

8  wasn't bad enough to merit a termination of my tenure.  And all

9  the while the university is saying, these decisions made by

10 universities, they are meant to be final, they're not meant to

11 have Court review of educational decisions.  The only thing you

12 should be able to prove as a breach of contract is a breach of

13 procedure.  So you can't argue in a case that your termination

14 -- you were terminated for something just not bad enough.  You

15 have to argue as a procedural breach.

16     So at the beginning of this case Marywood filed a

17 motion to dismiss under 12(b)(6).  I think they argued, well,

18 they're not -- if you look at the contract they can't really be

19 arguing a procedural breach because that's not what the

20 contract says.  So they must implyably be arguing that what

21 Fred did was simply not bad enough, and you're not allowed to

22 do that.  Now we've come full circle, okay.  Now, for the past

23 two days we have been arguing -- we have flipped Murphy on its

24 head and because they're arguing that the procedures don't

25 apply anymore because the material breach, guess what we have

1  been arguing for the past two days?  Exactly what Murphy

2  prohibits, how bad was the breach.  If a university could

3  suspend its disciplinary rules simply on the argument, well,

4  the breach was so bad we didn't have to abide by the rules,

5  then the university in Murphy could have done the same thing.

6          They could have said, you know what, Murphy, get off

7  campus, we are terminating this contract and those disciplinary

8  rules don't apply.  Any university in this situation could just

9  simply say, you know what, we think your breach was so bad, our

10  own disciplinary rules don't apply, get off campus, we dare you

11  to sue.  They have flipped Murphy on its head.  I doubt if the

12  Your Honor reads Murphy again that the concept of material

13  breach is even available in this case.

14          Next I will move on to assuming they haven't waived

15  the material breach and assuming it's even available to that

16  defense under Murphy, was it a material breach, and we would

17  argue that it's non-material.  And simply put, this is a very

18  subjective determination under the restatement.  I believe

19  there are five or six elements to consider, and it's an issue

20  of fact.  And basically what the Pennsylvania courts have said

21  is that materiality requires a, quote, substantial showing of

22  several factors including, quote, the extent to which the

23  injured party will be deprived of the benefit which he

24  reasonably expected, quote, the extent to which the party

25  failing to perform or to offer to perform will suffer

1   forfeiture and, quote, the likelihood that the party failing to

2   perform or offered to perform will cure his failure, end of

3   quote.

4          Those are three of the considerations, okay.  Let's

5   look at the first one.  The extent to which the injured party

6   will be deprived of the benefit which he reasonably expected.

7   My client was not hired to exhibit Marywood's core values every

8   single day.  He was hired to teach, and he did that for many

9   years.  There's never been any argument that he -- you know,

10  took a month off and neglected his students.  He drove two

11  hours every day to teach these students.  Okay.  The faculty

12  manual says the primary duty of a faculty member is to teach.

13  That's not surprising.  It's a university.

14          Secondly, it's not even clear whether some of these

15  core values that Marywood is citing are even part of the

16  contract.  They are mentioned in the contract.  But they are

17  mentioned in aspirational ways, goals and objectives.  Not

18  binding requirements.  Second, the extent to which the party

19  offered suffer forfeiture.  That's exactly what happened here,

20  forfeiture, job over .  That the likelihood that the party

21  failed to perform or offered to perform will cure his failure.

22  Again at no point was he even asked to cure his failure.  We

23  did that voluntarily, we took down the video voluntarily.

24          Marywood represents in its faculty handbook that its

25  professors have the, quote, rights and obligations of other

1  citizens, end of quote, and reminds them that, quote, as

2  citizens engaged in the profession that depends upon freedom

3  for its health and integrity they have a, quote, particular

4  obligation to promote conditions of free inquiry, end of quote.

5         Marywood claims a commitment to, quote, a tradition

6  grounded on individual rights, a tradition that, quote, posits

7  open discussion and unrestricted exchange of ideas.

8  Professors, quote, maintain their right to criticize.  As I am

9  reading these, I am starting to realize maybe they breached

10  their contract.  They are trying to suppress free speech when

11  here they are saying you have to encourage it.

12         THE COURT:  Do you think a university can put limits

13  on the speech of a professor?

14         MR. COHEN:  Absolutely, Your Honor, absolutely can.

15         THE COURT:  Isn't that what we are talking about

16  here?

