# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FREDERICK F. FAGAL, JR., | |
| Plaintiff, | CIVIL ACTION NO. 3:14-CV-02404 |
| v. | (JUDGE CAPUTO) |
| MARYWOOD UNIVERSITY, | |
| Defendant. | |

## **MEMORANDUM**

Frederick Fagal, PhD ("Dr. Fagal"), the Plaintiff, was a tenured faculty member at Marywood University. Fagal was terminated by Marywood, the Defendant, on April 3, 2012 following his development and distribution of two parodies which depicted members of the Marywood administration as Nazis ("*Downfall* videos"). Following his termination, Dr. Fagal filed a Complaint in this Court, which was amended on January 15, 2015, asserting a single claim premised on a breach of contract. (*Doc*. 7.)

On February 23, 2015, Marywood filed a Motion to Dismiss for failure to state a claim upon which relief could be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). (*Doc*. 14.) This motion was fully briefed, and I concluded that Dr. Fagal had pled facts sufficient to allege a plausible claim. (*Doc*. 29.) Marywood answered the Amended Complaint on June 30, 2015. (*Doc*. 30.) Next, the parties filed cross motions for summary judgment. (*Docs*. 61-62.) Both motions were denied because I found that there was a genuine dispute of material fact regarding the materiality of Dr. Fagal's breach of contract. (*Doc*. 102.)

This matter proceeded to trial on April 23, 2018. At the close of Dr. Fagal's case, Marywood moved for Judgment on Partial Findings under Federal Rule of Civil Procedure 52(c). (*Doc*.131, at 12:18-20; 32:15-17.) I granted this motion. (*Doc*.131, at 35:3-7.) As required by Rule 52, I must offer findings of fact and conclusions of law to

support this decision and enter judgment in favor of Marywood and against Dr. Fagal. FED. R. CIV. P. 52(a).

## II. Discussion

**A.     Federal Rule of Civil Procedure 52:**

Rule 52 of the Federal Rules of Civil Procedure provides, in pertinent part:

> (a) **Findings and Conclusions.**
>
> (1) **In General.** In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its legal conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court. Judgment must be entered under Rule 58.
>
> . . .
>
> (c) **Judgment on Partial Findings.** If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgement on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

Pursuant to Rule 52(a), the Court's decision must "be supported by subordinate factual findings." *Giles v. Kearney*, 571 F.3d 318, 322 (3d Cir. 2009) (citing *O'Neill v. United States*, 411 F.2d 139, 146 (3d Cir. 1969)). As applied to a Rule 52(c) motion, the Court should apply "the same standard of proof and weigh the evidence as it would at the conclusion of the trial." *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 272 (3d Cir. 2010) (citing *Emerson Elec. Co. v. Farmer*, 427 F.2d 1082, 1086 (5th Cir. 1970). While the Court is not permitted to "view the evidence through a particular lens or draw inferences favorable to either party," *Clark Bldg.,* 618 F.3d at 272 (citing *Ritchie v. United States*, 451 F.3d 1019, 1023 (9th Cir. 2006); *Giant Eagle, Inc. v. Fed. Ins. Co.*, 884 F. Supp. 979, 982 (W.D. Pa. 1995)), the Court should "make determinations of witness credibility where appropriate." *Clark Bldg.*, 618 F.3d at 273 (citing *Parker v. Long Beach Mortg. Co.*, 534 F. Supp. 2d 528, 535 (E.D. Pa. 2008)).

**B.     Pennsylvania Law: Breach of Contract**

Dr. Fagal asserted a single claim for breach of contract. He argued that Marywood failed to provide him a variety of process owed prior to his suspension and termination from Marywood. Marywood disagreed and argued that: (1) Dr. Fagal materially breached his contract with the University when he distributed the *Downfall* videos, and thus was not owed the process outlined in the contract; and (2) the University complied with the procedures outlined in the contract related to termination and suspension. While I do not agree that Dr. Fagal materially breached the contract at issue, I do find that Marywood University fulfilled its obligations under the contract and provided Dr. Fagal with the process owed.