17         MR. COHEN:  Yes, the problem is they're not exactly

18  clear what the limits are because the contract is quite frankly

19  a little chaotic.  It says you -- it says open discussion and

20  unrestricted exchange of ideas and conflicting parts.  It's not

21  clear what is allowed and not.  It seems that the line -- the

22  speech no longer becomes free at this university as when the

23  president becomes offended.  That's the line.  The university

24  has a liberal disciplinary policy making even violent acts and

25  threats and thefts against the institution and carrying deadly

1  weapons, quote, subject to university disciplinary policies and

2  procedures or the progressive discipline policy.  What does

3  that tell you?  You know, they've been arguing that this

4  progressive discipline policy can't cover everything, it wasn't

5  intended it.  It can't cover, for example, the person that

6  comes onto campus that is physically threatening.  Well,

7  strangely, it does seem to cover that.  It's in the contract.

8  They've wrote it.  It contemplates even violence.

9          To argue they can throw their whole contract away

10  because of a parody, it simply doesn't make sense.  Here we

11  have a professor in his 25th year of service to Marywood and

12  18th year of tenure, terminated for publishing a video parody

13  of frankly reprehensible behavior by the university.  They

14  claim -- they encourage him to spread free speech there.  He

15  has someone come to class.  They approved the posters.  Then

16  they remove them.  They don't give him notice.  You know,

17  there's 46 posters.  He's paid money for this.  He spent a lot

18  of time.  He asked for an apology.  He doesn't get it.  I can

19  understand why he was angry .

20          The issue was easily recognizable satire.  Apparently

21  no member of the Marywood community filed a civil rights

22  complaint against Fred.  Nor did anyone ask the obvious, which

23  was simply to remove the video, which he did anyway.  There's

24  no objective evidence that Marywood's reputation suffered

25  because of the video.  There's no allegation that Fred

1  abandoned his primary role of teacher or teaching skills

2  suffered in any way.  And given those factors, we think it's a

3  stretch to argue that plaintiff's video parody was so

4  substantial a breach as to permit Marywood to bypass its own

5  disciplinary rules.

6         Next Marywood argues that this contract they cite

7  never existed anymore, they didn't breach it anyway.  And they

8  have their own interpretation of the contract.  And they have

9  always argued progressive discipline is not required in all

10 cases, and they raised that argument at the beginning of the

11 case on their motion under 12(b)(6), and this Court said, well,

12 we looked at the contract because it was attached to the

13 complaint and it does appear to say, well, what plaintiff says

14 it says, that a professor that has alleged to have committed

15 misconduct is entitled to warnings and various progressive

16 discipline before he is kicked off campus and terminated.

17 That's not what happened here.

18         THE COURT:  So you're getting to -- in their view of

19 things, you get to publish one video like this with immunity?

20         MR. COHEN:  In whose view?

21         THE COURT:  In their view.  In your view of their

22 rules.  How do you warn -- how is a warning applicable here?

23         MR. COHEN:  Well, Your Honor, it's --

24         THE COURT:  I can see the -- I can see the

25 progressive discipline being applied to someone that brings a

1  gun on campus.  You can remove that person or remove the gun.

2  No harm, no foul.  Once this video -- forgetting whether the

3  video is offensive or not -- they think it's offensive.  Once

4  it's done, how do you engage in progressive discipline?

5          MR. COHEN:  Well, if it you interpret the contract

6  literally, which I think we argue you have to, they would

7  simply have to say, take it down, this is your oral warning,

8  don't do it again.  If you do it again, you're going to a

9  written warning.  Does it sound a little ridiculous, it does.

10  My client didn't write the contract.  They did.  They did.

11  And, you know, because they wrote the contract it must be --

12  any ambiguities or uncertainties must be resolved against them.

13          THE COURT:  Even though something would on its face

14  not be -- not be applicable?

15          MR. COHEN:  Your Honor, I think I just argued I think

16  it would be applicable.  Here they would simply have to say,

17  you posted this video, we think it's offensive, take it down,

18  this is your oral warning, next one will be a written warning.

19          THE COURT:  All right, okay.

20          MR. COHEN:  There's another argument that defendant

21  has been making, and it's a fairly new argument, and that

22  argument is that not only are we allowed to do what we did, we

23  had to do what we did because this could have created a hostile

24  work environment, we had a legal obligation to do what we did.

25  And you heard several witnesses come up referencing legal

29

phrases that they never said before, okay, that sounded great

like hostile work environment.  The problem is they never

raised this as an affirmative defense.  They can't do it now.