(1)     Legal Standard:

In order to prevail on a breach of contract claim under Pennsylvania law, a plaintiff must demonstrate: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages. *Haywood v. Univ. of Pittsburgh*, 976 F. Supp. 2d 606, 645 (W.D. Pa. 2013). "The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties." *Murphy v. Duquesne Univ. of The Holy Ghost*, 777 A.2d 418, 429 (Pa. 2001) (citing *Felte v. White*, 302 A.2d 347, 351 (Pa. 1973)). "Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed." *Id.* (citing *Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982)). Notably, "the meaning of an unambiguous written instrument presents a question of law for resolution by the court." *Murphy*, 777 A.2d at 430 (citing *Cmty. Coll. v. Cmty. Coll., Soc'y of the Faculty*, 375 A.2d 1267, 1275 (Pa. 1977)).

"When performance of a duty under a contract is due, any nonperformance is a breach." *Widmer Eng'g, Inc. v. Dufalla*, 837 A.2d 459, 467 (Pa. Super. Ct. 2003) (quoting Restatement (Second) of Contracts § 235(2)); *see Grudkowski v. Foremost Ins. Co.*, 556 Fed. Appx. 165, 168 (3d Cir. 2014) (citing *Dufalla*, 837 A.2d at 467-68) ("At its core, a breach of contract involves the nonperformance of any duty imposed by a contract between parties."). Thus, if a party is able to prove a breach of contract but can show no damages

3

flowing from the breach, the party is nevertheless able to recover nominal damages under Pennsylvania law. *See Wolfe v. Allstate Prop. & Cas. Ins. Co.*, 790 F.3d 487,497 (3d Cir. 2015) (citing *Thorsen v. Iron & Glass Bank*, 476 A.2d 928, 931 (Pa. Super. Ct. 1984)).

"[T]he standard of review for an action for breach of a tenure contract is the same as that applicable to a contract between private parties." *Waggaman v. Villanova Univ.*, No. 04-4447, 2008 WL 4091015, at *20 (E.D. Pa. Sept. 4, 2008) (citing *Murphy*, 777 A.2d at 429). The Pennsylvania Supreme Court expressly declined to apply a deferential standard of review in contractual disputes between a private university and its professors. *See Murphy*, 777 A.2d at 428-29. However, the Pennsylvania Supreme Court has also distinguished claims for breach of contract contesting the merits of a private university's decision to terminate a tenured professor, which are generally unreviewable if the contract exclusively reserves such decisions to the university, from claims that allege a university failed to adhere to the procedural protections afforded to tenured professors per the terms of their employment contract, which are subject to judicial scrutiny. *See Ferrer v. Trs. of Univ. of Pa.*, 573 Pa. 310, 339-40 (2002); *Murphy*, 777 A.2d at 428-29, 443-44; *see also Chen v. Pa. State Univ.*, No. 2-235, 2015 WL 9259395, at *2 (M.D. Pa. Dec. 18, 2015); *Waggaman*, 2008 WL 4091015, at *20; *Reardon v. Allegheny Coll.*, 926 A.2d 477, 483 (Pa. Super. Ct. 2007). As the *Ferrer* court explained:

> [A] breach of contract claim may be brought by a tenured professor when it is asserted that the University failed to comply with the procedures established by the parties' contractual agreement. This cause of action is distinguishable from a tenured professor's claim that a university that has followed the established procedures for termination has made the wrong decision. We stated that "while [a professor] is free to assert in a court of law that the process of forfeiture that was afforded him did not comply with the [c]ontract's terms, he is not free to demand that a jury re-consider and re-decide the merits of his termination."

*Ferrer*, 573 Pa. at 340 (quoting *Murphy*, 777 A.2d at 433).

(2) <u>Marywood Did Not Breach the Contract:</u>

Here, I find that Marywood did not breach the contract at issue when it suspended, and subsequently terminated, Dr. Fagal. While Dr. Fagal points to a number of potential breaches, no Marywood act or omissions resulted in a breach

4

of its contract with Dr. Fagal.

First, Dr. Fagal argued that his suspension was not consistent with Marywood's Progressive Discipline Policy ("PDP"). Specifically, Dr. Fagal contended that he was owed a verbal or written warning and an opportunity to remediate his conduct prior to suspension. While the PDP does appear to strongly favor the use of "informal process," which includes the warnings now requested by Dr. Fagal, the policy does not require such process for *all* offending conduct. (*Joint Ex.* 3, at 40; *Joint Ex.* 8.) In fact, the policy expressly states that this "informal process" was only provided "where applicable." (*Joint Ex.* 8.) More importantly, the Faculty Handbook explains that the "informal process" was not applicable when "[s]erious violations of professional responsibilities" were in question. (Joint Ex. 3, at 40.) In other words, the informal procedures outlined in the PDP are permissive. Moreover, Dr. Fagal was given the opportunity to remediate his conduct, by way of an apology to President Munley, but refused. (*Doc.* 124, at 115:21-25.) For these reasons, Marywood's failure to provide informal process to Dr. Fagal–such as a verbal warning or opportunity to remediate–does not amount to a breach of the contract.