Then there's the argument that Fred didn't authorize

a release of personal information.  I don't know how many times

I had to write letters saying it's authorized.  I mean, are

they questioning whether I had the authority, you know, to

speak for my client --

THE COURT:  Why didn't he sign?

MR. COHEN:  We didn't sign it because the release if

you look at it, it says you consent to a release of personal

information so that a committee could be convened to adjudicate

Fred's termination, and it left out suspension.  We felt that

by signing it, we would be agreeing that he wouldn't get a

committee for his suspension.

THE COURT:  So you believed that suspension is a

prerequisite to termination?

MR. COHEN:  Yes, Your Honor, we do.

THE COURT:  What's your authority for that?

MR. COHEN:  Our authority is the contract itself.

It's --

THE COURT:  Where does it say you can't terminate

someone unless they are suspended first?

MR. COHEN:  Under one of the provisions either it's

--

1          THE COURT:  You're telling me you can't terminate

2    someone if you don't suspend them first?

3          MR. COHEN:  Under the plain reading of their

4    contract, yes.

5          THE COURT:  Okay.

6          MR. COHEN:  Again, it seems like it could be

7    ridiculous.  My client didn't write the policy.  They did.

8          THE COURT:  I understand.

9          MR. COHEN:  They subsequently -- I'm not going to go

10   into -- I am not going to argue anything.  So, Your Honor,

11   those are my arguments.  Any argument that there's a material

12   breach has been waived, many, many times over now, we don't

13   even think a material breach is a valid offense policy-wise

14   under this Murphy case.  We don't think there was a material

15   breach.  We think the disciplinary procedures read the way

16   required progressive discipline, step by step, oral warning,

17   written warning, suspension and dismissal.  We think they

18   waived this affirmative defense they had an obligation to get

19   rid of Fred and the release of personal information was clearly

20   authorized.  We think the motion should be denied.

21          THE COURT:  All right.  Thank you.  Any rejoinder?

22          MS. McGINLEY:  Briefly.  The case we cite for waiver

23   is Camco v. Lovejoy.  That is a reported case in the Eastern

24   District of Pennsylvania from 2011, and it applies Pennsylvania

25   law.  In that case an independent commissioned salesperson had

1   a dispute with the distributor over commission payments, and he

2   notified the distributor of that dispute but continued to

3   service his clients and customers under the agreement and abide

4   by the non-compete provision if only to mitigate his own

5   damages while he pursued material breach.

6         Second, courts are not H. R. departments and that's

7   why the merits of the termination are not reviewable, and also

8   the materiality argument is about Dr. Fagal's breach, not about

9   Marywood's breach.  And then Marywood -- Marywood's

10  expectations were communicated in the contract.  The academic

11  freedom policy states that it presupposed first respect for

12  your colleagues.  The professional ethics policy states

13  explicitly --

14        THE COURT:  What's your answer to his argument that

15  suspension is a prerequisite to termination?

16        MS. McGINLEY:  That's what I was reading from earlier

17  in the beginning it says or, suspension or dismissal for very

18  serious violations.  It's the second paragraph of the policy.

19        THE COURT:  What does it say?

20        MS. McGINLEY:  I have my notes right here.  It says

21  that the university regards disciplinary action as corrective

22  and not punitive.  The policy recognizes, one, personal or

23  professional problems that may be rectified by an informal

24  educational process as well as serious violations of

25  professional responsibilities implicating possible

1   recommendation for suspension or dismissal.  Thank you.

2           THE COURT:  Thank you.  Anything else?

3           MR. COHEN:  One more thing, Your Honor.  Your Honor

4   was asking does suspension have to precede dismissal.  And

5   under the policy, which is joint exhibit 8, there's a section

6   called dismissal.  And there's just one sentence.  If remedial

7   actions taken during the suspension does not sufficiently

8   resolve the issues that lead to the suspension, the university

9   may move towards dismissal of the faculty member.  That's all

10  it says about dismissal.

11          THE COURT:  All right.  We will take about ten

12  minutes, and I will come back and tell you what I -- what I am

13  going to do, okay.

14          (A brief recess was taken.)