Second, Dr. Fagal argued that Marywood breached the contract when Marywood's President, not its Vice President of Academic Affairs ("VPAA"), notified him of his suspension. There is no question that the VPAA has the authority to suspend a tenured faculty member: a "faculty member may be suspended by the VPAA at any time during the [disciplinary] proceedings." (*Joint Ex.* 8.) However, a superior officer at the University is endowed with the powers of her subordinates. To suggest that the President of the University, the VPAA's superior, did not have the authority to notify Dr. Fagal of his suspension is simply without merit. It is also important to remember that President Munley removed VPAA Levine from participating in Dr. Fagal's disciplinary proceedings because of his emotional reaction to the *Downfall* videos. (*Doc.* 124, at 10:15-19.) Thus, absent the VPAA, there is no question that the President had the authority to notify Dr. Fagal of his suspension.

5

Third, Dr. Fagal argued that Marywood breached the contract when it suspended him even though he did not pose a "immediate harm" to himself or others. Dr. Fagal roots this argument in the PDP, which explains: "[s]uspension is justified if immediate harm to the faculty member or others is threatened by the person's continuance in the faculty position." (*Joint Ex.* 8.)The policy does not say suspension is *only* justified upon a finding of immediate harm. Further, the policy does not limit harm to physical harm, and Dr. Fagal elicited testimony from a number of witnesses, including Dr. Levine, that suggested there was an immediate psychological or emotional harm that would result from Dr. Fagal's continued presence at Marywood. (Doc. 124, at 10:10-14; 26:10-13; 27:6-23.) Finally, this Court does not have the authority to review the University's decision that Dr. Fagal did pose an immediate harm. *See Murphy*, 777 A.2d at 428-29 (declining to reexamine a university's good-faith conclusion that a tenured professor engaged in "serious misconduct."); *see also Mekuns v. Capella Educ. Co.*, 655 Fed. Appx 149, 150 (3d Cir. 2016) ("[A]s a matter of Pennsylvania law, the provision of the policy stating that 'the decision of the university president is final' precludes appellate-like review of the merits of [the professors] disciplinary decision."); *Yongsheng Chen v. Pa. State Univ.*, 2015 WL 9259395, at *6 (M.D. Pa. Dec. 18, 2015) ("[I]n cases involving university tenure decisions, while substantive review of a university's tenure decision will not be conducted by the courts, the procedural safeguards to which an applicant was contractually entitled to may be reviewed."); Furjan v. Univ. of Pa., No. 718 EDA 2016, 2016 WL 7212502, at *3 ("The trial court's role in breach of contract cases involving a university's decision to deny tenure to a faculty member is limited to determining whether the university complied with the procedure that it was contractually obligated to extend to the applicant.").

Fourth, Dr. Fagal claims that Marywood breached the contract when it refused to impanel two separate and distinct Ad Hoc Committees; one to review his suspension and one to review his termination. The policy, however, does not require

6

the President impanel two distinct Committees. Rather, the policy states, "should a faculty member request that [an Ad Hoc] Committee be convened twice (i.e. once for suspension and once for dismissal), the membership of the committee *may be* similar or different, a determination which is made by the President . . . ." (*Joint Ex.* 8, at 2 (emphasis added).) Here, the President decided to have a single panel, made up of the same faculty members. (*Joint Ex.* 33.) This Committee considered both Dr. Fagal's termination and suspension and found that termination was proper.[1] There was no need for a formal decision on the legitimacy of Dr. Fagal's suspension because it was subsumed in the termination. (*Joint Ex.* 36, at 3.) Thus, Marywood did not breach the contract when it failed to impanel two distinct Ad Hoc Committees.

Finally, while raised in his pre-trial memorandum, no evidence was provided to suggest that Dr. Fagal was retaliated against for his use of the Faculty Grievance and Appeals policy. Therefore, it will not serve as a basis to support a claim for breach of contract.