15          THE COURT:  All right.  On the motion for directed

16  verdict -- are you making this motion under --

17          MS. McGINLEY:  52 C.

18          THE COURT:  My analysis of it is this.  First of all,

19  on the question of material breach, I don't think the breach

20  was material.  That's my view.  The -- however, we move then to

21  the question of the conduct that occurred thereafter, and in my

22  view -- you raised six or seven points, Mr. Cohen.  You talk

23  about the suspension not being consistent with the progressive

24  disciplinary policy, namely , no prior warnings or opportunity

25  to -- for remedial action or monitored assistance provided for

1   in the policy.

2          In my view I don't think that's applicable given the

3   nature of the conduct that's at issue here.  In addition, you

4   also argue that the vice president of academic affairs had to

5   suspend Dr. Fagal.  Again, I don't find that to be a winner

6   because it appears to me a superior of Mr. Levine could have

7   superseded him in that function.  You also argued there was no

8   immediate harm at the time of his suspension.  And, of course,

9   there was testimony of -- from Mr. -- Professor Levine about

10  the impact this had on him.  It's not just physical harm, it's

11  any kind of psychological or emotional harm.  It appears to me

12  that was met in any event.

13         There's also testimony that there was reputational

14  harm to Marywood.  I don't know that -- I thought there wasn't

15  an awful lot of evidence of that, but that was testimony to

16  that effect.  But given all that -- in addition to those

17  things, there's this idea that the suspension has to precede

18  termination, and it would appear to me that if there's a basis

19  for termination, I don't think you have to have suspension in

20  terms of the way they interpret their own rules in a way I

21  would interpret them although you can argue that I'm not

22  supposed to interpret them given the law in Pennsylvania about

23  academic governance.  So I am -- I think that's pretty much

24  subsumed.  The suspension is pretty much subsumed in the

25  termination.

1    In any event, the procedures were followed, may not
2 be exactly in accordance with order and so forth, but there was
3 an effort to have an ad hoc committee.  Dr. Fagal selected a
4 member as he was -- as it was provided in their rules.  The
5 committee met, the committee decided unanimously including the
6 member that was appointed by him that the -- the termination
7 was appropriate, albeit after he received a letter indicating a
8 recommendation of termination or a determination that he should
9 be terminated, I don't see how else it could have been done.
10 He had an opportunity twice to have this hearing, and he choose
11 not to sign the document.  I see no -- I see no -- I see no
12 rational basis for that frankly.
13    So in my view Marywood followed the rules that they
14 had in place, and they gave Dr. Fagal the process that was
15 provided for in the rules in this kind of a circumstance.  So I
16 think you can say that the idea of the suspension and not
17 having had a hearing or an ad hoc committee on suspension while
18 it didn't occur at the time, it occurred later on.  The only
19 argument you might have there is since -- similar or different,
20 the composition of the committee.  I don't know what that
21 means, but the fact it was the same people, I don't think
22 matters because in my view termination trumps suspension
23 anyway.
24    I'm not even sure you would have been entitled to a
25 hearing on suspension at that point.  A couple other things.

1  You raised the retaliation in your pretrial memo, but I didn't

2  see any evidence of that.  So I am not going to address that.

3  I think I covered everything.  That's essentially my basis.  I

4  will give you a written memorandum of this essentially, but

5  those are the core reasons that support my decision to grant

6  this motion for judgment in favor of the defendant.  Anything

7  further?

8          MR. ENGLISH:  No, Your Honor.

9          MR. COHEN:  No, Your Honor.

10          THE COURT:  All right.  Thank you.  We're adjourned.

11          MR. ENGLISH:  Thank you, Your Honor.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

36

1                        REPORTER'S CERTIFICATE

2

3        I, Laura Boyanowski, RMR, CRR, Official Court Reporter for

4   the United States District Court for the Middle District of

5   Pennsylvania, appointed pursuant to the provisions of Title 28,

6   United States Code, Section 753, do hereby certify that the

7   foregoing is a true and correct transcript of the

8   within-mentioned proceedings had in the above-mentioned and

9   numbered cause on the date or dates hereinbefore set forth; and

10  I do further certify that the foregoing transcript has been

11  prepared by me or under my supervision.

12

13

14                            _____
                              Laura Boyanowski, RMR, CRR
15                            Official Court Reporter

16  REPORTED BY:

17       LAURA BOYANOWSKI, RMR, CRR
         Official Court Reporter
18       United States District Court
         Middle District of Pennsylvania
19       235 N. Washington Avenue
         Scranton, PA  18503

20

21       (The foregoing certificate of this transcript does not
    apply to any reproduction of the same by any means unless under
22  the direct control and/or supervision of the certifying
    reporter.)

23

24

25