For the above stated reasons, Dr. Fagal has failed to support a claim for breach of contract. So, judgement will be entered in favor of Marywood University and against Dr. Fagal.

**C.    Breach of Contract: Findings of Fact**

*Undisputed Facts*[2]

1. Defendant Marywood University ("Marywood") is a Catholic university sponsored by the Congregation of the Sisters, Servants of the Immaculate Heart of Mary, and a Pennsylvania non-profit corporation located in Scranton, Pennsylvania.

2. In the Fall semester of 1987, Plaintiff Frederick F. Fagal, Jr. became a

---

[1] Dr. Fagal acknowledged that the Committee was "convened for the purpose of reviewing [his] suspension and termination." (*Joint Ex.* 34.)

[2] The following facts have been stipulated by the parties. (*Doc.* 135.)

7

member of Marywood's faculty.

3. Dr. Fagal had earned a bachelor's degree from Union College in 1968, a master's degree in Economics from Cornell University in 1971, and a Ph.D. in Social Studies Education from Syracuse University in 1981.

4. Dr. Fagal attained tenure at Marywood in September 1994.

5. Throughout his employment at Marywood, Dr. Fagal was a professor in the Department of Social Sciences and reported to the Chairperson of the Department.

6. At all relevant times to this litigation, Marywood's President was Sister Anne Munley, IHM ("Munley").

7. In 1992, Dr. Fagal signed a document entitled "Agreement and Appointment for Full-Time Faculty. This document states that the "TERMS OF THIS AGREEMENT are offered . . . to Dr. Frederick Fagal Jr. . . . by Marywood College." The document further states that "[t]he policies and practices listed in the Faculty Manual are agreed upon by the parties hereto."

8. Dr. Fagal and Marywood entered into written agreements for Dr. Fagal to serve on Marywood's full-time faculty for each year between 1992 and 2012. For the 2010-2011 academic year, the parties entered into such an agreement, which was entitled "Tenured Faculty Letter of Agreement 2010-2011 Academic Year."

9. Marywood maintains a Faculty Handbook (the "Handbook"), which contains policies on contractual agreements with faculty members, faculty grievances and appeals, discipline, tenure, civil rights, computer use, academic freedom, and professional ethics.

10. On July 1, 2010, Marywood issued a new edition of its Handbook. The third page of the Handbook states: "This handbook is effective with the 2010-2011 faculty letters of agreement."

11. In May 2011, Dr. Fagal and Munley signed a document titled "Tenured Faculty Letter of Agreement 2011-2012 Academic Year," which stated that Dr. Fagal would serve as a tenured Associate Professor from August 22, 2011 to May 18, 2012 and earn a salary of $76,196.00.

12. Dr. Fagal was not an at-will employee during the relevant times.

13. In November 2011, Dr. Fagal invited a speaker from the Foundation for Individual Rights in Education ("FIRE") to speak at Marywood later that month, in connection with Dr. Fagal's Introduction to Social Science class regarding free speech on college campuses.

14. The topic of the FIRE presentation was "Know Your Rights: Free Speech and Thought Reform on Campus," which was related to Dr. Fagal's teachings on the U.S. Constitution. Dr. Fagal paid for the FIRE speaker.

15. Approximately two days before the presentation, Dr. Fagal and some students, one of whom Dr. Fagal paid, hung posters around campus advertising the event and announcing a $50 attendance prize.

16. These posters had been approved for distribution on campus.

17. Dr. Fagal personally paid for some of these posters.

18. Marywood personnel removed some of the posters.

19. Dr. Fagal attempted to secure an apology and reimbursement from Marywood for the removal of his posters, but Marywood refused.

20. No one from Marywood prevented the FIRE speaker from speaking, shortened the length of his speech, or otherwise tried to change or influence the topic of his discussion.

21. The FIRE speaker spoke at Marywood as scheduled.

22. On January 13, 2012, Dr. Fagal sent an email from his personal email address to Marywood faculty members, at their Marywood University email accounts, concerning the removal of the posters.

23. The email contained an "abstract" purporting to describe events that

transpired, which stated in part:

> On November 28-29, 2011, Marywood University tore down "stamped approved" posters announcing an open to all [FIRE] presentation....On December 5[,] Alan Levine, VP for Academic Affairs, told me [Fagal] there were no written policy statements which justified Marywood's action, but that my offer of a $50 random prize to a student for attending was, in the eyes of the administration's Executive Council which met on November 29, "pandering" to students to get them to come to class, and that this justified tearing down the posters....It is transparently obvious Marywood University is discriminating against Professor Fagal.

24. The email also contained hyperlinks to two YouTube videos created by Dr. Fagal.

25. The two videos are adaptations of scenes in *Downfall*, a 2004 German-language movie depicting the last days of Adolf Hitler's rule. The scenes adapted by Dr. Fagal show Hitler chastising several of his lieutenants over setbacks suffered by the Nazis during World War II. Dr. Fagal replaced the English subtitles with his own subtitles.

26. The videos were publicly available to anyone that had access to YouTube.

27. In his email on January 13, 2012, Dr. Fagal advised the recipients about Marywood's Computer Use Policy and suggested that they respond to him using their personal email addresses.

28. Dr. Fagal signed this email in his capacity as an Associate Professor at Marywood.

29. Prior to sending the January 13, 2012 email, he sent the videos to some other individuals, including Geri Lynn Smith and Rod Carveth on January 3, 2012.

30. When Smith asked "[c]an they really try to fire you over all this?" Dr. Fagal responded, "I do NOT think they will try to fire me over 'all this.'" He then stated:

> I do NOT think they will try to fire me over "all this." If by "this" you mean what has happened so far, then absolutely not. I have done nothing other than complain about and ask for recompense for their

10

> tearing down my approved posters ! A joke.
>
> . . .
>
> Tenure is on my side. To fire me they would have to go through procedures, set up a committee, have hearings [on some charge -- but what? Some baloney about not supporting the mission's core values?]. They know I would raise a big stink and they would look foolish. Game not worth the candle. Better for them to grimace and wait it out until I retire.

31. Carveth stated that he thought the videos were "brilliant satire," but that "[a]nytime Hitler gets raised, no one pays attention to the message, but the symbolism of Hitler as a murderer and butcher. I think the university would try and find some loophole to undo your tenure and fire you."

32. In response, Dr. Fagal stated:

> [a]nd I know the Hitler link is considered by many to be out of bounds. I would have to face that possibility. I am going to rethink this, but I think I won't change my mind about the release. I will look over the faculty manual again (heh). Go to YouTube. In the search box type Hitler parody. There are tons of them out there…helps my case.
>
> . . .
>
> Assuming the videos are released, if Marywood considers going after my job they will probably realize that I would NOT go quietly. If I were a tenured 42 year old likely to cause trouble for another 20-25 years then the game might be worth their votive candle. But I will be 66 years old in a month! IF they are rational they will think I can't be around that much longer and they would take a big publicity hit for trying to get rid of me.

33. On February 15, 2012, Dr. Fagal exchanged emails with an individual by the name of Lindsay, last name unknown, about the videos. She said "[t]he real-estate portfolio/young wife stuff is really personal! Geez!...I think you should take down the second video!!!" In response, Dr. Fagal stated:

> Only those in the know know that Levine (written LeVINE as a joke because as a Jewish guy working for Hitler his name cannot be Levine!) is on his second family. Nothing wrong with that – but it does get expensive ! Levine actually not a horrible guy, he might even laugh. I think he finds himself in a tough position carrying out orders he does not like....

34. On January 17, 2012, Munley received an email from Levine informing her about Dr. Fagal's email and videos. This was the first time that Munley was

11

made aware of the email and videos.

35. At approximately 8:45 AM on January 23, 2012, former Marywood Dean of the College of Arts and Sciences Michael A. Foley, PhD ("Foley"), visited Dr. Fagal's office and informed him that Munley was summoning him to a meeting at 9:00 AM.

36. Dr. Fagal, Munley, Dunleavy, and Foley attended the meeting.

37. At the meeting, Munley asked Dr. Fagal whether he posted the videos on YouTube.

38. Dr. Fagal acknowledged that he had created and posted the videos.

39. Munley asked Dr. Fagal to explain his actions, but when Dr. Fagal attempted to raise the issue of the poster removals, Munley indicated that she wanted to discuss the videos, not the poster incident.

40. Dr. Fagal requested that Munley put her questions in writing so that he could craft a response, but Munley did not agree to do so.

41. At the meeting, Munley told Dr. Fagal that his employment was suspended effective immediately and that he should return his keys and University identification card.

42. Alan Levine was not present at this meeting.

43. At no time did Levine tell Dr. Fagal that he was suspended.

44. At 2:24 PM on that same day, Dunleavy sent an email to Dr. Fagal confirming that he had been suspended and directing him to clean out his office.

45. On January 24, 2012, Frances D. Ferrese, Executive Secretary to Munley, sent an email to Dr. Fagal, which included as an attachment a letter to Dr. Fagal from Munley.

46. In that letter, Munley stated that she was "recommending that [Dr. Fagal's] tenure and employment with Marywood be terminated immediately; the University will, however, pay you the remainder of your 2011-12

Agreement and keep you on benefits through August, 2012."

47. The letter also provided the following Statement of Charges:

> [Charge 1] Violation of Tenure Policy[,] which includes "a strong acceptance by the Individual (requesting tenure) of the mission, goals and objective of the University";
>
> [Charge 2]1 Violation of the Civil Rights Policy (re in particular harassment of Dr. Levine and his family and other personal attacks on executive officers) . . . ;
>
> [Charge 3] Violation of Professional Ethics Policy[,] which states that professors "do not discriminate against or harass colleagues"; and
>
> [Charge 4] Violation of the University's Mission and Values as well as the principles of collegiality.

48. Munley also stated in the letter that she was "prepared to send this statement of charges to a duly appointed faculty committee for review along with the emails and videos you forwarded to members of our community." To that end, Munley requested that Dr. Fagal sign and return an attached authorization form granting Marywood permission to do so.

49. Dr. Fagal did not sign the authorization form attached to that letter.

50. On February 2, 2012, Dr. Fagal's attorney, Jonathan Z. Cohen ("Cohen"), sent a letter to Munley. The letter expressed his opinion that Marywood was in breach of its contract with Dr. Fagal and requested that the University convene two ad hoc faculty committees pursuant to Marywood's Progressive Disciplinary Policy: one for the decision to suspend Dr. Fagal, and the other for Munley's recommendation to terminate Dr. Fagal.

51. On February 8, 2012, Munley sent a second letter to Dr. Fagal, in which she again stated that she was recommending Dr. Fagal's tenure and employment be terminated immediately. The letter also included a "revised statement of charges" and additional attachments.

52. Charge 1, now labeled "Breach of Tenure Agreement," was revised to note that Dr. Fagal's "decision to author and disseminate the above video is a breach of your commitment to Marywood and is in direct contravention of

13

the letter and spirit of Marywood's Mission, Core Values and Objectives." This revised charge further stated: "[d]epicting the University's President as Adolf Hitler . . . is an intentional, malicious and blatant violation of your tenure commitments. Portraying other University officials as Nazi leaders, using crude and vulgar language and belittling University officials also violates your agreement with Marywood. You gravely injured our community by your actions."

53. Charge 2, "Violation of Civil Rights Policy," was revised to note that the videos "demean[ed] and belittle[d] Dr. Levine and his family and launch[ed] personal attacks on executive officers. Harassment of this type directly violates our Civil Rights Policy and will not be tolerated."

54. Munley raised a new violation in Charge 3, "Violation of Marywood's Conditions of Computer Use Policy," which noted that Dr. Fagal used Marywood's email system and claimed that Dr. Fagal might have violated copyright laws and, regardless, failed to respect the civil rights of others by his conduct.

55. Charge 4, "Violation of Academic Freedom Policy; Professional Ethics Policy and University's Mission and Values as well as the principles of collegiality," was revised to claim that Dr. Fagal contravened Marywood's Academic Freedom Policy in that the videos were "not in furtherance of any scholarly pursuit and w[ere] clearly not intended to be part of an academic exercise. . . . [the email and videos were] devoid of personal integrity, ha[ve] no scholarly competence and [are] in total disregard of the stated mission of the University." The revised charge further asserted that Dr. Fagal violated Marywood's Professional Ethics Policy by invoking "images of hatred" and "ridicul[ing] your colleagues."

56. Munley again stated that she was prepared to send this statement of charges to a duly appointed faculty committee for review, and requested

that Dr. Fagal sign and return an attached authorization form.

57. Again, Dr. Fagal refused to sign the authorization.
58. Munley also noted that the faculty committee "may agree or disagree with my recommendation," and that she would finalize her decision after receiving the committee's determination.
59. On February 22, 2012, Dr. Fagal sent an email to Sr. Gail Cabral, President of Marywood's Faculty Senate, containing a written grievance against Munley. In his grievance, Dr. Fagal alleged that: (1) he was improperly suspended because Munley, not Levine (the Vice President for Academic Affairs), informed Dr. Fagal of the suspension; (2) he was improperly suspended because he was not an immediate harm to himself or to others; (3) Munley improperly moved to terminate his employment and tenure without remedial measures; and (4) he did not have an opportunity to convene an ad hoc committee to appeal his suspension.
60. On February 27, 2012, Cabral sent Munley a letter advising of Dr. Fagal's grievance.
61. On February 28, 2012, Cohen sent a letter to Marywood's attorney advising that Dr. Fagal had removed the videos in question from YouTube.
62. A Faculty Grievance Committee ("FGC") was formed and was comprised of three tenured professors: Dr. Erin Sadlack, Dr. Patricia Arter, and Dr. William Conlogue.
63. On March 26, 2012, Dr. Sadlack, the Chair of the FGC, following its deliberation, sent a letter to Dr. Fagal summarizing his arguments in support of his grievance and concluding, "we have found no evidence of improper action on President Munley's part which would constitute a legitimate grievance."
64. On March 29, 2012, Dr. Fagal sent a letter to Munley in which he granted

Marywood permission to release Munley's revised "Recommendation for Termination and Statement of Charges" to an ad hoc faculty committee ("AHFC") to be convened once to appeal Munley's decision to suspend Dr. Fagal and once to appeal Munley's recommendation to terminate his employment and tenure.

65. On April 30, 2012, Cabral sent an email to Dr. Fagal. In that email, Cabral advised that Dr. Fagal's selection of Dr. Ed O'Brien to serve on the AHFC had been accepted. Cabral also stated that Munley had chosen Dr. Helen Bittel and Matthew Povse as the other AHFC members.

66. On May 6, 2012, Dr. Fagal emailed the members of the AHFC a written defense to the revised charges made by Munley.

67. On May 17, 2012, the AHFC held its first of several meetings about Dr. Fagal's case.

68. On July 2, 2012, the AHFC issued its decision. In a document titled "Review of Sister Anne Munley's Decision to Terminate the Employment and Tenure of Dr. Frederick Fagal," the AHFC did not agree with all of the charges raised against Dr. Fagal, but concurred with Munley's decision to revoke tenure and terminate his employment.

69. The AHFC concluded that "Sister Anne Munley's termination of Dr. Fagal's employment and tenure is an extreme decision justified by the extreme nature of Dr. Fagal's behavior" because, among other reasons, the Committee found Dr. Fagal's actions were a breach of the tenure policy because the videos were "a flagrant abuse of academic freedom' because [the videos] include[] gratuitous and malicious personal attacks well beyond the spirit and limits of academic freedom" and that "the videos constitute harassment of the individuals who are impugned therein."

70. On July 6, 2012, Dr. Fagal sent an email to the AHFC members, objecting that they had not reviewed his suspension and requesting that they do so.

71. On July 13, 2012, Munley sent Dr. Fagal a letter advising Dr. Fagal that she received and reviewed the report of the AHFC and stating in part: "My decision to terminate your employment with Marywood University and your tenure effective April 3, 2012 stands."

72. Though Dr. Fagal's employment was terminated effective April 3, 2012, the University paid him during his suspension beginning January 23, 2012 through the end of the 2011-2012 Letter Agreement. Dr. Fagal remained eligible for Marywood's benefits through August 2012.

*Additional Background*

73. Marywood has adopted a set of "Core Values," which include respect for the value of each human being, diversity in the context of vibrant community, and the earth and all creation.

74. Dr. Alan Levine was prohibited from participating in Dr. Fagal's disciplinary proceeding by President Munley due to the emotion distress caused by Dr. Fagal's videos.

75. Dr. Fagal never apologized to anyone at Marywood for publishing the *Downfall* video.

76. Dr. Fagal was offered the opportunity to have an Ad Hoc Committee review his suspension and termination recommendation, but Dr. Fagal did not return the authorization forms necessary for the University to convene an Ad Hoc Committee.

77. This authorization forms attached to the letters sent to Dr. Fagal detailing President Munley's recommendation for termination needed to be completed because Marywood had a strict policy regarding the confidentiality of its Faculty's personal information. Absent Dr. Fagal's authorization, the prospective Ad Hoc Committee would have no record to review.

*Applicability of the Progressive Discipline Policy*

78. Marywood has discretion to take corrective action under the Progressive Discipline Policy for misconduct by tenured faculty.

79. The Progressive Discipline Policy does not prohibit Marywood from issuing punitive punishment, including termination, for serious misconduct by tenured faculty.

80. The Progressive Discipline Policy does not prohibit the President of Marywood from notifying a faculty member of a suspension.

81. The Progressive Discipline Policy does not prohibit the President of Marywood from recommending the termination of employment and tenure of a faculty member.

82. The Progressive Discipline Policy does not prohibit the membership of two Ad Hoc Committees convened to review a suspension and termination from being the same.

83. The Ad Hoc Committee reviewing a decision to terminate may also review a decision to suspend because any decision to terminate would moot concerns related to suspension.

84. Suspension of a faculty member does not require an immediate threat of *physical* harm. Emotional or reputational harm may meet this standard.

*Process afforded to Dr. Fagal*

85. Dr. Fagal was offered the opportunity to have an Ad Hoc Committee review his suspension and termination.

86. Dr. Fagal refused to sign the authorization forms necessary to impanel an Ad Hoc Committee on at least two occasions.

87. Despite failing to sign the required authorizations, Dr. Fagal ultimately provided authorization and an Ad Hoc Committee was formed.

88. This Ad Hoc Committee reviewed both Dr. Fagal's suspension and termination.

89. This Committee found that termination was appropriate.

90. A formal opinion from the Committee related to Dr. Fagal's suspension was unnecessary because the Committee's decision to recommend termination mooted any issue related to suspension.

**D.** **Breach of Contract: Conclusions of Law**:

91. The substantive law of Pennsylvania governs this action.

92. To establish a breach of contract claim under Pennsylvania law a plaintiff must establish: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages. *See Ware v. Rodale Press, Inc.*, 322 F3d 218, 225 (3d Cir. 2003); *Haywood*, 976 F. Supp. 2d at 645.

93. When performance of a duty under a contract is due, any nonperformance is a breach." *Dufalla*, 837 A.2d 459, 467 (Pa. Super. Ct. 2003) (quoting Restatement (Second) of Contracts § 235(2)); *see Grudkowski*, 556 Fed. Appx. at168 ("At its core, a breach of contract involves the nonperformance of any duty imposed by a contract between parties.").

94. Marywood was not required to provide Dr. Fagal with progressive discipline (*i.e.* a verbal or written warning) prior to suspension or termination, and as such Marywood's failure to provide such discipline does not constitute a breach of the contract.

95. Marywood was not in breach of the contract at issue when Anne Munley, instead of Vice President for Academic Affairs Alan Levine, notified Dr. Fagal of his suspension. Ann Munley, as the President of the University was vested with the authority to suspend Dr. Fagal.

96. This Court may not review the University's finding of immediate harm. *See Murphy*, 777 A.2d at 428-29 (declining to reexamine a university's good-faith conclusion that a tenured professor engaged in "serious misconduct."); *see also Mekuns*, 655 Fed. Appx at 150; *Yongsheng Chen*,

2015 WL 9259395, at *6; Furjan, 2016 WL 7212502, at *3.

97. Marywood was not in breach of the contract at issue when it failed to provide remedial measures to Dr. Fagal as defined under the Progressive Discipline Policy because such measures were not required under the contract.

98. Marywood was not in breach of its contract when it impaneled a single Ad Hoc Committee to review both the suspension and termination of Dr. Fagal.

99. Marywood was not in breach of its contract when it terminated Dr. Fagal on April 3, 2012.

100. Marywood did not retaliate against Dr. Fagal for his use of the Faculty Grievance and Appeals policy.

101. Dr. Fagal did not suffer any damage because Marywood paid Dr. Fagal, as contracted, through the expiration of his 2011-2012 Agreement.

102. Therefore, I find that Dr. Fagal has failed to establish a claim for breach of contract and enter judgment in favor of Defendant Marywood University.

## IV. Conclusion

For the above stated reasons, Marywood's Motion for Judgment on Partial Findings pursuant to Federal Rule of Civil Procedure 52(c) is granted. Judgment will be entered in favor of Defendant Marywood University and against Plaintiff Frederick Fagal.

An appropriate order follows.


April 27, 2018                                                     /s/ A. Richard Caputo
Date                                                               A. Richard Caputo
                                                                             United States District Judge